APPEAL NO. 24-142

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAM POE, by and through her parents and next friends Penny and Peter Poe, et al.,

*Plaintiffs-Appellees,*

v.

RAÚL LABRADOR, in official capacity as Attorney General of the State of Idaho, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:23-cv-00269-BLW

## RULE 27-3 EMERGENCY MOTION FOR STAY PENDING APPEAL
## (RELIEF REQUESTED BY FEBRUARY 1, 2024)

RAÚL R. LABRADOR
ATTORNEY GENERAL

JOSHUA N. TURNER
ACTING SOLICITOR GENERAL

JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense
IDAHO OFFICE OF
THE ATTORNEY GENERAL
700 W. Jefferson St., Suite 210
Boise, ID 83720
(208) 334-2400
james.craig@ag.idaho.gov

JONATHAN A. SCRUGGS
HENRY W. FRAMPTON, IV
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

JOHN J. BURSCH
LINCOLN DAVIS WILSON
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
lwilson@ADFlegal.org

DAVID H. THOMPSON
BRIAN W. BARNES
JOHN D. RAMER
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
202-220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Appellants*

## CIRCUIT RULE 27-3 CERTIFICATE

The undersigned certifies that the following is the information required by

Circuit Rule 27-3:

(i)     Attorneys for the parties

<u>Counsel for Appellants Raúl Labrador, et al.</u>

Joshua N. Turner
Acting Solicitor General
josh.turner@ag.idaho.gov

James E. M. Craig
Chief, Civil Litigation and Constitutional Defense
james.craig@ag.idaho.gov

Idaho Office of the Attorney General
P.O. Box 83720
Boise, ID 83720
(208) 334-2400

John J. Bursch
Lincoln Davis Wilson
Alliance Defending Freedom
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
lwilson@ADFlegal.org

Jonathan A. Scruggs
Henry W. Frampton, IV
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

David H. Thompson
Brian W. Barnes
John D. Ramer
Cooper & Kirk, PLLC

1523 New Hampshire Avenue, NW
Washington, DC 20036
202-220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Counsel for Appellees Pam Poe, et al.

Li Nowlin-Sohl
lnowlin-sohl@aclu.org
Leslie Cooper
lcooper@aclu.org
American Civil Liberties Union Foundation
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2500

Richard Eppink
ritchie@wrest.coop
Casey Parsons
casey@wrest.coop
David A. Deroin
david@wrest.coop
Wrest Collective
812 W. Franklin St.
Boise, ID 83702

Brad S. Karp
bkar@paulweiss.com
Alexia D. Korberg
akorberg@paulweiss.com
Jackson Yates
jyates@paulweiss.com
Dana L. Kennedy
dkennedy@paulweiss.com
Paul, Wiess, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

Eric Alan Stone
eric.stone@groombridgewu.com
Ariella C. Barbel
ariella.arel@groombridgewu.com
Groombridge, Wu, Baughman and Stone LLP

565 5th Avenue, Suite 2900
New York, NY 10017
(332) 269-0030

Philip S. May
philip.may@groombridgewu.com
Groombridge, Wu, Baughman and Stone LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
(202) 505-5830

Jordan Orosz
jorosz@paulweiss.com
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300

Dina Flores-Brewer
dfloresbrewer@acluidaho.org
ACLU of Idaho Foundation
P.O. Box 1897
Boise, ID 83701
(208) 344-9750

(ii)     Facts showing the existence and nature of the emergency

Idaho's Vulnerable Child Protection Act (VCPA) was scheduled to take effect on January 1, 2024. But on December 26, 2023, the district court enjoined the Attorney General from enforcing any provision of the Act against anyone, even though Plaintiffs have no interaction with the majority of the Act's provision. That injunction is preventing the Attorney General from enforcing a law designed to protect vulnerable children from dangerous medical interventions. The Attorney General seeks emergency relief to allow the law to go into effect.

(iii)    Earlier filing.

This motion is being filed within two days of the district court's denial of the Attorney General's motion to stay the injunction.

(iv)    Notice to counsel.

Counsel confirmed by e-mail on January 17, 2024, that Plaintiffs oppose the relief requested in this motion. Counsel will serve the motion on opposing counsel via the Court's electronic filing system.

(v)    Submission to the district court.

The Attorney General sought relief in the district court, which the court denied on January 16, 2024.

*/s/ Joshua N. Turner* _____

Joshua N. Turner
*Counsel for Appellants*

January 18, 2024

# TABLE OF CONTENTS

Table of Authorities ...................................................................... vi

Introduction .................................................................................. 1

Background ................................................................................... 3

Argument ...................................................................................... 4

I.     Idaho Is Likely To Succeed On The Merits. ...................... 4

     A.    The VCPA does not violate equal protection. ................. 5

          1.    The law regulates procedures, not sex or transgender status. ...... 5

          2.    The VCPA satisfies intermediate scrutiny. ............................ 10

     B.    There is no due process right to experimental interventions............... 15

II.    The Other Injunction Factors Favor Idaho. ............................. 18

III.   The Injunction Is Overbroad. ................................................ 18

Conclusion .................................................................................. 20

Certificate of Compliance ......................................................... 22

Certificate of Service ................................................................. 23

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
  138 S. Ct. 2305 (2018) ...............................................................................18

*Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*,
  495 F.3d 695 (D.C. Cir. 2007) ..................................................................16

