APPEAL NO. 24-142

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAM POE, by and through her parents and next friends Penny and Peter Poe, et al.,

*Plaintiffs-Appellees*,

v.

RAÚL LABRADOR, in official capacity as Attorney General of the State of Idaho, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:23-cv-00269-BLW

## APPENDIX TO APPELLANTS' RULE 27-3 EMERGENCY MOTION
## FOR STAY PENDING APPEAL – VOLUME 1

RAÚL R. LABRADOR
ATTORNEY GENERAL

JOSHUA N. TURNER
ACTING SOLICITOR GENERAL

JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense
IDAHO OFFICE OF
THE ATTORNEY GENERAL
700 W. Jefferson St., Suite 210
Boise, ID 83720
(208) 334-2400
james.craig@ag.idaho.gov

JONATHAN A. SCRUGGS
HENRY W. FRAMPTON, IV
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

JOHN J. BURSCH
LINCOLN DAVIS WILSON
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
lwilson@ADFlegal.org

DAVID H. THOMPSON
BRIAN W. BARNES
JOHN D. RAMER
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
(202) 220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Appellants*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PAM POE, by and through her parents and next friends, Penny and Peter Poe; PENNY POE; PETER POE; JANE DOE, by and through her parents and next friends, Joan and John Doe; JOAN DOE, and JOHN DOE,<br><br>    Plaintiffs,<br><br>    v.<br><br>RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho *et al.*<br><br>    Defendants. | Case No. 1:23-cv-00269-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is Defendant Attorney General Raúl Labrador's Motion for Stay of Injunction Pending Appeal (Dkt. 80). The motion was filed as an emergency motion, with limited time for briefing and consideration.[1] For the reasons explained below, the Court will deny the motion.

---

[1] The motion was filed on January 3, 2024; it ripened on January 12, 2024; and the Attorney General asked for a decision within two weeks of filing the motion, or by January 17, 2024.

MEMORANDUM DECISION AND ORDER - 1

## BACKGROUND

On December 26, 2023, the Court denied Attorney General Labrador's and Ada County Prosecuting Attorney Jan Bennetts' motions to dismiss this lawsuit. On the same date, the Court granted plaintiffs' motion for a preliminary injunction. The injunction prevents the Attorney General and the Ada County Prosecutor from enforcing any provision of Idaho's Vulnerable Child Protection Act during the pendency of this lawsuit. Shortly after the Court issued its order, the Attorney General appealed this Court's decision and filed an emergency motion asking the Court to stay its preliminary injunction during the pendency of this appeal.

## DISCUSSION

Granting a stay is "an exercise of judicial discretion" that is "dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433, (2009). In exercising its discretion, the Court considers four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id*. at 434 (*citing Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). But "if the petition has not made a certain threshold showing regarding irreparable harm then a stay may not issue, regardless of the petitioner's proof regarding the other stay factors." *Doe v. Trump*, 957 F.3d

1050, 1058 (9th Cir. 2020) (cleaned up) (internal citation omitted). The moving

party bears the burden of showing that the circumstances justify an exercise of the

court's discretion. *Nken*, 556 U.S. at 434.

## 1.     Claimed Injuries

The Court will begin with the second and third factors, which deal with the

injuries that will be suffered if the Court stays its injunction. The Attorney General

says he will suffer irreparable harm in the absence of a stay for two reasons. First,

he says the loss of his Eleventh Amendment immunity works an irreparable injury

upon him. Second, he argues that the State of Idaho will be irreparably injured by

virtue of the fact that a federal court has enjoined the enforcement of a duly

enacted state law. The Court is not persuaded by either argument.

### A. The Attorney General's Immunity Argument

As for the immunity argument, the Attorney General contends that the Court

erred when it concluded that *Planned Parenthood of Idaho, Inc. v. Wasden*, 376

F.3d 908, 919 (9th Cir. 2004) forecloses his claim of immunity. Before addressing

this asserted error, the Court will reproduce the relevant portion of its earlier

decision here, to ground the discussion:

The starting point for the analysis is Idaho Code § 67-1401, which

empowers Idaho's attorney general to "assist" county prosecutors. It

provides: "When required by public service, [the attorney general has

App.004

a duty] to repair to any county in the state and assist the prosecuting

attorney thereof in the discharge of duties." Idaho Code § 67-1401(7).

Idaho caselaw construing this statute has clarified that, while the

attorney general may "assist" county prosecutors in a "collaborative

effort," he may not assert "dominion and control" over prosecutions

against the county prosecutor's wishes. *Newman v. Lance*, 922 P.2d

395, 399–401 (Idaho 1996). Otherwise, unless the county prosecutor

objects, the attorney general is empowered to "do every act that the

county attorney can perform" in rendering assistance. *Id.* at 399. In

*Wasden*, the Ninth Circuit summarized the Idaho attorney general's

powers as follows: "the attorney general in effect may deputize

himself . . . to stand in the role of a county prosecutor, and in that role

exercise the same power to enforce the statute the prosecutor would

have." *Id*. Given these "assistance powers," *Wasden* concluded that

plaintiffs had demonstrated the "causal connection" and

"redressability" elements for purposes of standing and also

demonstrated that Idaho's attorney general was a proper defendant

under an *Ex Parte Young* theory. *Id.*

*Dec. 26, 2023 Mem. Decision & Order,* Dkt. 78, at 28. In rejecting the Attorney

General's claim of immunity, the Court went on to note that nothing has changed

since the Ninth Circuit's 2004 decision in *Wasden*. *Id.* at 27.

In seeking to stay the injunction, the Attorney General doesn't meaningfully engage with *Wasden*. Instead, he points out that the Idaho legislature did not explicitly provide him with enforcement powers when it enacted the Vulnerable Child Protection Act (HB 71). But that argument ignores the enforcement powers that were already in place, by virtue of Idaho Code § 67-1401. *Wasden* relied on that statutory grant of power in deciding that the Attorney General was suable under an *Ex Parte Young* theory. *See* 376 F.3d at 919-920. Thus, the Court is not persuaded that it erred by relying on *Wasden*.

The Attorney General also points to a recent Idaho state trial court decision, *Adkins v. Idaho*, No. CV01-23-14744, Mem. Decision & Order, at 11 (Idaho Fourth Judicial Dist. Dec. 29, 2023), to support his argument that the Court erred. In *Adkins,* the plaintiffs challenged Idaho's criminal abortion laws, naming four defendants: (1) the State of Idaho; (2) Idaho's governor; (3) Idaho's attorney general; and (4) the Idaho Board of Medicine. The *Adkins* Court granted the Attorney General's motion to dismiss in that case, albeit with leave to amend as to one claim. *Adkins* is not binding. Moreover, as a state tribunal, *Adkins* was not called upon to wrestle with the Eleventh Amendment or the *Ex Parte Young* exception. Rather, that court granted the Attorney General's motion to dismiss after concluding that he was a redundant defendant, given that the State of Idaho

was also a defendant. In reaching its conclusion, *Adkins* noted that Idaho's
Attorney General had only "secondary enforcement authority" with respect to the
challenged statute. *Id.* at 21. Critically though, and as already noted, *Adkins* did not
have to determine whether the Attorney General's enforcement authority satisfied
the "modest [connection] requirement" under *Ex Parte Young. See Mecinas v.
Hobbs*, 30 F.4th 890, 903 (9th Cir. 2022). Under *Wasden*, and in light of the Idaho
Attorney General's statutory "assistance" powers, he qualifies as a proper
defendant.

Finally, the Court has previously observed that the Attorney General's loss
of Eleventh Amendment immunity might offer some support for an argument that
the *proceedings* should be stayed, but loss of immunity does not amount to the sort
of irreparable harm necessary to show an *injunction* should be stayed pending
appeal. *See Planned Parenthood v. Labrador,* No. 1:23-cv-142-BLW, 2023 WL
5237613, * 2 (D. Idaho Aug. 15, 2023).

**B. Idaho's Claimed Injury**

The Attorney General next argues that the State of Idaho will be irreparably
injured by the preliminary injunction order because the injunction will thwart the
will of the Idaho legislature. But, for all the reasons discussed in its previous order,
the Court has concluded that Idaho's Vulnerable Child Protection Act is

App.007

unconstitutional. The State is not harmed when a federal court enjoins an

unconstitutional law. *See Latta v. Otter*, 771 F.3d 496, 500, n.1 (9th Cir. 2014).

### C. Plaintiffs' Claimed Injury

As for plaintiffs' alleged injuries, this Court has already determined they

will suffer irreparable harm in the absence of preliminary relief. *See Dec. 26, 2023*

*Order*, Dkt. 78, at 49-50. Staying that relief would, in turn, place the plaintiffs in

the same position they were in before that determination, subjecting them to the

same likelihood of harm. The Attorney General does not present any new

arguments or facts in his motion that would cause the Court to change its mind.

### 2.    Likelihood of Success on the Merits

This Court has also previously decided, after an extensive round of briefing

and a hearing, that plaintiffs are likely to succeed on the merits of the equal-

protection and due-process claims. In seeking to stay the injunction, the Attorney

General says the Court erred in its earlier decision because it "ignored the U.S.

Supreme Court's reluctance to constitutionalize areas in which 'the States are

currently engaged in serious, thoughtful examinations.'" *Mtn Mem.*, Dkt, 80-1, at

8. In particular, the Attorney General focuses on the fact that in granting the

preliminary injunction, the Court acknowledged the "conflicting evidence

regarding the risks and benefits associated with gender-affirming medical care."

MEMORANDUM DECISION AND ORDER - 7

*Dec. 26, 2023 Order,* Dkt. 78, at 39 (quoted, in part, in the AG's Motion Memo, Dkt. 80-1, at 8, 9).

### A. Conflicting Evidence

The Court is not persuaded by this argument. The Court acknowledged the conflicting evidence in the context of determining whether the challenged law was likely to survive heightened scrutiny—and after having determined that the law discriminated on the basis of sex and transgender status. This was entirely appropriate, as the Ninth Circuit has acknowledged that "[h]eightened scrutiny analysis is an extraordinarily fact-bound test," *Hecox v. Little*, 79 F.4th 1009, 1039 (9th Cir. 2023) and that the state is obligated to come forward with an "an "exceedingly persuasive justification for its differential treatment." *Id.* at 1028 (citing *United States v. Virginia*, 518 U.S. 515, 533 (1996)). Further, after having noted the conflicting evidence regarding gender-affirming medical care, the Court went on to explain that the law would likely fail heightened scrutiny because a total prohibition on gender-affirming medical care does not closely fit the stated goal of protecting children—even accounting for such conflicts:

> The Court acknowledges the conflicting evidence regarding the risks and benefits associated with gender-affirming medical care. As noted above, however, the Court has found that the risks associated with the treatments used in gender-affirming medical care are similar to risks associated with other types of healthcare families may seek for minors. Moreover, even assuming the risks were different in the context of providing gender-affirming medical care, HB 71 still would not satisfy heightened scrutiny because the means (a total prohibition

App.009

> on gender-affirming medical care) is not closely fitted with the ends
> (protecting children). *Cf. Hecox,* 79 F.4th at 1030 (sweeping
> prohibition on transgender athletes in Idaho too overbroad to satisfy
> heightened scrutiny).

*Order,* Dkt. 78, at 39. In short, then, the Court disagrees with the Attorney

General's suggestion that once the Court acknowledged the existence of

conflicting evidence, it was duty-bound to "allow[]the legislature to draw the

policy line given the 'conflicting evidence regarding the risks and benefits . . . .'"

*Mtn. Mem.*, Dkt. 80-1, at 9.

It's also notable that the Attorney General's line-drawing/policy argument is

logically tethered to his argument that the parent plaintiffs are not likely to succeed

on the merits of their due-process claim. On this point, the Attorney General has

argued that plaintiffs are asking the courts to create a *new* right for parents: the

right to access the specific medical treatments at issue in this lawsuit (e.g., puberty

blockers, hormone therapy, and other treatments) for their children. As the Court

explained, though, it is not persuaded that the fundamental rights at issue here are

new rights. Rather, the Supreme Court long ago decided that parents have the right

to direct the care and upbringing of their children, and this right logically includes

the parents' right to choose a particular medical treatment, in consultation with

their healthcare provider, that is generally available and accepted in the medical

community. *See Dec. 26, Order,* Dkt. 78, at 42-44 (citing, among other cases,

*Parham v. J.R.*, 442 U.S. 584 (1979) and *Troxel v. Granville*, 530 U.S. 57, 65

App.010

(2000) (plurality opinion)). The Attorney General's argument to the contrary relies on the Sixth Circuit's decision in *L.W. ex. rel. Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023). *L.W.*, however, is not binding and, for the reasons explained earlier, the Court does not find its treatment of the substantive due-process issue persuasive. In short, the *L.W.* majority framed the fundamental right at issue far too narrowly and disregarded the Supreme Court's decision in *Parham v. J.R.*, 442 U.S. 584 (1979). This Court finds the various district court opinions (cited in the original order) and dissenting Judge White's opinion far more persuasive on this issue. *See L.W.*, 83 F.4th at 507-12 (White, J., dissenting). Put differently, the Supreme Court has drawn the line around parents' fundamental rights; this Court did not, in accepting and applying those constitutional limits, usurp the legislature's role.

### B. Financial Incentives

The Attorney General next contends that in its earlier decision, the Court went astray by wrongly "credit[ing] the opinions of expert witnesses with a direct financial stake in ensuring the continued availability of 'gender affirming care,' as opposed to those expert witnesses with no direct financial stake in the outcome of the litigation." *Mtn. Mem.*, Dkt. 80-1, at 9. As a point of clarification, the Attorney General is referring to a footnote in the Court's opinion, which explained that the Court gave particular weight to plaintiffs' experts on a specific issue: the risks of

allowing gender dysphoric youth to go untreated, which include increased risks of anxiety, depression, self-harm, and suicidality. *See Order,* Dkt. 78, at 38 n.5. The Court explained that it gave particular weight to plaintiffs' experts on this issue because they currently treat adolescents with gender dysphoria, whereas the defense experts do not. *See id.* It stands to reason that doctors who actually treat gender dysphoric youth will have a better idea as to what happens when these youth go untreated.

More broadly, the Court is not persuaded by the Attorney General's suggestion that the plaintiffs' experts have a direct financial interest in the outcome of this case. As plaintiffs have pointed out: (1) any alleged benefit these doctors would gain is far too attenuated to be considered a financial stake in this litigation; (2) these doctors don't provide care in Idaho and will not, therefore, lose any business if HB 71 goes into effect; and (3) as a psychologist, Dr. Brady does not provide any of the treatments banned by HB 71. For all these reasons, the Court is not persuaded that it erred by crediting opinions offered by plaintiffs' experts.

### 3. The Public Interest

The Court has already determined that the public interest favors an injunction. Nothing in the stay motion persuades the Court to alter that earlier determination.

App.012

## ORDER

**IT IS ORDERED that** Defendant Attorney General Labrador's Emergency

Motion for a Stay Pending Appeal (Dkt. 80) is **DENIED**.

DATED: January 16, 2024

B. Lynn Winmill
U.S. District Court Judge

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PAM POE, by and through her parents and next friends, Penny and Peter Poe; PENNY POE; PETER POE; JANE DOE, by and through her parents and next friends, Joan and John Doe; JOAN DOE, and JOHN DOE, | Case No. 1:23-cv-00269-BLW **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | |
| v. | |
| RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho; JAN M. BENNETTS, in her official capacity as Ada County Prosecuting Attorney; and the INDIVIDUAL MEMBERS OF THE IDAHO CODE COMMISSION, in their official capacities, | |
| Defendants. | |

# I
# INTRODUCTION

Since its adoption in 1868, the Fourteenth Amendment has been the primary safeguard of our individual rights. Its two preeminent goals—to ensure equality under the law and protect our most fundamental rights against state intrusion—are both implicated here. The passage of Idaho's Vulnerable Child Protection Act, which precludes health care professionals from providing transgender children

with generally accepted medical treatment for gender dysphoria, raises two critically important constitutional questions: First, does the State of Idaho violate the Equal Protection Clause of the Fourteenth Amendment when it bars certain medical procedures to treat gender dysphoria, while those same procedures are left freely available for the treatment of other medical conditions? Second, does the Due Process Clause of the Fourteenth Amendment prohibit the State from interfering with the decision of parents to obtain a particular type of medical care for their transgender children—care that has been broadly endorsed as both appropriate and necessary by the American medical community?

In some senses, the answers to those questions are intuitive and obvious to lawyers and laypeople alike: Transgender children should receive equal treatment under the law. Parents should have the right to make the most fundamental decisions about how to care for their children. As it turns out, case law applying the Fourteenth Amendment tracks with our intuition. Time and again, these cases illustrate that the Fourteenth Amendment's primary role is to protect disfavored minorities and preserve our fundamental rights from legislative overreach. That was true for newly freed slaves following the civil war. It was true in the 20th Century for women, people of color, inter-racial couples, and individuals seeking access to contraception. And it is no less true for transgender children and their parents in the 21st Century.

MEMORANDUM DECISION AND ORDER - 2

Over the next 50-plus pages, the Court will explain why Idaho's Vulnerable Child Protection Act violates the Fourteenth Amendment. But before wading into that analysis, it is important to briefly address a criticism common to court decisions that apply the Fourteenth Amendment to strike down legislative enactments. Critics say such decisions are anti-democratic and frustrate the will of the people as expressed by their elected legislature. And they are right. But that is precisely how our constitutional democracy is supposed to work. The authors of the Fourteenth Amendment fully understood and intended that the amendment would prevent state legislatures from passing laws that denied equal protection of the laws or invaded the fundamental rights of the people.

## II
## BACKGROUND

### A.  Overview

This lawsuit challenges the constitutionality of Idaho's Vulnerable Child Protection Act, which is slated to take effect on January 1, 2024. The plaintiffs— two transgender minors and their parents—allege that the Act's prohibition on the use of puberty blockers, hormones and other treatments violates the Equal Protection Clause and the Due Process Clause. They ask the Court to enjoin defendants from enforcing the Act during the pendency of this lawsuit. Defendants move to dismiss the complaint and oppose the request for injunctive relief.

For the reasons explained below, the Court will deny Attorney General

Labrador's and Ada County Prosecutor Bennetts' motions to dismiss. The Court will, however, grant the Idaho Code Commission members' motion to dismiss. The Court will also grant plaintiffs' motion for a preliminary injunction, as they have shown a strong likelihood of success on the merits of their claims and otherwise meet the requirements for preliminary injunctive relief.

## B. Idaho's Vulnerable Child Protection Act

In April 2023, Idaho's governor signed House Bill 71 (HB 71) into law. The new law prohibits medical professionals from providing certain medications and treatments to minors, but only if the purpose is to enable a minor to live with a gender identity inconsistent with that minor's "biological sex." The relevant provisions are as follows:

> A medical provider shall not engage in any of the following practices upon a child for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex:
>
> (a)  Performing surgeries that sterilize or mutilate, or artificially construct tissue with the appearance of genitalia that differs from the child's biological sex . . . .
>
> (b)  Performing a mastectomy;
>
> (c)  Administering or supplying the following medications that induce profound morphologic changes in the genitals of a child or induce transient or permanent infertility:
>
>> (i)  Puberty-blocking medication to stop or delay normal puberty;

    (ii)    Supraphysiological doses of testosterone to a female; or

    (iii)    Supraphysiological doses of estrogen to a male; or

(d)    Removing any otherwise healthy or nondiseased body part or tissue.

HB 71 § 3(a)-(d). As shown, HB 71 uses the terms "sex" and "biological sex." "Sex" is defined elsewhere to mean "the immutable biological and physiological characteristics, specifically the chromosomes and internal and external reproductive anatomy, genetically determined at conception and generally recognizable at birth, that define an individual as male or female." § 2(b). Medical providers who violate HB 71 are guilty of a felony and face up to 10 years in prison. § (5).

## C. The Lawsuit

Shortly after Governor Little signed HB 71 into law, plaintiffs sued Attorney General Raúl Labrador, Ada County Prosecuting Attorney Jan Bennetts, and the Idaho Code Commission members. They allege three claims: (1) the minor plaintiffs allege that HB 71 violates the Equal Protection Clause because it discriminates on the basis of sex and transgender status; (2) the parent plaintiffs allege that HB 71 violates the Due Process Clause because it violates their fundamental right to seek and follow medical advice to protect the health and wellbeing of their minor children; and (3) all plaintiffs allege that the Idaho Code

Commission members will imminently violate their due process rights by publishing HB 71 in the official Idaho codebook without notifying the public that the law is unconstitutional and unenforceable.

The key factual allegations are that Pam Poe and Jane Doe have been diagnosed with gender dysphoria and are currently receiving gender-affirming medical care that HB 71 will ban. All plaintiffs express extreme anxiety about the possibility of the minor plaintiffs being forced to discontinue this care. More specific details regarding the Poe and Doe families are as follows:[1]

*The Poe Plaintiffs.* Pam Poe is a 15-year-old transgender girl. She has lived in Idaho her entire life. Pam's natal sex is male, but when she was in seventh grade, Pam began to realize she was transgender. Afterward, she struggled with depression, anxiety, and self-harm. In February 2022, she was admitted to a residential treatment facility where she was diagnosed with gender dysphoria. About a month after she was released (and a year after she began to realize she was transgender), Pam's doctor prescribed puberty blockers. The medication had near-immediate positive effects on Pam. By pausing the physical changes that were causing her depression and anxiety, her mental health greatly improved.

---

[1] Details regarding the Poe family are alleged in paragraphs 71-81 of the complaint; details regarding the Doe family are alleged in paragraphs 82-94. *See Compl.*, Dkt. 1.

The following year, when she was 15, Pam's doctor prescribed hormone therapy, and she continues to be on hormone therapy. The Poe plaintiffs allege that they worry about the severe stress and anxiety associated with Pam's gender dysphoria returning if she is forced to stop gender-affirming medical care. They allege that if HB 71 takes effect, they are considering moving out of Idaho.

***The Doe Plaintiffs***. Jane Doe is a 16-year-old transgender girl. Like Pam, her natal sex is male, and she has lived in Idaho her entire life. Jane alleges that as she was growing up, "she always felt more like a girl than a boy." As she explains it, she was more comfortable associating with and playing with girls; she felt as though she belonged on girls' teams during recess; and she would always be a girl character in make-believe games. When puberty began, Jane hated the way her body was changing, and her mental health worsened. As stated in the complaint, "Jane did not like *who she was* when she had to move through the world as a boy. She sometimes wished she did not even exist."

In the summer and fall of 2020, Jane came out as transgender to her friends and family and began "social transitioning," which involved dressing, wearing makeup, and using her new name consistent with her female gender identity. Around that time, Jane was diagnosed with gender dysphoria. After several months of therapy, additional visits with her doctor, and lab work, Jane began taking puberty blockers. A few months later, at age 14, Jane began low-dose hormone

App.020

therapy. Jane's doctor has been monitoring her, adjusting medications as needed.

Since receiving gender-affirming medical care, Jane's mental health has significantly improved, but the debate over HB 71 and other anti-transgender bills has affected her mental health and her grades; when the bill passed, Jane wept in the hallway at school, and her parents had to take her home. The passage of the bill has also caused the Doe family to consider leaving Idaho so that Jane can continue to access the medical care that has helped her so significantly.

**D.  The Motions & the Record**

There are three motions before the Court: two motions to dismiss and the motion for a preliminary injunction. The parties said there was no need for an evidentiary hearing on the injunction motion, so the Court did not hear evidence at the November 6, 2023 hearing—just argument. The parties did, however, submit hundreds of pages of evidence, mainly consisting of expert declarations and deposition transcripts. The Court will make its factual findings on the paper record alone, recognizing that such findings are not final and may well change after the Court has had a chance to observe witnesses testify. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); 18B Wright, Miller, & Cooper, *Federal Practice & Procedure* § 4478.1 (3d ed.) ("An order granting or denying a preliminary injunction ... rests on tentative findings that are subject to reconsideration, either at trial or during later stages of pretrial proceedings.").

## E.  Factual Findings[2]

The Court will begin by defining some key terms:

- *Birth Sex; Natal Sex; Sex Assigned at Birth:* These terms will be used interchangeably throughout this opinion and refer to the sex an individual is assigned at birth, based upon the appearance of external genitalia.

- *Gender Identity:* Gender identity is a person's core, internal sense of belonging to a particular gender, such as male or female.

- *Gender Dysphoria*: Gender dysphoria is a condition identified by diagnostic criteria set out in the Diagnostic and Statistical Manual of Mental Disorders 5-TR ("the DSM-5"). The condition is generally characterized by an incongruence between a person's assigned gender and their "experienced/expressed gender" that is present for at least six months, and which causes clinically significant distress of a sufficient severity to impair the individual's ability to function in their daily life setting. The more specific DSM-5 diagnostic criteria for children and for adolescents and adults are in the record. *See Brady Dec*. ¶¶ 16-19; *Weiss Dec*. ¶¶ 22-23.

- *Cisgender:* Cisgender individuals have a gender identity that aligns with their birth sex.

- *Transgender:* Transgender individuals have a gender identity that does not align with their birth sex.

The World Professional Association for Transgender Health ("WPATH")

publishes clinical practice guidelines—known as Standards of Care for the Health

of Transgender and Gender Diverse People—relevant to the evaluation and

---

[2] These factual findings are relevant to the preliminary injunction motion. In considering the Rule 12(b) motions, the Court will rely upon the facts alleged in the complaint.

App.022

treatment of gender dysphoria. The WPATH Standards of Care were first published in 1979, and the most recent iteration was published in 2022. The Endocrine Society also publishes a guideline for the treatment of gender dysphoria; its first guideline was published in 2009 and the most recent update in 2017. The WPATH and Endocrine Society guidelines, which overlap in many respects, are discussed in the record and, therefore, not fully detailed here. *See, e.g., Brady Dec.* ¶¶ 4, 26-37; *Connelly Dec.* ¶¶ 15-22. In general, however, neither guideline recommends medical interventions for treatment of gender dysphoria before the onset of puberty. But for adolescents—youth who have started puberty—the guidelines indicate that medical interventions may be appropriate to treat gender dysphoria depending on the patient's individual needs. These interventions, often referred to as "gender-affirming medical care," may include medication to delay puberty (GnRH agonists, or "puberty blockers"), hormone therapy (*e.g.*, testosterone for transgender boys and testosterone suppression and estrogen for transgender girls), and surgeries. Both the WPATH and Endocrine Society guidelines emphasize the importance of a comprehensive mental health evaluation prior to the initiation of gender-affirming medical care for adolescents.

The parties' key point of disagreement in this litigation is whether medical interventions allowed under the WPATH and Endocrine Society guidelines are safe, effective, and medically necessary for some adolescents suffering from

gender dysphoria. Plaintiffs' experts have submitted declarations saying they are.

Defendants' experts have submitted declarations raising various concerns as to

their use. After carefully considering the voluminous evidence on this point, the

Court finds that the treatment for gender dysphoria—when provided in accordance

with the guidelines published by WPATH and the Endocrine Society, and which

may include medical interventions such as puberty blockers, hormone therapy, and

surgeries—is safe, effective, and medically necessary for some adolescents. The

weight of the evidence before the Court strongly supports this finding. Most

significantly, the standards of care published in the WPATH and Endocrine

Society guidelines are accepted by every major medical organization in the United

States, including, among many others, the American Academy of Pediatrics, the

American Medical Association, the American Academy of Child & Adolescent

Psychiatry, the American Academy of Family Physicians, the Pediatric Endocrine

Society, and the Society for Adolescent Health and Medicine. *See Amicus Br.*, Dkt.

33-1.

The Court further finds that: (1) the medical treatments banned by HB 71

have a long history of safe use in minors for various conditions and are supported

by medical evidence that has been subjected to rigorous study; (2) the medications

and procedures used in gender-affirming medical care (such as puberty blockers,

hormones, and mastectomies) are used to treat cisgender adolescents for other

purposes; (3) gender-affirming medical care raises risks comparable to risks associated with other types of medical care families are free to seek for minors; (4) gender-affirming medical care improves the wellbeing of some adolescents with gender dysphoria, and delaying or withholding such care can be harmful, potentially increasing depression, anxiety, self-harm, and suicidal ideation; and (5) adolescents with gender dysphoria are unlikely to later identify as their birth sex. With these findings in place, the Court will turn to the pending motions.

## III
## THE MOTIONS TO DISMISS

All defendants contend that plaintiffs lack standing, that their claims are unripe, and that their claims fail as a matter of law.

### A.  The Governing Legal Standards

Standing and ripeness are challenged through Federal Rule of Civil Procedure 12(b)(1). *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may challenge jurisdiction either on the face of the pleadings or by presenting extrinsic evidence. *See Safer Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Where, as here, an attack is facial, the court confines its inquiry to allegations in the complaint. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

When ruling on a facial jurisdictional attack, courts must accept as true all

material allegations of the complaint and must construe the complaint in favor of the complaining party. *De La Cruz v. Tormey*, 582 F.2d 45, 62 (9th Cir. 1978) (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). However, the plaintiff bears the burden of alleging facts that are legally sufficient to invoke the court's jurisdiction. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

Rule 12(b)(6) permits a court to dismiss a claim if the plaintiff has failed to state a claim upon which relief can be granted. A Rule 12(b)(6) dismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008). In deciding whether to grant a motion to dismiss, the court must accept as true all well-pleaded factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court is not, however, required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). However, a "complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Id.* (citation omitted).

## B. Ada County Prosecutor Bennetts' Rule 12(b)(1) Motion

In her Rule 12(b)(1) motion, Prosecutor Bennetts discusses standing and ripeness together, ultimately arguing that the complaint should be dismissed under

both doctrines. The doctrines of standing and ripeness are closely related, but while "standing is primarily concerned with *who* is a proper party to litigate a particular matter, ripeness addresses *when* that litigation may occur." *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1123 (9th Cir. 2009) (internal quotation marks and citation omitted).

