APPEAL NO. 24-142

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAM POE, by and through her parents and next friends Penny and Peter Poe, et al.,

*Plaintiffs-Appellees*,

v.

RAÚL LABRADOR, in official capacity as Attorney General of the State of Idaho, et al.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:23-cv-00269-BLW

## APPENDIX TO APPELLANTS' RULE 27-3 EMERGENCY MOTION
## FOR STAY PENDING APPEAL – VOLUME 3

RAÚL R. LABRADOR
ATTORNEY GENERAL

JOSHUA N. TURNER
ACTING SOLICITOR GENERAL

JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense
IDAHO OFFICE OF
THE ATTORNEY GENERAL
700 W. Jefferson St., Suite 210
Boise, ID 83720
(208) 334-2400
james.craig@ag.idaho.gov

JONATHAN A. SCRUGGS
HENRY W. FRAMPTON, IV
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

JOHN J. BURSCH
LINCOLN DAVIS WILSON
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
lwilson@ADFlegal.org

DAVID H. THOMPSON
BRIAN W. BARNES
JOHN D. RAMER
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
(202) 220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Appellants*

IN THE UNITED STATES DISTRICT COURT
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

Pam POE, et al.,

      Plaintiffs,

v.                                                              Case No. 1:23-cv-00269-CWD

Raúl LABRADOR, et al.,

      Defendants.

_____/

## **Expert Report of**

## **James M. Cantor, PhD**

# **Table of Contents**

I.    **Credentials and Qualifications** ...................................................... **1**

    A.  Education and professional background..................................1

    B.  Clinical expertise vs. scientific expertise ...............................4

    C.  The professional standard to evaluate treatment models is to rely on objective assessors, not treatment model users in a conflict of interest with its results. ..........4

II.   **Multiple international health care systems that had initially expanded medicalized transition to include minors have reversed that policy, as research on safety and effectiveness accumulated, in a growing international trend against the medicalized transition of minors.** ............................................. **7**

    A.  England.......................................................................7

    B.  Finland.......................................................................9

    C.  Sweden.....................................................................11

    D.  France ......................................................................13

    E.  Norway ....................................................................14

    F.  Assertions by U.S. organizations and officials that there is 'no debate' over medicalized transition are false. ................15

III.  **Clinical research has a standard Pyramid of Evidence that summarizes the relative strength of potential sources of information.** .......................................... **17**

    A.  Clinical research comprises a standard *Pyramid of Evidence*, wherein studies from higher levels of evidence outrank even more numerous studies from lower levels of research. ....................................................17

    B.  The highest level of evidence for safety and effectiveness research is the systematic review of clinical experiments.......................18

        1.  Systematic reviews prevent the 'cherry-picking' of studies that favor a particular result..............................................19

        2.  Systematic reviews prevent biased assessment of individual studies by uniformly applying standard criteria to each study reviewed. The most widely used criteria set is "GRADE." ..................20

    C.  The highest level experimental study of clinical safety and effectiveness is the Randomized Controlled Trial (RCT). RCTs can demonstrate that a given treatment causes (rather than only correlates with) a given outcome. ...................21

        1.  RCTs, but not lower levels of evidence, overcome biases representing 'regression to the mean' and other factors that can mimic clinical improvement. ...............................................22

        2.  When a 'no treatment control group' is untenable, RCTs use an 'active comparator' group instead. ................................23

    D.  Cohort studies are the highest level of evidence about medicalized transition currently available. ...........................................23

    E.  Expert opinion represents the least reliable evidence. ...........................23

F.  Surveys and cross-sectional studies cannot demonstrate treatment effectiveness. ...............................................................................24

**IV.  Methodological defects limit or negate the evidentiary value of many studies of treatments for gender dysphoria in minors. ............................. 25**

A.  In science, to be valid, a claim must be objective, testable, and falsifiable. ..........25
B.  Correlation does not imply causation. ...................................................25
C.  When two or more treatments are provided at the same time, one cannot know which treatment caused observed changes (i.e., 'confounding')..................26
D.  Extrapolation to dissimilar populations and dissimilar conditions. ........................26
E.  Mental health assessment used for gate-keeping medicalized transition establishes a *selection bias,* creating a statistical illusion of mental health improvement among the selected. ...............................................................28

**V.  Systematic reviews of safety and effectiveness have been conducted by the health care ministries/departments of several governments. They *unanimously* concluded the evidence on medicalized transition in minors to be of poor quality. ..................... 30**

A.  Understanding safety and efficacy. ......................................................30
B.  The McMaster University systematic review of systematic reviews. ......................31
C.  The quality of the systematic reviews from governmental bodies and professional associations. ...............................................................32
D.  United Kingdom ..........................................................................35
E.  Sweden ....................................................................................38
F.  Finland.....................................................................................38
G.  Norway .....................................................................................39

**VI.  The Endocrine Society, WPATH, and the American Academy of Pediatrics did not conduct systematic reviews of safety and efficacy in establishing clinical guidelines, despite systematic reviews being the foundation and gold standard of evidence-based care. ........................................................................... 40**

A.  The Endocrine Society reviewed cross-sex hormones, but not puberty blockers. They reviewed safety, but did not review effectiveness research............40
B.  WPATH reviewed effectiveness, but not the safety of medicalized transition of minors.............................................................................41
C.  The American Academy of Pediatrics did not conduct a systematic review either of safety or effectiveness.............................................................45

**VII.  Definitions of sex, gender identity, and gender dysphoria. ........................... 46**

A.  Sex and sex-assigned-at-birth represent objective features......................................46
B.  Gender identity refers to subjective feelings that cannot be defined, measured, or verified by science. ...............................................................47

**VIII.  Gender Dysphoria is a mental health diagnosis. ........................................ 48**

**IX.  Distinct mental health phenomena must not be—but frequently are—confused or conflated. ...............................................................................49**

A. Adult-Onset Gender Dysphoria consists predominantly of males sexually attracted to females.................................................................49

B. Childhood-onset gender dysphoria (prepubertal-onset) is a distinct phenomenon characterized by high rates of desistance in the absence of social or medical transition.................................................50

1. Eleven cohort studies followed children not permitted social transition, all showing the majority to desist feeling gender dysphoric upon follow-up after puberty. ....................................................50

2. One cohort study followed children who were permitted social transition. In contrast with children not permitted to transition socially, most persisted in expressing gender dysphoria. ...........................53

3. There is no reliable method for predicting for which children who present with gender dysphoria will persist versus desist. ......................54

4. Temple Newhook's attempts to dismiss evidence of high rates of desistance from childhood gender dysphoria are invalid............................56

C. Adolescent-Onset Gender Dysphoria, the predominant clinical population today, is a distinct and largely unstudied phenomenon............................................59

X.    Suicide and suicidality are distinct phenomena representing different mental health issues and indicating different clinical needs. .................................... 61

A. Rates of suicidality among all adolescents have skyrocketed with the advent of social media........................................................................61

B. *Suicidality* is substantially more common among females, and *suicide*, among males. Sexual orientation is strongly associated with suicidality, but much less associated with suicide. ..................................................62

C. There is no evidence that medicalized transition reduces rates of suicide or suicidality. ..............................................................................64

XI.    Mental health profiles differ across adult-, adolescent-, and childhood-onset gender dysphoria. .................................................................................. 67

A. Mental health issues in Adult-Onset Gender Dysphoria. ..........................67

B. Mental health issues in Childhood-Onset Gender Dysphoria. ..................67

C. Mental health issues in Adolescent-Onset Gender Dysphoria (ROGD). .............69

D. Neuroimaging studies have associated brain features with sex and with sexual orientation, but not gender identity. ..............................................71

XII.    Medicalized transition of gender remains *experimental,* lacking causal evidence of mental health improvement. .................................................................. 73

A. Criteria distinguishing *'experimental'* from *'established'*. ....................73

B. International consensus explicitly regards gender transition to be experimental. ..............................................................................73

C. Claims that medical transition is "medically necessary" are undefined, unsupported, and self-interested........................................................75

D. WPATH repeatedly warns of untested hypotheses, continuing unknowns, and lack of research......................................................................76

XIII.   **There have been 14 cohort studies of puberty blockers and cross-sex hormones in minors. They provide no reliable evidence of effectiveness for improving mental health relative to mental health treatments that lack medical risk. ........................... 79**

    A. Of the cohort studies, five found little to no improvement in mental health. .........80

    B. Six of the cohort studies confounded medical treatment with psychotherapy. .......82

    C. Two found no advantage of medicalization over psychotherapy. ...........................85

    D. One failed to report whether psychotherapy was provided. ...................................86

XIV.   **Known and potential harms associated with administration of puberty blockers and cross-sex hormones to children and adolescents. ....................................................... 89**

    A. Sterilization without proven fertility preservation options. .....................................90

    B. Permanent loss of capacity for breast-feeding in adulthood. ..................................90

    C. Lifetime lack of orgasm and sexual function. .......................................................91

    D. Hormonal treatments during puberty interfere with neurodevelopment and cognitive development. ........................................................................................91

    E. Substantially delayed puberty is associated with medical harms. ...........................93

    F. Elevated risk of Parkinsonism in adult females. ....................................................93

    G. Reduced bone density. ..........................................................................................93

    H. Short-term/Immediate side-effects of puberty blockers include sterile abscesses, leg pain, headache, mood swings, and weight gain. ............................95

    I. Long-term use of cross-sex hormones in adults with gender dysphoria is associated with unfavorable lipid profiles (cholesterol and triglycerides) and other issues. ..........................................................................................................96

XV.   **Assertions that puberty blockers act only as a "fully reversible" "pause button" are not supported by scientific evidence. ...................................................................... 97**

    A. Stopping puberty does not stop time: Patients' peers continue to develop and mature, with patients falling increasingly behind. ....................................................98

    B. Blocking puberty blocks the awareness of sexuality and sexual orientation that can play an important role in the individual's understanding of gender identity. ................................................................................................................99

    C. Blocking puberty may block development of adult decision-making capacity. ...100

    D. Time spent on puberty blockers poses significant opportunity costs. ...................101

XVI.   **Assessments of clinical guidelines, standards, and position statements. ....................102**

    A. The Dutch Protocol (aka Dutch Approach). ..........................................................102

    B. World Professional Association for Transgender Health (WPATH). ....................104

    C. Endocrine Society (ES). .......................................................................................105

    D. American Academy of Pediatrics (AAP). .............................................................106

XVII.   **Assessment of expert declaration of Dr. Christine Brady. ..........................................108**

    A. Dr. Brady's opinions are not the product of the principles and methods accepted as reliable by the fields of medical science or behavioral science. ........108

    B. Clinically evaluating rather than assuming literal accuracy of self-report represents competent mental health care, not conversion therapy. .......................111

App.438

C.  DSM-5 criteria pre-date nearly all outcomes research on adolescents. ...............112

D.  Dr. Brady's analysis fails to distinguish between the distinct phenomena that can lead to gender dysphoria. ..............................................................117

E.  Anecdotal claims based on one's personal experiences do not constitute reliable clinical evidence. ................................................................118

F.  The mental health issues reported by gender dysphoric adolescents correspond entirely to the mental health issues widely reported by youth of the social media generation. ..........................................................119

G.  Dr. Brady is unaware of the status of the science of gender dysphoria. ...............125

**References** .................................................................................................................**127**

**List of Appendices** .................................................................................................**145**

**I.     Credentials and Qualifications**

**A. Education and professional background**

1.      I am a sexual behavior scientist, with an internationally recognized record studying the development of human sexualities, and an expert in research methodology of sexuality. My curriculum vitae is attached as Appendix 1 to this report. My publication record includes both biological and non-biological influences on sexuality, ranging from pre-natal brain development, through adulthood, to senescence. The primary, but not exclusive, focus of my own research studies has been the development of atypical sexualities. In addition to the studies I myself have conducted, I am regularly consulted to evaluate the research methods, analyses, and proposals from sexual behavior scientists throughout the world. The methodologies I am qualified to assess span the neurochemical and neuroanatomic level, individual behavioral level, and social and interpersonal levels.

2.      I am trained as a clinical psychologist and neuroscientist, and I am the author of over 50 peer-reviewed articles in my field, spanning the development of sexual orientation, gender identity, hypersexuality, and atypical sexualities collectively referred to as *paraphilias*. Although I have studied many atypical sexualities, the most impactful of my work has been MRI and other biological studies of the origins of pedophilia. That work has revolutionized several aspects of the sex offender field, both with regard to the treatment of offenders and to the prevention of sexual abuse of children. In 2022, I received the Distinguished Contribution Award from the Association for the Treatment and Prevention of Sexual Abuse in recognition of my research and its integration into public policy. My efforts in this regard have been the subject of several documentary films.

3.      Over my academic career, my posts have included Senior Scientist and Psychologist

at the Centre for Addiction and Mental Health (CAMH), and Head of Research for CAMH's

Sexual Behaviour Clinic. I was on the Faculty of Medicine of the University of Toronto for 15

years and have served as Editor-in-Chief of the peer reviewed journal, *Sexual Abuse*. That

journal is one of the top-impact, peer-reviewed journals in sexual behavior science and is the

official journal of the Association for the Treatment and Prevention of Sexual Abuse. In that

appointment, I was charged to be the final arbiter for impartially deciding which contributions

from other scientists in my field merited publication. I believe that appointment indicates not

only my extensive experience evaluating scientific claims and methods, but also the faith put in

me by the other scientists in my field. I have also served on the Editorial Boards of *The Journal

of Sex Research*, the *Archives of Sexual Behavior*, and *Journal of Sexual Aggression*. I am

currently the Director of the Toronto Sexuality Centre in Canada. Thus, although I cannot speak

for other scientists, I regularly interact with and am routinely exposed to the views and opinions

of most of the scientists active in our field today, within the United States and throughout the

world.

4.      For my education and training, I received my Bachelor of Science degree from

Rensselaer Polytechnic Institute, where I studied mathematics, physics, and computer science. I

received my Master of Arts degree in psychology from Boston University, where I studied

neuropsychology. I earned my doctoral degree in psychology from McGill University, which

included successfully defending my doctoral dissertation studying the effects of psychiatric

medication and neurochemical changes on sexual behavior, and included a clinical internship

assessing and treating people with a wide range of sexual and gender identity issues.

5.      I have a decades-long, international, and award-winning history of advocacy for

destigmatizing people with atypical sexualities. While still a trainee in psychology, I founded the

American Psychological Association's (APA) Committee for Lesbian, Gay, and Bisexual Graduate Students. Subsequently, I have served as the Chair for the Committee on Science Issues for APA's Division for the Psychology of Sexual Orientation and Gender Diversity and was appointed to its Task Force on Transgender Issues. Throughout my career, my writings and public statements have consistently supported rights for transgender populations and the application of science to help policy-makers best meet their diverse needs. Because my professional background also includes neurobiological research on the development of other atypical sexualities, I have become recognized as an international leader also in the destigmatizing of the broader range of human sexuality patterns.

6.      I am highly experienced in the application of sex research to forensic proceedings: I have served as the Head of Research for the Law and Mental Health Program of the University of Toronto's psychiatric teaching hospital, the Centre for Addiction and Mental Health, where I was appointed to the Faculty of Medicine.

7.      I have served as an expert witness in 21 cases in the past four years, as listed on my *curriculum vitae*. These cases included criminal, civil, and custody proceedings, preliminary injunction and Frye hearings, as well as trials. I have testified in courts in Canada and throughout the U.S., including Alabama, Arizona, Florida, Illinois, Indiana, Kansas, Kentucky, Massachusetts, New York, Texas, Utah, and West Virginia. I have provided expert testimony concerning the nature and origins of atypical sexualities, as well as concerning gender dysphoria and gender identity in children.

8.      For my work in this case, I am being compensated at the hourly rate of $400 per hour. My compensation does not change based on the conclusions and opinions that I provide here or later in this case or on the outcome of this lawsuit.

App.442

## B. Clinical expertise vs. scientific expertise

9.      In clinical science, there are two kinds of expertise: Clinicians' expertise regards applying general principles to the care of an individual patient and the unique features of that case. A scientist's expertise is the reverse, accumulating information about many individual cases and identifying the generalizable principles that may be applied to all cases. Thus, different types of decisions may require different kinds of experts, such that questions about whether a specific patient represents an exception to the general rule might be better posed to a physician's expertise, whereas questions about establishing the general rules themselves might be better posed to a scientist's.

10.     In legal matters, the most familiar situation pertains to whether a given clinician correctly employed relevant clinical standards. Often, it is other clinicians who practice in that field who will be best equipped to speak to that question. When it is the clinical standards that are themselves in question, however, it is the experts in the assessment of scientific studies who are the relevant experts.

## C. The professional standard to evaluate treatment models is to rely on objective assessors, not treatment model users in a conflict of interest with its results.

11.     I describe in a later section the well-recognized procedures for conducting reviews of literature in medical and scientific fields to evaluate the strength of evidence for particular procedures or treatments. Importantly, the standard procedure is for such evaluations to be conducted by objective assessors with expertise in the science of assessment, and not by those with an investment in the procedure being assessed. Because the people engaged in providing clinical services are necessarily in a conflict of interest when claiming that their services are effective, formal evaluations of evidence are routinely conducted by those *without* direct

professional involvement and thus without financial or other personal interest in whether services are deemed to be safe or effective. This routine practice standard is exemplified by all of the only three systematic, comprehensive research reviews that have been conducted concerning the safety and efficacy of puberty blockers and cross-sex hormones as treatments for gender dysphoria in children.

12.     In 2020, England's National Health Service (NHS) commissioned a major review of the use of puberty blockers and cross-sex hormones in children and young people and appointed prominent pediatrician Dr. Hilary Cass to lead that review, explicating that "Given the increasingly evident polarization among clinical professionals, Dr. Cass was asked to chair the group as a senior clinician with *no prior involvement* or fixed views in this area." (Cass 2022 at 35, italics added.) Dr. Cass's committee in turn commissioned formal systematic reviews of evidence from the England National Institute for Health & Care Excellence (NICE), a government entity of England's Department of Health and Social Care, established to provide guidance to health care policy, such as by conducting systematic reviews of clinical research, but without direct involvement in providing treatment to gender dysphoric individuals. (https://www.nice.org.uk/.) Similarly, the Finnish health care council commissioned its systematic review to an external firm, Summaryx Oy. (Pasternack 2019.) Summaryx Oy is a "social enterprise" (a Finnish organization analogous to a non-profit think-tank) that conducts systematic research reviews and other analyses for supporting that nation's medical and social systems. Its reviews are conducted by assessment professionals, not by clinicians providing services. (www.summaryx.eu/en/.) The systematic review by Sweden's National Board of Health and Welfare (NBHW) included four experts. (SBU Scoping Review 2019.) In addition to their own research fields, they provided clinical services in areas adjacent to but apart from gender

dysphoric children, such as physical disorders of sexual development (Dr. Berit Kriström) or gender dysphoria in adults (Dr. Mikael Landén).

13.     My own most-cited peer-reviewed paper relating to gender dysphoria in minors illustrates the expertise in the evaluation of scientific evidence that I have and am recognized for. That is, that paper provided not clinical advice or a clinical study, but rather a review and interpretation of the available evidence concerning desistance in children who suffer from gender dysphoria, as well as of evidence (and lack of evidence) concerning the safety and efficacy of medical transition to treat gender dysphoria in minors. (Cantor 2019.)

14.     My extensive background in the assessment of sexuality research and in the development of human sexuality places me in exactly the position of objectivity and freedom from conflict-of-interest required by the universal standards of medical research science.

15.     I do not offer opinions about the best public policy. Multiple jurisdictions have attempted multiple different means of implementing that science into various public policies. Although I accept as an axiom that good public policy must be consistent with the scientific evidence, science cannot objectively assess societal values and priorities. Therefore, my opinions summarize and assess the science on which public policy is based, but I can offer no opinion regarding which public policy mechanisms would be best in light of that science.

## II. Multiple international health care systems that had initially expanded medicalized transition to include minors have reversed that policy, as research on safety and effectiveness accumulated, in a growing international trend against the medicalized transition of minors.

16. Medicalized interventions for minors originated in European clinics (most prominently in the Netherlands and Sweden), and these precedents (and in particular the so-called "Dutch Protocol") are frequently cited by American clinicians. However, growing concerns about safety together with the continuing absence of reliable evidence of benefit even after more than 20 years of experience have led respected and far-from "conservative" European health care ministries to step back and discourage or even cease providing medicalized transition of minors, other than in exceptional and carefully limited circumstances, such as within registered and approved research trials. Instead, these authorities now endorse psychotherapy as the treatment of choice for minors, with medical interventions representing a method of last resort, if permitted at all. These range from medical advisories to outright bans on the medical transition of minors. I provide details concerning these policy changes below, and provide additional details regarding the underlying systematic reviews in Sections V and VI below.

### A. England

17. The National Health Service (NHS) of England centralized gender counselling and transitioning services into a single clinic, the Gender Identity Development Service (GIDS) of the Tavistock and Portman NHS Foundation Trust. Between 2008 and 2018, the number of referrals to the clinic had increased by a factor of 40, leading to a government inquiry into the causes. (Rayner 2018.) The GIDS was repeatedly accused of approving and endorsing medical transition in minors without adequate justification, including by 35 members of the GIDS own staff, who resigned by 2019. (BBC News 2021; Donnelly 2019). An ex-governor and psychotherapist of the Trust who resigned, Marcus Evans, said staff feared being called

transphobic, which was impacting their objectivity in their work. (Doward 2019).

18.     In 2020, a former patient of the GIDS, Keira Bell, brought a lawsuit alleging that the GIDS practices with respect to prescribing puberty blockers for minors were unproven and potentially harmful in ways that meant that it was impossible for minors to give meaningful informed consent. After taking extensive expert evidence, the trial court concluded that puberty blockers might have "potentially irreversible" and "life-changing" effects on a young person (*Bell v. Tavistock*, [2020] EWHC 3274 (Admin), ¶148, 151), that there was "very limited evidence as to its efficacy" (¶134) such that "it is right to call the treatment experimental" (¶148), and that use of puberty blockers almost always led to use of cross-sex hormones that "may well lead to a loss of fertility" (¶¶ 137-138). While an appeals court later concluded that the trial court had exceeded the proper role of the court in making factual findings on these questions, the appeals court acknowledged that "Medical opinion is far from unanimous about the wisdom of embarking on treatment before adulthood. The question raises not only clinical medical issues but also moral and ethical issues, all of which are the subject of intense professional and public debate." (Bell v. Tavistock 2021 at ¶3.)

19.     Perhaps prompted by the Keira Bell litigation, also in 2020 the English National Health Service ("NHS") commissioned the thorough independent review of the use of puberty blockers and cross-sex hormones to be chaired by Dr. Cass that I have described above. After an extensive process that included obtaining the systematic reviews of all published studies bearing on safety or efficacy of these hormonal interventions in minors as well as "extensive" listening sessions with clinicians, patients, and families, in February 2022 Dr. Cass issued an extensive "Interim Report" summarizing the state of the relevant medical science and in particular highlighting the presence of serious but unstudied risks and the lack of strong evidence of

efficacy. I will quote specific items from Dr. Cass's Report as relevant to specific topics below. At a high level, Dr. Cass concluded that to date there has been "very limited research on the sexual, cognitive, or broader developmental outcomes" from the use of puberty blockers for gender dysphoria (Cass 2022 at 19), that it is an unanswered question "whether the evidence for the use and safety of [puberty blockers] is strong enough as judged by reasonable clinical standards" (at 37), and that "the available evidence was not strong enough to form the basis of a policy position" with regard to use of both puberty blockers and cross-sex hormones in minors (at 35).

20.     Following issuance of Dr. Cass's Interim Report, the National Health Service of England (NHS England) published a consultation document concerning a proposed revised service specification under which "NHS England will only commission [puberty blockers] in the context of a formal research protocol." (NHS Interim Service Specification at 12.) As of June 9, 2023, the NHS England announced its implementation of its previously interim policy. They reasserted "there is not enough evidence to support their safety or clinical effectiveness as a routinely available treatment." and that it will limit the use puberty-blockers to formal clinical trials. (Ghorayshi 2023; Moss & Parry 2023).

## B. Finland

21.     In Finland, minors were made eligible for medicalized transition in 2011 by that country's health care service, the Council for Choices in Health Care in Finland (COHERE). Assessments of mental health and preparedness were centralized by law into two research clinics, Helsinki University Central Hospital and Tampere University Hospital.

22.     In 2019, the Service Selection Council (Palko) of the Finnish Ministry of Social Affairs and Health commissioned a systematic review of the effectiveness and safety of

medicalized transition (Pasternack 2019), and in 2020, Finnish researchers published an analysis

of the outcomes of adolescents diagnosed with gender dysphoria and receiving cross-sex

hormone treatment in Finland's Tampere University Hospital. (Kaltiala 2020.) Despite the

purpose of medical transition being to improve mental health, the study showed:

> Medical gender reassignment is not enough to improve functioning and relieve
> psychiatric comorbidities among adolescents with gender dysphoria. Appropriate
> interventions are warranted for psychiatric comorbidities and problems in
> adolescent development. (Kaltiala 2020 at 213.)

They concluded that the youth who were functioning well after transition were those who were

already functioning well before transition, and those who were functioning poorly before

transition continued to function poorly after transition.

23.     Importantly, the results of this study exemplify why correlations reported from

surveys cannot be interpreted as evidence of causality. Mental health assessment would exclude

the most poorly functioning youth from among those permitted to transition, but transition itself

did not improve the functioning of those who were permitted to transition.

24.     Consistent with the results of the independent evidence review by Summaryx Oy and

analysis of the ethical issues involved, Finland's health care service ended the surgical transition

of minors, ruling in 2020 that "Surgical treatments are not part of the treatment methods for

dysphoria caused by gender-related conflicts in minors." (COHERE Summary 2020.) The review

of the research concluded that "[N]o conclusions can be drawn on the stability of gender identity

during the period of disorder caused by a psychiatric illness with symptoms that hamper

development." (COHERE Summary 2020.) COHERE also greatly restricted access to puberty-

blocking and cross-sex hormonal treatments, explicating that they may be considered for minors

"only if it can be ascertained that their identity as the other sex is of a permanent nature and

causes severe dysphoria," and only "if the need for it continues *after* [any] other psychiatric

symptoms have *ceased* and adolescent development is progressing normally." (COHERE
Summary 2020, italics added.) They restricted the procedures to their centralized research
clinics. The council was explicit in noting the lack of research needed for decision-making,
"There is also a need for more information on the disadvantages of procedures and on people
who regret them." (COHERE Summary 2020.) In light of the special developmental and ethical
considerations surrounding minors, COHERE recommended that "no decisions should be made
that can permanently alter a still-maturing minor's mental and physical development."
(COHERE Recommendation 2020 at 7.)

### C. Sweden

25.     Sweden's national health care policy regarding trans issues has developed quite
similarly to that of the UK. Already in place 20 years ago, Swedish health care policy permitted
otherwise eligible minors to receive puberty-blockers beginning at age 14 and cross-sex
hormones at age 16. At that time, only small numbers of minors sought medical transition
services. An explosion of referrals ensued in 2013–2014. Sweden's Board of Health and Welfare
("Socialstyrelsen") reported that, in 2018, the number of diagnoses of gender dysphoria was 15
times higher than 2008 among girls ages 13–17. (Swedish Socialstyrelsen Support 2022 at 15.)

26.     Sweden has long been very accepting with regard to sexual and gender diversity. In
2018, a law was proposed to lower the age of eligibility for surgical care from age 18 to 15,
remove the requirement for parental consent, and lower the legal age for change of gender to age
12. A series of cases of regret and suicide following medical transition were reported in the
Swedish media. (Orange 2020.) In 2019, the Swedish Agency for Health Technology
Assessment and Assessment of Social Services (SBU) therefore initiated its own systematic
review of the research. The SBU released English-language results first as a summary and then

published as a peer reviewed article. (Ludvigsson et al., 2023.) Like the UK, the Swedish

investigation employed standardized review methods to ensure the encapsulation of all the

relevant evidence and came to the same conclusions: "This systematic review of almost 10 000

screened abstracts suggests that long-term effects of hormone therapy on psychosocial and

somatic health are unknown, except that GnRHa treatment seems to delay bone maturation and

gain in bone mineral density." (Ludvigsson 2023 at 12.) They emphasized, "The absence of

long-term studies is worrying because many individuals start treatment as minors (<18 years)

and CSHT is lifelong." (Ludvigsson 2023 at 10.) Regarding the full set of studies, "No

randomised controlled trials were found, but we could identify 24 relevant observational studies.

However, these were limited by methodological weaknesses, for instance lack of or inappropriate

control group, lack of intra-individual analyses, high attrition rates that precluded conclusion to

be drawn." (Ludvigsson 2023 at 9–10.)

27.     In 2021, the leading Swedish pediatric gender clinic, at the Karolinska Institute,

issued a new policy statement in which it stated that the Swedish evidence review "showed a

lack of evidence for both the long-term consequences of the treatments, and the reasons for the

large influx of patients in recent years." (Karolinska 2021.) The Karolinska Institute further

stated that "These treatments are potentially fraught with extensive and irreversible adverse

consequences such as cardiovascular disease, osteoporosis, infertility, increased cancer risk, and

thrombosis." In a dramatic reversal of its policy, the Institute announced that "In light of the

above, and based on the precautionary principle, which should always be applied, it has been

decided that hormonal treatments (i.e., puberty blocking and cross-sex hormones) will not be

initiated in gender dysphoric patients under the age of 16." Further, the Karolinska clinic

announced that patients ages 16–18 would receive such treatments *only* within research settings

(clinical trials monitored by the appropriate Swedish research ethics board). (Karolinska 2021.)

28. In 2022, the Swedish National Board of Health and Welfare published a major new national policy document concerning "Support, investigation and hormone therapy in gender incongruence in children and youth," including an English-language summary. (Swedish Socialstyrelsen Support 2022.) The National Board of Health noted "the continued lack of reliable scientific evidence concerning the efficacy and the safety of both [puberty blockers and cross-sex hormones]," and concluded (based on the commissioned evidence reviews) that "the evidence on treatment efficacy and safety is still insufficient and inconclusive for all reported outcomes. Further, it is not possible to determine how common it is for adolescents who undergo gender-affirming treatment to later change their perception of their gender identity or interrupt an ongoing treatment." As a result, the Board of Health concluded that, "[f]or adolescents with gender incongruence, the . . . risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits." (Swedish Socialstyrelsen Support 2022 at 10-12.) Accordingly, the Swedish Board of Health and Welfare "recommends restraint when it comes to hormone treatment." (Swedish Socialstyrelsen Updated Recommendations 2/22/22.)

### D. France

29. While medical authorities in France have not issued any actual restriction, in 2022, the Académie Nationale de Médecine of France issued a strongly worded statement, citing the Swedish ban on hormone treatments:

> [A] great medical caution must be taken in children and adolescents, given the vulnerability, particularly psychological, of this population and the many undesirable effects, and even serious complications, that some of the available therapies can cause…such as impact on growth, bone fragility, risk of sterility, emotional and intellectual consequences and, for girls, symptoms reminiscent of menopause." (Académie Nationale de Médecine 2022.)

For hormones, the Académie concluded "the greatest reserve is required in their use," and for surgical treatments, "[T]heir irreversible nature must be emphasized." The Académie warned "the risk of over-diagnosis is real, as shown by the increasing number of transgender young adults wishing to 'detransition'." Rather than medical interventions, it advised health care providers "to extend as much as possible the psychological support phase." The Académie reviewed and emphasized the evidence indicating the very large and very sudden increase in youth requesting medical transition. It attributed the change, not to society now being more accepting of sexual diversity, but to social media, "underlining the addictive character of excessive consultation of social networks which is both harmful to the psychological development of young people and responsible, for a very important part, of the growing sense of gender incongruence." (Académie Nationale de Médecine 2022.)

### E. Norway

30.     In 2022, Norway's Healthcare Investigation Board (Ukom) began a review of that country's guidelines for the medicalized transition of minors. (Block, Norway's Guidance, 2023.) In 2023, it released its report, which concluded that the evidence for the use of puberty blockers and cross-sex hormone treatments in youth was insufficient, and acknowledged the international recognition of the dearth of evidence of safety and effectiveness. The report deemed medicalized transition to be experimental. (Ukom 2023, Summary and Section 11.) The report faulted the existing Norwegian guidelines, published in 2020, for concentrating on "equality and rights" while "deviating from the requirements for the development of knowledge-based guidelines." (Ukom 2023, Summary.)

31.     The Norwegian report concluded that "The knowledge base, especially research-based knowledge for gender-affirming treatment (hormonal and surgical), is insufficient and the

long-term effects are little known" and that "This applies particularly to the teenage population, which accounts for a large part of the increase in referrals to the specialist health service in the last decade." (Ukom 2023, Summary and Section 7.)

32.     In an interview about the report with the *British Medical Journal,* the Ukom Medical Director, Stine Marit Moen, said, "We're concerned that there may be undertreatment, overtreatment, and the wrong treatment" and added:

> We've seen a marked increase in referrals to specialised healthcare services in Norway for teenagers, as seen in many other western countries, and nobody knows the reason. The stability of the gender dysphoria of these teenagers is not known, and the evidence of long term effects of gender affirming treatments for this young population is insufficient. (Block, Norway's Guidance, 2023.)

33.     Ukom noted that referrals to its national treatment service increased by a factor of eight between 2007 and 2018, and that this increase was largely from young biological females. Seventy-five percent of the referrals to its National Treatment Service had other co-morbid psychiatric diagnoses, including not only depression and anxiety but also autism spectrum disorders, ADHD, and Tourette's Syndrome. (Ukom 2023, Summary and Section 7.)

## F. Assertions by U.S. organizations and officials that there is 'no debate' over medicalized transition are false.

34.     The international consensus is clearly demonstrated by the multiple recent analyses, statements, and policy decisions from the health care service systems around the world. These include England's National Health Service, which noted the "Scarce and inconclusive evidence to support clinical decision making [which] has led to a lack of clinical consensus on what the best model of care for children and young people experiencing gender incongruence and dysphoria should be." (NHS 2022 at 5.)

35.     As these several recent national policy reviews, statements, and recommendations make very clear, there is a great deal of doubt and debate among the sophisticated international

medical and mental health community as to whether the administration of puberty blockers and cross-sex hormones to children and young people is the best clinical practice, and as to whether these treatments have been shown to be safe and effective. Indeed, the lack of scientifically reliable data concerning safety and efficacy highlighted by the systematic evidence reviews commissioned by the English National Health Service, by the Swedish National Board of Health and Welfare, and by the Finnish Council for Choices in Health Care in Finland have caused those national health authorities and others to move sharply away from approving puberty blockers, cross-sex hormones, or surgery for minors.

36.     In this report, I explain the evidence and lack of evidence behind that doubt, that debate, and the emerging international consensus of caution reflected in the several recent European policy statements or changes.

37.     *I note that the plaintiffs' experts have excluded all mention of the international reversals of policy, suggesting a consensus that does not exist. In fact, practices at U.S. gender clinics and statements by U.S. advocacy voices increasingly represent an outlier view, failing to update policy despite the mounting evidence.*

### III.   Clinical research has a standard Pyramid of Evidence that summarizes the relative strength of potential sources of information.

38.   The widely accepted starting point in evidence-based medicine is the recognition that clinical experiences and recollections of individual practitioners (often called "expert opinion" or "clinical anecdote") do not and cannot provide a reliable, scientific basis for treatment decisions. Rather, in evidence-based medicine, clinical decision-making is based on objectively demonstrated evidence of outcomes from the treatment options. An essential first step in evidence-based medicine is identifying the relevant findings from among the immense flood of clinical journal articles published each year. Those studies and the evidence they report are then assessed according to the strength offered by the research methods used in each study. The research methods used in a study determine its reliability and generalizability, meaning the confidence one may have that using the same treatment again will have the same result again on other people. In this section, I explain the well-accepted criteria for evaluating the evidentiary value of clinical studies.

### A.   Clinical research comprises a standard *Pyramid of Evidence*, wherein studies from higher levels of evidence outrank even more numerous studies from lower levels of research.

39.   The accepted hierarchy of reliability for assessing clinical outcomes research is routinely represented as a "Pyramid of Evidence" (Figure 1). Scientific questions are not resolved by the number of studies coming to one versus another conclusion. Studies representing higher levels of evidence outrank studies from lower levels. Even large numbers of lower-level studies cannot overcome a study representing a higher level of evidence. Indeed, because lower-level studies are generally faster and less expensive to conduct, it is typical for them to outnumber higher level studies. This is the property meant to be reflected by the pyramid's shape, which is larger at the base and smaller at the apex.

**Figure 1: Pyramid of Standards of Evidence**

**Source: Cass, H. (2022, February).** *The Cass Review: Independent review of gender identity services for children and young people Interim report.* **National Health Service (NHS), UK. Available from https://cass.independent-review.uk/publications/interim-report/, citing OpenMD, retrieved from https://openmd.com/guide/levels-of-evidence.**

**B. The highest level of evidence for safety and effectiveness research is the systematic review of clinical experiments.**

40.     The most reliable and conclusive method of determining what is actually known or not known with respect to a particular treatment is the *systematic review.* Systematic reviews employ standardized procedures to assess comprehensively all available evidence on an issue, minimizing opportunities for bias in gathering and evaluating research evidence. As described by Dr. Gordon Guyatt, the internationally recognized pioneer in medical research who invented the term *evidence-based medicine,* "A fundamental principle to the hierarchy of evidence [is] that optimal clinical decision making requires systematic summaries of the best available evidence." (Guyatt 2015 at xxvi.)

## 1. Systematic reviews prevent the 'cherry-picking' of studies that favor a particular result.

41.    Because systematic reviews are designed to prevent researchers from including only the studies they favor and other biases, systematic reviews are the routine starting point for developing clinical practice guidelines. (Moher 2009.) The methods of a systematic review include:

- Define the scope, including the "PICO": Population/Patient, Intervention, Comparison/Control, and Outcome(s);
- Select and disclose the keywords used to search the (massive) available clinical research database(s) for potentially relevant articles, identify the databases they were applied to, and the date(s) of the searches, including any subsequent updates;
- Select and disclose the inclusion/exclusion criteria to be used to filter the "hits" from the keyword searches to identify research studies to be included in the detailed review;
- Review abstracts to select the final set of studies, using at least two independent reviewers to allow for measuring inter-rater reliability on the criteria;
- Code each study's results impacting the research question(s), disclosing the list of all studies and the results coded from each;
- Evaluate the reliability of the results [risk of bias] of each included study, applying uniform criteria across them all.

42.    As detailed in Section V, several systematic reviews have been conducted of the outcomes of medicalized transition of gender in minors. Their conclusions are highly consistent with each other. Much of the expert testimony offered by plaintiffs' experts, however, depends on levels of evidence far lower on the pyramid of evidence (e.g., "expert opinion") or beneath the pyramid entirely (e.g., survey studies) while ignoring the thorough, high-quality systematic reviews available in the research literature. Doing so is in direct conflict with foundational principles of evidence-based medicine.

## 2. Systematic reviews prevent biased assessment of individual studies by uniformly applying standard criteria to each study reviewed. The most widely used criteria set is "GRADE."

43. In order to produce unbiased assessment of the studies within the systematic review, all the studies must be evaluated using the same evaluation criteria. Without such criteria, assessments can become influenced by researchers who, intentionally or not, hold the evaluative bar higher or lower for studies according to whether the studies' conclusions support or challenge that researcher's perspective. Several such systems have been developed. The most widely used system is the "Grading of Recommendations, Assessment, Development and Evaluations" (GRADE). (Goldet & Howick 2013.) In the GRADE system, studies' findings are downgraded for:

- Risk of bias:[1]
  - o Lack of clearly randomized allocation sequence,
  - o Lack of blinding,
  - o Lack of allocation concealment,
  - o Failure to adhere to intention-to-treat analysis,
  - o Trial is cut short,
  - o Large losses to follow-up;
- Inconsistency;
- Indirectness of evidence;
- Imprecision; and
- Publication bias (when studies with 'negative' findings remain unpublished).

 Studies' ratings are upgraded if their findings identify:

- A large effect of the treatment;
- A dose-response relationship (the size of the effect has a systematic association with the dose of the treatment given); or
- That all plausible biases only *reduce* the apparent effect of the treatment ( necessarily making the estimated effect sizes conservative estimates).

---

[1] In science, including in the GRADE system, the term "bias" refers to any external influence leading to a systematic over- or underreporting of the outcome being measured. That is, in this context "bias" is not used in the sociopolitical sense of personal values.

44.     GRADE assessments yield a four-point score representing the certainty that a reported treatment effect is true. These certainty scores are (GRADE Handbook, Section 5):

| Certainty | Meaning |
|---|---|
| **High** | We are very confident that the true effect lies close to that of the estimate of the effect. |
| **Moderate** | We are moderately confident in the effect estimate: The true effect is likely to be close to the estimate of the effect, but there is a possibility that it is substantially different. |
| **Low** | Our confidence in the effect estimate is limited: The true effect may be substantially different from the estimate of the effect. |
| **Very Low** | We have very little confidence in the effect estimate: The true effect is likely to be substantially different from the estimate of effect. |

### C.  The highest level experimental study of clinical safety and effectiveness is the Randomized Controlled Trial (RCT). RCTs can demonstrate that a given treatment causes (rather than only correlates with) a given outcome.

45.     Randomized Controlled Trials are the gold standard method of assessing the effects caused by an experimental treatment. The great scientific weight of RCTs follows from the randomization: People do not pick which research group they are in—a treatment group or a control group. Without random group assignment, it is not possible to identify which, if any, changes are due to the treatment itself or to the factors that led to who did and did not receive treatment.

46.     Levels of evidence lower than RCTs are unable to distinguish when changes are caused by the experimental treatment, or by factors that can mimic treatment effects, such as 'regression to the mean' and the placebo effect.

47.     In the absence of evidence that X causes Y, it is a scientific error to use language indicating there is causal relationship. In the absence of evidence of causality, it is scientifically unsupportable to describe a correlation with terms such as: increases, improves, benefits, elevates, leads to, alters, influences, results in, is effective for, causes, changes, contributes to,

yields, impacts, decreases, harms, and depresses. Scientifically valid terms for correlations include: relates to, is associated with, predicts, and varies with.

*48.     I note that the plaintiffs' experts repeatedly misrepresent studies using causal language to describe studies that are unable to demonstrate causality. Such language incorrectly asserts that the evidence is stronger than it actually is.*

## 1. RCTs, but not lower levels of evidence, overcome biases representing 'regression to the mean' and other factors that can mimic clinical improvement.

49.     'Regression to the mean' arises when researching issues, such as mood, depression, or levels of emotional distress that typically fluctuate over time. People are more likely to seek out treatment during low points rather than high points in their emotional lives. Thus, when tracking emotional states over time, the average of a group of people in a treatment group may often show an increase; however, without an untreated control group to which to compare them, researchers cannot know whether the group average would have increased anyway, with only the passage of time.

50.     Blinding or masking participants in an RCT from which group they are in has been described as a preferred strategy since the 1950s, in order to exclude the possibility that a person's expectations of change caused any changes observed (the "placebo effect"). In practice, however, it has often made little or no significant difference. For example, a study using very high quality methods—meta-analysis of meta-analysis research—has revealed no statistical difference in the sizes of the effects detected by blinded/placebo-controlled studies from non-blinded/non-placebo-controlled studies of depression. (Moustgaard 2019.) That is, the pre-/post-treatment differences found in placebo groups are not as attributable to participants' expectations of improvement as they are to expectable regression to the mean. (Hengartner 2020.)

## 2. When a 'no treatment control group' is untenable, RCTs use an 'active comparator' group instead.

51.     It is not always possible to compare a group receiving a treatment to a group receiving only an inactive procedure, such as a placebo treatment or no treatment at all. In such situations, the standard, ethical, clinical research method is to compare two active treatments with each other.

52.     The systematic reviews from England explicitly called for 'active comparator' studies to test whether medicalized transition of minors shows mental health benefits superior to those obtained from psychotherapy. (NICE 2020a at 40; NICE 2020b at 47.) Risk:benefit analysis cannot justify the greater risks associated with medicalization without evidence of correspondingly greater benefit.

## D. Cohort studies are the highest level of evidence about medicalized transition currently available.

53.     The highest-level study of medicalized transition of minors conducted thus far are cohort studies: gathering a sample of individuals who chose to undergo treatment and tracking them over time. Cohort studies are able to answer some questions that lower-level studies cannot, such as whether a high-functioning group improved over time versus having been composed of people who were already high-functioning. Cohort studies are, however, unable to demonstrate causality, to identify how much of any change was due to regression to the mean, or to detect any placebo effects.

## E. Expert opinion represents the least reliable evidence.

54.     As Figure 1 illustrates, in evidence-based medicine, opinion based on clinical experience is identified as the *least* reliable source of medical knowledge. Among other reasons, this is because non-systematic recollections of unstructured clinical experiences with self-

selected clientele in an uncontrolled setting is the most subject to bias. Indeed, mere "clinical experience" was long the basis of most medical and mental health clinical decisions, and it was precisely the scientific and clinical inadequacy of this type of "knowledge" that led to the development and widespread acceptance of the importance of evidence-based medicine. As Dr. Guyatt has written, "EBM places the unsystematic observations of individual clinicians lowest on the hierarchy," both because EBM "requires awareness of the best available evidence," and because "clinicians fall prey to muddled clinical reasoning and to neglect or misunderstanding of research findings." (Guyatt 2015 at 10, 15.)

### F. Surveys and cross-sectional studies cannot demonstrate treatment effectiveness.

55.     Surveys represent observational research rather than experimental research. (In science, experiments are studies involving a manipulation, not merely observation, by the researcher.) Surveys and cross-sectional studies can provide only correlational data and cannot demonstrate causality. (See Section IV below). It is not possible for a survey to yield evidence that a treatment is effective. No number of surveys can test a treatment, advancing it from 'experimental' to 'established' status.

56.     Survey studies do not even appear on the *pyramid of evidence.* In accordance with the routine standards, systematic reviews of treatment studies exclude surveys.

57.     *I note that the plaintiffs' experts' reports rely largely on survey studies. The misplaced emphasis on surveys, open to whoever wanted to fill them out, masks how much the plaintiff's experts are merely parroting the claims of these youth.*

24

App.463

## IV.  Methodological defects limit or negate the evidentiary value of many studies of treatments for gender dysphoria in minors.

### A.  In science, to be valid, a claim must be objective, testable, and falsifiable.

58.    In behavioral science, people's self-reports do not represent objective evidence. It is when emotional and other pressures are strongest that the distinction between and need for objective over subjective evidence is greatest. Surveys do not represent objective evidence. This is especially true of non-random surveys and polls, recruited through online social networks of the like-minded.

### B.  Correlation does not imply causation.

59.    Studies representing lower levels of evidence are often used because they are faster and less expensive than studies representing higher levels. A disadvantage, however, is that they are often limited to identifying which features are *associated* with which other features, but they cannot show which ones are *causing* which. It is a standard property of statistical science that when a study reports a correlation, there are necessarily three possible explanations. Assuming the correlation actually exists (rather than represents a statistical fluke or bias), it is possible that X causes Y, that Y causes X, or that there is some other variable, Z, that causes both X and Y. (More than one of these can be true at the same time.) To be complete, a research analysis of a correlation must explore all three possibilities.

60.    For example, assuming a correlation between treatment of gender dysphoria in minors and mental health actually exists (rather than is a fluke): (1) It is *possible* that treatment causes improvement in mental health. (2) Yet, it is also possible that having good mental health is (part of) what enabled transition to occur in the first place. That is, because of gate-keeping procedures in the clinical studies, those with the poorest mental health are typically not permitted to transition, causing the higher mental health scores to be sorted into the transitioned group.

(See Section IV.E on *Selection Bias*.) (3) It is also possible that a third factor, such as wealth or socioeconomic status, causes both the higher likelihood of transitioning (by being better able to afford it) and the likelihood of mental health (such as by avoiding the stresses of poverty or affording psychotherapy).

61.     This principle of scientific evidence is why surveys do not (cannot) represent evidence of treatment effectiveness: Surveys are limited to correlations. (See Section III.F. on *Surveys*.)

### C.  When two or more treatments are provided at the same time, one cannot know which treatment caused observed changes (i.e., 'confounding').

62.     Confounding is a well-known issue in clinical research design. As detailed in the present report, it applies throughout treatment studies of gender dysphoria. Patients who undergo medical transition procedures in research clinics routinely undergo mental health treatment (psychotherapy) at the same time. Without explicit procedures to distinguish them, it cannot be known which treatment produced which outcome (or in what proportions). Indeed, that mental health improvement came from mental health treatment is a more parsimonious (and therefore, scientifically superior) conclusion than is medicalized treatment causing mental health improvement.

### D.  Extrapolation to dissimilar populations and dissimilar conditions.

63.     The purpose of clinical science is to establish from a finite sample of study participants information about the effectiveness and safety, or other variables, of a treatment that can be generalized to other people. Such extrapolation is only scientifically justified with populations matched on all relevant variables. The identification of those variables can itself be a complicated question, but when an experimental sample differs from another group on variables already known to be related, extrapolation cannot be assumed but must be demonstrated directly

and explicitly.

64.     Each of the systematic reviews from the UK, Sweden, and Finland emphasized that the recently observed, greatly increased numbers of youth coming to clinical attention are a population different in important respects from the subjects of often-cited research studies. Conclusions from studies of adult-onset gender dysphoria and from childhood-onset gender dysphoria cannot be assumed to apply to the current patient populations of adolescent-onset gender dysphoria. The Cass Report correctly advised:

> It is also important to note that any data that are available do not relate to the current predominant cohort of later-presenting birth-registered female teenagers. This is because the rapid increase in this subgroup only began from around 2014-15. Since young people may not reach a settled gender expression until their mid-20s, it is too early to assess the longer-term outcomes of this group. (Cass 2022 at 36.)

The report also indicated:

> [I]t is important that it is not assumed that outcomes for, and side effects in, children treated for precocious puberty will necessarily be the same in children or young people with gender dysphoria. (Cass 2022 at 63.)

65.     Finland's review repeated the observation of greatly (20 times) increased numbers, an entirely different demographic of cases, and increased proportions of psychiatric co-morbidities. (Finnish Palko Preparation Memo at 4-6.) The Swedish review highlighted "the uncertainty that follows from the yet unexplained increase in the number of care seekers, an increase particularly large among adolescents registered as females at birth." (Swedish Socialstyrelsen Support 2022 at 11.)

66.     It is well known that males and females differ dramatically in the incidence of many mental health conditions and in their responses to treatments for mental health conditions. Thus, research from male-to-female transitioners (the predominant population until recent years) cannot be extrapolated to female-to-male transitioners (the predominant population presenting at clinics today). Outcomes from patients who experienced clear pre-pubertal childhood gender

dysphoria cannot be extrapolated to patients who first manifest diagnosable gender dysphoria well into puberty. Outcomes from clinics employing rigorous and openly reported gate-keeping procedures cannot be extrapolated to clinics or clinicians employing only minimal or perfunctory assessments without external review. Developmental trajectories and outcomes from before the social media era cannot be assumed to apply to those of the current era or the future. Research from youth with formal diagnoses and attending clinics cannot be extrapolated to self-identifying youth and those responding to surveys advertised on social media sites.

67.     Further, treatment of gender dysphoria in children and adolescents presents novel-use cases very dissimilar to the contexts in which puberty blockers and cross-sex hormones have previously been studied. Whereas use of puberty blockers to treat precocious puberty *avoids* the medical risks caused by undergoing puberty growth before the body is ready (thus outweighing other risks), use of blockers to treat gender dysphoria in patients already at their natural puberty pushes them *away* from the mean age of the healthy population. Instead of avoiding an objective problem, one is created: Among other things, patients become subject to the issues and risks associated with being late-bloomers, *very* late-bloomers. This transforms the risk:benefit balance, where the offsetting benefit is primarily (however validly) cosmetic.

68.     Similarly, administering testosterone to an adult male to treat testosterone deficiency addresses both a different condition and a different population than administration of that same drug to an adolescent female to treat gender dysphoria; the benefits and harms observed in the first case cannot be extrapolated to the second.

### E. Mental health assessment used for gate-keeping medicalized transition establishes a *selection bias,* creating a statistical illusion of mental health improvement among the selected.

69.     Importantly, clinics are expected to conduct mental health assessments of applicants

seeking medicalized transition, disqualifying from medical services patients with poor mental health. (The adequacy of the assessment procedures of specific clinics and clinicians remains under debate, however.) Such gate-keeping—which was also part of the original "Dutch Protocol" studies—can lead to misinterpretation of data unless care is explicitly taken. A side-effect of excluding those with significant mental health issues from medical transition is that when a researcher compares the average mental health of the gender dysphoric individuals first presenting to a clinic with the average mental health of those who completed medical transition, then the post-transition group would show better mental health—but only because of the *selection bias*, (Larzelere 2004; Tripepi 2010) even when the transition had no effect at all.

## V. Systematic reviews of safety and effectiveness have been conducted by the health care ministries/departments of several governments. They *unanimously* concluded the evidence on medicalized transition in minors to be of poor quality.

### A. Understanding safety and efficacy.

70.     Plaintiffs' experts assert that use of puberty blockers and cross-sex hormones on adolescents is "safe." This claim is unsupported by any substantial scientific evidence, depreciates widely recognized risks of serious harm to minors so medicalized, and ignores both the many unknowns and the growing international doubts about their use.

71.     At the outset, it is important to understand the meaning of "safety" in the clinical context. The criteria for assessing safety involve two independent components, and discussion of the safety of hormonal interventions on the natural development of children requires consideration of both of them. The term *safety* in the clinical context represents a "risk:benefit ratio," not an absolute statement that can be extrapolated across applications. In clinical research, assessing safety requires simultaneous consideration of both components of the risk:benefit ratio. That is, treatments are not deemed simply "safe" or "unsafe," as the plaintiffs' experts repeatedly use those words. These dual components are reflected in FDA regulation:

> There is reasonable assurance that a device is safe when it can be determined, based upon valid scientific evidence, that *the probable benefits* to health from use of the device for its intended uses and conditions of use, when accompanied by adequate directions and warnings against unsafe use, outweigh *any probable risks*. (Code of Federal Regulations Title 21 Sec. 860.7, italics added.)

72.     Thus, for example, as I explain in further detail below, because the Endocrine Society did not undertake (or rely on) any systematic review of the efficacy of hormonal interventions to relieve gender dysphoria in minors (i.e., their benefits), and WPATH did not undertake (or rely on) any systematic review of the safety of hormonal interventions in minors (i.e., their risks), neither gathered the evidence necessary to assess the risk:benefit ratio of medicalized transition

30

App.469

in minors.

73.     In fact, as I also review below, after conducting systematic reviews, the English, Finnish, and Swedish national health care institutions all concluded that there is insufficient evidence to determine that hormonal interventions as treatments for gender dysphoria in minors are safe. Reasons for these consistent conclusions include lack of research, insufficient research quality among the existing investigations, and insufficient investigation of long-term safety.

74.     To understand the uniform conclusions of these national health care bodies, it is important to understand that—at least where there is *prima facie* reason to be concerned that certain harms may result—when the research has not been done, the absence of evidence cannot be taken as evidence of the absence of such harms. "We don't know" does not permit the conclusion "It is safe." Plaintiffs' experts and many advocates in the field of transgender medicine make this error.

### B.  The McMaster University systematic review of systematic reviews.

75.     McMaster University is recognized as a center of expertise in the performance of methodologically sound systematic reviews. In 2022, authors associated with that McMaster University team (Dr. Romina Brignardello-Petersen and Dr. Wojtek Wiercioch) conducted a systematic review, "Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence," spanning all the available systematic reviews in this area, including their methodological strength, the evidence they cited, and the conclusions they reached. (Brignardello-Petersen & Wiercioch 2022.) Applying carefully disclosed criteria and methods, they identified on-point systematic reviews, and graded the methodological quality of each on-point review as high, moderate, low, or critically low. With regard to systematic reviews relating to the effects of puberty blockers or cross-sex hormones, the authors included in their

analysis all reviews that achieved at least a "low" rating of methodological quality, while excluding those rated as "very low." No systematic reviews earned a "high" methodological rating, except a review performed by the highly respected Cochrane Library of the effects of cross-sex hormones on transitioning natal males (Haupt 2020), but that most careful review in turn found *no* published studies on this topic of sufficient methodological soundness to satisfy its inclusion criteria and thus merit review. After this careful review of the data and analysis contained in available systematic reviews, the McMaster authors concluded:

> Due to important limitations in the body of evidence, there is great uncertainty about the effects of puberty blockers, cross-sex hormones, and surgeries in young people with gender dysphoria. This evidence alone is not sufficient to support whether using or not using these treatments. (Brignardello-Petersen & Wiercioch 2022 at 5.)

## C. The quality of the systematic reviews from governmental bodies and professional associations.

76.     To ensure consideration of all available evidence, I compiled into a single table all the cohort studies of safety and effectiveness included by any of the systematic reviews from the international health care systems and (although they were incomplete) by the U.S.-based clinical associations issuing guidelines or standards. I discuss their specific findings in the following sections.

77.     New studies continue to be conducted and published. I have identified two additional studies that were published after these reviews were released, but that meet their inclusion criteria: Tordoff, *et al.,* 2022, and Chen, *et al.,* 2023. The findings from both these studies are consistent with those already included and are noted here for completeness.

(40 of 238), Page 40 of 238
Case: 24-142 01/18/2024 DktEntry: 14.5 Page 40 of 238
Case 1:23-cv-00269-BLW Document 56-4 Filed 09/05/23 Page 39 of 151

**Table 1. Cohort studies of effectiveness and safety of puberty-blockers and cross-sex hormones in minors.**

| | Finland (2019) | NICE (2020a,b) | Sweden (2022) | E.S. (2017) | AAP (2018) | Baker (2021) (WPATH) |
|---|---|---|---|---|---|---|
| **Effectiveness GnRHa** | Costa et al, 2015<br>de Vries et al, 2011 | Costa et al, 2015<br>de Vries et al, 2011 | Becker-Hebly et al, 2020<br>Carmichael et al, 2021<br>Costa et al, 2015<br>***<br>Hisle-Gorman et al, 2021 | | | de Vries et al, 2011 |
| **Effectiveness Sex Hormones** | de Vries et al, 2014* | Achille et al, 2020<br>Allen et al, 2019<br><br>Kaltiala et al, 2020<br>Lopez de Lara et al, 2020 | ***<br>***<br>Cantu et al, 2020*<br>de Vries et al, 2014*<br><br>*** | | | Achille et al, 2020<br><br>de Vries et al, 2014*<br><br>López de Lara et al, 2020 |
| **Safety (Bones) GnRHa** | | Brik et al, 2020<br>Joseph et al, 2019<br>Khatchadourian et al, 2014<br>Klink et al, 2015<br><br><br>Vlot et al, 2017 | Joseph et al, 2019<br><br>Klink et al, 2015<br>Navabi et al, 2021<br>Schagen et al, 2020<br>Stoffers et al, 2019<br>Vlot et al, 2017<br>Lee et al, 2020<br>van der Loos et al, 2021 | | | |
| **Safety (Bloods) GnRHa** | | Klaver et al, 2020<br><br>Schagen et al, 2016 | Klaver et al, 2018<br>Klaver et al, 2020<br>Nokoff et al, 2020<br>Perl et al, 2020<br>Schagen et al, 2016<br>Schulmeister et al, 2021 | | | |
| **Safety (Bones) Sex Hormones** | **** | Khatchadourian et al, 2014<br>Klaver et al, 2020<br>Klink et al, 2015<br>Kuper et al, 2020<br>Stoffers et al, 2019<br>Vlot et al, 2017 | | Klink et al, 2015 | | |
| **Safety (Bloods) Sex Hormones** | | | Jarin, 2017<br>Mullins et al, 2021<br>Tack et al, 2016 | | | |

*Included both puberty-blockers and cross-sex hormones.

**The Endocrine Society review included bone/skeletal health, but did not explicate whether the scope included minors.

***Sweden explicitly excluded due to high risk of bias: Achille, *et al.,* (2020), Allen, *et al.* (2019), de Vries, *et al.,* (2011), and López de Lara, *et al.,* (2020).

****The Finnish review adopted the Endocrine Society review, but did not indicate whether minors were included.

### D. United Kingdom

78.     The National Health Service (NHS) of the United Kingdom conducted an independent review of its services for minors with gender dysphoria. (Cass 2022.) Included in that process were two systematic, comprehensive reviews of the research literature, conducted by England's National Institute for Health Care Excellence (NICE) in 2020. One regarded the efficacy, safety, and cost-effectiveness of Gonadotrophin-Releasing Hormone (GnRH) analogs (or "puberty blockers") in minors. (NICE 2020a.) The other regarded the efficacy, safety, and cost-effectiveness of cross-sex hormones, or "gender-affirming hormones," in minors. (NICE 2020b.) (Only efficacy and safety are relevant to the present report.)

79.     The puberty-blocker review was tasked with reviewing the research on two relevant questions. For one:

> *In children and adolescents with gender dysphoria, what is the clinical effectiveness of treatment with GnRH analogues compared with one or a combination of psychological support, social transitioning to the desired gender or no intervention?* (NICE 2020a at 4.)

Clinical effectiveness of puberty-blockers was composed of three factors deemed "critical outcomes": impact on gender dysphoria, impact on mental health, and impact on quality of life. The second question addressed in the review was:

> *In children and adolescents with gender dysphoria, what is the short-term and long-term safety of GnRH analogues compared with one or a combination of psychological support, social transitioning to the desired gender or no intervention?* (NICE 2020a at 6.)

Puberty-blocker safety was assessed as its effect on three categories of health: bone density, cognitive development or functioning, and "other."

80.     The second review, for cross-sex hormone treatment, was tasked with the corresponding questions. For one:

> *In children and adolescents with gender dysphoria, what is the clinical effectiveness of treatment with gender-affirming hormones compared with one or a combination of psychological support, social transitioning to the desired gender or no intervention?* (NICE 2020b at 4.)

The critical outcomes were again deemed to be impact on gender dysphoria, on mental health, and on quality of life. The impact on mental health was composed of indicators of depression, anxiety, and suicidality and self-injury. The second question was:

> *In children and adolescents with gender dysphoria, what is the short-term and long-term safety of gender-affirming hormones compared with one or a combination of psychological support, social transitioning to the desired gender or no intervention?* (NICE 2020b at 7.)

Cross-sex hormone treatment safety was assessed as its effect on bone density and on "clinical parameters," which included insulin, cholesterol, and blood pressure levels.

81.     These two reviews included a systematic consolidation of all the research evidence, following established procedures for preventing the "cherry-picking" or selective citation favoring or down-playing any one conclusion, carefully setting out the criteria for including or excluding specific studies from the review, and providing detailed analyses of each included study. The whole was made publicly available, consistent with good practice.

82.     The reviews' results were unambiguous: For both puberty blockers and cross-sex hormones, "The critical outcomes for decision making are the impact on gender dysphoria, mental health and quality of life." The quality of evidence for these outcomes was assessed as "very low" using the established GRADE procedures for assessing clinical research evidence. (NICE 2020a at 4; NICE 2020b at 4.) The reviews also assessed as "very low" the quality of evidence regarding "body image, psychosocial impact, engagement with health care services, impact on extent of satisfaction with surgery and stopping treatment" or (in the case of cross-sex hormones) of "detransition." (NICE 2020a at 5; NICE 2020b at 6.) The review of puberty blockers concluded that of the existing research, "The studies included in this evidence review

36

App.475

are all small, uncontrolled observational studies, which are subject to bias and confounding," "They suggest little change with GnRH analogues [puberty blockers] from baseline to follow-up." (NICE 2020a at 13.) The cross-sex hormone review likewise reported a lengthy list of methodological defects or limitations affecting all available studies. (NICE 2020b at 13-14.)

83.     The NHS changed the language on its website describing puberty blockers and cross sex hormones. It removed the statement that "The effects of treatment with GnRH analogues are considered to be fully reversible,"[2] replacing that text with:[3]

> Little is known about the long-term side effects of hormone or puberty blockers in children with gender dysphoria. . . . [I]t is not known what the psychological effects may be. It's also not known whether hormone blockers affect the development of the teenage brain or children's bones.

84.     As mentioned in the McMaster review, the highly respected Cochrane Library, based in England, undertook a systematic review of studies of the safety and efficacy of the administration of cross-sex hormones to natal males. That review focused primarily on adults (age 16 and older). The results, including a detailed explanation of methodology and inclusion criteria, were published in 2020. Unfortunately, but importantly, the Cochrane review found *zero* studies, globally, that were sufficiently reliable to meet the inclusion criteria even at a "very low" level of evidentiary quality. The authors reported:

> Despite more than four decades of ongoing efforts to improve the quality of hormone therapy for women in transition, we found that no RCTs or suitable cohort studies have yet been conducted to investigate the efficacy and safety of hormonal treatment approaches for transgender women in transition….We found insufficient evidence to determine the efficacy or safety of hormonal treatment approaches…for transgender women in transition. The evidence is very incomplete, demonstrating a gap between current clinical practice and clinical research. (Haupt 2020 at 10-11.)

The authors' frustration at the total lack of reliable research was evident: "The lack of reliable

---

[2] BBC. Retrieved from https://www.bbc.co.uk/sounds/play/m000kgsj; Kurkup, J. (2020, June 4). *The Spectator.* Available from https://www.spectator.co.uk/article/the-nhs-has-quietly-changed-its-trans-guidance-to-reflect-reality/
[3] NHS. Retrieved from https://www.nhs.uk/conditions/gender-dysphoria/treatment/

data on hormone therapy for transitioning transgender women should encourage the development of well-planned RCTs and cohort studies to evaluate widespread empirical practice in the treatment of gender dysphoria." (Haupt 2020 at 10.)

### E. Sweden

85.     Sweden similarly commissioned a systematic review, published in 2022 and charged with addressing these three questions:

> *Are there any scientific studies explaining the increase in numbers seeking for gender dysphoria?*
>
> *Are there any scientific studies on long-term effects of treatment for gender dysphoria?*
>
> *What scientific papers on diagnosis and treatment of gender dysphoria has been published after the National Board of Health and Welfare in Sweden issued its national support for managing children and adolescents with gender dysphoria in 2015?* (SBU Scoping Review Summary 2019.)

The databases searched included CINAHL (EBSCO), Cochrane Library (Wiley), EMBASE (Embase.com), PsychINFO (EBSCO), PubMed (NLM), Scopus (Elsevier), and SocINDEX (EBSCO). A total of 8,867 abstracts were identified, from which 315 full text articles were assessed for eligibility. The review concluded that "literature on management and long-term effects in children and adolescents is sparse," that no RCTs have been conducted, and that there remains no explanation for the recent and dramatic increases in numbers of minors presenting with gender dysphoria. (SBU Scoping Review Summary 2019.) I have quoted other conclusions from the Swedish systematic review in Section II above.

### F. Finland

86.     Finland's Ministry of Social Affairs and Health commissioned a systematic review, completed in 2019, of the effectiveness and safety of medicalized transition. (COHERE Recommendation 2020.) The review spanned both minors and adults and included both puberty

blockers and cross-sex hormones (Pasternack 2019). Three reviewers tabulated the results. In

total, 38 studies were identified, of which two pertained to minors: de Vries (2011) and Costa

(2015). The report noted that, because the methodological quality of the studies was already

"weak" (no study including any control groups), the assessors declined detailed quality

assessment of the existing studies. (Pasternack 2019 at 3.) I have quoted other conclusions from

the Finnish systematic review in Section II above.

## G. Norway

87.     Norway's investigation of its health care policy for gender dysphoric minors also

revealed substantial safety concerns:

> There are unsettled questions related to puberty blockers in young people. A
> published study shows that puberty-inducing hormones cause slower height growth
> and a slower increase in bone density. It is also noted that the effects on cognitive
> development have not been mapped. Unexplained side effects and long-term effects
> of both puberty blockers (hormone treatment) and gender-affirming hormone
> treatments are increasingly being questioned. However, experience with other
> patient groups shows that long-term use of sex hormones can affect disease risk.
> When people with gender incongruence are treated, it is with significantly longer
> duration and intensity of hormone treatment than hormone treatments for other
> conditions. (Ukom 2023.)

## VI. The Endocrine Society, WPATH, and the American Academy of Pediatrics did not conduct systematic reviews of safety and efficacy in establishing clinical guidelines, despite systematic reviews being the foundation and gold standard of evidence-based care.

88.     I have also examined the reviews conducted by the U.S.-based professional associations that have published standards and guidelines for the treatment of gender dysphoric youth. As detailed herein, and unlike the European reviews, none of the U.S.-based professional associations conducted a systematic review of both effectiveness and safety, without which they are unable to assess the risk:benefit ratio posed by medicalized transition of minors.

### A. The Endocrine Society reviewed cross-sex hormones, but not puberty blockers. They reviewed safety, but did not review effectiveness research.

89.     The Endocrine Society appointed a task force which commissioned two systematic reviews as part of updating their 2009 recommendations. (Hembree 2017.) The scopes of the two reviews were limited to physiological effects of cross-sex hormones, narrowly defined: "The first one aimed to summarize the available evidence on the effect of sex steroid use in transgender individuals on lipids and cardiovascular outcomes….The second review summarized the available evidence regarding the effect of sex steroids on bone health in transgender individuals." (Hembree 2017 at 3873.) As described in the Endocrine Society Guidelines, those reviews did not, however, include the effectiveness of any treatment on mental health (quality of life, suicidality, rates of detransition, cosmetic or functional outcomes, or improvements in feelings of gender dysphoria). What appears to be the referenced review of lipids and cardiovascular outcomes (Maraka 2017) did not identify any study of adolescents, noting "literature addressing this clinical question in the pediatric/adolescent population is completely lacking." (Maraka at 3921.) What appears to be the referenced review of bone health (Singh-Ospina 2017) identified only one small study on adolescents, involving 15 male-to-female and 19 female-to-male cases.

(Klink 2015.) Notably, the median duration of puberty-blocker administration was 1.2 years, leaving unknown the effects on children receiving blockers from puberty onset (usually age 9–10) to age 14 or 16.

90.　　Further, the Endocrine Society does not claim to have conducted or consulted any systematic review of the efficacy of puberty blockers or cross-sex hormones to reduce gender dysphoria or increase mental health or well-being by any metric. Nor does it claim to have conducted or consulted any systematic review of safety of any of these treatments for minors with respect to brain development, future fertility, actual reversibility, or any other factor of safety or adverse event other than cardiovascular disease and bone strength.

91.　　For all these reasons, I concur with the opinion of Dr. Guyatt, who has said that he finds "serious problems" with the Endocrine Society guidelines, among other reasons because the only systematic reviews those guidelines refer to did not look at the efficacy of the recommended hormonal interventions to improve gender dysphoria, which he termed "the most important outcome." (Block, Gender Dysphoria 2023 at 4.)

92.　　The current Endocrine Society guidelines, released in 2017, include this disclaimer:

> The Endocrine Society makes no warranty, express or implied, regarding the guidelines and specifically excludes any warranties of merchantability and fitness for a particular use or purpose. The Society shall not be liable for direct, indirect, special, incidental, or consequential damages related to the use of the information contained herein. (Hembree 2017 at 3895.)

The previous, 2009, version included no disclaimers. (Hembree 2009.)

## B.  WPATH reviewed effectiveness, but not the safety of medicalized transition of minors.

93.　　WPATH engaged in a multi-step process in updating its Standards of Care from version 7 to version 8. That process included commissioning a systematic review, which was published as Baker, *et al.* (2021) which included the disclaimer "The authors are responsible for

its content. Statements in this report do not necessarily reflect the official views of or imply endorsement by WPATH." (Baker 2021 at 14.)

94. The literature search was completed in June 2020, and spanned 13 questions. Two questions related to the effectiveness of medicalized transition of minors: Question #10 was "[W]hat are the effects of suppressing puberty with GnRH agonists on quality of life?", and question #11 was "[W]hat are the psychological effects (including quality of life) associated with hormone therapy?" (Sharma 2018; Baker 2021.) That is, the review included studies of the effectiveness of puberty blockers and cross-sex hormones, but, remarkably, did not include any effort to determine the *safety* of either.

95. Baker (2021) identified that among all experimental evidence published on medicalized transition, a total of "Three studies focused on adolescents." (Baker 2021 at 1.) These were Achille, *et al.* (2020), López de Lara, *et al.* (2020), and de Vries, *et al.* (2011, 2014). (Baker 2021 considered the two de Vries articles as a single study, because the later one included the subset of patients from the earlier one who continued in treatment. I will refer to this set as four studies, however, to be consistent with the other reviews.) Notably, in contrast with WPATH's review, the Swedish review entirely excluded Achille *et al.* (2020), López de Lara *et al.* (2020), and de Vries *et al.* (2011) due to their high risks of bias. (SBU Scoping Review Appendix 2.) The Baker team did not use the GRADE system for assessing the quality of evidence, instead using the Methods Guide for Conducting Comparative Effectiveness Reviews.

96. The Baker team noted "no study reported separate results by gender identity for transgender youth." (Baker 2021 at 3.) They also found that "No study reported on hormone therapy among nonbinary people." (at 3.) (Despite this finding, WPATH SOC-8 now includes recommendations for people who identify as nonbinary.)

97.     My assessment of the Baker review revealed that there were substantial discrepancies and misleading ambiguities in their reporting: Baker, *et al.* indicated in the abstract that "Hormone therapy was associated with increased QOL [quality of life], decreased depression, and decreased anxiety" (Baker 2021 at 1,) and that "Associations were similar across gender identity and age" (Baker 2021 at 12). This is not what its actual data tables showed, however. Table 2 presented the only study of QOL specifically among adolescents included in the review and indicated that "Mean QOL scores did *not* change." (Baker 2021 at 7, italics added.)

98.     The review, however, did not rate the quality of the studies of adolescents on their own, instead combining them with the studies of adults. (at 10, italics added.) Table 4 of that study presented three analyses of anxiety: One showed a decrease, and on the other two, "Mean anxiety score did *not* change." (at 11, italics added.) Finally, the review also concluded, "It was impossible to draw conclusions about the effects of hormone therapy on death by suicide." (at 12.) Even for the combined set, the review read the strength of evidence to be "low" for each of QOL, depression, and anxiety, and to be "insufficient" for death by suicide. (Baker 2021 at 13, Table 6.) Specifically, the review indicated, "There is insufficient evidence to draw a conclusion about the effect of hormone therapy on death by suicide among transgender people." (at 13, Table 6.) Overall, "The strength of evidence for these conclusions is low due to methodological limitations." (at 12.) Of particular concern was that "Uncontrolled confounding was a major limitation in this literature." (at 12.)

99.     Additionally, although WPATH commissioned the Baker review, WPATH did not follow its results. Baker 2021 indicated the use of two systematic quality assessment methods, called RoB 2 and ROBINS-I (Baker 2021 at 3); however, WPATH modified the conclusions that that process yielded. WPATH SOC-8 states, "This evidence is not only based on the published

literature (direct as well as background evidence) but also on consensus-based expert opinion."

(Coleman 2022 at S8.) Moreover:

> Recommendations in the SOC-8 are based on available evidence supporting interventions, a discussion of risks and harms, as well as feasibility and acceptability within different contexts and country settings. Consensus on the final recommendations was attained using the Delphi process that included all members of the guidelines committee and required that recommendation statements were approved by at least 75% of members. (Coleman 2022 at S8.)

100.    By allowing "consensus-based expert opinion" to modify or overrule conclusions supported by systematic reviews that apply accepted criteria of evidentiary strength, WPATH has explicitly abandoned evidence-based medicine. As indicated already by the Pyramid of Evidence, "expert opinion" represents the *lowest* level of evidence in science, whereas systematic review, the highest. (Also, it is unclear what the authors mean by "background evidence.") To modify systematic results according to committee opinion is to re-introduce the very biases that the systematic process is meant to overcome. The WPATH document attempts to claim the authority of a systematic review, while reserving the ability to "overrule" results that WPATH members did not like.

101.    As to evidence supporting hormonal interventions in minors, WPATH asserted that "a systematic review regarding outcomes of [hormonal] treatment in adolescents is not possible" due to the lack of "outcome studies that follow youth into adulthood." (Coleman 2022 at S46.) WPATH is correct that essential outcome studies have not been done, but incorrect that this authorizes issuance of guidelines or standards in the absence of a systematic review. As Dr. Guyatt has stated, "systematic reviews are always possible"—and indeed an important conclusion from such a review may be (as here) that insufficient evidence exists to support any evidence-based guideline. As Dr. Guyatt further elaborated, if an organization issues recommendations without performing an on-point systematic review, "they'd be violating

standards of trustworthy guidelines." (Block, Dysphoria Rising, 2023 at 3.)

102.    Finally, the WPATH SOC-8 were revised immediately after their release, removing all age minimums to all recommendations. None of these studies and none of these reviews support such a change, and WPATH cites no studies or other document in support of the change.

103.    In sum, the WPATH SOC8 cannot be called evidence-based guidelines under any accepted meaning of that term.

### C.  The American Academy of Pediatrics did not conduct a systematic review either of safety or effectiveness.

104.    While the AAP policy statement is often referenced, the AAP did not report conducting any systematic review of any aspect of transgender care in producing its policy statement on gender-diverse children and adolescents. (Rafferty 2018.) Further, the AAP policy statement on its face is the work of a single author rather than of any committee or the membership more broadly (Dr. Rafferty "conceptualized," "drafted," "reviewed," "revised," and "approved" the statement), and the statement explicitly states that it does not "indicate an exclusive course of treatment" nor "serve as a standard of medical care." (Rafferty 2018 at 1.)

## VII.   Definitions of sex, gender identity, and gender dysphoria.

### A. Sex and sex-assigned-at-birth represent objective features.

105.    Sex is an *objective* feature: It can be ascertained regardless of any declaration by a person, such as by chromosomal analysis or visual inspection. Gender identity, however, is *subjective:* There exists no means of either falsifying or verifying people's declarations of their gender identities. In science, it is the objective factors—and only the objective factors—that matter to a valid definition. Objectively, sex can be ascertained, not only in humans or only in the modern age, but throughout the animal kingdom and throughout its long history in natural evolution.

106.    I use the term "sex" in this report with this objective meaning, which is consistent with definitions articulated by multiple medical organizations:

> Endocrine Society (Bhargava 2021 at 220.)
> "Sex is dichotomous, with sex determination in the fertilized zygote stemming from unequal expression of sex chromosomal genes."

> American Academy of Pediatrics (Rafferty 2018 at 2 Table 1.):
> "An assignment that is made at birth, usually male or female, typically on the basis of external genital anatomy but sometimes on the basis of internal gonads, chromosomes, or hormone levels."

> American Psychological Association (APA Answers 2014):
> "Sex is assigned at birth, refers to one's biological status as either male or female, and is associated primarily with physical attributes such as chromosomes, hormone prevalence, and external and internal anatomy."

> American Psychological Association (APA Resolution 2021 at 1):
> "While gender refers to the trait characteristics and behaviors culturally associated with one's sex assigned at birth, in some cases, gender may be distinct from the physical markers of biological sex (e.g., genitals, chromosomes)."

> American Psychiatric Association (Am. Psychiatric Ass'n Guide):
> "Sex is often described as a biological construct defined on an anatomical, hormonal, or genetic basis. In the U.S., individuals are assigned a sex at birth based on external genitalia."

107.    The phrases "assigned male at birth" and "assigned female at birth" are increasingly

popular, but they lack any scientific merit. Science is the systematic study of natural phenomena, and nothing objective changes upon humans' labelling or re-labelling it. That is, the objective sex of a newborn was the same on the day before as the day after the birth. Indeed, the sex of a fetus is typically known by sonogram or amniocentesis many months before birth. The use of the term "assign" insinuates that the label is arbitrary and that it was possible to have been assigned a different label that is equally objective and verifiable, which is untrue. Infants were born male or female before humans invented language at all. Indeed, it is exactly because an expected child's sex is known before birth that there can exist the increasingly popular "gender reveal" events. Biologically, the sex of an individual (for humans and almost all animal species) as male or female is irrevocably determined at the moment it is conceived. Terms such as "assign" obfuscate rather than clarify the objective evidence.

### B. Gender identity refers to subjective feelings that cannot be defined, measured, or verified by science.

108.    It is increasingly popular to define gender identity as a person's "inner sense," however, neither "inner sense" nor any similar phrase is scientifically meaningful. In science, a valid construct must be both objectively measurable and falsifiable with objective testing. The concept of an "inner sense" fits none of these requirements.

## VIII.    Gender Dysphoria is a mental health diagnosis.

109.    Gender Dysphoria is a mental health condition identified by diagnostic criteria set out in the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM") 5-TR. (American Psychiatric Ass'n 2022.) While the criteria contain multiple components and vary modestly for children, adolescents, and adults, all cases are characterized by a strong and lasting desire to be the opposite sex, and "clinically significant" distress of sufficient severity to impair the individuals' ability to function in their daily life setting. Gender dysphoria is nowhere defined as a medical (as opposed to mental health) diagnosis, and it is not characterized by any disability or impairment or ill health affecting any part of the physical body.

## IX. Distinct mental health phenomena must not be—but frequently are—confused or conflated.

110.   One of the most widespread public misunderstandings about people expressing gender dysphoria is that all such cases represent the same phenomenon; however, the clinical science has long and consistently demonstrated that prepubescent children expressing gender dysphoria represent a phenomenon distinct from that of adults starting to experience it. That is, gender dysphoric children are not simply younger versions of gender dysphoric adults. They differ in virtually every objective variable measured, including in their responses to treatments. A third presentation has recently become increasingly observed among people presenting to gender clinics: these cases appear to have an onset in adolescence—after the onset of puberty and before adulthood—and occur in the absence of any childhood history of gender dysphoria. Such cases have been called adolescent-onset or "rapid-onset" gender dysphoria (ROGD). Despite having only recently been observed, they have quickly and greatly outnumbered the better characterized types. Moreover, large numbers of adolescents are today self-identifying in surveys as "gender fluid" and "non-binary." These are not recognized mental health diagnoses, and do not relate in any known way to gender dysphoric groups that have been the subject of previous treatment outcome studies. Because each of these phenomena differ in multiple objective features, it is scientifically invalid to extrapolate findings from one type to the others.

### A. Adult-Onset Gender Dysphoria consists predominantly of males sexually attracted to females.

111.   Whereas Childhood-Onset Gender Dysphoria occurs in biological males and females and is strongly associated with later homosexuality (next section), Adult-Onset Gender Dysphoria consists primarily of biological males sexually attracted to females. (Lawrence 2010.) They typically report being sexually attracted to women and rarely showed gender atypical

(effeminate) behavior or interests in childhood (or adulthood). Some individuals express being sexually attracted to both men and women, and some profess asexuality, but very few indicate having a primary sexual interest only in men. (Blanchard 1998.) Cases of adult-onset gender dysphoria are typically associated with a sexual interest pattern involving themselves in female form (a paraphilia called autogynephilia). (Blanchard 1989a, 1989b, 1991.)

112.    Because of the numerous objective differences between adult-, childhood-, and adolescent-onset gender dysphoria, it is not possible to extrapolate from these results to juvenile populations, which responsible authors are careful not to do.

## B. Childhood-onset gender dysphoria (prepubertal-onset) is a distinct phenomenon characterized by high rates of desistance in the absence of social or medical transition.

113.    For many decades, small numbers of prepubescent children have been brought to mental health professionals for help with their unhappiness with their sex and in the belief they would be happier living as the other sex. The large majority of childhood onset cases of gender dysphoria occur in biological males, with clinics reporting 2–6 biological male children to each female. (Cohen-Kettenis 2003; Steensma Evidence 2018; Wood 2013.)

### 1. Eleven cohort studies followed children not permitted social transition, all showing the majority to desist feeling gender dysphoric upon follow-up after puberty.

114.    Currently, the studies of outcomes among children who experience gender dysphoria before puberty that provide the most evidentiary strength available are only "cohort studies," which follow people over time, recording the outcomes of the treatments they have undergone. Such studies supersede (i.e., overrule) the outcomes of surveys, which are much more prone to substantial error. As I have explained above, however, cohort studies can describe developmental pathways, but cannot provide evidence of causation.

50

115. In total, there have been 11 cohort studies showing the outcomes for these children, listed in Table 2. I first published this comprehensive list of studies in my own peer-reviewed article on the topic. (Cantor 2019.)

**Table 2. Cohort studies of gender dysphoric, prepubescent children.**

| Count | Group | Study |
|---|---|---|
| 2/16<br>4/16<br>10/16 | gay<br>trans-/crossdress<br>straight/uncertain | Lebovitz, P. S. (1972). Feminine behavior in boys: Aspects of its outcome. *American Journal of Psychiatry, 128,* 1283–1289. |
| 2/16<br>2/16<br>12/16 | trans-<br>uncertain<br>gay | Zuger, B. (1978). Effeminate behavior present in boys from childhood: Ten additional years of follow-up. *Comprehensive Psychiatry, 19,* 363–369. |
| 0/9<br>9/9 | trans-<br>gay | Money, J., & Russo, A. J. (1979). Homosexual outcome of discordant gender identity/role: Longitudinal follow-up. *Journal of Pediatric Psychology, 4,* 29–41. |
| 2/45<br>10/45<br>33/45 | trans-/crossdress<br>uncertain<br>gay | Zuger, B. (1984). Early effeminate behavior in boys: Outcome and significance for homosexuality. *Journal of Nervous and Mental Disease, 172,* 90–97. |
| 1/10<br>2/10<br>3/10<br>4/10 | trans-<br>gay<br>uncertain<br>straight | Davenport, C. W. (1986). A follow-up study of 10 feminine boys. *Archives of Sexual Behavior, 15,* 511–517. |
| 1/44<br>43/44 | trans-<br>cis- | Green, R. (1987). The "sissy boy syndrome" and the development of homosexuality. New Haven, CT: Yale University Press. |
| 0/8<br>8/8 | trans-<br>cis- | Kosky, R. J. (1987). Gender-disordered children: Does inpatient treatment help? *Medical Journal of Australia, 146,* 565–569. |
| 21/54<br>33/54 | trans-<br>cis- | Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric children. *Journal of the American Academy of Child and Adolescent Psychiatry, 47,* 1413–1423. |
| 3/25<br>6/25<br>16/25 | trans-<br>lesbian/bi-<br>straight | Drummond, K. D., Bradley, S. J., Badali-Peterson, M., & Zucker, K. J. (2008). A follow-up study of girls with gender identity disorder. *Developmental Psychology, 44,* 34–45. |
| 47/127<br>80/127 | trans-<br>cis- | Steensma, T. D., McGuire, J. K., Kreukels, B. P. C., Beekman, A. J., & Cohen-Kettenis, P. T. (2013). Factors associated with desistence and persistence of childhood gender dysphoria: A quantitative follow-up study. *Journal of the American Academy of Child and Adolescent Psychiatry, 52,* 582–590. |

App.490

| 17/139 | trans- | Singh, D., Bradley, S. J., Zucker, K. J. (2021). A follow-up study |
| 122/139 | cis- | of boys with Gender Identity Disorder. *Frontiers in Psychiatry*, 12:632784. |

*For brevity, the list uses "gay" for "gay and cis-", "straight" for "straight and cis-", etc.

116.     The children in these studies were receiving professional mental health support during the study period, but did not "socially transition." In sum, despite coming from a variety of countries, conducted by a variety of labs, using a variety of methods, at various times across four decades, every study without exception has come to the identical conclusion: among prepubescent children who feel gender dysphoric, the majority cease to want to be the other gender over the course of puberty—ranging from 61–88% desistance across the large, prospective studies. Such cases are often referred to as "desisters," whereas children who continue to feel gender dysphoric are often called "persisters."

117.     This interpretation of these studies is widely accepted, including by the Endocrine Society, which concluded:

> In most children diagnosed with GD/gender incongruence, it did not persist into adolescence. . . . [T]he large majority (about 85%) of prepubertal children with a childhood diagnosis did not remain GD/gender incongruent in adolescence. (Hembree 2017 at 3879.)

The developers of the Dutch Protocol, at the Vrije University gender clinic, likewise concluded based on these studies that "Although the persistence rates differed between the various studies…the results unequivocally showed that the gender dysphoria remitted after puberty in the vast majority of children." (Steensma & Cohen-Kettenis 2011 at 2.)

118.     The consistent observation of high rates of desistance among pre-pubertal children who present with gender dysphoria demonstrates a pivotally important—yet often overlooked—feature: because gender dysphoria so often desists on its own, clinical researchers cannot assume that therapeutic intervention cannot facilitate or speed desistance for at least some patients. That

is, it cannot be assumed that gender identity is immune to influence such as from psychotherapy. Such is an empirical question, and there has not yet been any such research.

119.    These same studies are often vaguely cited to assert that the high desistance rates uniformly reported in these 11 studies do not apply to children who have persisted until "the start of puberty" (which is taken to mean Tanner Stage 2), or in an alternative phrasing, that children "who persist until the start of puberty" are likely to continue to persist into adulthood. But these studies taken together do not support that degree of precision. Rather, the studies do not specify at exactly what developmental stage the reported desistance occurred—what they report is that the subjects had desisted by late adolescence or early adulthood. I am aware of no systematic study that establishes that—in the absence of social and/or medical transition—children who experience gender dysphoria are unlikely to desist if they have not desisted by the start of Tanner Stage 2.

### 2. One cohort study followed children who were permitted social transition. In contrast with children not permitted to transition socially, most persisted in expressing gender dysphoria.

120.    In contrast, Olson et al. have now published a single cohort study of prepubescent children, ages 3–12 (average of 8), who had already made a complete, binary (rather than intermediate) social transition, including a change of pronouns. (Olson 2022.) The study did not employ DSM-5 diagnosis, as "Many parents in this study did not believe that such diagnoses were either ethical or useful and some children did not experience the required distress criterion." (Olson 2022.) Unlike the prior research studies, only 7.3% of these (socially transitioned) children ceased to feel gender dysphoric.

121.    Although the team publishing this cohort study did not discuss it, their finding matches the prediction of other researchers, that social transition itself represents an active

intervention, such that social transition may *cause* the persistence of gender dysphoria when it would have otherwise resolved, avoiding any need for subsequent medicalization and its attendant risks. Conversely stated, social transition seems to prevent desistance. (Singh 2021; Zucker 2018, 2020.)

122.    As recognized by multiple authors, the potential impact of social transition on rates of desistance is pivotal. The Endocrine Society cautions that "social transition...has been found to contribute to the likelihood of persistence." (Hembree 2017 at 3879.) WPATH has stated that after social transition, "A change back to the original gender role can be highly distressing and [social transition can] even result in postponement of this second transition on the child's part." (Coleman 2012 at 176.) In 2013, prominent Vrije University researchers observed:

> Childhood social transitions were important predictors of persistence, especially among natal boys. Social transitions were associated with more intense GD in childhood, but have never been independently studied regarding the possible impact of the social transition itself on cognitive representation of gender identity or persistence. [Social transition] may, with the hypothesized link between social transitioning and the cognitive representation of the self, influence the future rates of persistence. (Steensma 2013 at 588-589.)

### 3.    There is no reliable method for predicting for which children who present with gender dysphoria will persist versus desist.

123.    The Endocrine Society Guidelines stated in 2017 that "With current knowledge, we cannot predict the psychosexual outcome for any specific child" (Hembree 2017 at 3876), and this remains true today. Research has not yet identified any reliable procedure for discerning which children who present with gender dysphoria will persist, as against the large majority who will desist, absent transition and "affirmation." Such a method would be valuable, as the more accurately that potential persisters can be distinguished from desisters, the better the risks and benefits of options can be weighted. Such "risk prediction" and "test construction" are standard components of applied statistics in the behavioral sciences. Multiple research teams have

reported that, on average, groups of persisters are somewhat more gender non-conforming than desisters, but not so different as to usefully predict the course of any particular child. (Singh 2021; Steensma 2013.)

124.    In contrast, one research team (the aforementioned Olson group) claimed the opposite, asserting that they developed a method of distinguishing persisters from desisters, using a single composite score representing a combination of children's "peer preference, toy preference, clothing preference, gender similarity, and gender identity." (Rae 2019 at 671.) They reported a statistical association (mathematically equivalent to a correlation) between that composite score and the probability of persistence. As they indicated, "Our model predicted that a child with a gender-nonconformity score of .50 would have roughly a .30 probability . . . of socially transitioning. By contrast, a child with gender-nonconformity score of .75 would have roughly a .48 probability." (Rae 2019 at 673.) Although the Olson team declared that "social transitions may be predictable from gender identification and preferences" (Rae 2019 at 669), their actual results suggest the opposite: the gender-nonconforming group who went on to transition (socially) had a mean composite score of .73 (which is less than .75), and the gender-nonconforming group who did not transition had a mean composite score of .61, also less than .75. (Rae 2019, Supplemental material at 6, Table S1.) Both of those are lower than the value of .75, so both of those would be more likely than not to desist, rather than to proceed to transition. That is, Olson's model does not distinguish likely from unlikely to transition; rather, it distinguishes unlikely from even less likely to transition.

125.    Further, in the absence of long-term follow-up, it cannot be known what proportion of those who transition and persist through the early stages of puberty will later (for example as young adults) come to regret having transitioned and then *de*transition. Because only a minority

of gender dysphoric children persist in feeling gender dysphoric in the first place, "transition-on-demand" increases the probability of unnecessary transition and unnecessary medical risks.

### 4. Temple Newhook's attempts to dismiss evidence of high rates of desistance from childhood gender dysphoria are invalid.

126.    The unanimous consistency across all 11 cohort studies of (non-transitioned) gender dysphoric children offers high confidence in the conclusion that most childhood-onset cases desist during the course of puberty. In 2018, however, a commentary was published, contesting that conclusion, criticizing four studies. (Temple Newhook 2018.) Multiple accomplished international researchers studying outcomes of gender dysphoric children responded (Zucker 2018; Steensma & Cohen-Kettenis 2018), to which the Temple Newhook team wrote a rejoinder. (Winters 2018.) I have reviewed each of these arguments, finding that the Temple Newhook comments rely on demonstrable falsehoods, whereas the responses remain consistent with the peer-reviewed evidence. The Temple Newhook commentary has not altered the consensus of the international medical community, which continues to cite and rely upon these cohort studies.

127.    Before delineating each of their arguments, it should be noted that the Temple Newhook team based their analysis on the wrong research reports, attacking only a straw-person version of the contents of the research literature. Table 3 repeats the 11 cohort studies (on the left left) and the four studies Temple Newhook criticized (right):

**Table 3.**

| | |
|---|---|
| • Lebovitz (1972) | |
| • Zuger (1978) | |
| • Money & Russo (1979) | |
| • Davenport (1986) | |
| • Green (1987) | |
| • Kosky (1987) | |
| • Wallien & Cohen-Kettenis (2008) | Wallien & Cohen-Kettenis (2008) |
| • Drummond, *et al.* (2008) | Drummond, *et al.* (2008) |

- Steensma, *et al.* (2013)      Steensma, *et al.* (2011, 2013)
- Singh, 2012/Singh, *et al.* (2021)[4]

128.    It should also be noted that the Temple Newhook 2018 commentary does not represent a systematic review. Temple Newhook did not indicate search strategies, inclusion/exclusion criteria, coding methods, reliability checks, or other standard procedures used for ensuring objective and unbiased assessment of all relevant studies. Rather, the Temple Newhook analysis targeted a small and selective subset of the research available—a scientifically invalid endeavor, which the systematic review process is meant to prevent. Not only did Temple Newhook skip most of the relevant science, but conversely, Temple Newhook inserted the Steensma 2011 study, which should have been rejected. (The data it reported was already included in Wallien & Cohen-Kettenis 2008.) The Temple Newhook commentary claimed it was "systematically engaging scholarly literature." (Temple Newhook 2018 at 2.) However, as the above reference lists demonstrate, that commentary involved no such systematic procedures.

129.    Temple Newhook does not report any research evidence of its own. Rather, the commentary hypothesizes issues they assert could, theoretically, have affected the rates of desistance consistently detected. Scientifically, such a criticism is vacuous: In science, it is always possible for additional, external factors to have affected what was observed.

130.    Also, as already detailed herein, the currently available level of evidence for outcomes of medicalized transition is the cohort study. The methodological issues highlighted by Temple Newhook are exactly why randomized, controlled trials (RCTs) need to be conducted, as such studies would be capable of resolving exactly those questions (in whichever direction). In the absence of randomized, controlled studies, however, the correct scientific process is to follow the results of the cohort studies (that is, the systematic reviews of the cohort studies).

---

[4] At the time of the 2018 Temple Newhook commentary, the Singh *et al.,* 2021 study was available as Singh, 2012.

131.    In the science process, one cannot merely continue to retain a desired hypothesis, rejecting all counter-evidence until a perfect study emerges. This is especially important in clinical science, when the hypothesis relates to physical interventions, in children, with the potential to affect them for their entire lives. Rather, the scientific process proceeds by successive approximation, with results from the best available research replacing lesser quality research, increasing in confidence, but always with the possibility of changes imposed by future evidence.

132.    By involving only a few of the full set of cohort studies, the Temple Newhook commentary removes one of the most compelling implications of the existing (cohort) studies: Their results are unanimous. However unlikely it might be for four studies to produce the same result randomly, it is even more unlikely for eleven studies all to come to the same result randomly.

133.    Temple Newhook emphasized that gender identity issues differ across times and contexts/political environments, hypothesizing that children attending her clinic might differ from children attending the Toronto and the Amsterdam clinics. Returning once again to the full set of all studies, however, the evidence shows the very opposite: All studies yielded the same result, whether from the 1970s, 80s, 90s, 2000s, 2010s, and wherever in the world any clinic was. Acknowledging the possibility that future studies may lead to a different conclusion, the existing evidence shows majority desistance, constantly and across all time periods.

134.    Consideration of the full set of studies also indicates that the contrast is not Toronto and Amsterdam versus whatever "reality" Temple Newhook perceives. Rather, they show the contrast is between Temple Newhook and every facility in every country ever reporting desistance data on childhood-onset gender dysphoria. Moreover, despite Temple Newhook's

58

App.497

mention of influences of political cultures, that commentary does not point out that Canada and the Netherlands are much more politically liberal than the U.S. Although the commentary offers the hypothesis that the Canadian and Dutch contexts might decrease persistence, the commentary does not include the inverse possibility: that these liberal environments might be *"iatrogenic"*— that is, causing dysphoria to continue when it might otherwise remit.

135.    Also, the very evidence suggesting that gender dysphoria can be influenced by local environmental factors is itself evidence that gender identity is not, in fact, an innate and immutable feature, potentially amenable to change.

### C. Adolescent-Onset Gender Dysphoria, the predominant clinical population today, is a distinct and largely unstudied phenomenon.

136.    Concurrent with the advent of social media, a third profile began appearing clinically and socially, characteristically distinct from the two previously identified profiles. (Kaltiala-Heino 2015; Littman 2018.) Despite lacking any history before the current generation, this profile has now numerically overwhelmed the previously known and better characterized types in clinics and on Internet surveys. Unlike adult-onset or childhood-onset gender dysphoria, this group is predominately biologically female. This group typically presents in adolescence, but lacks the history of cross-gender behavior in childhood like the childhood-onset cases have. It is that feature which led to the term Rapid Onset Gender Dysphoria (ROGD). (Littman 2018.)[5] Cases commonly appear to occur within clusters of peers in association with increased social media use (Littman 2018), and among people with autism or other mental health issues. (Kaltiala-Heino 2015; Littman 2018; Warrier 2020.) (See section XI on Mental Health.)

137.    There do not yet exist any cohort studies of people with adolescent-onset gender

---

[5] After initial criticism, the publishing journal conducted a reassessment of the article. The article was expanded with additional detail and republished. The relevant results were unchanged. Littman's paper as revised has been widely cited.

dysphoria undergoing medicalized transition. Current studies are limited to surveys typically of volunteers from activist and support groups on the Internet.

138.    Moreover, no study has yet been organized in such a way as to allow for a distinct analysis of the adolescent-onset group, as distinct from childhood-onset or adult-onset cases. Many published studies fail to distinguish between people who had childhood-onset gender dysphoria and have aged into adolescence versus people whose onset was not until adolescence. (Analogously, there are reports failing to distinguish people who had adolescent-onset gender dysphoria and aged into adulthood from adult-onset gender dysphoria.) Studies selecting groups according to their current age instead of their ages of onset produces confounded results, representing unclear mixes according to how many of each type of case wound up in the final sample.

## X. Suicide and suicidality are distinct phenomena representing different mental health issues and indicating different clinical needs.

139.    *Suicide* refers to completed suicides and the sincere intent to die. It is substantially associated with impulsivity, using more lethal means, and being a biological male. (Freeman 2017.) *Suicidality* refers to *para*-suicidal behaviors, including suicidal ideation, threats, and gestures.

### A. Rates of suicidality among all adolescents have skyrocketed with the advent of social media.

140.    The CDC's 2019 Youth Risk Behavior Survey found that 24.1% of female and 13.3% of male high school students reported "seriously considering attempting suicide." (Ivey-Stephenson 2020 at 48.)

141.    The CDC survey reported not only that these already alarming rates of suicide attempt were still increasing (by 8.1%–11.0% per year), but also that this increase was occurring only among female students. No such trend was observed among male students. That is, the demographic increasingly reporting suicidality is the same demographic increasingly reporting gender dysphoria. (Ivey-Stephenson 2020 at 51.)

142.    The U.S. Substance Abuse and Mental Health Services Administration (SAMHSA) produces a series of evidence-based resource guides which includes their Treatment for Suicidal Ideation, Self-Harm, and Suicide Attempts Among Youth. It noted (italics added):

> [F]rom 1999 through 2018, the suicide death rate doubled for females aged 15 to 19 and 20 to 24. For youth aged 10 to 14, the suicide death rate more than tripled from 2001 to 2018. Explanations for the increase in suicide may include bullying, social isolation, increase in technology and *social media*, increase in *mental illnesses*, and economic recession. (SAMHSA 2020 at 5.)

The danger potentially posed by social media follows from suicidality spreading as a social contagion, as suicidality increases after media reports, occurs in clusters of social groups, and in

adolescents after the death of a peer. (Gould & Lake 2013.)

143. Social media voices today loudly advocate "hormones-on-demand" while issuing hyperbolic warnings that teens will commit suicide unless this is not granted. Both adolescents and parents are exposed to the widely circulated slogan that "I'd rather have a living son than a dead daughter," and such baseless threats or fears are treated as a justification for referring to affirming gender transitions as 'life-saving' or 'medically necessary'. Such claims grossly misrepresent the research literature, however. Indeed, they are unethical: Suicide prevention research and public health campaigns repeatedly warn against circulating messages that can be taken to publicize or even glorify suicide, due to the risk of copy-cat behavior they encourage. (Gould & Lake 2013.)

144. Systematic review of 44 studies of suicidal thoughts and behaviors in LGBTQ youth and suicidality found only a small association between suicidality and sexual minority stress. (Hatchel 2021.) The quantitative summary of the studies (an especially powerful type of systematic review called *meta-analysis*) found no statistically significant association between suicidality and any of having an unsupportive school climate, stigma and discrimination, or outness/openness. There were, however, significant associations between suicidality and indicators of social functioning problems, including violence from intimate partners, victimization from LGBT peers and from non-LGBT peers, and sexual risk taking.

## B. *Suicidality* is substantially more common among females, and *suicide,* among males. Sexual orientation is strongly associated with suicidality, but much less associated with suicide.

145. Notwithstanding public misconceptions about the frequency of suicide and related behaviors, the highest rates of death by suicide are among middle-aged and elderly men in high income countries. (Turecki & Brent 2016 at 3.) Males are at three times greater risk of death by

suicide than are females, whereas suicidal ideation, plans, and attempts are three times more common among females. (Klonsky 2016; Turecki & Brent 2016.) In contrast with completed suicides, the frequency of suicidal ideation, plans, and attempts is highest during adolescence and young adulthood, with reported ideation rates spanning 12.1–33%. (Borges 2010; Nock 2008.) Relative to other countries, Americans report elevated rates of each of suicidal ideation (15.6%), plans (5.4%), and attempts (5.0%). (Klonsky 2016.) Suicide attempts occur up to 30 times more frequently than completed suicides. (Bachmann 2018.) The rate of completed suicides in the U.S. population is 14.5 per 100,000 people. (WHO 2022.)

146.    There is substantial research associating sexual orientation with suicidality, but much less so with completed suicide. (Haas 2014.) More specifically, there is some evidence suggesting gay adult men are more likely to die by suicide than are heterosexual men, but there is less evidence of an analogous pattern among lesbian women. Regarding suicidality, surveys of self-identified LGB Americans repeatedly report rates of suicidal ideation and suicide attempts 2–7 times higher than their heterosexual counterparts. Because of this association of suicidality with sexual orientation, one must apply caution in interpreting findings allegedly about gender identity: because of the overlap between people who self-identify as non-heterosexual and as transgender or gender diverse, correlations detected between suicidality and gender dysphoria may instead reflect (be confounded by) sexual orientation. Indeed, other authors have made explicit their surprise that so many studies, purportedly of gender identity, entirely omitted measurement or consideration of sexual orientation, creating the situation where features that seem to be associated with gender identity instead reflect the sexual orientation of the members of the sample. (McNeil 2017.)

## C. There is no evidence that medicalized transition reduces rates of suicide or suicidality.

147.    It is repeatedly asserted that despite the known risks, despite the lack of research into

the reality or severity of unquantified risks, it is essential and "the only ethical response" to

provide medical transition to minors because medical transition is known to reduce the

likelihood of suicide among minors who suffer from gender dysphoria. This is simply untrue. *No*

*studies* have documented any reduction in suicide rates in minors (or any population) as a result

of medical transition. No methodologically sound studies have provided meaningful evidence

that medical transition reduces suicidality in minors. Instead, multiple studies show tragically

high rates of suicide after medical transition, with that rate beginning to spike several years after

medical transition.

148.    Among post-transition adults, completed suicide rates remain elevated. (Wiepjes

2020.) Among post-operative transsexual adults in Sweden's highly tolerant society, death by

suicide is 19 times higher than among the cisgendered. (Dhejne 2011.) Systematic review of 17

studies of suicidality in transsexual adults confirmed suicide rates remain elevated even after

complete transition. (McNeil 2017.) Among post-operative patients in the Netherlands, long-

term suicide rates of six times to eight times that of the general population were observed

depending on age group. (Asscheman 2011 at 638.) Also studying patients in the Netherlands,

Wiepjes et al. (2020) reported the "important finding" that "suicide occurs similarly" before and

after medical transition. (Wiepjes 2020 at 490.) In other words, *transition did not reduce suicide*.

A very large dataset from the U.K. GIDS clinic showed that those referred to the GIDS clinic for

evaluation and treatment for gender dysphoria committed suicide at a rate five times that of the

general population, both before and after commencement of medical transition (Biggs 2022).

Finally, in a still-ongoing longitudinal study of U.S. patients, Chen *et al.* have reported a

shockingly high rate of completed suicide among adolescent subjects in the first two years *after* hormonal transition, although they provide no pre-treatment data for this population to compare against. (Chen 2023 at 245.)

149.    WPATH's systematic review of the effectiveness of puberty blockers and cross-sex hormones on suicide in minors concluded that "It was impossible to draw conclusions about the effects of [either] hormone therapy on death by suicide." (Baker 2021 at 12.) In short, I am aware of no respected voice that asserts that medical transition reduces suicide among minors who suffer from gender dysphoria.

150.    As to the separate and far more common phenomenon of suicidality, of course, that claim is widely made. McNeil's systematic review revealed, however, a complicated set of interrelated factors rather than supporting the common hypothesis that rates of suicidal ideation and suicidal attempts would decrease upon transition. Rates of suicidal ideation did not show the same pattern as suicide attempts, male-to-female transitioners did not show the same patterns as female-to-male transitioners, and social transition did not show the same patterns as medical transition. Importantly, the review included one study that reported "a positive relationship between higher levels of social support from leaders (e.g., employers or teachers) and increased suicide attempt, which they suggested may be due to attempts instigating increased support from those around the person, rather than causing it." (McNeil 2017 at 348.)

151.    Moreover, the 2020 Kuper, *et al.* cohort study of minors receiving hormone treatment found *increases* in each of suicidal ideation (from 25% to 38%), attempts (from 2% to 5%), and non-suicidal self-injury (10% to 17%). (Kuper 2020 at Table 5.) Research has found social support to be associated with *increased* suicide attempts, suggesting the reported suicidality may represent attempts to evoke more support. (Bauer 2015; Canetto 2021.)

App.504

152.    Overall, the research evidence is only minimally consistent with the hypothesis that an absence of transition causes mental health issues and suicide, but very strongly consistent with the hypothesis that mental health issues, such as *Borderline Personality Disorder* (BPD), cause both suicidality and unstable identity formation (including gender identity confusion). (See section XI.) BPD is repeatedly documented to be greatly elevated among sexuality minorities (Reuter 2016; Rodriguez-Seijas 2021; Zanarini 2021), and both suicidality and identity confusion are symptoms of that disorder. Thus, diverting distressed youth towards transition necessarily diverts youth away from receiving the psychotherapies designed for treating the issues actually causing their distress.

153.    Despite the fact that mental health issues, including suicidality, are repeatedly required by clinical standards of care to be resolved before transition, threats of suicide are instead oftentimes used as the very justification for labelling transition a "medical necessity". However plausible it might seem that failing to affirm transition causes suicidality, the epidemiological evidence does not support that hypothesis.

## XI.  Mental health profiles differ across adult-, adolescent-, and childhood-onset gender dysphoria.

### A. Mental health issues in Adult-Onset Gender Dysphoria.

154.    Systematic review of all studies examining mental health issues in transgender adults identified 38 such studies. (Dhejne 2016.) The review indicated that many studies were methodologically weak, but nonetheless consistently found (1) that the average rate of mental health issues among adults is highly elevated both before *and after* transition, (2) but that the average was less elevated among adults who completed transition. It could not be concluded that transition improves mental health, however. Patients were commonly receiving concurrent psychotherapy, introducing a confound (meaning, again, that it cannot be determined whether the change was caused by the transitioning or the mental health treatment). Further, several studies showed more than 40% of patients to become "lost to follow-up." It remains unknowable to what extent the information from the remaining participants accurately reflects the whole population.

### B. Mental health issues in Childhood-Onset Gender Dysphoria.

155.    Elevated rates of multiple mental health issues among gender dysphoric children are reported throughout the research literature. A formal analysis of children (ages 4–11) undergoing assessment at the Dutch child gender clinic showed that 52% fulfilled criteria for a formal DSM diagnosis of a clinical mental health condition other than Gender Dysphoria. (Wallien 2007 at 1307.) A comparison of the children attending the Canadian versus Dutch child gender dysphoria clinic showed only few differences between them, and a large proportion in both groups were diagnosable with clinically significant mental health issues. Results of standard assessment instruments (Child Behavior Check List, or CBCL) demonstrated that among 6–11-year-olds, 61.7% of the Canadian and 62.1% of the Dutch sample satisfied the diagnostic criteria for one or more mental health conditions other than gender dysphoria. (Cohen-Kettenis 2003 at 46-47.)

156.     A systematic review of all studies of Autism Spectrum Disorders (ASDs) and
Attention-Deficit Hyperactivity Disorder (ADHD) among children diagnosed with gender
dysphoria was recently conducted. (Thrower 2020.) It was able to identify a total of 22 studies
examining the prevalence of ASD or ADHD youth with gender dysphoria. Studies reviewing
medical records of children and adolescents referred to gender clinics showed 6–26% to have
been diagnosed with ASD. (Thrower 2020 at 695.) Moreover, those authors gave specific caution
on the "considerable overlap between symptoms of ASD and symptoms of gender variance,
exemplified by the subthreshold group which may display symptoms which could be interpreted
as either ASD or gender variance. Overlap between symptoms of ASD and symptoms of GD
may well confound results." (Thrower 2020 at 703.) The rate of ADHD among children with GD
was 8.3–11%. Conversely, data from children (ages 6–18) with Autism Spectrum Disorders
(ASDs) show they are more than seven times more likely to have parent-reported "gender
variance." (Janssen 2016 at 63.)

157.     As shown by the outcomes studies (see Section XIII), there is little reliable evidence
that transition improves the mental well-being of children. As shown repeatedly by clinical
guidelines from multiple professional associations, mental health issues are expected or required
to be resolved *before* undergoing transition. The reasoning behind these conclusions is that
children may be expressing gender dysphoria, not because they are experiencing what gender
dysphoric adults report, but because they mistake what their experiences indicate or to what they
might lead. For example, a child experiencing depression from social isolation might develop the
hope—and the unrealistic expectation—that transition will help them fit in, as a member of the
other sex.

158.     In cases where gender dysphoria is secondary to a different issue, efforts at transition

are aiming at the wrong target and leave the primary issue(s) unaddressed. Given the highly reliable, repeatedly replicated finding that childhood-onset gender dysphoria resolves with puberty for the large majority of children, the evidence indicates that blocking a child's puberty blocks the child's natural maturation that itself would resolve the dysphoria.

### C. Mental health issues in Adolescent-Onset Gender Dysphoria (ROGD).

159.    The literature varies in the range of gender dysphoric adolescents with co-occurring disorders. In addition to self-reported rates of suicidality (see Section X), clinical assessments reveal elevated rates not only of depression (Holt 2016; Skagerberg 2013; Wallien 2007), but also anxiety disorders, disruptive behavior difficulties, Attention Deficit/Hyperactivity Disorder, Autism Spectrum Disorder, and personality disorders, especially Borderline Personality Disorder (BPD). (Anzani 2020; de Vries 2010; Jacobs 2014; Janssen 2016; May 2016; Strang 2014, 2016; Swedish Socialstyrelsen, Evolution 2020.)

160.    Of particular concern in the context of adolescent-onset gender dysphoria is Borderline Personality Disorder (BPD; diagnostic criteria in Table 4 below). Symptoms of BPD overlap in important respects with symptoms commonly interpreted as signs of gender dysphoria, and it is increasingly hypothesized that very many cases appearing to be adolescent-onset gender dysphoria actually represent cases of BPD. (E.g. Anzani 2020; Zucker 2019.) That is, some people may be misinterpreting their experiencing of the broader "identity disturbance" of symptom Criterion 3 to represent a gender identity issue specifically. Like adolescent-onset gender dysphoria, BPD begins to manifest in adolescence, is three times more common in biological females than males, and occurs in 2–3% of the population, rather than 1-in-5,000 people. (Thus, if even only a portion of people with BPD experienced an identity disturbance, and focused that disturbance on gender identity resulting in transgender identification, they could

easily overwhelm the number of genuine cases of gender dysphoria.)

**Table 4. DSM-5-TR Diagnostic Criteria for Borderline Personality Disorder.**

A pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following:

1. Frantic efforts to avoid real or imagined abandonment. (Note: Do not include suicidal or self-mutilating behaviour covered in Criterion 5.)

2. A pattern of unstable and intense interpersonal relationship characterized by alternating between extremes of idealization and devaluation.

3. *Identity disturbance: markedly and persistently unstable self-image or sense of self.*

4. Impulsivity in at least two areas that are potentially self-damaging (e.g., spending, sex, substance abuse, reckless driving, binge eating). (Note: Do not include suicidal or self-mutilating behavior covered in Criterion 5.)

5. *Recurrent suicidal behaviour, gestures, or threats, or self-mutilating behavior.*

6. Affective instability due to a marked reactivity of mood (e.g., intense episodic dysphoria, irritability, or anxiety usually lasting a few hours and only rarely more than a few days).

7. Chronic feelings of emptiness.

8. Inappropriate, intense anger or difficulty controlling anger (e.g., frequent displays of temper, constant anger, recurrent physical fights).

9. Transient, stress-related paranoid ideation or severe dissociative symptoms.
(Italics added.)

(American Psychiatric Association 2022 at 752-753.)

161.    Mistaking cases of BPD for cases of Gender Dysphoria may prevent such youth from receiving the correct mental health services for their condition. A primary cause for concern is symptom Criterion 5: *recurrent suicidality.* (See Section X on suicide and suicidality.) Regarding the provision of mental health care, the distinction between these conditions is crucial: A person with BPD going undiagnosed will not receive the appropriate treatments (the currently most effective of which is Dialectical Behavior Therapy). The problem was not about *gender* identity, but about having an *unstable* identity.

162.    Regarding research, there have now been several attempts to document rates of suicidality among gender dysphoric adolescents. The scientific concern presented by BPD is that

it poses a potential confound: samples of gender dysphoric adolescents could appear to have elevated rates of suicidality, not because of the gender dysphoria (or transphobia in society), but because of the number of people with BPD in the sample.

### D. Neuroimaging studies have associated brain features with sex and with sexual orientation, but not gender identity.

163.    Claims that transgender identity is an innate property resulting from brain structure remain unproven. Neuroimaging and other studies of brain anatomy repeatedly identify patterns distinguishing male from female brains, but when analyses search for those patterns among transgender individuals, "gender identity and gender incongruence could not be reliably identified." (Baldinger-Melich 2020 at 1345.) Although much smaller than male/female differences, statistically significant neurological differences are repeatedly associated with sexual orientation (termed "homosexual" vs "nonhomosexual" in the research literature). Importantly, despite the powerful associations between transsexuality and homosexuality, as explicated by Blanchard, many studies analyzing gender identity failed to control for sexual orientation, representing a problematic and centrally important confound. I myself pointed this out in the research literature, noting that neuroanatomical differences attributed to gender dysphoria should instead be attributed to sexual orientation. (Cantor 2011, Cantor 2012.) A more recent review of the science, by Guillamon, et al. (2016), agreed, stating:

> Following this line of thought, Cantor (2011, 2012, but also see Italiano, 2012) has recently suggested that Blanchard's predictions have been fulfilled in two independent structural neuroimaging studies. Specifically, Savic and Arver (2011) using VBM on the cortex of untreated nonhomosexual MtFs and another study using DTI in homosexual MtFs (Rametti et al., 2011b) illustrate the predictions. *Cantor seems to be right*". (Guillamon 2016 at 1634, italics added; see also Italiano 2012.)

In addition to this confound, because snapshot neurobiological studies can provide only correlational data, it would not be possible for such studies to distinguish whether brain

differences cause gender identity or if gender atypical behavior modifies the brain over time, such as through neuroplasticity. As noted by one team of neuroscientists, "[I]t remains unclear if the differences in brain phenotype of transgender people may be the result of a sex-atypical neural development or of a lifelong experience of gender non-conformity." (Fisher 2020 at 1731.) In sum, at present assertions that transgender identity is caused by neurology represent faith, not science.

## XII.  Medicalized transition of gender remains *experimental,* lacking causal evidence of mental health improvement.

### A.  Criteria distinguishing *'experimental'* from *'established'.*

164.    In science, the term "experimental" has a specific technical meaning. Within the scientific method, research studies can be *observational* or *experimental.* Among observational studies, such as surveys, the researchers do not administer any treatment and instead only describe the features of the group observed. Among experimental studies, treatments are actively administered by the researchers, who then compare the treated and untreated groups (or compare a group to itself, before versus after treatment). Also, within a given treatment study, the term "experimental treatment" would be used to distinguish it from the "control treatment" or "treatment-as-usual" being provided to the control group.

165.    Outside research studies and within public and legal contexts, the term 'experimental' typically denotes '*unverified by experimental evidence'.* A treatment would continue to be experimental until the demonstration of (1) reliable, clinically meaningful improvement and (2) the reliable estimation of safety risks in randomized, controlled trials (RCTs) or research of equivalent level of evidence. A treatment would remain experimental while its effects, including side effects, remain uninvestigated.

166.    Being long-standing, popular, or familiar do not, of themselves, impact whether a treatment is experimental—they suggest opportunities for the experiments to have been done. Clinicians' feelings of self-confidence do not impact status as experimental.

### B.  International consensus explicitly regards gender transition to be experimental.

167.    In England, after a thorough review of the literature and the current practice, Dr. Cass stated that the critical and currently unanswered question "is whether the evidence for the use

and safety of the medication is strong enough as judged by reasonable clinical standards." She recognized that these treatments cannot formally be called "experimental" not because they are proven, but because the experiments needed to test their efficacy and safety have not only not been done, but are not even being attempted. (Cass 2022 at 37.) To address this, Dr. Cass called for "the rapid establishment of the necessary research infrastructure to prospectively enrol young people being considered for hormone treatment into a formal research programme." (Cass Review Letter 2022). In response, in its interim service specification NHS England states that it "will only commission GnRHa [i.e., puberty blockers] in the context of a formal research protocol." (NHS 2022 at 12.)

168.     Finland, by law, restricts all assessment and treatment activities for gender dysphoric minors to its two research clinics, Helsinki University Central Hospital and Tampere University Hospital. (COHERE Summary.) Further, after conducting a systematic review of the research, the council responsible for the assessment of public health care services in Finland (COHERE Finland) concluded, "In light of available evidence, gender reassignment of minors is *an experimental practice.*" (COHERE Summary, italics added.)

169.     Sweden's research on gender transition is conducted at the Karolinska Institutet in Stockholm. In 2015, that facility registered its research on medicalized transition with the U.S. National Institutes for Health (NIH), noting "[H]ormonal treatment includes inhibition of one's own sex hormone production followed by treatment with testosterone or estrogen levels that are normal for the opposite sex. *Seen as experimental model,* this is a process that provides an opportunity to study the sex hormone dependent influences." (Clinicaltrials.gov.) In its policy updates in 2021, Sweden limited medicalized treatments for gender dysphoria in minors to clinical research studies approved by the Swedish national research ethics board ("EPM").

(Medscape Psychiatry 2021.)

170.    Norway reviewed its own national policy on transition in minors in 2023, explicitly

concluding such medical procedures to be experimental. (Ukom 2023.)

171.    The widely cited Dutch studies were co-conducted by Dr. Thomas Steensma. Despite

being an originator and international leader of medicalized transition of gender dysphoric

minors, Dr. Steensma stated in an interview in 2021 that he still considers it to be experimental:

"Little research has yet been done on the treatment with puberty inhibitors and hormones in

young people. That is why it is also *seen as experimental*." Dr. Steensma decried other clinics for

"blindly adopting our research" despite the indications that those results may not actually apply:

"We don't know whether studies we have done in the past are still applicable to today. Many

more children are registering, and also a different type." Steensma opined that "every doctor or

psychologist who is involved in transgender care should feel the obligation to do a good pre- and

post-test." (Tetelepta 2021.) But few if any are doing so.

### C.  Claims that medical transition is "medically necessary" are undefined, unsupported, and self-interested.

172.    While European health authorities have examined the science and concluded that

medical transition for minors remains "experimental" and of unproven benefit, terminology has

been distorted in the U.S. because the U.S. lacks a public health care system and the terms

"medically necessary" and "experimental" impact health insurance coverage. "Medically

necessary" justifies coverage for these procedures; advocates know or fear that the term

"experimental" will preclude coverage.

173.    WPATH's 2016 statement asserting "medical necessity" was explicitly made in order

to facilitate insurance claims, as is clear in their document entitled, "Position Statement on

Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A."

(WPATH Position Statement.) The AMA released a similar statement supporting insurance coverage for medical transition as a result of being assertedly medically necessary.[6] U.S. medical associations' advocacy corresponds to the financial interests of their members.

174. Moreover, there do not exist a scientific definition or objective criteria of "medically necessary." An analysis published in the *Canadian Medical Association Journal,* however (not pertaining to gender dysphoria or transition), attempted to define 'medically necessary.' (Caulfield 2012.) The article quoted Timothy Caulfield, Research Chair in Health, Law, and Policy at the University of Alberta (Edmonton), Canada: "As for putting great effort into coming up with a tidy, all-encompassing definition of 'medically necessary'—it's probably a waste of time…Given the history of the concept of 'medically necessary' and the numerous failed attempts to define it, a practical, operational and meaningful definition is likely unattainable." (Caulfield at 1771–1772.) According to Mark Stabile, director of the School of Public Policy and Governance and professor of economics and public policy at the Rotman School of Management at the University of Toronto, "Providers of those services will naturally be critical of the decision if they feel that the demand for their services will decline as a result." (Caulfield at 1772.)

### D. WPATH repeatedly warns of untested hypotheses, continuing unknowns, and lack of research.

175. The latest (2022) WPATH Standards of Care v8 document avoided the word "experimental" in its guidelines, but instead repeatedly deployed terms and phrases that are synonymous with being experimental: "The criteria in this chapter [on assessment of adults] have been significantly revised from SOC-7 to reduce requirements and unnecessary barriers to care. *It is hoped that future research will explore the effectiveness* of this model." (Coleman

---

[6] Available from https://www.ama-assn.org/system/files/2019-03/transgender-coverage-talking-points.pdf

2022 at S33, italics added.)

176.    The WPATH Standards of Care v8 (Coleman 2022) indicates the lack of

experimental evidence available again and again (italics added):

- "It primarily includes an assessment approach that uses specific criteria that are examined by [a Health Care Provider, or] HCP in close cooperation with a TGD adult and does not include randomized controlled trials or long-term longitudinal research" (at S33.)

- "While there was *limited supportive research,* this recommendation was considered to be good clinical practice as it allows a more reversible experience prior to the irreversible experience of surgery" (at S40.)

- "Due to *the limited research in this area,* clinical guidance is based primarily on individual case studies and the expert opinion of HCPs" (at S41.)

- "While available research shows consistent positive outcomes for the majority of TGD adults who choose to transition…some TGD adults may decompensate or experience a worsened condition following transition. *Little research has been conducted to systematically examine variables that correlate with poor or worsened biological, psychological, or social conditions following transition"* (at S42.)

- "Future research would shed more light on gender identity development if conducted over long periods of time with diverse cohort groups" (at S45.)

- "In addition, elevated scrotal temperatures can be associated with poor sperm characteristics, and genital tucking could theoretically affect spermatogenesis and fertility (Marsh 2019) although *there are no definitive studies evaluating these adverse outcomes.* Further *research is needed to determine the specific benefits and risks* of tucking in youth" (at S54.)

- *"There is no formal research evaluating* how menstrual suppression may impact gender incongruence and/or dysphoria" (at S54-55.)

- "Currently, there are only preliminary results from retrospective studies evaluating transgender adults and the decisions they made when they were young regarding the consequences of medical-affirming treatment on reproductive capacity. It is important not to make assumptions about what future adult goals an adolescent may have" (at S57.)

- *"Only limited empirical research exists* to evaluate such interventions" (at S75.)

- *"Research has not been conclusive* about when in the life span such detransition is most likely to occur, or what percentage of youth will eventually experience gender fluidity and/or a desire to detransition" (at S77.)

- "Research on pitch-lowering surgeries is limited" (at S139.)

- "The number and quality of research studies evaluating pitch-lowering surgeries are currently insufficient" (at S141.)

- "To date, *research on the long-term impact of [Gender Affirming Hormone Treatment or] GAHT on cancer risk is limited*…We have *insufficient evidence* to estimate the prevalence of cancer of the breast or reproductive organs among TGD populations (Joint et al., 2018.)" (at S144.)

- "Contraceptive *research gaps within this population are profound. No studies have examined* how the use of exogenous androgens (e.g., testosterone) may modify the efficacy or safety profile of hormonal contraceptive methods (e.g., combined estrogen and progestin hormonal contraceptives, progestin-only based contraceptives) or non-hormonal and barrier contraceptive methods" (at S162.)

- "TGD individuals AFAB undergoing abortion still represents a critical gap in research" (at S162.)

- "The effects of current TGD-related medical treatments on sexuality are heterogeneous (Ozer et al., 2022; T'Sjoen et al., 2020), and *there has been little research on the sexuality of TGD adolescents*" (at S163.)

- "While sex-positive approaches to counseling and treatment for sexual difficulties experienced by TGD individuals have been proposed (Fielding, 2021; Jacobson et al., 2019; Richards, 2021), to date *there is insufficient research on the effectiveness of such interventions*" (at S163.)

**XIII. There have been 14 cohort studies of puberty blockers and cross-sex hormones in minors. They provide no reliable evidence of effectiveness for improving mental health relative to mental health treatments that lack medical risk.**

177.    Several studies are cited by plaintiffs' experts and in the media as purporting to show that medical transition in minors brings important improvements in mental health beyond the issues of suicide and suicidality that I have already addressed. In fact, there is no reliable evidence of any such benefit.

178.    In this section, I summarize the results of all cohort studies investigating the mental health outcomes of puberty blockers and cross-sex hormones on minors. These include all such studies identified by any of the systematic reviews of effectiveness from England, Sweden, Finland, and WPATH. (Listed in Table 1, *Cohort studies of effectiveness and safety of puberty blockers and cross-sex hormones in minors.*)

179.    As enumerated in the following section, all of these studies that reported improved mental health among transitioners were also providing psychotherapy at the same time. (See Section VI on confounding.) None of these studies was able to differentiate which of them was contributing to the improvement.

180.    The problem imposed by confounding medicalized transition with psychotherapy is widely recognized. As explicated in the NICE review from England:

> [V]ery little data are reported on how many children and adolescents needed additional mental health support, and for what reasons, or whether additional interventions, and what form and duration (for example drug treatment or counselling) that took. This is a possible confounder for the treatment outcomes in the studies because *changes in critical and important outcomes may be attributable to external care rather than the psychological support or GnRH analogues used in the studies.* (NICE 2020a at 41, italics added.)

Similarly, WPATH's own systematic review noted that "[T]his conclusion is limited by high risk of bias in study designs, small sample sizes, and *confounding with other interventions.*" (Baker

2021 at 1, italics added.)

181.    The need to disentangle the roles of these two treatments has been largely ignored despite that several issues depend upon them. If medicalized transition does not show mental health improvement superior to that of mental health treatment, it cannot readily be called "medically necessary" for insurance purposes or other institutional needs. Clinicians may be subjecting minors to known and potential (but unstudied) harms without any scientific justification.

182.    Moreover, without a control group for comparison (i.e., another group of similar age, sex, and mental health status), these studies are also unable to identify when and if any changes are due to regression to the mean or maturation over time.

## A. Of the cohort studies, five found little to no improvement in mental health.

183.    Cantu, *et al.* (2020) studied 80 youth, 11–18 years of age (average of 15.1 years), measuring patients' levels of anxiety, depression, and suicidality. This sample was 18.75% male-to-female, 72.5% female-to-male, and 8.75% nonbinary, but the report did not include the patients' ages of onset. The study authors compared youth according to those receiving puberty blockers only, cross-sex hormones only, both treatments, or neither. No significant differences in mental health were detected on any of these variables. Of the 27 youth reporting suicidality before medicalized treatment, 81% continued to report suicidality after medicalized treatment. Remarkably, although the authors reported that "the results of this study suggest that no clinically significant changes in mood symptoms occur" (Cantu 2020 at 199), they did not convey the logical interpretation that transition failed to help these youth. Instead, they emphasized that "findings suggest changes may actually take longer to occur." (Cantu 2020 at 196.)

184.    Kaltiala, *et al.* (2020) similarly reported that after cross-sex hormone treatment, "Those who had psychiatric treatment needs or problems in school, peer relationships and managing everyday matters outside of home continued to have problems during real-life." (Kaltiala 2020 at 213.) They concluded:

> Medical gender reassignment is not enough to improve functioning and relieve psychiatric comorbidities among adolescents with gender dysphoria. Appropriate interventions are warranted for psychiatric comorbidities and problems in adolescent development. (Kaltiala 2020 at 213.)

185.    Carmichael, *et al.* (2021) released their findings from the Tavistock and Portman clinic in the U.K. (Carmichael 2021.) Study participants were ages 12–15 (Tanner stage 3 and above for natal males, Tanner stage 2 and above for natal females) and were repeatedly tested before beginning puberty-blocking medications and then every six months thereafter. Cases exhibiting serious mental illnesses (*e.g.*, psychosis, bipolar disorder, anorexia nervosa, severe body-dysmorphic disorder unrelated to gender dysphoria) were excluded. Relative to the time point before beginning puberty suppression, there were *no* significant changes in any psychological measure, from either the patients' or their parents' perspective.

186.    Hisle-Gorman, *et al.* (2021) analyzed military families' healthcare data to compare 963 transgender and gender-diverse youth before versus after hormonal treatment, using their non-gender dysphoric siblings as a control group. The study participants included youth undergoing puberty-blocking as well as those undergoing cross-sex hormone treatment, but these subgroups did not differ from each other. Study participants had a mean age of 18 years when beginning hormonal treatments, but their initial clinical contacts and diagnoses occurred at a mean age of 10 years. According to the study, "mental health care visits overall did not significantly change following gender-affirming pharmaceutical care" (Hisle-Gorman 2021 at 1448), yet, "psychotropic medication use *increased*," (Hisle-Gorman 2021 at 1448, italics added)

indicating *deteriorating* mental health.

187.    Tordoff, *et al.* (2022) reported on the mental health of youth (mean age 15.8) as they underwent their first year of puberty blocker or cross-sex hormone treatment.  The study began with 104 youth, 39 of whom dropped out by the end of the study.  Of the initial 104, 62.5% were receiving psychotherapy at the same time. (Tordoff 2022 at 5 Table 1.)  Tordoff did not separate participants into an experimental group and control group.  Rather, the study began with the youth as non-medicated and then shifted them from the non-medicated to the medicated group when eligible. (Tordoff 2022 suppl eFigure 1.)  At the beginning of the study, seven of the 104 initial participants were already receiving medication (6.7%).  By the end of the study, 57 of the remaining 65 participants were receiving medication (i.e., 87.7%).  At the beginning of the study, 59.0% of the youth were experiencing moderate to severe depression, and at the end, 58.5% were.  At the beginning, 52.0% were experiencing moderate to severe anxiety, and at the end, 51.5%.  At the beginning, 45% were experiencing suicidality or thoughts of self-harm, and at the end, 42.2%.  Importantly, the report failed to indicate its procedures for assessing the mental health readiness of prospective transitioners, and the results are highly susceptible to selection bias between those deemed eligible for hormones or puberty blockers, and those who were not.

## B.  Six of the cohort studies confounded medical treatment with psychotherapy.

188.    The initial enthusiasm for medical blocking of puberty followed largely from early reports from the Dutch clinical research team suggesting at least some mental health improvement. (de Vries 2011, 2014.)

189.    The Dutch clinical research team followed up a cohort of youth at their clinic undergoing puberty suppression (de Vries 2011), and later cross-sex hormone treatment and surgical sex reassignment (de Vries 2014). The youth improved on several variables upon

follow-up as compared to pre-suppression measurement, including depressive symptoms and general functioning. No changes were detected in feelings of anxiety, or anger, or in gender dysphoria itself as a result of puberty suppression. Moreover, natal females suffered *increased* body dissatisfaction both with their secondary sex characteristics and with nonsexual characteristics. (Biggs 2020.)

190.    The reports' own authors noted that while it remains possible that the improvement on some variables was due to the puberty blockers, it was also possible that the improvement was due to the mental health support or to natural maturation. The study authors noted this explicitly: "All these factors may have contributed to the psychological well-being of these gender dysphoric adolescents." (de Vries 2011 at 2281.)

191.    van der Miesen, et al. (2020) provided an update of the Dutch clinic's sample, reporting continued improvement in transitioners' psychological functioning, but the medical and psychological treatments remained confounded. Also, the authors indicate that the changing demographic and other features among gender dysphoric youth might have caused the treated group to differ from the control group in unknown ways. The study authors expressly noted, "The present study can, therefore, not provide evidence about the direct benefits of puberty suppression over time and long-term mental health outcomes." (van der Miesen 2020 at 703.)

192.    Allen, *et al.* (2019) reported on a sample of 47 youth, ages 13–20, undergoing cross-sex hormone treatment. They reported observing increases in measures of well-being and decreases in measures of suicidality; however, as the authors also noted, "whether a patient is actively receiving psychotherapy" may have been a confounding variable. (Allen 2019.)

193.    Becker-Hebly, *et al.* (2021) assessed the quality of life and overall functioning of a sample of German youth both before and after undergoing treatment with GnRHa, CSHT, or

both. Excluded from participating were youth with severe psychiatric issues, including suicidality. Of the sample, 79% of the sample participated in psychotherapy at the same time. As the study authors were careful to indicate, "Because this study did not test for statistically significant differences between the four intervention groups or before and after treatment, the findings cannot be generalized to other samples of transgender adolescents." (Becker-Hebly 2021 at 1755.)

194.     In Kuper, *et al.* (2020), a multidisciplinary team from Dallas used a battery of mental health tests to assess 148 youth undergoing either puberty-blocking or cross-sex hormone treatment. The tests revealed highly inconsistent results: Most revealed no significant change, some indicated improvement, and some indicated deterioration. Because 144 of the 148 participants were also in treatment with a therapist or counselor (Kuper at 7, Table 4), no conclusions can be drawn regarding the cause of the improvements. Similarly, 47% of the sample were receiving psychiatric medication at the time of their initial assessments, but it was 61% of the sample at the follow-up time: It cannot be known to what extent mental health improvement was associated with transition-related or with psychiatric medication. Importantly, the variables demonstrating deterioration included each of the ones indicating suicidality and self-harm: At follow-up time, the sample showed *higher* levels of suicidal ideation (from 25% to 38%), suicide attempts (from 2% to 5%), and "non-suicidal self-injury" (from 10% to 17%) (Kuper at 8, Table 5).

195.     This evidence of worsening mental health was highly obscured in the Kuper report, however. Rather than provide the standard comparison of pre- and post-treatment rates, Kuper instead listed the post-treatment rates alongside the full *lifetime* rates: "Lifetime and follow-up rates were 81% and 39% for suicidal ideation, 16% and 4% for suicide attempt, and 52% and

84

App.523

18% for NSSI, respectively" (p. 1). Rates from over a lifetime are necessarily higher numbers, and putting them where pre-treatment rates normally appear conveys the statistical illusion of a decrease, exactly opposite to the actual pattern.

### C. Two found no advantage of medicalization over psychotherapy.

196.    Costa, *et al.* (2015) provided preliminary outcomes from a small study conducted with patients of the GIDS clinic in the UK. They compared the psychological functioning of one group of youth receiving psychological support with a second group receiving both psychological support as well as puberty blocking medication (representing an "active comparator" group. See Section III.C.2). The "untreated" group, however, was different from the treated group in another important respect, in that these were the patients who began with such severe psychiatric co-morbidities that they were deemed ineligible to begin puberty blockers until mental health improved. Further, the study suffered a dramatic loss-to-follow-up, with almost two thirds of participants dropping out across just 18 months. (Biggs 2019.) In this preliminary report, both groups improved in psychological functioning over the course of the study, but no statistically significant difference between the groups was detected at any point. (Costa 2015 at 2212, Table 2.) In any event, all these findings have been superseded, however, and are moot. The final outcomes report for this cohort was subsequently published (as Carmichael 2021, above), finding that neither group actually had experienced any significant improvement at all. (Carmichael 2021.)

197.    Achille, *et al.* (2020) at Stony Brook Children's Hospital in New York studied a sample of 95 youth with gender dysphoria, but 45 were lost-to-follow-up within just 12 months, failing to complete follow-up surveys at 6 month and or 1 year. That is, outcomes were available only for the 50 who remained in the study. As well as receiving puberty blocking medications,

"Most subjects were followed by mental health professionals. Those that were not were encouraged to see a mental health professional." (Achille 2020 at 2.) Upon follow-up, some incremental improvements were noted; however, after statistically adjusting for psychiatric medication and engagement in counselling, "*most predictors did not reach statistical significance.*" (Achille 2020 at 3, italics added.) That is, puberty blockers did not improve mental health any more than did mental health care on its own. More specifically, only one of the 12 predictors reached statistical significance. (Achille 2020 at Table 4.) That is, medicalized transition was not associated with improved mental health beyond improvement associated with the mental health care received. Moreover, the single predictor reaching the threshold for statistical significance is not reliable: the study authors made a methodological error by failing to account for the multiple comparisons it conducted. Had the study applied the standard adjustment for correcting for multiple comparisons, that remaining predictor would also have ceased to be statistically significant.

### D. One failed to report whether psychotherapy was provided.

198.    Chen, *et al.* (2023) reported finding some improvement in some mental health variables associated with the cosmetic changes after two years of cross-sex hormone treatment in a sample of 315 youth (mean age, 16 years). Unlike the other studies, Chen et al. did not report how many participants were receiving psychotherapy or psychiatric medication at the same time as the hormone treatments. It is therefore not possible to assess to what extent any changes were due to hormone treatment versus the potential confounds. Because the study did not include a control group, it is not possible to assert that changes were due to hormone treatment rather than representing regression to the mean (see Section III.C.1. *Biases representing 'regression to the mean'*). Potential conclusions are also hampered by the large proportion of mental health data

that were missing: Of the 315 youth in the sample, analyses could be conducted with only 208–217 (Chen 2023, supp. Material at 12, Table S5). The purported changes in mental health variables were statistically significant, but not clinically meaningful. The depression test used by Chen et al consisted of 21 items, with each item contributing up to 3-points to the total score. For example:

> 0 I do not feel sad.
> 1 I feel sad.
> 2 I am sad all the time and I can't snap out of it.
> 3 I am so sad and unhappy that I can't stand it.

Thus, the total scores range from 0 to 63. Scores 0–13 represent minimal difficulty; 14–19 represent mild depression; 20–28, moderate; and 29–63, severe. The change that Chen et al. found after two years of hormone treatment was from 16.39 to 13.95 (at Table S5). Changes of this size are unlikely to be associated with patients reporting they feel better. Such scores are below the "minimum clinically important difference." (Button 2015.) Although the report did not include data on co-morbid mental health diagnoses, it noted that two patients receiving cross-hormone treatment died by suicide (representing 0.6% mortality within just two years). (Chen 2023 at 240.)

199. In addition to the incomplete reporting of key aspects of the project and large proportion of missing data, Chen et al appears to have provided only a selected subportion of the information it collected. A knowledgeable journalist investigating transgender issues, Jesse Singal, identified documentation representing the full set of information the Chen et al team planned to collect. I have verified that documentation and have come to the same conclusion. As described by Singal:

> In their study protocol, including a version that they submitted into a preregistration database, the researchers hypothesized that members of this cohort would experience improvement on eight measures, including ones that are just about universally recognized by youth gender researchers as important outcomes, such as

gender dysphoria, suicidality, and self-harm. Then, in the published *NEJM* paper, the researchers changed their hypothesis and six of those variables were nowhere to be found. The two remaining—anxiety and depression—moved in a positive direction for trans boys (natal females) but not trans girls (natal males). The researchers reported on three other variables, too, without explaining how they picked them (two improved for trans girls and boys, and one just for trans boys). (Singal 2023.)

200.    This appears to represent "cherry-picking" of the findings being reported, rather than a comprehensive reporting on the complete set of evidence. Further, Chen et al. failed to balance the concrete and strikingly high rate of *completed* suicide among their sample against the very incremental mental health changes they claim, even though the ethical and clinical importance of those suicides is obvious.

## XIV.   Known and potential harms associated with administration of puberty blockers and cross-sex hormones to children and adolescents.

201.   As I have explained, any conclusion about safety requires knowledge about and balancing of both risks and benefits.

202.   In concluding that safety has not been established (see Section V above), national health authorities, authors of systematic reviews, and researchers have identified a number of harms which are either known to result from administration of puberty blockers and cross-sex hormones to children and adolescents, or can be reasonably anticipated but have not been sufficiently studied to reach any conclusion as to the likelihood or severity of harm.

203.   When applying research regarding harms to clinical policy, several considerations need to be included: (1) The harms of medicalized transition of gender does or may differ between male-to-female and female-to-male cases, differ between ages of transition, and differ according to age-of-onset of the gender dysphoria. Evidence and conclusions about harms (and safety) cannot be generalized or extrapolated across such cases. (2) The evidence has strongly shown that after social transition of gender, minors are much more likely than otherwise to undergo medicalized transition of gender. Thus, the appropriate assessment of the risk:benefit ratio for social transition must include the increased risks posed by the medicalized path to which it is likely to lead. (3) The evidence has shown strongly that youth who undergo puberty blocking are highly likely to undergo cross-sex hormone treatment. Thus, the appropriate risk:benefit evaluation must also consider its potential implications over the full lifespan.

204.   Systematic reviews of the evidence have identified fewer than 10 studies investigating potential harms of medicalized transition of minors at all, (NICE 2020a at 6) and most of these have been limited to bone and skeletal health. As concluded by the NICE systematic review, "A key limitation to identifying the effectiveness and safety of GnRH

analogues for children and adolescents with gender dysphoria is the lack of reliable comparative studies." (NICE 2020a at 40.) With that said, numerous harms are either known, or reasonably anticipated by respected health authorities but thus far unmeasured.

### A. Sterilization without proven fertility preservation options.

205.    Clinical guidelines for the medical transition of gender among children include the need to caution and counsel patients and parents about what are euphemistically called "options for fertility preservation." (e.g., Endocrine Society Guidelines, Hembree 2017 at 3872.) For children who are placed on puberty blockers at Tanner Stage 2, however, because most continue onto cross-sex hormones once they begin a medicalized approach to their dysphoria, no viable fertility preservation options exist. The decision to undergo medicalized transition also represents the decision never to have biological children of one's own.

206.    For the large new population of young people who are first being put on puberty blockers and/or cross-sex hormones at a somewhat later stage of puberty, no studies at all have been done of when, whether, or with what probability either males or females can achieve healthy fertility if they later regret their transition decision and cease taking puberty blockers and/or cross-sex hormones. Much less has this been studied as a function of the stage of development at which they began puberty blockers and/or cross-sex hormones, and how long their gonads were subjected to cross-sex hormones.

### B. Permanent loss of capacity for breast-feeding in adulthood.

207.    While the removal of the breasts of a biological female adolescent or young adult may be cosmetically revised, it is functionally irreversible; even if the person later regrets and detransitions before or during adulthood, breast-feeding a child will never be possible. To the adolescent determined to transition, this may seem no cost at all. To the future adult mother, it

may be a very severe harm indeed.

### C. Lifetime lack of orgasm and sexual function.

208.    There has not been systematic investigation of the effects on adult sexuality among people medically transitioned at an early stage of puberty. Notably, Dr. Marci Bowers, current President of WPATH, and surgeon with substantial experience conducting penis-to-vagina operations, opined, "If you've never had an orgasm pre-surgery, and then your puberty's blocked, it's very difficult to achieve that afterwards….I consider that a big problem, actually. It's kind of an overlooked problem that in our 'informed consent' of children undergoing puberty blockers, we've in some respects overlooked that a little bit." (Shrier 2021.) In my opinion as a psychologist and sex and couple's therapist, this represents a large potential harm to future relationships and mental health to "overlook," and must be taken into consideration in any serious risk:benefit analysis of "safety."

### D. Hormonal treatments during puberty interfere with neurodevelopment and cognitive development.

209.    It is well known that pubertal hormone levels drive important stages of neural development and resulting capabilities, although the mechanisms are not yet well understood. Dr. John Strang (Research Director of the Gender Development Program at Children's National Hospital in Washington, D.C.) (Terhune 2022), the Cass Report from the U.K., and the systematic review from Finland all reiterated the central importance and unknown effects of GnRH-agonists on windows, or "sensitive periods," in brain development, notably including adolescence. As Dr. Cass put it:

> A further concern is that adolescent sex hormone surges may trigger the opening of a critical period for experience-dependent rewiring of neural circuits underlying executive function (i.e. maturation of the part of the brain concerned with planning, decision making and judgement). If this is the case, brain maturation may be temporarily or permanently disrupted by puberty blockers, which could have

significant impact on the ability to make complex risk-laden decisions, as well as possible longer-term neuropsychological consequences. To date, there has been very limited research on the short-, medium- or longer-term impact of puberty blockers on neurocognitive development. (Cass Review Letter 2022 at 6.)

210. In a meta-analysis (a highly rigorous type of systematic review) of studies of neuropsychological performance, non-transsexual males undergoing puberty earlier show a different cognitive profile than those underdoing puberty later. The association of brain development with age of pubertal onset exists in humans as well as non-human animals. (Shirazi 2022.)

211. Even in adults, neuroscience studies employing MRI and other methods have shown that the blockade of normal levels of hormones associated with puberty and adulthood degrade brain performance. Thus, when GnRH-agonists are administered to adult biological women, several brain networks decrease in activity, and cognitive performance, such as working memory, declines. (Craig 2007; Grigorova 2006.)

212. In light of this science, multiple voices have expressed concern that blocking the process of puberty during its natural time could have a negative and potentially permanent impact on brain development (Cass 2022 at 38–39; Chen 2020; Hembree 2017 at 3874.) As Chen *et al.* (2020) observed:

> [I]t is possible these effects are temporary, with youth 'catching up'…However, pubertal suppression may prevent key aspects of development during a sensitive period of brain organization. Neurodevelopmental impacts might emerge over time, akin to the 'late effects' cognitive findings associated with certain [other] oncology treatments. (Chen 2020 at 249.)

Chen et al. (2020) noted that no substantial studies have been conducted to identify such impacts outside "two small studies" (at 248) with conflicting results. I have not identified any systematic review of neurodevelopment or cognitive capacity.

213. A related concern is that by slowing or preventing stages of neural development,

puberty blockers may impair precisely the mature cognitive capabilities that would be necessary to evaluation of, and meaningful informed consent to, the type of life-changing impacts that accompany cross-sex hormones. (See Section XV.)

### E.   Substantially delayed puberty is associated with medical harms.

214.   The research cited by the WPATH Standards of Care includes the evidence that children whose natural puberty started very late (top 2.3% in age) have elevated risks of multiple health issues in adulthood. (Zhu & Chan 2017.) These include elevations in metabolic and cardiovascular disease, lower height, and decreased bone mineral density. It has not been studied whether these correlations also occur in children whose puberty is chemically delayed. Undergoing puberty much later than one's peers is also associated with poorer psychosocial functioning and lesser educational achievement. (Koerselman & Pekkarinen 2018.)

### F.   Elevated risk of Parkinsonism in adult females.

215.   Epidemiological research has shown adult women without gender dysphoria, undergoing surgical removal of both ovaries for other reasons, to have substantially elevated odds of developing parkinsonism, including Parkinson's Disease, relative to age-matched women randomly selected from the local population in an on-going epidemiological study. (Rocca 2022.) The effect was greater among younger women, showing 7–8 times greater odds among women under 43. The observed delay between removal of ovaries and the onset of parkinsonism was 26.5 years. Whether chemically suppressing the ovaries of a biological female via puberty blockers during adolescence followed by cross-sex hormones will cause a similar increase in parkinsonism, or when, remains unknown.

### G.   Reduced bone density.

216.   The systematic reviews by Sweden, Finland, and England all included bone health as

an outcome. *The New York Times* also recently commissioned its own independent review of the available studies. (Twohey & Jewett 2022.) These reviews all identified subsets of the same group of eight studies of bone health. (Carmichael 2021; Joseph 2019; Klink 2015; Navabi 2021; Schagen 2020; Stoffers 2019; van der Loos 2021; Vlot 2017.) These studies repeatedly arrived at the same conclusion. As described by *The New York Times* review:

> [I]t's increasingly clear that the drugs are associated with deficits in bone development. During the teen years, bone density typically surges by about 8 to 12 percent a year. The analysis commissioned by *The Times* examined seven studies from the Netherlands, Canada and England involving about 500 transgender teens from 1998 through 2021. Researchers observed that while on blockers, the teens did not gain any bone density, on average—and lost significant ground compared to their peers.[7] (Twohey & Jewett 2022.)

217.    There is some evidence that some of these losses of bone health are regained in some of these youth when cross-sex hormones are later administered. The rebounding appears to be limited to female-to-male cases, while bone development remains deficient among male-to-female cases.

218.    The long-term effects of the deficient bone growth of people who undergo hormonal interventions at puberty remain unstudied. The trajectory of bone quality over the human lifetime includes decreases during aging in later adulthood. Because these individuals may enter their senior years with already deficient bone health, greater risks of fracture and other issues are expectable in the long term. As the *New York Times'* analysts summarized, "That could lead to heightened risk of debilitating fractures earlier than would be expected from normal aging—in their 50s instead of 60s." Such harms, should they occur, would not be manifest during the youth and younger adulthood of these individuals. This distinction also represents one of the differences between adult transitioners and childhood transitioners and why their experiences

---

[7] The eighth study was Lee, *et al.,* 2020, which reported the same deficient bone development.

cannot be extrapolated between them.

219.    There does not exist an evidence-based method demonstrated to prevent these

outcomes. The recommendations offered by groups endorsing puberty blockers are quite limited.

As summarized by *The Times:*

> A full accounting of blockers' risk to bones is not possible. While the Endocrine
> Society recommends baseline bone scans and then repeat scans every one to two
> years for trans youths, WPATH and the American Academy of Pediatrics provide
> little guidance about whether to do so. Some doctors require regular scans and
> recommend calcium and exercise to help to protect bones; others do not. Because
> most treatment is provided outside of research studies, there's little public
> documentation of outcomes. (Twohey & Jewett 2022.)

## H. Short-term/Immediate side-effects of puberty blockers include sterile abscesses, leg pain, headache, mood swings, and weight gain.

220.    The Cass Report summarized that "In the short-term, puberty blockers may have a

range of side effects such as headaches, hot flushes, weight gain, tiredness, low mood and

anxiety, all of which may make day-to-day functioning more difficult for a child or young person

who is already experiencing distress." (Cass 2022 at 38.)

221.    In 2016, the U.S. FDA began requiring drug manufacturers to add a warning about

the psychiatric side effects, after reports of suicidal ideation and a suicide attempt began to

emerge among children prescribed GnRH-agonists (for precocious puberty).[8] The warning label

on Lupron reads that "Psychiatric events have been reported in patients…such as crying,

irritability, impatience, anger and aggression."

222.    Other than the suicide attempt, such adverse effects may seem minor relative to the

major health and developmental risks I have reviewed above, and they may be dismissed by

children and by parents confronted by fears of suicidality and an urgent hope that transition will

---

[8] Reuters Special Report; 2022, Oct. 6. Retrieved from https://www.reuters.com/investigates/special-report/usa-transyouth-care/

resolve the child's unhappiness and mental health issues. However, when assessing risk:benefit

ratio for "safety" against the undemonstrated benefits claimed for hormonal interventions, these

observed harms should not be ignored.

### I. Long-term use of cross-sex hormones in adults with gender dysphoria is associated with unfavorable lipid profiles (cholesterol and triglycerides) and other issues.

223.    As the Cass Report correctly and succinctly indicated, "Sex hormones have been

prescribed for transgender adults for several decades, and the long-term risks and side effects are

well understood. These include increased cardiovascular risk, osteoporosis, and hormone-

dependent cancers." (Cass 2022 at 36.)

224.    Minors who begin puberty blockers and proceed to cross-sex hormones—as almost

all do—will require continuing treatment with cross-sex hormones for life, unless they go

through the very difficult process of detransition. Because a lifetime dependence on cross-sex

hormones is the expected course, the known adverse effects of cross-sex hormones on adults

must also be part of the risk:benefit analysis of the "safety" of putting a minor on cross-sex

hormones (and indeed, of the initial decision to put a child on puberty blockers).

225.    Systematic review identified 29 studies of the effects of cross-sex hormone treatment

on cardiovascular health in adults. (Maraka 2017.) By the two-year follow-up mark among

female-to-male transitioners, hormone administration was associated with increased serum

triglycerides (indicating poorer health), increased low-density-lipid (LDL) cholesterol (indicating

poorer health), and decreased high-density-lipid (HDL) cholesterol (indicating poorer health).

Among male-to-female transitioners at the two-year mark, cross-sex hormone treatment was

associated with increased serum triglycerides (indicating poorer health).

## XV.    Assertions that puberty blockers act only as a "fully reversible" "pause button" are not supported by scientific evidence.

226.    Plaintiffs' experts, along with many advocates and organizations, have boldly asserted that the administration of puberty blockers to adolescents is "fully reversible." The assertion is not consistent with or supported by any objective assessment of the existing science. Although withdrawal of the medication will allow the pubertal process to resume, that is very far from establishing that the impact of that interruption of natural development is "fully reversible." The evidence is not that the person's life will proceed as if the medical intervention never happened, as the popularized phrase suggests. Rather, the evidence repeatedly indicates that stopping a healthy child's natural onset of puberty imposes multiple substantial harms, risks, or opportunity costs.

227.    First, as I have previously mentioned (Section IV.D), it is scientifically invalid to extrapolate results from using puberty blockers to prevent precocious puberty by delaying the pubertal process to its normal age range, to using them to *prevent* normally occurring healthy puberty, merely assuming the effects and side-effects will be the same. The two are very different populations and very different uses.

228.    Second, not all the effects of GnRHa's in otherwise healthy children are known: It is therefore not possible to assess whether all effects are reversed or to what extent. Indeed, within the scientific method, it is never possible to demonstrate that any intervention is "fully reversible." In science, it always remains possible for future evidence to identify an effect that does not reverse. To assert that all the effects of GnRHa's are fully reversible is to assert that all its effects have been investigated and checked for reversibility, which is false.

229.    Third, and more concretely, I have reviewed above a large number of medical and developmental risks which multiple responsible voices have associated with administration of

puberty blockers to adolescents, and which are either established by studies or have not been shown not to exist. In the face of this knowledge and lack of knowledge, it is scientifically unsupported and irresponsible to assert that this use of puberty blockers is "fully reversible" and "just a pause."

230.    Here, I identify additional psycho-social developmental impacts of delaying healthy, naturally-occurring puberty which are likely to be irreversible, but have not been meaningfully studied.

### A. Stopping puberty does not stop time: Patients' peers continue to develop and mature, with patients falling increasingly behind.

231.    Initiating puberty blockers at Tanner Stage 2 (at the very first signs of puberty, typically ages 9 or 10) holds the child in a prepubescent state, while their peer group and classmates continue to grow. By the time many patients begin cross-sex hormone treatment, their peers will have completed puberty and progressed far into adolescence. Puberty may become unblocked, but these children have irreversibly lost the opportunity and experience of developing with their peers and must instead do so alone.

232.    Being a "late bloomer," indeed among the latest possible bloomers, has psychological consequences of its own. Having the body and mind of a prepubescent child while one's friends have grown into physically mature sixteen-year-olds is extreme. Despite being a teenager chronologically, remaining prepubescent both physically and mentally while the lives of one's peers have advanced to teenagers' interests only increases the isolation of children already reporting social distress. There does not exist a means of distinguishing how much of any improvement in mental health that might be observed across these years in a particular study is simply the result of finally undergoing at least some pubertal development and finally catching up with one's peers in at least some parameters.

App.537

233.     Concretely, undergoing puberty much later than one's peers (as a result of naturally occurring rather than medically induced conditions) has been associated with poorer psychosocial functioning and lesser educational achievement. (Koerselman & Pekkarinen 2018.) Whether this holds true when the late puberty is the result of puberty blockers has not been studied.

## B. Blocking puberty blocks the awareness of sexuality and sexual orientation that can play an important role in the individual's understanding of gender identity.

234.     As demonstrated unanimously by the cohort studies of prepubescent children with gender dysphoria, the great majority cease to feel gender dysphoric during the course of puberty. (Section IX.B.) Studies also find that many such children subsequently identify as gay or lesbian, providing a potential alternative source and understanding of their atypical childhood gender interests. But for all children, blocking puberty necessarily blocks the onset of adult sexual interest, sexual arousal, and sexual response which are part of "the usual process of sexual orientation and gender identity development." (Cass 2022 at 38.) That is, blocking the experience of sexual feelings and development blocks normal phenomena that enable the young person to understand sexuality and sexual orientation, as distinct from gender identity. As Dr. Cass summarized:

> We do not fully understand the role of adolescent sex hormones in driving the development of both sexuality and gender identity through the early teen years, so by extension we cannot be sure about the impact of stopping these hormone surges on psychosexual and gender maturation. We therefore have no way of knowing whether, rather than buying time to make a decision, puberty blockers may disrupt that decision-making process. (Cass Review Letter 2022 at 5.)

Thus, contrary to the hypothesis that providing time might permit more considered understanding and decision-making, the prevention of puberty blocks the awareness of a central factor that may well influence that understanding.

235.    Because puberty blockers prevent prepubescent children from developing any understanding of sexual arousal and sexual relationships they would otherwise gain with maturation, such children are necessarily incapable of providing informed consent. There does not exist—indeed, there cannot exist—an age-appropriate way to equip a child who has not gone through puberty to make an informed decision about age-inappropriate issues, such as their future sex life, choices of sexual partners, sex-bonded relationships including marriage, and sacrificing ever experiencing orgasm.

## C. Blocking puberty may block development of adult decision-making capacity.

236.    As I have explained above, there are reasons to fear that use of puberty blockers may have permanent negative effects on brain development. That long-term risk aside, blocking puberty nevertheless threatens to prevent the child from growing towards adult decision-making capability during precisely the years in which he or she is being asked to make life-altering decisions about gender identity, gender presentation and cross-sex hormones. Pubertal brain development includes pervasive change in structural and functional connectivity (Chen 2020), re-balancing its capabilities between the acquisition of skills and knowledge and their application. Foremost among these are acquiring the abilities to control impulsivity and engage in rational and long-term decision-making (Crone & Steinbeis 2017), in association with development of a brain region called the "prefrontal cortex," and similarly acquiring the capacity to process adult social interaction, in association with the development of a network of brain areas (Kilford 2016), collectively called the "social brain." To understand medicalized transition of gender and its known and unknown consequences is one of the most complicated questions that a young person today could face, and a prepubescent brain is not equipped to process that information rationally, objectively, and with a whole lifetime rather than immediate desires and

social pressures in mind.

### D.  Time spent on puberty blockers poses significant opportunity costs.

237.    One of the primary, if not the foremost, justifications for medically transitioning

children and adolescents is to reduce the psychological distress they report. That hypothesis

interprets these children's psychological concerns (e.g., anxiety and depression) to gender

dysphoria and/or external sources (e.g., transphobia). As I have noted here previously, however,

many gender dysphoric children and adolescents suffer from multiple other mental health issues.

In several studies of minors on puberty blockers, a substantial portion of the subjects do not

report ongoing psychological care. If years spent on puberty blockers in the hopes that that will

relieve distress distract from systematic efforts to directly address comorbidities through

psychotherapy, then it diverts the minors from treatment which exhibits substantial evidence of

effectiveness for improving mental health and lacks the multiple and significant side-effects of

puberty blockers.

## XVI.   Assessments of clinical guidelines, standards, and position statements.

238.    Several sets of recommendations have been offered regarding the clinical treatment of people with gender dysphoria. In this section, I comment on these protocols or recommendations individually.

### A.  The Dutch Protocol (aka Dutch Approach).

239.    The Netherlands' child gender identity clinic in Amsterdam associated with the Vrije University (VU) was one of the international leaders in the use of hormonal interventions to treat gender dysphoria in minors. Researchers associated with that clinic have generated a large portion of the seminal research literature in the field. Key early publications from that group spelled out criteria and procedures that are collectively referred to as the "Dutch Protocol," and this approach has been widely influential internationally.

240.    The purpose of the protocol was to compromise conflicting desires and considerations including: clients' initial wishes upon assessment; the long-established and repeated observation that those wishes will change in the majority of (but not in all) childhood cases; and that cosmetic aspects of medical transition are perceived to be better when they occur earlier rather than later in pubertal development.

241.    The VU team summarized and explicated their approach in their paper, *Clinical management of gender dysphoria in children and adolescents: The Dutch Approach*. (de Vries & Cohen-Kettens 2012.) Key components of the Dutch Approach are:

- no social transition at all considered before age 12 (watchful waiting period),
- no puberty blockers considered before age 12,
- cross-sex hormones considered only after age 16, and
- resolution of mental health issues before any transition.

242.    For youth under age 12, "the general recommendation is watchful waiting and

carefully observing how gender dysphoria develops in the first stages of puberty." (de Vries & Cohen-Kettenis 2012 at 301.)

243. The age cut-offs of the Dutch Approach were not based on any research demonstrating their superiority over other potential age cut-offs. Rather, they were chosen to correspond to the ages of consent to medical procedures under Dutch law. Nevertheless, whatever the original rationale, the data from this clinic simply contain no information about the safety or efficacy of employing these measures at younger ages.

244. The authors of the Dutch Approach repeatedly and consistently emphasize the need for extensive mental health assessment, including clinical interviews, formal psychological testing with validated psychometric instruments, and multiple sessions with the child and the child's parents.

245. Within the Dutch Approach, there is no social transition before age twelve. That is, social affirmation of the new gender may not begin until age 12—as desistance is less likely to occur past that age. "Watchful Waiting" refers to a child's developmental period up to that age. Watchful waiting does not mean do nothing but passively observe the child. Rather, such children and families typically present with substantial distress involving both gender and non-gender issues, and it is during the watchful waiting period that a child (and other family members as appropriate) would undergo therapy, resolving other issues which may be exacerbating psychological stress or dysphoria. As noted by the Dutch clinic, "[T]he adolescents in this study received extensive family or other social support [and they] were all regularly seen by one of the clinic's psychologists or psychiatrists." (de Vries 2011 at 2281.) One is actively treating the person, while carefully "watching" the dysphoria.

246. The use of hormonal interventions described in the Dutch Protocol, while markedly

more conservative than today's practice in many U.S. clinics, has recently been criticized in detail in a peer-reviewed article as unjustified by reliable evidence (Biggs 2022; Levine 2023; Levine 2022). Certainly, the published research evidence base concerning safety and efficacy available to the VU clinicians is and was no greater than the global evidence base that the NICE review recently labelled as uniformly of "very low quality."

247.    Because clinical practices are often justified by alluding to the Dutch Protocol, however, it is important to be aware of the limitations on the use of hormones and puberty blockers specified by the Dutch Protocol and listed above (and thus the limits of the clinical evidence published out of the VU clinic) which are regularly ignored by clinicians in the U.S.

**B. World Professional Association for Transgender Health (WPATH).**

248.    The WPATH standards of care have been lauded as long-established and high quality procedures. This does not reflect any objective assessment, however. The previous WPATH standards (version 7) were subjected to standardized evaluation, the Appraisal of Guidelines for Research and Evaluation ("AGREE II") method. (Dahlen 2021.) That assessment concluded "[t]ransition-related [clinical practice guidelines] tended to lack methodological rigour and rely on patchier, lower-quality primary research." (Dahlen 2021 at 6.) The WPATH guidelines were not merely given low scores, but received unanimous ratings of "Do not recommend." (Dahlen 2021 at 7.)

249.    Immediately after the release of the current (2023) version of WPATH's standards (version 8), WPATH fundamentally altered it by removing from it minimum ages previously required for undergoing social or medical transition of gender. (WPATH Correction 2022.) This is despite the fact that age is the central component to young people's emerging understanding of their sexual identities through social identity formation, pubertal development, and the onset of

sexual interest. The removal of age restrictions was not based on any research evidence at all—WPATH provided no reference to any study as justification, and the WPATH leadership have been explicit in indicating that the change was intended to prevent clinical care providers from legal liability for physicians rejecting those minimums. The implementation of such fundamental and dramatic changes, in the complete absence of any supporting science whatsoever, negates entirely any claim that WPATH represents evidence-based or empirically-supported treatment. As explicated herein, on Table 1, the systematic review on which WPATH based its standards for minors included exactly one study on puberty blockers and three studies on cross-sex hormones. All other references represent cherry-picked citations of studies rejected by its own systematic process. Moreover, even among the four studies in WPATH's review, three were rejected by the Swedish review, due to the low quality of the science they contained.

### C. Endocrine Society (ES).

250.    As I have noted, in preparing its guidelines the Endocrine Society did not conduct systematic reviews of evidence relating to efficacy of any hormonal intervention in children or adolescents, and instead conducted reviews on only two safety-related endpoints.

251.    Although outside the professional expertise of endocrinologists, mental health issues were also addressed by the Endocrine Society, repeating the need to handle such issues before engaging in transition, "In cases in which severe psychopathology, circumstances, or both seriously interfere with the diagnostic work or make satisfactory treatment unlikely, clinicians should assist the adolescent in managing these other issues." (Hembree 2017 at 3877.) This ordering—to address mental health issues before embarking on transition—avoids relying on the unproven belief that transition will solve such issues.

252.    The Endocrine Society did not endorse any affirmation-only approach. The guidelines

were neutral with regard to social transitions before puberty, instead advising that such decisions be made only under clinical supervision: "We advise that decisions regarding the social transition of prepubertal youth are made with the assistance of a mental health professional or similarly experienced professional." (Hembree 2017 at 3870.)

253.    The Endocrine Society guidelines make explicit that, after gathering information from adolescent clients seeking medical interventions and their parents, the clinician "provides correct information to prevent unrealistically high expectations [and] assesses whether medical interventions may result in unfavorable psychological and social outcomes." (Hembree 2017 at 3877.)

254.    The 2017 update of the Endocrine Society's guidelines added a disclaimer not previously appearing:

> The guidelines cannot guarantee any specific outcome, nor do they establish a standard of care….The Endocrine Society makes no warranty, express or implied, regarding the guidelines and specifically excludes any warranties of merchantability and fitness for a particular use or purpose. The Society shall not be liable for direct, indirect, special, incidental, or consequential damages related to the use of the information contained herein. (Hembree 2017 at 3895-3896.)

255.    The Endocrine Society guidelines do not rely on any systematic review of evidence of *efficacy* of any form of treatment for gender dysphoria. The Dahlen et al. team also subjected these guidelines to review according to the AGREE II criteria, and two out of three independent reviewers concluded that they should *not* be used clinically. (Dahlen 2021 at 7.)

### D. American Academy of Pediatrics (AAP).

256.    A "Policy Statement" issued by the American Academy of Pediatrics (AAP) in 2018—which on its face declared to represent exclusively the work of one author who alone is "accountable for all aspects of the work"—is unique among the major medical associations in being the only one to endorse an affirmation-on-demand policy, including social transition

before puberty without any watchful waiting period. (Rafferty 2018.) Although changes in recommendations can obviously be appropriate in response to new research evidence, the AAP identified no such new evidence to justify a radical departure from the "therapy first" approach of the Dutch Protocol. Rather, the research studies AAP cited in support of its policy simply did not say what AAP claimed they did. In fact, the references that AAP cited as the basis of their policy instead outright contradicted that policy, repeatedly endorsing watchful waiting. (Cantor 2019.) Moreover, of all the outcomes research published, the AAP policy cited *one*, and that without mentioning the outcome data it contained. (Cantor 2019.)

257.     Immediately following the publication of the AAP policy, I conducted a point-by-point fact-check of the claims it asserted and the references it cited in support. I submitted that to the *Journal of Sex & Marital Therapy*, a well-known research journal of my field, where it underwent blind peer review and was published. I append that article as part of this report. *See* Appendix 2. A great deal of published attention ensued; however, the AAP has yet to respond to the errors I demonstrated its policy contained. Writing for *The Economist* about the use of puberty blockers, Helen Joyce asked AAP directly, "Has the AAP responded to Dr Cantor? If not, have you any response now?" The AAP Media Relations Manager, Lisa Black, responded: "We do not have anyone available for comment."

## XVII.  Assessment of expert declaration of Dr. Christine Brady.

258.    In the body of my report above, I summarized the nature and strength of the published

scientific evidence regarding the central issues pertaining to the medicalized transition of gender

in minors.  The present section provides additional remarks directed to specific evidentiary or

logical defects in the opinions offered in the declaration of Dr. Christine Brady, which I have

also reviewed.

259.    Dr. Brady's declaration included that "100 percent of my clinical practice are

transgender youth" (Brady decl ¶7), which represents a significant conflict of interest: The

income she derives from providing services to these children stands to be directly affected by the

outcome of this case.  Individuals whose incomes would be impacted on the basis of research

findings cannot be objective in their assessment of those findings. (See Section I.B. on *Clinical*

*vs. Scientific Expertise* and Section I.C. on the *Professional Standard on Conflict of Interest.)*

### A.  Dr. Brady's opinions are not the product of the principles and methods accepted as reliable by the fields of medical science or behavioral science.

260.    As outlined in the body of the present report (section III.A. *Pyramid of Evidence*), the

standard in these fields is to apply systematic reviews of the research evidence, which minimizes

opportunities for bias, including the cherry-picking of studies from only one side of an issue or

holding studies to higher or lower standards according to whether they favor one's own view

(see Section III.B. *Systematic Reviews*).  Despite Dr. Brady's referring to her sources as "widely

adopted" (e.g., ¶26, ¶27), her declaration (1) excludes the systematic reviews of the safety and

effectiveness of the medicalized transition of minors, instead engaging in the very biases which

the systematic review process was designed to remove from evidence-based medicine, (2)

excludes the international consensus reached by every public health care system that conducted

such systematic reviews, and (3) excludes any analysis of the risk-to-benefit ratio of the

alternatives available to minors who express gender dysphoria, instead describing only the medical option, from which she receives income.

261.    As explicated in the present report, the strongest level of evidence currently available regarding the safety and effectiveness of medicalized transition of minors are cohort studies. (See Section XIII.)  Of the 14 such studies, Dr. Brady included only four (de Vries et al., 2011; de Vries et al., 2014; Costa et al., 2015; and Chen et al., 2023).  Dr. Brady left out all studies showing a lack of improvement after medicalized transition (as well as several others).  Of the studies she did cite, none was able to distinguish whether mental health improvement was caused by medicalization or by the psychotherapy received at the same time.  That is, rather than include all relevant outcomes studies, which would document the unreliability of claims of improvement, Dr. Brady selected to cite only a small minority of studies and included only select portions from within those studies, seeming to suggest improvement, and simply ignored all else.

262.    Dr. Brady's opinions rely largely on survey studies, which do not yield reliable facts about the risks or benefits of clinical outcomes.  Indeed, her survey citations all represent *the same* survey: Green et al. (2022), Turban et al. (2019), Turban et al. (2020), and Turban et al. (2021).  As outlined in the present report, surveys recording the replies of anyone who wants to respond do not appear at all on the standard pyramid of evidence in science. (See section III.A *Pyramid of Evidence.*)

263.    Entirely missing from Dr. Brady's report is any discussion, consideration, or comment on the international consensus, unanimous across every public health care system conducting systematic reviews of the evidence.  Every national health care system in the world that has conducted such reviews of the safety and efficacy of medicalized transition has come to the same conclusion: For minors, the harms outweigh the benefits.  No U.S. professional

association has conducted such a review of the evidence, and the associations' views correspond to their economic interests: Acknowledging transition of minors to be experimental disqualifies the procedures from medical insurance coverage, and permitting governments to ban these medical procedures opens the door to the government regulation of others.

*264.* Dr. Brady repeatedly based her opinions on personal recollections of providing services to this population, in what science calls *anecdotal evidence.* The advantages of accumulated personal experience is its low cost and potential utility when there do not exist systematic studies of the unique combination of variables represented by some cases. The disadvantages include that it is the most subject to human biases, such as recall bias, confirmation bias, survivorship bias, as well as to sampling biases including both self-selection biases (who decides to come into the clinic in the first place) and any variables which led to dropping out of the clinic, leaving clinicians no capacity for knowing why.

*265.* If there did not already exist multiple studies systematically studying cohorts of minors undergoing puberty-blocking or cross-sex hormone treatment, then expert opinion based on anecdotal evidence might represent the only option available. That is not the current situation, however: Rather than engage in the scientifically valid research method of accepting higher order evidence over lower order evidence, Dr. Brady accepted and rejected evidence according to their results, that is, *cherry-picking* only the seemingly supportive studies.

266. Dr. Brady's very definition of gender identity, as an "internal sense" (Brady decl ¶13), represents a fundamental violation of the scientific method: Nothing in science can be defined as an internal sense.  To be scientifically valid, a claim must be objective, testable, and falsifiable. (See Section VII.B *Subjective feelings.*)  Gender identity is unlike emotions, which are associated with objectively measurable physiological changes, such as respiration and brain

activity. (Davidson, 2003; Seeley 2015). Gender identity is unlike sexual orientation, which can be objectively measured by genital and other physiological responses to sexual stimuli. (Freund, 1967; Hess, 1965; Rieger, 2005). Gender identity is unlike disorders of sexual development (DSD's, also called "intersex conditions"), which are objectively detectable with physical measures such as chromosomal analysis. (Vilain, 2006). Definitions based on vague metaphors, such as "a person's core" and "an essential part of one's being" (Brady decl. ¶¶ 13–14) do not possess the fundamental features required of the scientific method.

### B. Clinically evaluating rather than assuming literal accuracy of self-report represents competent mental health care, not conversion therapy.

267.     To argue that medicalized transition is the only appropriate clinical response, Dr. Brady declared that gender identity cannot be "*voluntarily* changed" (Brady decl ¶15, italics added). That statement would seem to concede that there exist at least some cases of changing gender identities. As already detailed in the present report, gender dysphoria indeed does change in the large majority of youth with prepubescent onset (see section IX.B.1). Accepting that gender identity can change, even if only *involuntarily,* calls for the very policy Dr. Brady rejects: Hold off medicalization until adulthood.

268.     Activists and social media increasingly, but erroneously, apply the term "conversion therapy" moving farther and farther from what the research has actually reported. "Conversion therapy" (or "reparative therapy" and other names) was the attempt to change a person's *sexual orientation,* not *gender identity.* With the lay public more frequently accustomed to "LGB" being expanded to "LGBTQ+", however, the claims relevant only to sexual orientation are being misapplied to gender identity. As the field grows increasingly polarized, any therapy failing to provide affirmation-on-demand is mislabeled "conversion therapy" (D'Angelo, *et al.,* 2021). Indeed, even actions of non-therapists, unrelated to any therapy, have been (mis-)labelled

conversion therapy, including the prohibition of biological males competing on female teams (e.g., Turban, 2021, March 16.)

269.    The research has repeatedly demonstrated that once one explicitly acknowledges being gay or lesbian, one is only very rarely mistaken. That is entirely unlike gender identity: As already noted herein (section IX.B.1), in all 11 of the 11 follow-up studies of children not permitted social transition prepubertally, the great majority of children declaring a cross-gender identity ceased to so identify.  Moreover, because highly discrepant rates of persistence and desistence were almost entirely reversed when children were transitioned socially, we have very powerful evidence that the social environment was at the root of the children's gender identities rather than any innate feature.

270.    Dr. Brady's reference to actively attempting to *change* gender identity avoids the pertinent issue: As demonstrated in the following, the evidence is much more parsimoniously interpreted to indicate, after the advent of social media, the far more typical situation to be youth who are *mistaken* about their gender identity. That is, socially vulnerable youth are misinterpreting their experiences to indicate they are transgender or are exaggerating their descriptions of their experiences in service of psychological needs, such as attention-seeking or externalizing sources of internal distress.

### C.  DSM-5 criteria pre-date nearly all outcomes research on adolescents.

271.    In ¶¶16–19, Dr. Brady listed the DSM-5 criteria for the formal diagnosis of Gender Dysphoria, noting that "The diagnosis and its criteria have changed over time to reflect the most current research regarding the presentation of this diagnosis" (Brady decl ¶16).  Dr. Brady correctly included the current diagnostic criteria to be those from the DSM-5, released in 2013.[9]

---

[9] The 2022 update from the DSM-5 to the DSM-5-TR represented "text revision" (abbreviated "-TR") and did not include change to the diagnostic criteria in the manual.

Dr. Brady did not include, however, that the DSM-5 criteria for Gender Dysphoria are outdated: They do *not* in fact reflect the current research.  In 2013, only two presentation types of gender dysphoria were known: the early- or childhood-onset type and the late- or adulthood-onset type. (See sections IX.A and IX.B.)  The third type of presentation, the adolescent- or rapid-onset type, had not yet been observed and reported in the research literature.  As illustrated by the timeline below, of the now 14 cohort studies reporting on the outcomes of minors undergoing medicalized transition, only one was available in 2013, and the youth participating in that study are psychologically and epidemiologically unlike the youth currently seeking medicalized interventions.  (See section IX.C.)

| Year | Professional Association | DSM | Research Studies |
|------|--------------------------|-----|------------------|
| 2000 | | DSM-IV-TR | |
| 2006 | WPATH v6 | | |
| … | | | |
| 2008 | | | |
| 2009 | E.S. v1 | | |
| 2010 | | | |
| 2011 | | | de Vries |
| 2012 | WPATH v7 | | |
| 2013 | | DSM-5 | |
| 2014 | | | de Vries |
| 2015 | APA | | Costa |
| 2016 | | | |
| 2017 | E.S. v2 | | |
| 2018 | AAP | | |
| 2019 | | | Allen |
| 2020 | WPATH v8 | | Achille; Cantu; Kaltiala; Kuper; van der Miesen |
| 2021 | | | Becker-Hebly; Carmichael; Hisle-Gorman |
| 2022 | | DSM-5TR | Tordoff |
| 2023 | | | Chen |

272.    Similarly, Dr. Brady repeatedly cited statements from the Endocrine Society (E.S.), WPATH, and the American Psychological Association (APA) as the justification of her claim that strong evidence exists to support medicalized transition of minors (Brady decl ¶¶25–29).  As

she wrote:

> They have analyzed all available scientific research, and are widely referenced and endorsed by all major U.S. medical and mental health associations. (Brady decl ¶29.)

In direct contrast with her unsourced claim: (1) None of these groups has conducted a systematic review of the safety and effectiveness of medicalized transition of minors did have the several public health case systems in Europe. (2) As the timeline above makes explicit, at the time of the writing of their statements, most of the outcomes data did not yet exist. Phrases such as Dr. Brady's "all available scientific research" are hollow. The APA statement that Dr. Brady cited: (1) expired in 2022, and (2) pertained to gender dysphoric adults, not minors, with the exception of Guideline No. 8:

> Psychologists working with gender-questioning and TGNC youth understand the different developmental needs of children and adolescents, and that not all youth will persist in a TGNC identity into adulthood. (APA, 2015, p. 841.)

That is, despite Dr. Brady citation of it, that document supports my conclusion, not Dr. Brady's.

273. Dr. Brady referred to the WPATH Standards of Care as (SoC) widely accepted, citing no evidence in support of that belief. In direct contrast with that belief, the WPATH SoC have not only been long seen as providing *insufficient* protection from harm, but also the subsequent revisions have further *decreased* the protections it did include: One early survey of clinics providing medical transition of gender found 74% of those clinics did not adhere to the WPATH standards of that time, instead applying *more conservative* standards (Petersen & Dickey, 1995). Systematic evaluation of subsequent WPATH standards received unanimous ratings of "Do not recommend." (Dahlen 2021 at 7.) After the current set of standards (version 8) were released, all age minimums were removed, all outside the review process used in developing them. (See Section XVI.B. *WPATH.*) Dr. Brady's deposition failed to acknowledge the conclusions, or even the existence, of the systematic reviews of research conducted by the international medical

community that entirely rejected the conclusions asserted in the WPATH standards. (See Section

V. *Systematic Reviews*.)

274.    For reference, WPATH released version 6 of its "Standards of Care" in 2001, version

7 in 2012, and version 8 in 2022.  The criteria of WPATH version 6 included: a DSM diagnosis,

indications that hormones will be used responsibly, three months of either psychotherapy or a

"real life test" of living as the new sex, increasing consolidation of gender identity during that

period, progress in solving life problems, and (for genital surgery) two clinical approval letters,

one of which must be a comprehensive psychosocial assessment.

275.    These criteria of version 6 were the subject of a systematic assessment, comparing

them against the research evidence, in preparation for the development of version 7 of WPATH's

standards (De Cuypere & Vercrusse, 2009).  The review included an exhaustive search of the

research evidence:

> For follow-up studies between 1991 and the present we searched Medline and
> Embase using the following keywords: "transsexual, gender identity disorder, sex
> reassignment surgery, follow-up study, regret, standards of care, eligibility
> criteria."  We made a selection of these follow-up studies, retaining only those
> papers that contained information "on whom and under what circumstances SRS is
> effective." (De Cuypere & Vercrusse, 2009, p. 195)

276.    The results were peer-reviewed, published in the *International Journal of*

*Transgenderism*, included the conclusion that "inadequate diagnosis and major psychiatric co-

morbidity are the major indicators for regret" (De Cuypere & Vercrusse, 2009, p. 197), and

reiterated the consensus that "Most authors agree that a careful differential diagnosis and

screening for co-morbidity is imperative for good clinical practice" (De Cuypere & Vercrusse,

2009, p. 200).

277.    In contrast with that assessment, WPATH version 7 did the opposite.  Rather than

follow the evidence base in the research literature, version 7 *lowered* the criteria that had been

preventing regretful cases and instead adopted the "informed consent model." Comprehensive psychosocial assessment was reduced to an assessment needing only to demonstrate only a capacity to provide informed consent. The requirement for psychotherapy or real life test time was reduced to the requirement that any significant mental health concerns (left undefined) be reasonably well-controlled (left undefined).

278. Importantly, whereas version 6 included:

> The SOC are intended to provide flexible direction for the treatment of persons with gender identity disorders. When eligibility requirements are stated they are meant to be *minimum requirements*. (WPATH, 2002, pp. 1–2, italics added)

version 7 instead included:

> As for all previous versions of the SOC, the criteria put forth in this document for hormone therapy and surgical treatments for gender dysphoria are clinical guidelines; individual health professionals and programs may modify them. (Coleman, 2012, p. 2.)

279. This contrast is remarkable for two reasons. First, whereas version 6 permitted clinicians only to move criteria up, version 7 removed the words "minimum requirements," thus permitting clinicians to move criteria up *or down*. Second, version 7 added the words "As for all previous versions," which is a demonstrable falsehood. The change to this single passage, embedded in introductory text, allowing clinicians to change any criterion, removes any claim the document might have to being called "standards" at all.

280. A systematic assessment of version 7 was conducted in the lead-up to WPATH's release of version 8 (Dahlen et al., 2021). The evaluation followed a standardized assessment method, the internationally employed *Appraisal of Guidelines for Research and Evaluation* procedure ("AGREE II"). Utilizing community stakeholders to set domain priorities for the evaluation, the assessment concluded that the guidelines regarding HIV and its prevention were of high quality, but that "[t]ransition-related CPGs tended to lack methodological rigour and rely

on patchier, lower-quality primary research" (Dahlen et al., 2021, p. 6).  The WPATH guidelines

received unanimous ratings of *"Do not recommend"* (Dahlen et al., 2021, p. 7).

281.    WPATH's version 8 also included the language again allowing clinicians to change

any criterion up or down:

> The SOC-8 guidelines are intended to be flexible to meet the diverse health care
> needs of TGD people globally….As in all previous versions of the SOC, the criteria
> put forth in this document for gender-affirming interventions are clinical
> guidelines; individual health care professionals and programs may modify them in
> consultation with the TGD person. (Coleman, 2022, p. S6)

### D. Dr. Brady's analysis fails to distinguish between the distinct phenomena that can lead to gender dysphoria.

282.    In ¶20, Dr. Brady further confuses (or misrepresents) the distinct types of gender

dysphoria: Specifically, the Brady declaration erroneously claimed that "For adolescents and

adults whose gender identity differs from their sex assigned at birth, it is very unlikely that they

will later come to identify with the birth-assigned sex."  The present report already listed the

results of all 11 cohort studies of childhood-onset gender dysphoria, all showing that feelings of

gender dysphoria desist in the large majority of cases, persisting in only some (Table 2, in

section IX.B.1).  Despite that these cases of persistence were found in—and only in—childhood-

onset cases, Dr. Brady (mis)applies it as universally true, expanding it to include adolescent-

onset and adult-onset cases, despite their differing on all objective variables.  Dr. Brady cites no

research studies supporting her claim.  No such systematic research has been conducted for these

other types of gender dysphoria.

283.    Dr. Brady next rejected the conclusion of all 11 of these outcomes studies, writing

"There is some research on pre-pubertal children that has been described as showing high rates

of 'desistance' of transgender identity among pre-pubertal children" (Brady decl ¶21).  First, Dr.

Brady is incorrect to say "some" research: As explicated here already, that conclusion has been

unanimous across all studies examining it.  The single research study that Dr. Brady claimed to

supplant the other 11 was Olson et al. (2022).  Second, as already noted in the present report (see

section IX.B.2), the Olson study differed from the other 11 in having permitted the children to

undergo social transition while the other 11 did not.  That is, the Olson study appears to

demonstrate that social transition encourages the persistence of gender dysphoria that would

otherwise desist.  Finally, Dr. Brady's rejection of the demonstration that most childhood-onset

cases desist contradicts the Endocrine Society guidelines, which Dr. Brady otherwise repeatedly

cited as authoritative.  According that document, "the GD/gender incongruence of a *minority* of

prepubertal children appears to persist in adolescence….In adolescence, a significant number of

these desisters identify as homosexual or bisexual" (Hembree 2017 at 3876, italics added).

### E.  Anecdotal claims based on one's personal experiences do not constitute reliable clinical evidence.

284.    Instead of the principles and methods accepted as reliable in evidence-based

medicine, Dr. Brady repeatedly based her opinions only on her non-systematic recollections of

her own personal experiences providing services to this population (e.g., Brady decl ¶¶20, 38,

39, 40, 44), in what science calls *anecdotal evidence.*  "Clinical experience" is not capable of

demonstrating whether treatments are causing improvements.  As illustrated by the standard

*Pyramid of Evidence,* it represents the lowest rung, due to being the most subject to bias. (See

Section III.A.)  In research on clinical experience itself, as shown by a recent systematic review

of the topic: "We found no clear evidence of an association between measures of physicians'

clinical experience and overall healthcare quality." (Ajmi 2021.)  A review of the research on the

clinical experience of psychotherapists reported that: "Years of clinical experience were found to

be positively associated with increased confidence [but] does not suggest that it is associated

with improved ability to increase its quality." (Dawson 2018 at 89.)  As Dr. Roger Bertholf,

Editor-in-Chief of the peer-reviewed journal, *Laboratory Medicine,* wrote in its 50th anniversary edition: "Anecdotism is the antithesis of medical science" (Bertholf, 2020, p. 555).

285.    The advantages of accumulated personal experience is its low cost and potential utility when there do not exist systematic studies of the unique combination of variables presented by some cases. The disadvantages include that it is the most subject to human biases, such as recall bias and confirmation bias, as well as to sampling biases including both self-selection biases (who decides to come into the clinic in the first place) and any variables which lead to dropping out of the clinic, leaving clinicians with little opportunity for knowing the outcome at all.

286.    If there did not already exist multiple studies systematically studying cohorts of minors undergoing puberty-blocking or cross-sex hormone treatment, then expert opinion based on anecdotal evidence might represent the only option available. That is not the current situation, however: Yet, rather than engage in the scientifically valid research method of accepting higher order evidence over lower order evidence, Dr. Brady cited and ignored reported the reported research evidence according to the favorability of their results, *cherry-picking* only the (seemingly) supportive subset.

### F. The mental health issues reported by gender dysphoric adolescents correspond entirely to the mental health issues widely reported by youth of the social media generation.

287.    Dr. Brady referred to indications of high levels of emotional distress and poor levels of mental health among youth with gender dysphoria (Brady decl¶ 24–25). Her declaration repeatedly inferred the causal conclusion that the mental health issues are caused by transphobia and failures to support transition. Missing entirely from Dr. Brady's interpretation of the correlations is that high rates of mental distress are not unique to gender dysphoric minors.

Signs of distress are increasing throughout the current generation of youth, especially adolescent females, and these indicators all began their exponential increases at the same time—upon the introduction of social media.  The great increases in each of gender dysphoria, mental illness, and suicide and suicidality, are all primarily affecting the same demographic most vulnerable to negative social influence on body image and self-perception: adolescent females.

288.    Data from the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA) show the rapid rise in depressive episodes, more than doubling, accompanying the social media age, and mostly affecting youth under 25:



**Figure 1. Percent of the population with a major depressive episode in the past year by age, 2008-2020**

Source: Substance Abuse and Mental Health Services Administration

**Available from https://www.whitehouse.gov/cea/written-materials/2022/05/31/reducing-the-economic-burden-of-unmet-mental-health-needs/**



**Figure 2: Percent of U.S. 12- to 17-year-olds with major depression in the last year, 2005-2020**
Source: National Study of Drug Use and Health. NOTE: Depression assessed using DSM criteria.

**Twenge, J. Institute for Family Studies. Available from https://ifstudies.org/blog/how-much-is-social-media-to-blame-for-teens-declining-mental-health**

The indicators of increasing distress include suicide and suicidality: In 2020, the U.S. Centers for Disease Control (CDC) reported "[A]pproximately 18.8 percent of high school students reported suicidal ideation in the past year, and 8.9 percent of high school students reported a suicide attempt in the past year" (Ivey-Stephenson et al., 2020). The greatest increases in rates of suicide and suicidality were among adolescent females.



**Available from https://www.economist.com/graphic-detail/2023/05/03/suicide-rates-for-girls-are-rising-are-smartphones-to-blame**

SAMHSA reported "[F]rom 1999 through 2018, the suicide death rate doubled for females aged 15 to 19 and 20 to 24. For youth aged 10 to 14, the suicide death rate more than tripled from 2001 to 2018" (SAMHSA, 2020).  Peer reviewed research published in the *American Journal of Public Health* reported rates of high school students reporting purposefully hurting themselves without wanting to die over the past 12 months ranged from 6.4 to 14.8 percent for males and 17.7 to 30.8 percent for females in 2015 (Monto et al., 2018).

From Twenge (2020):



FIGURE 1. Indicators of poor mental health among U.S. girls and young women, 2001–2018[a]

The timeline of these large, sudden increases in multiple indicators of psychological distress coincides exactly with the large, sudden increase in cases of youth expressing gender dysphoria, again primarily among adolescent females:



**From Cass (2022).**

The correlations among mental health, sex, gender dysphoria, and treatment outcomes are all much better explained as individual facets of mental health brought on by social media. The treatments associated with improvement are those that include psychotherapy.  Dr. Brady's explanation for these correlations is not an explanation at all: It leaves the conspicuous simultaneity of these phenomena, the consistent demographic repeatedly being the most affected, and the ubiquity of social perception and attachment needs across them all as merely coincidental.

289.    Adolescents use social media for social comparison and feedback, and social media use is associated with decreased mental health (Nesi & Prinstein, 2015).  Social media exposure to ideals of beauty and appearance reduces body image, especially in adolescent females (Kleeman et al., 2018). Adolescent females are the demographic most vulnerable to social comparison and use social media as the basis of their self-image (Fioravanti et al., 2022),

especially so for those with co-morbid mental illnesses that interfere with social functioning, who are disproportionately influenced negatively by social media (Maheux et al., 2022).  The mental illness profiles associated with adolescent-onset gender dysphoria are unlike those shown by the better- and longer-established types of gender dysphoria including in their overrepresentation of issues such as Autism Spectrum Disorder, which reflects problems in social functioning.  The mental illness profile associated with sexual minority stress, in contrast, consists of anxiety and depression.  Sexual minority stress does not cause Autism Spectrum Disorder, but it can increase vulnerability to social identity development.  Although these data are still only correlational, they strongly suggest that to support is to reinforce the belief of these youth that they are not real women or real men because they do fit the exaggerated and perfected social images of femaleness and maleness now flooding their virtual social environments.

### G.  Dr. Brady is unaware of the status of the science of gender dysphoria.

290.    In addition to lacking any mention of the international consensus of the science of adolescent-onset gender dysphoria, Dr. Brady claimed "There are no scientific studies demonstrating that non-medical treatments alone (such as therapy only) are effective in the treatment of gender dysphoria" (Brady decl ¶41).  Dr. Brady's claim is simply false and is easily shown to be false.  No only do such studies exist, Dr. Brady cited one herself in her declaration (Brady decl ¶39): Costa et al. (2015).  Costa compared a group of gender dysphoric youth receiving therapy only with a group receiving both therapy and puberty blockers.  The result and conclusion of Costa was exactly the opposite of what Dr. Brady claimed in her report:

> Psychological support and puberty suppression *were both associated* with an improved global psychosocial functioning in GD adolescence. Both these interventions may be considered effective in the clinical management of psychosocial functioning difficulties in GD adolescence (Costa et al., 2015, p. 2206, italics added).

Remarkably, where Dr. Brady did cite that study, it was to support of her claim that "Studies have demonstrated improvements in mental health following gender-affirming *medical* interventions" (Brady decl ¶39, italics added). That is, while Costa was entirely explicit that *both* psychotherapy and puberty suppression were effective in improving mental health, Dr. Brady instead related the half of that the finding for medical intervention, yet outright denied the very same conclusion for psychotherapy from the very same study that provided it in the very same sentence. Additionally, as already detailed within the present report (see Section XIII.B), six of the fourteen follow up studies of adolescent medicalized transition provided *both* psychotherapy *and* medicalized interventions, making it impossible to ascertain which might be responsible for any changes (or in what proportions). This same problem pertains to the other cohort studies Dr. Brady cited in claiming medicalized transition to improve mental health.[10]

291. The distinction between psychotherapy and medicalized transition is not merely an equivalent alternative, however: Because psychotherapy poses no objective risk of harm, whereas medicalized transition of gender poses substantial risk to objectively healthy and functioning tissue, the risk-to-benefit ratio imposed by medical ethics rejects medicalized transition until and unless it demonstrates proportionately greater evidence of benefit to outweigh its greater risks.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___2 Sept 2023___ .

James M. Cantor, Ph.D.

---

[10] In her footnote 16, Dr. Brady cited de Vries et al. (2011) and de Vries et al. (2014), both of which included both psychotherapy and medical intervention, and she cited Chen et al. (2023), which did not mention or account for concurrent psychotherapy. The remaining two citations in footnote 16—Green et al. (2022) and Turban et al. (2020)—are survey studies. (Indeed, they are the same survey.) As emphasized already in the present report, surveys are not scientifically capable of demonstrating treatment effects.

# References

Abbruzzese, E., Levine, S., & Mason, J. (2023). The myth of "reliable research" in pediatric gender medicine: A critical evaluation of the Dutch Studies—and research that has followed. *Journal of Sex & Marital Therapy*. DOI: 10.1080/0092623X.2022.215046.

Académie Nationale de Médecine. (2022, Feb. 25). Press Release: Medicine in the face of the change of gender identity in children and adolescents. Retrieved from https://www.academie-medecine.fr/la-medecine-face-a-la-transidentite-de-genre-chez-les-enfants-et-les-adolescents/?lang=en

Achille, C., Taggart, T., Eaton, N. R., Osipoff, J., Tafuri, K., Lane, A., & Wilson, T. A. (2020). Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: Preliminary results. *International Journal of Pediatric Endocrinology*. doi: 10.1186/s13633-020-00078-2

Adams, N. J., & Vincent, B. (2019). Suicidal thoughts and behaviors among transgender adults in relation to education, ethnicity, and income: A systematic review. *Transgender Health, 4,* 226–246.

Adelson, S. L., & American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Quality Issues. (2012). Practice parameter on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. *Journal of the American Academy of Child & Adolescent Psychiatry, 51*, 957–974.

Ajmi, S. C., Aase, K. (2021) Physicians' clinical experience and its association with healthcare quality: A systematised review BMJ Open Quality, 10, e001545.

Allen, L. R., Watson, L. B., Egan, A. M., & Moser, C. N. (2019). Well-being and suicidality among transgender youth after gender-affirming hormones. *Clinical Practice in Pediatric Psychology, 7,* 302-311.

American College of Obstetricians and Gynecologists. (2017). Care for transgender adolescents. Committee Opinion No. 685. Retrieved from www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2017/01/care-for-transgender-adolescents .

American Psychiatric Association (2017). A guide for working with transgender and gender nonconforming patients. https://www.psychiatry.org/psychiatrists/cultural-competency/transgender-and-gender-nonconforming-patients/a-guide-for-working-with-transgender-and-gender-nonconforming-patients.

American Psychiatric Association (2022). *Diagnostic and statistical manual for mental disorders, fifth edition, text revision (DSM-5-TR)*. Washington, DC: Author.

American Psychological Association (2014). Answers to your questions about transgender people, gender identity, and gender expression. https://www.apa.org/topics/lgbtq/transgender.pdf.

American Psychological Association (February 2021). APA resolution on gender identity change efforts.

American Psychological Association, Task Force on Appropriate Therapeutic Responses to Sexual Orientation. (2009). Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation. Retrieved from http://www. apa.org/pi/lgbc/publications/therapeutic-resp.html.

Anzani, A., De Panfilis, C., Scandurra, C., & Prunas, A. (2020). Personality disorders and personality profiles in a sample of transgender individuals requesting gender-affirming

treatments. *International Journal of Environmental Research and Public Health, 17,* 1521. Retrieved from https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7084367/.

Asscheman, H., Giltay, E. J., Megens, J. A. J., de Ronde W. (P.), van Trotsenburg, M. A. A., & Gooren, L. J. G. (2011). A long-term follow-up study of mortality in transsexuals receiving treatment with cross-sex hormones. *European Journal of Endocrinology, 164,* 635–642.

Bachmann, S. (2018). Epidemiology of suicide and the psychiatric perspective. *International Journal of Environmental Research and Public Health, 15,* 1425.

Baker, K. E., Wilson, L. M., Sharma, R., Dukhanin, V., McArthur, K., & Robinson, K. A. (2021). Hormone therapy, mental health, and quality of life among transgender people. *Journal of the Endocrine Society, 5.* Available from https://doi.org/10.1210/jendso/bvab011.

Baldinger-Melich, P., Urquijo Castro, M. F., Seiger, R., Ruef, A., Dwyer, D. B., Kranz, G. S., Klöbl, M., Kambeitz, J., Kaufmann, U., Windischberger, C., Kasper, S., Falkai, P., Lanzenberger, R., & Koutsouleris, N. (2020). Sex matters: A multivariate pattern analysis of sex and gender-related neuroanatomical differences in cis- and transgender individuals using structural Magnetic Resonance Imaging. *Cerebral Cortex, 30,* 1345–1356.

Bauer, G. R., Scheim, A. I., Pyne, J., Travers, R., & Hammond, R. (2015). Intervenable factors associated with suicide risk in transgender persons: A respondent driven sampling study in Ontario, Canada. *BMC Public Health, 15,* 525.

BBC News. (2021, Sept. 5). NHS child gender identity clinic whistleblower wins tribunal. *British Broadcasting Company.* Retrieved from https://www.bbc.com/news/uk-58453250.

Becker-Hebly, I., Fahrenkrug, S., Campion, F., Richter-Appelt, H., Schulte-Markwort, M., & Barkmann, C. (2021). Psychosocial health in adolescents and young adults with gender dysphoria before and after gender-affirming medical interventions: A descriptive study from the Hamburg Gender Identity Service. *European Child Adolescent Psychiatry, 30,* 1755–1767.

Bell v. Tavistock. United Kingdom Court of Appeal (Civil Division) (1/12/2020). [2021] EWCA Civ 1363.

Bell v. Tavistock. United Kingdom High Courts of Justice Divisional Court (1/12/2020). [2020] EWCA Civ 3274 (Admin).

Bhargava, A., Arnold, A. P., Bangasser, D. A., Denton, K. M., Gupta, A., Hilliard Krause, L. M., Mayer, E. A., McCarthy, M., Miller, W. L., Raznahan, A., & Verma, R. (2021). Considering sex as a biological variable in basic and clinical studies: An Endocrine Society Scientific Statement. *Endocrine Reviews, 20,* 1–40.

Biggs, M. (2019). A letter to the editor regarding the original article by Costa et al: psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria. *J. Sexual Med.* 2019; 16:2043.

Biggs, M. (2020). Gender dysphoria and psychological functioning in adolescents treated with GnRHa: Comparing Dutch and English prospective studies. *Archives of Sexual Behavior, 49,* 2231–2236.

Biggs, M. (2022). The Dutch Protocol for juvenile transsexuals: Origins and evidence. *Journal of Sex & Marital Therapy.*

Blanchard, R. (1985). Typology of male-to-female transsexualism. *Archives of Sexual Behavior, 14,* 247–261.

Blanchard, R. (1988). Nonhomosexual gender dysphoria. *The Journal of Sex Research, 24,* 188–193.

Blanchard, R. (1989a). The classification and labeling of nonhomosexual gender dysphorias. *Archives of Sexual Behavior, 18,* 315–334.

Blanchard, R. (1989b). The concept of autogynephilia and the typology of male gender dysphoria. *Journal of Nervous and Mental Disease, 177,* 616–623.

Blanchard, R. (1990). Gender identity disorders in adult women. In R. Blanchard & B. W. Steiner (Eds.), *Clinical management of gender identity disorders in children and adults* (pp. 77–91). Washington, DC: American Psychiatric Press.

Blanchard, R. (1991). Clinical observations and systematic studies of autogynephilia. *Journal of Sex and Marital Therapy, 17,* 235–251.

Blanchard, R., Steiner, B. W., Clemmensen, L. H., & Dickey, R. (1989). Prediction of regrets in postoperative transsexuals. *Canadian Journal of Psychiatry, 34,* 43–45.

Block, J. (2023). Norway's guidance on paediatric gender treatment is unsafe, says review. *BMJ* 2023:380,697.

Boivin, L., Notredame, C.-E., Jardri, R., & Medjkane, F. (2020). Supporting parents of transgender adolescents: Yes, but how? *Archives of Sexual Behavior, 49,* 81–83.

Borges, G., Nock, M. K., Haro Abad, J. M., Hwang, I., Sampson, N. A., Alonso, J., Helena Andrade, L.…Kessler, R. C. (2010) Twelve-month prevalence of and risk factors for suicide attempts in the World Health Organization World Mental Health Surveys. *Journal of Clinical Psychiatry, 71,* 1617–1628.

Brignardello-Petersen, R. and Wiercioch, W. (May 16, 2022). Effects of gender affirming therapies in people with gender dysphoria: evaluation of the best available evidence. Prepared for the Florida Agency for Health Care Administration.

Button, K. S., et al. (2015). Minimal clinically important difference on the Beck Depression Inventory-II according to the patient's perspective. *Psychological Medicine,* 45, 3269-3279.

Canetto, S. S., Antonelli, P., Ciccotti, A., Dettore, D., & Lamis, D. A. (2021). Suicidal as normal: A lesbian, gay, and bisexual youth script? *Crisis, 42,* 292–300.

Cantor, J. M. (2011). New MRI studies support the Blanchard typology of male-to-female transsexualism. *Archives of Sexual Behavior, 40,* 863–864. doi: 10.1007/s10508-011-9805-6

Cantor, J. M. (2012). Is homosexuality a paraphilia? The evidence for and against. *Archives of Sexual Behavior, 41,* 237–247. doi: 10.1007/s10508-012-9900-3

Cantor, J. M. (2019). Transgender and gender diverse children and adolescents: Fact-checking of AAP policy. *Journal of Sex & Marital Therapy, 46,* 307–313.

Cantu, A. L., Moyer, D. N., Connely, K. J., & Holley, A. L. (2020). Changes in anxiety and depression from intake to first follow-up among transgender youth in a pediatric endocrinology clinic. *Transgender Health, 5,* 196–200.

Carel, J. C., Eugster, E. A., Rogol, A., Ghizzoni, L., Palmert, M. R.; ESPE-LWPES GnRH Analogs Consensus Conference Group, Antoniazzi, F., Berenbaum, S., Bourguignon, J. P., Chrousos, G. P., Coste, J., Deal, S., de Vries, L., Foster, C., Heger, S., Holland, J., Jahnukainen, K., Juul, A., Kaplowitz, P., Lahlou, N., Lee, M. M., Lee, P., Merke, D. P., Neely, E. K., Oostdijk, W., Phillip, M., Rosenfield, R. L., Shulman, D., Styne, D., Tauber, M., Wit, J. M. (2009). Consensus statement on the use of gonadotropin-releasing hormone analogs in children. *Pediatrics, 123,* e752–e762.

129
App.568

Carmichael, P., Butler, G., Masic, U., Cole, T. J., De Stavola, B. L., Davidson, S., Skageberg, E. M., Khadr, S., Viner, R. M. (2021). Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK. *PLosONE, 16,* e0243894.

Cass, H. (2022, February). The Cass Review: Independent review of gender identity services for children and young people Interim report. National Health Service (NHS), UK.

Cass, H. (2022, July 19). Independent review of gender identity services for children and young people—Further advice. Letter from H. Cass to J. Stewart, NHS England. *The Cass Review*.

Catley, M. J., & Tomkinson, G. R. (2013). Normative health-related fitness values for children: Analysis of 85347 test results on 9-17 year old Australians since 1985. *British Journal of Sports Medicine, 47,* 98–108.

Caulfield, R. (2012). Medically necessary? How to decide. *CMAJ* 184 (16.

Chen, D., Berona, J., Chan, Y.-M., Ehrensaft, D., Garofalo, R., Hidalgo, M. A., Rosenthal, S. M., Tishelman, A. C., & Olson-Kennedy, J. (2023). Psychosocial functioning in transgender youth after 2 years of hormones. *New England Journal of Medicine, 288,* 240–250.

Chen, D., Strang, J. F., Kulbuck, V. D., Rosenthal, S. M., Wallen, K., Waber, D. P., …Garofalo, R. (2020). Consensus parameter: Research methodologies to evaluate neurodevelopmental effects of pubertal suppression in transgender youth. *Transgender Health, 5,* 246–257.

Clinicaltrials.gov (2022). Gender dysphoria treatment in Sweden (GETS). Clinicaltrials.gov identifier NCT02518009.

Cohen-Kettenis, P. T., Owen, A., Kaijser, V. G., Bradley, S. J., & Zucker, K. J. (2003). Demographic characteristics, social competence, and behavior problems in children with gender identity disorder: A cross-national, cross-clinic comparative analysis. *Journal of Abnormal Child Psychology, 31,* 41–53.

Cohen, J., Cohen, P., West, S. G., & Aiken, L. S. (2003). *Applied multiple regression/correlation analysis for the behavioral sciences (3rd ed.).* Mahwah, NJ: Lawrence Erlbaum Associates.

COHERE Finland (Council for Choices in Health Care in Finland) (2020, June 16). Medical treatment methods for dysphoria associated with variations in gender identity in minors—Summary of a recommendation. [Translated] Retrieved from https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en+(1).pdf/fa2054c5-8c35-8492-59d6-b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474

COHERE Finland (Council for Choices in Health Care in Finland) (2020, June 11). Alaikäisten sukupuoli-identiteetin variaatioihin liittyvän dysforian lääketieteelliset hoitomenetelmät [Medical treatment methods for dysphoria related to variations in gender identity of minors]. Available from https://palveluvalikoima.fi/sukupuolidysforia-alaikaiset

Coleman, E., et al. (2012). Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7 ("SOC 7"). *International Journal of Transgenderism*, 13, 165–232.

Coleman, E., et al. (2022). WPATH standards of care for the health of transgender and gender diverse people, version 8 ("SOC 8"). *International Journal of Transgender Health* 2022, Vol.. 23, No. S1.

Costa, R., Dunsford, M., Skagerberg, E., Holt V., Carmichael, P., & Colizzi, M. (2015). Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria. *Journal of Sexual Medicine, 12,* 2206–2214.

Craig, M. C., Fletcher, P. C., Daly, E. M., Rymer, J., Cutter, W J., Brammer, M., Giampietro, V., Wickham, H., Maki, P. M., Murphy, D.G. (2007). Gonadotropin hormone releasing hormone agonists alter prefrontal function during verbal encoding in young women. *Psychoneuroendocrinology, 32,* 1116–1127.

Crone, E. A., & Steinbeis, N. (2017). Neural perspectives on cognitive control development during childhood and adolescence. *Trends in Cognitive Science, 21,* 205–215.

Cumming, R., Sylvester, K., & Fuld, J. P. (2016). Understanding the effects on lung function of chest binder use in the transgender population. *Thorax, 71, A227.*

Dahlen, S., Connolly, D., Arif, I., Hyder Junejo, M., Bewley, S., & Meads, C. (2021). International clinical practice guidelines for gender minority/trans people: Systematic review and quality assessment. *BMJ Open, 11,* e048943.

D'Angelo, R., Syrulnik, E., Ayad, S., Marchiano, L., Kenny, D. T., & Clarke, P. (2021). One size does not fit all: In support of psychotherapy for gender dysphoria. *Archives of Sexual Behavior, 50,* 7–16.

Daniel, H., & Butkus, R. (2015a). Lesbian, gay, bisexual, and transgender health disparities: Executive summary of a policy position paper from the American College of Physicians. *Annals of Internal Medicine, 163,* 135–137.

Daniel, H., & Butkus, R. (2015b). Appendix: Lesbian, gay, bisexual, and transgender health disparities: A policy position paper from the American College of Physicians. *Annals of Internal Medicine, 163,* [unpaginated].

Davidson, R. J. (2003). Affective neuroscience and psychophysiology: Toward a synthesis. Psychophysiology, 40, 655–665.

Dawson, G. C. (2018). Years of clinical experience and therapist professional development: A literature review. Journal of Contemporary Psychotherapy, 48, 89–97. https://link.springer.com/article/10.1007/s10879-017-9373-8

De Cuypere, G., & Vercruysse, H., Jr. (2009) Eligibility and readiness criteria for sex reassignment surgery: Recommendations for revision of the WPATH Standards of Care. *International Journal of Transgenderism, 11,* 194–205.

de Vries, A. L. C. & Cohen-Kettenis, P. T. (2012). Clinical management of gender dysphoria in children and adolescents: The Dutch Approach. *Journal of Homosexuality, 59,* 301–320.

de Vries, A. L. C., Doreleijers, T. A., Steensma, T. D., & Cohen-Kettenis, P. T. (2011). Psychiatric comorbidity in gender dysphoric adolescents. *Journal of Child Psychology and Psychiatry, 52,* 1195–1202.

de Vries, A. L. C., McGuire, J. K., Steensma, T. D., Wagenaar, E. C. F., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2014). Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics, 134,* 1–9.

de Vries, A. L. C., Noens, I. L., Cohen-Kettenis, P. T., van Berckelaer- Onnes, I. A., & Doreleijers, T. A. (2010). Autism spectrum disorders in gender dysphoric children and adolescents. *Journal of Autism and Developmental Disorders, 40,* 930–936.

de Vries, A. L. C., Steensma, T. D., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *Journal of Sexual Medicine, 8,* 2276–2283.

Delemarre-van de Waal, H. A., & Cohen-Kettenis, P. T. (2006). Clinical management of gender identity disorder in adolescents: A protocol on psychological and paediatric endocrinology aspects. *European Journal of Endocrinology, 155* (suppl 1), S131–S137.

Dhejne, C., Van Vlerken, R., Geylens, G., & Arcelus, J. (2016). Mental health and gender dysphoria: A review of the literature. *International Review of Psychiatry, 28,* 44–57.

Dhejneberg, C., Öberg, K., Arver, S., & Landén, M. (2014). An analysis of all applications for sex reassignment surgery in Sweden, 1960–2010: Prevalence, incidence, and regrets. *Archives of Sexual Behavior, 43,* 1535–1545.

Donnelly, L. (2019, Dec. 12). Children's transgender clinic hit by 35 resignations in three years as psychologists warn of gender dysphoria 'over-diagnoses'. *The Telegraph.* Retrieved from https://www.telegraph.co.uk/news/2019/12/12/childrens-transgender-clinic-hit-35-resignations-three-years/?WT.mc_id=tmg_share_em

Doward, J. (2019). Politicised trans groups put children at risk, says expert. *The Observer*, July 27, 2019.

Drummond, K. D., Bradley, S. J., Peterson-Badali, M., & Zucker, K. J. (2008). A follow up study of girls with gender identity disorder. *Developmental Psycholo*gy, *44,* 34–45.

Eriksen, M. B., & Frandsen, T. F. (2018). The impact of patient, intervention, comparison, outcome (PICO) as a search strategy tool on literature search quality: A systematic review. *Journal of the Medical Library Association, 106,* 420–431.

Finnish Palveluvalikoima ("Palko") (Health Service Selection Council). Preparation memorandum of the Service Selection Council. Retrieved from https://palveluvalikoima.fi/documents/1237350/22895008/Valmistelumuistio_sukupuoli-identiteetin+variaatiot.pdf/991c7413-3bd5-3e9d-52c4-24c4e2a7a9e5/Valmistelumuistio_sukupuoli-identiteetin+variaatiot.pdf?t=1592317702000.

Fioravanti, G., Bocci Benucci, S., Ceragioli, G., & Casale, S. (2022). How the exposure to beauty ideals on social networking sites influences body image: A systematic review of experimental studies. *Adolescent Research Review, 7,* 419–458.

Fisher, A. D., Ristori, J., Castellini, G., Cocchetti, C., Cassioli, E., Orsolini, S., Sensi, C., Romani, A., Mazzoli, F., Cipriani, A., Ricca, V., Vignozzi, L., Viggiano, M. P., Mascalchi, M., Maggi, M., & Gavazzi, G. (2020). Neural correlates of gender face perception in transgender people. *Journal of Clinical Medicine*, 9, 1731.

Freeman, A., Mergl, R., Kohls, E., Székely, A., Gusmao, R., Arensman, E., Koburger, N., Hegerl, U., & Rummel-Kluge, C. (2017). A cross-national study on gender differences in suicide intent. *BMC Psychiatry, 17,* 234.

Freund, K. (1967). Diagnosing homo- or heterosexuality and erotic age preference by means of a psychophysiological test. Behavioral Research and Therapy, 5, 209–228.

Ghorayshi, A. (2023, June 9). England limits use of puberty-blocking drugs to research only. New York Times. https://www.nytimes.com/2023/06/09/health/puberty-blockers-transgender-children-britain-nhs.html

Goldet, G., & Howick, J (2013). Understanding GRADE: An introduction. *Journal of Evidence-Based Medicine, 6,* 50–54.

Gould, M. S., & Lake, A. M. (2013, Feb. 6). II.4 *The contagion of suicidal behavior.* Forum on Global Violence Prevention, Board on Global Health; Institute of Medicine; National Research Council. Contagion of Violence: Workshop Summary. National Academies

Press: Washington, DC. Retrieved from
https://www.ncbi.nlm.nih.gov/books/NBK207262/

GRADE Handbook, Quality of evidence definitions table.
https://gdt.gradepro.org/app/handbook/handbook.html#h.wsfivfhuxv4r at Section 5.

Green, A. E., DeChants, J. P., Price, M. N., & Davis, C. K. (2021). Association of gender-affirming hormone therapy with depression, thoughts of suicide, and attempted suicide among transgender and nonbinary youth. *Journal of Adolescent Health, 70, 643–649.*

Green, R. (1987). The "sissy boy syndrome" and the development of homosexuality. New Haven, CT: Yale University Press.

Grigorova, M., Sherwin, B. B., & Tulandi, T. (2006). Effect of treatment with leuprolide acetate depot on working memory and executive functions in young premenopausal women. *Psychoneuroendocrinology, 31,* 935–947.

Gudayol-Ferré, E., Peró-Cebollero, M., González-Garrido, A. A., & Guárdia-Olmos, J. (2015). Changes in brain connectivity related to the treatment of depression measure through fMRI: A systematic review. *Frontiers in Human Neuroscience*, 9. doi: 10.3389/fnhum.2015.00582.

Guillamon, A., Junque, C., & Gómez-Gil, E. (2016). A review of the status of brain structure research in transsexualism. *Archives of Sexual Behavior, 45,* 1615–1648. doi: 10.1007/s10508-016-0768-5

Gulias-González, R., Sánchez-López, M., Olivas-Bravo, A., Solera-Martinez, M., & Marinez-Vuzcaino, V. (2014). Physical fitness in Spanish schoolchildren aged 6–12 years: Reference values of the battery EUROFIT and associated cardiovascular risk. *Journal of School Health, 84,* 625–635.

Guyatt, G., Rennie, D., Meade, M., & Cook, D. (Eds.) (2015). Users' guide to the medical literature: essentials of evidence-based clinical practice, 3rd edition. *JAMAevidence, American Medical Association.*

Haas, A. P., Eliason, M., Mays, V. M., Mathy, R. M., Cochran, S. D., D'Augelli, A. R., Silverman, M. M., Fisher, P. W., Hughes, T., Rosario, M., Russell, S. T., Malley, E., Reed, J., Litts, D. A., Haller, E., Sell, R. L., Remafedi, G., Bradford, J., Beautrais, A. L., Brown, G. K., … Clayton, P. J. (2011). Suicide and suicide risk in lesbian, gay, bisexual, and transgender populations: Review and recommendations. *Journal of homosexuality*, *58,* 10–51.

Haas, A. P., Rodgers, P. L., & Herman, J. L. (2014, Jan.). *Suicide attempts among transgender and gender nonconforming adults.* Williams Institute, UCLA School of Law.

Handelsman, D. J. (2017). Sex differences in athletic performance coinciding with the onset of male puberty. *Clinical Endocrinology, 87,* 68–72.

Hatchel, T., Polanin, J., & Espelage, D. (2021). Suicidal thoughts and behaviors among LGBTQ youth: Meta-analyses and a systematic review. *Archives of Suicide Research,* 25, 1–37.

Haupt, C., Henke, M., Kutschmar, A., Hauser, B., Baldinger, S., Saenz S. R., & Schreiber, G. (2020). Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women. *Cochrane Database of Systematic Reviews, 11,* Art. No.: CD013138.

Hembree, W. C., Cohen-Kettenis, P. T., Delemarre-van de Waal, H. A., Gooren, L. J., Meyer, W. J., III, Spack, N. P., Tangpricha, V., & Montori, V. M. (2009). Endocrine treatment of transsexual persons: An Endocrine Society clinical practice guideline. *Journal of Clinical Endocrinology & Metabolism, 94,* 3132–3154.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H., Rosenthal, S. M., Safer, T. D., Tangpricha, V., & T'Sjoen, G. G. (2017). Endocrine treatment of gender-dysphoric/ gender-incongruent persons: An Endocrine Society clinical practice guideline. *Journal of Clinical Endocrinology & Metabolism, 102,* 3869–3903.

Hengartner, M. (2020). Is there a genuine placebo effect in acute depression treatments? A reassessment of regression to the mean and spontaneous remission. *BMJ Evidence-based Medicine* 2020;25:46-48.

Hess, E. H., Seltzer, A. L., & Shlien, J. M. (1965). Pupil responses to hetero- and homosexual males to pictures of men and women: A pilot study. Journal of Abnormal Psychology, 70, 165–168.

Higgins, J. P. T., Thomas, J., Chandler, J., Cumpston, M., Li, T., Page, M. J., & Welch, V. A. (Eds.). (2022, Feb.) Cochrane Handbook for Systematic Reviews of Interventions (version 6.3). *Cochrane.* Available from www.training.cochrane.org/handbook

Hisle-Gorman, E., Schvey, N. A., Adirim, T. A., Rayne, A. K., Susi, A., Roberts, T. A., & Klein, D. A. (2021). Mental healthcare utilization of transgender youth before and after affirming treatment. *The Journal of Sexual Medicine, 18,* 1444–1454.

Holt, V., Skagerberg, E., & Dunsford, M. (2016). Young people with features of gender dysphoria: Demographics and associated difficulties. *Clinical Child Psychology and Psychiatry, 21*, 108–118.

Institute of Medicine. (2011). *Clinical practice guidelines we can trust.* Washington, DC: The National Academies Press.

Institute of Medicine. (2011). *The health of lesbian, gay, bisexual, and transgender people: building a foundation for better understanding.* Washington, DC: The National Academies Press.

Italiano, M. (2012). Comment on Cantor (2011). *Archives of Sexual Behavior, 41,* 1079.

Ivey-Stephenson, A., Demissie, Z., Crosby, A., Stone, D., Gaylor, E., Wilkins, N., Lowry, R., & Brown, M. (2020, Aug. 21). Suicidal ideation and behaviors among high school students—Youth Risk Behavior Survey, United States, 2019. US Department of Health/Centers for Disease Control and Prevention. *MMWR, 69,* 47–55.

Jacobs, L. A., Rachlin, K., Erickson-Schroth, L., & Janssen, A. (2014). Gender dysphoria and co-occurring autism spectrum disorders: Review, case examples, and treatment considerations. *LGBT Health, 1*, 277–282.

James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). *The report of the 2015 U.S. transgender survey.* National Center for Transgender Equality. Retrieved from https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-final.pdf

Janssen, A., Busa, S., Wernick, J. (2019). The complexities of treatment planning for transgender youth with co-occurring severe mental illness: A literature review and case study. *Archives of Sexual Behavior, 48*, 2003–2009.

Janssen, A., Huang, H., & Duncan, C. (2016). Gender variance among youth with autism spectrum disorders: A retrospective chart review. *Transgender Health, 1*, 63–68.

Joseph, T., Ting, J., & Butler, G. (2019). The effect of GnRH analogue treatment on bone mineral density in young adolescents with gender dysphoria: Findings from a large national cohort. *Journal of Pediatric Endocrinology and Metabolism, 32,* 1077–1081.

134
App.573

Joy, A., Muralidharan, A., Alfaraj, M., Shantharam, D., Cherukuri, A. S. S., & Muthukumar, A. (2022) The role of belimumab in systemic Lupus Erythematosis: A systematic review. *Cureus, 14,* e25887.

Kaltiala-Heino, R., Sumia, M., Työläjärvi, M., & Lindberg, N. (2015). Two years of gender identity service for minors: Overrepresentation of natal girls with severe problems in adolescent development. *Child and Adolescent Psychiatry and Mental Health, 9,* 9.

Kaltiala, R, Heino, E., Työläjärvi, & Suomalainen, L. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. *Nordic Journal of Psychiatry, 74,* 213–219.

Karolinska Institutet. (March 2021). Policy change regarding hormonal treatment of minors with gender dysphoria at Tema Barn – Astrid Lindgren Children's Hospital.

Karsan, N., Bose, P. R, O'Daly, O., Zelaya, F. O., & Goadsby, P. J. (2020). Alterations in functional connectivity during different phases of the triggered migraine attack. Headache, 60, 1244–1258.

Khatchadourian, K., Amed, S., & Metzger, D. L. (2014). Clinical management of youth with gender dysphoria in Vancouver. *Journal of Pediatrics, 164,* 906–911.

Kilford, E., Garrett, E., & Blakemore, S. (2016). The development of social cognition in adolescence: An integrated perspective. *Neuroscience & Biobehavioral Reviews* 2016;70:106-120.

Kleemans, M., Daalmans, S., Carbaat, I., & Anschütz, D. (2018). Picture perfect: The direct effect of manipulated instagram photos on body image in adolescent girls. *Media Psychology*, *21*, 93–110.

Klink, D., Caris, M., Heijboer, A., van Trotsenburg, M., & Rotteveel, J. (2015). Bone mass in young adulthood following gonadotropin-releasing hormone analog treatment and cross-sex hormone treatment in adolescents with gender dysphoria. *Journal of Clinical Endocrinology & Metabolism, 100,* E270–E275.

Klonsky, E. D., May, A. M., & Saffer, B. Y. (2016). Suicide, suicide attempts, and suicidal ideation. *Annual Review of Clinical Psychology, 12,* 307–330.

Koerselman, K., & Pekkarinen, T. (2017). The timing of puberty and gender differences in educational achievement. Institute of Labor Economics. *IZA DP No. 10889.

Kolesar, T. A., Bilevicius, E., Wilson, A. D., & Kornelsen, J. (2019). Systematic review and meta-analyses of neural structural and functional differences in generalized anxiety disorder and healthy controls using magnetic resonance imaging. *NeuroImage: Clinical*, *24*, 102016.

Kregel, J., Meeus, M., Malfliet, A., Dolphens, M., Danneels, L., Nijs, J., & Cagnie, B. (2015). Structural and functional brain abnormalities in chronic low back pain: a systematic review. *Seminars in Arthritis and Rheumatism* 45 (2015) 229-237.

Kuper, L. E., Stewart, S., Preston, S., Lau, M., & Lopez, X. (2020). Body dissatisfaction and mental health outcomes of youth on gender- affirming hormone therapy. *Pediatrics, 145*, e20193006.

Larzelere, R., Kuhn, B., & Johnson, B. (2004). The intervention selection bias: An underrecognized confound in intervention research. *Psychological Bulletin,* 130, 289–303.

Lawrence, A. A. (2010). Sexual orientation versus age of onset as bases for typologies (subtypes) for Gender Identity Disorder in adolescents and adults. *Archives of Sexual Behavior, 39,* 514–545.

Lee, J. Y., Finlayson, C., Olson-Kennedy, J., Garofalo, R., Chan, Y. M., Glidden, D. V., & Rosenthal, S. M. (2020). Low bone mineral density in early pubertal transgender/gender diverse youth: Findings From the Trans Youth Care Study. *Journal of the Endocrine Society, 4,* bvaa065. doi: 10.1210/jendso/bvaa065.

Levine, S., Abbruzzese, E., & Mason, J. (2022). Reconsidering informed consent for trans-identified children, adolescents, and young adults. *Journal of Sex & Marital Therapy.* DOI: 10.1080/0092623X.2022.2046221.

Littman, L. (2018). Parent reports of adolescents and young adults perceived to show signs of a raid onset of gender dysphoria. *PLoS ONE, 13*(8), e0202330.

Ludvigsson, J. F., Adolfsson, J., Höistad, M., Rydelius, P.-A., Kriström, B., & Landén, M. (2023). A systematic review of hormone treatment for children with gender dysphoria and recommendations for research. *Acta Paediatrica.* doi: 10.1111/apa.16791

Maheux, A. J., Roberts, S. R., Nesi, J., Widman, L., & Choukas-Bradley, S. (2022). Longitudinal associations between appearance-related social media consciousness and adolescents' depressive symptoms. *Journal of Adolescence, 94,* 264–269.

Malta, M., LeGrand, S., Turban, J. L., & Poteat, T. (2020). Gender-congruent government identification is crucial for gender affirmation. [Comment.] *The Lancet Public Health, 5,* E178–E179.

Maraka, S., Ospina, N., Rodriguez-Gutierrez, R., Davidge-Pitts, C., Nippoldt, T., Prokop, L., & Murad, M. (2017). Sex steroids and cardiovascular outcomes in transgender individuals: A systematic review and meta-analysis. *Journal of Clinical Endocrinology and Metabolism*, 102, 3914–3923.

Marsh, S. (2020, Sept. 20). NHS to hold review into gender identity services for children and young people. *The Guardian.* Retrieved from https://www.theguardian.com/society/2020/sep/22/nhs-to-hold-review-into-gender-identity-services-for-children-and-young-people

Marshall, E., Claes, L. L., Bouman, W. P., Witcomb, G. L., & Arcelus, J. (2016). Non-suicidal self-injury and suicidality in trans people: A systematic review of the literature. *International Review of Psychiatry, 28,* 58–69.

May, T., Pang, K., & Williams, K. J. (2016). Gender variance in children and adolescents with autism spectrum disorder from the National Database for Autism Research. *International Journal of Transgenderism, 18,* 7–15.

McCall, B. (2021, October 7). Psychiatrists shift stance on gender dysphoria, recommend therapy. *Medscape Psychiatry.* Retrieved from www.medscape.com/viewarticle/960390?src=soc_tw_share.

McFarlane, T., Zajac, J. D., & Cheung, A. S. (2018). Gender-affirming hormone therapy and the risk of sex hormone-dependent tumours in transgender individuals: A systematic review. *Clinical Endocrinology, 89,* 700–711.

McNeil, J., Ellis, S. J., & Eccles, F. J. R. (2017). Suicide in trans populations: A systematic review of prevalence and correlates. *Psychology of Sexual Orientation and Gender Diversity, 4,* 341–353.

Meyer, I. H. (2003) . Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: Conceptual issues and research evidence. *Psychological Bulletin, 129*, 674–697.

App.575

Moher, D., Liberati, A., Tetzlaff, J., Altman, D. G., & PRISMA Group (2009). Preferred reporting items for systematic reviews and meta-analyses: The PRISMA statement. *PLoS medicine, 6,* e1000097.

Money, J., & Russo, A. J. (1979). Homosexual outcome of discordant gender identity/ role in childhood: Longitudinal follow-up. *Journal of Pediatric Psychology, 4,* 29–41.

Monto, M. A., McRee, N., Deryck, F. S. (2018). Nonsuicidal self-injury among a representative sample of US adolescents, 2015. *American Journal of Public Health, 108,* 1042–1048. doi: 10.2105/AJPH.2018.304470.

Moss, L. (2023, June 10). Puberty blockers to be given only in clinical research. *BBC News.* https://www.bbc.com/news/uk-65860272

Moustgaard, H., Clayton, G., Jones, E., Boutron, I., Jorgensen, L, Laursen, D., Olsen, M., Paludan-Muller, A., Ravaud, P., Savovic, J., Sterne, J., Higgins, J., & Hrobjartsson, A. (2020). Impact of blinding on estimated treatment effects in randomised clinical trials: meta-epidemiological study. *British Medical Journal, 368,* 16802.

MSNBC. (2015, Jan. 5). Trans youth and suicide: An epidemic. Retrieved from https://www.msnbc.com/ronan-farrow/watch/trans-youth-and-suicide-an-epidemic-380294211712.

Mueller, S. C., Guillamon, A., Zubiaurre-Elorza, L., Schneider, M. A., T'Sjoen, G., … Luders, E. (2021). The neuroanatomy of transgender identity: Mega-analytic findings from the ENIGMA transgender persons working group. *Journal of Sexual Medicine, 18,* 1122–1129.

Mustanski, B. S., Garofalo, R., & Emerson, E. M. (2010). Mental health disorders, psychological distress, and suicidality in a diverse sample of lesbian, gay, bisexual, and transgender youths. *American Journal of Public Health, 100,* 2426–2432.

Nainggolan, L. (2021 May 12). Hormonal Tx of youth with gender dysphoria stops in Sweden. *Medscape Psychiatry.* Retrieved from www.medscape.com/viewarticle/950964?src=soc_tw_share.

Navabi, B., Tang, K., Khatchadourian, K., & Lawson, M. L. (2021). Pubertal suppression, bone mass and body composition in youth with gender dysphoria. *Pediatrics, 148,* e2020039339.

Nesi, J., & Prinstein, M. J. (2015). Using social media for social comparison and feedback-seeking: Gender and popularity moderate associations with depressive symptoms. *Journal of Abnormal Child Psychology*, *43,* 1427–1438.

NHS (National Health Service) England. (2020 September 22). NHS announces independent review into gender identity services for children and young people. United Kingdom. Retrieved from https://www.england.nhs.uk/2020/09/nhs-announces-independent-review-into-gender-identity-services-for-children-and-young-people/.

NHS (National Health Service) England. (2022 October 20). Interim service specification for specialist gender dysphoria services for children and young people. Retrieved from https://www.engage.england.nhs.uk/specialised-commissioning/gender-dysphoria-services/user_uploads/b1937-ii-interim-service-specification-for-specialist-gender-dysphoria-services-for-children-and-young-people-22.pdf.

NICE (National Institute for Health and Care Excellence) (2020a). Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria. Retrieved from https://arms.nice.org.uk/resources/hub/1070905/attachment.

137

NICE (National Institute for Health and Care Excellence) (2020b). Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria. Retrieved from https://cass.independent-review.uk/wp-content/uploads/2022/09/20220726_Evidence-review_Gender-affirming-hormones_For-upload_Final.pdf.

Nock, M. K., Borges, G., Bromet, E. J., Alonso, J., Angermeyer, M., Beautrais, A….Williams, D. (2008). Cross-national prevalence and risk factors for suicidal ideation, plans and attempts. *British Journal of Psychiatry, 192,* 98–105.

Olson, K. R., Durwood, L., Horton, R., Gallagher, N. M., & Devor, A. (2022). Gender identity 5 years after social transition. *Pediatrics.* doi: 10.1542/peds.2021-056082

Orange, R. (2020, Feb 22). Teenage transgender row splits Sweden as dysphoria diagnoses soar by 1,500%: New health report and TV debates highlight backlash against gender reassignment. *The Guardian.* Retrieved from https://www.theguardian.com/society/2020/feb/22/ssweden-teenage-transgender-row-dysphoria-diagnoses-soar

Pasternack, I., Söderström, I., Saijonkari, M., & Mäkelä, M. (2019). Lääketieteelliset menetelmät sukupuolivariaatioihin liittyvän dysforian hoidossa. Systemaattinen katsaus. [Medical methods in the treatment of dysphoria related to gender variations: A systematic review.] Symmaryx Oy Helsinki, Finland. Available from https://palveluvalikoima.fi/documents/1237350/22895008/Valmistelumuistion+Liite+1.+Kirjallisuuskatsaus.pdf/5ad0f362-8735-35cd-3e53-3d17a010f2b6/Valmistelumuistion+Liite+1.+Kirjallisuuskatsaus.pdf?t=1592317703000

Pediatric Endocrine Society & Endocrine Society. (2020, December 15). *Transgender health.* Retrieved from www.endocrine.org/advocacy/position-statements/transgender-health.

Pediatric Endocrine Society. (Online). About PES. Retrieved from https://pedsendo.org/about-pes/

Peitzmeier, S. M., Silberholz, J., Gardner, I. H., Weinand, J., & Acevedo, K. (2021). Time to first onset of chest binding-related symptoms. *Pediatrics, 147,* e20200728.

Peitzmeier, S., Gardner, I., Weinand, J., Corbet A., & Acevedo, K. (2017). Health impact of chest binding among transgender adults: A community-engaged, cross-sectional study. *Culture, Health & Sexuality, 19,* 64–75.

Petersen, M. E., & Dickey, R. (1995). Surgical sex reassignment: A comparative survey of international centers. *Archives of Sexual Behavior, 24,* 135–156.Bertholf, R. L. (2020). Scientific evidence, medical practice, and the insidious danger of anecdotal reports. [Editorial] *Laboratory Medicine, 51,* 555–556

Rae, J. R., Gülgoz, S., Durwood, L., DeMeules, M., Lowe, R., Lindquist, G., & Olson, K. R. (2019). Predicting early-childhood gender transitions. *Psychological Science, 30*, 669–681.

Rafferty, J., AAP Committee on psychosocial aspects of child and family health, AAP Committee on adolescence, AAP Section on lesbian, gay, bisexual, and transgender health and wellness. (2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics, 142*(4), e20182162.

Rayner, G. (2018, Sept. 16). Minister orders inquiry into 4000 percent rise in children wanting to change sex. *The Telegraph.* Retrieved from https://www.telegraph.co.uk/politics/2018/09/16/minister-orders-inquiry-4000-per-cent-rise-children-wanting.

Reisner, S. L., Vetters, R., Leclerc, M., Zaslow, S., Wolfrum, S., Shumer, D., & Mimiaga, M. J. (2015). Mental health of transgender youth in care at an adolescent urban community health center: A matched retrospective cohort study. *Journal of Adolescent Health, 56*, 274–279.

Reuter, T. R., Sharp, C., Kalpakci, A. H., Choi, H. J., & Temple, J. R. (2016). Sexual orientation and Borderline Personality Disorder features in a community sample of adolescents. *Journal of Personality Disorders, 30,* 694–707.

Rieger, G., Chivers, M. L., & Bailey, J. M. (2005). Sexual arousal patterns of bisexual men. Psychological Science, 16, 579–584.

Rocca, W. A., Smith, C. Y., Gazzuola Rocca, L., Savica, R., & Mielke, M. M. (2022). Association of premenopausal bilateral oophorectomy with Parkinsonism and Parkinson Disease. *JAMA Network Open, 5,* e2238663.

Rodriguez-Seiljas, C., Morgan, T. A., & Zimmerman, M. (2021). A population-based examination of criterion-level disparities in the diagnosis of Borderline Personality Disorder among sexual minority adults. *Assessment, 28,* 1097–1109.

Royal Australian & New Zealand College of Psychiatrists. (2021, August). *Recognising and addressing the mental health needs of people experiencing Gender Dysphoria/Gender Incongruence* [Position Statement 103]. Retrieved from https://www.ranzcp.org/news-policy/policy-and-advocacy/position-statements/gender-dysphoria.

Ryan, C., Russell, S. T., Huebner, D., Diaz, R., & Sanchez, J. (2010). Family acceptance in adolescence and the health of LGBT young adults. *Journal of Child and Adolescent Psychiatric Nursing, 23,* 205–213.

Safer, J. D., Tangpricha, V. (2019). In the clinic: Care of the transgender patient. *Annals of Internal Medicine, 171*(1), ITC1–ITC6.

Samaritans. (2020). Media guidelines for reporting suicide. Ewell, Surrey, UK. Retrieved from https://media.samaritans.org/documents/Media_Guidelines_FINAL_v2_TABa8C6.pdf.

Sauka, M., Priedite, I. S., Artjuhova, L., Larins, V., Selga, G., Dahlström, Ö., & Timpka, T. (2011). Physical fitness in northern European youth: Reference values from the Latvian Physical Health in Youth Study. *Scandinavian Journal of Public Health, 39,* 35–43.

SBU (Statens Beredning för Medicinsk och Social Utvärdering [Swedish National Agency for Medical and Social Evaluation]) (2019, September 6). Gender dysphoria in children and adolescents: An inventory of the literature. A systematic scoping review. Summary retrieved from https://www.sbu.se/en/publications/sbu-bereder/gender-dysphoria-in-children-and-adolescents-an-inventory-of-the-literature/.

SBU (Statens Beredning för Medicinsk och Social Utvärdering [Swedish National Agency for Medical and Social Evaluation]) (2022). Hormone treatment of children and adolescents with gender dysphoria, Appendix 2: Studies excluded due to high risk of bias.

SBU (Statens Beredning för Medicinsk och Social Utvärdering [Swedish National Agency for Medical and Social Evaluation]. (2019, December). *Gender dysphoria in children and adolescents: An inventory of the literature A systematic scoping review.* Retrieved from https://www.sbu.se/contentassets/bfd7263c06da44ca9168bf1df8a1c7e0/eng_gender-dysphoria-in-children-and-adolescents--an-inventory-of-the-literature.pdf?utm_medium=email&utm_source=govdelivery

Schagen, S. E. E., Wouters, F. M., Cohen-Kettenis, P. T., Gooren, L. J., & Hannema, S. E. (2020). Bone development in transgender adolescents treated with gnrh analogues and

subsequent gender-affirming hormones. *Journal of Clinical Endocrinology & Metabolism, 105,* e4252–e4263.

Scheim, A. I., Perez-Brumer, A. G., & Bauer, G. R. (2020). Gender-concordant identity documents and mental health among transgender adults in the USA: A cross-sectional study. *The Lancet: Public Health, 5,* e196–203.

Schumm, W. R., & Crawford, D. W. (2020). Is research on transgender children what it seems? Comments on recent research on transgender children with high levels of parental support. *The Linacre Quarterly, 87,* 9–24.

Schumm, W. R., Crawford, D. W., Fawver, M. M., Gray, N. K., Niess, Z. M., & Wagner, A. D. (2019). Statistical errors in major journals: Two case studies used in a basic statistics class to assess understanding of applied statistics. *Psychology and Education—An Interdisciplinary Journal, 56,* 35–42.

Scott, E., Kidgell, D. J., Frazer, A. K., & Pearce, A. J. (2020). The neurophysiological responses of concussive impacts: A systematic review and meta-analysis of transcranial magnetic stimulation studies. *Frontiers in Human Neuroscience, 14.* doi: 10.3389/fnhum.2020.00306.

Seeley, S. H., Garcia, E., & Mennin, D. S. (2015). Recent advances in laboratory assessment of emotion regulation. Current Opinion in Psychology, 3, 58–63.

Sharma, R., et al. (2018). Effects of hormone therapy in transgender people. *National Institute for Health Research PROSPERO International prospective register of systematic reviews.* Accessed at https://www.crd.york.ac.uk/prospero/display_record.php?RecordID=115379.

Shirazi, T. N., Self, H., Dawood, K., Cárdenas, R., Welling, L. L. M., Rosenfield, K. A., Ortiz, T. L., Carré, J. M., Balasubramanian, R., Delaney, A., Crowley, W., Breedlove, S. M., & Puts, D. A. (2020). Pubertal timing predicts adult psychosexuality: Evidence from typically developing adults and adults with isolated GnRH deficiency. *Psychoneuroendocrinology, 119,* 104733.

Shirazi, T., Self, H., Cantor, J., Dawood, K., Cardenas, R., Rosenfield, K., Ortiz, T., Carré, J., McDaniel, M., Blanchard, R., Balasubramanian, R., Delaney, A., Crowley, W., S Marc Breedlove, S. M., & Puts, D. (2020). Timing of peripubertal steroid exposure predicts visuospatial cognition in men: Evidence from three samples. *Hormones and Behavior, 121, 104712.*

Shrier, A. (2021). Top trans doctors blow the whistle on 'sloppy' care. *The Free Press.* https://www.thefp.com/p/top-trans-doctors-blow-the-whistle

Singal, J. (7 Feb. 2023). The new, highly-touted study on hormones for transgender teens doesn't really tell us much of anything. https://jessesingal.substack.com/p/the-new-highly-touted-study-on-hormones.

Singh-Ospina, N., Maraka, S., Rodriguez-Gutierrez, R., Davidge-Pitts, C., Nippoldt, T., Prokop, L., and Murad, M. (2017). Effect of sex steroids on the bone health of transgender individuals: A systematic review and meta-analysis. *J. Clin. Endocrinal. Metab.* 2017;102:3904-3913.

Singh, D., Bradley, S. J., & Zucker, K. J. (2021). A follow-up study of boys with gender identity disorder. *Frontiers in Psychiatry, 12,* 632784.

Skagerberg, E., Parkinson, R., & Carmichael, P. (2013). Self-harming thoughts and behaviors in a group of children and adolescents with gender dysphoria. *International Journal of Transgenderism, 14*, 86–92.

Skelly, A. C., Dettori, J. R., & Brodt, E. D. (2012). Assessing bias: The importance of considering confounding. *Evidence-based Spine-Care Journal, 3,* 9–12.

Skorska, M. N., Chavez, S., Devenyi, G. A., Patel, R., Thurston, L. T., Lai, M.-C., Zucker, K. J.., Chakravarty, M. M., Lobaugh, N. J., & VanderLaan, D. P. (2021). A multi-modal MRI analysis of cortical structure in relation to gender dysphoria, sexual orientation, and age in adolescents. *Journal of Clinical Medicine, 10, 345.*

Steensma, T. D., & Cohen-Kettenis, P. T. (2011). Desisting and persisting gender dysphoria after childhood: A qualitative follow-up study. *Clinical Child Psychology and Psychiatry, 16,* 499–516.

Steensma, T. D., & Cohen-Kettenis, P. T. (2018). A critical commentary on "A critical commentary on follow-up studies and 'desistence' theories about transgender and gender non-conforming children". *International Journal of Transgenderism, 19,* 225–230.

Steensma, T. D., Cohen-Kettenis, P. T., & Zucker, K. J. (2018). Evidence for a change in the sex ratio of children referred for gender dysphoria: Data from the Center of Expertise on Gender Dysphoria in Amsterdam (1988–2016). *Journal of Sex & Marital Therapy, 44,* 713–715.

Steensma, T. D., McGuire, J. K., Kreukels, B. P. C., Beekman, A. J., & Cohen-Kettenis, P. T. (2013). Factors associated with desistence and persistence of childhood gender dysphoria: A quantitative follow-up study. *Journal of the American Academy of Child and Adolescent Psychiatry, 52,* 582–590.

Stoffers, I. E., de Vries, M. C., & Hannema, S. (2019). Physical changes, laboratory parameters and bone mineral density during testosterone treatment in adolescents with gender dysphoria. *The Journal of Sexual Medicine, 16,* 1459–1468.

Strang, J. F., Kenworthy, L., Dominska, A., Sokoloff, J., Kenealy, L. E., Berl, M., Wallace, G. L. (2014). Increased gender variance in autism spectrum disorders and attention deficit hyperactivity disorder. *Archives of Sexual Behavior, 43,* 1525–1533.

Strang, J. F., Meagher, H., Kenworthy, L., de Vries, A. L., Menvielle, E., Leibowitz, S., Anthony, L. G. (2016). Initial clinical guidelines for co-occurring autism spectrum disorder and gender dysphoria or incongruence in adolescents. *Journal of Clinical Child and Adolescent Psychology, 47,* 105–115.

Substance Abuse and Mental Health Services Administration (SAMHSA). (2020). *Treatment for suicidal ideation, self-harm, and suicide attempts among youth.* https://store.samhsa.gov/sites/default/files/pep20-06-01-002.pdf.

Swedish Socialstyrelsen. (2020). The evolution of the diagnosis of gender dysphoria: prevalence, co-occurring psychiatric diagnoses and mortality from suicide. www.socialstyrelsen.se Article number 2020-2-6600.

Swedish Socialstyrelsen. (2022, February 22). Uppdaterade rekommendationer för hormonbehandling vid könsdysfori hos unga. [*Updated recommendations for hormone therapy for gender dysphoria in young people.*] Retrieved from https://www.socialstyrelsen.se/om-socialstyrelsen/pressrum/press/uppdaterade-rekommendationer-for-hormonbehandling-vid-konsdysfori-hos-unga/.

Swedish Socialstyrelsen. (2022, February). Stöd, utredning och hormonbehandling vid könsinkongruens hos barn och ungdomar Delvis uppdatering av kunskapsstöd. [*Support, investigation and hormone treatment at gender incongruity in children and young people.*] Available from https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2022-2-7774.pdf

App.580

Telfer, M. M., Tollit, M. A., Pace, C. C., & Pang, K. C. (2018). Australian standards of care and treatment guidelines for transgender and gender diverse children and adolescents. *The Medical Journal of Australia, 209,* 132–136.

Temple Newhook, J. T., Pyne, J., Winters, K., Feder, S., Holmes, C., Tosh, J., Sinnott, M.-L., Jamieson, A., & Pickett, S. (2018). A critical commentary on follow-up studies and "desistance" theories about transgender and gender-nonconforming children. *International Journal of Transgenderism, 19,* 212–224.

Terhune, C., Respaut, R., & Conlin, M. (2022, Oct. 6). As more transgender children seek medical care, families confront many unknowns. *Reuters Special Report.* Retrieved from https://www.reuters.com/investigates/special-report/usa-transyouth-care/

Tetelepta, B. (2021, Feb 27). More research is urgently needed into transgender care for young people: 'Where does the large flow of children come from?' [translated]. Algemeen Dagblad. Retrieved from https://www.voorzij.nl/more-research-is-urgently-needed-into-transgender-care-for-young-people-where-does-the-large-increase-of-children-come-from/.

The Trevor Project. (2019). The Trevor Project National Survey on LGBTQ Youth Mental Health 2019. Retrieved from https://www.thetrevorproject.org/wp-content/uploads/2019/06/The-Trevor-Project-National-Survey-Results-2019.pdf

Thrower, E., Bretherton, I., Pang, K. C., Zajac, J. D., & Cheung, A. S. (2020). Prevalence of autism spectrum disorder and attention-deficit hyperactivity disorder amongst individuals with gender dysphoria: A systematic review. *Journal of Autism and Developmental Disorders, 50,* 695–706.

Tønnessen, E., Siobhan Svendsen, I., Christoffer Olsen, I., Guttormsen, A., & Haugen, T. (2015). Performance development in adolescent track and field athletes according to age, sex and sport discipline. *PLOSONE, 10*(6), e0129014.

Toomey, R. B., Syvertsen, A. K., Shramko, M. (2018). Transgender adolescent suicide behavior. *Pediatrics, 142,* e20174218.

Tordoff, D. M., Wanta, J. W., Stepney, C., Inwards-Breland, D. J., & Ahrens, K. (2022). Mental health outcomes in transgender and nonbinary youths receiving gender-affirming care. *JAMA Network Open, 5*(2):e220978.

Tripepi, G., Jager, K., Dekker, F., and Zoccali, C. (2010). Selection bias and information bias in clinical research. *Nephron. Clin. Practice* 2010; 115:94-99.

Turban, J. (2021, March 16). Trans girls belong on girls' sports teams. *Scientific American.* www.scientificamerican.com/article/trans-girls-belong-on-girls-sports-teams/

Turban, J. L., King, D., Kobe, J., Reisner, S. L., & Keuroghlian, A. S. (2022). Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PlosONE.*

Turban, J. L., King, D., Li, J. J., Keuroghlian, A. S. (2021). Timing of social transition for transgender and gender diverse youth, K-12 harassment, and adult mental health outcomes. *Journal of Adolescent Health, 69,* 991–998.

Turban, J. L., Loo, S. S., Almazan, A. N., & Keuroghlian, A. S. (2021). Factors leading to "detransition" among transgender and gender diverse people in the United States: A mixed-methods analysis. *LGBT Health, 8,* 273–280.

Turecki, G., & Brent, D. A. (2016). Suicide and suicidal behavior. *Lancet, 387,* 1227–1239.

App.581

Twohey, M., & Jewett, C. (2022). They paused puberty, but is there a cost? *New York Times.* Available from https://www.nytimes.com/2022/11/14/health/puberty-blockers-transgender.html.

Ukom Norway. (March 9, 2023). *Patient safety for children and adolescents with gender incongruence.* Unofficial translation.

van der Loos, M., Hellinga, I., Vlot, M., Klink, D., Den Heijer, M., Wiepjes, C. (2021). Development of hip bone geometry in transgender adolescents resembles the experienced gender if GnRHa treatment is started in early, but not late, puberty. *J. Endocrine Soc*. Volume 5, Issue Supplement 1, April-May 2021.

van der Miesen, A. I. R., Steensma, T. D., de Vries, A. L. C., Bos, H., Popma, A. (2020). Psychological functioning in transgender adolescence before and after gender-affirmative care compared with cisgender general population peers. *Journal of Adolescent Health, 66*, 699–704.

Vilain, E. (2006). Genetics of intersexuality. *Journal of Gay & Lesbian Psychotherapy, 10,* 9–26.

Vlot, M., Klink, D. T., den Heijer, M., Blankenstein, M. A., Rotteveel, J., & Heijboer, A. C. (2017). Effect of pubertal suppression and cross-sex hormone therapy on bone turnover markers and bone mineral apparent density (BMAD) in transgender adolescents. *Bone, 95,* 11–19.

Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric children. *Journal of the American Academy of Child & Adolescent Psychiatry, 47*, 1413–1423.

Wallien, M. S., Swaab, H., & Cohen-Kettenis, P. T. (2007). Psychiatric comorbidity among children with gender identity disorder. *Journal of the American Academy of Child and Adolescent Psychiatry, 46*, 1307–1314.

Warrier, V., Greenberg, D. M., Weir, E., Buckingham, C., Smith, P., Lai, M.-C., Allison, C., & Baron-Cohen, S. (2020). Elevated rates of autism, other neurodevelopmental and psychiatric diagnoses, and autistic traits in transgender and gender-diverse individuals. *Nature Communications, 11,* 3959.

WHO (World Health Organization). (2022). *Age standardized suicide rates (per 100 000 population.* Retrieved from https://www.who.int/data/gho/data/themes/mental-health/suicide-rates

Wiepjes, C. M., den Heijer, M., Bremmer, M. A., Nota, N. M., de Block, C. J. M., Coumou, B. J. G., & Steensma, T. D. (2020). Trends in suicide death risk in transgender people: Results from the Amsterdam Cohort of Gender Dysphoria study (1972–2017). *Acta Psychiatrica Scandinavica, 141,* 486–491.

Wiepjes, C. M., Nota, N. M., de Bok, C. J. M., Klaver, M., de Vries, A. L. C., Wensing-Kruger, S. A., de Jongh, R. T., Bouman, M-B., Steensma, T. D., Cohen-Kettenis, P., Gooren, L. J. G., Kreukels B. P. C., & den Heijer, M. (2018). The Amsterdam Cohort of Gender Dysphoria Study (1972–2015): Trends in prevalence, treatment, and regrets. *Journal of Sexual Medicine, 15,* 582–590.

Wierckx, K., Mueller, S., Weyers, S., Van Caenegem, E., Roef, G., Heylens, G., & T'Sjoen, G. (2012). Long-term evaluation of cross-sex hormone treatment in transsexual persons. *The Journal of Sexual Medicine, 9,* 2641–2651.

Winters, K., Temple Newhook, J., Pyne, J., Feder, S., Jamieson, A., Holmes, C., Sinnott, M.-L., Pickett, S., & Tosh, J. (2018). Learning to listen to trans and gender diverse children: A

response to Zucker (2018) and Steensma and Cohen-Kettenis (2018). *International Journal of Transgenderism, 19,* 246–250.

Woll, A., Kurth, B. M., Opper, E., Worth, A., & Bos, K. (2011). The 'Motorik- Modul' (MoMo): Physical fitness and physical activity in German children and adolescents. *European Journal of Pediatrics, 170,* 1129–1142.

Wood, H., Sasaki, S., Bradley, S. J., Singh, D., Fantus, S., Own-Anderson, A., Di Giacomo, A., Bain, J., & Zucker, K. J. (2013). Patterns of referral to a gender identity service for children and adolescents (1976–2011): Age, sex ratio, and sexual orientation. *Journal of Sex & Marital Therapy, 39,* 1–6.

WPATH. (2016). Position statement on medical necessity of treatment, sex reassignment, and insurance coverage in the U.S.A..

WPATH. (2022). Correction. Int. J. of Transgender Health, 23:Sup1, S259-261.

Zanarini, M. C., Magni, L. R., Temes, C. M., Hein, K. E., Aguirre, B. A., & Goodman, M. (2021). Sexual orientation and gender of intimate relationship partners among adolescents with BPD and psychiatrically healthy adolescents. *Journal of Personality Disorders, 35 (Suppl. B),* 1–7.

Zhao, J., Dong, L., Lin, Z., Sui, X., Wang, Y., Li, L., Liu, T., & Liu, J. (2023). Effects of selenium supplementation on Polycystic Ovarian Syndrome: A systematic review and meta-analysis on randomized clinical trials. *BMC Endocrine Disorders, 23,* 33.

Zhu, J., & Chan, Y.-M. (2017). Adult consequences of self-limited delayed puberty. *Pediatrics, 13, 9,* e20163177.

Zucker, K. J. (2018). The myth of persistence: Response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender nonconforming children" by Temple Newhook et al. (2018). *International Journal of Transgenderism, 19,* 231–245.

Zucker, K. J. (2019). Adolescents with gender dysphoria: Reflections on some contemporary clinical and research issues. *Archives of Sexual Behavior, 48,* 1983–1992.

Zucker, K. J. (2020). Debate: Different strokes for different folks. *Child and Adolescent Mental Health, 25,* 36–37.

Zucker, K. J., & Bradley, S. J. (1995). *Gender identity disorder and psychosexual problems in children and adolescents*. New York: Guilford Press.

Zucker, K. J., Bradley, S. J., Owen-Anderson, A., Kibblewhite, S. J., Wood, H., Singh, D., & Choi, K. (2012). Demographics, behavior problems, and psychosexual characteristics of adolescents with gender identity disorder or transvestic fetishism. *Journal of Sex & Marital Therapy, 38,* 151–189.

Zucker, K.J. (2018). The myth of persistence: response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender non-conforming children" by Temple Newhook et al. (2018). *International Journal of Transgenderism*. DOI: 10.1080/15532739.2018.1468293.

Zuger, B. (1984). Early effeminate behavior in boys: Outcome and significance for homosexuality. *Journal of Nervous and Mental Disease, 172,* 90–97.

## List of Appendices

**Appendix 1**

      Curriculum Vita

**Appendix 2**

      Cantor, J. M. (2020). Transgender and gender diverse children and adolescents: Fact-checking of AAP policy. *Journal of Sex & Marital Therapy, 46,* 307–313. doi: 10.1080/0092623X.2019.1698481

Li Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
David A. DeRoin (ISB no. 10404)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

*Additional counsel for Plaintiffs identified on
the following page*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| **PAM POE**, by and through her parents and next friends, Penny and Peter Poe; **PENNY POE**; **PETER POE**; **JANE DOE**, by and through her parents and next friends, Joan and John Doe; **JOAN DOE**; **JOHN DOE**, <br><br> *Plaintiffs*, <br><br> v. <br><br> **RAÚL LABRADOR**, in his official capacity as Attorney General of the State of Idaho; **JAN M. BENNETTS**, in her official capacity as County Prosecuting Attorney for Ada, Idaho; and the **INDIVIDUAL MEMBERS OF THE IDAHO CODE COMMISSION**, in their official capacities, <br><br> *Defendants*. | Case No. 1:23-cv-00269-CWD |

**EXPERT DECLARATION OF CHRISTINE BRADY, PhD**

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com
kyle.bersani@groombridgewu.com

Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Philip S. May*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com

Dina Flores-Brewer (ISB no. 6141)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
(208) 344-9750
Tel: dfloresbrewer@acluidaho.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

App.586

I, Christine Brady, PhD, hereby declare and state as follows:

1.      I am over 18 years of age and competent to testify.

2.      I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.  The opinions expressed herein are my own and do not necessarily express the views or opinions of my employer.

3.      I have actual knowledge of the matters stated herein.  If called to testify in this matter, I would testify truthfully and based on my expert opinions.

4.      In preparing this declaration, I reviewed Idaho State Legislature House Bill 71 (hereafter "Ban").  My opinions contained in this declaration are based on my training as a psychologist; my clinical experience as a pediatric psychologist, including my experience treating youth and young adults up to age 23 with gender dysphoria; my knowledge of peer reviewed research relevant to the treatment of gender dysphoria; my knowledge of the clinical best practice guidelines set forth by professional organizations for the treatment of gender dysphoria including the World Professional Association for Transgender Health ("WPATH") Standards of Care for the Health of Transgender and Gender Diverse People Version 8 ("SOC 8"), Endocrine Society's the Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline ("Endocrine Society Guideline"), and the American Psychological Association ("APA") Guidelines for Psychological Practice With Transgender and Gender Nonconforming People.

**BACKGROUND AND QUALIFICATIONS**

5.      I am a Clinical Assistant Professor in the Department of Pediatric Endocrinology and Diabetes, and (by courtesy) Psychiatry and Behavioral Sciences at Stanford University School of Medicine.  I am the full-time psychologist at the Pediatric and Adolescent Gender

1

Clinic at Stanford Medicine Children's Health.  I provide direct therapeutic service to patients

(average of 350 families per year), clinical supervision/training to the psychology graduate

program and psychiatry fellowship program, and lectures on gender affirming care to psychology

students, residents, and fellows and psychiatry fellows.  I also conduct research on cultural

considerations related to Asian American Native Hawaii Pacific Islander (AANHPI) gender

diverse youth.

6.      I received my Bachelor of Science and Master of Arts in Psychology from James

Madison University, Harrisonburg, VA.  I completed my Ph.D. in Clinical Psychology at Ohio

University, Athens, OH in 2014.  I completed a year-long Pre-Doctoral Internship at the

University of Washington/Seattle Children's Hospital as well as a year-long Post-Doctoral

Fellowship at the University of Louisville/Norton Children's Hospital.

7.      In 2015, I co-founded and was Co-Director of the Gender Clinic at Hennepin

Healthcare in Minneapolis, MN.  After a year in Minnesota, I became Co-Director of the

Pediatric Gender Clinic at the University of Louisville and was there for three years before

coming to Stanford, where I have been working for almost three years.  In the eight years I have

been working with individuals with gender dysphoria, I have treated over 1,000 youth and

families.  Currently, 100 percent of my clinical practice are transgender youth.  In previous

positions, I provided therapy to a wide range of presenting problems including ADHD,

depression, anxiety, trauma, and coping with medical illness such as cancer. Thus, I have

extensive experience and strong therapeutic skills in working with patients with gender

dysphoria as well as other common diagnoses in adolescents and young adults.

8.      I am a licensed psychologist in the state of California.

9.      I have been a member of WPATH since 2017.

2

App.588

10.     Further information about my professional background and experience is outlined in my curriculum vitae, a true and accurate copy of which is attached as **Exhibit A** to this report.

11.     I am being compensated at an hourly rate of $250 per hour for preparation of expert declarations and reports, and $400 per hour for time spent preparing for or giving deposition or trial testimony.  My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

## EXPERT OPINIONS

### A.  Gender Identity

12.     A person's sex is typically assigned at birth based upon the external genitalia observed.  A person's assigned or designated sex may or may not align with their gender identity.  Transgender or gender diverse individuals have a gender identity that does not align with their assigned sex.  Cisgender individuals have a gender identity that does align with their assigned sex.

13.     Gender identity is a person's core, internal sense of gender, such as male or female.  Every person has a gender identity.

14.     Gender identity is not a choice.  It is an essential part of one's identity and being.  Moreover, gender identity is not something that can be voluntarily changed.

15.     Efforts to try to change a person's gender identity through therapy have been shown to be ineffective and harmful.  For example, in a survey of transgender adults, those who reported receiving talk therapy aimed at changing their gender identity to match their sex assigned at birth (sometimes referred to as conversion therapy) indicated a lack of effectiveness

of that treatment, higher psychological distress, and increased odds of suicide attempts.[1]  The

survey found that conversion efforts in children under the age of 10 correlated with a 4-fold

increase in attempted suicides.[2]  Major U.S. professional medical organizations have therefore

published statements warning against the dangers of conversion therapy and their

recommendations that it should not be used with transgender individuals (e.g., American

Psychological Association, American Medical Association, and American Academy of Child and

Adolescent Psychiatry).[3]

### B. Diagnosing Gender Dysphoria

16.      Gender dysphoria is a clinical diagnosis given to an individual who is

experiencing significant symptoms and impairment of function due to the incongruence between

their assigned sex and their gender identity.  Gender dysphoria (and past iterations of gender

dysphoria) was added to the Diagnostic and Statistical Manual of Mental Disorders (DSM) in the

1980s (version 3).  The diagnosis and its criteria have changed over time to reflect the most

current research regarding the presentation of this diagnosis.

17.      The current version of the DSM (DSM-5 published in 2013 and DSM-5-TR

published in 2022) define gender dysphoria as a "marked difference between the individual's

---

[1] Jack L. Turban et al., *Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults*, 77 JAMA PSYCHIATRY 68, 69 (2019).

[2] *Id*. at 68.

[3] AMERICAN PSYCHOLOGICAL ASSOCIATION, APA RESOLUTION ON GENDER IDENTITY CHANGE EFFORTS 1-2 (2021), https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf; AMERICAN MEDICAL ASSOCIATION & GLMA: HEALTH PROFESSIONALS ADVANCING LGBTQ EQUALITY, SEXUAL ORIENTATION AND GENDER IDENTITY CHANGE EFFORTS (SO-CALLED "CONVERSION THERAPY") 4 (2022), https://www.ama-assn.org/system/files/conversion-therapy-issue-brief.pdf; American Academy of Child & Adolescent Psychiatry, *Conversion Therapy Policy Statement* (Feb. 2018), https://www.aacap.org/AACAP/Policy_Statements/2018/Conversion_Therapy.aspx.

expressed/experienced gender and the gender others would assign him or her."  Symptoms must be present for at least six months, be verbalized externally, and be causing significant impairment in various domains of functioning such as peer relationships, school, or home life.  There are different diagnostic criteria for children than there are for adolescents and adults.

18.  For pre-pubertal children, DSM-5 diagnostic criteria are as follows:

A.  A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months duration, as manifested by at least six of the following (one of which must be Criterion A1):

1.  A strong desire to be of the other gender or insistence that one is the other gender (or some alternative gender different from one's assigned gender).

2.  In boys (assigned gender), a strong preference for cross-dressing or simulating female attire, or in girls (assigned gender), a strong preference for wearing only typical masculine clothing and a strong resistance to the wearing of typical feminine clothing.

3.  A strong preference for cross-gender roles in make-believe play or fantasy play.

4.  A strong preference for the toys, games, or activities stereotypically used or engaged in by the other gender.

5.  A strong preference for playmates of the other gender.

6.  In boys (assigned gender), a strong rejection of typically masculine toys, games, and activities and a strong avoidance of rough-and-tumble play; or in girls (assigned gender), a strong rejection of typically feminine toys, game and activities.

7.  A strong dislike of one's sexual anatomy.

8.  A strong desire for the primary and/or secondary sex characteristics that match one's experienced gender.

B. The condition is associated with clinically significant distress or impairment in social circles, school, or other important areas of functioning.

5

App.591

19.    For adolescents and adults, DSM-5 diagnostic criteria are as follows:

A.  A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months duration, as manifested by at least two of the following:

1.  A marked incongruence between one's experienced/expressed gender and primary or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).

2.  A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

3.  A strong desire for the primary and/or secondary sex characteristics of the other gender.

4.  A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5.  A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

6.  A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B.  The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

20.    For adolescents and adults whose gender identity differs from their sex assigned at birth, it is very unlikely that they will later come to identify with their birth-assigned sex.  In my experience with over 900 transgender adolescent patients who met the criteria for gender dysphoria, only 6 have later come to identify with their sex assigned at birth (4 had not engaged in medical interventions; 2 had received puberty delaying medications, stopped those medications, and their endogenous puberty resumed; none expressed regret around their gender exploration or care).

App.592

21.     There is some research on pre-pubertal children that has been described as showing high rates of "desistance" of transgender identity among pre-pubertal children.[4] Because that research included gender-non-conforming children who did not necessarily identify as a sex different than their birth-assigned sex, it can be misleading when used to talk about desistance of transgender identity.  In other words, many of these youth did not identify as transgender, would not meet the criteria of gender dysphoria under the current DSM 5 standards, and would not be included in studies of transgender youth today.  A more recent study of pre-pubertal transgender children who had socially transitioned (mean age of 8-years-old) reports 2.5% of participants identified with their designated sex at birth five years later (mean age of 13-years-old at follow-up).[5] Moreover, there is no evidence that transgender adolescents are likely to "desist" at high rates. One study found that only 3.5% of adolescents stopped taking puberty blockers because they no longer wished to have gender affirming treatment.[6]

22.     Some patients with gender dysphoria may discontinue gender-affirming medical interventions for a variety of reasons, including having achieved their transition goals (e.g., voice deepening, facial hair growth), barriers to accessing care such as lack of insurance, or family or social pressure.  Discontinuing care should not be interpreted to mean that the patient has "detransitioned" in the sense of coming to identify with one's birth-assigned sex[7] and there are

---

[4] *See, e.g.*, Madeleine S.C. Wallien & Peggy T. Cohen-Kettenis, *Psychosexual Outcome of Gender-Dysphoric Children*, 47 J. AM. ACAD. CHILD & ADOLESCENT PSYCHIATRY 1413, 1413-23 (2008) (investigating which childhood measures of gender behavior related to "desistance").
[5] Kristina R. Olson et. al., *Gender Identity 5 Years After Social Transition*, 150 PEDIATRICS 1, 3 (2022).
[6] Tessa Brik et al., *Trajectories of Adolescents Treated with Gonadotropin-Releasing Hormone Analogues for Gender Dysphoria*, 49 ARCHIVES SEXUAL BEHAV. 2611, 2615 (2020).
[7] Jack L. Turban et al., *Factors Leading to "Detransition" Among Transgender and Gender Diverse People in the United States: A Mixed-Methods Analysis*, 8 LGBT HEALTH 273, 273-80 (2021).

7

no studies that have found that such an experience is common among those who receive gender affirming medical care.

### C. The Treatment of Gender Dysphoria

23.     Being transgender or gender diverse alone is not pathological; a person's gender identity is not a medical condition or the target of treatment.  DSM-5 states that treatments for the diagnosis of gender dysphoria should be focused on alleviating the distress/impairment of function stemming from the incongruence between the patient's gender identity and birth-assigned sex, not trying to change the patient's gender identity.

24.     Gender dysphoria can be debilitating and cause significant impairment in function.  It is well recognized that transgender adolescents and young adults are a vulnerable population at higher risk for depression/anxiety, suicidal ideation and suicide attempts.  The Youth Risk and Behavior Survey (YRBS) is an ongoing study conducted by the Center for Disease Control that obtains data on variables relevant to adolescents in the United States.  Data from states that ask about and can analyze variables related to gender identity found that adolescents who are gender diverse, when compared to cisgender peers, had higher rates of consideration of suicide (45% vs 10-20%) and attempted suicide (35% vs. less than 10%).[8]

25.     Without treatment, adolescents and young adults with gender dysphoria can experience symptoms that make very basic tasks feel impossible such as showering, eating, attending school, or socializing.  Clinically, many of my patients report not participating in class due to discomfort with their voice, avoiding the use of bathrooms throughout the school day,

---

[8] Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students–19 States and Large Urban School Districts, 2017*, MORBIDITY & MORTALITY WKLY. REP., Jan. 25, 2019, at 67, 69.

8

App.594

avoiding physical activity due to body discomfort, as well as discomfort leaving the house in general. Delays in treatment can exacerbate symptoms, creating more impairment and psychological distress. A recent study of adults showed that longer wait times to establish care at a gender clinic resulted in low mood, worsening suicidal ideation and poorer quality of life.[9]

26.     The World Professional Association for Transgender Health (WPATH) Standards of Care for the Health of Transgender and Gender Diverse People are the most widely adopted clinical practice guidelines for the treatment of transgender and gender diverse individuals. The Standards of Care (SOC) were first published in 1979 and the most recent iteration (SOC 8) was published in 2022.[10] Per the methodology described by WPATH "SOC-8 is based on the best available science and expert professional consensus in transgender health. International professionals and stakeholders were selected to serve on the SOC-8 committee. Recommendation statements were developed based on data derived from independent systematic literature reviews, where available, background reviews and expert opinions."[11] SOC 8 provides detailed guidance for evaluation of gender dysphoria and criteria for medical intervention, as well as procedures for hormone treatment and surgery when indicated.[12]

27.     The Endocrine Society has also published a widely adopted clinical practice guideline for the treatment of gender dysphoria (Endocrine Society Guideline) to help guide

---

[9] N. Henderson et al., *The Impact of Gender Identity Clinic Waiting Times on the Mental Health of Transitioning Individuals*, 65 EUR. PSYCHIATRY S851 (2022)
[10] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 INT'L J. TRANSGENDER HEALTH S1 (2022).
[11] *Id.* at S3.
[12] *Id.*

App.595

providers working with gender diverse adolescents and adults.[13]  The SOC 8 and Endocrine

Society Guideline have a high degree of overlap and consensus regarding best practices.

28.     The American Psychological Association (APA) also released guidelines specific

to the provision of mental health care to gender diverse individuals.[14] The APA defines gender

affirming care to be "care that is respectful, aware, and supportive of the identities and life

experiences of [transgender and gender non-conforming] people."[15] Gender affirming care is

creating a safe, therapeutic space where individuals can grow, evolve and understand themselves

more completely, wherever their path may lead.

29.     As stated above, these guidelines are widely accepted in the professional

community.  They have analyzed all available scientific research, and are widely referenced and

endorsed by all major U.S. medical and mental health associations.

30.     The SOC 8 and Endocrine Society Guideline described above emphasize the

importance of mental health assessments and evaluations in the treatment of gender diverse

adolescents.  Beyond assessing eligibility criteria for medical interventions (puberty-delay,

hormones, or surgery), which will be discussed below, mental health providers can facilitate

exploration and deepen understanding of an individual's gender, help manage anxiety/depression

or other mental health diagnoses related to gender dysphoria, provide support related to social

transition (e.g. dressing and using names and pronouns that accord with one's gender identity),

provide education to caregivers to increase support and positive communication, and enhance

---

[13] Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869 (2017).

[14] American Psychological Association, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, AM. PSYCH. 832 (2015).

[15] *Id.* at 832-33.

coping skills to manage discrimination/minority stress.  For some, non-medical interventions such as social transition, creating gender congruent expression, and getting social support of their identity is sufficient to manage gender dysphoria.  For many others, medical intervention is clinically indicated.

31.     Under the WPATH SOC 8 and the Endocrine Society Guideline, no medical interventions are recommended or indicated for the treatment of gender dysphoria prior to the onset of puberty (otherwise referred to as Tanner Stage 2).  Prior to Tanner Stage 2, the recommended care is to help youth in their gender exploration, and provide support to youth and families as described above.

32.     Once puberty begins, many adolescents with gender dysphoria will experience great distress related to the changes in their bodies that do not match their gender identity.  For some of these youth, medical interventions may be deemed necessary.  They may include puberty blockers (GnRH agonists) to pause puberty, hormone therapy in accordance with one's gender identity (e.g. testosterone for transgender boys and estrogen and anti-androgens for transgender girls), and sometimes surgery. Pausing puberty with blockers can help prevent the distress associated with physical changes inconsistent with an adolescent's gender identity and also provide the adolescent more time to understand their gender identity before considering less reversible treatments. Hormone therapy and surgery can alleviate the distress of gender dysphoria by helping align the adolescent's body with their gender identity.

33.     The WPATH SOC and the Endocrine Society Guideline outline criteria for eligibility for medical interventions for adolescents with gender dysphoria including a) significant duration of gender incongruity, b) the diagnostic criteria for gender dysphoria are met, c) the adolescent has the emotional and cognitive capacity to provide informed consent

regarding the treatment they are seeking; d) any other mental health conditions do not interfere with diagnostic clarity or ability to consent and e) the patient and their family is fully informed of potential risks and fertility preservation options.

34.     To determine if the eligibility criteria are met and if medical interventions are appropriate for an adolescent patient, the SOC 8 and Endocrine Society Guideline recommend a comprehensive psychosocial assessment.  Assessment procedures can vary based on the practice setting, discipline of the provider conducting the assessment, presence of neurodiversity, or other individual patient considerations/needs.

35.     During the assessment, a thorough history and diagnosis of gender dysphoria (evolution of identity, onset of symptoms, types of symptoms experienced, disclosure of identity, impairment experienced) is obtained.  It is important to understand fully how identity has developed over time and how their gender dysphoria manifests. Some patients who are evaluated do not meet the criteria for gender dysphoria (either due to symptom length or lack of symptoms), in which case a treatment plan may include non-medical support and intervention to address symptoms/distress.

36.     Evaluation of co-occurring mental health disorders is also obtained.  If other conditions are present, it is important to understand how/if other diagnoses are related to gender dysphoria and ensure that other mental health needs are getting adequate support and are addressed.  Further assessment or testing may be needed to fully understand more complex presentations (e.g., challenging psychopathology, co-occurring neurodiversity) prior to initiating medical intervention.  The presence of co-occurring disorders does not preclude eligibility for medical intervention.  Gender dysphoria can contribute to symptoms of depression, anxiety, eating disorder, etc., thus we often cannot expect symptoms to improve or be in remission until

the gender dysphoria is treated.  Any co-occurring mental health issue should be managed enough so that it is not interfering in the diagnostic picture or impairing one's judgment or ability to make informed decisions.  In some cases, further testing or therapy may be needed to address this criterion prior to recommending medical intervention.

37.     The assessment should also include an evaluation of an adolescent's ability to understand the potential risks, benefits, and long-term consequences of treatment.  Treatment options should be discussed thoroughly, including changes (both reversible and permanent), timeline for when changes occur, realistic expectations of physical changes, medical risks and side effects, and potential implications for fertility and fertility preservation options.  As with all medicine, information should be presented in a developmentally appropriate manner to both the adolescent and caregivers.  Information should be presented using the current evidence available. Once an adolescent has been provided all the information necessary to make an informed choice, if they want to proceed with the treatment, they must provide assent and their parent or guardian must provide consent.

### D.  Efficacy of Medical Treatment for Gender Dysphoria

38.     In the years that I have been seeing patients with gender dysphoria, I have clinically seen the life-changing—and sometimes life-saving—benefits of gender-affirming medical interventions.  Not only do I see improvements in depression, anxiety, and suicidal ideation, but I have seen significant improvements in overall daily functioning in adolescents after receiving gender-affirming medical care.  Adolescents who were previously too anxious to attend school in person are now going to school and thriving academically.  They are now able to make friends, date, and work, and do so with confidence.  Caregivers have often commented on

the weight that has been lifted from their child or how happy they are to see their child thriving again.

39.     Research conducted in this area echoes what I have seen clinically.  A substantial body of evidence shows the efficacy of gender affirming medical care.  Studies have demonstrated improvements in mental health following gender-affirming medical interventions.[16]  Many of these studies demonstrate improvement in depression and anxiety symptoms, quality of life indicators, as well as reductions in suicidal ideation and attempts.

40.     Moreover, as I have seen in my experience as a clinician the use of hormone blockers and cross-sex hormone therapy during adolescence can prevent the need for future medical treatments (such as surgeries to remove or alter secondary sex characteristics) and allow for more favorable future outcomes.  This, in turn, reduces the gender dysphoria associated with one's body failing to align with one's gender identity.

41.     There are no scientific studies demonstrating that non-medical treatments alone (such as therapy only) are effective in the treatment of gender dysphoria.

---

[16] *See e.g.*, Diane Chen et al., *Psychological Functioning in Transgender Youth After 2 Years of Hormones*, 388 NEW ENG. J. MED. 240, 245-247 (2023) (demonstrating increased mental health benefits from gender affirming care for transgender people); Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. ADOLESCENT HEALTH 643, 647-48 (2022) (same); Jack L. Turban et al., *Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation*, 145 PEDIATRICS 1, 3 (2020) (same); Annelou L.C. de Vries et al., *Puberty Suppression in Adolescents with Gender Identity Disorder: A Prospective Follow-Up Study*, 8 J. SEXUAL MED. 2276, 2281-90 (2011) (same); Rosalia Costa et al., *Psychological Support, Puberty Suppression, and Psychosocial Functioning in Adolescents with Gender Dysphoria*, 12 J. SEXUAL MED. 2206, 2212-13 (2015) (same); Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 PEDIATRICS 696, 701-03 (2014) (same).

**E.  Harm to Transgender Youth if Care is Restricted**

42.     Withholding or discontinuing widely accepted, effective medical care from adolescents with gender dysphoria will cause serious harm.  Having seen the significant distress and limitations on function experienced by adolescent patients with gender dysphoria, and the transformative effects of gender affirming medical treatments, the thought of withholding this care from those who need it is deeply concerning.  Doing so will predictably result in adolescents unnecessarily suffering distress, withdrawing from life activities and, for some, hurting themselves.  It will deny many adolescents with gender dysphoria the opportunity to be healthy and thrive.  In a large survey of transgender adolescents and young adults, those who had access to medical interventions reported lower depression and suicidal ideation compared to adolescents and young adults who sought medical interventions but were not receiving them.[17]  Restricting access will increase depression and suicidal ideation within an already vulnerable population.

43.     For youth entering puberty, access to puberty blockers prior to the onset of irreversible secondary sex characteristics (e.g., deep voice, chest development) bypasses much of the dysphoria, distress and psychological harm that going through misaligned puberty can cause, as well as prevent more invasive and costly procedures in adolescence and adulthood such as surgery.

44.     Clinically, I have had cases where patients are not able to receive gender affirming medical care for various reasons and are forced to wait until they turn 18.  While waiting, there is often increased psychological distress impairing their daily life and functioning.  For example, individuals may become so dysphoric with their bodies that they are not able to

---

[17] Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy With Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. ADOLESCENT HEALTH 643, 647-48 (2022).

15

leave the house to attend school, participate in extra-curricular activities, or continue working or obtain employment. Those who are forced to wait can decompensate. I have had several cases where depression related to gender dysphoria increased to such a degree that inpatient hospitalization was needed for stabilization following significant self-harm, suicidal ideation or a suicide attempt. In some cases, adolescent patients become desperate and have explored or obtained hormones online or from other countries. Doing so without appropriate dosing and monitoring places them at risk for physical harm.

45.    Our clinic has recently had around ten families come to us from other states where bans on gender-affirming medical care for minors have been enacted. With some families, they come to us every 3-6 months for follow-up. This places significant financial strain on families as well as disrupts daily life every 3-6 months. Some families have made the difficult decision to move to California, leaving a state that they loved and leaving their support systems behind in order to care for their child.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 7/19/2023

Christine Brady, PhD

16

App.602

# Exhibit A

Curriculum Vitae
**Christine Erin Lam Brady, PhD**
bradyce@stanford.edu
California License # PSY31431
Updated 01/19/2023

## A. IDENTIFYING DATA

| | |
|---|---|
| **Name** | **Christine Erin Lam Brady, PhD** |
| **Current Position** | **Clinical Assistant Professor** |
| | **Psychologist Gender Clinic** |
| **Current Affiliation** | **Stanford University** |

## II.  EDUCATIONAL BACKGROUND

**Colleges and Universities Attended**

2009 - 2014    Ph.D.
Child Clinical Psychology, Ohio University, Athens, OH
Dissertation: *Adolescent Social Functioning: Theory, Measure Development and Preliminary Validation.*
Advisor:  Dr. Steven W. Evans

2007- 2009    M.A.
Psychological Sciences, Clinical, James Madison University, Harrisonburg, VA
Thesis: *Psychometric properties of the Alabama Parenting Questionnaire Using an Adolescent Sample*

2001- 2005    B.S.
Psychology, minor in English, James Madison University, Harrisonburg, VA
Previously attended Mary Washington College August 2001-May 2002

**Residency and Fellowship Training**

2014 – 2015    Post-Doctoral Fellowship Pediatric Psychology, Consultation Liaison
University of Louisville, Norton      Children's Hospital

2013 – 2014    Pre-Doctoral Internship, Child Track
University of Washington School of Medicine,        Seattle Children's Hospital

**Board Certifications**

2019 - present  California Board of Psychology – Licensed Psychologist (# 31431)

Previously licensed in Minnesota and Kentucky (expired)

App.604

## III.  EMPLOYMENT

**Academic Appointments:**

2020 – present    Clinical Assistant Professor, Stanford University, Palo Alto, CA
                  Psychologist, Pediatric and Adolescent Gender Clinic


2016 – 2019       Assistant Professor, University of Louisville School of Medicine, Louisville, KY
                  Pediatric Psychologist, Bingham Clinic
                  Director Pediatric Consultation Liaison Service, Norton Children's Hospital
                  Co-Director, Pediatric Gender Clinic

**Other Appointments:**

2019 – 2020       Gender Specialist, Gender Case Manager, and Child Psychologist
                  Kaiser Permanente Santa Clara, CA

2015 – 2016       Senior Clinical Pediatric Psychologist
                  Hennepin County Medical Center, Minneapolis, MN

## IV.  HONORS AND AWARDS

2020        1st Place Poster Award Diversity Special Interest Group APA Division 54
2017        Building Block Award for Psychology, Excellence in Teaching

## V.  BIBLIOGRAPHY

**Peer-Reviewed Original Research (6 total)**

1.  Carter, B., Kronenberger, W., Cruce, S., Mizell, D., Threlkeld, B., **Brady, C. E.*,** & Jones, L. (2015).  Factors associated with dropout versus completion of a manualized treatment for pediatric chronic pain.  *Clinical Practice in Pediatric Psychology*, 3, 327-339.

2.  Zoromski, A. K., Owens, J. S., Evans, S. W., **Brady, C. E***. (2015). Identifying ADHD symptoms that best predict disorder-related impairment in early, middle, and late childhood. *Journal of Abnormal Child Psychology*, 43, 1243-1255.

3.  Evans, S.W., **Brady, C.E.*,** Harrison, J.R., Bunford, N., State, T., Kern, L., & Andrews, C. (2013). Measuring ADHD Symptoms and Impairment Based on High School Teachers' Ratings.  *Journal of Clinical Child and Adolescent Psychology,* 42, 197-207.

4. Evans, S.W., Koch, R., **Brady, C.E.\*,** Meszaros, P., & Sadler, J.M. (2013). Community and school mental health professionals' knowledge and use of evidence based substance use prevention programs. *Administration and Policy in Mental Health and Mental Health Service Research*, 40, 319-330.

5. **Brady, C.E.,** Evans, S.W., Berlin, K.S., Bunford, N., & Kern, L. (2012). Evaluating School Impairment with Adolescents: A Psychometric Evaluation of the Classroom Performance Survey. *School Psychology Review.* 41, 429-446.

6. Evans, S. W., Schultz, B., White, C. L., **Brady, C. E.\*,** Sibley, M. H., & Van Eck, K. (2009). A school-based organization intervention for young adolescents with ADHD: Patterns of responding. *School Mental Health,* 1, 78-88.

## Invited Commentaries (1 total)

1. Turban, J., **Brady, C. E.,** & Olson-Kennedy, J. (2022). Understanding and supporting patients with dynamic desires for gender-affirming medical interventions. *Journal of the American Medical Association Network Open.* doi:10.1001/jamanetworkopen.2022.24722

## Book Chapters (4 total)

1. Carter, B., Tsang, K., & **Brady, C. E.** (2020). Models of Consultation-Liaison. In B. Carter and K. Kullgren (Eds.), *Clinician Handbook of Pediatric Psychological Consultation in Medical Settings*, 11-24.

2. **Brady, C. E.** & Ernst, M. M. (2020). Gender identity: Disorders/differences of sex development/intersex and transgender concerns. In B. Carter and K. Kullgren (Eds.), *Clinician Handbook of Pediatric Psychological Consultation in Medical Settings*, 439-450.

3. Carter, B., Kronenberger, W., Scott, E., Kullgren, K., Piazza-Waggoner, C., & **Brady, C. E.** (2017). Inpatient pediatric consultation-liaison. In M. Roberts and R. Steele (Eds.), *Handbook of pediatric psychology (5th Ed.),* 105-118.

4. Evans, S.W., Sadler, J.M., & **Brady, C.E.** (2009). *Treating Children and Adolescents with ADHD in the Schools.* In A. Roberts (Ed.), Social Workers Desk Reference 2nd Edition. New York, NY: Oxford University Press.

## Books (1 total)

1. Carter, B., Kronenberger, W., Scott, E., & **Brady, C. E.** (2020). *Children's Health and Illness Recovery Program: Clinician's Handbook.* Oxford, England: Oxford University Press, Programs that Work Series.

## Abstracts (39 total)

App.606

1. Aye, T., **Brady, C. E.,** & Orr, A. (July 2022). Multidisciplinary Lessons Learned from the Care of Transgender and Gender Expansive AAPI Youth and Adolescents. Symposium presented at Gender Spectrum 2022 Professional Symposium (virtual conference).

2. Aye, T., **Brady, C. E.,** & Orr, A. (Nov 2021). Multidisciplinary Lessons Learned from the Care of Transgender and Gender Expansive AAPI Youth and Adolescents. Mini Symposium presented at the US Professional Association for Transgender Health (virtual conference).

3. **Brady, C.E.,** & Aye, T. (July 2021). Supporting Gender Diverse Youth with Medical Conditions. Workshop presented at the Gender Spectrum Professional Symposium (virtual conference).

4. Bazier, A., Anastasiadis, W., Gilbert, E., **Brady, C.,** Schwartzkopf, K., & Naramore, S. (April 2021). Optimizing Equity of Healthcare for Transgender Youth within a Pediatric Gastroenterology Subspecialty Clinic. Poster presented at the 51st annual Society of Pediatric Psychology Conference (virtual conference).

5. **Brady, C. E.,** Gilbert, E., & Kellison, J. (April, 2019). *Health Disparities in Pediatric Populations: Recommendations for Sensitive and Inclusive Care.* Professional development workshop given at the 50th annual Society for Pediatric Psychology Annual in New Orleans, LA.

6. Carter, B. D. & **Brady, C. E.** (July, 2015). *Innovations in the Treatment of Children and Adolescents with Chronic Pain and Medically Unexplained Conditions.* Talk given at the annual meeting of the Indiana Psychological Association, Evansville, IN.

7. **Brady, C. E.,** Evans, S. W., Bunford, N., & Weist, M. (February, 2013). *Measuring school impairment in secondary schools.* Paper presentation given at the annual meeting of the National Association of School Psychologists, Seattle, WA.

8. Zoromski, A. K., Evans, S. W., Owens, J. S., & **Brady, C. E.** (February 2013). *Relationship between ADHD symptoms and impairment across three age ranges.* Paper presented at the National Association of School Psychologists 2013 Annual Convention, Seattle, Washington.

9. Zoromski, A. K., **Brady, C. E**., & Evans, S. W. (November, 2012). Poster presented at the 46th annual meeting of the Association for Behavioral and Cognitive Therapies, National Harbor, MD.

10. Evans, S. W., **Brady, C. E.,** Harrison, J.R., Bunford, N., State, T., & Kern, L. (November, 2011). *Measuring ADHD symptoms and impairment in adolescence.* Paper presented at the 45th annual meeting of the Association for Behavioral and Cognitive Therapies, Toronto, Canada.

11. Zoromski, A. K., **Brady, C. E.**, & Evans, S.W. (November, 2011).  *ADHD Symptoms in Adolescence: Which are most predictive of impairment?* Poster presented at the 45th annual meeting of the Association for Behavioral and Cognitive Therapies, Toronto, Canada.

12. Sadler, J.M., **Brady, C. E.**, & Evans, S. W. (September, 2011). *Interpersonal Skills Group: A social functioning intervention for adolescents with ADHD.* Talk presented at the annual meeting of the Center for School Mental Health, Charleston, SC.

13. Davis, H. I., **Brady, C. E.**, & Evans, S. W. (August 2011).  *Rates of Assignment Completion in High School Students Meeting Symptom Criteria for a Disruptive Behavior Disorder.* Poster presented at the 119th American Psychological Association Conference, Washington, D.C.

14. **Brady, C. E**. & Evans, S. W. (February, 2011). Measuring parenting practices: Implications for school mental health. In J. S. Owens (Chair), *Impact of family factors on school-based assessment and treatment.* Symposium presented at the annual meeting of the National Association of School Psychologists, San Francisco, CA.

15. Evans, S. W., Schultz, B. K., Sadler, J. M., **Brady, C. E.**, & Demars, C. (November, 2010). *Psychosocial and educational school based interventions for high school students with ADHD.* In S. W. Evans (Chair), *Providing evidence-based interventions in secondary schools.* Symposium presented at the 44th annual meeting of the Association for Behavioral and Cognitive Therapies, San Francisco, CA.

16. Zoromski, A. K., Sadler, J. M., **Brady, C. E.**, Schultz, B. K., & Evans, S. W. (November, 2010).  *An organization intervention for high school students with Attention Deficit Hyperactivity Disorder.*  Poster presented at the 44th annual meeting of the Association for Behavioral and Cognitive Therapies, San Francisco, CA.

17. Evans, S. W., Owens, J. S., Sadler, J. M., **Brady, C. E.**, Storer, J., Zoromski, A. (October, 2010).  *Evidence-based Interventions for Helping Children & Adolescents with ADHD.* Intensive Training Session presented at the 15th annual conference on Advancing School Mental Health, Albuquerque, NM.

18. **Brady, C. E**., Sadler, J. M., Zoromski, A. K., & Evans, S.W. (October, 2010). *Youth with ADHD and Sports Participation: A Preliminary Investigation.* Poster presented at the 15th annual conference on Advancing School Mental Health, Albuquerque, NM.

19. Evans, S. W., Cloth, A., **Brady, C. E**., & Sadler, J. M. (August, 2010). *Overcoming Obstacles to Implementing Evidence Based Mental Health Practices in Secondary Schools.* In C. Paternite (Chair), *Development of Effective Interventions for Adolescents with ED.* Symposium presented at the 118th annual conference of the American Psychological Association, San Diego, CA.

20. Evans, S. W., **Brady, C. E.**, Kern, L., Andrews, C. & CARS Research Team. (June 2010). Measurement development and inclusion criteria: Developing meaningful standards. In J. Buckley (Chair), *It's Time to Stem the Tide of Failure: Building Interventions to Support High School Students with Emotional and Behavioral Disorders*. Symposium presented at 5th Annual IES Research Conference, Washington D.C.

21. Evans, S. W., **Brady, C. E.**, Sadler, J. & Schultz, B. (November, 2009). The relationship between improvement in symptoms and functioning for young adolescents with ADHD. In J.S. Owens (Chair), *Symptoms and Beyond: The Importance of Assessing Treatment-Related Changes in Functioning in Youth and Parents with ADHD*. Symposium presented at the 43rd annual meeting of the Association for Behavioral and Cognitive Therapies, New York, New York.

22. Koch, R. J., Meszaros, P. S., Evans, S. W., Meyer, B. L., **Brady, C. E**.,  Duncan Lane, C. L, Mays, S.A., & Sadler, J. M. (November 2009).  *An evidence-based substance abuse preventive intervention for youth with psychiatric disorders: Initial results.*  Presentation given at the American Public Health Association Meeting and Expo, Philadelphia, PA.

23. **Brady, C. E.,** Sadler, J., Sibley, M., Zoromski, A., & Evans, S. (November 2009). *Peer characteristics preferred by youth with and without ADHD.*  Poster presented at the 43rd annual meeting of the Association for Behavioral and Cognitive Therapies, New York, NY.

24. Sadler, J., **Brady, C. E.,** Zoromski, A., Light, C., Schultz, B., & Evans, S. (October 2009).  *Treatment of high school students with ADHD: Adolescent, parent, and teacher satisfaction.* Poster presented at the 14th annual conference on Advancing School Mental Health, Minneapolis, MN.

25. Sadler, J., **Brady, C. E.,** Zoromski, A., & Evans, S. (October 2009).  *Does mastery of goal effect outcomes in a psychosocial intervention?* Poster presented at the 14th annual conference on Advancing School Mental Health, Minneapolis, MN.

26. Eid, R. K., Hawkins, M. E., Davis, H. I., Redford, E. S., Ross, J. M., Sadler, J. M., **Brady, C. E**., & Evans, S. W. (August 2009). *Parental Perspective on ADHD: Household Issues that Predict Strain & Conflict.*  Poster presented at the American Psychological Association Conference, Toronto, ON Canada.

27. **Brady, C. E.,** Sadler, J. M., Evans, S. W., Koch, J. R., Lane, C., Mays, S., Meszaros, P., & Meyer, B. (April 2009). *The Effectiveness of SFP for Youth with Psychiatric Disorders*. Poster presented at the Virginia Forum on Youth Tobacco Use: Translating Research into Policy and Practice Conference, Richmond, VA.

28. Serpell, Z. N., Evans, S. W., & **Brady, C. E.** (November 2008). *Preventing Youth Tobacco Use by Treating the Risk-Factor of ADHD: A Follow-up Study of Adolescents*

*with ADHD.* Symposium presented at the Virginia Youth Tobacco Project Research Coalition Meeting, Richmond, VA.

29. Sadler, J.M., Christensen, O.A., **Brady, C.E**., Sax, K., Rainear, C., & Evans, S.W. (November 2008). *The Effect of Pacing on Academic Interventions in a Six-Week Summer Treatment Program.* Poster presented at the Association for Behavioral and Cognitive Therapy Conference, Orlando, FL.

30. Sadler, J.M., **Brady, C.E.,** Neugroschel, R.A., Moore, S., Evans, S.W., Koch, J.R., & Meszaros, P.S. (September 2008). *Current Practices and Best Practices for Substance Use Prevention in Schools: Implications for Training.* Poster presented at the 13th Annual Conference on Advancing School Mental Health, Phoenix, AZ.

31. Christensen, O.A., Sadler, J.M., **Brady, C.E.,** Schultz, B.K., & Evans, S.W. (August 2008). *Teacher Satisfaction with a School-Based Treatment for Adolescents with ADHD.* Poster presented at the 116th annual American Psychological Association Conference, Boston, MA.

32. Davis, H., Sax, K., & **Brady, C.E.** (March 2008). *Parental Strain in Relation to the Characteristics of Children with ADHD.* Poster presented at the 7th annual Raising the Bar Conference, Harrisonburg, Va. and the 2008 Psychology Student Symposium, Harrisonburg, VA.

33. Chen, C., Christensen, O., Hawkins, M., **Brady, C.E**., Schultz, B., & Evans, S.W. (March 2008). *Interactive Media Games: A Fun New Treatment for ADHD?* Poster presented at the 7th annual Raising the Bar Conference, Harrisonburg, VA.

34. Neugroschel, R., Sadler, J.M., & **Brady, C.E.** (March 2008). *Factors Associated with the Implementation of Evidence Based Practices for Substance Use Prevention.* Poster presented at the 7th annual Raising the Bar Conference, Harrisonburg, VA.

35. Evans, S. W., Serpell, Z. N., Sibley, M. H., Van Eck, K., **Brady, C. E.,** Sadler, J. M., & Schultz, B. (November, 2007). Developing interventions targeting social skills for youth with ADHD. In J. Langberg (Chair), *Innovations in the Assessment and Measurement of Children and Adolescents With ADHD: Implications for Developing Effective Interventions.* Symposium conducted at the annual Association for Behavioral Cognitive Therapy Conference, Philadelphia, PA.

36. **Brady, C. E**., Sadler, J. M., Van Eck, K., & Evans, S. W. (November, 2007). *New directions in social skills interventions for youth with ADHD: Results of a pilot study.* Poster presented at the Association for Behavioral Cognitive Therapy Conference, Philadelphia, PA.

37. Van Eck, K., Christenson, O. A., **Brady, C. E.,** Sadler, J. M., Evans, S. W. (October, 2007). *Helping children with ADHD get a JumpStart on the school year.* Poster presented at the 12th Annual Conference on Advancing School Mental Health, Orlando, FL.

38. Blom, D., **Brady, C. E.,** Kremer, M. & Potts, H. (April 2005) *Virtual Pavlov 2000: Assessing Effectiveness of Computer Simulators.* Paper presented at Virginia Psychological Association, Williamsburg, VA.

39. **Brady, C. E.,** Donaghy, J. M., Tucker, K. D., Yuen, N. C., & Kerr, N. A. (April 2005) *The importance of performance feedback on self-efficacy and intrinsic motivation.* Poster presented at the Virginia Psychological Association, Williamsburg, VA.

## VI. GRANT FUNDING

None

## VII. CLINICAL TRIALS

None

## VIII. PATENTS

None

## IX. EDITORAL SERVICE

**Ad Hoc Reviewer**
2022 – present   *Journal of the American Medical Association*
2022 – present   *Perspectives on Psychological Science*
2011– 2014    *School Mental Health: A Multidisciplinary Research and Practice Journal*
2014– 2015   *Journal of Pediatric Psychology*
2014      *Pain Letter*

## X. SERVICE AS GRANT REVIEWER

None

## XI. UNIVERSITY ADMINISTRATIVE SERVICE

**CARE (Center for Asian Health Research and Education) Scholar Mentor, Stanford University** (Provide research mentorship to three scholars and one implementation science fellow on the Cultural Characteristics of Families Seeking Gender Care study)

**Supervisor Parent Mentor Program Gender Clinic, Stanford Children's Health** (The Parent Mentor program is a Family-Centered Care service. It matches parents of children who are being cared for at Lucile Packard Children's Hospital with trained, veteran

parents. In my role, I trained and now supervise the mentorship activities of two parent mentors) (2022 – present)

**eQuality Steering Committee** (a University of Louisville School of Medicine project aimed at improving medical school education by infusing 200+ hours of LGBTQ+ content into the curriculum, I served as a representative from pediatrics/psychiatry) (2018 - 2019)

**Co-Director, Pediatric Gender Clinic University of Louisville** (2017 - 2019)

**Director Pediatric Consultation Liaison Service University of Louisville** (2019)

## XII. SERVICE TO PROFESSIONAL ORGANIZATIONS

Co-chair APA Division 54 Special Interest Group Consultation-Liaison (2018-2020)

American Psychological Association (APA) – Division 54 Pediatric Psychology (member) (2014 – present)

World Professional Association for Transgender Health (WPATH) (member) (2015 – present)

## XIII. INVITED PRESENTATIONS

**Ground Rounds:**

1. Brady, C. E. (August 2022). "Working with Caregivers of Gender Diverse Youth" Behavioral Health ECHO.

2. **Brady, C. E.** (December 2021). "Gender Diverse Youth" Grand Rounds El Camino Hopsital Mountain View, CA.

3. **Brady, C. E.,** & Aye, T. (August 2021). "Supporting LGBTQ+ Youth." Webinar Stanford Corporate Partners Palo Alto, CA.

4. **Brady, C. E.** (July 2021). "Gender 101: A crash course on terminology, current research and affirmative care." Grand Rounds Dominican Hospital, Santa Cruz, CA.

5. **Brady, C. E.** (April 2021). "Gender 101: A crash course on terminology, current research and affirmative care." Invited Educational Seminar Bayside Medical Group, Berkley, CA.

6. **Brady, C. E.** (November, 2017). "Mental health issues and the LGBT community across the lifespan." Psychiatry Grand Rounds of the University of Louisville School of Medicine, Louisville, KY.

App.612

**National and Regional Meetings:**

1. **Brady, C. E.** (April, 2022). *Fireside Chat: Personal Gender Journeys.* Moderated panel given as part of the Diversity, Equity and Inclusion Panel for the Stanford University Department of Pathology. Stanford, CA.

2. **Brady, C. E.** (June, 2019). *Ethical Dilemmas in Pediatric LGBTQI Care.* Ethics workshop given as part of the Kentucky Psychological Association continuing education series. Louisville, KY.

3. **Brady, C. E.** (November, 2018). *Transgender and Gender Nonconforming Youth: Current Research and Best Practices.* Presentation given at the 7th annual Pediatric Behavioral and Mental Health Symposium in Louisville, KY.

4. **Brady, C. E.,** & Kingery, S. E. (November 2018). *Complex Cases: Ethics, Diversity and Legal Issues in Transgender Care.* Presentation given at the 7th annual Pediatric Behavioral and Mental Health Symposium in Louisville, KY.

5. **Brady, C. E.** (February, 2018). *Transgender and Gender Creative Youth: Mental Health and Evidence-Based Treatments.* Invited talk given at the LGBT Healthcare Summit sponsored by Humana, Louisville, KY.

**Lectures:**

> **Psychology internship seminar, CAP2 lectures, psychology fellow seminar, San Mateo Psychiatry Residency Program lecture series,**

## IX. TRAINEES

**Psychiatry Fellows:**

**Janet Baek, MD,** 2022 – present, Child and Adolescent Psychiatry Fellow
**Jack Turban III, MD,** 2021-2022, Child and Adolescent Psychiatry Fellow

**Psychology Practicum Students:**

**Agatha Barnowski, MS,** 2022, Stanford University Psychology Graduate Program
**Samantha Sims, MS,** 2022, Stanford University Psychology Graduate Program
**Yoonhee Kim, MS,** 2021, Stanford University Psychology Graduate Program

Li Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
David A. DeRoin (ISB no. 10404)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

*Additional counsel for Plaintiffs identified on
the following page*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO
## SOUTHERN DIVISION

**PAM POE**, by and through her parents and next friends, Penny and Peter Poe; **PENNY POE**; **PETER POE**; **JANE DOE**, by and through her parents and next friends, Joan and John Doe; **JOAN DOE**; **JOHN DOE**,

*Plaintiffs*,

v.

**RAÚL LABRADOR**, in his official capacity as Attorney General of the State of Idaho; **JAN M. BENNETTS**, in her official capacity as County Prosecuting Attorney for Ada, Idaho; and the **INDIVIDUAL MEMBERS OF THE IDAHO CODE COMMISSION**, in their official capacities,

*Defendants*.

Case No. 1:23-cv-00269-CWD

## EXPERT DECLARATION OF KARA CONNELLY, MD

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
Groombridge, Wu, Baughman and
Stone LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com
kyle.bersani@groombridgewu.com

Philip S. May*
Groombridge, Wu, Baughman and
Stone LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel:  (202) 505-5830
philip.may@groombridgewu.com

*Admitted *pro hac vice*

Jordan Orosz*
Paul, Weiss, Rifkind, Wharton
& Garrison LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel:  (202) 223-7300
jorosz@paulweiss.com

Dina Flores-Brewer (ISB no. 6141)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID  83701
(208) 344-9750
dfloresbrewer@acluidaho.org

*Attorneys for Plaintiffs*

I, Kara Connelly, MD, hereby declare and state as follows:

1.     I am over 18 years of age and competent to testify.

2.     I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

3.     I have actual knowledge of the matters stated herein.  If called to testify in this matter, I would testify truthfully and based on my expert opinions.

4.     In preparing this declaration, I reviewed Idaho State Legislature House Bill 71 (hereinafter, "Ban").  My opinions contained in this declaration are based on my training as a pediatric endocrinologist; my clinical experience as a pediatric endocrinologist, including my experience treating youth and young adults with hormonal therapies for a variety of conditions, including gender dysphoria; my knowledge of peer-reviewed research relevant to the treatment of gender dysphoria and other medical conditions for which hormonal therapies are provided; and my knowledge of the clinical practice guidelines for the treatment of gender dysphoria set forth by professional organizations including the World Professional Association for Transgender Health ("WPATH") and the Endocrine Society, as well as clinical practice guidelines for the treatment of a wide range of conditions within the field of endocrinology.

5.     I am being compensated at a rate of $350 per hour for the time I spend on this case.  My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

6.     In the past four years, I have not given expert testimony at trial or deposition in any cases.

I.    **BACKGROUND AND QUALIFICATIONS**

7.    I received my medical doctor degree from the University of Texas Health Science Center at San Antonio in 2007.  I completed my residency in pediatrics and fellowship in pediatric endocrinology at Oregon Health and Science University ("OHSU").

8.    Since completing my fellowship in 2013, I have been a pediatric endocrinologist at OHSU, holding faculty appointments in the Division of Pediatric Endocrinology in the Department of Pediatrics (I am currently an Associate Professor of Pediatrics) and serving as an attending physician in Doernbecher Children's Hospital at OHSU.  I am currently the medical director of the Doernbecher Gender Clinic and co-founder of the Doernbecher Sexual Development Program.

9.    I have extensive experience treating a variety of endocrine conditions in children and adolescents and special expertise in treating youth with differences in sex differentiation as well as youth with gender dysphoria.  I have attended specialized training sessions on these topics and routinely review the literature to remain knowledgeable of and familiar with all emerging research.

10.    I have been providing medical care for youth with gender dysphoria since 2014. In 2015, I founded the Doernbecher Gender Clinic, which has grown over the years to an interdisciplinary team providing comprehensive medical and mental health care for youth with gender dysphoria and their families.  In 2022, our team cared for 993 youth and their families.  I have personally delivered care to over 700 patients with gender dysphoria.

11.    I have been providing medical care for children and adolescents with intersex traits since 2010.  In 2016, I co-founded the Doernbecher Sexual Development program.  I have personally cared for nearly 100 intersex youth through this program.

12.     I have published research on a variety of pediatric endocrine issues, including the treatment of gender dysphoria, in peer-reviewed scholarly journals.  I also serve as a reviewer for scholarly journals in my field.

13.     I am an active member of the Oregon Pediatric Society, American Academy of Pediatrics, Pediatric Endocrine Society, World Professional Association of Transgender Health (WPATH), and the United States Association of Transgender Health.  I've also served as a faculty member for WPATH's General Education Initiative and have been an invited speaker on gender-affirming care for the Pediatric Endocrine Society.  I have given numerous lectures on the treatment of gender dysphoria and other endocrine issues at meetings of medical professional associations.

14.     Further information about my professional background and experience is outlined in my curriculum vitae, a true and accurate copy of which is attached as **Exhibit A** to this declaration.

## II.     TREATMENT PROTOCOLS FOR GENDER DYSPHORIA

15.     The Endocrine Society, in partnership with the Pediatric Endocrine Society, and WPATH have published clinical practice guidelines for the treatment of gender dysphoria that are based on systematic reviews of research and the expert opinions of clinicians in the field.  The first version of the WPATH guidelines, known as the Standards of Care, was published in 1979, and the most recent version—version 8—was released in 2022.[1]  The first clinical practice

---

[1]  Coleman, E., et al. (2022).  Standards of Care for Health of Transgender and Gender Diverse People, Version 8. *Int J Transgender Health*. 23:S1–S258.  *Available at* https://doi.org/10.1080/26895269.2022.2100644 (hereinafter, "WPATH guideline").

3

**App.618**

guideline for the treatment of gender dysphoria issued by the Endocrine Society was published in

2009, and the most recent update was released in 2017.[2]

16.     Like other clinical practice guidelines issued by the Endocrine Society and other

professional medical organizations regarding the treatment of other medical conditions, the

WPATH and Endocrine Society guidelines on the treatment of gender dysphoria provide

recommendations to healthcare providers about how to approach treatment of a condition based

on the best available evidence.

17.     Under the WPATH and Endocrine Society guidelines, prior to onset of puberty,

there are no medical interventions that are indicated or recommended for children with gender

dysphoria.

18.     For adolescents—youth who have started puberty—and adults, medical

interventions may be appropriate to treat gender dysphoria depending on the patient's individual

needs.  These interventions may include medication to delay puberty, hormone therapy (e.g.,

testosterone for transgender boys and testosterone suppression and estrogen for transgender

girls), and surgeries.  These interventions are often collectively referred to as gender-affirming

medical care.

19.     The WPATH and Endocrine Society guidelines on the treatment of gender

dysphoria are recognized as authoritative by the major medical and mental health professional

organizations in the United States, including the American Academy of Pediatrics, the American

Medical Association, the American Psychiatric Association, the American Psychological

Association, the American Academy of Child & Adolescent Psychiatry, the American Academy

---

[2] Hembree, W.C., et al. (2017). Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent
Persons: An Endocrine Society Clinical Practice Guideline. *JCEM*. 102(11):3869–3903.
*Available at* https://doi.org/10.1210/jc.2017-01658 (hereinafter, "Endocrine Society Guideline").

4

of Family Physicians, and the American College of Obstetricians and Gynecologists. These organizations all support the provision of gender-affirming medical care to adolescent patients with gender dysphoria when indicated.[3]

20. Gender-affirming medical care is provided to adolescents with gender dysphoria in many other countries. While some European national health authorities have issued guidelines recommending caution about providing such care, or providing that such care should occur in clinical research settings, care is provided when deemed appropriate for adolescents.

21. Gonadotropin releasing hormone agonists (GnRHa) can be used to suppress puberty and delay the development of secondary sex characteristics that are not in alignment with the individual's gender identity. These medications have been used successfully to delay pubertal changes in youth with central precocious puberty. If treatment is stopped, endogenous puberty resumes.

22. Under the Endocrine Society Guideline, adolescents with gender dysphoria may be eligible for pubertal suppression if they meet the following criteria:

1. A qualified mental health professional has confirmed that:

    a. the adolescent has demonstrated a long-standing pattern of gender nonconformity, gender incongruence or gender dysphoria (whether suppressed or expressed),

    b. gender dysphoria worsened with the onset of puberty,

---

[3] In contrast with the broad support of the medical community for gender-affirming medical care for adolescents with gender dysphoria, cosmetic genital surgeries on infants with intersex traits, which are permitted under the Ban, are highly controversial and many children's hospitals and major medical organizations such as the American Medical Academy have recommended that these surgeries be deferred until children are old enough to assent to these procedures. *See* Mulkey, N., Streed, C.G., & Chubak, B.M. (2021). A Call to Update Standard of Care for Children with Differences in Sex Development, AMA J Ethics. 23(7):E550–556.

5

    c.  any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment,

    d.  the adolescent has sufficient emotional capacity and maturity to give informed consent to this (reversible) treatment,

2.  And the adolescent:

    a.  has been informed of the effects and side effects of treatment (including potential loss of fertility if the individual subsequently continues with sex hormone treatment) and options to preserve fertility,

    b.  has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process,

3.  And a pediatric endocrinologist or other clinician experienced in pubertal assessment:

    a.  agrees with the indication for GnRH agonist treatment,

    b.  has confirmed that puberty has started in the adolescent, and

    c.  has confirmed that there are no medical contraindications to GnRH agonist treatment.[4]

---

[4] Endocrine Society Guideline at 3878.

6

App.621

23.     Hormone therapy—testosterone for transgender males and estrogen and anti-androgens (to suppress testosterone) for transgender females—can be used to initiate puberty consistent with a patient's gender identity.

24.     Under the Endocrine Society Guideline, adolescents may be eligible for gender-affirming hormone therapy if they meet the following criteria:

1. A qualified mental health professional has confirmed:

   a. the persistence of gender dysphoria,

   b. any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start sex hormone treatment,

   c. the adolescent has sufficient mental capacity to estimate the consequences of this (partly) irreversible treatment, weigh the benefits and risks, and give informed consent to this (partly) irreversible treatment,

2. And the adolescent:

   a. has been informed of the (irreversible) effects and side effects of treatment (including potential loss of fertility and options to preserve fertility),

   b. has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process,

3. And a pediatric endocrinologist or other clinician experienced in pubertal induction:

7

App.622

    a.  agrees with the indication for sex hormone treatment, and

    b.  has confirmed that there are no medical contraindications to sex hormone

      treatment.[5]

25.     The WPATH standards of care have similar recommendations concerning eligibility of adolescents for pubertal suppression and gender-affirming hormone therapy.

26.     Surgical care for gender dysphoria is rarely provided to youth under 18. If surgical services are offered, they are almost always gender-affirming chest surgeries for youth assigned female at birth—also known as gender-affirming mastectomy.[6] Under the Endocrine Society Guideline, genital surgery is not recommended to patients under age 18. The WPATH standards of care do not provide an age delineation for vaginoplasty, but strongly caution about the need to ensure that the patient has the maturity to make this decision.

27.     Both the WPATH and Endocrine Society guidelines emphasize the importance of a comprehensive mental health evaluation prior to the initiation of gender-affirming medical care for adolescents. This evaluation should include an assessment of the youth's gender identity development; the presence of any co-occurring mental health conditions and whether symptoms may interfere with diagnosis or functioning to the extent that decision-making is compromised; and emotional maturity and decision-making capacity.

28.     Gender-affirming medical interventions are not indicated for all individuals who present for care. Overall, about one-third of our patient population continues to see our team for support without accessing medical interventions.

---

[5] *Id.*

[6] Surgery is not offered before an individual has reached their final adult height, and only after other attempts to relieve dysphoria are pursued.

8

## App.623

29.     The WPATH and Endocrine Society guidelines also highlight the importance of informing the patient and their parents of the potential risks and benefits of treatment, including the potential risk to fertility and options for fertility preservation, and obtaining informed consent from the parents or legal guardians.  The WPATH guideline also recommends that doctors inform families of the limitations of the research and the possibility that some patients will come to experience their gender differently.

### III.     GENDER-AFFIRMING MEDICAL CARE FOR ADOLESCENTS IS EFFECTIVE

30.     Gender-affirming medical care has been provided to adolescents for decades, and clinicians have seen the significant benefits of such treatment to patients.

31.     In our clinic, when adolescents present for care, they often present with high degrees of anxiety, depression, and suicidal ideation.  Most of our patients also come in experiencing challenges with social isolation, school attendance, and lack of desire to engage in relationships with family and peers.  Most of these mental health and social challenges are linked to gender dysphoria and experiences of minority stress.  While the social and political environment may continue to negatively impact a patient's mental health, we see dramatic improvements in our patients after they begin gender-affirming medical care.  Depression, anxiety, self-harm, and suicidal ideation are significantly reduced, based on the screening tools, PHQ-9 and GAD-7, which patients complete at every visit.  Patients routinely comment about finally feeling like themselves and being able to engage with the rest of their world.  Parents regularly tell our clinical team that gender-affirming medical care has resulted in great improvement in their children's psychological well-being, school performance, and relationships.  As treatment helps address their gender dysphoria, our patients feel motivated to apply for

college, join the military, and pursue employment and creative outlets.  Many become leaders in their schools and communities.

32.     Research conducted by investigators in the United States and around the world has evaluated a variety of mental health outcomes for minors with gender dysphoria who have been treated with puberty blockers, hormone therapy, or both, and their findings are consistent with what we experience in clinic—that treatment is associated with improvement in mental health.[7]

33.     Research also demonstrates the negative impacts of not receiving treatment, or having to delay treatment into adulthood.  For example, a study of 20,619 transgender adults found that access to pubertal suppression during adolescence resulted in lower odds of lifetime suicidal ideation (Turban 2020).  Another survey of 11,914 transgender and nonbinary youth demonstrated that individuals who had access to gender-affirming hormones had lower odds of depression and suicidality (Green 2022).

---

[7] *See, e.g.*, de Vries, A.L., et al. (2011). Puberty Suppression in Adolescents With Gender Identity Disorder: A Prospective Follow-Up Study. *J Sex Med.* 8(8):2276–2283; de Vries, A.L., et al. (2014). Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment. *Pediatrics.* 134(4):696–704; Turban, J., et al. (2020). Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation. *Pediatrics.* 145(2):e20191725; van der Miesen, A.I., et al. Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared with Cisgender General Population Peers. *J Adolesc Health.* 66(6):699–704; Achille, C., et al. (2020). Longitudinal Impact of Gender-Affirming Endocrine Intervention on the Mental Health and Well-Being of Transgender Youths: Preliminary Results. *Int J Pediatr Endocrinol.* 2020:8; Chen, D., et al. (2023). Psychosocial Functioning in Transgender Youth after 2 Years of Hormones. *New England J Med.* 388:240–250; Allen, L.R., et al. (2019). Well-Being and Suicidality Among Transgender Youth After Gender-Affirming Hormones. *Clin Pract Ped Psychol.* 7(3):302–311; de Lara, D.L., et al. (2020). Psychosocial Assessment in Transgender Adolescents. *Anales de Pediatría (Eng Ed).* 93(1):41–48; Green, A.E., et al. (2022). Association of gender-affirming hormone therapy with depression, thoughts of suicide, and attempted suicide among transgender and nonbinary youth. *J Adol Health.* 70(4):643–649.

34.     Research also shows the benefit of access to care during adolescence as opposed to waiting until adulthood.  A study of 27,715 transgender and nonbinary adults revealed lower lifetime odds of suicidality for those who were able to access gender-affirming care during adolescence compared to those who could not access care until adulthood.[8]

35.     The findings of the research on adolescents who receive gender-affirming hormone therapy are consistent with findings of the body of research on treatment of adults.  Numerous studies have found that hormone therapy is effective at alleviating gender dysphoria and improving mental health in adults.[9]

## IV.     GENDER-AFFIRMING MEDICAL CARE FOR ADOLESCENTS IS SAFE

36.     Pubertal suppression with GnRHa medications, hormone therapy, and mastectomy are treatments that have been used for many years for a range of conditions in adolescents.

37.     GnRHa medications have been used for 40 years to treat central precocious puberty (CPP), a condition that causes early pubertal development in children.  The medications pause pubertal development until the child reaches the typical age for puberty, at which point the medication is stopped, endogenous hormone production resumes, and typical secondary sex characteristics develop.  GnRHa medications are also used to treat endometriosis, uterine

---

[8]  Turban, J.L., et al. (2022). Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PLoS ONE* 17(1):e0261039.

[9]  *See, e.g*., van Leerdam, T.R., Zajac, J.D., & Cheung, A.S. (2023). The Effect of Gender-Affirming Hormones on Gender Dysphoria, Quality of Life, and Psychological Functioning in Transgender Individuals: A Systematic Review, *Transgender Health*. 8(1); Colizzi, M., Costa, R., & Todarello., O. (2014). Transsexual patients' psychiatric comorbidity and positive effect of cross-sex hormonal treatment on mental health: results from a longitudinal study. *Psychoneuroendocrinology*. 39:65–73.

leiomyoma, ovarian cancer, fertility preservation in women with cancer, premenstrual syndrome, and as an adjunct to growth hormone therapy in youth with idiopathic short stature.

38.     Some adolescents have medical conditions (i.e., ovarian failure, Turner syndrome, hypogonadotropic hypogonadism, Klinefelter syndrome, or constitutional delay of puberty) which require the use of sex steroid hormone therapy.  Cisgender girls also utilize estrogen-containing medications to manage menstrual cycles and prevent pregnancy.

39.     Cisgender girls with polycystic ovarian syndrome ("PCOS") utilize spironolactone—an anti-androgen medication—to manage the increased facial and body hair that is often associated with that condition.

40.     Mastectomy is a commonly performed and widely accepted surgical procedure to treat gynecomastia in adolescent cisgender boys.  Gynecomastia is enlargement of the breast tissue in cisgender boys or men.

41.     In some cases, these medications or surgical treatments are aimed at bringing cisgender adolescent patients' bodies into alignment with their gender.  For example, mastectomy is often provided to cisgender boys with gynecomastia to address the distress related to being a boy with breasts.  And for some cisgender girls with PCOS, treatment with spironolactone addresses distress related to being a girl with facial hair.

42.     Children and adolescents of all gender identities often need the assistance of medicine when their bodies start puberty too early, they are delayed in starting puberty or not able to start puberty at all, they experience the development of secondary sex characteristics that do not accord with their cisgender identity, or they start a puberty that causes secondary sex characteristics causing or exacerbating gender dysphoria.

12

App.627

43.     GnRHa medications for pubertal suppression, testosterone, estrogen, and anti-androgens have all been demonstrated to be safe in clinical experience and research studies.  The same is true of mastectomies.

44.     There are risks and benefits to any medical treatment; gender-affirming medical treatments are not an exception.

45.     The risks of puberty blockers are decreased bone density with prolonged use, sterile abscess at an injection site, and, very rarely, prolonged cardiac QT and increased intercranial hypertension.  These risks are the same for youth receiving treatment for gender dysphoria as those being treated for central precocious puberty and other conditions.

46.     Pubertal suppression does not result in any permanent changes to the body and has no permanent impact on fertility as a stand-alone medication.

47.     Risks of estrogen therapy include blood clots, elevated blood pressure, diabetes, and migraine headaches.  These risks are not higher than for the general population in the absence of individual or family history, or the use of nicotine.  These risks exist whether the treatment is for transgender girls with gender dysphoria or for cisgender girls with ovarian failure, or any other hypogonadal condition.

48.     Risks of testosterone therapy include increased red blood cells, liver inflammation (research studies show that risk of liver inflammation is very low), high cholesterol, high blood pressure, and heart disease, especially with a positive family history.  These same risks exist whether the treatment is for transgender boys with gender dysphoria or for cisgender boys with testicular failure or any other hypogonadal condition.

49.     For all of these medications, the risks are well-managed when care is provided and monitored by a healthcare provider.  The risks become more significant when patients resort

13

App.628

to self-treatment.  There are well-documented stories, including those we have witnessed in our own clinic, where adolescents were unable to access this care through a doctor and instead turned to black markets or took medications from friends/family to self-treat.  Self-treatment can result in non-therapeutic hormone levels, which can negatively impact mood and increase several health risks, such as blood clots, cardiovascular problems, and liver and kidney dysfunction.

50.     Gender-affirming hormone therapy may have an impact on future fertility potential,[10] although treatment can be tailored to minimize that risk if maintaining fertility is important to the family and there are options for fertility preservation.  Impairment of fertility is not unique to gender-affirming hormone therapy.  For example, treatments for some pediatric cancers cause likely loss of fertility.  Some youth with intersex traits have their gonads surgically removed if they are at high risk of developing gonadal cancer.

51.     As with all medical treatments, doctors are expected to fully inform patients and their parents, based on the available evidence, of the potential risks, benefits, and alternatives to treatment so that the families can weigh them and make an informed decision about whether to pursue treatment.  The informed consent process is the hallmark of medical decision-making. Patients—and if minors, their parents—make the decision after being provided the information necessary to make an informed decision.  The informed consent process for gender-affirming

---

[10]  Many individuals assigned female at birth who take testosterone are able to achieve pregnancy or use assisted reproductive technology to conceive after discontinuing testosterone. *See, e.g.*, Light, A.D., et al. (2014). Transgender Men Who Experienced Pregnancy after Female to Male Gender Transitioning, *Obstetrics & Gynecology*, 124(6):1120–1127.  In addition, testosterone is not an effective form of contraception and some transgender men have conceived while taking testosterone. *See, e.g.*, Thornton, K.G. & Mattatall, F. (2021). Pregnancy in transgender men. *CMAJ.* 193(33):E1303.  Some transgender women may elect to use only anti-androgen medications without estrogen to preserve sperm production and fertility potential. Sperm production may resume in some transgender women.  *See, e.g.*, Jiang, D.D., et al. (2019). Effects of Estrogen on Spermatogenesis in Transgender Women. *Urology.* 132:117–122.

App.629

medical care for minors is no different than how medical decision-making for minors occurs in other areas of medicine.

52.    As discussed above, the WPATH and Endocrine Society guidelines offer recommendations about information that should be provided to families regarding gender-affirming medical care, including information about limitations in research—what is known and unknown; the potential impacts of some gender-affirming medical interventions on fertility; and the rare but potential possibility of returning to living consistently with their birth-assigned gender.[11]

53.    Informed consent is a dynamic process; frequent assessment of the benefits of medications, and whether they continue to align with the individual's goals and outweigh risks, occurs in both medical and behavioral health follow-up visits.

54.    There is nothing unique about gender-affirming medical care that warrants departing from the normal principles of medical decision-making for youth that parents make the decision after being informed of the risks, benefits, and alternatives by physicians.

---

[11] Both clinical experience and research show that adolescents and adults who have received gender-affirming medical care rarely later come to identify with their sex assigned at birth and/or regret the care.  For example, a prospective longitudinal study by de Vries, et al. found that none of the 55 adults who had initiated puberty blockers and hormones in adolescence reported regret with any of their treatment (de Vries 2014).  Wiepjes, et al. (2018) found that 0.6% of transgender women and 0.3% of transgender men experienced regret (n=6793) related to gender-affirming medical interventions.  Their study also noted that in many of those cases, the regret was "social regret"—regret related to rejection, loss of community, or threats of violence.  *See* Wiepjes, C.M., et al. (2018). The Amsterdam Cohort of Gender Dysphoria Study (1972–2015): Trends in Prevalence, Treatment, and Regrets. *J Sexual Med*. 15(4):582–590.  *See also* Brik, T., et al. (2020). Trajectories of adolescents treated with gonadotropin-releasing hormone analogues for gender dysphoria. *Archives of Sexual Behavior*. 49(7):2611–2618 (finding that 3.5% of study cohort discontinued GnRHa and did not go on to hormone therapy because they no longer wished gender-affirming treatment); Wiepjes, et al. (2018) (finding 1.9% of cohort discontinued GnRHa but reasons not provided); Olson, K.R., et al. (2022). Gender Identity 5 Years After Social Transition. *Pediatrics*. 150(2) (2.5% of study cohort returned to cisgender identity by five years after their initial social transition).

## V. THE EVIDENCE SUPPORTING GENDER-AFFIRMING CARE IS COMPARABLE TO EVIDENCE SUPPORTING MANY OTHER MEDICAL TREATMENTS

55. The studies on gender-affirming medical care for adolescents (and adults) use a variety of commonly used research methods including prospective observational and retrospective cross-sectional studies comparing individuals who receive treatment to those who do not, and longitudinal studies that follow individuals over a period of time. These research methods are widely used in the field of medicine to evaluate the efficacy of treatment.

56. While randomized controlled clinical trials ("RCTs") can provide especially strong evidence in medical research by limiting confounding variables, given that such studies require that outcomes of a particular treatment are compared to outcomes of patients not receiving the treatment, it is frequently not feasible or ethical to rely on RCTs. Thus, many medications used to treat medical conditions in both pediatrics and adults are used based only on observational and retrospective research studies—or clinical experience alone—without randomized controlled clinical trials. For example, insulin, the hormone discovered in the 1920s as a treatment for type 1 diabetes mellitus, was used successfully to prevent death in several patients with diabetic ketoacidosis. Based on the outcomes of these clinical experiences, insulin became widely accepted as the standard treatment for type 1 diabetes mellitus; a randomized controlled trial would have been unethical given the high rate of death associated with other earlier attempted treatments.[12] Because pubertal suppression and gender-affirming hormones to treat gender dysphoria are now widely accepted in the medical field based on decades of clinical experience and research studies demonstrating efficacy, denying this care for a population of youth to serve as the "control," or comparison, group for an RCT would be unethical.

---

[12] Rosenfeld, L. (2002). Insulin: discovery and controversy. *Clin Chem.* 48:2270–2288.

16

App.631

57.     While the body of research on gender-affirming medical care for adolescents continues to grow, we presently have sufficient clinical and research evidence in both youth and adult populations that shows the risks and benefits of providing this care, in addition to the risks of not providing care.  The evidence is comparable in quantity and quality to evidence we have in support of many other medical interventions.

58.     Some who oppose gender-affirming medical care have asserted that this care is "experimental," suggesting this is an area of medicine where there is no clear understanding of the impact of an intervention.  Here, we have decades of experience providing care and a growing body of research also supporting the efficacy and safety of this care, in addition to substantial evidence about the use of these medications in other areas of medicine.

59.     Once the Food and Drug Administration ("FDA") has approved a medication as safe and effective for an indication, prescribers are generally free to prescribe it for other indications. The fact that the FDA has not approved puberty blockers, testosterone, or estrogen specifically for the treatment of gender dysphoria does not mean that the treatment is experimental or unproven.  The use of medication for indications that have not received FDA approval—often called "off-label use"—is a widely accepted practice in medicine.  This practice is legal, ethical, and common.  The Agency for Healthcare Research and Quality estimates that one in five medications prescribed is prescribed off-label.  Off-label use is even more common in pediatrics: 45% of pediatric outpatient prescriptions are off-label, and nearly 80% of hospitalized children receive at least one drug off-label.[13]  Off-label use is so common because it is often not worth the cost to pharmaceutical companies to pursue approval for additional indications once a

---

[13] Antoon, J.W., et al. (2023). . Advancing pediatric medication safety using real-world data: Current problems and potential solutions. *J Hosp Med*. doi:10.1002/jhm.13068. Epub ahead of print. PMID: 36855275.

App.632

medication has been approved by the FDA.  For example, Gabapentin has an FDA indication for treating seizures and fibromyalgia, but is often (more than 80% of the time) used off-label to treat bipolar disorder, subacute low back pain, neuropathy, as migraine prophylaxis, and for additional indications.[14]  Some of the same medications used off-label in gender-affirming medical care are also widely used off-label for other purposes.  Spironolactone, which was approved by the FDA for controlling blood pressure, is used in cisgender women and girls off-label to control side effects of PCOS.  And GnRHa medications have been approved for the treatment of precocious puberty but not for many other indications for which they are commonly used, including ovarian cancer, premenstrual syndrome, fertility preservation in women and adolescent girls with cancer, and as an adjunct to growth hormone therapy in youth with idiopathic short stature.

## VI.    HARM TO ADOLESCENTS WITH GENDER DYSPHORIA AND THEIR FAMILIES IF THE BAN TAKES EFFECT

60.    We know from clinical experience and research that delaying or denying patients gender-affirming medical care when needed comes with an increase in emotional harm.  Social transition can offer many benefits, but social transition alone does not prevent an adolescent from experiencing the trauma of seeing their body change in ways that do not align with their gender identity.  Additionally, many of these body changes would require major surgical interventions in the future to address, and some are not fully treatable by future medical intervention.  For example, once vocal cords are exposed to testosterone, only vocal training can potentially shift the deepening of the voice, but this treatment has mixed success.  Pubertal

---

[14] *See* Fukada C., et al. (2012). Prescribing gabapentin off label: perspectives from psychiatry, pain and neurology specialists. *Can Pharm J (Ott)*. 145:280–284.e1.

suppression prevents this psychological trauma and the need for more invasive medical interventions in the future.

61.     As previously discussed, clinical experience and research have shown that gender-affirming medical care improves mental health outcomes; the converse is also true—that being unable to access care increases mental health distress.  We see a marked difference in the social functioning, emotional wellness, and psychological stability of our patients after they are able to access pubertal suppression and hormone therapy when indicated.

62.     Additionally, our older adolescent patients who have experienced at least some secondary sex characteristics not aligned with their identity report higher levels of depression and anxiety, lower participation in school, and less ability to engage in social relationships.

63.     Adolescents in Idaho who are already receiving gender-affirming medical care will be forced to medically detransition by the Ban.  Abruptly discontinuing hormone therapy can result in emotional instability and dysregulation as well as adverse medical outcomes such as profound fatigue, hot flashes, and difficulty concentrating.

64.     If this Ban takes effect, patients who have had the benefit of pubertal suppression and/or hormone therapy will see their bodies change in ways that will cause profound distress. And for some, discontinuing care will not return their body to match their assigned sex but will leave them with a mix of typically male and female phenotype.  Adolescents assigned male at birth who have been treated with pubertal suppression and estrogen will have had permanent breast development from the estrogen and suppression of testosterone.  Once these medications are stopped, endogenous testosterone becomes the dominant hormone, leading to masculinizing physical changes.  Patients assigned female at birth who have taken testosterone may have experienced permanent voice deepening, masculinized facial structure, and facial and body hair

19

App.634

growth.  Discontinuing care would be followed by breast development and resumption of menses, which often cause significant distress.

65.    Psychologically, adolescents who have been receiving care for years and have to discontinue treatment will see a return of, or dramatic increase in, distress related to gender dysphoria.  Based on what we know about patients' experiences prior to receiving care, if care is cut off or denied, we will see increased rates of depression, anxiety, suicidal ideation, and hospitalizations for suicide attempts.  We also will likely see the tragedy of lives ended by suicide.

66.    Patients may be the most directly and seriously harmed by these care bans, but their families are also suffering.  At our clinic in Oregon, we are already seeing the impact on families who have already or are planning to leave their states because of healthcare bans; there are also families deciding to attempt to seek care in states where the care is available.  Our clinic has already received inquiries from Idaho families wanting to travel for care.  We do not yet have a clear answer of whether or how we will have the capacity to be able to meet the care needs of these patients.  Idaho parents and providers are calling in states of desperation and hopelessness, unable to confirm that they will have access to care in Oregon.

67.    Parents are having to make the difficult decision to relocate the family so that their children can continue to access care.  In some cases, it is more financially viable to relocate, rather than to regularly travel.  In others, the families are afraid that traveling for care and bringing medications back to a state with a ban may put their providers or their family at risk.  The need to relocate removes patients and families from their support systems at a time when direct emotional and material support is most needed.  Financial resources are drained and family units are split up.  For example, in one family from another state that we see in the clinic, one

20

parent was able to secure a job in Oregon, but the other parent has not yet and has stayed behind with the cisgender sibling.  The family is paying for a mortgage, plus the cost of relocation and temporary housing.  Another clinic family that came to Oregon from a state with a ban does not have the means to afford housing and is living in a camper van in a city where they are at risk of being ticketed and towed.

68.     Parents of families from out of state are often in a state of grief, unable to believe that the state that they've called home, many for generations, is harming their children.  The emotional and logistical burden for parents is high, and the areas that they are moving to do not have the infrastructure or resources to absorb the increasing demand and severity of mental health issues.  Many existing clinics are challenged in getting patients in on a timeline that will not result in a gap in treatment.  As parental stress increases, we've seen parental mental health declines and the overall health of the family system decrease.

69.     Adolescents are painfully aware of the sacrifices their families are making to get them care and many see this as evidence that they are a burden; belief of the adolescent that they are a burden is an intrusive thought that drives suicidal ideation and attempts.[15]

70.     We are seeing these scenarios unfold as families move to Oregon from Texas, Tennessee, Arkansas, Iowa, Florida, Alabama, and Idaho.  Others are exploring traveling to Oregon for care.  Our clinic wait-times continue to increase, which increases patient distress (for both existing Oregonians and those relocating to Oregon) and risk for psychological harm.

71.     Idaho families that have reached out to our clinic are already suffering and feeling the impact of this Ban, even before it goes into effect.  We are receiving an increasing number of

---

[15] *See, e.g.*, Chu, C., et al. (2017). The interpersonal theory of suicide: A systematic review and meta-analysis of a decade of cross-national research, *Psychol Bull*. 143(12):1313–1345.

App.636

calls and emails requesting care from families and providers in Idaho and other states who are desperate to continue the care their adolescents need.  Providers are distraught because they will be forced to abandon their patients and/or force them to medically detransition, which directly violates their code of medical ethics—to do no harm.

72.      It is often the most well-connected and resourced families that are able to relocate.  If the Ban goes into effect, Idaho families will feel the pain more deeply and Idaho will continue to lose medical providers and other front-line healthcare staff, business owners, teachers, first responders, and individuals in the hospitality industry, to name a few of the occupations held by parents who are seeking to relocate.

73.      For those families that are less resourced and unable to move or travel out of state for care, they will have to watch as their children are withdrawn from treatment that has enabled them to flourish and see them return to the suffering that brought them to care.  We know that gender diverse people from communities of color and families living in poverty have significantly worse mental health outcomes than their white and financially resourced peers.[16]


I declare under penalty of perjury that the foregoing is true and correct.


Executed on: _7/14/2023_

Kara Connelly MD

_____

Kara Connelly, MD


---

[16] James, S.E., et al. (2016). The Report of the 2015 U.S. Transgender Survey. Washington, DC: National Center for Transgender Equality.

22

App.637

# Exhibit A

**CURRICULUM VITAE**
**OREGON HEALTH & SCIENCE UNIVERSITY**

| NAME | Kara Jeanne Connelly, MD, MCR | DATE | 4/2023 |
|------|-------------------------------|------|--------|

## I. PRESENT POSITION AND ADDRESS

| | |
|---|---|
| **Academic Rank:** | **Associate Professor** |
| **Department/Division:** | **Pediatrics/Endocrinology** |
| **Professional Address:** | **707 S.W. Gaines Road, CDRC-P** <br> **Portland, Oregon 97239-3098** |
| **E-Mail Address:** | **connellk@ohsu.edu** |

## II.  EDUCATION

**Undergraduate and Graduate:**

| 1997-2001 | Tulane University, New Orleans, LA <br> B.S. – 2001 |
|-----------|-----------------------------------------------------|
| 2003-2007 | University of Texas Health Science Center at San Antonio, San Antonio, TX <br> M.D. – 2007 |
| 2010-2017 | Oregon Health and Science University, Portland, OR <br> Master of Clinical Research – 2017 |

**Postgraduate:**

| 2007-2008 | Pediatric Internship <br> Doernbecher Children's Hospital, Oregon Health & Science University, Portland, OR <br> H. Stacy Nicholson, M.D, M.P.H., Chairman, Department of Pediatrics |
|-----------|-------------------------------------------------------------------------------------------|
| 2008-2010 | Pediatric Residency <br> Doernbecher Children's Hospital, Oregon Health & Science University, Portland, OR <br> H. Stacy Nicholson, M.D, M.P.H., Chairman, Department of Pediatrics |

1

| 2010-2013 | Fellow, Pediatric Endocrinology |
|---|---|
| | Doernbecher Children's Hospital, Oregon Health & Science University, Portland, OR |
| | Bruce Boston, M.D., Division Head |

**Honors:**

Pediatric Resident Humanism Award
OHSU, Dept of Pediatrics, Doernbecher Children's Hospital, 2008

Outstanding Pediatric Resident Award
Emanuel Hospital, 2009

Clinical Research Fellowship and Mentor Award in Women's Health
Endocrine Society, 2013

Joseph B. Bilderback Fellow Teaching Award
OHSU, Dept of Pediatrics, Doernbecher Children's Hospital, 2013

Michael Miller Faculty Teaching Award
OHSU, Dept of Pediatrics, Doernbecher Children's Hospital, 2019

Outstanding Mentorship of Pediatric Fellows
OHSU, Dept of Pediatrics, Doernbecher Children's Hospital, 2019

Outstanding Leader for Electives in Clinical Experiences
OHSU School of Medicine, 2019

Gold Humanism Honor Society member, 2022

**Certification:**
American Board of Pediatrics
General Pediatrics: No. 97042, October 18, 2010 (exp 2020)

Pediatric Endocrinology: No. 1494, November 13, 2013 (exp 2023)

**Licensure:**
Current        Oregon no. MD151770

## III.  PROFESSIONAL EXPERIENCE
**Faculty Appointments:**

| 2013-2018 | Assistant Professor |
|---|---|
| | Division of Pediatric Endocrinology, Department of Pediatrics |
| | Oregon Health and Science University, Portland, Oregon |

| 2018-present | Associate Professor |
|---|---|

2

App.640

Division of Pediatric Endocrinology, Department of Pediatrics
Oregon Health and Science University, Portland, Oregon

**Hospital Staff Appointments:**
2013-Present   Attending Physician
               Doernbecher Children's Hospital
               Oregon Health and Science University, Portland, Oregon

**Hospital Administrative Appointments:**
2013-Present   Rotation Director, Pediatric Residency Endocrinology Rotation
               Doernbecher Children's Hospital, Oregon Health & Science University
2016-Present   Medical Director, Doernbecher Gender Clinic
               Doernbecher Children's Hospital, Oregon Health & Science University
               Provided clinical and programmatic leadership for the development of a multidisciplinary clinical
               program dedicated to providing comprehensive medical and mental health services for
               transgender and gender diverse youth.  This is occurring under the umbrella of the OHSU
               Transgender Health Program.
2016-Present   Co-founder, Doernbecher Sex Development Program and DUETT (Doernbecher Urology and
               Endocrinology Treatment Team) Clinic
               Doernbecher Children's Hospital, Oregon Health & Science University
               Provided leadership in the initiation of an interdisciplinary program involving clinicians from
               pediatric endocrinology and pediatric urology providing care for children with disorders of
               sexual differentiation (DSD).  Developed an inpatient DSD response team to evaluate newborns
               with suspected DSDs and established an outpatient clinical program.  Applied for and awarded
               acceptance into the national DSD Translational Research Network, funded by federal grant
               number 5RO1HD068138 awarded by the NIH/NICHD

## IV. SCHOLARSHIP

**Area(s) of Research/Scholarly Interest:**
<u>Transgender Healthcare for youth</u>: I am interested in conducting research pertaining to evaluating outcomes of
current gender transition treatments available for transgender youth and developing improved treatment
modalities.

**Grants and Contracts:**
Source:              Eli Lilly USA, LLC
Program Director:    Elisa Razzoli, M.D.
Title:               GeNesis: Genetics and Neuroendocrinology of Short Stature International Study
Role:                Site PI
Entire Project:      1999-2015
The goal of this prospective observational study is to evaluate the safety and tolerability of Humatrope by
determining the incidence of type 2 diabetes mellitus in Humatrope-treated children, the incidence of de novo
neoplasia in Humatrope-treated children without a prior history of neoplastic disease, and to optimize the
outcome in Humatrope-treated patients by identifying factors associated with final height.

3

Pending Funding:
Source:          NIH/NICHD
National Director:     Eric Vilain, MD, David Sandberg, PhD
Role:                  Site PI
Title:                 National Disorders in Sexual Differentiation Translational Research Network

Pending Funding:
Source:          Nike
National Director:     Kate Ackerman, MD
Role:                  Site PI
Title:                 Transgender athlete study

**Publications/Creative Work:**

Peer Reviewed Manuscripts

1. **Connelly KJ,** Boston BA, Pearce EN, Sesser D, Pino S, Braverman LA, Snyder D, LaFranchi S. Congenital hypothyroidism caused by excess prenatal maternal iodine ingestion. *Journal of Pediatrics*. 161(4):760-2, 2012. PMID 22841183 doi 10.1016/j.peds.2012.05.057

2. **Connelly KJ** and LaFranchi SH.  Detection of neonates with mild congenital hypothyroidism (primary) or isolated hyperthyrotropinemia: an increasingly common management dilemma.  *Expert Review of Endocrinology and Metabolism*.  9(3):263-271, 2014.

3. **Connelly KJ**, Larson EA, Marks DL, Klein RF.  Neonatal estrogen exposure results in biphasic age-dependent effects on the skeletal development of male mice.  *Endocrinology*.  156(1):193-202, 2015 PMID:25330099 doi: 10.1210/en.2014-1324.

4. Shatzel JJ, **Connelly KJ**, DeLoughery TG.  Thrombotic issues in Transgender Medicine: A Review. *American Journal of Hematology*.  92(2):204-208, 2017 PMID 27779767 doi: 10.1002/ajh.24593

5. **Connelly KJ,** Pierce M, Hanna CE, LaFranchi SH.  Detecting Congenital Central Hypothyroidism by Newborn Screening: Difficulty in Distinguishing from Congenital Thryoxine-Binding Globulin Deficiency.  *Horm Res Pediatr*. 88(5):331-338, 2017. PMID:28910808 doi: 10.1159/000479367

6. Coghlan RF, Oberdorf JA, Sienko S, Aiona MD, Boston BA, **Connelly KJ**, Bahney C, LaRouche J, Almubarak SM, Coleman DT, Girkontaite I, von der Mark K, Lunstrum GP, Horton WA.  A degradation fragment of type X collagen is a real-time biomarker for bone growth velocity.  *Sci Transl Med*. 9(419), 2017.  PMID:29212713 doi: 10.1126/scitranslmed.aan4669.

7. Moyer DN, **Connelly KJ**, Holley AL.  Using the PHQ-9 and GAD-7 to screen for acute distress in transgender youth: findings from a pediatric endocrinology clinic. *J Ped Endocrin Metab*. 32(1):71-74, 2018.

8. Cantu AL, Moyer DN, **Connelly KJ,** Holley AL. Changes in Acute Distress from Intake to First Follow-up among Transgender Youth in a Pediatric Endocrinology Clinic.  *Transgender Health*. 5(2):1-5, 2020.

4

9. Eshragh N, Doan LV, **Connelly KJ,** Denniston S, Willis S, LaFranchi SH.  Outcome of Newborn Screening for Congenital Adrenal Hyperplasia at Two Time Points.  *Horm Res Pediatr*. 13:1-9, 2020.

10. Lee J, Eimecke T, Rehm J, Roberts S, **Connelly KJ.**  Providing gender-affirmative care during the SARS-CoV-2 pandemic era: Experiences and perspectives from pediatric endocrinologists in the United States. *Transgender Health.* 7(2):179-174, *2022.*

11. Hedrik H, **Connelly KJ,** Guerriero J, Moyer D. New Virtual Reality: Benefits and Barriers to Providing Pediatric Gender-Affirming Healthcare Virtually During the COVID-19 Pandemic.  *Transgender Health.* 7(2):144-149, *2022.*

12. **Connelly KJ,** Parks J, LaFranchi SH.  History of the Thyroid.  *Horm Res Pediatr,* 95(6):546-556, 2022.

13. Dy G, **Connelly KJ.**  Multi-disciplinary care for transgender individuals seeking feminizing gender-affirming surgery after pubertal suppression: a retrospective review and proposed clinical pathway. *Pediatrics, submitted.*

14. Baines H, **Connelly KJ**.  Subcutaneous (SQ) and Intramuscular (IM) Testosterone Injections Equally Effective in Pubertal Induction of Transgender Male Adolescents, *Transgender Health, submitted*

15. Downing JM, **Connelly KJ,** McConnell J.  Access to Gender Affirming Care for Youth Enrolled in Oregon's Medicaid Program.  *JAMA Ped*, *submitted*

16. Dunbar A, **Connelly KJ,** Moyer D.  Not the destination, but the journey (mapping): A public health evaluation of an interdisciplinary pediatric gender clinic and the role of psychology in improving health equity. *In preparation*

Chapters
1. **Connelly KJ,** Steiner RD.  Osteogenesis Imperfecta.  In M. Cabana, P. Brakeman, M. Curran, L. Dimeglio, W. Golden, R. Goldsby, A. Hartman, T. Kind, J. Lightdale, C. Sabella, and R. Tanel (Eds.), *The 5-Minute Pediatric Consult* (7th ed).  Philadelphia, PA: Wolters Kluwer Health – Lippinocott Williams & Wilkins, 2015.

Workshops
1. Blaschke G, Weddle M, Green S, Crossen E, Stevenson E, Nolt D, **Connelly K**, Phillipi C. Tales From Portlandia II: Navigating the Unconventional In General Pediatrics. Workshop, Pediatric Academic Societies Meeting. April 2015.

2. Burleton J, **Connelly KJ.** Holistic Partnerships: Supporting Affirming Care for Transgender and Gender Nonconforming Youth and their Families.  Workshop, US Professional Association for Transgender Health annual meeting, San Diego, CA, 2017.

3. Guerriero J, Baines H, **Connelly KJ,** Penkin A.  Centralized Intakes to Improve Outcomes in Multi-Disciplinary Pediatric Gender Clinic.  Workshop, UCSF 2017 National Transgender Health Summit, San

5

Francisco, CA, 2017

4. Jacobs M, **Connelly KJ.**  Histrelin acetate subcutaneous implant for gender affirming care: hands-on training for outpatient procedure.  Workshop, Society for Adolescent Health & Medicine annual meeting, 2020

Abstracts: Oral Presentations

1. **Connelly KJ,** Boston B, Pearce E, Sesser D, LaFranchi S. Congenital hypothyroidism caused by excess maternal iodine ingestion.  Western Society for Pediatric Research (WSPR). Carmel-by-the-Sea, CA. January 2012.

2. Burleton J**, Connelly KJ.** "Working with Transgender Youth and Teens."  The LGBTQ Meaningful Care Conference, Portland, OR, 2014.

3. Pierce MJ, Penkin A, Usher C, **Connelly KJ**.  Utilization of mental health providers in gender clinics and barriers to access.  Oral Presentation, US Professional Association for Transgender Health annual meeting, San Diego, CA, 2016.

4. Penkin A, Blenning C, Baunach C, Milano C, Dugi D, Rae-StockLynn J, Burleton J, Berli J, Lager-Mesulam J, **Connelly KJ**, Shaffer L, Haque, N.  OHSU: The Journey Towards a Comprehensive Transgender Health Program Serving Oregon and Beyond.  Mini-Symposium, US Professional Association for Transgender Health annual meeting, San Diego, CA, 2016.

5. Guerriero J, Baines H, Burleton J, Connelly KJ.  A Natural Variation: Holistic Care for Transgender Children and Youth. The LGBTQ Meaningful Care Conference, Portland, OR, 2016.

6. **Connelly KJ,** Guerriero J, Penkin A, Berli J, Dugi D.  A Model for Family-Centered Decision-Making Regarding Gender Affirming Surgery for Minors. US Professional Association for Transgender Health Annual Meeting, Washington, DC 2019.

7. Baines H, **Connelly KJ.**  Subcuaneous (SQ) and Intramuscular (IM) Testosterone Injections Equally Effective in Pubertal Induction of Transgender Male Adolescents.  US Professional Association for Transgender Health Annual Meeting, Washington, DC 2019.

8. Gallet de St. Aurin C, Guerriero J, Penkin A, Baker R, **Connelly KJ.**  Future State: Strategies for Improved health and wellness for Oregon's Gender Diverse Youth.  LGBTQ Meaningful Care Conference, Portland, OR, 2020.

9. Guerriero J, **Connelly KJ.**  One Team, One Mission: Reducing Barriers for Youth and Families through Interdisciplinary Care.  LGBTQ Meaningful Care Conference, Portland, OR, 2020.

10. Sandberg S, Moyer D, Guerriero J, Kerwin T, **Connelly KJ.**  BREAKING BARRIERS: INCREASING PATIENT RETENTION AND SATISFACTION IN AN INTERDISCIPLINARY PEDIATRIC GENDER CLINIC.  World Professional Association for Transgender Health Annual Meeting, 2020.

6

11. Downing J, **Connelly KJ.**  ACCESS TO GENDER-AFFIRMING CARE FOR YOUTH ENROLLED IN OREGON'S MEDICAID PROGRAM.  World Professional Association for Transgender Health Annual Meeting, 2020.

12. Arndt A, Jacobs M, Baines H, **Connelly KJ.**  Retrospective comparison of two GnRH agonist subdermal implants for pubertal suppression for pediatric gender affirming care.  World Professional Association for Transgender Health Annual Meeting, 2020.

13. Dy G, Peters B, Baines H, Moyer D, Guerriero J, Dugi D, **Connelly KJ.**  Vaginoplasty After Pubertal Suppression: A Multi-Disciplinary Approach.  Mini symposium presented to the annual convention for the US Professional Association for Transgender Health, 2021.

14. Guerriero J, Moyer D, Baines H, **Connelly KJ.**  Beyond "Born in the Wrong Body:" Challenging our Biases to Provide Inclusive Care for Nonbinary Youth. Mini symposium presented to the annual convention for the US Professional Association for Transgender Health, 2021.

15. Dy G, Peters B, Baines H, Moyer D, Guerriero J, Dugi D, **Connelly KJ.**  Vaginoplasty After Pubertal Suppression: A Multi-Disciplinary Approach.  2SLGBTQ+ Meaningful Care Conference, 2022

16. Guerriero J, Moyer D, Baines H, **Connelly KJ.**  Beyond "Born in the Wrong Body": Challenging our Biases to Provide Inclusive Care for Nonbinary Youth. 2SLGBTQ+ Meaningful Care Conference, 2022

17. **Connelly KJ**, Guerriero J, Baines H, Moyer D.  CARE AS UNIQUE AS YOU ARE: EXPLORING INDIVIDUAL PATHWAYS OF CARE FOR YOUTH WHO IDENTIFY BEYOND THE GENDER BINARY.  World Professional Association for Transgender Health Annual Meeting, 2022.

Abstracts: Poster Presentations
1. **Connelly KJ,** Boston B, Pearce E, Sesser D, Pino S, Braverman L, Snyder D, LaFranchi S: Congenital hypothyroidism caused by excess prenatal maternal iodine ingestion: Endocrine Society annual meeting, Houston, TX, June 2012.

2. **Connelly KJ,** Larson E, Klein RK. Early-Life Exposure of Male Mice to Estrogen Alters the Trajectory of Somatic Growth and Skeletal Development: American Society for Bone and Mineral Research (ASBMR), Minneapolis, MN, October 2012.

3. **Connelly KJ,** Marks DL, Klein RF.  Impact of neonatal estrogen exposure on skeletal development in pre-pubertal male mice: Endocrine Society annual meeting, San Francisco, CA, June 2013.

4. **Connelly KJ,** Huang, S, Krol A, Jugo, R, LaFranchi, SH.  Hypothyroidism in an infant with a fibrosarcoma expressing type 3 deiodinase (D3).  American Thyroid Association annual meeting, Coronado, CA, Nov 2014.

5. **Connelly KJ,** Selva KA.  Expanded Insurance Coverage for Pediatric Gender Dysphoria Results in More Children Receiving Pubertal Suppression.  Pediatric Academic Societies Annual Meeting, Baltimore, MD, May 2016.

7

6. Pierce ME, **Connelly KJ**, Hanna CE, LaFranchi SH.  Misleading TBG Levels in Separation of Central Congenital Hypothyroidism from TBG Deficiency in Neonates Detected by Newborn Screening. Pediatric Academic Societies Annual Meeting, Baltimore, MD, May 2016.

7. Baines, HK, LaFranchi SH, Boston BB, **Connelly KJ.**  Lipoid congenital adrenal hyperplasia (LCAH) first presenting at 7 months with acute salt-wasting crisis.  International Meeting of Pediatric Endocrinology, Washington, DC, 2017

8. Deane M, **Connelly KJ**.  Redesigning Testosterone Prescribing in the Doernbecher Gender Clinic: Interdisciplinary Process Improvement Results in Enhanced Patient Experience.  Pediatric Academic Societies Annual Meeting, Toronto, CA, May 2018.

9. Baines HK, Guerriero J, Penkin A, **Connelly KJ.**  Quality improvement efforts to create patient-centered individualized intake process in a large pediatric gender clinic results in improved patient satisfaction and reduced barriers to care.  Pediatric Academic Societies Annual Meeting, Toronto, CA, May 2018.

10. Cantu AL, **Connelly KJ,** Moyer DN, Holley AL.  Examining Changes in PHQ-9 and GAD-7 Scores in Transgender & Gender Nonconforming Youth Receiving Care in a Pediatric Endocrinology Clinic. SPPAC Annual Meeeting, New Orleans, LA 2019.

11. O'Neill A, Seideman C, **Connelly KJ.** Standardizing Urology Follow-Up and Patient Education for Girls with Classical Congenital Adrenal Hyperplasia.  Pediatric Academic Societies Annual Meeting, Baltimore, MD 2019.

12. Baines H, **Connelly KJ.** Comparison of clinical and biochemical effects of subcutaneous and intramuscular testosterone injections in transgender male adolescents. Pediatric Academic Societies Annual Meeting, Baltimore, MD 2019.

13. Doan L, Baines H, Boston BA, **Connelly KJ,** Guttmann-Bauman I, LaFranchi SH, Livett T, Madison L, Nicol L, Woods K.  Hypertension In Pediatric Diabetes Patients at OHSU: Quality Improvement Process to Improve Detection of Abnormal Blood Pressures.  Pediatric Academic Societies Annual Meeting, Baltimore, MD 2019.

14. Eshragh N, Doan L, **Connelly KJ**, LaFranchi SH. Severity and natural history of congenital adrenal hyperplasia detected on the second versus first newborn screen in the Northwest Regional Newborn Screening Program. Pediatric Academic Societies Annual Meeting, Baltimore, MD 2019.

15. Berry A, **Connelly KJ.**  The Influence of Discrimination, Gender Assumption, and (Trans)-Misogyny on Psychological Distress and Suicidality in Non-Binary Participants of the 2015 US Transgender Survey, US Professional Association for Transgender Health Annual Meeting, Washington, DC 2019.

16. Guerriero J, **Connelly KJ.**  Impacts of scheduled v. spontaneous intakes and follow along in patient retention for a pediatric gender clinic.  US Professional Association for Transgender Health Annual Meeting, Washington, DC 2019.

8

17. Berman, AM, Klees, AM, Heyerman TA, Harrison R, **Connelly KJ,** Hoffman LM. From Farm to Patient: A Novel Community-Based Health Promotion Program to Support Patients with Diabetes Experiencing Food Insecurity During in the COVID-19 Pandemic. SGIM annual meeting

18. Mullin R, Baines H, **Connelly KJ.** Congenital Disorder of Glycosylation 1b: Rare cause of hyperinsulinemic hypoglycemia treated with oral mannose therapy. Pediatric Endocrine Society annual meeting, 2021.

19. Hedrick H, Glover N, **Connelly KJ**, Guerriero J, Moyer DN. Virtual visits: Benefits and barriers to providing pediatric gender affirming care via telehealth. US Professional Association for Transgender Health annual meeting, 2021.

20. Battison E, Murphy C, Moyer D, **Connelly KJ**, Dy G, Holley A, Wilson A. Pain and Psychosocial Risk in Adolescents and Young Adults Receiving Gender Affirming Surgery. International Association for the Study of Pain annual meeting, 2022


## V. SERVICE

**Membership in Professional Societies:**
>Pediatric Endocrine Society, 2011-present
>The Endocrine Society, 2011-2015
>American Thyroid Association, 2013
>Oregon Pediatric Society


**Committees:**
<u>Department of Pediatrics</u>
2013-present   Resident Education Committee, member
2014-present   Doernbecher Gender Clinic Workgroup, chair
2016-present   Doernbecher Sex Development Team Workgroup, co-chair

<u>OHSU</u>
2013-2016      OHSU Healthcare Transitions for Adolescents with Diabetes Committee, member
2013-present   OHSU Transgender Health Program Committee, member
2015-present   OHSU Transgender Health Program Advisory Board, member
2017-present   OHSU Transgender Health Program Multidisciplinary Surgical Planning Workgroup, member

<u>Local</u>
2013-2018      TransActive Gender Center Health Care Advisory Committee, member

<u>National</u>
2015-present   Pediatric Endocrine Society Transgender Special Interest Group, member
2017-present   Disorders of Sex Development Translational Research Network (DSD-TRN) Leadership Group, member
2018-present   Disorders of Sex Development Translational Research Network (DSD-TRN) Endocrine Workgroup Co-Lead

9

2018-2021    Pediatric Endocrine Society Transgender Special Interest Group, Co-Chair
2020-present   Pediatric Endocrine Society Equity, Diversity & Committee, member

**Invited Reviewer:**
Journal Adolescent Health
J Andrology
Transgender Health

**Community Service:**
1998          Project Coordinator, Save the Children Nicaragua.  Managua, Nicaragua.
1999-2001     Emergency Medical Technician and Assistant Director of Operations.  Tulane
              Emergency Medical Service, New Orleans, LA.
2005          Medical Volunteer, Hurricane Katrina Relief.  San Antonio, TX.
2004-2007     Steering Committee member and volunteer, UTHSCSA Student-run Free Clinic
              Program.  San Antonio, TX.
2010          Volunteer Physician, Casa Base de Salud.  Managua, Nicaragua.
2010-present   Camp Physician, Gales Creek Camp for children with diabetes.  Tillamook, OR.

**Interviews/Submissions for Public Media**
The Atlantic. Delaying Puberty with the Help of the State.  October 22, 2014
Portland Monthly.  Let's Talk About Gender.  March 2016
OPB
Podcast (Camp Wildheart) x 2
Science Friday
Portland Tribune
KGW
Portland Mercury
Reuters
NY Times
OHSU Now

**Clinical Responsibilities:**
2013-present   Attending, Pediatric Endocrinology Service: 9 weeks per year
2013-present   Attending, Pediatric Endocrinology Clinic: 1 session per week
2013-present   Attending, Pediatric Diabetes Clinic: 1 session per week
2013-present   Medford Outreach Pediatric Endocrinology Clinic: 8 sessions per year
2015-present   Eugene Outreach Pediatric Endocrinology and Telehealth Clinic: 8 sessions per year
2016-2021     Salem Outreach Pediatric Endocrinology Clinic: 12 days per year
2021-present   Doernbecher Gender Clinic HV: 2 sessions per week

**Honors and Awards in Service:**
2017          OHSU Professional Staff Award – Outstanding Contribution to Innovation in New Models of
              Clinical Care and Interdisciplinary Teams
2022          Gold Humanism Honor Society, member
2023          Oregon Pediatric Society – Annual Meeting Special Recognition Award

10

App.648

**VI. TEACHING (Also see attached OHSU Educators Portfolio):**

**Overview of Your Role as an Educator:**
Educational activity includes: (1) Didactic teaching of housestaff (residents and fellows), medical students, physician assistant students, dental residents, pharmacy residents, and ancillary staff, (2) Small group clinical teaching of housestaff and medical students. (3) As-needed education of OHSU staff on topics related to infectious diseases, infection prevention and control, including hospital infection control policy (4) Regional and national education conferences to provide medical education to healthcare providers and trainees

**Scholarship of Teaching:**

Curriculum Development and Instructional Design
| | |
|---|---|
| 2010 | Developed and implemented online case-based teaching tool that was used by pediatric residents and medical students on pediatric endocrinology rotation. |
| 2016-2019 | Teaching Communication Skills through Video Self-Observation and Feedback. IRB STUDY00015211. Randomized controlled trial of use of video self-observation and feedback on development of communication skills in pediatric residents. |

**Educational Activity (Also see attached OHSU Educators Portfolio):**

Teaching Activity: Invited Lectures

**Institutional**
| | |
|---|---|
| 2013 | "Pediatric Endocrinology Challenging Clinical Case." Pediatric Grand Rounds, |
| 2013 | "Pediatric Diabetes." Family Nurse Practitioner Program |
| 2014 | "Principles of Sexual Differentiation." OHSU School of Medicine |
| 2015 | "Care of Transgender and Gender Non-Conforming Youth." OHSU School of Medicine |
| 2016 | "Care of the Transgender Child/Adolescent." OHSU School of Medicine |
| 2016 | "Care of the Transgender Child/Adolescent." Child Psychology Program |
| 2017 | "Panel Discussion: Care of Transgender Patients." OHSU School of Medicine |
| 2017 | "Care of the Transgender Child/Adolescent." Doernbecher Child Psychology Program |
| 2017 | Department of Pediatrics Quality Grand Rounds |
| 2017 | "Care of the LGBTQ Patient" OHSU School of Medicine Developing Human Course |
| 2018 | "Care of the LGBTQ Patient" OHSU School of Medicine Developing Human Course |
| 2018 | "Principles of Sexual Differentiation." OHSU School of Medicine Developing Human Course |
| 2019 | "Gender Affirming Hormone Therapy." OHSU Physician Assistant Program |
| 2019 | "Care of the LGBTQ Patient" OHSU School of Medicine Developing Human Course |
| 2019 | "Principles of Sexual Differentiation." OHSU School of Medicine Developing Human Course |
| 2020 | "Affirming and Informed." Training for OHSU Behavioral Health Consultants |
| 2020 | "Trauma Informed Care." OHSU Pediatric Urology Program |
| 2020 | "Gender Affirming Care for Youth." Doernbecher Child Psychology Program |
| 2020 | "Growth Disorders in Children." OHSU Family Medicine Residency Program |
| 2020 | "Care of the LGBTQ Patient" OHSU School of Medicine Developing Human Course |
| 2020 | "Principles of Sexual Differentiation." OHSU School of Medicine Developing Human Course |

11

| 2021 | More than Medicine: Creating Safety Nets for Gender Diverse Youth**.**  OHSU School of Medicine Health Equity series |
|---|---|
| 2021 | "Beyond Born in the Wrong Body: Challenging our Biases to Provide Inclusive Care for Nonbinary Youth." Department of Pediatrics Grand Rounds |
| 2021 | "More than Medicine: Creating Safety Nets for Gender Diverse Youth**."** Doernbecher Children's Hospital Perioperative Anesthesia |
| 2021 | "More than Medicine: Creating Safety Nets for Gender Diverse Youth**."** OHSU Foundation. |
| 2022 | "More than Medicine: Empowering Providers to Create Safety Nets for Gender Diverse Youth." Invited lecture for OHSU Pediatric Hematology/Oncology Grand Rounds |

**Local**

| 2015 | "The Pediatric Transgender Patient: What Primary Care Physicians Need to Know."  Trans Health Provider training sponsored by Family Care and Health Share of Oregon |
|---|---|
| 2017 | "Care of the Transgender and Gender Diverse Pediatric and Adolescent Patient."  Metropolitan Pediatrics CME presentation |
| 2018 | "Care of the Transgender and Gender Diverse Pediatric and Adolescent Patient."  Metropolitan Pediatrics CME presentation |
| 2018 | Transgender Health Program – Ob/Gyn Grand Rounds |
| 2018 | "Care of the Transgender and Gender Diverse Pediatric and Adolescent Patient."  Pacific Medical Group CME presentation |
| 2019 | "Affirming Care for Gender Expansive Youth." Portland State University School of Public Health |
| 2020 | "Affirming Care for Gender Expansive Youth." Portland State University School of Social Work |
| 2020 | "More than Medicine: Creating Safety Nets for Gender Diverse Youth**"** Department of Pediatrics Grand Rounds |
| 2021 | "Caring for Gender Expansive Youth." Lewis & Clark College |
| 2022 | "Creating Safety Nets for Gender Diverse Youth." Invited speaker, Clackamas County School Nurses meeting |

**Regional**

| 2014 | "Medical Care of Transgender Youth."  Kaiser Grand Rounds |
|---|---|
| 2014 | "Medical Care of Transgender Youth."  OHSU 9th Annual Pediatric Review & Update |
| 2015 | "Culturally Sensitive and Respectful Interdisciplinary Care of Transgender Patients."  Pacific University College of Health Professions Interdisciplinary Case Conference |
| 2016 | "Transgender and Gender-Diverse Youth: What Primary Care Providers Need to Know." Medford, OR |
| 2016 | "Transgender and Gender-Diverse Youth: What Primary Care Providers Need to Know." PeaceHealth Pediatric Grand Rounds, Eugene, OR |
| 2016 | "Medical Options for Youth with Gender Dysphoria."  Affirmative Mental Health Care for Transgender and Gender Non-conforming Youth Training |
| 2016 | "Culturally Sensitive and Respectful Interdisciplinary Care of Transgender Patients."  Pacific University College of Health Professions Interdisciplinary Case Conference |
| 2016 | "Transgender and Gender-Diverse Youth: What Primary Care Providers Need to Know."  OHSU 47th Annual Primary Care Review |
| 2017 | "Culturally Sensitive and Respectful Interdisciplinary Care of Transgender Patients."  Pacific University College of Health Professions Interdisciplinary Case Conference |

12

App.650

| | |
|---|---|
| 2017 | "Caring for Transgender and Gender Diverse Youth" OHSU Annual Pediatric Review and Update |
| 2017 | "Comprehensive Affirming Care for Transgender and Gender Diverse Patients Across the Lifespan." 44th Annual Acute and Critical Care Nursing Symposium |
| 2017 | "Care of the Transgender and Gender Diverse Pediatric and Adolescent Patient." Oregon Chapter of the National Society of Pediatric Nurse Practitioners (NAPNAP) Fall Symposium. |
| 2018 | "Many Doors One Path: A Model for a Patient/Family Centered Care in the Pediatric Endocrinology Environment." The LGBTQ Meaningful Care Conference |
| 2018 | "Building Affirming Environments for Gender Expansive Youth." Invited speaker, Oregon Pediatric Society Annual Meeting |
| 2018 | "Considerations for Trans and Gender Diverse Youth in Accessing Medical Transition." Invited speaker, Basic Rights Oregon Annual Trans Health Forum |
| 2018 | "Medical Options for Gender Expansive Youth." Healthcare for the Transgender Individual CME training. Bend, Oregon. |
| 2018 | "Affirming Healthcare for Gender Expansive Youth: Review and Update" Invited Speaker, Pacific NW Pediatric CME Symposium. Portland, OR |
| 2019 | "Transgender and Gender Diverse Patients: Building Affirming Care Environments." Invited Speaker, Mountain States Hemophilia Network Annual Regional Meeting |
| 2019 | "Affirming Care for Gender Expansive Youth" Invited Speaker, Southern Oregon LGBTQ+ Health and Wellness Summit |
| 2019 | "Pubertal Suppression and gender affirming hormone therapy for youth/adolescents" Introduction to Transgender Health For Medical and Mental Health Professionals: OHSU Transgender Health Program CME Event |
| 2019 | Taking a Sexual History, Fertility Counseling/Preservation, and Reproductive Health." Introduction to Transgender Health For Medical and Mental Health Professionals: OHSU Transgender Health Program CME Event |
| 2020 | "One Team, One Mission: Reducing Barriers for Youth and Families through Interdisciplinary Care." Pediatric Endocrine Association for Research and Learning (PEARL) Annual Regional CME meeting |
| 2020 | "OneTeam, One Mission: Reducing Barriers for Youth and Families through Interdisciplinary Care, The LGBTQ Meaningful Care Conference |
| 2020 | FUTURE STATE: Strategies for improved health and wellness for Oregon's Gender Diverse Youth, The LGBTQ Meaningful Care Conference |
| 2020 | "More than Medicine: Creating Safety Nets for Gender Diverse Youth" Hot Topics in Nursing |
| 2021 | "Supporting and affirming gender diverse youth." Invited lecture for the regional Mama Dragons group. |
| 2021 | "Pubertal Suppression." Invited lecture, OHSU Transgender Health ECHO |
| 2022 | "More than Medicine: Empowering Providers to Create Safety Nets for Gender Diverse Youth." Invited lecture for Oregon Pediatric Society annual meeting |
| 2022 | "Youth SAVE: Suicide Prevention Training for Primary Care." Trainer for 2-day training |
| 2022 | Gender-Affirming Care Advocacy Panel for medical students at Western University of Health Sciences |
| 2022 | Invited panelist with Gina Sequeira |
| 2022 | "Safe Binding and Tucking for Gender Diverse Youth." Invited speaker, Indian Health Board ECHO series |

13

| 2023 | "Navigating Stress and Burnout Given Anti-Trans Propaganda and Laws Denying Healthcare." Indian Health Board ECHO series |
|---|---|

**National**

| 2015 | "Newborn Screening for congenital adrenal hyperplasia." Webinar, Association of Public Health Laboratories: NewSTEPs Short Term Follow Up. |
|---|---|
| 2016, 2017, | "Medical Options for Youth with Gender Dysphoria." |
| 2018, 2019 | "Affirmative Mental Health Care for Transgender and Gender Non-conforming Youth" Training |
| 2020 | "Double trouble: Let's talk about sex (of rearing) and gender identity in a complex case of XY, DSD." Case presentation for the Disorders of Sex Development Translational Research Network (DSD-TRN). |
| 2021 | "More than Medicine: Creating safety nets for gender diverse youth." Half-day seminar presented to national audience organized by Corvallis Samaritan Health. |
| 2021 | Transgender & Non-Binary Surgery Allied Research Collective (TRANS-ARC). Invited member of the research resource team. |
| 2021 | "Safe binding and tucking for gender diverse youth." Invited lecturer, National Indian Health Board Transgender ECHO |
| 2022 | Transgender Health Doc in The Box session. Invited speaker for the Pediatric Endocrine Society Annual Meeting |

**International**

| 2013 | "Autoimmune Hyperthyroidism." European Society of Pediatric Endocrinology Summer School Program, Lago di Maggio, Italy, September 2013. |
|---|---|
| 2018 | "Growth Problems in Children." Neonatal Review Course 2018 American Pediatric Meeting, Lithuania |
| 2018 | "Hypothyroidism in Children." Neonatal Review Course 2018 American Pediatric Meeting, Lithuania |
| 2018 | "Puberty: What is Normal and When to Worry." Neonatal Review Course 2018 American Pediatric Meeting, Lithuania |
| 2018 | "Affirming Medical Care for Gender Expansive Youth." World Professional Association for Transgender Health Global Health Initiative, Portland OR. |
| 2018 | "Child and Adolescent Workshop: Fertility and Reproductive Options." World Professional Association for Transgender Health Global Health Initiative, Portland OR. |
| 2021 | World Professional Association for Transgender Health Global Education Initiative, invited faculty |
| 2021 | World Professional Association for Transgender Health Global Education Initiative, invited faculty |

Advisor/Mentoring

| 2013-2016 | Faculty advisor for pediatric resident: Abbie Bauer, MD; faculty member, pediatric nephrology, OHSU |
|---|---|
| 2016-2019 | Faculty advisor for pediatric resident: Sasha Ondusko, MD; currently clinical fellow in Neonatology at OHSU |
| 2016-2019 | Faculty mentor for OHSU School of Medicine scholarly project: Mackenzie Deane |
| 2016-2019 | Faculty mentor for OHSU Pediatric Endocrinology Fellowship scholarly project: Hayley Baines, MD |
| 2017-2020 | Faculty advisor for pediatric resident: Terry Kho, MD |

14

| 2017-2019 | Faculty mentor for OHSU pediatric resident: Alison O'Neill, MD; currently clinical fellow in pediatric endocrinology at CHOP |
| 2018-2021 | Faculty advisor for pediatric resident: Jordan Frei, MD |
| 2019-2020 | Faculty mentor for OHSU School of Medicine scholarly project: Alisha Berry |
| 2019-2022 | Faculty mentor for OHSU School of Medicine scholarly project: Corey Gallet De St Aurin |
| 2019-2022 | Faculty mentor for OHSU School of Medicine scholarly project: Alec Berman |
| 2021-2022 | Faculty mentor for OHSU School of Medicine scholarly project: Abraham Rickett |
| 2021-2022 | Faculty mentor for OHSU School of Medicine scholarly project: Marie Piatski |
| 2020-present | Faculty mentor for OHSU pediatric resident: Kim Vidmar, MD |
| 2022-present | Max Sutherland |

**Effectiveness of Educational Activity:**
Please see OHSU Educators Portfolio for summary of completed evaluations

**Educational Administration: Leadership and Service:**

| 2013-present | Pediatric Endocrinology Resident and Medical Student Education Rotation Director |
| 2014 | Pediatric Endocrine Association for Research and Learning Regional (PEARL) CME meeting – Program Director/Organizer |
| 2013-2016 | Pediatric residency program interviewer (approximately 8-11 hours per year) |
| 9/2015, 1/2016, 9/2016, 11/2017, 5/2018 | Affirmative Mental Health Care for Transgender and Gender Non-Conforming Youth Training Course – Program Director/Organizer (September 2015, January 2016) |
| 2015-2020 | OHSU School of Medicine College Program Lead, OHSU School of Medicine |
| 2019 | Introduction to Transgender Health For Medical and Mental Health Professionals: OHSU Transgender Health Program CME Event – Program Director/Organizer |
| 2021 | OHSU Transgender Health Program CME Grand Rounds Series – Program Organizer |

**Honors and Awards for Education:**

| 2013 | Joseph B Bilderback Fellow Teaching Award, Doernbecher Children's Hospital |
| 2019 | OHSU School of Medicine Continuing Professional Development Honored Planner Award |
| 2019 | OHSU School of Medicine Outstanding Leader in Electives for Clinical Experiences Award |

PROFESSIONAL DEVELOPMENT

Formal Training

| 2016-2017 | Certificate, Education Scholars Program, Oregon Health & Science University, Portland, OR |
| | A nine-month, longitudinal program designed to facilitate clinical educators' deeper understanding of teaching and learning so that each will be prepared to effectively and adaptively teach in multiple settings, mentor others in the development of teaching skills, contribute to the scholarship of teaching, and serve as educational leaders of courses, units, departments, and schools. |

15

Li Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
David A. DeRoin (ISB no. 10404)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

*Additional counsel for Plaintiffs identified on
the following page*

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF IDAHO

|  |  |
|---|---|
| **PAM POE**, *by and through her parents and next friends, Penny and Peter Poe*; **PENNY POE**; **PETER POE**, *et al.*, <br><br> v. <br> *Plaintiffs*, <br><br> **RAÚL LABRADOR**, *in his official capacity as Attorney General of Idaho, et al.*, <br><br> *Defendants*. | Case No. 1:23-cv-00269-CWD <br><br> **DECLARATION OF PAM POE IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com
kyle.bersani@groombridgewu.com

Philip S. May*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com

*Admitted *pro hac vice*

Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Dina Flores-Brewer (ISB no. 6141)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
(208) 344-9750
Tel: dfloresbrewer@acluidaho.org

*Attorneys for Plaintiffs*

### DECLARATION OF PAM POE IN SUPPORT OF
### PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Pam Poe, hereby declare as follows:

1.      I am a fifteen-year-old transgender girl, living with my mom, dad, and sibling in Meridian, Idaho. I am a Plaintiff in this lawsuit and call myself "Pam Poe." Our counsel have explained to me and my family what a preliminary injunction is, and we eagerly join the other Plaintiffs in seeking an injunction. Our lawyers have helped me prepare this Declaration, but the story below is mine. I have personal knowledge of the facts I explain below, and I would testify to them if called as a witness.

2.      I have lived in Meridian, Idaho my entire life. I will be a sophomore in high school beginning in August 2023. I am interested in engineering, programming, and math. During the summer, I have a part-time job. This year is my second year working there.

3.      While I am a girl, I was designated male at birth. Growing up, I always felt different, like I was not really a boy, but I did not know how to describe those feelings. I also did not know how to describe the mental and emotional distress I began experiencing as I got older because I knew that my gender was wrong. I know that I am a girl, not a boy. I just want to live and be treated like any other girl.

4.      Around the time I was in 7th grade, as I began to experience puberty, I noticed how heavily I was struggling with depression, anxiety, and thoughts of self-harm. I started engaging in acts of self-injury. I did not really understand why exactly, but I was in a very dark place. During that time, there were times I felt like I did not want to exist anymore because I was so unhappy with what was happening to my body, feeling trapped and not like myself, and because people saw me as a boy and addressed me as one.

1

App.656

5.      Eventually, these feelings became so overwhelming that I finally told my mom what I was feeling in August 2021.

6.      I remember that moment clearly.  We had a bunch of family over at the house, but I was feeling uncomfortable with myself, so I stayed in my room for most of the evening. As it got late that night, I realized that I could not wait any longer.  I had to tell my mom my truth. I had been wanting to tell her for so long, but I was scared.  I decided to text her and come out. I told her that I was non-binary (I was still exploring my gender identity and knew I was not a boy, but did not yet understand that I am a girl), that I wanted to be called "Pam," and that I wanted people to use different pronouns in referring to me. I was not sure how or if she was going to respond, because it was so late and she was entertaining family. But she did respond. She used my new name and told me that she loved me, and that we would talk about it in the morning, when things were quieter and we would have more privacy.

7.      The next morning my mom came into my room. She sat by me on the floor and hugged me. She told me that she loved me. It was very emotional, but I was so happy that she accepted me. Because we still had family in town and some staying with us, we also talked about who knew, who did not know, and who we should avoid finding out for now. My mom was already trying to protect me, and that also made me feel very happy, safe, and loved.

8.      I continued to try to understand my gender identity and who I am. Not long after coming out, I told my parents I was more comfortable with she/her pronouns. I knew I didn't feel like a boy and was coming to realize I didn't have to force a masculine presence on myself. I was still exploring whether nonbinary, transgender, or no gender felt like the right label for how I was feeling.  I stopped trying to be the boy that society told me to be, and I focused on presenting my true self.

2

App.657

9.      My parents found a counselor, who I started seeing weekly.  He diagnosed me with depression. Even with counseling, I continued to struggle. Due to puberty, my body was still changing in ways that were making me feel miserable, because with every change, I became more and more physically a boy, and I just knew that was not who I was.

10.      One day in early 2022, I sent my mom a text at 2am because I did not want to wake her, asking for admission to hospitalized care. I told her that I did not want to be alive anymore. It was hard to describe to her how I was feeling at the time. I decided that an inpatient stay at a residential treatment facility would help me and provide me with greater support. With my parents' support, I entered residential treatment at the end of February 2022 and stayed there for one week. During my time in inpatient treatment, I opened up more to one of the providers I was seeing about my gender identity and the distress, depression, and anxiety around my body. That provider diagnosed me with gender dysphoria, in addition to my depression and anxiety.

11.      Before, when I thought about the possibility of being diagnosed with gender dysphoria,  I had assumed it would be something negative and that I would feel shame about the diagnosis. However, when I received the diagnosis, I felt relief and validation. I felt like I had permission to stop fighting my identity and pretending to be someone I wasn't. My body and its developments were causing me severe dysphoria, because I was unable to be seen by others as a girl, or even a feminine human being

12.      After I left the residential treatment facility, I was referred to a doctor who is an expert in treating gender dysphoria.  Unfortunately, the next available appointment was not until a few weeks later, in May 2022.

13.      At the appointment, my doctor evaluated me, talked with my parents and me about the possibility of me being treated with puberty blockers, and discussed with us the benefits of

3

App.658

treatment and the risks. I also had blood drawn to figure out where my body was, in terms of puberty. I remember leaving that first appointment with a huge smile and feeling just overwhelmed with relief. Learning that puberty blockers were possible and that they would stop the changes happening to my body took a huge weight off my shoulders and helped my mental health.

14.     At my next visit with the doctor, after again discussing everything we discussed at the first meeting, my parents and I, along with the doctor, decided that puberty blockers were the right treatment for me. I began puberty blockers in June 2022. I just felt so happy and relieved because I knew that it was going to stop what was happening to me. My mental health started to improve and only continued to improve over the next few months.

15.     A counselor had been recommended to us as someone with experience caring for people with gender dysphoria, and after several months on the waitlist, I began therapy with her in July 2022.

16.     With my parents' support, I had begun socially transitioning after coming out to them. I started wearing more feminine clothing, wearing makeup, and dying my hair and growing it out. Making these changes made me feel more like myself. Seeing that that my family saw me, accepted me, and treated me as who I really am also made me feel more like myself.

17.     Being able to be myself, because of the puberty blockers and socially transitioning, I became more confident. I was already out to my close friends and family, and I realized I was ready to reintroduce myself, my real self, to other people in my life. When I started high school in August 2022, I entered as a girl and have been treated as a girl since day one.

18.     Socially transitioning helped me feel like I wasn't hiding when I was in public. I felt more confident that people were seeing *me*, not the masculine role I was assigned. It didn't alleviate all of my distress though. I still constantly worried about people seeing certain parts of

4

App.659

me that are not in line with my gender identity and expression. Puberty blockers paused more changes to my body that did not align with my gender identity, and I was still having a lot of gender dysphoria about the ways my body didn't align with my gender identity.

19.     In April 2023, after being on puberty blockers for almost a year, my parents and I had a conversation with my doctor about starting estrogen therapy. My doctor performed more bloodwork, talked to us about the potential risks and benefits of estrogen therapy, discussed options for fertility preservation, and confirmed my ongoing therapy and mental health support. My parents and I, in talking with my doctor, decided that estrogen therapy was the best and appropriate treatment for my gender dysphoria.  I started treatment and I have been on estrogen ever since. Just like with the puberty blockers, the estrogen therapy has made such a difference in my life. My mental health is the best it has ever been. I am feeling more confident, happy, and excited that I am developing as a girl.

20.     Before I began gender-affirming medical treatment, I was in a very dark place. I struggled so hard, with anxiety, depression, hiding away by myself, thoughts of self-harm, and even harming myself to cope with it all. The changes because of male puberty were making me miserable and causing all of those bad symptoms. I could not see a future for myself and did not want to exist. Gender-affirming medical care saved my life. When I think back to that time, it makes me sad. I know it really scared my parents. It scared me too. I did not want to die, I just wanted to be myself, my true self. I am so glad that I told my parents about what I was struggling with.  I wish I had told them sooner.

21.     It is hard for me to find the words to explain the difference in my life now that I am receiving gender-affirming medical care and living as the girl that I know I am. I am happy and confident. I am excited about the future I see for myself.

22.     That is also why I am incredibly anxious and scared about H.B. 71. My entire family is very scared. If H.B. 71 becomes law, I would have to stop receiving the medical treatment that has saved me. I have already lived through the extreme mental health symptoms of not receiving treatment and I never want to experience that again. I cannot go back to that.

23.     If H.B. 71 becomes law, my parents have talked about moving out of Idaho when my sister graduates from high school next year. We also talked about traveling to get care, but that would be a significant financial burden for my family. If we move, I will leave the only home I have ever known, my close community of friends, and my healthcare providers, who I trust, who have supported me, and who have changed my life for the better. I do not want to leave. I want to stay in Idaho, in my home, and continue receiving the healthcare I need. Please, please do not let this law take effect.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Idaho, on this 18th day of July, 2023

Pam Poe
Pam Poe

6

App.661

Li Nowlin-Sohl*
(Admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
David A. DeRoin (ISB no. 10404)
Casey Parsons (ISB no. 11323)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 6th Avenue
New York, NY 10019
Tel: (212) 373-3000
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com
jorosz@paulweiss.com

*Admitted Pro hac vice

Attorneys for Plaintiffs

Additional counsel for Plaintiffs identified
on the following page

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF IDAHO

| | |
|---|---|
| **PAM POE**, *by and through her parents and next friends, Penny and Peter Poe*; **PENNY POE**; **PETER POE**, *et al.*,<br><br>v.<br><br>*Plaintiffs,*<br><br>**RAÚL LABRADOR**, *in his official capacity as Attorney General of Idaho, et al.*,<br><br>*Defendants.* | Case No. 1:23-cv-00269-CWD<br><br>**DECLARATION OF JANE DOE IN SUPPORT OF PLAINTIFFS' MOTION FOR A <u>PRELIMINARY INJUNCTION</u>** |

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com
kyle.bersani@groombridgewu.com

Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Philip S. May*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com

Dina Flores-Brewer (ISB no. 6141)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**DECLARATION OF JANE DOE IN SUPPORT OF**
<u>**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**</u>

I, Jane Doe, hereby declare as follows:

1.  I am a Plaintiff in this action, and refer to myself here as "Jane Doe." I make this Declaration in support of my and the other Plaintiffs' Motion for a Preliminary Injunction. My lawyers have helped me prepare this Declaration because I am not a lawyer and I have no experience with Declarations. The facts I describe below are about my own experience, however. I have personal knowledge of them, and would testify competently to them if called as a witness.

2.  I am a sixteen-year old girl. I live with my mom, dad, and siblings in Boise, Idaho, where I have lived my entire life. This fall, I will be a high school senior. After high school, I plan to attend college. I am in interested in majors related to computer coding, cybersecurity, or videogame development.

3.  I am transgender. I have a female gender identity, but I was designated as male at birth.

4.  I have gender dysphoria, and was diagnosed with gender dysphoria by my doctor in November 2020.

5.  For as long as I can remember, I knew that something felt off about my being a boy. I have always naturally related to other girls, felt the most like myself around other girls, and had similar interests as other girls. When I was younger, I did not have the words to express my feelings related to my gender identity or being transgender. But I knew it even before I knew the words for it.

6.  In school, when we would be divided into girls' teams and boys' teams, I always wanted to be and felt like I belonged on the girls' team. When I would play "make believe" with my friends, I was always a girl character. When I would play video games, I would almost always

1

App.664

choose a girl avatar. My mom and dad have told me that when I was little and my mom was pregnant with my younger sibling, I would lay down and place a doll on my stomach and tell them that I wanted to be a mom.

7. While I always felt like I was not a boy, it was difficult and scary for me to address these feelings. That distress became severe with puberty. I now understand this to be gender dysphoria. But I never tried to tell my parents about my feelings when I was young, out of my own fear of rejection from friends and the community.

8. I did not meet a transgender person, or at least someone I knew was transgender, until I was about 10 years old and met a transgender woman who was friends with my parents. My parents explained to me that their friend was transgender, that she had been born a boy but was a woman on the inside, and was now living her life as a woman. It was like hearing them describe my own life to me. Before that, I did not know that transitioning was even possible. I was immediately excited about the possibility that I could do the same one day.

9. In 2018, my body started changing as I entered puberty. It became increasingly devastating to me, and my mental health began to deteriorate. The changes to my body made me look like a boy. I remember that I would often refuse to allow my photograph to be taken during that time because of the pain it caused me seeing myself as someone I was not. I could not hide all of the physical changes, and I would often self-isolate and avoid social settings. I wanted to be social, but the pain of being perceived as a boy and seeing myself with male features was too much to bear. I also began to suffer academically at school because I could not focus on my schoolwork due to the severe mental health issues my gender dysphoria was causing me. There were times that I simply just did not want to exist because the physical changes to my body were trapping me in an existence that was not me and caused me so much pain, on a constant basis.

2

App.665

10.     In June 2020, my gender dysphoria had intensified so badly that I needed to tell someone. I told one friend in July and then a couple more in September. In late September 2020, I finally found the courage to tell my parents that I am transgender, that I am a girl, that I was suffering, and that I needed help. My parents did not hesitate. They told me they loved me, they would support me in anything, and they just wanted me to be happy and healthy.

11.     With my parents' support, I began socially transitioning in October 2020. I began going by a female first name and using feminine pronouns. I wore a feminine hairstyle and I started wearing girls' clothes. I told my mom I wanted to wear makeup and, as part of all of the ways in which she supported me when I asked for her help, she taught me about makeup and how to apply it. All of this helped my gender dysphoria, but I was still experiencing male puberty, which was causing significant physical changes to my body that I could not hide or cover up with makeup or clothes. And I knew that some of these unwanted changes would be permanent. My gender dysphoria was still causing me significant pain.

12.     In mid-October 2020, my parents and I had a visit with my pediatrician to discuss what I was experiencing. My pediatrician referred me to a doctor who specializes in the treatment of gender dysphoria. My parents also found a therapist for me.

13.     We had our first visit with the doctor in November 2020. The doctor examined me, asked me about my experience regarding my gender over the years, took blood for tests, and talked to me about the options for treating gender dysphoria based on my age, the risks and benefits of treatment, and things we could do to preserve my ability to have children.

14.     After several months of therapy, an additional visit with the doctor, and much discussion with my parents, we decided to start on puberty blockers. I began receiving that treatment in January 2021.

App.666

15.     The puberty blockers stopped any new changes from happening to my body and prevented my gender dysphoria from getting worse. Knowing that further changes would not happen was a big relief to me and improved my mental health.

16.     After a few successful months on puberty blockers, we began talking about starting gender-affirming estrogen therapy. I spoke to my parents about it and during one of our visits with my doctor, he talked to my parents and me about the risks and benefits of estrogen therapy and fertility preservation, and he drew more blood for tests. Eventually, my parents and I agreed that gender-affirming estrogen therapy was appropriate for me. The doctor agreed. In April 2021, at the age of 14, I began a low dose of gender-affirming estrogen therapy.

17.     Since April 2021, I see my doctor regularly for lab work, so that he can make sure I remain healthy and so he can check my hormone levels and change my estrogen dosage if needed to remain in target ranges for my age.

18.     Estrogen has been amazing. It has changed my body in more feminine ways that I am so happy with. Seeing these bodily changes has helped my gender dysphoria a lot, and I feel like my body more accurately reflects who I am.

19.     With the help of my parents, I began legally transitioning in 2023. My parents and I first obtained a court-ordered name change in Idaho. We then had my Idaho birth certificate corrected with my new legal name and we corrected the gender marker, changing it from male to female. My parents also helped me update my information with the United States Social Security Office and helped me obtain a United States passport with my new legal name and a female gender marker.

20.     My parents and I also spoke to the administrators at my school, who were great about everything. They readily corrected my name and gender marker in my digital school records,

so that my teachers and any substitute teachers would not use the wrong name for me or the wrong pronouns and gender. This is really important to me, and I am so glad that the administrators at my school are supportive of me.

21.     Being able to medically transition and see myself, and be seen by others, as the girl I am absolutely saved my life. Before I told my parents I was transgender and about the feelings of my gender dysphoria, I was not me. I was isolating myself, depressed, anxious, and I felt trapped and scared almost daily. I could not see a future for myself and did not want to exist. I am so grateful that when I told my parents about what I was experiencing, they listened to me, trusted me, and took me to providers who could give me the gender-affirming health care that I needed to be who I am.

22.     My whole life has turned around. I am confident in who I am. My academics have improved. My mental health has improved substantially. I no longer feel the need to isolate, and I can live my life more fully and authentically. I am excited about what comes next in my life and everything I hope to do in the future.

23.     Now all of that is at risk because of H.B. 71 and I am really scared. My parents and siblings are scared, and the others who love and care about me are scared, too. The anxiety from H.B. 71 and the possibility of my healthcare being taken away and having to go back to life as it was before I began receiving gender-affirming medical care is very stressful and harmful to my mental health. It caused me to miss a lot of school while the law was being debated. As a result, my grades suffered last semester.

24.     If H.B. 71 becomes law, I would no longer be able to receive the estrogen therapy that I have been on for over two years that treats my gender dysphoria. I fear what would happen

App.668

to my mental, emotional, and physical health if my medication is cut off because of H.B. 71 and I have to resume male puberty. I have already lived that pain.

25.    My parents have talked to my siblings and me about trying to find care for me out of state or selling our house and leaving Idaho—the only home I've ever known—because of H.B. 71. I don't know if we can find care out of state or what it would look like to have to regularly travel for healthcare. Having to move would mean losing my friends, my family, my home, my community, my school, and everything that I have always known. It would mean the same for my parents and siblings. My oldest sibling is starting college in Idaho in the fall. I worry about what impact moving will have on him, his college plans, and our relationship. I do not want to move to a different state far away from him. I do not want any of this. I just want to stay in Idaho, my home, and continue receiving the healthcare I have been receiving that has made the life I am now living possible. But if H.B. 71 goes into effect, my family understands that this healthcare is so central to my wellbeing that we will likely have no other choice but to move out of Idaho.

26.    I ask that the Court please help me. Please do not let my healthcare be taken away.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Idaho, on this 18th day of July, 2023

Jane Doe
Jane Doe

App.669

**REVISED**

## STATEMENT OF PURPOSE

### RS29985C2 / H0071

The Vulnerable Child Protective Act would prohibit puberty blockers, cross-sex hormones, and sex reassignment surgeries for children under the age of 18 when administered or performed for the purpose of changing the appearance of a child's sex. These medical and surgical interventions can cause irreversible physical alterations; and some render the patient sterile or with lifelong sexual dysfunction, while others mutilate healthy body organs. This legislation also provides for exemptions for medically necessary uses of these drugs and procedures.

## FISCAL NOTE

There is no anticipated fiscal impact on the general fund because it requires no expenditure of State funds nor is there an impact on local governments.

**Contact:**

Representative Bruce D. Skaug
(208) 332-1000
Senator Lori Den Hartog
(208) 332-1000
Blaine Conzatti
Idaho Family Policy Center
(208) 260-5844

**DISCLAIMER: This statement of purpose and fiscal note are a mere attachment to this bill and prepared by a proponent of the bill. It is neither intended as an expression of legislative intent nor intended for any use outside of the legislative process, including judicial review (Joint Rule 18).**

**Statement of Purpose / Fiscal Note**            Bill SOP/FN REVISED: 03/24/2023, 8:01 AM