**No. 24-142**

_____

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

_____

PAM POE, by and through her parents and next friends PENNY and
PETER POE, et al.,

*Plaintiffs-Appellees*,

v.

RAÚL LABRADOR, in his official capacity as Attorney General of the
State of Idaho, et al.,

*Defendants-Appellant*.

_____

On Appeal from the United States District Court
for the District of Idaho
No. 1:23-cv-00269-BLW

_____

### RESPONSE TO APPELLANT'S MOTION FOR STAY PENDING
### APPEAL

_____

Li Nowlin-Sohl
(admitted only in Washington)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
Lnowlin-sohl@aclu.org

Brad S. Karp
Alexia D. Korberg
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com

Richard Eppink
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop


Philip S. May
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com

Jordan Orosz
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Dina Flores-Brewer
Paul Carlos Southwick (admitted only in
Oregon)
Emily Myrei Croston (admitted only in
the District of Columbia)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org
psouthwick@acluidaho.org
ecroston@acluidaho.org

*Attorneys for Plaintiffs-Appellees*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................... iv

INTRODUCTION ..........................................................................................1

STANDARD OF REVIEW ...........................................................................3

ARGUMENT ..................................................................................................4

    I.    Appellant is Unlikely to Succeed on the Merits ...................................4

        A.    The District Court Correctly Held Plaintiffs Are Likely to Succeed on Their Equal Protection Claim ...................................4

        B.    The District Court Correctly Held that Plaintiffs Are Likely to Succeed on Their Due Process Claim .......................15

    II.    Appellant Fails to Satisfy the Remaining Stay Factors.....................188

    III.    Appellant Is Unlikely to Succeed on His Challenge to the Scope of the Injunction .................................................................199

CONCLUSION ........................................................................................244

iii

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*4805 Convoy, Inc. v. City of San Diego*,
   183 F.3d 1108 (9th Cir. 1999) ...................................................................23

*Abigail All. for Better Access to Developmental Drugs v. von
   Eschenbach*,
   495 F.3d 695 (D.C. Cir. 2007)...................................................................17

*Ariz. Dream Act Coalition v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ...................................................................19

*Bostock v. Clayton Cnty., Georgia*,
   140 S. Ct. 1731 (2020).................................................................................7

*Brandt v. Rutledge*,
   47 F.4th 661 (8th Cir. 2022) ......................................................................20

*Brandt v. Rutledge*,
   No. 4:21CV00450 JM, 2023 WL 4073727 (E.D. Ark. June 20,
   2023), *appeal docketed* ....................................................................13, 14

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993).....................................................................................6

*Bresgal v. Brock*, 843 F.2d 1163 (9th Cir. 1987)....................................................20

*Dobbs v. Jackson Women's Health Org.*,
   597 U.S. 215 (2022).....................................................................................8

*Dodds v. U.S. Dep't of Educ.*,
   845 F.3d 217 (6th Cir. 2016) (*per curiam*)...............................................9

*Doe #1 v. Trump*,
   957 F.3d 1050 (9th Cir. 2020) .....................................................................3

*Easyriders Freedom F.I.G.H.T. v. Hannigan*,
   92 F.3d 1486 (9th Cir. 1996) .....................................................................21

*F.V. v. Barron*,
  286 F. Supp. 3d 1131 (D. Idaho 2018) ............................................20

*Geduldig v. Aiello*,
  417 U.S. 484 (1974)............................................................................8

*Get Outdoors II, LLC v. City of San Diego*,
  506 F.3d 886 (9th Cir. 2007) ...........................................................23

*Glenn v. Brumby*,
  663 F.3d 1312 (11th Cir. 2011) ..........................................................9

*Washington v. Glucksberg*,
  521 U.S. 702 (1997)..........................................................................17

*Hecox v. Little*,
  79 F.4th 1009 (9th Cir. 2023) ...................................................*passim*

*K.C. v. Medical Licensing Board of Indiana*,
  No. 1:23-cv-00595-JPH-KMB, 2023 WL 4054086 (S.D. Ind. June
  16, 2023) ............................................................................................14

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) ........................................................4, 5

*Latta v. Otter*,
  771 F.3d 496 (9th Cir. 2014) ............................................................19

*Lawrence v. Texas*,
  539 U.S. 558 (2003)..........................................................................17

*Loving v. Virginia*,
  388 U.S. 1 (1967)..............................................................................17

*M.H. v. Jeppesen*,
  No. 1:22-CV-00409-REP, 2023 WL 4080542 (D. Idaho June 20,
  2023), *appeal docketed* .....................................................................6

