No. 24-142

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PAM POE, by and through her parents and next friends PENNY and
PETER POE, et al.,

*Plaintiffs-Appellees*,

v.

RAÚL LABRADOR, in his official capacity as Attorney General of the
State of Idaho, et al.,

*Defendants-Appellant*.

On Appeal from the United States District Court
for the District of Idaho
No. 1:23-cv-00269-BLW

## SUPPLEMENTAL APPENDIX TO PLAINTIFFS-APPELLEES'
## RESPONSE TO MOTION FOR STAY PENDING APPEAL

Li Nowlin-Sohl
(admitted only in Washington)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
Lnowlin-sohl@aclu.org

Brad S. Karp
Alexia D. Korberg
PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com

Richard Eppink
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop

Philip S. May
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com

Jordan Orosz
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Dina Flores-Brewer
Paul Carlos Southwick (admitted only in
Oregon)
Emily Myrei Croston (admitted only in
the District of Columbia)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org
psouthwick@acluidaho.org
ecroston@acluidaho.org

*Attorneys for Plaintiffs-Appellees*

Li Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
David A. DeRoin (ISB no. 10404)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

*Additional counsel for Plaintiffs identified on
the following page*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **PAM POE**, by and through her parents and next friends, Penny and Peter Poe; **PENNY POE**; **PETER POE**; **JANE DOE**, by and through her parents and next friends, Joan and John Doe; **JOAN DOE**; **JOHN DOE**,<br>        *Plaintiffs*,<br><br>                        v.<br><br>**RAÚL LABRADOR**, in his official capacity as Attorney General of the State of Idaho; **JAN M. BENNETTS**, in her official capacity as County Prosecuting Attorney for Ada, Idaho; and the **INDIVIDUAL MEMBERS OF THE IDAHO CODE COMMISSION**, in their official capacities,<br>        *Defendants*. | Case No. 1:23-cv-00269-CWD |

## EXPERT REBUTTAL DECLARATION OF JACK TURBAN, MD, MHS

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
Groombridge, Wu, Baughman and
Stone LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com
kyle.bersani@groombridgewu.com

Jordan Orosz*
Paul, Weiss, Rifkind, Wharton
& Garrison LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Philip S. May*
Groombridge, Wu, Baughman and
Stone LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com

Dina Flores-Brewer (ISB no. 6141)
ACLU of Idaho Foundation
P.O. Box 1897
Boise, ID  83701
(208) 344-9750
dfloresbrewer@acluidaho.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

I, JACK TURBAN, MD, MHS hereby declare as follows:

1.      I have been retained by counsel for Plaintiffs as an expert witness in connection with the above-captioned litigation.

2.      I have actual knowledge of the matters stated herein.

3.      In preparing this declaration, I reviewed the State's combined memorandum of law in opposition to motion for preliminary injunction and in support of motion to dismiss and the expert declarations by Drs. James Cantor and Daniel Weiss.  The materials I have relied upon in preparing this declaration are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject.  I may wish to supplement these opinions or the bases for them as a result of new scientific research or publications or other developments in my area of expertise.

## BACKGROUND AND QUALIFICATIONS

4.      My curriculum vitae is attached as Exhibit A to this declaration.  I am currently an Assistant Professor of Child & Adolescent Psychiatry at the University of California, San Francisco (UCSF) School of Medicine, where I am also Affiliate Faculty at the Philip R. Lee Institute for Health Policy Studies.  As a member of the faculty at UCSF, I serve as director of the Gender Psychiatry Program in the Division of Child & Adolescent Psychiatry.  I also serve as an attending psychiatrist in the adult LGBT psychiatry clinic and in the eating disorders program.  In my career, I have cared for at least 100 adolescents with gender dysphoria.  In addition to my clinical work, I conduct research focusing on the determinants of mental health among transgender youth and teach medical students, psychology trainees, psychiatry residents, and child and adolescent psychiatry fellows.

5.      I received my undergraduate degree in neuroscience from Harvard College.  I received both my MD and Master of Health Science (MHS) degrees from Yale University School

of Medicine.  I completed residency training in general psychiatry in the combined Massachusetts General Hospital / McLean Hospital residency training program (Harvard Medical School) and fellowship training in child and adolescent psychiatry at Stanford University.  I am board certified in psychiatry by The American Board of Psychiatry and Neurology.

6.      My research focuses on the mental health of transgender youth and youth experiencing gender dysphoria.  While at Yale, I was awarded the Ferris Prize for my thesis entitled "Evolving Treatment Paradigms for Transgender Youth."  In 2017, I received the United States Preventative Health Services Award for Excellence in Public Health based on my work related to the mental health of transgender youth.  I have lectured on the mental health of transgender youth at Yale School of Medicine, UCSF, Stanford University, and The Massachusetts General Hospital (a teaching hospital of Harvard Medical School).  I have given invited grand rounds presentations at academic institutions around the country and have presented nationally and internationally on topics related to the mental health of transgender people and people experiencing gender dysphoria.

7.      I have served as a manuscript reviewer for numerous professional publications, including *The Journal of The American Medical Association (JAMA)*, *JAMA Pediatrics*, *JAMA Psychiatry*, *The Journal of The American Academy of Child & Adolescent Psychiatry*, *Pediatrics*, *The Journal of Adolescent Health*, and *The American Journal of Public Health*.  I received commendation as a top peer reviewer from *Annals of Internal Medicine*, the academic journal of the American College of Physicians.  I am an academic editor for the journal *PLoS One* and a contributing editor for *The Journal of The American Academy of Child & Adolescent Psychiatry.* I have served as lead author for textbook chapters on the mental health of transgender youth, including for *Lewis's Child & Adolescent Psychiatry: A Comprehensive Textbook* and the textbook

Case 1:23-cv-00269-BLW   Document 70-4   Filed 10/13/23   Page 5 of 49

of The International Academy for Child & Adolescent Psychiatry and Allied Professionals.  I am

co-editor of the textbook *Pediatric Gender Identity: Gender-Affirming Care for Transgender and*

*Gender Diverse Youth.*

8.      I have published extensively on the topic of transgender youth, including nine

articles in peer-reviewed journals within the past two years.

9.      In the last four years, I have been retained as an expert and provided testimony at

trial or by deposition in the following cases: *Brandt et al. v. Rutledge, et al.*, No. 21-CV-450 (D.

Ark.) (deposition and trial testimony); *K.C. v. Medical Licensing Board of Indiana*, No. 1:23-cv-

00595-JPH-KMB (S.D. Ind.) (deposition).

10.     I am being compensated at an hourly rate of $400 per hour for preparation of expert

declarations and reports and time spent preparing for or giving deposition or trial testimony.  My

compensation does not depend on the outcome of this litigation, the opinions I express, or the

testimony I provide.

**THERE IS NO BASIS FOR THE STATE'S EXPERTS' ASSERTIONS THAT THERE IS
NO RELIABLE RESEARCH SHOWING THE EFFICACY AND EFFECTIVENESS OF
GENDER-AFFIRMING MEDICAL CARE FOR ADOLESCENTS**

11.     There are over a dozen studies evaluating the efficacy and effectiveness[1] of puberty

blockers and gender-affirming hormones for the treatment of adolescents with gender dysphoria.[2]

---

[1] Efficacy refers to studies looking at an intervention under "ideal circumstances" (*e.g.*, in a research clinic), whereas effectiveness studies look at the impact of an intervention under "real world" conditions (*i.e.*, in the general community practice setting).

[2] Such studies include: De Vries, A. L., Steensma, T. D., Doreleijers, T. A., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *The Journal of Sexual Medicine*, *8*(8), 2276-2283; De Vries, A. L., McGuire, J. K., Steensma, T. D., Wagenaar, E. C., Doreleijers, T. A., & Cohen-Kettenis, P. T. (2014). Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*, *134*(4), 696-704; Costa, R., Dunsford, M., Skagerberg, E., Holt, V., Carmichael, P., & Colizzi, M. (2015). Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria. *The Journal of Sexual Medicine*, *12*(11), 2206-2214; Allen, L. R., Watson, L.

3

These studies can be roughly delineated into two categories: uncontrolled longitudinal studies and controlled cross-sectional studies. Uncontrolled longitudinal studies (*e.g.*, Chen et al. *New England Journal of Medicine* 2023[3] and deVries et al. *Journal of Sexual Medicine* 2011[4]) have examined mental health before and after gender-affirming medical interventions and found that mental health is improved after treatment. Controlled cross-sectional studies (*e.g.*, van der Miesen

B., Egan, A. M., & Moser, C. N. (2019). Well-being and suicidality among transgender youth after gender-affirming hormones. *Clinical Practice in Pediatric Psychology*, *7*(3), 302-311; Kaltiala, R., Heino, E., Työläjärvi, M., & Suomalainen, L. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. *Nordic Journal of Psychiatry*, *74*(3), 213-219; de Lara, D. L., Rodríguez, O. P., Flores, I. C., Masa, J. L. P., Campos-Muñoz, L., Hernández, M. C., & Amador, J. T. R. (2020). Psychosocial assessment in transgender adolescents. *Anales de Pediatría (English Edition), 93*(1), 41-48; van der Miesen, A. I., Steensma, T. D., de Vries, A. L., Bos, H., & Popma, A. (2020). Psychological functioning in transgender adolescents before and after gender-affirmative care compared with cisgender general population peers. *Journal of Adolescent Health, 66*(6), 699-704; Kuper, L. E., Stewart, S., Preston, S., Lau, M., & Lopez, X. (2020). Body dissatisfaction and mental health outcomes of youth on gender-affirming hormone therapy. *Pediatrics, 145*(4), e20193006; Turban, J. L., King, D., Carswell, J. M., & Keuroghlian, A. S. (2020). Pubertal suppression for transgender youth and risk of suicidal ideation. *Pediatrics, 145*(2), e20191725; Green, A. E., DeChants, J. P., Price, M. N., & Davis, C. K. (2021). Association of gender-affirming hormone therapy with depression, thoughts of suicide, and attempted suicide among transgender and nonbinary youth. *Journal of Adolescent Health, 70*(4), 643-649; Turban, J. L., King, D., Kobe, J., Reisner, S. L., & Keuroghlian, A. S. (2022). Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PLoS One, 17*(1), e0261039; Tordoff, D. M., Wanta, J. W., Collin, A., Stephney, C., Inwards-Breland, D. J., Ahrens, K. (2022). Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care. *JAMA Network Open, 5*(2), e220978; Chen, D., Berona, J., Chan, Y. M., Ehrensaft, D., Garofalo, R., Hidalgo, M. A., Rosenthal, S. M., Tishelman, A. C., & Olson-Kennedy, J. (2023). Psychosocial functioning in transgender youth after 2 years of hormones. *New England Journal of Medicine*, *388*(3), 240-250.

[3] Chen, D., Berona, J., Chan, Y. M., Ehrensaft, D., Garofalo, R., Hidalgo, M. A., Rosenthal, S. M., Tishelman, A.C., & Olson-Kennedy, J. (2023). Psychosocial functioning in transgender youth after 2 years of hormones. *New England Journal of Medicine*, *388*(3), 240-250.

[4] De Vries, A. L., Steensma, T. D., Doreleijers, T. A., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *The Journal of Sexual Medicine, 8*(8), 2276-2283.

4

et al. *Journal of Adolescent Health*[5] and Turban et al. *PLoS One*[6]) have compared those who accessed gender-affirming medical care to those who desired but did not access this treatment and found that those who accessed treatment had better mental health outcomes. These two types of study designs offer complementary information that make experts in this field confident regarding the mental health benefits of these treatments. These studies are additionally supplemented by decades of clinical experience from experts around the world who care for adolescents with gender dysphoria.

12.   The State's experts devote many pages to quarreling with individual studies' methodologies. All studies in medicine have strengths and weaknesses, and one must examine the body of literature as a whole to draw conclusions. Examining the body of literature regarding gender-affirming medical care for adolescent gender dysphoria as a whole provides a rich scientific perspective, linking these treatments to clear mental health benefits.

13.   The State's experts often discuss the concept of "confounding" variables—the notion that certain *other variables* that are related to gender-affirming care and mental health outcomes may be the true reason for observed mental health benefits. The question of "confounding effect" has been examined in several ways. For instance, a 2022 paper from my research group that assessed the relationship between treatment with gender-affirming medical interventions and improved mental health statistically adjusted for a range of potentially confounding variables including age, gender identity, sex assigned at birth, sexual orientation,

---

[5] van der Miesen, A. I., Steensma, T. D., de Vries, A. L., Bos, H., & Popma, A. (2020). Psychological functioning in transgender adolescents before and after gender-affirmative care compared with cisgender general population peers. *Journal of Adolescent Health*, *66*(6), 699-704.

[6] Turban, J. L., King, D., Kobe, J., Reisner, S. L., & Keuroghlian, A. S. (2022). Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PLoS One*, *17*(1), e0261039

5

race/ethnicity, level of family support for gender identity, relationship status, level of education, employment status, household income, having ever received pubertal suppression, having ever been exposed to gender identity conversion efforts, and having experienced any harassment based on gender identity in school.[7] Even after adjusting for these potential confounding factors, the study found that treatment with gender-affirming medical care during adolescence was associated with lower odds of adverse mental health outcomes.

14.     A potential confounder that the State's experts raise in particular is whether or not participants received supportive psychotherapy in addition to gender-affirming medical care. Of note, there is no evidence-based psychotherapy that treats gender dysphoria itself, so such therapy is generally aimed at supporting the patient in general with their mental health. Some studies assessing gender-affirming medical care in adolescents have taken psychotherapy into account and found that benefits seen were not explained by the psychotherapy. Costa et al.[8] examined two cohorts of adolescents with gender dysphoria. Both cohorts received six months of supportive psychotherapy for the initial six months of the study. For the next twelve months, one group continued to receive supportive psychotherapy alone (the "delayed eligible" group), while the other received supportive psychotherapy *and* pubertal suppression (the "immediately eligible" group). The delayed eligible group had statistically significant improvement in global functioning after six months of psychotherapy alone. Of note, this supportive psychotherapy was aimed at improving mental health generally, not gender dysphoria specifically. The delayed eligible group

---

[7] Turban, J. L., King, D., Kobe, J., Reisner, S. L., & Keuroghlian, A. S. (2022). Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PLoS One*, *17*(1), e0261039.

[8] Costa R, Dunsford M, Skagerberg E, Holt V, Carmichael P, Colizzi M (2015). Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria. *The Journal of Sexual Medicine*, *12*(11), 2206-2214.

likely had worse mental health at baseline and thus was more likely to have their mental health improve with therapy. The "immediately eligible" group, which was deemed eligible for puberty blockers likely in part because their other mental health conditions besides gender dysphoria were reasonably well-controlled, did not see an improvement with therapy over these first six months. For the next twelve months of the study, the delayed eligible group that continued to receive psychotherapy alone saw no further improvement in their mental health. However, the immediately eligible group that received pubertal suppression in addition to psychotherapy saw statistically significant improvement in their global mental health functioning. This shows that pubertal suppression alleviated psychological distress that supportive psychotherapy alone could not—presumably gender dysphoria-related distress, given the mechanism of the medication. A study by Tordoff et al. similarly examined psychotherapy as a potentially confounding variable and their results showed that mental health improvements seen were not from psychotherapy alone.[9] Another study by Achille et al.[10] ran regression analyses in order to separate out the impacts of gender-affirming medical interventions from the impact of counseling and psychiatric medications. Though the sample size made it statistically difficult to detect differences, pubertal suppression was associated with better scores on the Center for Epidemiology Studies Depression Scale for participants assigned male at birth, which was a statistically significant finding.[11]

---

[9] Tordoff, D. M., Wanta, J. W., Collin, A., Stepney, C., Inwards-Breland, D. J., & Ahrens, K. (2022). Mental health outcomes in transgender and nonbinary youths receiving gender-affirming care. *JAMA Network Open*, *5*(2), e220978.

[10] Achille, C., Taggart, T., Eaton, N. R., Osipoff, J., Tafuri, K., Lane, A., & Wilson, T. A. (2020). Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results. *International Journal of Pediatric Endocrinology*, *2020*(8). doi: 10.1186/s13633-020-00078-2.

[11] It is important to note that in statistics, a statistically significant finding tells you that a finding is likely to represent a true effect and the finding was not due to random chance. In contrast, the lack of a statistically significant finding does not tell you one way or another if there is an effect. I would caution against over-interpreting non-statistically significant findings. Lack of a

15.     As discussed above, Dr. Cantor is likely correct (Cantor, ¶ 196) that the pubertal suppression plus therapy group in Costa was different from the therapy alone group in that the latter group had other mental health concerns.  However, this would mean that this group would be even more likely to respond well to psychotherapy than the therapy plus pubertal suppression group—as the study found in the first six months of psychotherapy alone; the pubertal suppression plus therapy had improvement over the latter course of the study when pubertal suppression was added, whereas the therapy alone group did not.[12]  Again, this speaks to the mental health benefits of pubertal suppression for gender dysphoria, separate from the impact of supportive psychotherapy.

16.     Of note, Dr. Cantor asserts that Carmichael et al. 2021[13] supersedes the results of Costa et al. 2015 because "neither group actually had experienced any significant improvement at all."  (Cantor, ¶196).  He failed to recognize that the Carmichael study did find that global functioning scores improved; however, for reasons not clearly outlined in the Carmichael study,

---

statistically significant finding does not mean that no effect exists; it simply means the analysis in question does not tell the researchers one way or another if an effect exists.

[12] Dr. Cantor also references a letter to the editor about the Costa study that mentions the "dropout" rate being high (Cantor, ¶ 196).  However, the dropout rate is nearly identical in the two groups, and there is no clear reason to think that the dropout rates would have thus impacted the results.  If one had seen, for instance, that the dropout rate was much higher in the pubertal suppression group, one may think that people were leaving the study due to adverse effects of treatment; however, this was not seen in the study—the dropout rates were nearly identical in both groups.  Biggs, M. (2019). A letter to the editor regarding the original article by Costa et al: Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria. *Journal of Sexual Medicine*, 16(12), 2043.

[13] Carmichael, P., Butler, G., Masic, U., Cole, T. J., De Stavola, B. L., Davidson, S., Skageberg, E. M., Khadr, S., Viner, R. M. (2021). Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK. *PLoS One*, 16(2), e0243894.

8

the authors did not run statistical analyses on this measure, as they did in the Costa 2015 publication.[14]

17.    Dr. Cantor raises the possibility that the studies finding benefits of gender-affirming medical care for adolescents reflect reverse causation (*i.e.,* the notion that improved mental health causes one to access gender-affirming medical care rather than the reverse, that gender-affirming medical care leads to better mental health).  (*See* Cantor, ¶ 61).  This issue has been examined in the literature.  For example, in a recent major publication in *The New England Journal of Medicine*, Chen et al. used a technique called parallel process modeling and found that improvements in mental health tracked along with improvements in appearance congruence over time (a measure of the degree to which study participants' bodies aligned with their gender identities), suggesting that gender-affirming medical care was the cause of the improvements in mental health, and arguing against the notion of reverse causation.[15]

18.    The State's experts spend a great deal of time focusing on the lack of randomized controlled trial ("RCT") studies in this area.   First, controlled cross-sectional studies and uncontrolled longitudinal cohort studies are well-accepted in medical research and often relied upon in medicine.  It is true that randomized controlled trials provide valuable information and strong evidence of causation that other studies do not.  But such studies are not always feasible or ethical in medicine, and many treatments are provided without the benefit of randomized

---

[14] The discussion in the Carmichael study goes on to say, "Participant experience of treatment as reported in interviews was positive for the majority, particularly relating to feeling happier, feeling more comfortable, better relationships with family and peers and positive changes in gender role" and that their lack of statistically significant findings for other measures that were statistically analyzed "may relate simply to sample size."

[15] Chen, D., Berona, J., Chan, Y. M., Ehrensaft, D., Garofalo, R., Hidalgo, M. A., Rosenthal, S. M., Tishelman, A.C., & Olson-Kennedy, J. (2023). Psychosocial functioning in transgender youth after 2 years of hormones. *New England Journal of Medicine*, *388*(3), 240-250.

9

controlled trials. Randomized controlled trials are not feasible in the realm of gender-affirming medical care for adolescent gender dysphoria in particular. Because of the existing body of literature linking gender-affirming medical care to improved mental health outcomes for adolescents with gender dysphoria, it would be extraordinarily difficult to recruit people to participate in studies, knowing they could be randomized to receive no treatment. Particularly for vulnerable and pediatric populations, is not considered ethical to randomize patients to placebo treatments when there is substantial evidence that active treatment confers important benefits. Thus, a randomized controlled trial of gender-affirming medical care for adolescent gender dysphoria would be unlikely to be approved by an Institutional Review Board (IRB), the ethical boards at universities that decide if research is allowed to proceed). [16]

19.    The State's experts also claim that data based on self-report and surveys are not valid or reliable evidence. Their claims represent a broad misunderstanding of psychiatry. Clinical psychiatry and clinical psychiatric research almost always involve patient reports of their symptoms. Because psychiatric conditions (*e.g.*, generalized anxiety disorder, major depressive disorder, schizophrenia, obsessive compulsive disorder, and gender dysphoria, among many others) do not have laboratory tests, diagnosis is made largely based on patient reports of their symptoms. At times these may be supplemented by reports from parents and clinician observations, particularly for establishing a diagnosis; however, they are not considered standard

---

[16] Of note, an RCT was recently conducted in Australia among adults with gender dysphoria to examine the impact of testosterone therapy. Nolan, B. J., Zwickl, S., Locke, P., Zajac, J. D., & Cheung, A. S. (2023). Early Access to Testosterone Therapy in Transgender and Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical Trial. *JAMA Network Open*, 6(9), e2331919. The RCT found that those randomized to immediate testosterone therapy had better mental health outcomes than those randomized to the clinic's regular waitlist. Given that they are a vulnerable group that generally warrants stricter protection under IRB review, it is unlikely that such an RCT would be approved for minors.

or necessary in clinical trials that track symptoms over time or compare the mental health of those receiving treatment to those not receiving treatment. The studies cited in this declaration utilize commonly used and validated self-report psychometric measures including the Kessler-6 measure of past-month severe psychological distress,[17] Beck Depression Inventory II,[18] and self-report measures from the National Institutes of Health Toolbox Emotion Battery.[19] These self-report instruments are standard in psychiatric research.

