APPEAL NO. 24-142

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAM POE, by and through her parents and next friends Penny and Peter Poe, et al.,

*Plaintiffs-Appellees*,

v.

RAÚL LABRADOR, in official capacity as Attorney General of the State of Idaho, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:23-cv-00269-BLW

## SUPPLEMENTAL APPENDIX TO APPELLANTS'
## RULE 27-3 EMERGENCY MOTION FOR STAY PENDING APPEAL

RAÚL R. LABRADOR
ATTORNEY GENERAL

ALAN HURST
SOLICITOR GENERAL

JOSHUA N. TURNER
CHIEF OF
CONSTITUTIONAL
LITIGATION AND POLICY

JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense
OFFICE OF ATTORNEY
GENERAL
700 W. Jefferson St.,
Suite 210
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
josh.turner@ag.idaho.gov
james.craig@ag.idaho.gov

JONATHAN A. SCRUGGS
HENRY W. FRAMPTON, IV
ALLIANCE DEFENDING
FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

JOHN J. BURSCH
LINCOLN DAVIS WILSON
ALLIANCE DEFENDING
FREEDOM
440 First Street, NW,
Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
lwilson@ADFlegal.org

DAVID H. THOMPSON
BRIAN W. BARNES
JOHN D. RAMER
COOPER & KIRK, PLLC
1523 New Hampshire
Avenue, NW
Washington, DC 20036
202-220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Appellants*

Christine Brady, Ph.D. August 31, 2023

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF IDAHO
 3
 4      PAM POE, by and through her  )  Case No.
        parents and next friends,   )  1:23-cv-00269-CWD
 5      Penny and Peter Poe; PENNY   )
        POE; PETER POE; JANE DOE, by )
 6      and through her parents and  )
        next friends, Joan and John  )
 7      Doe; JOAN DOE; JOHN DOE,     )
                                     )
 8                     Plaintiffs, )
                                     )
 9      v.                           )
                                     )
10      RAÚL LABRADOR, in his        )
        official capacity as the     )
11      Attorney General of the State)
        of Idaho; JAN M. BENNETTS, in)
12      her official capacity as     )
        County Prosecuting Attorney  )
13      for Ada, Idaho; and the      )
        INDIVIDUAL MEMBERS OF THE    )
14      IDAHO CODE COMMISSION, in    )
        their official capacities,   )
15                                   )
                       Defendants. )
16      _____)
17
18
19       REMOTE VIDEOTAPED DEPOSITION OF CHRISTINE BRADY, Ph.D.
20                 THURSDAY, AUGUST 31, 2023
21
22                                          EXHIBIT
23                                             B
24
25      Reported By: Amy E. Simmons, CSR, RDR, CRR, CRC
```

                                                    Page 1

Christine Brady, Ph.D. August 31, 2023

1      REMOTE VIDEOTAPED DEPOSITION OF CHRISTINE BRADY, M.D.

2

3          BE IT REMEMBERED that the remote videotaped

4     deposition of CHRISTINE BRADY, M.D., was taken via Zoom

5     videoconference by the attorney for the Defendants before

6     Associated Reporting & Video, a Veritext company, Amy E.

7     Simmons, Idaho CSR No. 685, California CSR No. 14553,

8     Washington CSR No. 22012915, Oregon CSR No. 22-009, and

9     Notary Public in and for the County of Ada, State of

10    Idaho, on Thursday, the 31st day of August, 2023,

11    commencing at the hour of 10:06 a.m. Mountain time in the

12    above-entitled matter.

13

14

15    APPEARANCES (remotely):

16    For the Plaintiffs:    AMERICAN CIVIL LIBERTIES UNION
                             By:  Li Nowlin-Sohl, Esq.
17                                Leslie Cooper, Esq.
                             125 Broad Street
18                           New York, NY 10004
                             Telephone:  212.549.2584
19                           lnowlin-sohl@aclu.org
                             lcooper@aclu.org
20

21                           GROOMBRIDGE WU BAUGHMAN & STONE
                             By:  Philip S. May, Esq.
22                           801 17th Street, Suite 1050
                             Washington, D.C. 20006
23                           Telephone:  202.539.6620
                             philip.may@groombridgewu.com
24

25

                                                    Page  2

Christine Brady, Ph.D. August 31, 2023

```
 1    APPEARANCES (remotely, continued):
 2
      For the Plaintiffs:     PAUL WEISS RIFKIND,
 3                            WHARTON & GARRISON LLP
                              By:  Sheridan Cunningham, Law Clerk
 4                            1285 Avenue of the Americas
                              New York, NY 10019
 5                            Telephone:  212.373.3000
                              rcunningham@paulweiss.com
 6
                              WREST COOPERATIVE
 7                            By:  David DeRoin, Esq.
                              812 West Franklin Street
 8                            Boise, ID 83702
                              Telephone:  208.742.6789
 9                            david@wrest.coop
10
      For the Defendants, Labrador and the Individual Members
11    of the Idaho Code Commission:
12                            COOPER & KIRK PLLC
                              By:  John Ramer, Esq.
13                            1523 New Hampshire Ave NW
                              Washington, D.C. 20036
14                            Telephone: 202.220.9621
                              jramer@cooperkirk.com
15
                              OFFICE OF THE ATTORNEY GENERAL
16                            By: Aaron Green, Esq.
                              Post Office Box 83720
17                            Boise, ID  83720
                              Telephone:  208.334.2400
18                            Facsimile:  208.854.8073
19
      For the Defendant, Jan M. Bennetts:
20
                              ADA COUNTY PROSECUTOR'S OFFICE
21                            By:  Dayton P. Reed, Esq.
                              200 West Front Street, Room 3191
22                            Boise, ID 83702
                              Telephone:  208.287.7700
23                            dreed@adacounty.id.org
24
      Also Present:          Chris Ennis, Videographer
25                           Jocelyn Larsson,
                             Court Reporting Intern
```

Page 3

App.0771

Christine Brady, Ph.D. August 31, 2023

```
 1                    I N D E X
 2                E X A M I N A T I O N
 3
 4   CHRISTINE BRADY, M.D.                              PAGE
 5
      By:  Mr. Ramer.......................................6
 6
 7
 8
                      E X H I B I T S
 9
     NO.                                               PAGE
10
```

```
     Exhibit 1.    Curriculum Vitae of Christine Erin    12
11                  Lam Brady, Ph.D. (10 pages)
12   Exhibit 2.    Expert Declaration of Christine       16
                   Brady, Ph.D. (18 pages)
13
     Exhibit 3.    "Gender Identity 5 Years After        98
14                 Social Transition," Olson (7 pages)
15   Exhibit 4.    Borderline Personality Disorder      123
                   Diagnostic Criteria (1 page)
16
     Exhibit 5.    "Guidelines for Psychological        134
17                 Practice with Transgender and
                   Gender Nonconforming People,"
18                 American Psychological Association
                   (33 pages)
19
     Exhibit 6.    "APA Resolution on the Imposition    168
20                 of Death as a Penalty for Persons
                   Aged 18 Through 20, Also Known as
21                 the Late Adolescent Class,"
                   American Psychological Association
22                 (5 pages)
23   Exhibit 7.    "Understanding and Supporting        183
                   Patients with Dynamic Desires for
24                 Gender-Affirming Medical
                   Interventions" (3 pages)
25
```

```
                                               Page  4
```

Christine Brady, Ph.D. August 31, 2023

```
 1              P R O C E E D I N G S

 2

 3          THE VIDEOGRAPHER:  All right.  So we are

 4   recording, and we are on the record.  Today's date

 5   is August 31, 2023.  The time is 10:06 a.m.

 6   Mountain time.

 7          For the record, this is the remote

 8   videotaped deposition of Dr. Christine Brady.  It

 9   is taken by the Defendants in the matter of Poe,

10   et al., vs. Labrador, et al., Case No.

11   1:23-cv-00269-CWD.  It's in the United States

12   District Court for the District of Idaho.

13          The videotaped deposition is being held

14   remotely via Zoom videoconference.  The videotaped

15   deposition is being recorded by Chris Ennis and

16   reported by Amy Simmons of Associated Reporting &

17   Video.

18          And if counsel will please state their

19   appearances and any stipulations for the record.

20          MR. RAMER:  John Ramer on behalf of

21   Defendants.

22          MS. NOWLIN-SOHL:  Li Nowlin-Sohl with the

23   ACLU on behalf of Plaintiffs.

24          MS. COOPER:  Leslie Cooper, ACLU,

25   Plaintiffs.
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

App.0773

Christine Brady, Ph.D. August 31, 2023

```
1              MR. MAY:  Philip May from the law firm of
2      Groombridge Wu Baughman & Stone on behalf of
3      Plaintiffs.
4              MR. DeROIN:  David DeRoin with Wrest
5      Collective on behalf of Plaintiffs.
6              MR. CUNNINGHAM:  Ridan Cunningham, Paul
7      Weiss Rifkind, Wharton & Garrison, Plaintiffs, not
8      yet admitted.
9              MR. GREEN:  Aaron Green, Idaho Attorney
10     General's Office.  I haven't appeared.  I'm just
11     observing.
12             THE VIDEOGRAPHER:  And if the court
13     reporter will please swear the witness.
14
15                     CHRISTINE BRADY, M.D.,
16     a witness having been first duly sworn to tell the truth,
17     the whole truth, and nothing but the truth, testified as
18     follows:
19
20                     EXAMINATION
21     BY MR. RAMER:
22        Q.  Hi, Dr. Brady.  My name is John Ramer.
23     I'm from the law firm of Cooper & Kirk
24     representing the Defendants in this case.
25             And my first question to you is have you
```

                                                    Page 6

Christine Brady, Ph.D. August 31, 2023

```
 1    ever been deposed before?
 2          A.    Not as an expert witness.
 3          Q.    Okay.  I take that answer as -- that you
 4    have been deposed in a different context; is that
 5    right?
 6          A.    Yes.
 7          Q.    So I assume you have a general
 8    understanding of how it goes.  I'll just go over
 9    quickly some brief ground rules to make sure we're
10    all on the same page.
11              As you know, I'll ask you questions.  If
12    you don't understand my question, please just ask
13    for an explanation, and I'll attempt to clarify
14    it.  Otherwise I'll assume that you understood the
15    question and are answering the question that I
16    asked.
17              As you also know, the proceeding is being
18    transcribed by the court reporter, so I'll ask
19    that you respond verbally rather than shaking your
20    head yes or no.
21              And I will do my best not to interrupt
22    you and just ask that you do your best not to
23    interrupt me so we can help the court reporter
24    keep a clean transcript.
25              Your counsel may object to a question
```

Page 7

Christine Brady, Ph.D. August 31, 2023

```
 1   that I ask, but unless counsel instructs you not

 2   to answer the question, you should provide an

 3   answer.

 4            And we can take breaks whenever you want.

 5   Just let me know.  The only request is that you

 6   would answer any pending questions before we break

 7   and then we'll go on the break.

 8            Does that all make sense?

 9       A.   Yes.

10       Q.   Okay.  And, Dr. Brady, is anyone other

11   than counsel in the room with you?

12       A.   No.

13       Q.   And do you have any documents open in

14   front of you?

15       A.   No.

16       Q.   And what did you do to prepare for this

17   deposition?

18       A.   I read the case filings as well as

19   pertinent research as it is relevant to my report

20   and declaration.

21            I also reviewed the expert declarations

22   of the case in Tennessee.

23       Q.   When you say "the case in Tennessee,"

24   what do you mean by that?

25       A.   The similar litigation that was proposed
```

Page 8

Christine Brady, Ph.D. August 31, 2023

1    in Tennessee.
2         Q.   And do you know the status of that
3    litigation?
4         A.   I do not.  The current status, no.
5         Q.   Did you speak with anyone about your
6    deposition today?
7         A.   Just my legal counsel.
8         Q.   And you mentioned you reviewed pertinent
9    research to prepare for today; is that right?
10        A.   Yes.
11        Q.   Can you just give me a general
12   description of what you mean by "pertinent
13   research"?
14        A.   So I'm sorry.  Do you mean prior to today
15   or just in preparing my report?
16        Q.   My earlier question is what you had done
17   to prepare for the deposition.  And I thought you
18   had said you reviewed pertinent research.  And I
19   was just asking what you mean by that.
20        A.   Yeah.  So I just reviewed the -- my
21   report and then the citations that I had used in
22   my report.
23        Q.   Did you review any articles or
24   publications that are not cited in your report?
25        A.   Not in preparation for today, no.

Page 9

Christine Brady, Ph.D. August 31, 2023

```
1        Q.   Dr. Brady, do you consider yourself to be
2    an expert?
3            MS. NOWLIN-SOHL:  Objection to form.
4            THE WITNESS:  I consider myself to have
5    expertise in clinical psychology.  And I have a
6    specialization in treating youth with gender
7    dysphoria.
8        Q.   (BY MR. RAMER)  Dr. Brady, are you an
9    endocrinologist?
10       A.   No.
11       Q.   Are you a neurologist?
12       A.   No.
13       Q.   Are you a surgeon?
14       A.   No.
15       Q.   Are you a social worker?
16       A.   No.
17       Q.   Are you a urologist?
18       A.   No.
19       Q.   Are you a gynecologist?
20       A.   No.
21       Q.   Are you a bioethicist?
22       A.   No.
23       Q.   Are you an expert in cognitive
24   development?
25           MS. NOWLIN-SOHL:  Object to form.
```

App.0778

Christine Brady, Ph.D. August 31, 2023

```
 1              THE WITNESS:  In my general graduate
 2     school training, I did receive training in child
 3     development, and part of that included cognitive
 4     development.  I also took neuropsychology.
 5          Q.   (BY MR. RAMER)  Are those courses that
 6     you took?
 7          A.   Yes.
 8          Q.   And so do you consider yourself an expert
 9     in neuropsychology?
10          A.   Not an expert, no.
11          Q.   Do you consider yourself an expert in
12     child cognitive development?
13          A.   I wouldn't -- I received training.  I
14     wouldn't consider myself an expert.
15          Q.   And could you briefly describe your
16     current position?
17          A.   So I'm the psychologist at the Pediatric
18     and Adolescent Gender Clinic at Stanford
19     University.  That is my full-time position.
20          Q.   And at just a high level of generality,
21     could you walk me through your professional
22     background since you received your bachelor's
23     degree?
24          A.   Sure.  So after receiving my bachelor's
25     degree, I got -- I went to James Madison
```

Page 11

Christine Brady, Ph.D. August 31, 2023

1    University and received a master's in

2    psychological sciences with a focus on child

3    psychology.

4            After my terminal master's, I then

5    attended a Ph.D. program at Ohio University in

6    clinical psychology.

7        Q.   And then after that -- is that your

8    educational background?  Is that right?

9        A.   Yes.  And then for our degrees, we are

10   required to do internship and fellowship.  And so

11   my internship was one year at Seattle Children's

12   Hospital with the University of Washington.  And

13   then my fellowship was at the University of

14   Louisville, which was then Kosair Children's

15   Hospital, now Norton Children's Hospital.

16           MR. RAMER:  And, Li, I just tried to send

17   what I'll call Brady Exhibit 1.

18           MS. NOWLIN-SOHL:  I have not yet received

19   it.  It's through on my phone, so I know it's

20   coming to my email shortly.  All right.

21           THE WITNESS:  I can see it.

22           (Deposition Exhibit No. 1 was marked.)

23       Q.   (BY MR. RAMER)  And, Dr. Brady, does this

24   appear to be a copy of your CV?

25       A.   Yes.

Page 12

Christine Brady, Ph.D. August 31, 2023

1      Q.    And is it up-to-date?

2      A.    No.

3      Q.    What should be included on here that is

4  not?

5      A.    There might just be a few other talks

6  that I've given since this was submitted.

7      Q.    Any publications?

8      A.    No.

9      Q.    I'd like to go to page 2.  And under

10  Roman Numeral IV, do you see there's "Honors and

11  Awards"?

12      A.    Yes.

13      Q.    And in 2020, it says you received a

14  "First Place Poster Award."

15            Do you see that?

16      A.    Yes.

17      Q.    And can you just explain what that award

18  was for?

19      A.    So this poster was -- I was last author

20  on a poster that was submitted to the conference,

21  the Pediatric Psychology -- sorry, Society of

22  Pediatric Psychology annual conference in 2020.

23            And that poster was done by a student at

24  Indiana University on -- it was four cases of

25  gender-diverse youth who also had GI problems.

Page 13

Christine Brady, Ph.D. August 31, 2023

1    Q.    Could you explain what "GI" mean?

2    A.    Gastrointestinal.

3    Q.    And a question I should have asked

4  earlier, but are you board certified?

5    A.    No.

6    Q.    And, Doctor, you've publish peer-reviewed

7  original research, correct?

8    A.    Yes.

9    Q.    Has any of your peer-reviewed original

10 research related to transgender medicine?

11   A.    No.

12   Q.    And you're a member of the American

13 Psychological Association; is that right?

14   A.    Yes.

15   Q.    Are you a member of the American Medical

16 Association?

17   A.    No.

18   Q.    And are you a member of WPATH?

19   A.    Yes.

20   Q.    And are you also a member of USPATH?

21   A.    Yes.

22   Q.    Can you just explain the relationship

23 between WPATH and USPATH?

24   A.    Sure.  So WPATH is the larger

25 organization, umbrella organization that's an

Page 14

App.0782

Christine Brady, Ph.D. August 31, 2023

1    international group.
2            And then some countries have developed
3    their own sub sort of groups, so USPATH being the
4    United States sort of subgroup within WPATH.
5    Europe has one as well.
6        Q.   Is it just one for all of Europe?
7        A.   I'm not sure.
8        Q.   On your CV, I'd like to just go to the
9    final page and down toward the bottom.  And you
10   have a Roman Numeral IX for "Trainees."
11           Do you see that?
12       A.   Yes.
13       Q.   And then it lists "Psychiatry Fellows";
14   is that right?
15       A.   Yes.
16       Q.   And this is my own ignorance, but you're
17   a psychologist, correct?
18       A.   Yes.
19       Q.   Can you just help me understand why you
20   would have psychiatry fellows?
21       A.   Sure.  So during their training,
22   psychiatry fellows do get training in therapy, and
23   sometimes that is supervised by a psychologist who
24   has more experience in that area.  And so when the
25   psychiatry fellows rotate with me, I'm supervising

Page 15

Christine Brady, Ph.D. August 31, 2023

```
 1    them on their therapy.
 2         Q.   And of your fellows is Jack Turban,
 3    Dr. Jack Turban; is that right?
 4         A.   Yes.
 5         Q.   Is that the same Dr. Turban that you have
 6    published before?
 7         A.   We published one commentary together,
 8    yes.
 9              MR. RAMER:  And, Li, I tried sending a
10    little while ago to see if we could move it along,
11    but I think Connelly Exhibit 2 hopefully you've
12    received.
13              MS. NOWLIN-SOHL:  Yes.
14              MR. RAMER:  I'm sorry, Brady Exhibit 2.
15              MS. NOWLIN-SOHL:  Yes, we have it.
16              (Deposition Exhibit No. 2 was marked.)
17         Q.   (BY MR. RAMER)  Okay.  And, Dr. Brady,
18    does this appear to be the expert declaration that
19    you submitted in this case?
20         A.   Yes.
21         Q.   And how did you come to be involved in
22    this case?
23         A.   So Li, the ACLU, sent me an email,
24    reached out to me, and we discussed the potential
25    of working together.
```

Page 16

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.    Have you ever served as an expert witness
 2    before?
 3        A.    No.
 4        Q.    And what were you -- as a general matter
 5    what were you asked to do?
 6              MS. NOWLIN-SOHL:   I'm just going to
 7    object to the extent it calls for a legal
 8    communication.
 9              But you can still answer.
10              MR. RAMER:   And I'll clarify the answer.
11        Q.    (BY MR. RAMER)  Not looking for the
12    substance of any communications with counsel.
13    Just as a general matter, what were you asked to
14    do as an expert in the case?
15        A.    That I would be submitting this
16    declaration that we see before us and provide
17    deposition, which we are doing today, and then
18    possibly appear in court at a later date.
19        Q.    And did you personally draft this
20    declaration?
21        A.    Yes.
22        Q.    And did anyone help you at all with the
23    drafting process?
24        A.    No.
25        Q.    Did you personally identify all the
```

Page 17

Christine Brady, Ph.D. August 31, 2023

1    studies that you cite in this declaration?

2        A.   Yes.

3        Q.   And did you speak with anyone other than

4    counsel about the contents of this declaration?

5        A.   No.

6        Q.   And is it -- let me just ask.

7             You co-founded a gender clinic at

8    Hennepin Healthcare; is that right?

9        A.   Yes.

10       Q.   And what led you to co-found that clinic?

11       A.   My original position at that institution

12   was to be the psychologist embedded into their

13   pediatrics clinic.  And there were several

14   programs running out of that pediatrics clinic.

15            And there was a pediatrician who

16   expressed interest in starting a gender program

17   within that clinic, and he asked if I would be

18   interested in providing mental health support to

19   that clinic.

20       Q.   And you're currently at the Stanford

21   Pediatric and Adolescent Gender Clinic, right?

22       A.   Yes.

23       Q.   And do you treat patients at that clinic?

24       A.   Yes.

25       Q.   We'll discuss it in more detail a little

Page 18

Christine Brady, Ph.D. August 31, 2023

```
 1    bit later, but just at a high level of generality,
 2    could you explain what the gender clinic does?
 3         A.   So we provide a variety of services to
 4    gender-diverse youth; some medical, some
 5    nonmedical.  My role is providing therapeutic
 6    services and also mental health consultation to
 7    our larger, integrated team.
 8         Q.   When you say "therapeutic services," what
 9    do you mean?
10         A.   Psychotherapy.
11         Q.   Does the clinic serve a particular age
12    group?
13         A.   Yes.  So we don't have a lower limit, but
14    typically our youngest patient has been about
15    three years old.  And then we do have an upper
16    limit of 25, but typically most young adults are
17    transitioning out of our clinic around 22, 23.
18         Q.   And do you know how many patients the
19    clinic serves?
20         A.   The clinic's been open for almost six
21    years, and my -- the most recent number I was
22    given was that we have now served over 1,000
23    patients.
24         Q.   When you say "have now served," do you
25    mean in the totality of the clinic's existence?
```

Page 19

Christine Brady, Ph.D. August 31, 2023

```
1        A.    Yes, in the six years that we've been --
2    yeah.
3        Q.    Do you know approximately how many
4    patients are currently receiving treatment at the
5    clinic?
6        A.    I do not.
7        Q.    And you've been there for three years; is
8    that right?
9        A.    Almost three.
10       Q.    And in those almost three years that you
11   have been there, has the patient population at the
12   clinic grown?
13       A.    Could you be more specific?  What do you
14   mean by "grown"?
15       Q.    Have the number of patients receiving
16   treatment -- excuse me.
17             Has the number of patients receiving
18   treatment increased?
19       A.    So if you mean, like, the number of new
20   patients increasing per year, that's actually
21   remained quite stable.  But it's grown because we
22   carry the patients that we saw the year before and
23   we're continuing to see them the next year and the
24   next year.  So the number has increased over six
25   years.
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

App.0788

Christine Brady, Ph.D. August 31, 2023

1    Q.   When you say the new patients have been
2    stable, you're referring to patients coming into
3    the clinic over those three years, the number has
4    remained stable; is that right?
5    A.   Yeah, meaning, like, the number of new
6    referrals we get per week has been pretty stable
7    over that six years.
8    Q.   And you say that in the last eight years,
9    you've treated over a thousand youth and families,
10   correct?
11   A.   Yes.
12   Q.   How many current patients do you have?
13   A.   What would you consider to be current?
14   Q.   What would you consider to be current?
15   A.   So because I have some who, you know, see
16   me infrequently, and I have others who see me
17   pretty regularly, so it's sort of hard for me to
18   say.  And then some, you know, pop in when I
19   haven't seen them in a long time.
20        So I guess what I would say is my active
21   caseload that I'm seeing fairly regularly and at a
22   decent frequency, maybe 70.
23   Q.   70 patients?
24   A.   Um-hmm.
25   Q.   Sorry.  Say again.

Page 21

Christine Brady, Ph.D. August 31, 2023

1      A.   I was just saying "yes" instead of

2   "um-hmm."

3      Q.   I need to work on that too, so I

4   appreciate it.

5           And you say 100 percent of your patients

6   are transgender youth; is that right?

7           MS. NOWLIN-SOHL:  Object to form.

8           THE WITNESS:  Currently all of my

9   patients are experiencing some sort of gender

10  questioning.

11     Q.   (BY MR. RAMER)  Well, I guess let's go to

12  your paragraph 7 in your declaration, which is

13  page 2.  I think fourth sentence, kind of middle

14  of the paragraph.

15          Do you see where it says "Currently

16  100 percent of my clinical practice are

17  transgender youth"?

18     A.   Yes.

19     Q.   And so is that statement accurate?

20     A.   In this case, I'm using "transgender" as

21  the umbrella term for gender diversity, so yes,

22  it's accurate.

23     Q.   And when you say "youth," do you mean

24  individuals under the age of 18?

25     A.   Some are young adults, but a majority are

Page 22

Christine Brady, Ph.D. August 31, 2023

 1    under the age of 18.

 2         Q.   When you say "young adults," you're

 3    referring to people who are over 18?

 4         A.   Yes.

 5         Q.   What percentage of your current patients

 6    are over the age of 18?

 7         A.   I would say maybe 10 percent.

 8         Q.   And could you describe -- I think you had

 9    started to describe, but could you explain a

10    little bit more what happens with patients once

11    they turn 18 years of age with respect to care at

12    your clinic?

13         A.   So because we can follow kids up until --

14    or young adults until 25, we've sort of -- it's up

15    to them and their life circumstances whether or

16    not they want to transfer services.

17              So some of our youth go off to college in

18    other states, making it difficult for us to

19    continue providing their care.  So we might find

20    them care that's, you know, closer to their

21    college or wherever they end up living.

22              Some youth stay local and continue with

23    us until a time in which they feel ready to

24    transfer to adult services.

25              Sometimes they reach the upper limit and

                                        Page 23

Christine Brady, Ph.D. August 31, 2023

```
 1    they're not necessarily ready, but we sort of
 2    transfer them anyway.
 3         Q.   And was the upper limit 25 years old?
 4         A.   Yes.
 5         Q.   When patients transfer to a new provider,
 6    does your clinic stay in formal communication with
 7    them?
 8              MS. NOWLIN-SOHL:  Object to form.
 9              THE WITNESS:  I'm not sure, because
10    typically that would be the medical provider that
11    is probably facilitating that communication.  So
12    I'm not sure.
13         Q.   (BY MR. RAMER)  Of your current patients,
14    have all of them been diagnosed with gender
15    dysphoria?
16         A.   No.
17         Q.   What percentage of your current patients
18    have been diagnosed with gender dysphoria?
19         A.   Because a lot of our patients are coming
20    to gender clinics sort of late in their journeys,
21    so oftentimes they've been exploring things with
22    an outside therapist or have been discussing this
23    with their family for a long time, they're sort of
24    coming to gender clinic at a point where they've
25    already explored a lot.  And so I would say a
```

Page 24

Christine Brady, Ph.D. August 31, 2023

1    majority have gender dysphoria, maybe 75 percent.

2        Q.   And what was the significance of the

3    point that they've been on their journey for a

4    while before they come to the clinic?

5        A.   That we're sort of seeing a subset of

6    gender-diverse youth.  You know, it takes a lot

7    for families to make the decision to come to a

8    gender clinic, and oftentimes they're speaking

9    with other professionals and seeking advice from

10   their pediatrician or seeking advice from their

11   child's current therapist with regards to where to

12   go or what to do.

13           So my point was that just that, you know,

14   we are typically not seeing youth who are at the

15   beginning of their journey.  And so they're more

16   likely to meet criteria because they've been

17   persistent, consistent for longer.

18       Q.   I see.  By "criteria," you mean the

19   criteria for gender dysphoria; is that right?

20       A.   Correct.

21       Q.   And so the point is that because these

22   are individuals who have progressed in their

23   journey, the percentage of individuals who are

24   formally diagnosed with gender dysphoria may be

25   higher than at other providers?  Is that what

Page 25

Christine Brady, Ph.D. August 31, 2023

```
 1    you're saying?
 2              MS. NOWLIN-SOHL:  Object to form.
 3              THE WITNESS:  I don't know how the
 4    percentages compare, but that might be the case.
 5         Q.   (BY MR. RAMER)  But that's why you were
 6    talking about that, right?
 7         A.   Yes.
 8         Q.   In this field, do you understand a
 9    distinction between a child and adolescent?
10              MS. NOWLIN-SOHL:  Object to form.
11              THE WITNESS:  Could you specify "this
12    field"?
13         Q.   (BY MR. RAMER)  Transgender medicine.
14              MS. NOWLIN-SOHL:  Same objection.
15              THE WITNESS:  So do I understand the
16    difference between child and adolescents?
17         Q.   (BY MR. RAMER)  I'm just asking is there
18    a difference in the terminology that's -- excuse
19    me.
20              When you use the term "child" or
21    "adolescent," are you referring to individuals at
22    different stages of maturity?
23              MS. NOWLIN-SOHL:  Object to form.
24              THE WITNESS:  Typically when we're
25    referring to children, we're talking about
```

Page 26

Christine Brady, Ph.D. August 31, 2023

 1    prepuberty.  And when we're talking about

 2    adolescents, we're talking about pubertal or

 3    post-pubertal.

 4         Q.   (BY MR. RAMER)  And at what stage do you

 5    consider the conclusion of the prepubertal phase?

 6         A.   So as a mental health professional, I'm

 7    not able to make that distinction.  I rely on my

 8    medical team to make that distinction.

 9              But typically it's with Tanner staging

10    and with blood work.

11         Q.   And do you know what Tanner stage?

12         A.   So typically it's early Tanner Stage II.

13    Between II and III is when puberty begins.

14         Q.   Do you have patients who were diagnosed

15    with gender dysphoria before Tanner Stage II?

16         A.   Yes.

17         Q.   Do you have patients who were diagnosed

18    with gender dysphoria after the beginning of

19    Tanner Stage II?

20         A.   Yes.

21         Q.   Of your patients, which diagnosis is more

22    common?

23              MS. NOWLIN-SOHL:  Object to form.

24              THE WITNESS:  Meaning which is more

25    common, childhood or adolescent gender dysphoria?

                                        Page 27

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.   (BY MR. RAMER)   Correct.
 2        A.   In our clinic, it's about 30 percent of
 3    our patients are prepubertal, and about 70 percent
 4    are post -- or pubertal or post-pubertal.
 5    Pubertal, excuse me.
 6        Q.   Of your current patients, do you know
 7    what percentage are natal females?
 8             MS. NOWLIN-SOHL:  Object to form.
 9             THE WITNESS:  The general -- a general
10    estimate in our clinic, which we looked at
11    relatively recently, was that we actually have a
12    50/50 split of designated females and designated
13    males in both age groups.
14        Q.   (BY MR. RAMER)   When did you look at
15    that?
16        A.   About a year ago.
17        Q.   And is that percentage, that 50/50 split,
18    the same for patients who have been formally
19    diagnosed with gender dysphoria?
20        A.   Yes.
21        Q.   Did the 50/50 split surprise you?
22        A.   The reason that we looked at it is
23    because I was interested to know, you know --
24    given that I've been doing this work for eight
25    years, I've been interested, you know, to know how
```

Page 28

Christine Brady, Ph.D. August 31, 2023

```
 1   things have sort of evolved since I first started.
 2           When I was working in Louisville, we kind
 3   of had different rates, so I was interested to
 4   see.
 5           It wasn't surprising because clinically,
 6   you know, that's what I was seeing in my office.
 7   If you look at my schedule, it's a pretty 50/50
 8   mix of the designated sex.
 9      Q.   What were the rates in Louisville?
10           MS. NOWLIN-SOHL:  Object to form.
11           THE WITNESS:  I don't remember exactly,
12   but it felt as though we were seeing a lot more
13   binary-identifying individuals and more often
14   transmasculine.
15      Q.   (BY MR. RAMER)  When you say "binary,"
16   you're distinguishing from nonbinary; is that
17   right?
18      A.   Nonbinary, agender, genderqueer, gender
19   fluid.
20      Q.   And when you say "transmasculine," you're
21   referring to -- can you explain what you mean by
22   "transmasculine"?
23      A.   Designated females who identify as
24   masculine.
25      Q.   Of your patient population that has been
```

Page 29

Christine Brady, Ph.D. August 31, 2023

1  diagnosed with gender dysphoria, what percentage

2  receive puberty blockers?

3       A.   That would be hard for me to estimate.

4  Not all of our youth are seeking medical

5  intervention, and not all are eligible for medical

6  interventions, and not all are Tanner Stage --

7  between Tanner Stage II and III.

8            So I mean, I guess if it's prepubertal,

9  which was your question, it would be none because

10  they wouldn't be medically ready for pubertal

11  blockade.

12       Q.   When you said not all of them are seeking

13  medical interventions, what did you mean by that?

14       A.   So some families are coming to our clinic

15  to just get education, support, resources to

16  support their child or youth, or the youth

17  themselves might just be wanting to explore ways

18  to express gender or socially transition rather

19  than are coming specifically seeking medical

20  intervention.

21       Q.   So are some coming specifically seeking

22  medical intervention?

23       A.   Yes.

24       Q.   As a psychologist, are you the provider

25  who would actually be making the diagnosis of

Page 30

Christine Brady, Ph.D. August 31, 2023

1    gender dysphoria?

2         A.    Oftentimes in our clinic that is the

3    case, but I'm not the only person who can do that.

4         Q.    Have you ever personally diagnosed a

5    child with gender dysphoria?

6         A.    Yes.

7         Q.    Have you ever personally diagnosed an

8    adolescent with gender dysphoria?

9         A.    Yes.

10        Q.    Do you also determine whether a

11   patient -- or I guess let me just back up.  Maybe

12   you can just kind of explain your role in this

13   process.

14             My general understanding is that the

15   clinics are interdisciplinary or

16   multidisciplinary, and so you have different

17   providers doing different things.

18             Could you just explain your role?

19        A.    Sure.  And it gets complicated too,

20   because we are in a fairly well-resourced area, so

21   sometimes it's not even our team that's providing

22   services.  It might be community providers as

23   well.

24             But when a family comes to our clinic, we

25   spend a lot of time getting to know the family,

Page 31

Christine Brady, Ph.D. August 31, 2023

1    getting to know the youth, understanding their
2    gender identity, and kind of goals for why they're
3    coming to gender clinic.
4          And then we will kind of pick a treatment
5    plan as a team for what will happen next with that
6    family.
7          Sometimes the focus might be more on the
8    mental health piece, in which case it might be
9    meetings with myself to provide support around
10   social transition, resources, education.
11         Might be also to just support youth with
12   gender dysphoria who are struggling with their
13   dysphoria or other comorbid diagnoses that they
14   may be experiencing.
15         Sometimes they have a therapist in the
16   community already who we can coordinate and
17   collaborate with and get collaborative information
18   from so they don't necessarily have to see a
19   member of our behavioral health team.  It can be
20   done out in the community if they have a provider
21   with proper training.
22     Q.   You mentioned social transitioning.  Can
23   you explain what you mean by that?
24     A.   Sure.  So social transition is a pretty
25   diverse set of actions that some people choose to

                                        Page 32

Christine Brady, Ph.D. August 31, 2023

```
 1    take.  So oftentimes that includes changing name
 2    and pronouns.
 3              At school, extracurricular activities,
 4    within the family, with peers.
 5              It could also mean adopting a clothing
 6    style that's more consistent with their affirmed
 7    gender, haircuts, you know, makeup, jewelry, the
 8    kind of, like, external things that other people
 9    can see, and making steps to be more comfortable
10    with those.
11        Q.   And I think you said that those are
12    actions that individuals choose to take; is that
13    right?
14        A.   Yes.
15        Q.   Is there ever a clinical indication that
16    somebody should social transition?
17              MS. NOWLIN-SOHL:  Object to form.
18              THE WITNESS:  It's very individualized.
19    We need to understand the context in which a
20    person lives.
21              So, for example, we are -- our capture
22    area for our clinic is quite vast, so we have
23    people coming from several hours away in rural
24    areas where they might be the only gender-diverse
25    person in their community or at their school, and
```

Page 33

(35 of 288), Page 35 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 35 of 288
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 34 of 267
Christine Brady, Ph.D. August 31, 2023

1   it might not be safe for them to take certain
2   steps towards affirming their gender.  And so we
3   certainly don't force anyone, which is why I kind
4   of said it's their choice if they want to do that
5   or not.
6            There are some instances in which it can
7   be very helpful.  There's research that shows that
8   social transition can help in terms of reducing
9   negative psychological distress.
10       Q.   (BY MR. RAMER)  And so you said that you
11  don't force anybody to social -- start again.
12           You said you don't force anybody to
13  socially transition.
14           And I guess my question is do you ever
15  recommend it?
16       A.   Yeah.
17       Q.   And what would you observe that would
18  lead you to recommend socially transition?
19       A.   There are some situations where, for
20  example, with certain family members, it's helpful
21  to, you know, come out and share their identity
22  with certain people.
23           Oftentimes there's distress with being
24  closeted, and so social transition is an
25  opportunity to, you know, come out and present

Page 34

Christine Brady, Ph.D. August 31, 2023

```
 1    yourself more authentically.  And so it can
 2    alleviate some of that distress and anxiety.  So
 3    sometimes it is sort of mentioned as, hey, this
 4    would be helpful.
 5        Q.   Have you ever recommended that a patient
 6    socially transition before Tanner Stage II?
 7        A.   Most of the young kids that are
 8    presenting to our clinic have already socially
 9    transitioned.  So I would say maybe like
10    90 percent have done that already prior to coming
11    to us.
12        Q.   What is the youngest patient you've ever
13    seen that has socially transitioned?
14        A.   Four.
15        Q.   And I think earlier you had mentioned you
16    have patients as young as three years old; is that
17    right?
18        A.   Yes.
19        Q.   And what kind of care is a patient of
20    that age receiving at the clinic?
21        A.   So there are no medical interventions
22    until that pubertal, post-pubertal period.  So at
23    that point we're really just providing supportive
24    care, maybe recommending support groups for the
25    caregivers, recommending -- you know, kind of
```

Page 35

Christine Brady, Ph.D. August 31, 2023

```
1    giving guidance on how to discuss their child's
2    gender with the school.  And, you know, just
3    helping parents to navigate different
4    conversations or different complex situations that
5    they might face.
6         Q.   School at three years old would be
7    preschool?
8         A.   Yes.
9         Q.   And you said "medical interventions," I
10   believe.
11             What do you mean by that?
12        A.   So puberty blockers, hormones, you know,
13   menstrual suppression.
14        Q.   Are there interventions that are not
15   labeled "medical"?
16        A.   So, yeah.  It's -- the terminology is
17   difficult.  As a mental health professional, I
18   consider therapy to be an intervention.  And so,
19   you know, that's what I'm providing is also
20   support and, you know, therapy.  I consider that
21   to be an intervention.
22        Q.   So do you consider social transition an
23   intervention?
24        A.   Yes.
25        Q.   Can you walk me through the diagnosis
```

Page 36

Christine Brady, Ph.D. August 31, 2023

1    process from the time a patient walks into your

2    office?

3         A.   So by the time I'm seeing a patient, we

4    already have a wealth of information.  So

5    typically families who are referred to us, we have

6    a kind of pre-intake meeting with just the

7    caregivers to get background information.

8    Typically that's an hour or hour and a half.

9            And then they meet for the first

10   appointment.  That's typically an hour and a half

11   to two hours.

12           And we're getting a lot of information

13   from the youth directly during that meeting.

14   Sometimes I've met them during that meeting as

15   well before I have my individual appointment with

16   them.

17           So typically we have, you know, three

18   hours' worth of information.

19           So when a family is working with me, I'm

20   sort of confirming the information that we've

21   obtained already, and then asking more detail

22   about things relevant to mental health and gender

23   dysphoria specifically so you can use it.

24           But I use the DSM criteria, and we just

25   have a kind of clinical interview regarding a

                                          Page 37

Christine Brady, Ph.D. August 31, 2023

```
 1    youth's experience with those symptoms or not, how

 2    their dysphoria manifests, what distresses it

 3    causes in their life, and what their goals are.

 4         Q.   What did you mean by a "clinical

 5    interview"?

 6         A.   So it's a kind of semi-structured

 7    interview in which I'm asking about each of the

 8    diagnostic criteria and then asking follow-up

 9    questions after the youth has responded.

10         Q.   And then when you refer to the goals that

11    the individual has, what do you mean by that?

12         A.   So depending on the treatment plan, it

13    might be what are your goals for therapy, right?

14              Like, what are you hoping to get out of

15    our meetings together?

16              What supports do you need?

17              What would you like to improve?

18              Sometimes it is what are your goals for

19    transition, physical transition?

20              Sometimes it's what are your goals for,

21    you know, helping your family understand you

22    better.  It just depends on what they're being

23    referred to me for.

24         Q.   And I'd like to, in your declaration, go

25    to page 5, paragraph 18.
```

Page 38

Christine Brady, Ph.D. August 31, 2023

```
 1              And here you discuss the diagnostic
 2    criteria for prepubertal children, right?
 3         A.   Yes.
 4         Q.   And so you would use this diagnostic
 5    criteria for children who are pre-Tanner Stage II;
 6    is that right?
 7         A.   Tanner Stage II and below, yeah.
 8         Q.   And in the first sentence after A, it
 9    refers to a "marked incongruence."
10              Do you see that?
11         A.   Yes.
12         Q.   What does the word "marked" mean there?
13         A.   Yeah, so this is direct verbiage from the
14    DSM-5.  But, you know, typically with all of the
15    diagnoses in the DSM, you have to meet criteria,
16    but then there also has to be impairment
17    experience from those symptoms.
18              So typically "marked" means, you know,
19    it's not just there, but it's there and it's
20    causing some sort of difficulty or impairment in
21    daily functioning.
22         Q.   Well, I guess if you look at the bottom
23    of the page with B -- and I understand this is
24    just the DSM criteria in the report, but doesn't B
25    just describe what you just said?
```

Page 39

Christine Brady, Ph.D. August 31, 2023

1       A.    Yes.

2       Q.    And so you're saying that in A, the word

3    "marked" means B?

4       A.    I think that's part of it.  I mean, I

5    think for me as a clinician, it also means marked

6    as in noted, right?

7            So, you know, and typically -- I should

8    have mentioned earlier that I'm not just

9    conducting a clinical interview with the youth,

10   right?  I'm also talking with caregivers and other

11   adults and getting their observations and views of

12   youths over time, and especially in early

13   childhood when maybe the youth don't remember so

14   well.  And so, you know, marked incongruence could

15   mean like observed or noted.

16      Q.    Okay.  You don't think that that word --

17   whether we pronounce it marked or marked, I

18   sincerely don't know --

19      A.    Sure.

20      Q.    But you don't think that that is

21   suggesting a particular degree of incongruence?

22      A.    Well, I think the criteria below is

23   referencing the degree being strong in many of

24   those criteria.

25      Q.    Can there be an incongruence that isn't

Page 40

Christine Brady, Ph.D. August 31, 2023

1    marked?

2        A.    I mean, there are sometimes incongruence

3    that is not observed by the youth themselves or by

4    parents.  You know, some kids have very low

5    insight and so they might not see it as, you know,

6    an incongruence.

7        Q.    Have you ever had a patient where you've

8    concluded that the patient has an incongruence but

9    it's not marked?

10           MS. NOWLIN-SOHL:  Object to form.

11           THE WITNESS:  I have had youth who don't

12   meet criteria for gender dysphoria.  And that

13   might be a case in which they don't meet criteria.

14       Q.    (BY MR. RAMER)  Okay.  So I take it you

15   don't really think that that word adds much to

16   this diagnosis; is that right?

17           MS. NOWLIN-SOHL:  Object to form.

18           THE WITNESS:  I don't see it as critical,

19   that word.

20       Q.    (BY MR. RAMER)  You don't see it as

21   critical?

22       A.    In determining my diagnosis.

23       Q.    So still in A, the DSM-5 requires at

24   least six-month duration of the incongruence; is

25   that right?

Page 41

Christine Brady, Ph.D. August 31, 2023

1        A.    Six-month duration consisting of at least
2    six of the criteria below.  So they have to have
3    the six criteria for at least six months, yes.
4        Q.    Yeah, sorry.  And I'm not trying -- we're
5    just going to walk through it.  When I ask
6    specific questions, I don't want -- I'm not
7    implying that you're over-focused on that when
8    you're doing the diagnoses.
9              But with respect to the six-month
10   duration, why is that a requirement?
11             MS. NOWLIN-SOHL:  Object to form;
12   foundation.
13             THE WITNESS:  So the duration component
14   is also very common in other diagnoses within the
15   DSM.  And typically it's to establish some sort of
16   pattern and stability in the symptoms.
17       Q.    (BY MR. RAMER)  And so here, this would
18   be establishing stability of the incongruence; is
19   that right?
20       A.    Yes.
21       Q.    And so if there were only five months'
22   duration of incongruence, that incongruence may be
23   unstable?
24             MS. NOWLIN-SOHL:  Object to form;
25   mischaracterizes testimony.

Page 42

Christine Brady, Ph.D. August 31, 2023

1              THE WITNESS:  They would just be
2    subclinical and not meet criteria for gender
3    dysphoria at this moment in time.
4         Q.   (BY MR. RAMER)  What do you mean by
5    "subclinical"?
6         A.   So they might meet some of the criteria
7    but not all the criteria.
8         Q.   And I think let's go to page 12 of your
9    declaration, paragraph 35.  I think this might be
10   what you were referring to.  I just want to
11   confirm.
12              The final sentence of paragraph 35 -- and
13   I'll just read it and ask if I read it correctly.
14              It says "Some patients who are evaluated
15   do not meet the criteria for gender dysphoria
16   either due to symptom length or lack of symptoms,
17   in which case a treatment plan may include
18   nonmedical support and intervention to address
19   symptoms/distress."
20              Did I read that correctly?
21        A.   Yes.
22        Q.   And here you refer to symptom length.
23              Is that what we were just talking about?
24        A.   The six-month duration, yes.
25        Q.   Do you think a six-month duration is a

                                        Page 43

Christine Brady, Ph.D. August 31, 2023

1    good idea?

2            MS. NOWLIN-SOHL:  Object to form.

3            THE WITNESS:  I think having a duration

4    criteria is helpful.  I know there was a task

5    force put together for DSM-5 for revisiting gender

6    dysphoria diagnosis, and that criterion was based

7    on research.

8        Q.   (BY MR. RAMER)  The six-month number was

9    based on research?

10       A.   Yes.

11       Q.   And you refer here to nonmedical support

12   and intervention.

13           Do you see that?

14       A.   Yes.

15       Q.   And could you just explain what you mean

16   by that?

17       A.   So again, you know, it might be my choice

18   in terms, but typically that might include

19   education, psychoeducation.

20           It might include working with parents on

21   how to best support their child.

22           It might include social transition or

23   different changes in gender expression.  That can

24   still be supportive for a subclinical

25   gender-diverse patient.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Christine Brady, Ph.D. August 31, 2023

1          Q.    Would it include psychotherapy?

2          A.    If they're in significant distress or if

3    they have other diagnoses.

4          Q.    And how does -- sorry.  Go ahead.

5          A.    I said yes.  I nodded but didn't say yes.

6          Q.    And how does nonmedical support and

7    intervention address symptoms/distress?

8          A.    So sometimes distress is coming from

9    conflict.  So sometimes as a youth is sort of

10   exploring gender or, you know, trying to

11   understand themselves.  They might just have

12   distress from trying to figure that out.

13         Or they might have distress in

14   communicating about what's going on with them to

15   caregivers, adults, peers.

16         They might also be struggling with some

17   symptoms, even though they don't meet full

18   criteria for gender dysphoria.  They might be, you

19   know, experiencing gender distress with those

20   symptoms.

21         So psychotherapy is really aimed at

22   support and also teaching coping skills and

23   managing some of the distress.

24         Q.    So psychotherapy can address

25   symptoms/distress?

Page 45

Christine Brady, Ph.D. August 31, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form.
 2              THE WITNESS:  It can help to manage them.
 3         Q.    (BY MR. RAMER)  So you used the phrase
 4    "to address."
 5              Am I understanding you think -- or you're
 6    using the phrase "to address" to help and manage;
 7    is that right?
 8         A.    Yes.
 9         Q.    Are you distinguishing between helping
10    and managing symptoms/distress and something else?
11         A.    Could you say that again?
12         Q.    Is that different from -- do you consider
13    helping and managing symptoms/distress to be
14    different from treating symptoms/distress?
15         A.    Yes.  So, you know, for -- there is a
16    difference between sort of like managing and
17    alleviating symptoms, and there is a difference
18    between treatment to me.
19              So that distinction being, you know --
20    treatment would seem to suggest that those
21    symptoms might go away.
22              And so I'm more aiming in psychotherapy
23    at alleviating kind of any distress, but not
24    necessarily treating symptoms or making symptoms
25    go away.
```

Page 46

Christine Brady, Ph.D. August 31, 2023

1     Q.    Do you think medical interventions are

2   treatment?

3     A.    Yes.

4     Q.    So you think medical interventions are

5   distinct from psychotherapy with respect to

6   addressing symptoms and distress?

7           MS. NOWLIN-SOHL:   Object to form.

8           THE WITNESS:   Here we're talking

9   specifically about subclinical -- you know, those

10  who don't meet full criteria for gender dysphoria,

11  in which case we probably wouldn't be considering

12  medical intervention if they didn't have full

13  criteria for gender dysphoria.

14    Q.    (BY MR. RAMER)  Do you use psychotherapy

15  on people who have met the criteria for gender

16  dysphoria?

17    A.    Yes.

18    Q.    And is the psychotherapy in that context

19  a treatment as you use the term?

20    A.    For those who meet full criteria for

21  gender dysphoria, it cannot be a stand-alone

22  treatment.  There is no evidence to suggest that.

23    Q.    When you say "it cannot be a stand-alone

24  treatment," what do you mean by that?

25    A.    So we -- the only evidence we have for

Page 47

Christine Brady, Ph.D. August 31, 2023

1    treating, treating in the sense of truly, like,

2    alleviating the distress and symptoms of gender

3    dysphoria are medical interventions.

4         And so psychotherapy alone isn't

5    sufficient to be able to treat full gender

6    dysphoria.

7    Q.   And so you said we don't have evidence

8    that psychotherapy can be a treatment for gender

9    dysphoria; is that right?

10        MS. NOWLIN-SOHL:   Object to form;

11   mischaracterizes the testimony.

12        THE WITNESS:   That psychotherapy isn't

13   effective treatment of gender dysphoria.

14   Q.   (BY MR. RAMER)  Is there evidence that

15   medical interventions alone are an effective

16   treatment for gender dysphoria?

17   A.   Yes.

18   Q.   What evidence is that?

19   A.   So there are many studies that look at

20   the benefits.  So medical interventions for

21   gender-diverse youth and young adults,

22   specifically that they show improvements in their

23   psychological functioning like depression and

24   anxiety, as well as reductions in their symptoms

25   of gender dysphoria.

Page 48

Christine Brady, Ph.D. August 31, 2023

1       Q.   And those studies look at medical
2   interventions alone?
3       A.   Sorry, I'm thinking.  I would have to --
4   I'm not sure if it's looking -- if it controls for
5   receiving therapy or not.
6       Q.   Do you know if there is any study that
7   controls for receiving therapy that shows a
8   benefit?
9            MS. NOWLIN-SOHL:  Object to form.
10           THE WITNESS:  I think those studies are
11  hard to conduct, and so I don't -- I don't know if
12  there's one that looks at medical as stand-alone.
13           MR. RAMER:  We've been going almost an
14  hour.  I don't know, would this be a good time for
15  a short break?
16           MS. NOWLIN-SOHL:  Yeah, that sounds good.
17           MR. RAMER:  Do you want to just take five
18  since we've got the kind of longer break later?
19           MS. NOWLIN-SOHL:  Yeah.
20           MR. RAMER:  Okay.  So we'll do 10 after
21  the hour.
22           THE WITNESS:  Okay.  Thanks.
23           THE VIDEOGRAPHER:  Okay.  So the time is
24  11:05 a.m. Mountain time, and we are off the
25  record.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

App.0817

Christine Brady, Ph.D. August 31, 2023

1          (Break taken from 11:05 a.m. to 11:11 a.m.)
2          THE VIDEOGRAPHER:  All right.  So we are
3     recording.  The time is 11:11 a.m. Mountain time,
4     and we are back on the record.
5          Q.   (BY MR. RAMER)  Dr. Brady, I'd like to go
6     to page 5 in your declaration, back to paragraph
7     18, and specifically going down to what I'll call
8     subparagraph 6.
9          And my question is what are typically
10     masculine toys?
11          A.   Yeah.  So the criteria are still not
12     perfect, but, you know, what DSM is trying to
13     achieve here, you know, is things that people
14     stereotypically still think of as masculine or
15     feminine.
16          And so in the case of masculine toys
17     might be more like sports, trucks, things of that
18     nature versus girls being more, like, dolls,
19     crafts, things like that.
20          Q.   So you said sports are typically
21     masculine.  I guess you'd say activities?
22          A.   Yes.
23          Q.   And you said crafts are typically -- what
24     are you saying about crafts?
25          A.   So again, these are just stereotypes of

Page 50

Christine Brady, Ph.D. August 31, 2023

1    how parents might view toys.  So crafts in that

2    case might be more typically associated with

3    females.

4        Q.   And so if I understand your answer, if a

5    girl -- no, I'm sorry.

6            If a boy has a strong rejection in

7    sports, that's an indication that the boy may have

8    gender dysphoria?

9            MS. NOWLIN-SOHL:  Object to form;

10   mischaracterizes testimony.

11           Sorry to interrupt.  Real quick, did we

12   lose Amy?

13           (Discussion held off the record.)

14           THE WITNESS:  So one of the important

15   things about the diagnosis of gender dysphoria in

16   childhood is that you need six of the criteria.

17   And so that stand-alone criteria, no, would not

18   indicate that necessarily somebody is transgender

19   or gender dysphoria.

20       Q.   (BY MR. RAMER)  Right.  My question was

21   not whether that standing alone --

22           My question was whether under the DSM-5,

23   if a boy has a strong rejection of sports, that

24   would indicate the boy potentially has gender

25   dysphoria; is that right?

Page 51

Christine Brady, Ph.D. August 31, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form.
 2              THE WITNESS:  So clinically, I would want
 3     to see more than just one sort of rejection and
 4     activity and then, of course, have to look at all
 5     the other criteria together.
 6              However, if the designated male is kind
 7     of rejecting all masculine activities, then that
 8     is certainly something of interest.
 9         Q.   (BY MR. RAMER)  Then what are some other
10     masculine activities?
11         A.   So it might be things like
12     rough-and-tumble play.
13              It might be things like, you know, again,
14     like trucks, construction, stereotypical things
15     like that.
16              It might be even, you know, gravitating
17     towards wanting to play with other girls and not
18     wanting to play with boys.
19         Q.   Well, that last one, that's in
20     subparagraph 5, right?
21         A.   Yes.
22         Q.   And so I'm asking specifically about
23     subparagraph 6 where we're referring to typically
24     masculine activities.
25              And I thought you had said a strong
```

Page 52

Christine Brady, Ph.D. August 31, 2023

1    rejection of one, like sports, may not be enough,
2    but a rejection of all typically masculine
3    activities may be something you take into account.
4              And my question was simply this, which is
5    in addition to sports and I believe you said
6    rough-and-tumble play, what are some other
7    typically masculine activities?
8              MS. NOWLIN-SOHL:  Object to form; asked
9    and answered.
10             THE WITNESS:  It might be even things
11   that are marketed towards boys.  So, for example,
12   a toy that's in the store and in the typically
13   kind of boy aisle, you know, youth might say, "I
14   don't want that because that's for boys."
15        Q.   (BY MR. RAMER)  What is the boy aisle of
16   a store?
17        A.   So toys are typically marketed for either
18   boys or girls.  So if you go to a Target or any
19   other store, you might notice that some aisles are
20   predominately pink and purple still and other
21   aisles are predominately blue and black and red.
22   And those are, you know, stereotypically where
23   they place boys' and girls' toys.
24        Q.   What's the significance of pink and
25   purple?

Page 53

Christine Brady, Ph.D. August 31, 2023

1      A.    So these are colors that are typically
2    associated with girls.  Marketing has shown that
3    girls have a preference for those colors.
4      Q.    Do you have expertise in marketing?
5      A.    No.
6      Q.    And so what are typically feminine
7    activities?
8      A.    On the flip side of our boys examples, it
9    might be, you know, toys that are marketed towards
10   girls.  They might have a rejection of those toys,
11   dolls, you know, games and activities, like I
12   said, like art or crafts, cooking, you know,
13   playing house, these kinds of things.
14     Q.    Did you say art is a typically feminine
15   activity?
16           MS. NOWLIN-SOHL:  Object to form;
17   mischaracterizes testimony.
18           THE WITNESS:  This isn't my -- what I
19   believe to be typical, but this is just what
20   society tends to view as feminine and masculine
21   activities.
22     Q.    (BY MR. RAMER)  But, Doctor, aren't you
23   the one who diagnoses individuals with the DSM-5
24   criteria?
25           MS. NOWLIN-SOHL:  Object to form.

                                        Page 54

Christine Brady, Ph.D. August 31, 2023

1          THE WITNESS:  I do diagnose gender

2   dysphoria, yes.

3       Q.   (BY MR. RAMER)  Do you use the DSM-5

4   criteria?

5       A.   Yes.

6       Q.   And does the DSM-5 criteria for

7   prepubertal children discuss typically feminine

8   activities?

9       A.   Yes.

10      Q.   And I'm asking you when you're doing the

11  diagnosis and reading the DSM-5, where it says

12  "typically feminine activities," what are those?

13  And I'm just confirming what your answer was.

14          Did you say that art was a typically

15  feminine activity?

16          MS. NOWLIN-SOHL:  Object to form.

17          THE WITNESS:  It can be.  So a lot of

18  times these -- this criteria in particular and

19  these activities are not judged or determined by

20  me, but are, you know, kind of determined by the

21  family and also the youth themselves.  So it's

22  more important if a youth sees something as

23  feminine or masculine.

24      Q.   (BY MR. RAMER)  I'm sorry.  The criteria

25  in the DSM-5 are determined by the youth or the

                                      Page 55

Christine Brady, Ph.D. August 31, 2023

1   families themselves?  Is that what you said?

2         MS. NOWLIN-SOHL:  Object to form;

3   mischaracterizes testimony.

4         THE WITNESS:  The judgment of whether or

5   not something is considered to be masculine or

6   feminine is more often determined by the youth and

7   family.  But whether or not they're rejecting of

8   that is determined by me.

9         Q.  (BY MR. RAMER)  You said "more often."

10  Does that mean not always?

11        A.   I mean, I guess, yeah.  I mean not

12  always.

13        Q.   And just -- I want to understand that

14  answer, which is you were saying the families and

15  the individuals determine what is a typically

16  masculine activity within the meaning of the

17  DSM-5, and then you determine whether there is a

18  strong rejection of that?

19        MS. NOWLIN-SOHL:  Object to form;

20  mischaracterizes testimony.

21        THE WITNESS:  So if a youth is saying,

22  "Dr. Brady, I don't like this toy or I don't like

23  this activity because that's a boy activity or

24  because that's what girls do and I'm not a girl or

25  I'm not a boy," whether or not that activity or

Page 56

Christine Brady, Ph.D. August 31, 2023

1    that toy is typically or stereotypically seen as

2    boy or girl is less important than the youth

3    viewing that as being a boy or a girl activity.

4         Q.  (BY MR. RAMER)  So I think -- am I wrong

5    in thinking that what you just described is in

6    subparagraph 4 on this page?

7         A.   So it's the reverse of item 6, so

8    rejecting of one thing but the liking of other

9    things.

10        Q.   And so your testimony is that when the

11   DSM-5 says typically masculine toys, it is not up

12   to the medical provider to be determining what are

13   typically masculine toys?  Is that what you're

14   saying?

15           MS. NOWLIN-SOHL:  Object to form;

16   mischaracterizes testimony.

17           THE WITNESS:  I'm not sure how to answer

18   your question because it's just that what is

19   considered typical is sort of subjective and

20   constantly evolving.  So that's why I rely more on

21   whether our youth sees that or categorizes that.

22   Because what one youth feels is girl things might

23   not be true for another youth.

24        Q.  (BY MR. RAMER)  Do you use these criteria

25   to diagnose patients?

Page 57

Christine Brady, Ph.D. August 31, 2023

```
1        A.    Yes.
2        Q.    And do you ensure that the marketing
3   congruence is manifested by at least six of the
4   criteria?
5        A.    Yes.
6        Q.    Have you ever had a patient in which
7   you've seen a strong rejection of typically
8   masculine toys?
9        A.    Yes.
10       Q.    What were the toys?
11       A.    So in some cases it could be any toy
12  that's just the color blue because the, you know,
13  youth felt that blue was a stereotypical male
14  color and they were very rejecting of blue.  So it
15  could have been any toy that just happened to be
16  the color blue.
17            In other cases it has been, you know,
18  things like, you know, light cars and trucks.
19  Again, the youth felt that that was a boy thing
20  and so they didn't want to necessarily play with
21  those and were rejecting of those kinds of toys.
22            And then for criterion 4, preferred,
23  sometimes the other gender toys like those.
24       Q.    Am I wrong in thinking that you seem to
25  be boiling everything down to the criterion in
```

Page 58

Christine Brady, Ph.D. August 31, 2023

```
 1   subparagraph 1?
 2            MS. NOWLIN-SOHL:  Object to form;
 3   argumentative.
 4            THE WITNESS:  Can you state that again?
 5        Q.   (BY MR. RAMER)  I guess it just seems
 6   like the way you're interpreting these criteria is
 7   that in the end, what really matters is a strong
 8   desire to be of the other gender, which is
 9   criterion A1.
10            MS. NOWLIN-SOHL:  Object to form.  Oh,
11   sorry.
12            MR. RAMER:  It's all right.
13        Q.   (BY MR. RAMER)  I guess I'll just leave
14   it there and ask, is that wrong?
15            MS. NOWLIN-SOHL:  Object to form;
16   argumentative, mischaracterizes testimony.
17            THE WITNESS:  So the way I interpret the
18   criteria -- you know, somebody could very much
19   have criterion 6 in my example of, you know, I
20   don't like blue things because I typically see
21   them as boy things.  But they might not feel not
22   boy.  Like, they might not have criterion 1.
23            It might just be, I don't like these
24   things because they're boy things, but they still
25   identify as a boy.  So I see them as separate.
```

Page 59

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.   (BY MR. RAMER)  Okay.  And just to
 2   confirm, you -- when you are diagnosing
 3   individuals under this part of the DSM-5, you do
 4   not determine what a typically masculine toy,
 5   game, or activity is; is that correct?
 6             MS. NOWLIN-SOHL:  Object to form; asked
 7   and answered.
 8             THE WITNESS:  It's never needed to
 9   happen.  I mean, most of my patients will say, "I
10   don't like this," for this reason.  And so my
11   judgment of whether or not that's a typical boy or
12   girl thing doesn't matter.
13        Q.   (BY MR. RAMER)  And so it's true that you
14   do not determine what a typically masculine toy,
15   game, or activity is when diagnosing individuals
16   under this part of the DSM-5; is that right?
17             MS. NOWLIN-SOHL:  Object to form; asked
18   and answered.
19             THE WITNESS:  I can, but I don't need to
20   in most cases.
21        Q.   (BY MR. RAMER)  You can what?
22        A.   I can determine if something is, in my
23   opinion, typically masculine or feminine, but I
24   don't need to in most cases because the youth and
25   the family are able to determine that within their
```

Page 60

Christine Brady, Ph.D. August 31, 2023

```
 1    own, you know, culture, within the family of
 2    what's -- you know, every family has different
 3    ideas of what gender things are.
 4         Q.   Okay.  And my questions are now about
 5    what you deem typically masculine or feminine,
 6    which you said you can do, correct?
 7         A.   Yes.
 8         Q.   Okay.  What do you deem typically
 9    masculine toys apart from trucks or blue things?
10              MS. NOWLIN-SOHL:  Object to form; asked
11    and answered.
12              THE WITNESS:  I guess in my mind, I might
13    think about, again, cars, construction-type toys,
14    building-type toys, activities like sports, like
15    scouts.
16         Q.   (BY MR. RAMER)  What about a soccer ball?
17              MS. NOWLIN-SOHL:  Object to form.
18              THE WITNESS:  So again, this is difficult
19    because of course, you know, I believe that a ball
20    is a ball and anybody can play with a ball.
21              But if a youth is saying, "I do not want
22    to play with this specifically because I associate
23    it with boy," then it becomes -- it meets that
24    criterion.
25         Q.   (BY MR. RAMER)  I understand that part of
```

Page 61

Christine Brady, Ph.D. August 31, 2023

1   your answer, but we had also just been discussing

2   how you also can make the determination of what is

3   a typically masculine toy.

4            And my question is do you deem a soccer

5   ball a typically masculine toy?

6            MS. NOWLIN-SOHL:  Object to form; asked

7   and answered.

8            THE WITNESS:  It could be.

9        Q.   (BY MR. RAMER)  What does it depend on?

10       A.   Again, so there might be situations in

11   which a child is rejecting toys, but it might be

12   for non-gendered reasons, and then there's going

13   to be times where it's for gendered reasons.

14            So if they're rejecting the soccer ball

15   because they just don't like physical activity,

16   that's not relevant to me or my diagnosis.

17            But if they're rejecting the ball because

18   they are associating it with a boy, then it is

19   relevant to me.

20       Q.   Okay.  What is rough-and-tumble play?

21       A.   Typically that's categorized as sort of,

22   like, horseplay, like wrestling.  Kind of, you

23   know, more physical forms of play.

24       Q.   And why is that typically masculine?

25       A.   So there's studies looking at types of

Page 62

Christine Brady, Ph.D. August 31, 2023

1     play in early childhood between the designated

2     sexes, and rough-and-tumble play is more

3     characteristic of designated males.

4         Q.    Have you read those studies?

5         A.    Yes.

6         Q.    Can you name any of them?

7         A.    Not off the top of my head.

8         Q.    Moving up to 3 here, it refers to

9     cross-gender roles in make-believe play.

10         What does that mean?

11         A.    So, for example, if kids are playing

12     house, if a designated male wants to be the mom in

13     that scenario or if the designated female wants to

14     be the dad in that scenario.

15         Q.    And then in 2, it refers to typical

16     masculine clothing.

17         What is typical masculine clothing?

18         A.    So this might be being -- it's easier to

19     discuss this criterion in terms of formal wear.

20     So it might be, you know, having to attend a

21     wedding and having to wear, you know, pants,

22     button-up shirt, tie, jacket.

23         Q.    That's what criterion A2 is referring to

24     when it talks about -- sorry. I'll just ask the

25     question and then I assume Li will object and then

Page 63

Christine Brady, Ph.D. August 31, 2023

```
 1    you can have an opportunity to answer.
 2             But criterion A2, when it refers to
 3    "typical masculine clothing," is referring to
 4    formal wear?
 5             MS. NOWLIN-SOHL:  Object to form;
 6    mischaracterizes the testimony.
 7             THE WITNESS:  Not only, but it is a way
 8    to assess for that.
 9        Q.   (BY MR. RAMER)  What else is it referring
10    to if it's not only referring to formal wear?
11        A.   So typical masculine clothing, again,
12    might just be a button-up shirt.  It might be,
13    again, the color of that clothing, regardless of
14    what type of clothing it is.
15        Q.   And with blue, black, and red being the
16    masculine colors; is that right?
17             MS. NOWLIN-SOHL:  Object to form;
18    mischaracterizes testimony.
19             THE WITNESS:  Commonly, those might be
20    some of the colors.
21        Q.   (BY MR. RAMER)  What are some other ones?
22        A.   It could -- so again, I -- it depends on
23    what a youth views to be the colors that are
24    associated with masculine versus the colors that
25    are associated with feminine.
```

Page 64

Christine Brady, Ph.D. August 31, 2023

1    Q.   Okay.  Let's go to the next page.  And

2    this is the DSM-5 diagnostic criteria for

3    adolescents and adults; is that right?

4    A.   Yes.

5    Q.   And down in 6, so criterion A6, it refers

6    to typical feelings and reactions of the other

7    gender.

8         Do you see that?

9    A.   Yes.

10   Q.   What are the typical feelings of the

11   female gender?

12        MS. NOWLIN-SOHL:  Object to form.

13        THE WITNESS:  So this criterion is trying

14   to get at what people might consider to be typical

15   responses emotionally or behaviorally to certain

16   situations.

17        So, for example, a designated male who's

18   feminine in identifying might feel that their

19   emotional responses are more consistent with those

20   of other girls rather than their designated sex.

21   Q.   (BY MR. RAMER)  How would emotional

22   responses be more typical of other girls?

23   A.   So stereotypically women might -- and

24   girls might respond to things with more sadness

25   rather than irritability or anger.

Page 65

Christine Brady, Ph.D. August 31, 2023

1    Q.    Are you saying girls might respond to
2  things with more sadness rather than irritability
3  or anger than boys would?
4    A.    Stereotypically that's what people
5  believe, yeah.
6    Q.    Is it fair to say a diagnosis under the
7  DSM-5 turns on stereotypes?
8          MS. NOWLIN-SOHL:  Object to form.
9          THE WITNESS:  So again, you know, this
10  criterion is really looking at not only do they
11  have these feelings and reactions, but the
12  patients themselves have a strong conviction that
13  those reactions are more typical of the gender
14  that they are identifying as.
15    Q.    (BY MR. RAMER)  But you were referring to
16  how this is stereotypical feelings and reactions,
17  right?
18          MS. NOWLIN-SOHL:  Objection;
19  argumentative.
20          THE WITNESS:  Can you ask that again?
21    Q.    (BY MR. RAMER)  We'll move on.
22    A.    Okay.
23    Q.    In 6, in the parenthetical, it refers to
24  some alternative gender different from one's
25  assigned gender.

Page 66

Christine Brady, Ph.D. August 31, 2023

1           Do you see that?

2      A.    Yes.

3      Q.    And what is that referring to?

4      A.    So the parentheses are trying to be

5  inclusive to the range of gender identities.  So

6  before the parentheses, it says "other gender,"

7  which means that, you know, you're born one and

8  then there's one other gender that you could

9  identify with.

10          And so the parentheses are to indicate

11  there's more than just the one gender on the other

12  side.  It doesn't have to be the open side of your

13  designated sex.

14     Q.    So what is on the other side apart from

15  the opposite of your designated sex?

16          MS. NOWLIN-SOHL:  Object to form.

17          THE WITNESS:  So it may be nonbinary or

18  agender or gender-fluid.

19     Q.    (BY MR. RAMER)  I heard "nonbinary" and I

20  heard "gender-fluid."

21          Did you say something in between?  I just

22  didn't hear it.

23     A.    Agender.

24     Q.    What is agender?

25     A.    So this is a label that some individuals

Page 67

Christine Brady, Ph.D. August 31, 2023

1   used -- use to define a gender that -- people use
2   it in different ways, but most commonly it's used
3   to sort of describe feeling as though you have a
4   gender that maybe can't -- there's no label to it.
5   It's sort of like its own, you know, thing -- it's
6   its own, like, gender.  It's, like, unique to me,
7   so I'm kind of agender.
8            Others have used it to say that, you
9   know, I don't necessarily want to be defined by my
10  gender so I'm -- it's typically just sort of an
11  androgenous, nonbinary subcategory.
12       Q.   And you said there how different people
13  might use the term.
14            How do you use the term?
15       A.   So my -- how am I using it today or how
16  do I use it clinically?
17       Q.   Do both.
18       A.   In the case of just my comment earlier, I
19  was kind of just using it as an example on another
20  gender label that people sometimes use.
21  Clinically I use it sort of interchangeably with
22  nonbinary.
23       Q.   What are the typical feelings and
24  reactions of the nonbinary gender?
25       A.   So I assume you're referring to

Page 68

Christine Brady, Ph.D. August 31, 2023

1    criterion 6?

2          Q.    Sorry, yes, still on 6.

3          A.    Okay.  So the typical feelings and

4    reactions -- I mean, in this case, it's kind of

5    saying that I have reactions and feelings that are

6    not consistent with my designated sex.

7          Q.    Apart from an individual just saying that

8    to you, is there any other way you determine

9    whether A6 is satisfied?

10         A.    With all the criterion, I do want

11   examples of how that has played out, you know, in

12   a person's life.  Certainly also getting examples

13   from caregivers about how they've seen that

14   externally and behaviorally.

15              So it's not just a yes, I feel that way.

16   It's a yes, and here are some examples of that.

17         Q.    Why do you ask for or require examples?

18         A.    So that's true of any diagnosis in the

19   DSM.  We always want to confirm with examples to

20   help really, you know, fill out that diagnosis to

21   ensure that that is an accurate report.  So we

22   don't just rely on someone's self-report of saying

23   yes or no, I have this.  We want to also have an

24   example to be able to determine for ourselves yes

25   or no, you have this.

Page 69

Christine Brady, Ph.D. August 31, 2023

1      Q.   So what's an example, then, of a typical
2   feeling and reaction of somebody who's nonbinary?
3      A.   So again, a nonbinary person might
4   report -- let's say they're designated male.  So a
5   designated male is in a situation, and it is
6   stressful, and they believe that, you know, most
7   guys or most other teens their age would respond
8   with -- in this way.  So let's say, you know, most
9   people who are designated male who are my age
10   would respond by yelling or, you know, getting
11   upset and, like, going off on a person.
12           But I don't react that way.  I, you know,
13   want to cry, or I want to withdraw or, you know, I
14   don't want to -- I feel like the way that I
15   respond to those types of situations isn't
16   consistent with how other boys, you know -- how
17   boys my age react.
18      Q.   So if adolescent who was, in your words,
19   designated male said, "I don't want to respond by
20   yelling or getting upset or going off on a
21   person," would that individual have satisfied A6?
22           MS. NOWLIN-SOHL:  Object to form.
23           THE WITNESS:  I expect more than one
24   example, and so, no, that wouldn't be sufficient
25   enough.  I would need more examples to be able to

Page 70

Christine Brady, Ph.D. August 31, 2023

1    understand that better.

2         Q.   (BY MR. RAMER)  But that is an example?

3         A.   It is an example.

4         Q.   I'd like to turn to -- in your

5    declaration to paragraph 12, page 3, paragraph 12.

6              And I guess not asking a question about

7    anything in the text, but just asking you, what

8    does it mean to be transgender?

9         A.   Transgender is an umbrella term to

10   describe people whose designated sex and gender

11   identity are not congruent.

12        Q.   Can an individual be transgender without

13   having gender dysphoria?

14        A.   Yes.

15        Q.   So I think I understand the phrase

16   "umbrella term," but is being transgender

17   different from being gender-diverse?

18        A.   So often the terms are used pretty

19   interchangeably.  Gender-diverse is just another

20   umbrella term that some people prefer to use.

21   And, you know, people's taxonomy in terms of

22   vocabulary are a little bit different.

23              So I, you know, tend to prefer

24   gender-diverse to be a little more inclusive of

25   the range of possible identities and whether or

Page 71

Christine Brady, Ph.D. August 31, 2023

```
 1    not they have gender dysphoria, but some people
 2    use "transgender" as the umbrella term.
 3         Q.   So is gender-diverse your umbrella term?
 4         A.   Yeah.
 5         Q.   And so an individual can be
 6    gender-diverse but not be transgender?
 7         A.   Correct.
 8         Q.   Can a gender-diverse individual who is
 9    not transgender be diagnosed with gender
10    dysphoria?
11         A.   Yes.
12         Q.   And so a gender-diverse individual who is
13    not transgender may receive puberty blockers and
14    cross-sex hormones to treat that gender dysphoria,
15    correct?
16              MS. NOWLIN-SOHL:  Object to form.
17              THE WITNESS:  They could.
18         Q.   (BY MR. RAMER)  Is gender-diverse
19    different from gender-nonconforming?
20         A.   So again, sometimes those terms can be
21    used interchangeably.
22         Q.   How do you use them?
23         A.   I use them interchangeably.
24         Q.   So, sorry.  Just so I can confirm, so you
25    view the term "gender-diverse" to mean the exact
```

Page 72

Christine Brady, Ph.D. August 31, 2023

1    same thing as gender-nonconforming; is that right?

2        A.    Yes.

3        Q.    Okay.  In your declaration, paragraph --

4    page 3, same paragraph we're on, paragraph 13,

5    first sentence, I'm just going to read it, and my

6    first question will be whether I read it

7    correctly.

8            It says "Gender identity is a person's

9    core internal sense of gender such as male or

10   female."

11           Did I read that correctly?

12       A.    Yes.

13       Q.    And when you say "internal," what do you

14   mean by that?

15       A.    Internal meaning within one's self.

16       Q.    Is an internal sense located somewhere

17   internally?

18           MS. NOWLIN-SOHL:  Object to form.

19           THE WITNESS:  I'm not sure what that

20   means.

21       Q.    (BY MR. RAMER)  Is this sense you're

22   referring to, is it, like, in an individual's

23   brain?

24           MS. NOWLIN-SOHL:  Object to form.

25           THE WITNESS:  So not necessarily, like,

Page 73

Christine Brady, Ph.D. August 31, 2023

1    located in a specific part of the brain or a

2    specific part of the body, but it does involve

3    thoughts and feelings, in which case the brain is

4    involved.

5         Q.   (BY MR. RAMER)  Do you think a core

6    internal sense could be described as a strongly

7    held belief?

8              MS. NOWLIN-SOHL:  Object to form.

9              THE WITNESS:  Some may consider it to be

10   a belief, yes.

11        Q.   (BY MR. RAMER)  I'm asking you if you

12   think a core internal sense can be described as a

13   strongly held belief.

14             MS. NOWLIN-SOHL:  Object to form.

15             THE WITNESS:  Sure.  Yeah.

16        Q.   (BY MR. RAMER)  Is the core internal

17   sense of gender biological?

18        A.   There are some studies that indicate that

19   there might be a biological component.

20        Q.   In your opinion is it biological?

21             MS. NOWLIN-SOHL:  Object to form.

22             THE WITNESS:  I think it's a combination

23   of a lot of things, biology being one.

24        Q.   (BY MR. RAMER)  What else?

25        A.   So it's biological, cultural, societal.

Page 74

Christine Brady, Ph.D. August 31, 2023

1        Q.    Sorry.  Were you still going?

2        A.    No.

3        Q.    Oh.  The last two, cultural and societal,

4    is it fair to label those as something external to

5    the person?

6              MS. NOWLIN-SOHL:  Object to form.

7              THE WITNESS:  Not necessarily.  I

8    think -- I wouldn't want to categorize it as

9    external or internal because I think it can be

10   both.  Once something is present enough, it

11   becomes internalized.

12       Q.    (BY MR. RAMER)  But what is being

13   internalized?  Something -- let me rephrase that.

14             The thing that is being internalized in

15   the situation you just described is something that

16   was previously external to the individual,

17   correct?

18             MS. NOWLIN-SOHL:  Object to form.

19             THE WITNESS:  There are some theories in

20   psychology that look at how something can be so

21   ingrained in a culture that it is just, like,

22   innately known.  And so it's something that is

23   internalized even before, like, knowing that it

24   is --

25             So, for example, archetypes and myths.

Page 75

Christine Brady, Ph.D. August 31, 2023

1    So myths have a very common structure across
2    cultures and across time, and so they're -- and
3    then there's just some innate knowledge that we
4    all have that mishap this structure, but it's not
5    something necessarily that we were aware of.  But
6    that's something that is external and then becomes
7    somewhat internalized.
8        Q.   (BY MR. RAMER)  Do you see a distinction
9    between something that is cultural and societal
10   and something that is biological?
11           MS. NOWLIN-SOHL:  Object to form.
12           THE WITNESS:  I'm not sure.
13       Q.   (BY MR. RAMER)  You're not sure that you
14   see a distinction between -- if I describe
15   something as a biological factor or a cultural
16   and -- excuse me.  Start again.
17           If I describe something as a biological
18   factor and I describe something else as a cultural
19   or societal factor, you do not see a distinction
20   between those two categories?
21           MS. NOWLIN-SOHL:  Object to form.
22           THE WITNESS:  If you presented it to me
23   that way, yes, I would.
24       Q.   (BY MR. RAMER)  Okay.  And what is that
25   distinction?

Page 76

Christine Brady, Ph.D. August 31, 2023

1       A.   So biological components or variables

2   being something that, I guess, is like organic in

3   nature.  It's, like, physical, you know, like

4   within the physical body, has a physical

5   manifestation.

6       Q.   And are you implying that the others do

7   not have that bodily physical manifestation?

8       A.   Yes.

9       Q.   So in that same sentence, you say "core

10  internal sense."

11       And my question is, are there internal

12  senses that are not core?

13       A.   Yeah.  Identity is multi-faceted.  And

14  there are some aspects that are not core to one's

15  self.

16       And there are also internal senses that

17  again are not core to one's self.  You know, for

18  example, like if I have a feeling, that doesn't

19  necessarily define who I am.  It's just a feeling.

20       Q.   What distinguishes a core internal sense

21  from a feeling or non-core internal sense?

22       A.   So something that's at somebody's core

23  really defines them in every aspect of their life.

24  So it's kind of cross-cutting in that way and is

25  essential to how they define themselves.

Page 77

Christine Brady, Ph.D. August 31, 2023

```
1        Q.   Can you give me any other examples of a
2   core internal sense other than gender?
3        A.   So I strongly identify as a psychologist.
4   And that is an important part of my identity and
5   who I am, so I would consider that to be a core
6   sense of who I am.
7        Q.   Your identity as a psychologist is a core
8   internal sense of yours?
9        A.   Yes.
10       Q.   Do you have any other examples?
11       A.   So people might -- of course, sense of
12  self might be, you know, related to other than
13  their profession, might be, you know, their skill
14  sets, so what a person believes to be their
15  strengths and weaknesses.
16            So, you know, it might be like -- with my
17  teenagers it might be academically, like, I know
18  I'm good at math.  And that is, like, core to who
19  I am.  And I, you know, want to maybe major in
20  math because I know I'm good at that.
21       Q.   When did you begin to identify as a
22  psychologist?
23       A.   So I knew that I wanted to become a
24  psychologist probably when I was 20.
25       Q.   Do you think biological factors
```

Page 78

Christine Brady, Ph.D. August 31, 2023

```
 1    contributed to that identity?
 2              MS. NOWLIN-SOHL:  Object to form;
 3    relevance.
 4              THE WITNESS:  I think it contributed in
 5    some ways in terms of, you know, as I was
 6    considering what I wanted to do in my career, I
 7    had to consider if I was going to be good at it or
 8    not.
 9              And I think biologically, I was
10    pre-dispositioned with some strengths that made me
11    well-suited for psychology.
12        Q.   (BY MR. RAMER)  Do you think that
13    cultural factors also contributed to your identity
14    as a psychologist?
15        A.   Not so much.
16        Q.   Do you think societal factors contributed
17    to your identity as a psychologist?
18        A.   No.
19        Q.   Did anything other than biology
20    contribute to your identity as a psychologist?
21              MS. NOWLIN-SOHL:  Object to the form;
22    relevance.
23              THE WITNESS:  Probably my values and
24    what -- how I wanted to contribute.
25        Q.   (BY MR. RAMER)  What do you mean by
```

Page 79

Christine Brady, Ph.D. August 31, 2023

```
 1    "values"?
 2        A.    So the values that I hold for wanting to
 3    help people led me to a profession where I could
 4    help people.
 5        Q.    And where do those values come from?
 6            MS. NOWLIN-SOHL:  Objection; relevance.
 7            THE WITNESS:  I don't know.  Just a
 8    self-determined set of values.
 9        Q.    (BY MR. RAMER)  Can an individual have a
10    sense of gender that is not a core internal sense
11    of gender?
12        A.    There are some individuals whose gender
13    might not be as relevant or important to them as
14    other individuals.
15        Q.    And in that situation, is their gender
16    identity not a core internal sense of gender?
17            MS. NOWLIN-SOHL:  Object to form.
18            THE WITNESS:  I think it's still
19    definitely an internal sense that everyone has.
20    And it is sort of known for most people.  Whether
21    or not it's core is individualized.
22        Q.    (BY MR. RAMER)  So it may or may not be
23    core in people; is that right?
24        A.    Correct.
25        Q.    How do you determine when it is or is not
```

Page 80

Christine Brady, Ph.D. August 31, 2023

```
 1    core?

 2              MS. NOWLIN-SOHL:  Object to form.

 3              THE WITNESS:  So I would spend time, you

 4    know, understanding just how much of a role that

 5    plays in a person's life and how, you know,

 6    important it is to them and how strongly

 7    identified they are with that.

 8              So, for example -- and maybe a better

 9    example than me as a psychologist is now you have

10    racial identity.  So, you know, I identify as

11    Asian.  Not everybody, you know, who is Asian

12    strongly identifies that way, but that's something

13    that is very important to me.

14        Q.   (BY MR. RAMER)  So gender identity is a

15    core internal sense for people for whom gender

16    identity is very important; is that right?

17              MS. NOWLIN-SOHL:  Object to form;

18    mischaracterizes prior testimony.

19              THE WITNESS:  Could you say that again?

20        Q.   (BY MR. RAMER)  Yeah.  So to determine

21    whether a person's internal sense of gender is

22    core or not, the question is whether that sense of

23    gender is something they care significantly about;

24    is that right?

25              MS. NOWLIN-SOHL:  Object to form;
```

Page 81

App.0849

Christine Brady, Ph.D. August 31, 2023

1    mischaracterizes prior testimony.

2         THE WITNESS:  I'm sorry.  I'm still not

3    understanding.

4         Q.   (BY MR. RAMER)  So I thought you said

5    that the reason your Asian identity is core for

6    you is that it's something that is very important

7    to you.

8         Am I misremembering that?

9         A.   That's correct.

10        Q.   And my question is to decide whether

11   someone's gender identity is core for them, is the

12   question whether their gender identity is very

13   important to them?

14        MS. NOWLIN-SOHL:  Same objections.

15        THE WITNESS:  Part of the evaluation,

16   yes, is looking at how strongly that part of them

17   falls -- is.

18        Q.   (BY MR. RAMER)  Is what?  Did you finish?

19        A.   That was the end of my sentence.  It

20   wasn't a well-structured sentence, but that was

21   the end.

22        Q.   Let's go to paragraph 14, same page.  And

23   third sentence in this paragraph.  And I'll just

24   read it and ask if I read it correctly.

25        It says "Moreover, gender identity is not

                                            Page 82

Christine Brady, Ph.D. August 31, 2023

```
 1    something that can be voluntarily changed."
 2            Did I read that correctly?
 3        A.    Yes.
 4        Q.    Does an individual's gender identity ever
 5    change?
 6        A.    It can.
 7        Q.    How so?
 8        A.    So there are instances where someone's
 9    gender identity still might be gender-diverse but
10    fluctuate in terms of the labels they're using or
11    how they choose to categorize themselves.
12            There are other folks who over time do
13    have congruence with their designated sex.
14        Q.    What do you mean by that, "over time they
15    have congruence with their designated sex"?
16        A.    I have some patients who identify as
17    gender-diverse and then later on identify as their
18    designated sex.
19        Q.    And you're saying that that type of
20    change is never voluntary; is that right?
21        A.    Correct.
22        Q.    What do you mean by that?
23        A.    It's not necessarily someone is forcing
24    themselves to identify as a certain identity.   It
25    just, you know, over time evolves in alliance for
```

Page 83

Christine Brady, Ph.D. August 31, 2023

1    them.

2         Q.    What causes that change?

3              MS. NOWLIN-SOHL:  Object to form.

4              THE WITNESS:  It's pretty individualized,

5    so, you know, I think sometimes it's through our

6    work together and exploration that they're able to

7    understand themselves differently or understand

8    just their feelings differently.

9         Q.    (BY MR. RAMER)  By "work together," do

10   you mean psychotherapy?

11        A.    Yes.

12        Q.    Are you familiar with the term

13   exploratory therapy?

14        A.    Yes.

15        Q.    What is your understanding of that term?

16        A.    My understanding is creating a safe

17   environment and a safe place for young people to,

18   you know, just express their thoughts and feelings

19   regarding gender and to have a therapist sort of

20   facilitate that exploration process by asking

21   questions or probing further and being a sounding

22   board for those ideas.

23        Q.    Just going back to this final sentence in

24   paragraph 14, so are you saying that any change in

25   gender identity is involuntary?

Page 84

Christine Brady, Ph.D. August 31, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form;
 2    mischaracterizes prior testimony.
 3              THE WITNESS:  I guess I think of
 4    voluntary as conscious and intentional versus just
 5    the natural course of the development of someone's
 6    identity.
 7         Q.   (BY MR. RAMER)  What alters the course of
 8    someone's gender identity?
 9              MS. NOWLIN-SOHL:  Object to form.
10              THE WITNESS:  Again, individualized, but
11    in some cases it might be -- it might be
12    understanding more about gender diversity and the
13    spectrum of gender diversity.
14              It might be with regards to learning new
15    information about themselves that they didn't have
16    before.  I'll stop there.
17         Q.   (BY MR. RAMER)  Anything else?
18         A.   Not that I can think of.
19         Q.   Have you ever heard gender described as a
20    spectrum?
21         A.   Yes.
22         Q.   Do you think gender is a spectrum?
23         A.   Yes.
24         Q.   And can you just explain what you mean by
25    that?
```

Page 85

Christine Brady, Ph.D. August 31, 2023

1      A.    So gender -- there are lots of ways for
2  people to kind of describe their gender.  And I
3  think of it as a spectrum from -- in the most
4  simplified way, masculinity to femininity with
5  sort of androgyny being in the middle.
6      Q.    Can an individual who I would call a
7  natal male, you would say assigned male at birth,
8  have a gender identity that is more masculine than
9  the individual's body?
10            MS. NOWLIN-SOHL:  Object to form.
11            THE WITNESS:  I was confused by that.
12  Could you say that again?
13      Q.    (BY MR. RAMER)  I guess can you -- what's
14  your definition of gender dysphoria?
15      A.    So meeting criteria for gender dysphoria
16  per the DSM.
17      Q.    And just as a shorthand, if somebody
18  said, "What is gender dysphoria?" -- I mean, I
19  guess we can do it a different way rather than --
20            Let's go back to page -- let's go to
21  page 6 of your declaration.
22            And paragraph 19A refers to the marked
23  incongruence between someone's
24  experience/expressed gender and assigned gender.
25            Do you see that?

Page 86

Christine Brady, Ph.D. August 31, 2023

```
 1          A.    Yes.
 2          Q.    And in your view, it is not binary?  Or
 3     let me rephrase.
 4              The gender is not binary, right?
 5              MS. NOWLIN-SOHL:  Object to form.
 6              THE WITNESS:  Yes.
 7          Q.    (BY MR. RAMER)  And could an individual
 8     who is assigned male have an experienced or
 9     expressed gender that is more masculine than that
10     individual's present gender?
11              MS. NOWLIN-SOHL:  Object to form.
12              THE WITNESS:  So let me just -- I'm going
13     to rephrase and see if I understood this
14     correctly.
15              So a designated male who has gender
16     incongruence but still identifies as male?
17          Q.    (BY MR. RAMER)  Let me ask it a different
18     way, which is does gender incongruence for an
19     individual who is assigned male at birth always
20     involve an incongruence with a more feminine
21     gender identity?
22              MS. NOWLIN-SOHL:  Object to form.
23              THE WITNESS:  I see.  So you're wondering
24     like how far on the spectrum they need to go in
25     order to have gender incongruence?
```

Page 87

Christine Brady, Ph.D. August 31, 2023

1    Q.   (BY MR. RAMER)  I think my question is
2    does it always go one way?
3        A.   Yeah, so I think the oversimplification
4    there -- I mean, there are lots of different ways
5    I could go.  But the oversimplified version is it
6    could be nonbinary, which is not necessarily
7    feminine.  It's just less masculine.
8        Q.   Okay.  We'll take that.
9             Does it always go one way, meaning less
10   masculine?
11            MS. NOWLIN-SOHL:  Object to form.
12            THE WITNESS:  Typically.
13       Q.   (BY MR. RAMER)  Always?
14       A.   Yeah, I can't think of a case in which
15   that hasn't been the direction.
16       Q.   Do you think it's possible for a male
17   assigned at birth to say, "My gender identity is
18   more masculine than what I've been assigned"?
19            MS. NOWLIN-SOHL:  Object to form; calls
20   for speculation.
21            THE WITNESS:  I think it would be
22   difficult to meet the criteria in someone
23   presenting that way.  So that would be hard for me
24   to imagine.
25       Q.   (BY MR. RAMER)  Why would it be difficult

Page 88

Christine Brady, Ph.D. August 31, 2023

1    to meet the criteria for someone presenting that

2    way?

3         A.   Because they -- I can't see how they

4    would necessarily have distress over that if

5    their, you know, designated sex and masculinity

6    are part aligned.

7         Q.   So it is binary, then, and it's not a

8    spectrum?

9              MS. NOWLIN-SOHL:  Object to form;

10   mischaracterizes prior testimony.

11             THE WITNESS:  So again, there's the range

12   of masculinity to femininity.  So it's a spectrum

13   in the sense of it's not just there's one other

14   option here.  There's a wide range of options and

15   a range of identity within the spectrum.

16        Q.   (BY MR. RAMER)  Right.  But the

17   incongruence for an assigned male based on what

18   you're saying seems like it can only go -- it only

19   counts if it goes one direction, which is less

20   masculine than being assigned male.

21             Is that wrong?

22             MS. NOWLIN-SOHL:  Object to form.

23             THE WITNESS:  I think that's correct.

24        Q.   (BY MR. RAMER)  I think you've mentioned

25   the phrase "gender-fluid."

Page 89

Christine Brady, Ph.D. August 31, 2023

```
 1                  Am I remembering --
 2            MS. NOWLIN-SOHL:  John, real quick.
 3            MR. RAMER:  Yeah.
 4            MS. NOWLIN-SOHL:  We've been going for
 5   about an hour.  Were you planning to go straight
 6   up to the long break, or should we take five
 7   minutes?
 8            MR. RAMER:  Yeah, let's take five and
 9   then come back and then we'll go up until the long
10   break.
11            MS. NOWLIN-SOHL:  Okay.  Sounds good.
12            THE WITNESS:  Thank you.
13            THE VIDEOGRAPHER:  Okay.  So the time is
14   12:14 p.m. Mountain time, and we are off the
15   record.
16         (Break taken from 12:14 p.m. to 12:20 p.m.)
17            THE VIDEOGRAPHER:  All right.  So we are
18   recording.  The time is 12:20 p.m. Mountain time,
19   and we are back on the record.
20       Q.   (BY MR. RAMER)  Dr. Brady, I believe
21   earlier today you may have used the phrase
22   "gender-fluid."
23            Am I remembering that right?
24       A.   Yes.
25       Q.   And can you explain what that means?
```

Page 90

Christine Brady, Ph.D. August 31, 2023

```
 1        A.   So some individuals use this term to
 2   describe -- again, if we're talking about the
 3   simplified spectrum of masculinity to femininity
 4   with androgyny or nonbinary being in the middle,
 5   some people fluidly move within that spectrum.
 6   Typically the identity isn't shifting, but it's
 7   just the expression is what is moving on that
 8   spectrum.
 9        Q.   What do you mean when you say the
10   identity is not moving but the expression is
11   moving?
12        A.   So typically we separate gender identity
13   and gender expression.  Gender identity being the
14   internal, core sense of what your gender is versus
15   the expression is, again, the external things that
16   people can see, like how you choose to express
17   your internal gender, so clothing, hairstyles,
18   accessories, those sorts of things.
19             So gender-fluid folks sometimes have a
20   stable gender identity, but how they choose to
21   express themselves is more fluid.  So on some days
22   they might gravitate towards more feminine
23   expression or more masculine expression or more
24   androgenous expression.
25        Q.   So does gender-fluid ever -- and correct
```

Page 91

(93 of 288), Page 93 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 93 of 288
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 92 of 267
Christine Brady, Ph.D. August 31, 2023

1   me if I'm wrong, but I think I hear you saying
2   gender-fluid in the context you just described is
3   fluidity in gender expression; is that fair?
4        A.   Yes.
5        Q.   And is there fluidity in any individual's
6   gender identity?
7        A.   For some individuals who define
8   themselves as gender-fluid, there can be also
9   fluctuations in the identity on that spectrum.
10       Q.   So gender fluidity is itself an
11  identification?
12       A.   Yes.
13       Q.   When a patient identifies as
14  gender-fluid, how does that identity manifest
15  itself?
16           MS. NOWLIN-SOHL:  Object to form.
17           THE WITNESS:  So it might present itself
18  in terms of, again, the expressions of wearing
19  different, you know, types of clothing, or
20  sometimes it's using different pronouns on
21  different days, depending on, you know, how
22  they're identifying that particular day.
23       Q.   (BY MR. RAMER)  And sorry.  I just want
24  to make sure I understand gender fluidity, which
25  is -- and maybe it's helpful if I try to use it in

Page 92

Christine Brady, Ph.D. August 31, 2023

1    a sentence and you tell me if I'm using it wrong,

2    which is a person says, "I am gender-fluid because

3    my gender identity often changes."

4           Based on your understanding of

5    gender-fluidity, is that sentence coherent?

6           MS. NOWLIN-SOHL:   Object to form.

7           THE WITNESS:   The sentence may or may not

8    characterize every person's experience, but you

9    did use it correctly, yes.

10      Q.   (BY MR. RAMER)   Okay.   Maybe an easier

11   way to ask this is if somebody is gender-fluid, is

12   it that their gender identity is changing, or is

13   that there simply is no identity other than the

14   fluidity?

15      A.   So again, it depends.   So for some folks

16   it is that the gender identity is fluid and

17   moving.   For other folks it might just be the

18   expression piece that is fluid and moving.   So it

19   can be used in different ways depending on the

20   individual.

21      Q.   And do you have a particular way that you

22   use it?

23      A.   For us it doesn't necessarily -- you

24   know, the label that people use for their identity

25   doesn't matter as much as -- for me, whether or

Page 93

Christine Brady, Ph.D. August 31, 2023

1    not they meet criteria for gender dysphoria.

2         Q.   Well, I guess you have to determine

3    whether there is a marked incongruence between

4    their experience/expressed gender and their

5    assigned gender, right?

6              MS. NOWLIN-SOHL:  Object to form.

7              THE WITNESS:  As part of the criteria,

8    yeah, it's determinate.

9         Q.   (BY MR. RAMER)  And so don't you --

10   wouldn't the label be critical to understanding

11   what the individual's experienced/expressed gender

12   is?

13        A.   So the -- I would care more about the

14   description of what that means to them rather than

15   the actual table that they're using.

16        Q.   In your declaration, page 3,

17   paragraph 14, the second sentence -- I'll just

18   read it and ask if I read it correctly.

19             It says "It is an essential part of one's

20   identity and being."

21             Did I read that correctly?

22        A.   Yes.

23        Q.   And the "it" there is referring to gender

24   identity; is that right?

25        A.   Yes.

Page 94

Christine Brady, Ph.D. August 31, 2023

1    Q.   With respect to the second sentence, me

2  saying that gender identity is an essential part

3  of one's identity and being, what is your

4  authority for that proposition?

5    A.   I -- so I believe this to be true because

6  everybody has a gender identity, and so it's kind

7  of an essential part of the human condition.

8    Q.   I mean, don't you think there are other

9  things that everybody has that are not an

10  essential part of their identity and being?

11        MS. NOWLIN-SOHL:  Object to form;

12  argumentative.

13        THE WITNESS:  Could you give me an

14  example?

15    Q.   (BY MR. RAMER)  I guess how are you using

16  the word "essential"?  Maybe we'll start there.

17    A.   I think essential is to say that -- you

18  know, again, much like race.  My earlier example,

19  much like race, it's something, you know, everyone

20  has a racial identity.  Everyone has a gender

21  identity.  And so it's essential in the sense that

22  everybody has it.

23    Q.   You think race is an essential part of

24  one's identity and being?

25    A.   Yes.

(97 of 288), Page 97 of 288 Case: 24-142 01/26/2024 DktEntry: 23.3 Page 97 of 288
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 96 of 267

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.   And now turning to -- still in your
 2   declaration -- paragraph 21, which I think is
 3   page 7, can you kind of just walk me through what
 4   you're explaining in this paragraph?
 5        A.   Sure.  So I am discussing sort of the
 6   different -- so I'm trying to figure out how to
 7   summarize this.
 8             So essentially kind of discussing just
 9   the persistence of gender identity through
10   development.
11        Q.   And is it fair to say that in this
12   paragraph you are criticizing the study you cite
13   in footnote 4?
14        A.   There are some methodological concerns
15   with citation No. 4, yes.
16        Q.   And what are those methodological
17   concerns?
18        A.   So that study is outdated.  It's rather
19   old.  And so the criteria that were used for
20   inclusion into that study were from DSM-4, gender
21   identity disorder, and the criteria for
22   prepubertal kids was much lower.
23             So DSM-5 has a requirement of six
24   criterion.  DSM-4 had fewer than that.  So based
25   on DSM-5 criterion of gender dysphoria, many of
```

Page 96

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

App.0864

Christine Brady, Ph.D. August 31, 2023

1    the kids in that study would not have been
2    included because they don't meet criteria for
3    gender dysphoria.
4         Q.   And why is that a limitation of the
5    study?
6         A.   Because it overinflates the number of
7    people who no longer identify as gender-diverse.
8         Q.   And then is it fair to say you favorably
9    cite the Olson article in -- that you cite in
10   footnote 5?
11            MS. NOWLIN-SOHL:  Object to form.
12            THE WITNESS:  It addresses some of the
13   limitations of citation 4 in that it is using
14   DSM-5 inclusion criteria.
15        Q.   (BY MR. RAMER)  It is using DSM-5?
16   Sorry, let me rephrase.
17            The Olson article is using DSM-5
18   inclusion criteria?
19        A.   Yes.
20            MR. RAMER:  I've just got about ten
21   minutes.  Let me try and send an exhibit.
22            Okay.  I just hit send.  We shall see
23   when it arrives.
24            Have we gotten the early warning from the
25   phone yet, Li?

Page 97

Christine Brady, Ph.D. August 31, 2023

```
 1              MS. NOWLIN-SOHL:  No, not yet.  Amy, you
 2    usually beat me to it.  Have you received it?
 3              THE REPORTER:  I did receive it.
 4              MS. NOWLIN-SOHL:  Okay.  Then I should be
 5    hopefully not too far behind.
 6              I still do not have it on either device.
 7              Oh, here we go.
 8              THE WITNESS:  It was somewhere over
 9    Colorado.
10              MS. NOWLIN-SOHL:  Yes.  Okay.
11              MR. RAMER:  Is it pulled up?
12              MS. NOWLIN-SOHL:  Yes.
13              (Deposition Exhibit No. 3 was marked.)
14         Q.   (BY MR. RAMER)  And, Dr. Brady, is this
15    the article you cite in footnote 5?
16         A.   Yes.
17         Q.   And did you read this article before you
18    cited it?
19         A.   Yes.
20         Q.   I'd like to go to page 2, and middle
21    column, the first full paragraph.  And I'll just
22    read the first sentence and ask if I read it
23    correctly.
24              It says "This study did not assess
25    whether participants met criteria for the
```

Page 98

Christine Brady, Ph.D. August 31, 2023

1    Diagnostic and Statistical Manual of Mental

2    Disorders, Fifth Edition, diagnosis of gender

3    dysphoria in children."

4            Did I read that correctly?

5        A.   Yes.

6        Q.   And so did this study assess whether the

7    participants met the criteria of the DSM-5?

8        A.   This study did not diagnose them.

9        Q.   Well, you said "diagnose" there.

10           My question is whether it assessed

11   whether they had been diagnosed under the DSM-5.

12       A.   So they did not do their -- yeah, sorry,

13   I was just scrolling around.  They did not do

14   their own assessment.

15       Q.   But you think this study accounted for

16   whether they were diagnosed under the DSM-5?  Is

17   that what you're saying?

18       A.    I would have to read it more thoroughly,

19   but my understanding is that they did ask, so it

20   was sort of self-reported diagnosis.

21       Q.   Okay.  So you're saying the participants

22   in this study self-reported whether they were

23   diagnosed under the DSM-5?

24           MS. NOWLIN-SOHL:  Object to form;

25   mischaracterizes the testimony.

Page 99

Christine Brady, Ph.D. August 31, 2023

```
 1              THE WITNESS:  I believe so.
 2      Q.   (BY MR. RAMER)  Do you know where they
 3  say that in the article?
 4      A.   So I believe that with their recruitment
 5  methodology, they were recruiting individuals who
 6  had socially transitioned.
 7      Q.   Okay.  Sorry.  Can you point me to where
 8  in the article it says that the participants
 9  reported that they had been diagnosed with gender
10  dysphoria under the DSM-5?
11      A.   Yeah, I cannot point to that in this
12  article right now.  I would have to read it more
13  closely.
14      Q.   If it's not in there, is it fair to say
15  your criticism of the article in footnote 4
16  applies to your criticism of the article in
17  footnote 5?
18              MS. NOWLIN-SOHL:  Object to form.
19              THE WITNESS:  The limitations of
20  citation 4 still stand.  However, you know,
21  citation 5 still has stronger and more rigorous
22  scientific inquiry because it is -- has been done
23  more recently, and is with kids in the United
24  States.
25      Q.   (BY MR. RAMER)  Do you think the article
```

Page 100

Christine Brady, Ph.D. August 31, 2023

```
 1    in footnote 5 is more reliable because it's more
 2    recent and conducted with kids in the United
 3    States?  Is that right?
 4              MS. NOWLIN-SOHL:  Object to form;
 5    mischaracterizes prior testimony.
 6              THE WITNESS:  Compared to citation 4,
 7    yes.
 8         Q.   (BY MR. RAMER)  Why is doing a study with
 9    individuals in the United States more reliable
10    than doing a study with individuals elsewhere?
11         A.    Perhaps not more reliable, but more
12    relevant given that all of my patients live in the
13    United States.
14         Q.   Do you think the experience of
15    individuals in the United States is different from
16    the experience of individuals in Europe?
17              MS. NOWLIN-SOHL:  Object to form.
18              THE WITNESS:  Potentially.
19         Q.   (BY MR. RAMER)  How about with -- do you
20    think their experience -- do you think the
21    experience of individuals in the United States
22    with respect to gender identity is different from
23    the individuals -- let me restart.
24              Do you think the experience of
25    individuals in the United States with respect to
```

Page 101

Christine Brady, Ph.D. August 31, 2023

1  gender identity is different from the experience

2  of individuals in Europe with respect to gender

3  identity?

4          MS. NOWLIN-SOHL:  Object to form.

5          THE WITNESS:  They may be.

6      Q.  (BY MR. RAMER)  What's the basis for the

7  possibility that they may be different?

8      A.  So there are, you know, different

9  experiences of potentially discrimination or there

10 are different, like, laws protecting trans youth

11 in different countries.  Different abilities in

12 terms of, like, legal rights to consent and things

13 of that nature.

14     Q.  And the idea there is that -- what effect

15 do you think more restrictive laws or more

16 discrimination has?

17         MS. NOWLIN-SOHL:  Object to form.

18         THE WITNESS:  I just think the experience

19 would be different.  And, you know, I don't know

20 without scientific inquiry if that leads to any

21 different outcomes.  But, you know, I think when

22 we're talking about youth in the United States, we

23 want to know about youth in the United States.

24     Q.  (BY MR. RAMER)  And so you think a study

25 out of a country like Sweden, for example, would

Page 102

Christine Brady, Ph.D. August 31, 2023

```
 1   not be relevant to the experience of individuals
 2   in the United States?
 3          MS. NOWLIN-SOHL:  Object to form;
 4   argumentative, mischaracterizes prior testimony.
 5          THE WITNESS:  I don't think that it makes
 6   it irrelevant.  I just think that it would be
 7   stronger if it pertains to youth in the United
 8   States if we're talking about youth in the United
 9   States.
10      Q.   (BY MR. RAMER)  With respect to the Olson
11   study that we were just looking at, had the
12   participants in that study socially transitioned?
13      A.   Yes.
14      Q.   Do you think there is a possibility that
15   socially transitioning could affect the likelihood
16   of desistance?
17          MS. NOWLIN-SOHL:  Object to form.
18          THE WITNESS:  Could you phrase that
19   again?
20      Q.   (BY MR. RAMER)  Do you think there's a
21   possibility that socially transitioning could
22   affect the likelihood of desistance in an
23   individual?
24          MS. NOWLIN-SOHL:  Object to form.
25          THE WITNESS:  So I am aware of one other
```

Page 103

Christine Brady, Ph.D. August 31, 2023

1  study where they looked at social transition and

2  the strength of identity, and there was no

3  association with whether or not youth had socially

4  transitioned on strengthening or weakening their

5  identity over time.

6          Also clinically I've had socially

7  transitioned youth socially transition again when

8  their identity has changed, so it's certainly not

9  something that is creating a barrier to their

10  identity evolving if that's what's going to

11  happen.

12      Q.    (BY MR. RAMER)  So is the answer to the

13  question, then, no, you do not think there is a

14  possibility that socially transitioning could

15  affect the likelihood of desistance?

16          MS. NOWLIN-SOHL:  Object to form;

17  mischaracterizes prior testimony.

18          THE WITNESS:  There's -- I'm only aware

19  of the one study that says that there is no

20  relationship in either direction.  And then

21  clinically I've seen it go -- I've not seen that

22  to be true.

23      Q.    (BY MR. RAMER)  Does the existence of

24  that one study in your expert opinion foreclose

25  the possibility that social transitioning could

Page 104

Christine Brady, Ph.D. August 31, 2023

1   affect the likelihood of desistance?

2        A.   I don't think that one study is enough.

3   But again, clinically, I've seen people be able to

4   socially transition again, retransition without

5   difficulties.

6        Q.   Why don't you think that one study is

7   enough?

8             MS. NOWLIN-SOHL:  Object to form.

9             THE WITNESS:  So as a scientist, it

10  helps, you know, to have replication studies or

11  more, you know, participants to be able to say for

12  sure.

13       Q.   (BY MR. RAMER)  Replication studies or --

14  what was the last thing?  I missed that.  I'm

15  sorry.

16       A.   Increased number of participants.

17            MR. RAMER:  And I think we're coming up

18  on quarter to.  So maybe it's a good time we can

19  take our break?

20            MS. NOWLIN-SOHL:  Yeah, that sounds good.

21            THE VIDEOGRAPHER:  Okay.  So then the

22  time is 12:44 p.m. Mountain time, and we are off

23  the record.

24            (Break taken from 12:44 p.m. to 3:14 p.m.)

25            THE VIDEOGRAPHER:  All right.  So we are

                                        Page 105

Christine Brady, Ph.D. August 31, 2023

```
1    recording.  The time is 3:14 p.m. Mountain time,
2    and we are back on the record.
3         Q.   (BY MR. RAMER)  Dr. Brady, do you think a
4    diagnosis under the DSM-5 should be necessary to
5    receive gender-affirming medical care?
6         A.   In my practice, yes.
7         Q.   Why do you say that?
8              MS. NOWLIN-SOHL:  Object to form.
9              THE WITNESS:  Because I can't speak for
10   what other people might feel is appropriate or
11   not, but that is how we run in our clinic.
12        Q.   (BY MR. RAMER)  So granting that you do
13   follow the DSM-5, my question is a little bit
14   different, which is just do you think that the
15   diagnosis as articulated in the DSM-5 should be
16   necessary to receive gender-affirming medical
17   care?
18             MS. NOWLIN-SOHL:  Object to form.
19             THE WITNESS:  Yes.
20        Q.   (BY MR. RAMER)  And that's even though
21   you described the DSM-5 as -- I think it was
22   either "not perfect" or "imperfect" earlier today.
23             Do you think it is sufficient?
24             MS. NOWLIN-SOHL:  Object to form.
25             THE WITNESS:  I do.
```

Page 106

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.    (BY MR. RAMER)  Do you think that
 2   reducing gender dysphoria is the only purpose for
 3   gender-affirming medical interventions?
 4        A.    I think that is the main goal.  However,
 5   there are secondary goals that, you know, just
 6   include, like, making someone happier.  Reducing
 7   their dysphoria but also making them happier.
 8        Q.    So I guess in that answer you're saying
 9   in reducing the gender dysphoria, there are other
10   benefits that may come along with that reduction?
11   Is that what you mean?
12        A.    Yes.
13             MS. NOWLIN-SOHL:  Object to form;
14   mischaracterizes prior testimony.
15             THE WITNESS:  Yes.  The primary goal of
16   medical interventions is to reduce dysphoria.  And
17   then there are secondary benefits that come from
18   that.
19        Q.    (BY MR. RAMER)  And before we went on the
20   break, we were discussing desistance.
21             Do you recall that, roughly?
22        A.    Yes.
23        Q.    And one of the questions I had asked you
24   was whether you thought social transition could
25   affect the likelihood of desistance.
```

Page 107

Christine Brady, Ph.D. August 31, 2023

```
1              And my next question is do you think
2    there's any possibility that medically
3    transitioning an adolescent could affect the
4    likelihood of desistance?
5              MS. NOWLIN-SOHL:  Object to form.
6              THE WITNESS:  To my knowledge, there
7    isn't any research that looks at that question
8    specifically.  Clinically I've not had -- seen
9    that to be the case.
10       Q.   (BY MR. RAMER)  You're unaware of any
11   research that looks at that question at all?
12             MS. NOWLIN-SOHL:  Object to form.
13             THE WITNESS:  Research that looks or
14   answers the question of does medical intervention
15   impact the rates of persistence or desistance.
16       Q.   (BY MR. RAMER)  And so with respect to
17   scientific research, we don't know the answer to
18   that question; is that right?
19             MS. NOWLIN-SOHL:  Object to form.
20             THE WITNESS:  We do not know whether
21   there is a relationship or isn't, but again,
22   clinically I've seen that there does not appear to
23   be a relationship.
24       Q.   (BY MR. RAMER)  Are you aware of any
25   study -- this is closely related but a slightly
```

Page 108

(110 of 288), Page 110 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 110 of 288
Case 1:23-cv-00269-BLW  Document 56-2  Filed 09/05/23  Page 109 of 267
Christine Brady, Ph.D. August 31, 2023

```
1    different question.
2            Are you aware of any study that analyzes
3    desistance rates for individuals who are diagnosed
4    with gender dysphoria as adolescents?
5        A.   Can you ask that one more time?
6        Q.   Are you aware of any study that analyzes
7    desistance rates for individuals who are diagnosed
8    with gender dysphoria as adolescents?
9        A.   I am not.
10       Q.   I'd like to go to your declaration to
11   page 11, paragraph 33.  And my question is
12   actually going to be about the part of the
13   paragraph that runs over on to page 12, so maybe
14   we'll flip to page 12.  And specifically about --
15   I'll call it subsection -- subparagraph D.
16           And there you refer to any other mental
17   health conditions -- I'm sorry.
18           And there you say "Any other mental
19   health conditions do not interfere with diagnostic
20   clarity."
21           Do you see that?
22       A.   Yes.
23       Q.   And what does that mean?
24       A.   So in some cases an individual might have
25   comorbid mental health diagnoses that could be
```

Page 109

Christine Brady, Ph.D. August 31, 2023

```
 1   impacting -- could be overlapping with gender or
 2   could just be interfering with our ability to
 3   fully diagnose gender dysphoria or for us to
 4   elucidate someone's -- that someone's, you know,
 5   decision-making ability is unclouded.  So, for
 6   example, you know, somebody who has
 7   obsessive-compulsive disorder, for example.
 8           So I've had patients where someone can
 9   hyper focus as a symptom of their OCD on, for
10   example, a particular part of the body.  And that
11   might, at first blush, look like a symptom of
12   gender dysphoria, but upon further evaluation and
13   investigation might be body dysmorphia, not
14   necessarily gender dysphoria, and because of the
15   OCD.  So in that case, the OCD is interfering with
16   the clarity of us being able to assess the gender.
17       Q.   Are there any other conditions like OCD
18   that would interfere with diagnostic clarity?
19       A.   There might be other sort of mental
20   health conditions.  Off the top of my head, like
21   someone who suffering from depression and is in a
22   depressive episode that is impacting their
23   abilities to, you know, really think clearly about
24   decision-making because the emotions are running
25   too high in that particular moment.
```

Page 110

Christine Brady, Ph.D. August 31, 2023

```
1              So it's not necessarily because they have
2     depression, but the depression symptoms are such a
3     level of severity that it's impacting their
4     ability to provide informed consent.
5         Q.   And just to clarify, not only provide
6     informed consent, but would also interfere with
7     the diagnosis; is that right?
8         A.   Potentially.
9         Q.   Right.  And you mentioned OCD.  Have you
10    had experience with other conditions that
11    potentially interfered with diagnostic clarity?
12              MS. NOWLIN-SOHL:  Object to form.
13              THE WITNESS:  Sometimes with other
14    diagnoses it just might take longer to do a
15    thorough assessment due to the complexity of the
16    psychosocial evaluation.
17              So, you know, for example, someone who
18    has multiple diagnoses simultaneously, that's
19    going to take us longer to be able to get the full
20    history and understand how and if those things are
21    related to each other.
22              So potentially it could be any diagnosis,
23    but I'm just listing some of the ones that are
24    more common.
25         Q.   (BY MR. RAMER)  And so is it possible for
```

Page 111

Christine Brady, Ph.D. August 31, 2023

```
 1    an individual who is diagnosed with gender
 2    dysphoria to have a co-occurring mental health
 3    disorder that is not related to the gender
 4    dysphoria?
 5          A.   Yes.
 6          Q.   And what are some examples that you've
 7    had in your practice where an individual has been
 8    diagnosed with gender dysphoria but has a
 9    co-occurring mental health disorder that is not
10    related to the gender dysphoria?
11          A.   So it can still be the same diagnoses
12    that I've given as example.  So sometimes just
13    because someone has OCD doesn't necessarily mean
14    that the symptoms are related to gender, and they
15    could have two separate diagnoses.
16               Depression similarly, many of our
17    patients have gender dysphoria and depression.
18    Maybe there's some overlap between the two, but
19    sometimes they are distinct also.
20          Q.   And what about individuals diagnosed with
21    gender dysphoria and ADHD?
22               MS. NOWLIN-SOHL:  Object to form.
23               THE WITNESS:  We do have individuals who
24    have both of those diagnoses.
25          Q.   (BY MR. RAMER)  And do you have
```

Page 112

1    individuals where the ADHD is not related to the
2    gender dysphoria?
3         A.   I've never actually had a case where the
4    two were related.
5         Q.   That makes sense.
6              And then what about with respect to
7    autism spectrum disorder?  Have you ever had
8    patients that have been diagnosed with gender
9    dysphoria and also been diagnosed with autism
10   spectrum disorder?
11        A.   Yes.
12        Q.   And in those instances, do you have
13   patients where the autism -- and I guess I'll try
14   again based on the last one.
15             Is autism spectrum disorder ever related
16   to gender dysphoria?
17             MS. NOWLIN-SOHL:  Object to form.
18             THE WITNESS:  It can be related.  I'll
19   just -- yes, it can be related.
20        Q.   (BY MR. RAMER)  How so?
21        A.   So this is more common on our prepubertal
22   kids.  But I've had patients who similar to the
23   OCD maybe misattribute a set of rules.
24             So, for example, I had one patient who
25   was designated male and he expressed really loving

                                        Page 113

(115 of 288), Page 115 of 288
Case 1:23-cv-00269-BLW   Document 56-2   Filed 09/05/23   Page 114 of 267
Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 115 of 288
Christine Brady, Ph.D. August 31, 2023

1    the color pink.  And his cognitive rigidity sort
2    of led him to, well, if I like pink, then I must
3    be a girl.

4              And so he started to question that, and
5    with further psychotherapy and exploration was
6    able to determine that, well, anybody can like
7    pink.  That's not necessarily -- doesn't
8    necessarily lead to having a female identity.

9         Q.   And so how do you determine if a
10   co-occurring mental health condition is related to
11   gender dysphoria?

12        A.   So again to that kind of clinical
13   semi-structure sort of interview process, so
14   asking questions, getting a response, and delving
15   deeper and sort of probing about, you know, are
16   these things related, challenging some of the
17   thoughts that are presented.

18             So in this case with this young person
19   with ASD, sort of challenging, well, you know, can
20   boys like pink?  Like, is that a possibility?  Is
21   that something that, you know, you could integrate
22   into your rule-based thinking?

23             So it's kind of just that back and forth
24   of providing information, sort of challenging a
25   thought and understanding if there's flexibility

                                          Page 114

(116 of 288), Page 116 of 288
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 115 of 267
Christine Brady, Ph.D. August 31, 2023

```
 1   there or not.
 2        Q.   That process that you just described,
 3   would that fall within the umbrella of exploratory
 4   therapy, or am I misunderstanding?
 5        A.   It could be considered exploratory
 6   therapy or it could be considered just part of our
 7   assessment process.
 8        Q.   So same page of your expert declaration,
 9   same page, paragraph 36.  And in the third
10   sentence in the parenthetical you mention changing
11   pathopsychology.
12             Do you see that?
13        A.   Yes.
14        Q.   And could you just explain what that
15   means?
16        A.   Give me one moment to read the full
17   sentence.
18             Yeah, so an example being, you know,
19   maybe we could interchangeably use challenging or
20   complex psychopathology, so, you know, multiple
21   diagnoses.
22             It could also be, you know, challenging
23   psychopathology in terms of behaviorally
24   challenging.  It can be difficult to conduct
25   therapy or hold evaluations with people who have a
```

Page 115

Christine Brady, Ph.D. August 31, 2023

```
 1    lot of energy or behavioral problems, so that
 2    could be considered challenging psychopathology as
 3    well.
 4         Q.   And then in that same parenthetical, you
 5    refer to co-occurring neurodiversity.
 6              Do you see that?
 7         A.   Yes.
 8         Q.   And could you just explain what that is?
 9         A.   Could include ADHD or autism spectrum
10    disorder or other neurocognitive disorders.
11         Q.   Do you have any examples of others?  I'm
12    familiar with the first two you listed.  I'm just
13    curious if there are others.
14         A.   Like differences of learning, like
15    learning with dyslexia or...
16         Q.   And when you referred in this sentence to
17    further -- at the beginning of the sentence, you
18    refer to further assessment or testing.
19              Is that just what we were talking about
20    with respect to either exploratory therapy or the
21    psychosocial screening?  Or is there something
22    else you're referring to when you say "further
23    assessment or testing"?
24         A.   It could include those things.  It could
25    also include more extensive psychoeducational
```

Page 116

Christine Brady, Ph.D. August 31, 2023

1    testing.  So, for example, somebody who is
2    undiagnosed but we have a suspicion that there
3    might be neurodiversity or neurocognitive
4    disorder, we would want to know before proceeding
5    so we could refer the family for evaluation.
6         Q.   And in that -- I'll just read the
7    sentence and then ask if I read it correctly, and
8    then I'll have kind of a question about it.
9              It says "Further assessment or testing
10   may be needed to fully understand more complex
11   presentations, e.g., challenging psychopathology,
12   co-occurring neurodiversity prior to initiating
13   medical intervention."
14             Did I read that right?
15        A.   Yes.
16        Q.   And why do you need to fully understand
17   those situations prior to initiating medical
18   intervention?
19        A.   So one of the SOC-8's criteria for
20   blockers, hormones, and surgery is that an
21   individual is able to understand the intervention
22   fully and provide informed consent.
23             And so typically we're referring for
24   these things if there is concern that that
25   criteria is not being reached so that we can

                                    Page 117

```
 1   understand better why.
 2        Q.   And have you had patients who were
 3   diagnosed with gender dysphoria but were not
 4   eligible for medical intervention due to a
 5   co-occurring mental health issue?
 6        A.   Yes.
 7        Q.   And what happens in that situation?
 8        A.   Typically we're providing referrals or
 9   plugging them into other resources that could
10   support, you know, getting more information about
11   what's going on diagnostically or to better manage
12   any co-occurring mental health problems that are
13   interfering with our ability to move forward, and
14   then we would sort of check in maybe six months
15   later after those things had been done to see
16   where we are and reevaluate.
17        Q.   And I guess how do you ultimately make
18   the judgment when somebody does have a
19   co-occurring mental health issue that they are
20   eligible for medical intervention?
21             MS. NOWLIN-SOHL:   Object to form.
22             THE WITNESS:   So again, through these
23   series of conversations and assessment and also
24   gaining collateral information from other people
25   and the young person's life, we're sort of able to
```

Page 118

Christine Brady, Ph.D. August 31, 2023

```
1    put that together and make a determination about,
2    yes, this person understands.  This
3    decision-making is coming from a thoughtful and
4    logical place rather than an emotional, impulsive
5    one.
6              And then we kind of present whether or
7    not they meet eligibility criteria.  But then
8    ultimately it's up to families and youth to make
9    the decision about how they want to move forward.
10       Q.   (BY MR. RAMER)  Are you familiar with the
11   term "borderline personality disorder"?
12       A.   Yes.
13       Q.   And is that sometimes referred to as
14   "BPD" as a shorthand?
15       A.   Yes.
16       Q.   Have you ever diagnosed or treated BPD?
17       A.   Yes.
18       Q.   Have you ever had a patient who was
19   diagnosed with both BPD and gender dysphoria?
20       A.   Yes.
21       Q.   And did you deem that patient eligible
22   for medical intervention?
23       A.   So BPD can only be diagnosed in patients
24   who are 18 and older, so it's only been in a
25   handful of cases because most of my patients are
```

Page 119

Christine Brady, Ph.D. August 31, 2023

1    under the age of 18 that that has occurred.

2            And in those cases, I'm rarely the one

3    that has given that diagnosis.  Typically they've

4    been with a therapist before who has given them

5    that diagnosis.  But, yes, I have had some

6    patients who have had both of those diagnoses.

7       Q.   Why is BPD, why is it a cutoff of 18

8    years?

9       A.   So all of the personality disorders in

10   DSM-5 are 18 and above.  Personality disorders are

11   an ingrained sort of pattern of behaviors, and so

12   the mental health community has reserved labeling

13   people with those diagnoses until they reach

14   adulthood because there's a lot of development

15   that's still occurring.

16           And so if it's with a younger person,

17   typically we'll say they have borderline

18   personality traits, but not borderline personality

19   disorder.

20      Q.   Do you see any similarity there between

21   borderline personality disorder and gender

22   dysphoria?

23           MS. NOWLIN-SOHL:  Objection to form.

24           THE WITNESS:  Similarities in what ways?

25      Q.   (BY MR. RAMER)  Well, did you say that

Page 120

Christine Brady, Ph.D. August 31, 2023

```
 1    the mental health community has decided that a BPD
 2    diagnosis should wait until the individual is over
 3    18 because more development will take place?
 4            MS. NOWLIN-SOHL:  Objection to form;
 5    mischaracterizes prior testimony.
 6            THE WITNESS:  So more that it's an
 7    ingrained set of behaviors and a pattern of
 8    behavior.  So a lot of it is very externalized.
 9    It's not necessarily like an internal sense of
10    self as a BPD person that that person is born with
11    that.  It is something that develops over time,
12    that pattern of behavior.
13        Q.   (BY MR. RAMER)  What's the behavior at
14    issue with BPD?
15        A.    What are the diagnostic criteria for BPD?
16        Q.    Or just generally.  I'm not trying to
17    quiz you, but when you mention the pattern of
18    behavior, broadly speaking, what does that mean?
19        A.    It's kind of a description of a category
20    of behaviors that people exhibit in interpersonal
21    interactions that are maladaptive.  So, you know,
22    trying to get validation in unhealthy ways is an
23    example.
24        Q.    Does BPD also involve some form of
25    identity disturbance?
```

Page 121

Christine Brady, Ph.D. August 31, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form.
 2              THE WITNESS:  No, not necessarily.
 3         Q.   MR. RAMER)  But is that -- I guess I'll
 4    just --
 5              MR. RAMER:  All right.  This will take a
 6    few minutes while the pigeon flies the exhibit.
 7    In my defense, it is one page, Li, so this one
 8    shouldn't be as long as the others.
 9         Q.   (BY MR. RAMER)  I guess while we're
10    waiting I can ask you a question, which is what is
11    the treatment for BPD?
12         A.   So the most evidence-based therapy for
13    borderline personality disorder is something
14    called DBT, which is dialectical behavioral
15    therapy.
16         Q.   And what does that entail?
17         A.   So it's a therapy can be done in a lot of
18    different formats.  Sometimes it's individual;
19    sometimes it's groups; sometimes it's both.  But
20    it entails learning a particular set of emotion
21    regulation and de-escalation, coping skills.  And
22    then has some specific cognitive restructuring
23    tasks that are learned over the course of therapy.
24              MS. NOWLIN-SOHL:  We have the exhibit
25    whenever you're ready, John.
```

Page 122

Christine Brady, Ph.D. August 31, 2023

1          MR. RAMER:  Okay.  And this is, I think,
2    Brady Exhibit 4.  And I'll just represent this is
3    from the DSM-5, and it's the diagnostic criteria
4    for BPD.
5          (Deposition Exhibit No. 4 was marked.)
6       Q.   (BY MR. RAMER)  And I guess my question
7    is about the third one down.
8          Now, I understand that the diagnosis
9    looks like you need -- it's five or more.  And so
10   you could theoretically have one without this
11   third criterion, but could you just explain what
12   that criterion is?
13      A.   Sure.  So typically this presents itself
14   as, you know, people who are defining their
15   self-worth based on how others view them.  And so
16   there isn't a strong sense of internal kind of
17   confidence.  And so they value themselves based on
18   how much other people value them.
19          So sometimes we consider that to be
20   identity diffusion because self-identity is not
21   very strong.
22      Q.   Are there other forms of identity
23   disturbance other than identity diffusion?
24      A.   I'm not a borderline personality disorder
25   expert.  I received some training in my graduate

                                        Page 123

Christine Brady, Ph.D. August 31, 2023

1    training, but it's not my area of expertise, so
2    I'm not sure.
3         Q.   That's fair.  Do you know if the
4    treatment for BPD involves any form of medical
5    intervention?
6         A.   Sometimes medications are involved,
7    psychotropic medications.
8         Q.   And that would be psychiatric medication;
9    is that right?
10        A.   Yes.
11        Q.   And I know you just said you're not a BPD
12   expert.  If you don't know the answers to these,
13   that's fine.
14             Just out of curiosity, do you know if BPD
15   is more common in the population than gender
16   dysphoria?
17        A.   I do not.
18        Q.   Do you know if BPD is more common in
19   natal females or females assigned at birth?
20             MS. NOWLIN-SOHL:  Object to form.
21             THE WITNESS:  I believe that the ratio
22   of, like, epidemiologically, I think it is more
23   commonly diagnosed in assigned females.
24        Q.   (BY MR. RAMER)  Have you ever considered
25   the possibility that an individual's identity

Page 124

Christine Brady, Ph.D. August 31, 2023

1    disturbance for BPD could manifest itself as a

2    disturbance in gender identity?

3             MS. NOWLIN-SOHL:  Object to form.

4             THE WITNESS:  Could you repeat that?

5        Q.   (BY MR. RAMER)  Have you ever considered

6    the possibility that an individual's identity

7    disturbance for BPD could be experienced as a

8    disturbance in gender identity?

9             MS. NOWLIN-SOHL:  Same objection.

10            THE WITNESS:  Through our evaluation

11   process, we are exploring all aspects of identity,

12   not just gender.  And it is important that

13   someone's gender identity is stable.  I wouldn't

14   necessarily be more worried with someone who has

15   also co-occurring BPD.  I would do the same

16   evaluation as I do with every patient.

17       Q.   (BY MR. RAMER)  When you say it's

18   important that gender identity is stable, what do

19   you mean by that?

20       A.   You know, that it is persistent, like,

21   has been present and for a good amount of time.

22   DSM says six months or more, but more is always

23   better.

24            And that there haven't been any major

25   fluctuations in that identity, and that it -- you

                                        Page 125

Christine Brady, Ph.D. August 31, 2023

1    know, how it evolved is also important in

2    understanding how they came to understand that

3    aspect of themselves.

4          And, you know, for example, like, if I

5    heard that a patient identified as male but then

6    six months later, you know, or four months later

7    identified as like goth instead -- I don't know.

8    I'm just picking like a random personality.  But,

9    you know, goes from gender to something else

10   that's not within gender, that would be something

11   worth exploring further.

12       Q.   How can someone who is gender-fluid have

13   a gender identity that is stable?

14       A.   So again, the gender identity could be

15   stable, but it's the expression that is fluid.

16          But for the ones whose identity does

17   fluctuate, they often are fluctuating within a

18   genderqueer, gender-diverse spectrum.  So I've not

19   had a gender-fluid person who one day identifies

20   as cis female and then a week later is identifying

21   as trans male.

22       Q.   In your declaration, page 12 -- I think

23   we're already there -- paragraph 34, the second

24   sentence.  I'll just read it and ask if I read it

25   correctly.

Page 126

Christine Brady, Ph.D. August 31, 2023

```
 1              It says "Assessment procedures can vary
 2    based on the practice setting, discipline of the
 3    provider conducting the assessment, presence of
 4    neurodiversity or other individual patient
 5    considerations/needs."
 6              Did I read that correctly?
 7        A.   Yes.
 8        Q.   And is there any requirement in the SOC-8
 9    or the Endocrine Society guidelines about how an
10    assessment must be conducted?
11        A.   In SOC-8 there's recommendations that it
12    be conducted by a qualified health professional.
13        Q.   Does it explain what that means, to be a
14    qualified health professional?
15        A.   It does define qualified health
16    professionals.
17        Q.   And you say in this sentence that
18    assessment procedures can vary based on the
19    discipline of the provider conducting the
20    assessment.
21              Do you see that?
22        A.   Yes.
23        Q.   And what does that mean?
24        A.   So they can -- the format with which this
25    information is obtained can look different based
```

Page 127

Christine Brady, Ph.D. August 31, 2023

```
 1    on these factors.
 2              So in terms of the discipline of the
 3    provider, you know, it might just be the setting
 4    in which this information is obtained.  It might
 5    be, you know -- in our clinic, our health
 6    providers, for example, can't -- can only bill for
 7    certain things.
 8              And so, you know, information, for
 9    example, like, can't be obtained through a phone
10    call.  It has to be a virtual meeting or an
11    in-person meeting.  And so -- I can bill for a
12    phone call, however.
13              So the format with which we obtain this
14    information, gather this information, might be
15    different just based on the discipline.
16        Q.   Oh, I'm sorry.  The word "discipline"
17    here is referring to like the --
18        A.   The letters that come after someone's
19    name.
20        Q.   Gotcha.  Okay.  That clarifies it for me.
21    Thank you.
22              Okay.  So in your declaration, let's go
23    to page 10, paragraph 29.  And first sentence,
24    I'll just read the whole thing and ask if I read
25    it correctly.
```

Page 128

Christine Brady, Ph.D. August 31, 2023

```
 1              "As stated above, these guidelines are
 2     widely accepted in the professional community.
 3     They have analyzed all available scientific
 4     research and are widely referenced and endorsed by
 5     all major U.S. medical and mental health
 6     associations."
 7              Did I read that correctly?
 8        A.    Yes.
 9        Q.    And what guidelines are you referring to
10     in this paragraph?
11        A.    The American Psychological Association
12     guidelines on gender-affirming care and the WPATH
13     SOC-8 and the Endo Society guidelines.
14        Q.    And what year were the Endocrine Society
15     guidelines published?
16        A.    2017.
17        Q.    And what year were the APA guidelines
18     published?
19        A.    I think it's 2015.
20        Q.    Looking at footnote 14 -- I think that's
21     right.  Yeah.
22              And so those guidelines did not analyze
23     any research in the last half-decade, correct?
24        A.    Yeah, so my understanding is that the
25     Endo Society and APA are working on that currently
```

Page 129

Christine Brady, Ph.D. August 31, 2023

1    to update.

2        Q.   Okay.  But just so -- it's not correct to

3    say that those guidelines have analyzed all

4    available scientific research, correct?

5            MS. NOWLIN-SOHL:  Object to form.

6            THE WITNESS:  They analyzed all available

7    research at the time of publication.

8        Q.   (BY MR. RAMER)  And when you say in the

9    first sentence of this paragraph that these

10   guidelines are widely accepted in the professional

11   community, do you mean the American professional

12   community exclusively?

13       A.   That's what I have the most knowledge of.

14   I'm not sure about how other countries -- if other

15   countries are using the same practices we are.

16       Q.   Is there a difference between clinical

17   guidelines and standards of care?

18           MS. NOWLIN-SOHL:  Object to form.  Object

19   to the extent that it calls for a legal

20   conclusion.

21           THE WITNESS:  I'm not sure.

22       Q.   (BY MR. RAMER)  Do you know whether the

23   American Psychological Association has ever made a

24   distinction between standards and guidelines?

25       A.   I don't know.

Page 130

Christine Brady, Ph.D. August 31, 2023

1     Q.   In your declaration on page 1,

2  paragraph 4, in the second sentence, you state

3  that the opinions in this declaration are based

4  on, among many other things, your knowledge of

5  peer-reviewed research relevant to the treatment

6  of gender dysphoria; is that right?

7     A.   Yes.

8     Q.   And what is the extent of that knowledge?

9          MS. NOWLIN-SOHL:  Object to form.

10          THE WITNESS:  Because my current position

11  is 100 percent in the gender clinic and devoted to

12  this population, a majority of my continuing

13  education and a majority of the journals that I

14  subscribe to and the list serves that I'm on are

15  all gender related.

16          So to the extent that I can, I try to

17  keep up-to-date on recent publications in this

18  area as it pertains to my work.

19     Q.   (BY MR. RAMER)  And how do you follow new

20  developments in the research?

21     A.   So again, a lot of the -- I have

22  memberships to things, so I'll get email alerts

23  when things are published.

24          I also have a Google Scholar filter that

25  alerts me every week about new publications with

                                        Page 131

```
 1    key words.
 2        Q.   And how do you determine what papers are
 3    reliable?
 4            MS. NOWLIN-SOHL:  Object to form.
 5            THE WITNESS:  So typically I'm, you know,
 6    being a critical consumer of the research, and so
 7    I'm making my own judgments based on the
 8    methodologies described in the papers, but also
 9    impact factors, which is kind of the reach that a
10    journal has, like how many people subscribe to it.
11    All of the things that I read are peer reviewed,
12    and so that process also ensures that quality is
13    being published.
14        Q.   (BY MR. RAMER)  And what are other impact
15    factors in addition to the number of subscribers?
16        A.   Yeah, I forget exactly all the variables
17    that go into an impact factor.  There's, like, a
18    formula that creates a number.  And a number of
19    subscribers is one variable that goes into that
20    number, but I'm not sure what the other variables
21    are.
22            MR. RAMER:  And, Li, have you received
23    Brady Exhibit 5?
24            MS. NOWLIN-SOHL:  I have not.
25        Q.   (BY MR. RAMER)  Doctor, have you ever
```

Page 132

Christine Brady, Ph.D. August 31, 2023

1    read a research publication that said there was a
2    lack of evidence to justify gender-affirming
3    medical interventions for minors?
4            MS. NOWLIN-SOHL:  Object to form.
5            THE WITNESS:  I would have to see the
6    article.  I don't know.
7        Q.   (BY MR. RAMER)  No, I'm just asking if
8    you've ever read one, ever.
9            MS. NOWLIN-SOHL:  Same objection.
10           THE WITNESS:  That says what?
11       Q.   (BY MR. RAMER)  I'll have to start from
12    the beginning.
13           Have you ever read a research publication
14    that said there was a lack of evidence to justify
15    gender-affirming medical interventions for minors?
16           MS. NOWLIN-SOHL:  Object to form.
17           THE WITNESS:  I -- off the top of my
18    head, I don't know.
19       Q.   (BY MR. RAMER)  Are you familiar with the
20    term "systematic review"?
21       A.   Yes.
22       Q.   And could you explain your understanding
23    of that term?
24       A.   So systematic reviews are combining --
25    looking at a particular line of inquiry and

                                        Page 133

Christine Brady, Ph.D. August 31, 2023

```
 1    combining all of the studies that look at that
 2    line of inquiry together to create more robust
 3    conclusions about the evidence for or against it.
 4              MS. NOWLIN-SOHL:  We have 5.
 5              MR. RAMER:  Okay.  We can pivot back to
 6    that right now if you don't mind pulling that up.
 7          (Deposition Exhibit No. 5 was marked.)
 8        Q.   (BY MR. RAMER)  And, Doctor, are these
 9    the APA guidelines you cite in your article?
10        A.   Yes.
11        Q.   I'm sorry, in your declaration.
12        A.   Yes.
13        Q.   And I'd like to go to page 833, which is
14    the second page, and in particular to the right
15    column below the bold distinction between
16    standards and guidelines.
17              And I'll just read -- no, because these
18    citations will mess it up.
19              So can you just read the first two
20    sentences of that paragraph and let me know when
21    you've finished reading that?
22        A.   Sure.  Okay.
23        Q.   Were you aware the APA has made an
24    important distinction between standards and
25    guidelines?
```

Page 134

Christine Brady, Ph.D. August 31, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form.
 2              THE WITNESS:  Reading this paragraph, I'm
 3      aware now.
 4         Q.   (BY MR. RAMER)  Were you aware before you
 5      read that paragraph?
 6         A.   No.
 7         Q.   Do you understand the distinction it's
 8      drawing in the second sentence?
 9         A.   My understanding of it and my
10      interpretation of it are that -- and there are
11      many ways to define standards, but that -- and I
12      might be wrong, but I think the only standards,
13      really, that APA has committed to are our ethical
14      principles in our code of conduct.
15              So even within other diagnoses, there
16      aren't necessarily standards of care because
17      there's a lot of individual autonomy when it comes
18      to the delivery of psychotherapy.
19         Q.   What does it mean when it says
20      "guidelines are aspirational"?
21              MS. NOWLIN-SOHL:  Object to form;
22      foundation.
23              THE WITNESS:  I can't -- I can guess.  I
24      don't know what the intent was because I wasn't on
25      the committee that wrote this.
```

Page 135

Christine Brady, Ph.D. August 31, 2023

```
 1          Q.   (BY MR. RAMER)  Yeah, and I guess I'm
 2     just asking as a psychologist, when you read this,
 3     what is your understanding?  I'm not asking what
 4     the authors meant.
 5               But as you read it, what is your
 6     understanding of the statement "guidelines are
 7     aspirational"?
 8          A.   I think these are -- these
 9     recommendations are kind of in an ideal world what
10     we would -- the kind of care we would be
11     delivering.
12          Q.   Is the distinction from standards that
13     you are not required to deliver care in accordance
14     with the guidelines?
15               MS. NOWLIN-SOHL:  Object to form.
16               THE WITNESS:  So as it goes on to say in
17     the paragraph, you know, it's recommended that we
18     use these guidelines in conjunction with our
19     ethical principles and code of conduct.  And there
20     are some things related to gender care that APA
21     has deemed to be unethical.
22          Q.   (BY MR. RAMER)  But those aren't -- okay.
23               All right.  We'll go back to systematic
24     reviews, where we were.
25               And have you ever conducted a systematic
```

Page 136

(138 of 288), Page 138 of 288
Case 1:23-cv-00269-BLW   Document 56-2   Filed 09/05/23   Page 137 of 267
Christine Brady, Ph.D. August 31, 2023

1   review?

2       A.   No.

3       Q.   Have you ever read a systematic review?

4       A.   About any topic?  Yes.

5       Q.   As you sit here today, are you able to

6   name any specific systematic review relating to

7   the treatment of gender dysphoria that you have

8   read?

9       A.   I have read summaries of systematic

10  reviews but not the systematic reviews themselves.

11      Q.   What summaries do you recall reading?

12      A.   So, for example, you know, the SOC-8 was

13  founded based on a systematic review of the

14  literature, so that's kind of the combination of

15  the results of that systematic review.  But I

16  didn't read in detail their methodology and

17  systematic review.

18          Endo Society, similarly.

19      Q.   Do you know what questions the systematic

20  review for the SOC-8 was investigating?

21          MS. NOWLIN-SOHL:  Object to form.

22          THE WITNESS:  I don't know specifically.

23      Q.   (BY MR. RAMER)  Do you know what

24  questions the systematic reviews for the Endocrine

25  Society guidelines were investigating?

Page 137

Christine Brady, Ph.D. August 31, 2023

```
 1          A.   No.
 2          Q.   Are you familiar with the term
 3     "evidence-based medicine"?
 4          A.   Yes.
 5          Q.   And can you explain your understanding of
 6     that term for me?
 7          A.   So evidence-based medicine, to my
 8     understanding, is when something has acquired
 9     enough evidence to support doing that
10     intervention.
11          Q.   I'm sorry.  Can you say that again?
12          A.   Sure.  So when enough evidence has been
13     amassed to support doing an intervention or in
14     support of an intervention.
15          Q.   Have you taken any particular courses on
16     evidence-based medicine?
17          A.   So in my field, there are evidence-based
18     therapies.  And so not necessarily medicine, but I
19     have training in evidence-based therapies.
20          Q.   So is the training in the therapy itself?
21     Or is the training in the theoretical principles
22     of evidence-based medicine?
23               MS. NOWLIN-SOHL:  Object to form.
24               THE WITNESS:  So in my training, I've
25     received -- I took courses on research methods and
```

Page 138

Christine Brady, Ph.D. August 31, 2023

1    statistics and how to conduct scholarly work.

2              So in my field, there's a lot of

3    evidence -- emphasis placed on evidence-based

4    therapies.  And so, you know, being a data

5    scientist and, you know, a Ph.D., that was part of

6    my training is how to conduct that.

7          Q.   (BY MR. RAMER)  Are you familiar with the

8    term "observational study"?

9          A.   Yes.  In the context of my world, yes.

10         Q.   Yeah, right.  What do you understand that

11   term to mean?

12         A.   So typically in mental health, it's --

13   the most readily available example that comes to

14   mind is, like, in an educational setting.

15             So at a school, for example, they might

16   go in and observe the behavior of students and

17   code that data and then use that as their data.

18   So rather than asking the students specifically

19   things they just observe and then code that data.

20         Q.   Were some of your ADHD publications

21   observational studies?

22         A.   No.

23         Q.   Are you familiar with the term

24   "randomized controlled trial"?

25         A.   Yes.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Christine Brady, Ph.D. August 31, 2023

1    Q.   And what do you understand that term to
2    mean?
3    A.   So it's a type of research wherein
4    participants are randomly assigned to different
5    conditions within the experiment.
6         And so they're randomly assigned, which
7    is the random part.
8         And then it's controlled because they
9    control for as many variables as they can to get
10   clean outcomes and be able to interpret the data.
11   Q.   With respect to study design, is evidence
12   from a randomized control trial more reliable than
13   evidence from an observational study?
14        MS. NOWLIN-SOHL:  Object to form;
15   foundation.
16        THE WITNESS:  It is considered to be the
17   most rigorous type of study.
18   Q.   (BY MR. RAMER)  Are you familiar with the
19   term "GRADE methodology"?
20   A.   No.
21   Q.   In your declaration, going to page 14,
22   paragraph 39, and in the third sentence, I'll read
23   it and ask if I read it correctly.
24        You say "Studies have demonstrated
25   improvements in mental health following

Page 140

Christine Brady, Ph.D. August 31, 2023

1    gender-affirming medical interventions."

2          Did I read that correctly?

3      A.   Yes.

4      Q.   And what do you mean when you say

5    "studies have demonstrated improvements following

6    gender-affirming medical interventions"?

7      A.   So through various statistical methods,

8    they have shown to correlate the gender-affirming

9    medical intervention with improvements in mental

10   health.

11     Q.   In your opinion, have you concluded that

12   gender-affirming medical care causes improvements

13   in mental health?

14     A.   The research shows that.  And clinically

15   that is what I have seen, so yes.

16     Q.   The research shows causation?

17     A.   Not causation, but the statistical data

18   that is presented plus my clinical experience

19   leads me to say yes.

20     Q.   So the research did not show causation,

21   but when you personally combine the research with

22   your clinical experience, you have concluded that

23   gender-affirming medical care causes improvements

24   in mental health; is that right?

25          MS. NOWLIN-SOHL:  Object to form.

                                    Page 141

Christine Brady, Ph.D. August 31, 2023

1          THE WITNESS:  I believe that it leads to

2    improvements in mental health, yes.

3          Q.   (BY MR. RAMER)  I asked the question with

4    the verb "cause" for a reason.  And I think in

5    your answer you switched to "lead."

6          And I'm just trying to -- you know, I

7    think in this context the word "cause" -- just to

8    be clear, have you concluded that gender-affirming

9    medical care causes improvements in mental health?

10         A.   And I can share why I'm avoiding the word

11   "cause" in this case.

12         So for me, causation is specifically a

13   statistical term that is very difficult, even in

14   our randomized control trials, to prove because

15   there are so many other variables that account for

16   change.

17         And so to the best of their scientific

18   ability, I believe these studies to be robust but

19   aren't statistically showing causation.  And so

20   that's why I'm saying "leads to."

21         Q.   So just to clarify, you are declining to

22   say that gender-affirming medical care causes

23   improvements in mental health; is that right?

24         A.   From a statistical perspective, yes.

25         Q.   As opposed to what's a non-statistical

Page 142

Christine Brady, Ph.D. August 31, 2023

1    perspective?

2              MS. NOWLIN-SOHL:  Object to form.

3              THE WITNESS:  So -- which is why I'm

4    using "clinically" also.  Clinically I have seen A

5    to B and B to C, and, you know, I've not conducted

6    this research myself to be able to show that

7    statistically.  But clinically I do see that it is

8    directly linked to gender-affirming medical care

9    that I'm seeing these improvements.

10        Q.   (BY MR. RAMER)  Back on your declaration,

11   on this page, you list a number of articles in

12   footnote 16.

13             Are these articles the basis for your

14   conclusion that studies have demonstrated

15   improvements following gender-affirming medical

16   care?

17        A.   They are samples of those studies, yes.

18        Q.   There are other articles?

19        A.   Yes.

20        Q.   Do you cite them in your declaration?

21        A.   No.

22        Q.   Is there a reason you didn't?

23        A.   I just felt like these were the best

24   representation, and they summarized the previous

25   studies within them as well.

                                        Page 143

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.    Okay.  So now are these the best articles
 2    in footnote 16?
 3            MS. NOWLIN-SOHL:  Object to form.
 4            THE WITNESS:  I'm not sure I'm qualified
 5    to say if they're the best or not, but they are
 6    good representations of these relationships.
 7        Q.    (BY MR. RAMER)  Okay.  So are there other
 8    articles that you're not -- I'm sorry.  I'm going
 9    to start again.
10            Are there other articles that you are
11    relying on for the basis of your expert opinion
12    that you've not cited in your declaration?
13        A.    These are the ones I'm most familiar
14    with.  And again, they include a review of the
15    other articles that I would have maybe included,
16    but these are the ones that I'm most familiar
17    with.
18        Q.    Okay.  So the universe of articles
19    includes what you've cited here and then what is
20    cited within these articles; is that fair?
21        A.    Yes.
22        Q.    Okay.  And you cite two articles by
23    de Vries here.
24            Do you see that?
25        A.    Yes.
```

Page 144

Christine Brady, Ph.D. August 31, 2023

```
1          Q.    Do you consider de Vries an expert?

2              MS. NOWLIN-SOHL:  Object to form.

3              THE WITNESS:  I don't know.  I don't know

4     de Vries personally.

5          Q.    (BY MR. RAMER)  Yeah.  Fair.  Do you know

6     what country the de Vries studies come out of?

7              MS. NOWLIN-SOHL:  Object to form.

8              THE WITNESS:  I would have to look at the

9     article.  I'm assuming it says in there.

10         Q.    (BY MR. RAMER)  If the studies involved

11    participants from the Netherlands, given our

12    discussion earlier today about your preference for

13    studies from the United States, does that mean you

14    deem the de Vries studies less reliable?

15             MS. NOWLIN-SOHL:  Objection to form;

16    mischaracterizes prior testimony.

17             THE WITNESS:  I don't necessarily -- I

18    don't always consider non-U.S. studies to be of

19    lower quality.  It's just if we have similarly

20    robust studies that are about kids in the United

21    States, those might be preferable over other

22    studies.  But they can be included in the wealth

23    and averaging and aggregation of data.

24         Q.    (BY MR. RAMER)  Do you have any knowledge

25    of systematic reviews regarding the treatment for
```

Page 145

Christine Brady, Ph.D. August 31, 2023

```
 1   gender dysphoria that have been conducted by
 2   European health authorities?
 3            MS. NOWLIN-SOHL:  Object to form.
 4            THE WITNESS:  I don't believe so.
 5       Q.   (BY MR. RAMER)  Have you ever heard of
 6   the Cass report?
 7       A.   No.
 8       Q.   Okay.  Let's go back to your declaration,
 9   back to footnote 16.
10            The second article you cite there is
11   by -- well, the lead author is Amy Green, correct?
12       A.   Yes.
13       Q.   Do you recall where the authors of that
14   article obtained the data they used?
15       A.   I would have to go back to the article to
16   confirm that.
17       Q.   Do you recall whether any of the articles
18   in footnote 16 isolated medical interventions from
19   psychotherapy when recording their results?
20            MS. NOWLIN-SOHL:  Object to form.
21            THE WITNESS:  Off the top of my head, I
22   cannot recall.  They might have controlled for
23   other -- you know, if they were receiving therapy
24   and their analyses, but I would have to check.
25       Q.   (BY MR. RAMER)  But as you sit here, you
```

Page 146

(148 of 288), Page 148 of 288
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 147 of 267
Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 148 of 288

Christine Brady, Ph.D. August 31, 2023

```
1    don't know the answer to that question?
2         A.   Correct.
3         Q.   Do you have any knowledge regarding the
4    neurological effects of pubertal suppression in
5    adolescents?
6         A.   Can you repeat that again?
7         Q.   Do you have any knowledge regarding the
8    neurological effects of pubertal suppression in
9    adolescents?
10        A.   My understanding is that -- I'm not aware
11   of data, but I'm aware of kind of like theoretical
12   ideas regarding if there's a relationship between
13   those two things.
14        Q.   What kind of theoretical ideas are you
15   aware of?
16        A.   So -- and again, I'm not a medical
17   expert, so usually I'm deferring to my medical
18   team on these kinds of things, but that there is
19   kind of two time points in which there's a lot of
20   neuronal development, one being in very early
21   childhood; the second being in adolescence, and
22   that potentially one variable that triggers that
23   second neuronal development in adolescence is the
24   presence of sex hormones with puberty.
25        Q.   And what do you know about -- I guess are
```

Page 147

1    neurological effects of pubertal suppression

2    beyond the scope of your expertise?

3         A.    Yes.

4         Q.    Okay.  Are you aware of any study

5    researching the effect of puberty blockers on

6    neurodevelopment in adolescents with neurodiverse

7    characteristics?

8         A.    I am not aware.

9         Q.    Does that concern you?

10             MS. NOWLIN-SOHL:  Object to form.

11             THE WITNESS:  Could you repeat the topic

12   again one more time?

13        Q.    (BY MR. RAMER)  My previous question was

14   are you aware of any study researching the effect

15   of puberty blockers on neurodevelopment in

16   adolescents with neurodiverse characteristics?

17             And then I asked -- and then you said no.

18             And then I asked does that concern you?

19             MS. NOWLIN-SOHL:  Same objection.

20             THE WITNESS:  Not necessarily.  I --

21   that's a very niche subgroup, and -- yeah.  That

22   would be a very small group of our patients, so

23   that doesn't necessarily concern me that that

24   inquiry has not been done.

25        Q.    (BY MR. RAMER)  Adolescents with

Page 148

(150 of 288), Page 150 of 288
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 149 of 267
Base: 24-142, 01/26/2024, DktEntry: 23.3, Page 150 of 288

Christine Brady, Ph.D. August 31, 2023

1    neurodiverse characteristics are a niche subgroup?
2         A.   Those who have done puberty blockade and
3    also have ASD and are now adolescents.
4         Q.   I guess what makes it -- I guess how many
5    of your patients do you think are neurodiverse?
6         A.   Very ballpark estimate, maybe 20 percent.
7         Q.   And then how many of those would receive
8    pubertal suppression?
9              MS. NOWLIN-SOHL:  Object to form.
10             THE WITNESS:  So the age makeup of our
11   clinic is probably -- again, this is a guess, but
12   would probably be 30 percent are Tanner II-III and
13   below.
14        Q.   (BY MR. RAMER)  So the vast majority -- I
15   think I understand.
16             So you're saying the vast majority of the
17   patients at your clinic are past the stage where
18   they would have their puberty suppressed; is that
19   right?
20        A.   Yes.
21        Q.   Okay.
22             MR. RAMER:  I guess we've been going for
23   about an hour.  Do you want to take five or ten
24   minutes?
25             MS. NOWLIN-SOHL:  Yeah.  I think this

                                        Page 149

```
 1    could be a good five-minute break.
 2            MR. RAMER:  Okay.  Let's do that.
 3            THE VIDEOGRAPHER:  Okay.  So the time is
 4    4:17 p.m. Mountain time, and we are off the
 5    record.
 6            (Break taken from 4:17 p.m. to 4:23 p.m.)
 7            THE VIDEOGRAPHER:  All right.  So we are
 8    recording.  The time is 4:23 p.m. Mountain time,
 9    and we are back on the record.
10        Q.   (BY MR. RAMER)  Dr. Brady, I'd like to go
11    in your declaration to page 11, paragraph 32, and
12    specifically the second to last sentence.  And
13    I'll read it and ask if I read it correctly.
14            It says "Pausing puberty with blockers
15    can help prevent the distress associated with
16    physical changes inconsistent with an adolescent's
17    gender identity and also provide the adolescent
18    more time to understand their gender identity
19    before considering less-reversible treatments."
20            Did I read that correctly?
21        A.   Yes.
22        Q.   What do you mean by "less-reversible"?
23        A.   So other medical interventions such as
24    hormone therapies have permanent effects and
25    reversible effects.
```

Christine Brady, Ph.D. August 31, 2023

```
 1          Q.    Do you think puberty blockers are
 2     reversible?
 3          A.    Yes.
 4          Q.    And what do you mean by that?
 5          A.    So for patients who choose to come off
 6     the blocker, stop the blockers, puberty --
 7     endogenous puberty will resume as normal.
 8          Q.    Do you think there could be -- in setting
 9     aside that endogenous puberty resumes, do you
10     think there could be other effects from pubertal
11     suppression?
12              MS. NOWLIN-SOHL:  Object to form.
13              THE WITNESS:  There's, to my knowledge,
14     no research that indicates long-term effects from
15     puberty blockade.
16          Q.    (BY MR. RAMER)  Is there any research
17     that suggests there are not long-term effects from
18     puberty blockade?
19          A.    So the majority of research in this area
20     has been done with precocious puberty, not
21     necessarily gender.
22              In precocious puberty, blockade is
23     sometimes started at very younger, much younger
24     than we would do in gender.  So sometimes 7 or
25     earlier depending on what's going on pubertally
```

<div align="right">Page 151</div>

 1    for that child.
 2              So these are youth who are on blockade
 3    for much longer than we would do or recommend for
 4    our patients in gender.  And there are studies
 5    looking at there -- that there are no long-term
 6    consequences of puberty blockade for those youth.
 7         Q.   But individuals who receive puberty
 8    blockers for central precocious puberty eventually
 9    go through their endogenous puberty, correct?
10         A.   Some do.
11         Q.   Who does not?
12         A.   If they're gender-diverse, they might
13    not.
14         Q.   Fair.  And earlier we were discussing
15    potentially neurological effects from pubertal
16    suppression.
17              And are you able to say based on your
18    knowledge of neurological effects from pubertal
19    suppression that puberty blockers are reversible?
20              MS. NOWLIN-SOHL:  Object to form;
21    foundation.
22              THE WITNESS:  In my clinical experience,
23    I've not had patients who are on blockers develop
24    academic struggles or show cognitive impairment.
25              I know of several studies that are

                                        Page 152

Christine Brady, Ph.D. August 31, 2023

```
 1    currently being conducted that are looking at that
 2    question specifically.  I don't know of any that
 3    have already been published.
 4         Q.   (BY MR. RAMER)  Don't you lose contact
 5    with most of your patients by the time they're age
 6    22?
 7              MS. NOWLIN-SOHL:  Object to form.
 8              THE WITNESS:  It is common when patients
 9    transfer to other clinics that we will not hear
10    from them.
11         Q.   (BY MR. RAMER)  And so in other words,
12    you wouldn't know whether they were suffering any
13    sort of long-term effects after that point, right?
14              MS. NOWLIN-SOHL:  Object to form;
15    argumentative.
16              THE WITNESS:  Clinically, many of my
17    patients are able to succeed.  So many go to
18    college and many are accepted into college; many
19    are able to get jobs.
20              And so from that perspective, they are
21    not experiencing cognitive impairments at the
22    point of time of transfer.
23         Q.   (BY MR. RAMER)  Which is -- for most
24    patients is 22 years old; is that right?
25         A.   Yes.
```

Page 153

App.0921

Christine Brady, Ph.D. August 31, 2023

```
 1          Q.    And what are the permanent -- I guess
 2     backing up.
 3               I believe you said when you were
 4     referring to less-reversible treatments -- were
 5     you including cross-sex hormones?
 6          A.    Yes.
 7          Q.    And what are the permanent effects of
 8     cross-sex hormones?
 9          A.    For estrogen in particular -- I'll just
10     start with estrogen.  So for estrogen, permanent
11     effects would be the development of breast tissue.
12     So if someone stops their estrogen, that tissue
13     does not revert or recede.
14               Additionally, there might be impacts in
15     terms of fertility and sperm count on those who
16     undertake estrogen that is permanent.
17               For testosterone, any hair that has grown
18     is permanent.  Any hair that is lost is also
19     permanent.  Bottom growth or clitoral enlargement
20     is also permanent as well as voice changes.
21          Q.    In your declaration, same page,
22     paragraph 33, subpart C, you refer to emotional
23     and cognitive capacity.
24               Do you see that?
25          A.    Yes.
```

Page 154

Christine Brady, Ph.D. August 31, 2023

1      Q.   Could you explain what emotional capacity
2   is?
3      A.   So if someone sort of similar to the
4   example I provided earlier about someone who has
5   severe depression, if they are too emotional,
6   sometimes that can cloud their judgment and
7   ability to make informed decisions.
8      Q.   And can you explain what "cognitive
9   capacity" is?
10      A.   That's the ability to comprehend, the
11   ability to understand an informed consent model,
12   the medical intervention that they are wanting to
13   undertake, the risks, benefits, side effects, and
14   long-term consequences.
15      Q.   And how do you determine whether an
16   adolescent has the emotional and cognitive
17   capacity to provide informed consent?
18      A.   So over the course of many sessions, we
19   provide education regarding the risks, benefits,
20   side effects, consequences, and have thorough
21   discussions regarding all of that.  And then we
22   sort of assess if a young person is able to absorb
23   that information, process that information, repeat
24   back that information, and has given this a lot of
25   thought and consideration.

Page 155

App.0923

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.   Do different treatments require a
 2   different level of emotional and cognitive
 3   capacity?
 4             MS. NOWLIN-SOHL:  Object to form.
 5             THE WITNESS:  Not necessarily.  I think
 6   we want -- you know, I think it varies in terms of
 7   the complexity depending on what medicine or
 8   procedure they're undertaking.  So some things
 9   have more side effects than others or just more
10   complex in understanding the ins and outs of a
11   particular procedure.  So it might just be the
12   thing that we're talking about is more complex.
13        Q.   (BY MR. RAMER)  Would a treatment with
14   more serious side effects require a higher level
15   of capacity?
16             MS. NOWLIN-SOHL:  Object to form.
17             THE WITNESS:  Yeah.
18        Q.   (BY MR. RAMER)  Could an individual under
19   18 have the emotional and cognitive capacity to
20   consent to puberty blockers but not cross-sex
21   hormones?
22        A.   Yes, possibly.
23        Q.   And could an individual under 18 have the
24   emotional and cognitive capacity to consent to
25   cross-sex hormones but not surgery?
```

Page 156

Christine Brady, Ph.D. August 31, 2023

```
1          A.    Yes.
2          Q.    In your declaration page 15, paragraph
3     43, in the first sentence you're referring to
4     irreversible secondary sex characteristics.  And
5     you provide the example of chest development,
6     which I believe you previously mentioned as well.
7               And my question is why do you deem chest
8     development an irreversible secondary sex
9     characteristic?
10         A.    So in this particular section, I'm
11    discussing the changes that come with endogenous
12    puberty.  And so for someone assigned male, that
13    would be the deep voice example.  So once that
14    voice is deepened for that assigned male, that
15    cannot can reversed for them, even if they are
16    female-identifying and go on estrogen.
17              Similarly with a designated female who
18    goes through endogenous puberty, chest development
19    can't be reversed except for by surgery, but
20    that's a very significant intervention.  So if
21    they were to take testosterone, it can't be
22    reversed.
23         Q.    Okay.  And I think I see the point.  So
24    the point is if it requires surgery, then you
25    would view that as an irreversible secondary sex
```

Page 157

Christine Brady, Ph.D. August 31, 2023

1    characteristic; is that right?

2         A.    Some things can't be changed even with

3    surgery, but that can be one of the criteria.

4         Q.    Page 14, paragraph 40, I'll read the

5    first sentence and ask if I read it correctly.

6              You say, "Moreover, as I have seen in my

7    experience as a clinician, the use of hormone

8    blockers and cross-sex hormone therapy during

9    adolescence can prevent the need for future

10   medical treatment such as surgeries to remove or

11   alter secondary sex characteristics and allow for

12   more favorable future outcomes."

13             Did I read that correctly?

14        A.    Yes.

15        Q.    And are you saying here that the use of

16   puberty blockers or hormones can prevent the need

17   for surgeries later?

18        A.    So, for example, with a designated female

19   who has gone through puberty and developed chest

20   tissue, if they identify as masculine and have

21   gender dysphoria and want to treat that dysphoria

22   through surgery, that would be the only way to

23   treat that area of the body.

24             But if that same designated female was on

25   blockers, did not go through that endogenous

Page 158

Christine Brady, Ph.D. August 31, 2023

1   puberty or develop that chest tissue, they would

2   not necessarily need or seek that surgery later on

3   because they have a masculine chest.

4        Q.   Are there any examples other than the

5   example of chest development in the natal female

6   or assigned female at birth?

7        A.   So in a designated male, it could be as

8   simple as body hair.  So body hair is also

9   irreversible except for, you know, permanent laser

10  electrolysis and different methods like that.

11            So puberty blockade can also prevent body

12  hair from growing and prevent their voice from

13  deepening as well, which would prevent the need to

14  manage that with other procedures in the future.

15       Q.   And why does preventing the need for

16  future medical treatment such as surgeries allow

17  for more favorable future outcomes?

18       A.   Well, I think it minimizes the distress

19  that can be experienced from developing those

20  secondary sex characteristics of the assigned sex

21  from ever developing.  So then they would never

22  develop the distress that they would have

23  developing those parts.  But also, you know, we

24  want to minimize medical intervention as much as

25  we can.

Page 159

Christine Brady, Ph.D. August 31, 2023

```
 1              And, you know, that creates -- you know,
 2    any procedure, any medicine has risks associated
 3    with it.  And if we can prevent a child from
 4    receiving surgery, that seems like a good outcome.
 5         Q.   And can you just -- I think I understand
 6    the principle, but can you just explain why that
 7    is?
 8         A.   Which part?
 9         Q.   Sorry, why you would -- if you can avoid
10    medical intervention, why you would want to do
11    that.
12         A.   So, for example, if it's surgery, any
13    surgery has risks associated with it.  And if we
14    can avoid someone -- a young person getting
15    surgery, then we would want to do that.
16         Q.   And so basically if you have two
17    procedures that are equally effective but one is
18    more invasive, you would prefer the less invasive
19    procedure; is that right?
20              MS. NOWLIN-SOHL:  Object to form.
21              THE WITNESS:  I think we would weigh, you
22    know, the pros and cons and the risks and benefits
23    of all the potential interventions and want to
24    minimize risk and harm as much as we can.
25         Q.   (BY MR. RAMER)  Yeah, I guess this is
```

Page 160

(162 of 288), Page 162 of 288
Case 1:23-cv-00269-BLW   Document 56-2   Filed 09/05/23   Page 161 of 267
Base: 24-142, 01/26/2024, DktEntry: 23.3, Page 162 of 288

Christine Brady, Ph.D. August 31, 2023

1    more of a theoretical question because I doubt
2    there are situations where you have procedures
3    that are perfectly equally effective.
4           But the question is if you did have in
5    theory two procedures that were equally effective,
6    one was more invasive and one was less invasive,
7    you would prefer the less invasive procedure,
8    right?
9           MS. NOWLIN-SOHL:  Object to form; asked
10   and answered.
11          THE WITNESS:  Yes.
12       Q.   (BY MR. RAMER)  In your declaration,
13   going to page 13, paragraph 37 and the third
14   sentence -- I'll just read it and ask if I read it
15   correctly.
16          It says "As with all medicine,
17   information should be presented in a
18   developmentally appropriate manner to both the
19   adolescent and caregivers."
20          Did I read that correctly?
21       A.   Yes.
22       Q.   And why should care be given in a
23   developmentally appropriate manner?
24       A.   To ensure that youth are able to absorb
25   and comprehend to the best of their abilities.

Page 161

Christine Brady, Ph.D. August 31, 2023

1      Q.   And how do you discuss the risk
2  associated with fertility, for example, in a
3  developmentally appropriate manner with an
4  adolescent?
5      A.   So we spend a lot of time focusing on
6  that side effect in particular.  And we, again,
7  talk both with the adolescent and the caregivers
8  and present the information.
9           You know, first we sort of discuss how --
10  whatever the medical intervention is, how that
11  impacts fertility or what we know regarding the
12  impacts of fertility.
13          We discuss sort of hypothetically the
14  possibilities in the future of, you know, in
15  hypothetical scenario 1, you do not want kids.
16  And hypothetical scenario 2, you do want to have
17  kids.  And hypothetical scenario 3, you know, you
18  want to do a donor or adoption.  So we talk about
19  the different ways in which, you know, their life
20  might sort of play out.  And we talk about each of
21  those situations and how they may deal or cope
22  with choosing an intervention that impacts their
23  options later on.
24          We also counsel about the options that
25  are available in terms of fertility preservation

Page 162

App.0930

(164 of 288), Page 164 of 288
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 163 of 267
Base: 24-142, 01/26/2024, DktEntry: 23.3, Page 164 of 288

Christine Brady, Ph.D. August 31, 2023

```
 1    and the pros and cons of that and answer

 2    questions.

 3              And we also provide referrals to

 4    fertility specialists for further counseling if

 5    that's something families are interested in.

 6         Q.   What are the options for fertility

 7    preservation?

 8         A.   So for sperm preservation, the -- there's

 9    kind of three main methods.  So one is a hospital

10    visit in which we can obtain a sample.

11              Another is just going to a traditional

12    sperm bank and collecting a sample there to be

13    frozen.

14              There are also mail companies that will

15    mail you a kit to your home so that you can obtain

16    a sample and then send it back to the company for

17    analysis and freezing.

18              For egg preservation, we have -- patients

19    meet with our gyn team, and also we have a

20    fertility department at Stanford that also meets

21    with patients to talk about egg retrieval and

22    preservation.

23         Q.   I think I understand the retrieval part.

24    On the preservation part, you had mentioned, I

25    think with respect to sperm, freezing.
```

Page 163

Christine Brady, Ph.D. August 31, 2023

1      And is that the same with respect to

2  eggs?

3      A.   Both freezing, yes.

4      Q.   Both freezing.  Are there any other

5  options?

6      A.   Not at Stanford.

7      Q.   Why did you qualify that with "not at

8  Stanford"?

9      A.   Because I believe that there are some

10  places that can do ovary preservation and testicle

11  preservation, so removal of the whole organ and

12  freezing it.

13      Q.   Do you know anything beyond that, what

14  you just said?

15      A.   I don't.

16      Q.   Do you agree that an individual who

17  begins taking puberty blockers at Tanner Stage II

18  and proceeds without interruption to cross-sex

19  hormones will be infertile?

20           MS. NOWLIN-SOHL:  Object to form.

21           THE WITNESS:  So it just -- we haven't

22  had a case of youth who was blocked, went on to

23  cross-sex hormones, so never had endogenous

24  puberty who was then -- you know, stopped their

25  hormones or tried to get pregnant or have a child.

Page 164

Christine Brady, Ph.D. August 31, 2023

1    So that situation has just not come up, so I don't

2    think we're able to say.

3         Q.   (BY MR. RAMER)  Would that treatment

4    regimen of going from puberty blockers to

5    cross-sex hormones to going off hormones to go

6    through endogenous puberty be in accordance with

7    the SOC-8?

8              MS. NOWLIN-SOHL:  Object to form.

9              THE WITNESS:  I'm not sure I understand

10   "in accordance."  I'm not sure what you mean.

11        Q.   (BY MR. RAMER)  Do the guidelines discuss

12   how to properly do that procedure?

13             MS. NOWLIN-SOHL:  Object to form.

14             THE WITNESS:  How to do -- how to do

15   fertility preservation in someone who went on

16   blockade and then hormones and then stopped?

17        Q.   (BY MR. RAMER)  Yeah, I think that's my

18   question.

19             That process that you just described,

20   like, is that in the guidelines?

21             MS. NOWLIN-SOHL:  Same objection.

22             THE WITNESS:  I think it -- you know,

23   SOC-8, to the best of my knowledge, doesn't really

24   have specific scenarios.  So, you know, they have

25   dosing recommendations for someone who's on

                                      Page 165

Christine Brady, Ph.D. August 31, 2023

1  testosterone but not necessarily like, you know,

2  more globally somebody who did this and then this

3  and then this and what to do with that.  So I

4  don't believe so.

5      Q.   (BY MR. RAMER)  And is a natal male or a

6  male assigned at birth sexually mature by Tanner

7  Stage II?

8          MS. NOWLIN-SOHL:  Object to form.

9          THE WITNESS:  I think -- I'm not sure

10 because I'm not a medical expert, but I think it

11 depends.  Some might be; some may not be.

12     Q.   (BY MR. RAMER)  Of all your patients,

13 have you ever had a case of a natal male or

14 assigned male at birth who underwent prolonged

15 cross-sex hormone treatment and subsequently

16 conceived a child?

17         MS. NOWLIN-SOHL:  Object to form.

18         THE WITNESS:  I have had cases of both

19 designated males and designated females.  They

20 were not on blockers, but they did -- they were on

21 both estrogen and testosterone and then did

22 fertility preservation.  So stopped their hormone

23 treatments and did fertility preservation after

24 several years of being on hormone therapies and

25 then got back on their hormones after doing

Page 166

(168 of 288), Page 168 of 288
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 167 of 267
Christine Brady, Ph.D. August 31, 2023

1  preservation, and that was successful.
2     Q.   (BY MR. RAMER)  I guess which part of
3  that was successful?  The retrieval?
4     A.   So the eggs and the sperm were analyzed
5  for viability and were deemed to be viable, but in
6  those two cases they have not become children yet.
7     Q.   And how long were those individuals on
8  hormones?
9     A.   Testosterone, I believe, was about six
10 years.  And then the estrogen case was about four.
11    Q.   And is this documented in the literature,
12 or is this just knowledge in your clinic?
13    A.   This is just my, yeah, personal
14 experience.
15    Q.   And have you had any more other than
16 those?
17         MS. NOWLIN-SOHL:  Object to form.
18         THE WITNESS:  I've not had any other
19 patients express wanting to do fertility
20 preservation after starting the medical
21 interventions, just those two.
22    Q.   (BY MR. RAMER)  I guess what percentage
23 of your patients do pursue fertility preservation
24 options?
25         MS. NOWLIN-SOHL:  Object to form.

Page 167

Christine Brady, Ph.D. August 31, 2023

1          THE WITNESS:  So I would guess maybe
2    30 percent.
3          MR. RAMER:  And, Li, do you have -- let's
4    see.  I guess it's now Brady Exhibit 6?
5          MS. NOWLIN-SOHL:  Yes.
6          MR. RAMER:  Okay.
7          (Deposition Exhibit No. 6 was marked.)
8      Q.   (BY MR. RAMER)  Doctor, have you ever
9    seen this document before?
10     A.   No.
11     Q.   And you see it's a document by the
12   American Psychological Association?
13     A.   Yes.
14     Q.   And you're a member of the American
15   Psychological Association, correct?
16     A.   Yes.
17     Q.   And I'll just represent to you basically
18   by reading the top, which says it's an "APA
19   Resolution on the Imposition of Death as a Penalty
20   For Persons Aged 18 Through 20, Also Known As the
21   Late Adolescent Class."
22          And do you see it says it was published
23   in August of 2022?
24     A.   Yes.
25     Q.   And my questions for you are not about

                                      Page 168

Christine Brady, Ph.D. August 31, 2023

```
1    the substance of this or your views on the
2    imposition of the death penalty, but I have a
3    question about a couple of statements made in this
4    and just to get your reaction to the scientific
5    statements.
6              MS. NOWLIN-SOHL:  Could she just have a
7    second to look at it?
8              MR. RAMER:  Yeah, absolutely.
9              THE WITNESS:  Thanks.
10       Q.   (BY MR. RAMER)  And I can tell you where
11   the questions will be if you want to read those
12   paragraphs in particular, which is on page 2 on
13   the left column, the second "whereas" paragraph,
14   and then in the right column the first full
15   "whereas" paragraph.  But, please, take your time.
16       A.   Sorry, you said page 2, right-hand
17   column, "whereas," second paragraph.
18              And what was the second one?
19       Q.   So page 2, left column, second "whereas"
20   paragraph.
21       A.   Okay.
22       Q.   Same page, right column, first "whereas"
23   paragraph.
24       A.   Thank you.  Okay.
25       Q.   Okay.  So we'll start with the second --
```

Page 169

Christine Brady, Ph.D. August 31, 2023

```
 1    sorry.  We'll start with left column, second

 2    "whereas" paragraph.  And I'm first just going to

 3    read it without saying the citations.  So just

 4    effectively read the English, and then I'll ask if

 5    I read that correctly.

 6              It says "Whereas developmental

 7    neuroscience, including research on both the

 8    structure and function of brain development,

 9    establishes that significant maturation of the

10    brain continues through at least age 20,

11    especially in the key brain systems implicated in

12    a person's capacity to evaluate behavioral

13    options, make rational decisions about behavior,

14    meaningfully consider the consequences of acting

15    and not acting in a particular way, and to act

16    deliberately in stressful or highly charged

17    emotional environments, as well as continued

18    development of personality traits, e.g., emotional

19    stability and conscientiousness and what is

20    popularly known as 'character.'"

21              Did I read that correctly?

22         A.   Yes.

23         Q.   And were you aware that significant

24    maturation of the brain continues through at least

25    age 20?
```

Page 170

Christine Brady, Ph.D. August 31, 2023

```
 1          A.   Yes.
 2          Q.   Okay.  And now I'm just going to read --
 3     let me see if I have another question.
 4               Were you aware that this maturation
 5     occurs in the key brain systems implicated in a
 6     person's capacity to evaluate behavioral options,
 7     make rational decisions about behavior, and
 8     meaningfully consider the consequences of acting
 9     and not acting in a particular way?
10          A.   Yes.
11          Q.   Okay.  So same page, right column and the
12     first full "whereas" clause.  And again I'll read
13     it without the citations and ask if I read it
14     correctly.
15               It says "Whereas it is clear the brains
16     of 18- to 20-year-olds are continuing to develop
17     and key brain systems relate to higher-order
18     executive functions and self-control, such as
19     planning ahead, weighing consequences of behavior,
20     and emotional regulation.  Their brain development
21     cannot be distinguished reliably from that of
22     17-year-olds with regard to these key brain
23     systems."
24               Did I read that correctly?
25          A.   Yes.
```

Page 171

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.   And do you agree that up until an
 2   individual is 20, they are continuing to develop
 3   the key brain systems related to higher-order,
 4   executive functions, and self-control such as
 5   planning ahead, weighing consequences of behavior,
 6   and emotional regulation?
 7        A.   I believe that our brains are always
 8   developing.  I don't necessarily think that it
 9   stops at age 20.
10        Q.   Do you agree with the statements -- let
11   me restart.
12             Do you agree with the statements in this
13   paragraph?
14             MS. NOWLIN-SOHL:  Object to form; asked
15   and answered.
16             THE WITNESS:  Yes.
17        Q.   (BY MR. RAMER)  Do the statements in the
18   paragraphs we just read give you any concern about
19   whether individuals under 18 can provide informed
20   consent to a treatment that bears risk of
21   infertility?
22             MS. NOWLIN-SOHL:  Object to form.
23             THE WITNESS:  So just because a brain is
24   continuing to develop doesn't mean it's not able
25   to do these tasks.  It just means that they are
```

Page 172

Christine Brady, Ph.D. August 31, 2023

```
1    still maturing in order to reach their full
2    capacity to do these tests.  So it's not to say
3    they're not able to do them.
4        Q.   (BY MR. RAMER)  Do you have any concern
5    about whether adolescents as a category possess
6    the maturity to provide consent to treatment that
7    carries risks of infertility?
8             MS. NOWLIN-SOHL:  Object to form.
9             THE WITNESS:  So everybody develops at
10   their own pace, and some of within -- some are
11   precocious; some are delayed.  And so, you know,
12   each individual is approached as such, as an
13   individual.
14            And there are some who are not able to
15   meet the SOC-8 criteria of being able to have the
16   emotional or cognitive capacity to provide
17   informed consent, in which case we would not
18   proceed with any medical intervention for that
19   youth.
20            So it is embedded in our evaluation
21   process to assess for that.
22       Q.   (BY MR. RAMER)  And so you think that
23   there are adolescents who are able to -- excuse
24   me.
25            There are adolescents who are able to
```

Page 173

Christine Brady, Ph.D. August 31, 2023

```
1    provide informed consent to that treatment; is
2    that right?
3         A.   Yes.
4         Q.   I'd like to turn in your declaration to
5    page 12, paragraph 35, first sentence.  And you
6    refer in the parenthetical to "evolution of
7    identity."
8              Do you see that?
9         A.   Yes.
10        Q.   What do you mean by that?
11        A.   That's a term that I like to use, but
12   essentially it means how the identity developed
13   over time.  So when did it first come into their
14   awareness that there might be incongruence or
15   differences?
16             When did they finally find the words or
17   the labels at which they define themselves?
18             And what information did they obtain to
19   be able to use those words and that kind of thing?
20        Q.   Turning to page 7, paragraph 22, last
21   sentence on the page -- I'm sorry.  Yes, last
22   sentence on the page.  You use the word
23   "detransitioned" in quotation marks.
24             Do you see that?
25        A.   Yes.
```

Page 174

Christine Brady, Ph.D. August 31, 2023

1     Q.   What's your understanding of that word?

2     A.   My understanding of that word is that

3 there are many ways to define it, depending on the

4 study.  So typically it has been used to mean

5 people who stop their medical interventions,

6 gender-diverse people who stop their medical

7 interventions.

8     Q.   And is that your understanding of the

9 word?

10     A.   That is how it's most commonly used and

11 defined in the research.

12     Q.   And previous page from this, page 6,

13 paragraph 20, first sentence, I'll just read it

14 and ask if I read it correctly.

15        It says "For adolescents and adults whose

16 gender identity differs from their sex assigned at

17 birth, it is very unlikely that they will later

18 come to identify with their birth-assigned sex."

19        Did I read that correctly?

20     A.   Yes.

21     Q.   And this assertion you make here, does it

22 apply to individuals whose gender incongruence

23 arose during adolescence?

24        MS. NOWLIN-SOHL:  Object to form.

25        THE WITNESS:  Can you ask that again?

Page 175

Christine Brady, Ph.D. August 31, 2023

1    Q.   (BY MR. RAMER)  Yes.  The proposition in
2    the first sentence here, does that apply to
3    individuals whose gender incongruence arose during
4    adolescence?
5              MS. NOWLIN-SOHL:  Same objection.
6              THE WITNESS:  It includes -- I mean, I
7    think it -- excuse me.  Let me back up.
8              It includes -- it could be they
9    identified in early childhood.  It could be they
10   identified in adolescence, but they are currently
11   adolescents and adults.
12   Q.   (BY MR. RAMER)  And I guess if you're
13   isolating the category that identified as gender
14   incongruent as adolescents, does it hold true that
15   it is very unlikely that they will later come to
16   identify with their birth-assigned sex?
17             MS. NOWLIN-SOHL:  Object to form.
18             THE WITNESS:  I'm not sure I understood
19   that.
20   Q.   (BY MR. RAMER)  Well, I guess in your
21   answer I thought you were saying it includes --
22   when you use the word "adolescents" in this
23   sentence, it includes individuals who identified
24   as gender incongruent as adolescents and also
25   individuals who identified as gender incongruent

Page 176

Christine Brady, Ph.D. August 31, 2023

1    during childhood and then aged into adolescence;
2    is that right?
3         A.    Correct.
4         Q.    And my question is specifically about the
5    first category of individuals who identified as
6    gender incongruent in adolescence.
7              And if you're talking only about that
8    category, is it true that it is very unlikely that
9    they will later come to identify with their
10   birth-assigned sex?
11             MS. NOWLIN-SOHL:  Object to form.
12             THE WITNESS:  I'm not aware of any
13   research that indicates that that subgroup has
14   higher rates of detransition.
15        Q.    (BY MR. RAMER)  What about higher rates
16   of desistance?
17             MS. NOWLIN-SOHL:  Object to form.
18             THE WITNESS:  If by "desistance" you mean
19   identified as gender diverse and then now identify
20   as their assigned sex -- is that how you're
21   defining "desistance"?
22        Q.    (BY MR. RAMER)  I guess how do you define
23   "desistance"?
24        A.    So sometimes desistance is also just
25   talking about stopping medical intervention.

Page 177

Christine Brady, Ph.D. August 31, 2023

```
 1              But in my terminology, I guess
 2    "desistance" would be identifying as cisgender or
 3    aligning with the assigned sex at birth later.
 4         Q.   Okay.  Yeah, let's take your definition.
 5              And are there any studies analyzing
 6    desistance rates for individuals specifically who
 7    identified as gender incongruent during
 8    adolescence?
 9         A.   Not to my knowledge.
10         Q.   Do you keep statistics of regret at your
11    clinic?
12              MS. NOWLIN-SOHL:  Object to form.
13              THE WITNESS:  Keep in what way?
14         Q.   (BY MR. RAMER)  Do you know how many
15    patients have ever expressed regret about their
16    treatment?
17              MS. NOWLIN-SOHL:  Object to form.
18              THE WITNESS:  Of our clinic patients?
19         Q.   (BY MR. RAMER)  Yes.
20         A.   We do not keep record of, like, the
21    number, no.
22         Q.   How do you define "regret"?
23         A.   "Regret" to me would mean someone who has
24    done a medical intervention and wishes that they
25    hadn't.
```

Page 178

(180 of 288), Page 180 of 288
Case 1:23-cv-00269-BLW   Document 56-2   Filed 09/05/23   Page 179 of 267
Base: 24-142, 01/26/2024, DktEntry: 23.3, Page 180 of 288

Christine Brady, Ph.D. August 31, 2023

1    Q.   Has a patient in your clinic ever
2  expressed regret at having taken puberty blockers?
3    A.   Not to my knowledge.
4    Q.   Has a patient in your clinic ever
5  expressed regret at having taken cross-sex
6  hormones?
7    A.   Not to my knowledge.
8    Q.   Have you ever had any patients receive
9  what's called a gender-affirming mastectomy?
10         MS. NOWLIN-SOHL:  Object to form.
11         THE WITNESS:  Masculinizing top surgery?
12    Q.   (BY MR. RAMER)  Yes.
13    A.   Yes.
14    Q.   Have you ever had a patient express
15  regret about receiving masculinizing top surgery?
16    A.   No, not to my knowledge.
17    Q.   In your declaration, page 6 -- we're
18  there.  Sorry.  Page 6, paragraph 20.
19         And the second sentence, you refer to six
20  individuals who were your patients who later came
21  to identify with their sex assigned at birth; is
22  that right?
23    A.   Yes.
24    Q.   And do you recall how -- whether these
25  individuals were diagnosed with gender dysphoria

Page 179

Christine Brady, Ph.D. August 31, 2023

1    during childhood or adolescence?
2         A.   I believe all six met criteria at some
3    point.
4         Q.   Right.   And I'm not suggesting they
5    didn't.
6              I guess my question is when they met the
7    criteria -- when they were formally diagnosed, do
8    you recall whether it was their childhood or
9    adolescence?
10        A.   So I know for sure two that had received
11   the puberty blockade in childhood.   The other four
12   I'm not sure.   I don't remember.
13        Q.   Do you recall whether the six were natal
14   females or females assigned at birth?
15        A.    I believe it was pretty 50/50 of the six,
16   three and three.   It might have been two and four,
17   but...
18        Q.   And when you say in your declaration that
19   "none expressed regret around their gender
20   exploration or care," do you just mean they didn't
21   tell you that they regretted their care?
22        A.   No.   So I supported them after they --
23   you know, I supported them through retransition or
24   coming off their medications.   And so we continued
25   to do therapy with these patients and, you know,

Page 180

Christine Brady, Ph.D. August 31, 2023

1    explored, you know, if they were experiencing any

2    side effects, whether that be socially or

3    physically or mentally, and none of them endorsed

4    any negative side effects and were glad that they

5    had done the exploration process and glad that

6    they -- in the case of the two, done the puberty

7    blockade.

8         Q.   I think in your answer you had referred

9    to "retransition."  Is that -- first of all, did

10   you use that word?

11        A.   Yes.

12        Q.   Is that something distinct from

13   "detransition"?

14        A.   It's -- it can be used interchangeably, I

15   just prefer the term "retransition."

16        Q.   Okay.  Because I've heard --

17        A.   Sorry.

18        Q.   It's all right.  Go ahead.

19        A.   To transition back to the assigned sex.

20        Q.   Okay.  Because I -- okay.  Got it.

21             If a patient regretted a medical

22   intervention, do you think the patient would

23   return to the provider who gave them that

24   intervention to express their regret?

25             MS. NOWLIN-SOHL:  Object to form; calls

Page 181

Christine Brady, Ph.D. August 31, 2023

```
 1    for speculation.
 2              THE WITNESS:  I certainly hope so.  We
 3    create -- we try to create an environment that is
 4    welcoming to all.  We're not a transgender clinic;
 5    we are a gender clinic.  And so we will support
 6    patients regardless of how their identity shifts
 7    and changes.
 8              And so we, you know, often check in with
 9    patients along the path to make sure that, you
10    know, are you happy with your medicines?  Do you
11    want to stop your medicines for whatever reason?
12              And so we welcome that conversation and
13    we're very open to all the pathways that a youth
14    might take.  So I would hope we're creating an
15    environment in which families and patients feel
16    safe to do so.
17       Q.   (BY MR. RAMER)  Yeah, and I wasn't asking
18    the question to cast doubt on your clinic in
19    particular.  I think I was asking the question
20    more from the perspective of the psychology of the
21    individual patient and if the patient regretted a
22    medical intervention as a psychologist, do you
23    think that that patient would have reservations
24    about returning to the provider who gave them that
25    intervention to express their regret?
```

Page 182

Christine Brady, Ph.D. August 31, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form; calls
 2       for speculation, foundation.
 3              THE WITNESS:  Given that these six
 4       reached out to us and wanted my support through
 5       that process, I mean, it's possible that that is
 6       happening.  But in the case of these six, they
 7       felt very comfortable coming back and wanted the
 8       gender clinic to support them through
 9       retransition.
10              MR. RAMER:  I'm going to send an exhibit.
11       It's going to probably take a minute.  I just sent
12       it, so just let me know whenever it arrives.
13              MS. NOWLIN-SOHL:  Okay.
14              MR. RAMER:  Are we looking?
15              MS. NOWLIN-SOHL:  Still looking.
16              MR. RAMER:  All right.  Well, maybe I can
17       ask a question to introduce this, and we can deal
18       with it when it arrives.
19          Q.   (BY MR. RAMER)  But, Dr. Brady, did you
20       help author an article entitled "Understanding and
21       Supporting Patients With Dynamic Desires For
22       Gender-Affirming Medical Interventions"?
23          A.   Yes.
24              MS. NOWLIN-SOHL:  Okay.  We have it now.
25              (Deposition Exhibit No. 7 was marked.)
```

Page 183

(185 of 288), Page 185 of 288
Case 1:23-cv-00269-BLW   Document 56-2   Filed 09/05/23   Page 184 of 267
Base: 24-142, 01/26/2024, DktEntry: 23.3, Page 185 of 288

Christine Brady, Ph.D. August 31, 2023

1      Q.   (BY MR. RAMER)   And my question will be

2   is this that article?

3      A.   Yes.

4      Q.   And in the second paragraph, you first

5   highlight a study from the Netherlands.

6           Do you see that?

7      A.   Yes.

8      Q.   And I assume that even though the study

9   included participants from the Netherlands, you

10  still deem it useful with respect to your work in

11  the United States?

12     A.   Yes.

13     Q.   With respect to the last sentence of that

14  paragraph, I'll read it and ask if I read it

15  correctly.

16          It says "Studies of adolescents who start

17  pubertal suppression had found that only a few

18  percent ultimately chose to discontinue

19  gender-affirming medical care."

20          Did I read that correctly?

21     A.   Yes.

22     Q.   And so that sentence speaks only about

23  adolescents who chose to discontinue care, right?

24     A.   Yes.

25     Q.   Do you think that metric adequately

Page 184

Christine Brady, Ph.D. August 31, 2023

1    captures regret?

2           MS. NOWLIN-SOHL:  Object to form.

3           THE WITNESS:  So, no, because not all of

4    these individuals, such as the two in my clinical

5    practice who chose not to pursue further

6    intervention and stopped puberty blockers -- they

7    did not express regret.  So this doesn't

8    necessarily -- this number doesn't equate to

9    regret.

10       Q.   (BY MR. RAMER)  So you actually think

11   this is over-counting potentially?

12       A.   [Indiscernible due to cross-talk.]

13       Q.   Do you think it's potentially

14   under-counting?

15       A.   In many studies some people are lost to

16   follow-up, and that happens in our clinic as well,

17   so potentially.

18       Q.   Well, I mean, even leaving aside lost to

19   follow-up, just because somebody chooses not to

20   discontinue the care, does that mean they don't

21   regret it?

22           MS. NOWLIN-SOHL:  Object to form; calls

23   for speculation.

24           THE WITNESS:  Are you saying -- so

25   somebody who does a blocker and stays on a blocker

Page 185

Christine Brady, Ph.D. August 31, 2023

1    might still be experiencing regret while still on

2    that blocker?

3         Q.   (BY MR. RAMER)  I mean, I guess I take a

4    more advanced example of somebody who was on a

5    blocker and then took cross-sex hormones and so

6    has, short of surgery, fully medically

7    transitioned.

8              Isn't it possible for that person to

9    regret where they currently are, even though they

10   don't want to go through the process of

11   retransition?

12             MS. NOWLIN-SOHL:  Object to form; calls

13   for speculation.

14             THE WITNESS:  Regret where they currently

15   are or regret having made the decision to do

16   hormone therapies?

17        Q.   (BY MR. RAMER)  I guess what's the

18   distinction you're drawing there?

19        A.   Because many people might regret where

20   they are in life, that might -- may or may not

21   involve their gender.

22        Q.   Yes, sorry.  For purposes of the

23   question, the regret was specific to the

24   transition.

25             MS. NOWLIN-SOHL:  Same objections.

Page 186

Christine Brady, Ph.D. August 31, 2023

```
 1              THE WITNESS:  So it's possible.  Anything
 2     is possible.  However, in my clinical experience,
 3     it would be difficult to hide that level of
 4     distress if I'm working with somebody in a
 5     therapeutic context.  And that might be something
 6     I'd become suspicious of, even if someone is
 7     trying to hide that.
 8          Q.   (BY MR. RAMER)  And you mentioned "lost
 9     to follow-up."
10              Can you just explain what that is?
11          A.   So it can mean a number of different
12     things, but typically, you know, in the medical
13     world, it's -- you know, they maybe moved and
14     didn't tell us they were moving.  And so we don't
15     really know where that person is.
16              It might be that they transferred care,
17     even if they didn't move but they just transferred
18     care to another hospital.
19              Maybe insurance changed and they had to
20     change providers.
21              And so people get lost to follow-up in
22     that way.
23          Q.   Do you recall as you sit here the
24     percentage of participants that were lost to
25     follow-up in this study out of the Netherlands
```

Page 187

Christine Brady, Ph.D. August 31, 2023

1    that you cite?

2         A.   Let me look at the citation.

3              I shouldn't have touched it.  If I could

4    look at the citation form.

5              These particular studies I do not

6    remember what particular percent was lost to

7    follow-up, no.

8         Q.   Do you think that particularly with

9    respect to a study that is assessing regret that

10   lost to follow-up is a significant limitation?

11             MS. NOWLIN-SOHL:  Object to form.

12             THE WITNESS:  In all research, you know,

13   we hope for complete data.  That's often not able

14   to be obtained.  You know, you do wonder about

15   the -- those who were not able to participate in

16   the study and where they are and how they feel,

17   but we can't know for sure what's going on with

18   them.

19        Q.   (BY MR. RAMER)  Would it surprise you to

20   know that the loss to follow-up in this study you

21   cite is over 35 percent?

22        A.   That's not uncommon for research.  That's

23   longitudinal.

24        Q.   Do you think that high of a loss to

25   follow-up is concerning when the purpose of the

                                        Page 188

Christine Brady, Ph.D. August 31, 2023

```
 1    study is measuring regret?
 2            MS. NOWLIN-SOHL:  Object to form.
 3            THE WITNESS:  Given that it's a pretty
 4    standard number with regards to other fields and
 5    other studies, it doesn't necessarily give me
 6    cause for concern.
 7        Q.  (BY MR. RAMER)  Wouldn't the conservative
 8    estimate be that you have to treat that percentage
 9    as individuals who regret the care?
10            MS. NOWLIN-SOHL:  Object to form; calls
11    for speculation.
12            THE WITNESS:  That seems like an
13    inappropriate leap to just consider that whole
14    group.
15            Statistically there might be ways of
16    applying the rates and percentages that are seen
17    in those who were able to participate and
18    translating that to the lost-to-follow-up group
19    and proportionately applying those percentages.
20        Q.  (BY MR. RAMER)  You don't see any
21    methodological issue with taking the .6 percent of
22    the people who were not lost to follow-up and just
23    applying that percentage to the lost-to-follow-up
24    group?
25            MS. NOWLIN-SOHL:  Objection to form;
```

Page 189

Christine Brady, Ph.D. August 31, 2023

1    mischaracterizes prior testimony.

2              THE WITNESS:  I mean, I'm just giving

3    that as an example of maybe something that's a

4    little more appropriate.  The researchers didn't

5    choose to do that, so clearly they didn't feel

6    like that was appropriate to do, nor did they feel

7    like it was appropriate to assume that that

8    32 percent experienced regret.

9        Q.   (BY MR. RAMER)  Do you acknowledge that

10   that amount of lost to follow-up is a study

11   limitation of that article?

12             MS. NOWLIN-SOHL:  Object to form.

13             THE WITNESS:  Yeah, lost to follow-up is

14   a limitation of any article.

15       Q.   (BY MR. RAMER)  In your -- oh, no.  On

16   this article, sorry, first page, fourth paragraph,

17   in the first sentence you refer to the fact that

18   some individuals discontinue or reverse

19   gender-affirming medical or surgical care.

20             Do you see that?

21       A.   Yes.

22       Q.   And then you say that fact has been,

23   quote, woefully politicized.

24             Do you see that?

25       A.   Yes.

Page 190

Christine Brady, Ph.D. August 31, 2023

1     Q.   And can you explain what you mean by

2   that?

3     A.   So this concern that those who choose to

4   discontinue or reverse their gender affirmation or

5   interventions are seen as a reason not to do this

6   work, even though that percentage is low, and even

7   though there are many more who benefit from such

8   interventions.  And so the few are being used,

9   unfortunately, to make a case that has a lot of

10   limitations.

11     Q.   And so you think that these individuals

12   are being used; is that what you said?

13          MS. NOWLIN-SOHL:  Object to form;

14   mischaracterizes prior testimony.

15          THE WITNESS:  I think the data on these

16   individuals is being used to make a case that has

17   limitations.

18     Q.   (BY MR. RAMER)  Can you explain what you

19   mean by "a case that has limitations"?

20     A.   So again, those who discontinue don't

21   necessarily regret and haven't necessarily

22   detransitioned.  So many sought medical

23   intervention because they're happy and have met

24   their transition goals.

25          They still identify as gender diverse,

Page 191

Christine Brady, Ph.D. August 31, 2023

```
 1    and so sometimes those numbers are used to say
 2    that many discontinue or many regret their
 3    decisions, but that's not necessarily the case.
 4         Q.   Do you think we know the percentage that
 5    will ultimately discontinue or regret
 6    gender-affirming medical or surgical care?
 7              MS. NOWLIN-SOHL:  Object to form.
 8              THE WITNESS:  We have estimates.
 9         Q.   (BY MR. RAMER)  And what estimates are
10    you referring to?
11         A.   So, you know, some of the citations are
12    included in my declaration talk about the percents
13    in those studies who detransition or choose to
14    stop medical care.
15         Q.   Do you agree that in the last ten years,
16    there has been a substantial increase in the
17    number of individuals under 18 who have been
18    diagnosed with gender dysphoria?
19         A.   So in the last ten years, I know that the
20    instance of gender -- excuse me.
21              There has been a rise in the number of
22    individuals who will -- who endorse that they are
23    transgender or gender diverse, and that's, you
24    know -- like, the Williams study is .6 percent, .7
25    percent to 1.4 percent over the last four years --
```

Page 192

Christine Brady, Ph.D. August 31, 2023

1    sorry, ten years.

2         Q.   When you say "a rise in the number of

3    individuals who will endorse that they are

4    transgender or gender diverse," what did you mean

5    by that?

6         A.   So specifically you asked me about

7    individuals who are diagnosed with gender

8    dysphoria, and I don't know what the estimates are

9    in terms of the increase in gender dysphoria.

10             All I know is the increase in the number

11   of people who will self-declare that they are

12   transgender or gender diverse.

13        Q.   So you do not know whether the rate --

14   let me rephrase.

15             You do not know whether the number of

16   minors diagnosed with gender dysphoria in the last

17   ten years has significantly increased?

18        A.   I can assume because the number of those

19   who are self-identifying as transgender or gender

20   diverse has increased, that the number of people

21   who are getting diagnosed with gender dysphoria is

22   also increasing.

23        Q.   But you're saying that would be an

24   assumption on your part?

25        A.   Yeah.  I don't know of any, like,

                                        Page 193

(195 of 288), Page 195 of 288
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 194 of 267
Base: 24-142, 01/26/2024, DktEntry: 23.3, Page 195 of 288

Christine Brady, Ph.D. August 31, 2023

```
 1    specific rates or, you know, numbers.
 2         Q.   Do you agree that the majority of
 3    individuals under 18 who are currently being
 4    diagnosed with gender dysphoria in the last three
 5    years are natal females or females assigned at
 6    birth?
 7              MS. NOWLIN-SOHL:  Object to form.
 8              THE WITNESS:  Again, I don't know of any
 9    data that's looking at differential rates in terms
10    of gender -- like, sex ratio in the diagnosis of
11    gender dysphoria.  In our clinic it's 50/50, so...
12         Q.   (BY MR. RAMER)  And you do not know the
13    ratio outside of your clinic; is that right?
14         A.   I don't know if there are reports of
15    gender -- a sex ratio difference.
16         Q.   In the same paragraph --
17              MR. RAMER:  Actually we've been going for
18    a little over an hour.  Do you just want to take a
19    quick break?
20              MS. NOWLIN-SOHL:  Yeah, let's take five.
21              MR. RAMER:  Okay.
22              THE VIDEOGRAPHER:  All right.  So the
23    time is 5:26 p.m. Mountain time, and we are off
24    the record.
25              (Break taken from 5:26 p.m. to 5:36 p.m.)
```

Page 194

Christine Brady, Ph.D. August 31, 2023

```
 1          THE VIDEOGRAPHER:  So we are recording.
 2   The time is 5:36 p.m., and we are back on the
 3   record.
 4       Q.   (BY MR. RAMER)  Dr. Brady, I'd like to
 5   stick with your article we were previously
 6   discussing.  And specifically I'd like to go to
 7   page 2 and the last paragraph on the page and the
 8   first sentence of that paragraph.
 9          Do you see where you say, "The field of
10   gender medicine has historically focused on binary
11   and static conceptualization of gender identity"?
12       A.   Yes.
13       Q.   Do you think the DSM-5 focuses on static
14   conceptualizations of gender identity?
15       A.   So DSM-4 certainly did.  I think
16   improvements were made in DSM-5 to be more
17   inclusive such as criteria that we were talking
18   about earlier.
19       Q.   Do you think there are still improvements
20   to be made with respect to the eventual DSM-6?
21          MS. NOWLIN-SOHL:  Object to form.
22          THE WITNESS:  In every iteration of DSM
23   they're always integrating new research and new
24   understanding, so every diagnosis gets a facelift
25   with the next DSM.
```

Page 195

Christine Brady, Ph.D. August 31, 2023

1        Q.    (BY MR. RAMER)  Do you think there are

2   improvements that can be made in the DSM-5 with

3   respect to static conceptualizations of gender

4   identity?

5             MS. NOWLIN-SOHL:  Object to form.

6             THE WITNESS:  I think the current DSM

7   criteria capture gender dysphoria well.

8        Q.    (BY MR. RAMER)  Same page, the top

9   paragraph, I think it's the third and fourth

10  sentences, you refer to a nocebo effect.

11            Can you just explain what you're saying

12  in those two sentences?

13       A.    Sure.  Let me find it.  I'm sorry.  You

14  said second page, first paragraph.

15       Q.    Second page, first paragraph, and I think

16  it's the third and fourth sentences.  The third

17  sentence looks like it starts with "For example."

18       A.    Okay.  It's difficult for -- I can try.

19  I didn't write that sentence.  I have two

20  coauthors.

21            But would you want me to guess what it

22  is?

23       Q.    Yeah, I'd just be curious if you -- you

24  know, to the extent you understand that, what it's

25  saying.

Page 196

App.0964

Christine Brady, Ph.D. August 31, 2023

```
 1        A.    Yeah.  So a placebo effect would be, you
 2   know, administering a sugar pill or something that
 3   we know doesn't have an effect and feeling as
 4   though it does have an effect.
 5             So in this case I think "nocebo" would
 6   mean like knowing that they're without something
 7   feels like it's having an effect when maybe it's
 8   not.
 9             So having lower testosterone -- just
10   knowing that your testosterone is lower might make
11   you feel like you have less energy when you
12   actually might not have less energy.
13        Q.    Do you know which one of your coauthors
14   wrote those sentences?
15        A.    I believe it's Dr. Turban.
16        Q.    I think going back to the first page, and
17   in the fourth paragraph, second sentence, you
18   refer to "dynamic gender-affirming needs."
19             Do you see that?
20        A.    Yes.
21        Q.    Could you explain what you mean by
22   "dynamic gender-affirming needs"?
23        A.    If you'll just give me a minute, I'm
24   going to read the whole sentence.
25        Q.    Please, go ahead.
```

Page 197

Christine Brady, Ph.D. August 31, 2023

```
 1         A.    So in this case, we're referring to --
 2    so, for example, a nonbinary-identifying
 3    individual, let's say designated female nonbinary
 4    identifying, might want some masculinization from
 5    testosterone but not full masculinization.  And
 6    they may even from the outset know that they do
 7    not want to stay on testosterone indefinitely.
 8    And so they are going to be on testosterone until
 9    they've acquired some of the changes but not all
10    of the changes and then choose to discontinue that
11    intentionally.
12              And so that's sort of what we were
13    considering to be, like, of a dynamic need because
14    traditionally we think of you start on hormone
15    therapies and you stay on hormone therapies.  But
16    there are kind of -- we're understanding more and
17    more that there are some more dynamic or maybe
18    non-traditional ways of doing gender-affirming
19    medical intervention.
20         Q.    Were you talking about examples, though,
21    where the individual knows from the outset what
22    treatment they're desiring?
23         A.    In some cases people know, you know, that
24    "I only want to be on testosterone for however
25    long it takes to achieve X, Y, Z."
```

Page 198

Christine Brady, Ph.D. August 31, 2023

1              For other folks it's something that

2       evolves over time.

3              And while they're on testosterone, if

4       they become comfortable with the changes and are

5       happy with the changes, they may choose to

6       discontinue at that time too, so either case.

7          Q.   For individuals whose gender identity

8       changes at some point, do they still satisfy the

9       criteria for gender dysphoria under the DSM-5?

10             MS. NOWLIN-SOHL:  Object to form.

11             THE WITNESS:  It depends.  Because again,

12      they can still identify as gender diverse even

13      though their identity has evolved or changed, and

14      they still might meet criteria for gender

15      dysphoria.

16         Q.   (BY MR. RAMER)  So -- and maybe it's

17      easiest if we can go back to your declaration to

18      page 6, paragraph 19 and just return to 19A where

19      we're talking about the marked incongruence and

20      the six months' duration.

21             And I guess I'm struggling to understand

22      how if the gender -- if someone's gender identity

23      is changing, how they could show a marked

24      incongruence of six months' duration.

25             MS. NOWLIN-SOHL:  Is there a question

                                                Page 199

Christine Brady, Ph.D. August 31, 2023

```
 1    there?
 2         Q.   (BY MR. RAMER)  Can you explain that?
 3              MS. NOWLIN-SOHL:  Object to form.
 4              THE WITNESS:  So a lot of things can
 5    qualify as an incongruence.  So in the case of,
 6    again, let's say again a nonbinary individual who
 7    later identifies as transmasculine.  So their
 8    identity has evolved and changed, but both of
 9    those identities were incongruent with the
10    assigned sex at birth.
11              And so we don't necessarily need six
12    months' duration in the new identity to meet
13    criteria for gender dysphoria.
14         Q.   (BY MR. RAMER)  So basically all
15    incongruences are created equal for purposes of
16    the DSM-5 diagnostic criteria; is that right?
17              MS. NOWLIN-SOHL:  Object to form;
18    mischaracterizes prior testimony.
19              THE WITNESS:  In terms of criterion A and
20    1 where it states "marked incongruence," it can be
21    any identity, any donor identity that's not
22    congruent with assigned sex.
23         Q.   (BY MR. RAMER)  And so your gender
24    identity could be changing every week, but so long
25    as at no point during a six-month period your
```

Page 200

Christine Brady, Ph.D. August 31, 2023

1    gender identity is congruent with your assigned
2    gender, you still fall within DSM-5 diagnostic
3    criteria in paragraph A?
4             MS. NOWLIN-SOHL:  Object to form;
5    mischaracterizes prior testimony.
6             THE WITNESS:  If they have other criteria
7    and needs, yes.
8        Q.   (BY MR. RAMER)  So the duration part of
9    paragraph A here, the only thing that matters is
10   that at no point during the six months was your
11   gender identity congruent with your assigned
12   gender; is that fair?
13            MS. NOWLIN-SOHL:  Object to form;
14   argumentative, mischaracterizes prior testimony,
15   asked and answered.
16            THE WITNESS:  Yes.
17       Q.   (BY MR. RAMER)  Have you ever had a
18   patient whose gender identity goes from being --
19   let me rephrase.
20            Have you ever had a patient who was
21   gender-fluid and as part of the fluidity at times
22   would have a gender identity that is consistent
23   with the individual's assigned gender?
24       A.   So I've not had a case -- again,
25   gender-fluid is a more rare identity, so that's

Page 201

Christine Brady, Ph.D. August 31, 2023

```
 1    only a small subset of my patients.
 2            But I've not had clinically a patient who
 3    part of the fluid identity involved their cis --
 4    like a cisgender identity.
 5        Q.    Have you ever heard of that, though?
 6        A.    Not to my knowledge.
 7        Q.    I think I only have a few more questions,
 8    though it potentially depends on the answers to
 9    the questions.
10            But I just want to clarify a few things
11    from -- for the record, which is with respect to
12    the Endocrine Society guidelines, you do not
13    recall ever reading the systematic reviews that
14    those guidelines commissioned, correct?
15        A.    Correct.
16        Q.    With respect to the WPATH guidelines, you
17    do not recall ever reading the systematic review
18    that those guidelines commissioned, correct?
19            MS. NOWLIN-SOHL:  Object to form.
20            THE WITNESS:  Only as it is described in
21    SOC-8, so the summarization of the systematic
22    review.
23        Q.    (BY MR. RAMER)  So in other words you've
24    not read the separate systematic review; is that
25    right?
```

Page 202

Christine Brady, Ph.D. August 31, 2023

```
 1        A.    Correct.
 2              MS. NOWLIN-SOHL:  Object to form.
 3              THE WITNESS:  Correct.
 4        Q.    (BY MR. RAMER)  Have you read any
 5    publication from a European health authority
 6    regarding the treatment for gender dysphoria?
 7        A.    No.
 8              MR. RAMER:  Okay.  I think that's all
 9    that I have.  Thank you very much, Dr. Brady.  At
10    this point I'm going to turn it over to your
11    counsel.
12              And, Li, I understand if you need a few
13    minutes off the record to prep, but I'll turn
14    things over to you.
15              MS. NOWLIN-SOHL:  Yeah.  I know we just
16    took a break.  Do you mind if we just take ten
17    minutes so I can speak with my co-counsel?
18              MR. RAMER:  Yeah, not a problem at all.
19              MS. NOWLIN-SOHL:  Okay.  Thank you.
20              THE VIDEOGRAPHER:  Okay.  So the time is
21    5:50 p.m. Mountain time, and we are off the
22    record.
23              (Break taken from 5:50 p.m. to 5:56 p.m.)
24              THE VIDEOGRAPHER:  All right.  So we are
25    recording.  The time is 5:56 p.m. Mountain time,
```

Page 203

Christine Brady, Ph.D. August 31, 2023

1    and we are back on the record.

2              MS. NOWLIN-SOHL:  Okay.  I have no

3    questions.

4              MR. RAMER:  Well, great.  Well, that's it

5    for me.  Thank you, Dr. Brady, for your time.

6              THE WITNESS:  Thank you.

7              THE VIDEOGRAPHER:  Okay.  Then this

8    concludes our video deposition with Dr. Christine

9    Brady.  It is August 31, 2023.  The time is

10   5:56 p.m. Mountain time, and we are off the

11   record.

12

13      (Whereupon the deposition was concluded at 5:56 p.m.)

14                        ****

15                  (Signature requested.)

16

17

18

19

20

21

22

23

24

25

                                           Page  204

Christine Brady, Ph.D. August 31, 2023

```
 1                    VERIFICATION

 2

     STATE OF  _____  )

 3                              )

     COUNTY OF _____  )

 4

 5       I, CHRISTINE BRADY, Ph.D., being first duly sworn on

 6   my oath, depose and say:

 7       That I am the witness named in the foregoing

 8   deposition taken the 31st day of August, 2023, consisting

 9   of pages numbered 1 to 204, inclusive; that I have read

10   the said deposition and know the contents thereof; that

11   the questions contained therein were propounded to me;

12   the answers to said questions were given by me, and that

13   the answers as contained therein (or as corrected by me

14   therein) are true and correct.

15

16   Corrections Made:  Yes_____ No_____

17

18

                     _____

19                        CHRISTINE BRADY, Ph.D.

20

21     Subscribed and sworn to before me this _____ day of

22   _____, 2023, at _____, Idaho.

23

                     _____

24                   Notary Public for Idaho

                     Residing at _____, Idaho

25                   My commission expires: _____.

                                            Page 205
```

Christine Brady, Ph.D. August 31, 2023

```
 1                    REPORTER'S CERTIFICATE
 2    STATE OF IDAHO        )
                            )
 3    COUNTY OF ADA         )

 4

 5         I, Amy E. Simmons, Certified Shorthand Reporter and
 6    Notary Public in and for the State of Idaho, do hereby
 7    certify:
 8         That prior to being examined, the witness named in
 9    the foregoing deposition was by me duly sworn to testify
10    to the truth, the whole truth, and nothing but the truth;
11         That said deposition was taken down by me in
12    shorthand at the time and place therein named and
13    thereafter reduced to typewriting under my direction, and
14    that the foregoing transcript contains a full, true, and
15    verbatim record of said deposition.
16         I further certify that I have no interest in the
17    event of the action.
18         WITNESS my hand and seal this 31st day of August,
19    2023.
20

21

                  AMY E. SIMMONS
22                ID CSR No. 685
                  CA CSR No. 14453
23                WA CSR No. 22012915
                  OR CSR No. 22-009
24                RDR, CRR, CRC,
                  and Notary Public
25    My commission expires:  6/13/28.
```

Page 206

(208 of 288), Page 208 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 208 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 1 of 177
Jack Turban , M.D., MHS October 16, 2023

```
 1                UNITED STATES DISTRICT COURT
 2                    DISTRICT OF IDAHO
 3
 4      PAM POE, by and through her  )  Case No.
        parents and next friends,   )  1:23-cv-00269-CWD
 5      Penny and Peter Poe; PENNY   )
        POE; PETER POE; JANE DOE, by )
 6      and through her parents and  )
        next friends, Joan and John  )
 7      Doe; JOAN DOE; JOHN DOE,     )
                                     )
 8                      Plaintiffs,  )
                                     )
 9      v.                           )
                                     )
10      RAÚL LABRADOR, in his        )
        official capacity as the     )
11      Attorney General of the State)
        of Idaho; JAN M. BENNETTS, in)
12      her official capacity as     )
        County Prosecuting Attorney  )
13      for Ada, Idaho; and the      )
        INDIVIDUAL MEMBERS OF THE    )
14      IDAHO CODE COMMISSION, in    )
        their official capacities,   )
15                                   )
                        Defendants.  )
16      _____)
17
18
19       REMOTE VIDEOTAPED DEPOSITION OF JACK TURBAN, M.D., MHS
20                    MONDAY, OCTOBER 16, 2023
21
22
23
24
25      Reported By: Amy E. Simmons, CSR, RDR, CRR, CRC

                                              Page 1
```

Jack Turban , M.D., MHS October 16, 2023

| 1 | REMOTE VIDEOTAPED DEPOSITION OF JACK TURBAN, M.D., MHS |
| 2 | |
| 3 | BE IT REMEMBERED that the remote videotaped |
| 4 | deposition of JACK TURBAN, M.D., MHS was taken via Zoom |
| 5 | videoconference by the attorney for the Defendants before |
| 6 | Associated Reporting & Video, a Veritext company, Amy E. |
| 7 | Simmons, Idaho CSR No. 685, California CSR No. 14553, |
| 8 | Washington CSR No. 22012915, Oregon CSR No. 22-009, and |
| 9 | Notary Public in and for the County of Ada, State of |
| 10 | Idaho, on Monday, the 16th day of October, 2023, |
| 11 | commencing at the hour of 9:06 a.m. Pacific time in the |
| 12 | above-entitled matter. |
| 13 | |
| 14 | |
| 15 | APPEARANCES (remotely): |
| 16 | For the Plaintiffs:   AMERICAN CIVIL LIBERTIES UNION |
|    | By:  Li Nowlin-Sohl, Esq. |
| 17 | Leslie Cooper, Esq. |
|    | 125 Broad Street |
| 18 | New York, NY 10004 |
|    | Telephone:  212.549.2584 |
| 19 | lnowlin-sohl@aclu.org |
|    | lcooper@aclu.org |
| 20 | |
| 21 | GROOMBRIDGE WU BAUGHMAN & STONE |
|    | By:  Philip S. May, Esq. |
| 22 | 801 17th Street, Suite 1050 |
|    | Washington, D.C. 20006 |
| 23 | Telephone:  202.539.6620 |
|    | philip.may@groombridgewu.com |
| 24 | |
| 25 | |

Page 2

| 1 | APPEARANCES (remotely, continued): |
| 2 | |
|   | For the Plaintiffs:   ACLU OF IDAHO FOUNDATION |
| 3 | By:  Dina Flores-Brewer, Esq. |
|   | Post Office Box 1897 |
| 4 | Boise, ID 83701 |
|   | Telephone:  208.344.9750 |
| 5 | dfloresbrewer@acluidaho.org |
| 6 | |
| 7 | For the Defendants, Labrador and the Individual Members |
|   | of the Idaho Code Commission: |
| 8 | |
|   | COOPER & KIRK PLLC |
| 9 | By:  John Ramer, Esq. |
|   | 1523 New Hampshire Ave NW |
| 10 | Washington, D.C. 20036 |
|   | Telephone:  202.220.9621 |
| 11 | jramer@cooperkirk.com |
| 12 | OFFICE OF THE ATTORNEY GENERAL |
|   | By:  Rafael J. Droz, Esq. |
| 13 | Post Office Box 83720 |
|   | Boise, ID  83720 |
| 14 | Telephone:  208.334.2400 |
|   | Facsimile:  208.854.8073 |
| 15 | rafael.droz@ag.idaho.gov |
| 16 | |
|   | Also Present:   Chris Ennis, Videographer |
| 17 | Jocelyn Larsson, |
|   | Court Reporting Intern |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 3

| 1 | I N D E X |
| 2 | E X A M I N A T I O N |
| 3 | |
| 4 | JACK TURBAN, M.D.                         PAGE |
| 5 | |
|   | By:  Mr. Ramer...............................10, 315 |
| 6 | |
|   | Ms. Nowlin-Sohl.............................313 |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | E X H I B I T S |
| 12 | NO.                         PAGE |
| 13 | Exhibit 1.   Expert Rebuttal Declaration of Jack    11 |
|    | Turban, MD, MHS (49 pages) |
| 14 | Exhibit 2.   Deposition Transcript of Jack          11 |
|    | Turban, M.D., MHS, Taken 5/19/23 |
| 15 | (354 pages) |
| 16 | Exhibit 3.   Errata Sheet for Deposition Taken      11 |
|    | 5/19/23 (5 pages) |
| 17 | |
|    | Exhibit 4.   Users' Guides to the Medical           21 |
| 18 | Literature (545 pages) |
| 19 | Exhibit 5.   The Cass Review Document               29 |
|    | (112 pages) |
| 20 | |
|    | Exhibit 6.   Harvard Countway Library Systematic    56 |
| 21 | Reviews and Meta Analysis (3 pages) |
| 22 | Exhibit 7.   International Journal of               83 |
|    | Transgender Health Chapter 6, |
| 23 | Adolescents (24 pages) |
| 24 | Exhibit 8.   GenderGP Podcast Transcript            102 |
|    | (14 pages) |
| 25 | |

Page 4

| 1 | E X H I B I T S (continued) |
| 2 | NO.                         PAGE |
| 3 | Exhibit 9.   HHS Public Access Author Manuscript  125 |
|   | (15 pages) |
| 4 | |
|   | Exhibit 10.  2015 Report of the U.S. Transgender  131 |
| 5 | Survey (302 pages) |
|   | Exhibit 11.  Plos One "Access to              136 |
| 6 | Gender-Affirming Hormones During |
| 7 | Adolescence and Mental Health |
|   | Outcomes Among Transgender Adults" |
| 8 | (15 pages) |
|   | Exhibit 12.  JAMA Psychology "Association     139 |
| 9 | Between Recalled Exposure to Gender |
| 10 | Identity Conversion Efforts and |
|   | Psychological Distress and Suicide |
| 11 | Attempts Among Transgender Adults" |
|   | (9 pages) |
| 12 | |
| 13 | Exhibit 13.  "Transgender Conversion Therapy    148 |
|    | Associated with Severe |
| 14 | Psychological Distress" (3 pages) |
|    | Exhibit 14.  Journal of Adolescent Health "Age   151 |
| 15 | of Realization and Disclosure of |
|    | Gender Identity Among Transgender |
| 16 | Adults" (8 pages) |
| 17 | Exhibit 15.  Annalou de Vries and Sabine Hannema  177 |
|    | "Growing Evidence and Remaining |
| 18 | Questions in Adolescent Transgender |
|    | Care" (3 pages) |
| 19 | |
|    | Exhibit 16.  Transgender Health "Consensus        194 |
| 20 | Parameter" Research Methodologies |
|    | to Evaluate Neurodevelopmental |
| 21 | Effects of Pubertal Suppression in |
|    | Transgender Youth" (12 pages) |
| 22 | |
|    | Exhibit 17.  "Evidence Review: Gonadotrophin      213 |
| 23 | Releasing Hormone Analogues for |
|    | Children and Adolescents with |
| 24 | Gender Dysphoria" (131 pages) |
| 25 | |

Page 5

2 (Pages 2 - 5)

| | E X H I B I T S (continued) | |
|---|---|---|
| NO. | | PAGE |
| Exhibit 18. | "Evidence Review: Gender-Affirming Hormones for Children and Adolescents with Gender Dysphoria" (156 pages) | 224 |
| Exhibit 19. | ACTA Peadiatrica "A Systematic Review of Hormone Treatment For Children with Gender Dysphoria and Recommendations for Research" (14 pages) | 230 |
| Exhibit 20. | Bilaga Till Rapport Article (2 pages) | 234 |
| Exhibit 21. | Brignardello-Peterson, et al. "Effects of Gender-Affirming Therapies in People with Gender Dysphoria: Evaluation of the Best Available Evidence" (70 pages) | 255 |
| Exhibit 22. | Socialstyrelsen "Care of Children and Adolescents with Gender Dysphoria" (6 pages) | 236 |
| Exhibit 23. | Turban "The Evidence for Trans Youth Gender-Affirming Medical Care" (10 pages) | 258 |
| Exhibit 24. | Plos One "Correction: Access to Gender-Affirming Hormones During Adolescence and Mental Health Outcomes Among Transgender Adults" (7 pages) | 267 |
| Exhibit 25. | Tweet by Jack Turban, MD (1 page) | 274 |
| Exhibit 26. | Tweet by Jack Turban, MD (1 page) | 277 |
| Exhibit 27. | Tweet by Jack Turban, MD (1 page) | 280 |
| Exhibit 28. | Tweet by Jack Turban, MD (1 page) | 284 |
| Exhibit 29. | "One Size Does Not Fit All: In Support of Psychotherapy for Gender Dysphoria (10 pages) | 296 |

Page 6

---

| | E X H I B I T S (continued) | |
|---|---|---|
| NO. | | PAGE |
| Exhibit 30. | LGBT Health "Factors Leading to 'Detransition' Among Transgender and Gender Diverse People in the United States: A Mixed-Methods Analysis" (8 pages) | 299 |

Page 7

---

P R O C E E D I N G S

1
2
3    THE VIDEOGRAPHER:  All right.  So we are
4    recording, and we are on the record.  Today's date
5    is October 16, 2023.  The time is 9:06 a.m.
6    Pacific.
7        For the record, this is the remote
8    videotaped deposition of Dr. Jack Turban.  It's
9    taken by the Defendants in the matter of Poe, et
10   al. vs. Labrador, et al.  It's Case
11   No. 1:23-cv-00269-CWD.  It is in the United States
12   District Court for the District of Idaho.
13       The videotaped deposition is being held
14   remotely via Zoom videoconference.  The videotaped
15   deposition is being recorded by Chris Ennis and
16   reported by Amy Simmons of Associated Reporting &
17   Video, a Veritext Company.
18       And if counsel will please state their
19   appearances and any stipulations for the record.
20       MR. RAMER:  John Ramer of the law firm
21   Cooper & Kirk representing the State defendants.
22       MS. NOWLIN-SOHL:  Li Nowlin-Sohl with the
23   ACLU representing Plaintiffs.
24       MS. COOPER:  Leslie Cooper with the ACLU,
25   Plaintiffs.

Page 8

---

1        MR. MAY:  And Philip May from
2    Groombridge, Wu, Baughman & Stone on behalf of
3    Plaintiffs.
4        THE VIDEOGRAPHER:  And if the court
5    reporter will please swear the witness.
6        THE REPORTER:  I think we have a couple
7    more people that need to identify themselves
8    first.  I've got Rafael Droz and Dina Flores.
9        MS. FLORES-BREWER:  Yes.  This is Dina
10   Flores-Brewer.  I'm one of the attorneys for ACLU
11   of Idaho.  I am just listening in today.
12       THE REPORTER:  Thank you.  And Mr. Droz
13   is for the State; is that correct?  I'm thinking
14   he's just not on.
15       MR. RAMER:  That's right.  He's with the
16   Idaho Attorney General's Office representing the
17   State defendants.
18
19       JACK TURBAN, M.D., MHS,
20   a witness having been first duly sworn to tell the truth,
21   the whole truth, and nothing but the truth, testified as
22   follows:
23   ///
24   ///
25   ///

Page 9

3 (Pages 6 - 9)

App.0977

(211 of 288), Page 211 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 4 of 177
Base: 24-142, 01/26/2024, DktEntry: 23.3, Page 211 of 288
Jack Turban , M.D., MHS October 16, 2023

Page 10

```
 1          EXAMINATION
 2   BY MR. RAMER:
 3       Q.  (BY MR. RAMER)  Good morning, Dr. Turban.
 4       A.  Good morning.
 5       Q.  My name is John Ramer.  I'm from the law
 6   firm Cooper & Kirk representing the State
 7   defendants in this case.
 8          I know you've been deposed before, but
 9   just as a quick refresher for both of us -- more
10   for me -- but for the benefit of the court
11   reporter, we'll try not to talk over one another.
12          And I'd just ask that you respond
13   verbally when answering questions.
14          If you don't understand anything about my
15   question, please just let me know; otherwise, I'll
16   assume you're answering the question asked.
17          And I typically aim for a break every
18   hour or so, but if you need a break at any point,
19   just let me know.  And my only request would be
20   that you answer any question that's pending before
21   we go on a break.
22          Does that all sound good?
23       A.  Yes.
24          MR. RAMER:  And first, I'm just going to
25   introduce and mark some documents that we'll
```

Page 11

```
 1   likely be referring to throughout the day.  The
 2   first one Li should have.  It's Turban Exhibit 1.
 3   I think the file name says "Tab A."  When you have
 4   it, just let me know.
 5          (Deposition Exhibit No. 1 was marked.)
 6          THE WITNESS:  I have it.
 7       Q.  (BY MR. RAMER)  And, Dr. Turban, is this
 8   a copy of the declaration you submitted in this
 9   case?
10       A.  Yes.
11       Q.  Okay.  And attached to the declaration,
12   is your CV attached?
13       A.  Yes.
14       Q.  And I assume there are not any major
15   changes over the weekend from when this was filed
16   on Friday?
17       A.  Correct.
18          (Deposition Exhibit No. 2 was marked.)
19       Q.  (BY MR. RAMER)  Okay.  The next document,
20   Turban Exhibit 2, does this appear to be the
21   transcript of your deposition in the Indiana case,
22   K.C. vs. The Individual Members of the Medical
23   Licensing Board?
24       A.  It appears to be, yes.
25          (Deposition Exhibit No. 3 was marked.)
```

Page 12

```
 1       Q.  (BY MR. RAMER)  And then Turban
 2   Exhibit 3, does this document appear to be your
 3   signed errata sheet for your deposition in the
 4   Indiana case?
 5       A.  Yes.
 6       Q.  And, Dr. Turban, is anyone in the room
 7   with you besides Li Nowlin-Sohl?
 8       A.  Sorry, no.
 9       Q.  And do you have any documents open in
10   front of you?
11       A.  Just the exhibits that you sent.
12       Q.  Great.  Dr. Turban, are you familiar with
13   the term "evidence-based medicine"?
14       A.  Yes.
15       Q.  And what is your understanding of that
16   term?
17       A.  The broad term, that refers to using the
18   existing published research literature when making
19   decisions about medical care.
20       Q.  And do you practice evidence-based
21   medicine?
22       A.  Yes.
23       Q.  And how does one practice evidence-based
24   medicine?
25       A.  That's a big question that involves many
```

Page 13

```
 1   years of medical school and residency and
 2   fellowship training, but as a general matter it
 3   involves having a patient in front of you and
 4   referencing the existing research literature to
 5   try to make the best decision for that patient
 6   based on the research that's been published.
 7       Q.  Are you familiar with the term
 8   "systematic review"?
 9       A.  Yes.
10       Q.  And what is your understanding of that
11   term?
12       A.  Systematic review is when one predefines
13   search terms that they are going to use when
14   searching various research databases.  Then they
15   provide a review of the literature that they
16   identify through that search method.
17       Q.  When you say "they provide a review of
18   the literature," what do you mean by that?
19       A.  They would define search terms.  They
20   would put those search terms into the research
21   databases.  Many papers will come out of there,
22   but then there's variation in how they may choose
23   to include or exclude different studies, how they
24   interpret them, and how they summarize their
25   reading of those papers.
```

4 (Pages 10 - 13)

Page 14

1    Q.  And what does the practice of
2  evidence-based medicine say about the role of
3  systematic reviews in clinical decision-making?
4       MS. NOWLIN-SOHL:  Object to the form.
5       THE WITNESS:  Again, because systematic
6  reviews can be so broad, there would be systematic
7  reviews that would be very useful and there would
8  be some other systematic reviews that would be
9  less useful.
10      Usually in evidence-based medicine people
11  are talking about systematic reviews of clinical
12  trials or of non -- like, observational studies or
13  comparative studies, but there's not really a
14  straightforward answer.  Systematic review is just
15  one way of collecting literature that you may then
16  use when working through evidence-based medicine.
17   Q.  (BY MR. RAMER)  And do you know how a
18  systematic review is conducted?
19   A.  There are many different ways to conduct
20  a systematic review, but again, in general, one
21  would predefine their search terms to find the
22  databases they're going to use, put those search
23  terms into those databases, screen abstracts,
24  identify the abstracts that they feel are relevant
25  to their questions, and then summarize that

Page 15

1  literature.
2    Q.  What is the value of a systematic review
3  over an alternative method of reviewing a body of
4  scientific literature?
5    A.  Do you mean comparing a systematic review
6  to, say, a narrative review?
7    Q.  Sure.  Or any other -- I guess what other
8  types of reviews of the body of scientific
9  literature are there besides systematic review and
10  a narrative review?
11   A.  Those are the two main ones that people
12  would discuss.  So a narrative view is usually
13  written by an expert who knows the literature
14  broadly but they may not include in their
15  manuscript what specific search terms they used,
16  what specific databases they used, but they'll
17  summarize what's known about the research, and
18  they'll go through peer review where other experts
19  check that material also.
20      They would add additional literature if
21  that individual author has missed something.  It
22  goes back and forth through the peer-review
23  process until the reviewer, the editor, and the
24  author feel that it's comprehensive.
25      A systematic review is different in that

Page 16

1  the manuscript will actually say "These are the
2  search terms that we used when searching our
3  literature databases, and these are the databases
4  that we used."  So it makes it a little bit easier
5  for another researcher to repeat their search.
6    Q.  Have you ever conducted a systematic
7  review?
8    A.  Not as a first author, but I've been part
9  of a team that's conducted a systematic review.
10   Q.  And what systematic review was that?
11   A.  The systematic review of a broad category
12  of functional neurologic disorders among sexual-
13  and gender-minority people.
14   Q.  Do you happen to know the name of that
15  paper?
16   A.  I think the first author is Lerario,
17  L-e-r-a-r-i-o, I believe.
18   Q.  And what was your role in that systematic
19  review?
20   A.  I assisted the team with choosing our
21  search terms, choosing the databases, and also in
22  writing the manuscript, editing the manuscript.
23   Q.  As you sit here today, are you able to
24  name any specific systematic reviews relating to
25  literature in your field that you have read?

Page 17

1       MS. NOWLIN-SOHL:  Object to form.
2       THE WITNESS:  I don't know that I would
3  have, like, a specific title that I could rattle
4  off, but there have been many systematic
5  reviews -- is there a specific part of my field
6  that you're referencing?
7    Q.  (BY MR. RAMER)  I guess what field are
8  you opining upon as an expert in this case?
9    A.  The treatment of adolescents with gender
10  dysphoria.
11   Q.  So then, yes, I guess I'll talk about
12  that field.
13      Have you -- as you sit here today, are
14  you able to name any specific systematic reviews
15  relating to literature in that field that you have
16  read?
17   A.  I don't remember the exact titles, but I
18  know there was one, I believe, in the Journal of
19  Transgender Health a few years ago.
20      There have been a number of
21  non-peer-reviewed systematic reviews.
22      I believe there were systematic reviews
23  conducted as part of some of the guidelines that
24  were written.
25   Q.  And I know you said you don't know the

5 (Pages 14 - 17)

(213 of 288), Page 213 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 213 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 6 of 177
Jack Turban , M.D., MHS October 16, 2023

Page 18

```
1   title, but the one that you first referred to in
2   the Journal For Transgender Health, can you
3   describe it so that we can at least try to
4   identify it?
5       A.  It was a few years ago that it came out,
6   but it was I think generally looking at the mental
7   health impacts of different gender-affirming
8   medical interventions for adolescents with gender
9   dysphoria.
10        And, as a systematic review generally
11  does, goes through the strengths and weaknesses of
12  different studies that have been published.
13      Q.  Do you remember any of the authors on it?
14      A.  I don't recall.
15      Q.  Of the systematic reviews you described,
16  did you study them in detail?
17        MS. NOWLIN-SOHL:  Object to form.
18        THE WITNESS:  Generally if you are in a
19  specific field where you know most of the research
20  papers, the thing that's most interesting about
21  systematic review is if it identifies a paper that
22  you didn't already know about.
23        The big thing about systematic review is
24  that it's using specific search terms and doing
25  this really comprehensive search of these large
```

Page 20

```
1       So can you repeat that answer for me,
2   please?
3       THE WITNESS:  Yeah, sorry.  I'm trying to
4   see if I can turn up the microphone also.
5       THE REPORTER:  Thank you.
6       THE WITNESS:  I think the microphone is
7   up all the way.  Is this better with it close?
8       THE REPORTER:  Let's try it.
9       THE WITNESS:  I think the question was if
10  I've had any coursework in using evidence-based
11  medicine?
12      Q.  (BY MR. RAMER)  That's right.
13      A.  So certainly that would be part of -- my
14  undergraduate degree was in neuroscience from
15  Harvard College.
16        And then I received my medical school
17  degree from Yale School of Medicine where we
18  talked about evidence-based medicine both in our
19  preclinical classroom courses and through our
20  clinical courtships when we're working with
21  patients.
22        And then received a master's of health
23  sciences research from Yale also.
24        I did my adult psychiatry residency at
25  Harvard Medical School at MGH McLean where we had
```

Page 19

```
1   databases, so it's values that can identify a
2   peer-reviewed research paper that you didn't know
3   about previously.
4       So probably what I would have done is if
5   there were any papers in there that I didn't know
6   about, I would have added it to my running list of
7   papers that I think are important for me to know
8   and for my fellows to know and others in the
9   field.
10      Q.  (BY MR. RAMER)  And this question may not
11  make sense, but have you taken any particular
12  courses on the evidence-based medicine?  Or is it
13  more it's a set of principles that is infused into
14  all of medical education?
15        MS. NOWLIN-SOHL:  Object to form.
16        THE WITNESS:  Certainly there is some in
17  my undergraduate degree in neuroscience that was
18  from Harvard.  Also my medical school courses --
19  [indiscernible].
20        THE REPORTER:  Dr. Turban, I'm sorry to
21  interrupt.  I'm having a hard time understanding
22  you a little bit.  I don't know if you can get
23  closer to the microphone or maybe slow down a tiny
24  bit?  Some of your words are just cutting out, and
25  I'm struggling with understanding them.
```

Page 21

```
1   more courses on it as well as applying it
2   practically to seeing patients.
3       And then similarly in my fellowship in
4   child and adolescent psychiatry at Stanford.
5       MR. RAMER:  Okay.  And I'd like to
6   introduce what will be Turban Exhibit 4.  And it
7   should be the Users' Guides to the Medical
8   Literature Third Edition.
9       (Deposition Exhibit No. 4 was marked.)
10      Q.  (BY MR. RAMER)  Do you see that?
11      A.  Yes.
12      Q.  And have you seen this document before?
13      A.  I do not believe I have.
14      Q.  Do you recognize the lead author's name,
15  Gordon Guyatt?
16      A.  I do not.  It looks like he is a
17  biostatistician in Ontario.
18      Q.  Where are you getting that information?
19      A.  From the first page.
20      Q.  Oh, I see.  And I'd like to go to page 4,
21  which I think is 33 in the PDF.
22      A.  Okay.
23      Q.  The second full sentence on this page,
24  I'll just read it and ask if I've read it
25  correctly.
```

6 (Pages 18 - 21)

(214 of 288), Page 214 of 288
Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 214 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 7 of 177
Jack Turban , M.D., MHS   October 16, 2023

**Page 22**

```
1        It says "Efficient and optimally
2   effective evidence-based practice dictates
3   bypassing the critical assessment of primary
4   studies and, if they are available, moving
5   straight to the evaluation of rigorous systematic
6   reviews."
7        Did I read that correctly?
8   A.  Yes.
9   Q.  And do you agree with that statement?
10  A.  Yeah, I think this is similar to what I
11  was saying before, that it wouldn't be a good
12  practice to just look at one or two individual
13  studies.  [Indiscernible] -- of a systematic
14  review is that it's going to identify more studies
15  that you may not find -- that a more, as they're
16  saying, quote, rigorous systematic review with a
17  certain search approach would potentially
18  identify.
19       It's basically saying that you don't want
20  to miss individual studies that might be important
21  for your interpretation.
22  Q.  But it looks like it's discussing that
23  you need to bypass, quote, the critical assessment
24  primary studies, end quote, and instead proceed to
25  systematic reviews.
```

**Page 24**

```
1   understand the very last part of what you just
2   said.
3        Could you say that again?
4   A.  The word "bypass" is tricky because I
5   think -- correct me if I'm wrong, but I think you
6   were reading "bypass" as meaning you should not
7   read the individual studies and you should just go
8   to the systematic review.  That's not my
9   interpretation.
10       I think they're saying that you shouldn't
11  just read individual studies because you might
12  miss other important studies.  So you should read
13  the studies that you identified, but you should
14  also go to systematic reviews to make sure you're
15  not missing important information or studies that
16  you yourself didn't identify in your search.
17  Q.  And then I'd like to go to page 14, which
18  I think is page 43 in the PDF.
19  A.  Okay.
20  Q.  And the first full paragraph on this
21  page, I'm just going to read the first two
22  sentences and ask if I read it correctly.
23       It says "Rational clinical decisions
24  require systematic summaries of the best available
25  evidence.  Without such summaries, clinicians,
```

**Page 23**

```
1        And that -- do you agree that seems to be
2   discussing something different than merely
3   identifying studies?
4        MS. NOWLIN-SOHL:  Object to form.
5        THE WITNESS:  I may have to read it in
6   context to see what they mean by "bypass," if you
7   give me a moment.
8        If read in context, this seems to talk
9   about how one could read individual studies.  It
10  then goes on to say that there are times where an
11  individual study doesn't give you the full picture
12  because other studies may provide additional
13  information.
14       Then they're saying, you know, you should
15  bypass the individual studies and go to the
16  systematic reviews, but I think really what they
17  mean is don't only read individual studies because
18  that would put you at risk of missing other
19  studies that are important for understanding the
20  body of research as a whole is how I read that
21  sentence.  I don't think they're saying to ignore
22  individual studies or to not consider reading them
23  in depth when they're identified in the systematic
24  review.
25  Q.  (BY MR. RAMER)  I'm sorry.  I didn't
```

**Page 25**

```
1   expert or otherwise, will be unduly influenced by
2   their own preconceptions and by unrepresentative
3   and often lower quality evidence."
4        Did I read that correctly?
5   A.  Yes.
6   Q.  And do you agree with those statements?
7   A.  Again, I think what this is saying is
8   that if you only knew some of the research
9   literature and you were missing several research
10  studies, then you wouldn't have the complete
11  picture of the evidence.  And I believe that is
12  true.
13  Q.  What do you take them to be referring to
14  when they discuss "lower quality evidence"?
15       MS. NOWLIN-SOHL:  Object to form;
16  foundation.
17       THE WITNESS:  They don't -- I don't know
18  if they provided a specific definition earlier,
19  but it's a subjective term relevant to others.  It
20  would depend on what you were comparing,
21  presumably something lower quality than the other
22  papers you had not identified in some way.  But I
23  don't think they're specifying a specific way in
24  which one paper is lower quality than another,
25  just highlighting that some papers may be higher
```

7 (Pages 22 - 25)

(215 of 288), Page 215 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 215 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 8 of 177
Jack Turban , M.D., MHS October 16, 2023

Page 26

1  quality than others.
2     Q.  (BY MR. RAMER)  How can one paper be
3  higher quality than another?
4     A.  Oh, I would need to give you an entire
5  course on clinical research and statistical
6  approaches.
7     Q.  Okay.  So your point -- just to kind of
8  summarize here, your point is that the value of
9  the systematic review is really just the value of
10  identifying relevant studies; is that fair?
11     A.  The major goal of systematic review is to
12  collect the best you can.  Systematic reviews are
13  never perfect.  There are intricacies in what
14  search terms you use, which databases you use, how
15  you choose to include and exclude different
16  studies, so there are many ways that systematic
17  review can be high quality or low quality itself.
18        But in general the goal, if it's done
19  well, is that you would identify all the relevant
20  research, that you could really be making your
21  summaries of the literature based on a complete
22  picture, that you're not missing important
23  studies.
24     Q.  So it's just about locating studies; is
25  that right?

Page 27

1     MS. NOWLIN-SOHL:  Objection;
2  mischaracterizes prior testimony.
3     THE WITNESS:  It's about in a systematic
4  way, identifying relevant papers and then one
5  generally summarizes them as well.
6        Ideally, a critical reader of a
7  systematic review would go back to those studies
8  and read them as well, if it were feasible.
9     MR. RAMER:  And I tried to send what I'll
10  call Turban Exhibit 5.  Did you receive that, Li?
11     MS. NOWLIN-SOHL:  I have not.
12     MR. RAMER:  Okay.
13     Q.  (BY MR. RAMER)  Let's do it this way.
14  Dr. Turban, have you ever heard of the pyramid of
15  evidence?
16     A.  Broadly speaking.
17     MR. RAMER:  Hey, Li, do you mind if we go
18  off the record for just one second to discuss a
19  technical issue?
20     MS. NOWLIN-SOHL:  Yeah, that's fine.
21     THE VIDEOGRAPHER:  Okay.  So the time is
22  9:32 a.m. Pacific time, and we are off the record.
23        (Brief pause in the proceedings.)
24     THE VIDEOGRAPHER:  All right.  So we are
25  recording.  The time is 9:33 a.m. Pacific time,

Page 28

1  and we are back on the record.
2     MR. RAMER:  Okay.  I just tried hitting
3  send again the compressed version.  So if that
4  shows up, Li, just let me know.
5     Q.  (BY MR. RAMER)  While we're waiting,
6  Dr. Turban, have you ever heard the term the
7  "hierarchy of evidence"?
8        Sorry.  Did you hear me?
9     MR. RAMER:  Amy, can you hear me?
10     THE WITNESS:  Something just happened
11  with our A/V system.
12     MS. NOWLIN-SOHL:  Can you hear us, John?
13     MR. RAMER:  I just said while we're
14  waiting --
15     MS. NOWLIN-SOHL:  Okay.  We cannot hear
16  you.
17     MR. RAMER:  Okay.  Let's go off the
18  record again.
19     THE WITNESS:  Try again now, please.
20     MR. RAMER:  Can you hear me?  All right.
21     THE VIDEOGRAPHER:  Okay.  I'll take you
22  guys off here.  One second.
23        So the time is 9:35 a.m. Pacific, and we
24  are off the record.
25        (Brief pause in the proceedings.)

Page 29

1     THE VIDEOGRAPHER:  Okay.  So we are
2  regarding.  The time is 9:37 a.m. Pacific, and we
3  are back on the record.
4        (Deposition Exhibit No. 5 was marked.)
5     Q.  (BY MR. RAMER)  Okay.  Dr. Turban, do you
6  have Turban Exhibit 5, which says "The Cass
7  Review" at the top in front of you?
8     A.  Yes.  February 2022.
9     Q.  And have you seen this document before?
10     A.  Yes.
11     Q.  Have you read it?
12     A.  Yes.
13     Q.  And when did you first read it?
14     A.  I don't recall.  Many months ago.
15     Q.  Do you recall what you thought when you
16  read it?
17     A.  My main takeaways were that they --
18  there's a lot of news coverage of it also.
19        My understanding is there were very long
20  wait lists for the central gender clinic in the
21  U.K.  And because of those long waits, there was
22  concern that the physicians weren't able to
23  provide comprehensive care and be able to see the
24  number of patients they had on their very long
25  wait list.

8 (Pages 26 - 29)

(216 of 288), Page 216 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 216 of 288
Case 1:23-cv-00269-BLW   Document 74-2   Filed 11/02/23   Page 9 of 177
Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1      So I think the review went in and<br>2 ultimately determined it would be better to close<br>3 that centralized clinic and open several regional<br>4 clinics where they'd be able to provide more<br>5 comprehensive individualized care.<br>6     Q. Okay. And I'd like to go to page 62 of<br>7 this document.<br>8     And just let me know when you're there.<br>9     A. We're there. Figure 3?<br>10     Q. Yes. And so Figure 3 is entitled<br>11 "Pyramid of Standards of Evidence"; is that right?<br>12     A. Yes.<br>13     Q. And have you seen this image before?<br>14     A. I've seen images like this one before.<br>15     Q. And have you ever heard the term<br>16 "hierarchy of evidence"?<br>17     A. In a general sense, yes.<br>18     Q. And what's your understanding of that<br>19 term?<br>20     A. Just a broad reference to the fact that<br>21 some research studies may have fewer potential<br>22 interpretive pitfalls than others.<br>23     Q. And can you explain why this figure has<br>24 "Systematic reviews" at the top of the pyramid?<br>25     A. I think this is going to the point that<br><br>Page 30 | 1     Q. And why is that of higher value?<br>2     A. Because you're looking at all of the<br>3 studies instead of looking at just one.<br>4     Q. And so again, you think that what this<br>5 figure is showing is that systematic reviews are<br>6 at the top of the pyramid because they identify<br>7 all the studies?<br>8     MS. NOWLIN-SOHL: Objection;<br>9 mischaracterizes prior testimony.<br>10     THE WITNESS: Yeah, I would say what's at<br>11 the top is "Systematic review and meta-analyses,"<br>12 and that a systematic review with a meta-analysis<br>13 is summarizing to the best of its ability with<br>14 many caveats as much of the literature as<br>15 possible.<br>16     Q. (BY MR. RAMER) Okay. Can you explain<br>17 why cohort studies are below randomized controlled<br>18 trials on this pyramid?<br>19     A. So cohort studies are studies where you<br>20 have a group of patients and you follow them over<br>21 time. So the realm of gender-affirming medical<br>22 care, this would be something like having<br>23 adolescents with gender dysphoria who are treated<br>24 with testosterone, and you look before and after<br>25 and you see their mental health is better after.<br><br>Page 32 |
| 1 knowing the body of literature as a whole is more<br>2 useful than just an individual study.<br>3     I think it's worth pointing out that it<br>4 actually says "Systematic reviews and<br>5 meta-analyses."<br>6     And meta-analyses are different. So<br>7 meta-analyses are when you actually take all the<br>8 research studies that have been done and conduct<br>9 statistical analyses to create a composite number<br>10 that really tells you in a quantitative way how to<br>11 put all the research together instead of some of<br>12 these systematic reviews where their description<br>13 is narrative; they're just kind of saying their<br>14 interpretation of the data.<br>15     That's different from a meta-analysis<br>16 where they actually apply statistical techniques<br>17 to summarize all of the research as a whole.<br>18     So systematic review and meta-analysis is<br>19 a specific kind of paper that's not just a<br>20 systematic review.<br>21     But generally what this figure is getting<br>22 at is that if you have a paper that has all of the<br>23 research literature, or as much as possible of the<br>24 research literature together and summarized,<br>25 that's of higher value than individual studies.<br><br>Page 31 | 1 That's a cohort study.<br>2     If you were looking just at an individual<br>3 cohort study -- and again, this is why you<br>4 shouldn't look at just one paper -- you might ask,<br>5 "Okay. Did their mental health improve because of<br>6 the testosterone? Or was their mental health<br>7 going to improve anyway?"<br>8     Does that make sense?<br>9     So in the research, we have other studies<br>10 that compared those who had access to treatment to<br>11 those who didn't. We have parallel process<br>12 models. We have all these ways to answer that<br>13 question that aren't on this, like, very basic<br>14 teaching tool that's this pyramid.<br>15     The reason a randomized controlled trial<br>16 is above that is because a randomized controlled<br>17 trial in a single paper could answer two<br>18 questions. So it could tell you does mental<br>19 health improve before and after? And also do<br>20 people who get treatment do better than those who<br>21 don't do treatment, which approaches this question<br>22 of would their mental health have just gotten<br>23 better anyway?<br>24     So a randomized controlled trial can kind<br>25 of hit more things in one study than a cohort<br><br>Page 33 |

9 (Pages 30 - 33)

(217 of 288), Page 217 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 217 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 10 of 177
Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1   study can.<br>2      Q.  Do you think this pyramid is saying that<br>3   a randomized controlled trial is of higher quality<br>4   than a cohort study?<br>5      A.  I think that's a broad<br>6   oversimplification, but I think what it's saying<br>7   is that if you had a single randomized controlled<br>8   trial that was well conducted, it would likely<br>9   give you more information than a cohort study.<br>10      Q.  Because it's of higher quality?<br>11      A.  Not necessary -- what do you mean by<br>12   "higher quality"?<br>13      Q.  Because that study design is of higher<br>14   quality than a cohort study.<br>15      A.  I would say because it has the benefit of<br>16   having a control group, medical cohort study does<br>17   not, which gives you additional information about<br>18   whether or not your outcome would have improved<br>19   whether or not the introduction was given.  It<br>20   gives you more information.<br>21      A single randomized controlled trial,<br>22   when well conducted, can give more information<br>23   than a cohort study.<br>24      Q.  What about -- and I know this is -- I'm<br>25   not -- this question is not about a specific<br>Page 34 | 1      THE WITNESS:  Again, with all due<br>2   respect, I think your question is implying lack of<br>3   understanding of how the studies are designed.<br>4   You can't put the exact same inputs into a cohort<br>5   study and a randomized controlled trial because<br>6   they're different study designs.<br>7      So when you're saying "all else being<br>8   equal," I really don't know what you -- I need you<br>9   to be more specific.<br>10      Q.  (BY MR. RAMER)  And when you say they're<br>11   a different study design, does the design of one<br>12   lead to a higher quality study than the design of<br>13   the other?<br>14      MS. NOWLIN-SOHL:  Object to the form.<br>15      THE WITNESS:  I believe I answered that<br>16   question.<br>17      Q.  (BY MR. RAMER)  Could you remind me what<br>18   your answer was?<br>19      MS. NOWLIN-SOHL:  Same objection.<br>20      THE WITNESS:  So they're different study<br>21   designs.  A cohort study tells you whether or not<br>22   an outcome changes before and after the<br>23   intervention.  It does not have a control group.<br>24      So you could be left with the question of<br>25   whether or not your outcome improved because of<br>Page 36 |
| 1   study.  It's more about methodology in theory.<br>2      And so my question is looking at this, in<br>3   theory you have a group of four cohort studies.<br>4   And if you have a group of four randomized<br>5   controlled trials, all else being equal, based on<br>6   the design of those studies, are the randomized<br>7   controlled trials of higher quality than the<br>8   cohort studies?<br>9      MS. NOWLIN-SOHL:  Object to form.<br>10      THE WITNESS:  It's hard to say all else<br>11   being equal because there are so many variables<br>12   that go into how you design a cohort study or how<br>13   you design a randomized controlled trial, so I<br>14   would really need you to kind of give me specific<br>15   studies to answer that question.<br>16      Q.  (BY MR. RAMER)  Well, no.  It's a<br>17   hypothetical about the theory and the method of<br>18   it, and so the hypothetical is all else being<br>19   equal -- they have the exact same inputs, the<br>20   exact same outputs, one is a randomized controlled<br>21   trial; one is a group of cohort studies.<br>22      And my question is is the group of<br>23   randomized controlled trials of higher quality<br>24   than the group of cohort studies?<br>25      MS. NOWLIN-SOHL:  Object to form.<br>Page 35 | 1   the intervention or because it was going to<br>2   improve anyway over time.<br>3      A randomized controlled trial generally<br>4   has two groups.  One group gets intervention; one<br>5   group doesn't.  So you can see maybe the treatment<br>6   group improves and the other group, which could be<br>7   many different groups -- let's say it's a placebo<br>8   in this case -- does not improve, and then that<br>9   would tell you, okay.  It probably wasn't that<br>10   they improved just because of time.<br>11      So in that case, a randomized controlled<br>12   trial can give you more information than a cohort<br>13   study wouldn't.  So it has the potential to give<br>14   you more information certainly.<br>15      Q.  And on this pyramid, on the left side of<br>16   it, the arrow that's adjacent that refers to<br>17   quality, what do you think that's referring to?<br>18      A.  I think it's just a vague reference to<br>19   the fact that -- these are all different study<br>20   designs as you go up the pyramid.<br>21      And as you go up the pyramid, you get --<br>22   the study designs have the potential to answer<br>23   other kinds of questions, right?<br>24      So the cohort study can't tell you about<br>25   whether or not mental health would have improved<br>Page 37 |

10 (Pages 34 - 37)

(218 of 288), Page 218 of 288Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 218 of 288
Case 1:23-cv-00269-BLW  Document 74-2  Filed 11/02/23  Page 11 of 177
Jack Turban , M.D., MHS October 16, 2023

1  without the treatment.  The randomized controlled
2  trial tells you that.
3        And then all randomized controlled trials
4  are going to have strengths and benefits, right?
5  They may have different patient populations.  They
6  might have different study outcomes.  They may
7  have different blinding procedures.
8        And so a systematic review and
9  meta-analysis would tell you instead of like, oh,
10  look, I only have this one study I'm looking at,
11  you would look at all of them, and that would give
12  you more and more richer information.
13     Q.  Okay.  I'd like to go back to Turban
14  Exhibit 4, which is the Users' Guide to the
15  Medical Literature.
16        And I would like to go to page 6 in the
17  document.  I think it's 35 in the PDF.
18     A.  Yes.
19     Q.  And I'm just going to read the -- it's
20  the sentence at the very bottom that carries over
21  on to page 7.  And I'll just read it and ask if I
22  read it correctly.
23        It says "In our discussions of systematic
24  reviews and guidelines, we introduce the GRADE
25  (Grading of Recommendations Assessment,

Page 38

several other factors that would be important to
2  consider when -- whether or not to recommend a
3  treatment.
4        But it has two steps in that way.  It has
5  kind of the grading of the evidence and then
6  determining strength of recommendations.
7     Q.  And have you ever attempted to apply the
8  criteria specified by GRADE to assess a study?
9     A.  It's generally recommended that one do
10  that as part of, like, a full research group.  And
11  I've not been on one of those groups.
12     Q.  And so then you -- you've also never
13  attempted to do that for any of the studies that
14  you cite in your declaration, correct?
15     A.  No, not apply specific GRADE criteria.
16  Generally GRADE criteria is used when one is
17  writing guidelines.
18     Q.  I'm sorry.  Say that again?
19     A.  GRADE is typically used when one is
20  writing clinical practice guidelines.
21     Q.  Is GRADE ever used in a systematic
22  review?
23     A.  Some people might.  I have not.
24     Q.  How many systematic reviews have you
25  done?

Page 40

1  Development, and Evaluation) approach to
2  summarizing evidence and developing
3  recommendations, an approach that we believe
4  represents a major advance in EBM," parentheses,
5  cross-reference to chapter 15.
6        Did I read that correctly?
7     A.  Yes.
8     Q.  And are you familiar with the GRADE
9  approach that's referenced here?
10     A.  Broadly, yes.
11     Q.  And could you explain your understanding
12  of that approach?
13     A.  Yes.  So GRADE generally involves looking
14  at the research literature.  And then there's some
15  subjectivity to it, but they provide you with
16  general guidelines about how you would -- like,
17  great level of confidence in the research itself.
18        Then there's a -- and then each of those
19  get GRADE scores.  I think it's something like
20  low, very low, high, very high.  I could be wrong
21  about the exact names of the categories.
22        And then there's a separate set of
23  factors that are applied about strength of
24  recommendation.  So it takes into account both
25  what the research literature is, but then makes

Page 39

1     A.  Just one.
2     Q.  Can you explain how those who would use
3  GRADE in a systematic review would use it in the
4  process of creating the systematic review?
5        MS. NOWLIN-SOHL:  Object to the form;
6  foundation.
7        THE WITNESS:  Yeah, I don't think they
8  would GRADE the systematic review.  I think they
9  would have different research questions, and there
10  would be a body of literature they would identify
11  through their search that they would then look at
12  in their specific tables that give you, like, a
13  rough general sense of how to apply the GRADE
14  criteria to different conclusions.
15     Q.  (BY MR. RAMER)  And then sticking with
16  this document, I'd like to go to page 273, which
17  is 302 in the PDF, I believe.
18        Are you there?
19     A.  Yes.
20     Q.  Okay.  And then the -- well, the only
21  full paragraph on the page, it's a little long,
22  but I'm going to read it and ask if I read it
23  correctly.
24        It says "In contrast to systematic
25  reviews, traditional narrative reviews typically

Page 41

11 (Pages 38 - 41)

(219 of 288), Page 219 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 219 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 12 of 177
Jack Turban , M.D., MHS October 16, 2023

1  address multiple aspects of the disease (e.g.,
2  etiology, diagnosis, prognosis, or management),
3  have no explicit criteria for selecting the
4  included studies, do not include systematic
5  assessments of the risk of bias associated with
6  primary studies and do not provide quantitative
7  best estimates or rate the confidence in these
8  estimates.
9     "The traditional narrative review
10 articles are useful for obtaining a broad overview
11 of a clinical condition, but may not provide a
12 reliable and unbiased answer to a focused,
13 clinical question."
14    Did I read that correctly?
15    A. Yes.
16    Q. And then what is your understanding of
17 how systematic reviews differ from narrative
18 reviews with respect to systematic assessment of
19 the risk of bias associated with primary studies?
20    A. A systematic review may or may not
21 include an assessment of the risk of bias.
22    Also, as the paragraph that you skipped
23 over notes, it may or may not include, like, an
24 unbiased summary of the literature, like a
25 meta-analysis.
Page 42

1     So systematic reviews can have some of
2  these same problems that you're outlining.
3     Q. Do narrative reviews include systematic
4  assessments of the risk of bias associated with
5  the primary studies?
6     A. Neither a systematic review nor a
7  narrative review necessarily include that.
8     Q. Does a narrative review ever include
9  that?
10    A. It could.
11    Q. And for systematic reviews, can they
12 include systematic assessments of the risk of bias
13 associated with primary studies?
14    A. They could.
15    Q. Would that be a value --
16    A. Yes.
17    Q. I'm sorry?
18    A. Yes.
19    Q. Well, let me ask this question: Would
20 that be a value that comes with conducting a
21 systematic review?
22    MS. NOWLIN-SOHL: Object to form.
23    THE WITNESS: Not necessarily. A
24 systematic review may or may not do that, and a
25 narrative review may or may not do that.
Page 43

1     Q. (BY MR. RAMER) Well, let's suppose you
2  have a systematic review that does include a
3  systematic assessment of the risk of bias
4  associated with primary studies.
5     Do you agree that would be a valuable
6  consideration from that systematic review?
7     A. I believe that would be useful
8  information.
9     Q. And sticking with this document, I'd like
10 to go to page 275, which is just a couple pages
11 up.
12    And specifically Figure 14-2, which is
13 entitled "The Process of Conducting a Systematic
14 Review and Meta-Analysis."
15    Do you see that?
16    A. Yes.
17    Q. Do you see how this figure divides
18 between a systematic review and a meta-analysis on
19 the right-hand side?
20    A. Yes.
21    Q. And as part of the systematic review part
22 of this figure, do you agree that it includes the
23 bullet "Assess risk of bias, abstract data"?
24    A. Yes. I believe the point of this
25 textbook chapter is to tell you the best way --
Page 44

1  highest quality way to do a systematic review.
2     Q. Okay.
3     A. I think it's strongly implying you should
4  do the meta-analysis as well.
5     Q. So as part of the systematic review
6  process that's outlined here, authors would assess
7  risk of bias, correct?
8     A. I believe they're saying ideally you
9  would do that, yes.
10    Q. And how does one assess the risk of bias?
11    A. There are a lot of different ways. There
12 are formal ways in which I'm not a statistical
13 expert, but they can create these kind of summary
14 plots and run statistical analyses to try and,
15 like, quantitatively look at the risk of bias.
16    But then also just as you look at
17 individuals studies by study, there are a lot of
18 different types of bias. There's selection bias;
19 there's recall bias; there's social desirability
20 bias. So it's a broad area of technologic
21 analysis.
22    Q. And have you ever assessed risk of bias
23 as part of the systematic review that you
24 conducted?
25    A. I'd have to go back and look. What we
Page 45

12 (Pages 42 - 45)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1 were doing was specifically called a scoping | 1 final two sentences of that paragraph. |
| 2 review. So that's more focused on identification | 2 A. Okay. I'm there now. |
| 3 what has been looked at and what's not been looked | 3 Q. Okay. I'll start again. |
| 4 at. | 4 "Even if the results of different studies |
| 5 And our main conclusion from that was | 5 are consistent, determining their risk of bias is |
| 6 that there hasn't been much research on functional | 6 still important. Consistent results are less |
| 7 neurologic disorders among sexual- and | 7 compelling if they come from studies with a high |
| 8 gender-minority people, so there wasn't a lot of | 8 risk of bias than if they come from studies with a |
| 9 literature to analyze the depth in that way. | 9 low risk of bias." |
| 10 Q. And what is this figure referring to when | 10 Did I read that correctly? |
| 11 it refers to the process of abstracting data? | 11 A. Yes. |
| 12 A. I usually think of that as something more | 12 Q. So this is saying even if you have |
| 13 for the meta-analysis where you're going into the | 13 numerous studies showing the same results, you |
| 14 tables and pulling out summary statistics and | 14 still should assess those individual studies for |
| 15 P-values and confidence intervals so that you can, | 15 risk of bias, correct? |
| 16 like, pull out the most relevant numbers and | 16 A. Yes. I think we can broadly always agree |
| 17 statistics from the paper. | 17 in medicine that anytime you have a research |
| 18 For a meta-analysis, you then feed that | 18 study, you should assess it for risk and bias. |
| 19 into a different statistical analysis where you're | 19 I think I'd also highlight that there are |
| 20 pulling the data all together. | 20 many different types of bias. I don't know what |
| 21 But if they're saying just as part of the | 21 specific type of bias they're referencing here |
| 22 systematic review of doing that, I think they're | 22 without reading the full chapter and the context. |
| 23 more just broadly saying pulling out the key | 23 Q. And is some bias worse than others? |
| 24 findings of the research. Because if it's not a | 24 A. I don't know that I would say "worse." |
| 25 meta-analysis, you wouldn't be feeding that | 25 They're different. |
| Page 46 | Page 48 |

| | |
|---|---|
| 1 abstracted data into a more sophisticated | 1 Q. And for the studies that you cite in your |
| 2 methodology of summarizing the data | 2 declaration, have you assessed them for risk of |
| 3 quantitatively. | 3 bias? |
| 4 Q. And sticking with this document, I'd like | 4 MS. NOWLIN-SOHL: Object to form. |
| 5 to go to page 283, which I think is page 312 in | 5 THE WITNESS: Yes. Any scientific |
| 6 the PDF. And just let me know when you're there. | 6 research paper you read is going to, likely in the |
| 7 A. Sorry. Which part of page 312? | 7 discussion section, talk about for that individual |
| 8 Q. So it's page 283 in the book. Page 312 | 8 paper what biases may come up or what limitations |
| 9 in the PDF. | 9 there are to how you interpret that study in |
| 10 A. Yes. We're on the page. | 10 isolation, which is why, back to your point of why |
| 11 Q. Okay. And I want to look at the -- in | 11 you want the systematic review and identifying all |
| 12 the middle of the page you see the blue header? | 12 of the research, that you always want to look at |
| 13 It says "Was the risk of bias of the primary | 13 all the research as a whole, because every |
| 14 studies assessed?" | 14 individual study is going to have strengths and |
| 15 A. Yes. | 15 weaknesses. They're pointing out that's true even |
| 16 Q. And the first full paragraph below that, | 16 for randomized controlled trials. |
| 17 I'm just going to read the final two sentences of | 17 Q. (BY MR. RAMER) And so I think you |
| 18 that paragraph and ask if I read it correctly. | 18 discussed that you read the discussion to see |
| 19 It says "Even if the results of different | 19 where the bias is in the study. |
| 20 studies are consistent, determining their risk of | 20 And is that generally how you assess |
| 21 bias is still important." | 21 studies for risk of bias? |
| 22 A. Sorry, I thought you were -- Sorry. | 22 A. That's a good starting point, because |
| 23 You're starting halfway down? | 23 often the author of the paper, in the peer-review |
| 24 Q. So it's the first full paragraph after | 24 process, whatever peer reviewer identifies as a |
| 25 the blue header. And I'm going to be reading the | 25 limitation of the study, if that -- that's due to |
| Page 47 | Page 49 |

13 (Pages 46 - 49)

(221 of 288), Page 221 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 221 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 14 of 177
Jack Turban , M.D., MHS October 16, 2023

1 something like recall bias, et cetera, that's
2 usually the part of the paper where that's going
3 to be written.
4      But I think most experts are also going
5 to read the full paper to see if they identify any
6 other limitations of the study that weren't
7 explicitly noted in the discussion section of the
8 paper.
9    Q.  And this will for now be my last question
10 on this, and then maybe we can take a break.
11      But I'd like to go to page 182 in this
12 document.  Just let me know if you're there.
13    A.  We're there.
14    Q.  Okay.  And I'd like to look at the last
15 paragraph on the page in the first sentence.  And
16 I'll just read it and ask if I read it correctly.
17      It says "In answering any clinical
18 question, our first goal should be to identify
19 whether there is an existing systematic review of
20 the topic that can provide a summary of the
21 highest quality available evidence (see the
22 summarizing the evidence section)."
23      Did I read that correctly?
24    A.  Yes.
25    Q.  And do you agree that the first goal in

Page 50

1 wanted to be an expert, you would probably pull
2 the individual studies that are identified in the
3 systematic review, analyze them further, see what
4 additional information can be teased out that
5 maybe wasn't teased out by the person who did the
6 initial systematic review where likely their goal
7 was just to give you a sense of the whole of the
8 literature.
9      MR. RAMER:  All right.  I think maybe
10 we're at a breaking point here.  Does that sound
11 good?
12      MS. NOWLIN-SOHL:  Yeah, that sounds good.
13 Five minutes?
14      MR. RAMER:  Yeah, works for me.
15      THE VIDEOGRAPHER:  Okay.  So the time is
16 10:06 a.m. Pacific time, and we are off the
17 record.
18    (Break taken from 10:06 a.m. to 10:12 a.m.)
19      THE VIDEOGRAPHER:  So we are recording.
20 The time is 10:12 a.m. Pacific, and we are back on
21 the record.
22    Q.  (BY MR. RAMER)  Dr. Turban, I'd like to
23 go to your declaration, which is Turban Exhibit 1,
24 and specifically go to page 15 and paragraph 24.
25      And I just want to read the -- it's

Page 52

1 answering any clinical question is to identify
2 whether there is an existing systematic review of
3 the topic?
4      MS. NOWLIN-SOHL:  Object to the form.
5      THE WITNESS:  I think what this is likely
6 referencing -- not having read the entire
7 textbook, but it looks like it's a textbook about
8 teaching clinicians how to conduct evidence-based
9 medicine -- I think they're saying when you first
10 come to a topic, so if you're not an expert in a
11 topic -- let's say I were going to treat someone
12 with -- let's just say it's a hypothetical
13 condition that I don't treat every day but I have
14 a patient who I need to help.
15      One of the first things I would look for
16 is yes, a systematic review.  If I don't already
17 know that literature, that's going to be a really
18 fast way for me to find a summary of a lot of the
19 literature that I need to know for that given
20 situation.  So yes, it would be a good place to
21 start.
22      I think if your aim is to be an expert in
23 the field, you wouldn't stop there.  You would
24 read the systematic review.  You would look at the
25 evidence that's in there but then if you really

Page 51

1 toward the end of the paragraph on this page.
2 I'll read the sentence starting with the word
3 "but" and then just ask if I read it correctly.
4      It says "But all a systematic review
5 means is that the authors of the reports
6 predefined the search terms they used when
7 conducting literature reviews in various
8 databases."
9      And did I read that correctly?
10    A.  Correct.  There's a citation to the
11 Harvard Countway Library.
12    Q.  And based on what we've discussed so far
13 today, do you agree that this sentence is wrong?
14    A.  No.
15    Q.  You maintain that all a systematic review
16 means is that the authors of the reports predefine
17 the search terms used when conducting the
18 literature reviews; is that right?
19    A.  Correct.
20    Q.  Okay.
21    A.  There are other things one may do as part
22 of a systematic review to add to it, but the label
23 at its face means that the review was systematic,
24 that you defined your search terms and your
25 databases for how you identified your literature.

Page 53

14 (Pages 50 - 53)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| Page 54 | Page 56 |

**Page 54**

1 Different authors might do different things from
2 there.
3     Q.  And so you do not think that a systematic
4 review includes the assessment of the individual
5 studies that make up the review?
6     A.  What differentiates a systematic review
7 from a narrative review or a different type of
8 review -- all of those are going to talk about the
9 literature, but what distinguishes it is that it
10 defines its search terms and the bases that it
11 uses so that others can repeat that search.
12     Q.  And so you do not think that the
13 assessment of individual studies for bias is a
14 component of a systematic review; is that right?
15     A.  It may or may not be. Depends on the
16 systematic review. Ideally it would, but just
17 calling something a systematic review doesn't mean
18 it will do that.
19     Q.  And so you're not speaking categorically
20 in that sentence; is that right?
21     MS. NOWLIN-SOHL: Object to form.
22     THE WITNESS: I'm saying the term
23 "systematic review" means that the authors of the
24 reports predefined the search terms they used when
25 conducting the literature reviews in various

**Page 55**

1 databases.
2     Q.  (BY MR. RAMER) Are there systematic
3 reviews where the authors also include an
4 assessment of the individual studies that make up
5 the systematic review?
6     A.  Yes.
7     Q.  So then isn't it wrong to say that all a
8 systematic review is is just predefining the
9 search terms?
10     MS. NOWLIN-SOHL: Object to the form;
11 argumentative, mischaracterizes prior testimony.
12     THE WITNESS: It says "but all a
13 systematic review means is that the authors of the
14 reports predefined the search terms they used when
15 conducting literature reviews in various
16 databases."
17     So if you're calling a paper a systematic
18 review, that is what the term "systematic review"
19 means.
20     It's not saying there's nothing else in
21 it but the search terms. There's the search terms
22 that the papers identify that they summarize in
23 the literature, but when you're using the term
24 "systematic review," what you're highlighting is
25 that -- exactly what I put there, that you

**Page 56**

1 predefined your search terms and the databases you
2 used for searching.
3     MR. RAMER: Okay. I'd like to go to --
4 yeah, I'd like to go to what I'll call Turban
5 Exhibit 6 that I just sent. Let me know when you
6 have it.
7     (Deposition Exhibit No. 6 was marked.)
8     Q.  (BY MR. RAMER) And is this the web page
9 you're citing in footnote 31?
10     A.  Yes, it appears to be.
11     Q.  Okay. And you cite this page in support
12 of the proposition that all a systematic review
13 means is that the authors of the reports
14 predefined the search terms they used when
15 conducting literature reviews in various
16 databases, correct?
17     A.  Correct. This then goes on to say other
18 things went in to add to a systematic review to
19 make it a better systematic review, but again,
20 what the phrase "systematic review" means is that
21 you were systematic in how you collected your
22 literature for the review.
23     Q.  You don't think that it also includes
24 being systematic in how you assess the studies
25 that form the systematic review?

**Page 57**

1     A.  Not necessarily. Ideally it would be,
2 but I don't believe all systematic reviews reach
3 that level of rigor.
4     Q.  Okay. So on this document, Turban
5 Exhibit 6, there is a -- on page 1 there is a bold
6 question that says "What is a systematic review?"
7 And I'm just going to read the first two sentences
8 under that and ask if I read them correctly.
9     It says "A systematic review is guided
10 filtering and synthesis of all available evidence
11 addressing a specific, focused research question,
12 generally about a specific intervention or
13 exposure. The use of a standardized, systematic
14 methods and preselected eligibility criteria
15 reduce the risk of bias in identifying, selecting,
16 and analyzing relevant studies."
17     Did I read that correctly?
18     A.  Yes.
19     Q.  What is your understanding of what this
20 page is describing when it mentions "analyzing
21 relevant studies"?
22     MS. NOWLIN-SOHL: Object to form.
23     THE WITNESS: So they're saying you use
24 standardized systematic methods in preselected
25 eligibility criteria, so those are all things to

15 (Pages 54 - 57)

Page 58

1   identify the studies you're going to look at.
2       They're saying that doing that reduces
3   the risk of bias in identifying, selecting, and
4   then reporting out the relevant studies.  If
5   you -- if you didn't do a systematic review -- and
6   again, a systematic review doesn't guarantee that
7   your search methods are perfect, but it increases
8   the likelihood that you're not going to miss
9   important studies that need to be analyzed.
10      But I don't read this as saying that you
11  necessarily need to have a standardized systematic
12  method of analyzing the relevant studies, although
13  that would be ideal.
14      Q.  (BY MR. RAMER)  Well, in the first
15  sentence then, what is your understanding of what
16  it's referring to when it is discussing the
17  synthesis of all available evidence?
18      A.  The general process of taking all the
19  studies that you identify and then reporting out
20  the summary.
21      Q.  Would creating a synthesis of all
22  available evidence require analyzing the relevant
23  studies?
24      A.  There are many ways you could go about
25  analyzing the relevant studies.

Page 59

1       Q.  Like what?
2       A.  You could read them and give your general
3   impression.
4       You could, if you were doing a practice
5   guideline, you might be able to create criteria.
6   Those are two examples.
7       You might look at the sample size of all
8   of that.
9       You might look at the inclusion and
10  exclusion criteria.
11      Q.  Do you agree that this paragraph states
12  that a systematic review is something more than
13  predefining search terms used when conducting
14  literature reviews in various databases?
15      MS. NOWLIN-SOHL:  Object to form.
16      THE WITNESS:  I believe it explains that
17  the term "systematic review" means that one
18  defines the way that they're defining their search
19  terms and their databases.  That's what a
20  systematic review as a whole means.
21      It goes on to say -- it says -- well, it
22  says halfway down a well-designed systematic
23  review includes clear objectives, preselected
24  criteria, an explicit methodology, a thorough and
25  reproducible search of the literature, an

Page 60

1   assessment of the validity or risk of bias.  And
2   it does go on to tell you how ideally they would
3   be conducted.
4       But the term "systematic review" means
5   what I noted in my declaration.
6       Q.  (BY MR. RAMER)  But you think the meaning
7   of the term you note in your declaration comes
8   from what we're looking at right now?
9       MS. NOWLIN-SOHL:  Object to form;
10  argumentative.
11      THE WITNESS:  Yes.
12      Q.  (BY MR. RAMER)  What is this paragraph --
13  let me rephrase.
14      What is your understanding of what this
15  paragraph is discussing in the sentence you were
16  reading where it says "an assessment of the
17  validity or risk of bias of each included study"?
18      MS. NOWLIN-SOHL:  Object to form; asked
19  and answered.
20      THE WITNESS:  Sorry.  I'm not sure which
21  sentence you're referring to.
22      Q.  (BY MR. RAMER)  You were reading the
23  second-to-last sentence in this paragraph, and you
24  got to the point where it says "an assessment of
25  the validity or risk of bias of each included

Page 61

1   study."
2       And my question is what is your
3   understanding of what that is referring to?
4       MS. NOWLIN-SOHL:  Same objections.
5       THE WITNESS:  Yeah.  So again, that
6   sentence starts "A well-designed systematic review
7   includes," and it ends with "an analysis and
8   presentation of the findings of the included
9   studies."  And before that, "an assessment of the
10  validity or risk of bias that each study
11  included."
12      Not all systematic reviews will be well
13  designed.
14      Q.  (BY MR. RAMER)  Why would a well-designed
15  systematic review include an assessment of the
16  validity or risk of bias of each included study?
17      A.  Again, it's useful information.
18  Different -- analyses of different types of bias
19  provide different types of useful information.
20      But for instance, recall bias would be
21  important to know if people are asked questions
22  about the remote past.  Right?  Like, you'd want
23  to know if you were asking someone about their
24  childhood how long ago was that?  What kind of
25  question was it?  Is it likely that they would

Veritext Legal Solutions
Calendar-Idaho@veritext.com   208-343-4004

1  remember something that long ago given the nature
2  of the event?  It's just one example of the many
3  types of bias we may examine.
4    Q.  And why would a well-designed systematic
5  review look for bias in the individual studies?
6    A.  Because it gets you more information
7  about what the study actually tells you.
8    Q.  Do you agree that assessing bias in the
9  individual studies is an advantage of a systematic
10 review over a narrative review?
11      MS. NOWLIN-SOHL:  Object to form.
12      THE WITNESS:  No.  I think both can do
13 that.
14    Q.  (BY MR. RAMER)  Do they both do it
15 systematically?
16      MS. NOWLIN-SOHL:  Object to form.
17      THE WITNESS:  Not necessarily.
18    Q.  (BY MR. RAMER)  And why not necessarily?
19    A.  Both of them could do it unsystematically
20 based on general impression of the authors.
21    Q.  And I'd like to go back to your
22 declaration and the same paragraph but on the next
23 page, so the run-over.  And the second to last
24 sentence, I'll just read it and ask if I read it
25 correctly.

Page 62

1    A.  So I don't know that I would use this
2  specific citation.
3    Q.  Okay.  And then just going back to your
4  declaration page -- sorry, paragraph 24, but back
5  to page 15 and the sentence we were previously
6  discussing, and so the point of -- I'll just -- to
7  refresh, the sentence says "But all a systematic
8  review means is that the authors of the reports
9  predefined the search terms they used when
10 conducting literature reviews in various
11 databases."
12      And you would agree that the description
13 you give there does not define a well-designed
14 systematic review, correct?
15      MS. NOWLIN-SOHL:  Object to form.
16      THE WITNESS:  I think it's a
17 rectangle/square situation.  I think my definition
18 will cover all systematic reviews.
19    Q.  (BY MR. RAMER)  I think where I'm getting
20 hung up with that answer is the beginning of the
21 sentence where you say, "but all a systematic
22 review means," which means to describe the full
23 universe of systematic reviews can be defined
24 strictly by the fact that the authors used
25 predefined search terms.

Page 64

1      It says "The primary advantage to a
2  systematic review would be its potential, and no
3  guarantee, to identify research publications that
4  had not previously been identified in this
5  discussion."
6      Did I read that correctly?
7    A.  Yes.
8    Q.  And you do not cite anything for that
9  proposition, correct?
10    A.  Correct.  There's no citation on that
11 sentence.
12    Q.  Do you think the documents we were
13 looking at, Turban Exhibit 6 from Harvard that you
14 cited in footnote 31, could support that
15 proposition?
16    A.  Let me look.
17    Q.  And if you don't know, that's fine.
18      Just so I can keep track of time, what
19 page are you on currently?
20    A.  I went through -- I'm not seeing that
21 there is a section that explicitly is discussing
22 what the advantage of the systematic review is
23 over something else.  It's mostly describing what
24 they are.
25    Q.  Okay.

Page 63

1      Is there --
2    A.  All systematic reviews will have
3  predefined their search terms.
4    Q.  And will well-designed systematic reviews
5  only predefine their search terms?
6      MS. NOWLIN-SOHL:  Object to form.
7      THE WITNESS:  This is my rectangle/square
8  comment.
9      So when you're calling something a
10 systematic review, the piece of information you're
11 communicating is that they predefined their search
12 terms and the databases they used.  So that term
13 is telling you that.
14      There are a million other things that the
15 term doesn't tell you, right?  It doesn't tell you
16 the author list.  It doesn't tell you how long it
17 is.  It doesn't tell you how they went about
18 analyzing all the studies.
19      That term tells you that they predefined
20 their search terms in some way, and they tell you
21 what databases they used.  It doesn't tell you
22 more than that.
23    Q.  And can we return to Turban Exhibit --
24 let's see -- Exhibit 4, which is the Users'
25 Guidelines to the Medical Literature?

Page 65

17 (Pages 62 - 65)

(225 of 288), Page 225 of 288
Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 225 of 288
Case 1:23-cv-00269-BLW   Document 74-2   Filed 11/02/23   Page 18 of 177

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1   MS. NOWLIN-SOHL:  What page, John? | 1   expert in this case? |
| 2   MR. RAMER:  Yeah, sorry.  Database | 2   A.  I'm not sure I understand the question. |
| 3   page 275, which I believe is page 304. | 3   Q.  How did you -- |
| 4   MS. NOWLIN-SOHL:  Okay.  We're there. | 4   A.  Sorry.  Come to be an expert in the |
| 5   Q.  (BY MR. RAMER)  And just looking at | 5   field, or how did I get involved in the case? |
| 6   Figure 14-2 again. | 6   Q.  How did you become an expert witness in |
| 7   It seems as though you are defining a | 7   this particular case? |
| 8   systematic review to be something less than what | 8   A.  I was asked by one of the attorneys on |
| 9   Figure 14-2 is defining to be a systematic review; | 9   the case. |
| 10   is that fair? | 10   Q.  And who specifically asked you? |
| 11   MS. NOWLIN-SOHL:  Object to form. | 11   A.  Leslie Cooper. |
| 12   THE WITNESS:  Could you repeat the | 12   Q.  And without going into anything that you |
| 13   question? | 13   spoke about with counsel, when were you contacted |
| 14   Q.  (BY MR. RAMER)  Is it fair to say that | 14   to serve as an expert witness in this case? |
| 15   you were defining systematic review differently | 15   A.  I don't recall.  Sometime recently, |
| 16   from how this is defining systematic review? | 16   perhaps in the past month or so. |
| 17   MS. NOWLIN-SOHL:  Object to form; | 17   Q.  Was it after August? |
| 18   mischaracterizes prior testimony. | 18   A.  I believe so. |
| 19   THE WITNESS:  I don't think that these | 19   Q.  Was it after September 5th? |
| 20   definitions are in conflict with each other. | 20   A.  I really have to look at my call logs. |
| 21   Q.  (BY MR. RAMER)  Do you agree that this | 21   I'm not entirely sure when. |
| 22   figure defines a systematic review to include | 22   Q.  Do you know whether the Defendants in the |
| 23   reviewing the full text of possibly eligible | 23   case had already submitted their brief opposing |
| 24   studies and then assessing risk of bias and | 24   the preliminary injunction when you were asked to |
| 25   abstracting data? | 25   serve as an expert? |
| Page 66 | Page 68 |

| | |
|---|---|
| 1   MS. NOWLIN-SOHL:  Object to form. | 1   A.  I know I received -- I'm not a lawyer.  I |
| 2   THE WITNESS:  Again, not all systematic | 2   received -- what was it? -- a combined brief, I |
| 3   reviews would necessarily assess the risk of bias. | 3   believe, opposing preliminary injunction, |
| 4   I think this is describing how you would ideally | 4   something, the second half of the goal of the |
| 5   conduct a systematic review.  They will always | 5   memorandum that I reviewed at some point. |
| 6   involve reviewing the text of the studies that you | 6   But I don't remember when I received |
| 7   identify.  That's what a review is. | 7   that, so I don't know how the dates lined up.  I |
| 8   Q.  (BY MR. RAMER)  And so you think that in | 8   know I asked to see it at a certain point because |
| 9   this figure, the bottom two lines that make up the | 9   I think it's referenced in something. |
| 10   systematic review are unnecessary for something to | 10   Q.  And do you know the other expert |
| 11   be a systematic review; is that right? | 11   witnesses supporting the Plaintiffs in this case? |
| 12   MS. NOWLIN-SOHL:  Object to the form; | 12   A.  If you named them I could tell you. |
| 13   mischaracterizes prior testimony. | 13   Q.  Dr. Kara Connelly? |
| 14   THE WITNESS:  I don't think all | 14   A.  I know of Dr. Connelly but do not know |
| 15   systematic reviews are necessarily going to assess | 15   her personally. |
| 16   the risk of bias. | 16   Q.  Did you read the declaration she |
| 17   Abstract data -- I'm not sure what | 17   submitted in this case? |
| 18   they're referencing specifically in this figure | 18   A.  I did not. |
| 19   since it's a vague term.  I do think all | 19   Q.  Do you know Dr. Christine Brady? |
| 20   systematic reviews are going to review the studies | 20   A.  I do.  Dr. Brady is a former supervisor |
| 21   that they identify through their predefined | 21   of mine from Stanford. |
| 22   searches. | 22   Q.  Have you spoken at all with Dr. Brady in |
| 23   Q.  (BY MR. RAMER)  And we can kind of shift | 23   this case? |
| 24   gears a little bit and move off that document. | 24   A.  I speak with Dr. Brady because we have |
| 25   Dr. Turban, how did you come to be an | 25   some shared patients.  I don't recall if we |
| Page 67 | Page 69 |

18 (Pages 66 - 69)

(226 of 288), Page 226 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 226 of 288
Case 1:23-cv-00269-BLW  Document 74-2  Filed 11/02/23  Page 19 of 177
Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1 specifically talked about the case, but it | 1 disclosing the contents of the discussion? |
| 2 wouldn't have been anything more than in passing. | 2  A.  Li was with me here, Leslie Cooper, and I |
| 3  Q.  Before you were asked to be an expert in | 3 believe Philip May. |
| 4 this case, did you know that Dr. Brady was serving | 4  Q.  Anyone else? |
| 5 as an expert? | 5  A.  No, not that I recall. |
| 6  A.  I think I knew that Dr. Brady -- I knew | 6  Q.  And, Dr. Turban, what does it mean to be |
| 7 of another case she'd done in Louisiana, and I | 7 transgender? |
| 8 think I knew she was considering doing other | 8  A.  One has a gender identity different from |
| 9 cases.  But I don't know if I knew she was doing | 9 their sex assigned at birth. |
| 10 this one specifically. | 10  Q.  And what is gender dysphoria? |
| 11  Q.  What is the case in Louisiana you're | 11  A.  Gender dysphoria is a diagnosis in the |
| 12 referring to? | 12 DSM-5 -- now DSM-5 text revision that involves |
| 13  A.  I believe it was a case related to the | 13 having a gender identity different from one's sex |
| 14 gender clinic that she worked in.  Sorry, | 14 assigned at birth, and then having clinically |
| 15 what's -- was it Louisville?  University of | 15 relevant distress related to that that causes some |
| 16 Louisville, I think.  I'm forgetting the details. | 16 impairment in social, occupational, or other |
| 17 I talked to her about it years ago. | 17 functioning. |
| 18  Q.  And she was serving as an expert in that | 18  There are two sets of criteria.  One set |
| 19 case? | 19 for prepubertal children, and another set for |
| 20  A.  I don't know if she was an expert or | 20 adolescents and adults. |
| 21 because she was in the clinic was deposed, but | 21  Q.  Can an individual be transgender but not |
| 22 there was some forensic component to it where I | 22 experience gender dysphoria? |
| 23 think they were asking her about care for | 23  A.  Yes. |
| 24 adolescent gender dysphoria. | 24  Q.  Is gender dysphoria different from |
| 25  Q.  Did I freeze? | 25 anxiety? |
| Page 70 | Page 72 |
| 1  A.  Yeah.  You're back up, though. | 1  A.  "Anxiety" is a very broad, untechnical |
| 2  Q.  Okay. | 2 term.  There are a series of anxiety disorders |
| 3  MR. RAMER:  Amy, could you read back the | 3 that are specified in the DSM, like generalized |
| 4 last answer for me? | 4 anxiety disorder or social anxiety disorder. |
| 5  (The record was read by the reporter.) | 5  Q.  And are those different from gender |
| 6  Q.  (BY MR. RAMER)  And, Dr. Turban, before | 6 dysphoria? |
| 7 you were asked to be an expert in this case, did | 7  A.  Those are different diagnoses, yes. |
| 8 Dr. Brady ever contact you about the process of | 8  Q.  And what is the difference between |
| 9 serving as an expert witness? | 9 generalized anxiety disorder and gender dysphoria? |
| 10  A.  We may have spoken about it, like the | 10  A.  In generalized anxiety disorder, one |
| 11 general process of doing expert witness work when | 11 typically has anxiety in several different |
| 12 I was at Stanford, but I don't remember specific | 12 domains.  So for instance, they might be anxious |
| 13 conversations. | 13 about their health and anxious about their grades |
| 14  Q.  And what did you do to prepare for this | 14 and anxious about being late. |
| 15 deposition? | 15  One classic thing we say in psychiatry is |
| 16  A.  I reviewed my own declaration.  I earlier | 16 people with generalized anxiety disorder sometimes |
| 17 reviewed the declarations of Dr. Cantor and | 17 become anxious that they will become anxious, so |
| 18 Dr. Weiss, and I read the State's memorandum that | 18 just highlighting that there are many, many |
| 19 I think was -- I keep forgetting.  I think it was | 19 different types of things that they become anxious |
| 20 a combined memoranda and opposition to preliminary | 20 about. |
| 21 injunction, maybe motion to dismiss. | 21  And then again, that needs to lead to |
| 22  Q.  Did you do any prep for the deposition? | 22 some sort of clinic-basing assent impairment.  So |
| 23  A.  I had two meetings with the lawyers from | 23 all of us have day-to-day worries, but that |
| 24 the ACLU to go through my declaration and prepare. | 24 wouldn't necessarily meet the criteria for |
| 25  Q.  And who was in those meetings, without | 25 generalized anxiety disorder. |
| Page 71 | Page 73 |

19 (Pages 70 - 73)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1       Gender dysphoria is different in that the<br>2 distress is specifically related to an<br>3 incongruence, if you will, which means their<br>4 gender identity and their sex assigned at birth.<br>5     Q.  And is gender dysphoria different from<br>6 some form of clinical depression?<br>7     MS. NOWLIN-SOHL:  Object to form.<br>8     THE WITNESS:  Those are different<br>9 diagnoses.  So there's major depressive disorder,<br>10 for instance, that requires two weeks of a number<br>11 of symptoms related to depression.  It would be<br>12 different combinations of the symptoms, but<br>13 generally depressed mood, loss of ability to enjoy<br>14 things, disturbances in sleep, disturbances in<br>15 appetite, delayed psychomotor movements,<br>16 impairments of concentration.<br>17       Then again separately, gender dysphoria<br>18 is more about the psychological distress related<br>19 to one's sex assigned at birth being different<br>20 from their gender identity.<br>21     Q.  (BY MR. RAMER)  And what is gender<br>22 identity?<br>23     A.  Gender identity is one's psychological<br>24 understanding of their gender broadly in terms of<br>25 masculinity, femininity.<br><br>Page 74 | 1 does not change over time, but the language<br>2 someone uses to describe it can change over time?<br>3     A.  That's how I conceptualize it given the<br>4 biological literature that we have.<br>5     Q.  If an individual identifies as a male at<br>6 age 16 and later identifies as a female at age 22,<br>7 has that person's gender identity changed?<br>8     A.  It would be really difficult to know.  So<br>9 I think I cited in my declaration a paper we wrote<br>10 in the Journal of the American Academy of Child<br>11 and Adolescent Psychiatry about thinking about<br>12 changes in the way people conceptualize their<br>13 gender identity or people's evolution of interests<br>14 in gender-affirming medical care.  And in it, we<br>15 describe that that could be due to internal<br>16 factors or external factors.<br>17       So what we often see -- we call this<br>18 [indiscernible] -- is that if you are constantly<br>19 told that your gender identity or you're harassed<br>20 for being transgender or you're discriminated<br>21 against, you can certainly internalize a lot of<br>22 those messages and then -- which -- or state that<br>23 you are now cisgender.<br>24       We talked about it can also be an<br>25 internal factor where without those external<br><br>Page 76 |
| 1     Q.  Can gender identity change over time?<br>2     A.  So there's research showing that there's<br>3 a strong innate biological basis for gender<br>4 identity that forms kind of the base, if you will.<br>5 That's what I think of as the person's gender<br>6 identity.<br>7       But in the same way that we, with other<br>8 parts of ourselves, kind of describe language to<br>9 that and conceptualize it, put words to it, that<br>10 can evolve over time.<br>11     Q.  And so the latter that you just described<br>12 can change over time, but can the former category,<br>13 the gender identity itself, change over time?<br>14     A.  It seems no.  It seems that there's -- we<br>15 have twin studies, for instance, I think are the<br>16 strongest piece of data that we have for that,<br>17 that are usually what we use for determining if<br>18 something has an innate biological determinate.<br>19 And those show that gender identity has a strong<br>20 biological component, particularly trans<br>21 identities is what the studies looked at.<br>22       But certainly we see patients where the<br>23 language they ascribe to their gender identity or<br>24 their understanding of it could evolve over time.<br>25     Q.  So is it fair to say that gender identity<br><br>Page 75 | 1 negative pressures, you may evolve on your own to<br>2 have a different conceptualization of your gender<br>3 identity.<br>4       The thing that's further complicated is<br>5 minority stress framework explains the ways in<br>6 which people internalize negative messages that<br>7 might minoritize people from the commute.  So you<br>8 can imagine if you are a young trans person who's<br>9 constantly told that trans people are invalid or<br>10 being trans is a result of trauma or you're a<br>11 danger to people on sports teams or you're a<br>12 danger to people in bathrooms, they might start to<br>13 internalize those negative views of trans people<br>14 and then kind of push yourself to present as<br>15 cisgender.<br>16       I think it's similar to what we saw with<br>17 the ex-gay movements in the past.  But again, this<br>18 is seeking broadly and I think we'd have to kind<br>19 of look person by person because it's such a<br>20 complex question.<br>21     Q.  But those examples that you just gave,<br>22 those are examples of the way the language they're<br>23 using to describe their gender identity changes.<br>24 But their actual gender identity has not changed,<br>25 correct?<br><br>Page 77 |

20 (Pages 74 - 77)

(228 of 288), Page 228 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 228 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 21 of 177
Jack Turban , M.D., MHS October 16, 2023

1    MS. NOWLIN-SOHL: Object to form;
2  mischaracterizes prior testimony.
3    THE WITNESS: Yeah, I think I gave
4  examples, both in which the language they used
5  changes but also the ways in which their
6  understanding of their gender identity has evolved
7  potentially through those internal or external
8  factors.
9    But I would go back to the fact that
10  there are these data showing this strong
11  biological determinate of our gender identities.
12  But obviously the human psyche is complex in how
13  it understands and evolves in its understanding of
14  itself.
15    Q. (BY MR. RAMER) So are you saying that
16  there are examples where because they have --
17  individuals have. Let me rephrase.
18    Are you saying there are examples where
19  internal and external factors do in fact change
20  someone's gender identity?
21    A. The external factors can drive internal
22  factors, which can subsequently change one's
23  understanding of their gender identity.
24    Q. And is there a distinction between gender
25  identity and one's understanding of their gender

Page 78

1  identity?
2    A. I believe so. I think it's important to
3  differentiate with what we know about the brain
4  and these innate biological factors from the
5  influence of how people ascribe language and
6  understanding to themselves over time.
7    Q. And so when you're discussing examples
8  where an individual's understanding of their
9  gender identity has changed, that does not mean
10  that their gender identity has changed, correct?
11    A. That's how I would conceptualize it. I
12  think that's fair.
13    Q. And so just going back to my question, if
14  an individual identifies as a male at age 16 and
15  later identifies as a female at age 22, that
16  individual's gender identity has not changed,
17  correct?
18    MS. NOWLIN-SOHL: Object to form; asked
19  and answered.
20    THE WITNESS: Are you thinking of a
21  person that you have more detail where we can
22  discuss it in depth?
23    Q. (BY MR. RAMER) I don't understand. I
24  guess I don't understand how the question -- how
25  the answer, based on your view that gender

Page 79

1  identity does not change over time, could alter
2  the answer to the question.
3    A. So I think your question was the person
4  had a gender identity at one point and then had a
5  different gender identity at the other points, but
6  I would want to know from you what you mean by
7  their gender identity was different at one point
8  in time or two.
9    Did their understanding change? Did
10  something happen? Were they told something? Or
11  even assessing this based on what they are telling
12  you?
13    Q. But so your view is, though, that at time
14  point 1 and time point 2, there is never a change
15  in gender identity, correct?
16    MS. NOWLIN-SOHL: Object to form;
17  argumentative, mischaracterizes prior testimony.
18    THE WITNESS: What I'm saying is there is
19  strong evidence of an innate biological
20  determinate of gender identity that appears to be
21  stable throughout time, but there is extreme
22  complexity in how people think about themselves,
23  and they ascribe language to that and feel
24  comfortable sharing it or not at various times.
25    Q. (BY MR. RAMER) So can you -- are you

Page 80

1  able to say that the evidence shows that gender
2  identity does not change over time?
3    MS. NOWLIN-SOHL: Object to form.
4    THE WITNESS: If you're defining "gender
5  identity" as those innate biological factors, then
6  yes, because they're innate biological factors,
7  that they would be unlikely to change over time.
8    And if you look at clinical experience,
9  I've not had any patients who identified as
10  transgender and then subsequently identified as
11  cisgender.
12    I have had patients who have kind of had
13  this core transgender identity but have kind of
14  shifted the way they conceptualize it between,
15  say, transmasculine or nonbinary.
16    I've had patients who moved somewhere or
17  studied abroad and felt that they weren't safe
18  being out as trans so they went into the closet.
19  To everyone around them, they presented as being
20  cisgender for that period of time.
21    I hope that helps provide context.
22    Q. (BY MR. RAMER) Do you ever think it
23  would be appropriate to provide puberty blockers
24  to a patient who was not formally diagnosed with
25  gender dysphoria under the DSM-5?

Page 81

21 (Pages 78 - 81)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1  A.  Perhaps if they had central precocious | 1  Q.  And have you read it? |
| 2  puberty. | 2  A.  Yes. |
| 3  Q.  Would the exception of central precocious | 3  Q.  Okay.  I'd like to go to page S43, which |
| 4  puberty -- I'll just rephrase it differently. | 4  is page 45 in the PDF. |
| 5  Do you think it is appropriate to provide | 5  MS. NOWLIN-SOHL:  So, John, we have an |
| 6  puberty blockers as a treatment for gender | 6  excerpt that starts at S43, and it's only a |
| 7  dysphoria to a patient who was not formally | 7  24-page PDF. |
| 8  diagnosed with gender dysphoria under the DSM-5? | 8  MR. RAMER:  Yes.  I apologize.  So that's |
| 9  MS. NOWLIN-SOHL:  Object to form. | 9  my fault, so let's just stick with this.  So page |
| 10  THE WITNESS:  I guess I don't understand | 10  S43, the page we're on. |
| 11  how the patient has gender dysphoria if they don't | 11  MS. NOWLIN-SOHL:  Okay. |
| 12  meet the criteria for gender dysphoria. | 12  MR. RAMER:  Sorry about that. |
| 13  Q.  (BY MR. RAMER) Well, would you -- do you | 13  Q.  (BY MR. RAMER)  And this chapter is about |
| 14  think it's appropriate to give puberty blockers to | 14  adolescents, correct? |
| 15  a patient who meets the classification of gender | 15  A.  Correct. |
| 16  incongruence under the ICD-11? | 16  Q.  Okay.  And I'd like to go down to S48, |
| 17  A.  But does not meet the criteria for gender | 17  which is page 6 in the PDF. |
| 18  dysphoria? | 18  And these are WPATH statements of |
| 19  Q.  Correct. | 19  recommendations regarding care for adolescents, |
| 20  MS. NOWLIN-SOHL:  Object to form. | 20  correct? |
| 21  THE WITNESS:  No.  In the United States, | 21  A.  Yes. |
| 22  that would not be appropriate practice. | 22  Q.  So about partway down this box, there's |
| 23  Q.  (BY MR. RAMER)  Is the primary purpose of | 23  an italics that says -- I'll just read it and ask |
| 24  gender-affirming medical interventions to reduce | 24  if I read it correctly. |
| 25  the distress associated with gender dysphoria | 25  It says "The following recommendations |
| Page 82 | Page 84 |

| | |
|---|---|
| 1  A.  Yes. | 1  are made regarding the requirements for |
| 2  Q.  And so a treatment that does not reduce | 2  gender-affirming medical and surgical treatment |
| 3  the distress associated with gender dysphoria | 3  (all of them must be met)." |
| 4  cannot be deemed an effective treatment for gender | 4  Did I read that correctly? |
| 5  dysphoria, correct? | 5  A.  Yes. |
| 6  MS. NOWLIN-SOHL:  Object to form. | 6  Q.  And then I'd like to go to 6.12.C in this |
| 7  THE WITNESS:  The caveat I would add is | 7  box just a few lines down.  And I'll read that and |
| 8  that generally in actual history of gender | 8  ask if I read it correctly. |
| 9  dysphoria is that it worsens over time. | 9  It says "The adolescent demonstrates the |
| 10  So if there were a treatment that could | 10  emotional and cognitive maturity required to |
| 11  prevent the worsening of the distress, that would | 11  provide informed consent/assent for the |
| 12  be an improvement as well, and a notable goal. | 12  treatment." |
| 13  Q.  (BY MR. RAMER)  Oh, I see.  You're saying | 13  Did I read that correctly? |
| 14  like -- you're referring to, like, maintaining the | 14  A.  Yes. |
| 15  baseline is what you're saying? | 15  Q.  And am I right in thinking that as a |
| 16  A.  Yeah.  If you can prevent it from getting | 16  general matter, minors do not actually consent to |
| 17  worse, that would also be a good goal. | 17  treatments but rather their parents provide |
| 18  MR. RAMER:  And, Dr. Turban, I'd like to | 18  informed consent and then the minor provides |
| 19  introduce what we'll call Turban Exhibit 7. | 19  informed assent? |
| 20  (Deposition Exhibit No. 7 was marked.) | 20  MS. NOWLIN-SOHL:  Object to the extent |
| 21  Q.  (BY MR. RAMER)  And I'll just represent | 21  that it calls for a legal conclusion. |
| 22  to you that this is Chapter 6 of the WPATH | 22  THE WITNESS:  In general, that is |
| 23  Standards of Care, Version 8. | 23  correct.  I'll say this is a very conservative |
| 24  And have you seen this document before? | 24  area of medicine, and generally when assessing |
| 25  A.  Yes. | 25  capacity, which is kind of the medical version of |
| Page 83 | Page 85 |

22 (Pages 82 - 85)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| Page 86 | Page 88 |

**Page 86**

1  ability to consent, we use something called the
2  Applebaum criteria for adults.
3      And I think I and many apply those
4  Applebaum criteria for being able to provide
5  informed consent to minors, but technically
6  because they are minors, even if they have -- they
7  meet those Applebaum criteria that we would use
8  for adults saying that they could give informed
9  consent, we would call it assent because of their
10  minor status. Their parents would need to provide
11  the consent for them to be able to access care.
12    Q. (BY MR. RAMER) Would you ever provide --
13  let me rephrase.
14      Would you ever provide the treatment
15  described in Chapter 6 when a minor provides
16  informed assent but you do not have informed
17  consent from the parent?
18    MS. NOWLIN-SOHL: Object to form.
19    THE WITNESS: No, I can't imagine I would
20  do that.
21      And the latest guidelines I think have a
22  statement in there that you need informed consent
23  from parents. I think it says something like
24  unless that would be dangerous. I think that
25  means, you know, like a noncustodial parent or a

**Page 87**

1  parent who is physically abusive or a parent who
2  is not in the child's life that you would need a
3  legal guardian to provide the informed consent.
4    Q. (BY MR. RAMER) And I want to look still
5  in this box. I want to look at first read 6.12.b
6  and ask if I read it correctly, and then I'll read
7  d.
8      So 6.12.b says "The experience of gender
9  diversity/incongruence is marked and sustained
10  over time."
11      Did I read that correctly?
12    A. Yes.
13    Q. And then 6.12.d says "the adolescent's
14  mental health concerns (if any) that may interfere
15  with diagnostic clarity, capacity to consent, and
16  gender-affirming medical treatments have been
17  addressed."
18      And did I read that correctly?
19    A. Yes.
20    Q. So based on these guidelines, could there
21  be times where an adolescent is able to provide
22  informed assent for a treatment but a provider
23  still should not provide the treatment?
24    MS. NOWLIN-SOHL: Object to form.
25    THE WITNESS: I think most of these other

**Page 88**

1  criteria that are kind of separate from the
2  consent criteria would likely make them unable to
3  be able to provide the consent.
4    Q. (BY MR. RAMER) Okay. Well, let's take
5  that and with respect to 6.12.b.
6      Do you think that if an individual has
7  not experienced gender diversity or incongruence
8  for a marked and sustained period of time that
9  they would not be able to provide informed assent?
10    A. Oh, sorry. I thought you were only
11  referencing the text within d and e.
12    Q. Sorry. Do you want me to back out? Can
13  I ask the question again?
14    A. Sure.
15    Q. All I'm asking is so we have this
16  requirement of informed consent/assent in 6.12.c.
17      And my question is simply based on this
18  list and the statement above it that says all of
19  these criteria must be met, doesn't that mean that
20  there can be a situation where adolescent can
21  provide informed assent or consent and thus
22  satisfy 6.12.c and yet nevertheless not be
23  eligible for treatment based on one of these other
24  requirements?
25    A. Yes.

**Page 89**

1    Q. And have you ever heard the terms
2  "assessment model" and "informed consent model"
3  used to describe a treatment protocol?
4    A. Yes.
5    Q. What is the difference between an
6  assessment model and an informed consent model?
7    A. They're not as clearly delineated as I
8  think one would like, but I can kind of describe
9  the two broad concepts.
10      So an informed consent model, this is
11  what we do pretty much in all of medicine where we
12  provide individuals with the risks of a treatment,
13  the potential benefits of a treatment, unknowns of
14  the treatment, just everything that's important to
15  know, like, when making a decision about the
16  treatment.
17      And then they decide -- in pediatric
18  medicine -- again, in the vast majority of the
19  cases it's not actually the adolescent deciding;
20  it's the parents deciding and the adolescent
21  agreeing -- but I think generally most doctors,
22  particularly for their adolescent patients, really
23  want the patients to have about as strong of an
24  understanding of the treatment as their parents
25  do.

23 (Pages 86 - 89)

(231 of 288), Page 231 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 231 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 24 of 177
Jack Turban , M.D., MHS October 16, 2023

Page 90

1 The assessment model is a little bit
2 ill-defined, but it involves still informed
3 consent because you're giving them all the
4 information.
5 But in particular for gender-affirming
6 medical interventions, the guidelines require the
7 biopsychosocial assessment, where in addition to
8 making sure that they have all the information
9 about the treatments to make the decision, you as
10 the provider want to know more so that you're
11 making sure you're supporting them in all the ways
12 that they need to be supported.
13 So you want to know their family history.
14 You want to know genetic predispositions they
15 have. That's kind of the bio -- you want to know
16 any medications they're on. You would want to
17 know any medical conditions they have, bio.
18 Psycho is understanding the way their
19 mind works. Do they have certain personality
20 characteristics? Do they have certain typical
21 thought patterns? We try and vary all psychiatry,
22 but it's safe to say there are many different
23 psychological dynamics that you can evaluate.
24 And then social is particularly important
25 for these kids because you want to understand

Page 91

1 their family environment. You want to understand
2 their peer environment. You want to understand
3 how their teachers are treating them. You want to
4 know if there's potential for bullying or violence
5 or harassment, all of these things that can affect
6 mental health.
7 So you want to have the comprehensive
8 biopsychosocial assessment so you can know all the
9 ways you can help the person, right? So maybe
10 they need us to talk to their school to make sure
11 there's a bathroom where they feel safe.
12 Maybe we need them to talk to their
13 families, help their families understand their
14 experience. Or if there's communication breaking
15 down, getting everyone together to make sure
16 they're on the same page so everyone can feel
17 loved and respected.
18 And maybe in some of the those cases the
19 medical interventions will be in part to consider
20 also, but that assessment model takes a very broad
21 look at the young person, but ultimately does
22 involve a lot of the informed consent work as
23 well.
24 Q. And do you think Chapter 6, these
25 guidelines that we've been looking at, do you

Page 92

1 think these have elements of both models? Or do
2 you think this is better described as an
3 assessment model? Or how would you characterize
4 these particular guidelines?
5 MS. NOWLIN-SOHL: Object to form.
6 THE WITNESS: My understanding is that
7 they require a comprehensive biopsychosocial
8 assessment prior to initiating any
9 gender-affirming medical or surgical care for a
10 minor.
11 Q. (BY MR. RAMER) And if there are
12 requirements over and above informed consent or
13 informed assent such as the provider needs to
14 confirm the length of time of the gender
15 incongruence or the provider needs to address
16 particular comorbidities before providing
17 treatment, wouldn't those be aspects of an
18 assessment model?
19 MS. NOWLIN-SOHL: Object to form.
20 THE WITNESS: This is what I was saying.
21 The distinction is not always entirely cut and
22 dried in that way, because to be able to -- in my
23 opinion, to be able to give true informed consent,
24 you would -- you as the provider would need to
25 understand a lot of those dynamics about the

Page 93

1 person so that you could properly educate them on
2 how to make the decision and the relevant things
3 that they need to consider.
4 Q. (BY MR. RAMER) So I guess -- sorry. Go
5 ahead.
6 A. So I think, you know, informed consent is
7 not the model in pediatrics, I'll say, first and
8 foremost. But I think just the concept of
9 informed consent requires asking the person a lot
10 of questions in a focused assessment kind of way
11 because you need to understand them well to be
12 able to counsel them on informed consent.
13 Q. So you could not accurate -- let me
14 rephrase.
15 You could not accurately describe the
16 guidelines in Chapter 6 as an informed consent
17 model, correct?
18 MS. NOWLIN-SOHL: Object to form; asked
19 and answered.
20 THE WITNESS: I think they involved
21 informed consent, but I think they moved past that
22 into more of an assessment as well. But again,
23 they're not clean distinctions between those two
24 terms.
25 Q. (BY MR. RAMER) And I'd like to go to

24 (Pages 90 - 93)

Jack Turban , M.D., MHS October 16, 2023

1    page S62, which is page 20 in the PDF.
2         And then in the right column it appears
3    there is a section discussing statement 6.12.d in
4    more depth; is that fair?
5         A.   Yes.
6         Q.   Okay.  And I'd like to go to the next
7    page and the left column and specifically the
8    paragraph that is numbered 2.  And I'll just read
9    this full paragraph and ask if I read it
10   correctly, and then we can go from there.
11        It says "Second, mental health can also
12   complicate the assessment of gender development
13   and gender identity related needs.  For example,
14   it is critical to differentiate gender
15   incongruence from specific mental health
16   presentations such as obsessions and compulsions,
17   special interests in autism, rigid thinking,
18   broader identity problems, parent/child
19   interaction difficulties, severe developmental
20   anxieties, (e.g., fear of growing up and pubertal
21   changes unrelated to gender identity), trauma or
22   psychotic thoughts.  Mental health challenges that
23   interfere with the clarity of identity development
24   and gender-related decision-making should be
25   prioritized and addressed."

Page 94

1         Did I read that correctly?
2         A.  Yes.
3         Q.   And what is diagnostic clarity?
4         A.   Sorry, I'm just going to see where it
5    came up in that paragraph.
6         Q.   Sorry.  I think it's in -- let's see
7    here.  It actually might be in the statement
8    itself.  Yeah, sorry.
9         So going back another page -- going back
10   another page, right column, so this is S62,
11   Statement 6.12.d.
12        It says "The adolescent's mental health
13   concerns parentheses (if any) that may interfere
14   with diagnostic clarity."
15        And my question is just what is
16   diagnostic clarity?
17        A.   I think in their instance, they're
18   referencing clarity around a gender dysphoria
19   diagnosis.
20        Q.   And do you agree that mental health
21   concerns can interfere with diagnostic clarity?
22        A.   Yes.
23        Q.   How so?
24        A.   In many of the ways listed.  One example
25   that you gave was autism.

Page 95

1         So I had a patient once who came to me
2    wanting to better understand his gender identity.
3    He had autism and somewhat rigid thinking.  And
4    really enjoyed -- is it okay if I change some of
5    the details to protected the patient's
6    confidentiality if the theme is the same?
7         Q.   We can just say we're talking about a
8    hypothetical, but sure, go ahead.
9         A.   So let's say he enjoyed ballet, like a
10   stereotypical female activity, and wondered if
11   that meant that he was trans.
12        The more we talked to him, we realized
13   that no, he just likes that particular activity,
14   but still very much identified as male and
15   certainly didn't actually have a disconnect
16   between his gender identity and his sex assigned
17   at birth.  Certainly didn't have any problem with
18   his physical body or primary or secondary sex
19   characteristics.
20        And the more we talked through it, it
21   seemed clear, you know, he didn't have gender
22   dysphoria.  But maybe at first glance he did have
23   suspicion for it because of how he was describing
24   this rigid thinking around gender roles' behavior.
25        Q.   If -- and this is another hypothetical.

Page 96

1         If the adolescent is at the beginning of
2    Tanner Stage II has been diagnosed with gender
3    dysphoria and wants puberty blockers, but the
4    adolescent is expressing suicidal ideation, in
5    your opinion, is that adolescent eligibility to
6    receive puberty blockers as a treatment?
7         MS. NOWLIN-SOHL:  Object to form.
8         THE WITNESS:  It depends.  Suicidal
9    ideation is a broad construct.  That kind of
10   ranges from what some people will call passive
11   suicidal ideation, something like, I'd rather not
12   be alive.  I'm so miserable.  But I don't have any
13   plan or intent to harm myself.
14        Another end of the spectrum might be, you
15   know, active suicidal ideation with intent to
16   plan, where somebody wants to die and they have a
17   plan to act on it and they plan to act on it soon.
18   If you were on that side of the spectrum, then
19   we're not going to start talking about puberty
20   blockers.  We're going to work towards an
21   inpatient hospitalization to make sure that that
22   person is safe and stabilized, and then they could
23   potentially be a candidate in the future.
24        Another end of the spectrum I would
25   really want to understand the nature of the

Page 97

25 (Pages 94 - 97)

Jack Turban , M.D., MHS October 16, 2023

Page 98

1 suicidality, you know, if it was not acute
2 suicidality, the person doesn't have a physical
3 safety risk but they're so unhappy that they're
4 expressing a desire not to live even though they
5 wouldn't act on that, and a lot of that is related
6 to gender dysphoria and the fear of puberty
7 progressing. And that's a patient where you might
8 do more work towards understanding if they would
9 be a candidate for pubertal suppression.
10    Q. (BY MR. RAMER) If the patient is
11 expressing passive suicidal ideation, are you
12 saying they would not be eligible until after
13 you've done the further assessment? Or are you
14 saying if the patient is expressing passive
15 suicidal ideation, they would be eligible?
16    A. If they're expressing passive suicidal
17 ideation, that wouldn't make them immediately
18 ineligible but they would need to go through the
19 full biopsychosocial assessment, meet all the
20 other criteria.
21    And if they had -- if their suicidality
22 was being driven by other things that aren't
23 gender dysphoria, we would want to treat those as
24 well. And we'd likely work on safety planning,
25 the standard approaches that we take for patients

Page 99

1 who are having suicidal thoughts.
2    Q. So is passive suicidal ideation, for lack
3 of a better term, less serious than active
4 suicidal ideation?
5    A. Do you have a better term?
6    Q. I'm asking you. You're saying you treat
7 people differently based on whether they have
8 passive suicidal ideation or active, and I guess
9 the question is how do you justify treating them
10 differently?
11    MS. NOWLIN-SOHL: Object to form.
12    THE WITNESS: So if a person has active
13 suicidal ideation with intent to plan, we need to
14 get them somewhere where they can be watched and
15 supervised and make sure they're not going to act
16 on that plan and die.
17    If the person is confident they're not
18 going to act on it; they don't have a plan, then
19 wouldn't necessarily need to be in that type of
20 restrictive setting.
21    MR. RAMER: I think we've been going just
22 a little over an hour. Do you want to -- could
23 you use a break? I could if you couldn't, but
24 either way, do you want to take a break?
25    MS. NOWLIN-SOHL: That sounds good.

Page 100

1    MR. RAMER: Okay.
2    THE VIDEOGRAPHER: Okay. So the time is
3 11:17 a.m. Pacific time, and we are off the
4 record.
5    (Break taken from 11:17 a.m. to 11:23 a.m.)
6    THE VIDEOGRAPHER: All right. So we are
7 recording. The time is 11:23 a.m. Pacific, and we
8 are back on the record.
9    Q. (BY MR. RAMER) Dr. Turban, I'd like to
10 return to Turban Exhibit 7, which is Chapter 6,
11 the "Adolescents" chapter of the SOC8. And going
12 back to page S48, which is 6 in the PDF.
13    I want to look again at statement 6.12.B,
14 which requires that the experience of gender
15 diversity/incongruence is marked and sustained
16 over time.
17    And my question is based on your review
18 of the evidence, do you agree with that
19 requirement as a precondition for adolescent
20 receiving treatment?
21    MS. NOWLIN-SOHL: Object to form;
22 foundation.
23    THE WITNESS: Yes.
24    Q. (BY MR. RAMER) And then with 6.12.d,
25 same page, do you -- let me rephrase.

Page 101

1    Also based on your review of the
2 evidence, do you agree with that requirement as a
3 precondition for receiving treatment?
4    MS. NOWLIN-SOHL: Object to form.
5    THE WITNESS: Yes, as well as based on
6 clinical experience.
7    Q. (BY MR. RAMER) Do you think there's an
8 argument that a less rigorous mental health
9 assessment could be better because patients would
10 not have to go untreated for gender dysphoria as
11 long?
12    MS. NOWLIN-SOHL: Object to form.
13    THE WITNESS: I'm aware that argument has
14 increased.
15    Q. (BY MR. RAMER) And do you agree with
16 that argument?
17    A. I see the theoretical basis for it. That
18 being said, it wouldn't be in line with current
19 guidelines. It's a balance, right? Like, the
20 level of assessment, make sure someone's making a
21 very good, informed decision.
22    The longer the assessment is,
23 particularly for pubertal suppression, the longer
24 people are waiting and progressing through
25 puberty, which is worsening their gender

26 (Pages 98 - 101)

App.1000

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1 dysphoria. So it's a complex balance between | 1     THE WITNESS: So what I was referencing |
| 2 those two factors. | 2 here -- and you'll see at the top I mentioned |
| 3     MR. RAMER: And I'd like to turn to | 3 adult, quote, gatekeeping models, was that there |
| 4 Turban -- or introduce Turban Exhibit 8. | 4 was a history within psychiatry where there was an |
| 5     MR. RAMER: Do you have that, Li? | 5 extensive assessment process prior to adults being |
| 6     MS. NOWLIN-SOHL: Not yet. | 6 able to start gender-affirming medical |
| 7     MR. RAMER: Okay. | 7 interventions, and some of the assessment criteria |
| 8     Q. (BY MR. RAMER) And I can start while | 8 were not very reasonable. You know, if the |
| 9 we're waiting and just ask, Dr. Turban, have you | 9 psychiatrist felt that the trans woman's outfit |
| 10 appeared on an episode of the GenderGP podcast? | 10 was not particularly feminine or felt that her |
| 11     A. Perhaps I'm not sure which podcast that | 11 makeup was done well or that she didn't have the |
| 12 is, but it sounds like a podcast I did appear on. | 12 sexual orientation that the psychiatrist thought |
| 13     MR. RAMER: And are you still waiting on | 13 she should have, they would refuse to provide the |
| 14 it, Li? | 14 person with care. |
| 15     MS. NOWLIN-SOHL: We just got it. | 15     And then also what happened was the trans |
| 16     (Deposition Exhibit No. 8 was marked.) | 16 community just learned the questions that some of |
| 17     THE WITNESS: I see. Yes, I do recall | 17 those physicians were asking, and they would go in |
| 18 this one. | 18 and address the way the person wanted and answer |
| 19     Q. (BY MR. RAMER) Okay. And I'll just | 19 the questions the way they were [indiscernible] |
| 20 represent to you that this is a transcript that is | 20 and it really stifled the relationship. |
| 21 posted on GenderGP's website. | 21     You know the person wasn't actually |
| 22     And on page 1, is that your photo? | 22 answering the questions honestly to the physician |
| 23     A. That is quite the photo of me, yes. | 23 because the things that were being asked weren't |
| 24     Q. I'd like to go to page 6. And at the top | 24 really so much about whether or not decision was |
| 25 of this page, there is a response attributed to | 25 right for the person, and was more about the |
| Page 102 | Page 104 |
| 1 you. And I'll just read the first, the first part | 1 therapist's views around what women should look |
| 2 of this paragraph, and ask you a question about | 2 like. |
| 3 it. | 3     I do think there's a role for assessment |
| 4     And it says "Yeah, I think that's a huge | 4 in pediatrics, but I think it shouldn't be that |
| 5 question that especially in pediatrics people are | 5 kind of thing. I don't think they should be |
| 6 grappling with -- I think people have had an | 6 sitting judging a patient's physical appearance, |
| 7 easier time in adult medicine kind of recognizing | 7 but rather really trying to understand them in a |
| 8 that these, like, assessment/gatekeeping were a | 8 collaborative way so they feel comfortable |
| 9 little bit ridiculous and damaging. And it's | 9 speaking with me, so I really understand them, the |
| 10 interesting that not all of the lessons from that | 10 whole spectrum of their lives, all the ways I can |
| 11 have made it into pediatrics yet because people | 11 support them and guide them and their family |
| 12 don't trust kids to make decisions in the same | 12 through these decisions about whether they will |
| 13 way, obviously, but, like, things people are | 13 benefit from puberty blockers or gender-affirming |
| 14 familiar with, right? Like, if you're -- if you | 14 hormones. |
| 15 set up this assessment, gatekeeping protocol, | 15     Q. Do you think that acquiring a diagnosis |
| 16 people are just going to figure out the answers | 16 of gender dysphoria on the DSM-5 before an |
| 17 and then tell you what you want to hear. And | 17 adolescent can obtain gender-affirming medical |
| 18 you've set up this really kind of like argument | 18 interventions is an assessment model? |
| 19 representative with your patient or client. | 19     A. I think it's somewhat semantics, but |
| 20 (Unclear time stamped 1407). And you're like why? | 20 determining the diagnosis is an assessment. |
| 21 Why even bother? You know?" | 21 You're doing a diagnostic assessment to come to |
| 22     And do you think there's any reason to | 22 that diagnostic conclusion. |
| 23 bother with an assessment model for | 23     Q. Do you think there's a risk that |
| 24 gender-affirming medical interventions? | 24 individuals would be able to figure out the |
| 25     MS. NOWLIN-SOHL: Object to form. | 25 answers to obtain a diagnosis of gender dysphoria |
| Page 103 | Page 105 |

27 (Pages 102 - 105)

App.1001

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1  on the DSM-5 and then tell the providers what they<br>2  want to hear?<br>3      MS. NOWLIN-SOHL:  Object to form; calls<br>4  for speculation.<br>5      THE WITNESS:  I think less so in minors<br>6  because we're usually interviewing their parents<br>7  and other people in their lives as well, so we<br>8  want to have fairly consistent answers between the<br>9  different members of the family.<br>10      And when answers seem to be discordant<br>11  with each other, we usually facilitate family<br>12  therapy sessions to try to come to a shared<br>13  understanding of what's going on to make sure we<br>14  have a clear understanding of the picture.<br>15      Q.  (BY MR. RAMER)  So you think parents'<br>16  observations or conclusions regarding the gender<br>17  identity of their children is relevant to this<br>18  assessment?<br>19      A.  I think the parents' experience and<br>20  perception is a piece of the puzzle, yes.<br>21      Q.  And are you aware of any providers in the<br>22  United States who use only an informed consent<br>23  model to provide gender-affirming medical<br>24  interventions?<br>25      MS. NOWLIN-SOHL:  Object to form.<br><br>Page 106 | 1      A.  Correct.<br>2      Q.  And you're talking about the diagnosis<br>3  for gender dysphoria here; is that right?<br>4      A.  In the context of psychiatric<br>5  appointments.<br>6      Q.  So what do you mean when you say, "The<br>7  only argument for the diagnosis existing is<br>8  insurance coverage"?<br>9      A.  I believe this was in the context of<br>10  arguments about whether or not gender dysphoria<br>11  should be in the DSM.  And there have been<br>12  arguments on both sides.  Some people have<br>13  highlighted concerns that because gender dysphoria<br>14  is in the DSM, that the general public will<br>15  misinterpret that to think that trans identities<br>16  are a mental illness and that that will promote<br>17  stigma, which I think is something that we've<br>18  seen.<br>19      My philosophy on that is that we just<br>20  shouldn't stigmatize mental health conditions<br>21  broadly.  I wouldn't stigmatize someone with major<br>22  depressive disorder in the same way that I<br>23  wouldn't stigmatize someone with gender dysphoria,<br>24  but I understand that stigma exists.<br>25      Another side of the spectrum, people have<br><br>Page 108 |
| 1      THE WITNESS:  For minors or adults?<br>2      Q.  (BY MR. RAMER)  Minors.<br>3      A.  No.  But again, it's this what do you<br>4  mean by informed consent?<br>5      So what I would say, which hopefully<br>6  answers the question, is that everyone I know<br>7  conducts this comprehensive biopsychosocial<br>8  evaluation prior to initiating care, and that that<br>9  biopsychosocial assessment involves ensuring the<br>10  patient can provide informed consent or assent and<br>11  that the parents can provide informed consent.<br>12      Q.  In sticking with this same document, I'd<br>13  like to move to page 11.  And on this page there<br>14  are two answers attributed to you.  One is very<br>15  short.  I'm looking at the second one further<br>16  down.<br>17      And in particular in that paragraph, I<br>18  just want to read the third to last sentence that<br>19  begins with the words "And right."  And I'll<br>20  ask -- I'm sorry.  Maybe the fourth to last -- the<br>21  sentence that begins with the words "And right,"<br>22  and then I'll ask if I read it correctly.<br>23      It says "And right.  The only argument<br>24  for the diagnosis existing is insurance coverage."<br>25      Did I read that correctly?<br><br>Page 107 | 1  made arguments that it should be in the DSM, and<br>2  there are plenty of peer-reviewed publications<br>3  that highlight that for psychiatrists, the main<br>4  reason it's in the DSM is for insurance billing.<br>5  So that if I'm talking to someone about<br>6  gender-affirming medical care, for instance, and<br>7  doing that biopsychosocial evaluation, I need some<br>8  diagnostic code to put down, otherwise I wouldn't<br>9  be able to do that work theoretically.<br>10      Q.  And here you say the only argument for<br>11  the diagnosis existing is insurance coverage.<br>12      Is that what you think?<br>13      MS. NOWLIN-SOHL:  Object to form.<br>14      THE WITNESS:  Again, I think that's in<br>15  the context of psychiatric events.  Like, on a<br>16  broader level, it's a useful diagnosis for<br>17  establishing that somebody could be a candidate<br>18  for gender-affirming medical intervention.<br>19      But, you know, you could get at a similar<br>20  concept of gender dysphoria without using that<br>21  specific term that many find stigmatizing.<br>22      Q.  (BY MR. RAMER)  So, I mean, what do<br>23  you -- how would you do it without using that<br>24  term?  You'd just call it something else?<br>25      MS. NOWLIN-SOHL:  Object to form.<br><br>Page 109 |

28 (Pages 106 - 109)

App.1002

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| Page 110 | Page 112 |

**Page 110**

1       THE WITNESS: I mean, you could describe
2 that the person has a gender identity that's
3 incongruent with their sex assigned at birth and
4 have for many years, and that's creating
5 clinically relevant distress. Maybe describe the
6 different elements of typical gender dysphoria
7 that they have. But the way insurance billing is
8 set up, you would need to actually generally bill
9 that kind of diagnostic code.
10       Similarly, a lot of insurance companies
11 won't cover, I think, some of the medical
12 appointments as well unless there's a diagnostic
13 code.
14     Q. (BY MR. RAMER) Do you think that an
15 individual who has distress resulting from --
16 well, no, let me rephrase.
17       Do you think there are instances where an
18 individual can desire gender-affirming medical
19 interventions but not meet the criteria for a
20 diagnosis of gender dysphoria under the DSM-5?
21     A. It's theoretically possible.
22     Q. And do you think that those individuals
23 should receive gender-affirming medical
24 interventions?
25       MS. NOWLIN-SOHL: Object to form; calls

**Page 111**

1 for speculation.
2       THE WITNESS: No. That would be
3 practicing outside of guidelines.
4     Q. (BY MR. RAMER) Don't the guidelines
5 create exceptions? Or are they rigid rules?
6     A. They're a general set of guidelines for
7 care.
8       But that would be an extreme departure,
9 to provide the intervention to somebody in the
10 United States where we use the DSM where who doesn't
11 meet the criteria for gender dysphoria. It's hard
12 for me to imagine that situation happening.
13     Q. And just as a -- you know, an expert in
14 this field, do you think the guidelines should
15 prevent those individuals from receiving
16 gender-affirming medical interventions?
17       MS. NOWLIN-SOHL: Object to form. Also
18 objection to the extent that it calls for a legal
19 conclusion.
20       THE WITNESS: Yeah, I mean, I'm hesitant
21 to make broad characterizations of all of medicine
22 not knowing, like, all the specific details of a
23 given case. But I can't picture a case that
24 would be a reasonable practice.
25     Q. (BY MR. RAMER) I couldn't hear you at

**Page 112**

1 this end.
2       Did you say you could not picture a case?
3     A. I cannot picture a case where that would
4 be a reasonable practice.
5     Q. And I want to skip the next sentence and
6 then read the one after that and ask if I read it
7 correctly.
8       It says "Never once have I had a" --
9 sorry. I'll start again.
10       "Never once have I had a treatment plan
11 for someone's, like, gender dysphoria. But I've
12 had treatment plans to help them with their
13 anxiety or their depression or trauma-related
14 symptoms."
15       Did I read that correctly?
16     A. Sorry. I'm just finding where you are.
17       Yes.
18     Q. And is it true that you have never once
19 had a treatment plan for someone's gender
20 dysphoria?
21     A. So again, this is talking in the context
22 of a psychiatric treatment plan. So I wouldn't
23 have -- there's no evidence psychotherapy is to
24 try and push someone to identify with their sex
25 assigned at birth.

**Page 113**

1       I might try and work with their school
2 around bullying or work with their family around,
3 like, communication and validation skills or --
4 what I'm getting at here is there's not an
5 evidence-based psychotherapy or psychiatric
6 medication that's evidence based for gender
7 dysphoria.
8     Q. I guess I thought we were just discussing
9 that the only reason for the diagnosis is so that
10 you can enter a code for health insurance
11 purposes.
12       And I guess I don't understand if you
13 don't have treatment plans for gender dysphoria
14 because you're a psychiatrist, what is the need
15 for the diagnosis?
16       MS. NOWLIN-SOHL: Object to form;
17 mischaracterizes prior testimony.
18       THE WITNESS: So for instance, if I were
19 doing the biopsychosocial assessment for somebody
20 to consider starting pubertal suppression, and I'm
21 conducting the biopsychosocial assessment to
22 broadly support them in many areas of their life
23 and then also, you know, pass them on to the next

29 (Pages 110 - 113)

(237 of 288), Page 237 of 288
Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 237 of 288
Case 1:23-cv-00269-BLW   Document 74-2   Filed 11/02/23   Page 30 of 177

Jack Turban , M.D., MHS   October 16, 2023

Page 114

1  step to actually get them treatment, which is the
2  pubertal suppression. So it's a bit of semantics
3  in that way.
4       I think another problem that comes up
5  sometimes -- and, again, with the insurance
6  issue -- is let's say I do an assessment and the
7  person doesn't meet the criteria for a gender
8  dysphoria, then you're also left with, you know,
9  what do we bill insurance in this instance?
10      But it's just kind of a technicality of
11 how insurance billing works.
12      Q.  (BY MR. RAMER) So is the only thing that
13 you as a psychiatrist do for the treatment for
14 gender dysphoria is the initial biopsycho -- let
15 me rephrase.
16      Is the only thing that you, as a
17 psychiatrist, do for the treatment of gender
18 dysphoria the initial biopsychosocial assessment?
19      MS. NOWLIN-SOHL:  Object to form.
20      THE WITNESS:  Yes.  In terms of the
21 distress the person's having related to their
22 physical body not aligning with their gender
23 identity, our primary role is to do that
24 biopsychosocial assessment.
25      If they had something else going on, if

Page 115

1  they had major depressive disorder or generalized
2  anxiety disorder, I would treat that as well.  And
3  I'll also do general psychosocial intervention so
4  family therapy or working with the school or
5  trying to prevent bullying.
6       But those things don't work to get rid of
7  the fact that they're distressed about their
8  body not aligning with their gender identity,
9  which is the gender dysphoria.
10      Q.  (BY MR. RAMER) Are there individuals who
11 have gender dysphoria but do not have anxiety that
12 rises to the level of general anxiety disorder?
13      A.  Generalized anxiety disorder is not
14 defined by the level of anxiety but rather the
15 types of things about which one has anxiety.
16      Q.  So in this sentence when you say "But
17 I've had treatment plans to help them with their
18 anxiety or their depression," are you referring to
19 actual diagnoses of an anxiety disorder or a
20 depression disorder?
21      A.  Yeah.  Those are colloquialisms for
22 anxiety disorders, which there are many, or
23 depression which can have many different diagnoses
24 that cause it.
25      Q.  And so for that treatment you're

Page 116

1  describing there, there actually is a different
2  diagnostic code for purposes of health insurance,
3  right?  You're treating anxiety or you're treating
4  depression?
5       MS. NOWLIN-SOHL:  Object to form.
6       THE WITNESS:  If I were treating someone
7  who had that.  But not everyone who comes to see
8  me as part of gender-related care is going to have
9  those other diagnoses.
10      Q.  (BY MR. RAMER)  So do you see patients
11 who are receiving gender-affirming medical
12 interventions after you have conducted the
13 biopsychosocial assessment with them?
14      A.  Like, do I continue to see them?
15      Q.  Yes.
16      A.  Yes.
17      Q.  And what are you doing during those
18 meetings?
19      A.  It depends on the patient.
20      Q.  Can you provide me some examples?
21      A.  If they also had -- generally if they --
22 for someone who ultimately did start the
23 gender-affirming medical intervention, I would
24 check with them to see how they're feeling about
25 the intervention, making sure that they're

Page 117

1  comfortable continuing with it, seeing if they
2  have any questions or if there are any worries
3  that are coming up around it.
4       If they also had generalized anxiety
5  disorder, I might be offering an evidence-based
6  medication or an evidence-based psychotherapy for
7  generalized anxiety disorder like cognitive
8  behavioral therapy.
9       Q.  Was there more?
10      A.  I don't know how many examples --
11      Q.  That's fine.  That's fine.  Let's -- so
12 same page, toward the bottom, and just there's a
13 statement attributed to Dr. Helen Webberley.
14      In this paragraph she's discussing
15 Johanna Olson-Kennedy, correct?
16      A.  Do you want me to --
17      Q.  Sure, you can.  And just as a reminder,
18 my question is just simply if she is discussing
19 Johanna Olson-Kennedy.
20      A.  Looks like she's referencing
21 Dr. Olson-Kennedy as well as -- I don't know who
22 Darlene Tando is.  I don't know Aiden's last name,
23 but I believe Aiden is a psychotherapist who works
24 with trans youth.
25      Q.  And do you know Dr. Olson-Kennedy?

30 (Pages 114 - 117)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1     A. Yes. | 1   mental health treatment. |

1    A.  Yes.
2    Q.  And on page 12, Dr. Webberley -- so top
3  of page 12, second and third full sentences,
4  Dr. Webberley says, "And basically Johanna has
5  just said, 'Look, if your kid -- if your kid tells
6  you that they're trans, they most likely are.
7  Just believe it.'"
8      Did I read that correctly?
9    A.  Yes.
10    Q.  Do you agree that Dr. Olson's -- well,
11  sorry.
12      Do you agree that Dr. Olson-Kennedy's
13  practice is that if your kids tell you that
14  they're trans, you should just believe it?
15      MS. NOWLIN-SOHL:  Object to form;
16  foundation.
17      THE WITNESS:  I think probably that's
18  mostly glib. I don't think that's her actual
19  practice.
20      My understanding is that she conducts the
21  biopsychosocial evaluation, and that Aiden --
22  again, whose last name I forget -- is a therapist
23  who similarly conducts those evaluations.
24    Q.  (BY MR. RAMER)  And then same page down
25  to your response which follows.  And I'll just

Page 118

1  mental health treatment.
2      The good thing that's unique about their
3  model versus other models is it's not necessarily
4  like an LMFT or a social worker or a psychologist.
5  It's this medical doctor who has special training
6  in conducting biopsychosocial assessments, whereas
7  other places it's more, you know, a psychologist
8  or a psychiatrist.
9      And then what they've told me is that if
10  it is particularly complex and they feel that they
11  need someone like a Ph.D. or psychologist, those
12  individual patients they'll refer over.  So if
13  someone has complex autism or trauma or psychosis.
14    Q.  And you used an acronym, "LMFT."
15      What is that?
16    A.  It's a licensed marriage and family
17  therapist.
18    Q.  And at Brown University, you said -- did
19  you say Dr. Forcier?
20    A.  Yes.  F-o-r-c-i-e-r.
21    Q.  But in this passage, you say that, quote,
22  they don't have a lot of mental health
23  involvement, end quote.
24      What did you mean by that?
25    A.  Yeah, that in their clinics, there are

Page 120

1  read the first few sentences and ask if I read it
2  correctly.
3      It says "Yeah, I was really talking
4  around it and not naming names, but that model
5  does exist in the U.S., right?  So Dr. Olson,
6  that's her model.  Brown University's clinic has a
7  similar model.  And I think we're now starting to
8  have the conversations like, great.  Those models
9  have now been around for a little while where they
10  don't have a lot of mental health involvement.
11  They don't have a gatekeeping model.  They have
12  this informed consent model, and so far it seems
13  to be going fine."
14      Did I read that correctly?
15    A.  Yes.
16    Q.  And are you, in this response, accurately
17  describing the model that Dr. Olson-Kennedy uses?
18    A.  Again, I think it's a little tricky
19  between these terms, assessment and gatekeeping
20  and informed consent being somewhat unclear.
21      But my understanding, especially talking
22  to Dr. Olson and -- Dr. Forcier is the one at the
23  Brown University clinic -- is that they do conduct
24  these biopsychosocial assessments as adolescent
25  medicine physicians who are trained in doing

Page 119

1  these adolescent medicine physicians who have kind
2  of broader training.  So they -- they can
3  prescribe hormones and puberty blockers, but they
4  also are the pediatric medical specialty that
5  focuses the most on mental health.  So they're not
6  pure psychiatrists the way that I am, so there's
7  not necessarily a psychologist or psychiatrist
8  involved in every single case.  Sometimes it's an
9  adolescent medicine physician who has mental
10  health expertise.
11    Q.  And so that model results in less mental
12  health involvement; is that right?
13      MS. NOWLIN-SOHL:  Object to form.
14      THE WITNESS:  Yeah, I guess I'm saying
15  less mental health involvement.  I just mean that
16  it's an adolescent medicine doctor who has mental
17  health training that is different than, say, a
18  psychiatrist or a psychologist who only has mental
19  health training.
20      So for them, it could be the same person
21  doing the biopsychosocial mental health assessment
22  and also providing the hormones, whereas in other
23  models you have a specified, separate person.
24    Q.  (BY MR. RAMER)  So are there patients
25  receiving fewer mental health interventions as a

Page 121

31 (Pages 118 - 121)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1  result? | 1  psychiatrist, so I am the one doing mental health |
| 2  MS. NOWLIN-SOHL:  Object to form; calls | 2  assessment, but I can't remember if there's |
| 3  for speculation. | 3  specific language in the old guidelines versus the |
| 4  THE WITNESS:  No, I think it's fewer | 4  new guidelines that said whether it could be an |
| 5  practitioners that they're seeing but not | 5  adolescent medicine physician doing the mental |
| 6  necessarily fewer mental health interventions. | 6  health biopsychosocial evaluation versus another |
| 7  Q.  (BY MR. RAMER)  And what's the benefit of | 7  type of medical professional. |
| 8  having fewer practitioners that they're seeing? | 8  Q.  (BY MR. RAMER)  And you don't know the |
| 9  A.  I think their logic is that it would be | 9  answer to that question with respect to the |
| 10  more streamlined.  So for instance, in our model, | 10  current guidelines either? |
| 11  a patient has to wait many months to be able to | 11  MS. NOWLIN-SOHL:  Object to form. |
| 12  come in to see me.  You know, there's, like, the | 12  THE WITNESS:  I believe the current |
| 13  delay going from provider to provider having more | 13  guidelines say "mental health professional," but I |
| 14  and more appointments. | 14  would have to go back and look.  It hasn't been |
| 15  So in our model, we do often have | 15  relevant since I am a mental health professional. |
| 16  patients who are progressing through puberty while | 16  Q.  (BY MR. RAMER)  Yeah.  Yeah.  Okay.  That |
| 17  their mental health is worsening while we try and | 17  makes sense. |
| 18  work on logistics of getting that biopsychosocial | 18  MR. RAMER:  Li, did you receive Turban |
| 19  assessment done.  But in their model, because it's | 19  Exhibit 9? |
| 20  the same doctor, it's more streamlined. | 20  MS. NOWLIN-SOHL:  No. |
| 21  And again, I don't work in these clinics. | 21  MR. RAMER:  Still no? |
| 22  I'm giving you my understanding from talking to | 22  MS. NOWLIN-SOHL:  Still no. |
| 23  them to the best of my ability.  But take it with | 23  MR. RAMER:  Well, I'll just -- we can get |
| 24  a grain of salt, having not actually worked in | 24  started and then we can confirm the document. |
| 25  there or seen their exact protocols. | 25  Q.  (BY MR. RAMER)  But what I'm going to be |
| Page 122 | Page 124 |

| | |
|---|---|
| 1  Q.  And at the beginning of this answer you | 1  bringing up, Dr. Turban, is your article entitled |
| 2  say you were talking around it and not naming | 2  "Pubertal" -- "Pubertal Suppression For |
| 3  names. | 3  Transgender Youth and Risk of Suicidal Ideation," |
| 4  Why were you not naming names? | 4  which is published in Pediatrics. |
| 5  A.  I don't remember.  I'd have to go through | 5  MR. RAMER:  You still do not have the |
| 6  the rest of the -- | 6  document? |
| 7  Q.  That's fine.  If you don't know -- | 7  MS. NOWLIN-SOHL:  Just arrived. |
| 8  A.  Probably because I was just speaking in | 8  THE WITNESS:  Okay. |
| 9  general terms and not talking about the specific | 9  (Deposition Exhibit No. 9 was marked.) |
| 10  clinics. | 10  Q.  (BY MR. RAMER)  And is this that |
| 11  Q.  And so it doesn't have something to do | 11  document, Doctor? |
| 12  with the fact that the type of model they're using | 12  A.  Yes. |
| 13  would somehow be controversial? | 13  Q.  And where did the data for this article |
| 14  MS. NOWLIN-SOHL:  Object to form. | 14  come from? |
| 15  THE WITNESS:  I don't know what you mean | 15  A.  This data is from the 2015 U.S. |
| 16  by "controversial." | 16  Transgender Survey. |
| 17  Q.  (BY MR. RAMER)  Well, I guess that it | 17  Q.  And looking -- sticking with your |
| 18  would be inconsistent with the WPATH guidelines. | 18  article, going to page 3 under "Methods," and just |
| 19  MS. NOWLIN-SOHL:  Object to form. | 19  at a high level of generality, I'm trying to |
| 20  THE WITNESS:  I would have to go back and | 20  understand what the study does.  And basically -- |
| 21  look at when this interview was and look at how | 21  tell me if I have this generally correct. |
| 22  the guidelines evolved, because I think it was | 22  Basically the study takes two different |
| 23  during Standards of Care 7. | 23  groups.  The first group is individuals who wanted |
| 24  And I can't remember -- it's something | 24  puberty blockers and received them; and the second |
| 25  that's irrelevant to me because I am a | 25  group is individuals who wanted puberty blockers |
| Page 123 | Page 125 |

32 (Pages 122 - 125)

App.1006

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1 but did not receive them.<br>2     Is that fair?<br>3     A. Yes.<br>4     Q. And then you compared those two groups on<br>5 a number of different metrics, correct?<br>6     A. Yes.<br>7     Q. And on this page, moving down to "Study<br>8 Population," I just -- the second and third<br>9 sentences I'm going to read and ask if I read them<br>10 correctly.<br>11     It says that "Given that pubertal<br>12 suppression for transgender youth was not<br>13 available in the United States until 1998, only<br>14 participants who are 17 or younger in 1998 would<br>15 have had healthcare access to GnRHa for pubertal<br>16 suppression. We thus restricted the analysis to<br>17 participants who were 36 or younger at the time of<br>18 the survey resulting in a sample of 20,619<br>19 participants."<br>20     Did I read that correctly?<br>21     A. Yes.<br>22     Q. And the basic idea there is that it's<br>23 highly unlikely, if not impossible, that anyone<br>24 over the age of 36 at the time of the survey would<br>25 have had access to puberty blockers to treat<br><br>Page 126 | 1 the sentence that says "P less than .05 defines<br>2 statistical significance."<br>3     Is that right?<br>4     MS. NOWLIN-SOHL: Object to form.<br>5     THE WITNESS: That's talking about one<br>6 specific -- but the way you build these models,<br>7 there are different statistical thresholds for<br>8 different parts in how you build the model.<br>9     Q. (BY MR. RAMER) And is a P-value of less<br>10 than .05, is that a standard P-value for a<br>11 threshold of statistical significance?<br>12     A. It depends on what you're doing.<br>13     Q. And so like what? What does it depend<br>14 on?<br>15     A. For instance, if you were running a study<br>16 that had, like, hundreds and hundreds of<br>17 comparisons, you'd want to do a correction for<br>18 multiple comparisons and do it using a lower<br>19 P-value.<br>20     If you were deciding which variables to<br>21 build into a logistic progression model, you would<br>22 probably use a higher P-value like the .2 that we<br>23 used.<br>24     Q. When you have a threshold of statistical<br>25 significance of less than .05, what do you make of<br><br>Page 128 |
| 1 gender dysphoria; is that right?<br>2     A. I wouldn't say it's impossible. There<br>3 have been some historical studies done by Jules<br>4 Gill-Peterson, who I think is at the University of<br>5 Pittsburgh now, that found that individual<br>6 physicians were offering pubertal suppression in<br>7 the United States earlier than this.<br>8     But this is a rough guideline based on<br>9 what we knew from the published literature. This<br>10 was then in the published literature. The first<br>11 time it seemed to be offered was at the Gender<br>12 Management Service at Boston Children's Hospital,<br>13 it made a publication that -- roughly 1988 is when<br>14 they started.<br>15     Q. And then going to the next page,<br>16 statistical analysis, about three-quarters of the<br>17 way down the paragraph, it states that your<br>18 threshold for statistical significance was a<br>19 P-value of less than .05; is that right?<br>20     A. I believe that's just for when we were<br>21 comparing demographic differences. In the<br>22 multivariable logistic progression, we chose<br>23 anything with a P-value of less than .2 to include<br>24 in the model.<br>25     Q. Okay. That's fair. And I'm just reading<br><br>Page 127 | 1 a finding with a P-value of .07 or .08 just as a<br>2 theoretical manner?<br>3     A. Theoretically it would tell you nothing<br>4 one way or another.<br>5     Q. Have you heard people use the term<br>6 "substantial finding" or "important finding" for<br>7 something like that where the P-value doesn't<br>8 fully reach the threshold of statistical<br>9 significance?<br>10     MS. NOWLIN-SOHL: Object to form.<br>11     THE WITNESS: I've heard people use the<br>12 term "trend" toward whatever the recitation<br>13 they're looking at is. I was trying not to do<br>14 that.<br>15     Q. (BY MR. RAMER) And sticking with page 4,<br>16 going up to the top, the first full paragraph but<br>17 then the last two sentences in that paragraph,<br>18 just read and ask if I read it correctly.<br>19     It says "Those who reported beginning<br>20 treatment after age 17 were excluded to only<br>21 include participants who likely had pubertal<br>22 suppression during the active endogenous puberty.<br>23 The vast majority of adolescents would have<br>24 reached Tanner 5, the final stage of puberty, by<br>25 age 17."<br><br>Page 129 |

33 (Pages 126 - 129)

Jack Turban , M.D., MHS   October 16, 2023

| | |
|---|---|
| 1  Did I read that correctly?<br>2  A.  Yes.<br>3  Q.  Why would someone report receiving<br>4  pubertal suppression after age 17?<br>5  A.  For birth-assigned males, estrogen alone<br>6  is not strong enough to suppress your endogenous<br>7  testosterone, so you often need a second<br>8  medication on board.  You could use a puberty<br>9  blocker or GnRH agonist to do that.  They're<br>10 expensive, so generally they're not.  Generally<br>11 one uses something like spironolactone.<br>12  But want to really be looking at it in<br>13 people who are using it to suppress active puberty<br>14 rather than, you know, suppress testosterone for<br>15 someone who was already past the pubertal<br>16 adolescent window.<br>17  Q.  So you excluded participants who reported<br>18 beginning pubertal suppression after age 17<br>19 because you didn't want to look at that particular<br>20 treatment?<br>21  MS. NOWLIN-SOHL:  Object to form.<br>22  THE WITNESS:  Our clinical question here<br>23 was pubertal suppression during adolescence rather<br>24 than, you know, blocking endogenous testosterone<br>25 as an adult.<br><br>                                          Page 130 | 1  like to go to page 100.<br>2  And in the right column there's a blue<br>3  header it says "See puberty blocking hormones,"<br>4  and there's one paragraph below it.  And the final<br>5  sentence of that paragraph says "However, less<br>6  than 1 percent of respondents reported ever having<br>7  them."  And then there's an endnote 12.<br>8  Do you see that?<br>9  A.  Yes.<br>10 Q.  And then if we go to page 126, the left<br>11 column is endnote 12.  And I'd just like to read<br>12 the middle sentences here and ask if I read them<br>13 correctly.<br>14  It says "While puberty-blocking<br>15 medications are usually used to delay physical<br>16 changes associated with puberty and youth ages 9<br>17 to 16 prior to beginning hormone replacement<br>18 therapy, a large majority, 73 percent of<br>19 respondents who reported having taken puberty<br>20 blockers in Q.12.9, reported doing so after age 18<br>21 in Q.12.11.  This indicates that the question may<br>22 have misinterpreted by some respondents who<br>23 confused puberty blockers with the hormone therapy<br>24 given to adults and older adolescents."<br>25  Did I read that correctly?<br><br>                                          Page 132 |
| 1  MR. RAMER:  And, Li, do you have Turban<br>2  Exhibit 10?<br>3  MS. NOWLIN-SOHL:  Yes.<br>4<br>5  (Deposition Exhibit No. 10 was marked.)<br>6  Q.  (BY MR. RAMER)  And, Dr. Turban, is this<br>7  the survey that you used for this paper?<br>8  A.  This looks like the report of the full<br>9  survey, yes.<br>10 Q.  Fair.  And I'd like to go to page 271 and<br>11 specifically question 12.9 on that page.<br>12  And is this the question that you used to<br>13 determine the number of participants who received<br>14 pubertal suppression?<br>15 A.  Yes.<br>16 Q.  And then they would have, for -- I guess<br>17 let's go to 272 now.<br>18  And then if they had selected puberty<br>19 blocking hormones in 12.9, they would be sent to<br>20 question 12.11; is that right?<br>21 A.  Yes.<br>22 Q.  And then they would have a drop-down and<br>23 report their age; is that right?<br>24 A.  Correct.<br>25 Q.  Okay.  Sticking with this document, I'd<br><br>                                          Page 131 | 1  A.  Yes.<br>2  Q.  Would you agree that 73 percent is a<br>3  large percentage of these respondents?<br>4  A.  Yes.  And again, these are the<br>5  respondents that we excluded from our study<br>6  because we didn't want to look at those who<br>7  potentially misinterpreted the question or had<br>8  accessed puberty blockers later as adults.<br>9  Q.  Do you agree with the second statement I<br>10 read that "Respondents may have misinterpreted<br>11 this question and confused puberty blockers with<br>12 the hormone therapy given to adults and older<br>13 adolescents"?<br>14  MS. NOWLIN-SOHL:  Object to form;<br>15 foundation.<br>16  THE WITNESS:  Potentially for those older<br>17 respondents who we excluded.  I think it's less<br>18 likely for younger people who would be more aware<br>19 of what pubertal suppression is.<br>20 Q.  (BY MR. RAMER)  If that many people<br>21 misunderstood the question, how can you assume the<br>22 other 27 percent correctly understood the<br>23 question?<br>24  MS. NOWLIN-SOHL:  Object to form.<br>25  THE WITNESS:  There is no way to be<br><br>                                          Page 133 |

34 (Pages 130 - 133)

Page 134
1  certain, but I think for younger people who are
2  closer to when pubertal suppression was around and
3  available and in conversation, they would know the
4  difference between the two.  But there's no way to
5  be sure.
6      Q.  (BY MR. RAMER)  And so this error that's
7  described in footnote 12 does not give you pause
8  in relying on this data?
9      A.  Not extreme pause again, because these
10  people were all excluded from the study, all of
11  the adults who would have said they accessed it
12  late.
13      Q.  I'd like to go back to page 271, and in
14  the right column, question 12.8.
15          And this is the question you used to
16  define the group of people who have ever wanted
17  pubertal suppression, correct?
18      A.  Correct.
19      Q.  And did you adjust the results for this
20  question based on the same error that affected the
21  results for question 12.9?
22          MS. NOWLIN-SOHL:  Object to form.
23          THE WITNESS:  We similarly excluded all
24  older individuals who wouldn't have been able to
25  access them, which would have gotten rid of a lot

Page 136
1  and after and find all that's improved after the
2  treatment, then there's the study that compares
3  those who did receive treatment to those who
4  didn't at a single time point.  And this is one of
5  those latter studies.
6          MR. RAMER:  I'm going to send now, see
7  when it reaches you, what I'll mark as Turban
8  Exhibit 11.  And this will be --
9          (Deposition Exhibit No. 11 was marked.)
10      Q.  (BY MR. RAMER)  This will be your article
11  in Plos One -- sorry, I guess clarification.
12          Do you say "Plos One"?
13      A.  I do.
14      Q.  Okay.  This will be your article in Plos
15  One entitled "Access to Gender-Affirming Hormones
16  During Adolescence and Mental Health Outcomes
17  Among Transgender Adults."
18          And the method in this article is similar
19  to the article we just looked at, right?
20          MS. NOWLIN-SOHL:  John, we don't actually
21  have the exhibit quite yet.  Can we actually just
22  hang on a second?
23          MR. RAMER:  I mean, does he not --
24      Q.  (BY MR. RAMER)  Doctor, is the method you
25  used in accessing gender-affirming hormones with

Page 135
1  of the older people who answered the question.
2      Q.  (BY MR. RAMER)  In the relevant time
3  periods -- I'm sorry.
4          First let's go back to your article,
5  which is Turban Exhibit 9.  And it's page 4 where
6  it says "Outcomes."
7          And the relevant time periods for the
8  metrics in this paragraph were the past month, the
9  past year, and lifetime, correct?
10      A.  Yes.
11      Q.  And with respect to the time periods for
12  the past month and the past year, those dates are
13  from the date the survey was taken, right?
14      A.  Correct.
15      Q.  And so with you excluding anybody 36
16  years old and older, your data would still include
17  a 35-year-old who said he had suicidal ideation in
18  the last month, right?
19      A.  Correct.
20      Q.  And this paper does not report the change
21  in these metrics based on the purported inability
22  to access pubertal suppression, correct?
23      A.  No.  So as I explained in the
24  declaration, there are two types of studies
25  generally for this area, studies that look before

Page 137
1  respect to the U.S. Transgender Survey similar to
2  what you did in the article we just looked at?
3      A.  The methodology of the Plos One paper is
4  similar to the Pediatrics paper.
5      Q.  And the major difference is this paper
6  that we're going to be looking at is focused on
7  cross-sex hormones, whereas the prior one was
8  focused on pubertal suppression; is that right?
9      A.  Generally, yes.
10          MR. RAMER:  And are we still waiting on
11  it, Li?
12          MS. NOWLIN-SOHL:  Yes.
13      Q.  (BY MR. RAMER)  I guess I'll just ask you
14  a general question, Doctor, about what an odds
15  ratio is.  And here's what I think it is, and
16  please tell me if I have this wrong.
17          Basically an odds ratio of one tells us
18  there is no relationship between an exposure and
19  an outcome.  And an odds ratio of greater than one
20  tells us that the exposure is associated with
21  higher odds of that particular outcome.  And an
22  odds ratio of less than one tells us that the
23  exposure is associated with lower odds of that
24  particular outcome.
25          Is that close to being right?

35 (Pages 134 - 137)

| | |
|---|---|
| 1    A. Yes, with the caveat that you would also | 1   JAMA Psychiatry about association between exposure |
| 2   want to look at the key value and the confidence | 2   to gender identity conversion efforts and mental |
| 3   intervals. | 3   health outcomes. |

Page 138:

1    A. Yes, with the caveat that you would also
2   want to look at the key value and the confidence
3   intervals.
4      MS. NOWLIN-SOHL: We have the document
5   now, John.
6      MR. RAMER: Okay. Great.
7    Q. (BY MR. RAMER) And just to confirm,
8   Doctor, is this your Plos One article titled
9   "Access to Gender-Affirming Hormones During
10   Adolescence and Mental Health Outcomes Among
11   Transgender Adults"?
12    A. It is. I would just be careful because
13   we published a correction on this paper later.
14   The overall conclusions didn't change, but some of
15   the numbers changed.
16    Q. And did the numbers change -- well, let's
17   go to page 9, Table 2. And if the numbers I'm
18   going to ask about did change, maybe we'll take
19   our longer break a little earlier.
20      But did the numbers change with respect
21   to the age 16 or 17 group?
22    A. I don't think so, but I would want to
23   look to be sure.
24      MR. RAMER: Okay. Well, we're almost
25   coming up on an hour, and then maybe I'll track

Page 138

Page 139:

1   down the corrected version of that.
2      And so do we want to break until --
3   what's good for you, Doctor and Li?
4      MS. NOWLIN-SOHL: Yeah, I think we need
5   to go get lunch, so 45 minutes would probably be
6   best. We can come back right around 1:00 Pacific
7   time.
8      MR. RAMER: Top of the hour?
9      MS. NOWLIN-SOHL: Yeah.
10      MR. RAMER: That sounds good to me.
11      THE VIDEOGRAPHER: Okay. So the time is
12   12:17 p.m. Pacific time, and we are off the
13   record.
14      (Break taken from 12:17 p.m. to 1:05 p.m.)
15      THE VIDEOGRAPHER: All right. So we are
16   recording. The time is 1:05 p.m. Pacific time,
17   and we are back on the record.
18      (Deposition Exhibit No. 12 was marked.)
19    Q. (BY MR. RAMER) Dr. Turban, I'd like to
20   introduce Turban Exhibit 12. If you'd let me know
21   when you have that in front of you.
22    A. Is it the JAMA Psychiatry paper?
23    Q. That's correct. And can you tell me what
24   this document is?
25    A. This is a research paper we published in

Page 139

Page 140:

1   JAMA Psychiatry about association between exposure
2   to gender identity conversion efforts and mental
3   health outcomes.
4    Q. And on page 69, which I think is page 2
5   of the article, in the second paragraph, second
6   sentence, you say, "Gender identity conversion
7   therapy refers to psychological interventions with
8   a predetermined goal to change a person's gender
9   identity to align with their sex assigned at
10   birth."
11      Did I read that correctly?
12    A. Yes. Citation 8, so it looks like that
13   definition is from Byne, et al., but it's also the
14   general definition from the American Academy of
15   Child and Adolescent Psychiatry.
16    Q. And would a psychological intervention
17   with a predetermined goal of affirming a person's
18   gender identity constitute gender identity
19   conversion therapy?
20    A. What do you mean by the predetermined
21   goal of affirming their gender identity?
22    Q. I guess what do you mean by the
23   predetermined goal to change a person's gender
24   identity in this passage?
25    A. I guess make it different than it is, or

Page 140

Page 141:

1   force it to change.
2      Affirming would be accepting the identity
3   they currently have.
4    Q. What about a psychological intervention
5   with a predetermined goal of consolidating a
6   person's gender identity? Would that constitute a
7   gender identity conversion therapy?
8      MS. NOWLIN-SOHL: Object to form.
9      THE WITNESS: I don't know what you mean
10   by "consolidate."
11    Q. (BY MR. RAMER) Is any psychological
12   intervention with a predetermined goal ethical?
13      MS. NOWLIN-SOHL: Object to form.
14      THE WITNESS: Yes. For instance, if the
15   goal was to make someone's major depressive
16   disorder go into remission, that would be
17   appropriate.
18    Q. (BY MR. RAMER) And are you familiar with
19   the term "exploratory therapy"?
20    A. Yes.
21    Q. And what is your understanding of that
22   term?
23    A. My understanding of exploratory
24   psychotherapy is working with a person in a
25   nondirective way to explore their gender identity

Page 141

36 (Pages 138 - 141)

(244 of 288), Page 244 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 244 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 37 of 177
Jack Turban , M.D., MHS October 16, 2023

1  and help them understand it without having a
2  predetermined goal in mind.
3        So you wouldn't be doing therapy to try
4  and make them be cisgender; you wouldn't be doing
5  the therapy to try and make them transgender, but
6  rather helping them explore to understand
7  themselves.
8     Q.  And if you had a psychological
9  intervention with a predetermined goal of making
10  someone transgender, would that constitute
11  transgender identity conversion therapy?
12     A.  Essentially, yes.
13     Q.  And do you engage in exploratory therapy
14  with your patients?
15     A.  Yes.
16     Q.  And why do you engage in exploratory
17  therapy with your patients?
18     A.  I think of it as part of the
19  biopsychosocial evaluation to make sure the person
20  has a clear understanding of their identity and
21  the many ways in which they can exist in this
22  world and understanding themselves.
23     Q.  Can exploratory therapy reduce stress
24  related to an individual's gender incongruence?
25        MS. NOWLIN-SOHL:  Object to form.
                                    Page 142

1  trans?
2        MS. NOWLIN-SOHL:  Object to form; calls
3  for speculation.
4        THE WITNESS:  No.  I think that would be
5  a stretch.
6     Q.  (BY MR. RAMER)  Why?
7     A.  I routinely talk to my patients about the
8  risks and benefits of treatments.  They never
9  think that I'm trying to force them to stop being
10  trans.
11        They understand that I am informing them
12  about important risks and benefits to consider
13  about medical treatments they're considering.
14     Q.  If a provider tells a patient that the
15  patient may not access gender-affirming medical
16  interventions until the patient completes a
17  biopsychosocial assessment, do you think it's
18  possible the patient will view that limitation as
19  the provider trying to stop the patient from being
20  trans?
21        MS. NOWLIN-SOHL:  Object to form; calls
22  for speculation.
23        THE WITNESS:  I do not.
24     Q.  (BY MR. RAMER)  And why not?
25        MS. NOWLIN-SOHL:  Same objections.
                                    Page 144

1        THE WITNESS:  I'm not familiar with any
2  evidence that that is the case.
3     Q.  (BY MR. RAMER)  You're not familiar with
4  any evidence that exploratory therapy can reduce
5  stress related to an individual's gender
6  incongruence?
7     A.  Correct.
8     Q.  Are you aware of any evidence that
9  exploratory therapy -- I'll move on.
10        The data for this article also came from
11  the 2015 U.S. Transgender Survey, correct?
12     A.  Yes.
13     Q.  And then if we could go back to
14  Exhibit 10, which is the report of the survey, and
15  I'd like to go to page 273.  And specifically
16  question 13.2 in the left column.
17        And is this the question you used to
18  represent conversion therapy?
19     A.  We use the term "gender identity
20  conversion efforts," but yes.
21     Q.  And if a provider informs a patient about
22  the risks associated with gender-affirming medical
23  interventions, do you think it's possible the
24  patient would construe that information as the
25  provider trying to stop the patient from being
                                    Page 143

1        THE WITNESS:  That's my routine practice,
2  and I've never had a patient think that I was
3  trying to force them to be cisgender when
4  describing to them the treatment guidelines that I
5  would follow.
6     Q.  (BY MR. RAMER)  Do you think your
7  patient -- if one of your patients thought that
8  you were trying to stop them from being trans, do
9  you think that they would tell you?
10        MS. NOWLIN-SOHL:  Object to form; calls
11  for speculation.
12        THE WITNESS:  My patients don't usually
13  hold back if they're unhappy with me about
14  something.  I think they would usually tell me.
15     Q.  (BY MR. RAMER)  Do you think that belief
16  holds true for the majority of adolescents
17  expressing gender dysphoria?
18        MS. NOWLIN-SOHL:  Object to form;
19  foundation, speculation.
20        THE WITNESS:  Could you repeat the
21  question?
22     Q.  (BY MR. RAMER)  I thought you said you
23  don't believe that if your patients thought you
24  were trying to stop them from being trans that
25  they would tell you.
                                    Page 145

37 (Pages 142 - 145)

(245 of 288), Page 245 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 245 of 288
Case 1:23-cv-00269-BLW   Document 74-2   Filed 11/02/23   Page 38 of 177
Jack Turban , M.D., MHS October 16, 2023

1     I'm sorry.  You said that -- in effect,
2  you said they would tell you; is that fair?
3     A.  I believe they would tell me or their
4  parents would tell me.  If they were really angry
5  and thought I was trying to force them to be
6  cisgender, they would probably not want to keep
7  seeing me, in which case the parents would
8  probably tell me if they didn't want to keep
9  seeing me, and I would ask why.
10     I think generally that would come to my
11  attention in some way.
12     MR. RAMER:  And, Li, do you have Turban
13  Exhibit 13?
14     MS. NOWLIN-SOHL:  Not yet.
15     MR. RAMER:  Okay.  Well, we'll stick with
16  this document and go to -- I think it's page 75.
17     MS. NOWLIN-SOHL:  And this is still the
18  U.S. Trans Survey?
19     MR. RAMER:  No, I'm sorry.  Return to
20  Turban Exhibit 12, the -- Dr. Turban's paper.  I
21  apologize.  You can go to page 75 in that
22  document.
23     MS. NOWLIN-SOHL:  Okay.  We are there.
24     Q.  (BY MR. RAMER)  Okay.  And in the left
25  column below "Strengths and Limitations," the

Page 146

1  or internalized transphobia, which would have been
2  basically due to experiencing transphobia that
3  they start to internalize in terms of self-hatred,
4  that people who are exposed to these ideas that
5  they should be forced to be cisgender because
6  maybe trans is bad might be more likely to seek
7  out these conversion efforts than other types of
8  therapy that don't try and force them to be
9  cisgender.
10     But that would imply that a societal
11  rejection is leading to that internalized
12  transphobia and other bad mental health outcomes.
13     MR. RAMER:  And, Li, do you have Turban
14  Exhibit 13?
15     MS. NOWLIN-SOHL:  We do.
16     MR. RAMER:  Okay.  Let's bring that up.
17     (Deposition Exhibit No. 13 was marked.)
18     Q.  (BY MR. RAMER)  And, Dr. Turban, I'll
19  represent that this is an NBC news article
20  entitled "Transgender Conversion Therapy
21  Associated with Severe Psychological Distress."
22     And have you seen this article before?
23     A.  Yes.
24     Q.  And toward the top, do you see the date
25  and time -- or actually just the date.

Page 148

1  third sentence says "It is possible that those
2  with worse mental health or internalized
3  transphobia may have been more likely to seek out
4  conversion therapy rather than non-GICE therapy,
5  suggesting that conversion efforts themselves are
6  not causative of these poor mental health
7  outcomes.
8     Did I read that correctly?
9     A.  It's part of a -- I think the next
10  sentence would be important to read.
11     Q.  Okay.  But that sentence I read, I read
12  that correctly, for the record?
13     A.  You read the words correctly without the
14  context, yes.
15     Q.  Okay.  And do you say -- do you say
16  "GICE"?  Do you pronounce that or do you say
17  "GICE"?
18     A.  I usually just say gender identity
19  conversion efforts.
20     Q.  Okay.  And here's an opportunity to add
21  context.
22     Can you just explain what you're saying
23  in that sentence?
24     A.  Yes.  The first sentence you read said
25  it's possible that those with worse mental health

Page 147

1     Do you see the date that this article was
2  published?
3     A.  Yes.
4     Q.  And do you recall what day you published
5  the article we were just looking at in Turban
6  Exhibit 12?
7     A.  I do not.
8     Q.  If we go back to Turban Exhibit 12 and go
9  to the first page, which is page 68, and then
10  towards the bottom, do you see where it says
11  "Published online September 11, 2019"?
12     A.  Yes.
13     Q.  And so the news article in Turban
14  Exhibit 13 was published the same day that you
15  published this article in Turban Exhibit 12
16  online; is that correct?
17     A.  That seems to be the case.  That's
18  generally how news outlets cover new research
19  articles is they get them ahead of time while
20  they're under embargoes so they have time to read
21  them and conduct interviews so that they can
22  publish them around the same time that the paper
23  comes out.
24     Q.  How do the news organizations become
25  aware of the article when it's embargoed?

Page 149

38 (Pages 146 - 149)

(246 of 288), Page 246 of 288
Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 246 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 39 of 177
Jack Turban , M.D., MHS October 16, 2023

1    A.  I'm not sure if they sign up for it or --
2  but essentially most of the major high-impact
3  medical journals send out press releases about
4  articles that are coming out in their future
5  editions that aren't out yet to journalists so
6  that the journalists have a chance to request an
7  embargoed version of the article with the
8  agreement that they don't talk about it publicly
9  until the article is officially posted online.
10    Q.  And then in this NBC article, which is
11  Turban Exhibit 13, I'd like to go to page 2 of the
12  PDF.  And about halfway down before this blank
13  space, there's a quote attributed to you.
14    And it says "We hope our findings
15  contribute to ongoing legislative efforts to ban
16  gender identity conversion efforts."
17    Do you see that?
18    A.  Yes.
19    Q.  And do you think that's an accurate
20  quote?
21    A.  Yes.
22    Q.  And before you conducted this study, did
23  you want to ban gender identity conversion
24  efforts?
25    A.  They were labeled dangerous and unethical

Page 150

1  by all major medical organizations, including the
2  American Psychiatric Association and the American
3  Academy of Child and Adolescent Psychiatry.  And
4  there was broad consensus prior to this research
5  that they were dangerous and ineffective.
6    And anytime there's broad consensus that
7  the practice is harmful towards children in
8  particular, I would be in favor of children not
9  being exposed to that practice.
10    Q.  And so yes, you did want to ban gender
11  identity conversion efforts before you conducted
12  this study, correct?
13    A.  I am personally not in a position to ban
14  practices, but I was in agreement with the
15  position statements of the American Psychiatric
16  Association and the American Academy of Child and
17  Adolescent Psychiatry.
18    MR. RAMER:  Let's turn to -- I'd like to
19  introduce Turban Exhibit 14.  Do you have that?
20    MS. NOWLIN-SOHL:  We do.
21    MR. RAMER:  Okay.
22    (Deposition Exhibit No. 14 was marked.)
23    Q.  (BY MR. RAMER)  And, Dr. Turban, do you
24  recognize this document?  And if so, what is it?
25    A.  Yes.  This is a research article we

Page 151

1  published in the Journal of Adolescent Health in
2  2023.
3    Q.  And just as a general matter for me to
4  understand the method in this article, basically
5  you're identifying two relevant time periods.
6    And the first is when -- the first time
7  period is when participants realize their
8  transgender identity, correct?
9    A.  Correct.
10    Q.  Sorry?
11    A.  Correct.
12    Q.  And the second time point is when
13  participants share that identity with others,
14  correct?
15    A.  Correct.
16    Q.  And so you measure the period between
17  those two points.  And as a general matter, if the
18  time period between those two points is longer,
19  that tends to undermine the ROGD hypothesis,
20  right?
21    MS. NOWLIN-SOHL:  Object to form.
22    THE WITNESS:  I wouldn't say the ROGD
23  hypothesis was a major part of this study.  It's
24  been -- I don't think there are many people who
25  take that hypothesis seriously, and the American

Page 152

1  Psychological Association has emphasized that it's
2  not a valid diagnosis and shouldn't be used in
3  assessment or clinical context.
4    So I think that's an interesting, like,
5  extra thing to think about with this paper, but I
6  think what was most interesting about this paper
7  was that a substantial proportion of trans adults
8  don't come to realize their gender identity until
9  later, after age 10, and that for those who
10  realize in childhood before age 10 that there is a
11  very long period of time before they tell someone
12  else, 14 years.
13    The reason that's interesting for that
14  survey from 2018 about rapid onset gender
15  dysphoria is the way they determined in that study
16  that the person's gender identity or gender
17  dysphoria was rapid in onset was based on when
18  parents came to know that the child had gender
19  dysphoria or a trans identity.
20    And this is just highlighting that there
21  are many years.  The median was 14 years between
22  somebody knowing their gender identity and telling
23  it to another person when they realized as
24  children, highlighting that using parent report
25  alone the way that survey did is not reliable.

Page 153

39 (Pages 150 - 153)

1    Q. Yeah. And so the reason that the
2  findings here tend to undermine the ROGD
3  hypothesis is because of how long that -- in part
4  because of how long that time period was between
5  the point that the individual identified as
6  transgender and the point that the individual
7  disclosed that information, correct?
8    A. Yes. It undermines the notion, one of
9  many notions in the hypothesis that when a parent
10  comes to understand that their child is trans that
11  that coincides with when the child themselves came
12  to understand that.
13    Q. Right. Okay. And so yeah, the longer
14  the time period, the more it tends to undermine
15  the hypothesis.
16       And that's why the 14 years is relevant,
17  right?
18       MS. NOWLIN-SOHL: Object to form.
19       THE WITNESS: I don't know that I really
20  agree with that characterization that, you know,
21  if it were 16 versus 14, that would be a matter,
22  or if it would be 14 versus 30. Just the fact
23  that there is a substantial period of time I think
24  is what undermines it.
25    Q. (BY MR. RAMER) And for this study, the

Page 154

1  gender identity after the onset of puberty that
2  they are less likely to continue to have that
3  identity in adulthood.
4       So it's interesting to see that among
5  trans adults. It's actually not an uncommon
6  experience.
7    Q. (BY MR. RAMER) Right. And the reason
8  it's interesting is it undercuts the idea that,
9  you know, late realization is some sort of new
10  experience, correct?
11       MS. NOWLIN-SOHL: Object to form.
12       THE WITNESS: I suppose, or that the
13  later realization, you know, is synonymous --
14  [indiscernible].
15       THE REPORTER: Dr. Turban, I'm sorry to
16  interrupt. I couldn't understand you.
17       THE WITNESS: Oh, sorry. How far back do
18  you want me to go?
19       THE REPORTER: Just repeat your answer,
20  if you wouldn't mind.
21       THE WITNESS: So just saying the thing
22  that's interesting to me is that there was this
23  notion, less so in the field, but sometimes out
24  among the general public, that if one comes to
25  understand their trans identity after puberty,

Page 156

1  data you used again comes from the U.S.
2  Transgender Survey; is that right?
3    A. Yes.
4    Q. And so on page 1 here under "Results,"
5  the first sentence says "Of 27,497 participants,
6  40.8 percent reported 'later realization' of TGD
7  identities."
8       Did I read that correctly?
9    A. Yes.
10    Q. And so you're saying there that -- I
11  mean, the upshot of this is that later realization
12  was common among the adult survey participants --
13       MS. NOWLIN-SOHL: Objection.
14       MR. RAMER: I'm sorry.
15       MS. NOWLIN-SOHL: I'm sorry, go ahead.
16  Continue.
17    Q. (BY MR. RAMER) Okay. Well, I guess why
18  is that relevant with respect to the ROGD
19  hypothesis?
20       MS. NOWLIN-SOHL: Object to form.
21       THE WITNESS: It's not necessarily. I
22  think it's more relevant that there's the
23  misconcept, I think, less within the field, but
24  more kind of in, like, media and public policy
25  debates that if one comes to understand their

Page 155

1  that it will not persist into adulthood.
2       But here we saw that among adults, it was
3  actually a fairly common experience for them to
4  first come to understand their gender identity
5  after age 10, which is a rough cutoff for puberty.
6    Q. (BY MR. RAMER) Well, I guess if the 40.8
7  percent is relevant in the context of persistence
8  or desistance, wouldn't you need to know the
9  individuals who had later realization but then
10  did, in fact, come to identify as cisgender?
11    A. Yeah, I think you're pointing out there
12  are different studies that could be done. You
13  could follow people longitudinally and then you
14  could find a desistance rate, if that's the term
15  you wanted to use.
16       This study wasn't that since we didn't
17  follow people longitudinally. We didn't have that
18  data available.
19       So this was just showing that among trans
20  adults, this isn't an uncommon experience. But it
21  doesn't tell you how many people would continue to
22  identify that way longitudinally.
23    Q. And then still on the same page in the
24  same results paragraph, the second and third
25  sentences, you say, "Within the 'childhood

Page 157

(248 of 288), Page 248 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 248 of 288
Case 1:23-cv-00269-BLW   Document 74-2   Filed 11/02/23   Page 41 of 177
Jack Turban , M.D., MHS   October 16, 2023

Page 158

```
1   realization' group, the median age of sharing
2   one's gender identity with another person was 20.
3   In this group, the median time between realization
4   of one's gender identity and sharing this with
5   another person was 14 years."
6       And did I read that correctly?
7   A.  Yes.
8   Q.  Did you also record the median age of
9   participants sharing their gender identity for the
10  later realization group?
11  A.  We did.  We didn't have room in this
12  paper because it wasn't the focus.  But we
13  recently published a response to the letter to the
14  editor where we provided that additional data.  I
15  would have to pull it up to get the numbers.
16  Q.  What letter to the editor are you
17  referring to?
18  A.  I forget the author of the letter, but
19  someone wrote in to the journal asking for more
20  information and analyses, and so we provided them.
21  Q.  And so the -- and this is just a
22  clarification, not a trick question.
23      So in the last sentence here, you're
24  talking about the median time.  That is only
25  referring to the childhood realization group; is
```

Page 159

```
1   that right?
2   A.  Correct.  The letter author asks for what
3   you're asking, and so we had it published in the
4   letter response, but I don't have it in front of
5   me.
6   Q.  Okay.  And do you think it's fair to say
7   that -- granting that you disagree with any sort
8   of ROGD hypothesis, do you think it's fair to say
9   that people who think the ROGD hypothesis may be
10  worth investigating, that the hypothesis is
11  focused on adolescents and not children?
12  A.  I think you're missing the point of it in
13  that the reason this childhood question is
14  relevant is that the rapid onset gender dysphoria
15  study survey used the time that parents heard
16  about their child's gender identity as when the
17  children came to recognize their gender identity.
18      What this paper is showing is that those
19  people where the parents first found out in
20  adolescence may have known 12 years earlier,
21  right?  Because there's a mean 12 years between
22  realizing and telling another person.
23      So for what was, from the parents'
24  perspective, the onset of time was actually much,
25  much later potentially than when the young person
```

Page 160

```
1   came to know.
2       So I think one author called it rapid
3   onset parental notification, like the parents
4   found out all of a sudden in adolescence, but that
5   it's actually pretty typical for children to
6   withhold this information from their parents for
7   many years, in my clinical experience, due to fear
8   that their parents won't accept them.
9   Q.  And I'd like to go back to Turban
10  Exhibit 10, which is the U.S. -- the report of the
11  U.S. Transgender Survey.  And go to page 259.  And
12  left column, Section 3 --
13  A.  Yes, we have it.
14  Q.  So question 3.1 says "At about what age
15  did you begin to feel that your gender was
16  'different' from your assigned birth sex?"
17      Did I read that correctly?
18  A.  Yes.
19  Q.  And this is the question you used to
20  collect data for determining when the participants
21  first realized their transgender identity,
22  correct?
23      MS. NOWLIN-SOHL:  Object to form.
24      THE WITNESS:  Let me double-check.
25  Sorry.  I'm looking at the underlying question
```

Page 161

```
1   because I just want to make sure I'm telling you
2   correct.
3   Q.  (BY MR. RAMER)  I guess it's page -- in
4   your article, page 54, left column under "Age of
5   sharing" -- oh, no, that's the other one.  Sorry.
6       Yeah, so page 853, right column, very
7   bottom.  "Age of TGD identity realization."
8       And you say, "As outlined above,
9   participants were asked the age at which they felt
10  that their gender was different from societal
11  expectations based on their sex assigned at birth
12  and were provided with a drop-down list of integer
13  ages from 1 to 99 years."
14  A.  Yes, question 3.1.
15  Q.  And so returning to -- sorry, if you
16  can -- and so returning to Exhibit 10 in the same
17  page we were on, 259, and same left column,
18  Section 3, I'm going to read question 3.2 and ask
19  if I read it correctly.
20      It says, "At about what age did you start
21  to think you were trans (even if you did not know
22  the word for it)?"
23      Did I read that correctly?
24  A.  Yes.
25  Q.  So why did you use question 3.1 instead
```

41 (Pages 158 - 161)

(249 of 288), Page 249 of 288
Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 249 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 42 of 177

Jack Turban , M.D., MHS October 16, 2023

1 of 3.2?
2    A. We thought that 3.1 was a bit broader,
3 even though they're quite similar.
4    Q. Why would you use the broader question,
5 then?
6    A. Because it captures -- they're really
7 similar questions. We did not design the survey.
8 We were doing secondary data analyses of the
9 surveys, so we were in a position to try and pick
10 which question we thought was best.
11    The second one says "When did you think
12 you were trans (even if you didn't have the word
13 for it)," and then 3.1 basically asks without the
14 word, the feeling of it.
15    So we felt that 3.1 was just a cleaner
16 question even though they asked quite similar
17 things. We felt like 3.2 was a little bit more
18 about, like, ascribing language to it, like the
19 word "trans" or maybe someone had a word like
20 "trans" whereas we thought 3.1 captured more like
21 the gender identity experience rather than the
22 language they were ascribing to it. But they're
23 very similar.
24    Q. Do you know how the data would have
25 changed if you had used question 3.2 instead of
Page 162

1 3.1?
2    A. No. We tried not to run a ton of
3 analyses in that way that we think are going to be
4 similar. Because when you do that, you're more
5 likely to find a statistical finding due to chance
6 called P-hacking that's commonly criticized in
7 statistical research. Usually the cleaner, fewer
8 comparisons you make, the better.
9    So we did not repeat the analysis with
10 3.2. One could do that.
11    Q. Would you agree that a component of the
12 ROGD hypothesis, as those individuals who suggest
13 it might be legitimate would view it, concerns the
14 effect of social media on adolescents?
15    MS. NOWLIN-SOHL: Object to form.
16    THE WITNESS: I don't have any colleagues
17 who are experts in the field who do believe in
18 that hypothesis.
19    Again, the American Psychological
20 Association has argued against using it
21 clinically, the correction on the paper
22 highlighted that it's not a formal valid mental
23 health diagnosis.
24    All I can go off of is that one paper
25 where that single author was describing her
Page 163

1 thoughts about it. And my reading of that paper
2 is that I think that she did think that it had
3 something to do with social media influence. But
4 I think you would have to ask her.
5    Q. (BY MR. RAMER) Would you agree that as a
6 general matter you would probably have to be born
7 in the 1990s to have grown up with social media as
8 an adolescent?
9    A. I don't know enough about the history of
10 social media to give you an answer.
11    Q. Do you think there's a chance that social
12 media existed in its current form before 1990?
13    MS. NOWLIN-SOHL: Object to form.
14    THE WITNESS: You're making me think back
15 to when I first got social media. To be honest, I
16 don't know. Was MySpace first? I honestly don't
17 know when social media began. I don't know that
18 this is within my area of expertise.
19    Q. (BY MR. RAMER) And what year was the
20 data collected for the U.S. Transgender Survey?
21    A. 2015.
22    Q. And an individual had to be 18 years old
23 to take the survey, correct?
24    A. Correct.
25    Q. All right. Sticking with your article,
Page 164

1 I'd like to go to page 855, Table 1.
2    MS. NOWLIN-SOHL: Sorry, we might have
3 gotten a little bit lost.
4    Which exhibit are we in right now?
5    MR. RAMER: Turban Exhibit 14, the "Age
6 of Realization" -- sorry, it's hard in the virtual
7 setting to keep track of what's pulled up. So
8 Turban Exhibit 14, the "Age of Realization" paper.
9    MS. NOWLIN-SOHL: Okay.
10    MR. RAMER: And page 855, which has
11 Table 1.
12    MS. NOWLIN-SOHL: Okay. We are there.
13    Q. (BY MR. RAMER) Okay. And for this
14 article, you included all age groups in the data,
15 correct?
16    A. Sorry. What do you mean by "all age
17 groups"?
18    Q. Did you exclude anybody from the data
19 based on their age?
20    A. Based on their age at the time of the
21 survey?
22    Q. Yes.
23    A. No.
24    Q. And so it looks like there's about
25 roughly 800 people in the dataset who are 65 and
Page 165

42 (Pages 162 - 165)

(250 of 288), Page 250 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 250 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 43 of 177
Jack Turban , M.D., MHS October 16, 2023

Page 166:

1 older, correct?
2 A. Yeah. Looks like that would account for
3 about 5 or 6 percent of the total study.
4 Q. And then for 45 to 64, about --
5 A. Maybe 27 percent of the study.
6 Q. And I appreciate I'm having you do math
7 on the fly, so I'm not looking for it precise.
8 But and then from 25 to 44 it looks like
9 it's -- I'll put myself up -- well, I guess I
10 don't know. What percentage of the study?
11 A. Were in the 25 to 44 group?
12 Q. Yeah.
13 A. About 77 percent.
14 Q. Well, maybe this is why we shouldn't do
15 math on the fly. Because you're just adding those
16 parentheses, but I don't think that would --
17 A. Oh, wait. Sorry, yeah.
18 Q. Well, let's just step back. This is not
19 the point of the question.
20 A. To get to your whole point, the most were
21 very young, so mostly the 18 to 24 group.
22 Q. Okay. Yeah. Would you agree that it's
23 highly unlikely if not impossible that individuals
24 in the 45 to 64 age group used social media as
25 adolescents?

Page 167:

1 A. Probably, but they're a small portion of
2 the study.
3 Q. Would you agree it's highly unlikely, if
4 not impossible, that the majority of the 25 to 44
5 age group used social media as adolescents?
6 A. We'd have to know the distribution of how
7 many were closer to 25, how many were closer to
8 44.
9 Q. But it didn't occur to you to make an
10 adjustment for that based on -- sorry.
11 A. I mean, this paper was not --
12 MS. NOWLIN-SOHL: Object to form;
13 argumentative.
14 MR. RAMER: I'll re-ask it. Let me
15 re-ask it, and then we'll try again.
16 Q. (BY MR. RAMER) It didn't occur to you to
17 make an adjustment for that given the fact that
18 the first sentence of the purpose in your paper is
19 discussing rapid onset gender dysphoria?
20 MS. NOWLIN-SOHL: Object to form;
21 argumentative.
22 THE WITNESS: Though it's the first
23 sentence, I wouldn't say this paper was really
24 primarily focused on the rapid onset gender
25 dysphoria hypothesis. That, again, is not a valid

Page 168:

1 mental health diagnosis. It doesn't have support,
2 and the American Psychological Association
3 recommended against using it. So we weren't
4 designing the study around that hypothesis in a
5 single paper.
6 Q. (BY MR. RAMER) Sorry. I didn't mean to
7 cut you off.
8 And so for this -- sticking with this
9 article and page 855, Table 1, you have two
10 columns here with one for childhood realization
11 and one for late realization, correct?
12 A. Correct.
13 Q. And starting with the 65-plus group, is
14 it fair to say the vast majority fall into the
15 childhood realization category?
16 MS. NOWLIN-SOHL: Object to form.
17 THE WITNESS: I'd have to -- I'd have to
18 add the numbers and then divide it -- I don't want
19 to do the math.
20 Q. (BY MR. RAMER) Fair. I'll ask it this
21 way.
22 You would agree that 573 is larger than
23 215?
24 A. That, I can do in my head, yes.
25 Q. And for the 45 to 64 group, you would

Page 169:

1 agree that 3,224 is significantly larger than 825,
2 correct?
3 MS. NOWLIN-SOHL: Object to form.
4 THE WITNESS: Yes.
5 Q. (BY MR. RAMER) And for the 25 to 44
6 group, you would agree that 7,043 is much larger
7 than 3,856, correct?
8 MS. NOWLIN-SOHL: Object to form.
9 THE WITNESS: Yes.
10 Q. (BY MR. RAMER) But then when you get to
11 the 18 to 24 group, do you see that it looks like
12 the numbers flip for the first time?
13 MS. NOWLIN-SOHL: Object to form.
14 THE WITNESS: Yeah, I would caution
15 against making any of the comparisons you're
16 making because the statistics weren't applied in
17 that way, and so we don't know the degree to which
18 those would be meaningfully different.
19 Q. (BY MR. RAMER) I guess why didn't you
20 apply the statistics in that way?
21 MS. NOWLIN-SOHL: Object to form.
22 THE WITNESS: Our statistician elected to
23 do these large kind of square analyses so that we,
24 as I referenced earlier, wouldn't be running a ton
25 of analyses that leads you to the potential of

43 (Pages 166 - 169)

| | |
|---|---|
| 1  that P-hacking concern.  Otherwise you would be | 1      MS. NOWLIN-SOHL:  Object to form; calls |
| 2  doing a statistical test on every single row in | 2  for speculation. |
| 3  this table, which you can see would progressively | 3      THE WITNESS:  I don't think they would |
| 4  become a large number of comparisons. | 4  actually be in -- let me look. |
| 5      Q.  (BY MR. RAMER)  Did that data that we | 5      Because the USTS isn't a sample of trans |
| 6  were just discussing, the fact that is -- in the | 6  people, if there were a cisgender person who was |
| 7  18 to 24 group for the first time, based on these | 7  just generally nonconforming, they wouldn't be in |
| 8  raw numbers, that a majority of the group fell | 8  this study. |
| 9  into the later realization group, did that | 9      Q.  (BY MR. RAMER)  Isn't gender expression a |
| 10  interest you? | 10  major part of living out your gender identity? |
| 11      MS. NOWLIN-SOHL:  Object to form. | 11      A.  It could be a major part, but there are |
| 12      THE WITNESS:  It wasn't the focus of the | 12  people who have gender expressions that you might |
| 13  paper, and I wouldn't recommend drawing | 13  think of as feminine who would have cisgender |
| 14  conclusions based on raw numbers. | 14  identities. |
| 15      Q.  (BY MR. RAMER)  Yeah, I'm not drawing | 15      If you've ever seen a cisgender man wear |
| 16  conclusions or trying to say what the focus of the | 16  nail polish, you might think of that as a feminine |
| 17  paper was.  I'm just -- I mean, as a non-expert | 17  gender expression, but it doesn't mean that person |
| 18  looking at that table, like, that struck me.  I | 18  is transgender. |
| 19  found that striking. | 19      Q.  I guess what I'm trying to understand is |
| 20      And I'm curious if you found that | 20  for the second time point in this study, you |
| 21  interesting and whether you're going to research | 21  focused on when the individual's transgender |
| 22  it more or, you know, you've seen enough. | 22  identity was, like, expressly disclosed to |
| 23      MS. NOWLIN-SOHL:  Object to form. | 23  somebody else, whereas it seems like much more |
| 24      THE WITNESS:  You could go back and run | 24  common that an individual is going to be living |
| 25  the individual T tests on those lines. | 25  out their transgender identity with their gender |
| Page 170 | Page 172 |
| 1      Q.  (BY MR. RAMER)  Well, I could not because | 1  expression and people are going to understand, or |
| 2  I do not have the expertise you have. | 2  like, for lack of a better term, have a hunch of |
| 3      A.  I also would need to harass my | 3  their gender identity -- |
| 4  statistician to do it and give her time, but it's | 4      A.  Absolutely. |
| 5  a publicly available data set also, so anyone | 5      MS. NOWLIN-SOHL:  Hold on.  Let him |
| 6  would be able to request the numbers and run those | 6  finish. |
| 7  analyses. | 7      Q.  (BY MR. RAMER)  Well, no, go ahead.  I |
| 8      Q.  And stepping back from the table now, do | 8  was meandering.  Please. |
| 9  you think it's possible for a parent to observe | 9      MS. NOWLIN-SOHL:  Object to form.  Was |
| 10  that their child is transgender before the child | 10  there a question? |
| 11  expressly states it? | 11      MR. RAMER:  Well, he was going to give an |
| 12      A.  There can maybe be suggestions, but it's | 12  answer.  So please. |
| 13  hard to know somebody's internal experience | 13      THE WITNESS:  I lost track -- I lost |
| 14  without them telling you. | 14  track of the question, honestly.  What was the |
| 15      For instance, I'd caution against making | 15  question? |
| 16  assumptions that, you know -- I think we referred | 16      Q.  (BY MR. RAMER)  I guess it's just isn't |
| 17  to assigned male wanted to play with dolls or wear | 17  the premise of your paper that parents would not |
| 18  dresses, that doesn't mean that the young person | 18  know that their child has a transgender identity |
| 19  is transgender.  They could be cisgender and like | 19  until the child expressly discloses it to them? |
| 20  dolls and dresses. | 20      MS. NOWLIN-SOHL:  Object to form. |
| 21      So it's drawing the conclusions based on | 21      THE WITNESS:  I think that's very common, |
| 22  observations without the person telling you their | 22  that young trans people live in a world where they |
| 23  experience is limited. | 23  know that trans identities are stigmatized, and |
| 24      Q.  Well, that example you just gave, how | 24  trans people are commonly bullied and harassed. |
| 25  would that person have answered 3.1? | 25      Often these kids when they're young have |
| Page 171 | Page 173 |

44 (Pages 170 - 173)

(252 of 288), Page 252 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 252 of 288
Case 1:23-cv-00269-BLW   Document 74-2   Filed 11/02/23   Page 45 of 177
Jack Turban , M.D., MHS   October 16, 2023

Page 174

```
 1   expressed some small amount of gender diverse
 2   expression.  So, say, the young kid who played
 3   with dolls or played with dresses, and they're
 4   usually yelled at or socially sanctioned -- I
 5   think the message very early on is that's not
 6   acceptable.  So it's actually very common that
 7   they go to great lengths to hide that for a long
 8   time.
 9         So no, it's usually not apparent to other
10   people because the kids are trying to hide it
11   because they're afraid of the consequences if
12   people were to know.
13       Q.  (BY MR. RAMER)  Right.  And that was my
14   question.
15         Isn't the premise of your paper that
16   parents wouldn't know the child has a transgender
17   identity until the child expressly disclosed it to
18   them?
19         MS. NOWLIN-SOHL:  Object to form.
20         THE WITNESS:  I wouldn't say it's the
21   premise of the paper.  I would say it's a finding
22   of the paper that the young people didn't feel
23   comfortable sharing it with another person for 12
24   years.  Why would they not feel comfortable?
25       Q.  (BY MR. RAMER)  But the reason the paper
```

Page 175

```
 1   is relevant to the ROGD hypothesis is the parents
 2   didn't know until a later time, correct?
 3         MS. NOWLIN-SOHL:  Object to form.
 4         THE WITNESS:  Again, I think you're
 5   over-indexing on how important that one survey
 6   paper is about ROGD.  And again, this paper isn't
 7   a direct response to that 2018 single survey, but
 8   if you want to tie it to that question of rapid
 9   onset, then yes, the point of this paper is that
10   often young people don't tell another person for
11   many years.  And so at the time point when parents
12   are being told, that does not necessarily coincide
13   with when the young person first realized.
14       Q.  (BY MR. RAMER)  Sorry to keep going back
15   to this, but the point is that the parents would
16   not know until they are told, correct?
17         MS. NOWLIN-SOHL:  Object to form; asked
18   and answered.
19         THE WITNESS:  I think I answered the
20   question.
21       Q.  (BY MR. RAMER)  And what was the answer?
22         MS. NOWLIN-SOHL:  Same objection.  Asked
23   and answered.
24         THE WITNESS:  That the study found that
25   there were median 12 years before the young people
```

Page 176

```
 1   told another person.  So the parents would have
 2   found out 12 years after the young person knew.
 3         And as I said earlier, you can't presume
 4   someone's gender identity by observing their
 5   gender expression, as many cisgender people may
 6   like things that you may not consider gender
 7   typical.  Like a cisgender man who likes musicals,
 8   I wouldn't recommend assuming that person is
 9   transgender.
10       Q.  (BY MR. RAMER)  Switching gears a little
11   bit, how do you stay up-to-date on the literature
12   in your field?
13       A.  A lot of ways.  We have conferences.  I
14   use Google Scholar notifications so when new
15   peer-reviewed papers are published they come to my
16   inbox.  Conversation with colleagues.
17       Q.  Are there any particular authors you
18   trust in the field?
19         MS. NOWLIN-SOHL:  Object to form.
20         THE WITNESS:  I'm not really sure what
21   you mean by, like, "trust" or "distrust."
22       Q.  (BY MR. RAMER)  Sure.  Do you think that
23   Annelou de Vries is a leading expert in the field?
24       A.  Yes.
25       Q.  Do you think Diane Chen is a leading
```

Page 177

```
 1   expert in the field?
 2       A.  Yes.
 3         MR. RAMER:  And, Li, if you have it, I'd
 4   like to introduce Turban Exhibit 15.
 5         MS. NOWLIN-SOHL:  We are still waiting on
 6   that.
 7         MR. RAMER:  Please just let me know when
 8   it arrives.
 9         MS. NOWLIN-SOHL:  Still waiting.  Is
10   it -- no, just got it.
11         (Deposition Exhibit No. 15 was marked.)
12       Q.  (BY MR. RAMER)  Okay.  Dr. Turban, have
13   you seen this editorial before?
14       A.  Yes.
15       Q.  And when was the last time you read it?
16       A.  Probably when it first came out.
17       Q.  And this editorial is coauthored by
18   Annelou de Vries, correct?
19       A.  Yes.
20       Q.  And if you turn to page 277, which I
21   think is the third page in the PDF, and you look
22   at footnote 1 --
23       A.  Sorry.  What page again?
24       Q.  277 in the pagination, but I think the
25   last page of the PDF.  Or it's an endnote.  Sorry,
```

45 (Pages 174 - 177)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1 endnote 1. | 1 would have provided more data along that same |
| 2    A. The first citation? | 2 line. I think they could have adjusted for that |
| 3    Q. Yes. | 3 variable the way some of the other studies have |
| 4    A. Yes. | 4 that I cite in my declaration. |
| 5    Q. And that is the Chen article that you | 5    Q. Why would you need to adjust for that |
| 6 cite in your declaration, correct? | 6 variable? |
| 7    A. Yes. I think the exhibit you sent is an | 7    A. So I think there's been this question |
| 8 editorial on that paper that came out at the time | 8 raised, like the experts' declarations of whether |
| 9 the paper was published. | 9 or not the improvement that you see when |
| 10    Q. And so I'd like to go back to -- back one | 10 adolescents with gender dysphoria get medical |
| 11 page to page 276, and left column and second full | 11 interventions is that improvement from the |
| 12 paragraph. And I'll just read the first two | 12 medication like the puberty blocker or the |
| 13 sentences and ask if I read them correctly. | 13 hormones? Or is it from therapy they're getting |
| 14      It says "Yet the study leaves some | 14 at the same time? |
| 15 concerns unanswered. Although overall | 15      So I cited, I believe, three studies in |
| 16 psychological functioning in the study | 16 my declaration that looked at that question. This |
| 17 participants improved, there was substantial | 17 was one of them. The way they looked at it was by |
| 18 variation among participants. A considerable | 18 this parallel process analysis that showed that |
| 19 number still had depression, anxiety, or both at | 19 the improvement tracked with their physical gender |
| 20 24 months, and two died by suicide." | 20 incongruence improving as opposed to it not being |
| 21      Did I read that correctly? | 21 related to the actual physical impact of the |
| 22    A. Yes. | 22 hormones. |
| 23    Q. And were you aware of these facts before | 23    Q. So is the idea that de Vries is |
| 24 you cited the Chen article? | 24 discussing here the possibility that mental health |
| 25    A. Yes. | 25 care could be a confounding variable in this |

| | |
|---|---|
| 1    Q. And so same paragraph, two sentences | 1 study? |
| 2 later, it says "However, other possible | 2      MS. NOWLIN-SOHL: Object to form. |
| 3 determinates of outcomes were not reported, | 3      THE WITNESS: She's highlighting they did |
| 4 particularly the extent of mental health care | 4 a specific analysis to look at that, and it |
| 5 provided throughout GAH treatment." | 5 suggested that the improvements were from not |
| 6      Did I read that correctly? | 6 mental health, especially how there's another |
| 7    A. You skipped a sentence in between, but | 7 additional way they could have looked at it. |
| 8 yes. | 8    Q. (BY MR. RAMER) And so yes, it could be a |
| 9    Q. Yeah. And what is your understanding of | 9 confounding variable? |
| 10 what de Vries is saying in that sentence I just | 10      MS. NOWLIN-SOHL: Object to form; |
| 11 read? | 11 mischaracterizes his prior testimony. |
| 12    A. So the sentence that you skipped, which I | 12      THE WITNESS: Yeah, I think that's a |
| 13 explained in my declaration, is that they looked | 13 mischaracterization of what I just said. |
| 14 at the correlation between appearance congruence | 14    Q. (BY MR. RAMER) No, I wasn't trying to |
| 15 in mental health outcomes and found that degree of | 15 repeat what you were saying. |
| 16 physical congruence predicted the improvement in | 16      I was asking the question of is the |
| 17 mental health, which is suggesting that it was | 17 concerns that are unanswered that de Vries is |
| 18 actually the physical effects of the intervention | 18 talking about in this paragraph where she |
| 19 resulting in the mental health outcomes rather | 19 references that the extent of mental health care |
| 20 than something like psychotherapy. | 20 provided throughout GAH treatment was not reported |
| 21      Then going to the sentence that you read, | 21 have to do with the fact that mental health care |
| 22 they're highlighting that, so that that provides | 22 is potentially a confounding variable? |
| 23 evidence that it was from the intervention. It | 23      MS. NOWLIN-SOHL: Object to form. |
| 24 would have been nice if they also collected data | 24      THE WITNESS: That line is pretty far |
| 25 about the degree of mental health involvement that | 25 removed from when she uses that phrase |

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1    "unanswered." | 1    are there separate from any impact of |
| 2        And again, they did the parallel process | 2    psychotherapy. |
| 3    modeling that found that the mental health | 3        And the Costa study that I cited gets at |
| 4    improvement tracked along with adherence | 4    that question as well. |
| 5    congruence, suggesting that it was the physical | 5    Q.  (BY MR. RAMER) So the answer is that -- |
| 6    effects of the gender-affirming hormones leading | 6    well, I guess I'm not totally clear. |
| 7    the person phenotype to align more with their | 7        Is the answer that mental health care |
| 8    gender identity that was driving the improvements | 8    does not -- let me rephrase. |
| 9    in mental health as opposed to it being from | 9        You can say that the evidence does not |
| 10    therapy. | 10    support the proposition that mental health care |
| 11    Q.  (BY MR. RAMER) Why do you need to | 11    can improve the distress associated with gender |
| 12    control for mental health care, though, if it's | 12    dysphoria? |
| 13    not a potentially confounding variable? | 13    A.  Now I'm unclear with your question.  So |
| 14        MS. NOWLIN-SOHL:  Object to form. | 14    the thing that is being brought up in this |
| 15        THE WITNESS:  You -- they looked at it in | 15    editorial was brought up in some of the State's |
| 16    a different way using this parallel process | 16    expert reports in which they asked this question: |
| 17    monitoring to separate out the impact of the | 17    In these studies where people are receiving |
| 18    physical effects of the hormones from other | 18    gender-affirming medical interventions, they're |
| 19    potential things like therapy. | 19    also often receiving therapy.  So is their mental |
| 20    Q.  (BY MR. RAMER) And I understand that | 20    health improving because of the therapy or it's |
| 21    you're describing what they did. | 21    improving because of the gender-affirming |
| 22        I guess my question is why do you need to | 22    hormones? |
| 23    control for mental health care -- | 23        This study, the Tordoff study, and the |
| 24        MS. NOWLIN-SOHL:  Object to form. | 24    Costa study provide evidence that their mental |
| 25        THE WITNESS:  The reason why -- | 25    health isn't just improving from the therapy. |
| Page 182 | Page 184 |

| | |
|---|---|
| 1    Q.  (BY MR. RAMER) Okay.  Why do you need to | 1    Their mental health is improving from the |
| 2    control for mental health care if it is not a | 2    gender-affirming hormones. |
| 3    potentially confounding variable? | 3    Q.  And my question is about the word "just" |
| 4        MS. NOWLIN-SOHL:  Object to form. | 4    that you're using there in your answer. |
| 5        THE WITNESS:  The reason they did that is | 5        Because you say, "It shows that it's not |
| 6    to address the potential of it being a confounding | 6    improving just because of the mental health |
| 7    variable, that they wanted to see was the | 7    therapy." |
| 8    improvement in mental health from the physical | 8        And my question is can you say that the |
| 9    effects of the gender-affirming hormones as | 9    evidence shows that mental health care is not |
| 10    opposed to potential things like mental health, | 10    effective in reducing the distress associated with |
| 11    like you're implying, or psychotherapy. | 11    gender dysphoria? |
| 12        And they found that it was from the | 12        MS. NOWLIN-SOHL:  Object to form. |
| 13    physical effects of the hormones, answering this | 13        THE WITNESS:  So that's not -- these |
| 14    question of whether or not it could have just been | 14    studies are looking -- are not asking that |
| 15    from any psychotherapy they were receiving. | 15    question. |
| 16    Q.  (BY MR. RAMER) And in your view, given | 16        These studies are asking do |
| 17    the body of evidence, can we rule out mental | 17    gender-affirming hormones improve mental health? |
| 18    health care as a potentially confounding variable? | 18        You're asking does what psychotherapy |
| 19        MS. NOWLIN-SOHL:  Object to form. | 19    improve gender dysphoria? |
| 20        THE WITNESS:  So this study provides | 20    Q.  (BY MR. RAMER) Say again. |
| 21    evidence that it's not just from -- that the | 21    A.  What psychotherapy are you asking me if |
| 22    improvements we see from gender-affirming hormones | 22    it -- there's evidence that it improves gender |
| 23    aren't just from therapy provided in time. | 23    dysphoria? |
| 24        The Tordoff study that I cited similarly | 24    Q.  The psychotherapy that's a potentially |
| 25    looked at that question and found that the effects | 25    confounding variable that they're controlling for |
| Page 183 | Page 185 |

47 (Pages 182 - 185)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1    in these studies. | 1    because there is not a clean measure for that. |
| 2      A. Again, the de Vries study didn't take | 2      Q. You can't use the UGDS? |
| 3   that statistical approach of controlling for a | 3      A. Not really. You'd have to flip the |
| 4   potential confounder of psychotherapy. They did | 4   scores the way the Dutch have done it |
| 5   it through parallel process models. | 5   intermittently, but it's not really a good measure |
| 6      Q. Do you mean the Chen study? | 6   of those things, more measure the degree to which |
| 7      A. Yes. | 7   you don't identify with your sex assigned at |
| 8      Q. Why is it significant if you have a study | 8   birth. They're not really designed to track |
| 9   where the patients are receiving both | 9   improvements in the distress related to that over |
| 10   gender-affirming medical interventions and | 10   time. |
| 11   psychotherapy to control for the psychotherapy? | 11      Q. Okay. Well, let's go back to the |
| 12      MS. NOWLIN-SOHL: Object to form. | 12   hypothetical -- and if you'll just allow me to |
| 13      THE WITNESS: Because you want to know if | 13   finish, and then I'll give you the opportunity to |
| 14   the improvement was from the hormones or from the | 14   answer -- which is you have a study. The patients |
| 15   psychotherapy. | 15   are receiving both gender-affirming medical |
| 16      Q. (BY MR. RAMER) And my question for you | 16   interventions and psychotherapy. The outcome is |
| 17   is does the evidence show that psychotherapy is | 17   improvement in quality of life. |
| 18   ineffective at reducing the distress associated | 18      Do you think that that study provides |
| 19   with gender dysphoria? | 19   evidence that gender-affirming medical |
| 20      MS. NOWLIN-SOHL: Object to form. | 20   interventions are effective in improving quality |
| 21      THE WITNESS: So to say that something is | 21   of life? |
| 22   ineffective, you would need to do something like a | 22      MS. NOWLIN-SOHL: Object to form. |
| 23   noninferiority study, which has not been done. | 23      THE WITNESS: So you're describing the |
| 24      But I'm not aware of any research that | 24   Costa study from 2015 essentially which does |
| 25   shows that psychotherapy is effective in | 25   exist, which did show that pubertal suppression |
| Page 186 | Page 188 |

| | |
|---|---|
| 1   alleviating gender dysphoria. | 1   improved mental health, whereas for the group that |
| 2      Q. (BY MR. RAMER) What about studies where | 2   got six months of therapy and then got a year of |
| 3   they are giving the patients both gender-affirming | 3   therapy plus puberty blockers, they did not |
| 4   medical interventions and psychotherapy and they | 4   improve when they just got therapy, but when they |
| 5   are not controlling for psychotherapy? | 5   got therapy with the blockers, they improved, |
| 6      Do you think that those studies suggest | 6   suggesting that the blockers improved their |
| 7   that the gender-affirming medical interventions | 7   health -- |
| 8   can reduce distress associated with gender | 8      Q. (BY MR. RAMER) Sorry, go ahead. |
| 9   dysphoria? | 9      A. For that immediately eligible group they |
| 10      MS. NOWLIN-SOHL: Object to form. | 10   got six months of therapy, but therapy did not |
| 11      THE WITNESS: Sorry. Can you repeat the | 11   improve their mental health in a statistically |
| 12   question? | 12   significant way with the caveat to not interpret |
| 13      Q. (BY MR. RAMER) So maybe it's more of a | 13   one statistical finding as valid. But then once |
| 14   hypothetical about a theory, which is you have a | 14   they got pubertal suppression with the therapy, |
| 15   study. In the study, the patients are receiving | 15   their mental health did improve. |
| 16   both gender-affirming medical interventions and | 16      Q. And so I'm not describing the Costa study |
| 17   psychotherapy. The outcome of the study is | 17   because in my hypothetical the study is not |
| 18   improvement on all scores. | 18   distinguishing between patients who received only |
| 19      What? | 19   psychotherapy and patients who received |
| 20      A. Scores on what? | 20   psychotherapy and then proceeded on to |
| 21      Q. On all metrics that you're -- depression, | 21   gender-affirming medical intervention. |
| 22   anxiety, distress associated with gender | 22      My hypothetical is a study where the |
| 23   dysphoria. | 23   patients received both for the entire time, and |
| 24      A. It would be hard to have a scale to | 24   they show improvement. |
| 25   measure distress associated with gender dysphoria | 25      And my question is does that type of |
| Page 187 | Page 189 |

48 (Pages 186 - 189)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1 study in my hypothetical constitute evidence that<br>2 gender-affirming medical interventions are<br>3 effective in improving that quality of life<br>4 metric?<br>5      MS. NOWLIN-SOHL:  Object to form.<br>6      THE WITNESS:  In that study, you would --<br>7 in that theoretical study, you would want to<br>8 disentangle what was from therapy and what was<br>9 from the pubertal suppression.  If that were the<br>10 only study that existed and that was the study<br>11 that you were looking at and you had this question<br>12 of whether or not therapy alone was effective,<br>13 then you would want to separate it.<br>14     Q.  (BY MR. RAMER)  What if the question is<br>15 whether or not gender-affirming medical<br>16 interventions are effective?  Is that study also<br>17 worthless in that context?<br>18      MS. NOWLIN-SOHL:  Object to form.<br>19      THE WITNESS:  I wouldn't call it<br>20 worthless.  I think it would be interesting.  But<br>21 I think it would be more informative if you<br>22 adjusted for -- separated out the impacts of<br>23 therapy from puberty blockers.<br>24     Q.  (BY MR. RAMER)  And so if you don't<br>25 separate it out, can you cite that hypothetical<br>*Page 190* | 1 correctly.<br>2     It says "Finally, benefits of early<br>3 medical intervention, including puberty<br>4 suppressions, need to be weighed against possible<br>5 adverse effects -- for example, with regard to<br>6 bone and brain development and fertility."<br>7     Did I read that correctly?<br>8     A.  Yes.<br>9     Q.  And you see where de Vries mentions<br>10 possible adverse effects on brain development?<br>11     A.  Just in that sentence?<br>12     Q.  In that sentence.<br>13     A.  Yes.<br>14     Q.  What do you know about the risk of<br>15 adverse effects on brain development from pubertal<br>16 suppression?<br>17     A.  So there's only one study that looked at<br>18 potential impacts on effective functioning that<br>19 seemed to suggest no adverse impact.<br>20     I think Dr. de Vries mentions something<br>21 here, educational achievements are expected given<br>22 their pretreatment status is reassuring.<br>23     I'm not aware of any convincing clinical<br>24 data that says there's an adverse impact on brain<br>25 development.<br>*Page 192* |
| 1 study as evidence that gender-affirming medical<br>2 interventions are effective?<br>3      MS. NOWLIN-SOHL:  Object to form; calls<br>4 for speculation.<br>5      THE WITNESS:  It would be a piece of<br>6 evidence.  I wouldn't recommend using it in<br>7 isolation but look at the full body of literature<br>8 where they've done some other things to try to<br>9 tease apart those two interventions.<br>10     MR. RAMER:  Okay.  I think we've been<br>11 going for just about an hour if you all want to<br>12 take a break.<br>13     MS. NOWLIN-SOHL:  Yeah, that sounds good.<br>14     MR. RAMER:  Let's go off the record.<br>15     THE VIDEOGRAPHER:  Okay.  So the time is<br>16 2:13 p.m. Pacific time, and we are off the record.<br>17     (Break taken from 2:13 p.m. to 2:19 p.m.)<br>18     THE VIDEOGRAPHER:  All right.  So we are<br>19 recording.  The time is 2:19 Pacific time, and we<br>20 are back on record.<br>21     Q.  (BY MR. RAMER)  And, Dr. Turban, I'd like<br>22 to stick with the article we were just discussing.<br>23 And I'd like to look on page 276 and the right<br>24 column and the second full paragraph, first<br>25 sentence.  And I'll read it and ask if I read it<br>*Page 191* | 1     Certainly the delay in bone density<br>2 accrual is well known with pubertal suppression,<br>3 but to be honest, I'm not sure what she's<br>4 referencing with brain development.<br>5     Q.  Is adolescence associated with<br>6 significant neurodevelopment?<br>7     A.  Yes.<br>8     Q.  And do you agree that adolescence is<br>9 associated with an increase in capabilities for<br>10 abstraction and logical thinking?<br>11     A.  Yes.<br>12     Q.  And is puberty linked to developmental<br>13 changes in social and emotional processing?<br>14     A.  I'm not an expert on the intricacies of<br>15 that research, but I can say as a clinical matter<br>16 in terms of cognitive development for my<br>17 patients -- I mean, I have a handful of patients<br>18 who are now at Ivy League universities who are<br>19 doing quite well, so there doesn't seem to be an<br>20 apparent, clear negative path on cognition.<br>21     Q.  So you are not an expert on cognitive<br>22 development; is that right?<br>23     A.  I am broadly, but I wouldn't be able to<br>24 dive into the depths of the study of -- like,<br>25 neuroimaging studies that look at different<br>*Page 193* |

49 (Pages 190 - 193)

Jack Turban , M.D., MHS October 16, 2023

1 neuroimaging paths throughout adolescence.
2     Q.  In this case are you opining as an expert
3 on cognitive development?
4         MS. NOWLIN-SOHL:  Object to form.
5         THE WITNESS:  At the level of being a
6 child in adolescent psychiatry, yes, but not at
7 the level of being somebody who spends my whole
8 career doing things like neuroimaging studies,
9 looking at neural pathway development.
10        MR. RAMER:  And, Li, do you have Turban
11 Exhibit 16 yet?
12        MS. NOWLIN-SOHL:  I do.
13        MR. RAMER:  Oh, great.
14        (Deposition Exhibit No. 16 was marked.)
15    Q.  (BY MR. RAMER)  And, Dr. Turban, have you
16 seen this article before?
17    A.  No.
18    Q.  Do you recognize the lead author?
19    A.  Yes.
20    Q.  And I'd like to go to page 254 in this
21 article, and specifically the left column under
22 "Discussion," and the second sentence in that
23 paragraph following the discussion header.  And
24 I'll read it and ask if I read it correctly.
25        It says "However, puberty is a major

Page 194

1         But I think the sentence you read is too
2 vague to say a lot from.
3     Q.  And what are the two studies you're
4 referencing?
5     A.  I have to remember the -- I think the one
6 that was the meta-analysis looking among young
7 adults I believe was in the Journal of Psycho
8 Neurologic Chronology I think in 2021.
9         The executive functioning one I believe
10 was by the Dutch, but I don't know the name of the
11 first author.
12    Q.  Is the executive functioning one the one
13 with the Tower of London test?
14    A.  Yes.
15    Q.  I'd like to go to page -- stick with this
16 article, go to page 249, and right column and
17 first full paragraph.  And I'd like to just read
18 it and ask if I read it correctly.
19        It says "We employed a two-round Delphi
20 procedure to obtain expert consensus regarding the
21 most efficacious research design elements
22 addressing the following research question:  What,
23 if any, real world impact does pubertal
24 suppression have on transgender children's
25 cognitive and neural development?"

Page 196

1 developmental process.  And the full consequences,
2 both beneficial and adverse of suppressing
3 endogenous puberty, are not yet understood."
4         Did I read that correctly?
5     A.  Yes.
6     Q.  Do you agree that the full consequences
7 of suppressing endogenous puberty are not yet
8 understood?
9     A.  This is a somewhat vague sentence.  I
10 think the thing that's difficult when talking
11 about the impact of any medication on cognition is
12 that there are really infinite cognitive domains
13 one could look at.  So in many ways, it's an
14 unanswerable question.
15        People have looked at different
16 questions, for instance, impact on executive
17 functioning.  It does not seem that there's an
18 adverse impact.
19        There is also a meta-analysis that looked
20 mostly at young adults, not adolescents, so
21 different, that did find an adverse impact on
22 several cognitive things they looked at.
23        They found an improvement in visual
24 spatial reasoning among people that took
25 testosterone.

Page 195

1         Did I read that correctly?
2     A.  Yes.
3     Q.  Do you know the answer to that question?
4         MS. NOWLIN-SOHL:  Object to form.
5         THE WITNESS:  I think it's too broad of a
6 question to have a straightforward answer.  I
7 don't know that I could answer any question for
8 any medical intervention.
9     Q.  (BY MR. RAMER)  Do you think that
10 question is unanswerable?
11        MS. NOWLIN-SOHL:  Object to form.
12        THE WITNESS:  I think it's too broad to
13 really be able to answer.  It kind of would
14 involve nearly infinite subquestions.  So it would
15 be interesting to see the results of this Delphi
16 procedure to see what they thought were the
17 important subquestions to be answered.
18    Q.  (BY MR. RAMER)  Do you agree that
19 learning the answer to that question could have
20 important clinical implications?
21        MS. NOWLIN-SOHL:  Object to form.
22        THE WITNESS:  Again, it's such a broad
23 question.  I certainly could imagine that there
24 would be subquestions that come out of it that
25 would be interesting, but nothing this paper

Page 197

50 (Pages 194 - 197)

Jack Turban , M.D., MHS October 16, 2023

| Page 198 | Page 200 |
|---|---|
| 1 ultimately does. But I have not seen this<br>2 particular paper.<br>3    Q. (BY MR. RAMER) So are you -- just to<br>4 understand, are you criticizing the question<br>5 that's in italics there?<br>6    MS. NOWLIN-SOHL: Object to form;<br>7 mischaracterizes prior testimony.<br>8    THE WITNESS: I think it's a broad<br>9 question that is likely designed from more<br>10 specific questions.<br>11    Q. (BY MR. RAMER) Do you know -- can you<br>12 describe any impact -- let me put it this way:<br>13 What can you tell me about the effect of pubertal<br>14 suppression on transgender children's cognitive<br>15 and neural development?<br>16    MS. NOWLIN-SOHL: Object to form.<br>17    THE WITNESS: It appears to result in<br>18 improved anxiety, depression, and from the data we<br>19 have, not impact executive functioning in that<br>20 clinically these young people don't seem to have<br>21 major issues in academic functioning.<br>22    Q. (BY MR. RAMER) Would you agree that<br>23 anxiety, depression, executive functioning, and<br>24 academic functioning are not necessarily the same<br>25 thing as neural and cognitive development? | 1    "In addition, cognitive/behavioral<br>2 flexibility, a component of executive functioning,<br>3 should be measured, given that studies in rodents<br>4 show ovarian hormones, acting during puberty,<br>5 program cognitive flexibility by exerting<br>6 long-lasting effects on excitatory and inhibitory<br>7 balance in the prefrontal cortex."<br>8    Did I read that correctly?<br>9    A. Yes.<br>10    Q. Do you agree that rodent studies have<br>11 shown that ovarian hormones can have long-lasting<br>12 effects in brain development?<br>13    MS. NOWLIN-SOHL: Object to form;<br>14 foundation.<br>15    THE WITNESS: Whether or not a research<br>16 finding from rodents is going to translate to<br>17 humans is always very up in the air. I'd have to<br>18 look at the specific citation to know the details<br>19 of this rodent study.<br>20    Q. (BY MR. RAMER) Well, I guess following<br>21 up on that, if a scientist is faced with animal<br>22 studies reporting that pubertal hormones have<br>23 long-lasting effects on brain development,<br>24 shouldn't that scientist conclude there was some<br>25 possibility that pubertal hormones may also have |
| Page 199 | Page 201 |
| 1    MS. NOWLIN-SOHL: Object to form.<br>2    THE WITNESS: I think they're aspects of<br>3 cognitive development. Again, this is kind of my<br>4 overall point here, that cognitive neural<br>5 development is such a broad term that it could<br>6 encompass nearly infinite things.<br>7    Q. (BY MR. RAMER) So you think -- sorry.<br>8 So just to confirm that I understand, you think<br>9 that the question that was developed by these<br>10 researchers is so broad that it encompasses an<br>11 infinite number of things?<br>12    MS. NOWLIN-SOHL: Object to form;<br>13 mischaracterizes prior testimony.<br>14    THE WITNESS: I don't think this is the<br>15 question that came out of the Delphi procedure.<br>16 It looks like this is the question they used to<br>17 prompt their Delphi procedure to then see what<br>18 their more specific questions would be.<br>19    I haven't read this paper, but from the<br>20 section you showed me, that's what it looks like.<br>21    Q. (BY MR. RAMER) Let's go to page 253 in<br>22 this document. Right column, about halfway down<br>23 there's a sentence that begins with "In addition."<br>24 And I'll just read it and ask if I read it<br>25 correctly. | 1 long-lasting effects on brain development in<br>2 humans?<br>3    MS. NOWLIN-SOHL: Object to form.<br>4    THE WITNESS: Not necessarily a high<br>5 probability because rodent studies often don't<br>6 translate into clinically meaningful measures in<br>7 humans, but potentially.<br>8    Q. (BY MR. RAMER) I'd like to go to --<br>9 well, I guess before seeing this article, which<br>10 you said you've seen for the first time today,<br>11 were you aware of references in literature<br>12 regarding the effect of pubertal suppression on<br>13 brain development in animals?<br>14    MS. NOWLIN-SOHL: Object to form.<br>15    THE WITNESS: I believe there is one<br>16 study in sheep that's been referenced.<br>17    I mean, the way I think about this<br>18 clinically is that these medications have been<br>19 around for decades. And generally, anytime<br>20 there's a medication that's FDA approved and on<br>21 the market, there's market surveillance.<br>22    And we will often identify if there is a<br>23 really serious consequence, and there haven't been<br>24 any apparent serious -- when I say "apparent,"<br>25 adverse consequences from pubertal suppression |

51 (Pages 198 - 201)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1 that I'm aware of. | 1    Q.  Well, what about the second sentence that |
| 2        But certainly it's reasonable to do | 2 says "any GnRHa-related difference in brain |
| 3 research to study this more in depth to see if | 3 structure is likely to be observed over the long |
| 4 maybe there are finer, less clinically significant | 4 term rather than immediately"? |
| 5 or obvious impacts. | 5    A.  It's somewhat imprecise.  I don't know |
| 6    Q.  (BY MR. RAMER)  When you say the | 6 what they mean "over the long term" versus |
| 7 medications have been around for a while -- I'm | 7 "immediately," but I don't have any specific |
| 8 paraphrasing -- but the use of puberty blockers in | 8 objection to the sentence. |
| 9 particular, the FDA approval is for central | 9    Q.  And going to 255 in this document, left |
| 10 precocious puberty, correct? | 10 column, second full paragraph about halfway down |
| 11    A.  Correct. | 11 that paragraph, there's a sentence that starts |
| 12    Q.  And when treating central precocious | 12 with "Yet."  And I'll just read these two |
| 13 puberty, you will eventually cease giving the | 13 sentences in this paragraph and ask if I read them |
| 14 patient puberty blockers and then the patient will | 14 correctly first. |
| 15 then proceed through endogenous puberty, correct? | 15        "Yet, evidence suggests an |
| 16    A.  Correct. | 16 over-occurrence of neurodiversity characteristics, |
| 17    Q.  And so if the question is suppressing | 17 (especially related to autism) among |
| 18 endogenous puberty permanently, and what effect | 18 gender-referred youth.  The neurodevelopmental |
| 19 that has on cognition, the fact that puberty | 19 impact of pubertal suppression on neurodiverse |
| 20 blockers have been FDA approved for central | 20 gender-diverse youth might well be different than |
| 21 precocious puberty is irrelevant, correct? | 21 in neurotypical gender-diverse youth given |
| 22        MS. NOWLIN-SOHL:  Object to form. | 22 variations in neurodevelopmental trajectories |
| 23        THE WITNESS:  I wouldn't call it | 23 observed across neurodevelopment conditions." |
| 24 irrelevant.  I think in both circumstances people | 24        Did I read that correctly? |
| 25 are exposed to the medications for a period of | 25    A.  Yes. |
| Page 202 | Page 204 |
| 1 time that puberty is suppressed.  And then they go | 1    Q.  Are you aware of any studies researching |
| 2 through either estrogen or testosterone puberty. | 2 the effect of pubertal suppression on |
| 3    Q.  (BY MR. RAMER)  Well, you're saying | 3 neurodevelopment in adolescents with neurodiverse |
| 4 estrogen or testosterone puberty.  That is not the | 4 characteristics? |
| 5 same thing, necessarily, as endogenous puberty, | 5    A.  Yes.  So the research on the relationship |
| 6 correct? | 6 between autism and gender dysphoria has been |
| 7    A.  For any given person, yeah, their | 7 controversial about whether or not there is a true |
| 8 endogenous -- or endogenous puberty, it would be | 8 relationship between the two. |
| 9 estrogen or testosterone puberty, depending on | 9        So we published a paper in the Journal of |
| 10 their sex assigned at birth. | 10 the American Academy of Child and Adolescent |
| 11    Q.  I'd like to go to page 252 in this | 11 Psychiatry a few years ago where we looked at the |
| 12 document.  And the left column just about over | 12 different studies that looked at whether or not |
| 13 halfway down the paragraph there's a sentence that | 13 there was a co-occurrence between gender dysphoria |
| 14 starts with the words "The effects."  And I'll | 14 and autism or vice versus, and pointed out that |
| 15 read it and ask if I read it correctly. | 15 there were a lot of issues with that research. |
| 16        "The effects of pubertal suppression may | 16        So for the research, looking at those |
| 17 not appear for several years.  Any GnRHa-related | 17 with gender dysphoria, they would often use |
| 18 difference in brain structure is likely to be | 18 screening instruments like the social |
| 19 observed over the long term rather than | 19 responsiveness scale or the autism quotient.  And |
| 20 immediately." | 20 they found that trans youth with gender dysphoria |
| 21        Did I read that correctly? | 21 were more likely to score in the clinical range on |
| 22    A.  Yes. | 22 those instruments than youth without gender |
| 23    Q.  Do you agree with those statements? | 23 dysphoria. |
| 24    A.  I mean it says "may," so hard to argue | 24        The problem, as you know, is those |
| 25 with the sentence. | 25 instruments are very nonspecific, so as many as |
| Page 203 | Page 205 |

52 (Pages 202 - 205)

(260 of 288), Page 260 of 288 Case: 24-142 01/26/2024 DktEntry: 23.3, Page 260 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 53 of 177
Jack Turban , M.D., MHS October 16, 2023

1 80 percent of the kids who just have social
2 anxiety will score in the clinical range.
3    So for that reason we didn't know are
4 these young people scoring in the clinical range
5 because they truly have autism? Or is it because
6 they have other conditions that they're screening
7 for in this range too.
8    So that prompted some people to wonder if
9 these, quote, autism results were truly a result
10 of autism or if they were a result of minority
11 stress or gender dysphoria. So it raised the
12 question of whether or not these supposed autism
13 symptoms would improve following gender-affirming
14 medical care.
15    And I know there was at least one study
16 that only looked at pubertal suppression for, I
17 forget how long, a year or two, and looked at how
18 the social responsiveness scale changed over time
19 after gender-affirming medical treatment.
20    Q. What is the social responsiveness scale?
21    A. Screening instrument for autism that
22 again is somewhat nonspecific, because people with
23 other conditions like social anxiety disorder will
24 often screen in the clinical range.
25    Q. So in your previous answer, what question

Page 206

1 different cognitive outcomes. It could be the
2 social responsiveness scale that they looked it.
3 It can look at neuroimaging techniques.
4    Q. Okay. Exclude the social responsiveness
5 scale.
6    Are you aware of any study researching
7 the effect of pubertal suppression on
8 neurodevelopment in adolescents with neurodiverse
9 characteristics?
10    A. I have to look back at what other
11 outcomes that study looked at, but I can't recall.
12    Q. Okay. Let's go back to -- it was a while
13 ago -- Turban Exhibit 5, which I believe is the
14 Cass interim report.
15    And specifically I'd like to go to
16 page 38. And in the right column there is a
17 paragraph numbered 3.32. I'm just going to read
18 the first sentence and ask if I read it correctly.
19    MS. NOWLIN-SOHL: Can you give us one
20 second, John?
21    MR. RAMER: Oh, sorry. Yep.
22    MS. NOWLIN-SOHL: You said 3.32?
23    MR. RAMER: Yeah, so page 38, right
24 column, paragraph numbered 3.32.
25    MS. NOWLIN-SOHL: Okay. We are there.

Page 208

1 were you answering?
2    A. You asked if I was aware of any studies
3 looking at the impact of gender-affirming medical
4 care among those with neurodivergent
5 characteristics like autism.
6    Q. Well, it was actually specifically are
7 you aware of any study researching the effect of
8 pubertal suppression on neurodevelopment in
9 adolescents with neurodiverse characteristics?
10    A. Autism is a -- neurodiversity is a
11 category that includes autism. People often use
12 "neurodiversity" to reference people who have
13 autism characteristics. And so that was a study
14 of looking at people who were neurodiverse and
15 that they had presumably autism. And they
16 followed them after pubertal suppression.
17    Q. And so I appreciate that "neurodiverse"
18 includes people who have autism.
19    My question is the study about the effect
20 of pubertal suppression on neurodevelopment
21 specifically in adolescents who are neurodiverse.
22    Aware of any study researching that?
23    A. What do you mean by "neurodevelopment"?
24    Q. What do you understand that term to mean?
25    A. It's a broad term that could look at

Page 207

1    Q. (BY MR. RAMER) Okay. I'll read the
2 first sentence of that paragraph and ask if I read
3 it correctly.
4    It says "A closely linked concern is the
5 unknown impacts on development, maturation, and
6 cognition if a child or young person is not
7 exposed to the physical, psychological,
8 physiological, neurochemical, and sexual changes
9 that accompany adolescent hormone surges."
10    Did I read that correctly?
11    A. Yes.
12    Q. And do you agree that the impact of
13 puberty blockers on the child's developmental
14 cognition is currently unknown?
15    MS. NOWLIN-SOHL: Object to form.
16    THE WITNESS: There are elements of
17 neurocognition that have been studied, but we
18 don't know for every domain of neurocognition.
19 And I think the same is probably true for the vast
20 majority of medications.
21    Q. (BY MR. RAMER) What's your basis for
22 that conclusion?
23    A. That we don't routinely study every
24 medication for every way in which it could impact
25 every domain of neurocognitive development.

Page 209

53 (Pages 206 - 209)

(261 of 288), Page 261 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 261 of 288
Case 1:23-cv-00269-BLW   Document 74-2   Filed 11/02/23   Page 54 of 177
Jack Turban , M.D., MHS   October 16, 2023

| | |
|---|---|
| 1     You know, there's impact to their<br>2 functioning; there's visual/spatial reasoning;<br>3 there's verbal fluency; there's different measures<br>4 of mathematical ability.  There's just so many<br>5 different ways you can measure neurocognitive<br>6 development, and we don't routinely -- we just<br>7 don't have research for the vast majority of<br>8 medications and how they impact all those<br>9 different domains because there are so many.<br>10    Q.  In your testimony --<br>11    A.  If there were -- again, like a<br>12 post-medication surveillance signal that came up<br>13 from the FDA showing, wow, we have a lot of<br>14 patients who took this specific medication, and it<br>15 seems like they're having clinically significant<br>16 impairment in their neurocognitive domain, that<br>17 would probably prompt that research.<br>18     But that's not routinely done for every<br>19 medication.  It would be nice if it were, but it's<br>20 a lot of research and really intensive research to<br>21 do.<br>22    Q.  And so you're saying that for the vast<br>23 majority of medications, we do not know the<br>24 neurocognitive outcomes from taking those<br>25 medications; is that right?<br><div align="right">Page 210</div> | 1 hormones?<br>2    MS. NOWLIN-SOHL:  Object to form.<br>3    THE WITNESS:  I can say clinically most<br>4 patients who get pubertal suppression -- well,<br>5 essentially all of them, will later either stop<br>6 pubertal suppression and go through endogenous<br>7 puberty, or they'll start gender-affirming<br>8 hormones.<br>9     Generally clinical experience has been<br>10 that those patients do quite well, and we don't<br>11 see that they have major cognitive impairments<br>12 that are clinically significant, but I'm not aware<br>13 of a specific peer-reviewed study looking at that<br>14 question, and again would point out that this term<br>15 "brain maturation" is very vague and not a very<br>16 technical term.  And so I'm not sure exactly what<br>17 metric of brain maturation you're referencing.<br>18    Q.  (BY MR. RAMER)  You read this when --<br>19 well, when did you read this?<br>20    A.  I don't remember.  Many months ago.<br>21    Q.  And if you thought that the phrase "brain<br>22 maturation" was vague, did it lead you to want to<br>23 investigate further what they were talking about?<br>24    MS. NOWLIN-SOHL:  Object to form.<br>25    THE WITNESS:  From this specific<br><div align="right">Page 212</div> |
| 1    MS. NOWLIN-SOHL:  Object to form.<br>2    THE WITNESS:  We might know some<br>3 neurocognitive outcomes, but we don't know the<br>4 full range of neurocognitive outcomes.<br>5    Q.  (BY MR. RAMER)  And for pubertal<br>6 suppression, do we know some neurocognitive<br>7 outcomes?<br>8    A.  I would say we have some mental health<br>9 outcomes, and we have executive functioning.  And<br>10 those are the ones that I'm aware of.<br>11    Q.  So same paragraph, final sentence at the<br>12 bottom starting with "If."  I'll read it and ask<br>13 if I read it correctly first.<br>14    "If pubertal sex hormones are essentially<br>15 to these brain maturation processes, this raises a<br>16 secondary question of whether there is a critical<br>17 time window for the processes to take place or<br>18 whether catch-up is possible when estrogen or<br>19 testosterone is introduced later."<br>20    Did I read that correctly?<br>21    A.  Yes.<br>22    Q.  Are you aware of any study that addresses<br>23 whether a negative impact on brain maturation due<br>24 to pubertal blockade can be corrected later if the<br>25 child is exposed to either endogenous or cross-sex<br><div align="right">Page 211</div> | 1 international report, no.<br>2    Q.  (BY MR. RAMER)  Did anything in this<br>3 report lead you to do additional investigation?<br>4    A.  What do you mean by "investigation"?<br>5    Q.  I mean, did you read something in this<br>6 report and say, "Oh, that's a valid concern.  I<br>7 should look into that"?  Or no?<br>8    MS. NOWLIN-SOHL:  Object to form.<br>9    THE WITNESS:  I don't recall this report<br>10 bringing up anything relevant to my practice that<br>11 was new or interesting or present any new or<br>12 interesting data to my practice.<br>13     I remember the most interesting thing<br>14 being the description of how care is delivered in<br>15 the U.K. and how they're changing that.  But it<br>16 didn't -- I don't recall it presenting any new<br>17 research or concepts that I wasn't previously<br>18 familiar with.<br>19    MR. RAMER:  Okay.  I'd like to go to<br>20 Turban Exhibit 17.  Let me know when you have that<br>21 in front of you.<br>22    MS. NOWLIN-SOHL:  Okay.<br>23    (Deposition Exhibit No. 17 was marked.)<br>24    Q.  (BY MR. RAMER)  Dr. Turban, do you<br>25 recognize this document?<br><div align="right">Page 213</div> |

<div align="right">54 (Pages 210 - 213)</div>

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1  A.  Yes. | 1  A.  Yes. |
| 2  Q.  What is it? | 2  Q.  And the fourth one down on this table, |
| 3  A.  I believe this was a report by a U.K. | 3  the de Vries study, do you recall, is that also a |
| 4  government agency looking at the research related | 4  study you cite in your declaration? |
| 5  to pubertal suppression for adolescent gender | 5  A.  Yes. |
| 6  dysphoria. | 6  Q.  And the next page, third from the bottom, |
| 7  Q.  And do you understand this to be a | 7  the Turban article.  And do you recall is this a |
| 8  systematic review? | 8  study you cite in your declaration? |
| 9  A.  Yes. | 9  A.  Yes. |
| 10  Q.  And is this something that you've read | 10  Q.  And did you know the review excluded |
| 11  before? | 11  these studies? |
| 12  A.  Yes. | 12  A.  Yes. |
| 13  Q.  And did you read it in some detail or did | 13  Q.  And do you disagree with the review's |
| 14  you skim it? | 14  conclusion to exclude these studies? |
| 15  A.  When I initially read it, I read it in | 15  A.  I call it a decision, not a conclusion, |
| 16  detail. | 16  but yes. |
| 17  Q.  And what did you think when you read it? | 17  Q.  And why? |
| 18  A.  It's been a while, but I remember that -- | 18  A.  Because I think the studies give you |
| 19  to our point earlier that all a systematic review | 19  valuable information.  The Achille study, though |
| 20  really means is that they define their search | 20  it doesn't separate GnRH analogues out from the |
| 21  terms.  But then subsequent decisions about which | 21  other interventions because it's underpowered when |
| 22  research you include or don't include can be very | 22  it does that, I do think it's valuable information |
| 23  subjective.  I recall them excluding studies that | 23  to know when they look at the group that received |
| 24  I thought were important to include. | 24  gender-affirming medical interventions including |
| 25  Q.  And did this review reach conclusions | 25  blockers and hormones that their mental health |
| Page 214 | Page 216 |

| | |
|---|---|
| 1  that you disagree with? | 1  improved.  I think that that's useful information. |
| 2  A.  It's been a while since I read it, so I'd | 2  The de Vries study they excluded, I think |
| 3  have to ask you if there's a specific line you're | 3  may be okay since this report was just interested |
| 4  referencing. | 4  in pubertal suppression, but I do think that's an |
| 5  Q.  Well, when you -- the comment you just | 5  important paper to know about because it looks at |
| 6  made about them excluding studies that you thought | 6  pubertal suppression followed by gender-affirming |
| 7  were important, so do you have reason to doubt | 7  hormones followed by gender-affirming surgery.  So |
| 8  that the analysis in this document is reliable? | 8  it gives you a lot of fresh informational, albeit |
| 9  MS. NOWLIN-SOHL:  Object to form. | 9  not just about puberty blockers. |
| 10  THE WITNESS:  I recall them not including | 10  And then our study where it says they |
| 11  all the studies that they should have included. | 11  excluded because it doesn't report separately from |
| 12  Q.  (BY MR. RAMER)  And do you know whether | 12  other interventions, I'd have to pull up our paper |
| 13  this systematic review assessed any of the studies | 13  again but I'm pretty sure that's not true.  I |
| 14  that you rely on in your declaration? | 14  believe we adjusted for access to gender-affirming |
| 15  A.  I presume it reviews some of them, but | 15  hormones. |
| 16  it's been a while since I've read it. | 16  Q.  You don't know as you sit here whether |
| 17  Q.  Okay.  Let's go to page 74.  And kind of | 17  you adjusted for -- |
| 18  middle of the page, you see appendix D entitled | 18  A.  I just don't want to say on the record |
| 19  "Excluded Studies Table"? | 19  without double-checking, but do you want to pull |
| 20  A.  Yes. | 20  up the -- |
| 21  Q.  And do you recall whether you cite the | 21  Q.  No, I think my question is actually, |
| 22  first study -- let me rephrase. | 22  like, as you sit here, you don't know the answer |
| 23  Do you recall whether in your declaration | 23  to that? |
| 24  you submitted in this case that you cite the first | 24  A.  I'm pretty sure, but want to |
| 25  study listed here? | 25  double-check. |
| Page 215 | Page 217 |

55 (Pages 214 - 217)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1    Q.   Okay.  That's sufficient. | 1    subjective and there are different ways you can |
| 2         Okay.  I'd like to go to -- let's stick | 2    decide to up score or down score each thing. |
| 3    with this document and go to page 99.  And at the | 3         I'd really have to sit down with them and |
| 4    top it says "Appendix G Grade Profiles." | 4    go through it in detail to see how they decided |
| 5         Do you see that? | 5    for each of the columns.  But it doesn't surprise |
| 6    A.  Yes. | 6    me that on the GRADE supporting system that |
| 7    Q.   And the first study in Table 2 here is | 7    prioritizes randomized controlled trials that it |
| 8    de Vries 2011 study. | 8    would have ended up in a low, very low category |
| 9         And you cite that in your declaration, | 9    according to that term of art of GRADE scoring. |
| 10   correct? | 10   Q.  (BY MR. RAMER) If you don't use GRADE, |
| 11   A.  Yes. | 11   what tool are you using to assess the degree of |
| 12   Q.   And in that table, there's a little | 12   bias in this study? |
| 13   footnote 2.  And then you go down to footnote 2 | 13        MS. NOWLIN-SOHL:  Object to form. |
| 14   and it says "Downgraded one level -- the cohort | 14        THE WITNESS:  GRADE is not really just |
| 15   study by de Vries, et al. (2011) was assessed as | 15   about bias.  I think one part of the GRADE |
| 16   at high risk of bias (poor quality overall, lack | 16   criteria is they look at risk of bias.  But I |
| 17   of binding, and no control group)." | 17   generally look at study by study to go into more |
| 18        Do you see that? | 18   detail on different types of bias and how they |
| 19   A.  Yes. | 19   impact the results. |
| 20   Q.   And do you disagree with that assessment? | 20   Q.  (BY MR. RAMER) Do you use a particular |
| 21   A.  No. | 21   methodology to assess the degree of bias in a |
| 22   Q.   And then I'd like to go to page 101. | 22   study? |
| 23   Actually, I'm sorry, 102.  The following page. | 23   A.  Depends on the type of bias that you're |
| 24        And do you see they refer to the Costa | 24   looking at.  It could be recall bias, selection |
| 25   2015 study in this table? | 25   bias.  They're all managed differently. |
| Page 218 | Page 220 |
| 1    A.  Yes. | 1         The other thing about the GRADE criteria |
| 2    Q.   And you also cite the Costa 2015 study, | 2    is that they that -- they grade each individual study, |
| 3    right? | 3    but I find it's useful to look at the body of |
| 4    A.  Yes. | 4    research as a whole because certain studies are |
| 5    Q.   And if you go to page 106, down at the | 5    going to have weaknesses that other studies |
| 6    very bottom there's another little footnote 1. | 6    complement with their strengths, so it's important |
| 7    And it says "Downgraded one level -- the cohort | 7    to look at the full body of research as a whole |
| 8    study by Costa, et al. (2015) was assessed as at | 8    where these individual GRADE scores for different |
| 9    high risk of bias (poor quality overall, lack of | 9    individual studies are true because studies are |
| 10   binding, and no control group." | 10   going to have strengths and limitations.  But it's |
| 11        Do you see that? | 11   useful within the body of literature as a whole. |
| 12   A.  Yes. | 12   Q.   (BY MR. RAMER)  And you mention there |
| 13   Q.   And do you agree with that assessment? | 13   were different tools to assess different types of |
| 14   A.  I agree with the lack of binding.  I | 14   bias. |
| 15   don't think it's fully accurate to say there | 15        What tools do you use? |
| 16   wasn't a control group. | 16   A.  Is there a specific type of bias you're |
| 17   Q.   Do you agree it's at high risk of bias? | 17   interested in? |
| 18   A.  It depends on how they're defining that | 18   Q.  Any of the examples you provided. |
| 19   term. | 19   A.  So recall bias, for instance, you would |
| 20   Q.   What if they're defining it in accordance | 20   look at the amount of time between when you're |
| 21   with the GRADE methodology? | 21   asking the person the survey question and when |
| 22        MS. NOWLIN-SOHL:  Object to form. | 22   that happened. |
| 23        THE WITNESS:  The thing about GRADE | 23        You would look at the salience of the |
| 24   methodology is there are several categories to go | 24   event.  People are more likely to have more |
| 25   through each one, and then it's somewhat | 25   intense recall bias if it was a relatively mundane |
| Page 219 | Page 221 |

56 (Pages 218 - 221)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1  event from the distant past than they are if it | 1  "subjective" talking about the GRADE methodology. |
| 2  were a very notable event from the somewhat recent | 2      What were you referring to? |
| 3  past. | 3      A.  That when you go through the categories, |
| 4      Q.  I guess do you use a method to assess | 4  like, for instance, bias, indirectness, and |
| 5  bias?  Or do you just read the study and reach a | 5  inconsistence, there's subjectivity in how you |
| 6  conclusion based on your expertise? | 6  apply those criteria on each of those and |
| 7      MS. NOWLIN-SOHL:  Object to form. | 7  discretionary decisions that are made based on the |
| 8      THE WITNESS:  It depends on the type of | 8  general guidance that the GRADE system creates. |
| 9  bias.  So if it's recall bias, you're looking, for | 9      MR. RAMER:  I'd like to turn to Turban |
| 10  instance, at the number of years between the | 10  Exhibit 18, if you have that, Li. |
| 11  recall and the event, which is quantitative. | 11      MS. NOWLIN-SOHL:  Yes. |
| 12      And then secondarily you're assessing how | 12      (Deposition Exhibit No. 18 was marked.) |
| 13  salient that event is. | 13      Q.  (BY MR. RAMER)  Okay.  And, Dr. Turban, |
| 14      Q.  (BY MR. RAMER)  What about a bias for a | 14  do you recognize this document? |
| 15  confounding variable?  How do you assess that when | 15      A.  Yes. |
| 16  you're reading an individual study? | 16      Q.  And what is it? |
| 17      A.  Let's say it's a logistic regression | 17      A.  This is a report from a U.K. agency |
| 18  model.  You would look at whether or not they | 18  looking at the research of gender-affirming |
| 19  collected that -- the data point for that | 19  hormone treatments for adolescent gender |
| 20  potential confounder and built it into their | 20  dysphoria. |
| 21  statistical model.  If they didn't, then there's a | 21      Q.  And do you understand this to be a |
| 22  risk of confounding. | 22  systematic review? |
| 23      Q.  And so do you agree that the evidence | 23      A.  Yes. |
| 24  quality for the use of puberty blockers to treat | 24      Q.  And is this by the same organization as |
| 25  gender dysphoria is very low on the GRADE scale? | 25  the one we were just previously looking at? |
| Page 222 | Page 224 |

| | |
|---|---|
| 1      MS. NOWLIN-SOHL:  Object to form. | 1  Correct? |
| 2      THE WITNESS:  Again, GRADE scaling is a | 2      A.  Yes. |
| 3  little difficult because you go through -- and | 3      Q.  And is this something you've read before? |
| 4  really you're supposed to have a committee where | 4      A.  Yes. |
| 5  you go through each individual one and it's | 5      Q.  And did you study it closely? |
| 6  somewhat subjective because there are many | 6      A.  At the time. |
| 7  determinations for deciding how to score each | 7      Q.  And what did you think when you read it? |
| 8  category, but I will say the way the GRADE scoring | 8      A.  What I recall, it reviewed studies that I |
| 9  system is set up, it does really prioritize things | 9  generally was already aware of, and I believe |
| 10  like randomized controlled trials. | 10  similarly had excluded a handful of studies. |
| 11      So I would expect any group that went | 11      I think when I was reading it, it was -- |
| 12  through the GRADE scoring would find that it would | 12  it had been published for a while, so I also |
| 13  be in the low, very low categories. | 13  noticed that there understandably was not |
| 14      Q.  (BY MR. RAMER)  And you say GRADE scoring | 14  inclusion of important studies that were published |
| 15  was somewhat subjective. | 15  after it came out. |
| 16      Do you think it's more or less subjective | 16      Q.  Okay.  I'd like to go to page 70.  And |
| 17  than you just reading individual studies? | 17  toward the bottom there's a bold blue header that |
| 18      MS. NOWLIN-SOHL:  Object to form. | 18  says "Appendix D Excluded Studies Table." |
| 19      THE WITNESS:  I don't understand the | 19      Do you see that?  Sorry.  I missed you. |
| 20  question. | 20  Did you see that? |
| 21      Q.  (BY MR. RAMER)  What don't you understand | 21      A.  Yes. |
| 22  about it? | 22      Q.  And then I'd like to go to page 72.  And |
| 23      MS. NOWLIN-SOHL:  Object to form. | 23  the second study listed there, the de Vries 2014 |
| 24      THE WITNESS:  Subjective in what way? | 24  study.  That's a study that you cite in your |
| 25      Q.  (BY MR. RAMER)  Well, you used the term | 25  declaration, correct? |
| Page 223 | Page 225 |

57 (Pages 222 - 225)

(265 of 288), Page 265 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 265 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 58 of 177
Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1   A. Correct.<br>2   Q. And then I'd like to go to -- well, and<br>3 you were aware that the publishers of this<br>4 systematic review excluded that study from<br>5 consideration before you cited it in your<br>6 declaration, correct?<br>7   A. It's years ago that I read this, but yes,<br>8 I would have at some point been aware of that.<br>9   Q. And let's go to page 77. And that's<br>10 entitled "Appendix E, Evidence Tables."<br>11   Do you see that?<br>12   A. Yes.<br>13   Q. And there they are discussing the Achille<br>14 article that you cite, correct?<br>15   A. I believe that's how you pronounce it.<br>16   Q. But that's the article that you cite,<br>17 correct?<br>18   A. Yes.<br>19   Q. And then go to page 79. And toward the<br>20 bottom, that's the Allen study that you cite,<br>21 correct?<br>22   A. Correct.<br>23   Q. And then 81. And that's the Kaltiala<br>24 study that you cite, correct?<br>25   A. Yes.<br><br>Page 226 | 1   Q. Do you agree that it will take longer<br>2 than 5.8 years for some of the effects associated<br>3 with these hormonal interventions to become<br>4 apparent?<br>5   MS. NOWLIN-SOHL: Object to form.<br>6   THE WITNESS: Hard to know. I guess I<br>7 would point out that this isn't uncommon in<br>8 medicine. Any medication that was approved by the<br>9 FDA in the past few years we're not going to have,<br>10 you know, years and years of follow-up data for.<br>11 That's not really unusual in medicine.<br>12   And it would be unusual to ban the<br>13 treatment because we didn't have more than six<br>14 years of treatment. It would make it so you had<br>15 to ban every treatment every time it was approved<br>16 essentially.<br>17   But I can't tell you with 100 percent<br>18 certainty about years past, the data we have.<br>19   Q. (BY MR. RAMER) And going to the next<br>20 paragraph below that, the first sentence, just<br>21 read it, ask if I read it correctly.<br>22   It says "Most studies included in this<br>23 review did not report comorbidities (physical or<br>24 mental health) and no study reported concomitant<br>25 treatments in detail."<br><br>Page 228 |
| 1   Q. And then two more. Page 97. I'm sorry,<br>2 page 92, I apologize.<br>3   And that is the Cooper study that you<br>4 cite, correct?<br>5   A. Yes.<br>6   Q. And page 97 and toward the bottom,<br>7 that is the de Lara study that you cite, correct?<br>8   A. Yes.<br>9   Q. I'd like to go back to page 13 of this<br>10 document. And just above the middle of the page<br>11 there is a bold blue header that says<br>12 "Discussion." And then the third paragraph after<br>13 that starts with the words "The included studies."<br>14 And I'd just like to read that, and I'll ask if I<br>15 read it correctly.<br>16   "The included studies have relatively<br>17 short follow-up with an average duration of<br>18 treatment with gender-affirming hormones between<br>19 around one year and 5.8 years. Further studies<br>20 with a longer follow-up are needed to determine<br>21 the long-term effect of gender-affirming hormones<br>22 for children and adolescents with gender<br>23 dysphoria."<br>24   Did I read that correctly?<br>25   A. Yes.<br><br>Page 227 | 1   Did I read that correctly?<br>2   A. Yeah. I think that's true because this<br>3 was published prior to some of those other studies<br>4 that looked at psychotherapy as a potential<br>5 confounder.<br>6   Q. But for the record, I read that<br>7 correctly?<br>8   A. Yes.<br>9   Q. Okay. And what do you -- well, let me<br>10 read the next sentence, and then I'll -- my first<br>11 question will be did I read it correctly.<br>12   "Because of this, it is not clear whether<br>13 any changes seen were due to gender-affirming<br>14 hormones or other treatments the participants may<br>15 have received."<br>16   And did I read that correctly?<br>17   A. Yes.<br>18   Q. And is this paragraph describing a<br>19 confounding variable like we discussed earlier?<br>20   MS. NOWLIN-SOHL: Object to form.<br>21   THE WITNESS: Yes.<br>22   Q. (BY MR. RAMER) And the, quote, other<br>23 treatments in that last sentence could include<br>24 psychotherapy, correct?<br>25   A. Theoretically, yes. I can't be sure what<br><br>Page 229 |

58 (Pages 226 - 229)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| Page 230 | Page 232 |

1    they meant, but...
2       Q.  Well, when you read this, what did you
3    understand it to mean?
4       A.  That was my best guess, but they didn't
5    say.
6       Q.  Could it also include psychiatric
7    medication?
8       A.  Potentially.
9       MR. RAMER:  I'd like to now go to Turban
10   Exhibit 19.  And do you have that, Li?
11      MS. NOWLIN-SOHL:  We do.
12      MR. RAMER:  Great.
13     (Deposition Exhibit No. 19 was marked.)
14      Q.  (BY MR. RAMER)  And, Dr. Turban, have you
15   seen this document before?
16      A.  I think yes.  It's a review article that
17   was published in, I think, a Swedish medical
18   journal.
19      Q.  And have you read this?
20      A.  I did read it.  It has, if I remember
21   correctly, a lot of hyperlinks to very long
22   appendices that I have not fully read in detail.
23      Q.  I'd like to go to page 2280, which is the
24   second page of the article.  And right column
25   under Section 2.1, I'll read the first sentence.

*Page 230*

1      It says "This systematic review
2   originated from a two-year commissioned work from
3   the governmental body of the Swedish agency for
4   health, technology, assessment, and assessment of
5   social services (SBU)."
6      Did I read that correctly?
7      A.  Yes.
8      Q.  And do you understand this article to be
9   a systematic review commissioned by the Swedish
10   government?
11      A.  I believe so, yes.
12      Q.  So same page in the very top in the fully
13   gray box, there is a conclusion.  And I'll read it
14   and ask if I read it correctly.
15      It says "Evidence to assess the effects
16   of hormone treatment on the above fields in
17   children with gender dysphoria is insufficient.
18   To improve future research, we present the GENDHOR
19   checklist, a checklist for studies in gender
20   dysphoria."
21      Did I read that correctly?
22      A.  Yes.
23      Q.  Do you disagree with the conclusion that
24   evidence to assess the effects of hormone
25   treatment on children with gender dysphoria is

*Page 231*

1    insufficient?
2       MS. NOWLIN-SOHL:  Object to form.
3       THE WITNESS:  I would need a precise
4   definition of what they mean by "insufficient."
5      Q.  (BY MR. RAMER)  When you read this, did
6   you try to figure out what they meant by
7   "insufficient"?
8      A.  Probably at the time.  I don't recall
9   what their definition was.
10      Q.  And so you said the article included a
11   lot of hyperlinks to very long appendices; is that
12   right?
13      A.  Yes.
14      Q.  And did you ever try to analyze those?
15      A.  I started to, but didn't have time.  But
16   as I mentioned earlier, a lot of what happens with
17   the systematic review is there are subjective
18   choices made in how you define your search
19   terminology, how you decide to exclude and
20   include.
21      So my intention was to go through and
22   better understand their full methodology, but
23   ultimately I did not have time.
24      Q.  Okay.  I'd like to go to -- maybe we're
25   still on 2280.  And in the right column there is a

*Page 232*

1    box with key notes and then some bullets below it.
2       And the last bullet says "GnRHa treatment
3   in children with gender dysphoria should be
4   considered experimental treatment of individual
5   cases rather than standard procedure."
6      Did I read that correctly?
7      A.  Yes.
8      Q.  And do you disagree with that conclusion?
9       MS. NOWLIN-SOHL:  Object to form.
10      THE WITNESS:  Again, the terminology they
11   use doesn't have clear definitions, from my
12   perspective, by calling it an experimental
13   treatment.
14      I think that we always in medicine are
15   considering treatments on a case-by-case basis,
16   and for the individual patient we're weighing
17   risks, benefits, and unknowns, including for
18   puberty blockers.
19      So it's in line with my clinical practice
20   and I think most people's clinical practices that
21   treatment is individualized, and we take things
22   into account for the individual patient.
23      I'm not sure what they would mean by
24   "standard procedure."
25      Q.  (BY MR. RAMER)  I'd like to go to 2281 to

*Page 233*

59 (Pages 230 - 233)

1  the next page, right column, 3.1.  And the final
2  sentence of that paragraph in 3.1 says "A list of
3  excluded studies is provided at the SBU web page,"
4  and then includes a hyperlink.
5      Do you see that?
6  A.  Yes.
7  Q.  All right.
8      MR. RAMER:  I'd like to now introduce
9  Turban Exhibit 20 if you have that, Li.
10     MS. NOWLIN-SOHL:  Yes.
11     (Deposition Exhibit No. 20 was marked.)
12  Q.  (BY MR. RAMER)  And, Dr. Turban, I will
13  represent to you that this document is located at
14  the hyperlink that we just read.
15     And is this one of the long appendices
16  you were referring to?
17  A.  It looks a lot nicer than the one I
18  remember.  I wonder if they fixed some of the
19  formatting in translation.
20  Q.  It could be.
21  A.  But no, that's fine.  It's not very long.
22  Q.  And the -- let's see here.
23     Okay.  Can you see in the light blue -- I
24  won't ask you to read Swedish -- but after the
25  backslash, it says "Appendix 2 studies excluded
                                                    Page 234

1      Do we want to take a break here?
2      MS. NOWLIN-SOHL:  Yeah.
3      THE VIDEOGRAPHER:  Okay.  So the time is
4  3:20 p.m. Pacific time, and we are off the record.
5      (Break taken from 3:20 p.m. to 3:27 p.m.)
6      THE VIDEOGRAPHER:  All right.  So we are
7  recording.  The time is 3:27 p.m. Pacific time,
8  and we are back on the record.
9      MR. RAMER:  Okay.  Dr. Turban, I'd like
10  to introduce Turban Exhibit 21 if that has
11  arrived.
12     MS. NOWLIN-SOHL:  It has not.
13     MR. RAMER:  Then we'll hold that as
14  Turban Exhibit 21 just to keep the numbering
15  clear, and I'll introduce Turban Exhibit 22.
16     MS. NOWLIN-SOHL:  Okay.  We have that up.
17     MR. RAMER:  Okay.  Great.
18     (Deposition Exhibit No. 22 was marked.)
19  Q.  (BY MR. RAMER)  And, Dr. Turban, have you
20  seen this document before?
21  A.  Yes.
22  Q.  I'm sorry?
23  A.  Yes.
24  Q.  And did you read it?
25  A.  Yes.
                                                    Page 236

1  due to high risk of bias."
2  A.  Yes.
3  Q.  And do you cite -- let me rephrase.
4      The first study listed is the Achille
5  study you cite, correct?
6  A.  Yes.
7  Q.  And the second study listed is the Allen
8  study you cite, correct?
9  A.  Yes.
10  Q.  And the third study listed is one of the
11  de Vries studies that you cite, correct?
12  A.  Yes.
13  Q.  And at the bottom of this page is the de
14  Lara study that you cite, correct?
15  A.  Yes.
16  Q.  Dr. Turban, are you aware of any
17  systematic reviews that have been able to draw
18  conclusions about the effects of gender-affirming
19  hormone therapy on suicide?
20  A.  Like death from suicide?
21  Q.  Yes.
22  A.  No.
23     MR. RAMER:  I think this is a good
24  breaking point.  I also think I've been going for
25  about an hour.
                                                    Page 235

1  Q.  And when was the last time you read it?
2  A.  I read this one recently, a few days ago
3  when I was writing my statement.
4  Q.  And I'd like to go to page 3.  And
5  under -- there's a blue header that says "Caution
6  in the use of hormonal and surgical treatment."
7  And I'll just read the first sentence and ask if I
8  read it correctly.
9      It says "At group level (i.e., for the
10  group of adolescents with gender dysphoria as a
11  whole) the National Board of Health and Welfare
12  currently assesses that the risk of puberty
13  blockers and gender-affirming treatment are likely
14  to outweigh the expected benefits of these
15  treatments."
16     Did I read that correctly?
17  A.  Yes.
18  Q.  And a little further down on this page,
19  the second full paragraph -- I guess, sorry.  Let
20  me ask first, do you agree that the risks of
21  puberty blockers and gender-affirming treatment
22  are likely to outweigh the expected benefits of
23  those treatments?
24     MS. NOWLIN-SOHL:  Object to form.
25     THE WITNESS:  They have a strange clause
                                                    Page 237

60 (Pages 234 - 237)

(268 of 288), Page 268 of 288 Case: 24-142 01/26/2024 DktEntry: 23.3, Page 268 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 61 of 177
Jack Turban , M.D., MHS October 16, 2023

1  of "at a group level (i.e., for the group
2  adolescents with gender dysphoria)" as a whole.
3  They say risks likely outweigh the benefits.
4        This document later goes on to note that
5  you should consider these interventions on a
6  case-by-case basis for the individual patient,
7  which, in my view, is very similar to WPATH
8  guidelines and how we practice. So we conduct
9  these biopsychosocial evaluations to determine if,
10 for an individual person, the potential benefits
11 outweigh the potential risks.
12       So I would say that sentence, I agree.
13    Q. (BY MR. RAMER) You think that the policy
14 set forth by this document is consistent with the
15 WPATH guidelines?
16    MS. NOWLIN-SOHL: Object to the form;
17 mischaracterizes prior testimony.
18    THE WITNESS: I think in that it
19 recommends being very thoughtful about who
20 receives gender-affirming medical interventions
21 but still considering them. I think that's a
22 theme of both.
23    Q. (BY MR. RAMER) If Sweden's policy were
24 implemented in the United States, would treatment
25 change at all?

Page 238

1  some other questions we can ask, but you think
2  that that first sentence is consistent with the
3  practice in the United States currently?
4    MS. NOWLIN-SOHL: Object to form. Object
5  to prior mischaracterization of testimony.
6    Q. (BY MR. RAMER) And if that sentence is
7  just not relevant, that's fine, but just following
8  up on your answer.
9    A. I think I answered the question that it's
10 similar between what's written here and what's
11 practiced in the U.S., that we don't, without a
12 thoughtful biopsychosocial evaluation, routinely
13 provide gender-affirming medical interventions
14 without carefully weighing the potential risks
15 against potential benefits for individuals.
16    Q. On the same page a little further down,
17 second paragraph, there's a sentence that begins
18 with "In revising its recommendations." I just
19 want to read it and first ask if I read it
20 correctly.
21       "In revising its recommendations, the
22 National Board of Health and Welfare has taken
23 account of the fact that the efficacy and safety,
24 benefits, and risks of treatments are not proven,
25 and that three factors have shifted the balance

Page 240

1    MS. NOWLIN-SOHL: Object to form.
2    THE WITNESS: You'll have to give me a
3  minute to read it in detail again for any
4  potential --
5    Q. (BY MR. RAMER) Sorry. To read what in
6  detail? That sentence?
7    A. This document of the guidelines. You
8  wanted me to tell you if the guidelines are
9  essentially identical to what's practiced in the
10 U.S.
11    Q. Well, the question I originally asked was
12 about the first sentence. Do you agree that the
13 risks of puberty blockers and gender-affirming
14 treatment are likely to outweigh the expected
15 benefits of these treatments?
16       And I thought your answer was, well,
17 they're talking about the group level. They have
18 this strange clause about the group level. And we
19 don't practice medicine any different here in the
20 United States because we go on an individualized
21 basis.
22       And so I guess you were extrapolating
23 from the first sentence to the practice of care
24 here, and that's why I asked the question. So I
25 frankly do not want to take -- you know, I have

Page 239

1  between benefit and risk in a negative direction."
2       Did I read that correctly?
3    A. Yes.
4    Q. And the first bullet they list is --
5  refers to "the uncertainty resulting from the lack
6  of clarity about the causes that the number of
7  people diagnosed with gender dysphoria has
8  continued to rise since the publication of the
9  guidelines in 2015, particularly in the 13 to 17
10 age group, and especially among people whose
11 registered sex at birth is female."
12       Do you see that?
13    A. Yes.
14    Q. And do you agree there's uncertainty
15 resulting from the lack of clarity about the cause
16 for the increase of gender dysphoria among
17 adolescents whose registered sex at birth is
18 female?
19    MS. NOWLIN-SOHL: Object to form.
20    THE WITNESS: I believe I wrote this in
21 my declaration, but most experts think that the
22 reason for the increase in referrals to gender
23 clinics is due to increased public knowledge that
24 these interventions exist.
25       I believe I cited a paper from the Dutch

Page 241

61 (Pages 238 - 241)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1 group that noted that the number of referrals that | 1 The Brick, et al. study, I'm not sure if |
| 2 they received increased, but the percentage of | 2 I referenced that one or not, that one found of |
| 3 individuals who presented to the clinic and | 3 those who started pubertal suppression, a few of |
| 4 actually received gender-affirming medical | 4 them did not go on to gender-affirming hormones |
| 5 interventions was low, highlighting that despite | 5 for various reasons.  Some of them still |
| 6 the increase of referrals, there's still a | 6 identified as transgender; some did not. |
| 7 stringent process and evaluation on an individual | 7 There's also the Wiepjes study where |
| 8 basis, as I noted, for who actually receives | 8 1.9 percent of adolescents who started pubertal |
| 9 gender-affirming medical interventions. | 9 suppression did not go on to gender-affirming |
| 10 The question of the sex ratio, I believe | 10 hormones. |
| 11 I discussed also.  When we look at large data sets | 11 So again there is more data known than is |
| 12 in the United States of community samples, it's | 12 provided in this bullet point, and I think the |
| 13 actually quite close to one to one among trans | 13 bullet point is confusing and that it contradicts |
| 14 youth, how many are sex assigned at birth, male | 14 itself.  I don't know if it's a translation issue. |
| 15 versus female. | 15 Q.  Well, with respect to the contradiction, |
| 16 So there's a lot of research on this | 16 you agree there is a distinction between knowing |
| 17 question. | 17 the number of individuals who would detransition |
| 18 Q.  (BY MR. RAMER)  And so you disagree that | 18 and knowing how common it would be for people to |
| 19 there's a lack of clarity about that? | 19 later detransition, correct? |
| 20 MS. NOWLIN-SOHL:  Object to form. | 20 A.  Would you repeat the question? |
| 21 THE WITNESS:  I think there's more known | 21 Q.  Is there a distinction between a number |
| 22 than is explained here. | 22 and a probability is basically the question? |
| 23 Q.  (BY MR. RAMER)  In the second -- flipping | 23 A.  The probability is a number.  Sorry.  I'm |
| 24 to the next page, the second bullet states "The | 24 not understanding. |
| 25 documented prevalence among young adults of | 25 Q.  I guess you're saying the first sentence |
| Page 242 | Page 244 |
| 1 medical detransition, which is the process by | 1 of the bullet point is contradictory because the |
| 2 which a person discontinues gender-affirming | 2 first sentence says "The documented prevalence |
| 3 medical treatment for any reason or seeks to | 3 among young adults," so it's admitting it knows |
| 4 reverse the medical effects of completed | 4 that these people exist. |
| 5 gender-affirming treatment, according to the SBU, | 5 And then the second sentence says "It is |
| 6 it is not possible to assess how common it is for | 6 not possible to assess how common it is." |
| 7 young people to later change their perception of | 7 And I thought your answer was that's |
| 8 their gender identity or to discontinue a | 8 contradictory. |
| 9 gender-affirming treatment." | 9 And I guess my question is is it really |
| 10 Did I read that correctly? | 10 contradictory if you know that a certain number of |
| 11 A.  You read it correctly. | 11 people experience something but you also don't |
| 12 Q.  Do you agree that it is not possible to | 12 know how common it will be for others to have that |
| 13 assess how common it is for young people to later | 13 same experience? |
| 14 change their perception of their gender identity? | 14 A.  The word "prevalence" means how common |
| 15 A.  I think this bullet point is somewhat | 15 something is, not just that it exists. |
| 16 contradictory because it first says that there is | 16 Q.  And so you think "prevalence" does mean |
| 17 a documented prevalence of detransition, | 17 how common something is? |
| 18 suggesting that we do know the number, and then it | 18 A.  In medicine, that's what "prevalence" |
| 19 goes on to say that it's not possible to know the | 19 means. |
| 20 number. | 20 Q.  And with respect to -- with respect to |
| 21 There are some studies that have looked | 21 determining how common it is for young people to |
| 22 at that question.  The de Vries study followed 55 | 22 later change their perception of their gender |
| 23 adolescents through pubertal suppression, | 23 identity, is it your testimony that we do have |
| 24 gender-affirming hormones into young adulthood. | 24 good evidence of how common it would be? |
| 25 None of their gender identities changed. | 25 MS. NOWLIN-SOHL:  Object to form. |
| Page 243 | Page 245 |

62 (Pages 242 - 245)

(270 of 288), Page 270 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 270 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 63 of 177
Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1    THE WITNESS:  We have the studies I just<br>2  described.<br>3    Q.  (BY MR. RAMER)  And you think those<br>4  constitute good evidence for determining how<br>5  common it is for young people to later change<br>6  their perception of their gender identity?<br>7    MS. NOWLIN-SOHL:  Object to form.<br>8    THE WITNESS:  As a scientist, I don't<br>9  like words like this that don't have precise<br>10  meaning, but it is evidence to that question.<br>11    Q.  (BY MR. RAMER)  Do you agree that some<br>12  individuals regret receiving gender-affirming<br>13  medical interventions?<br>14    A.  Yes.<br>15    Q.  Is it possible to predict beforehand<br>16  which individuals will come to regret those<br>17  interventions?<br>18    MS. NOWLIN-SOHL:  Object to form.<br>19    THE WITNESS:  The goal of the<br>20  biopsychosocial evaluation is to understand the<br>21  person's biological factors, psychological<br>22  factors, social environment as much as is<br>23  possible.  And it's all designed to minimize that<br>24  risk, but it's not certain, as with most things in<br>25  medicine, to determine with 100 percent certainty.<br>Page 246 | 1  conducting a biopsychosocial evaluation prior to<br>2  proceeding with treatment.<br>3    And the second is that treatment is<br>4  offered in a step-wise fashion from most<br>5  reversible to least reversible.  So you would<br>6  start with pubertal suppression prior to<br>7  considering gender-affirming hormones, which are<br>8  less reversible.  And then the last resort would<br>9  be surgery.<br>10    Q.  Does the criteria of the Dutch protocol<br>11  require incongruence since childhood?<br>12    A.  I think they've evolved in their practice<br>13  over time.  Certainly initially they focused<br>14  specifically on prepubertal diagnoses of gender<br>15  dysphoria, or at least documented history of that,<br>16  but I've not checked in with them recently to know<br>17  if that's still a search criterion or not.<br>18    Q.  I'll read the second sentence here and<br>19  ask if I read it correctly.<br>20    It says "The criteria include the<br>21  existence of the incongruence since childhood, the<br>22  stability of gender identity over time, clear<br>23  distress caused by the onset of puberty, and the<br>24  absence of factors that complicate the diagnostic<br>25  assessment."<br>Page 248 |
| 1    Q.  (BY MR. RAMER)  And then staying on this<br>2  page, I'd like to go down.  There is a section<br>3  entitled "Decisions on Treatment in an Individual<br>4  Case."<br>5    Do you see that?<br>6    A.  Yes.<br>7    Q.  And I'm going to read the first sentence<br>8  and ask if I read it correctly.<br>9    It says "To guide the decision on<br>10  puberty-suppressing treatment for an adolescent in<br>11  Tanner Stage 3 and for gender-affirming hormone<br>12  therapy, the National Board of Health and Welfare<br>13  recommends the criteria whose use has been<br>14  documented and monitored within the framework of<br>15  the Dutch protocol."<br>16    Did I read that correctly?<br>17    A.  Yes.<br>18    Q.  And can you describe the criteria that<br>19  has been used for the Dutch protocol?<br>20    A.  The WPATH guidelines are modeled off of<br>21  the Dutch protocol.  They were the first to<br>22  publish in the academic literature their approach<br>23  to these gender-affirming medical interventions<br>24  for adolescents with gender dysphoria.<br>25    I'd say the biggest themes are, one,<br>Page 247 | 1    Did I read that correctly?<br>2    A.  Yes.<br>3    Q.  And so the Swedish government seems to<br>4  think the criteria for the Dutch protocol does<br>5  include the incongruence since childhood, correct?<br>6    MS. NOWLIN-SOHL:  Object to form.<br>7    THE WITNESS:  That's what that sentence<br>8  is implying.  Again, I've not checked with the<br>9  Dutch to know if they still have that element in<br>10  place.<br>11    Q.  (BY MR. RAMER)  If -- is that<br>12  requirement -- are the current WPATH guidelines<br>13  consistent with that requirement?<br>14    A.  They are certainly influenced by that<br>15  requirement, but they say if there's not a clear<br>16  history of gender incongruence during childhood,<br>17  then you should extend the biopsychosocial<br>18  assessment process.<br>19    Q.  But a patient would be eligible for<br>20  treatment under the WPATH guidelines even if that<br>21  patient did not have gender incongruence during<br>22  childhood, correct?<br>23    MS. NOWLIN-SOHL:  Object to form.<br>24    THE WITNESS:  They would need to go<br>25  through a longer diagnostic assessment process,<br>Page 249 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

App.1037

1 but it wouldn't be considered an absolute
2 contraindication, if you will, but something that
3 would kind of raise a flag for the medical team to
4 proceed with more caution.
5     Q. (BY MR. RAMER) Did the Dutch protocol
6 assess individuals who had a nonbinary gender
7 identity?
8       MS. NOWLIN-SOHL: Object to form.
9       THE WITNESS: Historically most of their
10 patients, I believe, had expressed a binary
11 understanding of their gender identity. I would
12 be surprised if they haven't also treated patients
13 with nonbinary identities, but I can't say for
14 sure.
15     Q. (BY MR. RAMER) Well, I guess the studies
16 that you cite out of the Dutch clinic -- well, no,
17 let's do it this way.
18       Same page, paragraph below the one we
19 were just looking at, first sentence says "The
20 documented experience with the Dutch protocol
21 includes only adolescents with binary gender
22 identity. And among participating experts, there
23 is a lack of clinical experience with
24 puberty-suppressing and gender-affirming hormone
25 therapy with adolescents with nonbinary gender

1 identity."
2       Did I read that correctly?
3     A. Yes.
4     Q. And so are they wrong where they state
5 the Dutch protocol includes only adolescents with
6 binary gender identity?
7       MS. NOWLIN-SOHL: Object to form and
8 foundation.
9       THE WITNESS: Again, in the past I think
10 the vast majority of their patients had binary
11 gender identities. I'm not sure if they still
12 have that requirement in the Dutch clinic.
13     Q. (BY MR. RAMER) Did the individuals in
14 the de Vries 2011 or de Vries 2014 studies have a
15 nonbinary gender identity?
16     A. I believe in the 2014 study they all had
17 binary gender identities.
18       To the 2011 study, I'd have to go back
19 and look at the details of the methodology.
20     Q. If there was a requirement in the United
21 States that an adolescent could not obtain
22 gender-affirming medical interventions unless the
23 adolescent had a history of gender incongruence
24 since childhood, would gender-affirming medical
25 interventions be less available?

1       MS. NOWLIN-SOHL: Object to form;
2 foundation.
3       THE WITNESS: I don't know what you mean
4 by "less available."
5     Q. (BY MR. RAMER) Do you treat patients
6 whose gender identity -- excuse me.
7       Do you treat patients whose gender
8 incongruence arose during adolescence as opposed
9 to during childhood?
10     A. All of my patients I can think of had
11 some degree of gender incongruence during
12 childhood, but it's not considered an absolute
13 contraindication.
14       Again, as the WPATH guidelines note, if
15 you had a patient, they would have to meet
16 criteria for gender dysphoria, so they would need
17 to have a gender identity different than their sex
18 assigned at birth for at least six months. And
19 then you would need to extend the diagnostic
20 process to better understand the situation.
21     Q. So your clinical population -- let me
22 rephrase.
23       Your practice would not change if there
24 was a requirement imposed that patients needed to
25 have a history of gender incongruence in

1 childhood; is that right?
2       MS. NOWLIN-SOHL: Object to form;
3 mischaracterizes prior testimony.
4       THE WITNESS: Some of my current patients
5 that I can think of, they all had some amount of
6 gender incongruence during childhood. But I can't
7 speak as to what patients I would have in the
8 future and if all of them would.
9       I think the WPATH guidelines, in
10 acknowledging that there are some patients who
11 come to understand their gender identity later, in
12 that they explain that you need to extend the
13 diagnostic process, highlights that patients like
14 that do exist.
15       The Journal of Adolescent Health paper we
16 talked about recently also shows there's a sizable
17 portion of patients like that.
18       So I think it would be limiting care for
19 those such patients who might need treatment.
20     Q. (BY MR. RAMER) Are puberty blockers
21 available as a treatment for gender dysphoria in
22 the U.K.?
23     A. My understanding is yes. My reading of
24 the Cass Interim Report is that the plan was to
25 close their centralized clinic and open regional

1  clinics around the country.  I don't know what
2  their progress has been in doing that.
3      Q.  So you think that minors with gender
4  dysphoria can receive puberty blockers at those
5  regional clinics in the U.K.?
6      A.  My understanding is that that their plan,
7  to set up regional clinics so that patients could
8  access care, and that care could include pubertal
9  suppression.
10     Q.  So you do not think that access to
11 pubertal suppression in the U.K. is limited to
12 research trials?
13     MS. NOWLIN-SOHL:  Object to form;
14 mischaracterizes prior testimony.
15     THE WITNESS:  I believe what they said is
16 that the regional centers should have ongoing data
17 collection.  So if you would call that the
18 clinical trial, then sure.
19     Q.  (BY MR. RAMER)  Ongoing data collection
20 on the administration of puberty blockers to treat
21 gender dysphoria?
22     A.  I believe it said that the regional
23 clinic should have ongoing data collection, yes.
24     Q.  And so the regional clinics, your
25 understanding is that they are permitted to

Page 254

1  policies that restricted access to
2  gender-affirming medical interventions?
3      A.  I read it in the news.
4      Q.  And did you ever try to research the
5  evidentiary basis for that decision?
6      MS. NOWLIN-SOHL:  Object to form.
7      THE WITNESS:  I know they commissioned a
8  report that was criticized by others, but I
9  personally did not go through it.
10     Q.  (BY MR. RAMER)  Okay.  That's all I have
11 on that one.
12     And, Dr. Turban, do you consider yourself
13 to be an expert?
14     MS. NOWLIN-SOHL:  Object to form.
15     THE WITNESS:  Are you still there?
16     Q.  (BY MR. RAMER)  I didn't hear you.  I'm
17 sorry.
18     My question was do you consider yourself
19 to be an expert?
20     MS. NOWLIN-SOHL:  Same objection.
21     THE WITNESS:  Do you mean in something
22 specific?
23     Q.  (BY MR. RAMER)  In anything.
24     A.  I would say I'm an expert in the research
25 regarding the mental health treatment of

Page 256

1  provide puberty blockers to adolescents with
2  gender dysphoria; is that correct?
3      MS. NOWLIN-SOHL:  Object to form.  Object
4  to the extent that it calls for a legal
5  conclusion.
6      THE WITNESS:  I'm not certain if it's
7  physically in that center, but the report makes it
8  clear that pubertal suppression is still an option
9  for individual patients, and that the general
10 gender dysphoria care is being moved from that
11 centralized clinic to regional clinics.
12     MR. RAMER:  I'd like to look at -- did
13 the Turban Exhibit 21 come through, Li?
14     MS. NOWLIN-SOHL:  Yes.
15     MR. RAMER:  Okay.  I'd like to pull up
16 Turban Exhibit 21, which has the title "Effects of
17 Gender-Affirming Therapies and People With Gender
18 Dysphoria:  Evaluation of the Best Available
19 Evidence."
20     (Deposition Exhibit No. 21 was marked.)
21     Q.  (BY MR. RAMER)  And Dr. Turban, have you
22 seen this document before?
23     A.  I have not.
24     Q.  And were you aware that the Florida
25 Agency For Healthcare Administration imposed

Page 255

1  adolescents and children with gender dysphoria.
2      Q.  And are you an endocrinologist?
3      A.  No.
4      Q.  Are you a surgeon?
5      A.  No.
6      Q.  Are you a social worker?
7      A.  No.
8      Q.  Are you a urologist?
9      A.  No.
10     Q.  Are you a gynecologist?
11     A.  I'm not.
12     Q.  Are you a bioethicist?
13     A.  I've given bioethics grand rounds at Yale
14 and spoken on ethics issues, but it's not my
15 primary area of focus.
16     Q.  Are you a neurologist?
17     A.  No.
18     Q.  And could you just briefly describe what
19 your current position is?
20     A.  I'm an assistant professor of child and
21 adolescent psychiatry at the University of
22 California San Francisco and affiliate faculty as
23 the chief for health policy studies there.
24     I direct our gender psychiatry program in
25 the area of child and adolescent psychiatry.

Page 257

65 (Pages 254 - 257)

(273 of 288), Page 273 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 273 of 288
Case 1:23-cv-00269-BLW   Document 74-2   Filed 11/02/23   Page 66 of 177
Jack Turban , M.D., MHS  October 16, 2023

| | |
|---|---|
| 1     And I serve as an attending in the eating<br>2 disorder clinic and the adult LGBT psychiatry<br>3 program as well, in addition to my research work.<br>4   Q. And if that were not enough, are you also<br>5 going to be attending law school soon?<br>6   A. I'm enrolled in a master's of legal<br>7 studies program.<br>8   Q. And where is that?<br>9   A. UC Law San Francisco. There's an<br>10 affiliation with UCSF.<br>11     MR. RAMER: And, Li, did Turban<br>12 Exhibit 23 come through?<br>13     MS. NOWLIN-SOHL: It did.<br>14     (Deposition Exhibit No. 23 was marked.)<br>15   Q. (BY MR. RAMER) And Dr. Turban, do you<br>16 recognize this document?<br>17   A. Yes.<br>18   Q. And what is it?<br>19   A. This is, like, a popular press article I<br>20 wrote for a Psychology Today blog.<br>21   Q. And this was initially published in<br>22 January of 2022, correct?<br>23   A. I do not recall the date.<br>24   Q. On the first page below the title and the<br>25 subheader, do you see it says "Posted January 24,<br>Page 258 | 1   Q. Sure.<br>2   A. I think that's reference to my<br>3 declaration also, that often with gender-affirming<br>4 interventions, we see improvements of mental<br>5 health but not a complete elimination of mental<br>6 health challenges because although these<br>7 treatments improve mental health, these people are<br>8 still experiencing minority stress and societal<br>9 stigmas that can drive anxiety, depression, et<br>10 cetera.<br>11   So if you want to have a study where<br>12 you're looking at whether or not the intervention<br>13 improves, you need to either look at whether or<br>14 not the person improved before and after or<br>15 whether those who received treatment do better<br>16 than those who don't.<br>17   We've come to expect that you can't use<br>18 the general population as the control group<br>19 because though the treatments may improve physical<br>20 gender dysphoria, we don't expect them to improve<br>21 bullying, discrimination, et cetera.<br>22   Q. So going to the next page for study 7,<br>23 the final sentence there says "However, because<br>24 subjects received psychotherapy, the authors note<br>25 that the study did not provide direct evidence<br>Page 260 |
| 1 2022"?<br>2   A. Yes.<br>3   Q. And then there's a list of key points.<br>4 And then a little further down there's a note that<br>5 says "This post was updated on October 11, 2022.<br>6 In discussions of studies 5, 7, 8, and 10, the<br>7 final sentence was appended to include further<br>8 information about the study."<br>9   Do you see that?<br>10   A. Yes.<br>11   Q. And I'd like to go down and just look at<br>12 those.<br>13   So study No. 5, which I think is the<br>14 fourth page in the PDF, and that is the Kaltiala<br>15 study, correct?<br>16   A. Yes.<br>17   Q. And the last sentence says "However, the<br>18 authors note that gender reassignment is not<br>19 enough to improve functioning and relieve<br>20 psychiatric comorbidities among adolescents with<br>21 gender dysphoria," correct?<br>22   A. Yes.<br>23   Q. And then going to study 7, which is on<br>24 the next page --<br>25   A. To clarify --<br>Page 259 | 1 that pubertal suppression improves mental health<br>2 in transgender youth."<br>3   Did I read that correctly?<br>4   A. Yes. And again, this is why I wouldn't<br>5 take any one study in isolation since they all<br>6 have strengths and weaknesses. This was not one<br>7 of the studies that adjusted for psychotherapy. I<br>8 think we mentioned earlier some of the ones that<br>9 did.<br>10   Q. And so next page, study 10, I believe<br>11 this is your own study. And the final sentence<br>12 says "Of note, this study did not identify<br>13 psychotherapy as a potentially confounding<br>14 variable."<br>15   Did I read that correctly?<br>16   A. Yes.<br>17   Q. Was this the one you were struggling to<br>18 remember earlier?<br>19   A. No. The question was whether or not it<br>20 adjusted for access to gender-affirming hormones.<br>21   Q. Which -- the question in the study or the<br>22 question I had earlier?<br>23   A. The question I could not recall for sure<br>24 is whether or not it adjusted for gender-affirming<br>25 hormones, not psychotherapy.<br>Page 261 |

66 (Pages 258 - 261)

1    Q.  Okay.  And then just going back to
2  study 8 on the previous page, the last sentence
3  there is "Over the course of the study, there was
4  a statistically significant decrease in depression
5  scores in one group, male to female transitioners
6  who underwent pubertal suppression only."
7        Did I read that correctly?
8    A.  Yes.  I generally wouldn't use the word
9  "transitioners."  I think these editors -- some of
10 these edits were from -- not me but from
11 Psychology Today.
12       And the thing about this study is they
13 found that overall there was mental health
14 improvement, the full group.  And then I think
15 when they went and made their subgroups that
16 sample size got smaller and smaller and smaller so
17 they became underpowered to detect most
18 statistically significant differences.
19   Q.  When you say the editors were changing
20 things in the document, was there anything else
21 that you can think of that the editors changed
22 without your approval?
23   A.  I think several things.  The story here
24 was that there was someone at the Manhattan
25 Institute who's been very focused on this blog

Page 262

1  post and I think sent a long series of emails to
2  Psychology Today wanting them to add information.
3        And as it's a blog post, they didn't feel
4  it was essential to devote a lot of time going
5  back and forth to them, so I left Psychology Today
6  to do whatever edits they needed to do.  And when
7  I read them, they were generally reasonable.
8    Q.  Okay.  So for study 8 -- well, just to
9  clarify, the individual at the Manhattan
10 Institute, are you referring to Leor Sapir?
11   A.  Yes.
12   Q.  And for study 8, just to unpack what's
13 going on there, so there was -- am I correct in
14 reading this to conclude that there was no
15 statistically significant -- start again -- no
16 statistically significant decrease in depression
17 scores for any female to male transitioners in
18 that study; is that right?
19       MS. NOWLIN-SOHL:  Object to form.
20       THE WITNESS:  So again, it's this issue
21 that you shouldn't -- you can't interpret a lack
22 of statistically significant findings to mean that
23 there's not an effect, because when you start
24 looking at smaller and smaller subgroups and parse
25 out your data, you lose statistical power.

Page 263

1        So they couldn't say one way or another
2  for those specific subgroups.
3        So it doesn't mean that the treatment
4  worked.  It doesn't mean that the treatment
5  doesn't work.  It just means that their sample
6  size got very small and they weren't able to tell
7  you one way or another.
8    Q.  (BY MR. RAMER)  And going back to the
9  first page of this, the second paragraph, the
10 first sentence, you say -- well, maybe you, maybe
11 the editors.  I guess I'll ask you that.
12       The sentence says "Since several U.S.
13 states are introducing legislation to outlaw
14 gender-affirming medical care this year (despite
15 opposition from just about every major medical
16 organization, including the American Medical
17 Association, the American Academy of Pediatrics,
18 and the American Psychiatric Association), I
19 thought this was a good time to review the
20 relevant research for you all."
21       Did I read that correctly?
22   A.  Yes.
23   Q.  Did you write that sentence?
24   A.  I believe so.
25   Q.  And why did the introduction of

Page 264

1  legislation lead you to think it was a good time
2  to review the relevant research for the readers of
3  this blog?
4    A.  Because legislators in several states
5  were making false statements that there was not
6  evidence regarding the benefits of this care, and
7  that I thought it was important for constituents
8  to know when statements by lawmakers are untrue.
9    Q.  Is it fair to say that the -- I'm going
10 to put it this way:  In the cases where you have
11 testified as an expert, is it fair to say that the
12 laws at issue in those cases were enacted by
13 Republican lawmakers?
14       MS. NOWLIN-SOHL:  Object to form;
15 foundation.
16       THE WITNESS:  I believe that's true.
17       MR. RAMER:  And to go back to -- I think
18 I finally have the correction, so I will send
19 that.
20   Q.  (BY MR. RAMER)  Okay.  So I will
21 represent to you that what I am sending is the
22 correction to the Plos One article entitled
23 "Access to Gender-Affirming Hormones During
24 Adolescence and Mental Health Outcomes Among
25 Transgender Adults."

Page 265

67 (Pages 262 - 265)

(275 of 288), Page 275 of 288 Case: 24-142 01/26/2024, DktEntry: 23.3, Page 275 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 68 of 177
Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1      And once you receive it, I'll just ask | 1   correction -- we might need to open the original |
| 2   that we kind of pick up where we left off with the | 2   paper to see what the cutoff was. |
| 3   prior version, which is Table 2. | 3      Q. Hold on. What did you say? It has a |
| 4      MS. NOWLIN-SOHL: So, John, are you | 4   what correction? |
| 5   saying we should open up the prior exhibit as well | 5      A. So this is what I was saying earlier that |
| 6   as the correction? | 6   we try not to run a lot of comparisons because |
| 7      MR. RAMER: Oh, no. I was just trying to | 7   when you run a lot of comparisons, it increases |
| 8   explain that we'll use the correction, Turban | 8   the probability of you detecting something that |
| 9   Exhibit 24. And just go to Table 2, which was the | 9   looks significant when it's not. |
| 10   table I was previously asking questions about, and | 10      This is one of those papers where we did |
| 11   then -- | 11   run a lot of analyses. So when you do that, you |
| 12      MS. NOWLIN-SOHL: Got it. Okay. We're | 12   do something called a Bonferroni correction where |
| 13   still waiting on it, but I'll let you know when we | 13   it takes into account how many things you looked |
| 14   have it. | 14   at. |
| 15      MR. RAMER: Okay. | 15      And the more statistical comparisons you |
| 16      Okay. Are we still waiting? | 16   make, the stricter it makes your statistical |
| 17      MS. NOWLIN-SOHL: We are. | 17   cutoff. So I need to look at what that number was |
| 18      MR. RAMER: We actually probably have | 18   from the original paper. |
| 19   about an hour left on the clock would be my guess. | 19      Q. When you say "what that number was," are |
| 20      Do you want to take a final break here? | 20   you referring to the threshold you're using? |
| 21   Or if it's arrived, we can just continue. | 21      A. Correct. |
| 22      MS. NOWLIN-SOHL: Yeah, let's do a | 22      Q. So the P-value for the data in this row |
| 23   five-minute break. | 23   where it says "less than .0001," I mean, that's |
| 24      MR. RAMER: Okay. | 24   going to be -- |
| 25      THE VIDEOGRAPHER: Okay. So the time is | 25      A. So those would all clearly meet the |
| <div align="right">Page 266</div> | <div align="right">Page 268</div> |
| 1   4:07 p.m. Pacific time, and we are off the record. | 1   threshold, but if you wanted to go through more, I |
| 2      (Break taken from 4:07 p.m. to 4:13 p.m.) | 2   would need to look up what the threshold was. |
| 3      THE VIDEOGRAPHER: All right. So we are | 3      Q. Maybe we should do that. So that was -- |
| 4   recording. The time is 4:13 p.m. Pacific, and we | 4   the original, pre-corrections, was Turban |
| 5   are back on the record. | 5   Exhibit 11, I believe. |
| 6      (Deposition Exhibit No. 24 was marked.) | 6      And you would typically report your |
| 7      Q. (BY MR. RAMER) Okay. And, Dr. Turban, | 7   threshold of statistical significance down in the |
| 8   do you have -- well, I'll introduce Turban | 8   statistical analyses, I would assume? |
| 9   Exhibit 24. | 9      A. Yes. |
| 10      And does this appear to be the correction | 10      Q. So that's down on page 4. |
| 11   you were referring to earlier today? | 11      A. So it was .001. |
| 12      A. Yes. | 12      Q. And where are you seeing that? |
| 13      Q. And I'd like to go down to page 4 and | 13      A. Page 5 at the top. |
| 14   Table 2, and I just want to understand. | 14      Q. Oh, okay. Gotcha. Okay. So the -- |
| 15      The first row of this chart is basically | 15   okay. So the threshold you were using was .001. |
| 16   showing that exposure to GAH, or gender-affirming | 16      Now going back to what is Turban |
| 17   hormones, is associated with lower odds of past | 17   Exhibit 24, the correction, we can see that the |
| 18   year suicidal ideation; is that right? | 18   P-values on those returns is less than .0001, so |
| 19      A. Yes. | 19   clearly below the threshold for statistical |
| 20      Q. And the way to understand that is because | 20   significance, correct? |
| 21   the adjusted odds ratio for those categories are | 21      A. Yes. |
| 22   less than one, and you've hit your statistical | 22      Q. Okay. And just staying on this row, in |
| 23   significance threshold of less than .0001; is that | 23   looking at the first group, so those who accessed |
| 24   right? | 24   gender-affirming hormones at age 13 through 15, |
| 25      A. I believe this paper has a bottom | 25   you have an adjusted odds ratio of .4. |
| <div align="right">Page 267</div> | <div align="right">Page 269</div> |

<div align="right">68 (Pages 266 - 269)</div>

(276 of 288), Page 276 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 276 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 69 of 177
Jack Turban , M.D., MHS October 16, 2023

1    Do you see that?
2    A.   Yes.
3    Q.   And in plain English, to the extent these
4  things can be explained in plain English, does
5  that basically mean that exposure to
6  gender-affirming hormones at ages 13 to 15 is
7  associated with a 60 percent decrease in reporting
8  past year suicidal ideation?
9    A.   60 percent lower odds.
10   Q.   Okay.  So you're 60 percent less likely
11 to report that.  Is that --
12   A.   Odds ratios are a little less intuitive
13 than that, but I would say the odds ratio was
14 60 percent less.
15   Q.   Okay.  If we go down to -- if we go down
16 a row to "Past Year Suicidal Ideation With Plan,"
17 the odds ratios on this one all kind of hover
18 around one, and the P-values do not really come
19 close to statistical significance.
20      So basically we can't really draw any
21 conclusions from that row; is that right?
22   A.   Correct, one way or another.
23   Q.   And then going down to the fourth row,
24 past year's suicide attempt requiring inpatient
25 hospitalization, and with respect to the middle

Page 270

1  somebody had asked us to do that, and I think we
2  did it.  But I don't remember the results, to be
3  honest.
4    Q.   And so you don't recall whether there
5  were any differences in outcomes based on whether
6  the individual received testosterone or estrogen;
7  is that right?
8    A.   I remember it cutting a lot of the sample
9  sizes in half, so we lost a lot of the statistical
10 power.  So it's a little bit harder to interpret
11 the results, but I don't remember the specifics.
12 Because as you can see, for every single statement
13 here, we ran a ton of analyses.
14   Q.   And do you think there could be a
15 difference in outcomes based on whether the
16 individual received testosterone or estrogen?
17   A.   Potentially.
18      MS. NOWLIN-SOHL:  Object to form.
19      THE WITNESS:  Sorry.  Potentially.
20   Q.  (BY MR. RAMER)  And why?
21   A.   I mean, just theoretically, when you
22 break groups up by different characteristics, it
23 could be that certain groups respond to things
24 differently than others, but hard to know.
25      I would expect so, based on clinical

Page 272

1  group, which accessed gender-affirming hormones at
2  ages 16 or 17, there you have an adjusted odds
3  ratio of 2.2, correct?
4    A.   The P-value is .01, so the -- you can't
5  interpret it.  It doesn't mean anything.  It's not
6  statistically significant, so it doesn't tell you
7  anything one way or another.
8    Q.   And you would decline to use any sort of
9  terminology like "trending towards statistical
10 significance," correct?
11   A.   No.  That's technically incorrect.
12   Q.   Wait.  What?  No, I'm asking if you would
13 use that term.  And I thought --
14   A.   I would not.  That's not appropriate
15 statistical terminology.
16   Q.   And for this paper generally, did you
17 ever break out data by sex assigned at birth?
18   A.   So in the original paper, we did not.
19 Again, because the more comparisons you make, the
20 more you need to do that Bonferroni correction
21 that makes your levels for statistical
22 significance more and more stringent.  And if you
23 go too far with that, then essentially nothing
24 works.
25      I believe as part of the correction,

Page 271

1  experience and the general phenomenology of gender
2  dysphoria.
3    Q.   What are --
4    A.   It's a few different things.  So clinical
5  experience we generally see, both for assigned
6  males and for assigned females, tend to improve.
7      And then in terms of just the
8  phenomenology of gender dysphoria, we know a lot
9  of the distress is from one's physical body not
10 aligning with the secondary sex characteristics of
11 one's gender identity.  So our hypothesis would be
12 that both would help with that.
13      That being said, testosterone is a
14 stronger hormone than estrogen, so its physical
15 effects become apparent more quickly than
16 estrogen, and it has more physical effects than
17 estrogen does.
18      So it's possible that those assigned
19 female at birth who were taking testosterone might
20 have more robust or earlier improvement, but the
21 hypothesis would be that both would improve but
22 not necessarily at the same rate or to the same
23 degree.
24      MR. RAMER:  And, Li, do you have Turban
25 Exhibit 25?

Page 273

69 (Pages 270 - 273)

| | |
|---|---|
| 1     MS. NOWLIN-SOHL:  I believe so.  Yes. | 1   take care of know that it's not a universal view |
| 2     (Deposition Exhibit No. 25 was marked.) | 2   that people think that they should be forced to |
| 3     Q.  (BY MR. RAMER)  And, Dr. Turban, do you | 3   hide or that any symbols that represent that they |
| 4   have a -- an account on the website formerly known | 4   should be proud of themselves should be removed |
| 5   as Twitter, now known as X? | 5   from public life. |
| 6     A.  Yes. | 6     Q.  Do you think the legislators who enacted |
| 7     Q.  And is your handle @jack_turban? | 7   the law at issue in this case hate LGBTQ people? |
| 8     A.  Yes. | 8     MS. NOWLIN-SOHL:  Object to form; |
| 9     Q.  And do you have Exhibit 25 in front of | 9   foundation. |
| 10   you? | 10     THE WITNESS:  Admittedly, I didn't follow |
| 11     A.  Yes. | 11   the legislative debates about this specific law in |
| 12     Q.  And is this a Tweet that you sent? | 12   Idaho, so I don't even know who introduced it. |
| 13     A.  Yes. | 13     Q.  (BY MR. RAMER)  So you think that |
| 14     Q.  And I'll just read it first and then ask | 14   somebody could support legislation like the law at |
| 15   if I read it correctly.  It says "I'm really sick | 15   issue in this case without hating LGBTQ people? |
| 16   of the #GOP's creative ways of signaling bigotry. | 16     MS. NOWLIN-SOHL:  Object to form; |
| 17   They don't care about the flag.  They just want to | 17   foundation, mischaracterizes prior testimony. |
| 18   signal that they:  (1) hate #LGBTQ people, (2) | 18     THE WITNESS:  I don't think I can say |
| 19   want them to shut up and hide, and (3) want to | 19   anything about the motivations of the people who |
| 20   (and feel entitled to) have power over them.  It's | 20   introduced this specific bill.  I think it's |
| 21   gross." | 21   possible that they were provided with |
| 22     Did I read that correctly? | 22   misinformation about the care that maybe led them |
| 23     A.  Yes. | 23   to want to introduce it, but I've not spoken with |
| 24     Q.  Do you think that Republicans hate LGBTQ | 24   them about their motivations. |
| 25   people? | 25     Q.  (BY MR. RAMER)  And so you think that the |
| Page 274 | Page 276 |

| | |
|---|---|
| 1     A.  So this Tweet -- | 1   legislators that you were referring to in this |
| 2     MS. NOWLIN-SOHL:  Object to form. | 2   Tweet about the flag -- and sorry.  Where was |
| 3     THE WITNESS:  This Tweet was specifically | 3   that, the flag episode that you were describing? |
| 4   in reference to several GOP members not wanting | 4     A.  This was back in June.  I don't recall |
| 5   the LGBT Pride flag to be hung at certain events. | 5   the specifics. |
| 6   And they were arguing that they felt that having | 6     Q.  It was back just a few months ago.  You |
| 7   the flag -- the LGBTQ flag raised in certain | 7   don't recall, like, what state?  Was it Congress? |
| 8   places was disrespectful to the American flag, | 8     A.  There have been many instances like this |
| 9   which in my mind, that specific view of wanting to | 9   over the past several months.  I wish this one |
| 10   erase a symbol of LGBTQ people from public spaces | 10   stood out more than others, but no, I don't |
| 11   was a creative way of wanting to force LGBTQ | 11   remember this specific instance in June. |
| 12   people to hide or not be visible in society or | 12     MR. RAMER:  And I'd like to go to Turban |
| 13   telling them that they need to hide the symbols | 13   Exhibit 26. |
| 14   that represented them. | 14     (Deposition Exhibit No. 26 was marked.) |
| 15     So it's not a broad statement about all | 15     Q.  (BY MR. RAMER)  And do you have that up? |
| 16   members of that political party, but in a specific | 16     A.  Yes. |
| 17   instance where people were very actively trying to | 17     Q.  And I'll just read this one again and ask |
| 18   eliminate any symbol of LGBT people from public | 18   if I read it correctly. |
| 19   spaces, I did feel that that was a creative way of | 19     "Republicans don't believe in freedom of |
| 20   trying to exercise power over that population, | 20   speech.  They silenced an elected representative |
| 21   which includes a lot of young patients I take care | 21   because she disagreed with them on the House |
| 22   of who are very vulnerable and are impacted by | 22   floor.  It's not a coincidence that she's |
| 23   those messages. | 23   transgender.  They are steadfast in silencing and |
| 24     And I think it was important for that to | 24   attacking trans Americans.  American democracy is |
| 25   be voiced, particularly so these young patients I | 25   dead." |
| Page 275 | Page 277 |

70 (Pages 274 - 277)

Jack Turban , M.D., MHS October 16, 2023

1    Did I read that correctly?
2    A.  Yes, with a -- there's a statement below
3  it from the representative who was forced to stop
4  speaking on the House floor.
5    Q.  Do you think that Republicans are
6  steadfast in attacking trans Americans?
7    MS. NOWLIN-SOHL:  Object to form.
8    THE WITNESS:  I think there's been a
9  clear rise in legislation that is not evidence
10  based and goes against the broad consensus in
11  medicine about how we can help these young people
12  I'm responsible for taking care of.  And I have
13  been watching more and more legislation being
14  introduced that is harmful to them and that is
15  concerning to me.
16    Q.  (BY MR. RAMER)  Do you think supporters
17  of that legislation are attacking trans Americans?
18    MS. NOWLIN-SOHL:  Object to form.
19    THE WITNESS:  Again, I can't speak to
20  every individual who's introducing legislation,
21  but I can tell you it's legislation where the
22  evidence suggests that it's going to be harmful to
23  this population.
24    And it's very sad to me to watch that
25  non-evidence-based legislation be pushed forward

Page 278

1  when all the evidence we have suggests that it's
2  going to be harmful to the young patients that I
3  take care of.
4    Q.  (BY MR. RAMER)  You said the previous
5  Tweet was not a categorical statement.
6    Is this Tweet where you say "Republicans
7  are steadfast in attracting" -- excuse me.
8    "Republicans are steadfast in attacking
9  trans Americans," is that a categorical statement?
10    MS. NOWLIN-SOHL:  Object to form;
11  mischaracterizes prior testimony.
12    THE WITNESS:  This, again, was in
13  response to a specific instance that is described
14  in the screenshot below the Tweet in which a bill
15  was being discussed that would impact trans youth.
16    And there was a representative who was
17  trying to share information about the research and
18  evidence about why that legislation would be
19  harmful to young people.
20    And these Republican lawmakers in
21  question voted to ban her from the House floor to
22  prevent her from making any more comments about
23  the evidence behind why this legislation was
24  potentially dangerous.
25    Q.  (BY MR. RAMER)  And do you think American

Page 279

1  democracy is dead?
2    MS. NOWLIN-SOHL:  Object to form.
3    THE WITNESS:  I think it's very scary
4  that politicians would weaponize the government to
5  silence elected representatives from being able to
6  speak on legislation.
7    And as someone who's aware that often
8  physicians don't do a good job sharing evidence
9  broadly and that often the information that we
10  have and this research and peer-reviewed journals
11  doesn't always make its way into legislative
12  debates, it's scary to imagine that the few ways
13  in which that research and data is supposed to get
14  into the law-making process is in some instances
15  being prevented.
16    MR. RAMER:  And I'd like to go to Turban
17  Exhibit 27.
18    (Deposition Exhibit No. 27 was marked.)
19    Q.  (BY MR. RAMER)  And do you have that up?
20    A.  Yes.
21    Q.  And I'll just read it first and then ask
22  if I read it correctly.
23    "Our country is dying and the GOP is
24  killing it.  They are abusing power to attack
25  minorities, then demand that they stand silent

Page 280

1  while attacked.  We've seen this before in
2  history, and it's never ended well."
3    Did I read that part of the Tweet
4  correctly?
5    A.  I'll have to read the screenshot below it
6  to know what the context was, but you read the
7  part above the screenshot correct.
8    Q.  And do you think that the GOP is killing
9  our country?
10    MS. NOWLIN-SOHL:  Object to form.
11    THE WITNESS:  I'll need a second to read
12  the part you didn't read.
13    Q.  (BY MR. RAMER)  Okay.
14    A.  Okay.  This seems like the same -- a
15  reference to the same situation as the last Tweet,
16  which, again, I think was very concerning that
17  there was a member of this legislative body trying
18  to share research and data about -- I think in
19  this case it was a ban on gender-affirming medical
20  care for adolescents being dangerous.
21    And they used different techniques to
22  eventually silence that representative from being
23  able to share that information.
24    And I think the representatives who did
25  that and actively worked to try and remove

Page 281

71 (Pages 278 - 281)

(279 of 288), Page 279 of 288
Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 279 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 72 of 177

Jack Turban , M.D., MHS   October 16, 2023

| | |
|---|---|
| 1  evidence from debates about health policy that | 1  and answered. |
| 2  impact young people are dangerous. | 2      THE WITNESS:  I think I answered the |
| 3      I think when public policy doesn't | 3  question. |
| 4  consider research and evidence and isn't based on | 4  Q.  (BY MR. RAMER)  Are you refusing to |
| 5  science and data, that that's dangerous. | 5  answer the question yes or no of whether you think |
| 6      And as somebody who spends all of my time | 6  that those certain GOP lawmakers who you just |
| 7  working with young people who are impacted by this | 7  referenced are killing our country? |
| 8  legislation and it's my responsibility to protect | 8      MS. NOWLIN-SOHL:  Object to form; |
| 9  their mental health and make sure that they do | 9  argumentative, asked and answered. |
| 10  well, I think it's important to call out when laws | 10      THE WITNESS:  I don't think it's a |
| 11  are being passed that aren't based on research and | 11  yes-or-no question, and I think I answered the |
| 12  evidence and are not in the best interest of young | 12  question. |
| 13  people based on what we know about the science. | 13      MR. RAMER:  All right.  Let's go to |
| 14  Q.  And in the first sentence of the Tweet | 14  Turban Exhibit 28. |
| 15  you say, "Our country is dying, and the GOP is | 15      (Deposition Exhibit No. 28 was marked.) |
| 16  killing it." | 16  Q.  (BY MR. RAMER)  Do you have that up? |
| 17      And my question is do you think that is | 17  A.  Yes. |
| 18  true? | 18  Q.  I'll just read this and then ask if I |
| 19      MS. NOWLIN-SOHL:  Object to form; asked | 19  read it correctly. |
| 20  and answered. | 20      "I should clarify.  I don't hate all |
| 21      THE WITNESS:  I think I already answered | 21  conservatives," exclamation point.  "Mostly just |
| 22  that question. | 22  the aggressive anti-trans Heritage folks," heart |
| 23  Q.  (BY MR. RAMER)  I don't think you did. | 23  emoji.  "I should use more precise terminology for |
| 24  I'll just ask it again. | 24  my haters." |
| 25      And you say, "Our country is dying, and | 25      Did I read that correctly? |
| Page 282 | Page 284 |

| | |
|---|---|
| 1  the GOP is killing it." | 1  A.  Yes. |
| 2      And my question is do you think that is | 2  Q.  And what are anti-trans Heritage folks? |
| 3  true? | 3  A.  I don't recall the specific context of |
| 4      MS. NOWLIN-SOHL:  Object to form; asked | 4  this Tweet, but presumably it was someone similar |
| 5  and answered. | 5  to this line of questioning accusing me of hating |
| 6      THE WITNESS:  Again, this was a reference | 6  all conservatives. |
| 7  to a situation in which certain GOP lawmakers | 7      I have many conservative friends.  I have |
| 8  eliminated evidence that was important to be | 8  all throughout my education.  I'm very close with |
| 9  discussed and made sure that scientific evidence | 9  conservatives and people across the political |
| 10  didn't enter discussion about laws that would | 10  spectrum. |
| 11  impact the mental health of young people who I'm | 11      At the end of the day I work as a child |
| 12  responsible for taking care of. | 12  psychiatrist who takes care of a specific |
| 13      And I think that is a sad sign for our | 13  population that I care deeply, which are the young |
| 14  country that we're pushing forward legislation | 14  transgender youth. |
| 15  that's not based in science and evidence, | 15      There are individuals at the Heritage |
| 16  particularly when the stakes are as high as the | 16  Foundation who intermittently have passed |
| 17  mental health of young people. | 17  misinformation or said things about this |
| 18  Q.  (BY MR. RAMER)  And do you think those | 18  population or the research regarding them that's |
| 19  certain GOP lawmakers are killing our country? | 19  not true, and it is very upsetting for me to see |
| 20      MS. NOWLIN-SOHL:  Object to form; asked | 20  people spread misinformation that's going to hurt |
| 21  and answered. | 21  the young patients that I take care of. |
| 22      THE WITNESS:  I think I answered the | 22      So again, this is meant to clarify -- I |
| 23  question. | 23  think the line of questioning that you're going |
| 24  Q.  (BY MR. RAMER)  Yes or no. | 24  after is whether or not I have an issue with a |
| 25      MS. NOWLIN-SOHL:  Object to form; asked | 25  certain political party.  And this Tweet is |
| Page 283 | Page 285 |

72 (Pages 282 - 285)

App.1046

1  highlighting that I don't at all, but I do very
2  much have a problem with attacks on young patients
3  and the research that's designed to improve their
4  mental health and keep them safe.
5      Q.  Who are the individuals at the Heritage
6  Foundation you were referencing?
7      A.  Honestly, I haven't seen reports from
8  them for a while.  This is from back in 2020.  I
9  think at the time they were issuing individual
10 reports that were non-peer-reviewed scientific
11 research to spread misinformation about various
12 forms of gender care for young people.
13     Q.  And so you do hate those people?
14         MS. NOWLIN-SOHL:  Object to form;
15 mischaracterizes prior testimony.
16         THE WITNESS:  I have a strong negative
17 feeling towards people spreading misinformation
18 that would result in public policies that would
19 harm young people.
20     Q.  (BY MR. RAMER)  Is there anyone else you
21 can think of you would group into the Heritage
22 Foundation bucket?
23         MS. NOWLIN-SOHL:  Object to form.
24         THE WITNESS:  I think it's a large group,
25 but specifically I believe this was years ago, and

Page 286

1  opinion on everyone at the Heritage Foundation as
2  I know very few of them.
3      Q.  (BY MR. RAMER)  Would you put Leor Sapir
4  into this bucket?
5          MS. NOWLIN-SOHL:  Object to the form.
6          THE WITNESS:  I wasn't aware that he
7  worked at the Heritage Foundation.
8      Q.  (BY MR. RAMER)  I'm not saying he does.
9  I'm saying would you classify Leor Sapir as
10 somebody who is spreading misinformation?
11     A.  I haven't really seen something from him
12 recently.
13         Is there some specific report that he
14 issued that you want me to comment on?
15     Q.  No, I'm just asking in general.
16     A.  I can't think of something specific.  I
17 know I've seen him spread things in the past that
18 I didn't think were accurate or true, but I can't
19 think of anything recently.
20     Q.  And a few times today you've discussed
21 the "minority stress."  I don't know if you called
22 it a theory or minority stress -- a principle of
23 minority stress.
24         Just as a general matter, can you explain
25 that to me?

Page 288

1  it was in reference to somebody who had written a
2  supposed research paper that they didn't submit to
3  peer review, which is the standard process for
4  making sure that scientific research is valid and
5  the sort of thing that should influence public
6  policy because it's been checked by experts to be
7  valid.
8          And this person attempted to circumvent
9  that process to spread the misinformation that
10 could have had the potential to promote public
11 policy that could have been harmful.
12     Q.  (BY MR. RAMER)  When you say "it's a
13 large group," what do you mean by that?
14     A.  I mean there are many people that work at
15 the Heritage Foundation, and I do not know all of
16 them.
17     Q.  So is your hate only directed at the
18 Heritage Foundation?
19         MS. NOWLIN-SOHL:  Object to form;
20 mischaracterizes prior testimony.
21         THE WITNESS:  As I just said, my hate or
22 anger was towards the specific action that I
23 thought had the potential to harm young people and
24 lead to public policies that were harmful.
25         And I wouldn't be able to give you an

Page 287

1      A.  So minority stress is a framework that
2  was described by Ilan Meyer at UCLA initially used
3  to described why we see mental health disparities
4  among sexual minorities to include bisexual
5  cisgender men.
6          And it describes distal factors and
7  proximal factors.  Distal factors are factors from
8  the outside world that impact one's mental health,
9  so things like harassment based on your sexual
10 orientation, discrimination, violence.
11         Both described that over time, those
12 external factors can drive internal factors,
13 things like internalized homophobia, feeling that
14 you need to conceal your identity like we
15 discussed earlier, and anticipatory anxiety where
16 people develop a constant fear that they're going
17 to be victims of that past discrimination again in
18 the future even if they're in a safe environment.
19 And they may have trouble calibrating when they're
20 safe and when they're not, which can drive
21 anxiety.
22         That model was later adopted for trans
23 people in the gender minority stress model
24 by Hendricks and Testa that has essentially
25 analogous proximal and distal factors described.

Page 289

73 (Pages 286 - 289)

Jack Turban , M.D., MHS    October 16, 2023

| | |
|---|---|
| 1   Q. Did external factors ever drive internal<br>2 factors --<br>3     MS. NOWLIN-SOHL: Object to form.<br>4     MR. RAMER: Sorry. I'm just talking<br>5 slowly.<br>6   Q. (BY MR. RAMER) Can external factors ever<br>7 drive internal factors to lead someone to identify<br>8 as transgender?<br>9     MS. NOWLIN-SOHL: Object to form.<br>10     THE WITNESS: Are you asking if -- what<br>11 kind of external factor? Like a sexual minority<br>12 stress external factor?<br>13   Q. (BY MR. RAMER) Well, I guess do you<br>14 think that external factors for -- let me back up.<br>15     Somebody who identifies as transgender<br>16 and then at some point ceases identifying as<br>17 transgender, the reason they can do that could be<br>18 for a number of external factors such as<br>19 discrimination, correct?<br>20     MS. NOWLIN-SOHL: Object to form.<br>21     THE WITNESS: I'm trying to understand<br>22 the question.<br>23   Q. (BY MR. RAMER) Well, were there<br>24 individuals who responded to the U.S. Transgender<br>25 Survey who said that they detransitioned at some<br><div align="right">Page 290</div> | 1     So in this case, it was, I believe, go<br>2 back to living as your sex assigned at birth at<br>3 least for some time, so it didn't necessarily<br>4 imply that their gender identity changed, but<br>5 their gender expression changed or, quote, they<br>6 went into the closet, to use that colloquialism.<br>7   Q. Well, gender identity never changes,<br>8 correct?<br>9     MS. NOWLIN-SOHL: Object to form.<br>10     THE WITNESS: So as we talked about<br>11 earlier, that core, biologically determined gender<br>12 identity is not the way in which one ascribes body<br>13 language to it or sexualizes or understands it.<br>14   Q. (BY MR. RAMER) And so the -- is living<br>15 as your sex assigned at birth different from<br>16 identifying as cisgender?<br>17   A. Yes.<br>18   Q. How so?<br>19   A. One may still identify as transgender but<br>20 be somewhere where it wouldn't be safe to tell<br>21 people that or be open about it, so they may<br>22 present to the world as cisgender due to fear that<br>23 they would be subject to violence or harassment or<br>24 other maltreatment if they were to be openly<br>25 transgender.<br><div align="right">Page 292</div> |
| 1 point in their life?<br>2   A. Yes.<br>3   Q. And what would you say are the<br>4 explanations for why they would detransition at<br>5 some point in their life?<br>6   A. So we published a paper on this that you<br>7 might be referencing in LGBT Health, I believe, in<br>8 2021. I don't have the numbers in front of me,<br>9 but we found that a substantial proportion of<br>10 trans adults, so people who currently are living<br>11 their lives in their gender identity, had<br>12 transitioned, at some point in the past<br>13 detransitioned. So it was presumably temporary<br>14 because they're now living as trans adults.<br>15     I want to say it was maybe somewhere<br>16 between 10 and 15 percent said that they had that<br>17 experience in the past. And of those,<br>18 82.5 percent of them said it was due to at least<br>19 one external factor, so things like harassment and<br>20 discrimination.<br>21   Q. And so external factors could lead<br>22 someone to identify as cisgender; is that right?<br>23   A. That's not specifically what the study<br>24 said. You have to be careful about the term<br>25 "detransition" and how it's defined.<br><div align="right">Page 291</div> | 1   Q. And so what you were measuring -- or I<br>2 guess is this the point that you're making that<br>3 the word "detransition" is complex?<br>4   A. It can represent a broad heterogenous<br>5 range of experiences.<br>6     And when looking at the academic<br>7 research, it's important to look at how it's<br>8 defined.<br>9     Sometimes people will conflate<br>10 detransition with regret, or conflate detransition<br>11 with the changing gender identity understanding.<br>12 So it's important to look at how the individual<br>13 study really defines it.<br>14   Q. And what was the last one you said,<br>15 change in gender identity understanding? Is that<br>16 right?<br>17   A. Yeah, the way in which they conceptualize<br>18 their gender identity.<br>19   Q. And could somebody -- could a transgender<br>20 individual cease identifying as transgender for<br>21 reasons other than regret?<br>22     MS. NOWLIN-SOHL: Object to form.<br>23     THE WITNESS: Can you explain how you<br>24 would see regret as a reason for one's identity<br>25 change?<br><div align="right">Page 293</div> |

<div align="right">74 (Pages 290 - 293)</div>

1    Q.  (BY MR. RAMER)  Well, I'm asking can't
2  somebody do it without having regret?
3    A.  Can somebody stop a gender-affirming
4  medical intervention and not have regret?  Is that
5  the question?
6    Q.  Let's start there, yes.  Can somebody
7  cease a gender-affirming medical intervention and
8  not have regret?
9    A.  Yes.
10    Q.  And why?
11    A.  It can be for all sorts of reasons.  I've
12  had patients who took testosterone, for instance,
13  and had sufficient physical effects from it that
14  they felt that they didn't need any more physical
15  changes, so they stopped the medication but didn't
16  regret it.
17        We wrote about one patient who took
18  estrogen for a period of time and had some body
19  fat redistribution and then stopped it because
20  they identified as nonbinary, but they noted that
21  they didn't regret the body fat redistribution and
22  felt that that experience was necessary for them
23  to understand themselves.
24        Someone might lose insurance coverage and
25  not be able to access their gender-affirming

Page 294

1  medical interventions anymore.  So in that case
2  they would stop them, but it doesn't mean they
3  regretted taking them.  In fact, they might want
4  to keep taking them.
5    Q.  When you say the patient felt they didn't
6  need it anymore, are you using colloquial terms to
7  say that the distress associated with gender
8  dysphoria had resolved?
9    A.  That they had -- in that example,
10  testosterone -- achieved a level of physical
11  masculinization of their secondary sex
12  characteristics that their gender dysphoria
13  resolved, yes.
14    Q.  And so we were discussing why somebody --
15  or we were discussing how and why somebody could
16  cease gender-affirming medical interventions and
17  not have regret.
18        And my next question is could someone
19  receive a gender-affirming medical intervention
20  and later in life decide -- take the word "decide"
21  out of it.  I'm going to restart.
22        Could someone receive a gender-affirming
23  medical intervention and later in life identify
24  with their sex assigned at birth and not have
25  regret for having received the prior

Page 295

1  gender-affirming medical intervention?
2    A.  I've not had such a patient, but
3  potentially.
4    Q.  So if individuals receive
5  gender-affirming medical interventions and then
6  subsequently identify with their sex assigned at
7  birth, they likely would regret the
8  gender-affirming medical interventions?
9        MS. NOWLIN-SOHL:  Object to form;
10  mischaracterizes prior testimony.
11        THE WITNESS:  I think that's a different
12  question.  I've not had such a patient.  They
13  could potentially.  That's something that we
14  counsel patients as a possibility.
15        MR. RAMER:  And I'd like to introduce
16  Turban Exhibit 29.
17        Do you have that?
18        THE WITNESS:  Yes.
19        (Deposition Exhibit No. 29 was marked.)
20    Q.  (BY MR. RAMER)  And you've seen this
21  before, correct?
22    A.  Yes.  I've not read it in a while, but
23  I've seen it.
24    Q.  I'd just like to ask you one kind of
25  narrow question on -- so I'd like to go to

Page 296

1  page 11, right column under "Discussion," and the
2  second full paragraph.
3        And in that paragraph, the second to last
4  sentence -- and I'll just read it and ask if I
5  read it correctly, and then that will be my first
6  question.
7        "To the best of our knowledge, all of the
8  letters written to the editor JAMA Psychiatry,
9  many by respected academics and clinicians who
10  outlined the serious problems in the study, have
11  been rejected (some of them were later submitted
12  as non-indexed comments in the online
13  publication)."
14        Did I read that correctly?
15    A.  Yes.
16    Q.  And were you aware of letters being
17  written to the editor of JAMA Psychiatry outlining
18  problems with your study?
19    A.  No.
20    Q.  Were you serving as a manuscript reviewer
21  for JAMA Psychiatry at the time?
22    A.  I do ad hoc manuscript reviews for most
23  of the top journals, so I probably intermittently
24  reviewed papers for them.
25    Q.  Do you know if you were reviewing one at

Page 297

75 (Pages 294 - 297)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1 the time that these letters to the editor were | 1 THE WITNESS: Yes. |
| 2 being rejected? | 2 Q. (BY MR. RAMER) And do you recognize this |
| 3 A. Not that I recall, but I'm kind of | 3 document? |
| 4 reviewing a steady stream of articles for | 4 A. Yes. |
| 5 different journals. | 5 Q. And what is it? |
| 6 Q. And how often is there turnover at the | 6 A. This is a paper we published in the |
| 7 position of editor of JAMA Psychiatry? | 7 Journal of LGBT Health in 2021. |
| 8 MS. NOWLIN-SOHL: Object to form; | 8 Q. And this is the article that either you |
| 9 foundation. | 9 or I, probably me, was kind of alluding to earlier |
| 10 THE WITNESS: I do not know. | 10 that we were kind of talking around, right? |
| 11 Q. (BY MR. RAMER) How do the letters to the | 11 A. One of them, yes. |
| 12 editor -- I know they're called letters to the | 12 Q. Okay. And this study used data from the |
| 13 editor, but, like, is the editor actually reading | 13 U.S. Transgender Survey, correct? |
| 14 them? | 14 A. Yes. |
| 15 Or, just based on your experience working | 15 Q. And on 274, which I think is page 2, down |
| 16 at these journals, what is the process once a | 16 in the left column above "Methods," the last |
| 17 letter to the editor is submitted? | 17 sentence you acknowledge that because the USTS |
| 18 MS. NOWLIN-SOHL: Object to form. | 18 exclusively surveyed people who currently |
| 19 THE WITNESS: I think it probably varies | 19 identified as TGD, that your study is restricted |
| 20 journal by journal, but generally they would be | 20 to the examination of detransition among people |
| 21 read by members of the editorial board who would | 21 who subsequently identified as TGD, right? |
| 22 read them to decide if they have scientific merit. | 22 A. Yes. |
| 23 And if they were deemed to have | 23 Q. And then in the right column below |
| 24 scientific merit, they would be sent to the author | 24 "Quantitative Responses and Analysis," I'm just |
| 25 of the paper, and they would ask the author of the | 25 going to read the first sentence. |
| Page 298 | Page 300 |

| | |
|---|---|
| 1 paper to respond to them, in which case the letter | 1 Actually, no. It's a very long sentence. |
| 2 to the editor gets published and then a response. | 2 I'm just going to read the first part, which says |
| 3 The vast majority of the time, they're | 3 "Respondents who reported a history of |
| 4 not sent for external peer review, but sometimes | 4 detransition were asked 'Why did you detransition? |
| 5 they are. Again, I think that's a | 5 In other words, why did you go back to living as |
| 6 journal-by-journal decision. | 6 your sex assigned at birth?' Mark all that |
| 7 MR. RAMER: And maybe it would be good if | 7 apply." |
| 8 we just took a short break and I can clarify if | 8 Do you see that? |
| 9 there's anything else I need to ask, but otherwise | 9 A. Yes. |
| 10 I'm pretty close to being done. | 10 Q. And so the question you used to define |
| 11 MS. NOWLIN-SOHL: Yes, that's fine. | 11 detransition in this study was whether the |
| 12 MR. RAMER: We'll go off the record. | 12 participants went back to living as their sex |
| 13 THE VIDEOGRAPHER: Okay. So the time is | 13 assigned at birth, right? |
| 14 4:56 p.m. Pacific time, and we are off the record. | 14 A. So this is from data we did a secondary |
| 15 (Break taken from 4:56 p.m. to 5:04 p.m.) | 15 analysis on on the U.S. Transgender Survey, so I |
| 16 THE VIDEOGRAPHER: All right. So we are | 16 didn't design this survey question, but that's the |
| 17 recording. The time is 5:04 p.m. Pacific time, | 17 question that was used. |
| 18 and we are back on the record. | 18 Q. Right, but -- so fair enough. You didn't |
| 19 Q. (BY MR. RAMER) And, Dr. Turban, I just | 19 write the survey questions, but to use the survey |
| 20 wanted to kind of put more detail on the | 20 data for this paper, you used that question to |
| 21 conversation we were trying to have earlier. | 21 shape the definition of "detransition" that you |
| 22 MR. RAMER: And so I'll introduce Turban | 22 use in this paper, right? |
| 23 Exhibit 30. And just let me know when you have | 23 A. Yeah. I admittedly don't love the |
| 24 that up. | 24 wording of the question, but it's the question |
| 25 (Deposition Exhibit No. 30 was marked.) | 25 that was in the data set that we had available, so |
| Page 299 | Page 301 |

76 (Pages 298 - 301)

Jack Turban , M.D., MHS October 16, 2023

1 that's the one that was used.
2     Q.  What would you change about it?
3     A.  I just find the term "detransition" in
4 general to be somewhat vague and heterogenous.  So
5 I prefer a more specific question like "Did you
6 regret the certain intervention?  Did you stop
7 gender-affirming medical care?  Did you go back to
8 presenting as your sex assigned at birth?"
9        This was kind of a broad question that
10 encapsulated a lot of experiences, but
11 conveniently -- or not conveniently because it was
12 a lot of work -- but there was a free response, so
13 we were able to go through and code the 800 free
14 responses, which helped us get a rich perspective
15 on what exactly people were describing as their,
16 quote, detransition experiences.
17     Q.  And in this paragraph toward the bottom
18 the second to last sentence, it says in
19 quotations, "'I realized that gender transition
20 was not for me'" was collapsed into a
21 'fluctuations in identity/desire' category."
22        Did I read that correctly?
23     A.  Sorry.  I'm just reading what it was --
24 this paragraph.
25        Yeah, I think there weren't many people,

Page 302

1 if I remember correctly, who chose that one, which
2 I think is why we collapsed them together.  But
3 that's another one where I think the wording was
4 pretty unclear, unfortunately.
5     Q.  That was going to be my next question.
6        So using the definition of -- well, let
7 me step back.
8        I think it's implied in what we've
9 already discussed, but just to clarify, this study
10 did not set out to tell us and does not tell us
11 anything about individuals who transitioned and
12 then permanently went back to living as their sex
13 assigned at birth, correct?
14     A.  Correct.
15     Q.  And using the definition of
16 "detransition" that you use in this study, of all
17 individuals who have detransitioned, do you think
18 the majority of them subsequently identify as
19 transgender?
20     A.  It's hard to answer quantitatively, but
21 the research that has worked to identify people
22 who detransitioned -- probably the science would
23 say they stopped gender-affirming medical
24 interventions -- the numbers have been relatively
25 low.  The lowest one that I've seen was that one

Page 303

1 study that identified 100 people.
2        This one, we're looking at trans people
3 who have at least temporarily detransitioned, and
4 it was over 2,000 people, and that was just of
5 this survey.
6        So, I mean, it's an imperfect way to look
7 at it, but it appears that there are a lot of
8 people who detransition due to these external
9 factors.
10     Q.  Were you just -- sorry.
11        Were you just comparing the 100 people in
12 that study to the 2,000 people here to draw a
13 conclusion about the prevalence?
14        MS. NOWLIN-SOHL:  Object to form.
15        THE WITNESS:  I think you were asking,
16 like, of people who detransition -- are you asking
17 if I think most people are, like, detransitioning
18 in this way versus are detransitioning in the
19 Littman description?  I'm not sure I understand
20 the question.
21     Q.  (BY MR. RAMER)  Sorry.  Let me just
22 clarify.  Is the Littman study -- I didn't
23 actually hear you all that well.
24        Is the Littman study the one that you're
25 referring to that identified the 100 people?  Did

Page 304

1 you say Littman?
2     A.  Yes.
3     Q.  Okay.  I guess what I'm asking is of
4 people -- let me try and ask it this way:  Of
5 people who detransition using the definition you
6 use in this study, do you think most of them go on
7 to retransition and identify as transgender?
8        MS. NOWLIN-SOHL:  Object to the form.
9        THE WITNESS:  I just want to be clear
10 that this study doesn't look at that question at
11 all.
12     Q.  (BY MR. RAMER)  No.  I understand that.
13 And that's why I'm asking.
14        I'm asking does this study capture the
15 typical detransitioner or not?
16        MS. NOWLIN-SOHL:  Object to the form;
17 calls for speculation.
18        THE WITNESS:  I don't know that we have
19 research because it seems there aren't enough
20 detransitioners to have a rigorous study on what
21 the common detransition experience is.
22        The largest study I know is that Littman
23 study of 100 individuals that I think I put in my
24 declaration, but it would be helpful if we pulled
25 the paper up.

Page 305

77 (Pages 302 - 305)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1      But even within there, they had | 1   less common, I think this would become a less |
| 2   heterogenous experiences where some had regret; | 2   common experience. So I don't know that I can |
| 3   some did not. Some felt that they benefitted from | 3   predict. |
| 4   the transition despite the fact that they later | 4     Q. Would external factors only ever drive |
| 5   stopped gender-affirming medical interventions; | 5   somebody to detransition? Or could they ever |
| 6   others did not. | 6   drive somebody to transition in the first |
| 7      That study is also complicated because it | 7   instance? |
| 8   recruited from various and specific social media | 8     MS. NOWLIN-SOHL: Object to form. |
| 9   websites, so it's really hard to know how | 9     THE WITNESS: It would be pretty -- maybe |
| 10   representative that is. | 10   we're not having a shared definition of "external |
| 11     I don't know how to answer that question | 11   factors." |
| 12   with the data. | 12     It sounds like generally external factors |
| 13     Q. (BY MR. RAMER) When you say we don't | 13   are anti-trans discrimination. |
| 14   have enough detransitioners to properly study the | 14     I'm having trouble understanding why |
| 15   question, are you basing that off of the fact that | 15   someone would choose to transition because of |
| 16   Littman only identified 100 people? Or is there | 16   stigma and harassment towards trans people if they |
| 17   something else that is leading you to that | 17   weren't trans. |
| 18   conclusion? | 18   Q. (BY MR. RAMER) Well, I guess -- |
| 19     A. Just all the research we have is | 19     A. That would seem counter to their personal |
| 20   suggesting that it's not a very common experience. | 20   interests. |
| 21     There's that paper. | 21     Q. I guess my question is are external |
| 22     There's the Wiepjes paper that generally | 22   factors always negative, like discrimination? |
| 23   looks like -- they were more looking at regret, | 23     MS. NOWLIN-SOHL: Object to form. |
| 24   where regret rates were low, at least for surgery. | 24     THE WITNESS: That's why I'm asking if we |
| 25     When we look at the papers, how many | 25   have a shared definition. |
|                            Page 306 |                            Page 308 |
| 1   people take blockers and then don't go on to | 1      The way they're used in the minority |
| 2   gender-affirming hormones, it's in the low, few | 2   stress framework is they're referring to stigma |
| 3   percent. | 3   external factors. |
| 4      But, again, all of this is kind of | 4     Q. (BY MR. RAMER) And so in the minority |
| 5   muddied by what your definition of "detransition" | 5   stress framework, external factors are always |
| 6   is. | 6   negative stigmatic factors; is that fair? |
| 7     Q. Do you expect that the -- let me put it | 7     A. Definition in the way it's used in that |
| 8   this way: In terms of raw numbers, do you expect | 8   framework. |
| 9   that the number of detransitioners, using the | 9      They do have other -- I mean, there's |
| 10   definition you use in this study, will increase in | 10   other elements of the framework, a buffering |
| 11   the next 15 years? | 11   effect against internal and external factors of |
| 12     MS. NOWLIN-SOHL: Object to form; calls | 12   community connectedness at pride, but I think we |
| 13   for speculation. | 13   call those resilience factors. |
| 14     THE WITNESS: The definition of going | 14     Q. And what do you mean by "pride"? |
| 15   back to presenting as their sex assigned at birth? | 15     A. Like having pride in one -- as opposed to |
| 16     Q. (BY MR. RAMER) Go back to living as your | 16   shame, like being proud of the trans community, |
| 17   sex assigned at birth, yes. | 17   recognizing that trans people make important |
| 18     A. I think it's really hard to predict. It | 18   contributions to society, being able to have trans |
| 19   would depend on a lot of different factors. This | 19   role models in the type of things that you want to |
| 20   study specifically was on -- most of the people in | 20   do. |
| 21   the study were doing that because of some sort of | 21      So say you're a young trans person who |
| 22   anti-trans stigma they were encountering in their | 22   wants to be a physician and you don't have any |
| 23   communities. | 23   role models. You might think, oh, trans people |
| 24      So if that were to continue to rise, this | 24   can't be doctors. So meeting a trans doctor or |
| 25   would be a more common experience. If that became | 25   seeing an example of someone in the media. |
|                            Page 307 |                            Page 309 |

78 (Pages 306 - 309)

(286 of 288), Page 286 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 286 of 288
Case 1:23-cv-00269-BLW   Document 74-2   Filed 11/02/23   Page 79 of 177
Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1     Q.  Could an external factor like that ever | 1   have never seen, but something that would come up |
| 2   shape an internal factor? | 2   in the evaluation process as a possibility. |
| 3       MS. NOWLIN-SOHL:  Object to form. | 3     Q.  And in your answer why did you say "even |
| 4       THE WITNESS:  Those aren't called | 4   in California"? |
| 5   external factors in the model.  Those are | 5     A.  There's often a perception that in the |
| 6   resilience factors. | 6   Bay Area where I work that there's a lot of |
| 7       But are you trying to ask if, like, | 7   acceptance of trans young people.  It's something |
| 8   somebody being in a community where there are | 8   that people will often mention to me when they go |
| 9   positive views of trans people would lead them to | 9   to conferences or when I'm presenting such as at |
| 10   transition to be trans? | 10   different academic institutions. |
| 11     Q.  (BY MR. RAMER)  Well, sure.  What is the | 11       But sadly I find that's often not the |
| 12   answer to that? | 12   case in this area that people think of being very |
| 13     A.  Is that the question? | 13   accepting towards young trans people. |
| 14     Q.  Yes. | 14     Q.  And why did you reference a liberal |
| 15     A.  Sorry.  The question is kind of are | 15   school? |
| 16   there -- you just asked -- | 16     A.  Because those schools people tend to |
| 17     Q.  What did you just say?  Sorry.  What did | 17   think of as having more acceptance towards young |
| 18   you just say?  And that's the question. | 18   trans people. |
| 19     A.  Are there environments where there could | 19     Q.  And do you disagree with that perception? |
| 20   be a positive view of trans people that would lead | 20     A.  Yes, I don't think it's universal.  I |
| 21   someone to come out as trans when they're not | 21   think I've seen schools where people think of them |
| 22   trans? | 22   as being very liberal, whatever that means, but |
| 23     Q.  Yes, that question. | 23   that the kids still experience a lot of bullying |
| 24       MS. NOWLIN-SOHL:  Object to form. | 24   and harassment and stigmas when they come out as |
| 25       THE WITNESS:  I have not experienced any | 25   trans. |
| <div align="right">Page 310</div> | <div align="right">Page 312</div> |
| 1   such environment.  Even in California where I work | 1       MR. RAMER:  And I don't have any further |
| 2   in the Bay, my patients routinely have harassment | 2   questions for now.  I'll turn things over to your |
| 3   and stigma.  Other people don't realize that. | 3   counsel, but thank you very much, Doctor. |
| 4       But at one local school that people think | 4       THE WITNESS:  Thank you. |
| 5   of liberal, somebody burned a Pride flag outside | 5       MS. NOWLIN-SOHL:  I think I just have a |
| 6   to express anti-trans stigma. | 6   couple. |
| 7       We published a paper in Pediatrics where | 7   |
| 8   we looked at the rates of bullying victimization | 8         EXAMINATION |
| 9   against trans youth versus cisgender sexual | 9   BY MS. NOWLIN-SOHL: |
| 10   minority youth, and the rates were substantially | 10     Q.  So, Dr. Turban, do you remember earlier |
| 11   higher, so I don't think that's the social | 11   when we were talking about Exhibit -- I believe it |
| 12   environment that we live in. | 12   was 14, which is the article in the Journal of |
| 13       When we do a biopsychosocial evaluation, | 13   Adolescent Health titled the "Age of Realization |
| 14   we always ask, if you were to start a | 14   and Disclosure of Gender Identity Among |
| 15   gender-affirming medical intervention, how would | 15   Transgender Adults"? |
| 16   your parents react?  How would your peers react? | 16     A.  Yes. |
| 17   How would other people in your community react? | 17       MS. NOWLIN-SOHL:  John, do you want a |
| 18       I'll say almost universally young people | 18   minute to pull that up? |
| 19   are afraid that there are going to be negative | 19     Q.  (BY MS. NOWLIN-SOHL)  And I believe you |
| 20   reactions. | 20   and Mr. Ramer at one point were talking about |
| 21       If there were a circumstance where they | 21   table one, the demographics. |
| 22   said, "Oh, everyone is going to give me a ton of | 22       Do you recall that conversation? |
| 23   praise and presents and positive things," then | 23     A.  Yes. |
| 24   that would be a major flag for us to try and | 24     Q.  And on that table, there's two kind of |
| 25   figure out what was going on.  That's something we | 25   columns for different age categories, one for the |
| <div align="right">Page 311</div> | <div align="right">Page 313</div> |

<div align="right">79 (Pages 310 - 313)</div>

(287 of 288), Page 287 of 288 Case: 24-142, 01/26/2024, DktEntry: 23.3, Page 287 of 288
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 80 of 177
Jack Turban , M.D., MHS October 16, 2023

| | | | |
|---|---|---|---|
| 1 | age less than 10, and one for age 11-plus; is that | 1 | THE VIDEOGRAPHER: Okay. Then this |
| 2 | correct? | 2 | concludes our video deposition with Dr. Jack |
| 3 | A. Yes. | 3 | Turban. It is October 16, 2023. The time is |
| 4 | Q. And I think you and Mr. Ramer were | 4 | 5:26 p.m. Pacific time, and we are off the record. |
| 5 | talking about the percentages in those columns | 5 | |
| 6 | as -- at one point it was mentioned that they | 6 | (Whereupon the deposition was concluded at 5:26 p.m.) |
| 7 | didn't quite add up to 100 percent. | 7 | **** |
| 8 | Can you help clarify what the numbers in | 8 | (Signature requested.) |
| 9 | parentheses after each block number reflects? | 9 | |
| 10 | A. Yes. So I think the question was trying | 10 | |
| 11 | to get at how many participants in the overall | 11 | |
| 12 | study were in each of those age brackets at the | 12 | |
| 13 | top left, 18 to 24, 25 to 44, 45 to 64, and 65 | 13 | |
| 14 | plus. | 14 | |
| 15 | And the question was how many of them are | 15 | |
| 16 | in each of those categories of percentage of the | 16 | |
| 17 | full population, and I was doing incorrect math. | 17 | |
| 18 | My apologies. | 18 | |
| 19 | So in order to calculate that, you would | 19 | |
| 20 | add the two numbers in each of the rows from both | 20 | |
| 21 | columns, and then divide that by the total number | 21 | |
| 22 | in the study. So the percentages I was giving | 22 | |
| 23 | earlier were incorrect. | 23 | |
| 24 | MS. NOWLIN-SOHL: No further questions. | 24 | |
| 25 | MR. RAMER: Can I just ask one follow-up | 25 | |

Page 314 / Page 316

| | | | |
|---|---|---|---|
| 1 | on that? | 1 | REPORTER'S CERTIFICATE |
| 2 | | 2 | STATE OF IDAHO       ) |
| 3 | FURTHER EXAMINATION | | ) |
| 4 | BY MR. RAMER: | 3 | COUNTY OF ADA      ) |
| 5 | Q. Which, looking at that same table, | 4 | |
| 6 | looking at the 18 to 24 group, do you agree -- | 5 | I, Amy E. Simmons, Certified Shorthand Reporter and |
| 7 | well, sorry. I may have gotten more confused. | 6 | Notary Public in and for the State of Idaho, do hereby |
| 8 | But so the 33.4 next to 18 to -- in the | 7 | certify: |
| 9 | 18 to 24 row, the 33.4 in parentheses, that means | 8 | That prior to being examined, the witness named in |
| 10 | that the 18 to 24 group makes up 33.4 percent of | 9 | the foregoing deposition was by me duly sworn to testify |
| 11 | the early realization group; is that right? | 10 | to the truth, the whole truth, and nothing but the truth; |
| 12 | A. Yes. I believe that's true. | 11 | That said deposition was taken down by me in |
| 13 | Q. And then when you shift over a column, | 12 | shorthand at the time and place therein named and |
| 14 | the 18 to 24 group makes up 56.4 percent of the | 13 | thereafter reduced to typewriting under my direction, and |
| 15 | later realization group, correct? | 14 | that the foregoing transcript contains a full, true, and |
| 16 | A. Yeah, that looks correct. Whatever 6,322 | 15 | verbatim record of said deposition. |
| 17 | divided by 11,218 is, which sounds roughly like | 16 | I further certify that I have no interest in the |
| 18 | 56.4. | 17 | event of the action |
| 19 | 11,218 is the total number of people in | 18 | WITNES                    day of October, |
| 20 | the late realization group. | 19 | 2023. |
| 21 | Q. Got it. Okay. I'm clear now. | 20 | |
| 22 | MR. RAMER: Thank you very much, Doctor, | 21 | |
| 23 | I appreciate it. I think we're all set. | 22 | AMY E. SIMMONS |
| 24 | THE VIDEOGRAPHER: All right. That's it? | | ID CSR No. 685 |
| 25 | MR. RAMER: Yeah. | 23 | CA CSR No. 14453 |
| | | | WA CSR No. 22012915 |
| | | 24 | OR CSR No. 22-009 |
| | | | RDR, CRR, CRC, |
| | | 25 | and Notary Public |
| | | | My commission expires: 6/13/28. |

Page 315 / Page 317

80 (Pages 314 - 317)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1 Philip S. May | 1 Poe, Et Al. v. Labrador, Et Al. |
| 2 philip.may@groombridgewu.com | 2 Jack Turban , M.D., MHS (#6058443) |
| 3         October 20, 2023 | 3         ACKNOWLEDGEMENT OF DEPONENT |
| 4 RE:   Poe, Et Al. v. Labrador, Et Al. | 4   I, Jack Turban , M.D., MHS, do hereby declare that I |
| 5   10/16/2023, Jack Turban , M.D., MHS (#6058443) | 5 have read the foregoing transcript, I have made any |
| 6   The above-referenced transcript is available for | 6 corrections, additions, or changes I deemed necessary as |
| 7 review. | 7 noted above to be appended hereto, and that the same is |
| 8   Within the applicable timeframe, the witness should | 8 a true, correct and complete transcript of the testimony |
| 9 read the testimony to verify its accuracy. If there are | 9 given by me. |
| 10 any changes, the witness should note those with the | 10 |
| 11 reason, on the attached Errata Sheet. | 11 _____   _____ |
| 12   The witness should sign the Acknowledgment of | 12 Jack Turban , M.D., MHS            Date |
| 13 Deponent and Errata and return to the deposing attorney. | 13 *If notary is required |
| 14 Copies should be sent to all counsel, and to Veritext at | 14   SUBSCRIBED AND SWORN TO BEFORE ME THIS |
| 15 Calendar-Idaho@veritext.com. | 15   _____ DAY OF _____, 20___. |
| 16 | 16 |
| 17  Return completed errata within 30 days from | 17 |
| 18 receipt of testimony. | 18   _____ |
| 19   If the witness fails to do so within the time | 19 NOTARY PUBLIC |
| 20 allotted, the transcript may be used as if signed. | 20 |
| 21 | 21 |
| 22         Yours, | 22 |
| 23         Veritext Legal Solutions | 23 |
| 24 | 24 |
| 25 | 25 |
| Page 318 | Page 320 |

| |
|---|
| 1 Poe, Et Al. v. Labrador, Et Al. |
| 2 Jack Turban , M.D., MHS (#6058443) |
| 3     E R R A T A  S H E E T |
| 4 PAGE_____ LINE_____ CHANGE_____ |
| 5 _____ |
| 6 REASON_____ |
| 7 PAGE_____ LINE_____ CHANGE_____ |
| 8 _____ |
| 9 REASON_____ |
| 10 PAGE_____ LINE_____ CHANGE_____ |
| 11 _____ |
| 12 REASON_____ |
| 13 PAGE_____ LINE_____ CHANGE_____ |
| 14 _____ |
| 15 REASON_____ |
| 16 PAGE_____ LINE_____ CHANGE_____ |
| 17 _____ |
| 18 REASON_____ |
| 19 PAGE_____ LINE_____ CHANGE_____ |
| 20 _____ |
| 21 REASON_____ |
| 22 |
| 23 _____   _____ |
| 24 Jack Turban , M.D., MHS            Date |
| 25 |
| Page 319 |

81 (Pages 318 - 320)