APPEAL NO. 24-142

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PAM POE, by and through her parents and next friends Penny and Peter Poe, et al.,

*Plaintiffs-Appellees,*

v.

RAÚL LABRADOR, in official capacity as Attorney General of the State of Idaho,

*Defendant-Appellant,*

and

JAN M. BENNETTS, in official capacity as Ada County Prosecuting Attorney, et al.,

*Defendants.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:23-cv-00269-BLW

## APPELLANT'S OPENING BRIEF

RAÚL R. LABRADOR
ATTORNEY GENERAL

ALAN M. HURST
Solicitor General

JOSHUA N. TURNER
Chief of Constitutional
Litigation and Policy

JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense
OFFICE OF IDAHO
ATTORNEY GENERAL
700 W. Jefferson St.
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
josh.turner@ag.idaho.gov
james.craig@ag.idaho.gov

JOHN J. BURSCH
LINCOLN DAVIS WILSON
ALLIANCE DEFENDING
FREEDOM
440 First Street, NW,
Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
lwilson@ADFlegal.org

JONATHAN A. SCRUGGS
HENRY W. FRAMPTON, IV
ALLIANCE DEFENDING
FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

DAVID H. THOMPSON
BRIAN W. BARNES
JOHN D. RAMER
COOPER & KIRK, PLLC
1523 New Hampshire
Avenue, NW
Washington, DC 20036
202-220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Appellant Raúl R. Labrador*

TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................iii

INTRODUCTION ..............................................................................................1

STATEMENT OF JURISDICTION ....................................................................3

STATEMENT OF THE ISSUES .........................................................................3

PERTINENT STATUTES AND REGULATIONS ...............................................3

STATEMENT OF FACTS AND OF THE CASE .................................................4

I.      Medicalized Transition Is an Experimental Science.................................4

        A.      Sex, Gender Dysphoria, and Desistance. ......................................4

        B.      Substantial Risks and Unproven Benefits of Medical Transition...............6

        C.      The International Turn Against Medicalized Transition in Minors.........10

        D.      Plaintiffs' Experts Confirm Uncertainty of Medicalized Transition.
                ....................................................................................................11

II.     Idaho Enacts the VCPA to Protect Vulnerable Children. ...................15

III.    The District Court Enjoins the Act in its Entirety.................................15

SUMMARY OF ARGUMENT............................................................................17

STANDARD OF REVIEW .................................................................................18

ARGUMENT .....................................................................................................19

I.      Plaintiffs Cannot Prove Likely Success on the Merits. ..........................19

        A.      The Act Does Not Violate Equal Protection.................................20

                1.      The Act triggers and survives rational-basis scrutiny. ...................20

                2.      The Act satisfies intermediate scrutiny. ..........................................31

        B.      The Act Does Not Violate Substantive Due Process. ..............................36

II.      The Other Injunction Factors Favor the Attorney General. ...............................40

III.     The Injunction Is Overbroad. ...................................................42

CONCLUSION ..................................................................................45

STATEMENT OF RELATED CASES..................................................47

CERTIFICATE OF SERVICE.............................................................48

CERTIFICATE OF COMPLIANCE FOR BRIEFS ....................................49

ADDENDUM ...................................................................................50

TABLE OF AUTHORITIES

### Cases

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018) ..................................................................41

*Abigail Alliance For Better Access to Developmental Drugs v. von Eschenbach,*
    495 F.3d 695 (D.C. Cir. 2007) .............................................. 22, 37

*Aden v. Younger,*
    57 Cal. App. 3d 662 (Ct. App. 1976) ...........................................23

*Alliance For the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) .....................................................41

*Barsky v. Board of Regents of University of New York,*
    347 U.S. 442 (1954) .....................................................................37

*Bostock v. Clayton County,*
    140 S. Ct. 1731 (2020) .................................................................25

*Bray v. Alexandria Women's Health Clinic,*
    506 U.S. 263 (1993) .....................................................................28

*Bresgal v. Brock,*
    843 F.2d 1163 (9th Cir. 1987) .....................................................43

*Califano v. Jobst,*
    434 U.S. 47 (1977) .......................................................................35

*City of Los Angeles v. Almeda Books, Inc.,*
    525 U.S. 425 (2002) .....................................................................36

*Clark ex rel. Clark v. Arizona Interscholastic Association,*
    695 F.2d 1126 (9th Cir. 1982) .....................................................36

*Contest Promotions, LLC v. City & County of San Francisco,*
    874 F.3d 597 (9th Cir. 2017) .......................................................34

*Coyote Publishing, Inc. v. Miller,*
    598 F.3d 592 (9th Cir. 2010) .......................................................34

*Dobbs v. Jackson Women's Health Organization,*
    597 U.S. 215 (2022) ............................................... 17, 25–26, 29

*Doe v. Snyder,*
   28 F.4th 103 (9th Cir. 2022) ............................................................. 29, 41

*Drakes Bay Oyster Company v. Jewell,*
   747 F.3d 1073 (9th Cir. 2014) ........................................................... 18, 42

*Dunagin v. City of Oxford,*
   718 F.2d 738 (5th Cir. 1983) .................................................................19

*Eknes-Tucker v. Governor of Alabama,*
   80 F.4th 1205 (11th Cir. 2023).......................1, 21, 24, 27, 29, 32, 35, 37

*Federal Trade Commission v. Enforma Natural Products, Inc.,*
   362 F.3d 1204 (9th Cir. 2004) ...............................................................19

*Garcia v. Google, Inc.,*
   786 F.3d 733 (9th Cir. 2015) ..................................................................41

*Geduldig v. Aiello,*
   417 U.S. 484 (1974) ........................................................................ 17, 25

*Get Outdoors II, LLC v. City of San Diego,*
   506 F.3d 886 (9th Cir. 2007) ..................................................................43

*Golden Gate Restaurant Association v. City & County of San Francisco,*
   512 F.3d 1112 (9th Cir. 2008) ................................................................42

*Griffin v. HM Florida-ORL, LLC,*
   144 S. Ct. 1 (2023) ................................................................................44

*Heller v. Doe,*
   509 U.S. 312 (1993) ..............................................................................22

*In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Products Liability
   Litigation,*
   892 F.3d 624 (4th Cir. 2018) .................................................................14

*John Doe No. 1 v. Reed,*
   561 U.S. 186 (2010) ..............................................................................44

*Kansas v. Hendricks,*
   521 U.S. 346 (1997) ..............................................................................40

*Karnoski v. Trump*,
　　926 F.3d 1180 (9th Cir. 2019) ........................................................... 27, 29

*L.W. by & through Williams v. Skrmetti*,
　　83 F.4th 460 (6th Cir. 2023) .................. 1, 4, 19–20, 22, 24–26, 29–30, 32, 37, 40

*Lockhart v. McCree*,
　　476 U.S. 162 (1986) ................................................................................19

*Medtronic, Inc. v. Lohr*,
　　518 U.S. 470 (1996) ................................................................................21

*Menora v. Illinois High School Association*,
　　683 F.2d 1030 (7th Cir. 1982) ..............................................................19

*Michael M. v. Superior Court of Sonoma County*,
　　450 U.S. 464 (1981) ................................................................................35

*Minority Television Project, Inc. v. F.C.C.*,
　　736 F.3d 1192 (9th Cir. 2013) ..............................................................33

*Mississippi University for Women v. Hogan*,
　　458 U.S. 718 (1982) ........................................................................ 24, 31

*Mitchell v. Clayton*,
　　995 F.2d 772 (7th Cir. 1993) ................................................................37

*Munaf v. Geren*,
　　553 U.S. 674 (2008) ................................................................................19

*National Association for Advancement of Psychoanalysis v. California Board of Psychology*,
　　228 F.3d 1043 (9th Cir. 2000) ........................................................ 22, 37

*National Institute of Family & Life Advocates v. Becerra*,
　　138 S. Ct. 2361 (2018) ...........................................................................38

*New York v. Ferber*,
　　458 U.S. 747 (1982) ................................................................................31

*Parham v. J.R.*,
　　442 U.S. 584 (1979) ................................................................................38

*Personnel Administrator of Massachusetts v. Feeney*,
　　442 U.S. 256 (1979) ................................................................................20

*Pickup v. Brown*,
    740 F.3d 1208 (9th Cir. 2014) ......................................................37

*Raich v. Gonzales*,
    500 F.3d 850 (9th Cir. 2007) ........................................................38

*Raidoo v. Moylan*,
    75 F.4th 1115 (9th Cir. 2023) ......................................................22

*Rosen v. Ciba-Geigy Corp.*,
    78 F.3d 316 (7th Cir. 1996) ........................................................13

*Schall v. Martin*,
    467 U.S. 253 (1984) ....................................................................21

*Tingley v. Ferguson*,
    47 F.4th 1055 (9th Cir. 2022) ................................................26, 29

*United States v. Salerno*,
    481 U.S. 739 (1987) ....................................................................42

*United States v. Virginia*,
    518 U.S. 515 (1996) ....................................................................27

*Vivid Entertainment, LLC v. Fielding*,
    774 F.3d 566 (9th Cir. 2014) ......................................................36

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ..............................................20–21, 36, 40

*Whalen v. Roe*,
    429 U.S. 589 (1977) ....................................................................37

*Williams-Yulee v. Florida Bar*,
    575 U.S. 433 (2015) ....................................................................34

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................18

*World Wide Video of Washington, Inc. v. City of Spokane*,
    368 F.3d 1186 (9th Cir. 2004) ....................................................36

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ....................................................................21

*Zepeda v. I.N.S.*,
    753 F.2d 719 (9th Cir. 1983) ...................................................................43

**Statutes**

28 U.S.C. 1292 ...................................................................................................3

28 U.S.C. 1331 ...................................................................................................3

Alaska Stat. § 47.30.825(g) (2004) ...............................................................23

Cal. Welf. & Inst. Code § 5326.6 (Deering 1976)........................................23

Idaho Code § 16-2423(3) (2005) ...................................................................23

Idaho Code § 18-1506C........................................................ 4, 15–16, 21, 30, 42

Tenn. Comp. R. & Regs. 0940-05-16-.23 (1988) ...........................................23

**Other Authorities**

Anderson, Erica, *Opinion: When it comes to trans youth, we're in danger of losing our way*,
    San Francisco Examiner (June 16, 2022) ............................................28

Dr. Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People: Interim Report* (2022) .......................................................5

E. Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1 (2023) ................7

