APPEAL NO. 24-142

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAM POE, by and through her parents and next friends Penny and Peter Poe, et al.,

*Plaintiffs-Appellees,*

v.

RAÚL LABRADOR, in official capacity as Attorney General of the State of Idaho, et al.,

*Defendants-Appellants,*

and

JAN M. BENNETTS, in official capacity as Ada County Prosecuting Attorney, et al.

*Defendants.*

On Appeal from the United States District Court
for the District of Idaho / Case No. 1:23-cv-00269-BLW

# EXCERPTS OF RECORD OF APPELLANTS
# VOLUME 1 of 5

RAÚL R. LABRADOR
ATTORNEY GENERAL

ALAN M. HURST
Solicitor General

JOSHUA N. TURNER
Chief, Constitutional
Litigation and Policy

JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense
OFFICE OF IDAHO
ATTORNEY GENERAL
700 W. Jefferson St.
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
josh.turner@ag.idaho.gov
james.craig@ag.idaho.gov

JOHN J. BURSCH
LINCOLN DAVIS WILSON
ALLIANCE DEFENDING
FREEDOM
440 First Street, NW,
Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
lwilson@ADFlegal.org

JONATHAN A. SCRUGGS
HENRY W. FRAMPTON, IV
ALLIANCE DEFENDING
FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

DAVID H. THOMPSON
BRIAN W. BARNES
JOHN D. RAMER
COOPER & KIRK, PLLC
1523 New Hampshire
Avenue, NW
Washington, DC 20036
202-220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Appellants*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PAM POE, by and through her parents and next friends, Penny and Peter Poe; PENNY POE; PETER POE; JANE DOE, by and through her parents and next friends, Joan and John Doe; JOAN DOE, and JOHN DOE,<br><br>　　　Plaintiffs,<br><br>　　v.<br><br>RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho *et al.*<br><br>　　　Defendants. | Case No. 1:23-cv-00269-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Before the Court is Defendant Attorney General Raúl Labrador's Motion for Stay of Injunction Pending Appeal (Dkt. 80). The motion was filed as an emergency motion, with limited time for briefing and consideration.[1] For the reasons explained below, the Court will deny the motion.

---

[1] The motion was filed on January 3, 2024; it ripened on January 12, 2024; and the Attorney General asked for a decision within two weeks of filing the motion, or by January 17, 2024.

MEMORANDUM DECISION AND ORDER - 1

ER-002

## BACKGROUND

On December 26, 2023, the Court denied Attorney General Labrador's and Ada County Prosecuting Attorney Jan Bennetts' motions to dismiss this lawsuit. On the same date, the Court granted plaintiffs' motion for a preliminary injunction. The injunction prevents the Attorney General and the Ada County Prosecutor from enforcing any provision of Idaho's Vulnerable Child Protection Act during the pendency of this lawsuit. Shortly after the Court issued its order, the Attorney General appealed this Court's decision and filed an emergency motion asking the Court to stay its preliminary injunction during the pendency of this appeal.

## DISCUSSION

Granting a stay is "an exercise of judicial discretion" that is "dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433, (2009). In exercising its discretion, the Court considers four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id*. at 434 (*citing Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). But "if the petition has not made a certain threshold showing regarding irreparable harm then a stay may not issue, regardless of the petitioner's proof regarding the other stay factors." *Doe v. Trump*, 957 F.3d

1050, 1058 (9th Cir. 2020) (cleaned up) (internal citation omitted). The moving

party bears the burden of showing that the circumstances justify an exercise of the

court's discretion. *Nken*, 556 U.S. at 434.

## 1.    Claimed Injuries

The Court will begin with the second and third factors, which deal with the

injuries that will be suffered if the Court stays its injunction. The Attorney General

says he will suffer irreparable harm in the absence of a stay for two reasons. First,

he says the loss of his Eleventh Amendment immunity works an irreparable injury

upon him. Second, he argues that the State of Idaho will be irreparably injured by

virtue of the fact that a federal court has enjoined the enforcement of a duly

enacted state law. The Court is not persuaded by either argument.

### A. The Attorney General's Immunity Argument

As for the immunity argument, the Attorney General contends that the Court

erred when it concluded that *Planned Parenthood of Idaho, Inc. v. Wasden*, 376

F.3d 908, 919 (9th Cir. 2004) forecloses his claim of immunity. Before addressing

this asserted error, the Court will reproduce the relevant portion of its earlier

decision here, to ground the discussion:

The starting point for the analysis is Idaho Code § 67-1401, which

empowers Idaho's attorney general to "assist" county prosecutors. It

provides: "When required by public service, [the attorney general has

a duty] to repair to any county in the state and assist the prosecuting

attorney thereof in the discharge of duties." Idaho Code § 67-1401(7).

Idaho caselaw construing this statute has clarified that, while the

attorney general may "assist" county prosecutors in a "collaborative

effort," he may not assert "dominion and control" over prosecutions

against the county prosecutor's wishes. *Newman v. Lance*, 922 P.2d

395, 399–401 (Idaho 1996). Otherwise, unless the county prosecutor

objects, the attorney general is empowered to "do every act that the

county attorney can perform" in rendering assistance. *Id.* at 399. In

*Wasden*, the Ninth Circuit summarized the Idaho attorney general's

powers as follows: "the attorney general in effect may deputize

himself . . . to stand in the role of a county prosecutor, and in that role

exercise the same power to enforce the statute the prosecutor would

have." *Id*. Given these "assistance powers," *Wasden* concluded that

plaintiffs had demonstrated the "causal connection" and

"redressability" elements for purposes of standing and also

demonstrated that Idaho's attorney general was a proper defendant

under an *Ex Parte Young* theory. *Id*.

*Dec. 26, 2023 Mem. Decision & Order,* Dkt. 78, at 28. In rejecting the Attorney

General's claim of immunity, the Court went on to note that nothing has changed

since the Ninth Circuit's 2004 decision in *Wasden. Id.* at 27.

In seeking to stay the injunction, the Attorney General doesn't meaningfully engage with *Wasden.* Instead, he points out that the Idaho legislature did not explicitly provide him with enforcement powers when it enacted the Vulnerable Child Protection Act (HB 71). But that argument ignores the enforcement powers that were already in place, by virtue of Idaho Code § 67-1401. *Wasden* relied on that statutory grant of power in deciding that the Attorney General was suable under an *Ex Parte Young* theory. *See* 376 F.3d at 919-920. Thus, the Court is not persuaded that it erred by relying on *Wasden.*

The Attorney General also points to a recent Idaho state trial court decision, *Adkins v. Idaho*, No. CV01-23-14744, Mem. Decision & Order, at 11 (Idaho Fourth Judicial Dist. Dec. 29, 2023), to support his argument that the Court erred. In *Adkins,* the plaintiffs challenged Idaho's criminal abortion laws, naming four defendants: (1) the State of Idaho; (2) Idaho's governor; (3) Idaho's attorney general; and (4) the Idaho Board of Medicine. The *Adkins* Court granted the Attorney General's motion to dismiss in that case, albeit with leave to amend as to one claim. *Adkins* is not binding. Moreover, as a state tribunal, *Adkins* was not called upon to wrestle with the Eleventh Amendment or the *Ex Parte Young* exception. Rather, that court granted the Attorney General's motion to dismiss after concluding that he was a redundant defendant, given that the State of Idaho

MEMORANDUM DECISION AND ORDER - 5

was also a defendant. In reaching its conclusion, *Adkins* noted that Idaho's Attorney General had only "secondary enforcement authority" with respect to the challenged statute. *Id.* at 21. Critically though, and as already noted, *Adkins* did not have to determine whether the Attorney General's enforcement authority satisfied the "modest [connection] requirement" under *Ex Parte Young. See Mecinas v. Hobbs*, 30 F.4th 890, 903 (9th Cir. 2022). Under *Wasden*, and in light of the Idaho Attorney General's statutory "assistance" powers, he qualifies as a proper defendant.

Finally, the Court has previously observed that the Attorney General's loss of Eleventh Amendment immunity might offer some support for an argument that the *proceedings* should be stayed, but loss of immunity does not amount to the sort of irreparable harm necessary to show an *injunction* should be stayed pending appeal. *See Planned Parenthood v. Labrador,* No. 1:23-cv-142-BLW, 2023 WL 5237613, * 2 (D. Idaho Aug. 15, 2023).

**B. Idaho's Claimed Injury**

The Attorney General next argues that the State of Idaho will be irreparably injured by the preliminary injunction order because the injunction will thwart the will of the Idaho legislature. But, for all the reasons discussed in its previous order, the Court has concluded that Idaho's Vulnerable Child Protection Act is

unconstitutional. The State is not harmed when a federal court enjoins an

unconstitutional law. *See Latta v. Otter*, 771 F.3d 496, 500, n.1 (9th Cir. 2014).

### C. Plaintiffs' Claimed Injury

As for plaintiffs' alleged injuries, this Court has already determined they

will suffer irreparable harm in the absence of preliminary relief. *See Dec. 26, 2023*

*Order*, Dkt. 78, at 49-50. Staying that relief would, in turn, place the plaintiffs in

the same position they were in before that determination, subjecting them to the

same likelihood of harm. The Attorney General does not present any new

arguments or facts in his motion that would cause the Court to change its mind.

### 2.    Likelihood of Success on the Merits

This Court has also previously decided, after an extensive round of briefing

and a hearing, that plaintiffs are likely to succeed on the merits of the equal-

protection and due-process claims. In seeking to stay the injunction, the Attorney

General says the Court erred in its earlier decision because it "ignored the U.S.

Supreme Court's reluctance to constitutionalize areas in which 'the States are

currently engaged in serious, thoughtful examinations.'" *Mtn Mem.*, Dkt, 80-1, at

8. In particular, the Attorney General focuses on the fact that in granting the

preliminary injunction, the Court acknowledged the "conflicting evidence

regarding the risks and benefits associated with gender-affirming medical care."

