APPEAL NO. 24-142

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PAM POE, by and through her parents and next friends Penny and Peter Poe, et al.,

*Plaintiffs-Appellees*,

v.

RAÚL LABRADOR, in official capacity as Attorney General of the State of Idaho, et al.,

*Defendants-Appellants,*

and

JAN M. BENNETTS, in official capacity as Ada County Prosecuting Attorney, et al.

*Defendants.*

On Appeal from the United States District Court
for the District of Idaho / Case No. 1:23-cv-00269-BLW

# EXCERPTS OF RECORD OF APPELLANTS
## VOLUME 2 of 5

RAÚL R. LABRADOR
ATTORNEY GENERAL

ALAN M. HURST
Solicitor General

JOSHUA N. TURNER
Chief, Constitutional
Litigation and Policy

JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense
OFFICE OF IDAHO
ATTORNEY GENERAL
700 W. Jefferson St.
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
josh.turner@ag.idaho.gov
james.craig@ag.idaho.gov

JOHN J. BURSCH
LINCOLN DAVIS WILSON
ALLIANCE DEFENDING
FREEDOM
440 First Street, NW,
Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
lwilson@ADFlegal.org

JONATHAN A. SCRUGGS
HENRY W. FRAMPTON, IV
ALLIANCE DEFENDING
FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

*Counsel for Appellants*

DAVID H. THOMPSON
BRIAN W. BARNES
JOHN D. RAMER
COOPER & KIRK, PLLC
1523 New Hampshire
Avenue, NW
Washington, DC 20036
202-220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

RAÚL R. LABRADOR
ATTORNEY GENERAL

JOSHUA N. TURNER, ISB #12193
Acting Solicitor General

JAMES E. M. CRAIG, ISB #6365
Chief, Civil Litigation and
Constitutional Defense
RAFAEL J. DROZ, ISB #9934
Deputy Attorney General
Office of the Attorney General
P. O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
josh.turner@ag.idaho.gov
james.craig@ag.idaho.gov
rafael.droz@ag.idaho.gov

*Attorneys for Defendant Raúl Labrador*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PAM POE, by and through her parents and next friends, Penny and Peter Poe, et al.<br><br>*Plaintiffs,*<br><br>v.<br><br>RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho, et al.<br><br>*Defendants.* | Case No. 1:23-cv-00269-BLW<br><br>**EMERGENCY MOTION TO STAY INJUNCTION PENDING APPEAL** |

Defendant Raúl Labrador hereby moves the Court to stay the preliminary injunction previously entered by it on December 26, 2023. *See* Dkt. 78; *see also* F.R.C.P. 62(d); Fed. R. App. P. 8(a)(1). This motion is supported by the memorandum in support of the motion, filed herewith.

DATED:  January 3, 2024.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By:   /s/ *James E. M. Craig*
JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense
JOSHUA N. TURNER
Acting Solicitor General
RAFAEL J. DROZ
Deputy Attorney General

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 3, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which caused the same to be served by electronic service upon all counsel of record.

/s/ *James E. M. Craig*
JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense

(4 of 289), Page 4 of 289     Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 4 of 289
Case 1:23-cv-00269-BLW  Document 74-2  Filed 11/02/23  Page 1 of 177
Jack Turban , M.D., MHS October 16, 2023

```
 1                    UNITED STATES DISTRICT COURT

 2                       DISTRICT OF IDAHO

 3

 4      PAM POE, by and through her  )  Case No.

        parents and next friends,   )  1:23-cv-00269-CWD

 5      Penny and Peter Poe; PENNY   )

        POE; PETER POE; JANE DOE, by )

 6      and through her parents and  )

        next friends, Joan and John  )

 7      Doe; JOAN DOE; JOHN DOE,     )

                                     )

 8                      Plaintiffs,  )

                                     )

 9      v.                           )

                                     )

10      RAÚL LABRADOR, in his        )

        official capacity as the     )

11      Attorney General of the State)

        of Idaho; JAN M. BENNETTS, in)

12      her official capacity as     )

        County Prosecuting Attorney  )

13      for Ada, Idaho; and the      )

        INDIVIDUAL MEMBERS OF THE    )

14      IDAHO CODE COMMISSION, in    )

        their official capacities,   )

15                                   )

                        Defendants.  )

16      _____)

17

18

19        REMOTE VIDEOTAPED DEPOSITION OF JACK TURBAN, M.D., MHS

20                   MONDAY, OCTOBER 16, 2023

21

22

23

24

25      Reported By: Amy E. Simmons, CSR, RDR, CRR, CRC
```

Page 1

ER-070

Jack Turban , M.D., MHS October 16, 2023

1   REMOTE VIDEOTAPED DEPOSITION OF JACK TURBAN, M.D., MHS
2
3       BE IT REMEMBERED that the remote videotaped
4   deposition of JACK TURBAN, M.D., MHS was taken via Zoom
5   videoconference by the attorney for the Defendants before
6   Associated Reporting & Video, a Veritext company, Amy E.
7   Simmons, Idaho CSR No. 685, California CSR No. 14553,
8   Washington CSR No. 22012915, Oregon CSR No. 22-009, and
9   Notary Public in and for the County of Ada, State of
10  Idaho, on Monday, the 16th day of October, 2023,
11  commencing at the hour of 9:06 a.m. Pacific time in the
12  above-entitled matter.
13
14
15  APPEARANCES (remotely):
16  For the Plaintiffs:  AMERICAN CIVIL LIBERTIES UNION
                By: Li Nowlin-Sohl, Esq.
17              Leslie Cooper, Esq.
                125 Broad Street
18              New York, NY 10004
                Telephone: 212.549.2584
19              lnowlin-sohl@aclu.org
                lcooper@aclu.org
20
21  GROOMBRIDGE WU BAUGHMAN & STONE
                By: Philip S. May, Esq.
22              801 17th Street, Suite 1050
                Washington, D.C. 20006
23              Telephone: 202.539.6620
                philip.may@groombridgewu.com
24
25

Page 2

1   APPEARANCES (remotely, continued):
2
    For the Plaintiffs:  ACLU OF IDAHO FOUNDATION
3              By: Dina Flores-Brewer, Esq.
               Post Office Box 1897
4              Boise, ID 83701
               Telephone: 208.344.9750
5              dfloresbrewer@acluidaho.org
6
7   For the Defendants, Labrador and the Individual Members
    of the Idaho Code Commission:
8
    COOPER & KIRK PLLC
9              By: John Ramer, Esq.
               1523 New Hampshire Ave NW
10             Washington, D.C. 20036
               Telephone: 202.220.9621
11             jramer@cooperkirk.com
12  OFFICE OF THE ATTORNEY GENERAL
               By: Rafael J. Droz, Esq.
13             Post Office Box 83720
               Boise, ID  83720
14             Telephone: 208.334.2400
               Facsimile:  208.854.8073
15             rafael.droz@ag.idaho.gov
16
    Also Present:     Chris Ennis, Videographer
17             Jocelyn Larrson,
               Court Reporting Intern
18
19
20
21
22
23
24
25

Page 3

I N D E X
E X A M I N A T I O N

JACK TURBAN, M.D.                         PAGE

By:  Mr. Ramer................................10, 315

     Ms. Nowlin-Sohl.............................313

E X H I B I T S

NO.                          PAGE

Exhibit 1.   Expert Rebuttal Declaration of Jack    11
             Turban, MD, MHS (49 pages)
Exhibit 2.   Deposition Transcript of Jack          11
             Turban, M.D., MHS, Taken 5/19/23
             (354 pages)
Exhibit 3.   Errata Sheet for Deposition Taken      11
             5/19/23 (5 pages)

Exhibit 4.   Users' Guides to the Medical           21
             Literature (545 pages)
Exhibit 5.   The Cass Review Document               29
             (112 pages)

Exhibit 6.   Harvard Countway Library Systematic    56
             Reviews and Meta Analysis (3 pages)
Exhibit 7.   International Journal of               83
             Transgender Health Chapter 6,
             Adolescents (24 pages)
Exhibit 8.   GenderGP Podcast Transcript           102
             (14 pages)

Page 4

E X H I B I T S (continued)
NO.                          PAGE
Exhibit 9.   HHS Public Access Author Manuscript   125
             (15 pages)

Exhibit 10.  2015 Report of the U.S. Transgender   131
             Survey (302 pages)
Exhibit 11.  Plos One "Access to                   136
             Gender-Affirming Hormones During
             Adolescence and Mental Health
             Outcomes Among Transgender Adults"
             (15 pages)
Exhibit 12.  JAMA Psychology "Association          139
             Between Recalled Exposure to
             Gender Identity Conversion Efforts and
             Psychological Distress and Suicide
             Attempts Among Transgender Adults"
             (9 pages)
Exhibit 13.  "Transgender Conversion Therapy       148
             Associated with Severe
             Psychological Distress" (3 pages)

Exhibit 14.  Journal of Adolescent Health "Age     151
             of Realization and Disclosure of
             Gender Identity Development Among
             Adults" (8 pages)
Exhibit 15.  Annalou de Vries and Sabine Hannema   177
             "Growing Evidence and Remaining
             Questions in Adolescent Transgender
             Care" (3 pages)

Exhibit 16.  Transgender Health "Consensus         194
             Parameter" Research Methodologies
             to Evaluate Neurodevelopmental
             Effects of Pubertal Suppression in
             Transgender Youth" (12 pages)
Exhibit 17.  "Evidence Review: Gonadotrophin       213
             Releasing Hormone Analogues for
             Children and Adolescents with
             Gender Dysphoria" (131 pages)

Page 5

2 (Pages 2 - 5)

Jack Turban , M.D., MHS October 16, 2023

E X H I B I T S (continued)

NO.                                                           PAGE

Exhibit 18.  "Evidence Review: Gender-Affirming    224
Hormones for Children and
Adolescents with Gender Dysphoria"
(156 pages)

Exhibit 19.  ACTA Peadiatrica "A Systematic        230
Review of Hormone Treatment For
Children with Gender Dysphoria and
Recommendations for Research"
(14 pages)

Exhibit 20.  Bilaga Till Rapport Article           234
(2 pages)

Exhibit 21.  Brignardello-Peterson, et al.         255
"Effects of Gender-Affirming
Therapies in People with Gender
Dysphoria: Evaluation of the Best
Available Evidence" (70 pages)

Exhibit 22.  Socialstyrelsen "Care of Children     236
and Adolescents with Gender
Dysphoria" (6 pages)

Exhibit 23.  Turban "The Evidence for Trans        258
Youth Gender-Affirming Medical
Care" (10 pages)

Exhibit 24.  Plos One "Correction: Access to       267
Gender-Affirming Hormones During
Adolescence and Mental Health
Outcomes Among Transgender Adults"
(7 pages)

Exhibit 25.  Tweet by Jack Turban, MD (1 page)     274
Exhibit 26.  Tweet by Jack Turban, MD (1 page)     277
Exhibit 27.  Tweet by Jack Turban, MD (1 page)     280
Exhibit 28.  Tweet by Jack Turban, MD (1 page)     284
Exhibit 29.  "One Size Does Not Fit All: In        296
Support of Psychotherapy for Gender
Dysphoria (10 pages)

Page 6

E X H I B I T S (continued)

NO.                                                    PAGE

Exhibit 30.  LGBT Health "Factors Leading to      299
'Detransition' Among Transgender
and Gender Diverse People in the
United States: A Mixed-Methods
Analysis" (8 pages)

Page 7

P R O C E E D I N G S

THE VIDEOGRAPHER:  All right.  So we are
recording, and we are on the record.  Today's date
is October 16, 2023.  The time is 9:06 a.m.
Pacific.

For the record, this is the remote
videotaped deposition of Dr. Jack Turban.  It's
taken by the Defendants in the matter of Poe, et
al. vs. Labrador, et al.  It's Case
No. 1:23-cv-00269-CWD.  It is in the United States
District Court for the District of Idaho.

The videotaped deposition is being held
remotely via Zoom videoconference.  The videotaped
deposition is being recorded by Chris Ennis and
reported by Amy Simmons of Associated Reporting &
Video, a Veritext Company.

And if counsel will please state their
appearances and any stipulations for the record.

MR. RAMER:  John Ramer of the law firm
Cooper & Kirk representing the State defendants.

MS. NOWLIN-SOHL:  Li Nowlin-Sohl with the
ACLU representing Plaintiffs.

MS. COOPER:  Leslie Cooper with the ACLU,
Plaintiffs.

Page 8

MR. MAY:  And Philip May from
Groombridge, Wu, Baughman & Stone on behalf of
Plaintiffs.

THE VIDEOGRAPHER:  And if the court
reporter will please swear the witness.

THE REPORTER:  I think we have a couple
more people that need to identify themselves
first.  I've got Rafael Droz and Dina Flores.

MS. FLORES-BREWER:  Yes.  This is Dina
Flores-Brewer.  I'm one of the attorneys for ACLU
of Idaho.  I am just listening in today.

THE REPORTER:  Thank you.  And Mr. Droz
is for the State; is that correct?  I'm thinking
he's just not on.

MR. RAMER:  That's right.  He's with the
Idaho Attorney General's Office representing the
State defendants.


JACK TURBAN, M.D., MHS,
a witness having been first duly sworn to tell the truth,
the whole truth, and nothing but the truth, testified as
follows:
///
///
///

Page 9

3 (Pages 6 - 9)

ER-072

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1        EXAMINATION | 1      Q. (BY MR. RAMER) And then Turban |
| 2 BY MR. RAMER: | 2 Exhibit 3, does this document appear to be your |

Page 10

1        EXAMINATION
2 BY MR. RAMER:
3      Q. (BY MR. RAMER) Good morning, Dr. Turban.
4      A. Good morning.
5      Q. My name is John Ramer. I'm from the law
6 firm Cooper & Kirk representing the State
7 defendants in this case.
8        I know you've been deposed before, but
9 just as a quick refresher for both of us -- more
10 for me -- but for the benefit of the court
11 reporter, we'll try not to talk over one another.
12        And I'd just ask that you respond
13 verbally when answering questions.
14        If you don't understand anything about my
15 question, please just let me know; otherwise, I'll
16 assume you're answering the question asked.
17        And I typically aim for a break every
18 hour or so, but if you need a break at any point,
19 just let me know. And my only request would be
20 that you answer any question that's pending before
21 we go on a break.
22        Does that all sound good?
23      A. Yes.
24        MR. RAMER: And first, I'm just going to
25 introduce and mark some documents that we'll

Page 10

1 likely be referring to throughout the day. The
2 first one Li should have. It's Turban Exhibit 1.
3 I think the file name says "Tab A." When you have
4 it, just let me know.
5      (Deposition Exhibit No. 1 was marked.)
6      THE WITNESS: I have it.
7      Q. (BY MR. RAMER) And, Dr. Turban, is this
8 a copy of the declaration you submitted in this
9 case?
10      A. Yes.
11      Q. Okay. And attached to the declaration,
12 is your CV attached?
13      A. Yes.
14      Q. And I assume there are not any major
15 changes over the weekend from when this was filed
16 on Friday?
17      A. Correct.
18      (Deposition Exhibit No. 2 was marked.)
19      Q. (BY MR. RAMER) Okay. The next document,
20 Turban Exhibit 2, does this appear to be the
21 transcript of your deposition in the Indiana case,
22 K.C. vs. The Individual Members of the Medical
23 Licensing Board?
24      A. It appears to be, yes.
25      (Deposition Exhibit No. 3 was marked.)

Page 11

1      Q. (BY MR. RAMER) And then Turban
2 Exhibit 3, does this document appear to be your
3 signed errata sheet for your deposition in the
4 Indiana case?
5      A. Yes.
6      Q. And, Dr. Turban, is anyone in the room
7 with you besides Li Nowlin-Sohl?
8      A. Sorry, no.
9      Q. And do you have any documents open in
10 front of you?
11      A. Just the exhibits that you sent.
12      Q. Great. Dr. Turban, are you familiar with
13 the term "evidence-based medicine"?
14      A. Yes.
15      Q. And what is your understanding of that
16 term?
17      A. The broad term, that refers to using the
18 existing published research literature when making
19 decisions about medical care.
20      Q. And do you practice evidence-based
21 medicine?
22      A. Yes.
23      Q. And how does one practice evidence-based
24 medicine?
25      A. That's a big question that involves many

Page 12

1 years of medical school and residency and
2 fellowship training, but as a general matter it
3 involves having a patient in front of you and
4 referencing the existing research literature to
5 try to make the best decision for that patient
6 based on the research that's been published.
7      Q. Are you familiar with the term
8 "systematic review"?
9      A. Yes.
10      Q. And what is your understanding of that
11 term?
12      A. Systematic review is when one predefines
13 search terms that they are going to use when
14 searching various research databases. Then they
15 provide a review of the literature that they
16 identify through that search method.
17      Q. When you say "they provide a review of
18 the literature," what do you mean by that?
19      A. They would define search terms. They
20 would put those search terms into the research
21 databases. Many papers will come out of there,
22 but then there's variation in how they may choose
23 to include or exclude different studies, how they
24 interpret them, and how they summarize their
25 reading of those papers.

Page 13

4 (Pages 10 - 13)

ER-073

Jack Turban , M.D., MHS October 16, 2023

Page 14

1    Q.  And what does the practice of
2  evidence-based medicine say about the role of
3  systematic reviews in clinical decision-making?
4        MS. NOWLIN-SOHL:  Object to the form.
5        THE WITNESS:  Again, because systematic
6  reviews can be so broad, there would be systematic
7  reviews that would be very useful and there would
8  be some other systematic reviews that would be
9  less useful.
10        Usually in evidence-based medicine people
11  are talking about systematic reviews of clinical
12  trials or of non -- like, observational studies or
13  comparative studies, but there's not really a
14  straightforward answer.  Systematic review is just
15  one way of collecting literature that you may then
16  use when working through evidence-based medicine.
17    Q.  (BY MR. RAMER)  And do you know how a
18  systematic review is conducted?
19    A.  There are many different ways to conduct
20  a systematic review, but again, in general, one
21  would predefine their search terms to find the
22  databases they're going to use, put those search
23  terms into those databases, screen abstracts,
24  identify the abstracts that they feel are relevant
25  to their questions, and then summarize that

Page 15

1  literature.
2    Q.  What is the value of a systematic review
3  over an alternative method of reviewing a body of
4  scientific literature?
5    A.  Do you mean comparing a systematic review
6  to, say, a narrative review?
7    Q.  Sure.  Or any other -- I guess what other
8  types of reviews of the body of scientific
9  literature are there besides systematic review and
10  a narrative review?
11    A.  Those are the two main ones that people
12  would discuss.  So a narrative view is usually
13  written by an expert who knows the literature
14  broadly but they may not include in their
15  manuscript what specific search terms they used,
16  what specific databases they used, but they'll
17  summarize what's known about the research, and
18  they'll go through peer review where other experts
19  check that material also.
20        They would add additional literature if
21  that individual author has missed something.  It
22  goes back and forth through the peer-review
23  process until the reviewer, the editor, and the
24  author feel that it's comprehensive.
25        A systematic review is different in that

Page 16

1  the manuscript will actually say "These are the
2  search terms that we used when searching our
3  literature databases, and these are the databases
4  that we used."  So it makes it a little bit easier
5  for another researcher to repeat their search.
6    Q.  Have you ever conducted a systematic
7  review?
8    A.  Not as a first author, but I've been part
9  of a team that's conducted a systematic review.
10    Q.  And what systematic review was that?
11    A.  The systematic review of a broad category
12  of functional neurologic disorders among sexual-
13  and gender-minority people.
14    Q.  Do you happen to know the name of that
15  paper?
16    A.  I think the first author is Lerario,
17  L-e-r-a-r-i-o, I believe.
18    Q.  And what was your role in that systematic
19  review?
20    A.  I assisted the team with choosing our
21  search terms, choosing the databases, and also in
22  writing the manuscript, editing the manuscript.
23    Q.  As you sit here today, are you able to
24  name any specific systematic reviews relating to
25  literature in your field that you have read?

Page 17

1        MS. NOWLIN-SOHL:  Object to form.
2        THE WITNESS:  I don't know that I would
3  have, like, a specific title that I could rattle
4  off, but there have been many systematic
5  reviews -- is there a specific part of my field
6  that you're referencing?
7    Q.  (BY MR. RAMER)  I guess what field are
8  you opining upon as an expert in this case?
9    A.  The treatment of adolescents with gender
10  dysphoria.
11    Q.  So then, yes, I guess I'll talk about
12  that field.
13        Have you -- as you sit here today, are
14  you able to name any specific systematic reviews
15  relating to literature in that field that you have
16  read?
17    A.  I don't remember the exact titles, but I
18  know there was one, I believe, in the Journal of
19  Transgender Health a few years ago.
20        There have been a number of
21  non-peer-reviewed systematic reviews.
22        I believe there were systematic reviews
23  conducted as part of some of the guidelines that
24  were written.
25    Q.  And I know you said you don't know the

5 (Pages 14 - 17)

(9 of 289), Page 9 of 289     Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 9 of 289
Case 1:23-cv-00269-BLW   Document 74-2   Filed 11/02/23   Page 6 of 177
Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1  title, but the one that you first referred to in | 1      So can you repeat that answer for me, |
| 2  the Journal For Transgender Health, can you | 2  please? |
| 3  describe it so that we can at least try to | 3      THE WITNESS:  Yeah, sorry.  I'm trying to |
| 4  identify it? | 4  see if I can turn up the microphone also. |
| 5      A.  It was a few years ago that it came out, | 5      THE REPORTER:  Thank you. |
| 6  but it was I think generally looking at the mental | 6      THE WITNESS:  I think the microphone is |
| 7  health impacts of different gender-affirming | 7  up all the way.  Is this better with it close? |
| 8  medical interventions for adolescents with gender | 8      THE REPORTER:  Let's try it. |
| 9  dysphoria. | 9      THE WITNESS:  I think the question was if |
| 10      And, as a systematic review generally | 10  I've had any coursework in using evidence-based |
| 11  does, goes through the strengths and weaknesses of | 11  medicine? |
| 12  different studies that have been published. | 12      Q.  (BY MR. RAMER)  That's right. |
| 13      Q.  Do you remember any of the authors on it? | 13      A.  So certainly that would be part of -- my |
| 14      A.  I don't recall. | 14  undergraduate degree was in neuroscience from |
| 15      Q.  Of the systematic reviews you described, | 15  Harvard College. |
| 16  did you study them in detail? | 16      And then I received my medical school |
| 17      MS. NOWLIN-SOHL:  Object to form. | 17  degree from Yale School of Medicine where we |
| 18      THE WITNESS:  Generally if you are in a | 18  talked about evidence-based medicine both in our |
| 19  specific field where you know most of the research | 19  preclinical classroom courses and through our |
| 20  papers, the thing that's most interesting about | 20  clinical courtships when we're working with |
| 21  systematic review is if it identifies a paper that | 21  patients. |
| 22  you didn't already know about. | 22      And then received a master's of health |
| 23      The big thing about systematic review is | 23  sciences research from Yale also. |
| 24  that it's using specific search terms and doing | 24      I did my adult psychiatry residency at |
| 25  this really comprehensive search of these large | 25  Harvard Medical School at MGH McLean where we had |
| Page 18 | Page 20 |
| 1  databases, so it's values that can identify a | 1  more courses on it as well as applying it |
| 2  peer-reviewed research paper that you didn't know | 2  practically to seeing patients. |
| 3  about previously. | 3      And then similarly in my fellowship in |
| 4      So probably what I would have done is if | 4  child and adolescent psychiatry at Stanford. |
| 5  there were any papers in there that I didn't know | 5      MR. RAMER:  Okay.  And I'd like to |
| 6  about, I would have added it to my running list of | 6  introduce what will be Turban Exhibit 4.  And it |
| 7  papers that I think are important for me to know | 7  should be the Users' Guides to the Medical |
| 8  and for my fellows to know and others in the | 8  Literature Third Edition. |
| 9  field. | 9      (Deposition Exhibit No. 4 was marked.) |
| 10      Q.  (BY MR. RAMER)  And this question may not | 10      Q.  (BY MR. RAMER)  Do you see that? |
| 11  make sense, but have you taken any particular | 11      A.  Yes. |
| 12  courses on the evidence-based medicine?  Or is it | 12      Q.  And have you seen this document before? |
| 13  more it's a set of principles that is infused into | 13      A.  I do not believe I have. |
| 14  all of medical education? | 14      Q.  Do you recognize the lead author's name, |
| 15      MS. NOWLIN-SOHL:  Object to form. | 15  Gordon Guyatt? |
| 16      THE WITNESS:  Certainly there is some in | 16      A.  I do not.  It looks like he is a |
| 17  my undergraduate degree in neuroscience that was | 17  biostatistician in Ontario. |
| 18  from Harvard.  Also my medical school courses -- | 18      Q.  Where are you getting that information? |
| 19  [indiscernible]. | 19      A.  From the first page. |
| 20      THE REPORTER:  Dr. Turban, I'm sorry to | 20      Q.  Oh, I see.  And I'd like to go to page 4, |
| 21  interrupt.  I'm having a hard time understanding | 21  which I think is 33 in the PDF. |
| 22  you a little bit.  I don't know if you can get | 22      A.  Okay. |
| 23  closer to the microphone or maybe slow down a tiny | 23      Q.  The second full sentence on this page, |
| 24  bit?  Some of your words are just cutting out, and | 24  I'll just read it and ask if I've read it |
| 25  I'm struggling with understanding them. | 25  correctly. |
| Page 19 | Page 21 |

6 (Pages 18 - 21)

Jack Turban , M.D., MHS October 16, 2023

Page 22

1     It says "Efficient and optimally
2  effective evidence-based practice dictates
3  bypassing the critical assessment of primary
4  studies and, if they are available, moving
5  straight to the evaluation of rigorous systematic
6  reviews."
7     Did I read that correctly?
8     A.  Yes.
9     Q.  And do you agree with that statement?
10    A.  Yeah, I think this is similar to what I
11  was saying before, that it wouldn't be a good
12  practice to just look at one or two individual
13  studies.  [Indiscernible] -- of a systematic
14  review is that it's going to identify more studies
15  that you may not find -- that a more, as they're
16  saying, quote, rigorous systematic review with a
17  certain search approach would potentially
18  identify.
19     It's basically saying that you don't want
20  to miss individual studies that might be important
21  for your interpretation.
22    Q.  But it looks like it's discussing that
23  you need to bypass, quote, the critical assessment
24  primary studies, end quote, and instead proceed to
25  systematic reviews.

Page 24

1  understand the very last part of what you just
2  said.
3     Could you say that again?
4     A.  The word "bypass" is tricky because I
5  think -- correct me if I'm wrong, but I think you
6  were reading "bypass" as meaning you should not
7  read the individual studies and you should just go
8  to the systematic review.  That's not my
9  interpretation.
10    I think they're saying that you shouldn't
11  just read individual studies because you might
12  miss other important studies.  So you should read
13  the studies that you identified, but you should
14  also go to systematic reviews to make sure you're
15  not missing important information or studies that
16  you yourself didn't identify in your search.
17    Q.  And then I'd like to go to page 14, which
18  I think is page 43 in the PDF.
19    A.  Okay.
20    Q.  And the first full paragraph on this
21  page, I'm just going to read the first two
22  sentences and ask if I read it correctly.
23    It says "Rational clinical decisions
24  require systematic summaries of the best available
25  evidence.  Without such summaries, clinicians,

Page 23

1     And that -- do you agree that seems to be
2  discussing something different than merely
3  identifying studies?
4     MS. NOWLIN-SOHL:  Object to form.
5     THE WITNESS:  I may have to read it in
6  context to see what they mean by "bypass," if you
7  give me a moment.
8     If read in context, this seems to talk
9  about how one could read individual studies.  It
10  then goes on to say that there are times where an
11  individual study doesn't give you the full picture
12  because other studies may provide additional
13  information.
14    Then they're saying, you know, you should
15  bypass the individual studies and go to the
16  systematic reviews, but I think really what they
17  mean is don't only read individual studies because
18  that would put you at risk of missing other
19  studies that are important for understanding the
20  body of research as a whole is how I read that
21  sentence.  I don't think they're saying to ignore
22  individual studies or to not consider reading them
23  in depth when they're identified in the systematic
24  review.
25    Q.  (BY MR. RAMER)  I'm sorry.  I didn't

Page 25

1  expert or otherwise, will be unduly influenced by
2  their own preconceptions and by unrepresentative
3  and often lower quality evidence."
4     Did I read that correctly?
5     A.  Yes.
6     Q.  And do you agree with those statements?
7     A.  Again, I think what this is saying is
8  that if you only knew some of the research
9  literature and you were missing several research
10  studies, then you wouldn't have the complete
11  picture of the evidence.  And I believe that is
12  true.
13    Q.  What do you take them to be referring to
14  when they discuss "lower quality evidence"?
15    MS. NOWLIN-SOHL:  Object to form;
16  foundation.
17    THE WITNESS:  They don't -- I don't know
18  if they provided a specific definition earlier,
19  but it's a subjective term relevant to others.  It
20  would depend on what you were comparing,
21  presumably something lower quality than the other
22  papers you had not identified in some way.  But I
23  don't think they're specifying a specific way in
24  which one paper is lower quality than another,
25  just highlighting that some papers may be higher

7 (Pages 22 - 25)

ER-076

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| Page 26 | Page 28 |

**Page 26**

1　quality than others.
2　　Q.　(BY MR. RAMER)  How can one paper be
3　higher quality than another?
4　　A.　Oh, I would need to give you an entire
5　course on clinical research and statistical
6　approaches.
7　　Q.　Okay.  So your point -- just to kind of
8　summarize here, your point is that the value of
9　the systematic review is really just the value of
10　identifying relevant studies; is that fair?
11　　A.　The major goal of systematic review is to
12　collect the best you can.  Systematic reviews are
13　never perfect.  There are intricacies in what
14　search terms you use, which databases you use, how
15　you choose to include and exclude different
16　studies, so there are many ways that systematic
17　review can be high quality or low quality itself.
18　　　　But in general the goal, if it's done
19　well, is that you would identify all the relevant
20　research, that you could really be making your
21　summaries of the literature based on a complete
22　picture, that you're not missing important
23　studies.
24　　Q.　So it's just about locating studies; is
25　that right?

**Page 28**

1　and we are back on the record.
2　　　MR. RAMER:  Okay.  I just tried hitting
3　send again the compressed version.  So if that
4　shows up, Li, just let me know.
5　　Q.　(BY MR. RAMER)  While we're waiting,
6　Dr. Turban, have you ever heard the term the
7　"hierarchy of evidence"?
8　　　Sorry.  Did you hear me?
9　　　MR. RAMER:  Amy, can you hear me?
10　　　THE WITNESS:  Something just happened
11　with our A/V system.
12　　　MS. NOWLIN-SOHL:  Can you hear us, John?
13　　　MR. RAMER:  I just said while we're
14　waiting --
15　　　MS. NOWLIN-SOHL:  Okay.  We cannot hear
16　you.
17　　　MR. RAMER:  Okay.  Let's go off the
18　record again.
19　　　THE WITNESS:  Try again now, please.
20　　　MR. RAMER:  Can you hear me?  All right.
21　　　THE VIDEOGRAPHER:  Okay.  I'll take you
22　guys off here.  One second.
23　　　So the time is 9:35 a.m. Pacific, and we
24　are off the record.
25　　　(Brief pause in the proceedings.)

**Page 27**

1　　　MS. NOWLIN-SOHL:  Objection;
2　mischaracterizes prior testimony.
3　　　THE WITNESS:  It's about in a systematic
4　way, identifying relevant papers and then one
5　generally summarizes them as well.
6　　　Ideally, a critical reader of a
7　systematic review would go back to those studies
8　and read them as well, if it were feasible.
9　　　MR. RAMER:  And I tried to send what I'll
10　call Turban Exhibit 5.  Did you receive that, Li?
11　　　MS. NOWLIN-SOHL:  I have not.
12　　　MR. RAMER:  Okay.
13　　Q.　(BY MR. RAMER)  Let's do it this way.
14　Dr. Turban, have you ever heard of the pyramid of
15　evidence?
16　　A.　Broadly speaking.
17　　　MR. RAMER:  Hey, Li, do you mind if we go
18　off the record for just one second to discuss a
19　technical issue?
20　　　MS. NOWLIN-SOHL:  Yeah, that's fine.
21　　　THE VIDEOGRAPHER:  Okay.  So the time is
22　9:32 a.m. Pacific time, and we are off the record.
23　　　(Brief pause in the proceedings.)
24　　　THE VIDEOGRAPHER:  All right.  So we are
25　recording.  The time is 9:33 a.m. Pacific time,

**Page 29**

1　　　THE VIDEOGRAPHER:  Okay.  So we are
2　regarding.  The time is 9:37 a.m. Pacific, and we
3　are back on the record.
4　　　(Deposition Exhibit No. 5 was marked.)
5　　Q.　(BY MR. RAMER)  Okay.  Dr. Turban, do you
6　have Turban Exhibit 5, which says "The Cass
7　Review" at the top in front of you?
8　　A.　Yes.  February 2022.
9　　Q.　And have you seen this document before?
10　　A.　Yes.
11　　Q.　Have you read it?
12　　A.　Yes.
13　　Q.　And when did you first read it?
14　　A.　I don't recall.  Many months ago.
15　　Q.　Do you recall what you thought when you
16　read it?
17　　A.　My main takeaways were that they --
18　there's a lot of news coverage of it also.
19　　　My understanding is there were very long
20　wait lists for the central gender clinic in the
21　U.K.  And because of those long waits, there was
22　concern that the physicians weren't able to
23　provide comprehensive care and be able to see the
24　number of patients they had on their very long
25　wait list.

8 (Pages 26 - 29)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1    So I think the review went in and<br>2 ultimately determined it would be better to close<br>3 that centralized clinic and open several regional<br>4 clinics where they'd be able to provide more<br>5 comprehensive individualized care.<br>6    Q.  Okay.  And I'd like to go to page 62 of<br>7 this document.<br>8      And just let me know when you're there.<br>9    A.  We're there.  Figure 3?<br>10    Q.  Yes.  And so Figure 3 is entitled<br>11 "Pyramid of Standards of Evidence"; is that right?<br>12    A.  Yes.<br>13    Q.  And have you seen this image before?<br>14    A.  I've seen images like this one before.<br>15    Q.  And have you ever heard the term<br>16 "hierarchy of evidence"?<br>17    A.  In a general sense, yes.<br>18    Q.  And what's your understanding of that<br>19 term?<br>20    A.  Just a broad reference to the fact that<br>21 some research studies may have fewer potential<br>22 interpretive pitfalls than others.<br>23    Q.  And can you explain why this figure has<br>24 "Systematic reviews" at the top of the pyramid?<br>25    A.  I think this is going to the point that<br>Page 30 | 1    Q.  And why is that of higher value?<br>2    A.  Because you're looking at all of the<br>3 studies instead of looking at just one.<br>4    Q.  And so again, you think that what this<br>5 figure is showing is that systematic reviews are<br>6 at the top of the pyramid because they identify<br>7 all the studies?<br>8      MS. NOWLIN-SOHL:  Objection;<br>9 mischaracterizes prior testimony.<br>10      THE WITNESS:  Yeah, I would say what's at<br>11 the top is "Systematic review and meta-analyses,"<br>12 and that a systematic review with a meta-analysis<br>13 is summarizing to the best of its ability with<br>14 many caveats as much of the literature as<br>15 possible.<br>16    Q.  (BY MR. RAMER)  Okay.  Can you explain<br>17 why cohort studies are below randomized controlled<br>18 trials on this pyramid?<br>19    A.  So cohort studies are studies where you<br>20 have a group of patients and you follow them over<br>21 time.  So the realm of gender-affirming medical<br>22 care, this would be something like having<br>23 adolescents with gender dysphoria who are treated<br>24 with testosterone, and you look before and after<br>25 and you see their mental health is better after.<br>Page 32 |
| 1 knowing the body of literature as a whole is more<br>2 useful than just an individual study.<br>3      I think it's worth pointing out that it<br>4 actually says "Systematic reviews and<br>5 meta-analyses."<br>6      And meta-analyses are different.  So<br>7 meta-analyses are when you actually take all the<br>8 research studies that have been done and conduct<br>9 statistical analyses to create a composite number<br>10 that really tells you in a quantitative way how to<br>11 put all the research together instead of some of<br>12 these systematic reviews where their description<br>13 is narrative; they're just kind of saying their<br>14 interpretation of the data.<br>15      That's different from a meta-analysis<br>16 where they actually apply statistical techniques<br>17 to summarize all of the research as a whole.<br>18      So systematic review and meta-analysis is<br>19 a specific kind of paper that's not just a<br>20 systematic review.<br>21      But generally what this figure is getting<br>22 at is that if you have a paper that has all of the<br>23 research literature, or as much as possible of the<br>24 research literature together and summarized,<br>25 that's of higher value than individual studies.<br>Page 31 | 1 That's a cohort study.<br>2      If you were looking just at an individual<br>3 cohort study -- and again, this is why you<br>4 shouldn't look at just one paper -- you might ask,<br>5 "Okay.  Did their mental health improve because of<br>6 the testosterone?  Or was their mental health<br>7 going to improve anyway?"<br>8      Does that make sense?<br>9      So in the research, we have other studies<br>10 that compared those who had access to treatment to<br>11 those who didn't.  We have parallel process<br>12 models.  We have all these ways to answer that<br>13 question that aren't on this, like, very basic<br>14 teaching tool that's this pyramid.<br>15      The reason a randomized controlled trial<br>16 is above that is because a randomized controlled<br>17 trial in a single paper could answer two<br>18 questions.  So it could tell you does mental<br>19 health improve before and after?  And also do<br>20 people who get treatment do better than those who<br>21 don't do treatment, which approaches this question<br>22 of would their mental health have just gotten<br>23 better anyway?<br>24      So a randomized controlled trial can kind<br>25 of hit more things in one study than a cohort<br>Page 33 |

9 (Pages 30 - 33)

ER-078

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1   study can. | 1      THE WITNESS: Again, with all due |
| 2     Q. Do you think this pyramid is saying that | 2   respect, I think your question is implying lack of |
| 3   a randomized controlled trial is of higher quality | 3   understanding of how the studies are designed. |
| 4   than a cohort study? | 4   You can't put the exact same inputs into a cohort |
| 5     A. I think that's a broad | 5   study and a randomized controlled trial because |
| 6   oversimplification, but I think what it's saying | 6   they're different study designs. |
| 7   is that if you had a single randomized controlled | 7      So when you're saying "all else being |
| 8   trial that was well conducted, it would likely | 8   equal," I really don't know what you -- I need you |
| 9   give you more information than a cohort study. | 9   to be more specific. |
| 10     Q. Because it's of higher quality? | 10     Q. (BY MR. RAMER) And when you say they're |
| 11     A. Not necessary -- what do you mean by | 11   a different study design, does the design of one |
| 12   "higher quality"? | 12   lead to a higher quality study than the design of |
| 13     Q. Because that study design is of higher | 13   the other? |
| 14   quality than a cohort study. | 14      MS. NOWLIN-SOHL: Object to the form. |
| 15     A. I would say because it has the benefit of | 15      THE WITNESS: I believe I answered that |
| 16   having a control group, medical cohort study does | 16   question. |
| 17   not, which gives you additional information about | 17     Q. (BY MR. RAMER) Could you remind me what |
| 18   whether or not your outcome would have improved | 18   your answer was? |
| 19   whether or not the introduction was given. It | 19      MS. NOWLIN-SOHL: Same objection. |
| 20   gives you more information. | 20      THE WITNESS: So they're different study |
| 21      A single randomized controlled trial, | 21   designs. A cohort study tells you whether or not |
| 22   when well conducted, can give more information | 22   an outcome changes before and after the |
| 23   than a cohort study. | 23   intervention. It does not have a control group. |
| 24     Q. What about -- and I know this is -- I'm | 24      So you could be left with the question of |
| 25   not -- this question is not about a specific | 25   whether or not your outcome improved because of |
|                   Page 34 |                   Page 36 |
| 1   study. It's more about methodology in theory. | 1   the intervention or because it was going to |
| 2      And so my question is looking at this, in | 2   improve anyway over time. |
| 3   theory you have a group of four cohort studies. | 3      A randomized controlled trial generally |
| 4   And if you have a group of four randomized | 4   has two groups. One group gets intervention; one |
| 5   controlled trials, all else being equal, based on | 5   group doesn't. So you can see maybe the treatment |
| 6   the design of those studies, are the randomized | 6   group improves and the other group, which could be |
| 7   controlled trials of higher quality than the | 7   many different groups -- let's say it's a placebo |
| 8   cohort studies? | 8   in this case -- does not improve, and then that |
| 9      MS. NOWLIN-SOHL: Object to form. | 9   would tell you, okay. It probably wasn't that |
| 10      THE WITNESS: It's hard to say all else | 10   they improved just because of time. |
| 11   being equal because there are so many variables | 11      So in that case, a randomized controlled |
| 12   that go into how you design a cohort study or how | 12   trial can give you more information than a cohort |
| 13   you design a randomized controlled trial, so I | 13   study wouldn't. So it has the potential to give |
| 14   would really need you to kind of give me specific | 14   you more information certainly. |
| 15   studies to answer that question. | 15     Q. And on this pyramid, on the left side of |
| 16     Q. (BY MR. RAMER) Well, no. It's a | 16   it, the arrow that's adjacent that refers to |
| 17   hypothetical about the theory and the method of | 17   quality, what do you think that's referring to? |
| 18   it, and so the hypothetical is all else being | 18     A. I think it's just a vague reference to |
| 19   equal -- they have the exact same inputs, the | 19   the fact that -- these are all different study |
| 20   exact same outputs, one is a randomized controlled | 20   designs as you go up the pyramid. |
| 21   trial; one is a group of cohort studies. | 21      And as you go up the pyramid, you get -- |
| 22      And my question is is the group of | 22   the study designs have the potential to answer |
| 23   randomized controlled trials of higher quality | 23   other kinds of questions, right? |
| 24   than the group of cohort studies? | 24      So the cohort study can't tell you about |
| 25      MS. NOWLIN-SOHL: Object to form. | 25   whether or not mental health would have improved |
|                   Page 35 |                   Page 37 |

10 (Pages 34 - 37)

ER-079

Jack Turban , M.D., MHS October 16, 2023

1  without the treatment.  The randomized controlled
2  trial tells you that.
3       And then all randomized controlled trials
4  are going to have strengths and benefits, right?
5  They may have different patient populations.  They
6  might have different study outcomes.  They may
7  have different blinding procedures.
8       And so a systematic review and
9  meta-analysis would tell you instead of like, oh,
10 look, I only have this one study I'm looking at,
11 you would look at all of them, and that would give
12 you more and more richer information.
13    Q.  Okay.  I'd like to go back to Turban
14 Exhibit 4, which is the Users' Guide to the
15 Medical Literature.
16      And I would like to go to page 6 in the
17 document.  I think it's 35 in the PDF.
18    A.  Yes.
19    Q.  And I'm just going to read the -- it's
20 the sentence at the very bottom that carries over
21 on to page 7.  And I'll just read it and ask if I
22 read it correctly.
23      It says "In our discussions of systematic
24 reviews and guidelines, we introduce the GRADE
25 (Grading of Recommendations Assessment,

Page 38

1  several other factors that would be important to
2  consider when -- whether or not to recommend a
3  treatment.
4       But it has two steps in that way.  It has
5  kind of the grading of the evidence and then
6  determining strength of recommendations.
7    Q.  And have you ever attempted to apply the
8  criteria specified by GRADE to assess a study?
9    A.  It's generally recommended that one do
10 that as part of, like, a full research group.  And
11 I've not been on one of those groups.
12    Q.  And so then you -- you've also never
13 attempted to do that for any of the studies that
14 you cite in your declaration, correct?
15    A.  No, not apply specific GRADE criteria.
16 Generally GRADE criteria is used when one is
17 writing guidelines.
18    Q.  I'm sorry.  Say that again?
19    A.  GRADE is typically used when one is
20 writing clinical practice guidelines.
21    Q.  Is GRADE ever used in a systematic
22 review?
23    A.  Some people might.  I have not.
24    Q.  How many systematic reviews have you
25 done?

Page 40

1  Development, and Evaluation) approach to
2  summarizing evidence and developing
3  recommendations, an approach that we believe
4  represents a major advance in EBM," parentheses,
5  cross-reference to chapter 15.
6       Did I read that correctly?
7    A.  Yes.
8    Q.  And are you familiar with the GRADE
9  approach that's referenced here?
10    A.  Broadly, yes.
11    Q.  And could you explain your understanding
12 of that approach?
13    A.  Yes.  So GRADE generally involves looking
14 at the research literature.  And then there's some
15 subjectivity to it, but they provide you with
16 general guidelines about how you would -- like,
17 great level of confidence in the research itself.
18      Then there's a -- and then each of those
19 get GRADE scores.  I think it's something like
20 low, very low, high, very high.  I could be wrong
21 about the exact names of the categories.
22      And then there's a separate set of
23 factors that are applied about strength of
24 recommendation.  So it takes into account both
25 what the research literature is, but then makes

Page 39

1    A.  Just one.
2    Q.  Can you explain how those who would use
3  GRADE in a systematic review would use it in the
4  process of creating the systematic review?
5       MS. NOWLIN-SOHL:  Object to the form;
6  foundation.
7       THE WITNESS:  Yeah, I don't think they
8  would GRADE the systematic review.  I think they
9  would have different research questions, and there
10 would be a body of literature they would identify
11 through their search that they would then look at
12 in their specific tables that give you, like, a
13 rough general sense of how to apply the GRADE
14 criteria to different conclusions.
15    Q.  (BY MR. RAMER)  And then sticking with
16 this document, I'd like to go to page 273, which
17 is 302 in the PDF, I believe.
18      Are you there?
19    A.  Yes.
20    Q.  Okay.  And then the -- well, the only
21 full paragraph on the page, it's a little long,
22 but I'm going to read it and ask if I read it
23 correctly.
24      It says "In contrast to systematic
25 reviews, traditional narrative reviews typically

Page 41

11 (Pages 38 - 41)

Jack Turban , M.D., MHS October 16, 2023

1  address multiple aspects of the disease (e.g.,
2  etiology, diagnosis, prognosis, or management),
3  have no explicit criteria for selecting the
4  included studies, do not include systematic
5  assessments of the risk of bias associated with
6  primary studies and do not provide quantitative
7  best estimates or rate the confidence in these
8  estimates.
9      "The traditional narrative review
10  articles are useful for obtaining a broad overview
11  of a clinical condition, but may not provide a
12  reliable and unbiased answer to a focused,
13  clinical question."
14      Did I read that correctly?
15  A.  Yes.
16  Q.  And then what is your understanding of
17  how systematic reviews differ from narrative
18  reviews with respect to systematic assessment of
19  the risk of bias associated with primary studies?
20  A.  A systematic review may or may not
21  include an assessment of the risk of bias.
22      Also, as the paragraph that you skipped
23  over notes, it may or may not include, like, an
24  unbiased summary of the literature, like a
25  meta-analysis.

Page 42

1      So systematic reviews can have some of
2  these same problems that you're outlining.
3  Q.  Do narrative reviews include systematic
4  assessments of the risk of bias associated with
5  the primary studies?
6  A.  Neither a systematic review nor a
7  narrative review necessarily include that.
8  Q.  Does a narrative review ever include
9  that?
10  A.  It could.
11  Q.  And for systematic reviews, can they
12  include systematic assessments of the risk of bias
13  associated with primary studies?
14  A.  They could.
15  Q.  Would that be a value --
16  A.  Yes.
17  Q.  I'm sorry?
18  A.  Yes.
19  Q.  Well, let me ask this question:  Would
20  that be a value that comes with conducting a
21  systematic review?
22      MS. NOWLIN-SOHL:  Object to form.
23      THE WITNESS:  Not necessarily.  A
24  systematic review may or may not do that, and a
25  narrative review may or may not do that.

Page 43

1  Q.  (BY MR. RAMER)  Well, let's suppose you
2  have a systematic review that does include a
3  systematic assessment of the risk of bias
4  associated with primary studies.
5      Do you agree that would be a valuable
6  consideration from that systematic review?
7  A.  I believe that would be useful
8  information.
9  Q.  And sticking with this document, I'd like
10  to go to page 275, which is just a couple pages
11  up.
12      And specifically Figure 14-2, which is
13  entitled "The Process of Conducting a Systematic
14  Review and Meta-Analysis."
15      Do you see that?
16  A.  Yes.
17  Q.  Do you see how this figure divides
18  between a systematic review and a meta-analysis on
19  the right-hand side?
20  A.  Yes.
21  Q.  And as part of the systematic review part
22  of this figure, do you agree that it includes the
23  bullet "Assess risk of bias, abstract data"?
24  A.  Yes.  I believe the point of this
25  textbook chapter is to tell you the best way --

Page 44

1  highest quality way to do a systematic review.
2  Q.  Okay.
3  A.  I think it's strongly implying you should
4  do the meta-analysis as well.
5  Q.  So as part of the systematic review
6  process that's outlined here, authors would assess
7  risk of bias, correct?
8  A.  I believe they're saying ideally you
9  would do that, yes.
10  Q.  And how does one assess the risk of bias?
11  A.  There are a lot of different ways.  There
12  are formal ways in which I'm not a statistical
13  expert, but they can create these kind of summary
14  plots and run statistical analyses to try and,
15  like, quantitatively look at the risk of bias.
16      But then also just as you look at
17  individuals studies by study, there are a lot of
18  different types of bias.  There's selection bias;
19  there's recall bias; there's social desirability
20  bias.  So it's a broad area of technologic
21  analysis.
22  Q.  And have you ever assessed risk of bias
23  as part of the systematic review that you
24  conducted?
25  A.  I'd have to go back and look.  What we

Page 45

12 (Pages 42 - 45)

(16 of 289), Page 16 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 16 of 289
Case 1:23-cv-00269-BLW   Document 74-2   Filed 11/02/23   Page 13 of 177
Jack Turban , M.D., MHS   October 16, 2023

1 were doing was specifically called a scoping
2 review. So that's more focused on identification
3 what has been looked at and what's not been looked
4 at.
5 And our main conclusion from that was
6 that there hasn't been much research on functional
7 neurologic disorders among sexual- and
8 gender-minority people, so there wasn't a lot of
9 literature to analyze the depth in that way.
10 Q. And what is this figure referring to when
11 it refers to the process of abstracting data?
12 A. I usually think of that as something more
13 for the meta-analysis where you're going into the
14 tables and pulling out summary statistics and
15 P-values and confidence intervals so that you can,
16 like, pull out the most relevant numbers and
17 statistics from the paper.
18 For a meta-analysis, you then feed that
19 into a different statistical analysis where you're
20 pulling the data all together.
21 But if they're saying just as part of the
22 systematic review of doing that, I think they're
23 more just broadly saying pulling out the key
24 findings of the research. Because if it's not a
25 meta-analysis, you wouldn't be feeding that

Page 46

1 final two sentences of that paragraph.
2 A. Okay. I'm there now.
3 Q. Okay. I'll start again.
4 "Even if the results of different studies
5 are consistent, determining their risk of bias is
6 still important. Consistent results are less
7 compelling if they come from studies with a high
8 risk of bias than if they come from studies with a
9 low risk of bias."
10 Did I read that correctly?
11 A. Yes.
12 Q. So this is saying even if you have
13 numerous studies showing the same results, you
14 still should assess those individual studies for
15 risk of bias, correct?
16 A. Yes. I think we can broadly always agree
17 in medicine that anytime you have a research
18 study, you should assess it for risk and bias.
19 I think I'd also highlight that there are
20 many different types of bias. I don't know what
21 specific type of bias they're referencing here
22 without reading the full chapter and the context.
23 Q. And is some bias worse than others?
24 A. I don't know that I would say "worse."
25 They're different.

Page 48

1 abstracted data into a more sophisticated
2 methodology of summarizing the data
3 quantitatively.
4 Q. And sticking with this document, I'd like
5 to go to page 283, which I think is page 312 in
6 the PDF. And just let me know when you're there.
7 A. Sorry. Which part of page 312?
8 Q. So it's page 283 in the book. Page 312
9 in the PDF.
10 A. Yes. We're on the page.
11 Q. Okay. And I want to look at the -- in
12 the middle of the page you see the blue header?
13 It says "Was the risk of bias of the primary
14 studies assessed?"
15 A. Yes.
16 Q. And the first full paragraph below that,
17 I'm just going to read the final two sentences of
18 that paragraph and ask if I read it correctly.
19 It says "Even if the results of different
20 studies are consistent, determining their risk of
21 bias is still important."
22 A. Sorry, I thought you were -- Sorry.
23 You're starting halfway down?
24 Q. So it's the first full paragraph after
25 the blue header. And I'm going to be reading the

Page 47

1 Q. And for the studies that you cite in your
2 declaration, have you assessed them for risk of
3 bias?
4 MS. NOWLIN-SOHL: Object to form.
5 THE WITNESS: Yes. Any scientific
6 research paper you read is going to, likely in the
7 discussion section, talk about for that individual
8 paper what biases may come up or what limitations
9 there are to how you interpret that study in
10 isolation, which is why, back to your point of why
11 you want the systematic review and identifying all
12 of the research, that you always want to look at
13 all the research as a whole, because every
14 individual study is going to have strengths and
15 weaknesses. They're pointing out that's true even
16 for randomized controlled trials.
17 Q. (BY MR. RAMER) And so I think you
18 discussed that you read the discussion to see
19 where the bias is in the study.
20 And is that generally how you assess
21 studies for risk of bias?
22 A. That's a good starting point, because
23 often the author of the paper, in the peer-review
24 process, whatever peer reviewer identifies as a
25 limitation of the study, if that -- that's due to

Page 49

13 (Pages 46 - 49)

ER-082

Jack Turban , M.D., MHS October 16, 2023

Page 50

1 something like recall bias, et cetera, that's
2 usually the part of the paper where that's going
3 to be written.
4     Q. And this will for now be my last question
5 on this, and then maybe we can take a break.
6     But I'd like to go to page 182 in this
7 document. Just let me know if you're there.
8     A. We're there.
9     Q. And this will for now be my last question
10 on this, and then maybe we can take a break.
11     But I'd like to go to page 182 in this
12 document. Just let me know if you're there.
13     A. We're there.
14     Q. Okay. And I'd like to look at the last
15 paragraph on the page in the first sentence. And
16 I'll just read it and ask if I read it correctly.
17     It says "In answering any clinical
18 question, our first goal should be to identify
19 whether there is an existing systematic review of
20 the topic that can provide a summary of the
21 highest available evidence (see the
22 summarizing the evidence section)."
23     Did I read that correctly?
24     A. Yes.
25     Q. And do you agree that the first goal in

Page 51

1 answering any clinical question is to identify
2 whether there is an existing systematic review of
3 the topic?
4     MS. NOWLIN-SOHL: Object to the form.
5     THE WITNESS: I think what this is likely
6 referencing -- not having read the entire
7 textbook, but it looks like it's a textbook about
8 teaching clinicians how to conduct evidence-based
9 medicine -- I think they're saying when you first
10 come to a topic, so if you're not an expert in a
11 topic -- let's say I were going to treat someone
12 with -- let's just say it's a hypothetical
13 condition that I don't treat every day but I have
14 a patient who I need to help.
15     One of the first things I would look for
16 is yes, a systematic review. If I don't already
17 know that literature, that's going to be a really
18 fast way for me to find a summary of a lot of the
19 literature that I need to know for that given
20 situation. So yes, it would be a good place to
21 start.
22     I think if your aim is to be an expert in
23 the field, you wouldn't stop there. You would
24 read the systematic review. You would look at the
25 evidence that's in there but then if you really

Page 52

1 wanted to be an expert, you would probably pull
2 the individual studies that are identified in the
3 systematic review, analyze them further, see what
4 additional information can be teased out that
5 maybe wasn't teased out by the person who did the
6 initial systematic review where likely their goal
7 was just to give you a sense of the whole of the
8 literature.
9     MR. RAMER: All right. I think maybe
10 we're at a breaking point here. Does that sound
11 good?
12     MS. NOWLIN-SOHL: Yeah, that sounds good.
13 Five minutes?
14     MR. RAMER: Yeah, works for me.
15     THE VIDEOGRAPHER: Okay. So the time is
16 10:06 a.m. Pacific time, and we are off the
17 record.
18     (Break taken from 10:06 a.m. to 10:12 a.m.)
19     THE VIDEOGRAPHER: So we are recording.
20 The time is 10:12 a.m. Pacific, and we are back on
21 the record.
22     Q. (BY MR. RAMER) Dr. Turban, I'd like to
23 go to your declaration, which is Turban Exhibit 1,
24 and specifically go to page 15 and paragraph 24.
25     And I just want to read the -- it's

Page 53

1 toward the end of the paragraph on this page.
2 I'll read the sentence starting with the word
3 "but" and then just ask if I read it correctly.
4     It says "But all a systematic review
5 means is that the authors of the reports
6 predefined the search terms they used when
7 conducting literature reviews in various
8 databases."
9     And did I read that correctly?
10     A. Correct. There's a citation to the
11 Harvard Countway Library.
12     Q. And based on what we've discussed so far
13 today, do you agree that this sentence is wrong?
14     A. No.
15     Q. You maintain that all a systematic review
16 means is that the authors of the reports predefine
17 the search terms used when conducting the
18 literature reviews; is that right?
19     A. Correct.
20     Q. Okay.
21     A. There are other things one may do as part
22 of a systematic review to add to it, but the label
23 at its face means that the review was systematic,
24 that you defined your search terms and your
25 databases for how you identified your literature.

14 (Pages 50 - 53)

Jack Turban , M.D., MHS  October 16, 2023

1 Different authors might do different things from
2 there.
3     Q.  And so you do not think that a systematic
4 review includes the assessment of the individual
5 studies that make up the review?
6     A.  What differentiates a systematic review
7 from a narrative review or a different type of
8 review -- all of those are going to talk about the
9 literature, but what distinguishes it is that it
10 defines its search terms and the bases that it
11 uses so that others can repeat that search.
12     Q.  And so you do not think that the
13 assessment of individual studies for bias is a
14 component of a systematic review; is that right?
15     A.  It may or may not be.  Depends on the
16 systematic review.  Ideally it would, but just
17 calling something a systematic review doesn't mean
18 it will do that.
19     Q.  And so you're not speaking categorically
20 in that sentence; is that right?
21     MS. NOWLIN-SOHL:  Object to form.
22     THE WITNESS:  I'm saying the term
23 "systematic review" means that the authors of the
24 reports predefined the search terms they used when
25 conducting the literature reviews in various

Page 54

1 predefined your search terms and the databases you
2 used for searching.
3     MR. RAMER:  Okay.  I'd like to go to --
4 yeah, I'd like to go to what I'll call Turban
5 Exhibit 6 that I just sent.  Let me know when you
6 have it.
7     (Deposition Exhibit No. 6 was marked.)
8     Q.  (BY MR. RAMER)  And is this the web page
9 you're citing in footnote 31?
10     A.  Yes, it appears to be.
11     Q.  Okay.  And you cite this page in support
12 of the proposition that all a systematic review
13 means is that the authors of the reports
14 predefined the search terms they used when
15 conducting literature reviews in various
16 databases, correct?
17     A.  Correct.  This then goes on to say other
18 things went in to add to a systematic review to
19 make it a better systematic review, but again,
20 what the phrase "systematic review" means is that
21 you were systematic in how you collected your
22 literature for the review.
23     Q.  You don't think that it also includes
24 being systematic in how you assess the studies
25 that form the systematic review?

Page 56

1 databases.
2     Q.  (BY MR. RAMER)  Are there systematic
3 reviews where the authors also include an
4 assessment of the individual studies that make up
5 the systematic review?
6     A.  Yes.
7     Q.  So then isn't it wrong to say that all a
8 systematic review is is just predefining the
9 search terms?
10     MS. NOWLIN-SOHL:  Object to the form;
11 argumentative, mischaracterizes prior testimony.
12     THE WITNESS:  It says "but all a
13 systematic review means is that the authors of the
14 reports predefined the search terms they used when
15 conducting literature reviews in various
16 databases."
17     So if you're calling a paper a systematic
18 review, that is what the term "systematic review"
19 means.
20     It's not saying there's nothing else in
21 it but the search terms.  There's the search terms
22 that the papers identify that they summarize in
23 the literature, but when you're using the term
24 "systematic review," what you're highlighting is
25 that -- exactly what I put there, that you

Page 55

1     A.  Not necessarily.  Ideally it would be,
2 but I don't believe all systematic reviews reach
3 that level of rigor.
4     Q.  Okay.  So on this document, Turban
5 Exhibit 6, there is a -- on page 1 there is a bold
6 question that says "What is a systematic review?"
7 And I'm just going to read the first two sentences
8 under that and ask if I read them correctly.
9     It says "A systematic review is guided
10 filtering and synthesis of all available evidence
11 addressing a specific, focused research question,
12 generally about a specific intervention or
13 exposure.  The use of a standardized, systematic
14 methods and preselected eligibility criteria
15 reduce the risk of bias in identifying, selecting,
16 and analyzing relevant studies."
17     Did I read that correctly?
18     A.  Yes.
19     Q.  What is your understanding of what this
20 page is describing when it mentions "analyzing
21 relevant studies"?
22     MS. NOWLIN-SOHL:  Object to form.
23     THE WITNESS:  So they're saying you use
24 standardized systematic methods in preselected
25 eligibility criteria, so those are all things to

Page 57

15 (Pages 54 - 57)

(19 of 289), Page 19 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 19 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 16 of 177
Jack Turban , M.D., MHS    October 16, 2023

Page 58

1  identify the studies you're going to look at.
2      They're saying that doing that reduces
3  the risk of bias in identifying, selecting, and
4  then reporting out the relevant studies.  If
5  you -- if you didn't do a systematic review -- and
6  again, a systematic review doesn't guarantee that
7  your search methods are perfect, but it increases
8  the likelihood that you're not going to miss
9  important studies that need to be analyzed.
10     But I don't read this as saying that you
11 necessarily need to have a standardized systematic
12 method of analyzing the relevant studies, although
13 that would be ideal.
14     Q.  (BY MR. RAMER)  Well, in the first
15 sentence then, what is your understanding of what
16 it's referring to when it is discussing the
17 synthesis of all available evidence?
18     A.  The general process of taking all the
19 studies that you identify and then reporting out
20 the summary.
21     Q.  Would creating a synthesis of all
22 available evidence require analyzing the relevant
23 studies?
24     A.  There are many ways you could go about
25 analyzing the relevant studies.

Page 59

1      Q.  Like what?
2      A.  You could read them and give your general
3  impression.
4      You could, if you were doing a practice
5  guideline, you might be able to create criteria.
6  Those are two examples.
7      You might look at the sample size of all
8  of that.
9      You might look at the inclusion and
10 exclusion criteria.
11     Q.  Do you agree that this paragraph states
12 that a systematic review is something more than
13 predefining search terms used when conducting
14 literature reviews in various databases?
15     MS. NOWLIN-SOHL:  Object to form.
16     THE WITNESS:  I believe it explains that
17 the term "systematic review" means that one
18 defines the way that they're defining their search
19 terms and their databases.  That's what a
20 systematic review as a whole means.
21     It goes on to say -- it says -- well, it
22 says halfway down a well-designed systematic
23 review includes clear objectives, preselected
24 criteria, an explicit methodology, a thorough and
25 reproducible search of the literature, an

Page 60

1  assessment of the validity or risk of bias.  And
2  it does go on to tell you how ideally they would
3  be conducted.
4      But the term "systematic review" means
5  what I noted in my declaration.
6      Q.  (BY MR. RAMER)  But you think the meaning
7  of the term you note in your declaration comes
8  from what we're looking at right now?
9      MS. NOWLIN-SOHL:  Object to form;
10 argumentative.
11     THE WITNESS:  Yes.
12     Q.  (BY MR. RAMER)  What is this paragraph --
13 let me rephrase.
14     What is your understanding of what this
15 paragraph is discussing in the sentence you were
16 reading where it says "an assessment of the
17 validity or risk of bias of each included study"?
18     MS. NOWLIN-SOHL:  Object to form; asked
19 and answered.
20     THE WITNESS:  Sorry.  I'm not sure which
21 sentence you're referring to.
22     Q.  (BY MR. RAMER)  You were reading the
23 second-to-last sentence in this paragraph, and you
24 got to the point where it says "an assessment of
25 the validity or risk of bias of each included

Page 61

1  study."
2      And my question is what is your
3  understanding of what that is referring to?
4      MS. NOWLIN-SOHL:  Same objections.
5      THE WITNESS:  Yeah.  So again, that
6  sentence starts "A well-designed systematic review
7  includes," and it ends with "an analysis and
8  presentation of the findings of the included
9  studies."  And before that, "an assessment of the
10 validity or risk of bias that each study
11 included."
12     Not all systematic reviews will be well
13 designed.
14     Q.  (BY MR. RAMER)  Why would a well-designed
15 systematic review include an assessment of the
16 validity or risk of bias of each included study?
17     A.  Again, it's useful information.
18 Different -- analyses of different types of bias
19 provide different types of useful information.
20     But for instance, recall bias would be
21 important to know if people are asked questions
22 about the remote past.  Right?  Like, you'd want
23 to know if you were asking someone about their
24 childhood how long ago was that?  What kind of
25 question was it?  Is it likely that they would

Jack Turban , M.D., MHS October 16, 2023

Page 62

1 remember something that long ago given the nature
2 of the event? It's just one example of the many
3 types of bias we may examine.
4 Q. And why would a well-designed systematic
5 review look for bias in the individual studies?
6 A. Because it gets you more information
7 about what the study actually tells you.
8 Q. Do you agree that assessing bias in the
9 individual studies is an advantage of a systematic
10 review over a narrative review?
11 MS. NOWLIN-SOHL: Object to form.
12 THE WITNESS: No. I think both can do
13 that.
14 Q. (BY MR. RAMER) Do they both do it
15 systematically?
16 MS. NOWLIN-SOHL: Object to form.
17 THE WITNESS: Not necessarily.
18 Q. (BY MR. RAMER) And why not necessarily?
19 A. Both of them could do it unsystematically
20 based on general impression of the authors.
21 Q. And I'd like to go back to your
22 declaration and the same paragraph but on the next
23 page, so the run-over. And the second to last
24 sentence, I'll just read it and ask if I read it
25 correctly.

Page 63

1 It says "The primary advantage to a
2 systematic review would be its potential, and no
3 guarantee, to identify research publications that
4 had not previously been identified in this
5 discussion."
6 Did I read that correctly?
7 A. Yes.
8 Q. And you do not cite anything for that
9 proposition, correct?
10 A. Correct. There's no citation on that
11 sentence.
12 Q. Do you think the documents we were
13 looking at, Turban Exhibit 6 from Harvard that you
14 cited in footnote 31, could support that
15 proposition?
16 A. Let me look.
17 Q. And if you don't know, that's fine.
18 Just so I can keep track of time, what
19 page are you on currently?
20 A. I went through -- I'm not seeing that
21 there is a section that explicitly is discussing
22 what the advantage of the systematic review is
23 over something else. It's mostly describing what
24 they are.
25 Q. Okay.

Page 64

1 A. So I don't know that I would use this
2 specific citation.
3 Q. Okay. And then just going back to your
4 declaration page -- sorry, paragraph 24, but back
5 to page 15 and the sentence we were previously
6 discussing, and so the point of -- I'll just -- to
7 refresh, the sentence says "But all a systematic
8 review means is that the authors of the reports
9 predefined the search terms they used when
10 conducting literature reviews in various
11 databases."
12 And you would agree that the description
13 you give there does not define a well-designed
14 systematic review, correct?
15 MS. NOWLIN-SOHL: Object to form.
16 THE WITNESS: I think it's a
17 rectangle/square situation. I think my definition
18 will cover all systematic reviews.
19 Q. (BY MR. RAMER) I think where I'm getting
20 hung up with that answer is the beginning of the
21 sentence where you say, "but all a systematic
22 review means," which means to describe the full
23 universe of systematic reviews can be defined
24 strictly by the fact that the authors used
25 predefined search terms.

Page 65

1 Is there --
2 A. All systematic reviews will have
3 predefined their search terms.
4 Q. And will well-designed systematic reviews
5 only predefine their search terms?
6 MS. NOWLIN-SOHL: Object to form.
7 THE WITNESS: This is my rectangle/square
8 comment.
9 So when you're calling something a
10 systematic review, the piece of information you're
11 communicating is that they predefined their search
12 terms and the databases they used. So that term
13 is telling you that.
14 There are a million other things that the
15 term doesn't tell you, right? It doesn't tell you
16 the author list. It doesn't tell you how long it
17 is. It doesn't tell you how they went about
18 analyzing all the studies.
19 That term tells you that they predefined
20 their search terms in some way, and they tell you
21 what databases they used. It doesn't tell you
22 more than that.
23 Q. And can we return to Turban Exhibit --
24 let's see -- Exhibit 4, which is the Users'
25 Guidelines to the Medical Literature?

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004
ER-086

(21 of 289), Page 21 of 289  Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 21 of 289
Case 1:23-cv-00269-BLW  Document 74-2  Filed 11/02/23  Page 18 of 177
Jack Turban , M.D., MHS October 16, 2023

Page 66

1    MS. NOWLIN-SOHL:  What page, John?
2    MR. RAMER:  Yeah, sorry.  Database
3  page 275, which I believe is page 304.
4    MS. NOWLIN-SOHL:  Okay.  We're there.
5    Q.  (BY MR. RAMER)  And just looking at
6  Figure 14-2 again.
7    It seems as though you are defining a
8  systematic review to be something less than what
9  Figure 14-2 is defining to be a systematic review;
10  is that fair?
11    MS. NOWLIN-SOHL:  Object to form.
12    THE WITNESS:  Could you repeat the
13  question?
14    Q.  (BY MR. RAMER)  Is it fair to say that
15  you were defining systematic review differently
16  from how this is defining systematic review?
17    MS. NOWLIN-SOHL:  Object to form;
18  mischaracterizes prior testimony.
19    THE WITNESS:  I don't think that these
20  definitions are in conflict with each other.
21    Q.  (BY MR. RAMER)  Do you agree that this
22  figure defines a systematic review to include
23  reviewing the full text of possibly eligible
24  studies and then assessing risk of bias and
25  abstracting data?

Page 67

1    MS. NOWLIN-SOHL:  Object to form.
2    THE WITNESS:  Again, not all systematic
3  reviews would necessarily assess the risk of bias.
4  I think this is describing how you would ideally
5  conduct a systematic review.  They will always
6  involve reviewing the text of the studies that you
7  identify.  That's what a review is.
8    Q.  (BY MR. RAMER)  And so you think that in
9  this figure, the bottom two lines that make up the
10  systematic review are unnecessary for something to
11  be a systematic review; is that right?
12    MS. NOWLIN-SOHL:  Object to the form;
13  mischaracterizes prior testimony.
14    THE WITNESS:  I don't think all
15  systematic reviews are necessarily going to assess
16  the risk of bias.
17    Abstract data -- I'm not sure what
18  they're referencing specifically in this figure
19  since it's a vague term.  I do think all
20  systematic reviews are going to review the studies
21  that they identify through their predefined
22  searches.
23    Q.  (BY MR. RAMER)  And we can kind of shift
24  gears a little bit and move off that document.
25    Dr. Turban, how did you come to be an

Page 68

1  expert in this case?
2    A.  I'm not sure I understand the question.
3    Q.  How did you --
4    A.  Sorry.  Come to be an expert in the
5  field, or how did I get involved in the case?
6    Q.  How did you become an expert witness in
7  this particular case?
8    A.  I was asked by one of the attorneys on
9  the case.
10    Q.  And who specifically asked you?
11    A.  Leslie Cooper.
12    Q.  And without going into anything that you
13  spoke about with counsel, when were you contacted
14  to serve as an expert witness in this case?
15    A.  I don't recall.  Sometime recently,
16  perhaps in the past month or so.
17    Q.  Was it after August?
18    A.  I believe so.
19    Q.  Was it after September 5th?
20    A.  I really have to look at my call logs.
21  I'm not entirely sure when.
22    Q.  Do you know whether the Defendants in the
23  case had already submitted their brief opposing
24  the preliminary injunction when you were asked to
25  serve as an expert?

Page 69

1    A.  I know I received -- I'm not a lawyer.  I
2  received -- what was it? -- a combined brief, I
3  believe, opposing preliminary injunction,
4  something, the second half of the goal of the
5  memorandum that I reviewed at some point.
6    But I don't remember when I received
7  that, so I don't know how the dates lined up.  I
8  know I asked to see it at a certain point because
9  I think it's referenced in something.
10    Q.  And do you know the other expert
11  witnesses supporting the Plaintiffs in this case?
12    A.  If you named them I could tell you.
13    Q.  Dr. Kara Connelly?
14    A.  I know of Dr. Connelly but do not know
15  her personally.
16    Q.  Did you read the declaration she
17  submitted in this case?
18    A.  I did not.
19    Q.  Do you know Dr. Christine Brady?
20    A.  I do.  Dr. Brady is a former supervisor
21  of mine from Stanford.
22    Q.  Have you spoken at all with Dr. Brady in
23  this case?
24    A.  I speak with Dr. Brady because we have
25  some shared patients.  I don't recall if we

18 (Pages 66 - 69)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| Page 70 | Page 72 |

**Page 70**

1 specifically talked about the case, but it
2 wouldn't have been anything more than in passing.
3    Q.  Before you were asked to be an expert in
4 this case, did you know that Dr. Brady was serving
5 as an expert?
6    A.  I think I knew that Dr. Brady -- I knew
7 of another case she'd done in Louisiana, and I
8 think I knew she was considering doing other
9 cases.  But I don't know if I knew she was doing
10 this one specifically.
11    Q.  What is the case in Louisiana you're
12 referring to?
13    A.  I believe it was a case related to the
14 gender clinic that she worked in.  Sorry,
15 what's -- was it Louisville?  University of
16 Louisville, I think.  I'm forgetting the details.
17 I talked to her about it years ago.
18    Q.  And she was serving as an expert in that
19 case?
20    A.  I don't know if she was an expert or
21 because she was in the clinic was deposed, but
22 there was some forensic component to it where I
23 think they were asking her about care for
24 adolescent gender dysphoria.
25    Q.  Did I freeze?

**Page 71**

1    A.  Yeah.  You're back up, though.
2    Q.  Okay.
3       MR. RAMER:  Amy, could you read back the
4 last answer for me?
5    (The record was read by the reporter.)
6    Q.  (BY MR. RAMER)  And, Dr. Turban, before
7 you were asked to be an expert in this case, did
8 Dr. Brady ever contact you about the process of
9 serving as an expert witness?
10    A.  We may have spoken about it, like the
11 general process of doing expert witness work when
12 I was at Stanford, but I don't remember specific
13 conversations.
14    Q.  And what did you do to prepare for this
15 deposition?
16    A.  I reviewed my own declaration.  I earlier
17 reviewed the declarations of Dr. Cantor and
18 Dr. Weiss, and I read the State's memorandum that
19 I think was -- I keep forgetting.  I think it was
20 a combined memoranda and opposition to preliminary
21 injunction, maybe motion to dismiss.
22    Q.  Did you do any prep for the deposition?
23    A.  I had two meetings with the lawyers from
24 the ACLU to go through my declaration and prepare.
25    Q.  And who was in those meetings, without

**Page 72**

1 disclosing the contents of the discussion?
2    A.  Li was with me here, Leslie Cooper, and I
3 believe Philip May.
4    Q.  Anyone else?
5    A.  No, not that I recall.
6    Q.  And, Dr. Turban, what does it mean to be
7 transgender?
8    A.  One has a gender identity different from
9 their sex assigned at birth.
10    Q.  And what is gender dysphoria?
11    A.  Gender dysphoria is a diagnosis in the
12 DSM-5 -- now DSM-5 text revision that involves
13 having a gender identity different from one's sex
14 assigned at birth, and then having clinically
15 relevant distress related to that that causes some
16 impairment in social, occupational, or other
17 functioning.
18       There are two sets of criteria.  One set
19 for prepubertal children, and another set for
20 adolescents and adults.
21    Q.  Can an individual be transgender but not
22 experience gender dysphoria?
23    A.  Yes.
24    Q.  Is gender dysphoria different from
25 anxiety?

**Page 73**

1    A.  "Anxiety" is a very broad, untechnical
2 term.  There are a series of anxiety disorders
3 that are specified in the DSM, like generalized
4 anxiety disorder or social anxiety disorder.
5    Q.  And are those different from gender
6 dysphoria?
7    A.  Those are different diagnoses, yes.
8    Q.  And what is the difference between
9 generalized anxiety disorder and gender dysphoria?
10    A.  In generalized anxiety disorder, one
11 typically has anxiety in several different
12 domains.  So for instance, they might be anxious
13 about their health and anxious about their grades
14 and anxious about being late.
15       One classic thing we say in psychiatry is
16 people with generalized anxiety disorder sometimes
17 become anxious that they will become anxious, so
18 just highlighting that there are many, many
19 different types of things that they become anxious
20 about.
21       And then again, that needs to lead to
22 some sort of clinic-basing assent impairment.  So
23 all of us have day-to-day worries, but that
24 wouldn't necessarily meet the criteria for
25 generalized anxiety disorder.

19 (Pages 70 - 73)

(23 of 289), Page 23 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 23 of 289
Case 1:23-cv-00269-BLW   Document 74-2   Filed 11/02/23   Page 20 of 177
Jack Turban , M.D., MHS October 16, 2023

1    Gender dysphoria is different in that the
2  distress is specifically related to an
3  incongruence, if you will, which means their
4  gender identity and their sex assigned at birth.
5    Q.  And is gender dysphoria different from
6  some form of clinical depression?
7    MS. NOWLIN-SOHL:  Object to form.
8    THE WITNESS:  Those are different
9  diagnoses.  So there's major depressive disorder,
10  for instance, that requires two weeks of a number
11  of symptoms related to depression.  It would be
12  different combinations of the symptoms, but
13  generally depressed mood, loss of ability to enjoy
14  things, disturbances in sleep, disturbances in
15  appetite, delayed psychomotor movements,
16  impairments of concentration.
17    Then again separately, gender dysphoria
18  is more about the psychological distress related
19  to one's sex assigned at birth being different
20  from their gender identity.
21    Q.  (BY MR. RAMER)  And what is gender
22  identity?
23    A.  Gender identity is one's psychological
24  understanding of their gender broadly in terms of
25  masculinity, femininity.

Page 74

1  does not change over time, but the language
2  someone uses to describe it can change over time?
3    A.  That's how I conceptualize it given the
4  biological literature that we have.
5    Q.  If an individual identifies as a male at
6  age 16 and later identifies as a female at age 22,
7  has that person's gender identity changed?
8    A.  It would be really difficult to know.  So
9  I think I cited in my declaration a paper we wrote
10  in the Journal of the American Academy of Child
11  and Adolescent Psychiatry about thinking about
12  changes in the way people conceptualize their
13  gender identity or people's evolution of interests
14  in gender-affirming medical care.  And in it, we
15  describe that that could be due to internal
16  factors or external factors.
17    So what we often see -- we call this
18  [indiscernible] -- is that if you are constantly
19  told that your gender identity or you're harassed
20  for being transgender or you're discriminated
21  against, you can certainly internalize a lot of
22  those messages and then -- which -- or state that
23  you are now cisgender.
24    We talked about it can also be an
25  internal factor where without those external

Page 76

1    Q.  Can gender identity change over time?
2    A.  So there's research showing that there's
3  a strong innate biological basis for gender
4  identity that forms kind of the base, if you will.
5  That's what I think of as the person's gender
6  identity.
7    But in the same way that we, with other
8  parts of ourselves, kind of describe language to
9  that and conceptualize it, put words to it, that
10  can evolve over time.
11    Q.  And so the latter that you just described
12  can change over time, but can the former category,
13  the gender identity itself, change over time?
14    A.  It seems no.  It seems that there's -- we
15  have twin studies, for instance, I think are the
16  strongest piece of data that we have for that,
17  that are usually what we use for determining if
18  something has an innate biological determinate.
19  And those show that gender identity has a strong
20  biological component, particularly trans
21  identities is what the studies looked at.
22    But certainly we see patients where the
23  language they ascribe to their gender identity or
24  their understanding of it could evolve over time.
25    Q.  So is it fair to say that gender identity

Page 75

1  negative pressures, you may evolve on your own to
2  have a different conceptualization of your gender
3  identity.
4    The thing that's further complicated is
5  minority stress framework explains the ways in
6  which people internalize negative messages that
7  might minoritize people from the commute.  So you
8  can imagine if you are a young trans person who's
9  constantly told that trans people are invalid or
10  being trans is a result of trauma or you're a
11  danger to people on sports teams or you're a
12  danger to people in bathrooms, they might start to
13  internalize those negative views of trans people
14  and then kind of push yourself to present as
15  cisgender.
16    I think it's similar to what we saw with
17  the ex-gay movements in the past.  But again, this
18  is seeking broadly and I think we'd have to kind
19  of look person by person because it's such a
20  complex question.
21    Q.  But those examples that you just gave,
22  those are examples of the way the language they're
23  using to describe their gender identity changes.
24  But their actual gender identity has not changed,
25  correct?

Page 77

20 (Pages 74 - 77)

Jack Turban , M.D., MHS October 16, 2023

**Page 78**

1    MS. NOWLIN-SOHL:  Object to form;
2  mischaracterizes prior testimony.
3    THE WITNESS:  Yeah, I think I gave
4  examples, both in which the language they used
5  changes but also the ways in which their
6  understanding of their gender identity has evolved
7  potentially through those internal or external
8  factors.
9    But I would go back to the fact that
10  there are these data showing this strong
11  biological determinate of our gender identities.
12  But obviously the human psyche is complex in how
13  it understands and evolves in its understanding of
14  itself.
15    Q.  (BY MR. RAMER) So are you saying that
16  there are examples where because they have --
17  individuals have.  Let me rephrase.
18    Are you saying there are examples where
19  internal and external factors do in fact change
20  someone's gender identity?
21    A.  The external factors can drive internal
22  factors, which can subsequently change one's
23  understanding of their gender identity.
24    Q.  And is there a distinction between gender
25  identity and one's understanding of their gender

**Page 79**

1  identity?
2    A.  I believe so.  I think it's important to
3  differentiate with what we know about the brain
4  and these innate biological factors from the
5  influence of how people ascribe language and
6  understanding to themselves over time.
7    Q.  And so when you're discussing examples
8  where an individual's understanding of their
9  gender identity has changed, that does not mean
10  that their gender identity has changed, correct?
11    A.  That's how I would conceptualize it.  I
12  think that's fair.
13    Q.  And so just going back to my question, if
14  an individual identifies as a male at age 16 and
15  later identifies as a female at age 22, that
16  individual's gender identity has not changed,
17  correct?
18    MS. NOWLIN-SOHL:  Object to form; asked
19  and answered.
20    THE WITNESS:  Are you thinking of a
21  person that you have more detail where we can
22  discuss it in depth?
23    Q.  (BY MR. RAMER) I don't understand.  I
24  guess I don't understand how the question -- how
25  the answer, based on your view that gender

**Page 80**

1  identity does not change over time, could alter
2  the answer to the question.
3    A.  So I think your question was the person
4  had a gender identity at one point and then had a
5  different gender identity at the other points, but
6  I would want to know from you what you mean by
7  their gender identity was different at one point
8  in time or two.
9    Did their understanding change?  Did
10  something happen?  Were they told something?  Or
11  even assessing this based on what they are telling
12  you?
13    Q.  But so your view is, though, that at time
14  point 1 and time point 2, there is never a change
15  in gender identity, correct?
16    MS. NOWLIN-SOHL:  Object to form;
17  argumentative, mischaracterizes prior testimony.
18    THE WITNESS:  What I'm saying is there is
19  strong evidence of an innate biological
20  determinate of gender identity that appears to be
21  stable throughout time, but there is extreme
22  complexity in how people think about themselves,
23  and they ascribe language to that and feel
24  comfortable sharing it or not at various times.
25    Q.  (BY MR. RAMER) So can you -- are you

**Page 81**

1  able to say that the evidence shows that gender
2  identity does not change over time?
3    MS. NOWLIN-SOHL:  Object to form.
4    THE WITNESS:  If you're defining "gender
5  identity" as those innate biological factors, then
6  yes, because they're innate biological factors,
7  that they would be unlikely to change over time.
8    And if you look at clinical experience,
9  I've not had any patients who identified as
10  transgender and then subsequently identified as
11  cisgender.
12    I have had patients who have kind of had
13  this core transgender identity but have kind of
14  shifted the way they conceptualize it between,
15  say, transmasculine or nonbinary.
16    I've had patients who moved somewhere or
17  studied abroad and felt that they weren't safe
18  being out as trans so they went into the closet.
19  To everyone around them, they presented as being
20  cisgender for that period of time.
21    I hope that helps provide context.
22    Q.  (BY MR. RAMER)  Do you ever think it
23  would be appropriate to provide puberty blockers
24  to a patient who was not formally diagnosed with
25  gender dysphoria under the DSM-5?

21 (Pages 78 - 81)

(25 of 289), Page 25 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 25 of 289
Case 1:23-cv-00269-BLW  Document 74-2  Filed 11/02/23  Page 22 of 177
Jack Turban , M.D., MHS  October 16, 2023

| | |
|---|---|
| 1    A.  Perhaps if they had central precocious | 1    Q.  And have you read it? |
| 2  puberty. | 2    A.  Yes. |
| 3    Q.  Would the exception of central precocious | 3    Q.  Okay.  I'd like to go to page S43, which |
| 4  puberty -- I'll just rephrase it differently. | 4  is page 45 in the PDF. |
| 5      Do you think it is appropriate to provide | 5      MS. NOWLIN-SOHL:  So, John, we have an |
| 6  puberty blockers as a treatment for gender | 6  excerpt that starts at S43, and it's only a |
| 7  dysphoria to a patient who was not formally | 7  24-page PDF. |
| 8  diagnosed with gender dysphoria under the DSM-5? | 8      MR. RAMER:  Yes.  I apologize.  So that's |
| 9      MS. NOWLIN-SOHL:  Object to form. | 9  my fault, so let's just stick with this.  So page |
| 10      THE WITNESS:  I guess I don't understand | 10  S43, the page we're on. |
| 11  how the patient has gender dysphoria if they don't | 11      MS. NOWLIN-SOHL:  Okay. |
| 12  meet the criteria for gender dysphoria. | 12      MR. RAMER:  Sorry about that. |
| 13    Q.  (BY MR. RAMER) Well, would you -- do you | 13    Q.  (BY MR. RAMER)  And this chapter is about |
| 14  think it's appropriate to give puberty blockers to | 14  adolescents, correct? |
| 15  a patient who meets the classification of gender | 15    A.  Correct. |
| 16  incongruence under the ICD-11? | 16    Q.  Okay.  And I'd like to go down to S48, |
| 17    A.  But does not meet the criteria for gender | 17  which is page 6 in the PDF. |
| 18  dysphoria? | 18      And these are WPATH statements of |
| 19    Q.  Correct. | 19  recommendations regarding care for adolescents, |
| 20      MS. NOWLIN-SOHL:  Object to form. | 20  correct? |
| 21      THE WITNESS:  No.  In the United States, | 21    A.  Yes. |
| 22  that would not be appropriate practice. | 22    Q.  So about partway down this box, there's |
| 23    Q.  (BY MR. RAMER) Is the primary purpose of | 23  an italics that says -- I'll just read it and ask |
| 24  gender-affirming medical interventions to reduce | 24  if I read it correctly. |
| 25  the distress associated with gender dysphoria | 25      It says "The following recommendations |
| Page 82 | Page 84 |

| | |
|---|---|
| 1    A.  Yes. | 1  are made regarding the requirements for |
| 2    Q.  And so a treatment that does not reduce | 2  gender-affirming medical and surgical treatment |
| 3  the distress associated with gender dysphoria | 3  (all of them must be met)." |
| 4  cannot be deemed an effective treatment for gender | 4      Did I read that correctly? |
| 5  dysphoria, correct? | 5    A.  Yes. |
| 6      MS. NOWLIN-SOHL:  Object to form. | 6    Q.  And then I'd like to go to 6.12.C in this |
| 7      THE WITNESS:  The caveat I would add is | 7  box just a few lines down.  And I'll read that and |
| 8  that generally in actual history of gender | 8  ask if I read it correctly. |
| 9  dysphoria is that it worsens over time. | 9      It says "The adolescent demonstrates the |
| 10      So if there were a treatment that could | 10  emotional and cognitive maturity required to |
| 11  prevent the worsening of the distress, that would | 11  provide informed consent/assent for the |
| 12  be an improvement as well, and a notable goal. | 12  treatment." |
| 13    Q.  (BY MR. RAMER) Oh, I see.  You're saying | 13      Did I read that correctly? |
| 14  like -- you're referring to, like, maintaining the | 14    A.  Yes. |
| 15  baseline is what you're saying? | 15    Q.  And am I right in thinking that as a |
| 16    A.  Yeah.  If you can prevent it from getting | 16  general matter, minors do not actually consent to |
| 17  worse, that would also be a good goal. | 17  treatments but rather their parents provide |
| 18      MR. RAMER:  And, Dr. Turban, I'd like to | 18  informed consent and then the minor provides |
| 19  introduce what we'll call Turban Exhibit 7. | 19  informed assent? |
| 20      (Deposition Exhibit No. 7 was marked.) | 20      MS. NOWLIN-SOHL:  Object to the extent |
| 21    Q.  (BY MR. RAMER) And I'll just represent | 21  that it calls for a legal conclusion. |
| 22  to you that this is Chapter 6 of the WPATH | 22      THE WITNESS:  In general, that is |
| 23  Standards of Care, Version 8. | 23  correct.  I'll say this is a very conservative |
| 24      And have you seen this document before? | 24  area of medicine, and generally when assessing |
| 25    A.  Yes. | 25  capacity, which is kind of the medical version of |
| Page 83 | Page 85 |

Jack Turban , M.D., MHS October 16, 2023

| Page 86 | Page 88 |
|---|---|
| 1 ability to consent, we use something called the<br>2 Applebaum criteria for adults.<br>3 And I think I and many apply those<br>4 Applebaum criteria for being able to provide<br>5 informed consent to minors, but technically<br>6 because they are minors, even if they have -- they<br>7 meet those Applebaum criteria that we would use<br>8 for adults saying that they could give informed<br>9 consent, we would call it assent because of their<br>10 minor status.  Their parents would need to provide<br>11 the consent for them to be able to access care.<br>12 Q.  (BY MR. RAMER)  Would you ever provide --<br>13 let me rephrase.<br>14 Would you ever provide the treatment<br>15 described in Chapter 6 when a minor provides<br>16 informed assent but you do not have informed<br>17 consent from the parent?<br>18 MS. NOWLIN-SOHL:  Object to form.<br>19 THE WITNESS:  No, I can't imagine I would<br>20 do that.<br>21 And the latest guidelines I think have a<br>22 statement in there that you need informed consent<br>23 from parents.  I think it says something like<br>24 unless that would be dangerous.  I think that<br>25 means, you know, like a noncustodial parent or a | 1 criteria that are kind of separate from the<br>2 consent criteria would likely make them unable to<br>3 be able to provide the consent.<br>4 Q.  (BY MR. RAMER)  Okay.  Well, let's take<br>5 that and with respect to 6.12.b.<br>6 Do you think that if an individual has<br>7 not experienced gender diversity or incongruence<br>8 for a marked and sustained period of time that<br>9 they would not be able to provide informed assent?<br>10 A.  Oh, sorry.  I thought you were only<br>11 referencing the text within d and e.<br>12 Q.  Sorry.  Do you want me to back out?  Can<br>13 I ask the question again?<br>14 A.  Sure.<br>15 Q.  All I'm asking is so we have this<br>16 requirement of informed consent/assent in 6.12.c.<br>17 And my question is simply based on this<br>18 list and the statement above it that says all of<br>19 these criteria must be met, doesn't that mean that<br>20 there can be a situation where adolescent can<br>21 provide informed assent or consent and thus<br>22 satisfy 6.12.c and yet nevertheless not be<br>23 eligible for treatment based on one of these other<br>24 requirements?<br>25 A.  Yes. |
| 1 parent who is physically abusive or a parent who<br>2 is not in the child's life that you would need a<br>3 legal guardian to provide the informed consent.<br>4 Q.  (BY MR. RAMER)  And I want to look still<br>5 in this box.  I want to look at first read 6.12.b<br>6 and ask if I read it correctly, and then I'll read<br>7 d.<br>8 So 6.12.b says "The experience of gender<br>9 diversity/incongruence is marked and sustained<br>10 over time."<br>11 Did I read that correctly?<br>12 A.  Yes.<br>13 Q.  And then 6.12.d says "the adolescent's<br>14 mental health concerns (if any) that may interfere<br>15 with diagnostic clarity, capacity to consent, and<br>16 gender-affirming medical treatments have been<br>17 addressed."<br>18 And did I read that correctly?<br>19 A.  Yes.<br>20 Q.  So based on these guidelines, could there<br>21 be times where an adolescent is able to provide<br>22 informed assent for a treatment but a provider<br>23 still should not provide the treatment?<br>24 MS. NOWLIN-SOHL:  Object to form.<br>25 THE WITNESS:  I think most of these other | 1 Q.  And have you ever heard the terms<br>2 "assessment model" and "informed consent model"<br>3 used to describe a treatment protocol?<br>4 A.  Yes.<br>5 Q.  What is the difference between an<br>6 assessment model and a informed consent model?<br>7 A.  They're not as clearly delineated as I<br>8 think one would like, but I can kind of describe<br>9 the two broad concepts.<br>10 So an informed consent model, this is<br>11 what we do pretty much in all of medicine where we<br>12 provide individuals with the risks of a treatment,<br>13 the potential benefits of a treatment, unknowns of<br>14 the treatment, just everything that's important to<br>15 know, like, when making a decision about the<br>16 treatment.<br>17 And then they decide -- in pediatric<br>18 medicine -- again, in the vast majority of the<br>19 cases it's not actually the adolescent deciding;<br>20 it's the parents deciding and the adolescent<br>21 agreeing -- but I think generally most doctors,<br>22 particularly for their adolescent patients, really<br>23 want the patients to have about as strong of an<br>24 understanding of the treatment as their parents<br>25 do. |

Page 87      Page 89

23 (Pages 86 - 89)

**Page 90**

1    The assessment model is a little bit
2  ill-defined, but it involves still informed
3  consent because you're giving them all the
4  information.
5    But in particular for gender-affirming
6  medical interventions, the guidelines require the
7  biopsychosocial assessment, where in addition to
8  making sure that they have all the information
9  about the treatments to make the decision, you as
10  the provider want to know more so that you're
11  making sure you're supporting them in all the ways
12  that they need to be supported.
13    So you want to know their family history.
14  You want to know genetic predispositions they
15  have.  That's kind of the bio -- you want to know
16  any medications they're on.  You would want to
17  know any medical conditions they have, bio.
18    Psycho is understanding the way their
19  mind works.  Do they have certain personality
20  characteristics?  Do they have certain typical
21  thought patterns?  We try and vary all psychiatry,
22  but it's safe to say there are many different
23  psychological dynamics that you can evaluate.
24    And then social is particularly important
25  for these kids because you want to understand

**Page 91**

1  their family environment.  You want to understand
2  their peer environment.  You want to understand
3  how their teachers are treating them.  You want to
4  know if there's potential for bullying or violence
5  or harassment, all of these things that can affect
6  mental health.
7    So you want to have the comprehensive
8  biopsychosocial assessment so you can know all the
9  ways you can help the person, right?  So maybe
10  they need us to talk to their school to make sure
11  there's a bathroom where they feel safe.
12    Maybe we need them to talk to their
13  families, help their families understand their
14  experience.  Or if there's communication breaking
15  down, getting everyone together to make sure
16  they're on the same page so everyone can feel
17  loved and respected.
18    And maybe in some of the those cases the
19  medical interventions will be in part to consider
20  also, but that assessment model takes a very broad
21  look at the young person, but ultimately does
22  involve a lot of the informed consent work as
23  well.
24    Q.  And do you think Chapter 6, these
25  guidelines that we've been looking at, do you

**Page 92**

1  think these have elements of both models?  Or do
2  you think this is better described as an
3  assessment model?  Or how would you characterize
4  these particular guidelines?
5    MS. NOWLIN-SOHL:  Object to form.
6    THE WITNESS:  My understanding is that
7  they require a comprehensive biopsychosocial
8  assessment prior to initiating any
9  gender-affirming medical or surgical care for a
10  minor.
11    Q.  (BY MR. RAMER)  And if there are
12  requirements over and above informed consent or
13  informed assent such as the provider needs to
14  confirm the length of time of the gender
15  incongruence or the provider needs to address
16  particular comorbidities before providing
17  treatment, wouldn't those be aspects of an
18  assessment model?
19    MS. NOWLIN-SOHL:  Object to form.
20    THE WITNESS:  This is what I was saying.
21  The distinction is not always entirely cut and
22  dried in that way, because to be able to -- in my
23  opinion, to be able to give true informed consent,
24  you would -- you as the provider would need to
25  understand a lot of those dynamics about the

**Page 93**

1  person so that you could properly educate them on
2  how to make the decision and the relevant things
3  that they need to consider.
4    Q.  (BY MR. RAMER)  So I guess -- sorry.  Go
5  ahead.
6    A.  So I think, you know, informed consent is
7  not the model in pediatrics, I'll say, first and
8  foremost.  But I think just the concept of
9  informed consent requires asking the person a lot
10  of questions in a focused assessment kind of way
11  because you need to understand them well to be
12  able to counsel them on informed consent.
13    Q.  So you could not accurate -- let me
14  rephrase.
15    You could not accurately describe the
16  guidelines in Chapter 6 as an informed consent
17  model, correct?
18    MS. NOWLIN-SOHL:  Object to form; asked
19  and answered.
20    THE WITNESS:  I think they involved
21  informed consent, but I think they moved past that
22  into more of an assessment as well.  But again,
23  they're not clean distinctions between those two
24  terms.
25    Q.  (BY MR. RAMER)  And I'd like to go to

24 (Pages 90 - 93)

Jack Turban , M.D., MHS  October 16, 2023

| | |
|---|---|
| 1  page S62, which is page 20 in the PDF. | 1  So I had a patient once who came to me |
| 2  And then in the right column it appears | 2  wanting to better understand his gender identity. |
| 3  there is a section discussing statement 6.12.d in | 3  He had autism and somewhat rigid thinking.  And |
| 4  more depth; is that fair? | 4  really enjoyed -- is it okay if I change some of |
| 5  A.  Yes. | 5  the details to protected the patient's |
| 6  Q.  Okay.  And I'd like to go to the next | 6  confidentiality if the theme is the same? |
| 7  page and the left column and specifically the | 7  Q.  We can just say we're talking about a |
| 8  paragraph that is numbered 2.  And I'll just read | 8  hypothetical, but sure, go ahead. |
| 9  this full paragraph and ask if I read it | 9  A.  So let's say he enjoyed ballet, like a |
| 10  correctly, and then we can go from there. | 10  stereotypical female activity, and wondered if |
| 11  It says "Second, mental health can also | 11  that meant that he was trans. |
| 12  complicate the assessment of gender development | 12  The more we talked to him, we realized |
| 13  and gender identity related needs.  For example, | 13  that no, he just likes that particular activity, |
| 14  it is critical to differentiate gender | 14  but still very much identified as male and |
| 15  incongruence from specific mental health | 15  certainly didn't actually have a disconnect |
| 16  presentations such as obsessions and compulsions, | 16  between his gender identity and his sex assigned |
| 17  special interests in autism, rigid thinking, | 17  at birth.  Certainly didn't have any problem with |
| 18  broader identity problems, parent/child | 18  his physical body or primary or secondary sex |
| 19  interaction difficulties, severe developmental | 19  characteristics. |
| 20  anxieties, (e.g., fear of growing up and pubertal | 20  And the more we talked through it, it |
| 21  changes unrelated to gender identity), trauma or | 21  seemed clear, you know, he didn't have gender |
| 22  psychotic thoughts.  Mental health challenges that | 22  dysphoria.  But maybe at first glance he did have |
| 23  interfere with the clarity of identity development | 23  suspicion for it because of how he was describing |
| 24  and gender-related decision-making should be | 24  this rigid thinking around gender roles' behavior. |
| 25  prioritized and addressed." | 25  Q.  If -- and this is another hypothetical. |
| Page 94 | Page 96 |

| | |
|---|---|
| 1  Did I read that correctly? | 1  If the adolescent is at the beginning of |
| 2  A.  Yes. | 2  Tanner Stage II has been diagnosed with gender |
| 3  Q.  And what is diagnostic clarity? | 3  dysphoria and wants puberty blockers, but the |
| 4  A.  Sorry, I'm just going to see where it | 4  adolescent is expressing suicidal ideation, in |
| 5  came up in that paragraph. | 5  your opinion, is that adolescent eligibility to |
| 6  Q.  Sorry.  I think it's in -- let's see | 6  receive puberty blockers as a treatment? |
| 7  here.  It actually might be in the statement | 7  MS. NOWLIN-SOHL:  Object to form. |
| 8  itself.  Yeah, sorry. | 8  THE WITNESS:  It depends.  Suicidal |
| 9  So going back another page -- going back | 9  ideation is a broad construct.  That kind of |
| 10  another page, right column, so this is S62, | 10  ranges from what some people will call passive |
| 11  Statement 6.12.d. | 11  suicidal ideation, something like, I'd rather not |
| 12  It says "The adolescent's mental health | 12  be alive.  I'm so miserable.  But I don't have any |
| 13  concerns parentheses (if any) that may interfere | 13  plan or intent to harm myself. |
| 14  with diagnostic clarity." | 14  Another end of the spectrum might be, you |
| 15  And my question is just what is | 15  know, active suicidal ideation with intent to |
| 16  diagnostic clarity? | 16  plan, where somebody wants to die and they have a |
| 17  A.  I think in their instance, they're | 17  plan to act on it and they plan to act on it soon. |
| 18  referencing clarity around a gender dysphoria | 18  If you were on that side of the spectrum, then |
| 19  diagnosis. | 19  we're not going to start talking about puberty |
| 20  Q.  And do you agree that mental health | 20  blockers.  We're going to work towards an |
| 21  concerns can interfere with diagnostic clarity? | 21  inpatient hospitalization to make sure that that |
| 22  A.  Yes. | 22  person is safe and stabilized, and then they could |
| 23  Q.  How so? | 23  potentially be a candidate in the future. |
| 24  A.  In many of the ways listed.  One example | 24  Another end of the spectrum I would |
| 25  that you gave was autism. | 25  really want to understand the nature of the |
| Page 95 | Page 97 |

25 (Pages 94 - 97)

ER-094

(29 of 289), Page 29 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 29 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 26 of 177
Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1 suicidality, you know, if it was not acute | 1 MR. RAMER: Okay. |
| 2 suicidality, the person doesn't have a physical | 2 THE VIDEOGRAPHER: Okay. So the time is |
| 3 safety risk but they're so unhappy that they're | 3 11:17 a.m. Pacific time, and we are off the |
| 4 expressing a desire not to live even though they | 4 record. |
| 5 wouldn't act on that, and a lot of that is related | 5 (Break taken from 11:17 a.m. to 11:23 a.m.) |
| 6 to gender dysphoria and the fear of puberty | 6 THE VIDEOGRAPHER: All right. So we are |
| 7 progressing. And that's a patient where you might | 7 recording. The time is 11:23 a.m. Pacific, and we |
| 8 do more work towards understanding if they would | 8 are back on the record. |
| 9 be a candidate for pubertal suppression. | 9 Q. (BY MR. RAMER) Dr. Turban, I'd like to |
| 10 Q. (BY MR. RAMER) If the patient is | 10 return to Turban Exhibit 7, which is Chapter 6, |
| 11 expressing passive suicidal ideation, are you | 11 the "Adolescents" chapter of the SOC8. And going |
| 12 saying they would not be eligible until after | 12 back to page S48, which is 6 in the PDF. |
| 13 you've done the further assessment? Or are you | 13 I want to look again at statement 6.12.B, |
| 14 saying if the patient is expressing passive | 14 which requires that the experience of gender |
| 15 suicidal ideation, they would be eligible? | 15 diversity/incongruence is marked and sustained |
| 16 A. If they're expressing passive suicidal | 16 over time. |
| 17 ideation, that wouldn't make them immediately | 17 And my question is based on your review |
| 18 ineligible but they would need to go through the | 18 of the evidence, do you agree with that |
| 19 full biopsychosocial assessment, meet all the | 19 requirement as a precondition for adolescent |
| 20 other criteria. | 20 receiving treatment? |
| 21 And if they had -- if their suicidality | 21 MS. NOWLIN-SOHL: Object to form; |
| 22 was being driven by other things that aren't | 22 foundation. |
| 23 gender dysphoria, we would want to treat those as | 23 THE WITNESS: Yes. |
| 24 well. And we'd likely work on safety planning, | 24 Q. (BY MR. RAMER) And then with 6.12.d, |
| 25 the standard approaches that we take for patients | 25 same page, do you -- let me rephrase. |
| Page 98 | Page 100 |

| | |
|---|---|
| 1 who are having suicidal thoughts. | 1 Also based on your review of the |
| 2 Q. So is passive suicidal ideation, for lack | 2 evidence, do you agree with that requirement as a |
| 3 of a better term, less serious than active | 3 precondition for receiving treatment? |
| 4 suicidal ideation? | 4 MS. NOWLIN-SOHL: Object to form. |
| 5 A. Do you have a better term? | 5 THE WITNESS: Yes, as well as based on |
| 6 Q. I'm asking you. You're saying you treat | 6 clinical experience. |
| 7 people differently based on whether they have | 7 Q. (BY MR. RAMER) Do you think there's an |
| 8 passive suicidal ideation or active, and I guess | 8 argument that a less rigorous mental health |
| 9 the question is how do you justify treating them | 9 assessment could be better because patients would |
| 10 differently? | 10 not have to go untreated for gender dysphoria as |
| 11 MS. NOWLIN-SOHL: Object to form. | 11 long? |
| 12 THE WITNESS: So if a person has active | 12 MS. NOWLIN-SOHL: Object to form. |
| 13 suicidal ideation with intent to plan, we need to | 13 THE WITNESS: I'm aware that argument has |
| 14 get them somewhere where they can be watched and | 14 increased. |
| 15 supervised and make sure they're not going to act | 15 Q. (BY MR. RAMER) And do you agree with |
| 16 on that plan and die. | 16 that argument? |
| 17 If the person is confident they're not | 17 A. I see the theoretical basis for it. That |
| 18 going to act on it; they don't have a plan, then | 18 being said, it wouldn't be in line with current |
| 19 wouldn't necessarily need to be in that type of | 19 guidelines. It's a balance, right? Like, the |
| 20 restrictive setting. | 20 level of assessment, make sure someone's making a |
| 21 MR. RAMER: I think we've been going just | 21 very good, informed decision. |
| 22 a little over an hour. Do you want to -- could | 22 The longer the assessment is, |
| 23 you use a break? I could if you couldn't, but | 23 particularly for pubertal suppression, the longer |
| 24 either way, do you want to take a break? | 24 people are waiting and progressing through |
| 25 MS. NOWLIN-SOHL: That sounds good. | 25 puberty, which is worsening their gender |
| Page 99 | Page 101 |

26 (Pages 98 - 101)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1 dysphoria. So it's a complex balance between<br>2 those two factors.<br>3  MR. RAMER: And I'd like to turn to<br>4 Turban -- or introduce Turban Exhibit 8.<br>5  MR. RAMER: Do you have that, Li?<br>6  MS. NOWLIN-SOHL: Not yet.<br>7  MR. RAMER: Okay.<br>8  Q. (BY MR. RAMER) And I can start while<br>9 we're waiting and just ask, Dr. Turban, have you<br>10 appeared on an episode of the GenderGP podcast?<br>11  A. Perhaps I'm not sure which podcast that<br>12 is, but it sounds like a podcast I did appear on.<br>13  MR. RAMER: And are you still waiting on<br>14 it, Li?<br>15  MS. NOWLIN-SOHL: We just got it.<br>16  (Deposition Exhibit No. 8 was marked.)<br>17  THE WITNESS: I see. Yes, I do recall<br>18 this one.<br>19  Q. (BY MR. RAMER) Okay. And I'll just<br>20 represent to you that this is a transcript that is<br>21 posted on GenderGP's website.<br>22  And on page 1, is that your photo?<br>23  A. That is quite the photo of me, yes.<br>24  Q. I'd like to go to page 6. And at the top<br>25 of this page, there is a response attributed to<br><div align="right">Page 102</div> | 1  THE WITNESS: So what I was referencing<br>2 here -- and you'll see at the top I mentioned<br>3 adult, quote, gatekeeping models, was that there<br>4 was a history within psychiatry where there was an<br>5 extensive assessment process prior to adults being<br>6 able to start gender-affirming medical<br>7 interventions, and some of the assessment criteria<br>8 were not very reasonable. You know, if the<br>9 psychiatrist felt that the trans woman's outfit<br>10 was not particularly feminine or felt that her<br>11 makeup was done well or that she didn't have the<br>12 sexual orientation that the psychiatrist thought<br>13 she should have, they would refuse to provide the<br>14 person with care.<br>15  And then also what happened was the trans<br>16 community just learned the questions that some of<br>17 those physicians were asking, and they would go in<br>18 and address the way the person wanted and answer<br>19 the questions the way they were [indiscernible]<br>20 and it really stifled the relationship.<br>21  You know the person wasn't actually<br>22 answering the questions honestly to the physician<br>23 because the things that were being asked weren't<br>24 really so much about whether or not decision was<br>25 right for the person, and was more about the<br><div align="right">Page 104</div> |
| 1 you. And I'll just read the first, the first part<br>2 of this paragraph, and ask you a question about<br>3 it.<br>4  And it says "Yeah, I think that's a huge<br>5 question that especially in pediatrics people are<br>6 grappling with -- I think people have had an<br>7 easier time in adult medicine kind of recognizing<br>8 that these, like, assessment/gatekeeping were a<br>9 little bit ridiculous and damaging. And it's<br>10 interesting that not all of the lessons from that<br>11 have made it into pediatrics yet because people<br>12 don't trust kids to make decisions in the same<br>13 way, obviously, but, like, things people are<br>14 familiar with, right? Like, if you're -- if you<br>15 set up this assessment, gatekeeping protocol,<br>16 people are just going to figure out the answers<br>17 and then tell you what you want to hear. And<br>18 you've set up this really kind of like argument<br>19 representative with your patient or client.<br>20 (Unclear time stamped 1407). And you're like why?<br>21 Why even bother? You know?"<br>22  And do you think there's any reason to<br>23 bother with an assessment model for<br>24 gender-affirming medical interventions?<br>25  MS. NOWLIN-SOHL: Object to form.<br><div align="right">Page 103</div> | 1 therapist's views around what women should look<br>2 like.<br>3  I do think there's a role for assessment<br>4 in pediatrics, but I think it shouldn't be that<br>5 kind of thing. I don't think they should be<br>6 sitting judging a patient's physical appearance,<br>7 but rather really trying to understand them in a<br>8 collaborative way so they feel comfortable<br>9 speaking with me, so I really understand them, the<br>10 whole spectrum of their lives, all the ways I can<br>11 support them and guide them and their family<br>12 through these decisions about whether they will<br>13 benefit from puberty blockers or gender-affirming<br>14 hormones.<br>15  Q. Do you think that acquiring a diagnosis<br>16 of gender dysphoria on the DSM-5 before an<br>17 adolescent can obtain gender-affirming medical<br>18 interventions is an assessment model?<br>19  A. I think it's somewhat semantics, but<br>20 determining the diagnosis is an assessment.<br>21 You're doing a diagnostic assessment to come to<br>22 that diagnostic conclusion.<br>23  Q. Do you think there's a risk that<br>24 individuals would be able to figure out the<br>25 answers to obtain a diagnosis of gender dysphoria<br><div align="right">Page 105</div> |

<div align="right">27 (Pages 102 - 105)</div>

(31 of 289), Page 31 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 31 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 28 of 177
Jack Turban , M.D., MHS October 16, 2023

Page 106

1  on the DSM-5 and then tell the providers what they
2  want to hear?
3       MS. NOWLIN-SOHL: Object to form; calls
4  for speculation.
5       THE WITNESS: I think less so in minors
6  because we're usually interviewing their parents
7  and other people in their lives as well, we
8  want to have fairly consistent answers between the
9  different members of the family.
10      And when answers seem to be discordant
11  with each other, we usually facilitate family
12  therapy sessions to try to come to a shared
13  understanding of what's going on to make sure we
14  have a clear understanding of the picture.
15   Q. (BY MR. RAMER) So you think parents'
16  observations or conclusions regarding the gender
17  identity of their children is relevant to this
18  assessment?
19   A. I think the parents' experience and
20  perception is a piece of the puzzle, yes.
21   Q. And are you aware of any providers in the
22  United States who use only an informed consent
23  model to provide gender-affirming medical
24  interventions?
25       MS. NOWLIN-SOHL: Object to form.

Page 107

1       THE WITNESS: For minors or adults?
2   Q. (BY MR. RAMER) Minors.
3   A. No. But again, it's this what do you
4  mean by informed consent?
5       So what I would say, which hopefully
6  answers the question, is that everyone I know
7  conducts this comprehensive biopsychosocial
8  evaluation prior to initiating care, and that that
9  biopsychosocial assessment involves ensuring the
10  patient can provide informed consent or assent and
11  that the parents can provide informed consent.
12   Q. In sticking with this same document, I'd
13  like to move to page 11. And on this page there
14  are two answers attributed to you. One is very
15  short. I'm looking at the second one further
16  down.
17      And in particular in that paragraph, I
18  just want to read the third to last sentence that
19  begins with the words "And right." And I'll
20  ask -- I'm sorry. Maybe the fourth to last -- the
21  sentence that begins with the words "And right,"
22  and then I'll ask if I read it correctly.
23      It says "And right. The only argument
24  for the diagnosis existing is insurance coverage."
25      Did I read that correctly?

Page 108

1   A. Correct.
2   Q. And you're talking about the diagnosis
3  for gender dysphoria here; is that right?
4   A. In the context of psychiatric
5  appointments.
6   Q. So what do you mean when you say, "The
7  only argument for the diagnosis existing is
8  insurance coverage"?
9   A. I believe this was in the context of
10  arguments about whether or not gender dysphoria
11  should be in the DSM. And there have been
12  arguments on both sides. Some people have
13  highlighted concerns that because gender dysphoria
14  is in the DSM, that the general public will
15  misinterpret that to think that trans identities
16  are a mental illness and that that will promote
17  stigma, which I think is something that we've
18  seen.
19      My philosophy on that is that we just
20  shouldn't stigmatize mental health conditions
21  broadly. I wouldn't stigmatize someone with major
22  depressive disorder in the same way that I
23  wouldn't stigmatize someone with gender dysphoria,
24  but I understand that stigma exists.
25      Another side of the spectrum, people have

Page 109

1  made arguments that it should be in the DSM, and
2  there are plenty of peer-reviewed publications
3  that highlight that for psychiatrists, the main
4  reason it's in the DSM is for insurance billing.
5  So that if I'm talking to someone about
6  gender-affirming medical care, for instance, and
7  doing that biopsychosocial evaluation, I need some
8  diagnostic code to put down, otherwise I wouldn't
9  be able to do that work theoretically.
10   Q. And here you say the only argument for
11  the diagnosis existing is insurance coverage.
12      Is that what you think?
13       MS. NOWLIN-SOHL: Object to form.
14       THE WITNESS: Again, I think that's in
15  the context of psychiatric events. Like, on a
16  broader level, it's a useful diagnosis for
17  establishing that somebody could be a candidate
18  for gender-affirming medical intervention.
19      But, you know, you could get at a similar
20  concept of gender dysphoria without using that
21  specific term that many find stigmatizing.
22   Q. (BY MR. RAMER) So, I mean, what do
23  you -- how would you do it without using that
24  term? You'd just call it something else?
25       MS. NOWLIN-SOHL: Object to form.

28 (Pages 106 - 109)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1   THE WITNESS: I mean, you could describe<br>2 that the person has a gender identity that's<br>3 incongruent with their sex assigned at birth and<br>4 have for many years, and that's creating<br>5 clinically relevant distress. Maybe describe the<br>6 different elements of typical gender dysphoria<br>7 that they have. But the way insurance billing is<br>8 set up, you would need to actually generally bill<br>9 that kind of diagnostic code.<br>10   Similarly, a lot of insurance companies<br>11 won't cover, I think, some of the medical<br>12 appointments as well unless there's a diagnostic<br>13 code.<br>14   Q. (BY MR. RAMER) Do you think that an<br>15 individual who has distress resulting from --<br>16 well, no, let me rephrase.<br>17   Do you think there are instances where an<br>18 individual can desire gender-affirming medical<br>19 interventions but not meet the criteria for a<br>20 diagnosis of gender dysphoria under the DSM-5?<br>21   A. It's theoretically possible.<br>22   Q. And do you think that those individuals<br>23 should receive gender-affirming medical<br>24 interventions?<br>25   MS. NOWLIN-SOHL: Object to form; calls<br>Page 110 | 1 this end.<br>2   Did you say you could not picture a case?<br>3   A. I cannot picture a case where that would<br>4 be a reasonable practice.<br>5   Q. And I want to skip the next sentence and<br>6 then read the one after that and ask if I read it<br>7 correctly.<br>8   It says "Never once have I had a" --<br>9 sorry. I'll start again.<br>10   "Never once have I had a treatment plan<br>11 for someone's, like, gender dysphoria. But I've<br>12 had treatment plans to help them with their<br>13 anxiety or their depression or trauma-related<br>14 symptoms."<br>15   Did I read that correctly?<br>16   A. Sorry. I'm just finding where you are.<br>17   Yes.<br>18   Q. And is it true that you have never once<br>19 had a treatment plan for someone's gender<br>20 dysphoria?<br>21   A. So again, this is talking in the context<br>22 of a psychiatric treatment plan. So I wouldn't<br>23 have -- there's no evidence psychotherapy is to<br>24 try and push someone to identify with their sex<br>25 assigned at birth.<br>Page 112 |
| 1 for speculation.<br>2   THE WITNESS: No. That would be<br>3 practicing outside of guidelines.<br>4   Q. (BY MR. RAMER) Don't the guidelines<br>5 create exceptions? Or are they rigid rules?<br>6   A. They're a general set of guidelines for<br>7 care.<br>8   But that would be an extreme departure,<br>9 to provide the intervention to somebody in the<br>10 United States where we use the DSM who doesn't<br>11 meet the criteria for gender dysphoria. It's hard<br>12 for me to imagine that situation happening.<br>13   Q. And just as a -- you know, an expert in<br>14 this field, do you think the guidelines should<br>15 prevent those individuals from receiving<br>16 gender-affirming medical interventions?<br>17   MS. NOWLIN-SOHL: Object to form. Also<br>18 objection to the extent that it calls for a legal<br>19 conclusion.<br>20   THE WITNESS: Yeah, I mean, I'm hesitant<br>21 to make broad characterizations of all of medicine<br>22 not knowing, like, all the specific details of a<br>23 given case. But I can't picture a case that<br>24 would be a reasonable practice.<br>25   Q. (BY MR. RAMER) I couldn't hear you at<br>Page 111 | 1   I might try and work with their school<br>2 around bullying or work with their family around,<br>3 like, communication and validation skills or --<br>4 what I'm getting at here is there's not an<br>5 evidence-based psychotherapy or psychiatric<br>6 medication that's evidence based for gender<br>7 dysphoria.<br>8   Q. I guess I thought we were just discussing<br>9 that the only reason for the diagnosis is so that<br>10 you can enter a code for health insurance<br>11 purposes.<br>12   And I guess I don't understand if you<br>13 don't have treatment plans for gender dysphoria<br>14 because you're a psychiatrist, what is the need<br>15 for the diagnosis?<br>16   MS. NOWLIN-SOHL: Object to form;<br>17 mischaracterizes prior testimony.<br>18   THE WITNESS: So for instance, if I were<br>19 doing the biopsychosocial assessment for somebody<br>20 to consider starting pubertal suppression for<br>21 gender dysphoria, I would conceptualize that as<br>22 the treatment is the pubertal suppression, and I'm<br>23 conducting the biopsychosocial assessment to<br>24 broadly support them in many areas of their life<br>25 and then also, you know, pass them on to the next<br>Page 113 |

29 (Pages 110 - 113)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1 step to actually get them treatment, which is the<br>2 pubertal suppression.  So it's a bit of semantics<br>3 in that way.<br>4        I think another problem that comes up<br>5 sometimes -- and, again, with the insurance<br>6 issue -- is let's say I do an assessment and the<br>7 person doesn't meet the criteria for a gender<br>8 dysphoria, then you're also left with, you know,<br>9 what do we bill insurance in this instance?<br>10        But it's just kind of a technicality of<br>11 how insurance billing works.<br>12    Q.  (BY MR. RAMER)  So is the only thing that<br>13 you as a psychiatrist do for the treatment for<br>14 gender dysphoria is the initial biopsycho -- let<br>15 me rephrase.<br>16        Is the only thing that you, as a<br>17 psychiatrist, do for the treatment of gender<br>18 dysphoria the initial biopsychosocial assessment?<br>19       MS. NOWLIN-SOHL:  Object to form.<br>20       THE WITNESS:  Yes.  In terms of the<br>21 distress the person's having related to their<br>22 physical body not aligning with their gender<br>23 identity, our primary role is to do that<br>24 biopsychosocial assessment.<br>25        If they had something else going on, if<br>                                    Page 114 | 1 describing there, there actually is a different<br>2 diagnostic code for purposes of health insurance,<br>3 right?  You're treating anxiety or you're treating<br>4 depression?<br>5       MS. NOWLIN-SOHL:  Object to form.<br>6       THE WITNESS:  If I were treating someone<br>7 who had that.  But not everyone who comes to see<br>8 me as part of gender-related care is going to have<br>9 those other diagnoses.<br>10    Q.  (BY MR. RAMER)  So do you see patients<br>11 who are receiving gender-affirming medical<br>12 interventions after you have conducted the<br>13 biopsychosocial assessment with them?<br>14    A.  Like, do I continue to see them?<br>15    Q.  Yes.<br>16    A.  Yes.<br>17    Q.  And what are you doing during those<br>18 meetings?<br>19    A.  It depends on the patient.<br>20    Q.  Can you provide me some examples?<br>21    A.  If they also had -- generally if they --<br>22 for someone who ultimately did start the<br>23 gender-affirming medical intervention, I would<br>24 check with them to see how they're feeling about<br>25 the intervention, making sure that they're<br>                                    Page 116 |
| 1 they had major depressive disorder or generalized<br>2 anxiety disorder, I would treat that as well.  And<br>3 I'll also do general psychosocial intervention so<br>4 family therapy or working with the school or<br>5 trying to prevent bullying.<br>6        But those things don't work to get rid of<br>7 the fact that they're distressed about their<br>8 body not aligning with their gender identity,<br>9 which is the gender dysphoria.<br>10    Q.  (BY MR. RAMER)  Are there individuals who<br>11 have gender dysphoria but do not have anxiety that<br>12 rises to the level of general anxiety disorder?<br>13    A.  Generalized anxiety disorder is not<br>14 defined by the level of anxiety but rather the<br>15 types of things about which one has anxiety.<br>16    Q.  So in this sentence when you say "But<br>17 I've had treatment plans to help them with their<br>18 anxiety or their depression," are you referring to<br>19 actual diagnoses of an anxiety disorder or a<br>20 depression disorder?<br>21    A.  Yeah.  Those are colloquialisms for<br>22 anxiety disorders, which there are many, or<br>23 depression which can have many different diagnoses<br>24 that cause it.<br>25    Q.  And so for that treatment you're<br>                                    Page 115 | 1 comfortable continuing with it, seeing if they<br>2 have any questions or if there are any worries<br>3 that are coming up around it.<br>4        If they also had generalized anxiety<br>5 disorder, I might be offering an evidence-based<br>6 medication or an evidence-based psychotherapy for<br>7 generalized anxiety disorder like cognitive<br>8 behavioral therapy.<br>9    Q.  Was there more?<br>10    A.  I don't know how many examples --<br>11    Q.  That's fine.  That's fine.  Let's -- so<br>12 same page, toward the bottom, and just there's a<br>13 statement attributed to Dr. Helen Webberley.<br>14        In this paragraph she's discussing<br>15 Johanna Olson-Kennedy, correct?<br>16    A.  Do you want me to --<br>17    Q.  Sure, you can.  And just as a reminder,<br>18 my question is just simply if she is discussing<br>19 Johanna Olson-Kennedy.<br>20    A.  Looks like she's referencing<br>21 Dr. Olson-Kennedy as well as -- I don't know who<br>22 Darlene Tando is.  I don't know Aiden's last name,<br>23 but I believe Aiden is a psychotherapist who works<br>24 with trans youth.<br>25    Q.  And do you know Dr. Olson-Kennedy?<br>                                    Page 117 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

ER-099

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1   A.  Yes. | 1   mental health treatment. |
| 2   Q.  And on page 12, Dr. Webberley -- so top | 2       The good thing that's unique about their |
| 3   of page 12, second and third full sentences, | 3   model versus other models is it's not necessarily |
| 4   Dr. Webberley says, "And basically Johanna has | 4   like an LMFT or a social worker or a psychologist. |
| 5   just said, 'Look, if your kid -- if your kid tells | 5   It's this medical doctor who has special training |
| 6   you that they're trans, they most likely are. | 6   in conducting biopsychosocial assessments, whereas |
| 7   Just believe it.'" | 7   other places it's more, you know, a psychologist |
| 8       Did I read that correctly? | 8   or a psychiatrist. |
| 9   A.  Yes. | 9       And then what they've told me is that if |
| 10  Q.  Do you agree that Dr. Olson's -- well, | 10  it is particularly complex and they feel that they |
| 11  sorry. | 11  need someone like a Ph.D. or psychologist, those |
| 12      Do you agree that Dr. Olson-Kennedy's | 12  individual patients they'll refer over.  So if |
| 13  practice is that if your kids tell you that | 13  someone has complex autism or trauma or psychosis. |
| 14  they're trans, you should just believe it? | 14  Q.  And you used an acronym, "LMFT." |
| 15      MS. NOWLIN-SOHL:  Object to form; | 15      What is that? |
| 16  foundation. | 16  A.  It's a licensed marriage and family |
| 17      THE WITNESS:  I think probably that's | 17  therapist. |
| 18  mostly glib.  I don't think that's her actual | 18  Q.  And at Brown University, you said -- did |
| 19  practice. | 19  you say Dr. Forcier? |
| 20      My understanding is that she conducts the | 20  A.  Yes.  F-o-r-c-i-e-r. |
| 21  biopsychosocial evaluation, and that Aiden -- | 21  Q.  But in this passage, you say that, quote, |
| 22  again, whose last name I forget -- is a therapist | 22  they don't have a lot of mental health |
| 23  who similarly conducts those evaluations. | 23  involvement, end quote. |
| 24  Q.  (BY MR. RAMER)  And then same page down | 24      What did you mean by that? |
| 25  to your response which follows.  And I'll just | 25  A.  Yeah, that in their clinics, there are |
| Page 118 | Page 120 |

| | |
|---|---|
| 1   read the first few sentences and ask if I read it | 1   these adolescent medicine physicians who have kind |
| 2   correctly. | 2   of broader training.  So they -- they can |
| 3       It says "Yeah, I was really talking | 3   prescribe hormones and puberty blockers, but they |
| 4   around it and not naming names, but that model | 4   also are the pediatric medical specialty that |
| 5   does exist in the U.S., right?  So Dr. Olson, | 5   focuses the most on mental health.  So they're not |
| 6   that's her model.  Brown University's clinic has a | 6   pure psychiatrists the way that I am, so there's |
| 7   similar model.  And I think we're now starting to | 7   not necessarily a psychologist or psychiatrist |
| 8   have the conversations like, great.  Those models | 8   involved in every single case.  Sometimes it's an |
| 9   have now been around for a little while where they | 9   adolescent medicine physician who has mental |
| 10  don't have a lot of mental health involvement. | 10  health expertise. |
| 11  They don't have a gatekeeping model.  They have | 11  Q.  And so that model results in less mental |
| 12  this informed consent model, and so far it seems | 12  health involvement; is that right? |
| 13  to be going fine." | 13      MS. NOWLIN-SOHL:  Object to form. |
| 14      Did I read that correctly? | 14      THE WITNESS:  Yeah, I guess I'm saying |
| 15  A.  Yes. | 15  less mental health involvement.  I just mean that |
| 16  Q.  And are you, in this response, accurately | 16  it's an adolescent medicine doctor who has mental |
| 17  describing the model that Dr. Olson-Kennedy uses? | 17  health training that is different than, say, a |
| 18  A.  Again, I think it's a little tricky | 18  psychiatrist or a psychologist who only has mental |
| 19  between these terms, assessment and gatekeeping | 19  health training. |
| 20  and informed consent being somewhat glib. | 20      So for them, it could be the same person |
| 21      But my understanding, especially talking | 21  doing the biopsychosocial mental health assessment |
| 22  to Dr. Olson and -- Dr. Forcier is the one at the | 22  and also providing the hormones, whereas in other |
| 23  Brown University clinic -- is that they do conduct | 23  models you have a specified, separate person. |
| 24  these biopsychosocial assessments as adolescent | 24  Q.  (BY MR. RAMER)  So are there patients |
| 25  medicine physicians who are trained in doing | 25  receiving fewer mental health interventions as a |
| Page 119 | Page 121 |

31 (Pages 118 - 121)

Jack Turban , M.D., MHS October 16, 2023

**Page 122**

1  result?
2      MS. NOWLIN-SOHL: Object to form; calls
3  for speculation.
4      THE WITNESS: No, I think it's fewer
5  practitioners that they're seeing but not
6  necessarily fewer mental health interventions.
7      Q. (BY MR. RAMER) And what's the benefit of
8  having fewer practitioners that they're seeing?
9      A. I think their logic is that it would be
10 more streamlined. So for instance, in our model,
11 a patient has to wait many months to be able to
12 come in to see me. You know, there's, like, the
13 delay going from provider to provider having more
14 and more appointments.
15     So in our model, we do often have
16 patients who are progressing through puberty while
17 their mental health is worsening while we try and
18 work on logistics of getting that biopsychosocial
19 assessment done. But in their model, because it's
20 the same doctor, it's more streamlined.
21     And again, I don't work in these clinics.
22 I'm giving you my understanding from talking to
23 them to the best of my ability. But take it with
24 a grain of salt, having not actually worked in
25 there or seen their exact protocols.

**Page 123**

1      Q. And at the beginning of this answer you
2  say you were talking around it and not naming
3  names.
4      Why were you not naming names?
5      A. I don't remember. I'd have to go through
6  the rest of the --
7      Q. That's fine. If you don't know --
8      A. Probably because I was just speaking in
9  general terms and not talking about the specific
10 clinics.
11     Q. And so it doesn't have something to do
12 with the fact that the type of model they're using
13 would somehow be controversial?
14     MS. NOWLIN-SOHL: Object to form.
15     THE WITNESS: I don't know what you mean
16 by "controversial."
17     Q. (BY MR. RAMER) Well, I guess that it
18 would be inconsistent with the WPATH guidelines.
19     MS. NOWLIN-SOHL: Object to form.
20     THE WITNESS: I would have to go back and
21 look at when this interview was and look at how
22 the guidelines evolved, because I think it was
23 during Standards of Care 7.
24     And I can't remember -- it's something
25 that's irrelevant to me because I am a

**Page 124**

1  psychiatrist, so I am the one doing mental health
2  assessment, but I can't remember if there's
3  specific language in the old guidelines versus the
4  new guidelines that said whether it could be an
5  adolescent medicine physician doing the mental
6  health biopsychosocial evaluation versus another
7  type of medical professional.
8      Q. (BY MR. RAMER) And you don't know the
9  answer to that question with respect to the
10 current guidelines either?
11     MS. NOWLIN-SOHL: Object to form.
12     THE WITNESS: I believe the current
13 guidelines say "mental health professional," but I
14 would have to go back and look. It hasn't been
15 relevant since I am a mental health professional.
16     Q. (BY MR. RAMER) Yeah. Yeah. Okay. That
17 makes sense.
18     MR. RAMER: Li, did you receive Turban
19 Exhibit 9?
20     MS. NOWLIN-SOHL: No.
21     MR. RAMER: Still no?
22     MS. NOWLIN-SOHL: Still no.
23     MR. RAMER: Well, I'll just -- we can get
24 started and then we can confirm the document.
25     Q. (BY MR. RAMER) But what I'm going to be

**Page 125**

1  bringing up, Dr. Turban, is your article entitled
2  "Pubertal" -- "Pubertal Suppression For
3  Transgender Youth and Risk of Suicidal Ideation,"
4  which is published in Pediatrics.
5      MR. RAMER: You still do not have the
6  document?
7      MS. NOWLIN-SOHL: Just arrived.
8      THE WITNESS: Okay.
9      (Deposition Exhibit No. 9 was marked.)
10     Q. (BY MR. RAMER) And is this that
11 document, Doctor?
12     A. Yes.
13     Q. And where did the data for this article
14 come from?
15     A. This data is from the 2015 U.S.
16 Transgender Survey.
17     Q. And looking -- sticking with your
18 article, going to page 3 under "Methods," and just
19 at a high level of generality, I'm trying to
20 understand what the study does. And basically --
21 tell me if I have this generally correct.
22     Basically the study takes two different
23 groups. The first group is individuals who wanted
24 puberty blockers and received them; and the second
25 group is individuals who wanted puberty blockers

32 (Pages 122 - 125)

Jack Turban , M.D., MHS October 16, 2023

| | | |
|---|---|---|
| 1 but did not receive them. | | 1 the sentence that says "P less than .05 defines |
| 2     Is that fair? | | 2 statistical significance." |
| 3   A.  Yes. | | 3     Is that right? |
| 4   Q.   And then you compared those two groups on | | 4     MS. NOWLIN-SOHL:  Object to form. |
| 5 a number of different metrics, correct? | | 5     THE WITNESS:  That's talking about one |
| 6   A.  Yes. | | 6 specific -- but the way you build these models, |
| 7   Q.   And on this page, moving down to "Study | | 7 there are different statistical thresholds for |
| 8 Population," I just -- the second and third | | 8 different parts in how you build the model. |
| 9 sentences I'm going to read and ask if I read them | | 9   Q.   (BY MR. RAMER)  And is a P-value of less |
| 10 correctly. | | 10 than .05, is that a standard P-value for a |
| 11     It says that "Given that pubertal | | 11 threshold of statistical significance? |
| 12 suppression for transgender youth was not | | 12   A.  It depends on what you're doing. |
| 13 available in the United States until 1998, only | | 13   Q.   And so like what?  What does it depend |
| 14 participants who are 17 or younger in 1998 would | | 14 on? |
| 15 have had healthcare access to GnRHa for pubertal | | 15   A.  For instance, if you were running a study |
| 16 suppression.  We thus restricted the analysis to | | 16 that had, like, hundreds and hundreds of |
| 17 participants who were 36 or younger at the time of | | 17 comparisons, you'd want to do a correction for |
| 18 the survey resulting in a sample of 20,619 | | 18 multiple comparisons and do it using a lower |
| 19 participants." | | 19 P-value. |
| 20     Did I read that correctly? | | 20     If you were deciding which variables to |
| 21   A.  Yes. | | 21 build into a logistic progression model, you would |
| 22   Q.   And the basic idea there is that it's | | 22 probably use a higher P-value like the .2 that we |
| 23 highly unlikely, if not impossible, that anyone | | 23 used. |
| 24 over the age of 36 at the time of the survey would | | 24   Q.   When you have a threshold of statistical |
| 25 have had access to puberty blockers to treat | | 25 significance of less than .05, what do you make of |
| Page 126 | | Page 128 |

| | | |
|---|---|---|
| 1 gender dysphoria; is that right? | | 1 a finding with a P-value of .07 or .08 just as a |
| 2   A.  I wouldn't say it's impossible.  There | | 2 theoretical manner? |
| 3 have been some historical studies done by Jules | | 3   A.  Theoretically it would tell you nothing |
| 4 Gill-Peterson, who I think is at the University of | | 4 one way or another. |
| 5 Pittsburgh now, that found that individual | | 5   Q.   Have you heard people use the term |
| 6 physicians were offering pubertal suppression in | | 6 "substantial finding" or "important finding" for |
| 7 the United States earlier than this. | | 7 something like that where the P-value doesn't |
| 8     But this is a rough guideline based on | | 8 fully reach the threshold of statistical |
| 9 what we knew from the published literature.  This | | 9 significance? |
| 10 was then in the published literature.  The first | | 10     MS. NOWLIN-SOHL:  Object to form. |
| 11 time it seemed to be offered was at the Gender | | 11     THE WITNESS:  I've heard people use the |
| 12 Management Service at Boston Children's Hospital, | | 12 term "trend" toward whatever the recitation |
| 13 it made a publication that -- roughly 1988 is when | | 13 they're looking at is.  I was trying not to do |
| 14 they started. | | 14 that. |
| 15   Q.   And then going to the next page, | | 15   Q.   (BY MR. RAMER)  And sticking with page 4, |
| 16 statistical analysis, about three-quarters of the | | 16 going up to the top, the first full paragraph but |
| 17 way down the paragraph, it states that your | | 17 then the last two sentences in that paragraph, |
| 18 threshold for statistical significance was a | | 18 just read and ask if I read it correctly. |
| 19 P-value of less than .05; is that right? | | 19     It says "Those who reported beginning |
| 20   A.  I believe that's just for when we were | | 20 treatment after age 17 were excluded to only |
| 21 comparing demographic differences.  In the | | 21 include participants who likely had pubertal |
| 22 multivariable logistic progression, we chose | | 22 suppression during the active endogenous puberty. |
| 23 anything with a P-value of less than .2 to include | | 23 The vast majority of adolescents would have |
| 24 in the model. | | 24 reached Tanner 5, the final stage of puberty, by |
| 25   Q.   Okay.  That's fair.  And I'm just reading | | 25 age 17." |
| Page 127 | | Page 129 |

33 (Pages 126 - 129)

(37 of 289), Page 37 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 37 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 34 of 177
Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1    Did I read that correctly? | 1    like to go to page 100. |
| 2    A.  Yes. | 2    And in the right column there's a blue |
| 3    Q.  Why would someone report receiving | 3    header it says "See puberty blocking hormones," |
| 4    pubertal suppression after age 17? | 4    and there's one paragraph below it.  And the final |
| 5    A.  For birth-assigned males, estrogen alone | 5    sentence of that paragraph says "However, less |
| 6    is not strong enough to suppress your endogenous | 6    than 1 percent of respondents reported ever having |
| 7    testosterone, so you often need a second | 7    them."  And then there's an endnote 12. |
| 8    medication on board.  You could use a puberty | 8    Do you see that? |
| 9    blocker or GnRH agonist to do that.  They're | 9    A.  Yes. |
| 10   expensive, so generally they're not.  Generally | 10   Q.  And then if we go to page 126, the left |
| 11   one uses something like spironolactone. | 11   column is endnote 12.  And I'd just like to read |
| 12   But want to really be looking at it in | 12   the middle sentences here and ask if I read them |
| 13   people who are using it to suppress active puberty | 13   correctly. |
| 14   rather than, you know, suppress testosterone for | 14   It says "While puberty-blocking |
| 15   someone who was already past the pubertal | 15   medications are usually used to delay physical |
| 16   adolescent window. | 16   changes associated with puberty and youth ages 9 |
| 17   Q.  So you excluded participants who reported | 17   to 16 prior to beginning hormone replacement |
| 18   beginning pubertal suppression after age 17 | 18   therapy, a large majority, 73 percent of |
| 19   because you didn't want to look at that particular | 19   respondents who reported having taken puberty |
| 20   treatment? | 20   blockers in Q.12.9, reported doing so after age 18 |
| 21   MS. NOWLIN-SOHL:  Object to form. | 21   in Q.12.11.  This indicates that the question may |
| 22   THE WITNESS:  Our clinical question here | 22   have misinterpreted by some respondents who |
| 23   was pubertal suppression during adolescence rather | 23   confused puberty blockers with the hormone therapy |
| 24   than, you know, blocking endogenous testosterone | 24   given to adults and older adolescents." |
| 25   as an adult. | 25   Did I read that correctly? |
| Page 130 | Page 132 |

| | |
|---|---|
| 1    MR. RAMER:  And, Li, do you have Turban | 1    A.  Yes. |
| 2    Exhibit 10? | 2    Q.  Would you agree that 73 percent is a |
| 3    MS. NOWLIN-SOHL:  Yes. | 3    large percentage of these respondents? |
| 4 | 4    A.  Yes.  And again, these are the |
| 5    (Deposition Exhibit No. 10 was marked.) | 5    respondents that we excluded from our study |
| 6    Q.  (BY MR. RAMER)  And, Dr. Turban, is this | 6    because we didn't want to look at those who |
| 7    the survey that you used for this paper? | 7    potentially misinterpreted the question or had |
| 8    A.  This looks like the report of the full | 8    accessed puberty blockers later as adults. |
| 9    survey, yes. | 9    Q.  Do you agree with the second statement I |
| 10   Q.  Fair.  And I'd like to go to page 271 and | 10   read that "Respondents may have misinterpreted |
| 11   specifically question 12.9 on that page. | 11   this question and confused puberty blockers with |
| 12   And is this the question that you used to | 12   the hormone therapy given to adults and older |
| 13   determine the number of participants who received | 13   adolescents"? |
| 14   pubertal suppression? | 14   MS. NOWLIN-SOHL:  Object to form; |
| 15   A.  Yes. | 15   foundation. |
| 16   Q.  And then they would have, for -- I guess | 16   THE WITNESS:  Potentially for those older |
| 17   let's go to 272 now. | 17   respondents who we excluded.  I think it's less |
| 18   And then if they had selected puberty | 18   likely for younger people who would be more aware |
| 19   blocking hormones in 12.9, they would be sent to | 19   of what pubertal suppression is. |
| 20   question 12.11; is that right? | 20   Q.  (BY MR. RAMER)  If that many people |
| 21   A.  Yes. | 21   misunderstood the question, how can you assume the |
| 22   Q.  And then they would have a drop-down and | 22   other 27 percent correctly understood the |
| 23   report their age; is that right? | 23   question? |
| 24   A.  Correct. | 24   MS. NOWLIN-SOHL:  Object to form. |
| 25   Q.  Okay.  Sticking with this document, I'd | 25   THE WITNESS:  There is no way to be |
| Page 131 | Page 133 |

34 (Pages 130 - 133)

Jack Turban , M.D., MHS October 16, 2023

1 certain, but I think for younger people who are
2 closer to when pubertal suppression was around and
3 available and in conversation, they would know the
4 difference between the two. But there's no way to
5 be sure.
6    Q.  (BY MR. RAMER) And so this error that's
7 described in footnote 12 does not give you pause
8 in relying on this data?
9    A.  Not extreme pause again, because these
10 people were all excluded from the study, all of
11 the adults who would have said they accessed it
12 late.
13    Q.  I'd like to go back to page 271, and in
14 the right column, question 12.8.
15       And this is the question you used to
16 define the group of people who have ever wanted
17 pubertal suppression, correct?
18    A.  Correct.
19    Q.  And did you adjust the results for this
20 question based on the same error that affected the
21 results for question 12.9?
22       MS. NOWLIN-SOHL:  Object to form.
23       THE WITNESS:  We similarly excluded all
24 older individuals who wouldn't have been able to
25 access them, which would have gotten rid of a lot

Page 134

1 of the older people who answered the question.
2    Q.  (BY MR. RAMER) In the relevant time
3 periods -- I'm sorry.
4       First let's go back to your article,
5 which is Turban Exhibit 9. And it's page 4 where
6 it says "Outcomes."
7       And the relevant time periods for the
8 metrics in this paragraph were the past month, the
9 past year, and lifetime, correct?
10    A.  Yes.
11    Q.  And with respect to the time periods for
12 the past month and the past year, those dates are
13 from the date the survey was taken, right?
14    A.  Correct.
15    Q.  And so with you excluding anybody 36
16 years old and older, your data would still include
17 a 35-year-old who said he had suicidal ideation in
18 the last month, right?
19    A.  Correct.
20    Q.  And this paper does not report the change
21 in these metrics based on the purported inability
22 to access pubertal suppression, correct?
23    A.  No.  So as I explained in the
24 declaration, there are two types of studies
25 generally for this area, studies that look before

Page 135

1 and after and find all that's improved after the
2 treatment, then there's the study that compares
3 those who did receive treatment to those who
4 didn't at a single time point. And this is one of
5 those latter studies.
6       MR. RAMER:  I'm going to send now, see
7 when it reaches you, what I'll mark as Turban
8 Exhibit 11. And this will be --
9       (Deposition Exhibit No. 11 was marked.)
10    Q.  (BY MR. RAMER) This will be your article
11 in Plos One -- sorry, I guess clarification.
12       Do you say "Plos One"?
13    A.  I do.
14    Q.  Okay.  This will be your article in Plos
15 One entitled "Access to Gender-Affirming Hormones
16 During Adolescence and Mental Health Outcomes
17 Among Transgender Adults."
18       And the method in this article is similar
19 to the article we just looked at, right?
20       MS. NOWLIN-SOHL:  John, we don't actually
21 have the exhibit quite yet.  Can we actually just
22 hang on a second?
23       MR. RAMER:  I mean, does he not --
24    Q.  (BY MR. RAMER) Doctor, is the method you
25 used in accessing gender-affirming hormones with

Page 136

1 respect to the U.S. Transgender Survey similar to
2 what you did in the article we just looked at?
3    A.  The methodology of the Plos One paper is
4 similar to the Pediatrics paper.
5    Q.  And the major difference is this paper
6 that we're going to be looking at is focused on
7 cross-sex hormones, whereas the prior one was
8 focused on pubertal suppression; is that right?
9    A.  Generally, yes.
10       MR. RAMER:  And are we still waiting on
11 it, Li?
12       MS. NOWLIN-SOHL:  Yes.
13    Q.  (BY MR. RAMER) I guess I'll just ask you
14 a general question, Doctor, about what an odds
15 ratio is.  And here's what I think it is, and
16 please tell me if I have this wrong.
17       Basically an odds ratio of one tells us
18 there is no relationship between an exposure and
19 an outcome.  And an odds ratio of greater than one
20 tells us that the exposure is associated with
21 higher odds of that particular outcome.  And an
22 odds ratio of less than one tells us that the
23 exposure is associated with lower odds of that
24 particular outcome.
25       Is that close to being right?

Page 137

35 (Pages 134 - 137)

ER-104

(39 of 289), Page 39 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 39 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 36 of 177
Jack Turban , M.D., MHS October 16, 2023

Page 138

1     A.  Yes, with the caveat that you would also
2 want to look at the key value and the confidence
3 intervals.
4     MS. NOWLIN-SOHL:  We have the document
5 now, John.
6     MR. RAMER:  Okay.  Great.
7     Q.  (BY MR. RAMER)  And just to confirm,
8 Doctor, is this your Plos One article titled
9 "Access to Gender-Affirming Hormones During
10 Adolescence and Mental Health Outcomes Among
11 Transgender Adults"?
12     A.  It is.  I would just be careful because
13 we published a correction on this paper later.
14 The overall conclusions didn't change, but some of
15 the numbers changed.
16     Q.  And did the numbers change -- well, let's
17 go to page 9, Table 2.  And if the numbers I'm
18 going to ask about did change, maybe we'll take
19 our longer break a little earlier.
20     But did the numbers change with respect
21 to the age 16 or 17 group?
22     A.  I don't think so, but I would want to
23 look to be sure.
24     MR. RAMER:  Okay.  Well, we're almost
25 coming up on an hour, and then maybe I'll track

Page 139

1 down the corrected version of that.
2     And so do we want to break until --
3 what's good for you, Doctor and Li?
4     MS. NOWLIN-SOHL:  Yeah, I think we need
5 to go get lunch, so 45 minutes would probably be
6 best.  We can come back right around 1:00 Pacific
7 time.
8     MR. RAMER:  Top of the hour?
9     MS. NOWLIN-SOHL:  Yeah.
10     MR. RAMER:  That sounds good to me.
11     THE VIDEOGRAPHER:  Okay.  So the time is
12 12:17 p.m. Pacific time, and we are off the
13 record.
14     (Break taken from 12:17 p.m. to 1:05 p.m.)
15     THE VIDEOGRAPHER:  All right.  So we are
16 recording.  The time is 1:05 p.m. Pacific time,
17 and we are back on the record.
18     (Deposition Exhibit No. 12 was marked.)
19     Q.  (BY MR. RAMER)  Dr. Turban, I'd like to
20 introduce Turban Exhibit 12.  If you'd let me know
21 when you have that in front of you.
22     A.  Is it the JAMA Psychiatry paper?
23     Q.  That's correct.  And can you tell me what
24 this document is?
25     A.  This is a research paper we published in

Page 140

1 JAMA Psychiatry about association between exposure
2 to gender identity conversion efforts and mental
3 health outcomes.
4     Q.  And on page 69, which I think is page 2
5 of the article, in the second paragraph, second
6 sentence, you say, "Gender identity conversion
7 therapy refers to psychological interventions with
8 a predetermined goal to change a person's gender
9 identity to align with their sex assigned at
10 birth."
11     Did I read that correctly?
12     A.  Yes.  Citation 8, so it looks like that
13 definition is from Byne, et al., but it's also the
14 general definition from the American Academy of
15 Child and Adolescent Psychiatry.
16     Q.  And would a psychological intervention
17 with a predetermined goal of affirming a person's
18 gender identity constitute gender identity
19 conversion therapy?
20     A.  What do you mean by the predetermined
21 goal of affirming their gender identity?
22     Q.  I guess what do you mean by the
23 predetermined goal to change a person's gender
24 identity in this passage?
25     A.  I guess make it different than it is, or

Page 141

1 force it to change.
2     Affirming would be accepting the identity
3 they currently have.
4     Q.  What about a psychological intervention
5 with a predetermined goal of consolidating a
6 person's gender identity?  Would that constitute a
7 gender identity conversion therapy?
8     MS. NOWLIN-SOHL:  Object to form.
9     THE WITNESS:  I don't know what you mean
10 by "consolidate."
11     Q.  (BY MR. RAMER)  Is any psychological
12 intervention with a predetermined goal ethical?
13     MS. NOWLIN-SOHL:  Object to form.
14     THE WITNESS:  Yes.  For instance, if the
15 goal was to make someone's major depressive
16 disorder go into remission, that would be
17 appropriate.
18     Q.  (BY MR. RAMER)  And are you familiar with
19 the term "exploratory therapy"?
20     A.  Yes.
21     Q.  And what is your understanding of that
22 term?
23     A.  My understanding of exploratory
24 psychotherapy is working with a person in a
25 nondirective way to explore their gender identity

36 (Pages 138 - 141)

Jack Turban , M.D., MHS October 16, 2023

**Page 142**

1  and help them understand it without having a
2  predetermined goal in mind.
3       So you wouldn't be doing therapy to try
4  and make them be cisgender; you wouldn't be doing
5  the therapy to try and make them transgender, but
6  rather helping them explore to understand
7  themselves.
8     Q.  And if you had a psychological
9  intervention with a predetermined goal of making
10  someone transgender, would that constitute
11  transgender identity conversion therapy?
12     A.  Essentially, yes.
13     Q.  And do you engage in exploratory therapy
14  with your patients?
15     A.  Yes.
16     Q.  And why do you engage in exploratory
17  therapy with your patients?
18     A.  I think of it as part of the
19  biopsychosocial evaluation to make sure the person
20  has a clear understanding of their identity and
21  the many ways in which they can exist in this
22  world and understanding themselves.
23     Q.  Can exploratory therapy reduce stress
24  related to an individual's gender incongruence?
25       MS. NOWLIN-SOHL:  Object to form.

**Page 143**

1       THE WITNESS:  I'm not familiar with any
2  evidence that that is the case.
3     Q.  (BY MR. RAMER)  You're not familiar with
4  any evidence that exploratory therapy can reduce
5  stress related to an individual's gender
6  incongruence?
7     A.  Correct.
8     Q.  Are you aware of any evidence that
9  exploratory therapy -- I'll move on.
10       The data for this article also came from
11  the 2015 U.S. Transgender Survey, correct?
12     A.  Yes.
13     Q.  And then if we could go back to
14  Exhibit 10, which is the report of the survey, and
15  I'd like to go to page 273.  And specifically
16  question 13.2 in the left column.
17       And is this the question you used to
18  represent conversion therapy?
19     A.  We use the term "gender identity
20  conversion efforts," but yes.
21     Q.  And if a provider informs a patient about
22  the risks associated with gender-affirming medical
23  interventions, do you think it's possible the
24  patient would construe that information as the
25  provider trying to stop the patient from being

**Page 144**

1  trans?
2       MS. NOWLIN-SOHL:  Object to form; calls
3  for speculation.
4       THE WITNESS:  No.  I think that would be
5  a stretch.
6     Q.  (BY MR. RAMER)  Why?
7     A.  I routinely talk to my patients about the
8  risks and benefits of treatments.  They never
9  think that I'm trying to force them to stop being
10  trans.
11       They understand that I am informing them
12  about important risks and benefits to consider
13  about medical treatments they're considering.
14     Q.  If a provider tells a patient that the
15  patient may not access gender-affirming medical
16  interventions until the patient completes a
17  biopsychosocial assessment, do you think it's
18  possible the patient will view that limitation as
19  the provider trying to stop the patient from being
20  trans?
21       MS. NOWLIN-SOHL:  Object to form; calls
22  for speculation.
23       THE WITNESS:  I do not.
24     Q.  (BY MR. RAMER)  And why not?
25       MS. NOWLIN-SOHL:  Same objections.

**Page 145**

1       THE WITNESS:  That's my routine practice,
2  and I've never had a patient think that I was
3  trying to force them to be cisgender when
4  describing to them the treatment guidelines that I
5  would follow.
6     Q.  (BY MR. RAMER)  Do you think your
7  patient -- if one of your patients thought that
8  you were trying to stop them from being trans, do
9  you think that they would tell you?
10       MS. NOWLIN-SOHL:  Object to form; calls
11  for speculation.
12       THE WITNESS:  My patients don't usually
13  hold back if they're unhappy with me about
14  something.  I think they would usually tell me.
15     Q.  (BY MR. RAMER)  Do you think that belief
16  holds true for the majority of adolescents
17  expressing gender dysphoria?
18       MS. NOWLIN-SOHL:  Object to form;
19  foundation, speculation.
20       THE WITNESS:  Could you repeat the
21  question?
22     Q.  (BY MR. RAMER)  I thought you said you
23  don't believe that if your patients thought you
24  were trying to stop them from being trans that
25  they would tell you.

37 (Pages 142 - 145)

(41 of 289), Page 41 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 41 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 38 of 177
Jack Turban , M.D., MHS October 16, 2023

Page 146

1    I'm sorry.  You said that -- in effect,
2  you said they would tell you; is that fair?
3    A.  I believe they would tell me or their
4  parents would tell me.  If they were really angry
5  and thought I was trying to force them to be
6  cisgender, they would probably not want to keep
7  seeing me, in which case the parents would
8  probably tell me if they didn't want to keep
9  seeing me, and I would ask why.
10    I think generally that would come to my
11  attention in some way.
12    MR. RAMER:  And, Li, do you have Turban
13  Exhibit 13?
14    MS. NOWLIN-SOHL:  Not yet.
15    MR. RAMER:  Okay.  Well, we'll stick with
16  this document and go to -- I think it's page 75.
17    MS. NOWLIN-SOHL:  And this is still the
18  U.S. Trans Survey?
19    MR. RAMER:  No, I'm sorry.  Return to
20  Turban Exhibit 12, the -- Dr. Turban's paper.  I
21  apologize.  You can go to page 75 in that
22  document.
23    MS. NOWLIN-SOHL:  Okay.  We are there.
24    Q.  (BY MR. RAMER)  Okay.  And in the left
25  column below "Strengths and Limitations," the

Page 147

1  third sentence says "It is possible that those
2  with worse mental health or internalized
3  transphobia may have been more likely to seek out
4  conversion therapy rather than non-GICE therapy,
5  suggesting that conversion efforts themselves are
6  not causative of these poor mental health
7  outcomes.
8    Did I read that correctly?
9    A.  It's part of a -- I think the next
10  sentence would be important to read.
11    Q.  Okay.  But that sentence I read, I read
12  that correctly, for the record?
13    A.  You read the words correctly without the
14  context, yes.
15    Q.  Okay.  And do you say -- do you say
16  "GICE"?  Do you pronounce that or do you say
17  "GICE"?
18    A.  I usually just say gender identity
19  conversion efforts.
20    Q.  Okay.  And here's an opportunity to add
21  context.
22    Can you just explain what you're saying
23  in that sentence?
24    A.  Yes.  The first sentence you read said
25  it's possible that those with worse mental health

Page 148

1  or internalized transphobia, which would have been
2  basically due to experiencing transphobia that
3  they start to internalize in terms of self-hatred,
4  that people who are exposed to these ideas that
5  they should be forced to be cisgender because
6  maybe trans is bad might be more likely to seek
7  out these conversion efforts than other types of
8  therapy that don't try and force them to be
9  cisgender.
10    But that would imply that a societal
11  rejection is leading to that internalized
12  transphobia and other bad mental health outcomes.
13    MR. RAMER:  And, Li, do you have Turban
14  Exhibit 13?
15    MS. NOWLIN-SOHL:  We do.
16    MR. RAMER:  Okay.  Let's bring that up.
17    (Deposition Exhibit No. 13 was marked.)
18    Q.  (BY MR. RAMER)  And, Dr. Turban, I'll
19  represent that this is an NBC news article
20  entitled "Transgender Conversion Therapy
21  Associated with Severe Psychological Distress."
22    And have you seen this article before?
23    A.  Yes.
24    Q.  And toward the top, do you see the date
25  and time -- or actually just the date.

Page 149

1    Do you see the date that this article was
2  published?
3    A.  Yes.
4    Q.  And do you recall what day you published
5  the article we were just looking at in Turban
6  Exhibit 12?
7    A.  I do not.
8    Q.  If we go back to Turban Exhibit 12 and go
9  to the first page, which is page 68, and then
10  towards the bottom, do you see where it says
11  "Published online September 11, 2019"?
12    A.  Yes.
13    Q.  And so the news article in Turban
14  Exhibit 13 was published the same day that you
15  published this article in Turban Exhibit 12
16  online; is that correct?
17    A.  That seems to be the case.  That's
18  generally how news outlets cover new research
19  articles is they get them ahead of time while
20  they're under embargoes so they have time to read
21  them and conduct interviews so that they can
22  publish them around the same time that the paper
23  comes out.
24    Q.  How do the news organizations become
25  aware of the article when it's embargoed?

38 (Pages 146 - 149)

Jack Turban , M.D., MHS    October 16, 2023

| | |
|---|---|
| 1    A.  I'm not sure if they sign up for it or -- | 1    published in the Journal of Adolescent Health in |
| 2    but essentially most of the major high-impact | 2    2023. |
| 3    medical journals send out press releases about | 3        Q.  And just as a general matter for me to |
| 4    articles that are coming out in their future | 4    understand the method in this article, basically |
| 5    editions that aren't out yet to journalists so | 5    you're identifying two relevant time periods. |
| 6    that the journalists have a chance to request an | 6        And the first is when -- the first time |
| 7    embargoed version of the article with the | 7    period is when participants realize their |
| 8    agreement that they don't talk about it publicly | 8    transgender identity, correct? |
| 9    until the article is officially posted online. | 9    A.  Correct. |
| 10    Q.  And then in this NBC article, which is | 10    Q.  Sorry? |
| 11    Turban Exhibit 13, I'd like to go to page 2 of the | 11    A.  Correct. |
| 12    PDF.  And about halfway down before this blank | 12    Q.  And the second time point is when |
| 13    space, there's a quote attributed to you. | 13    participants share that identity with others, |
| 14        And it says "We hope our findings | 14    correct? |
| 15    contribute to ongoing legislative efforts to ban | 15    A.  Correct. |
| 16    gender identity conversion efforts." | 16    Q.  And so you measure the period between |
| 17        Do you see that? | 17    those two points.  And as a general matter, if the |
| 18    A.  Yes. | 18    time period between those two points is longer, |
| 19    Q.  And do you think that's an accurate | 19    that tends to undermine the ROGD hypothesis, |
| 20    quote? | 20    right? |
| 21    A.  Yes. | 21        MS. NOWLIN-SOHL:  Object to form. |
| 22    Q.  And before you conducted this study, did | 22        THE WITNESS:  I wouldn't say the ROGD |
| 23    you want to ban gender identity conversion | 23    hypothesis was a major part of this study.  It's |
| 24    efforts? | 24    been -- I don't think there are many people who |
| 25    A.  They were labeled dangerous and unethical | 25    take that hypothesis seriously, and the American |
| Page 150 | Page 152 |

| | |
|---|---|
| 1    by all major medical organizations, including the | 1    Psychological Association has emphasized that it's |
| 2    American Psychiatric Association and the American | 2    not a valid diagnosis and shouldn't be used in |
| 3    Academy of Child and Adolescent Psychiatry.  And | 3    assessment or clinical context. |
| 4    there was broad consensus prior to this research | 4        So I think that's an interesting, like, |
| 5    that they were dangerous and ineffective. | 5    extra thing to think about with this paper, but I |
| 6        And anytime there's broad consensus that | 6    think what was most interesting about this paper |
| 7    the practice is harmful towards children in | 7    was that a substantial proportion of trans adults |
| 8    particular, I would be in favor of children not | 8    don't come to realize their gender identity until |
| 9    being exposed to that practice. | 9    later, after age 10, and that for those who |
| 10    Q.  And so yes, you did want to ban gender | 10    realize in childhood before age 10 that there is a |
| 11    identity conversion efforts before you conducted | 11    very long period of time before they tell someone |
| 12    this study, correct? | 12    else, 14 years. |
| 13    A.  I am personally not in a position to ban | 13        The reason that's interesting for that |
| 14    practices, but I was in agreement with the | 14    survey from 2018 about rapid onset gender |
| 15    position statements of the American Psychiatric | 15    dysphoria is the way they determined in that study |
| 16    Association and the American Academy of Child and | 16    that the person's gender identity or gender |
| 17    Adolescent Psychiatry. | 17    dysphoria was rapid in onset was based on when |
| 18    MR. RAMER:  Let's turn to -- I'd like to | 18    parents came to know that the child had gender |
| 19    introduce Turban Exhibit 14.  Do you have that? | 19    dysphoria or a trans identity. |
| 20    MS. NOWLIN-SOHL:  We do. | 20        And this is just highlighting that there |
| 21    MR. RAMER:  Okay. | 21    are many years.  The median was 14 years between |
| 22    (Deposition Exhibit No. 14 was marked.) | 22    somebody knowing their gender identity and telling |
| 23    Q.  (BY MR. RAMER)  And, Dr. Turban, do you | 23    it to another person when they realized as |
| 24    recognize this document?  And if so, what is it? | 24    children, highlighting that using parent report |
| 25    A.  Yes.  This is a research article we | 25    alone the way that survey did is not reliable. |
| Page 151 | Page 153 |

39 (Pages 150 - 153)

Jack Turban , M.D., MHS October 16, 2023

1    Q.  Yeah.  And so the reason that the
2  findings here tend to undermine the ROGD
3  hypothesis is because of how long that -- in part
4  because of how long that time period was between
5  the point that the individual identified as
6  transgender and the point that the individual
7  disclosed that information, correct?
8    A.  Yes.  It undermines the notion, one of
9  many notions in the hypothesis that when a parent
10  comes to understand that their child is trans that
11  that coincides with when the child themselves came
12  to understand that.
13    Q.  Right.  Okay.  And so yeah, the longer
14  the time period, the more it tends to undermine
15  the hypothesis.
16      And that's why the 14 years is relevant,
17  right?
18      MS. NOWLIN-SOHL:  Object to form.
19      THE WITNESS:  I don't know that I really
20  agree with that characterization that, you know,
21  if it were 16 versus 14, that would be a matter,
22  or if it would be 14 versus 30.  Just the fact
23  that there is a substantial period of time I think
24  is what undermines it.
25    Q.  (BY MR. RAMER)  And for this study, the

Page 154

1  data you used again comes from the U.S.
2  Transgender Survey; is that right?
3    A.  Yes.
4    Q.  And so on page 1 here under "Results,"
5  the first sentence says "Of 27,497 participants,
6  40.8 percent reported 'later realization' of TGD
7  identities."
8      Did I read that correctly?
9    A.  Yes.
10    Q.  And so you're saying there that -- I
11  mean, the upshot of this is that later realization
12  was common among the adult survey participants --
13      MS. NOWLIN-SOHL:  Objection.
14      MR. RAMER:  I'm sorry.
15      MS. NOWLIN-SOHL:  I'm sorry, go ahead.
16  Continue.
17    Q.  (BY MR. RAMER)  Okay.  Well, I guess why
18  is that relevant with respect to the ROGD
19  hypothesis?
20      MS. NOWLIN-SOHL:  Object to form.
21      THE WITNESS:  It's not necessarily.  I
22  think it's more relevant that there's the
23  misconcept, I think, less within the field, but
24  more kind of in, like, media and public policy
25  debates that if one comes to understand their

Page 155

1  gender identity after the onset of puberty that
2  they are less likely to continue to have that
3  identity in adulthood.
4      So it's interesting to see that among
5  trans adults.  It's actually not an uncommon
6  experience.
7    Q.  (BY MR. RAMER)  Right.  And the reason
8  it's interesting is it undercuts the idea that,
9  you know, late realization is some sort of new
10  experience, correct?
11      MS. NOWLIN-SOHL:  Object to form.
12      THE WITNESS:  I suppose, or that the
13  later realization, you know, is synonymous --
14  [indiscernible].
15      THE REPORTER:  Dr. Turban, I'm sorry to
16  interrupt.  I couldn't understand you.
17      THE WITNESS:  Oh, sorry.  How far back do
18  you want me to go?
19      THE REPORTER:  Just repeat your answer,
20  if you wouldn't mind.
21      THE WITNESS:  So just saying the thing
22  that's interesting to me is that there was this
23  notion, less so in the field, but sometimes out
24  among the general public, that if one comes to
25  understand their trans identity after puberty,

Page 156

1  that it will not persist into adulthood.
2      But here we saw that among adults, it was
3  actually a fairly common experience for them to
4  first come to understand their gender identity
5  after age 10, which is a rough cutoff for puberty.
6    Q.  (BY MR. RAMER)  Well, I guess if the 40.8
7  percent is relevant in the context of persistence
8  or desistance, wouldn't you need to know the
9  individuals who had later realization but then
10  did, in fact, come to identify as cisgender?
11    A.  Yeah, I think you're pointing out there
12  are different studies that could be done.  You
13  could follow people longitudinally and then you
14  could find a desistance rate, if that's the term
15  you wanted to use.
16      This study wasn't that since we didn't
17  follow people longitudinally.  We didn't have that
18  data available.
19      So this was just showing that among trans
20  adults, this isn't an uncommon experience.  But it
21  doesn't tell you how many people would continue to
22  identify that way longitudinally.
23    Q.  And then still on the same page in the
24  same results paragraph, the second and third
25  sentences, you say, "Within the 'childhood

Page 157

40 (Pages 154 - 157)

(44 of 289), Page 44 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 44 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 41 of 177
Jack Turban , M.D., MHS October 16, 2023

Page 158

1 realization' group, the median age of sharing
2 one's gender identity with another person was 20.
3 In this group, the median time between realization
4 of one's gender identity and sharing this with
5 another person was 14 years."
6     And did I read that correctly?
7     A.  Yes.
8     Q.  Did you also record the median age of
9 participants sharing their gender identity for the
10 later realization group?
11     A.  We did.  We didn't have room in this
12 paper because it wasn't the focus.  But we
13 recently published a response to the letter to the
14 editor where we provided that additional data.  I
15 would have to pull it up to get the numbers.
16     Q.  What letter to the editor are you
17 referring to?
18     A.  I forget the author of the letter, but
19 someone wrote in to the journal asking for more
20 information and analyses, and so we provided them.
21     Q.  And so the -- and this is just a
22 clarification, not a trick question.
23     So in the last sentence here, you're
24 talking about the median time.  That is only
25 referring to the childhood realization group; is

Page 159

1 that right?
2     A.  Correct.  The letter author asks for what
3 you're asking, and so we had it published in the
4 letter response, but I don't have it in front of
5 me.
6     Q.  Okay.  And do you think it's fair to say
7 that -- granting that you disagree with any sort
8 of ROGD hypothesis, do you think it's fair to say
9 that people who think the ROGD hypothesis may be
10 worth investigating, that the hypothesis is
11 focused on adolescents and not children?
12     A.  I think you're missing the point of it in
13 that the reason this childhood question is
14 relevant is that the rapid onset gender dysphoria
15 study survey used the time that parents heard
16 about their child's gender identity as when the
17 children came to recognize their gender identity.
18     What this paper is showing is that those
19 people where the parents first found out in
20 adolescence may have known 12 years earlier,
21 right?  Because there's a mean 12 years between
22 realizing and telling another person.
23     So for what was, from the parents'
24 perspective, the onset of time was actually much,
25 much later potentially than when the young person

Page 160

1 came to know.
2     So I think one author called it rapid
3 onset parental notification, like the parents
4 found out all of a sudden in adolescence, but that
5 it's actually pretty typical for children to
6 withhold this information from their parents for
7 many years, in my clinical experience, due to fear
8 that their parents won't accept them.
9     Q.  And I'd like to go back to Turban
10 Exhibit 10, which is the U.S. -- the report of the
11 U.S. Transgender Survey.  And go to page 259.  And
12 left column, Section 3 --
13     A.  Yes, we have it.
14     Q.  So question 3.1 says "At about what age
15 did you begin to feel that your gender was
16 'different' from your assigned birth sex?"
17     Did I read that correctly?
18     A.  Yes.
19     Q.  And this is the question you used to
20 collect data for determining when the participants
21 first realized their transgender identity,
22 correct?
23     MS. NOWLIN-SOHL:  Object to form.
24     THE WITNESS:  Let me double-check.
25 Sorry.  I'm looking at the underlying question

Page 161

1 because I just want to make sure I'm telling you
2 correct.
3     Q.  (BY MR. RAMER)  I guess it's page -- in
4 your article, page 54, left column under "Age of
5 sharing" -- oh, no, that's the other one.  Sorry.
6     Yeah, so page 853, right column, very
7 bottom.  "Age of TGD identity realization."
8     And you say, "As outlined above,
9 participants were asked the age at which they felt
10 that their gender was different from societal
11 expectations based on their sex assigned at birth
12 and were provided with a drop-down list of integer
13 ages from 1 to 99 years."
14     A.  Yes, question 3.1.
15     Q.  And so returning to -- sorry, if you
16 can -- and so returning to Exhibit 10 in the same
17 page we were on, 259, and same left column,
18 Section 3, I'm going to read question 3.2 and ask
19 if I read it correctly.
20     It says, "At about what age did you start
21 to think you were trans (even if you did not know
22 the word for it)?"
23     Did I read that correctly?
24     A.  Yes.
25     Q.  So why did you use question 3.1 instead

41 (Pages 158 - 161)

(45 of 289), Page 45 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 45 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 42 of 177
Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1   of 3.2? | 1   thoughts about it. And my reading of that paper |
| 2     A. We thought that 3.1 was a bit broader, | 2   is that I think that she did think that it had |
| 3   even though they're quite similar. | 3   something to do with social media influence. But |
| 4     Q. Why would you use the broader question, | 4   I think you would have to ask her. |
| 5   then? | 5     Q. (BY MR. RAMER) Would you agree that as a |
| 6     A. Because it captures -- they're really | 6   general matter you would probably have to be born |
| 7   similar questions. We did not design the survey. | 7   in the 1990s to have grown up with social media as |
| 8   We were doing secondary data analyses of the | 8   an adolescent? |
| 9   surveys, so we were in a position to try and pick | 9     A. I don't know enough about the history of |
| 10   which question we thought was best. | 10   social media to give you an answer. |
| 11     The second one says "When did you think | 11     Q. Do you think there's a chance that social |
| 12   you were trans (even if you didn't have the word | 12   media existed in its current form before 1990? |
| 13   for it)," and then 3.1 basically asks without the | 13     MS. NOWLIN-SOHL: Object to form. |
| 14   word, the feeling of it. | 14     THE WITNESS: You're making me think back |
| 15     So we felt that 3.1 was just a cleaner | 15   to when I first got social media. To be honest, I |
| 16   question even though they asked quite similar | 16   don't know. Was MySpace first? I honestly don't |
| 17   things. We felt like 3.2 was a little bit more | 17   know when social media began. I don't know that |
| 18   about, like, ascribing language to it, like the | 18   this is within my area of expertise. |
| 19   word "trans" or maybe someone had a word like | 19     Q. (BY MR. RAMER) And what year was the |
| 20   "trans" whereas we thought 3.1 captured more like | 20   data collected for the U.S. Transgender Survey? |
| 21   the gender identity experience rather than the | 21     A. 2015. |
| 22   language they were ascribing to it. But they're | 22     Q. And an individual had to be 18 years old |
| 23   very similar. | 23   to take the survey, correct? |
| 24     Q. Do you know how the data would have | 24     A. Correct. |
| 25   changed if you had used question 3.2 instead of | 25     Q. All right. Sticking with your article, |
| Page 162 | Page 164 |
| 1   3.1? | 1   I'd like to go to page 855, Table 1. |
| 2     A. No. We tried not to run a ton of | 2     MS. NOWLIN-SOHL: Sorry, we might have |
| 3   analyses in that way that we think are going to be | 3   gotten a little bit lost. |
| 4   similar. Because when you do that, you're more | 4     Which exhibit are we in right now? |
| 5   likely to find a statistical finding due to chance | 5     MR. RAMER: Turban Exhibit 14, the "Age |
| 6   called P-hacking that's commonly criticized in | 6   of Realization" -- sorry, it's hard in the virtual |
| 7   statistical research. Usually the cleaner, fewer | 7   setting to keep track of what's pulled up. So |
| 8   comparisons you make, the better. | 8   Turban Exhibit 14, the "Age of Realization" paper. |
| 9     So we did not repeat the analysis with | 9     MS. NOWLIN-SOHL: Okay. |
| 10   3.2. One could do that. | 10     MR. RAMER: And page 855, which has |
| 11     Q. Would you agree that a component of the | 11   Table 1. |
| 12   ROGD hypothesis, as those individuals who suggest | 12     MS. NOWLIN-SOHL: Okay. We are there. |
| 13   it might be legitimate would view it, concerns the | 13     Q. (BY MR. RAMER) Okay. And for this |
| 14   effect of social media on adolescents? | 14   article, you included all age groups in the data, |
| 15     MS. NOWLIN-SOHL: Object to form. | 15   correct? |
| 16     THE WITNESS: I don't have any colleagues | 16     A. Sorry. What do you mean by "all age |
| 17   who are experts in the field who do believe in | 17   groups"? |
| 18   that hypothesis. | 18     Q. Did you exclude anybody from the data |
| 19     Again, the American Psychological | 19   based on their age? |
| 20   Association has argued against using it | 20     A. Based on their age at the time of the |
| 21   clinically, the correction on the paper | 21   survey? |
| 22   highlighted that it's not a formal valid mental | 22     Q. Yes. |
| 23   health diagnosis. | 23     A. No. |
| 24     All I can go off of is that one paper | 24     Q. And so it looks like there's about |
| 25   where that single author was describing her | 25   roughly 800 people in the dataset who are 65 and |
| Page 163 | Page 165 |

Jack Turban , M.D., MHS October 16, 2023

| Page 166 | Page 168 |
|---|---|
| 1 older, correct? | 1 mental health diagnosis. It doesn't have support, |
| 2 A. Yeah. Looks like that would account for | 2 and the American Psychological Association |
| 3 about 5 or 6 percent of the total study. | 3 recommended against using it. So we weren't |
| 4 Q. And then for 45 to 64, about -- | 4 designing the study around that hypothesis in a |
| 5 A. Maybe 27 percent of the study. | 5 single paper. |
| 6 Q. And I appreciate I'm having you do math | 6 Q. (BY MR. RAMER) Sorry. I didn't mean to |
| 7 on the fly, so I'm not looking for it precise. | 7 cut you off. |
| 8 But and then from 25 to 44 it looks like | 8 And so for this -- sticking with this |
| 9 it's -- I'll put myself up -- well, I guess I | 9 article and page 855, Table 1, you have two |
| 10 don't know. What percentage of the study? | 10 columns here with one for childhood realization |
| 11 A. Were in the 25 to 44 group? | 11 and one for late realization, correct? |
| 12 Q. Yeah. | 12 A. Correct. |
| 13 A. About 77 percent. | 13 Q. And starting with the 65-plus group, is |
| 14 Q. Well, maybe this is why we shouldn't do | 14 it fair to say the vast majority fall into the |
| 15 math on the fly. Because you're just adding those | 15 childhood realization category? |
| 16 parentheses, but I don't think that would -- | 16 MS. NOWLIN-SOHL: Object to form. |
| 17 A. Oh, wait. Sorry, yeah. | 17 THE WITNESS: I'd have to -- I'd have to |
| 18 Q. Well, let's just step back. This is not | 18 add the numbers and then divide it -- I don't want |
| 19 the point of the question. | 19 to do the math. |
| 20 A. To get to your whole point, the most were | 20 Q. (BY MR. RAMER) Fair. I'll ask it this |
| 21 very young, so mostly the 18 to 24 group. | 21 way. |
| 22 Q. Okay. Yeah. Would you agree that it's | 22 You would agree that 573 is larger than |
| 23 highly unlikely if not impossible that individuals | 23 215? |
| 24 in the 45 to 64 age group used social media as | 24 A. That, I can do in my head, yes. |
| 25 adolescents? | 25 Q. And for the 45 to 64 group, you would |

| Page 167 | Page 169 |
|---|---|
| 1 A. Probably, but they're a small portion of | 1 agree that 3,224 is significantly larger than 825, |
| 2 the study. | 2 correct? |
| 3 Q. Would you agree it's highly unlikely, if | 3 MS. NOWLIN-SOHL: Object to form. |
| 4 not impossible, that the majority of the 25 to 44 | 4 THE WITNESS: Yes. |
| 5 age group used social media as adolescents? | 5 Q. (BY MR. RAMER) And for the 25 to 44 |
| 6 A. We'd have to know the distribution of how | 6 group, you would agree that 7,043 is much larger |
| 7 many were closer to 25, how many were closer to | 7 than 3,856, correct? |
| 8 44. | 8 MS. NOWLIN-SOHL: Object to form. |
| 9 Q. But it didn't occur to you to make an | 9 THE WITNESS: Yes. |
| 10 adjustment for that based on -- sorry. | 10 Q. (BY MR. RAMER) But then when you get to |
| 11 A. I mean, this paper was not -- | 11 the 18 to 24 group, do you see that it looks like |
| 12 MS. NOWLIN-SOHL: Object to form; | 12 the numbers flip for the first time? |
| 13 argumentative. | 13 MS. NOWLIN-SOHL: Object to form. |
| 14 MR. RAMER: I'll re-ask it. Let me | 14 THE WITNESS: Yeah, I would caution |
| 15 re-ask it, and then we'll try again. | 15 against making any of the comparisons you're |
| 16 Q. (BY MR. RAMER) It didn't occur to you to | 16 making because the statistics weren't applied in |
| 17 make an adjustment for that given the fact that | 17 that way, and so we don't know the degree to which |
| 18 the first sentence of the purpose in your paper is | 18 those would be meaningfully different. |
| 19 discussing rapid onset gender dysphoria? | 19 Q. (BY MR. RAMER) I guess why didn't you |
| 20 MS. NOWLIN-SOHL: Object to form; | 20 apply the statistics in that way? |
| 21 argumentative. | 21 MS. NOWLIN-SOHL: Object to form. |
| 22 THE WITNESS: Though it's the first | 22 THE WITNESS: Our statistician elected to |
| 23 sentence, I wouldn't say this paper was really | 23 do these large kind of square analyses so that we, |
| 24 primarily focused on the rapid onset gender | 24 as I referenced earlier, wouldn't be running a ton |
| 25 dysphoria hypothesis. That, again, is not a valid | 25 of analyses that leads you to the potential of |

43 (Pages 166 - 169)

(47 of 289), Page 47 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 47 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 44 of 177
Jack Turban , M.D., MHS  October 16, 2023

Page 170

1  that P-hacking concern.  Otherwise you would be
2  doing a statistical test on every single row in
3  this table, which you can see would progressively
4  become a large number of comparisons.
5     Q.  (BY MR. RAMER)  Did that data that we
6  were just discussing, the fact that is -- in the
7  18 to 24 group for the first time, based on these
8  raw numbers, that a majority of the group fell
9  into the later realization group, did that
10  interest you?
11     MS. NOWLIN-SOHL:  Object to form.
12     THE WITNESS:  It wasn't the focus of the
13  paper, and I wouldn't recommend drawing
14  conclusions based on raw numbers.
15     Q.  (BY MR. RAMER)  Yeah, I'm not drawing
16  conclusions or trying to say what the focus of the
17  paper was.  I'm just -- I mean, as a non-expert
18  looking at that table, like, that struck me.  I
19  found that striking.
20     And I'm curious if you found that
21  interesting and whether you're going to research
22  it more or, you know, you've seen enough.
23     MS. NOWLIN-SOHL:  Object to form.
24     THE WITNESS:  You could go back and run
25  the individual T tests on those lines.

Page 171

1     Q.  (BY MR. RAMER)  Well, I could not because
2  I do not have the expertise you have.
3     A.  I also would need to harass my
4  statistician to do it and give her time, but it's
5  a publicly available data set also, so anyone
6  would be able to request the numbers and run those
7  analyses.
8     Q.  And stepping back from the table now, do
9  you think it's possible for a parent to observe
10  that their child is transgender before the child
11  expressly states it?
12     A.  There can maybe be suggestions, but it's
13  hard to know somebody's internal experience
14  without them telling you.
15     For instance, I'd caution against making
16  assumptions that, you know -- I think we referred
17  to assigned female wanted to play with dolls or wear
18  dresses, that doesn't mean that the young person
19  is transgender.  They could be cisgender and like
20  dolls and dresses.
21     So it's drawing the conclusions based on
22  observations without the person telling you their
23  experience is limited.
24     Q.  Well, that example you just gave, how
25  would that person have answered 3.1?

Page 172

1     MS. NOWLIN-SOHL:  Object to form; calls
2  for speculation.
3     THE WITNESS:  I don't think they would
4  actually be in -- let me look.
5     Because the USTS isn't a sample of trans
6  people, if there were a cisgender person who was
7  just generally nonconforming, they wouldn't be in
8  this study.
9     Q.  (BY MR. RAMER)  Isn't gender expression a
10  major part of living out your gender identity?
11     A.  It could be a major part, but there are
12  people who have gender expressions that you might
13  think of as feminine who would have cisgender
14  identities.
15     If you've ever seen a cisgender man wear
16  nail polish, you might think of that as a feminine
17  gender expression, but it doesn't mean that person
18  is transgender.
19     Q.  I guess what I'm trying to understand is
20  for the second time point in this study, you
21  focused on when the individual's transgender
22  identity was, like, expressly disclosed to
23  somebody else, whereas it seems like much more
24  common that an individual is going to be living
25  out their transgender identity with their gender

Page 173

1  expression and people are going to understand, or
2  like, for lack of a better term, have a hunch of
3  their gender identity --
4     A.  Absolutely.
5     MS. NOWLIN-SOHL:  Hold on.  Let him
6  finish.
7     Q.  (BY MR. RAMER)  Well, no, go ahead.  I
8  was meandering.  Please.
9     MS. NOWLIN-SOHL:  Object to form.  Was
10  there a question?
11     MR. RAMER:  Well, he was going to give an
12  answer.  So please.
13     THE WITNESS:  I lost track -- I lost
14  track of the question, honestly.  What was the
15  question?
16     Q.  (BY MR. RAMER)  I guess it's just isn't
17  the premise of your paper that parents would not
18  know that their child has a transgender identity
19  until the child expressly discloses it to them?
20     MS. NOWLIN-SOHL:  Object to form.
21     THE WITNESS:  I think that's very common,
22  that young trans people live in a world where they
23  know that trans identities are stigmatized, and
24  trans people are commonly bullied and harassed.
25     Often these kids when they're young have

44 (Pages 170 - 173)

(48 of 289), Page 48 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 48 of 289
Case 1:23-cv-00269-BLW  Document 74-2  Filed 11/02/23  Page 45 of 177
Jack Turban , M.D., MHS  October 16, 2023

| | |
|---|---|
| 1 expressed some small amount of gender diverse<br>2 expression. So, say, the young kid who played<br>3 with dolls or played with dresses, and they're<br>4 usually yelled at or socially sanctioned -- I<br>5 think the message very early on is that's not<br>6 acceptable. So it's actually very common that<br>7 they go to great lengths to hide that for a long<br>8 time.<br>9     So no, it's usually not apparent to other<br>10 people because the kids are trying to hide it<br>11 because they're afraid of the consequences if<br>12 people were to know.<br>13     Q. (BY MR. RAMER) Right. And that was my<br>14 question.<br>15     Isn't the premise of your paper that<br>16 parents wouldn't know the child has a transgender<br>17 identity until the child expressly disclosed it to<br>18 them?<br>19     MS. NOWLIN-SOHL: Object to form.<br>20     THE WITNESS: I wouldn't say it's the<br>21 premise of the paper. I would say it's a finding<br>22 of the paper that the young people didn't feel<br>23 comfortable sharing it with another person for 12<br>24 years. Why would they not feel comfortable?<br>25     Q. (BY MR. RAMER) But the reason the paper<br>Page 174 | 1 told another person. So the parents would have<br>2 found out 12 years after the young person knew.<br>3     And as I said earlier, you can't presume<br>4 someone's gender identity by observing their<br>5 gender expression, as many cisgender people may<br>6 like things that you may not consider gender<br>7 typical. Like a cisgender man who likes musicals,<br>8 I wouldn't recommend assuming that person is<br>9 transgender.<br>10     Q. (BY MR. RAMER) Switching gears a little<br>11 bit, how do you stay up-to-date on the literature<br>12 in your field?<br>13     A. A lot of ways. We have conferences. I<br>14 use Google Scholar notifications so when new<br>15 peer-reviewed papers are published they come to my<br>16 inbox. Conversation with colleagues.<br>17     Q. Are there any particular authors you<br>18 trust in the field?<br>19     MS. NOWLIN-SOHL: Object to form.<br>20     THE WITNESS: I'm not really sure what<br>21 you mean by, like, "trust" or "distrust."<br>22     Q. (BY MR. RAMER) Sure. Do you think that<br>23 Annelou de Vries is a leading expert in the field?<br>24     A. Yes.<br>25     Q. Do you think Diane Chen is a leading<br>Page 176 |
| 1 is relevant to the ROGD hypothesis is the parents<br>2 didn't know until a later time, correct?<br>3     MS. NOWLIN-SOHL: Object to form.<br>4     THE WITNESS: Again, I think you're<br>5 over-indexing on how important that one survey<br>6 paper is about ROGD. And again, this paper isn't<br>7 a direct response to that 2018 single survey, but<br>8 if you want to tie it to that question of rapid<br>9 onset, then yes, the point of this paper is that<br>10 often young people don't tell another person for<br>11 many years. And so at the time point when parents<br>12 are being told, that does not necessarily coincide<br>13 with when the young person first realized.<br>14     Q. (BY MR. RAMER) Sorry to keep going back<br>15 to this, but the point is that the parents would<br>16 not know until they are told, correct?<br>17     MS. NOWLIN-SOHL: Object to form; asked<br>18 and answered.<br>19     THE WITNESS: I think I answered the<br>20 question.<br>21     Q. (BY MR. RAMER) And what was the answer?<br>22     MS. NOWLIN-SOHL: Same objection. Asked<br>23 and answered.<br>24     THE WITNESS: That the study found that<br>25 there were median 12 years before the young people<br>Page 175 | 1 expert in the field?<br>2     A. Yes.<br>3     MR. RAMER: And, Li, if you have it, I'd<br>4 like to introduce Turban Exhibit 15.<br>5     MS. NOWLIN-SOHL: We are still waiting on<br>6 that.<br>7     MR. RAMER: Please just let me know when<br>8 it arrives.<br>9     MS. NOWLIN-SOHL: Still waiting. Is<br>10 it -- no, just got it.<br>11     (Deposition Exhibit No. 15 was marked.)<br>12     Q. (BY MR. RAMER) Okay. Dr. Turban, have<br>13 you seen this editorial before?<br>14     A. Yes.<br>15     Q. And when was the last time you read it?<br>16     A. Probably when it first came out.<br>17     Q. And this editorial is coauthored by<br>18 Annelou de Vries, correct?<br>19     A. Yes.<br>20     Q. And if you turn to page 277, which I<br>21 think is the third page in the PDF, and you look<br>22 at footnote 1 --<br>23     A. Sorry. What page again?<br>24     Q. 277 in the pagination, but I think the<br>25 last page of the PDF. Or it's an endnote. Sorry,<br>Page 177 |

45 (Pages 174 - 177)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1 endnote 1. | 1 would have provided more data along that same |
| 2    A. The first citation? | 2 line. I think they could have adjusted for that |
| 3    Q. Yes. | 3 variable the way some of the other studies have |
| 4    A. Yes. | 4 that I cite in my declaration. |
| 5    Q. And that is the Chen article that you | 5    Q. Why would you need to adjust for that |
| 6 cite in your declaration, correct? | 6 variable? |
| 7    A. Yes. I think the exhibit you sent is an | 7    A. So I think there's been this question |
| 8 editorial on that paper that came out at the time | 8 raised, like the experts' declarations of whether |
| 9 the paper was published. | 9 or not the improvement that you see when |
| 10    Q. And so I'd like to go back to -- back one | 10 adolescents with gender dysphoria get medical |
| 11 page to page 276, and left column and second full | 11 interventions is that improvement from the |
| 12 paragraph. And I'll just read the first two | 12 medication like the puberty blocker or the |
| 13 sentences and ask if I read them correctly. | 13 hormones? Or is it from therapy they're getting |
| 14     It says "Yet the study leaves some | 14 at the same time? |
| 15 concerns unanswered. Although overall | 15    So I cited, I believe, three studies in |
| 16 psychological functioning in the study | 16 my declaration that looked at that question. This |
| 17 participants improved, there was substantial | 17 was one of them. The way they looked at it was by |
| 18 variation among participants. A considerable | 18 this parallel process analysis that showed that |
| 19 number still had depression, anxiety, or both at | 19 the improvement tracked with their physical gender |
| 20 24 months, and two died by suicide." | 20 incongruence improving as opposed to it not being |
| 21     Did I read that correctly? | 21 related to the actual physical impact of the |
| 22    A. Yes. | 22 hormones. |
| 23    Q. And were you aware of these facts before | 23    Q. So is the idea that de Vries is |
| 24 you cited the Chen article? | 24 discussing here the possibility that mental health |
| 25    A. Yes. | 25 care could be a confounding variable in this |
| Page 178 | Page 180 |

| | |
|---|---|
| 1    Q. And so same paragraph, two sentences | 1 study? |
| 2 later, it says "However, other possible | 2    MS. NOWLIN-SOHL: Object to form. |
| 3 determinates of outcomes were not reported, | 3    THE WITNESS: She's highlighting they did |
| 4 particularly the extent of mental health care | 4 a specific analysis to look at that, and it |
| 5 provided throughout GAH treatment." | 5 suggested that the improvements were from not |
| 6     Did I read that correctly? | 6 mental health, especially how there's another |
| 7    A. You skipped a sentence in between, but | 7 additional way they could have looked at it. |
| 8 yes. | 8    Q. (BY MR. RAMER) And so yes, it could be a |
| 9    Q. Yeah. And what is your understanding of | 9 confounding variable? |
| 10 what de Vries is saying in that sentence I just | 10    MS. NOWLIN-SOHL: Object to form; |
| 11 read? | 11 mischaracterizes his prior testimony. |
| 12    A. So the sentence that you skipped, which I | 12    THE WITNESS: Yeah, I think that's a |
| 13 explained in my declaration, is that they looked | 13 mischaracterization of what I just said. |
| 14 at the correlation between appearance congruence | 14    Q. (BY MR. RAMER) No, I wasn't trying to |
| 15 in mental health outcomes and found that degree of | 15 repeat what you were saying. |
| 16 physical congruence predicted the improvement in | 16    I was asking the question of is the |
| 17 mental health, which is suggesting that it was | 17 concerns that are unanswered that de Vries is |
| 18 actually the physical effects of the intervention | 18 talking about in this paragraph where she |
| 19 resulting in the mental health outcomes rather | 19 references that the extent of mental health care |
| 20 than something like psychotherapy. | 20 provided throughout GAH treatment was not reported |
| 21     Then going to the sentence that you read, | 21 have to do with the fact that mental health care |
| 22 they're highlighting that, so that that provides | 22 is potentially a confounding variable? |
| 23 evidence that it was from the intervention. It | 23    MS. NOWLIN-SOHL: Object to form. |
| 24 would have been nice if they also collected data | 24    THE WITNESS: That line is pretty far |
| 25 about the degree of mental health involvement that | 25 removed from when she uses that phrase |
| Page 179 | Page 181 |

46 (Pages 178 - 181)

Jack Turban , M.D., MHS October 16, 2023

1    "unanswered."
2        And again, they did the parallel process
3    modeling that found that the mental health
4    improvement tracked along with adherence
5    congruence, suggesting that it was the physical
6    effects of the gender-affirming hormones leading
7    the person phenotype to align more with their
8    gender identity that was driving the improvements
9    in mental health as opposed to it being from
10   therapy.
11       Q.   (BY MR. RAMER)  Why do you need to
12   control for mental health care, though, if it's
13   not a potentially confounding variable?
14       MS. NOWLIN-SOHL:  Object to form.
15       THE WITNESS:  You -- they looked at it in
16   a different way using this parallel process
17   monitoring to separate out the impact of the
18   physical effects of the hormones from other
19   potential things like therapy.
20       Q.   (BY MR. RAMER)  And I understand that
21   you're describing what they did.
22       I guess my question is why do you need to
23   control for mental health care --
24       MS. NOWLIN-SOHL:  Object to form.
25       THE WITNESS:  The reason why --

Page 182

1    Q.   (BY MR. RAMER)  Okay.  Why do you need to
2    control for mental health care if it is not a
3    potentially confounding variable?
4        MS. NOWLIN-SOHL:  Object to form.
5        THE WITNESS:  The reason they did that is
6    to address the potential of it being a confounding
7    variable, that they wanted to see was the
8    improvement in mental health from the physical
9    effects of the gender-affirming hormones as
10   opposed to potential things like mental health,
11   like you're implying, or psychotherapy.
12       And they found that it was from the
13   physical effects of the hormones, answering this
14   question of whether or not it could have just been
15   from any psychotherapy they were receiving.
16       Q.   (BY MR. RAMER)  And in your view, given
17   the body of evidence, can we rule out mental
18   health care as a potentially confounding variable?
19       MS. NOWLIN-SOHL:  Object to form.
20       THE WITNESS:  So this study provides
21   evidence that it's not just from -- that the
22   improvements we see from gender-affirming hormones
23   aren't just from therapy provided in time.
24       The Tordoff study that I cited similarly
25   looked at that question and found that the effects

Page 183

1    are there separate from any impact of
2    psychotherapy.
3        And the Costa study that I cited gets at
4    that question as well.
5        Q.   (BY MR. RAMER)  So the answer is that --
6    well, I guess I'm not totally clear.
7        Is the answer that mental health care
8    does not -- let me rephrase.
9        You can say that the evidence does not
10   support the proposition that mental health care
11   can improve the distress associated with gender
12   dysphoria?
13       A.   Now I'm unclear with your question.  So
14   the thing that is being brought up in this
15   editorial was brought up in some of the State's
16   expert reports in which they asked this question:
17   In these studies where people are receiving
18   gender-affirming medical interventions, they're
19   also often receiving therapy.  So is their mental
20   health improving because of the therapy or it's
21   improving because of the gender-affirming
22   hormones?
23       This study, the Tordoff study, and the
24   Costa study provide evidence that their mental
25   health isn't just improving from the therapy.

Page 184

1    Their mental health is improving from the
2    gender-affirming hormones.
3        Q.   And my question is about the word "just"
4    that you're using there in your answer.
5        Because you say, "It shows that it's not
6    improving just because of the mental health
7    therapy."
8        And my question is can you say that the
9    evidence shows that mental health care is not
10   effective in reducing the distress associated with
11   gender dysphoria?
12       MS. NOWLIN-SOHL:  Object to form.
13       THE WITNESS:  So that's not -- these
14   studies are looking -- are not asking that
15   question.
16       These studies are asking do
17   gender-affirming hormones improve mental health?
18       You're asking does what psychotherapy
19   improve gender dysphoria?
20       Q.   (BY MR. RAMER)  Say again.
21       A.   What psychotherapy are you asking me if
22   it -- there's evidence that it improves gender
23   dysphoria?
24       Q.   The psychotherapy that's a potentially
25   confounding variable that they're controlling for

Page 185

47 (Pages 182 - 185)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1  in these studies. | 1  because there is not a clean measure for that. |
| 2      A.  Again, the de Vries study didn't take | 2      Q.  You can't use the UGDS? |
| 3  that statistical approach of controlling for a | 3      A.  Not really.  You'd have to flip the |
| 4  potential confounder of psychotherapy.  They did | 4  scores the way the Dutch have done it |
| 5  it through parallel process models. | 5  intermittently, but it's not really a good measure |
| 6      Q.  Do you mean the Chen study? | 6  of those things, more measure the degree to which |
| 7      A.  Yes. | 7  you don't identify with your sex assigned at |
| 8      Q.  Why is it significant if you have a study | 8  birth.  They're not really designed to track |
| 9  where the patients are receiving both | 9  improvements in the distress related to that over |
| 10  gender-affirming medical interventions and | 10  time. |
| 11  psychotherapy to control for the psychotherapy? | 11      Q.  Okay.  Well, let's go back to the |
| 12      MS. NOWLIN-SOHL:  Object to form. | 12  hypothetical -- and if you'll just allow me to |
| 13      THE WITNESS:  Because you want to know if | 13  finish, and then I'll give you the opportunity to |
| 14  the improvement was from the hormones or from the | 14  answer -- which is you have a study.  The patients |
| 15  psychotherapy. | 15  are receiving both gender-affirming medical |
| 16      Q.  (BY MR. RAMER)  And my question for you | 16  interventions and psychotherapy.  The outcome is |
| 17  is does the evidence show that psychotherapy is | 17  improvement in quality of life. |
| 18  ineffective at reducing the distress associated | 18      Do you think that that study provides |
| 19  with gender dysphoria? | 19  evidence that gender-affirming medical |
| 20      MS. NOWLIN-SOHL:  Object to form. | 20  interventions are effective in improving quality |
| 21      THE WITNESS:  So to say that something is | 21  of life? |
| 22  ineffective, you would need to do something like a | 22      MS. NOWLIN-SOHL:  Object to form. |
| 23  noninferiority study, which has not been done. | 23      THE WITNESS:  So you're describing the |
| 24      But I'm not aware of any research that | 24  Costa study from 2015 essentially which does |
| 25  shows that psychotherapy is effective in | 25  exist, which did show that pubertal suppression |
| Page 186 | Page 188 |

| | |
|---|---|
| 1  alleviating gender dysphoria. | 1  improved mental health, whereas for the group that |
| 2      Q.  (BY MR. RAMER)  What about studies where | 2  got six months of therapy and then got a year of |
| 3  they are giving the patients both gender-affirming | 3  therapy plus puberty blockers, they did not |
| 4  medical interventions and psychotherapy and they | 4  improve when they just got therapy, but when they |
| 5  are not controlling for psychotherapy? | 5  got therapy with the blockers, they improved, |
| 6      Do you think that those studies suggest | 6  suggesting that the blockers improved their |
| 7  that the gender-affirming medical interventions | 7  health -- |
| 8  can reduce distress associated with gender | 8      Q.  (BY MR. RAMER)  Sorry, go ahead. |
| 9  dysphoria? | 9      A.  For that immediately eligible group they |
| 10      MS. NOWLIN-SOHL:  Object to form. | 10  got six months of therapy, but therapy did not |
| 11      THE WITNESS:  Sorry.  Can you repeat the | 11  improve their mental health in a statistically |
| 12  question? | 12  significant way with the caveat to not interpret |
| 13      Q.  (BY MR. RAMER)  So maybe it's more of a | 13  one statistical finding as valid.  But then once |
| 14  hypothetical about a theory, which is you have a | 14  they got pubertal suppression with the therapy, |
| 15  study.  In the study, the patients are receiving | 15  their mental health did improve. |
| 16  both gender-affirming medical interventions and | 16      Q.  And so I'm not describing the Costa study |
| 17  psychotherapy.  The outcome of the study is | 17  because in my hypothetical the study is not |
| 18  improvement on all scores. | 18  distinguishing between patients who received only |
| 19      What? | 19  psychotherapy and patients who received |
| 20      A.  Scores on what? | 20  psychotherapy and then proceeded on to |
| 21      Q.  On all metrics that you're -- depression, | 21  gender-affirming medical intervention. |
| 22  anxiety, distress associated with gender | 22      My hypothetical is a study where the |
| 23  dysphoria. | 23  patients received both for the entire time, and |
| 24      A.  It would be hard to have a scale to | 24  they show improvement. |
| 25  measure distress associated with gender dysphoria | 25      And my question is does that type of |
| Page 187 | Page 189 |

48 (Pages 186 - 189)

Jack Turban , M.D., MHS October 16, 2023

| | Page 190 | | Page 192 |
|---|---|---|---|
| 1 | study in my hypothetical constitute evidence that | 1 | correctly. |
| 2 | gender-affirming medical interventions are | 2 | It says "Finally, benefits of early |
| 3 | effective in improving that quality of life | 3 | medical intervention, including puberty |
| 4 | metric? | 4 | suppressions, need to be weighed against possible |
| 5 | MS. NOWLIN-SOHL: Object to form. | 5 | adverse effects -- for example, with regard to |
| 6 | THE WITNESS: In that study, you would -- | 6 | bone and brain development and fertility." |
| 7 | in that theoretical study, you would want to | 7 | Did I read that correctly? |
| 8 | disentangle what was from therapy and what was | 8 | A. Yes. |
| 9 | from the pubertal suppression. If that were the | 9 | Q. And you see where de Vries mentions |
| 10 | only study that existed and that was the study | 10 | possible adverse effects on brain development? |
| 11 | that you were looking at and you had this question | 11 | A. Just in that sentence? |
| 12 | of whether or not therapy alone was effective, | 12 | Q. In that sentence. |
| 13 | then you would want to separate it. | 13 | A. Yes. |
| 14 | Q. (BY MR. RAMER) What if the question is | 14 | Q. What do you know about the risk of |
| 15 | whether or not gender-affirming medical | 15 | adverse effects on brain development from pubertal |
| 16 | interventions are effective? Is that study also | 16 | suppression? |
| 17 | worthless in that context? | 17 | A. So there's only one study that looked at |
| 18 | MS. NOWLIN-SOHL: Object to form. | 18 | potential impacts on effective functioning that |
| 19 | THE WITNESS: I wouldn't call it | 19 | seemed to suggest no adverse impact. |
| 20 | worthless. I think it would be interesting. But | 20 | I think Dr. de Vries mentions something |
| 21 | I think it would be more informative if you | 21 | here, educational achievements are expected given |
| 22 | adjusted for -- separated out the impacts of | 22 | their pretreatment status is reassuring. |
| 23 | therapy from puberty blockers. | 23 | I'm not aware of any convincing clinical |
| 24 | Q. (BY MR. RAMER) And so if you don't | 24 | data that says there's an adverse impact on brain |
| 25 | separate it out, can you cite that hypothetical | 25 | development. |

| | Page 191 | | Page 193 |
|---|---|---|---|
| 1 | study as evidence that gender-affirming medical | 1 | Certainly the delay in bone density |
| 2 | interventions are effective? | 2 | accrual is well known with pubertal suppression, |
| 3 | MS. NOWLIN-SOHL: Object to form; calls | 3 | but to be honest, I'm not sure what she's |
| 4 | for speculation. | 4 | referencing with brain development. |
| 5 | THE WITNESS: It would be a piece of | 5 | Q. Is adolescence associated with |
| 6 | evidence. I wouldn't recommend using it in | 6 | significant neurodevelopment? |
| 7 | isolation but look at the full body of literature | 7 | A. Yes. |
| 8 | where they've done some other things to try to | 8 | Q. And do you agree that adolescence is |
| 9 | tease apart those two interventions. | 9 | associated with an increase in capabilities for |
| 10 | MR. RAMER: Okay. I think we've been | 10 | abstraction and logical thinking? |
| 11 | going for just about an hour if you all want to | 11 | A. Yes. |
| 12 | take a break. | 12 | Q. And is puberty linked to developmental |
| 13 | MS. NOWLIN-SOHL: Yeah, that sounds good. | 13 | changes in social and emotional processing? |
| 14 | MR. RAMER: Let's go off the record. | 14 | A. I'm not an expert on the intricacies of |
| 15 | THE VIDEOGRAPHER: Okay. So the time is | 15 | that research, but I can say as a clinical matter |
| 16 | 2:13 p.m. Pacific time, and we are off the record. | 16 | in terms of cognitive development for my |
| 17 | (Break taken from 2:13 p.m. to 2:19 p.m.) | 17 | patients -- I mean, I have a handful of patients |
| 18 | THE VIDEOGRAPHER: All right. So we are | 18 | who are now at Ivy League universities who are |
| 19 | recording. The time is 2:19 Pacific time, and we | 19 | doing quite well, so there doesn't seem to be an |
| 20 | are back on record. | 20 | apparent, clear negative path on cognition. |
| 21 | Q. (BY MR. RAMER) And, Dr. Turban, I'd like | 21 | Q. So you are not an expert on cognitive |
| 22 | to stick with the article we were just discussing. | 22 | development; is that right? |
| 23 | And I'd like to look on page 276 and the right | 23 | A. I am broadly, but I wouldn't be able to |
| 24 | column and the second full paragraph, first | 24 | dive into the depths of the study of -- like, |
| 25 | sentence. And I'll read it and ask if I read it | 25 | neuroimaging studies that look at different |

49 (Pages 190 - 193)

Jack Turban , M.D., MHS  October 16, 2023

| | |
|---|---|
| 1  neuroimaging paths throughout adolescence. | 1  But I think the sentence you read is too |
| 2  Q.  In this case are you opining as an expert | 2  vague to say a lot from. |
| 3  on cognitive development? | 3  Q.  And what are the two studies you're |
| 4  MS. NOWLIN-SOHL:  Object to form. | 4  referencing? |
| 5  THE WITNESS:  At the level of being a | 5  A.  I have to remember the -- I think the one |
| 6  child in adolescent psychiatry, yes, but not at | 6  that was the meta-analysis looking among young |
| 7  the level of being somebody who spends my whole | 7  adults I believe was in the Journal of Psycho |
| 8  career doing things like neuroimaging studies, | 8  Neurologic Chronology I think in 2021. |
| 9  looking at neural pathway development. | 9  The executive functioning one I believe |
| 10  MR. RAMER:  And, Li, do you have Turban | 10  was by the Dutch, but I don't know the name of the |
| 11  Exhibit 16 yet? | 11  first author. |
| 12  MS. NOWLIN-SOHL:  I do. | 12  Q.  Is the executive functioning one the one |
| 13  MR. RAMER:  Oh, great. | 13  with the Tower of London test? |
| 14  (Deposition Exhibit No. 16 was marked.) | 14  A.  Yes. |
| 15  Q.  (BY MR. RAMER)  And, Dr. Turban, have you | 15  Q.  I'd like to go to page -- stick with this |
| 16  seen this article before? | 16  article, go to page 249, and right column and |
| 17  A.  No. | 17  first full paragraph.  And I'd like to just read |
| 18  Q.  Do you recognize the lead author? | 18  it and ask if I read it correctly. |
| 19  A.  Yes. | 19  It says "We employed a two-round Delphi |
| 20  Q.  And I'd like to go to page 254 in this | 20  procedure to obtain expert consensus regarding the |
| 21  article, and specifically the left column under | 21  most efficacious research design elements |
| 22  "Discussion," and the second sentence in that | 22  addressing the following research question:  What, |
| 23  paragraph following the discussion header.  And | 23  if any, real world impact does pubertal |
| 24  I'll read it and ask if I read it correctly. | 24  suppression have on transgender children's |
| 25  It says "However, puberty is a major | 25  cognitive and neural development?" |
| Page 194 | Page 196 |

| | |
|---|---|
| 1  developmental process.  And the full consequences, | 1  Did I read that correctly? |
| 2  both beneficial and adverse of suppressing | 2  A.  Yes. |
| 3  endogenous puberty, are not yet understood." | 3  Q.  Do you know the answer to that question? |
| 4  Did I read that correctly? | 4  MS. NOWLIN-SOHL:  Object to form. |
| 5  A.  Yes. | 5  THE WITNESS:  I think it's too broad of a |
| 6  Q.  Do you agree that the full consequences | 6  question to have a straightforward answer.  I |
| 7  of suppressing endogenous puberty are not yet | 7  don't know that I could answer any question for |
| 8  understood? | 8  any medical intervention. |
| 9  A.  This is a somewhat vague sentence.  I | 9  Q.  (BY MR. RAMER)  Do you think that |
| 10  think the thing that's difficult when talking | 10  question is unanswerable? |
| 11  about the impact of any medication on cognition is | 11  MS. NOWLIN-SOHL:  Object to form. |
| 12  that there are really infinite cognitive domains | 12  THE WITNESS:  I think it's too broad to |
| 13  one could look at.  So in many ways, it's an | 13  really be able to answer.  It kind of would |
| 14  unanswerable question. | 14  involve nearly infinite subquestions.  So it would |
| 15  People have looked at different | 15  be interesting to see the results of this Delphi |
| 16  questions, for instance, impact on executive | 16  procedure to see what they thought were the |
| 17  functioning.  It does not seem that there's an | 17  important subquestions to be answered. |
| 18  adverse impact. | 18  Q.  (BY MR. RAMER)  Do you agree that |
| 19  There is also a meta-analysis that looked | 19  learning the answer to that question could have |
| 20  mostly at young adults, not adolescents, so | 20  important clinical implications? |
| 21  different, that did find an adverse impact on | 21  MS. NOWLIN-SOHL:  Object to form. |
| 22  several cognitive things they looked at. | 22  THE WITNESS:  Again, it's such a broad |
| 23  They found an improvement in visual | 23  question.  I certainly could imagine that there |
| 24  spatial reasoning among people that took | 24  would be subquestions that come out of it that |
| 25  testosterone. | 25  would be interesting, but nothing this paper |
| Page 195 | Page 197 |

50 (Pages 194 - 197)

(54 of 289), Page 54 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 54 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 51 of 177
Jack Turban , M.D., MHS October 16, 2023

1 ultimately does. But I have not seen this
2 particular paper.
3     Q. (BY MR. RAMER) So are you -- just to
4 understand, are you criticizing the question
5 that's in italics there?
6     MS. NOWLIN-SOHL: Object to form;
7 mischaracterizes prior testimony.
8     THE WITNESS: I think it's a broad
9 question that is likely designed from more
10 specific questions.
11     Q. (BY MR. RAMER) Do you know -- can you
12 describe any impact -- let me put it this way:
13 What can you tell me about the effect of pubertal
14 suppression on transgender children's cognitive
15 and neural development?
16     MS. NOWLIN-SOHL: Object to form.
17     THE WITNESS: It appears to result in
18 improved anxiety, depression, and from the data we
19 have, not impact executive functioning in that
20 clinically these young people don't seem to have
21 major issues in academic functioning.
22     Q. (BY MR. RAMER) Would you agree that
23 anxiety, depression, executive functioning, and
24 academic functioning are not necessarily the same
25 thing as neural and cognitive development?

Page 198

1     MS. NOWLIN-SOHL: Object to form.
2     THE WITNESS: I think they're aspects of
3 cognitive development. Again, this is kind of my
4 overall point here, that cognitive neural
5 development is such a broad term that it could
6 encompass nearly infinite things.
7     Q. (BY MR. RAMER) So you think -- sorry.
8 So just to confirm that I understand, you think
9 that the question that was developed by these
10 researchers is so broad that it encompasses an
11 infinite number of things?
12     MS. NOWLIN-SOHL: Object to form;
13 mischaracterizes prior testimony.
14     THE WITNESS: I don't think this is the
15 question that came out of the Delphi procedure.
16 It looks like this is the question they used to
17 prompt their Delphi procedure to then see what
18 their more specific questions would be.
19     I haven't read this paper, but from the
20 section you showed me, that's what it looks like.
21     Q. (BY MR. RAMER) Let's go to page 253 in
22 this document. Right column, about halfway down
23 there's a sentence that begins with "In addition."
24 And I'll just read it and ask if I read it
25 correctly.

Page 199

1     "In addition, cognitive/behavioral
2 flexibility, a component of executive functioning,
3 should be measured, given that studies in rodents
4 show ovarian hormones, acting during puberty,
5 program cognitive flexibility by exerting
6 long-lasting effects on excitatory and inhibitory
7 balance in the prefrontal cortex."
8     Did I read that correctly?
9     A. Yes.
10     Q. Do you agree that rodent studies have
11 shown that ovarian hormones can have long-lasting
12 effects in brain development?
13     MS. NOWLIN-SOHL: Object to form;
14 foundation.
15     THE WITNESS: Whether or not a research
16 finding from rodents is going to translate to
17 humans is always very up in the air. I'd have to
18 look at the specific citation to know the details
19 of this rodent study.
20     Q. (BY MR. RAMER) Well, I guess following
21 up on that, if a scientist is faced with animal
22 studies reporting that pubertal hormones have
23 long-lasting effects on brain development,
24 shouldn't that scientist conclude there was some
25 possibility that pubertal hormones may also have

Page 200

1 long-lasting effects on brain development in
2 humans?
3     MS. NOWLIN-SOHL: Object to form.
4     THE WITNESS: Not necessarily a high
5 probability because rodent studies often don't
6 translate into clinically meaningful measures in
7 humans, but potentially.
8     Q. (BY MR. RAMER) I'd like to go to --
9 well, I guess before seeing this article, which
10 you said you've seen for the first time today,
11 were you aware of references in literature
12 regarding the effect of pubertal suppression on
13 brain development in animals?
14     MS. NOWLIN-SOHL: Object to form.
15     THE WITNESS: I believe there is one
16 study in sheep that's been referenced.
17     I mean, the way I think about this
18 clinically is that these medications have been
19 around for decades. And generally, anytime
20 there's a medication that's FDA approved and on
21 the market, there's market surveillance.
22     And we will often identify if there is a
23 really serious consequence, and there haven't been
24 any apparent serious -- when I say "apparent,"
25 adverse consequences from pubertal suppression

Page 201

51 (Pages 198 - 201)

ER-120

Jack Turban , M.D., MHS October 16, 2023

1  that I'm aware of.
2      But certainly it's reasonable to do
3  research to study this more in depth to see if
4  maybe there are finer, less clinically significant
5  or obvious impacts.
6      Q.  (BY MR. RAMER)  When you say the
7  medications have been around for a while -- I'm
8  paraphrasing -- but the use of puberty blockers in
9  particular, the FDA approval is for central
10  precocious puberty, correct?
11      A.  Correct.
12      Q.  And when treating central precocious
13  puberty, you will eventually cease giving the
14  patient puberty blockers and then the patient will
15  then proceed through endogenous puberty, correct?
16      A.  Correct.
17      Q.  And so if the question is suppressing
18  endogenous puberty permanently, and what effect
19  that has on cognition, the fact that puberty
20  blockers have been FDA approved for central
21  precocious puberty is irrelevant, correct?
22      MS. NOWLIN-SOHL:  Object to form.
23      THE WITNESS:  I wouldn't call it
24  irrelevant.  I think in both circumstances people
25  are exposed to the medications for a period of

Page 202

1      Q.  Well, what about the second sentence that
2  says "any GnRHa-related difference in brain
3  structure is likely to be observed over the long
4  term rather than immediately"?
5      A.  It's somewhat imprecise.  I don't know
6  what they mean "over the long term" versus
7  "immediately," but I don't have any specific
8  objection to the sentence.
9      Q.  And going to 255 in this document, left
10  column, second full paragraph about halfway down
11  that paragraph, there's a sentence that starts
12  with "Yet."  And I'll just read these two
13  sentences in this paragraph and ask if I read them
14  correctly first.
15      "Yet, evidence suggests an
16  over-occurrence of neurodiversity characteristics,
17  (especially related to autism) among
18  gender-referred youth.  The neurodevelopmental
19  impact of pubertal suppression on neurodiverse
20  gender-diverse youth might well be different than
21  in neurotypical gender-diverse youth given
22  variations in neurodevelopmental trajectories
23  observed across neurodevelopment conditions."
24      Did I read that correctly?
25      A.  Yes.

Page 204

1  time that puberty is suppressed.  And then they go
2  through either estrogen or testosterone puberty.
3      Q.  (BY MR. RAMER)  Well, you're saying
4  estrogen or testosterone puberty.  That is not the
5  same thing, necessarily, as endogenous puberty,
6  correct?
7      A.  For any given person, yeah, their
8  endogenous -- or endogenous puberty, it would be
9  estrogen or testosterone puberty, depending on
10  their sex assigned at birth.
11      Q.  I'd like to go to page 252 in this
12  document.  And the left column just about over
13  halfway down the paragraph there's a sentence that
14  starts with the words "The effects."  And I'll
15  read it and ask if I read it correctly.
16      "The effects of pubertal suppression may
17  not appear for several years.  Any GnRHa-related
18  difference in brain structure is likely to be
19  observed over the long term rather than
20  immediately."
21      Did I read that correctly?
22      A.  Yes.
23      Q.  Do you agree with those statements?
24      A.  I mean it says "may," so hard to argue
25  with the sentence.

Page 203

1      Q.  Are you aware of any studies researching
2  the effect of pubertal suppression on
3  neurodevelopment in adolescents with neurodiverse
4  characteristics?
5      A.  Yes.  So the research on the relationship
6  between autism and gender dysphoria has been
7  controversial about whether or not there is a true
8  relationship between the two.
9      So we published a paper in the Journal of
10  the American Academy of Child and Adolescent
11  Psychiatry a few years ago where we looked at the
12  different studies that looked at whether or not
13  there was a co-occurrence between gender dysphoria
14  and autism or vice versus, and pointed out that
15  there were a lot of issues with that research.
16      So for the research, looking at those
17  with gender dysphoria, they would often use
18  screening instruments like the social
19  responsiveness scale or the autism quotient.  And
20  they found that trans youth with gender dysphoria
21  were more likely to score in the clinical range on
22  those instruments than youth without gender
23  dysphoria.
24      The problem, as you know, is those
25  instruments are very nonspecific, so as many as

Page 205

52 (Pages 202 - 205)

ER-121

Jack Turban , M.D., MHS  October 16, 2023

1  80 percent of the kids who just have social
2  anxiety will score in the clinical range.
3      So for that reason we didn't know are
4  these young people scoring in the clinical range
5  because they truly have autism?  Or is it because
6  they have other conditions that they're screening
7  for in this range too.
8      So that prompted some people to wonder if
9  these, quote, autism results were truly a result
10  of autism or if they were a result of minority
11  stress or gender dysphoria.  So it raised the
12  question of whether or not these supposed autism
13  symptoms would improve following gender-affirming
14  medical care.
15      And I know there was at least one study
16  that only looked at pubertal suppression for, I
17  forget how long, a year or two, and looked at how
18  the social responsiveness scale changed over time
19  after gender-affirming medical treatment.
20      Q.  What is the social responsiveness scale?
21      A.  Screening instrument for autism that
22  again is somewhat nonspecific, because people with
23  other conditions like social anxiety disorder will
24  often screen in the clinical range.
25      Q.  So in your previous answer, what question

Page 206

1  were you answering?
2      A.  You asked if I was aware of any studies
3  looking at the impact of gender-affirming medical
4  care among those with neurodivergent
5  characteristics like autism.
6      Q.  Well, it was actually specifically are
7  you aware of any study researching the effect of
8  pubertal suppression on neurodevelopment in
9  adolescents with neurodiverse characteristics?
10      A.  Autism is a -- neurodiversity is a
11  category that includes autism.  People often use
12  "neurodiversity" to reference people who have
13  autism characteristics.  And so that was a study
14  of looking at people who were neurodiverse and
15  that they had presumably autism.  And they
16  followed them after pubertal suppression.
17      Q.  And so I appreciate that "neurodiverse"
18  includes people who have autism.
19      My question is the study about the effect
20  of pubertal suppression on neurodevelopment
21  specifically in adolescents who are neurodiverse.
22      Aware of any study researching that?
23      A.  What do you mean by "neurodevelopment"?
24      Q.  What do you understand that term to mean?
25      A.  It's a broad term that could look at

Page 207

1  different cognitive outcomes.  It could be the
2  social responsiveness scale that they looked it.
3  It can look at neuroimaging techniques.
4      Q.  Okay.  Exclude the social responsiveness
5  scale.
6      Are you aware of any study researching
7  the effect of pubertal suppression on
8  neurodevelopment in adolescents with neurodiverse
9  characteristics?
10      A.  I have to look back at what other
11  outcomes that study looked at, but I can't recall.
12      Q.  Okay.  Let's go back to -- it was a while
13  ago -- Turban Exhibit 5, which I believe is the
14  Cass interim report.
15      And specifically I'd like to go to
16  page 38.  And in the right column there is a
17  paragraph numbered 3.32.  I'm just going to read
18  the first sentence and ask if I read it correctly.
19      MS. NOWLIN-SOHL:  Can you give us one
20  second, John?
21      MR. RAMER:  Oh, sorry.  Yep.
22      MS. NOWLIN-SOHL:  You said 3.32?
23      MR. RAMER:  Yeah, so page 38, right
24  column, paragraph numbered 3.32.
25      MS. NOWLIN-SOHL:  Okay.  We are there.

Page 208

1      Q.  (BY MR. RAMER)  Okay.  I'll read the
2  first sentence of that paragraph and ask if I read
3  it correctly.
4      It says "A closely linked concern is the
5  unknown impacts on development, maturation, and
6  cognition if a child or young person is not
7  exposed to the physical, psychological,
8  physiological, neurochemical, and sexual changes
9  that accompany adolescent hormone surges."
10      Did I read that correctly?
11      A.  Yes.
12      Q.  And do you agree that the impact of
13  puberty blockers on the child's developmental
14  cognition is currently unknown?
15      MS. NOWLIN-SOHL:  Object to form.
16      THE WITNESS:  There are elements of
17  neurocognition that have been studied, but we
18  don't know for every domain of neurocognition.
19  And I think the same is probably true for the vast
20  majority of medications.
21      Q.  (BY MR. RAMER)  What's your basis for
22  that conclusion?
23      A.  That we don't routinely study every
24  medication for every way in which it could impact
25  every domain of neurocognitive development.

Page 209

53 (Pages 206 - 209)

ER-122

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1     You know, there's impact to their<br>2 functioning; there's visual/spatial reasoning;<br>3 there's verbal fluency; there's different measures<br>4 of mathematical ability.  There's just so many<br>5 different ways you can measure neurocognitive<br>6 development, and we don't routinely -- we just<br>7 don't have research for the vast majority of<br>8 medications and how they impact all those<br>9 different domains because there are so many.<br>10     Q.  In your testimony --<br>11     A.  If there were -- again, like a<br>12 post-medication surveillance signal that came up<br>13 from the FDA showing, wow, we have a lot of<br>14 patients who took this specific medication, and it<br>15 seems like they're having clinically significant<br>16 impairment in their neurocognitive domain, that<br>17 would probably prompt that research.<br>18     But that's not routinely done for every<br>19 medication.  It would be nice if it were, but it's<br>20 a lot of research and really intensive research to<br>21 do.<br>22     Q.  And so you're saying that for the vast<br>23 majority of medications, we do not know the<br>24 neurocognitive outcomes from taking those<br>25 medications; is that right?<br>                                Page 210 | 1 hormones?<br>2     MS. NOWLIN-SOHL:  Object to form.<br>3     THE WITNESS:  I can say clinically most<br>4 patients who get pubertal suppression -- well,<br>5 essentially all of them, will later either stop<br>6 pubertal suppression and go through endogenous<br>7 puberty, or they'll start gender-affirming<br>8 hormones.<br>9     Generally clinical experience has been<br>10 that those patients do quite well, and we don't<br>11 see that they have major cognitive impairments<br>12 that are clinically significant, but I'm not aware<br>13 of a specific peer-reviewed study looking at that<br>14 question, and again would point out that this term<br>15 "brain maturation" is very vague and not a very<br>16 technical term.  And so I'm not sure exactly what<br>17 metric of brain maturation you're referencing.<br>18     Q.  (BY MR. RAMER)  You read this when --<br>19 well, when did you read this?<br>20     A.  I don't remember.  Many months ago.<br>21     Q.  And if you thought that the phrase "brain<br>22 maturation" was vague, did it lead you to want to<br>23 investigate further what they were talking about?<br>24     MS. NOWLIN-SOHL:  Object to form.<br>25     THE WITNESS:  From this specific<br>                                Page 212 |
| 1     MS. NOWLIN-SOHL:  Object to form.<br>2     THE WITNESS:  We might know some<br>3 neurocognitive outcomes, but we don't know the<br>4 full range of neurocognitive outcomes.<br>5     Q.  (BY MR. RAMER)  And for pubertal<br>6 suppression, do we know some neurocognitive<br>7 outcomes?<br>8     A.  I would say we have some mental health<br>9 outcomes, and we have executive functioning.  And<br>10 those are the ones that I'm aware of.<br>11     Q.  So same paragraph, final sentence at the<br>12 bottom starting with "If."  I'll read it and ask<br>13 if I read it correctly first.<br>14     "If pubertal sex hormones are essentially<br>15 to these brain maturation processes, this raises a<br>16 secondary question of whether there is a critical<br>17 time window for the processes to take place or<br>18 whether catch-up is possible when estrogen or<br>19 testosterone is introduced later."<br>20     Did I read that correctly?<br>21     A.  Yes.<br>22     Q.  Are you aware of any study that addresses<br>23 whether a negative impact on brain maturation due<br>24 to pubertal blockade can be corrected later if the<br>25 child is exposed to either endogenous or cross-sex<br>                                Page 211 | 1 international report, no.<br>2     Q.  (BY MR. RAMER)  Did anything in this<br>3 report lead you to do additional investigation?<br>4     A.  What do you mean by "investigation"?<br>5     Q.  I mean, did you read something in this<br>6 report and say, "Oh, that's a valid concern.  I<br>7 should look into that"?  Or no?<br>8     MS. NOWLIN-SOHL:  Object to form.<br>9     THE WITNESS:  I don't recall this report<br>10 bringing up anything relevant to my practice that<br>11 was new or interesting or present any new or<br>12 interesting data to my practice.<br>13     I remember the most interesting thing<br>14 being the description of how care is delivered in<br>15 the U.K. and how they're changing that.  But it<br>16 didn't -- I don't recall it presenting any new<br>17 research or concepts that I wasn't previously<br>18 familiar with.<br>19     MR. RAMER:  Okay.  I'd like to go to<br>20 Turban Exhibit 17.  Let me know when you have that<br>21 in front of you.<br>22     MS. NOWLIN-SOHL:  Okay.<br>23     (Deposition Exhibit No. 17 was marked.)<br>24     Q.  (BY MR. RAMER)  Dr. Turban, do you<br>25 recognize this document?<br>                                Page 213 |

54 (Pages 210 - 213)

ER-123

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1    A.   Yes. | 1    A.   Yes. |
| 2    Q.   What is it? | 2    Q.   And the fourth one down on this table, |
| 3    A.   I believe this was a report by a U.K. | 3   the de Vries study, do you recall, is that also a |
| 4   government agency looking at the research related | 4   study you cite in your declaration? |
| 5   to pubertal suppression for adolescent gender | 5    A.   Yes. |
| 6   dysphoria. | 6    Q.   And the next page, third from the bottom, |
| 7    Q.   And do you understand this to be a | 7   the Turban article.  And do you recall is this a |
| 8   systematic review? | 8   study you cite in your declaration? |
| 9    A.   Yes. | 9    A.   Yes. |
| 10    Q.   And is this something that you've read | 10    Q.   And did you know the review excluded |
| 11   before? | 11   these studies? |
| 12    A.   Yes. | 12    A.   Yes. |
| 13    Q.   And did you read it in some detail or did | 13    Q.   And do you disagree with the review's |
| 14   you skim it? | 14   conclusion to exclude these studies? |
| 15    A.   When I initially read it, I read it in | 15    A.   I call it a decision, not a conclusion, |
| 16   detail. | 16   but yes. |
| 17    Q.   And what did you think when you read it? | 17    Q.   And why? |
| 18    A.   It's been a while, but I remember that -- | 18    A.   Because I think the studies give you |
| 19   to our point earlier that all a systematic review | 19   valuable information.  The Achille study, though |
| 20   really means is that they define their search | 20   it doesn't separate GnRH analogues out from the |
| 21   terms.  But then subsequent decisions about which | 21   other interventions because it's underpowered when |
| 22   research you include or don't include can be very | 22   it does that, I do think it's valuable information |
| 23   subjective.  I recall them excluding studies that | 23   to know when they look at the group that received |
| 24   I thought were important to include. | 24   gender-affirming medical interventions including |
| 25    Q.   And did this review reach conclusions | 25   blockers and hormones that their mental health |
| Page 214 | Page 216 |

| | |
|---|---|
| 1   that you disagree with? | 1   improved.  I think that that's useful information. |
| 2    A.   It's been a while since I read it, so I'd | 2        The de Vries study they excluded, I think |
| 3   have to ask you if there's a specific line you're | 3   may be okay since this report was just interested |
| 4   referencing. | 4   in pubertal suppression, but I do think that's an |
| 5    Q.   Well, when you -- the comment you just | 5   important paper to know about because it looks at |
| 6   made about them excluding studies that you thought | 6   pubertal suppression followed by gender-affirming |
| 7   were important, so do you have reason to doubt | 7   hormones followed by gender-affirming surgery.  So |
| 8   that the analysis in this document is reliable? | 8   it gives you a lot of fresh informational, albeit |
| 9        MS. NOWLIN-SOHL:  Object to form. | 9   not just about puberty blockers. |
| 10        THE WITNESS:  I recall them not including | 10        And then our study where it says they |
| 11   all the studies that they should have included. | 11   excluded because it doesn't report separately from |
| 12    Q.   (BY MR. RAMER)  And do you know whether | 12   other interventions, I'd have to pull up our paper |
| 13   this systematic review assessed any of the studies | 13   again but I'm pretty sure that's not true.  I |
| 14   that you rely on in your declaration? | 14   believe we adjusted for access to gender-affirming |
| 15    A.   I presume it reviews some of them, but | 15   hormones. |
| 16   it's been a while since I've read it. | 16    Q.   You don't know as you sit here whether |
| 17    Q.   Okay.  Let's go to page 74.  And kind of | 17   you adjusted for -- |
| 18   middle of the page, you see appendix D entitled | 18    A.   I just don't want to say on the record |
| 19   "Excluded Studies Table"? | 19   without double-checking, but do you want to pull |
| 20    A.   Yes. | 20   up the -- |
| 21    Q.   And do you recall whether you cite the | 21    Q.   No, I think my question is actually, |
| 22   first study -- let me rephrase. | 22   like, as you sit here, you don't know the answer |
| 23        Do you recall whether in your declaration | 23   to that? |
| 24   you submitted in this case that you cite the first | 24    A.   I'm pretty sure, but want to |
| 25   study listed here? | 25   double-check. |
| Page 215 | Page 217 |

55 (Pages 214 - 217)

(59 of 289), Page 59 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 59 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 56 of 177
Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1   Q.  Okay. That's sufficient.<br>2      Okay. I'd like to go to -- let's stick<br>3  with this document and go to page 99. And at the<br>4  top it says "Appendix G Grade Profiles."<br>5      Do you see that?<br>6   A.  Yes.<br>7   Q.  And the first study in Table 2 here is<br>8  de Vries 2011 study.<br>9      And you cite that in your declaration,<br>10  correct?<br>11   A.  Yes.<br>12   Q.  And in that table, there's a little<br>13  footnote 2. And then you go down to footnote 2<br>14  and it says "Downgraded one level -- the cohort<br>15  study by de Vries, et al. (2011) was assessed as<br>16  at high risk of bias (poor quality overall, lack<br>17  of binding, and no control group)."<br>18      Do you see that?<br>19   A.  Yes.<br>20   Q.  And do you disagree with that assessment?<br>21   A.  No.<br>22   Q.  And then I'd like to go to page 101.<br>23  Actually, I'm sorry, 102. The following page.<br>24      And do you see they refer to the Costa<br>25  2015 study in this table?<br><br><div align="right">Page 218</div> | 1  subjective and there are different ways you can<br>2  decide to up score or down score each thing.<br>3      I'd really have to sit down with them and<br>4  go through it in detail to see how they decided<br>5  for each of the columns. But it doesn't surprise<br>6  me that on the GRADE supporting system that<br>7  prioritizes randomized controlled trials that it<br>8  would have ended up in a low, very low category<br>9  according to that term of art of GRADE scoring.<br>10   Q.  (BY MR. RAMER) If you don't use GRADE,<br>11  what tool are you using to assess the degree of<br>12  bias in this study?<br>13      MS. NOWLIN-SOHL: Object to form.<br>14      THE WITNESS: GRADE is not really just<br>15  about bias. I think one part of the GRADE<br>16  criteria is they look at risk of bias. But I<br>17  generally look at study by study to go into more<br>18  detail on different types of bias and how they<br>19  impact the results.<br>20   Q.  (BY MR. RAMER) Do you use a particular<br>21  methodology to assess the degree of bias in a<br>22  study?<br>23   A.  Depends on the type of bias that you're<br>24  looking at. It could be recall bias, selection<br>25  bias. They're all managed differently.<br><br><div align="right">Page 220</div> |
| 1   A.  Yes.<br>2   Q.  And you also cite the Costa 2015 study,<br>3  right?<br>4   A.  Yes.<br>5   Q.  And if you go to page 106, down at the<br>6  very bottom there's another little footnote 1.<br>7  And it says "Downgraded one level -- the cohort<br>8  study by Costa, et al. (2015) was assessed as at<br>9  high risk of bias (poor quality overall, lack of<br>10  binding, and no control group."<br>11      Do you see that?<br>12   A.  Yes.<br>13   Q.  And do you agree with that assessment?<br>14   A.  I agree with the lack of binding. I<br>15  don't think it's fully accurate to say there<br>16  wasn't a control group.<br>17   Q.  Do you agree it's at high risk of bias?<br>18   A.  It depends on how they're defining that<br>19  term.<br>20   Q.  What if they're defining it in accordance<br>21  with the GRADE methodology?<br>22      MS. NOWLIN-SOHL: Object to form.<br>23      THE WITNESS: The thing about GRADE<br>24  methodology is there are several categories to go<br>25  through each one, and then it's somewhat<br><br><div align="right">Page 219</div> | 1      The other thing about the GRADE criteria<br>2  is that they -- they grade each individual study,<br>3  but I find it's useful to look at the body of<br>4  research as a whole because certain studies are<br>5  going to have weaknesses that other studies<br>6  complement with their strengths, so it's important<br>7  to look at the full body of research as a whole<br>8  where these individual GRADE scores for different<br>9  individual studies are true because studies are<br>10  going to have strengths and limitations. But it's<br>11  useful within the body of literature as a whole.<br>12   Q.  (BY MR. RAMER) And you mention there<br>13  were different tools to assess different types of<br>14  bias.<br>15      What tools do you use?<br>16   A.  Is there a specific type of bias you're<br>17  interested in?<br>18   Q.  Any of the examples you provided.<br>19   A.  So recall bias, for instance, you would<br>20  look at the amount of time between when you're<br>21  asking the person the survey question and when<br>22  that happened.<br>23      You would look at the salience of the<br>24  event. People are more likely to have more<br>25  intense recall bias if it was a relatively mundane<br><br><div align="right">Page 221</div> |

<div align="right">56 (Pages 218 - 221)</div>

Jack Turban , M.D., MHS October 16, 2023

Page 222

1    event from the distant past than they are if it
2    were a very notable event from the somewhat recent
3    past.
4        Q.  I guess do you use a method to assess
5    bias?  Or do you just read the study and reach a
6    conclusion based on your expertise?
7        MS. NOWLIN-SOHL:  Object to form.
8        THE WITNESS:  It depends on the type of
9    bias.  So if it's recall bias, you're looking, for
10   instance, at the number of years between the
11   recall and the event, which is quantitative.
12       And then secondarily you're assessing how
13   salient that event is.
14       Q.  (BY MR. RAMER)  What about a bias for a
15   confounding variable?  How do you assess that when
16   you're reading an individual study?
17       A.  Let's say it's a logistic regression
18   model.  You would look at whether or not they
19   collected that -- the data point for that
20   potential confounder and built it into their
21   statistical model.  If they didn't, then there's a
22   risk of confounding.
23       Q.  And so do you agree that the evidence
24   quality for the use of puberty blockers to treat
25   gender dysphoria is very low on the GRADE scale?

Page 223

1        MS. NOWLIN-SOHL:  Object to form.
2        THE WITNESS:  Again, GRADE scaling is a
3    little difficult because you go through -- and
4    really you're supposed to have a committee where
5    you go through each individual one and it's
6    somewhat subjective because there are many
7    determinations for deciding how to score each
8    category, but I will say the way the GRADE scoring
9    system is set up, it does really prioritize things
10   like randomized controlled trials.
11       So I would expect any group that went
12   through the GRADE scoring would find that it would
13   be in the low, very low categories.
14       Q.  (BY MR. RAMER)  And you say GRADE scoring
15   was somewhat subjective.
16       Do you think it's more or less subjective
17   than you just reading individual studies?
18       MS. NOWLIN-SOHL:  Object to form.
19       THE WITNESS:  I don't understand the
20   question.
21       Q.  (BY MR. RAMER)  What don't you understand
22   about it?
23       MS. NOWLIN-SOHL:  Object to form.
24       THE WITNESS:  Subjective in what way?
25       Q.  (BY MR. RAMER)  Well, you used the term

Page 224

1    "subjective" talking about the GRADE methodology.
2        What were you referring to?
3        A.  That when you go through the categories,
4    like, for instance, bias, indirectness, and
5    inconsistence, there's subjectivity in how you
6    apply those criteria on each of those and
7    discretionary decisions that are made based on the
8    general guidance that the GRADE system creates.
9        MR. RAMER:  I'd like to turn to Turban
10   Exhibit 18, if you have that, Li.
11       MS. NOWLIN-SOHL:  Yes.
12       (Deposition Exhibit No. 18 was marked.)
13       Q.  (BY MR. RAMER)  Okay.  And, Dr. Turban,
14   do you recognize this document?
15       A.  Yes.
16       Q.  And what is it?
17       A.  This is a report from a U.K. agency
18   looking at the research of gender-affirming
19   hormone treatments for adolescent gender
20   dysphoria.
21       Q.  And do you understand this to be a
22   systematic review?
23       A.  Yes.
24       Q.  And is this by the same organization as
25   the one we were just previously looking at?

Page 225

1    Correct?
2        A.  Yes.
3        Q.  And is this something you've read before?
4        A.  Yes.
5        Q.  And did you study it closely?
6        A.  At the time.
7        Q.  And what did you think when you read it?
8        A.  What I recall, it reviewed studies that I
9    generally was already aware of, and I believe
10   similarly had excluded a handful of studies.
11       I think when I was reading it, it was --
12   it had been published for a while, so I also
13   noticed that there understandably was not
14   inclusion of important studies that were published
15   after it came out.
16       Q.  Okay.  I'd like to go to page 70.  And
17   toward the bottom there's a bold blue header that
18   says "Appendix D Excluded Studies Table."
19       Do you see that?  Sorry.  I missed you.
20   Did you see that?
21       A.  Yes.
22       Q.  And then I'd like to go to page 72.  And
23   the second study listed there, the de Vries 2014
24   study.  That's a study that you cite in your
25   declaration, correct?

57 (Pages 222 - 225)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1     A. Correct. | 1     Q. Do you agree that it will take longer |
| 2     Q. And then I'd like to go to -- well, and | 2  than 5.8 years for some of the effects associated |
| 3  you were aware that the publishers of this | 3  with these hormonal interventions to become |
| 4  systematic review excluded that study from | 4  apparent? |
| 5  consideration before you cited it in your | 5     MS. NOWLIN-SOHL: Object to form. |
| 6  declaration, correct? | 6     THE WITNESS: Hard to know. I guess I |
| 7     A. It's years ago that I read this, but yes, | 7  would point out that this isn't uncommon in |
| 8  I would have at some point been aware of that. | 8  medicine. Any medication that was approved by the |
| 9     Q. And let's go to page 77. And that's | 9  FDA in the past few years we're not going to have, |
| 10  entitled "Appendix E, Evidence Tables." | 10  you know, years and years of follow-up data for. |
| 11     Do you see that? | 11  That's not really unusual in medicine. |
| 12     A. Yes. | 12     And it would be unusual to ban the |
| 13     Q. And there they are discussing the Achille | 13  treatment because we didn't have more than six |
| 14  article that you cite, correct? | 14  years of treatment. It would make it so you had |
| 15     A. I believe that's how you pronounce it. | 15  to ban every treatment every time it was approved |
| 16     Q. But that's the article that you cite, | 16  essentially. |
| 17  correct? | 17     But I can't tell you with 100 percent |
| 18     A. Yes. | 18  certainty about years past, the data we have. |
| 19     Q. And then go to page 79. And toward the | 19     Q. (BY MR. RAMER) And going to the next |
| 20  bottom, that's the Allen study that you cite, | 20  paragraph below that, the first sentence, just |
| 21  correct? | 21  read it, ask if I read it correctly. |
| 22     A. Correct. | 22     It says "Most studies included in this |
| 23     Q. And then 81. And that's the Kaltiala | 23  review did not report comorbidities (physical or |
| 24  study that you cite, correct? | 24  mental health) and no study reported concomitant |
| 25     A. Yes. | 25  treatments in detail." |
|                       Page 226 |                       Page 228 |
| 1     Q. And then two more. Page 97. I'm sorry, | 1     Did I read that correctly? |
| 2  page 92, I apologize. | 2     A. Yeah. I think that's true because this |
| 3     And that is the Cooper study that you | 3  was published prior to some of those other studies |
| 4  cite, correct? | 4  that looked at psychotherapy as a potential |
| 5     A. Yes. | 5  confounder. |
| 6     Q. And then page 97 and toward the bottom, | 6     Q. But for the record, I read that |
| 7  that is the de Lara study that you cite, correct? | 7  correctly? |
| 8     A. Yes. | 8     A. Yes. |
| 9     Q. I'd like to go back to page 13 of this | 9     Q. Okay. And what do you -- well, let me |
| 10  document. And just above the middle of the page | 10  read the next sentence, and then I'll -- my first |
| 11  there is a bold blue header that says | 11  question will be did I read it correctly. |
| 12  "Discussion." And then the third paragraph after | 12     "Because of this, it is not clear whether |
| 13  that starts with the words "The included studies." | 13  any changes seen were due to gender-affirming |
| 14  And I'd just like to read that, and I'll ask if I | 14  hormones or other treatments the participants may |
| 15  read it correctly. | 15  have received. |
| 16     "The included studies have relatively | 16     And did I read that correctly? |
| 17  short follow-up with an average duration of | 17     A. Yes. |
| 18  treatment with gender-affirming hormones between | 18     Q. And is this paragraph describing a |
| 19  around one year and 5.8 years. Further studies | 19  confounding variable like we discussed earlier? |
| 20  with a longer follow-up are needed to determine | 20     MS. NOWLIN-SOHL: Object to form. |
| 21  the long-term effect of gender-affirming hormones | 21     THE WITNESS: Yes. |
| 22  for children and adolescents with gender | 22     Q. (BY MR. RAMER) And the, quote, other |
| 23  dysphoria." | 23  treatments in that last sentence could include |
| 24     Did I read that correctly? | 24  psychotherapy, correct? |
| 25     A. Yes. | 25     A. Theoretically, yes. I can't be sure what |
|                       Page 227 |                       Page 229 |

58 (Pages 226 - 229)

Jack Turban , M.D., MHS October 16, 2023

1  they meant, but...
2      Q.  Well, when you read this, what did you
3  understand it to mean?
4      A.  That was my best guess, but they didn't
5  say.
6      Q.  Could it also include psychiatric
7  medication?
8      A.  Potentially.
9      MR. RAMER:  I'd like to now go to Turban
10  Exhibit 19.  And do you have that, Li?
11      MS. NOWLIN-SOHL:  We do.
12      MR. RAMER:  Great.
13      (Deposition Exhibit No. 19 was marked.)
14      Q.  (BY MR. RAMER)  And, Dr. Turban, have you
15  seen this document before?
16      A.  I think yes.  It's a review article that
17  was published in, I think, a Swedish medical
18  journal.
19      Q.  And have you read this?
20      A.  I did read it.  It has, if I remember
21  correctly, a lot of hyperlinks to very long
22  appendices that I have not fully read in detail.
23      Q.  I'd like to go to page 2280, which is the
24  second page of the article.  And right column
25  under Section 2.1, I'll read the first sentence.
Page 230

1      It says "This systematic review
2  originated from a two-year commissioned work from
3  the governmental body of the Swedish agency for
4  health, technology, assessment, and assessment of
5  social services (SBU)."
6      Did I read that correctly?
7      A.  Yes.
8      Q.  And do you understand this article to be
9  a systematic review commissioned by the Swedish
10  government?
11      A.  I believe so, yes.
12      Q.  So same page in the very top in the fully
13  gray box, there is a conclusion.  And I'll read it
14  and ask if I read it correctly.
15      It says "Evidence to assess the effects
16  of hormone treatment on the above fields in
17  children with gender dysphoria is insufficient.
18  To improve future research, we present the GENDHOR
19  checklist, a checklist for studies in gender
20  dysphoria."
21      Did I read that correctly?
22      A.  Yes.
23      Q.  Do you disagree with the conclusion that
24  evidence to assess the effects of hormone
25  treatment on children with gender dysphoria is
Page 231

1  insufficient?
2      MS. NOWLIN-SOHL:  Object to form.
3      THE WITNESS:  I would need a precise
4  definition of what they mean by "insufficient."
5      Q.  (BY MR. RAMER)  When you read this, did
6  you try to figure out what they meant by
7  "insufficient"?
8      A.  Probably at the time.  I don't recall
9  what their definition was.
10      Q.  And so you said the article included a
11  lot of hyperlinks to very long appendices; is that
12  right?
13      A.  Yes.
14      Q.  And did you ever try to analyze those?
15      A.  I started to, but didn't have time.  But
16  as I mentioned earlier, a lot of what happens with
17  the systematic review is there are subjective
18  choices made in how you define your search
19  terminology, how you decide to exclude and
20  include.
21      So my intention was to go through and
22  better understand their full methodology, but
23  ultimately I did not have time.
24      Q.  Okay.  I'd like to go to -- maybe we're
25  still on 2280.  And in the right column there is a
Page 232

1  box with key notes and then some bullets below it.
2      And the last bullet says "GnRHa treatment
3  in children with gender dysphoria should be
4  considered experimental treatment of individual
5  cases rather than standard procedure."
6      Did I read that correctly?
7      A.  Yes.
8      Q.  And do you disagree with that conclusion?
9      MS. NOWLIN-SOHL:  Object to form.
10      THE WITNESS:  Again, the terminology they
11  use doesn't have clear definitions, from my
12  perspective, by calling it an experimental
13  treatment.
14      I think that we always in medicine are
15  considering treatments on a case-by-case basis,
16  and for the individual patient we're weighing
17  risks, benefits, and unknowns, including for
18  puberty blockers.
19      So it's in line with my clinical practice
20  and I think most people's clinical practices that
21  treatment is individualized, and we take things
22  into account for the individual patient.
23      I'm not sure what they would mean by
24  "standard procedure."
25      Q.  (BY MR. RAMER)  I'd like to go to 2281 to
Page 233

59 (Pages 230 - 233)

ER-128

(63 of 289), Page 63 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 63 of 289
Case 1:23-cv-00269-BLW  Document 74-2  Filed 11/02/23  Page 60 of 177
Jack Turban , M.D., MHS  October 16, 2023

| | |
|---|---|
| 1 the next page, right column, 3.1.  And the final | 1 Do we want to take a break here? |
| 2 sentence of that paragraph in 3.1 says "A list of | 2 MS. NOWLIN-SOHL:  Yeah. |
| 3 excluded studies is provided at the SBU web page," | 3 THE VIDEOGRAPHER:  Okay.  So the time is |
| 4 and then includes a hyperlink. | 4 3:20 p.m. Pacific time, and we are off the record. |
| 5 Do you see that? | 5 (Break taken from 3:20 p.m. to 3:27 p.m.) |
| 6 A.  Yes. | 6 THE VIDEOGRAPHER:  All right.  So we are |
| 7 Q.  All right. | 7 recording.  The time is 3:27 p.m. Pacific time, |
| 8 MR. RAMER:  I'd like to now introduce | 8 and we are back on the record. |
| 9 Turban Exhibit 20 if you have that, Li. | 9 MR. RAMER:  Okay.  Dr. Turban, I'd like |
| 10 MS. NOWLIN-SOHL:  Yes. | 10 to introduce Turban Exhibit 21 if that has |
| 11 (Deposition Exhibit No. 20 was marked.) | 11 arrived. |
| 12 Q.  (BY MR. RAMER)  And, Dr. Turban, I will | 12 MS. NOWLIN-SOHL:  It has not. |
| 13 represent to you that this document is located at | 13 MR. RAMER:  Then we'll hold that as |
| 14 the hyperlink that we just read. | 14 Turban Exhibit 21 just to keep the numbering |
| 15 And is this one of the long appendices | 15 clear, and I'll introduce Turban Exhibit 22. |
| 16 you were referring to? | 16 MS. NOWLIN-SOHL:  Okay.  We have that up. |
| 17 A.  It looks a lot nicer than the one I | 17 MR. RAMER:  Okay.  Great. |
| 18 remember.  I wonder if they fixed some of the | 18 (Deposition Exhibit No. 22 was marked.) |
| 19 formatting in translation. | 19 Q.  (BY MR. RAMER)  And, Dr. Turban, have you |
| 20 Q.  It could be. | 20 seen this document before? |
| 21 A.  But no, that's fine.  It's not very long. | 21 A.  Yes. |
| 22 Q.  And the -- let's see here. | 22 Q.  I'm sorry? |
| 23 Okay.  Can you see in the light blue -- I | 23 A.  Yes. |
| 24 won't ask you to read Swedish -- but after the | 24 Q.  And did you read it? |
| 25 backslash, it says "Appendix 2 studies excluded | 25 A.  Yes. |
| Page 234 | Page 236 |
| 1 due to high risk of bias." | 1 Q.  And when was the last time you read it? |
| 2 A.  Yes. | 2 A.  I read this one recently, a few days ago |
| 3 Q.  And do you cite -- let me rephrase. | 3 when I was writing my statement. |
| 4 The first study listed is the Achille | 4 Q.  And I'd like to go to page 3.  And |
| 5 study you cite, correct? | 5 under -- there's a blue header that says "Caution |
| 6 A.  Yes. | 6 in the use of hormonal and surgical treatment." |
| 7 Q.  And the second study listed is the Allen | 7 And I'll just read the first sentence and ask if I |
| 8 study you cite, correct? | 8 read it correctly. |
| 9 A.  Yes. | 9 It says "At group level (i.e., for the |
| 10 Q.  And the third study listed is one of the | 10 group of adolescents with gender dysphoria as a |
| 11 de Vries studies that you cite, correct? | 11 whole) the National Board of Health and Welfare |
| 12 A.  Yes. | 12 currently assesses that the risk of puberty |
| 13 Q.  And at the bottom of this page is the de | 13 blockers and gender-affirming treatment are likely |
| 14 Lara study that you cite, correct? | 14 to outweigh the expected benefits of these |
| 15 A.  Yes. | 15 treatments." |
| 16 Q.  Dr. Turban, are you aware of any | 16 Did I read that correctly? |
| 17 systematic reviews that have been able to draw | 17 A.  Yes. |
| 18 conclusions about the effects of gender-affirming | 18 Q.  And a little further down on this page, |
| 19 hormone therapy on suicide? | 19 the second full paragraph -- I guess, sorry.  Let |
| 20 A.  Like death from suicide? | 20 me ask first, do you agree that the risks of |
| 21 Q.  Yes. | 21 puberty blockers and gender-affirming treatment |
| 22 A.  No. | 22 are likely to outweigh the expected benefits of |
| 23 MR. RAMER:  I think this is a good | 23 those treatments? |
| 24 breaking point.  I also think I've been going for | 24 MS. NOWLIN-SOHL:  Object to form. |
| 25 about an hour. | 25 THE WITNESS:  They have a strange clause |
| Page 235 | Page 237 |

(64 of 289), Page 64 of 289 Case: 24-142 02/06/2024 DktEntry: 26.3, Page 64 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 61 of 177
Jack Turban , M.D., MHS   October 16, 2023

| | |
|---|---|
| 1  of "at a group level (i.e., for the group<br>2  adolescents with gender dysphoria)" as a whole.<br>3  They say risks likely outweigh the benefits.<br>4       This document later goes on to note that<br>5  you should consider these interventions on a<br>6  case-by-case basis for the individual patient,<br>7  which, in my view, is very similar to WPATH<br>8  guidelines and how we practice.  So we conduct<br>9  these biopsychosocial evaluations to determine if,<br>10  for an individual person, the potential benefits<br>11  outweigh the potential risks.<br>12       So I would say that sentence, I agree.<br>13       Q.  (BY MR. RAMER)  You think that the policy<br>14  set forth by this document is consistent with the<br>15  WPATH guidelines?<br>16       MS. NOWLIN-SOHL:  Object to the form;<br>17  mischaracterizes prior testimony.<br>18       THE WITNESS:  I think in that it<br>19  recommends being very thoughtful about who<br>20  receives gender-affirming medical interventions<br>21  but still considering them.  I think that's a<br>22  theme of both.<br>23       Q.  (BY MR. RAMER)  If Sweden's policy were<br>24  implemented in the United States, would treatment<br>25  change at all?<br><br><div align="right">Page 238</div> | 1  some other questions we can ask, but you think<br>2  that that first sentence is consistent with the<br>3  practice in the United States currently?<br>4       MS. NOWLIN-SOHL:  Object to form.  Object<br>5  to prior mischaracterization of testimony.<br>6       Q.  (BY MR. RAMER)  And if that sentence is<br>7  just not relevant, that's fine, but just following<br>8  up on your answer.<br>9       A.  I think I answered the question that it's<br>10  similar between what's written here and what's<br>11  practiced in the U.S., that we don't, without a<br>12  thoughtful biopsychosocial evaluation, routinely<br>13  provide gender-affirming medical interventions<br>14  without carefully weighing the potential risks<br>15  against potential benefits for individuals.<br>16       Q.  On the same page a little further down,<br>17  second paragraph, there's a sentence that begins<br>18  with "In revising its recommendations."  I just<br>19  want to read it and first ask if I read it<br>20  correctly.<br>21       "In revising its recommendations, the<br>22  National Board of Health and Welfare has taken<br>23  account of the fact that the efficacy and safety,<br>24  benefits, and risks of treatments are not proven,<br>25  and that three factors have shifted the balance<br><br><div align="right">Page 240</div> |
| 1       MS. NOWLIN-SOHL:  Object to form.<br>2       THE WITNESS:  You'll have to give me a<br>3  minute to read it in detail again for any<br>4  potential --<br>5       Q.  (BY MR. RAMER)  Sorry.  To read what in<br>6  detail?  That sentence?<br>7       A.  This document of the guidelines.  You<br>8  wanted me to tell you if the guidelines are<br>9  essentially identical to what's practiced in the<br>10  U.S.<br>11       Q.  Well, the question I originally asked was<br>12  about the first sentence.  Do you agree that the<br>13  risks of puberty blockers and gender-affirming<br>14  treatment are likely to outweigh the expected<br>15  benefits of these treatments?<br>16       And I thought your answer was, well,<br>17  they're talking about the group level.  They have<br>18  this strange clause about the group level.  And we<br>19  don't practice medicine any different here in the<br>20  United States because we go on an individualized<br>21  basis.<br>22       And so I guess you were extrapolating<br>23  from the first sentence to the practice of care<br>24  here, and that's why I asked the question.  So I<br>25  frankly do not want to take -- you know, I have<br><br><div align="right">Page 239</div> | 1  between benefit and risk in a negative direction."<br>2       Did I read that correctly?<br>3       A.  Yes.<br>4       Q.  And the first bullet they list is --<br>5  refers to "the uncertainty resulting from the lack<br>6  of clarity about the causes that the number of<br>7  people diagnosed with gender dysphoria has<br>8  continued to rise since the publication of the<br>9  guidelines in 2015, particularly in the 13 to 17<br>10  age group, and especially among people whose<br>11  registered sex at birth is female."<br>12       Do you see that?<br>13       A.  Yes.<br>14       Q.  And do you agree there's uncertainty<br>15  resulting from the lack of clarity about the cause<br>16  for the increase of gender dysphoria among<br>17  adolescents whose registered sex at birth is<br>18  female?<br>19       MS. NOWLIN-SOHL:  Object to form.<br>20       THE WITNESS:  I believe I wrote this in<br>21  my declaration, but most experts think that the<br>22  reason for the increase in referrals to gender<br>23  clinics is due to increased public knowledge that<br>24  these interventions exist.<br>25       I believe I cited a paper from the Dutch<br><br><div align="right">Page 241</div> |

<div align="right">61 (Pages 238 - 241)</div>

Jack Turban , M.D., MHS October 16, 2023

1  group that noted that the number of referrals that
2  they received increased, but the percentage of
3  individuals who presented to the clinic and
4  actually received gender-affirming medical
5  interventions was low, highlighting that despite
6  the increase of referrals, there's still a
7  stringent process and evaluation on an individual
8  basis, as I noted, for who actually receives
9  gender-affirming medical interventions.
10      The question of the sex ratio, I believe
11  I discussed also.  When we look at large data sets
12  in the United States of community samples, it's
13  actually quite close to one to one among trans
14  youth, how many are sex assigned at birth, male
15  versus female.
16      So there's a lot of research on this
17  question.
18      Q.  (BY MR. RAMER)  And so you disagree that
19  there's a lack of clarity about that?
20      MS. NOWLIN-SOHL:  Object to form.
21      THE WITNESS:  I think there's more known
22  than is explained here.
23      Q.  (BY MR. RAMER)  In the second -- flipping
24  to the next page, the second bullet states "The
25  documented prevalence among young adults of

Page 242

1      The Brick, et al. study, I'm not sure if
2  I referenced that one or not, that one found of
3  those who started pubertal suppression, a few of
4  them did not go on to gender-affirming hormones
5  for various reasons.  Some of them still
6  identified as transgender; some did not.
7      There's also the Wiepjes study where
8  1.9 percent of adolescents who started pubertal
9  suppression did not go on to gender-affirming
10  hormones.
11      So again there is more data known than is
12  provided in this bullet point, and I think the
13  bullet point is confusing and that it contradicts
14  itself.  I don't know if it's a translation issue.
15      Q.  Well, with respect to the contradiction,
16  you agree there is a distinction between knowing
17  the number of individuals who would detransition
18  and knowing how common it would be for people to
19  later detransition, correct?
20      A.  Would you repeat the question?
21      Q.  Is there a distinction between a number
22  and a probability is basically the question?
23      A.  The probability is a number.  Sorry.  I'm
24  not understanding.
25      Q.  I guess you're saying the first sentence

Page 244

1  medical detransition, which is the process by
2  which a person discontinues gender-affirming
3  medical treatment for any reason or seeks to
4  reverse the medical effects of completed
5  gender-affirming treatment, according to the SBU,
6  it is not possible to assess how common it is for
7  young people to later change their perception of
8  their gender identity or to discontinue a
9  gender-affirming treatment."
10      Did I read that correctly?
11      A.  You read it correctly.
12      Q.  Do you agree that it is not possible to
13  assess how common it is for young people to later
14  change their perception of their gender identity?
15      A.  I think this bullet point is somewhat
16  contradictory because it first says that there is
17  a documented prevalence of detransition,
18  suggesting that we do know the number, and then it
19  goes on to say that it's not possible to know the
20  number.
21      There are some studies that have looked
22  at that question.  The de Vries study followed 55
23  adolescents through pubertal suppression,
24  gender-affirming hormones into young adulthood.
25  None of their gender identities changed.

Page 243

1  of the bullet point is contradictory because the
2  first sentence says "The documented prevalence
3  among young adults," so it's admitting it knows
4  that these people exist.
5      And then the second sentence says "It is
6  not possible to assess how common it is."
7      And I thought your answer was that's
8  contradictory.
9      And I guess my question is is it really
10  contradictory if you know that a certain number of
11  people experience something but you also don't
12  know how common it will be for others to have that
13  same experience?
14      A.  The word "prevalence" means how common
15  something is, not just that it exists.
16      Q.  And so you think "prevalence" does mean
17  how common something is?
18      A.  In medicine, that's what "prevalence"
19  means.
20      Q.  And with respect to -- with respect to
21  determining how common it is for young people to
22  later change their perception of their gender
23  identity, is it your testimony that we do have
24  good evidence of how common it would be?
25      MS. NOWLIN-SOHL: Object to form.

Page 245

62 (Pages 242 - 245)

(66 of 289), Page 66 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 66 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 63 of 177
Jack Turban , M.D., MHS October 16, 2023

Page 246

1    THE WITNESS:  We have the studies I just
2  described.
3    Q.  (BY MR. RAMER)  And you think those
4  constitute good evidence for determining how
5  common it is for young people to later change
6  their perception of their gender identity?
7    MS. NOWLIN-SOHL:  Object to form.
8    THE WITNESS:  As a scientist, I don't
9  like words like this that don't have precise
10  meaning, but it is evidence to that question.
11    Q.  (BY MR. RAMER)  Do you agree that some
12  individuals regret receiving gender-affirming
13  medical interventions?
14    A.  Yes.
15    Q.  Is it possible to predict beforehand
16  which individuals will come to regret those
17  interventions?
18    MS. NOWLIN-SOHL:  Object to form.
19    THE WITNESS:  The goal of the
20  biopsychosocial evaluation is to understand the
21  person's biological factors, psychological
22  factors, social environment as much as is
23  possible.  And it's all designed to minimize that
24  risk, but it's not certain, as with most things in
25  medicine, to determine with 100 percent certainty.

Page 247

1    Q.  (BY MR. RAMER)  And then staying on this
2  page, I'd like to go down.  There is a section
3  entitled "Decisions on Treatment in an Individual
4  Case."
5    Do you see that?
6    A.  Yes.
7    Q.  And I'm going to read the first sentence
8  and ask if I read it correctly.
9    It says "To guide the decision on
10  puberty-suppressing treatment for an adolescent in
11  Tanner Stage 3 and for gender-affirming hormone
12  therapy, the National Board of Health and Welfare
13  recommends the criteria whose use has been
14  documented and monitored within the framework of
15  the Dutch protocol."
16    Did I read that correctly?
17    A.  Yes.
18    Q.  And can you describe the criteria that
19  has been used for the Dutch protocol?
20    A.  The WPATH guidelines are modeled off of
21  the Dutch protocol.  They were the first to
22  publish in the academic literature their approach
23  to these gender-affirming medical interventions
24  for adolescents with gender dysphoria.
25    I'd say the biggest themes are, one,

Page 248

1  conducting a biopsychosocial evaluation prior to
2  proceeding with treatment.
3    And the second is that treatment is
4  offered in a step-wise fashion from most
5  reversible to least reversible.  So you would
6  start with pubertal suppression prior to
7  considering gender-affirming hormones, which are
8  less reversible.  And then the last resort would
9  be surgery.
10    Q.  Does the criteria of the Dutch protocol
11  require incongruence since childhood?
12    A.  I think they've evolved in their practice
13  over time.  Certainly initially they focused
14  specifically on prepubertal diagnoses of gender
15  dysphoria, or at least documented history of that,
16  but I've not checked in with them recently to know
17  if that's still a search criterion or not.
18    Q.  I'll read the second sentence here and
19  ask if I read it correctly.
20    It says "The criteria include the
21  existence of the incongruence since childhood, the
22  stability of gender identity over time, clear
23  distress caused by the onset of puberty, and the
24  absence of factors that complicate the diagnostic
25  assessment."

Page 249

1    Did I read that correctly?
2    A.  Yes.
3    Q.  And so the Swedish government seems to
4  think the criteria for the Dutch protocol does
5  include the incongruence since childhood, correct?
6    MS. NOWLIN-SOHL:  Object to form.
7    THE WITNESS:  That's what that sentence
8  is implying.  Again, I've not checked with the
9  Dutch to know if they still have that element in
10  place.
11    Q.  (BY MR. RAMER)  If -- is that
12  requirement -- are the current WPATH guidelines
13  consistent with that requirement?
14    A.  They are certainly influenced by that
15  requirement, but they say if there's not a clear
16  history of gender incongruence during childhood,
17  then you should extend the biopsychosocial
18  assessment process.
19    Q.  But a patient would be eligible for
20  treatment under the WPATH guidelines even if that
21  patient did not have gender incongruence during
22  childhood, correct?
23    MS. NOWLIN-SOHL:  Object to form.
24    THE WITNESS:  They would need to go
25  through a longer diagnostic assessment process,

63 (Pages 246 - 249)

(67 of 289), Page 67 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 67 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 64 of 177
Jack Turban , M.D., MHS October 16, 2023

1 but it wouldn't be considered an absolute
2 contraindication, if you will, but something that
3 would kind of raise a flag for the medical team to
4 proceed with more caution.
5     Q. (BY MR. RAMER) Did the Dutch protocol
6 assess individuals who had a nonbinary gender
7 identity?
8       MS. NOWLIN-SOHL: Object to form.
9       THE WITNESS: Historically most of their
10 patients, I believe, had expressed a binary
11 understanding of their gender identity. I would
12 be surprised if they haven't also treated patients
13 with nonbinary identities, but I can't say for
14 sure.
15     Q. (BY MR. RAMER) Well, I guess the studies
16 that you cite out of the Dutch clinic -- well, no,
17 let's do it this way.
18       Same page, paragraph below the one we
19 were just looking at, first sentence says "The
20 documented experience with the Dutch protocol
21 includes only adolescents with binary gender
22 identity. And among participating experts, there
23 is a lack of clinical experience with
24 puberty-suppressing and gender-affirming hormone
25 therapy with adolescents with nonbinary gender
               Page 250

1 identity."
2       Did I read that correctly?
3     A. Yes.
4     Q. And so are they wrong where they state
5 the Dutch protocol includes only adolescents with
6 binary gender identity?
7       MS. NOWLIN-SOHL: Object to form and
8 foundation.
9       THE WITNESS: Again, in the past I think
10 the vast majority of their patients had binary
11 gender identities. I'm not sure if they still
12 have that requirement in the Dutch clinic.
13     Q. (BY MR. RAMER) Did the individuals in
14 the de Vries 2011 or de Vries 2014 studies have a
15 nonbinary gender identity?
16     A. I believe in the 2014 study they all had
17 binary gender identities.
18       To the 2011 study, I'd have to go back
19 and look at the details of the methodology.
20     Q. If there was a requirement in the United
21 States that an adolescent could not obtain
22 gender-affirming medical interventions unless the
23 adolescent had a history of gender incongruence
24 since childhood, would gender-affirming medical
25 interventions be less available?
               Page 251

1       MS. NOWLIN-SOHL: Object to form;
2 foundation.
3       THE WITNESS: I don't know what you mean
4 by "less available."
5     Q. (BY MR. RAMER) Do you treat patients
6 whose gender identity -- excuse me.
7       Do you treat patients whose gender
8 incongruence arose during adolescence as opposed
9 to during childhood?
10     A. All of my patients I can think of had
11 some degree of gender incongruence during
12 childhood, but it's not considered an absolute
13 contraindication.
14       Again, as the WPATH guidelines note, if
15 you had a patient, they would have to meet
16 criteria for gender dysphoria, so they would need
17 to have a gender identity different than their sex
18 assigned at birth for at least six months. And
19 then you would need to extend the diagnostic
20 process to better understand the situation.
21     Q. So your clinical population -- let me
22 rephrase.
23       Your practice would not change if there
24 was a requirement imposed that patients needed to
25 have a history of gender incongruence in
               Page 252

1 childhood; is that right?
2       MS. NOWLIN-SOHL: Object to form;
3 mischaracterizes prior testimony.
4       THE WITNESS: Some of my current patients
5 that I can think of, they all had some amount of
6 gender incongruence during childhood. But I can't
7 speak as to what patients I would have in the
8 future and if all of them would.
9       I think the WPATH guidelines, in
10 acknowledging that there are some patients who
11 come to understand their gender identity later, in
12 that they explain that you need to extend the
13 diagnostic process, highlights that patients like
14 that do exist.
15       The Journal of Adolescent Health paper we
16 talked about recently also shows there's a sizable
17 portion of patients like that.
18       So I think it would be limiting care for
19 those such patients who might need treatment.
20     Q. (BY MR. RAMER) Are puberty blockers
21 available as a treatment for gender dysphoria in
22 the U.K.?
23     A. My understanding is yes. My reading of
24 the Cass Interim Report is that the plan was to
25 close their centralized clinic and open regional
               Page 253

64 (Pages 250 - 253)

(68 of 289), Page 68 of 289 Case: 24-142 02/06/2024 DktEntry: 26.3 Page 68 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 65 of 177
Jack Turban , M.D., MHS October 16, 2023

Page 254

1 clinics around the country. I don't know what
2 their progress has been in doing that.
3    Q. So you think that minors with gender
4 dysphoria can receive puberty blockers at those
5 regional clinics in the U.K.?
6    A. My understanding is that that their plan,
7 to set up regional clinics so that patients could
8 access care, and that care could include pubertal
9 suppression.
10    Q. So you do not think that access to
11 pubertal suppression in the U.K. is limited to
12 research trials?
13    MS. NOWLIN-SOHL: Object to form;
14 mischaracterizes prior testimony.
15    THE WITNESS: I believe what they said is
16 that the regional centers should have ongoing data
17 collection. So if you would call that the
18 clinical trial, then sure.
19    Q. (BY MR. RAMER) Ongoing data collection
20 on the administration of puberty blockers to treat
21 gender dysphoria?
22    A. I believe it said that the regional
23 clinic should have ongoing data collection, yes.
24    Q. And so the regional clinics, your
25 understanding is that they are permitted to

Page 255

1 provide puberty blockers to adolescents with
2 gender dysphoria; is that correct?
3    MS. NOWLIN-SOHL: Object to form. Object
4 to the extent that it calls for a legal
5 conclusion.
6    THE WITNESS: I'm not certain if it's
7 physically in that center, but the report makes it
8 clear that pubertal suppression is still an option
9 for individual patients, and that the general
10 gender dysphoria care is being moved from that
11 centralized clinic to regional clinics.
12    MR. RAMER: I'd like to look at -- did
13 the Turban Exhibit 21 come through, Li?
14    MS. NOWLIN-SOHL: Yes.
15    MR. RAMER: Okay. I'd like to pull up
16 Turban Exhibit 21, which has the title "Effects of
17 Gender-Affirming Therapies and People With Gender
18 Dysphoria: Evaluation of the Best Available
19 Evidence."
20    (Deposition Exhibit No. 21 was marked.)
21    Q. (BY MR. RAMER) And Dr. Turban, have you
22 seen this document before?
23    A. I have not.
24    Q. And were you aware that the Florida
25 Agency For Healthcare Administration imposed

Page 256

1 policies that restricted access to
2 gender-affirming medical interventions?
3    A. I read it in the news.
4    Q. And did you ever try to research the
5 evidentiary basis for that decision?
6    MS. NOWLIN-SOHL: Object to form.
7    THE WITNESS: I know they commissioned a
8 report that was criticized by others, but I
9 personally did not go through it.
10    Q. (BY MR. RAMER) Okay. That's all I have
11 on that one.
12    And, Dr. Turban, do you consider yourself
13 to be an expert?
14    MS. NOWLIN-SOHL: Object to form.
15    THE WITNESS: Are you still there?
16    Q. (BY MR. RAMER) I didn't hear you. I'm
17 sorry.
18    My question was do you consider yourself
19 to be an expert?
20    MS. NOWLIN-SOHL: Same objection.
21    THE WITNESS: Do you mean in something
22 specific?
23    Q. (BY MR. RAMER) In anything.
24    A. I would say I'm an expert in the research
25 regarding the mental health treatment of

Page 257

1 adolescents and children with gender dysphoria.
2    Q. And are you an endocrinologist?
3    A. No.
4    Q. Are you a surgeon?
5    A. No.
6    Q. Are you a social worker?
7    A. No.
8    Q. Are you a urologist?
9    A. No.
10    Q. Are you a gynecologist?
11    A. I'm not.
12    Q. Are you a bioethicist?
13    A. I've given bioethics grand rounds at Yale
14 and spoken on ethics issues, but it's not my
15 primary area of focus.
16    Q. Are you a neurologist?
17    A. No.
18    Q. And could you just briefly describe what
19 your current position is?
20    A. I'm an assistant professor of child and
21 adolescent psychiatry at the University of
22 California San Francisco and affiliate faculty as
23 the chief for health policy studies there.
24    I direct our gender psychiatry program in
25 the area of child and adolescent psychiatry.

65 (Pages 254 - 257)

Jack Turban , M.D., MHS October 16, 2023

| |
|---|
| 1    And I serve as an attending in the eating |
| 2  disorder clinic and the adult LGBT psychiatry |
| 3  program as well, in addition to my research work. |
| 4    Q.  And if that were not enough, are you also |
| 5  going to be attending law school soon? |
| 6    A.  I'm enrolled in a master's of legal |
| 7  studies program. |
| 8    Q.  And where is that? |
| 9    A.  UC Law San Francisco.  There's an |
| 10  affiliation with UCSF. |
| 11    MR. RAMER:  And, Li, did Turban |
| 12  Exhibit 23 come through? |
| 13    MS. NOWLIN-SOHL:  It did. |
| 14    (Deposition Exhibit No. 23 was marked.) |
| 15    Q.  (BY MR. RAMER)  And Dr. Turban, do you |
| 16  recognize this document? |
| 17    A.  Yes. |
| 18    Q.  And what is it? |
| 19    A.  This is, like, a popular press article I |
| 20  wrote for a Psychology Today blog. |
| 21    Q.  And this was initially published in |
| 22  January of 2022, correct? |
| 23    A.  I do not recall the date. |
| 24    Q.  On the first page below the title and the |
| 25  subheader, do you see it says "Posted January 24, |

Page 258

| |
|---|
| 1    Q.  Sure. |
| 2    A.  I think that's reference to my |
| 3  declaration also, that often with gender-affirming |
| 4  interventions, we see improvements of mental |
| 5  health but not a complete elimination of mental |
| 6  health challenges because although these |
| 7  treatments improve mental health, these people are |
| 8  still experiencing minority stress and societal |
| 9  stigmas that can drive anxiety, depression, et |
| 10  cetera. |
| 11    So if you want to have a study where |
| 12  you're looking at whether or not the intervention |
| 13  improves, you need to either look at whether or |
| 14  not the person improved before and after or |
| 15  whether those who received treatment do better |
| 16  than those who don't. |
| 17    We've come to expect that you can't use |
| 18  the general population as the control group |
| 19  because though the treatments may improve physical |
| 20  gender dysphoria, we don't expect them to improve |
| 21  bullying, discrimination, et cetera. |
| 22    Q.  So going to the next page for study 7, |
| 23  the final sentence there says "However, because |
| 24  subjects received psychotherapy, the authors note |
| 25  that the study did not provide direct evidence |

Page 260

| |
|---|
| 1  2022"? |
| 2    A.  Yes. |
| 3    Q.  And then there's a list of key points. |
| 4  And then a little further down there's a note that |
| 5  says "This post was updated on October 11, 2022. |
| 6  In discussions of studies 5, 7, 8, and 10, the |
| 7  final sentence was appended to include further |
| 8  information about the study." |
| 9    Do you see that? |
| 10    A.  Yes. |
| 11    Q.  And I'd like to go down and just look at |
| 12  those. |
| 13    So study No. 5, which I think is the |
| 14  fourth page in the PDF, and that is the Kaltiala |
| 15  study, correct? |
| 16    A.  Yes. |
| 17    Q.  And the last sentence says "However, the |
| 18  authors note that gender reassignment is not |
| 19  enough to improve functioning and relieve |
| 20  psychiatric comorbidities among adolescents with |
| 21  gender dysphoria," correct? |
| 22    A.  Yes. |
| 23    Q.  And then going to study 7, which is on |
| 24  the next page -- |
| 25    A.  To clarify -- |

Page 259

| |
|---|
| 1  that pubertal suppression improves mental health |
| 2  in transgender youth." |
| 3    Did I read that correctly? |
| 4    A.  Yes.  And again, this is why I wouldn't |
| 5  take any one study in isolation since they all |
| 6  have strengths and weaknesses.  This was not one |
| 7  of the studies that adjusted for psychotherapy.  I |
| 8  think we mentioned earlier some of the ones that |
| 9  did. |
| 10    Q.  And so next page, study 10, I believe |
| 11  this is your own study.  And the final sentence |
| 12  says "Of note, this study did not identify |
| 13  psychotherapy as a potentially confounding |
| 14  variable." |
| 15    Did I read that correctly? |
| 16    A.  Yes. |
| 17    Q.  Was this the one you were struggling to |
| 18  remember earlier? |
| 19    A.  No.  The question was whether or not it |
| 20  adjusted for access to gender-affirming hormones. |
| 21    Q.  Which -- the question in the study or the |
| 22  question I had earlier? |
| 23    A.  The question I could not recall for sure |
| 24  is whether or not it adjusted for gender-affirming |
| 25  hormones, not psychotherapy. |

Page 261

66 (Pages 258 - 261)

ER-135

(70 of 289), Page 70 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 70 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 67 of 177
Jack Turban , M.D., MHS    October 16, 2023

Page 262

1    Q.  Okay.  And then just going back to
2  study 8 on the previous page, the last sentence
3  there is "Over the course of the study, there was
4  a statistically significant decrease in depression
5  scores in one group, male to female transitioners
6  who underwent pubertal suppression only."
7        Did I read that correctly?
8    A.  Yes.  I generally wouldn't use the word
9  "transitioners."  I think these editors -- some of
10  these edits were from -- not me but from
11  Psychology Today.
12        And the thing about this study is they
13  found that overall there was mental health
14  improvement, the full group.  And then I think
15  when they went and made their subgroups that
16  sample size got smaller and smaller and smaller so
17  they became underpowered to detect most
18  statistically significant differences.
19    Q.  When you say the editors were changing
20  things in the document, was there anything else
21  that you can think of that the editors changed
22  without your approval?
23    A.  I think several things.  The story here
24  was that there was someone at the Manhattan
25  Institute who's been very focused on this blog

Page 263

1  post and I think sent a long series of emails to
2  Psychology Today wanting them to add information.
3        And as it's a blog post, they didn't feel
4  it was essential to devote a lot of time going
5  back and forth to them, so I left Psychology Today
6  to do whatever edits they needed to do.  And when
7  I read them, they were generally reasonable.
8    Q.  Okay.  So for study 8 -- well, just to
9  clarify, the individual at the Manhattan
10  Institute, are you referring to Leor Sapir?
11    A.  Yes.
12    Q.  And for study 8, just to unpack what's
13  going on there, so there was -- am I correct in
14  reading this to conclude that there was no
15  statistically significant -- start again -- no
16  statistically significant decrease in depression
17  scores for any female to male transitioners in
18  that study; is that right?
19        MS. NOWLIN-SOHL:  Object to form.
20        THE WITNESS:  So again, it's this issue
21  that you shouldn't -- you can't interpret a lack
22  of statistically significant findings to mean that
23  there's not an effect, because when you start
24  looking at smaller and smaller subgroups and parse
25  out your data, you lose statistical power.

Page 264

1        So they couldn't say one way or another
2  for those specific subgroups.
3        So it doesn't mean that the treatment
4  worked.  It doesn't mean that the treatment
5  doesn't work.  It just means that their sample
6  size got very small and they weren't able to tell
7  you one way or another.
8    Q.  (BY MR. RAMER) And going back to the
9  first page of this, the second paragraph, the
10  first sentence, you say -- well, maybe you, maybe
11  the editors.  I guess I'll ask you that.
12        The sentence says "Since several U.S.
13  states are introducing legislation to outlaw
14  gender-affirming medical care this year (despite
15  opposition from just about every major medical
16  organization, including the American Medical
17  Association, the American Academy of Pediatrics,
18  and the American Psychiatric Association), I
19  thought this was a good time to review the
20  relevant research for you all."
21        Did I read that correctly?
22    A.  Yes.
23    Q.  Did you write that sentence?
24    A.  I believe so.
25    Q.  And why did the introduction of

Page 265

1  legislation lead you to think it was a good time
2  to review the relevant research for the readers of
3  this blog?
4    A.  Because legislators in several states
5  were making false statements that there was not
6  evidence regarding the benefits of this care, and
7  that I thought it was important for constituents
8  to know when statements by lawmakers are untrue.
9    Q.  Is it fair to say that the -- I'm going
10  to put it this way:  In the cases where you have
11  testified as an expert, is it fair to say that the
12  laws at issue in those cases were enacted by
13  Republican lawmakers?
14        MS. NOWLIN-SOHL:  Object to form;
15  foundation.
16        THE WITNESS:  I believe that's true.
17        MR. RAMER:  And to go back to -- I think
18  I finally have the correction, so I will send
19  that.
20    Q.  (BY MR. RAMER) Okay.  So I will
21  represent to you that what I am sending is the
22  correction to the Plos One article entitled
23  "Access to Gender-Affirming Hormones During
24  Adolescence and Mental Health Outcomes Among
25  Transgender Adults."

67 (Pages 262 - 265)

1 And once you receive it, I'll just ask
2 that we kind of pick up where we left off with the
3 prior version, which is Table 2.
4 MS. NOWLIN-SOHL: So, John, are you
5 saying we should open up the prior exhibit as well
6 as the correction?
7 MR. RAMER: Oh, no. I was just trying to
8 explain that we'll use the correction, Turban
9 Exhibit 24. And just go to Table 2, which was the
10 table I was previously asking questions about, and
11 then --
12 MS. NOWLIN-SOHL: Got it. Okay. We're
13 still waiting on it, but I'll let you know when we
14 have it.
15 MR. RAMER: Okay.
16 Okay. Are we still waiting?
17 MS. NOWLIN-SOHL: We are.
18 MR. RAMER: We actually probably have
19 about an hour left on the clock would be my guess.
20 Do you want to take a final break here?
21 Or if it's arrived, we can just continue.
22 MS. NOWLIN-SOHL: Yeah, let's do a
23 five-minute break.
24 MR. RAMER: Okay.
25 THE VIDEOGRAPHER: Okay. So the time is

Page 266

1 4:07 p.m. Pacific time, and we are off the record.
2 (Break taken from 4:07 p.m. to 4:13 p.m.)
3 THE VIDEOGRAPHER: All right. So we are
4 recording. The time is 4:13 p.m. Pacific, and we
5 are back on the record.
6 (Deposition Exhibit No. 24 was marked.)
7 Q. (BY MR. RAMER) Okay. And, Dr. Turban,
8 do you have -- well, I'll introduce Turban
9 Exhibit 24.
10 And does this appear to be the correction
11 you were referring to earlier today?
12 A. Yes.
13 Q. And I'd like to go down to page 4 and
14 Table 2, and I just want to understand.
15 The first row of this chart is basically
16 showing that exposure to GAH, or gender-affirming
17 hormones, is associated with lower odds of past
18 year suicidal ideation; is that right?
19 A. Yes.
20 Q. And the way to understand that is because
21 the adjusted odds ratio for those categories are
22 less than one, and you've hit your statistical
23 significance threshold of less than .0001; is that
24 right?
25 A. I believe this paper has a bottom

Page 267

1 correction -- we might need to open the original
2 paper to see what the cutoff was.
3 Q. Hold on. What did you say? It has a
4 what correction?
5 A. So this is what I was saying earlier that
6 we try not to run a lot of comparisons because
7 when you run a lot of comparisons, it increases
8 the probability of you detecting something that
9 looks significant when it's not.
10 This is one of those papers where we did
11 run a lot of analyses. So when you do that, you
12 do something called a Bonferroni correction where
13 it takes into account how many things you looked
14 at.
15 And the more statistical comparisons you
16 make, the stricter it makes your statistical
17 cutoff. So I need to look at what that number was
18 from the original paper.
19 Q. When you say "what that number was," are
20 you referring to the threshold you're using?
21 A. Correct.
22 Q. So the P-value for the data in this row
23 where it says "less than .0001," I mean, that's
24 going to be --
25 A. So those would all clearly meet the

Page 268

1 threshold, but if you wanted to go through more, I
2 would need to look up what the threshold was.
3 Q. Maybe we should do that. So that was --
4 the original, pre-corrections, was Turban
5 Exhibit 11, I believe.
6 And you would typically report your
7 threshold of statistical significance down in the
8 statistical analyses, I would assume?
9 A. Yes.
10 Q. So that's down on page 4.
11 A. So it was .001.
12 Q. And where are you seeing that?
13 A. Page 5 at the top.
14 Q. Oh, okay. Gotcha. Okay. So the --
15 okay. So the threshold you were using was .001.
16 Now going back to what is Turban
17 Exhibit 24, the correction, we can see that the
18 P-values on those returns is less than .0001, so
19 clearly below the threshold for statistical
20 significance, correct?
21 A. Yes.
22 Q. Okay. And just staying on this row, in
23 looking at the first group, so those who accessed
24 gender-affirming hormones at age 13 through 15,
25 you have an adjusted odds ratio of .4.

Page 269

68 (Pages 266 - 269)

(72 of 289), Page 72 of 289 Case: 24-142 02/06/2024 DktEntry: 26.3, Page 72 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 69 of 177
Jack Turban , M.D., MHS October 16, 2023

1    Do you see that?
2    A.  Yes.
3    Q.  And in plain English, to the extent these
4  things can be explained in plain English, does
5  that basically mean that exposure to
6  gender-affirming hormones at ages 13 to 15 is
7  associated with a 60 percent decrease in reporting
8  past year suicidal ideation?
9    A.  60 percent lower odds.
10   Q.  Okay.  So you're 60 percent less likely
11 to report that.  Is that --
12   A.  Odds ratios are a little less intuitive
13 than that, but I would say the odds ratio was
14 60 percent less.
15   Q.  Okay.  If we go down to -- if we go down
16 a row to "Past Year Suicidal Ideation With Plan,"
17 the odds ratios on this one all kind of hover
18 around one, and the P-values do not really come
19 close to statistical significance.
20     So basically we can't really draw any
21 conclusions from that row; is that right?
22   A.  Correct, one way or another.
23   Q.  And then going down to the fourth row,
24 past year's suicide attempt requiring inpatient
25 hospitalization, and with respect to the middle

Page 270

1  somebody had asked us to do that, and I think we
2  did it.  But I don't remember the results, to be
3  honest.
4    Q.  And so you don't recall whether there
5  were any differences in outcomes based on whether
6  the individual received testosterone or estrogen;
7  is that right?
8    A.  I remember it cutting a lot of the sample
9  sizes in half, so we lost a lot of the statistical
10 power.  So it's a little bit harder to interpret
11 the results, but I don't remember the specifics.
12 Because as you can see, for every single statement
13 here, we ran a ton of analyses.
14   Q.  And do you think there could be a
15 difference in outcomes based on whether the
16 individual received testosterone or estrogen?
17   A.  Potentially.
18     MS. NOWLIN-SOHL:  Object to form.
19     THE WITNESS:  Sorry.  Potentially.
20   Q.  (BY MR. RAMER)  And why?
21   A.  I mean, just theoretically, when you
22 break groups up by different characteristics, it
23 could be that certain groups respond to things
24 differently than others, but hard to know.
25     I would expect so, based on clinical

Page 272

1  group, which accessed gender-affirming hormones at
2  ages 16 or 17, there you have an adjusted odds
3  ratio of 2.2, correct?
4    A.  The P-value is .01, so the -- you can't
5  interpret it.  It doesn't mean anything.  It's not
6  statistically significant, so it doesn't tell you
7  anything one way or another.
8    Q.  And you would decline to use any sort of
9  terminology like "trending towards statistical
10 significance," correct?
11   A.  No.  That's technically incorrect.
12   Q.  Wait.  What?  No, I'm asking if you would
13 use that term.  And I thought --
14   A.  I would not.  That's not appropriate
15 statistical terminology.
16   Q.  And for this paper generally, did you
17 ever break out data by sex assigned at birth?
18   A.  So in the original paper, we did not.
19 Again, because the more comparisons you make, the
20 more you need to do that Bonferroni correction
21 that makes your levels for statistical
22 significance more and more stringent.  And if you
23 go too far with that, then essentially nothing
24 works.
25     I believe as part of the correction,

Page 271

1  experience and the general phenomenology of gender
2  dysphoria.
3    Q.  What are --
4    A.  It's a few different things.  So clinical
5  experience we generally see, both for assigned
6  males and for assigned females, tend to improve.
7      And then in terms of just the
8  phenomenology of gender dysphoria, we know a lot
9  of the distress is from one's physical body not
10 aligning with the secondary sex characteristics of
11 one's gender identity.  So our hypothesis would be
12 that both would help with that.
13     That being said, testosterone is a
14 stronger hormone than estrogen, so its physical
15 effects become apparent more quickly than
16 estrogen, and it has more physical effects than
17 estrogen does.
18     So it's possible that those assigned
19 female at birth who were taking testosterone might
20 have more robust or earlier improvement, but the
21 hypothesis would be that both would improve but
22 not necessarily at the same rate or to the same
23 degree.
24     MR. RAMER:  And, Li, do you have Turban
25 Exhibit 25?

Page 273

69 (Pages 270 - 273)

ER-138

(73 of 289), Page 73 of 289  Case: 24-142  02/06/2024  DktEntry: 26.3, Page 73 of 289
Case 1:23-cv-00269-BLW  Document 74-2  Filed 11/02/23  Page 70 of 177
Jack Turban , M.D., MHS  October 16, 2023

| | |
|---|---|
| 1     MS. NOWLIN-SOHL:  I believe so.  Yes. | 1  take care of know that it's not a universal view |
| 2     (Deposition Exhibit No. 25 was marked.) | 2  that people think that they should be forced to |
| 3     Q.  (BY MR. RAMER)  And, Dr. Turban, do you | 3  hide or that any symbols that represent that they |
| 4  have a -- an account on the website formerly known | 4  should be proud of themselves should be removed |
| 5  as Twitter, now known as X? | 5  from public life. |
| 6     A.  Yes. | 6     Q.  Do you think the legislators who enacted |
| 7     Q.  And is your handle @jack_turban? | 7  the law at issue in this case hate LGBTQ people? |
| 8     A.  Yes. | 8     MS. NOWLIN-SOHL:  Object to form; |
| 9     Q.  And do you have Exhibit 25 in front of | 9  foundation. |
| 10  you? | 10     THE WITNESS:  Admittedly, I didn't follow |
| 11     A.  Yes. | 11  the legislative debates about this specific law in |
| 12     Q.  And is this a Tweet that you sent? | 12  Idaho, so I don't even know who introduced it. |
| 13     A.  Yes. | 13     Q.  (BY MR. RAMER)  So you think that |
| 14     Q.  And I'll just read it first and then ask | 14  somebody could support legislation like the law at |
| 15  if I read it correctly.  It says "I'm really sick | 15  issue in this case without hating LGBTQ people? |
| 16  of the #GOP's creative ways of signaling bigotry. | 16     MS. NOWLIN-SOHL:  Object to form; |
| 17  They don't care about the flag.  They just want to | 17  foundation, mischaracterizes prior testimony. |
| 18  signal that they:  (1) hate #LGBTQ people, (2) | 18     THE WITNESS:  I don't think I can say |
| 19  want them to shut up and hide, and (3) want to | 19  anything about the motivations of the people who |
| 20  (and feel entitled to) have power over them.  It's | 20  introduced this specific bill.  I think it's |
| 21  gross." | 21  possible that they were provided with |
| 22     Did I read that correctly? | 22  misinformation about the care that maybe led them |
| 23     A.  Yes. | 23  to want to introduce it, but I've not spoken with |
| 24     Q.  Do you think that Republicans hate LGBTQ | 24  them about their motivations. |
| 25  people? | 25     Q.  (BY MR. RAMER)  And so you think that the |
| Page 274 | Page 276 |

| | |
|---|---|
| 1     A.  So this Tweet -- | 1  legislators that you were referring to in this |
| 2     MS. NOWLIN-SOHL:  Object to form. | 2  Tweet about the flag -- and sorry.  Where was |
| 3     THE WITNESS:  This Tweet was specifically | 3  that, the flag episode that you were describing? |
| 4  in reference to several GOP members not wanting | 4     A.  This was back in June.  I don't recall |
| 5  the LGBT Pride flag to be hung at certain events. | 5  the specifics. |
| 6  And they were arguing that they felt that having | 6     Q.  It was back just a few months ago.  You |
| 7  the flag -- the LGBTQ flag raised in certain | 7  don't recall, like, what state?  Was it Congress? |
| 8  places was disrespectful to the American flag, | 8     A.  There have been many instances like this |
| 9  which in my mind, that specific view of wanting to | 9  over the past several months.  I wish this one |
| 10  erase a symbol of LGBTQ people from public spaces | 10  stood out more than others, but no, I don't |
| 11  was a creative way of wanting to force LGBTQ | 11  remember this specific instance in June. |
| 12  people to hide or not be visible in society or | 12     MR. RAMER:  And I'd like to go to Turban |
| 13  telling them that they need to hide the symbols | 13  Exhibit 26. |
| 14  that represented them. | 14     (Deposition Exhibit No. 26 was marked.) |
| 15     So it's not a broad statement about all | 15     Q.  (BY MR. RAMER)  And do you have that up? |
| 16  members of that political party, but in a specific | 16     A.  Yes. |
| 17  instance where people were very actively trying to | 17     Q.  And I'll just read this one again and ask |
| 18  eliminate any symbol of LGBT people from public | 18  if I read it correctly. |
| 19  spaces, I did feel that that was a creative way of | 19     "Republicans don't believe in freedom of |
| 20  trying to exercise power over that population, | 20  speech.  They silenced an elected representative |
| 21  which includes a lot of young patients I take care | 21  because she disagreed with them on the House |
| 22  of who are very vulnerable and are impacted by | 22  floor.  It's not a coincidence that she's |
| 23  those messages. | 23  transgender.  They are steadfast in silencing and |
| 24     And I think it was important for that to | 24  attacking trans Americans.  American democracy is |
| 25  be voiced, particularly so these young patients I | 25  dead." |
| Page 275 | Page 277 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

(74 of 289), Page 74 of 289 Case: 24-142 02/06/2024 DktEntry: 26.3 Page 74 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 71 of 177
Jack Turban , M.D., MHS  October 16, 2023

| | |
|---|---|
| 1 Did I read that correctly? | 1 democracy is dead? |
| 2 A.  Yes, with a -- there's a statement below | 2 MS. NOWLIN-SOHL:  Object to form. |
| 3 it from the representative who was forced to stop | 3 THE WITNESS:  I think it's very scary |
| 4 speaking on the House floor. | 4 that politicians would weaponize the government to |
| 5 Q.  Do you think that Republicans are | 5 silence elected representatives from being able to |
| 6 steadfast in attacking trans Americans? | 6 speak on legislation. |
| 7 MS. NOWLIN-SOHL:  Object to form. | 7 And as someone who's aware that often |
| 8 THE WITNESS:  I think there's been a | 8 physicians don't do a good job sharing evidence |
| 9 clear rise in legislation that is not evidence | 9 broadly and that often the information that we |
| 10 based and goes against the broad consensus in | 10 have and this research and peer-reviewed journals |
| 11 medicine about how we can help these young people | 11 doesn't always make its way into legislative |
| 12 I'm responsible for taking care of.  And I have | 12 debates, it's scary to imagine that the few ways |
| 13 been watching more and more legislation being | 13 in which that research and data is supposed to get |
| 14 introduced that is harmful to them and that is | 14 into the law-making process is in some instances |
| 15 concerning to me. | 15 being prevented. |
| 16 Q.  (BY MR. RAMER) Do you think supporters | 16 MR. RAMER:  And I'd like to go to Turban |
| 17 of that legislation are attacking trans Americans? | 17 Exhibit 27. |
| 18 MS. NOWLIN-SOHL:  Object to form. | 18 (Deposition Exhibit No. 27 was marked.) |
| 19 THE WITNESS:  Again, I can't speak to | 19 Q.  (BY MR. RAMER)  And do you have that up? |
| 20 every individual who's introducing legislation, | 20 A.  Yes. |
| 21 but I can tell you it's legislation where the | 21 Q.  And I'll just read it first and then ask |
| 22 evidence suggests that it's going to be harmful to | 22 if I read it correctly. |
| 23 this population. | 23 "Our country is dying and the GOP is |
| 24 And it's very sad to me to watch that | 24 killing it.  They are abusing power to attack |
| 25 non-evidence-based legislation be pushed forward | 25 minorities, then demand that they stand silent |
| Page 278 | Page 280 |

| | |
|---|---|
| 1 when all the evidence we have suggests that it's | 1 while attacked.  We've seen this before in |
| 2 going to be harmful to the young patients that I | 2 history, and it's never ended well." |
| 3 take care of. | 3 Did I read that part of the Tweet |
| 4 Q.  (BY MR. RAMER)  You said the previous | 4 correctly? |
| 5 Tweet was not a categorical statement. | 5 A.  I'll have to read the screenshot below it |
| 6 Is this Tweet where you say "Republicans | 6 to know what the context was, but you read the |
| 7 are steadfast in attracting" -- excuse me, | 7 part above the screenshot correct. |
| 8 "Republicans are steadfast in attacking | 8 Q.  And do you think that the GOP is killing |
| 9 trans Americans," is that a categorical statement? | 9 our country? |
| 10 MS. NOWLIN-SOHL:  Object to form; | 10 MS. NOWLIN-SOHL:  Object to form. |
| 11 mischaracterizes prior testimony. | 11 THE WITNESS:  I'll need a second to read |
| 12 THE WITNESS:  This, again, was in | 12 the part you didn't read. |
| 13 response to a specific instance that is described | 13 Q.  (BY MR. RAMER)  Okay. |
| 14 in the screenshot below the Tweet in which a bill | 14 A.  Okay.  This seems like the same -- a |
| 15 was being discussed that would impact trans youth. | 15 reference to the same situation as the last Tweet, |
| 16 And there was a representative who was | 16 which, again, I think was very concerning that |
| 17 trying to share information about the research and | 17 there was a member of this legislative body trying |
| 18 evidence about why that legislation would be | 18 to share research and data about -- I think in |
| 19 harmful to young people. | 19 this case it was a ban on gender-affirming medical |
| 20 And these Republican lawmakers in | 20 care for adolescents being dangerous. |
| 21 question voted to ban her from the House floor to | 21 And they used different techniques to |
| 22 prevent her from making any more comments about | 22 eventually silence that representative from being |
| 23 the evidence behind why this legislation was | 23 able to share that information. |
| 24 potentially dangerous. | 24 And I think the representatives who did |
| 25 Q.  (BY MR. RAMER)  And do you think American | 25 that and actively worked to try and remove |
| Page 279 | Page 281 |

71 (Pages 278 - 281)

ER-140

1  evidence from debates about health policy that
2  impact young people are dangerous.
3      I think when public policy doesn't
4  consider research and evidence and isn't based on
5  science and data, that that's dangerous.
6      And as somebody who spends all of my time
7  working with young people who are impacted by this
8  legislation and it's my responsibility to protect
9  their mental health and make sure that they do
10 well, I think it's important to call out when laws
11 are being passed that aren't based on research and
12 evidence and are not in the best interest of young
13 people based on what we know about the science.
14 Q.  And in the first sentence of the Tweet
15 you say, "Our country is dying, and the GOP is
16 killing it."
17     And my question is do you think that is
18 true?
19     MS. NOWLIN-SOHL:  Object to form; asked
20 and answered.
21     THE WITNESS:  I think I already answered
22 that question.
23 Q.  (BY MR. RAMER)  I don't think you did.
24 I'll just ask it again.
25     And you say, "Our country is dying, and

Page 282

1  the GOP is killing it."
2      And my question is do you think that is
3  true?
4      MS. NOWLIN-SOHL:  Object to form; asked
5  and answered.
6      THE WITNESS:  Again, this was a reference
7  to a situation in which certain GOP lawmakers
8  eliminated evidence that was important to be
9  discussed and made sure that scientific evidence
10 didn't enter discussion about laws that would
11 impact the mental health of young people who I'm
12 responsible for taking care of.
13     And I think that is a sad sign for our
14 country that we're pushing forward legislation
15 that's not based in science and evidence,
16 particularly when the stakes are as high as the
17 mental health of young people.
18 Q.  (BY MR. RAMER)  And do you think those
19 certain GOP lawmakers are killing our country?
20     MS. NOWLIN-SOHL:  Object to form; asked
21 and answered.
22     THE WITNESS:  I think I answered the
23 question.
24 Q.  (BY MR. RAMER)  Yes or no.
25     MS. NOWLIN-SOHL:  Object to form; asked

Page 283

1  and answered.
2      THE WITNESS:  I think I answered the
3  question.
4  Q.  (BY MR. RAMER)  Are you refusing to
5  answer the question yes or no of whether you think
6  that those certain GOP lawmakers who you just
7  referenced are killing our country?
8      MS. NOWLIN-SOHL:  Object to form;
9  argumentative, asked and answered.
10     THE WITNESS:  I don't think it's a
11 yes-or-no question, and I think I answered the
12 question.
13     MR. RAMER:  All right.  Let's go to
14 Turban Exhibit 28.
15     (Deposition Exhibit No. 28 was marked.)
16 Q.  (BY MR. RAMER)  Do you have that up?
17 A.  Yes.
18 Q.  I'll just read this and then ask if I
19 read it correctly.
20     "I should clarify.  I don't hate all
21 conservatives," exclamation point.  "Mostly just
22 the aggressive anti-trans Heritage folks," heart
23 emoji.  "I should use more precise terminology for
24 my haters."
25     Did I read that correctly?

Page 284

1  A.  Yes.
2  Q.  And what are anti-trans Heritage folks?
3  A.  I don't recall the specific context of
4  this Tweet, but presumably it was someone similar
5  to this line of questioning accusing me of hating
6  all conservatives.
7      I have many conservative friends.  I have
8  all throughout my education.  I'm very close with
9  conservatives and people across the political
10 spectrum.
11     At the end of the day I work as a child
12 psychiatrist who takes care of a specific
13 population that I care deeply, which are the young
14 transgender youth.
15     There are individuals at the Heritage
16 Foundation who intermittently have passed
17 misinformation or said things about this
18 population or the research regarding them that's
19 not true, and it is very upsetting for me to see
20 people spread misinformation that's going to hurt
21 the young patients that I take care of.
22     So again, this is meant to clarify -- I
23 think the line of questioning that you're going
24 after is whether or not I have an issue with a
25 certain political party.  And this Tweet is

Page 285

72 (Pages 282 - 285)

Jack Turban , M.D., MHS October 16, 2023

Page 286

1  highlighting that I don't at all, but I do very
2  much have a problem with attacks on young patients
3  and the research that's designed to improve their
4  mental health and keep them safe.
5      Q.  Who are the individuals at the Heritage
6  Foundation you were referencing?
7      A.  Honestly, I haven't seen reports from
8  them for a while.  This is from back in 2020.  I
9  think at the time they were issuing individual
10  reports that were non-peer-reviewed scientific
11  research to spread misinformation about various
12  forms of gender care for young people.
13      Q.  And so you do hate those people?
14      MS. NOWLIN-SOHL:  Object to form;
15  mischaracterizes prior testimony.
16      THE WITNESS:  I have a strong negative
17  feeling towards people spreading misinformation
18  that would result in public policies that would
19  harm young people.
20      Q.  (BY MR. RAMER)  Is there anyone else you
21  can think of you would group into the Heritage
22  Foundation bucket?
23      MS. NOWLIN-SOHL:  Object to form.
24      THE WITNESS:  I think it's a large group,
25  but specifically I believe this was years ago, and

Page 287

1  it was in reference to somebody who had written a
2  supposed research paper that they didn't submit to
3  peer review, which is the standard process for
4  making sure that scientific research is valid and
5  the sort of thing that should influence public
6  policy because it's been checked by experts to be
7  valid.
8      And this person attempted to circumvent
9  that process to spread the misinformation that
10  could have had the potential to promote public
11  policy that could have been harmful.
12      Q.  (BY MR. RAMER)  When you say "it's a
13  large group," what do you mean by that?
14      A.  I mean there are many people that work at
15  the Heritage Foundation, and I do not know all of
16  them.
17      Q.  So is your hate only directed at the
18  Heritage Foundation?
19      MS. NOWLIN-SOHL:  Object to form;
20  mischaracterizes prior testimony.
21      THE WITNESS:  As I just said, my hate or
22  anger was towards the specific action that I
23  thought had the potential to harm young people and
24  lead to public policies that were harmful.
25      And I wouldn't be able to give you an

Page 288

1  opinion on everyone at the Heritage Foundation as
2  I know very few of them.
3      Q.  (BY MR. RAMER)  Would you put Leor Sapir
4  into this bucket?
5      MS. NOWLIN-SOHL:  Object to the form.
6      THE WITNESS:  I wasn't aware that he
7  worked at the Heritage Foundation.
8      Q.  (BY MR. RAMER)  I'm not saying he does.
9  I'm saying would you classify Leor Sapir as
10  somebody who is spreading misinformation?
11      A.  I haven't really seen something from him
12  recently.
13      Is there some specific report that he
14  issued that you want me to comment on?
15      Q.  No, I'm just asking in general.
16      A.  I can't think of something specific.  I
17  know I've seen him spread things in the past that
18  I didn't think were accurate or true, but I can't
19  think of anything recently.
20      Q.  And a few times today you've discussed
21  the "minority stress."  I don't know if you called
22  it a theory or minority stress -- a principle of
23  minority stress.
24      Just as a general matter, can you explain
25  that to me?

Page 289

1      A.  So minority stress is a framework that
2  was described by Ilan Meyer at UCLA initially used
3  to described why we see mental health disparities
4  among sexual minorities to include bisexual
5  cisgender men.
6      And it describes distal factors and
7  proximal factors.  Distal factors are factors from
8  the outside world that impact one's mental health,
9  so things like harassment based on your sexual
10  orientation, discrimination, violence.
11      Both described that over time, those
12  external factors can drive internal factors,
13  things like internalized homophobia, feeling that
14  you need to conceal your identity like we
15  discussed earlier, and anticipatory anxiety where
16  people develop a constant fear that they're going
17  to be victims of that past discrimination again in
18  the future even if they're in a safe environment.
19  And they may have trouble calibrating when they're
20  safe and when they're not, which can drive
21  anxiety.
22      That model was later adopted for trans
23  people in the gender minority stress model
24  by Hendricks and Testa that has essentially
25  analogous proximal and distal factors described.

73 (Pages 286 - 289)

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1    Q. Did external factors ever drive internal<br>2 factors --<br>3    MS. NOWLIN-SOHL: Object to form.<br>4    MR. RAMER: Sorry. I'm just talking<br>5 slowly.<br>6    Q. (BY MR. RAMER) Can external factors ever<br>7 drive internal factors to lead someone to identify<br>8 as transgender?<br>9    MS. NOWLIN-SOHL: Object to form.<br>10    THE WITNESS: Are you asking if -- what<br>11 kind of external factor? Like a sexual minority<br>12 stress external factor?<br>13    Q. (BY MR. RAMER) Well, I guess do you<br>14 think that external factors for -- let me back up.<br>15    Somebody who identifies as transgender<br>16 and then at some point ceases identifying as<br>17 transgender, the reason they can do that could be<br>18 for a number of external factors such as<br>19 discrimination, correct?<br>20    MS. NOWLIN-SOHL: Object to form.<br>21    THE WITNESS: I'm trying to understand<br>22 the question.<br>23    Q. (BY MR. RAMER) Well, were there<br>24 individuals who responded to the U.S. Transgender<br>25 Survey who said that they detransitioned at some<br>*Page 290* | 1    So in this case, it was, I believe, go<br>2 back to living as your sex assigned at birth at<br>3 least for some time, so it didn't necessarily<br>4 imply that their gender identity changed, but<br>5 their gender expression changed or, quote, they<br>6 went into the closet, to use that colloquialism.<br>7    Q. Well, gender identity never changes,<br>8 correct?<br>9    MS. NOWLIN-SOHL: Object to form.<br>10    THE WITNESS: So as we talked about<br>11 earlier, that core, biologically determined gender<br>12 identity is not the way in which one ascribes body<br>13 language to it or sexualizes or understands it.<br>14    Q. (BY MR. RAMER) And so the -- is living<br>15 as your sex assigned at birth different from<br>16 identifying as cisgender?<br>17    A. Yes.<br>18    Q. How so?<br>19    A. One may still identify as transgender but<br>20 be somewhere where it wouldn't be safe to tell<br>21 people that or be open about it, so they may<br>22 present to the world as cisgender due to fear that<br>23 they would be subject to violence or harassment or<br>24 other maltreatment if they were to be openly<br>25 transgender.<br>*Page 292* |
| 1 point in their life?<br>2    A. Yes.<br>3    Q. And what would you say are the<br>4 explanations for why they would detransition at<br>5 some point in their life?<br>6    A. So we published a paper on this that you<br>7 might be referencing in LGBT Health, I believe, in<br>8 2021. I don't have the numbers in front of me,<br>9 but we found that a substantial proportion of<br>10 trans adults, so people who currently are living<br>11 their lives in their gender identity, had<br>12 transitioned, at some point in the past<br>13 detransitioned. So it was presumably temporary<br>14 because they're now living as trans adults.<br>15    I want to say it was maybe somewhere<br>16 between 10 and 15 percent said that they had that<br>17 experience in the past. And of those,<br>18 82.5 percent of them said it was due to at least<br>19 one external factor, so things like harassment and<br>20 discrimination.<br>21    Q. And so external factors could lead<br>22 someone to identify as cisgender; is that right?<br>23    A. That's not specifically what the study<br>24 said. You have to be careful about the term<br>25 "detransition" and how it's defined.<br>*Page 291* | 1    Q. And so what you were measuring -- or I<br>2 guess is this the point that you're making that<br>3 the word "detransition" is complex?<br>4    A. It can represent a broad heterogenous<br>5 range of experiences.<br>6    And when looking at the academic<br>7 research, it's important to look at how it's<br>8 defined.<br>9    Sometimes people will conflate<br>10 detransition with regret, or conflate detransition<br>11 with the changing gender identity understanding.<br>12 So it's important to look at how the individual<br>13 study really defines it.<br>14    Q. And what was the last one you said,<br>15 change in gender identity understanding? Is that<br>16 right?<br>17    A. Yeah, the way in which they conceptualize<br>18 their gender identity.<br>19    Q. And could somebody -- could a transgender<br>20 individual cease identifying as transgender for<br>21 reasons other than regret?<br>22    MS. NOWLIN-SOHL: Object to form.<br>23    THE WITNESS: Can you explain how you<br>24 would see regret as a reason for one's identity<br>25 change?<br>*Page 293* |

74 (Pages 290 - 293)

(78 of 289), Page 78 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 78 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 75 of 177
Jack Turban , M.D., MHS October 16, 2023

1    Q.  (BY MR. RAMER)  Well, I'm asking can't
2  somebody do it without having regret?
3    A.  Can somebody stop a gender-affirming
4  medical intervention and not have regret?  Is that
5  the question?
6    Q.  Let's start there, yes.  Can somebody
7  cease a gender-affirming medical intervention and
8  not have regret?
9    A.  Yes.
10    Q.  And why?
11    A.  It can be for all sorts of reasons.  I've
12  had patients who took testosterone, for instance,
13  and had sufficient physical effects from it that
14  they felt that they didn't need any more physical
15  changes, so they stopped the medication but didn't
16  regret it.
17    We wrote about one patient who took
18  estrogen for a period of time and had some body
19  fat redistribution and then stopped it because
20  they identified as nonbinary, but they noted that
21  they didn't regret the body fat redistribution and
22  felt that that experience was necessary for them
23  to understand themselves.
24    Someone might lose insurance coverage and
25  not be able to access their gender-affirming

Page 294

1  medical interventions anymore.  So in that case
2  they would stop them, but it doesn't mean they
3  regretted taking them.  In fact, they might want
4  to keep taking them.
5    Q.  When you say the patient felt they didn't
6  need it anymore, are you using colloquial terms to
7  say that the distress associated with gender
8  dysphoria had resolved?
9    A.  That they had -- in that example,
10  testosterone -- achieved a level of physical
11  masculinization of their secondary sex
12  characteristics that their gender dysphoria
13  resolved, yes.
14    Q.  And so we were discussing why somebody --
15  or we were discussing how and why somebody could
16  cease gender-affirming medical interventions and
17  not have regret.
18    And my next question is could someone
19  receive a gender-affirming medical intervention
20  and later in life decide -- take the word "decide"
21  out of it.  I'm going to restart.
22    Could someone receive a gender-affirming
23  medical intervention and later in life identify
24  with their sex assigned at birth and not have
25  regret for having received the prior

Page 295

1  gender-affirming medical intervention?
2    A.  I've not had such a patient, but
3  potentially.
4    Q.  So if individuals receive
5  gender-affirming medical interventions and then
6  subsequently identify with their sex assigned at
7  birth, they likely would regret the
8  gender-affirming medical interventions?
9    MS. NOWLIN-SOHL:  Object to form;
10  mischaracterizes prior testimony.
11    THE WITNESS:  I think that's a different
12  question.  I've not had such a patient.  They
13  could potentially.  That's something that we
14  counsel patients as a possibility.
15    MR. RAMER:  And I'd like to introduce
16  Turban Exhibit 29.
17    Do you have that?
18    THE WITNESS:  Yes.
19    (Deposition Exhibit No. 29 was marked.)
20    Q.  (BY MR. RAMER)  And you've seen this
21  before, correct?
22    A.  Yes.  I've not read it in a while, but
23  I've seen it.
24    Q.  I'd just like to ask you one kind of
25  narrow question on -- so I'd like to go to

Page 296

1  page 11, right column under "Discussion," and the
2  second full paragraph.
3    And in that paragraph, the second to last
4  sentence -- and I'll just read it and ask if I
5  read it correctly, and then that will be my first
6  question.
7    "To the best of our knowledge, all of the
8  letters written to the editor JAMA Psychiatry,
9  many by respected academics and clinicians who
10  outlined the serious problems in the study, have
11  been rejected (some of them were later submitted
12  as non-indexed comments in the online
13  publication)."
14    Did I read that correctly?
15    A.  Yes.
16    Q.  And were you aware of letters being
17  written to the editor of JAMA Psychiatry outlining
18  problems with your study?
19    A.  No.
20    Q.  Were you serving as a manuscript reviewer
21  for JAMA Psychiatry at the time?
22    A.  I do ad hoc manuscript reviews for most
23  of the top journals, so I probably intermittently
24  reviewed papers for them.
25    Q.  Do you know if you were reviewing one at

Page 297

75 (Pages 294 - 297)

ER-144

(79 of 289), Page 79 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 79 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 76 of 177
Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| Page 298 | Page 300 |

**Page 298**

1  the time that these letters to the editor were
2  being rejected?
3      A.   Not that I recall, but I'm kind of
4  reviewing a steady stream of articles for
5  different journals.
6      Q.   And how often is there turnover at the
7  position of editor of JAMA Psychiatry?
8          MS. NOWLIN-SOHL:  Object to form;
9  foundation.
10         THE WITNESS:  I do not know.
11     Q.   (BY MR. RAMER)  How do the letters to the
12  editor -- I know they're called letters to the
13  editor, but, like, is the editor actually reading
14  them?
15         Or, just based on your experience working
16  at these journals, what is the process once a
17  letter to the editor is submitted?
18         MS. NOWLIN-SOHL:  Object to form.
19         THE WITNESS:  I think it probably varies
20  journal by journal, but generally they would be
21  read by members of the editorial board who would
22  read them to decide if they have scientific merit.
23         And if they were deemed to have
24  scientific merit, they would be sent to the author
25  of the paper, and they would ask the author of the

**Page 299**

1  paper to respond to them, in which case the letter
2  to the editor gets published and then a response.
3          The vast majority of the time, they're
4  not sent for external peer review, but sometimes
5  they are.  Again, I think that's a
6  journal-by-journal decision.
7          MR. RAMER:  And maybe it would be good if
8  we just took a short break and I can clarify if
9  there's anything else I need to ask, but otherwise
10  I'm pretty close to being done.
11         MS. NOWLIN-SOHL:  Yes, that's fine.
12         MR. RAMER:  We'll go off the record.
13         THE VIDEOGRAPHER:  Okay.  So the time is
14  4:56 p.m. Pacific time, and we are off the record.
15         (Break taken from 4:56 p.m. to 5:04 p.m.)
16         THE VIDEOGRAPHER:  All right.  So we are
17  recording.  The time is 5:04 p.m. Pacific time,
18  and we are back on the record.
19     Q.   (BY MR. RAMER)  And, Dr. Turban, I just
20  wanted to kind of put more detail on the
21  conversation we were trying to have earlier.
22         MR. RAMER:  And so I'll introduce Turban
23  Exhibit 30.  And just let me know when you have
24  that up.
25         (Deposition Exhibit No. 30 was marked.)

**Page 300**

1          THE WITNESS:  Yes.
2      Q.   (BY MR. RAMER)  And do you recognize this
3  document?
4      A.   Yes.
5      Q.   And what is it?
6      A.   This is a paper we published in the
7  Journal of LGBT Health in 2021.
8      Q.   And this is the article that either you
9  or I, probably me, was kind of alluding to earlier
10  that we were kind of talking around, right?
11     A.   One of them, yes.
12     Q.   Okay.  And this study used data from the
13  U.S. Transgender Survey, correct?
14     A.   Yes.
15     Q.   And on 274, which I think is page 2, down
16  in the left column above "Methods," the last
17  sentence you acknowledge that because the USTS
18  exclusively surveyed people who currently
19  identified as TGD, that your study is restricted
20  to the examination of detransition among people
21  who subsequently identified as TGD, right?
22     A.   Yes.
23     Q.   And then in the right column below
24  "Quantitative Responses and Analysis," I'm just
25  going to read the first sentence.

**Page 301**

1          Actually, no.  It's a very long sentence.
2  I'm just going to read the first part, which says
3  "Respondents who reported a history of
4  detransition were asked 'Why did you detransition?
5  In other words, why did you go back to living as
6  your sex assigned at birth?'  Mark all that
7  apply."
8          Do you see that?
9      A.   Yes.
10     Q.   And so the question you used to define
11  detransition in this study was whether the
12  participants went back to living as their sex
13  assigned at birth, right?
14     A.   So this is from data we did a secondary
15  analysis on on the U.S. Transgender Survey, so I
16  didn't design this survey question, but that's the
17  question that was used.
18     Q.   Right, but -- so fair enough.  You didn't
19  write the survey questions, but to use the survey
20  data for this paper, you used that question to
21  shape the definition of "detransition" that you
22  use in this paper, right?
23     A.   Yeah.  I admittedly don't love the
24  wording of the question, but it's the question
25  that was in the data set that we had available, so

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

(80 of 289), Page 80 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 80 of 289
Case 1:23-cv-00269-BLW   Document 74-2   Filed 11/02/23   Page 77 of 177
Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1  that's the one that was used. | 1  study that identified 100 people. |
| 2      Q.  What would you change about it? | 2      This one, we're looking at trans people |
| 3      A.  I just find the term "detransition" in | 3  who have at least temporarily detransitioned, and |
| 4  general to be somewhat vague and heterogenous.  So | 4  it was over 2,000 people, and that was just of |
| 5  I prefer a more specific question like "Did you | 5  this survey. |
| 6  regret the certain intervention?  Did you stop | 6      So, I mean, it's an imperfect way to look |
| 7  gender-affirming medical care?  Did you go back to | 7  at it, but it appears that there are a lot of |
| 8  presenting as your sex assigned at birth?" | 8  people who detransition due to these external |
| 9      This was kind of a broad question that | 9  factors. |
| 10  encapsulated a lot of experiences, but | 10      Q.  Were you just -- sorry. |
| 11  conveniently -- or not conveniently because it was | 11      Were you just comparing the 100 people in |
| 12  a lot of work -- but there was a free response, so | 12  that study to the 2,000 people here to draw a |
| 13  we were able to go through and code the 800 free | 13  conclusion about the prevalence? |
| 14  responses, which helped us get a rich perspective | 14      MS. NOWLIN-SOHL:  Object to form. |
| 15  on what exactly people were describing as their, | 15      THE WITNESS:  I think you were asking, |
| 16  quote, detransition experiences. | 16  like, of people who detransition -- are you asking |
| 17      Q.  And in this paragraph toward the bottom | 17  if I think most people are, like, detransitioning |
| 18  the second to last sentence, it says in | 18  in this way versus are detransitioning in the |
| 19  quotations, "'I realized that gender transition | 19  Littman description?  I'm not sure I understand |
| 20  was not for me'" was collapsed into a | 20  the question. |
| 21  'fluctuations in identity/desire' category." | 21      Q.  (BY MR. RAMER)  Sorry.  Let me just |
| 22      Did I read that correctly? | 22  clarify.  Is the Littman study -- I didn't |
| 23      A.  Sorry.  I'm just reading what it was -- | 23  actually hear you all that well. |
| 24  this paragraph. | 24      Is the Littman study the one that you're |
| 25      Yeah, I think there weren't many people, | 25  referring to that identified the 100 people?  Did |
| Page 302 | Page 304 |

| | |
|---|---|
| 1  if I remember correctly, who chose that one, which | 1  you say Littman? |
| 2  I think is why we collapsed them together.  But | 2      A.  Yes. |
| 3  that's another one where I think the wording was | 3      Q.  Okay.  I guess what I'm asking is of |
| 4  pretty unclear, unfortunately. | 4  people -- let me try and ask it this way:  Of |
| 5      Q.  That was going to be my next question. | 5  people who detransition using the definition you |
| 6      So using the definition of -- well, let | 6  use in this study, do you think most of them go on |
| 7  me step back. | 7  to retransition and identify as transgender? |
| 8      I think it's implied in what we've | 8      MS. NOWLIN-SOHL:  Object to the form. |
| 9  already discussed, but just to clarify, this study | 9      THE WITNESS:  I just want to be clear |
| 10  did not set out to tell us and does not tell us | 10  that this study doesn't look at that question at |
| 11  anything about individuals who transitioned and | 11  all. |
| 12  then permanently went back to living as their sex | 12      Q.  (BY MR. RAMER)  No.  I understand that. |
| 13  assigned at birth, correct? | 13  And that's why I'm asking. |
| 14      A.  Correct. | 14      I'm asking does this study capture the |
| 15      Q.  And using the definition of | 15  typical detransitioner or not? |
| 16  "detransition" that you use in this study, of all | 16      MS. NOWLIN-SOHL:  Object to the form; |
| 17  individuals who have detransitioned, do you think | 17  calls for speculation. |
| 18  the majority of them subsequently identify as | 18      THE WITNESS:  I don't know that we have |
| 19  transgender? | 19  research because it seems there aren't enough |
| 20      A.  It's hard to answer quantitatively, but | 20  detransitioners to have a rigorous study on what |
| 21  the research that has worked to identify people | 21  the common detransition experience is. |
| 22  who detransitioned -- probably the science would | 22      The largest study I know is that Littman |
| 23  say they stopped gender-affirming medical | 23  study of 100 individuals that I think I put in my |
| 24  interventions -- the numbers have been relatively | 24  declaration, but it would be helpful if we pulled |
| 25  low.  The lowest one that I've seen was that one | 25  the paper up. |
| Page 303 | Page 305 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com   208-343-4004

ER-146

(81 of 289), Page 81 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 81 of 289
Case 1:23-cv-00269-BLW Document 74-2 Filed 11/02/23 Page 78 of 177
Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1     But even within there, they had<br>2 heterogenous experiences where some had regret;<br>3 some did not. Some felt that they benefitted from<br>4 the transition despite the fact that they later<br>5 stopped gender-affirming medical interventions;<br>6 others did not.<br>7     That study is also complicated because it<br>8 recruited from various and specific social media<br>9 websites, so it's really hard to know how<br>10 representative that is.<br>11     I don't know how to answer that question<br>12 with the data.<br>13   Q. (BY MR. RAMER) When you say we don't<br>14 have enough detransitioners to properly study the<br>15 question, are you basing that off of the fact that<br>16 Littman only identified 100 people? Or is there<br>17 something else that is leading you to that<br>18 conclusion?<br>19   A. Just all the research we have is<br>20 suggesting that it's not a very common experience.<br>21     There's that paper.<br>22     There's the Wiepjes paper that generally<br>23 looks like -- they were more looking at regret,<br>24 where regret rates were low, at least for surgery.<br>25     When we look at the papers, how many<br><div align="right">Page 306</div> | 1 less common, I think this would become a less<br>2 common experience. So I don't know that I can<br>3 predict.<br>4   Q. Would external factors only ever drive<br>5 somebody to detransition? Or could they ever<br>6 drive somebody to transition in the first<br>7 instance?<br>8     MS. NOWLIN-SOHL: Object to form.<br>9     THE WITNESS: It would be pretty -- maybe<br>10 we're not having a shared definition of "external<br>11 factors."<br>12     It sounds like generally external factors<br>13 are anti-trans discrimination.<br>14     I'm having trouble understanding why<br>15 someone would choose to transition because of<br>16 stigma and harassment towards trans people if they<br>17 weren't trans.<br>18   Q. (BY MR. RAMER) Well, I guess --<br>19   A. That would seem counter to their personal<br>20 interests.<br>21   Q. I guess my question is are external<br>22 factors always negative, like discrimination?<br>23     MS. NOWLIN-SOHL: Object to form.<br>24     THE WITNESS: That's why I'm asking if we<br>25 have a shared definition.<br><div align="right">Page 308</div> |
| 1 people take blockers and then don't go on to<br>2 gender-affirming hormones, it's in the low, few<br>3 percent.<br>4     But, again, all of this is kind of<br>5 muddied by what your definition of "detransition"<br>6 is.<br>7   Q. Do you expect that the -- let me put it<br>8 this way: In terms of raw numbers, do you expect<br>9 that the number of detransitioners, using the<br>10 definition you use in this study, will increase in<br>11 the next 15 years?<br>12     MS. NOWLIN-SOHL: Object to form; calls<br>13 for speculation.<br>14     THE WITNESS: The definition of going<br>15 back to presenting as their sex assigned at birth?<br>16   Q. (BY MR. RAMER) Go back to living as your<br>17 sex assigned at birth, yes.<br>18   A. I think it's really hard to predict. It<br>19 would depend on a lot of different factors. This<br>20 study specifically was on -- most of the people in<br>21 the study were doing that because of some sort of<br>22 anti-trans stigma they were encountering in their<br>23 communities.<br>24     So if that were to continue to rise, this<br>25 would be a more common experience. If that became<br><div align="right">Page 307</div> | 1     The way they're used in the minority<br>2 stress framework is they're referring to stigma<br>3 external factors.<br>4   Q. (BY MR. RAMER) And so in the minority<br>5 stress framework, external factors are always<br>6 negative stigmatic factors; is that fair?<br>7   A. Definition in the way it's used in that<br>8 framework.<br>9     They do have other -- I mean, there's<br>10 other elements of the framework, a buffering<br>11 effect against internal and external factors of<br>12 community connectedness at pride, but I think we<br>13 call those resilience factors.<br>14   Q. And what do you mean by "pride"?<br>15   A. Like having pride in one -- as opposed to<br>16 shame, like being proud of the trans community,<br>17 recognizing that trans people make important<br>18 contributions to society, being able to have trans<br>19 role models in the type of things that you want to<br>20 do.<br>21     So say you're a young trans person who<br>22 wants to be a physician and you don't have any<br>23 role models. You might think, oh, trans people<br>24 can't be doctors. So meeting a trans doctor or<br>25 seeing an example of someone in the media.<br><div align="right">Page 309</div> |

<div align="right">78 (Pages 306 - 309)</div>

(82 of 289), Page 82 of 289  Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 82 of 289
Case 1:23-cv-00269-BLW  Document 74-2  Filed 11/02/23  Page 79 of 177
Jack Turban , M.D., MHS  October 16, 2023

1    Q.  Could an external factor like that ever
2  shape an internal factor?
3        MS. NOWLIN-SOHL:  Object to form.
4        THE WITNESS:  Those aren't called
5  external factors in the model.  Those are
6  resilience factors.
7        But are you trying to ask if, like,
8  somebody being in a community where there are
9  positive views of trans people would lead them to
10  transition to be trans?
11    Q.  (BY MR. RAMER)  Well, sure.  What is the
12  answer to that?
13    A.  Is that the question?
14    Q.  Yes.
15    A.  Sorry.  The question is kind of are
16  there -- you just asked --
17    Q.  What did you just say?  Sorry.  What did
18  you just say?  And that's the question.
19    A.  Are there environments where there could
20  be a positive view of trans people that would lead
21  someone to come out as trans when they're not
22  trans?
23    Q.  Yes, that question.
24        MS. NOWLIN-SOHL:  Object to form.
25        THE WITNESS:  I have not experienced any

Page 310

1  have never seen, but something that would come up
2  in the evaluation process as a possibility.
3    Q.  And in your answer why did you say "even
4  in California"?
5    A.  There's often a perception that in the
6  Bay Area where I work that there's a lot of
7  acceptance of trans young people.  It's something
8  that people will often mention to me when they go
9  to conferences or when I'm presenting such as at
10  different academic institutions.
11        But sadly I find that's often not the
12  case in this area that people think of being very
13  accepting towards young trans people.
14    Q.  And why did you reference a liberal
15  school?
16    A.  Because those schools people tend to
17  think of as having more acceptance towards young
18  trans people.
19    Q.  And do you disagree with that perception?
20    A.  Yes, I don't think it's universal.  I
21  think I've seen schools where people think of them
22  as being very liberal, whatever that means, but
23  that the kids still experience a lot of bullying
24  and harassment and stigmas when they come out as
25  trans.

Page 312

1  such environment.  Even in California where I work
2  in the Bay, my patients routinely have harassment
3  and stigma.  Other people don't realize that.
4        But at one local school that people think
5  of liberal, somebody burned a Pride flag outside
6  to express anti-trans stigma.
7        We published a paper in Pediatrics where
8  we looked at the rates of bullying victimization
9  against trans youth versus cisgender sexual
10  minority youth, and the rates were substantially
11  higher, so I don't think that's the social
12  environment that we live in.
13        When we do a biopsychosocial evaluation,
14  we always ask, if you were to start a
15  gender-affirming medical intervention, how would
16  your parents react?  How would your peers react?
17  How would other people in your community react?
18        I'll say almost universally young people
19  are afraid that there are going to be negative
20  reactions.
21        If there were a circumstance where they
22  said, "Oh, everyone is going to give me a ton of
23  praise and presents and positive things," then
24  that would be a major flag for us to try and
25  figure out what was going on.  That's something we

Page 311

1        MR. RAMER:  And I don't have any further
2  questions for now.  I'll turn things over to your
3  counsel, but thank you very much, Doctor.
4        THE WITNESS:  Thank you.
5        MS. NOWLIN-SOHL:  I think I just have a
6  couple.
7
8              EXAMINATION
9  BY MS. NOWLIN-SOHL:
10    Q.  So, Dr. Turban, do you remember earlier
11  when we were talking about Exhibit -- I believe it
12  was 14, which is the article in the Journal of
13  Adolescent Health titled the "Age of Realization
14  and Disclosure of Gender Identity Among
15  Transgender Adults"?
16    A.  Yes.
17        MS. NOWLIN-SOHL:  John, do you want a
18  minute to pull that up?
19    Q.  (BY MS. NOWLIN-SOHL)  And I believe you
20  and Mr. Ramer at one point were talking about
21  table one, the demographics.
22        Do you recall that conversation?
23    A.  Yes.
24    Q.  And on that table, there's two kind of
25  columns for different age categories, one for the

Page 313

79 (Pages 310 - 313)

(83 of 289), Page 83 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 83 of 289
Case 1:23-cv-00269-BLW   Document 74-2   Filed 11/02/23   Page 80 of 177
Jack Turban , M.D., MHS October 16, 2023

1 age less than 10, and one for age 11-plus; is that
2 correct?
3   A.  Yes.
4   Q.  And I think you and Mr. Ramer were
5 talking about the percentages in those columns
6 as -- at one point it was mentioned that they
7 didn't quite add up to 100 percent.
8     Can you help clarify what the numbers in
9 parentheses after each block number reflects?
10   A.  Yes.  So I think the question was trying
11 to get at how many participants in the overall
12 study were in each of those age brackets at the
13 top left, 18 to 24, 25 to 44, 45 to 64, and 65
14 plus.
15     And the question was how many of them are
16 in each of those categories of percentage of the
17 full population, and I was doing incorrect math.
18 My apologies.
19     So in order to calculate that, you would
20 add the two numbers in each of the rows from both
21 columns, and then divide that by the total number
22 in the study.  So the percentages I was giving
23 earlier were incorrect.
24     MS. NOWLIN-SOHL:  No further questions.
25     MR. RAMER:  Can I just ask one follow-up

Page 314

1     THE VIDEOGRAPHER:  Okay.  Then this
2 concludes our video deposition with Dr. Jack
3 Turban.  It is October 16, 2023.  The time is
4 5:26 p.m. Pacific time, and we are off the record.
5
6   (Whereupon the deposition was concluded at 5:26 p.m.)
7                ****
8     (Signature requested.)

Page 316

1 on that?
2
3         FURTHER EXAMINATION
4 BY MR. RAMER:
5   Q.  Which, looking at that same table,
6 looking at the 18 to 24 group, do you agree --
7 well, sorry.  I may have gotten more confused.
8     But so the 33.4 next to 18 to -- in the
9 18 to 24 row, the 33.4 in parentheses, that means
10 that the 18 to 24 group makes up 33.4 percent of
11 the early realization group; is that right?
12   A.  Yes.  I believe that's true.
13   Q.  And then when you shift over a column,
14 the 18 to 24 group makes up 56.4 percent of the
15 later realization group, correct?
16   A.  Yeah, that looks correct.  Whatever 6,322
17 divided by 11,218 is, which sounds roughly like
18 56.4.
19     11,218 is the total number of people in
20 the late realization group.
21   Q.  Got it.  Okay.  I'm clear now.
22     MR. RAMER:  Thank you very much, Doctor.
23 I appreciate it.  I think we're all set.
24     THE VIDEOGRAPHER:  All right.  That's it?
25     MR. RAMER:  Yeah.

Page 315

1         REPORTER'S CERTIFICATE
2 STATE OF IDAHO      )
                      )
3 COUNTY OF ADA      )
4
5   I, Amy E. Simmons, Certified Shorthand Reporter and
Notary Public in and for the State of Idaho, do hereby
6
7 certify:
8     That prior to being examined, the witness named in
9 the foregoing deposition was by me duly sworn to testify
10 to the truth, the whole truth, and nothing but the truth;
11     That said deposition was taken down by me in
12 shorthand at the time and place therein named and
13 thereafter reduced to typewriting under my direction, and
14 that the foregoing transcript contains a full, true, and
15 verbatim record of said deposition.
16     I further certify that I have no interest in the
17 event of the action.
18   WITNES                          day of October,
19 2023.
20
21
22   AMY E. SIMMONS
23   ID CSR No. 685
   CA CSR No. 14453
   WA CSR No. 22012915
24   OR CSR No. 22-009
   RDR, CRR, CRC,
25   and Notary Public
My commission expires:  6/13/28.

Page 317

80 (Pages 314 - 317)

ER-149

Jack Turban , M.D., MHS October 16, 2023

| | |
|---|---|
| 1   Philip S. May | 1   Poe, Et Al. v. Labrador, Et Al. |
| 2   philip.may@groombridgewu.com | 2   Jack Turban , M.D., MHS (#6058443) |
| 3      October 20, 2023 | 3      ACKNOWLEDGEMENT OF DEPONENT |
| 4   RE:   Poe, Et Al. v. Labrador, Et Al. | 4    I, Jack Turban , M.D., MHS, do hereby declare that I |
| 5    10/16/2023, Jack Turban , M.D., MHS (#6058443) | 5   have read the foregoing transcript, I have made any |
| 6    The above-referenced transcript is available for | 6   corrections, additions, or changes I deemed necessary as |
| 7   review. | 7   noted above to be appended hereto, and that the same is |
| 8    Within the applicable timeframe, the witness should | 8   a true, correct and complete transcript of the testimony |
| 9   read the testimony to verify its accuracy. If there are | 9   given by me. |
| 10   any changes, the witness should note those with the | 10 |
| 11   reason, on the attached Errata Sheet. | 11   _____   _____ |
| 12    The witness should sign the Acknowledgment of | 12   Jack Turban , M.D., MHS      Date |
| 13   Deponent and Errata and return to the deposing attorney. | 13   *If notary is required |
| 14   Copies should be sent to all counsel, and to Veritext at | 14    SUBSCRIBED AND SWORN TO BEFORE ME THIS |
| 15   Calendar-Idaho@veritext.com. | 15    _____ DAY OF _____, 20___. |
| 16 | 16 |
| 17   Return completed errata within 30 days from | 17 |
| 18   receipt of testimony. | 18   _____ |
| 19   If the witness fails to do so within the time | 19   NOTARY PUBLIC |
| 20   allotted, the transcript may be used as if signed. | 20 |
| 21 | 21 |
| 22     Yours, | 22 |
| 23     Veritext Legal Solutions | 23 |
| 24 | 24 |
| 25 | 25 |
|           Page 318 |           Page 320 |

1   Poe, Et Al. v. Labrador, Et Al.
2   Jack Turban , M.D., MHS (#6058443)
3      E R R A T A   S H E E T
4   PAGE_____ LINE_____ CHANGE_____
5   _____
6   REASON_____
7   PAGE_____ LINE_____ CHANGE_____
8   _____
9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____   _____
24   Jack Turban , M.D., MHS      Date
25
          Page 319

81 (Pages 318 - 320)

ER-150

Dr. Kara Connelly August 28, 2023

```
 1                    UNITED STATES DISTRICT COURT
 2                       DISTRICT OF IDAHO
 3
 4      PAM POE, by and through her  )  Case No.
        parents and next friends,    )  1:23-cv-00269-CWD
 5      Penny and Peter Poe; PENNY    )
        POE; PETER POE; JANE DOE, by  )
 6      and through her parents and   )
        next friends, Joan and John   )
 7      Doe; JOAN DOE; JOHN DOE,      )
                                      )
 8                        Plaintiffs, )
                                      )
 9      v.                            )
                                      )
10      RAÚL LABRADOR, in his         )
        official capacity as the      )
11      Attorney General of the State )
        of Idaho; JAN M. BENNETTS, in )
12      her official capacity as      )
        County Prosecuting Attorney   )
13      for Ada, Idaho; and the       )
        INDIVIDUAL MEMBERS OF THE     )
14      IDAHO CODE COMMISSION, in     )
        their official capacities,    )
15                                    )
                         Defendants.  )
16      _____ )
17
18
19        REMOTE VIDEOTAPED DEPOSITION OF KARA CONNELLY, M.D.
20                    MONDAY, AUGUST 28, 2023
21
22
23
24
25      Reported By: Amy E. Simmons, CSR, RDR, CRR, CRC
```

```
┌─────────────┐
│   EXHIBIT   │
│      A      │
└─────────────┘
```

Page 1

ER-151

Dr. Kara Connelly August 28, 2023

1       REMOTE VIDEOTAPED DEPOSITION OF KARA CONNELLY, M.D.

2

3       BE IT REMEMBERED that the remote videotaped

4   deposition of KARA CONNELLY, M.D., was taken via Zoom

5   videoconference by the attorney for the Defendants before

6   Associated Reporting & Video, a Veritext company, Amy E.

7   Simmons, Idaho CSR No. 685, California CSR No. 14553,

8   Washington CSR No. 22012915, Oregon CSR No. 22-009, and

9   Notary Public in and for the County of Ada, State of

10  Idaho, on Monday, the 28th day of August, 2023,

11  commencing at the hour of 10:08 a.m. Mountain time in the

12  above-entitled matter.

13

14

15  APPEARANCES (remotely):

16  For the Plaintiffs:    AMERICAN CIVIL LIBERTIES UNION
                           By:  Li Nowlin-Sohl, Esq.

17                              Leslie Cooper, Esq.
                           125 Broad Street

18                         New York, NY 10004
                           Telephone:  212.549.2584

19                         lnowlin-sohl@aclu.org
                           lcooper@aclu.org

20

21                         GROOMBRIDGE WU BAUGHMAN & STONE
                           By:  Philip S. May, Esq.

22                         801 17th Street, Suite 1050
                           Washington, D.C. 20006

23                         Telephone:  202.539.6620
                           philip.may@groombridgewu.com

24

25

                                                    Page 2

Dr. Kara Connelly August 28, 2023

```
 1    APPEARANCES (remotely, continued):
 2
      For the Plaintiffs:    PAUL WEISS RIFKIND,
 3                           WHARTON & GARRISON LLP
                             By:  Dana L. Kennedy, Esq.
 4                           1285 Avenue of the Americas
                             New York, NY 10019
 5                           Telephone:  212.373.3000
                             dkennedy@paulweiss.com
 6
                             WREST COOPERATIVE
 7                           By:  Casey Parsons, Esq.
                             812 West Franklin Street
 8                           Boise, ID 83702
                             Telephone:  208.742.6789
 9                           casey@wrest.coop
10
      For the Defendants, Labrador and the Individual Members
11    of the Idaho Code Commission:
12                           COOPER & KIRK PLLC
                             By:  John Ramer, Esq.
13                           1523 New Hampshire Ave NW
                             Washington, D.C. 20036
14                           Telephone: 202.220.9621
                             jramer@cooperkirk.com
15
                             OFFICE OF THE ATTORNEY GENERAL
16                           By:  Lincoln D. Wilson, Esq.
                                  Rafael J. Droz, Esq.
17                                Aaron Green, Esq.
                             Post Office Box 83720
18                           Boise, ID  83720
                             Telephone:  208.334.2400
19                           Facsimile:  208.854.8073
                             lincoln.wilson@ag.idaho.gov
20                           rafael.droz@ag.idaho.gov
21
22
23
24
25
                                                    Page  3
```

Dr. Kara Connelly August 28, 2023

```
 1    APPEARANCES (remotely, continued):

 2

      For the Defendant, Jan M. Bennetts:

 3

                           ADA COUNTY PROSECUTOR'S OFFICE
 4                         By:  Dayton P. Reed, Esq.
                           200 West Front Street, Room 3191
 5                         Boise, ID 83702
                           Telephone:  208.287.7700
 6                         dreed@adacounty.id.org

 7

      Also Present:        Chris Ennis, Videographer
 8                         Jocelyn Larsson,
                           Court Reporting Intern

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                            Page  4
```

ER-154

Dr. Kara Connelly August 28, 2023

```
 1                    I N D E X
 2                E X A M I N A T I O N
 3
 4    KARA CONNELLY, M.D.                              PAGE
 5
       By:  Mr. Ramer.......................................9
 6
           Ms. Nowlin-Sohl.............................287
 7
 8
 9                  E X H I B I T S
10    NO.                                              PAGE
```

| | | PAGE |
|---|---|---|
| Exhibit 1. | Curriculum Vitae, Kara Jean Connelly, MD, MCR (15 pages) | 14 |
| Exhibit 2. | Expert Declaration of Kara Connelly, MD (24 pages) | 17 |
| Exhibit 3. | "A New Virtual Reality: Benefits and Barriers to Providing Pediatric Gender-Affirming Health Care Through Telehealth," Hedrick (6 pages) | 41 |
| Exhibit 4. | Users' Guides to the Medical Literature, Guyatt (545 pages) | 120 |
| Exhibit 5. | "Grade Guidelines: 3. Rating the Quality of Evidence," Balshem (6 pages) | 130 |
| Exhibit 6. | "Grade Guidelines: 4. Rating the Quality of Evidence -- Study Limitations (Risk of Bias)," Guyatt (9 pages) | 134 |
| Exhibit 7. | "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," Hembree (35 pages) | 139 |

Page 5

Dr. Kara Connelly August 28, 2023

```
 1              E X H I B I T S (continued)
 2     NO.                                              PAGE
 3       Exhibit 8.    "Hormone Therapy, Mental Health,   149
                       and Quality of Life Among
 4                     Transgender People: A Systematic
                       Review," WPATH (16 pages)
 5
         Exhibit 9.    "Potential Suppression for         155
 6                     Transgender Youth and Risk of
                       Suicidal Ideation," Turban
 7                     (15 pages)
 8       Exhibit 10.   "Access to Gender-Affirming        155
                       Hormones During Adolescence and
 9                     Mental Health Outcomes Among
                       Transgender Adults," Turban
10                     (15 pages)
11       Exhibit 11.   The Report of the U.S. Transgender 156
                       Survey, 2015 (302 pages)
12
         Exhibit 12.   Pediatric Endocrine Society        164
13                     Position Statement (2 pages)
14       Exhibit 13.   "Changes in Anxiety and Depression 180
                       from Intake to First Follow-Up
15                     Among Transgender Youth in a
                       Pediatric Endocrinology Clinic,"
16                     Cantu (5 pages)
17       Exhibit 14.   Endocrine Society Webpage Printout 168
                       (2 pages)
18
         Exhibit 15.   "Growing Evidence and Remaining    204
19                     Questions in Adolescent Transgender
                       Care," de Vries (3 pages)
20
         Exhibit 16.   Consensus Parameter: Research      208
21                     Methodologies to Evaluate
                       Neurodevelopment Effects of
22                     Pubertal Suppression in Transgender
                       Youth," Chen (12 pages)
23
         Exhibit 17.   Sweden Summary, "Care of Children  224
24                     and Adolescents with Gender
                       Dysphoria" (6 pages)
25
```

Page 6

ER-156

Dr. Kara Connelly August 28, 2023

```
 1              E X H I B I T S (continued)
 2    NO.                                           PAGE
 3     Exhibit 18.   Sweden Appendix 2 (2 pages)      230
 4     Exhibit 19.   "Independent Review of Gender    236
                     Identity Services for Children and
 5                   Young People: Interim Report," The
                     Cass Review, Dated February 2022
 6                   (112 pages)
 7     Exhibit 20.   "Evidence Review: Gonadotrophin  241
                     Releasing Hormone Analogues for
 8                   Children and Adolescents with
                     Gender Dysphoria," NICE (131 pages)
 9
       Exhibit 21.   "Evidence Review: Gender-Affirming 262
10                   Hormones for Children and
                     Adolescents with Gender Dysphoria,"
11                   NICE (156 pages)
12     Exhibit 22.   "Regret After Gender-Affirming    275
                     Surgery: A Multidisciplinary
13                   Approach to a Multifaceted Patient
                     Experience," Jedrzejewski (9 pages)
14
       Exhibit 23.   OpenPaymentsData.CMS.gov Printout
15                   (3 pages)
16
17
18
19
20
21
22
23
24
25
                                              Page  7
```

Dr. Kara Connelly August 28, 2023

```
 1                    P R O C E E D I N G S

 2

 3              THE VIDEOGRAPHER:  All right.  We are on

 4     the record and we are recording.  Today's date is

 5     August 28, 2023.  The time is 10:08 a.m. Mountain

 6     time.

 7              For the record, this is the videotaped

 8     deposition of Dr. Kara Connelly.  It's taken by

 9     the Defendants in the matter of Poe, et al., vs.

10     Labrador, et al.  It's Case No. 1:23-cv-00269-CWD.

11     It is in the United States District Court for the

12     District of Idaho.

13              The videotaped deposition is being held

14     remotely via Zoom videoconference.  The videotaped

15     deposition is being recorded by Chris Ennis and

16     reported by Amy E. Simmons of Associated Reporting

17     & Video, a Veritext Company.

18              And if counsel will please state their

19     appearances and any stipulations for the record.

20              MR. RAMER:  John Ramer on behalf of the

21     Idaho Attorney General's Office.

22              MS. NOWLIN-SOHL:  Li Nowlin-Sohl on

23     behalf of Plaintiffs.

24              MS. COOPER:  Leslie Cooper, Plaintiffs.

25              MR. MAY:  Philip May from the law firm of
```

Page 8

Dr. Kara Connelly August 28, 2023

```
 1    Groombridge Wu Baughman & Stone on behalf of the
 2    Plaintiffs.
 3              MR. WILSON:  Lincoln Wilson for the Idaho
 4    Attorney General's Office.
 5              MR. DROZ:  Rafael Droz, Idaho Attorney
 6    General's Office.
 7              MR. REED:  Dayton Reed, Ada County
 8    Prosecutor's Office.
 9              MX. PARSONS:  Casey Parsons from the
10    Wrest Collective for the Plaintiffs.
11              THE REPORTER:  I think we still need
12    Mr. Green and Ms. Kennedy.
13              MS. KENNEDY:  Dana Kennedy for Plaintiffs
14    from Paul Weiss.
15              MR. GREEN:  Aaron Green, Attorney
16    General's Office, Defendants.
17              THE VIDEOGRAPHER:  And if the court
18    reporter will please swear the witness.
19
20                        EXAMINATION
21    BY MR. RAMER:
22         Q.   All right.  Good morning, Dr. Connelly.
23    My name is John Ramer.  I'm representing the Idaho
24    Attorney General's Office in this case.
25              Have you ever been deposed before?
```

Page 9

Dr. Kara Connelly August 28, 2023

```
 1       A.    No.
 2       Q.    Okay.  So I'm sure counsel has covered
 3   much of this with you extensively, but I'll just
 4   cover some ground rules just to make sure we're
 5   all on the same page.
 6            Basically, as you almost certainly know,
 7   I'll ask you questions.  If you don't understand a
 8   question, please just ask for an explanation;
 9   otherwise I'll assume you understood it and are
10   answering the question I asked.
11            Our discussion is going to be
12   transcribed, as you likely know.  And so I'll need
13   you to respond verbally rather than shaking your
14   head yes or no.
15            And I will do my best not to interrupt
16   you, and I'd ask that you do your best not to
17   interrupt me just so the court reporter will be
18   able to record my questions and your answers and
19   we'll have a cleaner transcript.
20            Your counsel may object to a question
21   that I ask.  And unless your counsel instructs you
22   not to answer the question, you should go ahead
23   and provide an answer.
24            And then we can take breaks whenever you
25   want.  I kind of plan on every hour or so, and
```

Page 10

Dr. Kara Connelly August 28, 2023

```
 1    then I assume we'll take a little bit longer break
 2    for lunch.
 3            And one thing for Li, I'm East Coast, so
 4    just helping me keep track of West Coast lunchtime
 5    will be helpful.
 6            But the one thing is if you do want to
 7    take a break, just let me know.  My only request
 8    is that you would answer a question that's on the
 9    table and then we'll go and take the break.
10            Does that all make sense?
11        A.   Yes.
12        Q.   And besides counsel, is anyone in the
13    room with you?
14        A.   No.
15        Q.   And do you have any documents open in
16    front of you?
17        A.   No.
18        Q.   And what did you do to prepare for this
19    deposition?
20        A.   I met with the attorney team, and I did a
21    lot of reading of articles and documents online.
22        Q.   What kind of documents online did you
23    read?
24        A.   It was reviewing the standards of care,
25    clinical practice guidelines, other policy
```

Page 11

Dr. Kara Connelly August 28, 2023

```
 1    statements.  And a lot of the articles that I
 2    reviewed were online.
 3         Q.    And did you speak with anyone other than
 4    counsel about your deposition?
 5         A.    No.
 6         Q.    Okay.  And, Dr. Connelly, do you consider
 7    yourself to be an expert?
 8         A.    Yes.
 9         Q.    And in what field or fields of study do
10    you consider yourself to be an expert?
11         A.    I consider myself an expert in pediatric
12    endocrinology.
13         Q.    And are you a psychiatrist?
14         A.    No.
15         Q.    Are you a psychologist?
16         A.    No.
17         Q.    I've got a series of these, just to warn
18    you.
19              Are you a neurologist?
20         A.    No.
21         Q.    Are you a surgeon?
22         A.    No.
23         Q.    Are you a social worker?
24         A.    No.
25         Q.    Are you a urologist?
```

Page 12

ER-162

Dr. Kara Connelly August 28, 2023

```
 1          A.    No.

 2          Q.    Are you a gynecologist?

 3          A.    No.

 4          Q.    Are you a bioethicist?

 5          A.    No.

 6          Q.    Are you an expert in cognitive

 7    development?

 8          A.    I have experience in cognitive

 9    development, but I don't really consider myself an

10    expert in that field.

11          Q.    And could you briefly describe your

12    current position?

13          A.    Yes.  I am an associate professor at

14    Oregon Health & Science University and a pediatric

15    endocrinologist at Doernbecher Children's

16    Hospital.

17          Q.    And could you just walk me through your

18    professional background at a high level of

19    generality since you received your MD?

20          A.    Yes.  I received my MD from the

21    University of Texas Health Science Center at San

22    Antonio in Texas and subsequently completed my

23    pediatric residency at OHSU Doernbecher Children's

24    Hospital.  And following that, completed my

25    fellowship in pediatric endocrinology at the same
```

Page 13

Dr. Kara Connelly August 28, 2023

```
 1   institution.  And a few years after that completed
 2   a master's in clinical research.
 3          Q.    And are you board certified?
 4          A.    Yes.
 5          Q.    In what?
 6          A.    In pediatric endocrinology.
 7                MR. RAMER:  Okay.  I'm about to make my
 8   first attempt at emailing an exhibit.
 9                Okay.  I believe I have just sent what I
10   will describe as Connelly Exhibit 1.
11                Just let me know when you all have
12   received it.
13                THE REPORTER:  I've received it.
14                MS. NOWLIN-SOHL:  Still waiting on it.
15                All right.  We have it.
16                (Deposition Exhibit No. 1 was marked.)
17                MR. RAMER:  Great.
18          Q.    (BY MR. RAMER)  And, Dr. Connelly, does
19   this appear to be a copy of your CV?
20          A.    Yes.
21          Q.    And is it up-to-date?
22          A.    Yes.  Well, that version is up-to-date as
23   of April of this year.
24          Q.    Okay.  Are there any developments since
25   April that should be included on here?
```

Page 14

Dr. Kara Connelly August 28, 2023

```
 1          A.    No significant developments.

 2          Q.    On page 2 of the CV under

 3    "Certification," it's about halfway down the page.

 4          Do you see that?

 5          A.    Yes.

 6          Q.    It states that your certification for

 7    general pediatrics expired in 2020; is that

 8    correct?

 9          A.    That's correct.

10          Q.    And why did you not renew it?

11          A.    It's not a requirement for my position to

12    be board certified in pediatrics or to continue

13    the board certification as long as I maintain

14    board certification in my specialty.

15          Q.    And then on page 4, for the top you list

16    pending funding from Nike for a transgender

17    athlete study.

18          Do you see that?

19          A.    Yes.

20          Q.    What is that?

21          A.    That is a multicenter study that is

22    currently in preparation.  It has not begun

23    recruiting participants.  And it is currently in

24    the process of obtaining IRB approval.

25          Q.    What's it going to study?
```

Page 15

Dr. Kara Connelly August 28, 2023

```
1        A.    It's basically going to look at athletic
2   performance of youth who identify as transgender
3   compared to youth who identify as cisgender.
4        Q.    And then on your CV on page 9, middle of
5   the page, there's a section for "Service."
6             Do you see that?
7        A.    Yes.
8        Q.    And it states you were a member of the
9   Endocrine Society from 2011 to 2015; is that
10  right?
11       A.    Yes.
12       Q.    And why did you cease being a member?
13       A.    My membership in professional
14  organizations, I've had to basically select the
15  ones that I'm going to maintain and continue as an
16  active participant.  And that's been the Pediatric
17  Endocrine Society, the World Professional
18  Association for Transgender Health, the Oregon
19  Pediatric Society.  And then intermittently I've
20  been a member of the Endocrine Society, but it
21  hasn't been continuous.
22            MR. RAMER:  And I've just tried to send
23  what I'll call Connelly Exhibit 2.  And if you'll
24  just let me know when you receive it.
25            Maybe it just sent.
```

Page 16

Dr. Kara Connelly August 28, 2023

```
 1            MS. NOWLIN-SOHL:  Okay.  I've been
 2   hitting refresh and still don't have it.
 3            MR. RAMER:  I figure it takes a long time
 4   to get from the East Coast to the West Coast, but
 5   I don't think that's how it works.
 6            MS. NOWLIN-SOHL:  All right.
 7            (Deposition Exhibit No. 2 was marked.)
 8       Q.   (BY MR. RAMER)  Okay.  And, Dr. Connelly,
 9   does this appear to be the expert declaration that
10   you submitted in this case?
11       A.   Yes.
12       Q.   And how did you come to be involved in
13   this case?
14       A.   I was contacted by an attorney with the
15   ACLU and -- asking me if I would be willing to
16   participate.
17       Q.   And what were you asked to do?
18       A.   I was asked to be -- serve as an expert
19   witness.
20       Q.   And did you personally draft this
21   declaration?
22       A.   Yes.
23       Q.   And did anyone help you with the drafting
24   process?
25       A.   No.
```

Page 17

Dr. Kara Connelly August 28, 2023

1      Q.   Did you personally identify all the
2   studies that you cite in this declaration?
3      A.   Yes.
4      Q.   And did you speak with anyone other than
5   counsel about the contents of this declaration?
6      A.   I showed it to one of my colleagues that
7   I work with in my clinic to look at it for clarity
8   and grammar.  But all of the content was written
9   by me.
10     Q.   And who was that colleague?
11     A.   It was our clinic social worker.
12     Q.   And what's that colleague's name?
13     A.   Their name is Jess Guerrero.
14     Q.   Guerrero.  And, Dr. Connelly, I think you
15   said you are the medical director of the
16   Doernbecher Gender Clinic; is that right?
17     A.   Yes.
18     Q.   And you actually founded the clinic,
19   correct?
20     A.   Yes.
21     Q.   And we'll discuss in more detail later,
22   but at a high level of generality, could you
23   explain what the gender clinic does?
24     A.   Yes.  It's an interdisciplinary clinic
25   that provides holistic, comprehensive medical and

Page 18

Dr. Kara Connelly August 28, 2023

```
 1    mental health care to gender-diverse youth from
 2    childhood all the way through young adulthood.
 3        Q.   And what led you to found the clinic?
 4        A.   I began working with transgender and
 5    gender-diverse youth during my training and
 6    especially during my fellowship.
 7             Our clinics had been -- in pediatric
 8    endocrinology had been caring for transgender
 9    youth for a number of years, and my mentors
10    trained me in providing gender-affirming care for
11    youth.
12             And as I began to develop an interest and
13    more of an expertise in the area, I realized that
14    we needed more resources and a more comprehensive
15    program, and, in particular, integrated behavioral
16    health.
17        Q.   And I think it's implied in the word
18    "youth," but does the clinic serve a particular
19    age group?
20        A.   Yes.  The clinic will see children of all
21    ages.  No medical interventions are provided prior
22    to puberty.
23             And then we'll continue to see
24    adolescents through late adolescence and in some
25    cases young adulthood until we're able to
```

Page 19

Dr. Kara Connelly August 28, 2023

1    successfully transition their care to an adult

2    provider.

3        Q.   So is it fair to say 100 percent of your

4    patients are below the age of 18?

5        A.   Not 100 percent.  100 percent of new

6    patients that establish care with us are under 18,

7    but we continue to follow them into -- some of

8    them into their early 20s if we have difficulty

9    transitioning their care to an adult provider.

10       Q.   And then in your -- turning to your

11   declaration, I'd like to look at page 2,

12   paragraph 10, third sentence.

13            And you state that your clinic had 993

14   patients in 2022; is that right?

15       A.   That's correct.

16       Q.   And do you have more patients now than in

17   prior years?

18            MS. NOWLIN-SOHL:  Objection to form.

19            THE WITNESS:  Can you clarify what you

20   mean by "now"?

21       Q.   (BY MR. RAMER)  Okay.  Did you have more

22   patients in 2022 than you did in prior years?

23       A.   Yes.

24       Q.   All right.  How much would you estimate

25   your patient population has grown over the last

Page 20

Dr. Kara Connelly August 28, 2023

```
 1    five years?
 2         A.   Do you mean like a percentage growth?
 3         Q.   Sure.
 4         A.   Or a number of growth?
 5              So five years ago, 2017, I'd estimate
 6    that we saw about 500 patients.  I can't say for
 7    certain exactly how many patients.
 8         Q.   Yeah, that's fair.  An estimate of 500 is
 9    what you said; is that right?
10         A.   Yes.
11         Q.   And of the 993 patients that you
12    reference in paragraph 10, had all those patients
13    been diagnosed with gender dysphoria?
14         A.   Not all of them.
15         Q.   Okay.  What percentage of those patients
16    would you estimate were diagnosed with gender
17    dysphoria?
18         A.   I'd say at least 90 percent.
19         Q.   And at your clinic, do you have patients
20    who were diagnosed with gender dysphoria during
21    childhood?
22         A.   Yes.
23         Q.   And just to confirm we're on the same
24    page, what do you understand "childhood" to mean?
25         A.   I generally understand "childhood" to
```

Page 21

Dr. Kara Connelly August 28, 2023

```
 1    mean prior to the onset of puberty, or prior to
 2    adolescence.
 3         Q.   And when you say "the onset of puberty,"
 4    do you equate that with Tanner Stage II?
 5         A.   Yeah.  Yes, I do.
 6         Q.   And do you have patients who were
 7    diagnosed after Tanner Stage II but before they
 8    turned 18?
 9         A.   Yes.
10         Q.   And if I called that period between
11    Tanner Stage II and 18 years old "adolescence,"
12    would you understand what I mean?
13         A.   Yes, generally.
14         Q.   And so you don't have any -- because of
15    the -- sorry, start again.
16              Because of the ages of your patients that
17    you treat, you don't have any who were diagnosed
18    with gender dysphoria after 18, correct?
19         A.   That is correct.
20         Q.   And of the patients in your clinic, which
21    diagnosis would you estimate is more common,
22    childhood or adolescence?
23         A.   In my clinic, adolescence is more common.
24         Q.   Can you estimate a percentage of patients
25    that were diagnosed in adolescence as opposed to
```

Page 22

Dr. Kara Connelly August 28, 2023

```
 1    childhood?
 2         A.    I'd estimate approximately two-thirds.
 3         Q.    And of the -- of your patients, what
 4    percentage would you estimate are natal females?
 5              MS. NOWLIN-SOHL:  Objection to form.
 6              THE WITNESS:  Can you please specify what
 7    you mean by "natal females"?
 8         Q.    (BY MR. RAMER)  I think you'd probably
 9    describe it as "female assigned at birth."
10              For the purposes of our discussion today,
11    if I use the phrase "natal female," you can deem
12    it as female assigned at birth, and the same for
13    natal males.
14              Does that make sense?
15         A.    Yes.  Okay.
16         Q.    And so the question is, of your patients,
17    what percentage would you estimate are natal
18    females?
19              MS. NOWLIN-SOHL:  Same objection.
20              THE WITNESS:  In our clinic, I would
21    estimate also about two-thirds are patients who
22    were assigned female at birth.
23         Q.    (BY MR. RAMER)  And is the ratio the same
24    for patients who have been formally diagnosed with
25    gender dysphoria as for your patients as a total?
```

Page 23

Dr. Kara Connelly August 28, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form.
 2              THE WITNESS:  Can you clarify that
 3      question?
 4         Q.   (BY MR. RAMER)  Yeah, it's a bad
 5      question.
 6              Basically am I correct -- you said about
 7      90 percent of your patients have been diagnosed
 8      with gender dysphoria; is that right?
 9         A.   Yes.
10         Q.   Okay.  And has that ratio -- sorry, going
11      back, you said about two-thirds you'd estimate
12      were natal females, correct?
13         A.   Correct.
14         Q.   Has that ratio been steady since you
15      opened the clinic?
16         A.   It has been steady.
17         Q.   And of your patient population, what
18      percentage would you estimate receive puberty
19      blockers?
20         A.   Of the total patient population, what
21      percentage received puberty blockers?
22         Q.   Yes.
23         A.   Regardless of sex assigned at birth?
24         Q.   Correct.  Just total percentage, what do
25      you estimate -- let me rephrase.
```

Page 24

Dr. Kara Connelly August 28, 2023

```
 1              Of your total patient population, what
 2    percentage would you estimate receive puberty
 3    blockers?
 4         A.   I would estimate approximately 20 to
 5    25 percent.
 6         Q.   And of your total patient population,
 7    what percentage would you estimate receive
 8    cross-sex hormones?
 9         A.   I would estimate approximately 80 to
10    85 percent.
11         Q.   And of your total patient population,
12    what percentage would you estimate receive
13    surgical interventions?
14         A.   The -- it is very, very rare for our
15    patients to have surgeries under the age of 18, so
16    do you mean -- you mean also including those over
17    18?
18         Q.   No.  I think for purposes of this
19    question, just under 18 years old.
20         A.   What percentage receive surgery?
21         Q.   Correct.
22         A.   I'd estimate probably about 5 percent or
23    less.  And those are -- the overwhelming majority
24    are top surgery.
25         Q.   And could you clarify what you mean by
```

Page 25

Dr. Kara Connelly August 28, 2023

```
 1    "top surgery"?
 2         A.    Mastectomy, or removal of the chest
 3    tissue.
 4         Q.    And that's a procedure that would take
 5    place -- sorry.
 6               That's a procedure that would be
 7    conducted on natal females, correct?
 8         A.    That is a procedure that would be
 9    conducted on individuals assigned female at birth.
10         Q.    Do you have neuro-diverse patients?
11         A.    Can you clarify what you mean by
12    "neurodiverse"?
13         Q.    Well, as a clinician, what's your
14    understanding of the term "neurodiverse"?
15         A.    Well, I think there are a lot of
16    different conditions that can be included in that
17    phrase.  Some people think of neurodiversity as
18    simply somebody who falls on the autism spectrum
19    disorder or carries a diagnosis of autism.  A lot
20    of other clinicians also include ADHD in that
21    category.
22               And so in my definition, I have the more
23    broad -- I use the more broad definition,
24    including individuals who have been diagnosed with
25    a condition such as autism spectrum disorder or
```

Page 26

Dr. Kara Connelly August 28, 2023

```
 1    ADHD and carry that diagnosis.
 2         Q.   Okay.  So if we view the term
 3    "neurodiverse" to include autism spectrum disorder
 4    and ADHD, do you have neurodiverse patients?
 5         A.   Yes.
 6         Q.   And what percentage of your total patient
 7    population would you estimate is neurodiverse?
 8         A.   I am not sure if I can give a very
 9    accurate estimation.
10         Q.   Can you state whether it's less than
11    25 percent?
12         A.   Yes.
13         Q.   Can you state whether it's less than
14    10 percent?
15         A.   I was originally going to say less than
16    15 percent, but again, I can't say with certainty.
17         Q.   And you mentioned autism spectrum
18    disorder.
19              Do you have patients who have autism
20    spectrum disorder?
21         A.   Yes.
22         Q.   And what percentage of your total patient
23    population would you estimate have autism spectrum
24    disorder?
25              A.   Again, that would be difficult for me to
```

Page 27

ER-177

Dr. Kara Connelly August 28, 2023

```
 1   say with certainty, but with a formal diagnosis of
 2   autism spectrum disorder, less than 5 percent.
 3        Q.   So turning back to your declaration,
 4   going to page 8, paragraph 28, I'm just going to
 5   read that paragraph.  And my first question is
 6   going to be if I read it correctly.
 7             "Gender-affirming medical interventions
 8   are not indicated for all individuals who present
 9   for care.  Overall, about one-third of our patient
10   population continues to see our team for support
11   without accessing medical interventions."
12             Did I read that correctly?
13        A.   Yes.
14        Q.   So does this mean that two-thirds of your
15   patient population does access medical
16   interventions?
17        A.   Yes.
18        Q.   In the second sentence, when you say
19   "patients receive support without accessing
20   medical interventions," what kind of support are
21   you referencing?
22        A.   That can include mental health care and
23   support and connecting the patients and their
24   families with resources.
25        Q.   What kind of resources?
```

Page 28

Dr. Kara Connelly August 28, 2023

1      A.    It can be support groups.  It can be also
2  connecting them with resources for certain pieces
3  of clothing that can be used to conceal secondary
4  sex characteristics that are not congruent with
5  the young person's gender identity but who are not
6  moving towards starting medical interventions.
7      Q.    And when you say clothing to conceal
8  secondary sex characteristics, what are you
9  referring to?
10     A.    Generally something called a chest
11 binder.
12     Q.    And what is a chest binder?
13     A.    There are various different kinds and
14 styles, but it's generally a piece of clothing
15 that is made out of compression fabric to give the
16 appearance of a flatter chest.
17     Q.    And so that would be something natal
18 females who have gender dysphoria would use; is
19 that right?
20     A.    If someone is generally -- most of the
21 time someone assigned female at birth who has
22 chest tissue, but it can be used in other
23 populations as well.  I know cisgender boys who
24 have more chest tissue than they desire who also
25 use similar devices.

Page 29

Dr. Kara Connelly August 28, 2023

```
 1        Q.    Are those patients in your clinic?
 2        A.    No, not in my gender clinic.
 3        Q.    And you know -- sorry, I just want to
 4   understand.
 5              So you know -- what I call natal males
 6   you would call males assigned at birth that wear
 7   chest binders?
 8        A.    There are some patients who have a
 9   condition called gynecomastia, which is the
10   presence of breast tissue in someone who was
11   assigned male at birth.  And in some cases, they
12   do pursue clothing to give the appearance of or
13   compression clothing such as binder-type clothing
14   items to give the appearance of a flatter chest.
15        Q.    And you had mentioned mental health care.
16   What does that entail at your clinic?
17        A.    We have a pediatric psychiatrist who is
18   part of our program and a pediatric social worker,
19   both of whom are trained and experienced in
20   working with pediatric and young adult patients
21   and providing mental health.
22              So the mental health care that we provide
23   is -- encompasses comprehensive, psychological
24   evaluations, psychosocial assessments, assessment
25   of suicidal risk.  It's provision -- in some cases
```

Page 30

ER-180

Dr. Kara Connelly August 28, 2023

1   provision of ongoing therapy.  And it's
2   essentially providing any psychosocial support
3   that's needed throughout the time that they're
4   receiving care in our clinic.
5       Q.   And so are there individuals who are
6   diagnosed with gender dysphoria who receive only
7   mental health care at your clinic?
8       A.   Yes.
9       Q.   And what is the purpose of that mental
10  health care?
11      A.   In a lot of cases, it's helping them to
12  explore what their -- explore their gender
13  expression and whether medical interventions are
14  going to be beneficial for them in helping them to
15  decide which -- in some cases which medical
16  interventions.  So if medical interventions would
17  be beneficial, and, if so, which medical
18  interventions.  And then helping them understand
19  or develop realistic expectations for what those
20  interventions can provide.
21      Q.   What is a situation where medical
22  interventions would not be beneficial?
23      A.   It may be in a situation where either --
24  if an individual has received the diagnosis of
25  gender dysphoria but may not meet all the criteria

Page 31

(116 of 289), Page 116 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 32 of 374
Case: 24-142   02/06/2024   DktEntry: 26.3   Page 116 of 289

Dr. Kara Connelly August 28, 2023

```
 1    for initiation of medical interventions as
 2    described by the clinical practice guidelines that
 3    we follow, or if the individual doesn't appear to
 4    have realistic expectations about what the medical
 5    interventions can and can't do, those are
 6    situations where we might -- our mental health
 7    providers might be working with the youth more
 8    extensively to help them in determining whether
 9    medical interventions would be beneficial for
10    them.
11         Q.   And what did you mean when you were
12    discussing how patients may not have realistic
13    expectations of medical interventions?
14         A.   In some cases, patients may think that,
15    for example, hormones will pause certain body
16    changes that hormones can't do.  So one of our
17    roles is to help them understand what different
18    medical interventions realistically can do so that
19    they can better understand what to expect if they
20    are to move forward with medical interventions.
21         Q.   Can you provide an example of a situation
22    where a patient had an unrealistic expectation of
23    how hormones would have an effect?
24         A.   Yes.  I can give several examples.
25              In one -- in the case of pubertal
```

Page 32

(117 of 289), Page 117 of 289
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 33 of 374
Case: 24-142  02/06/2024  DktEntry: 26.3  Page 117 of 289

1  suppression for individuals assigned male at

2  birth, I have seen -- I have had patients who have

3  thought that if they have already started going

4  through their endogenous puberty and experiencing

5  deepening of the voice from endogenous

6  testosterone, they have thought that puberty

7  blockers alone could raise the pitch of the voice.

8      Q.   And I think -- did you say you had

9  several examples?

10      A.   Another example similar to individuals

11  assigned male at birth who've undergone some of

12  the pubertal changes related to endogenous

13  testosterone such as deepening of the voice

14  thinking that estrogen could raise the pitch of

15  the voice.

16      Q.   Do you have any that aren't related to

17  voice pitch?

18      A.   There are some youth assigned female at

19  birth who may have expectations around specific

20  body shape changes that -- and hopes of body shape

21  changes that testosterone may not be able to

22  pause.

23      Q.   What kind of body shape changes?

24      A.   It can be just changes in the shape of

25  the hips, for example.

Dr. Kara Connelly August 28, 2023

```
 1        Q.   And what you're saying is the patients
 2   think it will have that effect, but it actually
 3   does not?  Is that what you're saying?
 4        A.   In what -- the patients may have specific
 5   thoughts about what testosterone can cause in
 6   terms of how their body shape may change that is
 7   not always realistic.  So we spend a great deal of
 8   time helping them understand that.
 9        Q.   When a patient is diagnosed with gender
10   dysphoria, in your professional opinion, should
11   providers discuss nonmedical options for gender
12   affirmation with as much emphasis as medical
13   options?
14             MS. NOWLIN-SOHL:  Objection to form.
15             THE WITNESS:  In my professional opinion,
16   I believe that nonmedical options should be
17   discussed as well as medical options.
18        Q.   (BY MR. RAMER)  And so do you agree that
19   providers should place equal value on nonmedical
20   options and medical options?
21             MS. NOWLIN-SOHL:  Objection to form.
22             THE WITNESS:  And can you specify what
23   you mean by "nonmedical options" in this case?
24        Q.   (BY MR. RAMER)  I guess if somebody asked
25   you, "What are nonmedical options for treating
```

Page 34

ER-184

Dr. Kara Connelly August 28, 2023

```
 1   gender dysphoria?" how would you respond?
 2        A.   It depends on -- so there are
 3   some -- well, I guess as I described before,
 4   things like chest binders and the use of an
 5   affirmed name and pronouns and essentially
 6   different ways of affirming a young person's
 7   gender identity that doesn't involve prescribing
 8   medications or taking medications is how I
 9   describe medical options.
10        Q.   Do you think mental health therapy --
11   excuse me.
12            Do you think mental health care is a
13   medical intervention?
14            MS. NOWLIN-SOHL:  Objection to form.
15            THE WITNESS:  I don't generally think of
16   mental health care as a medical treatment.
17        Q.   (BY MR. RAMER)  So let's take that, that
18   nonmedical interventions include the items you
19   listed, which is it fair to broadly describe those
20   as social transition?  Sorry, let me rephrase.
21            The items you listed about pronouns and
22   clothing, is it fair to describe that as broadly
23   understood as social transitioning?
24            MS. NOWLIN-SOHL:  Objection.
25            THE WITNESS:  I think that some people
```

Page 35

ER-185

Dr. Kara Connelly August 28, 2023

```
 1   use that term, but not always.
 2        Q.   (BY MR. RAMER)  Okay.  Well, let me come
 3   at it another way.
 4            Let's say medical interventions.  Assume
 5   for the purposes of my question that medical
 6   interventions include the use of puberty blockers
 7   and cross-sex hormones.
 8            Do you agree that the provider should
 9   place equal value on nonmedical interventions and
10   medical interventions?
11            MS. NOWLIN-SOHL:  Objection to form.
12            THE WITNESS:  And for nonmedical
13   interventions, are you including mental health
14   care or the nonmedical interventions that I
15   described earlier?
16        Q.   (BY MR. RAMER)  For purposes of my
17   question, let's include both the nonmedical
18   interventions you described and mental health care
19   under the category of nonmedical interventions.
20            And in the category of medical
21   interventions, we're including puberty blockers
22   and cross-sex hormones.
23            And my question is this:  Do you agree
24   that a provider should place equal value on
25   nonmedical interventions and medical
```

Page 36

(121 of 289), Page 121 of 289Case: 24-142 02/06/2024, DktEntry: 26.3, Page 121 of 289
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 37 of 374
Dr. Kara Connelly August 28, 2023

```
1    interventions?

2              MS. NOWLIN-SOHL:  Objection to form.

3              THE WITNESS:  Well, the care that we

4    provide, and I believe should be provided, is

5    individualized.

6              And mental health care is always a

7    component of the care provided for the diagnosis

8    of gender dysphoria.  But what that looks like is

9    different for different individuals.

10             And the medical and nonmedical

11   interventions we discuss with every single

12   patient.  But I can't -- it's hard for me to say

13   that one is emphasized more or equally than

14   another.  It's just that we always discuss -- so

15   every patient that we see in our program receives

16   mental health care and discussion of medical and

17   nonmedical options.

18             And just to clarify, when I think about

19   medical options, medical options include more than

20   just puberty blockers and cross-sex hormones.

21        Q.   (BY MR. RAMER)  Understood.  And when I

22   asked the question, I was creating the

23   hypothetical.  So I did not intend to suggest that

24   that's what you thought that that included.

25             And just to confirm I understand your
```

Page 37

Dr. Kara Connelly August 28, 2023

```
1    answer, you are unable to say whether a provider
2    should place equal value on nonmedical
3    interventions and medical interventions; is that
4    correct?
5             MS. NOWLIN-SOHL:  Objection;
6    mischaracterizes testimony.
7             THE WITNESS:  I can say that medical
8    interventions and nonmedical interventions should
9    be discussed with every patient.
10       Q.   (BY MR. RAMER)  And are you able to say
11   that the provider should place equal value on
12   nonmedical interventions and medical
13   interventions?
14            MS. NOWLIN-SOHL:  Objection to form;
15   asked and answered.
16            THE WITNESS:  I think that all I can say
17   is that all interventions should be discussed and
18   that care is delivered in an individualized manner
19   according to who the patient is.
20       Q.   (BY MR. RAMER)  And so it's fair to say
21   that you cannot say as you sit here that the
22   provider should place equal value on medical
23   interventions and nonmedical interventions,
24   correct?
25            MS. NOWLIN-SOHL:  Objection to form;
```

Page 38

ER-188

Dr. Kara Connelly August 28, 2023

 1    mischaracterizes testimony; asked and answered.
 2        Q.   (BY MR. RAMER)  You can answer the
 3    question.  Sorry.  I didn't know if you were
 4    thinking or --
 5        A.   Oh, yeah.  I'm just thinking about how to
 6    explain better.
 7            All I can say is that all options should
 8    be discussed, both medical and nonmedical.
 9        Q.   We'll move on.
10            Could you describe the process at your
11    clinic when you -- start again.
12            Just at a high-level generality, could
13    you describe the process at your clinic when you
14    receive a new patient or referral?
15        A.   Yes.  Every new patient referral has a
16    dedicated phone intake with our clinic social
17    worker.  And the social worker during that time is
18    determining who the young person is and what
19    they're seeking.
20            Subsequently, some of our patients will
21    meet with our pediatric psychologist.
22            And then some of them will go on to have
23    the interdisciplinary -- what we call the team
24    visit that includes a medical provider and a
25    behavioral health provider in the same visit.

Page 39

ER-189

(124 of 289), Page 124 of 289
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 124 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 40 of 374

Dr. Kara Connelly August 28, 2023

 1      Q.   And I think you were using the word
 2   "some."
 3           Does that mean that some do not progress
 4   to that phase?
 5      A.   That is correct.
 6      Q.   And you mentioned the phone intake call.
 7           What happens during that call?
 8      A.   During that call, the social worker is
 9   gaining an understanding of who the patient is and
10   who their family is, what they are -- what they
11   are looking for, what supports they need, what
12   supports they have already obtained, getting a
13   sense of what their school environment is like,
14   what their support system looks like, getting a
15   basic understanding of mental health, and then
16   connecting them with resources when necessary or
17   indicated and then discussing the options moving
18   forward if they want to continue with our program.
19      Q.   And you may have said this, but is
20   it -- did you say the social worker is the one who
21   conducts the intake phone call?  Is that right?
22      A.   That's correct.
23           MR. RAMER:  Okay.  Now I'm about to try
24   sending another exhibit that -- I will call this
25   Connelly Exhibit 3.

```
 1              (Deposition Exhibit No. 3 was marked.)
 2              MR. RAMER:  And just let me know when you
 3      receive it.
 4              Still nothing?
 5              MS. NOWLIN-SOHL:  Yeah, still nothing.
 6              THE REPORTER:  I did receive it.
 7              MS. NOWLIN-SOHL:  I think the Wi-Fi in
 8      this room is a little slow.  My phone just let me
 9      know that it's coming, but it hasn't showed up on
10      the computer yet.
11              Okay.
12          Q.  (BY MR. RAMER)  And, Doctor, do you
13      recognize this document?
14              MS. NOWLIN-SOHL:  Sorry.  The email is
15      here -- there's the PDF.  Okay.
16              THE WITNESS:  Yes.
17          Q.  (BY MR. RAMER)  And are you an author of
18      this article?
19          A.  Yes.
20          Q.  And what is this article about, just as a
21      general matter?
22          A.  Generally this was looking at how we
23      continued to provide care in the beginning of the
24      COVID-19 pandemic using telehealth or virtual
25      visits.
```

Page 41

Dr. Kara Connelly August 28, 2023

```
1         Q.    And I'd like to go to page 145, which I
2    believe is just the second page of the article.
3    And I want to look at the right column.  And below
4    in bold, there's "Materials and Methods."
5              And below that it says "Clinical model
6    and transition to telehealth."
7              And I just want to read the first
8    sentence, and my question will be if I read it
9    correctly.
10             "Since 2017, the DGC has provided
11   multidisciplinary care to TGD youth, including a
12   dedicated intake phone call and psychosocial
13   screening with social work before initiating care
14   with an endocrinologist in person at the clinic."
15             And did I read that correctly?
16        A.    Yes.
17        Q.    And is DGC the Doernbecher Gender Clinic?
18        A.    Yes.
19        Q.    And does TGD stand for transgender and
20   gender diverse?
21        A.    Yes.
22        Q.    And what is the psychosocial screening?
23        A.    That basically entails what I described
24   that the social worker does during the intake
25   phone call.
```

Page 42

Dr. Kara Connelly August 28, 2023

```
 1          Q.    What does it screen for?  I believe --
 2     you may have mentioned this, but just to -- with
 3     respect to -- let me start again.
 4               With respect to mental health, does it
 5     screen for anything?
 6          A.    No formal screening or diagnoses are
 7     made.
 8          Q.    And how long does an intake call
 9     typically take?
10          A.    About 45 minutes.
11          Q.    And what --
12          A.    Sometimes longer.
13          Q.    Sorry.  I didn't mean to cut you off.
14          A.    I'm sorry.  Sometimes longer.
15          Q.    And what is the end product from the
16     intake phone call?
17          A.    Can you specify what you mean by "the end
18     product"?
19          Q.    Yeah.  So when the social worker conducts
20     the intake phone call, does the social worker
21     write a report or send an email or fill out a form
22     as the end product for the call?
23          A.    The social worker just documents their
24     conversation in the patient's medical record.
25          Q.    So is the social worker making a
```

Page 43

ER-193

Dr. Kara Connelly August 28, 2023

```
 1    recommendation about anything?
 2        A.    No.
 3        Q.    I'd like to go back to your declaration
 4    and specifically to page 9, paragraph 31 in the
 5    first sentence.  And I'll read it and ask if I
 6    read it correctly.
 7             "In our clinic when adolescents present
 8    for care, they often present with high degrees of
 9    anxiety, depression, and suicidal ideation."
10             Did I read that correctly?
11        A.    Yes.
12        Q.    And so that anxiety, depression, and
13    suicidal ideation is not detected during the
14    psychosocial screening; is that right?
15             MS. NOWLIN-SOHL:  Objection to form.
16             THE WITNESS:  The patients may -- may
17    discuss diagnoses that they have received from
18    mental health providers outside of our clinic.  If
19    they have received a diagnosis of depression or
20    anxiety, then that is part of the intake is
21    getting that history.
22        Q.    (BY MR. RAMER)  Well, when you say
23    "intake" there, you mean part of the psychosocial
24    screening?
25        A.    Yes.  The psychosocial screening is what
```

Page 44

ER-194

Dr. Kara Connelly August 28, 2023

```
 1    we generally call the intake, the psychosocial
 2    intake.
 3         Q.   Okay.  I understand.  I understand.
 4              And in the same paragraph in your
 5    declaration, in the third sentence -- I'll read it
 6    and ask if I read it correctly.
 7              It says "Most of these mental health and
 8    social challenges are linked to gender dysphoria
 9    and experiences of minority stress."
10              Did I read that correctly?
11         A.   Yes.
12         Q.   Are there ever mental health and social
13    challenges that are not linked to gender dysphoria
14    or experiences of minority stress?
15         A.   Yes.
16         Q.   And can you provide some examples of
17    that?
18         A.   Yes.  The patients may have mental health
19    diagnoses or stressors that are not linked to
20    gender dysphoria.
21         Q.   Does that include anxiety?
22         A.   That can include anxiety.  It can include
23    a variety of different mental health conditions.
24         Q.   And so a patient could be diagnosed with
25    gender dysphoria and have a separate mental health
```

Page 45

(130 of 289), Page 130 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 130 of 289
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 46 of 374
Dr. Kara Connelly August 28, 2023

 1   condition that is not linked to gender dysphoria;

 2   is that right?

 3        A.   That is possible.

 4        Q.   And if a patient has anxiety or

 5   depression that is not linked to gender dysphoria

 6   or minority stress, what does your clinic do?

 7        A.   Can you just help to clarify like what --

 8   what specifically you mean by what do we do?

 9        Q.   Fair.  If a patient has anxiety or

10   depression that is not linked to gender dysphoria

11   or minority stress, how does your clinic approach

12   that anxiety or depression and treat it?

13        A.   Yeah.  So again, every patient is -- the

14   care that's provided is individualized, so it

15   depends on the patient and the situation.

16            But generally our program will -- and it

17   depends on at what phase and who is working with

18   the patient at that given moment in time, but what

19   that can entail is understanding -- trying to gain

20   an understanding of where that might be coming

21   from or what it's related to and working with

22   outside therapists or mental health providers when

23   they're involved in the young person's care.

24        Q.   And if a patient has anxiety or

25   depression that is not linked to gender dysphoria

                                          Page 46

Dr. Kara Connelly August 28, 2023

```
 1    or minority stress, do you resolve those mental
 2    health issues before proceeding with medical
 3    interventions?
 4              MS. NOWLIN-SOHL:  Object to form.
 5              THE WITNESS:  We -- can you clarify what
 6    you mean by "resolve"?
 7         Q.   (BY MR. RAMER) As a clinician, do you
 8    have an understanding of what it means to resolve
 9    a mental health issue?
10         A.   I'm not a -- I wouldn't consider myself a
11    mental health provider, and so I don't have a
12    great definition of it.
13              It would seem to me that "resolve" would
14    mean there are no symptoms of depression or
15    anxiety if something has resolved.
16              MR. RAMER:  We've been going for almost
17    an hour.  Do you want to take a break or keep
18    going?  Either way.
19              THE WITNESS:  I can take a break.
20              MR. RAMER:  Li, does that sound good?
21              MS. NOWLIN-SOHL:  Yeah, that's fine.
22              MR. RAMER:  Ten minutes?
23              MS. NOWLIN-SOHL:  Yeah.
24              MR. RAMER:  Okay.  So we'll be back
25    at -- well, we're about to hit 1:03 -- I'm sorry,
```

Page 47

ER-197

(132 of 289), Page 132 of 289
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 48 of 374
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 132 of 289

Dr. Kara Connelly August 28, 2023

```
 1    that's East Coast.  So we'll be back at 13 after
 2    the hour.
 3              MS. NOWLIN-SOHL:  Sounds good.
 4              MR. RAMER:  Okay.
 5              THE VIDEOGRAPHER:  Okay.  So the time is
 6    11:03 a.m. Mountain time, and we are off the
 7    record.
 8         (Break taken from 11:03 a.m. to 11:17 a.m.)
 9              THE VIDEOGRAPHER:  All right.  So we are
10    recording.  The time is 11:17 Mountain time, and
11    we are back on the record.
12         Q.   (BY MR. RAMER)  Okay.  Doctor, I just
13    wanted to start by asking you a hypothetical
14    question.
15              And the hypothetical is this:  If there
16    are two treatments for a condition and the
17    treatments are equally effective, all else being
18    equal, should the provider prefer the treatment
19    that carries fewer risks?
20              MS. NOWLIN-SOHL:  Object to form.
21              THE WITNESS:  That's a difficult
22    hypothetical to imagine.  I think in all
23    treatments, the risk -- potential risks and
24    benefits are weighed and discussed.
25         Q.   (BY MR. RAMER)  So why is it a difficult
```

Page 48

Dr. Kara Connelly August 28, 2023

```
 1   hypothetical to imagine?
 2        A.   Well, because the benefits are not
 3   included in that hypothetical.
 4        Q.   Well, I tried to ask it by saying the
 5   treatments were equally effective, but I can
 6   restate it with the word "benefits."
 7             And so the question is this:  If there
 8   are two treatments for a condition and their
 9   benefits are equal, all else being equal, should
10   the provider prefer the treatment that carries
11   fewer risks?
12             MS. NOWLIN-SOHL:  Object to form.
13             THE WITNESS:  I think it's also hard to
14   kind of characterize all risks as just a single.
15   I think risks are different in terms of what, I
16   guess -- yeah, risk category and what the risk is.
17   So it's difficult to put it all in one category.
18        Q.   (BY MR. RAMER)  What do you mean "it's
19   difficult to put it all in one category"?
20        A.   Well, risks that -- different risks can
21   carry different weight, so it's hard to say that
22   one thing carries more risks than another.  It
23   depends on what the risks are.
24        Q.   That's fair.  And for purposes of just
25   the hypothetical -- and it's a hypothetical for a
```

Page 49

 1    reason, just to understand the concept as opposed

 2    to understand practice on the ground.

 3            And so the hypothetical is just you have

 4    two treatments.  The benefits are the same.  The

 5    costs or risks, whichever word you prefer, are

 6    greater with one than the other.

 7            Should the provider prefer the treatment

 8    that has fewer risks?

 9            MS. NOWLIN-SOHL:  Object to form.

10            THE WITNESS:  Well, one of the ethical

11    principles that we follow as medical providers is

12    to do no harm.  And so we will always try to

13    pursue treatments that will not cause harm to the

14    patient.

15        Q.   (BY MR. RAMER)  Got it.  I just want to

16    go back to where we left off at the break.  And I

17    asked a question, and we kind of got hung up on

18    the word "resolve."  And so I want to ask the

19    question a different way.

20            So we were discussing situations where a

21    patient has anxiety or depression that is not

22    linked to gender dysphoria or minority stress.

23            Do you recall that discussion?

24        A.   Yes.

25        Q.   And my question is this:  When a patient

                                        Page 50

Dr. Kara Connelly August 28, 2023

```
 1   has anxiety or depression that is not linked to
 2   gender dysphoria or minority stress, do you
 3   address those mental health issues before
 4   proceeding with medical interventions?
 5              MS. NOWLIN-SOHL:  Object to form.
 6              THE WITNESS:  And can you specify what
 7   you mean by "address"?
 8        Q.   (BY MR. RAMER)  What would you understand
 9   that term to mean as a clinician in this context?
10        A.   Well, I think it can mean several
11   different things.  It can mean treat or it can
12   mean acknowledge.  It can mean evaluate further.
13   It depends on the -- the way it's defined.
14        Q.   What do you think the term means when
15   it's used in the Endocrine Society guidelines?
16              MS. NOWLIN-SOHL:  Object to form.
17              THE WITNESS:  Can you specify where in
18   the guidelines?
19        Q.   (BY MR. RAMER)  Yeah, I'll go to -- just
20   in your declaration, go to page 6.  And I think
21   it's -- it's in paragraph 22, but at page 6,
22   there's a little C before the relevant passage.
23   And I'll just read it, and my first question will
24   be whether I read it correctly.
25              "Any coexisting psychological, medical,
```

Page 51

```
1    or social problems that could interfere with
2    treatment, e.g., that may compromise treatment
3    adherence, have been addressed such that the
4    adolescent's situation and functioning are stable
5    enough to start treatment."
6            Did I read that correctly?
7        A.   Yes.
8        Q.   And so what do you think the word
9    "addressed" means there?
10       A.    I -- in that context, I interpret it to
11   mean that the coexisting psychological, medical,
12   or social problems have been acknowledged and
13   evaluated to the extent that the mental health
14   provider can ascertain that they are not
15   inhibiting in the individual's ability to make
16   complex cognitive decisions about treatment
17   options.
18       Q.   And so you think -- just to confirm, you
19   think that this part of the Endocrine Society
20   guidelines goes to whether the adolescent can make
21   proper decisions; is that right?
22       A.   This part of the guidelines are
23   pertaining to any coexisting psychological,
24   medical, or social problems that could interfere
25   with their ability to make decisions.
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Dr. Kara Connelly August 28, 2023

```
 1        Q.   And that's what you think this part of
 2   the guidelines is saying is that you need to
 3   address those conditions so that the
 4   adolescent -- let me rephrase.
 5             It's saying that you need to address
 6   those conditions to ensure the adolescent can make
 7   good decisions; is that right?
 8             MS. NOWLIN-SOHL:  Object to the form.
 9             THE WITNESS:  It's saying that if there
10   are any coexisting psychological, medical, or
11   social problems that could interfere with
12   treatment, that they have those -- have been
13   acknowledged and assessed and to ensure that they
14   are not interfering with the individual's ability
15   to make complex, cognitive decisions.
16        Q.   (BY MR. RAMER)  Are you familiar with the
17   term "diagnostic overshadowing"?
18        A.   Not really.
19        Q.   Okay.  When an individual reports -- at
20   your clinic, when an individual reports distress
21   resulting from gender incongruence, do employers
22   at your clinic explore other possible causes of
23   that distress?
24        A.   Can you specify which specific providers?
25        Q.   Any providers.
```

Page 53

Dr. Kara Connelly August 28, 2023

1      A.    Our mental health providers, that's part
2  of their psychological evaluation.
3      Q.    And what do they do to explore those
4  other possible causes of distress?
5      A.    Well, I'm not the psychologist so I can't
6  say for certain, but it's part of their -- it's
7  part of their evaluation and the way that they can
8  make those determinations.
9      Q.    And what, if anything, do you change in
10 your protocol when dealing with a patient who has
11 autism spectrum disorder?
12          MS. NOWLIN-SOHL:  Object to form.
13          THE WITNESS:  Can you be more specific?
14     Q.    (BY MR. RAMER)  With respect to what?
15     A.    You said what do you change.  With
16 respect to what?  What did you mean by --
17     Q.    Sorry, yes.  Let me phrase it this way:
18 If a patient has autism spectrum disorder, is
19 their treatment exactly the same as any other
20 patient at your clinic?
21          MS. NOWLIN-SOHL:  Object to form.
22          THE WITNESS:  Well, every patient is
23 treated as an individual, so every patient
24 receives individualized care.  And so that can
25 look different from patient to patient.

Page 54

Dr. Kara Connelly August 28, 2023

```
 1              If a patient has the diagnosis of autism
 2     spectrum disorder, the -- then the mental health
 3     provider who is working with that patient or our
 4     psychologist may contribute more information about
 5     the patient and the care that they're seeking and
 6     the way that they communicate and receive
 7     communication and information.
 8              So it can really vary from person to
 9     person.
10        Q.   (BY MR. RAMER)  At your clinic, are
11     patients with autism spectrum disorder eligible to
12     receive puberty blockers?
13        A.   Are you asking if a patient has autism
14     spectrum disorder and meet the criteria -- and
15     have the diagnosis of gender dysphoria and meet
16     the criteria for treatment outlined in the
17     guidelines and standards of care, if care would be
18     considered for that patient?
19        Q.   I think I was with you up until the very
20     end of "care would be considered."
21              I think, yes, let's say everything else
22     is equal, but the patient has autism spectrum
23     disorder.
24              Are they able to receive puberty blockers
25     at your clinic?
```

Page 55

Dr. Kara Connelly August 28, 2023

```
 1           MS. NOWLIN-SOHL:  Object to form.
 2           THE WITNESS:  I can say that patients
 3    would not be denied puberty blockers simply
 4    because they have autism spectrum disorder.
 5       Q.   (BY MR. RAMER)  And I'd like to return to
 6    Exhibit 3, Connelly Exhibit 3.  And I'd like to go
 7    back to page 145, right column again.
 8           And it's actually going to be right below
 9    the sentence we previously read in the "Materials
10    and Methods" section.  And I'm just going
11    to -- it's going to be the second full sentence.
12    And I'll read it, and my first question will be if
13    I've read it correctly.
14           "In October of 2019, the DGC transitioned
15    from a multidisciplinary clinic to a fully
16    interdisciplinary model in which every new patient
17    meets with endocrinology, psychology, and social
18    work simultaneously during their first medical
19    appointment to develop individualized patient and
20    family-centered treatment plans."
21           Did I read that correctly?
22       A.   Yes.
23       Q.   And is this generally what occurs at your
24    clinic?
25       A.   Yes.
```

Page 56

ER-206

Dr. Kara Connelly August 28, 2023

```
 1          Q.   And you refer to the first medical
 2     appointment; is that right?
 3          A.   Yes.
 4          Q.   And could you describe what that first
 5     medical appointment is like for a patient?
 6          A.   Yes.  The first medical appointment --
 7     well, prior to the start of the medical
 8     appointment, the interdisciplinary team meets to
 9     discuss what is already known about the patient
10     and family and the information that's been
11     obtained in the intake and any -- in the
12     psychological evaluation.
13               And then when the patient and family are
14     brought into the room, we gather medical history
15     about the patient and family and determine what
16     questions they have and then discuss different
17     treatment options depending on what they're
18     seeking.
19          Q.   And how long does a visit typically last?
20          A.   Average, an hour.
21          Q.   And back in Exhibit 3, the very next
22     sentence -- I'll read it and ask if I read it
23     correctly.
24               "For adolescent patients, these
25     appointments include dedicated time for the
```

Page 57

ER-207

Dr. Kara Connelly August 28, 2023

1    patient to meet with the endocrinologist and

2    social worker alone while caregivers meet with

3    psychology for assessment of overall family

4    needs."

5              Did I read that correctly?

6        A.    Yes.

7        Q.    And why do adolescent patients have

8    dedicated time to meet with the endocrinologist

9    alone?

10       A.    Well, these are for adolescents.  And

11   generally as medical providers or as adolescent

12   medical providers, we always reserve part of the

13   appointment time to discuss topics that they may

14   want to discuss confidentially.

15             And again, that can look different from

16   person to person, patient to patient.

17       Q.    Is the information from this dedicated

18   meeting with the endocrinologist alone ultimately

19   shared with caregivers?

20       A.    It depends.

21       Q.    What does it depend on?

22       A.    It depends on basically what is in the

23   patient's best interest.

24       Q.    And so there's times where in your

25   judgment it's in the patient's best interest to

Page 58

ER-208

Dr. Kara Connelly August 28, 2023

```
 1    not disclose something to a caregiver?
 2         A.   If we have concerns about how it may
 3    impact their safety, then yes.
 4         Q.   And what do you mean by that?
 5         A.   What do I mean by if it may impact their
 6    safety?
 7         Q.   Correct.  What do you mean by you're
 8    concerned about how it may impact their safety?
 9         A.   If disclosing information that was shared
10    with the medical provider confidentially may pose
11    a risk to the patient.
12         Q.   A risk of what?
13         A.   Of harm.  Of physical harm.
14         Q.   So you're referring to physical harm by
15    the caregiver on the patient; is that right?
16         A.   That's an example.
17         Q.   Have there been situations where you've
18    determined that disclosing confidential
19    information would put the patient at risk of harm
20    from a caregiver?
21         A.   It's rare, but yes, it has happened.
22         Q.   Do you call the police in that situation?
23         A.   It depends.
24         Q.   Have you ever?
25         A.   I have never called the police.
```

Page 59

Dr. Kara Connelly August 28, 2023

1    Q.   Has anyone -- to your knowledge, has
2  anyone at your clinic ever called the police in
3  that situation?
4    A.   No.
5    Q.   Okay.  So is it correct that the first
6  medical appointment results in I think what you
7  called a treatment plan?
8    A.   I don't believe that I used those words.
9    Q.   Okay.  I guess in -- so in Exhibit 3, the
10  second sentence we read, it refers at the very end
11  of the sentence to individualized patient and
12  family-centered treatment plans.
13        What is a treatment plan?
14    A.   That can be a variety of -- it can look
15  different from person to person, but basic
16  detailing any next steps, if any further tests
17  need to be done, medical tests, laboratory
18  evaluations, imaging pertaining to their medical
19  history or their family medical history, any other
20  information that they need that we will kind of
21  help to share with them.  So it really just is
22  kind of detailing next steps if indicated.
23    Q.   For any patients, does the treatment plan
24  from the first medical visit call for the
25  administration of puberty blockers?

Page 60

ER-210

Dr. Kara Connelly August 28, 2023

```
 1          A.    It's very rare, and -- it's very rare,
 2    but it can.
 3          Q.    For any patients, does the treatment plan
 4    from the first medical visit call for the
 5    administration of cross-sex hormones?
 6          A.    It's also very rare, but it can.
 7          Q.    How would you define "very rare" as
 8    you're using it?
 9          A.    I would say probably less than 2 percent
10    of the time.
11          Q.    So just so I understand what you're
12    saying, you're saying less than 2 percent of the
13    time a patient will begin puberty blockers or
14    cross-sex hormones after the first medical visit?
15             MS. NOWLIN-SOHL:  Objection;
16    mischaracterizes the testimony.
17             THE WITNESS:  What do you mean by
18    "after"?  Do you mean at the time of the first
19    visit or immediately after or later at some point?
20          Q.    (BY MR. RAMER)  Like, what was the
21    2 percent number you just gave?
22          A.    The 2 percent is if any treatments will
23    be initiated immediately after the first visit and
24    before the second visit.
25          Q.    Okay.  So you're saying -- I'm just
```

Page 61

Dr. Kara Connelly August 28, 2023

```
 1    trying to make sure I understand.
 2            So you're saying only 2 percent of
 3    patients will initiate puberty blockers or
 4    cross-sex hormones before the second visit?
 5        A.   Correct.
 6        Q.   What medication does your clinic use -- I
 7    guess that should be plural.
 8            What medications does your clinic use for
 9    cross-sex hormones?
10        A.   Testosterone and estradiol.
11        Q.   And is there a particular brand you use?
12        A.   No.
13        Q.   Do you recall what company produces those
14    drugs?
15        A.   No.
16        Q.   What medication does your clinic use for
17    puberty blockers?
18        A.   We use leuprolide acetate and histrelin
19    implants.
20        Q.   And is there a particular brand you use?
21        A.   The brands that are available for
22    leuprolide acetate can be dependent on insurance
23    coverage, but generally the brandings are Depot,
24    Lupron, and Eligard.
25        Q.   And do you recall what company produces
```

Page 62

(147 of 289), Page 147 of 289
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 63 of 374
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 147 of 289

Dr. Kara Connelly August 28, 2023

```
 1    those drugs?
 2         A.   I can't say with certainty what company
 3    produces them.
 4         Q.   After the first medical visit, do you
 5    require patients to return to your clinic for
 6    follow-up examinations?
 7              MS. NOWLIN-SOHL:  Object to the form.
 8              THE WITNESS:  Can you specify "follow-up
 9    examinations"?
10         Q.   (BY MR. RAMER)  Yeah, sorry.  That's not
11    supposed to be a trick question.  I just -- do the
12    patients have follow-up visits?
13         A.   Yes.
14         Q.   At your clinic?
15         A.   Yes.
16         Q.   And how often are those follow-up
17    appointments?
18         A.   Generally every three months.
19         Q.   And I think you previously mentioned
20    this, but I just want to confirm.  And just
21    correct me if my understanding is wrong.
22              As a general matter, your clinic treats
23    patients until they turn 18, except for those
24    patients who have not yet transferred to another
25    provider; is that right?
```

Page 63

Dr. Kara Connelly August 28, 2023

```
1              And so in other words, the reason you
2     would have a patient in your clinic who is over 18
3     years old is because they have not yet transferred
4     to a provider for adults; is that fair?
5          A.   Yes.  Generally that is correct, but
6     there can be some circumstances where they may be
7     in our care for a bit longer than 18.
8          Q.   But that's not the general practice; is
9     that right?
10         A.   Correct.
11         Q.   And do you stay in formal communication
12    with your patients after they turn 18?
13         A.   If they are still engaged in care in our
14    clinic, then yes.
15         Q.   And what percentage of your patients
16    receive care elsewhere after they turn 18?
17         A.   Do you mean gender-affirming care?
18         Q.   Well, I guess at the gender clinic -- I
19    guess any treatment at the gender clinic, yeah.
20         A.   But you said "care elsewhere."  Are you
21    specifically saying gender-affirming care
22    elsewhere?
23         Q.   Yeah, let's do that for this question.
24    So of your patients who are -- who turn 18, what
25    percentage no longer receive gender-affirming
```

Page 64

Dr. Kara Connelly August 28, 2023

```
 1   health care from your clinic?
 2        A.   It's definitely the minority.  So the
 3   majority of patients when they turn 18 continue to
 4   receive care through our clinic.
 5        Q.   Sorry.  Could you say that answer again?
 6        A.   Yeah.  The majority continue to receive
 7   care after their 18th birthday through our clinic.
 8        Q.   So the majority of your patients stay on
 9   with the clinic after they turn 18?
10        A.   Yes.
11        Q.   I guess I don't know what I'm missing.  I
12   thought that you generally treat patients until
13   they're 18, and then the idea was that they
14   then -- you know, they're adults at 18, so they go
15   elsewhere to receive treatment.
16             But you're saying now that that is
17   incorrect; the majority stay with you?  Is that
18   right?
19        A.   So we only see new patients who are
20   younger than age 18 who establish with us.
21   Generally the majority of patients will still be
22   in the process of -- still receiving care with us
23   after they turn 18.  And it's when they're older
24   that their care is transferred to an adult
25   provider.
```

Page 65

ER-215

Dr. Kara Connelly August 28, 2023

1      Q.   And when you say "older," approximately
2   what age?
3      A.   I'd say approximately average of 20.  But
4   we have some patients that are in their 20s when
5   they successfully transfer to an adult provider.
6      Q.   So let's say for patients of yours by the
7   time -- let me rephrase.
8           Of your patient population, by the time
9   patients turn 22 years old, what percentage do you
10  estimate are still receiving treatment at your
11  clinic?
12     A.   I can't say for certainty, but I'd
13  probably estimate less than 10 percent.
14     Q.   And for the other approximately
15  90 percent, does your clinic stay in formal
16  communication with them?
17     A.   Can you specify what you mean by "formal
18  communication"?
19     Q.   Well, do you communicate with them at
20  all?
21     A.   If they reach out after they've made that
22  transfer to an adult provider and have difficulty
23  continuing to access care through that provider or
24  getting refills on their prescriptions, they may
25  request refills, in which case we would

                                        Page 66

(151 of 289), Page 151 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 67 of 374
Dr. Kara Connelly August 28, 2023

1    communicate formally with them to bring them back
2    in for another visit and again attempt to transfer
3    care to an adult provider.
4        Q.   Do you communicate with your patients
5    when they do not reach out to you in the first
6    instance?
7             MS. NOWLIN-SOHL:  Object to form.
8             THE WITNESS:  Can you specify which
9    patients we're talking about?
10       Q.   (BY MR. RAMER)  Yeah.  Sorry.  I was
11   talking about the universe we were just
12   discussing, which is those who have progressed on
13   to other care providers.
14            And I had asked you if you stay in formal
15   communication, and I think you described an
16   example where they reach out to you for help in
17   some way, shape, or form.
18            And my question is do you formally
19   communicate with that universe of patients,
20   meaning those who have gone on to receive care
21   elsewhere, when they have not reached out to you
22   in the first instance?
23       A.   We don't have a protocol of contacting
24   patients who have already successfully transferred
25   care to an adult provider.  But we do have

Page 67

Dr. Kara Connelly August 28, 2023

```
 1    patients that are seeing adult providers, and
 2    those providers communicate with us about the
 3    patients.
 4         Q.   And I think in your declaration you have
 5    said that you have personally delivered care to
 6    over 700 patients with gender dysphoria; is that
 7    right?
 8         A.   Yes.
 9         Q.   And were all of those patients under the
10    age of 18?
11         A.   At the time that they establish with our
12    clinic, yes.
13         Q.   And when did you in your practice first
14    begin treating children or adolescents for gender
15    dysphoria?
16         A.   Do you mean in what year or what stage of
17    my professional development?
18         Q.   Both.
19         A.   In my pediatric endocrinology fellowship
20    under the supervision of the attending physicians.
21         Q.   And when was that, approximately, in
22    terms of a year?
23         A.   I started in 2010, so between 2010 and
24    2013.
25         Q.   And do you personally prescribe puberty
```

Page 68

ER-218

Dr. Kara Connelly August 28, 2023

```
 1    blockers and cross-sex hormones?

 2         A.    Yes.

 3         Q.    And at what age do you prescribe puberty

 4    blockers?

 5              MS. NOWLIN-SOHL:  Object to the form.

 6              THE WITNESS:  That depends on pubertal

 7    stage.

 8         Q.    (BY MR. RAMER)  And so at what pubertal

 9    stage do you prescribe puberty blockers?

10         A.    Tanner II.

11         Q.    Do you prescribe puberty blockers or

12    cross-sex hormones to patients who identify as

13    nonbinary?

14         A.    Yes, I have.

15         Q.    Do you still?

16         A.    Yes.  Yeah.

17         Q.    The primary purpose of gender-affirming

18    care is to reduce the distress associated with

19    gender dysphoria, correct?

20         A.    Yes.

21         Q.    And reducing the distress associated with

22    gender dysphoria is the only purpose of

23    gender-affirming care, correct?

24              MS. NOWLIN-SOHL:  Object to form.

25              THE WITNESS:  That is not how I would
```

Page 69

ER-219

Dr. Kara Connelly August 28, 2023

```
 1   define gender-affirming care.
 2       Q.   (BY MR. RAMER)  Could you elaborate on
 3   that?
 4       A.   Well, gender-affirming care can entail
 5   many different aspects of care or treatment and
 6   can be alleviating distress if gender dysphoria is
 7   present, but it generally means affirming
 8   someone's gender identity at that moment in time.
 9       Q.   Okay.  I understand.  So let me ask this
10   question:  Reducing gender dysphoria -- start
11   again.
12           Reducing the distress associated with
13   gender dysphoria is the only purpose of providing
14   puberty blockers and cross-sex hormones, correct?
15           MS. NOWLIN-SOHL:  Object to form.
16           THE WITNESS:  The main purpose of any
17   medication, including puberty blockers and
18   hormones, would be to alleviate distress
19   associated with gender dysphoria.
20       Q.   (BY MR. RAMER)  So you said "main
21   purpose."
22           Are there other purposes of prescribing
23   puberty blockers and cross-sex hormones with
24   respect to gender-diverse youth?
25       A.   No, I can't think of any.
```

Page 70

ER-220

(155 of 289), Page 155 of 289
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 71 of 374
Case: 24-142 02/06/2024 DktEntry: 26.3 Page 155 of 289

Dr. Kara Connelly August 28, 2023

1      Q.    And so the effect of treatment -- sorry.

2            And so the effect of puberty blockers and

3      cross-sex hormones on reducing the distress

4      associated with gender dysphoria is the outcome

5      that matters the most when analyzing these

6      treatments, correct?

7            MS. NOWLIN-SOHL:  Object to the form.

8            MR. RAMER:  That's fair.  Never mind.

9      Listen, I think we've already answered the

10     question.

11     Q.    (BY MR. RAMER)  Have you ever prescribed

12     puberty blockers to a patient who was not formally

13     diagnosed with gender dysphoria under the DSM-V?

14     A.    Only if it was a patient with a different

15     diagnosis, central precocious puberty.

16     Q.    Apart from central precocious puberty,

17     have you ever prescribed puberty blockers to a

18     patient who is not formally diagnosed with gender

19     dysphoria under the DSM-V?

20     A.    No.

21     Q.    Why not?

22     A.    Well, I follow the clinical practice

23     guidelines and established standards of care that

24     require that an individual be diagnosed with

25     gender dysphoria prior to initiating treatments.

Page 71

Dr. Kara Connelly August 28, 2023

1    Q.   And have you ever prescribed cross-sex
2    hormones to a patient who is not formally
3    diagnosed with gender dysphoria under the DSM-V?
4    A.   No.
5    Q.   Are you familiar with the term "gender
6    incongruence"?
7    A.   Yes.
8    Q.   What is your understanding of that term?
9    A.   It's a term that refers to a patient
10   whose gender identity does not match the sex that
11   was assigned to them at birth.
12   Q.   And so is it different from gender
13   dysphoria?
14   A.   Gender dysphoria is the distress that is
15   experienced by someone's gender identity that is
16   not in alignment with the sex that was assigned to
17   them at birth.
18   Q.   I guess -- so it's possible for someone
19   to be gender incongruent but not be suffering from
20   gender dysphoria, correct?
21   A.   Well, I think it depends on where the
22   definition of "gender incongruent" is coming from.
23   Q.   I guess under your definition was what I
24   was asking.
25   A.   Well, I -- usually when I hear the term

Page 72

ER-222

(157 of 289), Page 157 of 289    Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 157 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 73 of 374
Dr. Kara Connelly August 28, 2023

```
 1    "gender incongruent," I generally will think about
 2    the origin being the ICD-11 code.
 3            And I can't remember the specific words
 4    that are used and whether "distress" is included
 5    in the definition.
 6        Q.   If the phrase "gender incongruence" does
 7    not -- let me rephrase.
 8            If the phrase "gender incongruent" is
 9    defined without reference to clinically
10    significant distress, do you agree that it means
11    something different from gender dysphoria?
12        A.   If the definition does not include the
13    "distress," then yes, I would say that's different
14    from gender dysphoria.
15        Q.   Sorry.  I didn't mean to cut you off.
16            And if the definition of "gender
17    incongruence" does not include clinically
18    significant distress, you would not prescribe
19    puberty blockers or cross-sex hormones to treat
20    gender incongruence, correct?
21            MS. NOWLIN-SOHL:  Object to form.
22            THE WITNESS:  I have only prescribed
23    puberty blockers or cross-sex hormones for
24    patients who have been diagnosed with gender
25    dysphoria.
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

(158 of 289), Page 158 of 289
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 74 of 374
Dr. Kara Connelly August 28, 2023

```
 1        Q.   (BY MR. RAMER)  Do you assess a patient's
 2   developmental readiness when describing whether to
 3   prescribe puberty blockers or cross-sex hormones?
 4        A.   Our multidisciplinary team does together.
 5        Q.   And how does your team make that
 6   assessment?
 7        A.   Well, it involves the different
 8   disciplines using their finer expertise in
 9   assessing that individual patient.
10        Q.   And what specifically does your team
11   assess?
12        A.   About develop -- sorry.  I forgot what
13   you --
14        Q.   Sorry, yeah.  When you're assessing a
15   patient's developmental readiness for a particular
16   intervention, what does your team assess?
17        A.   Well, again, I'm not the pediatric
18   psychologist who is the one conducting the
19   assessments, so I can't say for certain all of the
20   different tools and measures that she uses, but
21   she uses her expertise and knowledge and expertise
22   in child and adolescent development in determining
23   their developmental stage and ability to
24   participate in decision-making.
25        Q.   Okay.  So the pediatric psychologist
```

Page 74

(159 of 289), Page 159 of 289
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 75 of 374
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 159 of 289

Dr. Kara Connelly August 28, 2023

```
 1    makes that determination; is that right?
 2        A.   Yes.
 3        Q.   And that's beyond your area of expertise;
 4    is that what you're saying?
 5             MS. NOWLIN-SOHL:  Objection;
 6    mischaracterizes testimony.
 7             THE WITNESS:  The pediatric psychologist
 8    is the one with the expertise in child and
 9    adolescent development and is the person who makes
10    a determination about developmental readiness.
11        Q.   (BY MR. RAMER)  Right.  All I'm asking is
12    the proper way to assess for developmental
13    readiness is something that is beyond your
14    expertise?  Or is it not?
15        A.   I would not say that it's my expertise to
16    make that assessment.
17        Q.   Well, so I understand the pediatric
18    psychologist makes the assessment.
19             And my question is do you know how to
20    make that assessment?
21        A.   About developmental readiness?
22        Q.   Correct.
23        A.   My role is to -- is to assess their
24    physical developmental readiness.  And we as an
25    interdisciplinary team come together to determine
```

Page 75

Dr. Kara Connelly August 28, 2023

1    overall developmental readiness with our different
2    disciplines' expertise contributing.
3         Q.   And all I'm asking is just the
4    developmental readiness that you described is
5    determined by the pediatric psychologist.
6              That determination is not something that
7    you make, correct?
8         A.   Correct.
9         Q.   And the process for making the
10   determination that the pediatric psychologist
11   makes is something that is beyond your individual
12   expertise, correct?
13        A.   Correct.
14        Q.   I'd like to go back to your declaration,
15   which I guess is Connelly Exhibit 2.  And I'd like
16   to go to page 5 and paragraph 21.
17             And this paragraph you're talking about
18   puberty blockers, correct?
19        A.   Correct.
20        Q.   And I'm going to read the second sentence
21   and ask if I read it correctly.
22             It says "These medications have been used
23   successfully to delay pubertal changes in youth
24   with central precocious puberty."
25             Did I read that correctly?

                                      Page 76

Dr. Kara Connelly August 28, 2023

1      A.   Yes.

2      Q.   And you'd already mentioned central

3   precocious puberty, but could you just explain

4   what that is?

5      A.   Yes.  That is when the brain activates

6   puberty at an age that is younger or earlier than

7   is what is determined to be a normal age range.

8      Q.   And what is that normal age range?

9      A.   Well, for individuals assigned female at

10  birth, it's generally age 7 is the youngest that

11  is considered normal for starting puberty.

12        And for individuals assigned male at

13  birth, that's generally age 9.

14     Q.   And so is it -- just so I understand, if

15  the individual starts puberty before those ages

16  you just listed, that is what constitutes central

17  precocious puberty; is that right?

18     A.   Yes.

19     Q.   And do you prescribe puberty blockers

20  every time a child falls within that definition?

21     A.   No.

22     Q.   Is there a typical age where a child

23  would be diagnosed with central precocious puberty

24  but you would not prescribe puberty blockers?

25     A.   It's not so much of age, chronological

Page 77

(162 of 289), Page 162 of 289    Case: 24-142  02/06/2024  DktEntry: 26.3  Page 162 of 289
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 78 of 374
Dr. Kara Connelly August 28, 2023

```
 1   age, but we look at pubertal stage and we look at
 2   skeletal age and development.
 3        Q.   And when you say you "look at pubertal
 4   stage and skeletal age and development," what
 5   specifically are you assessing in making the
 6   determination whether to prescribe puberty
 7   blockers?
 8        A.   For central precocious puberty?
 9        Q.   Yes.
10        A.   So we want to -- basically we will assess
11   pubertal stage in terms of Tanner staging and how
12   far along they are in puberty at the time they are
13   given the diagnosis.
14             And we look at how much maturation has
15   happened at the growth plates by pubertal hormones
16   to determine if there's benefit to suppressing
17   puberty at that time.
18        Q.   And just as a general matter, when is
19   there benefit to suppressing puberty at that time?
20        A.   Again, it's different for everyone
21   because it depends on where -- what their growth
22   patterns look like and what their family pubertal
23   development patterns are.
24             But if we determine that treatment is
25   going to result in an improvement in height
```

Page 78

Dr. Kara Connelly August 28, 2023

```
 1    outcome, that's generally what we're looking at.
 2              And if we -- if the patient is far enough
 3    along in puberty that it does not appear that
 4    treatment is going to result in a benefit in final
 5    height outcome, then we may not use prescribed.
 6        Q.   Sorry.  And this is my own ignorance of
 7    this.
 8              The last part you said -- is it that if
 9    they are far along enough then you won't
10    prescribe?
11        A.   It depends -- again, it depends on the
12    patient, but if they are far enough -- if they are
13    far enough along in puberty -- and I can give you
14    an example if that would be helpful.
15        Q.   Yes, please.  I'm clearly adrift here.
16        A.   Yeah.  So if a patient who is assigned
17    female at birth has achieved menarche, or their
18    first menstrual cycle, and we look at their
19    skeletal age or the age of their growth plates and
20    determine that starting puberty blockers is really
21    not going to result in a benefit of -- resulting
22    in improved height outcome, then we may consider
23    not using puberty blockers.
24        Q.   Okay.  So I think I understand.
25              So the idea is central precocious
```

Page 79

(164 of 289), Page 164 of 289
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 164 of 289
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 80 of 374

Dr. Kara Connelly August 28, 2023

1   puberty, one of the outcomes if you did not treat

2   it is they would have a reduced height profile; is

3   that right?

4        A.   In some cases.

5        Q.   But right.  Right.  But that is one of

6   the animated concerns, just as a general matter;

7   is that fair?

8        A.   Yes.

9        Q.   So same paragraph, same sentence in your

10  declaration that I had previously read.

11           Could you explain the relevance of the

12  points you're making here?

13       A.   Can you -- I'm sorry.  Can you clarify?

14  Of that same sentence?

15       Q.   Yeah.  I guess put, you know, less

16  directly, why are we talking about central

17  precocious puberty in your declaration?

18           MS. NOWLIN-SOHL:  Object to form.

19           THE WITNESS:  It's another population or

20  another diagnosis that the medications have been

21  used in demonstrating the effectiveness of

22  suppressing endogenous sex steroid production.

23       Q.   (BY MR. RAMER)  Are you talking about

24  central precocious puberty solely with respect to

25  effectiveness?  Or something else?

Page 80

```
 1            MS. NOWLIN-SOHL:  Object to the form.
 2            THE WITNESS:  The medications have been
 3     used successfully to delay pubertal changes for
 4     youth who have central precocious puberty.
 5        Q.   (BY MR. RAMER)  Okay.  So when your
 6     declaration is discussing central precocious
 7     puberty, the relevance of that discussion is
 8     solely the fact that puberty blockers have been
 9     effective in delaying the onset of puberty; is
10     that right?
11            MS. NOWLIN-SOHL:  Objection
12     mischaracterizes the testimony.  And also
13     objection to the extent this calls for a legal
14     conclusion.
15            THE WITNESS:  The statement that is in
16     this paragraph is that they have been used
17     successfully to delay pubertal changes.
18        Q.   (BY MR. RAMER)  Okay.  So same paragraph,
19     final sentence.  And I'll just read it and again
20     ask if I read it correctly.
21            It says "If treatment is stopped,
22     endogenous puberty resumes."
23            Did I read that correctly?
24        A.   Yes.
25        Q.   When you diagnose a patient with gender
```

Page 81

(166 of 289), Page 166 of 289
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 166 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 82 of 374

Dr. Kara Connelly August 28, 2023

```
 1    dysphoria, how do you determine when that child
 2    should begin puberty blockers?
 3              MS. NOWLIN-SOHL:  Object to form.
 4              THE WITNESS:  Can you clarify the
 5    question?
 6         Q.   (BY MR. RAMER)  Yeah.  I guess do you
 7    prescribe puberty blockers at Tanner Stage II?
 8              MS. NOWLIN-SOHL:  Object to the form.
 9              THE WITNESS:  I wouldn't prescribe
10    puberty blockers if they have not yet reached
11    Tanner Stage II.
12         Q.   (BY MR. RAMER)  Would you ever prescribe
13    them when the patient reaches Tanner Stage II?
14         A.   Yes.
15         Q.   And just as an approximation, at what age
16    does that stage typically occur?
17         A.   At what age does Tanner Stage II occur?
18         Q.   Correct.
19         A.   For individuals assigned female at birth,
20    it's approximately -- it's an average of 10 to 10
21    and a half years.
22              And for individuals assigned male at
23    birth, it's around 11 to 11 and a half.
24         Q.   And how long -- I guess let me rephrase.
25              Under the guidelines, how long does the
```

Page 82

```
 1    individual remain on puberty blockers?
 2              MS. NOWLIN-SOHL:  Object to the form.
 3              THE WITNESS:  Can you specify which
 4    guidelines?
 5         Q.   (BY MR. RAMER)  Is it different for the
 6    WPATH guidelines versus the Endocrine Society
 7    guidelines?
 8         A.   I just wanted to be sure.  I didn't know
 9    what specific guidelines.  But you mean Endocrine
10    Society and WPATH?
11         Q.   Or any other relevant ones.  I'm just
12    trying to understand, in this treatment when they
13    receive puberty blockers to treat gender
14    dysphoria, how long do they typically remain on
15    puberty blockers?
16              MS. NOWLIN-SOHL:  Object to form.
17              THE WITNESS:  It depends on the patient,
18    and -- it depends on the patient and whether they
19    go on to start hormones or not.
20         Q.   (BY MR. RAMER)  If they do go on to start
21    hormones, at what age does that typically occur?
22         A.   I would say around 14, but sometimes
23    older.
24         Q.   So if a patient started puberty
25    blockers -- sorry, let me try that again.
```

Page 83

Dr. Kara Connelly August 28, 2023

1          If the patient is on puberty blockers

2    from Tanner Stage II for, let's say, two and a

3    half years and then treatment is stopped, is it

4    correct that the patient will be going through

5    endogenous puberty two and a half years later?

6          A.   So if a patient is on puberty blockers

7    but not on cross-sex hormones and the puberty

8    blockers are stopped, then yes, endogenous puberty

9    begins again.

10         Q.   Is an individual's gender identity

11   expected to evolve over time?

12              MS. NOWLIN-SOHL:  Object to the form.

13              THE WITNESS:  I wouldn't use the word

14   "expect."  It's not expected.  I think that some

15   people can have a shift in their gender identity.

16         Q.   (BY MR. RAMER)  When you say "some

17   people," what do you mean by that?

18         A.   I think that for some people, it's

19   possible that their gender identity can shift over

20   time.

21         Q.   Can you identify those people ahead of

22   time or no?

23         A.   No.  But I would say that the

24   overwhelming majority of the patients that I have

25   worked with have not experienced a shift in their

Page 84

(169 of 289), Page 169 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 85 of 374
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 169 of 289

Dr. Kara Connelly August 28, 2023

```
 1    gender identity.
 2            MR. RAMER:  And we're coming up on an
 3    hour.  I kind of have a good stopping point here.
 4            Do you want to take, I guess, five
 5    minutes this time?
 6            MS. NOWLIN-SOHL:  Yes.  That sounds good.
 7            MR. RAMER:  Let's call it -- we're about
 8    to hit 12, so we'll call it 17 after the hour?
 9            MS. NOWLIN-SOHL:  Yeah.
10            MR. RAMER:  Okay.
11            THE VIDEOGRAPHER:  Okay.  So the time is
12    12:11 p.m. Mountain time, and we are off the
13    record.
14        (Break taken from 12:11 p.m. to 12:18 p.m.)
15            THE VIDEOGRAPHER:  All right.  So we are
16    recording.  The time is 12:18 p.m. Mountain time,
17    and we are back on the record.
18        Q.  (BY MR. RAMER)  Dr. Connelly, I'd like to
19    go back to your declaration, and specifically to
20    page 14 and paragraph 50 and first sentence.  And
21    I'll read it and ask if I read it correctly.
22            "Gender-affirming hormone therapy may
23    have an impact on future fertility potential
24    although treatment can be tailored to minimize
25    that risk if maintaining fertility is important to
```

Page 85

```
 1    the family and there are options for fertility
 2    preservation."
 3             Did I read that correctly?
 4        A.   Yes.
 5        Q.   And what are the options for fertility
 6    preservation you mention there?
 7        A.   Well, that depends on what gonads the
 8    person was born with.  But generally sperm
 9    preservation or cryopreservation or ovocyte
10    cryopreservation.
11        Q.   Sorry, could you say those again.  So
12    cryopreservation is one; is that right?
13        A.   Sperm cryopreservation, which is
14    essentially freezing sperm, and ovocyte
15    cryopreservation is freezing eggs from ovarian
16    tissue.
17        Q.   Are there any other options for fertility
18    preservation other than those two?
19        A.   Well, the other options may involve
20    development of an embryo after the sperm or eggs
21    are retrieved and then freezing embryos.
22        Q.   When you -- sorry, go ahead.
23        A.   Sorry.  I was going to say those are much
24    less often sought, especially in younger patients.
25        Q.   What are much less often sought?
```

Page 86

Dr. Kara Connelly August 28, 2023

1      A.    Freezing embryos.

2      Q.    And in describing that option, you had

3  mentioned retrieving.

4            Are you saying retrieving from the

5  cryopreservation or retrieving from the

6  individual?

7      A.    Can you remind me what I said?

8      Q.    Well, I don't know if I know.  So the --

9  we had the sperm cryopreservation.

10           I think you said ova cryopreservation.

11           And then the third one you had mentioned

12  embryos.  And I just didn't understand what that

13  was.  Could you just explain that a little bit?

14     A.    Yeah.  The embryos are -- the embryos are

15  formed if either a sperm or an egg is obtained and

16  fertilized at the time that they are obtained and

17  prior to freezing.

18     Q.    I see.  Have you ever had a patient

19  pursue that option?

20     A.    No.  Not -- no, not a patient in my care.

21     Q.    And what do you tell your patients about

22  the options for fertility preservation?

23     A.    Do you mean regardless -- it's a little

24  different depending on what gonads they have,

25  whether they have testicles or ovaries.

Page 87

1     Q.   Let's start with one and then do the

2   other.

3     A.   Okay.  So for individuals who were born

4   with testicles, the options include preserving

5   sperm and freezing sperm.

6          And one of the ways of obtaining sperm is

7   through ejaculation.

8          And another way can be what's called

9   testicular extraction where a urologist -- I don't

10  know the specifics of the procedure, but it's

11  something that -- a procedure that a urologist

12  performs.  And then the sperm is frozen until

13  later, if they desire to use it later on.

14    Q.   And then what about the other categories?

15    A.   So for individuals who are born with

16  ovaries, that generally involves freezing eggs.

17  And so that -- again, it happens in a reproductive

18  endocrinology and then fertility clinic, so I'm

19  not the provider that does the procedures, but

20  generally involves development of the eggs and

21  then the retrieval through a procedure and then

22  freezing the eggs.

23    Q.   And what do you tell your patients about

24  the likelihood of those options being successful?

25          MS. NOWLIN-SOHL:  Object to form.

Page 88

Dr. Kara Connelly August 28, 2023

```
 1              THE WITNESS:  Can you specify which
 2    option?
 3         Q.   (BY MR. RAMER)  Let's assume -- am I
 4    right we're talking about cryopreservation for
 5    both?
 6         A.   Yes.
 7         Q.   And unless there's a distinction, which
 8    please -- a relevant distinction, just please tell
 9    me.
10              All I'm wondering is when you are
11    discussing this with patients, what do you tell
12    them about the prospect that either form of
13    cryopreservation will ultimately be successful if
14    they want to have children later in life?
15              MS. NOWLIN-SOHL:  Object to form.
16              THE WITNESS:  And are you defining
17    "successful" as resulting in a baby or a
18    pregnancy?
19         Q.   (BY MR. RAMER)  Sure, a healthy pregnancy
20    or a healthy birth in the context of, you know,
21    those with testicles.
22              MS. NOWLIN-SOHL:  Object to the form.
23              THE WITNESS:  So we're just talking about
24    those with testicles?
25         Q.   (BY MR. RAMER)  No.  I was trying to
```

Page 89

(174 of 289), Page 174 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 174 of 289
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 90 of 374
Dr. Kara Connelly August 28, 2023

```
 1   bring them both in, but let's just take them one
 2   at a time.
 3           For those with ovaries, what do you say
 4   about the prospect of achieving a successful,
 5   healthy birth later in life?
 6           MS. NOWLIN-SOHL:  Object to the form.
 7           THE WITNESS:  Well, there is -- for
 8   individuals who were born with ovaries and have
 9   not started any cross-sex hormones -- is that the
10   population that you are referring to?
11       Q.   (BY MR. RAMER)  Sure.  Yeah.  Let's start
12   there.  Yeah.
13       A.   There has been research that has shown
14   that preserving eggs has been successful in the
15   future in resulting in a healthy pregnancy.
16       Q.   In -- I mean, not to quiz you.  As you
17   sit here, do you know -- is there a particular
18   article you're thinking of, or --
19       A.   I can't -- I can't say.  I don't know
20   what particular article.
21       Q.   Are these fertility options that we just
22   discussed, are these fertility options discussed
23   in the WPATH guidelines?
24       A.   I believe so.
25       Q.   Are they discussed in the Endocrine
```

Page 90

Dr. Kara Connelly August 28, 2023

1    Society guidelines?

2         A.   I believe so.  I don't recall in what

3    amount of detail.

4         Q.   Switching gears a little bit, does your

5    clinic perform surgeries on adolescents?

6         A.   No.

7         Q.   So you just -- you refer adolescents for

8    surgeries; is that right?

9              MS. NOWLIN-SOHL:  Object to form.

10             THE WITNESS:  Patients that have been

11   seen in our clinic are referred -- in some cases

12   are referred out to surgeons that are not

13   affiliated with our clinic.

14        Q.   (BY MR. RAMER)  Yeah.  I was just trying

15   to understand -- we discussed that for some

16   patients gender-affirming surgery is indicated.

17             And all I was trying to understand is if

18   it's indicated, is the surgery done at your

19   clinic?  Or is the patient referred to a surgeon

20   somewhere else?

21        A.   The patient is referred to a surgeon

22   somewhere else.

23        Q.   And for patients who have been referred

24   for surgery from your clinic, are any of

25   them -- sorry.  Let me rephrase that.

Page 91

(176 of 289), Page 176 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 92 of 374
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 176 of 289

Dr. Kara Connelly August 28, 2023

```
 1              For patients who have been referred for
 2     surgery from your clinic, have any of those
 3     patients received a form of surgery other than top
 4     surgery as you've described it?
 5              MS. NOWLIN-SOHL:  Object to form.
 6              THE WITNESS:  Can you be more specific
 7     about what types of surgeries?
 8          Q.   (BY MR. RAMER)  Well, I guess let's start
 9     there.
10              What types of surgeries has your clinic
11     referred patients for?
12          A.   Well, so you're specifying
13     gender-affirming surgeries?
14          Q.   Right.
15          A.   Okay.  Well, we've had patients that have
16     pursued surgeries, and a lot of the times they
17     don't require a referral from our clinic.
18              We've had patients who had been seen in
19     our clinic that have accessed surgeries with
20     outside surgeons.
21          Q.   Okay.  So taking the kind of technical
22     concept of a referral out of the equation, what
23     types of gender-affirming surgeries have patients
24     of your clinic received?
25          A.   And do you mean of all ages or just
```

Page 92

Dr. Kara Connelly August 28, 2023

1    patients that had been seen in our clinic?

2         Q.    Could you explain the distinction you're

3    drawing there?

4         A.    You mean any patient who has ever been

5    seen in our clinic?

6         Q.    No.  I mean for patients who are under 18

7    years of age who have received a gender-affirming

8    surgery, what kind of surgeries have they received

9    while under 18?

10        A.    Okay.  So while under 18.

11              Almost all of them have been top

12   surgeries.  And I can think of one person who has

13   had a vaginoplasty.

14        Q.    And could you explain what a vaginoplasty

15   is?

16        A.    It is the creation of a vulva and vaginal

17   canal.

18        Q.    What is it created from?

19        A.    That depends on the surgical technique

20   that's used.

21        Q.    What does it depend on?

22        A.    It can depend on the surgeon and the

23   technique that the surgeon determines would be the

24   best for that patient.  I can't -- I'm not the one

25   that makes the decisions about what technique is

Page 93

Dr. Kara Connelly August 28, 2023

```
 1   used.
 2        Q.   Could you just explain an example of what
 3   you mean by different techniques would result in
 4   the vaginoplasty being the -- just explain what
 5   you mean by "different techniques."
 6        A.   Well, the surgeons can use different
 7   types of tissue to create the vaginal canal.
 8        Q.   Can you give some examples of types of
 9   tissue that can be used to create the vaginal
10   canal?
11        A.   In some cases it can be the genital skin.
12   And some surgeons I believe have used colon tissue
13   and some surgeons have used something called the
14   peritoneum.
15        Q.   What is that?
16        A.   And some surgeons have used skin grafts.
17        Q.   What was the -- peritoneum?
18        A.   Yeah.  It's -- again, not being the
19   surgeon and the expert in the -- in that anatomy,
20   it's difficult for me to explain how that's used.
21   It's intraabdominal, in the abdomen.
22        Q.   And you said, I believe, you're aware of
23   one vaginoplasty; is that right?
24        A.   One patient who had vaginoplasty under
25   the age of 18.
```

Page 94

Dr. Kara Connelly August 28, 2023

```
 1        Q.    And for the other examples of surgery in
 2    that category, you said almost all were
 3    gender-affirming chest surgery; is that right?
 4        A.    Correct.  Yeah.
 5        Q.    And is there -- are there any other forms
 6    of surgery other than those two types that you're
 7    aware of?
 8        A.    That our patients have accessed under age
 9    18?
10        Q.    Correct.
11        A.    No.
12        Q.    At your clinic, of the natal females who
13    are diagnosed with gender dysphoria, what
14    percentage would you estimate receive a
15    mastectomy?
16             MS. NOWLIN-SOHL:  Object to form.
17             THE WITNESS:  Are you still referring to
18    under age 18?
19        Q.    (BY MR. RAMER)  Yes.
20        A.    So I'm just going to make sure that I
21    understand your question.
22             For patients who were assigned female at
23    birth that are under age 18, what percentage
24    pursue or complete mastectomy?
25        Q.    Sure.
```

Page 95

Dr. Kara Connelly August 28, 2023

1      A.    Under the age of 18?

2      Q.    Yes.

3      A.    Because we have some patients who attempt

4   to pursue surgery under the age of 18 but don't

5   actually have surgery until they're 18 or older.

6   That's the majority.

7      Q.    And what do you mean by they "attempt to

8   pursue" it?

9      A.    They start seeking visits or consultation

10  with a surgeon, but by the time they actually

11  complete the surgery, they're over 18.

12     Q.    Okay.  I see.  And so of patients at your

13  clinic who are natal females which you describe as

14  female assigned at birth, are under age 18, and

15  have been diagnosed with gender dysphoria, what

16  would you estimate is the percentage of those

17  patients for whom gender-affirming top surgery is

18  clinically indicated?

19     A.    Can you clarify what you mean by

20  "clinically indicated"?

21     Q.    What do you understand that phrase to

22  mean?

23     A.    Well, I would say -- I would probably

24  interpret that phrase as meeting criteria for

25  surgery, but I'm not the one that's usually making

Page 96

ER-246

Dr. Kara Connelly August 28, 2023

1    that assessment.
2        Q.   Okay.  Maybe I -- all I'm trying to
3    understand is your patients who are under 18 and
4    were assigned female at birth, how many of them
5    receive gender-affirming chest surgery while under
6    18?
7        A.   It's a very small number.
8        Q.   Can you give me an estimate?
9        A.   I would say probably less than 5 percent
10   in that population.
11       Q.   All right.  I want to just look at your
12   declaration again, and page 8 and paragraph 26.
13   And second sentence kind of covers some of what
14   we've been talking about, but I'll just read it
15   and ask if I read it correctly.
16           It says "If surgical services are
17   offered, they are almost always gender-affirming
18   chest surgeries for youth assigned female at
19   birth, also known as gender-affirming mastectomy."
20           Did I read that correctly?
21       A.   Yes.
22       Q.   And you say "almost always."
23           And my question is are there surgical
24   services offered to youth under 18 that are not
25   gender-affirming mastectomies?

Page 97

Dr. Kara Connelly August 28, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form.
 2              THE WITNESS:  I'm sorry.  Can you repeat
 3     the question?
 4         Q.   (BY MR. RAMER)  Yes, sorry.  In this
 5     sentence, you say, "If surgical services are
 6     offered, they are almost always gender-affirming
 7     chest surgeries for youth assigned female at
 8     birth."
 9              And in that sentence, you say "almost
10     always."  And you've mentioned vaginoplasty.
11              And my question is, are there other
12     surgical services offered to youth under 18 that
13     are not gender-affirming mastectomies or
14     vaginoplasties?
15              MS. NOWLIN-SOHL:  Same objection.
16              THE WITNESS:  Not that I'm aware of.
17         Q.   (BY MR. RAMER)  Is a mastectomy
18     reversible?
19              MS. NOWLIN-SOHL:  Object to the form.
20              THE WITNESS:  I don't know if I can
21     accurately answer that question since I'm not the
22     surgeon.
23         Q.   (BY MR. RAMER)  Do you talk to your
24     patients about gender-affirming mastectomies?
25         A.   I do in basic terms, but acknowledging
```

Page 98

(183 of 289), Page 183 of 289
Case: 24-142  02/06/2024  DktEntry: 26.3  Page 183 of 289
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 99 of 374
Dr. Kara Connelly  August 28, 2023

```
 1    that I'm not a surgeon and that the surgeon will
 2    be the one to counsel them on potential benefits
 3    and risks.
 4        Q.   Okay.  So you are unable to answer the
 5    question of whether a mastectomy is reversible; is
 6    that right?
 7            MS. NOWLIN-SOHL:  Objection;
 8    mischaracterizes testimony.
 9            THE WITNESS:  Can you specify what you
10    mean by "reversible"?
11        Q.   (BY MR. RAMER)  What do you understand
12    "reversible" to mean in this context?
13        A.   To return to the original state.
14        Q.   Okay.  Taking that definition, is a
15    mastectomy reversible?
16            MS. NOWLIN-SOHL:  Object to form.
17            THE WITNESS:  A mastectomy cannot replace
18    the chest tissue that's been removed.
19        Q.   (BY MR. RAMER)  Sorry.  Could you say
20    that again?
21        A.   A mastectomy cannot replace the chest
22    tissue that has already been removed.
23        Q.   Isn't the mastectomy the removal of the
24    tissue?
25        A.   Yes.  Yes.  So the mastectomy -- with
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

ER-249

```
 1   mastectomy, after it has occurred, the chest
 2   tissue that's been removed cannot be replaced,
 3   cannot be reintroduced onto the body.
 4        Q.   And sorry, this is for my own -- is the
 5   first T in that word pronounced, so it's
 6   "mastectomy"?
 7        A.   Yes.
 8        Q.   Okay.  After a natal female, which you
 9   described as assigned female at birth, receives a
10   gender-affirming mastectomy, will she
11   ever -- sorry.  Let me rephrase.
12            After a natal female, also described as
13   assigned female at birth, receives a
14   gender-affirming mastectomy, will that individual
15   ever be able to breastfeed a child?
16        A.   That depends on the type of surgery
17   that's performed.
18        Q.   Can you say more about that?
19        A.   Well, again, I'm not a surgeon, but my
20   understanding is there are some surgeries that are
21   characterized as top surgeries where not all of
22   the chest tissue is removed.  And it depends on
23   the patient.
24        Q.   Why would not all of the chest tissue be
25   removed?
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Dr. Kara Connelly August 28, 2023

```
 1        A.    Again --
 2              MS. NOWLIN-SOHL:  Objection; foundation.
 3              THE WITNESS:  I can't say for certain
 4     because I'm not the surgeon having these
 5     conversations with patients.
 6        Q.    (BY MR. RAMER)  So I guess if the
 7     question is after a natal female receives a
 8     gender-affirming mastectomy, will that individual
 9     ever be able to breastfeed a child, if that is the
10     question, is the answer to that question beyond
11     the scope of your expertise?
12        A.    I would not consider it within my scope
13     of expertise to be able to determine if someone is
14     able to breastfeed after they've had
15     gender-affirming top surgery.
16        Q.    Okay.  So same -- back in your
17     declaration, same paragraph which is on -- we're
18     on page 8, paragraph 26, and it is the sentence
19     after the one we were just discussing.  And I'll
20     just read it and ask if I read it correctly.
21              It says "Under the Endocrine Society
22     guideline, genital surgery is not recommended to
23     patients under age 18."
24              Did I read that correctly?
25        A.    Yes.
```

Page 101

Dr. Kara Connelly August 28, 2023

```
 1        Q.    And does the category of genital surgery
 2    include more than just a vaginoplasty?
 3        A.    Meaning other genital surgeries other
 4    than vaginoplasty options?
 5        Q.    I guess are there other genital surgeries
 6    other than vaginoplasty?
 7        A.    There are, yes.
 8        Q.    Okay.  What are those?
 9        A.    There are -- there's something called a
10    vulvoplasty.
11        Q.    And what is that?
12        A.    That is the creation of the external
13    vulva without the creation of a vaginal canal.
14        Q.    And like our discussion of the
15    vaginoplasty, does the tissue used for that
16    procedure vary based on the technique the surgeon
17    uses?
18        A.    I believe so.
19        Q.    In the next sentence in this paragraph,
20    I'll read it and ask if I read it correctly.
21            It says "The WPATH standards of care do
22    not provide an age delineation for vaginoplasty,
23    but strongly caution about the need to ensure that
24    the patient has the maturity to make this
25    decision."
```

Page 102

ER-252

Dr. Kara Connelly August 28, 2023

```
 1              Did I read that correctly?
 2        A.    Yes.
 3        Q.    And do the WPATH standards caution
 4   against any genital surgery for a patient under 18
 5   other than a vaginoplasty?
 6              MS. NOWLIN-SOHL:  Objection to form.
 7              THE WITNESS:  I would need to read that
 8   section, but I don't believe that it is specific
 9   to only vaginoplasty.
10        Q.    (BY MR. RAMER)  And a surgeon could
11   perform a vaginoplasty on a patient under 18 and
12   still be in compliance with the WPATH guidelines,
13   correct?
14        A.    If all of the other criteria are met,
15   including that -- ensuring that the patient has
16   the maturity to make the decision.
17        Q.    And would that surgeon be in compliance
18   with the Endocrine Society guideline?
19              MS. NOWLIN-SOHL:  Objection to form.
20              THE WITNESS:  The Endocrine Society
21   guideline -- in the Endocrine Society guideline,
22   it states that general surgery is not recommended
23   to patients under 18 but doesn't specify that it
24   cannot be performed.
25        Q.    (BY MR. RAMER)  So when the Endocrine
```

Page 103

ER-253

Dr. Kara Connelly August 28, 2023

1    Society's guidelines do not recommend something,
2    is it your testimony that you could still perform
3    that procedure and be in compliance with the
4    Endocrine Society guideline?
5              MS. NOWLIN-SOHL:  Objection to form.
6    Objection; mischaracterizes testimony.
7              THE WITNESS:  The guidelines are,
8    create -- the guidelines are a set of
9    recommendations and that -- for clinicians and
10   practitioners to follow.
11             And there may be extenuating
12   circumstances when something may -- or different
13   care may be provided that may not be included in
14   the guidelines.
15        Q.   (BY MR. RAMER)  In your professional
16   opinion, should there be age limits on
17   gender-affirming surgeries?
18             MS. NOWLIN-SOHL:  Objection to form.
19             THE WITNESS:  Can you be more specific
20   about types of surgeries?
21        Q.   (BY MR. RAMER)  I guess does your answer
22   vary based on the type of surgery at issue?
23        A.   Generally, yes, but I also think that
24   it's more than just chronologic age.
25        Q.   The "generally, yes," can you clarify

Page 104

Dr. Kara Connelly August 28, 2023

```
 1   what you were saying yes to?
 2        A.   I follow the Endocrine Society guidelines
 3   in that general surgery is not recommended under
 4   the age of 18, whereas there may be situations
 5   where patients can benefit from gender-affirming
 6   top surgery under the age of 18.
 7        Q.   So do you think there should be maturity
 8   limits on the availability for gender-affirming
 9   surgeries?
10             MS. NOWLIN-SOHL:  Objection to form.
11             THE WITNESS:  Can you explain what you
12   mean by "maturity limits"?
13        Q.   (BY MR. RAMER)  Well, I guess what do you
14   mean is distinct from chronological age when you
15   answered the prior question?
16        A.   Well, I think that maturity is definitely
17   a factor that needs to be taken into account as
18   one of the factors.
19        Q.   And why is that?
20        A.   Well, again, going back to criteria for
21   accessing different aspects of gender-affirming
22   medical care, one of the criteria is that the
23   individual has reached a level of maturity where
24   they're able to make complex, cognitive decisions
25   about the different treatment options.
```

Page 105

Dr. Kara Connelly August 28, 2023

1      Q.    And do you agree with that limitation?

2           MS. NOWLIN-SOHL:  Object to the form.

3           THE WITNESS:  What do you mean by

4      "limitation"?

5      Q.    (BY MR. RAMER)  That to receive a

6      gender-affirming surgery, a patient should

7      demonstrate an appropriate level of maturity.

8      A.    I'm in agreement with the statement

9      that's in the Endocrine Society guidelines about

10     having a level of maturity where they are able to

11     make complex cognitive decisions.

12     Q.    And should the maturity -- I'll call it a

13     limit.  Let's just say -- let me rephrase it.

14          Do you think a patient should need to

15     demonstrate a different level of maturity to

16     access cross-sex hormones, for example?

17          MS. NOWLIN-SOHL:  Object to form.

18          THE WITNESS:  I don't know that I'm able

19     to answer what specific level of maturity and how

20     that -- and again, it's an assessment that's

21     performed by the behavioral health expert to

22     determine if the patient is of the maturation

23     where they can make a complex cognitive decision

24     specific to that intervention.  So I think it

25     depends on the person.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

```
 1          Q.   (BY MR. RAMER)  If a patient is mature
 2     enough to proceed with cross-sex hormones, is the
 3     patient mature enough to decide to proceed with
 4     the gender-affirming surgery?
 5               MS. NOWLIN-SOHL:  Object to the form.
 6               THE WITNESS:  I don't think that I can
 7     agree with that statement.
 8          Q.   (BY MR. RAMER)  Why not?
 9          A.   Because again, every patient is
10     approached as an individual.  And their maturity
11     may be -- their reaching different levels of
12     maturity may occur at different time points.
13          Q.   Well, can you think of a situation where
14     an individual would be mature enough to decide to
15     take cross-sex hormones but not be mature enough
16     to decide to undergo a gender-affirming surgery?
17               MS. NOWLIN-SOHL:  Object to form.
18               THE WITNESS:  Well, again, I think it
19     goes back to the gender-affirming surgery -- the
20     psychological evaluation and determining the
21     patient's ability to understand -- not only the
22     ability to understand the different interventions
23     and their level of maturity to make complex
24     cognitive decisions, but also taking into whether
25     the assessment is that the different interventions
```

Page 107

ER-257

(192 of 289), Page 192 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 192 of 289
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 108 of 374
Dr. Kara Connelly August 28, 2023

```
 1    will result in -- will benefit them, will result
 2    in a benefit to them, and whether they fully
 3    understand the potential benefits and potential
 4    risks.
 5            And with the potential benefits and
 6    potential risks being different for hormones
 7    versus surgeries, then I think it -- they have to
 8    be assessed separately.
 9       Q.   (BY MR. RAMER)  So in theory, a patient
10    could be mature enough to decide to use cross-sex
11    hormones, but not mature enough to decide to
12    undergo a gender-affirming surgery; is that right?
13            MS. NOWLIN-SOHL:  Object to form.
14            THE WITNESS:  I don't know if I can say
15    it's all just their level of maturation because,
16    again, it's all of the other components that go
17    into the psychological evaluation that are taken
18    into account when determining if a patient would
19    benefit from a specific intervention.
20       Q.   (BY MR. RAMER)  So I understand that
21    point that just because a patient is mature enough
22    does not mean that they're automatically going to
23    receive the intervention.
24            But my question is specifically about the
25    maturity component of that assessment.
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

(193 of 289), Page 193 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 193 of 289
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 109 of 374
Dr. Kara Connelly August 28, 2023

```
 1              And what I'm trying to understand is in

 2    theory, can a patient actually be mature enough to

 3    decide to undergo cross-sex hormones but not

 4    mature enough to decide to undergo a

 5    gender-affirming surgery?

 6              MS. NOWLIN-SOHL:  Same objection.

 7              THE WITNESS:  I think it depends on how

 8    maturity is defined and assessed.

 9         Q.   (BY MR. RAMER)  And how do you define and

10    assess maturity?

11         A.   Well, again it's primarily done by the

12    behavioral health expert when they're doing their

13    evaluation and working with the patient to

14    determine their level of maturity to be able to

15    make different decisions.

16         Q.   Okay.  So is it fair to say this

17    assessment of the level of maturity to decide to

18    pursue a particular treatment is beyond your level

19    of expertise?

20              MS. NOWLIN-SOHL:  Objection.

21              THE WITNESS:  Can you repeat the

22    question?

23         Q.   (BY MR. RAMER)  Is it fair to say that

24    the determination of a patient's maturity with

25    respect to deciding whether to undergo an
```

Page 109

1    intervention is beyond the scope of your

2    expertise?

3              MS. NOWLIN-SOHL:  Same objection.

4              THE WITNESS:  I would not be making that

5    determination without the assessment of the

6    behavioral health provider.

7         Q.   (BY MR. RAMER)  And so is the answer,

8    then, that yes, it is beyond your individual

9    expertise?

10              MS. NOWLIN-SOHL:  Objection.

11              THE WITNESS:  Well, I would say that it's

12    a shared -- a shared -- it's shared between the

13    medical provider and myself and the behavioral

14    health provider.

15         Q.   (BY MR. RAMER)  Right.  I guess what I'm

16    getting at is I was asking you these questions

17    about maturity, and I think the response is you

18    are not the one who is assessing the maturity and

19    determining the maturity level, and so that

20    suggested that it was potentially beyond the scope

21    of your expertise.  And that was why I asked the

22    question.

23              And am I right in thinking that your last

24    answer was that it's joint expertise with you and

25    the others on the team?  Is that right?

Page 110

Dr. Kara Connelly August 28, 2023

1          A.    I would say that I'm not the only one

2     that's assessing someone's level of maturity and

3     making decisions about these different treatments

4     and that it is shared expertise.

5          Q.    And so then is it fair to say that you

6     individually could not determine the maturity

7     level of the patient with respect to pursuing a

8     particular treatment?

9               MS. NOWLIN-SOHL:  Object to form.

10              THE WITNESS:  I would not make a

11    determination that a patient was developmentally

12    or -- and the level of maturity without the

13    expertise of a behavioral health provider to say

14    that someone should pursue a certain intervention.

15         Q.    (BY MR. RAMER)  Okay.  So changing gears

16    a bit here, stick with your declaration.  And I'd

17    like to go to page 2, and specifically

18    paragraph 9.  And my question relates to the

19    second sentence.  And I'll read it and ask if I

20    read it correctly.

21              You state, "I have attended specialized

22    training sessions on these topics and routinely

23    review the literature to remain knowledgeable of

24    and familiar with all emerging research."

25              Did I read that correctly?

                                        Page 111

Dr. Kara Connelly August 28, 2023

 1        A.    Yes.

 2        Q.    And could you describe the process you

 3   use to routinely review the literature?

 4        A.    Well, I have a system in place with

 5   our -- kind of the national literature library, or

 6   libraries, to alert me when new literature is

 7   released or published within these different

 8   topics or fields.

 9        Q.    And so is that how you determine which

10   papers to read is that alert?

11        A.    That's one of them.  I also might learn

12   of new publications or research from other

13   professional organizations or other professional

14   colleagues.

15        Q.    Any other ways that you determine what

16   papers to read?

17        A.    Anytime a patient or family has a

18   question about any particular topic, then I will

19   usually go and review the literature to make sure

20   that my guidance is up-to-date.

21        Q.    Are there particular authors you trust in

22   this field?

23             MS. NOWLIN-SOHL:  Object to form.

24             THE WITNESS:  Can you be more specific?

25        Q.    (BY MR. RAMER)  Are there particular

                                          Page 112

Dr. Kara Connelly August 28, 2023

```
 1    researchers that you deem experts in the field?
 2              MS. NOWLIN-SOHL:  Same objection.
 3              THE WITNESS:  I think there are many, but
 4    it depends on what specific area of the field
 5    you're referring to.
 6         Q.   (BY MR. RAMER)  Well, I guess -- just to
 7    simplify, are you familiar with the name Annelou
 8    de Vries?
 9         A.   Yes.
10         Q.   Do you consider Annelou de Vries an
11    expert in the field?
12              MS. NOWLIN-SOHL:  Object to form.
13              THE WITNESS:  Again, can you specify to
14    what aspect of the field?
15         Q.   (BY MR. RAMER)  I mean, I guess what
16    literature are you routinely reviewing?
17         A.   Well, I review literature pertaining to
18    outcomes related to different medical and
19    nonmedical interventions, but also literature that
20    may be pertaining to mental health outcomes or
21    psychological outcomes.  So it really depends.
22              And that particular researcher I know has
23    many publications of her work that I have read.
24         Q.   And do you have any reason to think
25    Annelou de Vries is not an expert on topics on
```

Page 113

Dr. Kara Connelly August 28, 2023

```
 1    which de Vries publishes?

 2            MS. NOWLIN-SOHL:  Object to form.

 3            THE WITNESS:  I can't say.  I don't have

 4    any reason to believe that.

 5        Q.   (BY MR. RAMER)  To believe that de Vries

 6    is not an expert?  Is that right?

 7        A.   I would say that I believe that de Vries

 8    has a lot of expertise.

 9        Q.   Are you familiar with the name Diane

10    Chen?

11        A.   Yes.

12        Q.   And does Diane Chen have a lot of

13    expertise?

14        A.   I would say so, yes.

15        Q.   How do you determine what papers or

16    articles are reliable?

17        A.   Well, there are a lot of factors that I

18    look at when I'm making that determination.

19        Q.   Can we run through them?  Like what

20    factors?

21        A.   Yeah.  So a lot of it can be reliance

22    upon the methodology, the sample sizes, the type

23    of study, what the outcomes are, other variables

24    that may be impacting or playing a role in the

25    outcome, any potential bias.  And that's just --
```

Page 114

(199 of 289), Page 199 of 289
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 199 of 289
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 115 of 374

Dr. Kara Connelly August 28, 2023

1      Q.    What do you mean by "bias"?

2      A.    There are some -- bias is generally

3  something that can impact the way that results are

4  interpreted.

5      Q.    Can you be a little more specific?  What

6  do you mean by that?

7      A.    Yeah, like scientific study design,

8  generally researchers will do their best to reduce

9  elements of bias that may influence their results.

10     Q.    Do you think the existing literature

11 lacks granularity around the cause of gender

12 dysphoria?

13         MS. NOWLIN-SOHL:  Object to form.

14         THE WITNESS:  I'm sorry.  I don't

15 understand the question.

16     Q.    (BY MR. RAMER)  Is there something in

17 particular you don't understand it or just the --

18     A.    Granularity.

19     Q.    Are you familiar with the term

20 "confounding variable"?

21     A.    Yes.

22     Q.    And can you explain your understanding of

23 that term?

24     A.    Yeah.  The way that I explain everything,

25 think of it as something, again, that is -- it's a

Page 115

Dr. Kara Connelly August 28, 2023

```
 1    variable that can have an influence on an outcome.
 2         Q.    What do you mean by "influence"?
 3         A.    It can have -- it can have an influence
 4    separate from a variable that is being studied as
 5    producing outcome.
 6         Q.    And are you familiar with the term
 7    "selection bias"?
 8         A.    Yes.
 9         Q.    And can you explain your understanding of
10    that term?
11         A.    My understanding of that term is bias
12    that's introduced in a research study related to
13    the population that's being studied not being
14    representative of the larger population and the
15    way that the participants are included.
16         Q.    Are you familiar with the term
17    "systematic review"?
18         A.    Yes.
19         Q.    Could you explain your understanding of
20    that term?
21         A.    Yes.  Systematic review and the way that
22    I explain it is when a team of researchers review
23    and obtain all -- or establish a question that
24    they want answered through the systematic review
25    and then have a series of techniques for
```

Page 116

1    identifying existing literature and determining

2    which of those articles meet their specific

3    inclusion criteria, and then coming together again

4    using their process to summarize and in some cases

5    draw conclusions based on the literature that

6    exists.

7        Q.   What is the value of a systematic review

8    of literature as compared to some other form of

9    review of literature?

10           MS. NOWLIN-SOHL:  Object to form and

11   foundation.

12           THE WITNESS:  Can you specify what you

13   mean by "other form"?

14       Q.   (BY MR. RAMER)  I guess have you ever

15   heard of a narrative review of literature?

16       A.   That's not a term that I'm very familiar

17   with.

18       Q.   Let me try a different way of just --

19   what is the point of the systematic review -- let

20   me rephrase.

21           Why do researchers conduct systematic

22   reviews?

23       A.   Well, I think it can depend on what the

24   researcher's identified purpose is.  But generally

25   it can serve as bringing together existing

Page 117

(202 of 289), Page 202 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 202 of 289
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 118 of 374
Dr. Kara Connelly August 28, 2023

```
 1    literature and comparing findings or

 2    summarizing -- attempting to summarize findings.

 3         Q.    And have you ever conducted a systematic

 4    review?

 5         A.    No.

 6         Q.    Have you ever studied a systematic review

 7    carefully?

 8         A.    Can you specify "studied carefully"?

 9         Q.    Have you ever read a systematic review?

10         A.    Yes.

11         Q.    As you sit here today, are you able to

12    name any specific systematic reviews relating to

13    literature in your field that you have read?

14         A.    I have read a systematic review.  I

15    cannot remember the title of it, that is -- that

16    pertains to existing literature about

17    gender-affirming care for youth.

18         Q.    Any others other than that one?

19         A.    Not that I can think of at the moment.

20         Q.    Are you familiar with the term

21    "evidence-based medicine"?

22         A.    Yes.

23         Q.    And can you explain your understanding of

24    that term?

25         A.    Yes.  The way that I explained that is
```

Page 118

Dr. Kara Connelly August 28, 2023

```
 1   medicine that is guided by published evidence.
 2       Q.   And have you taken any particular courses
 3   on evidence-based medicine?
 4       A.   I may have had a course as part of the
 5   curriculum for my master's in clinical research,
 6   but I can't recall if they were titled that.
 7            MR. RAMER:  I'm going to try and send
 8   another exhibit.  Let's see here.  I think this is
 9   the Wi-Fi on my end.  It's hung up in my outbox.
10   There we go.
11            MS. NOWLIN-SOHL:  We're waiting on it.
12            MR. RAMER:  Okay.  It's a little bit
13   larger of a file, so it may take a second.
14            MS. NOWLIN-SOHL:  Have others received it
15   yet?
16            THE REPORTER:  I did receive it.
17            MR. RAMER:  Still waiting?
18            MS. NOWLIN-SOHL:  Yeah.  I'm hitting the
19   refresh button, but still nothing.
20            MR. RAMER:  All right.  I wonder if we
21   still haven't received it, if we should just break
22   for a minute.
23            MS. NOWLIN-SOHL:  I mean, are you at a
24   good spot?  Does it make sense to stop for lunch
25   now?
```

Page 119

Dr. Kara Connelly August 28, 2023

```
 1              MR. RAMER:  Sure.  We can do that.
 2              MS. NOWLIN-SOHL:  Sorry.
 3              MR. RAMER:  No.  No problem.  And maybe
 4     I'll just send a couple in advance for the next.
 5     I assume you still haven't got --
 6              MS. NOWLIN-SOHL:  I have not.  It's not
 7     on my phone either.
 8              MR. RAMER:  Okay.  So showing 3:12, how
 9     long would you like for lunch?
10              MS. NOWLIN-SOHL:  Should we go to 4:00
11     Eastern?
12              MR. RAMER:  Sure.  That works for me.
13     Does that work for -- yeah, okay.  All right.
14     Let's do that.
15              MS. NOWLIN-SOHL:  All right.  Sounds
16     good.  We'll see you then.
17              THE VIDEOGRAPHER:  So the time is
18     1:12 p.m. Mountain time, and we are off the
19     record.
20         (Lunch break taken from 1:12 p.m. to 2:03 p.m.)
21              THE VIDEOGRAPHER:  Okay.  So we are
22     recording.  The time is 2:03 Mountain time, and we
23     are back on the record.
24              (Deposition Exhibit No. 4 was marked.)
25         Q.   (BY MR. RAMER)  Hello, Dr. Connelly.
```

Page 120

Dr. Kara Connelly August 28, 2023

```
 1        A.    Hello.
 2        Q.    Do you have what I've described as
 3   Connelly Exhibit 4 in front of you?
 4        A.    Yes.
 5        Q.    And I assume you're able to read through
 6   this whole document at lunch?  That's a joke.
 7   It's a joke.
 8        A.    Oh.
 9        Q.    But do you recognize this document?
10        A.    I do not.
11        Q.    Do you recognize the lead author's name,
12   Gordon Guyatt?
13        A.    I may have seen it before, but I can't
14   remember where.
15        Q.    Okay.  I'm just going to ask a couple of
16   questions about just the discussion of concepts in
17   this.  And I'll direct you there.  I'm not going
18   to ask you about the contents of the entire
19   document.
20        A.    Okay.
21        Q.    And the first point I want to discuss is
22   actually in the preface of this, so it's Roman
23   Numeral 26, XXVI.
24             MS. NOWLIN-SOHL:  Do you know what page
25   of the PDF that's on?
```

Page 121

Dr. Kara Connelly August 28, 2023

```
 1              MR. RAMER:  I can try to find that.  So
 2     27 of the PDF.
 3              MS. NOWLIN-SOHL:  Okay.  We are on
 4     page 27.
 5         Q.  (BY MR. RAMER)  Okay.  And the first full
 6     paragraph, second sentence, I'm just going to read
 7     it and ask if I read it correctly.
 8              It says "We have added a fundamental
 9     principle to the hierarchy of evidence and the
10     necessity for value and preference judgments:
11     that optimal clinical decision-making requires
12     systematic summaries of the best available
13     evidence."
14              Did I read that correctly?
15         A.  Yes.
16         Q.  And do you agree that optimal
17     decision-making requires systematic summaries of
18     the best available evidence?
19              MS. NOWLIN-SOHL:  Objection; foundation.
20              THE WITNESS:  I would say that systematic
21     summaries of the best available evidence are
22     definitely important contributions to clinical
23     decision-making.
24         Q.  (BY MR. RAMER)  When you say "important
25     contributions," I take it to mean that you do not
```

Page 122

Dr. Kara Connelly August 28, 2023

```
1    think that optimal clinical decision-making
2    requires systematic summaries of the best
3    available evidence; is that fair?
4         A.   I think --
5              MS. NOWLIN-SOHL:  Objection;
6    mischaracterizes the testimony.
7              THE WITNESS:  The optimal clinical
8    decision-making can include systematic summaries.
9         Q.   (BY MR. RAMER)  But does not require it?
10   Is that your testimony?
11        A.   I don't know if I would say that it
12   requires systematic summaries.
13        Q.   Okay.  So you disagree with this
14   statement; is that right?
15             MS. NOWLIN-SOHL:  Objection; form.
16             THE WITNESS:  In some cases -- systematic
17   summaries are not always available.  So with that
18   in mind -- and I believe that clinical -- optimal
19   clinical decision-making can be performed if
20   systematic summaries are not available.
21        Q.   (BY MR. RAMER)  What about if systematic
22   summaries are available?
23        A.   Then I would say that the systematic
24   summaries should be included in all of the
25   evidence that's used in clinical decision-making.
```

Page 123

Dr. Kara Connelly August 28, 2023

1      Q.    What do you understand the phrase

2    "hierarchy of evidence" to mean?

3      A.    Is that in this sentence?  Or in this

4    paragraph?

5      Q.    Sorry, yeah.  It's in the -- it is in the

6    sentence before the colon.  It says "We have added

7    a fundamental principle to the hierarchy of

8    evidence."

9            Are you familiar with that term, the

10   "hierarchy of evidence"?

11     A.    It can mean -- it could mean different

12   things.

13     Q.    Like what?

14     A.    I can explain what my understanding of

15   hierarchy of evidence is.

16     Q.    Please.

17     A.    It is categorization of different types

18   of evidence as -- in terms of validity and

19   reliability.

20     Q.    And I think next in this, I'd like to go

21   to -- and this is the only other page we'll go to

22   in this.  It's page 15.  And I'll see if I can

23   find what that is in the PDF.  Looks like it is 44

24   of the PDF.

25           MS. NOWLIN-SOHL:  Okay.

Page 124

Dr. Kara Connelly August 28, 2023

```
 1          Q.    (BY MR. RAMER)  Are you there?

 2          A.    Yes.

 3          Q.    And I'm just going to read the first

 4     sentence of the first full paragraph and ask if I

 5     read it correctly.

 6                It says "Returning to the hierarchy of

 7     therapy, noting the limitations of human

 8     intuition, EBM places the" --

 9                MS. NOWLIN-SOHL:  Hold on.  Do you see

10     that?

11                THE WITNESS:  No.  Am I in the wrong

12     paragraph?

13                MR. RAMER:  Are you on page -- what page

14     are you on?

15                MS. NOWLIN-SOHL:  Okay.  We just hadn't

16     scrolled far enough down.  We're there.

17                MR. RAMER:  Gotcha.  I'll start that

18     again.

19          Q.    (BY MR. RAMER)  "Return to the hierarchy

20     of therapy, noting the limitations of human

21     intuition, EBM places the unsystematic

22     observations of individual clinicians lowest on

23     the hierarchy."

24                Did I read that correctly?

25          A.    Yes.
```

Page 125

ER-275

(210 of 289), Page 210 of 289
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 126 of 374
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 210 of 289

Dr. Kara Connelly August 28, 2023

```
 1        Q.    What is your understanding of what "the
 2   unsystematic observations of individual
 3   clinicians" means?
 4              MS. NOWLIN-SOHL:  Objection; foundation.
 5              You can also look at this document if you
 6   need to.
 7              THE WITNESS:  Yeah, I think it's hard for
 8   me to understand.  I'm not familiar with the term
 9   "unsystematic observations of individual
10   clinicians," and I can't comment without reading
11   more of the context.
12        Q.    (BY MR. RAMER)  Okay.  Do you see the
13   figure on the same page, Figure 2-3?
14        A.    Yes.
15        Q.    Were these the categories you were
16   describing when you were discussing the hierarchy
17   of evidence earlier?
18        A.    No.
19        Q.    Are you familiar with the term
20   "observational study"?
21        A.    Yes.
22        Q.    And what do you understand an
23   observational study to be?
24        A.    An observational study is looking at a
25   treatment and its outcome without the researcher
```

Page 126

Dr. Kara Connelly August 28, 2023

```
 1    entering any influence or variable.  So it's
 2    simply observing the outcome of a particular
 3    treatment that's been -- the patient has received.
 4         Q.   And are you familiar with the "Multiple
 5    patient randomized trial"?
 6         A.   I can only assume what that is referring
 7    to.  I generally don't see that term that's
 8    just -- in the way that it's listed.
 9         Q.   What would you assume it's referring to?
10         A.   A randomized trial.
11         Q.   And can you describe what a randomized
12    trial is?
13         A.   Randomized trial is when there are two --
14    or at least more than one treatment that's being
15    investigated, and patients are randomly assigned
16    to one or more of the treatment groups without
17    them knowing or choosing what group they're
18    assigned to.
19         Q.   And can you explain why a randomized
20    trial would rank higher in the hierarchy of
21    evidence than an observational study?
22              MS. NOWLIN-SOHL:  Objection; foundation.
23              THE WITNESS:  The main difference between
24    the two is that patients are randomly assigned to
25    treatment groups rather than other ways that they
```

Page 127

(212 of 289), Page 212 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 212 of 289
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 128 of 374
Dr. Kara Connelly August 28, 2023

1  are given treatment.  And so the way that the

2  studies are interpreted can be different in terms

3  of the validity and reliability.

4       Q.   (BY MR. RAMER)  How can they be different

5  in terms of validity and reliability?

6       A.   It depends on the -- it depends on the

7  patient population, the treatments being studied,

8  and the size of the -- the sample sizes of the

9  studies that may play a role in the way that they

10  are viewed in terms of validity and reliability.

11       Q.   Sorry.  I just want to clarify that.

12            So the reason that randomized trials

13  would potentially be deemed more reliable has to

14  do with the patient population and the sample

15  size?  Is that what you said?

16       A.   No.  That's not what I said.  The

17  randomized trials, the factor that may influence

18  the way that it's interpreted in terms of validity

19  and reliability is the fact that the samples

20  are -- the patients are randomized to the

21  different treatment groups rather than having

22  a -- rather than -- yeah, rather than not being

23  randomly assigned to different treatment groups.

24            But if there's a large observational

25  study, it's difficult -- you can't always compare

Page 128

1    and say that every single randomized trial is

2    stronger evidence than an observational study.

3    There's a lot of factors that play into that

4    determination.

5         Q.   And still looking at this figure at the

6    bottom, are you familiar with the term "clinical

7    experience"?

8         A.   Yes.

9         Q.   And are you able to explain why clinical

10   experience is at the bottom of the hierarchy of

11   evidence?

12        A.   At the bottom of this figure, hierarchy

13   of evidence?

14        Q.   Correct.

15        A.   I can only assume what that is meaning to

16   say is that it can be more difficult to make -- to

17   draw conclusions about populations based on one

18   person's clinical experience.

19        Q.   Do you agree with that principle?

20        A.   I think in a lot of cases, that can be

21   accurate.

22        Q.   Are you familiar with the term "GRADE

23   methodology"?

24        A.   Yes.

25        Q.   And could you explain your understanding

Dr. Kara Connelly August 28, 2023

1   of that term?

2        A.   My understanding of the term is a system

3   that is used to classify different types of

4   evidence.

5        Q.   Have you ever attempted to apply the

6   criteria specified by the GRADE methodology?

7             MS. NOWLIN-SOHL:  Object to the form.

8             THE WITNESS:  In my own practice?  Or

9   in --

10        Q.   (BY MR. RAMER)  Ever.

11             MS. NOWLIN-SOHL:  Same objection.

12             THE WITNESS:  I have not ever used the

13   GRADE methodology in -- while writing a paper.

14        Q.   (BY MR. RAMER)  I guess why did you use

15   the qualifier "while writing a paper" at the end

16   there?

17        A.   I wasn't sure what you mean by using.  I

18   think generally the GRADE methodology is used

19   when -- for example, writing clinical methods

20   guidelines.  I have not done that.

21             MR. RAMER:  Okay.  And then I think

22   we'll -- we should have Connelly Exhibit 5.  Let

23   me know if that's not the case.

24             MS. NOWLIN-SOHL:  Yes, we do.

25             (Deposition Exhibit No. 5 was marked.)

Page 130

(215 of 289), Page 215 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 215 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 131 of 374
Dr. Kara Connelly August 28, 2023

```
 1        Q.   (BY MR. RAMER)   Okay.   And, Doctor, have
 2   you seen this article before?
 3        A.   I have not.
 4        Q.   Okay.   I am just going to ask you about
 5   some concepts in it, specifically page 402.   It's
 6   the second page of the document, and in the upper
 7   left of that page, there's a box labeled "Key
 8   Points."
 9             And the third bullet down, I'd just like
10   to read and ask if I read it correctly.
11             It says "The optimal application of GRADE
12   requires systematic review of the impact of
13   alternative management strategies on all
14   patient-important outcomes."
15             Did I read that correctly?
16        A.   Yes.
17        Q.   Are you familiar with the term
18   "patient-important outcome"?
19        A.   That's not a term that I am all that
20   familiar with.   I'm not sure what refers to in
21   this -- or what this paper is referring to with
22   those -- with that statement.
23        Q.   Okay.   As a general matter, based on your
24   understanding of GRADE, GRADE is a method for
25   rating the strength of evidence to predict the
```

Page 131

Dr. Kara Connelly August 28, 2023

1    outcome of a particular intervention, correct?

2        A.    Yes.

3        Q.    And I'd like to go, same document,

4    page 404, so two pages later.  And at the top,

5    there's Table 2, and it's entitled "Significance

6    of the four levels of evidence."

7            Do you see that?

8        A.    Yes.

9        Q.    Are you familiar with this concept of the

10   GRADE quality levels that's represented in the

11   table, just as a general matter?

12       A.    Yes.

13       Q.    And basically the GRADE methodology calls

14   for the assignment of one of those quality levels

15   to the body of evidence that's being assessed,

16   correct?

17       A.    I think that's generally how it's applied

18   or used.

19       Q.    And I just want to -- looking in that

20   table at the "Quality level low," I just want to

21   read the current definition, which is in the

22   second column and ask if I read it correctly.

23            It says "Our confidence in the effect

24   estimate is limited.  The true effect may be

25   substantially different from the estimate of that

Page 132

Dr. Kara Connelly August 28, 2023

```
 1   effect."

 2            Sorry, I read it wrong.  Let me try

 3   again.

 4            "Our confidence in the effect estimate is

 5   limited.  The true effect may be substantially

 6   different from the estimate of the effect."

 7            Did I read that correctly?

 8        A.   Yes.

 9        Q.   And below that is "Very low," and I'll

10   read the definition for that, which says "We have

11   very little confidence in the effect estimate.

12   The true effect is likely to be substantially

13   different from the estimate of effect."

14            Did I read that correctly?

15        A.   Yes.

16        Q.   Okay.  On this same page at the bottom,

17   there's Table 3.  And it's entitled "A summary of

18   GRADE's approach to rating quality of evidence."

19            Do you see that?

20        A.   Yes.

21        Q.   And in the first column, it talks -- you

22   see it's labeled "Study design"?

23        A.   Yes.

24        Q.   And then the second column over you have

25   "Initial quality of a body of evidence"; is that
```

Page 133

Dr. Kara Connelly August 28, 2023

```
 1    right?

 2         A.    Yes.

 3         Q.    And then the next two columns, the first

 4    one is entitled "Lower if," correct?

 5         A.    Yes.

 6         Q.    And the second one is entitled "Higher

 7    if," correct?

 8         A.    Yes.

 9         Q.    Do you know what those two columns are

10    saying?

11         A.    I can't say for certain.  I'm not

12    familiar -- I haven't seen those two columns

13    before.

14              MR. RAMER:  Okay.  We'll move on to

15    Connelly Exhibit 6.

16              (Deposition Exhibit No. 6 was marked.)

17         Q.    (BY MR. RAMER)  And are you familiar with

18    this document?

19              MS. NOWLIN-SOHL:  Hang on real quick,

20    sorry.  They came in in the wrong order in my

21    email.

22              MR. RAMER:  All right.

23              MS. NOWLIN-SOHL:  So this is GRADE

24    guidelines 4?

25              MR. RAMER:  That's correct.
```

Page 134

(219 of 289), Page 219 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 135 of 374
Dr. Kara Connelly August 28, 2023

```
 1              MS. NOWLIN-SOHL:  Okay.
 2              THE WITNESS:  I'm sorry.  What was the
 3      question?
 4         Q.   (BY MR. RAMER)  Are you familiar with
 5      this document?
 6         A.   No.
 7         Q.   Okay.  I'll just ask limited questions on
 8      this.
 9              On page 409, which I think is the third
10      page of the document, in the right column, there
11      is section 7.1.  And I'm just going to read the
12      sentence that starts below that and runs over onto
13      the next page and ask if I read that correctly.
14              It says "Ideally observational studies
15      will choose contemporaneous comparison groups
16      that, as far as possible, differ from intervention
17      groups only in the decision (typically by patient
18      or clinician) not to use the intervention."
19              Did I read that correctly?
20         A.   Yes.
21         Q.   Why would one ideally include a
22      comparison group?
23         A.   The comparison group can reduce the risk
24      of bias like I was talking about earlier.
25         Q.   And then on the next page, 410, the first
```

1   full paragraph, I'm going to read the first two

2   sentences this time and ask if I read those

3   correctly.

4           It says "An alternative approach is to

5   study only patients exposed to the intervention, a

6   design we refer to as a case series (others may

7   use 'single group cohort').  To make inferences

8   regarding intervention effect, case series must

9   still refer to results in a comparison group."

10          Did I read that correctly?

11      A.   Yes.

12      Q.   Do you agree that to make interventions

13  regarding intervention effects, case series must

14  still refer to results in a comparison group?

15      A.   I think that referring to results in a

16  comparison group can increase the reliability of

17  the inferences of the intervention effects.

18      Q.   So in other words, you do not think a

19  case series must refer to results in a comparison

20  group in order to make inferences; is that

21  correct?

22      A.   Having the comparison group improves the

23  ability to make the inferences.

24      Q.   Do you think you can make inferences

25  regarding intervention effects from a case series

Page 136

Dr. Kara Connelly August 28, 2023

```
 1    when there is no comparison group?
 2             MS. NOWLIN-SOHL:  Object to form.
 3             THE WITNESS:  I think that it's possible
 4    to make inferences about intervention effects, but
 5    those inferences are more reliable than the
 6    comparison group that's used.
 7        Q.  (BY MR. RAMER)  Are you familiar with the
 8    term "lost to follow-up"?
 9        A.  Yes.
10        Q.  Can you explain your understanding of
11    that term?
12        A.  Well, do you mean in a research setting
13    or --
14        Q.  Yes, in a research setting.
15        A.  I think different research groups or
16    different research studies may refer to it
17    differently, but I generally think of it as
18    participants in a research study that did not
19    complete the study or did not complete the --
20    yeah, the study measures.
21        Q.  And so now I'd like to return to your
22    declaration, and specifically page 3, paragraph
23    15, in the first sentence.  And typical drill,
24    I'll read it and ask if I read it correctly.
25             You state, "The Endocrine Society, in
```

Page 137

Dr. Kara Connelly August 28, 2023

1    partnership with the Pediatric Endocrine Society
2    and WPATH, have published clinical practice
3    guidelines for the treatment of gender dysphoria
4    that are based on systematic reviews of research
5    and the expert opinions of clinicians in the
6    field."
7              Did I read that correctly?
8         A.    Yes.
9         Q.    I'd just like to talk through the
10   Endocrine Society guidelines and the WPATH
11   guidelines one at a time.  And I'll start with the
12   Endocrine Society guidelines.
13             And in this sentence, you say that these
14   guidelines are based on systematic reviews of
15   research; is that right?
16        A.    Yes.
17        Q.    And what do you mean by that?
18        A.    That means that systematic reviews may
19   have been included in addition to research studies
20   that may not fall under the definition of
21   systematic reviews.
22        Q.    What do you mean when you say "may have
23   been included"?
24        A.    I would have to look back at all of the
25   references of the guidelines, but that systematic

                              Page 138

Dr. Kara Connelly August 28, 2023

```
 1    reviews may have been a part of how those clinical
 2    practice guidelines were established.
 3         Q.   And specifically with respect to the
 4    Endocrine Society guidelines, what systematic
 5    reviews are you referring to?
 6         A.   I can't say without looking -- again,
 7    looking at the references.
 8              MR. RAMER:  Okay.  I think you should
 9    have, Li, the Connelly Exhibit 7.
10              (Deposition Exhibit No. 7 was marked.)
11              MS. NOWLIN-SOHL:  The Endocrine Society
12    guidelines?
13              MR. RAMER:  Yes.  Well, I'll ask
14    Dr. Connelly.
15         Q.   (BY MR. RAMER)  Are these the Endocrine
16    Society guidelines?
17         A.   Yes.
18         Q.   Okay.  And these are what you're
19    referring to in your declaration, correct?
20         A.   Yes, just making sure this is the -- yes,
21    the version from 2017.
22         Q.   Did you help draft these?
23         A.   No.
24         Q.   And I'd like to go to -- so you likely
25    know the pagination is a little odd on these.  I'd
```

Page 139

(224 of 289), Page 224 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 224 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 140 of 374
Dr. Kara Connelly  August 28, 2023

1    like to go to 3873, and specifically the left
2    column.
3            And there's a bold header that says
4    "Commissioned systematic review."
5            Do you see that?
6        A.   Yes.
7        Q.   And I'm just going to read the first
8    sentence and ask if I read it correctly.
9            It says "The task force commissioned two
10   systematic reviews to support this guideline."
11           Did I read that correctly?
12       A.   Yes.
13       Q.   And are these the systematic reviews
14   you're referencing in your declaration?
15       A.   Yes.
16       Q.   And have you ever read these systematic
17   reviews?
18       A.   I cannot say that I -- I cannot recall
19   that I have, but I would need to see what the
20   titles of them are.
21       Q.   Well, do you recall what the subject was
22   of the two systematic reviews?
23       A.   No.
24       Q.   Turning to the sentence after the one I
25   just read, I'll read it and ask if I read it

                                    Page 140

Dr. Kara Connelly August 28, 2023

 1    correctly.

 2            It says "The first one aims to summarize

 3    the available evidence on the effect of sex

 4    steroid use in transgender individuals on lipids

 5    and cardiovascular outcomes."

 6            Did I read that correctly?

 7        A.    Yes.

 8        Q.    Do you have an understanding of how

 9    lipids and cardiovascular outcomes are potentially

10    relevant to your field?

11        A.    Yes.

12        Q.    How?

13        A.    Some treatments could potentially have an

14    impact on lipids and cardiovascular outcomes.

15        Q.    What kind of impact?

16        A.    Well, some treatments can change -- can

17    have an impact on the different types of lipids

18    and cholesterol.  Some lipids can have an impact

19    on blood pressure.  Some treatments may have an

20    impact on -- well, those are the two main ones

21    that I can think of.

22        Q.    Is it fair to say when you're saying

23    "impact," you mean harmful impact?

24        A.    Not necessarily.

25        Q.    Why not necessarily?

Page 141

```
 1       A.    Well, it depends on the -- there are some
 2  treatments that may have -- that may raise the
 3  risk of some cardiovascular outcomes and some
 4  treatments that may lower the risk of some
 5  cardiovascular outcomes, depending on the
 6  individual, their family history, and the
 7  medication that's involved.
 8       Q.    Returning to 3873 and now the right
 9  column, the very top, the first full sentence,
10  I'll read it and ask if I read it correctly.
11            It says "The second review summarized the
12  available evidence regarding the effect of sex
13  steroids on bone health in transgender individuals
14  and identified 13 studies."
15            Did I read that correctly?
16       A.    Yes.
17       Q.    And do you have an understanding of what
18  relevance bone health has to your field?
19       A.    Yes.
20       Q.    And what is that?
21       A.    Sex steroid hormones have differing
22  impacts on bone development in general.
23       Q.    In what sense?
24       A.    The different -- well, they both --
25  both -- well, estrogen and testosterone both
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Dr. Kara Connelly August 28, 2023

```
 1    impact acquisition of bone, but they can have
 2    different effects on what part of the bone
 3    structure they impact.
 4         Q.   And what do you mean by that?
 5         A.   So there's two types of bone, cortical
 6    bone and trabecular bone.  And there are different
 7    hormone receptors on the different parts of the
 8    bone.
 9              So different hormones can impact one or
10    both parts of the bone depending on which hormone
11    it is.
12         Q.   Did either of these two systematic
13    reviews assess the effectiveness of treatment on
14    patients' mental health?
15         A.   I don't know.
16         Q.   Did either of these two systematic
17    reviews assess the effectiveness of puberty
18    blockers to reduce gender dysphoria?
19         A.   I can't answer that.  I haven't --
20    without reading them.
21         Q.   You don't know that as you sit here
22    today?
23         A.   I can't say what the systematic
24    reviews -- what the outcomes were, the specific
25    outcomes of both systematic review studies without
```

Page 143

Dr. Kara Connelly August 28, 2023

```
 1    reviewing them.
 2         Q.   Well, I guess I'm not asking for the
 3    specific outcome.  I'm asking what they actually
 4    assessed.
 5              And the question is did either of these
 6    systematic reviews assess the effectiveness of
 7    puberty blockers to reduce gender dysphoria?
 8         A.   I am not sure.
 9         Q.   Did either of these systematic reviews
10    assess the effectiveness of cross-sex hormones to
11    reduce gender dysphoria?
12         A.   Can you repeat that question?
13         Q.   Did either of these systematic reviews
14    assess the effectiveness of cross-sex hormones to
15    reduce gender dysphoria?
16         A.   I also -- I'm not sure without looking at
17    the reviews.
18         Q.   Did either of these systematic reviews
19    assess the effectiveness of surgeries to reduce
20    gender dysphoria?
21         A.   I don't know that either without reading
22    them.
23         Q.   If you had been tasked with drafting
24    these guidelines, would you have commissioned
25    systematic reviews to assess those topics?
```

Page 144

(229 of 289), Page 229 of 289
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 229 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 145 of 374

Dr. Kara Connelly August 28, 2023

```
 1              MS. NOWLIN-SOHL:  Objection; form,
 2     foundation, speculation.
 3              THE WITNESS:  If I had been commissioned
 4     as part of the team that was putting these
 5     guidelines together, I would work with the team of
 6     experts in determining whether the systematic
 7     reviews should be performed.  I can't say how that
 8     decision was made.
 9         Q.   (BY MR. RAMER)  We'll move on to the
10     WPATH guidelines and specifically -- just going
11     back to your declaration discussion of those,
12     page 3, paragraph 15.
13              I'm just going to read the second
14     sentence of paragraph 15 and ask if I read it
15     correctly.
16              You state "The first version of the WPATH
17     guidelines known as the standards of care was
18     published in 1979, and the most recent version,
19     version 8, was released in 2022."
20              Did I read that correctly?
21         A.   Yes.
22         Q.   And you called them guidelines and then
23     note that they are known as the standards of care;
24     is that right?
25         A.   Yes.
```

Page 145

Dr. Kara Connelly August 28, 2023

```
 1          Q.   Is there a distinction between clinical
 2    guidelines and the standard of care?
 3                MS. NOWLIN-SOHL:  Objection to the extent
 4    that that calls for a legal conclusion.
 5                THE WITNESS:  I think some people use
 6    those terms interchangeably when talking about the
 7    WPATH standards of care.
 8          Q.   (BY MR. RAMER)  Okay.  I understand that.
 9    I'm just asking in your field, or as a clinician,
10    is there a distinction between clinical guidelines
11    and a standard of care?
12                MS. NOWLIN-SOHL:  Objection to the extent
13    that that calls for a legal conclusion.
14                THE WITNESS:  If -- I'm sorry.  Can you
15    repeat the question again?
16          Q.   (BY MR. RAMER)  Is there a distinction
17    between clinical guidelines and a standard of
18    care?
19                MS. NOWLIN-SOHL:  Same objection.
20                THE WITNESS:  They're -- I think that
21    there's a lot of ways that the word "guidelines"
22    are applied.  And in the case of this sentence,
23    it's used interchangeably with "standards of
24    care."
25          Q.   (BY MR. RAMER)  Okay.  So as a clinician,
```

Page 146

ER-296

Dr. Kara Connelly August 28, 2023

```
 1    you don't think there's a distinction between, as

 2    a general matter, clinical guidelines and standard

 3    of care; is that right?

 4              MS. NOWLIN-SOHL:  Objection;

 5    mischaracterizes the testimony and to the extent

 6    that it calls for a legal conclusion.

 7              THE WITNESS:  Can you repeat the question

 8    again?

 9         Q.   (BY MR. RAMER)  I guess the question is

10    just this:  Is there a distinction as a general

11    matter between clinical guidelines and a standard

12    of care?

13              MS. NOWLIN-SOHL:  Same objection.

14              THE WITNESS:  I think it just -- I think

15    it depends upon which clinical guideline is being

16    referred to and the way that that clinical

17    guideline was established, if it's a -- there can

18    be different ways that clinical guidelines are

19    established, and so it depends on what -- which --

20    what type of guideline is being referred to.

21         Q.   (BY MR. RAMER)  Well, then what is a

22    standard of care?

23              MS. NOWLIN-SOHL:  Objection to the extent

24    that that calls for a legal conclusion.

25              THE WITNESS:  Do you mean what is a
```

Page 147

ER-297

(232 of 289), Page 232 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 232 of 289
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 148 of 374
Dr. Kara Connelly August 28, 2023

1   standard of care in WPATH's definition?  Or --
2       Q.   (BY MR. RAMER)  No.  I just mean as a
3   general matter as a clinician, when somebody is
4   talking about the standard of care, what does that
5   mean?
6           MS. NOWLIN-SOHL:  Same objection.
7           THE WITNESS:  I think it can be used as
8   what is -- what is considered best practice for a
9   patient population.
10      Q.   (BY MR. RAMER)  If somebody said that a
11  standard of care was more authoritative than
12  clinical guidelines, would that statement make
13  sense?
14          MS. NOWLIN-SOHL:  Object to form.
15          THE WITNESS:  Would it -- I don't think
16  that I can make sense of that.
17      Q.   (BY MR. RAMER)  So same paragraph in your
18  declaration, back to the first sentence.  And we
19  already discussed this in the context of the
20  Endocrine Society guidelines, but you state that
21  the WPATH guidelines are based on systematic
22  reviews of research, correct?
23      A.   Yes.
24      Q.   And with respect to the WPATH guidelines,
25  what systematic reviews are you referring to here?

                                        Page 148

(233 of 289), Page 233 of 289
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 233 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 149 of 374

Dr. Kara Connelly August 28, 2023

```
 1         A.    I can't say for certain what systematic
 2    reviews.
 3         Q.    That you're referring to in paragraph 15?
 4         A.    Yes, without reading the references.
 5         Q.    And as you sit here today, do you know
 6    whether WPATH commissioned a systematic review
 7    during the development of the current guidelines?
 8         A.    I am not sure if they -- I'm not sure.
 9              MR. RAMER:  So we'll go to -- Li, we'll
10    go to Connelly Exhibit 8, I believe.  It should be
11    Baker, article by Baker.
12              (Deposition Exhibit No. 8 was marked.)
13              MS. NOWLIN-SOHL:  Okay.  We have it.
14         Q.    (BY MR. RAMER)  And, Dr. Connelly, have
15    you seen this article before?
16         A.    Not that I can recall.
17         Q.    Okay.  Let's go to page 2 and
18    specifically right column under the bold "Search
19    Strategy and Selection Criteria."
20              Do you see that?
21         A.    Yes.
22         Q.    And I'll just read the first sentence and
23    ask if I read it correctly.
24              It says "This review is one of a series
25    of systematic reviews on gender-affirming care
```

Page 149

1    conducted for WPATH to inform the eighth revision

2    of the Standards of Care."

3            Did I read that correctly?

4        A.   Yes.

5        Q.   And do you recall reading this article

6    before?

7        A.   This article?

8        Q.   Correct.

9        A.   No.

10       Q.   I want to skip to page 12.  And under the

11   bold discussion, first paragraph, last sentence,

12   I'll read it and ask if I read it correctly.

13           It says "It was impossible to draw

14   conclusions about the effects of hormone therapy

15   on deaths by suicide."

16           Did I read that correctly?

17       A.   Yes.

18       Q.   Do you have any reason to disagree with

19   that statement?

20           MS. NOWLIN-SOHL:  Object to form;

21   foundation.

22           THE WITNESS:  I can't comment without

23   looking at the specific studies that they are

24   referring to.

25       Q.   (BY MR. RAMER)  Are you aware of any

Dr. Kara Connelly August 28, 2023

```
 1    systematic reviews that have been able to draw
 2    conclusions about the effect of hormone therapy on
 3    suicide?
 4         A.   I am not aware of systematic reviews that
 5    have drawn that -- or conclusions around that.
 6         Q.   Is the adolescent chapter of the eighth
 7    version of the Standards of Care based on a
 8    systematic review?
 9              MS. NOWLIN-SOHL:  Object to form.
10              THE WITNESS:  I can't say for certain
11    whether it's based on a systematic review.
12         Q.   (BY MR. RAMER)  I'd like to go to the
13    same article, page 7.
14              And is page 7 turned so you can actually
15    read it?
16         A.   Yeah.
17         Q.   And so this is a table that -- I'm just
18    going to read the title at the top.  It says
19    "Effects of Gender-Affirming Hormone Therapy on
20    Quality of Life Among Transgender People"; is that
21    right?
22         A.   Yeah.
23         Q.   And if you look at the very small font at
24    the bottom below the table where it lists
25    abbreviations, do you see about three-quarters of
```

Page 151

Dr. Kara Connelly August 28, 2023

1    the way down the line it says "QOL" is the

2    abbreviation for quality of life?

3         A.   On the first line of the abbreviations?

4         Q.   Correct.  It's about three-quarters of

5    the way down the line.

6         A.   Yes.

7         Q.   And going back up to the table, there are

8    six columns.

9              And do you see the second column labeled

10   "Transgender Population"?

11        A.   Yes.

12        Q.   And of the studies in this table, all of

13   them except one involved adults, correct?

14        A.   I can't see where ages were included or

15   reported.

16        Q.   So if you look down in the bottom study

17   of the table, I'm going to pronounce it "Achille."

18   I don't know if that's how you pronounce it, but

19   do you see for that study, the transgender

20   population is girls and boys?

21        A.   Yes.

22        Q.   And the study above Achille, the

23   transgender population is women and men?

24        A.   Yes.

25        Q.   Is it fair to say that Achille is

Page 152

ER-302

```
 1    children and adolescents and the study above is
 2    adults?
 3              MS. NOWLIN-SOHL:  Objection; foundation.
 4              THE WITNESS:  I would have to look at the
 5    way that their study populations are defined with
 6    regards to age.
 7         Q.   (BY MR. RAMER)  And for Achille, if you
 8    go to the final column which is labeled
 9    "Findings," do you see where it states -- I'll
10    read it and ask if I read it correctly.  It says
11    "Mean QOL scores did not change."
12              Did I read that correctly?
13         A.   Yes.
14         Q.   Okay.
15              MR. RAMER:  It's a little early, but it's
16    time for kind of another wave of exhibits.  Do you
17    want to take a break now?  Because I -- for the --
18    you know, I don't want to sit on the clock while
19    waiting for documents to come through on the email
20    server, so do you want to take ten minutes now and
21    then I can send a wave of exhibits and we can
22    reconvene?
23              MS. NOWLIN-SOHL:  We don't have a
24    preference.  We're happy to keep going, but if you
25    think that they're quite large exhibits and you
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Dr. Kara Connelly August 28, 2023

```
 1   want to take a break, we can do that as well.
 2              MR. RAMER:  I think let's do that and
 3   just keep the flow going.  Makes sense.
 4              MS. NOWLIN-SOHL:  Okay.
 5              MR. RAMER:  So maybe top of the hour, how
 6   about?
 7              MS. NOWLIN-SOHL:  Sounds good.
 8              MR. RAMER:  Okay.
 9              THE VIDEOGRAPHER:  Okay.  So the time is
10   2:50 p.m. Mountain time, and we are off the
11   record.
12         (Break taken from 2:50 p.m. to 3:00 p.m.)
13              THE VIDEOGRAPHER:  All right.  So we are
14   recording.  The time is 3:00 p.m. Mountain time,
15   and we are back on the record.
16       Q.   (BY MR. RAMER)  Dr. Connelly, I'd like to
17   return to your declaration, and specifically to
18   page 10, paragraph 32, and in particular,
19   footnote 7.
20              And in footnote 7, you cite an article
21   where the lead author is Turban; is that right?
22       A.   Yes.
23       Q.   And do you recall where the authors
24   obtained the data that they used in that study?
25       A.   Yes.  I believe it was the U.S. Trans
```

Page 154

```
 1    Health.
 2         Q.   The U.S. what?
 3         A.   Trans Health Survey.
 4         Q.   And on the next page of your declaration,
 5    paragraph 34, footnote 8, you cite another Turban
 6    article here, right?
 7         A.   Yes.
 8         Q.   And do you recall where the authors
 9    obtained the data that they used for that article?
10         A.   I can't remember for certain, but I
11    believe it was also from the U.S. Trans Health
12    survey.
13         Q.   So I agree.
14              MR. RAMER:  Exhibits 9 and 10, Li, for
15    you, were sent solely to establish that.  So I
16    think we'll deem those as included, but I'm not
17    going to bring them up to ask questions.
18              Does that make sense?
19              MS. NOWLIN-SOHL:  Yeah, that's fine.  I
20    haven't looked at them.  So those are the two
21    Turban studies?
22              MR. RAMER:  Correct.  And Dr. Connelly is
23    correct about where the data came from for that.
24              MS. NOWLIN-SOHL:  Okay.
25         (Deposition Exhibit Nos. 9 and 10 were marked.)
```

Page 155

```
 1                MR. RAMER:  Okay.  So we'll skip to --
 2      should be Connelly Exhibit 11.
 3                Did you receive that one?  It's a larger
 4      one.
 5                MS. NOWLIN-SOHL:  Yes.
 6                MR. RAMER:  Great.
 7                (Deposition Exhibit No. 11 was marked.)
 8                MS. NOWLIN-SOHL:  So are you introducing
 9      the two Turban articles to be marked as exhibits?
10                MR. RAMER:  Yes, correct, just to keep
11      the numbering.
12                And so do we have Connelly Exhibit 11?
13                MS. NOWLIN-SOHL:  We do.
14           Q.   (BY MR. RAMER)  Okay.  And, Doctor, is
15      this the survey you were referencing?
16           A.   Yes.
17           Q.   And do you recall how this survey was
18      conducted?
19           A.   I can't recall the specifics.
20           Q.   I'd like to turn to page 25.  Just let me
21      know when you're there.
22           A.   Okay.
23           Q.   And in the right column, there's a big
24      blue Roman Numeral IV with a header.
25                Do you see that?
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

(241 of 289), Page 241 of 289Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 241 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 157 of 374
Dr. Kara Connelly August 28, 2023

 1          A.    Yes.

 2          Q.    And I'm just going to read the first

 3     sentence below that header and ask if I read it

 4     correctly.

 5               It says "The survey was produced and

 6     distributed in an online-only format after a

 7     determination that it would not be feasible to

 8     offer it in paper format due to the length and the

 9     complexity of the skip logic required to move

10     through the questionnaire."

11               Did I read that correctly?

12          A.    Yes.

13          Q.    And did you know this was an online

14     survey before you cited the Turban articles?

15          A.    Yes.

16          Q.    And do you know the age of the

17     respondents in this survey?

18               MS. NOWLIN-SOHL:  Object to form.

19               THE WITNESS:  I can't recall the

20     specifics.

21          Q.    (BY MR. RAMER)  If we could go to page 23

22     and the left column.  And below "II," the second

23     paragraph, I'll read the first two sentences and

24     ask if I read them correctly.

25               It says "The study included individuals

                                        Page 157

Dr. Kara Connelly August 28, 2023

```
 1   aged 18 and older at the time of survey
 2   completion, as did the NTDS.  The study was not
 3   offered to individuals under the age of 18 due to
 4   limitations created by specific risk factors and
 5   recommendations associated with research involving
 6   minors."
 7           Did I read that correctly?
 8      A.   Yes.
 9      Q.   And did you know that the survey was only
10   individuals ages 18 and older before you cited the
11   two Turban articles?
12      A.   Yes.
13      Q.   Do you think a survey regarding the
14   experience of transgender adults adequately
15   captures the experience of transgender youth?
16           MS. NOWLIN-SOHL:  Object to the form.
17           THE WITNESS:  I'm sorry.  Can you repeat
18   the question?
19      Q.   (BY MR. RAMER)  Do you think a survey
20   regarding the experience of transgender adults
21   adequately captures the experience of transgender
22   youth?
23           MS. NOWLIN-SOHL:  Same objection.
24           THE WITNESS:  Can you clarify what you
25   mean by "experience"?
```

Page 158

Dr. Kara Connelly August 28, 2023

```
 1          Q.   (BY MR. RAMER)  Are you familiar with the
 2     phrase "lived experience"?
 3          A.   I've heard the phrase, and I think it can
 4     mean different things for different people.
 5          Q.   Do you think that data from a survey of
 6     transgender adults can reliably be used to assess
 7     outcomes in transgender youth?
 8               MS. NOWLIN-SOHL:  Object to form.
 9               THE WITNESS:  I think that information
10     that is gathered from transgender adults about
11     their own experience as transgender youth can be
12     valuable.
13          Q.   (BY MR. RAMER)  Do you think the results
14     of this survey can be used to assess outcomes for
15     transgender youth?
16               MS. NOWLIN-SOHL:  Object to form.
17               THE WITNESS:  Can you be a little more
18     specific?
19          Q.   (BY MR. RAMER)  So you agree the data in
20     this survey only comes from adults, right?
21          A.   Correct.
22          Q.   And do you think that that data is useful
23     in understanding the needs of transgender youth?
24          A.   I think that the transgender adults'
25     reports on their experiences as transgender youth
```

Page 159

ER-309

```
 1    is -- can be valuable and helpful.

 2         Q.   Is that what this survey does?

 3         A.   This survey asks a lot of questions, and

 4    one portion or aspect of it is asking transgender

 5    adults to -- about questions pertaining to their

 6    experiences as transgender youth.

 7         Q.   Just returning to that same paragraph,

 8    I'd like to read the sentence that runs over to

 9    the next column, and I'll just ask if I read it

10    correctly.

11         It says "Furthermore, the current

12    experiences and needs of transgender youth often

13    differ those of adults in a number of key areas,

14    including experiences related to education,

15    employment, accessing health care, and updating

16    identity documents and many of these experiences

17    or needs could be adequately captured in a survey

18    that was not specifically tailored to transgender

19    people under the age of 18."

20         Did I read that correctly?

21         A.   Yes.

22         Q.   And do you agree with that statement?

23         A.   I agree with the first portion that

24    current experiences and needs of transgender youth

25    can differ or often differ from those of adults.
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

(245 of 289), Page 245 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 245 of 289
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 161 of 374
Dr. Kara Connelly August 28, 2023

1          And I don't know how to comment on the
2    second portion that many of these experiences or
3    needs could not be adequately captured in a
4    survey, that portion.  It's -- I think what my
5    interpretation of that second part of this
6    sentence is is that the survey was not designed to
7    study the -- was not originally designed to study
8    the experiences of transgender -- current
9    experiences of transgender youth.
10       Q.   And what's the consequence of that?
11            MS. NOWLIN-SOHL:  Object to form.
12            THE WITNESS:  Can you be more specific?
13       Q.   (BY MR. RAMER)  That the study was not
14    designed to assess the experiences of transgender
15    youth.  Isn't a consequence of that that the data
16    from the study should not be used to assess the
17    current experiences of transgender youth?
18            MS. NOWLIN-SOHL:  Object to form.
19            THE WITNESS:  That would not be my
20    interpretation.
21       Q.   (BY MR. RAMER)  What would your
22    interpretation be?
23       A.   I interpret this more as an explanation
24    of the way that the survey was designed and
25    acknowledging that there may have been questions

Page 161

(246 of 289), Page 246 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 162 of 374
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 246 of 289

Dr. Kara Connelly August 28, 2023

```
 1    that could be asked of transgender youth that were
 2    not asked in a survey that was designed for
 3    adults.
 4         Q.   And switching to -- oh, no, I'm sorry.  I
 5    have another question.  I apologize.
 6              Were the respondents to this survey all
 7    diagnosed with gender dysphoria?
 8         A.   I don't know.
 9         Q.   Do you know how the respondents were
10    selected for this survey?
11         A.   I don't recall.
12         Q.   Let's go to page 26.  Left column, the
13    carryover paragraph.  And I'm going to read the --
14    I'm going to read the last two sentences of this
15    paragraph and ask if I read them correctly.
16              "Although the intention was to recruit a
17    sample that was as representative as possible of
18    trans" --
19              MS. NOWLIN-SOHL:  Real quick, John, I'm
20    not sure we're on the same spot.  You said the
21    left-hand column of page 26?
22              MR. RAMER:  Correct.  It will be the
23    runover paragraph, so it will be the sentences
24    above the blue Roman V.
25              MS. NOWLIN-SOHL:  Okay.  We're there.
```

                                          Page 162

ER-312

Dr. Kara Connelly August 28, 2023

```
 1              MR. RAMER:  And I'll read that, the
 2     sentence beginning with "Although."
 3              "Although the intention was to recruit a
 4     sample that was as representative as possible of
 5     transgender people in the U.S., it is important to
 6     note that respondents in this study were not
 7     randomly sampled, and the actual population
 8     characteristics of transgender people in the U.S.
 9     are not known.  Therefore, it is not appropriate
10     to generalize the findings in this study to all
11     transgender people."
12              Did I read that correctly?
13         A.    Yes.
14         Q.    And were you aware of this limitation
15     before you cited the Turban studies?
16              MS. NOWLIN-SOHL:  Object to form.
17              THE WITNESS:  Can you clarify what you
18     mean by "limitation"?
19         Q.    (BY MR. RAMER)  I'm referring to the last
20     sentence where it says -- the survey itself says
21     it is not appropriate to generalize the findings
22     in this study to all transgender people.
23         A.    Was I aware of that sentence before
24     citing the Turban studies?
25         Q.    Were you aware the survey says that it's
```

Page 163

```
 1    not appropriate to generalize its findings to all
 2    transgender people before you cited the Turban
 3    studies?
 4         A.   I can't say that I recall reading that
 5    exact sentence, but -- yeah, I don't -- I can't --
 6    I don't recall remembering or reading that exact
 7    sentence.
 8         Q.   And I guess my question isn't so much
 9    whether you recall reading that exact sentence.
10    It's more were you aware of that fact?
11              MS. NOWLIN-SOHL:  Object to form.
12              THE WITNESS:  The statement that they
13    made in the survey?
14         Q.   (BY MR. RAMER)  Were you aware that
15    respondents in the study were not randomly
16    sampled?
17         A.   Yes.
18              MR. RAMER:  And now we'll switch to a new
19    exhibit, which I believe -- let's see what I sent
20    it as.  It should be Connelly Exhibit 12.
21         (Deposition Exhibit No. 12 was marked.)
22              THE WITNESS:  Okay.
23         Q.   (BY MR. RAMER)  Doctor, have you seen
24    this document before?
25         A.   I may have seen this document, but I -- I
```

Page 164

Dr. Kara Connelly August 28, 2023

1    don't see where it was released or who the authors

2    are.

3        Q.   Well, I guess that's a question is did

4    you help develop this statement?

5        A.   No.

6        Q.   Have you helped develop any statement for

7    the Pediatric Endocrine Society?

8        A.   No.

9        Q.   So under the first paragraph -- and just

10   to confirm, the Pediatric Endocrine Society is the

11   organization that you're a member of, right?

12       A.   Correct.

13       Q.   Under the first paragraph, the final

14   sentence, I'll read it and ask if I read it

15   correctly.

16            It says "While there continue to be gaps

17   in knowledge about the optimal care for

18   transgender individuals, the framework for

19   providing care is increasingly well established,

20   as is the recognition of needed policy changes."

21            Did I read that correctly?

22       A.   Yes.

23       Q.   And do you think there are gaps in

24   knowledge about the optimal care for transgender

25   individuals?

Page 165

Dr. Kara Connelly August 28, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form.
 2              THE WITNESS:  I think that there is
 3    information that we still need to learn more
 4    about.
 5         Q.   (BY MR. RAMER)  Like what?
 6         A.   You mean specific examples?
 7         Q.   Yes.
 8         A.   Well, an example might be different
 9    medications that may be successful for menstrual
10    cycle cessation.  Some may be more effective than
11    others in certain populations, is one example that
12    comes to mind.
13         Q.   And in the second paragraph below
14    "Background," I'm going to read the last three
15    sentences, so really everything except the first
16    sentence, and ask if I read that correctly.
17              It says "Gender identity was considered
18    malleable and subject to external influences.
19    Today, however, this attitude is no longer
20    considered valid.  Considerable scientific
21    evidence has emerged demonstrating a durable
22    biological element underlying gender identity.
23    Individuals may make choices due to other factors
24    in their lives, but there do not seem to be
25    external forces that generally cause individuals
```

Page 166

ER-316

(251 of 289), Page 251 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 167 of 374
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 251 of 289
Dr. Kara Connelly August 28, 2023

```
 1    to change gender identity."
 2           Did I read that correctly?
 3       A.   Yes.
 4       Q.   And what is your understanding of the
 5    statement that "gender identity is durable"?
 6       A.   I would have to look at the two
 7    references that are listed there, that are
 8    attached to that statement, that sentence.
 9       Q.   You don't have an opinion without looking
10    at those references what it means for gender
11    identity to be durable?
12       A.   I'm not sure what it means by a "durable
13    biological element."
14       Q.   And what's your --
15       A.   I would need to look at the two
16    references to know what they are and how that is
17    defined to be able to say whether -- to really say
18    what they're trying to, what they mean by that
19    statement.
20           MR. RAMER:  And, Li, did Exhibit 14 -- I
21    realize I'm skipping ahead a bit, but did
22    Exhibit 14 come through?
23           MS. NOWLIN-SOHL:  Yes.
24           MR. RAMER:  All right.  I'd like to pull
25    that up.
```

Page 167

ER-317

(252 of 289), Page 252 of 289Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 252 of 289
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 168 of 374
Dr. Kara Connelly August 28, 2023

1          (Deposition Exhibit No. 14 was marked.)

2          MS. NOWLIN-SOHL:  Okay.

3      Q.   (BY MR. RAMER)  And, Doctor, I'll

4  represent this is a printout from the Endocrine

5  Society website.  And you can see the upper right

6  it says "November 30, 2020."

7          And in the second paragraph, the second

8  sentence -- I'm just going to read that and ask if

9  I read it correctly.

10          It says "The group updated the society's

11  transgender health position statement to provide

12  further background and support on the treatment of

13  transgender minors and developed a new fact sheet

14  focused on ways to improve pediatric care for

15  transgender minors."

16          Did I read that correctly?

17      A.   Yes.

18      Q.   And then further down on the same page,

19  the very last paragraph, it says "Special thanks

20  to," and then it lists a bunch of names.

21          And then it says "as well as Kara

22  Connelly, MD," and lists a bunch of names, "all of

23  whom participated in the development of these

24  documents."

25          Do you see that?

                                    Page 168

Dr. Kara Connelly August 28, 2023

```
 1        A.    Yes.
 2        Q.    So just so I understand, did you
 3   participate in the development of this position
 4   statement?
 5        A.    Do you mean the --
 6        Q.    The previous exhibit we were looking at.
 7   Sorry.
 8        A.    Oh, no.
 9        Q.    Okay.  Do you understand what this would
10   be referencing with respect to the documents that
11   you participated in the development of?
12        A.    The special thanks statement?  I
13   participated in the development of the new fact
14   sheet.
15        Q.    Okay.  And does the fact sheet reference
16   a durable biological underpinning to gender
17   identity?
18        A.    I can't recall.  I would have to look at
19   it again.  It's been a few years since I looked at
20   it.
21        Q.    And so on this page, for example, they
22   reference the durable biological underpinning to
23   gender identity.
24              And just to clarify, your testimony is
25   that you don't know what that's referring to; is
```

Page 169

(254 of 289), Page 254 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 170 of 374
Dr. Kara Connelly August 28, 2023

```
1    that right?
2           MS. NOWLIN-SOHL:  John, are you still on
3    the web printout, or are you back to the previous
4    exhibit?
5           MR. RAMER:  Sorry, yeah.  That was
6    unclear.  I'm still on the web printout, and you
7    can see there is a numbered list.
8       Q.   (BY MR. RAMER)  And No. 1 states "There
9    is a durable biological underpinning to gender
10   identity that should be considered in policy
11   determinations."
12          And my question is just similar to one we
13   were discussing, the previous exhibit, is that
14   you, Dr. Connelly, don't know what that means when
15   it says "durable biological underpinning"; is that
16   right?
17          MS. NOWLIN-SOHL:  Object to form;
18   mischaracterizes testimony.
19          THE WITNESS:  I'm sorry.  Can you repeat
20   the question?
21      Q.   (BY MR. RAMER)  Just to simplify the
22   question, it's just do you know what this is
23   referring to when it says "durable biological
24   underpinning to gender identity"?
25          MS. NOWLIN-SOHL:  Object to form.
```

Page 170

Dr. Kara Connelly August 28, 2023

```
 1              THE WITNESS:  I can't say what that is
 2     referring to.  And there may be more information
 3     in other references about what exactly that
 4     statement is referring.
 5         Q.   (BY MR. RAMER)  So let's switch back to
 6     the previous exhibit, which should be Connelly
 7     Exhibit 12.
 8              MS. NOWLIN-SOHL:  And just to confirm,
 9     John, because the numbering on the PDF files are
10     different than the exhibit labeling, this is the
11     one that's numbered 10?
12              MR. RAMER:  Yes, that's right, Li.  I
13     apologize.
14              MS. NOWLIN-SOHL:  No problem.  I just
15     wanted to make sure we're looking at the same
16     thing.
17         Q.   (BY MR. RAMER)  And back in that left
18     column, the paragraph we were previously looking
19     at, the sentence that says -- sorry.
20              The fourth sentence in that paragraph
21     says "Considerable scientific evidence has emerged
22     demonstrating a durable biological element
23     underlying gender identity."
24              I just want to understand, do you think
25     that statement is true?
```

Page 171

Dr. Kara Connelly August 28, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form.
 2              THE WITNESS:  I can't say.  I can't say
 3    whether I think that that's true, again, without
 4    knowing what they refer to as "durable biological
 5    element."
 6         Q.   (BY MR. RAMER)  And in the last sentence
 7    in that paragraph, it says "There do not seem to
 8    be external forces that genuinely cause
 9    individuals to change gender identity."
10              Do you see that?
11         A.   Yes.
12         Q.   In your opinion, is it true that
13    individuals do not genuinely change gender
14    identity?
15              MS. NOWLIN-SOHL:  Object to form.
16              THE WITNESS:  Can you repeat the
17    question?
18         Q.   (BY MR. RAMER)  Yeah, just in your
19    opinion, is it true that individuals do not
20    genuinely change gender identity?
21              MS. NOWLIN-SOHL:  Same objection.
22              THE WITNESS:  In my professional opinion,
23    it is that generally there are not forces that
24    cause someone's gender identity to change.
25         Q.   (BY MR. RAMER)  Does someone's gender
```

Page 172

(257 of 289), Page 257 of 289    Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 257 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 173 of 374
Dr. Kara Connelly August 28, 2023

```
 1    identity change?
 2         A.   I think sometimes someone -- someone's
 3    experiences in gender identity can change,
 4    although I think it's very, very rare.
 5         Q.   And do you think that change is genuine?
 6         A.   Can you explain what you mean by
 7    "genuine"?
 8         Q.   I guess as more a theoretical matter,
 9    when somebody's experienced that their gender
10    identity changes, that change is a genuine change
11    in their gender identity, meaning it is not a
12    mistake; is that right?
13              MS. NOWLIN-SOHL:  Object to form.
14              THE WITNESS:  I'm confused by the
15    question.
16         Q.   (BY MR. RAMER)  Okay.  We'll move on.
17              So same document, the right column.  And
18    there's a blue header, "Considerations," and then
19    the second paragraph down.
20              It says "The Endocrine Society's clinical
21    practice guideline on gender dysphoria/gender
22    incongruence provides the standard of care for
23    supporting transgender individuals."
24              Did I read that correctly?
25         A.   Yes.
```

Page 173

ER-323

Dr. Kara Connelly August 28, 2023

1        Q.   And is that true?

2             MS. NOWLIN-SOHL:  Object to form.  Object

3    to the extent that it calls for a legal

4    conclusion.

5             THE WITNESS:  I think I would say that

6    the Endocrine Society's clinical practice

7    guideline helps to establish what would be

8    considered best practices in the care of

9    transgender individuals.

10       Q.   (BY MR. RAMER)  So would you be unwilling

11   to say that the Endocrine Society guideline

12   provides the standard of care for supporting

13   transgender individuals?

14            MS. NOWLIN-SOHL:  Object to the extent

15   that it calls for a legal conclusion.

16            THE WITNESS:  I think that there are --

17   there's -- people use the word "standard of care"

18   in different ways.  So I can't say that that would

19   be the -- would be true in every situation that --

20   in every meaning of the word "standard of care."

21   It would depend on how standard of care is being

22   defined.

23       Q.   (BY MR. RAMER)  And so this statement is

24   issued by the Pediatric Endocrine Society.

25            And how do you think members of the

Page 174

(259 of 289), Page 259 of 289
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 259 of 289
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 175 of 374
Dr. Kara Connelly August 28, 2023

1    Pediatric Endocrine Society would understand the

2    phrase the "standard of care"?

3            MS. NOWLIN-SOHL:  Objection; speculation.

4            THE WITNESS:  I was not an author of this

5    statement, and I can't -- I can't say what all the

6    members of the Pediatric Endocrine Society or the

7    authors are meaning by this statement.

8        Q.   (BY MR. RAMER)  Do you recall whether the

9    Endocrine Society guidelines say if they establish

10   a standard of care?

11       A.   I don't recall that.

12           MR. RAMER:  Let's go back to those

13   guidelines, which I believe are Connelly

14   Exhibit 7.  And the file name unfortunately begins

15   with an 8.

16           MS. NOWLIN-SOHL:  We have that.

17           MR. RAMER:  Okay.  And I'd like to go to

18   3895, which should be toward the back.

19           MS. NOWLIN-SOHL:  Okay.

20       Q.   (BY MR. RAMER)  And in the right column

21   under the bold "Acknowledgements," do you see

22   there's a paragraph that begins with "Disclaimer"?

23       A.   Yes.

24       Q.   And I'm just going to read the third

25   sentence and ask if I read it correctly, which is

                                            Page 175

(260 of 289), Page 260 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 176 of 374
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 260 of 289
Dr. Kara Connelly August 28, 2023

1   "The guidelines cannot guarantee any specific

2   outcome, nor do they establish a standard of

3   care."

4        Did I read that correctly?

5        A.   Yes.

6        Q.   Okay.  We'll next move back to your

7   declaration, and specifically page 9,

8   paragraph 31.  And starting with the fourth

9   sentence, I'm just going to read the fourth and

10  fifth sentences and ask if I read them correctly.

11       "While the social and political

12  environments may continue to negatively impact a

13  patient's mental health, we see dramatic

14  improvements in our patients after they begin

15  gender-affirming medical care.  Depression,

16  anxiety, self-harm, and suicidal ideations are

17  significantly reduced based on the screening tools

18  PHQ-9 and GAD-7, which patients complete at every

19  visit."

20       Did I read that correctly?

21       A.   Yes.

22       Q.   And can you just explain what the PHQ-9

23  is?

24       A.   Yes.  It -- I believe it stands for

25  patient health questionnaire, but I'm not certain.

<div align="right">Page 176</div>

Dr. Kara Connelly August 28, 2023

```
 1    And it is a screening tool for depression,
 2    clinical depression.
 3         Q.   And do you happen to know what the 9
 4    means?
 5         A.   I think it refers to the number of
 6    questions that's included.
 7         Q.   And when a patient completes the PHQ-9,
 8    it results in a score; is that right?
 9         A.   Yes.
10         Q.   And essentially the higher the score, the
11    worst patient's depression; is that right?
12         A.   The higher the score -- the score
13    determines the -- I can't remember the exact term.
14    The likelihood that a patient has clinically
15    significant depression.
16         Q.   And so just as a general matter, a higher
17    score is worse than a lower score; is that right?
18         A.   There isn't a way of characterizing it as
19    better or worse just simply based on the number.
20         Q.   Can you explain that a little more?
21         A.   Yeah.  So there -- so clinically
22    significant depression can include several of the
23    different numbers of the score.  But if they fall
24    within the same category of the clinically
25    significant depression, one number -- like, a 24
```

Page 177

(262 of 289), Page 262 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 262 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 178 of 374
Dr. Kara Connelly August 28, 2023

1    or -- I can't remember what the total, what the

2    highest number is, but let's say 22 may not be

3    more significant than a 21.

4            And we also look at the specific

5    questions and the way that those are answered when

6    looking at the score.  So we don't just look at

7    the total score to determine how significant

8    someone's depression is.

9        Q.   Well, is there a score for the PHQ-9 that

10   serves as a cutoff for particular conclusions?

11       A.   I cannot recall that.  That's more in the

12   expertise of our behavioral health team members.

13       Q.   So I take your point about the 24 versus

14   the 22, you can't make any conclusions.

15           But just as a general matter if somebody

16   scores a zero and somebody scores 22, the person

17   who scores a 22 has more indications of

18   depression, correct?

19       A.   The person who scores a 22 would be at a

20   higher likelihood of experiencing clinically

21   significant depression compared to someone who

22   scores a zero.

23       Q.   And then could you explain what the GAD-7

24   is?

25       A.   Yes.  That is a screening tool for

                                        Page 178

(263 of 289), Page 263 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 263 of 289
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 179 of 374
Dr. Kara Connelly August 28, 2023

1  determining clinically significant anxiety.

2      Q.   So it's kind of like the PHQ-9, but for

3  anxiety; is that right?

4      A.   Yes.

5      Q.   And in your declaration back in

6  paragraph 31, the sentences we were just talking

7  about, you say you see dramatic improvements in

8  your patients after they begin gender-affirming

9  medical care; is that right?

10     A.   Yes.

11     Q.   Is that something you studied before?

12          MS. NOWLIN-SOHL:  Object to form.

13          THE WITNESS:  Can you be more specific?

14     Q.   (BY MR. RAMER)  Have you ever looked at

15  data to confirm that statement?

16          MS. NOWLIN-SOHL:  Object to form.

17          THE WITNESS:  In our clinic?

18     Q.   (BY MR. RAMER)  Correct.

19     A.   I can't say that we have conducted any

20  studies that have -- that have looked at overall

21  improvements in patients after they begin care.

22          MR. RAMER:  And, Li, I'd like to go to

23  Connelly Exhibit 13, which has, again,

24  unfortunately an 11 in the file name.

25          MS. NOWLIN-SOHL:  Okay.

Page 179

(264 of 289), Page 264 of 289Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 264 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 180 of 374
Dr. Kara Connelly August 28, 2023

```
 1              (Deposition Exhibit No. 13 was marked.)
 2         Q.   (BY MR. RAMER)  And, Doctor, do you
 3    recognize this article?
 4         A.   Yes.
 5         Q.   And did you help author this article?
 6         A.   Yes.
 7         Q.   And did the data used in this article
 8    come from your clinic?
 9         A.   Yes.
10         Q.   Okay.  I'd like to go to page 198, I
11    guess the third page, Table 1.
12              And in Table 1, do you see there's a
13    category for affirmed gender?
14         A.   Yes.
15         Q.   And for male in that category, does that
16    mean it's an assigned female at birth with a
17    gender identity of male?
18         A.   Yes.
19         Q.   And so am I reading the table correctly
20    that over 70 percent of the sample were assigned
21    female at birth?
22         A.   In this study, yes, 72 percent were --
23    had an affirmed gender of male.  And I think in
24    likely all cases, that meant that they had -- we
25    can only -- I can only assume what their assigned
```

Dr. Kara Connelly August 28, 2023

```
 1   sex at birth is because it doesn't specify it
 2   here.  And some people who are assigned male at
 3   birth may still list their gender as male.
 4           But I would say yes, the majority are
 5   likely assigned female at birth.
 6      Q.   Does that percentage of 70 percent -- or
 7   let me ask it a different way.
 8           Is that percentage of 70 percent, in your
 9   estimation, reflective of your patient population
10   generally?
11      A.   Not generally.
12      Q.   Do you think it's higher or lower?
13      A.   It's higher in this sample than what we
14   see generally.
15      Q.   How much higher, do you think?
16      A.   Well, generally I'd say about two-thirds
17   of our patient population are assigned female at
18   birth.
19      Q.   And then going to page 197, the left
20   column, and there's the bold header "Methods."
21   And then under "Methods," it says "Participants
22   and procedure."  And then I'd like to read the
23   third sentence in that paragraph and ask if I read
24   it correctly.
25           It says "In this clinic, youth do not
```

Page 181

(266 of 289), Page 266 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 266 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 182 of 374
Dr. Kara Connelly August 28, 2023

1    receive prescriptions for hormone medication

2    management at the initial visit, but many patients

3    initiate medications between their first and

4    second appointments after completing required

5    steps (family receives extensive counseling, signs

6    consent form, completes assessment, and acquires a

7    letter of support from an experienced mental

8    health provider.)"

9         Did I read that correctly?

10        A.   Yeah.

11        Q.   And is it true that many patients at your

12   clinic begin taking either puberty blockers or

13   cross-sex hormones after only one appointment?

14        A.   You mean after one -- after the first

15   medical visit?

16        Q.   Is that what "initial visit" refers to in

17   here?

18        A.   Yes.

19        Q.   So yes, that's what I'm asking.

20        A.   Yes.  There are a number of patients that

21   initiate medications after their first medical

22   visit, but that may not be the first visit that

23   they had with our team.

24        Q.   And over to page 198, back to Table 1,

25   and do you see there's a category toward the

Page 182

Dr. Kara Connelly August 28, 2023

```
 1   bottom of the table that says "Interventions"?
 2        A.   Yes.
 3        Q.   And in that category, there's a row that
 4   says "Neither hormone blockers or HT."
 5             Do you see that?
 6        A.   Yes.
 7        Q.   Does "HT" stand for hormone therapy?
 8        A.   Yes.
 9        Q.   And hormone therapy can also be described
10   as cross-sex hormones; is that right?
11        A.   Yes.
12        Q.   And in this table, it says that
13   96.2 percent were not on puberty blockers or
14   cross-sex hormones at the initial visit, correct?
15        A.   I have to go back to look to see what
16   exactly initial visit is referring to.
17        Q.   What could it be referring to?
18        A.   If -- I don't know if that means that
19   they -- when they were seen for that initial visit
20   they were already on treatment or if they were
21   prescribed that treatment following the initial
22   visit.
23        Q.   Well, I guess let's move to the second
24   column, then, in that same row.  And it looks like
25   by the time of the follow-up visit, the number --
```

                                          Page 183

Dr. Kara Connelly August 28, 2023

```
 1    excuse me.

 2            The percentage that is not on hormone

 3    blockers or cross-sex hormones falls to only

 4    47.5 percent; is that right?

 5            MS. NOWLIN-SOHL:  Object to the form.

 6            THE WITNESS:  I'm sorry.  Can you repeat

 7    the question?

 8        Q.   (BY MR. RAMER)  Yeah.  Just in Table 1,

 9    we were just looking at the row that discusses

10    neither hormone blockers or hormone therapy.

11            And we saw that at the initial visit, it

12    says there were -- 96.2 percent of the sample were

13    on neither hormone blockers or hormone therapy,

14    correct?

15        A.   Correct.

16        Q.   And then when you move over a column to

17    the follow-up, that percentage falls to

18    47.5 percent.

19            Do you see that?

20        A.   Yes.

21        Q.   So by the time of the follow-up

22    appointment, over half the patients in this sample

23    were on either puberty blockers or cross-sex

24    hormones, correct?

25            MS. NOWLIN-SOHL:  Object to form.
```

Page 184

Dr. Kara Connelly  August 28, 2023

```
 1              THE WITNESS:  So is your question what
 2     was the percentage of individuals who started who
 3     were on therapy by the time of the follow-up
 4     visit?
 5         Q.  (BY MR. RAMER)  My question is simply
 6     just trying to understand the data on that line.
 7     And what it looks like -- and correct me if I'm
 8     wrong -- is what it looks like is that at the
 9     initial visit, 96.2 percent of the sample were on
10     neither puberty blockers nor cross-sex hormones,
11     but then by the time of the follow-up visit, only
12     47.5 percent were neither on puberty blockers or
13     cross-sex hormones.
14              Am I reading that correctly?
15         A.  Yes.
16              MS. NOWLIN-SOHL:  The follow-up does not
17     say the initial follow-up.
18              MR. RAMER:  Sure.
19         Q.  (BY MR. RAMER)  And is that percentage
20     reflective of your patient population generally?
21         A.  I would say generally no.
22         Q.  I'd like to go back to page 197.  I guess
23     why would you say that, "generally no"?
24         A.  Because generally there are a higher
25     number of patients that are not on cross-sex
```

Page 185

Dr. Kara Connelly August 28, 2023

1    hormone therapy or puberty blockers at the time of
2    their first follow-up visit.
3         Q.   And is that higher number or higher
4    percentage?
5         A.   Than this study?
6         Q.   I'm asking because I would assume the
7    number is certainly higher because this is just a
8    sample.  And my question is about the percentage.
9         A.   Yes, a higher percentage than -- in this
10   study are not on cross-sex hormones or puberty
11   blockers at the time of their first follow-up
12   visit.
13        Q.   So did you choose -- for this article did
14   you choose a data set that was not representative
15   of your clinic?
16             MS. NOWLIN-SOHL:  Object to the form.
17             THE WITNESS:  No.  This wasn't a sample
18   that was chosen, but it is a sample in this period
19   of time that is different than what our population
20   is now.
21        Q.   (BY MR. RAMER)  And so how much higher do
22   you think the percentage is now?
23             MS. NOWLIN-SOHL:  Object to form.
24             THE WITNESS:  How much higher is the
25   percentage of patients who are not on cross-sex

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

(271 of 289), Page 271 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 271 of 289
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 187 of 374
Dr. Kara Connelly August 28, 2023

1    hormones or puberty blockers at the time of their

2    first follow-up appointment?

3         Q.   (BY MR. RAMER)  Correct.

4         A.   I would probably estimate closer to

5    70 percent.

6         Q.   So then by the time of the first

7    follow-up, your estimation is that 30 percent are

8    on either puberty blockers or cross-sex hormones;

9    is that right?

10        A.   Yes.

11        Q.   And is that greater than the 2 percent

12   you mentioned earlier this morning?

13        A.   Can you remind me what the 2 percent --

14        Q.   It's not important.  Sorry.  I'll move

15   on.

16             Okay.  So page 197, left column, first

17   full paragraph which begins with the phrase "To

18   fill these gaps in the research," do you see that?

19        A.   Yes.

20        Q.   And in this paragraph, is it fair to say

21   you are listing the aims of this study?

22        A.   Yes.

23        Q.   And I'm going to read the first aim and

24   just ask if I read it correctly.

25             It says "Describe changes in anxiety and

                                        Page 187

(272 of 289), Page 272 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 188 of 374
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 272 of 289
Dr. Kara Connelly August 28, 2023

```
 1   depression and suicidality from intake visit to
 2   first follow-up appointment using the PHQ-9 and
 3   GAD-7 in TGN youth."
 4            Did I read that correctly?
 5       A.   Yes.
 6       Q.   And "TGN," does that stand for
 7   transgender and gender nonconforming?
 8       A.   I'm just going to double-check.  Yes.
 9       Q.   And then for the third aim, it says
10   "Examine changes in anxiety and depression from
11   intake to first follow-up among the TGN youth who
12   initiate HT"; is that right?
13       A.   Yes.
14       Q.   And "HT" there refers to hormone therapy,
15   correct?
16       A.   Yes.
17       Q.   Okay.  I'd like to go back to 198 and to
18   Table 2 now.  And in Table 2, that table is
19   entitled "Change in depression and anxiety from
20   initial visit to first follow-up," correct?
21       A.   Yes.
22       Q.   And so there's kind of four groupings
23   here.  The first is PHQ-9 distance.  The second is
24   GAD-7 distance.  The third is PHQ-9 HT, and the
25   fourth is GAD-7 HT.
```

Page 188

Dr. Kara Connelly August 28, 2023

1           Do you see that?

2     A.   Yes.

3     Q.   And my questions are going to relate to

4  the bottom two groups.

5          And starting with the group that's

6  labeled "PHQ-9 HT," is it fair to say this is

7  measuring the PHQ-9 scores for the sample?

8     A.   Yes.

9     Q.   And in this category, it's broken out

10  between those who have initiated cross-sex

11  hormones and those who have not initiated

12  cross-sex hormones, correct?

13     A.   Yes.

14     Q.   And then as you move to the columns, is

15  it correct that you're providing the average PHQ-9

16  scores for the initial visit in the first column?

17     A.   Yes, it's the mean scores and the

18  standard deviation in the parentheses.

19     Q.   And then in the second column, you're

20  providing the mean scores for the follow-up visit;

21  is that right?

22     A.   Yes.

23     Q.   And for the category of patients who had

24  initiated hormone therapy, this table shows that

25  their PHQ-9 scores on average increased from the

Page 189

(274 of 289), Page 274 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 274 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 190 of 374
Dr. Kara Connelly August 28, 2023

1    initial visit to the follow-up visit, correct?

2         A.   The mean score at the follow-up visit of

3    the group as a whole is numerically higher but not

4    statistically significantly higher than at the

5    initial visit.

6         Q.   And for the category of patients who had

7    not initiated hormone therapy, this table shows

8    that their PHQ-9 scores on average decreased from

9    the initial visit to the follow-up visit, correct?

10        A.   Again, not statistically significant, but

11   the follow-up mean score of the group as a whole

12   was lower than the initial visit mean score of the

13   group as a whole.

14        Q.   Why does the lack of statistical

15   significance matter?

16        A.   Because with the lack of statistical

17   significance, we can't draw any conclusions about

18   the data and the tables.

19        Q.   Right.  I want to go down to the group

20   below that for the GAD-7.

21             And this is broken out along the same way

22   as the PHQ-9 group, correct?

23        A.   Yes.

24        Q.   And this also shows that the average

25   scores of the GAD-7 increased between initial

                                         Page 190

(275 of 289), Page 275 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 275 of 289
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 191 of 374
Dr. Kara Connelly August 28, 2023

```
 1   visit and follow-up visit for those who had
 2   initiated hormone therapy, correct?
 3        A.   The average GAD-7 score, there was no
 4   statistically significant difference between the
 5   initial visit and the follow-up visit.
 6        Q.   I understand the point about statistical
 7   significance.
 8             My question is simply the data that you
 9   recorded in this study shows that the average
10   score for those who had initiated hormone therapy
11   increased from the initial visit to the follow-up
12   visit, correct?
13        A.   The follow-up visit average score is .5
14   higher than the average score at the initial
15   visit -- .1, sorry.
16        Q.   And for the category of patients who had
17   not initiated hormone therapy, the average score
18   decreased from the initial visit to the follow-up
19   visit, correct?
20        A.   Again, not statistically significant, the
21   average GAD-7 score at the follow-up was .5 points
22   lower than at the initial visit, the average score
23   at the initial visit.
24        Q.   And just returning to your declaration,
25   to page 9, paragraph 31, the fourth sentence down,
```

Page 191

(276 of 289), Page 276 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 276 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 192 of 374
Dr. Kara Connelly August 28, 2023

```
 1    and you say you see dramatic improvements in your

 2    patients after they begin gender-affirming medical

 3    care.

 4             Do you see that?

 5        A.   Yes.

 6        Q.   And you also say depression, anxiety,

 7    self-harm, and suicidal ideation are significantly

 8    reduced.

 9             Do you see that?

10        A.   Yes.

11        Q.   How do you reconcile those statements

12    with the results reported in your own article?

13        A.   The article was only over a very short

14    period of time from the initial visit to the

15    follow-up, usually about three months later, and

16    the dramatic improvements that we see take place

17    over a longer period of time.

18        Q.   So you do not see dramatic improvements

19    after your patients begin gender-affirming medical

20    care; is that right?

21             MS. NOWLIN-SOHL:  Object to form.

22             THE WITNESS:  We do see dramatic

23    improvements in our patients after they begin

24    gender-affirming medical care over time.

25        Q.   (BY MR. RAMER)  And is that measured
```

Page 192

ER-342

Dr. Kara Connelly August 28, 2023

```
 1   anywhere?
 2        A.   It's not in -- it's measured in the
 3   patient's electronic medical records.
 4        Q.   Is it measured in a format for you to
 5   make the conclusion that you see dramatic
 6   improvements based on PHQ-9 and GAD-7 scores?
 7             MS. NOWLIN-SOHL:  Object to form.
 8             THE WITNESS:  It's not collated in a
 9   database, but it is something that we look at at
10   every single visit, their score and their numbers,
11   the total score, and again, how they answer each
12   of the questions from last visit to this visit,
13   the next visit, and so on.
14        Q.   (BY MR. RAMER)  And when you say
15   improvement is over a longer term, what kind of
16   length are you talking about?
17        A.   Well, it really varies.  And so for some
18   patients, it is a shorter period of time.
19             For some patients it might take a longer
20   period of time.  It might take six months.  It
21   might take eight months.  It really depends on a
22   lot of factors.
23        Q.   And have you seen a dramatic improvement
24   in a statistically significant measure?
25        A.   In our clinic?
```

Page 193

Dr. Kara Connelly August 28, 2023

1      Q.    Correct.

2      A.    No.  We haven't studied that.

3      Q.    Just going back to the exhibit -- let's

4  see what number that is.  Oh, Exhibit 13, 11 file

5  name, I'd like to go to page 199.  And left

6  column, first full paragraph, second sentence.

7      A.    Excuse me, before the next question, can

8  I just clarify my last answer?

9      Q.    Sure.

10      A.    The question I believe was have we

11  observed a statistically significant difference in

12  our clinic patient population?  And -- is that the

13  question?  Was that the question?

14      Q.    It may have been.  Let's assume that's

15  the question.  Go ahead.

16      A.    I meant to say that we have not

17  specifically done a study to assess that.

18      Q.    Okay.  So page 199, left column, first

19  full paragraph, second sentence.  I just want to

20  read this and ask if I read it correctly.

21          It says "While some evidence to date

22  lends strong support for symptom improvement over

23  time, the current study suggests changes likely

24  occur gradually and may not begin to occur until

25  several months into treatment."

Page 194

1        Did I read that correctly?

2    A.    Yes.

3    Q.    And after you say "some evidence to

4    date," then "strong support for symptom

5    improvement over time," you cite endnote 4 and

6    then endnotes 12 through 16; is that right?

7    A.    Yes.

8    Q.    And if we flip down to endnotes 12

9    through 16, as you sit here today, do you know

10   whether any of those studies involved individuals

11   under 18 years of age?

12   A.    I can't say just looking at the titles.

13   Q.    Okay.  In the other study you cited in

14   endnote 4, that is de Vries.

15        Do you see that?

16   A.    Yes.

17   Q.    And we've gone a little over an hour.  Do

18   you want to take a break or keep going?  Up to

19   you.

20   A.    I can keep going.

21   Q.    Okay.  So on the same article, on

22   page 198, right column, the only full paragraph in

23   that column and the last sentence right before the

24   conclusion, I'm just going to read that and ask if

25   I read it correctly.

Dr. Kara Connelly August 28, 2023

```
 1            It says "Similarly, there were no
 2    differences in the endorsement of suicidal
 3    ideation between initial and follow-up visit for
 4    youth who did versus did not initiate
 5    gender-affirming hormones."
 6            Did I read that correctly?
 7       A.   Yes.
 8       Q.   And same page, left column, only full
 9    paragraph in that column, the last sentence.
10            It says "Of the 27 (34 percent) youth who
11    endorsed suicidality at intake, 22 (81 percent)
12    continued to endorse suicidality at their
13    follow-up visit, and only 4 (4 percent) no longer
14    endorsed suicidality at follow-up."
15            Did I read that correctly?
16       A.   Yes.
17       Q.   And are those statements reflective of
18    your -- are those statements accurate?
19       A.   Specific to this paper?
20       Q.   Yes.
21       A.   I'm just going to look back at the
22    tables.
23       Q.   Yeah.  That's fine.  And if you don't
24    know, that's fine.  We can move on.
25       A.   The only thing, I can't recall where the
```

Page 196

(281 of 289), Page 281 of 289 Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 281 of 289
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 197 of 374
Dr. Kara Connelly August 28, 2023

```
 1   actual numbers, the 27 and 34 percent, I just -- I
 2   can't find them in the paper.
 3        Q.   That's fine.  That's fine.  So moving on
 4   from this article, are you familiar with the term
 5   "the Dutch studies"?
 6             MS. NOWLIN-SOHL:  Object to form.
 7             THE WITNESS:  Can you be a little more
 8   specific about what you mean by "the Dutch
 9   studies"?
10        Q.   (BY MR. RAMER)  Just the studies that
11   came out of the Netherlands, sometimes referred
12   to, you know, as establishing the Dutch protocol.
13             MS. NOWLIN-SOHL:  Object to form.
14             THE WITNESS:  I'm familiar with studies
15   out of the -- reporting on outcomes from the
16   clinic in the Netherlands.
17        Q.   (BY MR. RAMER)  And going to your
18   declaration, page 10, paragraph 32, note 7, you
19   cite the first citation is the de Vries article,
20   correct?
21        A.   Yes.
22        Q.   And do you cite another de Vries article
23   in this footnote?
24        A.   Yes, there are two.
25        Q.   Okay.  And these studies came out of the
```

Page 197

Dr. Kara Connelly August 28, 2023

```
 1   work in the Netherlands that you were previously
 2   describing, correct?
 3        A.   Yes.
 4        Q.   And in paragraph 32, you cite these
 5   studies for the proposition that treatment with
 6   puberty blockers and cross-sex hormones is
 7   associated with improvement in mental health,
 8   correct?
 9        A.   I'm sorry.  Can you tell me again where
10   that is written?
11        Q.   Yeah.  I'm just looking at -- so on
12   paragraph 32, you have the little footnote 7 at
13   the end.
14             And the way I read it -- and please
15   correct me if I'm wrong -- is that the studies
16   you're citing in footnote 7, you're citing for the
17   proposition that treatment is associated with
18   improvement in mental health.
19        A.   Yes.
20        Q.   And in the paragraph 32, you're talking
21   about puberty blockers and hormone therapy,
22   correct?
23        A.   Yes, but some of the studies look more
24   specifically at one of the treatment -- one of
25   those treatments versus the others, and some
```

Page 198

Dr. Kara Connelly August 28, 2023

```
 1    looked at both.

 2         Q.    That's fair.  Understood.

 3               Do you recall whether the subjects in

 4    these two de Vries articles were receiving

 5    psychotherapy?

 6         A.    Can you be more specific about what you

 7    mean by "psychotherapy"?

 8         Q.    What do you understand that term to mean?

 9         A.    Ongoing -- ongoing therapy throughout the

10    course of their treatment.

11         Q.    Yeah, let's go with that.

12               Do you understand the subjects in the

13    de Vries studies to be receiving that?

14         A.    I can't recall that.

15         Q.    If they were receiving that

16    psychotherapy, do you think that would be a

17    confounding variable in these studies?

18               MS. NOWLIN-SOHL:  Object to form;

19    foundation.

20               THE WITNESS:  I don't think that that --

21    I wouldn't consider that a confounding variable in

22    these studies.

23         Q.    (BY MR. RAMER)  And why not?

24         A.    I would just think of it as something

25    separate than the different medical interventions
```

Page 199

Dr. Kara Connelly August 28, 2023

1    that they're undergoing, yeah.

2         Q.   If you had a study and the subjects were

3    receiving medical interventions while also

4    receiving psychotherapy at the same time and the

5    study showed an improvement, do you not think that

6    the psychotherapy would be a confounding variable?

7              MS. NOWLIN-SOHL:  Object to form.

8              THE WITNESS:  I think it would really

9    depend on how the study was designed.

10        Q.   (BY MR. RAMER)  In what way?

11        A.   Well, if it was being considered a

12   variable, it would have to be -- and, you know, it

13   would have to be something that was consistently

14   done the same way, or differently.

15             It's hard to just characterize it as a

16   confounding variable without knowing what

17   psychotherapy actually entailed.

18        Q.   So I guess depending on what the

19   psychotherapy entailed, it could be a confounding

20   variable; is that right?

21        A.   I don't know that I could characterize it

22   as a confounding variable without knowing --

23   without really knowing more about what that

24   psychotherapy entailed and how it was being

25   utilized in the patient population.

Page 200

ER-350

Dr. Kara Connelly August 28, 2023

```
1         Q.   And so lack of knowledge about the
2    psychotherapy would potentially be an indication
3    of a confounding variable, right?
4              MS. NOWLIN-SOHL:  Object to form.
5              THE WITNESS:  Can you repeat that
6    question?
7         Q.   (BY MR. RAMER)  I guess I thought your
8    answer was you can't say it's a confounding
9    variable if you don't know what the psychotherapy
10   was; is that right?
11        A.   I would say that it would be hard to say
12   that it's a confounding variable without -- yeah,
13   without knowing what that is or what that means to
14   know if it's -- if it is having any influence on
15   the individuals separate from the medical
16   interventions that they are receiving.
17        Q.   Well, isn't the point of a confounding
18   variable that you don't know what is influencing
19   what and that's why it's a study limitation?
20             MS. NOWLIN-SOHL:  Object to form.
21             THE WITNESS:  Are you referring to these
22   specific studies?
23        Q.   (BY MR. RAMER)  Now I'm just asking in
24   the -- as a concept based on your answer of
25   whether psychotherapy was a confounding variable
```

Page 201

Dr. Kara Connelly August 28, 2023

```
1    in these studies.
2              And I guess I'm misunderstanding because
3    the hypothetical -- let me just -- I'll restate
4    it.
5              The hypothetical is you have a study
6    where the subjects were receiving medical
7    interventions at the same time they were receiving
8    psychotherapy, and the study shows an improvement.
9              And my question is can you conclude from
10   that that the medical interventions caused the
11   improvement?
12             MS. NOWLIN-SOHL:  Object to the form.
13             THE WITNESS:  I don't know that you can't
14   make that conclusion.
15             And again, because the psychotherapy, if
16   it's not part of the study design where we know
17   that all patients are having the same experience
18   and receiving the same treatment in terms of
19   psychotherapy, I don't think that that can be
20   included in drawing conclusions about the outcomes
21   of the medical interventions.
22        Q.   (BY MR. RAMER)  And what if the
23   psychotherapy was part of the study design and all
24   the patients were receiving psychotherapy?
25             MS. NOWLIN-SOHL:  Object to form.
```

Page 202

(287 of 289), Page 287 of 289
Case: 24-142, 02/06/2024, DktEntry: 26.3, Page 287 of 289
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 203 of 374

Dr. Kara Connelly August 28, 2023

```
 1              THE WITNESS:  What -- and in that case --
 2    and then what's the question?
 3         Q.   (BY MR. RAMER)  So backing out, the
 4    hypothetical is all the patients are receiving
 5    medical interventions; all the patients are
 6    receiving the same psychotherapy, and then you see
 7    a benefit from those treatments.
 8              Can you conclude that the benefit came
 9    from the medical interventions?
10              MS. NOWLIN-SOHL:  Object to form; asked
11    and answered.
12              THE WITNESS:  In that study design, I
13    don't think that you can draw the conclusion that
14    the outcomes or improvements aren't from the
15    medical interventions and -- yeah.
16         Q.   (BY MR. RAMER)  Okay.  Let's go back to
17    footnote 7 of your declaration.
18              Do you want to take a -- we can take a
19    break as well if you --
20         A.   Sure.
21              MS. NOWLIN-SOHL:  Yeah, let's do that.
22              MR. RAMER:  Okay.  So I have about 16.
23    Do you want to say 25 after so, like, nine minutes
24    or so?
25              MS. NOWLIN-SOHL:  That sounds good.
```

Page 203

Dr. Kara Connelly August 28, 2023

```
 1              MR. RAMER:  All right.  Let's do that.
 2              THE VIDEOGRAPHER:  Okay.  So the time is
 3     4:16 p.m. Mountain time, and we are off the
 4     record.
 5          (Break taken from 4:16 p.m. to 4:27 p.m.)
 6              THE VIDEOGRAPHER:  All right.  So we are
 7     recording.  The time is 4:27 p.m. Mountain time,
 8     and we are back on the record.
 9         Q.   (BY MR. RAMER)  Okay.  Dr. Connelly, I'd
10     like to go to your declaration, same page 10,
11     footnote 7.
12              And in this footnote, you also cite a
13     study by Chen, correct?
14         A.   Sorry.  I'm just looking for it.  Yes.
15              MR. RAMER:  Okay.  And, Li, we sent
16     Connelly Exhibit 15 which has a 12 in the file
17     name.
18              MS. NOWLIN-SOHL:  Okay.
19          (Deposition Exhibit No. 15 was marked.)
20         Q.   (BY MR. RAMER)  Doctor, have you seen
21     this article before?
22         A.   Article 10 --
23         Q.   Sorry, yes.  Partway down starts with
24     "Growing evidence."
25              Have you seen this before?
```

Page 204

Dr. Kara Connelly August 28, 2023

```
 1        A.    I don't recall seeing this article.
 2        Q.    Okay.  And do you recognize the name of
 3   the lead author?
 4        A.    Dr. de Vries or Dr. Hannema?  But yes, I
 5   recognize the names.
 6        Q.    Okay.  And toward the bottom, you can see
 7   the kind of smaller print below the paragraphs.
 8              The date on this is January 19, 2023,
 9   correct?
10        A.    Yes.
11        Q.    And this editorial is reviewing the Chen
12   article that you cite, correct?
13        A.    I have to go down to the footnote.  Okay.
14   Yes.
15        Q.    And I'd like to go down to page 276,
16   which is the second page, and look in the left
17   column, the second full paragraph and the second
18   sentence.  I'll read it and ask if I read it
19   correctly.
20              It says "Although overall psychological
21   functioning in the study participants improved,
22   there was substantial variation among
23   participants, a considerable number still had
24   depression, anxiety, or both at 24 months, and two
25   died by suicide."
```

Page 205