APPEAL NO. 24-142

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

PAM POE, by and through her parents and next friends Penny and Peter Poe, et al.,

*Plaintiffs-Appellees*,

v.

RAÚL LABRADOR, in official capacity as Attorney General of the State of Idaho, et al.,

*Defendants-Appellants,*

and

JAN M. BENNETTS, in official capacity as Ada County Prosecuting Attorney, et al.

*Defendants.*

---

On Appeal from the United States District Court
for the District of Idaho / Case No. 1:23-cv-00269-BLW

---

## EXCERPTS OF RECORD OF APPELLANTS
## VOLUME 3 of 5

---

RAÚL R. LABRADOR
ATTORNEY GENERAL

ALAN M. HURST
Solicitor General

JOSHUA N. TURNER
Chief, Constitutional
Litigation and Policy

JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense
OFFICE OF IDAHO
ATTORNEY GENERAL
700 W. Jefferson St.
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
josh.turner@ag.idaho.gov
james.craig@ag.idaho.gov

JOHN J. BURSCH
LINCOLN DAVIS WILSON
ALLIANCE DEFENDING
FREEDOM
440 First Street, NW,
Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
lwilson@ADFlegal.org

JONATHAN A. SCRUGGS
HENRY W. FRAMPTON, IV
ALLIANCE DEFENDING
FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

*Counsel for Appellants*

DAVID H. THOMPSON
BRIAN W. BARNES
JOHN D. RAMER
COOPER & KIRK, PLLC
1523 New Hampshire
Avenue, NW
Washington, DC 20036
202-220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Dr. Kara Connelly August 28, 2023

1           Did I read that correctly?

2       A.    Yes.

3       Q.    And were you aware of these facts before

4   you cited the Chen article?

5       A.    I was -- I read the Chen article, and I

6   would have to go back to the Chen article to be

7   sure that this -- these statements are accurate.

8       Q.    And two sentences down, it says -- and

9   I'll read it and ask if I read it correctly.

10          It says "However, other possible

11  determinants of outcomes were not reported,

12  particularly the extent of mental health care

13  provided throughout GAH treatment."

14          Did I read that correctly?

15      A.    Yes.

16      Q.    What is your understanding of what

17  de Vries and the co-author are saying there?

18          MS. NOWLIN-SOHL:  Object to form.

19          THE WITNESS:  What is my interpretation

20  of that sentence?

21      Q.    (BY MR. RAMER)  What do you understand

22  that sentence to be saying?  Yes.

23          MS. NOWLIN-SOHL:  Objection; foundation.

24  If you need to look at this article, you can.

25      Q.    (BY MR. RAMER)  And if you don't know as

                                        Page 206

Dr. Kara Connelly August 28, 2023

1    you sit here, that's fine.

2         A.   Yeah, I don't know what -- I don't know

3    what they're referring to in that statement

4    without looking at the rest of it and seeing how

5    it correlates with the Chen article.

6         Q.   All right.  And so same editorial right

7    column, second full paragraph that begins with

8    "Finally."  And I'll just read this sentence and

9    ask if I read it correctly.

10             It says "Finally, benefits of early

11   medical intervention, including puberty

12   suppression, need to be weighed against possible

13   adverse effects, for example, with regard to bone

14   and brain development and fertility."

15             Did I read that correctly?

16        A.   Yes.

17        Q.   Do you see where de Vries mentions

18   possible effect on brain development?

19        A.   In that sentence?

20        Q.   Yes.

21        A.   Yes.

22        Q.   And what do you know about the risk of

23   adverse effects on brain development from puberty

24   suppression?

25        A.   What do I know about adverse effects on

Page 207

Dr. Kara Connelly August 28, 2023

1    brain development?

2        Q.    Correct.

3        A.    Just in general?

4        Q.    Yes.

5        A.    I don't think there's enough data to draw

6    conclusions about adverse effects on brain

7    development in patients treated with medical

8    interventions.

9        Q.    Is adolescence associated with

10   significant neurodevelopment?

11       A.    Can you be more specific about

12   neurodevelopment?

13       Q.    Yeah, I guess maybe we'll do it this way.

14   We'll go to Connelly Exhibit 16, which has a 13 in

15   the file name.

16           (Deposition Exhibit No. 16 was marked.)

17       Q.    (BY MR. RAMER)   And, Doctor, have you

18   seen this article before?

19       A.    I don't recall seeing it before.

20       Q.    Do you recognize the name of the lead

21   author?

22       A.    Diane Chen.

23       Q.    Is that the same Chen that you cite in

24   your declaration?

25       A.    Yes, I believe so.

Page 208

(5 of 296), Page 5 of 296    Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 5 of 296
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 209 of 374
Dr. Kara Connelly August 28, 2023

```
 1        Q.    And I understand you haven't read this,
 2   but I just want to make sure I understand the
 3   scope of your expert opinion.  And I'd like to go
 4   to page 254 and specifically the left column.
 5   There's the bold "Discussion" header, and then I'd
 6   like to read the second sentence, and I'll ask if
 7   I read it correctly.
 8            It says "However, puberty is a major
 9   developmental process and the full consequences
10   (both beneficial and adverse) of suppressing
11   endogenous puberty are not yet understood."
12            Did I read that correctly?
13        A.    Yes.
14        Q.    And do you agree that the full
15   consequences of suppressing endogenous puberty are
16   not yet understood?
17        A.    I think I would need to look at this in a
18   little more depth.
19        Q.    Okay.  Well, let's go to page 249.  And
20   right column, first full paragraph, first sentence
21   and then the italics after that.  I'll read it and
22   ask if I read it correctly.
23            "We employed a two-round Delphi procedure
24   to obtain expert consensus regarding the most
25   efficacious research design elements to address
```

Page 209

```
 1    the following research question:  What, if any,
 2    real-world impact does pubertal suppression have
 3    on transgender children's cognitive and neural
 4    development?"
 5              Did I read that correctly?
 6        A.    Yes.
 7        Q.    And do you know the answer to that
 8    question?
 9              MS. NOWLIN-SOHL:  Object to form;
10    foundation.
11              THE WITNESS:  The answer to the question
12    in italics?
13        Q.    (BY MR. RAMER)  Correct.  Do you know the
14    answer to the question "What, if any, real-world
15    impacts does pubertal suppression have on
16    transgender children's cognitive and neural
17    development?"
18              MS. NOWLIN-SOHL:  Same objections.
19              THE WITNESS:  I don't think I can
20    formulate an answer to that question without
21    knowing what exactly it's referring to in terms of
22    real-world impact and what specifically it's
23    referring to on cognitive and neural development.
24        Q.    (BY MR. RAMER)  So what would you need to
25    know?
```

Page 210

Dr. Kara Connelly August 28, 2023

```
 1        A.   I'm not sure what it means by "real-world
 2   impact."  And then specifically what aspects of
 3   cognitive and neural development they're referring
 4   to.
 5        Q.   Do you know what effect pubertal
 6   suppression has on an individual's cognitive and
 7   neural development?
 8        A.   I don't know that there is enough
 9   published data on that to be able to make a
10   general statement without looking at -- without
11   being more specific.
12        Q.   Okay.  Let's go to page 248.  And left
13   column, the second full paragraph, so it's toward
14   the bottom.  And I'm going to read the second
15   sentence and ask if I read it correctly.
16             It says "Animal studies demonstrate
17   pubertal hormones exert broad neuronal influence,
18   including effects on neurogenesis,
19   differentiation, apoptosis, dendritic branching,
20   spine density, and regional gray and white matter
21   volumes."
22             And apart from almost certain
23   mispronunciations, did I read that correctly?
24        A.   Yes.
25        Q.   And why do you think the authors of this
```

Page 211

ER-362

Dr. Kara Connelly August 28, 2023

```
 1   study are mentioning studies on animals?
 2            MS. NOWLIN-SOHL:  Objection; speculation.
 3            THE WITNESS:  I don't know.  I can't
 4   answer that.
 5       Q.   (BY MR. RAMER)  Do you agree that medical
 6   research often begins by studying the effects of
 7   research on animals such as rodents?
 8       A.   Some research studies involve animals,
 9   but not all.
10       Q.   And you've published studies conducting
11   medical research on rodents before, right?
12       A.   Yes.
13       Q.   And do you agree that ethical principles
14   often require experiments be done on animals
15   before they are done on humans?
16       A.   It depends on -- it depends on what's
17   being studied.  Sometimes it may not be either
18   feasible, if we can't develop an appropriate
19   animal model, or may not be appropriate, or may
20   not be generalizable to non -- or to humans.
21       Q.   So it's true that in some situations
22   ethical principles would require that experiments
23   be done on animals before they are done on humans,
24   right?
25       A.   I don't know that ethical principles
```

Page 212

Dr. Kara Connelly August 28, 2023

1    require that some experiments be done on animals.

2    It depends on -- it depends on what's being

3    studied.

4        Q.   Right.  And is there any instance where

5    ethical principles would suggest you need to study

6    the effect on animals before you study the effect

7    on humans?

8        A.   I guess what do you mean by "ethical

9    principles"?

10        Q.   What do you understand that term to mean

11    in the context of medicine?

12            MS. NOWLIN-SOHL:  Object to form.

13            THE WITNESS:  It means a wide range of

14    things that are pertaining to ethical principles.

15        Q.   (BY MR. RAMER)  What do you think the

16    term means in the context of research?

17        A.   Again, I think it can -- it means a --

18    there's a lot of things that go into ethical

19    principles of conducting research.

20        Q.   Okay.  So you've conducted research

21    conducting -- I'm sorry.

22            You've conducted medical research on

23    rodents before, correct?

24        A.   Yes.

25        Q.   And why did you conduct that research on

Page 213

Dr. Kara Connelly August 28, 2023

```
 1    rodents rather than humans?
 2         A.   That specific -- the specific projects
 3    that I did?
 4         Q.   Yes.
 5         A.   Well, it was to look specifically at
 6    specific -- changes of different treatments
 7    specific to the animals and the outcomes in the
 8    animals.
 9         Q.   So you were conducting that study because
10    you wanted to know the effect on the animals?
11         A.   Yes.  And it was under the guidance and
12    supervision of my research mentor, who was the
13    principal investigator of the study.
14         Q.   And why did you want to know the effect
15    of the treatment on animals?
16         A.   We were learning how -- or my research
17    mentor, principal investigator of the study, it
18    was an expert in bone development in rodents.  And
19    that was part of his research program to better
20    understand the components of bone development in
21    rodents.
22         Q.   Isn't it true the reason you want to
23    understand bone development in rodents is so that
24    you can make conclusions about bone development in
25    humans?
```

Page 214

ER-365

Dr. Kara Connelly August 28, 2023

```
 1        A.    Not always.
 2        Q.    Right.  But in that study, were you
 3   studying rodents for the sake of studying rodents?
 4        A.    Yes.
 5        Q.    Okay.  I'd like to go to page 253.  And
 6   right column, the -- it's just unfortunately a
 7   block of text.  And I'd like to go to the sentence
 8   a little over halfway down that begins with "In
 9   addition."  And I'd just like to read that and see
10   if I read it correctly.
11             It says "In addition,
12   cognitive/behavioral flexibility, a component of
13   executive functioning, should be measured given
14   that studies in rodents show ovarian hormones
15   acting during puberty, program cognitive
16   flexibility by exerting long-lasting effects on
17   excitatory-inhibitory balance in the prefrontal
18   cortex."
19             And did I read that correctly?
20        A.    Yes.
21        Q.    And do you agree that rodent studies have
22   shown that ovarian hormones can have lasting
23   effects in brain development?
24        A.    I am not familiar with the studies
25   looking at -- looking at that specifically in
```

Page 215

Dr. Kara Connelly August 28, 2023

```
 1    rodents.
 2         Q.   If a scientist is faced with animal
 3    studies reporting that pubertal hormones have
 4    long-lasting effects on brain development,
 5    shouldn't that scientist conclude there's some
 6    possibility that pubertal hormones may also have
 7    long-lasting effects on brain development in
 8    humans?
 9              MS. NOWLIN-SOHL:  Object to form.
10              THE WITNESS:  I think it's too hard to
11    make that statement.  There are -- there's too
12    many variables that would need to be considered to
13    make that statement.
14         Q.   (BY MR. RAMER)  Before seeing this
15    article today, were you aware of reference in
16    literature regarding the effect of pubertal
17    suppression on brain development in animals?
18              MS. NOWLIN-SOHL:  Sorry, could you repeat
19    that, John?
20         Q.   (BY MR. RAMER)  Before seeing this
21    article, were you aware of references in
22    literature regarding the effect of pubertal
23    suppression on brain development in animals?
24         A.   Not that I can recall.
25         Q.   And now that you are aware, does this
```

Page 216

Dr. Kara Connelly August 28, 2023

```
 1   cause you as a clinician to want to know the
 2   answer to the question of whether puberty blockers
 3   have long-lasting effects on brain development in
 4   a human?
 5           MS. NOWLIN-SOHL:  Object to form.
 6           THE WITNESS:  Can you repeat the
 7   question?
 8       Q.  (BY MR. RAMER)  Now that you are aware,
 9   does this cause you as a clinician to want to know
10   the answer as to whether puberty blockers have
11   long-lasting effects on brain development in
12   humans?
13           MS. NOWLIN-SOHL:  Same objection.
14           THE WITNESS:  Having read this statement
15   about studies in rodents and hormones during
16   puberty does not change -- does not have an impact
17   on how I want to know the effects of pubertal
18   suppression on brain development in humans.
19       Q.  (BY MR. RAMER)  So this doesn't concern
20   you?
21       A.  This does not --
22           MS. NOWLIN-SOHL:  Objection to form;
23   mischaracterization of testimony.
24           THE WITNESS:  This does not have an
25   impact on how I think about that question.
```

Page 217

Dr. Kara Connelly August 28, 2023

```
 1        Q.    (BY MR. RAMER)  And why not?
 2        A.    Well, because I haven't read the study
 3   and would need to look at the study to really
 4   understand more about that statement.
 5        Q.    Do you want to learn more about that
 6   statement given what we just read?
 7        A.    Do I want to learn more about ovarian
 8   hormones acting during puberty programming
 9   cognitive flexibility by exerting long-lasting
10   effects on excitatory-inhibitory balance in the
11   prefrontal cortex?
12        Q.    Yes.  Does reading that sentence lead you
13   to want to know whether that holds true in humans?
14        A.    Well, I want to know if that holds true
15   in humans regardless of what is found in rodents.
16        Q.    And do you know if that holds true in
17   humans?
18              MS. NOWLIN-SOHL:  Object to form.
19              THE WITNESS:  This exact statement?
20        Q.    (BY MR. RAMER)  That puberty suppression
21   can have long-lasting effects on brain
22   development, yes.
23              MS. NOWLIN-SOHL:  Object to form.
24              THE WITNESS:  Okay.  I'm sorry.  I am
25   confused by the question.
```

Page 218

Dr. Kara Connelly August 28, 2023

1    Q.   (BY MR. RAMER)  I guess I'll ask it this

2  way:  If you were presented with a study that says

3  pubertal suppression has a long-lasting

4  neurological effect on rodents, as a clinician,

5  would that concern you with respect to prescribing

6  puberty blockers to suppress puberty in humans?

7         MS. NOWLIN-SOHL:  Object to form.

8         THE WITNESS:  Again, it would depend on

9  what specific concerns or developmental changes

10  were observed, especially in the recognition that

11  brains of rodents are different than brains of

12  humans and that the changes in rodent brains from

13  pubertal suppression may not be generalizable to

14  the human population.

15    Q.   (BY MR. RAMER)  Do you think you'll read

16  this study in full after this deposition?

17    A.   I was not planning on it.

18    Q.   Okay.  I'd like to go to page 252.  Left

19  column, about halfway down of that paragraph, and

20  there's a sentence that starts with "The effects

21  of pubertal suppression."

22         Do you see that?

23    A.   Yes.

24    Q.   Okay.  I'm just going to read those two

25  sentences and ask if I read them correctly.

Page 219

Dr. Kara Connelly August 28, 2023

1           It says "The effects of pubertal
2    suppression may not appear for several years.  Any
3    GnRHa related difference in brain structure is
4    likely to be observed over the long term rather
5    than immediately."
6           Did I read that correctly?
7    A.   Yes.
8    Q.   And do you agree with those statements?
9           MS. NOWLIN-SOHL:  Objection; foundation.
10           THE WITNESS:  I would need to read more
11   of this paper to be able to answer that.
12    Q.   (BY MR. RAMER)  Do you think the question
13   of the effect of pubertal suppression on brain
14   structure is beyond the scope of your expertise?
15           MS. NOWLIN-SOHL:  Object to form.
16           THE WITNESS:  Can you repeat the
17   question?
18    Q.   (BY MR. RAMER)  Do you think that the
19   effect of pubertal suppression on brain structure
20   is beyond the scope of your expertise?
21           MS. NOWLIN-SOHL:  Same objection.
22           THE WITNESS:  I would not consider myself
23   an expert in the effects of pubertal suppression
24   on brain structure.
25    Q.   (BY MR. RAMER)  Okay.  I'd like to go to

Page 220

ER-371

Dr. Kara Connelly August 28, 2023

```
 1    page -- and I think it's my last question on

 2    this -- page 255, and left column, second full

 3    paragraph, third sentence.  It starts with the

 4    word "Yet."

 5            Do you see that?

 6      A.    Yes.

 7      Q.    I'm going to read that sentence and the

 8    one after and ask if I read it correctly.

 9            It says "Yet, evidence suggests an

10    over-occurrence of neurodiversity characteristics,

11    (especially related to autism) among

12    gender-referred youth.  The neurodevelopmental

13    impacts of pubertal suppression on neurodiverse,

14    gender-diverse youth might well be different than

15    in neurotypical gender-diverse youth given

16    variations in neurodevelopmental trajectories

17    observed across neurodevelopmental conditions."

18            Did I read that correctly?

19      A.    Yes.

20      Q.    Is it consistent with your own clinical

21    observations that young people with neurodiverse

22    characteristics such as autism are

23    disproportionately represented in your clinic as

24    compared to the general population?

25      A.    I can't say that with certainty.  Our
```

Page 221

Dr. Kara Connelly August 28, 2023

1    behavioral health team would be able to answer

2    that more accurately.

3        Q.    Are you aware of any study researching

4    the effect of puberty blockers on neurodevelopment

5    in adolescents with neurodiverse characteristics?

6        A.    Can you repeat the question one more

7    time?

8        Q.    Are you aware of any study researching

9    the effect of puberty blockers on neurodevelopment

10   in adolescents with neurodiverse characteristics?

11       A.    I can't think of any studies that looked

12   at that specific question only.

13       Q.    Does that mean you think there are

14   studies that look at that question in addition to

15   other questions?  Or what do you mean by that?

16       A.    Well, I can't think of a study that was

17   only looking at effects of pubertal suppression on

18   the -- on neurodivergent people.

19       Q.    I'm getting -- sorry.  The "only" is

20   tripping me up a little.

21             What do you mean by you're not aware of

22   studies looking at only that?

23       A.    That don't also include individuals who

24   were not neurodivergent.

25       Q.    Okay.  So the point is you're not aware

Page 222

Dr. Kara Connelly August 28, 2023

```
 1    of a study that looks at the effect on
 2    neurodiverse individuals specifically; is that
 3    right?
 4         A.   Not any that immediately come to mind.
 5         Q.   I'd like to flip back to your
 6    declaration, page 5, paragraph 20, second
 7    sentence.  And I'll just read it and ask if I read
 8    it correctly.
 9              It says "While some European national
10    health authorities have issued guidelines
11    recommending caution about providing such care, or
12    providing that such care should occur in clinical
13    research settings, care is provided when deemed
14    appropriate for adolescents."
15              Did I read that correctly?
16         A.   Yes.
17         Q.   And what European national health
18    authorities are you referring to there?
19         A.   Generally -- you mean like which
20    countries?
21         Q.   Yeah.
22         A.   So Sweden, U.K., and Finland are the ones
23    that primarily come to mind.
24         Q.   And why have European national health
25    authorities been recommending caution?
```

Page 223

Dr. Kara Connelly August 28, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form;
 2    foundation.
 3              THE WITNESS:  I can't say why the
 4    authorities have made the decisions that they
 5    have.  I haven't participated in the -- in the
 6    creation of those statements.
 7              I've only -- I'm only familiar with the
 8    statements that they have made, but not
 9    necessarily all of the reasons why they've come to
10    those conclusions.
11         Q.   (BY MR. RAMER)  Do any of the statements
12    that you've reviewed explain why they've come to
13    those conclusions?
14         A.   Some of them have used available data and
15    research to guide their recommendations that care
16    should be -- guide their recommendations about how
17    care should be provided.
18              MR. RAMER:  Okay.  Let's look at Connelly
19    Exhibit 17, which has a 15 in the file name.
20              (Deposition Exhibit No. 17 was marked.)
21              THE WITNESS:  I think we have it.
22         Q.   (BY MR. RAMER)  Okay.  And have you seen
23    this document before?
24         A.   I have to look.  I haven't seen it in
25    this format.  And I can't tell -- I haven't seen
```

Page 224

Dr. Kara Connelly August 28, 2023

```
 1   it in this format, and I can't tell what year it
 2   was released or where this was obtained.
 3        Q.   Okay.  So in other words, have you seen
 4   something similar to this before?  Is that what
 5   you're recalling?
 6        A.   I have seen recommendations by the
 7   National Board of Health and Welfare in Sweden
 8   about the -- their recommendations for the
 9   provision of gender-affirming care for youth.
10        Q.   I'd like to go to page 3.  Do you see
11   there's a bold "Recommendations and Criteria For
12   Hormonal Treatment" in the center of the page?
13   And I'd like to read the first sentence, and then
14   I'll ask if I read it correctly.
15            It says "For adolescents with gender
16   incongruence, the NBHW deems that the risks of
17   puberty-suppressing treatment with GnRH-analogues
18   and gender-affirming hormonal treatment currently
19   outweigh the possible benefits and that the
20   treatment should be offered only in exceptional
21   cases."
22            Did I read that correctly?
23        A.   Yes.
24        Q.   Is it fair to say that Sweden is
25   recommending caution because the risks of puberty
```

Page 225

ER-376

Dr. Kara Connelly August 28, 2023

1  blockers and gender-affirming treatment are likely

2  to outweigh the benefits?

3      A.  My interpretation of that statement is

4  that the National Board of Health and Welfare

5  has -- or is making the claim that the risks of

6  these treatments outweigh the benefits, and that

7  the care should continue to be provided in

8  exceptional cases and then in research settings,

9  primarily.

10     Q.  Do you disagree with the statement here

11  that the risks of puberty blockers and

12  gender-affirming treatment -- am I reading --

13  sorry.  I'm omitting a sentence.  Let me rephrase

14  that.

15         Do you disagree with the statement here

16  that the risks of puberty-suppressing treatment

17  with GnRH-analogues and gender-affirming hormonal

18  treatment currently outweigh the possible

19  benefits?

20         MS. NOWLIN-SOHL:  Objection.

21         THE WITNESS:  Yeah, I don't agree with

22  that statement.

23     Q.  (BY MR. RAMER)  And on what basis do you

24  disagree?

25     A.  On the basis of the research that is

Page 226

(23 of 296), Page 23 of 296  Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 23 of 296
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 227 of 374
Dr. Kara Connelly August 28, 2023

```
 1    available.
 2         Q.   Meaning the articles you cite in your
 3    declaration?
 4         A.   Yes.
 5         Q.   So looking at the following sentence
 6    here, I'll just read it again and ask if I read it
 7    correctly.
 8              It says "This judgment is based mainly on
 9    three factors, the continued lack of reliable
10    scientific" -- excuse me.  I'll start again.
11              "This judgment is based mainly on three
12    factors, the continued lack of reliable scientific
13    evidence concerning the efficacy and the safety of
14    both treatments, the new knowledge that
15    detransition occurs among young adults, and the
16    uncertainty that follows from the yet-unexplained
17    increase in the number of care seekers, an
18    increase particularly large among adolescents
19    registered as females at birth."
20              Did I read that correctly?
21         A.   Yes.
22         Q.   In their third factor they list here
23    refers to an unexplained increase in the number of
24    care seekers, which it says "is particularly large
25    among adolescents registered as females at birth."
```

Page 227

Dr. Kara Connelly August 28, 2023

1           Do you see that?

2       A.    Yes.

3       Q.    Do you agree there's been an unexplained

4   increase in the number of youth seeking this care?

5           MS. NOWLIN-SOHL:  Object to form.

6           THE WITNESS:  I can agree that -- I can

7   say that there has been in some clinics an

8   increase in the number of individuals assigned

9   female at birth that are being seen at gender

10  clinics.

11      Q.    (BY MR. RAMER)  And what is the

12  explanation for that?

13          MS. NOWLIN-SOHL:  Object to form.

14          THE WITNESS:  Well, I think that there

15  are likely a variety of factors that may influence

16  that, but I've -- I don't know that I can -- that

17  anyone can say with certainty exactly what has led

18  to that.

19      Q.    (BY MR. RAMER)  So do you agree, then,

20  that it's unexplained?

21      A.    I wouldn't say that it's unexplained.  I

22  think that, again, there are likely a variety of

23  factors that have been considered as influence --

24  at least partially influencing that.

25      Q.    And in that sentence I read, the second

Page 228

Dr. Kara Connelly August 28, 2023

```
1    factor is the knowledge that detransition occurs
2    among young adults.
3              Do you see that?
4         A.   Yes.
5         Q.   And do you agree with that statement?
6              MS. NOWLIN-SOHL:  Object to form.
7              THE WITNESS:  I think that's a -- I
8    wouldn't say that I agree with that statement in
9    the way that it is phrased.
10        Q.   (BY MR. RAMER)  Do you agree that
11   detransition occurs among young adults?
12        A.   I think that some individuals may say
13   that their experience -- that they would
14   characterize their experience as detransitioning.
15        Q.   And the first factor listed here is the
16   continued lack of scientific evidence concerning
17   the efficacy and safety of using puberty blockers
18   and cross-sex hormones.
19             Do you see that?
20        A.   Yes.
21        Q.   I assume you disagree with that
22   statement; is that right?
23             MS. NOWLIN-SOHL:  Object to form.
24             THE WITNESS:  Yeah, I would not say that
25   there is a lack of reliable scientific evidence
```

Page 229

Dr. Kara Connelly August 28, 2023

```
 1    concerning the efficacy and the safety of the
 2    treatments.
 3         Q.   (BY MR. RAMER)  And is the basis for that
 4    disagreement the articles you cite in your
 5    declaration?
 6              MS. NOWLIN-SOHL:  Object to form.
 7              THE WITNESS:  Yes.
 8         Q.   (BY MR. RAMER)  So same document, same
 9    page, the following paragraph.  The first sentence
10    references a systematic review published in 2022
11    by the Swedish Agency for Health, Technology,
12    Assessment, and Assessment of Social Services.
13              Do you see that?
14         A.   Yes.
15         Q.   Have you read that systematic review?
16         A.   Yes.
17         Q.   Did you review the appendix?  Let me
18    rephrase.
19              Did you review the appendices to that
20    systematic review?
21         A.   I'm not sure.
22              MR. RAMER:  Let's turn to Connelly
23    Exhibit 18, which has a 16 in the file name.
24              (Deposition Exhibit No. 18 was marked.)
25         Q.   (BY MR. RAMER)  Have you seen this
```

Page 230

Dr. Kara Connelly August 28, 2023

```
 1    document before?
 2        A.    This does not look familiar.
 3        Q.    Obviously some of this is in Swedish.
 4    I'm only going to ask you about the English.
 5            Toward the top, there is kind of a header
 6    in the upper right.  And then there's a backslash
 7    and then there's English.  And it says "Hormone
 8    treatment of children and adolescents with gender
 9    dysphoria."
10            Do you see that?
11        A.    Yes.
12        Q.    And then as you move down to the light
13    blue text below, after the slash, in English it
14    says "Appendix 2 studies excluded due to high risk
15    of bias."
16            Do you see that?
17        A.    Yes.
18        Q.    And then below that after the backslash
19    in English, it says "Studies with high risk of
20    bias."
21            Do you see that?
22        A.    Yes.
23        Q.    And the very first study listed, is that
24    a study you cite in footnote 7 of your
25    declaration?
```

Page 231

Dr. Kara Connelly August 28, 2023

 1          MS. NOWLIN-SOHL:  Real quick, John, where

 2     does this document come from?

 3          MR. RAMER:  What do you mean?

 4          MS. NOWLIN-SOHL:  So it's appendix 2.

 5     What is it appendix 2 to?

 6          MR. RAMER:  My understanding it's

 7     appendix 2 to the system -- Swedish systematic

 8     review.

 9          MS. NOWLIN-SOHL:  Okay.

10       Q.   (BY MR. RAMER)  And, Doctor, my question

11     is the first study listed here, is that a study

12     you cite in footnote 7 of your declaration?

13       A.   It may be, but I would have to go back

14     and double-check the title.

15       Q.   Okay.  And do you recall whether the

16     second study listed here is a study you cite in

17     your declaration?

18       A.   I'd have to go back and look at the

19     declaration to be certain.

20       Q.   If -- do you have any reason to disagree

21     with the conclusion in this document that the

22     studies listed here have high risk of bias?

23          MS. NOWLIN-SOHL:  Objection to form;

24     foundation.

25          THE WITNESS:  I would have to review how

                                            Page 232

Dr. Kara Connelly August 28, 2023

```
 1    that conclusion was determined.

 2            MR. RAMER:  Okay.  Let's move on to

 3    Exhibit -- Connelly Exhibit 19 that has a 17 in

 4    the file name.

 5            (Deposition Exhibit No. 19 was marked.)

 6       Q.   (BY MR. RAMER)  And, Doctor, have you

 7    seen this document before?

 8       A.   I have seen this document before.

 9       Q.   And have you read it before?

10       A.   I have read some of it.

11       Q.   When you read the parts that you've read,

12    was it your opinion that this document raised any

13    concerns?

14            MS. NOWLIN-SOHL:  Object to form.

15            THE WITNESS:  I think I would need more

16    specifics about parts, the parts.

17       Q.   (BY MR. RAMER)  Okay.  What do you recall

18    reading in this document?

19       A.   I was -- I recall reading how this report

20    was developed and the general summary, but I would

21    need more specifics about what parts you're

22    referring to.

23       Q.   Okay.  Let's go to page 38.

24            MS. NOWLIN-SOHL:  Okay.

25       Q.   (BY MR. RAMER)  Okay.  And right column,
```

Page 233

ER-384

Dr. Kara Connelly August 28, 2023

```
1    do you see a paragraph that's numbered 3.32?

2         A.   Yes.

3         Q.   Okay.  I'm going to read the first

4    sentence and ask if I read it correctly.

5              It says "A closely linked concern is the

6    unknown impacts on development, maturation, and

7    cognition if a child or young person is not

8    exposed to the physical, psychological,

9    physiological, neurochemical, and sexual changes

10   that accompany adolescent hormone surges."

11             Did I read that correctly?  Sorry, I

12   didn't hear you.

13        A.   Yes.  Yes, you did.

14        Q.   And do you agree that the impact of

15   puberty blockers on a child's developmental

16   cognition is currently unknown?

17             MS. NOWLIN-SOHL:  Objection; form,

18   foundation, mischaracterizing -- well, yeah.

19   We'll leave it at that.

20             THE WITNESS:  Can you repeat the

21   question?

22        Q.   (BY MR. RAMER)  Do you agree that the

23   impact of puberty blockers on a child's -- let me

24   rephrase.

25             Do you agree that the impact of puberty
```

Page 234

Dr. Kara Connelly August 28, 2023

```
 1    blockers on an individual's developmental
 2    cognition is currently unknown?
 3            MS. NOWLIN-SOHL:  Same objections.
 4            THE WITNESS:  Again, I think that
 5    there's -- I would need more specific description
 6    of what exactly you mean by "cognition."
 7        Q.   (BY MR. RAMER)  What do you understand --
 8    as a clinician, what do you understand cognition
 9    to be?
10        A.   I think of it as encompassing -- I mean,
11    I'm not a brain expert, but it can include
12    intellectual development.
13        Q.   Okay.  Same page, same paragraph, but the
14    last sentence.  I'll just read it and ask if I
15    read it correctly.
16            It says "If pubertal sex hormones are
17    essential to these brain maturation processes,
18    this raises a secondary question of whether there
19    is a critical time window for the processes to
20    take place or whether catch-up is possible when
21    estrogen or testosterone is introduced later."
22            Did I read that correctly?
23        A.   Yes.
24        Q.   Are you aware of any study that addresses
25    whether a negative impact on brain maturation due
```

Page 235

ER-386

Dr. Kara Connelly August 28, 2023

```
 1    to puberty blockade can be made up later through
 2    either endogenous or cross-sex hormones?
 3         A.   Can you repeat that, please?
 4         Q.   Yeah.  My question is about the last part
 5    of this where it's talking about catch-up,
 6    c-a-t-c-h u-p.
 7              And my question is whether you're aware
 8    of any studies that have researched whether the
 9    impact from puberty blockade on brain maturation
10    can be made up if an individual is later exposed
11    to either endogenous or cross-sex hormones.
12         A.   I'm not aware of studies that have
13    defined -- I can't remember the word that you
14    used.  I can't remember if you used the word
15    "detriments" in brain development that look
16    specifically at that -- has defined that and then
17    looked specifically at whether that changes the
18    hormones.
19              MR. RAMER:  And then let's move to
20    another exhibit.  Should be Connelly Exhibit 20,
21    which has an 18 in the file name, if that came
22    through.
23              (Deposition Exhibit No. 20 was marked.)
24         Q.   (BY MR. RAMER)  And, Doctor, do you
25    recognize this document?
```

Page 236

Dr. Kara Connelly August 28, 2023

```
 1        A.    I don't believe that I have read this.
 2             MS. NOWLIN-SOHL:  Can we give her a
 3   minute just to take a look at it?
 4             MR. RAMER:  Yeah, and I can describe it.
 5        Q.   (BY MR. RAMER)  If it is a systematic
 6   review conducted by the U.K.'s National Institute
 7   For Health and Care Excellence, is that something
 8   you think you've read before?
 9        A.    Tell me again what -- how you described
10   it.
11        Q.    A systematic review conducted by the
12   U.K.'s National Institute For Health and Care
13   Excellence which I read as -- I believe is
14   typically abbreviated as NICE, N-I-C-E.
15             Is that something you've read before?
16        A.    I am not sure if I have read it.  I need
17   to look at it.
18        Q.    Okay.  But as you sit here today, you
19   can't recall whether you've ever read this?
20        A.    This document?
21        Q.    Have you ever read any systematic review
22   conducted by NICE?
23        A.    I don't believe that I have.
24        Q.    I'd like to go to page 99 of this.  And
25   just let me know when you're there.
```

Page 237

Dr. Kara Connelly August 28, 2023

```
 1              MS. NOWLIN-SOHL:  Appendix G?

 2              MR. RAMER:  Correct.

 3              MS. NOWLIN-SOHL:  Okay.  We're there.

 4         Q.   (BY MR. RAMER)  And the study that's

 5    being assessed on this page, is this the de Vries

 6    study that you cite?

 7         A.   Is there a place where I can see what the

 8    title is?

 9         Q.   Yeah.  Let's go to page 82 and then we'll

10    come back to this.

11              MS. NOWLIN-SOHL:  Okay.  We're there.

12         Q.   (BY MR. RAMER)  And is that the study

13    that you cite?

14         A.   That's one of them.

15         Q.   Okay.  So let's go back to 99.  And do

16    you see kind of in the middle of the page there's

17    a small footnote 2 in small print?

18         A.   Yes.

19         Q.   And that footnote says that "The

20    researchers here assess that the de Vries study

21    had a high risk of bias due to poor quality

22    overall, lack of blinding, and no control group,"

23    correct?

24         A.   That is what this statement says.

25         Q.   And do you disagree with that assessment?
```

Page 238

Dr. Kara Connelly August 28, 2023

```
 1              MS. NOWLIN-SOHL:  Objection to form;
 2    foundation.
 3              THE WITNESS:  I would need to go and look
 4    at how these assessments and determinations were
 5    made in this specific review.
 6        Q.   (BY MR. RAMER)  I guess do you think the
 7    de Vries study you cite has a high risk of bias or
 8    no?
 9              MS. NOWLIN-SOHL:  Same objections.
10              THE WITNESS:  Again, there's -- bias can
11    mean a lot of different things, and so I would
12    have to see how "bias" is defined here and how the
13    risk of bias was ascertained.
14        Q.   (BY MR. RAMER)  Under any definition of
15    "bias" that's used in research, do you think that
16    the de Vries study that you cite is bias?
17              MS. NOWLIN-SOHL:  Objection to form.
18              THE WITNESS:  I can say that this
19    de Vries study is -- as far as I can recall, did
20    not include -- it's correct that it did not
21    include a control group.
22              But I can't say whether it has a high
23    risk of bias.
24        Q.   (BY MR. RAMER)  Can you say whether it
25    has poor quality overall?
```

Page 239

Dr. Kara Connelly August 28, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form.
 2              THE WITNESS:  I would not -- I would have
 3     to look to see how that is defined in this review.
 4         Q.   (BY MR. RAMER)  Under a normal reading of
 5     the phrase "poor quality overall," is there any
 6     situation where you would agree that the de Vries
 7     study you cite has poor quality overall?
 8              MS. NOWLIN-SOHL:  Object to form.
 9              THE WITNESS:  I would not use those words
10     to describe this study.
11              MS. NOWLIN-SOHL:  John, are you at a good
12     stopping spot for a break?
13              MR. RAMER:  Yeah.  Yeah, let's do that.
14     25.  How long would you like?
15              MS. NOWLIN-SOHL:  Let's do ten minutes.
16     We might just need to get a little fresh air for a
17     minute.
18              MR. RAMER:  That's fine with me.
19              MS. NOWLIN-SOHL:  Okay.  Thank you.
20              THE VIDEOGRAPHER:  Okay.  So the time is
21     5:25 p.m. Mountain time, and we are off the
22     record.
23          (Break taken from 5:25 p.m. to 5:38 p.m.)
24              THE VIDEOGRAPHER:  All right.  We are
25     recording.  The time is 5:38 Mountain time, and we
```

Page 240

(37 of 296), Page 37 of 296 Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 37 of 296
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 241 of 374
Dr. Kara Connelly August 28, 2023

```
 1    are back on the record.

 2               (Deposition Exhibit No. 21 was marked.)

 3          Q.    (BY MR. RAMER)  Dr. Connelly, I'd like to

 4    turn to Connelly Exhibit 21, which has a 19 in the

 5    file name.

 6               And have you seen this systematic review

 7    from NICE before?

 8          A.    I'm aware that it exists, and I may have

 9    seen it.

10          Q.    But you don't specifically recall reading

11    it; is that right?

12          A.    I don't recall that I've read this whole

13    review.

14          Q.    How much of it would you estimate you

15    have read?

16          A.    I've probably read -- well, I've read the

17    conclusions and the -- yeah, mostly focused on the

18    conclusions.

19          Q.    And do you recall what the conclusions

20    were?

21          A.    I would have to look back and

22    specifically to this review to say.

23          Q.    Okay.  Let's go to page 13 of this

24    document.  And just let me know when you're there.

25          A.    Okay.
```

Page 241

Dr. Kara Connelly August 28, 2023

1      Q.   And under "Discussion," kind of the

2   middle of the page, I want to start with the third

3   paragraph below "Discussion."  And I'll just read

4   it and ask if I read it correctly.

