APPEAL NO. 24-142

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAM POE, by and through her parents and next friends Penny and Peter Poe, et al.,

*Plaintiffs-Appellees,*

v.

RAÚL LABRADOR, in official capacity as Attorney General of the State of Idaho, et al.,

*Defendants-Appellants,*

and

JAN M. BENNETTS, in official capacity as Ada County Prosecuting Attorney, et al.

*Defendants.*

On Appeal from the United States District Court
for the District of Idaho / Case No. 1:23-cv-00269-BLW

## EXCERPTS OF RECORD OF APPELLANTS
## VOLUME 5 of 5

RAÚL R. LABRADOR
ATTORNEY GENERAL

ALAN M. HURST
Solicitor General

JOSHUA N. TURNER
Chief, Constitutional
Litigation and Policy

JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense
OFFICE OF IDAHO
ATTORNEY GENERAL
700 W. Jefferson St.
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
josh.turner@ag.idaho.gov
james.craig@ag.idaho.gov

JOHN J. BURSCH
LINCOLN DAVIS WILSON
ALLIANCE DEFENDING
FREEDOM
440 First Street, NW,
Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
lwilson@ADFlegal.org

JONATHAN A. SCRUGGS
HENRY W. FRAMPTON, IV
ALLIANCE DEFENDING
FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

*Counsel for Appellants*

DAVID H. THOMPSON
BRIAN W. BARNES
JOHN D. RAMER
COOPER & KIRK, PLLC
1523 New Hampshire
Avenue, NW
Washington, DC 20036
202-220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

Li Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
David A. DeRoin (ISB no. 10404)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

*Additional counsel for Plaintiffs identified on
the following page*

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF IDAHO

**PAM POE**, *by and through her parents
and next friends, Penny and Peter Poe*;
**PENNY POE; PETER POE**, *et al.*,

v.                              *Plaintiffs*,

**RAÚL LABRADOR**, *in his official
capacity as Attorney General of Idaho,
et al.*,

                                *Defendants.*

Case No. 1:23-cv-00269-CWD

**DECLARATION OF PAM POE
IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com
kyle.bersani@groombridgewu.com

Philip S. May*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com

*Admitted *pro hac vice*

Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Dina Flores-Brewer (ISB no. 6141)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
(208) 344-9750
Tel: dfloresbrewer@acluidaho.org

*Attorneys for Plaintiffs*

**DECLARATION OF PAM POE IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, Pam Poe, hereby declare as follows:

1.      I am a fifteen-year-old transgender girl, living with my mom, dad, and sibling in Meridian, Idaho. I am a Plaintiff in this lawsuit and call myself "Pam Poe."  Our counsel have explained to me and my family what a preliminary injunction is, and we eagerly join the other Plaintiffs in seeking an injunction.  Our lawyers have helped me prepare this Declaration, but the story below is mine.  I have personal knowledge of the facts I explain below, and I would testify to them if called as a witness.

2.      I have lived in Meridian, Idaho my entire life. I will be a sophomore in high school beginning in August 2023. I am interested in engineering, programming, and math.  During the summer, I have a part-time job. This year is my second year working there.

3.      While I am a girl, I was designated male at birth. Growing up, I always felt different, like I was not really a boy, but I did not know how to describe those feelings.  I also did not  know how to describe the mental and emotional distress I began experiencing as I got older because I knew that my gender was wrong.  I know that I am a girl, not a boy. I just want to live and be treated like any other girl.

4.      Around the time I was in 7th grade, as I began to experience puberty, I noticed how heavily I was struggling with depression, anxiety, and thoughts of self-harm. I started engaging in acts of self-injury. I did not really understand why exactly, but I was in a very dark place. During that time, there were times I felt like I did not want to exist anymore because I was so unhappy with what was happening to my body, feeling trapped and not like myself, and because people saw me as a boy and addressed me as one.

ER0939

5.      Eventually, these feelings became so overwhelming that I finally told my mom what I was feeling in August 2021.

6.      I remember that moment clearly.  We had a bunch of family over at the house, but I was feeling uncomfortable with myself, so I stayed in my room for most of the evening. As it got late that night, I realized that I could not wait any longer.  I had to tell my mom my truth. I had been wanting to tell her for so long, but I was scared.  I decided to text her and come out. I told her that I was non-binary (I was still exploring my gender identity and knew I was not a boy, but did not yet understand that I am a girl), that I wanted to be called "Pam," and that I wanted people to use different pronouns in referring to me. I was not sure how or if she was going to respond, because it was so late and she was entertaining family. But she did respond. She used my new name and told me that she loved me, and that we would talk about it in the morning, when things were quieter and we would have more privacy.

7.      The next morning my mom came into my room. She sat by me on the floor and hugged me. She told me that she loved me. It was very emotional, but I was so happy that she accepted me. Because we still had family in town and some staying with us, we also talked about who knew, who did not know, and who we should avoid finding out for now. My mom was already trying to protect me, and that also made me feel very happy, safe, and loved.

8.      I continued to try to understand my gender identity and who I am. Not long after coming out, I told my parents I was more comfortable with she/her pronouns. I knew I didn't feel like a boy and was coming to realize I didn't have to force a masculine presence on myself. I was still exploring whether nonbinary, transgender, or no gender felt like the right label for how I was feeling.  I stopped trying to be the boy that society told me to be, and I focused on presenting my true self.

2

ER0940

9.     My parents found a counselor, who I started seeing weekly.  He diagnosed me with depression. Even with counseling, I continued to struggle. Due to puberty, my body was still changing in ways that were making me feel miserable, because with every change, I became more and more physically a boy, and I just knew that was not who I was.

10.     One day in early 2022, I sent my mom a text at 2am because I did not want to wake her, asking for admission to hospitalized care. I told her that I did not want to be alive anymore. It was hard to describe to her how I was feeling at the time. I decided that an inpatient stay at a residential treatment facility would help me and provide me with greater support. With my parents' support, I entered residential treatment at the end of February 2022 and stayed there for one week. During my time in inpatient treatment, I opened up more to one of the providers I was seeing about my gender identity and the distress, depression, and anxiety around my body. That provider diagnosed me with gender dysphoria, in addition to my depression and anxiety.

11.     Before, when I thought about the possibility of being diagnosed with gender dysphoria,  I had assumed it would be something negative and that I would feel shame about the diagnosis. However, when I received the diagnosis, I felt relief and validation. I felt like I had permission to stop fighting my identity and pretending to be someone I wasn't. My body and its developments were causing me severe dysphoria, because I was unable to be seen by others as a girl, or even a feminine human being

12.     After I left the residential treatment facility, I was referred to a doctor who is an expert in treating gender dysphoria.  Unfortunately, the next available appointment was not until a few weeks later, in May 2022.

13.     At the appointment, my doctor evaluated me, talked with my parents and me about the possibility of me being treated with puberty blockers, and discussed with us the benefits of

ER0941

treatment and the risks. I also had blood drawn to figure out where my body was, in terms of puberty. I remember leaving that first appointment with a huge smile and feeling just overwhelmed with relief . Learning that puberty blockers were possible and that they would stop the changes happening to my body took a huge weight off my shoulders and helped my mental health.

14.     At my next visit with the doctor, after again discussing everything we discussed at the first meeting, my parents and I, along with the doctor, decided that puberty blockers were the right treatment for me. I began puberty blockers in June 2022. I just felt so happy and relieved because I knew that it was going to stop what was happening to me. My mental health started to improve and only continued to improve over the next few months.

15.     A counselor had been recommended to us as someone with experience caring for people with gender dysphoria, and after several months on the waitlist, I began therapy with her in July 2022.

16.     With my parents' support, I had begun socially transitioning after coming out to them. I started wearing more feminine clothing, wearing makeup, and dying my hair and growing it out. Making these changes made me feel more like myself. Seeing that that my family saw me, accepted me, and treated me as who I really am also made me feel more like myself.

17.     Being able to be myself, because of the puberty blockers and socially transitioning, I became more confident. I was already out to my close friends and family, and I realized I was ready to reintroduce myself, my real self, to other people in my life. When I started high school in August 2022, I entered as a girl and have been treated as a girl since day one.

18.     Socially transitioning helped me feel like I wasn't hiding when I was in public. I felt more confident that people were seeing *me*, not the masculine role I was assigned. It didn't alleviate all of my distress though. I still constantly worried about people seeing certain parts of

4

me that are not in line with my gender identity and expression. Puberty blockers paused more changes to my body that did not align with my gender identity, and I was still having a lot of gender dysphoria about the ways my body didn't align with my gender identity.

19.     In April 2023, after being on puberty blockers for almost a year, my parents and I had a conversation with my doctor about starting estrogen therapy. My doctor performed more bloodwork, talked to us about the potential risks and benefits of estrogen therapy, discussed options for fertility preservation, and confirmed my ongoing therapy and mental health support. My parents and I, in talking with my doctor, decided that estrogen therapy was the best and appropriate treatment for my gender dysphoria.  I started treatment and I have been on estrogen ever since. Just like with the puberty blockers, the estrogen therapy has made such a difference in my life. My mental health is the best it has ever been. I am feeling more confident, happy, and excited that I am developing as a girl.

20.     Before I began gender-affirming medical treatment, I was in a very dark place. I struggled so hard, with anxiety, depression, hiding away by myself, thoughts of self-harm, and even harming myself to cope with it all. The changes because of male puberty were making me miserable and causing all of those bad symptoms. I could not see a future for myself and did not want to exist. Gender-affirming medical care saved my life. When I think back to that time, it makes me sad. I know it really scared my parents. It scared me too. I did not want to die, I just wanted to be myself, my true self. I am so glad that I told my parents about what I was struggling with.  I wish I had told them sooner.

21.     It is hard for me to find the words to explain the difference in my life now that I am receiving gender-affirming medical care and living as the girl that I know I am. I am happy and confident. I am excited about the future I see for myself.

ER0943

22.     That is also why I am incredibly anxious and scared about H.B. 71. My entire family

is very scared. If H.B. 71 becomes law, I would have to stop receiving the medical treatment that

has saved me. I have already lived through the extreme mental health symptoms of not receiving

treatment and I never want to experience that again. I cannot go back to that.

23.     If H.B. 71 becomes law, my parents have talked about moving out of Idaho when

my sister graduates from high school next year. We also talked about traveling to get care, but that

would be a significant financial burden for my family. If we move, I will leave the only home I

have ever known, my close community of friends, and my healthcare providers, who I trust, who

have supported me, and who have changed my life for the better. I do not want to leave. I want to

stay in Idaho, in my home, and continue receiving the healthcare I need. Please, please do not let

this law take effect.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Idaho, on this 18th day of July, 2023

Pam Poe
_____
Pam Poe

6

ER0944

Li Nowlin-Sohl*
(Admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 6th Avenue
New York, NY 10019
Tel: (212) 373-3000
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com
jorosz@paulweiss.com

Richard Eppink (ISB no. 7503)
David A. DeRoin (ISB no. 10404)
Casey Parsons (ISB no. 11323)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

*Admitted Pro hac vice

Attorneys for Plaintiffs

Additional counsel for Plaintiffs identified
on the following page

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF IDAHO

|  |  |
|---|---|
| **PAM POE**, *by and through her parents and next friends, Penny and Peter Poe*; **PENNY POE**; **PETER POE**, *et al.*,<br><br>v.<br><br>*Plaintiffs,*<br><br>**RAÚL LABRADOR**, *in his official capacity as Attorney General of Idaho, et al.*,<br><br>*Defendants.* | Case No. 1:23-cv-00269-CWD<br><br>**DECLARATION OF JANE DOE IN SUPPORT OF PLAINTIFFS' MOTION FOR A <u>PRELIMINARY INJUNCTION</u>** |

ER0945

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com
kyle.bersani@groombridgewu.com

Philip S. May*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com

Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Dina Flores-Brewer (ISB no. 6141)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**DECLARATION OF JANE DOE IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Jane Doe, hereby declare as follows:

1.      I am a Plaintiff in this action, and refer to myself here as "Jane Doe." I make this Declaration in support of my and the other Plaintiffs' Motion for a Preliminary Injunction. My lawyers have helped me prepare this Declaration because I am not a lawyer and I have no experience with Declarations. The facts I describe below are about my own experience, however. I have personal knowledge of them, and would testify competently to them if called as a witness.

2.      I am a sixteen-year old girl. I live with my mom, dad, and siblings in Boise, Idaho, where I have lived my entire life. This fall, I will be a high school senior. After high school, I plan to attend college. I am in interested in majors related to computer coding, cybersecurity, or videogame development.

3.      I am transgender. I have a female gender identity, but I was designated as male at birth.

4.      I have gender dysphoria, and was diagnosed with gender dysphoria by my doctor in November 2020.

5.      For as long as I can remember, I knew that something felt off about my being a boy. I have always naturally related to other girls, felt the most like myself around other girls, and had similar interests as other girls. When I was younger, I did not have the words to express my feelings related to my gender identity or being transgender. But I knew it even before I knew the words for it.

6.      In school, when we would be divided into girls' teams and boys' teams, I always wanted to be and felt like I belonged on the girls' team. When I would play "make believe" with my friends, I was always a girl character. When I would play video games, I would almost always

1

ER0947

choose a girl avatar. My mom and dad have told me that when I was little and my mom was pregnant with my younger sibling, I would lay down and place a doll on my stomach and tell them that I wanted to be a mom.

7.    While I always felt like I was not a boy, it was difficult and scary for me to address these feelings. That distress became severe with puberty. I now understand this to be gender dysphoria. But I never tried to tell my parents about my feelings when I was young, out of my own fear of rejection from friends and the community.

8.    I did not meet a transgender person, or at least someone I knew was transgender, until I was about 10 years old and met a transgender woman who was friends with my parents. My parents explained to me that their friend was transgender, that she had been born a boy but was a woman on the inside, and was now living her life as a woman. It was like hearing them describe my own life to me. Before that, I did not know that transitioning was even possible. I was immediately excited about the possibility that I could do the same one day.

9.    In 2018, my body started changing as I entered puberty. It became increasingly devastating to me, and my mental health began to deteriorate. The changes to my body made me look like a boy. I remember that I would often refuse to allow my photograph to be taken during that time because of the pain it caused me seeing myself as someone I was not. I could not hide all of the physical changes, and I would often self-isolate and avoid social settings. I wanted to be social, but the pain of being perceived as a boy and seeing myself with male features was too much to bear. I also began to suffer academically at school because I could not focus on my schoolwork due to the severe mental health issues my gender dysphoria was causing me. There were times that I simply just did not want to exist because the physical changes to my body were trapping me in an existence that was not me and caused me so much pain, on a constant basis.

ER0948

10.     In June 2020, my gender dysphoria had intensified so badly that I needed to tell someone. I told one friend in July and then a couple more in September. In late September 2020, I finally found the courage to tell my parents that I am transgender, that I am a girl, that I was suffering, and that I needed help. My parents did not hesitate. They told me they loved me, they would support me in anything, and they just wanted me to be happy and healthy.

11.     With my parents' support, I began socially transitioning in October 2020. I began going by a female first name and using feminine pronouns. I wore a feminine hairstyle and I started wearing girls' clothes. I told my mom I wanted to wear makeup and, as part of all of the ways in which she supported me when I asked for her help, she taught me about makeup and how to apply it. All of this helped my gender dysphoria, but I was still experiencing male puberty, which was causing significant physical changes to my body that I could not hide or cover up with makeup or clothes. And I knew that some of these unwanted changes would be permanent. My gender dysphoria was still causing me significant pain.

12.     In mid-October 2020, my parents and I had a visit with my pediatrician to discuss what I was experiencing. My pediatrician referred me to a doctor who specializes in the treatment of gender dysphoria. My parents also found a therapist for me.

13.     We had our first visit with the doctor in November 2020. The doctor examined me, asked me about my experience regarding my gender over the years, took blood for tests, and talked to me about the options for treating gender dysphoria based on my age, the risks and benefits of treatment, and things we could do to preserve my ability to have children.

14.     After several months of therapy, an additional visit with the doctor, and much discussion with my parents, we decided to start on puberty blockers. I began receiving that treatment in January 2021.

ER0949

15.     The puberty blockers stopped any new changes from happening to my body and prevented my gender dysphoria from getting worse. Knowing that further changes would not happen was a big relief to me and improved my mental health.

16.     After a few successful months on puberty blockers, we began talking about starting gender-affirming estrogen therapy. I spoke to my parents about it and during one of our visits with my doctor, he talked to my parents and me about the risks and benefits of estrogen therapy and fertility preservation, and he drew more blood for tests. Eventually, my parents and I agreed that gender-affirming estrogen therapy was appropriate for me. The doctor agreed. In April 2021, at the age of 14, I began a low dose of gender-affirming estrogen therapy.

17.     Since April 2021, I see my doctor regularly for lab work, so that he can make sure I remain healthy and so he can check my hormone levels and change my estrogen dosage if needed to remain in target ranges for my age.

18.     Estrogen has been amazing. It has changed my body in more feminine ways that I am so happy with. Seeing these bodily changes has helped my gender dysphoria a lot, and I feel like my body more accurately reflects who I am.

19.     With the help of my parents, I began legally transitioning in 2023. My parents and I first obtained a court-ordered name change in Idaho. We then had my Idaho birth certificate corrected with my new legal name and we corrected the gender marker, changing it from male to female. My parents also helped me update my information with the United States Social Security Office and helped me obtain a United States passport with my new legal name and a female gender marker.

20.     My parents and I also spoke to the administrators at my school, who were great about everything. They readily corrected my name and gender marker in my digital school records,

4

ER0950

so that my teachers and any substitute teachers would not use the wrong name for me or the wrong pronouns and gender. This is really important to me, and I am so glad that the administrators at my school are supportive of me.

21.    Being able to medically transition and see myself, and be seen by others, as the girl I am absolutely saved my life. Before I told my parents I was transgender and about the feelings of my gender dysphoria, I was not me. I was isolating myself, depressed, anxious, and I felt trapped and scared almost daily. I could not see a future for myself and did not want to exist. I am so grateful that when I told my parents about what I was experiencing, they listened to me, trusted me, and took me to providers who could give me the gender-affirming health care that I needed to be who I am.

22.    My whole life has turned around. I am confident in who I am. My academics have improved. My mental health has improved substantially. I no longer feel the need to isolate, and I can live my life more fully and authentically. I am excited about what comes next in my life and everything I hope to do in the future.

23.    Now all of that is at risk because of H.B. 71 and I am really scared. My parents and siblings are scared, and the others who love and care about me are scared, too. The anxiety from H.B. 71 and the possibility of my healthcare being taken away and having to go back to life as it was before I began receiving gender-affirming medical care is very stressful and harmful to my mental health. It caused me to miss a lot of school while the law was being debated. As a result, my grades suffered last semester.

24.    If H.B. 71 becomes law, I would no longer be able to receive the estrogen therapy that I have been on for over two years that treats my gender dysphoria. I fear what would happen

ER0951

to my mental, emotional, and physical health if my medication is cut off because of H.B. 71 and I have to resume male puberty. I have already lived that pain.

25.    My parents have talked to my siblings and me about trying to find care for me out of state or selling our house and leaving Idaho—the only home I've ever known—because of H.B. 71. I don't know if we can find care out of state or what it would look like to have to regularly travel for healthcare. Having to move would mean losing my friends, my family, my home, my community, my school, and everything that I have always known. It would mean the same for my parents and siblings. My oldest sibling is starting college in Idaho in the fall. I worry about what impact moving will have on him, his college plans, and our relationship. I do not want to move to a different state far away from him. I do not want any of this. I just want to stay in Idaho, my home, and continue receiving the healthcare I have been receiving that has made the life I am now living possible. But if H.B. 71 goes into effect, my family understands that this healthcare is so central to my wellbeing that we will likely have no other choice but to move out of Idaho.

26.    I ask that the Court please help me. Please do not let my healthcare be taken away.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Idaho, on this 18th day of July, 2023

Jane Doe
_____
Jane Doe

6

Li Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
David A. DeRoin (ISB no. 10404)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

*Additional counsel for Plaintiffs identified on
the following page*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **PAM POE**, by and through her parents and next friends, Penny and Peter Poe; **PENNY POE**; **PETER POE**; **JANE DOE**, by and through her parents and next friends, Joan and John Doe; **JOAN DOE**; **JOHN DOE**, <br>        *Plaintiffs*, <br> v. <br> **RAÚL LABRADOR**, in his official capacity as Attorney General of the State of Idaho; **JAN M. BENNETTS**, in her official capacity as County Prosecuting Attorney for Ada, Idaho; and the **INDIVIDUAL MEMBERS OF THE IDAHO CODE COMMISSION**, in their official capacities, <br>        *Defendants*. | Case No. 1:23-cv-00269-CWD |

## EXPERT REBUTTAL DECLARATION OF JACK TURBAN, MD, MHS

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridewu.com
kyle.bersani@groombridewu.com

Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Philip S. May*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com

Dina Flores-Brewer (ISB no. 6141)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
(208) 344-9750
dfloresbrewer@acluidaho.org

*Admitted *pro hac vice*                              *Attorneys for Plaintiffs*

I, JACK TURBAN, MD, MHS hereby declare as follows:

1.      I have been retained by counsel for Plaintiffs as an expert witness in connection with the above-captioned litigation.

2.      I have actual knowledge of the matters stated herein.

3.      In preparing this declaration, I reviewed the State's combined memorandum of law in opposition to motion for preliminary injunction and in support of motion to dismiss and the expert declarations by Drs. James Cantor and Daniel Weiss.  The materials I have relied upon in preparing this declaration are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject.  I may wish to supplement these opinions or the bases for them as a result of new scientific research or publications or other developments in my area of expertise.

## BACKGROUND AND QUALIFICATIONS

4.      My curriculum vitae is attached as Exhibit A to this declaration.  I am currently an Assistant Professor of Child & Adolescent Psychiatry at the University of California, San Francisco (UCSF) School of Medicine, where I am also Affiliate Faculty at the Philip R. Lee Institute for Health Policy Studies.  As a member of the faculty at UCSF, I serve as director of the Gender Psychiatry Program in the Division of Child & Adolescent Psychiatry.  I also serve as an attending psychiatrist in the adult LGBT psychiatry clinic and in the eating disorders program.  In my career, I have cared for at least 100 adolescents with gender dysphoria.  In addition to my clinical work, I conduct research focusing on the determinants of mental health among transgender youth and teach medical students, psychology trainees, psychiatry residents, and child and adolescent psychiatry fellows.

5.      I received my undergraduate degree in neuroscience from Harvard College.  I received both my MD and Master of Health Science (MHS) degrees from Yale University School

1

ER0955

of Medicine.  I completed residency training in general psychiatry in the combined Massachusetts General Hospital / McLean Hospital residency training program (Harvard Medical School) and fellowship training in child and adolescent psychiatry at Stanford University.  I am board certified in psychiatry by The American Board of Psychiatry and Neurology.

6.      My research focuses on the mental health of transgender youth and youth experiencing gender dysphoria.  While at Yale, I was awarded the Ferris Prize for my thesis entitled "Evolving Treatment Paradigms for Transgender Youth."  In 2017, I received the United States Preventative Health Services Award for Excellence in Public Health based on my work related to the mental health of transgender youth.  I have lectured on the mental health of transgender youth at Yale School of Medicine, UCSF, Stanford University, and The Massachusetts General Hospital (a teaching hospital of Harvard Medical School).  I have given invited grand rounds presentations at academic institutions around the country and have presented nationally and internationally on topics related to the mental health of transgender people and people experiencing gender dysphoria.

7.      I have served as a manuscript reviewer for numerous professional publications, including *The Journal of The American Medical Association (JAMA)*, *JAMA Pediatrics*, *JAMA Psychiatry*, *The Journal of The American Academy of Child & Adolescent Psychiatry*, *Pediatrics*, *The Journal of Adolescent Health*, and *The American Journal of Public Health*.  I received commendation as a top peer reviewer from *Annals of Internal Medicine*, the academic journal of the American College of Physicians.  I am an academic editor for the journal *PLoS One* and a contributing editor for *The Journal of The American Academy of Child & Adolescent Psychiatry.* I have served as lead author for textbook chapters on the mental health of transgender youth, including for *Lewis's Child & Adolescent Psychiatry: A Comprehensive Textbook* and the textbook

2

ER0956

of The International Academy for Child & Adolescent Psychiatry and Allied Professionals.  I am

co-editor of the textbook *Pediatric Gender Identity: Gender-Affirming Care for Transgender and*

*Gender Diverse Youth.*

8.      I have published extensively on the topic of transgender youth, including nine

articles in peer-reviewed journals within the past two years.

9.      In the last four years, I have been retained as an expert and provided testimony at

trial or by deposition in the following cases: *Brandt et al. v. Rutledge, et al.*, No. 21-CV-450 (D.

Ark.) (deposition and trial testimony); *K.C. v. Medical Licensing Board of Indiana*, No. 1:23-cv-

00595-JPH-KMB (S.D. Ind.) (deposition).

10.      I am being compensated at an hourly rate of $400 per hour for preparation of expert

declarations and reports and time spent preparing for or giving deposition or trial testimony.  My

compensation does not depend on the outcome of this litigation, the opinions I express, or the

testimony I provide.

**THERE IS NO BASIS FOR THE STATE'S EXPERTS' ASSERTIONS THAT THERE IS
NO RELIABLE RESEARCH SHOWING THE EFFICACY AND EFFECTIVENESS OF
GENDER-AFFIRMING MEDICAL CARE FOR ADOLESCENTS**

11.      There are over a dozen studies evaluating the efficacy and effectiveness[1] of puberty

blockers and gender-affirming hormones for the treatment of adolescents with gender dysphoria.[2]

---

[1] Efficacy refers to studies looking at an intervention under "ideal circumstances" (*e.g.*, in a research clinic), whereas effectiveness studies look at the impact of an intervention under "real world" conditions (*i.e.*, in the general community practice setting).

[2] Such studies include: De Vries, A. L., Steensma, T. D., Doreleijers, T. A., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *The Journal of Sexual Medicine*, *8*(8), 2276-2283; De Vries, A. L., McGuire, J. K., Steensma, T. D., Wagenaar, E. C., Doreleijers, T. A., & Cohen-Kettenis, P. T. (2014). Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*, *134*(4), 696-704; Costa, R., Dunsford, M., Skagerberg, E., Holt, V., Carmichael, P., & Colizzi, M. (2015). Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria. *The Journal of Sexual Medicine*, *12*(11), 2206-2214; Allen, L. R., Watson, L.

3

These studies can be roughly delineated into two categories: uncontrolled longitudinal studies and controlled cross-sectional studies. Uncontrolled longitudinal studies (*e.g.*, Chen et al. *New England Journal of Medicine* 2023[3] and deVries et al. *Journal of Sexual Medicine* 2011[4]) have examined mental health before and after gender-affirming medical interventions and found that mental health is improved after treatment. Controlled cross-sectional studies (*e.g.*, van der Miesen

---

B., Egan, A. M., & Moser, C. N. (2019). Well-being and suicidality among transgender youth after gender-affirming hormones. *Clinical Practice in Pediatric Psychology*, *7*(3), 302-311; Kaltiala, R., Heino, E., Työläjärvi, M., & Suomalainen, L. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. *Nordic Journal of Psychiatry*, *74*(3), 213-219; de Lara, D. L., Rodríguez, O. P., Flores, I. C., Masa, J. L. P., Campos-Muñoz, L., Hernández, M. C., & Amador, J. T. R. (2020). Psychosocial assessment in transgender adolescents. *Anales de Pediatría (English Edition), 93*(1), 41-48; van der Miesen, A. I., Steensma, T. D., de Vries, A. L., Bos, H., & Popma, A. (2020). Psychological functioning in transgender adolescents before and after gender-affirmative care compared with cisgender general population peers. *Journal of Adolescent Health*, *66*(6), 699-704; Kuper, L. E., Stewart, S., Preston, S., Lau, M., & Lopez, X. (2020). Body dissatisfaction and mental health outcomes of youth on gender-affirming hormone therapy. *Pediatrics*, *145*(4), e20193006; Turban, J. L., King, D., Carswell, J. M., & Keuroghlian, A. S. (2020). Pubertal suppression for transgender youth and risk of suicidal ideation. *Pediatrics*, *145*(2), e20191725; Green, A. E., DeChants, J. P., Price, M. N., & Davis, C. K. (2021). Association of gender-affirming hormone therapy with depression, thoughts of suicide, and attempted suicide among transgender and nonbinary youth. *Journal of Adolescent Health*, *70*(4), 643-649; Turban, J. L., King, D., Kobe, J., Reisner, S. L., & Keuroghlian, A. S. (2022). Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PLoS One*, *17*(1), e0261039; Tordoff, D. M., Wanta, J. W., Collin, A., Stephney, C., Inwards-Breland, D. J., Ahrens, K. (2022). Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care. *JAMA Network Open*, *5*(2), e220978; Chen, D., Berona, J., Chan, Y. M., Ehrensaft, D., Garofalo, R., Hidalgo, M. A., Rosenthal, S. M., Tishelman, A. C., & Olson-Kennedy, J. (2023). Psychosocial functioning in transgender youth after 2 years of hormones. *New England Journal of Medicine*, *388*(3), 240-250.

