No. 24-142

## UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

◆

PAM POE, by and through her parents and next friends, et al.,
*Plaintiffs-Appellees*,

v.

RAÚL LABRADOR, in his official capacity as
Attorney General of Idaho, et al.,
*Defendants-Appellants*.

◆

On Appeal from the U.S. District Court for the District of Idaho,
No. 1:23-cv-00269-BLW

## BRIEF OF ALABAMA, ARKANSAS, AND 21 OTHER STATES AS *AMICI CURIAE* SUPPORTING APPELLANTS AND REVERSAL

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
  *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov

Tim Griffin
  *Attorney General*
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni@ArkansasAG.gov
Dylan.Jacobs@ArkansasAG.gov

*Additional Counsel Listed on Signature Page*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ......................................................... ii

INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT ............ 1

ARGUMENT .............................................................................. 7

    I.    Laws Prohibiting Pediatric Gender-Transition Procedures Do Not Trigger Heightened Scrutiny ................................................. 7

        A.    The Act Does Not Discriminate Based On Sex ................................. 7

        B.    The Act Does Not Discriminate Based On Transgender Status ................................................................. 16

    II.    Idaho's Law Survives Any Level of Review .......................................... 21

        A.    Courts Should Defer to Legislatures in the Face of Medical Uncertainty ......................................................... 21

        B.    Plaintiffs Erroneously Rely on American Medical Interest Groups That Are Biased Advocates, Not Neutral Experts ......................................................... 24

CONCLUSION ......................................................................... 30

ADDITIONAL COUNSEL .......................................................... 31

CERTIFICATE OF COMPLIANCE .................................................. 32

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
  138 S. Ct. 2305 (2018)................................................................20

*Abigail All. For Better Access to Developmental Drugs v. von Eschenbach*,
  495 F.3d 695 (D.C. Cir. 2007)......................................................2

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) ....................................................16

*Boe v. Marshall*,
  No. 2:22-cv-184-LCB (N.D. Ala.)................................................27

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020)................................................................12

*Craig v. Boren*,
  429 U.S. 190 (1976)................................................................8, 24

*Dent v. West Virginia*,
  129 U.S. 114 (1889)......................................................................2

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022)............................ 2, 7, 12, 14, 17, 23, 29

*Eknes-Tucker v. Governor of Ala.*,
  80 F.4th 1205 (11th Cir. 2023) ............... 2, 7, 9, 12, 14, 20, 21, 23, 24

*Frontiero v. Richardson*,
  411 U.S. 677 (1973)....................................................................16

*Geduldig v. Aiello*,
  417 U.S. 484 (1974)....................................................................17

*Gibson v. Collier*,
  920 F.3d 212 (5th Cir. 2019) .....................................................29

*Gonzales v. Carhart*,
    550 U.S. 124 (2007)...................................................................... 2, 20, 21

*Kosilek v. Spencer*,
    774 F.3d 63 (1st Cir. 2014)...................................................................29

*L.W. ex rel. Williams v. Skrmetti*,
    83 F.4th 460 (6th Cir. 2023) .........................................2, 7, 8, 11-14, 20, 21, 23

*L.W. v. Skrmetti*,
    73 F.4th 408 (6th Cir. 2023) .........................................................................2

*Lange v. Houston Cnty.*,
    No. 22-13626 (11th Cir. Mar. 17, 2023)........................................................4

*Marshall v. United States*,
    414 U.S. 417 (1974)....................................................................................20

*Michael M. v. Super. Ct.*,
    450 U.S. 464 (1981).....................................................................................8

*Orr v. Orr*,
    440 U.S. 268 (1979).....................................................................................8

*Planned Parenthood v. Casey*,
    505 U.S. 833 (1992)...................................................................................21

*Poe v. Drummond*,
    -- F. Supp. 3d --, No. 23-CV-177-JFH-SH, 2023 WL 6516449,
    (N.D. Okla. Oct. 5, 2023) ..........................................................................23

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989)...................................................................................15

*Rucho v. Com. Cause*,
    139 S. Ct. 2484 (2019)...............................................................................21

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017)........................................................................................8

iii

*Tigner v. Texas*,
    310 U.S. 141 (1940)............................................................14

*United States v. Virginia*,
    518 U.S. 515 (1996)..........................................................3, 8

*Washington v. Glucksberg*,
    521 U.S. 702 (1997).............................................................5

**Statutes**

18 U.S.C. §116......................................................................3

Ala. Code §26-26-4..............................................................1

Ark. Code Ann. 20-9-1502...................................................1

Fla. Admin. Code Ann. R.64B8-9.019 ................................1

Ga. Code Ann. §31-7-3.5.....................................................1

Idaho Code §18-1506C(3) .................................................7, 8

Ind. Code §25-1-22-13.........................................................1

Iowa Code §147.164.............................................................1

Ky. Rev. Stat. Ann. §311.372 .............................................1

La. Stat. Ann. §40:1098.......................................................1

Miss. Code Ann. §41-141-1-9 .............................................1

Mo. Rev. Stat. Ann. §191.1720 ..........................................1

S.B. 99, 68th Leg., 2023 Sess. (Mont. 2023)......................1

Neb. Rev. Stat. §72-7301-07................................................1

iv

H.B. 808, 2023 Sess. (N.C. 2023)...........................................................1

N.D. Cent. Code. §12.1-36.1-02 ...........................................................1

H.B. 68, 135th General Assembly (Ohio 2024) ....................................1

Okla. Stat. tit. 63, § 2607.1 ...................................................................1

H.B. 1080, 98th Leg. Sess. (S.D. 2023).................................................1

Tenn. Code Ann. §68-33-101 ...............................................................1

S.B. 14, 88th Leg. Sess. (Tex. 2023) .....................................................1

S.B. 14, 2023 Sess. (Tex. 2023) ............................................................1

Utah Code Ann. §58-68-502(1)(g) ........................................................1

W. Va. Code §30-3-20 ...........................................................................1

## Rules

Federal Rule of Appellate Procedure 29(a)(2).........................................1

## Other Authorities

AHRQ, *Topic Brief: Treatments for Gender Dysphoria in Transgender Youth*
(Jan. 8, 2021), https://perma.cc/23B5-D7C8 ....................................22

Affidavit of Jamie Reed, Missouri Attorney General's Office (Feb. 7, 2023),
https://perma.cc/QE9Q-K2QP .........................................................18

Agnieszka Marianowicz-Szcygiel, *Rise of Gender Identity Disorders Among
Children and Adolescents—Data From 10 Countries*,
49 Q. J. OF FIDES ET RATIO 122 (2022) ...........................................18

American Society of Plastic Surgeries, *Aesthetic Genital Plastic Surgery Surgical Options: What Is A Vaginoplasty?*, https://perma.cc/5WFH-57QP (last accessed Dec. 10, 2023) ..................................................................4

Andrew Gelman & Eric Loken, *The Statistical Crisis in Science*, 102 AMERICAN SCIENTIST 460 (2014) ............................................................25

Anna Smith Haghighi, *What To Know About Estrogen in Men*, MEDICAL NEWS TODAY (Nov. 9, 2020), https://perma.cc/B358-S7UW ...........11

