No. 24-142

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

PAM POE, BY AND THROUGH HER PARENTS AND NEXT FRIENDS PENNY AND PETER
POE, ET AL.,

*PLAINTIFFS-APPELLEES,*

v.

RAÚL LABRADOR, in official capacity as Attorney General of the State of Idaho,
*Defendant-Appellant,*

and

JAN M. BENNETTS, in official capacity as Ada County Prosecuting Attorney, et
al.,

*Defendants.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:23-cv-00269-BLW

---

**BRIEF OF JAMES DOBSON FAMILY INSTITUTE AS *AMICUS
CURIEA* IN SUPPORT OF APPELLANT AND REVERSAL**

---

Andrew M. Nussbaum
NUSSBAUM | GLEASON PLLC
2 North Cascade Avenue, Suite 1430
Colorado Springs, Colorado 80903
(719) 428-1919
andrew@nussbaumgleason.com
*Attorney for Amicus Curiea James Dobson
Family Institute*

## DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1, the *amicus curiae* James Dobson Family Institute is a nonprofit corporation. It does not issue stock and is neither owned by nor is it the owner of any other corporate entity, in part or in whole. It has no parent companies, subsidiaries, affiliates, or members that have issued shares or debt securities to the public. It is operated by a volunteer board of directors.

Date: February 13, 2024.

NUSSBAUM GLEASON PLLC

*/s/ Andrew M. Nussbaum*
Andrew M. Nussbaum
*Attorney for James Dobson Family Institute*

i

## TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ............................................................... i

TABLE OF AUTHORITIES ................................................................ iii

INTEREST OF *AMICUS CURIEA* ......................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..........................1

ARGUMENT ...................................................................................4

    I.     Parents have a fundamental right to make decisions about their children's healthcare. ...........................................................4

    II.    Parents' fundamental rights include, at least, the right not to be excluded from healthcare decisions about their own children............12

    III.   Parental rights do *not* give parents special access to experimental medical or surgical interventions a state has reasonably restricted. ...20

CONCLUSION .................................................................................27

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Abigail All. For Better Access to Dev. Drugs v. von Eschenbach*, 495 F.3d 695 (D.C. Cir. 2007) ................................................................................22

*Alfonso v. Fernandez*, 195 A.D.2d 46, 606 N.Y.S.2d 259 (1993) ..............................15

*Arnold v. Bd. of Educ. of Escambia County*, 880 F.2d 305 (11th Cir. 1989)................14

*Beydoun v. Sessions*, 871 F.3d 459 (6th Cir. 2017).....................................................25

*Bonner v. Moran*, 126 F.2d 121 (D.C. Cir. 1941).......................................................14

*Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990) .......... 10, 21

*Deanda v. Becerra*, 2022 WL 17572093 (N.D. Tex. Dec. 8, 2022), *appeal pending*, No. 23-10159 (5th Cir.) ..............................................................................15

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ...................... passim

*Doe 1 v. Madison Metro. Sch. Dist.*, 976 N.W.2d 584 (Wis. 2022)...........................19

*Doe ex rel. Doe v. Pub. Health Tr. Of Dade Cnty.*, 696 F.2d 901 (11th Cir. 1983)......21

*Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003) .......................................11

*Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023)................2, 12

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421 (6th Cir. 2019) .......24

*Gibson v. Collier*, 920 F.3d 212 (5th Cir. 2019)........................................................24

*Gonzales v. Carhart*, 550 U.S. 124 (2007) ...............................................................21

*Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000) ......................................................3, 13

*Heller v. Doe*, 509 U.S. 312 (1993) ...........................................................................26

*Hodgson v. Minnesota*, 497 U.S. 417 (1990) ...............................................................6

*Kanuszewski v. Michigan Department of Health & Human Services, 927 F.3d 396 (6th Cir. 2019)* ...........................................................................................11

*L. W. by & through Williams v. Skrmetti*, 73 F.4th 408 (6th Cir. 2023)..... 1, 2, 12, 23

*Lehnert v. Ferris Faculty Ass'n*,  U.S. 507 (1991).....................................................25

*Mann v. Cnty. of San Diego*, 907 F.3d 1154 (9th Cir. 2018) ............................... 11, 20

*Meyer v. Nebraska*, 262 U.S. 390 (1923) .....................................................7, 9

*Morrissey v. United States*, 871 F.3d 1260 (11th Cir. 2017) ......................................22

*N.Y. Trust Co. v. Eisner*, 256 U.S. 345 (1921)............................................................6

*Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020) ................................. 24, 26

*Parham v. J.R.*, 442 U.S. 584 (1979) ................................................................ passim

*Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) ............................................9

*Poe v. Labrador*, 2023 WL 8935065 (D. Idaho Dec. 26, 2023) ........................ passim

*Raich v. Gonzales*, 500 F.3d 850 (9th Cir. 2007) ........................................2, 22

*Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, No. 5:22-CV-4015, 2022 WL 1471372 (D. Kan. May 9, 2022).........................................................................................19

*Roe v. Wade*, 410 U.S. 113 (1973)......................................................... 23, 24

*Rutherford v. United States*, 616 F.2d 455 (10th Cir. 1980) .............................. 22, 27

*Tatel v. Mt. Lebanon Sch. Dist.*, No. 22-CV-837, 2022 WL 15523185 (W.D. Pa. Oct. 27, 2022) ....................................................................................................19

