No. 24-142

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PAM POE, by and through her parents and next friends PENNY and PETER POE, et al.,

*Plaintiffs-Appellees*,

v.

RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho, et al.,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the District of Idaho
No. 1:23-cv-00269-BLW

## Brief of Plaintiffs-Appellees

Li Nowlin-Sohl
(admitted only in Washington)
Chase B. Strangio
James D. Esseks
American Civil Liberties Union
Foundation
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584m
lnowlin-sohl@aclu.org
cstrangio@aclu.org
jesseks@aclu.org

Brad S. Karp
Alexia D. Korberg
Paul, Weiss, Rifkind, Wharton &
Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com

Richard Eppink
Wrest Collective
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop

Eric Alan Stone
Groombridge, Wu, Baughman and
Stone LLP
565 Fifth Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0034
eric.stone@groombridgewu.com

Philip S. May
Groombridge, Wu, Baughman and
Stone LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com

Jordan E. Orosz
Paul, Weiss, Rifkind, Wharton &
Garrison LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Dina Flores-Brewer
Paul Carlos Southwick (admitted only in
Oregon)
Emily Myrei Croston (admitted only in
the District of Columbia)
ACLU of Idaho Foundation
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org
psouthwick@acluidaho.org
ecroston@acluidaho.org

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... iii

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT .................................................... 4

STATUTORY AUTHORITIES ........................................................... 4

STATEMENT OF THE ISSUES ......................................................... 4

STATEMENT OF FACTS AND THE CASE .................................... 5

    I.     The Treatment of Adolescents with Gender Dysphoria .................... 5

    II.    Idaho Criminalizes Gender-Affirming Medical Care for Transgender Adolescents ............................................................. 9

    III.   The Families ................................................................................. 10

    IV.   Proceedings Below ...................................................................... 12

         A.    The Expert Testimony Before the District Court ................. 12

         B.    The District Court Preliminarily Enjoins the Ban ................ 16

         C.    Appeal and Motions to Stay the Preliminary Injunction ......... 18

STANDARD OF REVIEW .................................................................. 18

SUMMARY OF THE ARGUMENT .................................................. 19

ARGUMENT ........................................................................................ 22

    I.     The District Court Did Not Abuse its Discretion in Holding That The Families Are Likely to Succeed on the Merits ....................... 22

         A.    The District Court Did Not Clearly Err in Finding That Gender-Affirming Medical Care Is Safe, Effective, and Medically Necessary for Some Adolescents, or in Rejecting Idaho's Assertions About Gender-Affirming Medical Care for Adolescents .......................................... 23

i

B.     The District Court Did Not Abuse Its Discretion in Holding That The Families Are Likely to Succeed on Their Equal Protection Claim ............................................. 30

       i.     The Ban Classifies on the Basis of Transgender Status ............................................................ 30

       ii.    The Ban Facially Classifies on the Basis of Sex .......... 34

       iii.   The Ban Has the Intent and Effect of Enforcing Sex Stereotypes ......................................................... 39

       iv.   The District Court Did Not Abuse Its Discretion in Holding That the Families Are Likely to Show the Ban Fails Heightened Scrutiny ........................................ 40

       v.    The Ban Would Fail Any Level of Scrutiny ............... 44

C.     The District Court Did Not Abuse its Discretion in Holding That the Parents are Likely to Succeed on Their Due Process Claim ................................................. 45

II.   The District Court Did Not Abuse its Discretion in Holding That Idaho Fails the Remaining Stay Factors ....................................... 49

    A.     The District Court Did Not Abuse Its Discretion in Holding That the Families Will Be Irreparably Harmed ........ 49

    B.     The District Court Did Not Abuse its Discretion in Holding That the Public Interest and Balance of Equities Favor the Families ........................................................... 51

III.  The Scope of the Injunction Is Proper ......................................... 52

    A.     The District Court Did Not Abuse its Discretion in Granting Facial Relief ..................................................... 52

    B.     The Families Properly Challenged the Ban's Prohibition on Treatments for the Purpose of Affirming a Transgender Minor's Gender ................................................................ 54

    C.     The District Court Did Not Abuse its Discretion in Granting Statewide Relief .............................................. 56

CONCLUSION ........................................................................... 58

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*4805 Convoy, Inc.* v. *City of San Diego*,
    183 F.3d 1108 (9th Cir. 1999)....................................................56

*Abigail All. for Better Access to Developmental Drugs* v. *von Eschenbach*,
    495 F.3d 695 (D.C. Cir. 2007) (en banc).....................................48

*All. for the Wild Rockies* v. *Cottrell*,
    632 F.3d 1127 (9th Cir. 2011)....................................................50

*Bostock* v. *Clayton Cnty.*,
    590 U.S. 644 (2020) ..........................................................36, 39

*Bowers* v. *Hardwick*,
    478 U.S. 186 (1986) ................................................................47

*Brandt* v. *Rutledge*,
    551 F. Supp. 3d 882 (E.D. Ark. 2021), *aff'd*, 47 F.4th 661 (8th Cir. 2022).............................................................................23, 33, 58

*Brandt* v. *Rutledge*, No. 4:21-CV-00450, 2023 WL 4073727 (E.D. Ark. June 20, 2023), *aff'd* 47 F.4th 661, *rehearing en banc granted*, No. 23-2681 (8th Cir. Oct. 6, 2023)..............................23

*Bray* v. *Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993) ................................................................34

*Christian Legal Soc.* v. *Martinez*,
    561 U.S. 661 (2010) ................................................................33

*City of Los Angeles* v. *Almeda Books, Inc.*,
    535 U.S. 425 (2002) ................................................................43

*City of Cleburne* v. *Cleburne Living Ctr., Inc.*, 473 U.S. 432, 448 (1985)..................................................................................45

iii

*Cooper* v. *Harris*,
    581 U.S. 285 (2017) ................................................................ 18

*Crittenden* v. *Chappell*,
    804 F.3d 998 (9th Cir. 2015)................................................. 19

*DaimlerChrysler Corp.* v. *Cuno*,
    547 U.S. 332 (2006) ................................................................ 56

*Dobbs* v. *Jackson Women's Health Org.*,
    597 U.S. 215 (2022) ......................................................... 33, 37

*Doe 1* v. *Thornbury*,
    No. 3:23-CV-230-DJH, 2023 WL 4230481 (W.D. Ky. June 28,
    2023), *rev'd*, 83 F.4th 460 (6th Cir. 2023) ................................. 24

*Doe* v. *Ladapo*,
    No. 4:23-CV-114-RH-MAF, 2023 WL 3833848 (N.D. Fla. June 6,
    2023), *appeal filed*, No. 23-12159 (11th Cir. June 27, 2023) ........................ 24

*Duncan* v. *Becerra*,
    742 F. App'x 218 (9th Cir. 2018) ......................................... 43

*Easyriders Freedom F.I.G.H.T.* v. *Hannigan*,
    92 F.3d 1486 (9th Cir. 1996)................................................. 57

*Edmo* v. *Corizon, Inc.*,
    935 F.3d 757 (9th Cir. 2019)................................................. 19

*Eisenstadt* v. *Baird*,
    405 U.S. 438 (1972) ................................................................ 45

*Eknes-Tucker* v. *Marshall*,
    603 F. Supp. 3d 1131 (M.D. Ala. 2022), *vacated*, 80 F.4th 1205
    (11th Cir. Aug. 21, 2023) ............................................... 16, 23

*F.V.* v. *Barron*,
    286 F. Supp. 3d 1131 (D. Idaho 2018)................................. 58

*Fyock* v. *Sunnyvale*,
    779 F.3d 991 (9th Cir. 2015), *abrogated on other grounds by N.Y.*
    *State Rifle & Pistol Ass'n, Inc.* v. *Bruen*, 597 U.S. 1 (2022) ........................ 43

*Get Outdoors II* v. *City of San Diego*, 506 F.3d 886, 890 (9th Cir. 2007)......................................................................... 55, 56

*Glossip* v. *Gross*,
576 U.S. 863 (2015) .............................................................. 19

*Washington* v. *Glucksberg*,
521 U.S. 702 (1997) ......................................................... 46, 47

*Hecox* v. *Little*,
79 F.4th 1009 (9th Cir. 2023).........................................*passim*

*Hernandez* v. *Sessions*,
872 F.3d 976 (9th Cir. 2017).................................................. 49

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW* v. *Johnson Controls, Inc.* (*UAW*),
499 U.S. 187 (1991) ............................................................. 36

*J.E.B.* v. *Alabama ex rel. T.B.*,
511 U.S. 127 (1994) ............................................................. 36

*K.C.* v. *Individual Members of Med. Licensing Bd. Of Ind.*,
2023 WL 4054086 (S.D. Ind. June 16, 2023), *appeal filed*, No. 23-2366 (7th Cir. Jul. 12, 2023) ...................................................... 23

*Karnoski* v. *Trump*,
926 F.3d 1800 (9th Cir. 2019)........................................... 20, 31

*Koe* v. *Noggle*,
No. 1:23-CV-2904-SEG, 2023 WL 5339281 (N.D. Ga. Aug. 20, 2023)..................................................................... 16, 23

*L.W.* v. *Skrmetti*,
No. 3:23-CV-00376, 2023 WL 4232308 (M.D. Tenn. June 28, 2023), *rev'd*, 83 F.4th 460 (6th Cir. 2023) ......................... 24, 48

*Latta* v. *Otter*,
771 F.3d 456 (9th Cir. 2014)................................................. 44

*Lawrence* v. *Texas*,
539 U.S. 558 (2003) (O'Connor, J. concurring).................... 33, 47

v

*Lewis* v. *Casey*,
518 U.S. 343 (1996) ..................................................... 56

*M.H.* v. *Jeppesen*,
No. 1:22-CV-00409, 2023 WL 4080542 (D. Idaho June 20, 2023),
*appeal docketed* ......................................................... 32

*Melendres* v. *Arpaio*,
695 F.3d 990 (9th Cir. 2012) ....................................... 18

*Nat'l Ass'n for Advancement of Psychoanalysis* v. *Cal. Bd. of
Psychology*
228 F.3d 1043 (9th Cir. 2000) ..................................... 48

*Nguyen* v. *INS*,
533 U.S. 53 (2001) ...................................................... 38

*Pac. Shores Properties, LLC* v. *City of Newport Beach*,
730 F.3d 1142 (9th Cir. 2013) ................................ 32, 34

*Padgett* v. *Wright*,
587 F.3d 983 (9th Cir. 2009) ....................................... 50

*Parham* v. *J. R.*,
442 U.S. 584 (1979) ............................................. 5, 21, 46

*Pickup* v. *Brown*,
740 F.3d 1208 (9th Cir. 2014) ..................................... 38

*Poe* v. *Drummond*,
No. 4:23-CV-177-JFH-SH, 2023 WL 4560820 (N.D. Okla. July
17, 2023), *appeal filed*, No. 23-5110 (10th Cir. Oct. 10, 2023) .................... 24

*Powers* v. *Ohio*,
499 U.S. 400 (1991) .................................................... 36

*Raich* v. *Gonzales*,
500 F.3d 850 (9th Cir. 2007) ....................................... 48

*Romer* v. *Evans*,
517 U.S. 620 (1996) ............................................. 21, 45

*S. Bay United Pentecostal Church* v. *Newsom*,
141 S. Ct. 716 (2021) (Statement of Gorsuch, J.)......................................49

*United States* v. *Salerno*,
481 U.S. 739 (1987) .............................................................................. 22, 53

*Sessions* v. *Morales-Santana*,
582 U.S. 47 (2017) ......................................................................................40