*Barsky v. Board of Regents of University of New York*,
  347 U.S. 442 (1954) ...................................................................................17

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993) .....................................................................................9

*Bresgal v. Brock*,
  843 F.2d 1163 (9th Cir. 1987) ...................................................................19

*Califano v. Jobst*,
  434 U.S. 47 (1977) .....................................................................................14

*Clark ex rel. Clark v. Arizona Interscholastic Association*,
  695 F.2d 1126 (9th Cir. 1982) ...................................................................15

*Conant v. Walters*,
  309 F.3d 629 (9th Cir. 2002) ................................................................ 6, 15

*Dobbs v. Jackson Women's Health Organization*,
  142 S. Ct. 2228 (2022) .......................................................................... 6, 7

*Doe #1 v. Trump*,
  957 F.3d 1050 (9th Cir. 2020) .....................................................................4

*Doe v. Snyder*,
  28 F.4th 103 (9th Cir. 2022) ........................................................................9

*Eknes-Tucker v. Governor of Alabama*,
  80 F.4th 1205 (11th Cir. 2023)................................. 1, 6, 8, 10, 14, 15, 16

*Geduldig v. Aiello*,
  417 U.S. 484 (1974) ............................................................................... 6, 7

*Get Outdoors II, LLC v. City of San Diego*,
  506 F.3d 886 (9th Cir. 2007) .....................................................................19

*Golden Gate Restaurant Association v. City & County of San Francisco,*
    512 F.3d 1112 (9th Cir. 2008) ...................................................................18

*Gonzales v. Carhart,*
    550 U.S. 124 (2007) ...........................................................................6, 15, 17

*Griffin v. HM Fla.-ORL, LLC,*
    144 S. Ct. 1 (2023) ...................................................................................20

*Hecox v. Little,*
    79 F.4th 1009 (9th Cir. 2023).........................................................7, 9, 20

*In re Lipitor (atorvastatin calcium) Marketing, Sales Practices & Products Liability*
    *Litigation,*
    892 F.3d 624 (4th Cir. 2018) ...................................................................13

*John Doe No. 1. v. Reed,*
    561 U.S. 186 (2010) ..................................................................................20

*Karnoski v. Trump,*
    926 F.3d 1180 (9th Cir. 2019) ...................................................................9

*L.W. ex rel. Williams v. Skrmetti,*
    73 F.4th 408 (6th Cir. 2023) ......................................................................3

*L.W. ex rel. Williams v. Skrmetti,*
    83 F.4th 460 (6th Cir. 2023)................................... 1, 4, 6, 7, 8, 10, 16, 18

*Michael M. v. Superior Court of Sonoma County,*
    450 U.S. 464 (1981) ..................................................................................14

*Mississippi University for Women v. Hogan,*
    458 U.S. 718 (1982) ..................................................................................10

*Mitchell v. Clayton,*
    995 F.2d 772 (7th Cir. 1993) ....................................................................17

*National Institute of Family & Life Advocates v. Becerra,*
    138 S. Ct. 2361 (2018)...............................................................................17

*New York v. Ferber,*
    458 U.S. 747 (1982) ..................................................................................10

*Pickup v. Brown,*
    740 F.3d 1208 (9th Cir. 2014) ....................................................17

*Raich v. Gonzales,*
    500 F.3d 850 (9th Cir. 2007) ......................................................16

*Raidoo v. Moylan,*
    75 F.4th 1115 (9th Cir. 2023) ....................................................10

*Tuan Anh Nguyen v. I.N.S.,*
    533 U.S. 53 (2001) ............................................................. 13, 14

*United States v. Salerno,*
    481 U.S. 739 (1987) ....................................................................18

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ..........................................................4, 15, 16

*Whalen v. Roe,*
    429 U.S. 589 (1977) ....................................................................17

*Zepeda v. I.N.S.,*
    753 F.2d 719 (9th Cir. 1983) ......................................................19

## **<u>Statutes</u>**

Idaho Code § 18-1506C......................................................3, 5, 7, 19

Idaho Code § 2-212..................................................................7

Idaho Code § 41-2144..............................................................7

Idaho Code § 72-438................................................................7

Idaho Code § 18-1506B.............................................................7

## INTRODUCTION

Idaho seeks an emergency stay pending appeal of the district court's injunction against Idaho's Vulnerable Child Protection Act (VCPA). Idaho enacted the law in 2023 after witnessing a ten-fold increase of minors diagnosed with "gender dysphoria"—distress resulting from a misalignment of a child's sex and the child's perception of it. Unfortunately, Idaho saw an increasing use of new, experimental, and dangerous procedures on minors suffering from gender dysphoria. Because substantial medical data shows harm from medical treatments that attempt to pharmaceutically and surgically alter a minor's sex rather than addressing the underlying causes of dysphoria, the VCPA restricts the use of cross-sex hormones, puberty blockers, and surgeries for the purpose of changing the appearance of a child's sex.

Idaho was not alone in this. Twenty-one other states have passed similar laws. And European health authorities that once endorsed these procedures later published systematic reviews that highlighted their risks and found no reliable evidence of benefits. Meanwhile, two other circuits have upheld laws just like Idaho's, recognizing that the Constitution allows state legislatures to regulate this area of medical practice. *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 477 (6th Cir. 2023); *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1228 (11th Cir. 2023). And the only court of appeals to hold otherwise has taken the matter en banc. Order, *Brandt v. Griffin*, No. 23-2681 (8th Cir. Oct. 6, 2023).