To establish Article III standing, a plaintiff must show: (1) an injury-in-fact that is "concrete and particularized" and "actual or imminent," as opposed to one that is conjectural or hypothetical; (2) a causal connection between the challenged conduct and defendant's action; and (3) a likelihood that the injury will be redressed by a favorable judicial decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). To survive a Rule 12(b)(1) motion at the pleading stage (a facial challenge to subject-matter jurisdiction), the complaint must clearly allege facts demonstrating each element of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

If plaintiffs launch a pre-enforcement challenge, as is the case here, they may establish an injury-in-fact by showing that: (1) they intend "to engage in a course of conduct arguably affected with a constitutional interest;" (2) the intended future conduct is proscribed by the law in question; and (3) there is a credible threat of prosecution under the challenged law. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). (The final three factors are referred to as the *Driehaus*

App.027

factors.)

As for ripeness, that "inquiry contains both a constitutional and a prudential component." *Portman v. Cty. of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993). The constitutional component is generally coextensive with the "injury-in-fact" element of the standing analysis. *See Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 n.2 (9th Cir. 2003). The prudential component "focuses on whether there is an adequate record upon which to base effective review." *Portman*, 995 F.2d at 903. In evaluating prudential ripeness, the Court considers "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000) (en banc) (citations omitted). Ultimately, prudential considerations of ripeness are discretionary. *Id.* at 1142.

With this legal framework in place, the Court will tick through each factor enumerated above, including the three traditional standing requirements (injury, causation, redressability) as well as the *Dreihaus* factors. The Court will then move to the prudential ripeness inquiry. Before doing so, however, the Court will generally observe that the Supreme Court long ago held that "a person who must comply with the law or face injury has standing to challenge its application to him, even if the threat of prosecution is not immediate—indeed, even if the law is not yet in effect." *Hays v. City of Urbana*, 104 F.3d 102, 103 (7th Cir. 1997) (citations

omitted). To offer just one example, in *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), plaintiffs sued four years before the law was to take effect, and the Supreme Court resolved the case two years before its intended effective date. *Id.* at 536; *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."); *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979); *Doe v. Bolton*, 410 U.S. 179, 188 (1973). Based on this general principle, plaintiffs argue that they do not need to satisfy the *Driehaus* factors because they will "suffer medical and constitutional harm" the moment HB 71 takes effect. *Plaintiffs' Response,* Dkt. 60, at 3; *see generally Teter v. Lopez*, 76 F.4th 938, 944 n.2 (9th Cir. 2023); *Jackson v. City & County of San Francisco*, 746 F.3d 953 967 (9th Cir. 2014). The Court agrees. Still, though, the Court will analyze the *Driehaus* factors, ultimately concluding that plaintiffs satisfy those factors.

1. **Injury-In-Fact**

Returning to the requirement of an injury-in-fact, and beginning with the first *Dreihaus* factor, plaintiffs have plausibly alleged that they intend to engage in future conduct affected with a constitutional interest. The parent plaintiffs plan to seek out for their children medical care banned by HB 71. That conduct is arguably affected with their fundamental liberty interest of directing the upbringing of their

children, which logically includes directing their children's medical care. Thus, the

Due Process Clause is implicated. And the minor plaintiffs wish to access medical

treatments that doctors may not legally offer to them but may offer (1) to minors of

the opposite birth sex or (2) to minors of the same birth sex, but only so long as the

treatments are used for anything other than "attempting to alter the appearance of

or affirm the child's perception of the child's sex if that perception is inconsistent

with the child's biological sex." Thus, the minor plaintiffs' intended future conduct

is affected by the Equal Protection Clause.

Bennetts argues that plaintiffs have not sufficiently alleged that they intend

to continue seeking the treatment that will soon be banned. *See Mtn. Mem.,* Dkt.

51-1, at 7. But, viewing all reasonable inferences in plaintiffs' favor, such an

allegation has been made. Both minor plaintiffs allege that they live in Idaho and

are "currently receiving medically necessary care that would be prohibited by the

Healthcare Ban." *Compl.*, Dkt. 1, ¶¶ 5-7. And both families allege that although

they do not wish to leave Idaho, they are considering doing so to ensure that the

minor plaintiffs may continue receiving gender-affirming healthcare. *Id.* ¶¶ 81, 94.

The reasonable inference is that but for HB 71, they would continue to seek the

gender-affirming medical care that will be banned under HB 71.

Moving to the second *Driehaus* factor, plaintiffs' intended conduct is

proscribed by the law in question. Granted, the statute does not criminalize parents

and children for seeking the banned care. But plaintiffs can establish injury for standing purposes by showing "determinative or coercive effect upon the action of someone else." *San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1170 (9th Cir. 2011) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). Here, once HB 71 goes into effect, plaintiffs would be unable to access the medical care they seek because any medical professional who could provide that care is banned from doing so, under the threat of a felony conviction and ten years in prison. As such, plaintiffs will suffer an imminent injury.

The third and final *Driehaus* factor requires plaintiff to show a credible threat of prosecution. To evaluate whether such a threat exists, the Ninth Circuit considers three factors, referred to here as the *Thomas* factors: (1) whether the plaintiff has a "concrete plan" to violate the law, (2) whether the enforcement authorities have "communicated a specific warning or threat to initiate proceedings," and (3) whether there is a "history of past prosecution or enforcement." *Thomas*, 220 F.3d at 1139. Generally speaking, "[n]either the mere existence of a proscriptive statute nor a generalized threat of prosecution" satisfies this test. *Id.*

Here, plaintiffs have satisfied the first *Thomas* factor because they have alleged that they are currently receiving gender-affirming medical care and that they wish to continue receiving that care after HB 71 goes into effect. The fact that

MEMORANDUM DECISION AND ORDER - 18

they are considering leaving Idaho to obtain that treatment should not bar their suit. As the Ninth Circuit recently stated, a plaintiff's "choice to eliminate the threat of enforcement by not doing what they want to do should not bar the suit." *Isaacson v. Mayes*, 84 F.4th 1089, 1099 (9th Cir. 2023) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) ("Given [the] genuine threat of enforcement, we did not require, as a prerequisite to testing the validity of the law in a suit for injunction, that the plaintiff bet the farm, so to speak, by taking the violative action.") and *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) ("[E]nforcement history alone is not dispositive. Courts have found standing where no one had ever been prosecuted under the challenged provision.")).

As for the second *Thomas* factor, the Ninth Circuit has held that a plaintiff need not always show a specific warning or threat of prosecution in a pre-enforcement challenge. *See Teter v. Lopez*, 76 F.4th 938, 946 (9th Cir. 2023). Further, even though plaintiffs haven't been threatened with prosecution, Bennetts is vested with authority to enforce all penal statutes in Ada County, *see* Idaho Code § 31-2227(1), and she hasn't disavowed HB 71. It would be illogical to assume that she would elect to simply ignore violations of the statute. Finally, the "third factor, concerning the history of enforcement, carries 'little weight' when the challenged law is 'relatively new' and the record contains little information as to enforcement." *Tingley v. Ferguson*, 47 F.4th 1055, 1069 (9th Cir. 2022) (citations

omitted). The Court therefore concludes that plaintiffs have alleged the requisite injury-in-fact.

### 2.  Causal Connection & Redressability

Prosecutor Bennetts next argues that plaintiffs trace any alleged injury to the Idaho Legislature and the existence of HB 71—not to any action she has taken. But, as noted, plaintiffs reside in Ada County; they are currently receiving healthcare that will be banned by HB 71; HB 71 will go into effect imminently; and they wish to continue receiving healthcare that will be banned. *See Compl.*, Dkt. 1, ¶¶ 5, 6, 7, 71-94. Plus, as noted above, Bennetts is vested with the primary duty of enforcing all penal statutes in Ada County, *see* Idaho Code § 31-2227(1), and she has not disavowed HB 71. As such, plaintiffs trace their imminent injuries to Bennetts, and an order enjoining her from enforcing HB 71 will redress those injuries.

### 3.  Prudential Ripeness Considerations

The Court also concludes that prudential ripeness considerations favor the plaintiffs. As noted above, the Court considers fitness for judicial decision and hardship to the parties if a decision were withheld. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009). Regarding fitness, the Court considers "whether the action has a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate

App.033

compliance with its terms." *Id.* And as to hardship, the Court considers whether the challenged law "requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Id.* Both considerations favor exercising jurisdiction, as HB 71 will take effect imminently and at that time will have an immediate, harmful effect on all plaintiffs.

For all these reasons, plaintiffs have standing and their claims are ripe for review. The Court will therefore deny Bennetts' Rule 12(b)(1) motion.

## C.  Ada County Prosecutor Bennetts' Rule 12(b)(6) Motion

### 1.  *Monell*

The Court will also deny Bennetts' Rule 12(b)(6) motion. Here, Bennetts says plaintiffs' claims must be viewed under the rubric of municipal liability as established in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). But in a *Monell* claim, the defendant must be an official policymaker *for the municipality*—not the state. *See McMillian v. Monroe Cnty.*, 520 U.S. 781, 785 (1997). Here, in the context of prosecuting and enforcing *state* criminal laws, the Ada County Prosecutor acts on behalf of the state. *See generally* Idaho Code § 31-2227; *cf. Chilcoat v. San Juan Cnty.*, 41 F.4th 1196 (10th Cir. 2022) (determining that under Utah law, a county prosecutor acted on behalf of the state, not the county, in prosecuting violations of the state criminal code). As such, Bennetts' argument misses the mark, as it focuses on the requirements of a *Monell* claim,

whereas the Court views the complaint as having alleged a plausible § 1983 claim against Bennetts under an *Ex Parte Young* theory. *See RFL Republican Labor Farmer Caucus v. Freeman*, No. 19-cv-1949, 2020 WL 1333154, at *3 (D. Minn. Mar. 23, 2020) (denying motion to dismiss *Monell* claim after concluding that plaintiffs had alleged *Ex Parte Young* claims).

Alternatively, the Court will deny Bennetts' motion because the Ninth Circuit rejected a similar argument in *Evers v. County of Custer*, 745 F.2d 1196 (9th Cir. 1984). In *Evers*, a county defendant argued that it should be immune from suit because it was merely acting according to state law, rather than carrying out county policy. The court explained that such an argument "goes only to the question of the Commissioners' good faith in applying the statute. The fact that the Commissioners are immune from suit under section 1983 because of their good faith does not relieve the County from liability." *Id*. at 1203 (citing *Owen v. City of Independence*, 445 U.S. 622 (1979)).

### 2. Taxpayer Burden and Necessity of Bennetts' Presence

Bennetts' final argument is that the Court should dismiss her as a defendant because (1) this action could just as easily proceed in her absence, and (2) if she is kept on as a defendant, Ada County taxpayers might have to help pay attorneys' fees. *See Mtn. Mem.,* Dkt. 51-1, at 15-16; *Reply*, Dkt. 64, at 8-10. Bennetts has not cited any authority in support of these arguments, however, and the Court is not

persuaded that dismissal is warranted for those reasons. The Court will therefore deny Bennetts' Rule 12(b)(6) motion.

## D. The State Defendants'[3] Rule 12(b)(1) Motion

Next up is Attorney General Labrador and the Idaho Code Commission Members' Rule 12(b)(1) motion. That motion focuses primarily on a claim of Eleventh Amendment immunity, although these defendants also raised an extremely brief argument asserting that plaintiffs lack standing and that their claims are unripe. *See Mtn. Mem.*, Dkt. 66, at 11. The Court resolved most aspects of these arguments above, in the context of deciding Bennetts' motion to dismiss. The State Defendants raise unique arguments, however, regarding the "causation" and "redressability" elements of standing. The Court will address those arguments here, through the lens of the Eleventh Amendment sovereign immunity analysis.

As the Ninth Circuit has observed, whether defendants, acting in their official capacities as state officials, are proper defendants, "is really the common denominator of two separate inquiries: first, there is the requisite causal connection between their responsibilities and any injury that the plaintiffs might suffer, such that relief against the defendants would provide redress; and second, whether … jurisdiction over the defendants is proper under the doctrine of *Ex parte Young*,

---

[3] Throughout this opinion, the Court will sometimes refer to Labrador and the Code Commission members as "the State Defendants."

209 U.S. 123 (1908), which requires 'some connection' between a named state officer and enforcement of a challenged state law." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004) (internal citations omitted).

In general, the Eleventh Amendment protects states from being haled into federal court without their consent. U.S. Const. amend. XI; *Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 258 (2011). But under *Ex parte Young*, 209 U.S. 123 (1908), plaintiffs may sometimes sue state officials in federal court to prevent them from enforcing an unconstitutional act. To fall within the *Ex Parte Young* exception, the named official must have "some connection with the enforcement of [HB 71]." *Mecinas v. Hobbs*, 30 F.4th 890, 903 (9th Cir. 2022). The Ninth Circuit has explained that the "modest [connection] requirement" under *Ex parte Young* merely demands that the implicated state official have a relevant role that goes beyond "a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision." *Id.* (citation omitted).

## 1. Idaho Code Commission Members

Applying this standard to the claim against the Idaho Code Commission members should be a straightforward, three-step analysis, as follows: (1) The Commission is tasked with publishing the official Idaho codebook, which includes an obligation to annotate the codebook with citations to federal and state case

authority. *See* Idaho Code § 73-205. (2) The Commission has no power to enforce the laws they publish; the limit of their power is to publish. (3) Thus, the Commission is not suable under *Ex Parte Young. See generally Whole Woman's Health v. Jackson*, 595 U.S. 30, 40-41 (2021); *Snoeck v. Brussa*, 153 F.3d 984, 987 (9th Cir. 1998) (dismissing case against state commission after concluding that "the Commission has no enforcement power, and therefore, it has no connection to the enforcement of the challenged law as required under *Ex Parte Young*"). And that should be the end of it. But plaintiffs say the conclusion doesn't follow because they are advancing a different theory—namely, that if a code publisher fails to properly and timely annotate a codebook to apprise the public of federal case law holding a state statute unconstitutional, the Commission thereby violates plaintiffs' due process rights. In pursuing this theory, plaintiffs acknowledge that the Commission has no power to enforce Idaho statutory law. But they say the problem is that the Commission has a history of falling down on the job by failing to properly annotate Idaho's official codebook with citations to federal court decisions holding Idaho statutes unconstitutional. And, from there, plaintiffs allege that the Code Commission will soon publish an unconstitutional law—Idaho's Vulnerable Child Protection Act—in the Idaho codebook without simultaneously notifying the public that the law is unconstitutional. That, plaintiffs say, will "mislead and deceive Idahoans . . . about the requirements of the law." *Compl.,*

Dkt. 1, ¶ 123. Invoking this logic, plaintiffs appear to be arguing that HB 71 is subject to a vagueness challenge under the Fourteenth Amendment. *Id.* ¶ 124; *see also Plaintiff's Response*, Dkt. 61, at 8 (citing various cases decided under the void-for-vagueness doctrine).

The Court is not persuaded. Plaintiffs do not cite any authority applying the void-for-vagueness doctrine to any similar factual scenario. Plus, the simpler, narrower answer is that this is a dispute about the Commission's obligation to comply with state law. Plaintiffs cannot properly invoke the *Ex Parte Young* exception as a way to enforce an Idaho statutory obligation "through the back door." *Wozniak v. Adesida*, 932 F.3d 1008, 1011 (7th Cir. 2019). Accordingly, the Court is compelled to grant the Code Commission members' motion to dismiss. *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 98 (1984).

### 2. Attorney General Labrador

The outcome is different for Attorney General Labrador, however, as he is empowered to enforce HB 71. Labrador disputes this, arguing that he lacks authority to enforce Idaho criminal law absent a referral by a county prosecutor, which has not occurred here. A few months ago, this Court rejected a substantially similar argument and will do so again now, for the same reasons. In a nutshell, Mr. Labrador's argument is foreclosed by *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004).

The starting point for the analysis is Idaho Code § 67-1401, which empowers Idaho's attorney general to "assist" county prosecutors. It provides: "When required by public service, [the attorney general has a duty] to repair to any county in the state and assist the prosecuting attorney thereof in the discharge of duties." Idaho Code § 67-1401(7). Idaho caselaw construing this statute has clarified that, while the attorney general may "assist" county prosecutors in a "collaborative effort," he may not assert "dominion and control" over prosecutions against the county prosecutor's wishes. *Newman v. Lance*, 922 P.2d 395, 399–401 (Idaho 1996). Otherwise, unless the county prosecutor objects, the attorney general is empowered to "*do every act* that the county attorney can perform" in rendering assistance. *Id.* at 399. In *Wasden*, the Ninth Circuit summarized the Idaho attorney general's powers as follows: "the attorney general in effect may deputize himself . . . to stand in the role of a county prosecutor, and in that role exercise the same power to enforce the statute the prosecutor would have." *Id.* Given these "assistance powers," *Wasden* concluded that plaintiffs had demonstrated the "causal connection" and "redressability" elements for purposes of standing and also demonstrated that Idaho's attorney general was a proper defendant under an *Ex Parte Young* theory. *Id.*

Nothing has changed since the Ninth Circuit's 2004 decision in *Wasden.* Idaho's attorney general still has the same "assistance powers" he had then, and,

App.040

for that reason, he is a proper defendant here. Attorney General Labrador did issue an opinion letter in April 2023, opining that his "assistance" powers don't spring into existence unless and until a county prosecutor whistles for him by filing a motion under Idaho Code § 31-2603.[4] *See* Idaho Op. Atty. Gen. No. 23-1, 2023 WL 4397789. But the opinion letter is not binding, and the Court is not persuaded by its reasoning. Most significantly, the opinion letter does not meaningfully account for the fact that so long as a county prosecutor doesn't object, the attorney general can "do every act" a county prosecutor can do—which logically includes initiating a criminal case before a county prosecutor asks a court to appoint the AG as a special prosecutor. In fact, that is precisely what happened in *State v. Summer*, 76 P.3d 963 (Idaho 2003), which the opinion letter cites and partly relies upon. That particular factual scenario illustrates that the Attorney General may indeed deputize himself and do every act a county prosecutor can do. The Court will therefore deny the Attorney General's Rule 12(b)(1) motion.

## E. Attorney General Labrador's Rule 12(b)(6) Motion

Attorney General Labrador also argues that plaintiffs failed to state claims

---

[4] Idaho Code § 31-2603(b) provides: "The prosecuting attorney may petition the district judge of his county for the appointment of a special assistant attorney-general to assist in the prosecution of any criminal case pending in the county; and if it appears to the district judge to whom such petition is addressed that good cause appears for granting such petition, the district judge, may, with the approval of the attorney-general, appoint an assistant attorney-general to assist in such prosecution."

upon which relief may be granted. As discussed below, however, the Court has concluded that plaintiffs are likely to succeed on the merits of their equal-protection and due-process claims. Inherent in that ruling is a finding that plaintiffs have pleaded plausible claims. The Court will therefore deny the Attorney General's Rule 12(b)(6) motion.

**IV**
**THE MOTION FOR A PRELIMINARY INJUNCTION**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Fraihat v. U.S. Immigration & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021) (citation omitted). To obtain relief, plaintiffs must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 24 (2008). "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

**A. Likelihood of Success on the Merits**

Plaintiffs have shown a likelihood of success on their equal-protection and due-process claims.

### 1.  Plaintiff's Equal-Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that no

App.042

state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In other words, "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). But the constitutional promise of equal protection "must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996). The Supreme Court has attempted to reconcile this tension by developing tiers of judicial scrutiny against which a government's classification can be measured. *See id.; Latta v. Otter*, 19 F. Supp. 3d 1054, 1072-73 (D. Idaho), *aff'd* 771 F.3d 456 (9th Cir. 2014). As discussed in the next section, three tiers of scrutiny have developed—strict scrutiny, heightened scrutiny, and rational-basis review. The level of scrutiny applied to any given law depends on the characteristics of the disadvantaged group, or the rights implicated by the classification.

### a.  The Levels of Scrutiny

When a state restricts an individual's access to a fundamental right, the policy must withstand strict scrutiny, which requires that the government action serve a compelling purpose and that it is the least restrictive means of doing so. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16-17 (1973). The Supreme Court has recognized that the Constitution protects a number of

fundamental rights, including a parent's right to direct the "care, custody, and control of their children," *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion), and to "recognize symptoms of illness and to seek and follow medical advice." *Parham v. J.R.*, 442 U.S. 584, 602 (1979).

When a fundamental right is not at stake, a court must analyze whether the government policy discriminates against a suspect class. *Cleburne*, 473 U.S. at 440. Because government policies that discriminate on the basis of race or national origin typically reflect prejudice, such policies will survive only if the law survives strict scrutiny. *Id.* Strict-scrutiny review is so exacting that most laws subjected to this standard fail. *See generally Fullilove v. Klutznick*, 448 U.S. 448, 519 (1980) (Marshall, J., concurring) (commenting that strict-scrutiny review is "strict in theory, but fatal in fact").

Statutes that discriminate on the basis of sex—a "quasi-suspect" classification—need to withstand the slightly less stringent standard of "heightened" scrutiny. *Craig v. Boren*, 429 U.S. 190, 197 (1976); *United States v. Virginia*, 518 U.S. 515, 533 (1996). The Ninth Circuit has held that "heightened scrutiny applies to laws that discriminate on the basis of transgender status, reasoning that gender identity is at least a 'quasi-suspect class.'" *Hecox v. Little*, 79 F.4th 1009, 1026 (9th Cir. 2023) (citing *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019)). To withstand heightened scrutiny, classification by sex or

transgender status "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig*, 429 U.S. at 197.

Finally, the least stringent level of scrutiny is rational-basis review. Rational-basis review is applied to laws that impose a difference in treatment between groups but do not infringe upon a fundamental right or target a suspect or quasi-suspect class. *Heller v. Doe*, 509 U.S. 312, 319–321 (1993). "[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Id.* at 319 (citations omitted). Rational-basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* (citation omitted). Rather, a classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id*. at 320 (citation omitted). Yet, even under rational-basis review, if a court finds that a classification is "born of animosity toward the class of persons affected," a law that implicates neither a suspect classification nor a fundamental right may be ruled constitutionally invalid. *Romer*, 517 U.S. at 634.

### b.  HB 71 Discriminates on the Basis of Transgender Status

HB 71 explicitly classifies on the basis of transgender status. Granted, the word "transgender" doesn't appear in the statute. But if you consider the definition of a transgender person—again, someone whose gender identity doesn't match

their birth sex—a quick skim of HB 71 reveals that the legislature classified on that basis. The operative provision is § (3), which bans certain medical treatments if (and only if) those treatments are provided "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex *if that perception is inconsistent with the child's biological sex*." HB 71 § (3) (emphasis added). Thus, the classified group (transgender minors) cannot have medical treatments that the similarly situated group (cisgender minors) can. That is classification based on transgender status, pure and simple. *Cf. Hecox,* 79 F.4th at 1025 (observing that while an act did not use the word "transgender" it had nonetheless been carefully drawn to target transgender women and girls).

The State Defendants say HB 71 does not classify on the basis of transgender status but, instead, simply regulates a treatment for a particular diagnosis—gender dysphoria. But, to borrow from some oft-quoted examples, that's like saying that classifying on the basis of gray hair doesn't classify on the basis of age, or that classifying on the basis of wearing a yarmulke doesn't classify on the basis of being Jewish. *See Davis v. Guam*, 932 F.3d 822, 837-38 (9th Cir. 2019) (providing the gray hair/age example); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) (providing the yarmulke/Jewish example). In other words, accepting that line of logic, HB 71 discriminates by proxy, as only transgender people seek treatment for gender dysphoria. For this additional reason,

HB 71 classifies on the basis of transgender status.

### c. HB 71 Discriminates on the Basis of Sex

HB 71 also discriminates on the basis of sex. *First*, as just explained, it discriminates on the basis of transgender status, and the Ninth Circuit has held that "discrimination on the basis of transgender status is a form of sex-based discrimination." *Hecox* 79 F.4th at 1026. *Second*, it classifies on the basis of gender nonconformity because it effectively prohibits transgender minors from taking medications or undergoing treatments due to their gender nonconformity. *See generally Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1742-42, 1746 (2020); *Grabowski v. Arizona Board of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023). *Third,* it draws sex-based classifications on its face. HB 71 begins by defining "sex" to mean "the immutable biological and physiological characteristics, specifically the chromosomes and internal and external reproductive anatomy, genetically determined at conception and generally recognizable at birth, that define an individual as male or female." HB 71 § 2(b). It then goes on to ban puberty blockers, hormones, and other treatments when administered "for the purpose of attempting to alter appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." HB 71 § 3. Thus, under HB 71, "the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law." *Brandt v. Rutledge,*

47 F.4th 661, 669 (8th Cir. 2022). As such, HB 71 discriminates on the basis of sex. *See id. But see Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1230 (11th Cir. 2023); *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 481 (6th Cir. 2023).

The Court is not persuaded by the State Defendants' arguments to the contrary. Among other things, they argue that HB 71 applies equally to boys and girls. But that does not change the fact that "[t]he biological sex of the minor patient is the basis on which the law distinguishes between those who may receive certain types of medical care and those who may not." *Brandt*. 47 F. 4th at 670.

Likewise, the State Defendants' arguments based on Supreme Court cases relating to abortion and pregnancy—*Dobbs v. Jackson Women's Health Org*., 142 S. Ct. 2228 (2022) and *Geduldig v. Aiello*, 417 U.S. 484 (1974)—are not persuasive. *Dobbs* just reiterated language from *Geduldig*, and *Geduldig*, in turn, held that a state disability insurance system that excluded coverage for certain pregnancy-related disabilities did not classify on the basis of sex. The Court explained that because the insurance program created two groups—a group that contained only females and a group that contained males and females—there was a "lack of identity" between the exclusion of those female-related disabilities from coverage and discrimination on the basis of being female since "[t]he fiscal and actuarial benefits of the program ... accrue[d] to members of both sexes." *Id.* at 496

n.20. Ultimately, neither men nor women were allowed pregnancy-related

coverage under the policy. That is not so here. Analogous to the policy benefits in

*Geduldig* are the medical treatments which HB 71 bans. Cisgender adolescents

may still access these treatments, while transgender adolescents may not—

meaning that there is differential treatment based on sex and transgender status.

*Geduldig* is thus distinguishable. *Accord Doe v. Ladapo*, No. 4:23CV114-RH-

MAF, 2023 WL 3833848, at *10 (N.D. Fla. June 6, 2023).

But there is another important distinction between *Geduldig* and the case

presented here. The Supreme Court's decision in *Geduldig* relied heavily on the

fact that the State was using an objective, non-invidious standard to maintain a

comprehensive, actuarially-sound disability program. In short, the pregnancy-

based distinction was not a proxy for singling out women. By comparison, as

discussed elsewhere in this decision, there is every indication that HB 71 was

intended to single out transgender children based solely upon their transgender

status. *Geduldig* is distinguishable for this additional reason.

### d.  HB 71 is Unlikely to Survive Heightened Scrutiny

Having determined that HB 71 classifies on the basis of sex and transgender

status, the next step is to determine whether it is likely to survive heightened

scrutiny. As noted, heightened scrutiny is a "demanding" standard, with the burden

"rest[ing] entirely on the State" to demonstrate an "exceedingly persuasive"

justification for its differential treatment. *Hecox*, 79 F.4th at 1028 (citing *Virginia*, 518 U.S. at 533). To survive heightened scrutiny, the state must demonstrate "that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* Further, "heightened scrutiny is an extremely fact-bound test," *id.,* which requires the Court to examine the "actual purposes" of state action, and to "carefully consider the resulting inequality to ensure our most fundamental institutions neither send nor reinforce messages of stigma or second-class status." *SmithKline Beecham v. Abbott Laboratories*, 740 F.3d 471, 483 (9th Cir. 2014).

Generally, the State Defendants say the legislature's purpose in passing HB 71 was to protect vulnerable children from the dangers of unproven medical and surgical treatments. At a general level, safeguarding the physical wellbeing of children is of course important. *See generally New York v. Ferber*, 458 U.S. 747, 756-57 (1982). But in this case, the Court finds that the asserted objective is pretextual, given that HB 71 allows the same treatments for cisgender minors that are deemed unsafe and thus banned for transgender minors. That is, the medications and procedures that are used in gender-affirming medical care (such as puberty blockers, hormones, and surgeries) are used to treat cisgender adolescents for other purposes. But rather than targeting the treatments themselves, HB 71 allows children to have these treatments—but only so long as they are used for any

MEMORANDUM DECISION AND ORDER - 37

reason other than as gender-affirming medical care. On this point, the Court finds, as did another court faced with a similar law, that "[i]f the State's health concerns were genuine, the State would prohibit these procedures for all patients under 18 regardless of gender identity. The State's goal in passing [the challenged Act] was not to ban a treatment. It was to ban an outcome that the State deems undesirable." *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021), *aff'd* 47 F.4th 661 (8th Cir. 2022).

Moreover, even assuming the State's asserted interest was genuine, the weight of the evidence shows not only that gender-affirming medical care delivered in accordance with WPATH and Endocrine Society guidelines is helpful and necessary for some adolescents, but also that withholding such care is harmful. As plaintiffs' experts have explained, allowing gender dysphoric youth to go untreated can increase the risk of anxiety, depression, self-harm, and suicidality.[5] Seen in that light, HB 71 undermines, rather than serves, the asserted goal of protecting children. As matters currently stand, doctors decide—based on a widely accepted standard of care—whether puberty blockers, hormones, and other treatments are appropriate for any particular patient. HB 71 would not only prevent

---

[5] The Court gave particular weight to plaintiffs' experts on this issue, as Dr. Brady and Dr. Connelly currently treat adolescents with gender dysphoria, while the defense experts do not.

doctors from acting in accordance with that standard of care; it would subject them to felony charges and a potential 10-year prison sentence. Again, that does not serve the State's interest in protecting Idaho's youth; it harms them.