*Nguyen v. INS*,
  533 U.S. 53 (2001)..............................................................................8

*Nken v. Holder*,
  556 U.S. 418 (2009)........................................................................3, 4

*Pac. Shores Properties, LLC v. City of Newport Beach*,
   730 F.3d 1142 (9th Cir. 2013) ................................................................. 6

*Parham v. J.R.*,
   442 U.S. 584 (1979) ......................................................................... 16

*Reno v. Flores*,
   507 U.S. 292 (1993) ......................................................................... 18

*United States v. Salerno*,
   481 U.S. 739 (1987) ......................................................................... 19

*Santosky v. Kramer*,
   455 U.S. 745 (1982) ......................................................................... 16

*Sessions v. Morales-Santana*,
   582 U.S. 47 (2017) ....................................................................... 9, 12

*Sierra Club v. Trump*,
   929 F.3d 670 (9th Cir. 2019) ............................................................... 4

*Troxel v. Granville*,
   530 U.S. 57 (2000) ..................................................................... 15, 17

*Wallis v. Spencer*,
   202 F.3d 1126 (9th Cir. 2000) ........................................................... 16

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. Of Educ.*,
   858 F.3d 1034 (7th Cir. 2017), *abrogated on other grounds as recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020) ................................................................................ 8

*L.W. ex rel. Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023) ......................................................... 3, 18

## Statutes

Idaho Code § 18-1506C ......................................................... *passim*

San Diego Muncipal Code § 142.12 ........................................... 23

San Diego Muncipal Code § 142.1210 ........................................ 23

vi

San Diego Muncipal Code § 142.1240 ....................................................23

**Other Authorities**

E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, 23(1) Int'l J. Transgender Health (Supp. 1) S1 (2022) ...................................................13

9th Cir. R. 27-3 ...........................................................................................2

U.S. Const. amend. XIV ..........................................................................16

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102(11), J. Clin. Endocrinology & Metabolism 3869 (2017)...............................................................12

## **INTRODUCTION**

HB 71, codified at Idaho Code § 18-1506C (the "Ban"), makes it a crime—punishable by up to ten years in prison—for doctors to provide certain evidence-based medical treatments to transgender minors. The Ban specifically prohibits doctors from providing minor patients puberty blockers, estrogen, testosterone, or certain surgeries if the purpose is to affirm the minor's gender identity if it is inconsistent with their birth-assigned sex. In a thoughtful opinion examining hundreds of pages of testimony, the district court determined that the Ban likely violates the Constitution and entered a preliminary injunction to maintain the status quo and prevent irreparable harm while this litigation is pending. The court held that the Ban discriminates against transgender youth based on transgender status and sex, triggering heightened scrutiny, and that the Ban likely fails such scrutiny, based on its findings of fact, including that:

- the prohibited care (often referred to as "gender-affirming care") is safe, effective, and medically necessary for some adolescents with gender dysphoria; it is supported by every major medical organization in the United States;

- the potential risks posed by the treatments are comparable to those of other medical care that families may freely seek for minors; and

- delaying or withholding such care can be harmful, potentially

1

increasing depression, anxiety, self-harm, and suicidal ideation. The court further held that the Ban burdens parents' fundamental right to care for their children and likely fails strict scrutiny. And it concluded that Plaintiffs would suffer irreparable harm absent injunctive relief as they would be forced to stop necessary medical treatment or move or regularly travel out of state for care.

The Idaho Attorney General ("Appellant") now seeks an *emergency*[1] stay of the preliminary injunction. But Appellant cannot satisfy his burden to obtain this extraordinary intervention. He has not even *attempted* to address one of the four necessary factors: whether a stay would injure other parties. He completely fails to engage with the undisputed evidence and court's finding of irreparable harm to Plaintiffs should the Ban take effect; indeed, he barely acknowledges the Poe and Doe families.

In contrast, there will be no harm to Appellant, or the public interest, to maintain the status quo pending the appeal—that doctors, parents, and patients make these medical decisions rather than the State.

---

[1] The emergency designation is nothing more than gamesmanship by Appellant to truncate Plaintiffs' response time. The preliminary injunction maintains the status quo—there is no emergent harm that will occur in the next 21 days. 9th Cir. R. 27-3. If the inability to enforce a state law is an emergency, then every motion to stay an injunction of a state law would be an emergency.

2

Nor has Appellant demonstrated a likelihood of success on the merits of his appeal. His legal arguments, which largely rely on the nonbinding decision in *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023), petition for cert. filed, are precluded by this Court's and Supreme Court precedent. His factual assertions have been rejected by the district court and he offers no argument that the court's findings were clearly erroneous.