20. Survey methodologies are widely used in psychiatric research. Of note, the State's experts repeatedly cite survey research in their own reports (*e.g.,* Littman 2018,[20] Diaz 2023,[21] Littman 2021[22]). It is worth highlighting that there exist both high-quality and low-quality survey

---

[17] Kessler, R. C., Green, J. G., Gruber, M. J., Sampson, N. A., Bromet, E., Cuitan, M., Furukawa, T.A., Gureje, O., Hinkov, H., Hu, C., Lara, C., Lee, S., Mneimneh, Z., Myer, L., Oakley-Browne, M., Posada-Villa, J., Sagar, R., Viana, M. C., & Zaslavsky, A. M. (2010). Screening for serious mental illness in the general population with the K6 screening scale: results from the WHO World Mental Health (WMH) survey initiative. *International Journal of Methods in Psychiatric Research*, *19*(S1), 4-22.

[18] Beck, A. T., Steer, R. A., & Brown, G. (1996). Beck depression inventory–II. *Psychological Assessment*.

[19] Slotkin, J., Nowinski, C., Hays, R., Beaumont, J., Griffith, J., Magasi, S., & Gershon, R. (2012). NIH Toolbox scoring and interpretation guide. *Washington (DC): National Institutes of Health*, 6-7.

[20] Littman, L. (2018). Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. *PLoS One*, *13*(8), e0202330.

[21] Diaz, S. & Bailey, J. M. (2023). Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases. *Archives of Sexual Behavior*, *52*(3), 1031-1043. This article was later retracted by the journal. Diaz, S. & Bailey, J. M. (2023). Retraction Note: Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases. *Archives of Sexual Behavior*, doi: 10.1007/s10508-023-02635-1.

[22] Littman, L. (2021). Individuals treated for gender dysphoria with medical and/or surgical transition who subsequently detransitioned: A survey of 100 detransitioners. *Archives of Sexual Behavior*, *50*(8), 3353-3369.

11

methodologies. For example, Littman 2018 has been criticized for asking leading questions to a
group that is ideologically focused, making it easy for participants to bias results and analyses.[23]
In contrast, the 2015 US Transgender Survey had over 180 questions across 32 sections.[24] If
participants were to attempt to bias the results in a certain direction, they would have needed to
answer questions at distant parts of the survey in a particular fashion, based on what study design
they believed researchers would use. Our group's analyses also utilized regression analyses that
adjusted for a range of potentially confounding variables, further adding to the complexity of the
analyses. Of note, the analysis plans for our group's studies were designed only after the 2015
USTS was already administered.

21.     The State's experts' opinions concerning the evidence related to gender-affirming
medical care and its impact on suicidality demonstrate a lack of understanding of suicidality
research. Dr. Weiss and Dr. Cantor focus on a lack of data showing elevated rates of completed
suicides among youth with gender dysphoria, at least as compared to youth with other mental
health disorders. (Weiss, ¶ 89; Cantor, ¶¶ 147–53). It is true that there is a paucity of literature in
this regard. Such research is often conducted by examination of death records, and because gender
identity is rarely recorded on such records, this research has been difficult to conduct. However,
there have been studies showing lower odds of suicidal ideation among those who receive
treatment.[25] The suggestion that there is not really an elevated risk of suicide because the data we

---

[23] Littman, L. (2018). Parent reports of adolescents and young adults perceived to show signs of a
rapid onset of gender dysphoria. *PLoS One*, *13*(8), e0202330; Littman, L. (2019). Correction:
Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender
dysphoria. *PLoS One*, *14*(3), e0214157.

[24] James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). The Report
of the 2015 U.S. Transgender Survey. Washington, DC: National Center for Transgender Equality.

[25] See for example Turban, J. L., King, D., Carswell, J. M., & Keuroghlian, A. S. (2020). Pubertal
suppression for transgender youth and risk of suicidal ideation. *Pediatrics*, *145*(2), e20191725 in
the realm of cross-sectional studies and Allen, L. R., Watson, L. B., Egan, A. M., & Moser, C. N.

12

have is about suicidal ideation and not completed suicides demonstrates a profound lack of understanding of suicidality. Moreover, suicidal ideation is an indicator of severe psychological distress, rising to the level of the individual not wanting to live. Whether or not it ultimately results in a completed suicide, suicidal ideation is a serious negative outcome to be prevented. Reducing suicidal ideation is an important goal of mental health treatment, and it is vital for patients to have access to interventions that that reduce suicidal ideation.

22. The State's experts highlight that rates of suicidality are elevated among transgender people after gender-affirming care and Dr. Weiss even suggests that gender-affirming medical care "may increase the risk of suicide." (Weiss, ¶ 90). For example, he highlights a study by Dhejne et al. published in 2011[26] that found that those who had gender-affirming surgery had a 19-fold increased odds of suicidality when compared to the general population. Such statistics are not evidence that gender-affirming care is ineffective or that it increases suicide risk. The discussion from that very study explains:

> "It is therefore important to note that the current study is only informative with respect to transsexual persons health after sex reassignment; no inferences can be drawn as to the effectiveness of sex reassignment as a treatment for transsexualism. In other words, the results should not be interpreted such as sex reassignment *per se* increases morbidity and mortality. Things might have been even worse without sex reassignment. As an analogy, similar studies have found increased somatic morbidity, suicide rate, and overall mortality for patients treated for bipolar disorder and schizophrenia. This is important information, but it does not follow that mood stabilizing treatment or antipsychotic treatment is the culprit."

---

(2019). Well-being and suicidality among transgender youth after gender-affirming hormones. *Clinical Practice in Pediatric Psychology*, *7*(3), 302-311 in the realm of longitudinal studies.

[26] Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L., Långström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: Cohort study in Sweden. *PLoS One*, *6*(2), e16885.

13

In other words, though gender-affirming care improves mental health, it does not eliminate other factors like societal experiences of transphobia that adversely impact mental health. To evaluate if gender-affirming medical care is helpful to mental health using a control group, the control group would need to be transgender people who desired but did not access the treatment, not the general population. Almazan & Keuroghlian used that appropriate control group in a study published in *JAMA Surgery* in 2021[27] and found that access to gender-affirming surgery was associated with lower odds of past-year suicidal ideation. They further conducted post-hoc analyses that argued against the possibility of reverse causation (*i.e.,* they showed that people who received surgery had better mental health after the treatment, rather than having better mental health at baseline prior to having the surgery).

### THE STATE'S EXPERTS' CLAIM THAT IDAHO'S BAN ON GENDER-AFFIRMING MEDICAL CARE FOR ADOLESCENT GENDER DYSPHORIA IS CONSISTENT WITH INTERNATIONAL CONSENSUS IS NOT ACCURATE

23. The State's experts rely on reports from some European countries and imply that Idaho's ban on gender-affirming medical care is in line with "international consensus." (*See* for example Cantor, ¶¶ 17-33).[28] This is not accurate. *None* of these countries have banned—let alone

---

[27] Almazan, A. N., & Keuroghlian, A. S. (2021). Association between gender-affirming surgeries and mental health outcomes. *JAMA Surgery*, *156*(7), 611-618.

[28] For example, Cass, H. (2022, February). The Cass Review: Independent review of gender identity services for children and young people Interim report. National Health Service (NHS), UK (England); COHERE Finland (Council for Choices in Health Care in Finland) (2020, June 16). Medical treatment methods for dysphoria associated with variations in gender identity in minors—Summary of a recommendation. [Translated], *available at* https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en+(1).pdf/fa2054c5-8c35-8492-59d6-b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474 (Finland); Swedish Socialstyrelsen. (2022, February 22). Uppdaterade rekommendationer för hormonbehandling vid könsdysfori hos unga. [Updated recommendations for hormone therapy for gender dysphoria in young people.], *available at* https://www.socialstyrelsen.se/om-socialstyrelsen/pressrum/press/uppdateraderekommendationer-for-hormonbehandling-vid-konsdysfori-hos-unga/ (Sweden); Swedish Socialstyrelsen. (2022, December). Care of children and adolescents with gender dysphoria. Summary of national guidelines, *available at*

---

14

criminalized—gender-affirming medical care for adolescents with gender dysphoria as Idaho does.

Rather, the government health authorities in the select countries referenced have made changes to

the way in which gender-affirming care is being delivered (*e.g.,* moving care to research settings

where more data can be collected).[29]  Rather than put it in line with "international consensus,"

Idaho's ban on gender-affirming medical care for adolescent gender dysphoria puts the law

squarely outside of mainstream medical views and policies around the world.

24.     The State's experts focus on the European reports' assessment of the body of

research on gender-affirming care for minors.  Of note, most of these reports were not peer-

reviewed and were published by government entities.[30]  These types of government reports are not

the types of research that experts rely upon when forming conclusions about research.  Moreover,

they do not include all of the relevant literature.  The State's experts attempt to bolster the

importance of these reports by calling them "systematic reviews."  But all a "systematic review"

means is that the authors of the reports pre-defined the search terms they used when conducting

literature reviews in various databases.[31]  Merely pre-defining search terms does not guarantee that

---

https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2023-1-8330.pdf (Sweden); French Academy of Medicine. (2022) Medicine and gender transidentity in children and adolescents, *available at* https://www.academie-medecine.fr/la-medecine-face-a-la-transidentite-de-genre-chez-les-enfants-et-les-adolescents/?lang=en.

[29] Contrary to the suggestion of Dr. Weiss (¶ 168), that gender services for minors have been shut down in the U.K., the National Health Service replaced a centralized clinic with several regional clinics.

[30] The one exception is that the Swedish Agency for Health Technology Assessment and Assessment of Social Services (SBU) published its systematic review in the journal *Acta Paediatrica*, a Swedish medical journal that appears to be peer-reviewed.  *See* Ludvigsson, J. F., Adolfsson, J., Höistad, M., Rydelius, P.-A., Kriström, B., & Landén, M. (2023). A systematic review of hormone treatment for children with gender dysphoria and recommendations for research. *Acta Paediatrica.* doi: 10.1111/apa.16791.

[31] Harvard Countway Library. Systematic Reviews and Meta Analysis Q&A. Accessed: October 1, 2023, *available at* https://guides.library.harvard.edu/meta-analysis/GettingStarted.

the systematic review will identify the full body of relevant literature,[32] nor does it tell you anything about the reliability of the review authors' description and analysis of the literature. The primary advantage to a systematic review would be its potential (though no guarantee) to identify research publications that had not previously been identified in this discussion. The reports cited by the State's experts did not identify any such new research reports that affect my conclusions about the research.

### THE STATE'S EXPERTS HAVE INAPPROPRIATELY APPLIED RESEARCH ON PREPUBERTAL CHILDREN TO TRANSGENDER ADOLESCENTS IN CLAIMING THAT THERE IS A HIGH LIKELIHOOD OF "DESISTANCE" AMONG ADOLESCENTS WITH GENDER DYSPHORIA

25.     Dr. Cantor inappropriately uses studies of young prepubertal children to imply that adolescents who are candidates for gender-affirming medical care are likely to desist if not provided with gender-affirming care. (Cantor, ¶115). Though the terms "children" and "adolescents" are sometimes used synonymously in common parlance, these terms have specific and distinct meanings in the context of child and adolescent psychiatric research. In this field, "child" and "children" refer to minors who have not yet reached the earliest stages of puberty (*i.e.*, Tanner 2). The terms "adolescent" and "adolescents" refer to minors who have begun puberty. Studies of prepubertal children (who are not candidates for gender-affirming medical interventions under *any* existing clinical guidelines) cannot be conflated with studies of adolescents (who,

---

[32] This is the case with a Cochrane review abstract from 2020 cited by Defendants' experts regarding gender-affirming hormone therapy among transgender women (Haupt, C., Henke, M., Kutschmar, A., Hauser, B., Baldinger, S., Saenz, S. R., & Schreiber, G. (2020). Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women. *Cochrane Database of Systematic Reviews*, *2020*(11), CD013138). The Cochrane review did not identify several cohort studies examining gender-affirming medical care for adolescent gender dysphoria, likely due to its search methodology, and because it only examined studies published prior to 2019.

depending on several factors, *may* be candidates for various forms of gender-affirming medical interventions).

26.     This distinction is vital in the realm of "desistence" studies (*i.e.*, studies that aim to assess how many young people who identify as transgender will later identify as cisgender).  The suggestion by Dr. Cantor that a majority of transgender minors affected by the Idaho law will come to identify with their assigned sex at birth inappropriately relies on studies of gender diverse *prepubertal* children, which have, in the past, shown that many of these children will not grow up to be transgender.  These studies do not apply to transgender minors who have reached puberty (*i.e.*, "adolescents").[33]  Once a transgender youth begins puberty, it is extremely rare for them to later identify as cisgender.[34]  The notion that puberty will generally result in transgender people coming to identify as cisgender is also clearly not true given the fact that there are over 1 million transgender adults in the U.S.[35] and the vast majority of older cohorts were unable to access pubertal suppression.[36]

---

[33] Dr. Cantor suggests that the desistance studies are not irrelevant to adolescents because they do not specify at what developmental stage the reported desistance occurred.  (Cantor, ¶119).  But those studies say nothing about whether desistance is common among adolescents with gender incongruence.

[34] See Turban, J.L., de Vries, A.L.C., & Zucker, K.  (2018).  Gender Incongruence & Gender Dysphoria.  In Martin A., Bloch M.H., & Volkmar F.R. (Editors): *Lewis's Child and Adolescent Psychiatry: A Comprehensive Textbook, Fifth Edition*. Philadelphia: Wolters Kluwer. This textbook chapter provides comment from the directors of two of the oldest and most established gender clinics in the world.

[35] Flores, A. R., Herman, J., Gates, G. J., & Brown, T. N. (2016). *How many adults identify as transgender in the United States?* (Vol. 13). Los Angeles, CA: Williams Institute.

[36] See, for example, Turban, J. L., King, D., Carswell, J. M., & Keuroghlian, A. S. (2020). Pubertal suppression for transgender youth and risk of suicidal ideation. *Pediatrics*, *145*(2), e20191725, which found that only 2.5% of those who desired pubertal suppression for gender dysphoria were able to access it.

17

27.     Any study regarding prepubertal children and their likelihood of ultimately identifying as transgender should not be used to assess the interventions targeted by the Idaho law, namely, pubertal suppression, gender-affirming hormones, and gender-affirming surgery, since none of these interventions are provided to prepubertal patients under current medical guidelines.[37]

28.     Further, the utility of "desistence" studies even for predicting the future gender identity of prepubertal children is not appropriate due to their reliance on an outdated diagnosis of "gender identity disorder in children," which did not require a child to identify as a sex different than their sex assigned at birth.  This diagnosis likely captured many cisgender "tomboys" or cisgender boys with feminine interests like dresses or dolls who never identified as transgender to begin with and, thus, unsurprisingly did not identify as transgender when followed up with later in life. In fact, an analysis of the so-called "desistence" studies found that, when asked their gender identity, 90% of the children with "gender identity disorder" in these studies reported an answer that aligned with their sex assigned at birth.[38] In contrast, the diagnosis of "gender dysphoria in children" requires one to not merely have gender atypical interests and behaviors; one must identify as a gender different than one's sex assigned at birth.  This is a vital distinction.  While the diagnostic category of "gender identity disorder" would capture many cisgender children, the diagnostic category of "gender dysphoria" from the DSM-5, by definition, does not. [39]

---

[37] Hembree, W.C., Cohen-Kettenis, P.T., Gooren, L., *et al*.  (2017).  Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline. *Journal of Clinical Endocrinology & Metabolism*, 102(11), 3869-3903.

[38] Olson, K. R. (2016). Prepubescent Transgender Children: What We Do and Do Not Know. *Journal of the American Academy of Child and Adolescent Psychiatry*, *55*(3), 155-156.

[39] For more information on the limits of "desistence studies" see Olson, K.R.   (2016). Prepubescent Transgender Children: What We Do and Do Not Know.  *Journal of the American Academy of Child & Adolescent Psychiatry*, 3(55), 155-156.

18

**THE STATE'S EXPERTS' ASSERTION THAT GENDER AFFIRMING CARE CAUSES PERSISTENCE OF GENDER INCONGRUENCE IS NOT SUPPORTED BY EVIDENCE**

29.     The State's experts suggest that gender affirming care, including social transition, causes the persistence of gender incongruence among youth.  Despite Dr. Cantor spending a considerable portion of his declaration on the importance of differentiating correlation from causation, he does not apply that to the findings that social transition is correlated with "persistence."  He outlines data showing that youth who socially transition are more likely to continue to identify as transgender later in life (*i.e.,* correlation).  But this correlation could be due to two possibilities: (1) social transition could influence a child's gender identity, making them identify more strongly as transgender and thus more likely to persist, or (2) children who go on to socially transition identified more strongly as transgender than those who did not *prior* to social transition, and thus their pre-transition gender incongruence lead to the social transition in the first place.

30.     Research by Rae et al. has shown that the second possibility is far more likely to be what is occurring.[40]  Rae et al.'s 2019 study showed that gender identification is not significantly different before and after a social transition, but that those who ultimately underwent a social transition had a greater degree of gender incongruence *prior to social transition*.[41]  The study made clear that this correlation—between pre-pubertal social transition and transgender identity—is because those who undergo a pre-pubertal social transition had stronger discordance between

---

[40] Rae, J. R., Gülgöz, S., Durwood, L., DeMeules, M., Lowe, R., Lindquist, G., & Olson, K. R. (2019). Predicting early-childhood gender transitions. *Psychological Science*, *30*(5), 669-681.

[41] Note that in most studies, a lack of a statistically significant finding is not informative.  This study used sophisticated Bayesian statistics to show that gender identification was not different before and after a social transition.  Such a finding of something not being different is, under these methods, reliable.

19

their sex assigned at birth and their gender identity to begin with, and that social transition itself does not appear to increase gender discordance.

31.     The State's experts also point to studies showing that the overwhelming majority of transgender adolescents who start pubertal suppression go on to future additional gender-affirming medical interventions, suggesting that pubertal suppression causes continued gender incongruence.  (*E.g.*, Weiss, ¶119, referring to a "conveyer belt of 'gender transition'").   It is another logical fallacy to infer that a study showing that the majority of adolescents on puberty blockers proceeding on to future gender-affirming medical interventions is evidence that the treatment causes persistence; rather, it is just as possible, and in my opinion more likely, that, given the comprehensive biopsychosocial mental health assessment that is done prior to starting gender-affirming medical interventions under current guidelines, the adolescents who started pubertal suppression were those who were, through medical and mental health screening, determined, prior to starting pubertal suppression, to have a low likelihood of future desistence in their transgender identity.

### THE STATE'S EXPERTS' SUGGESTION THAT PATIENTS SEEK GENDER-AFFIRMING MEDICAL CARE BECAUSE OF SOCIAL INFLUENCE IS WITHOUT BASIS

32.     The State's experts claim that social influence is responsible for adolescents seeking gender-affirming medical care and is a cause of "rapid-onset gender dysphoria".  (Cantor ¶ 136; Weiss ¶¶ 35, 106.)

33.     As an initial matter, Defendants' experts fail to note that "rapid-onset gender dysphoria" is not a recognized mental health condition.[42]  The term "rapid-onset gender dysphoria"

---

[42] Littman, L. (2019). Correction: Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. *PLoS One, 14*(3), e0214157.

entered the literature in 2018 through a publication by Dr. Lisa Littman, discussed briefly above.[43]

Soon after the initial publication of Dr. Littman's article, a correction was published.[44] The

correction noted, "Rapid-onset gender dysphoria (ROGD) is not a formal mental health diagnosis

at this time. This report did not collect any data from the adolescents and young adults (AYAs) or

clinicians and therefore does not validate the phenomenon."[45] The correction goes on to say "the

term should not be used in any way to imply that it explains the experiences of all gender dysphoric

youth . . . ." The American Psychological Association has highlighted that, due to the lack of

empiric basis, "rapid-onset gender dysphoria" should not be used in assessment or clinical

treatment contexts.[46] Despite this, the State's experts cite the 2018 Littman article to make

unsubstantiated claims about adolescents with gender dysphoria.

34. The Littman study was an anonymous online survey of the parents of transgender

youth, recruited from websites where this notion of "social contagion" leading to transgender

identity is popular. The anonymous survey participants were asked what they thought was the

---

[43] Littman, L. (2018). Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. *PLoS One*, *13*(8), e0202330.

[44] Littman, L. (2019). Correction: Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. *PLoS One*, *14*(3), e0214157.

[45] A recent study by Bauer et al. in *The Journal of Pediatrics* examined some of the associations that would be consistent with the existence of "rapid-onset gender dysphoria" and concluded that their results "did not support the rapid onset gender dysphoria hypothesis." Bauer, G. R., Lawson, M. L., Metzger, D. L., & Trans Youth CAN! Research Team. (2022). Do Clinical Data from Transgender Adolescents Support the Phenomenon of "Rapid Onset Gender Dysphoria"?. *Journal of Pediatrics*, *2022*(243), 224-227. Two recent publications from our group similarly did not support the notion: Turban, J. L., Dolotina, B., King, D., & Keuroghlian, A. S. (2022). Sex assigned at birth ratio among transgender and gender diverse adolescents in the United States. *Pediatrics*, *150*(3), e2022056567 and Turban, J. L., Dolotina, B., Freitag, T. M., King, D., & Keuroghlian, A. S. (2023). Age of Realization and Disclosure of Gender Identity Among Transgender Adults. *Journal of Adolescent Health*, *72*(6), 852-859.

[46] American Psychological Association et al. CAAPS Position Statement on Rapid Onset Gender Dysphoria (ROGD). Available at: https://www.caaps.co/rogd-statement. Accessed: October 1, 2023.

etiology of their children's transgender identity. Some of these parents believed that their children became transgender as a result of watching transgender-related content on websites like *YouTube* and having LGBTQ friends. The alternative interpretation, and in my opinion more likely interpretation, is that these youth sought out transgender-related media and LGBTQ friends because they wanted to find other people who understood their experiences and could offer support. The parent respondents also noted that, from their perspective, their children became transgender "all of a sudden," hence the term "rapid-onset." Once again, the problem here is that the study did not interview the adolescents themselves, nor their healthcare providers. It is common for transgender (as with gay, lesbian and bisexual) children and adolescents to conceal their identity from their parents for long periods of time. In a recent study from our research group, transgender people who first understood their gender identity in childhood waited a median 14 years before sharing this with another person.[47] In my experience working with transgender youth and adults, the reasons for this tend to be out of fear of negative repercussions (rejection, being kicked out of the house, or even physical assault) were their parents to find out that they are transgender. Children often learn to conceal their gender non-conforming behaviors and transgender identity early, particularly if their parents have strong negative reactions to them exhibiting gender non-confirming behavior.