Glintborg, et al., *Gender-affirming treatment and mental health diagnoses in Danish transgender persons: a nationwide register-based cohort study*, 189 Eur. J. of Endocrinology 336 (2023) .....................................................11

Imma Perfetto, *Women Are Not Just Small Men – More Pre-Clinical Research Needed on Sex-Specific Drug Doses*, Cosmos Magazine (Dec. 14, 2022) ...................27

Kaltiala, et al., *Have the psychiatric needs of people seeking gender reassignment changes as their numbers increase? A register study in Finland*, 66 Eur. Psy. e93, 1 (2023) ...........11

Michael Biggs, *The Dutch Protocol for Juvenile Transsexuals: Origins & Evidence*, 49 J. Sex & Marital Therapy 343 (2023) .............................................8

Pamela Paul, *As Kids, They Thought They Were Trans. They No Longer Do.*, N.Y. Times (Feb. 2, 2024)..................................................................................6

Roland Nadler & Jennifer A. Chandler, *Legal Regulation of Psychosurgery: A Fifty-State Survey*, 39 J. Leg. Med. 335 (2019) ................................................................... 23, 24

**<u>Rules</u>**

Fed. R. Evid. 201 ........................................................................................................19

## INTRODUCTION

Idaho and twenty-one other states have passed laws to protect children from experimental and dangerous medical procedures that alter their bodies to reflect their perceived identity. These laws are part of an international trend. As many of the countries that pioneered these procedures now recognize, they carry significant risks; yet no evidence reliably establishes their benefits. In fact, the most recent evidence from Europe shows that these experimental procedures fail to improve young people's mental health, even as the procedures' use is increasing in the United States.

The lack of reliable studies showing the procedures' benefits is not surprising. For one, gender dysphoria in children typically resolves on its own before adulthood. And since no one can predict which child will take a different path, using medical procedures to alter these children's bodies always carries risks. For another, gender dysphoria is the *only* dysphoria of many (e.g., anorexia, body dysmorphia) where kids and teens are urged to alter their bodies to conform with the dysphoria.

Against this backdrop, governments around the world are grappling with what to do. Some have prohibited surgeries for minors and limited drugs to tightly controlled clinical trials. Idaho and twenty-one other states have decided not to allow any of these procedures on minors, prioritizing children's safety and the procedures' certain risks over their questionable benefits. Two circuits have upheld these laws, and a third has taken the question en banc after a panel reached the contrary conclusion. *L.W. by & through Williams v. Skrmetti*, 83 F.4th 460, 473 (6th Cir. 2023); *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1227 (11th Cir. 2023); Order, *Brandt v. Griffin*, No. 23-2681 (8th

1

Cir. Oct. 6, 2023). This Court should join that burgeoning consensus and vacate the district court's injunction against Idaho's law.

In our federal system, states have the primary responsibility to regulate the practice of medicine. And the regulation here—like any other on specific procedures—triggers only rational-basis scrutiny under equal protection. It does not discriminate based on sex or transgender status; it applies equally to both sexes and targets risky procedures, not any class of persons. That is imminently rational. In fact, Idaho's law satisfies even intermediate scrutiny. It substantially advances the State's interest in protecting children from experimental procedures more likely to harm than help.

The law also satisfies due process, as there is no deeply rooted and fundamental right to access unproven and risky medical interventions. The opposite conclusion would constitutionalize countless medical decisions, freeze one particular medical regime into the Fourteenth Amendment in the face of quickly evolving science, and take away the legislature's prerogative to set state health policy. The Supreme Court has moved itself and the lower courts off this path.

Because Plaintiffs cannot show a likelihood of success on the merits, that alone warrants dissolving the preliminary injunction. But the other factors favor Idaho too. Plaintiffs cannot show that a law restricting dangerous medical procedures irreparably harms them, and the equities and public interest favor enforcing the law.

The injunction is also grossly overbroad. It prevents Idaho from enforcing obviously constitutional applications of its law, like stopping genital surgeries that the Endocrine Society says should not be used on minors. And it enjoins provisions of the law that Plaintiffs do not want—or have standing—to challenge. Nothing justifies this

breadth. This Court should dissolve the injunction and allow Idaho's law to take effect or, in the alternative, narrow the injunction to apply only to Plaintiffs and only to the aspects of the law that Plaintiffs have standing to challenge.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. 1331 over Plaintiffs' federal constitutional challenges. This Court has jurisdiction under 28 U.S.C. 1292(a)(1) over the Attorney General's appeal of the district court's December 26, 2023 order granting a preliminary injunction. 1-ER-66. The Attorney General timely filed his appeal of the district court's order on January 3, 2024. 5-ER-1041.

## STATEMENT OF THE ISSUES

1.      Whether a law that regulates procedures for treatment of specific medical conditions violates the Fourteenth Amendment's equal protection clause.

2.      Whether the tradition of ordered liberty recognizes a right for parents to obtain for their children experimental medical procedures that are prohibited by state law.

3.      Whether a district court may facially enjoin a law when some of its applications do not injure the plaintiffs and are concededly constitutional.

## PERTINENT STATUTES AND REGULATIONS

The pertinent statute is included in an addendum.

3

### STATEMENT OF FACTS AND OF THE CASE

Idaho's Vulnerable Child Protection Act ("VCPA" or the "Act") protects children from "unsettled, developing, in truth still experimental" medical procedures designed to alter their primary and secondary sex characteristics. *L.W.*, 83 F.4th at 488. The Act prohibits medical providers from using these procedures "to alter the appearance of or affirm the child's perception of the child's sex" where that perception does not align with the child's biology. Idaho Code § 18-1506C (3).

## I.     Medicalized Transition Is an Experimental Science.

### A.     Sex, Gender Dysphoria, and Desistance.

Sex is a biological concept. 4-ER-767. As the Endocrine Society notes, sex is "dichotomous"—male and female. 4-ER-767. And it stems "from the unequal expression of sex chromosomal genes," determined at conception. 4-ER-767. Thus, sex is an objective, unchangeable biological characteristic. 4-ER-660–61, 768.

Gender dysphoria is a mental health condition that arises when people experience discordance with their sex. 4-ER-657–58, 769, 872–74. While the diagnostic criteria vary slightly by age, all forms of gender dysphoria feature a "marked incongruence" between the person's biology and felt gender lasting at least 6 months and associated with "clinically significant distress." 4-ER-657–58, 769, 872–74.

In children, feelings of gender incongruence typically resolve over the course of adolescence without medical intervention. 4-ER-662, 773. As the Endocrine Society puts it, a "large majority (about 85%) of prepubertal children with a childhood diagnosis" do not continue to experience dysphoria or incongruence through adolescence. 4-ER-773. The precise age at which the incongruence often ceases is not

4

known. 4-ER-774. But by early adulthood, most dysphoric children naturally become comfortable with their sex. 4-ER-774.

There is no way to predict which child's gender incongruence will naturally cease and which child's will not. 4-ER-775–76. Even the best predictive model available gets it wrong most of the time. 4-ER-776. So uncertainty is an unavoidable feature of treating minors with gender incongruence.

Adding to the uncertainty, the population seeking gender-dysphoria care is growing exponentially. Gender dysphoria diagnoses have skyrocketed among adolescents, increasing by a factor of ten between 2009 and 2016:[1]



Current services

Figure 1: Sex ratio in children and adolescents referred to GIDS in the UK (2009-16)

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|
| Adolescents F | 15 | 48* | 78* | 141* | 221* | 314* | 689* | 1071* |
| Adolescents M | 24 | 44* | 41 | 77* | 120* | 185* | 293* | 426* |
| Children F | 2 | 7 | 12 | 17 | 22 | 36 | 77* | 138* |
| Children M | 10 | 19 | 29 | 30 | 31 | 55* | 103* | 131 |

AFAB = assigned female at birth; AMAB = assigned male at birth
*Indicates p<.05 which shows a significant increase of referrals compared to the previous year
Source: de Graaf NM, Giovanardi G, Zitz C, Carmichael P (2018).[32]

---

[1] Dr. Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People: Interim Report* at 33 (2022), https://cass.independent-review.uk/publications/interim-report/.

Not only that, but the population of those diagnosed with gender dysphoria is changing in sex and age demographics for unknown reasons. Historically, minors presenting with gender incongruence were mostly prepubertal males. 4-ER-748–49, 771. But recently, the "predominant cohort" of presenting minors are adolescent girls with no history of gender issues. 4-ER-748–49. They are driving a worldwide rapid and substantial increase in minors seeking care related to gender dysphoria. 4-ER-728, 734–36, 748–49, 759, 780–81. The reasons for this shift are unknown. 4-ER-780–81. And there are no rigorous studies about how to treat this new population. 4-ER-780–81.

Deepening the uncertainty, more and more adults are "de-transitioning"—ceasing hormones, re-identifying with their sex, and deeply regretting how adolescent transition interventions permanently changed their bodies. 4-ER-694–96. There are no rigorous studies on this group, either. 4-ER-731–32, 757–58, 761–62, 776–77, 798–99. But their stories of ostracism, pain, and lifelong regret—for interventions the medical community assured them were safe and effective—should give any policymaker pause. *See, e.g.* Pamela Paul, *As Kids, They Thought They Were Trans. They No Longer Do.*, N.Y. Times (Feb. 2, 2024), https://bit.ly/3umodsD.

**B.     Substantial Risks and Unproven Benefits of Medical Transition.**

Medicalized transition has three basic components. *First*, puberty-blocking drugs to stop the physiological changes associated with puberty. 4-ER-682–89. *Second*, cross-sex hormones (estrogen for boys, testosterone for girls) to induce physical changes mimicking the secondary sex characteristics of the opposite sex. 4-ER-689. *Third*, surgical procedures to remove or alter physical characteristics of the individual's sex,

6

such as breasts and genitals. 4-ER-693, 878–79, 901. All of these interventions carry substantial risks; none has proven benefits.

**Known Risks**. Some of the interventions' risks are known. For example, a child who begins puberty-blocking drugs at the onset of puberty and then progresses directly to cross-sex hormones—as nearly all of them do—will be infertile. 4-ER-685–86, 811. Puberty-blockers can also cause depression, anxiety, and suicidal ideation. 4-ER-816–17. Dr. Hillary Cass, the pediatrician commissioned by the British government to review medical transition in minors, has noted that these drugs may "make day-to-day functioning more difficult for a child or young person who is already experiencing distress." 4-ER-816.