*Dec. 26, 2023 Order,* Dkt. 78, at 39 (quoted, in part, in the AG's Motion Memo, Dkt. 80-1, at 8, 9).

### A. Conflicting Evidence

The Court is not persuaded by this argument. The Court acknowledged the conflicting evidence in the context of determining whether the challenged law was likely to survive heightened scrutiny—and after having determined that the law discriminated on the basis of sex and transgender status. This was entirely appropriate, as the Ninth Circuit has acknowledged that "[h]eightened scrutiny analysis is an extraordinarily fact-bound test," *Hecox v. Little*, 79 F.4th 1009, 1039 (9th Cir. 2023) and that the state is obligated to come forward with an "an "exceedingly persuasive justification for its differential treatment." *Id.* at 1028 (citing *United States v. Virginia*, 518 U.S. 515, 533 (1996)). Further, after having noted the conflicting evidence regarding gender-affirming medical care, the Court went on to explain that the law would likely fail heightened scrutiny because a total prohibition on gender-affirming medical care does not closely fit the stated goal of protecting children—even accounting for such conflicts:

> The Court acknowledges the conflicting evidence regarding the risks and benefits associated with gender-affirming medical care. As noted above, however, the Court has found that the risks associated with the treatments used in gender-affirming medical care are similar to risks associated with other types of healthcare families may seek for minors. Moreover, even assuming the risks were different in the context of providing gender-affirming medical care, HB 71 still would not satisfy heightened scrutiny because the means (a total prohibition

> on gender-affirming medical care) is not closely fitted with the ends
> (protecting children). *Cf. Hecox,* 79 F.4th at 1030 (sweeping
> prohibition on transgender athletes in Idaho too overbroad to satisfy
> heightened scrutiny).

*Order,* Dkt. 78, at 39. In short, then, the Court disagrees with the Attorney

General's suggestion that once the Court acknowledged the existence of

conflicting evidence, it was duty-bound to "allow[]the legislature to draw the

policy line given the 'conflicting evidence regarding the risks and benefits . . . .'"

*Mtn. Mem.*, Dkt. 80-1, at 9.

It's also notable that the Attorney General's line-drawing/policy argument is

logically tethered to his argument that the parent plaintiffs are not likely to succeed

on the merits of their due-process claim. On this point, the Attorney General has

argued that plaintiffs are asking the courts to create a *new* right for parents: the

right to access the specific medical treatments at issue in this lawsuit (e.g., puberty

blockers, hormone therapy, and other treatments) for their children. As the Court

explained, though, it is not persuaded that the fundamental rights at issue here are

new rights. Rather, the Supreme Court long ago decided that parents have the right

to direct the care and upbringing of their children, and this right logically includes

the parents' right to choose a particular medical treatment, in consultation with

their healthcare provider, that is generally available and accepted in the medical

community. *See Dec. 26, Order,* Dkt. 78, at 42-44 (citing, among other cases,

*Parham v. J.R.*, 442 U.S. 584 (1979) and *Troxel v. Granville*, 530 U.S. 57, 65

(2000) (plurality opinion)). The Attorney General's argument to the contrary relies on the Sixth Circuit's decision in *L.W. ex. rel. Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023). *L.W.*, however, is not binding and, for the reasons explained earlier, the Court does not find its treatment of the substantive due-process issue persuasive. In short, the *L.W.* majority framed the fundamental right at issue far too narrowly and disregarded the Supreme Court's decision in *Parham v. J.R.*, 442 U.S. 584 (1979). This Court finds the various district court opinions (cited in the original order) and dissenting Judge White's opinion far more persuasive on this issue. *See L.W.*, 83 F.4th at 507-12 (White, J., dissenting). Put differently, the Supreme Court has drawn the line around parents' fundamental rights; this Court did not, in accepting and applying those constitutional limits, usurp the legislature's role.

## B. Financial Incentives

The Attorney General next contends that in its earlier decision, the Court went astray by wrongly "credit[ing] the opinions of expert witnesses with a direct financial stake in ensuring the continued availability of 'gender affirming care,' as opposed to those expert witnesses with no direct financial stake in the outcome of the litigation." *Mtn. Mem.*, Dkt. 80-1, at 9. As a point of clarification, the Attorney General is referring to a footnote in the Court's opinion, which explained that the Court gave particular weight to plaintiffs' experts on a specific issue: the risks of

allowing gender dysphoric youth to go untreated, which include increased risks of anxiety, depression, self-harm, and suicidality. *See Order,* Dkt. 78, at 38 n.5. The Court explained that it gave particular weight to plaintiffs' experts on this issue because they currently treat adolescents with gender dysphoria, whereas the defense experts do not. *See id.* It stands to reason that doctors who actually treat gender dysphoric youth will have a better idea as to what happens when these youth go untreated.

More broadly, the Court is not persuaded by the Attorney General's suggestion that the plaintiffs' experts have a direct financial interest in the outcome of this case. As plaintiffs have pointed out: (1) any alleged benefit these doctors would gain is far too attenuated to be considered a financial stake in this litigation; (2) these doctors don't provide care in Idaho and will not, therefore, lose any business if HB 71 goes into effect; and (3) as a psychologist, Dr. Brady does not provide any of the treatments banned by HB 71. For all these reasons, the Court is not persuaded that it erred by crediting opinions offered by plaintiffs' experts.

### 3. The Public Interest

The Court has already determined that the public interest favors an injunction. Nothing in the stay motion persuades the Court to alter that earlier determination.

# ORDER

**IT IS ORDERED that** Defendant Attorney General Labrador's Emergency

Motion for a Stay Pending Appeal (Dkt. 80) is **DENIED**.

DATED: January 16, 2024

B. Lynn Winmill
U.S. District Court Judge

ER-013

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PAM POE, by and through her parents and next friends, Penny and Peter Poe; PENNY POE; PETER POE; JANE DOE, by and through her parents and next friends, Joan and John Doe; JOAN DOE, and JOHN DOE,<br><br>    Plaintiffs,<br><br>    v.<br><br>RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho; JAN M. BENNETTS, in her official capacity as Ada County Prosecuting Attorney; and the INDIVIDUAL MEMBERS OF THE IDAHO CODE COMMISSION, in their official capacities,<br><br>    Defendants. | Case No. 1:23-cv-00269-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

# I
# INTRODUCTION

Since its adoption in 1868, the Fourteenth Amendment has been the primary

safeguard of our individual rights. Its two preeminent goals—to ensure equality

under the law and protect our most fundamental rights against state intrusion—are

both implicated here. The passage of Idaho's Vulnerable Child Protection Act,

which precludes health care professionals from providing transgender children

with generally accepted medical treatment for gender dysphoria, raises two critically important constitutional questions: First, does the State of Idaho violate the Equal Protection Clause of the Fourteenth Amendment when it bars certain medical procedures to treat gender dysphoria, while those same procedures are left freely available for the treatment of other medical conditions? Second, does the Due Process Clause of the Fourteenth Amendment prohibit the State from interfering with the decision of parents to obtain a particular type of medical care for their transgender children—care that has been broadly endorsed as both appropriate and necessary by the American medical community?

In some senses, the answers to those questions are intuitive and obvious to lawyers and laypeople alike: Transgender children should receive equal treatment under the law. Parents should have the right to make the most fundamental decisions about how to care for their children. As it turns out, case law applying the Fourteenth Amendment tracks with our intuition. Time and again, these cases illustrate that the Fourteenth Amendment's primary role is to protect disfavored minorities and preserve our fundamental rights from legislative overreach. That was true for newly freed slaves following the civil war. It was true in the 20th Century for women, people of color, inter-racial couples, and individuals seeking access to contraception. And it is no less true for transgender children and their parents in the 21st Century.

MEMORANDUM DECISION AND ORDER - 2

Over the next 50-plus pages, the Court will explain why Idaho's Vulnerable Child Protection Act violates the Fourteenth Amendment. But before wading into that analysis, it is important to briefly address a criticism common to court decisions that apply the Fourteenth Amendment to strike down legislative enactments. Critics say such decisions are anti-democratic and frustrate the will of the people as expressed by their elected legislature. And they are right. But that is precisely how our constitutional democracy is supposed to work. The authors of the Fourteenth Amendment fully understood and intended that the amendment would prevent state legislatures from passing laws that denied equal protection of the laws or invaded the fundamental rights of the people.

## II
## BACKGROUND

### A.  Overview

This lawsuit challenges the constitutionality of Idaho's Vulnerable Child Protection Act, which is slated to take effect on January 1, 2024. The plaintiffs—two transgender minors and their parents—allege that the Act's prohibition on the use of puberty blockers, hormones and other treatments violates the Equal Protection Clause and the Due Process Clause. They ask the Court to enjoin defendants from enforcing the Act during the pendency of this lawsuit. Defendants move to dismiss the complaint and oppose the request for injunctive relief.

For the reasons explained below, the Court will deny Attorney General

Labrador's and Ada County Prosecutor Bennetts' motions to dismiss. The Court will, however, grant the Idaho Code Commission members' motion to dismiss. The Court will also grant plaintiffs' motion for a preliminary injunction, as they have shown a strong likelihood of success on the merits of their claims and otherwise meet the requirements for preliminary injunctive relief.

## B.  Idaho's Vulnerable Child Protection Act

In April 2023, Idaho's governor signed House Bill 71 (HB 71) into law. The new law prohibits medical professionals from providing certain medications and treatments to minors, but only if the purpose is to enable a minor to live with a gender identity inconsistent with that minor's "biological sex." The relevant provisions are as follows:

> A medical provider shall not engage in any of the following practices upon a child for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex:
>
> (a)    Performing surgeries that sterilize or mutilate, or artificially construct tissue with the appearance of genitalia that differs from the child's biological sex . . . .
>
> (b)    Performing a mastectomy;
>
> (c)    Administering or supplying the following medications that induce profound morphologic changes in the genitals of a child or induce transient or permanent infertility:
>
>> (i)    Puberty-blocking medication to stop or delay normal puberty;

      (ii)    Supraphysiological doses of testosterone to a
                female; or

      (iii)   Supraphysiological doses of estrogen to a male; or

   (d)     Removing any otherwise healthy or nondiseased body part
         or tissue.