5           "The included studies have relatively

6   short follow-up with an average duration of

7   treatment with gender-affirming hormones between

8   around 1 year and 5.8 years.  Further studies with

9   a longer follow-up are needed to determine the

10  long-term effect of gender-affirming hormones for

11  children and adolescents with gender dysphoria."

12          Did I read that correctly?

13      A.   Yes.

14      Q.   Do you agree that it will take longer

15  than 5.8 years for some of the effects associated

16  with some of these hormonal interventions to

17  become apparent?

18      A.   I think that longer follow-up would

19  definitely add evidence to the existing evidence

20  of the shorter duration studies.

21      Q.   And so in other words, we don't know what

22  happens in the longer term; is that right?

23          MS. NOWLIN-SOHL:  Object to form.

24          THE WITNESS:  Their -- well, in these

25  particular studies that have only gone for as long

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

ER-393

(39 of 296), Page 39 of 296 Case: 24-142 02/06/2024 DktEntry: 26.4, Page 39 of 296
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 243 of 374
Dr. Kara Connelly August 28, 2023

1    as 5.8 years, we can't make conclusions about what

2    happens longer term in those studies, but there

3    have been some studies that apparently aren't

4    included in this statement that have looked at

5    longer-term outcomes.

6        Q.    (BY MR. RAMER)  Were those longer-term

7    outcome studies that you're referring to regarding

8    adolescents or children?

9        A.    Well, they were regarding treatments that

10   were started during adolescence.

11       Q.    And what studies specifically are you

12   referring to?

13       A.    So the -- several of the studies from the

14   Netherlands looked at longer-term outcomes than

15   5.8 years.  And some of the bone health studies

16   from the Netherlands and Belgium have looked at

17   longer-term outcomes than 5.8 years.

18       Q.    And do you recall whether the researchers

19   in this systematic review considered those

20   studies?

21       A.    I can't remember.  I'd have to look at

22   the references.

23       Q.    And I'll just read the next paragraph on

24   the page and ask if I read it correctly.

25             It says "Most studies included in its

Page 243

(40 of 296), Page 40 of 296  Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 40 of 296
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 244 of 374
Dr. Kara Connelly August 28, 2023

 1    review did not report comorbidities (physical or

 2    mental health), and no study reported concomitant

 3    treatments and detail.  Because of this, it is not

 4    clear whether any changes seen were due to

 5    gender-affirming hormones or other treatments the

 6    participants may have received."

 7            Did I read that correctly?

 8        A.   Yes.

 9        Q.   What do you understand this paragraph to

10    be saying?

11        A.    My interpretation is that in most of the

12    studies, there may have been comorbidities or

13    concomitant treatments that may have also had an

14    impact or played a role in outcomes.

15        Q.   So is this paragraph describing a

16    confounding variable like we discussed earlier?

17            MS. NOWLIN-SOHL:  Object to the form.

18            THE WITNESS:  It's possible, but again,

19    they're kind of making a summary statement about

20    multiple studies, not any specific ones.

21        Q.   (BY MR. RAMER)  Right.  And the paragraph

22    appears to say that because no study recorded

23    concomitant treatments in detail, it's not clear

24    whether any changes seen were due to

25    gender-affirming hormones or other treatments the

Page 244

 1    participants may have received, right?

 2        A.    That is what they are saying.

 3        Q.    And that's similar to the hypothetical I

 4    asked earlier today about a study where you have

 5    patients receiving medical interventions alongside

 6    mental health therapy, right?

 7        A.    Medical interventions -- and the mental

 8    health therapy being a concomitant treatment?

 9        Q.    Right.

10        A.    Yes.

11        Q.    Okay.  Let's -- we can move on from this

12    document.  I'd like to just go back to your

13    declaration now and go to page 11.

14            And the header for part IV says

15    "Gender-Affirming medical care for adolescents is

16    safe"; is that right?

17        A.    Yes.

18        Q.    And what do you mean by the word "safe"?

19        A.    In general, I -- in this case I mean that

20    the benefits likely outweigh the risks.

21        Q.    So same page, paragraph 37, and the very

22    last sentence that carries over onto the other

23    page, but my question is only about the part

24    that's on this page.

25            And you say that GnRHa medications are

Page 245

Dr. Kara Connelly August 28, 2023

1    also used to treat endometriosis, correct?

2        A.    Yes.

3        Q.    And can you explain -- just stepping

4    back, GnRHa medications can also be called puberty

5    blockers, right?

6        A.    Yeah.  That's a term when they're used

7    for the purposes of suppressing puberty.

8        Q.    That's fair.  So I'll stick with GnRHa

9    medications.

10            So can you explain how GnRHa medications

11   are used to treat endometriosis?

12       A.    I can explain my understanding; however,

13   I have not prescribed them for those indications.

14            And so my understanding is that they're

15   used to suppress endogenous estrogen production to

16   prevent the changes to the uterine lining that can

17   lead to symptoms related to endometriosis.

18       Q.    And when an individual is receiving GnRHa

19   medications to treat endometriosis, do you know

20   how long they're on the medication for that

21   treatment?

22            MS. NOWLIN-SOHL:  Object to form.

23            THE WITNESS:  Since I don't prescribe it

24   for that indication, I can't say with certainty.

25       Q.    (BY MR. RAMER)  So let's go next page in

Page 246

Dr. Kara Connelly August 28, 2023

```
 1    your declaration, and paragraph 41, and second
 2    sentence.
 3            You're referring to gynecomastia; is that
 4    right?
 5        A.   Yes.
 6        Q.   And how is gynecomastia diagnosed?
 7        A.   It's diagnosed clinically by physical
 8    exam.
 9        Q.   So the diagnosis for gynecomastia does
10    not turn on the presence of psychological
11    distress, correct?
12        A.   The diagnosis -- I'm sorry.  Can you
13    repeat that?
14        Q.   The diagnosis for gynecomastia does not
15    turn on the presence or lack thereof of
16    psychological distress, correct?
17        A.   Correct.
18        Q.   And same paragraph, next sentence, you
19    refer to either PCOS or PCOS.  I don't know how
20    you pronounce it.  Which is it?
21        A.   I say PCOS.
22        Q.   Okay.  I will defer to you.
23            And how is PCOS diagnosed?
24        A.   PCOS is diagnosed based on clinical and
25    laboratory evaluation.
```

Page 247

Dr. Kara Connelly August 28, 2023

```
1        Q.    And so the diagnosis for PCOS does not
2   turn on the presence or lack thereof of
3   psychological distress, correct?
4        A.    The diagnosis -- the diagnosis is not
5   dependent -- or to establish a diagnosis is not
6   dependent of psychological distress, but some of
7   the treatments for both PCOS and gynecomastia are
8   considered to alleviate psychological distress if
9   they are present in an individual.
10              So the treatment can be influenced by the
11   presence or absence of psychological distress.
12        Q.    But gynecomastia is not psychological
13   distress, right?
14        A.    The physical condition of gynecomastia is
15   not, but it can in some individuals pause
16   psychological distress.
17        Q.    Right.  And in your declaration, page 14,
18   paragraph 50, in the first sentence there, you
19   say, "Gender-affirming hormone therapy may have an
20   impact on future fertility potential, although
21   treatment can be tailored to minimize that risk if
22   maintaining fertility is important to the family
23   and there are options for fertility preservation";
24   is that right?
25        A.    Yes.
```

Page 248

Dr. Kara Connelly August 28, 2023

```
 1        Q.    And down in footnote 10, your first
 2   sentence there, you say, "Many individuals
 3   assigned female at birth who take testosterone are
 4   able to achieve pregnancy or use assisted
 5   reproductive technology to conceive after
 6   discontinuing testosterone."
 7            Did I read that right?
 8        A.    Yes.
 9        Q.    And do you tell that to your patients?
10        A.    I tell them that the way that I counsel
11   patients -- and this would be specific to patients
12   assigned female at birth; it's not pertinent to
13   patients assigned male at birth, the specific
14   statement -- but what I explain is that what is
15   known about the impacts of testosterone on future
16   fertility is based on small studies of individuals
17   who start -- who started testosterone as adults in
18   their 20s or older.
19            And that what those small studies have
20   shown is that the majority of the individuals in
21   those studies resumed menstrual cycles after
22   discontinuation of testosterone, and then some of
23   them went on to achieve pregnancy or carry a
24   pregnancy, or had their eggs be for someone else
25   to carry a pregnancy.
```

Page 249

ER-400

Dr. Kara Connelly August 28, 2023

```
 1              But where we don't have all of the
 2   answers is whether those outcomes are different
 3   for individuals who start testosterone at a
 4   younger age.
 5        Q.    In this first sentence in footnote 10,
 6   you cite the Light study; is that right?
 7        A.    Yes.
 8        Q.    And did the patients in the Light study
 9   go through natural puberty before taking
10   testosterone?
11        A.    My understanding is that they did.
12        Q.    And do you think that the difference
13   between taking testosterone before going through
14   natural puberty on the one hand and taking
15   testosterone after going through natural puberty
16   on the other hand could make a difference in
17   fertility outcomes?
18        A.    So are you referring to for patients who
19   have not gone through natural puberty, are you
20   referring to patients who are on puberty blockers?
21        Q.    I guess either -- sure, yes, puberty
22   blockers.
23        A.    I think it's possible that
24   testosterone -- I'm sorry, can you repeat the
25   specific question?
```

Page 250

ER-401

Dr. Kara Connelly August 28, 2023

```
 1        Q.    Yeah.  It's just do you think that the
 2   difference between taking testosterone before
 3   going through natural puberty on the one hand and
 4   taking testosterone after going through natural
 5   puberty on the other hand could make a difference
 6   in fertility outcomes?
 7        A.    I think it's possible.
 8        Q.    And do you know what the treatment
 9   regimen was for the patients in the Light study?
10        A.    Can you be more specific about "treatment
11   regimen"?
12        Q.    Do you know what -- how they were
13   receiving testosterone?  Let me rephrase.
14              Do you know what their treatment regimen
15   for receiving testosterone was in the Light study?
16              MS. NOWLIN-SOHL:  Object to form.
17              THE WITNESS:  Do you mean dosage or how
18   it was administered?
19        Q.    (BY MR. RAMER)  Both.
20        A.    I can't remember specific dosages or if
21   they reported on that, but testosterone is
22   generally administered by injection.
23        Q.    And in this citation for Light, before it
24   you say "See, e.g."
25              Do you see that?
```

Page 251

Dr. Kara Connelly August 28, 2023

```
 1          A.    Yes.

 2          Q.    And what does "See, e.g." mean?

 3          A.    It's an example of a study that is --

 4    that I'm referring to or that I'm referencing in

 5    making the prior statement.

 6          Q.    And so are you suggesting there are other

 7    studies that support the proposition that many

 8    individuals assigned female at birth who take

 9    testosterone are able to achieve pregnancy or use

10    assistive reproductive technology to conceive

11    after discontinuing testosterone?

12          A.    Yes.  There's another reference in the

13    same paragraph.

14          Q.    I'm sorry.  Can you clarify that answer?

15    What do you mean?

16          A.    So were you saying that I'm saying that

17    there are other studies that can --

18          Q.    I guess -- sorry.

19          A.    -- support the statement?

20          Q.    Right.  The way I was reading this is you

21    say -- you make this statement at the beginning of

22    footnote 10, and then you say "See, for example,

23    the Light study."

24                And when I read that, it suggests the

25    Light study is just one example that shows the
```

Page 252

ER-403

Dr. Kara Connelly August 28, 2023

```
 1   proposition in this first sentence.

 2           And my question is can you name another

 3   study that demonstrates that proposition?

 4        A.   Yeah.  The second -- the second study

 5   following that one or following the next statement

 6   can also support the prior statement.  It's a

 7   study, a completely different way of looking at

 8   the question, but it was a study that demonstrated

 9   that transgender men can achieve pregnancy,

10   transgender men who have taken testosterone can

11   achieve pregnancy.

12        Q.   And just to make sure we're on the same

13   page, are you referencing the Thornton study

14   there?

15        A.   Yes.

16        Q.   Okay.  Are you aware of any study that

17   suggests many individuals who are assigned female

18   at birth who transition during adolescence are

19   able to achieve pregnancy?

20        A.   No, not of adolescence.  I don't believe

21   that there are any studies that have reported on

22   that specific question in a large population.

23        Q.   And in the same footnote, its second to

24   last sentence starts with "Some transgender

25   women."
```

Page 253

Dr. Kara Connelly August 28, 2023

```
 1              Do you see that?
 2      A.    Yes.
 3      Q.    Do you counsel your patients about this
 4  option?
 5              MS. NOWLIN-SOHL:  Object to form.
 6              THE WITNESS:  Can you be more specific
 7  about counseling patients about this option for
 8  this specific reason?
 9      Q.    (BY MR. RAMER)  Right.  Do you ever tell
10  your patients that to preserve fertility
11  potential, you could elect to use only
12  antiandrogen medications without estrogen?
13      A.    Yes.
14      Q.    And do patients choose that option?
15      A.    Yes.
16      Q.    And is that protocol in accordance with
17  the WPATH guidelines?
18              MS. NOWLIN-SOHL:  Object to form.
19              THE WITNESS:  Can you be more specific
20  about -- what do you mean by "protocol"?
21      Q.    (BY MR. RAMER)  Prescribing antiandrogen
22  medications without estrogen to a patient.
23              Is that consistent with the WPATH
24  guidelines?
25              MS. NOWLIN-SOHL:  Same objection.
```

Page 254

ER-405

Dr. Kara Connelly August 28, 2023

```
 1            THE WITNESS:  I don't recall that it's
 2   not included as an option in the guidelines.  I
 3   believe that spironolactone is included in the
 4   guidelines as an option.
 5            I don't know if the standards of care --
 6   did you mean the Endocrine Society guidelines or
 7   WPATH standards of care?
 8       Q.   (BY MR. RAMER)  Well, my first question
 9   was WPATH.  After you answer this, my next
10   question is going to be Endocrine Society.  But --
11   so go ahead.
12       A.   So antiandrogen medications are in a
13   completely different category as estrogen and have
14   different clinical effects.
15            So when I'm counseling patients about
16   different options, we talk about spironolactone as
17   a category of medications that can lower the
18   effects of androgens, but don't pause the physical
19   body changes like breast development that estrogen
20   causes.  And spironolactone does not have the same
21   impact on sperm -- future fertility potential or
22   sperm production as estrogen does.
23            So some individuals may want the androgen
24   lower effects but may not want breast development.
25       Q.   And my question is as you sit here today,
```

Page 255

Dr. Kara Connelly August 28, 2023

```
1    do you know whether the WPATH guidelines say that
2    for adolescents you could use only antiandrogen
3    medications without estrogen to preserve sperm
4    production?
5             MS. NOWLIN-SOHL:  Object to form.
6             THE WITNESS:  I don't know if that exact
7    statement is made.
8         Q.   (BY MR. RAMER)  Do you know if that
9    statement is made in substance in the WPATH
10   guidelines?
11            MS. NOWLIN-SOHL:  Object to form.
12            THE WITNESS:  I don't know if it's made
13   in reference to preserving fertility.
14        Q.   (BY MR. RAMER)  And what about with
15   respect -- same question with respect to the
16   Endocrine Society guidelines.
17            MS. NOWLIN-SOHL:  Same objections.
18            THE WITNESS:  Same.  I don't think that
19   it's made in reference to preserving fertility --
20   as an option for preserving fertility.  Because
21   the option for preserving fertility really lies in
22   not using estrogen.
23        Q.   (BY MR. RAMER)  Can you explain that,
24   what you mean by that?
25        A.   Yeah.  So the estrogen is what has --
```

Page 256

Dr. Kara Connelly August 28, 2023

```
 1    what, based on research available, can have an
 2    impact on future sperm production.  So if future
 3    fertility is desired, then there is an option to
 4    not take estrogen.
 5        Q.   And is -- no, I think we'll move on.
 6             In that footnote in the last citation
 7    there, you cite Yang.
 8             Do you see that?
 9        A.   Yes.
10        Q.   And as you sit here today, can you recall
11    whether the subjects in that study were adults?
12        A.   Yes.
13        Q.   Yes, they were?
14        A.   Yes, they were.
15        Q.   Of all your patients, have you ever had a
16    case of an individual who was assigned male at
17    birth who underwent cross-sex hormone treatment
18    for a period of years and subsequently conceived a
19    child?
20        A.   I am not -- and do you mean by -- so
21    conceived -- I'm assuming you mean conceived a
22    child as having had their sperm used to result in
23    pregnancy?
24        Q.   We can include that, yes.
25        A.   Okay.  I'm not aware of any of my
```

Page 257

Dr. Kara Connelly August 28, 2023

1    patients that have reached that point and have had

2    their sperm used to conceive a pregnancy or to

3    conceive a child.

4        Q.   And are you aware of any report of such a

5    case in the literature?

6        A.   Of?  Can you remind me?  The case of

7    someone who started treatment as adolescent?

8        Q.   Right.  Male -- assigned male at birth

9    who underwent cross-sex hormone treatment for a

10   period of years.

11       A.   I can't say specifically, but there are a

12   number of individuals who elected to undergo sperm

13   cryopreservation, which would -- that held that

14   the sperm would not have been impacted by the

15   gender-affirming hormone treatment.

16       Q.   And are you aware of any patients that

17   have pursued that option successfully?

18            MS. NOWLIN-SOHL:  Object to form.

19            THE WITNESS:  I have -- can you define

20   what you mean by "successful"?

21       Q.   (BY MR. RAMER)  Have you ever had a

22   patient, natal male or assigned male at birth, who

23   pursued cryopreservation of sperm and then

24   subsequently conceived a child?

25       A.   None of my patients that I have

Page 258

(55 of 296), Page 55 of 296  Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 55 of 296
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 259 of 374
Dr. Kara Connelly  August 28, 2023

```
1    prescribed treatments to have, as far as I know,

2    conceived a child.  I do have a number of patients

3    that have undergone sperm cryopreservation, and

4    they may use the cryopreserved sperm in the

5    future, but the majority -- I can't think of any

6    of my patients that I have treated who have

7    reached -- who are out of their 20s at this time.

8    So it may not be a goal of theirs right now.

9        Q.   Are you aware of any published case study

10   that documents a natal female or assigned female

11   at birth who underwent cross-sex hormone treatment

12   for a period of years and subsequently gave birth

13   to a healthy child?

14       A.   I'm sorry if I missed this, but are you

15   referring to people who started hormone treatment

16   at any age?

17       Q.   Let's start with adolescence.

18       A.   I'm not aware of a study that has looked

19   specifically at this question for someone to --

20   for people who started hormones in adolescence.

21   But in adults, yes.

22       Q.   Do you agree that a child who begins

23   taking -- let me rephrase.

24            Do you agree that an individual who

25   begins taking puberty blockers at Tanner Stage II
```

Page 259

ER-410

(56 of 296), Page 56 of 296 Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 56 of 296
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 260 of 374
Dr. Kara Connelly August 28, 2023

1    and proceeds without interruption to cross-sex

2    hormones will be infertile?

3              MS. NOWLIN-SOHL:  Object to form.

4              THE WITNESS:  I think that we are --

5    we're still learning the effects of hormones on

6    future fertility for individuals who start puberty

7    blockers prior to completion of their endogenous

8    puberty, but there are some situations such as

9    individuals assigned female at birth and start

10   puberty blockers and then testosterone, cross-sex

11   hormones, without going through or completing

12   their endogenous puberty who in the future may be

13   able to come off treatments and be able to carry a

14   pregnancy in the uterus that they were born with.

15   But I'm not aware of any studies that specifically

16   looked at that.

17        Q.   (BY MR. RAMER)  For a natal male or an

18   individual who's assigned male at birth who is at

19   Tanner Stage II and seeking to begin puberty

20   blockers, what are the options for preserving that

21   individual's fertility?

22        A.   So at Tanner Stage II of testicular

23   development, the only options are either to not

24   start puberty suppression, pubertal suppression,

25   and there are some research protocols that -- in

Page 260

Dr. Kara Connelly August 28, 2023

```
 1    some centers that are investigating the
 2    possibility of cryopreservation of testicular
 3    tissue.  But that is only done in -- under
 4    clinical research protocols.
 5         Q.   Let's go back to your declaration,
 6    page 9, paragraph 29.  And in the last sentence of
 7    that paragraph, you say that "Some patients will
 8    come to experience their gender differently"; is
 9    that right?
10         A.   Can you tell me what paragraph again?
11         Q.   Sorry, page 9, paragraph 29.  It's at the
12    top in that it's the last sentence of that
13    paragraph and the last part of that sentence.
14              MS. NOWLIN-SOHL:  Can you repeat what the
15    question is?
16         Q.   (BY MR. RAMER)  The question is just you
17    say that some patients will come to experience
18    their gender differently, right?
19              MS. NOWLIN-SOHL:  Objection;
20    mischaracterizes testimony.
21              THE WITNESS:  I'm sorry.  I missed what
22    the actual question is.
23         Q.   (BY MR. RAMER)  Let's do it this way,
24    which I've been doing and maybe I shouldn't have
25    switched.  I'll read the sentence and then I'll
```

Page 261

Dr. Kara Connelly August 28, 2023

```
 1    ask if I read it correctly.
 2            "The WPATH guidelines also recommend that
 3    doctors inform families of the limitations in the
 4    research and the possibility that some patients
 5    will come to experience their gender differently."
 6            Did I read that correctly?
 7        A.   Yes.
 8        Q.   And what is that referring to when it
 9    says that some patients will come to experience
10    their gender differently?
11        A.   It's referring to the possibility that
12    their gender expression or gender role may shift
13    and change over time.
14            MR. RAMER:  I'd like to look at Connelly
15    Exhibit 22.  It should be the last one I sent most
16    recently.  It has a 23 in the title.
17            (Deposition Exhibit No. 22 was marked.)
18        Q.   (BY MR. RAMER)  Doctor, do you recognize
19    this article?
20        A.   Yes.
21        Q.   And did you help author this article?
22        A.   Yes.
23        Q.   Is the data in this article from your
24    clinic?
25        A.   It is not from my clinic.
```

Page 262

Dr. Kara Connelly August 28, 2023

1          Q.    What clinic is it from?

2          A.    I believe it is from the clinics -- I

3    just need to go back to look at the methods.  It's

4    individuals who had gender-affirming surgery at

5    OHSU in the departments of plastic surgery,

6    urology, and gynecology.

7          Q.    Okay.  And that's the university where

8    you work, correct?

9          A.    Correct.

10         Q.    And your point is that these weren't

11   people in your clinic, I assume, because your

12   clinic doesn't do surgeries?

13         A.    Correct.

14         Q.    Okay.  And is this article listed in your

15   CV?

16         A.    I can't recall because it just was

17   recently published.  It is listed in my CV now,

18   but I don't know if in the version that you have

19   if it had been added.

20         Q.    In the orange -- so page 1 in the orange

21   box after "Results," it refers to 1,989

22   individuals who underwent gender-affirming

23   surgery, correct?

24         A.    In the abstract?

25         Q.    How are you -- sorry.  Just that orange

Page 263

ER-414

Dr. Kara Connelly August 28, 2023

```
 1    box at the top.
 2              MS. NOWLIN-SOHL:  There's a couple orange
 3    boxes.  So do you mean the one at the top that's
 4    shaded orange?
 5              MR. RAMER:  Yes.  Thank you.
 6              THE WITNESS:  Okay.  Yes, I see that.
 7       Q.   (BY MR. RAMER)  And of those 1,989
 8    individuals, do you know if any were under the age
 9    of 18?
10       A.   Who underwent -- no.
11       Q.   No, you don't know?
12       A.   No, I don't know, but I don't believe any
13    of them were.  But I can't say with certainty.
14       Q.   That's fair.  And in that same sentence,
15    I'll read it and ask you if I read it correctly.
16              It says "Among 1,989 individuals who
17    underwent GAS, 6 or .3 percent, either requested
18    reversal surgery or transitioned back to their sex
19    assigned at birth."
20              Did I read that correctly?
21       A.   Yes.
22       Q.   And as a general matter, the purpose of
23    this article is to look into the concept of regret
24    after gender-affirming surgery, correct?
25       A.   Yes.
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

ER-415

Dr. Kara Connelly August 28, 2023

1    Q.   And the way that you measure regret in
2  this article is by counting the number who
3  requested reversal surgery or transitioned back to
4  their sex assigned at birth, correct?
5    A.   I'm just going to review how that
6  population was identified and defined.
7         The patients that were identified, the
8  six patients, were individuals who requested
9  reversal surgery or said that they transitioned
10  back to their gender assigned at birth.
11    Q.   And were these individuals who requested
12  reversal surgery or transitioned back at your
13  university?
14    A.   They had received some aspect of their
15  care at OHSU, but it's possible that prior aspects
16  of their gender-affirming care occurred elsewhere.
17  I can't say with certainty if all of their care
18  happened at OHSU.
19    Q.   I guess my question was more about the
20  reversal care or the transition back.  That would
21  have happened at your university that you're
22  recording here, right?
23    A.   Yes.  These are patients that approached
24  the surgical teams to make these requests or
25  statements of transitioning back to their gender

Page 265

ER-416

(62 of 296), Page 62 of 296  Case: 24-142  02/06/2024  DktEntry: 26.4  Page 62 of 296
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 266 of 374
Dr. Kara Connelly August 28, 2023

```
 1    assigned at birth.
 2         Q.   And so the .3 percent statistic would not
 3    include anyone who detransitioned with a different
 4    medical provider outside of the university, right?
 5              MS. NOWLIN-SOHL:  Object to form.
 6              THE WITNESS:  This -- I don't believe
 7    that any of these six individuals presented and
 8    made that request outside of the university.
 9         Q.   (BY MR. RAMER)  Yeah, sorry.  I guess
10    what I'm asking is we have these six individuals
11    which represents .3 percent of the sample.
12              And my question is this sample would not
13    include individuals who initially transitioned at
14    the university but then went elsewhere to request
15    reverse surgery or transition back, right?
16         A.   Right.  It wouldn't include those
17    hypothetical individuals.  However, in -- I can
18    say that I know -- I know the surgeon's approach
19    and the behavioral health team's approach of the
20    surgical patients is that they encouraged their
21    patients to return to care with them if there are
22    any desire for reversal surgeries or concerns
23    about wanting to transition back to the gender
24    assigned at birth.
25         Q.   Has a patient in your clinic ever
```

Page 266

ER-417

(63 of 296), Page 63 of 296 Case: 24-142 02/06/2024, DktEntry: 26.4, Page 63 of 296
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 267 of 374
Dr. Kara Connelly August 28, 2023

```
 1   expressed regret at having taken puberty blockers?
 2        A.   No.
 3        Q.   Has a patient in your clinic ever
 4   expressed regret at taking cross-sex hormones?
 5        A.   No.
 6        Q.   I'd like to go to page 207 in this
 7   document.  I think it's the second page.  And
 8   right column, second full paragraph under the bold
 9   "OHSU THP Care Model."  And I'd like to read the
10   third -- let's see.  I'd like to read the fourth
11   sentence, and I'll ask if I read it correctly.
12             It says "Ongoing exploration and
13   evolution of identity is expected and normalized
14   as part of the consenting process, leaving open
15   the conversation around shifts in identity or
16   transition goals without shame or judgment."
17             Did I read that correctly?
18        A.   Yes.
19        Q.   What do you mean when you say that "the
20   evolution of identity is expected"?
21        A.   Well, we know that adolescents are
22   undergoing -- it's a developmental process in
23   terms of development of identity.  And while
24   gender identity is fixed and identity is fixed and
25   stable in the overwhelming majority of individuals
```

Page 267

ER-418

(64 of 296), Page 64 of 296  Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 64 of 296
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 268 of 374
Dr. Kara Connelly August 28, 2023

```
 1    as they go through adolescence, the way that they

 2    express that identity or experience that identity

 3    can shift and change as they go through

 4    adolescence and young adulthood.

 5         Q.   And that shift or change is expected,

 6    right?

 7         A.   It's part of the -- it's part of the

 8    developmental process in adolescents is that the

 9    way that somebody expresses their gender and

10    experiences their gender can and usually does

11    shift and change, not always.  And that's

12    referring again not to gender identity, but to

13    expression and their experience of their gender.

14         Q.   Well, this says evolution of identity is

15    expected, right?

16         A.   Evolution of their identity in general in

17    adolescence, identity.  Not solely specific to

18    gender identity.  And it also includes the way

19    that they experience and express their identity.

20         Q.   Okay.  In that same sentence, what are

21    the shifts in identity you're referring to?

22         A.   So again, shifts -- that was referring to

23    shifts in how someone experiences or expresses

24    their identity.  And that's also linked to the

25    following statement, transition-related goals.  So
```

Page 268

ER-419

Dr. Kara Connelly August 28, 2023

```
 1   goals around gender transition or goals around
 2   gender expression can shift and change over time.
 3        Q.   Okay.  Same page, left column, the large
 4   carryover paragraph, and the second to last
 5   sentence in that paragraph, you refer to
 6   "weaponization of information on regret."
 7        A.   I'm looking at it.  I see that.
 8        Q.   And what do you mean by that?
 9        A.   That statement is generally saying that
10   in some cases, the idea of regret can -- that can
11   be some patients' experiences.  There have been
12   some -- some who have made the claim that because
13   of that potential for some people, that the
14   provision of gender-affirming care for a
15   population should be prohibited.
16        Q.   Do you have any particular individuals in
17   mind?
18             MS. NOWLIN-SOHL:  Object to form.
19             THE WITNESS:  I don't have any particular
20   individuals.
21        Q.   (BY MR. RAMER)  Do you think the Idaho
22   legislature has weaponized information on regret?
23             MS. NOWLIN-SOHL:  Object to form;
24   foundation.
25             THE WITNESS:  I have not seen anything
```

Page 269

(66 of 296), Page 66 of 296  Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 66 of 296
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 270 of 374
Dr. Kara Connelly August 28, 2023

1    that I would characterize as weaponization of

2    information on regret.

3          Q.   (BY MR. RAMER)  I'd like to turn to

4    page 211 in this article, and right column, first

5    full paragraph.

6              And in the first sentence you say, "It

7    may be unrealistic to predict or eliminate

8    gender-related regret."

9              Do you see that?

10         A.   Yes.

11         Q.   What do you mean by that?

12         A.   Well, that -- it's important to interpret

13   that in the context of the rest of the article,

14   which talks about different factors that can

15   influence someone's experience of regret.

16             And that's in addition to other studies

17   that have shown that it's -- that generally

18   individuals, if there are individuals who

19   experience regret around gender-affirming

20   treatments, that most of the time it's not related

21   to a change in identity, rather, factors in their

22   environments such as -- that can cause things like

23   minority stress or lack of support or

24   discrimination or safety concerns that contribute

25   to that experience of regret.

Page 270

(67 of 296), Page 67 of 296  Case: 24-142  02/06/2024, DktEntry: 26.4, Page 67 of 296
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 271 of 374
Dr. Kara Connelly August 28, 2023

1          So with that in mind and the fact that
2    there are many factors that can play into
3    someone's experiences of regret, we may not ever
4    be able to fully predict or eliminate all of the
5    factors that may play into someone's experience of
6    regret.
7          Q.   Is regret ever the result of a change in
8    gender identity?
9          A.   It can.
10         Q.   And do you think it is unrealistic to
11   predict or eliminate gender-related regret that
12   results from a change in gender identity?
13         A.   I'm sorry.
14              MS. NOWLIN-SOHL:  Can you repeat that?
15         Q.   (BY MR. RAMER)  Do you think it is
16   unrealistic to predict or eliminate gender-related
17   regret that results from a change in gender
18   identity?
19              MS. NOWLIN-SOHL:  Object to form.
20              THE WITNESS:  Yeah, I think I would agree
21   with that statement that it may be unrealistic to
22   predict or eliminate that.
23         Q.   (BY MR. RAMER)  On the same page, the
24   left column, the second full paragraph kind of a
25   little over halfway down, there's a sentence that

Page 271

(68 of 296), Page 68 of 296 Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 68 of 296
Case 1:23-cv-00269-BLW Document 56-1 Filed 09/05/23 Page 272 of 374
Dr. Kara Connelly August 28, 2023

```
 1    begins with the phrase "At our center."
 2           Do you see that?
 3      A.   Yes.
 4      Q.   And I'll just read it and ask if I read
 5    it correctly.
 6           It says "At our center it is not unusual
 7    to encounter patients who detransitioned earlier
 8    in life but because of changing societal context,
 9    present for retransition.  (See next section.)"
10           Did I read that correctly?
11      A.   Yes.
12      Q.   Is that true that it is not unusual to
13    encounter patients who are retransitioning?
14      A.   There is -- it's hard to generalize
15    because some people use that term in their -- to
16    describe their experience, and some don't.
17           But -- it's not common, but we do have
18    patients who have used the word -- the word
19    "detransition" and then subsequently
20    "retransition."
21      Q.   Well, this says it's not unusual.  And do
22    you -- can something be not unusual yet also be
23    not common?
24           MS. NOWLIN-SOHL:  Object to form.
25           THE WITNESS:  Well, again, this is in the
```

Page 272

ER-423

Dr. Kara Connelly August 28, 2023

1   surgical setting, so I don't have that experience

2   with my patients.  That isn't experience that our

3   patients have expressed or have experienced.  So I

4   can't comment on exactly what the lead author

5   meant by "not unusual."

6           I think it would be -- I would have to

7   clarify with the surgeons about how they defined

8   that qualifying term.

9       Q.   (BY MR. RAMER)  Okay.  And one more

10  question on this.

11          Page 212 under "Limitations," the first

12  sentence says "The understanding of gender

13  incongruence is evolving, and much of the

14  presented information is based on the limited data

15  available, our workgroup discussions, TGD

16  community input, and clinical experience."

17          Did I read that correctly?

18      A.   Yes.

19      Q.   And do you agree the understanding of

20  gender incongruence is evolving?

21      A.   I agree that the field in general and

22  research pertaining to the field of gender

23  incongruence is -- you know, with more research

24  that is performed, the understanding is growing.

25          And with that, then I would say that

Page 273

(70 of 296), Page 70 of 296  Case: 24-142  02/06/2024  DktEntry: 26.4  Page 70 of 296
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 274 of 374
Dr. Kara Connelly August 28, 2023

```
 1   there will be evolutions in our understanding of
 2   the field in general.
 3            MR. RAMER:  And, Li, if we could pull up
 4   Exhibit 23, which has a 26 in the file name.
 5            MS. NOWLIN-SOHL:  Is this a good time for
 6   a break?
 7            MR. RAMER:  Yeah, sure.  I mean, this is
 8   the last -- I think I only have like 20 minutes
 9   left on the clock.  Happy to take a break if you
10   want, but this is the last document I was going to
11   talk about.  Either way, up to you.
12            MS. NOWLIN-SOHL:  Let's see.  Yeah, I
13   guess let's take a five-minute break.
14            And can we also just do a time check, how
15   much time is remaining?
16            THE VIDEOGRAPHER:  Sure.  Let me just go
17   off the record here real quick and I can add it
18   up.
19            So the time is 6:35 p.m. Mountain, and we
20   are off the record.
21        (Break taken from 6:35 p.m. to 6:42 p.m.)
22            THE VIDEOGRAPHER:  All right.  So we are
23   recording.  The time is 6:42 p.m. Mountain time,
24   and we are back on the record.
25            MR. RAMER:  Okay.  I'd like to take a
```

Page 274

ER-425

Dr. Kara Connelly August 28, 2023

```
 1    look at Connelly Exhibit 23, which has a 26 in the
 2    file name.
 3              (Deposition Exhibit No. 23 was marked.)
 4         Q.   (BY MR. RAMER)  Do you have that pulled
 5    up?
 6         A.   Yes.
 7         Q.   And, Doctor, this is a printout from the
 8    CMS website.
 9              And have you seen the information
10    contained in this printout before?
11         A.   Yes.
12         Q.   And moving down the page, there's a kind
13    of bold header that says "General Payment."
14              Do you see that?
15         A.   Yes.
16         Q.   And it says "From Endo Pharmaceuticals,
17    Inc.," correct?
18         A.   Yes.
19         Q.   And on the next line, is that your name?
20         A.   Yes.
21         Q.   And on the line after that, it says
22    "Nature of payment, consulting fee"; is that
23    right?
24         A.   Yes.
25         Q.   And the payment amount was $2,110; is
```

Page 275

ER-426

Dr. Kara Connelly August 28, 2023

```
1    that correct?

2        A.   Yes.

3        Q.   And the date of the payment was June 27,

4    2018; is that right?

5        A.   That sounds like -- I can't remember the

6    exact date, but 2018, spring of 2018, yes, that

7    sounds --

8        Q.   And sorry.  I should have directed you

9    down a line.  I was just reading the date of

10   payment, June 27, 2018.

11       A.   Okay.

12       Q.   And then on the next page in the middle,

13   it says "Associated products."

14            Do you see that?

15       A.   Yes.

16       Q.   And below that in the right column, in

17   the second row it says "Drug"; is that right?

18       A.   Yes.

19       Q.   And then two rows below that, it says

20   "National Drug Code, NDC."

21            Do you see that?

22       A.   Yes.

23       Q.   And then in the right column in that row

24   it lists a code.