[3] Chen, D., Berona, J., Chan, Y. M., Ehrensaft, D., Garofalo, R., Hidalgo, M. A., Rosenthal, S. M., Tishelman, A.C., & Olson-Kennedy, J. (2023). Psychosocial functioning in transgender youth after 2 years of hormones. *New England Journal of Medicine*, *388*(3), 240-250.

[4] De Vries, A. L., Steensma, T. D., Doreleijers, T. A., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *The Journal of Sexual Medicine*, *8*(8), 2276-2283.

ER0958

et al. *Journal of Adolescent Health*[5] and Turban et al. *PLoS One*[6]) have compared those who accessed gender-affirming medical care to those who desired but did not access this treatment and found that those who accessed treatment had better mental health outcomes. These two types of study designs offer complementary information that make experts in this field confident regarding the mental health benefits of these treatments. These studies are additionally supplemented by decades of clinical experience from experts around the world who care for adolescents with gender dysphoria.

12. The State's experts devote many pages to quarreling with individual studies' methodologies. All studies in medicine have strengths and weaknesses, and one must examine the body of literature as a whole to draw conclusions. Examining the body of literature regarding gender-affirming medical care for adolescent gender dysphoria as a whole provides a rich scientific perspective, linking these treatments to clear mental health benefits.

13. The State's experts often discuss the concept of "confounding" variables—the notion that certain *other variables* that are related to gender-affirming care and mental health outcomes may be the true reason for observed mental health benefits. The question of "confounding effect" has been examined in several ways. For instance, a 2022 paper from my research group that assessed the relationship between treatment with gender-affirming medical interventions and improved mental health statistically adjusted for a range of potentially confounding variables including age, gender identity, sex assigned at birth, sexual orientation,

---

[5] van der Miesen, A. I., Steensma, T. D., de Vries, A. L., Bos, H., & Popma, A. (2020). Psychological functioning in transgender adolescents before and after gender-affirmative care compared with cisgender general population peers. *Journal of Adolescent Health*, *66*(6), 699-704.

[6] Turban, J. L., King, D., Kobe, J., Reisner, S. L., & Keuroghlian, A. S. (2022). Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PLoS One*, *17*(1), e0261039

5

race/ethnicity, level of family support for gender identity, relationship status, level of education, employment status, household income, having ever received pubertal suppression, having ever been exposed to gender identity conversion efforts, and having experienced any harassment based on gender identity in school.[7]  Even after adjusting for these potential confounding factors, the study found that treatment with gender-affirming medical care during adolescence was associated with lower odds of adverse mental health outcomes.

14.    A potential confounder that the State's experts raise in particular is whether or not participants received supportive psychotherapy in addition to gender-affirming medical care.  Of note, there is no evidence-based psychotherapy that treats gender dysphoria itself, so such therapy is generally aimed at supporting the patient in general with their mental health.  Some studies assessing gender-affirming medical care in adolescents have taken psychotherapy into account and found that benefits seen were not explained by the psychotherapy.  Costa et al.[8] examined two cohorts of adolescents with gender dysphoria.  Both cohorts received six months of supportive psychotherapy for the initial six months of the study.  For the next twelve months, one group continued to receive supportive psychotherapy alone (the "delayed eligible" group), while the other received supportive psychotherapy *and* pubertal suppression (the "immediately eligible" group).  The delayed eligible group had statistically significant improvement in global functioning after six months of psychotherapy alone.  Of note, this supportive psychotherapy was aimed at improving mental health generally, not gender dysphoria specifically.  The delayed eligible group

---

[7] Turban, J. L., King, D., Kobe, J., Reisner, S. L., & Keuroghlian, A. S. (2022). Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PLoS One*, *17*(1), e0261039.

[8] Costa R, Dunsford M, Skagerberg E, Holt V, Carmichael P, Colizzi M (2015). Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria. *The Journal of Sexual Medicine*, *12*(11), 2206-2214.

ER0960

likely had worse mental health at baseline and thus was more likely to have their mental health improve with therapy. The "immediately eligible" group, which was deemed eligible for puberty blockers likely in part because their other mental health conditions besides gender dysphoria were reasonably well-controlled, did not see an improvement with therapy over these first six months. For the next twelve months of the study, the delayed eligible group that continued to receive psychotherapy alone saw no further improvement in their mental health. However, the immediately eligible group that received pubertal suppression in addition to psychotherapy saw statistically significant improvement in their global mental health functioning. This shows that pubertal suppression alleviated psychological distress that supportive psychotherapy alone could not—presumably gender dysphoria-related distress, given the mechanism of the medication. A study by Tordoff et al. similarly examined psychotherapy as a potentially confounding variable and their results showed that mental health improvements seen were not from psychotherapy alone.[9] Another study by Achille et al.[10] ran regression analyses in order to separate out the impacts of gender-affirming medical interventions from the impact of counseling and psychiatric medications. Though the sample size made it statistically difficult to detect differences, pubertal suppression was associated with better scores on the Center for Epidemiology Studies Depression Scale for participants assigned male at birth, which was a statistically significant finding.[11]

---

[9] Tordoff, D. M., Wanta, J. W., Collin, A., Stepney, C., Inwards-Breland, D. J., & Ahrens, K. (2022). Mental health outcomes in transgender and nonbinary youths receiving gender-affirming care. *JAMA Network Open*, *5*(2), e220978.

[10] Achille, C., Taggart, T., Eaton, N. R., Osipoff, J., Tafuri, K., Lane, A., & Wilson, T. A. (2020). Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results. *International Journal of Pediatric Endocrinology*, *2020*(8). doi: 10.1186/s13633-020-00078-2.

[11] It is important to note that in statistics, a statistically significant finding tells you that a finding is likely to represent a true effect and the finding was not due to random chance. In contrast, the lack of a statistically significant finding does not tell you one way or another if there is an effect. I would caution against over-interpreting non-statistically significant findings. Lack of a

15.     As discussed above, Dr. Cantor is likely correct (Cantor, ¶ 196) that the pubertal suppression plus therapy group in Costa was different from the therapy alone group in that the latter group had other mental health concerns.  However, this would mean that this group would be even more likely to respond well to psychotherapy than the therapy plus pubertal suppression group—as the study found in the first six months of psychotherapy alone; the pubertal suppression plus therapy had improvement over the latter course of the study when pubertal suppression was added, whereas the therapy alone group did not.[12]  Again, this speaks to the mental health benefits of pubertal suppression for gender dysphoria, separate from the impact of supportive psychotherapy.

16.     Of note, Dr. Cantor asserts that Carmichael et al. 2021[13] supersedes the results of Costa et al. 2015 because "neither group actually had experienced any significant improvement at all."  (Cantor, ¶196).  He failed to recognize that the Carmichael study did find that global functioning scores improved; however, for reasons not clearly outlined in the Carmichael study,

---

statistically significant finding does not mean that no effect exists; it simply means the analysis in question does not tell the researchers one way or another if an effect exists.

[12] Dr. Cantor also references a letter to the editor about the Costa study that mentions the "dropout" rate being high (Cantor, ¶ 196).  However, the dropout rate is nearly identical in the two groups, and there is no clear reason to think that the dropout rates would have thus impacted the results. If one had seen, for instance, that the dropout rate was much higher in the pubertal suppression group, one may think that people were leaving the study due to adverse effects of treatment; however, this was not seen in the study—the dropout rates were nearly identical in both groups. Biggs, M. (2019). A letter to the editor regarding the original article by Costa et al: Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria. *Journal of Sexual Medicine*, 16(12), 2043.

[13] Carmichael, P., Butler, G., Masic, U., Cole, T. J., De Stavola, B. L., Davidson, S., Skageberg, E. M., Khadr, S., Viner, R. M. (2021). Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK. *PLoS One*, 16(2), e0243894.

8

the authors did not run statistical analyses on this measure, as they did in the Costa 2015 publication.[14]

17.     Dr. Cantor raises the possibility that the studies finding benefits of gender-affirming medical care for adolescents reflect reverse causation (*i.e.,* the notion that improved mental health causes one to access gender-affirming medical care rather than the reverse, that gender-affirming medical care leads to better mental health).  (*See* Cantor, ¶ 61).  This issue has been examined in the literature.  For example, in a recent major publication in *The New England Journal of Medicine*, Chen et al. used a technique called parallel process modeling and found that improvements in mental health tracked along with improvements in appearance congruence over time (a measure of the degree to which study participants' bodies aligned with their gender identities), suggesting that gender-affirming medical care was the cause of the improvements in mental health, and arguing against the notion of reverse causation.[15]

18.     The State's experts spend a great deal of time focusing on the lack of randomized controlled trial ("RCT") studies in this area.  First, controlled cross-sectional studies and uncontrolled longitudinal cohort studies are well-accepted in medical research and often relied upon in medicine.  It is true that randomized controlled trials provide valuable information and strong evidence of causation that other studies do not.  But such studies are not always feasible or ethical in medicine, and many treatments are provided without the benefit of randomized

---

[14] The discussion in the Carmichael study goes on to say, "Participant experience of treatment as reported in interviews was positive for the majority, particularly relating to feeling happier, feeling more comfortable, better relationships with family and peers and positive changes in gender role" and that their lack of statistically significant findings for other measures that were statistically analyzed "may relate simply to sample size."

[15] Chen, D., Berona, J., Chan, Y. M., Ehrensaft, D., Garofalo, R., Hidalgo, M. A., Rosenthal, S. M., Tishelman, A.C., & Olson-Kennedy, J. (2023). Psychosocial functioning in transgender youth after 2 years of hormones. *New England Journal of Medicine*, *388*(3), 240-250.

9

ER0963

controlled trials. Randomized controlled trials are not feasible in the realm of gender-affirming medical care for adolescent gender dysphoria in particular. Because of the existing body of literature linking gender-affirming medical care to improved mental health outcomes for adolescents with gender dysphoria, it would be extraordinarily difficult to recruit people to participate in studies, knowing they could be randomized to receive no treatment. Particularly for vulnerable and pediatric populations, is not considered ethical to randomize patients to placebo treatments when there is substantial evidence that active treatment confers important benefits. Thus, a randomized controlled trial of gender-affirming medical care for adolescent gender dysphoria would be unlikely to be approved by an Institutional Review Board (IRB), the ethical boards at universities that decide if research is allowed to proceed). [16]

19. The State's experts also claim that data based on self-report and surveys are not valid or reliable evidence. Their claims represent a broad misunderstanding of psychiatry. Clinical psychiatry and clinical psychiatric research almost always involve patient reports of their symptoms. Because psychiatric conditions (*e.g.*, generalized anxiety disorder, major depressive disorder, schizophrenia, obsessive compulsive disorder, and gender dysphoria, among many others) do not have laboratory tests, diagnosis is made largely based on patient reports of their symptoms. At times these may be supplemented by reports from parents and clinician observations, particularly for establishing a diagnosis; however, they are not considered standard

---

[16] Of note, an RCT was recently conducted in Australia among adults with gender dysphoria to examine the impact of testosterone therapy. Nolan, B. J., Zwickl, S., Locke, P., Zajac, J. D., & Cheung, A. S. (2023). Early Access to Testosterone Therapy in Transgender and Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical Trial. *JAMA Network Open*, 6(9), e2331919. The RCT found that those randomized to immediate testosterone therapy had better mental health outcomes than those randomized to the clinic's regular waitlist. Given that they are a vulnerable group that generally warrants stricter protection under IRB review, it is unlikely that such an RCT would be approved for minors.

ER0964

or necessary in clinical trials that track symptoms over time or compare the mental health of those receiving treatment to those not receiving treatment. The studies cited in this declaration utilize commonly used and validated self-report psychometric measures including the Kessler-6 measure of past-month severe psychological distress,[17] Beck Depression Inventory II,[18] and self-report measures from the National Institutes of Health Toolbox Emotion Battery.[19] These self-report instruments are standard in psychiatric research.

20.    Survey methodologies are widely used in psychiatric research. Of note, the State's experts repeatedly cite survey research in their own reports (*e.g.,* Littman 2018,[20] Diaz 2023,[21] Littman 2021[22]). It is worth highlighting that there exist both high-quality and low-quality survey

---

[17] Kessler, R. C., Green, J. G., Gruber, M. J., Sampson, N. A., Bromet, E., Cuitan, M., Furukawa, T.A., Gureje, O., Hinkov, H., Hu, C., Lara, C., Lee, S., Mneimneh, Z., Myer, L., Oakley-Browne, M., Posada-Villa, J., Sagar, R., Viana, M. C., & Zaslavsky, A. M. (2010). Screening for serious mental illness in the general population with the K6 screening scale: results from the WHO World Mental Health (WMH) survey initiative. *International Journal of Methods in Psychiatric Research*, *19*(S1), 4-22.

[18] Beck, A. T., Steer, R. A., & Brown, G. (1996). Beck depression inventory–II. *Psychological Assessment*.

[19] Slotkin, J., Nowinski, C., Hays, R., Beaumont, J., Griffith, J., Magasi, S., & Gershon, R. (2012). NIH Toolbox scoring and interpretation guide. *Washington (DC): National Institutes of Health*, 6-7.

[20] Littman, L. (2018). Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. *PLoS One*, *13*(8), e0202330.

[21] Diaz, S. & Bailey, J. M. (2023). Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases. *Archives of Sexual Behavior*, *52*(3), 1031-1043. This article was later retracted by the journal. Diaz, S. & Bailey, J. M. (2023). Retraction Note: Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases. *Archives of Sexual Behavior*, doi: 10.1007/s10508-023-02635-1.

[22] Littman, L. (2021). Individuals treated for gender dysphoria with medical and/or surgical transition who subsequently detransitioned: A survey of 100 detransitioners. *Archives of Sexual Behavior*, *50*(8), 3353-3369.

11

methodologies. For example, Littman 2018 has been criticized for asking leading questions to a group that is ideologically focused, making it easy for participants to bias results and analyses.[23] In contrast, the 2015 US Transgender Survey had over 180 questions across 32 sections.[24] If participants were to attempt to bias the results in a certain direction, they would have needed to answer questions at distant parts of the survey in a particular fashion, based on what study design they believed researchers would use. Our group's analyses also utilized regression analyses that adjusted for a range of potentially confounding variables, further adding to the complexity of the analyses. Of note, the analysis plans for our group's studies were designed only after the 2015 USTS was already administered.

21. The State's experts' opinions concerning the evidence related to gender-affirming medical care and its impact on suicidality demonstrate a lack of understanding of suicidality research. Dr. Weiss and Dr. Cantor focus on a lack of data showing elevated rates of completed suicides among youth with gender dysphoria, at least as compared to youth with other mental health disorders. (Weiss, ¶ 89; Cantor, ¶¶ 147–53). It is true that there is a paucity of literature in this regard. Such research is often conducted by examination of death records, and because gender identity is rarely recorded on such records, this research has been difficult to conduct. However, there have been studies showing lower odds of suicidal ideation among those who receive treatment.[25] The suggestion that there is not really an elevated risk of suicide because the data we

---

[23] Littman, L. (2018). Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. *PLoS One*, *13*(8), e0202330; Littman, L. (2019). Correction: Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. *PLoS One*, *14*(3), e0214157.

[24] James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). The Report of the 2015 U.S. Transgender Survey. Washington, DC: National Center for Transgender Equality.

[25] See for example Turban, J. L., King, D., Carswell, J. M., & Keuroghlian, A. S. (2020). Pubertal suppression for transgender youth and risk of suicidal ideation. *Pediatrics*, *145*(2), e20191725 in the realm of cross-sectional studies and Allen, L. R., Watson, L. B., Egan, A. M., & Moser, C. N.

ER0966

have is about suicidal ideation and not completed suicides demonstrates a profound lack of understanding of suicidality. Moreover, suicidal ideation is an indicator of severe psychological distress, rising to the level of the individual not wanting to live. Whether or not it ultimately results in a completed suicide, suicidal ideation is a serious negative outcome to be prevented. Reducing suicidal ideation is an important goal of mental health treatment, and it is vital for patients to have access to interventions that that reduce suicidal ideation.

22.     The State's experts highlight that rates of suicidality are elevated among transgender people after gender-affirming care and Dr. Weiss even suggests that gender-affirming medical care "may increase the risk of suicide." (Weiss, ¶ 90). For example, he highlights a study by Dhejne et al. published in 2011[26] that found that those who had gender-affirming surgery had a 19-fold increased odds of suicidality when compared to the general population. Such statistics are not evidence that gender-affirming care is ineffective or that it increases suicide risk. The discussion from that very study explains:

> "It is therefore important to note that the current study is only informative with respect to transsexual persons health after sex reassignment; no inferences can be drawn as to the effectiveness of sex reassignment as a treatment for transsexualism. In other words, the results should not be interpreted such as sex reassignment *per se* increases morbidity and mortality. Things might have been even worse without sex reassignment. As an analogy, similar studies have found increased somatic morbidity, suicide rate, and overall mortality for patients treated for bipolar disorder and schizophrenia. This is important information, but it does not follow that mood stabilizing treatment or antipsychotic treatment is the culprit."

---

(2019). Well-being and suicidality among transgender youth after gender-affirming hormones. *Clinical Practice in Pediatric Psychology*, *7*(3), 302-311 in the realm of longitudinal studies.

[26] Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L., Långström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: Cohort study in Sweden. *PLoS One*, *6*(2), e16885.

ER0967

In other words, though gender-affirming care improves mental health, it does not eliminate other factors like societal experiences of transphobia that adversely impact mental health. To evaluate if gender-affirming medical care is helpful to mental health using a control group, the control group would need to be transgender people who desired but did not access the treatment, not the general population. Almazan & Keuroghlian used that appropriate control group in a study published in *JAMA Surgery* in 2021[27] and found that access to gender-affirming surgery was associated with lower odds of past-year suicidal ideation. They further conducted post-hoc analyses that argued against the possibility of reverse causation (*i.e.,* they showed that people who received surgery had better mental health after the treatment, rather than having better mental health at baseline prior to having the surgery).

### THE STATE'S EXPERTS' CLAIM THAT IDAHO'S BAN ON GENDER-AFFIRMING MEDICAL CARE FOR ADOLESCENT GENDER DYSPHORIA IS CONSISTENT WITH INTERNATIONAL CONSENSUS IS NOT ACCURATE

23.     The State's experts rely on reports from some European countries and imply that Idaho's ban on gender-affirming medical care is in line with "international consensus." (*See* for example Cantor, ¶¶ 17-33).[28] This is not accurate. *None* of these countries have banned—let alone

---

[27] Almazan, A. N., & Keuroghlian, A. S. (2021). Association between gender-affirming surgeries and mental health outcomes. *JAMA Surgery*, *156*(7), 611-618.

[28] For example, Cass, H. (2022, February). The Cass Review: Independent review of gender identity services for children and young people Interim report. National Health Service (NHS), UK (England); COHERE Finland (Council for Choices in Health Care in Finland) (2020, June 16). Medical treatment methods for dysphoria associated with variations in gender identity in minors—Summary of a recommendation. [Translated], *available at* https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en+(1).pdf/fa2054c 5-8c35-8492-59d6-b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474 (Finland); Swedish Socialstyrelsen. (2022, February 22). Uppdaterade rekommendationer för hormonbehandling vid könsdysfori hos unga. [Updated recommendations for hormone therapy for gender dysphoria in young people.], *available at* https://www.socialstyrelsen.se/om-socialstyrelsen/pressrum/press/uppdateraderekommendationer-for-hormonbehandling-vid-konsdysfori-hos-unga/ (Sweden); Swedish Socialstyrelsen. (2022, December). Care of children and adolescents with gender dysphoria. Summary of national guidelines, *available at*

14

criminalized—gender-affirming medical care for adolescents with gender dysphoria as Idaho does. Rather, the government health authorities in the select countries referenced have made changes to the way in which gender-affirming care is being delivered (*e.g.,* moving care to research settings where more data can be collected).[29]  Rather than put it in line with "international consensus," Idaho's ban on gender-affirming medical care for adolescent gender dysphoria puts the law squarely outside of mainstream medical views and policies around the world.

24.    The State's experts focus on the European reports' assessment of the body of research on gender-affirming care for minors.  Of note, most of these reports were not peer-reviewed and were published by government entities.[30]  These types of government reports are not the types of research that experts rely upon when forming conclusions about research.  Moreover, they do not include all of the relevant literature.  The State's experts attempt to bolster the importance of these reports by calling them "systematic reviews."  But all a "systematic review" means is that the authors of the reports pre-defined the search terms they used when conducting literature reviews in various databases.[31]  Merely pre-defining search terms does not guarantee that

---

https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2023-1-8330.pdf (Sweden); French Academy of Medicine. (2022) Medicine and gender transidentity in children and adolescents, *available at* https://www.academie-medecine.fr/la-medecine-face-a-la-transidentite-de-genre-chez-les-enfants-et-les-adolescents/?lang=en.

[29] Contrary to the suggestion of Dr. Weiss (¶ 168), that gender services for minors have been shut down in the U.K., the National Health Service replaced a centralized clinic with several regional clinics.

[30] The one exception is that the Swedish Agency for Health Technology Assessment and Assessment of Social Services (SBU) published its systematic review in the journal *Acta Paediatrica*, a Swedish medical journal that appears to be peer-reviewed.  *See* Ludvigsson, J. F., Adolfsson, J., Höistad, M., Rydelius, P.-A., Kriström, B., & Landén, M. (2023). A systematic review of hormone treatment for children with gender dysphoria and recommendations for research. *Acta Paediatrica.* doi: 10.1111/apa.16791.

[31] Harvard Countway Library. Systematic Reviews and Meta Analysis Q&A. Accessed: October 1, 2023, *available at* https://guides.library.harvard.edu/meta-analysis/GettingStarted.

15

the systematic review will identify the full body of relevant literature,[32] nor does it tell you anything about the reliability of the review authors' description and analysis of the literature. The primary advantage to a systematic review would be its potential (though no guarantee) to identify research publications that had not previously been identified in this discussion. The reports cited by the State's experts did not identify any such new research reports that affect my conclusions about the research.

### THE STATE'S EXPERTS HAVE INAPPROPRIATELY APPLIED RESEARCH ON PREPUBERTAL CHILDREN TO TRANSGENDER ADOLESCENTS IN CLAIMING THAT THERE IS A HIGH LIKELIHOOD OF "DESISTANCE" AMONG ADOLESCENTS WITH GENDER DYSPHORIA

25.     Dr. Cantor inappropriately uses studies of young prepubertal children to imply that adolescents who are candidates for gender-affirming medical care are likely to desist if not provided with gender-affirming care.  (Cantor, ¶115).  Though the terms "children" and "adolescents" are sometimes used synonymously in common parlance, these terms have specific and distinct meanings in the context of child and adolescent psychiatric research.  In this field, "child" and "children" refer to minors who have not yet reached the earliest stages of puberty (*i.e.*, Tanner 2).  The terms "adolescent" and "adolescents" refer to minors who have begun puberty. Studies of prepubertal children (who are not candidates for gender-affirming medical interventions under *any* existing clinical guidelines) cannot be conflated with studies of adolescents (who,

---

[32] This is the case with a Cochrane review abstract from 2020 cited by Defendants' experts regarding gender-affirming hormone therapy among transgender women (Haupt, C., Henke, M., Kutschmar, A., Hauser, B., Baldinger, S., Saenz, S. R., & Schreiber, G. (2020). Antiandrogen or estradiol treatment or both during hormone therapy in transitioning transgender women. *Cochrane Database of Systematic Reviews*, *2020*(11), CD013138).  The Cochrane review did not identify several cohort studies examining gender-affirming medical care for adolescent gender dysphoria, likely due to its search methodology, and because it only examined studies published prior to 2019.

16

ER0970

depending on several factors, *may* be candidates for various forms of gender-affirming medical interventions).

26.     This distinction is vital in the realm of "desistence" studies (*i.e.*, studies that aim to assess how many young people who identify as transgender will later identify as cisgender).  The suggestion by Dr. Cantor that a majority of transgender minors affected by the Idaho law will come to identify with their assigned sex at birth inappropriately relies on studies of gender diverse *prepubertal* children, which have, in the past, shown that many of these children will not grow up to be transgender.  These studies do not apply to transgender minors who have reached puberty (*i.e.*, "adolescents").[33]  Once a transgender youth begins puberty, it is extremely rare for them to later identify as cisgender.[34]  The notion that puberty will generally result in transgender people coming to identify as cisgender is also clearly not true given the fact that there are over 1 million transgender adults in the U.S.[35] and the vast majority of older cohorts were unable to access pubertal suppression.[36]

---

[33] Dr. Cantor suggests that the desistance studies are not irrelevant to adolescents because they do not specify at what developmental stage the reported desistance occurred.  (Cantor, ¶119).  But those studies say nothing about whether desistance is common among adolescents with gender incongruence.

[34] See Turban, J.L., de Vries, A.L.C., & Zucker, K.  (2018).  Gender Incongruence & Gender Dysphoria.  In Martin A., Bloch M.H., & Volkmar F.R. (Editors): *Lewis's Child and Adolescent Psychiatry: A Comprehensive Textbook, Fifth Edition*. Philadelphia: Wolters Kluwer. This textbook chapter provides comment from the directors of two of the oldest and most established gender clinics in the world.

[35] Flores, A. R., Herman, J., Gates, G. J., & Brown, T. N. (2016). *How many adults identify as transgender in the United States?* (Vol. 13). Los Angeles, CA: Williams Institute.

[36] See, for example, Turban, J. L., King, D., Carswell, J. M., & Keuroghlian, A. S. (2020). Pubertal suppression for transgender youth and risk of suicidal ideation. *Pediatrics*, *145*(2), e20191725, which found that only 2.5% of those who desired pubertal suppression for gender dysphoria were able to access it.

17

27.     Any study regarding prepubertal children and their likelihood of ultimately identifying as transgender should not be used to assess the interventions targeted by the Idaho law, namely, pubertal suppression, gender-affirming hormones, and gender-affirming surgery, since none of these interventions are provided to prepubertal patients under current medical guidelines.[37]

28.     Further, the utility of "desistence" studies even for predicting the future gender identity of prepubertal children is not appropriate due to their reliance on an outdated diagnosis of "gender identity disorder in children," which did not require a child to identify as a sex different than their sex assigned at birth.  This diagnosis likely captured many cisgender "tomboys" or cisgender boys with feminine interests like dresses or dolls who never identified as transgender to begin with and, thus, unsurprisingly did not identify as transgender when followed up with later in life. In fact, an analysis of the so-called "desistence" studies found that, when asked their gender identity, 90% of the children with "gender identity disorder" in these studies reported an answer that aligned with their sex assigned at birth.[38] In contrast, the diagnosis of "gender dysphoria in children" requires one to not merely have gender atypical interests and behaviors; one must identify as a gender different than one's sex assigned at birth.  This is a vital distinction.  While the diagnostic category of "gender identity disorder" would capture many cisgender children, the diagnostic category of "gender dysphoria" from the DSM-5, by definition, does not.[39]

---

[37] Hembree, W.C., Cohen-Kettenis, P.T., Gooren, L., *et al*.  (2017).  Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline. *Journal of Clinical Endocrinology & Metabolism*, 102(11), 3869-3903.