Azeen Ghorayshi, *How a Small Gender Clinic Landed in a Political Storm*, N.Y. TIMES (Aug. 23, 2023), https://www.ny-times.com/2023/08/23/health/transgender-youth-st-louis-jamie-reed.html .......19

Azeen Ghorayshi, *Medical Group Backs Youth Gender Treatments, but Calls for Research Review,* N.Y. TIMES (Aug. 3, 2023), https://perma.cc/N3BJ-TB9J ........................................................................ 25, 26

Colin Wright, *Anatomy of a Scientific Scandal*, CITY JOURNAL (June 12, 2023), https://perma.cc/22J3-C5JA..............................................................29

Correction, 23 Int'l J. of Transgender Health S259 (2022), https://perma.cc/4342-KFEN; https://bit.ly/3qSqC9b ......................................28

E. Coleman et al., *WPATH Standards of Care for the Health of Transgender & Gender Diverse People, Version 8*, INT'L J. OF TRANSGENDER HEALTH (Sept. 15, 2022)......................................................................... 5, 6, 27

Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. TIMES MAGAZINE (June 15, 2022), https://perma.cc/ZMT2-W6DX ..............................................28

Endocrine Society, *Precocious Puberty* (Jan. 24, 2022), https://perma.cc/6Q3E-PEMP .......................................................................................................10

Fan Liang, Johns Hopkins Medicine, *Phalloplasty for Gender Affirmation*, https://perma.cc/776J-U65C (last accessed Feb. 8, 2024)..................................13

Fan Liang, Johns Hopkins Medicine, *Vaginoplasty for Gender Affirmation*, https://perma.cc/RFU9-S72N (last accessed Dec. 10, 2023) ..............................4

Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, Reduxx (May 17, 2022), https://perma.cc/5DWF-MLRU ................................................................................................5

Hannah Barnes, Time to Think: The Inside Story of the Collapse of the Tavistock's Gender Service for Children (2023) .....................................19

HHS, *30 Achievements in Women's Health in 30 Years (1984-2014)*, https://perma.cc/HXQ3-TRAM ...........................................................................3

Jamie Reed, *I Thought I was Saving Trans Kids. Now I'm Blowing the Whistle.*, The Free Press (Feb. 9, 2023), https://www.thefp.com/p/i-thought-i-was-saving-trans-kids .................................................................................18

Jayne Leonard, *What Causes High Testosterone in Women?*, Medical News Today (Jan. 12, 2023), https://perma.cc/BT38-L79X.............10

Jennifer Block, *Gender Dysphoria in Young People is Rising—and So Is Professional Disagreement*, British Med. J. (Feb. 23, 2023), https://perma.cc/5SC6-FY2Z............................................................. 18, 19, 27

Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, British Med. J. (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9 ..23

Joshua Safer, *State of the Art: Transgender Hormone Care*, YouTube (Feb. 15, 2019).........................................................................................27

Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, Wall St. Journal (Apr. 17, 2022) ..............................26

Karen O. Klein, *Review of Hormone Replacement Therapy in Girls and Adolescents with Hypogonadism*, 32 J. Pediatric & Adolescent Gynecology 460 (2019), https://perma.cc/WU36-5889 ..................................11

Kenzie Birse et al., *The Neovaginal Microbiome of Transgender Women Post-Gender Reassignment Surgery*, 8 Microbiome 61 (2020). https://doi.org/10.1186/s40168-020-00804-1 ......................................................14

Leor Sapir & Colin Wright, *Medical Journal's False Consensus on "Gender-Affirming Care,"* Wall St. J. (June 9, 2023).................................................29

Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 ARCHIVES OF SEXUAL BEHAVIOR 3353 (2021) ............ 15, 16

Maria Vogiatzi et al., *Testosterone Use in Adolescent Males*, 5 J. ENDOCRINE SOC'Y 1 (2021), https://perma.cc/E3ZQ-4PZV .................................................. 11

Nat'l Inst. for Health & Care Excellence *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/93NB-BGAN ........................ 10, 22

Nat'l Inst. for Health & Care Excellence *Gender-affirming hormones for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/M8J5-MXVG ............................................................. 11, 19, 22

Pamela Paul, *As Kids, They Thought They Were Trans. They No Longer Do.*, N.Y. TIMES (Feb. 2, 2024), https://www.nytimes.com/2024/02/02/opinion/transgender-children-gender-dysphoria.html ...................................................................................... 15

*Recommendation of the Council for Choices in Health Care in Finland: Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors*, PALKO/COHERE Finland (2020), https://perma.cc/VN38-67WT .................. 22

Riitakerttu Kaltiala, *"Gender-Affirming Care Is Dangerous. I Know Because I helped Pioneer It."*, THE FREE PRESS (Oct. 30, 2023), https://perma.cc/Q3E5-YBXQ ....................................................................................................... 19

Robin Respaut et al., *Why Detransitioners Are Crucial to the Science of Gender Care*, REUTERS (Feb. 22, 2022), https://www.reuters.com/investigates/special-report/usa-transyouth-outcomes/ ....................................................................... 18

Roy Eappen & Ian Kingsbury, *The Endocrine Society's Dangerous Transgender Politicization*, WALL ST. J. (June 28, 2023) ...................................................... 26

Sweden National Board of Health and Welfare Policy Statement, Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* 3 (2022), https://perma.cc/FDS5-BDF3 ...................................................................... 19, 22

Tamara Pietzke, *I Was Told to Approve All Teen Gender Transitions. I Refused.*, THE FREE PRESS (Feb. 5, 2024), https://www.thefp.com/p/i-refused-to-approve-all-teen-gender-transitions ................................................................................18

U.S. Dep't of Health & Human Servs., Office on Women's Health, *Addressing Sex Differences in Health*, https://perma.cc/93H3-66C5 (last accessed Dec. 10, 2023) ................................................................................................3

Videorecording of Dr. Tishelman's WPATH presentation, https://perma.cc/4M52-WG4X ......................................................................................................28

World Health Organization, *Frequently Asked Questions – WHO Development of a Guideline on the Health of Trans and Gender Diverse People* (Jan. 15, 2024), https://perma.cc/L39M-MH7N ........................................................................6

Yuval Levin, A TIME TO BUILD: FROM FAMILY AND COMMUNITY TO CONGRESS AND THE CAMPUS, HOW RECOMMITTING TO OUR INSTITUTIONS CAN REVIVE THE AMERICAN DREAM (2020)......................................................................25

## INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT[1]

Amici curiae are the States of Alabama, Arkansas, Alaska, Florida, Georgia, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, and West Virginia.

Amici are acutely aware that the American medical establishment has been responsible for both great healing and, at times, great harm. Eugenics, lobotomies, and opioids are just a few examples of scandals sanctioned by America's leading medical organizations. Amici are concerned that another devastating scandal is at hand: the medical establishment's fast-tracking of vulnerable youth suffering from gender dysphoria—and, almost always, a host of other psychiatric co-morbidities—for hormonal and surgical gender-transition procedures that can leave them sterilized and permanently harmed. In response, over twenty States have joined Idaho in generally requiring children to reach the age of majority before undergoing medicalized sex-change procedures.[2]

---

[1] This brief is filed under Federal Rule of Appellate Procedure 29(a)(2).