*Timbs v. Indiana*, 139 S. Ct. 682 (2019) ........................................................9

*Troxel v. Granville*, 530 U.S. 57 (2000) ...................................................... 4, 9, 12

*United States v. Rutherford*, 442 U.S. 544 (1979) ....................................................25

*Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000) ...............................................4, 23

*Washington v. Glucksberg*, 521 U.S. 702 (1997)................................................ passim

*Whalen v. Roe*, 429 U.S. 589 (1977)............................................................21

*Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, No. 23-CV-069-SWS, 2023 WL 4297186 (D. Wyo. June 30, 2023). ..........................................................18

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ...................................................... 4, 5, 11

## Other Authorities

Brief of *Amicus Curiae* American Hospital Association, *Washington v. Glucksberg*, 521 U.S. 702 (1997) (No. 96-110), 1996 WL 656278 ....................................26

Daniel J. Hulsebosch, *An Empire of Law: Chancellor Kent & the Revolution in Books in the Early Republic*, 60 Alabama Law Review 377 (2009) .............................8

Eric A. DeGroff, *Parental Rights & Public School Curricula: Revisiting Mozert after 20 Years*, 38 Journal of Law & Education 83 (2009) ............................................6

James Kent, *Commentaries on American Law* (10th ed. 1860) ...............................8, 9

Martin Guggenheim, *The (Not So) New Law of the Child*, 127 Yale Law Journal Forum 942 (2018) .........................................................................................5

Melissa Moschella, *Defending the Fundamental Rights of Parents: A Response to Recent Attacks*, 37 Notre Dame Journal of Law, Ethics & Public Policy 397 (2023) ......................................................................................................................5

Richard W. Garnett, *Taking* Pierce *Seriously: The Family, Religious Education, and Harm to Children*, 76 Notre Dame Law Review 109 (2000) ..........................5

William Blackstone, *Commentaries* (10th ed. 1787) ..............................................7, 8

## INTEREST OF *AMICUS CURIEA*[1]

The Dr. James Dobson Family Institute is a nonprofit corporation that uplifts and defends the biblical and traditional framework of the family, which includes parental rights and the freedom to exercise one's religious beliefs. Inherent within these convictions are the freedom of speech and the right for parents to have the principal input and influence over their child's upbringing. These fundamental rights have been preserved for centuries and must be maintained for the institution of the family to remain intact and flourish.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiffs ask this Court to hold that the Fourteenth Amendment "delegate[s] to parents and a doctor exclusive authority to decide whether to permit a potentially irreversible new drug treatment" on a child. *L. W. by & through Williams v. Skrmetti*, 73 F.4th 408, 417 (6th Cir. 2023). No court has understood parental rights that way. At least, no court *had* until a series of recent district court decisions considering laws like Idaho's. But neither the district court below nor any of the other district courts that have announced this new due-process right have shown how it is,

---

[1] No counsel for a party authored this brief in whole or in part; no one, other than *amicus* and its counsel, made a monetary contribution for its preparation or submission; and all parties have consented to its filing.

1

"objectively, deeply rooted in this Nation's history and tradition." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2247 (2022) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)). If those courts had applied the Supreme Court's history-and-tradition test, as the Eleventh and Sixth circuits did when considering similar laws, *see Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1220 (11th Cir. 2023); *L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 476 (6th Cir. 2023), they could not have acceded to the putative right for which Plaintiffs here and others like them advocate.

There is no "deeply rooted" parental right to veto a State's determination that a medical or surgical intervention is not safe for children. To be clear, the Constitution does protect parents' fundamental right to make medical decisions for their children. *Parham v. J.R.*, 442 U.S. 584, 603–04 (1979). But that doesn't settle the matter. Though that framing invokes "fundamental rights that have been recognized at least in part by the Supreme Court," the "centerpiece" of Plaintiffs' claimed right is "[c]onspicuously missing." *Raich v. Gonzales*, 500 F.3d 850, 864 (9th Cir. 2007).

Like Ms. Raich, Plaintiffs deemphasize the key aspect of the right they seek. She sought not just to exercise her right "to preserve bodily integrity, avoid pain, and preserve her life" but "the right to use *marijuana*" to do those things. *Id.* Plaintiffs

2

and the district court here similarly omit the "centerpiece" of the right they assert: to access *otherwise unlawful medical procedures* on behalf of their children. If this Court "engage[s] in a careful analysis of the history of th[at] right," *Dobbs*, 142 S. Ct. at 2246, it will conclude such a right is neither "deeply rooted in this Nation's history and tradition," nor "implicit in the concept of ordered liberty," *id.* at 2242 (quoting *Glucksberg*, 521 U.S. at 721).

But rejection of Plaintiffs' putative right ought not lead the Court to reject well-settled parental rights wholesale. Our history and tradition confirm that parents have a right—indeed, "a 'high duty'"—to make medical decisions on behalf of their children. *Parham*, 442 U.S. at 602. And that right places real constraints on States. They may not, for example, step into parents' shoes to make individualized decisions about what is best for a particular child, or "transfer the power to make [a] decision from the parents to some agency or officer of the state." *Id.* at 603. Nor may they "withhold information" from parents about children's health or wellbeing. *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000).