*SmithKline Beecham Corp.* v. *Abbott Lab'ys*,
740 F.3d 471 (9th Cir. 2014)......................................................................41

*Tingley* v. *Ferguson*,
47 F.4th 1055 (9th Cir. 2022), *cert. denied*, 144 S. Ct. 33 (2023).................32

*Troxel* v. *Granville*,
530 U.S. 57 (2000)......................................................................................46

*United States* v. *Virginia* (*VMI*),
518 U.S. 515 (1996) .......................................................................35, 40, 41

*Wallis* v. *Spencer*,
202 F.3d 1126 (9th Cir. 2000)..........................................................5, 21, 46

*Wedbush, Noble, Cooke, Inc.* v. *S.E.C.*,
714 F.2d 923 (9th Cir. 1983).......................................................................32

## Statutes

Idaho Code § 18-1506C..........................................................................9, 31, 57

Idaho Code § 32-1010(2) ..............................................................................46

San Diego Municipal Code § 142.12 *et seq.* ................................................55

## Other Authorities

U.S. Const. amend. I ...............................................................32, 38, 42, 43

U.S. Const. amend. XIV ..........................................................................*passim*

H.B. 265, 67th Leg., 1st Reg. Sess. (Idaho 2023) ...........................................34

S.B. 1003, 67th Leg., 1st Reg. Sess. (Idaho 2023) ..........................................34

vii

S.B. 1016, 67th Leg., 1st Reg. Sess. (Idaho 2023)............................................34

S.B. 1071, 67th Leg., 1st Reg. Sess. (Idaho 2023)............................................34

S.B. 1100, 67th Leg., 1st Reg. Sess. (Idaho 2023)............................................34

## INTRODUCTION

Pam Poe and Jane Doe know firsthand what thousands of transgender youth have experienced over the course of decades and what the district court found: gender-affirming medical care is safe, effective, and, for some transgender adolescents, medically necessary. 5-ER-877–82. Gender-affirming treatments have transformed Appellees' lives for the better—both for Pam and Jane themselves and their parents (collectively the "Families").

Theirs are not outlier stories; the evidence before the district court showed that gender-affirming care "can be a crucial part of treatment for adolescents with gender dysphoria, and necessary to preserve their health." 1-ER-62. This treatment is provided after comprehensive mental health assessments, with the consent of parents, and in accordance with evidence-based guidelines supported by decades of research, clinical experience, and every major American medical association, including from the American Medical Association to the American Academy of Pediatrics to the American Psychiatric Association (and many others). 5-ER-877–81. Stripping Pam and Jane of that care would be nothing short of catastrophic.

Yet Idaho did just that when it passed H.B. 71 (the "Ban"), (i) forbidding those treatments, *but only if* for the purpose of affirming a transgender adolescent's gender identity; and (ii) imposing potential criminal liability and up to 10 years'

1

imprisonment on healthcare professionals who provide those treatments, *but only if* for that purpose.

Idaho's brief offers no basis to disturb the district court's findings of fact supporting its conclusion that the Ban does not protect youth, and thus fails the requisite constitutional scrutiny. Idaho does not attempt to argue clear error; rather Idaho's brief reads like a closing argument at trial, not an appeal from an adverse decision. Thus, Idaho begins by insisting that the banned medical treatments are "dangerous" and "fail to improve young people's mental health." Br. 1; *see also id.* at 4–14. But the district court specifically noted that this was the parties' "key point of disagreement in this litigation"—whether the banned treatments are safe, effective, and medically necessary—and found, as a matter of fact, that they are:

> After carefully considering the voluminous evidence on this point, **the Court finds that the treatment for gender dysphoria**—when provided in accordance with the guidelines published by WPATH and the Endocrine Society, and which may include medical interventions such as puberty blockers, hormone therapy, and surgeries—**is safe, effective, and medically necessary for some adolescents**. The weight of the evidence before the Court strongly supports this finding.

1-ER-23–24 (emphases added).

The district court's assessment that the evidence "strongly" supports the Poe and Doe families is, if anything, an understatement. The Families are supported by experts with extensive experience treating adolescents with gender dysphoria. The Families presented a wealth of evidence showing that decades of clinical experience

2

and scientific research demonstrate the effectiveness of gender-affirming medical care for adolescents; that the potential risks are comparable to those seen in many types of care parents may freely choose for their minor children; and that denying or delaying access to this care can result in serious harm.

Idaho, in contrast, in contrast, quarrels with the quality of the research; exaggerates the risks and glosses over the fact that most of those risks apply equally whether the medications are used for gender-affirming medical care or other common uses; and erroneously suggests that Idaho's law is similar to practices in Europe.

The district court's fact-findings in favor of the Families were not error of any kind, much less the clear error Idaho would need to prevail in this Court.

And Idaho is equally unlikely to prevail on its legal arguments. The Ban is subject to heightened scrutiny both because it criminalizes these treatments only if given to allow a transgender minor to live in accordance with a gender identity that is inconsistent with their sex designated at birth, thus classifying based on transgender status and sex, and because it infringes on "perhaps the oldest" fundamental right, that of parents to direct the care of their children, including their medical care. 1-ER-55 (quoting *Troxel* v. *Granville*, 530 U.S. 57, 65 (2000)). Under heightened scrutiny, it is Idaho's burden to show that the Ban substantially advances an important governmental interest. The district court held that Idaho likely could

3

not meet that demanding standard. The court then found that the Ban would irreparably harm transgender adolescents and their families, that an injunction would serve the public interest, that the balance of equities tips in the Families' favor, and that a state-wide injunction was necessary to grant the Families full relief.

Each of those conclusions was correct. This Court should affirm.

## JURISDICTIONAL STATEMENT

The Families agree with Idaho's jurisdictional statement.

## STATUTORY AUTHORITIES

The relevant statute, H.B. 71, is included as an addendum to Idaho's opening brief.

## STATEMENT OF THE ISSUES

Idaho presents its three Issues at a level of abstraction that seeks advisory opinions. *See* Br. 3. This Court need not decide, for example, whether each "law that regulates procedures for treatment of specific medical conditions violates the Fourteenth Amendment's equal protection clause." *Id.* Rather, the issues here are narrow and discrete:

1.  Idaho enacted a law that classifies based on sex and transgender status, criminalizing medical treatments for minors *only* when prescribed for the purpose of affirming a patient's gender identity that is inconsistent with their birth-assigned sex, while permitting non-transgender minors to receive the same treatments for *any*

4

purpose, including to affirm their gender identity. The first issue is: Did the district court abuse its discretion in holding that Idaho's law likely violates the Equal Protection Clause?

2.　　Idaho usurped the right of parents of transgender minors with gender dysphoria to "to seek and follow medical advice," *Parham* v. *J. R.*, 442 U.S. 584, 602 (1979), and "to make important medical decisions for their children," *Wallis* v. *Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000). The second issue is: Did the district court abuse its discretion in holding that the Ban likely violates parents' Due Process rights to direct their children's upbringing?

3.　　Idaho's Ban applies to all transgender minors in Idaho for whom gender-affirming medical care is medically indicated. It is facially unconstitutional. The court found that the Families would be irreparably harmed if the Ban went into effect, and that the equities and public interest favor statewide preliminary relief. The third issue is: Did the district court abuse its discretion in enjoining the enforcement of the Ban statewide?

## STATEMENT OF FACTS AND THE CASE

### I.　　The Treatment of Adolescents with Gender Dysphoria

As the district court found, "gender identity" refers to a person's core, internal sense of their gender. 1-ER-22. Everyone has a gender identity, and it is "an essential part of one's identity and being." 4-ER-871. A person's gender identity

cannot be changed voluntarily or by external forces such as medical or mental health intervention. 4-ER-871–72.

"Cisgender" people are those whose gender identity matches their sex assigned at birth; "transgender" people's gender identity differs from their sex assigned at birth. 1-ER-022. Some transgender people recognize this misalignment in early childhood. For others, it becomes apparent with the onset of puberty and resultant physical changes, or even in adulthood.

Being transgender is not itself a medical condition. 4-ER-876. But transgender people commonly experience "gender dysphoria," which is distress arising from the incongruence between their gender identity and their sex assigned at birth. 1-ER-22. To meet the criteria for gender dysphoria in the Diagnostic and Statistical Manual of Mental Disorders 5-TR, the incongruence must be present for at least six months and cause clinically significant distress or impairment in social, occupational, or other important areas of functioning. *Id.* As the district court found, gender dysphoria is a serious medical condition; left untreated, it "can increase the risk of anxiety, depression, self-harm, and suicidality." 1-ER-051.

The Endocrine Society (an organization representing more than 18,000 endocrinologists) and the World Professional Association for Transgender Health ("WPATH") (the leading association of medical professionals treating transgender people) have developed evidence-based clinical guidelines (the "Guidelines") for the

6

treatment of gender dysphoria.  1-ER-022–23 (WPATH published the first version

of its Standards of Care in 1979); *see also* 4-ER-900–01; 4-ER-877–78.  As the

district court found, *all* major medical and mental-health organizations in the United

States have accepted the Guidelines.  1-ER-24.  The Guidelines reflect the medical

consensus on the appropriate treatment for gender dysphoria:  that gender-affirming

medical care in accordance with the Guidelines is not only safe and effective, but

also can be medically necessary for adolescents with gender dysphoria.  *Id.*

The court further found that the Guidelines condition treatment on

individualized assessment of each patient's mental and physical health and needs, 1-

ER-23, and requires a robust consent process.  4-ER-879-81.  The Guidelines

recommend medical interventions for minors with gender dysphoria only if: (i) the

patient has a diagnosis of gender dysphoria; (ii) the patient experiences gender

incongruence that is sustained over time; (iii) the patient and their family are fully

informed of potential risks (including specifically the potential impact of some

treatments on fertility and fertility preservation options); (iv) the patient has

sufficient emotional and cognitive maturity to understand and provide informed

assent; and (v) the patient has no other mental health conditions that would interfere

with diagnostic clarity or ability to consent.  4-ER-879–81; *see also* 4-ER-904–05;

1-SER-6–7.  Both parental consent and minor assent are required.  4-ER-881.

7

Prior to puberty, no medical treatments are indicated or recommended, as the court also found.  1-ER-023; 4-ER-901.  After puberty starts (adolescence), those bodily changes can exacerbate gender dysphoria and cause extreme distress for some transgender youth.  4-ER-879.  Additionally, there is broad consensus that after the onset of puberty, youth whose gender identity is incongruent with their sex-assigned at birth are highly unlikely to come to identify with their birth-assigned sex.[1]  1-ER-025; 4-ER-874–75; 5-ER-971; *see also* 4-ER-824 (Idaho's expert stating that desistance is less likely to occur after age 12).  Thus, for adolescents with gender dysphoria, medical interventions may be indicated after a comprehensive psychosocial assessment of the patient.  4-ER-878–81, 905.

Puberty-delaying medications pause endogenous puberty to address the heightened gender dysphoria that can come with those physical changes, and give patients and their families time to make medical decisions with longer-lasting impact.  4-ER-879.  If puberty delaying treatment is discontinued, endogenous

---

[1] Idaho relies on an ultimately irrelevant body of research sometimes referred to as "desistance" studies, which assessed a much broader population of children who merely failed to conform to gender stereotypes, many of whom *never* identified as a gender different from their birth-assigned sex.  Unsurprisingly, many of those youth who were not necessarily transgender to begin with also did not identify as transgender at follow up.  Moreover, those studies evaluated prepubertal children, and say nothing about the likelihood of desistance among adolescents actually eligible for care.  5-ER-970–72; 4-ER-874–75; 1-SER-8–9.

puberty will resume consistent with the person's birth-assigned sex. 4-ER-902, 910. Hormone therapy—testosterone for adolescent transgender boys and testosterone suppression and estrogen for adolescent transgender girls—may be indicated to alleviate the distress of gender dysphoria by allowing the patient to go through puberty consistent with their gender identity. 4-ER-879. In rare cases, a minor may access surgery (almost all are chest surgeries for transgender males). 4-ER-905.