Despite all this, the district court preliminarily enjoined the VCPA in its entirety—not just as to Plaintiffs' desired procedures, but against every possible application of the law. That decision is wrong under controlling precedents, violates

1

Idaho's sovereignty every day it remains in effect, and harms Idaho children. This Court should stay the district court's erroneous injunction pending appeal for three reasons.

*First*, Idaho will likely prevail on appeal. The VCPA does not violate the Equal Protection Clause. It simply regulates experimental medical procedures. As the Supreme Court has held, just because a law on medical procedures references sex does not mean it unlawfully discriminates based on sex. Nor does the law discriminate based on transgender status. It regulates procedures based on their purpose and risks, not anyone's gender identity. And while the VCPA need only satisfy rational-basis review, it easily survives intermediate scrutiny too. The regulated procedures indisputably carry risks of lifelong harm for minors who cannot adequately grasp the consequences, and no reliable scientific evidence establishes a benefit from these procedures. Plaintiffs' citation to unsupported positions of advocacy organizations does not change the analysis. The Idaho legislature need not defer to them to evaluate risks and set the State's health policy. And there is no "deeply rooted" substantive due process right for parents to demand access to dangerous and untested medical procedures for minors.

*Second*, the equities favor a stay. Idaho is harmed every day its law is enjoined, and the public interest is served by protecting children from these harmful procedures.

*Third*, the injunction is grossly overbroad. To obtain facial relief, challengers must show a law is unconstitutional in every application. But Plaintiffs do not seek many procedures covered by the law. They did not even argue, much less prove, that every covered procedure (like genital surgery) is always appropriate for minors of every age.

The district court's order is deeply flawed under controlling law. The Court should stay it pending appeal.

## BACKGROUND

There is a robust, worldwide "medical and policy debate" about how best to treat gender dysphoria in minors. *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023). Some advocate for medicalized transition procedures that block natural puberty, cause irreversible and often sterilizing physical changes, and surgically alter the body to mimic characteristics of the opposite sex. Others, including concerned parents, international health authorities, systematic reviewers, and scores of detransitioners, recognize these procedures are dangerous and unproven.

Idaho legislatively weighed in by passing the VCPA to protect children from interventions that cause "irreversible physical alternations," "mutilate healthy body organs," and can leave children "sterile or with lifelong sexual dysfunction." App.670. The VCPA prohibits three forms of medicalized transition efforts in minors: (1) surgical interventions to remove or replace breasts or sex organs, (2) cross-sex hormones (testosterone for girls, estrogen for boys) to induce the development of physical characteristics associated with the opposite sex, and (3) puberty-blocking drugs to stop a child's natural progression through puberty. Idaho Code § 18-1506C.

Suing through their parents, Plaintiffs are two adolescent males who identify as female and currently take estrogen. App.660, 667. Neither currently takes or desires to take puberty blockers. *Id.* Nor is either seeking any surgical procedures prohibited by the VCPA. *Id.* And no plaintiff is a female seeking testosterone. *Id.*

Despite the narrowness of Plaintiffs' alleged injuries from the VCPA, the district court granted a preliminary injunction that stops Idaho from enforcing *any* provision of the law against *anyone*. App.66. Idaho immediately appealed and moved the district court

3

to stay the injunction, which the district court denied. App.13, 67, 69. Idaho now asks this Court to stay the preliminary injunction pending appeal.

## ARGUMENT

On a motion to stay an injunction pending appeal, this Court considers whether (1) the applicant shows a strong likelihood of success on the merits, (2) the applicant shows irreparable harm absent a stay, (3) a stay will not substantially injure other parties, and (4) the public interest favors a stay. *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020). All four factors favor a stay here.

What's more, the district court enjoined the entire statute even though it has many concededly constitutional applications. Plaintiffs do not even have standing to challenge most of the VCPA's provisions.

## I.    Idaho Is Likely To Succeed On The Merits.

Plaintiffs cannot prevail on their claims unless they show "that the original fixed meaning of the due process or equal protection guarantees covers these claims." *L.W.*, 83 F.4th at 471. That "prompts the question whether the people of this country ever agreed to remove debates of this sort" from "the democratic process," "particularly when 'the States are currently engaged in serious, thoughtful' debates about the issue." *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997)). The answer is an emphatic no—indeed, more than twenty other states, like Idaho, have laws that prohibit irreversible procedures intended to change the appearance of a minor's sex. *See id.*

Idaho's law is just as valid as these other state laws that have been upheld around the country. The VCPA does not violate equal protection—it triggers rational-basis review and easily survives intermediate scrutiny as well. Nor does the VCPA violate

substantive due process, since there is no traditional parental right to obtain banned medical procedures in general, and there is even less a recognized right to these specific procedures. Idaho is therefore likely to succeed on appeal and so a stay is warranted.

### A.    The VCPA does not violate equal protection.

#### 1.    The law regulates procedures, not sex or transgender status.

The VCPA triggers rational-basis review because it regulates based on medical procedures, not sex or transgender status. The Act prohibits certain interventions for minors "to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." Idaho Code § 18-1506C(3). The law narrowly regulates how certain medical conditions, like gender dysphoria, may be treated, which has long been the prerogative of state legislatures.