The Court acknowledges the conflicting evidence regarding the risks and benefits associated with gender-affirming medical care. As noted above, however, the Court has found that the risks associated with the treatments used in gender-affirming medical care are similar to risks associated with other types of healthcare families may seek for minors. Moreover, even assuming the risks were different in the context of providing gender-affirming medical care, HB 71 still would not satisfy heightened scrutiny because the means (a total prohibition on gender-affirming medical care) is not closely fitted with the ends (protecting children). *Cf. Hecox,* 79 F.4th at 1030 (sweeping prohibition on transgender athletes in Idaho too overbroad to satisfy heightened scrutiny).

In support of their argument that gender-affirming medical care is experimental and risky, the State Defendants rely heavily on systematic review studies produced by some European countries, and subsequent policy actions taken by those countries. Specifically, the evidence submitted by the defendants shows the following: (1) In *England*, the National Health Service has limited the use of puberty blockers to formal clinical trials. (2) In *Finland,* the national health service "ended the surgical transition of minors" and has restricted puberty blockers and

App.052

cross-sex hormone therapies to situations where gender dysphoria is severe and other psychiatric symptoms have ceased. (3) In *Sweden,* the "leading Swedish pediatric gender clinic" decided to limit puberty blockers and cross-sex hormones to those 16 and older and, even then, those treatments would be administered in clinical trials monitored by the appropriate Swedish research ethics board. The Swedish Health Service, however, has not implemented those recommendations generally and instead "recommends restraint." (4) In *France,* the Académie Nationale de Médecine of France advises health care providers "to extend as much as possible the psychological support phase," although "medical authorities in France have not issued any actual restriction." (5) In *Norway,* the Healthcare Investigation Board released a report stating that "the knowledge base, especially research-based knowledge for gender-affirming treatment (hormonal and surgical), is insufficient," although no policy action seems to have been taken. *See Cantor Dec.* ¶¶ 17-33. These countries' approaches to gender-affirming medical care highlight that Idaho's chosen "means"—a sweeping ban on such care—fails to properly account for the "close means-end fit" heightened scrutiny requires of sex-based classifications. *Sessions v. Morales-Santana*, 582 U.S. 47, 68 (2017).

In sum, the State has not shown that HB 71's discrimination on the basis of sex and transgender status "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of

those objectives." *Virginia*, 518 U.S. at 24 (citation omitted). The law therefore fails heightened scrutiny, and plaintiffs thus have a strong likelihood of success on the merits of their equal-protection claim.

### 2. Plaintiffs' Due-Process Claim

Likewise, the parent plaintiffs have shown a strong likelihood of success on the merits of their due-process claim. The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV, § 1. But the clause "guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). It "also provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* at 720. This heightened protection encompasses two types of substantive rights: (1) enumerated rights, which are those guaranteed by the first eight amendments; and (2) implied rights, which are "a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Dobbs*, 142 S. Ct. at 2277.

The parent plaintiffs assert rights falling into the second category (implied rights), which calls for a two-step analysis. First, the Court must carefully describe the asserted fundamental liberty interest. *See Glucksberg,* 521 U.S. at 721. Second, the Court must decide whether that interest is objectively, deeply rooted in this

MEMORANDUM DECISION AND ORDER - 41

nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. *Id.*

Plaintiffs frame their asserted right as "the fundamental right of parents to make decision concerning the care, custody, and control of their children," specifically including a parent's "right to seek and follow medical advice to protect the health and wellbeing of their minor children." *Compl.,* Dkt. 1, ¶¶ 114-15. The State says the asserted right must be framed more narrowly, such that the Court asks whether parents have a fundamental right to access for their children the specific medications at issue, including puberty blockers and hormone therapy. As the Court sees it, the appropriately precise way to frame the issue is to ask whether parents' fundamental right to care for their children includes the right to choose a particular medical treatment, in consultation with their healthcare provider, that is generally available and accepted in the medical community. And the Court has no difficulty concluding that such a right is deeply rooted in our nation's history and traditions and implicit in our concept of ordered liberty.

The Supreme Court has described a parent's right to direct the "care, custody, and control of their children" as "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel*, 530 U.S. at 65. As for a parent's more specific right to seek out a specific medical treatment for their child, the Supreme Court addressed that right in *Parham v. J.R.*, 442 U.S. 584 (1979).

*Parham* involved a controversial and unpopular treatment for children—involuntary commitment to a state mental hospital. The specific issue in the case involved the child's procedural due process rights—namely, whether the child had a right to a hearing before commitment. But to decide that, the Court first had to determine if a parent had the right to commit their child. In making that determination, the Court drew on a long line of precedent speaking generally to parents' liberty interest in raising their children as they see fit, including landmark cases such as *Meyer v. Nebraska*, 262 U.S. 390 (1923), *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972).

With that precedent in hand, the *Parham* Court explained that this country has a long tradition of allowing parents broad control over their children. As the Court put it, "our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children." 442 U.S. at 602. The *Parham* Court further explained that "our constitutional system long ago rejected any notion that a child is "the mere creature of the State" and, on the contrary, asserted that parents generally "have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations." *Id.* (citations omitted). The Court then concluded that parents' fundamental right to direct their children's upbringing encompassed the narrower right at issue: the right to seek a particular form of medical treatment for their children, subject to a

physician's independent examination and medical judgment. *Id.* "Surely," the Court said, a parent's authority over their children "includes a 'high duty' to recognize symptoms of illness and to seek and follow medical advice." *Id.* The Court held that the child did have a right to a hearing before being committed. But, as is more relevant here, the Court also held that parents "retain plenary authority to seek such care for their children [i.e., involuntary commitment], subject to a physician's independent examination and medical judgment." *Id.* at 604.

Roughly twenty years after *Parham* was handed down, the Ninth Circuit decided *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000). There, two young children were removed from their home and subjected to highly invasive physical examinations without a prior court order or their parents' consent. Citing *Parham, Wallis* held that "[t]he right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Id.* (citations omitted).

To be sure, both the Supreme Court and the Ninth Circuit have recognized there are limits to parents' rights to care for their children. *See generally Prince v. Massachusetts*, 321 U.S. 158, 170 (1944) (holding that a state may constitutionally intervene in the parent-child relationship for the purpose of enforcing child-labor laws). In *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), *overruled on other grounds in NIFLA v. Becerra*, 138 S. Ct. 2361 (2018), for example, the Ninth

Circuit held that parents do not have a fundamental right to choose "a particular type of provider" (namely, state-licensed therapists) to engage in conversion therapy (or SOCE) with their children if the state has reasonably deemed such therapy harmful. *Id.* at 1236. There, while parents were free to seek conversion therapy for their children in other ways (through a church, for example), the *Pickup* Court held that they not "compel the California legislature, in shaping its regulation of mental health providers, to accept Plaintiffs' personal views of what therapy is safe and effective for minors." *Id.*

*Pickup* does not control here, however—and the State does not argue that it does.[6] The case is distinguishable because the California legislature reasonably concluded that conversion therapy was harmful, as "the overwhelming consensus was that SOCE was harmful and ineffective." *Id.* at 1232. The opposite is true here. The American medical establishment overwhelmingly supports the gender-affirming medical care HB 71 bans; indeed the various medical and mental health organizations filed a brief stating that HB 71 "effectively bans healthcare providers from providing patients under 18 with critical, medically necessary, evidence-based treatments for gender dysphoria, . . . ." *Amici Br.*, Dkt. 33-1, at 2. This Court has likewise found such care safe, effective, and medically necessary for some

---

[6] None of the parties cited or discussed *Pickup*, either in the briefing or during argument.

adolescents. And, more broadly, it doesn't make sense to allow a state to "simply deem a treatment harmful to children without support in reality and thereby deprive parents of the right to make medical decisions on their children's behalf. Allowing the state to do so is tantamount to saying there is no fundamental right." *L.W.,* 83 F.4th at 511 (White, J., dissenting) (citing *Pickup* and other cases in the context of acknowledging that a state may prohibit a parent from subjecting a child to "genuinely harmful treatment"). And while judges are of course "not scientists . . . neither may [Courts] abandon the field when government officials with experts in tow seek to infringe a constitutionally protected liberty. The whole point of strict scrutiny is to test the government's assertions . . . ." *Id.* (quoting *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) (statement of Gorsuch, J.)).

Returning, then, to *Parham* and *Wallis,* this Court easily concludes that the parent plaintiffs enjoy a fundamental right to seek a specific form of medical treatment for their children, which would include the gender-affirming medical care banned by HB 71. Most federal district courts confronting similar statutory bans have agreed,[7] though the two circuit courts that have weighed in thus far (the

---

[7] *See Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1144 (M.D. Ala. 2022) (finding that the right of parents to make decisions concerning the care, custody, and control of their (Continued)

Sixth and the Eleventh Circuits) do not. *See L.W. ex. rel. Williams v. Skrmetti*, 83

F.4th 460 (6th Cir. 2023); *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205

(11th Cir. 2023).[8] This Court finds the majority of the district court opinions

persuasive, and, by contrast, respectfully disagrees with the Sixth and Eleventh

Circuit's treatment of the issue. In this Court's view, the Sixth and Eleventh

Circuits framed the asserted fundamental right far too narrowly and then

incorrectly brushed *Parham* aside on the grounds that it was a procedural due

process case. *L.W.*, 83 F.4th at 476-77; *Eknes-Tucker*, 80 F.4th at 1222-23.

 The Sixth and Eleventh Circuit's framing of the fundamental right renders

the Fourteenth Amendment largely meaningless. If the right is narrowly defined as

---

children "encompassed . . . the more specific right to direct a child's medical care"), *vacated,* 80 F.4th 1205 (11th Cir. 2023); *Brandt v. Rutledge*, 551 F. Supp. 3d at 892–893 ("The Court finds that the Parent Plaintiffs have a fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary."), *aff'd* 47 F.4th 661 (8th Cir. 2022); *Doe v. Thornbury*, 2023 WL 4230481, at *6 (W.D. Ky. June 28, 2023) (finding that the parent plaintiffs enjoyed a due-process right to obtain established medical treatments to protect their children's health and wellbeing," distinguishing cases such as *Pickup,* "in which plaintiffs claimed a right to access treatment for themselves that was not already available or accepted); *L.W. ex rel Williams v. Skrmetti,* 2023 WL 4232308 (M.D. Tenn. June 28, 2023), *rev'd and remanded,* 83 F.4th 460 (6th Cir. 2023); *Doe v. Ladapo*, 2023 WL 3833848 (N.D. Fla. June 6, 2023) (finding that plaintiffs were substantially likely to succeed on the merits of their claim that Florida's ban violated parents' rights under the Due Process Clause). *But see Poe v. Drummond*, 2023 WL 6516449, at *11 (N.D. Okla. Oct. 5, 2023) (holding that the parent plaintiffs failed to establish a liberty interest because they did not provide any "historical antecedents demonstrating that a right to the Treatment Protocols is deeply rooted").

 [8] The Eighth Circuit affirmed a district court's preliminary injunction of a statute banning gender-affirming medical care but did not address the substantive due-process claim. *See **Brandt***, 47 F.4th at 672.

the right to seek a specific medical treatment, the entirety of modern medicine would fall outside of the scope of a parent's right to control their children's health care. That is so, because no such medical treatment could be shown to be deeply rooted in our nation's history and traditions. Circumscribing the right in this manner means there would be no constitutionally protected right for a parent to seek for their children, without state interference, a whole host of critical 20th and 21st Century medical innovations, e.g., noninvasive fetal heart monitoring, penicillin, insulin, organ transplants, the polio vaccine, corrective heart surgery, and mRNA-based vaccines for the COVID virus.

As for the Sixth and Eleventh Circuits' treatment of *Parham,* the Court agrees that *Parham is* a procedural due process case. But, as discussed, *Parham* also necessarily decided the contours of a parent's authority to make medical decisions for their children in the context of deciding the procedural question. *Accord L.W.*, 83 F.4th at 511 (White, J., dissenting) ("Clearly, … *Parham* was expounding the substantive due-process right of parents to direct their children's medical care, although the discussion was in the context of addressing the minor plaintiffs' procedural due-process claims.")

For all these reasons, the Court concludes that the parent plaintiffs have asserted a fundamental right and that HB 71 must therefore survive strict scrutiny. And given that HB 71 is unlikely to survive heightened scrutiny, it is also unlikely

to survive strict scrutiny. The parent plaintiffs have thus shown they are likely to succeed on the merits of their claim.

## B. Irreparable Harm

It is well established that the deprivation of constitutional rights "unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Hecox*, 79 F.4th at 1035–36. Therefore, because HB 71 is likely unconstitutional, "it follows inexorably" that plaintiffs have demonstrated irreparable harm. *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) Additionally, plaintiffs have submitted declarations stating that the gender-affirming medical care the minor plaintiffs are receiving has dramatically improved their condition and that eliminating access to those treatments would cause serious consequences, including severe psychological distress and, potentially, the need to regularly incur the expense of out-of-state travel or move out of state permanently. *See Poe Decs.*, Dkts. 32-2, 32-3; *Doe Decs.*, Dkts. 32-4, 32-5. Alternatively, if the plaintiffs do not move or travel out of state for care, they will be forced to stop the hormone therapy they are currently receiving and which has helped them so dramatically. And, more generally, the record reflects that medical treatments banned by HB 71 can be a crucial part of treatment for adolescents with gender dysphoria, and necessary to preserve their health.

The Court is not persuaded by the State's arguments to the contrary. In essence, the State is arguing that the minor plaintiffs and others who receive gender-affirming medical care will be harmed if the law does *not* take effect. In that regard, after arguing that plaintiffs failed to show that the benefits of these treatments outweighs the harms, the State points out that "the *entire point* of HB 71 is to *prevent* irreparable harm to children and adolescents from these specific interventions." *Def.s' Resp.*, Dkt. 65, at 27; *see also id.* at 28 (arguing that "[i]f HB 71 is enjoined, untold numbers of children in Idaho will face lasting harm and irreversible damage to their bodies."). But as explained above, the Court has found that the evidence shows the opposite.

## C. Balance of Equities & Public Interest

"When the government is a party to a lawsuit, the balance of the equities and public interest prongs of the preliminary injunction test merge, because government actions presumably are in the public interest." *Hecox*, 79 F.4th at 1036. Here, because plaintiffs have shown a likelihood that a state law violates the Constitution, they have also established that both the public interest and the balance of equities favors a preliminary injunction, as both factors favor "prevent[ing] the violation of a party's constitutional rights." *Id. (*citing *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

## D. Scope of the Injunction

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assist. Project*, 582 U.S. 571, 579 (2017). In the absence of class certification, injunctive relief generally should be limited to the named plaintiffs. *See Zepeda v. INS*, 753 F.2d 719, 727-28 (9th Cir. 1983). Still, though, the Ninth Circuit has held that "an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987). In *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996), for example, the Ninth Circuit affirmed a statewide injunction prohibiting enforcement of California's motorcycle helmet law, even though there were just 14 plaintiffs.

Defendants say the injunction should be limited to the named plaintiffs, as plaintiffs cannot satisfy the "no set of circumstances" test of *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which HB 71 would be valid."). Plaintiffs do not engage with this argument, other than to say that a

statewide injunction is necessary to afford them complete relief.

The Court finds that a statewide injunction is appropriate here for three reasons. *First*, all plaintiffs in this case are proceeding under pseudonyms, and it would be administratively burdensome, if even possible, to fashion an injunction that would allow them to secure relief without compromising their anonymity. The Court is particularly mindful of the privacy interests here, as two plaintiffs are minors. *Second*, the Ninth Circuit has upheld statewide injunctions in similar cases. In *Hecox v. Little,* 79 F.4th 1009 (9th Cir. 2023), for example, the court upheld the district court's grant of a state-wide injunction of an Idaho law even though the district court had dismissed plaintiff's facial Fourteenth Amendment challenge. *Id.* at 1036-37 (citing *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (holding that a challenge to a category of applications of a statute may be characterized as an as-applied challenge)). *Third*, if the Court were to issue a plaintiffs-only injunction, it would likely face a number of follow-on lawsuits by similarly situated plaintiffs, which would create needless and repetitive litigation. *Accord Koe v. Noggle*, No. 1:23-CV-2904-SEG, 2023 WL 5339281, at *30 (N.D. Ga. Aug. 20, 2023).

## E. Bond Requirement

Plaintiffs ask the Court to waive the bond requirement under Federal Rule of Civil Procedure 65(c), and defendants do not oppose that request. The Court will therefore waive the requirement, finding that a bond under Rule 65 is unnecessary.

# V
# ORDER

**IT IS ORDERED that:**

1.  Prosecutor Bennetts' Motion to Dismiss (Dkt. 51) is **DENIED**.

2.  Attorney General Labrador and the Idaho Code Commission Members' Motion to Dismiss (Dkt. 57) is **GRANTED in part and DENIED in part** as follows: The motion is **GRANTED** as to the Idaho Code Commission defendants and **DENIED** as to Defendant Attorney General Labrador.

3.  Plaintiffs' Motion for a Preliminary Injunction (Dkt. 32) is **GRANTED**. Accordingly, Defendants Attorney General Labrador and Ada County Prosecutor Bennetts and their successors in office are enjoined from enforcing any provision of House Bill 71 during the pendency of this litigation.

DATED: December 26, 2023

B. Lynn Winmill
United States District Judge

RAÚL R. LABRADOR
ATTORNEY GENERAL

JOSHUA N. TURNER, ISB #12193
Acting Solicitor General

JAMES E. M. CRAIG, ISB #6365
Chief, Civil Litigation and
Constitutional Defense
RAFAEL J. DROZ, ISB #9934
Deputy Attorney General
Office of the Attorney General
P. O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
josh.turner@ag.idaho.gov
james.craig@ag.idaho.gov
rafael.droz@ag.idaho.gov

*Attorneys for Defendant Raúl Labrador*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PAM POE, by and through her parents and next friends, Penny and Peter Poe, et al.<br><br>*Plaintiffs,*<br><br>v.<br><br>RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho, et al.<br><br>*Defendants.* | Case No. 1:23-cv-00269-BLW<br><br>**EMERGENCY MOTION TO STAY INJUNCTION PENDING APPEAL** |

Defendant Raúl Labrador hereby moves the Court to stay the preliminary injunction previously entered by it on December 26, 2023. *See* Dkt. 78; *see also* F.R.C.P. 62(d); Fed. R. App. P. 8(a)(1). This motion is supported by the memorandum in support of the motion, filed herewith.

DATED:  January 3, 2024.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By:   /s/ *James E. M. Craig*
JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense
JOSHUA N. TURNER
Acting Solicitor General
RAFAEL J. DROZ
Deputy Attorney General

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 3, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which caused the same to be served by electronic service upon all counsel of record.

 /s/ *James E. M. Craig*
JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense

RAÚL R. LABRADOR
ATTORNEY GENERAL

JOSHUA N. TURNER, ISB #12193
Acting Solicitor General

JAMES E. M. CRAIG, ISB #6365
Chief, Civil Litigation and
Constitutional Defense
RAFAEL J. DROZ, ISB #9934
Deputy Attorney General
Office of the Attorney General
P. O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
josh.turner@ag.idaho.gov
james.craig@ag.idaho.gov
rafael.droz@ag.idaho.gov

*Attorneys for Defendant Raúl Labrador*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PAM POE, by and through her parents and next friends, Penny and Peter Poe, et al.<br><br>*Plaintiffs,*<br><br>v.<br><br>RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho, et al.<br><br>*Defendants.* | Case No. 1:23-cv-00269-BLW<br><br>**NOTICE OF APPEAL**<br><br>**PRELIMINARY INJUNCTION APPEAL**<br><br>**ELEVENTH AMENDMENT IMMUNITY APPEAL** |

NOTICE OF APPEAL — 1

Defendant Raúl Labrador, in his official capacity as Attorney General for the State of Idaho, hereby appeals to the Ninth Circuit Court of Appeals the district court's December 26, 2023 Memorandum Decision and Order [Dkt. 78], granting Plaintiffs' Motion for a Preliminary Injunction.  Attorney General Labrador further appeals the district court's decision [Dkt. 78] denying Attorney General Labrador's Motion to Dismiss, which motion argued that he is immune from suit under the Eleventh Amendment. *See* 28 U.S.C § 1292(a)(1); *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993) ("We hold that States and state entities that claim to be 'arms of the State' may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity.").

### FORM 1 INFORMATION

- Date case was first filed in U.S. District Court: May 31, 2023

- Date of judgment or order being appealed: December 26, 2023.

- Docket entry number of judgment or order appealed from: 78 (Memorandum Decision and Order).

- Docketing fee of $605 paid to the U.S. District Court for the District of Idaho.

- Appellant: Defendant Raúl Labrador.

- This is not a cross-appeal.

NOTICE OF APPEAL — 2

- A representation statement follows on the next page.

DATED:  January 3, 2024.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By:   /s/ *James E. M. Craig*
        JAMES E. M. CRAIG
        Chief, Civil Litigation and
        Constitutional Defense
        JOSHUA N. TURNER
        Acting Solicitor General

NOTICE OF APPEAL — 3

REPRESENTATION STATEMENT

I.    Counsel for Appellant

JOSHUA N. TURNER
Acting Solicitor General
josh.turner@ag.idaho.gov

JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense
james.craig@ag.idaho.gov

Idaho Office of the Attorney General
P.O. Box 83720
Boise, ID 83720-0010

II.   Counsel for Appellees

LI NOWLIN-SOHL
lnowlin-sohl@aclu.org
LESLIE COOPER
lcooper@aclu.org
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004

RICHARD EPPINK
ritchie@wrest.coop
CASEY PARSONS
casey@wrest.coop
DAVID A. DEROIN
david@wrest.coop
Wrest Collective
812 W. Franklin St.
Boise, ID 83702

NOTICE OF APPEAL — 4

BRAD S. KARP
bkar@paulweiss.com
ALEXIA D. KORBERG
akorberg@paulweiss.com
JACKSON YATES
jyates@paulweiss.com
DANA L. KENNEDY
dkennedy@paulweiss.com
Paul, Wiess, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

ERIC ALAN STONE
eric.stone@groombridgewu.com
ARIELLA C. BAREL
ariella.barel@groombridgewu.com
KYLE BERSANI
kyle.bersani@groombridgewu.com
Groombridge, Wu, Baughman and Stone LLP
565 5th Avenue, Suite 2900
New York, NY 10017

PHILIP S. MAY
philip.may@groombridgewu.com
Groombridge, Wu, Baughman and Stone LLP
801 17th St. NW, Suite 1050
Washington, DC 20006

JORDAN OROSZ
jorosz@paulweiss.com
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K Street, NW
Washington, DC 20006-1047

DINA FLORES-BREWER
dfloresbrrewer@acluidaho.org
ACLU of Idaho Foundation
P.O. Box 1897
Boise, ID 83701

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 3, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which caused the same to be served by electronic service upon all counsel of record.

        /s/ *James E. M. Craig*
        JAMES E. M. CRAIG
        Chief, Civil Litigation and
        Constitutional Defense

(75 of 224), Page 75 of 224 Case: 24-142 01/18/2024 DktEntry: 14.3 Page 75 of 224
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 1 of 374
Dr. Kara Connelly August 28, 2023

```
 1                UNITED STATES DISTRICT COURT
 2                   DISTRICT OF IDAHO
 3
 4    PAM POE, by and through her   )  Case No.
      parents and next friends,     )  1:23-cv-00269-CWD
 5    Penny and Peter Poe; PENNY    )
      POE; PETER POE; JANE DOE, by  )
 6    and through her parents and   )
      next friends, Joan and John   )
 7    Doe; JOAN DOE; JOHN DOE,      )
                                    )
 8                      Plaintiffs, )
                                    )
 9    v.                            )
                                    )
10    RAÚL LABRADOR, in his         )
      official capacity as the      )
11    Attorney General of the State )
      of Idaho; JAN M. BENNETTS, in )
12    her official capacity as      )
      County Prosecuting Attorney   )
13    for Ada, Idaho; and the       )
      INDIVIDUAL MEMBERS OF THE     )
14    IDAHO CODE COMMISSION, in     )
      their official capacities,    )
15                                  )
                      Defendants.   )
16    _____ )
17
18
19      REMOTE VIDEOTAPED DEPOSITION OF KARA CONNELLY, M.D.
20                 MONDAY, AUGUST 28, 2023
21
22                              EXHIBIT
23                                 A
24
25    Reported By: Amy E. Simmons, CSR, RDR, CRR, CRC

                                            Page 1
```

(76 of 224), Page 76 of 224 Case: 24-142 01/18/2024 DktEntry: 14.3 Page 76 of 224
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 2 of 374
Dr. Kara Connelly August 28, 2023

```
 1        REMOTE VIDEOTAPED DEPOSITION OF KARA CONNELLY, M.D.

 2

 3        BE IT REMEMBERED that the remote videotaped

 4   deposition of KARA CONNELLY, M.D., was taken via Zoom

 5   videoconference by the attorney for the Defendants before

 6   Associated Reporting & Video, a Veritext company, Amy E.

 7   Simmons, Idaho CSR No. 685, California CSR No. 14553,

 8   Washington CSR No. 22012915, Oregon CSR No. 22-009, and

 9   Notary Public in and for the County of Ada, State of

10   Idaho, on Monday, the 28th day of August, 2023,

11   commencing at the hour of 10:08 a.m. Mountain time in the

12   above-entitled matter.

13

14

15   APPEARANCES (remotely):

16   For the Plaintiffs:    AMERICAN CIVIL LIBERTIES UNION
                            By:  Li Nowlin-Sohl, Esq.

17                               Leslie Cooper, Esq.
                            125 Broad Street

18                          New York, NY 10004
                            Telephone:  212.549.2584

19                          lnowlin-sohl@aclu.org
                            lcooper@aclu.org

20

21                          GROOMBRIDGE WU BAUGHMAN & STONE
                            By:  Philip S. May, Esq.

22                          801 17th Street, Suite 1050
                            Washington, D.C. 20006

23                          Telephone:  202.539.6620
                            philip.may@groombridgewu.com

24

25

                                                  Page  2
```

Dr. Kara Connelly August 28, 2023

```
 1    APPEARANCES (remotely, continued):
 2
      For the Plaintiffs:    PAUL WEISS RIFKIND,
 3                           WHARTON & GARRISON LLP
                             By:  Dana L. Kennedy, Esq.
 4                           1285 Avenue of the Americas
                             New York, NY 10019
 5                           Telephone:  212.373.3000
                             dkennedy@paulweiss.com
 6
                             WREST COOPERATIVE
 7                           By:  Casey Parsons, Esq.
                             812 West Franklin Street
 8                           Boise, ID 83702
                             Telephone:  208.742.6789
 9                           casey@wrest.coop
10
      For the Defendants, Labrador and the Individual Members
11    of the Idaho Code Commission:
12                           COOPER & KIRK PLLC
                             By:  John Ramer, Esq.
13                           1523 New Hampshire Ave NW
                             Washington, D.C. 20036
14                           Telephone: 202.220.9621
                             jramer@cooperkirk.com
15
                             OFFICE OF THE ATTORNEY GENERAL
16                           By:  Lincoln D. Wilson, Esq.
                                  Rafael J. Droz, Esq.
17                                Aaron Green, Esq.
                             Post Office Box 83720
18                           Boise, ID  83720
                             Telephone:  208.334.2400
19                           Facsimile:  208.854.8073
                             lincoln.wilson@ag.idaho.gov
20                           rafael.droz@ag.idaho.gov
21
22
23
24
25
                                                     Page  3
```

Dr. Kara Connelly August 28, 2023

```
 1    APPEARANCES (remotely, continued):

 2

      For the Defendant, Jan M. Bennetts:

 3

                           ADA COUNTY PROSECUTOR'S OFFICE
 4                         By:  Dayton P. Reed, Esq.
                           200 West Front Street, Room 3191
 5                         Boise, ID 83702
                           Telephone:  208.287.7700
 6                         dreed@adacounty.id.org

 7

      Also Present:        Chris Ennis, Videographer
 8                         Jocelyn Larsson,
                           Court Reporting Intern

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                         Page  4
```

Dr. Kara Connelly August 28, 2023

```
 1              I N D E X
 2            E X A M I N A T I O N
 3
 4   KARA CONNELLY, M.D.                           PAGE
 5
      By:  Mr. Ramer......................................9
 6
          Ms. Nowlin-Sohl..............................287
 7
 8
 9              E X H I B I T S
10   NO.                                           PAGE
11    Exhibit 1.     Curriculum Vitae, Kara Jean      14
                     Connelly, MD, MCR (15 pages)
12
      Exhibit 2.     Expert Declaration of Kara       17
13                   Connelly, MD (24 pages)
14    Exhibit 3.     "A New Virtual Reality: Benefits  41
                     and Barriers to Providing Pediatric
15                   Gender-Affirming Health Care
                     Through Telehealth," Hedrick
16                   (6 pages)
17    Exhibit 4.     Users' Guides to the Medical     120
                     Literature, Guyatt (545 pages)
18
      Exhibit 5.     "Grade Guidelines: 3. Rating the 130
19                   Quality of Evidence," Balshem
                     (6 pages)
20
      Exhibit 6.     "Grade Guidelines: 4. Rating the 134
21                   Quality of Evidence -- Study
                     Limitations (Risk of Bias)," Guyatt
22                   (9 pages)
23    Exhibit 7.     "Endocrine Treatment of          139
                     Gender-Dysphoric/Gender-Incongruent
24                   Persons: An Endocrine Society
                     Clinical Practice Guideline,"
25                   Hembree (35 pages)


                                             Page 5
```