## STANDARD OF REVIEW

In determining whether to grant a stay, the Court considers four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 43–44 (2009) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). But "if the petition has not made a certain threshold showing regarding irreparable harm then a stay may not issue, regardless of the petitioner's proof regarding the other stay factors." *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020) (cleaned up) (internal citation omitted).

When assessing whether an appeal of a preliminary injunction is likely to succeed, this Court reviews a district court's grant of a preliminary injunction for abuse of discretion, reviewing legal conclusions de novo and factual findings for

clear error. *Hecox v. Little*, 79 F.4th 1009, 1020 (9th Cir. 2023). The moving party bears the burden of showing that the circumstances justify a stay. *Nken*, 556 U.S. at 433–34. "A stay is not a matter of right" but "an intrusion into the ordinary processes of administration and judicial review," "not to be issued 'reflexively,' but rather based on the circumstances of the particular case." *Sierra Club v. Trump*, 929 F.3d 670, 687–88 (9th Cir. 2019) (quoting *Nken*, 556 U.S. at 427, 433) (alterations omitted).

## **ARGUMENT**

### I.  **Appellant is Unlikely to Succeed on the Merits**

### A.  **The District Court Correctly Held Plaintiffs Are Likely to Succeed on Their Equal Protection Claim**

The district court correctly applied heightened scrutiny to Plaintiffs' equal protection claim because the Ban classifies based on both transgender status and sex, and based on its findings of fact, concluded that Defendants were unlikely to meet their burden under that standard.

#### 1.  **The District Court Correctly Held That the Ban Is Subject to Heightened Scrutiny**

##### a.  The Ban Classifies Based on Transgender Status

As the district court properly recognized, the Ban classifies based on transgender status—a quasi-suspect class—and is therefore subject to heightened scrutiny. App. 45–46, 49–50; *see Hecox*, 79 F.4th at 1026; *Karnoski* v. *Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019). A transgender person is, by definition, someone

4

whose sex designated at birth is different from their gender identity. App. 589; *see also Karnoski*, 926 F.3d at 1187 n.1 (transgender people have a "gender identity [that] does not match their birth-assigned sex"). The Ban prohibits medical treatments for minors only when provided "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex" Idaho Code § 18-1506C(3). By banning medical care only when it affirms a gender different from sex assigned at birth—the defining trait of being transgender—the law classifies "based on transgender status, pure and simple." App. 46 (citing *Hecox*, 79 F.4th at 1025 (finding definition in statute so closely associated with disfavored group that statute facially discriminated against group)). Moreover, under the Ban, "the classified group (transgender minors) cannot have medical treatments that the similarly situated group (cisgender minors) can," App.46, even when used for the same purpose; a cisgender male adolescent can receive testosterone to affirm his male gender identity, but a transgender male adolescent cannot. *See* Appellant's Motion for Stay Pending Appeal ("Motion") at 8 (stating that the Ban "allows all minors to receive these medical procedures" for other purposes).

Appellant incorrectly argues that the Ban does not classify based on transgender status but instead regulates the treatment of gender dysphoria. But the Ban makes no mention of gender dysphoria; it targets treatments that affirm a gender

that is inconsistent with a person's "biological sex" without regard for medical condition. Even if the Ban did regulate treatment for gender dysphoria, such regulation would be proxy discrimination. *See* App. 46; *M.H. v. Jeppesen*, No. 1:22-CV-00409-REP, 2023 WL 4080542, at *12–13 (D. Idaho June 20, 2023) (targeting gender dysphoria can be both proxy and facial discrimination against transgender people), *appeal docketed*; *see also Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013) (explaining proxy discrimination as constructively facial discrimination); *Hecox*, 79 F.4th at 1024. Only transgender people have gender dysphoria and the two are so closely correlated that singling out gender dysphoria is akin to singling out transgender people. Just like classifying based on wearing a yarmulke is "obviously" a classification based on being Jewish—a point Appellant concedes (Motion at 9)—even though not all Jews wear yarmulkes, singling out gender dysphoria is akin to singling out transgender people even though not all transgender people have gender dysphoria. Proxy discrimination does not require that the proxy apply to *every* member of the classified group. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("[T]hat many Jews do not wear yarmulkes . . . would not prevent a finding that the [yarmulke] tax . . . targeted a particular class.").