35. The State's experts point to the increase in referrals to gender clinics, particular among birth-assigned females, over time as a point of concern. (*E.g.*, Cantor, ¶17, ¶25; Weiss ¶179). The increase in referrals has coincided with increased visibility of transgender people, including transgender men, in society and greater awareness of gender dysphoria and access to

---

[47] Turban, J. L., Dolotina, B., Freitag, T. M., King, D., & Keuroghlian, A. S. (2023). Age of Realization and Disclosure of Gender Identity Among Transgender Adults. *Journal of Adolescent Health*, *72*(6), 852-859.

medical care to treat it. In the past, people thought of gender dysphoria as something that primarily impacted birth-assigned males. This likely led to many cases of gender dysphoria among birth-assigned females being overlooked by families or undiagnosed or "missed" by doctors. In recent years, literacy regarding gender dysphoria among birth-assigned females has increased among physicians. As fewer birth-assigned females go undiagnosed, the sex ratio in gender clinics has shifted away from predominantly birth-assigned males. This is similar to a pattern that has been seen in autism spectrum disorder. For example, a large study found that with increasing awareness that autism spectrum disorder can impact birth-assigned females as well as birth-assigned males, the sex ratio shifted more toward birth-assigned females, from 5.1:1 (birth-assigned males to females) to 3.1:1.[48] The same study saw the sex ratio for the related diagnosis of Asperger's syndrome similarly shift from 8.4:1 to 3.0:1. Whereas parents and pediatricians in the past may have had limited literacy regarding gender diversity in adolescents, today more Americans, as well as people abroad, have greater understanding of the experiences of transgender youth. This fact has undoubtedly increased the number of parents bringing their adolescents to gender clinics for evaluation and pediatricians referring patients to gender clinics. Additionally, insurance coverage of gender-affirming medical interventions has improved drastically, meaning that more families are able to afford care, which results in an increase in referrals for evaluation.

36.     Of note, not all adolescents who present at gender clinics ultimately go on to receive gender-affirming medical interventions.[49] In fact, in a large study from a Netherlands gender

---

[48] Jensen, C. M., Steinhausen, H. C., & Lauritsen, M. B. (2014). Time trends over 16 years in incidence-rates of autism spectrum disorders across the lifespan based on nationwide Danish register data. *Journal of Autism and Developmental Disorders*, *44*(8), 1808-1818.

[49] Wiepjes, C. M., Nota, N. M., de Blok, C. J., Klaver, M., de Vries, A. L., Wensing-Kruger, S. A., de Jongh, R. T., Bouman, M. B., Steensma, T. D., Cohen-Kettenis, P., Gooren, L. J. G., Kreukels, B. P. C., & den Heijer, M. (2018). The Amsterdam cohort of gender dysphoria study

23

clinic, the percentage of patients who presented for evaluation who actually started any kind of gender-affirming treatment has decreased over time.[50]  The authors of that study note:

> "[T]his finding may be explained by the fact that in the past it was harder to find information about [gender dysphoria] and its treatment, and only people with extreme types of [gender dysphoria] managed to visit our gender identity clinic for treatment.  Currently, owing to media attention and the internet, it is easier to access information about our gender identity clinic, making the threshold lower to search for help."

This shows that while more people may be coming in for evaluation, the criteria for diagnosis and treatment remain stringent and a smaller percentage of patients are actually being diagnosed with gender dysphoria and referred on for medical treatment.

## THE STATE'S EXPERTS ASSERTIONS OF HIGH RATES OF TRANSITION REGRET ARE UNSUPPORTED BY THE EVIDENCE

37.  The State's experts suggest that a large number of adolescents who undergo gender-affirming medical care go on to regret treatment; however, this is not supported by extant evidence. In 2018, Amsterdam's VUMC Center of Expertise on Gender Dysphoria published the rates of regret among their cohort of 6,793 transgender patients who had undergone gender-affirming medical and surgical interventions.[51]  Among transgender women with gender dysphoria who underwent gender-affirming surgery, 0.6% experienced regret.  Among transgender men with

---

(1972–2015): trends in prevalence, treatment, and regrets.  *Journal of Sexual Medicine*, *15*(4), 582-590.

[50] Wiepjes, C. M., Nota, N. M., de Blok, C. J., Klaver, M., de Vries, A. L., Wensing-Kruger, S. A., de Jongh, R. T., Bouman, M. B., Steensma, T. D., Cohen-Kettenis, P., Gooren, L. J. G., Kreukels, B. P. C., & den Heijer, M. (2018). The Amsterdam cohort of gender dysphoria study (1972–2015): trends in prevalence, treatment, and regrets.  *Journal of Sexual Medicine*, *15*(4), 582-590.

[51] Wiepjes, C. M., Nota, N. M., de Blok, C. J., Klaver, M., de Vries, A. L., Wensing-Kruger, S. A., de Jongh, R. T., Bouman, M. B., Steensma, T. D., Cohen-Kettenis, P., Gooren, L. J. G., Kreukels, B. P. C., & den Heijer, M. (2018). The Amsterdam cohort of gender dysphoria study (1972–2015): trends in prevalence, treatment, and regrets.  *Journal of Sexual Medicine*, *15*(4), 582-590.

gender dysphoria who underwent gender-affirming surgery, 0.3% experienced regret. Several of those who experienced regret were classified as having "social regret" rather than "true regret," defined in the study as still identifying as transgender but deciding to reverse their gender-affirming surgery due to factors like "the loss of relatives [being] a large sacrifice." The study also reported that only 1.9% of adolescents who started pubertal suppression did not choose to go onto gender-affirming hormones. In a second study of 143 transgender adolescents who started pubertal suppression, 5 (3.5%) decided not to proceed with further gender-affirming medical treatments.[52] One of these adolescents noted that pubertal suppression helped them to better understand their gender identity, and they ultimately identified with their sex assigned at birth. One birth-assigned female had ongoing chest dysphoria but chose to live with a female gender expression regardless, though was dreading further breast development and menstruation. One stopped due to unspecified "psychosocial reasons" but continued to identify as transgender. One identified as gender non-binary and felt they no longer needed treatment. One came to identify with his sex assigned at birth. There was no indication that any of these adolescents *regretted* pubertal suppression; rather, this study shows that the treatment served its goal of allowing adolescents more time to better understand their gender identity before being assessed for additional treatment.

38. The State's experts cite some studies discussing rates of discontinuing gender-affirming medical interventions. For example, Dr. Weiss cites findings from a study by Roberts et al. published in 2022 that "[a]mong those who had started hormonal intervention before age eighteen, 26% discontinued treatment. Among all the natal females in this follow up study, 36%

---

[52] Brik, T., Vrouenraets, L. J., de Vries, M. C., & Hannema, S. E. (2020). Trajectories of adolescents treated with gonadotropin-releasing hormone analogues for gender dysphoria. *Archives of Sexual Behavior*, 49(7), 2611-2618.

25

discontinued treatment."[53]    (Weiss, ¶159).    It is essential to note that discontinuation of a medication does not necessarily indicate regret. This study examined only rates of discontinuation, not *reasons* for discontinuation.  Reasons for discontinuing can include satisfaction with degree of physical gender congruence already attained, social stress related to transphobia, or financial reasons like loss of insurance.  As the paper notes, in citing our 2021 publication in the journal *LGBT Health*, "many individuals who report [stopping] gender-affirming hormones [report] subsequently restarting treatment or the intention to restart treatment."

39.    Dr. Weiss also failed to mention that the Roberts study found that discontinuation rates were lower among those who started gender-affirming medical care as minors when compared to those who started as adults, likely due to the comprehensive psychosocial mental health evaluations conducted prior to initiating care.  The publication's discussion section notes, "Regardless of the reason for the higher hormone continuation rate among TGD youth, this finding provides support for the idea that TGD individuals below the age of legal majority, with the assistance of their parents or legal guardians and health care providers, can provide meaningful informed assent for gender-affirming hormones and do not appear to be at a higher risk of future discontinuation of gender-affirming hormones because of their young age alone."

40.    The State, on page nine of its combined memorandum of law in opposition to motion for preliminary injunction and in support of motion to dismiss, asserts that a paper by Hall et al. shows that "the medical detransition rate among youth who underwent gender transitions in recent years may be as high as 30% . . ." The cited paper shows no such thing. First, this was a study of adults, not youth. Second, the study did not find a detransition rate of 30%. The paper

---

[53] Roberts, C. M., Klein, D. A., Adirim, T. A., Schvey, N. A., Hisle-Gorman, E. (2022). Continuation of Gender-affirming Hormones among Transgender Adolescents and Adults. *Journal of Clinical Endocrinology & Metabolism*, *107*(9) e3937-e3943.

notes, "twelve cases (12/175, 6.9%) were agreed by all authors to meet the case definition for detransitioning. Regret was specifically documented in two cases [1.1%]"[54] Also of note in this study is that the authors did not record reasons for detransition (defined in this study as going back to presenting as one's sex assigned at birth). The State also cites a press release from the French Academy of Medicine, which, though it states there is an "increasing number of transgender young adults wishing to "detransition," provides no detransition rate, nor any citation that shows this is true.[55] One of the few citations the press release does provide is to the 2018 Littman paper I discuss above.[56]

41. In a peer-reviewed manuscript that was named Best Clinical Perspectives Manuscript of the year by *The Journal of The American Academy of Child & Adolescent Psychiatry*, Dr. Alex Keuroghlian and I created a framework for understanding transgender adolescent patients who discontinue gender-affirming medical interventions.[57] We explained that this may be due to external factors (*e.g.*, pressure from family, societal rejection, harassment by peers) or internal factors (*e.g.*, a change in the understanding of one's gender identity). We highlighted that discontinuation of gender-affirming medical interventions does not always coincide with a change in understanding of one's gender identity or with transition-related regret.

---

[54] Hall, R., Mitchell, L., & Sachdeva, J. (2021). Access to care and frequency of detransition among a cohort discharged by a UK national adult gender identity clinic: retrospective case-note review. *BJPsych Open*, *7*(6), e184.

[55] French Academy of Medicine. (2022) Medicine and gender transidentity in children and adolescents, *available at* https://www.academie-medecine.fr/la-medecine-face-a-la-transidentite-de-genre-chez-les-enfants-et-les-adolescents/?lang=en.

[56] The French Academy of Medicine press release itself recommends, "in the event of a persistent desire for transition, a careful decision about medical treatment with hormone blockers or hormones of the opposite sex within the framework of multi-disciplinary consultation meetings."

[57] Turban, J. L., & Keuroghlian, A. S. (2018). Dynamic gender presentations: understanding transition and" de-transition" among transgender youth. *Journal of the American Academy of Child and Adolescent Psychiatry*, *57*(7), 451-453.

27

Our team later published a study highlighting that a substantial number of currently identified transgender people (13.1%) have "de-transitioned"[58] at some point in their life, with the majority (82.5%) citing external factors like family rejection, societal stigma, or harassment.[59] Given that these people *currently* identify as transgender, it highlights that many people who "de-transition" choose to transition again in the future. This harkens to the history of the "ex-gay" movement in which many gay and lesbian individuals reported that they were "cured" of their homosexuality, only to later reveal that they were still gay but felt pressured by their communities to say for many years that they were not.

42. The State's experts cite two papers discussing the experiences of some individuals who detransitioned, one by Littman and one by Vandenbussche.[60] (Weiss, ¶157). Neither of these papers provide information on the prevalence of detransition or, specifically. the rate of detransition among those who initiate gender-affirming medical care during adolescence. In fact, the introduction of the Littman article states that the paper is not "designed to assess the prevalence of detransition as an outcome of transition." In addition, in the Littman study, 34% of the participants reported that gender-affirming care was "a necessary part of [their] journey." And

---

[58] This study defined "de-transition" as an affirmative answer to the following: "Have you ever de-transitioned? In other words, have you ever gone back to living as your sex assigned at birth, at least for a while?"

[59] Turban, J. L., Loo, S. S., Almazan, A. N., & Keuroghlian, A. S. (2021). Factors Leading to "Detransition" Among Transgender and Gender Diverse People in the United States: A Mixed-Methods Analysis. *LGBT Health,* 8(4), 273-280.

[60] Littman L. (2021). Individuals treated for gender dysphoria with medical and/or surgical transition who subsequently detransitioned: A survey of 100 detransitioners. *Archives of Sexual Behavior*, 50(8), 3353–3369; Vandenbussche, E. (2021). Detransition-related needs and support: A cross-sectional online survey. *Journal of Homosexuality*, 69(9), 1602-1620. Of note, of the 237 individuals in the Vandenbussche study, only 25% had medically transitioned as minors and many did not medically transition at all.

28

among this group of people who de-transitioned, most reported that undergoing gender-affirming medical care was in some way helpful.

43. Dr. Weiss cites Reddit in his attempt to claim there is evidence that rates of detransition and regret among those initiating gender-affirming medical care are high. (Weiss, ¶156). He notes that one Reddit group called r/detrains has over 49,000 members. However, there is no indication that all or even many of the 49,000 members of that group have detransitioned, even if that term is broadly defined. In fact, in reading r/detrans, one will find posts expressing concern that the group has been dominated by members who have not actually detransitioned but rather by "people who are wanting to prey on their vulnerability and use them as political pawns."[61]

44. There are undoubtedly some people who start gender-affirming medical interventions and later stop them. A small minority of these appear to regret the treatment, though differentiating regret related to transphobia from regret related to the treatment itself can be difficult to disentangle. But as I reviewed above, all existing research suggests that regret following gender-affirming medical interventions is rare. As with all medical interventions, gender-affirming medical interventions cannot claim a 100% success rate. However, for the vast majority of adolescents, these interventions improve mental health. Accordingly, it is dangerous to take this option away from families and physicians.

### THERE IS NO EVIDENCE-BASED PSYCHOTHERAPY TO TREAT GENDER DYSPHORIA

45. The State's experts suggest that psychotherapy can provide relief for gender dysphoria in lieu of gender-affirming medical care. While psychotherapy can be very helpful for

---

[61] Post by a member of the Reddit group r/detrans, available at: https://www.reddit.com/r/honesttransgender/comments/k6fidf/rdetrans_is_just_an_antitrans_sub_now/?utm_source=share&utm_medium=web2x&context=3. Accessed: October 1, 2023.

adolescents with gender dysphoria to help explore their gender identity and address comorbid conditions like depression and anxiety, there are no evidence-based psychotherapy protocols that effectively treat gender dysphoria itself.

46.     In the past, some clinicians have described psychotherapeutic strategies to attempt to lead youth with gender dysphoria to identify with their sex assigned at birth.[62]  Such practices, often referred to as "gender identity conversion efforts", have subsequently been linked to adverse mental health outcomes, including suicide attempts, particularly when people are exposed to them as children.[63]  In addition to being harmful, there is no peer-reviewed research to suggest that these gender identity conversion efforts are successful in changing a person from transgender to cisgender.[64]

47.     While the State's experts repeatedly criticize the extensive body of research linking gender-affirming medical care to improved mental health outcomes for adolescent gender dysphoria, they do not provide evidence to support their implication that gender dysphoria can be treated with psychotherapy alone.

48.     Dr. Weiss asserts that "exploratory, non-judgmental psychotherapy can alleviative suffering in patients with 'gender dysphoria' and may help them accept their natal sex."  (Weiss,

---

[62] Meyer-Bahlburg, H.F.  (2002).  Gender Identity Disorder in Young Boys: A Parent-and Peer-Based Treatment Protocol.  *Clinical Child Psychology and Psychiatry*, *7*(3), 360-376.

[63] Turban, J.L., Beckwith, N., Reisner, S.L., & Keuroghlian, A.S.  (2020).  Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults. *JAMA Psychiatry*, *77*(1), 68-76.

[64] Gender identity conversion efforts have therefore been labelled unethical by major medical organizations including The American Medical Association and The American Academy of Child & Adolescent Psychiatry. American Medical Association.  (2017).  Health Care Needs of Lesbian, Gay, Bisexual and Transgender Populations.  H-160.991.  *Available at* https://policysearch.ama-assn.org/policyfinder/detail/gender%20identity?uri=%2FAMADoc%2FHOD.xml-0-805.xml;
The American Academy of Child & Adolescent Psychiatry.  (2018).  Conversion Therapy.  *Available at* https://www.aacap.org/AACAP/Policy_Statements/2018/Conversion_Therapy.aspx.

¶40). Exploratory psychotherapy can be helpful for adolescent patients who are unsure of their gender identity to come to understand it. Dr. Weiss appears to be suggesting that such therapy can help transgender people become cisgender. The sources he cites to support this do no such thing. The first is a letter to the editor that provides no data or evidence to support the assertion.[65] The second is a description of twelve adolescent patients who underwent the psychosocial assessment that is required prior to initiating gender-affirming medical care for adolescent gender dysphoria and ultimately did not pursue gender-affirming medical care.[66] This case series is not evidence that psychotherapy is effective in promoting identification with one's sex assigned at birth, but rather, that the psychosocial evaluation is effective in identifying appropriate candidates for gender-affirming medical care.[67]

## CONCLUSION

49. In summary, the declarations from the State's experts do not provide justification for banning gender-affirming medical care for adolescents with gender dysphoria. The scientific evidence that I outlined above shows the benefits of the proscribed care. This research is consistent with the decades of clinical experience from around the world—including my own—of improved mental health outcomes from these interventions. None of the European countries the State's experts cite have banned care. The research the State's experts cite on "desistance" among prepubertal children has no bearing on adolescents with gender dysphoria, and there is no scientific

---

[65] D'Angelo, R., Syrulnik, E., Ayad, S., Marchiano, L., Kenny, D. T., & Clarke, P. (2021). One size does not fit all: In support of psychotherapy for gender dysphoria. *Archives of Sexual Behavior*, *50*(1), 7-16.

[66] Churcher Clarke, A., & Spiliadis, A. (2019). 'Taking the lid off the box': The value of extended clinical assessment for adolescents presenting with gender identity difficulties. *Clinical Child Psychology and Psychiatry*, *24*(2), 338-352.

[67] Incidentally, it is surprising to see Dr. Weiss rely on this study at all as throughout the remainder of his declaration, he dismisses research that lacks high GRADE-level data.

31

support for their assertions that providing gender-affirming medical care causes "persistence" of gender incongruence.  Nor is there any evidence supporting the State's experts' claims that youth are seeking gender-affirming medical care due to peer and social media influence, or that those who receive care are likely to come to regret it.  Finally, there are no evidence-based alternatives for treating gender dysphoria. While the State's experts critique the literature regarding the benefits of gender-affirming medical care, they offer no studies supporting an alternative treatment. The Idaho ban would leave physicians, adolescents, and their parents without any evidence-based treatments for adolescent gender dysphoria, a condition that can cause immense suffering.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*Jack L. Turban*

Executed on: October 13, 2023                              JACK L. TURBAN, MD, MHS

32

# Exhibit A

**Jack Lewis Turban III MD MHS**
401 Parnassco Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

## ACADEMIC APPOINTMENTS

**University of California, San Francsisco School of Medicine** San Francisco, CA.                September 2022-Present
*Assistant Professor of Child & Adolescent Psychiatry and Affiliate Faculty in the Philip R. Lee Institute for Health Policy Studies*. Responsibilities include serving as director of the gender psychiatry program, and as an attending psychiatrist in the adult gender and sexual minority clinic, and in the eating disorders clinic, as well as research focusing on the determinants of mental health among transgender and gender diverse youth and the teaching of medical students, residents, and fellows.

## EDUCATION & TRAINING

**Stanford University School of Medicine** Palo Alto, CA                July 2020-June 2022
*Fellow in Child & Adolescent Psychiatry*. Fellow in child and adolescent psychiatry. Research focused on pediatric gender identity and LGBTQ mental health. Served as administrative chief fellow 2021-2022.

**Massachusetts General Hospital & McLean Hospital** Boston, MA                July 2017 – May 2020
*Integrated Adult, Child, & Adolescent Psychiatry Resident*. Resident physician in the integrated adult, child, and adolescent psychiatry program. Research focused on pediatric gender identity and LGBT mental health.

**Yale School of Medicine** New Haven, CT.                August 2012- May 2017
*Doctor of Medicine & Master of Health Science with honors*. Clinical rotations included inpatient pediatrics, inpatient child psychiatry, inpatient adolescent psychiatry, residential adolescent psychiatry, psychiatric consult liaison service, clinical neuromodulation, neurology clinics, and neurosurgery. Completed award-winning masters' thesis as a Howard Hughes Medical Institute (HHMI) medical research fellow on evolving treatment paradigms for transgender youth. Clerkship Grades: All Honors
USMLE: Step 1 (252), Step 2 (256)

**Harvard University** Cambridge, MA                September 2007- May 2011
*B.A. Neurobiology magna cum laude with a secondary in the Dramatic Arts.* Coursework included clinical neuroscience, systems neurobiology, visual neuroscience, positive psychology, neurobiology of behavior, CNS regenerative techniques, neuroanatomy, vertebrate surgery, and extensive coursework in dramatic theory and practice. International study included Spanish language (Alicante, Spain), stem cell biology (Shanghai, China), and studying how visual art may be used as a window into the mechanisms of neural processing (Trento, Italy). Honors thesis completed at The Massachusetts Eye & Ear Infirmary studying inner-ear development and regeneration. GPA: 3.8/4.0

## RESEARCH EXPERIENCE

**The Fenway Institute** Boston, MA                2017-Present
*Post-doctoral Research Fellow.* Currently using data from the National Transgender Discrimination Survey to determine the adult mental health correlates of recalled childhood experiences including exposure to conversion therapy and access to gender-affirming hormonal interventions. PIs: Timothy Wilens, Alex Keuroghlian, & Sari Reisner

**Stanford Division of Child & Adolescent Psychiatry** Palo Alto, CA                2020-2022
*Post-doctoral Resaerch Fellow.* Estabished the Stanford Evaluation of Gender Affirmation (SEGA) study, which examines the impact of gender-affirming medical and surgical interventions on the mental health of transgender and gender diverse youth. Mentors: Dr. David Hong & Dr. Tandy Aye

**McLean Institute for Technology in Psychiatry** Belmont, MA.                2017-2020
*Post-doctoral Research Fellow.* Conducted cross-sectional studies that examine the associations between geosocial "hook-up apps," internalizing psychopathology, and compulsive sexual behavior. Utilizing the TestMyBrain platform. PI: Laura Germine

## Jack Lewis Turban III MD MHS
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

**Yale Program for Research on Impulsivity & Impulse Control Disorders** New Haven, CT          2016-2019
*Pre-doctoral Research Fellow.* Conducted a studies of US military veterans who had recently returned from deployment, studying rates and comorbidities of those veterans who exhibit compulsive sexual behavior facilitated by social media. PI: Marc Potenza MD/PhD

**Yale Child Study Center** New Haven, CT          2015-2017
*Pre-doctoral Research Fellow.* Conducted a study to evaluate pediatric attending and medical student knowledge regarding transgender pediatric patient care. Additionally studied participants' personal ethical views regarding pubertal blockade and cross-sex hormone therapy for adolescent patients. PI: Timothy VanDeusen MD

**Yale Department of Dermatology** New Haven, CT          2015-2016
*HHMI Medical Research Fellow.* Studied the potential molecular mediators of Langerhans Cell-mediated UVB-induced epidermal carcinogenesis. Techniques included transgenic mouse models of chronic UV exposure, epidermal sheet preparations, immunohistochemistry, confocal microscopy, flow cytometry, Bioplex analysis, quantitative PCR and tissue culture. PI: Michael Girardi MD

**Yale Department Laboratory Medicine** New Haven, CT          2012-2014
*Pre-doctoral Research Fellow.* Employed mass spectrometry to compare metabolite profiles of recurrent tumor versus radiation-induced necrosis following Gamma Knife Radiosurgery for brain metastases, working to identify novel biomarkers for non-invasive imaging techniques.  PI: Tore Eid MD/PhD

**Yale Department of Neurosurgery** New Haven, CT          2012-2012
*Pre-doctoral Research Fellow.* Developed a database of patients who received gamma knife radiosurgery or whole brain radiation for the treatment of brain metastases. This database is designed to evaluate the relative risks of radiation-induced necrosis following these two treatment modalities.  PI: Veronica Chiang MD

**Eaton-Peabody Laboratory** Cambridge, MA          2009-2011
*Undergraduate Rearch Fellow.* Worked at the Massachusetts Eye and Ear Infirmary laboratory, studying stem cells of the inner ear and working toward cochlear hair cell regeneration. PI: Albert Edge PhD

**Novartis Pharmaceuticals** Shanghai, China          2009-2009
*Intern.* Worked as a biological research intern, studying the role of Math-1 in inner-ear development and regeneration.