Cross-sex hormones likewise carry various well-understood risks. "Infertility is frequent" in females who take testosterone. 4-ER-690. And testosterone more than triples women's risk of heart attacks, doubles the risk of strokes, lowers the average age of breast cancer onset by 20 years, and leads to pap smear abnormalities that make diagnosing cervical cancer harder. 4-ER-690–91. Administered to males, estrogen raises the risk of breast cancer, stroke, and potentially fatal thromboembolisms. 4-ER-692.

Likewise, females who undergo a double mastectomy will never breastfeed a child. 4-ER-811. And minors undergoing "gender affirming" mastectomies often require multiple surgeries and experience complications like excessive scarring, pain and swelling, and nipple necrosis. 4-ER-693–94. Genital surgery is sterilizing and irreversible. E. Coleman, et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1 (2023) at S40–41. Even proponents of medicalized transition generally don't recommend surgical interventions

in minors, 4-ER-905, though the district court's injunction here prevents Idaho from regulating them.

**_Emerging Risks._** Some of the most alarming risks need further study. Respected scientists—including those cited by Plaintiffs' experts—note that puberty blockers "may prevent key aspects of [neurological] development during a sensitive period of brain organization." 4-ER-813.

These drugs "could have significant impact on the ability to make complex risk-laden decisions, as well as possible longer-term neuropsychological consequences." 4-ER-812–13. The research to date is too limited to evaluate these neurodevelopmental risks. 4-ER-813–14.

Puberty blockers also prevent increases in bone mineral density that typically occur during puberty. 4-ER-685–87, 814–16. While females appear to experience some (but not complete) rebound in density upon taking cross-sex hormones, males do not. 4-ER-815. The long-term effects of these deficits are unknown, as issues with bone quality tend to emerge later in life. 4-ER-815–16. As the New York Times put it, "[a] full accounting of blockers' risk to bones is not possible." _Id._

The early use of puberty blockers also appears to cause lifelong loss of sexual function in many cases, but systematic research on the issue is lacking. 4-ER-685, 812. A prominent genital surgeon and former WPATH president said that in her experience "really about zero" males who take puberty blockers at the inception of puberty ever experience orgasm. Michael Biggs, _The Dutch Protocol for Juvenile Transsexuals: Origins & Evidence_, 49 J. Sex & Marital Therapy 343, 360 (2023). And she called this a "big problem." 4-ER-812.

Cross-sex hormones, too, carry risks that are not yet well-studied or understood. Plaintiffs' expert admits that we do not know the long-term fertility of adolescents who experienced puberty but then take cross-sex hormones. 3-ER-404; 4-ER-690, 811. And many physical effects of cross-sex hormones cannot be reversed (e.g., voice deepening with testosterone), 4-ER-916–17, so desistence and regret are substantial risks.

**Lack of Proven Benefits**. No proven benefits weigh against these significant risks. In clinical research, the most reliable form of evidence is the systematic review, which uses a published process to comprehensively gather and evaluate the available research on a particular question. 4-ER-739–40. Here, the systematic reviews show there is no proof these interventions are beneficial.

In a systematic review of reviews, a team from Ontario's McMaster University concluded that "there is great uncertainty about the effects of puberty blockers, cross-sex hormones, and surgeries in young people with gender dysphoria." 4-ER-752–53. The evidence is "not sufficient" to support their use. *Id.* Likewise, systematic reviews commissioned by the British government found "little change" in mental health outcomes for children using puberty blockers. 4-ER-757–58. Evidence on the efficacy of puberty blockers and cross-sex hormones was "very low" quality. *Id.* The Swedish government commissioned a systematic review that also found no "reliable scientific evidence" that hormonal interventions were effective. 4-ER-734. The Cochrane Library, a renowned medical organization, published a systematic review on the efficacy of cross-sex hormones and could not find a single study reliable enough to include. 4-ER-753. WPATH's own systematic review on cross-sex hormones found "insufficient

evidence to draw a conclusion about the effect of hormone therapy on death by suicide among transgender people." 4-ER-764.

Equally telling are the organizations that have *not* conducted or used systematic reviews. Although the Endocrine Society published clinical practice guidelines on medicalized transition, it only conducted systematic reviews on bone density and cardiovascular health, not the efficacy or benefits of the interventions. 4-ER-761–62. So too the American Academy of Pediatrics, which published a single-author policy statement not based on a systematic review. 4-ER-766. Same for WPATH: though it conducted a systematic review on the benefits—not risks—of hormonal interventions in *adults*, it asserted that "a systematic review regarding outcomes of [hormonal] treatment in *adolescents* is not possible" because of the lack of evidence. 4-ER-765 (emphasis added).

### C. The International Turn Against Medicalized Transition in Minors.

Over the past several years, many countries and clinics that pioneered medicalized transition procedures for minors have re-evaluated them and found the risks outweigh the benefits. In Sweden, the leading gender clinic recently stopped providing hormonal interventions for children under the age of 16 and limited such interventions to formal research trials for children aged 16 to 18. 4-ER-733–34. The Swedish National Board of Health endorsed this limitation in 2022. 4-ER-698.

In Britain, the government commissioned an independent review of medicalized transition in minors. 4-ER-726. So far, the NHS has concluded that "there is not enough evidence to support" the "safety or clinical effectiveness" of puberty blockers or cross-sex hormones. 4-ER-730. So the NHS, like Sweden, limited their use to formal

clinical trials. 4-ER-730. Indeed, the data from the NHS's own gender clinic—then the largest in the world—showed no improvement in mental health following the use of puberty blockers. 4-ER-668, 802.

The Finnish government also recently restricted access to medicalized transition procedures for minors. They stopped allowing surgical transition procedures altogether. 4-ER-731–32. And they limited puberty blockers and cross-sex hormones to centralized research clinics. 4-ER-731–32.

These developments continue apace. In the last few months, Danish and Finnish researchers have published studies looking at 20+ years of data showing no difference in mental-health outcomes between dysphoric people who did and did not pursue medicalized transition.[2] As this evidence shows, medicalized transition does not improve mental health. The Swedish Board of Health hits the key summary: the "risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits." 4-ER-734.

### D. Plaintiffs' Experts Confirm Uncertainty of Medicalized Transition.

Plaintiffs named three experts supporting their case: Dr. Christine Brady, a psychologist; Dr. Kara Connelly, an endocrinologist, and Dr. Jack Turban, a psychiatrist. All of them work at clinics that provide medicalized transition interventions to minors. 2-ER-98–99, 174–76; 3-ER-472–76; 5-ER-955. And their testimony highlights how much risk and uncertainty medicalized transition entails.

---

[2] Glintborg, et al., *Gender-affirming treatment and mental health diagnoses in Danish transgender persons: a nationwide register-based cohort study*, 189 Eur. J. of Endocrinology 336–45 (2023); Kaltiala, et al., *Have the psychiatric needs of people seeking gender reassignment changes as their numbers increase? A register study in Finland*, 66 Eur. Psy. e93, 1–8 (2023).

To begin with, Plaintiffs' experts can't even agree among themselves if gender identity changes. Drs. Brady and Connelly agree that children who meet the criteria for gender dysphoria may still come to identify with their sex before adulthood. 2-ER-234–35; 3-ER-528. Dr. Brady has treated such patients. 3-ER-624–25. But Dr. Turban holds that gender identity is biologically based and does not change. 2-ER-90.

Likewise, Dr. Connelly agrees that current science cannot predict whether a child will experience such a change. 2-ER-234; 3-ER-422. And Drs. Connelly and Brady agree that the new population of young people—not children—diagnosed as adolescents dominate their own clinics. 2-ER-172–73; 3-ER-472–73. Plus, they agree this new population is largely unstudied. 3-ER-379, 554, 623.

Plaintiffs' experts also admit to serious limitations in the research. Dr. Connelly testified there's not "enough data to draw conclusions about adverse effects on brain development" in children given puberty blockers. 3-ER-359. Dr. Turban agrees that puberty blockers' impact on brain structure is likely to manifest over the long term, and he cannot say what real-world impacts puberty suppression has on cognitive and neural development. 2-ER-119, 121.

Plaintiffs' experts also admit uncertainty concerning the benefits of medicalized transition. Dr. Brady, for example, admits the research does not show a causal relationship between these interventions and mental health improvements. 3-ER-586–88. So does Dr. Turban. He testified that cohort studies—rather than randomized controlled trials, which are unavailable—"can't tell you about whether or not mental health would have improved without the treatment." 2-ER-79–80. And he agreed that the available evidence is "low" or "very low" quality using the well-accepted GRADE

evidence-rating methodology. 2-ER-126. He even agrees with the Swedish Board of Health that "at a group level (i.e., for the group of adolescents with gender dysphoria) as a whole … the risks of puberty blockers and gender-affirming treatment are [sic] likely to outweigh the expected benefits of these treatments." 2-ER-130.

Yet these providers and their clinics continue to promote medicalized transition. They often cite their personal experience, even when it goes against the science. *See, e.g.*, 3-ER-379, 553, 586–88. That's unreliable. Evidence-based medicine "places the unsystematic observations of individual clinicians lowest on the hierarchy" of evidence. 2-ER-279; 4-ER-745. So the district court got it backwards when it placed more weight on the anecdotes of Plaintiffs' experts because they "currently treat adolescents with gender dysphoria." 1-ER-51. Their unsystematic observations are the very "unscientific speculation offered by a genuine scientist" that courts routinely exclude altogether. *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).

Take one example of crediting personal experience over science. Dr. Connelly claimed to see "dramatic improvements" when her patients begin puberty blockers and cross-sex hormones, including "significant" reductions in depression and anxiety. 4-ER-906. But her own clinic's peer-reviewed study—and she's a co-author—showed no statistically significant changes in these mental health outcomes. 2-ER-338–42. To be sure, Dr. Connelly hypothesizes that the results would be different if the study extended over a longer period, but that's pure conjecture. 2-ER-343–44.

Plaintiffs' experts also ignored the evidence that undercut their opinions. Dr. Brady, for example, could not recall reading a single publication from a European health authority, a single systematic review concerning gender dysphoria, or any research

13

disagreeing with her position—even though, as outlined above, it is clear such research exists. 3-ER-648. Likewise, Dr. Connelly could only recall reading one systematic review, but she couldn't say which one. 2-ER-268. And Dr. Turban had not studied the Swedish systematic review because he "did not have time." 2-ER-128. Nor did he cite the British systematic reviews, presumably because they excluded as biased some of the key studies supporting his conclusions. 2-ER-124–28. This is precisely the kind of "[r]esults-driven analysis" and "cherry-picking" that renders an expert unreliable. *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 634 (4th Cir. 2018).