HB 71 § 3(a)-(d). As shown, HB 71 uses the terms "sex" and "biological sex."

"Sex" is defined elsewhere to mean "the immutable biological and physiological

characteristics, specifically the chromosomes and internal and external

reproductive anatomy, genetically determined at conception and generally

recognizable at birth, that define an individual as male or female." § 2(b). Medical

providers who violate HB 71 are guilty of a felony and face up to 10 years in

prison. § (5).

## C.  The Lawsuit

     Shortly after Governor Little signed HB 71 into law, plaintiffs sued Attorney

General Raúl Labrador, Ada County Prosecuting Attorney Jan Bennetts, and the

Idaho Code Commission members. They allege three claims: (1) the minor

plaintiffs allege that HB 71 violates the Equal Protection Clause because it

discriminates on the basis of sex and transgender status; (2) the parent plaintiffs

allege that HB 71 violates the Due Process Clause because it violates their

fundamental right to seek and follow medical advice to protect the health and

wellbeing of their minor children; and (3) all plaintiffs allege that the Idaho Code

Commission members will imminently violate their due process rights by publishing HB 71 in the official Idaho codebook without notifying the public that the law is unconstitutional and unenforceable.

The key factual allegations are that Pam Poe and Jane Doe have been diagnosed with gender dysphoria and are currently receiving gender-affirming medical care that HB 71 will ban. All plaintiffs express extreme anxiety about the possibility of the minor plaintiffs being forced to discontinue this care. More specific details regarding the Poe and Doe families are as follows:[1]

***The Poe Plaintiffs.*** Pam Poe is a 15-year-old transgender girl. She has lived in Idaho her entire life. Pam's natal sex is male, but when she was in seventh grade, Pam began to realize she was transgender. Afterward, she struggled with depression, anxiety, and self-harm. In February 2022, she was admitted to a residential treatment facility where she was diagnosed with gender dysphoria. About a month after she was released (and a year after she began to realize she was transgender), Pam's doctor prescribed puberty blockers. The medication had near-immediate positive effects on Pam. By pausing the physical changes that were causing her depression and anxiety, her mental health greatly improved.

---

[1] Details regarding the Poe family are alleged in paragraphs 71-81 of the complaint; details regarding the Doe family are alleged in paragraphs 82-94. *See Compl.*, Dkt. 1.

The following year, when she was 15, Pam's doctor prescribed hormone therapy, and she continues to be on hormone therapy. The Poe plaintiffs allege that they worry about the severe stress and anxiety associated with Pam's gender dysphoria returning if she is forced to stop gender-affirming medical care. They allege that if HB 71 takes effect, they are considering moving out of Idaho.

*The Doe Plaintiffs*. Jane Doe is a 16-year-old transgender girl. Like Pam, her natal sex is male, and she has lived in Idaho her entire life. Jane alleges that as she was growing up, "she always felt more like a girl than a boy." As she explains it, she was more comfortable associating with and playing with girls; she felt as though she belonged on girls' teams during recess; and she would always be a girl character in make-believe games. When puberty began, Jane hated the way her body was changing, and her mental health worsened. As stated in the complaint, "Jane did not like *who she was* when she had to move through the world as a boy. She sometimes wished she did not even exist."

In the summer and fall of 2020, Jane came out as transgender to her friends and family and began "social transitioning," which involved dressing, wearing makeup, and using her new name consistent with her female gender identity. Around that time, Jane was diagnosed with gender dysphoria. After several months of therapy, additional visits with her doctor, and lab work, Jane began taking puberty blockers. A few months later, at age 14, Jane began low-dose hormone

therapy. Jane's doctor has been monitoring her, adjusting medications as needed.

Since receiving gender-affirming medical care, Jane's mental health has significantly improved, but the debate over HB 71 and other anti-transgender bills has affected her mental health and her grades; when the bill passed, Jane wept in the hallway at school, and her parents had to take her home. The passage of the bill has also caused the Doe family to consider leaving Idaho so that Jane can continue to access the medical care that has helped her so significantly.

## D.  The Motions & the Record

There are three motions before the Court: two motions to dismiss and the motion for a preliminary injunction. The parties said there was no need for an evidentiary hearing on the injunction motion, so the Court did not hear evidence at the November 6, 2023 hearing—just argument. The parties did, however, submit hundreds of pages of evidence, mainly consisting of expert declarations and deposition transcripts. The Court will make its factual findings on the paper record alone, recognizing that such findings are not final and may well change after the Court has had a chance to observe witnesses testify. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); 18B Wright, Miller, & Cooper, *Federal Practice & Procedure* § 4478.1 (3d ed.) ("An order granting or denying a preliminary injunction ... rests on tentative findings that are subject to reconsideration, either at trial or during later stages of pretrial proceedings.").

## E. Factual Findings[2]

The Court will begin by defining some key terms:

- *Birth Sex; Natal Sex; Sex Assigned at Birth:* These terms will be used interchangeably throughout this opinion and refer to the sex an individual is assigned at birth, based upon the appearance of external genitalia.

- *Gender Identity:* Gender identity is a person's core, internal sense of belonging to a particular gender, such as male or female.

- *Gender Dysphoria*: Gender dysphoria is a condition identified by diagnostic criteria set out in the Diagnostic and Statistical Manual of Mental Disorders 5-TR ("the DSM-5"). The condition is generally characterized by an incongruence between a person's assigned gender and their "experienced/expressed gender" that is present for at least six months, and which causes clinically significant distress of a sufficient severity to impair the individual's ability to function in their daily life setting. The more specific DSM-5 diagnostic criteria for children and for adolescents and adults are in the record. *See Brady Dec*. ¶¶ 16-19; *Weiss Dec*. ¶¶ 22-23.

- *Cisgender:* Cisgender individuals have a gender identity that aligns with their birth sex.

- *Transgender:* Transgender individuals have a gender identity that does not align with their birth sex.

The World Professional Association for Transgender Health ("WPATH") publishes clinical practice guidelines—known as Standards of Care for the Health of Transgender and Gender Diverse People—relevant to the evaluation and

---

[2] These factual findings are relevant to the preliminary injunction motion. In considering the Rule 12(b) motions, the Court will rely upon the facts alleged in the complaint.

treatment of gender dysphoria. The WPATH Standards of Care were first published in 1979, and the most recent iteration was published in 2022. The Endocrine Society also publishes a guideline for the treatment of gender dysphoria; its first guideline was published in 2009 and the most recent update in 2017. The WPATH and Endocrine Society guidelines, which overlap in many respects, are discussed in the record and, therefore, not fully detailed here. *See, e.g., Brady Dec.* ¶¶ 4, 26-37; *Connelly Dec.* ¶¶ 15-22. In general, however, neither guideline recommends medical interventions for treatment of gender dysphoria before the onset of puberty. But for adolescents—youth who have started puberty—the guidelines indicate that medical interventions may be appropriate to treat gender dysphoria depending on the patient's individual needs. These interventions, often referred to as "gender-affirming medical care," may include medication to delay puberty (GnRH agonists, or "puberty blockers"), hormone therapy (*e.g.*, testosterone for transgender boys and testosterone suppression and estrogen for transgender girls), and surgeries. Both the WPATH and Endocrine Society guidelines emphasize the importance of a comprehensive mental health evaluation prior to the initiation of gender-affirming medical care for adolescents.

The parties' key point of disagreement in this litigation is whether medical interventions allowed under the WPATH and Endocrine Society guidelines are safe, effective, and medically necessary for some adolescents suffering from

gender dysphoria. Plaintiffs' experts have submitted declarations saying they are. Defendants' experts have submitted declarations raising various concerns as to their use. After carefully considering the voluminous evidence on this point, the Court finds that the treatment for gender dysphoria—when provided in accordance with the guidelines published by WPATH and the Endocrine Society, and which may include medical interventions such as puberty blockers, hormone therapy, and surgeries—is safe, effective, and medically necessary for some adolescents. The weight of the evidence before the Court strongly supports this finding. Most significantly, the standards of care published in the WPATH and Endocrine Society guidelines are accepted by every major medical organization in the United States, including, among many others, the American Academy of Pediatrics, the American Medical Association, the American Academy of Child & Adolescent Psychiatry, the American Academy of Family Physicians, the Pediatric Endocrine Society, and the Society for Adolescent Health and Medicine. *See Amicus Br.*, Dkt. 33-1.

The Court further finds that: (1) the medical treatments banned by HB 71 have a long history of safe use in minors for various conditions and are supported by medical evidence that has been subjected to rigorous study; (2) the medications and procedures used in gender-affirming medical care (such as puberty blockers, hormones, and mastectomies) are used to treat cisgender adolescents for other

purposes; (3) gender-affirming medical care raises risks comparable to risks associated with other types of medical care families are free to seek for minors; (4) gender-affirming medical care improves the wellbeing of some adolescents with gender dysphoria, and delaying or withholding such care can be harmful, potentially increasing depression, anxiety, self-harm, and suicidal ideation; and (5) adolescents with gender dysphoria are unlikely to later identify as their birth sex. With these findings in place, the Court will turn to the pending motions.

## III
## THE MOTIONS TO DISMISS

All defendants contend that plaintiffs lack standing, that their claims are unripe, and that their claims fail as a matter of law.