25            And do you know what drug corresponds to
```

Page 276

Dr. Kara Connelly August 28, 2023

1    the National Drug Code listed there?

2        A.   I can't say without looking it up.

3        Q.   If we go down a line below that, do you

4    see it says "Supprelin LA"?

5        A.   Yes.

6        Q.   What is that?

7        A.   That is a brand of the histrelin implant

8    that is in the category of GnRH -- the

9    gonadotropin releasing hormone agonist.

10       Q.   Does that refresh your recollection of

11   whether the -- what the National Drug Code above

12   that is related to?

13       A.   I just can't say.  I don't have the

14   National Drug Code memorized for that medication,

15   but I do know the medication name.

16       Q.   Okay.  And so did you receive a

17   consulting fee from Endo Pharmaceuticals in 2018?

18       A.   Yes.

19       Q.   And was that consulting fee related to

20   Supprelin LA?

21       A.   The consulting fee was -- it was a

22   one-time meeting of a medical advisory board

23   convened to discuss this medication and

24   potentially developing research trials pertaining

25   to the medication.

Page 277

Dr. Kara Connelly August 28, 2023

1    Q.    And when you say "medication," you're
2    referring to Supprelin LA?
3    A.    Yes.  Yes.
4    Q.    And is that a drug that your clinic has
5    ever prescribed as a puberty blocker?
6    A.    Yes.
7    Q.    Did you ever prescribe that drug as a
8    puberty blocker in 2018?
9    A.    I would have to go back to look
10   specifically, but it's possible.
11   Q.    And since 2018, have you ever prescribed
12   that drug as a puberty blocker?
13   A.    Yes.
14   Q.    Since 2018, have you received any other
15   payments from Endo Pharmaceuticals?
16   A.    No.
17   Q.    Did you list this consulting work in your
18   CV?
19   A.    I don't believe that I listed it in my
20   CV.
21   Q.    Did you ever disclose this consulting fee
22   in any of your published research?
23   A.    I disclosed -- I disclosed it -- I don't
24   believe it was disclosed in published research,
25   but I've disclosed it in accordance with my

Page 278

ER-429

Dr. Kara Connelly August 28, 2023

```
 1    university's standards.
 2         Q.    Did you ever disclose this consulting fee
 3    to patients to whom you prescribed Supprelin LA?
 4         A.    I don't believe that I have.
 5         Q.    And can you just describe the full scope
 6    of the nature of your consulting work for Endo
 7    Pharmaceuticals?
 8         A.    Yes.  So it was -- as I said, it was a
 9    one-time meeting in 2018 of medical professionals
10    who were brought to serve on an advisory board to
11    discuss factors that would need to be considered
12    or that could be considered in the development of
13    research studies using this medication.
14         Q.    Is that type of meeting something that
15    you regularly participate in?
16         A.    No.
17              MS. NOWLIN-SOHL:  Object to form.
18              THE WITNESS:  That -- that's the only
19    time that I have participated in that type of
20    meeting.
21         Q.    (BY MR. RAMER)  And you said to discuss
22    factors that could be considered in development of
23    research studies using the drug; is that right?
24         A.    Um-hmm.
25         Q.    What does that mean?
```

Page 279

ER-430

Dr. Kara Connelly August 28, 2023

```
 1          A.    I'm pausing because I had to sign an NDA,
 2    and -- at the time.
 3              But it was essentially helping to inform
 4    the pharmaceutical company of what -- for example,
 5    what outcomes would need to be considered and
 6    measured as part of research studies that they
 7    were considering pursuing.
 8          Q.    And just to clarify, are you unable to
 9    fully answer my questions because of an NDA that
10    you signed with Endo Pharmaceuticals?
11          A.    I -- I've been able to answer them, your
12    questions, in the way that I consider fully to
13    explain what my participation was with the -- in
14    this meeting.
15          Q.    But why did you mention the NDA a moment
16    ago?
17          A.    I don't know if I can provide specifics
18    about -- I'd have to go back and review that --
19    specifics about the -- their plans for -- their
20    plans that they were considering in terms of
21    pursuing research studies.
22          Q.    Okay.  So if I asked you that question,
23    you would be unable to answer because of the NDA;
24    is that right?
25              MS. NOWLIN-SOHL:  Objection;
```

Page 280

ER-431

(77 of 296), Page 77 of 296  Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 77 of 296
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 281 of 374
Dr. Kara Connelly August 28, 2023

```
 1    mischaracterizes testimony.
 2            THE WITNESS:  If you were to ask me which
 3    question?
 4        Q.   (BY MR. RAMER)  Well, I thought I just
 5    asked why did you mention the NDA, and I thought
 6    you had said that it's because there are certain
 7    things you cannot disclose; is that right?
 8            MS. NOWLIN-SOHL:  Objection;
 9    mischaracterizes her testimony.
10            THE WITNESS:  No, that's not what I meant
11    by that.  I believe that I can answer all of the
12    questions that you will ask me about the meeting.
13        Q.   (BY MR. RAMER)  Okay.  What were the
14    research studies that Endo was considering
15    pursuing that you were advising on?
16            MS. NOWLIN-SOHL:  Objection to form and
17    to relevance.
18        Q.   (BY MR. RAMER)  You can answer.
19        A.   The research studies were pertaining to
20    use of the medication in youth with gender
21    dysphoria.
22        Q.   And so the meeting with Endo
23    Pharmaceuticals that you attended was to discuss
24    potential research studies regarding the use of
25    Supprelin LA to treat youth with gender dysphoria;
```

Page 281

(78 of 296), Page 78 of 296  Case: 24-142  02/06/2024  DktEntry: 26.4  Page 78 of 296
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 282 of 374
Dr. Kara Connelly August 28, 2023

```
 1   is that correct?
 2        A.   The meeting was to advise on
 3   considerations around different variables that
 4   would need to be considered in measuring their
 5   desired outcomes if they were to develop a
 6   research study looking at the use of this
 7   medication in use of gender dysphoria.
 8             And I should clarify, no such study was
 9   developed as a result of the meeting.
10        Q.   Can you do a research study like that if
11   the drug is not approved by the FDA for that use?
12             MS. NOWLIN-SOHL:  Objection to form and
13   to relevance and to foundation.
14             THE WITNESS:  Can you be a little more
15   specific?
16        Q.   (BY MR. RAMER)  Well, I guess the use of
17   Supprelin LA to treat gender dysphoria in youth is
18   not approved by the FDA, correct?
19             MS. NOWLIN-SOHL:  Object to form.
20             THE WITNESS:  The use of Supprelin LA --
21   or gender dysphoria is not an FDA-approved
22   indication.  Or it's an off-label indication for
23   the use of this medication -- of Supprelin LA.
24        Q.   (BY MR. RAMER)  And my question was just
25   at this meeting you were discussing research
```

Page 282

1    studies regarding the use of Supprelin LA to treat
2    gender dysphoria in youth.
3             And my question is can you do that if
4    it's not approved by the FDA?
5             MS. NOWLIN-SOHL:  Objection.  Same
6    objections; relevance, foundation.
7        Q.   (BY MR. RAMER)  Yeah, that's -- you can
8    ignore that question.  I don't actually think it
9    makes any sense.
10            Okay.  So what were the factors that you
11   were discussing about desired outcomes at this
12   meeting?
13            MS. NOWLIN-SOHL:  I'm going to -- we
14   might go off the record here and talk a little bit
15   about the NDA because I think you're now
16   encroaching onto that area, but I'm not sure that
17   this is relevant.  But we can have a conversation
18   about it if you'd like to keep asking questions.
19            MR. RAMER:  You want to go off the record
20   to discuss the NDA?
21            MS. NOWLIN-SOHL:  With Dr. Connelly and
22   the scope of it, because I feel like you're now
23   going into that.
24            MR. RAMER:  Okay.  How much time do you
25   think -- so just to be clear, are you instructing

Page 283

Dr. Kara Connelly  August 28, 2023

```
 1    her not to answer that last question?
 2              MS. NOWLIN-SOHL:  No, I'm not at this
 3    time, but I'd like to talk to her about the scope
 4    of the NDA before we proceed.
 5              MR. RAMER:  Can I have her answer the
 6    question that's on the table and then we'll take a
 7    break and you can discuss the NDA?
 8              MS. NOWLIN-SOHL:  Can you repeat the
 9    question?
10        Q.   (BY MR. RAMER)  It was just what are the
11    factors that you discussed at this meeting
12    regarding desired outcomes?
13              MS. NOWLIN-SOHL:  Would you like to have
14    a conversation about the NDA before answering,
15    or --
16              And I'm also going to object to form, to
17    relevance, and --
18              THE WITNESS:  I can say that the factors
19    that were discussed were around things like how we
20    would -- how would be the best way to assess
21    growth measurements and potential side effects and
22    just general things around factors that may have
23    been important to include in the design of the
24    study.
25        Q.   (BY MR. RAMER)  Do you know why the study
```

Page 284

ER-435

Dr. Kara Connelly August 28, 2023

```
 1    was never pursued?
 2            MS. NOWLIN-SOHL:  Object to the form;
 3    speculation, foundation.
 4            THE WITNESS:  I don't.
 5        Q.   (BY MR. RAMER)  Do you recall anyone else
 6    who was at this meeting?
 7        A.   Do I recall who was at the meeting?
 8        Q.   Correct.
 9        A.   Yes, I recall some of the people, but I
10    don't remember everyone's name.
11        Q.   Can you give me any names that you do
12    remember?
13            MS. NOWLIN-SOHL:  Object to relevance.
14            THE WITNESS:  Steve Rosenthal and Jeremy
15    Carswell are the only two that I can remember.
16        Q.   (BY MR. RAMER)  And where was the
17    meeting?
18            MS. NOWLIN-SOHL:  Object to relevance.
19            THE WITNESS:  I can't remember for
20    certain.  I think it was maybe in Chicago.
21        Q.   (BY MR. RAMER)  And why were you paid to
22    attend the meeting?
23        A.   I was paid a consulting fee as a
24    consultant to contribute my expertise to the
25    meeting.
```

Page 285

Dr. Kara Connelly August 28, 2023

```
1         Q.    To contribute your expertise to the
2    design of the potential study; is that right?
3              MS. NOWLIN-SOHL:  Object to form.
4              THE WITNESS:  It was not to contribute to
5    the design of the study.  I did not -- we did not
6    discuss the design of the study.
7              MR. RAMER:  Okay.  I think with that, I
8    don't have any more questions, Dr. Connelly.  I
9    appreciate the time that you've taken today.
10             And I will pass the witness to your
11   counsel if counsel has any questions for you.
12   Otherwise, thank you.
13             MS. NOWLIN-SOHL:  John, do you mind if we
14   take -- I know it's late on the East Coast, so I'm
15   sorry to ask this, but do you mind if we take 15
16   minutes for me to look over my notes and stuff?
17             MR. RAMER:  Yeah, absolutely.
18             MS. NOWLIN-SOHL:  Okay.  So we'll come
19   back at a quarter after.
20             MR. RAMER:  Sounds good.
21             THE VIDEOGRAPHER:  Okay.  So the time is
22   7:00 p.m. Mountain time, and we are off the
23   record.
24         (Break taken from 7:00 p.m. to 7:17 p.m.)
25             THE VIDEOGRAPHER:  All right.  So we are
```

Page 286

ER-437

Dr. Kara Connelly August 28, 2023

```
 1    recording.  The time is 7:17 p.m. Mountain time,

 2    and we are back on the record.

 3

 4                        EXAMINATION

 5    BY MS. NOWLIN-SOHL:

 6         Q.    Okay.  So, Dr. Connelly, you spoke

 7    earlier about puberty blockers being used as

 8    treatment for precocious puberty.

 9              Do you recall that?

10         A.    Yes, specifically central precocious

11    puberty.

12         Q.    Okay.  And how long have puberty blockers

13    been used for that purpose?

14         A.    I believe at least 30 years.

15         Q.    Okay.  And how long have you been using

16    puberty blockers to treat gender dysphoria?

17         A.    How long have I personally?

18         Q.    Um-hmm.

19         A.    Since I started providing care.  I'd say

20    probably within the last ten years.

21         Q.    Okay.  And during the time that you've

22    been practicing, are you aware of any issues

23    affecting cognition as a result of the use of

24    puberty blockers that have been identified by

25    clinicians or researchers?
```

Page 287

Dr. Kara Connelly August 28, 2023

```
1        A.    I am not aware of any.
2        Q.    And do endocrinologists today continue to
3    provide puberty blockers when indicated to treat
4    central precocious puberty?
5        A.    Yes.
6        Q.    So earlier you were also asked a few
7    questions about the basis -- bases of your
8    opinions about the effectiveness of blockers and
9    hormone therapy for the treatment of adolescents
10   with gender dysphoria, and you were referencing
11   scientific research.
12           Do you recall that?
13       A.    Yes.
14       Q.    Does your clinical experience also
15   contribute to those opinions that you expressed?
16       A.    Yes.
17       Q.    So earlier you were talking about initial
18   medical visits with patients at your clinic.
19           Do you recall that conversation?
20       A.    Yes.
21       Q.    And how many of the patients leave those
22   initial medical visits with a prescription for
23   either puberty blockers or hormone therapy or
24   another type of gender-affirming medication?
25       A.    That is very rare.  And I would estimate
```

Page 288

Dr. Kara Connelly August 28, 2023

```
 1   less than 5 percent of the time.
 2        Q.    Okay.  And after that initial visit, what
 3   happens?  What do the patients do prior to their
 4   follow-up visit?
 5        A.    Yeah, so that -- again, the care is
 6   individualized, and it depends on the patient.
 7   But it usually includes the patients reviewing
 8   information that they receive at the visit,
 9   information that we give them at the conclusion of
10   the visit that they may go home and read over.
11             They have the opportunity to ask
12   additional questions of the medical provider
13   either by phone or through -- or written or
14   through the electronic health record.
15             Many of them will continue to have
16   conversations with their parents.  Their parents
17   may have additional questions for the different
18   members of the treatment team.
19             Some patients will have ongoing
20   conversations with their therapists.
21             Some patients will have another visit
22   with our psychologist.
23             Some parents will have a visit with the
24   psychologist.
25             And so it can be any of those -- can be
```

Page 289

Dr. Kara Connelly August 28, 2023

```
 1    any of those, that variety of different items.
 2         Q.   Okay.  And as a result of those items,
 3    does it ever happen that a patient might have a
 4    prescription for puberty blockers or hormone
 5    therapy at the time of their follow-up medical
 6    appointment?
 7         A.   Yes.
 8         Q.   Okay.  And do you have a rough idea of
 9    how often that happens?
10         A.   Yeah.  I would estimate maybe about
11    20 percent of patients who have completed the
12    initial visit will initiate a medication prior to
13    their first follow-up appointment.
14         Q.   And has that number changed over time?
15         A.   It has.  And, yeah, generally -- so we've
16    actually seen -- we've seen less patients over
17    time that have -- that initiate a medication prior
18    to the first follow-up appointment.
19              And that's partially due to the fact that
20    we're seeing -- we're seeing patients that are in
21    childhood, haven't yet reached puberty, so aren't
22    eligible for any medical interventions.  We're
23    seeing an increase in that population.
24              And then we're also seeing an increase in
25    the population of individuals who determine that
```

Page 290

ER-441

(87 of 296), Page 87 of 296  Case: 24-142  02/06/2024  DktEntry: 26.4, Page 87 of 296
Case 1:23-cv-00269-BLW  Document 56-1  Filed 09/05/23  Page 291 of 374
Dr. Kara Connelly August 28, 2023

```
 1    they don't want to start any of the treatments
 2    that we've discussed or don't want to start
 3    cross-sex hormones or puberty blockers or want
 4    more time to consider the treatment.
 5         Q.   Okay.  And so earlier I think you were
 6    asked whether only 2 percent of patients will
 7    initiate puberty blockers or cross-sex hormones
 8    before the second visit, and you said that that
 9    was correct.
10              Was that testimony correct or --
11         A.   What I was referring to with that
12    2 percent was individuals who are prescribed a
13    medication at the completion or at their initial
14    visit.
15         Q.   And that is different from the number of
16    patients who will be -- have a prescription for
17    medication at the time of the follow-up visit?
18         A.   Yes.
19              MS. NOWLIN-SOHL:  Okay.  No further
20    questions.
21              MR. RAMER:  I don't have any either.
22              So thank you very much, Doctor.
23              And thank you, Li.
24              MS. NOWLIN-SOHL:  Yes.  And thank you to
25    everyone for staying later into the evening,
```

Page 291

ER-442

Dr. Kara Connelly August 28, 2023

```
 1    particularly on the East Coast.

 2              MR. RAMER:  Okay.

 3              THE WITNESS:  Thank you, all.

 4              MR. RAMER:  Have a good day.

 5              THE VIDEOGRAPHER:  All right.  So then

 6    this concludes our video deposition with Dr. Kara

 7    Connelly.  It is August 28, 2023.  The time is

 8    7:24 p.m. Mountain time, and we are off the

 9    record.

10

11      (Whereupon the deposition was concluded at 7:24 p.m.)

12                        ****

13                  (Signature requested.)

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 292

(89 of 296), Page 89 of 296  Case: 24-142  02/06/2024  DktEntry: 26.4  Page 89 of 296
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 293 of 374
Dr. Kara Connelly August 28, 2023

```
 1                          VERIFICATION

 2

     STATE OF  _____  )

 3                               )

     COUNTY OF _____  )

 4

 5       I, KARA CONNELLY, M.D., being first duly sworn on my

 6   oath, depose and say:

 7       That I am the witness named in the foregoing

 8   deposition taken the 28th day of August, 2023, consisting

 9   of pages numbered 1 to 292, inclusive; that I have read

10   the said deposition and know the contents thereof; that

11   the questions contained therein were propounded to me;

12   the answers to said questions were given by me, and that

13   the answers as contained therein (or as corrected by me

14   therein) are true and correct.

15

16   Corrections Made:  Yes_____ No_____

17

18

                         _____

19                            KARA CONNELLY, M.D.

20

21     Subscribed and sworn to before me this _____ day of

22   _____, 2023, at _____, Idaho.

23

                         _____

24                       Notary Public for Idaho

                         Residing at _____, Idaho

25                       My commission expires: _____.


                                                    Page 293
```

ER-444

(90 of 296), Page 90 of 296  Case: 24-142  02/06/2024  DktEntry: 26.4  Page 90 of 296
Case 1:23-cv-00269-BLW   Document 56-1   Filed 09/05/23   Page 294 of 374
Dr. Kara Connelly August 28, 2023

```
 1                    REPORTER'S CERTIFICATE
 2    STATE OF IDAHO       )
                           )
 3    COUNTY OF ADA        )

 4

 5        I, Amy E. Simmons, Certified Shorthand Reporter and
 6    Notary Public in and for the State of Idaho, do hereby
 7    certify:
 8        That prior to being examined, the witness named in
 9    the foregoing deposition was by me duly sworn to testify
10    to the truth, the whole truth, and nothing but the truth;
11        That said deposition was taken down by me in
12    shorthand at the time and place therein named and
13    thereafter reduced to typewriting under my direction, and
14    that the foregoing transcript contains a full, true, and
15    verbatim record of said deposition.
16        I further certify that I have no interest in the
17    event of the action.
18        WITNESS my hand and seal this 28th day of August,
19    2023.
20

21                    AMY E. SIMMONS
                      ID CSR No. 685
22                    CA CSR No. 14453
                      WA CSR No. 22012915
23                    OR CSR No. 22-009
                      RDR, CRR, CRC,
24                    and Notary Public
25

      My commission expires:  6/13/28.


                                            Page 294
```

(91 of 296), Page 91 of 296 Case: 24-142 02/06/2024 DktEntry: 26.4 Page 91 of 296
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 1 of 267
Christine Brady, Ph.D. August 31, 2023

```
 1              UNITED STATES DISTRICT COURT

 2                   DISTRICT OF IDAHO

 3

 4      PAM POE, by and through her  )  Case No.
        parents and next friends,    )  1:23-cv-00269-CWD
 5      Penny and Peter Poe; PENNY    )
        POE; PETER POE; JANE DOE, by  )
 6      and through her parents and   )
        next friends, Joan and John   )
 7      Doe; JOAN DOE; JOHN DOE,      )
                                      )
 8                      Plaintiffs,   )
                                      )
 9      v.                            )
                                      )
10      RAÚL LABRADOR, in his         )
        official capacity as the      )
11      Attorney General of the State )
        of Idaho; JAN M. BENNETTS, in )
12      her official capacity as      )
        County Prosecuting Attorney   )
13      for Ada, Idaho; and the       )
        INDIVIDUAL MEMBERS OF THE     )
14      IDAHO CODE COMMISSION, in     )
        their official capacities,    )
15                                    )
                        Defendants.   )
16      _____)

17

18

19       REMOTE VIDEOTAPED DEPOSITION OF CHRISTINE BRADY, Ph.D.

20                  THURSDAY, AUGUST 31, 2023

21

22

23

24

25      Reported By: Amy E. Simmons, CSR, RDR, CRR, CRC
```

**EXHIBIT**

**B**

Page 1

(92 of 296), Page 92 of 296  Case: 24-142  02/06/2024  DktEntry: 26.4  Page 92 of 296
Case 1:23-cv-00269-BLW  Document 56-2  Filed 09/05/23  Page 2 of 267
Christine Brady, Ph.D. August 31, 2023

```
 1       REMOTE VIDEOTAPED DEPOSITION OF CHRISTINE BRADY, M.D.

 2

 3          BE IT REMEMBERED that the remote videotaped

 4   deposition of CHRISTINE BRADY, M.D., was taken via Zoom

 5   videoconference by the attorney for the Defendants before

 6   Associated Reporting & Video, a Veritext company, Amy E.

 7   Simmons, Idaho CSR No. 685, California CSR No. 14553,

 8   Washington CSR No. 22012915, Oregon CSR No. 22-009, and

 9   Notary Public in and for the County of Ada, State of

10   Idaho, on Thursday, the 31st day of August, 2023,

11   commencing at the hour of 10:06 a.m. Mountain time in the

12   above-entitled matter.

13

14

15   APPEARANCES (remotely):

16   For the Plaintiffs:    AMERICAN CIVIL LIBERTIES UNION
                            By:  Li Nowlin-Sohl, Esq.
17                               Leslie Cooper, Esq.
                            125 Broad Street
18                          New York, NY 10004
                            Telephone:  212.549.2584
19                          lnowlin-sohl@aclu.org
                            lcooper@aclu.org
20

21                          GROOMBRIDGE WU BAUGHMAN & STONE
                            By:  Philip S. May, Esq.
22                          801 17th Street, Suite 1050
                            Washington, D.C. 20006
23                          Telephone:  202.539.6620
                            philip.may@groombridgewu.com
24

25

                                                         Page  2
```

Christine Brady, Ph.D. August 31, 2023

```
 1     APPEARANCES (remotely, continued):
 2
       For the Plaintiffs:     PAUL WEISS RIFKIND,
 3                             WHARTON & GARRISON LLP
                               By:  Sheridan Cunningham, Law Clerk
 4                             1285 Avenue of the Americas
                               New York, NY 10019
 5                             Telephone:  212.373.3000
                               rcunningham@paulweiss.com
 6
                               WREST COOPERATIVE
 7                             By:  David DeRoin, Esq.
                               812 West Franklin Street
 8                             Boise, ID 83702
                               Telephone:  208.742.6789
 9                             david@wrest.coop
10
       For the Defendants, Labrador and the Individual Members
11     of the Idaho Code Commission:
12                             COOPER & KIRK PLLC
                               By:  John Ramer, Esq.
13                             1523 New Hampshire Ave NW
                               Washington, D.C. 20036
14                             Telephone: 202.220.9621
                               jramer@cooperkirk.com
15
                               OFFICE OF THE ATTORNEY GENERAL
16                             By: Aaron Green, Esq.
                               Post Office Box 83720
17                             Boise, ID  83720
                               Telephone:  208.334.2400
18                             Facsimile:  208.854.8073
19
       For the Defendant, Jan M. Bennetts:
20
                               ADA COUNTY PROSECUTOR'S OFFICE
21                             By:  Dayton P. Reed, Esq.
                               200 West Front Street, Room 3191
22                             Boise, ID 83702
                               Telephone:  208.287.7700
23                             dreed@adacounty.id.org
24
       Also Present:           Chris Ennis, Videographer
25                             Jocelyn Larsson,
                               Court Reporting Intern
```

Page  3

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

ER-448

Christine Brady, Ph.D. August 31, 2023

```
1                    I N D E X
2                E X A M I N A T I O N
3
4   CHRISTINE BRADY, M.D.                           PAGE
5
     By:  Mr. Ramer......................................6
6
7
8
                    E X H I B I T S
9
    NO.                                             PAGE
10
    Exhibit 1.    Curriculum Vitae of Christine Erin   12
11                Lam Brady, Ph.D. (10 pages)
12  Exhibit 2.    Expert Declaration of Christine       16
                  Brady, Ph.D. (18 pages)
13
    Exhibit 3.    "Gender Identity 5 Years After        98
14                Social Transition," Olson (7 pages)
15  Exhibit 4.    Borderline Personality Disorder      123
                  Diagnostic Criteria (1 page)
16
    Exhibit 5.    "Guidelines for Psychological        134
17                Practice with Transgender and
                  Gender Nonconforming People,"
18                American Psychological Association
                  (33 pages)
19
    Exhibit 6.    "APA Resolution on the Imposition    168
20                of Death as a Penalty for Persons
                  Aged 18 Through 20, Also Known as
21                the Late Adolescent Class,"
                  American Psychological Association
22                (5 pages)
23  Exhibit 7.    "Understanding and Supporting        183
                  Patients with Dynamic Desires for
24                Gender-Affirming Medical
                  Interventions" (3 pages)
25
```

Page 4

Christine Brady, Ph.D. August 31, 2023

```
 1              P R O C E E D I N G S

 2

 3           THE VIDEOGRAPHER:  All right.  So we are

 4    recording, and we are on the record.  Today's date

 5    is August 31, 2023.  The time is 10:06 a.m.

 6    Mountain time.

 7           For the record, this is the remote

 8    videotaped deposition of Dr. Christine Brady.  It

 9    is taken by the Defendants in the matter of Poe,

10    et al., vs. Labrador, et al., Case No.

11    1:23-cv-00269-CWD.  It's in the United States

12    District Court for the District of Idaho.

13           The videotaped deposition is being held

14    remotely via Zoom videoconference.  The videotaped

15    deposition is being recorded by Chris Ennis and

16    reported by Amy Simmons of Associated Reporting &

17    Video.

18           And if counsel will please state their

19    appearances and any stipulations for the record.

20           MR. RAMER:  John Ramer on behalf of

21    Defendants.

22           MS. NOWLIN-SOHL:  Li Nowlin-Sohl with the

23    ACLU on behalf of Plaintiffs.

24           MS. COOPER:  Leslie Cooper, ACLU,

25    Plaintiffs.
```

ER-450

Christine Brady, Ph.D. August 31, 2023

```
 1              MR. MAY:  Philip May from the law firm of
 2     Groombridge Wu Baughman & Stone on behalf of
 3     Plaintiffs.
 4              MR. DeROIN:  David DeRoin with Wrest
 5     Collective on behalf of Plaintiffs.
 6              MR. CUNNINGHAM:  Ridan Cunningham, Paul
 7     Weiss Rifkind, Wharton & Garrison, Plaintiffs, not
 8     yet admitted.
 9              MR. GREEN:  Aaron Green, Idaho Attorney
10     General's Office.  I haven't appeared.  I'm just
11     observing.
12              THE VIDEOGRAPHER:  And if the court
13     reporter will please swear the witness.
14
15                    CHRISTINE BRADY, M.D.,
16     a witness having been first duly sworn to tell the truth,
17     the whole truth, and nothing but the truth, testified as
18     follows:
19
20                    EXAMINATION
21     BY MR. RAMER:
22        Q.   Hi, Dr. Brady.  My name is John Ramer.
23     I'm from the law firm of Cooper & Kirk
24     representing the Defendants in this case.
25              And my first question to you is have you
```

Page 6

Christine Brady, Ph.D. August 31, 2023

```
 1    ever been deposed before?
 2         A.   Not as an expert witness.
 3         Q.   Okay.  I take that answer as -- that you
 4    have been deposed in a different context; is that
 5    right?
 6         A.   Yes.
 7         Q.   So I assume you have a general
 8    understanding of how it goes.  I'll just go over
 9    quickly some brief ground rules to make sure we're
10    all on the same page.
11              As you know, I'll ask you questions.  If
12    you don't understand my question, please just ask
13    for an explanation, and I'll attempt to clarify
14    it.  Otherwise I'll assume that you understood the
15    question and are answering the question that I
16    asked.
17              As you also know, the proceeding is being
18    transcribed by the court reporter, so I'll ask
19    that you respond verbally rather than shaking your
20    head yes or no.
21              And I will do my best not to interrupt
22    you and just ask that you do your best not to
23    interrupt me so we can help the court reporter
24    keep a clean transcript.
25              Your counsel may object to a question
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

ER-452

Christine Brady, Ph.D. August 31, 2023

```
 1    that I ask, but unless counsel instructs you not
 2    to answer the question, you should provide an
 3    answer.
 4            And we can take breaks whenever you want.
 5    Just let me know.  The only request is that you
 6    would answer any pending questions before we break
 7    and then we'll go on the break.
 8            Does that all make sense?
 9        A.   Yes.
10        Q.   Okay.  And, Dr. Brady, is anyone other
11    than counsel in the room with you?
12        A.   No.
13        Q.   And do you have any documents open in
14    front of you?
15        A.   No.
16        Q.   And what did you do to prepare for this
17    deposition?
18        A.   I read the case filings as well as
19    pertinent research as it is relevant to my report
20    and declaration.
21            I also reviewed the expert declarations
22    of the case in Tennessee.
23        Q.   When you say "the case in Tennessee,"
24    what do you mean by that?
25        A.   The similar litigation that was proposed
```

Page 8

Christine Brady, Ph.D. August 31, 2023

```
 1    in Tennessee.
 2         Q.   And do you know the status of that
 3    litigation?
 4         A.   I do not.  The current status, no.
 5         Q.   Did you speak with anyone about your
 6    deposition today?
 7         A.   Just my legal counsel.
 8         Q.   And you mentioned you reviewed pertinent
 9    research to prepare for today; is that right?
10         A.   Yes.
11         Q.   Can you just give me a general
12    description of what you mean by "pertinent
13    research"?
14         A.   So I'm sorry.  Do you mean prior to today
15    or just in preparing my report?
16         Q.   My earlier question is what you had done
17    to prepare for the deposition.  And I thought you
18    had said you reviewed pertinent research.  And I
19    was just asking what you mean by that.
20         A.   Yeah.  So I just reviewed the -- my
21    report and then the citations that I had used in
22    my report.
23         Q.   Did you review any articles or
24    publications that are not cited in your report?
25         A.   Not in preparation for today, no.
```

Page 9

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.   Dr. Brady, do you consider yourself to be
 2   an expert?
 3             MS. NOWLIN-SOHL:  Objection to form.
 4             THE WITNESS:  I consider myself to have
 5   expertise in clinical psychology.  And I have a
 6   specialization in treating youth with gender
 7   dysphoria.
 8        Q.   (BY MR. RAMER)  Dr. Brady, are you an
 9   endocrinologist?
10        A.   No.
11        Q.   Are you a neurologist?
12        A.   No.
13        Q.   Are you a surgeon?
14        A.   No.
15        Q.   Are you a social worker?
16        A.   No.
17        Q.   Are you a urologist?
18        A.   No.
19        Q.   Are you a gynecologist?
20        A.   No.
21        Q.   Are you a bioethicist?
22        A.   No.
23        Q.   Are you an expert in cognitive
24   development?
25             MS. NOWLIN-SOHL:  Object to form.
```

Page 10

ER-455

Christine Brady, Ph.D. August 31, 2023

```
 1              THE WITNESS:  In my general graduate
 2   school training, I did receive training in child
 3   development, and part of that included cognitive
 4   development.  I also took neuropsychology.
 5         Q.   (BY MR. RAMER)  Are those courses that
 6   you took?
 7         A.   Yes.
 8         Q.   And so do you consider yourself an expert
 9   in neuropsychology?
10         A.   Not an expert, no.
11         Q.   Do you consider yourself an expert in
12   child cognitive development?
13         A.   I wouldn't -- I received training.  I
14   wouldn't consider myself an expert.
15         Q.   And could you briefly describe your
16   current position?
17         A.   So I'm the psychologist at the Pediatric
18   and Adolescent Gender Clinic at Stanford
19   University.  That is my full-time position.
20         Q.   And at just a high level of generality,
21   could you walk me through your professional
22   background since you received your bachelor's
23   degree?
24         A.   Sure.  So after receiving my bachelor's
25   degree, I got -- I went to James Madison
```

Page 11

Christine Brady, Ph.D. August 31, 2023

```
 1    University and received a master's in
 2    psychological sciences with a focus on child
 3    psychology.
 4            After my terminal master's, I then
 5    attended a Ph.D. program at Ohio University in
 6    clinical psychology.
 7       Q.   And then after that -- is that your
 8    educational background?  Is that right?
 9       A.   Yes.  And then for our degrees, we are
10    required to do internship and fellowship.  And so
11    my internship was one year at Seattle Children's
12    Hospital with the University of Washington.  And
13    then my fellowship was at the University of
14    Louisville, which was then Kosair Children's
15    Hospital, now Norton Children's Hospital.
16            MR. RAMER:  And, Li, I just tried to send
17    what I'll call Brady Exhibit 1.
18            MS. NOWLIN-SOHL:  I have not yet received
19    it.  It's through on my phone, so I know it's
20    coming to my email shortly.  All right.
21            THE WITNESS:  I can see it.
22            (Deposition Exhibit No. 1 was marked.)
23       Q.   (BY MR. RAMER)  And, Dr. Brady, does this
24    appear to be a copy of your CV?
25       A.   Yes.
```

Page 12

ER-457

Christine Brady, Ph.D. August 31, 2023

 1        Q.    And is it up-to-date?

 2        A.    No.

 3        Q.    What should be included on here that is

 4   not?

 5        A.    There might just be a few other talks

 6   that I've given since this was submitted.

 7        Q.    Any publications?

 8        A.    No.

 9        Q.    I'd like to go to page 2.  And under

10   Roman Numeral IV, do you see there's "Honors and

11   Awards"?

12        A.    Yes.

13        Q.    And in 2020, it says you received a

14   "First Place Poster Award."

15              Do you see that?

16        A.    Yes.

17        Q.    And can you just explain what that award

18   was for?

19        A.    So this poster was -- I was last author

20   on a poster that was submitted to the conference,

21   the Pediatric Psychology -- sorry, Society of

22   Pediatric Psychology annual conference in 2020.

23              And that poster was done by a student at

24   Indiana University on -- it was four cases of

25   gender-diverse youth who also had GI problems.

                                        Page 13

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.    Could you explain what "GI" mean?

 2        A.    Gastrointestinal.

 3        Q.    And a question I should have asked

 4   earlier, but are you board certified?

 5        A.    No.

 6        Q.    And, Doctor, you've publish peer-reviewed

 7   original research, correct?

 8        A.    Yes.

 9        Q.    Has any of your peer-reviewed original

10   research related to transgender medicine?

11        A.    No.

12        Q.    And you're a member of the American

13   Psychological Association; is that right?

14        A.    Yes.

15        Q.    Are you a member of the American Medical

16   Association?

17        A.    No.

18        Q.    And are you a member of WPATH?

19        A.    Yes.

20        Q.    And are you also a member of USPATH?

21        A.    Yes.

22        Q.    Can you just explain the relationship

23   between WPATH and USPATH?

24        A.    Sure.  So WPATH is the larger

25   organization, umbrella organization that's an
```

Page 14

ER-459

Christine Brady, Ph.D. August 31, 2023

```
 1    international group.
 2            And then some countries have developed
 3    their own sub sort of groups, so USPATH being the
 4    United States sort of subgroup within WPATH.
 5    Europe has one as well.
 6        Q.   Is it just one for all of Europe?
 7        A.   I'm not sure.
 8        Q.   On your CV, I'd like to just go to the
 9    final page and down toward the bottom.  And you
10    have a Roman Numeral IX for "Trainees."
11            Do you see that?
12        A.   Yes.
13        Q.   And then it lists "Psychiatry Fellows";
14    is that right?
15        A.   Yes.
16        Q.   And this is my own ignorance, but you're
17    a psychologist, correct?
18        A.   Yes.
19        Q.   Can you just help me understand why you
20    would have psychiatry fellows?
21        A.   Sure.  So during their training,
22    psychiatry fellows do get training in therapy, and
23    sometimes that is supervised by a psychologist who
24    has more experience in that area.  And so when the
25    psychiatry fellows rotate with me, I'm supervising
```

Page 15

Christine Brady, Ph.D. August 31, 2023

```
 1    them on their therapy.
 2         Q.   And of your fellows is Jack Turban,
 3    Dr. Jack Turban; is that right?
 4         A.   Yes.
 5         Q.   Is that the same Dr. Turban that you have
 6    published before?
 7         A.   We published one commentary together,
 8    yes.
 9              MR. RAMER:  And, Li, I tried sending a
10    little while ago to see if we could move it along,
11    but I think Connelly Exhibit 2 hopefully you've
12    received.
13              MS. NOWLIN-SOHL:  Yes.
14              MR. RAMER:  I'm sorry, Brady Exhibit 2.
15              MS. NOWLIN-SOHL:  Yes, we have it.
16         (Deposition Exhibit No. 2 was marked.)
17         Q.   (BY MR. RAMER)  Okay.  And, Dr. Brady,
18    does this appear to be the expert declaration that
19    you submitted in this case?
20         A.   Yes.
21         Q.   And how did you come to be involved in
22    this case?
23         A.   So Li, the ACLU, sent me an email,
24    reached out to me, and we discussed the potential
25    of working together.
```

Page 16

Christine Brady, Ph.D. August 31, 2023

1      Q.   Have you ever served as an expert witness
2   before?
3      A.   No.
4      Q.   And what were you -- as a general matter
5   what were you asked to do?
6           MS. NOWLIN-SOHL:  I'm just going to
7   object to the extent it calls for a legal
8   communication.
9           But you can still answer.
10          MR. RAMER:  And I'll clarify the answer.
11     Q.   (BY MR. RAMER)  Not looking for the
12   substance of any communications with counsel.
13   Just as a general matter, what were you asked to
14   do as an expert in the case?
15     A.   That I would be submitting this
16   declaration that we see before us and provide
17   deposition, which we are doing today, and then
18   possibly appear in court at a later date.
19     Q.   And did you personally draft this
20   declaration?
21     A.   Yes.
22     Q.   And did anyone help you at all with the
23   drafting process?
24     A.   No.
25     Q.   Did you personally identify all the

Page 17

Christine Brady, Ph.D. August 31, 2023

```
 1    studies that you cite in this declaration?
 2         A.    Yes.
 3         Q.    And did you speak with anyone other than
 4    counsel about the contents of this declaration?
 5         A.    No.
 6         Q.    And is it -- let me just ask.
 7               You co-founded a gender clinic at
 8    Hennepin Healthcare; is that right?
 9         A.    Yes.
10         Q.    And what led you to co-found that clinic?
11         A.    My original position at that institution
12    was to be the psychologist embedded into their
13    pediatrics clinic.  And there were several
14    programs running out of that pediatrics clinic.
15               And there was a pediatrician who
16    expressed interest in starting a gender program
17    within that clinic, and he asked if I would be
18    interested in providing mental health support to
19    that clinic.
20         Q.    And you're currently at the Stanford
21    Pediatric and Adolescent Gender Clinic, right?
22         A.    Yes.
23         Q.    And do you treat patients at that clinic?
24         A.    Yes.
25         Q.    We'll discuss it in more detail a little
```

Page 18

(109 of 296), Page 109 of 296 Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 109 of 296
Case 1:23-cv-00269-BLW   Document 56-2   Filed 09/05/23   Page 19 of 267
Christine Brady, Ph.D. August 31, 2023

```
 1    bit later, but just at a high level of generality,
 2    could you explain what the gender clinic does?
 3         A.   So we provide a variety of services to
 4    gender-diverse youth; some medical, some
 5    nonmedical.  My role is providing therapeutic
 6    services and also mental health consultation to
 7    our larger, integrated team.
 8         Q.   When you say "therapeutic services," what
 9    do you mean?
10         A.   Psychotherapy.
11         Q.   Does the clinic serve a particular age
12    group?
13         A.   Yes.  So we don't have a lower limit, but
14    typically our youngest patient has been about
15    three years old.  And then we do have an upper
16    limit of 25, but typically most young adults are
17    transitioning out of our clinic around 22, 23.
18         Q.   And do you know how many patients the
19    clinic serves?
20         A.   The clinic's been open for almost six
21    years, and my -- the most recent number I was
22    given was that we have now served over 1,000
23    patients.
24         Q.   When you say "have now served," do you
25    mean in the totality of the clinic's existence?
```

Page 19

ER-464

Christine Brady, Ph.D. August 31, 2023

1      A.    Yes, in the six years that we've been --

2    yeah.

3      Q.    Do you know approximately how many

4    patients are currently receiving treatment at the

5    clinic?

6      A.    I do not.

7      Q.    And you've been there for three years; is

8    that right?

9      A.    Almost three.

10     Q.    And in those almost three years that you

11   have been there, has the patient population at the

12   clinic grown?

13     A.    Could you be more specific?  What do you

14   mean by "grown"?

15     Q.    Have the number of patients receiving

16   treatment -- excuse me.

17          Has the number of patients receiving

18   treatment increased?

19     A.    So if you mean, like, the number of new

20   patients increasing per year, that's actually

21   remained quite stable.  But it's grown because we

22   carry the patients that we saw the year before and

23   we're continuing to see them the next year and the

24   next year.  So the number has increased over six

25   years.

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.    When you say the new patients have been
 2   stable, you're referring to patients coming into
 3   the clinic over those three years, the number has
 4   remained stable; is that right?
 5        A.    Yeah, meaning, like, the number of new
 6   referrals we get per week has been pretty stable
 7   over that six years.
 8        Q.    And you say that in the last eight years,
 9   you've treated over a thousand youth and families,
10   correct?
11        A.    Yes.
12        Q.    How many current patients do you have?
13        A.    What would you consider to be current?
14        Q.    What would you consider to be current?
15        A.    So because I have some who, you know, see
16   me infrequently, and I have others who see me
17   pretty regularly, so it's sort of hard for me to
18   say.  And then some, you know, pop in when I
19   haven't seen them in a long time.
20              So I guess what I would say is my active
21   caseload that I'm seeing fairly regularly and at a
22   decent frequency, maybe 70.
23        Q.    70 patients?
24        A.    Um-hmm.
25        Q.    Sorry.  Say again.
```