[38] Olson, K. R. (2016). Prepubescent Transgender Children: What We Do and Do Not Know. *Journal of the American Academy of Child and Adolescent Psychiatry*, *55*(3), 155-156.

[39] For more information on the limits of "desistence studies" see Olson, K.R.  (2016).  Prepubescent Transgender Children: What We Do and Do Not Know.  *Journal of the American Academy of Child & Adolescent Psychiatry*, 3(55), 155-156.

ER0972

**THE STATE'S EXPERTS' ASSERTION THAT GENDER AFFIRMING CARE CAUSES PERSISTENCE OF GENDER INCONGRUENCE IS NOT SUPPORTED BY EVIDENCE**

29.     The State's experts suggest that gender affirming care, including social transition, causes the persistence of gender incongruence among youth.  Despite Dr. Cantor spending a considerable portion of his declaration on the importance of differentiating correlation from causation, he does not apply that to the findings that social transition is correlated with "persistence."  He outlines data showing that youth who socially transition are more likely to continue to identify as transgender later in life (*i.e.,* correlation).  But this correlation could be due to two possibilities: (1) social transition could influence a child's gender identity, making them identify more strongly as transgender and thus more likely to persist, or (2) children who go on to socially transition identified more strongly as transgender than those who did not *prior* to social transition, and thus their pre-transition gender incongruence lead to the social transition in the first place.

30.     Research by Rae et al. has shown that the second possibility is far more likely to be what is occurring.[40]  Rae et al.'s 2019 study showed that gender identification is not significantly different before and after a social transition, but that those who ultimately underwent a social transition had a greater degree of gender incongruence *prior to social transition*.[41]  The study made clear that this correlation—between pre-pubertal social transition and transgender identity—is because those who undergo a pre-pubertal social transition had stronger discordance between

---

[40] Rae, J. R., Gülgöz, S., Durwood, L., DeMeules, M., Lowe, R., Lindquist, G., & Olson, K. R. (2019). Predicting early-childhood gender transitions. *Psychological Science*, *30*(5), 669-681.

[41] Note that in most studies, a lack of a statistically significant finding is not informative.  This study used sophisticated Bayesian statistics to show that gender identification was not different before and after a social transition.  Such a finding of something not being different is, under these methods, reliable.

19

their sex assigned at birth and their gender identity to begin with, and that social transition itself does not appear to increase gender discordance.

31.     The State's experts also point to studies showing that the overwhelming majority of transgender adolescents who start pubertal suppression go on to future additional gender-affirming medical interventions, suggesting that pubertal suppression causes continued gender incongruence.  (*E.g.*, Weiss, ¶119, referring to a "conveyer belt of 'gender transition'").  It is another logical fallacy to infer that a study showing that the majority of adolescents on puberty blockers proceeding on to future gender-affirming medical interventions is evidence that the treatment causes persistence; rather, it is just as possible, and in my opinion more likely, that, given the comprehensive biopsychosocial mental health assessment that is done prior to starting gender-affirming medical interventions under current guidelines, the adolescents who started pubertal suppression were those who were, through medical and mental health screening, determined, prior to starting pubertal suppression, to have a low likelihood of future desistence in their transgender identity.

## THE STATE'S EXPERTS' SUGGESTION THAT PATIENTS SEEK GENDER-AFFIRMING MEDICAL CARE BECAUSE OF SOCIAL INFLUENCE IS WITHOUT BASIS

32.     The State's experts claim that social influence is responsible for adolescents seeking gender-affirming medical care and is a cause of "rapid-onset gender dysphoria".  (Cantor ¶ 136; Weiss ¶¶ 35, 106.)

33.     As an initial matter, Defendants' experts fail to note that "rapid-onset gender dysphoria" is not a recognized mental health condition.[42]  The term "rapid-onset gender dysphoria"

---

[42] Littman, L. (2019). Correction: Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. *PLoS One*, *14*(3), e0214157.

ER0974

entered the literature in 2018 through a publication by Dr. Lisa Littman, discussed briefly above.[43]

Soon after the initial publication of Dr. Littman's article, a correction was published.[44] The

correction noted, "Rapid-onset gender dysphoria (ROGD) is not a formal mental health diagnosis

at this time. This report did not collect any data from the adolescents and young adults (AYAs) or

clinicians and therefore does not validate the phenomenon."[45] The correction goes on to say "the

term should not be used in any way to imply that it explains the experiences of all gender dysphoric

youth . . . ." The American Psychological Association has highlighted that, due to the lack of

empiric basis, "rapid-onset gender dysphoria" should not be used in assessment or clinical

treatment contexts.[46] Despite this, the State's experts cite the 2018 Littman article to make

unsubstantiated claims about adolescents with gender dysphoria.

34.     The Littman study was an anonymous online survey of the parents of transgender

youth, recruited from websites where this notion of "social contagion" leading to transgender

identity is popular. The anonymous survey participants were asked what they thought was the

---

[43] Littman, L. (2018). Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. *PLoS One*, *13*(8), e0202330.

[44] Littman, L. (2019). Correction: Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria. *PLoS One*, *14*(3), e0214157.

[45] A recent study by Bauer et al. in *The Journal of Pediatrics* examined some of the associations that would be consistent with the existence of "rapid-onset gender dysphoria" and concluded that their results "did not support the rapid onset gender dysphoria hypothesis." Bauer, G. R., Lawson, M. L., Metzger, D. L., & Trans Youth CAN! Research Team. (2022). Do Clinical Data from Transgender Adolescents Support the Phenomenon of "Rapid Onset Gender Dysphoria"?. *Journal of Pediatrics*, *2022*(243), 224-227. Two recent publications from our group similarly did not support the notion: Turban, J. L., Dolotina, B., King, D., & Keuroghlian, A. S. (2022). Sex assigned at birth ratio among transgender and gender diverse adolescents in the United States. *Pediatrics*, *150*(3), e2022056567 and Turban, J. L., Dolotina, B., Freitag, T. M., King, D., & Keuroghlian, A. S. (2023). Age of Realization and Disclosure of Gender Identity Among Transgender Adults. *Journal of Adolescent Health*, *72*(6), 852-859.

[46] American Psychological Association et al. CAAPS Position Statement on Rapid Onset Gender Dysphoria (ROGD). Available at: https://www.caaps.co/rogd-statement. Accessed: October 1, 2023.

etiology of their children's transgender identity. Some of these parents believed that their children became transgender as a result of watching transgender-related content on websites like *YouTube* and having LGBTQ friends. The alternative interpretation, and in my opinion more likely interpretation, is that these youth sought out transgender-related media and LGBTQ friends because they wanted to find other people who understood their experiences and could offer support. The parent respondents also noted that, from their perspective, their children became transgender "all of a sudden," hence the term "rapid-onset." Once again, the problem here is that the study did not interview the adolescents themselves, nor their healthcare providers. It is common for transgender (as with gay, lesbian and bisexual) children and adolescents to conceal their identity from their parents for long periods of time. In a recent study from our research group, transgender people who first understood their gender identity in childhood waited a median 14 years before sharing this with another person.[47] In my experience working with transgender youth and adults, the reasons for this tend to be out of fear of negative repercussions (rejection, being kicked out of the house, or even physical assault) were their parents to find out that they are transgender. Children often learn to conceal their gender non-conforming behaviors and transgender identity early, particularly if their parents have strong negative reactions to them exhibiting gender non-confirming behavior.

35. The State's experts point to the increase in referrals to gender clinics, particular among birth-assigned females, over time as a point of concern. (*E.g.*, Cantor, ¶17, ¶25; Weiss ¶179). The increase in referrals has coincided with increased visibility of transgender people, including transgender men, in society and greater awareness of gender dysphoria and access to

---

[47] Turban, J. L., Dolotina, B., Freitag, T. M., King, D., & Keuroghlian, A. S. (2023). Age of Realization and Disclosure of Gender Identity Among Transgender Adults. *Journal of Adolescent Health*, *72*(6), 852-859.

ER0976

medical care to treat it.  In the past, people thought of gender dysphoria as something that primarily impacted birth-assigned males.  This likely led to many cases of gender dysphoria among birth-assigned females being overlooked by families or undiagnosed or "missed" by doctors.  In recent years, literacy regarding gender dysphoria among birth-assigned females has increased among physicians.  As fewer birth-assigned females go undiagnosed, the sex ratio in gender clinics has shifted away from predominantly birth-assigned males.  This is similar to a pattern that has been seen in autism spectrum disorder.  For example, a large study found that with increasing awareness that autism spectrum disorder can impact birth-assigned females as well as birth-assigned males, the sex ratio shifted more toward birth-assigned females, from 5.1:1 (birth-assigned males to females) to 3.1:1.[48]  The same study saw the sex ratio for the related diagnosis of Asperger's syndrome similarly shift from 8.4:1 to 3.0:1.  Whereas parents and pediatricians in the past may have had limited literacy regarding gender diversity in adolescents, today more Americans, as well as people abroad, have greater understanding of the experiences of transgender youth.  This fact has undoubtedly increased the number of parents bringing their adolescents to gender clinics for evaluation and pediatricians referring patients to gender clinics.  Additionally, insurance coverage of gender-affirming medical interventions has improved drastically, meaning that more families are able to afford care, which results in an increase in referrals for evaluation.

36.     Of note, not all adolescents who present at gender clinics ultimately go on to receive gender-affirming medical interventions.[49]  In fact, in a large study from a Netherlands gender

---

[48] Jensen, C. M., Steinhausen, H. C., & Lauritsen, M. B. (2014).  Time trends over 16 years in incidence-rates of autism spectrum disorders across the lifespan based on nationwide Danish register data. *Journal of Autism and Developmental Disorders*, *44*(8), 1808-1818.

[49] Wiepjes, C. M., Nota, N. M., de Blok, C. J., Klaver, M., de Vries, A. L., Wensing-Kruger, S. A., de Jongh, R. T., Bouman, M. B., Steensma, T. D., Cohen-Kettenis, P., Gooren, L. J. G., Kreukels, B. P. C., & den Heijer, M. (2018). The Amsterdam cohort of gender dysphoria study

23

clinic, the percentage of patients who presented for evaluation who actually started any kind of gender-affirming treatment has decreased over time.[50]  The authors of that study note:

> "[T]his finding may be explained by the fact that in the past it was harder to find information about [gender dysphoria] and its treatment, and only people with extreme types of [gender dysphoria] managed to visit our gender identity clinic for treatment.  Currently, owing to media attention and the internet, it is easier to access information about our gender identity clinic, making the threshold lower to search for help."

This shows that while more people may be coming in for evaluation, the criteria for diagnosis and treatment remain stringent and a smaller percentage of patients are actually being diagnosed with gender dysphoria and referred on for medical treatment.

## THE STATE'S EXPERTS ASSERTIONS OF HIGH RATES OF TRANSITION REGRET ARE UNSUPPORTED BY THE EVIDENCE

37.    The State's experts suggest that a large number of adolescents who undergo gender-affirming medical care go on to regret treatment; however, this is not supported by extant evidence.  In 2018, Amsterdam's VUMC Center of Expertise on Gender Dysphoria published the rates of regret among their cohort of 6,793 transgender patients who had undergone gender-affirming medical and surgical interventions.[51]  Among transgender women with gender dysphoria who underwent gender-affirming surgery, 0.6% experienced regret.  Among transgender men with

---

(1972–2015): trends in prevalence, treatment, and regrets. *Journal of Sexual Medicine*, *15*(4), 582-590.

[50] Wiepjes, C. M., Nota, N. M., de Blok, C. J., Klaver, M., de Vries, A. L., Wensing-Kruger, S. A., de Jongh, R. T., Bouman, M. B., Steensma, T. D., Cohen-Kettenis, P., Gooren, L. J. G., Kreukels, B. P. C., & den Heijer, M. (2018). The Amsterdam cohort of gender dysphoria study (1972–2015): trends in prevalence, treatment, and regrets. *Journal of Sexual Medicine*, *15*(4), 582-590.

[51] Wiepjes, C. M., Nota, N. M., de Blok, C. J., Klaver, M., de Vries, A. L., Wensing-Kruger, S. A., de Jongh, R. T., Bouman, M. B., Steensma, T. D., Cohen-Kettenis, P., Gooren, L. J. G., Kreukels, B. P. C., & den Heijer, M. (2018). The Amsterdam cohort of gender dysphoria study (1972–2015): trends in prevalence, treatment, and regrets. *Journal of Sexual Medicine*, *15*(4), 582-590.

ER0978

gender dysphoria who underwent gender-affirming surgery, 0.3% experienced regret. Several of those who experienced regret were classified as having "social regret" rather than "true regret," defined in the study as still identifying as transgender but deciding to reverse their gender-affirming surgery due to factors like "the loss of relatives [being] a large sacrifice." The study also reported that only 1.9% of adolescents who started pubertal suppression did not choose to go onto gender-affirming hormones. In a second study of 143 transgender adolescents who started pubertal suppression, 5 (3.5%) decided not to proceed with further gender-affirming medical treatments.[52] One of these adolescents noted that pubertal suppression helped them to better understand their gender identity, and they ultimately identified with their sex assigned at birth. One birth-assigned female had ongoing chest dysphoria but chose to live with a female gender expression regardless, though was dreading further breast development and menstruation. One stopped due to unspecified "psychosocial reasons" but continued to identify as transgender. One identified as gender non-binary and felt they no longer needed treatment. One came to identify with his sex assigned at birth. There was no indication that any of these adolescents *regretted* pubertal suppression; rather, this study shows that the treatment served its goal of allowing adolescents more time to better understand their gender identity before being assessed for additional treatment.

38.    The State's experts cite some studies discussing rates of discontinuing gender-affirming medical interventions. For example, Dr. Weiss cites findings from a study by Roberts et al. published in 2022 that "[a]mong those who had started hormonal intervention before age eighteen, 26% discontinued treatment. Among all the natal females in this follow up study, 36%

---

[52] Brik, T., Vrouenraets, L. J., de Vries, M. C., & Hannema, S. E. (2020). Trajectories of adolescents treated with gonadotropin-releasing hormone analogues for gender dysphoria. *Archives of Sexual Behavior*, 49(7), 2611-2618.

ER0979

discontinued treatment."[53]   (Weiss, ¶159).   It is essential to note that discontinuation of a medication does not necessarily indicate regret. This study examined only rates of discontinuation, not *reasons* for discontinuation.  Reasons for discontinuing can include satisfaction with degree of physical gender congruence already attained, social stress related to transphobia, or financial reasons like loss of insurance.  As the paper notes, in citing our 2021 publication in the journal *LGBT Health*, "many individuals who report [stopping] gender-affirming hormones [report] subsequently restarting treatment or the intention to restart treatment."

39.     Dr. Weiss also failed to mention that the Roberts study found that discontinuation rates were lower among those who started gender-affirming medical care as minors when compared to those who started as adults, likely due to the comprehensive psychosocial mental health evaluations conducted prior to initiating care.  The publication's discussion section notes, "Regardless of the reason for the higher hormone continuation rate among TGD youth, this finding provides support for the idea that TGD individuals below the age of legal majority, with the assistance of their parents or legal guardians and health care providers, can provide meaningful informed assent for gender-affirming hormones and do not appear to be at a higher risk of future discontinuation of gender-affirming hormones because of their young age alone."

40.     The State, on page nine of its combined memorandum of law in opposition to motion for preliminary injunction and in support of motion to dismiss, asserts that a paper by Hall et al. shows that "the medical detransition rate among youth who underwent gender transitions in recent years may be as high as 30% . . ." The cited paper shows no such thing. First, this was a study of adults, not youth. Second, the study did not find a detransition rate of 30%. The paper

---

[53] Roberts, C. M., Klein, D. A., Adirim, T. A., Schvey, N. A., Hisle-Gorman, E. (2022). Continuation of Gender-affirming Hormones among Transgender Adolescents and Adults. *Journal of Clinical Endocrinology & Metabolism*, *107*(9) e3937-e3943.

notes, "twelve cases (12/175, 6.9%) were agreed by all authors to meet the case definition for detransitioning. Regret was specifically documented in two cases [1.1%]"[54] Also of note in this study is that the authors did not record reasons for detransition (defined in this study as going back to presenting as one's sex assigned at birth). The State also cites a press release from the French Academy of Medicine, which, though it states there is an "increasing number of transgender young adults wishing to "detransition," provides no detransition rate, nor any citation that shows this is true.[55] One of the few citations the press release does provide is to the 2018 Littman paper I discuss above.[56]

41. In a peer-reviewed manuscript that was named Best Clinical Perspectives Manuscript of the year by *The Journal of The American Academy of Child & Adolescent Psychiatry*, Dr. Alex Keuroghlian and I created a framework for understanding transgender adolescent patients who discontinue gender-affirming medical interventions.[57] We explained that this may be due to external factors (*e.g.*, pressure from family, societal rejection, harassment by peers) or internal factors (*e.g.*, a change in the understanding of one's gender identity). We highlighted that discontinuation of gender-affirming medical interventions does not always coincide with a change in understanding of one's gender identity or with transition-related regret.

---

[54] Hall, R., Mitchell, L., & Sachdeva, J. (2021). Access to care and frequency of detransition among a cohort discharged by a UK national adult gender identity clinic: retrospective case-note review. *BJPsych Open*, *7*(6), e184.

[55] French Academy of Medicine. (2022) Medicine and gender transidentity in children and adolescents, *available at* https://www.academie-medecine.fr/la-medecine-face-a-la-transidentite-de-genre-chez-les-enfants-et-les-adolescents/?lang=en.

[56] The French Academy of Medicine press release itself recommends, "in the event of a persistent desire for transition, a careful decision about medical treatment with hormone blockers or hormones of the opposite sex within the framework of multi-disciplinary consultation meetings."

[57] Turban, J. L., & Keuroghlian, A. S. (2018). Dynamic gender presentations: understanding transition and" de-transition" among transgender youth. *Journal of the American Academy of Child and Adolescent Psychiatry*, *57*(7), 451-453.

27

Our team later published a study highlighting that a substantial number of currently identified transgender people (13.1%) have "de-transitioned"[58] at some point in their life, with the majority (82.5%) citing external factors like family rejection, societal stigma, or harassment.[59] Given that these people *currently* identify as transgender, it highlights that many people who "de-transition" choose to transition again in the future. This harkens to the history of the "ex-gay" movement in which many gay and lesbian individuals reported that they were "cured" of their homosexuality, only to later reveal that they were still gay but felt pressured by their communities to say for many years that they were not.

42.     The State's experts cite two papers discussing the experiences of some individuals who detransitioned, one by Littman and one by Vandenbussche.[60] (Weiss, ¶157). Neither of these papers provide information on the prevalence of detransition or, specifically. the rate of detransition among those who initiate gender-affirming medical care during adolescence. In fact, the introduction of the Littman article states that the paper is not "designed to assess the prevalence of detransition as an outcome of transition." In addition, in the Littman study, 34% of the participants reported that gender-affirming care was "a necessary part of [their] journey." And

---

[58] This study defined "de-transition" as an affirmative answer to the following: "Have you ever de-transitioned? In other words, have you ever gone back to living as your sex assigned at birth, at least for a while?"

[59] Turban, J. L., Loo, S. S., Almazan, A. N., & Keuroghlian, A. S. (2021). Factors Leading to "Detransition" Among Transgender and Gender Diverse People in the United States: A Mixed-Methods Analysis. *LGBT Health,* 8(4), 273-280.

[60] Littman L. (2021). Individuals treated for gender dysphoria with medical and/or surgical transition who subsequently detransitioned: A survey of 100 detransitioners. *Archives of Sexual Behavior*, 50(8), 3353–3369; Vandenbussche, E. (2021). Detransition-related needs and support: A cross-sectional online survey. *Journal of Homosexuality*, 69(9), 1602-1620. Of note, of the 237 individuals in the Vandenbussche study, only 25% had medically transitioned as minors and many did not medically transition at all.

28

among this group of people who de-transitioned, most reported that undergoing gender-affirming medical care was in some way helpful.

43.    Dr. Weiss cites Reddit in his attempt to claim there is evidence that rates of detransition and regret among those initiating gender-affirming medical care are high. (Weiss, ¶156). He notes that one Reddit group called r/detrains has over 49,000 members. However, there is no indication that all or even many of the 49,000 members of that group have detransitioned, even if that term is broadly defined. In fact, in reading r/detrans, one will find posts expressing concern that the group has been dominated by members who have not actually detransitioned but rather by "people who are wanting to prey on their vulnerability and use them as political pawns."[61]

44.    There are undoubtedly some people who start gender-affirming medical interventions and later stop them. A small minority of these appear to regret the treatment, though differentiating regret related to transphobia from regret related to the treatment itself can be difficult to disentangle. But as I reviewed above, all existing research suggests that regret following gender-affirming medical interventions is rare. As with all medical interventions, gender-affirming medical interventions cannot claim a 100% success rate. However, for the vast majority of adolescents, these interventions improve mental health. Accordingly, it is dangerous to take this option away from families and physicians.

## THERE IS NO EVIDENCE-BASED PSYCHOTHERAPY TO TREAT GENDER DYSPHORIA

45.    The State's experts suggest that psychotherapy can provide relief for gender dysphoria in lieu of gender-affirming medical care. While psychotherapy can be very helpful for

---

[61] Post by a member of the Reddit group r/detrans, available at: https://www.reddit.com/r/honesttransgender/comments/k6fidf/rdetrans_is_just_an_antitrans_sub_now/?utm_source=share&utm_medium=web2x&context=3. Accessed: October 1, 2023.

29

adolescents with gender dysphoria to help explore their gender identity and address comorbid conditions like depression and anxiety, there are no evidence-based psychotherapy protocols that effectively treat gender dysphoria itself.

46.     In the past, some clinicians have described psychotherapeutic strategies to attempt to lead youth with gender dysphoria to identify with their sex assigned at birth.[62]  Such practices, often referred to as "gender identity conversion efforts", have subsequently been linked to adverse mental health outcomes, including suicide attempts, particularly when people are exposed to them as children.[63]  In addition to being harmful, there is no peer-reviewed research to suggest that these gender identity conversion efforts are successful in changing a person from transgender to cisgender.[64]

47.     While the State's experts repeatedly criticize the extensive body of research linking gender-affirming medical care to improved mental health outcomes for adolescent gender dysphoria, they do not provide evidence to support their implication that gender dysphoria can be treated with psychotherapy alone.

48.     Dr. Weiss asserts that "exploratory, non-judgmental psychotherapy can alleviative suffering in patients with 'gender dysphoria' and may help them accept their natal sex."  (Weiss,

---

[62] Meyer-Bahlburg, H.F.  (2002).  Gender Identity Disorder in Young Boys: A Parent-and Peer-Based Treatment Protocol.  *Clinical Child Psychology and Psychiatry*, *7*(3), 360-376.

[63] Turban, J.L., Beckwith, N., Reisner, S.L., & Keuroghlian, A.S.  (2020).  Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults. *JAMA Psychiatry*, *77*(1), 68-76.

[64] Gender identity conversion efforts have therefore been labelled unethical by major medical organizations including The American Medical Association and The American Academy of Child & Adolescent Psychiatry. American Medical Association.  (2017).  Health Care Needs of Lesbian, Gay, Bisexual and Transgender Populations.  H-160.991.  *Available at* https://policysearch.ama-assn.org/policyfinder/detail/gender%20identity?uri=%2FAMADoc%2FHOD.xml-0-805.xml;
The American Academy of Child & Adolescent Psychiatry.  (2018).  Conversion Therapy. *Available at* https://www.aacap.org/AACAP/Policy_Statements/2018/Conversion_Therapy.aspx.

30

ER0984

¶40). Exploratory psychotherapy can be helpful for adolescent patients who are unsure of their gender identity to come to understand it. Dr. Weiss appears to be suggesting that such therapy can help transgender people become cisgender. The sources he cites to support this do no such thing. The first is a letter to the editor that provides no data or evidence to support the assertion.[65] The second is a description of twelve adolescent patients who underwent the psychosocial assessment that is required prior to initiating gender-affirming medical care for adolescent gender dysphoria and ultimately did not pursue gender-affirming medical care.[66] This case series is not evidence that psychotherapy is effective in promoting identification with one's sex assigned at birth, but rather, that the psychosocial evaluation is effective in identifying appropriate candidates for gender-affirming medical care.[67]

## CONCLUSION

49. In summary, the declarations from the State's experts do not provide justification for banning gender-affirming medical care for adolescents with gender dysphoria. The scientific evidence that I outlined above shows the benefits of the proscribed care. This research is consistent with the decades of clinical experience from around the world—including my own—of improved mental health outcomes from these interventions. None of the European countries the State's experts cite have banned care. The research the State's experts cite on "desistance" among prepubertal children has no bearing on adolescents with gender dysphoria, and there is no scientific

---

[65] D'Angelo, R., Syrulnik, E., Ayad, S., Marchiano, L., Kenny, D. T., & Clarke, P. (2021). One size does not fit all: In support of psychotherapy for gender dysphoria. *Archives of Sexual Behavior*, *50*(1), 7-16.

[66] Churcher Clarke, A., & Spiliadis, A. (2019). 'Taking the lid off the box': The value of extended clinical assessment for adolescents presenting with gender identity difficulties. *Clinical Child Psychology and Psychiatry*, *24*(2), 338-352.

[67] Incidentally, it is surprising to see Dr. Weiss rely on this study at all as throughout the remainder of his declaration, he dismisses research that lacks high GRADE-level data.

31

support for their assertions that providing gender-affirming medical care causes "persistence" of gender incongruence. Nor is there any evidence supporting the State's experts' claims that youth are seeking gender-affirming medical care due to peer and social media influence, or that those who receive care are likely to come to regret it. Finally, there are no evidence-based alternatives for treating gender dysphoria. While the State's experts critique the literature regarding the benefits of gender-affirming medical care, they offer no studies supporting an alternative treatment. The Idaho ban would leave physicians, adolescents, and their parents without any evidence-based treatments for adolescent gender dysphoria, a condition that can cause immense suffering.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*Jack L. Turban*

Executed on: October 13, 2023                    JACK L. TURBAN, MD, MHS

ER0986

# Exhibit A

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

## ACADEMIC APPOINTMENTS

**University of California, San Francsisco School of Medicine** San Francisco, CA.                September 2022-Present
*Assistant Professor of Child & Adolescent Psychiatry and Affiliate Faculty in the Philip R. Lee Institute for Health Policy Studies*. Responsibilities include serving as director of the gender psychiatry program, and as an attending psychiatrist in the adult gender and sexual minority clinic, and in the eating disorders clinic, as well as research focusing on the determinants of mental health among transgender and gender diverse youth and the teaching of medical students, residents, and fellows.

## EDUCATION & TRAINING

**Stanford University School of Medicine** Palo Alto, CA                July 2020-June 2022
*Fellow in Child & Adolescent Psychiatry*. Fellow in child and adolescent psychiatry. Research focused on pediatric gender identity and LGBTQ mental health. Served as administrative chief fellow 2021-2022.

**Massachusetts General Hospital & McLean Hospital** Boston, MA                July 2017 – May 2020
*Integrated Adult, Child, & Adolescent Psychiatry Resident*. Resident physician in the integrated adult, child, and adolescent psychiatry program. Research focused on pediatric gender identity and LGBT mental health.