[2] *See* Ala. Code §26-26-4; Ark. Code Ann. 20-9-1502; Fla. Admin. Code Ann. R.64B8-9.019; Ga. Code Ann. §31-7-3.5; Ind. Code §25-1-22-13; Iowa Code §147.164; Ky. Rev. Stat. Ann. §311.372; La. Stat. Ann. §40:1098; Miss. Code Ann. §41-141-1-9; Mo. Rev. Stat. Ann. §191.1720; S.B. 99, 68th Leg., 2023 Sess. (Mont. 2023); Neb. Rev. Stat. §72-7301-07; H.B. 808, 2023 Sess. (N.C. 2023); N.D. Cent. Code. §12.1-36.1-02; H.B. 68, 135th General Assembly (Ohio 2024) (effective Apr. 24, 2024); Okla. Stat. tit. 63, § 2607.1; H.B. 1080, 98th Leg. Sess. (S.D. 2023); Tenn.

"State[s] plainly ha[ve] authority, in truth a responsibility, to look after the health and safety of [their] children." *L.W. v. Skrmetti*, 73 F.4th 408, 419 (6th Cir. 2023) (staying injunction of Tennessee's similar law). Governments have done so "from time immemorial"—regulating the medical profession, restricting access to potentially dangerous medicines, and banning treatments that are unsafe or unproven. *Dent v. West Virginia*, 129 U.S. 114, 121-24 (1889); *see Abigail All. For Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703-05 (D.C. Cir. 2007) (en banc).

When it comes to "areas where there is medical and scientific uncertainty," States have particularly "wide discretion." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). States like Idaho can "choose fair-minded caution and their own approach to child welfare" before subjecting their children to irreversible transitioning treatments. *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 488 (6th Cir. 2023) (vacating preliminary injunctions of similar laws in Tennessee and Kentucky). "Absent a constitutional mandate to the contrary, these types of issues are quintessentially the sort that our system of government reserves to legislative, not judicial, action." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1231 (11th Cir. 2023) (vacating preliminary injunction of similar Alabama law).

---

Code Ann. §68-33-101; S.B. 14, 88th Leg. Sess. (Tex. 2023); S.B. 14, 2023 Sess. (Tex. 2023); Utah Code Ann. §58-68-502(1)(g); W. Va. Code §30-3-20.

Yet rather than accord Idaho's "health and welfare laws" a "strong presumption of validity," *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022) (citation omitted), the district court inverted the constitutional standard and set Plaintiffs' favored medical interest groups as the *real* regulators, authoring standards no mere State can contradict. 1-ER-15, 24, 58. This Court should reverse.

*First*, Idaho's law is presumed constitutional. While the district court thought heightened scrutiny applies any time a medical regulation depends on a patient's sex, 1-ER-47, that has never been true. The Constitution takes as given that "[p]hysical differences between men and woman" "are enduring." *United States v. Virginia*, 518 U.S. 515, 533 (1996). As the U.S. Department of Health and Human Services (HHS) explains, "a woman's body [is] obviously different from a man's," "[s]o it is no surprise that diseases, and the medications and medical devices used to treat them, may affect women differently" from men.[3] Accordingly, HHS regularly oversees health initiatives that are sex specific—from improving breast cancer screening for women to promoting sex-specific approaches to treating heart disease.[4] And Congress routinely recognizes differences between the sexes, as when it made it a felony to perform genital mutilation on a minor girl. 18 U.S.C. §116. As here, "the minor's

---

[3] U.S. Dep't of Health & Human Servs., Office on Women's Health, *Addressing Sex Differences in Health*, https://perma.cc/93H3-66C5.

[4] *Id.*; *see also* HHS, *30 Achievements in Women's Health in 30 Years (1984-2014)*, https://perma.cc/HXQ3-TRAM.

sex at birth determines whether or not" that procedure is allowed, 1-ER-47, but the prohibition is nonetheless presumed constitutional. Why? Because it is rooted in biological reality, not stereotype—and, it must be said, the presence of a penis or XY chromosomes is not a "stereotype."

Common sense also answers the district court's "same treatments" line of reasoning. Idaho prohibits a physician from providing a vaginoplasty to a minor boy to transition his gender appearance. The district court concluded that Idaho's law not only triggered heightened scrutiny but constituted pretextual animus against transgender people because Idaho "allows the same treatments for cisgender minors." 1-ER-50.[5] This is not true. There is a world of difference between a vaginoplasty for a female and the "same treatment" for a transitioning male. The former can be performed under local anesthesia and brings "separated muscles together" to surgically tighten the vagina and restore normal function following trauma.[6] The

---

[5] Not even the Endocrine Society or the World Professional Association for Transgender Health recommend vaginoplasties for minors, but the district court nonetheless wholly enjoined Idaho's ban on the surgery. 1-ER-64-65.

[6] *See* American Society of Plastic Surgeries, *Aesthetic Genital Plastic Surgery Surgical Options: What Is A Vaginoplasty?*, https://perma.cc/5WFH-57QP.

latter is major "surgery to create a vagina" and "involves removing the penis, testicles and scrotum."[7] These are not the "same treatments."[8]

*Second*, the Constitution does not put the World Professional Association for Transgender Health (WPATH) and the Endocrine Society in charge of regulating medicine. Not only would this flip the purpose of regulation on its head (making the regulated the regulators), but one could scarcely dream up a more radical organization to outsource the job to than WPATH (whose members are also almost entirely responsible for the Endocrine Society Guidelines). While "Americans are engaged in an earnest and profound debate about" how best to help children suffering from gender dysphoria, *cf. Washington v. Glucksberg*, 521 U.S. 702, 735 (1997), WPATH has left evidence-based care far behind and included in its latest Standards of Care an entire chapter on self-identified "eunuchs"—individuals "assigned male at birth" who "wish to eliminate masculine physical features, masculine genitals, or genital functioning."[9] Drawing on the "Eunuch Archive"—a "large online peer-support

---

[7] *See* Fan Liang, Johns Hopkins Medicine, *Vaginoplasty for Gender Affirmation*, https://perma.cc/RFU9-S72N (last accessed Dec. 10, 2023).

[8] Lest the Court think this is an absurd example, pending before the Eleventh Circuit is a case in which the United States advances the "same treatments" argument to claim that Title VII requires an employer's health insurance carrier to cover transitioning "vaginoplasties" for men if it covers reparative vaginal surgery for women. *See* Brief for the United States as Amicus Curiae at 3, 6, 18 *Lange v. Houston Cnty.*, No. 22-13626 (11th Cir. Mar. 17, 2023).

[9] E. Coleman et al., *WPATH Standards of Care for the Health of Transgender & Gender Diverse People, Version 8*, INT'L J. OF TRANSGENDER HEALTH (Sept. 15, 2022), S88-89 ("SOC 8").

community" that WPATH boasts houses "the greatest wealth of information about contemporary eunuch-identified people"[10] (plus thousands of stories "focus[ing] on the eroticization of child castration," though WPATH doesn't tell its readers that[11])—the WPATH Standards assure that "castration" may be "medically necessary gender-affirming care" for eunuchs who "wish for a body that is compatible with their eunuch identity."[12]

No wonder healthcare authorities around the globe are rejecting the WPATH model of "care." The World Health Organization recently determined that it would not promulgate treatment guidelines for gender dysphoric adolescents because "the evidence base for children and adolescents is limited and variable regarding the longer-term outcomes of gender affirming care."[13] And governmental authorities throughout Europe have severely curtailed the availability of gender-transition procedures for minors after systematic evidence reviews revealed that WPATH's recommendations are not supported by evidence.