That said, parents' right to make healthcare decisions does not supersede States' power to regulate experimental and dangerous drugs or medical treatments. *Parham*, 442 U.S. at 602. Parental rights concern *substituted judgment*, not *expanded access*; it is about who decides on behalf of a child what is best from the menu of

3

available options. Because the district courts here misunderstood this right, their preliminary injunctions should be reversed.

## ARGUMENT

### I. Parents have a fundamental right to make decisions about their children's healthcare.

Parents have a right "to direct the education and upbringing of [their] children" that is "objectively, deeply rooted in this Nation's history and tradition." *Glucks-berg*, 521 U.S. at 720–21 (cleaned up). That much is established "beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). And this right includes "the right of parents to make important medical decisions for their children." *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000). Plaintiffs and the district court start from these correct premises. But they misapply these premises, because they fail to "engage[] in a careful analysis of the history of the right at issue." *Dobbs*, 142 S. Ct. at 2246; *see, e.g.*, *Poe v. Labrador*, 2023 WL 8935065, at *15-17 (D. Idaho Dec. 26, 2023) (citing no historical analogue).

The Supreme Court has repeatedly framed parental rights in terms of the "decisional framework"—that is, who makes decisions on behalf of children. *Troxel v. Granville*, 530 U.S. 57, 69 (2000) (plurality op.); *see id.* at 72–73 (recognizing "the fundamental right of parents to make child rearing decisions"). And the Court has long recognized that parents have the primary, and ultimate, decision-making au-

4

thority with respect to their own children. *E.g.*, *Yoder*, 406 U.S. at 232 (emphasizing the "primary role of the parents"); *Parham*, 442 U.S. at 602 ("Our jurisprudence historically has reflected … broad parental authority over minor children.").

In other words, "[p]arental rights are essentially a recognition of parents' authority to make decisions on behalf of or affecting their children, even when others (including state authorities) may disagree with those decisions." Melissa Moschella, *Defending the Fundamental Rights of Parents: A Response to Recent Attacks*, 37 Notre Dame J.L. Ethics & Pub. Pol'y 397, 402 (2023). Parental rights are about who has the "ultimate decision-making authority." Martin Guggenheim, *The (Not So) New Law of the Child*, 127 Yale L.J. Forum 942, 947 (2018); *see* Richard W. Garnett, *Taking* Pierce *Seriously: The Family, Religious Education, and Harm to Children*, 76 Notre Dame L. Rev. 109, 133 (2000) (asking whether a child would be better served if "contested matters" about her life "are determined by the State, rather than by her family").

Parental decision-making authority rests on two presumptions: "that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions," and that "natural bonds of affection lead parents to act in the best interests of their children." *Parham*, 442 U.S. at 602; *Yoder*, 406 U.S. at 232; *see* Eric A. DeGroff, *Parental Rights & Public School Curricu-*

5

*la: Revisiting Mozert after 20 Years*, 38 J.L. & Educ. 83, 108 (2009) (recounting how, at common law, parents had "both the responsibility and the authority to … make important decisions on their behalf"); *Hodgson v. Minnesota*, 497 U.S. 417, 483 (1990) (Kennedy, J., concurring and dissenting) ("The common law historically has given recognition to the right of parents, not merely to be notified of their children's actions, but to speak and act on their behalf.").

This "broad parental authority over minor children" includes healthcare decision-making. *Parham*, 442 U.S. at 602. Parents have a "high duty"—and correlative right—"to recognize symptoms of illness" in their children, "and to seek and follow medical advice." *Id.* Because "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning . . . their need for medical care," parents "can and must make those judgments." *Id.* at 603. Thus, parents ultimately decide whether to grant or withhold informed consent to healthcare procedures on behalf of their children and choose for their children which of the legally permissible medical options to pursue.

"Historical inquiries . . . are essential" to understanding the scope of parental rights. *Dobbs*, 142 S. Ct. at 2247; *cf. N.Y. Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921) (Holmes, J.) ("Upon this point a page of history is worth a volume of logic."). Common-law sources, in particular, are key. *See Meyer v. Nebraska*, 262 U.S.

6

390, 399 (1923) (understanding "liberty" in the Due Process Clause as "the right of the individual . . . generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men").

In the United States, few common-law sources are as influential as William Blackstone and James Kent. Those sources show that Plaintiffs and the district court have misunderstood the scope of parents' fundamental rights. While parents undeniably have a right to select among available healthcare options—or none of them—they do not have a right to supersede the States' reasonable choices about which drugs or medical procedures are safe enough to be available for minors.

Blackstone wrote primarily of the *duties* parents owe their children, rather than the *rights* parents hold against the state. *See* 1 William Blackstone, *Commentaries* *447–448, 450, 452 (10th ed. 1787).[2] The law grants a parent the right to make decisions for a child, "partly to enable the parent more effectually to perform his duty." *Id.* at *452; *see id.* ("The power of parents over their children is derived from the former consideration, their duty . . . ."). So, for example, at common law minors needed parental consent to marry, to protect them from "the snares of artful and designing persons." *Id.* In other words, because the government expects parents to

---

[2] https://hdl.handle.net/2027/mdp.35112203968112

protect their children, it allows parents to make decisions for their children, especially with respect to significant decisions like marriage or healthcare.