## II.     Idaho Criminalizes Gender-Affirming Medical Care for Transgender Adolescents

In April 2023, Idaho enacted H.B. 71, codified at Idaho Code § 18-1506C (the "Ban"). 1-ER-017. It prohibits minors from receiving medical treatments including puberty blockers, hormone therapies, and certain surgeries, but *only if* those treatments are "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex"—in other words, if the purpose is to affirm a transgender adolescent's gender identity. Idaho Code § 18-1506C(3). The same medical treatments are not banned if they are provided for any other purpose, including to affirm a cisgender minor's gender identity. For example, a cisgender boy with gynecomastia—medically benign enlargement of breast tissue—may receive a mastectomy to alleviate psychological distress related to being a boy with breasts, 4-ER-909, but a transgender boy cannot. Idaho Code § 18-1506C(3)(b). And a

9

cisgender girl experiencing a hormonally-induced increase in facial and body hair may be provided a testosterone suppressant to align her physical appearance with her gender identity, but a transgender girl cannot, Idaho Code § 18-1506C(3)(b).

The Ban makes it a felony for any healthcare professional to provide gender-affirming medical care, punishable by up to 10 years in prison, *id.* § 18-1506C(5), the same as applies to certain categories of manslaughter, *see id*. § 18-4007(3)(a). The Ban makes no exceptions for individual circumstances. *Id*. § 18-1506C(3).

## III.   The Families

Pam Poe and Jane Doe are Idaho teenagers who are currently receiving gender-affirming medical care to treat gender dysphoria.   The treatment has transformed their lives for the better. 5-ER-943, 951.  Both Pam, who is 16, and Jane, who is 17, experienced severe distress from gender dysphoria before starting gender-affirming medical care.   5-ER-941, 948–49.   Pam's dysphoria caused depression, anxiety, and self-harm, leading to her admittance to a residential treatment facility after telling her mom she "didn't want to be alive anymore."  5-ER-939–41.   Jane's mental health also deteriorated when puberty caused masculinizing changes to her body: she was depressed and anxious, felt trapped, and in response she isolated herself and her grades suffered.   1-ER-020; 5-ER-948. Sometimes the pain was so severe that she "did not want to exist."  *Id*.

10

For each family, the decision to start medical treatment was made by them and the parents, the adolescent, and their doctors. 5-ER-941–42, 949–50. Jane currently receives estrogen therapy, and Pam is currently on estrogen therapy and a puberty blocker. 1-ER-020; 5-ER-942–43, 949–50. For each, gender-affirming medical care has dramatically alleviated their gender dysphoria and enabled them to become healthy, thriving teenagers. 1-ER-019–20; 5-ER-943, 951. Pam has gone from a "very dark place" to feeling happy, confident, and excited about the future. 5-ER-939, 943. She says gender-affirming medical care saved her life: "I did not want to die, I just wanted to be myself, my true self." 5-ER-943. As her mom put it, "we have our child back and she is flourishing." 3-SER-745. For Jane, her "whole life has turned around" as a result of treatment. 5-ER-951. Her mental health and academics have improved, she is no longer isolating herself, and she is "excited about what comes next" in life. *Id*. Her family has seen her go from being withdrawn and in "so much pain" to a "vibrant, happy, outgoing, beautiful young woman." 3-SER-737.

The Families have been terrified about the impact on their daughters' health and lives if they are forced to discontinue their medical care. 3-SER 738–39, 746–47. As Pam's mother put it, "we do not even have to guess what will happen to her mental health and to her body, because we have been through it. The thought of my

child going back to feeling like she does not want to live or wants to hurt herself is just something I cannot even think about." 3-SER-746.

The Families have struggled with what they would do if Pam and Jane could no longer receive care in Idaho. As Pam's mother explained, regularly traveling out of state for care would be financially and logistically difficult, but moving would mean disrupting their lives, leaving schools, giving up jobs that give them financial stability, and leaving behind family and "everything we have ever known." 3-SER-746–47. Both options "would result in significant hardship on everyone in our family, but these are our only options if [the Ban] goes into effect." 3-SER-747.

## IV.  Proceedings Below

The Families asked the district court to preliminarily enjoin the Ban to prevent the irreparable harm that would befall them were the Ban to go into effect. They argued that the Ban violated the Equal Protection Clause of the Fourteenth Amendment, and that the Ban's usurpation of the parents' fundamental right to make decisions concerning the care, custody, and control of their children violated the Due Process Clause.

The district court held a hearing on November 6, 2023.

### A. The Expert Testimony Before the District Court

The parties submitted expert testimony by declaration and deposition. The district court gave particular weight to the Families' experts in its findings, because,

unlike Idaho's experts, the Families' experts "currently treat adolescents with gender dysphoria." 1-ER-051 n.5. This court review the district's courts findings for abuse of discretion. The district court's assessment far exceeds that deferential threshold:

The Families' three experts have extensive experience providing care to adolescents with gender dysphoria, and working with families to make informed decisions about gender-affirming medical care:

**Dr. Christine Brady** is a Clinical Assistant Professor at the Stanford University School of Medicine and is a psychologist at the Pediatric and Adolescent Gender Clinic at Stanford Medicine Children's Health. 4-ER-869–70. Dr. Brady provides direct therapeutic service to some 350 patients and families per year and has treated over 1,000 youth and families in the eight years she has been working with individuals with gender dysphoria. *Id.*

**Dr. Kara Connelly** is a pediatric endocrinologist and Associate Professor of Pediatrics at Oregon Health and Science University ("OHSU"), an attending physician in OHSU's Doernbecher Children's Hospital, and a Co-Founder of the Doernbecher Sexual Development Program and the Director of the Doernbecher Gender Clinic. 4-ER-899. Dr. Connelly has been providing medical care for youth with gender dysphoria since 2014 and has personally cared for over 700 such patients, in addition to nearly 100 intersex youth born with both female and male

biological traits. *Id.* In 2022 alone, Dr. Connelly's team provided care for nearly 1000 youth and their families. *Id.*

**Dr. Jack Turban** is an Assistant Professor of Child & Adolescent Psychiatry at the University of California, San Francisco ("UCSF") School of Medicine, and an affiliated faculty member at the Philip R. Lee Institute for Health Policy Studies. 5-ER-955. He is the Director of the Gender Psychiatry Program in the Division of Child & Adolescent Psychiatry at UCSF, and is an attending psychiatrist in the adult LGBT psychiatry clinic. *Id.* Dr. Turban has provided care for at least 100 adolescents with gender dysphoria, and conducts research focused on the mental health of transgender youth and those experiencing gender dysphoria. 5-ER-955–56.

By contrast, the Families presented testimony from two witnesses:

**Dr. Daniel Weiss** offers the sole support for several of Idaho's key claims. Br. 6, 7, 32-33. He is an endocrinologist who exclusively treats adults. He has no training or clinical experience in the treatment of gender dysphoria in minors. He based his views about gender dysphoria on his "rationality" and "common sense." While conceding he is not a mental health expert, most of Dr. Weiss's testimony comprised psychological opinions about gender dysphoria—at odds with the understanding within the mental health field and the DSM. 1-SER-99, 102–04, 111–

14

12, 117, 122, 125; 4-ER-656.  For example, Dr. Weiss testified that gender dysphoria is not itself a condition to be treated.  1-SER-131–32, 273–74.

He also relied on overtly biased materials, basing key claims on unverified accounts in various Internet forums (e.g., "parents for inconvenient truths about trans").  1-SER-256, 279; 2-SER-384.  Ultimately, even he was forced to admit that one of his primary opinions—that suicidality is not improved by gender-affirming medical care—is not supported by any of his cited literature, which calls into serious doubt the reliability of his other opinions.  2-SER-307.

And while Dr. Weiss was perfectly willing to testify that gender-affirming hormone therapy is ineffective and harmful for individuals of any age—a view he says he has held since at least 2013—he himself provided hormone therapy to adult transgender patients until 2022 (around the same time he began testifying as an expert in favor of bans on gender-affirming care) without telling those patients he was supposedly causing them harm.  1-SER-220–21, 246–47; 2-SER-347–48.

**Dr. James Cantor** is a psychologist and "sexual behavior scientist" whose career focus is pedophilia and other "atypical sexualities".  4-ER-722.  He generally does not see patients under age 25.  2-SER-460.  In his career he has seen only some 14 to 16 adolescents who were transgender or exploring that possibility, about half of those within the past year.  2-SER-456–65.  He has proffered substantially the same opinions in defense of similar bans across the country, but fared poorly:  courts

15

have assigned his testimony "less weight as to the medical conclusions that can reasonably be drawn from the evidence for the treatment of gender dysphoria in minors." *Koe* v. *Noggle*, No. 1:23-CV-2904-SEG, 2023 WL 5339281, at *21 n.8 (N.D. Ga. Aug. 20, 2023); *see also Eknes-Tucker* v. *Marshall*, 603 F. Supp. 3d 1131, 1142–43 (M.D. Ala. 2022), *vacated*, 80 F.4th 1205 (11th Cir. Aug. 21, 2023).

### B. The District Court Preliminarily Enjoins the Ban

In a thoughtful opinion issued after examining "hundreds of pages of evidence," 1-ER-21, the district court held that the Families had shown a likelihood of success on the merits of their Equal Protection and Due Process Clause claims, and preliminarily enjoined Idaho's enforcement of the Ban. 1-ER-42, 66. Because the Ban "explicitly classifies on the basis of transgender status" and "draws sex-based classifications on its face," 1-ER-45, 47, and burden's parents' fundamental right to provide medical care to their children, 1-ER-59–62, the district court examined the Ban under heightened scrutiny and held that the Ban was not substantially related to the government's asserted interest in protecting children. 1-ER-52.

Likewise, recognizing a parent's right to direct the "'care, custody, and control of their children' as 'perhaps the oldest of the fundamental liberty interests,'" 1-ER-55 (quoting *Troxel* v. *Granville*, 530 U.S. 57, 65 (2000)), the district court held that the Ban infringes on that right, and therefore is subject to strict judicial scrutiny, 1-

16

ER–59–61.  Because the Ban failed heightened scrutiny, it *a fortiori* failed strict scrutiny.  1-ER-61–62.

The court based its conclusions on a thorough review of the evidence and extensive findings of fact, including that:

1. the prohibited gender-affirming medical care, when provided in accordance with the Endocrine Society and WPATH guidelines, is "safe, effective, and medically necessary" for some adolescents suffering from gender dysphoria, 1-ER-24;

2. the Guidelines are accepted by "every major medical organization in the United States," *id.*;

3. "the medical treatments banned by HB 71 have a long history of safe use in minors for various conditions and are supported by medical evidence that has been subjected to rigorous study," *id.*;

4. "the medications and procedures used in gender-affirming care . . . are used to treat cisgender adolescents for other purposes," 1-ER-24–25;

5. the potential risks posed by the treatments are "comparable to those of other medical care families are free to seek for minors," 1-ER-25;

6. "gender-affirming medical care improves the wellbeing of some adolescents with gender dysphoria, and delaying or withholding such care can be harmful, potentially increasing depression, anxiety, self-harm, and suicidal ideation," *id.*; and

7. "adolescents with gender dysphoria are unlikely to later identify as their birth sex," *id.*

The district court further held that the Families had shown that without the injunction, they would experience irreparable harm, both from the deprivation of their constitutional rights and the "serious consequences" of losing access to gender-affirming care, including "severe psychological distress and, potentially, the need to

regularly incur the expense of out-of-state travel or move out of state permanently." 1-ER-62.   The Court concluded the balance of equities and the public interest supported an injunction.  1-ER-63.