"Gender dysphoria" is a psychiatric diagnosis defined in the DSM-5 and characterized by "clinically significant" distress from a strong and lasting desire to be the opposite sex. App.487. Idaho limited these procedures for good reason. The number of minors seeking medicalized transition has skyrocketed in the last decade. App.446, 453–54, 466. Yet systematic reviews have found major risks and no evident benefits from these procedures. App.452.

The VCPA limits these procedures when used to treat a minor's gender dysphoria, not for other purposes. But that is not unusual. Mastectomies used to treat breast cancers carry different risks and benefits than those used to surgically conform an adolescent's female body to a male gender identity. These are different procedures. As the Eleventh Circuit explained, a law like the VCPA "targets specific medical

interventions for minors, not one that classifies on the basis of any suspect characteristic under the Equal Protection Clause." *Eknes-Tucker*, 80 F.4th at 1227.

Regulations on medical procedures like the VCPA receive rational-basis scrutiny. As the Sixth Circuit held in upholding similar laws, "[s]tate and federal governments have long played a critical role in regulating health and welfare," and they are entitled to a presumption of validity, especially "in areas of 'medical and scientific uncertainty.'" *L.W.*, 83 F.4th at 473 (quoting *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007)). Indeed, states are "the primary regulators of professional conduct" with "broad police powers to regulate the administration of drugs by health professionals. *Conant v. Walters*, 309 F.3d 629, 639 (9th Cir. 2002). This rule precludes federal courts from imposing "a constitutional straightjacket on legislative choices before anyone knows how that 'medical and scientific uncertainty' will play out." *L.W.*, 83 F.4th at 473. "So long as a federal statute does not stand in the way and so long as an enumerated constitutional guarantee does not apply, the States may regulate or ban medical technologies they deem unsafe." *Id.* at 474 (collecting cases). That is exactly what Idaho has done here.

That some of these procedures may be sex-specific does not mean the law discriminates based on sex. As the Supreme Court recently explained, a statute regulating a procedure "that only one sex can undergo does not trigger heightened constitutional scrutiny" absent a showing of "'invidious discrimination against members of one sex or the other.'" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245–46 (2022) (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). That was true in *Dobbs*, where the Supreme Court held that prohibiting abortion, which only women can have, did not classify by sex. *See id.* It was true in *Geduldig*, where "the Supreme Court stated

6

that a classification based on pregnancy is not per se a classification based on sex, even though 'it is true that only women can become pregnant.'" *Hecox v. Little*, 79 F.4th 1009, 1025 (9th Cir. 2023) (quoting *Geduldig*, 417 U.S. at 496 n.20). And it is true here, where the VCPA regulates procedures that can be sex-specific—e.g., penectomies for men, or hysterectomies for women—by limiting the purposes for which those procedures may be performed. Idaho Code § 18-1506C(3)(a). The VCPA merely regulates specific procedures for a specific diagnosis in a specific age group.

The district court reasoned that the VCPA imposes sex classifications for no other reason than that it relies on a definition of "biological sex." App.47. But as the Sixth Circuit asked rhetorically, "how could they not?" *L.W.*, 83 F.4th at 482. "The point of the hormones is to help a minor transition from one gender to another," and so whether laws permit or prohibit that treatment, they "all face the same linguistic destiny of describing the biology of the procedures." *Id.* Accepting the district court's argument would mean that any reference to sex in law would trigger heightened scrutiny. *Id.* Courts would have to apply heightened scrutiny to every regulation referencing sex-specific medical procedures—from prostate cancer treatments to mastectomies.[1] As the Supreme Court recognized in *Dobbs*, courts may not constitutionalize this vast area best reserved for democratic decision-making. *See id.* (citing *Dobbs*, 142 S. Ct. at 2285–2300).

---

[1] *See, e.g.*, Idaho Code § 72-438 (compensating workers for certain diseases including "testicular cancer" and "breast cancer"); Idaho Code § 18-1506B (ban on "female genital mutilation"); Idaho Code § 2-212 (jury-duty exemption for "mother breastfeeding her child"); Idaho Code § 41-2144 (providing disability insurance coverage for mammograms in certain instances).

Similarly, the VCPA does not classify based on transgender status. "What is true for the word 'sex'" under Plaintiffs' argument "also would be true for the word 'gender.'" *Id.* at 482. "One simply cannot define, or create, a protected class solely by the nature of a denied medical benefit: in this instance childhood treatment for gender dysphoria." *Id.*

Accordingly, the district court was wrong to depart from the Sixth and Eleventh Circuits and find gender-identity discrimination, reasoning that "the classified group (transgender minors) cannot have medical treatments that the similarly situated group (cisgender minors) can." App.46. Quite the contrary, the VCPA allows *all* minors to receive these medical procedures for purposes other than treating gender dysphoria. For example, any minor could receive cross-sex hormones to treat congenital conditions like Kleinfelter Syndrome or Turner Syndrome, but no minor can receive them to treat gender dysphoria. *L.W.*, 83 F.4th at 481. "These distinct uses of testosterone and estrogen stem from different diagnoses and seek different results" based on different goals and risks. *Id.*

It does not trigger heightened scrutiny to "restrict[] a specific course of medical treatment that, by the nature of things, only gender nonconforming individuals may receive." *Eknes-Tucker*, 80 F.4th at 1229. "A state may reasonably conclude that a treatment is safe when used for one purpose but risky when used for another, especially when, as here, the treatment is being put to a relatively new use." *L.W.*, 83 F.4th at 480. Idaho may agree with the European scientific authorities that have restricted these procedures without "presumptively violat[ing] the Constitution." *Id.* at 481. So while Idaho disagrees with this Court's holding in *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir.