(80 of 224), Page 80 of 224 Case: 24-142 01/18/2024 DktEntry: 14.3 Page 80 of 224
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 6 of 374
Dr. Kara Connelly August 28, 2023

```
 1               E X H I B I T S (continued)
 2     NO.                                                  PAGE
 3       Exhibit 8.    "Hormone Therapy, Mental Health,      149
                       and Quality of Life Among
 4                     Transgender People: A Systematic
                       Review," WPATH (16 pages)
 5
         Exhibit 9.    "Potential Suppression for           155
 6                     Transgender Youth and Risk of
                       Suicidal Ideation," Turban
 7                     (15 pages)
 8       Exhibit 10.   "Access to Gender-Affirming          155
                       Hormones During Adolescence and
 9                     Mental Health Outcomes Among
                       Transgender Adults," Turban
10                     (15 pages)
11       Exhibit 11.   The Report of the U.S. Transgender   156
                       Survey, 2015 (302 pages)
12
         Exhibit 12.   Pediatric Endocrine Society          164
13                     Position Statement (2 pages)
14       Exhibit 13.   "Changes in Anxiety and Depression   180
                       from Intake to First Follow-Up
15                     Among Transgender Youth in a
                       Pediatric Endocrinology Clinic,"
16                     Cantu (5 pages)
17       Exhibit 14.   Endocrine Society Webpage Printout   168
                       (2 pages)
18
         Exhibit 15.   "Growing Evidence and Remaining      204
19                     Questions in Adolescent Transgender
                       Care," de Vries (3 pages)
20
         Exhibit 16.   Consensus Parameter: Research        208
21                     Methodologies to Evaluate
                       Neurodevelopment Effects of
22                     Pubertal Suppression in Transgender
                       Youth," Chen (12 pages)
23
         Exhibit 17.   Sweden Summary, "Care of Children    224
24                     and Adolescents with Gender
                       Dysphoria" (6 pages)
25

                                                    Page 6
```

Dr. Kara Connelly August 28, 2023

```
 1                E X H I B I T S (continued)
 2    NO.                                              PAGE
 3     Exhibit 18.    Sweden Appendix 2 (2 pages)        230
 4     Exhibit 19.    "Independent Review of Gender      236
                      Identity Services for Children and
 5                    Young People: Interim Report," The
                      Cass Review, Dated February 2022
 6                    (112 pages)
 7     Exhibit 20.    "Evidence Review: Gonadotrophin    241
                      Releasing Hormone Analogues for
 8                    Children and Adolescents with
                      Gender Dysphoria," NICE (131 pages)
 9
       Exhibit 21.    "Evidence Review: Gender-Affirming 262
10                    Hormones for Children and
                      Adolescents with Gender Dysphoria,"
11                    NICE (156 pages)
12     Exhibit 22.    "Regret After Gender-Affirming     275
                      Surgery: A Multidisciplinary
13                    Approach to a Multifaceted Patient
                      Experience," Jedrzejewski (9 pages)
14
       Exhibit 23.    OpenPaymentsData.CMS.gov Printout
15                    (3 pages)
16
17
18
19
20
21
22
23
24
25
                                                   Page  7
```

Dr. Kara Connelly August 28, 2023

```
1                    P R O C E E D I N G S

2

3            THE VIDEOGRAPHER:  All right.  We are on

4    the record and we are recording.  Today's date is

5    August 28, 2023.  The time is 10:08 a.m. Mountain

6    time.

7            For the record, this is the videotaped

8    deposition of Dr. Kara Connelly.  It's taken by

9    the Defendants in the matter of Poe, et al., vs.

10   Labrador, et al.  It's Case No. 1:23-cv-00269-CWD.

11   It is in the United States District Court for the

12   District of Idaho.

13           The videotaped deposition is being held

14   remotely via Zoom videoconference.  The videotaped

15   deposition is being recorded by Chris Ennis and

16   reported by Amy E. Simmons of Associated Reporting

17   & Video, a Veritext Company.

18           And if counsel will please state their

19   appearances and any stipulations for the record.

20           MR. RAMER:  John Ramer on behalf of the

21   Idaho Attorney General's Office.

22           MS. NOWLIN-SOHL:  Li Nowlin-Sohl on

23   behalf of Plaintiffs.

24           MS. COOPER:  Leslie Cooper, Plaintiffs.

25           MR. MAY:  Philip May from the law firm of
```

Page 8

App.082

Dr. Kara Connelly August 28, 2023

```
 1    Groombridge Wu Baughman & Stone on behalf of the
 2    Plaintiffs.
 3              MR. WILSON:  Lincoln Wilson for the Idaho
 4    Attorney General's Office.
 5              MR. DROZ:  Rafael Droz, Idaho Attorney
 6    General's Office.
 7              MR. REED:  Dayton Reed, Ada County
 8    Prosecutor's Office.
 9              MX. PARSONS:  Casey Parsons from the
10    Wrest Collective for the Plaintiffs.
11              THE REPORTER:  I think we still need
12    Mr. Green and Ms. Kennedy.
13              MS. KENNEDY:  Dana Kennedy for Plaintiffs
14    from Paul Weiss.
15              MR. GREEN:  Aaron Green, Attorney
16    General's Office, Defendants.
17              THE VIDEOGRAPHER:  And if the court
18    reporter will please swear the witness.
19
20                         EXAMINATION
21    BY MR. RAMER:
22        Q.   All right.  Good morning, Dr. Connelly.
23    My name is John Ramer.  I'm representing the Idaho
24    Attorney General's Office in this case.
25              Have you ever been deposed before?
```

Page 9

Dr. Kara Connelly August 28, 2023

```
 1        A.    No.
 2        Q.    Okay.  So I'm sure counsel has covered
 3   much of this with you extensively, but I'll just
 4   cover some ground rules just to make sure we're
 5   all on the same page.
 6             Basically, as you almost certainly know,
 7   I'll ask you questions.  If you don't understand a
 8   question, please just ask for an explanation;
 9   otherwise I'll assume you understood it and are
10   answering the question I asked.
11             Our discussion is going to be
12   transcribed, as you likely know.  And so I'll need
13   you to respond verbally rather than shaking your
14   head yes or no.
15             And I will do my best not to interrupt
16   you, and I'd ask that you do your best not to
17   interrupt me just so the court reporter will be
18   able to record my questions and your answers and
19   we'll have a cleaner transcript.
20             Your counsel may object to a question
21   that I ask.  And unless your counsel instructs you
22   not to answer the question, you should go ahead
23   and provide an answer.
24             And then we can take breaks whenever you
25   want.  I kind of plan on every hour or so, and
```

Page 10

App.084

(85 of 224), Page 85 of 224 Case: 24-142, 01/18/2024, DktEntry: 14.3, Page 85 of 224
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 11 of 374
Dr. Kara Connelly August 28, 2023

```
 1    then I assume we'll take a little bit longer break
 2    for lunch.
 3            And one thing for Li, I'm East Coast, so
 4    just helping me keep track of West Coast lunchtime
 5    will be helpful.
 6            But the one thing is if you do want to
 7    take a break, just let me know.  My only request
 8    is that you would answer a question that's on the
 9    table and then we'll go and take the break.
10            Does that all make sense?
11       A.   Yes.
12       Q.   And besides counsel, is anyone in the
13    room with you?
14       A.   No.
15       Q.   And do you have any documents open in
16    front of you?
17       A.   No.
18       Q.   And what did you do to prepare for this
19    deposition?
20       A.   I met with the attorney team, and I did a
21    lot of reading of articles and documents online.
22       Q.   What kind of documents online did you
23    read?
24       A.   It was reviewing the standards of care,
25    clinical practice guidelines, other policy
```

Dr. Kara Connelly August 28, 2023

```
 1    statements.  And a lot of the articles that I
 2    reviewed were online.
 3         Q.   And did you speak with anyone other than
 4    counsel about your deposition?
 5         A.   No.
 6         Q.   Okay.  And, Dr. Connelly, do you consider
 7    yourself to be an expert?
 8         A.   Yes.
 9         Q.   And in what field or fields of study do
10    you consider yourself to be an expert?
11         A.   I consider myself an expert in pediatric
12    endocrinology.
13         Q.   And are you a psychiatrist?
14         A.   No.
15         Q.   Are you a psychologist?
16         A.   No.
17         Q.   I've got a series of these, just to warn
18    you.
19              Are you a neurologist?
20         A.   No.
21         Q.   Are you a surgeon?
22         A.   No.
23         Q.   Are you a social worker?
24         A.   No.
25         Q.   Are you a urologist?
```

Page 12

Dr. Kara Connelly August 28, 2023

```
1          A.    No.
2          Q.    Are you a gynecologist?
3          A.    No.
4          Q.    Are you a bioethicist?
5          A.    No.
6          Q.    Are you an expert in cognitive
7    development?
8          A.    I have experience in cognitive
9    development, but I don't really consider myself an
10   expert in that field.
11         Q.    And could you briefly describe your
12   current position?
13         A.    Yes.  I am an associate professor at
14   Oregon Health & Science University and a pediatric
15   endocrinologist at Doernbecher Children's
16   Hospital.
17         Q.    And could you just walk me through your
18   professional background at a high level of
19   generality since you received your MD?
20         A.    Yes.  I received my MD from the
21   University of Texas Health Science Center at San
22   Antonio in Texas and subsequently completed my
23   pediatric residency at OHSU Doernbecher Children's
24   Hospital.  And following that, completed my
25   fellowship in pediatric endocrinology at the same
```

Page 13

Dr. Kara Connelly August 28, 2023

```
1    institution.  And a few years after that completed
2    a master's in clinical research.
3         Q.   And are you board certified?
4         A.   Yes.
5         Q.   In what?
6         A.   In pediatric endocrinology.
7              MR. RAMER:  Okay.  I'm about to make my
8    first attempt at emailing an exhibit.
9              Okay.  I believe I have just sent what I
10   will describe as Connelly Exhibit 1.
11             Just let me know when you all have
12   received it.
13             THE REPORTER:  I've received it.
14             MS. NOWLIN-SOHL:  Still waiting on it.
15             All right.  We have it.
16             (Deposition Exhibit No. 1 was marked.)
17             MR. RAMER:  Great.
18        Q.   (BY MR. RAMER)  And, Dr. Connelly, does
19   this appear to be a copy of your CV?
20        A.   Yes.
21        Q.   And is it up-to-date?
22        A.   Yes.  Well, that version is up-to-date as
23   of April of this year.
24        Q.   Okay.  Are there any developments since
25   April that should be included on here?
```

Page 14

Dr. Kara Connelly August 28, 2023

1      A.    No significant developments.

2      Q.    On page 2 of the CV under

3   "Certification," it's about halfway down the page.

4          Do you see that?

5      A.    Yes.

6      Q.    It states that your certification for

7   general pediatrics expired in 2020; is that

8   correct?

9      A.    That's correct.

10     Q.    And why did you not renew it?

11     A.    It's not a requirement for my position to

12  be board certified in pediatrics or to continue

13  the board certification as long as I maintain

14  board certification in my specialty.

15     Q.    And then on page 4, for the top you list

16  pending funding from Nike for a transgender

17  athlete study.

18          Do you see that?

19     A.    Yes.

20     Q.    What is that?

21     A.    That is a multicenter study that is

22  currently in preparation.  It has not begun

23  recruiting participants.  And it is currently in

24  the process of obtaining IRB approval.

25     Q.    What's it going to study?

Page 15

Dr. Kara Connelly August 28, 2023

```
 1        A.    It's basically going to look at athletic
 2   performance of youth who identify as transgender
 3   compared to youth who identify as cisgender.
 4        Q.    And then on your CV on page 9, middle of
 5   the page, there's a section for "Service."
 6              Do you see that?
 7        A.    Yes.
 8        Q.    And it states you were a member of the
 9   Endocrine Society from 2011 to 2015; is that
10   right?
11        A.    Yes.
12        Q.    And why did you cease being a member?
13        A.    My membership in professional
14   organizations, I've had to basically select the
15   ones that I'm going to maintain and continue as an
16   active participant.  And that's been the Pediatric
17   Endocrine Society, the World Professional
18   Association for Transgender Health, the Oregon
19   Pediatric Society.  And then intermittently I've
20   been a member of the Endocrine Society, but it
21   hasn't been continuous.
22              MR. RAMER:  And I've just tried to send
23   what I'll call Connelly Exhibit 2.  And if you'll
24   just let me know when you receive it.
25              Maybe it just sent.
```

Page 16

Dr. Kara Connelly August 28, 2023

```
 1                MS. NOWLIN-SOHL:  Okay.  I've been
 2      hitting refresh and still don't have it.
 3                MR. RAMER:  I figure it takes a long time
 4      to get from the East Coast to the West Coast, but
 5      I don't think that's how it works.
 6                MS. NOWLIN-SOHL:  All right.
 7                (Deposition Exhibit No. 2 was marked.)
 8           Q.   (BY MR. RAMER)  Okay.  And, Dr. Connelly,
 9      does this appear to be the expert declaration that
10      you submitted in this case?
11           A.   Yes.
12           Q.   And how did you come to be involved in
13      this case?
14           A.   I was contacted by an attorney with the
15      ACLU and -- asking me if I would be willing to
16      participate.
17           Q.   And what were you asked to do?
18           A.   I was asked to be -- serve as an expert
19      witness.
20           Q.   And did you personally draft this
21      declaration?
22           A.   Yes.
23           Q.   And did anyone help you with the drafting
24      process?
25           A.   No.
```

Page 17

Dr. Kara Connelly August 28, 2023

1      Q.    Did you personally identify all the
2  studies that you cite in this declaration?
3      A.    Yes.
4      Q.    And did you speak with anyone other than
5  counsel about the contents of this declaration?
6      A.    I showed it to one of my colleagues that
7  I work with in my clinic to look at it for clarity
8  and grammar.  But all of the content was written
9  by me.
10     Q.    And who was that colleague?
11     A.    It was our clinic social worker.
12     Q.    And what's that colleague's name?
13     A.    Their name is Jess Guerrero.
14     Q.    Guerrero.  And, Dr. Connelly, I think you
15  said you are the medical director of the
16  Doernbecher Gender Clinic; is that right?
17     A.    Yes.
18     Q.    And you actually founded the clinic,
19  correct?
20     A.    Yes.
21     Q.    And we'll discuss in more detail later,
22  but at a high level of generality, could you
23  explain what the gender clinic does?
24     A.    Yes.  It's an interdisciplinary clinic
25  that provides holistic, comprehensive medical and

Page 18

Dr. Kara Connelly August 28, 2023

1   mental health care to gender-diverse youth from

2   childhood all the way through young adulthood.

3       Q.   And what led you to found the clinic?

4       A.   I began working with transgender and

5   gender-diverse youth during my training and

6   especially during my fellowship.

7            Our clinics had been -- in pediatric

8   endocrinology had been caring for transgender

9   youth for a number of years, and my mentors

10  trained me in providing gender-affirming care for

11  youth.

12           And as I began to develop an interest and

13  more of an expertise in the area, I realized that

14  we needed more resources and a more comprehensive

15  program, and, in particular, integrated behavioral

16  health.

17      Q.   And I think it's implied in the word

18  "youth," but does the clinic serve a particular

19  age group?

20      A.   Yes.  The clinic will see children of all

21  ages.  No medical interventions are provided prior

22  to puberty.

23           And then we'll continue to see

24  adolescents through late adolescence and in some

25  cases young adulthood until we're able to

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Dr. Kara Connelly August 28, 2023

```
 1    successfully transition their care to an adult
 2    provider.
 3         Q.   So is it fair to say 100 percent of your
 4    patients are below the age of 18?
 5         A.   Not 100 percent.  100 percent of new
 6    patients that establish care with us are under 18,
 7    but we continue to follow them into -- some of
 8    them into their early 20s if we have difficulty
 9    transitioning their care to an adult provider.
10         Q.   And then in your -- turning to your
11    declaration, I'd like to look at page 2,
12    paragraph 10, third sentence.
13              And you state that your clinic had 993
14    patients in 2022; is that right?
15         A.   That's correct.
16         Q.   And do you have more patients now than in
17    prior years?
18              MS. NOWLIN-SOHL:  Objection to form.
19              THE WITNESS:  Can you clarify what you
20    mean by "now"?
21         Q.   (BY MR. RAMER)  Okay.  Did you have more
22    patients in 2022 than you did in prior years?
23         A.   Yes.
24         Q.   All right.  How much would you estimate
25    your patient population has grown over the last
```

Page 20

Dr. Kara Connelly August 28, 2023

```
 1    five years?
 2         A.    Do you mean like a percentage growth?
 3         Q.    Sure.
 4         A.    Or a number of growth?
 5               So five years ago, 2017, I'd estimate
 6    that we saw about 500 patients.  I can't say for
 7    certain exactly how many patients.
 8         Q.    Yeah, that's fair.  An estimate of 500 is
 9    what you said; is that right?
10         A.    Yes.
11         Q.    And of the 993 patients that you
12    reference in paragraph 10, had all those patients
13    been diagnosed with gender dysphoria?
14         A.    Not all of them.
15         Q.    Okay.  What percentage of those patients
16    would you estimate were diagnosed with gender
17    dysphoria?
18         A.    I'd say at least 90 percent.
19         Q.    And at your clinic, do you have patients
20    who were diagnosed with gender dysphoria during
21    childhood?
22         A.    Yes.
23         Q.    And just to confirm we're on the same
24    page, what do you understand "childhood" to mean?
25         A.    I generally understand "childhood" to
```

                                          Page 21

Dr. Kara Connelly August 28, 2023

```
 1   mean prior to the onset of puberty, or prior to
 2   adolescence.
 3        Q.   And when you say "the onset of puberty,"
 4   do you equate that with Tanner Stage II?
 5        A.   Yeah.  Yes, I do.
 6        Q.   And do you have patients who were
 7   diagnosed after Tanner Stage II but before they
 8   turned 18?
 9        A.   Yes.
10        Q.   And if I called that period between
11   Tanner Stage II and 18 years old "adolescence,"
12   would you understand what I mean?
13        A.   Yes, generally.
14        Q.   And so you don't have any -- because of
15   the -- sorry, start again.
16             Because of the ages of your patients that
17   you treat, you don't have any who were diagnosed
18   with gender dysphoria after 18, correct?
19        A.   That is correct.
20        Q.   And of the patients in your clinic, which
21   diagnosis would you estimate is more common,
22   childhood or adolescence?
23        A.   In my clinic, adolescence is more common.
24        Q.   Can you estimate a percentage of patients
25   that were diagnosed in adolescence as opposed to
```

Page 22

Dr. Kara Connelly August 28, 2023

1    childhood?

2         A.    I'd estimate approximately two-thirds.

3         Q.    And of the -- of your patients, what

4    percentage would you estimate are natal females?

5              MS. NOWLIN-SOHL:  Objection to form.

6              THE WITNESS:  Can you please specify what

7    you mean by "natal females"?

8         Q.    (BY MR. RAMER)  I think you'd probably

9    describe it as "female assigned at birth."

10             For the purposes of our discussion today,

11   if I use the phrase "natal female," you can deem

12   it as female assigned at birth, and the same for

13   natal males.

14             Does that make sense?

15        A.    Yes.  Okay.

16        Q.    And so the question is, of your patients,

17   what percentage would you estimate are natal

18   females?

19             MS. NOWLIN-SOHL:  Same objection.

20             THE WITNESS:  In our clinic, I would

21   estimate also about two-thirds are patients who

22   were assigned female at birth.

23        Q.    (BY MR. RAMER)  And is the ratio the same

24   for patients who have been formally diagnosed with

25   gender dysphoria as for your patients as a total?

                                        Page 23

Dr. Kara Connelly August 28, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form.
 2              THE WITNESS:  Can you clarify that
 3    question?
 4         Q.  (BY MR. RAMER)  Yeah, it's a bad
 5    question.
 6              Basically am I correct -- you said about
 7    90 percent of your patients have been diagnosed
 8    with gender dysphoria; is that right?
 9         A.  Yes.
10         Q.  Okay.  And has that ratio -- sorry, going
11    back, you said about two-thirds you'd estimate
12    were natal females, correct?
13         A.  Correct.
14         Q.  Has that ratio been steady since you
15    opened the clinic?
16         A.  It has been steady.
17         Q.  And of your patient population, what
18    percentage would you estimate receive puberty
19    blockers?
20         A.  Of the total patient population, what
21    percentage received puberty blockers?
22         Q.  Yes.
23         A.  Regardless of sex assigned at birth?
24         Q.  Correct.  Just total percentage, what do
25    you estimate -- let me rephrase.
```

Page 24

Dr. Kara Connelly August 28, 2023

1          Of your total patient population, what
2     percentage would you estimate receive puberty
3     blockers?
4          A.   I would estimate approximately 20 to
5     25 percent.
6          Q.   And of your total patient population,
7     what percentage would you estimate receive
8     cross-sex hormones?
9          A.   I would estimate approximately 80 to
10    85 percent.
11         Q.   And of your total patient population,
12    what percentage would you estimate receive
13    surgical interventions?
14         A.   The -- it is very, very rare for our
15    patients to have surgeries under the age of 18, so
16    do you mean -- you mean also including those over
17    18?
18         Q.   No.  I think for purposes of this
19    question, just under 18 years old.
20         A.   What percentage receive surgery?
21         Q.   Correct.
22         A.   I'd estimate probably about 5 percent or
23    less.  And those are -- the overwhelming majority
24    are top surgery.
25         Q.   And could you clarify what you mean by

                                        Page 25

Dr. Kara Connelly August 28, 2023

```
 1    "top surgery"?
 2         A.    Mastectomy, or removal of the chest
 3    tissue.
 4         Q.    And that's a procedure that would take
 5    place -- sorry.
 6              That's a procedure that would be
 7    conducted on natal females, correct?
 8         A.    That is a procedure that would be
 9    conducted on individuals assigned female at birth.
10         Q.    Do you have neuro-diverse patients?
11         A.    Can you clarify what you mean by
12    "neurodiverse"?
13         Q.    Well, as a clinician, what's your
14    understanding of the term "neurodiverse"?
15         A.    Well, I think there are a lot of
16    different conditions that can be included in that
17    phrase.  Some people think of neurodiversity as
18    simply somebody who falls on the autism spectrum
19    disorder or carries a diagnosis of autism.  A lot
20    of other clinicians also include ADHD in that
21    category.
22              And so in my definition, I have the more
23    broad -- I use the more broad definition,
24    including individuals who have been diagnosed with
25    a condition such as autism spectrum disorder or
```

Page 26

| | |
|---|---|
| 1 | ADHD and carry that diagnosis. |
| 2 | Q.   Okay.  So if we view the term |
| 3 | "neurodiverse" to include autism spectrum disorder |
| 4 | and ADHD, do you have neurodiverse patients? |
| 5 | A.   Yes. |
| 6 | Q.   And what percentage of your total patient |
| 7 | population would you estimate is neurodiverse? |
| 8 | A.   I am not sure if I can give a very |
| 9 | accurate estimation. |
| 10 | Q.   Can you state whether it's less than |
| 11 | 25 percent? |
| 12 | A.   Yes. |
| 13 | Q.   Can you state whether it's less than |
| 14 | 10 percent? |
| 15 | A.   I was originally going to say less than |
| 16 | 15 percent, but again, I can't say with certainty. |
| 17 | Q.   And you mentioned autism spectrum |
| 18 | disorder. |
| 19 | Do you have patients who have autism |
| 20 | spectrum disorder? |
| 21 | A.   Yes. |
| 22 | Q.   And what percentage of your total patient |
| 23 | population would you estimate have autism spectrum |
| 24 | disorder? |
| 25 | A.   Again, that would be difficult for me to |

Page 27

Dr. Kara Connelly August 28, 2023

1    say with certainty, but with a formal diagnosis of

2    autism spectrum disorder, less than 5 percent.

3         Q.   So turning back to your declaration,

4    going to page 8, paragraph 28, I'm just going to

5    read that paragraph.  And my first question is

6    going to be if I read it correctly.

7              "Gender-affirming medical interventions

8    are not indicated for all individuals who present

9    for care.  Overall, about one-third of our patient

10   population continues to see our team for support

11   without accessing medical interventions."

12             Did I read that correctly?

13        A.   Yes.

14        Q.   So does this mean that two-thirds of your

15   patient population does access medical

16   interventions?

17        A.   Yes.

18        Q.   In the second sentence, when you say

19   "patients receive support without accessing

20   medical interventions," what kind of support are

21   you referencing?

22        A.   That can include mental health care and

23   support and connecting the patients and their

24   families with resources.

25        Q.   What kind of resources?

                                              Page 28

Dr. Kara Connelly August 28, 2023

1      A.   It can be support groups.  It can be also
2  connecting them with resources for certain pieces
3  of clothing that can be used to conceal secondary
4  sex characteristics that are not congruent with
5  the young person's gender identity but who are not
6  moving towards starting medical interventions.
7      Q.   And when you say clothing to conceal
8  secondary sex characteristics, what are you
9  referring to?
10     A.   Generally something called a chest
11  binder.
12     Q.   And what is a chest binder?
13     A.   There are various different kinds and
14  styles, but it's generally a piece of clothing
15  that is made out of compression fabric to give the
16  appearance of a flatter chest.
17     Q.   And so that would be something natal
18  females who have gender dysphoria would use; is
19  that right?
20     A.   If someone is generally -- most of the
21  time someone assigned female at birth who has
22  chest tissue, but it can be used in other
23  populations as well.  I know cisgender boys who
24  have more chest tissue than they desire who also
25  use similar devices.

Page 29

Dr. Kara Connelly August 28, 2023

1      Q.    Are those patients in your clinic?

2      A.    No, not in my gender clinic.

3      Q.    And you know -- sorry, I just want to

4  understand.

5            So you know -- what I call natal males

6  you would call males assigned at birth that wear

7  chest binders?

8      A.    There are some patients who have a

9  condition called gynecomastia, which is the

10  presence of breast tissue in someone who was

11  assigned male at birth.  And in some cases, they

12  do pursue clothing to give the appearance of or

13  compression clothing such as binder-type clothing

14  items to give the appearance of a flatter chest.

15     Q.    And you had mentioned mental health care.

16  What does that entail at your clinic?

17     A.    We have a pediatric psychiatrist who is

18  part of our program and a pediatric social worker,

19  both of whom are trained and experienced in

20  working with pediatric and young adult patients

21  and providing mental health.

22            So the mental health care that we provide

23  is -- encompasses comprehensive, psychological

24  evaluations, psychosocial assessments, assessment

25  of suicidal risk.  It's provision -- in some cases

Page 30

1    provision of ongoing therapy.  And it's

2    essentially providing any psychosocial support

3    that's needed throughout the time that they're

4    receiving care in our clinic.

5        Q.   And so are there individuals who are

6    diagnosed with gender dysphoria who receive only

7    mental health care at your clinic?

8        A.   Yes.

9        Q.   And what is the purpose of that mental

10   health care?

11       A.   In a lot of cases, it's helping them to

12   explore what their -- explore their gender

13   expression and whether medical interventions are

14   going to be beneficial for them in helping them to

15   decide which -- in some cases which medical

16   interventions.  So if medical interventions would

17   be beneficial, and, if so, which medical

18   interventions.  And then helping them understand

19   or develop realistic expectations for what those

20   interventions can provide.

21       Q.   What is a situation where medical

22   interventions would not be beneficial?

23       A.   It may be in a situation where either --

24   if an individual has received the diagnosis of

25   gender dysphoria but may not meet all the criteria

Page 31

Dr. Kara Connelly August 28, 2023

1    for initiation of medical interventions as
2    described by the clinical practice guidelines that
3    we follow, or if the individual doesn't appear to
4    have realistic expectations about what the medical
5    interventions can and can't do, those are
6    situations where we might -- our mental health
7    providers might be working with the youth more
8    extensively to help them in determining whether
9    medical interventions would be beneficial for
10   them.
11        Q.   And what did you mean when you were
12   discussing how patients may not have realistic
13   expectations of medical interventions?
14        A.   In some cases, patients may think that,
15   for example, hormones will pause certain body
16   changes that hormones can't do.  So one of our
17   roles is to help them understand what different
18   medical interventions realistically can do so that
19   they can better understand what to expect if they
20   are to move forward with medical interventions.
21        Q.   Can you provide an example of a situation
22   where a patient had an unrealistic expectation of
23   how hormones would have an effect?
24        A.   Yes.  I can give several examples.
25             In one -- in the case of pubertal

Page 32

Dr. Kara Connelly August 28, 2023

```
 1  suppression for individuals assigned male at
 2  birth, I have seen -- I have had patients who have
 3  thought that if they have already started going
 4  through their endogenous puberty and experiencing
 5  deepening of the voice from endogenous
 6  testosterone, they have thought that puberty
 7  blockers alone could raise the pitch of the voice.
 8       Q.   And I think -- did you say you had
 9  several examples?
10       A.   Another example similar to individuals
11  assigned male at birth who've undergone some of
12  the pubertal changes related to endogenous
13  testosterone such as deepening of the voice
14  thinking that estrogen could raise the pitch of
15  the voice.
16       Q.   Do you have any that aren't related to
17  voice pitch?
18       A.   There are some youth assigned female at
19  birth who may have expectations around specific
20  body shape changes that -- and hopes of body shape
21  changes that testosterone may not be able to
22  pause.
23       Q.   What kind of body shape changes?
24       A.   It can be just changes in the shape of
25  the hips, for example.
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Dr. Kara Connelly August 28, 2023

1      Q.   And what you're saying is the patients

2   think it will have that effect, but it actually

3   does not?  Is that what you're saying?

4      A.   In what -- the patients may have specific

5   thoughts about what testosterone can cause in

6   terms of how their body shape may change that is

7   not always realistic.  So we spend a great deal of

8   time helping them understand that.

9      Q.   When a patient is diagnosed with gender

10  dysphoria, in your professional opinion, should

11  providers discuss nonmedical options for gender

12  affirmation with as much emphasis as medical

13  options?

14           MS. NOWLIN-SOHL:  Objection to form.

15           THE WITNESS:  In my professional opinion,

16  I believe that nonmedical options should be

17  discussed as well as medical options.

18      Q.   (BY MR. RAMER)  And so do you agree that

19  providers should place equal value on nonmedical

20  options and medical options?

21           MS. NOWLIN-SOHL:  Objection to form.

22           THE WITNESS:  And can you specify what

23  you mean by "nonmedical options" in this case?

24      Q.   (BY MR. RAMER)  I guess if somebody asked

25  you, "What are nonmedical options for treating

Page 34

1    gender dysphoria?" how would you respond?

2        A.   It depends on -- so there are

3    some -- well, I guess as I described before,

4    things like chest binders and the use of an

5    affirmed name and pronouns and essentially

6    different ways of affirming a young person's

7    gender identity that doesn't involve prescribing

8    medications or taking medications is how I

9    describe medical options.