Appellant also seems to argue that heightened scrutiny does not apply because "Idaho limited these procedures for good reason" and the state can conclude a

treatment is safe for one purpose but not another. Motion at 5, 8. This reasoning improperly collapses equal protection's two-step analysis, confusing the question of whether heightened scrutiny should be applied—does the law classify based on a protected status?—with whether their asserted justifications satisfy this demanding test.

b.    The Ban Classifies Based on Sex

The district court also properly held that the Ban classifies based on sex. First, "discrimination on the basis of transgender status is a form of sex-based discrimination." *Hecox*, 79 F.4th at 1026. Second, as the district court properly held, the Ban draws a sex-based classification on its face because "the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law." App. 47 (quoting *Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022)). When the government "penalizes a person identified as male at birth for traits or actions that it tolerates in" people "identified as female at birth,"—here, for example, receiving medical treatment to live in accordance with a female gender identity— the person's "sex plays an unmistakable and impermissible role." *See Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1741–42 (2020).

Contrary to Appellant's suggestion, the Ban does not merely *reference* sex (the way a regulation of prostate cancer treatment might reference men). *See* Motion at 7. Whether a medical intervention is permissible or criminal under the Ban *turns*

7

*on* a person's sex.

Appellant's reliance on *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), and *Geduldig v. Aiello*, 417 U.S. 484 (1974), is misplaced. As to equal protection, *Dobbs* merely restated the conclusion in *Geduldig* that classifications based on pregnancy do not automatically trigger heightened scrutiny, even if they exclusively affect women. *See Dobbs*, 597 U.S. at 236–37. By contrast, the Ban on its face requires that a person's sex be known and used to determine whether treatment is prohibited. *Dobbs* did not immunize all facial sex classifications in the healthcare context and direct that they are all subject to deferential review, nor did it overrule *VMI*'s command that all sex classifications warrant heightened scrutiny.[2]

Third, the district court also correctly held that the Ban classifies based on stereotypes relating to nonconformity with a person's sex assigned at birth. *See* App. 47. "By definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth." *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. Of Educ.*, 858 F.3d 1034, 1048

---

[2] The suggestion that only classifications grounded in invidious discrimination against the class trigger heightened scrutiny is foreclosed by *VMI* and other Supreme Court precedent. *See, e.g.*, *Nguyen v. INS*, 533 U.S. 53, 68 (2001) (applying heightened scrutiny to sex-based classification despite expressly finding that it was not premised on gender-based stereotypes). In any case, the Ban does invidiously discriminate by enforcing sex stereotypes. *See infra* 8-9; App. 49.

(7th Cir. 2017), *abrogated on other grounds as recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020); *accord Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011). "Sex stereotyping based on a person's" "fail[ure] to act and/or identify with his or her" sex designated at birth "is impermissible discrimination." *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016) (*per curiam*) (internal quotation and citation omitted)). The Ban "effectively prohibits treatments for minors due to their gender nonconformity." App. 47. Yet it expressly permits the same treatments for individuals with intersex conditions, including surgery on intersex infants, to conform their bodies with what is deemed typical of their assigned sex. Idaho Code § 18-1506C(4)(c).

### 2. The District Court Correctly Held That the Ban Likely Fails Heightened Scrutiny

"'[H]eightened scrutiny is an extremely fact-bound test' which requires the Court to examine the 'actual purposes' of state action, and to 'carefully consider the resulting inequality to ensure our most fundamental institutions neither send nor reinforce messages of stigma or second-class status.'" App. 50 (quoting *SmithKline Beecham v. Abbott Laboratories*, 740 F.3d 471, 483 (9th Cir. 2014)). The district court reviewed the substantial evidence and, based on its findings of fact, concluded that Defendants likely failed to meet their burden to demonstrate an "exceedingly persuasive justification" for the Ban's classification and a "close means-end fit" between the classification and an important government interest. *Sessions v.*

9

*Morales-Santana*, 582 U.S. 47, 58, 68 (2017) (internal quotation and citation omitted).

Appellant asserts an interest in protecting the well-being of minors, but the district court found that gender-affirming medical care is safe, effective, and medically necessary for some adolescents and supported by every major medical organization in the United States; the potential risks are comparable to the risks of other medical care families can seek for minors; and delaying or withholding such care can be harmful, potentially increasing depression, anxiety, self-harm, and suicidal ideation. App. 51, 58–59. Thus, the district court concluded, the Ban "undermines, rather than serves, the asserted goal of protecting children." App. 51.

Appellant does not contend that any of the district court's factual findings were clearly erroneous. Yet his argument that the Ban satisfies heightened scrutiny is based on assertions that were rejected as a factual matter by the district court.