## LEADERSHIP

**UCSF Child & Adolescent Psychiatry Grand Rounds Committee** San Francisco, CA.          2023-Present
*Member.* Works with with committee to select and work with grand rounds speakers for the weekly child and adolescent psychiatry grand rounds series.

**UCSF Child & Adolescent Psychaitry Fellowship Selection Committee** San Francisco, CA          2022-Present
*Member.* Conducts interviews for applications to the UCSF child and adolescent psychiatry fellowship training program, sits on selection committee, works on recruitment efforts.

**The Upswing Fund**          2020-Present
*Scientific Advisory Board.* Member of the scientific advisory board of a $15M charitable fund to support adolescent minority mental health during the COVID19 pandemic. Funded by Melinda Gates's Panorama Global.

**Stanford Medicine Diversity Cabinet LGBTQ+ / Sexual and Gender Minority Subcommittee**          2021-2022
*Member.* Working to improve Stanford School of Medicine in all aspects relevant to sexual and gender minorities including curriculum, clinical care, and employee support.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

**Stanford Pediatric Gender Journal Club** 2021-2022
*Founder.* Organizing a monthly journal club focusing on the latest research relevant to the care of transgender and gender diverse youth.

**MGH Psychiatry Gender Lab Meetings** Boston, MA 2019-2020
*Founder.* Established monthly lab meetings for those in the MGH psychiatry department to discuss ongoing research regarding transgender mental health.

**Yale School of Medicine Cultural Competence Committee** New Haven, CT 2012-2017
*Chair.* Worked with individual course directors to develop course material on cultural competence. Authored case studies on handling pediatric patient sexuality (Professional Responsibility Course), authored a pre-clinical lecture on LGBT healthcare (Ob/Gyn Module), and lectured on transgender pediatric patient care (Pediatrics Clinical Clerkship).

**Dean's Advisory Committee on LGBTQ Affairs (Yale School of Medicine)** New Haven, CT 2016-2017
*Member.* Served on the advisory committee to the Dean of Yale School of Medicine, advising on issues related to LGBTQ affairs.

**Yale HIV Dermatology Roundtable** New Haven, CT 2014-2017
*Founder.* Eighty percent of patients suffering from HIV face a dermatologic manifestation of their disease. Struck by these patients' experience of stigma, I organized a bi-monthly interdisciplinary roundtable to improve research, education, and clinical care in HIV dermatology. Interventions have included primary care provider training on the treatment of genital warts and improved referral systems for cutaneous malignancies.

**Yale Gay & Lesbian Medical Association** New Haven, CT 2013-2017
*President.* Led a group of medical students focused on supporting careers in medicine for LGBT individuals. Organized mixers with LGBT organizations from other graduate schools and with LGBT faculty. Coordinated trips to GLMA national conferences. Worked with the medical school administration to create an LGBT faculty advisor position.

## VOLUNTEER WORK & ADVOCACY

**American Academy of Child & Adolescent Psychiatry "Break the Cycle"** 2017-2017
*Event Coordinator.* Worked with Dr. Andres Martin to coordinate a fundraising indoor cycling event for the AACAP *Break The Cycle* fundraising campaign to fight children's mental illness.

**Yale Hunger & Homelessness Auction** New Haven, CT 2012-2014
*Logistics Co-Chair.* Organized a group of ten students to coordinate entertainment, donations, and event logistics for the Yale annual charity auction. All proceeds for the auction go to support local charities.

**Yale School of Medicine Admissions Committee** New Haven, CT 2015-2017
*Interviewer.* Served as a full voting member of the admissions committee. Responsibilities include student interviewing, recruitment, and organizing LGBT-focused activities for admitted students.

**Harvard College Admissions** New Haven, CT 2012-2020
*Interviewer.* Interviewing students from the Boston area for admission to Harvard College.

## SELECTED PEER REVIEWED PUBLICATIONS: ORIGINAL RESEARCH

**Turban J.L.**, Dolotina B., Freitag T.M., King D., Keuroghlian A.S. Age of realization of transgender identity and mental health outcomes among transgender and gender diverse adults: examining the "rapid onset gender dysphoria" hypothesis. *Journal of Adolescent Health.* [In Press]

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

**Turban J.L.**, Dolotina B., King D., Keuroghlian A.S. (2022) Sex assigned at birth ratio among transgender and gender diverse adolescents in the United States. *Pediatrics*. [Accepted]

**Turban J.L.**, King D., Kobe J., Reisner S.L., Keuroghlian A.S. (2022) Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PLoS ONE*, 17(1): e0261039.

Passell E., Rutter L.A., **Turban J.L.**, Scheuer L., Wright N., Germine L. (2021) Generalized Anxiety Disorder Symptoms are Higher Among Same- and Both-Sex Attracted Individuals in a Large, International Sample. *Sexuality Research and Social Policy*. [ePub ahead of print]

Lewis, J. M., Monico, P. F., Mirza, F. N., Xu, S., Yumeen, S., **Turban, J. L.**, Galan A., & Girardi, M. (2021). Chronic UV radiation–induced RORγt+ IL-22–producing lymphoid cells are associated with mutant KC clonal expansion. *Proceedings of the National Academy of Sciences*, 118(37).

**Turban J.L.**, King, D., Li, J.L., Keuroghian, A.S. (2021) Timing of Social Transition for Transgender and Gender Diverse Youth, K-12 Harassment, and Adult Mental Health Outcomes. *Journal of Adolescent Health*. 69(6), 991-998.

**Turban J.L.**, Loo, S. S., Almazan, A. N., Keuroghlian, A.S. (2021) Factors Leading to "Detransition" Among Transgender and Gender Diverse People in the United States: A Mixed-Methods Analysis. *LGBT Health*. 8(4), 273-280.

**Turban, J. L.**, Passell E, Scheer L, Germine L. (2020) Use of Geosocial Networking Applications Is Associated With Compulsive Sexual Behavior Disorder in an Online Sample. *The Journal of Sexual Medicine*. 17(8), 1574-1578.

**Turban, J. L.**, King, D., Carswell, J. M., & Keuroghlian, A. S. (2020). Pubertal suppression for transgender youth and risk of suicidal ideation. *Pediatrics*, *145*(2), e20191725.

**Turban, J. L.**, Shirk, S. D., Potenza, M. N., Hoff, R. A., & Kraus, S. W. (2020). Posting Sexually Explicit Images or Videos of Oneself Online Is Associated With Impulsivity and Hypersexuality but Not Measures of Psychopathology in a Sample of US Veterans. *The Journal of Sexual Medicine*, *17*(1), 163-167.

**Turban, J. L.**, Beckwith, N., Reisner, S. L., & Keuroghlian, A. S. (2020). Association between recalled exposure to gender identity conversion efforts and psychological distress and suicide attempts among transgender adults. *JAMA Psychiatry*, *77*(1), 68-76.

Acosta, W., Qayyum, Z., **Turban, J. L.**, & van Schalkwyk, G. I. (2019). Identify, engage, understand: Supporting transgender youth in an inpatient psychiatric hospital. *Psychiatric Quarterly*, 90(3), 601-612.

**Turban, J. L.**, King, D., Reisner, S. L., & Keuroghlian, A. S. (2019). Psychological Attempts to Change a Person's Gender Identity from Transgender to Cisgender: Estimated Prevalence Across US States, 2015. *American Journal of Public Health*, 109(10), 1452-1454.

**Turban, J. L.**, Winer, J., Boulware, S., VanDeusen, T., & Encandela, J. (2018). Knowledge and attitudes toward transgender health. *Clinical Teacher*, *15*(3), 203-207.

**Turban, J. L.**, Potenza, M. N., Hoff, R. A., Martino, S., & Kraus, S. W. (2017). Psychiatric disorders, suicidal ideation, and sexually transmitted infections among post-deployment veterans who utilize digital social media for sexual partner seeking. *Addictive Behaviors*, 66, 96-100.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

**Turban J. L.\***, Lu, A. Y\*., Damisah, E. C., Li, J., Alomari, A. K., Eid, T., ... & Chiang, V. L. (2017). Novel biomarker identification using metabolomic profiling to differentiate radiation necrosis and recurrent tumor following Gamma Knife radiosurgery. *Journal of Neurosurgery*, 127(2), 388-396.

Kempfle, J. S., **Turban, J. L.,** & Edge, A. S. (2016). Sox2 in the differentiation of cochlear progenitor cells. *Scientific Reports*, 6, 23293.

## SELECTED PEER REVIEWED PUBLICATIONS: COMMENTARY, REVIEWS, & PERSPECTIVES

Lerario, M. P., Rosendale, N., Waugh, J. L., Turban, J., & Maschi, T. (2023). Functional Neurological Disorder Among Sexual and Gender Minority People. *Neurologic Clinics*. [In Press]

Chen A, Cohen I.G., Kraschel K., **Turban J.L..** Legal & Ethical Perspectives on Criminalization of Standard of Care Medical Practices. *Cell Reports Medicine*.

**Turban J.L.**, Brady C., & Olson-Kennedy J. Understanding & Supporting Patients with Dynamic Desires for Gender-affirming Medical Interventions. *JAMA Network Open*.

Dolotina B. **& Turban J.L.** "Phantom Networks" Prevent Children & Adolescents from Obtaining the Mental Health Care They Need. *Health Affairs*. 41(7).

**Turban J.L.**, Kamceva M, Keuroghlian A.S. Pharmacologic Considerations for Transgender and Gender Diverse People. *JAMA Psychiatry*. 79(6): 629-630.

Dolotina B. & **Turban J.L..** (2022) A multipronged, evidence-based approach to improving mental health among transgender and gender diverse youth. *JAMA Network Open*. 5(2): e220926.

**Turban J.L.,** Almazan A.N., Reisner S.L., Keuroghlian A.S. (2022) The importance of non-probability samples in minority health research: lessons learned from studies of transgender and gender diverse mental health. *Transgender Health*. [ePub ahead of print]

**Turban J.L.**, Kraschel K.L., Cohen, G.C. (2021) Legislation to Criminalize Gender-affirming Medical Care for Transgender Youth. *JAMA*. 325(22), 2251-2252.

Liu M., **Turban J.L.**, Mayer K.H. (2021) The US Supreme Court and Sexual and Gender Minority Health. *American Journal of Public Health*. 111(7), 1220-1222.

Suto, D.J., Macapagal, K., **Turban, J.L.** (2021) Geosocial Networking Application Use Among Sexual Minority Adolescents. *Journal of the American Academy of Child & Adolescent Psychiatry*. 60(4), 429-431.

**Turban, J. L.,** Keuroghlian, A. S., & Mayer, K. H. (2020) Sexual Health in the SARS-CoV-2 Era. *Annals of Internal Medicine*. 173(5), 387-389.

Suozzi, K., **Turban, J.L.,** & Girardi, M. (2020). Focus: Skin: Cutaneous Photoprotection: A Review of the Current Status and Evolving Strategies. *The Yale Journal of Biology and Medicine*, *93*(1), 55.

Malta, M., LeGrand, S., **Turban, J.L.**, Poteat, T., & Whetten, K. (2020). Gender-congruent government identification is crucial for gender affirmation. *The Lancet Public Health*. 5(4), e178-e179.

**Turban J.L.** (2019). Medical Training in the Closet. *The New England Journal of Medicine*, *381*(14), 1305.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

**Turban, J. L.**, & Keuroghlian, A. S. (2018). Dynamic gender presentations: understanding transition and" de-transition" among transgender youth. *Journal of the American Academy of Child and Adolescent Psychiatry*, 57(7), 451-453.

**Turban, J. L.**, Carswell, J., & Keuroghlian, A. S. (2018). Understanding pediatric patients who discontinue gender-affirming hormonal interventions. *JAMA Pediatrics*, *172*(10), 903-904.

**Turban, J. L.** (2018). Potentially Reversible Social Deficits Among Transgender Youth. *Journal of Autism and Developmental Disorders*, 48(12), 4007-4009.

**Turban, J. L.**, & van Schalkwyk, G. I. (2018). "Gender dysphoria" and autism spectrum disorder: Is the link real?. *Journal of the American Academy of Child & Adolescent Psychiatry*, *57*(1), 8-9.

**Turban, J. L.**, & Ehrensaft, D. (2018). Research review: gender identity in youth: treatment paradigms and controversies. *Journal of Child Psychology and Psychiatry*, *59*(12), 1228-1243.

**Turban J. L.**, Genel, M. (2017) Evolving Treatment Paradigms for Transgender Patients. *Connecticut Medicine*, 81(8), 483-486.

**Turban, J.**, Ferraiolo, T., Martin, A., & Olezeski, C. (2017). Ten things transgender and gender nonconforming youth want their doctors to know. *Journal of the American Academy of Child & Adolescent Psychiatry*, *56*(4), 275-277.

**Turban, J. L.** (2017). Transgender Youth: The Building Evidence Base for Early Social Transition. *Journal of the American Academy of Child and Adolescent Psychiatry*, 56(2), 101.

**Turban J. L.**, Martin A. (2017) Book Forum: Becoming Nicole. *Journal of the American Academy of Child & Adolescent Psychiatry*, 56(1): 91-92.

## TEXTBOOKS AND TEXTBOOK CHAPTERS
Forcier, M., Van Schalkwyk, G., **Turban, J. L.** (Editors). Pediatric Gender Identity: Gender-affirming Care for Transgender & Gender Diverse Youth. Springer Nature, 2020.

Challa M., Scott C., **Turban J.L.** Epidemiology of Pediatric Gender Identity. In Forcier, M., Van Schalkwyk, G., **Turban, J. L.** (Editors). Pediatric Gender Identity: Gender-affirming Care for Transgender & Gender Diverse Youth. Springer Nature, 2020.

**Turban J.L.**, Shadianloo S. Transgender & Gender Non-conforming Youth. In Rey, J.M. (Editor): IACAPAP e-Textbook of Child and Adolescent Mental Health. Geneva. International Association of Child and Adolescent Psychiatry and Allied Professionals, 2018.

**Turban, J. L.**, DeVries, A.L.C., Zucker, K. Gender Incongruence & Gender Dysphoria. In Martin A., Bloch M.H., Volkmar F.R. (Editors): Lewis's Child and Adolescent Psychiatry: A Comprehensive Textbook, Fifth Edition. Philadelphia: Wolters Kluwer 2018.

## INVITED GRAND ROUNDS PRESENTATIONS
**Turban JL**. Transgender Youth Mental Health. Maudsley Hospital / Kings College London Grand Rounds, 2023.

**Turban JL.** Resaerch Updates: Supporting the Mental Health of Transgneder and Gender Diverse Youth. Department of Behavioral Health, Wake Forest School of Medicine / Atrium Health, 2023.

**Jack Lewis Turban III MD MHS**
401 Parnassco Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

**Turban JL**. Supporting the Mental Health of Transgender and Gender Diverse Youth. Child & Adolescent Psychiatry Grand Rounds, Long Island Jewish Medical Center / Zucker Hillside, 2023.

**Turban JL**. Suicidality in Sexual and Gender Minority Youth. Psychiatry Grand Rounds, Boston Children's Hospital, 2023.

**Turban JL**. Opinion Writing to Promote Public Health & Evidence-Based Public Policy. Medical Education Grand Rounds, The University of Vermont Larner College of Medicine, 2022.

**Turban JL**. Research Updates: Supporting the Mental Health of Transgender & Gener Diverse Youth. Division of Child & Adolescent Psychiatry Grand Rounds, Stanford University School of Medicine, 2022.

**Turban JL**. Supporting Transgender & Gender Diverse Youth: Research Updates & Treatment Paradigms. Department of Psychiatry Grand Rounds, University of Nebraska Medical Center, 2022.

**Turban JL**. Supporting the Mental Health of Transgener & Gender Diverse Youth. Department of Pediatrics, Division of Behavioral Health Grand Rounds, University of Utah, 2022.

**Turban JL**. Gender Diverse Youth: Treatment Paradigms & Research Updates. Psychiatry Grand Rounds, Thomas Jefferson University, 2021.

**Turban JL**. Supporting Gender Diverse Youth Throughout Development. Child Psychiatry Grand Rounds, Georgetown, 2021.

**Turban JL**. Understanding Pediatric Gender Identity through Childhood and Adolescence. Grand Rounds, Institute of Living, 2021.

**Turban JL**. Evolving treatment paradigms for transgender youth. Pediatric Grand Rounds, Albany Medical Center, 2021.

**Turban JL**. Evolving Treatment Paradigms for Transgender Youth. Psychiatry Grand Rounds, McLean Hospital (Harvard Medical School), 2021.

**Turban JL**. Einstein Psychiatry Grand Rounds: Evolving Treatment Paradigms for Transgender Youth. Psychiatry Grand Rounds, Einstein Medical Center, 2021.

**Turban JL**. COVID19 and Pediatric Mental Health. Pediatrics Grand Rounds, Stanford University School of Medicine, 2021.

**Turban JL**. Evolving Treatment Paradigms for Transgender Youth. Psychiatry Grand Rounds, Beth Israel Deaconess Medical Center (Harvard Medical School), 2020.

## ADDITIONAL INVITED PRESENTATIONS

**Turban JL**. Suicide Prevention for LGBTQ+ Youth. *National Institutes of Health*, Bethesda, 2023.

**Turban JL**. NAMI LGBTQ+ Mental Health Roundtable Discussion. *National Alliance on Mental Illness*, San Francisco, 2023.

**Turban JL**. Supporting the Mental Health of Transgender & Gender Diverse Youth. *United Nations NGO Committee on Mental Health*, United Nations, 2023.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

**Turban JL** & Spetz J. How to Give Expert Testimony. *UCSF Philip R. Lee Institute for Health Policy Studies Impacting Policy Series*, San Francisco, 2023.

**Turban JL**. The Research on Gender-affirming Care for Transgender Youth. *AusPATH Research Seminar*. Sydney, 2023.

**Turban JL**. Building a Career in Sexual & Gender Minority Health Research. *National Institutes of Health*, Bethesda, 2022.

**Turban JL**. Research Updates: Gender-affirming Care for Transgender Youth. MUSC LGBTQ+ Health Equity Summit, Medical University of South Carolina, 2022.

**Turban JL**. Keynote: Supporting The Mental Health of Transgender & Gender Diverse Youth. Edythe Kurz Educational Institute Conference, Westchester, 2022.

**Turban JL**, Peters B, Olson-Kennedy J. Gender-Affirming Care: Through a Medical, Surgical, and Mental Health Lens. Critical Issues in Child & Adolescent Mental Health Conference, San Diego, 2022.

**Turban JL**. Improving Mental Health Outcomes for Transgender and Gender Diverse (TGD) Youth Through Gender-affirming Care. National LGBTQIA+ Health Education Center, The Fenway Institute, 2022.

**Turban JL**. Combatting anti-trans legislation through science, data, and writing. State of Queer Mental Health Conference by The Mental Health Association of San Francisco, Online, 2021.

**Turban JL**. Updates on LGBTQ Mental Health. Annual Psychiatric Times World CME Conference, Online, 2021.

**Turban JL**. Imbasciani LGBTQ Health Equity Lecture: Evolving Treatment Paradigms for Transgender and Gender Diverse Youth. University of Vermont Larner College of Medicine, Burlington, 2021.

**Turban JL**. The Emergence of Gender-affirming Care for Transgender & Gender Diverse Youth, United Nations NGO Committee on Mental Health, Oral Presentation, Online, 2021.

**Turban JL**. Keynote – Transgender & Gender Diverse Youth: Research Updates. Stony Brook Transgender Health Conference, Online, 2021.

**Turban JL**. Opinion Writing on Sensitive Topics. Harvard Media & Medicine Course, Live Lecture, Online, 2021.

**Turban JL**. Gender affirming care for transgender and gender diverse youth: what we know and what we don't. University of Texas Pride Health Institute, Oral Presentation, Online, 2020.

**Turban JL**. Q&A on Transgender Youth Mental Health. PEOPLE in Healthcare at University of Toledo, Oral Presentation, Online, 2020.

**Turban JL**, Pagato S, Gold J, Broglie J, Naidoo U, Alvarado A. Innovation of Student Mental Health during COVID19. Panel to the People, Oral Presentation, Online, 2020.