And Plaintiffs' experts have financial and political incentives to promote medicalized transition. They all work at clinics that are paid for these interventions. 2-ER-98–99, 118, 174; 3-ER-472–76; 5-ER-955. As Dr. Connelly admitted, her clinic has referred a minor for vaginoplasty—a genital surgery—despite the Endocrine Society's contrary recommendation. 2-ER-243. And Dr. Turban regularly tweets that Republicans who oppose his political agenda "hate #LGBTQ people," "don't believe in freedom of speech," and are "killing" our country. 2-ER-139–40. He's told news organizations about his "hope" that his newly published research "contribute[s] to ongoing legislative efforts." 2-ER-107–08. And the organizations promulgating the standards of care the district court relied on—organizations like WPATH—likewise stray from the principals of evidence-based medicine to push a medicalized-transition agenda that serves the financial interest of its members. 4-ER-796–97, 825–26.

## II. Idaho Enacts the VCPA to Protect Vulnerable Children.

Faced with dramatic increases in gender-clinic referrals and prescriptions for dangerous interventions, Idaho passed the VCPA. The legislature found that medicalized transition procedures "can cause irreversible physical alterations," such as making "the patient sterile or with lifelong sexual dysfunction." 5-ER-1047. Some of the procedures "mutilate healthy body organs." *Id.*

So the Act prohibits medical providers from prescribing puberty blockers or cross-sex hormones and from performing surgeries to treat gender dysphoria—that is, "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." Idaho Code § 18-1506C (3).

The Act specifically allows medical providers to supply these interventions (1) where medically necessary for other purposes, (2) to deal with complications of medicalized transition procedures, or (3) to address genetic disorders of sexual development. Idaho Code § 18-1506C (4). So a girl with polycystic ovarian syndrome may receive estrogen, and a child with early puberty may receive puberty blockers. The Act only regulates the experimental, dangerous, and ineffective use of these interventions to try to resolve gender dysphoria by making a child's body look more like the opposite sex.

## III. The District Court Enjoins the Act in its Entirety.

Suing through their parents, Plaintiffs are two adolescent boys who identify as female and take estrogen to affirm that identity. 5-ER-939, 943, 947, 950. They do not seek surgery. And they do not seek testosterone to affirm a male gender identity. So

what affects them is the Act's prohibition on "[s]upraphysiological doses of estrogen to a male."[3] Idaho Code § 18-1506C (3)(c)(iii). Yet Plaintiffs sought and received a preliminary injunction prohibiting the Attorney General from "enforcing *any* provision" of the Act against *anyone*. 1-ER-66 (emphasis added).

The district court ruled that Plaintiffs were likely to succeed on their constitutional claims. On equal protection, the court ruled that the Act discriminates based on transgender status and sex, even though it prohibits medicalized transition for anybody, regardless of sex or transgender status. 1-ER-47–49. Applying heightened scrutiny, the court acknowledged the "conflicting evidence regarding the risks and benefits associated with gender-affirming medical care" but still deferred to advocacy organizations' assurances that such care is safe and effective. 1-ER-51–52.

On due process, the court found a broad parental "right to choose a particular medical treatment, in consultation with their healthcare provider, that is generally available and accepted in the medical community." 1-ER-55. The court further ruled that the Act fails strict scrutiny.

Having found that the injunction factors favor Plaintiffs, the court enjoined the entire statute. The court ruled that it would be "administratively burdensome" to fashion a narrower injunction 1-ER-65. And it wanted to avoid "follow-on lawsuits" by other potential plaintiffs. *Id.* This appeal followed.

---

[3] While both plaintiffs attest that they once took puberty blockers, the record does not clarify whether either still takes them. 5-ER-943, 950.

SUMMARY OF ARGUMENT

Plaintiffs' constitutional claims are not likely to succeed. Idaho's law regulates specific medical interventions used for specific medical conditions because the State found them experimental and dangerous based on the best systematic medical evidence available. The Act does not classify based on transgender status or sex, so rational-basis scrutiny applies. After all, precedent dictates that regulating medical procedures that only members of a protected category undergo does not trigger heightened scrutiny absent a showing of "invidious discrimination." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 236 (2022) (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). And there is none here. The scientific evidence and international consensus demonstrate that Idaho has good reason to regulate these procedures. So the Act triggers and easily satisfies rational-basis scrutiny.

The Act satisfies intermediate scrutiny too. The record is chock-full of scientific evidence that these procedures carry substantial risks, unproven benefits, and many unknowns. Regulating them substantially advances the State's interest in protecting vulnerable children. It does not matter that the State allows the same interventions for other purposes; the risk calculus changes depending on which condition the intervention is treating. Nor does it matter that some jurisdictions regulate these interventions differently. Intermediate scrutiny does not demand uniformity or perfection. So the Act does not violate equal protection.

The Act does not violate due process either. Plaintiffs would constitutionalize parental access to any medical intervention that met some undefined level of acceptance in the medical community. But there is no deeply rooted right for parents to access

experimental and dangerous medical interventions, particularly in areas of such uncertainty as here. What's deeply rooted is Idaho's police power to regulate medicine and to protect the public from interventions it considers dangerous. Due process does not require otherwise.

Plaintiffs' inability to show likely success is enough to reverse the preliminary injunction. But the other factors favor Idaho too. Plaintiffs cannot show irreparable harm from interventions the State considers dangerous, particularly without any plaintiff-specific medical evidence of their own. And the equities and public interest also favor enforcing Idaho's child-protection law.

Whatever else may be true, the injunction is substantially overbroad. It enjoins the entire law even though the law has admittedly constitutional applications. And it enjoins applications—like those on surgical procedures—that Plaintiffs don't even have standing to challenge. Plus, it sweeps beyond the named parties even though an order limited to Plaintiffs would accord them complete relief. So the district court's injunction cannot stand.

## STANDARD OF REVIEW

For a preliminary injunction, Plaintiffs must show they will likely succeed on the merits and face irreparable harm without an injunction and the balance of harms and public interest favor them. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

This Court reviews "de novo the legal premises underlying a preliminary injunction." *Fed. Trade Comm'n v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1211 (9th Cir.

2004). The Court "will reverse a preliminary injunction when a district court based its decision on an erroneous legal standard." *Id.* at 1211–12. Where the district court has granted an injunction on a claim that is subject to "any insuperable objection, in point of jurisdiction or merits," this Court may reverse and direct dismissal of the complaint. *See Munaf v. Geren*, 553 U.S. 674, 691 (2008).

Apart from those legal premises, this Court generally reviews the district court's factual findings for clear error, and its injunction grant for abuse of discretion. *Enforma*, 362 F.3d at 1211. But this case involves a variety of "legislative facts"—that is, facts relevant "to legal reasoning and the lawmaking process"—as distinguished from "adjudicative facts" about the specific parties or facts of the case. Fed. R. Evid. 201, Advisory Comm. Notes. Legislative facts include the scientific evidence about the risks, benefits, and unknowns of medicalized transition in minors. *See Lockhart v. McCree*, 476 U.S. 162, 168 n.3 (1986) (characterizing scientific studies as legislative facts). Appellate courts owe no deference to a district court's view of such legislative facts. *Id.*; *Menora v. Ill. High Sch. Ass'n*, 683 F.2d 1030, 1036 (7th Cir. 1982). This is because legislative facts are intertwined with the ultimate question of whether a law is constitutional. *Dunagin v. City of Oxford*, 718 F.2d 738, 748 n.8 (5th Cir. 1983) (en banc). And little deference applies anyway "to a written record like this one and the dueling affidavits that accompany it." *L.W.*, 83 F.4th at 488.

## ARGUMENT

## I.  Plaintiffs Cannot Prove Likely Success on the Merits.

Plaintiffs have not shown any claim that will likely succeed against the VCPA. That requires them to show "that the original fixed meaning of the due process or equal

protection guarantees covers these claims." *L.W.*, 83 F.4th at 471. In turn, it "prompts the question whether the people of this country ever agreed to remove debates of this sort" from "the democratic process," "particularly when 'the States are currently engaged in serious, thoughtful' debates about the issue." *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997)). Text, history, and tradition do not suggest that the Framers placed the regulation of these medical interventions beyond the democratic process—a question that has now led nearly half the states to pass laws like Idaho's.

Both of Plaintiffs' claims are legally defective. Their equal-protection claims fail because the VCPA classifies based on medical procedures, not any protected class, and it easily satisfies the rational basis test that applies to such classifications. The Act also satisfies intermediate scrutiny because regulating experimental and unproven procedures advances the State's interest in protecting vulnerable children. Finally, the Due Process Clause does not recognize as part of history and tradition any right to obtain illegal, experimental medical care for their children. Plaintiffs' claims will not succeed, and this Court should reverse.

### A.     The Act Does Not Violate Equal Protection.

### 1.     The Act triggers and survives rational-basis scrutiny.

The VCPA's regulation of medical procedures comports fully with the Equal Protection Clause. The first question in equal-protection analysis is how the law classifies, and whether it implicates a suspect class. *Hecox v. Little*, 79 F.4th 1009, 1021 (9th Cir. 2023). Absent purposeful discrimination, classification depends on the law's disparate *treatment* among different groups, not on whether the law has a disparate *impact* on a specific group. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979). On its face,

the VCPA classifies based on "specific medical interventions for minors," not on any suspect class. *Eknes-Tucker*, 80 F.4th at 1227. Nor does the VCPA engage in proxy discrimination based on sex or gender identity. *Id.* at 1227–28. That makes it subject to rational-basis review, a standard the law satisfies.

***The VCPA Is a Lawful Health Regulation.*** The VCPA is a lawful exercise of Idaho's police power to regulate the practice of medicine. The law identifies twenty-some different medical procedures with irreversible medical consequences, *see* 5-ER-1047, and it prohibits physicians from performing them on children for one specific indication—to "alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." Idaho Code § 18-1506C (3). The law thus concerns the treatment of gender dysphoria, a specific psychiatric diagnosis defined in the DSM-5 and characterized by "clinically significant" distress from a strong and lasting desire to be the opposite sex. 4-ER-769. The law does not ban all gender-dysphoria treatments or restrict procedures used for other purposes. Instead, it regulates which particular medical procedures can be used to treat gender dysphoria—based on the legislature's evaluation of risks and benefits.