### A.  The Governing Legal Standards

Standing and ripeness are challenged through Federal Rule of Civil Procedure 12(b)(1). *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may challenge jurisdiction either on the face of the pleadings or by presenting extrinsic evidence. *See Safer Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Where, as here, an attack is facial, the court confines its inquiry to allegations in the complaint. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

When ruling on a facial jurisdictional attack, courts must accept as true all

material allegations of the complaint and must construe the complaint in favor of the complaining party. *De La Cruz v. Tormey*, 582 F.2d 45, 62 (9th Cir. 1978) (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). However, the plaintiff bears the burden of alleging facts that are legally sufficient to invoke the court's jurisdiction. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

Rule 12(b)(6) permits a court to dismiss a claim if the plaintiff has failed to state a claim upon which relief can be granted. A Rule 12(b)(6) dismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008). In deciding whether to grant a motion to dismiss, the court must accept as true all well-pleaded factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court is not, however, required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). However, a "complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Id.* (citation omitted).

## B. Ada County Prosecutor Bennetts' Rule 12(b)(1) Motion

In her Rule 12(b)(1) motion, Prosecutor Bennetts discusses standing and ripeness together, ultimately arguing that the complaint should be dismissed under

both doctrines. The doctrines of standing and ripeness are closely related, but while "standing is primarily concerned with *who* is a proper party to litigate a particular matter, ripeness addresses *when* that litigation may occur." *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1123 (9th Cir. 2009) (internal quotation marks and citation omitted).

To establish Article III standing, a plaintiff must show: (1) an injury-in-fact that is "concrete and particularized" and "actual or imminent," as opposed to one that is conjectural or hypothetical; (2) a causal connection between the challenged conduct and defendant's action; and (3) a likelihood that the injury will be redressed by a favorable judicial decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). To survive a Rule 12(b)(1) motion at the pleading stage (a facial challenge to subject-matter jurisdiction), the complaint must clearly allege facts demonstrating each element of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

If plaintiffs launch a pre-enforcement challenge, as is the case here, they may establish an injury-in-fact by showing that: (1) they intend "to engage in a course of conduct arguably affected with a constitutional interest;" (2) the intended future conduct is proscribed by the law in question; and (3) there is a credible threat of prosecution under the challenged law. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). (The final three factors are referred to as the *Driehaus*

factors.)

As for ripeness, that "inquiry contains both a constitutional and a prudential component." *Portman v. Cty. of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993). The constitutional component is generally coextensive with the "injury-in-fact" element of the standing analysis. *See Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 n.2 (9th Cir. 2003). The prudential component "focuses on whether there is an adequate record upon which to base effective review." *Portman*, 995 F.2d at 903. In evaluating prudential ripeness, the Court considers "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000) (en banc) (citations omitted). Ultimately, prudential considerations of ripeness are discretionary. *Id.* at 1142.

With this legal framework in place, the Court will tick through each factor enumerated above, including the three traditional standing requirements (injury, causation, redressability) as well as the *Dreihaus* factors. The Court will then move to the prudential ripeness inquiry. Before doing so, however, the Court will generally observe that the Supreme Court long ago held that "a person who must comply with the law or face injury has standing to challenge its application to him, even if the threat of prosecution is not immediate—indeed, even if the law is not yet in effect." *Hays v. City of Urbana*, 104 F.3d 102, 103 (7th Cir. 1997) (citations

omitted). To offer just one example, in *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), plaintiffs sued four years before the law was to take effect, and the Supreme Court resolved the case two years before its intended effective date. *Id.* at 536; *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."); *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979); *Doe v. Bolton*, 410 U.S. 179, 188 (1973). Based on this general principle, plaintiffs argue that they do not need to satisfy the *Driehaus* factors because they will "suffer medical and constitutional harm" the moment HB 71 takes effect. *Plaintiffs' Response,* Dkt. 60, at 3; *see generally Teter v. Lopez*, 76 F.4th 938, 944 n.2 (9th Cir. 2023); *Jackson v. City & County of San Francisco*, 746 F.3d 953 967 (9th Cir. 2014). The Court agrees. Still, though, the Court will analyze the *Driehaus* factors, ultimately concluding that plaintiffs satisfy those factors.

### 1. Injury-In-Fact

Returning to the requirement of an injury-in-fact, and beginning with the first *Driehaus* factor, plaintiffs have plausibly alleged that they intend to engage in future conduct affected with a constitutional interest. The parent plaintiffs plan to seek out for their children medical care banned by HB 71. That conduct is arguably affected with their fundamental liberty interest of directing the upbringing of their

children, which logically includes directing their children's medical care. Thus, the

Due Process Clause is implicated. And the minor plaintiffs wish to access medical

treatments that doctors may not legally offer to them but may offer (1) to minors of

the opposite birth sex or (2) to minors of the same birth sex, but only so long as the

treatments are used for anything other than "attempting to alter the appearance of

or affirm the child's perception of the child's sex if that perception is inconsistent

with the child's biological sex." Thus, the minor plaintiffs' intended future conduct

is affected by the Equal Protection Clause.

Bennetts argues that plaintiffs have not sufficiently alleged that they intend

to continue seeking the treatment that will soon be banned. *See Mtn. Mem.,* Dkt.

51-1, at 7. But, viewing all reasonable inferences in plaintiffs' favor, such an

allegation has been made. Both minor plaintiffs allege that they live in Idaho and

are "currently receiving medically necessary care that would be prohibited by the

Healthcare Ban." *Compl.*, Dkt. 1, ¶¶ 5-7. And both families allege that although

they do not wish to leave Idaho, they are considering doing so to ensure that the

minor plaintiffs may continue receiving gender-affirming healthcare. *Id.* ¶¶ 81, 94.

The reasonable inference is that but for HB 71, they would continue to seek the

gender-affirming medical care that will be banned under HB 71.

Moving to the second *Driehaus* factor, plaintiffs' intended conduct is

proscribed by the law in question. Granted, the statute does not criminalize parents

and children for seeking the banned care. But plaintiffs can establish injury for standing purposes by showing "determinative or coercive effect upon the action of someone else." *San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1170 (9th Cir. 2011) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). Here, once HB 71 goes into effect, plaintiffs would be unable to access the medical care they seek because any medical professional who could provide that care is banned from doing so, under the threat of a felony conviction and ten years in prison. As such, plaintiffs will suffer an imminent injury.

The third and final *Driehaus* factor requires plaintiff to show a credible threat of prosecution. To evaluate whether such a threat exists, the Ninth Circuit considers three factors, referred to here as the *Thomas* factors: (1) whether the plaintiff has a "concrete plan" to violate the law, (2) whether the enforcement authorities have "communicated a specific warning or threat to initiate proceedings," and (3) whether there is a "history of past prosecution or enforcement." *Thomas*, 220 F.3d at 1139. Generally speaking, "[n]either the mere existence of a proscriptive statute nor a generalized threat of prosecution" satisfies this test. *Id.*

Here, plaintiffs have satisfied the first *Thomas* factor because they have alleged that they are currently receiving gender-affirming medical care and that they wish to continue receiving that care after HB 71 goes into effect. The fact that

MEMORANDUM DECISION AND ORDER - 18

they are considering leaving Idaho to obtain that treatment should not bar their suit. As the Ninth Circuit recently stated, a plaintiff's "choice to eliminate the threat of enforcement by not doing what they want to do should not bar the suit." *Isaacson v. Mayes*, 84 F.4th 1089, 1099 (9th Cir. 2023) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) ("Given [the] genuine threat of enforcement, we did not require, as a prerequisite to testing the validity of the law in a suit for injunction, that the plaintiff bet the farm, so to speak, by taking the violative action.") and *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) ("[E]nforcement history alone is not dispositive. Courts have found standing where no one had ever been prosecuted under the challenged provision.")).

As for the second *Thomas* factor, the Ninth Circuit has held that a plaintiff need not always show a specific warning or threat of prosecution in a pre-enforcement challenge. *See Teter v. Lopez*, 76 F.4th 938, 946 (9th Cir. 2023). Further, even though plaintiffs haven't been threatened with prosecution, Bennetts is vested with authority to enforce all penal statutes in Ada County, *see* Idaho Code § 31-2227(1), and she hasn't disavowed HB 71. It would be illogical to assume that she would elect to simply ignore violations of the statute. Finally, the "third factor, concerning the history of enforcement, carries 'little weight' when the challenged law is 'relatively new' and the record contains little information as to enforcement." *Tingley v. Ferguson*, 47 F.4th 1055, 1069 (9th Cir. 2022) (citations

omitted). The Court therefore concludes that plaintiffs have alleged the requisite injury-in-fact.

### 2. Causal Connection & Redressability

Prosecutor Bennetts next argues that plaintiffs trace any alleged injury to the Idaho Legislature and the existence of HB 71—not to any action she has taken. But, as noted, plaintiffs reside in Ada County; they are currently receiving healthcare that will be banned by HB 71; HB 71 will go into effect imminently; and they wish to continue receiving healthcare that will be banned. *See Compl.*, Dkt. 1, ¶¶ 5, 6, 7, 71-94. Plus, as noted above, Bennetts is vested with the primary duty of enforcing all penal statutes in Ada County, *see* Idaho Code § 31-2227(1), and she has not disavowed HB 71. As such, plaintiffs trace their imminent injuries to Bennetts, and an order enjoining her from enforcing HB 71 will redress those injuries.

### 3. Prudential Ripeness Considerations

The Court also concludes that prudential ripeness considerations favor the plaintiffs. As noted above, the Court considers fitness for judicial decision and hardship to the parties if a decision were withheld. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009). Regarding fitness, the Court considers "whether the action has a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate

compliance with its terms." *Id.* And as to hardship, the Court considers whether the challenged law "requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Id.* Both considerations favor exercising jurisdiction, as HB 71 will take effect imminently and at that time will have an immediate, harmful effect on all plaintiffs.

For all these reasons, plaintiffs have standing and their claims are ripe for review. The Court will therefore deny Bennetts' Rule 12(b)(1) motion.