Page 21

ER-466

Christine Brady, Ph.D. August 31, 2023

```
 1        A.   I was just saying "yes" instead of
 2   "um-hmm."
 3        Q.   I need to work on that too, so I
 4   appreciate it.
 5             And you say 100 percent of your patients
 6   are transgender youth; is that right?
 7             MS. NOWLIN-SOHL:  Object to form.
 8             THE WITNESS:  Currently all of my
 9   patients are experiencing some sort of gender
10   questioning.
11        Q.   (BY MR. RAMER)  Well, I guess let's go to
12   your paragraph 7 in your declaration, which is
13   page 2.  I think fourth sentence, kind of middle
14   of the paragraph.
15             Do you see where it says "Currently
16   100 percent of my clinical practice are
17   transgender youth"?
18        A.   Yes.
19        Q.   And so is that statement accurate?
20        A.   In this case, I'm using "transgender" as
21   the umbrella term for gender diversity, so yes,
22   it's accurate.
23        Q.   And when you say "youth," do you mean
24   individuals under the age of 18?
25        A.   Some are young adults, but a majority are
```

Page 22

Christine Brady, Ph.D. August 31, 2023

```
 1    under the age of 18.
 2         Q.   When you say "young adults," you're
 3    referring to people who are over 18?
 4         A.   Yes.
 5         Q.   What percentage of your current patients
 6    are over the age of 18?
 7         A.   I would say maybe 10 percent.
 8         Q.   And could you describe -- I think you had
 9    started to describe, but could you explain a
10    little bit more what happens with patients once
11    they turn 18 years of age with respect to care at
12    your clinic?
13         A.   So because we can follow kids up until --
14    or young adults until 25, we've sort of -- it's up
15    to them and their life circumstances whether or
16    not they want to transfer services.
17              So some of our youth go off to college in
18    other states, making it difficult for us to
19    continue providing their care.  So we might find
20    them care that's, you know, closer to their
21    college or wherever they end up living.
22              Some youth stay local and continue with
23    us until a time in which they feel ready to
24    transfer to adult services.
25              Sometimes they reach the upper limit and
```

Page 23

Christine Brady, Ph.D. August 31, 2023

```
 1    they're not necessarily ready, but we sort of
 2    transfer them anyway.
 3          Q.   And was the upper limit 25 years old?
 4          A.   Yes.
 5          Q.   When patients transfer to a new provider,
 6    does your clinic stay in formal communication with
 7    them?
 8               MS. NOWLIN-SOHL:  Object to form.
 9               THE WITNESS:  I'm not sure, because
10    typically that would be the medical provider that
11    is probably facilitating that communication.  So
12    I'm not sure.
13          Q.   (BY MR. RAMER)  Of your current patients,
14    have all of them been diagnosed with gender
15    dysphoria?
16          A.   No.
17          Q.   What percentage of your current patients
18    have been diagnosed with gender dysphoria?
19          A.   Because a lot of our patients are coming
20    to gender clinics sort of late in their journeys,
21    so oftentimes they've been exploring things with
22    an outside therapist or have been discussing this
23    with their family for a long time, they're sort of
24    coming to gender clinic at a point where they've
25    already explored a lot.  And so I would say a
```

Page 24

Christine Brady, Ph.D. August 31, 2023

```
 1   majority have gender dysphoria, maybe 75 percent.
 2        Q.   And what was the significance of the
 3   point that they've been on their journey for a
 4   while before they come to the clinic?
 5        A.   That we're sort of seeing a subset of
 6   gender-diverse youth.  You know, it takes a lot
 7   for families to make the decision to come to a
 8   gender clinic, and oftentimes they're speaking
 9   with other professionals and seeking advice from
10   their pediatrician or seeking advice from their
11   child's current therapist with regards to where to
12   go or what to do.
13             So my point was that just that, you know,
14   we are typically not seeing youth who are at the
15   beginning of their journey.  And so they're more
16   likely to meet criteria because they've been
17   persistent, consistent for longer.
18        Q.   I see.  By "criteria," you mean the
19   criteria for gender dysphoria; is that right?
20        A.   Correct.
21        Q.   And so the point is that because these
22   are individuals who have progressed in their
23   journey, the percentage of individuals who are
24   formally diagnosed with gender dysphoria may be
25   higher than at other providers?  Is that what
```

Page 25

ER-470

Case 1:23-cv-00269-BLW  Document 56-2  Filed 09/05/23  Page 26 of 267

Christine Brady, Ph.D. August 31, 2023

```
 1   you're saying?
 2            MS. NOWLIN-SOHL:  Object to form.
 3            THE WITNESS:  I don't know how the
 4   percentages compare, but that might be the case.
 5        Q.   (BY MR. RAMER)  But that's why you were
 6   talking about that, right?
 7        A.   Yes.
 8        Q.   In this field, do you understand a
 9   distinction between a child and adolescent?
10            MS. NOWLIN-SOHL:  Object to form.
11            THE WITNESS:  Could you specify "this
12   field"?
13        Q.   (BY MR. RAMER)  Transgender medicine.
14            MS. NOWLIN-SOHL:  Same objection.
15            THE WITNESS:  So do I understand the
16   difference between child and adolescents?
17        Q.   (BY MR. RAMER)  I'm just asking is there
18   a difference in the terminology that's -- excuse
19   me.
20            When you use the term "child" or
21   "adolescent," are you referring to individuals at
22   different stages of maturity?
23            MS. NOWLIN-SOHL:  Object to form.
24            THE WITNESS:  Typically when we're
25   referring to children, we're talking about
```

Page 26

ER-471

(117 of 296), Page 117 of 296

Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 117 of 296
Case 1:23-cv-00269-BLW   Document 56-2   Filed 09/05/23   Page 27 of 267
Christine Brady, Ph.D. August 31, 2023

```
 1    prepuberty.  And when we're talking about

 2    adolescents, we're talking about pubertal or

 3    post-pubertal.

 4         Q.   (BY MR. RAMER)  And at what stage do you

 5    consider the conclusion of the prepubertal phase?

 6         A.   So as a mental health professional, I'm

 7    not able to make that distinction.  I rely on my

 8    medical team to make that distinction.

 9              But typically it's with Tanner staging

10    and with blood work.

11         Q.   And do you know what Tanner stage?

12         A.   So typically it's early Tanner Stage II.

13    Between II and III is when puberty begins.

14         Q.   Do you have patients who were diagnosed

15    with gender dysphoria before Tanner Stage II?

16         A.   Yes.

17         Q.   Do you have patients who were diagnosed

18    with gender dysphoria after the beginning of

19    Tanner Stage II?

20         A.   Yes.

21         Q.   Of your patients, which diagnosis is more

22    common?

23              MS. NOWLIN-SOHL:  Object to form.

24              THE WITNESS:  Meaning which is more

25    common, childhood or adolescent gender dysphoria?
```

Page 27

ER-472

Christine Brady, Ph.D. August 31, 2023

```
 1         Q.    (BY MR. RAMER)  Correct.
 2         A.    In our clinic, it's about 30 percent of
 3    our patients are prepubertal, and about 70 percent
 4    are post -- or pubertal or post-pubertal.
 5    Pubertal, excuse me.
 6         Q.    Of your current patients, do you know
 7    what percentage are natal females?
 8              MS. NOWLIN-SOHL:  Object to form.
 9              THE WITNESS:  The general -- a general
10    estimate in our clinic, which we looked at
11    relatively recently, was that we actually have a
12    50/50 split of designated females and designated
13    males in both age groups.
14         Q.    (BY MR. RAMER)  When did you look at
15    that?
16         A.    About a year ago.
17         Q.    And is that percentage, that 50/50 split,
18    the same for patients who have been formally
19    diagnosed with gender dysphoria?
20         A.    Yes.
21         Q.    Did the 50/50 split surprise you?
22         A.    The reason that we looked at it is
23    because I was interested to know, you know --
24    given that I've been doing this work for eight
25    years, I've been interested, you know, to know how
```

Page 28

Christine Brady, Ph.D. August 31, 2023

1    things have sort of evolved since I first started.

2           When I was working in Louisville, we kind

3    of had different rates, so I was interested to

4    see.

5           It wasn't surprising because clinically,

6    you know, that's what I was seeing in my office.

7    If you look at my schedule, it's a pretty 50/50

8    mix of the designated sex.

9        Q.    What were the rates in Louisville?

10          MS. NOWLIN-SOHL:  Object to form.

11          THE WITNESS:  I don't remember exactly,

12   but it felt as though we were seeing a lot more

13   binary-identifying individuals and more often

14   transmasculine.

15       Q.    (BY MR. RAMER)  When you say "binary,"

16   you're distinguishing from nonbinary; is that

17   right?

18       A.    Nonbinary, agender, genderqueer, gender

19   fluid.

20       Q.    And when you say "transmasculine," you're

21   referring to -- can you explain what you mean by

22   "transmasculine"?

23       A.    Designated females who identify as

24   masculine.

25       Q.    Of your patient population that has been

Page 29

Christine Brady, Ph.D. August 31, 2023

```
 1   diagnosed with gender dysphoria, what percentage
 2   receive puberty blockers?
 3        A.   That would be hard for me to estimate.
 4   Not all of our youth are seeking medical
 5   intervention, and not all are eligible for medical
 6   interventions, and not all are Tanner Stage --
 7   between Tanner Stage II and III.
 8            So I mean, I guess if it's prepubertal,
 9   which was your question, it would be none because
10   they wouldn't be medically ready for pubertal
11   blockade.
12        Q.   When you said not all of them are seeking
13   medical interventions, what did you mean by that?
14        A.   So some families are coming to our clinic
15   to just get education, support, resources to
16   support their child or youth, or the youth
17   themselves might just be wanting to explore ways
18   to express gender or socially transition rather
19   than are coming specifically seeking medical
20   intervention.
21        Q.   So are some coming specifically seeking
22   medical intervention?
23        A.   Yes.
24        Q.   As a psychologist, are you the provider
25   who would actually be making the diagnosis of
```

Page 30

Christine Brady, Ph.D. August 31, 2023

1   gender dysphoria?

2        A.   Oftentimes in our clinic that is the

3   case, but I'm not the only person who can do that.

4        Q.   Have you ever personally diagnosed a

5   child with gender dysphoria?

6        A.   Yes.

7        Q.   Have you ever personally diagnosed an

8   adolescent with gender dysphoria?

9        A.   Yes.

10       Q.   Do you also determine whether a

11  patient -- or I guess let me just back up.  Maybe

12  you can just kind of explain your role in this

13  process.

14           My general understanding is that the

15  clinics are interdisciplinary or

16  multidisciplinary, and so you have different

17  providers doing different things.

18           Could you just explain your role?

19       A.   Sure.  And it gets complicated too,

20  because we are in a fairly well-resourced area, so

21  sometimes it's not even our team that's providing

22  services.  It might be community providers as

23  well.

24           But when a family comes to our clinic, we

25  spend a lot of time getting to know the family,

Page 31

Christine Brady, Ph.D. August 31, 2023

```
 1   getting to know the youth, understanding their
 2   gender identity, and kind of goals for why they're
 3   coming to gender clinic.
 4            And then we will kind of pick a treatment
 5   plan as a team for what will happen next with that
 6   family.
 7            Sometimes the focus might be more on the
 8   mental health piece, in which case it might be
 9   meetings with myself to provide support around
10   social transition, resources, education.
11            Might be also to just support youth with
12   gender dysphoria who are struggling with their
13   dysphoria or other comorbid diagnoses that they
14   may be experiencing.
15            Sometimes they have a therapist in the
16   community already who we can coordinate and
17   collaborate with and get collaborative information
18   from so they don't necessarily have to see a
19   member of our behavioral health team.  It can be
20   done out in the community if they have a provider
21   with proper training.
22       Q.   You mentioned social transitioning.  Can
23   you explain what you mean by that?
24       A.   Sure.  So social transition is a pretty
25   diverse set of actions that some people choose to
```

Page 32

Christine Brady, Ph.D. August 31, 2023

```
 1    take.  So oftentimes that includes changing name

 2    and pronouns.

 3             At school, extracurricular activities,

 4    within the family, with peers.

 5             It could also mean adopting a clothing

 6    style that's more consistent with their affirmed

 7    gender, haircuts, you know, makeup, jewelry, the

 8    kind of, like, external things that other people

 9    can see, and making steps to be more comfortable

10    with those.

11       Q.   And I think you said that those are

12    actions that individuals choose to take; is that

13    right?

14       A.   Yes.

15       Q.   Is there ever a clinical indication that

16    somebody should social transition?

17             MS. NOWLIN-SOHL:  Object to form.

18             THE WITNESS:  It's very individualized.

19    We need to understand the context in which a

20    person lives.

21             So, for example, we are -- our capture

22    area for our clinic is quite vast, so we have

23    people coming from several hours away in rural

24    areas where they might be the only gender-diverse

25    person in their community or at their school, and
```

Page 33

ER-478

Christine Brady, Ph.D. August 31, 2023

```
 1    it might not be safe for them to take certain
 2    steps towards affirming their gender.  And so we
 3    certainly don't force anyone, which is why I kind
 4    of said it's their choice if they want to do that
 5    or not.
 6              There are some instances in which it can
 7    be very helpful.  There's research that shows that
 8    social transition can help in terms of reducing
 9    negative psychological distress.
10         Q.   (BY MR. RAMER)  And so you said that you
11    don't force anybody to social -- start again.
12              You said you don't force anybody to
13    socially transition.
14              And I guess my question is do you ever
15    recommend it?
16         A.   Yeah.
17         Q.   And what would you observe that would
18    lead you to recommend socially transition?
19         A.   There are some situations where, for
20    example, with certain family members, it's helpful
21    to, you know, come out and share their identity
22    with certain people.
23              Oftentimes there's distress with being
24    closeted, and so social transition is an
25    opportunity to, you know, come out and present
```

Page 34

Christine Brady, Ph.D. August 31, 2023

```
 1    yourself more authentically.  And so it can
 2    alleviate some of that distress and anxiety.  So
 3    sometimes it is sort of mentioned as, hey, this
 4    would be helpful.
 5         Q.   Have you ever recommended that a patient
 6    socially transition before Tanner Stage II?
 7         A.   Most of the young kids that are
 8    presenting to our clinic have already socially
 9    transitioned.  So I would say maybe like
10    90 percent have done that already prior to coming
11    to us.
12         Q.   What is the youngest patient you've ever
13    seen that has socially transitioned?
14         A.   Four.
15         Q.   And I think earlier you had mentioned you
16    have patients as young as three years old; is that
17    right?
18         A.   Yes.
19         Q.   And what kind of care is a patient of
20    that age receiving at the clinic?
21         A.   So there are no medical interventions
22    until that pubertal, post-pubertal period.  So at
23    that point we're really just providing supportive
24    care, maybe recommending support groups for the
25    caregivers, recommending -- you know, kind of
```

Page 35

ER-480

Christine Brady, Ph.D. August 31, 2023

1    giving guidance on how to discuss their child's

2    gender with the school.  And, you know, just

3    helping parents to navigate different

4    conversations or different complex situations that

5    they might face.

6         Q.   School at three years old would be

7    preschool?

8         A.   Yes.

9         Q.   And you said "medical interventions," I

10   believe.

11             What do you mean by that?

12        A.   So puberty blockers, hormones, you know,

13   menstrual suppression.

14        Q.   Are there interventions that are not

15   labeled "medical"?

16        A.   So, yeah.  It's -- the terminology is

17   difficult.  As a mental health professional, I

18   consider therapy to be an intervention.  And so,

19   you know, that's what I'm providing is also

20   support and, you know, therapy.  I consider that

21   to be an intervention.

22        Q.   So do you consider social transition an

23   intervention?

24        A.   Yes.

25        Q.   Can you walk me through the diagnosis

Page 36

Christine Brady, Ph.D. August 31, 2023

```
 1   process from the time a patient walks into your
 2   office?
 3        A.   So by the time I'm seeing a patient, we
 4   already have a wealth of information.  So
 5   typically families who are referred to us, we have
 6   a kind of pre-intake meeting with just the
 7   caregivers to get background information.
 8   Typically that's an hour or hour and a half.
 9             And then they meet for the first
10   appointment.  That's typically an hour and a half
11   to two hours.
12             And we're getting a lot of information
13   from the youth directly during that meeting.
14   Sometimes I've met them during that meeting as
15   well before I have my individual appointment with
16   them.
17             So typically we have, you know, three
18   hours' worth of information.
19             So when a family is working with me, I'm
20   sort of confirming the information that we've
21   obtained already, and then asking more detail
22   about things relevant to mental health and gender
23   dysphoria specifically so you can use it.
24             But I use the DSM criteria, and we just
25   have a kind of clinical interview regarding a
```

Page 37

ER-482

Christine Brady, Ph.D. August 31, 2023

```
 1    youth's experience with those symptoms or not, how
 2    their dysphoria manifests, what distresses it
 3    causes in their life, and what their goals are.
 4         Q.   What did you mean by a "clinical
 5    interview"?
 6         A.   So it's a kind of semi-structured
 7    interview in which I'm asking about each of the
 8    diagnostic criteria and then asking follow-up
 9    questions after the youth has responded.
10         Q.   And then when you refer to the goals that
11    the individual has, what do you mean by that?
12         A.   So depending on the treatment plan, it
13    might be what are your goals for therapy, right?
14            Like, what are you hoping to get out of
15    our meetings together?
16            What supports do you need?
17            What would you like to improve?
18            Sometimes it is what are your goals for
19    transition, physical transition?
20            Sometimes it's what are your goals for,
21    you know, helping your family understand you
22    better.  It just depends on what they're being
23    referred to me for.
24         Q.   And I'd like to, in your declaration, go
25    to page 5, paragraph 18.
```

Page 38

Christine Brady, Ph.D. August 31, 2023

```
 1              And here you discuss the diagnostic
 2     criteria for prepubertal children, right?
 3          A.   Yes.
 4          Q.   And so you would use this diagnostic
 5     criteria for children who are pre-Tanner Stage II;
 6     is that right?
 7          A.   Tanner Stage II and below, yeah.
 8          Q.   And in the first sentence after A, it
 9     refers to a "marked incongruence."
10              Do you see that?
11          A.   Yes.
12          Q.   What does the word "marked" mean there?
13          A.   Yeah, so this is direct verbiage from the
14     DSM-5.  But, you know, typically with all of the
15     diagnoses in the DSM, you have to meet criteria,
16     but then there also has to be impairment
17     experience from those symptoms.
18              So typically "marked" means, you know,
19     it's not just there, but it's there and it's
20     causing some sort of difficulty or impairment in
21     daily functioning.
22          Q.   Well, I guess if you look at the bottom
23     of the page with B -- and I understand this is
24     just the DSM criteria in the report, but doesn't B
25     just describe what you just said?
```

Page 39

Christine Brady, Ph.D. August 31, 2023

```
 1        A.   Yes.
 2        Q.   And so you're saying that in A, the word
 3   "marked" means B?
 4        A.   I think that's part of it.  I mean, I
 5   think for me as a clinician, it also means marked
 6   as in noted, right?
 7             So, you know, and typically -- I should
 8   have mentioned earlier that I'm not just
 9   conducting a clinical interview with the youth,
10   right?  I'm also talking with caregivers and other
11   adults and getting their observations and views of
12   youths over time, and especially in early
13   childhood when maybe the youth don't remember so
14   well.  And so, you know, marked incongruence could
15   mean like observed or noted.
16        Q.   Okay.  You don't think that that word --
17   whether we pronounce it marked or marked, I
18   sincerely don't know --
19        A.   Sure.
20        Q.   But you don't think that that is
21   suggesting a particular degree of incongruence?
22        A.   Well, I think the criteria below is
23   referencing the degree being strong in many of
24   those criteria.
25        Q.   Can there be an incongruence that isn't
```

Christine Brady, Ph.D. August 31, 2023

```
 1    marked?
 2         A.   I mean, there are sometimes incongruence
 3    that is not observed by the youth themselves or by
 4    parents.  You know, some kids have very low
 5    insight and so they might not see it as, you know,
 6    an incongruence.
 7         Q.   Have you ever had a patient where you've
 8    concluded that the patient has an incongruence but
 9    it's not marked?
10              MS. NOWLIN-SOHL:  Object to form.
11              THE WITNESS:  I have had youth who don't
12    meet criteria for gender dysphoria.  And that
13    might be a case in which they don't meet criteria.
14         Q.   (BY MR. RAMER)  Okay.  So I take it you
15    don't really think that that word adds much to
16    this diagnosis; is that right?
17              MS. NOWLIN-SOHL:  Object to form.
18              THE WITNESS:  I don't see it as critical,
19    that word.
20         Q.   (BY MR. RAMER)  You don't see it as
21    critical?
22         A.   In determining my diagnosis.
23         Q.   So still in A, the DSM-5 requires at
24    least six-month duration of the incongruence; is
25    that right?
```

Page 41

Christine Brady, Ph.D. August 31, 2023

```
 1         A.    Six-month duration consisting of at least
 2    six of the criteria below.  So they have to have
 3    the six criteria for at least six months, yes.
 4         Q.    Yeah, sorry.  And I'm not trying -- we're
 5    just going to walk through it.  When I ask
 6    specific questions, I don't want -- I'm not
 7    implying that you're over-focused on that when
 8    you're doing the diagnoses.
 9              But with respect to the six-month
10    duration, why is that a requirement?
11              MS. NOWLIN-SOHL:  Object to form;
12    foundation.
13              THE WITNESS:  So the duration component
14    is also very common in other diagnoses within the
15    DSM.  And typically it's to establish some sort of
16    pattern and stability in the symptoms.
17         Q.    (BY MR. RAMER)  And so here, this would
18    be establishing stability of the incongruence; is
19    that right?
20         A.    Yes.
21         Q.    And so if there were only five months'
22    duration of incongruence, that incongruence may be
23    unstable?
24              MS. NOWLIN-SOHL:  Object to form;
25    mischaracterizes testimony.
```

Page 42

Christine Brady, Ph.D. August 31, 2023

```
 1              THE WITNESS:  They would just be
 2     subclinical and not meet criteria for gender
 3     dysphoria at this moment in time.
 4         Q.   (BY MR. RAMER)  What do you mean by
 5     "subclinical"?
 6         A.   So they might meet some of the criteria
 7     but not all the criteria.
 8         Q.   And I think let's go to page 12 of your
 9     declaration, paragraph 35.  I think this might be
10     what you were referring to.  I just want to
11     confirm.
12              The final sentence of paragraph 35 -- and
13     I'll just read it and ask if I read it correctly.
14              It says "Some patients who are evaluated
15     do not meet the criteria for gender dysphoria
16     either due to symptom length or lack of symptoms,
17     in which case a treatment plan may include
18     nonmedical support and intervention to address
19     symptoms/distress."
20              Did I read that correctly?
21         A.   Yes.
22         Q.   And here you refer to symptom length.
23              Is that what we were just talking about?
24         A.   The six-month duration, yes.
25         Q.   Do you think a six-month duration is a
```

Page 43

Christine Brady, Ph.D. August 31, 2023

1    good idea?

2             MS. NOWLIN-SOHL:  Object to form.

3             THE WITNESS:  I think having a duration

4    criteria is helpful.  I know there was a task

5    force put together for DSM-5 for revisiting gender

6    dysphoria diagnosis, and that criterion was based

7    on research.

8        Q.   (BY MR. RAMER)  The six-month number was

9    based on research?

10       A.   Yes.

11       Q.   And you refer here to nonmedical support

12   and intervention.

13            Do you see that?

14       A.   Yes.

15       Q.   And could you just explain what you mean

16   by that?

17       A.   So again, you know, it might be my choice

18   in terms, but typically that might include

19   education, psychoeducation.

20            It might include working with parents on

21   how to best support their child.

22            It might include social transition or

23   different changes in gender expression.  That can

24   still be supportive for a subclinical

25   gender-diverse patient.

Page 44

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.    Would it include psychotherapy?
 2        A.    If they're in significant distress or if
 3   they have other diagnoses.
 4        Q.    And how does -- sorry.  Go ahead.
 5        A.    I said yes.  I nodded but didn't say yes.
 6        Q.    And how does nonmedical support and
 7   intervention address symptoms/distress?
 8        A.    So sometimes distress is coming from
 9   conflict.  So sometimes as a youth is sort of
10   exploring gender or, you know, trying to
11   understand themselves.  They might just have
12   distress from trying to figure that out.
13            Or they might have distress in
14   communicating about what's going on with them to
15   caregivers, adults, peers.
16            They might also be struggling with some
17   symptoms, even though they don't meet full
18   criteria for gender dysphoria.  They might be, you
19   know, experiencing gender distress with those
20   symptoms.
21            So psychotherapy is really aimed at
22   support and also teaching coping skills and
23   managing some of the distress.
24        Q.    So psychotherapy can address
25   symptoms/distress?
```

Page 45

Christine Brady, Ph.D. August 31, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form.
 2              THE WITNESS:  It can help to manage them.
 3         Q.   (BY MR. RAMER)  So you used the phrase
 4    "to address."
 5              Am I understanding you think -- or you're
 6    using the phrase "to address" to help and manage;
 7    is that right?
 8         A.   Yes.
 9         Q.   Are you distinguishing between helping
10    and managing symptoms/distress and something else?
11         A.   Could you say that again?
12         Q.   Is that different from -- do you consider
13    helping and managing symptoms/distress to be
14    different from treating symptoms/distress?
15         A.   Yes.  So, you know, for -- there is a
16    difference between sort of like managing and
17    alleviating symptoms, and there is a difference
18    between treatment to me.
19              So that distinction being, you know --
20    treatment would seem to suggest that those
21    symptoms might go away.
22              And so I'm more aiming in psychotherapy
23    at alleviating kind of any distress, but not
24    necessarily treating symptoms or making symptoms
25    go away.
```

Page 46

ER-491

Christine Brady, Ph.D. August 31, 2023

1    Q.   Do you think medical interventions are

2  treatment?

3    A.   Yes.

4    Q.   So you think medical interventions are

5  distinct from psychotherapy with respect to

6  addressing symptoms and distress?

7         MS. NOWLIN-SOHL:   Object to form.

8         THE WITNESS:   Here we're talking

9  specifically about subclinical -- you know, those

10  who don't meet full criteria for gender dysphoria,

11  in which case we probably wouldn't be considering

12  medical intervention if they didn't have full

13  criteria for gender dysphoria.

14    Q.   (BY MR. RAMER)  Do you use psychotherapy

15  on people who have met the criteria for gender

16  dysphoria?

17    A.   Yes.

18    Q.   And is the psychotherapy in that context

19  a treatment as you use the term?

20    A.   For those who meet full criteria for

21  gender dysphoria, it cannot be a stand-alone

22  treatment.  There is no evidence to suggest that.

23    Q.   When you say "it cannot be a stand-alone

24  treatment," what do you mean by that?

25    A.   So we -- the only evidence we have for

Page 47

Christine Brady, Ph.D. August 31, 2023

1    treating, treating in the sense of truly, like,

2    alleviating the distress and symptoms of gender

3    dysphoria are medical interventions.

4          And so psychotherapy alone isn't

5    sufficient to be able to treat full gender

6    dysphoria.

7       Q.   And so you said we don't have evidence

8    that psychotherapy can be a treatment for gender

9    dysphoria; is that right?

10          MS. NOWLIN-SOHL:  Object to form;

11    mischaracterizes the testimony.

12          THE WITNESS:  That psychotherapy isn't

13    effective treatment of gender dysphoria.

14       Q.   (BY MR. RAMER)  Is there evidence that

15    medical interventions alone are an effective

16    treatment for gender dysphoria?

17       A.   Yes.

18       Q.   What evidence is that?

19       A.   So there are many studies that look at

20    the benefits.  So medical interventions for

21    gender-diverse youth and young adults,

22    specifically that they show improvements in their

23    psychological functioning like depression and

24    anxiety, as well as reductions in their symptoms

25    of gender dysphoria.

Page 48

Christine Brady, Ph.D. August 31, 2023

1      Q.    And those studies look at medical
2   interventions alone?
3      A.    Sorry, I'm thinking.  I would have to --
4   I'm not sure if it's looking -- if it controls for
5   receiving therapy or not.
6      Q.    Do you know if there is any study that
7   controls for receiving therapy that shows a
8   benefit?
9           MS. NOWLIN-SOHL:  Object to form.
10          THE WITNESS:  I think those studies are
11  hard to conduct, and so I don't -- I don't know if
12  there's one that looks at medical as stand-alone.
13          MR. RAMER:  We've been going almost an
14  hour.  I don't know, would this be a good time for
15  a short break?
16          MS. NOWLIN-SOHL:  Yeah, that sounds good.
17          MR. RAMER:  Do you want to just take five
18  since we've got the kind of longer break later?
19          MS. NOWLIN-SOHL:  Yeah.
20          MR. RAMER:  Okay.  So we'll do 10 after
21  the hour.
22          THE WITNESS:  Okay.  Thanks.
23          THE VIDEOGRAPHER:  Okay.  So the time is
24  11:05 a.m. Mountain time, and we are off the
25  record.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

Christine Brady, Ph.D. August 31, 2023

```
 1              (Break taken from 11:05 a.m. to 11:11 a.m.)
 2              THE VIDEOGRAPHER:  All right.  So we are
 3      recording.  The time is 11:11 a.m. Mountain time,
 4      and we are back on the record.
 5          Q.   (BY MR. RAMER)  Dr. Brady, I'd like to go
 6      to page 5 in your declaration, back to paragraph
 7      18, and specifically going down to what I'll call
 8      subparagraph 6.
 9              And my question is what are typically
10      masculine toys?
11          A.   Yeah.  So the criteria are still not
12      perfect, but, you know, what DSM is trying to
13      achieve here, you know, is things that people
14      stereotypically still think of as masculine or
15      feminine.
16              And so in the case of masculine toys
17      might be more like sports, trucks, things of that
18      nature versus girls being more, like, dolls,
19      crafts, things like that.
20          Q.   So you said sports are typically
21      masculine.  I guess you'd say activities?
22          A.   Yes.
23          Q.   And you said crafts are typically -- what
24      are you saying about crafts?
25          A.   So again, these are just stereotypes of
```

Page 50

ER-495

Christine Brady, Ph.D. August 31, 2023

 1  how parents might view toys.  So crafts in that
 2  case might be more typically associated with
 3  females.
 4      Q.   And so if I understand your answer, if a
 5  girl -- no, I'm sorry.
 6          If a boy has a strong rejection in
 7  sports, that's an indication that the boy may have
 8  gender dysphoria?
 9          MS. NOWLIN-SOHL:  Object to form;
10  mischaracterizes testimony.
11          Sorry to interrupt.  Real quick, did we
12  lose Amy?
13             (Discussion held off the record.)
14          THE WITNESS:  So one of the important
15  things about the diagnosis of gender dysphoria in
16  childhood is that you need six of the criteria.
17  And so that stand-alone criteria, no, would not
18  indicate that necessarily somebody is transgender
19  or gender dysphoria.
20      Q.   (BY MR. RAMER)  Right.  My question was
21  not whether that standing alone --
22          My question was whether under the DSM-5,
23  if a boy has a strong rejection of sports, that
24  would indicate the boy potentially has gender
25  dysphoria; is that right?

                                    Page 51

Christine Brady, Ph.D. August 31, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form.
 2              THE WITNESS:  So clinically, I would want
 3     to see more than just one sort of rejection and
 4     activity and then, of course, have to look at all
 5     the other criteria together.
 6              However, if the designated male is kind
 7     of rejecting all masculine activities, then that
 8     is certainly something of interest.
 9         Q.   (BY MR. RAMER)  Then what are some other
10     masculine activities?
11         A.   So it might be things like
12     rough-and-tumble play.
13              It might be things like, you know, again,
14     like trucks, construction, stereotypical things
15     like that.
16              It might be even, you know, gravitating
17     towards wanting to play with other girls and not
18     wanting to play with boys.
19         Q.   Well, that last one, that's in
20     subparagraph 5, right?
21         A.   Yes.
22         Q.   And so I'm asking specifically about
23     subparagraph 6 where we're referring to typically
24     masculine activities.
25              And I thought you had said a strong
```

Page 52

ER-497

Christine Brady, Ph.D. August 31, 2023

```
 1    rejection of one, like sports, may not be enough,

 2    but a rejection of all typically masculine

 3    activities may be something you take into account.

 4              And my question was simply this, which is

 5    in addition to sports and I believe you said

 6    rough-and-tumble play, what are some other

 7    typically masculine activities?

 8              MS. NOWLIN-SOHL:  Object to form; asked

 9    and answered.

10              THE WITNESS:  It might be even things

11    that are marketed towards boys.  So, for example,

12    a toy that's in the store and in the typically

13    kind of boy aisle, you know, youth might say, "I

14    don't want that because that's for boys."

15         Q.   (BY MR. RAMER)  What is the boy aisle of

16    a store?

17         A.   So toys are typically marketed for either

18    boys or girls.  So if you go to a Target or any

19    other store, you might notice that some aisles are

20    predominately pink and purple still and other

21    aisles are predominately blue and black and red.

22    And those are, you know, stereotypically where

23    they place boys' and girls' toys.

24         Q.   What's the significance of pink and

25    purple?
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

ER-498

Christine Brady, Ph.D. August 31, 2023

 1          A.    So these are colors that are typically

 2    associated with girls.  Marketing has shown that

 3    girls have a preference for those colors.

 4          Q.    Do you have expertise in marketing?

 5          A.    No.

 6          Q.    And so what are typically feminine

 7    activities?

 8          A.    On the flip side of our boys examples, it

 9    might be, you know, toys that are marketed towards

10    girls.  They might have a rejection of those toys,

11    dolls, you know, games and activities, like I

12    said, like art or crafts, cooking, you know,

13    playing house, these kinds of things.

14          Q.    Did you say art is a typically feminine

15    activity?

16                MS. NOWLIN-SOHL:  Object to form;

17    mischaracterizes testimony.

18                THE WITNESS:  This isn't my -- what I

19    believe to be typical, but this is just what

20    society tends to view as feminine and masculine

21    activities.

22          Q.    (BY MR. RAMER)  But, Doctor, aren't you

23    the one who diagnoses individuals with the DSM-5

24    criteria?

25                MS. NOWLIN-SOHL:  Object to form.

                                        Page 54

ER-499

Christine Brady, Ph.D. August 31, 2023

```
 1              THE WITNESS:  I do diagnose gender
 2   dysphoria, yes.
 3        Q.   (BY MR. RAMER)  Do you use the DSM-5
 4   criteria?
 5        A.   Yes.
 6        Q.   And does the DSM-5 criteria for
 7   prepubertal children discuss typically feminine
 8   activities?
 9        A.   Yes.
10        Q.   And I'm asking you when you're doing the
11   diagnosis and reading the DSM-5, where it says
12   "typically feminine activities," what are those?
13   And I'm just confirming what your answer was.
14              Did you say that art was a typically
15   feminine activity?
16              MS. NOWLIN-SOHL:  Object to form.
17              THE WITNESS:  It can be.  So a lot of
18   times these -- this criteria in particular and
19   these activities are not judged or determined by
20   me, but are, you know, kind of determined by the
21   family and also the youth themselves.  So it's
22   more important if a youth sees something as
23   feminine or masculine.
24        Q.   (BY MR. RAMER)  I'm sorry.  The criteria
25   in the DSM-5 are determined by the youth or the
```

Page 55

Christine Brady, Ph.D. August 31, 2023

```
 1    families themselves?  Is that what you said?
 2              MS. NOWLIN-SOHL:  Object to form;
 3    mischaracterizes testimony.
 4              THE WITNESS:  The judgment of whether or
 5    not something is considered to be masculine or
 6    feminine is more often determined by the youth and
 7    family.  But whether or not they're rejecting of
 8    that is determined by me.
 9         Q.  (BY MR. RAMER)  You said "more often."
10    Does that mean not always?
11         A.   I mean, I guess, yeah.  I mean not
12    always.
13         Q.   And just -- I want to understand that
14    answer, which is you were saying the families and
15    the individuals determine what is a typically
16    masculine activity within the meaning of the
17    DSM-5, and then you determine whether there is a
18    strong rejection of that?
19              MS. NOWLIN-SOHL:  Object to form;
20    mischaracterizes testimony.
21              THE WITNESS:  So if a youth is saying,
22    "Dr. Brady, I don't like this toy or I don't like
23    this activity because that's a boy activity or
24    because that's what girls do and I'm not a girl or
25    I'm not a boy," whether or not that activity or
```

Page 56

1   that toy is typically or stereotypically seen as

2   boy or girl is less important than the youth

3   viewing that as being a boy or a girl activity.

4          Q.   (BY MR. RAMER)  So I think -- am I wrong

5   in thinking that what you just described is in

6   subparagraph 4 on this page?

7          A.   So it's the reverse of item 6, so

8   rejecting of one thing but the liking of other

9   things.

10         Q.   And so your testimony is that when the

11  DSM-5 says typically masculine toys, it is not up

12  to the medical provider to be determining what are

13  typically masculine toys?  Is that what you're

14  saying?

15             MS. NOWLIN-SOHL:  Object to form;

16  mischaracterizes testimony.

17             THE WITNESS:  I'm not sure how to answer

18  your question because it's just that what is

19  considered typical is sort of subjective and

20  constantly evolving.  So that's why I rely more on

21  whether our youth sees that or categorizes that.

22  Because what one youth feels is girl things might

23  not be true for another youth.

24         Q.   (BY MR. RAMER)  Do you use these criteria

25  to diagnose patients?