**Yale School of Medicine** New Haven, CT.                August 2012- May 2017
*Doctor of Medicine & Master of Health Science with honors*. Clinical rotations included inpatient pediatrics, inpatient child psychiatry, inpatient adolescent psychiatry, residential adolescent psychiatry, psychiatric consult liaison service, clinical neuromodulation, neurology clinics, and neurosurgery. Completed award-winning masters' thesis as a Howard Hughes Medical Institute (HHMI) medical research fellow on evolving treatment paradigms for transgender youth. Clerkship Grades: All Honors
USMLE: Step 1 (252), Step 2 (256)

**Harvard University** Cambridge, MA                September 2007- May 2011
*B.A. Neurobiology magna cum laude with a secondary in the Dramatic Arts.* Coursework included clinical neuroscience, systems neurobiology, visual neuroscience, positive psychology, neurobiology of behavior, CNS regenerative techniques, neuroanatomy, vertebrate surgery, and extensive coursework in dramatic theory and practice. International study included Spanish language (Alicante, Spain), stem cell biology (Shanghai, China), and studying how visual art may be used as a window into the mechanisms of neural processing (Trento, Italy). Honors thesis completed at The Massachusetts Eye & Ear Infirmary studying inner-ear development and regeneration. GPA: 3.8/4.0

## RESEARCH EXPERIENCE

**The Fenway Institute** Boston, MA                2017-Present
*Post-doctoral Research Fellow.* Currently using data from the National Transgender Discrimination Survey to determine the adult mental health correlates of recalled childhood experiences including exposure to conversion therapy and access to gender-affirming hormonal interventions. PIs: Timothy Wilens, Alex Keuroghlian, & Sari Reisner

**Stanford Division of Child & Adolescent Psychiatry** Palo Alto, CA                2020-2022
*Post-doctoral Resaerch Fellow*. Estabished the Stanford Evaluation of Gender Affirmation (SEGA) study, which examines the impact of gender-affirming medical and surgical interventions on the mental health of transgender and gender diverse youth. Mentors: Dr. David Hong & Dr. Tandy Aye

**McLean Institute for Technology in Psychiatry** Belmont, MA.                2017-2020
*Post-doctoral Research Fellow*. Conducted cross-sectional studies that examine the associations between geosocial "hook-up apps," internalizing psychopathology, and compulsive sexual behavior. Utilizing the TestMyBrain platform. PI: Laura Germine

# Jack Lewis Turban III MD MHS

401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

**Yale Program for Research on Impulsivity & Impulse Control Disorders** New Haven, CT                2016-2019
*Pre-doctoral Research Fellow.* Conducted a studies of US military veterans who had recently returned from deployment, studying rates and comorbidities of those veterans who exhibit compulsive sexual behavior facilitated by social media. PI: Marc Potenza MD/PhD

**Yale Child Study Center** New Haven, CT                2015-2017
*Pre-doctoral Research Fellow.* Conducted a study to evaluate pediatric attending and medical student knowledge regarding transgender pediatric patient care. Additionally studied participants' personal ethical views regarding pubertal blockade and cross-sex hormone therapy for adolescent patients. PI: Timothy VanDeusen MD

**Yale Department of Dermatology** New Haven, CT                2015-2016
*HHMI Medical Research Fellow.* Studied the potential molecular mediators of Langerhans Cell-mediated UVB-induced epidermal carcinogenesis. Techniques included transgenic mouse models of chronic UV exposure, epidermal sheet preparations, immunohistochemistry, confocal microscopy, flow cytometry, Bioplex analysis, quantitative PCR and tissue culture. PI: Michael Girardi MD

**Yale Department Laboratory Medicine** New Haven, CT                2012-2014
*Pre-doctoral Research Fellow.* Employed mass spectrometry to compare metabolite profiles of recurrent tumor versus radiation-induced necrosis following Gamma Knife Radiosurgery for brain metastases, working to identify novel biomarkers for non-invasive imaging techniques. PI: Tore Eid MD/PhD

**Yale Department of Neurosurgery** New Haven, CT                2012-2012
*Pre-doctoral Research Fellow.* Developed a database of patients who received gamma knife radiosurgery or whole brain radiation for the treatment of brain metastases. This database is designed to evaluate the relative risks of radiation-induced necrosis following these two treatment modalities. PI: Veronica Chiang MD

**Eaton-Peabody Laboratory** Cambridge, MA                2009-2011
*Undergraduate Rearch Fellow.* Worked at the Massachusetts Eye and Ear Infirmary laboratory, studying stem cells of the inner ear and working toward cochlear hair cell regeneration. PI: Albert Edge PhD

**Novartis Pharmaceuticals** Shanghai, China                2009-2009
*Intern.* Worked as a biological research intern, studying the role of Math-1 in inner-ear development and regeneration.

## LEADERSHIP

**UCSF Child & Adolescent Psychiatry Grand Rounds Committee** San Francisco, CA.                2023-Present
*Member.* Works with with committee to select and work with grand rounds speakers for the weekly child and adolescent psychiatry grand rounds series.

**UCSF Child & Adolescent Psychaitry Fellowship Selection Committee** San Francisco, CA                2022-Present
*Member.* Conducts interviews for applications to the UCSF child and adolescent psychiatry fellowship training program, sits on selection committee, works on recruitment efforts.

**The Upswing Fund**                2020-Present
*Scientific Advisory Board.* Member of the scientific advisory board of a $15M charitable fund to support adolescent minority mental health during the COVID19 pandemic. Funded by Melinda Gates's Panorama Global.

**Stanford Medicine Diversity Cabinet LGBTQ+ / Sexual and Gender Minority Subcommittee**                2021-2022
*Member.* Working to improve Stanford School of Medicine in all aspects relevant to sexual and gender minorities including curriculum, clinical care, and employee support.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

**Stanford Pediatric Gender Journal Club**                                                                    2021-2022
*Founder.* Organizing a monthly journal club focusing on the latest research relevant to the care of transgender and gender diverse youth.

**MGH Psychiatry Gender Lab Meetings** Boston, MA                                               2019-2020
*Founder.* Established monthly lab meetings for those in the MGH psychiatry department to discuss ongoing research regarding transgender mental health.

**Yale School of Medicine Cultural Competence Committee** New Haven, CT                 2012-2017
*Chair.* Worked with individual course directors to develop course material on cultural competence. Authored case studies on handling pediatric patient sexuality (Professional Responsibility Course), authored a pre-clinical lecture on LGBT healthcare (Ob/Gyn Module), and lectured on transgender pediatric patient care (Pediatrics Clinical Clerkship).

**Dean's Advisory Committee on LGBTQ Affairs (Yale School of Medicine)** New Haven, CT        2016-2017
*Member.* Served on the advisory committee to the Dean of Yale School of Medicine, advising on issues related to LGBTQ affairs.

**Yale HIV Dermatology Roundtable** New Haven, CT                                               2014-2017
*Founder.* Eighty percent of patients suffering from HIV face a dermatologic manifestation of their disease. Struck by these patients' experience of stigma, I organized a bi-monthly interdisciplinary roundtable to improve research, education, and clinical care in HIV dermatology. Interventions have included primary care provider training on the treatment of genital warts and improved referral systems for cutaneous malignancies.

**Yale Gay & Lesbian Medical Association** New Haven, CT                                       2013-2017
*President.* Led a group of medical students focused on supporting careers in medicine for LGBT individuals. Organized mixers with LGBT organizations from other graduate schools and with LGBT faculty. Coordinated trips to GLMA national conferences. Worked with the medical school administration to create an LGBT faculty advisor position.

## VOLUNTEER WORK & ADVOCACY

**American Academy of Child & Adolescent Psychiatry "Break the Cycle"**                 2017-2017
*Event Coordinator.* Worked with Dr. Andres Martin to coordinate a fundraising indoor cycling event for the AACAP *Break The Cycle* fundraising campaign to fight children's mental illness.

**Yale Hunger & Homelessness Auction** New Haven, CT                                       2012-2014
*Logistics Co-Chair.* Organized a group of ten students to coordinate entertainment, donations, and event logistics for the Yale annual charity auction. All proceeds for the auction go to support local charities.

**Yale School of Medicine Admissions Committee** New Haven, CT                             2015-2017
*Interviewer.* Served as a full voting member of the admissions committee. Responsibilities include student interviewing, recruitment, and organizing LGBT-focused activities for admitted students.

**Harvard College Admissions** New Haven, CT                                                   2012-2020
*Interviewer.* Interviewing students from the Boston area for admission to Harvard College.

## SELECTED PEER REVIEWED PUBLICATIONS: ORIGINAL RESEARCH

**Turban J.L.**, Dolotina B., Freitag T.M., King D., Keuroghlian A.S. Age of realization of transgender identity and mental health outcomes among transgender and gender diverse adults: examining the "rapid onset gender dysphoria" hypothesis. *Journal of Adolescent Health.* [In Press]

ER0990

## Jack Lewis Turban III MD MHS

401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

**Turban J.L.**, Dolotina B., King D., Keuroghlian A.S. (2022) Sex assigned at birth ratio among transgender and gender diverse adolescents in the United States. *Pediatrics*. [Accepted]

**Turban J.L.**, King D., Kobe J., Reisner S.L., Keuroghlian A.S. (2022) Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PLoS ONE*, 17(1): e0261039.

Passell E., Rutter L.A., **Turban J.L.**, Scheuer L., Wright N., Germine L. (2021) Generalized Anxiety Disorder Symptoms are Higher Among Same- and Both-Sex Attracted Individuals in a Large, International Sample. *Sexuality Research and Social Policy*. [ePub ahead of print]

Lewis, J. M., Monico, P. F., Mirza, F. N., Xu, S., Yumeen, S., **Turban, J. L.**, Galan A., & Girardi, M. (2021). Chronic UV radiation–induced RORγt+ IL-22–producing lymphoid cells are associated with mutant KC clonal expansion. *Proceedings of the National Academy of Sciences*, 118(37).

**Turban J.L.**, King, D., Li, J.L., Keuroghian, A.S. (2021) Timing of Social Transition for Transgender and Gender Diverse Youth, K-12 Harassment, and Adult Mental Health Outcomes. *Journal of Adolescent Health*. 69(6), 991-998.

**Turban J.L.**, Loo, S. S., Almazan, A. N., Keuroghlian, A.S. (2021) Factors Leading to "Detransition" Among Transgender and Gender Diverse People in the United States: A Mixed-Methods Analysis. *LGBT Health*. 8(4), 273-280.

**Turban, J. L.**, Passell E, Scheer L, Germine L. (2020) Use of Geosocial Networking Applications Is Associated With Compulsive Sexual Behavior Disorder in an Online Sample. *The Journal of Sexual Medicine*. 17(8), 1574-1578.

**Turban, J. L.**, King, D., Carswell, J. M., & Keuroghlian, A. S. (2020). Pubertal suppression for transgender youth and risk of suicidal ideation. *Pediatrics*, *145*(2), e20191725.

**Turban, J. L.**, Shirk, S. D., Potenza, M. N., Hoff, R. A., & Kraus, S. W. (2020). Posting Sexually Explicit Images or Videos of Oneself Online Is Associated With Impulsivity and Hypersexuality but Not Measures of Psychopathology in a Sample of US Veterans. *The Journal of Sexual Medicine*, *17*(1), 163-167.

**Turban, J. L.**, Beckwith, N., Reisner, S. L., & Keuroghlian, A. S. (2020). Association between recalled exposure to gender identity conversion efforts and psychological distress and suicide attempts among transgender adults. *JAMA Psychiatry*, *77*(1), 68-76.

Acosta, W., Qayyum, Z., **Turban, J. L.**, & van Schalkwyk, G. I. (2019). Identify, engage, understand: Supporting transgender youth in an inpatient psychiatric hospital. *Psychiatric Quarterly*, 90(3), 601-612.

**Turban, J. L.**, King, D., Reisner, S. L., & Keuroghlian, A. S. (2019). Psychological Attempts to Change a Person's Gender Identity from Transgender to Cisgender: Estimated Prevalence Across US States, 2015. *American Journal of Public Health*, 109(10), 1452-1454.

**Turban, J. L.**, Winer, J., Boulware, S., VanDeusen, T., & Encandela, J. (2018). Knowledge and attitudes toward transgender health. *Clinical Teacher*, *15*(3), 203-207.

**Turban, J. L.**, Potenza, M. N., Hoff, R. A., Martino, S., & Kraus, S. W. (2017). Psychiatric disorders, suicidal ideation, and sexually transmitted infections among post-deployment veterans who utilize digital social media for sexual partner seeking. *Addictive Behaviors*, 66, 96-100.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

Turban J. L.\*, Lu, A. Y\*., Damisah, E. C., Li, J., Alomari, A. K., Eid, T., ... & Chiang, V. L. (2017). Novel biomarker identification using metabolomic profiling to differentiate radiation necrosis and recurrent tumor following Gamma Knife radiosurgery. *Journal of Neurosurgery*, 127(2), 388-396.

Kempfle, J. S., **Turban, J. L.,** & Edge, A. S. (2016). Sox2 in the differentiation of cochlear progenitor cells. *Scientific Reports*, 6, 23293.

## SELECTED PEER REVIEWED PUBLICATIONS: COMMENTARY, REVIEWS, & PERSPECTIVES

Lerario, M. P., Rosendale, N., Waugh, J. L., Turban, J., & Maschi, T. (2023). Functional Neurological Disorder Among Sexual and Gender Minority People. *Neurologic Clinics*. [In Press]

Chen A, Cohen I.G., Kraschel K., **Turban J.L.**. Legal & Ethical Perspectives on Criminalization of Standard of Care Medical Practices. *Cell Reports Medicine*.

**Turban J.L.**, Brady C., & Olson-Kennedy J. Understanding & Supporting Patients with Dynamic Desires for Gender-affirming Medical Interventions. *JAMA Network Open*.

Dolotina B. **& Turban J.L.** "Phantom Networks" Prevent Children & Adolescents from Obtaining the Mental Health Care They Need. *Health Affairs*. 41(7).

**Turban J.L.**, Kamceva M, Keuroghlian A.S. Pharmacologic Considerations for Transgender and Gender Diverse People. *JAMA Psychiatry*. 79(6): 629-630.

Dolotina B. & **Turban J.L.**. (2022) A multipronged, evidence-based approach to improving mental health among transgender and gender diverse youth. *JAMA Network Open*. 5(2): e220926.

**Turban J.L.**, Almazan A.N., Reisner S.L., Keuroghlian A.S. (2022) The importance of non-probability samples in minority health research: lessons learned from studies of transgender and gender diverse mental health. *Transgender Health*. [ePub ahead of print]

**Turban J.L.**, Kraschel K.L., Cohen, G.C. (2021) Legislation to Criminalize Gender-affirming Medical Care for Transgender Youth. *JAMA*. 325(22), 2251-2252.

Liu M., **Turban J.L.**, Mayer K.H. (2021) The US Supreme Court and Sexual and Gender Minority Health. *American Journal of Public Health*. 111(7), 1220-1222.

Suto, D.J., Macapagal, K., **Turban, J.L.** (2021) Geosocial Networking Application Use Among Sexual Minority Adolescents. *Journal of the American Academy of Child & Adolescent Psychiatry*. 60(4), 429-431.

**Turban, J. L.,** Keuroghlian, A. S., & Mayer, K. H. (2020) Sexual Health in the SARS-CoV-2 Era. *Annals of Internal Medicine*. 173(5), 387-389.

Suozzi, K., **Turban, J.L.,** & Girardi, M. (2020). Focus: Skin: Cutaneous Photoprotection: A Review of the Current Status and Evolving Strategies. *The Yale Journal of Biology and Medicine*, 93(1), 55.

Malta, M., LeGrand, S., **Turban, J.L.,** Poteat, T., & Whetten, K. (2020). Gender-congruent government identification is crucial for gender affirmation. *The Lancet Public Health*. 5(4), e178-e179.

**Turban J.L.** (2019). Medical Training in the Closet. *The New England Journal of Medicine*, 381(14), 1305.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

**Turban, J. L.**, & Keuroghlian, A. S. (2018). Dynamic gender presentations: understanding transition and" de-transition" among transgender youth. *Journal of the American Academy of Child and Adolescent Psychiatry*, 57(7), 451-453.

**Turban, J. L.**, Carswell, J., & Keuroghlian, A. S. (2018). Understanding pediatric patients who discontinue gender-affirming hormonal interventions. *JAMA Pediatrics*, *172*(10), 903-904.

**Turban, J. L.** (2018). Potentially Reversible Social Deficits Among Transgender Youth. *Journal of Autism and Developmental Disorders*, 48(12), 4007-4009.

**Turban, J. L.**, & van Schalkwyk, G. I. (2018). "Gender dysphoria" and autism spectrum disorder: Is the link real?. *Journal of the American Academy of Child & Adolescent Psychiatry*, *57*(1), 8-9.

**Turban, J. L.**, & Ehrensaft, D. (2018). Research review: gender identity in youth: treatment paradigms and controversies. *Journal of Child Psychology and Psychiatry*, *59*(12), 1228-1243.

**Turban J. L.**, Genel, M. (2017) Evolving Treatment Paradigms for Transgender Patients. *Connecticut Medicine*, 81(8), 483-486.

**Turban, J.,** Ferraiolo, T., Martin, A., & Olezeski, C. (2017). Ten things transgender and gender nonconforming youth want their doctors to know. *Journal of the American Academy of Child & Adolescent Psychiatry*, *56*(4), 275-277.

**Turban, J. L.** (2017). Transgender Youth: The Building Evidence Base for Early Social Transition. *Journal of the American Academy of Child and Adolescent Psychiatry*, 56(2), 101.

**Turban J. L.**, Martin A. (2017) Book Forum: Becoming Nicole. *Journal of the American Academy of Child & Adolescent Psychiatry*, 56(1): 91-92.

## TEXTBOOKS AND TEXTBOOK CHAPTERS

Forcier, M., Van Schalkwyk, G., **Turban, J. L.** (Editors). Pediatric Gender Identity: Gender-affirming Care for Transgender & Gender Diverse Youth. Springer Nature, 2020.

Challa M., Scott C., **Turban J.L.** Epidemiology of Pediatric Gender Identity. In Forcier, M., Van Schalkwyk, G., **Turban, J. L.** (Editors). Pediatric Gender Identity: Gender-affirming Care for Transgender & Gender Diverse Youth. Springer Nature, 2020.

**Turban J.L.**, Shadianloo S. Transgender & Gender Non-conforming Youth. In Rey, J.M. (Editor): IACAPAP e-Textbook of Child and Adolescent Mental Health. Geneva. International Association of Child and Adolescent Psychiatry and Allied Professionals, 2018.

**Turban, J. L.**, DeVries, A.L.C., Zucker, K. Gender Incongruence & Gender Dysphoria. In Martin A., Bloch M.H., Volkmar F.R. (Editors): Lewis's Child and Adolescent Psychiatry: A Comprehensive Textbook, Fifth Edition. Philadelphia: Wolters Kluwer 2018.

## INVITED GRAND ROUNDS PRESENTATIONS

Turban JL. Transgender Youth Mental Health. Maudsley Hospital / Kings College London Grand Rounds, 2023.

**Turban JL.** Resaerch Updates: Supporting the Mental Health of Transgneder and Gender Diverse Youth. Department of Behavioral Health, Wake Forest School of Medicine / Atrium Health, 2023.

## Jack Lewis Turban III MD MHS
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

**Turban JL**. Supporting the Mental Health of Transgender and Gender Diverse Youth. Child & Adolescent Psychiatry Grand Rounds, Long Island Jewish Medical Center / Zucker Hillside, 2023.

**Turban JL**. Suicidality in Sexual and Gender Minority Youth. Psychiatry Grand Rounds, Boston Children's Hospital, 2023.

**Turban JL**. Opinion Writing to Promote Public Health & Evidence-Based Public Policy. Medical Education Grand Rounds, The University of Vermont Larner College of Medicine, 2022.

**Turban JL**. Research Updates: Supporting the Mental Health of Transgender & Gener Diverse Youth. Division of Child & Adolescent Psychiatry Grand Rounds, Stanford University School of Medicine, 2022.

**Turban JL**. Supporting Transgender & Gender Diverse Youth: Research Updates & Treatment Paradigms. Department of Psychiatry Grand Rounds, University of Nebraska Medical Center, 2022.

**Turban JL**. Supporting the Mental Health of Transgener & Gender Diverse Youth. Department of Pediatrics, Division of Behavioral Health Grand Rounds, University of Utah, 2022.

**Turban JL**. Gender Diverse Youth: Treatment Paradigms & Research Updates. Psychiatry Grand Rounds, Thomas Jefferson University, 2021.

**Turban JL**. Supporting Gender Diverse Youth Throughout Development. Child Psychiatry Grand Rounds, Georgetown, 2021.

**Turban JL**. Understanding Pediatric Gender Identity through Childhood and Adolescence. Grand Rounds, Institute of Living, 2021.

**Turban JL**. Evolving treatment paradigms for transgender youth. Pediatric Grand Rounds, Albany Medical Center, 2021.

**Turban JL**. Evolving Treatment Paradigms for Transgender Youth. Psychiatry Grand Rounds, McLean Hospital (Harvard Medical School), 2021.

**Turban JL**. Einstein Psychiatry Grand Rounds: Evolving Treatment Paradigms for Transgender Youth. Psychiatry Grand Rounds, Einstein Medical Center, 2021.

**Turban JL**. COVID19 and Pediatric Mental Health. Pediatrics Grand Rounds, Stanford University School of Medicine, 2021.

**Turban JL**. Evolving Treatment Paradigms for Transgender Youth. Psychiatry Grand Rounds, Beth Israel Deaconess Medical Center (Harvard Medical School), 2020.

## ADDITIONAL INVITED PRESENTATIONS

**Turban JL**. Suicide Prevention for LGBTQ+ Youth. *National Institutes of Health*, Bethesda, 2023.

**Turban JL**. NAMI LGBTQ+ Mental Health Roundtable Discussion. *National Alliance on Mental Illness*, San Francisco, 2023.

**Turban JL**. Supporting the Mental Health of Transgender & Gender Diverse Youth. *United Nations NGO Committee on Mental Health*, United Nations, 2023.

**Jack Lewis Turban III MD MHS**
401 Parnassco Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

**Turban JL** & Spetz J. How to Give Expert Testimony. *UCSF Philip R. Lee Institute for Health Policy Studies Impacting Policy Series*, San Francisco, 2023.

**Turban JL**. The Research on Gender-affirming Care for Transgender Youth. *AusPATH Research Seminar*. Sydney, 2023.

**Turban JL**. Building a Career in Sexual & Gender Minority Health Research. *National Institutes of Health*, Bethesda, 2022.

**Turban JL**. Research Updates: Gender-affirming Care for Transgender Youth. MUSC LGBTQ+ Health Equity Summit, Medical University of South Carolina, 2022.

**Turban JL**. Keynote: Supporting The Mental Health of Transgender & Gender Diverse Youth. Edythe Kurz Educational Institute Conference, Westchester, 2022.

**Turban JL**, Peters B, Olson-Kennedy J. Gender-Affirming Care: Through a Medical, Surgical, and Mental Health Lens. Critical Issues in Child & Adolescent Mental Health Conference, San Diego, 2022.

**Turban JL**. Improving Mental Health Outcomes for Transgender and Gender Diverse (TGD) Youth Through Gender-affirming Care. National LGBTQIA+ Health Education Center, The Fenway Institute, 2022.

**Turban JL**. Combatting anti-trans legislation through science, data, and writing. State of Queer Mental Health Conference by The Mental Health Association of San Francisco, Online, 2021.

**Turban JL**. Updates on LGBTQ Mental Health. Annual Psychiatric Times World CME Conference, Online, 2021.

**Turban JL**. Imbasciani LGBTQ Health Equity Lecture: Evolving Treatment Paradigms for Transgender and Gender Diverse Youth. University of Vermont Larner College of Medicine, Burlington, 2021.

**Turban JL**. The Emergence of Gender-affirming Care for Transgender & Gender Diverse Youth, United Nations NGO Committee on Mental Health, Oral Presentation, Online, 2021.

**Turban JL**. Keynote – Transgender & Gender Diverse Youth: Research Updates. Stony Brook Transgender Health Conference, Online, 2021.

**Turban JL**. Opinion Writing on Sensitive Topics. Harvard Media & Medicine Course, Live Lecture, Online, 2021.

**Turban JL**. Gender affirming care for transgender and gender diverse youth: what we know and what we don't. University of Texas Pride Health Institute, Oral Presentation, Online, 2020.

**Turban JL**. Q&A on Transgender Youth Mental Health. PEOPLE in Healthcare at University of Toledo, Oral Presentation, Online, 2020.

**Turban JL**, Pagato S, Gold J, Broglie J, Naidoo U, Alvarado A. Innovation of Student Mental Health during COVID19. Panel to the People, Oral Presentation, Online, 2020.

**Turban JL**, Belkin B, Vito J, Campos K, Scasta D, Ahuja A, Harris S. Discussion on Abomination: Homosexuality and the Ex-Gay Movement. Panelist, The Association of LGBTQ+ Psychiatrists Virtual Session, Oral Presentation, Online, 2020.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

**Turban JL**. Is Grindr affecting gay men's mental health? Oral Presentation, UCLA & AETC Coping with Hope, Online, Oral Presentation, 2020.

**Turban JL**, Hall TM, Goldenberg D, Hellman R. Gay Sexuality and Dating. Moderator, The Association of LGBTQ+ Psychiatrists Virtual Session, Oral Presentation, Online, 2020.

## CONFERENCE PRESENTATIONS & ABSTRACTS

**Turban JL**, Calhoun A, Gold, J. Mission-Based Media Collaborative Work Concerning "Controversial" Topics in Psychiatry. Annual Meeting of The American Psychiatric Association, Oral Presentation, San Francisco, 2023.

**Turban JL,** Ahuja A. Autogynephilia: Historical Context, Clarifications, and Controversy. Annual Meeting of The American Psychiatric Association, Oral Presentation, San Francisco, 2023. [Cancelled]

**Turban JL**. A Systematic Approach for Understanding Gender Identity Evolution. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Toronto, 2022.

**Turban JL**. Transgender Youth: Evolving Gender Identities and "Detransition." Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Session Chair of Oral Symposium, Toronto, 2022.

**Turban JL**. From The New York Times to Hollywood: Communicating With the Public Through Opinion Writing, Publishing, Social Media, and Consulting for Film and TV, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Session Chair of Oral Symposium, Toronto, 2022.

**Turban JL**. Writing for the Lay Press to Combat Misinformation Regarding Pediatric Mental Health, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Toronto, 2022.

**Turban JL**. COVID-19 and Psychosexual Dynamics, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Oral Presentation, Toronto, 2022.

Dolotina B, **Turban JL**, King D, Keuroghlian AS. Age of Realization of Gender Identity and Mental Health Outcomes among Transgender Adults: Evaluating the "Rapid Onset Gender Dysphoria" Hypothesis, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Poster, Toronto, 2022.

**Turban JL**. Sex ratio among transgender adolescents in the United States. World Professional Association for Transgender Health Scientific Symposium, Oral Presentation, Montreal, 2022.

**Turban JL**. Access To Gender-Affirming Hormones During Adolescence And Mental Health Outcomes Among Transgender Adults. World Professional Association for Transgender Health Scientific Symposium, Oral Presentation, Montreal, 2022.

**Turban JL**, Gold J, Hartselle S, Yen J. From The New York Times to the Big Screen: Communicating With the Public Through Opinion Writing, Publishing, Social Media, and Consulting for Film and TV. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Session Chair of Oral Symposium, Online, 2021.

**Turban JL**. Creating Change through Opinion Writing in Child & Adolescent Psychiatry. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Online, 2021.

**Turban JL**, Giedinghagen A, Janssen A, Myint M, Daniolos P. Transgender Youth: Understanding "De-transition," Non-linear Gender Trajectories, and Dynamic Gender Identities. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Session Chair of Oral Symposium, Online, 2021.