Idaho went one step further and concluded that it would await the results of experiments being conducted elsewhere rather than allow its vulnerable children to

---

[10] *Id.* at S88-89.
[11] Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, REDUXX (May 17, 2022), https://perma.cc/5DWF-MLRU.
[12] *See* SOC 8, *supra*, at S88-89.
[13] World Health Organization, *Frequently Asked Questions – WHO Development of a Guideline on the Health of Trans and Gender Diverse People* (Jan. 15, 2024), https://perma.cc/L39M-MH7N.

be used as guinea pigs. Nothing in the Constitution prohibits that legislative deter-

mination. The Court should vacate the injunction.

## ARGUMENT

### I. Laws Prohibiting Pediatric Gender-Transition Procedures Do Not Trigger Heightened Scrutiny.

Idaho's Vulnerable Child Protection Act, like similar laws enacted by many of

the amici States, prohibits healthcare providers from performing surgeries on and

administering hormones to minors for the purpose of gender transition. Idaho Code

§18-1506C(3). As with "other health and welfare laws," the Act is subject only to

rational-basis review. *Dobbs*, 142 S. Ct. at 2284.

### A. The Act Does Not Discriminate Based On Sex.

The district court concluded that the default rule of rational basis does not

apply here because "the biological sex of the minor patient is the basis on which the

law distinguishes between those who may receive certain types of medical care and

those who may not." 1-ER-48 (cleaned up and citation omitted). As both the Sixth

and Eleventh Circuits have recently explained, this reasoning is flawed. *See L.W.*,

83 F.4th at 480-81; *Eknes-Tucker*, 80 F.4th at 1228.

As an initial matter, Idaho's law regulates gender-transition procedures for *all*

minors, regardless of sex. Under the Act, "[a] medical provider shall not engage" in

a listed procedure to "alter the appearance of or affirm the child's perception of the

child's sex if that perception is inconsistent with the child's biological sex." Idaho

7

Code §18-1506C(3). This type of "across-the-board regulation lacks any of the hall-marks of sex discrimination" and does not "prefer one sex over the other." *L.W.*, 83 F.4th at 480 (citation omitted). It does not include one sex and exclude the other. *Cf. Virginia*, 518 U.S. at 519-20. It does not "bestow benefits or burdens based on sex." *Cf. Michael M. v. Super. Ct.*, 450 U.S. 464, 466 (1981) (plurality opinion); *Orr v. Orr*, 440 U.S. 268, 271 (1979). And it does not "apply one rule for males and another for females." *Cf. Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017); *Craig v. Boren*, 429 U.S. 190, 192 (1976). The Act's prohibitions are sex-neutral and treat similarly situated individuals "evenhandedly." *L.W.*, 83 F.4th at 479-80.

The Act mentions sex, of course, noting that it would be unlawful to prescribe "[s]upraphysiological doses of testosterone to a female" or "[s]upraphysiological doses of estrogen to a male" for the purpose of gender transition. Idaho Code §18-1506C(3). "But how could [it] not? The point of the hormones is to help a minor transition from one gender to another, and laws banning, permitting, or otherwise regulating them all face the same linguistic destiny of describing the biology of the procedures." *L.W.*, 83 F.4th at 482. Heightened scrutiny is not triggered whenever a public entity recognizes  that certain drugs affect males and females differently due to their biology.

This gets to the nub of Plaintiffs' equal protection argument. They argue that the Act discriminates based on sex because a "male adolescent can receive

testosterone to affirm his male gender identity, but a transgender male adolescent"—
a natal female—"cannot." Pls' Resp. to Mot. to Stay at 5. Putting aside the fact that
Plaintiffs point to no evidence suggesting that boys in Idaho receive testosterone to
"affirm" their "male gender identity" (rather than simply to treat a testosterone defi-
ciency or kickstart delayed puberty), Plaintiffs' logic would "force [States] to *either*
ban puberty blockers and hormones for all purposes *or* allow them for all purposes."
*Eknes-Tucker*, 80 F.4th at 1234 (Brasher, J., concurring). Even the district court was
clear about that. 1-ER-51. The problem is that Plaintiffs (and the court below) erro-
neously view the administration of testosterone as one monolithic treatment—the
"same medical treatment" regardless of whether the hormone is used to treat a boy's
testosterone deficiency or transition a teenaged girl. But just as with the
"vaginoplasty" example discussed above, these are different treatments even if
Plaintiffs call them by the same name.

*First*, common sense tells us that a physician can use the same drug or proce-
dure to treat different conditions with different risk profiles. Doing so does not make
the two treatments the same. To the diabetic patient, injecting insulin is lifesaving.
To the hypoglycemic patient, it can be life ending. Same drug, different treatments.
States thus routinely allow drugs to be used for some treatments (morphine to treat
a patient's pain) but not for others (morphine to assist a patient's suicide).

That is the case here. Puberty blockers are typically prescribed to children to treat precocious puberty, a condition where a child begins puberty at an unusually early age.[14] When puberty blockers are used for that purpose, the aim is to ensure that children develop at the normal age of puberty. The purpose of using them to treat gender dysphoria, by contrast, is to *block* normally timed puberty. This distinction changes the risk-benefit analysis. Using puberty blockers beyond the normal pubertal age can, at minimum, risk a child's bone growth, social and cognitive development, and—particularly when followed by cross-sex hormones—fertility and sexual function.[15] So the risks are much more serious when puberty blockers are used to treat gender dysphoria than when they are used to treat precocious puberty. The benefits differ, too. When used for precocious puberty, the benefit is clear: the child gets to go through naturally timed puberty. When used to treat gender dysphoria, systematic reviews of the evidence reveal that the claimed benefits are utterly unproven.[16]

The same story applies to testosterone and estrogen, which also serve different purposes and carry different risks when given to boys versus girls. Excess

---

[14] Endocrine Society, *Precocious Puberty* (Jan. 24, 2022), https://perma.cc/6Q3E-PEMP.

[15] *See* Nat'l Inst. for Health & Care Excellence (NICE), *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/93NB-BGAN, at 26-32 ("NICE Puberty Blocker Evidence Review");

[16] *Id.*; *see* 4-ER-734, 751-52, 759.

testosterone in females can *cause* infertility,[17] while testosterone is used in males to *alleviate* fertility problems.[18] On the other hand, excessive amounts of estrogen in males can *cause* infertility and sexual dysfunction,[19] while estrogen is often given to females to *treat* problems with sexual development.[20] As a result, providing supraphysiological doses of testosterone or estrogen to a physically healthy child for the purpose of gender transitioning has different purposes and different risks than using the same drugs to treat a genetic or congenital condition that occurs exclusively in one sex.[21] *L.W.*, 83 F.4th at 481. And again, the benefits are radically different, too.[22] These distinctions, among others, make the use of the same hormones in the different sexes different treatments altogether. Contra the district court, Idaho's law does not use sex to forbid some children from receiving certain treatments while

---

[17] Jayne Leonard, *What Causes High Testosterone in Women?*, MEDICAL NEWS TODAY (Jan. 12, 2023), https://perma.cc/BT38-L79X.