Chancellor Kent—the "American Blackstone"—further expounded the rationale for the duties parents owe to their children. *See* Daniel J. Hulsebosch, *An Empire of Law: Chancellor Kent & the Revolution in Books in the Early Republic*, 60 Ala. L. Rev. 377, 380 (2009) (introducing Kent). Children need protection, and a child's parents are "the most fit and proper" decisionmakers to advance that purpose. *See* 2 James Kent, *Commentaries on American Law* *189 (10th ed. 1860)[3] ("The wants and weaknesses of children render it necessary that some person maintains them … ."). By imposing on parents a duty to "maintain" their children, "our municipal law" simply reflects the duty "prescribed … by those feelings of parental love and filial reverence which Providence has implanted in the human breast." *Id.*; *see* 1 William Blackstone, *Commentaries* *447 (describing the "insuperable degree of affection" that "providence" has "implant[ed] in the breast of every parent" to "enforce" the duty to maintain one's children).

Recognizing parents' legal and natural duties, our Nation's history and traditions have granted them correlative rights. *See* 2 James Kent, *Commentaries on*

---

[3] https://hdl.handle.net/2027/mdp.35112104656196

*American Law* *203 ("As they are bound to maintain and educate their children, the law has given them a right to such authority … ."). Ancient societies that did not grant parents such rights were built "upon the principle, totally inadmissible in the modern civilized world, of the absorption of the individual in the body politic, and of his entire subjection to the despotism of the state." *Id.* at *195; *see Meyer*, 262 U.S. at 402 (referring to ancient ideas about "the relation between individual and state" as "wholly different from those upon which our institutions rest"); *cf. Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925) ("The child is not the mere creature of the state"). Such "statist notion[s]" are "repugnant to American tradition." *Parham*, 442 U.S. at 603.

Our institutions presuppose—indeed, our *entire society* presupposes—that parents and not the state will act on behalf of children. *See Troxel*, 530 U.S. at 66 (plurality op.) (tracing the Court's "extensive precedent" on this point). Perhaps no right, therefore, is more "essential to our Nation's 'scheme of ordered liberty'" than parents' right to make decisions for their children. *Dobbs*, 142 S. Ct. at 2246 (quoting *Timbs v. Indiana*, 139 S. Ct. 682, 686 (2019)).

Understanding what this means for parents' right to make healthcare decisions requires understanding adults' own healthcare decision-making rights. "At common law, even the touching of one person by another without consent and without

9

legal justification was a battery." *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 269 (1990). As a result, "informed consent is generally required for medical treatment." *Id.* "The logical corollary of the doctrine of informed consent is that the patient generally possesses the right not to consent, that is, to refuse treatment." *Id.* at 270. This right to refuse treatment may have its limits. *See id.* at 299–301 (Scalia, J., concurring) (arguing that the Due Process Clause does not guarantee a right to refuse lifesaving treatment). But as a general rule, the law affords adults the right to choose whether they will undergo a legally available healthcare procedure.

"[C]arefully refined by [this] concrete example[]," *Glucksberg*, 521 U.S. at 722, parents' healthcare decision-making right takes clearer shape. Parents generally have the right to make decisions for their minor children that children would make for themselves if they were adults. And "[n]either state officials nor federal courts are equipped to review such parental decisions." *Parham*, 442 U.S. at 603–04. Among those decisions adults can make is whether to consent to healthcare procedures or to refuse. *Cruzan*, 497 U.S. at 269–70.

Parents thus have a right to consent to—or to refuse consent for—healthcare procedures on behalf of their children, whether "a tonsillectomy, appendectomy, or other medical procedure." *Parham*, 442 U.S. at 603. This Court has previously

10

reached a similar conclusion, reversing a summary judgment against two parents' healthcare decision-making claim based on a county's failure to obtain their consent. *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1164, 1167 (9th Cir. 2018). The county had performed an invasive "gynecological and rectal exam" on the children, *id.* at 1158, despite having no need to collect evidence related to this exam, *see id.* at 1163. Performing such an exam "without notifying the parents about the examinations and without obtaining either the parents' consent or judicial authorization" violated the parents' rights. *Id.* at 1161. On facts similar to *Mann*, the Tenth Circuit reached a similar result. *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203 (10th Cir. 2003) ("It is not implausible to think that the rights invoked here—the right to refuse a medical exam and the parent's right to control the upbringing, including the medical care, of a child—fall within this sphere of protected liberty.").

Of course, parents' decision-making authority has its limits. As the Sixth Circuit acknowledged in *Kanuszewski v. Michigan Department of Health & Human Services*, holding that state action "constitute[s] a denial of the parents' fundamental right to direct the medical care of their children" is only the first step. 927 F.3d 396, 420 (6th Cir. 2019). Such action still passes constitutional muster if it "survive[s] strict scrutiny." *Id.*; *see Yoder*, 406 U.S. at 234 (limiting parental rights "if it appears that parental decisions will jeopardize the health or safety of the child, or have a poten-

11

tial for significant social burdens"). But our Nation's longstanding "presumption" remains "that fit parents act in the best interests of their children," in healthcare decision-making and elsewhere. *Troxel*, 530 U.S. at 68 (plurality op.). "[S]o long as a parent adequately cares for his or her children (*i.e.,* is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68–69.