### C. Appeal and Motions to Stay the Preliminary Injunction

Idaho appealed to this Court, and sought a stay pending appeal, which a Panel of the Court denied, as well as a motion for reconsideration, which was also denied. Idaho has since asked the Supreme Court to stay the district court's injunction, but only insofar as it extends beyond the Plaintiffs.  The Supreme Court has not ruled on Idaho's application.

### STANDARD OF REVIEW

This Court reviews the district court's decision to grant a preliminary injunction for abuse of discretion, assessing its legal conclusions *de novo* and disturbing its factual findings only where clearly erroneous. *Hecox* v. *Little*, 79 F.4th 1009, 1020 (9th Cir. 2023).  "As long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Melendres* v. *Arpaio*, 695 F.3d 990, 999 (9th Cir. 2012); *see also Cooper* v. *Harris*, 581 U.S. 285, 293 (2017) ("A finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern.") (quoting *Anderson* v. *Bessemer City*, 470 U.S. 564, 574 (1985)).

Idaho argues that the district court's findings of fact are not entitled to deference because they are "legislative facts." Br. 19. That is wrong. Both the Supreme Court and this Court have applied clear-error review to findings of fact regarding disputed medical evidence in constitutional challenges to government policies. *See Glossip* v. *Gross*, 576 U.S. 863, 878 (2015) (concerning the effects of a drug used in a lethal injection protocol); *Hecox*, 79 F.4th at 1020, 1029 (regarding asserted physiological advantages of transgender female athletes); *Edmo* v. *Corizon, Inc.*, 935 F.3d 757, 766–67 (9th Cir. 2019) (findings about standard of care for gender confirmation surgery and their application to the plaintiff).

That deference is for good reason, and Idaho's suggestion that clear error should not apply to findings based on a written record is not the law in this circuit. *See Crittenden* v. *Chappell*, 804 F.3d 998, 1006 (9th Cir. 2015) (holding that the Federal Rules "squarely foreclose[]" an argument that this Court should review a district court's fact findings de novo if based on a written, rather than live, record).

## SUMMARY OF THE ARGUMENT

The district court did not abuse its discretion in preliminary enjoining the Ban statewide, finding the Families likely to succeed on their constitutional claims. Idaho's arguments rest on the faulty premise that the Ban serves the State's interest in protecting children because gender-affirming care is supposedly dangerous and ineffective. Br. 17. But the district court rejected that as a matter of fact, finding

19

that gender-affirming medical care is "safe, effective, and medically necessary for some adolescents," 1-ER-24, and that by taking away access to this care from those who need it, the Ban "does not serve the State's interest in protecting Idaho's youth; it harms them," 1-ER-52. Idaho does not even attempt to argue that those findings were clearly erroneous.

The district court properly applied heightened scrutiny to Plaintiffs' equal protection claim because the Ban classifies based on transgender status and sex. 1-ER-45–47. It is settled in this Circuit that transgender status is a quasi-suspect classification, *see, e.g.*, *Karnoski* v. *Trump*, 926 F.3d 1800, 1200–01 (9th Cir. 2019); *Hecox*, 79 F.4th at 1026. By prohibiting medical treatments for minors only when provided to affirm a transgender minor's gender identity that cisgender adolescents may receive for any purpose, the Ban facially classifies based on transgender status and sex. The district court correctly held that Idaho has not met its heightened burden in demonstrating an "exceedingly persuasive justification" for the Ban and a "close means-end fit," 1-ER-49, 53, between the all-encompassing, exceptionless prohibition on gender-affirming medical care for transgender adolescents in Idaho and the State's asserted interest in "'[s]afeguarding the physical and psychological well-being' of minors." Br. 31–32. No one disputes the importance of that interest, but the district court found that the Ban *undermines* it. 1-ER-52.

20

The district court also properly held that the Ban burdens the parent Plaintiffs' "fundamental right to care for their children," which includes the right to "seek and follow medical advice," *Parham* v. *J. R.*, 442 U.S. 584, 602 (1979), and "to make important medical decisions for their children, *Wallis* v. *Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000). 1-ER-55. Idaho has determined that here alone parents lack the ability to make this medical decision for their minor children for an otherwise available medical treatment. Such an intrusion into the aligned judgment of the family unit and doctors, warrants searching judicial review. 1-ER-59.

Although the district court properly applied heightened scrutiny, the Ban does not even satisfy rational basis review, as it "is so far removed from" the purported goal of protecting children, "it [is] impossible to credit" it. *Romer* v. *Evans*, 517 U.S. 620, 635 (1996).

The remaining injunction factors also favor the Families. As the district court found, denying Pam and Jane the care prohibited under the Ban would cause them "severe psychological distress and, potentially, and the need to regularly incur the expense of out-of-state travel or move out of state permanently," 1-ER-62, and because the Ban is likely unconstitutional, the balance of the equities and the public interest favor an injunction, 1-ER-63.

The district court did not abuse its discretion by enjoining the Ban state-wide. The court found that enjoining defendants from enforcing the Ban was necessary

21

because the Families cannot receive complete relief without an injunction allowing third parties to provide the banned care. 1-ER-64–65. Additionally, facial injunctive relief is warranted because there are no circumstances where the challenged law would be valid. *United States* v. *Salerno*, 481 U.S. 739, 745 (1987).

Idaho now gestures (for the first time) to standing to contest the scope of the injunction because the Families do not seek *every* prohibited treatment under the Ban. Br. 42. But the fact that the category of care outlawed by the Ban includes both treatments that Jane and Pam are and are not currently receiving is irrelevant; the Families have alleged an injury sufficient to establish standing to challenge the Ban's prohibition on gender-affirming medical care inconsistent with minor patients' "biological sex."

## **ARGUMENT**

### I.    **The District Court Did Not Abuse its Discretion in Holding That The Families Are Likely to Succeed on the Merits**

The district court correctly held that the Ban likely violates both the Equal Protection and Due Process Clauses. The Families address Idaho's challenges to those conclusions in Points I.B and I.C below. But Idaho's legal challenges presuppose that gender-affirming care is dangerous and ineffective, assumptions that directly contravene the district court's findings of fact, which the Families thus address first in Point I.A.

22

**A. The District Court Did Not Clearly Err in Finding That Gender-Affirming Medical Care Is Safe, Effective, and Medically Necessary for Some Adolescents, or in Rejecting Idaho's Assertions About Gender-Affirming Medical Care for Adolescents**

Idaho tries to relitigate the district court's factual finding across a large swath of its brief. *E.g.*, Br. 4–14, 19, 23, 28, 30, 32–33, 35, 38. But none of Idaho's contrary factual assertions are supported by the record, much less demonstrate *clear error*.

The district court did not err in its principal finding that gender-affirming care is "safe, effective, and medically necessary for some adolescents." 1-ER-24. The court arrived at this determination only after "carefully considering the voluminous evidence on this point," including weighing expert testimony from both sides. *Id.* This was not a close call.[2] It is consistent with the views of every major medical

---

[2] Nearly every other court to consider evidence and make findings of fact on this issue reached the same conclusion. *See Eknes-Tucker* v. *Marshall*, 603 F. Supp. 3d 1131 (M.D. Ala. 2022) (granting preliminary injunction), *rev'd on other grounds*, *Eknes-Tucker* v. *Governor of Ala.* 80 F.4th 1205 (11th Cir. 2023); *Brandt* v. *Rutledge*, 551 F. Supp. 3d 882 (E.D. Ark. 2021) (granting preliminary injunction), aff'd, 47 F.4th 661 (8th Cir. 2022); *Brandt* v. *Rutledge*, No. 4:21-CV-00450, 2023 WL 4073727 (E.D. Ark. June 20, 2023) (granting permanent injunction), *appeal filed*, No. 23-2681 (8th Cir. Jul. 21, 2023), *hearing en banc granted* Oct. 6, 2023; *Koe* v. *Noggle*, No. 1:23-CV-2904-SEG, 2023 WL 5339281 (N.D. Ga. Aug. 20, 2023) (granting preliminary injunction), *stayed*, No. 1:23-CV-2904-SEG (N.D. Ga. Sept. 5, 2023); *K.C.* v. *Individual Members of Med. Licensing Bd. Of Ind.*, 2023 WL 4054086 (S.D. Ind. June 16, 2023) (granting preliminary injunction), *appeal filed*, No. 23-2366 (7th Cir. Jul. 12, 2023) *stayed*, No. 23-2366 (7th Cir. Feb. 27, 2024);

organization in the United States, including the American Academy of Pediatrics and the American Medical Association, and the district court emphasized that this finding was "strongly" supported by the weight of the evidence. *Id.* In contrast, Idaho has *none* of the major medical organizations on its side and could muster as experts only an endocrinologist with no mental-health experience who nevertheless opined on mental-health issues, and a sexologist who has been discredited by other courts. The district court's fact-findings were not error of any kind, much less the clear error Idaho would need to prevail in this Court.

Idaho's factual contentions in this Court were rejected by the district court, are not supported by the record, and fail to demonstrate clear error:

***First***, Idaho asserts that gender affirming care has "[n]o proven benefits," Br. 9. The factual record in this case is replete with evidence of the benefits of gender-affirming medical care. This includes a substantial body of peer-reviewed research finding that gender-affirming medical care leads to "improvement in

---

*Doe* v. *Ladapo*, No. 4:23-CV-114-RH-MAF, 2023 WL 3833848 (N.D. Fla. June 6, 2023) (granting preliminary injunction), *appeal filed*, No. 23-12159 (11th Cir. June 27, 2023); *L.W.* v. *Skrmetti*, No. 3:23-CV-00376, 2023 WL 4232308 (M.D. Tenn. June 28, 2023), *rev'd*, 83 F.4th 460 (6th Cir. 2023*); Doe 1* v. *Thornbury*, No. 3:23-CV-230-DJH, 2023 WL 4230481 (W.D. Ky. June 28, 2023), *rev'd*, 83 F.4th 460 (6th Cir. 2023); *but see Poe* v. *Drummond*, No. 4:23-CV-177-JFH-SH, 2023 WL 4560820 (N.D. Okla. July 17, 2023) (denying preliminary injunction), *appeal filed*, No. 23-5110 (10th Cir. Oct. 10, 2023).

depression and anxiety symptoms, quality of life indicators, as well as reductions in suicidal ideation and attempts." 4-ER-882 (citing numerous studies).[3]  That research is consistent with the clinical observations of Plaintiffs' experts, who have collectively seen thousands of adolescents with gender dysphoria and observed the dramatic benefits of treatment.  1-ER-51; 4-ER-881, 906.  These benefits not only include improvements in mental health, but also "significant improvements in overall daily functioning in adolescents"—such as being able to "make friends, date, and work."  4-ER-881.