2019) (per curiam), that transgender identity constitutes a quasi-suspect class, *see* Pet. for Reh'g En Banc, *Hecox v. Little*, Nos. 20-35813, 20-35815 (9th Cir. Aug. 31, 2023), that decision is irrelevant here.

For the same reasons, the VCPA does not engage in proxy discrimination. That happens when laws use "seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Hecox*, 79 F.4th at 1024 (cleaned up). But the VCPA treats children the same regardless of gender identity and rationally regulates procedures based on risks and benefits. This Court has not held otherwise but reserved the question whether regulations of "gender dysphoria" are so "closely correlated with being transgender" that a regulation related to gender dysphoria "constitutes discrimination against transgender persons." *Karnoski*, 926 F.3d at 1201 n.18; *see also Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) (treating as an open question whether "disallowing gender reassignment surgery should be treated as discriminating against transgender persons"). This Court should not for the first time equate these procedures with status discrimination because, as Plaintiffs' own experts explained, individuals who identify as transgender do not all experience gender dysphoria, and individuals with gender dysphoria do not all seek the procedures regulated by the VCPA. App.105–106. The VCPA thus has a rational basis entirely apart from any individual's identity—which demonstrates why the VCPA is *not* equivalent to "classifying on the basis of wearing a yarmulke" (which is obviously a classification "on the basis of being Jewish"). *See* App.46 (invoking *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993)). Here, the Idaho Legislature reached the eminently reasonable

decision to prohibit the practice of dangerous and unproven medical procedures on minors. That's a standard exercise of the police power, not proxy discrimination.

Because the VCPA regulates based on medical procedures, it triggers rational-basis scrutiny, which is satisfied so long as the law has "some conceivable legitimate purpose." *Raidoo v. Moylan*, 75 F.4th 1115, 1121 (9th Cir. 2023). Given the "uncertainty regarding benefits, recent surges in use, and irreversible effects" of the regulated procedures, the VCPA satisfies this standard. *Eknes-Tucker*, 80 F.4th at 1225.

### 2. The VCPA satisfies intermediate scrutiny.

The VCPA also satisfies heightened scrutiny, which asks if the law "serves important governmental objectives" through means that are "substantially related to the achievement of those objectives." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (cleaned up). "[S]afeguarding the physical and psychological well-being" of minors is an important objective. *New York v. Ferber*, 458 U.S. 747, 756–57 (1982). And the VCPA serves that goal by protecting children from "unsettled, developing, in truth still experimental" interventions. *L.W.*, 83 F.4th at 488. Because these interventions have significant risks and unproven benefits, prohibiting them in children substantially relates to Idaho's interest in protecting vulnerable citizens. *See Eknes-Tucker*, 80 F.4th at 1232 (Brasher, J., concurring) (concluding that, although rational-basis review likely applied to Alabama's similar law, that law would also likely satisfy heightened scrutiny).

***Substantial Risks***. Some of the interventions' risks are known. For example, a child who begins puberty-blocking drugs at the onset of puberty and then progresses directly to cross-sex hormones—as nearly all of them do—will be infertile. App.402–403, 529. Likewise, females who undergo mastectomies will never breastfeed a child.

App.529. Puberty-blockers carry other well-known risks, including depression, anxiety, and suicidal ideation. App.534. And cross-sex hormones increase risk of cardiovascular disease, heart attacks, strokes, osteoporosis, and hormone-dependent cancers. App.535.

Other troubling risks need further study. "Infertility is frequent" in adult females taking testosterone; and as Plaintiffs' expert admits, the long-term fertility of adolescents who undergo puberty and then take cross-sex hormones is unknown. App.328, 407, 529. The early use of puberty blockers appears to cause lifelong loss of sexual function in many cases, but systematic research on the issue is lacking. App.402, 530.

Equally alarming is that respected scientists—including those cited by Plaintiffs' experts—note that puberty blockers "may prevent key aspects of [neurological] development during a sensitive period of brain organization." App.531. These drugs "could have significant impact on the ability to make complex risk-laden decisions, as well as possible longer-term neuropsychological consequences." App.530–31. The research to date is too limited to evaluate these neurodevelopmental risks. App.531–32.

Puberty blockers also prevent increases in bone mineral density that typically occur during puberty. App.402, 404, 532–33. The long-term effects of these deficits are unknown, as issues with bone quality tend to emerge later in life. App.533. So as the New York Times put it, "[a] full accounting of blockers' risk to bones is not possible." App.534.

***Lack of Proven Benefits***. No proven benefits outweigh these significant risks. In clinical research, the most reliable form of evidence is the systematic review, which uses a published process to comprehensively gather and evaluate the available research

on a particular question. App.457–59. Here, the systematic reviews show that there is no proof these interventions are beneficial.