10       Q.   Do you think mental health therapy --

11   excuse me.

12            Do you think mental health care is a

13   medical intervention?

14            MS. NOWLIN-SOHL:  Objection to form.

15            THE WITNESS:  I don't generally think of

16   mental health care as a medical treatment.

17       Q.   (BY MR. RAMER)  So let's take that, that

18   nonmedical interventions include the items you

19   listed, which is it fair to broadly describe those

20   as social transition?  Sorry, let me rephrase.

21            The items you listed about pronouns and

22   clothing, is it fair to describe that as broadly

23   understood as social transitioning?

24            MS. NOWLIN-SOHL:  Objection.

25            THE WITNESS:  I think that some people

Page 35

Dr. Kara Connelly August 28, 2023

1   use that term, but not always.

2        Q.   (BY MR. RAMER)  Okay.  Well, let me come

3   at it another way.

4             Let's say medical interventions.  Assume

5   for the purposes of my question that medical

6   interventions include the use of puberty blockers

7   and cross-sex hormones.

8             Do you agree that the provider should

9   place equal value on nonmedical interventions and

10  medical interventions?

11            MS. NOWLIN-SOHL:  Objection to form.

12            THE WITNESS:  And for nonmedical

13  interventions, are you including mental health

14  care or the nonmedical interventions that I

15  described earlier?

16       Q.   (BY MR. RAMER)  For purposes of my

17  question, let's include both the nonmedical

18  interventions you described and mental health care

19  under the category of nonmedical interventions.

20            And in the category of medical

21  interventions, we're including puberty blockers

22  and cross-sex hormones.

23            And my question is this:  Do you agree

24  that a provider should place equal value on

25  nonmedical interventions and medical

Page 36

1    interventions?

2             MS. NOWLIN-SOHL:  Objection to form.

3             THE WITNESS:  Well, the care that we

4    provide, and I believe should be provided, is

5    individualized.

6             And mental health care is always a

7    component of the care provided for the diagnosis

8    of gender dysphoria.  But what that looks like is

9    different for different individuals.

10            And the medical and nonmedical

11   interventions we discuss with every single

12   patient.  But I can't -- it's hard for me to say

13   that one is emphasized more or equally than

14   another.  It's just that we always discuss -- so

15   every patient that we see in our program receives

16   mental health care and discussion of medical and

17   nonmedical options.

18            And just to clarify, when I think about

19   medical options, medical options include more than

20   just puberty blockers and cross-sex hormones.

21       Q.   (BY MR. RAMER)  Understood.  And when I

22   asked the question, I was creating the

23   hypothetical.  So I did not intend to suggest that

24   that's what you thought that that included.

25            And just to confirm I understand your

Page 37

```
 1    answer, you are unable to say whether a provider
 2    should place equal value on nonmedical
 3    interventions and medical interventions; is that
 4    correct?
 5              MS. NOWLIN-SOHL:  Objection;
 6    mischaracterizes testimony.
 7              THE WITNESS:  I can say that medical
 8    interventions and nonmedical interventions should
 9    be discussed with every patient.
10       Q.   (BY MR. RAMER)  And are you able to say
11    that the provider should place equal value on
12    nonmedical interventions and medical
13    interventions?
14              MS. NOWLIN-SOHL:  Objection to form;
15    asked and answered.
16              THE WITNESS:  I think that all I can say
17    is that all interventions should be discussed and
18    that care is delivered in an individualized manner
19    according to who the patient is.
20       Q.   (BY MR. RAMER)  And so it's fair to say
21    that you cannot say as you sit here that the
22    provider should place equal value on medical
23    interventions and nonmedical interventions,
24    correct?
25              MS. NOWLIN-SOHL:  Objection to form;
```

Page 38

Dr. Kara Connelly August 28, 2023

1  mischaracterizes testimony; asked and answered.

2      Q.   (BY MR. RAMER)  You can answer the

3  question.  Sorry.  I didn't know if you were

4  thinking or --

5      A.   Oh, yeah.  I'm just thinking about how to

6  explain better.

7          All I can say is that all options should

8  be discussed, both medical and nonmedical.

9      Q.   We'll move on.

10         Could you describe the process at your

11  clinic when you -- start again.

12         Just at a high-level generality, could

13  you describe the process at your clinic when you

14  receive a new patient or referral?

15     A.   Yes.  Every new patient referral has a

16  dedicated phone intake with our clinic social

17  worker.  And the social worker during that time is

18  determining who the young person is and what

19  they're seeking.

20         Subsequently, some of our patients will

21  meet with our pediatric psychologist.

22         And then some of them will go on to have

23  the interdisciplinary -- what we call the team

24  visit that includes a medical provider and a

25  behavioral health provider in the same visit.

Page 39

Dr. Kara Connelly August 28, 2023

```
 1        Q.    And I think you were using the word
 2   "some."
 3              Does that mean that some do not progress
 4   to that phase?
 5        A.    That is correct.
 6        Q.    And you mentioned the phone intake call.
 7              What happens during that call?
 8        A.    During that call, the social worker is
 9   gaining an understanding of who the patient is and
10   who their family is, what they are -- what they
11   are looking for, what supports they need, what
12   supports they have already obtained, getting a
13   sense of what their school environment is like,
14   what their support system looks like, getting a
15   basic understanding of mental health, and then
16   connecting them with resources when necessary or
17   indicated and then discussing the options moving
18   forward if they want to continue with our program.
19        Q.    And you may have said this, but is
20   it -- did you say the social worker is the one who
21   conducts the intake phone call?  Is that right?
22        A.    That's correct.
23              MR. RAMER:  Okay.  Now I'm about to try
24   sending another exhibit that -- I will call this
25   Connelly Exhibit 3.
```

Page 40

Dr. Kara Connelly August 28, 2023

```
 1                  (Deposition Exhibit No. 3 was marked.)
 2                  MR. RAMER:  And just let me know when you
 3       receive it.
 4                  Still nothing?
 5                  MS. NOWLIN-SOHL:  Yeah, still nothing.
 6                  THE REPORTER:  I did receive it.
 7                  MS. NOWLIN-SOHL:  I think the Wi-Fi in
 8       this room is a little slow.  My phone just let me
 9       know that it's coming, but it hasn't showed up on
10       the computer yet.
11                  Okay.
12           Q.   (BY MR. RAMER)  And, Doctor, do you
13       recognize this document?
14                  MS. NOWLIN-SOHL:  Sorry.  The email is
15       here -- there's the PDF.  Okay.
16                  THE WITNESS:  Yes.
17           Q.   (BY MR. RAMER)  And are you an author of
18       this article?
19           A.    Yes.
20           Q.    And what is this article about, just as a
21       general matter?
22           A.    Generally this was looking at how we
23       continued to provide care in the beginning of the
24       COVID-19 pandemic using telehealth or virtual
25       visits.
```

Page 41

1    Q.   And I'd like to go to page 145, which I
2  believe is just the second page of the article.
3  And I want to look at the right column.  And below
4  in bold, there's "Materials and Methods."
5           And below that it says "Clinical model
6  and transition to telehealth."
7           And I just want to read the first
8  sentence, and my question will be if I read it
9  correctly.
10           "Since 2017, the DGC has provided
11  multidisciplinary care to TGD youth, including a
12  dedicated intake phone call and psychosocial
13  screening with social work before initiating care
14  with an endocrinologist in person at the clinic."
15           And did I read that correctly?
16      A.   Yes.
17      Q.   And is DGC the Doernbecher Gender Clinic?
18      A.   Yes.
19      Q.   And does TGD stand for transgender and
20  gender diverse?
21      A.   Yes.
22      Q.   And what is the psychosocial screening?
23      A.   That basically entails what I described
24  that the social worker does during the intake
25  phone call.

Page 42

1        Q.    What does it screen for?  I believe --
2    you may have mentioned this, but just to -- with
3    respect to -- let me start again.
4             With respect to mental health, does it
5    screen for anything?
6        A.    No formal screening or diagnoses are
7    made.
8        Q.    And how long does an intake call
9    typically take?
10       A.    About 45 minutes.
11       Q.    And what --
12       A.    Sometimes longer.
13       Q.    Sorry.  I didn't mean to cut you off.
14       A.    I'm sorry.  Sometimes longer.
15       Q.    And what is the end product from the
16   intake phone call?
17       A.    Can you specify what you mean by "the end
18   product"?
19       Q.    Yeah.  So when the social worker conducts
20   the intake phone call, does the social worker
21   write a report or send an email or fill out a form
22   as the end product for the call?
23       A.    The social worker just documents their
24   conversation in the patient's medical record.
25       Q.    So is the social worker making a

Page 43

(118 of 224), Page 118 of 224 Case: 24-142, 01/18/2024, DktEntry: 14.3, Page 118 of 224
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 44 of 374
Dr. Kara Connelly August 28, 2023

1    recommendation about anything?

2        A.   No.

3        Q.   I'd like to go back to your declaration

4    and specifically to page 9, paragraph 31 in the

5    first sentence.  And I'll read it and ask if I

6    read it correctly.

7            "In our clinic when adolescents present

8    for care, they often present with high degrees of

9    anxiety, depression, and suicidal ideation."

10           Did I read that correctly?

11       A.   Yes.

12       Q.   And so that anxiety, depression, and

13   suicidal ideation is not detected during the

14   psychosocial screening; is that right?

15           MS. NOWLIN-SOHL:  Objection to form.

16           THE WITNESS:  The patients may -- may

17   discuss diagnoses that they have received from

18   mental health providers outside of our clinic.  If

19   they have received a diagnosis of depression or

20   anxiety, then that is part of the intake is

21   getting that history.

22       Q.   (BY MR. RAMER)  Well, when you say

23   "intake" there, you mean part of the psychosocial

24   screening?

25       A.   Yes.  The psychosocial screening is what

Page 44

Dr. Kara Connelly August 28, 2023

```
 1    we generally call the intake, the psychosocial
 2    intake.
 3         Q.   Okay.  I understand.  I understand.
 4              And in the same paragraph in your
 5    declaration, in the third sentence -- I'll read it
 6    and ask if I read it correctly.
 7              It says "Most of these mental health and
 8    social challenges are linked to gender dysphoria
 9    and experiences of minority stress."
10              Did I read that correctly?
11         A.   Yes.
12         Q.   Are there ever mental health and social
13    challenges that are not linked to gender dysphoria
14    or experiences of minority stress?
15         A.   Yes.
16         Q.   And can you provide some examples of
17    that?
18         A.   Yes.  The patients may have mental health
19    diagnoses or stressors that are not linked to
20    gender dysphoria.
21         Q.   Does that include anxiety?
22         A.   That can include anxiety.  It can include
23    a variety of different mental health conditions.
24         Q.   And so a patient could be diagnosed with
25    gender dysphoria and have a separate mental health
```

Page 45

Dr. Kara Connelly August 28, 2023

```
 1    condition that is not linked to gender dysphoria;
 2    is that right?
 3         A.    That is possible.
 4         Q.    And if a patient has anxiety or
 5    depression that is not linked to gender dysphoria
 6    or minority stress, what does your clinic do?
 7         A.    Can you just help to clarify like what --
 8    what specifically you mean by what do we do?
 9         Q.    Fair.  If a patient has anxiety or
10    depression that is not linked to gender dysphoria
11    or minority stress, how does your clinic approach
12    that anxiety or depression and treat it?
13         A.    Yeah.  So again, every patient is -- the
14    care that's provided is individualized, so it
15    depends on the patient and the situation.
16         But generally our program will -- and it
17    depends on at what phase and who is working with
18    the patient at that given moment in time, but what
19    that can entail is understanding -- trying to gain
20    an understanding of where that might be coming
21    from or what it's related to and working with
22    outside therapists or mental health providers when
23    they're involved in the young person's care.
24         Q.    And if a patient has anxiety or
25    depression that is not linked to gender dysphoria
```

Page 46

```
 1   or minority stress, do you resolve those mental
 2   health issues before proceeding with medical
 3   interventions?
 4             MS. NOWLIN-SOHL:  Object to form.
 5             THE WITNESS:  We -- can you clarify what
 6   you mean by "resolve"?
 7        Q.   (BY MR. RAMER)  As a clinician, do you
 8   have an understanding of what it means to resolve
 9   a mental health issue?
10        A.   I'm not a -- I wouldn't consider myself a
11   mental health provider, and so I don't have a
12   great definition of it.
13             It would seem to me that "resolve" would
14   mean there are no symptoms of depression or
15   anxiety if something has resolved.
16             MR. RAMER:  We've been going for almost
17   an hour.  Do you want to take a break or keep
18   going?  Either way.
19             THE WITNESS:  I can take a break.
20             MR. RAMER:  Li, does that sound good?
21             MS. NOWLIN-SOHL:  Yeah, that's fine.
22             MR. RAMER:  Ten minutes?
23             MS. NOWLIN-SOHL:  Yeah.
24             MR. RAMER:  Okay.  So we'll be back
25   at -- well, we're about to hit 1:03 -- I'm sorry,
```

Page 47

```
 1    that's East Coast.  So we'll be back at 13 after
 2    the hour.
 3              MS. NOWLIN-SOHL:  Sounds good.
 4              MR. RAMER:  Okay.
 5              THE VIDEOGRAPHER:  Okay.  So the time is
 6    11:03 a.m. Mountain time, and we are off the
 7    record.
 8         (Break taken from 11:03 a.m. to 11:17 a.m.)
 9              THE VIDEOGRAPHER:  All right.  So we are
10    recording.  The time is 11:17 Mountain time, and
11    we are back on the record.
12        Q.   (BY MR. RAMER)  Okay.  Doctor, I just
13    wanted to start by asking you a hypothetical
14    question.
15              And the hypothetical is this:  If there
16    are two treatments for a condition and the
17    treatments are equally effective, all else being
18    equal, should the provider prefer the treatment
19    that carries fewer risks?
20              MS. NOWLIN-SOHL:  Object to form.
21              THE WITNESS:  That's a difficult
22    hypothetical to imagine.  I think in all
23    treatments, the risk -- potential risks and
24    benefits are weighed and discussed.
25        Q.   (BY MR. RAMER)  So why is it a difficult
```

Page 48

Dr. Kara Connelly August 28, 2023

```
 1    hypothetical to imagine?
 2         A.   Well, because the benefits are not
 3    included in that hypothetical.
 4         Q.   Well, I tried to ask it by saying the
 5    treatments were equally effective, but I can
 6    restate it with the word "benefits."
 7              And so the question is this:  If there
 8    are two treatments for a condition and their
 9    benefits are equal, all else being equal, should
10    the provider prefer the treatment that carries
11    fewer risks?
12              MS. NOWLIN-SOHL:  Object to form.
13              THE WITNESS:  I think it's also hard to
14    kind of characterize all risks as just a single.
15    I think risks are different in terms of what, I
16    guess -- yeah, risk category and what the risk is.
17    So it's difficult to put it all in one category.
18         Q.   (BY MR. RAMER)  What do you mean "it's
19    difficult to put it all in one category"?
20         A.   Well, risks that -- different risks can
21    carry different weight, so it's hard to say that
22    one thing carries more risks than another.  It
23    depends on what the risks are.
24         Q.   That's fair.  And for purposes of just
25    the hypothetical -- and it's a hypothetical for a
```

Page 49

(124 of 224), Page 124 of 224 Case: 24-142, 01/18/2024, DktEntry: 14.3, Page 124 of 224
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 50 of 374
Dr. Kara Connelly August 28, 2023

1  reason, just to understand the concept as opposed

2  to understand practice on the ground.

3          And so the hypothetical is just you have

4  two treatments.  The benefits are the same.  The

5  costs or risks, whichever word you prefer, are

6  greater with one than the other.

7          Should the provider prefer the treatment

8  that has fewer risks?

9          MS. NOWLIN-SOHL:  Object to form.

10          THE WITNESS:  Well, one of the ethical

11  principles that we follow as medical providers is

12  to do no harm.  And so we will always try to

13  pursue treatments that will not cause harm to the

14  patient.

15      Q.    (BY MR. RAMER)  Got it.  I just want to

16  go back to where we left off at the break.  And I

17  asked a question, and we kind of got hung up on

18  the word "resolve."  And so I want to ask the

19  question a different way.

20          So we were discussing situations where a

21  patient has anxiety or depression that is not

22  linked to gender dysphoria or minority stress.

23          Do you recall that discussion?

24      A.    Yes.

25      Q.    And my question is this:  When a patient

Page 50

1    has anxiety or depression that is not linked to

2    gender dysphoria or minority stress, do you

3    address those mental health issues before

4    proceeding with medical interventions?

5            MS. NOWLIN-SOHL:  Object to form.

6            THE WITNESS:  And can you specify what

7    you mean by "address"?

8        Q.   (BY MR. RAMER)  What would you understand

9    that term to mean as a clinician in this context?

10       A.   Well, I think it can mean several

11   different things.  It can mean treat or it can

12   mean acknowledge.  It can mean evaluate further.

13   It depends on the -- the way it's defined.

14       Q.   What do you think the term means when

15   it's used in the Endocrine Society guidelines?

16           MS. NOWLIN-SOHL:  Object to form.

17           THE WITNESS:  Can you specify where in

18   the guidelines?

19       Q.   (BY MR. RAMER)  Yeah, I'll go to -- just

20   in your declaration, go to page 6.  And I think

21   it's -- it's in paragraph 22, but at page 6,

22   there's a little C before the relevant passage.

23   And I'll just read it, and my first question will

24   be whether I read it correctly.

25           "Any coexisting psychological, medical,

Page 51

(126 of 224), Page 126 of 224 Case: 24-142 01/18/2024, DktEntry: 14.3, Page 126 of 224
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 52 of 374
Dr. Kara Connelly August 28, 2023

```
1    or social problems that could interfere with
2    treatment, e.g., that may compromise treatment
3    adherence, have been addressed such that the
4    adolescent's situation and functioning are stable
5    enough to start treatment."
6              Did I read that correctly?
7         A.   Yes.
8         Q.   And so what do you think the word
9    "addressed" means there?
10        A.   I -- in that context, I interpret it to
11   mean that the coexisting psychological, medical,
12   or social problems have been acknowledged and
13   evaluated to the extent that the mental health
14   provider can ascertain that they are not
15   inhibiting in the individual's ability to make
16   complex cognitive decisions about treatment
17   options.
18        Q.   And so you think -- just to confirm, you
19   think that this part of the Endocrine Society
20   guidelines goes to whether the adolescent can make
21   proper decisions; is that right?
22        A.   This part of the guidelines are
23   pertaining to any coexisting psychological,
24   medical, or social problems that could interfere
25   with their ability to make decisions.
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

(127 of 224), Page 127 of 224
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 53 of 374
Page 127 of 224

Dr. Kara Connelly August 28, 2023

1    Q.   And that's what you think this part of
2    the guidelines is saying is that you need to
3    address those conditions so that the
4    adolescent -- let me rephrase.
5         It's saying that you need to address
6    those conditions to ensure the adolescent can make
7    good decisions; is that right?
8         MS. NOWLIN-SOHL:  Object to the form.
9         THE WITNESS:  It's saying that if there
10   are any coexisting psychological, medical, or
11   social problems that could interfere with
12   treatment, that they have those -- have been
13   acknowledged and assessed and to ensure that they
14   are not interfering with the individual's ability
15   to make complex, cognitive decisions.
16   Q.   (BY MR. RAMER)  Are you familiar with the
17   term "diagnostic overshadowing"?
18   A.   Not really.
19   Q.   Okay.  When an individual reports -- at
20   your clinic, when an individual reports distress
21   resulting from gender incongruence, do employers
22   at your clinic explore other possible causes of
23   that distress?
24   A.   Can you specify which specific providers?
25   Q.   Any providers.

Page 53

Dr. Kara Connelly August 28, 2023

```
 1        A.    Our mental health providers, that's part
 2   of their psychological evaluation.
 3        Q.    And what do they do to explore those
 4   other possible causes of distress?
 5        A.    Well, I'm not the psychologist so I can't
 6   say for certain, but it's part of their -- it's
 7   part of their evaluation and the way that they can
 8   make those determinations.
 9        Q.    And what, if anything, do you change in
10   your protocol when dealing with a patient who has
11   autism spectrum disorder?
12             MS. NOWLIN-SOHL:  Object to form.
13             THE WITNESS:  Can you be more specific?
14        Q.    (BY MR. RAMER)  With respect to what?
15        A.    You said what do you change.  With
16   respect to what?  What did you mean by --
17        Q.    Sorry, yes.  Let me phrase it this way:
18   If a patient has autism spectrum disorder, is
19   their treatment exactly the same as any other
20   patient at your clinic?
21             MS. NOWLIN-SOHL:  Object to form.
22             THE WITNESS:  Well, every patient is
23   treated as an individual, so every patient
24   receives individualized care.  And so that can
25   look different from patient to patient.
```

Page 54

1         If a patient has the diagnosis of autism

2    spectrum disorder, the -- then the mental health

3    provider who is working with that patient or our

4    psychologist may contribute more information about

5    the patient and the care that they're seeking and

6    the way that they communicate and receive

7    communication and information.

8         So it can really vary from person to

9    person.

10        Q.   (BY MR. RAMER)  At your clinic, are

11   patients with autism spectrum disorder eligible to

12   receive puberty blockers?

13        A.   Are you asking if a patient has autism

14   spectrum disorder and meet the criteria -- and

15   have the diagnosis of gender dysphoria and meet

16   the criteria for treatment outlined in the

17   guidelines and standards of care, if care would be

18   considered for that patient?

19        Q.   I think I was with you up until the very

20   end of "care would be considered."

21        I think, yes, let's say everything else

22   is equal, but the patient has autism spectrum

23   disorder.

24        Are they able to receive puberty blockers

25   at your clinic?

Page 55

Dr. Kara Connelly August 28, 2023

```
1           MS. NOWLIN-SOHL:  Object to form.
2           THE WITNESS:  I can say that patients
3      would not be denied puberty blockers simply
4      because they have autism spectrum disorder.
5           Q.   (BY MR. RAMER)  And I'd like to return to
6      Exhibit 3, Connelly Exhibit 3.  And I'd like to go
7      back to page 145, right column again.
8                And it's actually going to be right below
9      the sentence we previously read in the "Materials
10     and Methods" section.  And I'm just going
11     to -- it's going to be the second full sentence.
12     And I'll read it, and my first question will be if
13     I've read it correctly.
14                "In October of 2019, the DGC transitioned
15     from a multidisciplinary clinic to a fully
16     interdisciplinary model in which every new patient
17     meets with endocrinology, psychology, and social
18     work simultaneously during their first medical
19     appointment to develop individualized patient and
20     family-centered treatment plans."
21                Did I read that correctly?
22          A.   Yes.
23          Q.   And is this generally what occurs at your
24     clinic?
25          A.   Yes.
```

Page 56

Dr. Kara Connelly August 28, 2023

1      Q.    And you refer to the first medical

2   appointment; is that right?

3      A.    Yes.

4      Q.    And could you describe what that first

5   medical appointment is like for a patient?

6      A.    Yes.  The first medical appointment --

7   well, prior to the start of the medical

8   appointment, the interdisciplinary team meets to

9   discuss what is already known about the patient

10  and family and the information that's been

11  obtained in the intake and any -- in the

12  psychological evaluation.

13          And then when the patient and family are

14  brought into the room, we gather medical history

15  about the patient and family and determine what

16  questions they have and then discuss different

17  treatment options depending on what they're

18  seeking.

19     Q.    And how long does a visit typically last?

20     A.    Average, an hour.

21     Q.    And back in Exhibit 3, the very next

22  sentence -- I'll read it and ask if I read it

23  correctly.

24          "For adolescent patients, these

25  appointments include dedicated time for the

Page 57

Dr. Kara Connelly August 28, 2023

1    patient to meet with the endocrinologist and
2    social worker alone while caregivers meet with
3    psychology for assessment of overall family
4    needs."
5            Did I read that correctly?
6       A.   Yes.
7       Q.   And why do adolescent patients have
8    dedicated time to meet with the endocrinologist
9    alone?
10      A.   Well, these are for adolescents.  And
11   generally as medical providers or as adolescent
12   medical providers, we always reserve part of the
13   appointment time to discuss topics that they may
14   want to discuss confidentially.
15           And again, that can look different from
16   person to person, patient to patient.
17      Q.   Is the information from this dedicated
18   meeting with the endocrinologist alone ultimately
19   shared with caregivers?
20      A.   It depends.
21      Q.   What does it depend on?
22      A.   It depends on basically what is in the
23   patient's best interest.
24      Q.   And so there's times where in your
25   judgment it's in the patient's best interest to

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Dr. Kara Connelly August 28, 2023

```
 1   not disclose something to a caregiver?
 2        A.   If we have concerns about how it may
 3   impact their safety, then yes.
 4        Q.   And what do you mean by that?
 5        A.   What do I mean by if it may impact their
 6   safety?
 7        Q.   Correct.  What do you mean by you're
 8   concerned about how it may impact their safety?
 9        A.   If disclosing information that was shared
10   with the medical provider confidentially may pose
11   a risk to the patient.
12        Q.   A risk of what?
13        A.   Of harm.  Of physical harm.
14        Q.   So you're referring to physical harm by
15   the caregiver on the patient; is that right?
16        A.   That's an example.
17        Q.   Have there been situations where you've
18   determined that disclosing confidential
19   information would put the patient at risk of harm
20   from a caregiver?
21        A.   It's rare, but yes, it has happened.
22        Q.   Do you call the police in that situation?
23        A.   It depends.
24        Q.   Have you ever?
25        A.   I have never called the police.
```

Page 59

Dr. Kara Connelly August 28, 2023

```
1        Q.    Has anyone -- to your knowledge, has
2   anyone at your clinic ever called the police in
3   that situation?
4        A.    No.
5        Q.    Okay.  So is it correct that the first
6   medical appointment results in I think what you
7   called a treatment plan?
8        A.    I don't believe that I used those words.
9        Q.    Okay.  I guess in -- so in Exhibit 3, the
10  second sentence we read, it refers at the very end
11  of the sentence to individualized patient and
12  family-centered treatment plans.
13            What is a treatment plan?
14        A.    That can be a variety of -- it can look
15  different from person to person, but basic
16  detailing any next steps, if any further tests
17  need to be done, medical tests, laboratory
18  evaluations, imaging pertaining to their medical
19  history or their family medical history, any other
20  information that they need that we will kind of
21  help to share with them.  So it really just is
22  kind of detailing next steps if indicated.
23        Q.    For any patients, does the treatment plan
24  from the first medical visit call for the
25  administration of puberty blockers?
```

Page 60

Dr. Kara Connelly August 28, 2023

```
1          A.    It's very rare, and -- it's very rare,
2     but it can.
3          Q.    For any patients, does the treatment plan
4     from the first medical visit call for the
5     administration of cross-sex hormones?
6          A.    It's also very rare, but it can.
7          Q.    How would you define "very rare" as
8     you're using it?
9          A.    I would say probably less than 2 percent
10    of the time.
11         Q.    So just so I understand what you're
12    saying, you're saying less than 2 percent of the
13    time a patient will begin puberty blockers or
14    cross-sex hormones after the first medical visit?
15              MS. NOWLIN-SOHL:  Objection;
16    mischaracterizes the testimony.
17              THE WITNESS:  What do you mean by
18    "after"?  Do you mean at the time of the first
19    visit or immediately after or later at some point?
20         Q.    (BY MR. RAMER)  Like, what was the
21    2 percent number you just gave?
22         A.    The 2 percent is if any treatments will
23    be initiated immediately after the first visit and
24    before the second visit.
25         Q.    Okay.  So you're saying -- I'm just
```

Page 61

(136 of 224), Page 136 of 224
Case 1:23-cv-00269-BLW    Document 56-1    Filed 09/05/23    Page 62 of 374
Dr. Kara Connelly August 28, 2023

1     trying to make sure I understand.

2          So you're saying only 2 percent of

3     patients will initiate puberty blockers or

4     cross-sex hormones before the second visit?

5     A.    Correct.

6     Q.    What medication does your clinic use -- I

7     guess that should be plural.

8          What medications does your clinic use for

9     cross-sex hormones?

10    A.    Testosterone and estradiol.

11    Q.    And is there a particular brand you use?

12    A.    No.

13    Q.    Do you recall what company produces those

14    drugs?

15    A.    No.

16    Q.    What medication does your clinic use for

17    puberty blockers?

18    A.    We use leuprolide acetate and histrelin

19    implants.

20    Q.    And is there a particular brand you use?

21    A.    The brands that are available for

22    leuprolide acetate can be dependent on insurance

23    coverage, but generally the brandings are Depot,

24    Lupron, and Eligard.

25    Q.    And do you recall what company produces

Page 62

```
 1    those drugs?
 2         A.   I can't say with certainty what company
 3    produces them.
 4         Q.   After the first medical visit, do you
 5    require patients to return to your clinic for
 6    follow-up examinations?
 7              MS. NOWLIN-SOHL:  Object to the form.
 8              THE WITNESS:  Can you specify "follow-up
 9    examinations"?
10         Q.   (BY MR. RAMER)  Yeah, sorry.  That's not
11    supposed to be a trick question.  I just -- do the
12    patients have follow-up visits?
13         A.   Yes.
14         Q.   At your clinic?
15         A.   Yes.
16         Q.   And how often are those follow-up
17    appointments?
18         A.   Generally every three months.
19         Q.   And I think you previously mentioned
20    this, but I just want to confirm.  And just
21    correct me if my understanding is wrong.
22              As a general matter, your clinic treats
23    patients until they turn 18, except for those
24    patients who have not yet transferred to another
25    provider; is that right?
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Dr. Kara Connelly August 28, 2023

```
 1              And so in other words, the reason you
 2   would have a patient in your clinic who is over 18
 3   years old is because they have not yet transferred
 4   to a provider for adults; is that fair?
 5        A.   Yes.  Generally that is correct, but
 6   there can be some circumstances where they may be
 7   in our care for a bit longer than 18.
 8        Q.   But that's not the general practice; is
 9   that right?
10        A.   Correct.
11        Q.   And do you stay in formal communication
12   with your patients after they turn 18?
13        A.   If they are still engaged in care in our
14   clinic, then yes.
15        Q.   And what percentage of your patients
16   receive care elsewhere after they turn 18?
17        A.   Do you mean gender-affirming care?
18        Q.   Well, I guess at the gender clinic -- I
19   guess any treatment at the gender clinic, yeah.
20        A.   But you said "care elsewhere."  Are you
21   specifically saying gender-affirming care
22   elsewhere?
23        Q.   Yeah, let's do that for this question.
24   So of your patients who are -- who turn 18, what
25   percentage no longer receive gender-affirming
```