Appellant first argues that gender-affirming medical care has "significant risks." Motion at 10–11. But the district court found based on the evidence that the same medications that are used in gender-affirming medical care—including puberty blockers, testosterone, and estrogen—are widely used to treat cisgender adolescents for other purposes and pose similar risks. App. 50–51. Most of the risks Appellant raises apply equally to cisgender adolescents receiving these medications for other purposes. *See* Motion at 11 (citing possible risks from hormone therapy of

10

cardiovascular disease, heart attacks, strokes, osteoporosis, and hormone-dependent cancers); App. 724 (risk profiles of estrogen and testosterone regarding these impacts are the same regardless of the treatment purpose and the birth-assigned sex of the patient). Indeed, Appellant's support for many of these risks are studies of ***non-transgender*** individuals (who would still be allowed to access these treatments under the Ban). *See*, *e.g.*, Motion at 11 (citing App. 534 (risk of depression, anxiety, and suicidal ideation with puberty blockers identified in children treated for precocious puberty) and App. 530–31 (alleged risks of puberty blockers to cognitive development identified in study of adult cisgender women)).

Appellant makes much of the fact that some types of gender-affirming medical care may impair fertility. But this is not unique to gender-affirming medical care and, as with other treatments that can impact fertility, this is discussed in the informed consent process. App. 629. Moreover, treatment can be adjusted to protect fertility if desired. *Id.*

In sum, the district court did not clearly err by holding that the asserted risks fail to justify prohibiting these medications for minors ***only*** when used for gender-affirming care. Indeed, risk is present in all of medicine. App. 628. There is simply not a close fit between the "means"—prohibiting certain medications only when used for gender-affirming care for transgender adolescents—and the purported "end"—protecting youth against the potential risks of these medications. *See*

11

*Sessions*, 582 U.S. at 68.

Appellant next argues that the prohibited care lacks any proven benefit. Motion at 11–12. But the district court rejected this assertion, finding that the weight of the evidence showed that gender-affirming medical care can be helpful and necessary for some adolescents. App. 51. The court's findings were supported by the "voluminous evidence" it considered, including the considerable research evidence, decades of clinical experience, and the overwhelming support of the medical community (*see* App. 58; App. 625–26, 628–29, 631–32; App. 600).

Appellant merely relitigates the issue without identifying clear error in the district court's evaluation of the evidence. For example, he suggests that because the World Professional Association for Transgender Health (WPATH) and the Endocrine Society—which publish the leading clinical practice guidelines regarding the treatment of gender dysphoria—did not commission systematic reviews of the benefits of gender-affirming care for minors, they should be considered unreliable. This claim is baseless. A systemic review is a survey and summary of the existing literature on an issue; WPATH and the Endocrine Society's guidelines were based on their own respective extensive reviews of hundreds of studies. *See* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102(11) J. Clin. Endocrinology & Metabolism 3869, 3896–903 (2017) (available at

12

https://www.endocrine.org/clinical-practice-guidelines/gender-dysphoria-gender-incongruence); E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, 23(1) Int'l J. Transgender Health (Supp. 1) S1 (2022) (available at https://www.wpath.org/publications/soc); *see also Brandt v. Rutledge*, No. 4:21CV00450 JM, 2023 WL 4073727, at \*17 (E.D. Ark. June 20, 2023), *appeal docketed* ("Like other clinical practice guidelines, the WPATH Standards of Care and Endocrine Society Guidelines were developed by experts in the field, including clinicians and researchers, who used systematic processes for collecting and reviewing scientific evidence.").

Appellant also focuses on some systematic reviews in which the authors expressed their views about limitations of the evidence. While a systematic review can be helpful in gathering scientific literature, App. 687–88, there is no basis for the suggestion that the authors' comments about the research are entitled to special deference. That some of the evidence is characterized as "low" or "very low" quality, Motion at 12, is a term of art that means that there are no randomized controlled trials, not that the evidence is poor or unreliable. App. 728. Indeed, the majority of health care interventions are made without the benefit of randomized controlled trials and in reliance on "low" or "very low" quality evidence, especially for minors, in part because it is not ethical to withhold effective medical treatment. App. 728. The quality of evidence supporting gender affirming medical care is comparable to

13

the quality of evidence supporting other medical treatments that may be provided to minors. App. 631–32; *Brandt*, 2023 WL 4073727, at \*17.

That the district court acknowledged the presence of some conflicting evidence regarding gender-affirming medical care does not, as Appellant suggests, mean the law survives heightened scrutiny. Motion at 14. The court found that the weight of the evidence "strongly supports" its finding that the care is safe, effective, and medically necessary for some adolescents. App. 024. Appellant also misleadingly suggests that Plaintiffs' experts relied only on anecdotal evidence. Motion at 13. The record disproves this. App. 594–96, 600; App. 625–26; App. 675–83.