**Turban JL**, Belkin B, Vito J, Campos K, Scasta D, Ahuja A, Harris S. Discussion on Abomination: Homosexuality and the Ex-Gay Movement. Panelist, The Association of LGBTQ+ Psychiatrists Virtual Session, Oral Presentation, Online, 2020.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

**Turban JL**. Is Grindr affecting gay men's mental health? Oral Presentation, UCLA & AETC Coping with Hope, Online, Oral Presentation, 2020.

**Turban JL**, Hall TM, Goldenberg D, Hellman R. Gay Sexuality and Dating. Moderator, The Association of LGBTQ+ Psychiatrists Virtual Session, Oral Presentation, Online, 2020.

## CONFERENCE PRESENTATIONS & ABSTRACTS

**Turban JL**, Calhoun A, Gold, J. Mission-Based Media Collaborative Work Concerning "Controversial" Topics in Psychiatry. Annual Meeting of The American Psychiatric Association, Oral Presentation, San Francisco, 2023.

**Turban JL,** Ahuja A. Autogynephilia: Historical Context, Clarifications, and Controversy. Annual Meeting of The American Psychiatric Association, Oral Presentation, San Francisco, 2023. [Cancelled]

**Turban JL**. A Systematic Approach for Understanding Gender Identity Evolution. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Toronto, 2022.

**Turban JL**. Transgender Youth: Evolving Gender Identities and "Detransition." Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Session Chair of Oral Symposium, Toronto, 2022.

**Turban JL**. From The New York Times to Hollywood: Communicating With the Public Through Opinion Writing, Publishing, Social Media, and Consulting for Film and TV, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Session Chair of Oral Symposium, Toronto, 2022.

**Turban JL**. Writing for the Lay Press to Combat Misinformation Regarding Pediatric Mental Health, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Toronto, 2022.

**Turban JL**. COVID-19 and Psychosexual Dynamics, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Oral Presentation, Toronto, 2022.

Dolotina B, **Turban JL**, King D, Keuroghlian AS. Age of Realization of Gender Identity and Mental Health Outcomes among Transgender Adults: Evaluating the "Rapid Onset Gender Dysphoria" Hypothesis, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Poster, Toronto, 2022.

**Turban JL**. Sex ratio among transgender adolescents in the United States. World Professional Association for Transgender Health Scientific Symposium, Oral Presentation, Montreal, 2022.

**Turban JL**. Access To Gender-Affirming Hormones During Adolescence And Mental Health Outcomes Among Transgender Adults. World Professional Association for Transgender Health Scientific Symposium, Oral Presentation, Montreal, 2022.

**Turban JL**, Gold J, Hartselle S, Yen J. From The New York Times to the Big Screen: Communicating With the Public Through Opinion Writing, Publishing, Social Media, and Consulting for Film and TV. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Session Chair of Oral Symposium, Online, 2021.

**Turban JL**. Creating Change through Opinion Writing in Child & Adolescent Psychiatry. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Online, 2021.

**Turban JL**, Giedinghagen A, Janssen A, Myint M, Daniolos P. Transgender Youth: Understanding "De-transition," Non-linear Gender Trajectories, and Dynamic Gender Identities. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Session Chair of Oral Symposium, Online, 2021.

## Jack Lewis Turban III MD MHS
401 Parnassus Ave
San Francisco, CA 94143
412.965.9308
jack.turban@ucsf.edu

**Turban JL**. A framework for understanding dynamic gender identities through internal and external factors. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Online, 2021.

**Turban JL**, Geosocial networking application use among birth-assigned male adolescents. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Online, 2021.

**Turban JL**. LGBTQ Families and the US Supreme Court. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentations, Online, 2021.

**Turban JL**, King D, Kobe J, Reisner SL, Keuroghlian AS. Access to Gender-affirming Hormones during Adolescence and Mental Health Outcomes among Transgender Adults. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Poster, Online, 2021.

**Turban JL**. Gender Identity Conversion Efforts: Quantitative Perspectives. Annual Meeting of The American Psychiatric Association, Oral Presentation, Online, 2021.

**Turban JL**. For Worse: Negative Aspects of Social Media for LGBT Youth. Oral Presentation, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Online, 2020.

**Turban JL**. Hookup App Use among Gay and Bisexual Males: Sexual Risk and Associated Psychopathology. Oral Presentation, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Online, 2020.

**Turban JL**. Communicating with the Public: From The New York Times to The Big Screen. Oral Presentation, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Online, 2020.

**Turban JL**, McFarland C, Walters O, Rosenblatt S. An Overview of Best Outpatient Practice in the Care of Transgender Individual. Oral Presentation, Annual Meeting of the American Psychiatric Association, Philadelphia, 2020. [Accepted, but cancelled due to COVID19]

**Turban JL**, Lakshmin P, Gold J, Khandai C. #PsychiatryMatters: Combating Mental Health Misinformation Through Social Media and Popular Press. Oral Presentation, Annual Meeting of the American Psychiatric Association, Philadelphia, 2020. [Accepted, but cancelled due to COVID19]

**Turban JL.** The Pen and the Psychiatrist: Outreach and Education Through the Written Word. Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Chicago, 2019.

**Turban JL.** For Better and For Worse: Gender and Sexuality Online, Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Chicago, 2019.

**Turban JL.** Gender Diverse Young Adults: Narratives and Clinical Considerations, Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Chicago, 2019.

**Turban JL.** Transgender Youth: Controversies and Research Updates, Oral Presentation, Annual Meeting of the American Psychiatric Association, San Francisco, 2019.

**Turban JL**, Beckwith N, Reisner S, Keuroghlian A. Exposure to Conversion Therapy for Gender Identity Is Associated with Poor Adult Mental Health Outcomes among Transgender People in the U.S. Poster Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Seattle, 2018.

# Jack Lewis Turban III MD MHS

401 Parnassco Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

Shirk SD, **Turban JL**, Potenza M, Hoff R, Kraus S. Sexting among military veterans: Prevalence and correlates with psychopathology, suicidal ideation, impulsivity, hypersexuality, and sexually transmitted infections. Oral Presentation, International Conference on Behavioral Addictions, Cologne, Germany, 2018.

**Turban JL**. Gender Identity and Autism Spectrum Disorder. Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Washington D.C., 2017.

**Turban JL**. Tackling Gender Dysphoria in Youth with Autism Spectrum Disorder from the Bible Belt to New York City. Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent psychiatry, Washington D.C., 2017.

**Turban JL.** Affirmative Protocols for Transgender Youth. Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Washington D.C., 2017.

**Turban, JL**. Evolving Management of Transgender Youth. Oral Presentation, Klingenstein Third Generation Foundation Conference, St Louis, 2017.

**Turban, JL**, Potenza M, Hoff R, Martino S, Kraus S. Clinical characteristics associated with digital hookups, psychopathology, and clinical hypersexuality among US military veterans. Oral Presentation, International Conference on Behavioral Addictions, Haifa, Israel, 2017.

Lewis J, Monaco P, **Turban JL**, Girardi M. UV-induced mutant p53 ketatinocyte clonal expansion dependence on IL-22 and RORγT. Poster, Society of Investigative Dermatology, Portland, 2017.

**Turban JL**, Winer J, Encandela J, Boulware S, VanDeusen T. Medical Student Knowledge of and Attitudes toward Transgender Pediatric Patient Care. Abstract, Gay & Lesbian Medical Association, St Louis, 2016.

**Turban JL**, Lu A, Damisah E, Eid T, Chiang V. Metabolomics to Differentiate Radiation Necrosis from Recurrent Tumor following Gamma Knife Stereotactic Radiosurgery for Brain Metastases. Oral Presentation, 14th Annual Leksell Gamma Knife Conference, New York City, 2014

**Turban JL**, Lewis J, Girardi M. UVB-induced HMGB1 and extracellular ATP increase Langerhans cell production of IL-23 implicated in ILC3 activation. Poster, Society of Investigative Dermatology, Scottsdale, 2016

**Turban JL**, Lewis J, Girardi M. Characterization of cytokine pathways associated with Langerhans cell facilitation of UVB-induced epidermal carcinogenesis. Poster, American Society of Clinical Investigation, Chicago, 2016.

Lewis J, **Turban JL**, Girardi M, Michael Girardi. Langerhans cells and UV-radiation drive local IL22+ ILC3 in association with enhanced cutaneous carcinogenesis. Poster, Society of Investigative Dermatology, Scottsdale, 2016.

Sewanan L, Zheng D, Wang P, Guo X, Di Bartolo I, Marukian N, **Turban JL**, Rojas-Velazques D, Reisman A. Reflective Writing Workshops Led By Near Peers During Third-Year Clerkships: A Safe Space for Solidarity, Conversation, and Finding Meaning in Medicine. Poster & Workshop, Society of General Internal Medicine, New Haven and Hollywood, 2016.

## TEACHING PRESENTATIONS
Advanced Topics in Pediatric Gender Care. Stanford Child & Adolescent Psychiatry Fellowship Didactics, 2023.
Opinion Writing About The "Politically Sensitive" and Personal. Harvard Medical School Master of Science in Media, Medicine, and Health Degree Program, 2022.
Gender-affirming Care for Transgender & Gender Diverse Youth, Zuckerberg San Francisco General Hospital Adolescent Psychology Internship Didactics, 2022.

# Jack Lewis Turban III MD MHS

401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

Supporting Transgender & Gender Diverse Youth. UCSF Trauma Recovery Center Didactics, 2022.
Developmental Psychopathology, Psychotherapy & Psychopharmacology Course: Pediatric Gender. Stanford University School of Medicine Child & Adolescent Psychiatry Fellowship Didactics, 2021.
Supporting Gender Diverse Youth Through Various Stages of Development. Univeristy of California San Francisco Child & Adolescent Psychiatry Fellowship Didactics, 2021.
Treatment of Transgender and Gender Diverse Youth. Stanford University School of Medicine Psychiatry Residency Didactic, 2021.
Caring for Transgender and Gender Diverse Youth. University of California San Diego General Psychiatry Residency Resident Rounds, 2021.
Opinion Writing 101. Stanford Pediatrics Residency Program, 2021.
Psychotherapeitic Considerations for Transgender Youth. Stanford PsyD Child Psychotherapy Course, 2021.
Transgender Youth: Treatment Paradigms and Research Updates. Children's Health Council DBT Program Lecture Series, 2021.
Gender-affirming Care for Patients with Primary Psychotic Disorders. McLean Psychotic Disorders Division Seminar Series, 2019.
Gender-affirming Care for Transgender Elders. McLean Geriatric Psychiatry Seminar Series, 2019.
Writing about Gender & Sexuality (Guest Lecture), Course: Sexual Outcasts & Uncommon Desires, Emerson College, 2019
Gender-affirming Care for Transgender and Gender Diverse Patients on Inpatient Psychiatric Units, MGH Inpatient Psychiatry Seminar Series, 2019.
Transgender & Gender Non-conforming Youth, MGH/McLean Adult Residency program, 2018.
Writing about Gender Identity for the Lay Audience (Guest Lecture), Course: Kids These Days, Emerson Journalism Program, 2017
International Approaches to the Treatment of Gender Incongruence, VU Medical Center, Amsterdam, 2017
Time to Talk About It: Physician Depression and Suicide, Yale Clerkship Didactics, 2017
Medical Management of Adolescent Gender Dysphoria. Yale Pediatrics Clerkship, 2015-2016
Medical Management of Children and Adolescents with Gender Dysphoria, Yale Pediatrics Residency Didactics, 2016
Reflective Writing Workshop Leader. Yale Surgery Clerkship, 2015-2016
Langerhans Cell Facilitation of Photocarcinogenesis. Yale Department of Dermatology Research Forum, 2016
Panel: Treating Transgender & Gender Non-conforming Patients in the Emergency Setting. Yale Emergency Medicine Clerkship, 2016
Panel: Challenges to the Learning Climate: Difficult Patients, Harassment, and Mistreatment. Yale Pre-Clinical Orientation, 2016
Panel: Personal Behavior and Professionalism, Introduction to the Profession, 2016

## RESEARCH SUPPORT

*Current Funding:*
Sorensen Foundation Fellowship, $287,000 (2021-2023)
The Impact of Gender-affirming Medical and Surgical Interventions on Psychopathology and Implicit Gender Incongruence among Transgender Adolescents
Role: Principal Investigator

UCSF Population Health Equity Scholars Grant, $20,000 (2023-2024)
Systematic content analysis of federal appellate court rulings regarding the constitutionality of bans on gender identity and sexual orientation conversion efforts
Role: Principal Investigator

*Completed Funding:*
Stanford Department of Psychiatry and Behavioral Sciences Trainee Innovator Grant, $5,000 (2020-2021)

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

Examining the impact of gender identity conversion therapy bans on suicidality among transgender and gender diverse people in the U.S.: a difference-in-differences analysis
Role: Principal Investigator

American Academy of Child & Adolescent Psychiatry Pilot Research Award, $15,000 (2019-2020)
Childhood and Adolescent Experiences with Gender-related Medical Care and Adult Mental Health Outcomes: Analysis of the 2015 U.S. Transgender Survey
Role: Principal Investigator

## AWARDS & HONORS

Top Peer Review Service, *Annals of Internal Medicine* (2022)
Stanford Child & Adolescent Psychiatry Chief Fellow (2021-2022)
Wasserman Award for Advocacy in Children's Mental Health (2021)
Top Manuscript of The Year - *Pediatrics* (2020)
American Psychiatric Association Child & Adolescent Psychiatry Fellowship (2019-2021)
Ted Stern Scholarship and Travel Award (2019)
Editor's Pick for Best Clinical Perspectives Manuscript – *Journal of The American Academy of Child & Adolescent Psychiatry* (2018)
SciShortform Project: Best Shortform Science Writing, Columns & Op-Eds (2018)
Ted Stern Scholarship and Travel Award (2018)
Medaris Grant (2018)
Editor's Pick for Best Clinical Perspectives Manuscript – *Journal of The American Academy of Child & Adolescent Psychiatry* (2017)
United States Preventative Health Services Award for Excellence in Public Health (2017)
NBC Pride 30 Innovator (2017)
Ferris Thesis Prize, Yale School of Medicine (2017)
Parker Prize, Yale School of Medicine (2017)
Howard Hughes Medical Institute Medical Research Fellowship (2015-2016)
American Academy of Child and Adolescent Psychiatry Life Members Mentorship Grant (2016)
Student Scholarship, Gender Conference East (2016)
Farr Award for Excellence in Research (2016)
Yale Office of International Medical Education Grant, Buenos Aires, Argentina (2016)
Yale Office of International Medical Education Grant, VU Medical Center, The Netherlands (2016)
Yale Summer Research Grant (2012)
AIG International Scholar, Harvard College (2007-2011)
Harvard International Study Grant, Alicante, Spain (2008)
David Rockefeller International Study Grant, Shanghai, China (2009)

## PROFESSIONAL MEMBERSHIPS & COMMITTEES

American Psychiatric Association, Member
American Academy of Child & Adolescent Psychiatry, Member
American Psychiatry Association, Council on Communications
American Academy of Child & Adolescent Psychiatry, Media Committee
American Academy of Child & Adolescent Psychiatry, Chair of Subcomittee on Interfacing with the Media
World Professional Association for Transgrender Health, Member
US Professional Association for Transgender Health, Member
US Professional Association for Transgender Health, Research Committee
Athlete Ally, Affiliate Scholar
Psychiatric Times, Editorial Board

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

## ACADEMIC JOURNAL SERVICE & AD HOC PEER REVIEW

PLoS One, Academic Editor
JAACAP, Contributing Editor
JAMA, Peer Reviewer
JAMA Pediatrics, Peer Reviewer
JAMA Psychiatry, Peer Reviewer
JAMA Network Open, Peer Reviewer
Annals of Internal Medicine, Peer Reviewer
Pediatrics, Peer Reviewer
Journal of the American Academy of Child & Adolescent Psychiatry, Peer Reviewer
JAACAP Open, Peer Reviewer
Journal of Child Psychology and Psychiatry, Peer Reviewer
Journal of Adolescent Health, Peer Reviewer
Academic Psychiatry, Peer Reviewer
Journal of Autism and Developmental Disorders, Peer Reviewer
American Journal of Public Health, Peer Reviewer
Perspectives on Psychological Science, Peer Reviewer
Transgender Health, Peer Reviewer
Journal of Clinical Medicine, Peer Reviewer
Brain Sciences, Peer Reviewer
Social Science & Medicine, Peer Reviewer
Sexual Health, Peer Reviewer
Women, Peer Reviewer

oLi Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
David A. DeRoin (ISB no. 10404)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

*Additional counsel for Plaintiffs identified on
the following page*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **PAM POE**, by and through her parents and next friends, Penny and Peter Poe; **PENNY POE**; **PETER POE**; **JANE DOE**, by and through her parents and next friends, Joan and John Doe; **JOAN DOE**; **JOHN DOE**, <br><br> *Plaintiffs*, <br><br> v. <br><br> **RAÚL LABRADOR**, in his official capacity as Attorney General of the State of Idaho; **JAN M. BENNETTS**, in her official capacity as County Prosecuting Attorney for Ada, Idaho; and the **INDIVIDUAL MEMBERS OF THE IDAHO CODE COMMISSION**, in their official capacities, <br><br> *Defendants*. | Case No. 1:23-cv-00269-CWD |

## EXPERT REBUTTAL DECLARATION OF KARA CONNELLY, MD

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com
kyle.bersani@groombridgewu.com

Philip S. May*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel:  (202) 505-5830
philip.may@groombridgewu.com

Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel:  (202) 223-7300
jorosz@paulweiss.com

Dina Flores-Brewer (ISB no. 6141)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID  83701
(208) 344-9750
dfloresbrewer@acluidaho.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

1.   I am submitting this rebuttal declaration to respond to some of the assertions made by Defendants and their experts.  While the Defendants' expert declarations are filled with many statements that I believe are not supported by evidence, I do not attempt to address all of them but rather focus on some of the issues that seem most pertinent.

## DEFENDANTS AND THEIR EXPERTS' ASSERTIONS ABOUT RISKS OF GENDER-AFFIRMING MEDICAL CARE

*Asserted risks of puberty blockers*

2.   Defendants' experts, *see*, *e.g*. Weiss ¶ 123. suggest that puberty blockers may negatively impact cognitive development.  These medications have been used for decades for youth with central precocious puberty without any observed or measured negative impact on cognitive development. Wojniusz S et *al*. Cognitive, Emotional, and Psychosocial Functioning of Girls Treated with Pharmacological Puberty Blockage for Idiopathic Central Precocious Puberty. Front Psychol. 2016.

3.   Defendants' experts' suggestion that the impact on cognitive development might be different with puberty blockers used for gender dysphoria compared to central precocious puberty is based on the mistaken assumption that youth treated with puberty blockers for gender dysphoria are left in a prolonged hypogonadal state.  In practice, the timing of discontinuing pubertal suppression for patients who have been treated with puberty blockers for gender dysphoria is typically at ages when many of their peers are also starting puberty.  Many youth begin puberty at age 13, 14 or even older.  In the field of pediatric endocrinology there are no concerns about brain development in patients related to the age of pubertal onset.  When delayed puberty is treated, the goals are to induce development of secondary sex characteristics or growth acceleration; concern about cognitive development is not a reason treatment is considered. Harrington H and Palmert MR. An Approach to the Patient With Delayed Puberty, *The Journal of Clinical Endocrinology & Metabolism*, Volume 107, Issue 6, June 2022, Pages 1739–1750.  In my general endocrine clinic, many cisgender youth present after age 14, and not uncommonly at age 16 or 17, for evaluation of absent or delayed puberty.  I have not had any concerns about cognition in these patients.

4.      In addition, cognitive development during adolescence is a complex process relying on a number of different mechanisms, including the psychosocial environment. Chronic stress, particularly during adolescence, can impact cognitive development. Eiland L, Romeo RD. Stress and the developing adolescent brain. Neuroscience. 2013 Sep 26;249:162-71. Gender diverse youth who are denied the option of puberty blockers and thus are forced to undergo development of secondary sex characteristics can experience significant stress; the contribution of this to cognitive development cannot be ignored.

5.      Defendants' experts also raise the risk of a negative impact on bone health with the use of puberty blockers. *See* Weiss ¶ 112. There is a risk of reduced bone density growth related to the use of puberty blockers, as I indicated in my opening declaration, whether used to treat gender dysphoria or central precocious puberty. This is something that is discussed with families prior to initiating treatment. Pubertal suppression can delay the peak accrual of bone mineralization that occurs during puberty. Research shows that bone mineral density increases when blockers are stopped and puberty resumes endogenously or with gender affirming hormone therapy. Schagen SEE, et *al*. Bone Development in Transgender Adolescents Treated With GnRH Analogues and Subsequent Gender-Affirming Hormones. J Clin Endocrinol Metab. 2020 Dec 1;105(12):e4252–63.; Vlot MC et *al*. Effect of pubertal suppression and cross-sex hormone therapy on bone turnover markers and bone mineral apparent density (BMAD) in transgender adolescents. Bone. 2017 Feb;95:11-19.

6.      Defendants' expert Dr. Weiss points to a risk of idiopathic intracranial hypertension (IIH) for youth prescribed puberty blockers as a reason not to treat gender dysphoria with this medication. *See* Weiss ¶ 113. This is in relation to a warning issued by the Federal Drug Administration (FDA) in 2022 based on postmarketing surveillance data. This warning was based on 6 cases of IIH in youth treated with puberty blockers, 5 of whom were being treated for central precocious puberty and 1 treated for gender dysphoria. The nature of the postmarketing surveillance data collection did not allow for calculation of incidence. A recently published registry-based cohort study out of Sweden reported that of the 410 individuals with gender dysphoria treated with puberty blockers over the 10-year study period, no cases of IIH were identified. Karamanis G et *al*. Incidence of Idiopathic Intracranial Hypertension in Individuals With Gonadotropin-Releasing

Hormone Analogue Treatment for Gender Dysphoria in Sweden. JAMA Pediatr. 2023 Jul 1;177(7):726-727.  I am not aware of any pediatric endocrinology practices that have ceased treatment with puberty blockers for central precocious puberty or any other condition based on this warning.