Such a law falls squarely within "the historic police powers of the States." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). The regulation of medicine is "a field which the States have traditionally occupied." *Wyeth v. Levine*, 555 U.S. 555, 565 & n.3 (2009). And states have a deep interest "in protecting the integrity and ethics of the medical profession," *Glucksberg*, 521 U.S. at 731, and in "preserving and promoting the welfare of the child," *Schall v. Martin*, 467 U.S. 253, 263 (1984). That includes "the administration of drugs by health professionals[,]" *Conant v. Walters*, 309 F.3d 629, 639

(9th Cir. 2002), such as the hormone therapies and puberty blockers regulated by the VCPA. And it includes mental health too, since "'health ... includes psychological as well as physical well-being,'" and "is within the state's police power to regulate." *Nat'l Ass'n for Advancement of Psychoanalysis v. California Bd. of Psychology*, 228 F.3d 1043, 1051–52 (9th Cir. 2000) (cleaned up).

These authorities dictate that "health and welfare laws" like the VCPA deserve great deference and "are generally subject only to rational basis review by the courts." *Raidoo v. Moylan*, 75 F.4th 1115, 1121 (9th Cir. 2023). They receive "a strong presumption of validity," *Heller v. Doe*, 509 U.S. 312, 319 (1993), particularly here, where they address areas of "medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). This deference guards against the risk that federal courts will "assume authority over an area of policy that is not theirs to regulate" or "impose a constitutional straightjacket on legislative choices before anyone knows how that 'medical and scientific uncertainty' will play out." *L.W.*, 83 F.4th at 473. For example, the FDA may "permit drugs to be used for some purposes but not others, or to allow some drugs to be used by adults but not by children," and "[n]either doctors, adults, nor their children have a constitutional right to use a drug that the FDA deems unsafe or ineffective." *Id.* (citing *Abigail All. For Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703, 706 (D.C. Cir. 2007) (en banc)). "So long as a federal statute does not stand in the way and so long as an enumerated constitutional guarantee does not apply, the States may regulate or ban medical technologies they deem unsafe." *Id.* at 474 (collecting cases).

This is hardly the first time that states have restricted access to procedures that initially garnered support and later were shown to cause harm. In the last century, Walter Freeman popularized treating certain psychiatric conditions with surgery (i.e., prefrontal lobotomy), a trend that peaked mid-twentieth century. *See* Roland Nadler & Jennifer A. Chandler, *Legal Regulation of Psychosurgery: A Fifty-State Survey*, 39 J. Leg. Med. 335, 338 (2019). But after science and experience revealed their harms, these experimental procedures faced a popular and legal backlash into the 1970s. *See id.* In the wake of that backlash, many states passed laws to restrict the use of lobotomy or psychosurgery more broadly. *See id.* at 375-399. Not only that, but many states specifically restricted psychosurgery for minors—for instance, California "categorically rules out its use on minors," *id.* at 361-62 (citing Cal. Welf. & Inst. Code § 5326.6 (Deering 1976)), and Idaho provides that parental consent to certain procedures for minors "'shall be invalid'" absent a court order. *Id.* at 362 (quoting Idaho Code § 16-2423(3) (2005)).[4] California's psychosurgery regulations faced an equal-protection challenge that an appellate court rejected as "without merit[,]" since this reasonable regulation "of intrusive and possibly hazardous forms of medical treatments is a proper exercise of the state's police power." *Aden v. Younger*, 57 Cal. App. 3d 662, 673 (Ct. App. 1976).

The VCPA and the similar laws in twenty-one other states are no different. They too regulate "intrusive and possibly hazardous forms of medical treatments." *Id.* They impose specific limits for minors to protect "vulnerable individuals from invasive and

---

[4] *See also, e.g.*, Tenn. Comp. R. & Regs. 0940-05-16-.23 (1988) (prohibiting psychosurgery for minors); Alaska Stat. § 47.30.825(g) (2004) (requiring parental consent and court order for psychosurgery on institutionalized persons).

potentially identity-altering procedures." Nadler & Chandler, *supra*, at 337. And "[p]lenty of rational bases exist for these laws." *L.W.*, 83 F.4th at 489. Ample evidence shows "the risks of these treatments and the flaws in existing research" as outlined more fully below, and "no one disputes that these treatments carry risks or that the evidence supporting their use is far from conclusive." *Id.* Idaho's rational regulation of these procedures is fully in accord with the Equal Protection Clause.

**The VCPA Does Not Classify Based on Sex.** Instead of evaluating the VCPA as a typical medical regulation, the district court mistakenly held that it "draws sex-based classifications on its face." 1-ER-47. The district court did so because the VCPA includes a statutory definition of "sex," then regulates specific procedures "when administered 'for the purpose of attempting to alter appearance of or affirm the child's perception of the child's sex if . . . inconsistent with the child's biological sex.'" *Id.* But this misunderstands what a "classification" entails under equal-protection analysis. Whether the law employs a suspect classification depends on whether it would "work[ ] to" anyone's "disadvantage" by imposing any burden the plaintiff "would not bear" if they were not a member of the suspect class. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 723 n.8 (1982) (cleaned up). The VCPA does no such thing—it only refers to "sex" to identify certain procedures with certain risks, and, to the extent they apply to both sexes, it regulates them equally. "Such an across-the-board regulation lacks any of the hallmarks of sex discrimination." *L.W.*, 83 F.4th at 480; *accord Eknes-Tucker*, 80 F.4th at 1227.

Of course such laws "mention the word 'sex'"—given their subject, "how could they not?" *L.W.*, 83 F.4th at 482. Referring to sex directly or indirectly is inevitable for

24

a law regulating procedures for "transition[ing] from one gender to another," But that does not mean that the law classifies based on sex. *Id.* Indeed, even if such a law *subsidized* those procedures rather than others, it would still meet "the same linguistic destiny of describing the biology of the procedures," which necessarily concerns sex. *Id.* But it still would not classify based on sex or trigger intermediate scrutiny.

The Supreme Court reaffirmed this point in *Dobbs*, which evaluated a law that facially referred to "the pregnant woman" when defining the scope of its abortion restriction. *Dobbs*, 597 U.S. at 232 n.14 (quoting *Geduldig*, 417 U.S. at 496 n.20). *See* Miss. Code § 41-41-191 (banning abortions based on unborn child's "gestational age," defined as the age "calculated from the first day of the last menstrual period of the pregnant woman.").

Whether this constituted sex discrimination was disputed: prominent scholars argued as amici that Mississippi's law "enforces a sex-based and coercive classification" by "using language" such as "maternal patient" and "women." Br. of Equal Prot. Const. L. Scholars at 4 & n.5, *Dobbs v. Jackson Women's Health Org.*, No. 19-1392 (S. Ct. Sept. 20, 2021) (citing *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020)). But the Supreme Court rejected that argument: "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny" absent "'invidious discrimination.'" *Dobbs*, 597 U.S. at 236–37 (quoting *Geduldig*, 417 U.S. at 496 n.20). Instead, laws regulating sex-specific medical procedures "are governed by the same standard of review as other health and safety measures." *Id.*

This Court's recent precedents highlight the problem with Plaintiffs' argument. In *Tingley v. Ferguson*, this Court upheld a Washington law regulating a different response

to gender dysphoria: counseling. 47 F.4th 1055, 1065 (9th Cir. 2022). Like the VCPA, the law in *Tingley* also referenced sex in defining the prohibited type of counseling to include "efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex." *Id.* Counsel for Plaintiffs here argued there as amici that the Washington law was a "reasonable medical regulation." Amicus Br. of ACLU, *Tingley v. Ferguson*, No. 21-35815 (9th Cir. Jan. 21, 2022). This Court agreed, applying the lenient *Dobbs* standard for "reasonable 'health and welfare laws.'" *Tingley*, 47 F.4th at 1082 (quoting *Dobbs*, 142 S. Ct. at 2284). But under Plaintiff's theory here, *Tingley* would reach a different result under the Equal Protection Clause. That makes little sense.

The district court's contrary analysis has no limit. As the Sixth Circuit reasoned, "[i]f any reference to sex in a statute dictated heightened review, virtually all abortion laws would require heightened review." *L.W.*, 83 F.4th at 482. But *Dobbs* shows that is not the case. And in addition to applying heightened scrutiny to abortion laws, courts would have to do the same for every regulation governing the propriety, purposes, and coverage of every sex-specific medical procedure—whether prostate cancer treatments, mastectomies, circumcisions, breast enhancements, erectile dysfunction medications, or therapies to improve breast-feeding of newborn babies.

Even individual choices by government-employed doctors would trigger scrutiny. Plaintiffs would make it a constitutional case every time a government doctor recommended a mastectomy. Same for a doctor dosing a drug differently for men and women based on emerging research. *See, e.g.*, Imma Perfetto, *Women Are Not Just Small Men – More Pre-Clinical Research Needed on Sex-Specific Drug Doses*, Cosmos Magazine (Dec.

26

14, 2022), http://bit.ly/3HL016j. These decisions and regulations do not discriminate or classify based on sex because biology, not state legislatures, dictates that only a man can have a vasectomy and only a woman can have a tubal ligation. Similar biological constraints apply to the procedures governed by the VCPA.

Finally, Plaintiffs mistakenly charge the VCPA with unlawful sex stereotyping. But "[p]hysical differences between men and women … are enduring," *United States v. Virginia*, 518 U.S. 515, 533 (1996), and "not a stereotype." *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 68 (2001). In fact, any stereotypes implicated here are inherent to the concept of gender dysphoria, the diagnosis of which turns on stereotypes—for example, whether a male child rejects "typically masculine toys, games, and activities" and avoids "rough-and-tumble play." 4-ER-873. The VCPA "does not further any particular gender stereotype," but rather regulates particular procedures for a diagnosis that turns on those stereotypes. *Eknes-Tucker*, 80 F.4th at 1229. Idaho's exercise of that sovereign prerogative does not invite heightened review.

**The VCPA Does Not Classify Based on Transgender Status.** Plaintiffs' argument that the VCPA classifies based on transgender status is even weaker. The contested holding in *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019), that transgender identity constitutes a quasi-suspect class, *see* Pet. For Reh'g En Banc, *Hecox v. Little*, Nos. 20-35813, 20-35815 (9th Cir. Aug. 31, 2023), does not control here. This case presents nothing like the military policy at issue there. That military policy "[o]n its face … regulate[d] on the basis of transgender status" by stating that, in general, "[t]ransgender persons … are disqualified from military service." *Karnoski*, 926 F.3d at 1201. Here, the VCPA makes no such classification—it does not even mention "transgender" status.