## C.  Ada County Prosecutor Bennetts' Rule 12(b)(6) Motion

### 1.  *Monell*

The Court will also deny Bennetts' Rule 12(b)(6) motion. Here, Bennetts says plaintiffs' claims must be viewed under the rubric of municipal liability as established in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). But in a *Monell* claim, the defendant must be an official policymaker *for the municipality*—not the state. *See McMillian v. Monroe Cnty.*, 520 U.S. 781, 785 (1997). Here, in the context of prosecuting and enforcing *state* criminal laws, the Ada County Prosecutor acts on behalf of the state. *See generally* Idaho Code § 31-2227; *cf. Chilcoat v. San Juan Cnty.*, 41 F.4th 1196 (10th Cir. 2022) (determining that under Utah law, a county prosecutor acted on behalf of the state, not the county, in prosecuting violations of the state criminal code). As such, Bennetts' argument misses the mark, as it focuses on the requirements of a *Monell* claim,

whereas the Court views the complaint as having alleged a plausible § 1983 claim against Bennetts under an *Ex Parte Young* theory. *See RFL Republican Labor Farmer Caucus v. Freeman*, No. 19-cv-1949, 2020 WL 1333154, at *3 (D. Minn. Mar. 23, 2020) (denying motion to dismiss *Monell* claim after concluding that plaintiffs had alleged *Ex Parte Young* claims).

Alternatively, the Court will deny Bennetts' motion because the Ninth Circuit rejected a similar argument in *Evers v. County of Custer*, 745 F.2d 1196 (9th Cir. 1984). In *Evers*, a county defendant argued that it should be immune from suit because it was merely acting according to state law, rather than carrying out county policy. The court explained that such an argument "goes only to the question of the Commissioners' good faith in applying the statute. The fact that the Commissioners are immune from suit under section 1983 because of their good faith does not relieve the County from liability." *Id*. at 1203 (citing *Owen v. City of Independence*, 445 U.S. 622 (1979)).

### 2. Taxpayer Burden and Necessity of Bennetts' Presence

Bennetts' final argument is that the Court should dismiss her as a defendant because (1) this action could just as easily proceed in her absence, and (2) if she is kept on as a defendant, Ada County taxpayers might have to help pay attorneys' fees. *See Mtn. Mem.,* Dkt. 51-1, at 15-16; *Reply*, Dkt. 64, at 8-10. Bennetts has not cited any authority in support of these arguments, however, and the Court is not

persuaded that dismissal is warranted for those reasons. The Court will therefore deny Bennetts' Rule 12(b)(6) motion.

## D. The State Defendants'[3] Rule 12(b)(1) Motion

Next up is Attorney General Labrador and the Idaho Code Commission Members' Rule 12(b)(1) motion. That motion focuses primarily on a claim of Eleventh Amendment immunity, although these defendants also raised an extremely brief argument asserting that plaintiffs lack standing and that their claims are unripe. *See Mtn. Mem.*, Dkt. 66, at 11. The Court resolved most aspects of these arguments above, in the context of deciding Bennetts' motion to dismiss. The State Defendants raise unique arguments, however, regarding the "causation" and "redressability" elements of standing. The Court will address those arguments here, through the lens of the Eleventh Amendment sovereign immunity analysis.

As the Ninth Circuit has observed, whether defendants, acting in their official capacities as state officials, are proper defendants, "is really the common denominator of two separate inquiries: first, there is the requisite causal connection between their responsibilities and any injury that the plaintiffs might suffer, such that relief against the defendants would provide redress; and second, whether … jurisdiction over the defendants is proper under the doctrine of *Ex parte Young*,

---

[3] Throughout this opinion, the Court will sometimes refer to Labrador and the Code Commission members as "the State Defendants."

209 U.S. 123 (1908), which requires 'some connection' between a named state officer and enforcement of a challenged state law." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004) (internal citations omitted).

In general, the Eleventh Amendment protects states from being haled into federal court without their consent. U.S. Const. amend. XI; *Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 258 (2011). But under *Ex parte Young*, 209 U.S. 123 (1908), plaintiffs may sometimes sue state officials in federal court to prevent them from enforcing an unconstitutional act. To fall within the *Ex Parte Young* exception, the named official must have "some connection with the enforcement of [HB 71]." *Mecinas v. Hobbs*, 30 F.4th 890, 903 (9th Cir. 2022). The Ninth Circuit has explained that the "modest [connection] requirement" under *Ex parte Young* merely demands that the implicated state official have a relevant role that goes beyond "a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision." *Id.* (citation omitted).

### 1. Idaho Code Commission Members

Applying this standard to the claim against the Idaho Code Commission members should be a straightforward, three-step analysis, as follows: (1) The Commission is tasked with publishing the official Idaho codebook, which includes an obligation to annotate the codebook with citations to federal and state case

authority. *See* Idaho Code § 73-205. (2) The Commission has no power to enforce the laws they publish; the limit of their power is to publish. (3) Thus, the Commission is not suable under *Ex Parte Young*. *See generally Whole Woman's Health v. Jackson*, 595 U.S. 30, 40-41 (2021); *Snoeck v. Brussa*, 153 F.3d 984, 987 (9th Cir. 1998) (dismissing case against state commission after concluding that "the Commission has no enforcement power, and therefore, it has no connection to the enforcement of the challenged law as required under *Ex Parte Young*"). And that should be the end of it. But plaintiffs say the conclusion doesn't follow because they are advancing a different theory—namely, that if a code publisher fails to properly and timely annotate a codebook to apprise the public of federal case law holding a state statute unconstitutional, the Commission thereby violates plaintiffs' due process rights. In pursuing this theory, plaintiffs acknowledge that the Commission has no power to enforce Idaho statutory law. But they say the problem is that the Commission has a history of falling down on the job by failing to properly annotate Idaho's official codebook with citations to federal court decisions holding Idaho statutes unconstitutional. And, from there, plaintiffs allege that the Code Commission will soon publish an unconstitutional law—Idaho's Vulnerable Child Protection Act—in the Idaho codebook without simultaneously notifying the public that the law is unconstitutional. That, plaintiffs say, will "mislead and deceive Idahoans . . . about the requirements of the law." *Compl.,*

Dkt. 1, ¶ 123. Invoking this logic, plaintiffs appear to be arguing that HB 71 is subject to a vagueness challenge under the Fourteenth Amendment. *Id.* ¶ 124; *see also Plaintiff's Response*, Dkt. 61, at 8 (citing various cases decided under the void-for-vagueness doctrine).

The Court is not persuaded. Plaintiffs do not cite any authority applying the void-for-vagueness doctrine to any similar factual scenario. Plus, the simpler, narrower answer is that this is a dispute about the Commission's obligation to comply with state law. Plaintiffs cannot properly invoke the *Ex Parte Young* exception as a way to enforce an Idaho statutory obligation "through the back door." *Wozniak v. Adesida*, 932 F.3d 1008, 1011 (7th Cir. 2019). Accordingly, the Court is compelled to grant the Code Commission members' motion to dismiss. *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 98 (1984).

## 2. Attorney General Labrador

The outcome is different for Attorney General Labrador, however, as he is empowered to enforce HB 71. Labrador disputes this, arguing that he lacks authority to enforce Idaho criminal law absent a referral by a county prosecutor, which has not occurred here. A few months ago, this Court rejected a substantially similar argument and will do so again now, for the same reasons. In a nutshell, Mr. Labrador's argument is foreclosed by *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004).

The starting point for the analysis is Idaho Code § 67-1401, which empowers Idaho's attorney general to "assist" county prosecutors. It provides: "When required by public service, [the attorney general has a duty] to repair to any county in the state and assist the prosecuting attorney thereof in the discharge of duties." Idaho Code § 67-1401(7). Idaho caselaw construing this statute has clarified that, while the attorney general may "assist" county prosecutors in a "collaborative effort," he may not assert "dominion and control" over prosecutions against the county prosecutor's wishes. *Newman v. Lance*, 922 P.2d 395, 399–401 (Idaho 1996). Otherwise, unless the county prosecutor objects, the attorney general is empowered to "*do every act* that the county attorney can perform" in rendering assistance. *Id.* at 399. In *Wasden*, the Ninth Circuit summarized the Idaho attorney general's powers as follows: "the attorney general in effect may deputize himself . . . to stand in the role of a county prosecutor, and in that role exercise the same power to enforce the statute the prosecutor would have." *Id.* Given these "assistance powers," *Wasden* concluded that plaintiffs had demonstrated the "causal connection" and "redressability" elements for purposes of standing and also demonstrated that Idaho's attorney general was a proper defendant under an *Ex Parte Young* theory. *Id.*

Nothing has changed since the Ninth Circuit's 2004 decision in *Wasden*. Idaho's attorney general still has the same "assistance powers" he had then, and,

for that reason, he is a proper defendant here. Attorney General Labrador did issue an opinion letter in April 2023, opining that his "assistance" powers don't spring into existence unless and until a county prosecutor whistles for him by filing a motion under Idaho Code § 31-2603.[4] *See* Idaho Op. Atty. Gen. No. 23-1, 2023 WL 4397789. But the opinion letter is not binding, and the Court is not persuaded by its reasoning. Most significantly, the opinion letter does not meaningfully account for the fact that so long as a county prosecutor doesn't object, the attorney general can "do every act" a county prosecutor can do—which logically includes initiating a criminal case before a county prosecutor asks a court to appoint the AG as a special prosecutor. In fact, that is precisely what happened in *State v. Summer*, 76 P.3d 963 (Idaho 2003), which the opinion letter cites and partly relies upon. That particular factual scenario illustrates that the Attorney General may indeed deputize himself and do every act a county prosecutor can do. The Court will therefore deny the Attorney General's Rule 12(b)(1) motion.