Page 57

(148 of 296), Page 148 of 296
Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 148 of 296
Case 1:23-cv-00269-BLW   Document 56-2   Filed 09/05/23   Page 58 of 267

Christine Brady, Ph.D. August 31, 2023

```
 1        A.    Yes.
 2        Q.    And do you ensure that the marketing
 3   congruence is manifested by at least six of the
 4   criteria?
 5        A.    Yes.
 6        Q.    Have you ever had a patient in which
 7   you've seen a strong rejection of typically
 8   masculine toys?
 9        A.    Yes.
10        Q.    What were the toys?
11        A.    So in some cases it could be any toy
12   that's just the color blue because the, you know,
13   youth felt that blue was a stereotypical male
14   color and they were very rejecting of blue.  So it
15   could have been any toy that just happened to be
16   the color blue.
17             In other cases it has been, you know,
18   things like, you know, light cars and trucks.
19   Again, the youth felt that that was a boy thing
20   and so they didn't want to necessarily play with
21   those and were rejecting of those kinds of toys.
22             And then for criterion 4, preferred,
23   sometimes the other gender toys like those.
24        Q.    Am I wrong in thinking that you seem to
25   be boiling everything down to the criterion in
```

Page 58

Christine Brady, Ph.D. August 31, 2023

```
 1   subparagraph 1?
 2           MS. NOWLIN-SOHL:  Object to form;
 3   argumentative.
 4           THE WITNESS:  Can you state that again?
 5       Q.   (BY MR. RAMER)  I guess it just seems
 6   like the way you're interpreting these criteria is
 7   that in the end, what really matters is a strong
 8   desire to be of the other gender, which is
 9   criterion A1.
10           MS. NOWLIN-SOHL:  Object to form.  Oh,
11   sorry.
12           MR. RAMER:  It's all right.
13       Q.   (BY MR. RAMER)  I guess I'll just leave
14   it there and ask, is that wrong?
15           MS. NOWLIN-SOHL:  Object to form;
16   argumentative, mischaracterizes testimony.
17           THE WITNESS:  So the way I interpret the
18   criteria -- you know, somebody could very much
19   have criterion 6 in my example of, you know, I
20   don't like blue things because I typically see
21   them as boy things.  But they might not feel not
22   boy.  Like, they might not have criterion 1.
23           It might just be, I don't like these
24   things because they're boy things, but they still
25   identify as a boy.  So I see them as separate.
```

Page 59

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.   (BY MR. RAMER)  Okay.  And just to
 2   confirm, you -- when you are diagnosing
 3   individuals under this part of the DSM-5, you do
 4   not determine what a typically masculine toy,
 5   game, or activity is; is that correct?
 6             MS. NOWLIN-SOHL:  Object to form; asked
 7   and answered.
 8             THE WITNESS:  It's never needed to
 9   happen.  I mean, most of my patients will say, "I
10   don't like this," for this reason.  And so my
11   judgment of whether or not that's a typical boy or
12   girl thing doesn't matter.
13        Q.   (BY MR. RAMER)  And so it's true that you
14   do not determine what a typically masculine toy,
15   game, or activity is when diagnosing individuals
16   under this part of the DSM-5; is that right?
17             MS. NOWLIN-SOHL:  Object to form; asked
18   and answered.
19             THE WITNESS:  I can, but I don't need to
20   in most cases.
21        Q.   (BY MR. RAMER)  You can what?
22        A.   I can determine if something is, in my
23   opinion, typically masculine or feminine, but I
24   don't need to in most cases because the youth and
25   the family are able to determine that within their
```

Page 60

ER-505

Christine Brady, Ph.D. August 31, 2023

```
 1    own, you know, culture, within the family of
 2    what's -- you know, every family has different
 3    ideas of what gender things are.
 4         Q.   Okay.  And my questions are now about
 5    what you deem typically masculine or feminine,
 6    which you said you can do, correct?
 7         A.   Yes.
 8         Q.   Okay.  What do you deem typically
 9    masculine toys apart from trucks or blue things?
10         MS. NOWLIN-SOHL:  Object to form; asked
11    and answered.
12         THE WITNESS:  I guess in my mind, I might
13    think about, again, cars, construction-type toys,
14    building-type toys, activities like sports, like
15    scouts.
16         Q.   (BY MR. RAMER)  What about a soccer ball?
17         MS. NOWLIN-SOHL:  Object to form.
18         THE WITNESS:  So again, this is difficult
19    because of course, you know, I believe that a ball
20    is a ball and anybody can play with a ball.
21         But if a youth is saying, "I do not want
22    to play with this specifically because I associate
23    it with boy," then it becomes -- it meets that
24    criterion.
25         Q.   (BY MR. RAMER)  I understand that part of
```

Page 61

ER-506

Christine Brady, Ph.D. August 31, 2023

```
 1    your answer, but we had also just been discussing

 2    how you also can make the determination of what is

 3    a typically masculine toy.

 4              And my question is do you deem a soccer

 5    ball a typically masculine toy?

 6              MS. NOWLIN-SOHL:  Object to form; asked

 7    and answered.

 8              THE WITNESS:  It could be.

 9         Q.   (BY MR. RAMER)  What does it depend on?

10         A.   Again, so there might be situations in

11    which a child is rejecting toys, but it might be

12    for non-gendered reasons, and then there's going

13    to be times where it's for gendered reasons.

14              So if they're rejecting the soccer ball

15    because they just don't like physical activity,

16    that's not relevant to me or my diagnosis.

17              But if they're rejecting the ball because

18    they are associating it with a boy, then it is

19    relevant to me.

20         Q.   Okay.  What is rough-and-tumble play?

21         A.   Typically that's categorized as sort of,

22    like, horseplay, like wrestling.  Kind of, you

23    know, more physical forms of play.

24         Q.   And why is that typically masculine?

25         A.   So there's studies looking at types of
```

Page 62

ER-507

Christine Brady, Ph.D. August 31, 2023

```
 1   play in early childhood between the designated
 2   sexes, and rough-and-tumble play is more
 3   characteristic of designated males.
 4        Q.   Have you read those studies?
 5        A.   Yes.
 6        Q.   Can you name any of them?
 7        A.   Not off the top of my head.
 8        Q.   Moving up to 3 here, it refers to
 9   cross-gender roles in make-believe play.
10             What does that mean?
11        A.   So, for example, if kids are playing
12   house, if a designated male wants to be the mom in
13   that scenario or if the designated female wants to
14   be the dad in that scenario.
15        Q.   And then in 2, it refers to typical
16   masculine clothing.
17             What is typical masculine clothing?
18        A.   So this might be being -- it's easier to
19   discuss this criterion in terms of formal wear.
20   So it might be, you know, having to attend a
21   wedding and having to wear, you know, pants,
22   button-up shirt, tie, jacket.
23        Q.   That's what criterion A2 is referring to
24   when it talks about -- sorry.  I'll just ask the
25   question and then I assume Li will object and then
```

Page 63

ER-508

Christine Brady, Ph.D. August 31, 2023

```
 1    you can have an opportunity to answer.
 2              But criterion A2, when it refers to
 3    "typical masculine clothing," is referring to
 4    formal wear?
 5              MS. NOWLIN-SOHL:  Object to form;
 6    mischaracterizes the testimony.
 7              THE WITNESS:  Not only, but it is a way
 8    to assess for that.
 9         Q.   (BY MR. RAMER)  What else is it referring
10    to if it's not only referring to formal wear?
11         A.   So typical masculine clothing, again,
12    might just be a button-up shirt.  It might be,
13    again, the color of that clothing, regardless of
14    what type of clothing it is.
15         Q.   And with blue, black, and red being the
16    masculine colors; is that right?
17              MS. NOWLIN-SOHL:  Object to form;
18    mischaracterizes testimony.
19              THE WITNESS:  Commonly, those might be
20    some of the colors.
21         Q.   (BY MR. RAMER)  What are some other ones?
22         A.   It could -- so again, I -- it depends on
23    what a youth views to be the colors that are
24    associated with masculine versus the colors that
25    are associated with feminine.
```

Page 64

Christine Brady, Ph.D. August 31, 2023

1      Q.    Okay.  Let's go to the next page.  And
2  this is the DSM-5 diagnostic criteria for
3  adolescents and adults; is that right?
4      A.    Yes.
5      Q.    And down in 6, so criterion A6, it refers
6  to typical feelings and reactions of the other
7  gender.
8           Do you see that?
9      A.    Yes.
10     Q.    What are the typical feelings of the
11  female gender?
12           MS. NOWLIN-SOHL:  Object to form.
13           THE WITNESS:  So this criterion is trying
14  to get at what people might consider to be typical
15  responses emotionally or behaviorally to certain
16  situations.
17           So, for example, a designated male who's
18  feminine in identifying might feel that their
19  emotional responses are more consistent with those
20  of other girls rather than their designated sex.
21     Q.    (BY MR. RAMER)  How would emotional
22  responses be more typical of other girls?
23     A.    So stereotypically women might -- and
24  girls might respond to things with more sadness
25  rather than irritability or anger.

Page 65

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.    Are you saying girls might respond to
 2   things with more sadness rather than irritability
 3   or anger than boys would?
 4        A.    Stereotypically that's what people
 5   believe, yeah.
 6        Q.    Is it fair to say a diagnosis under the
 7   DSM-5 turns on stereotypes?
 8             MS. NOWLIN-SOHL:  Object to form.
 9             THE WITNESS:  So again, you know, this
10   criterion is really looking at not only do they
11   have these feelings and reactions, but the
12   patients themselves have a strong conviction that
13   those reactions are more typical of the gender
14   that they are identifying as.
15        Q.    (BY MR. RAMER)  But you were referring to
16   how this is stereotypical feelings and reactions,
17   right?
18             MS. NOWLIN-SOHL:  Objection;
19   argumentative.
20             THE WITNESS:  Can you ask that again?
21        Q.    (BY MR. RAMER)  We'll move on.
22        A.    Okay.
23        Q.    In 6, in the parenthetical, it refers to
24   some alternative gender different from one's
25   assigned gender.
```

Page 66

Christine Brady, Ph.D. August 31, 2023

```
 1              Do you see that?
 2       A.    Yes.
 3       Q.    And what is that referring to?
 4       A.    So the parentheses are trying to be
 5   inclusive to the range of gender identities.  So
 6   before the parentheses, it says "other gender,"
 7   which means that, you know, you're born one and
 8   then there's one other gender that you could
 9   identify with.
10              And so the parentheses are to indicate
11   there's more than just the one gender on the other
12   side.  It doesn't have to be the open side of your
13   designated sex.
14       Q.    So what is on the other side apart from
15   the opposite of your designated sex?
16              MS. NOWLIN-SOHL:  Object to form.
17              THE WITNESS:  So it may be nonbinary or
18   agender or gender-fluid.
19       Q.    (BY MR. RAMER)  I heard "nonbinary" and I
20   heard "gender-fluid."
21              Did you say something in between?  I just
22   didn't hear it.
23       A.    Agender.
24       Q.    What is agender?
25       A.    So this is a label that some individuals
```

Page 67

Christine Brady, Ph.D. August 31, 2023

```
 1    used -- use to define a gender that -- people use
 2    it in different ways, but most commonly it's used
 3    to sort of describe feeling as though you have a
 4    gender that maybe can't -- there's no label to it.
 5    It's sort of like its own, you know, thing -- it's
 6    its own, like, gender.  It's, like, unique to me,
 7    so I'm kind of agender.
 8            Others have used it to say that, you
 9    know, I don't necessarily want to be defined by my
10    gender so I'm -- it's typically just sort of an
11    androgenous, nonbinary subcategory.
12        Q.   And you said there how different people
13    might use the term.
14            How do you use the term?
15        A.   So my -- how am I using it today or how
16    do I use it clinically?
17        Q.   Do both.
18        A.   In the case of just my comment earlier, I
19    was kind of just using it as an example on another
20    gender label that people sometimes use.
21    Clinically I use it sort of interchangeably with
22    nonbinary.
23        Q.   What are the typical feelings and
24    reactions of the nonbinary gender?
25        A.   So I assume you're referring to
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

ER-513

Christine Brady, Ph.D. August 31, 2023

```
 1   criterion 6?
 2        Q.   Sorry, yes, still on 6.
 3        A.   Okay.  So the typical feelings and
 4   reactions -- I mean, in this case, it's kind of
 5   saying that I have reactions and feelings that are
 6   not consistent with my designated sex.
 7        Q.   Apart from an individual just saying that
 8   to you, is there any other way you determine
 9   whether A6 is satisfied?
10        A.   With all the criterion, I do want
11   examples of how that has played out, you know, in
12   a person's life.  Certainly also getting examples
13   from caregivers about how they've seen that
14   externally and behaviorally.
15            So it's not just a yes, I feel that way.
16   It's a yes, and here are some examples of that.
17        Q.   Why do you ask for or require examples?
18        A.   So that's true of any diagnosis in the
19   DSM.  We always want to confirm with examples to
20   help really, you know, fill out that diagnosis to
21   ensure that that is an accurate report.  So we
22   don't just rely on someone's self-report of saying
23   yes or no, I have this.  We want to also have an
24   example to be able to determine for ourselves yes
25   or no, you have this.
```

Page 69

ER-514

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.    So what's an example, then, of a typical
 2   feeling and reaction of somebody who's nonbinary?
 3        A.    So again, a nonbinary person might
 4   report -- let's say they're designated male.  So a
 5   designated male is in a situation, and it is
 6   stressful, and they believe that, you know, most
 7   guys or most other teens their age would respond
 8   with -- in this way.  So let's say, you know, most
 9   people who are designated male who are my age
10   would respond by yelling or, you know, getting
11   upset and, like, going off on a person.
12              But I don't react that way.  I, you know,
13   want to cry, or I want to withdraw or, you know, I
14   don't want to -- I feel like the way that I
15   respond to those types of situations isn't
16   consistent with how other boys, you know -- how
17   boys my age react.
18        Q.    So if adolescent who was, in your words,
19   designated male said, "I don't want to respond by
20   yelling or getting upset or going off on a
21   person," would that individual have satisfied A6?
22              MS. NOWLIN-SOHL:  Object to form.
23              THE WITNESS:  I expect more than one
24   example, and so, no, that wouldn't be sufficient
25   enough.  I would need more examples to be able to
```

Page 70

ER-515

Christine Brady, Ph.D. August 31, 2023

 1    understand that better.

 2         Q.    (BY MR. RAMER)  But that is an example?

 3         A.    It is an example.

 4         Q.    I'd like to turn to -- in your

 5    declaration to paragraph 12, page 3, paragraph 12.

 6              And I guess not asking a question about

 7    anything in the text, but just asking you, what

 8    does it mean to be transgender?

 9         A.    Transgender is an umbrella term to

10    describe people whose designated sex and gender

11    identity are not congruent.

12         Q.    Can an individual be transgender without

13    having gender dysphoria?

14         A.    Yes.

15         Q.    So I think I understand the phrase

16    "umbrella term," but is being transgender

17    different from being gender-diverse?

18         A.    So often the terms are used pretty

19    interchangeably.  Gender-diverse is just another

20    umbrella term that some people prefer to use.

21    And, you know, people's taxonomy in terms of

22    vocabulary are a little bit different.

23              So I, you know, tend to prefer

24    gender-diverse to be a little more inclusive of

25    the range of possible identities and whether or

                                        Page 71

Christine Brady, Ph.D. August 31, 2023

```
 1    not they have gender dysphoria, but some people

 2    use "transgender" as the umbrella term.

 3         Q.   So is gender-diverse your umbrella term?

 4         A.   Yeah.

 5         Q.   And so an individual can be

 6    gender-diverse but not be transgender?

 7         A.   Correct.

 8         Q.   Can a gender-diverse individual who is

 9    not transgender be diagnosed with gender

10    dysphoria?

11         A.   Yes.

12         Q.   And so a gender-diverse individual who is

13    not transgender may receive puberty blockers and

14    cross-sex hormones to treat that gender dysphoria,

15    correct?

16              MS. NOWLIN-SOHL:  Object to form.

17              THE WITNESS:  They could.

18         Q.   (BY MR. RAMER)  Is gender-diverse

19    different from gender-nonconforming?

20         A.   So again, sometimes those terms can be

21    used interchangeably.

22         Q.   How do you use them?

23         A.   I use them interchangeably.

24         Q.   So, sorry.  Just so I can confirm, so you

25    view the term "gender-diverse" to mean the exact
```

Page 72

ER-517

Christine Brady, Ph.D. August 31, 2023

```
 1    same thing as gender-nonconforming; is that right?
 2         A.   Yes.
 3         Q.   Okay.  In your declaration, paragraph --
 4    page 3, same paragraph we're on, paragraph 13,
 5    first sentence, I'm just going to read it, and my
 6    first question will be whether I read it
 7    correctly.
 8              It says "Gender identity is a person's
 9    core internal sense of gender such as male or
10    female."
11              Did I read that correctly?
12         A.   Yes.
13         Q.   And when you say "internal," what do you
14    mean by that?
15         A.   Internal meaning within one's self.
16         Q.   Is an internal sense located somewhere
17    internally?
18              MS. NOWLIN-SOHL:  Object to form.
19              THE WITNESS:  I'm not sure what that
20    means.
21         Q.   (BY MR. RAMER)  Is this sense you're
22    referring to, is it, like, in an individual's
23    brain?
24              MS. NOWLIN-SOHL:  Object to form.
25              THE WITNESS:  So not necessarily, like,
```

Page 73

ER-518

Christine Brady, Ph.D. August 31, 2023

1    located in a specific part of the brain or a

2    specific part of the body, but it does involve

3    thoughts and feelings, in which case the brain is

4    involved.

5        Q.   (BY MR. RAMER)  Do you think a core

6    internal sense could be described as a strongly

7    held belief?

8            MS. NOWLIN-SOHL:  Object to form.

9            THE WITNESS:  Some may consider it to be

10   a belief, yes.

11       Q.   (BY MR. RAMER)  I'm asking you if you

12   think a core internal sense can be described as a

13   strongly held belief.

14           MS. NOWLIN-SOHL:  Object to form.

15           THE WITNESS:  Sure.  Yeah.

16       Q.   (BY MR. RAMER)  Is the core internal

17   sense of gender biological?

18       A.   There are some studies that indicate that

19   there might be a biological component.

20       Q.   In your opinion is it biological?

21           MS. NOWLIN-SOHL:  Object to form.

22           THE WITNESS:  I think it's a combination

23   of a lot of things, biology being one.

24       Q.   (BY MR. RAMER)  What else?

25       A.   So it's biological, cultural, societal.

Page 74

Christine Brady, Ph.D. August 31, 2023

1          Q.    Sorry.  Were you still going?

2          A.    No.

3          Q.    Oh.  The last two, cultural and societal,

4   is it fair to label those as something external to

5   the person?

6               MS. NOWLIN-SOHL:  Object to form.

7               THE WITNESS:  Not necessarily.  I

8   think -- I wouldn't want to categorize it as

9   external or internal because I think it can be

10  both.  Once something is present enough, it

11  becomes internalized.

12         Q.    (BY MR. RAMER)  But what is being

13  internalized?  Something -- let me rephrase that.

14              The thing that is being internalized in

15  the situation you just described is something that

16  was previously external to the individual,

17  correct?

18              MS. NOWLIN-SOHL:  Object to form.

19              THE WITNESS:  There are some theories in

20  psychology that look at how something can be so

21  ingrained in a culture that it is just, like,

22  innately known.  And so it's something that is

23  internalized even before, like, knowing that it

24  is --

25              So, for example, archetypes and myths.

                                            Page 75

Christine Brady, Ph.D. August 31, 2023

```
 1   So myths have a very common structure across
 2   cultures and across time, and so they're -- and
 3   then there's just some innate knowledge that we
 4   all have that mishap this structure, but it's not
 5   something necessarily that we were aware of.  But
 6   that's something that is external and then becomes
 7   somewhat internalized.
 8        Q.   (BY MR. RAMER)  Do you see a distinction
 9   between something that is cultural and societal
10   and something that is biological?
11             MS. NOWLIN-SOHL:  Object to form.
12             THE WITNESS:  I'm not sure.
13        Q.   (BY MR. RAMER)  You're not sure that you
14   see a distinction between -- if I describe
15   something as a biological factor or a cultural
16   and -- excuse me.  Start again.
17             If I describe something as a biological
18   factor and I describe something else as a cultural
19   or societal factor, you do not see a distinction
20   between those two categories?
21             MS. NOWLIN-SOHL:  Object to form.
22             THE WITNESS:  If you presented it to me
23   that way, yes, I would.
24        Q.   (BY MR. RAMER)  Okay.  And what is that
25   distinction?
```

Page 76

Christine Brady, Ph.D. August 31, 2023

```
 1        A.    So biological components or variables

 2   being something that, I guess, is like organic in

 3   nature.  It's, like, physical, you know, like

 4   within the physical body, has a physical

 5   manifestation.

 6        Q.    And are you implying that the others do

 7   not have that bodily physical manifestation?

 8        A.    Yes.

 9        Q.    So in that same sentence, you say "core

10   internal sense."

11             And my question is, are there internal

12   senses that are not core?

13        A.    Yeah.  Identity is multi-faceted.  And

14   there are some aspects that are not core to one's

15   self.

16             And there are also internal senses that

17   again are not core to one's self.  You know, for

18   example, like if I have a feeling, that doesn't

19   necessarily define who I am.  It's just a feeling.

20        Q.    What distinguishes a core internal sense

21   from a feeling or non-core internal sense?

22        A.    So something that's at somebody's core

23   really defines them in every aspect of their life.

24   So it's kind of cross-cutting in that way and is

25   essential to how they define themselves.
```

Page 77

ER-522

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.   Can you give me any other examples of a
 2   core internal sense other than gender?
 3        A.   So I strongly identify as a psychologist.
 4   And that is an important part of my identity and
 5   who I am, so I would consider that to be a core
 6   sense of who I am.
 7        Q.   Your identity as a psychologist is a core
 8   internal sense of yours?
 9        A.   Yes.
10        Q.   Do you have any other examples?
11        A.   So people might -- of course, sense of
12   self might be, you know, related to other than
13   their profession, might be, you know, their skill
14   sets, so what a person believes to be their
15   strengths and weaknesses.
16             So, you know, it might be like -- with my
17   teenagers it might be academically, like, I know
18   I'm good at math.  And that is, like, core to who
19   I am.  And I, you know, want to maybe major in
20   math because I know I'm good at that.
21        Q.   When did you begin to identify as a
22   psychologist?
23        A.   So I knew that I wanted to become a
24   psychologist probably when I was 20.
25        Q.   Do you think biological factors
```

Page 78

ER-523

Christine Brady, Ph.D. August 31, 2023

```
 1    contributed to that identity?
 2              MS. NOWLIN-SOHL:  Object to form;
 3    relevance.
 4              THE WITNESS:  I think it contributed in
 5    some ways in terms of, you know, as I was
 6    considering what I wanted to do in my career, I
 7    had to consider if I was going to be good at it or
 8    not.
 9              And I think biologically, I was
10    pre-dispositioned with some strengths that made me
11    well-suited for psychology.
12         Q.   (BY MR. RAMER)  Do you think that
13    cultural factors also contributed to your identity
14    as a psychologist?
15         A.   Not so much.
16         Q.   Do you think societal factors contributed
17    to your identity as a psychologist?
18         A.   No.
19         Q.   Did anything other than biology
20    contribute to your identity as a psychologist?
21              MS. NOWLIN-SOHL:  Object to the form;
22    relevance.
23              THE WITNESS:  Probably my values and
24    what -- how I wanted to contribute.
25         Q.   (BY MR. RAMER)  What do you mean by
```

Page 79

ER-524

Christine Brady, Ph.D. August 31, 2023

```
 1    "values"?
 2        A.    So the values that I hold for wanting to
 3    help people led me to a profession where I could
 4    help people.
 5        Q.    And where do those values come from?
 6            MS. NOWLIN-SOHL:  Objection; relevance.
 7            THE WITNESS:  I don't know.  Just a
 8    self-determined set of values.
 9        Q.    (BY MR. RAMER)  Can an individual have a
10    sense of gender that is not a core internal sense
11    of gender?
12        A.    There are some individuals whose gender
13    might not be as relevant or important to them as
14    other individuals.
15        Q.    And in that situation, is their gender
16    identity not a core internal sense of gender?
17            MS. NOWLIN-SOHL:  Object to form.
18            THE WITNESS:  I think it's still
19    definitely an internal sense that everyone has.
20    And it is sort of known for most people.  Whether
21    or not it's core is individualized.
22        Q.    (BY MR. RAMER)  So it may or may not be
23    core in people; is that right?
24        A.    Correct.
25        Q.    How do you determine when it is or is not
```

Page 80

Christine Brady, Ph.D. August 31, 2023

```
 1    core?

 2              MS. NOWLIN-SOHL:  Object to form.

 3              THE WITNESS:  So I would spend time, you

 4    know, understanding just how much of a role that

 5    plays in a person's life and how, you know,

 6    important it is to them and how strongly

 7    identified they are with that.

 8              So, for example -- and maybe a better

 9    example than me as a psychologist is now you have

10    racial identity.  So, you know, I identify as

11    Asian.  Not everybody, you know, who is Asian

12    strongly identifies that way, but that's something

13    that is very important to me.

14        Q.   (BY MR. RAMER)  So gender identity is a

15    core internal sense for people for whom gender

16    identity is very important; is that right?

17              MS. NOWLIN-SOHL:  Object to form;

18    mischaracterizes prior testimony.

19              THE WITNESS:  Could you say that again?

20        Q.   (BY MR. RAMER)  Yeah.  So to determine

21    whether a person's internal sense of gender is

22    core or not, the question is whether that sense of

23    gender is something they care significantly about;

24    is that right?

25              MS. NOWLIN-SOHL:  Object to form;
```

Page 81

Christine Brady, Ph.D. August 31, 2023

```
 1    mischaracterizes prior testimony.
 2            THE WITNESS:  I'm sorry.  I'm still not
 3    understanding.
 4        Q.   (BY MR. RAMER)  So I thought you said
 5    that the reason your Asian identity is core for
 6    you is that it's something that is very important
 7    to you.
 8            Am I misremembering that?
 9        A.   That's correct.
10        Q.   And my question is to decide whether
11    someone's gender identity is core for them, is the
12    question whether their gender identity is very
13    important to them?
14            MS. NOWLIN-SOHL:  Same objections.
15            THE WITNESS:  Part of the evaluation,
16    yes, is looking at how strongly that part of them
17    falls -- is.
18        Q.   (BY MR. RAMER)  Is what?  Did you finish?
19        A.   That was the end of my sentence.  It
20    wasn't a well-structured sentence, but that was
21    the end.
22        Q.   Let's go to paragraph 14, same page.  And
23    third sentence in this paragraph.  And I'll just
24    read it and ask if I read it correctly.
25            It says "Moreover, gender identity is not
```

Page 82

Christine Brady, Ph.D. August 31, 2023

```
 1    something that can be voluntarily changed."
 2           Did I read that correctly?
 3       A.    Yes.
 4       Q.    Does an individual's gender identity ever
 5    change?
 6       A.    It can.
 7       Q.    How so?
 8       A.    So there are instances where someone's
 9    gender identity still might be gender-diverse but
10    fluctuate in terms of the labels they're using or
11    how they choose to categorize themselves.
12           There are other folks who over time do
13    have congruence with their designated sex.
14       Q.    What do you mean by that, "over time they
15    have congruence with their designated sex"?
16       A.    I have some patients who identify as
17    gender-diverse and then later on identify as their
18    designated sex.
19       Q.    And you're saying that that type of
20    change is never voluntary; is that right?
21       A.    Correct.
22       Q.    What do you mean by that?
23       A.    It's not necessarily someone is forcing
24    themselves to identify as a certain identity.  It
25    just, you know, over time evolves in alliance for
```

Page 83

Christine Brady, Ph.D. August 31, 2023

```
 1    them.
 2         Q.   What causes that change?
 3              MS. NOWLIN-SOHL:  Object to form.
 4              THE WITNESS:  It's pretty individualized,
 5    so, you know, I think sometimes it's through our
 6    work together and exploration that they're able to
 7    understand themselves differently or understand
 8    just their feelings differently.
 9         Q.   (BY MR. RAMER)  By "work together," do
10    you mean psychotherapy?
11         A.   Yes.
12         Q.   Are you familiar with the term
13    exploratory therapy?
14         A.   Yes.
15         Q.   What is your understanding of that term?
16         A.   My understanding is creating a safe
17    environment and a safe place for young people to,
18    you know, just express their thoughts and feelings
19    regarding gender and to have a therapist sort of
20    facilitate that exploration process by asking
21    questions or probing further and being a sounding
22    board for those ideas.
23         Q.   Just going back to this final sentence in
24    paragraph 14, so are you saying that any change in
25    gender identity is involuntary?
```

Page 84

Christine Brady, Ph.D. August 31, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form;
 2     mischaracterizes prior testimony.
 3              THE WITNESS:  I guess I think of
 4     voluntary as conscious and intentional versus just
 5     the natural course of the development of someone's
 6     identity.
 7         Q.   (BY MR. RAMER)  What alters the course of
 8     someone's gender identity?
 9              MS. NOWLIN-SOHL:  Object to form.
10              THE WITNESS:  Again, individualized, but
11     in some cases it might be -- it might be
12     understanding more about gender diversity and the
13     spectrum of gender diversity.
14              It might be with regards to learning new
15     information about themselves that they didn't have
16     before.  I'll stop there.
17         Q.   (BY MR. RAMER)  Anything else?
18         A.   Not that I can think of.
19         Q.   Have you ever heard gender described as a
20     spectrum?
21         A.   Yes.
22         Q.   Do you think gender is a spectrum?
23         A.   Yes.
24         Q.   And can you just explain what you mean by
25     that?
```

Page 85

Christine Brady, Ph.D. August 31, 2023

1          A.    So gender -- there are lots of ways for

2     people to kind of describe their gender.  And I

3     think of it as a spectrum from -- in the most

4     simplified way, masculinity to femininity with

5     sort of androgyny being in the middle.

6          Q.    Can an individual who I would call a

7     natal male, you would say assigned male at birth,

8     have a gender identity that is more masculine than

9     the individual's body?

10               MS. NOWLIN-SOHL:  Object to form.

11               THE WITNESS:  I was confused by that.

12     Could you say that again?

13          Q.    (BY MR. RAMER)  I guess can you -- what's

14     your definition of gender dysphoria?

15          A.    So meeting criteria for gender dysphoria

16     per the DSM.

17          Q.    And just as a shorthand, if somebody

18     said, "What is gender dysphoria?" -- I mean, I

19     guess we can do it a different way rather than --

20               Let's go back to page -- let's go to

21     page 6 of your declaration.

22               And paragraph 19A refers to the marked

23     incongruence between someone's

24     experience/expressed gender and assigned gender.

25               Do you see that?

Page 86

Christine Brady, Ph.D. August 31, 2023

```
 1        A.   Yes.

 2        Q.   And in your view, it is not binary?  Or

 3   let me rephrase.

 4             The gender is not binary, right?

 5             MS. NOWLIN-SOHL:  Object to form.

 6             THE WITNESS:  Yes.

 7        Q.   (BY MR. RAMER)  And could an individual

 8   who is assigned male have an experienced or

 9   expressed gender that is more masculine than that

10   individual's present gender?

11             MS. NOWLIN-SOHL:  Object to form.

12             THE WITNESS:  So let me just -- I'm going

13   to rephrase and see if I understood this

14   correctly.

15             So a designated male who has gender

16   incongruence but still identifies as male?

17        Q.   (BY MR. RAMER)  Let me ask it a different

18   way, which is does gender incongruence for an

19   individual who is assigned male at birth always

20   involve an incongruence with a more feminine

21   gender identity?

22             MS. NOWLIN-SOHL:  Object to form.

23             THE WITNESS:  I see.  So you're wondering

24   like how far on the spectrum they need to go in

25   order to have gender incongruence?
```

Page 87

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.    (BY MR. RAMER)  I think my question is
 2   does it always go one way?
 3        A.    Yeah, so I think the oversimplification
 4   there -- I mean, there are lots of different ways
 5   I could go.  But the oversimplified version is it
 6   could be nonbinary, which is not necessarily
 7   feminine.  It's just less masculine.
 8        Q.    Okay.  We'll take that.
 9              Does it always go one way, meaning less
10   masculine?
11              MS. NOWLIN-SOHL:  Object to form.
12              THE WITNESS:  Typically.
13        Q.    (BY MR. RAMER)  Always?
14        A.    Yeah, I can't think of a case in which
15   that hasn't been the direction.
16        Q.    Do you think it's possible for a male
17   assigned at birth to say, "My gender identity is
18   more masculine than what I've been assigned"?
19              MS. NOWLIN-SOHL:  Object to form; calls
20   for speculation.
21              THE WITNESS:  I think it would be
22   difficult to meet the criteria in someone
23   presenting that way.  So that would be hard for me
24   to imagine.
25        Q.    (BY MR. RAMER)  Why would it be difficult
```

Page 88

ER-533

Christine Brady, Ph.D. August 31, 2023

 1  to meet the criteria for someone presenting that

 2  way?

 3       A.   Because they -- I can't see how they

 4  would necessarily have distress over that if

 5  their, you know, designated sex and masculinity

 6  are part aligned.

 7       Q.   So it is binary, then, and it's not a

 8  spectrum?

 9            MS. NOWLIN-SOHL:  Object to form;

10  mischaracterizes prior testimony.

11            THE WITNESS:  So again, there's the range

12  of masculinity to femininity.  So it's a spectrum

13  in the sense of it's not just there's one other

14  option here.  There's a wide range of options and

15  a range of identity within the spectrum.

16       Q.   (BY MR. RAMER)  Right.  But the

17  incongruence for an assigned male based on what

18  you're saying seems like it can only go -- it only

19  counts if it goes one direction, which is less

20  masculine than being assigned male.

21            Is that wrong?

22            MS. NOWLIN-SOHL:  Object to form.

23            THE WITNESS:  I think that's correct.

24       Q.   (BY MR. RAMER)  I think you've mentioned

25  the phrase "gender-fluid."

Page 89

Christine Brady, Ph.D. August 31, 2023

```
 1                    Am I remembering --
 2              MS. NOWLIN-SOHL:  John, real quick.
 3              MR. RAMER:  Yeah.
 4              MS. NOWLIN-SOHL:  We've been going for
 5    about an hour.  Were you planning to go straight
 6    up to the long break, or should we take five
 7    minutes?
 8              MR. RAMER:  Yeah, let's take five and
 9    then come back and then we'll go up until the long
10    break.
11              MS. NOWLIN-SOHL:  Okay.  Sounds good.
12              THE WITNESS:  Thank you.
13              THE VIDEOGRAPHER:  Okay.  So the time is
14    12:14 p.m. Mountain time, and we are off the
15    record.
16         (Break taken from 12:14 p.m. to 12:20 p.m.)
17              THE VIDEOGRAPHER:  All right.  So we are
18    recording.  The time is 12:20 p.m. Mountain time,
19    and we are back on the record.
20         Q.   (BY MR. RAMER)  Dr. Brady, I believe
21    earlier today you may have used the phrase
22    "gender-fluid."
23              Am I remembering that right?
24         A.   Yes.
25         Q.   And can you explain what that means?
```

Page 90

Christine Brady, Ph.D. August 31, 2023

```
 1        A.   So some individuals use this term to
 2   describe -- again, if we're talking about the
 3   simplified spectrum of masculinity to femininity
 4   with androgyny or nonbinary being in the middle,
 5   some people fluidly move within that spectrum.
 6   Typically the identity isn't shifting, but it's
 7   just the expression is what is moving on that
 8   spectrum.
 9        Q.   What do you mean when you say the
10   identity is not moving but the expression is
11   moving?
12        A.   So typically we separate gender identity
13   and gender expression.  Gender identity being the
14   internal, core sense of what your gender is versus
15   the expression is, again, the external things that
16   people can see, like how you choose to express
17   your internal gender, so clothing, hairstyles,
18   accessories, those sorts of things.
19             So gender-fluid folks sometimes have a
20   stable gender identity, but how they choose to
21   express themselves is more fluid.  So on some days
22   they might gravitate towards more feminine
23   expression or more masculine expression or more
24   androgenous expression.
25        Q.   So does gender-fluid ever -- and correct
```

Page 91

Christine Brady, Ph.D. August 31, 2023

1   me if I'm wrong, but I think I hear you saying

2   gender-fluid in the context you just described is

3   fluidity in gender expression; is that fair?

4        A.   Yes.

5        Q.   And is there fluidity in any individual's

6   gender identity?

7        A.   For some individuals who define

8   themselves as gender-fluid, there can be also

9   fluctuations in the identity on that spectrum.

10       Q.   So gender fluidity is itself an

11  identification?

12       A.   Yes.

13       Q.   When a patient identifies as

14  gender-fluid, how does that identity manifest

15  itself?

16           MS. NOWLIN-SOHL:  Object to form.

17           THE WITNESS:  So it might present itself

18  in terms of, again, the expressions of wearing

19  different, you know, types of clothing, or

20  sometimes it's using different pronouns on

21  different days, depending on, you know, how

22  they're identifying that particular day.

23       Q.   (BY MR. RAMER)  And sorry.  I just want

24  to make sure I understand gender fluidity, which

25  is -- and maybe it's helpful if I try to use it in

Page 92

Christine Brady, Ph.D. August 31, 2023

1    a sentence and you tell me if I'm using it wrong,

2    which is a person says, "I am gender-fluid because

3    my gender identity often changes."

4            Based on your understanding of

5    gender-fluidity, is that sentence coherent?

6            MS. NOWLIN-SOHL:  Object to form.

7            THE WITNESS:  The sentence may or may not

8    characterize every person's experience, but you

9    did use it correctly, yes.

10       Q.   (BY MR. RAMER)  Okay.  Maybe an easier

11   way to ask this is if somebody is gender-fluid, is

12   it that their gender identity is changing, or is

13   that there simply is no identity other than the

14   fluidity?

15       A.   So again, it depends.  So for some folks

16   it is that the gender identity is fluid and

17   moving.  For other folks it might just be the

18   expression piece that is fluid and moving.  So it

19   can be used in different ways depending on the

20   individual.

21       Q.   And do you have a particular way that you

22   use it?

23       A.   For us it doesn't necessarily -- you

24   know, the label that people use for their identity

25   doesn't matter as much as -- for me, whether or

Page 93

Christine Brady, Ph.D. August 31, 2023

```
 1    not they meet criteria for gender dysphoria.
 2        Q.   Well, I guess you have to determine
 3    whether there is a marked incongruence between
 4    their experience/expressed gender and their
 5    assigned gender, right?
 6            MS. NOWLIN-SOHL:  Object to form.
 7            THE WITNESS:  As part of the criteria,
 8    yeah, it's determinate.
 9        Q.   (BY MR. RAMER)  And so don't you --
10    wouldn't the label be critical to understanding
11    what the individual's experienced/expressed gender
12    is?
13        A.   So the -- I would care more about the
14    description of what that means to them rather than
15    the actual table that they're using.
16        Q.   In your declaration, page 3,
17    paragraph 14, the second sentence -- I'll just
18    read it and ask if I read it correctly.
19            It says "It is an essential part of one's
20    identity and being."
21            Did I read that correctly?
22        A.   Yes.
23        Q.   And the "it" there is referring to gender
24    identity; is that right?
25        A.   Yes.
```

Page 94

Christine Brady, Ph.D. August 31, 2023

1        Q.   With respect to the second sentence, me

2   saying that gender identity is an essential part

3   of one's identity and being, what is your

4   authority for that proposition?

5        A.   I -- so I believe this to be true because

6   everybody has a gender identity, and so it's kind

7   of an essential part of the human condition.

8        Q.   I mean, don't you think there are other

9   things that everybody has that are not an

10   essential part of their identity and being?

11             MS. NOWLIN-SOHL:   Object to form;

12   argumentative.

13             THE WITNESS:   Could you give me an

14   example?

15        Q.   (BY MR. RAMER)  I guess how are you using

16   the word "essential"?  Maybe we'll start there.

17        A.   I think essential is to say that -- you

18   know, again, much like race.  My earlier example,

19   much like race, it's something, you know, everyone

20   has a racial identity.  Everyone has a gender

21   identity.  And so it's essential in the sense that

22   everybody has it.

23        Q.   You think race is an essential part of

24   one's identity and being?

25        A.   Yes.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

ER-540

Christine Brady, Ph.D. August 31, 2023

1    Q.   And now turning to -- still in your

2  declaration -- paragraph 21, which I think is

3  page 7, can you kind of just walk me through what

4  you're explaining in this paragraph?

5    A.   Sure.  So I am discussing sort of the

6  different -- so I'm trying to figure out how to

7  summarize this.

8         So essentially kind of discussing just

9  the persistence of gender identity through

10  development.

11    Q.   And is it fair to say that in this

12  paragraph you are criticizing the study you cite

13  in footnote 4?

14    A.   There are some methodological concerns

15  with citation No. 4, yes.

16    Q.   And what are those methodological

17  concerns?

18    A.   So that study is outdated.  It's rather

19  old.  And so the criteria that were used for

20  inclusion into that study were from DSM-4, gender

21  identity disorder, and the criteria for

22  prepubertal kids was much lower.

23         So DSM-5 has a requirement of six

24  criterion.  DSM-4 had fewer than that.  So based

25  on DSM-5 criterion of gender dysphoria, many of

Page 96

Christine Brady, Ph.D. August 31, 2023

```
 1    the kids in that study would not have been
 2    included because they don't meet criteria for
 3    gender dysphoria.
 4         Q.   And why is that a limitation of the
 5    study?
 6         A.   Because it overinflates the number of
 7    people who no longer identify as gender-diverse.
 8         Q.   And then is it fair to say you favorably
 9    cite the Olson article in -- that you cite in
10    footnote 5?
11              MS. NOWLIN-SOHL:  Object to form.
12              THE WITNESS:  It addresses some of the
13    limitations of citation 4 in that it is using
14    DSM-5 inclusion criteria.
15         Q.   (BY MR. RAMER)  It is using DSM-5?
16    Sorry, let me rephrase.
17              The Olson article is using DSM-5
18    inclusion criteria?
19         A.   Yes.
20              MR. RAMER:  I've just got about ten
21    minutes.  Let me try and send an exhibit.
22              Okay.  I just hit send.  We shall see
23    when it arrives.
24              Have we gotten the early warning from the
25    phone yet, Li?
```

Page 97

Christine Brady, Ph.D. August 31, 2023

```
 1              MS. NOWLIN-SOHL:  No, not yet.  Amy, you

 2    usually beat me to it.  Have you received it?