ER0996

## Jack Lewis Turban III MD MHS

401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

**Turban JL**. A framework for understanding dynamic gender identities through internal and external factors. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Online, 2021.

**Turban JL**, Geosocial networking application use among birth-assigned male adolescents. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Online, 2021.

**Turban JL**. LGBTQ Families and the US Supreme Court. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentations, Online, 2021.

**Turban JL**, King D, Kobe J, Reisner SL, Keuroghlian AS. Access to Gender-affirming Hormones during Adolescence and Mental Health Outcomes among Transgender Adults. Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Poster, Online, 2021.

**Turban JL**. Gender Identity Conversion Efforts: Quantitative Perspectives. Annual Meeting of The American Psychiatric Association, Oral Presentation, Online, 2021.

**Turban JL**. For Worse: Negative Aspects of Social Media for LGBT Youth. Oral Presentation, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Oral Presentation, Online, 2020.

**Turban JL**. Hookup App Use among Gay and Bisexual Males: Sexual Risk and Associated Psychopathology. Oral Presentation, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Online, 2020.

**Turban JL**. Communicating with the Public: From The New York Times to The Big Screen. Oral Presentation, Annual Meeting of The American Academy of Child & Adolescent Psychiatry, Online, 2020.

**Turban JL**, McFarland C, Walters O, Rosenblatt S. An Overview of Best Outpatient Practice in the Care of Transgender Individual. Oral Presentation, Annual Meeting of the American Psychiatric Association, Philadelphia, 2020. [Accepted, but cancelled due to COVID19]

**Turban JL**, Lakshmin P, Gold J, Khandai C. #PsychiatryMatters: Combating Mental Health Misinformation Through Social Media and Popular Press. Oral Presentation, Annual Meeting of the American Psychiatric Association, Philadelphia, 2020. [Accepted, but cancelled due to COVID19]

**Turban JL.** The Pen and the Psychiatrist: Outreach and Education Through the Written Word. Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Chicago, 2019.

**Turban JL.** For Better and For Worse: Gender and Sexuality Online, Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Chicago, 2019.

**Turban JL.** Gender Diverse Young Adults: Narratives and Clinical Considerations, Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Chicago, 2019.

**Turban JL.** Transgender Youth: Controversies and Research Updates, Oral Presentation, Annual Meeting of the American Psychiatric Association, San Francisco, 2019.

**Turban JL**, Beckwith N, Reisner S, Keuroghlian A. Exposure to Conversion Therapy for Gender Identity Is Associated with Poor Adult Mental Health Outcomes among Transgender People in the U.S. Poster Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Seattle, 2018.

**Jack Lewis Turban III MD MHS**
401 Parnassco Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

Shirk SD, **Turban JL**, Potenza M, Hoff R, Kraus S. Sexting among military veterans: Prevalence and correlates with psychopathology, suicidal ideation, impulsivity, hypersexuality, and sexually transmitted infections. Oral Presentation, International Conference on Behavioral Addictions, Cologne, Germany, 2018.

**Turban JL**. Gender Identity and Autism Spectrum Disorder. Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Washington D.C., 2017.

**Turban JL**. Tackling Gender Dysphoria in Youth with Autism Spectrum Disorder from the Bible Belt to New York City. Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent psychiatry, Washington D.C., 2017.

**Turban JL.** Affirmative Protocols for Transgender Youth. Oral Presentation, Annual Meeting of the American Academy of Child & Adolescent Psychiatry, Washington D.C., 2017.

**Turban, JL**. Evolving Management of Transgender Youth. Oral Presentation, Klingenstein Third Generation Foundation Conference, St Louis, 2017.

**Turban, JL**, Potenza M, Hoff R, Martino S, Kraus S. Clinical characteristics associated with digital hookups, psychopathology, and clinical hypersexuality among US military veterans. Oral Presentation, International Conference on Behavioral Addictions, Haifa, Israel, 2017.

Lewis J, Monaco P, **Turban JL**, Girardi M. UV-induced mutant p53 ketatinocyte clonal expansion dependence on IL-22 and RORγT. Poster, Society of Investigative Dermatology, Portland, 2017.

**Turban JL**, Winer J, Encandela J, Boulware S, VanDeusen T. Medical Student Knowledge of and Attitudes toward Transgender Pediatric Patient Care. Abstract, Gay & Lesbian Medical Association, St Louis, 2016.

**Turban JL**, Lu A, Damisah E, Eid T, Chiang V. Metabolomics to Differentiate Radiation Necrosis from Recurrent Tumor following Gamma Knife Stereotactic Radiosurgery for Brain Metastases. Oral Presentation, 14th Annual Leksell Gamma Knife Conference, New York City, 2014

**Turban JL**, Lewis J, Girardi M. UVB-induced HMGB1 and extracellular ATP increase Langerhans cell production of IL-23 implicated in ILC3 activation. Poster, Society of Investigative Dermatology, Scottsdale, 2016

**Turban JL**, Lewis J, Girardi M. Characterization of cytokine pathways associated with Langerhans cell facilitation of UVB-induced epidermal carcinogenesis. Poster, American Society of Clinical Investigation, Chicago, 2016.

Lewis J, **Turban JL**, Girardi M, Michael Girardi. Langerhans cells and UV-radiation drive local IL22+ ILC3 in association with enhanced cutaneous carcinogenesis. Poster, Society of Investigative Dermatology, Scottsdale, 2016.

Sewanan L, Zheng D, Wang P, Guo X, Di Bartolo I, Marukian N, **Turban JL**, Rojas-Velazques D, Reisman A. Reflective Writing Workshops Led By Near Peers During Third-Year Clerkships: A Safe Space for Solidarity, Conversation, and Finding Meaning in Medicine. Poster & Workshop, Society of General Internal Medicine, New Haven and Hollywood, 2016.

## TEACHING PRESENTATIONS

Advanced Topics in Pediatric Gender Care. Stanford Child & Adolescent Psychiatry Fellowship Didactics, 2023.
Opinion Writing About The "Politically Sensitive" and Personal. Harvard Medical School Master of Science in Media, Medicine, and Health Degree Program, 2022.
Gender-affirming Care for Transgender & Gender Diverse Youth, Zuckerberg San Francisco General Hospital Adolescent Psychology Internship Didactics, 2022.

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

Supporting Transgender & Gender Diverse Youth. UCSF Trauma Recovery Center Didactics, 2022.
Developmental Psychopathology, Psychotherapy & Psychopharmacology Course: Pediatric Gender. Stanford University School of Medicine Child & Adolescent Psychiatry Fellowship Didactics, 2021.
Supporting Gender Diverse Youth Through Various Stages of Development. Univeristy of California San Francisco Child & Adolescent Psychiatry Fellowship Didactics, 2021.
Treatment of Transgender and Gender Diverse Youth. Stanford University School of Medicine Psychiatry Residency Didactic, 2021.
Caring for Transgender and Gender Diverse Youth. University of California San Diego General Psychiatry Residency Resident Rounds, 2021.
Opinion Writing 101. Stanford Pediatrics Residency Program, 2021.
Psychotherapeitic Considerations for Transgender Youth. Stanford PsyD Child Psychotherapy Course, 2021.
Transgender Youth: Treatment Paradigms and Research Updates. Children's Health Council DBT Program Lecture Series, 2021.
Gender-affirming Care for Patients with Primary Psychotic Disorders. McLean Psychotic Disorders Division Seminar Series, 2019.
Gender-affirming Care for Transgender Elders. McLean Geriatric Psychiatry Seminar Series, 2019.
Writing about Gender & Sexuality (Guest Lecture), Course: Sexual Outcasts & Uncommon Desires, Emerson College, 2019
Gender-affirming Care for Transgender and Gender Diverse Patients on Inpatient Psychiatry Units, MGH Inpatient Psychiatry Seminar Series, 2019.
Transgender & Gender Non-conforming Youth, MGH/McLean Adult Residency program, 2018.
Writing about Gender Identity for the Lay Audience (Guest Lecture), Course: Kids These Days, Emerson Journalism Program, 2017
International Approaches to the Treatment of Gender Incongruence, VU Medical Center, Amsterdam, 2017
Time to Talk About It: Physician Depression and Suicide, Yale Clerkship Didactics, 2017
Medical Management of Adolescent Gender Dysphoria. Yale Pediatrics Clerkship, 2015-2016
Medical Management of Children and Adolescents with Gender Dysphoria, Yale Pediatrics Residency Didactics, 2016
Reflective Writing Workshop Leader. Yale Surgery Clerkship, 2015-2016
Langerhans Cell Facilitation of Photocarcinogenesis. Yale Department of Dermatology Research Forum, 2016
Panel: Treating Transgender & Gender Non-conforming Patients in the Emergency Setting. Yale Emergency Medicine Clerkship, 2016
Panel: Challenges to the Learning Climate: Difficult Patients, Harassment, and Mistreatment. Yale Pre-Clinical Orientation, 2016
Panel: Personal Behavior and Professionalism, Introduction to the Profession, 2016

## RESEARCH SUPPORT

*Current Funding:*
Sorensen Foundation Fellowship, $287,000 (2021-2023)
The Impact of Gender-affirming Medical and Surgical Interventions on Psychopathology and Implicit Gender Incongruence among Transgender Adolescents
Role: Principal Investigator

UCSF Population Health Equity Scholars Grant, $20,000 (2023-2024)
Systematic content analysis of federal appellate court rulings regarding the constitutionality of bans on gender identity and sexual orientation conversion efforts
Role: Principal Investigator

*Completed Funding:*
Stanford Department of Psychiatry and Behavioral Sciences Trainee Innovator Grant, $5,000 (2020-2021)

## Jack Lewis Turban III MD MHS

401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

Examining the impact of gender identity conversion therapy bans on suicidality among transgender and gender diverse people in the U.S.: a difference-in-differences analysis
Role: Principal Investigator

American Academy of Child & Adolescent Psychiatry Pilot Research Award, $15,000 (2019-2020)
Childhood and Adolescent Experiences with Gender-related Medical Care and Adult Mental Health Outcomes: Analysis of the 2015 U.S. Transgender Survey
Role: Principal Investigator

## AWARDS & HONORS

Top Peer Review Service, *Annals of Internal Medicine* (2022)
Stanford Child & Adolescent Psychiatry Chief Fellow (2021-2022)
Wasserman Award for Advocacy in Children's Mental Health (2021)
Top Manuscript of The Year - *Pediatrics* (2020)
American Psychiatric Association Child & Adolescent Psychiatry Fellowship (2019-2021)
Ted Stern Scholarship and Travel Award (2019)
Editor's Pick for Best Clinical Perspectives Manuscript – *Journal of The American Academy of Child & Adolescent Psychiatry* (2018)
SciShortform Project: Best Shortform Science Writing, Columns & Op-Eds (2018)
Ted Stern Scholarship and Travel Award (2018)
Medaris Grant (2018)
Editor's Pick for Best Clinical Perspectives Manuscript – *Journal of The American Academy of Child & Adolescent Psychiatry* (2017)
United States Preventative Health Services Award for Excellence in Public Health (2017)
NBC Pride 30 Innovator (2017)
Ferris Thesis Prize, Yale School of Medicine (2017)
Parker Prize, Yale School of Medicine (2017)
Howard Hughes Medical Institute Medical Research Fellowship (2015-2016)
American Academy of Child and Adolescent Psychiatry Life Members Mentorship Grant (2016)
Student Scholarship, Gender Conference East (2016)
Farr Award for Excellence in Research (2016)
Yale Office of International Medical Education Grant, Buenos Aires, Argentina (2016)
Yale Office of International Medical Education Grant, VU Medical Center, The Netherlands (2016)
Yale Summer Research Grant (2012)
AIG International Scholar, Harvard College (2007-2011)
Harvard International Study Grant, Alicante, Spain (2008)
David Rockefeller International Study Grant, Shanghai, China (2009)

## PROFESSIONAL MEMBERSHIPS & COMMITTEES

American Psychiatric Association, Member
American Academy of Child & Adolescent Psychiatry, Member
American Psychiatry Association, Council on Communications
American Academy of Child & Adolescent Psychiatry, Media Committee
American Academy of Child & Adolescent Psychiatry, Chair of Subcomittee on Interfacing with the Media
World Professional Association for Transgrender Health, Member
US Professional Association for Transgender Health, Member
US Professional Association for Transgender Health, Research Committee
Athlete Ally, Affiliate Scholar
Psychiatric Times, Editorial Board

ER1000

**Jack Lewis Turban III MD MHS**
401 Parnassus Ave
San Francisco, CA 94143
412.965.9388
jack.turban@ucsf.edu

## ACADEMIC JOURNAL SERVICE & AD HOC PEER REVIEW

PLoS One, Academic Editor
JAACAP, Contributing Editor
JAMA, Peer Reviewer
JAMA Pediatrics, Peer Reviewer
JAMA Psychiatry, Peer Reviewer
JAMA Network Open, Peer Reviewer
Annals of Internal Medicine, Peer Reviewer
Pediatrics, Peer Reviewer
Journal of the American Academy of Child & Adolescent Psychiatry, Peer Reviewer
JAACAP Open, Peer Reviewer
Journal of Child Psychology and Psychiatry, Peer Reviewer
Journal of Adolescent Health, Peer Reviewer
Academic Psychiatry, Peer Reviewer
Journal of Autism and Developmental Disorders, Peer Reviewer
American Journal of Public Health, Peer Reviewer
Perspectives on Psychological Science, Peer Reviewer
Transgender Health, Peer Reviewer
Journal of Clinical Medicine, Peer Reviewer
Brain Sciences, Peer Reviewer
Social Science & Medicine, Peer Reviewer
Sexual Health, Peer Reviewer
Women, Peer Reviewer

RAÚL R. LABRADOR
ATTORNEY GENERAL

LINCOLN DAVIS WILSON, ISB #11860
Chief, Civil Litigation and
Constitutional Defense
RAFAEL J. DROZ, ISB #9934
Deputy Attorney General
Office of the Attorney General
P. O. Box 83720
Boise, ID  83720-0010
Telephone: (208) 334-2400
Fax: (208) 854-8073
lincoln.wilson@ag.idaho.gov
rafael.droz@ag.idaho.gov

*Attorneys for Defendants Raúl Labrador
and Individual Members of the Idaho
Code Commission*

DAVID H. THOMPSON (PHV)
Special Deputy Attorney General
BRIAN W. BARNES (PHV)
Special Deputy Attorney General
JOHN D. RAMER (PHV)
Special Deputy Attorney General
Cooper & Kirk PLLC
1523 New Hampshire Ave NW
Washington, DC 20036
Tel: (202) 220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

PAM POE, by and through her
parents and next friends, et al.

         *Plaintiffs,*

v.

RAÚL LABRADOR, in his official
capacity as Attorney General of the State
of Idaho, et al.

         *Defendants.*

Case No. 1:23-cv-00269-BLW

**COMBINED MEMORANDUM OF
LAW IN OPPOSITION TO MO-
TION FOR PRELIMINARY IN-
JUNCTION AND IN SUPPORT
OF MOTION TO DISMISS**

ER1002

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION ........................................................................... 1

BACKGROUND ............................................................................ 3

I.  Gender dysphoria is a psychiatric diagnosis ................................. 3

II.  "Transitioning" minors inflicts irreversible harms and unknown risk .......... 5

   A.  Taking cross-sex hormones before puberty causes sterility ..................... 5

   B.  The neurological effects of suppressing puberty are unknown ................. 6

   C.  Puberty blockers and cross-sex hormones cause other harms ................... 7

III.  No reliable science evidence justifies medical transition for minors ............. 7

   A.  Medical ethics require benefits outweigh the risks .................................... 7

   B.  European Authorities find benefits do not outweigh the risks .................. 8

   C.  Detransitioners cast significant doubt on Plaintiffs' claims ..................... 9

IV.  Idaho enacts the Vulnerable Child Protection Act ......................................... 10

STANDARD OF DECISION ................................................................ 10

ARGUMENT .............................................................................. 11

I.  The Court lacks subject matter jurisdiction ................................................... 11

II.  Plaintiffs fail to demonstrate a likelihood of success on the merits ............. 12

   A.  The Act does not discriminate by sex or transgender status .................... 13

      1.  The Act does not discriminate based on sex ......................................... 13

      2.  The Act does not discriminate based on transgender status ............... 15

   B.  Parents have no right to experimental and harmful treatments ............. 17

C. The Act satisfies any level of scrutiny ...................................................... 19

D. Plaintiffs' experts' opinions are unreliable ................................................ 24

III. Plaintiffs have not met the remaining preliminary-injunction factors ........... 27

IV. The scope of Plaintiffs' requested relief is inappropriate ............................... 29

CONCLUSION ............................................................................................................. 31

TABLE OF AUTHORITIES

CASES

*Abigail All. for Better Access to Developmental Drugs v. von Eschenbach,*
  495 F.3d 695 (D.C. Cir. 2007) ................................................................ 19

*California v. Azar,*
  911 F.3d 558 (9th Cir 2018) ............................................................. 12, 27

*Coalition for the Econ. Equity v. Wilson,*
  122 F.3d 718 (9th Cir. 1997) .................................................................. 27

*Daniels-Feasel v. Forest Pharms.,*
  2021 WL 4037820 (S.D.N.Y. September 3, 2021), *aff'd*, 2023 WL 4837521 (2d Cir.
  July 28, 2023) ......................................................................................... 24

*Dobbs v. Jackson Women's Health Organization,*
  142 S. Ct. 2228 (2022) .................................................................. *passim*

*Doe v. Snyder,*
  28 F.4th 103 (9th Cir. 2022) .................................................................. 16

*Doe 1 v. Thornbury,*
  75 F.4th 655 (6th Cir. 2023) .................................................................. 28

*Drakes Bay Oyster Co. v. Jewell,*
  747 F.3d 1073 (9th Cir. 2014) ............................................................... 28

*East Bay Sanctuary Covenant v. Barr,*
  934 F.3d 1026 (9th Cir 2019) ................................................................ 29

*EEOC v. Freeman,*
  778 F.3d 463 (4th Cir. 2015) ................................................................. 24

*Eknes-Tucker v. Gov of Alabama,*
  No., 22-11707, ___F.4th___ 2023 WL 5344981 (11th Cir. August 21, 2023) .. *passim*

*Ex parte McCardle,*
  74 U.S. 506 ............................................................................................ 11

*Ex parte Young,*
  209 U.S. 123 (1908) ............................................................................... 11

*Geduldig v. Aiello,*
   417 U.S. 484 (1974)......................................................................... 13

*Godecke v. Kinetic Concepts, Inc.,*
   937 F.3d 1201 (9th Cir. 2019)........................................................ 10

*Gonzales v. Carhart,*
   550 U.S. 124 (2007)......................................................................... 19

*Hecox v. Little,*
   Nos. 20-35813, 20-35815, ___F.4th___ 2023 WL 5283127 (9th Cir. August 17, 2023)
     *passim*

*In re Lipitor,*
   892 F.3d 624 (4th Cir. 2018)........................................................ 24

*In re Lipitor,*
   185 F. Supp. 3d (D.S.C. 2016) ................................................ 26, 27

*In re Zoloft,*
   26 F. Supp. 3d 449 (E.D. Penn. 2014) ...................................... 24

*Karnoski v. Trump,*
   926 F.3d 1180 (9th Cir. 2019).................................................... 3, 16

*Latta v. Otter,*
   771 F.3d 496 (9th Cir. 2014)........................................................ 27

*Lopez v. Candaele,*
   630 F.3d 775 (9th Cir. 2010)........................................................ 11

*L.W. v. Skrmetti,*
   73 F.4th 408 (6th Cir. 2023) .............................................. *passim*

*Newman v. Lance,*
   129 Idaho 98, 922 P.2d 395 (Idaho 1996)............................... 12

*Planned Parenthood Greater Northwest v. Labrador,*
   No. 1:23-cv-00142-BLW, ___F.Supp.3d___, 2023 WL 4864962 (D. Idaho July 31, 2023) ...................................................................... 11

*Parham v. J. R.,*
   442 U.S. 584 (1979)......................................................................... 18

*Raidoo v. Moylan,*
  75 F.4th 1115 (9th Cir. 2023) .................................................. 19

*Reed v. Reed,*
  404 U.S. 71 (1971)................................................................ 12

*Rink v. Cheminova, Inc.,*
  400 F.3d 1286 (11th Cir 2005)................................................ 24

*Roman v. Wolf,*
  977 F.3d 935 (9th Cir. 2020)................................................. 27

*Rosen v. Ciba-Geigy Corp.,*
  78 F.3d 316 (7th Cir. 1996)................................................... 26

*State v. Summer,*
  139 Idaho 219, 76 P.3d 963 (Idaho 2003)................................ 12

*Tingley v. Ferguson,*
  47 F.4th 1055 (9th Cir 2022) ................................................ 22

*Trump v. Hawaii,*
  138 S. Ct. 2392 (2018)........................................................ 21

*Tuan Anh Nguyen v. Immigration Naturalization Services,*
  533 U.S. 53 (2001) ............................................................. 14

*Twitter, Inc. v. Paxton,*
  56 F.4th 1170 (9th Cir. 2022) .............................................. 11

*United States v. Hansen,*
  143 S. Ct. 1932 (2023)........................................................ 30

*United States v. Virginia,*
  518 U.S. 515 (1996)............................................................ 14

*United States v. Wilson,*
  484 F.3d 267 (4th Cir. 2007)................................................ 26

*Washington v. Glucksberg,*
  521 U.S. 702 (1997)....................................................... 17, 18

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)............................................................... 10

## STATUTES

Idaho Code § 18-1506.................................................................... 10

Idaho Code § 31-2227.................................................................... 12

Idaho Code § 31-2604.................................................................... 12

## OTHER AUTHORITIES

Academie Nationale de Medecine of France, Medicine and gender transidentity in
  children and adolescents, February 25, 2022 ......................................... 9

Attorney General Opinion No. 23-1 ....................................................... 11

Diagnostic and Statistical Manual of Mental Disorders 5-TR ("DSM-5")................ 3,

Guidelines from the World Professional Association for Transgender Health
  (WPATH) and the Endocrine Society ................................................. 5, 30

*Health services for children and young people with gender dysphoria,*
  Ugeskr Læger 2023; 185; V11220740 (July 3, 2023)................................... 9

Senate Chamber Session Day 78 (March 27, 2023)
  https://tinyurl.com/3ebfbknt........................................................ 22

Swedish Socialstyrelsen Support 2022 ..................................................... 21

Testimony of Dr. Roger Hiatt, February 7, 2023,
  House Judiciary, Rules & Administration Hearing
  https://tinyurl.com/59jt7376 ....................................................... 23

The Cass Review, Independent Review of Gender Identity Services for Children and
  Young People: Interim Report at 33 (February 2022)
  http://tinyurl.com/5s55653n ........................................................ 4

## INTRODUCTION

Idaho's Vulnerable Child Protection Act regulates specific medical treatments for a specific psychiatric diagnosis in a specific age group. In particular, it prohibits the use of medical interventions (like puberty blockers and cross-sex hormones) and surgical interventions (like mastectomies and penectomies) as a treatment for gender dysphoria in minors. The Act permits the use of mental health therapy to treat gender dysphoria in minors. And the Act permits adults to obtain any intervention.

The reason for prohibiting these interventions for minors is clear: The interventions provide no proven benefit, impose lifelong and irreversible harm, and carry significant unknown risks. The harms include not only near-certain sterilization and lack of sexual function, but also increased chances of heart disease, stroke, blood clots, breast and uterine cancer, liver dysfunction, hypertension, and osteoporosis. The unknowns include a complete lack of evidence regarding long-term outcomes for the current patient population and *total* uncertainty regarding the neurological and cognitive effects resulting from the suppression of healthy puberty in adolescents. No benefit from these interventions has been reported in any reliable study. And not a single systematic review—the highest form of medical evidence—has ever demonstrated reduced death by suicide from these interventions.

Governments around the globe have taken note. Specifically, public health authorities in Europe have acknowledged that the risks associated with these interventions outweigh any demonstrated benefits. Several states in the U.S. have likewise acknowledged the danger of these interventions and corresponding lack of proven benefit and prohibited the practice of this experimental medicine on minors.

Two federal courts of appeals have concluded that such commonsense regulations are likely constitutional. The Eleventh Circuit Court of Appeals recently vacated a preliminary injunction against Alabama's law protecting minors from these interventions. And the Sixth Circuit Court of Appeals stayed preliminary injunctions against similar laws in both Tennessee and Kentucky.

The reasoning of those decisions shows why Idaho's Vulnerable Child Protection Act is likewise constitutional. Specifically, the Act is not subject to heightened scrutiny merely because it acknowledges biological differences that must be considered in the medical context. The Act is not subject to heightened scrutiny absent some showing of invidious discrimination—which cannot be made here. Lastly, the Parent Plaintiffs' claims fail because parents do not have a substantive Due Process right to obtain for their children puberty blockers, cross-sex hormones, and surgeries that are prohibited by state law. One cannot conclude that these interventions are "deeply rooted in our Nation's history."

Moreover, even if the Act were subject to heightened scrutiny, it easily passes. The Act serves the compelling government interest of protecting minors from harmful and unproven medical interventions. And a prohibition on those interventions is necessary to adequately serve that compelling interest because almost nothing is known about the long-term consequences associated with them. In addition, the existence of detransitioners—those who have transitioned but later come to identify with their sex—offers living proof that, as Plaintiffs' experts conceded, providers cannot know who has a "true" need for these interventions ahead of time.

Finally, even if Plaintiffs are entitled to injunctive relief, they have offered no justification for either statewide relief or an injunction against the Act in all its applications. Therefore, if the Court enters an injunction, it should limit the scope of that injunction to Plaintiffs and their providers.

## BACKGROUND

## I.    Gender dysphoria is a psychiatric diagnosis.

There are two human sexes—male and female. Malone Decl. ("Malone") ¶ 59. An individual's sex is an objective and biological fact that cannot be changed. *Id.*; Weiss Decl. ("Weiss")¶ 34. Distinct from "sex," an individual's "gender identity" is his or her personal sense of being male or female. *See* Malone ¶ 62. Individuals "identify as transgender" when their sex is different from their gender identity. *Karnoski v. Trump*, 926 F.3d 1180, 1187 n.1 (9th Cir. 2019). "Gender dysphoria," in contrast, is a specific psychiatric diagnosis defined by diagnostic criteria set out in the *Diagnostic and Statistical Manual of Mental Disorders* 5-TR ("DSM-5"). Cantor Decl. ("Cantor") ¶ 109.  Although its definitions vary slightly for children, adolescents, and adults, all cases are characterized by a strong and lasting desire to be the opposite sex and "clinically significant" distress that impairs the individual's ability to function in daily life. *Id.*

In the last decade, the number of minors diagnosed with gender dysphoria has exploded. Cantor ¶ 64; Malone ¶ 15. This explosion has disproportionately affected adolescent natal females. Malone ¶ 16. The following chart displays the number of minors, distinguished by sex, referred to the UK's Gender Identity Services clinic between 2009 and 2016:



Figure 1: Sex ratio in children and adolescents referred to GIDS in the UK (2009-16)

|             | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016  |
|-------------|------|------|------|------|------|------|------|-------|
| Adolescents F | 15  | 48*  | 78*  | 141* | 221* | 314* | 689* | 1071* |
| Adolescents M | 24  | 44*  | 41   | 77*  | 120* | 185* | 293* | 426*  |
| Children F    | 2   | 7    | 12   | 17   | 22   | 36   | 77*  | 138*  |
| Children M    | 10  | 19   | 29   | 30   | 31   | 55*  | 103* | 131   |

**AFAB** = assigned female at birth; **AMAB** = assigned male at birth

*Indicates p<.05 which shows a significant increase of referrals compared to the previous year

Source: de Graaf NM, Giovanardi G, Zitz C, Carmichael P (2018).[32]

The Cass Review, Independent Review of Gender Identity Services for Children and Young People: Interim Report at 33 (Feb. 2022), *available at* http://tinyurl.com/5s56653n.