[18] Maria Vogiatzi et al., *Testosterone Use in Adolescent Males*, 5 J. ENDOCRINE SOC'Y 1, 2 (2021), https://perma.cc/E3ZQ-4PZV.

[19] Anna Smith Haghighi, *What To Know About Estrogen in Men*, MEDICAL NEWS TODAY (Nov. 9, 2020), https://perma.cc/B358-S7UW.

[20] Karen O. Klein, *Review of Hormone Replacement Therapy in Girls and Adolescents with Hypogonadism*, 32 J. PEDIATRIC & ADOLESCENT GYNECOLOGY 460 (2019), https://perma.cc/WU36-5889.

[21] While there may be some instances in which administering testosterone to a female (for instance) could be necessary—say, to treat symptoms of menopause or a gland disorder—doing so would not be the "same medical treatment" as that given to a male.

[22] Nat'l Inst. for Health & Care Excellence, *Gender-affirming hormones for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/M8J5-MXVG ("NICE Cross-Sex Hormone Review").

allowing other children access to those "same treatments." *No* minor can be pre-scribed transitioning treatments.

*Second*, a State's medical regulation does not become "a sex-based classifica-tion" merely by mentioning sex or recognizing biology. *Dobbs*, 142 S. Ct. at 2245. That is because the fact that a patient's sex affects the nature of a treatment does not mean anyone is denied equal protection. The Constitution does not look askance on a hospital offering testicular exams only to boys or pap smears only to girls. And here, the Act relies on sex only because the procedures it regulates "are themselves sex-based." *Eknes-Tucker*, 80 F.4th at 1228. Yet just as States can enact laws con-cerning abortion, female genital mutilation, testicular cancer, prostate cancer, breast-feeding, cervical cancer, Cesarean sections, and in-vitro fertilization without those laws being considered "presumptively unconstitutional," so can they regulate exper-imental gender-transition procedures. *L.W.*, 83 F.4th at 482 (collecting examples).

This is one reason why the reasoning of *Bostock* does not apply. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020). Whatever the merits of the Supreme Court's "simple test" "in the workplace" (*id.* at 1737, 1743)—"if changing the em-ployee's sex would have yielded a different choice by the employer," the employer has treated the employee differently "because of sex," *id.* at 1741—it makes no sense to apply the test to medicine, where males and females are not similarly situated. A fertility clinic does not discriminate on the basis of sex by implanting fertilized eggs

only in females, even though "changing the [patient's] sex would have yielded a different choice by the [clinic]." There is no stereotype or inequality in the clinic's policy. So here. Administering testosterone to bring a boy's levels into a normal range is not the same treatment as ramping up a young girl's testosterone levels to that of a healthy boy—ten times that of a healthy girl—or, for that matter, as providing the hormone to a Tour de France cyclist seeking a yellow jersey. Once again: same drug, different treatments.

So it is *not* true that boys in Idaho can receive testosterone *to transition*. Not only is this because no minor, male *or* female, may be prescribed testosterone *to transition*, but biology dictates that a male minor could not use testosterone *to transition* even if he wanted to. Only females can use testosterone for the purpose of gender transition—never males. *See L.W.*, 83 F.4th at 481. Although a male can use testosterone for other types of treatment, no amount of testosterone will cause a male to develop female characteristics.

The inverse is true for estrogen gender-transitioning treatments. Biology dictates that estrogen can be used for gender transition *only* in males, never the reverse. *Id*. The same goes for the surgical procedures at issue here. Only females would obtain a double mastectomy or a phalloplasty (the creation of a faux-penis and

13

scrotum[23]) for the purpose of gender transition. And only males would seek breast enlargement surgery or the creation of a "neovagina"[24] for the purpose of gender transition. These are "medical procedure[s] that only one sex can undergo," making heightened scrutiny inappropriate. *Dobbs*, 142 S. Ct. at 2245.

As for puberty-blocking gender-transitioning treatment, sex does not matter to Idaho's law. "In contrast to cross-sex hormones, puberty blockers involve the same drug used equally by gender-transitioning boys and girls." *L.W.*, 83 F.4th at 483. Prohibiting their use for the purpose of gender transition does not depend on sex at all.

The "right question under the Equal Protection Clause" is whether "those who want to use these drugs to treat a discordance between their sex and gender identity and those who want to use these drugs to treat other conditions" are "similarly situated." *Eknes-Tucker*, 80 F.4th at 1233 (Brasher, J., concurring). To ask the question answers it. Idaho and other States have discretion to "permit varying treatments of distinct diagnoses, as the 'Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.'" *L.W.*, 83 F.4th at 482-83 (quoting *Tigner v. Texas*, 310 U.S. 141, 147 (1940)).

---

[23] *See* Fan Liang, Johns Hopkins Medicine, *Phalloplasty for Gender Affirmation*, https://perma.cc/776J-U65C (last accessed Feb. 8, 2024).
[24] *See* Kenzie Birse et al., *The Neovaginal Microbiome of Transgender Women Post-Gender Reassignment Surgery*, 8 MICROBIOME 61 (2020). https://doi.org/10.1186/s40168-020-00804-1.

This leaves Plaintiffs' complaint about stereotyping. *See* Pls' Resp. at 8-9. To hear Plaintiffs tell it, the Act "classifies based on stereotypes relating to noncomformity with a person's sex assigned a birth," *id.* at 8—as though Idaho makes access to gender-transition treatments turn on who "walk[s] more femininely, talk[s] more femininely, dress[es] more femininely, wear[s] make-up, ha[s] [their] hair styled, [or] wear[s] jewelry," *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989) (plurality op.). The irony is that stereotypes are actually integral to the transitioning treatments Plaintiffs desire, suggesting that a boy who rejects "typically masculine toys, games, and activities"—activities stereotypically associated with boys—is not a "real" boy, but a girl. 4-ER-873. And for some—about a quarter of respondents in one survey of individuals who stopped transitioning treatments—transitioning treatments are viewed as a pathway to escape internalized homophobia.[25] As one respondent explained, "[t]ransitioning to male would mean my attraction to girls would be 'normal.'"[26] Or as "one detransitioned man, now in a gay relationship," recently told the *New York Times*: "'I was a gay man pumped up to look like a

---

[25] Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 ARCHIVES OF SEXUAL BEHAVIOR 3353, 3362-63 (2021).
[26] *Id.* at 3363.

woman and dated a lesbian who was pumped up to look like a man. If that's not conversion therapy, I don't know what is.'"[27]

Idaho does not engage in such stereotyping. "[B]iological sex … is not a stereotype." *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 809 (11th Cir. 2022) (en banc). Characteristics determined by biological sex—hormonal levels or the presence of male or female genitalia—are not stereotypes. Stereotypes are not "immutable characteristics determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). The Constitution does not forbid States from accounting for biological reality when regulating medicine.