## II. Parents' fundamental rights include, at least, the right not to be excluded from healthcare decisions about their own children.

For the reasons explained briefly above, and in more detail below, *see infra* Part III, this Court should join the Sixth and Eleventh circuits in their correct holdings that parental rights do not include the right "to receive new medical or experimental drug treatments." *Skrmetti*, 73 F.4th at 417; *see also Eknes-Tucker*, 80 F.4th at 1221. The Sixth Circuit also correctly explained that parental rights "must be defined with care." *Skrmetti*, 73 F.4th at 417. But this cuts in both directions—the Court must also be careful in what it says about what parental rights *do not* cover, especially given the ongoing assault on parental rights in school districts across the country.

Because parental rights are ultimately about *who* makes decisions on behalf of children, government actors violate those rights when they directly override a pa-

12

rental decision, make a decision on behalf of a particular child that is for parents to decide, or attempt to "transfer the power to make [a] decision from the parents to some agency or officer of the state." *Parham*, 442 U.S. at 603.

Some examples illustrate how government actors can violate parental rights. In *Gruenke*, a high school swim coach, suspecting that a swimmer was pregnant, discussed the matter with others and then pressured her to take a pregnancy test, rather than notifying her parents. 225 F.3d at 295–97, 306. The mother sued, arguing that the coach's "failure to notify her" "obstruct[ed] [her] parental right to choose the proper method of resolution." *Id*. at 306. Had she been notified, she explained, she would have "quietly withdrawn [her daughter] from school" and sent her to live with her sister until the baby was born. *Id*.

While the court found that the defendants were entitled to qualified immunity, it also held that the mother had "sufficiently alleged a constitutional violation," due to the coach's "arrogation of the parental role": "Public schools must not forget that 'in loco parentis' does not mean 'displace parents.'" *Id*. at 306–07. In other words, the coach had "usurp[ed]" the mother's decision-making authority over a particular decision involving her child—how to handle the pregnancy. *Id*. The defendants violated the mother's parental rights by cutting her out of a healthcare decision about her child.

13

Similarly, in *Arnold v. Bd. of Educ. of Escambia County*, 880 F.2d 305 (11th Cir. 1989), the court found a parental-rights violation where school staff allegedly coerced a minor student to obtain an abortion and to hide this from her parents. *Id.* at 308–09. This "unduly interfere[d] with parental authority in the household and with the parental responsibility to direct the rearing of their child." *Id.* at 313. Hiding the decision from parents also "deprive[d] [them] of the opportunity to counter influences on the child [they] find inimical to their religious beliefs or the values they wish instilled in their children." *Id.* Again, this violated parental rights because government actors directly made a significant health-related decision for a particular child, the kind of decision that parents "can and must make." *Parham*, 442 U.S. at 603.

As explained above, parental decision-making authority also includes the right to say "no" to a child's requests, or, in the context of healthcare, to withhold consent. "The fact that a child may balk … does not diminish the parents' authority to decide what is best for the child." *Id.* at 604. Thus, government officials can violate parental rights by circumventing parents' gatekeeping role, preventing them from withholding consent to health services they believe will harm their children. *E.g.*, *Bonner v. Moran*, 126 F.2d 121, 122 (D.C. Cir. 1941) (listing cases and noting "the

14

general rule … that the consent of the parent is necessary for an operation on a child").

*Alfonso v. Fernandez*, 195 A.D.2d 46, 606 N.Y.S.2d 259 (1993), illustrates the point. The court there held that a school district's condom-distribution program violated parental rights, because it did not require prior parental consent or provide any opportunity for parents to opt out. *Id*. at 56–60. Since parents "must send their children to school" and many cannot afford private school, the policy effectively eliminated parental authority over whether their children should have access to contraceptives. *Id*. at 56. The district had "made a judgment that minors should have unrestricted access to contraceptives, a decision which is clearly within the purview of the petitioners' constitutionally protected right to rear their children, and then has forced that judgment on [parents]." *Id*. at 57–58. Along similar lines, the Northern District of Texas last year concluded that the federal government's program allowing minors to access contraceptives without parental consent violates parents' fundamental rights. *See Deanda v. Becerra,* 2022 WL 17572093, at *17 (N.D. Tex. Dec. 8, 2022), *appeal pending*, No. 23-10159 (5th Cir.).

Perhaps the most significant intrusion on parental rights today involves school district policies that facilitate secret gender-identity transitions at school (name, pronouns, and bathroom use) without notice to or consent from the parents, and

15

often over their objection.[4] One group has documented such shocking policies in over 1,000 school districts, covering almost 18,000 schools nationwide.[5]

A case out of the Kettle Moraine School District in Wisconsin illustrates how schools are directly overriding parents' decisions about what is best for their own children. According to the complaint, a 12-year-old girl had a mental health crisis during COVID, and, as part of that, questioned her gender and wanted to use a male name and pronouns at school.[6] Both school officials and a mental-health professional immediately began to facilitate her efforts to live as a boy, but her parents decided transitioning was not in her best interest, at least until she further processed what she was feeling.[7] The parents told the school that they wanted staff to address their daughter using her legal name and female pronouns. But the school refused. It responded that it would instead address her as if she were a boy while at

---

[4] *See generally* Josh Christenson, *Nearly 6,000 U.S. public schools hide child's gender status from parents*, New York Post (March 8, 2023), https://nypost.com/2023/03/08/us-public-schools-conceal-childs-gender-status-from-parents/.