    To try to support its claim of "no proven benefits," Br. 11, Idaho points to some systematic reviews of the literature—which it asserts are the most reliable form of evidence—and argues that these review demonstrate that evidence about gender-affirming medical care for adolescents is of low quality and insufficient to support its use.  Br. 9.  The district court considered and rejected this argument. 1-ER-52–54.  Although a systemic review is one way to survey and summarize existing literature on an issue, 5-ER-969–70, an author's commentary in such a

---

[3] Idaho points to two recent European studies not raised below that it claims support the purported lack of benefit to care.  Br. 11.  He mischaracterizes these studies, which have not been addressed by any experts in the case.  Idaho also points to a U.K. study that "showed no change" in psychiatric distress with puberty suppression. Br. 10.  But because gender dysphoria generally worsens with puberty, treatment that prevents worsening *is* an improvement.  2-ER-91; 4-ER-879.

review is not entitled to special deference.  Even Idaho's expert observed that "intelligent and well-informed review authors" can come to "discrepant judgments" in their respective systematic reviews. 3-SER-611.  Moreover, in medical research, "low" or "very low" quality evidence, Br. 12, is a term of art that generally means that there were no randomized controlled trials, not that the evidence itself is poor or unreliable.  2-ER-125; 4-ER-913; 5-ER-963–64.  Most healthcare interventions are made without randomized controlled trials and in reliance on "low" or "very low" quality evidence, in part because it is not ethical to withhold effective medical treatment to study participants in a control group.  5-ER-964.  Clinical practice guidelines across medicine make recommendations to doctors based on the best available evidence, not perfect evidence.  The quality of evidence supporting gender-affirming care is comparable to the quality of evidence supporting other treatments provided to minors.  4-ER-914; 1-SER-21.

*Second*, Idaho suggests that the district court did not weigh the risks associated with care. Br. 7–9.  The district court did so explicitly.  It found that the banned medical treatments "have a long history of safe use in minors for various conditions and are supported by medical evidence that has been subjected to rigorous study," 1-ER-24, and that "gender-affirming medical care raises risks comparable to risks associated with other types of medical care families are free to seek for minors." 1-ER-25.  In seeking gender-affirming medical care—as with all medical

26

treatments—patients and parents, in consultation with doctors, weigh the risks and potential benefits of treatment. 4-ER-906. While Idaho catalogs potential risks of puberty blockers and hormone therapy, Br. 6–9, it fails to mention, as the district court recognized, that the potential risks are comparable for these treatments, irrespective of the purpose for which they are prescribed, 1-ER-24–25. For example, the potential risks of testosterone or estrogen therapy, such as high blood pressure and blood clots, are identical whether used to treat transgender youth for gender dysphoria or cisgender youth for other conditions.[4] 4-ER-910; 1-SER-16; *see also* Br. at 8 (failing to mention that the report cited for risk of suicidal ideation with puberty blockers (*see* 4-ER-816–17) involved their use to treat precocious puberty).

Idaho notes that pubertal suppression delays the increase in bone mineral density that occurs during puberty. *See* Br. at 8. But that resumes when the patient stops taking blockers and experiences endogenous puberty or hormone therapy. 1-SER-15. And when puberty blockers are used to treat gender dysphoria, patients ultimately undergo puberty at an age when some of their peers are still starting puberty. 1-SER-14.

---

[4] Transgender girls who take hormone therapy have a similar risk profile to cisgender girls undergoing endogenous puberty, and transgender boys who take hormone therapy have a similar risk profile to cisgender boys undergoing endogenous puberty. 1-SER-16.

27

Like other medical treatments that families may choose to pursue for their children's health, some (but not all) gender-affirming medical care may affect fertility. Puberty blockers on their own do not affect fertility. 4-ER-910. Cross-sex hormone therapy can affect fertility, thus, families are counseled about these risks and about fertility preservation options before making treatment decisions. 4-ER-911–12. And treatment can be tailored to minimize the risk to fertility where that is important to the family. *See* 4-ER-910, 911; 1-SER-17.

Idaho misleadingly quotes snippets of Plaintiffs' experts' testimony to try to suggest they support various claims, e.g. that there is "uncertainty concerning the benefits of medicalized transition," Br. at 12,[5] or that there are risks to brain development associated with puberty blockers, *id*.[6] Idaho even goes so far as to falsely state that Dr. Turban agreed that the risks of gender-affirming medical care likely outweigh the benefits. Br. at 13 (citing 2-ER-130). He said no such thing.

---

[5] That Drs. Connelly and Turban agreed that certain types of studies do not permit conclusions about *causation* does not mean they are uncertain about the *benefits* of gender-affirming care. They testified extensively about research and clinical evidence showing the benefits of treatment. *See, e.g.*, 4-ER-881–82, 906–08, 913–15; 5-ER-957–68.

[6] Dr. Connelly's recognition of the lack of data about the wholly speculative risk of puberty blockers on brain development, 3-ER-359, is not agreement that this is a concern. *See* Br. 12. Indeed, her testimony is clear that it is not. 1-SER-14. Idaho also tries to suggest Dr. Turban has doubts about puberty blockers, Br. 12, but he testified that these medications have been in use for decades and no adverse cognitive impacts have been identified. 2-ER-120.

28

The record evidence amply supports the court's finding that "gender-affirming medical care raises risks comparable to risks associated with other types of medical care families are free to seek for minors." 1-ER-025.

*Third*, Idaho tries to relitigate the district court's factual finding that "adolescents with gender dysphoria are unlikely to later identify as their birth sex," 1-ER-25, or "de-transition." *See* Br. 4–6. To do so, Idaho relies on anecdotes in an opinion column in a newspaper and conflates *regretting* treatment with instances in which people stop or pause treatment—which they do for a variety of reasons, including that they lose insurance access or are simply satisfied with the results they have achieved. 5-ER-979—82; 1-SER-18–19. The record reflects that the true number of "detransitioners" and people who regret gender-affirming medical care is exceedingly low. *See, e.g.*, 5-ER-978–79; 4-ER-874–75; 4-ER-912. Indeed, Idaho's own expert, Dr. Weiss, testified that *not one* of his 100 transgender patients ever expressed regret for their hormone therapy. 2-SER-375.

*Fourth*, Idaho suggests (without explanation) that care should be banned because of the increase in the number of adolescents diagnosed with gender dysphoria in recent years and the rise in transgender boys seeking care. Br. 5–6. That increase reflects the increased visibility of transgender people and increased awareness of and access to care, particularly for transgender men, who have historically been underdiagnosed. 5-ER-976–77.

29

***Finally***, Idaho's assertion that laws like the Ban "are part of an international trend," Br. 1, is false and was squarely rejected by the district court. 1-ER-53. The record shows that the European countries Idaho identifies are working to *improve* the body of medical research and the quality of gender-affirming medical care for minors.—e.g., in some countries providing that treatment should occur within clinical research settings where data can be collected, or "extend[ing] the psychological support phase." 1-ER-52–53; 5-ER-968–69. As the district court recognized, not one of these European countries has banned gender affirming medical care for transgender youth, let alone criminalized it. 1-ER-52.

### B. The District Court Did Not Abuse Its Discretion in Holding That The Families Are Likely to Succeed on Their Equal Protection Claim

The district court properly held that the Ban likely violates the Equal Protection Clause because it "explicitly classifies based on transgender status" and sex, 1-ER-45, 47, and likely could not satisfy the requisite heightened scrutiny. 1-ER-54.

### i.   The Ban Classifies on the Basis of Transgender Status

As the district court properly recognized, the Ban "explicitly classifies based on transgender status"—a quasi-suspect classification—and is therefore subject to heightened scrutiny. ER-045–47. It is settled in this Court that classifications based

30

on transgender status are quasi-suspect. *Karnoski*, 926 F.3d at 1200–01; *Hecox*, 79 F.4th at 1026.

By prohibiting medical treatments for minors only when provided "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex *if that perception is inconsistent with the child's biological sex*," the Ban facially classifies based on transgender status. Idaho Code § 18-1506C(3) (emphasis added). A transgender person is, by definition, someone whose gender identity is inconsistent with their "biological sex." 1-ER-45–46; 4-ER-871; *see also Karnoski*, 926 F.3d at 1187 n.1.

***First***, in response, Idaho argues that the Ban simply regulates the treatment of gender dysphoria and does not use the word "transgender." Br. 27. But the Ban does not mention "gender dysphoria" either. The prohibition is tied to whether treatments affirm a gender that is inconsistent with a person's "biological sex," not any particular medical condition. *See* Idaho Code § 18-1506C. More importantly, *Hecox* foreclosed that argument by holding that "even if [the law] does not use the word 'transgender,'" because it has been "carefully drawn" to reach those who, by

31

definition are transgender, it classifies based on transgender status. *Hecox*, 79 F.4th at 1025.[7]

Idaho's argument ignores the text, purpose, and effect of the Ban. Even if it could be deemed a law that regulates the treatment of gender dysphoria, banning well-accepted treatments for gender dysphoria would still be proxy discrimination on the basis of transgender status, whether or not the statute uses the words "transgender." *See M.H.* v. *Jeppesen*, No. 1:22-CV-00409, 2023 WL 4080542, at *12–13 (D. Idaho June 20, 2023) (targeting gender dysphoria can be both proxy and facial discrimination against transgender people), *appeal docketed*; *see also Pac. Shores Properties, LLC* v. *City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013) (proxy discrimination "arises when [] a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group."); *see generally Hecox*, 79 F.4th at 1024–25. Transgender identity is so closely correlated

---

[7] Idaho notes that it has sought rehearing en banc in *Hecox*, Br. 27, but that does not undermine its precedential value. *See, e.g.*, *Wedbush, Noble, Cooke, Inc.* v. *S.E.C.*, 714 F.2d 923, 924 (9th Cir. 1983). Nor does this Court's prior First Amendment decision in *Tingley* v. *Ferguson*, 47 F.4th 1055, 1066 (9th Cir. 2022), *cert. denied*, 144 S. Ct. 33 (2023), which did not even reach the issue.

with gender dysphoria that singling out gender dysphoria singles out transgender people.  1-ER-46.[8]

**Second**, Idaho suggests that the Ban does not "regulate gender dysphoria treatments as a proxy" to invidiously classify based on transgender status because the state has a rational reason to regulate such treatments "based on their long-term risks and unproven benefits." Br. 28.  Setting aside the district court's clear contrary findings regarding the risks and benefits of the Ban, 1-ER-024–025, Idaho's position "conflates the classifications drawn by the law with the state's justification for it." *Brandt*, 47 F.4th at 670.  The strength of Idaho's justification—including the risks and benefits of gender-affirming care—may be relevant to determining whether the Ban survives heightened scrutiny.  But it is no basis to refuse to subject the law's transgender-status-based classification to heightened scrutiny.

**Third**, Idaho argues that because the law applies to only some transgender people—transgender adolescents seeking gender-affirming medical care—it cannot

---

[8] The fact that only transgender people undergo treatment for gender dysphoria does not make this a facially neutral classification under *Dobbs* v. *Jackson Women's Health Org.*, 597 U.S. 215 (2022).  *See* Br. 29–30.  In *Dobbs*, no party argued that being pregnant was a proxy for sex or womanhood.  *See Dobbs*, 597 U.S. 215.  The inquiry here is different, and the more analogous cases are those regulating same-sex intimacy in which the Court declined to distinguish between status and conduct. *See, e.g.*, *Christian Legal Soc.* v. *Martinez*, 561 U.S. 661, 689 (2010); *Lawrence* v. *Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J. concurring).

constitute proxy discrimination unless there is evidence that the law specifically targets those individuals because they are members of that class. Br. 28. But proxy discrimination does not require that the discrimination extend to every member of the classified group, or that animus be shown. Just as a yarmulke tax targets Jews even though not all Jews wear yarmulkes, *Bray* v. *Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993), and "discriminating against individuals with gray hair is a proxy for age discrimination" even though not all older people have gray hair, *Pac. Shores,* LLC, 730 F.3d at 1160 n.23, banning gender-affirming care for transgender adolescents classifies based on transgender status even if not all such adolescents seek treatment.[9]

ii.  The Ban Facially Classifies on the Basis of Sex

The Supreme Court has been unequivocal that "all gender-based classifications" must be subjected to "heightened scrutiny." *United States* v. *Virginia* (*VMI*), 518 U.S. 515, 555 (1996) (citation omitted).