In a systematic review of reviews, a McMaster University team concluded, "there is great uncertainty about the effects of puberty blockers, cross-sex hormones, and surgeries in young people with gender dysphoria." App.471. The evidence is "not sufficient" to support their use. *Id.* Likewise, systematic reviews commissioned by the British government found "little change" in mental health outcomes for children using puberty blockers. App.475–76. Evidence on the efficacy of both puberty blockers and cross-sex hormones was "very low" quality. *Id.* The Swedish government commissioned a systematic review that also concluded there was no "reliable scientific evidence" that hormonal interventions were effective. App.452. And WPATH's own systematic review on cross-sex hormones found "insufficient evidence to draw a conclusion about the effect of hormone therapy on death by suicide among transgender people." App.482.

Tellingly, many organizations supporting these interventions have *not* conducted or relied on systematic reviews. Though the Endocrine Society has published clinical practice guidelines, it limited its systematic reviews to bone density and cardiovascular health, not the efficacy or benefits of the interventions. App.479–80. Likewise, the American Academy of Pediatrics published a single-author policy statement that was not based on a systematic review. App.484. And though WPATH conducted a systematic review on the benefits—but not risks—of hormonal interventions in adults, it asserted that "a systematic review regarding outcomes of [hormonal] treatment in adolescents is not possible" because of the lack of evidence. App.483.

12

Plaintiffs' experts also avoid systematic evidence and rely instead on personal clinical experience. App.587, 592, 599-602, 616, 624, 628–29, 632, 634–35. But evidence-based medicine "places the unsystematic observations of individual clinicians lowest on the hierarchy" of evidence.[2] App.203, 463. Anecdotes cannot overcome what the systematic evidence shows: in the words of the Swedish Board of Health, the "risks of puberty suppressing treatment … and gender-affirming hormonal treatment currently outweigh the possible benefits." App.452.

**Substantial Means-End Fit**. This evidence is more than enough to satisfy heightened scrutiny, which requires that the means employed "substantially relate" to the state's important objective of protecting vulnerable children. *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 68 (2001). Prohibiting interventions for which the "risks … outweigh the possible benefits" easily fits that bill. App.452.

In ruling otherwise, the district court committed three legal errors. *First*, the court did not appreciate that the risk-benefit calculus for medical interventions depends on the condition treated. Treating a 5-year-old experiencing early puberty with puberty blockers until she's a biologically appropriate age to begin puberty is FDA-approved and well-studied. App.400–01, 467. Not so for using the same drugs to stop the natural

---

[2] The district court got it backwards when it placed more weight on the declarations of Plaintiffs' experts because they "currently treat adolescents with gender dysphoria." App.12, 51. Idaho's experts, unlike Plaintiffs', relied on systematic scientific evidence rather than cherry-picked studies and anecdotal clinical experience. *In re Lipitor (atorvastatin calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 634 (4th Cir. 2018) (excluding expert who cherry-picked studies). And Plaintiffs' experts profit from providing medicalized transition. *See, e.g.*, App.142-43, 353. Thus, for both scientific and legal evidentiary purposes, *Idaho's experts* are more reliable.

pubertal progression of a dysphoric 14-year-old mid-puberty. App.467, 536, 656, 659. The Constitution does not require the state to pretend these two interventions are the same.

*Second*, the court lumped together multiple different interventions—puberty blockers, estrogen, antiandrogens, testosterone, and a variety of surgeries—with their own sets of risks and uncertainties and treated them all the same. App.51–53. At the very least, the court should have evaluated whether each specific intervention with its specific set of risks was substantially related to Idaho's interest in protecting vulnerable children. But it did not.

*Third*, the district court erroneously required a perfect means-end fit instead of a substantial one. Although the court acknowledged the "conflicting evidence regarding the risks and benefits associated with gender-affirming medical care," the court condemned the VCPA under heightened scrutiny because the interventions are purportedly "helpful" for "some" people. App.51–52.

That's not the test. The VCPA does not have to "be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70. Nor need it be "drawn as precisely as it might have been." *Michael M. v. Super. Ct. of Sonoma Cnty.*, 450 U.S. 464, 473 (1981) (plurality op.). Heightened scrutiny does *not* ask if "the state could achieve its objective with some lesser restriction." *See Eknes-Tucker*, 80 F.4th at 1235-36 (Brasher, J., concurring) (determining that Alabama's similar law would likely survive heightened scrutiny). It is enough that "the means adopted … are in substantial furtherance of important governmental objectives." *Nguyen*, 533 U.S. at 70; *accord Califano v. Jobst*, 434 U.S. 47, 55 (1977) ("[B]road legislative classification must be judged

14

by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples.").

Here, they are. Faced with evidence that medicalized transition "carries potentially uncertain risks" and no proven benefits, the Act reasonably "regulat[es] the use of puberty blockers and hormones for [gender dysphoria] but not for other uses." *Eknes-Tucker*, 80 F.4th at 1235 (Brasher, J., concurring). It does not matter that some jurisdictions do otherwise. And the existence of alternatives—even those that courts may regard as "wiser alternatives"—"does not serve to invalidate the policy here since it is substantially related to the goal." *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1132 (9th Cir. 1982). Especially in this area of "medical and scientific uncertainty," the state enjoys "wide discretion" to make policy choices. *Gonzales*, 550 U.S. at 163. Because the "principles of federalism … have left states as the primary regulators of professional conduct," state legislatures, not courts, are the appropriate policymakers in the face of conflicting and developing scientific evidence. *Conant*, 309 F.3d at 639. Under heightened scrutiny, Idaho can restrict procedures it reasonably regards as more harmful than helpful.