Page 64

Dr. Kara Connelly August 28, 2023

```
 1    health care from your clinic?
 2         A.   It's definitely the minority.  So the
 3    majority of patients when they turn 18 continue to
 4    receive care through our clinic.
 5         Q.   Sorry.  Could you say that answer again?
 6         A.   Yeah.  The majority continue to receive
 7    care after their 18th birthday through our clinic.
 8         Q.   So the majority of your patients stay on
 9    with the clinic after they turn 18?
10         A.   Yes.
11         Q.   I guess I don't know what I'm missing.  I
12    thought that you generally treat patients until
13    they're 18, and then the idea was that they
14    then -- you know, they're adults at 18, so they go
15    elsewhere to receive treatment.
16              But you're saying now that that is
17    incorrect; the majority stay with you?  Is that
18    right?
19         A.   So we only see new patients who are
20    younger than age 18 who establish with us.
21    Generally the majority of patients will still be
22    in the process of -- still receiving care with us
23    after they turn 18.  And it's when they're older
24    that their care is transferred to an adult
25    provider.
```

Page 65

Dr. Kara Connelly August 28, 2023

```
 1        Q.   And when you say "older," approximately
 2   what age?
 3        A.   I'd say approximately average of 20.  But
 4   we have some patients that are in their 20s when
 5   they successfully transfer to an adult provider.
 6        Q.   So let's say for patients of yours by the
 7   time -- let me rephrase.
 8             Of your patient population, by the time
 9   patients turn 22 years old, what percentage do you
10   estimate are still receiving treatment at your
11   clinic?
12        A.   I can't say for certainty, but I'd
13   probably estimate less than 10 percent.
14        Q.   And for the other approximately
15   90 percent, does your clinic stay in formal
16   communication with them?
17        A.   Can you specify what you mean by "formal
18   communication"?
19        Q.   Well, do you communicate with them at
20   all?
21        A.   If they reach out after they've made that
22   transfer to an adult provider and have difficulty
23   continuing to access care through that provider or
24   getting refills on their prescriptions, they may
25   request refills, in which case we would
```

Page 66

Dr. Kara Connelly August 28, 2023

1    communicate formally with them to bring them back
2    in for another visit and again attempt to transfer
3    care to an adult provider.
4         Q.   Do you communicate with your patients
5    when they do not reach out to you in the first
6    instance?
7              MS. NOWLIN-SOHL:  Object to form.
8              THE WITNESS:  Can you specify which
9    patients we're talking about?
10        Q.   (BY MR. RAMER)  Yeah.  Sorry.  I was
11   talking about the universe we were just
12   discussing, which is those who have progressed on
13   to other care providers.
14             And I had asked you if you stay in formal
15   communication, and I think you described an
16   example where they reach out to you for help in
17   some way, shape, or form.
18             And my question is do you formally
19   communicate with that universe of patients,
20   meaning those who have gone on to receive care
21   elsewhere, when they have not reached out to you
22   in the first instance?
23        A.   We don't have a protocol of contacting
24   patients who have already successfully transferred
25   care to an adult provider.  But we do have

                                        Page 67

```
 1   patients that are seeing adult providers, and
 2   those providers communicate with us about the
 3   patients.
 4        Q.   And I think in your declaration you have
 5   said that you have personally delivered care to
 6   over 700 patients with gender dysphoria; is that
 7   right?
 8        A.   Yes.
 9        Q.   And were all of those patients under the
10   age of 18?
11        A.   At the time that they establish with our
12   clinic, yes.
13        Q.   And when did you in your practice first
14   begin treating children or adolescents for gender
15   dysphoria?
16        A.   Do you mean in what year or what stage of
17   my professional development?
18        Q.   Both.
19        A.   In my pediatric endocrinology fellowship
20   under the supervision of the attending physicians.
21        Q.   And when was that, approximately, in
22   terms of a year?
23        A.   I started in 2010, so between 2010 and
24   2013.
25        Q.   And do you personally prescribe puberty
```

```
 1    blockers and cross-sex hormones?
 2         A.   Yes.
 3         Q.   And at what age do you prescribe puberty
 4    blockers?
 5              MS. NOWLIN-SOHL:  Object to the form.
 6              THE WITNESS:  That depends on pubertal
 7    stage.
 8         Q.   (BY MR. RAMER)  And so at what pubertal
 9    stage do you prescribe puberty blockers?
10         A.   Tanner II.
11         Q.   Do you prescribe puberty blockers or
12    cross-sex hormones to patients who identify as
13    nonbinary?
14         A.   Yes, I have.
15         Q.   Do you still?
16         A.   Yes.  Yeah.
17         Q.   The primary purpose of gender-affirming
18    care is to reduce the distress associated with
19    gender dysphoria, correct?
20         A.   Yes.
21         Q.   And reducing the distress associated with
22    gender dysphoria is the only purpose of
23    gender-affirming care, correct?
24              MS. NOWLIN-SOHL:  Object to form.
25              THE WITNESS:  That is not how I would
```

Page 69

Dr. Kara Connelly August 28, 2023

```
 1    define gender-affirming care.
 2         Q.   (BY MR. RAMER)  Could you elaborate on
 3    that?
 4         A.   Well, gender-affirming care can entail
 5    many different aspects of care or treatment and
 6    can be alleviating distress if gender dysphoria is
 7    present, but it generally means affirming
 8    someone's gender identity at that moment in time.
 9         Q.   Okay.  I understand.  So let me ask this
10    question:  Reducing gender dysphoria -- start
11    again.
12              Reducing the distress associated with
13    gender dysphoria is the only purpose of providing
14    puberty blockers and cross-sex hormones, correct?
15              MS. NOWLIN-SOHL:  Object to form.
16              THE WITNESS:  The main purpose of any
17    medication, including puberty blockers and
18    hormones, would be to alleviate distress
19    associated with gender dysphoria.
20         Q.   (BY MR. RAMER)  So you said "main
21    purpose."
22              Are there other purposes of prescribing
23    puberty blockers and cross-sex hormones with
24    respect to gender-diverse youth?
25         A.   No, I can't think of any.
```

Page 70

Dr. Kara Connelly August 28, 2023

1 Q. And so the effect of treatment -- sorry.

2   And so the effect of puberty blockers and

3 cross-sex hormones on reducing the distress

4 associated with gender dysphoria is the outcome

5 that matters the most when analyzing these

6 treatments, correct?

7   MS. NOWLIN-SOHL: Object to the form.

8   MR. RAMER: That's fair. Never mind.

9 Listen, I think we've already answered the

10 question.

11 Q. (BY MR. RAMER) Have you ever prescribed

12 puberty blockers to a patient who was not formally

13 diagnosed with gender dysphoria under the DSM-V?

14 A. Only if it was a patient with a different

15 diagnosis, central precocious puberty.

16 Q. Apart from central precocious puberty,

17 have you ever prescribed puberty blockers to a

18 patient who is not formally diagnosed with gender

19 dysphoria under the DSM-V?

20 A. No.

21 Q. Why not?

22 A. Well, I follow the clinical practice

23 guidelines and established standards of care that

24 require that an individual be diagnosed with

25 gender dysphoria prior to initiating treatments.

Page 71

(146 of 224), Page 146 of 224
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 72 of 374
Case: 24-142, 01/18/2024, DktEntry: 14.3, Page 146 of 224

Dr. Kara Connelly August 28, 2023

1      Q.   And have you ever prescribed cross-sex
2  hormones to a patient who is not formally
3  diagnosed with gender dysphoria under the DSM-V?
4      A.   No.
5      Q.   Are you familiar with the term "gender
6  incongruence"?
7      A.   Yes.
8      Q.   What is your understanding of that term?
9      A.   It's a term that refers to a patient
10 whose gender identity does not match the sex that
11 was assigned to them at birth.
12     Q.   And so is it different from gender
13 dysphoria?
14     A.   Gender dysphoria is the distress that is
15 experienced by someone's gender identity that is
16 not in alignment with the sex that was assigned to
17 them at birth.
18     Q.   I guess -- so it's possible for someone
19 to be gender incongruent but not be suffering from
20 gender dysphoria, correct?
21     A.   Well, I think it depends on where the
22 definition of "gender incongruent" is coming from.
23     Q.   I guess under your definition was what I
24 was asking.
25     A.   Well, I -- usually when I hear the term

Page 72

```
 1    "gender incongruent," I generally will think about
 2    the origin being the ICD-11 code.
 3             And I can't remember the specific words
 4    that are used and whether "distress" is included
 5    in the definition.
 6        Q.   If the phrase "gender incongruence" does
 7    not -- let me rephrase.
 8             If the phrase "gender incongruent" is
 9    defined without reference to clinically
10    significant distress, do you agree that it means
11    something different from gender dysphoria?
12        A.   If the definition does not include the
13    "distress," then yes, I would say that's different
14    from gender dysphoria.
15        Q.   Sorry.  I didn't mean to cut you off.
16             And if the definition of "gender
17    incongruence" does not include clinically
18    significant distress, you would not prescribe
19    puberty blockers or cross-sex hormones to treat
20    gender incongruence, correct?
21             MS. NOWLIN-SOHL:  Object to form.
22             THE WITNESS:  I have only prescribed
23    puberty blockers or cross-sex hormones for
24    patients who have been diagnosed with gender
25    dysphoria.
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

(148 of 224), Page 148 of 224
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 74 of 374
Case: 24-142  01/18/2024  DktEntry: 14.3  Page 148 of 224
Dr. Kara Connelly August 28, 2023

1      Q.   (BY MR. RAMER)  Do you assess a patient's
2   developmental readiness when describing whether to
3   prescribe puberty blockers or cross-sex hormones?
4      A.   Our multidisciplinary team does together.
5      Q.   And how does your team make that
6   assessment?
7      A.   Well, it involves the different
8   disciplines using their finer expertise in
9   assessing that individual patient.
10      Q.   And what specifically does your team
11   assess?
12      A.   About develop -- sorry.  I forgot what
13   you --
14      Q.   Sorry, yeah.  When you're assessing a
15   patient's developmental readiness for a particular
16   intervention, what does your team assess?
17      A.   Well, again, I'm not the pediatric
18   psychologist who is the one conducting the
19   assessments, so I can't say for certain all of the
20   different tools and measures that she uses, but
21   she uses her expertise and knowledge and expertise
22   in child and adolescent development in determining
23   their developmental stage and ability to
24   participate in decision-making.
25      Q.   Okay.  So the pediatric psychologist

Page 74

```
 1    makes that determination; is that right?
 2         A.   Yes.
 3         Q.   And that's beyond your area of expertise;
 4    is that what you're saying?
 5              MS. NOWLIN-SOHL:  Objection;
 6    mischaracterizes testimony.
 7              THE WITNESS:  The pediatric psychologist
 8    is the one with the expertise in child and
 9    adolescent development and is the person who makes
10    a determination about developmental readiness.
11         Q.   (BY MR. RAMER)  Right.  All I'm asking is
12    the proper way to assess for developmental
13    readiness is something that is beyond your
14    expertise?  Or is it not?
15         A.   I would not say that it's my expertise to
16    make that assessment.
17         Q.   Well, so I understand the pediatric
18    psychologist makes the assessment.
19              And my question is do you know how to
20    make that assessment?
21         A.   About developmental readiness?
22         Q.   Correct.
23         A.   My role is to -- is to assess their
24    physical developmental readiness.  And we as an
25    interdisciplinary team come together to determine
```

Page 75

Dr. Kara Connelly August 28, 2023

1    overall developmental readiness with our different
2    disciplines' expertise contributing.
3         Q.   And all I'm asking is just the
4    developmental readiness that you described is
5    determined by the pediatric psychologist.
6              That determination is not something that
7    you make, correct?
8         A.   Correct.
9         Q.   And the process for making the
10   determination that the pediatric psychologist
11   makes is something that is beyond your individual
12   expertise, correct?
13        A.   Correct.
14        Q.   I'd like to go back to your declaration,
15   which I guess is Connelly Exhibit 2.  And I'd like
16   to go to page 5 and paragraph 21.
17             And this paragraph you're talking about
18   puberty blockers, correct?
19        A.   Correct.
20        Q.   And I'm going to read the second sentence
21   and ask if I read it correctly.
22             It says "These medications have been used
23   successfully to delay pubertal changes in youth
24   with central precocious puberty."
25             Did I read that correctly?

Page 76

Dr. Kara Connelly August 28, 2023

1      A.   Yes.

2      Q.   And you'd already mentioned central

3  precocious puberty, but could you just explain

4  what that is?

5      A.   Yes.  That is when the brain activates

6  puberty at an age that is younger or earlier than

7  is what is determined to be a normal age range.

8      Q.   And what is that normal age range?

9      A.   Well, for individuals assigned female at

10  birth, it's generally age 7 is the youngest that

11  is considered normal for starting puberty.

12          And for individuals assigned male at

13  birth, that's generally age 9.

14      Q.   And so is it -- just so I understand, if

15  the individual starts puberty before those ages

16  you just listed, that is what constitutes central

17  precocious puberty; is that right?

18      A.   Yes.

19      Q.   And do you prescribe puberty blockers

20  every time a child falls within that definition?

21      A.   No.

22      Q.   Is there a typical age where a child

23  would be diagnosed with central precocious puberty

24  but you would not prescribe puberty blockers?

25      A.   It's not so much of age, chronological

Page 77

Dr. Kara Connelly August 28, 2023

```
 1    age, but we look at pubertal stage and we look at
 2    skeletal age and development.
 3         Q.   And when you say you "look at pubertal
 4    stage and skeletal age and development," what
 5    specifically are you assessing in making the
 6    determination whether to prescribe puberty
 7    blockers?
 8         A.   For central precocious puberty?
 9         Q.   Yes.
10         A.   So we want to -- basically we will assess
11    pubertal stage in terms of Tanner staging and how
12    far along they are in puberty at the time they are
13    given the diagnosis.
14              And we look at how much maturation has
15    happened at the growth plates by pubertal hormones
16    to determine if there's benefit to suppressing
17    puberty at that time.
18         Q.   And just as a general matter, when is
19    there benefit to suppressing puberty at that time?
20         A.   Again, it's different for everyone
21    because it depends on where -- what their growth
22    patterns look like and what their family pubertal
23    development patterns are.
24              But if we determine that treatment is
25    going to result in an improvement in height
```

Page 78

(153 of 224), Page 153 of 224
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 79 of 374
Dr. Kara Connelly August 28, 2023

1    outcome, that's generally what we're looking at.
2            And if we -- if the patient is far enough
3    along in puberty that it does not appear that
4    treatment is going to result in a benefit in final
5    height outcome, then we may not use prescribed.
6        Q.   Sorry.  And this is my own ignorance of
7    this.
8            The last part you said -- is it that if
9    they are far along enough then you won't
10   prescribe?
11       A.   It depends -- again, it depends on the
12   patient, but if they are far enough -- if they are
13   far enough along in puberty -- and I can give you
14   an example if that would be helpful.
15       Q.   Yes, please.  I'm clearly adrift here.
16       A.   Yeah.  So if a patient who is assigned
17   female at birth has achieved menarche, or their
18   first menstrual cycle, and we look at their
19   skeletal age or the age of their growth plates and
20   determine that starting puberty blockers is really
21   not going to result in a benefit of -- resulting
22   in improved height outcome, then we may consider
23   not using puberty blockers.
24       Q.   Okay.  So I think I understand.
25            So the idea is central precocious

Page 79

```
1    puberty, one of the outcomes if you did not treat
2    it is they would have a reduced height profile; is
3    that right?
4         A.   In some cases.
5         Q.   But right.  Right.  But that is one of
6    the animated concerns, just as a general matter;
7    is that fair?
8         A.   Yes.
9         Q.   So same paragraph, same sentence in your
10   declaration that I had previously read.
11             Could you explain the relevance of the
12   points you're making here?
13        A.   Can you -- I'm sorry.  Can you clarify?
14   Of that same sentence?
15        Q.   Yeah.  I guess put, you know, less
16   directly, why are we talking about central
17   precocious puberty in your declaration?
18             MS. NOWLIN-SOHL:  Object to form.
19             THE WITNESS:  It's another population or
20   another diagnosis that the medications have been
21   used in demonstrating the effectiveness of
22   suppressing endogenous sex steroid production.
23        Q.   (BY MR. RAMER)  Are you talking about
24   central precocious puberty solely with respect to
25   effectiveness?  Or something else?
```

Page 80

Dr. Kara Connelly August 28, 2023

```
 1              MS. NOWLIN-SOHL:  Object to the form.
 2              THE WITNESS:  The medications have been
 3     used successfully to delay pubertal changes for
 4     youth who have central precocious puberty.
 5          Q.   (BY MR. RAMER)  Okay.  So when your
 6     declaration is discussing central precocious
 7     puberty, the relevance of that discussion is
 8     solely the fact that puberty blockers have been
 9     effective in delaying the onset of puberty; is
10     that right?
11              MS. NOWLIN-SOHL:  Objection
12     mischaracterizes the testimony.  And also
13     objection to the extent this calls for a legal
14     conclusion.
15              THE WITNESS:  The statement that is in
16     this paragraph is that they have been used
17     successfully to delay pubertal changes.
18          Q.   (BY MR. RAMER)  Okay.  So same paragraph,
19     final sentence.  And I'll just read it and again
20     ask if I read it correctly.
21              It says "If treatment is stopped,
22     endogenous puberty resumes."
23              Did I read that correctly?
24          A.   Yes.
25          Q.   When you diagnose a patient with gender
```

Page 81

1    dysphoria, how do you determine when that child
2    should begin puberty blockers?
3              MS. NOWLIN-SOHL:  Object to form.
4              THE WITNESS:  Can you clarify the
5    question?
6         Q.   (BY MR. RAMER)  Yeah.  I guess do you
7    prescribe puberty blockers at Tanner Stage II?
8              MS. NOWLIN-SOHL:  Object to the form.
9              THE WITNESS:  I wouldn't prescribe
10   puberty blockers if they have not yet reached
11   Tanner Stage II.
12        Q.   (BY MR. RAMER)  Would you ever prescribe
13   them when the patient reaches Tanner Stage II?
14        A.   Yes.
15        Q.   And just as an approximation, at what age
16   does that stage typically occur?
17        A.   At what age does Tanner Stage II occur?
18        Q.   Correct.
19        A.   For individuals assigned female at birth,
20   it's approximately -- it's an average of 10 to 10
21   and a half years.
22              And for individuals assigned male at
23   birth, it's around 11 to 11 and a half.
24        Q.   And how long -- I guess let me rephrase.
25              Under the guidelines, how long does the

Page 82

```
 1    individual remain on puberty blockers?
 2              MS. NOWLIN-SOHL:  Object to the form.
 3              THE WITNESS:  Can you specify which
 4    guidelines?
 5         Q.   (BY MR. RAMER)  Is it different for the
 6    WPATH guidelines versus the Endocrine Society
 7    guidelines?
 8         A.   I just wanted to be sure.  I didn't know
 9    what specific guidelines.  But you mean Endocrine
10    Society and WPATH?
11         Q.   Or any other relevant ones.  I'm just
12    trying to understand, in this treatment when they
13    receive puberty blockers to treat gender
14    dysphoria, how long do they typically remain on
15    puberty blockers?
16              MS. NOWLIN-SOHL:  Object to form.
17              THE WITNESS:  It depends on the patient,
18    and -- it depends on the patient and whether they
19    go on to start hormones or not.
20         Q.   (BY MR. RAMER)  If they do go on to start
21    hormones, at what age does that typically occur?
22         A.   I would say around 14, but sometimes
23    older.
24         Q.   So if a patient started puberty
25    blockers -- sorry, let me try that again.
```

Page 83

Dr. Kara Connelly August 28, 2023

```
1              If the patient is on puberty blockers
2    from Tanner Stage II for, let's say, two and a
3    half years and then treatment is stopped, is it
4    correct that the patient will be going through
5    endogenous puberty two and a half years later?
6         A.   So if a patient is on puberty blockers
7    but not on cross-sex hormones and the puberty
8    blockers are stopped, then yes, endogenous puberty
9    begins again.
10        Q.   Is an individual's gender identity
11   expected to evolve over time?
12             MS. NOWLIN-SOHL:  Object to the form.
13             THE WITNESS:  I wouldn't use the word
14   "expect."  It's not expected.  I think that some
15   people can have a shift in their gender identity.
16        Q.   (BY MR. RAMER)  When you say "some
17   people," what do you mean by that?
18        A.    I think that for some people, it's
19   possible that their gender identity can shift over
20   time.
21        Q.   Can you identify those people ahead of
22   time or no?
23        A.   No.  But I would say that the
24   overwhelming majority of the patients that I have
25   worked with have not experienced a shift in their
```

Page 84

Dr. Kara Connelly August 28, 2023

```
 1   gender identity.
 2              MR. RAMER:  And we're coming up on an
 3   hour.  I kind of have a good stopping point here.
 4              Do you want to take, I guess, five
 5   minutes this time?
 6              MS. NOWLIN-SOHL:  Yes.  That sounds good.
 7              MR. RAMER:  Let's call it -- we're about
 8   to hit 12, so we'll call it 17 after the hour?
 9              MS. NOWLIN-SOHL:  Yeah.
10              MR. RAMER:  Okay.
11              THE VIDEOGRAPHER:  Okay.  So the time is
12   12:11 p.m. Mountain time, and we are off the
13   record.
14          (Break taken from 12:11 p.m. to 12:18 p.m.)
15              THE VIDEOGRAPHER:  All right.  So we are
16   recording.  The time is 12:18 p.m. Mountain time,
17   and we are back on the record.
18       Q.   (BY MR. RAMER)  Dr. Connelly, I'd like to
19   go back to your declaration, and specifically to
20   page 14 and paragraph 50 and first sentence.  And
21   I'll read it and ask if I read it correctly.
22              "Gender-affirming hormone therapy may
23   have an impact on future fertility potential
24   although treatment can be tailored to minimize
25   that risk if maintaining fertility is important to
```

Page 85

```
 1    the family and there are options for fertility
 2    preservation."
 3              Did I read that correctly?
 4         A.   Yes.
 5         Q.   And what are the options for fertility
 6    preservation you mention there?
 7         A.   Well, that depends on what gonads the
 8    person was born with.  But generally sperm
 9    preservation or cryopreservation or ovocyte
10    cryopreservation.
11         Q.   Sorry, could you say those again.  So
12    cryopreservation is one; is that right?
13         A.   Sperm cryopreservation, which is
14    essentially freezing sperm, and ovocyte
15    cryopreservation is freezing eggs from ovarian
16    tissue.
17         Q.   Are there any other options for fertility
18    preservation other than those two?
19         A.   Well, the other options may involve
20    development of an embryo after the sperm or eggs
21    are retrieved and then freezing embryos.
22         Q.   When you -- sorry, go ahead.
23         A.   Sorry.  I was going to say those are much
24    less often sought, especially in younger patients.
25         Q.   What are much less often sought?
```

Page 86

1        A.    Freezing embryos.

2        Q.    And in describing that option, you had

3    mentioned retrieving.

4             Are you saying retrieving from the

5    cryopreservation or retrieving from the

6    individual?

7        A.    Can you remind me what I said?

8        Q.    Well, I don't know if I know.  So the --

9    we had the sperm cryopreservation.

10            I think you said ova cryopreservation.

11            And then the third one you had mentioned

12   embryos.  And I just didn't understand what that

13   was.  Could you just explain that a little bit?

14       A.    Yeah.  The embryos are -- the embryos are

15   formed if either a sperm or an egg is obtained and

16   fertilized at the time that they are obtained and

17   prior to freezing.

18       Q.    I see.  Have you ever had a patient

19   pursue that option?

20       A.    No.  Not -- no, not a patient in my care.

21       Q.    And what do you tell your patients about

22   the options for fertility preservation?

23       A.    Do you mean regardless -- it's a little

24   different depending on what gonads they have,

25   whether they have testicles or ovaries.

Page 87

1    Q.   Let's start with one and then do the

2  other.

3    A.   Okay.  So for individuals who were born

4  with testicles, the options include preserving

5  sperm and freezing sperm.

6         And one of the ways of obtaining sperm is

7  through ejaculation.

8         And another way can be what's called

9  testicular extraction where a urologist -- I don't

10  know the specifics of the procedure, but it's

11  something that -- a procedure that a urologist

12  performs.  And then the sperm is frozen until

13  later, if they desire to use it later on.

14    Q.   And then what about the other categories?

15    A.   So for individuals who are born with

16  ovaries, that generally involves freezing eggs.

17  And so that -- again, it happens in a reproductive

18  endocrinology and then fertility clinic, so I'm

19  not the provider that does the procedures, but

20  generally involves development of the eggs and

21  then the retrieval through a procedure and then

22  freezing the eggs.

23    Q.   And what do you tell your patients about

24  the likelihood of those options being successful?

25         MS. NOWLIN-SOHL:  Object to form.

Page 88

Dr. Kara Connelly August 28, 2023

1          THE WITNESS:  Can you specify which
2    option?
3       Q.   (BY MR. RAMER)  Let's assume -- am I
4    right we're talking about cryopreservation for
5    both?
6       A.   Yes.
7       Q.   And unless there's a distinction, which
8    please -- a relevant distinction, just please tell
9    me.
10          All I'm wondering is when you are
11   discussing this with patients, what do you tell
12   them about the prospect that either form of
13   cryopreservation will ultimately be successful if
14   they want to have children later in life?
15          MS. NOWLIN-SOHL:  Object to form.
16          THE WITNESS:  And are you defining
17   "successful" as resulting in a baby or a
18   pregnancy?
19       Q.   (BY MR. RAMER)  Sure, a healthy pregnancy
20   or a healthy birth in the context of, you know,
21   those with testicles.
22          MS. NOWLIN-SOHL:  Object to the form.
23          THE WITNESS:  So we're just talking about
24   those with testicles?
25       Q.   (BY MR. RAMER)  No.  I was trying to

                                          Page 89

Dr. Kara Connelly August 28, 2023

```
 1    bring them both in, but let's just take them one
 2    at a time.
 3             For those with ovaries, what do you say
 4    about the prospect of achieving a successful,
 5    healthy birth later in life?
 6             MS. NOWLIN-SOHL:  Object to the form.
 7             THE WITNESS:  Well, there is -- for
 8    individuals who were born with ovaries and have
 9    not started any cross-sex hormones -- is that the
10    population that you are referring to?
11        Q.   (BY MR. RAMER)  Sure.  Yeah.  Let's start
12    there.  Yeah.
13        A.   There has been research that has shown
14    that preserving eggs has been successful in the
15    future in resulting in a healthy pregnancy.
16        Q.   In -- I mean, not to quiz you.  As you
17    sit here, do you know -- is there a particular
18    article you're thinking of, or --
19        A.   I can't -- I can't say.  I don't know
20    what particular article.
21        Q.   Are these fertility options that we just
22    discussed, are these fertility options discussed
23    in the WPATH guidelines?
24        A.   I believe so.
25        Q.   Are they discussed in the Endocrine
```

Page 90

1    Society guidelines?

2        A.   I believe so.  I don't recall in what

3    amount of detail.

4        Q.   Switching gears a little bit, does your

5    clinic perform surgeries on adolescents?

6        A.   No.

7        Q.   So you just -- you refer adolescents for

8    surgeries; is that right?

9            MS. NOWLIN-SOHL:  Object to form.

10           THE WITNESS:  Patients that have been

11   seen in our clinic are referred -- in some cases

12   are referred out to surgeons that are not

13   affiliated with our clinic.

14       Q.   (BY MR. RAMER)  Yeah.  I was just trying

15   to understand -- we discussed that for some

16   patients gender-affirming surgery is indicated.

17           And all I was trying to understand is if

18   it's indicated, is the surgery done at your

19   clinic?  Or is the patient referred to a surgeon

20   somewhere else?

21       A.   The patient is referred to a surgeon

22   somewhere else.

23       Q.   And for patients who have been referred

24   for surgery from your clinic, are any of

25   them -- sorry.  Let me rephrase that.

Page 91

Dr. Kara Connelly August 28, 2023

```
 1              For patients who have been referred for
 2   surgery from your clinic, have any of those
 3   patients received a form of surgery other than top
 4   surgery as you've described it?
 5              MS. NOWLIN-SOHL:  Object to form.
 6              THE WITNESS:  Can you be more specific
 7   about what types of surgeries?
 8         Q.   (BY MR. RAMER)  Well, I guess let's start
 9   there.
10              What types of surgeries has your clinic
11   referred patients for?
12         A.   Well, so you're specifying
13   gender-affirming surgeries?
14         Q.   Right.
15         A.   Okay.  Well, we've had patients that have
16   pursued surgeries, and a lot of the times they
17   don't require a referral from our clinic.
18              We've had patients who had been seen in
19   our clinic that have accessed surgeries with
20   outside surgeons.
21         Q.   Okay.  So taking the kind of technical
22   concept of a referral out of the equation, what
23   types of gender-affirming surgeries have patients
24   of your clinic received?
25         A.   And do you mean of all ages or just
```

Page 92

Dr. Kara Connelly August 28, 2023