In sum, there is no basis to disturb the district court's findings that support its conclusion that the Ban likely fails heightened scrutiny. There is no justification—much less the "exceedingly persuasive justification" that the Constitution requires—for banning gender-affirming medical care for transgender minors.

Even if such a justification existed in *some* circumstances, the legislation categorically bans gender-affirming medical care when given to transgender minors, regardless of the circumstances. "[T]he means (a total prohibition on gender affirming medical care) is not closely fitted with the ends (protecting children)." App. 52 (comparing to *Hecox*, 79 F.4th at 1030); *see also K.C. v. Med. Licensing Bd of Ind.*, No. 1:23-cv-00595-JPH-KMB, 2023 WL 4054086, at \*11–12 (S.D. Ind.

14

June 16, 2023) (noting available less-restrictive means of regulating gender-affirming care and finding that Indiana's ban does not have the necessary "close means-end fit"). The "European scientific authorities" Appellant cites as having restricted care (Motion at 8)—but none of which have banned care (App. 52–53)—are examples of far less restrictive means of addressing asserted concerns about the treatments at issue.

There is no basis for Appellant's suggestion that some youth benefiting from the prohibited care merely makes the law an imperfect fit, and that such youth are "atypical." Motion at 14–15. The record demonstrates the opposite: that gender-affirming medical care typically benefits adolescents with gender dysphoria. App. 624–25; App. 599–600; App. 675–77.[3]

### B. The District Court Correctly Held that Plaintiffs Are Likely to Succeed on Their Due Process Claim

Appellant is also unlikely to prevail on his appeal regarding the parent Plaintiffs' due process claim. The Supreme Court has described a parent's right to direct the "care, custody, and control of their children" as "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530

---

[3] There is no basis for Appellant's assertion that "the court did not appreciate that the risk-benefit calculus for medical interventions depends on the condition treated" or that it did not consider each of the affected treatments. *See* Motion at 13–14. The record provided extensive evidence for the court to consider on these topics.

U.S. 57, 65 (2000). The Court in *Parham v. J.R.*, 442 U.S. 584, 602, 604 (1979), concluded that this encompasses the right "to seek and follow medical advice," and that parents "retain plenary authority to seek . . . care for their children, subject to a physician's independent examination and medical judgment." *See also* App. 56–57. And this Court has specifically held that the Fourteenth Amendment right to direct the upbringing of one's children includes "the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) (citing *Parham*, 442 U.S. at 602). Where, as here, the parent's and child's liberty interests in pursuing a course of medical care align, the strength of those interests is at its apex against state interference. *Cf. Santosky v. Kramer*, 455 U.S. 745, 760–61 (1982).

Appellant's attempts to frame the right as "a right to obtain specific medical procedures" is inconsistent with Supreme Court and this Court's case law on parental rights (and fundamental rights generally). Motion at 15. As the district court noted, Appellant's framing would "render[] the Fourteenth Amendment largely meaningless," putting "the entirety of modern medicine[4] . . . outside of the scope of

---

[4] Appellant's history-and-tradition approach that defines the right as tied to specific treatments would lead to the absurd result that parents could claim a fundamental right to vaccinate for smallpox but not polio; to amputate infected limbs but not

16

a parent's right to control their children's healthcare." App. 60–61. That rights must be "carefully described" in determining whether they are fundamental under federal due process, (*Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)), does not require limiting the scope of existing rights to the specific facts of the case. Indeed, *Glucksberg* itself defines the parental autonomy right broadly as the right "to direct the education and upbringing of one's children." *Glucksberg*, 521 U.S. at 720; *see also Troxel*, 530 U.S. at 66 (defining the right as one "to make decisions concerning the care, custody, and control of their children," rather than to control visitation rights); *Loving v. Virginia*, 388 U.S. 1, 12, (1967) (discussing the right to marry rather than to interracial marriage); *Lawrence v. Texas*, 539 U.S. 558, 566–67 (2003) (criticizing *Bowers v. Hardwick* for narrowly framing the issue as whether there is a fundamental right to homosexual sodomy rather than as falling within the right to intimate relationships).

This case is not about whether parents can "obtain treatments for their children that they could not receive for themselves," Motion at 16, or obtain a medication that the FDA has not approved for *any* use, *cf. Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703, 706 (D.C. Cir. 2007). The district court correctly found that the State's deprivation of Idaho parents' right

---

provide antibiotics; and to treat cholera and typhus, but not diabetes, asthma, or ADHD.