*Asserted health risks of hormone therapy*

7.      The defendants' experts bring up concerns about health risks resulting from hormone therapy, such as heart disease, stroke, blood clots, and liver dysfunction. *See*, *e.g.* Weiss ¶¶ 133-149.  However, these risks are the same when estrogen and testosterone are used to treat gender dysphoria as when they are used to treat delayed puberty or hypogonadism in cisgender adolescents.  In other words, these risks for transgender girls receiving estrogen therapy are the same as these risks for cisgender girls receiving estrogen therapy, and these risks for transgender boys receiving testosterone therapy are the same as these risks for cisgender boys receiving testosterone therapy.[1]  For cisgender or transgender youth receiving such treatments, it is important to monitor hormone levels to make sure they are in the appropriate range to avoid these adverse health consequences.  These risks are well-managed (for cisgender and transgender patients) when care is provided and monitored by a physician.  In my clinical experience with over 500 cisgender and gender diverse patients receiving hormone therapy, I have had no patients experience blood clots, heart disease, stroke or liver dysfunction.  One patient taking testosterone developed higher red blood cell counts but these normalized with reduction in the testosterone dose.

8.      One of the defendants' experts also makes the claim that testosterone therapy in birth-assigned females increases the risk of breast cancer; however, the references used, Weiss ¶ 139, are not represented accurately in the declaration.  These studies report that

---

[1] Additionally, given that hormone prescribing protocols in published guidelines by the Endocrine Society simulate natural endogenous puberty, the health risk profile for transgender boys receiving testosterone therapy becomes more in line with that for cisgender boys who go through endogenous puberty, which means, for example, higher risks of heart attack than cisgender girls.  Similarly, the health risk profile for transgender girls receiving estrogen therapy becomes more in line with that for cisgender girls who go through endogenous puberty, which means, for example, higher risks of breast cancer than cisgender boys.

transgender women treated with estrogen have a higher rate of breast cancer than cisgender men, but lower rate than cisgender women, and that transgender men treated with testosterone have a lower rate of breast cancer than cisgender women but a higher rate than cisgender men. Berliere M et *al*. Effects of Hormones on Breast Development and Breast Cancer Risk in Transgender Women. Cancers (Basel). 2022 Dec 30;15(1):245; Corso G et *al*. Risk and incidence of breast cancer in transgender individuals: a systematic review and meta-analysis. Eur J Cancer Prev. 2023 May 1;32(3):207-214.  These findings are not surprising given that estrogen causes the development of breast tissue and cisgender men have very little breast tissue.

*Asserted risks to fertility*

9.       Defendants' experts discuss the potential impact on fertility of gender-affirming medical care.  While, as I discussed in my opening declaration, some treatments can impair fertility and this is thoroughly discussed with patients and their families, along with fertility preservation options, this outcome is not certain.  There are many reports of transgender men who, after taking and stopping testosterone, are able to conceive children, with or without fertility treatment. Light AD et *al*. Transgender men who experienced pregnancy after female-to-male gender transitioning. Obstet Gynecol. 2014 Dec;124(6):1120-1127; Light AD et *al*. Family planning and contraception use in transgender men. Contraception. 2018 Oct;98(4):266-269; Stroumsa D et *al*. The Power and Limits of Classification - A 32-Year-Old Man with Abdominal Pain. N Engl J Med. 2019 May 16;380(20):1885-1888.[2]  For this reason, in our informed consent process, we inform trans males that testosterone is not an effective contraception and they could become pregnant.  Treatment can be tailored to minimize the risk to fertility where that is important to the family; for example, allowing some puberty to occur in transgender girls prior to starting puberty blockers so that they are able to preserve sperm, or temporarily stopping testosterone in transgender males to preserve eggs or try to get pregnant.

---

[2] Defendants suggest that the fact that I am not aware of any of my patients having conceived a child means they were unable to do so. Defs' brief. ¶ 20.  My patients transition their care to adult medical providers by their early 20's, before they would be ready to start having families.

*Asserted risk to sexual response*

10. Dr. Cantor suggests that gender-affirming medical care will lead to "lifetime lack of orgasm and sexual function." *See* Cantor ¶ 208. In actuality, sexual satisfaction is impacted by a multitude of factors, including psychological well-being. Studies have shown that as psychological well-being improves steadily during gender affirming treatment, so does sexual satisfaction. Young transgender adults who started their gender affirming care during adolescence had more sexual activity and satisfaction compared with individuals not accessing gender affirming care until adulthood. Bungener SL et *al.* Sexual Experiences of Young Transgender Persons During and After Gender-Affirmative Treatment. Pediatrics. 2020 Dec;146(6):e20191411. One study of transgender women having undergone vaginoplasty after pubertal suppression in adolescence reported that most were able to achieve orgasm. Bouman MB et *al*. Patient-Reported Esthetic and Functional Outcomes of Primary Total Laparoscopic Intestinal Vaginoplasty in Transgender Women With Penoscrotal Hypoplasia. J Sex Med. 2016 Sep;13(9):1438-1444. Another study found no difference between transgender women who were treated with puberty blockers early in puberty versus late in puberty in their ability to orgasm after gender affirming genital surgery. van der Meulen I et *al.* The Effect of Puberty Suppression on Sexual Functioning in Transwomen after Gender Affirmative Surgery, *The Journal of Sexual Medicine*, Volume 20, Issue Supplement_4, July 2023.

11. In my clinical experience with patients, gender affirming medical care improves sexual function and experiences due to the positive effect of physical effects on alignment with gender identity. Transgender men treated with testosterone do not experience any negative effects on sexual function, aside from possible vaginal dryness. Transgender women treated with estrogen can have diminished ability to achieve and sustain erections (which may be a desired effect), but treatment can be tailored to avoid that if desired.

*Assertions regarding regret and detransition*

12. Defendants and their experts devote significant time to suggesting that it is common for patients treated with gender-affirming medical care to detransition and regret treatment. There is no evidence to support this. One study of a large sample demonstrated that less

than 2% of people who transition ever detransition due to a shift in gender identity. Turban JL et *al*. Factors Leading to "Detransition" Among Transgender and Gender Diverse People in the United States: A Mixed-Methods Analysis. LGBT Health. 2021 May-Jun;8(4):273-280. Regret related to gender-affirming hormone use is rare. Wiepjes CM et *al*. The Amsterdam Cohort of Gender Dysphoria Study (1972-2015): Trends in Prevalence, Treatment, and Regrets. J Sex Med. 2018 Apr;15(4):582-590. In my experience with hundreds of patients with gender dysphoria who have received puberty blockers and/or gender-affirming hormones, a number of patients have discontinued hormones because they were satisfied and happy with the physical changes they had experienced and did not feel the need to continue treatment. These patients did not come to identify with their sex assigned at birth or regret treatment. I am aware of just two patients who, after undergoing gender affirming medical care, have said they had a shift in their gender identity to their birth-assigned sex and neither have any regrets about their treatment.

13.     Defendants' assertion, Defs' brief, ¶ 30, that I view detransitioners as "an inconvenient fact to be minimized" cannot be further from the truth. Defendants are aware of (and presented to me at my deposition) a paper I co-authored that details a multidisciplinary approach to adult patients who expressed desire to reverse their gender affirming surgery (0.3% in our institution). The study aimed to better understand factors impacting patient's experiences to aid in the development of protocols to support them. Patients in my clinic are all counseled about the possibility that their experience regarding their gender may shift and change and we encourage them to come to us for support if that occurs.

14.     The possibility of regretting medical decisions is part of medicine. A review of the body of research on this topic found that the mean rate of medical decision regret across studies was 16.5%. Perez, MMB, *et al*. Extent and Predictors of Decision Regret About Health Care Decisions: A Systematic Review. Medical Decision Making. Aug. 2016:777. A review of the research on regret in the context of surgeries found that across studies the average rate of regret was 14.4%. Wilson, A, *et al*. Regret in Surgical Decision Making: A Systematic Review of Patient and Physician Perspectives. World J. Surgery (2017) 41L1454-1465.

## DEFENDANTS AND THEIR EXPERTS' ASSERTIONS REGARDING THE EFFICACY OF GENDER-AFFIRMING MEDICAL CARE FOR ADOLESCENTS

15.     Defendants and their experts assert that there is a lack of evidence of efficacy of gender-affirming medical care.  First, they suggest that the research evidence we have demonstrating efficacy is not valuable because it is "low quality".  The defendants are referring to the Grading of Recommendations Assessment, Development and Evaluation (GRADE) approach to rating quality of evidence.  This approach includes four levels of evidence quality, and is largely dependent on the type and methods of investigation.  As such, observational studies including cross-sectional studies with comparison groups and longitudinal cohort studies—the types of studies done on gender-affirming medical care— are generally rated lower quality than randomized controlled clinical trials.  Observational studies are critical to medical research and informing the practice of medicine, and the label of "low quality" under GRADE does not mean that the evidence is unreliable or of poor quality.  Indeed, one recent study found that only 12% of health care interventions are supported by "high quality" evidence as defined by the GRADE standard, and more than half are supported by "low quality" or "very low quality" evidence.  Howick J et *al*. Most healthcare interventions tested in Cochrane Reviews are not effective according to high quality evidence: a systematic review and meta-analysis. J Clin Epidemiol. 2022 Aug;148:160-169.

16.     As I discussed in my opening declaration, Connelly ¶ 56, randomized controlled trials are not always feasible due to ethical concerns and methodological limitations. Ashley F et *al,* Randomized-controlled trials are methodologically inappropriate in adolescent transgender healthcare, Int J Trans Health.  Well-designed observational studies are necessary and valuable, and can provide reliable evidence, sometimes more reliable than randomized controlled trials.  This is not limited to research pertaining to gender affirming medical care.

17.     Also as discussed in my opening declaration, in my clinical experience, I've seen the profoundly beneficial impact of gender affirming medical care on my patients.  Defendants assert, Defs' brief, at 26-27, that my statement that gender affirming medical care improves depression and anxiety in patients is contradicted by a study published by my clinical team. Cantu AL et *al*. Changes in Anxiety and Depression from Intake to

First Follow-Up Among Transgender Youth in a Pediatric Endocrinology Clinic. Transgend Health. 2020 Sep 2;5(3):196-200.  This study looked at depression and anxiety screener data at the first follow up visit, which was typically just a few months after initiating hormone therapy (follow-up visits are recommended at 3-4 months after initial visit.[3]  We know from patients that physical changes occur very slowly, and often, patients do not notice physical differences until 3 to 6 months after initiating treatment; thus, we were not surprised that the improvements in depression and anxiety were not detected at the three month point.  Over time, as patients see their bodies begin to match their gender, we consistently see significant improvement in patient mental health.  In addition to seeing improvement in GAD-7 and PHQ-9 scores measuring anxiety and depression, we see reduction or elimination in suicidal ideation, improved family functioning and social relationships, and improved school engagement and performance.  We get this information from the patients as well as their parents, who are often surprised to see such dramatic changes in their children's lives and well-being.

18.     Defendants and their experts assert that clinical experience is not reliable evidence and appear to suggest that it should be disregarded.  *See* Cantor ¶¶ 284 et seq.  Yet Dr. Cantor seems to acknowledge that such evidence may be useful, as it "might be the only option available" if there aren't systematic cohort studies available.  While we would ideally always have more and stronger research to support all medical practices, as clinicians we must rely on the best evidence available to guide clinical care.  Clinical practice guidelines like those of the Endocrine Society and the WPATH Standards of Care make recommendations based on the best evidence that exists.  In all areas of medicine, sometimes treatment recommendations are made based on expert opinion from clinical experience.  Gender affirming medical care for adolescents is supported by multiple cohort and retrospective studies; however, the experience of clinicians is also valuable.

19.     Defendants and their experts suggest that lack of FDA approval of puberty blockers, testosterone, and estradiol for the treatment of gender dysphoria supports their position that these treatments are not effective.  My opening declaration discusses the wide-spread

---

[3] Our study was intended to continue to follow-up at additional time points, however our clinical operations shifted dramatically after this paper's publication due to the COVID-19 pandemic. We plan to collect more long-term data on the patients included in that study.

use of medications off-label (without FDA approval for a particular indication). The defendants' suggestion that lack of FDA approval for an indication means the FDA does not support that use[4] is erroneous. The lack of FDA approval does not mean disapproval of these medications for this indication; it says nothing at all about the FDA's views of the treatment. That is because the FDA does not opine on the safety or efficacy of a treatment for a particular indication unless a pharmaceutical company applies for approval for that indication. Making an application may not be financially reasonable or feasible if the treatment has already been approved for other conditions because, as the FDA states, "once the FDA approves a drug, healthcare providers generally may prescribe the drug for an unapproved use when they judge that it is medically appropriate for their patient." (https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label).

## DEFENDANTS AND THEIR EXPERTS' ASSERTIONS REGARDING WPATH'S GUIDELINES REGARDING GENDER-AFFIRMING SURGERIES

20.     Defendants' experts suggest that the fact that the WPATH Standards of Care 8 does not include a minimum age for genital surgery is equivalent to WPATH endorsing such surgeries at any age. *See* Cantor ¶ 249. This claim disregards the strong cautionary language included in the WPATH SOC 8 about assessing the patient's emotional and cognitive maturity to make each treatment decision and guidance about how to make that assessment. *See* WPATH SOC 8 at S61-62. The age at which an individual has the maturity and cognitive ability to develop realistic expectations for surgical outcomes and understand long-term consequences varies greatly from person to person, and is elucidated in the comprehensive mental health evaluation that is required prior to consideration of any surgical interventions.

---

[4] See Defs' brief, at 9 (stating that "the FDA is not prepared to put its credibility and careful testing protocols behind the use" of puberty blockers, estrogen and testosterone to treat gender dysphoria).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 13, 2023.

_____
Kara Connelly, MD

Li Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
(208) 742-6789
ritchie@wrest.coop
casey@wrest.coop

Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 6th Avenue
New York, NY 10019
Tel: (212) 373-3000
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com
jorosz@paulweiss.com

Eric Alan Stone*
Ariella C. Barel*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
(332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com

**Attorneys for Plaintiffs**                    *Pro hac vice application pending

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF IDAHO
### SOUTHERN DIVISION

| | |
|---|---|
| **PAM POE**, by and through her parents and next friends, Penny and Peter Poe; **PENNY POE**; **PETER POE; JANE DOE**, by and through her parents and next friends, Joan and John Doe; **JOAN DOE**; **JOHN DOE**, <br><br> Plaintiffs, <br><br> v. <br><br> **RAÚL LABRADOR**, in his official capacity as Attorney General of the State of Idaho; **JAN M. BENNETTS**, in her official capacity as County Prosecuting Attorney for Ada, Idaho; and the **INDIVIDUAL MEMBERS OF THE IDAHO CODE COMMISSION**, in their official capacities, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs Pam Poe, Penny Poe, Peter Poe, Jane Doe, Joan Doe, and John Doe, by and through their attorneys, bring this civil action for declaratory and injunctive relief and allege as follows:

## PRELIMINARY STATEMENT

The Idaho State Legislature has taken the extraordinary step of criminalizing the provision of well accepted medical care. Under House Bill 71, an Idaho doctor faces 10 years in prison for providing to a transgender minor healthcare that is supported by every major medical organization in the United States, including the American Academy of Pediatrics and the American Medical Association.

Specifically, HB 71 prohibits physicians from providing medications or surgical treatments to a minor "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." H.B. 71a (engrossed) § 1, 67th Leg., 1st Sess. (Idaho 2023) (the "Healthcare Ban," "Ban," or "H.B. 71") [appended at the end of the complaint]. In so doing, it prohibits gender-affirming medical care that is known to alleviate the debilitating distress of gender dysphoria and significantly improve patients' mental health, wellbeing and functioning.

The law is also an unprecedented intrusion into families' fundamental autonomy. HB 71 overrides medical decisions made by parents in consultation with their children's doctors, about the care of their children. Where the adolescent patient, their parents, and their doctor all agree that gender-affirming medical care is medically necessary, the law strips families of the ability to access such care. Simply put, the law preempts Idaho parents' (and doctors') judgment about what is best for their own children.

The Idaho legislature passed the Healthcare Ban, and on April 4, 2023, Governor Brad Little signed the bill into law in the name of "protecting minors." But lawmakers and the Governor ignored the extensive legislative testimony that the Healthcare Ban *harms* children. Idaho doctors testified about the damage that the Healthcare Ban would cause by limiting physicians' ability to treat patients' gender dysphoria, as well as the unavoidable, grave harm to the health and wellbeing of transgender youth if they are prohibited from receiving necessary medical care, including debilitating anxiety, severe depression, self-harm, and suicide. Transgender people testified about their painful experiences of depression and social isolation before receiving treatment for their gender dysphoria, and the marked improvement that care brought to their lives. Parents of transgender children begged legislators not to eliminate their ability to protect their children's health and wellbeing in Idaho. The Lawmakers disregarded *all* of this testimony and passed a law that interferes with loving parents' decisions about what is best for their children, and criminalizes doctors who provide medically necessary care for their patients.

The Healthcare Ban is not only harmful to the wellbeing of the minors it purports to protect; it is also unconstitutional. It violates the right to equal protection of transgender adolescents by singling out for prohibition only medical treatments that affirm a patient's gender if inconsistent with that patient's "biological sex"—thus prohibiting those treatments only for transgender minors. The law is subject to heightened scrutiny because it classifies based on sex and because classifications based on transgender status are at least quasi-suspect. The Healthcare Ban also infringes on a fundamental right—parents' right to make decisions about their children's medical care. Burdens on this right are subject to strict scrutiny. But the Healthcare Ban does not satisfy any level of constitutional scrutiny because it serves no

governmental interest whatsoever, let alone a compelling one. To the contrary, as major medical groups recognize, laws like the Healthcare Ban are a grave threat to the safety and wellbeing of minors. The Healthcare Ban is not narrowly tailored to further any government interest and is sweeping in its application, without exception. The Healthcare Ban is unconstitutional for the additional reason that it was based on negative attitudes toward and disapproval of transgender people. This was reflected in statements made by legislators who supported the law, and the fact that the Healthcare Ban is just part of a broader campaign by the Idaho Legislature targeting transgender people of all ages.

Idaho's Healthcare Ban is unconstitutional. Plaintiffs bring this action for declaratory and injunctive relief prohibiting its enforcement. The law by its own terms will not take effect until January 2024. Plaintiffs will work with Defendants' counsel and the Court to set a schedule for a preliminary injunction motion that will allow the Court to resolve that motion before the law would otherwise take effect.

## JURISDICTION AND VENUE

1. This action arises in part under the United States Constitution and 42 U.S.C. § 1983.

2. This Court has subject matter jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331, 1343, and 1367.

3. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 1983.

4. Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2), because one or more Defendants resides in this district and because a substantial part of the events giving rise to the claims occurred in this district, where one or more Plaintiffs reside.

5.      Consistent with Dist. Idaho Loc. Civ. R. 3.1, venue is proper in the Southern Division because Plaintiffs and some Defendants legally reside in Ada County, Idaho, and because that is where the claim for relief arose.

**PARTIES**

**I.      The Minor Plaintiffs and Their Families**

**A.      The Poe Family**

6.      Plaintiffs Pam Poe, Penny Poe, and Peter Poe live in Idaho.  Penny and Peter are the parents of Pam.  Pam is 15 years old and has lived in Idaho her whole life.  She is transgender and is currently receiving medically necessary care that would be prohibited by the Healthcare Ban.  The experience of Pam and her family is discussed in paragraphs 71-81 below.

**B.      The Doe Family**

7.      Plaintiffs Jane Doe, Joan Doe, and John Doe live in Idaho.  Joan and John met while in college and are the parents of Jane.  Jane is 16 years old and has lived in Boise her whole life.  She is transgender and currently receiving medically necessary care that would be prohibited by the Healthcare Ban.  The experience of Jane and her family is discussed in paragraphs 82-94 below.

**II.      Defendants**

8.      Defendant Raúl Labrador is the Attorney General of the State of Idaho.  The Attorney General's offices are located at 700 W. Jefferson St. #210, Boise, Idaho.  The Healthcare Ban grants Defendant Labrador authority to bring legal action to enforce the Ban, and Defendant Labrador has publicly announced that he intends to enforce the Healthcare Ban. Defendant Labrador is sued in his official capacity.

9.      Defendant Jan M. Bennetts is the Prosecuting Attorney for Ada County, Idaho, where Plaintiffs reside.  County Prosecutor Bennetts is named in her official capacity.  County

Prosecuting Attorneys bear "primary" responsibility for enforcing the Healthcare Ban in their respective Idaho counties. *See* Idaho Code § 31-2227.

10.    The individual members of the Idaho Code Commission (Defendants Jeremy Vaughn, Andrew Doman, and Jill Holinka) are sued in their official capacities and all reside in Idaho, and are designated in the caption by their titles pursuant to Federal Rule of Civil Procedure 17(d).  The Code Commission's members are each persons within the meaning of 42 U.S.C. § 1983 and act under color of state law as to the allegations in this complaint.  The Idaho Code Commission is an office of the Secretary of State established by statute.  *See* Idaho Code §§ 73-201–73-221.  The Commission's purpose is to keep the Idaho Code up to date by indicating changes to laws, including constitutional changes, and providing annotations, and the Commission has all power and authority necessary to accomplish that purpose.  It has the specific power to keep the Idaho Code up to date, to provide annotations to the Code, and to provide references in the Code to decisions of the federal courts.  *Id.* § 73-205.  These Defendants are referred to in this Complaint collectively as the "Idaho Code Commission Defendants."

## III.    FACTUAL BACKGROUND

### A.    Gender Dysphoria and Its Treatment

#### 1.    Gender Identity

11.    "Gender identity" is a person's internal sense of belonging to a particular gender.  Everyone has a gender identity, and it is a fundamental aspect of human development for all people.  No medical intervention can alter a person's gender identity.

12.    People are "transgender" when their gender identity does not align with the sex assigned to them at birth.  A transgender boy is a boy who was assigned a female sex at birth but

persistently, consistently, and insistently identifies as male. A transgender girl is a girl who was assigned a male sex at birth but persistently, consistently, and insistently identifies as female.

13. Some transgender people recognize this misalignment in early childhood. For others, it can become apparent with the onset of puberty and the resulting physical changes, or later into adulthood.

14. People are "cisgender" when their gender identity aligns with the sex assigned to them at birth. A cisgender boy is a boy who was assigned male at birth and persistently, consistently, and insistently identifies as male. A cisgender girl is a girl who was assigned female at birth  and persistently, consistently, and insistently identifies as female.

15. Some people's gender identity does not strictly fall within the binary categories of male and female. The term non-binary is commonly used to express such a gender identity.