Nor does the VCPA regulate gender dysphoria treatments as a proxy to target transgender people. *Contra* 1-ER-46. Proxy discrimination occurs when the regulated activity—here, medicalized transition in minors—is "an *irrational* object of disfavor" and "an *irrational* surrogate for opposition to" the protected class, such that "an intent to disfavor that class can readily be presumed." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) (emphasis added). Not so here. Idaho has "common and respectable reasons" for regulating these procedures on minors based on their long-term risks and unproven benefits. *Id.* Indeed, European countries regulate these procedures because of these risks, not as a conspiracy to harm transgender persons. In fact, some scientists who identify as transgender—and received medicalized transition as adults—worry about subjecting minors to these procedures.[5]

The poor overlap between transgender people as a class and the regulated procedures further belies any hint of animus. Idaho, for example, does not prohibit medicalized transition in adults because of their increased capacity to provide informed consent. Nor does it prevent minors with gender dysphoria from receiving counseling for a social transition, gender-conforming speech therapy, or any other non-invasive, fully reversible medical intervention. Nor it is the case that every child with gender dysphoria wants or should receive medicalized transition—even Plaintiffs' experts agree with that. *E.g.*, 4-ER-905. And those who want medicalized transition may or may not persist in identifying as transgender; indeed, without intervention, most will not. 4-ER-

---

[5] Anderson, Erica, *Opinion: When it comes to trans youth, we're in danger of losing our way*, San Francisco Examiner (June 16, 2022), https://www.sfexaminer.com/archives/opinion-when-it-comes-to-trans-youth-we-re-in-danger-of-losing-our-way

771–74. So Idaho's law is about protecting a vulnerable population from risky procedures, not targeting transgender people.

Plaintiffs' proxy-discrimination theory finds no help in this Court's precedents. In *Karnoski*, this Court specifically declined to address whether regulations of "gender dysphoria" are so "closely correlated with being transgender" that a regulation related to gender dysphoria "constitutes discrimination against transgender persons." 926 F.3d at 1201 n.18. In *Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022), this Court treated it as an open question whether "disallowing gender reassignment surgery should be treated as discriminating against transgender persons." *Id.* at 114. And most recently, in *Tingley*, this Court upheld a law that purported to restrict counseling for gender dysphoria— not as discrimination against a quasi-suspect class subject to intermediate scrutiny, but as a rational health and welfare regulation. *Tingley*, 47 F.4th at 1082. If Plaintiffs' theory were correct, then *Tingley* applied the wrong standard of review.

Indeed, attempting to equate laws on medical procedures with laws affecting legally protected status would nullify *Dobbs*'s holding that "[t]he regulation of a medical procedure" specific to a protected class "does not trigger heightened constitutional scrutiny" absent "'invidious discrimination.'" *Dobbs*, 597 U.S. at 236–37. As the Sixth Circuit explained, "[w]hat is true for the word 'sex'" under the district court's theory "also would be true for the word 'gender.'" *L.W.*, 83 F.4th at 482. To "restrict[] a specific course of medical treatment that, by the nature of things, only gender nonconforming individuals may receive" does not turn a rational medical regulation into a suspect classification subject to heightened scrutiny. *Eknes-Tucker*, 80 F.4th at 1229. "A state may reasonably conclude that a treatment is safe when used for one

purpose but risky when used for another, especially when, as here, the treatment is being put to a relatively new use." *L.W.*, 83 F.4th at 480. Idaho is entitled to agree with the European scientific authorities that have restricted these procedures without "presumptively violat[ing] the Constitution." *Id.* at 481.

The district court countered that "the classified group (transgender minors) cannot have medical treatments that the similarly situated group (cisgender minors) can," 1-ER-46, such as a child taking puberty blockers as a treatment for precocious or early puberty. But this faulty analogy fails to appreciate what is fundamental to medicine: the propriety of any treatment turns *on its use. See L.W.*, 83 F.4th at 473. Using a mastectomy to treat breast cancer entails different risks and benefits than using it to treat a girl's distress about her sex; consequently, allowing the former treatment while prohibiting the latter cannot be considered a "pretext" for differential treatment based on gender identity. *Contra* 1-ER-50. It is safeguarding the physical wellbeing of all children.

The VCPA, too, is indication-specific. It allows *all* minors to receive these medical procedures for purposes other than treating gender dysphoria. *See* Idaho Code § 18-1506C (4). So any minor, regardless of gender identity, could receive cross-sex hormones to treat congenital conditions like Klinefelter Syndrome or Turner Syndrome, but no minor—regardless of gender identity—can receive them to treat gender dysphoria. *L.W.*, 83 F.4th at 481. "These distinct uses of testosterone and estrogen stem from different diagnoses and seek different results" based on different goals and cost-benefit analyses. *Id.* Two people using the same procedure for two different purposes are not similarly situated.

Plaintiffs blur this distinction, arguing that the VCPA restricts treatments for transgender persons even for the "same conditions" it allows for others: that "a cisgender male adolescent can receive testosterone to affirm his male gender identity, but a transgender male adolescent [i.e., a biological female] cannot." Resp. 5 (citing Mot. 5). Yet a biological male has no reason to take testosterone for that purpose. As Plaintiffs' expert testified, it would be hard to imagine a male saying "[m]y gender identity is more masculine than what I've been assigned," since they would have no distress if their "designated sex and masculinity are part aligned." 3-ER-533–34. Per Dr. Brady, there's no such thing as gender-affirming care to affirm a person's actual sex.

And the risks and benefits differ in these situations. Using pharmaceuticals to disrupt a person's natural biological development is different from using them to support that development. This is a feature of biology, which Idaho's law takes as given and addresses the differing risks that flow from this reality. As a result, the law always treats similarly situated procedures on similarly situated patients the same. Changing the procedure or the patient's medical condition—as Plaintiffs' argument demands—does not trigger heightened review.

### 2.    The Act satisfies intermediate scrutiny.

The VCPA also satisfies intermediate scrutiny, which asks whether the "classification serves important governmental objectives" through means that are "substantially related to the achievement of those objectives." *Miss. Univ. for Women*, 458 U.S. at 724 (cleaned up). "[S]afeguarding the physical and psychological well-being" of minors is an important objective. *New York v. Ferber*, 458 U.S. 747, 756–57 (1982). And

the Act serves that goal by protecting children from "unsettled, developing, in truth still experimental" interventions. *L.W.*, 83 F.4th at 488.

The classification here is the Act's distinction between, on the one hand, using puberty blockers, cross-sex hormones, and surgeries to treat gender dysphoria and, on the other hand, using those interventions to treat other conditions. *Eknes-Tucker*, 80 F.4th at 1234–35 (Brasher, J., concurring) (concluding that, although rational-basis review applied, Alabama's similar law also satisfied intermediate scrutiny). Under intermediate scrutiny, the question is whether Idaho has a "good reason" for "regulating these [interventions] differently when they are used to treat a discordance between an individual's sex and sense of gender identity than when they are used for other purposes." *Id.*

It does. Start with surgical interventions. The Endocrine Society recommends against treating gender dysphoria with genital surgery before the age of 18. 4-ER-905. Yet clinics like Dr. Connelly's allow it anyway, so the State has a clear interest in regulating the practice. 2-ER-243. And there are obvious differences in the risk calculus of removing diseased breasts to treat cancer and removing healthy breasts to help the patient look more masculine. Ample evidence shows that "gender affirming" mastectomies often involve multiple surgeries and post-surgical complications. 4-ER-693–94. They're also irreversible and lack any proven benefits for dysphoric patients, so it makes sense a state would regulate them differently than mastectomies to remove cancer. 4-ER-693–94.

So too for cross-sex hormones. The potentially irreversible effects on fertility are unique to their cross-sex use. Nothing in the record suggests that giving males

testosterone impairs their fertility, but giving females testosterone often does. 4-ER-690. Same for giving estrogen to females versus males. 2-ER-200. And Idaho's expert, Dr. Weiss, detailed how cross-sex use of these hormones creates greater risks for heart attack, stroke, and cancer. 4-ER-690–92. Plus, unlike other uses, taking cross-sex hormones for gender dysphoria lacks any proven benefits. 4-ER-800–09.

Likewise for puberty blockers. Treating a 5-year-old experiencing early puberty with puberty blockers until she's a biologically appropriate age to begin puberty is FDA-approved and well-studied. 4-ER-683–84, 749. Not so for using the same drugs to stop the natural pubertal progression of a dysphoric 14-year-old mid-puberty. 4-ER-684, 748–49, 818. Plaintiffs' own experts admitted there are significant unknowns in how blocking puberty at its normal age affects brain development. 2-ER-119, 121; 3-ER-359, 387. And again, there is no reliable evidence that puberty blockers improve the distress associated with gender dysphoria. 4-ER-734, 751–52, 759, 764. So regulating that use—while allowing an FDA-approved use like treating early puberty—makes perfect sense.

The district court committed three legal errors in ruling otherwise. *First*, it held that Idaho's interest in protecting vulnerable children was "pretextual" because the Act allows the regulated interventions "for other purposes." 1-ER-50. But as noted, the regulated interventions have a radically different risk profile when used for gender dysphoria versus some other condition. The district court would require Idaho to regulate the removal of cancerous testicles the same as it regulates removing healthy testicles to feminize a male's appearance. That's nonsensical. *See Minority Television Project, Inc. v. F.C.C.*, 736 F.3d 1192, 1208 (9th Cir. 2013) (rejecting under-inclusivity challenge

33

because the unregulated activity "would not pose the same risk to" state's interest as the regulated activity).

What's more, "a law need not deal perfectly and fully with an identified problem" to satisfy intermediate scrutiny. *Contest Promotions, LLC v. City & Cnty. of S.F.*, 874 F.3d 597, 604 (9th Cir. 2017); *see also Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 435 (2015) (warning that the "[t]he State should not be punished for leaving open more, rather than fewer, avenues of expression"). So Idaho does not have to regulate every use of every medical procedure that, for example, impairs fertility the same way. Moreover, even if a medical procedure involves risk of impaired fertility, its probable benefit may outweigh those risks—which is not the case with medicalized transition.