### E. Attorney General Labrador's Rule 12(b)(6) Motion

Attorney General Labrador also argues that plaintiffs failed to state claims

---

[4] Idaho Code § 31-2603(b) provides: "The prosecuting attorney may petition the district judge of his county for the appointment of a special assistant attorney-general to assist in the prosecution of any criminal case pending in the county; and if it appears to the district judge to whom such petition is addressed that good cause appears for granting such petition, the district judge, may, with the approval of the attorney-general, appoint an assistant attorney-general to assist in such prosecution."

upon which relief may be granted. As discussed below, however, the Court has concluded that plaintiffs are likely to succeed on the merits of their equal-protection and due-process claims. Inherent in that ruling is a finding that plaintiffs have pleaded plausible claims. The Court will therefore deny the Attorney General's Rule 12(b)(6) motion.

**IV**
**THE MOTION FOR A PRELIMINARY INJUNCTION**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Fraihat v. U.S. Immigration & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021) (citation omitted). To obtain relief, plaintiffs must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 24 (2008). "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

## A. Likelihood of Success on the Merits

Plaintiffs have shown a likelihood of success on their equal-protection and due-process claims.

### 1. Plaintiff's Equal-Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that no

state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In other words, "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). But the constitutional promise of equal protection "must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996). The Supreme Court has attempted to reconcile this tension by developing tiers of judicial scrutiny against which a government's classification can be measured. *See id.; Latta v. Otter*, 19 F. Supp. 3d 1054, 1072-73 (D. Idaho), *aff'd* 771 F.3d 456 (9th Cir. 2014). As discussed in the next section, three tiers of scrutiny have developed—strict scrutiny, heightened scrutiny, and rational-basis review. The level of scrutiny applied to any given law depends on the characteristics of the disadvantaged group, or the rights implicated by the classification.

### a.  The Levels of Scrutiny

When a state restricts an individual's access to a fundamental right, the policy must withstand strict scrutiny, which requires that the government action serve a compelling purpose and that it is the least restrictive means of doing so. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16-17 (1973). The Supreme Court has recognized that the Constitution protects a number of

MEMORANDUM DECISION AND ORDER - 30

fundamental rights, including a parent's right to direct the "care, custody, and control of their children," *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion), and to "recognize symptoms of illness and to seek and follow medical advice." *Parham v. J.R.*, 442 U.S. 584, 602 (1979).

When a fundamental right is not at stake, a court must analyze whether the government policy discriminates against a suspect class. *Cleburne*, 473 U.S. at 440. Because government policies that discriminate on the basis of race or national origin typically reflect prejudice, such policies will survive only if the law survives strict scrutiny. *Id.* Strict-scrutiny review is so exacting that most laws subjected to this standard fail. *See generally Fullilove v. Klutznick*, 448 U.S. 448, 519 (1980) (Marshall, J., concurring) (commenting that strict-scrutiny review is "strict in theory, but fatal in fact").

Statutes that discriminate on the basis of sex—a "quasi-suspect" classification—need to withstand the slightly less stringent standard of "heightened" scrutiny. *Craig v. Boren*, 429 U.S. 190, 197 (1976); *United States v. Virginia*, 518 U.S. 515, 533 (1996). The Ninth Circuit has held that "heightened scrutiny applies to laws that discriminate on the basis of transgender status, reasoning that gender identity is at least a 'quasi-suspect class.'" *Hecox v. Little*, 79 F.4th 1009, 1026 (9th Cir. 2023) (citing *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019)). To withstand heightened scrutiny, classification by sex or

transgender status "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig*, 429 U.S. at 197.

Finally, the least stringent level of scrutiny is rational-basis review. Rational-basis review is applied to laws that impose a difference in treatment between groups but do not infringe upon a fundamental right or target a suspect or quasi-suspect class. *Heller v. Doe*, 509 U.S. 312, 319–321 (1993). "[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Id.* at 319 (citations omitted). Rational-basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* (citation omitted). Rather, a classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id*. at 320 (citation omitted). Yet, even under rational-basis review, if a court finds that a classification is "born of animosity toward the class of persons affected," a law that implicates neither a suspect classification nor a fundamental right may be ruled constitutionally invalid. *Romer*, 517 U.S. at 634.

### b.  HB 71 Discriminates on the Basis of Transgender Status

HB 71 explicitly classifies on the basis of transgender status. Granted, the word "transgender" doesn't appear in the statute. But if you consider the definition of a transgender person—again, someone whose gender identity doesn't match

their birth sex—a quick skim of HB 71 reveals that the legislature classified on that basis. The operative provision is § (3), which bans certain medical treatments if (and only if) those treatments are provided "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex *if that perception is inconsistent with the child's biological sex*." HB 71 § (3) (emphasis added). Thus, the classified group (transgender minors) cannot have medical treatments that the similarly situated group (cisgender minors) can. That is classification based on transgender status, pure and simple. *Cf. Hecox,* 79 F.4th at 1025 (observing that while an act did not use the word "transgender" it had nonetheless been carefully drawn to target transgender women and girls).

The State Defendants say HB 71 does not classify on the basis of transgender status but, instead, simply regulates a treatment for a particular diagnosis—gender dysphoria. But, to borrow from some oft-quoted examples, that's like saying that classifying on the basis of gray hair doesn't classify on the basis of age, or that classifying on the basis of wearing a yarmulke doesn't classify on the basis of being Jewish. *See Davis v. Guam*, 932 F.3d 822, 837-38 (9th Cir. 2019) (providing the gray hair/age example); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) (providing the yarmulke/Jewish example). In other words, accepting that line of logic, HB 71 discriminates by proxy, as only transgender people seek treatment for gender dysphoria. For this additional reason,

HB 71 classifies on the basis of transgender status.

### c. HB 71 Discriminates on the Basis of Sex

HB 71 also discriminates on the basis of sex. *First*, as just explained, it discriminates on the basis of transgender status, and the Ninth Circuit has held that "discrimination on the basis of transgender status is a form of sex-based discrimination." *Hecox* 79 F.4th at 1026. *Second*, it classifies on the basis of gender nonconformity because it effectively prohibits transgender minors from taking medications or undergoing treatments due to their gender nonconformity. *See generally Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1742-42, 1746 (2020); *Grabowski v. Arizona Board of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023). *Third,* it draws sex-based classifications on its face. HB 71 begins by defining "sex" to mean "the immutable biological and physiological characteristics, specifically the chromosomes and internal and external reproductive anatomy, genetically determined at conception and generally recognizable at birth, that define an individual as male or female." HB 71 § 2(b). It then goes on to ban puberty blockers, hormones, and other treatments when administered "for the purpose of attempting to alter appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." HB 71 § 3. Thus, under HB 71, "the minor's sex at birth determines whether or not the minor can receive certain types of medical care under the law." *Brandt v. Rutledge,*

47 F.4th 661, 669 (8th Cir. 2022). As such, HB 71 discriminates on the basis of sex. *See id. But see Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1230 (11th Cir. 2023); *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 481 (6th Cir. 2023).

The Court is not persuaded by the State Defendants' arguments to the contrary. Among other things, they argue that HB 71 applies equally to boys and girls. But that does not change the fact that "[t]he biological sex of the minor patient is the basis on which the law distinguishes between those who may receive certain types of medical care and those who may not." *Brandt*. 47 F. 4th at 670.

Likewise, the State Defendants' arguments based on Supreme Court cases relating to abortion and pregnancy—*Dobbs v. Jackson Women's Health Org*., 142 S. Ct. 2228 (2022) and *Geduldig v. Aiello*, 417 U.S. 484 (1974)—are not persuasive. *Dobbs* just reiterated language from *Geduldig*, and *Geduldig*, in turn, held that a state disability insurance system that excluded coverage for certain pregnancy-related disabilities did not classify on the basis of sex. The Court explained that because the insurance program created two groups—a group that contained only females and a group that contained males and females—there was a "lack of identity" between the exclusion of those female-related disabilities from coverage and discrimination on the basis of being female since "[t]he fiscal and actuarial benefits of the program ... accrue[d] to members of both sexes." *Id.* at 496

n.20. Ultimately, neither men nor women were allowed pregnancy-related coverage under the policy. That is not so here. Analogous to the policy benefits in *Geduldig* are the medical treatments which HB 71 bans. Cisgender adolescents may still access these treatments, while transgender adolescents may not—meaning that there is differential treatment based on sex and transgender status. *Geduldig* is thus distinguishable. *Accord Doe v. Ladapo*, No. 4:23CV114-RH-MAF, 2023 WL 3833848, at *10 (N.D. Fla. June 6, 2023).

But there is another important distinction between *Geduldig* and the case presented here. The Supreme Court's decision in *Geduldig* relied heavily on the fact that the State was using an objective, non-invidious standard to maintain a comprehensive, actuarially-sound disability program. In short, the pregnancy-based distinction was not a proxy for singling out women. By comparison, as discussed elsewhere in this decision, there is every indication that HB 71 was intended to single out transgender children based solely upon their transgender status. *Geduldig* is distinguishable for this additional reason.

### d. HB 71 is Unlikely to Survive Heightened Scrutiny

Having determined that HB 71 classifies on the basis of sex and transgender status, the next step is to determine whether it is likely to survive heightened scrutiny. As noted, heightened scrutiny is a "demanding" standard, with the burden "rest[ing] entirely on the State" to demonstrate an "exceedingly persuasive"

justification for its differential treatment. *Hecox*, 79 F.4th at 1028 (citing *Virginia*, 518 U.S. at 533). To survive heightened scrutiny, the state must demonstrate "that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* Further, "heightened scrutiny is an extremely fact-bound test," *id.,* which requires the Court to examine the "actual purposes" of state action, and to "carefully consider the resulting inequality to ensure our most fundamental institutions neither send nor reinforce messages of stigma or second-class status." *SmithKline Beecham v. Abbott Laboratories*, 740 F.3d 471, 483 (9th Cir. 2014).