 3              THE REPORTER:  I did receive it.

 4              MS. NOWLIN-SOHL:  Okay.  Then I should be

 5    hopefully not too far behind.

 6              I still do not have it on either device.

 7              Oh, here we go.

 8              THE WITNESS:  It was somewhere over

 9    Colorado.

10              MS. NOWLIN-SOHL:  Yes.  Okay.

11              MR. RAMER:  Is it pulled up?

12              MS. NOWLIN-SOHL:  Yes.

13              (Deposition Exhibit No. 3 was marked.)

14         Q.   (BY MR. RAMER)  And, Dr. Brady, is this

15    the article you cite in footnote 5?

16         A.   Yes.

17         Q.   And did you read this article before you

18    cited it?

19         A.   Yes.

20         Q.   I'd like to go to page 2, and middle

21    column, the first full paragraph.  And I'll just

22    read the first sentence and ask if I read it

23    correctly.

24              It says "This study did not assess

25    whether participants met criteria for the
```

Page 98

Christine Brady, Ph.D. August 31, 2023

```
 1    Diagnostic and Statistical Manual of Mental
 2    Disorders, Fifth Edition, diagnosis of gender
 3    dysphoria in children."
 4              Did I read that correctly?
 5         A.   Yes.
 6         Q.   And so did this study assess whether the
 7    participants met the criteria of the DSM-5?
 8         A.   This study did not diagnose them.
 9         Q.   Well, you said "diagnose" there.
10              My question is whether it assessed
11    whether they had been diagnosed under the DSM-5.
12         A.   So they did not do their -- yeah, sorry,
13    I was just scrolling around.  They did not do
14    their own assessment.
15         Q.   But you think this study accounted for
16    whether they were diagnosed under the DSM-5?  Is
17    that what you're saying?
18         A.   I would have to read it more thoroughly,
19    but my understanding is that they did ask, so it
20    was sort of self-reported diagnosis.
21         Q.   Okay.  So you're saying the participants
22    in this study self-reported whether they were
23    diagnosed under the DSM-5?
24              MS. NOWLIN-SOHL:  Object to form;
25    mischaracterizes the testimony.
```

Page 99

Christine Brady, Ph.D. August 31, 2023

```
 1              THE WITNESS:  I believe so.
 2         Q.   (BY MR. RAMER)  Do you know where they
 3    say that in the article?
 4         A.   So I believe that with their recruitment
 5    methodology, they were recruiting individuals who
 6    had socially transitioned.
 7         Q.   Okay.  Sorry.  Can you point me to where
 8    in the article it says that the participants
 9    reported that they had been diagnosed with gender
10    dysphoria under the DSM-5?
11         A.   Yeah, I cannot point to that in this
12    article right now.  I would have to read it more
13    closely.
14         Q.   If it's not in there, is it fair to say
15    your criticism of the article in footnote 4
16    applies to your criticism of the article in
17    footnote 5?
18              MS. NOWLIN-SOHL:  Object to form.
19              THE WITNESS:  The limitations of
20    citation 4 still stand.  However, you know,
21    citation 5 still has stronger and more rigorous
22    scientific inquiry because it is -- has been done
23    more recently, and is with kids in the United
24    States.
25         Q.   (BY MR. RAMER)  Do you think the article
```

Page 100

(191 of 296), Page 191 of 296Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 191 of 296
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 101 of 267
Christine Brady, Ph.D. August 31, 2023

```
 1    in footnote 5 is more reliable because it's more
 2    recent and conducted with kids in the United
 3    States?  Is that right?
 4              MS. NOWLIN-SOHL:  Object to form;
 5    mischaracterizes prior testimony.
 6              THE WITNESS:  Compared to citation 4,
 7    yes.
 8         Q.   (BY MR. RAMER)  Why is doing a study with
 9    individuals in the United States more reliable
10    than doing a study with individuals elsewhere?
11         A.   Perhaps not more reliable, but more
12    relevant given that all of my patients live in the
13    United States.
14         Q.   Do you think the experience of
15    individuals in the United States is different from
16    the experience of individuals in Europe?
17              MS. NOWLIN-SOHL:  Object to form.
18              THE WITNESS:  Potentially.
19         Q.   (BY MR. RAMER)  How about with -- do you
20    think their experience -- do you think the
21    experience of individuals in the United States
22    with respect to gender identity is different from
23    the individuals -- let me restart.
24              Do you think the experience of
25    individuals in the United States with respect to
```

Page 101

Christine Brady, Ph.D. August 31, 2023

```
1    gender identity is different from the experience
2    of individuals in Europe with respect to gender
3    identity?
4              MS. NOWLIN-SOHL:  Object to form.
5              THE WITNESS:  They may be.
6    Q.   (BY MR. RAMER)  What's the basis for the
7    possibility that they may be different?
8    A.   So there are, you know, different
9    experiences of potentially discrimination or there
10   are different, like, laws protecting trans youth
11   in different countries.  Different abilities in
12   terms of, like, legal rights to consent and things
13   of that nature.
14   Q.   And the idea there is that -- what effect
15   do you think more restrictive laws or more
16   discrimination has?
17             MS. NOWLIN-SOHL:  Object to form.
18             THE WITNESS:  I just think the experience
19   would be different.  And, you know, I don't know
20   without scientific inquiry if that leads to any
21   different outcomes.  But, you know, I think when
22   we're talking about youth in the United States, we
23   want to know about youth in the United States.
24   Q.   (BY MR. RAMER)  And so you think a study
25   out of a country like Sweden, for example, would
```

Page 102

Christine Brady, Ph.D. August 31, 2023

```
 1  not be relevant to the experience of individuals
 2  in the United States?
 3          MS. NOWLIN-SOHL:  Object to form;
 4  argumentative, mischaracterizes prior testimony.
 5          THE WITNESS:  I don't think that it makes
 6  it irrelevant.  I just think that it would be
 7  stronger if it pertains to youth in the United
 8  States if we're talking about youth in the United
 9  States.
10      Q.   (BY MR. RAMER)  With respect to the Olson
11  study that we were just looking at, had the
12  participants in that study socially transitioned?
13      A.   Yes.
14      Q.   Do you think there is a possibility that
15  socially transitioning could affect the likelihood
16  of desistance?
17          MS. NOWLIN-SOHL:  Object to form.
18          THE WITNESS:  Could you phrase that
19  again?
20      Q.   (BY MR. RAMER)  Do you think there's a
21  possibility that socially transitioning could
22  affect the likelihood of desistance in an
23  individual?
24          MS. NOWLIN-SOHL:  Object to form.
25          THE WITNESS:  So I am aware of one other
```

Page 103

Christine Brady, Ph.D. August 31, 2023

```
 1   study where they looked at social transition and
 2   the strength of identity, and there was no
 3   association with whether or not youth had socially
 4   transitioned on strengthening or weakening their
 5   identity over time.
 6            Also clinically I've had socially
 7   transitioned youth socially transition again when
 8   their identity has changed, so it's certainly not
 9   something that is creating a barrier to their
10   identity evolving if that's what's going to
11   happen.
12       Q.   (BY MR. RAMER)  So is the answer to the
13   question, then, no, you do not think there is a
14   possibility that socially transitioning could
15   affect the likelihood of desistance?
16            MS. NOWLIN-SOHL:  Object to form;
17   mischaracterizes prior testimony.
18            THE WITNESS:  There's -- I'm only aware
19   of the one study that says that there is no
20   relationship in either direction.  And then
21   clinically I've seen it go -- I've not seen that
22   to be true.
23       Q.   (BY MR. RAMER)  Does the existence of
24   that one study in your expert opinion foreclose
25   the possibility that social transitioning could
```

Page 104

(195 of 296), Page 195 of 296
Case 1:23-cv-00269-BLW   Document 56-2   Filed 09/05/23   Page 105 of 267
Christine Brady, Ph.D. August 31, 2023

```
 1    affect the likelihood of desistance?
 2         A.   I don't think that one study is enough.
 3    But again, clinically, I've seen people be able to
 4    socially transition again, retransition without
 5    difficulties.
 6         Q.   Why don't you think that one study is
 7    enough?
 8              MS. NOWLIN-SOHL:  Object to form.
 9              THE WITNESS:  So as a scientist, it
10    helps, you know, to have replication studies or
11    more, you know, participants to be able to say for
12    sure.
13         Q.   (BY MR. RAMER)  Replication studies or --
14    what was the last thing?  I missed that.  I'm
15    sorry.
16         A.   Increased number of participants.
17              MR. RAMER:  And I think we're coming up
18    on quarter to.  So maybe it's a good time we can
19    take our break?
20              MS. NOWLIN-SOHL:  Yeah, that sounds good.
21              THE VIDEOGRAPHER:  Okay.  So then the
22    time is 12:44 p.m. Mountain time, and we are off
23    the record.
24         (Break taken from 12:44 p.m. to 3:14 p.m.)
25              THE VIDEOGRAPHER:  All right.  So we are
```

Page 105

Christine Brady, Ph.D. August 31, 2023

```
 1    recording.  The time is 3:14 p.m. Mountain time,
 2    and we are back on the record.
 3         Q.   (BY MR. RAMER)  Dr. Brady, do you think a
 4    diagnosis under the DSM-5 should be necessary to
 5    receive gender-affirming medical care?
 6         A.   In my practice, yes.
 7         Q.   Why do you say that?
 8              MS. NOWLIN-SOHL:  Object to form.
 9              THE WITNESS:  Because I can't speak for
10    what other people might feel is appropriate or
11    not, but that is how we run in our clinic.
12         Q.   (BY MR. RAMER)  So granting that you do
13    follow the DSM-5, my question is a little bit
14    different, which is just do you think that the
15    diagnosis as articulated in the DSM-5 should be
16    necessary to receive gender-affirming medical
17    care?
18              MS. NOWLIN-SOHL:  Object to form.
19              THE WITNESS:  Yes.
20         Q.   (BY MR. RAMER)  And that's even though
21    you described the DSM-5 as -- I think it was
22    either "not perfect" or "imperfect" earlier today.
23              Do you think it is sufficient?
24              MS. NOWLIN-SOHL:  Object to form.
25              THE WITNESS:  I do.
```

Page 106

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.   (BY MR. RAMER)  Do you think that
 2   reducing gender dysphoria is the only purpose for
 3   gender-affirming medical interventions?
 4        A.   I think that is the main goal.  However,
 5   there are secondary goals that, you know, just
 6   include, like, making someone happier.  Reducing
 7   their dysphoria but also making them happier.
 8        Q.   So I guess in that answer you're saying
 9   in reducing the gender dysphoria, there are other
10   benefits that may come along with that reduction?
11   Is that what you mean?
12        A.   Yes.
13             MS. NOWLIN-SOHL:  Object to form;
14   mischaracterizes prior testimony.
15             THE WITNESS:  Yes.  The primary goal of
16   medical interventions is to reduce dysphoria.  And
17   then there are secondary benefits that come from
18   that.
19        Q.   (BY MR. RAMER)  And before we went on the
20   break, we were discussing desistance.
21             Do you recall that, roughly?
22        A.   Yes.
23        Q.   And one of the questions I had asked you
24   was whether you thought social transition could
25   affect the likelihood of desistance.
```

Page 107

Christine Brady, Ph.D. August 31, 2023

```
 1               And my next question is do you think
 2      there's any possibility that medically
 3      transitioning an adolescent could affect the
 4      likelihood of desistance?
 5               MS. NOWLIN-SOHL:  Object to form.
 6               THE WITNESS:  To my knowledge, there
 7      isn't any research that looks at that question
 8      specifically.  Clinically I've not had -- seen
 9      that to be the case.
10          Q.   (BY MR. RAMER)  You're unaware of any
11      research that looks at that question at all?
12               MS. NOWLIN-SOHL:  Object to form.
13               THE WITNESS:  Research that looks or
14      answers the question of does medical intervention
15      impact the rates of persistence or desistance.
16          Q.   (BY MR. RAMER)  And so with respect to
17      scientific research, we don't know the answer to
18      that question; is that right?
19               MS. NOWLIN-SOHL:  Object to form.
20               THE WITNESS:  We do not know whether
21      there is a relationship or isn't, but again,
22      clinically I've seen that there does not appear to
23      be a relationship.
24          Q.   (BY MR. RAMER)  Are you aware of any
25      study -- this is closely related but a slightly
```

Page 108

ER-553

Christine Brady, Ph.D. August 31, 2023

```
 1    different question.
 2            Are you aware of any study that analyzes
 3    desistance rates for individuals who are diagnosed
 4    with gender dysphoria as adolescents?
 5        A.   Can you ask that one more time?
 6        Q.   Are you aware of any study that analyzes
 7    desistance rates for individuals who are diagnosed
 8    with gender dysphoria as adolescents?
 9        A.   I am not.
10        Q.   I'd like to go to your declaration to
11    page 11, paragraph 33.  And my question is
12    actually going to be about the part of the
13    paragraph that runs over on to page 12, so maybe
14    we'll flip to page 12.  And specifically about --
15    I'll call it subsection -- subparagraph D.
16            And there you refer to any other mental
17    health conditions -- I'm sorry.
18            And there you say "Any other mental
19    health conditions do not interfere with diagnostic
20    clarity."
21            Do you see that?
22        A.   Yes.
23        Q.   And what does that mean?
24        A.   So in some cases an individual might have
25    comorbid mental health diagnoses that could be
```

Page 109

Christine Brady, Ph.D. August 31, 2023

1   impacting -- could be overlapping with gender or
2   could just be interfering with our ability to
3   fully diagnose gender dysphoria or for us to
4   elucidate someone's -- that someone's, you know,
5   decision-making ability is unclouded.  So, for
6   example, you know, somebody who has
7   obsessive-compulsive disorder, for example.
8           So I've had patients where someone can
9   hyper focus as a symptom of their OCD on, for
10  example, a particular part of the body.  And that
11  might, at first blush, look like a symptom of
12  gender dysphoria, but upon further evaluation and
13  investigation might be body dysmorphia, not
14  necessarily gender dysphoria, and because of the
15  OCD.  So in that case, the OCD is interfering with
16  the clarity of us being able to assess the gender.
17      Q.   Are there any other conditions like OCD
18  that would interfere with diagnostic clarity?
19      A.   There might be other sort of mental
20  health conditions.  Off the top of my head, like
21  someone who suffering from depression and is in a
22  depressive episode that is impacting their
23  abilities to, you know, really think clearly about
24  decision-making because the emotions are running
25  too high in that particular moment.

Page 110

ER-555

Christine Brady, Ph.D. August 31, 2023

1              So it's not necessarily because they have
2    depression, but the depression symptoms are such a
3    level of severity that it's impacting their
4    ability to provide informed consent.
5         Q.   And just to clarify, not only provide
6    informed consent, but would also interfere with
7    the diagnosis; is that right?
8         A.   Potentially.
9         Q.   Right.  And you mentioned OCD.  Have you
10   had experience with other conditions that
11   potentially interfered with diagnostic clarity?
12              MS. NOWLIN-SOHL:  Object to form.
13              THE WITNESS:  Sometimes with other
14   diagnoses it just might take longer to do a
15   thorough assessment due to the complexity of the
16   psychosocial evaluation.
17              So, you know, for example, someone who
18   has multiple diagnoses simultaneously, that's
19   going to take us longer to be able to get the full
20   history and understand how and if those things are
21   related to each other.
22              So potentially it could be any diagnosis,
23   but I'm just listing some of the ones that are
24   more common.
25         Q.   (BY MR. RAMER)  And so is it possible for

                                        Page 111

Christine Brady, Ph.D. August 31, 2023

```
 1    an individual who is diagnosed with gender

 2    dysphoria to have a co-occurring mental health

 3    disorder that is not related to the gender

 4    dysphoria?

 5         A.   Yes.

 6         Q.   And what are some examples that you've

 7    had in your practice where an individual has been

 8    diagnosed with gender dysphoria but has a

 9    co-occurring mental health disorder that is not

10    related to the gender dysphoria?

11         A.   So it can still be the same diagnoses

12    that I've given as example.  So sometimes just

13    because someone has OCD doesn't necessarily mean

14    that the symptoms are related to gender, and they

15    could have two separate diagnoses.

16              Depression similarly, many of our

17    patients have gender dysphoria and depression.

18    Maybe there's some overlap between the two, but

19    sometimes they are distinct also.

20         Q.   And what about individuals diagnosed with

21    gender dysphoria and ADHD?

22              MS. NOWLIN-SOHL:  Object to form.

23              THE WITNESS:  We do have individuals who

24    have both of those diagnoses.

25         Q.   (BY MR. RAMER)  And do you have
```

Page 112

ER-557

Christine Brady, Ph.D. August 31, 2023

 1    individuals where the ADHD is not related to the

 2    gender dysphoria?

 3         A.   I've never actually had a case where the

 4    two were related.

 5         Q.   That makes sense.

 6              And then what about with respect to

 7    autism spectrum disorder?  Have you ever had

 8    patients that have been diagnosed with gender

 9    dysphoria and also been diagnosed with autism

10    spectrum disorder?

11         A.   Yes.

12         Q.   And in those instances, do you have

13    patients where the autism -- and I guess I'll try

14    again based on the last one.

15              Is autism spectrum disorder ever related

16    to gender dysphoria?

17              MS. NOWLIN-SOHL:  Object to form.

18              THE WITNESS:  It can be related.  I'll

19    just -- yes, it can be related.

20         Q.   (BY MR. RAMER)  How so?

21         A.   So this is more common on our prepubertal

22    kids.  But I've had patients who similar to the

23    OCD maybe misattribute a set of rules.

24              So, for example, I had one patient who

25    was designated male and he expressed really loving

Page 113

```
 1    the color pink.  And his cognitive rigidity sort
 2    of led him to, well, if I like pink, then I must
 3    be a girl.
 4            And so he started to question that, and
 5    with further psychotherapy and exploration was
 6    able to determine that, well, anybody can like
 7    pink.  That's not necessarily -- doesn't
 8    necessarily lead to having a female identity.
 9        Q.   And so how do you determine if a
10    co-occurring mental health condition is related to
11    gender dysphoria?
12        A.   So again to that kind of clinical
13    semi-structure sort of interview process, so
14    asking questions, getting a response, and delving
15    deeper and sort of probing about, you know, are
16    these things related, challenging some of the
17    thoughts that are presented.
18            So in this case with this young person
19    with ASD, sort of challenging, well, you know, can
20    boys like pink?  Like, is that a possibility?  Is
21    that something that, you know, you could integrate
22    into your rule-based thinking?
23            So it's kind of just that back and forth
24    of providing information, sort of challenging a
25    thought and understanding if there's flexibility
```

Page 114

Christine Brady, Ph.D. August 31, 2023

```
 1    there or not.
 2         Q.   That process that you just described,
 3    would that fall within the umbrella of exploratory
 4    therapy, or am I misunderstanding?
 5         A.   It could be considered exploratory
 6    therapy or it could be considered just part of our
 7    assessment process.
 8         Q.   So same page of your expert declaration,
 9    same page, paragraph 36.  And in the third
10    sentence in the parenthetical you mention changing
11    pathopsychology.
12              Do you see that?
13         A.   Yes.
14         Q.   And could you just explain what that
15    means?
16         A.   Give me one moment to read the full
17    sentence.
18              Yeah, so an example being, you know,
19    maybe we could interchangeably use challenging or
20    complex psychopathology, so, you know, multiple
21    diagnoses.
22              It could also be, you know, challenging
23    psychopathology in terms of behaviorally
24    challenging.  It can be difficult to conduct
25    therapy or hold evaluations with people who have a
```

Page 115

Christine Brady, Ph.D. August 31, 2023

```
 1    lot of energy or behavioral problems, so that
 2    could be considered challenging psychopathology as
 3    well.
 4         Q.   And then in that same parenthetical, you
 5    refer to co-occurring neurodiversity.
 6              Do you see that?
 7         A.   Yes.
 8         Q.   And could you just explain what that is?
 9         A.   Could include ADHD or autism spectrum
10    disorder or other neurocognitive disorders.
11         Q.   Do you have any examples of others?  I'm
12    familiar with the first two you listed.  I'm just
13    curious if there are others.
14         A.   Like differences of learning, like
15    learning with dyslexia or...
16         Q.   And when you referred in this sentence to
17    further -- at the beginning of the sentence, you
18    refer to further assessment or testing.
19              Is that just what we were talking about
20    with respect to either exploratory therapy or the
21    psychosocial screening?  Or is there something
22    else you're referring to when you say "further
23    assessment or testing"?
24         A.   It could include those things.  It could
25    also include more extensive psychoeducational
```

Page 116

Christine Brady, Ph.D. August 31, 2023

```
 1    testing.  So, for example, somebody who is
 2    undiagnosed but we have a suspicion that there
 3    might be neurodiversity or neurocognitive
 4    disorder, we would want to know before proceeding
 5    so we could refer the family for evaluation.
 6         Q.   And in that -- I'll just read the
 7    sentence and then ask if I read it correctly, and
 8    then I'll have kind of a question about it.
 9              It says "Further assessment or testing
10    may be needed to fully understand more complex
11    presentations, e.g., challenging psychopathology,
12    co-occurring neurodiversity prior to initiating
13    medical intervention."
14              Did I read that right?
15         A.   Yes.
16         Q.   And why do you need to fully understand
17    those situations prior to initiating medical
18    intervention?
19         A.   So one of the SOC-8's criteria for
20    blockers, hormones, and surgery is that an
21    individual is able to understand the intervention
22    fully and provide informed consent.
23              And so typically we're referring for
24    these things if there is concern that that
25    criteria is not being reached so that we can
```

Page 117

1    understand better why.

2         Q.   And have you had patients who were

3    diagnosed with gender dysphoria but were not

4    eligible for medical intervention due to a

5    co-occurring mental health issue?

6         A.   Yes.

7         Q.   And what happens in that situation?

8         A.   Typically we're providing referrals or

9    plugging them into other resources that could

10   support, you know, getting more information about

11   what's going on diagnostically or to better manage

12   any co-occurring mental health problems that are

13   interfering with our ability to move forward, and

14   then we would sort of check in maybe six months

15   later after those things had been done to see

16   where we are and reevaluate.

17        Q.   And I guess how do you ultimately make

18   the judgment when somebody does have a

19   co-occurring mental health issue that they are

20   eligible for medical intervention?

21             MS. NOWLIN-SOHL:   Object to form.

22             THE WITNESS:   So again, through these

23   series of conversations and assessment and also

24   gaining collateral information from other people

25   and the young person's life, we're sort of able to

Christine Brady, Ph.D. August 31, 2023

1    put that together and make a determination about,

2    yes, this person understands.  This

3    decision-making is coming from a thoughtful and

4    logical place rather than an emotional, impulsive

5    one.

6            And then we kind of present whether or

7    not they meet eligibility criteria.  But then

8    ultimately it's up to families and youth to make

9    the decision about how they want to move forward.

10       Q.   (BY MR. RAMER)  Are you familiar with the

11   term "borderline personality disorder"?

12       A.   Yes.

13       Q.   And is that sometimes referred to as

14   "BPD" as a shorthand?

15       A.   Yes.

16       Q.   Have you ever diagnosed or treated BPD?

17       A.   Yes.

18       Q.   Have you ever had a patient who was

19   diagnosed with both BPD and gender dysphoria?

20       A.   Yes.

21       Q.   And did you deem that patient eligible

22   for medical intervention?

23       A.   So BPD can only be diagnosed in patients

24   who are 18 and older, so it's only been in a

25   handful of cases because most of my patients are

Page 119

Christine Brady, Ph.D. August 31, 2023

1    under the age of 18 that that has occurred.

2         And in those cases, I'm rarely the one

3    that has given that diagnosis.  Typically they've

4    been with a therapist before who has given them

5    that diagnosis.  But, yes, I have had some

6    patients who have had both of those diagnoses.

7         Q.   Why is BPD, why is it a cutoff of 18

8    years?

9         A.   So all of the personality disorders in

10   DSM-5 are 18 and above.  Personality disorders are

11   an ingrained sort of pattern of behaviors, and so

12   the mental health community has reserved labeling

13   people with those diagnoses until they reach

14   adulthood because there's a lot of development

15   that's still occurring.

16        And so if it's with a younger person,

17   typically we'll say they have borderline

18   personality traits, but not borderline personality

19   disorder.

20        Q.   Do you see any similarity there between

21   borderline personality disorder and gender

22   dysphoria?

23        MS. NOWLIN-SOHL:  Objection to form.

24        THE WITNESS:  Similarities in what ways?

25        Q.   (BY MR. RAMER)  Well, did you say that

Page 120

(211 of 296), Page 211 of 296
Case 1:23-cv-00269-BLW   Document 56-2   Filed 09/05/23   Page 121 of 267
Christine Brady, Ph.D. August 31, 2023

1   the mental health community has decided that a BPD
2   diagnosis should wait until the individual is over
3   18 because more development will take place?
4           MS. NOWLIN-SOHL:  Objection to form;
5   mischaracterizes prior testimony.
6           THE WITNESS:  So more that it's an
7   ingrained set of behaviors and a pattern of
8   behavior.  So a lot of it is very externalized.
9   It's not necessarily like an internal sense of
10  self as a BPD person that that person is born with
11  that.  It is something that develops over time,
12  that pattern of behavior.
13      Q.   (BY MR. RAMER)  What's the behavior at
14  issue with BPD?
15      A.   What are the diagnostic criteria for BPD?
16      Q.   Or just generally.  I'm not trying to
17  quiz you, but when you mention the pattern of
18  behavior, broadly speaking, what does that mean?
19      A.   It's kind of a description of a category
20  of behaviors that people exhibit in interpersonal
21  interactions that are maladaptive.  So, you know,
22  trying to get validation in unhealthy ways is an
23  example.
24      Q.   Does BPD also involve some form of
25  identity disturbance?

                                        Page 121

Christine Brady, Ph.D. August 31, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form.
 2              THE WITNESS:  No, not necessarily.
 3         Q.   MR. RAMER)  But is that -- I guess I'll
 4    just --
 5              MR. RAMER:  All right.  This will take a
 6    few minutes while the pigeon flies the exhibit.
 7    In my defense, it is one page, Li, so this one
 8    shouldn't be as long as the others.
 9         Q.   (BY MR. RAMER)  I guess while we're
10    waiting I can ask you a question, which is what is
11    the treatment for BPD?
12         A.   So the most evidence-based therapy for
13    borderline personality disorder is something
14    called DBT, which is dialectical behavioral
15    therapy.
16         Q.   And what does that entail?
17         A.   So it's a therapy can be done in a lot of
18    different formats.  Sometimes it's individual;
19    sometimes it's groups; sometimes it's both.  But
20    it entails learning a particular set of emotion
21    regulation and de-escalation, coping skills.  And
22    then has some specific cognitive restructuring
23    tasks that are learned over the course of therapy.
24              MS. NOWLIN-SOHL:  We have the exhibit
25    whenever you're ready, John.
```

Page 122

(213 of 296), Page 213 of 296
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 123 of 267
Base: 24-142, 02/06/2024, DktEntry: 26.4, Page 213 of 296

Christine Brady, Ph.D. August 31, 2023

1          MR. RAMER:  Okay.  And this is, I think,
2    Brady Exhibit 4.  And I'll just represent this is
3    from the DSM-5, and it's the diagnostic criteria
4    for BPD.
5          (Deposition Exhibit No. 4 was marked.)
6       Q.   (BY MR. RAMER)  And I guess my question
7    is about the third one down.
8          Now, I understand that the diagnosis
9    looks like you need -- it's five or more.  And so
10   you could theoretically have one without this
11   third criterion, but could you just explain what
12   that criterion is?
13      A.   Sure.  So typically this presents itself
14   as, you know, people who are defining their
15   self-worth based on how others view them.  And so
16   there isn't a strong sense of internal kind of
17   confidence.  And so they value themselves based on
18   how much other people value them.
19          So sometimes we consider that to be
20   identity diffusion because self-identity is not
21   very strong.
22      Q.   Are there other forms of identity
23   disturbance other than identity diffusion?
24      A.   I'm not a borderline personality disorder
25   expert.  I received some training in my graduate

Page 123

ER-568

Christine Brady, Ph.D. August 31, 2023

```
 1    training, but it's not my area of expertise, so
 2    I'm not sure.
 3         Q.   That's fair.  Do you know if the
 4    treatment for BPD involves any form of medical
 5    intervention?
 6         A.   Sometimes medications are involved,
 7    psychotropic medications.
 8         Q.   And that would be psychiatric medication;
 9    is that right?
10         A.   Yes.
11         Q.   And I know you just said you're not a BPD
12    expert.  If you don't know the answers to these,
13    that's fine.
14              Just out of curiosity, do you know if BPD
15    is more common in the population than gender
16    dysphoria?
17         A.   I do not.
18         Q.   Do you know if BPD is more common in
19    natal females or females assigned at birth?
20              MS. NOWLIN-SOHL:  Object to form.
21              THE WITNESS:  I believe that the ratio
22    of, like, epidemiologically, I think it is more
23    commonly diagnosed in assigned females.
24         Q.   (BY MR. RAMER)  Have you ever considered
25    the possibility that an individual's identity
```

Page 124

Christine Brady, Ph.D. August 31, 2023

```
 1    disturbance for BPD could manifest itself as a
 2    disturbance in gender identity?
 3              MS. NOWLIN-SOHL:  Object to form.
 4              THE WITNESS:  Could you repeat that?
 5         Q.   (BY MR. RAMER)  Have you ever considered
 6    the possibility that an individual's identity
 7    disturbance for BPD could be experienced as a
 8    disturbance in gender identity?
 9              MS. NOWLIN-SOHL:  Same objection.
10              THE WITNESS:  Through our evaluation
11    process, we are exploring all aspects of identity,
12    not just gender.  And it is important that
13    someone's gender identity is stable.  I wouldn't
14    necessarily be more worried with someone who has
15    also co-occurring BPD.  I would do the same
16    evaluation as I do with every patient.
17         Q.   (BY MR. RAMER)  When you say it's
18    important that gender identity is stable, what do
19    you mean by that?
20         A.   You know, that it is persistent, like,
21    has been present and for a good amount of time.
22    DSM says six months or more, but more is always
23    better.
24              And that there haven't been any major
25    fluctuations in that identity, and that it -- you
```

Page 125

ER-570

(216 of 296), Page 216 of 296 Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 216 of 296
Case 1:23-cv-00269-BLW   Document 56-2   Filed 09/05/23   Page 126 of 267
Christine Brady, Ph.D. August 31, 2023

1    know, how it evolved is also important in
2    understanding how they came to understand that
3    aspect of themselves.
4            And, you know, for example, like, if I
5    heard that a patient identified as male but then
6    six months later, you know, or four months later
7    identified as like goth instead -- I don't know.
8    I'm just picking like a random personality.  But,
9    you know, goes from gender to something else
10   that's not within gender, that would be something
11   worth exploring further.
12       Q.   How can someone who is gender-fluid have
13   a gender identity that is stable?
14       A.   So again, the gender identity could be
15   stable, but it's the expression that is fluid.
16           But for the ones whose identity does
17   fluctuate, they often are fluctuating within a
18   genderqueer, gender-diverse spectrum.  So I've not
19   had a gender-fluid person who one day identifies
20   as cis female and then a week later is identifying
21   as trans male.
22       Q.   In your declaration, page 12 -- I think
23   we're already there -- paragraph 34, the second
24   sentence.  I'll just read it and ask if I read it
25   correctly.

Christine Brady, Ph.D. August 31, 2023

```
 1              It says "Assessment procedures can vary
 2    based on the practice setting, discipline of the
 3    provider conducting the assessment, presence of
 4    neurodiversity or other individual patient
 5    considerations/needs."
 6              Did I read that correctly?
 7        A.    Yes.
 8        Q.    And is there any requirement in the SOC-8
 9    or the Endocrine Society guidelines about how an
10    assessment must be conducted?
11        A.    In SOC-8 there's recommendations that it
12    be conducted by a qualified health professional.
13        Q.    Does it explain what that means, to be a
14    qualified health professional?
15        A.    It does define qualified health
16    professionals.
17        Q.    And you say in this sentence that
18    assessment procedures can vary based on the
19    discipline of the provider conducting the
20    assessment.
21              Do you see that?
22        A.    Yes.
23        Q.    And what does that mean?
24        A.    So they can -- the format with which this
25    information is obtained can look different based
```

Page 127

(218 of 296), Page 218 of 296
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 128 of 267
Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 218 of 296

Christine Brady, Ph.D. August 31, 2023

```
 1    on these factors.
 2              So in terms of the discipline of the
 3    provider, you know, it might just be the setting
 4    in which this information is obtained.  It might
 5    be, you know -- in our clinic, our health
 6    providers, for example, can't -- can only bill for
 7    certain things.
 8              And so, you know, information, for
 9    example, like, can't be obtained through a phone
10    call.  It has to be a virtual meeting or an
11    in-person meeting.  And so -- I can bill for a
12    phone call, however.
13              So the format with which we obtain this
14    information, gather this information, might be
15    different just based on the discipline.
16         Q.   Oh, I'm sorry.  The word "discipline"
17    here is referring to like the --
18         A.   The letters that come after someone's
19    name.
20         Q.   Gotcha.  Okay.  That clarifies it for me.
21    Thank you.
22              Okay.  So in your declaration, let's go
23    to page 10, paragraph 29.  And first sentence,
24    I'll just read the whole thing and ask if I read
25    it correctly.
```

Page 128

Christine Brady, Ph.D. August 31, 2023

1           "As stated above, these guidelines are
2    widely accepted in the professional community.
3    They have analyzed all available scientific
4    research and are widely referenced and endorsed by
5    all major U.S. medical and mental health
6    associations."
7           Did I read that correctly?
8        A.   Yes.
9        Q.   And what guidelines are you referring to
10   in this paragraph?
11       A.   The American Psychological Association
12   guidelines on gender-affirming care and the WPATH
13   SOC-8 and the Endo Society guidelines.
14       Q.   And what year were the Endocrine Society
15   guidelines published?
16       A.   2017.
17       Q.   And what year were the APA guidelines
18   published?
19       A.   I think it's 2015.
20       Q.   Looking at footnote 14 -- I think that's
21   right.  Yeah.
22           And so those guidelines did not analyze
23   any research in the last half-decade, correct?
24       A.   Yeah, so my understanding is that the
25   Endo Society and APA are working on that currently

                                    Page 129

(220 of 296), Page 220 of 296 Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 220 of 296
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 130 of 267
Christine Brady, Ph.D. August 31, 2023

```
 1    to update.
 2         Q.    Okay.  But just so -- it's not correct to
 3    say that those guidelines have analyzed all
 4    available scientific research, correct?
 5              MS. NOWLIN-SOHL:  Object to form.
 6              THE WITNESS:  They analyzed all available
 7    research at the time of publication.
 8         Q.    (BY MR. RAMER)  And when you say in the
 9    first sentence of this paragraph that these
10    guidelines are widely accepted in the professional
11    community, do you mean the American professional
12    community exclusively?
13         A.    That's what I have the most knowledge of.
14    I'm not sure about how other countries -- if other
15    countries are using the same practices we are.
16         Q.    Is there a difference between clinical
17    guidelines and standards of care?
18              MS. NOWLIN-SOHL:  Object to form.  Object
19    to the extent that it calls for a legal
20    conclusion.
21              THE WITNESS:  I'm not sure.
22         Q.    (BY MR. RAMER)  Do you know whether the
23    American Psychological Association has ever made a
24    distinction between standards and guidelines?
25         A.    I don't know.
```

Page 130

Christine Brady, Ph.D. August 31, 2023

1    Q.   In your declaration on page 1,

2    paragraph 4, in the second sentence, you state

3    that the opinions in this declaration are based

4    on, among many other things, your knowledge of

5    peer-reviewed research relevant to the treatment

6    of gender dysphoria; is that right?

7    A.   Yes.

8    Q.   And what is the extent of that knowledge?

9         MS. NOWLIN-SOHL:  Object to form.

10        THE WITNESS:  Because my current position

11   is 100 percent in the gender clinic and devoted to

12   this population, a majority of my continuing

13   education and a majority of the journals that I

14   subscribe to and the list serves that I'm on are

15   all gender related.

16        So to the extent that I can, I try to

17   keep up-to-date on recent publications in this

18   area as it pertains to my work.

19   Q.   (BY MR. RAMER)  And how do you follow new

20   developments in the research?

21   A.   So again, a lot of the -- I have

22   memberships to things, so I'll get email alerts

23   when things are published.

24        I also have a Google Scholar filter that

25   alerts me every week about new publications with

Page 131

```
 1    key words.
 2        Q.    And how do you determine what papers are
 3    reliable?
 4            MS. NOWLIN-SOHL:  Object to form.
 5            THE WITNESS:  So typically I'm, you know,
 6    being a critical consumer of the research, and so
 7    I'm making my own judgments based on the
 8    methodologies described in the papers, but also
 9    impact factors, which is kind of the reach that a
10    journal has, like how many people subscribe to it.
11    All of the things that I read are peer reviewed,
12    and so that process also ensures that quality is
13    being published.
14        Q.    (BY MR. RAMER)  And what are other impact
15    factors in addition to the number of subscribers?
16        A.    Yeah, I forget exactly all the variables
17    that go into an impact factor.  There's, like, a
18    formula that creates a number.  And a number of
19    subscribers is one variable that goes into that
20    number, but I'm not sure what the other variables
21    are.
22            MR. RAMER:  And, Li, have you received
23    Brady Exhibit 5?
24            MS. NOWLIN-SOHL:  I have not.
25        Q.    (BY MR. RAMER)  Doctor, have you ever
```

Page 132

Christine Brady, Ph.D. August 31, 2023

```
 1    read a research publication that said there was a
 2    lack of evidence to justify gender-affirming
 3    medical interventions for minors?
 4              MS. NOWLIN-SOHL:  Object to form.
 5              THE WITNESS:  I would have to see the
 6    article.  I don't know.
 7         Q.   (BY MR. RAMER)  No, I'm just asking if
 8    you've ever read one, ever.
 9              MS. NOWLIN-SOHL:  Same objection.
10              THE WITNESS:  That says what?
11         Q.   (BY MR. RAMER)  I'll have to start from
12    the beginning.
13              Have you ever read a research publication
14    that said there was a lack of evidence to justify
15    gender-affirming medical interventions for minors?
16              MS. NOWLIN-SOHL:  Object to form.
17              THE WITNESS:  I -- off the top of my
18    head, I don't know.
19         Q.   (BY MR. RAMER)  Are you familiar with the
20    term "systematic review"?
21         A.   Yes.
22         Q.   And could you explain your understanding
23    of that term?
24         A.   So systematic reviews are combining --
25    looking at a particular line of inquiry and
```

Page 133

Christine Brady, Ph.D. August 31, 2023

1    combining all of the studies that look at that
2    line of inquiry together to create more robust
3    conclusions about the evidence for or against it.
4           MS. NOWLIN-SOHL:  We have 5.
5           MR. RAMER:  Okay.  We can pivot back to
6    that right now if you don't mind pulling that up.
7           (Deposition Exhibit No. 5 was marked.)
8      Q.   (BY MR. RAMER)  And, Doctor, are these
9    the APA guidelines you cite in your article?
10     A.   Yes.
11     Q.   I'm sorry, in your declaration.
12     A.   Yes.
13     Q.   And I'd like to go to page 833, which is
14   the second page, and in particular to the right
15   column below the bold distinction between
16   standards and guidelines.
17          And I'll just read -- no, because these
18   citations will mess it up.
19          So can you just read the first two
20   sentences of that paragraph and let me know when
21   you've finished reading that?
22     A.   Sure.  Okay.
23     Q.   Were you aware the APA has made an
24   important distinction between standards and
25   guidelines?

                                      Page 134

Christine Brady, Ph.D. August 31, 2023

```
 1              MS. NOWLIN-SOHL:  Object to form.