Health authorities in the UK, Sweden, and Finland have noted this phenomenon is "unexplained," with this group of "later-presenting birth-registered female teenagers" now the "current predominant cohort" of minors with gender dysphoria. Cantor ¶¶ 64-65. Some researchers posit that "social contagion," meaning the "well-established psychological concept defined as the spread of behaviors, attitude and affect through crowds and other types of social aggregates from one member to another," may be a "factor in both the rise of new cases and the demographic shift

towards females." Malone ¶¶ 16-17. Others have noted the correlation between this increase and social media. Cantor ¶¶ 287-89.

## II.    "Transitioning" minors inflicts irreversible harms and unknown risk.

Psychotherapy is an accepted approach to treating gender dysphoria. Cantor ¶¶ 16, 290.  Advocates of so-called "gender-affirming care," however, also endorse medically and surgically "transitioning" as a treatment for minors with gender dysphoria. These interventions cause known harms and carry unknown risks.

### A.    Taking cross-sex hormones before puberty causes sterility.

The protocol for *medical* interventions to treat gender dysphoria calls for the suppression of an adolescent's natural puberty. As Plaintiffs explain, under the guidelines from the World Professional Association for Transgender Health (WPATH) and the Endocrine Society, providers prescribe GnRH agonists (puberty blockers) to suppress an adolescent's natural puberty. Dkt. 32-1 at 4. This suppression allegedly prevents the distress associated with going through natural puberty when the adolescents' gender identity is not consistent with their sex. *See  id.*

Next, as Plaintiffs also explain, providers prescribe cross-sex hormones. *See id.*This means that natal females take testosterone, and natal males take estrogen. *Id.* Adolescents who are prescribed cross-sex hormones for this purpose "will require continuing treatment with cross-sex hormones for life." Cantor ¶ 224.

It is a near certainty that treatment in accordance with either the WPATH or Endocrine Society Guidelines will result in sterility. It is essentially indisputable that taking cross-sex hormones without first going through puberty will sterilize a person. Cantor ¶ 205; Malone ¶ 118; Weiss ¶ 116. Relatedly, these individuals may never be

able to achieve an orgasm. Cantor ¶ 208; Weiss ¶ 115.  Even for those who begin such treatment at a later stage of puberty, "no studies at all have been done" regarding "when, … or with what probability either males or females can achieve healthy fertility if they later regret their transition" and cease treatment.  Cantor ¶ 206. "Infertility is frequent in those females treated with testosterone even if not given puberty blockers." Weiss ¶ 134. And the "hormonal and surgical treatment pathway" will sterilize a person. Malone ¶ 19.

There are no established fertility options for minors who undergo medical transition.  For minors who take cross-sex hormones without going through puberty, "no viable fertility preservation options exist." Cantor ¶ 205. The "fertility options" for natal females who have been exposed to cross-sex hormones are so uncertain "that mouse studies are being done to try to understand how to mitigate the harm." Weiss ¶ 135. In addition, when natal females undergo a so-called "gender-affirming mastectomy," Connelly Decl. ¶ 26, "it is functionally irreversible" and "breast-feeding a child will never be possible."  Cantor ¶ 207.

## B.    The neurological effects of suppressing puberty are unknown.

Pubertal hormones "drive important stages of neural development."  Cantor ¶ 209. As UK health authorities have put it, a "further concern" regarding pubertal suppression "is that adolescent sex hormone surges may trigger the opening of a critical period for experience-dependent rewiring of neural circuits underlying executive function," meaning "maturation of the part of the brain concerned with planning, decision making and judgment." *Id.* (quotations omitted).

"To date, there has been very limited research on the short-, medium- or longer-term impact of puberty blockers on neurocognitive development." *Id.* (quotations omitted). Given this lack of knowledge, many "have expressed concern that blocking the process of puberty during its natural time could have a negative and potentially permanent impact on brain development." Cantor ¶ 212.

### C.    Puberty blockers and cross-sex hormones cause other harms.

In addition to near-certain infertility, medicalized transition causes additional harms.  These harms include "increased risks of heart disease, stroke, blood clots, breast and uterine cancer, liver dysfunction, hypertension, and osteoporosis." Malone ¶ 24; *see also* Cantor ¶¶ 214-225; Weiss ¶¶ 133, 136-49.

## III.   No reliable science evidence justifies medical transition for minors.

Because the "fundamental objective of medicine is to enhance an individual's health and well-being," a medical intervention is justified only when its probable benefits outweigh its probable risks.  Malone ¶ 40. Systematic reviews of the evidence—including those by European health authorities—have concluded that the evidence does not show the benefits of medically or surgically "transitioning" minors outweigh the risks. European health authorities concluded that the experience of "detransitioners" casts doubt on the safety and efficacy of these treatments.

### A.    Medical ethics require benefits outweigh the risks.

Any particular medical treatment cannot simply be labeled "safe."  Cantor ¶ 70. Instead, a medical treatment is appropriate only when the probable benefits outweigh the probable risks associated with the treatment. Cantor ¶ 71. Under this risk-benefit analysis, serious risks associated with a particular treatment cannot be

justified "without evidence of correspondingly greater benefit." Cantor ¶ 52. There-fore, no medical intervention that carries risks should be used unless there is "a higher degree of certainty regarding its benefits." Malone ¶ 40. Given the significant irreversible risks—including sterility—of medically and surgically transitioning mi-nors, these interventions cannot be justified unless there is a high degree of certainty regarding their benefits. *Id.* ¶¶ 40-42.

## B. European Authorities find benefits do not outweigh the risks.

Several European countries have concluded that the demonstrated benefits do not clearly outweigh the risks. *Id.* ¶¶ 124-30.  In particular, health authorities in Sweden and the U.K. have engaged in systematic reviews of the evidence surrounding these treatments.  Cantor ¶¶ 78-85.  This means the health authorities engaged in "a comprehensive analysis of the entire body of evidence" surrounding the "transition" of minors, rather than focused on "individual research studies alone." Malone ¶ 27. The point of the systematic review is to "minimiz[e] opportunities for bias in gather-ing and evaluating research evidence." Cantor ¶ 40.  A systematic review is the high-est form of medical evidence.  *Id.*

Every systematic review of medically and surgically transitioning minors shows a "low" or "very-low" degree of certainty in mental-health improvement. Malone ¶ 28. No systematic review has ever demonstrated reduced death by suicide resulting from these treatments. *Id.* After Swedish health authorities conducted their systematic review, they concluded that the "risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits." Cantor ¶ 28 (quotations omitted). UK health authorities have

said "it is an unanswered question whether the evidence for the use and safety of [puberty blockers] is strong enough as judged by reasonable clinical standards." *Id.* ¶ 19 (quotations omitted). Health authorities and researchers in Finland, Norway, France, and Denmark have expressed similar caution. *Id.* ¶¶ 21-24, 29-33; Malone ¶ 129. Meanwhile, in the United States, the FDA has not approved the use of puberty blockers or cross-sex hormones as a treatment for gender dysphoria. *L.W. v. Skrmetti*, 73 F.4th 408, 418 (6th Cir. 2023) (noting "the FDA is not prepared to put its credibility and careful testing protocols behind the use" of these drugs for this purpose).

### C.    Detransitioners cast significant doubt on Plaintiffs' claims.

With the rise of minors being diagnosed with gender dysphoria has come the rise of "detransitioners"—those who have previously undergone some form of "gender-affirming" treatment but later come to identify with their natal sex. Malone ¶ 12. At least two recent studies suggest the medical detransition rate among youth who underwent gender transitions in recent years may be as high as 30%—and that is only within a few years of beginning transition. *Id.* ¶ 34. A study based on a highly reliable dataset from the U.S. military healthcare system similarly showed that nearly 30% of youth who commenced medical transition discontinued it within the first four years. *Id.* ¶ 35.  The existence of detransitioners has been part of the basis for caution throughout the world. Cantor ¶ 29 (citing Press Release, Academie Nationale de Medecine of France, Medicine and gender transidentity in children and adolescents, February 25, 2022); Malone ¶ 129 (citing Status Article, *Health services for children and young people with gender dysphoria,* Ugeskr Læger 2023; 185: V11220740 (July 3, 2023)). The unexplained fact of those who transitioned as minors and later came

to identify with their natal sex casts doubt on the entire practice of "youth transgender medicine."

## IV.  Idaho enacts the Vulnerable Child Protection Act.

This past spring, Idaho passed a law to protect children and adolescents from the dangers of these unproven medical and surgical interventions. The Vulnerable Child Protection Act (the Act) makes it a crime to perform particular surgical or medical interventions on minors "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." *See* Idaho Code § 18-1506(c)(3).  The Act will go into effect on January 1, 2024.

Plaintiffs filed this lawsuit in May. *See* Dkt. 1.  The Plaintiffs are two minors and their respective parents. *Id.* ¶¶ 6-7.  They allege they are currently receiving care that will be prohibited by the Act in January.  *Id.*  Plaintiffs filed this motion for a preliminary injunction in July. *See* Dkt. 32.

## STANDARD OF DECISION

A motion to dismiss under Rule 12(b)(6) may seek dismissal based on "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

20 (2008). And a court cannot grant a preliminary injunction if it lacks subject matter jurisdiction. *See Ex parte McCardle*, 74 U.S. 506, 514.

ARGUMENT

## I.   The Court lacks subject matter jurisdiction.

At the outset, Plaintiffs' claims against the Attorney General and the members of the Idaho Code Commission fail for lack of subject matter jurisdiction. These Defendants have Eleventh Amendment immunity, and the *Ex parte Young* exception applies only if they are "clothed with some duty in regard to the enforcement of the laws of the state, and ... threaten and are about to commence proceedings ... to enforce against parties affected [by] an unconstitutional act." *Ex parte Young*, 209 U.S. 123, 155–56 (1908). And proving a justiciable controversy in the pre-enforcement context also requires a threat: for standing, "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings," *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (9th Cir. 2022), and for ripeness, a "specific and credible threat of adverse action." *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010).

Plaintiffs do not meet these standards as to the Attorney General and the Code Commission Defendants. As the Attorney General has recently explained, he lacks authority to enforce Idaho criminal law absent a referral by county prosecutors, and Plaintiffs do not allege that any such referral has occurred, much less that the Attorney General has made any threat of enforcement.[1] *See* Formal Att'y Gen. Op. 23-1;

---

[1] The Attorney General recognizes that the Court has recently rejected this argument but he asserts it here to preserve his immunity defense. *Planned Parenthood v. Labrador*, ___ F.Supp.3d ____, 2023 WL 4864962, at *7 (D. Idaho July 31, 2023).

Idaho Code § 31-2227; Idaho Code § 31-2604;*Newman v. Lance*, 922 P.2d 395, 399 (Idaho 1996); *State v. Summer*, 76 P.3d 963, 968 (Idaho 2003). And there is even less of a connection to the members of the Idaho Code Commission, which has *no* enforcement authority of any kind, nor do Plaintiffs allege otherwise. The mere act of publication of the code is not enforcement, and it has no nexus to Plaintiffs' purported harm.  Dkt. 1 ¶ 123. In fact, the only claim they assert against the members of the Code Commission—that the law is void for vagueness—is not even one on which they seek a preliminary injunction. *See* Dkt. 1, Count III.

## II. Plaintiffs fail to demonstrate a likelihood of success on the merits.

Plaintiffs fail to demonstrate a likelihood of success on the merits—the "most important" preliminary-injunction factor—for several reasons. *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (quotations omitted). First, the Act is not subject to heightened scrutiny because it does not discriminate on the basis of either sex or transgender status. Second, even if the Act were subject to heightened scrutiny, it is constitutional given the compelling interest served by the Act and the fact that the treatments at issue offer no proven benefit, impose numerous long-term irreversible harms, and carry risks that are completely unknown.

### A. The Act does not discriminate by sex or transgender status.

#### 1. The Act does not discriminate based on sex.

Under the Equal Protection Clause, sex discrimination is a "preference to members of either sex over members of the other." *Reed v. Reed*, 404 U.S. 71, 76 (1971).  The Act clearly does not violate this constitutional principle because it applies to both males and females the same. Instead, as the Eleventh Circuit held with

respect to a similar law, the Act "is best understood as a law that targets specific medical interventions for minors, not one that classifies on the basis of any suspect characteristic under the Equal Protection Clause." *Eknes-Tucker v. Gov. of Ala.*, No. 22-11707, --- F.4th---, 2023 WL 5344981, at *15 (11th Cir. Aug. 21, 2023).

Moreover, a statute regulating *medical procedures* does not trigger heightened scrutiny when it acknowledges sex-based distinctions. As the Supreme Court recently explained, "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny" absent a showing of "'invidious discrimination against members of one sex or the other.'" *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245–46 (2022) (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)). "In *Geduldig*, the Supreme Court stated that a classification based on pregnancy is not per se a classification based on sex, even though 'it is true that only women can become pregnant.'" *Hecox v. Little*, Nos. 20-35813, 20-35815, \_\_\_ F.4th \_\_\_\_, 2023 WL 5283127, at *11 (9th Cir. Aug. 17, 2023) (quoting *Geduldig*, 417 U.S. at 496 n.20). Here, the Act regulates two *separate* "medical procedure[s] that only one sex can undergo," *id.*, because a natal female "cannot transition through use of estrogen" and a natal male "cannot transition through use of testosterone," *L.W.*, 73 F.4th at 419. The Act does not trigger heightened scrutiny simply because it acknowledges these biological distinctions.

It is true the Act "mentions the word 'sex.'" *Id*. But as the Sixth Circuit recently asked with respect to a similar law, "how could it not?" *Id*. "That is the point of the existing hormone treatments—to help a minor transition from one gender to another." *Id*. Thus, the Act "refers to sex only because the medical procedures that it

regulates—puberty blockers and cross-sex hormones as a treatment for gender dysphoria—are themselves sex-based." *Eknes-Tucker*, 2023 WL 5344981 at *16.

Plaintiffs' sex-stereotyping argument fails for a similar reason. Dkt. 32-1 at 14–15. First, "[p]hysical differences between men and women are . . . enduring." *United States v. Virginia*, 518 U.S. 515, 533 (1996). They are "not a stereotype." *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 68 (2001). And this enduring biological reality explains *why* the "regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny." *Dobbs*, 142 S. Ct. at 2245–46.

Second, the diagnosis of gender dysphoria turns *expressly* on sex stereotypes. For example, the criteria for pre-pubertal children asks whether the child has shown a preference "for the toys, games, or activities *stereotypically* used or engaged in by the other gender." Dkt. 32-6 ¶ 18 (emphasis added). For boys, it asks if the child rejected "*typically masculine* toys, games, and activities" and demonstrated an "avoidance of rough-and-tumble play." *Id.* (emphasis added). For girls, it asks whether the child rejected "*typically feminine* toys, games, and activities." *Id.* (emphasis added). Thus, the Act "targets certain medical interventions for minors meant to treat the condition of gender dysphoria," which is expressly diagnosed based on gender stereotypes. *Eknes-Tucker*, 2023 WL 5344981 at *17. But the Act *itself* "does not further any particular gender stereotype." *Id.* Instead, it simply regulates particular interventions for a *diagnosis* that turns on gender stereotypes. *Id.*

Third, Plaintiffs' examples of medical procedures that, they say, demonstrate sex-based discrimination only undermine their argument. Specifically, Plaintiffs highlight treatments for gynecomastia in natal males and polycystic ovarian

syndrome (PCOS) in natal females. *See* Dkt. 32-1 at 15. But neither gynecomastia nor PCOS are *psychological* disorders. As Plaintiff's own expert admitted, gynecomastia is "diagnosed clinically by physical exam" and "does not turn on the presence or lack thereof of psychological distress." Connelly Dep. ("Ex. A") 247:6-8, 14-17. Similarly, Plaintiffs' expert admitted that the diagnosis for PCOS "is not dependent o[n] psychological distress." Ex. A 248:1-6. Thus, treatments for gynecomastia and PCOS do not "affirm" the gender of a patient to treat psychological distress; rather, they treat *physical* conditions. In contrast, and also as Plaintiffs' expert admitted, the purpose of prescribing puberty blockers and cross-sex hormones is to treat the *psychological* condition of gender dysphoria. Ex. A 70:12-25. Plaintiffs provide no example of a treatment permitted in Idaho that "affirms" the gender of a natal male as male or a natal female as female to treat *psychological distress*. Therefore, permitting treatments for gynecomastia and PCOS does not reflect any sort of sex-based discrimination in the Act's regulation of medical interventions as a treatment for gender dysphoria in minors.

### 2. The Act does not discriminate based on transgender status.

The Ninth Circuit has "held that heightened scrutiny applies to laws that discriminate on the basis of transgender status" because transgender persons are a "'quasi-suspect class.'" *Hecox*, 2023 WL 5283127 at *11. While Defendants dispute that holding and reserve their right to challenge it *en banc* or before the Supreme Court, even if it were correct, it would not apply here based on the testimony of Plaintiffs' own experts. That is because the Act regulates medical and surgical treatments for a particular psychiatric diagnosis—gender dysphoria—that Plaintiffs' experts say

is not the same as transgender status.  Brady Dep. (Ex. B") 71:12-14 (individual can be "transgender without having gender dysphoria"). Regulating treatment for a psychiatric diagnosis does not classify based on identity.

First, Ninth Circuit precedent does *not* establish that regulation of treatments for gender dysphoria constitute discrimination based on transgender status. To be sure, a law may not be drafted with "seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Hecox*, 2023 WL 5283127 at *10 (cleaned up). But the Ninth Circuit has expressly reserved the question whether the regulation of "gender dysphoria" is so "closely correlated with being transgender" that a regulation related to gender dysphoria "constitutes discrimination against transgender persons." *Karnoski,* 926 F.3d at 1201 n.18; *see also Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) (treating as an open question whether "disallowing gender reassignment surgery should be treated as discriminating against transgender persons").

Second, even if transgender identity were equivalent to having gender dysphoria, that still does not suggest heightened scrutiny applies to the regulation of *specific treatments* for gender dysphoria. It does not trigger heightened scrutiny to "restrict[] a specific course of medical treatment that, by the nature of things, only gender nonconforming individuals may receive." *Eknes-Tucker*, 2023 WL 5344981 at *17.  As the Ninth Circuit explained in *Hecox*, if "a classification based on pregnancy is not per se a classification based on sex, even though it is true that only women can become pregnant." *Hecox*, 2023 WL 5283127 at *11 (cleaned up). For the same reasons, then, a

classification based on a gender dysphoria is not per se a classification based on transgender status *even if* only transgender persons can be diagnosed with gender dysphoria. Therefore, just as the regulation of a procedure that only one *sex* can undergo "does not trigger heightened constitutional scrutiny" absent proof of invidious discrimination against members of one sex, *Dobbs*, 142 S. Ct. at 2245–46, so too "the regulation of a course of treatment that only gender nonconforming individuals undergo would not trigger heightened scrutiny unless the regulation were a pretext for invidious discrimination against such individuals." *Eknes-Tucker*, 2023 WL 5344981 at *17. And as explained in more detail below, there is no plausible basis to conclude that the Act is a mere pretext for invidious discrimination. In sum, the Act does not discriminate by sex or transgender status, and heightened scrutiny does not apply.

## B.     Parents have no right to experimental and harmful treatments.

Hidden away in the Due Process Clause, the Parent Plaintiffs purport to have discovered a constitutional right to obtain puberty blockers, cross-sex hormones, and gender-transition surgeries for their children. But their analysis falls well short of the Supreme Court's requirements for a substantive Due Process right. That test requires that the right is "fundamental" or "deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). "But the use of these medications in general—let alone for children—almost certainly is not 'deeply rooted' in our nation's history." *Eknes-Tucker* 2023 WL 5344981 at *10. The "earliest-recorded uses of puberty blocking medication and cross-sex hormone treatment for purposes of treating the discordance between an individual's biological sex and sense of gender identity did not occur until well into the twentieth century." *Id.*

In light of this history, the Parent Plaintiffs seek to raise the level of generality for the right they are asserting. They primarily rely on principles discussed in the Supreme Court's decision in *Parham v. J.R.*, 442 U.S. 584, 602 (1979), regarding the right of parents to make medical decisions for their children. *See* Dkt. 32-1 at 23. But because courts seek to "exercise the utmost care whenever" they "are asked to break new ground in th[e] field" of substantive Due Process, they require "a careful description of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721. And "*Parham* does not at all suggest that parents have a fundamental right to direct a particular medical treatment for their child that is prohibited by state law." *Eknes-Tucker*, 2023 WL 5344981 at *12.

Indeed, there is not even a "historical recognition of a fundamental right of *adults* to obtain the medications at issue for themselves." *Id.* at *13 n.18. Therefore, "it would make little sense for adults to have a *parental* right to obtain these medications for their children but not a *personal* right to obtain the same medications for themselves." *Id.* It would make little sense to find a parental right to a pharmacological treatment that the FDA has not even approved to treat gender dysphoria. *L.W.*, 73 F.4th at 418. This perhaps explains why the United States does not endorse this argument. *See* Dkt. 45 at 1 n.2. And the cases Plaintiffs cite "applying the fundamental parental right in the context of medical decision-making do not establish that parents have a derivative fundamental right to obtain a particular medical treatment for their children as long as a critical mass of medical professionals approve." *Eknes-Tucker*, 2023 WL 5344981 at *13; *see also L.W.*, 73 F.4th at 417-18 (citing *Abigail All. for Better Access to Dev. Drugs v. von Eschenbach*, 495 F.3d 695, 703 (D.C. Cir. 2007)

(en banc)). Thus, Plaintiffs "have not shown that a right to new medical treatments" such as these "is deeply rooted in our history and traditions and thus beyond the democratic process to regulate." *L.W.* 73 F.4th at 417.

### C.     The Act satisfies any level of scrutiny.

The Act, "like other health and welfare laws, is entitled to a strong presumption of validity." *Dobbs*, 142 S. Ct. at 2284. And "[j]udicial deference is especially appropriate where 'medical and scientific uncertainty' exists." *L.W.*, 73 F.4th at 417 (quoting *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007)). Because the Act does not trigger heightened scrutiny for reasons already explained, it is subject only to rational-basis review, which "is a paradigm of judicial restraint." *Raidoo v. Moylan*, 75 F.4th 1115, 1121 (9th Cir. 2023) (quotations omitted). And the Act clearly satisfies that standard, which "is highly deferential to the government" and asks only whether "some conceivable legitimate purpose could have supported it." *Id.*

Nevertheless, the Act satisfies any level of scrutiny that might be applied. Even if strict scrutiny applies, the Act survives, since States "have a compelling interest in protecting children from drugs, particularly those for which there is uncertainty regarding benefits, recent surges in use, and irreversible effects." *Eknes-Tucker*, 2023 WL 5344981 at *13. And the unknown long-term effects of these treatments, when combined with the impossibility of identifying who will persist in their identity as transgender, underscores that the Act's ban is necessary to *adequately* serve the compelling interest of protecting children and adolescents.

Here, the seriousness of the unknowns is staggering. For example, Plaintiffs' expert Dr. Connelly forthrightly admitted that she does not "think there's enough

data to draw conclusions about adverse effects on brain development in patients treated with medical interventions." Ex. A 208:5-8. In addition, Dr. Connelly also admitted she is not aware of a single study suggesting that natal females who transition during adolescence will be able to achieve pregnancy. Ex. A 253:16-20. And even from a clinical perspective, Dr. Connelly has no idea what the long-term outcomes are for her patients because over 90% of them move to different providers by the time they are 22 years old. Ex. A 66:8-13. And her clinic does not even attempt to contact them. Ex. A 67:23-25. To her knowledge, not a single one of her patients who has received medical interventions has ever conceived a child. Ex. A 258:25-259:2.

Moreover, the unexplained existence of detransitioners and those who regret their transition also justifies the need for a ban. Critically, as Plaintiffs' expert Dr. Connelly admitted, it is not possible to identify those who will detransition ahead of time. Ex. A 84:21-23; *see also id.* 271:15-22 (agreeing that it would "be unrealistic to predict or eliminate" gender-related regret "that results from a change in gender identity"). Plaintiffs' experts generally treat the existence of detransitioners as an inconvenient fact to be minimized—stating that there has been a "'weaponization of information on regret,'" Ex. A 269:3-15, or that regret "'has been woefully politicized.'" Ex. B. 190:17-25. But no amount of downplaying the tragic stories of detransitioners can undermine the fact that they are living proof of the lack of evidence to justify using these interventions on minors.

Because the Act satisfies strict scrutiny, it necessarily satisfies intermediate scrutiny. That standard asks whether the Act "serves important governmental objectives" and the alleged "'discriminatory means employed are substantially related to

the achievement of those objectives.'" *Hecox*, 2023 WL 5283127 at \*13 (quoting *Virginia*, 518 U.S. at 516). Here, the State of Idaho clearly "has an 'exceedingly persuasive justification' for regulating these drugs" and surgeries given the "potentially uncertain risks," the "uncertainty about how to tell which patients need these interventions for this purpose and which don't." *Eknes-Tucker*, 2023 WL 5344981 at \*21 (Brasher, J., concurring). Thus, "even if [Idaho's] statute triggered intermediate scrutiny, it would likely survive that heightened scrutiny." *Id.*

Plaintiffs assert that the Act would fail even rational-basis review. Specifically, both Plaintiffs and the United States assert that the Legislature enacted the Act out of animus. But "[o]n the few occasions where" the Supreme Court has held that a law fails rational basis, the "common thread has been that the laws at issue lack *any* purpose other than a bare . . . desire to harm a politically unpopular group." *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018) (cleaned up) (emphasis added). Given the state of scientific evidence regarding these treatments, it is impossible to suggest that the Act lacks *any* purpose other than a bare desire to harm transgender persons. As Swedish health authorities have concluded, the "risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits." Cantor ¶ 28 (citing Swedish Socialstyrelsen Support 2022 at 10-12). The law clearly has a rational basis.

In support of their animus argument, Plaintiffs and the United States cite two statements from Senator Tammy Nichols. But of course, "[s]tray remarks of individual legislators are among the weakest evidence of legislative intent." *Tingley v. Ferguson*, 47 F.4th 1055, 1087 (9th Cir. 2022). Indeed, the evidence of legislative intent

demonstrates beyond doubt that Idaho legislators were motivated by their concern regarding the lack of benefit and the harm associated with these treatments: The United States itself acknowledges that Idaho legislators deem these treatments "dangerous," "experimental, irreversible, and medically unnecessary." Dkt. 45 at 16, 17 n.38 (quotations omitted). Moreover, "[e]ven when an argument about legislative motive is backed by statements made by legislators who voted for a law," courts should be reluctant "to attribute those motives to the legislative body as a whole." *Dobbs*, 142 S. Ct. at 2256. "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *Id.*

In any event, the statements that Plaintiffs and the United States highlight are far from probative. For one, they came *after* the law was enacted. Moreover, Plaintiffs' assertion that Senator Nichols's support for this law was motivated by animus is belied by the public record. Before the bill was passed, Senator Nichols noted that the Act addressed a "very sensitive topic." Senate Chamber Session Day 78 (Mar. 27, 2023)(https://tinyurl.com/3ebfbknt) 3:08:23-3:08:24. Specifically, she highlighted that many children diagnosed with gender dysphoria may have other underlying mental health conditions that should be treated with therapy rather than medical intervention. *See id.* 3:08:45-3:12:10. Senator Nichols also discussed the experience of a transgender individual who came to Idaho to describe the adverse effects the individual suffered as a result of these treatments. *See id.* 3:12:15- 3:12:32. The Senator's thoughtful consideration of this "sensitive topic" is not a desire to harm transgender individuals.