### B.  The Act Does Not Discriminate Based On Transgender Status.

For many of these same reasons, the district court also erred in finding that the Act discriminates based on transgender status. To start, the court wrongly concluded that "only transgender people seek treatment for gender dysphoria," 1-ER-46, effectively erasing the experiences of a growing number of detransitioners who received gender-transition procedures but now live in accordance with their biological sex.[28] If detransitioners were never transgender, then it cannot be true that *only* transgender individuals seek the prohibited procedures. And if detransitioners *were*

---

[27] Pamela Paul, *As Kids, They Thought They Were Trans. They No Longer Do.*, N.Y. TIMES (Feb. 2, 2024), https://www.nytimes.com/2024/02/02/opinion/transgender-children-gender-dysphoria.html;
[28] *E.g.*, *id.*; Littman, *supra.*

transgender but no longer are, then transgender status should not be treated as an immutable characteristic under these circumstances.

In any event, the district court's determination that the Act discriminates based on transgender status turned entirely on its faulty "same treatments" line of reasoning discussed above: "The classified group (transgender minors) cannot have medical treatments that the similarly situated group (cisgender minors) can." 1-ER-46. But again, *no minor* in Idaho can get the prohibited treatments—period. Neither boys nor girls, cis nor trans, can receive puberty blockers to transition, while all of them—boys and girls, cis and trans—could receive puberty blockers to treat precocious puberty. And even if it were the case that only transgender-identifying children would pursue the transitioning puberty blocker treatment, that would not trigger heightened scrutiny. It would simply be akin to *Dobbs*: the regulation of a medical treatment that only one sex or gender could undergo. Rational-basis review would apply. *Dobbs*, 142 S. Ct. at 2245-46; *L.W.*, 83 F.4th at 482.

The district court sought to distinguish *Dobbs* and *Geduldig v. Aiello*, 417 U.S. 484 (1974), by claiming that Idaho's justifications were pretextual and that the *real reason* the State passed the Act was to "single out transgender children based solely upon their transgender status." 1-ER-49-50. This is an extraordinary and offensive conclusion given the context in which Idaho's law arose.

17

For most of the 2010s, gender clinics were largely left alone. During that time, the western world experienced an unexplained explosion of self-identified transgender teenagers, primarily natal girls—a new patient profile distinct from the traditional pre-adolescent boy that suffered from the childhood-onset gender dysphoria depicted in the DSM-5.[29] Pediatric gender clinics sprouted up everywhere.[30] And clinicians, purporting to follow the WPATH standards, assured anxious parents that a sex-change procedure would save their sick child. Wouldn't they prefer a living "son" to a dead daughter?[31]

Then things began to change. Stories of rushed transitions and regret made their way into the media.[32] Whistleblowers came forward, detailing the ways they

---

[29] *E.g.*, Agnieszka Marianowicz-Szcygiel, *Rise of Gender Identity Disorders Among Children and Adolescents—Data From 10 Countries*, 49 Q. J. OF FIDES ET RATIO 122, 126-27 (2022).

[30] *E.g.*, Jennifer Block, *Gender Dysphoria in Young People is Rising—and So Is Professional Disagreement*, BRITISH MED. J. (Feb. 23, 2023), https://perma.cc/5SC6-FY2Z ("[T]he number of private clinics that focus on providing hormones and surgeries has grown from just a few a decade ago to more than 100 today.").

[31] *See* Affidavit of Jamie Reed, Missouri Attorney General's Office (Feb. 7, 2023), https://perma.cc/QE9Q-K2QP (testifying that clinicians at the Washington University Pediatric Transgender Center gained parental "consent" by threatening parents: "You can either have a living son or a dead daughter").

[32] *E.g.*, Robin Respaut et al., *Why Detransitioners Are Crucial to the Science of Gender Care*, REUTERS (Feb. 22, 2022), https://www.reuters.com/investigates/special-report/usa-transyouth-outcomes/; Paul, *supra*.

saw the medical establishment and gender clinics fail our most vulnerable children.[33] Once-lauded multidisciplinary pediatric gender centers were shut down or are being investigated for providing inadequate mental health care (but lots of hormones).[34] And gender clinics founded on the promise of helping suffering children saw their patients get *worse* after transitioning.[35]

So healthcare authorities, particularly in Europe, began reviewing the evidence for themselves. Remarkably—horrifically—they discovered that the handful of studies shedding light on the safety and efficacy of transitioning minors were *all* "small, uncontrolled observational studies," "subject to bias and confounding," with "results … of very low certainty," to quote Britain's National Institute for Health and Care Excellence.[36] Sweden's National Board of Health and Welfare concluded

---

[33] *E.g.*, Jamie Reed, *I Thought I was Saving Trans Kids. Now I'm Blowing the Whistle.*, THE FREE PRESS (Feb. 9, 2023), https://www.thefp.com/p/i-thought-i-was-saving-trans-kids; Tamara Pietzke, *I Was Told to Approve All Teen Gender Transitions. I Refused.*, THE FREE PRESS (Feb. 5, 2024), https://www.thefp.com/p/i-refused-to-approve-all-teen-gender-transitions.

[34] *E.g.*, Hannah Barnes, TIME TO THINK: THE INSIDE STORY OF THE COLLAPSE OF THE TAVISTOCK'S GENDER SERVICE FOR CHILDREN (2023); Azeen Ghorayshi, *How a Small Gender Clinic Landed in a Political Storm*, N.Y. TIMES (Aug. 23, 2023), https://www.nytimes.com/2023/08/23/health/transgender-youth-st-louis-jamie-reed.html.

[35] *E.g.*, Riitakerttu Kaltiala, *"Gender-Affirming Care Is Dangerous. I Know Because I Helped Pioneer It."* THE FREE PRESS (Oct. 30, 2023), https://perma.cc/Q3E5-YBXQ.

[36] Nat'l Inst. for Health & Care Excellence, *Gender-affirming hormones for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/M8J5-MXVG.

that "the risk" of transitioning treatments for youth "currently outweigh the possible benefits."[37] These and other countries thus severely restricted the availability of sex-modification procedures for youth.[38]

Yet when Idaho responded to this same information and acted to protect its children, the district court determined that the State was *really* out to target transgender children because it didn't ban puberty blockers, testosterone, estrogen, or certain surgeries in toto. This makes no sense. "A state may reasonably conclude that a treatment is safe when used for one purpose but risky when used for another, especially when, as here, the treatment is being put to a relatively new use." *L.W.*, 83 F.4th at 480. That Idaho didn't outlaw puberty-blocker treatments for precocious puberty shows that its law was tailored to the unique risks the drug poses when used as a treatment for gender dysphoria. The district court was just plain wrong to find that it was evidence of pretextual discrimination. "The good faith of the state legislature" should have been "presumed," not overridden by this specious talking point. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (cleaned up).

---

[37] Sweden National Board of Health and Welfare Policy Statement, Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* 3 (2022), https://perma.cc/FDS5-BDF3.
[38] *See* Block, *supra*.

## II.    Idaho's Law Survives Any Level of Review.

Even if heightened scrutiny applied, Idaho's law would pass muster. *See Eknes-Tucker*, 80 F.4th at 1235 (Brasher, J., concurring) (finding "exceedingly persuasive justification" for prohibiting pediatric gender-transition procedures).