[5] Parents Defending Education, *List of School District Transgender-Gender Nonconforming Student Policies*, https://defendinged.org/investigations/list-of-school-district-transgender-gender-nonconforming-student-policies/ (last updated July 20, 2023).

[6] Complaint, ¶¶ 27, 31, *T.F., et al. v. Kettle Moraine School District*, No. 21-CV-1650 (Waukesha Cnty. Wis., Cir. Ct., filed Nov. 17, 2021), *available at* https://will-law.org/wp-content/uploads/2021/11/Kettle-Moraine-Complaint-Redacted.pdf.

[7] *Id.* ¶¶ 32, 33.

16

school.[8] The parents were forced to immediately withdraw her from school to protect her and preserve their parental role.[9] A few weeks after being removed from Kettle Moraine public schools, the girl realized her parents were right, and told her mother that "affirmative care really messed me up."[10]

In multiple other cases, parents only discovered a secret transition at school well after it occurred. In *Konen v. Caldeira*, for example, the complaint alleges that school staff pressured an 11-year-old girl to socially transition to a male identity at school in secret from her parents, which they did not discover for almost a year.[11] In *Perez v. Clay County School Board*, according to the complaint, a school counselor met weekly—in secret—with a 12-year-old girl, encouraged her to adopt a transgender identity, and referred to her using a male name and pronouns. The parents learned about this three months later when she attempted suicide at school, which she said was related to the counselor treating her as a boy.[12] And *Lavigne v. Great Salt Bay Community School Board* alleges that school staff secretly treated a

---

[8] *Id.* ¶¶ 34–35.

[9] *Id.* ¶¶ 36–38.

[10] *Id.* ¶¶ 39–40.

[11] Complaint, Dkt. 1-1 ¶¶ 27–54, *Konen v. Caldeira*, No. 5:22-CV-5195 (N.D. Cal. removed to federal court on Sept. 12, 2022).

[12] Second Amended Complaint, Dkt. 43 ¶¶ 17–63, *Perez v. Clay County Sch. Bd.*, No. 3:22-CV-83 (M.D. Fla., filed Jan. 24, 2022).

13-year-old girl as if she were a boy while she was at school, which the parents only discovered after a staff member had given their daughter a chest binder.[13]

Litigation over these policies is in its early stages. But courts are beginning to recognize that such policies violate parental rights by overriding or circumventing parents' decision-making authority with respect to whether a social transition is in their child's best interests. In *Kettle Moraine*, the trial court denied a motion to dismiss, holding that the allegations "demonstrate[] a potential violation of their rights as parents to direct the upbringing of their child."[14] And one court recently granted a partial injunction against a school district's policy of hiding a child's transition from parents. *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, No. 23-CV-069-SWS, 2023 WL 4297186, at *13–15 (D. Wyo. June 30, 2023). Insofar as that policy required staff to "refuse to disclose" or to "provide materially misleading or false information" in response to parental requests about names and pronouns used to address their children at school, it likely violated parents' fundamental rights. *Id.* at *15.

---

[13] Complaint, Dkt. 1 ¶¶ 5, 15–37, *v. Great Salt Bay Comty. Sch. Bd.*, No. 2:23-CV-158 (D. Me., filed Apr. 4, 2023 *Lavigne*).
[14] Decision and Order, Dkt. 57 at 4, *T.F. v. Kettle Moraine Sch. Dist.*, No. 21-CV-1650 (Waukesha Cnty. Cir. Ct., June 1, 2022), https://will-law.org/wp-content/uploads/2022/06/KM-2022-06-01-Decision-and-Order.pdf.

Considering a similar policy, three Justices of the Wisconsin Supreme Court wrote that "allowing a school to reassign a child's gender" "without parental consent" violates parents' constitutional rights because putting a school district "in charge of [this decision]" deprives parents of their constitutionally protected "decision-making [authority] for their children." *Doe 1 v. Madison Metro. Sch. Dist.*, 976 N.W.2d 584, 606–10 (Wis. 2022) (Roggensack, J., dissenting).[15]

Other courts have ruled against school districts that have taken similar actions to cut parents out of decisions about their children. One court granted a teacher's request to enjoin a secret-transition policy in part because parents' right to "raise their children as they see fit" necessarily "includes the right of a parent to have an opinion and to have a say in what a minor child is called and by what pronouns they are referred." *Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, No. 5:22-CV-4015, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022). Another denied a motion to dismiss a parental-rights claim against a teacher who taught first-grade students "how to determine one's gender identity" and "encouraged the[] children 'not to tell their parents about her instruction.'" *Tatel v. Mt. Lebanon Sch. Dist.*, No. 22-CV-837, 2022 WL 15523185, at *3, 17 (W.D. Pa. Oct. 27, 2022).

---

[15] Although this was a dissent, the four Justices in the majority did not comment one way or the other on the merits, but instead remanded to the trial court solely for procedural reasons. *Madison Metro. Sch. Dist.*, 976 N.W.2d at 595–99.