---

[9] Regardless, although Idaho denies "any hint of animus," Br. 28, the record shows that the Ban is part of an ongoing Idaho legislative effort to target transgender people, with the legislature considering six additional anti-transgender bills in 2023 alone. *See* H.B. 71, H.B. 265, S.B. 1003, S.B. 1016, S.B. 1071, S.B. 1100, 67th Leg., 1st Reg. Sess. (Idaho 2023). As just one example, less than a month after the Ban was passed, its co-sponsor publicly described the very *existence* of LGBTQ youth as "clearly an epidemic running in America," of which states "need to help stop the spread." 3-SER-731.

The Ban criminalizes the treatments at issue only if they are used "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." Idaho Code § 18-1506C(3) (2023). As such, the district court properly recognized that the Ban "draws sex-based classifications on its face" by sorting minors into two classes based on their birth-assigned sex: those who *are* legally permitted to access the medical care outlined in the law, and those who are *not*. 1-ER-47. Determining who is legally permitted to access these treatments therefore depends exclusively on comparing the minors' gender identity against their assigned sex. It is impossible to determine whether a treatment is permissible or criminalized under the Ban without knowing the individual's birth assigned sex and gender identity. That is a facial sex classification.

Trying to evade such a clear facial classification, Idaho *first* argues that because the Ban regulates both sexes "equally" by prohibiting gender-affirming care for both transgender boys and transgender girls, it "lacks . . . the hallmarks of sex discrimination" and heightened scrutiny should not apply. Br. 24. But it "is axiomatic" that such classifications do not somehow become neutral "on the assumption that all persons suffer them in equal degree." *Powers* v. *Ohio*, 499 U.S. 400, 410 (1991). The Supreme Court has explained that peremptory challenges based on sex are impermissible even "if each side uses its peremptory challenges in

35

an equally discriminatory fashion" because "the exclusion of even one juror for impermissible reasons" is an injury *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 142 n.13 (1994); cf. *Bostock* v. *Clayton Cnty.*, 590 U.S. 644, 671 (2020) (it does not matter "if an employer treats men and women comparably as groups; an employer who fires both lesbians and gay men equally doesn't diminish but doubles its liability.").[10]

> **Second**, Idaho contends that "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny" absent "'invidious discrimination.'" Br. 25 (quoting *Dobbs* v. *Jackson Women's Health Org.*, 597 U.S. 215 (2022), and *Geduldig* v. *Aiello*, 417 U.S. 484 (1974)). But *Dobbs* did not immunize facial sex classifications in the healthcare context and direct that they are subject to deferential review, nor did it overrule *VMI's* command that all

---

[10] Idaho offers another version of its "equal" application argument by claiming that heightened scrutiny does not apply because the law does not "'work to' anyone's 'disadvantage' by imposing any burden the plaintiff 'would not bear' if they were not a member of the suspect class." Br. 24 (quoting *Miss. Univ. for Women* v. *Hogan*, 458 U.S. 718, 723 n.8 (1982)). But that is incorrect as a matter of fact and law. As discussed above, the law criminalizes treatment based on an individual's sex designated at birth, thus "disadvantaging" Pam and Jane based on their sex. To the extent Idaho is arguing that a classification that does not intentionally disadvantage one sex vis-a-vis another does not trigger heightened scrutiny, that is not the proper legal test either. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW* v. *Johnson Controls, Inc.* (*UAW*), 499 U.S. 187, 199 (1991) ("the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect").

36

sex classifications warrant heightened scrutiny. Indeed, the Court in *Dobbs* explicitly directed that "[n]othing in th[at] opinion should be understood to cast doubt on precedents that do not concern abortion." *Dobbs*, 597 U.S. at 290; *see also id.* at 257, 262, 295. As to equal protection, *Dobbs* merely restated *Geduldig*'s conclusion that classifications based on pregnancy do not automatically trigger heightened scrutiny, even if they have a disparate impact on women. *See id.* at 236–37. That does not resolve the level of scrutiny here, where the Ban facially classifies based on sex. Moreover it is not merely a disparate impact when the prohibition turns on and is animated by the patient's sex, as here. Idaho tries to shoehorn the Ban into *Dobbs* by arguing that only a person designated female at birth takes testosterone to undergo a gender transition, and thus, *Dobbs*' disparate impact analysis applies. Br. 25. But that framing does not avoid the facial sex classification; it just builds the sex classification into the treatment's description (whether the patient is "undergo[s] a gender transition" still turns on the patient's birth-assigned sex). However you slice it, the Ban classifies based on sex.[11]

---

[11] Idaho's analogy to *Tingley* does not work. Br. 26. That the ban on conversion therapy at issue in *Tingley* did not violate the First Amendment says nothing about whether laws would be subject to heightened scrutiny under the Equal Protection Clause. *See, e.g.*, Motion for Leave to File Amicus Curiae Brief in Support of Defendants-Appellees and in Support of Affirmance of the Judgment Below at 24, *Pickup* v. *Brown*, 740 F.3d 1208 (9th Cir. 2014) (No. 12-17681) (arguing that

Additionally, Idaho's suggestion that only classifications grounded in invidious discrimination trigger heightened scrutiny, Br. 25, is foreclosed by *VMI* and other Supreme Court precedent. *See*, *e.g.*, *Nguyen* v. *INS*, 533 U.S. 53, 60, 68 (2001) (applying heightened scrutiny to sex-based classification despite expressly finding that it was not premised on gender-based stereotypes). In any case, the Ban *does* invidiously discriminate by enforcing and compelling conformity to sex stereotypes, and as the district court found, "there is every indication that [the Ban] was intended to single out transgender children based solely upon their transgender status." 1-ER-49.

***Finally***, Idaho imagines a parade of horribles if "any reference to sex in a statute dictated heightened review"—that the regulation of any sex-specific medical procedures such as prostate cancer treatment, therapies to improve breast feeding, and abortion would be subjected to heightened scrutiny-. Br. 26–27. This misses the point. The Ban is not subject to intermediate scrutiny because it *references* "sex," but rather because it facially *classifies* on the basis of sex and because whether the medical treatment is criminally banned *turns* on the patient's sex. *See supra* pp. 35–40.

---

substantive due process medical autonomy challenge to a conversion therapy ban should have been evaluated under heightened scrutiny).

### iii.   The Ban Has the Intent and Effect of Enforcing Sex Stereotypes

The Ban also discriminates based on sex stereotypes.  It bans only care that would help a minor depart from sex expectations while allowing all of the same medications and procedures for any other purpose, including helping a minor to conform to expectations for their birth-assigned sex. *See Bostock*, 590 U.S. at 659–63.

Under the Ban, whether any medication or procedure is permitted turns expressly and solely on whether it is for the purpose of "alter[ing]" the adolescent's "appearance" or "affirm[ing]" a gender identity that differs from their sex assigned at birth.   Idaho Code § 18-1506C(3).The Ban "effectively prohibits transgender minors from taking medications or undergoing treatments due to their gender nonconformity,"   1-ER-47, and therefore "'penalize[s]' [treatment for a minor] 'identified as male at birth'" but "'tolerate[s]' [the same treatment for a minor] 'identified as female at birth,'" *Bostock*, 590 U.S. at 660, and vice versa. *See also id*. at 662 (discrimination based on "failing to fulfill traditional sex stereotypes" is unlawful).  This is clear sex discrimination under *Bostock* and triggers heightened scrutiny under the Equal Protection Clause.

Idaho responds that biological differences between the sexes are not sex stereotypes, Br. 27, citing *Tuan Anh Nguyen* v. *INS*, 533 U.S. 53 (2001).  Nobody suggests they are.  Instead, it is the Ban's refusal to permit transgender minors to

39

seek medical care to affirm and express their gender identity that is rooted in stereotyping. *See VMI*, 518 U.S. at 550 ("generalizations about 'the way women are'" or "what is appropriate for *most women*" cannot be used to discriminate). The Ban penalizes gender non-conformity and adolescents who "alter their appearance" inconsistent with their sex-assigned at birth. Idaho Code § 18-1506C(3). While most people assigned female at birth will identify as women, not all do; the Ban targets those who do not.

> iv. <u>The District Court Did Not Abuse Its Discretion in Holding That the Families Are Likely to Show the Ban Fails Heightened Scrutiny</u>

Under heightened scrutiny, the government bears the burden of demonstrating an "exceedingly persuasive justification" for its action. *VMI,* 518 U.S. at 531. The government also bears the burden of demonstrating the law has a "close means-end fit" that does not "classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn." *Sessions* v. *Morales-Santana*, 582 U.S. 47, 63 n.13, 68 (2017). The "burden of justification is demanding"—not "deferential"—and "rests entirely on the State." *VMI*, 518 U.S. at 533, 555. It is then incumbent on the Court to "ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status." *SmithKline Beecham Corp.* v. *Abbott Lab'ys*, 740 F.3d 471, 483 (9th Cir. 2014)).

The district court correctly held that Idaho has not met its burden. Idaho's purported end in passing the Ban is "'safeguarding the physical and psychological well-being' of minors." Br. 31. The Families do not contest the importance of that end. But the means by which Idaho seeks to achieve those ends—a total, exceptionless ban on all types of gender-affirming medical care for transgender adolescents,[12] even when doctors, patients, and families agree treatment is in the patient's best interest—cannot possibly survive heightened scrutiny. The Ban prohibits care that *supports* the "physical and psychological wellbeing of minors," a finding supported by every major medical organization in the United States. 1-ER-24. The Ban thus *undermines* Idaho's purported purpose. As the district court observed, the Ban "does not serve the State's interest in protecting Idaho's youth; it harms them." 1-ER-52. Thus, the district court correctly concluded that Idaho failed to demonstrate an "exceedingly persuasive justification" for the Ban's classification

---

[12] Strangely, Idaho complains that the district court impermissibly "lumped together multiple different interventions—puberty blockers, estrogen, testosterone, and many surgeries—and treated them all the same." Br. 34. But it is the *Ban* that lumps multiple different interventions and criminalizes them all the same (though only if administered for the purpose of affirming a transgender person's gender identity). The district court considered the detailed factual record and extensive expert testimony on the risks and benefits of the banned treatments and the court found that the evidence showed insufficient ends-means fit for the law as written; the Ban's overbreadth evidences its unconstitutionality rather than inoculates against it. *See* 1-ER-52.

41

and a "close means-end fit" between it and an important government interest, and that the Ban fails heightened scrutiny. 1-ER-53–54 (citing *Sessions*, 582 U.S. at 68 (internal quotation and citation omitted)).