**B.    There is no due process right to experimental interventions.**

Plaintiffs' second theory of relief—a substantive due process right—is even more flawed than the first. For this, Plaintiffs must show a right that is "fundamental" or "deeply rooted in this Nation's history and tradition." *Glucksberg*, 521 U.S. at 720–21 (cleaned up). Properly framed as a right to obtain specific medical procedures, Plaintiffs' claims are "not 'deeply rooted' in our nation's history," since these means of treating "the discordance between an individual's biological sex and sense of gender identity did

15

not occur until well into the twentieth century." *Eknes-Tucker*, 80 F.4th at 1220–21. Nor is there a deeply rooted right for parents to demand that a state permit dangerous and untested treatments. Adults do not have a constitutional right to obtain medical treatment unauthorized by state law. *See Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703, 706 (D.C. Cir. 2007). "A parent's right to make decisions for a child," as the Sixth Circuit explained, "does not sweep more broadly than an adult's right to make decisions for herself." *L.W.*, 83 F.4th at 475.

Yet the district court ruled for Plaintiffs by framing their claims as a parent's right "to care for their children includ[ing] the right to choose a particular medical treatment, in consultation with their healthcare provider, that is generally available and accepted in the medical community." App.55. That framing is too broad. *Raich v. Gonzales*, 500 F.3d 850, 864–66 (9th Cir. 2007) (framing right as one to "use marijuana to preserve bodily integrity" rather than right to preserve bodily integrity). The question is whether parents have a deeply rooted right to access these particular interventions, not to "generally available and accepted" medical interventions. *Glucksburg*, 521 U.S. at 722–23 (framing issue as a right to assisted suicide, not a "right to die").

The alternative would mean parents could obtain treatments for their children that they could not receive for themselves. Indeed, it would require *Raich* to come out the other way—in favor of a substantive due process right to medical marijuana—if a parent sought the intervention on behalf of a child rather than on her own behalf.

To avoid these results, the district court tried to limit its logic on the ground that "[t]he American medical establishment overwhelmingly supports the gender-affirming medical care HB 71 bans." App.58. But this is no distinction at all. Apart from

16

misstating the science on these questions, as noted above, the district court's reasoning would divest the power to regulate medicine from the elected state legislatures—22 of which have enacted laws like the VCPA—and hand it to federal judges.

To be sure, the district court deferred to "[t]he American medical establishment." But federal courts should not be able to divest states of their traditional police powers by making a credibility determination between competing experts. To defer to these advocacy organizations would eliminate states' ability to regulate "in areas where there is medical and scientific uncertainty." *Gonzales*, 550 U.S. at 163. "It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state's police power." *Barsky v. Bd. of Regents of Univ. of N.Y.*, 347 U.S. 442, 449 (1954) Further, "[i]t is, of course, well settled that the State has broad police powers in regulating the administration of drugs by the health professions." *Whalen v. Roe*, 429 U.S. 589, 603 n.30 (1977). And "a patient does not have a constitutional right to obtain a particular type of treatment or to obtain treatment from a particular provider if the government has reasonably prohibited that type of treatment or provider."[3] *Pickup v. Brown*, 740 F.3d 1208, 1236 (9th Cir. 2014) (quoting *Mitchell v. Clayton*, 995 F.2d 772, 775 (7th Cir. 1993)), *abrogated on other grounds by Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018).

Yet the district court's order, if allowed to stand, would strip away states' "authority to regulate the healthcare industry whenever the subject of regulation—the

---

[3] This calculus may change when the government regulates protected speech. *See* Br. of Idaho and 11 Other States as Amici Curiae in Supp. of Pet'r, *Tingley v. Ferguson*, No. 22-942 (U.S. Apr. 26, 2023), https://bit.ly/3SiN4GR. But no one argues that these procedures involve speech.

medical profession and drug companies—found such regulation unnecessary." *L.W.*, 83 F.4th at 478. "[E]xpert consensus, whether in the medical profession or elsewhere, is not the North Star of substantive due process, lest judges become spectators rather than referees in construing our Constitution." *Id.* at 479. Especially not where these advocacy groups have a strong incentive to continue to resist the findings of the European countries "that pioneered these treatments" but "now express caution about them and have pulled back on their use." *Id.* at 477. The Court should reject this attempt to flout the state's authority and grant a stay pending appeal.

## II.  The Other Injunction Factors Favor Idaho.

Absent a stay, the district court's injunction will continue to "inflict[] irreparable harm on" Idaho by precluding it from enforcing "its duly enacted" laws. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). And Idaho providers will keep harming vulnerable children by prescribing interventions for which the "risks … outweigh the possible benefits." App.452. Allowing Idaho to prohibit these interventions will not substantially injure anyone. And because it is not "obvious" that the VCPA is unconstitutional— quite the contrary—deferring to the "responsible public officials" who enacted it serves the public interest. *Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*, 512 F.3d 1112, 1127 (9th Cir. 2008). All the factors favor a stay.