```
 1    patients that had been seen in our clinic?
 2         Q.    Could you explain the distinction you're
 3    drawing there?
 4         A.    You mean any patient who has ever been
 5    seen in our clinic?
 6         Q.    No.  I mean for patients who are under 18
 7    years of age who have received a gender-affirming
 8    surgery, what kind of surgeries have they received
 9    while under 18?
10         A.    Okay.  So while under 18.
11               Almost all of them have been top
12    surgeries.  And I can think of one person who has
13    had a vaginoplasty.
14         Q.    And could you explain what a vaginoplasty
15    is?
16         A.    It is the creation of a vulva and vaginal
17    canal.
18         Q.    What is it created from?
19         A.    That depends on the surgical technique
20    that's used.
21         Q.    What does it depend on?
22         A.    It can depend on the surgeon and the
23    technique that the surgeon determines would be the
24    best for that patient.  I can't -- I'm not the one
25    that makes the decisions about what technique is
```

Page 93

Dr. Kara Connelly August 28, 2023

```
 1    used.
 2         Q.   Could you just explain an example of what
 3    you mean by different techniques would result in
 4    the vaginoplasty being the -- just explain what
 5    you mean by "different techniques."
 6         A.   Well, the surgeons can use different
 7    types of tissue to create the vaginal canal.
 8         Q.   Can you give some examples of types of
 9    tissue that can be used to create the vaginal
10    canal?
11         A.   In some cases it can be the genital skin.
12    And some surgeons I believe have used colon tissue
13    and some surgeons have used something called the
14    peritoneum.
15         Q.   What is that?
16         A.   And some surgeons have used skin grafts.
17         Q.   What was the -- peritoneum?
18         A.   Yeah.  It's -- again, not being the
19    surgeon and the expert in the -- in that anatomy,
20    it's difficult for me to explain how that's used.
21    It's intraabdominal, in the abdomen.
22         Q.   And you said, I believe, you're aware of
23    one vaginoplasty; is that right?
24         A.   One patient who had vaginoplasty under
25    the age of 18.
```

Page 94

Dr. Kara Connelly August 28, 2023

1    Q.   And for the other examples of surgery in

2  that category, you said almost all were

3  gender-affirming chest surgery; is that right?

4    A.   Correct.  Yeah.

5    Q.   And is there -- are there any other forms

6  of surgery other than those two types that you're

7  aware of?

8    A.   That our patients have accessed under age

9  18?

10    Q.   Correct.

11    A.   No.

12    Q.   At your clinic, of the natal females who

13  are diagnosed with gender dysphoria, what

14  percentage would you estimate receive a

15  mastectomy?

16         MS. NOWLIN-SOHL:  Object to form.

17         THE WITNESS:  Are you still referring to

18  under age 18?

19    Q.   (BY MR. RAMER)  Yes.

20    A.   So I'm just going to make sure that I

21  understand your question.

22         For patients who were assigned female at

23  birth that are under age 18, what percentage

24  pursue or complete mastectomy?

25    Q.   Sure.

Page 95

Dr. Kara Connelly August 28, 2023

1      A.    Under the age of 18?

2      Q.    Yes.

3      A.    Because we have some patients who attempt

4   to pursue surgery under the age of 18 but don't

5   actually have surgery until they're 18 or older.

6   That's the majority.

7      Q.    And what do you mean by they "attempt to

8   pursue" it?

9      A.    They start seeking visits or consultation

10  with a surgeon, but by the time they actually

11  complete the surgery, they're over 18.

12     Q.    Okay.  I see.  And so of patients at your

13  clinic who are natal females which you describe as

14  female assigned at birth, are under age 18, and

15  have been diagnosed with gender dysphoria, what

16  would you estimate is the percentage of those

17  patients for whom gender-affirming top surgery is

18  clinically indicated?

19     A.    Can you clarify what you mean by

20  "clinically indicated"?

21     Q.    What do you understand that phrase to

22  mean?

23     A.    Well, I would say -- I would probably

24  interpret that phrase as meeting criteria for

25  surgery, but I'm not the one that's usually making

Page 96

Dr. Kara Connelly August 28, 2023

1    that assessment.

2         Q.   Okay.  Maybe I -- all I'm trying to

3    understand is your patients who are under 18 and

4    were assigned female at birth, how many of them

5    receive gender-affirming chest surgery while under

6    18?

7         A.   It's a very small number.

8         Q.   Can you give me an estimate?

9         A.   I would say probably less than 5 percent

10   in that population.

11        Q.   All right.  I want to just look at your

12   declaration again, and page 8 and paragraph 26.

13   And second sentence kind of covers some of what

14   we've been talking about, but I'll just read it

15   and ask if I read it correctly.

16             It says "If surgical services are

17   offered, they are almost always gender-affirming

18   chest surgeries for youth assigned female at

19   birth, also known as gender-affirming mastectomy."

20             Did I read that correctly?

21        A.   Yes.

22        Q.   And you say "almost always."

23             And my question is are there surgical

24   services offered to youth under 18 that are not

25   gender-affirming mastectomies?

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Dr. Kara Connelly August 28, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form.
 2              THE WITNESS:  I'm sorry.  Can you repeat
 3      the question?
 4          Q.   (BY MR. RAMER)  Yes, sorry.  In this
 5      sentence, you say, "If surgical services are
 6      offered, they are almost always gender-affirming
 7      chest surgeries for youth assigned female at
 8      birth."
 9              And in that sentence, you say "almost
10      always."  And you've mentioned vaginoplasty.
11              And my question is, are there other
12      surgical services offered to youth under 18 that
13      are not gender-affirming mastectomies or
14      vaginoplasties?
15              MS. NOWLIN-SOHL:  Same objection.
16              THE WITNESS:  Not that I'm aware of.
17          Q.   (BY MR. RAMER)  Is a mastectomy
18      reversible?
19              MS. NOWLIN-SOHL:  Object to the form.
20              THE WITNESS:  I don't know if I can
21      accurately answer that question since I'm not the
22      surgeon.
23          Q.   (BY MR. RAMER)  Do you talk to your
24      patients about gender-affirming mastectomies?
25          A.   I do in basic terms, but acknowledging
```

Page 98

Dr. Kara Connelly August 28, 2023

```
 1   that I'm not a surgeon and that the surgeon will
 2   be the one to counsel them on potential benefits
 3   and risks.
 4        Q.   Okay.  So you are unable to answer the
 5   question of whether a mastectomy is reversible; is
 6   that right?
 7             MS. NOWLIN-SOHL:  Objection;
 8   mischaracterizes testimony.
 9             THE WITNESS:  Can you specify what you
10   mean by "reversible"?
11        Q.   (BY MR. RAMER)  What do you understand
12   "reversible" to mean in this context?
13        A.   To return to the original state.
14        Q.   Okay.  Taking that definition, is a
15   mastectomy reversible?
16             MS. NOWLIN-SOHL:  Object to form.
17             THE WITNESS:  A mastectomy cannot replace
18   the chest tissue that's been removed.
19        Q.   (BY MR. RAMER)  Sorry.  Could you say
20   that again?
21        A.   A mastectomy cannot replace the chest
22   tissue that has already been removed.
23        Q.   Isn't the mastectomy the removal of the
24   tissue?
25        A.   Yes.  Yes.  So the mastectomy -- with
```

Page 99

1  mastectomy, after it has occurred, the chest
2  tissue that's been removed cannot be replaced,
3  cannot be reintroduced onto the body.
4       Q.   And sorry, this is for my own -- is the
5  first T in that word pronounced, so it's
6  "mastectomy"?
7       A.   Yes.
8       Q.   Okay.  After a natal female, which you
9  described as assigned female at birth, receives a
10  gender-affirming mastectomy, will she
11  ever -- sorry.  Let me rephrase.
12          After a natal female, also described as
13  assigned female at birth, receives a
14  gender-affirming mastectomy, will that individual
15  ever be able to breastfeed a child?
16       A.   That depends on the type of surgery
17  that's performed.
18       Q.   Can you say more about that?
19       A.   Well, again, I'm not a surgeon, but my
20  understanding is there are some surgeries that are
21  characterized as top surgeries where not all of
22  the chest tissue is removed.  And it depends on
23  the patient.
24       Q.   Why would not all of the chest tissue be
25  removed?

Page 100

Dr. Kara Connelly August 28, 2023

```
 1        A.    Again --

 2              MS. NOWLIN-SOHL:  Objection; foundation.

 3              THE WITNESS:  I can't say for certain

 4    because I'm not the surgeon having these

 5    conversations with patients.

 6        Q.    (BY MR. RAMER)  So I guess if the

 7    question is after a natal female receives a

 8    gender-affirming mastectomy, will that individual

 9    ever be able to breastfeed a child, if that is the

10    question, is the answer to that question beyond

11    the scope of your expertise?

12        A.    I would not consider it within my scope

13    of expertise to be able to determine if someone is

14    able to breastfeed after they've had

15    gender-affirming top surgery.

16        Q.    Okay.  So same -- back in your

17    declaration, same paragraph which is on -- we're

18    on page 8, paragraph 26, and it is the sentence

19    after the one we were just discussing.  And I'll

20    just read it and ask if I read it correctly.

21              It says "Under the Endocrine Society

22    guideline, genital surgery is not recommended to

23    patients under age 18."

24              Did I read that correctly?

25        A.    Yes.
```

Page 101

Dr. Kara Connelly August 28, 2023

```
1        Q.     And does the category of genital surgery
2    include more than just a vaginoplasty?
3        A.     Meaning other genital surgeries other
4    than vaginoplasty options?
5        Q.     I guess are there other genital surgeries
6    other than vaginoplasty?
7        A.     There are, yes.
8        Q.     Okay.  What are those?
9        A.     There are -- there's something called a
10   vulvoplasty.
11       Q.     And what is that?
12       A.     That is the creation of the external
13   vulva without the creation of a vaginal canal.
14       Q.     And like our discussion of the
15   vaginoplasty, does the tissue used for that
16   procedure vary based on the technique the surgeon
17   uses?
18       A.     I believe so.
19       Q.     In the next sentence in this paragraph,
20   I'll read it and ask if I read it correctly.
21              It says "The WPATH standards of care do
22   not provide an age delineation for vaginoplasty,
23   but strongly caution about the need to ensure that
24   the patient has the maturity to make this
25   decision."
```

Page 102

Dr. Kara Connelly August 28, 2023

1          Did I read that correctly?

2     A.    Yes.

3     Q.    And do the WPATH standards caution

4 against any genital surgery for a patient under 18

5 other than a vaginoplasty?

6          MS. NOWLIN-SOHL:  Objection to form.

7          THE WITNESS:  I would need to read that

8 section, but I don't believe that it is specific

9 to only vaginoplasty.

10    Q.    (BY MR. RAMER)  And a surgeon could

11 perform a vaginoplasty on a patient under 18 and

12 still be in compliance with the WPATH guidelines,

13 correct?

14    A.    If all of the other criteria are met,

15 including that -- ensuring that the patient has

16 the maturity to make the decision.

17    Q.    And would that surgeon be in compliance

18 with the Endocrine Society guideline?

19         MS. NOWLIN-SOHL:  Objection to form.

20         THE WITNESS:  The Endocrine Society

21 guideline -- in the Endocrine Society guideline,

22 it states that general surgery is not recommended

23 to patients under 18 but doesn't specify that it

24 cannot be performed.

25    Q.    (BY MR. RAMER)  So when the Endocrine

Page 103

Dr. Kara Connelly August 28, 2023

1   Society's guidelines do not recommend something,
2   is it your testimony that you could still perform
3   that procedure and be in compliance with the
4   Endocrine Society guideline?
5           MS. NOWLIN-SOHL:  Objection to form.
6   Objection; mischaracterizes testimony.
7           THE WITNESS:  The guidelines are,
8   create -- the guidelines are a set of
9   recommendations and that -- for clinicians and
10  practitioners to follow.
11          And there may be extenuating
12  circumstances when something may -- or different
13  care may be provided that may not be included in
14  the guidelines.
15      Q.   (BY MR. RAMER)  In your professional
16  opinion, should there be age limits on
17  gender-affirming surgeries?
18          MS. NOWLIN-SOHL:  Objection to form.
19          THE WITNESS:  Can you be more specific
20  about types of surgeries?
21      Q.   (BY MR. RAMER)  I guess does your answer
22  vary based on the type of surgery at issue?
23      A.   Generally, yes, but I also think that
24  it's more than just chronologic age.
25      Q.   The "generally, yes," can you clarify

Page 104

Dr. Kara Connelly August 28, 2023

```
 1   what you were saying yes to?
 2        A.   I follow the Endocrine Society guidelines
 3   in that general surgery is not recommended under
 4   the age of 18, whereas there may be situations
 5   where patients can benefit from gender-affirming
 6   top surgery under the age of 18.
 7        Q.   So do you think there should be maturity
 8   limits on the availability for gender-affirming
 9   surgeries?
10             MS. NOWLIN-SOHL:  Objection to form.
11             THE WITNESS:  Can you explain what you
12   mean by "maturity limits"?
13        Q.   (BY MR. RAMER)  Well, I guess what do you
14   mean is distinct from chronological age when you
15   answered the prior question?
16        A.   Well, I think that maturity is definitely
17   a factor that needs to be taken into account as
18   one of the factors.
19        Q.   And why is that?
20        A.   Well, again, going back to criteria for
21   accessing different aspects of gender-affirming
22   medical care, one of the criteria is that the
23   individual has reached a level of maturity where
24   they're able to make complex, cognitive decisions
25   about the different treatment options.
```

Page 105

Dr. Kara Connelly August 28, 2023

1      Q.    And do you agree with that limitation?

2            MS. NOWLIN-SOHL:  Object to the form.

3            THE WITNESS:  What do you mean by

4      "limitation"?

5      Q.    (BY MR. RAMER)  That to receive a

6      gender-affirming surgery, a patient should

7      demonstrate an appropriate level of maturity.

8      A.    I'm in agreement with the statement

9      that's in the Endocrine Society guidelines about

10     having a level of maturity where they are able to

11     make complex cognitive decisions.

12     Q.    And should the maturity -- I'll call it a

13     limit.  Let's just say -- let me rephrase it.

14           Do you think a patient should need to

15     demonstrate a different level of maturity to

16     access cross-sex hormones, for example?

17           MS. NOWLIN-SOHL:  Object to form.

18           THE WITNESS:  I don't know that I'm able

19     to answer what specific level of maturity and how

20     that -- and again, it's an assessment that's

21     performed by the behavioral health expert to

22     determine if the patient is of the maturation

23     where they can make a complex cognitive decision

24     specific to that intervention.  So I think it

25     depends on the person.

Page 106

Dr. Kara Connelly August 28, 2023

1    Q.   (BY MR. RAMER)  If a patient is mature

2    enough to proceed with cross-sex hormones, is the

3    patient mature enough to decide to proceed with

4    the gender-affirming surgery?

5              MS. NOWLIN-SOHL:  Object to the form.

6              THE WITNESS:  I don't think that I can

7    agree with that statement.

8    Q.   (BY MR. RAMER)  Why not?

9    A.   Because again, every patient is

10   approached as an individual.  And their maturity

11   may be -- their reaching different levels of

12   maturity may occur at different time points.

13   Q.   Well, can you think of a situation where

14   an individual would be mature enough to decide to

15   take cross-sex hormones but not be mature enough

16   to decide to undergo a gender-affirming surgery?

17             MS. NOWLIN-SOHL:  Object to form.

18             THE WITNESS:  Well, again, I think it

19   goes back to the gender-affirming surgery -- the

20   psychological evaluation and determining the

21   patient's ability to understand -- not only the

22   ability to understand the different interventions

23   and their level of maturity to make complex

24   cognitive decisions, but also taking into whether

25   the assessment is that the different interventions

Page 107

App.181

1  will result in -- will benefit them, will result

2  in a benefit to them, and whether they fully

3  understand the potential benefits and potential

4  risks.

5           And with the potential benefits and

6  potential risks being different for hormones

7  versus surgeries, then I think it -- they have to

8  be assessed separately.

9       Q.   (BY MR. RAMER)  So in theory, a patient

10  could be mature enough to decide to use cross-sex

11  hormones, but not mature enough to decide to

12  undergo a gender-affirming surgery; is that right?

13           MS. NOWLIN-SOHL:  Object to form.

14           THE WITNESS:  I don't know if I can say

15  it's all just their level of maturation because,

16  again, it's all of the other components that go

17  into the psychological evaluation that are taken

18  into account when determining if a patient would

19  benefit from a specific intervention.

20       Q.   (BY MR. RAMER)  So I understand that

21  point that just because a patient is mature enough

22  does not mean that they're automatically going to

23  receive the intervention.

24           But my question is specifically about the

25  maturity component of that assessment.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

(183 of 224), Page 183 of 224
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 109 of 374
Case: 24-142, 01/18/2024, DktEntry: 14.3, Page 183 of 224
Dr. Kara Connelly August 28, 2023

1        And what I'm trying to understand is in
2   theory, can a patient actually be mature enough to
3   decide to undergo cross-sex hormones but not
4   mature enough to decide to undergo a
5   gender-affirming surgery?
6        MS. NOWLIN-SOHL:  Same objection.
7        THE WITNESS:  I think it depends on how
8   maturity is defined and assessed.
9        Q.   (BY MR. RAMER)  And how do you define and
10  assess maturity?
11       A.   Well, again it's primarily done by the
12  behavioral health expert when they're doing their
13  evaluation and working with the patient to
14  determine their level of maturity to be able to
15  make different decisions.
16       Q.   Okay.  So is it fair to say this
17  assessment of the level of maturity to decide to
18  pursue a particular treatment is beyond your level
19  of expertise?
20       MS. NOWLIN-SOHL:  Objection.
21       THE WITNESS:  Can you repeat the
22  question?
23       Q.   (BY MR. RAMER)  Is it fair to say that
24  the determination of a patient's maturity with
25  respect to deciding whether to undergo an

Page 109

Dr. Kara Connelly August 28, 2023

1    intervention is beyond the scope of your

2    expertise?

3            MS. NOWLIN-SOHL:  Same objection.

4            THE WITNESS:  I would not be making that

5    determination without the assessment of the

6    behavioral health provider.

7        Q.   (BY MR. RAMER)  And so is the answer,

8    then, that yes, it is beyond your individual

9    expertise?

10           MS. NOWLIN-SOHL:  Objection.

11           THE WITNESS:  Well, I would say that it's

12   a shared -- a shared -- it's shared between the

13   medical provider and myself and the behavioral

14   health provider.

15       Q.   (BY MR. RAMER)  Right.  I guess what I'm

16   getting at is I was asking you these questions

17   about maturity, and I think the response is you

18   are not the one who is assessing the maturity and

19   determining the maturity level, and so that

20   suggested that it was potentially beyond the scope

21   of your expertise.  And that was why I asked the

22   question.

23           And am I right in thinking that your last

24   answer was that it's joint expertise with you and

25   the others on the team?  Is that right?

Page 110

Dr. Kara Connelly August 28, 2023

1        A.   I would say that I'm not the only one

2   that's assessing someone's level of maturity and

3   making decisions about these different treatments

4   and that it is shared expertise.

5        Q.   And so then is it fair to say that you

6   individually could not determine the maturity

7   level of the patient with respect to pursuing a

8   particular treatment?

9             MS. NOWLIN-SOHL:   Object to form.

10            THE WITNESS:   I would not make a

11   determination that a patient was developmentally

12   or -- and the level of maturity without the

13   expertise of a behavioral health provider to say

14   that someone should pursue a certain intervention.

15       Q.   (BY MR. RAMER)   Okay.   So changing gears

16   a bit here, stick with your declaration.   And I'd

17   like to go to page 2, and specifically

18   paragraph 9.   And my question relates to the

19   second sentence.   And I'll read it and ask if I

20   read it correctly.

21            You state, "I have attended specialized

22   training sessions on these topics and routinely

23   review the literature to remain knowledgeable of

24   and familiar with all emerging research."

25            Did I read that correctly?

Page 111

(186 of 224), Page 186 of 224
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 112 of 374
Dr. Kara Connelly August 28, 2023

1        A.    Yes.

2        Q.    And could you describe the process you

3   use to routinely review the literature?

4        A.    Well, I have a system in place with

5   our -- kind of the national literature library, or

6   libraries, to alert me when new literature is

7   released or published within these different

8   topics or fields.

9        Q.    And so is that how you determine which

10  papers to read is that alert?

11       A.    That's one of them.  I also might learn

12  of new publications or research from other

13  professional organizations or other professional

14  colleagues.

15       Q.    Any other ways that you determine what

16  papers to read?

17       A.    Anytime a patient or family has a

18  question about any particular topic, then I will

19  usually go and review the literature to make sure

20  that my guidance is up-to-date.

21       Q.    Are there particular authors you trust in

22  this field?

23             MS. NOWLIN-SOHL:  Object to form.

24             THE WITNESS:  Can you be more specific?

25       Q.    (BY MR. RAMER)  Are there particular

                                    Page 112

Dr. Kara Connelly August 28, 2023

 1   researchers that you deem experts in the field?

 2          MS. NOWLIN-SOHL:  Same objection.

 3          THE WITNESS:  I think there are many, but

 4   it depends on what specific area of the field

 5   you're referring to.

 6       Q.   (BY MR. RAMER)  Well, I guess -- just to

 7   simplify, are you familiar with the name Annelou

 8   de Vries?

 9       A.   Yes.

10       Q.   Do you consider Annelou de Vries an

11   expert in the field?

12          MS. NOWLIN-SOHL:  Object to form.

13          THE WITNESS:  Again, can you specify to

14   what aspect of the field?

15       Q.   (BY MR. RAMER)  I mean, I guess what

16   literature are you routinely reviewing?

17       A.   Well, I review literature pertaining to

18   outcomes related to different medical and

19   nonmedical interventions, but also literature that

20   may be pertaining to mental health outcomes or

21   psychological outcomes.  So it really depends.

22          And that particular researcher I know has

23   many publications of her work that I have read.

24       Q.   And do you have any reason to think

25   Annelou de Vries is not an expert on topics on

Page 113

Dr. Kara Connelly August 28, 2023

1    which de Vries publishes?

2              MS. NOWLIN-SOHL:  Object to form.

3              THE WITNESS:  I can't say.  I don't have

4    any reason to believe that.

5        Q.   (BY MR. RAMER)  To believe that de Vries

6    is not an expert?  Is that right?

7        A.   I would say that I believe that de Vries

8    has a lot of expertise.

9        Q.   Are you familiar with the name Diane

10   Chen?

11       A.   Yes.

12       Q.   And does Diane Chen have a lot of

13   expertise?

14       A.   I would say so, yes.

15       Q.   How do you determine what papers or

16   articles are reliable?

17       A.   Well, there are a lot of factors that I

18   look at when I'm making that determination.

19       Q.   Can we run through them?  Like what

20   factors?

21       A.   Yeah.  So a lot of it can be reliance

22   upon the methodology, the sample sizes, the type

23   of study, what the outcomes are, other variables

24   that may be impacting or playing a role in the

25   outcome, any potential bias.  And that's just --

Page 114

Dr. Kara Connelly August 28, 2023

```
 1        Q.    What do you mean by "bias"?
 2        A.    There are some -- bias is generally
 3   something that can impact the way that results are
 4   interpreted.
 5        Q.    Can you be a little more specific?  What
 6   do you mean by that?
 7        A.    Yeah, like scientific study design,
 8   generally researchers will do their best to reduce
 9   elements of bias that may influence their results.
10        Q.    Do you think the existing literature
11   lacks granularity around the cause of gender
12   dysphoria?
13              MS. NOWLIN-SOHL:  Object to form.
14              THE WITNESS:  I'm sorry.  I don't
15   understand the question.
16        Q.    (BY MR. RAMER)  Is there something in
17   particular you don't understand it or just the --
18        A.    Granularity.
19        Q.    Are you familiar with the term
20   "confounding variable"?
21        A.    Yes.
22        Q.    And can you explain your understanding of
23   that term?
24        A.    Yeah.  The way that I explain everything,
25   think of it as something, again, that is -- it's a
```

Page 115

Dr. Kara Connelly August 28, 2023

```
 1    variable that can have an influence on an outcome.
 2         Q.    What do you mean by "influence"?
 3         A.    It can have -- it can have an influence
 4    separate from a variable that is being studied as
 5    producing outcome.
 6         Q.    And are you familiar with the term
 7    "selection bias"?
 8         A.    Yes.
 9         Q.    And can you explain your understanding of
10    that term?
11         A.    My understanding of that term is bias
12    that's introduced in a research study related to
13    the population that's being studied not being
14    representative of the larger population and the
15    way that the participants are included.
16         Q.    Are you familiar with the term
17    "systematic review"?
18         A.    Yes.
19         Q.    Could you explain your understanding of
20    that term?
21         A.    Yes.  Systematic review and the way that
22    I explain it is when a team of researchers review
23    and obtain all -- or establish a question that
24    they want answered through the systematic review
25    and then have a series of techniques for
```

Page 116

Dr. Kara Connelly August 28, 2023

```
 1    identifying existing literature and determining
 2    which of those articles meet their specific
 3    inclusion criteria, and then coming together again
 4    using their process to summarize and in some cases
 5    draw conclusions based on the literature that
 6    exists.
 7         Q.   What is the value of a systematic review
 8    of literature as compared to some other form of
 9    review of literature?
10              MS. NOWLIN-SOHL:  Object to form and
11    foundation.
12              THE WITNESS:  Can you specify what you
13    mean by "other form"?
14         Q.   (BY MR. RAMER)  I guess have you ever
15    heard of a narrative review of literature?
16         A.   That's not a term that I'm very familiar
17    with.
18         Q.   Let me try a different way of just --
19    what is the point of the systematic review -- let
20    me rephrase.
21              Why do researchers conduct systematic
22    reviews?
23         A.   Well, I think it can depend on what the
24    researcher's identified purpose is.  But generally
25    it can serve as bringing together existing
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Dr. Kara Connelly August 28, 2023

```
1    literature and comparing findings or
2    summarizing -- attempting to summarize findings.
3         Q.   And have you ever conducted a systematic
4    review?
5         A.   No.
6         Q.   Have you ever studied a systematic review
7    carefully?
8         A.   Can you specify "studied carefully"?
9         Q.   Have you ever read a systematic review?
10        A.   Yes.
11        Q.   As you sit here today, are you able to
12   name any specific systematic reviews relating to
13   literature in your field that you have read?
14        A.   I have read a systematic review.  I
15   cannot remember the title of it, that is -- that
16   pertains to existing literature about
17   gender-affirming care for youth.
18        Q.   Any others other than that one?
19        A.   Not that I can think of at the moment.
20        Q.   Are you familiar with the term
21   "evidence-based medicine"?
22        A.   Yes.
23        Q.   And can you explain your understanding of
24   that term?
25        A.   Yes.  The way that I explained that is
```

Page 118

(193 of 224), Page 193 of 224
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 119 of 374
Dr. Kara Connelly August 28, 2023

1    medicine that is guided by published evidence.

2        Q.    And have you taken any particular courses

3    on evidence-based medicine?

4        A.    I may have had a course as part of the

5    curriculum for my master's in clinical research,

6    but I can't recall if they were titled that.

7            MR. RAMER:  I'm going to try and send

8    another exhibit.  Let's see here.  I think this is

9    the Wi-Fi on my end.  It's hung up in my outbox.

10   There we go.

11           MS. NOWLIN-SOHL:  We're waiting on it.

12           MR. RAMER:  Okay.  It's a little bit

13   larger of a file, so it may take a second.

14           MS. NOWLIN-SOHL:  Have others received it

15   yet?

16           THE REPORTER:  I did receive it.

17           MR. RAMER:  Still waiting?

18           MS. NOWLIN-SOHL:  Yeah.  I'm hitting the

19   refresh button, but still nothing.

20           MR. RAMER:  All right.  I wonder if we

21   still haven't received it, if we should just break

22   for a minute.

23           MS. NOWLIN-SOHL:  I mean, are you at a

24   good spot?  Does it make sense to stop for lunch

25   now?

                                    Page 119

Dr. Kara Connelly  August 28, 2023

```
 1              MR. RAMER:  Sure.  We can do that.

 2              MS. NOWLIN-SOHL:  Sorry.

 3              MR. RAMER:  No.  No problem.  And maybe

 4    I'll just send a couple in advance for the next.

 5    I assume you still haven't got --

 6              MS. NOWLIN-SOHL:  I have not.  It's not

 7    on my phone either.

 8              MR. RAMER:  Okay.  So showing 3:12, how

 9    long would you like for lunch?

10              MS. NOWLIN-SOHL:  Should we go to 4:00

11    Eastern?

12              MR. RAMER:  Sure.  That works for me.

13    Does that work for -- yeah, okay.  All right.

14    Let's do that.

15              MS. NOWLIN-SOHL:  All right.  Sounds

16    good.  We'll see you then.

17              THE VIDEOGRAPHER:  So the time is

18    1:12 p.m. Mountain time, and we are off the

19    record.

20         (Lunch break taken from 1:12 p.m. to 2:03 p.m.)

21              THE VIDEOGRAPHER:  Okay.  So we are

22    recording.  The time is 2:03 Mountain time, and we

23    are back on the record.

24              (Deposition Exhibit No. 4 was marked.)