17

to seek care for their children that is otherwise generally available and accepted in the medical community burdens the fundamental right of parental autonomy. App. 55; *see also L.W.*, 83 F.4th at 510 (White, J., dissenting) (where treatment is banned only for minors, "parents have, in the first instance, a fundamental right to decide whether their children should (or should not) undergo a given treatment otherwise available to adults") For the same reasons the Ban likely fails heightened equal protection scrutiny, it likely fails the more demanding strict scrutiny because it is not "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993).

## II.    Appellant Fails to Satisfy the Remaining Stay Factors

Appellant fails to show that any of the other factors for granting a stay weigh in his favor. Remarkably, he does not even attempt to address the imminent, irreparable harm Plaintiffs will suffer if the Ban takes effect. He does not dispute Plaintiffs' testimony—which the district court credited—about how gender-affirming medical care has dramatically improved the minor Plaintiffs' lives and the harms that would result to them and their families if this care is banned. App. 62–63. Nor does he suggest that the court's findings regarding harm are clearly erroneous. Motion at 18.

Moreover, Idaho has not (and will not) suffer any harm absent a stay. Although Appellant makes the claim that the preliminary injunction precludes him

from enforcing a duly enacted law, the State suffers no harm when an unconstitutional law is enjoined. *See Latta v. Otter*, 771 F.3d 496, 500, n.1 (9th Cir. 2014). Though Appellant asserts that an injunction is necessary to prevent harm to minors, the district court found "that the evidence shows the opposite"—allowing the Ban to go into effect would not prevent harm and would deprive minors of care that is effective and medically necessary for some youth. App. 63.

"[B]y establishing a likelihood that [the State's] policy violates the U.S. Constitution," as Plaintiffs have here, they "have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

## III. Appellant Is Unlikely to Succeed on His Challenge to the Scope of the Injunction

Appellant conflates arguments about the scope of relief and standing, all of which are meritless. First, he contends that a facial injunction is inappropriate because gender-affirming medical interventions for minors are not appropriate for every person. Motion at 18–19. Facial relief is warranted when there is no set of circumstances where the challenged law would be valid. *United States v. Salerno*, 481 U.S. 739, 745 (1987). The Ban lacks a close means-end fit, which does not become closer depending on the factual circumstances to which it is applied. A minor who does not have a medical need for the banned care would not have standing to challenge the law, but that does not change the proper scope of the

injunction for those—like Plaintiffs—whose claims are properly before the court. By analogy, a state law banning girls from playing sports in school does not become constitutional just because some girls do not play sports. A girl who had no interest in sports may not have an injury to bestow standing, but that is a different question and would not preclude a facial injunction.

Second, Appellant argues that any injunctive relief should be limited to the Plaintiffs. But where a state statute is likely unconstitutional, statewide relief is an appropriate remedy. *See Hecox*, 79 F.4th at 1036–37 (affirming statewide injunction where the district court found the law at issue was likely unconstitutional as written); *Brandt*, 47 F.4th at 672 (affirming state-wide preliminary injunction enjoining gender-affirming medical care ban); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1146 (D. Idaho 2018) (granting statewide relief).

Appellant cites *Zepeda* and *Bresgal* for the proposition that an injunction should apply only to individual plaintiffs. *See* Motion at 19. But *Bresgal* made explicit that *Zepeda* did not establish such a rule, and indeed affirmed a nationwide injunction. *Bresgal v. Brock*, 843 F.2d  1163, 1170 (9th Cir. 1987). The Court in *Bresgal* was clear that "an injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Id.* at 1170–71.

20

A statewide injunction is "necessary to give [Plaintiffs] the relief to which they are entitled," because they cannot receive complete relief without an injunction allowing third parties to provide the prohibited medical care. *Id.*; *see also Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501–02 (9th Cir. 1996) (affirming a statewide injunction prohibiting enforcement of California's motorcycle helmet law, even though there were just 14 plaintiffs, because plaintiffs could not otherwise "receive the complete relief to which they are entitled"). Because there are no exceptions to the Ban on care for transgender minors, doctors and pharmacists from whom Plaintiffs may pursue care will predictably cease providing these treatments out of fear of incarceration. It is unreasonable to expect doctors and pharmacists to take the risk to try to confirm that the individual seeking care or a prescription is a plaintiff given the extraordinary penalty if they get it wrong. Statewide relief is necessary to prevent irreparable harm.

Third and finally, Appellant raises, for the first time, arguments about scope of relief and standing based on claims that the law applies to treatments that the minor Plaintiffs are not personally receiving. Motion at 19.