16. The terms "sex designated at birth" or "sex assigned at birth" are more accurate and precise than the term "biological sex" used in the Healthcare Ban, because "biological sex" falsely implies clear divisions between and uniformity within "sexes." For example, some people with intersex characteristics may have a chromosomal configuration typically associated with a male sex designation (XY) but external genitalia typically designated female (a vulva rather than a penis). For these reasons, the Endocrine Society, an international medical organization of over 18,000 endocrinology researchers and clinicians, warns practitioners that the terms "biological sex" and "biological male or female" are imprecise and should be avoided.

### 2.    Gender Dysphoria

17. The lack of alignment between one's gender identity and their sex assigned at birth can cause significant distress, particularly during the onset of puberty, when the development of secondary sex characteristics—e.g., breasts for those assigned female at birth or

facial hair for those assigned male at birth—can widen the gap between someone's gender identity and their physical appearance.

18.    "Gender dysphoria" is the clinical diagnosis for the significant distress that can result from the incongruity between one's gender identity and the sex they were designated at birth.  It is codified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5-TR) (DSM-5 released in 2013, and DSM-5-TR released in 2022).  To be clear, being transgender is not a medical or psychiatric condition to be cured—gender identity is innate, and no medical or psychological treatment can change it.  The American Psychiatric Association has thus explained that "[t]he presence of gender variance is not the pathology."  Instead, gender dysphoria results "from the distress caused by the body and mind not aligning and/or societal marginalization of gender-variant people."  Laws targeting transgender people, like the one at issue here, are an example of such marginalization.

19.    To be diagnosed with gender dysphoria, a patient's incongruence between their gender identity and the sex they were designated at birth must have persisted for at least six months and the dysphoria must be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.  Gender dysphoria is a serious medical condition.  If left untreated, gender dysphoria can result in debilitating anxiety, severe depression, self-harm, and suicide.  These symptoms will only worsen without treatment.

### 3.    Treatment of Gender Dysphoria

20.    The World Professional Association for Transgender Health ("WPATH") has published guidelines for the treatment of gender dysphoria since 1979, which are widely accepted in the medical community.  These guidelines are now known as the Standards of Care

for the Health of Transgender and Gender Diverse People ("WPATH Standards of Care"). The current version is Standards of Care 8, published in 2022. The recommendations in WPATH's Standards of Care 8 are based on a systematic review of the evidence.

21.     The WPATH Standards of Care provide guidelines for multidisciplinary care of transgender people and describe criteria for medical interventions to treat gender dysphoria, including puberty-delaying medication, hormone treatment, and surgery when medically indicated. Every major medical organization in the United States recognizes that these treatments are medically necessary for some patients in order to treat gender dysphoria, and that they are safe and effective treatments.

22.     A clinical practice guideline from the Endocrine Society (the "Endocrine Society Guideline") provides protocols for the treatment of gender dysphoria similar to those outlined in the WPATH Standards of Care.

23.     Doctors in Idaho and throughout the country follow both the WPATH Standards of Care and the Endocrine Society Guideline to treat people with gender dysphoria.

24.     Recommendations for treatment for gender dysphoria depend on whether treatment is for a pre-pubertal child, an adolescent, or an adult. In all cases, the precise treatment recommended for gender dysphoria will depend upon each patient's individualized needs.

25.     Before puberty, gender-affirming care does not include any pharmaceutical or surgical interventions. Care for a pre-pubertal child often includes supporting the child's "social transition," which refers to living consistently within one's persistently expressed gender identity (e.g., adopting a new name and pronouns and dressing in a manner that aligns with one's gender identity).

26.     Under the WPATH Standards of Care and the Endocrine Society Guideline, medical interventions may become medically necessary and appropriate after transgender youth reach puberty.  Both guidelines recommend that adolescent patients receive comprehensive psychological assessments prior to receiving any gender-affirming medical interventions.

27.     Both Pam Poe and Jane Doe are receiving treatment in accordance with the WPATH Standards of Care and the Endocrine Society Guideline.

### (a)     Puberty-Delaying Treatment

28.     For many transgender adolescents, going through puberty in accordance with the sex designated to them at birth can cause extreme distress.  For these adolescents, puberty-delaying medications—known as gonadotropin-releasing hormone ("GnRH") antagonists—can minimize and potentially prevent gender dysphoria, as well as the permanent, unwanted physical changes that undergoing endogenous puberty would cause.  Puberty-delaying treatment is safe and effective in treating gender dysphoria in adolescents.

29.     Under the Endocrine Society Guideline, transgender adolescents may be eligible for puberty-delaying treatment if:

- A qualified mental health professional has confirmed that:

  - the adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria;

  - gender dysphoria worsened with the onset of puberty;

  - if there are any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence), those have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment; and

  - the adolescent has sufficient mental capacity to give informed consent to this (reversible) treatment.

- The adolescent:

  - has been informed of the effects and side effects of treatment (including potential loss of fertility if the individual subsequently continues with sex hormone treatment) and options to preserve fertility; and

  - has given informed consent, and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable law) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process.

- And a pediatric endocrinologist or other clinician experienced in pubertal assessment:

  - agrees with the indication for GnRH agonist treatment;

  - has confirmed that puberty has started in the adolescent; and

  - has confirmed that there are no medical contraindications to GnRH agonist treatment.

30.    WPATH Standards of Care similarly provide that transgender adolescents may be eligible for puberty-delaying treatment if:

- A health care professional has confirmed that:

  - The experience of gender diversity/incongruence is marked and sustained over time;

  - That puberty has started;

  - The adolescent's mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and gender-affirming medical treatments have been addressed;

  - The adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment.

- The adolescent:

  - Has been informed of possible reproductive effects, including the potential loss of fertility and the available options to preserve fertility, and these have been discussed in the context of the adolescent's stage of pubertal development.

31. Puberty-delaying treatment works by pausing a person's endogenous puberty. For transgender girls, this treatment pauses the physiological changes typical of male puberty and prevents the development of associated secondary sex characteristics like facial hair, a pronounced Adam's apple, deepening of the voice, and genital growth. For transgender boys, puberty-delaying treatment pauses the development of breasts and menstruation. The use of these interventions after the onset of puberty can eliminate or reduce the need for gender-affirming surgeries later in life, and prevent bodily changes that cannot be later corrected with surgical interventions.

32. Puberty-delaying treatment is reversible. If puberty-delaying treatment is stopped and no gender-affirming hormone therapy is provided, endogenous puberty resumes and patients undergo puberty in a timeline typical of their peers.

33. Puberty-delaying treatment does not, by itself, impair future fertility.

34. When puberty-delaying treatment is followed by gender-affirming hormone therapy, fertility may be affected. For this reason, patients and their families are counseled about fertility preservation before even beginning puberty-delaying treatment. Where preserving fertility is important to the family, treatment can be timed to minimize the risk.

35. If gender-affirming hormone therapy is provided after puberty-delaying treatment, patients then undergo puberty consistent with their gender identity on a timeline typical of their peers.

### (b)   Gender-Affirming Hormone Therapy

36. For some adolescents, it may be medically necessary and appropriate to treat their gender dysphoria with gender-affirming hormone therapy (testosterone for transgender boys, and testosterone suppression and estrogen for transgender girls).

37.     Under the Endocrine Society Guidelines, transgender adolescents may be eligible for gender-affirming hormone therapy if:

- A qualified mental health professional has confirmed:

  - the persistence of gender dysphoria; and

  - if there are any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence), those have been addressed, such that the adolescent's environment and functioning are stable enough to start sex hormone treatment.

- The adolescent:

  - has been informed of the partly irreversible effects and side effects of treatment (including potential loss of fertility and options to preserve fertility);

  - the adolescent has sufficient mental capacity to estimate the consequences of this (partly) irreversible treatment, weigh the benefits and risks, and give informed consent to the treatment; and

  - has given informed consent, and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable laws) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process.

- And a pediatric endocrinologist or other clinician experienced in pubertal induction:

  - agrees with the indication for sex hormone treatment; and

  - has confirmed that there are no medical contraindications to sex hormone treatment.

38.     WPATH Standards of Care similarly provide that transgender adolescents may be eligible for gender-affirming hormone therapy if:

- A health care professional has confirmed that:

  - The experience of gender diversity/incongruence is marked and sustained over time;

  - That puberty has started;

- The adolescent's mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and gender-affirming medical treatments have been addressed;

- The adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment.

- The adolescent:

  - Has been informed of the possible reproductive effects, including the potential loss of fertility and the available options to preserve fertility, and these have been discussed in the context of the adolescent's stage of pubertal development.

39.     Through decades of clinical experience and research, gender-affirming hormone therapy has been shown to be safe and effective at treating gender dysphoria in both adolescents and adults.

40.     Adverse side effects from clinically supervised gender-affirming hormone therapy are rare.

41.     While gender-affirming hormone therapy can in some circumstances affect fertility, many people receiving hormone therapy can conceive children while undergoing treatment or after discontinuing or pausing hormone therapy treatment (e.g., men who are transgender can give birth and women who are transgender can produce viable sperm).  Patients and their parents are counseled about fertility preservation, and treatment can be tailored to minimize the risk.

42.     Apart from the potential impact on fertility, gender-affirming hormone therapy poses the same (rare) potential risks as the use of these medications for non-transgender patients for other purposes.

### (c)     Gender-Affirming Surgical Interventions

43.     Under the WPATH Standards of Care, surgical interventions may become medically necessary and appropriate in certain cases for transgender adolescents.  Gender-

affirming surgeries are only considered for minors if they have longstanding gender dysphoria and are assessed to possess the emotional and cognitive maturity to understand the risks and benefits of the treatment.

44.     Plaintiffs are not aware of any doctors in Idaho who perform any gender-affirming surgeries on minors.  Elsewhere, gender-affirming surgeries for transgender minors are not common, and the vast majority are chest masculinization surgery for transgender boys.

## IV.     The  Enactment of the Healthcare Ban

45.     On March 29, 2023, the Idaho State Legislature passed the Healthcare Ban, prohibiting medical providers from providing medications or surgical treatments to minors "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex."  The law defines "sex" based on "chromosomes and internal and external reproductive anatomy."  H.B. 71 § 1.  The specified treatments include surgeries which alter "the appearance of genitalia that differs from the child's biological sex" or "mastectom[ies]," in addition to "administering or supplying . . . [p]uberty blocking medication," "testosterone to a female," or "estrogen to a male."  *Id*.  A child is defined as anyone under eighteen years of age.  *Id*.

46.     Notably, the Healthcare Ban makes it a felony for Idaho doctors to provide these medical treatments to minors *only* when it is "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex."  *Id.*  The same medical treatments are not banned under the law if they are provided for any other purposes, including to affirm a minor's gender if it is *consistent* with the child's "biological sex."

47.     The Healthcare Ban treats the provision of gender-affirming medical care to minors as a "crime[ ] of violence," *id.* § 2, and imposes on healthcare providers a penalty of

imprisonment up to 10 years. *Id.* § 1. This is equivalent to the prison penalty for involuntary or vehicular manslaughter. H.B. 71 § 2; Idaho Code § 18-4007. And the Ban authorizes up to $5,000 in fines in addition to imprisonment.

48. There is no exception for treatment that is necessary for the adolescent's health—regardless of their prior course of treatment, individual circumstances, or degree of distress—if the treatment's purpose is to affirm a minor's gender "inconsistent with [their] biological sex." HB 71E1 § 1, 18-1506C(4)(a).

49. The Ban expressly allows physicians to perform permanent and irreversible treatment on children with intersex conditions, including genital surgeries on newborns, despite their incapacity to assent, and despite the fact that major medical organizations like the American Academy of Family Physicians have expressly said that such surgeries on intersex infants and youth are harmful. H.B. 71 § 1.

50. In passing the law, the State Legislature ignored compelling testimony from the very people the Healthcare Ban affects. Indeed, the House Judiciary, Rules & Administration committee took the extraordinary, unprecedented step of trying to prevent people under the age of 18 from testifying, and after public outcry, ultimately passed a modified rule which made it harder for people under the age of 18 to testify. Further, the State Legislature ignored testimony from transgender adults who shared their painful experiences of depression and social isolation prior to receiving treatment for their gender dysphoria, and how their lives were improved by receiving care prohibited by the Healthcare Ban.

51. The State Legislature ignored testimony from parents of transgender children who testified to the harm that the legislation would do to their children's wellbeing, and who begged legislators not to strip them of their ability to get their children lifesaving care in their home

state.  The mother of one 15-year-old transgender Idahoan testified that since her daughter began receiving hormone therapy, she witnessed her "go from being lost and unhappy to being comfortable and thriving."  She added, "We know that there are risks to hormone treatments, but we also know there are risks to delaying those treatments, such as depression, suicide, and more difficulty integrating into society as adults.  Parenting is hard, and there are so many risks that we have to weigh from whether or not we circumcise an infant to which vaccinations to give to when to let our teenagers date or letting them drive a car for the first time, all of which can have negative consequences.  As a parent, I'm appealing to you to not take away my right to work with professionals to parent my child and help her fulfill her potential to be a healthy, productive adult."  But in passing the Healthcare Ban, the legislature did just that.  The State Legislature also ignored testimony from Idaho doctors about the damage that the Healthcare Ban would cause by limiting physicians' options for treating gender dysphoria, as well as the unavoidable grave harm to the health and wellbeing of transgender youth if they are prohibited from receiving necessary medical care.

52.     The legislature's decision to supplant the medical judgment of Idaho physicians (and every major medical association in the nation) with its own, to subject Idaho physicians to draconian penalties for providing patients with well-accepted medical care, and to intrude on family medical decisions, is extraordinary.

53.     Statements from members of the State Legislature demonstrate disapproval of transgender people.  For example, the bill's first-listed sponsor, Representative Bruce Skaug, and co-sponsor Senator Ben Adams equated the provision of well-accepted treatment for gender dysphoria in adolescents with "genital mutilation" and the "wicked past [of] sterilizations."  On her official Twitter account, Senator Tammy Nichols, another cosponsor, referred to identifying

as LGBTQ as an "epidemic" of which "States need to help stop the spread," and called gender-affirming medical care "Frankenstein Practices." On his official Twitter account, Senator Scott Herndon dismissed gender dysphoria as "a social mania that needs to stop."

54. This law is just the latest of a wave of recently proposed bills and laws in Idaho targeting transgender people for marginalization.

55. During the 2020 legislative session, the State Legislature passed, and the Governor signed into law, bills prohibiting transgender people from changing the gender recorded on their birth certificate, H.B. 509, 65th Leg., 2nd Sess. (Idaho 2020), and prohibiting transgender women and girls from participating in women's sports, regardless of the circumstances, H.B. 500, 65th Leg., 2nd Sess. (Idaho 2020).

56. On March 14, 2023, the State Legislature introduced H.B. 314, which would ban schools or public libraries from making material deemed inappropriate available, and which was widely understood to target books specifically discussing sexual orientation or gender identity. H.B. 314, 67th Leg., 1st Sess. (Idaho 2023). The bill passed both houses before being vetoed by Governor Little.

57. And just two weeks prior to signing the Healthcare Ban, Governor Little signed SB 1100 into law, which will ban transgender public-school students from using the bathroom that aligns with their gender identity. S.B. 1100, 67th Leg., 1st Sess. (Idaho 2023).

58. Viewed in the proper context, it is clear that the State Legislature's passage of the Healthcare Ban had nothing to do with protecting children and everything to do with expressing disapproval of, and stigmatizing, transgender people.

## V.    The Criminalized Treatment Is Permitted for Treating Other Conditions

59. While the Healthcare Ban prohibits the use of well-established treatments for gender dysphoria in transgender adolescents—including puberty-delaying drugs, testosterone

therapy, estrogen therapy, testosterone suppressants, and mastectomy—it permits the use of those very medications and surgeries for minors for other purposes, including to affirm the gender of cisgender minors.

60.     For example, cisgender boys may be prescribed testosterone if they have not begun puberty by 14 years of age.  For most of these patients, puberty would eventually initiate naturally even without testosterone.  But testosterone is prescribed to avoid some of the social stigma that can come from undergoing puberty later than one's peers and failing to develop the secondary sex characteristics consistent with their gender at the same time as one's peers. Similarly, cisgender boys who are forecasted to have a post-pubertal height of 5'4" or shorter— which is roughly the average height of an American woman—may be treated with testosterone for "short stature."  Idaho doctors are thus free to prescribe testosterone to cisgender boys, including to affirm cisgender boys' gender identity.  But under the Healthcare Ban, they would face imprisonment for prescribing exactly the same medication to affirm a transgender boy's gender identity.

61.     Likewise, cisgender girls with polycystic ovarian syndrome (a condition that can cause increased testosterone and, as a result, symptoms including facial hair) may be treated with testosterone suppressants.  The same treatments that are permitted for cisgender minors—often to affirm their gender—are banned if provided to transgender minors to affirm *their* gender.

62.     Puberty delaying medication is widely used to treat "central precocious puberty"—the premature initiation of puberty (before eight years of age in people assigned female at birth and before nine years of age in people assigned male).  Central precocious puberty can lead to anxiety, depression, and lower academic achievement, as well as impairment of final adult height.  Under the Healthcare Ban, doctors in Idaho can prescribe puberty-delaying

medications to treat children with precocious puberty, but cannot prescribe those very same medication to treat transgender adolescents with gender dysphoria..

63.     Cisgender girls may be treated with estrogen for a variety of conditions, including primary ovarian insufficiency, hypogonadotropic hypogonadism (lack of hormone production due to a problem with the pituitary gland or hypothalamus), and Turner's Syndrome (a chromosomal condition that can cause a failure of ovaries to develop).  Under the Healthcare Ban, doctors in Idaho can prescribe estrogen to treat cisgender girls with any of these conditions but cannot prescribe the same medication to treat transgender adolescents with gender dysphoria.

64.     The Healthcare Ban also criminalizes providing mastectomy to transgender young men to treat gender dysphoria because it is "inconsistent" with their "biological sex," but cisgender boys are permitted to undergo mastectomy to ensure their bodies track their own perception of their gender.  Cisgender adolescent boys can have surgery to treat gynecomastia— the proliferation of ductal or glandular breast tissue, as opposed to adipose tissue, in individuals assigned male at birth.  These surgeries are commonly performed to reduce psychosocial distress, often related to the incongruence with one's gender.  Therefore, a transgender boy cannot receive chest-masculinizing surgery to affirm his gender identity, but a cisgender boy can.

## VI.    The Healthcare Ban Will Cause Severe Harm to Transgender Adolescents

65.     Withholding gender-affirming medical care from adolescents with gender dysphoria when it is medically indicated puts them at risk of extreme harm to their health and wellbeing.

66.     Adolescents with untreated gender dysphoria often suffer significant distress. Many are on medications for depression and anxiety.  Self-harm and suicidal ideation are exceedingly common.  Indeed, suicidality among transgender young people is a crisis.  One

survey found that more than half of transgender youth had seriously contemplated suicide. Studies have found that as many as 40% of transgender people have attempted suicide at some point in their lives.

67. When adolescents are able to access puberty-delaying treatment and hormone therapy—which prevent them from going through endogenous puberty and allow them to go through puberty consistent with their gender identity—their distress recedes and their mental health improves. Both clinical experience and medical studies confirm that for many young people, this treatment is transformative, helping them go from suffering to thriving.

68. If a healthcare provider is forced to deny or discontinue puberty-delaying treatment or hormone therapy due to the Healthcare Ban, it will cause patients to undergo their endogenous puberty. For a girl who is transgender, this could mean that she would experience genital growth, body hair growth, deepening of her voice, and development of a more pronounced Adam's apple. For a boy who is transgender, this could mean the initiation or resumption of a menstrual cycle and breast growth. This can result in extreme distress for adolescents with gender dysphoria. Additionally, the effects of undergoing one's endogenous puberty may not be reversible even with subsequent hormone therapy and surgery in adulthood, thus exacerbating lifelong gender dysphoria in patients who have this treatment withheld or cut off.

69. And for patients who have been relying on puberty-delaying treatment and/or hormone therapy to alleviate their gender dysphoria, being forced to stop treatment and experience the changes of endogenous puberty can be extremely distressing and have significant impact on mental health. Moreover, abruptly withdrawing hormone therapy can pose additional risks to patients. The body takes about six weeks to ramp up endogenous hormones, so a patient

will be without sufficient circulating hormones at all if their treatment is abruptly halted. This can result in depressed mood as well as debilitating hot flashes and headaches. For patients on spironolactone—a testosterone suppressant—abruptly terminating treatment can cause a patient's blood pressure to spike, increasing the risk of heart attack or stroke even for young patients.

70. Gender-affirming medical care is lifesaving treatment for many adolescents experiencing gender dysphoria. The major medical and mental health associations in the United States all support the provision of such care as safe and effective treatment. These associations include the American Academy of Pediatrics, American Medical Association, the Endocrine Society, the Pediatric Endocrine Society, the American Psychological Association, the American Psychiatric Association, the American Academy of Family Physicians, the American College of Obstetricians and Gynecologists, the American Nurses Association, the National Association of Social Workers, and WPATH.

## VII. The Impact of the Healthcare Ban on Plaintiffs

### (a) The Poe Family

71. Pam Poe is a fifteen-year-old ninth grader and a lifelong Idaho resident. She has a part-time job and loves engineering, programming, and math. Pam lives with her parents and her seventeen-year old sister. Her oldest sister is nineteen years old and has moved out of the family home.

72. Pam is transgender. She is a girl with a female gender identity, but when she was born, she was designated as male.

73. Pam began to realize she was transgender around March 2021, while she was in seventh grade.

74.     In August of 2021, Pam worked up the courage to tell her mom that she was transgender.  Her mother reacted with acceptance and support, hugging her, thanking Pam for introducing herself, and declaring, "I love you."

75.     Pam began experimenting with traditionally feminine clothing and makeup throughout eighth grade.  She began living socially as a girl when she started high school in August 2022.

76.     In late-2021, Pam was struggling with depression, anxiety, and self-harm, and she began seeing a counselor weekly.  When counseling did not alleviate her negative feelings, Pam asked her mom to admit her to a residential treatment facility in late February 2022.  She spent one week there, and she was diagnosed with gender dysphoria while in treatment.

77.     Two months after leaving the treatment center, Pam began seeing a doctor who specializes in treating gender dysphoria.  Pam's mom observed that when she left her first appointment having learned that puberty blockers were a possibility for her, Pam had a huge smile and seemed like the happiest she had been in almost a year.

78.     After careful evaluation, thorough discussion of risks and benefits, and bloodwork, in May 2022, when Pam Poe was 14, her  doctor prescribed her puberty blockers.  The medication had a near-immediate positive effect on Pam.  By pausing the physical changes that were causing her depression and anxiety, her mental health greatly improved.