*Second*, the court lumped together multiple different interventions—puberty blockers, estrogen, testosterone, and many surgeries—and treated them all the same. 1-ER-51–52. Since "heightened scrutiny is an extremely fact-bound test," the court should have considered the facts about each regulated intervention. *Hecox*, 79 F.4th at 1028. That is how this Court applies heightened scrutiny: it evaluates the means-end fit of each challenged provision separately. *See, e.g., Coyote Publ'g, Inc. v. Miller*, 598 F.3d 592, 609–10 (9th Cir. 2010) (separately analyzing two challenged brothel advertising regulations under intermediate scrutiny). Failing to do so here was error.

*Third*, the district court erroneously required a perfect means-end fit instead of a substantial one. Although the court acknowledged the "conflicting evidence regarding the risks and benefits associated with gender-affirming medical care," the court condemned the VCPA under heightened scrutiny because the interventions are purportedly "helpful" for "some" people. 1-ER-51.

That's not the test. The VCPA does not have to "be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70. Nor need it be "drawn as precisely as it might have been." *Michael M. v. Super. Ct. of Sonoma Cnty.*, 450 U.S. 464, 473 (1981) (plurality op.). Heightened scrutiny does *not* ask if "the state could achieve its objective with some lesser restriction." *See Eknes-Tucker*, 80 F.4th at 1235-36 (Brasher, J., concurring) (determining that Alabama's similar law would likely survive heightened scrutiny). It is enough that "the means adopted … are in substantial furtherance of important governmental objectives." *Nguyen*, 533 U.S. at 70; *accord Califano v. Jobst*, 434 U.S. 47, 55 (1977) ("[B]road legislative classification must be judged by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples.").

Here, they are. Faced with evidence that medicalized transition "carries potentially uncertain risks" and no proven benefits, the Act reasonably "regulat[es] the use of puberty blockers and hormones for [gender dysphoria] but not for other uses." *Eknes-Tucker*, 80 F.4th at 1235 (Brasher, J., concurring).

It's irrelevant that some jurisdictions do otherwise. The district court cited European jurisdictions that have limited hormonal interventions to research trials as evidence of less restrictive approaches. 1-ER-53. For one thing, this approach is barely less restrictive than Idaho's: there's no evidence that anyone in Idaho is conducting research trials on these interventions, nor do Plaintiffs claim to be enrolled in any. Nor is there evidence in the record that any of the European countries with these restrictions are actually conducting any controlled research. For another thing, the existence of alternatives—even those that courts may regard as "wiser alternatives"—"does not

serve to invalidate the policy here since it is substantially related to the goal." *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1132 (9th Cir. 1982).

Under intermediate scrutiny, a state may rely on scientific evidence that "fairly support[s]" the "rationale" for its law, and courts should defer to its interpretation of that evidence. *City of Los Angeles v. Almeda Books, Inc.*, 525 U.S. 425, 438 (2002); *accord World Wide Video of Wash., Inc. v. City of Spokane*, 368 F.3d 1186, 1197 (9th Cir. 2004) (deferring to city's interpretation of scientific evidence). And a state may choose among conflicting evidence. *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 581–82 (9th Cir. 2014) (allowing regulation based on conflicting evidence). Especially in this area of "medical and scientific uncertainty," a state enjoys "wide discretion" to make policy choices. *Gonzales*, 550 U.S. at 163.

That's what Idaho did here. It relied on systematic reviews from around the world showing that medicalized transition carries substantial risks and unproven benefits. Even Dr. Turban doesn't object to the Swedish Board of Health's conclusion that the risks of these interventions generally outweigh their benefits. 2-ER-129–30.Because the "principles of federalism … have left states as the primary regulators of professional conduct," state legislatures, not courts, are the appropriate policymakers in the face of conflicting and developing scientific evidence. *Conant*, 309 F.3d at 639.

## B.    The Act Does Not Violate Substantive Due Process.

Plaintiffs' second theory of relief—a substantive due process right—is equally flawed. For this, Plaintiffs must show a right that is "fundamental" or "deeply rooted in this Nation's history and tradition." *Glucksberg*, 521 U.S. at 720–21. But this Court has already rejected the notion that patients have "a constitutional right to obtain a

particular type of treatment or to obtain treatment from a particular provider if the government has reasonably prohibited that type of treatment or provider." *Nat'l Ass'n for Advancement of Psychoanalysis*, 228 F.3d at 1050. Recharacterizing those claims as a parental right to those procedures is no help, since "[a] parent's right to make decisions for a child does not sweep more broadly than an adult's right to make decisions for herself." *L.W.*, 83 F.4th at 475; *accord Abigail Alliance*, 495 F.3d at 703, 706. And quite plainly, there is no right to the procedures prohibited by the VCPA that is "'deeply rooted' in our nation's history," since these means of treating "the discordance between an individual's biological sex and sense of gender identity did not occur until well into the twentieth century." *Eknes-Tucker*, 80 F.4th at 1221.

The State's police power to regulate medical practice undercuts Plaintiffs' claimed universal parental right to access any medical care. "It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone," as "a vital part of [its] police power." *Barsky v. Bd. of Regents of Univ. of N.Y.*, 347 U.S. 442, 449 (1954). Further, "[i]t is, of course, well settled that the State has broad police powers in regulating the administration of drugs by the health professions." *Whalen v. Roe*, 429 U.S. 589, 603 n.30 (1977). Even in the context of gender-dysphoria treatments, this Court has held that "a patient does not have a constitutional right to obtain a particular type of treatment or to obtain treatment from a particular provider if the government has reasonably prohibited that type of treatment or provider." *Pickup v. Brown*, 740 F.3d 1208, 1236 (9th Cir. 2014) (quoting *Mitchell v. Clayton*, 995 F.2d 772, 775 (7th Cir. 1993)), *abrogated on other grounds by Nat'l Inst. of Fam.*

*& Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018). That is fatal to Plaintiffs' due-process theory.

Still, the district court found this right anyway by framing it as a right "to make decision[s] concerning the care, custody, and control of their children, specifically … a parent's right to seek and follow medical advice to protect the health and wellbeing of their minor children." 1-ER-55 (quotation omitted). But this Court has rejected such a broad framing of purported substantive due-process rights. *Raich v. Gonzales*, 500 F.3d 850, 864-66 (9th Cir. 2007) (framing right as one to "use marijuana to preserve bodily integrity" rather than a general right to preserve bodily integrity). Surely, parents can make decisions about their children's health by selecting among *lawful* options—e.g., whether to administer antibiotics for an infection or whether to institutionalize a child. *Parham v. J.R.*, 442 U.S. 584, 602 (1979). But illegal medical decisions do not become constitutionally protected simply because parents want them for their child or received someone's "medical advice" to do so.

The district court said this holding was necessary to protect parental rights to various "medical innovations," like "noninvasive fetal heart monitoring, penicillin, insulin, organ transplants, the polio vaccine, corrective heart surgery," and others. 1-ER-61. But it cited no situation where any government ever banned those therapies for parents or their children and a court responded by allowing parents to override those laws and choose those therapies for their children. And far more troubling is the alternative: where parents would have a constitutional right to obtain dangerous treatments for their children that they could not receive for themselves. So *Raich* would come out the other way—in favor of a due-process right to medical marijuana—if a

parent sought the intervention for a child instead of for herself. That can't be right. The rightful limit of parental authority cabins it to governing decisions about one's children, not decisions about the legitimate practice of medicine.

To dodge this parade of horribles, the district court tried to limit its logic on the ground that "[t]he American medical establishment overwhelmingly supports the gender-affirming medical care HB 71 bans." 1-ER-58. But the court never explained why anecdotal and objectively unreliable American medical opinion counts more than systematic-research-based European opinion, much less articulated a constitutional principle to identify the relevant medical consensus and the relevant timing for that consensus. After all, scientific groups have often changed their views over time, and that includes the American Medical Association. (On this point, hormone replacement therapy for postmenopausal women, the push for prescribing opioids for pain management, and promoting smoking via ads in the Journal of the American Medical Association all come to mind.) Enshrining one group's contested judgment into the Fourteenth Amendment makes little sense—especially where, as here, the procedures are novel and the science is quickly evolving.

For these reasons, the political support of particular medical associations has never been relevant to what history and tradition recognize as a due process right. The contrary view would divest the people's legislative power to regulate medicine and hand it to unelected (and sometimes biased) private associations. To defer to these advocacy organizations would eliminate states' ability to regulate "in areas where there is medical and scientific uncertainty." *Gonzales*, 550 U.S. at 163 (cleaned up). It would strip away states' "authority to regulate the healthcare industry whenever the subject of

regulation—the medical profession and drug companies—found such regulation unnecessary." *L.W.*, 83 F.4th at 478. "[E]xpert consensus, whether in the medical profession or elsewhere, is not the North Star of substantive due process, lest judges become spectators rather than referees in construing our Constitution." *Id.* at 479. Especially not where these advocacy groups have a strong monetary incentive to continue to resist the findings of the European countries "that pioneered these treatments" but "now express caution about them and have pulled back on their use." *Id.* at 477.

Scores of medical organizations supported an abortion right in *Dobbs*, but the Supreme Court rejected it. Similarly, professional associations told the Supreme Court that repeat child abuse was not enough to justify civil commitment because pedophilia recidivism rates were "seemingly all below 50%," Br. of Am. Psychiatric Assoc., *Kansas v. Hendricks*, 95-1649, 1996 WL 469200 (U.S. Aug. 16, 1996), yet the Supreme Court rejected their position. *Kansas v. Hendricks*, 521 U.S. 346 (1997). And various medical groups supported a right to physician-assisted suicide in *Glucksberg* "as a product of the patient's knowing and intelligent choice." Amicus Br. of ACA at 23-24, *Washington v. Glucksberg*, 1996 WL 708960, 22-24 (U.S. 1996). But again, the Supreme Court rejected any such due process right as without support in history and tradition. *Glucksberg*, 521 U.S. at 720–21. Here too, this Court should uphold the State's authority to regulate the practice of medicine and vacate the district court's injunction.

## II.   The Other Injunction Factors Favor the Attorney General.

Because Plaintiffs' claims fail on the law, they are not entitled to a preliminary injunction, and this Court "need not consider" the other preliminary-injunction factors.

*Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (cleaned up). But the remaining factors also weigh in Idaho's favor.