Generally, the State Defendants say the legislature's purpose in passing HB 71 was to protect vulnerable children from the dangers of unproven medical and surgical treatments. At a general level, safeguarding the physical wellbeing of children is of course important. *See generally New York v. Ferber*, 458 U.S. 747, 756-57 (1982). But in this case, the Court finds that the asserted objective is pretextual, given that HB 71 allows the same treatments for cisgender minors that are deemed unsafe and thus banned for transgender minors. That is, the medications and procedures that are used in gender-affirming medical care (such as puberty blockers, hormones, and surgeries) are used to treat cisgender adolescents for other purposes. But rather than targeting the treatments themselves, HB 71 allows children to have these treatments—but only so long as they are used for any

reason other than as gender-affirming medical care. On this point, the Court finds, as did another court faced with a similar law, that "[i]f the State's health concerns were genuine, the State would prohibit these procedures for all patients under 18 regardless of gender identity. The State's goal in passing [the challenged Act] was not to ban a treatment. It was to ban an outcome that the State deems undesirable." *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 892 (E.D. Ark. 2021), *aff'd* 47 F.4th 661 (8th Cir. 2022).

Moreover, even assuming the State's asserted interest was genuine, the weight of the evidence shows not only that gender-affirming medical care delivered in accordance with WPATH and Endocrine Society guidelines is helpful and necessary for some adolescents, but also that withholding such care is harmful. As plaintiffs' experts have explained, allowing gender dysphoric youth to go untreated can increase the risk of anxiety, depression, self-harm, and suicidality.[5] Seen in that light, HB 71 undermines, rather than serves, the asserted goal of protecting children. As matters currently stand, doctors decide—based on a widely accepted standard of care—whether puberty blockers, hormones, and other treatments are appropriate for any particular patient. HB 71 would not only prevent

---

[5] The Court gave particular weight to plaintiffs' experts on this issue, as Dr. Brady and Dr. Connelly currently treat adolescents with gender dysphoria, while the defense experts do not.

MEMORANDUM DECISION AND ORDER - 38

doctors from acting in accordance with that standard of care; it would subject them to felony charges and a potential 10-year prison sentence. Again, that does not serve the State's interest in protecting Idaho's youth; it harms them.

The Court acknowledges the conflicting evidence regarding the risks and benefits associated with gender-affirming medical care. As noted above, however, the Court has found that the risks associated with the treatments used in gender-affirming medical care are similar to risks associated with other types of healthcare families may seek for minors. Moreover, even assuming the risks were different in the context of providing gender-affirming medical care, HB 71 still would not satisfy heightened scrutiny because the means (a total prohibition on gender-affirming medical care) is not closely fitted with the ends (protecting children). *Cf. Hecox,* 79 F.4th at 1030 (sweeping prohibition on transgender athletes in Idaho too overbroad to satisfy heightened scrutiny).

In support of their argument that gender-affirming medical care is experimental and risky, the State Defendants rely heavily on systematic review studies produced by some European countries, and subsequent policy actions taken by those countries. Specifically, the evidence submitted by the defendants shows the following: (1) In *England*, the National Health Service has limited the use of puberty blockers to formal clinical trials. (2) In *Finland,* the national health service "ended the surgical transition of minors" and has restricted puberty blockers and

MEMORANDUM DECISION AND ORDER - 39

cross-sex hormone therapies to situations where gender dysphoria is severe and other psychiatric symptoms have ceased. (3) In *Sweden,* the "leading Swedish pediatric gender clinic" decided to limit puberty blockers and cross-sex hormones to those 16 and older and, even then, those treatments would be administered in clinical trials monitored by the appropriate Swedish research ethics board. The Swedish Health Service, however, has not implemented those recommendations generally and instead "recommends restraint." (4) In *France,* the Académie Nationale de Médecine of France advises health care providers "to extend as much as possible the psychological support phase," although "medical authorities in France have not issued any actual restriction." (5) In *Norway,* the Healthcare Investigation Board released a report stating that "the knowledge base, especially research-based knowledge for gender-affirming treatment (hormonal and surgical), is insufficient," although no policy action seems to have been taken. *See Cantor Dec.* ¶¶ 17-33. These countries' approaches to gender-affirming medical care highlight that Idaho's chosen "means"—a sweeping ban on such care—fails to properly account for the "close means-end fit" heightened scrutiny requires of sex-based classifications. *Sessions v. Morales-Santana*, 582 U.S. 47, 68 (2017).

In sum, the State has not shown that HB 71's discrimination on the basis of sex and transgender status "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of

those objectives." *Virginia*, 518 U.S. at 24 (citation omitted). The law therefore fails heightened scrutiny, and plaintiffs thus have a strong likelihood of success on the merits of their equal-protection claim.

### 2. Plaintiffs' Due-Process Claim

Likewise, the parent plaintiffs have shown a strong likelihood of success on the merits of their due-process claim. The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV, § 1. But the clause "guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). It "also provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* at 720. This heightened protection encompasses two types of substantive rights: (1) enumerated rights, which are those guaranteed by the first eight amendments; and (2) implied rights, which are "a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Dobbs*, 142 S. Ct. at 2277.

The parent plaintiffs assert rights falling into the second category (implied rights), which calls for a two-step analysis. First, the Court must carefully describe the asserted fundamental liberty interest. *See Glucksberg,* 521 U.S. at 721. Second, the Court must decide whether that interest is objectively, deeply rooted in this

nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. *Id.*

Plaintiffs frame their asserted right as "the fundamental right of parents to make decision concerning the care, custody, and control of their children," specifically including a parent's "right to seek and follow medical advice to protect the health and wellbeing of their minor children." *Compl.,* Dkt. 1, ¶¶ 114-15. The State says the asserted right must be framed more narrowly, such that the Court asks whether parents have a fundamental right to access for their children the specific medications at issue, including puberty blockers and hormone therapy. As the Court sees it, the appropriately precise way to frame the issue is to ask whether parents' fundamental right to care for their children includes the right to choose a particular medical treatment, in consultation with their healthcare provider, that is generally available and accepted in the medical community. And the Court has no difficulty concluding that such a right is deeply rooted in our nation's history and traditions and implicit in our concept of ordered liberty.

The Supreme Court has described a parent's right to direct the "care, custody, and control of their children" as "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel*, 530 U.S. at 65. As for a parent's more specific right to seek out a specific medical treatment for their child, the Supreme Court addressed that right in *Parham v. J.R.*, 442 U.S. 584 (1979).

*Parham* involved a controversial and unpopular treatment for children—involuntary commitment to a state mental hospital. The specific issue in the case involved the child's procedural due process rights—namely, whether the child had a right to a hearing before commitment. But to decide that, the Court first had to determine if a parent had the right to commit their child. In making that determination, the Court drew on a long line of precedent speaking generally to parents' liberty interest in raising their children as they see fit, including landmark cases such as *Meyer v. Nebraska*, 262 U.S. 390 (1923), *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972).

With that precedent in hand, the *Parham* Court explained that this country has a long tradition of allowing parents broad control over their children. As the Court put it, "our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children." 442 U.S. at 602. The *Parham* Court further explained that "our constitutional system long ago rejected any notion that a child is "the mere creature of the State" and, on the contrary, asserted that parents generally "have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations." *Id.* (citations omitted). The Court then concluded that parents' fundamental right to direct their children's upbringing encompassed the narrower right at issue: the right to seek a particular form of medical treatment for their children, subject to a

physician's independent examination and medical judgment. *Id.* "Surely," the
Court said, a parent's authority over their children "includes a 'high duty' to
recognize symptoms of illness and to seek and follow medical advice." *Id.* The
Court held that the child did have a right to a hearing before being committed. But,
as is more relevant here, the Court also held that parents "retain plenary authority
to seek such care for their children [i.e., involuntary commitment], subject to a
physician's independent examination and medical judgment." *Id.* at 604.

Roughly twenty years after *Parham* was handed down, the Ninth Circuit
decided *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000). There, two young
children were removed from their home and subjected to highly invasive physical
examinations without a prior court order or their parents' consent. Citing *Parham,
Wallis* held that "[t]he right to family association includes the right of parents to
make important medical decisions for their children, and of children to have those
decisions made by their parents rather than the state." *Id.* (citations omitted).

To be sure, both the Supreme Court and the Ninth Circuit have recognized
there are limits to parents' rights to care for their children. *See generally Prince v.
Massachusetts*, 321 U.S. 158, 170 (1944) (holding that a state may constitutionally
intervene in the parent-child relationship for the purpose of enforcing child-labor
laws). In *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), *overruled on other
grounds in NIFLA v. Becerra*, 138 S. Ct. 2361 (2018), for example, the Ninth

Circuit held that parents do not have a fundamental right to choose "a particular type of provider" (namely, state-licensed therapists) to engage in conversion therapy (or SOCE) with their children if the state has reasonably deemed such therapy harmful. *Id.* at 1236. There, while parents were free to seek conversion therapy for their children in other ways (through a church, for example), the *Pickup* Court held that they not "compel the California legislature, in shaping its regulation of mental health providers, to accept Plaintiffs' personal views of what therapy is safe and effective for minors." *Id.*

*Pickup* does not control here, however—and the State does not argue that it does.[6] The case is distinguishable because the California legislature reasonably concluded that conversion therapy was harmful, as "the overwhelming consensus was that SOCE was harmful and ineffective." *Id.* at 1232. The opposite is true here. The American medical establishment overwhelmingly supports the gender-affirming medical care HB 71 bans; indeed the various medical and mental health organizations filed a brief stating that HB 71 "effectively bans healthcare providers from providing patients under 18 with critical, medically necessary, evidence-based treatments for gender dysphoria, . . . ." *Amici Br.*, Dkt. 33-1, at 2. This Court has likewise found such care safe, effective, and medically necessary for some

---

[6] None of the parties cited or discussed *Pickup*, either in the briefing or during argument.

adolescents. And, more broadly, it doesn't make sense to allow a state to "simply deem a treatment harmful to children without support in reality and thereby deprive parents of the right to make medical decisions on their children's behalf. Allowing the state to do so is tantamount to saying there is no fundamental right." *L.W.,* 83 F.4th at 511 (White, J., dissenting) (citing *Pickup* and other cases in the context of acknowledging that a state may prohibit a parent from subjecting a child to "genuinely harmful treatment"). And while judges are of course "not scientists . . . neither may [Courts] abandon the field when government officials with experts in tow seek to infringe a constitutionally protected liberty. The whole point of strict scrutiny is to test the government's assertions . . . ." *Id.* (quoting *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) (statement of Gorsuch, J.)).