 2              THE WITNESS:  Reading this paragraph, I'm

 3     aware now.

 4         Q.   (BY MR. RAMER)  Were you aware before you

 5     read that paragraph?

 6         A.   No.

 7         Q.   Do you understand the distinction it's

 8     drawing in the second sentence?

 9         A.   My understanding of it and my

10     interpretation of it are that -- and there are

11     many ways to define standards, but that -- and I

12     might be wrong, but I think the only standards,

13     really, that APA has committed to are our ethical

14     principles in our code of conduct.

15              So even within other diagnoses, there

16     aren't necessarily standards of care because

17     there's a lot of individual autonomy when it comes

18     to the delivery of psychotherapy.

19         Q.   What does it mean when it says

20     "guidelines are aspirational"?

21              MS. NOWLIN-SOHL:  Object to form;

22     foundation.

23              THE WITNESS:  I can't -- I can guess.  I

24     don't know what the intent was because I wasn't on

25     the committee that wrote this.
```

Page 135

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.   (BY MR. RAMER)  Yeah, and I guess I'm
 2    just asking as a psychologist, when you read this,
 3    what is your understanding?  I'm not asking what
 4    the authors meant.
 5            But as you read it, what is your
 6    understanding of the statement "guidelines are
 7    aspirational"?
 8        A.   I think these are -- these
 9    recommendations are kind of in an ideal world what
10    we would -- the kind of care we would be
11    delivering.
12        Q.   Is the distinction from standards that
13    you are not required to deliver care in accordance
14    with the guidelines?
15            MS. NOWLIN-SOHL:  Object to form.
16            THE WITNESS:  So as it goes on to say in
17    the paragraph, you know, it's recommended that we
18    use these guidelines in conjunction with our
19    ethical principles and code of conduct.  And there
20    are some things related to gender care that APA
21    has deemed to be unethical.
22        Q.   (BY MR. RAMER)  But those aren't -- okay.
23            All right.  We'll go back to systematic
24    reviews, where we were.
25            And have you ever conducted a systematic
```

Page 136

Christine Brady, Ph.D. August 31, 2023

```
 1    review?
 2         A.    No.
 3         Q.    Have you ever read a systematic review?
 4         A.    About any topic?  Yes.
 5         Q.    As you sit here today, are you able to
 6    name any specific systematic review relating to
 7    the treatment of gender dysphoria that you have
 8    read?
 9         A.    I have read summaries of systematic
10    reviews but not the systematic reviews themselves.
11         Q.    What summaries do you recall reading?
12         A.    So, for example, you know, the SOC-8 was
13    founded based on a systematic review of the
14    literature, so that's kind of the combination of
15    the results of that systematic review.  But I
16    didn't read in detail their methodology and
17    systematic review.
18              Endo Society, similarly.
19         Q.    Do you know what questions the systematic
20    review for the SOC-8 was investigating?
21              MS. NOWLIN-SOHL:  Object to form.
22              THE WITNESS:  I don't know specifically.
23         Q.    (BY MR. RAMER)  Do you know what
24    questions the systematic reviews for the Endocrine
25    Society guidelines were investigating?
```

Page 137

Christine Brady, Ph.D. August 31, 2023

```
 1        A.    No.
 2        Q.    Are you familiar with the term
 3    "evidence-based medicine"?
 4        A.    Yes.
 5        Q.    And can you explain your understanding of
 6    that term for me?
 7        A.    So evidence-based medicine, to my
 8    understanding, is when something has acquired
 9    enough evidence to support doing that
10    intervention.
11        Q.    I'm sorry.  Can you say that again?
12        A.    Sure.  So when enough evidence has been
13    amassed to support doing an intervention or in
14    support of an intervention.
15        Q.    Have you taken any particular courses on
16    evidence-based medicine?
17        A.    So in my field, there are evidence-based
18    therapies.  And so not necessarily medicine, but I
19    have training in evidence-based therapies.
20        Q.    So is the training in the therapy itself?
21    Or is the training in the theoretical principles
22    of evidence-based medicine?
23             MS. NOWLIN-SOHL:  Object to form.
24             THE WITNESS:  So in my training, I've
25    received -- I took courses on research methods and
```

Page 138

Christine Brady, Ph.D. August 31, 2023

1    statistics and how to conduct scholarly work.

2          So in my field, there's a lot of

3    evidence -- emphasis placed on evidence-based

4    therapies.  And so, you know, being a data

5    scientist and, you know, a Ph.D., that was part of

6    my training is how to conduct that.

7          Q.   (BY MR. RAMER)  Are you familiar with the

8    term "observational study"?

9          A.   Yes.  In the context of my world, yes.

10         Q.   Yeah, right.  What do you understand that

11   term to mean?

12         A.   So typically in mental health, it's --

13   the most readily available example that comes to

14   mind is, like, in an educational setting.

15         So at a school, for example, they might

16   go in and observe the behavior of students and

17   code that data and then use that as their data.

18   So rather than asking the students specifically

19   things they just observe and then code that data.

20         Q.   Were some of your ADHD publications

21   observational studies?

22         A.   No.

23         Q.   Are you familiar with the term

24   "randomized controlled trial"?

25         A.   Yes.

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

Christine Brady, Ph.D. August 31, 2023

1      Q.    And what do you understand that term to

2    mean?

3      A.    So it's a type of research wherein

4    participants are randomly assigned to different

5    conditions within the experiment.

6          And so they're randomly assigned, which

7    is the random part.

8          And then it's controlled because they

9    control for as many variables as they can to get

10   clean outcomes and be able to interpret the data.

11     Q.    With respect to study design, is evidence

12   from a randomized control trial more reliable than

13   evidence from an observational study?

14         MS. NOWLIN-SOHL:  Object to form;

15   foundation.

16         THE WITNESS:  It is considered to be the

17   most rigorous type of study.

18     Q.    (BY MR. RAMER)  Are you familiar with the

19   term "GRADE methodology"?

20     A.    No.

21     Q.    In your declaration, going to page 14,

22   paragraph 39, and in the third sentence, I'll read

23   it and ask if I read it correctly.

24         You say "Studies have demonstrated

25   improvements in mental health following

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

(231 of 296), Page 231 of 296 Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 231 of 296
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 141 of 267
Christine Brady, Ph.D. August 31, 2023

1    gender-affirming medical interventions."

2          Did I read that correctly?

3       A.    Yes.

4       Q.    And what do you mean when you say

5    "studies have demonstrated improvements following

6    gender-affirming medical interventions"?

7       A.    So through various statistical methods,

8    they have shown to correlate the gender-affirming

9    medical intervention with improvements in mental

10   health.

11      Q.    In your opinion, have you concluded that

12   gender-affirming medical care causes improvements

13   in mental health?

14      A.    The research shows that.  And clinically

15   that is what I have seen, so yes.

16      Q.    The research shows causation?

17      A.    Not causation, but the statistical data

18   that is presented plus my clinical experience

19   leads me to say yes.

20      Q.    So the research did not show causation,

21   but when you personally combine the research with

22   your clinical experience, you have concluded that

23   gender-affirming medical care causes improvements

24   in mental health; is that right?

25          MS. NOWLIN-SOHL:  Object to form.

Page 141

Christine Brady, Ph.D. August 31, 2023

```
 1              THE WITNESS:  I believe that it leads to
 2      improvements in mental health, yes.
 3         Q.   (BY MR. RAMER)  I asked the question with
 4      the verb "cause" for a reason.  And I think in
 5      your answer you switched to "lead."
 6              And I'm just trying to -- you know, I
 7      think in this context the word "cause" -- just to
 8      be clear, have you concluded that gender-affirming
 9      medical care causes improvements in mental health?
10         A.   And I can share why I'm avoiding the word
11      "cause" in this case.
12              So for me, causation is specifically a
13      statistical term that is very difficult, even in
14      our randomized control trials, to prove because
15      there are so many other variables that account for
16      change.
17              And so to the best of their scientific
18      ability, I believe these studies to be robust but
19      aren't statistically showing causation.  And so
20      that's why I'm saying "leads to."
21         Q.   So just to clarify, you are declining to
22      say that gender-affirming medical care causes
23      improvements in mental health; is that right?
24         A.   From a statistical perspective, yes.
25         Q.   As opposed to what's a non-statistical
```

Page 142

Christine Brady, Ph.D. August 31, 2023

```
 1    perspective?

 2              MS. NOWLIN-SOHL:  Object to form.

 3              THE WITNESS:  So -- which is why I'm

 4    using "clinically" also.  Clinically I have seen A

 5    to B and B to C, and, you know, I've not conducted

 6    this research myself to be able to show that

 7    statistically.  But clinically I do see that it is

 8    directly linked to gender-affirming medical care

 9    that I'm seeing these improvements.

10        Q.   (BY MR. RAMER)  Back on your declaration,

11    on this page, you list a number of articles in

12    footnote 16.

13              Are these articles the basis for your

14    conclusion that studies have demonstrated

15    improvements following gender-affirming medical

16    care?

17        A.   They are samples of those studies, yes.

18        Q.   There are other articles?

19        A.   Yes.

20        Q.   Do you cite them in your declaration?

21        A.   No.

22        Q.   Is there a reason you didn't?

23        A.   I just felt like these were the best

24    representation, and they summarized the previous

25    studies within them as well.
```

Page 143

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.   Okay.  So now are these the best articles
 2    in footnote 16?
 3             MS. NOWLIN-SOHL:  Object to form.
 4             THE WITNESS:  I'm not sure I'm qualified
 5    to say if they're the best or not, but they are
 6    good representations of these relationships.
 7        Q.   (BY MR. RAMER)  Okay.  So are there other
 8    articles that you're not -- I'm sorry.  I'm going
 9    to start again.
10             Are there other articles that you are
11    relying on for the basis of your expert opinion
12    that you've not cited in your declaration?
13        A.   These are the ones I'm most familiar
14    with.  And again, they include a review of the
15    other articles that I would have maybe included,
16    but these are the ones that I'm most familiar
17    with.
18        Q.   Okay.  So the universe of articles
19    includes what you've cited here and then what is
20    cited within these articles; is that fair?
21        A.   Yes.
22        Q.   Okay.  And you cite two articles by
23    de Vries here.
24             Do you see that?
25        A.   Yes.
```

Page 144

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.    Do you consider de Vries an expert?
 2              MS. NOWLIN-SOHL:  Object to form.
 3              THE WITNESS:  I don't know.  I don't know
 4    de Vries personally.
 5        Q.    (BY MR. RAMER)  Yeah.  Fair.  Do you know
 6    what country the de Vries studies come out of?
 7              MS. NOWLIN-SOHL:  Object to form.
 8              THE WITNESS:  I would have to look at the
 9    article.  I'm assuming it says in there.
10        Q.    (BY MR. RAMER)  If the studies involved
11    participants from the Netherlands, given our
12    discussion earlier today about your preference for
13    studies from the United States, does that mean you
14    deem the de Vries studies less reliable?
15              MS. NOWLIN-SOHL:  Objection to form;
16    mischaracterizes prior testimony.
17              THE WITNESS:  I don't necessarily -- I
18    don't always consider non-U.S. studies to be of
19    lower quality.  It's just if we have similarly
20    robust studies that are about kids in the United
21    States, those might be preferable over other
22    studies.  But they can be included in the wealth
23    and averaging and aggregation of data.
24        Q.    (BY MR. RAMER)  Do you have any knowledge
25    of systematic reviews regarding the treatment for
```

Page 145

Christine Brady, Ph.D. August 31, 2023

```
 1   gender dysphoria that have been conducted by

 2   European health authorities?

 3             MS. NOWLIN-SOHL:  Object to form.

 4             THE WITNESS:  I don't believe so.

 5        Q.   (BY MR. RAMER)  Have you ever heard of

 6   the Cass report?

 7        A.   No.

 8        Q.   Okay.  Let's go back to your declaration,

 9   back to footnote 16.

10             The second article you cite there is

11   by -- well, the lead author is Amy Green, correct?

12        A.   Yes.

13        Q.   Do you recall where the authors of that

14   article obtained the data they used?

15        A.   I would have to go back to the article to

16   confirm that.

17        Q.   Do you recall whether any of the articles

18   in footnote 16 isolated medical interventions from

19   psychotherapy when recording their results?

20             MS. NOWLIN-SOHL:  Object to form.

21             THE WITNESS:  Off the top of my head, I

22   cannot recall.  They might have controlled for

23   other -- you know, if they were receiving therapy

24   and their analyses, but I would have to check.

25        Q.   (BY MR. RAMER)  But as you sit here, you
```

Page 146

(237 of 296), Page 237 of 296 Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 237 of 296
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 147 of 267
Christine Brady, Ph.D. August 31, 2023

1   don't know the answer to that question?

2       A.    Correct.

3       Q.    Do you have any knowledge regarding the

4   neurological effects of pubertal suppression in

5   adolescents?

6       A.    Can you repeat that again?

7       Q.    Do you have any knowledge regarding the

8   neurological effects of pubertal suppression in

9   adolescents?

10      A.    My understanding is that -- I'm not aware

11  of data, but I'm aware of kind of like theoretical

12  ideas regarding if there's a relationship between

13  those two things.

14      Q.    What kind of theoretical ideas are you

15  aware of?

16      A.    So -- and again, I'm not a medical

17  expert, so usually I'm deferring to my medical

18  team on these kinds of things, but that there is

19  kind of two time points in which there's a lot of

20  neuronal development, one being in very early

21  childhood; the second being in adolescence, and

22  that potentially one variable that triggers that

23  second neuronal development in adolescence is the

24  presence of sex hormones with puberty.

25      Q.    And what do you know about -- I guess are

                                            Page 147

Christine Brady, Ph.D. August 31, 2023

```
1    neurological effects of pubertal suppression
2    beyond the scope of your expertise?
3         A.    Yes.
4         Q.    Okay.  Are you aware of any study
5    researching the effect of puberty blockers on
6    neurodevelopment in adolescents with neurodiverse
7    characteristics?
8         A.    I am not aware.
9         Q.    Does that concern you?
10             MS. NOWLIN-SOHL:  Object to form.
11             THE WITNESS:  Could you repeat the topic
12   again one more time?
13        Q.    (BY MR. RAMER)  My previous question was
14   are you aware of any study researching the effect
15   of puberty blockers on neurodevelopment in
16   adolescents with neurodiverse characteristics?
17             And then I asked -- and then you said no.
18             And then I asked does that concern you?
19             MS. NOWLIN-SOHL:  Same objection.
20             THE WITNESS:  Not necessarily.  I --
21   that's a very niche subgroup, and -- yeah.  That
22   would be a very small group of our patients, so
23   that doesn't necessarily concern me that that
24   inquiry has not been done.
25        Q.    (BY MR. RAMER)  Adolescents with
```

Page 148

Christine Brady, Ph.D. August 31, 2023

```
 1   neurodiverse characteristics are a niche subgroup?
 2        A.   Those who have done puberty blockade and
 3   also have ASD and are now adolescents.
 4        Q.   I guess what makes it -- I guess how many
 5   of your patients do you think are neurodiverse?
 6        A.   Very ballpark estimate, maybe 20 percent.
 7        Q.   And then how many of those would receive
 8   pubertal suppression?
 9             MS. NOWLIN-SOHL:  Object to form.
10             THE WITNESS:  So the age makeup of our
11   clinic is probably -- again, this is a guess, but
12   would probably be 30 percent are Tanner II-III and
13   below.
14        Q.   (BY MR. RAMER)  So the vast majority -- I
15   think I understand.
16             So you're saying the vast majority of the
17   patients at your clinic are past the stage where
18   they would have their puberty suppressed; is that
19   right?
20        A.   Yes.
21        Q.   Okay.
22             MR. RAMER:  I guess we've been going for
23   about an hour.  Do you want to take five or ten
24   minutes?
25             MS. NOWLIN-SOHL:  Yeah.  I think this
```

Page 149

(240 of 296), Page 240 of 296
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 150 of 267
Christine Brady, Ph.D. August 31, 2023

1    could be a good five-minute break.

2            MR. RAMER:  Okay.  Let's do that.

3            THE VIDEOGRAPHER:  Okay.  So the time is

4    4:17 p.m. Mountain time, and we are off the

5    record.

6            (Break taken from 4:17 p.m. to 4:23 p.m.)

7            THE VIDEOGRAPHER:  All right.  So we are

8    recording.  The time is 4:23 p.m. Mountain time,

9    and we are back on the record.

10       Q.   (BY MR. RAMER)  Dr. Brady, I'd like to go

11   in your declaration to page 11, paragraph 32, and

12   specifically the second to last sentence.  And

13   I'll read it and ask if I read it correctly.

14           It says "Pausing puberty with blockers

15   can help prevent the distress associated with

16   physical changes inconsistent with an adolescent's

17   gender identity and also provide the adolescent

18   more time to understand their gender identity

19   before considering less-reversible treatments."

20           Did I read that correctly?

21       A.   Yes.

22       Q.   What do you mean by "less-reversible"?

23       A.   So other medical interventions such as

24   hormone therapies have permanent effects and

25   reversible effects.

Page 150

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.   Do you think puberty blockers are
 2   reversible?
 3        A.   Yes.
 4        Q.   And what do you mean by that?
 5        A.   So for patients who choose to come off
 6   the blocker, stop the blockers, puberty --
 7   endogenous puberty will resume as normal.
 8        Q.   Do you think there could be -- in setting
 9   aside that endogenous puberty resumes, do you
10   think there could be other effects from pubertal
11   suppression?
12             MS. NOWLIN-SOHL:  Object to form.
13             THE WITNESS:  There's, to my knowledge,
14   no research that indicates long-term effects from
15   puberty blockade.
16        Q.   (BY MR. RAMER)  Is there any research
17   that suggests there are not long-term effects from
18   puberty blockade?
19        A.   So the majority of research in this area
20   has been done with precocious puberty, not
21   necessarily gender.
22             In precocious puberty, blockade is
23   sometimes started at very younger, much younger
24   than we would do in gender.  So sometimes 7 or
25   earlier depending on what's going on pubertally
```

Page 151

Christine Brady, Ph.D. August 31, 2023

1   for that child.

2           So these are youth who are on blockade

3   for much longer than we would do or recommend for

4   our patients in gender.  And there are studies

5   looking at there -- that there are no long-term

6   consequences of puberty blockade for those youth.

7       Q.   But individuals who receive puberty

8   blockers for central precocious puberty eventually

9   go through their endogenous puberty, correct?

10      A.   Some do.

11      Q.   Who does not?

12      A.   If they're gender-diverse, they might

13  not.

14      Q.   Fair.  And earlier we were discussing

15  potentially neurological effects from pubertal

16  suppression.

17          And are you able to say based on your

18  knowledge of neurological effects from pubertal

19  suppression that puberty blockers are reversible?

20          MS. NOWLIN-SOHL:  Object to form;

21  foundation.

22          THE WITNESS:  In my clinical experience,

23  I've not had patients who are on blockers develop

24  academic struggles or show cognitive impairment.

25          I know of several studies that are

                                    Page 152

Christine Brady, Ph.D. August 31, 2023

```
 1   currently being conducted that are looking at that
 2   question specifically.  I don't know of any that
 3   have already been published.
 4        Q.   (BY MR. RAMER)  Don't you lose contact
 5   with most of your patients by the time they're age
 6   22?
 7             MS. NOWLIN-SOHL:  Object to form.
 8             THE WITNESS:  It is common when patients
 9   transfer to other clinics that we will not hear
10   from them.
11        Q.   (BY MR. RAMER)  And so in other words,
12   you wouldn't know whether they were suffering any
13   sort of long-term effects after that point, right?
14             MS. NOWLIN-SOHL:  Object to form;
15   argumentative.
16             THE WITNESS:  Clinically, many of my
17   patients are able to succeed.  So many go to
18   college and many are accepted into college; many
19   are able to get jobs.
20             And so from that perspective, they are
21   not experiencing cognitive impairments at the
22   point of time of transfer.
23        Q.   (BY MR. RAMER)  Which is -- for most
24   patients is 22 years old; is that right?
25        A.   Yes.
```

Page 153

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.   And what are the permanent -- I guess
 2   backing up.
 3             I believe you said when you were
 4   referring to less-reversible treatments -- were
 5   you including cross-sex hormones?
 6        A.   Yes.
 7        Q.   And what are the permanent effects of
 8   cross-sex hormones?
 9        A.   For estrogen in particular -- I'll just
10   start with estrogen.  So for estrogen, permanent
11   effects would be the development of breast tissue.
12   So if someone stops their estrogen, that tissue
13   does not revert or recede.
14             Additionally, there might be impacts in
15   terms of fertility and sperm count on those who
16   undertake estrogen that is permanent.
17             For testosterone, any hair that has grown
18   is permanent.  Any hair that is lost is also
19   permanent.  Bottom growth or clitoral enlargement
20   is also permanent as well as voice changes.
21        Q.   In your declaration, same page,
22   paragraph 33, subpart C, you refer to emotional
23   and cognitive capacity.
24             Do you see that?
25        A.   Yes.
```

Page 154

Christine Brady, Ph.D. August 31, 2023

1    Q.    Could you explain what emotional capacity

2    is?

3    A.    So if someone sort of similar to the

4    example I provided earlier about someone who has

5    severe depression, if they are too emotional,

6    sometimes that can cloud their judgment and

7    ability to make informed decisions.

8    Q.    And can you explain what "cognitive

9    capacity" is?

10   A.    That's the ability to comprehend, the

11   ability to understand an informed consent model,

12   the medical intervention that they are wanting to

13   undertake, the risks, benefits, side effects, and

14   long-term consequences.

15   Q.    And how do you determine whether an

16   adolescent has the emotional and cognitive

17   capacity to provide informed consent?

18   A.    So over the course of many sessions, we

19   provide education regarding the risks, benefits,

20   side effects, consequences, and have thorough

21   discussions regarding all of that.  And then we

22   sort of assess if a young person is able to absorb

23   that information, process that information, repeat

24   back that information, and has given this a lot of

25   thought and consideration.

Page 155

ER-600

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.   Do different treatments require a
 2   different level of emotional and cognitive
 3   capacity?
 4             MS. NOWLIN-SOHL:  Object to form.
 5             THE WITNESS:  Not necessarily.  I think
 6   we want -- you know, I think it varies in terms of
 7   the complexity depending on what medicine or
 8   procedure they're undertaking.  So some things
 9   have more side effects than others or just more
10   complex in understanding the ins and outs of a
11   particular procedure.  So it might just be the
12   thing that we're talking about is more complex.
13        Q.   (BY MR. RAMER)  Would a treatment with
14   more serious side effects require a higher level
15   of capacity?
16             MS. NOWLIN-SOHL:  Object to form.
17             THE WITNESS:  Yeah.
18        Q.   (BY MR. RAMER)  Could an individual under
19   18 have the emotional and cognitive capacity to
20   consent to puberty blockers but not cross-sex
21   hormones?
22        A.   Yes, possibly.
23        Q.   And could an individual under 18 have the
24   emotional and cognitive capacity to consent to
25   cross-sex hormones but not surgery?
```

Page 156

ER-601

(247 of 296), Page 247 of 296
Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 247 of 296
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 157 of 267

Christine Brady, Ph.D. August 31, 2023

1       A.    Yes.

2       Q.    In your declaration page 15, paragraph

3    43, in the first sentence you're referring to

4    irreversible secondary sex characteristics.  And

5    you provide the example of chest development,

6    which I believe you previously mentioned as well.

7            And my question is why do you deem chest

8    development an irreversible secondary sex

9    characteristic?

10      A.    So in this particular section, I'm

11   discussing the changes that come with endogenous

12   puberty.  And so for someone assigned male, that

13   would be the deep voice example.  So once that

14   voice is deepened for that assigned male, that

15   cannot can reversed for them, even if they are

16   female-identifying and go on estrogen.

17           Similarly with a designated female who

18   goes through endogenous puberty, chest development

19   can't be reversed except for by surgery, but

20   that's a very significant intervention.  So if

21   they were to take testosterone, it can't be

22   reversed.

23      Q.    Okay.  And I think I see the point.  So

24   the point is if it requires surgery, then you

25   would view that as an irreversible secondary sex

Page 157

Christine Brady, Ph.D. August 31, 2023

1    characteristic; is that right?

2        A.   Some things can't be changed even with

3    surgery, but that can be one of the criteria.

4        Q.   Page 14, paragraph 40, I'll read the

5    first sentence and ask if I read it correctly.

6             You say, "Moreover, as I have seen in my

7    experience as a clinician, the use of hormone

8    blockers and cross-sex hormone therapy during

9    adolescence can prevent the need for future

10   medical treatment such as surgeries to remove or

11   alter secondary sex characteristics and allow for

12   more favorable future outcomes."

13            Did I read that correctly?

14       A.   Yes.

15       Q.   And are you saying here that the use of

16   puberty blockers or hormones can prevent the need

17   for surgeries later?

18       A.   So, for example, with a designated female

19   who has gone through puberty and developed chest

20   tissue, if they identify as masculine and have

21   gender dysphoria and want to treat that dysphoria

22   through surgery, that would be the only way to

23   treat that area of the body.

24            But if that same designated female was on

25   blockers, did not go through that endogenous

Page 158

Christine Brady, Ph.D. August 31, 2023

```
1    puberty or develop that chest tissue, they would

2    not necessarily need or seek that surgery later on

3    because they have a masculine chest.

4         Q.   Are there any examples other than the

5    example of chest development in the natal female

6    or assigned female at birth?

7         A.   So in a designated male, it could be as

8    simple as body hair.  So body hair is also

9    irreversible except for, you know, permanent laser

10   electrolysis and different methods like that.

11            So puberty blockade can also prevent body

12   hair from growing and prevent their voice from

13   deepening as well, which would prevent the need to

14   manage that with other procedures in the future.

15        Q.   And why does preventing the need for

16   future medical treatment such as surgeries allow

17   for more favorable future outcomes?

18        A.   Well, I think it minimizes the distress

19   that can be experienced from developing those

20   secondary sex characteristics of the assigned sex

21   from ever developing.  So then they would never

22   develop the distress that they would have

23   developing those parts.  But also, you know, we

24   want to minimize medical intervention as much as

25   we can.
```

Page 159

Christine Brady, Ph.D. August 31, 2023

```
 1              And, you know, that creates -- you know,
 2     any procedure, any medicine has risks associated
 3     with it.  And if we can prevent a child from
 4     receiving surgery, that seems like a good outcome.
 5          Q.   And can you just -- I think I understand
 6     the principle, but can you just explain why that
 7     is?
 8          A.   Which part?
 9          Q.   Sorry, why you would -- if you can avoid
10     medical intervention, why you would want to do
11     that.
12          A.   So, for example, if it's surgery, any
13     surgery has risks associated with it.  And if we
14     can avoid someone -- a young person getting
15     surgery, then we would want to do that.
16          Q.   And so basically if you have two
17     procedures that are equally effective but one is
18     more invasive, you would prefer the less invasive
19     procedure; is that right?
20              MS. NOWLIN-SOHL:  Object to form.
21              THE WITNESS:  I think we would weigh, you
22     know, the pros and cons and the risks and benefits
23     of all the potential interventions and want to
24     minimize risk and harm as much as we can.
25          Q.   (BY MR. RAMER)  Yeah, I guess this is
```

Page 160

```
 1    more of a theoretical question because I doubt
 2    there are situations where you have procedures
 3    that are perfectly equally effective.
 4            But the question is if you did have in
 5    theory two procedures that were equally effective,
 6    one was more invasive and one was less invasive,
 7    you would prefer the less invasive procedure,
 8    right?
 9            MS. NOWLIN-SOHL:  Object to form; asked
10    and answered.
11            THE WITNESS:  Yes.
12        Q.   (BY MR. RAMER)  In your declaration,
13    going to page 13, paragraph 37 and the third
14    sentence -- I'll just read it and ask if I read it
15    correctly.
16            It says "As with all medicine,
17    information should be presented in a
18    developmentally appropriate manner to both the
19    adolescent and caregivers."
20            Did I read that correctly?
21        A.   Yes.
22        Q.   And why should care be given in a
23    developmentally appropriate manner?
24        A.   To ensure that youth are able to absorb
25    and comprehend to the best of their abilities.
```

Page 161

Christine Brady, Ph.D. August 31, 2023

1     Q.    And how do you discuss the risk
2  associated with fertility, for example, in a
3  developmentally appropriate manner with an
4  adolescent?
5     A.    So we spend a lot of time focusing on
6  that side effect in particular.  And we, again,
7  talk both with the adolescent and the caregivers
8  and present the information.
9          You know, first we sort of discuss how --
10  whatever the medical intervention is, how that
11  impacts fertility or what we know regarding the
12  impacts of fertility.
13         We discuss sort of hypothetically the
14  possibilities in the future of, you know, in
15  hypothetical scenario 1, you do not want kids.
16  And hypothetical scenario 2, you do want to have
17  kids.  And hypothetical scenario 3, you know, you
18  want to do a donor or adoption.  So we talk about
19  the different ways in which, you know, their life
20  might sort of play out.  And we talk about each of
21  those situations and how they may deal or cope
22  with choosing an intervention that impacts their
23  options later on.
24         We also counsel about the options that
25  are available in terms of fertility preservation

Page 162

ER-607

1  and the pros and cons of that and answer

2  questions.

3        And we also provide referrals to

4  fertility specialists for further counseling if

5  that's something families are interested in.

6       Q.   What are the options for fertility

7  preservation?

8       A.   So for sperm preservation, the -- there's

9  kind of three main methods.  So one is a hospital

10  visit in which we can obtain a sample.

11        Another is just going to a traditional

12  sperm bank and collecting a sample there to be

13  frozen.

14        There are also mail companies that will

15  mail you a kit to your home so that you can obtain

16  a sample and then send it back to the company for

17  analysis and freezing.

18        For egg preservation, we have -- patients

19  meet with our gyn team, and also we have a

20  fertility department at Stanford that also meets

21  with patients to talk about egg retrieval and

22  preservation.

23       Q.   I think I understand the retrieval part.

24  On the preservation part, you had mentioned, I

25  think with respect to sperm, freezing.

Page 163

Christine Brady, Ph.D. August 31, 2023

1              And is that the same with respect to

2      eggs?

3         A.   Both freezing, yes.

4         Q.   Both freezing.  Are there any other

5      options?

6         A.   Not at Stanford.

7         Q.   Why did you qualify that with "not at

8      Stanford"?

9         A.   Because I believe that there are some

10     places that can do ovary preservation and testicle

11     preservation, so removal of the whole organ and

12     freezing it.

13        Q.   Do you know anything beyond that, what

14     you just said?

15        A.   I don't.

16        Q.   Do you agree that an individual who

17     begins taking puberty blockers at Tanner Stage II

18     and proceeds without interruption to cross-sex

19     hormones will be infertile?

20              MS. NOWLIN-SOHL:  Object to form.

21              THE WITNESS:  So it just -- we haven't

22     had a case of youth who was blocked, went on to

23     cross-sex hormones, so never had endogenous

24     puberty who was then -- you know, stopped their

25     hormones or tried to get pregnant or have a child.

Page 164

Christine Brady, Ph.D. August 31, 2023

```
 1   So that situation has just not come up, so I don't
 2   think we're able to say.
 3        Q.   (BY MR. RAMER)  Would that treatment
 4   regimen of going from puberty blockers to
 5   cross-sex hormones to going off hormones to go
 6   through endogenous puberty be in accordance with
 7   the SOC-8?
 8             MS. NOWLIN-SOHL:  Object to form.
 9             THE WITNESS:  I'm not sure I understand
10   "in accordance."  I'm not sure what you mean.
11        Q.   (BY MR. RAMER)  Do the guidelines discuss
12   how to properly do that procedure?
13             MS. NOWLIN-SOHL:  Object to form.
14             THE WITNESS:  How to do -- how to do
15   fertility preservation in someone who went on
16   blockade and then hormones and then stopped?
17        Q.   (BY MR. RAMER)  Yeah, I think that's my
18   question.
19             That process that you just described,
20   like, is that in the guidelines?
21             MS. NOWLIN-SOHL:  Same objection.
22             THE WITNESS:  I think it -- you know,
23   SOC-8, to the best of my knowledge, doesn't really
24   have specific scenarios.  So, you know, they have
25   dosing recommendations for someone who's on
```

Page 165

Christine Brady, Ph.D. August 31, 2023

1    testosterone but not necessarily like, you know,

2    more globally somebody who did this and then this

3    and then this and what to do with that.  So I

4    don't believe so.

5         Q.   (BY MR. RAMER)  And is a natal male or a

6    male assigned at birth sexually mature by Tanner

7    Stage II?

8              MS. NOWLIN-SOHL:  Object to form.

9              THE WITNESS:  I think -- I'm not sure

10   because I'm not a medical expert, but I think it

11   depends.  Some might be; some may not be.

12        Q.   (BY MR. RAMER)  Of all your patients,

13   have you ever had a case of a natal male or

14   assigned male at birth who underwent prolonged

15   cross-sex hormone treatment and subsequently

16   conceived a child?

17             MS. NOWLIN-SOHL:  Object to form.

18             THE WITNESS:  I have had cases of both

19   designated males and designated females.  They

20   were not on blockers, but they did -- they were on

21   both estrogen and testosterone and then did

22   fertility preservation.  So stopped their hormone

23   treatments and did fertility preservation after

24   several years of being on hormone therapies and

25   then got back on their hormones after doing

Page 166

Christine Brady, Ph.D. August 31, 2023

1    preservation, and that was successful.

2        Q.   (BY MR. RAMER)  I guess which part of

3    that was successful?  The retrieval?

4        A.   So the eggs and the sperm were analyzed

5    for viability and were deemed to be viable, but in

6    those two cases they have not become children yet.

7        Q.   And how long were those individuals on

8    hormones?

9        A.   Testosterone, I believe, was about six

10   years.  And then the estrogen case was about four.

11       Q.   And is this documented in the literature,

12   or is this just knowledge in your clinic?

13       A.   This is just my, yeah, personal

14   experience.

15       Q.   And have you had any more other than

16   those?

17            MS. NOWLIN-SOHL:  Object to form.

18            THE WITNESS:  I've not had any other

19   patients express wanting to do fertility

20   preservation after starting the medical

21   interventions, just those two.

22       Q.   (BY MR. RAMER)  I guess what percentage

23   of your patients do pursue fertility preservation

24   options?

25            MS. NOWLIN-SOHL:  Object to form.

Page 167

Christine Brady, Ph.D. August 31, 2023

```
 1              THE WITNESS:  So I would guess maybe
 2    30 percent.
 3              MR. RAMER:  And, Li, do you have -- let's
 4    see.  I guess it's now Brady Exhibit 6?
 5              MS. NOWLIN-SOHL:  Yes.
 6              MR. RAMER:  Okay.
 7              (Deposition Exhibit No. 6 was marked.)
 8         Q.   (BY MR. RAMER)  Doctor, have you ever
 9    seen this document before?
10         A.   No.
11         Q.   And you see it's a document by the
12    American Psychological Association?
13         A.   Yes.
14         Q.   And you're a member of the American
15    Psychological Association, correct?
16         A.   Yes.
17         Q.   And I'll just represent to you basically
18    by reading the top, which says it's an "APA
19    Resolution on the Imposition of Death as a Penalty
20    For Persons Aged 18 Through 20, Also Known As the
21    Late Adolescent Class."
22              And do you see it says it was published
23    in August of 2022?
24         A.   Yes.
25         Q.   And my questions for you are not about
```

Page 168

Christine Brady, Ph.D. August 31, 2023