In a footnote, the United States cites certain statements from Senator Ben Adams and Representative Bruce Skaug relating to a child's mental state and gender dysphoria.  Dkt. 45 at 19, n.45. The United States says these statements demonstrate animus because they "did not refer to or cite any medical or scientific support." *Id*. But this argument ignores the testimony offered at the hearings on these bills— namely, that providing medical interventions to affirm a child or adolescent's gender identity, rather than mental health therapy to treat the gender dysphoria, is harmful, not helpful. *See, e.g.*, Testimony of Dr. Roger Hiatt, February 7, 2023, House Judiciary, Rules & Administration Hearing, 24:07-24:21 (https://tinyurl.com/59jt7376)("Efforts to medicalize a psychiatric disorder robs otherwise healthy children of the opportunity to rediscover their innate biology and instead doom them to a lifetime as medical patients in pursuit of an impossible dream."). As noted by one individual who had transitioned as an adult and, after many complications, is transitioning back, children with gender dysphoria "need help, they need mental care help, not gender-affirming help." February 7, 2023, House Judiciary, Rules & Administration Hearing, 18:15-18:20. In sum, given the compelling interest served by the Act and the fact that the long-term outcomes and harms are completely unknown, the Act satisfies any level of scrutiny.

### D.    Plaintiffs' experts' opinions are unreliable.

As set forth above, the totality of the scientific literature shows that the risks of the procedures banned by the Act far outweigh their benefits. And Plaintiffs' experts opinions to the contrary are unreliable. Although the Rules of Evidence do not technically apply at the preliminary injunction stage, the serious defects in Plaintiffs'

experts' methodologies would preclude them from satisfying the reliability requirements of Rule 702. This absence of reliable scientific proof too is a reason Plaintiffs cannot show they are likely to succeed on the merits.

First, Plaintiffs' experts show a shocking lack of familiarity with the medical evidence surrounding these interventions. "[S]ound scientific methodology requires that a scientist consider all of the scientific evidence when making causation determinations," *In re Zoloft*, 26 F. Supp. 3d 449, 463 (E.D. Penn. 2014), and "expert testimony that 'cherry-picks' relevant data" should be excluded. *EEOC v. Freeman*, 778 F.3d 463, 469 (4th Cir. 2015) (Agee, J., concurring) (collecting cases); *In re Lipitor*, 892 F.3d 624, 634 (4th Cir. 2018); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005). But not only did Dr. Brady not consider contrary evidence, she has never even read a *single* publication from any European health authority regarding the treatment for gender dysphoria. Ex. B. 203:4-7. Indeed, at her deposition, she could not recall *ever* reading a research publication that disagreed with her conclusions. Ex. B. 133:13–18. Nor had she ever read a systematic review relating to the treatment of gender dysphoria. Ex. B. 137:5–10. Dr. Connelly, for her part, said she had read one systematic review but could not "remember the title of it." Ex. A 118:11–15. Neither of them cited these reviews in their declarations. It is frankly "alarming" that Plaintiffs' experts engaged in this "biased reliance on favorable sources" while ignoring systematic reviews by European medical authorities that "could not be more relevant" to their opinions. *Daniels-Feasel v. Forest Pharms., Inc.*, 2021 WL 4037820, at *12 (S.D.N.Y. Sept. 3, 2021), *aff'd*, 2023 WL 4837521 (2d Cir. July 28, 2023).

Second, Dr. Connelly and Dr. Brady either misunderstand or overstate the conclusions that can be drawn from the studies they cite. At her deposition, Dr. Brady could not recall whether *any* study of medical and surgical interventions, including those she cites, controlled for whether the participants were receiving mental-health therapy. Ex. B. 49:6-12. Where, as here, a critical question is whether the more intrusive interventions of medical and surgical interventions are necessary given the less intrusive option of mental-health therapy, the failure to control for mental-health therapy is a confounding variable that forecloses any reliable conclusion. Cantor ¶¶ 179-81; *see* Ex. B. (161:4-11) (agreeing that, all else being equal, providers should "prefer the less invasive procedure"). Relatedly, in her declaration, Dr. Brady asserts there are "no scientific studies demonstrating that non-medical treatments alone" are effective in the treatment of gender dysphoria. Brady Decl. ¶ 41. But not "only do such studies exist, Dr. Brady cited one herself in her declaration." Cantor ¶ 290 (highlighting Dr. Brady's reliance on the Costa study, which found that "psychotherapy" was "effective in improving mental health"). With respect to Dr. Connelly's opinion, when Swedish researchers conducted a systematic review, they "excluded due to high risk of bias" many of the studies that Dr. Connelly cites as her leading authorities. *Compare* Cantor Table 1 at 33-34 (noting exclusion by Swedish researchers of Achille, Allen, de Vries, and López de Lara studies), *with* Connelly Decl. ¶ 32 n.7 (relying on those same studies).

Third, it is no answer for Dr. Connelly and Dr. Brady to say they are relying on their clinical experience. Ex. A 288:6-16; Ex. B. 141:11-19. In "evidence-based medicine, opinion based on clinical experience" is "the *least* reliable source of medical

knowledge." Cantor ¶ 54. Compared to other forms of evidence, "non-systematic rec-ollections of unstructured clinical experiences with" individuals "in an uncontrolled setting" is "the most subject to bias." *Id.* Indeed, it was reliance on this anecdotal evidence that led to development of evidence-based medicine. *See id.* Thus, an expert who grounds an opinion in clinical experience must "explain how his experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007). Plaintiffs' experts make "no attempt to do this," *In re Lipitor*, 185 F. Supp. 3d 786, 806 (D.S.C. 2016), and their opinions are little more than "un-scientific speculation offered by a genuine scientist." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).

The distinction between clinical expertise and reported data is perhaps most stark with respect to Dr. Connelly's testimony. In her declaration, she states that her clinic sees "dramatic improvements" when patients "begin gender-affirming medical care" as measured by the anxiety-screening tool GAD-7 and the depression-screening tool PHQ-9. Connelly Decl. ¶ 31. But in an article published with data from her clinic that measured anxiety and depression using the GAD-7 and PHQ-9, the data showed that, between first and second visits at the clinic, the average scores indicating both anxiety and depression *increased* for patients on cross-sex hormones and *decreased* for patients who were *not* on cross-sex hormones. Ex. A 189:23-190:13; 191:8-23. In other words, the published data shows precisely *the opposite* of what Dr. Connelly reports seeing in her declaration. And even if these recorded changes were not statis-tically significant, that fact in and of itself refutes Dr. Connelly's claim of seeing

"dramatic improvement" at her clinic when patients "begin gender-affirming medical care." Connelly Decl. ¶ 31. Plaintiffs' experts' reliance on their unsupported clinical judgment is all the more troubling because their "opinion runs contrary to the published literature" in systematic reviews, which they fail to even cite. *In re Lipitor*, 185 F. Supp. 3d at 806.

## III. Plaintiffs have not met the remaining preliminary-injunction factors.

Although likelihood of success on the merits "is the most important factor" when analyzing a request for injunctive relief, *California v. Azar*, 911 F.3d at 575 (quotations omitted), Plaintiffs invoke the Ninth Circuit precedent that "serious questions going to the merits" are sufficient to obtain an injunction when "the balance of hardships tips sharply towards the plaintiff." *See* Dkt. 32-1 11 (citing *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020)). But even accounting for this standard, Plaintiffs have still failed to show they are entitled to a preliminary injunction.

Idaho "will suffer irreparable harm from its inability to enforce the will of its legislature, to further the public-health considerations undergirding the law, and to avoid irreversible health risks to its children." *L.W.*, 73 F.4th at 421; *see also Latta v. Otter*, 771 F.3d 496, 500 (9th Cir. 2014) (noting authority for the proposition "that 'a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined'" (quoting *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997))). Moreover, as catalogued above, Plaintiffs have failed to provide evidence showing that the benefits of these treatments outweigh the harms associated with them. Indeed, the *entire point* of the Act is to *prevent* irreparable harm to children and adolescents from these specific interventions. Idaho acknowledges that

Plaintiffs disagree about how best to treat gender dysphoria in minors, but Idaho's "elected representatives made these precise cost-benefit decisions" in adopting the Act. *L.W.*, 73 F.4th at 421. Finally, timing does not favor Plaintiffs because the Act does not go into effect until January 1, 2024. That provides Plaintiffs time to draw down their medication, which "'lessens the harm' to minors 'who wish to continue receiving treatment.'" *Doe 1 v. Thornbury*, 75 F.4th 655, 657 (6th Cir. 2023) (per curiam) (quoting *L.W.*, 73 F.4th at 421).

"When the government is a party," the balance of equities and public-interest "factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Here, Idaho's "interests in applying the law to its residents and in being permitted to protect its children from health risks weigh heavily in favor of the State at this juncture." *L.W.*, 73 F.4th at 421–22. If the Act is enjoined, untold numbers of children in Idaho will face lasting harm and irreversible damage to their bodies. Plaintiffs have not shown they are entitled to an injunction imposing that harm to the public.

## IV. The scope of Plaintiffs' requested relief is inappropriate.

Even if this Court concludes that Plaintiffs are entitled to injunctive relief, Plaintiffs have failed to demonstrate that the scope of relief they request is appropriate. As an initial matter, Plaintiffs' remedial argument seemingly conflates two distinct questions—whether Plaintiffs are entitled to a *statewide* injunction and whether Plaintiffs are entitled to an injunction against enforcement of the statute in *all*

applications. This conflation is ultimately irrelevant, however, because Plaintiffs have failed to demonstrate an entitlement to either form of relief.

With respect to the question of statewide relief, an "injunction must be narrowly tailored to remedy the specific harm shown." *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (quotations omitted). Plaintiffs would be entitled to an injunction throughout the State of Idaho only if "such breadth was necessary to remedy" Plaintiffs' "harm." *Id*. To obtain an injunction of that scope, Plaintiffs' request must be "supported by the record as it stands." *Id*. at 1028. The relief they seek is access to particular medical interventions, which could be provided by an injunction prohibiting enforcement of the Act against Plaintiffs and their providers. And the two premises of their request for that relief are flawed.

First, Plaintiffs speculate that providers would not know who the Plaintiffs are. Dkt. 32-1 at 28. But Plaintiffs provide no support for this speculation, and the Court's grant of leave for *them* to proceed anonymously cannot be used to leverage relief for non-parties. Moreover, the injunction runs against *Defendants*, and the Court could enter a protective order disclosing the identity of Plaintiffs and their Providers to ensure Defendants comply, so a statewide injunction is not "necessary." Second, Plaintiffs worry that "the institutions where" providers "work may implement policies prohibiting" the relevant care. Dkt. 32-1 at 28. But institutions may *already* prohibit the relevant care, which has nothing to do with any injunctive relief from this Court. Plaintiffs' speculative assertions are not "supported by the record" and come woefully short of showing a statewide injunction is "necessary to remedy" Plaintiffs' harm. *East Bay Sanctuary Covenant*, 934 F.3d at 1028–29.

With respect to whether Plaintiffs are entitled to facial, as opposed to as-applied relief, "litigants mounting a facial challenge to a statute normally must establish that *no set of circumstances* exists under which the statute would be valid." *United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023) (cleaned up). Plaintiffs do not argue the Act is unconstitutional in *every* circumstance. Nor could they, since the substance of their constitutional claims turn entirely on WPATH and Endocrine Society guidelines. Even the guidelines that Plaintiffs champion impose limitations on gender-affirming medical and surgical interventions. *See* Dkt. 32-1 at 3–5**.**

Thus, even under Plaintiffs' theory, the Legislature may clearly regulate the provision of interventions not in accordance with those guidelines. This regulation would include prohibiting the provision of any medical or surgical interventions to any child before puberty, Dkt. 32-1 at 3; providing any interventions to individuals who are not formally diagnosed with gender dysphoria under the DSM-V, *id.*; or providing interventions when an individual's co-occuring mental-health issues may interfere with diagnostic clarity or the ability to provide informed consent, *id.* at 4–5. And the concern that providers may not strictly follow the guidelines is not merely hypothetical: Plaintiffs' own expert stated that, in her opinion, "there may be extenuating circumstances" where "different care may be provided that may not be included in the guidelines." Ex. A 103:25–104:14. Plaintiffs are entitled to neither statewide relief nor an injunction against the Act in all applications.

## Conclusion

The Court should deny an injunction and dismiss the Complaint.

DATED: September 5, 2023.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By: /s/ *Lincoln D. Wilson*
LINCOLN DAVIS WILSON
Chief, Civil Litigation and
Constitutional Defense

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 5, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

| | |
|---|---|
| Alexia D. Korberg<br>akorber@paulweiss.com<br>mao_fednational@paulweiss.com | Heather M. McGarthy<br>hmccarthy@adacounty.id.gov<br>telemons@adacounty.id.gov |
| Ariella C. Barel<br>ariella.barel@groombridgewu.com | Jackson Cory Yates<br>jyates@paulweiss.com |
| Brad S. Karp<br>bkarp@paulweiss.com | Jordan E. Orosz<br>jorosz@paulweiss.com |
| Casey Parsons<br>casey@wrest.coop | Kyle N. Bersani<br>kyle.bersani@groombridgewu.com |
| Colleen Rosannah Smith<br>csmith@stris.com<br>6969944420@filings.docketbird.com | Richard Alan Eppink<br>ritchie@wrest.coop |
| Cortlin H. Lannin<br>clannin@cov.com<br>docketing@cov.com | Li Nowlin-Sohl<br>lnowlin-sohl@aclu.org |
| D Jean Veta<br>jveta@cov.com | Meredith Taylor Brown<br>tbrown@aclu.org |
| Dana Kennedy<br>dkennedy@paulweiss.com | Philip S. May<br>philip.may@groombridgewu.com |
| Leslie Jill Cooper<br>lcooper@aclu.org<br>ccaicedo@aclu.org<br>sgarcia@aclu.org | Dayton Patrick Reed<br>dreed@adacounty.id.gov<br>civilpafiles@adacounty.id.gov<br>citedemann@adacounty.id.gov |

By: /s/ *Lincoln D. Wilson*
LINCOLN DAVIS WILSON

RAÚL R. LABRADOR
ATTORNEY GENERAL

JOSHUA N. TURNER, ISB #12193
Acting Solicitor General

JAMES E. M. CRAIG, ISB #6365
Chief, Civil Litigation and
Constitutional Defense
RAFAEL J. DROZ, ISB #9934
Deputy Attorney General
Office of the Attorney General
P. O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
josh.turner@ag.idaho.gov
james.craig@ag.idaho.gov
rafael.droz@ag.idaho.gov

*Attorneys for Defendant Raúl Labrador*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PAM POE, by and through her parents and next friends, Penny and Peter Poe, et al.<br><br>*Plaintiffs,*<br><br>v.<br><br>RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho, et al.<br><br>*Defendants.* | Case No. 1:23-cv-00269-BLW<br><br>**NOTICE OF APPEAL**<br><br>**PRELIMINARY INJUNCTION APPEAL**<br><br>**ELEVENTH AMENDMENT IMMUNITY APPEAL** |

NOTICE OF APPEAL — 1

ER1041

Defendant Raúl Labrador, in his official capacity as Attorney General for the State of Idaho, hereby appeals to the Ninth Circuit Court of Appeals the district court's December 26, 2023 Memorandum Decision and Order [Dkt. 78], granting Plaintiffs' Motion for a Preliminary Injunction.  Attorney General Labrador further appeals the district court's decision [Dkt. 78] denying Attorney General Labrador's Motion to Dismiss, which motion argued that he is immune from suit under the Eleventh Amendment. *See* 28 U.S.C § 1292(a)(1); *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993) ("We hold that States and state entities that claim to be 'arms of the State' may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity.").

### FORM 1 INFORMATION

- Date case was first filed in U.S. District Court: May 31, 2023

- Date of judgment or order being appealed: December 26, 2023.

- Docket entry number of judgment or order appealed from: 78 (Memorandum Decision and Order).

- Docketing fee of $605 paid to the U.S. District Court for the District of Idaho.

- Appellant: Defendant Raúl Labrador.

- This is not a cross-appeal.

- A representation statement follows on the next page.

DATED:  January 3, 2024.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By:  /s/ *James E. M. Craig*
　　　JAMES E. M. CRAIG
　　　Chief, Civil Litigation and
　　　Constitutional Defense
　　　JOSHUA N. TURNER
　　　Acting Solicitor General

## REPRESENTATION STATEMENT

### I.      Counsel for Appellant

JOSHUA N. TURNER
Acting Solicitor General
josh.turner@ag.idaho.gov

JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense
james.craig@ag.idaho.gov

Idaho Office of the Attorney General
P.O. Box 83720
Boise, ID 83720-0010

### II.     Counsel for Appellees

LI NOWLIN-SOHL
lnowlin-sohl@aclu.org
LESLIE COOPER
lcooper@aclu.org
American Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004

RICHARD EPPINK
ritchie@wrest.coop
CASEY PARSONS
casey@wrest.coop
DAVID A. DEROIN
david@wrest.coop
Wrest Collective
812 W. Franklin St.
Boise, ID 83702

BRAD S. KARP
bkarp@paulweiss.com
ALEXIA D. KORBERG
akorberg@paulweiss.com
JACKSON YATES
jyates@paulweiss.com
DANA L. KENNEDY
dkennedy@paulweiss.com
Paul, Wiess, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

ERIC ALAN STONE
eric.stone@groombridgewu.com
ARIELLA C. BAREL
ariella.barel@groombridgewu.com
KYLE BERSANI
kyle.bersani@groombridgewu.com
Groombridge, Wu, Baughman and Stone LLP
565 5th Avenue, Suite 2900
New York, NY 10017

PHILIP S. MAY
philip.may@groombridgewu.com
Groombridge, Wu, Baughman and Stone LLP
801 17th St. NW, Suite 1050
Washington, DC 20006

JORDAN OROSZ
jorosz@paulweiss.com
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K Street, NW
Washington, DC 20006-1047

DINA FLORES-BREWER
dfloresbrrewer@acluidaho.org
ACLU of Idaho Foundation
P.O. Box 1897
Boise, ID 83701

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 3, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which caused the same to be served by electronic service upon all counsel of record.


      /s/ *James E. M. Craig*

JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense

**REVISED**

## STATEMENT OF PURPOSE

### RS29985C2 / H0071

The Vulnerable Child Protective Act would prohibit puberty blockers, cross-sex hormones, and sex reassignment surgeries for children under the age of 18 when administered or performed for the purpose of changing the appearance of a child's sex. These medical and surgical interventions can cause irreversible physical alterations; and some render the patient sterile or with lifelong sexual dysfunction, while others mutilate healthy body organs. This legislation also provides for exemptions for medically necessary uses of these drugs and procedures.

## FISCAL NOTE

There is no anticipated fiscal impact on the general fund because it requires no expenditure of State funds nor is there an impact on local governments.

**Contact:**
Representative Bruce D. Skaug
(208) 332-1000
Senator Lori Den Hartog
(208) 332-1000
Blaine Conzatti
Idaho Family Policy Center
(208) 260-5844

**DISCLAIMER: This statement of purpose and fiscal note are a mere attachment to this bill and prepared by a proponent of the bill. It is neither intended as an expression of legislative intent nor intended for any use outside of the legislative process, including judicial review (Joint Rule 18).**

**Statement of Purpose / Fiscal Note**          Bill SOP/FN REVISED: 03/24/2023, 8:01 AM

ER1047

**Query** **Reports** **Utilities** **Help** **Log Out**

APPEAL,LC10,LC17,STAYED

# U.S. District Court
# District of Idaho (LIVE) NextGen 1.7 (Boise - Southern)
# CIVIL DOCKET FOR CASE #: 1:23-cv-00269-BLW

Poe et al v. Labrador et al
Assigned to: Senior Judge B. Lynn Winmill
Case in other court: Ninth Circuit Court of
Appeals, 24-00142
Cause: 42:1983 Civil Rights Act

Date Filed: 05/31/2023
Jury Demand: None
Nature of Suit: 440 Civil Rights:
Other
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 05/31/2023 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against All Defendants ( Filing fee $ 402 receipt number AIDDC-2575743.), filed by All Plaintiffs. (Attachments: # 1 Cover Sheet)(Eppink, Richard) |
| 05/31/2023 | 2 | MOTION FOR PRO HAC VICE APPEARANCE by Ariella C. Barel. ( Filing fee $ 250 receipt number AIDDC-2575757.)Richard Alan Eppink appearing for Plaintiffs Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe. Responses due by 6/21/2023 (Eppink, Richard) |
| 05/31/2023 | 3 | MOTION FOR PRO HAC VICE APPEARANCE by Alexia D. Korberg. ( Filing fee $ 250 receipt number AIDDC-2575759.)Richard Alan Eppink appearing for Plaintiffs Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe. Responses due by 6/21/2023 (Eppink, Richard) |
| 05/31/2023 | 4 | MOTION FOR PRO HAC VICE APPEARANCE by Eric Alan Stone. ( Filing fee $ 250 receipt number AIDDC-2575765.)Richard Alan Eppink appearing for Plaintiffs Jane |

ER1048

| | | |
|---|---|---|
| | | Doe, Joan Doe, John Doe, Pam Doe, Penny Poe, Peter Poe. Responses due by 6/21/2023 (Eppink, Richard) |
| 05/31/2023 | 5 | MOTION FOR PRO HAC VICE APPEARANCE by Leslie Jill Cooper. ( Filing fee $ 250 receipt number AIDDC-2575769.)Richard Alan Eppink appearing for Plaintiffs Jane Doe, Joan Doe, John Doe, Pam Doe, Penny Poe, Peter Poe. Responses due by 6/21/2023 (Eppink, Richard) |
| 05/31/2023 | 6 | MOTION FOR PRO HAC VICE APPEARANCE by Li Nowlin-Sohl. ( Filing fee $ 250 receipt number AIDDC-2575772.)Richard Alan Eppink appearing for Plaintiffs Jane Doe, Joan Doe, John Doe, Pam Doe, Penny Poe, Peter Poe. Responses due by 6/21/2023 (Eppink, Richard) |
| 05/31/2023 | 7 | MOTION FOR PRO HAC VICE APPEARANCE by Jackson Yates. ( Filing fee $ 250 receipt number AIDDC-2575774.)Richard Alan Eppink appearing for Plaintiffs Jane Doe, Joan Doe, John Doe, Pam Doe, Penny Poe, Peter Poe. Responses due by 6/21/2023 (Eppink, Richard) |
| 05/31/2023 | 8 | MOTION FOR PRO HAC VICE APPEARANCE by Dana L. Kennedy. ( Filing fee $ 250 receipt number AIDDC-2575778.)Richard Alan Eppink appearing for Plaintiffs Jane Doe, Joan Doe, John Doe, Pam Doe, Penny Poe, Peter Poe. Responses due by 6/21/2023 (Eppink, Richard) |
| 05/31/2023 | 9 | MOTION FOR PRO HAC VICE APPEARANCE by Jordan E. Orosz. ( Filing fee $ 250 receipt number AIDDC-2575781.)Richard Alan Eppink appearing for Plaintiffs Jane Doe, Joan Doe, John Doe, Pam Doe, Penny Poe, Peter Poe. Responses due by 6/21/2023 (Eppink, Richard) |
| 05/31/2023 | 10 | MOTION FOR PRO HAC VICE APPEARANCE by Meredith Taylor Brown. ( Filing fee $ 250 receipt number AIDDC-2575782.)Richard Alan Eppink appearing for Plaintiffs Jane Doe, Joan Doe, John Doe, Pam Doe, Penny Poe, Peter Poe. Responses due by 6/21/2023 (Eppink, Richard) |
| 05/31/2023 | 11 | MOTION to Proceed under Pseudonyms Richard Alan Eppink appearing for Plaintiffs Jane Doe, Joan Doe, John Doe, Pam |

ER1049

| | | |
|---|---|---|
| | | Poe, Penny Poe, Peter Poe. Responses due by 6/21/2023 (Attachments: # 1 Memorandum in Support, # 2 Declaration of Penny Poe, # 3 Declaration of Joan Doe)(Eppink, Richard) |
| 06/01/2023 | 12 | DOCKET ENTRY ORDER approving 2 3 4 5 6 7 8 9 10 Motions for Pro Hac Vice Appearance of attorneys Ariella C. Barel, Alexia D. Korberg, Eric Alan Stone, Leslie Jill Cooper, Li Nowlin-Sohl, Jackson Yates, Dana L. Kennedy, Jordan E. Orosz, Meredith Taylor Brown for Pam Poe, Penny Poe, Peter Poe, Jane Doe, Joan Doe, and John Doe. Per Local Rule 83.4(e), out-of-state counsel shall immediately register for ECF. (Notice sent to CM/ECF Registration Clerk) (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (hs) |
| 06/05/2023 | 13 | LITIGATION ORDER AND NOTICE OF TELEPHONIC SCHEDULING CONFERENCE - On or before July 3, 2023, the parties must file with the Court the joint Litigation Plan and Discovery Plan. Telephonic Scheduling Conference set for 7/10/2023 11:00 AM in Telephonic Hearing - Boise Chambers before US Magistrate Judge Candy W Dale. Signed by US Magistrate Judge Candy W Dale. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (jd) |
| 06/16/2023 | 14 | NOTICE of Appearance by Dina M Flores-Brewer on behalf of All Plaintiffs (Flores-Brewer, Dina) |
| 06/20/2023 | 15 | MOTION FOR PRO HAC VICE APPEARANCE by Kyle N. Bersani. ( Filing fee $ 250 receipt number AIDDC-2586128.)Richard Alan Eppink appearing for Plaintiffs Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe. Responses due by 7/11/2023 (Eppink, Richard) |
| 06/20/2023 | 16 | MOTION FOR PRO HAC VICE APPEARANCE by Philip S. May. ( Filing fee $ 250 receipt number AIDDC-2586141.)Richard Alan Eppink appearing for Plaintiffs Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe. Responses due by 7/11/2023 (Eppink, Richard) |

ER1050

| 06/21/2023 | 17 | DOCKET ENTRY ORDER approving 15 16 Motions for Pro Hac Vice Appearance of attorneys Kyle N. Bersani, Philip S. May for Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe. Per Local Rule 83.4(e), out-of-state counsel shall immediately register for ECF. (Notice sent to CM/ECF Registration Clerk) (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (hs) |
| 06/29/2023 | 18 | WAIVER OF SERVICE Returned Executed by Peter Poe, Pam Poe, Penny Poe, Jane Doe, Joan Doe, John Doe. Jan M Bennetts waiver sent on 6/27/2023, answer due 8/28/2023. (Eppink, Richard) |
| 06/30/2023 | 19 | STATUS REPORT *re: Service of Complaint* by Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe. (Eppink, Richard) |
| 06/30/2023 | 20 | DOCKET ENTRY ORDER - The telephonic scheduling conference currently set for July 10, 2023, at 11:00 AM, and all associated deadlines, are hereby VACATED. The parties are to propose a briefing schedule related to Plaintiffs' anticipated motion for preliminary injunction. Should the parties need assistance with the same, they may contact chambers to request a status conference with the Court.<br>Signed by US Magistrate Judge Candy W Dale. (klw) |
| 07/12/2023 | 21 | DISREGARD per Corrective Entry (Wilson, Lincoln). Modified on 7/13/2023 (km). |
| 07/12/2023 | 22 | ERRATA by Defendants Individual Members of the Idaho Code Commission, Raul Labrador re 21 Notice of Appearance *Corrected Notice of Appearance*. (Wilson, Lincoln) |
| 07/12/2023 | 23 | NOTICE of Appearance by Joshua N. Turner on behalf of Individual Members of the Idaho Code Commission, Raul Labrador (Turner, Joshua) |
| 07/13/2023 |  | CORRECTIVE ENTRY - Please disregard docket number 21 Notice of Appearance as the document was inadvertently filed in |