### A.    Courts Should Defer to Legislatures in the Face of Medical Uncertainty.

States have "wide discretion" to regulate "in areas where there is medical and scientific uncertainty." *Gonzales*, 550 U.S. at 163; *accord Marshall v. United States*, 414 U.S. 417, 427 (1974) ("When [a legislature] undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad."). This deference applies even in cases involving heightened scrutiny. *Gonzales*, 550 U.S. at 163 (stating that "[t]his traditional rule is consistent with [*Planned Parenthood v.*] *Casey*," 505 U.S. 833 (1992), which involved heightened scrutiny)).

The reason for this deference is clear: The Constitution provides no guidance to courts for choosing between competing medical authorities. *Cf. Rucho v. Com. Cause*, 139 S. Ct. 2484, 2498 (2019) (requiring deference to legislatures unless there are "clear, manageable, and politically neutral" standards for judicial intervention). Federal courts are not equipped to choose, as a constitutional matter, between (on the one hand) the medical opinions of Plaintiffs' expert witnesses and preferred medical interest groups and (on the other hand) the medical opinions of Idaho's expert witnesses, half a dozen countries in Europe, and the U.S. Agency for Healthcare

21

Research and Quality. That job is for the legislature. *See Eknes-Tucker*, 80 F.4th at 1235 (Brasher, J., concurring) ("Intermediate scrutiny permits the legislature to make a predictive judgment based on competing evidence." (cleaned up)). And "the States are indeed engaged in thoughtful debates about the issue." *L.W.*, 83 F.4th at 471 (citation omitted).

Accordingly, all Idaho had to do to prevail even under heightened scrutiny was show that there is a medical dispute on the issue at hand. It did that. *See* 4-ER-794-822. The U.S. Agency for Healthcare Research and Quality itself admits that these interventions lack evidentiary support: "There is a lack of current evidence-based guidance for the care of children and adolescents who identify as transgender, particularly regarding the benefits and harms of pubertal suppression, medical affirmation with hormone therapy, and surgical affirmation."[39]

Finland's medical authority likewise concluded that, "[i]n light of available evidence, gender reassignment of minors is an experimental practice," and "there are no medical treatment[s] that can be considered evidence-based."[40] So did the United Kingdom's National Health Service, which recently restricted gender-transition interventions to formal research settings after an independent medical review

---

[39] AHRQ, *Topic Brief: Treatments for Gender Dysphoria in Transgender Youth* (Jan. 8, 2021), https://perma.cc/23B5-D7C8.
[40] *Recommendation of the Council for Choices in Health Care in Finland: Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors*, PALKO/COHERE Finland (2020), https://perma.cc/VN38-67WT.

concluded that there is no evidentiary support for these interventions given the "lack of reliable comparative studies."[41] Sweden's National Board of Health and Welfare reached a similar conclusion.[42] And earlier this year, the Norwegian Healthcare Investigation Board (Ukom) found "insufficient evidence for the use of puberty blockers and cross sex hormone treatments in young people, especially for teenagers who are increasingly seeking health services."[43] Thus, "Ukom defines such treatments as utprøvende behandling, or 'treatments under trial,'"[44]—that is, experimental.

In fact, calling the treatments "experimental" may be overstating things. As a district court in Oklahoma found, it may be "more accurate to state that the [treatments] are not 'experimental' only because the experimental phase has truly not yet begun." *Poe v. Drummond*, -- F. Supp. 3d --, No. 23-CV-177-JFH-SH, 2023 WL 6516449, at *13 (N.D. Okla. Oct. 5, 2023); *see Eknes-Tucker*, 80 F.4th at 1225 (noting that gender-transition drugs provided to minors have "uncertainty regarding benefits, recent surges in use," "irreversible effects," and "growing concern about the medications' risks." (citations omitted)); *L.W.*, 83 F.4th at 471 (gender-transition

---

[41] NICE Cross-Sex Hormone Review, *supra*; NICE Puberty Blocker Evidence Review, *supra*.

[42] Sweden National Board of Health and Welfare Policy Statement, SOCIALSTYREL-SEN, *Care of Children and Adolescents with Gender Dysphoria: Summary* 3 (2022), https://perma.cc/FDS5-BDF3.

[43] Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, BRITISH MED. J. (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9.

[44] *Id.*

procedures for minors is "a vexing and novel topic of medical debate."). In light of this uncertainty, Idaho had "wide discretion" to restrict these interventions to protect the "health and welfare" of children." *Dobbs*, 142 S. Ct. at 2284.

### B. Plaintiffs Erroneously Rely on American Medical Interest Groups That Are Biased Advocates, Not Neutral Experts.

The district court discounted the European experience because none of the European countries that have conducted systematic reviews responded by banning the procedures outright. 1-ER-53. But these countries do not allow gender transitioning interventions as a matter of general medical practice, which is what Plaintiffs here are seeking. Instead, they generally confine access to the procedures to formal research protocols. *See* 4-ER-728-36.

And regardless, if the treatments are experimental, what does it matter if England chooses to conduct the experiments? The Constitution does not require Idaho to offer its children as guinea pigs rather than waiting on results of the ongoing experiments. And considering whether there are less-restrictive alternatives to a ban is not "how intermediate scrutiny works under the Equal Protection Clause" in any case. *Eknes-Tucker*, 80 F.4th at 1235-36 (Brasher, J., concurring) (discussing *Boren*, 429 U.S. 190). The pertinent question is "whether the state has an interest in classifying based on sex"—*not* "whether, even if the state were allowed to classify based on sex, the state could achieve its objective with some lesser restriction." *Id.*

The district court's answer was that Idaho cannot await the results of the European experiments because "ever major medical organization in the United States" has not done so. 1-ER-24. Idaho is not bound by that geographic qualifier. While healthcare authorities in Europe have urged caution, American medical organizations advocate for unfettered access to transitioning treatments even as they admit more research is needed.[45]

In some ways, it is unsurprising that, until recent decisions by the Sixth and Eleventh Circuits, courts repeatedly deferred to these organizations. One would hope that medical societies like American Academy of Pediatrics (AAP), the Endocrine Society, and WPATH would be honest brokers, reviewing the evidence as Europe has done and responding accordingly. And one would hope that organizations like the American Medical Association—which has not published guidelines on this topic but supports the WPATH Standards of Care—would use their institutional goodwill, built up over time, to be the voice of reason and prioritize the safety of children.

Sadly, this has not happened. As with other institutions, American medical organizations have become increasingly "performative," treated by their leaders as platforms for advancing the current moment's cause célèbre.[46] Add to this a

---

[45] *E.g.*, Ghorayshi, *Medical Group Backs Youth Gender Treatments*, *supra*.
[46] *See generally* Yuval Levin, A TIME TO BUILD: FROM FAMILY AND COMMUNITY TO

replication crisis in scientific literature and the ability of researchers to use statistics to make findings appear significant,[47] and it is no wonder that medical organizations find it easier to just go with the zeitgeist. (Not to mention that the American interest groups that endorse gender-transition procedures are just that—interest groups, with a strong financial interest in the procedures their members make a living by providing.) Science is *hard*, and there is no reward in the current climate for any organization that questions the safety and efficacy of using sterilizing gender-transition procedures on children.