19

In all of those examples, government actors stepped into the role reserved for parents and made a decision about what is best for a particular child in a particular situation, directly displacing her parents, sometimes even without their knowledge. That is the crux of parents' healthcare decision-making right: while the state can regulate what kinds of medical treatments are generally available, it cannot act as the parents and make a decision for a particular child in a given situation about which treatment to choose from the menu of legal and available treatment options.

## III.    Parental rights do *not* give parents special access to experimental medical or surgical interventions a state has reasonably restricted.

Plaintiffs and the district court here would grant to parents a much different right, one with no grounding in our Nation's history and tradition. They claim parents have a "right to choose a particular medical treatment, in consultation with their healthcare provider, that is generally available and accepted in the medical community," *Poe*, 2023 WL 8935065, at *15, notwithstanding a State's determination that a particular intervention is experimental or unsafe. But there is no right to "obtain" a medical or surgical intervention that a State has reasonably prohibited, whether for oneself or for one's children.

As already discussed, parents' healthcare decision-making right arises from the right to give informed consent to a procedure. *See Mann*, 907 F.3d at 1161 (holding that, absent court order, government violates this right by not "notifying" parents

20

or "obtaining … the parents' consent" to procedure); *cf. Cruzan*, 497 U.S. at 269–70 (discussing common-law roots of informed consent). Because children can't give informed consent on their own, parents have a right to do so on their behalf. *See Parham*, 442 U.S. at 604. This right of parents to exercise their own judgment on behalf of their children is about *who decides* whether a child undergoes an available procedure. It implies nothing about *which procedures* a State must make available to that child. *Cf. Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) ("Under our precedents it is clear the State has a significant role to play in regulating the medical profession.").

When making healthcare decisions for their children, parents exercise an individual right that their children lack capacity to exercise. This parental right is, at its core, "derivative from, and therefore no stronger than," a child's own right to consent to an available procedure. *Whalen v. Roe*, 429 U.S. 589, 604 (1977). Conversely, a parent's "rights to make decisions for his daughter can be no greater than his rights to make medical decisions for himself." *Doe ex rel. Doe v. Pub. Health Tr. Of Dade Cnty.*, 696 F.2d 901, 903 (11th Cir. 1983). The parent-child relationship does not increase the medical options available to either parent or child; it only empowers the parent to choose from the *available* options on the child's behalf. So the question remains: What options are available? Does a child—and thus her parents,

21

acting on her behalf—have a right to access the medical and surgical interventions at issue here?

Many courts of appeals have addressed questions about which procedures the Constitution requires a State to make available. And "[n]o circuit court has acceded to an affirmative access claim"—*i.e.*, a claim "that the Constitution provides an affirmative right of access to particular medical treatments reasonably prohibited by the Government." *Abigail All. For Better Access to Dev. Drugs v. von Eschenbach*, 495 F.3d 695, 710 & n.18 (D.C. Cir. 2007) (en banc). To the contrary, the courts of appeals have consistently rejected such claims—even by terminally ill patients. *E.g.*, *Morrissey v. United States*, 871 F.3d 1260, 1269 (11th Cir. 2017); *Raich*, 500 F.3d at 864; *Rutherford v. United States*, 616 F.2d 455, 456 (10th Cir. 1980) ("*Rutherford II*"); *see also Eschenbach*, 495 F.3d at 710 n.18 (collecting cases). If "there is no fundamental right 'deeply rooted in this Nation's history and tradition' of access to experimental drugs for the terminally ill," *Eschenbach*, 495 F.3d at 697 (quoting *Glucksberg*, 521 U.S. at 720–21), then surely parental rights do not provide a special key unlocking access to the novel medical and surgical interventions restricted by Idaho.

This longstanding, unified body of precedent rejecting an affirmative right to obtain a particular medical or surgical intervention leaves no room for Plaintiffs'

putative parental right. Yet the district court did not address those decisions. *See Poe*, 2023 WL 8935065, at *15. It instead focused almost exclusively on *Parham v. J. R.* and *Wallis*. But in *Parham*, the Supreme Court merely held that a state must provide parents "some kind of inquiry" before committing children to a psychiatric hospital. 442 U.S. at 606. And in *Wallis*, this Court merely held parents must consent before the performance of "highly intrusive . . . examinations" may be performed on their children. 202 F.3d at 1131.

Overlooking the actual holdings of these cases, the district court framed the right broadly, so that it "easily" would cover Plaintiffs' novel claim here. *Poe*, 2023 WL 8935065, at *17. But that approach flouts the Supreme Court's caution that "concrete examples" from this Nation's history and tradition must guide any fundamental-rights analysis. *Glucksberg*, 521 U.S. at 722. And *Amicus* has already explained that the district court's conclusion is inconsistent with a historical understanding of parental rights.

The district court's reliance the opinions of "major medical organizations" is beside the point. Courts have refused to outsource constitutional standards to a "majority of experts." *Skrmetti*, 73 F.4th at 418. For example, the *Dobbs* Court criticized *Roe v. Wade*, 410 U.S. 113 (1973), for relying on "the 'position of the American Medical Association'" and other groups without "explain[ing] why these

23

sources shed light on the meaning of the Constitution." 142 S. Ct. at 2267 (quoting *Roe*, 410 U.S. at 141). The constitutionality of Idaho's law "is based on the relevant legal standard as interpreted by the Supreme Court … and not necessarily whether the law is consistent with medical-profession custom or views of certain medical groups." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 439 (6th Cir. 2019).