As discussed above, Idaho's arguments to the contrary rest on incorrect factual premises that were already rejected by the district court as unsupported by the evidence, namely that gender-affirming care "lacks any proven benefits" or is dangerous. Br. 17, 32–33. Instead, the court found, based on ample record support, that the treatment is beneficial and that the potential "risks [are] comparable to risks associated with other types of medical care families are free to seek for minors." 1-ER-24–25. There is no basis to disturb the district court's conclusion nor must this or any Court simply defer to either Idaho's interpretation of the scientific evidence or to the evidence it imagines the Idaho legislature relied upon.[13] Br. 36; *see supra*

---

[13] Idaho asserts that under heightened scrutiny, courts should defer to a state's interpretation of scientific evidence that "fairly support[s]" the "rationale" for its law, citing *City of Los Angeles* v. *Almeda Books, Inc.*, 535 U.S. 425, 426 (2002) (internal quotation marks and citation omitted), and two other First Amendment cases. Br. 36. Whatever scientific evidence Idaho imagines the Idaho legislature relied upon in enacting the Ban, the aforementioned cases were not Equal Protection cases, but rather First Amendment challenges to restrictions on adult establishments and the adult film industry, where different standards apply. In any case, even when applying the First Amendment standard, the court explained that a "municipality's evidence must fairly support its rationale for its ordinance," and that its proffered evidence is *not* entitled to deference if a plaintiff either demonstrates that the evidence does not support the municipality's rationale or offers contrary evidence disputing the municipality's factual findings. *Almeda Books*, 535 U.S. at 438–39.

p. 17; *see, e.g.*, *Fyock* v. *Sunnyvale*, 779 F.3d 991, 1000–01 (9th Cir. 2015) (declining to "re-weigh the evidence and overturn the district court's evidentiary determinations" where the court gave greater weight to more persuasive evidence in the record), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n, Inc.* v. *Bruen*, 597 U.S. 1 (2022); *see also Duncan* v. *Becerra*, 742 F. App'x 218, 221–22 (9th Cir. 2018) (state's disagreement with district court's analysis of evidence, including "numerous judgment calls regarding the quality, type, and reliability of the evidence, as well as repeated credibility determinations," was insufficient to reverse district court's finding that law failed intermediate scrutiny).

As the district court found, there is nothing unique about gender-affirming care that explains the state's decision to override parents' medical decision-making for this, and only this, care. 1-ER-58–59. Indeed, the Ban permits minors to receive the same treatments for any purpose other than affirming the gender identity of a transgender adolescent. *See supra* pp. 31–35. It even permits minors to receive the prohibited treatments to affirm their gender as long as it is consistent with their biological sex. *See* 4-ER-909. And while Appellant argues that cisgender minors never actually receive the procedures forbidden for transgender minors for the purpose of gender affirmation, Br. 31, the record proves otherwise. For example, a cisgender male adolescent with gynecomastia can undergo surgery to remove benign breast tissue to alleviate emotional distress from being a boy with breasts.

*See* ER-909. A cisgender girl experiencing a hormonally-induced increase in facial and body hair may be provided a testosterone suppressant to align her physical appearance with *her* gender identity. *Id.*

The district court correctly concluded, based on its findings of fact, that the Ban fails heightened scrutiny.[14]

v. The Ban Would Fail Any Level of Scrutiny

Heightened scrutiny is appropriate here for the reasons described above, but the Ban would fail any level of scrutiny, including rational-basis review, because it "is so far removed from" the purported goal of protecting children that "it [is] impossible to credit" it. *Romer* v. *Evans*, 517 U.S. 620, 635 (1996). The Ban does nothing to protect children; it simply harms transgender youth. There is no rational basis to conclude that allowing minors with gender dysphoria to receive gender-affirming medical care that they, their parents, and their doctors agree is medically necessary "would threaten [Idaho's] legitimate interests [] in a way that" allowing

---

[14] Although Idaho accuses the district court of violating the "principles of federalism," Br. 36, this Court has observed that "a primary purpose of the Constitution is to protect minorities from oppression by majorities . . . '[S]tate laws [] must respect the constitutional rights of persons.' Thus, considerations of federalism cannot carry the day [for Idaho]. They must instead rely on the substantive arguments that [the district court found lacking]." *Latta* v. *Otter*, 771 F.3d 456, 474 (9th Cir. 2014) (quoting *United States* v. *Windsor*, 570 U.S. 744, 766 (2013)); 1-ER-16.

44

other types of medical care—including the same medications for any other purpose—"would not." *City of Cleburne* v. *Cleburne Living Ctr., Inc.*, 473 U.S. 432, 448 (1985). Indeed, that these purportedly "risky procedures" are apparently acceptable for all other purposes further illustrates why the Ban fails rational-basis review.[15] *See Eisenstadt* v. *Baird*, 405 U.S. 438, 451–52 (1972) (applying rational basis review and holding that banning birth control for unmarried people based on the supposed health risks of the pills, while allowing married people to use the same pills violated the Equal Protection Clause).

### C. The District Court Did Not Abuse its Discretion in Holding That the Parents are Likely to Succeed on Their Due Process Claim

The Due Process Clause of the Fourteenth Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington* v. *Glucksberg*, 521 U.S. 702, 720 (1997).

"[T]he interest of parents in the care, custody, and control of their children is [] perhaps the oldest of the fundamental liberty interests recognized by th[e]

---

[15] Additionally, that the Ban *explicitly allows* physicians to perform permanent and irreversible cosmetic genital surgeries on children with intersex conditions, including newborns, despite their incapacity to assent, and despite the fact that major medical organizations like the American Medical Association have recommended against such surgeries on intersex infants and youth, is just further evidence of its irrationality. Idaho Code § 18-1506C(4); *see* 4-ER-902.

45

[Supreme] Court." *Troxel*, 530 U.S. at 65.[16]  In *Parham* v. *J.R.*, 442 U.S. 584, 602, 604 (1979), the Supreme Court concluded that this encompasses the right "to seek and follow medical advice," and that parents "retain plenary authority to seek . . . care for their children, subject to a physician's independent examination and medical judgment." *See also Wallis* v. *Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) (the right to family association includes "the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state.") (citing *Parham*, 442 U.S. at 602)).

Indeed, Idaho itself has recently emphasized the parental interests in medical decision-making to defend Idaho's efforts to ban minors from traveling out of state to obtain abortion care.  Specifically, Idaho has argued it has "an important and compelling interest in protecting a parent's right to make healthcare decisions for their children."  1-SER-36.

---

[16] Idaho has codified its recognition of the fundamental right of parents to direct the "care, custody and control of their children" as "both implicit in the concept of ordered liberty and deeply rooted in our nation's history and tradition." Idaho Code § 32-1010(2); *see also id.* §§ 32-1011, 32-1013 (preventing Idaho from interfering in the fundamental rights of parents in the absence of clear and convincing evidence that such interference is, among other things, the least restrictive means possible).

46

Idaho complains that the district court's holding that the Ban burdens parents' fundamental right to make medical decisions for their children casts the right too broadly. 1-ER-60–61; Br. 37–38. Although there must be a "'careful description' of the asserted fundamental liberty interest," *Glucksberg*, 521 U.S. at 721, describing the right "careful[ly]" does not mean describing the right so narrowly as to "render[] the Fourteenth Amendment largely meaningless," 1-ER-60. Idaho's position—that "there is no right to the procedures prohibited by the [the Ban] that is deeply rooted in our nation's history," since these treatments "did not occur until well into the twentieth century" (Br. 37, internal quotations and citation omitted)—does just that. By this logic, there would be a fundamental parental right to make medical decisions for one's children to access vaccines for smallpox but not polio or COVID-19. *See* 1-ER-061. This view fails "to appreciate the extent of the liberty at stake." *Lawrence* v. *Texas*, 539 U.S. 558, 566-68 (2003) (overturning *Bowers* v. *Hardwick*, 478 U.S. 186 (1986), observing that the *Bowers* court "misapprehended the claim of liberty" by too narrowly construing the right at issue as the "right [for] homosexuals to engage in sodomy").

Idaho argues that a parent's fundamental right "does not sweep more broadly than an adult's right to make decisions for herself." Br. 37 (quoting *L.W.*, 83 F.4th at 475). But the banned treatments are *not banned* for adults. Accordingly, Idaho's sky-is-falling fear that "parents would have a constitutional right to obtain dangerous

47

treatments for their children that they could not receive for themselves" is simply baseless.   Br. 38.   The district court *rejected* Idaho's claims that the banned treatments are dangerous.  1-ER-24–25.  And the cases upon which Idaho relies are inapposite because they concern medical treatments not available to *anyone*.  *See Nat'l Ass'n for Advancement of Psychoanalysis* v. *Cal. Bd. of Psychology* ("*NAAP*") 228 F.3d 1043, 1050 (9th Cir. 2000); *Abigail All. for Better Access to Developmental Drugs* v. *von Eschenbach*, 495 F.3d 695, 703, 706 (D.C. Cir. 2007) (en banc); *Raich* v. *Gonzales*, 500 F.3d 850, 854–55 (9th Cir. 2007).   Idaho has banned treatment for transgender minors only.  So "the issue is not the *what* of medical decision-making—that is, any right to a particular treatment or a particular provider" but "[r]ather, the issue is the who—who gets to decide whether a treatment otherwise available to an adult is right or wrong for a child?" *L.W.*, 83 F.4th at 510 (White, J., dissenting).  The district court correctly held that that decision belongs to parents, not the state.[17]

---

[17] Idaho suggests that the state's police power to regulate medicine effectively immunizes the Ban from constitutional scrutiny.  However, as it eventually acknowledges, the state's police power is constrained by the Constitution.  Br. 22 ("So long as a federal statute does not stand in the way and so long as an enumerated constitutional guarantee does not apply, the States may regulate or ban medical technologies they deem unsafe."); *see also S. Bay United Pentecostal Church* v. *Newsom*, 141 S. Ct. 716, 718 (2021) (Statement of Gorsuch, J.) ("Of course we are not scientists, but neither may we abandon the field when government officials with

## II.    The District Court Did Not Abuse its Discretion in Holding That Idaho Fails the Remaining Stay Factors

Idaho fails to show that the district court's findings that the remaining stay factors favored granting the injunction were an abuse of discretion. *Hernandez* v. *Sessions*, 872 F.3d 976, 987 (9th Cir. 2017).

### A. The District Court Did Not Abuse Its Discretion in Holding That the Families Will Be Irreparably Harmed

The district court credited the Families' "declarations stating that the gender-affirming medical care the minor plaintiffs are receiving has dramatically improved their condition and that eliminating access to those treatments would cause serious consequences, including severe psychological distress and, potentially, the need to regularly incur the expense of out-of-state travel or move out of state permanently" and that "if the plaintiffs do not move or travel out of state for care they will be forced to stop the hormone therapy they are currently receiving and which has helped them so dramatically." 1-ER-62. The district court found "the record reflects that medical treatments banned by HB 71 can be a crucial part of treatment for adolescents with gender dysphoria, and necessary to preserve their health." *Id.*

_____

experts in tow seek to infringe a constitutionally protected liberty."). As discussed, the district court correctly held that the Ban likely violates both the Equal Protection and Due Process Clauses.

49

Accordingly, relying on ample record support, the court found that the Families will be irreparably harmed if the Ban goes into effect.[18]

Idaho devotes just one paragraph to the irreparable-harm factor, and does not even attempt to dispute the overwhelming evidence that the Families will experience serious irreparable harm absent a preliminary injunction. Br. 41. Instead, Idaho makes conclusory assertions that the their evidence is insufficient, citing *Doe* v. *Snyder*, 28 F.4th 103 (9th Cir. 2022). *Doe* is not relevant to this case. There, the requested relief was a *mandatory* preliminary injunction to pay for gender-affirming surgery, "going well beyond the status quo." *Id.* at 106. In denying the mandatory preliminary injunction, the Court noted that Doe had not provided a declaration from a treating provider that surgery was necessary and suitable for *him*. *Id.* at 112. No such declaration is needed here because Pam and Jane's treating providers have already determined that treatment is necessary and suitable for them, as evidenced by the prescriptions that the doctors provided for treatment and the fact that they are *already receiving* treatment. 5-ER-939–44, 947–52. And because Pam and Jane are

---

[18] Idaho argues that the Families have demonstrated only "speculative harm," though fails to explain *how* Appellees' harm is "speculative," Br. 41–42, in the face of overwhelming evidence of harm. Its reliance on *All. for the Wild Rockies* v. *Cottrell*, 632 F.3d 1127, 1136–38 (9th Cir. 2011), where the asserted harm was found to be "speculative" because the party did not sufficiently quantify its expected monetary loss, is misplaced. And by failing to raise the argument in district court, Idaho waived it. *See Padgett* v. *Wright*, 587 F.3d 983, 985 n.2 (9th Cir. 2009).

already receiving treatment, they and their parents can personally speak to the harms that will occur should they be cut off from their treatment.