## III.  The Injunction Is Overbroad.

The district court's injunction grants facial relief—enjoining the VCPA's every application—without the necessary finding that "no set of circumstances exists under which the [challenged law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Not even Plaintiffs' experts contend that surgical and hormonal interventions

are *always* appropriate; they concede that such interventions are "not indicated" for scores of individuals who receive treatment from them. App.596–97, 623. And the Endocrine Society agrees that "genital surgery is not recommended to patients under age 18." App.175. Nor are any interventions appropriate for pre-pubertal children. App.619. So there are many concededly constitutional applications of the VCPA.

Plaintiffs also lack standing to challenge the VCPA's prohibition on puberty blockers, Idaho Code § 18-1506C(3)(c)(i); testosterone prescribed to females, Idaho Code § 18-1506C(3)(c)(ii); or surgeries, Idaho Code §§ 18-1506C(3)(a), (b), (d), as they seek none of these interventions. Plaintiffs must satisfy the standing requirements— injury-in-fact, causation, and redressability—"for each of the provisions [they] wish[] to challenge." *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 892 (9th Cir. 2007). But since Plaintiffs provide no facts suggesting they desire puberty blockers or surgeries, and since the VCPA does not prohibit them from receiving testosterone, the regulation of those procedures does not injure them. *Id.* (holding company lacked standing to challenge regulations it would not violate). So Plaintiffs cannot challenge these provisions, and the district court lacked jurisdiction to enjoin them.

Nor should the injunction have reached beyond Plaintiffs. Without class certification, injunctions should "apply only to the individual plaintiffs." *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983). "Where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown." *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987). Here, Plaintiffs' only purported injury is the inability to access estrogen. App.660, 668. An injunction covering just this procedure would fully address that alleged injury. Nothing further is required or appropriate.

19

The district court cited nothing to relieve it of these standards based on plaintiffs' anonymity or to avoid future lawsuits. These administrative concerns are speculative and cannot overcome Article III's constitutional limits. And nothing stops the district court from giving Plaintiffs a sealed court order that they can then show their doctors, or Plaintiffs can identify their doctors to the state under a confidentiality agreement. Plaintiffs will need to do that anyway so that Idaho can conduct discovery. Idaho is aware of no decision using two individuals' desire to proceed under pseudonyms to justify a facial injunction against a law that affects 1.8 million other people.

*Hecox* does not help Plaintiffs either. This Court there found that Idaho's sports law discriminated against women and was "unconstitutional as applied to all women." 79 F.4th at 1027, 1037. While Idaho disagrees on both counts, *Hecox* based its injunction on these broad findings. *Id.* at 1037–38 & n.22. No such breadth is at issue here. The VCPA regulates many distinct medical interventions that Plaintiffs' own experts agree should not be available to all who seek them, most of which do not affect Plaintiffs at all. The *Hecox* Court also concluded that it couldn't accord the plaintiff complete relief without enjoining the entire law. *Id.* at 1038 n.22. That doesn't hold here either, as an injunction granting Plaintiffs access to the specific interventions they seek would be complete relief. Any injunction should be so limited.[4]

## CONCLUSION

The Court should stay the injunction pending appeal.

---

[4] Injunctions issued in First Amendment cases are also irrelevant. *See, e.g.*, *John Doe No. 1. v. Reed*, 561 U.S. 186 (2010). Those cases present "doctrinal complexities about the scope of relief" not applicable outside the First Amendment context. *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 (2023) (Statement of Kavanaugh, J.).

Dated: January 18, 2024                    Respectfully submitted,

RAÚL R. LABRADOR                           /s/ Joshua N. Turner
ATTORNEY GENERAL
                                           JOHN J. BURSCH
JOSHUA N. TURNER                           LINCOLN DAVIS WILSON
ACTING SOLICITOR GENERAL                   ALLIANCE DEFENDING FREEDOM
                                           440 First Street, NW, Suite 600
JAMES E. M. CRAIG                          Washington, DC 20001
Chief, Civil Litigation and                (202) 393-8690
Constitutional Defense                     jbursch@ADFlegal.org
IDAHO OFFICE OF                            lwilson@ADFlegal.org
THE ATTORNEY GENERAL
700 W. Jefferson St., Suite 210            DAVID H. THOMPSON
Boise, ID 83720                            BRIAN W. BARNES
(208) 334-2400                             JOHN D. RAMER
james.craig@ag.idaho.gov                   COOPER & KIRK, PLLC
                                           1523 New Hampshire Avenue, NW
JONATHAN A. SCRUGGS                        Washington, DC 20036
HENRY W. FRAMPTON, IV                      202-220-9600
ALLIANCE DEFENDING FREEDOM                 dthompson@cooperkirk.com
15100 N. 90th Street                       bbarnes@cooperkirk.com
Scottsdale, AZ 85260                       jramer@cooperkirk.com
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

*Counsel for Appellants*

21

## CERTIFICATE OF COMPLIANCE

This motion complies with C.R. 27-1(d) because it contains 20 pages, excluding parts exempted by Fed. R. App. P. 27(a)(2)(B) and 32(f).

This motion complies with Fed. R. App. P. 32(a)5) and 32(a)(6) because it has been prepared in Word 365 using a proportionally spaced typeface, 14-point Garamond.

*/s/ Joshua N. Turner*
Joshua N. Turner
*Counsel for Appellants*

January 18, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2024, I electronically filed this Emergency Motion For Stay Pending Appeal with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Joshua N. Turner*
Joshua N. Turner
*Counsel for Appellants*

January 18, 2024