25         Q.   (BY MR. RAMER)  Hello, Dr. Connelly.
```

Page 120

(195 of 224), Page 195 of 224 Case: 24-142, 01/18/2024, DktEntry: 14.3, Page 195 of 224
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 121 of 374
Dr. Kara Connelly August 28, 2023

1       A.    Hello.

2       Q.    Do you have what I've described as

3   Connelly Exhibit 4 in front of you?

4       A.    Yes.

5       Q.    And I assume you're able to read through

6   this whole document at lunch?  That's a joke.

7   It's a joke.

8       A.    Oh.

9       Q.    But do you recognize this document?

10      A.    I do not.

11      Q.    Do you recognize the lead author's name,

12  Gordon Guyatt?

13      A.    I may have seen it before, but I can't

14  remember where.

15      Q.    Okay.  I'm just going to ask a couple of

16  questions about just the discussion of concepts in

17  this.  And I'll direct you there.  I'm not going

18  to ask you about the contents of the entire

19  document.

20      A.    Okay.

21      Q.    And the first point I want to discuss is

22  actually in the preface of this, so it's Roman

23  Numeral 26, XXVI.

24          MS. NOWLIN-SOHL:  Do you know what page

25  of the PDF that's on?

Page 121

```
 1              MR. RAMER:  I can try to find that.  So
 2     27 of the PDF.
 3              MS. NOWLIN-SOHL:  Okay.  We are on
 4     page 27.
 5          Q.  (BY MR. RAMER)  Okay.  And the first full
 6     paragraph, second sentence, I'm just going to read
 7     it and ask if I read it correctly.
 8              It says "We have added a fundamental
 9     principle to the hierarchy of evidence and the
10     necessity for value and preference judgments:
11     that optimal clinical decision-making requires
12     systematic summaries of the best available
13     evidence."
14              Did I read that correctly?
15          A.  Yes.
16          Q.  And do you agree that optimal
17     decision-making requires systematic summaries of
18     the best available evidence?
19              MS. NOWLIN-SOHL:  Objection; foundation.
20              THE WITNESS:  I would say that systematic
21     summaries of the best available evidence are
22     definitely important contributions to clinical
23     decision-making.
24          Q.  (BY MR. RAMER)  When you say "important
25     contributions," I take it to mean that you do not
```

                                              Page 122

1  think that optimal clinical decision-making

2  requires systematic summaries of the best

3  available evidence; is that fair?

4       A.   I think --

5            MS. NOWLIN-SOHL:  Objection;

6  mischaracterizes the testimony.

7            THE WITNESS:  The optimal clinical

8  decision-making can include systematic summaries.

9       Q.   (BY MR. RAMER)  But does not require it?

10  Is that your testimony?

11       A.   I don't know if I would say that it

12  requires systematic summaries.

13       Q.   Okay.  So you disagree with this

14  statement; is that right?

15            MS. NOWLIN-SOHL:  Objection; form.

16            THE WITNESS:  In some cases -- systematic

17  summaries are not always available.  So with that

18  in mind -- and I believe that clinical -- optimal

19  clinical decision-making can be performed if

20  systematic summaries are not available.

21       Q.   (BY MR. RAMER)  What about if systematic

22  summaries are available?

23       A.   Then I would say that the systematic

24  summaries should be included in all of the

25  evidence that's used in clinical decision-making.

Page 123

Dr. Kara Connelly August 28, 2023

```
 1        Q.    What do you understand the phrase
 2   "hierarchy of evidence" to mean?
 3        A.    Is that in this sentence?  Or in this
 4   paragraph?
 5        Q.    Sorry, yeah.  It's in the -- it is in the
 6   sentence before the colon.  It says "We have added
 7   a fundamental principle to the hierarchy of
 8   evidence."
 9              Are you familiar with that term, the
10   "hierarchy of evidence"?
11        A.    It can mean -- it could mean different
12   things.
13        Q.    Like what?
14        A.    I can explain what my understanding of
15   hierarchy of evidence is.
16        Q.    Please.
17        A.    It is categorization of different types
18   of evidence as -- in terms of validity and
19   reliability.
20        Q.    And I think next in this, I'd like to go
21   to -- and this is the only other page we'll go to
22   in this.  It's page 15.  And I'll see if I can
23   find what that is in the PDF.  Looks like it is 44
24   of the PDF.
25              MS. NOWLIN-SOHL:  Okay.
```

Page 124

Dr. Kara Connelly August 28, 2023

```
 1          Q.   (BY MR. RAMER)  Are you there?

 2          A.   Yes.

 3          Q.   And I'm just going to read the first

 4     sentence of the first full paragraph and ask if I

 5     read it correctly.

 6               It says "Returning to the hierarchy of

 7     therapy, noting the limitations of human

 8     intuition, EBM places the" --

 9               MS. NOWLIN-SOHL:  Hold on.  Do you see

10     that?

11               THE WITNESS:  No.  Am I in the wrong

12     paragraph?

13               MR. RAMER:  Are you on page -- what page

14     are you on?

15               MS. NOWLIN-SOHL:  Okay.  We just hadn't

16     scrolled far enough down.  We're there.

17               MR. RAMER:  Gotcha.  I'll start that

18     again.

19          Q.   (BY MR. RAMER)  "Return to the hierarchy

20     of therapy, noting the limitations of human

21     intuition, EBM places the unsystematic

22     observations of individual clinicians lowest on

23     the hierarchy."

24               Did I read that correctly?

25          A.   Yes.
```

Page 125

(200 of 224), Page 200 of 224
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 126 of 374
Case: 24-142, 01/18/2024, DktEntry: 14.3, Page 200 of 224

Dr. Kara Connelly August 28, 2023

```
 1        Q.    What is your understanding of what "the
 2   unsystematic observations of individual
 3   clinicians" means?
 4            MS. NOWLIN-SOHL:  Objection; foundation.
 5            You can also look at this document if you
 6   need to.
 7            THE WITNESS:  Yeah, I think it's hard for
 8   me to understand.  I'm not familiar with the term
 9   "unsystematic observations of individual
10   clinicians," and I can't comment without reading
11   more of the context.
12        Q.    (BY MR. RAMER)  Okay.  Do you see the
13   figure on the same page, Figure 2-3?
14        A.    Yes.
15        Q.    Were these the categories you were
16   describing when you were discussing the hierarchy
17   of evidence earlier?
18        A.    No.
19        Q.    Are you familiar with the term
20   "observational study"?
21        A.    Yes.
22        Q.    And what do you understand an
23   observational study to be?
24        A.    An observational study is looking at a
25   treatment and its outcome without the researcher
```

Page 126

1    entering any influence or variable.  So it's
2    simply observing the outcome of a particular
3    treatment that's been -- the patient has received.
4         Q.   And are you familiar with the "Multiple
5    patient randomized trial"?
6         A.   I can only assume what that is referring
7    to.  I generally don't see that term that's
8    just -- in the way that it's listed.
9         Q.   What would you assume it's referring to?
10        A.   A randomized trial.
11        Q.   And can you describe what a randomized
12   trial is?
13        A.   Randomized trial is when there are two --
14   or at least more than one treatment that's being
15   investigated, and patients are randomly assigned
16   to one or more of the treatment groups without
17   them knowing or choosing what group they're
18   assigned to.
19        Q.   And can you explain why a randomized
20   trial would rank higher in the hierarchy of
21   evidence than an observational study?
22             MS. NOWLIN-SOHL:  Objection; foundation.
23             THE WITNESS:  The main difference between
24   the two is that patients are randomly assigned to
25   treatment groups rather than other ways that they

Page 127

Dr. Kara Connelly August 28, 2023

```
1    are given treatment.  And so the way that the
2    studies are interpreted can be different in terms
3    of the validity and reliability.
4         Q.   (BY MR. RAMER)  How can they be different
5    in terms of validity and reliability?
6         A.   It depends on the -- it depends on the
7    patient population, the treatments being studied,
8    and the size of the -- the sample sizes of the
9    studies that may play a role in the way that they
10   are viewed in terms of validity and reliability.
11        Q.   Sorry.  I just want to clarify that.
12             So the reason that randomized trials
13   would potentially be deemed more reliable has to
14   do with the patient population and the sample
15   size?  Is that what you said?
16        A.   No.  That's not what I said.  The
17   randomized trials, the factor that may influence
18   the way that it's interpreted in terms of validity
19   and reliability is the fact that the samples
20   are -- the patients are randomized to the
21   different treatment groups rather than having
22   a -- rather than -- yeah, rather than not being
23   randomly assigned to different treatment groups.
24             But if there's a large observational
25   study, it's difficult -- you can't always compare
```

Page 128

Dr. Kara Connelly August 28, 2023

```
 1   and say that every single randomized trial is
 2   stronger evidence than an observational study.
 3   There's a lot of factors that play into that
 4   determination.
 5        Q.   And still looking at this figure at the
 6   bottom, are you familiar with the term "clinical
 7   experience"?
 8        A.   Yes.
 9        Q.   And are you able to explain why clinical
10   experience is at the bottom of the hierarchy of
11   evidence?
12        A.   At the bottom of this figure, hierarchy
13   of evidence?
14        Q.   Correct.
15        A.   I can only assume what that is meaning to
16   say is that it can be more difficult to make -- to
17   draw conclusions about populations based on one
18   person's clinical experience.
19        Q.   Do you agree with that principle?
20        A.   I think in a lot of cases, that can be
21   accurate.
22        Q.   Are you familiar with the term "GRADE
23   methodology"?
24        A.   Yes.
25        Q.   And could you explain your understanding
```

Page 129

App.203

Dr. Kara Connelly August 28, 2023

1    of that term?

2         A.   My understanding of the term is a system

3    that is used to classify different types of

4    evidence.

5         Q.   Have you ever attempted to apply the

6    criteria specified by the GRADE methodology?

7              MS. NOWLIN-SOHL:  Object to the form.

8              THE WITNESS:  In my own practice?  Or

9    in --

10        Q.   (BY MR. RAMER)  Ever.

11             MS. NOWLIN-SOHL:  Same objection.

12             THE WITNESS:  I have not ever used the

13   GRADE methodology in -- while writing a paper.

14        Q.   (BY MR. RAMER)  I guess why did you use

15   the qualifier "while writing a paper" at the end

16   there?

17        A.   I wasn't sure what you mean by using.  I

18   think generally the GRADE methodology is used

19   when -- for example, writing clinical methods

20   guidelines.  I have not done that.

21             MR. RAMER:  Okay.  And then I think

22   we'll -- we should have Connelly Exhibit 5.  Let

23   me know if that's not the case.

24             MS. NOWLIN-SOHL:  Yes, we do.

25             (Deposition Exhibit No. 5 was marked.)

Page 130

(205 of 224), Page 205 of 224
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 131 of 374
Case: 24-142, 01/18/2024, DktEntry: 14.3, Page 205 of 224

Dr. Kara Connelly August 28, 2023

```
 1        Q.   (BY MR. RAMER)   Okay.   And, Doctor, have
 2   you seen this article before?
 3        A.   I have not.
 4        Q.   Okay.   I am just going to ask you about
 5   some concepts in it, specifically page 402.   It's
 6   the second page of the document, and in the upper
 7   left of that page, there's a box labeled "Key
 8   Points."
 9             And the third bullet down, I'd just like
10   to read and ask if I read it correctly.
11             It says "The optimal application of GRADE
12   requires systematic review of the impact of
13   alternative management strategies on all
14   patient-important outcomes."
15             Did I read that correctly?
16        A.   Yes.
17        Q.   Are you familiar with the term
18   "patient-important outcome"?
19        A.   That's not a term that I am all that
20   familiar with.   I'm not sure what refers to in
21   this -- or what this paper is referring to with
22   those -- with that statement.
23        Q.   Okay.   As a general matter, based on your
24   understanding of GRADE, GRADE is a method for
25   rating the strength of evidence to predict the
```

Page 131

Dr. Kara Connelly August 28, 2023

1    outcome of a particular intervention, correct?

2        A.    Yes.

3        Q.    And I'd like to go, same document,

4    page 404, so two pages later.  And at the top,

5    there's Table 2, and it's entitled "Significance

6    of the four levels of evidence."

7             Do you see that?

8        A.    Yes.

9        Q.    Are you familiar with this concept of the

10   GRADE quality levels that's represented in the

11   table, just as a general matter?

12       A.    Yes.

13       Q.    And basically the GRADE methodology calls

14   for the assignment of one of those quality levels

15   to the body of evidence that's being assessed,

16   correct?

17       A.    I think that's generally how it's applied

18   or used.

19       Q.    And I just want to -- looking in that

20   table at the "Quality level low," I just want to

21   read the current definition, which is in the

22   second column and ask if I read it correctly.

23            It says "Our confidence in the effect

24   estimate is limited.  The true effect may be

25   substantially different from the estimate of that

                                        Page 132

```
 1   effect."
 2            Sorry, I read it wrong.  Let me try
 3   again.
 4            "Our confidence in the effect estimate is
 5   limited.  The true effect may be substantially
 6   different from the estimate of the effect."
 7            Did I read that correctly?
 8        A.   Yes.
 9        Q.   And below that is "Very low," and I'll
10   read the definition for that, which says "We have
11   very little confidence in the effect estimate.
12   The true effect is likely to be substantially
13   different from the estimate of effect."
14            Did I read that correctly?
15        A.   Yes.
16        Q.   Okay.  On this same page at the bottom,
17   there's Table 3.  And it's entitled "A summary of
18   GRADE's approach to rating quality of evidence."
19            Do you see that?
20        A.   Yes.
21        Q.   And in the first column, it talks -- you
22   see it's labeled "Study design"?
23        A.   Yes.
24        Q.   And then the second column over you have
25   "Initial quality of a body of evidence"; is that
```

Page 133

Dr. Kara Connelly August 28, 2023

```
 1    right?
 2          A.    Yes.
 3          Q.    And then the next two columns, the first
 4    one is entitled "Lower if," correct?
 5          A.    Yes.
 6          Q.    And the second one is entitled "Higher
 7    if," correct?
 8          A.    Yes.
 9          Q.    Do you know what those two columns are
10    saying?
11          A.    I can't say for certain.  I'm not
12    familiar -- I haven't seen those two columns
13    before.
14                MR. RAMER:  Okay.  We'll move on to
15    Connelly Exhibit 6.
16                (Deposition Exhibit No. 6 was marked.)
17          Q.    (BY MR. RAMER)  And are you familiar with
18    this document?
19                MS. NOWLIN-SOHL:  Hang on real quick,
20    sorry.  They came in in the wrong order in my
21    email.
22                MR. RAMER:  All right.
23                MS. NOWLIN-SOHL:  So this is GRADE
24    guidelines 4?
25                MR. RAMER:  That's correct.
```

Page 134

Dr. Kara Connelly August 28, 2023

```
 1              MS. NOWLIN-SOHL:  Okay.
 2              THE WITNESS:  I'm sorry.  What was the
 3      question?
 4         Q.   (BY MR. RAMER)  Are you familiar with
 5      this document?
 6         A.   No.
 7         Q.   Okay.  I'll just ask limited questions on
 8      this.
 9              On page 409, which I think is the third
10      page of the document, in the right column, there
11      is section 7.1.  And I'm just going to read the
12      sentence that starts below that and runs over onto
13      the next page and ask if I read that correctly.
14              It says "Ideally observational studies
15      will choose contemporaneous comparison groups
16      that, as far as possible, differ from intervention
17      groups only in the decision (typically by patient
18      or clinician) not to use the intervention."
19              Did I read that correctly?
20         A.   Yes.
21         Q.   Why would one ideally include a
22      comparison group?
23         A.   The comparison group can reduce the risk
24      of bias like I was talking about earlier.
25         Q.   And then on the next page, 410, the first
```

Page 135

Dr. Kara Connelly August 28, 2023

1    full paragraph, I'm going to read the first two

2    sentences this time and ask if I read those

3    correctly.

4            It says "An alternative approach is to

5    study only patients exposed to the intervention, a

6    design we refer to as a case series (others may

7    use 'single group cohort').  To make inferences

8    regarding intervention effect, case series must

9    still refer to results in a comparison group."

10           Did I read that correctly?

11       A.   Yes.

12       Q.   Do you agree that to make interventions

13   regarding intervention effects, case series must

14   still refer to results in a comparison group?

15       A.   I think that referring to results in a

16   comparison group can increase the reliability of

17   the inferences of the intervention effects.

18       Q.   So in other words, you do not think a

19   case series must refer to results in a comparison

20   group in order to make inferences; is that

21   correct?

22       A.   Having the comparison group improves the

23   ability to make the inferences.

24       Q.   Do you think you can make inferences

25   regarding intervention effects from a case series

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Dr. Kara Connelly August 28, 2023

```
 1    when there is no comparison group?
 2           MS. NOWLIN-SOHL:  Object to form.
 3           THE WITNESS:  I think that it's possible
 4    to make inferences about intervention effects, but
 5    those inferences are more reliable than the
 6    comparison group that's used.
 7       Q.  (BY MR. RAMER)  Are you familiar with the
 8    term "lost to follow-up"?
 9       A.  Yes.
10       Q.  Can you explain your understanding of
11    that term?
12       A.  Well, do you mean in a research setting
13    or --
14       Q.  Yes, in a research setting.
15       A.  I think different research groups or
16    different research studies may refer to it
17    differently, but I generally think of it as
18    participants in a research study that did not
19    complete the study or did not complete the --
20    yeah, the study measures.
21       Q.  And so now I'd like to return to your
22    declaration, and specifically page 3, paragraph
23    15, in the first sentence.  And typical drill,
24    I'll read it and ask if I read it correctly.
25           You state, "The Endocrine Society, in
```

Page 137

Dr. Kara Connelly August 28, 2023

1    partnership with the Pediatric Endocrine Society
2    and WPATH, have published clinical practice
3    guidelines for the treatment of gender dysphoria
4    that are based on systematic reviews of research
5    and the expert opinions of clinicians in the
6    field."
7            Did I read that correctly?
8        A.   Yes.
9        Q.   I'd just like to talk through the
10   Endocrine Society guidelines and the WPATH
11   guidelines one at a time.  And I'll start with the
12   Endocrine Society guidelines.
13           And in this sentence, you say that these
14   guidelines are based on systematic reviews of
15   research; is that right?
16       A.   Yes.
17       Q.   And what do you mean by that?
18       A.   That means that systematic reviews may
19   have been included in addition to research studies
20   that may not fall under the definition of
21   systematic reviews.
22       Q.   What do you mean when you say "may have
23   been included"?
24       A.   I would have to look back at all of the
25   references of the guidelines, but that systematic

                                        Page 138

1    reviews may have been a part of how those clinical

2    practice guidelines were established.

3        Q.   And specifically with respect to the

4    Endocrine Society guidelines, what systematic

5    reviews are you referring to?

6        A.   I can't say without looking -- again,

7    looking at the references.

8            MR. RAMER:  Okay.  I think you should

9    have, Li, the Connelly Exhibit 7.

10           (Deposition Exhibit No. 7 was marked.)

11           MS. NOWLIN-SOHL:  The Endocrine Society

12   guidelines?

13           MR. RAMER:  Yes.  Well, I'll ask

14   Dr. Connelly.

15       Q.   (BY MR. RAMER)  Are these the Endocrine

16   Society guidelines?

17       A.   Yes.

18       Q.   Okay.  And these are what you're

19   referring to in your declaration, correct?

20       A.   Yes, just making sure this is the -- yes,

21   the version from 2017.

22       Q.   Did you help draft these?

23       A.   No.

24       Q.   And I'd like to go to -- so you likely

25   know the pagination is a little odd on these.  I'd

Page 139

Dr. Kara Connelly August 28, 2023

1  like to go to 3873, and specifically the left

2  column.

3           And there's a bold header that says

4  "Commissioned systematic review."

5           Do you see that?

6      A.   Yes.

7      Q.   And I'm just going to read the first

8  sentence and ask if I read it correctly.

9           It says "The task force commissioned two

10 systematic reviews to support this guideline."

11          Did I read that correctly?

12     A.   Yes.

13     Q.   And are these the systematic reviews

14 you're referencing in your declaration?

15     A.   Yes.

16     Q.   And have you ever read these systematic

17 reviews?

18     A.   I cannot say that I -- I cannot recall

19 that I have, but I would need to see what the

20 titles of them are.

21     Q.   Well, do you recall what the subject was

22 of the two systematic reviews?

23     A.   No.

24     Q.   Turning to the sentence after the one I

25 just read, I'll read it and ask if I read it

Page 140

Dr. Kara Connelly August 28, 2023

```
 1    correctly.
 2            It says "The first one aims to summarize
 3    the available evidence on the effect of sex
 4    steroid use in transgender individuals on lipids
 5    and cardiovascular outcomes."
 6            Did I read that correctly?
 7        A.    Yes.
 8        Q.    Do you have an understanding of how
 9    lipids and cardiovascular outcomes are potentially
10    relevant to your field?
11        A.    Yes.
12        Q.    How?
13        A.    Some treatments could potentially have an
14    impact on lipids and cardiovascular outcomes.
15        Q.    What kind of impact?
16        A.    Well, some treatments can change -- can
17    have an impact on the different types of lipids
18    and cholesterol.  Some lipids can have an impact
19    on blood pressure.  Some treatments may have an
20    impact on -- well, those are the two main ones
21    that I can think of.
22        Q.    Is it fair to say when you're saying
23    "impact," you mean harmful impact?
24        A.    Not necessarily.
25        Q.    Why not necessarily?
```

Page 141

Dr. Kara Connelly August 28, 2023

1      A.    Well, it depends on the -- there are some
2   treatments that may have -- that may raise the
3   risk of some cardiovascular outcomes and some
4   treatments that may lower the risk of some
5   cardiovascular outcomes, depending on the
6   individual, their family history, and the
7   medication that's involved.
8      Q.    Returning to 3873 and now the right
9   column, the very top, the first full sentence,
10  I'll read it and ask if I read it correctly.
11         It says "The second review summarized the
12  available evidence regarding the effect of sex
13  steroids on bone health in transgender individuals
14  and identified 13 studies."
15         Did I read that correctly?
16      A.    Yes.
17      Q.    And do you have an understanding of what
18  relevance bone health has to your field?
19      A.    Yes.
20      Q.    And what is that?
21      A.    Sex steroid hormones have differing
22  impacts on bone development in general.
23      Q.    In what sense?
24      A.    The different -- well, they both --
25  both -- well, estrogen and testosterone both

Page 142

(217 of 224), Page 217 of 224
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 143 of 374
Case: 24-142, 01/18/2024, DktEntry: 14.3, Page 217 of 224
Dr. Kara Connelly August 28, 2023

1    impact acquisition of bone, but they can have
2    different effects on what part of the bone
3    structure they impact.
4         Q.   And what do you mean by that?
5         A.   So there's two types of bone, cortical
6    bone and trabecular bone.  And there are different
7    hormone receptors on the different parts of the
8    bone.
9              So different hormones can impact one or
10   both parts of the bone depending on which hormone
11   it is.
12        Q.   Did either of these two systematic
13   reviews assess the effectiveness of treatment on
14   patients' mental health?
15        A.   I don't know.
16        Q.   Did either of these two systematic
17   reviews assess the effectiveness of puberty
18   blockers to reduce gender dysphoria?
19        A.   I can't answer that.  I haven't --
20   without reading them.
21        Q.   You don't know that as you sit here
22   today?
23        A.   I can't say what the systematic
24   reviews -- what the outcomes were, the specific
25   outcomes of both systematic review studies without

Page 143

Dr. Kara Connelly August 28, 2023

```
 1   reviewing them.
 2        Q.   Well, I guess I'm not asking for the
 3   specific outcome.  I'm asking what they actually
 4   assessed.
 5             And the question is did either of these
 6   systematic reviews assess the effectiveness of
 7   puberty blockers to reduce gender dysphoria?
 8        A.   I am not sure.
 9        Q.   Did either of these systematic reviews
10   assess the effectiveness of cross-sex hormones to
11   reduce gender dysphoria?
12        A.   Can you repeat that question?
13        Q.   Did either of these systematic reviews
14   assess the effectiveness of cross-sex hormones to
15   reduce gender dysphoria?
16        A.   I also -- I'm not sure without looking at
17   the reviews.
18        Q.   Did either of these systematic reviews
19   assess the effectiveness of surgeries to reduce
20   gender dysphoria?
21        A.   I don't know that either without reading
22   them.
23        Q.   If you had been tasked with drafting
24   these guidelines, would you have commissioned
25   systematic reviews to assess those topics?
```

Page 144

```
1              MS. NOWLIN-SOHL:  Objection; form,
2       foundation, speculation.
3              THE WITNESS:  If I had been commissioned
4       as part of the team that was putting these
5       guidelines together, I would work with the team of
6       experts in determining whether the systematic
7       reviews should be performed.  I can't say how that
8       decision was made.
9          Q.   (BY MR. RAMER)  We'll move on to the
10      WPATH guidelines and specifically -- just going
11      back to your declaration discussion of those,
12      page 3, paragraph 15.
13             I'm just going to read the second
14      sentence of paragraph 15 and ask if I read it
15      correctly.
16             You state "The first version of the WPATH
17      guidelines known as the standards of care was
18      published in 1979, and the most recent version,
19      version 8, was released in 2022."
20             Did I read that correctly?
21         A.   Yes.
22         Q.   And you called them guidelines and then
23      note that they are known as the standards of care;
24      is that right?
25         A.   Yes.
```

Page 145

Dr. Kara Connelly August 28, 2023

1        Q.   Is there a distinction between clinical
2    guidelines and the standard of care?
3             MS. NOWLIN-SOHL:  Objection to the extent
4    that that calls for a legal conclusion.
5             THE WITNESS:  I think some people use
6    those terms interchangeably when talking about the
7    WPATH standards of care.
8        Q.   (BY MR. RAMER)  Okay.  I understand that.
9    I'm just asking in your field, or as a clinician,
10   is there a distinction between clinical guidelines
11   and a standard of care?
12            MS. NOWLIN-SOHL:  Objection to the extent
13   that that calls for a legal conclusion.
14            THE WITNESS:  If -- I'm sorry.  Can you
15   repeat the question again?
16       Q.   (BY MR. RAMER)  Is there a distinction
17   between clinical guidelines and a standard of
18   care?
19            MS. NOWLIN-SOHL:  Same objection.
20            THE WITNESS:  They're -- I think that
21   there's a lot of ways that the word "guidelines"
22   are applied.  And in the case of this sentence,
23   it's used interchangeably with "standards of
24   care."
25       Q.   (BY MR. RAMER)  Okay.  So as a clinician,

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

(221 of 224), Page 221 of 224 Case: 24-142, 01/18/2024, DktEntry: 14.3, Page 221 of 224
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 147 of 374
Dr. Kara Connelly August 28, 2023

```
 1    you don't think there's a distinction between, as
 2    a general matter, clinical guidelines and standard
 3    of care; is that right?
 4            MS. NOWLIN-SOHL:  Objection;
 5    mischaracterizes the testimony and to the extent
 6    that it calls for a legal conclusion.
 7            THE WITNESS:  Can you repeat the question
 8    again?
 9        Q.   (BY MR. RAMER)  I guess the question is
10    just this:  Is there a distinction as a general
11    matter between clinical guidelines and a standard
12    of care?
13            MS. NOWLIN-SOHL:  Same objection.
14            THE WITNESS:  I think it just -- I think
15    it depends upon which clinical guideline is being
16    referred to and the way that that clinical
17    guideline was established, if it's a -- there can
18    be different ways that clinical guidelines are
19    established, and so it depends on what -- which --
20    what type of guideline is being referred to.
21        Q.   (BY MR. RAMER)  Well, then what is a
22    standard of care?
23            MS. NOWLIN-SOHL:  Objection to the extent
24    that that calls for a legal conclusion.
25            THE WITNESS:  Do you mean what is a
```

Page 147

1    standard of care in WPATH's definition?  Or --
2        Q.    (BY MR. RAMER)  No.  I just mean as a
3    general matter as a clinician, when somebody is
4    talking about the standard of care, what does that
5    mean?
6            MS. NOWLIN-SOHL:  Same objection.
7            THE WITNESS:  I think it can be used as
8    what is -- what is considered best practice for a
9    patient population.
10       Q.    (BY MR. RAMER)  If somebody said that a
11   standard of care was more authoritative than
12   clinical guidelines, would that statement make
13   sense?
14           MS. NOWLIN-SOHL:  Object to form.
15           THE WITNESS:  Would it -- I don't think
16   that I can make sense of that.
17       Q.    (BY MR. RAMER)  So same paragraph in your
18   declaration, back to the first sentence.  And we
19   already discussed this in the context of the
20   Endocrine Society guidelines, but you state that
21   the WPATH guidelines are based on systematic
22   reviews of research, correct?
23       A.    Yes.
24       Q.    And with respect to the WPATH guidelines,
25   what systematic reviews are you referring to here?

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Dr. Kara Connelly August 28, 2023

1    A.    I can't say for certain what systematic
2    reviews.
3    Q.    That you're referring to in paragraph 15?
4    A.    Yes, without reading the references.
5    Q.    And as you sit here today, do you know
6    whether WPATH commissioned a systematic review
7    during the development of the current guidelines?
8    A.    I am not sure if they -- I'm not sure.
9    MR. RAMER:  So we'll go to -- Li, we'll
10   go to Connelly Exhibit 8, I believe.  It should be
11   Baker, article by Baker.
12   (Deposition Exhibit No. 8 was marked.)
13   MS. NOWLIN-SOHL:  Okay.  We have it.
14   Q.    (BY MR. RAMER)  And, Dr. Connelly, have
15   you seen this article before?
16   A.    Not that I can recall.
17   Q.    Okay.  Let's go to page 2 and
18   specifically right column under the bold "Search
19   Strategy and Selection Criteria."
20   Do you see that?
21   A.    Yes.
22   Q.    And I'll just read the first sentence and
23   ask if I read it correctly.
24   It says "This review is one of a series
25   of systematic reviews on gender-affirming care

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

App.223

(224 of 224), Page 224 of 224Case: 24-142, 01/18/2024, DktEntry: 14.3, Page 224 of 224
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 150 of 374
Dr. Kara Connelly August 28, 2023

```
 1    conducted for WPATH to inform the eighth revision
 2    of the Standards of Care."
 3            Did I read that correctly?
 4       A.   Yes.
 5       Q.   And do you recall reading this article
 6    before?
 7       A.   This article?
 8       Q.   Correct.
 9       A.   No.
10       Q.   I want to skip to page 12.  And under the
11    bold discussion, first paragraph, last sentence,
12    I'll read it and ask if I read it correctly.
13            It says "It was impossible to draw
14    conclusions about the effects of hormone therapy
15    on deaths by suicide."
16            Did I read that correctly?
17       A.   Yes.
18       Q.   Do you have any reason to disagree with
19    that statement?
20            MS. NOWLIN-SOHL:  Object to form;
21    foundation.
22            THE WITNESS:  I can't comment without
23    looking at the specific studies that they are
24    referring to.
25       Q.   (BY MR. RAMER)  Are you aware of any
```

Page 150