To begin, Appellant is incorrect regarding the treatments Plaintiffs are receiving. Plaintiff Jane Doe is receiving estrogen. App. 757. Plaintiff Pam Poe is receiving both puberty blockers and estrogen. Under her doctor's supervision, when she started estrogen, she did not stop taking the puberty blockers, which are

necessary to suppress the testosterone. App. 754–55. But, more importantly, whether framed as an argument about the scope of relief or about standing, Appellant's argument is without merit. The Ban's operative clause states that a medical provider shall not engage in certain practices for the purpose of affirming a minor's sex if their sex is inconsistent with their "biological sex," Idaho Code § 18-1506C(3), and then contains several subparts listing the practices, Idaho Code § 18-1506C(3)(a)-(d). Plaintiffs claim that § 18-1506C(3)'s prohibition on medical practices for the purpose of affirming a minor's sex inconsistent with their "biological sex" violates the Constitution (and the district court held that it likely does). App. 758. That the enumerated banned treatments include some that Plaintiffs are not currently receiving is irrelevant. There is no question that Plaintiffs have alleged an injury sufficient to establish standing to challenge the prohibition on medical treatments to affirm a minor's sex inconsistent with their "biological sex" because each minor Plaintiff alleges that she is currently receiving treatments to affirm her sex inconsistent with her "biological sex." Under Appellant's reasoning, the 15 surgical procedures listed in Idaho Code § 18-1506C(3)(a)–(b) could only be challenged one by one, by individuals seeking each specific procedure. Appellant cites no authority for such a narrow (and judicially burdensome) understanding of standing.

Appellant's merits arguments undercut his standing argument. Appellant

22

points to surgeries to argue that the Ban does not classify based on sex and to the risks of surgeries to justify banning all gender-affirming medical care, while simultaneously arguing that Plaintiffs lack standing to challenge the Ban on surgeries. *Compare* Motion at, *e.g.,* 5-7 *with* 19.

*Get Outdoors II* does not support Appellant's standing argument. There, the plaintiff challenged an entire municipal sign code after being denied a permit for a billboard. *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886 (9th Cir. 2007). The court held that the plaintiff could only challenge sections that applied to preclude the permit—an off-site sign ban (§ 142.1210) and a size and height restriction (§ 142.1240)—assuming they could demonstrate all the other standing elements. *Id.* at 892; *accord 4805 Convoy, Inc. v. City of San Diego*, 183 F.3d 1108 (9th Cir. 1999) (holding plaintiff only had standing to challenge license revocation provision, not license granting provision of ordinance). The sign ordinance at issue had over 90 separate sections addressing numerous types of signs (e.g. roof signs, construction signs, billboards) and for each, providing a host of requirements (e.g. regarding size, location, maintenance). *See* San Diego Municipal Code § 142.12 et seq. Here, Plaintiffs challenge just one section—Idaho Code § 18-1506C(3)—which prohibits medical providers from providing certain treatments to a minor "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's

23

sex if that perception is inconsistent with the child's biological sex." Because

Plaintiffs are injured by this provision, they have standing to challenge it.

## <u>CONCLUSION</u>

The Court should deny the motion to stay the preliminary injunction pending

appeal.

Date: January 23, 2024

Respectfully submitted,

/s/ *Alexia D. Korberg*
Alexia D. Korberg

Li Nowlin-Sohl (admitted only in WA)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org

Brad S. Karp
Alexia D. Korberg
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 6th Avenue
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com

Richard Eppink
Idaho State Bar no. 7503
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop

Jordan Orosz
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

24

Dina M. Flores-Brewer
Paul Carlos Southwick (admitted only in
Oregon)
Emily Myrei Croston (admitted only in
the District of Columbia)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF IDAHO
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org
psouthwick@acluidaho.org
ecroston@acluidaho.org

Philip S. May
GROOMBRIDGE, WU, BAUGHMAN
AND STONE LLP
801 17th St NW Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of 9th Cir. R. 27-1 and 32-3 because excluding parts exempted by Fed. R. App. P. 27(a)(2)(B) and 32(f) it contains 5,530 words, which when divided by 280 does not exceed the designated page limit of 20 pages. This brief complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Times New Roman 14-point font.

/s/ *Alexia D. Korberg*

Alexia D. Korberg
Counsel for Appellees

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2024, I electronically filed this Response to Appellant's Motion For Stay Pending Appeal with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

/s/ *Alexia D. Korberg*

Alexia D. Korberg
Counsel for Appellees