79.     In April 2023, when Pam was 15 years old, Pam's family and her doctor had a conversation about the possibility of Pam beginning hormone treatment.  The doctor performed bloodwork, discussed the risks and benefits as well as options for fertility preservation, and confirmed Pam's ongoing therapy and mental health support.  Pam and her parents, in close consultation with her doctor, decided that this was the appropriate treatment plan for Pam.  The

family signed a consent form, and the doctor wrote Pam a prescription for hormone therapy. Pam continues to be on hormone therapy.

80.     Pam and her family are afraid of the impact the Healthcare Ban will have on them if it goes into effect.  Pam is scared that losing access to her medication will mean that her body will undergo unwanted, permanent changes that are inconsistent with her gender identity.  Pam and her parents worry about the severe stress and anxiety associated with Pam's gender dysphoria returning if she is forced to stop gender-affirming medical care.

81.     Pam has lived in her Idaho neighborhood for her entire life, and Pam's school, friends, and family are all there, as well as her parents' jobs.  However, Pam's parents are not willing to sacrifice her health and wellbeing to stay if that means she can no longer receive the medical care she needs in Idaho.  If the Healthcare Ban goes into effect, the Poe family is considering upending their settled lives to move out of Idaho.

**(b)     The Doe Family**

82.     Jane Doe is a 16-year-old rising senior in high school and has lived in Idaho her entire life.  When she is not at school, she likes to play video games, listen to music, and go on walks.  She is interested in computer science and coding, and she plans to go to college after she graduates high school.

83.     Jane is transgender.  She is a girl with a female gender identity, but when she was born, she was designated as male.

84.     Growing up, Jane always felt more like a girl than a boy.  Socially, she was a lot more comfortable playing with and associating with the girls.  When teams were divided into girls and boys at recess, she felt like she belonged with the girls' team, and the girls would

usually allow her to join.  When playing "make believe," she was always a girl character. Beginning at a young age, Jane expressed a desire to be a mom.

85.     Before she came out as transgender, Jane's gender dysphoria negatively impacted her mental health.  In 2018, as she started puberty, Jane hated the way her body was changing, and her mental health worsened.  She particularly despised having her picture taken, and there are few photos of her from this time.  Jane did not like *who she was* when she had to move through the world as a boy.  She sometimes wished she did not even exist.  She frequently secluded herself because she did not think she could be herself in social settings.  Her schoolwork suffered as well.

86.     Jane came out to her friends in Summer 2020, and the response was overwhelmingly positive.  Her friends' support of her true self made Jane feel the happiest she had in years.

87.     Jane made the brave decision to tell her parents that she was transgender in Fall 2020.  Her parents were not surprised and were supportive and loving.  They knew that their daughter was the same beautiful soul she had always been.

88.     Around October, 2020, Jane began socially transitioning, dressing, wearing makeup, and using her new name consistent with her female gender identity.

89.      In mid-October 2020, Jane saw her pediatrician, who referred her to a doctor who specializes in treating gender dysphoria.  The next month, she met with that doctor and was diagnosed with gender dysphoria.  Jane and her parents had multiple conversations with the doctor over time, in which the doctor provided them with information about gender dysphoria, counseled them on the risks and benefits of gender-affirming medical care, counseled them on fertility preservation, and recommended that Jane see a therapist.

90.     After several months of therapy, additional visits with her doctor, and lab work, Jane Doe's doctor prescribed Jane a puberty blocker in January 2021.  Knowing that the pubertal changes to her body were not going to get worse was a huge relief to Jane.

91.     The family began to discuss amongst themselves the possibility of Jane starting on hormone therapy and later discussed this with the doctor.  The doctor advised them again on the risks and benefits, further counseled them on fertility preservation, and conducted additional lab work.   Jane had been consistent in her gender identity, and ultimately the doctor recommended hormone therapy to address her gender dysphoria.  In April 2021, at age fourteen, Jane started hormone therapy at a very low dose.  Her doctor has been monitoring Jane and her bloodwork since then, adjusting her medications as needed.

92.     Since receiving gender-affirming medical care, Jane's mental health has significantly improved.  She no longer has days where her gender dysphoria is so severe that she feels she cannot get out of bed.  She experiences happiness when she looks in the mirror.  She feels able to go out into the world.  Her grades in school have improved as well.  When Jane was preparing to go to the prom and looked at herself in the mirror, Jane's mom could see the glow of Jane's authentic gender expression.

93.     The ongoing debate over HB 71 and other anti-transgender bills has been a heavy cloud over Jane and has negatively impacted her life.  She feels like her home state does not recognize her humanity and is telling her she has to leave.  The 2023 legislative session brought back depressive and harmful thoughts for Jane that she had not had since transitioning.  The looming law has affected her school life and her grades.  She recently had to take several days off of school because she was too depressed to go.  When the bill passed, Jane wept in the hallway at school, and her parents had to come and take her home.

94.     Jane's family is seriously considering leaving Idaho for Jane's senior year of high school to ensure that she can continue to access the medical care that has helped her so significantly.  The Doe family loves living in Idaho; their community is in Idaho, and their friends are in Idaho.  They do not want to leave, but they might have to in order to care for their child.

## CAUSES OF ACTION

### COUNT ONE

**THE HEALTH CARE BAN VIOLATES THE
FOURTEENTH AMENDMENT'S GUARANTEE OF
EQUAL PROTECTION UNDER THE LAW
(MINOR PLAINTIFFS)**

95.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 94 as if fully set forth herein.

96.     Jane Doe and Pam Poe (the "Minor Plaintiffs") bring this Count against Defendant Labrador and Defendant Jan M. Bennetts, in their official capacities.

97.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, protects individuals and groups from discrimination by the government.

98.     The Healthcare Ban prohibits the provision of various medical treatments to minors only when the care is provided "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex."  HB 71E1 § 1, 18-1506C(3).  Whether or not a person can receive certain medical treatments turns on their sex and on whether the care is consistent with stereotypes associated with a person's sex assigned at birth.

99.     The Healthcare Ban therefore discriminates against transgender youth, including the Minor Plaintiffs, based on their transgender status and sex, including their failure to conform to stereotypes associated with their sex assigned at birth.

100.    In addition to facially discriminating based on sex and transgender status, the Ban was also passed because of its deleterious effects on transgender people, not in spite of them.

101.    Discrimination based on transgender status and sex is subject to heightened scrutiny under the Equal Protection Clause and is therefore presumptively unconstitutional, placing a demanding burden of justification upon the State to provide at least an exceedingly persuasive justification for the differential treatment.

102.    Transgender people have obvious, immutable, and distinguishing characteristics that define that class as a discrete group.  These characteristics bear no relation to transgender people's abilities to perform in, or contribute to, society.

103.    Transgender people have historically been subject to discrimination, and remain a very small minority of the American population that lacks political power.

104.    Gender identity is a core, defining trait, that cannot be changed voluntarily or through medical intervention, and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

105.    Under the Healthcare Ban, the same medical treatments that are prohibited when provided to transgender adolescents to help align their bodies with their gender identity may be provided to cisgender adolescents to help align their bodies with their gender identity, or for any other purpose.

106.    Under the Healthcare Ban, the Doctor Plaintiffs are prohibited from providing certain medically necessary care to their adolescent transgender patients that they are permitted to provide to their cisgender adolescent patients.

107.    The Healthcare Ban does nothing to protect the health or wellbeing of minors.  To the contrary, it gravely threatens the health and wellbeing of adolescents suffering from gender dysphoria by denying them access to necessary medical care that is recognized as safe and effective by every major medical association in the United States.

108.    The Healthcare Ban is not substantially related to any important government interest, nor is it even rationally related to any legitimate government interest.

109.    There is no rationale for the Healthcare Ban that could explain why only gender-affirming medical care—and *all* types of gender-affirming medical care—is singled out for prohibition.

110.    The Healthcare Ban's targeted ban on medically necessary care for transgender youth is based on generalized fears, negative attitudes, and disapproval of transgender people that are not legitimate bases for unequal treatment under any level of scrutiny.

111.    Defendants are liable for their violation of the right to equal protection under 42 U.S.C. § 1983, and the Minor Plaintiffs are entitled to a declaratory judgment that the Healthcare Ban violates the Equal Protection Clause of the Fourteenth Amendment.

## COUNT TWO

**THE HEALTH CARE BAN VIOLATES THE RIGHT TO
PARENTAL AUTONOMY GUARANTEED BY THE
FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE
(PARENT PLAINTIFFS)**

112.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 94 as if fully set forth herein.

113.    Joan Doe, John Doe, Penny Poe, and Peter Poe (the "Parent Plaintiffs") bring this Count against Defendant Labrador and Defendant Jan M. Bennett, in their official capacities.

114.    The Due Process Clause of the Fourteenth Amendment of the United States Constitution,  enforceable pursuant to 42 U.S.C. § 1983, protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

115.    That fundamental right of parental autonomy includes the right of parents to seek and follow medical advice to protect the health and wellbeing of their minor children.

116.    Parents' fundamental right to seek and follow medical advice is at its apogee when the parents, their minor child, and that child's doctor all agree on an appropriate course of medical treatment.

117.    The Healthcare Ban's prohibition against well-accepted medical treatments for adolescents with gender dysphoria stands directly at odds with parents' fundamental right to make decisions concerning the care of their children.  The Healthcare Ban barges into Idaho families' living rooms and strips Idaho parents of the right to provide medical care for their children.

118.    The Healthcare Ban does nothing to protect the health or wellbeing of minors.  To the contrary, it gravely threatens the health and wellbeing of adolescents with gender dysphoria by denying their parents the ability to obtain for them necessary medical care that is recognized as safe and effective by every major medical association in the United States.

119.    The Healthcare Ban's prohibition against the provision of medically accepted treatments for adolescents with gender dysphoria is not narrowly tailored to serve a compelling government interest; nor is it rationally related to any legitimate government interest.

120.    There is no rationale for the Healthcare Ban that could explain why only gender-affirming medical care—and *all* types of gender affirming medical care—is singled out for prohibition and the medical decision-making regarding this care is taken away from parents.

121.    Defendants are liable for their violation of the right to due process under 42 U.S.C. §1983, and the Parent Plaintiffs are entitled to a declaratory judgment that the Healthcare Ban violates the Due Process Clause of the Fourteenth Amendment.

## COUNT THREE

## PUBLISHING THE HEALTH CARE BAN IN THE IDAHO CODE VIOLATES DUE PROCESS GUARANTEED BY THE FOURTEENTH AMENDMENT DUE TO LACK OF FAIR NOTICE

## (ALL PLAINTIFFS AGAINST IDAHO CODE COMMISSION DEFENDANTS)

122.    All plaintiffs bring this count against the Idaho Code Commission defendants, in their official capacities.

123.    Because the Healthcare Ban is unconstitutional, if it is published in the Idaho Code, it will mislead and deceive Idahoans, including medical professionals, law enforcement, other government actors, and the general public, about the requirements of the law. The publication of HB 71's provisions in the official Idaho Code, especially without clear notice that the law is unconstitutional and unenforceable, would coerce compliance with the law despite its unconstitutionality and illegality, chill health care providers from providing necessary medical care, chill minors and their parents from seeking necessary medical care, and promote unconstitutional and illegal enforcement of the law by government actors.

124.    The lack of fair notice of the unconstitutionality and unenforceability of the Healthcare Ban in the Idaho Code would violate the due process clause of the Fourteenth Amendment.

125.     The Idaho Code Commission defendants are liable for their imminent violation of the right to due process under 42 U.S.C. §1983, and the Plaintiffs are entitled to declaratory judgment declaring that official publication of the provisions of HB 71, without clear notice of those provisions' unconstitutionality and unenforceability is unconstitutional, as well as injunctive relief prohibiting publication of those provisions without such clear notice.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

(a)     Enter a judgment declaring that the Healthcare Ban violates the equal protection clause and the due process clause of the Fourteenth Amendment and is therefore unenforceable;

(b)     Issue preliminary and permanent injunctions enjoining Defendants and their employees, agents, and successors in office from enforcing the Healthcare Ban;

(c)     Enter a judgment declaring that official publication of the Healthcare Ban in the Idaho Code without clear notice of the law's unconstitutionality and unenforceability is unconstitutional;

(d)     Issue preliminary and permanent injunctions enjoining the members of the Idaho Code Commission and their employees, agents, and successors in office from publishing the Healthcare Ban in the Idaho Code without clear notice of those provisions' unconstitutionality and unenforceability is unconstitutional;

(e)     Waive the requirement for the posting of a bond as security for entry of preliminary injunctive relief;

(f)     Award Plaintiffs their costs and expenses, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 and other applicable laws; and

(g)     Grant such other relief as the Court deems just and proper.

Dated: May 31, 2023

Respectfully submitted,

| AMERICAN CIVIL LIBERTIES UNION FOUNDATION | PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP |
|---|---|
| /s/ Li Nowlin-Sohl<br>Li Nowlin-Sohl | /s/ Alexia D. Korberg<br>Alexia D. Korberg |
| /s/ Leslie Cooper<br>Leslie Cooper | /s/ Jackson Yates<br>Jackson Yates |
| /s/ Taylor Brown<br>Taylor Brown | /s/ Dana L. Kennedy<br>Dana L. Kennedy |
| | /s/ Jordan Orosz<br>Jordan Orosz |
| WREST COLLECTIVE | GROOMBRIDGE, WU, BAUGHMAN AND STONE LLP |
| /s/ Richard Eppink<br>Richard Eppink | |
| | /s/ Eric Alan Stone<br>Eric Alan Stone |
| /s/ Casey Parsons<br>Casey Parsons | /s/ Ariella C. Barel<br>Ariella C. Barel |

LEGISLATURE OF THE STATE OF IDAHO

Sixty-seventh Legislature          First Regular Session - 2023

IN THE HOUSE OF REPRESENTATIVES

HOUSE BILL NO. 71, As Amended in the Senate

BY JUDICIARY, RULES AND ADMINISTRATION COMMITTEE

AN ACT

RELATING TO THE VULNERABLE CHILD PROTECTION ACT; AMENDING CHAPTER 15, TITLE 18, IDAHO CODE, BY THE ADDITION OF A NEW SECTION 18-1506C, IDAHO CODE, TO PROVIDE A SHORT TITLE, TO DEFINE TERMS, TO PROHIBIT CERTAIN PRACTICES UPON A CHILD, TO PROVIDE CERTAIN EXEMPTIONS, TO PROVIDE A PENALTY, AND TO PROVIDE SEVERABILITY; AMENDING SECTION 19-5307, IDAHO CODE, TO PRO-VIDE A CODE REFERENCE; AND PROVIDING AN EFFECTIVE DATE.

Be It Enacted by the Legislature of the State of Idaho:

SECTION 1. That Chapter 15, Title 18, Idaho Code, be, and the same is hereby amended by the addition thereto of a NEW SECTION, to be known and des-ignated as Section 18-1506C, Idaho Code, and to read as follows:

18-1506C. VULNERABLE CHILD PROTECTION. (1) This section shall be known and may be cited as the "Vulnerable Child Protection Act."

(2) As used in this section:

(a) "Child" means any person under eighteen (18) years of age; and

(b) "Sex" means the immutable biological and physiological charac-teristics, specifically the chromosomes and internal and external reproductive anatomy, genetically determined at conception and gener-ally recognizable at birth, that define an individual as male or female.

(3) A medical provider shall not engage in any of the following prac-tices upon a child for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is incon-sistent with the child's biological sex:

(a) Performing surgeries that sterilize or mutilate, or artificially construct tissue with the appearance of genitalia that differs from the child's biological sex, including castration, vasectomy, hysterec-tomy, oophorectomy, metoidioplasty, orchiectomy, penectomy, phal-loplasty, clitoroplasty, vaginoplasty, vulvoplasty, ovariectomy, or reconstruction of the fixed part of the urethra with or without metoid-ioplasty, phalloplasty, scrotoplasty, or the implantation of erection or testicular prostheses;

(b) Performing a mastectomy;

(c) Administering or supplying the following medications that induce profound morphologic changes in the genitals of a child or induce tran-sient or permanent infertility:

(i) Puberty-blocking medication to stop or delay normal puberty;

(ii) Supraphysiological doses of testosterone to a female; or

(iii) Supraphysiological doses of estrogen to a male; or

(d) Removing any otherwise healthy or nondiseased body part or tissue.

(4) A surgical operation or medical intervention shall not be a viola-tion of this section if the operation or intervention is:

2

1    (a) Necessary to the health of the person on whom it is performed and is
2    performed by a person licensed in the place of its performance as a med-
3    ical practitioner, except that a surgical operation or medical inter-
4    vention is never necessary to the health of the child on whom it is per-
5    formed if it is for the purpose of attempting to alter the appearance of
6    or affirm the child's perception of the child's sex if that perception
7    is inconsistent with the child's biological sex;
8    (b) For the treatment of any infection, injury, disease, or disorder
9    that has been caused or exacerbated by the performance of gender transi-
10    tion procedures, whether or not the procedures were performed in accor-
11    dance with state and federal law; or
12    (c) Performed in accordance with the good faith medical decision of a
13    parent or guardian of a child born with a medically verifiable genetic
14    disorder of sex development, including:
15        (i) A child with external biological sex characteristics that
16        are ambiguous and irresolvable, such as a child born having 46, XX
17        chromosomes with virilization, 46, XY chromosomes with undervir-
18        ilization, or with both ovarian and testicular tissue; or
19        (ii) When a physician has otherwise diagnosed a disorder of sex-
20        ual development in which the physician has determined through ge-
21        netic testing that the child does not have the normal sex chro-
22        mosome structure, sex steroid hormone production, or sex steroid
23        hormone action for a male or female.
24    (5) Any medical professional convicted of a violation of this section
25    shall be guilty of a felony and shall be imprisoned in the state prison for a
26    term of not more than ten (10) years.
27    (6) The provisions of this act are hereby declared to be severable,
28    and if any provision of this act or the application of such provision to any
29    person or circumstance is declared invalid for any reason, such declaration
30    shall not affect the validity of the remaining portions of this section.

31    SECTION 2. That Section 19-5307, Idaho Code, be, and the same is hereby
32    amended to read as follows:

33    19-5307. FINES IN CASES OF CRIMES OF VIOLENCE. (1) Irrespective of any
34    penalties set forth under state law, and in addition thereto, the court, at
35    the time of sentencing or such later date as deemed necessary by the court,
36    may impose a fine not to exceed five thousand dollars ($5,000) against any
37    defendant found guilty of any felony listed in subsections (2) and (3) of
38    this section.
39    The fine shall operate as a civil judgment against the defendant and
40    shall be entered on behalf of the victim named in the indictment or infor-
41    mation, or the family of the victim in cases of homicide or crimes against
42    children, and shall not be subject to any distribution otherwise required
43    in section 19-4705, Idaho Code. The clerk of the district court may collect
44    the fine in the same manner as other fines imposed in criminal cases are
45    collected and shall remit any money collected in payment of the fine to the
46    victim named in the indictment or information or to the family of the victim
47    in a case of homicide or crimes against minor children, provided that none
48    of the provisions of this section shall be construed as modifying the provi-
49    sions of chapter 6, title 11, Idaho Code, chapter 10, title 55, Idaho Code, or

3

1   section 72-802, Idaho Code. A fine created under this section shall be a sep-
2   arate written order in addition to any other sentence the court may impose.
3       The fine contemplated in this section shall be ordered solely as a puni-
4   tive measure against the defendant and shall not be based upon any require-
5   ment of showing of need by the victim. The fine shall not be used as a substi-
6   tute for an order of restitution as contemplated in section 19-5304, Idaho
7   Code, nor shall such an order of restitution or order of compensation en-
8   tered in accordance with section 72-1018, Idaho Code, be offset by the entry
9   of such fine.
10      A defendant may appeal a fine created under this section in the same man-
11  ner as any other aspect of a sentence imposed by the court. The imposition of
12  a fine created under this section shall not preclude the victim from seeking
13  any other legal remedy; provided that in any civil action brought by or on be-
14  half of the victim, the defendant shall be entitled to offset the amount of
15  any fine imposed pursuant to this section against any award of punitive dam-
16  ages.
17      (2)  The felonies for which a fine created under this section may be im-
18  posed are those described in:
19      Section 18-805, Idaho Code (Aggravated arson);
20      Section 18-905, Idaho Code (Aggravated assault);
21      Section 18-907, Idaho Code (Aggravated battery);
22      Section 18-909, Idaho Code (Assault with intent to commit a serious
23          felony);
24      Section 18-911, Idaho Code (Battery with intent to commit a serious
25          felony);
26      Section 18-913, Idaho Code (Felonious administration of drugs);
27      Section 18-918, Idaho Code (Felony domestic violence);
28      Section 18-923, Idaho Code (Attempted strangulation);
29      Section 18-1501, Idaho Code (Felony injury to children);
30      Section 18-1506, Idaho Code (Sexual abuse of a child under the age of
31          sixteen);
32      Section 18-1506A, Idaho Code (Ritualized abuse of a child);
33      Section 18-1506B, Idaho Code (Female genital mutilation of a child);
34      Section 18-1506C, Idaho Code (Vulnerable child protection);
35      Section 18-1507, Idaho Code (Sexual exploitation of a child);
36      Section 18-1508, Idaho Code (Lewd conduct with a child under the age of
37          sixteen);
38      Section 18-1508A, Idaho Code (Sexual battery of a minor child sixteen or
39          seventeen years of age);
40      Section 18-4001, Idaho Code (Murder);
41      Section 18-4006, Idaho Code (Felony manslaughter);
42      Section 18-4014, Idaho Code (Administering poison with intent to kill);
43      Section 18-4015, Idaho Code (Assault with intent to murder);
44      Section 18-4502, Idaho Code (First degree kidnapping);
45      Section 18-5001, Idaho Code (Mayhem);
46      Section 18-5501, Idaho Code (Poisoning food, medicine or wells);
47      Section 18-6101, Idaho Code (Rape);
48      Section 18-6501, Idaho Code (Robbery).

4

1      (3)  Notwithstanding the provisions of section 18-306(4) and (5), Idaho
2  Code, the fine created under this section may also be imposed up to five thou-
3  sand dollars ($5,000) for attempts of the felonies described in:
4      Section 18-4001, Idaho Code (Murder);
5      Section 18-6101, Idaho Code (Rape).

6      SECTION 3.  This act shall be in full force and effect on and after Jan-
7  uary 1, 2024.