***Irreparable Harm***. Plaintiffs cannot show irreparable harm from losing access to interventions for which the "risks … currently outweigh the possible benefits." 4-ER-734. To be sure, Plaintiffs self-report that they are on estrogen and fear losing access to it. 5-ER-943, 952. More than that, Plaintiffs have submitted no medical evidence specific to them showing that the Act will cause them irreparable harm, which is fatal to their case under *Doe v. Snyder*. There, a female teenager claimed irreparable harm from Arizona's law denying Medicaid coverage for mastectomies to masculinize a female's appearance. 28 F.4th at 106. Like Plaintiffs here, the *Doe* plaintiff provided no evidence from a treating physician or psychologist. *Id.* at 113. Instead, like Plaintiffs, the *Doe* plaintiff cited an expert who "had not met or examined Doe." *Id.* This Court ruled that wasn't sufficient and affirmed the denial of a preliminary injunction. *Id.* at 113 (cleaned up). Under this Court's decision in *Doe*, Plaintiffs have not shown irreparable harm.

***Balance of Equities / Public Interest***. Since Plaintiffs show only speculative harm, the balance of equities does not favor them, much less "tip[ ] sharply towards" them to justify an injunction. *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Against Plaintiffs' speculation stands Idaho's interest in enforcing "its duly enacted [laws]," the denial of which "inflicts irreparable harm on" the State. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). That interest is particularly acute because the law protects vulnerable children from experimental and dangerous medical interventions. And since it is not "obvious" that the VCPA is unconstitutional—quite the contrary—deferring to the "responsible public officials" who enacted it serves the

public interest. *Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*, 512 F.3d 1112, 1127 (9th Cir. 2008). These interests easily tip the balance of equities in Idaho's favor, which merges with the public interest here. *Drakes Bay*, 747 F.3d at 1092.

## III. The Injunction Is Overbroad.

The district court's injunction grants facial relief—enjoining the VCPA's every application—without the necessary finding that "no set of circumstances exists under which the [challenged law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Not even Plaintiffs' experts contend that surgical and hormonal interventions are *always* appropriate; they concede that such interventions are "not indicated" for many individuals who receive treatment from them. 4-ER-905. And the Endocrine Society agrees that "genital surgery is not recommended to patients under age 18." *Id.* Nor are any interventions appropriate for pre-pubertal children. 4-ER-901. So there are many concededly constitutional applications of the VCPA.

Nor are these obviously constitutional applications academic. Dr. Connelly admits that her clinic has referred a minor patient for genital surgery despite Endocrine Society guidelines to the contrary. 2-ER-243. And the district court made no factual findings specific to genital surgery. Yet it enjoined the VCPA's application to those surgeries anyway. The same is true for each of the specific interventions the Act regulates, as the district court evaluated none of the interventions individually. So the district court erred with its facial injunction.

Further, Plaintiffs lack standing to challenge the VCPA's prohibition of testosterone prescribed to females, Idaho Code § 18-1506C(3)(c)(ii), and surgeries, Idaho Code §§ 18-1506C (3)(a), (b), (d), as they seek neither. Plaintiffs must satisfy the

42

standing requirements—injury-in-fact, causation, and redressability—"for each of the provisions [they] wish[] to challenge." *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 892 (9th Cir. 2007). But since Plaintiffs don't seek testosterone or surgery, regulating those procedures does not injure them. *Id.* (holding company lacked standing to challenge regulations it would not violate). So Plaintiffs cannot challenge these provisions, and the district court lacked jurisdiction to enjoin them.

Nor should the injunction have reached beyond Plaintiffs. Without class certification, injunctions should "apply only to the individual plaintiffs." *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983). "Where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown." *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987). An injunction applying only to Plaintiffs and covering only the sought-after interventions would fully address their alleged injury.

The district court tried to justify its sweeping injunction on three grounds. *First*, the court said it would be "administratively burdensome" to craft a narrower injunction that would preserve Plaintiffs' anonymity. The court cited nothing saying that administrative concerns may overcome Article III's limits. Nor are these concerns valid. As the Attorney General argued below, the court could have given Plaintiffs a sealed court order to show to their doctors, who are themselves bound by HIPAA and medical ethics requiring confidentiality. 5-ER-1037. Idaho is aware of no decision using two individuals' need for pseudonyms to justify a facial injunction that affects every adolescent in the state.

*Second*, the district court issued a sweeping injunction to avoid "follow-on lawsuits by similarly situated plaintiffs." 1-ER-65. But again, the court did not explain

how this administrative concern trumps Article III or *Salerno*, and Idaho is aware of no cases holding that it does.

*Third*, the district court cited *Hecox* and *John Doe No. 1 v. Reed*, 561 U.S. 186 (2010), for the proposition that state-wide injunctions are permissible. But *Hecox* doesn't help. There, this Court concluded that Idaho's sports law discriminated against women and was "unconstitutional as applied to all women." 79 F.4th at 1027, 1037. While Idaho disagrees on both counts, *Hecox* based its injunction on these quasi-facial findings. *Id.* at 1037–38 & n.22.

No such breadth is at issue here. The VCPA regulates many distinct medical interventions that Plaintiffs' own experts agree should not be available to all who seek them, most of which do not affect Plaintiffs at all. So the district court did not and could not define a class, such as "all women," for whom there are no constitutional applications of the law.

The district court's citation to *Reed* is even less helpful. That case involved a First Amendment challenge to a law allowing a state to disclose publicly the names of people who signed electoral petitions. 561 U.S. at 192. But First Amendment cases present "doctrinal complexities about the scope of relief" not applicable to a case like this. *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 (2023) (Statement of Kavanaugh, J.). Moreover, though allowing the plaintiffs to "reach beyond" their specific circumstances and challenge the public disclosure of all referendum petitions, the Court required the plaintiffs to "satisfy our standards for a facial challenge to the extent of that reach." *Reed*, 561 U.S. at 194. That's the very thing Plaintiffs cannot do here, as there are plainly

constitutional applications of the VCPA. So any injunction should have been limited to Plaintiffs and the particular interventions they seek.

## CONCLUSION

This Court should vacate the district court's preliminary injunction and direct that Plaintiffs' complaint be dismissed. Alternatively, this Court should narrow the injunction to apply only to Plaintiffs and their ability to receive the specific interventions they seek, not to non-parties at all, much less to procedures Plaintiffs do not seek.

Dated: February 6, 2024

Respectfully submitted,

RAÚL R. LABRADOR
ATTORNEY GENERAL

/s/ Alan M. Hurst

ALAN M. HURST
SOLICITOR GENERAL

JOHN J. BURSCH
LINCOLN DAVIS WILSON
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
lwilson@ADFlegal.org

JOSHUA N. TURNER
CHIEF OF CONSTITUTIONAL
LITIGATION AND POLICY

JAMES E. M. CRAIG
CHIEF, CIVIL LITIGATION AND
CONSTITUTIONAL DEFENSE
OFFICE OF IDAHO
ATTORNEY GENERAL
700 W. Jefferson St., Suite 210
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
josh.turner@ag.idaho.gov
james.craig@ag.idaho.gov

DAVID H. THOMPSON
BRIAN W. BARNES
JOHN D. RAMER
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
202-220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

JONATHAN A. SCRUGGS
HENRY W. FRAMPTON, IV
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

*Counsel for Appellant Raúl R. Labrador*

## STATEMENT OF RELATED CASES

Under Ninth Circuit Rule 28-2.6, Appellants state they know of no cases related to the above-captioned appeal.

/s/ *Alan M. Hurst*
Alan M. Hurst
Counsel for Appellant

February 6, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2024, I electronically filed the foregoing Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Alan M. Hurst*
Alan M. Hurst
Counsel for Appellant

February 6, 2024

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

9th Circuit Case No.:    24-142

I am the attorney representing Appellant.

**This brief contains 11,876 words,** including 111 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

*/s/ Alan M. Hurst*
Alan M. Hurst
Counsel for Appellant

February 6, 2024

ADDENDUM

**Idaho Code 18-1506C – Vulnerable Child Protection**

(1) This section shall be known and may be cited as the "Vulnerable Child Protection Act."

(2) As used in this section:

(a) "Child" means any person under eighteen (18) years of age; and

(b) "Sex" means the immutable biological and physiological characteristics, specifically the chromosomes and internal and external reproductive anatomy, genetically determined at conception and generally recognizable at birth, that define an individual as male or female.

(3) A medical provider shall not engage in any of the following practices upon a child for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex:

(a) Performing surgeries that sterilize or mutilate, or artificially construct tissue with the appearance of genitalia that differs from the child's biological sex, including castration, vasectomy, hysterectomy, oophorectomy, metoidioplasty, orchiectomy, penectomy, phalloplasty, clitoroplasty, vaginoplasty, vulvoplasty, ovariectomy, or reconstruction of the fixed part of the urethra with or without metoidioplasty, phalloplasty, scrotoplasty, or the implantation of erection or testicular prostheses;

(b) Performing a mastectomy;

50

(c) Administering or supplying the following medications that induce profound morphologic changes in the genitals of a child or induce transient or permanent infertility:

(i) Puberty-blocking medication to stop or delay normal puberty;

(ii) Supraphysiological doses of testosterone to a female; or

(iii) Supraphysiological doses of estrogen to a male; or

(d) Removing any otherwise healthy or nondiseased body part or tissue.

(4) A surgical operation or medical intervention shall not be a violation of this section if the operation or intervention is:

(a) Necessary to the health of the person on whom it is performed and is performed by a person licensed in the place of its performance as a medical practitioner, except that a surgical operation or medical intervention is never necessary to the health of the child on whom it is performed if it is for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex;

(b) For the treatment of any infection, injury, disease, or disorder that has been caused or exacerbated by the performance of gender transition procedures, whether or not the procedures were performed in accordance with state and federal law; or

(c) Performed in accordance with the good faith medical decision of a parent or guardian of a child born with a medically verifiable genetic disorder of sex development, including:

51

(i) A child with external biological sex characteristics that are ambiguous and irresolvable, such as a child born having 46, XX chromosomes with virilization, 46, XY chromosomes with undervirilization, or with both ovarian and testicular tissue; or

(ii) When a physician has otherwise diagnosed a disorder of sexual development in which the physician has determined through genetic testing that the child does not have the normal sex chromosome structure, sex steroid hormone production, or sex steroid hormone action for a male or female.

(5) Any medical professional convicted of a violation of this section shall be guilty of a felony and shall be imprisoned in the state prison for a term of not more than ten (10) years.

(6) The provisions of this act are hereby declared to be severable, and if any provision of this act or the application of such provision to any person or circumstance is declared invalid for any reason, such declaration shall not affect the validity of the remaining portions of this section.