Returning, then, to *Parham* and *Wallis,* this Court easily concludes that the parent plaintiffs enjoy a fundamental right to seek a specific form of medical treatment for their children, which would include the gender-affirming medical care banned by HB 71. Most federal district courts confronting similar statutory bans have agreed,[7] though the two circuit courts that have weighed in thus far (the

---

[7] *See Eknes-Tucker v. Marshall*, 603 F. Supp. 3d 1131, 1144 (M.D. Ala. 2022) (finding that the right of parents to make decisions concerning the care, custody, and control of their

(Continued)

Sixth and the Eleventh Circuits) do not. *See L.W. ex. rel. Williams v. Skrmetti*, 83

F.4th 460 (6th Cir. 2023); *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205

(11th Cir. 2023).[8] This Court finds the majority of the district court opinions

persuasive, and, by contrast, respectfully disagrees with the Sixth and Eleventh

Circuit's treatment of the issue. In this Court's view, the Sixth and Eleventh

Circuits framed the asserted fundamental right far too narrowly and then

incorrectly brushed *Parham* aside on the grounds that it was a procedural due

process case. *L.W.*, 83 F.4th at 476-77; *Eknes-Tucker*, 80 F.4th at 1222-23.

The Sixth and Eleventh Circuit's framing of the fundamental right renders

the Fourteenth Amendment largely meaningless. If the right is narrowly defined as

---

children "encompassed . . . the more specific right to direct a child's medical care"), *vacated,* 80 F.4th 1205 (11th Cir. 2023); *Brandt v. Rutledge*, 551 F. Supp. 3d at 892–893 ("The Court finds that the Parent Plaintiffs have a fundamental right to seek medical care for their children and, in conjunction with their adolescent child's consent and their doctor's recommendation, make a judgment that medical care is necessary."), *aff'd* 47 F.4th 661 (8th Cir. 2022); *Doe v. Thornbury*, 2023 WL 4230481, at *6 (W.D. Ky. June 28, 2023) (finding that the parent plaintiffs enjoyed a due-process right to obtain established medical treatments to protect their children's health and wellbeing," distinguishing cases such as *Pickup,* "in which plaintiffs claimed a right to access treatment for themselves that was not already available or accepted); *L.W. ex rel Williams v. Skrmetti,* 2023 WL 4232308 (M.D. Tenn. June 28, 2023), *rev'd and remanded,* 83 F.4th 460 (6th Cir. 2023); *Doe v. Ladapo*, 2023 WL 3833848 (N.D. Fla. June 6, 2023) (finding that plaintiffs were substantially likely to succeed on the merits of their claim that Florida's ban violated parents' rights under the Due Process Clause). *But see Poe v. Drummond*, 2023 WL 6516449, at *11 (N.D. Okla. Oct. 5, 2023) (holding that the parent plaintiffs failed to establish a liberty interest because they did not provide any "historical antecedents demonstrating that a right to the Treatment Protocols is deeply rooted").

[8] The Eighth Circuit affirmed a district court's preliminary injunction of a statute banning gender-affirming medical care but did not address the substantive due-process claim. *See Brandt*, 47 F.4th at 672.

---

the right to seek a specific medical treatment, the entirety of modern medicine would fall outside of the scope of a parent's right to control their children's health care. That is so, because no such medical treatment could be shown to be deeply rooted in our nation's history and traditions. Circumscribing the right in this manner means there would be no constitutionally protected right for a parent to seek for their children, without state interference, a whole host of critical 20th and 21st Century medical innovations, e.g., noninvasive fetal heart monitoring, penicillin, insulin, organ transplants, the polio vaccine, corrective heart surgery, and mRNA-based vaccines for the COVID virus.

As for the Sixth and Eleventh Circuits' treatment of *Parham,* the Court agrees that *Parham is* a procedural due process case. But, as discussed, *Parham* also necessarily decided the contours of a parent's authority to make medical decisions for their children in the context of deciding the procedural question. *Accord L.W.*, 83 F.4th at 511 (White, J., dissenting) ("Clearly, … *Parham* was expounding the substantive due-process right of parents to direct their children's medical care, although the discussion was in the context of addressing the minor plaintiffs' procedural due-process claims.")

For all these reasons, the Court concludes that the parent plaintiffs have asserted a fundamental right and that HB 71 must therefore survive strict scrutiny. And given that HB 71 is unlikely to survive heightened scrutiny, it is also unlikely

MEMORANDUM DECISION AND ORDER - 48

to survive strict scrutiny. The parent plaintiffs have thus shown they are likely to succeed on the merits of their claim.

## B. Irreparable Harm

It is well established that the deprivation of constitutional rights "unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Hecox*, 79 F.4th at 1035–36. Therefore, because HB 71 is likely unconstitutional, "it follows inexorably" that plaintiffs have demonstrated irreparable harm. *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) Additionally, plaintiffs have submitted declarations stating that the gender-affirming medical care the minor plaintiffs are receiving has dramatically improved their condition and that eliminating access to those treatments would cause serious consequences, including severe psychological distress and, potentially, the need to regularly incur the expense of out-of-state travel or move out of state permanently. *See Poe Decs.*, Dkts. 32-2, 32-3; *Doe Decs.*, Dkts. 32-4, 32-5. Alternatively, if the plaintiffs do not move or travel out of state for care, they will be forced to stop the hormone therapy they are currently receiving and which has helped them so dramatically. And, more generally, the record reflects that medical treatments banned by HB 71 can be a crucial part of treatment for adolescents with gender dysphoria, and necessary to preserve their health.

The Court is not persuaded by the State's arguments to the contrary. In essence, the State is arguing that the minor plaintiffs and others who receive gender-affirming medical care will be harmed if the law does *not* take effect. In that regard, after arguing that plaintiffs failed to show that the benefits of these treatments outweighs the harms, the State points out that "the *entire point* of HB 71 is to *prevent* irreparable harm to children and adolescents from these specific interventions." *Def.s' Resp.*, Dkt. 65, at 27; *see also id.* at 28 (arguing that "[i]f HB 71 is enjoined, untold numbers of children in Idaho will face lasting harm and irreversible damage to their bodies."). But as explained above, the Court has found that the evidence shows the opposite.

## C. Balance of Equities & Public Interest

"When the government is a party to a lawsuit, the balance of the equities and public interest prongs of the preliminary injunction test merge, because government actions presumably are in the public interest." *Hecox*, 79 F.4th at 1036. Here, because plaintiffs have shown a likelihood that a state law violates the Constitution, they have also established that both the public interest and the balance of equities favors a preliminary injunction, as both factors favor "prevent[ing] the violation of a party's constitutional rights." *Id. (*citing *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

## D. Scope of the Injunction

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assist. Project*, 582 U.S. 571, 579 (2017). In the absence of class certification, injunctive relief generally should be limited to the named plaintiffs. *See Zepeda v. INS*, 753 F.2d 719, 727-28 (9th Cir. 1983). Still, though, the Ninth Circuit has held that "an injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987). In *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996), for example, the Ninth Circuit affirmed a statewide injunction prohibiting enforcement of California's motorcycle helmet law, even though there were just 14 plaintiffs.

Defendants say the injunction should be limited to the named plaintiffs, as plaintiffs cannot satisfy the "no set of circumstances" test of *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which HB 71 would be valid."). Plaintiffs do not engage with this argument, other than to say that a

statewide injunction is necessary to afford them complete relief.

The Court finds that a statewide injunction is appropriate here for three reasons. *First*, all plaintiffs in this case are proceeding under pseudonyms, and it would be administratively burdensome, if even possible, to fashion an injunction that would allow them to secure relief without compromising their anonymity. The Court is particularly mindful of the privacy interests here, as two plaintiffs are minors. *Second*, the Ninth Circuit has upheld statewide injunctions in similar cases. In *Hecox v. Little,* 79 F.4th 1009 (9th Cir. 2023), for example, the court upheld the district court's grant of a state-wide injunction of an Idaho law even though the district court had dismissed plaintiff's facial Fourteenth Amendment challenge. *Id.* at 1036-37 (citing *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (holding that a challenge to a category of applications of a statute may be characterized as an as-applied challenge)). *Third*, if the Court were to issue a plaintiffs-only injunction, it would likely face a number of follow-on lawsuits by similarly situated plaintiffs, which would create needless and repetitive litigation. *Accord Koe v. Noggle*, No. 1:23-CV-2904-SEG, 2023 WL 5339281, at *30 (N.D. Ga. Aug. 20, 2023).

## E. Bond Requirement

Plaintiffs ask the Court to waive the bond requirement under Federal Rule of Civil Procedure 65(c), and defendants do not oppose that request. The Court will therefore waive the requirement, finding that a bond under Rule 65 is unnecessary.

# V
# ORDER

**IT IS ORDERED that:**

1.  Prosecutor Bennetts' Motion to Dismiss (Dkt. 51) is **DENIED**.

2.  Attorney General Labrador and the Idaho Code Commission Members' Motion to Dismiss (Dkt. 57) is **GRANTED in part and DENIED in part** as follows: The motion is **GRANTED** as to the Idaho Code Commission defendants and **DENIED** as to Defendant Attorney General Labrador.

3.  Plaintiffs' Motion for a Preliminary Injunction (Dkt. 32) is **GRANTED**. Accordingly, Defendants Attorney General Labrador and Ada County Prosecutor Bennetts and their successors in office are enjoined from enforcing any provision of House Bill 71 during the pendency of this litigation.

DATED: December 26, 2023

B. Lynn Winmill
United States District Judge