```
 1    the substance of this or your views on the
 2    imposition of the death penalty, but I have a
 3    question about a couple of statements made in this
 4    and just to get your reaction to the scientific
 5    statements.
 6              MS. NOWLIN-SOHL:  Could she just have a
 7    second to look at it?
 8              MR. RAMER:  Yeah, absolutely.
 9              THE WITNESS:  Thanks.
10         Q.   (BY MR. RAMER)  And I can tell you where
11    the questions will be if you want to read those
12    paragraphs in particular, which is on page 2 on
13    the left column, the second "whereas" paragraph,
14    and then in the right column the first full
15    "whereas" paragraph.  But, please, take your time.
16         A.   Sorry, you said page 2, right-hand
17    column, "whereas," second paragraph.
18              And what was the second one?
19         Q.   So page 2, left column, second "whereas"
20    paragraph.
21         A.   Okay.
22         Q.   Same page, right column, first "whereas"
23    paragraph.
24         A.   Thank you.  Okay.
25         Q.   Okay.  So we'll start with the second --
```

Page 169

ER-614

Christine Brady, Ph.D. August 31, 2023

1   sorry.  We'll start with left column, second
2   "whereas" paragraph.  And I'm first just going to
3   read it without saying the citations.  So just
4   effectively read the English, and then I'll ask if
5   I read that correctly.
6            It says "Whereas developmental
7   neuroscience, including research on both the
8   structure and function of brain development,
9   establishes that significant maturation of the
10  brain continues through at least age 20,
11  especially in the key brain systems implicated in
12  a person's capacity to evaluate behavioral
13  options, make rational decisions about behavior,
14  meaningfully consider the consequences of acting
15  and not acting in a particular way, and to act
16  deliberately in stressful or highly charged
17  emotional environments, as well as continued
18  development of personality traits, e.g., emotional
19  stability and conscientiousness and what is
20  popularly known as 'character.'"
21           Did I read that correctly?
22     A.   Yes.
23     Q.   And were you aware that significant
24  maturation of the brain continues through at least
25  age 20?

Page 170

ER-615

Christine Brady, Ph.D. August 31, 2023

1      A.   Yes.

2      Q.   Okay.  And now I'm just going to read --

3  let me see if I have another question.

4         Were you aware that this maturation

5  occurs in the key brain systems implicated in a

6  person's capacity to evaluate behavioral options,

7  make rational decisions about behavior, and

8  meaningfully consider the consequences of acting

9  and not acting in a particular way?

10     A.   Yes.

11     Q.   Okay.  So same page, right column and the

12  first full "whereas" clause.  And again I'll read

13  it without the citations and ask if I read it

14  correctly.

15        It says "Whereas it is clear the brains

16  of 18- to 20-year-olds are continuing to develop

17  and key brain systems relate to higher-order

18  executive functions and self-control, such as

19  planning ahead, weighing consequences of behavior,

20  and emotional regulation.  Their brain development

21  cannot be distinguished reliably from that of

22  17-year-olds with regard to these key brain

23  systems."

24        Did I read that correctly?

25     A.   Yes.

Page 171

Christine Brady, Ph.D. August 31, 2023

```
 1        Q.    And do you agree that up until an
 2   individual is 20, they are continuing to develop
 3   the key brain systems related to higher-order,
 4   executive functions, and self-control such as
 5   planning ahead, weighing consequences of behavior,
 6   and emotional regulation?
 7        A.    I believe that our brains are always
 8   developing.  I don't necessarily think that it
 9   stops at age 20.
10        Q.    Do you agree with the statements -- let
11   me restart.
12            Do you agree with the statements in this
13   paragraph?
14            MS. NOWLIN-SOHL:  Object to form; asked
15   and answered.
16            THE WITNESS:  Yes.
17        Q.    (BY MR. RAMER)  Do the statements in the
18   paragraphs we just read give you any concern about
19   whether individuals under 18 can provide informed
20   consent to a treatment that bears risk of
21   infertility?
22            MS. NOWLIN-SOHL:  Object to form.
23            THE WITNESS:  So just because a brain is
24   continuing to develop doesn't mean it's not able
25   to do these tasks.  It just means that they are
```

Page 172

ER-617

Christine Brady, Ph.D. August 31, 2023

1    still maturing in order to reach their full

2    capacity to do these tests.  So it's not to say

3    they're not able to do them.

4         Q.   (BY MR. RAMER)  Do you have any concern

5    about whether adolescents as a category possess

6    the maturity to provide consent to treatment that

7    carries risks of infertility?

8              MS. NOWLIN-SOHL:  Object to form.

9              THE WITNESS:  So everybody develops at

10   their own pace, and some of within -- some are

11   precocious; some are delayed.  And so, you know,

12   each individual is approached as such, as an

13   individual.

14             And there are some who are not able to

15   meet the SOC-8 criteria of being able to have the

16   emotional or cognitive capacity to provide

17   informed consent, in which case we would not

18   proceed with any medical intervention for that

19   youth.

20             So it is embedded in our evaluation

21   process to assess for that.

22        Q.   (BY MR. RAMER)  And so you think that

23   there are adolescents who are able to -- excuse

24   me.

25             There are adolescents who are able to

                                        Page 173

Christine Brady, Ph.D. August 31, 2023

```
 1    provide informed consent to that treatment; is
 2    that right?
 3         A.   Yes.
 4         Q.   I'd like to turn in your declaration to
 5    page 12, paragraph 35, first sentence.  And you
 6    refer in the parenthetical to "evolution of
 7    identity."
 8              Do you see that?
 9         A.   Yes.
10         Q.   What do you mean by that?
11         A.   That's a term that I like to use, but
12    essentially it means how the identity developed
13    over time.  So when did it first come into their
14    awareness that there might be incongruence or
15    differences?
16              When did they finally find the words or
17    the labels at which they define themselves?
18              And what information did they obtain to
19    be able to use those words and that kind of thing?
20         Q.   Turning to page 7, paragraph 22, last
21    sentence on the page -- I'm sorry.  Yes, last
22    sentence on the page.  You use the word
23    "detransitioned" in quotation marks.
24              Do you see that?
25         A.   Yes.
```

Page 174

Christine Brady, Ph.D. August 31, 2023

1        Q.    What's your understanding of that word?

2        A.    My understanding of that word is that

3    there are many ways to define it, depending on the

4    study.  So typically it has been used to mean

5    people who stop their medical interventions,

6    gender-diverse people who stop their medical

7    interventions.

8        Q.    And is that your understanding of the

9    word?

10       A.    That is how it's most commonly used and

11   defined in the research.

12       Q.    And previous page from this, page 6,

13   paragraph 20, first sentence, I'll just read it

14   and ask if I read it correctly.

15            It says "For adolescents and adults whose

16   gender identity differs from their sex assigned at

17   birth, it is very unlikely that they will later

18   come to identify with their birth-assigned sex."

19            Did I read that correctly?

20       A.    Yes.

21       Q.    And this assertion you make here, does it

22   apply to individuals whose gender incongruence

23   arose during adolescence?

24            MS. NOWLIN-SOHL:  Object to form.

25            THE WITNESS:  Can you ask that again?

Page 175

(266 of 296), Page 266 of 296
Case 1:23-cv-00269-BLW  Document 56-2  Filed 09/05/23  Page 176 of 267
Christine Brady, Ph.D. August 31, 2023

```
1        Q.   (BY MR. RAMER)  Yes.  The proposition in
2   the first sentence here, does that apply to
3   individuals whose gender incongruence arose during
4   adolescence?
5             MS. NOWLIN-SOHL:  Same objection.
6             THE WITNESS:  It includes -- I mean, I
7   think it -- excuse me.  Let me back up.
8             It includes -- it could be they
9   identified in early childhood.  It could be they
10  identified in adolescence, but they are currently
11  adolescents and adults.
12       Q.   (BY MR. RAMER)  And I guess if you're
13  isolating the category that identified as gender
14  incongruent as adolescents, does it hold true that
15  it is very unlikely that they will later come to
16  identify with their birth-assigned sex?
17            MS. NOWLIN-SOHL:  Object to form.
18            THE WITNESS:  I'm not sure I understood
19  that.
20       Q.   (BY MR. RAMER)  Well, I guess in your
21  answer I thought you were saying it includes --
22  when you use the word "adolescents" in this
23  sentence, it includes individuals who identified
24  as gender incongruent as adolescents and also
25  individuals who identified as gender incongruent
```

Page 176

Christine Brady, Ph.D. August 31, 2023

1    during childhood and then aged into adolescence;

2    is that right?

3         A.    Correct.

4         Q.    And my question is specifically about the

5    first category of individuals who identified as

6    gender incongruent in adolescence.

7              And if you're talking only about that

8    category, is it true that it is very unlikely that

9    they will later come to identify with their

10   birth-assigned sex?

11             MS. NOWLIN-SOHL:  Object to form.

12             THE WITNESS:  I'm not aware of any

13   research that indicates that that subgroup has

14   higher rates of detransition.

15        Q.    (BY MR. RAMER)  What about higher rates

16   of desistance?

17             MS. NOWLIN-SOHL:  Object to form.

18             THE WITNESS:  If by "desistance" you mean

19   identified as gender diverse and then now identify

20   as their assigned sex -- is that how you're

21   defining "desistance"?

22        Q.    (BY MR. RAMER)  I guess how do you define

23   "desistance"?

24        A.    So sometimes desistance is also just

25   talking about stopping medical intervention.

Page 177

Christine Brady, Ph.D. August 31, 2023

```
 1              But in my terminology, I guess
 2    "desistance" would be identifying as cisgender or
 3    aligning with the assigned sex at birth later.
 4         Q.   Okay.  Yeah, let's take your definition.
 5              And are there any studies analyzing
 6    desistance rates for individuals specifically who
 7    identified as gender incongruent during
 8    adolescence?
 9         A.   Not to my knowledge.
10         Q.   Do you keep statistics of regret at your
11    clinic?
12              MS. NOWLIN-SOHL:  Object to form.
13              THE WITNESS:  Keep in what way?
14         Q.   (BY MR. RAMER)  Do you know how many
15    patients have ever expressed regret about their
16    treatment?
17              MS. NOWLIN-SOHL:  Object to form.
18              THE WITNESS:  Of our clinic patients?
19         Q.   (BY MR. RAMER)  Yes.
20         A.   We do not keep record of, like, the
21    number, no.
22         Q.   How do you define "regret"?
23         A.   "Regret" to me would mean someone who has
24    done a medical intervention and wishes that they
25    hadn't.
```

Page 178

Christine Brady, Ph.D. August 31, 2023

1      Q.   Has a patient in your clinic ever
2  expressed regret at having taken puberty blockers?
3      A.   Not to my knowledge.
4      Q.   Has a patient in your clinic ever
5  expressed regret at having taken cross-sex
6  hormones?
7      A.   Not to my knowledge.
8      Q.   Have you ever had any patients receive
9  what's called a gender-affirming mastectomy?
10          MS. NOWLIN-SOHL:  Object to form.
11          THE WITNESS:  Masculinizing top surgery?
12     Q.   (BY MR. RAMER)  Yes.
13     A.   Yes.
14     Q.   Have you ever had a patient express
15  regret about receiving masculinizing top surgery?
16     A.   No, not to my knowledge.
17     Q.   In your declaration, page 6 -- we're
18  there.  Sorry.  Page 6, paragraph 20.
19          And the second sentence, you refer to six
20  individuals who were your patients who later came
21  to identify with their sex assigned at birth; is
22  that right?
23     A.   Yes.
24     Q.   And do you recall how -- whether these
25  individuals were diagnosed with gender dysphoria

Page 179

Christine Brady, Ph.D. August 31, 2023

```
 1    during childhood or adolescence?
 2         A.   I believe all six met criteria at some
 3    point.
 4         Q.   Right.  And I'm not suggesting they
 5    didn't.
 6              I guess my question is when they met the
 7    criteria -- when they were formally diagnosed, do
 8    you recall whether it was their childhood or
 9    adolescence?
10         A.   So I know for sure two that had received
11    the puberty blockade in childhood.  The other four
12    I'm not sure.  I don't remember.
13         Q.   Do you recall whether the six were natal
14    females or females assigned at birth?
15         A.   I believe it was pretty 50/50 of the six,
16    three and three.  It might have been two and four,
17    but...
18         Q.   And when you say in your declaration that
19    "none expressed regret around their gender
20    exploration or care," do you just mean they didn't
21    tell you that they regretted their care?
22         A.   No.  So I supported them after they --
23    you know, I supported them through retransition or
24    coming off their medications.  And so we continued
25    to do therapy with these patients and, you know,
```

Page 180

ER-625

Christine Brady, Ph.D. August 31, 2023

1    explored, you know, if they were experiencing any

2    side effects, whether that be socially or

3    physically or mentally, and none of them endorsed

4    any negative side effects and were glad that they

5    had done the exploration process and glad that

6    they -- in the case of the two, done the puberty

7    blockade.

8         Q.   I think in your answer you had referred

9    to "retransition."  Is that -- first of all, did

10   you use that word?

11        A.   Yes.

12        Q.   Is that something distinct from

13   "detransition"?

14        A.   It's -- it can be used interchangeably, I

15   just prefer the term "retransition."

16        Q.   Okay.  Because I've heard --

17        A.   Sorry.

18        Q.   It's all right.  Go ahead.

19        A.   To transition back to the assigned sex.

20        Q.   Okay.  Because I -- okay.  Got it.

21             If a patient regretted a medical

22   intervention, do you think the patient would

23   return to the provider who gave them that

24   intervention to express their regret?

25             MS. NOWLIN-SOHL:  Object to form; calls

Page 181

Christine Brady, Ph.D. August 31, 2023

1    for speculation.

2          THE WITNESS:  I certainly hope so.  We

3    create -- we try to create an environment that is

4    welcoming to all.  We're not a transgender clinic;

5    we are a gender clinic.  And so we will support

6    patients regardless of how their identity shifts

7    and changes.

8          And so we, you know, often check in with

9    patients along the path to make sure that, you

10   know, are you happy with your medicines?  Do you

11   want to stop your medicines for whatever reason?

12         And so we welcome that conversation and

13   we're very open to all the pathways that a youth

14   might take.  So I would hope we're creating an

15   environment in which families and patients feel

16   safe to do so.

17   Q.   (BY MR. RAMER)  Yeah, and I wasn't asking

18   the question to cast doubt on your clinic in

19   particular.  I think I was asking the question

20   more from the perspective of the psychology of the

21   individual patient and if the patient regretted a

22   medical intervention as a psychologist, do you

23   think that that patient would have reservations

24   about returning to the provider who gave them that

25   intervention to express their regret?

Page 182

Christine Brady, Ph.D. August 31, 2023

```
 1            MS. NOWLIN-SOHL:  Object to form; calls
 2     for speculation, foundation.
 3            THE WITNESS:  Given that these six
 4     reached out to us and wanted my support through
 5     that process, I mean, it's possible that that is
 6     happening.  But in the case of these six, they
 7     felt very comfortable coming back and wanted the
 8     gender clinic to support them through
 9     retransition.
10            MR. RAMER:  I'm going to send an exhibit.
11     It's going to probably take a minute.  I just sent
12     it, so just let me know whenever it arrives.
13            MS. NOWLIN-SOHL:  Okay.
14            MR. RAMER:  Are we looking?
15            MS. NOWLIN-SOHL:  Still looking.
16            MR. RAMER:  All right.  Well, maybe I can
17     ask a question to introduce this, and we can deal
18     with it when it arrives.
19        Q.   (BY MR. RAMER)  But, Dr. Brady, did you
20     help author an article entitled "Understanding and
21     Supporting Patients With Dynamic Desires For
22     Gender-Affirming Medical Interventions"?
23        A.   Yes.
24            MS. NOWLIN-SOHL:  Okay.  We have it now.
25            (Deposition Exhibit No. 7 was marked.)
```

Page 183

Christine Brady, Ph.D. August 31, 2023

```
 1          Q.    (BY MR. RAMER)  And my question will be
 2     is this that article?
 3          A.    Yes.
 4          Q.    And in the second paragraph, you first
 5     highlight a study from the Netherlands.
 6                Do you see that?
 7          A.    Yes.
 8          Q.    And I assume that even though the study
 9     included participants from the Netherlands, you
10     still deem it useful with respect to your work in
11     the United States?
12          A.    Yes.
13          Q.    With respect to the last sentence of that
14     paragraph, I'll read it and ask if I read it
15     correctly.
16                It says "Studies of adolescents who start
17     pubertal suppression had found that only a few
18     percent ultimately chose to discontinue
19     gender-affirming medical care."
20                Did I read that correctly?
21          A.    Yes.
22          Q.    And so that sentence speaks only about
23     adolescents who chose to discontinue care, right?
24          A.    Yes.
25          Q.    Do you think that metric adequately
```

Page 184

Christine Brady, Ph.D. August 31, 2023

```
 1    captures regret?
 2              MS. NOWLIN-SOHL:  Object to form.
 3              THE WITNESS:  So, no, because not all of
 4    these individuals, such as the two in my clinical
 5    practice who chose not to pursue further
 6    intervention and stopped puberty blockers -- they
 7    did not express regret.  So this doesn't
 8    necessarily -- this number doesn't equate to
 9    regret.
10         Q.   (BY MR. RAMER)  So you actually think
11    this is over-counting potentially?
12         A.   [Indiscernible due to cross-talk.]
13         Q.   Do you think it's potentially
14    under-counting?
15         A.   In many studies some people are lost to
16    follow-up, and that happens in our clinic as well,
17    so potentially.
18         Q.   Well, I mean, even leaving aside lost to
19    follow-up, just because somebody chooses not to
20    discontinue the care, does that mean they don't
21    regret it?
22              MS. NOWLIN-SOHL:  Object to form; calls
23    for speculation.
24              THE WITNESS:  Are you saying -- so
25    somebody who does a blocker and stays on a blocker
```

Page 185

Christine Brady, Ph.D. August 31, 2023

```
 1    might still be experiencing regret while still on
 2    that blocker?
 3         Q.   (BY MR. RAMER)  I mean, I guess I take a
 4    more advanced example of somebody who was on a
 5    blocker and then took cross-sex hormones and so
 6    has, short of surgery, fully medically
 7    transitioned.
 8              Isn't it possible for that person to
 9    regret where they currently are, even though they
10    don't want to go through the process of
11    retransition?
12              MS. NOWLIN-SOHL:  Object to form; calls
13    for speculation.
14              THE WITNESS:  Regret where they currently
15    are or regret having made the decision to do
16    hormone therapies?
17         Q.   (BY MR. RAMER)  I guess what's the
18    distinction you're drawing there?
19         A.   Because many people might regret where
20    they are in life, that might -- may or may not
21    involve their gender.
22         Q.   Yes, sorry.  For purposes of the
23    question, the regret was specific to the
24    transition.
25              MS. NOWLIN-SOHL:  Same objections.
```

Page 186

Christine Brady, Ph.D. August 31, 2023

```
 1              THE WITNESS:  So it's possible.  Anything
 2     is possible.  However, in my clinical experience,
 3     it would be difficult to hide that level of
 4     distress if I'm working with somebody in a
 5     therapeutic context.  And that might be something
 6     I'd become suspicious of, even if someone is
 7     trying to hide that.
 8         Q.   (BY MR. RAMER)  And you mentioned "lost
 9     to follow-up."
10              Can you just explain what that is?
11         A.   So it can mean a number of different
12     things, but typically, you know, in the medical
13     world, it's -- you know, they maybe moved and
14     didn't tell us they were moving.  And so we don't
15     really know where that person is.
16              It might be that they transferred care,
17     even if they didn't move but they just transferred
18     care to another hospital.
19              Maybe insurance changed and they had to
20     change providers.
21              And so people get lost to follow-up in
22     that way.
23         Q.   Do you recall as you sit here the
24     percentage of participants that were lost to
25     follow-up in this study out of the Netherlands
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com   208-343-4004

ER-632

(278 of 296), Page 278 of 296  Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 278 of 296
Case 1:23-cv-00269-BLW  Document 56-2  Filed 09/05/23  Page 188 of 267
Christine Brady, Ph.D. August 31, 2023

```
 1    that you cite?
 2         A.   Let me look at the citation.
 3              I shouldn't have touched it.  If I could
 4    look at the citation form.
 5              These particular studies I do not
 6    remember what particular percent was lost to
 7    follow-up, no.
 8         Q.   Do you think that particularly with
 9    respect to a study that is assessing regret that
10    lost to follow-up is a significant limitation?
11              MS. NOWLIN-SOHL:  Object to form.
12              THE WITNESS:  In all research, you know,
13    we hope for complete data.  That's often not able
14    to be obtained.  You know, you do wonder about
15    the -- those who were not able to participate in
16    the study and where they are and how they feel,
17    but we can't know for sure what's going on with
18    them.
19         Q.   (BY MR. RAMER)  Would it surprise you to
20    know that the loss to follow-up in this study you
21    cite is over 35 percent?
22         A.   That's not uncommon for research.  That's
23    longitudinal.
24         Q.   Do you think that high of a loss to
25    follow-up is concerning when the purpose of the
```

Page 188

Christine Brady, Ph.D. August 31, 2023

1   study is measuring regret?

2            MS. NOWLIN-SOHL:  Object to form.

3            THE WITNESS:  Given that it's a pretty

4   standard number with regards to other fields and

5   other studies, it doesn't necessarily give me

6   cause for concern.

7       Q.   (BY MR. RAMER)  Wouldn't the conservative

8   estimate be that you have to treat that percentage

9   as individuals who regret the care?

10            MS. NOWLIN-SOHL:  Object to form; calls

11   for speculation.

12            THE WITNESS:  That seems like an

13   inappropriate leap to just consider that whole

14   group.

15            Statistically there might be ways of

16   applying the rates and percentages that are seen

17   in those who were able to participate and

18   translating that to the lost-to-follow-up group

19   and proportionately applying those percentages.

20       Q.   (BY MR. RAMER)  You don't see any

21   methodological issue with taking the .6 percent of

22   the people who were not lost to follow-up and just

23   applying that percentage to the lost-to-follow-up

24   group?

25            MS. NOWLIN-SOHL:  Objection to form;

Page 189

ER-634

Christine Brady, Ph.D. August 31, 2023

```
 1   mischaracterizes prior testimony.

 2            THE WITNESS:  I mean, I'm just giving

 3   that as an example of maybe something that's a

 4   little more appropriate.  The researchers didn't

 5   choose to do that, so clearly they didn't feel

 6   like that was appropriate to do, nor did they feel

 7   like it was appropriate to assume that that

 8   32 percent experienced regret.

 9       Q.   (BY MR. RAMER)  Do you acknowledge that

10   that amount of lost to follow-up is a study

11   limitation of that article?

12            MS. NOWLIN-SOHL:  Object to form.

13            THE WITNESS:  Yeah, lost to follow-up is

14   a limitation of any article.

15       Q.   (BY MR. RAMER)  In your -- oh, no.  On

16   this article, sorry, first page, fourth paragraph,

17   in the first sentence you refer to the fact that

18   some individuals discontinue or reverse

19   gender-affirming medical or surgical care.

20            Do you see that?

21       A.   Yes.

22       Q.   And then you say that fact has been,

23   quote, woefully politicized.

24            Do you see that?

25       A.   Yes.
```

Page 190

Christine Brady, Ph.D. August 31, 2023

1      Q.   And can you explain what you mean by

2    that?

3      A.   So this concern that those who choose to

4    discontinue or reverse their gender affirmation or

5    interventions are seen as a reason not to do this

6    work, even though that percentage is low, and even

7    though there are many more who benefit from such

8    interventions.  And so the few are being used,

9    unfortunately, to make a case that has a lot of

10   limitations.

11     Q.   And so you think that these individuals

12   are being used; is that what you said?

13          MS. NOWLIN-SOHL:  Object to form;

14   mischaracterizes prior testimony.

15          THE WITNESS:  I think the data on these

16   individuals is being used to make a case that has

17   limitations.

18     Q.   (BY MR. RAMER)  Can you explain what you

19   mean by "a case that has limitations"?

20     A.   So again, those who discontinue don't

21   necessarily regret and haven't necessarily

22   detransitioned.  So many sought medical

23   intervention because they're happy and have met

24   their transition goals.

25          They still identify as gender diverse,

                                        Page 191

Christine Brady, Ph.D. August 31, 2023

```
 1   and so sometimes those numbers are used to say
 2   that many discontinue or many regret their
 3   decisions, but that's not necessarily the case.
 4        Q.   Do you think we know the percentage that
 5   will ultimately discontinue or regret
 6   gender-affirming medical or surgical care?
 7             MS. NOWLIN-SOHL:  Object to form.
 8             THE WITNESS:  We have estimates.
 9        Q.   (BY MR. RAMER)  And what estimates are
10   you referring to?
11        A.   So, you know, some of the citations are
12   included in my declaration talk about the percents
13   in those studies who detransition or choose to
14   stop medical care.
15        Q.   Do you agree that in the last ten years,
16   there has been a substantial increase in the
17   number of individuals under 18 who have been
18   diagnosed with gender dysphoria?
19        A.   So in the last ten years, I know that the
20   instance of gender -- excuse me.
21             There has been a rise in the number of
22   individuals who will -- who endorse that they are
23   transgender or gender diverse, and that's, you
24   know -- like, the Williams study is .6 percent, .7
25   percent to 1.4 percent over the last four years --
```

Page 192

Christine Brady, Ph.D. August 31, 2023

```
 1    sorry, ten years.
 2        Q.   When you say "a rise in the number of
 3    individuals who will endorse that they are
 4    transgender or gender diverse," what did you mean
 5    by that?
 6        A.   So specifically you asked me about
 7    individuals who are diagnosed with gender
 8    dysphoria, and I don't know what the estimates are
 9    in terms of the increase in gender dysphoria.
10             All I know is the increase in the number
11    of people who will self-declare that they are
12    transgender or gender diverse.
13        Q.   So you do not know whether the rate --
14    let me rephrase.
15             You do not know whether the number of
16    minors diagnosed with gender dysphoria in the last
17    ten years has significantly increased?
18        A.   I can assume because the number of those
19    who are self-identifying as transgender or gender
20    diverse has increased, that the number of people
21    who are getting diagnosed with gender dysphoria is
22    also increasing.
23        Q.   But you're saying that would be an
24    assumption on your part?
25        A.   Yeah.  I don't know of any, like,
```

Page 193

Christine Brady, Ph.D. August 31, 2023

```
 1    specific rates or, you know, numbers.
 2        Q.   Do you agree that the majority of
 3    individuals under 18 who are currently being
 4    diagnosed with gender dysphoria in the last three
 5    years are natal females or females assigned at
 6    birth?
 7            MS. NOWLIN-SOHL:  Object to form.
 8            THE WITNESS:  Again, I don't know of any
 9    data that's looking at differential rates in terms
10    of gender -- like, sex ratio in the diagnosis of
11    gender dysphoria.  In our clinic it's 50/50, so...
12        Q.   (BY MR. RAMER)  And you do not know the
13    ratio outside of your clinic; is that right?
14        A.   I don't know if there are reports of
15    gender -- a sex ratio difference.
16        Q.   In the same paragraph --
17            MR. RAMER:  Actually we've been going for
18    a little over an hour.  Do you just want to take a
19    quick break?
20            MS. NOWLIN-SOHL:  Yeah, let's take five.
21            MR. RAMER:  Okay.
22            THE VIDEOGRAPHER:  All right.  So the
23    time is 5:26 p.m. Mountain time, and we are off
24    the record.
25            (Break taken from 5:26 p.m. to 5:36 p.m.)
```

Associated Reporting & Video - A Veritext Company
calendar-arv@veritext.com  208-343-4004

ER-639

Christine Brady, Ph.D. August 31, 2023

1            THE VIDEOGRAPHER:  So we are recording.

2    The time is 5:36 p.m., and we are back on the

3    record.

4        Q.   (BY MR. RAMER)  Dr. Brady, I'd like to

5    stick with your article we were previously

6    discussing.  And specifically I'd like to go to

7    page 2 and the last paragraph on the page and the

8    first sentence of that paragraph.

9            Do you see where you say, "The field of

10   gender medicine has historically focused on binary

11   and static conceptualization of gender identity"?

12       A.   Yes.

13       Q.   Do you think the DSM-5 focuses on static

14   conceptualizations of gender identity?

15       A.   So DSM-4 certainly did.  I think

16   improvements were made in DSM-5 to be more

17   inclusive such as criteria that we were talking

18   about earlier.

19       Q.   Do you think there are still improvements

20   to be made with respect to the eventual DSM-6?

21            MS. NOWLIN-SOHL:  Object to form.

22            THE WITNESS:  In every iteration of DSM

23   they're always integrating new research and new

24   understanding, so every diagnosis gets a facelift

25   with the next DSM.

Page 195

ER-640

Christine Brady, Ph.D. August 31, 2023

```
 1         Q.   (BY MR. RAMER)  Do you think there are
 2    improvements that can be made in the DSM-5 with
 3    respect to static conceptualizations of gender
 4    identity?
 5              MS. NOWLIN-SOHL:  Object to form.
 6              THE WITNESS:  I think the current DSM
 7    criteria capture gender dysphoria well.
 8         Q.   (BY MR. RAMER)  Same page, the top
 9    paragraph, I think it's the third and fourth
10    sentences, you refer to a nocebo effect.
11              Can you just explain what you're saying
12    in those two sentences?
13         A.   Sure.  Let me find it.  I'm sorry.  You
14    said second page, first paragraph.
15         Q.   Second page, first paragraph, and I think
16    it's the third and fourth sentences.  The third
17    sentence looks like it starts with "For example."
18         A.   Okay.  It's difficult for -- I can try.
19    I didn't write that sentence.  I have two
20    coauthors.
21              But would you want me to guess what it
22    is?
23         Q.   Yeah, I'd just be curious if you -- you
24    know, to the extent you understand that, what it's
25    saying.
```

Page 196

ER-641

Christine Brady, Ph.D. August 31, 2023

```
 1       A.    Yeah.  So a placebo effect would be, you
 2  know, administering a sugar pill or something that
 3  we know doesn't have an effect and feeling as
 4  though it does have an effect.
 5            So in this case I think "nocebo" would
 6  mean like knowing that they're without something
 7  feels like it's having an effect when maybe it's
 8  not.
 9            So having lower testosterone -- just
10  knowing that your testosterone is lower might make
11  you feel like you have less energy when you
12  actually might not have less energy.
13       Q.    Do you know which one of your coauthors
14  wrote those sentences?
15       A.    I believe it's Dr. Turban.
16       Q.    I think going back to the first page, and
17  in the fourth paragraph, second sentence, you
18  refer to "dynamic gender-affirming needs."
19            Do you see that?
20       A.    Yes.
21       Q.    Could you explain what you mean by
22  "dynamic gender-affirming needs"?
23       A.    If you'll just give me a minute, I'm
24  going to read the whole sentence.
25       Q.    Please, go ahead.
```

Page 197

ER-642

Christine Brady, Ph.D. August 31, 2023

```
 1        A.   So in this case, we're referring to --
 2   so, for example, a nonbinary-identifying
 3   individual, let's say designated female nonbinary
 4   identifying, might want some masculinization from
 5   testosterone but not full masculinization.  And
 6   they may even from the outset know that they do
 7   not want to stay on testosterone indefinitely.
 8   And so they are going to be on testosterone until
 9   they've acquired some of the changes but not all
10   of the changes and then choose to discontinue that
11   intentionally.
12        And so that's sort of what we were
13   considering to be, like, of a dynamic need because
14   traditionally we think of you start on hormone
15   therapies and you stay on hormone therapies.  But
16   there are kind of -- we're understanding more and
17   more that there are some more dynamic or maybe
18   non-traditional ways of doing gender-affirming
19   medical intervention.
20        Q.   Were you talking about examples, though,
21   where the individual knows from the outset what
22   treatment they're desiring?
23        A.   In some cases people know, you know, that
24   "I only want to be on testosterone for however
25   long it takes to achieve X, Y, Z."
```

Page 198

1          For other folks it's something that
2    evolves over time.
3          And while they're on testosterone, if
4    they become comfortable with the changes and are
5    happy with the changes, they may choose to
6    discontinue at that time too, so either case.
7       Q.   For individuals whose gender identity
8    changes at some point, do they still satisfy the
9    criteria for gender dysphoria under the DSM-5?
10          MS. NOWLIN-SOHL:  Object to form.
11          THE WITNESS:  It depends.  Because again,
12    they can still identify as gender diverse even
13    though their identity has evolved or changed, and
14    they still might meet criteria for gender
15    dysphoria.
16       Q.   (BY MR. RAMER)  So -- and maybe it's
17    easiest if we can go back to your declaration to
18    page 6, paragraph 19 and just return to 19A where
19    we're talking about the marked incongruence and
20    the six months' duration.
21          And I guess I'm struggling to understand
22    how if the gender -- if someone's gender identity
23    is changing, how they could show a marked
24    incongruence of six months' duration.
25          MS. NOWLIN-SOHL:  Is there a question

Page 199

Christine Brady, Ph.D. August 31, 2023

```
 1    there?
 2          Q.   (BY MR. RAMER)  Can you explain that?
 3                MS. NOWLIN-SOHL:  Object to form.
 4                THE WITNESS:  So a lot of things can
 5    qualify as an incongruence.  So in the case of,
 6    again, let's say again a nonbinary individual who
 7    later identifies as transmasculine.  So their
 8    identity has evolved and changed, but both of
 9    those identities were incongruent with the
10    assigned sex at birth.
11                And so we don't necessarily need six
12    months' duration in the new identity to meet
13    criteria for gender dysphoria.
14          Q.   (BY MR. RAMER)  So basically all
15    incongruences are created equal for purposes of
16    the DSM-5 diagnostic criteria; is that right?
17                MS. NOWLIN-SOHL:  Object to form;
18    mischaracterizes prior testimony.
19                THE WITNESS:  In terms of criterion A and
20    1 where it states "marked incongruence," it can be
21    any identity, any donor identity that's not
22    congruent with assigned sex.
23          Q.   (BY MR. RAMER)  And so your gender
24    identity could be changing every week, but so long
25    as at no point during a six-month period your
```

Page 200

Christine Brady, Ph.D. August 31, 2023

```
 1    gender identity is congruent with your assigned
 2    gender, you still fall within DSM-5 diagnostic
 3    criteria in paragraph A?
 4              MS. NOWLIN-SOHL:  Object to form;
 5    mischaracterizes prior testimony.
 6              THE WITNESS:  If they have other criteria
 7    and needs, yes.
 8         Q.   (BY MR. RAMER)  So the duration part of
 9    paragraph A here, the only thing that matters is
10    that at no point during the six months was your
11    gender identity congruent with your assigned
12    gender; is that fair?
13              MS. NOWLIN-SOHL:  Object to form;
14    argumentative, mischaracterizes prior testimony,
15    asked and answered.
16              THE WITNESS:  Yes.
17         Q.   (BY MR. RAMER)  Have you ever had a
18    patient whose gender identity goes from being --
19    let me rephrase.
20              Have you ever had a patient who was
21    gender-fluid and as part of the fluidity at times
22    would have a gender identity that is consistent
23    with the individual's assigned gender?
24         A.   So I've not had a case -- again,
25    gender-fluid is a more rare identity, so that's
```

Page 201

Christine Brady, Ph.D. August 31, 2023

```
 1    only a small subset of my patients.
 2            But I've not had clinically a patient who
 3    part of the fluid identity involved their cis --
 4    like a cisgender identity.
 5        Q.    Have you ever heard of that, though?
 6        A.    Not to my knowledge.
 7        Q.    I think I only have a few more questions,
 8    though it potentially depends on the answers to
 9    the questions.
10            But I just want to clarify a few things
11    from -- for the record, which is with respect to
12    the Endocrine Society guidelines, you do not
13    recall ever reading the systematic reviews that
14    those guidelines commissioned, correct?
15        A.    Correct.
16        Q.    With respect to the WPATH guidelines, you
17    do not recall ever reading the systematic review
18    that those guidelines commissioned, correct?
19            MS. NOWLIN-SOHL:  Object to form.
20            THE WITNESS:  Only as it is described in
21    SOC-8, so the summarization of the systematic
22    review.
23        Q.    (BY MR. RAMER)  So in other words you've
24    not read the separate systematic review; is that
25    right?
```

Page 202

Christine Brady, Ph.D. August 31, 2023

```
 1        A.    Correct.

 2              MS. NOWLIN-SOHL:  Object to form.

 3              THE WITNESS:  Correct.

 4        Q.    (BY MR. RAMER)  Have you read any

 5    publication from a European health authority

 6    regarding the treatment for gender dysphoria?

 7        A.    No.

 8              MR. RAMER:  Okay.  I think that's all

 9    that I have.  Thank you very much, Dr. Brady.  At

10    this point I'm going to turn it over to your

11    counsel.

12              And, Li, I understand if you need a few

13    minutes off the record to prep, but I'll turn

14    things over to you.

15              MS. NOWLIN-SOHL:  Yeah.  I know we just

16    took a break.  Do you mind if we just take ten

17    minutes so I can speak with my co-counsel?

18              MR. RAMER:  Yeah, not a problem at all.

19              MS. NOWLIN-SOHL:  Okay.  Thank you.

20              THE VIDEOGRAPHER:  Okay.  So the time is

21    5:50 p.m. Mountain time, and we are off the

22    record.

23              (Break taken from 5:50 p.m. to 5:56 p.m.)

24              THE VIDEOGRAPHER:  All right.  So we are

25    recording.  The time is 5:56 p.m. Mountain time,
```

Page 203

Christine Brady, Ph.D. August 31, 2023

```
 1    and we are back on the record.

 2              MS. NOWLIN-SOHL:  Okay.  I have no

 3    questions.

 4              MR. RAMER:  Well, great.  Well, that's it

 5    for me.  Thank you, Dr. Brady, for your time.

 6              THE WITNESS:  Thank you.

 7              THE VIDEOGRAPHER:  Okay.  Then this

 8    concludes our video deposition with Dr. Christine

 9    Brady.  It is August 31, 2023.  The time is

10    5:56 p.m. Mountain time, and we are off the

11    record.

12

13       (Whereupon the deposition was concluded at 5:56 p.m.)

14                         ****

15                  (Signature requested.)

16

17

18

19

20

21

22

23

24

25
```

Page 204

(295 of 296), Page 295 of 296 Case: 24-142, 02/06/2024, DktEntry: 26.4, Page 295 of 296
Case 1:23-cv-00269-BLW Document 56-2 Filed 09/05/23 Page 205 of 267
Christine Brady, Ph.D. August 31, 2023

```
 1                        VERIFICATION

 2

     STATE OF  _____  )

 3                               )

     COUNTY OF _____  )

 4

 5        I, CHRISTINE BRADY, Ph.D., being first duly sworn on

 6   my oath, depose and say:

 7        That I am the witness named in the foregoing

 8   deposition taken the 31st day of August, 2023, consisting

 9   of pages numbered 1 to 204, inclusive; that I have read

10   the said deposition and know the contents thereof; that

11   the questions contained therein were propounded to me;

12   the answers to said questions were given by me, and that

13   the answers as contained therein (or as corrected by me

14   therein) are true and correct.

15

16   Corrections Made:  Yes_____ No_____

17

18

                       _____

19                          CHRISTINE BRADY, Ph.D.

20

21      Subscribed and sworn to before me this _____ day of

22   _____, 2023, at _____, Idaho.

23

                       _____

24                     Notary Public for Idaho

                       Residing at _____, Idaho

25                     My commission expires: _____.


                                                    Page 205
```

ER-650

Christine Brady, Ph.D. August 31, 2023

```
 1                    REPORTER'S CERTIFICATE
 2    STATE OF IDAHO         )
                             )
 3    COUNTY OF ADA          )
 4
 5        I, Amy E. Simmons, Certified Shorthand Reporter and
 6    Notary Public in and for the State of Idaho, do hereby
 7    certify:
 8        That prior to being examined, the witness named in
 9    the foregoing deposition was by me duly sworn to testify
10    to the truth, the whole truth, and nothing but the truth;
11        That said deposition was taken down by me in
12    shorthand at the time and place therein named and
13    thereafter reduced to typewriting under my direction, and
14    that the foregoing transcript contains a full, true, and
15    verbatim record of said deposition.
16        I further certify that I have no interest in the
17    event of the action.
18        WITNESS my hand and seal this 31st day of August,
19    2023.
20
21
                       AMY E. SIMMONS
22                     ID CSR No. 685
                       CA CSR No. 14453
23                     WA CSR No. 22012915
                       OR CSR No. 22-009
24                     RDR, CRR, CRC,
                       and Notary Public
25    My commission expires:  6/13/28.
```

Page 206