ER1051

| | | |
|---|---|---|
| | | the wrong case. The filing party resubmitted the correct filing at docket no. <u>23</u> . (km) |
| 07/14/2023 | <u>24</u> | NOTICE of Assignment to Magistrate Judge and Requirement for Consent sent to counsel for re <u>1</u> Complaint, <u>23</u> Notice of Appearance Consent/Objection to Magistrate due by 9/12/2023. (hs) |
| 07/14/2023 | <u>25</u> | MOTION FOR PRO HAC VICE APPEARANCE by Brad S. Karp. ( Filing fee $ 250 receipt number AIDDC-2599164.)Richard Alan Eppink appearing for Plaintiffs Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe. Responses due by 8/4/2023 (Eppink, Richard) |
| 07/17/2023 | 26 | DOCKET ENTRY ORDER approving <u>25</u> Motion for Pro Hac Vice Appearance of attorney Brad S. Karp for Jane Doe,Brad S. Karp for Joan Doe,Brad S. Karp for John Doe,Brad S. Karp for Pam Doe,Brad S. Karp for Penny Doe,Brad S. Karp for Peter Poe Per Local Rule 83.4(e), out-of-state counsel shall immediately register for ECF. (Notice sent to CM/ECF Registration Clerk) (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (jd) |
| 07/18/2023 | <u>27</u> | MOTION for Leave to File Excess Pages *Stipulation re: Briefing Schedule and Page Limit on Motion* Li Nowlin-Sohl appearing for Plaintiffs Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe. Responses due by 8/8/2023 (Nowlin-Sohl, Li) |
| 07/19/2023 | <u>28</u> | NOTICE of Assignment to Magistrate Judge and Requirement for Consent sent to counsel for Jan M Bennetts re <u>27</u> *Stipulation re: Briefing Schedule and Page Limit on Motion* Consent/Objection to Magistrate due by 9/18/2023. (km) |
| 07/19/2023 | <u>29</u> | ORDER granting <u>27</u> Stipulation for overlength briefs and to extended briefing schedule. Signed by US Magistrate Judge Candy W Dale. (klw) |
| 07/19/2023 | 30 | DOCKET ENTRY ORDER - Upon review of the docket in this matter, and the parties' stipulation <u>27</u> concerning Plaintiffs' anticipated motion for preliminary injunction, the Court finds |

ER1052

| | | |
|---|---|---|
| | | good cause to shorten the deadline within which to consent to the jurisdiction of a magistrate judge. *See* <u>24</u> , <u>28</u> . The parties shall have up through and including **August 11, 2023,** within which to consent to proceed before a magistrate judge. Signed by US Magistrate Judge Candy W Dale. (klw) |
| 07/19/2023 | 31 | DOCKET ENTRY ORDER - Upon review of the <u>11</u> Motion To Proceed Under Pseudonyms and the parties' stipulation <u>27</u> concerning Plaintiffs' anticipated motion for preliminary injunction, the Court hereby ORDERS Defendants to respond to the motion <u>11</u> on or before **July 28, 2023**. If Defendants do not intend to oppose the motion <u>11</u> , they must file a notice of non-opposition. Dist. Idaho Loc. Civ. R. 7.1(a)(5). Signed by US Magistrate Judge Candy W Dale. (klw) |
| 07/21/2023 | <u>32</u> | MOTION for Preliminary Injunction Alexia D. Korberg appearing for Plaintiffs Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe. Responses due by 8/11/2023 (Attachments: # <u>1</u> Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction, # <u>2</u> Declaration of Pam Poe in Support of Plaintiffs' Motion for a Preliminary Injunction, # <u>3</u> Declaration of Penny Poe in Support of Plaintiffs' Motion for a Preliminary Injunction, # <u>4</u> Declaration of Jane Doe in Support of Plaintiffs' Motion for a Preliminary Injunction, # <u>5</u> Declaration of Joan Doe in Support of Plaintiffs' Motion for a Preliminary Injunction, # <u>6</u> Expert Declaration of Christine Brady, PhD, # <u>7</u> Expert Declaration of Kara Connelly, MD, # <u>8</u> Declaration of Ariella Barel in Support of Plaintiffs' Motion for a Preliminary Injunction)(Korberg, Alexia) |
| 07/25/2023 | <u>33</u> | MOTION for Leave to File *Brief of Amici Curiae in Support of Plaintiffs' Motion for Preliminary Injunction* Colleen Rosannah Smith appearing for Amicus Parties American Academy of Pediatrics, Academic Pediatric Association, American Academy of Child & Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American Association of Physicians for Human Rights, Inc., American College of Obstetricians and Gynecologists, American College of Osteopathic Pediatricians, American College of Osteopathic |

ER1053

| | | Pediatricians, American College of Physicians, American Medical Association,, American Pediatric Society, Association of American Medical Colleges, Association of Medical School Pediatric Department Chairs, Inc., Endocrine Society, Idaho Chapter of the American Academy of Pediatrics, National Association of Pediatric Nurse Practitioners, Pediatric Endocrine Society, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, Society of Pediatric Nurses, World Professional Association for Transgender Health. Responses due by 8/15/2023 (Attachments: # 1 Proposed Amici Curiae Brief)(Smith, Colleen) |
|---|---|---|
| 07/25/2023 | 34 | MOTION FOR PRO HAC VICE APPEARANCE by D. Jean Veta. ( Filing fee $ 250 receipt number AIDDC-2603902.)Colleen Rosannah Smith appearing for Amicus Parties Academic Pediatric Association, American Academy of Child & Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American Academy of Pediatrics, American Association of Physicians for Human Rights, Inc., American College of Obstetricians and Gynecologists, American College of Osteopathic Pediatricians, American College of Osteopathic Pediatricians, American College of Physicians, American Medical Association,, American Pediatric Society, Association of American Medical Colleges, Association of Medical School Pediatric Department Chairs, Inc., Endocrine Society, Idaho Chapter of the American Academy of Pediatrics, National Association of Pediatric Nurse Practitioners, Pediatric Endocrine Society, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, Society of Pediatric Nurses, World Professional Association for Transgender Health. Responses due by 8/15/2023 (Smith, Colleen) |
| 07/25/2023 | 35 | MOTION FOR PRO HAC VICE APPEARANCE by William R. Isasi. ( Filing fee $ 250 receipt number AIDDC-2603903.)Colleen Rosannah Smith appearing for Amicus Parties Academic Pediatric Association, American Academy of Child & Adolescent Psychiatry, American Academy of Family |

ER1054

| | | |
|---|---|---|
| | | Physicians, American Academy of Nursing, American Academy of Pediatrics, American Association of Physicians for Human Rights, Inc., American College of Obstetricians and Gynecologists, American College of Osteopathic Pediatricians, American College of Osteopathic Pediatricians, American College of Physicians, American Medical Association,, American Pediatric Society, Association of American Medical Colleges, Association of Medical School Pediatric Department Chairs, Inc., Endocrine Society, Idaho Chapter of the American Academy of Pediatrics, National Association of Pediatric Nurse Practitioners, Pediatric Endocrine Society, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, Society of Pediatric Nurses, World Professional Association for Transgender Health. Responses due by 8/15/2023 (Smith, Colleen) |
| 07/25/2023 | 36 | MOTION FOR PRO HAC VICE APPEARANCE by Cortlin H. Lannin. ( Filing fee $ 250 receipt number AIDDC-2603904.)Colleen Rosannah Smith appearing for Amicus Parties Academic Pediatric Association, American Academy of Child & Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American Academy of Pediatrics, American Association of Physicians for Human Rights, Inc., American College of Obstetricians and Gynecologists, American College of Osteopathic Pediatricians, American College of Osteopathic Pediatricians, American College of Physicians, American Medical Association,, American Pediatric Society, Association of American Medical Colleges, Association of Medical School Pediatric Department Chairs, Inc., Endocrine Society, Idaho Chapter of the American Academy of Pediatrics, National Association of Pediatric Nurse Practitioners, Pediatric Endocrine Society, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, Society of Pediatric Nurses, World Professional Association for Transgender Health. Responses due by 8/15/2023 (Smith, Colleen) |

ER1055

2/5/24, 2:17 PM

District of Idaho Live CM/ECF

| | | |
|---|---|---|
| 07/26/2023 | 37 | NOTICE by Jan M Bennetts re 11 MOTION to Proceed under Pseudonyms *Non-Opposition to Motion* (Reed, Dayton) |
| 07/26/2023 | 38 | DOCKET ENTRY ORDER approving 34 , 35 , 36 Motions for Pro Hac Vice Appearance of attorney D Jean Veta, William Isasi, Cortlin H. Lannin for Academic Pediatric Association, American Academy of Child & Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American Academy of Pediatrics, American Association of Physicians for Human Rights, Inc., American College of Obstetricians and Gynecologists, for American College of Osteopathic Pediatricians, American College of Osteopathic Pediatricians, for American College of Physicians, American Medical Association, American Pediatric Society, Association of American Medical Colleges, Association of Medical School Pediatric Department Chairs, Inc., Endocrine Society, Idaho Chapter of the American Academy of Pediatrics, National Association of Pediatric Nurse Practitioners, Pediatric Endocrine Society, Societies for Pediatric Urology, Adolescent Health and Medicine, Society for Pediatric Research, Society of Pediatric Nurses, World Professional Association for Transgender Health. Per Local Rule 83.4(e), out-of-state counsel shall immediately register for ECF. (Notice sent to CM/ECF Registration Clerk) (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (hs) |
| 07/28/2023 | 39 | RESPONSE to Motion re 11 MOTION to Proceed under Pseudonyms *Non-Opposition to Motion* filed by Individual Members of the Idaho Code Commission, Raul Labrador. Replies due by 8/11/2023.(Wilson, Lincoln) |
| 07/28/2023 | 40 | DOCKET ENTRY ORDER - Upon consideration of Defendants' non-opposition 37 , 39 , and good cause appearing therefor, Plaintiffs' 11 Motion to Proceed under Pseudonyms is GRANTED.<br>Signed by US Magistrate Judge Candy W Dale. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by KLW) (klw) |

ER1056

| 08/01/2023 | 41 | ORDER - IT IS HEREBY ORDERED: Upon consideration of the unopposed motion, the Court hereby orders that the motion (Dkt. 33 ) is GRANTED. The proposed brief at Docket No. 33 shall stand as the brief of Amicus Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations. It is further ORDERED that the State Defendants may have up to 35 pages for their response to the Plaintiffs' motion for a preliminary injunction. Signed by US Magistrate Judge Candy W Dale. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (hs) (Entered: 08/02/2023) |
|---|---|---|
| 08/07/2023 | 42 | Docket entry only - CONSENT to Magistrate Judge filed. (hs) |
| 08/11/2023 | 43 | Docket entry only - CONSENT to Magistrate Judge filed. (hs) (Entered: 08/14/2023) |
| 08/14/2023 | | The 60 day deadline has expired. Case has been reassigned to a District Judge. No more notice of availability or assignment will be sent out. Consent deadline(s) termed. (hs) |
| 08/14/2023 | | DOCKET ENTRY NOTICE of Case Number Change, Case reassigned to Judge B Lynn Winmill for all further proceedings. US Magistrate Judge Candy W Dale no longer assigned to case. Please use this case number on all future pleadings, 1:23-cv-269-BLW (hs) |
| 08/16/2023 | 44 | ERRATA by Plaintiffs Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe re 32 MOTION for Preliminary Injunction *(Plaintiffs' Notice of Errata Regarding Declarations of Dr. Christine Brady and Dr. Kara Connelly [Dkts. 32-6, 32-7])*. (Attachments: # 1 Expert Declaration of Christine Brady, PhD, # 2 Expert Declaration of Kara Connelly, MD)(Korberg, Alexia) |
| 08/23/2023 | 45 | NOTICE by United States of America re 32 MOTION for Preliminary Injunction *Statement of Interest* (Woychick, Nicholas) |
| 08/23/2023 | 46 | NOTICE of Appearance by Rafael John Droz on behalf of Individual Members of the Idaho Code Commission, Raul Labrador (Droz, Rafael) |

ER1057

| 08/23/2023 | <u>47</u> | NOTICE of Appearance by James Edward Monroe Craig on behalf of Individual Members of the Idaho Code Commission, Raul Labrador (Craig, James) |
|---|---|---|
| 08/25/2023 | <u>48</u> | MOTION FOR PRO HAC VICE APPEARANCE by John D. Ramer. ( Filing fee $ 250 receipt number AIDDC-2619114.)Lincoln Davis Wilson appearing for Defendants Individual Members of the Idaho Code Commission, Raul Labrador. Responses due by 9/15/2023 (Wilson, Lincoln) |
| 08/25/2023 | <u>49</u> | MOTION FOR PRO HAC VICE APPEARANCE by David H. Thompson. ( Filing fee $ 250 receipt number AIDDC-2619119.)Lincoln Davis Wilson appearing for Defendants Individual Members of the Idaho Code Commission, Raul Labrador. Responses due by 9/15/2023 (Wilson, Lincoln) |
| 08/25/2023 | <u>50</u> | MOTION FOR PRO HAC VICE APPEARANCE by Brian W. Barnes. ( Filing fee $ 250 receipt number AIDDC-2619126.)Lincoln Davis Wilson appearing for Defendants Individual Members of the Idaho Code Commission, Raul Labrador. Responses due by 9/15/2023 (Wilson, Lincoln) |
| 08/25/2023 | <u>51</u> | MOTION to Dismiss for Lack of Jurisdiction Dayton Patrick Reed appearing for Defendant Jan M Bennetts. Responses due by 9/15/2023 (Attachments: # <u>1</u> Memorandum in Support) (Reed, Dayton) |
| 08/28/2023 | 52 | DOCKET ENTRY ORDER approving <u>48</u> , <u>49</u> and <u>50</u> Motion for Pro Hac Vice Appearance of attorney John D. Ramer, David H. Thompson and Brian W. Barnes for Individual Members of the Idaho Code Commission and Raul Labrador. Per Local Rule 83.4(e), out-of-state counsel shall immediately register for ECF. (Notice sent to CM/ECF Registration Clerk) (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (jd) |
| 08/30/2023 | <u>53</u> | NOTICE of Appearance by David Amiable DeRoin on behalf of All Plaintiffs (DeRoin, David) |
| 08/31/2023 | 54 | DOCKET ENTRY NOTICE OF HEARING: A Status Conference is set for 9/5/2023 at 11:30 AM Mountain Time via |

2/5/24, 2:17 PM                                    District of Idaho Live CM/ECF

| | | Zoom before Judge B Lynn Winmill. A Zoom link will be provided by separate notification. (jlg) |
|---|---|---|
| 09/05/2023 | 55 | MEMORANDUM in Opposition re 32 MOTION for Preliminary Injunction filed by Jan M Bennetts. Replies due by 9/19/2023.(Reed, Dayton) |
| 09/05/2023 | 56 | MEMORANDUM in Opposition re 32 MOTION for Preliminary Injunction *and In Support of Motion to Dismiss* filed by Individual Members of the Idaho Code Commission, Raul Labrador. Replies due by 9/19/2023. (Attachments: # 1 Exhibit A - Dr. Connely Deposition Transcript, # 2 Exhibit B - Dr. Brady Deposition Transcript, # 3 Declaration of Dr. Daniel Weiss, # 4 Declaration of Dr. James Cantor, # 5 WITHDRAWN - Declaration of Dr. William Malone)(Wilson, Lincoln) Modified on 10/2/2023, see order entered 10/2/23 (jd). |
| 09/05/2023 | 57 | MOTION to Dismiss Lincoln Davis Wilson appearing for Defendants Individual Members of the Idaho Code Commission, Raul Labrador. Responses due by 9/26/2023 (Wilson, Lincoln) |
| 09/05/2023 | 58 | MEMORANDUM in Support re 57 MOTION to Dismiss filed by Individual Members of the Idaho Code Commission, Raul Labrador.(Wilson, Lincoln) |
| 09/05/2023 | 59 | Docket Text Minute Entry for proceedings held before Judge B Lynn Winmill: An informal Status Conference was held via Zoom on 9/5/2023. Appearances: Li Nowlin-Sohl on behalf of Plaintiffs. Lincoln Wilson on behalf of Defendant Raul Labrador. Dayton Reed on behalf of Defendant Jan Bennetts. The Court set a hearing on the following motions: 32 MOTION for Preliminary Injunction, 51 MOTION to Dismiss for Lack of Jurisdiction, and 57 MOTION to Dismiss. The Motion Hearing is set for 11/6/2023 at 1:30 PM in Boise - Courtroom 3 before Judge B Lynn Winmill. Hearing Not Recorded. (Time: 11:39 - 11:52 a.m.) (jlg) (Entered: 09/07/2023) |
| 09/15/2023 | 60 | MEMORANDUM in Opposition re 51 MOTION to Dismiss for Lack of Jurisdiction filed by Jane Doe, Joan Doe, John Doe, |

ER1059

| | | |
|---|---|---|
| | | Pam Poe, Penny Poe, Peter Poe. Replies due by 9/29/2023. (Parsons, Casey) |
| 09/21/2023 | 61 | RESPONSE to Motion re 57 MOTION to Dismiss filed by Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe. Replies due by 10/5/2023.(Korberg, Alexia) |
| 09/27/2023 | 62 | STIPULATION re 56 Memorandum in Opposition to Motion, 32 MOTION for Preliminary Injunction *re: Briefing Schedule, Surreply, and Striking of Declaration of Dr. Malone* by Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe. (Eppink, Richard) |
| 09/29/2023 | 63 | ERRATA by Plaintiffs Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe . (Attachments: # 1 Errata)(Parsons, Casey) |
| 09/29/2023 | 64 | REPLY to Response to Motion re 51 MOTION to Dismiss for Lack of Jurisdiction filed by Jan M Bennetts.Motion Ripe Deadline set for 10/2/2023.(Reed, Dayton) |
| 10/02/2023 | 65 | MEMORANDUM in Opposition re 32 MOTION for Preliminary Injunction filed by Individual Members of the Idaho Code Commission, Raul Labrador. Replies due by 10/16/2023. (Wilson, Lincoln) |
| 10/02/2023 | 66 | MEMORANDUM in Support re 57 MOTION to Dismiss filed by Individual Members of the Idaho Code Commission, Raul Labrador.(Wilson, Lincoln) |
| 10/02/2023 | 67 | ORDER MODIFYING DEADLINES, STRIKING DECLARATION AND GRANTING SUR-REPLY - Signed by Judge B Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (jd) |
| 10/02/2023 | | Set/Reset Deadlines as to 32 MOTION for Preliminary Injunction . Responses due by 10/2/2023. Replies due by 10/13/2023. Surreply due 10/27/23. (jd) |
| 10/05/2023 | 68 | REPLY to Response to Motion re 57 MOTION to Dismiss filed by Individual Members of the Idaho Code Commission, Raul |

ER1060

| | | |
|---|---|---|
| | | Labrador.Motion Ripe Deadline set for 10/6/2023.(Wilson, Lincoln) |
| 10/06/2023 | 69 | NOTICE by Individual Members of the Idaho Code Commission, Raul Labrador *of Withdrawal of Counsel* (Wilson, Lincoln) |
| 10/13/2023 | 70 | REPLY to Response to Motion re 32 MOTION for Preliminary Injunction filed by Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe.Motion Ripe Deadline set for 10/16/2023. (Attachments: # 1 Declaration of Alexia D. Korberg, # 2 Rebuttal Declaration of Kara Connelly, # 3 Rebuttal Declaration of Christine Brady, # 4 Rebuttal Declaration of Jack Turban) (Korberg, Alexia) |
| 10/27/2023 | 71 | REPLY re 70 Reply to Response to Motion, filed by Individual Members of the Idaho Code Commission, Raul Labrador *Surreply Regarding the Declaration of Dr. Jack Turban*. (Craig, James) |
| 10/27/2023 | 72 | ERRATA by Defendants Individual Members of the Idaho Code Commission, Raul Labrador re 71 Reply (generic) *Surreply Regarding the Declaration of Dr. Jack Turban*. (Attachments: # 1 Exhibit A - Transcript of Deposition of Dr. Jack Turban)(Droz, Rafael) |
| 11/02/2023 | 73 | NOTICE by Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe re 61 Response to Motion, 63 Errata *(Notice of Supplemental Authority)* (Attachments: # 1 9th Cir Opinion) (Korberg, Alexia) |
| 11/02/2023 | 74 | NOTICE by Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe re 72 Errata, 56 Memorandum in Opposition to Motion,, 32 MOTION for Preliminary Injunction , 71 Reply (generic) *Notice of Deposition Errata and Transcript* (Attachments: # 1 Errata to Deposition of Christine Brady, Ph.D., # 2 Complete Transcript of Deposition of Jack Turban, M.D., MHS, # 3 Errata to Deposition of Jack Turban, M.D., MHS)(May, Philip) |

ER1061

2/5/24, 2:17 PM                                     District of Idaho Live CM/ECF

| 11/06/2023 | <u>75</u> | Minute Entry for proceedings held before Judge B Lynn Winmill: A Motion Hearing was held on 11/6/2023 re <u>32</u> MOTION for Preliminary Injunction, <u>51</u> MOTION to Dismiss for Lack of Jurisdiction, and <u>57</u> MOTION to Dismiss. A written decision is forthcoming. (Court Reporter Tammy Hohenleitner.) (jlg) (Entered: 11/08/2023) |
| --- | --- | --- |
| 12/11/2023 | <u>76</u> | Notice of Filing of Official Transcript of Proceedings held on 11/6/23 before Judge B. Lynn Winmill. Court Reporter Tamara Hohenleitner, Email tammy_hohenleitner@id.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. This transcript is not available to the general public and as such is sealed until release of transcript restriction re <u>75</u> Motion Hearing. Redaction Request due 1/1/2024. Redacted Transcript Deadline set for 1/11/2024. Release of Transcript Restriction set for 3/11/2024. (th) |
| 12/14/2023 | <u>77</u> | NOTICE by Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe *of Withdrawal of Counsel (Taylor Brown)* (Eppink, Richard) |
| 12/26/2023 | <u>78</u> | MEMORANDUM DECISION & ORDER in which IT IS ORDERED that (1) Prosecutor Bennetts' Motion to Dismiss (Dkt. 51) is DENIED; (2) Attorney General Labrador and the Idaho Code Commission Members' Motion to Dismiss (Dkt. 57) is GRANTED in part and DENIED in part as follows: The motion is GRANTED as to the Idaho Code Commission defendants and DENIED as to Defendant Attorney General Labrador; and (3) Plaintiffs' Motion for a Preliminary Injunction (Dkt. 32) is GRANTED. Accordingly, Defendants Attorney General Labrador and Ada County Prosecutor Bennetts and their successors in office are enjoined from enforcing any provision of House Bill 71 during the pendency of this litigation. Signed by Judge B Lynn Winmill (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (mls) |

ER1062

| 01/03/2024 | 79 | NOTICE OF APPEAL (USCA 24-142) by Raul Labrador. Filing Fee Due. $ 605, receipt number AIDDC-2682481. (Notice sent to Court Reporter & 9th Cir) (Craig, James) Modified on 1/9/2024 to add USCA case number(hs). |
| --- | --- | --- |
| 01/03/2024 | 80 | Emergency MOTION to Stay re 78 Order on Motion for Preliminary Injunction,,,, Order on Motion to Dismiss/Lack of Jurisdiction,,,,,,, James Edward Monroe Craig appearing for Defendant Raul Labrador. Responses due by 1/24/2024 (Attachments: # 1 Memorandum in Support of Emergency Motion to Stay Pending Appeal)(Craig, James) |
| 01/03/2024 | 81 | MOTION to Expedite James Edward Monroe Craig appearing for Defendant Raul Labrador. Responses due by 1/24/2024 (Craig, James) |
| 01/04/2024 | 82 | DOCKET ENTRY ORDER granting in part and denying in part 81 Motion to Expedite. The Court will grant the motion to expedite to the extent that it will put the following briefing schedule in place: Plaintiffs' response to the emergency motion to stay the injunction pending appeal (filed at Dkt. 80) shall be due on January 10, 2024 at 6:30 p.m. Mountain Time. Defendant Labrador's optional reply, if any, shall be filed by January 12, 2024. The Court will resolve the motion as quickly as possible after it ripens, thought it cannot guarantee a ruling by January 17, 2024 as has been requested. IT IS SO ORDERED. Signed by Judge B. Lynn Winmill (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (mls) |
| 01/09/2024 | 83 | USCA Case Number 24-142 for 79 Notice of Appeal filed by Raul Labrador. (hs) |
| 01/09/2024 | 84 | USCA 24-142 Scheduling Order as to 79 Notice of Appeal filed by Raul Labrador. (Notice sent by e-mail to Court Reporter) (hs) |
| 01/10/2024 | 85 | RESPONSE to Motion re 80 Emergency MOTION to Stay re 78 Order on Motion for Preliminary Injunction,,,, Order on Motion to Dismiss/Lack of Jurisdiction,,,,,,, *Plaintiff's Response to Defendant Labrador's Emergency Motion For Stay of Injunction* |

ER1063

| | | |
|---|---|---|
| | | *Pending Appeal [Dkt. No. 80]* filed by Jane Doe, Joan Doe, John Doe, Pam Poe, Penny Poe, Peter Poe. Replies due by 1/24/2024. (DeRoin, David) |
| 01/12/2024 | 86 | TRANSCRIPT REQUEST *Designation Form* by Raul Labrador for proceedings held on 11/06/2023 before Judge B. Lynn Winmill.. (Craig, James) |
| 01/12/2024 | 87 | REPLY to Response to Motion re 80 Emergency MOTION to Stay re 78 Order on Motion for Preliminary Injunction,,,, Order on Motion to Dismiss/Lack of Jurisdiction,,,,,,, filed by Raul Labrador.Motion Ripe Deadline set for 1/16/2024.(Craig, James) |
| 01/16/2024 | 88 | MEMORANDUM DECISION AND ORDER - Defendant Attorney General Labradors Emergency Motion for a Stay Pending Appeal (Dkt. 80 ) is DENIED. Signed by Senior Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (jd) |
| 01/19/2024 | 90 | ORDER of USCA 24-142 as to 79 Notice of Appeal filed by Raul Labrador (hs) (Entered: 01/22/2024) |
| 01/22/2024 | 89 | DOCKET ENTRY NOTICE OF HEARING: A Video Status Conference is set for 2/1/2024 at 10:30 AM (Mountain Time) before Senior Judge B. Lynn Winmill. A Zoom link will be provided prior to the date of the status conference. (jlg) |
| 01/30/2024 | 91 | ORDER of USCA 24-142 as to 79 Notice of Appeal filed by Raul Labrador (hs) |
| 01/31/2024 | 92 | DOCKET ENTRY NOTICE OF HEARING: A Status Conference is set for 2/1/2024 at 10:30 AM Mountain time via Zoom before Senior Judge B. Lynn Winmill. Counsel received a video link via separate notification. Members of the public may use the following to attend this matter via Audio ONLY: 1-669-254-5252, Meeting ID: 161 453 0662, Meeting Passcode: 372351. Persons granted remote access to proceedings are reminded of the general prohibition under federal law and Local Rule 83.1 against photographing, recording, and rebroadcasting of court proceedings. (jlg) |

ER1064

2/5/24, 2:17 PM                                      District of Idaho Live CM/ECF

| 01/31/2024 | 93 | DOCKET ENTRY NOTICE OF VACATED HEARING: The Status Conference scheduled for February 1, 2024 at 10:30 a.m. before Judge B. Lynn Winmill is VACATED. (jlg) |
|---|---|---|
| 01/31/2024 | 94 | STAY ORDER - IT IS ORDERED that: This matter is STAYED pending the Ninth Circuit's resolution of the Attorney General's pending appeal, provided, however, that this Court's December 26, 2023 preliminary injunction shall remain in effect during the stay. The status conference scheduled for February 1, 2024 is VACATED. Signed by Senior Judge B. Lynn Winmill. (caused to be mailed to non Registered Participants at the addresses listed on the Notice of Electronic Filing (NEF) by (hs) (Entered: 02/01/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/05/2024 14:17:38 | | | |
| **PACER Login:** | cindyeville | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-00269-BLW |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

ER1065