Take AAP, for instance, which has "decried" "as transphobic" a resolution by its members discussing "the growing international skepticism of pediatric gender transition" and calling for a literature review.[48] Then, when AAP finally acknowledged that there are no systematic reviews supporting the treatments it recommends, the group promised to conduct one—while also promising that it would continue recommending the treatments while awaiting evidence of their safety and efficacy.

---

CONGRESS AND THE CAMPUS, HOW RECOMMITTING TO OUR INSTITUTIONS CAN REVIVE THE AMERICAN DREAM (2020).

[47] *E.g.*, Andrew Gelman & Eric Loken, *The Statistical Crisis in Science*, 102 AMERICAN SCIENTIST 460, 460-65 (2014) (noting "statistical significance" can "be obtained even from pure noise" by various tricks of the trade).

[48] Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, WALL ST. J. (Apr. 17, 2022).

As Dr. Gordon Guyatt, the father of evidence-based medicine, put it, that "puts the cart before the horse."[49]

Similar concerns have been raised about the Endocrine Society,[50] whose guidelines for treating gender dysphoria the *British Medical Journal* recently exposed as having "serious problems" because—remarkably—the "systematic reviews" the guidelines were based on "didn't look at the effect of the interventions on gender dysphoria itself."[51] No matter: The Endocrine Society recommends the treatments anyway. One member of the guidelines authoring committee even bragged, when not testifying in court against the States, that the committee did not even have "some little data"—it "had none"—to justify the language in the guideline allowing doctors to prescribe cross-sex hormones to youth under 16.[52]

Then there is WPATH, which at least confesses to being "an advocacy organization[]." *Boe v. Marshall*, No. 2:22-cv-184-LCB (N.D. Ala.), ECF 208. Ample evidence shows just how true that is. Despite claiming that its Standards of Care 8 was "based on research, including systematic reviews of evidence conducted by a team of independent researchers at Johns Hopkins University," WPATH admits that

---

[49] Azeen Ghorayshi, *Medical Group Backs Youth Gender Treatments, but Calls for Research Review,* N.Y. TIMES (Aug. 3, 2023), https://perma.cc/N3BJ-TB9J.

[50] *E.g.*, Roy Eappen & Ian Kingsbury, *The Endocrine Society's Dangerous Transgender Politicization*, WALL ST. J. (June 28, 2023).

[51] Block, *Gender dysphoria in young people is rising*, *supra*.

[52] Joshua Safer, *State of the Art: Transgender Hormone Care*, YOUTUBE (Feb. 15, 2019), https://www.youtube.com/watch?v=m7Xg9gZS_hg.

its recommendations for adolescents were not based on such reviews due to the "number of studies" being "low."[53] This admission by itself removes the chapter from the realm of evidence-based medicine because it means—according to DR. Guyatt—that WPATH "violat[ed] standards of trustworthy guidelines."[54]

But WPATH didn't stop there. Despite Standards of Care 8 taking years to develop, as soon as it was published WPATH issued a "correction" removing most minimum-age requirements for gender-modification procedures.[55] Why? WPATH didn't say. But according to the lead author of the chapter on children, it was to "bridge th[e] considerations" regarding the need for insurance coverage with the desire to ensure that doctors would not be held liable for malpractice if they deviated from the standards.[56]

WPATH has also suppressed dissent, including canceling the presentation of a prominent researcher who dared to question the safety of transitioning young children and censuring a board member who went public with concerns that medical providers in America are transitioning minors without proper safeguards.[57] And just

---

[53] SOC 8, *supra*, at S8, S248, S45-46.

[54] Block, *Gender dysphoria in young people is rising*, *supra*, at 8.

[55] *See Correction*, 23 INT'L J. OF TRANSGENDER HEALTH S259 (2022), https://perma.cc/4342-KFEN. Remarkably, this correction has itself since been removed. See https://bit.ly/3qSqC9b.

[56] Videorecording of Dr. Tishelman's WPATH presentation, https://perma.cc/4M52-WG4X.

[57] Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. TIMES MAGAZINE (June 15, 2022), https://perma.cc/ZMT2-W6DX.

recently, WPATH's leaders were successful in having a major scientific publishing house retract a published paper that dared to examine the growing phenomenon of groups of adolescents suddenly "declar[ing] a transgender identity after extensive exposure to social media and peer influence."[58] Indeed, WPATH has tried to cancel nearly every researcher that has studied "Rapid Onset Gender Dysphoria," for the simple reason that, "[e]ven mentioning the possibility that trans identity is socially influenced or a phase threatens [its] claims that children can know early in life they have a permanent transgender identity and therefore that they should have broad access to permanent body-modifying and sterilizing procedures."[59] More examples abound. *E.g.*, Amicus Br. of Family Research Council at 7-27.

There is thus good reason for the Supreme Court's observation that medical interest groups' position statements do not "shed light on the meaning of the Constitution." *Dobbs*, 142 S. Ct. at 2267. The First and Fifth Circuits had it right when they found that "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019); *see Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014). While medical organizations are certainly capable of establishing true, evidence-based

---

[58] Leor Sapir & Colin Wright, *Medical Journal's False Consensus on "Gender-Affirming Care,"* WALL ST. J. (June 9, 2023); Colin Wright, *Anatomy of a Scientific Scandal*, CITY JOURNAL (June 12, 2023), https://perma.cc/22J3-C5JA.
[59] Sapir & Wright, *supra*.

standards of care, they have utterly failed to act responsibly when it comes to pediatric gender-transition procedures. As a group of respected gender clinicians and researchers from Finland, the UK, Sweden, Norway, Belgium, France, Switzerland, and South Africa recently opined, "medical societies" in the United States should "align their recommendations with the best available evidence—rather than exaggerating the benefits and minimizing the risks."[60] Until they do so, States like Idaho are forced to step in to protect children.

## CONCLUSION

The Court should vacate the district court's injunction.

Dated: February 13, 2024

Respectfully submitted,

Steve Marshall
  *Attorney General*
<u>s/ Edmund G. LaCour Jr.</u>
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
  *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov

Tim Griffin
  *Attorney General*
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni@ArkansasAG.gov
Dylan.Jacobs@ArkansasAG.gov

*Additional Counsel for Amici Curiae Listed on Next Page*

---

[60] Riitakerttu Kaltiala et al., *Youth Gender Transition Is Pushed Without Evidence*, WALL ST. J. (Jul. 14, 2023).

## ADDITIONAL COUNSEL

TREG TAYLOR
Attorney General
State of Alaska

ASHLEY MOODY
Attorney General
State of Florida

CHRIS CARR
Attorney General
State of Georgia

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS W. KOBACH
Attorney General
State of Kansas

RUSSELL COLEMAN
Attorney General
Commonwealth of Kentucky

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW WRIGLEY
Attorney General
State of North Dakota

GENTNER DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General & Reporter
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

SEAN REYES
Attorney General
State of Utah

JASON MIYARES
Attorney General
Commonwealth of Virginia

PATRICK MORRISEY
Attorney General
State of West Virginia

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-142

I am the attorney or self-represented party.

**This brief contains** | 6,941 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [                ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Edmund G. LaCour Jr. | **Date** | 02/13/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**          *Rev. 12/01/22*