Indeed, on related subject matters, other courts have refused to follow the opinions of some of the same organizations relied on by the district courts here. *E.g.*, *Otto v. City of Boca Raton*, 981 F.3d 854, 868–69 (11th Cir. 2020) (explaining that court's reasons for discrediting the views of the American Psychological Association); *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019) ("As the First Circuit has concluded, however, the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate over sex reassignment surgery.") (referring to *Kosilek v. Spencer*, 774 F.3d 63, 76–77 (1st Cir. 2014) (en banc)). The "institutional positions" of groups like these "cannot define the boundaries of constitutional rights." *Otto*, 981 F.3d at 869.

In any event, the district court's reassurance that Plaintiffs here seek procedures "that [are] generally available and accepted in the medical community," *Poe*, 2023 WL 8935065, at *15, places no real limitation on Plaintiffs' putative right. The

24

"reasoning" behind Plaintiffs' claim "cannot be so readily confined." *United States v. Rutherford*, 442 U.S. 544, 557 (1979) ("*Rutherford I*").

At bottom, Plaintiffs claim—and the district court announced—a judicially enforceable right to obtain a healthcare intervention for their children as long as it is "accepted." And by "accepted," they apparently mean that some undefined subset of medical professionals supports the intervention in question. "To accept th[at] proposition … is to deny" the States' (and, for that matter, the United States') "authority over all drugs" and other medical or surgical procedures. *Rutherford I*, 442 U.S. at 557; *cf. Beydoun v. Sessions*, 871 F.3d 459, 466–67 (6th Cir. 2017) (applying Fourteenth Amendment fundamental rights jurisprudence to Fifth Amendment claim against federal government).

The Due Process Clause does not equip the federal judiciary to reliably determine when medical and surgical interventions are sufficiently "established" to receive constitutional protection. Such a standard "'seems calculated to perpetuate give-it-a-try litigation' before judges assigned an unwieldy and inappropriate task" under that Clause. *Dobbs*, 142 S. Ct. at 2275 (quoting *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 551 (1991) (Scalia, J., concurring in judgment in part and dissenting in part)). To borrow a phrase coauthored by Justice Gorsuch early in his career to describe the central flaw of the right claimed in *Glucksberg*: "Torn from its moor-

25

ings in history, the right championed by [Plaintiffs] is a free-floating derelict that can only wreak havoc on our constitutional structure." Br. of *Amicus Curiae* Am. Hosp. Ass'n, *Washington v. Glucksberg*, 521 U.S. 702 (1997) (No. 96-110), 1996 WL 656278, at *7.

To be sure, the government can't dodge judicial review simply by applying the "medical procedure" label to an activity it wishes to regulate. For example, Boca Raton, Florida, violated the First Amendment by outlawing talk therapy aimed at "changing a minor's sexual orientation, reducing a minor's sexual or romantic attractions … , or changing a minor's gender identity." *Otto*, 981 F.3d at 859. Because the outlawed therapy "consists—entirely—of words," Boca Raton could not avoid strict scrutiny by labeling that therapy as "a 'medical procedure.'" *Id.* at 865. Here, by contrast, there is no question that Idaho has regulated only medical and surgical procedures. *Poe*, 2023 WL 8935065, at *2.

Because there is no fundamental right to access experimental procedures on behalf of one's children, the Idaho law before the Court, "like other health and welfare laws, [are] entitled to a 'strong presumption of validity.'" *Dobbs*, 142 S. Ct. at 2284 (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)). They "must be sustained if there is a rational basis on which the legislature could have thought that [they] would serve legitimate state interests." *Id.* These laws are supported by the same

26

sorts of state interests that supported Washington's ban on assisted suicide in *Glucksberg*, or Mississippi's Gestational Age Act in *Dobbs*: safeguarding the integrity of the medical profession, protecting the vulnerable, and reducing the frequency of dangerous procedures, to name a few. *See Dobbs*, 142 S. Ct. at 2284; *Glucksberg*, 521 U.S. at 731.

As a result, this Court should hold that these laws do not violate parents' right to raise their children. Any other outcome would transgress the rule that "federal courts do not sit as councils of revision, empowered to rewrite legislation in accord with their own conceptions of prudent public policy." *Rutherford I*, 442 U.S. at 555.

## CONCLUSION

For these reasons, the district court's order granting a preliminary injunction should be reversed.

Date: Feburary 13, 2024.

NUSSBAUM GLEASON PLLC

*/s/ Andrew M. Nussbaum*
Andrew M. Nussbaum
2 North Cascade Avenue, Suite 1430
Colorado Springs, Colorado 80903
andrew@nussbaumgleason.com

*Attorney for Appellant James Dobson Family Institute*

27

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this amicus brief complies with Federal Rule of Appellate Procedure 29(a)(5) as it contains 6226 words, excluding the portions exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in 14-point Equity A, a proportionally spaced font.

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2024, I electronically filed the foregoing brief with the United States Court of Appeals for the Ninth Circuit using the CM/ECF system. I certify that counsel for all parties in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Andrew M. Nussbaum*
Andrew M. Nussbaum
*Counsel for Amicus Curiae*