The district court also correctly found irreparable harm because, given its holding that "HB 71 is likely unconstitutional, 'it follows inexorably' that plaintiffs have demonstrated irreparable harm." 1-ER-62 (quoting *Hernandez*, 872 F.3d at 995).

### B. The District Court Did Not Abuse its Discretion in Holding That the Public Interest and Balance of Equities Favor the Families

The district court correctly recognized that "because plaintiffs have shown a likelihood that a state law violates the Constitution, they have also established that both the public interest and the balance of equities favors a preliminary injunction, as both factors favor 'prevent[ing] the violation of a party's constitutional rights.'" 1-ER-63 (quoting *Hecox*, 79 F.4th at 1036). Idaho does not try to address this inexorable conclusion.

Idaho asserts that the injunction would cause irreparable harm to the state by preventing it from "protect[ing] vulnerable children." Br. 41–42. That again relies on factual assertions that the district court explicitly rejected. The court found that the Ban does not protect vulnerable children but rather, "the evidence shows the opposite," a finding that Idaho must show was clearly erroneous to prevail. 1-ER-63.

51

\*　　　\*　　　\*

Because Idaho fails at every step to show that the district court's factual findings were clear error, that its legal conclusions were erroneous, or that it abused its discretion in holding that the preliminary-injunction factors favor a preliminary injunction, the Families respectfully request this Court leave undisturbed the district court's decision.

## III.　The Scope of the Injunction Is Proper

All of Idaho's arguments regarding the scope of the district court's injunction lack merit, and several are waived, regardless.

### A. The District Court Did Not Abuse its Discretion in Granting Facial Relief

As Idaho acknowledges, Br. 42, facial relief is warranted when there is no set of circumstances where the challenged law would be valid. *United States* v. *Salerno*, 481 U.S. 739, 745 (1987). The district court correctly concluded that banning gender-affirming medical care for adolescents is not substantially related to an important governmental interest. 1-ER-53–54. The Ban lacks a close means-end fit, which does not become closer depending on the factual circumstances to which it is applied; it is unconstitutional in all circumstances. There are no circumstances in which it is constitutional to ban treatments only for gender-affirmation of

transgender youth while permitting them for all other purposes, or to usurp parents' fundamental medical decision-making authority.

The injunction's breadth is a direct function of the Ban's. The Ban prohibits a class of people—transgender minors in need of gender-affirming medical care and their families—from doing something everyone else is allowed to do: make medical decisions with their healthcare providers. That any given treatment may or may not be appropriate or necessary for any given patient, [19] Br. 42, is how medicine works and it is why patients, parents, and doctors get to make these individual determinations in other medical contexts *and* under the injunction. There are no factual circumstances in which a minor has a medical need for the prohibited treatments where the law could constitutionally be applied. That any particular treatment might not be medically indicated for any particular person is not an example of a circumstance where the law would be validly applied; it is an example where the law would be irrelevant.

---

[19] Idaho argues that the Ban can be constitutionally applied to genital surgeries because the Endocrine Society generally recommends against such surgeries for minors. Br. 42. But the Endocrine Society guidelines are explicit that they are not absolute and that "[t]reatment decisions must be made based on the independent judgement of healthcare providers and each patient's individual circumstances." 4-ER-669  The evidence showed that—as in all areas of medicine and as permitted for cisgender minors—doctors and families make individualized treatment decisions for adolescents with gender dysphoria based on the needs of the patient.  4-ER-900–06.

53

### B. The Families Properly Challenged the Ban's Prohibition on Treatments for the Purpose of Affirming a Transgender Minor's Gender

Idaho nominally invokes standing to contest the scope of the district court's injunction as to the prohibition on testosterone therapy and surgeries on the grounds that the Families do not seek every prohibited treatment. *See* Br. 2–3, 18, 42–43.

No matter how Idaho's argument is framed, it is without merit. The Ban's operative clause states that a medical provider shall not engage in certain practices for the purpose of affirming a minor's sex if their sex is inconsistent with their "biological sex," Idaho Code § 18-1506C(3), and then contains several subparts enumerating those practices, *id.* 1506C(3)(a)–(d). The Families allege that Section 18-1506C(3)'s prohibition on medical practices for the purpose of affirming a minor's sex inconsistent with their "biological sex" is unconstitutional, , and the district court held that it likely is. 1-ER-053–54, 061–62. That the enumerated banned treatments within the operative clause that undisputedly applies to Pam and Jane include some specific treatments that the two are not currently receiving is irrelevant. [20] There is no question that the Families have alleged an injury sufficient

---

[20] Under Idaho's reasoning, *see* Br. 42–43, the ban on each of the 15 surgical procedures listed in Idaho Code § 18-1506C(3)(a)–(b) could only be challenged one by one, by individuals seeking each specific procedure, even though they are all banned for the same reason—when the purpose is to affirm a patient's gender if

to establish standing to challenge the prohibition on medical treatments to affirm a minor's gender identity inconsistent with their "biological sex" because both Pam and Jane allege that they are currently receiving such treatments.

*Get Outdoors II* does not suggest otherwise. There, the plaintiff was denied a permit for an advertising billboard and tried to challenge the City of San Diego's entire sign ordinance, which had 90 separate operative sections addressing very different types of signs (e.g., construction site signs, warning signs, projecting signs, etc.), each with different requirements. 506 F.3d 886, 890 (9th Cir. 2007); *see* San Diego Municipal Code § 142.12 *et seq*. The court held that the plaintiff could challenge only sections that worked to preclude its permit. *Get Outdoors II*, 506 F.3d at 892; *accord 4805 Convoy, Inc.* v. *City of San Diego*, 183 F.3d 1108, 1111 (9th Cir. 1999) (holding plaintiff had standing to challenge only license revocation provision, not license-granting provision of ordinance). That the plaintiff in *Get Outdoors*, challenging a billboard-permit denial, could not invalidate the sections of the law addressing construction signs does not mean that the Families, who

---

inconsistent with their "biological sex." Idaho cites no authority for such a narrow (and judicially burdensome) understanding of standing. *See* Br. 42–43.

55

challenge just one statutory prohibition that undisputedly injures them, lack standing.[21]

### C. The District Court Did Not Abuse its Discretion in Granting Statewide Relief

Idaho argues that the injunction should not have "reached beyond the plaintiffs." Br. 43.

As the district court found, a statewide injunction is "necessary to give [the Families] the relief to which they are entitled," because they cannot receive complete relief without an injunction allowing third parties to provide the prohibited medical care. 1-ER-064–65 (quoting *Bresgal* v. *Brock*, 843 F.2d 1163 1170–71 (9th Cir. 1987)); *see also Easyriders Freedom F.I.G.H.T.* v. *Hannigan*, 92 F.3d 1486, 1501–02 (9th Cir. 1996) (affirming a statewide injunction prohibiting enforcement of California's motorcycle helmet law, even though there were just 14 plaintiffs,

---

[21] For the same reason, any reliance on *DaimlerChrysler Corp.* v. *Cuno*, 547 U.S. 332 (2006), and *Lewis* v. *Casey*, 518 U.S. 343 (1996), would be misplaced. In *DaimlerChrysler*, the plaintiffs—who had standing to challenge the municipal tax provision of a statute—admitted they likely did not have standing to challenge the state tax provision. 547 U.S. at 338–39. The Court's refusal to extend the doctrine of supplemental jurisdiction to allow those plaintiffs to challenge state taxes merely by piggybacking on their standing to challenge municipal taxes is inapplicable to this case. *Id.* at 352. In *Lewis*, the plaintiff class could only show that two inmates suffered actual harm, which limited their ability to seek systemwide changes. 518 U.S. at 346, 356. Here, the Families challenge a statewide law itself and Idaho does not dispute that the law sufficiently harms the Families for the purposes of standing. *See* Br. 2–3, 18, 42–43.

because the plaintiffs could not otherwise "receive the complete relief to which they [were] entitled"); Idaho Code § 18-1506C (criminalizing the provision of—not the receipt of—gender-affirming medical care).  The district court found that because plaintiffs are proceeding under pseudonyms, "it would be administratively burdensome, if even possible, to fashion an injunction that would allow them to secure relief without compromising their anonymity."  1-ER-65.  Moreover, an injunction applicable to only the Families would not allow them to obtain the relief they urgently need and to which they are entitled because it is not clear how any medical provider or pharmacist in Idaho would be able to verify that the patients were really the parties in this case, and thus feel safe to provide them care without risking a decade's imprisonment.

Because there are no exceptions to the Ban on care for transgender minors, doctors, pharmacists, and others from whom the Families may pursue care will predictably cease providing these treatments altogether, out of fear of incarceration. Specialists providing gender-affirming care may shut down their practices and move out of state.  And even if they stayed, it would be unreasonable to expect them to risk providing Pam and Jane with the banned care, given the extraordinary penalty if they got it wrong.

Statewide relief is necessary to prevent irreparable harm to the Families.  In addition, where a state statute is likely facially unconstitutional, statewide relief is

an appropriate remedy.  *See Hecox*, 79 F.4th at 1036–37 (affirming statewide injunction where the district court found the law at issue was likely unconstitutional); *Brandt*, 47 F.4th at 672 (affirming state-wide preliminary injunction enjoining gender-affirming medical care ban); *F.V.* v. *Barron*, 286 F. Supp. 3d 1131, 1146 (D. Idaho 2018) (granting statewide relief).  Idaho's attempt to distinguish *Hecox* fails. *See* Br. 44.  There, this Court concluded that Idaho's sports law was "unconstitutional as applied to all women."  *Hecox*, 79 F.4th at 1027, 1037.  So too, here, the district court correctly concluded that the Ban is facially unconstitutional because, as discussed above, it cannot be constitutionally applied to anyone for whom the prohibited medical care is indicated.  1-ER-045–46.  And it encroaches on the constitutional rights of *all* parents of transgender adolescents who need this care.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court and uphold the injunction.


Date: March 5, 2024                        Respectfully submitted,

                                           /s/ *Alexia D. Korberg*
                                           Alexia D. Korberg

Li Nowlin-Sohl
(admitted only in Washington)
Chase B. Strangio
James D. Esseks
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
cstrangio@aclu.org
jesseks@aclu.org

Richard Eppink
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop


Brad S. Karp
Alexia D. Korberg
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com

Jordan E. Orosz
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com


Eric Alan Stone
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 Fifth Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0034
eric.stone@groombridgewu.com

Philip S. May
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com


Dina Flores-Brewer
Paul Carlos Southwick (admitted only
in Oregon)
Emily Myrei Croston (admitted only in
the District of Columbia)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org
psouthwick@acluidaho.org
ecroston@acluidaho.org

59

## CERTIFICATE OF COMPLIANCE

I hereby certify:

1.     This brief complies with the type-volume limitation of Cir. R. 32-1(a) because it contains 13,866 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word-count feature of Microsoft Word.

2.     This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and the type-scale requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.


/s/ *Alexia D. Korberg*

Alexia D. Korberg
Counsel for Appellees

March 5, 2024

60

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2024, I electronically filed this Answering Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

/s/ *Alexia D. Korberg*

Alexia D. Korberg

Counsel for Appellees

March 5, 2024