APPEAL NO. 24-142

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PAM POE, by and through her parents and next friends Penny and Peter Poe, et al.,

*Plaintiffs-Appellees*,

v.

Raúl LABRADOR, in official capacity as Attorney General of the State of Idaho, et al.,

*Defendants-Appellants*,

and

JAN M. BENNETTS, in official capacity as Ada County Prosecuting Attorney, et al.

*Defendants.*

On Appeal from the United States District Court
for the District of Idaho / Case No. 1:23-cv-00269-BLW

## SUPPLEMENTAL EXCERPTS OF RECORD OF
## APPELLEES VOLUME 1 of 3

Li Nowlin-Sohl
(admitted only in
Washington)
Chase B. Strangio
James D. Esseks
AMERICAN CIVIL LIBERTIES
UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
jesseks@aclu.org
cstrangio@aclu.org

Richard Eppink
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop

Brad S. Karp
Alexia D. Korberg
PAUL, WEISS, RIFKIND,
WHARTON &
GARRISON LLP
1285 Avenue of the
Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com

Eric Alan Stone
GROOMBRIDGE, WU,
BAUGHMAN AND
STONE LLP
565 Fifth Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0034
eric.stone@groombridgewu.com

Philip S. May
GROOMBRIDGE, WU,
BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite
1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgew
u.com

Jordan E. Orosz
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON
LLP
2001 K Street, NW
Washington, DC 20006-
1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Dina Flores-Brewer
Paul Carlos Southwick
(admitted only in Oregon)
Emily Myrei Croston
(admitted only in the District
of Columbia)
ACLU OF IDAHO
FOUNDATION
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org
psouthwick@acluidaho.org
ecroston@acluidaho.org

*Counsel for Appellees*

Li Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
David A. DeRoin (ISB no. 10404)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

*Additional counsel for Plaintiffs identified on
the following page*

<div align="center">

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

</div>

| | |
|---|---|
| **PAM POE**, by and through her parents and next friends, Penny and Peter Poe; **PENNY POE**; **PETER POE**; **JANE DOE**, by and through her parents and next friends, Joan and John Doe; **JOAN DOE**; **JOHN DOE**, <br><br> *Plaintiffs*, <br><br> v. <br><br> **RAÚL LABRADOR**, in his official capacity as Attorney General of the State of Idaho; **JAN M. BENNETTS**, in her official capacity as County Prosecuting Attorney for Ada, Idaho; and the **INDIVIDUAL MEMBERS OF THE IDAHO CODE COMMISSION**, in their official capacities, <br><br> *Defendants*. | Case No. 1:23-cv-00269-CWD |

<div align="center">

**EXPERT REBUTTAL DECLARATION OF CHRISTINE BRADY, PhD**

</div>

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com
kyle.bersani@groombridgewu.com

Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Philip S. May*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel:  (202) 505-5830
philip.may@groombridgewu.com

Dina Flores-Brewer (ISB no. 6141)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID  83701
(208) 344-9750
dfloresbrewer@acluidaho.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

I, Christine Brady, PhD, hereby declare and state as follows:

1.  I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

2.  I have actual knowledge of the matters stated herein.

3.  My background and credentials are outlined in my initial declaration.

4.  I reviewed the declarations of Drs. Cantor and Weiss. There are many assertions made in those declarations that I do not believe are supported by evidence.  I do not attempt to address all of them here but, instead, respond to some of the central arguments made in those declarations.  I reserve the right to supplement my opinions, if necessary, as the case proceeds.

## DR. WEISS'S ASSERTION THAT GENDER DYSPHORIA IS A SYMPTOM OF OTHER MENTAL HEALTH DISORDERS IS UNSUPPORTED BY EVIDENCE

5.  Dr. Weiss misunderstands gender dysphoria to be a symptom of other mental health issues such as trauma, abuse and depression (as opposed to a separate diagnosis), and claims that if those other issues are addressed, that will resolve the gender dysphoria. Declaration of Daniel Weiss (Dkt. 56-3) ("Weiss Decl.") ¶ 21; Ex. B to the Declaration of Ritchie Eppink, Daniel Weiss Deposition Transcript ("Weiss Dep.") 213:1-215:8.  By using quotation marks when referring to gender dysphoria (but not any other diagnoses), Dr. Weiss apparently disagrees with the DSM's recognition of gender dysphoria as a psychiatric diagnosis.  His views are completely at odds with how gender dysphoria is understood by those working within the mental health field, including Dr. Cantor, who agrees that gender dysphoria is a mental health condition that should be treated.  Declaration of James Cantor (Dkt. 56-4) ("Cantor Decl.") ¶109. Indeed, gender dysphoria (and precursor diagnoses such as "gender identity disorder") has been included in the DSM as a diagnosis since the publication of the DSM-III in 1980.  Gender dysphoria, like all mental health conditions, can co-occur with other diagnosed conditions but

that does not mean that in those cases, gender dysphoria is a symptom of other conditions. Moreover, not all people with gender dysphoria have the other mental health conditions mentioned by Dr. Weiss. I have treated a number of adolescents with gender dysphoria who do not meet criteria for any other DSM diagnosis and have no history of trauma or abuse.

### DEFENDANTS' EXPERTS' STATED CONCERNS ABOUT GENDER-AFFIRMING CARE ARE BASED ON A MISUNDERSTANDING OF HOW SUCH CARE IS PROVIDED IN ACCORDANCE WITH THE WPATH SOC

6. The State's experts assert a number of concerns about the treatment of adolescents with gender dysphoria that are premised on a profound misunderstanding of how care is provided in accordance with the recommendations of the World Professional Association for Transgender Health's Standards of Care for Transgender and Gender Diverse People ("WPATH SOC"). Specifically, they assert concerns regarding automatic acceptance of reported transgender identity, the misdiagnosis of gender dysphoria, and social influences causing adolescents to present at gender clinics. All of these stated concerns ignore or misunderstand the comprehensive psychosocial evaluation, which is a core recommendation of the WPATH SOC prior to considering any medical interventions for adolescents.

7. Dr. Cantor suggests that gender affirming healthcare providers support "transition-on-demand". Cantor Decl. ¶ 125. He seems to be asserting that when patients present to gender clinics, if they say they are transgender, doctors fail to engage in exploration of the patient's gender identity and other comorbidities. *See* Cantor Decl. p. 111 (heading) (suggesting doctors "assum[e] literal accuracy of self-report"). This is simply untrue. Under the WPATH SOC, a comprehensive psychosocial assessment is a critical component of care prior to considering medical interventions. WPATH SOC, p. S59-S61. And that includes not only assessing whether the patient meets the criteria for gender dysphoria, but also assessing other mental health issues affecting the patient. *Id.*, p. S62-S63. Additionally, information is obtained

not *just* from the youth but also from their parents.  *Id.*, p. S60.  This is not only to increase the reliability of the clinical data obtained, but to more fully understand the history of the child's experience related to their gender and any other mental health issues.

8.      The State's experts also suggest that adolescents may be misdiagnosed with gender dysphoria when they have other mental health conditions that need to be addressed.[1] Again, this overlooks the comprehensive psychosocial evaluation that is provided prior to considering medical interventions.  Differential diagnosis is a part of the process and alternative or additional mental health conditions may be identified.  In my own clinical experience, I've had a number of patients who have presented expressing issues related to their gender identity where, after evaluation and exploration, it became clear that the patient did not have gender dysphoria and there were other issues that required attention and treatment.  In other cases, patients have gender dysphoria in addition to other mental health issues that need to be addressed.   It is not unique to gender dysphoria that individuals can carry multiple mental health

---

[1]  Dr. Cantor suggests a specific concern about gender dysphoria diagnoses being misdiagnosed as borderline personality disorder (BPD).  Cantor Decl. ¶ 160.  He highlighted two of nine criteria of BPD that he believes could be diagnostically confused with gender dysphoria, starting with "recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior" and "identity disturbance: markedly and persistently unstable self-image or sense of self."  While suicidal thoughts and self-harm behaviors are diagnostic criteria for many mental health disorders including various forms of depression, bipolar disorder, schizophrenia, anxiety and PTSD, they are not part of the diagnostic criteria for gender dysphoria and the presence of those symptoms would not impact or influence the diagnosis of gender dysphoria. As for the "identity disturbance" criterion, as stated in the diagnostic criteria for BPD, the identity must be "persistently unstable."  In the case of gender dysphoria, symptoms must be stably present for a duration of at least six months and in most cases presenting to our Gender Clinic, have been stable for several years.  Goldhammer and colleagues (2019) examined the relationship between BPD and gender dysphoria and concluded that "gender minority identity is rarely a sign of identity diffusion."  Hilary Goldhammer et al., *Distinguishing and Addressing Gender Minority Stress and Borderline Personality Symptoms*, 27 HARV REV PSYCHIATRY 317-325, 323 (2019). Finally, in order to be diagnosed with BPD, an individual must display 5 or more of the nine criteria.  Having these two symptoms alone would not meet criteria for BPD and completely different symptoms must be had in order to be diagnosed with gender dysphoria.

diagnoses.  And the suggestion by the State's experts that a gender dysphoria diagnosis and treatment with gender-affirming medication means that any other mental health conditions a patient has will not be addressed, *see* Cantor Decl. ¶¶ 158, 237, is without basis.  I provide psychotherapy for comorbidities to many patients who are receiving puberty blockers or hormone therapy, and this is common in gender clinics across the country.

9.     The State's experts assert that many adolescents present for care at gender clinics because they are influenced by social media and their peers.  Cantor Decl. ¶ 136; Weiss Decl. ¶ 30.  It is hard to imagine this happening given that in my clinical experience, most patients have experienced gender incongruity and dysphoria for several years prior to presenting to clinic. In any case, should social influence lead someone to present to a medical provider asserting a transgender identity and seek gender-affirming medical care, like all patients they would receive a comprehensive psychosocial evaluation prior to considering any medical interventions, which would examine the history of their gender identity and possible external drivers of identity.  I am confident that such evaluations would identify peer and social media influence if that were a factor and no medical interventions would be provided if the patient did not meet the criteria for gender dysphoria.

### THE STATE'S EXPERTS INAPPROPRIATELY RELY ON THE DESISTANCE STUDIES OF PREPUBERTAL CHILDREN TO SUPPORT BANNING GENDER-AFFIRMING MEDICAL CARE FOR ADOLESCENTS WITH GENDER DYSPHORIA

10.     The State presents data on pre-pubertal gender nonconforming children to suggest that most youth affected by the Idaho law will "cease to want to be the other gender."  Cantor Decl. ¶ 116.  There are several reasons why such a conclusion cannot be made from this data. First, the studies included in Dr. Cantor's meta-analysis date from 1972 – 2021 (with all but 1 of the 11 studies done during prior to the DSM-5).  Cantor Decl. Table 2, pp. 50-51.  As outlined in my opening declaration, prior to DSM-5, the diagnostic criteria did not require that a child

identify with a different sex – in other words, a child could be diagnosed with the precursor diagnosis of gender identity disorder solely on the basis of gender atypical behavior. As Dr. Cantor acknowledges in his report, many of the studies were not limited to transgender children, but rather included gay, uncertain, and crossdressing children; several of the studies—as indicated by their titles—assessed "effeminate behavior in boys". *Id*. Therefore, the studies do not provide data on desistance of children who have gender dysphoria.

11.    Second, the studies looked only at prepubertal children and say nothing about the likelihood of desistance among adolescents—youth who have started puberty, who Dr. Cantor recognizes are less likely to desist. Cantor Decl. ¶ 245 (desistance less likely to occur after age 12). It is important to note that medical interventions are not offered to pre-pubertal youth.  Thus, the rates of desistance among prepubertal children would not support an argument to prohibit medical care for adolescents.

**DR. CANTOR'S OPINION THAT GENDER-AFFIRMING MEDICAL CARE SHOULD BE POSTPONED UNTIL ADULTHOOD WOULD RESULT IN SERIOUS SUFFERING**

12.    Dr. Cantor states "Accepting that gender identity can change, even if only *involuntarily*, calls for the very policy Dr. Brady rejects: Hold off medicalization until adulthood."  Cantor Decl. ¶ 267.  As an initial matter, Dr. Cantor overstates the likelihood of gender identity changing among adolescents—the group affected by the Idaho law—by relying inappropriately on the desistance studies of prepubertal children.  In my clinical experience, while I have had patients who, over time, use different gender diverse identity labels for themselves, e.g., shifting from identifying as transgender female to non-binary, shifts from gender diverse to cisgender have been extremely rare (6 out of over 900 patients).  The fact that there may be some adolescents who have a shift in their gender identity to cisgender is not a basis to withhold treatment from those who need and would benefit from it.  The fact that a

patient's gender identity changed to cisgender does not equate with regretting treatment or negative consequences of treatment. That was my clinical experience with my two patients who shifted to a cisgender identity after having received pubertal suppression.  And research shows that people whose gender identity evolved to cisgender have nonetheless found that the treatment helpful for them at the time.[2]  Moreover, almost all if not all medical treatments have some patients who ultimately regret receiving them, but that is not a reason to deny treatment to those who need and benefit from it.

13.     The State's experts suggest that gender dysphoria can be treated with psychotherapy alone.  *See, e.g.*, Weiss Dep. 186:10-187:2.  While psychotherapy can be important to treat comorbidities—which is something I do regularly with patients—it does not address the distress of gender dysphoria. For my patients who have had to delay accessing medical treatment (e.g., because their parents did not consent to treatment), their gender dysphoria was not alleviated despite regular therapy and often their mental health severely decompensated until they were able to begin medical treatment.

14.     Dr. Cantor suggests that a study by Costa (2015) demonstrates the effectiveness of psychotherapy alone, and that I misinterpreted the findings of that study.  Cantor Decl. ¶ 290; *see* R. Costa et al, Psychological support, puberty suppression, and psychosocial functioning in adolescents with gender dysphoria, 12 J. SEXUAL MEDICINE 2206-2214 (2015).  That is not so. Costa found that psychosocial support alone for 6 months significantly improved psychosocial functioning in a group of adolescents with GD who were deemed "delayed eligible" for puberty blockers, but then no further significant improvements were observed (plateau) over the next 12

---

[2] *See, e.g.*, Lisa Littman, *Individuals treated for gender dysphoria with medical and/or surgical transition who subsequently detransitioned: A survey of 100 detransitioners*. 50 ARCHIVES SEXUAL BEHAV.3353-3369, 3363 (2021).

months of psychological support and their psychosocial functioning scores continue to be lower than those of healthy peers. *Id.* at 2211. In contrast, for adolescents with GD who were deemed "immediately eligible" for blockers, 6 months of psychosocial support alone did not significantly improve their psychosocial functioning but after 12 months of pubertal suppression, their psychosocial functioning significantly improved and their scores matched those of healthy peers. *Id.* The "delayed eligible" group included those individuals who needed more time to make a decision or where "clinicians needed more time to make the decision of starting GnRHa because of possible comorbid psychiatric problems and/or psychological difficulties." *Id.* at 2208-09.This study unsurprisingly reaffirms that psychological support can be helpful to improve psychosocial functioning, particularly in individuals with other psychiatric issues. *Id.* at 2212. It also shows that pubertal suppression provided benefits that did not come with psychotherapy alone. *Id.* at 2212-13. Also, of note, the delayed eligible group all elected to receive pubertal blockers on average 6 months after the study concluded. *Id.* at 2209.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _10/13/2023_                          _____

                                                Christine Brady, PhD

oLi Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
David A. DeRoin (ISB no. 10404)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

*Additional counsel for Plaintiffs identified on the following page*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

**PAM POE**, by and through her parents and next friends, Penny and Peter Poe; **PENNY POE**; **PETER POE**; **JANE DOE**, by and through her parents and next friends, Joan and John Doe; **JOAN DOE**; **JOHN DOE**,

*Plaintiffs*,

v.

**RAÚL LABRADOR**, in his official capacity as Attorney General of the State of Idaho; **JAN M. BENNETTS**, in her official capacity as County Prosecuting Attorney for Ada, Idaho; and the **INDIVIDUAL MEMBERS OF THE IDAHO CODE COMMISSION**, in their official capacities,

*Defendants*.

Case No. 1:23-cv-00269-CWD

## EXPERT REBUTTAL DECLARATION OF KARA CONNELLY, MD

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com
kyle.bersani@groombridgewu.com

Philip S. May*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel:  (202) 505-5830
philip.may@groombridgewu.com

Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel:  (202) 223-7300
jorosz@paulweiss.com

Dina Flores-Brewer (ISB no. 6141)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID  83701
(208) 344-9750
dfloresbrewer@acluidaho.org

*Admitted *pro hac vice*                    *Attorneys for Plaintiffs*

1.  I am submitting this rebuttal declaration to respond to some of the assertions made by Defendants and their experts.  While the Defendants' expert declarations are filled with many statements that I believe are not supported by evidence, I do not attempt to address all of them but rather focus on some of the issues that seem most pertinent.

### DEFENDANTS AND THEIR EXPERTS' ASSERTIONS ABOUT RISKS OF GENDER-AFFIRMING MEDICAL CARE

*Asserted risks of puberty blockers*

2.  Defendants' experts, *see*, *e.g*. Weiss ¶ 123. suggest that puberty blockers may negatively impact cognitive development.  These medications have been used for decades for youth with central precocious puberty without any observed or measured negative impact on cognitive development. Wojniusz S et *al.* Cognitive, Emotional, and Psychosocial Functioning of Girls Treated with Pharmacological Puberty Blockage for Idiopathic Central Precocious Puberty. Front Psychol. 2016.

3.  Defendants' experts' suggestion that the impact on cognitive development might be different with puberty blockers used for gender dysphoria compared to central precocious puberty is based on the mistaken assumption that youth treated with puberty blockers for gender dysphoria are left in a prolonged hypogonadal state.  In practice, the timing of discontinuing pubertal suppression for patients who have been treated with puberty blockers for gender dysphoria is typically at ages when many of their peers are also starting puberty.  Many youth begin puberty at age 13, 14 or even older.  In the field of pediatric endocrinology there are no concerns about brain development in patients related to the age of pubertal onset.  When delayed puberty is treated, the goals are to induce development of secondary sex characteristics or growth acceleration; concern about cognitive development is not a reason treatment is considered. Harrington H and Palmert MR. An Approach to the Patient With Delayed Puberty, *The Journal of Clinical Endocrinology & Metabolism*, Volume 107, Issue 6, June 2022, Pages 1739–1750.  In my general endocrine clinic, many cisgender youth present after age 14, and not uncommonly at age 16 or 17, for evaluation of absent or delayed puberty.  I have not had any concerns about cognition in these patients.

4.      In addition, cognitive development during adolescence is a complex process relying on a number of different mechanisms, including the psychosocial environment. Chronic stress, particularly during adolescence, can impact cognitive development. Eiland L, Romeo RD. Stress and the developing adolescent brain. Neuroscience. 2013 Sep 26;249:162-71. Gender diverse youth who are denied the option of puberty blockers and thus are forced to undergo development of secondary sex characteristics can experience significant stress; the contribution of this to cognitive development cannot be ignored.

5.      Defendants' experts also raise the risk of a negative impact on bone health with the use of puberty blockers. *See* Weiss ¶ 112. There is a risk of reduced bone density growth related to the use of puberty blockers, as I indicated in my opening declaration, whether used to treat gender dysphoria or central precocious puberty. This is something that is discussed with families prior to initiating treatment. Pubertal suppression can delay the peak accrual of bone mineralization that occurs during puberty. Research shows that bone mineral density increases when blockers are stopped and puberty resumes endogenously or with gender affirming hormone therapy. Schagen SEE, et *al*. Bone Development in Transgender Adolescents Treated With GnRH Analogues and Subsequent Gender-Affirming Hormones. J Clin Endocrinol Metab. 2020 Dec 1;105(12):e4252–63.; Vlot MC et *al*. Effect of pubertal suppression and cross-sex hormone therapy on bone turnover markers and bone mineral apparent density (BMAD) in transgender adolescents. Bone. 2017 Feb;95:11-19.

6.      Defendants' expert Dr. Weiss points to a risk of idiopathic intracranial hypertension (IIH) for youth prescribed puberty blockers as a reason not to treat gender dysphoria with this medication. *See* Weiss ¶ 113. This is in relation to a warning issued by the Federal Drug Administration (FDA) in 2022 based on postmarketing surveillance data. This warning was based on 6 cases of IIH in youth treated with puberty blockers, 5 of whom were being treated for central precocious puberty and 1 treated for gender dysphoria. The nature of the postmarketing surveillance data collection did not allow for calculation of incidence. A recently published registry-based cohort study out of Sweden reported that of the 410 individuals with gender dysphoria treated with puberty blockers over the 10-year study period, no cases of IIH were identified. Karamanis G et *al.* Incidence of Idiopathic Intracranial Hypertension in Individuals With Gonadotropin-Releasing

Hormone Analogue Treatment for Gender Dysphoria in Sweden. JAMA Pediatr. 2023 Jul 1;177(7):726-727.  I am not aware of any pediatric endocrinology practices that have ceased treatment with puberty blockers for central precocious puberty or any other condition based on this warning.

*Asserted health risks of hormone therapy*

7.     The defendants' experts bring up concerns about health risks resulting from hormone therapy, such as heart disease, stroke, blood clots, and liver dysfunction. *See*, *e.g.* Weiss ¶¶ 133-149.  However, these risks are the same when estrogen and testosterone are used to treat gender dysphoria as when they are used to treat delayed puberty or hypogonadism in cisgender adolescents.  In other words, these risks for transgender girls receiving estrogen therapy are the same as these risks for cisgender girls receiving estrogen therapy, and these risks for transgender boys receiving testosterone therapy are the same as these risks for cisgender boys receiving testosterone therapy.[1]  For cisgender or transgender youth receiving such treatments, it is important to monitor hormone levels to make sure they are in the appropriate range to avoid these adverse health consequences. These risks are well-managed (for cisgender and transgender patients) when care is provided and monitored by a physician.  In my clinical experience with over 500 cisgender and gender diverse patients receiving hormone therapy, I have had no patients experience blood clots, heart disease, stroke or liver dysfunction.  One patient taking testosterone developed higher red blood cell counts but these normalized with reduction in the testosterone dose.

8.     One of the defendants' experts also makes the claim that testosterone therapy in birth-assigned females increases the risk of breast cancer; however, the references used, Weiss ¶ 139, are not represented accurately in the declaration.  These studies report that

---

[1] Additionally, given that hormone prescribing protocols in published guidelines by the Endocrine Society simulate natural endogenous puberty, the health risk profile for transgender boys receiving testosterone therapy becomes more in line with that for cisgender boys who go through endogenous puberty, which means, for example, higher risks of heart attack than cisgender girls.  Similarly, the health risk profile for transgender girls receiving estrogen therapy becomes more in line with that for cisgender girls who go through endogenous puberty, which means, for example, higher risks of breast cancer than cisgender boys.

transgender women treated with estrogen have a higher rate of breast cancer than cisgender men, but lower rate than cisgender women, and that transgender men treated with testosterone have a lower rate of breast cancer than cisgender women but a higher rate than cisgender men. Berliere M et *al*. Effects of Hormones on Breast Development and Breast Cancer Risk in Transgender Women. Cancers (Basel). 2022 Dec 30;15(1):245; Corso G et *al*. Risk and incidence of breast cancer in transgender individuals: a systematic review and meta-analysis. Eur J Cancer Prev. 2023 May 1;32(3):207-214.  These findings are not surprising given that estrogen causes the development of breast tissue and cisgender men have very little breast tissue.

*Asserted risks to fertility*

9.     Defendants' experts discuss the potential impact on fertility of gender-affirming medical care.  While, as I discussed in my opening declaration, some treatments can impair fertility and this is thoroughly discussed with patients and their families, along with fertility preservation options, this outcome is not certain.  There are many reports of transgender men who, after taking and stopping testosterone, are able to conceive children, with or without fertility treatment. Light AD et *al*. Transgender men who experienced pregnancy after female-to-male gender transitioning. Obstet Gynecol. 2014 Dec;124(6):1120-1127; Light AD et *al*. Family planning and contraception use in transgender men. Contraception. 2018 Oct;98(4):266-269; Stroumsa D et *al*. The Power and Limits of Classification - A 32-Year-Old Man with Abdominal Pain. N Engl J Med. 2019 May 16;380(20):1885-1888.[2]  For this reason, in our informed consent process, we inform trans males that testosterone is not an effective contraception and they could become pregnant.  Treatment can be tailored to minimize the risk to fertility where that is important to the family; for example, allowing some puberty to occur in transgender girls prior to starting puberty blockers so that they are able to preserve sperm, or temporarily stopping testosterone in transgender males to preserve eggs or try to get pregnant.

---

[2] Defendants suggest that the fact that I am not aware of any of my patients having conceived a child means they were unable to do so. Defs' brief. ¶ 20.  My patients transition their care to adult medical providers by their early 20's, before they would be ready to start having families.

*Asserted risk to sexual response*

10.     Dr. Cantor suggests that gender-affirming medical care will lead to "lifetime lack of
        orgasm and sexual function." *See* Cantor ¶ 208.  In actuality, sexual satisfaction is
        impacted by a multitude of factors, including psychological well-being.  Studies have
        shown that as psychological well-being improves steadily during gender affirming
        treatment, so does sexual satisfaction.  Young transgender adults who started their gender
        affirming care during adolescence had more sexual activity and satisfaction compared
        with individuals not accessing gender affirming care until adulthood. Bungener SL et *al.*
        Sexual Experiences of Young Transgender Persons During and After Gender-Affirmative
        Treatment. Pediatrics. 2020 Dec;146(6):e20191411.  One study of transgender women
        having undergone vaginoplasty after pubertal suppression in adolescence reported that
        most were able to achieve orgasm. Bouman MB et *al*. Patient-Reported Esthetic and
        Functional Outcomes of Primary Total Laparoscopic Intestinal Vaginoplasty in
        Transgender Women With Penoscrotal Hypoplasia. J Sex Med. 2016 Sep;13(9):1438-
        1444.  Another study found no difference between transgender women who were treated
        with puberty blockers early in puberty versus late in puberty in their ability to orgasm
        after gender affirming genital surgery. van der Meulen I et *al.* The Effect of Puberty
        Suppression on Sexual Functioning in Transwomen after Gender Affirmative
        Surgery, *The Journal of Sexual Medicine*, Volume 20, Issue Supplement_4, July 2023.

11.     In my clinical experience with patients, gender affirming medical care improves sexual
        function and experiences due to the positive effect of physical effects on alignment with
        gender identity.  Transgender men treated with testosterone do not experience any
        negative effects on sexual function, aside from possible vaginal dryness.  Transgender
        women treated with estrogen can have diminished ability to achieve and sustain erections
        (which may be a desired effect), but treatment can be tailored to avoid that if desired.

*Assertions regarding regret and detransition*

12.     Defendants and their experts devote significant time to suggesting that it is common for
        patients treated with gender-affirming medical care to detransition and regret treatment.
        There is no evidence to support this.  One study of a large sample demonstrated that less

than 2% of people who transition ever detransition due to a shift in gender identity. Turban JL et *al*. Factors Leading to "Detransition" Among Transgender and Gender Diverse People in the United States: A Mixed-Methods Analysis. LGBT Health. 2021 May-Jun;8(4):273-280.  Regret related to gender-affirming hormone use is rare. Wiepjes CM et *al*. The Amsterdam Cohort of Gender Dysphoria Study (1972-2015): Trends in Prevalence, Treatment, and Regrets. J Sex Med. 2018 Apr;15(4):582-590.  In my experience with hundreds of patients with gender dysphoria who have received puberty blockers and/or gender-affirming hormones, a number of patients have discontinued hormones because they were satisfied and happy with the physical changes they had experienced and did not feel the need to continue treatment.  These patients did not come to identify with their sex assigned at birth or regret treatment.  I am aware of just two patients who, after undergoing gender affirming medical care, have said they had a shift in their gender identity to their birth-assigned sex and neither have any regrets about their treatment.

13.    Defendants' assertion, Defs' brief, ¶ 30, that I view detransitioners as "an inconvenient fact to be minimized" cannot be further from the truth.  Defendants are aware of (and presented to me at my deposition) a paper I co-authored that details a multidisciplinary approach to adult patients who expressed desire to reverse their gender affirming surgery (0.3% in our institution).  The study aimed to better understand factors impacting patient's experiences to aid in the development of protocols to support them.  Patients in my clinic are all counseled about the possibility that their experience regarding their gender may shift and change and we encourage them to come to us for support if that occurs.

14.    The possibility of regretting medical decisions is part of medicine.  A review of the body of research on this topic found that the mean rate of medical decision regret across studies was 16.5%. Perez, MMB, *et al*. Extent and Predictors of Decision Regret About Health Care Decisions:  A Systematic Review.  Medical Decision Making. Aug. 2016:777.  A review of the research on regret in the context of surgeries found that across studies the average rate of regret was 14.4%. Wilson, A, *et al*. Regret in Surgical Decision Making: A Systematic Review of Patient and Physician Perspectives. World J. Surgery (2017) 41L1454-1465.

**DEFENDANTS AND THEIR EXPERTS' ASSERTIONS REGARDING THE EFFICACY
OF GENDER-AFFIRMING MEDICAL CARE FOR ADOLESCENTS**

15.     Defendants and their experts assert that there is a lack of evidence of efficacy of gender-
affirming medical care.  First, they suggest that the research evidence we have
demonstrating efficacy is not valuable because it is "low quality".  The defendants are
referring to the Grading of Recommendations Assessment, Development and Evaluation
(GRADE) approach to rating quality of evidence.  This approach includes four levels of
evidence quality, and is largely dependent on the type and methods of investigation.  As
such, observational studies including cross-sectional studies with comparison groups and
longitudinal cohort studies—the types of studies done on gender-affirming medical
care— are generally rated lower quality than randomized controlled clinical trials.
Observational studies are critical to medical research and informing the practice of
medicine, and the label of "low quality" under GRADE does not mean that the evidence
is unreliable or of poor quality.  Indeed, one recent study found that only 12% of health
care interventions are supported by "high quality" evidence as defined by the GRADE
standard, and more than half are supported by "low quality" or "very low quality"
evidence.  Howick J et *al*. Most healthcare interventions tested in Cochrane Reviews are
not effective according to high quality evidence: a systematic review and meta-analysis. J
Clin Epidemiol. 2022 Aug;148:160-169.

16.     As I discussed in my opening declaration, Connelly ¶ 56, randomized controlled trials are
not always feasible due to ethical concerns and methodological limitations. Ashley F et
*al,* Randomized-controlled trials are methodologically inappropriate in adolescent
transgender healthcare, Int J Trans Health.  Well-designed observational studies are
necessary and valuable, and can provide reliable evidence, sometimes more reliable than
randomized controlled trials.  This is not limited to research pertaining to gender
affirming medical care.

17.     Also as discussed in my opening declaration, in my clinical experience, I've seen the
profoundly beneficial impact of gender affirming medical care on my patients.
Defendants assert, Defs' brief, at 26-27, that my statement that gender affirming medical
care improves depression and anxiety in patients is contradicted by a study published by
my clinical team. Cantu AL et *al*. Changes in Anxiety and Depression from Intake to

First Follow-Up Among Transgender Youth in a Pediatric Endocrinology Clinic. Transgend Health. 2020 Sep 2;5(3):196-200. This study looked at depression and anxiety screener data at the first follow up visit, which was typically just a few months after initiating hormone therapy (follow-up visits are recommended at 3-4 months after initial visit.[3] We know from patients that physical changes occur very slowly, and often, patients do not notice physical differences until 3 to 6 months after initiating treatment; thus, we were not surprised that the improvements in depression and anxiety were not detected at the three month point. Over time, as patients see their bodies begin to match their gender, we consistently see significant improvement in patient mental health. In addition to seeing improvement in GAD-7 and PHQ-9 scores measuring anxiety and depression, we see reduction or elimination in suicidal ideation, improved family functioning and social relationships, and improved school engagement and performance. We get this information from the patients as well as their parents, who are often surprised to see such dramatic changes in their children's lives and well-being.

18.     Defendants and their experts assert that clinical experience is not reliable evidence and appear to suggest that it should be disregarded. *See* Cantor ¶¶ 284 et seq. Yet Dr. Cantor seems to acknowledge that such evidence may be useful, as it "might be the only option available" if there aren't systematic cohort studies available. While we would ideally always have more and stronger research to support all medical practices, as clinicians we must rely on the best evidence available to guide clinical care. Clinical practice guidelines like those of the Endocrine Society and the WPATH Standards of Care make recommendations based on the best evidence that exists. In all areas of medicine, sometimes treatment recommendations are made based on expert opinion from clinical experience. Gender affirming medical care for adolescents is supported by multiple cohort and retrospective studies; however, the experience of clinicians is also valuable.

19.     Defendants and their experts suggest that lack of FDA approval of puberty blockers, testosterone, and estradiol for the treatment of gender dysphoria supports their position that these treatments are not effective. My opening declaration discusses the wide-spread

---

[3] Our study was intended to continue to follow-up at additional time points, however our clinical operations shifted dramatically after this paper's publication due to the COVID-19 pandemic. We plan to collect more long-term data on the patients included in that study.

use of medications off-label (without FDA approval for a particular indication).  The defendants' suggestion that lack of FDA approval for an indication means the FDA does not support that use[4] is erroneous.  The lack of FDA approval does not mean disapproval of these medications for this indication; it says nothing at all about the FDA's views of the treatment.  That is because the FDA does not opine on the safety or efficacy of a treatment for a particular indication unless a pharmaceutical company applies for approval for that indication.  Making an application may not be financially reasonable or feasible if the treatment has already been approved for other conditions because, as the FDA states, "once the FDA approves a drug, healthcare providers generally may prescribe the drug for an unapproved use when they judge that it is medically appropriate for their patient." (https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-unapproved-use-approved-drugs-label).

### DEFENDANTS AND THEIR EXPERTS' ASSERTIONS REGARDING WPATH'S GUIDELINES REGARDING GENDER-AFFIRMING SURGERIES

20.     Defendants' experts suggest that the fact that the WPATH Standards of Care 8 does not include a minimum age for genital surgery is equivalent to WPATH endorsing such surgeries at any age. *See* Cantor ¶ 249.  This claim disregards the strong cautionary language included in the WPATH SOC 8 about assessing the patient's emotional and cognitive maturity to make each treatment decision and guidance about how to make that assessment. *See* WPATH SOC 8 at S61-62.  The age at which an individual has the maturity and cognitive ability to develop realistic expectations for surgical outcomes and understand long-term consequences varies greatly from person to person, and is elucidated in the comprehensive mental health evaluation that is required prior to consideration of any surgical interventions.

---

[4] See Defs' brief, at 9 (stating that "the FDA is not prepared to put its credibility and careful testing protocols behind the use" of puberty blockers, estrogen and testosterone to treat gender dysphoria).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 13, 2023.

_____
Kara Connelly, MD

RAÚL R. LABRADOR
ATTORNEY GENERAL

LINCOLN DAVIS WILSON, ISB #11860
Chief, Civil Litigation and
Constitutional Defense

JAMES E. M. CRAIG, ISB #6365
Deputy Division Chief
Office of the Attorney General
P. O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
lincoln.wilson@ag.idaho.gov
james.craig@ag.idaho.gov

*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| LAURDES MATSUMOTO, NORTHWEST ABORTION ACCESS FUND, and INDIGENOUS IDAHO ALLIANCE, | Case No. 1:23-cv-00323-DKG |
| Plaintiffs, | **DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION** |
| v. | |
| RAÚL LABRADOR, in his capacity as the Attorney General for the State of Idaho, | |
| Defendant. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... ii

INTRODUCTION ............................................................... 1

STANDARD OF DECISION ............................................................... 3

ARGUMENT ............................................................... 5

I.    Plaintiffs are not likely to succeed on the merits ............................................ 5

    A. The Abortion Trafficking Ban protects parent's rights ................................... 6

        1.  Parents have a right to know about care for their children....................... 6

        2.  The Abortion Trafficking Ban protects parents' right to know ................. 8

    B. The Abortion Trafficking Ban does not punish speech ................................. 11

        1.  The law criminalizes conduct, not speech ................................. 11

        2.  Any minimal speech restriction passes constitutional scrutiny .............. 15

    C. The Abortion Trafficking Ban does not limit association............................ 19

    D. The Abortion Trafficking Ban is not vague.................................... 20

II.   The balance of harms and public interest do not favor an injunction .......... 24

III.  Plaintiffs have no irreparable injury............................................... 24

CONCLUSION ............................................................... 29

## TABLE OF AUTHORITIES

### CASES

*Alonso v. State,*
    228 So. 3d 1093 (Ala. Crim. App. 2016) ..................................................... 22

*Bartosz v. Jones,*
    146 Idaho 449, 197 P.3d 310 (2008) ................................................... 6, 16

*Bellotti v. Baird,*
    443 U.S. 622 (1979) ............................................................................. 10

*Bigelow v. Virginia,*
    421 U.S. 809 (1975) ........................................................................ 15, 25

*Dobbs v. Jackson Women's Health Organization,*
    142 S.Ct. 2228 (2022) ............................................................... 5, 10, 11

*Ex parte McCardle,*
    74 U.S. 506 ............................................................................................ 4

*Ex parte Young,*
    209 U.S. 123 (1908) ........................................................................ 25, 28

*Fraihat v. U.S. Immigr. and Customs Enf't,*
    16 F.4th 613 (9th Cir. 2021) ................................................................. 4

*Giboney v. Empire Storage & Ice. Co.,*
    336 U.S. 490 (1949) .............................................................................. 12

*Ginsberg v. State of N.Y.,*
    390 U.S. 629 (1968) ........................................................................... 8, 17

*Golden Gate Rest. Ass'n v. City & Cnty. Of San Francisco,*
    512 F3.d 1112 (9th Cir. 2008) ............................................................... 4

*Granny Goose Foods, Inc. v. Bhd. Of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty,*
    415 U.S. 423 (1974) ............................................................................... 4

*Hill v. Colorado,*
    530 U.S. 703 (2000) ........................................................................ 20, 23

*H. L. v. Matheson,*
   450 U.S. 398 (1981) .................................................................................... 10

*Hodgers-Durgin v. de la Vina,*
   199 F.3d 1037 (9th Cir. 1999) ................................................................. 28

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ........................................................................... *passim*

*Lopez v. Candaele,*
   630 F.3d 775 (9th Cir. 2010) ................................................................... 25

*Los Angeles Cnty Bar Ass'n v. Eu*
   979 F.2d 697 (9th Cir. 1992) .................................................................... 28

*Madsen v. Women's Health Ctr.,*
   512 U.S. 753 (1994) .................................................................................. 19

*Martin v. Vincent,*
   34 Idaho 432, 201 P. 492 (1921) .......................................................... 7, 14

*Nelson v. Evans,*
   170 Idaho 887, 517 P.3d 816 (Idaho 2022) ........................................... 1, 7

*Newman v. Lance,*
   922 P.2d 395, (Idaho 1996) ..................................................................... 26

*Parenthood of Idaho, Inc. v. Wasden,*
   376 F.3d 908 (9th Cir 2004) .................................................................... 26

*Planned Parenthood of Cent. Missouri v. Danforth,*
   428 U.S. 52 (1976) .................................................................................... 10

*Planned Parenthood Great Nw. v. State,*
   171 Idaho 374, 522 P.3d 1132 ............................................................. 5, 11

*Parham v. J.R.,*
   442 U.S. 584 (1979) ............................................................................... 7, 13

*Prince v. Massachusetts,*
   321 U.S. 158 (1944) ................................................................................... 6

*Recycle for Change v. City of Oakland,*
    856 F.3d 666 (9th Cir. 2017)...................................................... 11, 16, 17

*San Diego Cnty. Gun Rts. Comm. v. Reno,*
    98 F.3d 1121 (9th Cir 1996)........................................................ 28

*State v. Bryant,*
    953 So.2d 585 (Fla. App. 2007)................................................... 22

*State v. Guerra,*
    169 Idaho 486, 497 P.3d 1106 (Idaho 2021)............................... 8

*State v. Manzanares,*
    152 Idaho 410, 272 P.3d 382 (Idaho 2012)................................ 16

*State v. Scotia,*
    146 Ariz. 159 (Ariz. App. 1985) ................................................ 22

*State v. Stiffler,*
    117 Idaho 405, 788 P.2d 220 (1990) ......................................... 8

*State v. Summer,*
    139 Idaho 219, 76 P.3d 963, (Idaho 2003)................................. 26

*State v. Villafuerte,*
    160 Idaho 377, 373 P.3d 695 (2016) ......................................... 15

*Texas v. Johnson,*
    491 U.S. 397, (1989).................................................................. 17

*Thomas v. Anchorage Equal Rts. Comm'n,*
    220 F.3d 1134, (9th Cir. 2000)................................................... 28

*Troxel v. Granville,*
    530 U.S. 57, (2000).................................................................... 6, 7

*Twitter, Inc. v. Paxton*
    56 F.4th at 1170........................................................................ 25

*United States v. O'Brien,*
    391 U.S. 367 (1968)................................................................... 17, 19

*United States v. Snead.,*
2022 WL 17975015 at \*4 (4th Cir. 2022) .............................................. 22

*U.S. v. Gilbert,*
813 F.2d 1523 (9th Cir. 1987) ............................................................. 13

U.S. v. Swinson,
No. 1:12-CR-279-EJL, Dkt. 2 at 8 (D. Idaho. Oct. 26, 2012) ................. 21

*Wallis v. Spencer,*
202 F.3d 1126 (9th Cir. 2000) ............................................................... 7

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) .......................................................................... 16

*Winter v. Nat. Res. Def. Council, Inc.*
555 U.S. 7 (2008) .............................................................................. 4

## STATUTES

Ariz. Rev. Stat. Ann. § 13-1307 (2021) ..................................................... 21

Colo. Rev. Stat. § 18-3-504 (2019) ........................................................... 22

Idaho Code § 16-1605 .............................................................................. 14

Idaho Code § 18-202 ................................................................................ 15

Idaho Code § 18-4506 ........................................................................ 2, 14

Idaho Code § 18-622 .......................................................................... 5, 11

Idaho Code § 18-623 ..................................................................... *passim*

Idaho Code § 18-8602 .............................................................................. 21

Idaho Code § 19-301 ................................................................................ 15

Idaho Code § 19-302 ................................................................................ 15

Idaho Code § 31-2227 .............................................................................. 26

Idaho Code § 31-2604 .............................................................................. 26

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR TRO OR PRELIMINARY INJUNCTION – v

Wash. Rev. Code § 9A.40.100 (2017) .......................................................... 21

18 U.S.C. § 1591 .......................................................................................... 21

**RULES AND REGULATIONS**

Child Protective Act, Title 16, Chapter 16, Idaho Code ............................. 14

**OTHER AUTHORITIES**

Attorney General Opinion 23-1 (April 27, 2023) .................................. 26, 27

Press Release, Washington Man Sentenced in Idaho Sex Trafficking Case, U.S. Attorney, Dist. Of Idaho *Mar. 25, 2013) https://tinyurl.com/bddbupa2 ................ 21

*Newman, 129 Idaho at 102, 922 P.2d at 399* .......................................... 26

# INTRODUCTION

This is a lawsuit over the constitutionality of Idaho Code § 18-623, which Plaintiffs call the "Abortion Travel Ban." *See* Dkt. 12-1 at 2. But that is an egregious misnomer. The law does not ban anyone from traveling to another state, much less doing so to obtain an abortion that might be illegal in Idaho. The law prohibits not abortion travel, but rather abortion *trafficking*: recruiting, harboring, or transporting a pregnant minor for an abortion with *intent to conceal from the minor's parents or guardian.* Idaho Code § 18-623(1). It is an Abortion *Trafficking* Ban, not an Abortion *Travel* Ban. Plaintiffs still challenge it: they say they have a First Amendment right to help other people's children go to other states for abortions without their parents' knowledge, much less consent. But the Constitution recognizes no such thing.

To the contrary, the Constitution recognizes the rights of parents to be involved in medical decisions about their children. Plaintiffs' own allegations show that abortion is exactly that kind of decision. They allege that "[p]regnancy, childbirth and parenting significantly impact an individual's physical and mental health, finances, and personal relationships" and that becoming a parent "is extremely personal and permanent." Dkt. 1 ¶ 27. That is why "[a]n intimate decision of this magnitude," *id.*, should be made with the support and wisdom of at least one of a child's parents or guardians. "After all, there is the traditional presumption that a fit parent will act in the best interest of his or her child." *Nelson v. Evans*, 170 Idaho 887, 896, 517 P.3d 816, 825 (Idaho 2022) (internal quotation omitted).

Yet Plaintiffs turn this presumption on its head by taking it upon themselves to determine whether a parent is fit and whether they should get to decide their children's decisions. Plaintiffs believe that they, not a pregnant minor's parents, get to decide what is in her best interests:

- that *they* have a right to hide a minor child from that child's parents if *they* believe that is appropriate;

- that *they* have a right to help transport a minor child across state lines for an abortion while concealing this transportation from the minor's parents;

- that *they* have a right to determine whether it is appropriate to notify a minor's parents about "an intimate decision of this magnitude."

Dkt. 1 ¶¶ 26–30, 32; *see also* Dkt. 12-9 ¶¶ 17–19; Dkt. 1 ¶¶ 26–30, 32, 47–51, 55; Dkt. 12-1 at 14, 21, 25–26; Dkt. 12-7 ¶¶ 43–45, 47–51, 53–54; Dkt. 12-8 ¶¶ 39–41, 50–54; Dkt. 12-9 ¶¶ 12–14, 18–19, 20–23, 26–27.

In any other context, Plaintiffs' statements about their plans would readily be recognized for what they are: the crime of child custody interference. That offense is when one "intentionally and without lawful authority … takes, entices away, keeps or withholds any minor child from a parent or another person or institution having custody, joint custody, visitation, or other parental rights." *See* Idaho Code § 18-4506(1)(a). That is exactly what Plaintiffs want to do here. And if they do it for the additional purpose of helping a pregnant minor to obtain an abortion with an intent to conceal the abortion from the minor's parents, they also commit the crime of abortion trafficking.

In this light, Plaintiffs do not meet any of the requirements for a preliminary injunction. The law does not violate their freedom of speech, but rather regulates their conduct: helping other people's children cross state lines for an abortion with the intent to conceal the abortion from the minor's parents. That does not violate Plaintiffs' freedom of association either. Neither is the law vague, since the conduct it prohibits—recruiting, harboring, or transporting a minor—is the same conduct prohibited by other human trafficking statutes, including federal statutes that Plaintiffs' counsel enforced as U.S. Attorney. The balance of harms and public interest overwhelmingly favor the parents whom the Abortion Trafficking Ban protects, and whom Plaintiffs seek to prevent from knowing about major decisions affecting their children. Finally, Plaintiffs are not even injured with a threat of prosecution. They have not alleged any threat to actual protected speech, and the Attorney General has no authority to prosecute them until a county prosecutor either requests his assistance or refuses to enforce the law. That lack of prosecutorial authority is not just fatal to Plaintiffs' claims on the merits, but also to the Court's jurisdiction.

Plaintiffs' contention that the Constitution gives them the right to get minors to travel across state lines for an abortion without their parents' knowledge is truly shocking. That shocking contention does not entitle them to a preliminary injunction.

## STANDARD OF DECISION

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of

persuasion." *Fraihat v. U.S. Immigr. and Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021) (internal quotations omitted, emphasis removed). To obtain this extraordinary relief, Plaintiffs must show (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm without injunctive relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Couns., Inc.*, 555 U.S. 7, 20 (2008). "Likelihood of success on the merits is the most important factor." *Fraihat*, 16 F.4th at 635 (internal quotations and citation omitted). A "possibility" of irreparable injury is not sufficient, rather plaintiffs seeking preliminary relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 20 (emphasis in original). And a court cannot grant a preliminary injunction if it lacks subject matter jurisdiction. *See Ex parte McCardle*, 74 U.S. 506, 514.

A temporary restraining order follows the same test as for a preliminary injunction, but "should be restricted to ... preserving the status quo" pending a full hearing. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty*, 415 U.S. 423, 439 (1974). The Ninth Circuit holds that, for a challenge to state law, the status quo presumes that the legislation will go into effect as enacted. *See Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008). Thus, a temporary restraining order here would disturb, rather than preserve, the status quo.

## ARGUMENT

## I.    Plaintiffs are not likely to succeed on the merits.

While Plaintiffs nominally complain about the Abortion Trafficking Ban, their true grievance is with Idaho's abortion policy in general. Thus, they begin their brief with the assertion that "Idaho has some of the most oppressive criminal abortion statutes in the United States," since "'[e]very person who performs or attempts to perform an abortion … commits the crime of criminal abortion.'" Dkt. 12-1 at 1 (quoting Idaho Code § 18-622(1)). But no matter Plaintiffs' views that these laws are "oppressive," the Supreme Court of the United States in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), held that the U.S. Constitution does not impose any barriers on enacting them. And shortly thereafter, the Idaho Supreme Court held the Constitution of the State of Idaho also does not "protect abortion as a fundamental right," and that Idaho's criminal laws on abortion are constitutional. *Planned Parenthood Great Nw. v. State*, 171 Idaho 374, 522 P.3d 1132, 1148–49 (Idaho 2023). So, there is no question that Idaho can lawfully prohibit criminal abortion. And here too, despite Plaintiffs' many grievances about Idaho's laws, the question is not whether Idaho's Abortion Trafficking law "is good policy," but simply whether it is constitutional. *Id.* at 381, 522 P.3d at 1149. Plainly, it is.

None of Plaintiffs' claims are likely to succeed. They sidestep over the important purposes of the Abortion Trafficking Ban in protecting parents' rights. The law does not threaten their speech—instead, it prohibits only specified conduct that intentionally causes a pregnant minor's abortion with an intent to conceal the

abortion from the minor's parents. The law does not prohibit them from associating with anyone. Nor is it vague: the same three verbs that Plaintiffs challenge—recruit, harbor, and transport—are used in many human trafficking statutes, including the federal statutes that Plaintiffs' counsel previously enforced and the statutes of various State Amici. The Court should deny a preliminary injunction.

## A. The Abortion Trafficking Ban protects parents' rights.

The Abortion Trafficking Ban is targeted legislation designed to protect a fundamental right secured by both the Idaho and the U.S. Constitutions—parents' "fundamental right 'to make decisions concerning the care, custody and control of their children.'" *Bartosz v. Jones*, 146 Idaho 449, 465, 197 P.3d 310, 326 (Idaho 2008) (Eismann, J., concurring) (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000)). Thus, the Abortion Trafficking Ban does not punish those who take a pregnant minor across state lines for an abortion *unless* they do so with the specific intent to conceal it from her parents or guardian. Doing so is not constitutionally protected conduct.

### 1. Parents have a right to know about care for their children.

States have an important and compelling interest in protecting a parent's right to make healthcare decisions for their children. For almost 80 years, U.S. Supreme Court precedent has stated that "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). "The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and

capacity for judgment required for making life's difficult decisions." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). "More important, historically, it has recognized that natural bonds of affection lead parents to act in the best interests of their children." *Id.* "Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment." *Id.* at 603. "Parents can and must make those judgments." *Id.* And so "parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention." *Wallis v. Spencer*, 202 F.3d 1126, 1142 (9th Cir. 2000).

Idaho law has recognized the same thing for over a century: "[t]he right of a parent to the custody, control, and society of his child is one of the highest known to the law." *Martin v. Vincent*, 34 Idaho 432, 201 P. 492, 493 (Idaho 1921). Idaho law says that parents have a fundamental right to make child rearing decisions. *Nelson,* 170 Idaho at 894–95, 517 P.3d at 823–24 (citing *Troxel v. Granville*, 530 U.S. 57 (2000)). "[T]he interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by the Supreme Court of the United States." *Id.* at 896, 517 P.3d at 825 (internal quotations omitted).

Because the Constitution protects these rights *from* governmental interference, legislatures necessarily have authority to enact laws to further these rights. As the Supreme Court of the United States has recognized, because "the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society," a state legislature may "properly

conclude that parents … are entitled to the support of laws designed to aid discharge of that responsibility." *Ginsberg v. State of N.Y.*, 390 U.S. 629, 639 (1968). That is just what the Abortion Trafficking Ban does.

### 2. The Abortion Trafficking Ban protects parents' right to know.

The Abortion Trafficking Ban protects the fundamental rights of parents to give—and, in turn, their minor children to receive—help and advice to their minor children if they become pregnant. The law does so by making it an essential element of the offense, to be proved beyond a reasonable doubt, that it is done with "intent to conceal an abortion from the parents or guardian of a pregnant, unemancipated minor." Idaho Code § 18-623(1). "Crimes in Idaho are categorized as either 'general intent' or 'specific intent' crimes. *State v. Stiffler*, 117 Idaho 405, 406, 788 P.2d 220, 221 (1990)[,]" and a "specific intent" crime is one that, like this statute, "refers to that state of mind which in part defines the crime and is an element thereof." *State v. Guerra*, 169 Idaho 486, 503, 497 P.3d 1106, 1123 (Idaho 2021). Here, the specific intent required for Abortion Trafficking is the intent to conceal the abortion from the pregnant minor's parents or guardian. Simply assisting a pregnant child in obtaining an abortion, without that specific intent, does not violate the statute.

Plaintiffs largely ignore this important element of the crime. They erroneously assert that the statute "made it unlawful to provide travel assistance within Idaho, including helping minors reach or cross Idaho's borders." Dkt. 1 at 3. And they omit the specific intent element of the Abortion Trafficking statute repeatedly throughout

Plaintiffs' filings.[1]  The State Amici make the same mistake, not once addressing the intent to conceal requirement of the statute in their brief.  *See generally* Amicus Brief of the States in Support of Plaintiff's Motion for a Temporary Restraining Order, Dkt. 20-1.  But Plaintiffs plainly cannot prevail on a challenge to a state statute without acknowledging all of its essential elements.

Still, it is clear that Plaintiffs want to violate the specific intent requirement that they gloss over.  Plaintiff Matsumoto, a member of the bar, "would like to provide temporary shelter for pregnant minors … who are traveling to obtain … abortion care … *whether those minors' parents know or do not know*" by "assisting them obtain transportation from Idaho to those states."  *See* Dkt. 12-1 at 4 (emphasis added).  And Plaintiff NWAAF says that "[p]arents and guardians *may or may not have known or approved* of NWAAF's support of these minors," which support includes "provid[ing] food and lodging assistance" to minors seeking abortions.  Dkt. 12-9 ¶¶ 17-19. Plaintiff Indigenous Idaho Alliance states that its mission and belief includes "providing financial, transportation, and logistical assistance to pregnant minors

---

[1] *See, e.g.*, Dkt. 1 ¶ 26 (stating that "the simple act of driving a minor to the Oregon border to get an abortion without the minor's parent or guardian knowing" is illegal, but ignoring the specific intent element of the statute); *id.* ¶ 74 (stating that the statute "prevents Plaintiffs and pregnant minors from traveling within Idaho to reach a state where abortion is lawful," but ignoring the specific intent requirement of the statute); *id.* ¶ 79 (stating that the statute "prevent[s] minors from accessing abortion care that is legal in Idaho's neighbor states by criminalizing a trusted adult's travel," but ignoring the specific intent requirement of the statute); *id.* ¶ 106 (failing to recognize the specific intent requirement of the statute); *id.* ¶ 116 (failing to recognize the specific intent requirement of the statute); Dkt. 12-1 at 1 (stating that "Idaho criminalized conduct by adults who assist pregnant minors in receiving abortion care," but ignoring the specific intent element of the statute).

within the region seeking legal abortion, *with or without the knowledge or consent of their parents or guardians.*" Dkt. 12-8 ¶ 61.; *see also* Dkt. 1 ¶¶ 26–30, 32, 47–51, 55; Dkt. 12-1 at 14, 21, 25–26; Dkt. 12-7 ¶¶ 43–45, 47–51, 53–54; Dkt. 12-8 ¶¶ 39–41, 50–54; Dkt. 12-9 ¶¶ 12–14, 18–19, 20–23, 26–27.

The Amici States note that their laws allow minors to obtain an abortion without parental consent. Dkt. 20-1 at 2–4. But that does not diminish in the least the State of Idaho's choice to protect parents' fundamental right over these important decisions. Indeed, even in the *Roe* era, the Supreme Court of the United States recognized that parental involvement in these decisions is critical. There are "potentially grave emotional and psychological consequences of the decision to abort," which "has potentially traumatic and permanent consequences." *H. L. v. Matheson*, 450 U.S. 398, 412–13 (1981). Consultation with parents is "particularly desirable with respect to the abortion decision—one that for some people raises profound moral and religious concerns." *Bellotti v. Baird*, 443 U.S. 622, 640 (1979). As Justice Stewart so poignantly stated, "[t]here can be little doubt that the State furthers a constitutionally permissible end by encouraging an unmarried pregnant minor to seek the help and advice of her parents in making the very important decision whether or not to bear a child." *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 91 (1976) (Stewart, J. concurring), *abrogated as to the right to abortion by Dobbs*, 142 S. Ct. 2228 (2022). "That is a grave decision, and a girl of tender years, under emotional stress, may be ill-equipped to make it without mature advice and emotional support." *Id.*

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR TRO OR PRELIMINARY INJUNCTION – 10

Thus, now that the Supreme Court has recognized that no federal right to abortion exists, ensuring that a pregnant minor child receives the advice and support of her parents before making a decision to receive an abortion is all the more compelling. If anything, the laws of the Amici States—not Idaho—risk running afoul of the U.S. Constitution because they reject parental rights in this manner.

## B. The Abortion Trafficking Ban does not punish speech.

### 1. The law criminalizes conduct, not speech.

Plaintiffs are not likely to succeed on the merits because their claims do not implicate the First Amendment's free speech protections. "The first step of First Amendment analysis is to determine whether the regulation implicates protected expression." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th. Cir. 2017). That is not the case here: the Abortion Trafficking Ban regulates conduct, not speech, and does not implicate protected expression.

All of the key terms of the Abortion Trafficking Ban relate to conduct, not speech. The conduct it prohibits is procuring an abortion or obtaining an abortion-inducing drug for a pregnant minor "by recruiting, harboring, or transporting the pregnant minor within this state[.]" *See* Idaho Code § 18-623(1). Procuring an abortion is not protected expression—rather, it is a crime, Idaho Code § 18-622, one that the Supreme Court of the United States and the Idaho Supreme Court have concluded the State may lawfully punish. *Dobbs*, 142 S. Ct. 2228; *Planned Parenthood Great Nw.*, 171 Idaho at 380–81, 522 P.3d at 1148–49. Nor does the First

Amendment protect "recruiting, harboring, or transporting" a minor for the purpose of that crime.

Plaintiffs say that their intended activities are "expressive conduct" because their assistance to the pregnant unemancipated minors "conveys a message of support for pregnant minors seeking to obtain lawful abortion care" and "conveys a clear message of support for abortion itself." Dkt. 12-1 at 11–12. But that is true of all criminal conduct. Paying a hitman for a murder conveys a message of support for murder for hire. Propositioning a prostitute conveys a message of support for transactional sexual relationships. Possessing large quantities of methamphetamine conveys a message of support for the drug trade. Everything and anything conveys a message of support for something, but that does not make it protected under the First Amendment. And conduct lawfully criminalized by statute does not become speech simply because it necessarily "conveys a message."

Thus, the Supreme Court of the United States has specifically rejected the argument that "the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." *Giboney v. Empire Storage & Ice. Co.*, 336 U.S. 490, 498 (1949). In that case, the speech at issue, picketing outside a business, was part of a "single and integrated course of conduct" "to compel Empire to agree to stop selling ice to nonunion peddlers" in violation of Missouri law. *Id*. Similarly, in the instant case, to the extent the Abortion Trafficking statute impacts speech, it only does so when that speech is part of a "single and integrated course of conduct" to procure an

abortion or obtain an abortion-inducing drug for a pregnant unemancipated minor child with the intent to conceal that abortion from the minor's parents or guardian.

Nor is there support for Plaintiffs' claims in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). The statute there, which prohibited the material support for terrorist organizations, "regulate[d] speech on the basis of its content," and whether the plaintiffs were able to speak to certain groups depended solely on "what they say." *Id.* at 27. In contrast, the Abortion Trafficking Ban does not prohibit speech of any kind. It does not stop Plaintiffs from sharing their views about abortion, or any other subject, to any person they want, including pregnant unemancipated minor children. But what they cannot do is take certain steps to procure an abortion or obtain an abortion-inducing drug for that pregnant minor with the intent to conceal it from the child's parents or guardian. The mere fact that speech may be used in recruiting, harboring, or transporting the child is immaterial: "[a]n illegal course of conduct is not protected by the first amendment merely because the conduct was in part carried out by language in contrast to direct action." *United States v. Gilbert*, 813 F.2d 1523, 1529 (9th Cir. 1987).

Plaintiffs say they need to take these actions as to *all* pregnant minors because *some* of them may be abused or neglected by their parents. Dkt. 12-1 at 1. But "the statist notion" that Plaintiffs have the unilateral right to substitute themselves for a child's parents "in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition." *Parham*, 442 U.S. at 603. And if Plaintiffs have concerns about abuse and neglect, Idaho already has in effect a comprehensive

statutory scheme for protecting children from parents who abuse or neglect their children. *See* Child Protective Act, Title 16, Chapter 16, Idaho Code. This statutory scheme starts not with Plaintiffs determining for themselves whether parents are fit or not, but a report to the Idaho Department of Health and Welfare or local law enforcement. In fact, Plaintiffs, should they have a "reason to believe" that a pregnant minor they are trying to help "has been abused, abandoned, or neglected," have a *duty* to report the matter, within 24 hours, to the proper law enforcement agency or the Idaho Department of Health and Welfare. Idaho Code § 16-1605(1). Failing to make the report is a misdemeanor. *See* Idaho Code § 16-1605(4).

Plaintiffs do not have a First Amendment interest in frustrating Idaho's presumption of parental custody over children. "It is incumbent upon him who seeks to invade the home and remove a child from its protection, and from the custody of its natural guardians to show facts sufficient to justify his action[s] under the law." *Martin*, 34 Idaho 432, 201 P. at 493. "Parents are not required in the first instance to take upon themselves the burden of proving their fitness to have the care of their children, or that they are properly exercising their parental control." *Id.* That is why Idaho law makes it a crime, not a right, to interfere with a parent's custody, which is what Plaintiffs seek to do here. Idaho Code § 18-4506(1)(a). Plaintiffs' mere speculation that some parents might abuse their children is not sufficient to justify their argument that they should be allowed to remove all pregnant minors from the protection and custody of their parents regarding the decision as to whether to have an abortion or not.

The State Amici, quoting *Bigelow v. Virginia*, 421 U.S. 809, 824–25 (1975), argue that the State of Idaho "cannot 'bar a citizen of another State from disseminating information about an activity that is legal in that State,' even if it does so 'under the guise of exercising internal police powers.'" Dkt. 20-1 at 5. But this is not a situation like in *Bigelow* involving an attempt to prosecute the mere advertisement of something that is legal in another state. 421 U.S. at 815 n.5. The Abortion Trafficking Ban does not criminalize the mere act of publicizing the fact that abortion is legal in another state, but instead punishes specific conduct furthering specific crimes with specific intent. And as long as the defendant commits "any essential element of the crime" within the State of Idaho, Idaho courts have jurisdiction over the crime, even if other elements of the crime are committed outside Idaho's borders. *See State v. Villafuerte*, 160 Idaho 377, 379, 373 P.3d 695, 697 (2016) (citing Idaho Code §§ 18-202(1), 19-301(1), and 19-302). And just as the State of Idaho cannot criminalize abortion in the state of Washington, or any other state, those states cannot force Idaho to allow Plaintiffs, or any other person, to violate Idaho's criminal laws.

**2. Any minimal speech restriction passes constitutional scrutiny.**

Even if the Abortion Trafficking Ban had some minimal effect on speech, it would easily be upheld under applicable First Amendment standards. Plaintiffs say the law is "subject to strict scrutiny," but they fail to show the critical premise for applying that test: that the law regulates speech by its content. Dkt. 12-1 at 13. That premise is not met here.

"A content-based law is one that targets speech based on its communicative content or applies to particular speech because of the topic discussed or message expressed." *Recycle for Change*, 856 F.3d at 670 (internal quotations and brackets omitted). The first step to determining "whether a law is content based is to consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys." *Id.* (internal quotations omitted). But the Abortion Trafficking Ban does not reference speech at all, much less do so based on its content. Plaintiffs may express any message they like under the Abortion Trafficking Ban. To the extent the law even implicitly addresses speech, it addresses only its effects, not the message it expresses. Thus, the statute focuses on transitive action verbs—to "procure" or "obtain" an abortion or to "recruit," "harbor," or "transport" a pregnant minor—not on expressive verbs. The law does not discriminate on the basis of the content of any speech, but "on the basis of non-expressive, non-communicative conduct." *Id.* at 672. Speakers may express any message they wish, so long as they do not cause a pregnant minor to obtain an abortion with the specific intent to conceal the fact from the minor's parents.

That this may have "an incidental effect of some speakers or messages but not others" is immaterial because the law "serves purposes unrelated to the content of expression[.]" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Here, that purpose is the protection of the fundamental rights of parents to "make decisions concerning the care, custody and control of their children." *Bartosz*, 146 Idaho at 465 (Eismann, J. concurring). And that purpose is unrelated to the content of a message

Plaintiffs, or any other person, may wish to express through their conduct. The law is therefore content-neutral.

So, at the very most, if any speech-related test must be applied to the Abortion Trafficking Ban, the Court should apply the "relatively lenient" standard from *United States v. O'Brien*, 391 U.S. 367, 376 (1968). *Texas v. Johnson*, 491 U.S. 397, 407 (1989). This test applies to statutes in which "speech and nonspeech elements are combined in the same course of conduct." *Id.* (internal quotations omitted). Under this test, "a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* "Under *O'Brien*, a government regulation is sufficiently justified [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Recycle for Change*, 856 F.3d at 674 (internal quotations omitted, brackets in original). The Abortion Trafficking Ban meets all of these elements.

*First*, there is no question that Idaho has the power to enact this law. As noted above, a state legislature may "properly conclude that parents … are entitled to the support of laws designed to aid discharge" of their responsibility to care for their children. *Ginsberg*, 390 U.S. at 639.

*Second*, the Abortion Trafficking Ban furthers an important government interest. The law protects the fundamental right of parents to make medical

decisions for their children, and thus also protects the children themselves by helping ensure that they have the guidance of their parents. The fact that Plaintiffs are so eager to obtain and conceal abortions from children's parents shows the compelling need for a statute like this. Plaintiffs do not believe it is important for minors to have their parents' input in getting an abortion decision. And they believe that they have a right to help traffic children out of state for that purpose, regardless of whether their parents know. The State has a compelling interest in ensuring otherwise.

*Third*, the State's interest is unrelated to the restriction of free expression. Ensuring that any assistance for out-of-state abortions take place only with the knowledge of a child's parents has no relation to free speech.

*Fourth*, any incidental restriction on speech is no more than is necessary to protect parental rights. The Abortion Trafficking Ban satisfies this standard with its specific intent requirement concerning parental consent. Idaho Code § 18-623(1). That element goes directly to the interest served by the statute—helping ensure parental involvement in the pregnant minor's decision as to whether to have an abortion. The statute could have been written as a general intent crime, and simply required as an element of the crime that the parents or guardian did not affirmatively consent to the abortion. *Cf. Holder*, 561 U.S. at 17–18. Instead, the legislature narrowed the statute to require an intent to conceal the abortion from the pregnant minor's parents or guardian. That requirement quite arguably removes the conduct at issue entirely from First Amendment protections. *See id.* at 56–57 (Breyer, J.

dissenting).  But at the very least, it amply satisfies the lenient *O'Brien* test—the most rigorous test that could apply to the law.

The Abortion Trafficking Ban thus does not infringe on free speech.

## C. The Abortion Trafficking Ban does not limit association.

Neither does the Abortion Trafficking Ban violate Plaintiffs' "First Amendment rights of association."  Dkt. 12-1 at 12.  "The freedom of association protected by the First Amendment does not extend to joining with others for the purpose of depriving third parties of their lawful rights."  *State v. Manzanares*, 152 Idaho 410, 424, 272 P.3d 382, 396 (Idaho 2012) (quoting *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 776 (1994)).  That is exactly what the statute prohibits by requiring proof the intent to conceal an abortion from the pregnant minor's parents or guardian.  Nothing about that offends the Constitution.

At bottom, the law does not prohibit Plaintiffs from associating with anyone, including minor children.  What it prohibits is conduct related to such an association: procuring an abortion or obtaining an abortion inducing drug for a pregnant minor by recruiting, harboring, or transporting that minor with the intent to conceal the abortion from the minor's parents or guardian.  The Supreme Court of the United States in *Holder* summarily dismissed the notion that the statute there "prohibit[ed] being a member of one of the designated groups," since what it in fact "prohibits is the act of giving material support."  561 U.S. at 39–40.  The Court should reach the same conclusion here.

### D. The Abortion Trafficking Ban is not vague.

Finally, the Abortion Trafficking Ban does not fall afoul of constitutional vagueness principles. A statute is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder*, 561 U.S. at 18. While a more stringent test applies in the First Amendment context, Plaintiffs have not shown that the law restricts any protected speech. And even in the First Amendment context, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Id.* at 19. (internal quotations omitted). As the Supreme Court noted in *Hill v. Colorado*, "while there is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question, because we are condemned to the use of words, we can never expect mathematical certainty from our language." 530 U.S. 703, 733 (2000) (cleaned up).

Plaintiffs argue that the statute is unconstitutionally vague because it "does not contain or refer to a definitions section that would tell Plaintiffs when their conduct would constitute recruiting, harboring, or transporting." Dkt. 12-1 at 15. But these are not unfamiliar terms used in isolation that only lawyers could understand. Rather, these terms are well within common understanding, which is why they are so commonly used in state and federal criminal trafficking statutes across the country:

**Idaho law:** In addition to the Abortion Trafficking Ban, Idaho's general human trafficking statute criminalizes those same three verbs—"recruitment, harboring, transportation"—if in furtherance of subjecting a person "to involuntary servitude, peonage, debt bondage, or slavery." Idaho Code § 18-8602(1)(a)(ii). If those verbs are vague when used to prevent abortion, they are also vague when used to prevent slavery.

**Federal law:** The U.S. criminal code likewise makes it a crime to "recruit[],… harbor[], [or] transport[] … a person … knowing … that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a)(1). When Plaintiffs' counsel served as United States Attorney for the District of Idaho, she evidently believed the same three words—recruit, harbor, and transport—were clear enough that she could prosecute not just violations of the law, but even attempts to interfere with its enforcement. *See United States. v. Swinson*, No. 1:12-CR-279-EJL, Dkt. 2 at 8 (D. Idaho. Oct. 26, 2012); Press Release, Washington Man Sentenced in Idaho Sex Trafficking Case, U.S. Attorney, Dist. of Idaho (Mar. 25, 2013), https://tinyurl.com/bddbupa2. How she now claims those verbs are unconstitutionally vague is a mystery.

**Other states:** Several other states, including some of the Amici States, use similar verbiage to criminalize human trafficking. *See, e.g.*, Wash. Rev. Code § 9A.40.100 (2017) ("A person is guilty of trafficking in the first degree when such person recruits, harbors, transports ... by any means another person ....") (cleaned up); Ariz. Rev. Stat. Ann. § 13-1307 (2021) ("'Traffic' means to entice, recruit, harbor,

provide, transport or otherwise obtain another person."); Colo. Rev. Stat. § 18-3-504 (2019) ("A person commits human trafficking of a minor for sexual servitude if the person knowingly sells, recruits, harbors, transports ... by any means, maintains, or makes available a minor for the purpose of commercial sexual activity.").

Sex traffickers have repeatedly argued these terms are unconstitutionally vague. And courts have repeatedly held otherwise. *See, e.g.*, *United States v. Snead*, 2022 WL 17975015 at *4 (4th Cir. 2022) (stating that each of the verbs "recruits, entices, harbors, transports, provides" has an ordinary meaning that would provide a person of ordinary intelligence fair notice of what conduct is prohibited"); *Alonso v. State*, 228 So. 3d 1093, 1101–02 (Ala. Crim. App. 2016) (upholding a statute that assigning criminal liability to an individual who "knowingly obtains, recruits, ... harbors, ... transports, provides, or maintains any minor for the purpose of causing a minor to engage in sexual servitude" and rejecting a vagueness challenge to its constitutionality); *State v. Scotia*, 146 Ariz. 159, 160 (Ariz. App. 1985) (collecting cases regarding the use of the term "transport" for drug transport statute); *State v. Bryant*, 953 So.2d 585, 587 (Fla. App. 2007) (reversing trial court finding of unconstitutional vagueness based on word "transport"). The fact that the statute concerns abortion does not magically transform a plain word into an unclear one. Plaintiffs' vagueness challenge is thus wholly lacking in merit.

Plaintiffs also argue that the "statute fails to provide adequate notice regarding what culpability attaches to communication or the lack thereof with a minor's parents and/or guardians." Dkt. 12-1 at 16. But the many questions they

ask on this point do not move the needle. The elements of the statute do not depend upon any communication or lack of communication with the parents, but rather whether the defendant takes action to procure an abortion for a pregnant minor *with intent to conceal from the parents.* Idaho Code § 18-623(1). A prosecutor must prove that element of specific intent beyond a reasonable doubt. Thus, providing parents with notice and advance knowledge would likely prevent a prosecutor from bringing a case, while a prosecutor might be able to argue the specific intent requirement was met if a defendant provided no notice to the child's parents.

State Amici also raise other hypothetical arguments about what the statute may or may not cover. Dkt. 20-1 at 5. But this case involves challenges from the Plaintiffs, and as such the Court can only look at "the particular facts at issue," since a "plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *See Holder*, 561 U.S. at 18–19; *see also* Dkt. 31 at 3 ("The Amici States … may not initiate, create, extend, or enlarge the issues."). And the Supreme Court of the United States has admonished that "while there is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question, because we are condemned to the use of words, we can never expect mathematical certainty from our language." *Hill*, 530 U.S. at 733 (cleaned up). One can ask unending questions in an attempt to raise hypothetical situations in which the applicability of the statute might be in question. But the terms the Abortion Trafficking Ban employs have long been used by a variety of different trafficking statutes in a variety of different jurisdictions. So

Idaho Code § 18-623 provides more than ample notice to a person of ordinary intelligence of what it prohibits.

## II.    The balance of harms and public interest do not favor an injunction.

The balance of equities and the public interest weigh heavily in favor of the Attorney General and against issuing a temporary restraining order or preliminary injunction.  The Plaintiffs are asserting the right to determine for themselves whether a parent is fit in order to decide whether it is okay to conceal information about a pregnant minor's abortion from the parents.  Allowing the Plaintiffs to decide what is in the best interests of someone else's child and conceal that from the pregnant minor's parents actively undermines a parent's fundamental right and obligation to determine what is in the best interests of their children.  Given this fundamental right of parents to direct the care and upbringing of their children and to be involved in the medical decisions of their minor children, the State of Idaho's policy in favor of protecting those rights is in the public interest.  The constitutional rights of parents to determine what is in the best interests of their children heavily outweigh the desires of third parties to lead children into such consequential actions without their parents' knowledge or consent.

## III.    Plaintiffs have no irreparable injury.

Finally, the Court should deny Plaintiffs' motion for preliminary injunction for lack of an irreparable injury.  At the outset, Plaintiffs have no irreparable injury because, for the reasons set forth in Section I.B, they allege only an effect on their intended conduct, not on any protected speech that would be otherwise chilled.  As

Plaintiffs' own cases acknowledge, they must "present more than allegations of a subjective chill" and must instead show "specific present objective harm or a threat of specific future harm." *Bigelow*, 421 U.S. at 816–17 (internal quotations omitted). They have not made that showing here.

But in truth, and even more important, Plaintiffs have no injury at all, much less an irreparable one. And as will be set forth more fully in the Attorney General's forthcoming motion to dismiss, that deficiency is fatal to jurisdiction—under both the Eleventh Amendment and Article III justiciability—just as it is to the merits.

In the pre-enforcement context here, both Eleventh Amendment immunity and Article III justiciability turn on whether there is a threat of prosecution. The *Ex parte Young* exception to the Attorney General's Eleventh Amendment immunity applies only if he is "clothed with some duty in regard to the enforcement of the laws of the state, and ... threaten and are about to commence proceedings ... to enforce against parties affected [by] an unconstitutional act." *Ex parte Young*, 209 U.S. 123, 155–56 (1908). And proving a justiciable controversy in the pre-enforcement context also requires a threat: for standing, "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings," *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174, and for ripeness, a "specific and credible threat of adverse action." *Lopez v. Candaele*, 630 F.3d 775, 781 (9th Cir. 2010). That essential threat is wholly absent here.

Aside from the fact that Plaintiffs do not allege the Attorney General has made any statement regarding the enforcement of the Abortion Trafficking Ban, Plaintiffs'

attempt to show injury falters based on a more fundamental proposition of law: the Attorney General *has no authority* to threaten criminal prosecutions of the Abortion Trafficking Ban at this time. Under Idaho statutory law, "the primary duty of enforcing all the penal provisions of any and all statutes of this state, in any court, is vested in the sheriff and prosecuting attorney of each of the several counties." Idaho Code § 31-2227. Thus, while the Attorney General is Idaho's "chief legal officer," he is not its chief law enforcement officer, *Newman v. Lance*, 922 P.2d 395, 399 (Idaho 1996), and county prosecutors do not answer to him. Idaho Code § 31-2604. In fact, Idaho law previously allowed the Attorney General to "exercise supervisory powers over prosecuting attorneys in all matters pertaining to their duties," *Newman*, 129 Idaho at 102, 922 P.2d at 399, but the Legislature struck that provision in 1998, limiting the Attorney General's criminal enforcement authority to the ability to "assist the prosecuting attorney" in each respective county. *State v. Summer*, 139 Idaho 219, 224, 76 P.3d 963, 968 (Idaho 2003).

The Attorney General recently explained and clarified these principles in a formal opinion construing the limits on his own prosecutorial powers. Att'y Gen. Op. 23-1 (April 27, 2023). As he explained, he has prosecutorial authority only "if requested by county prosecutors and approved by a state district judge" or "if specifically conferred by the Legislature." *Id.* at 2. That definitive construction of the limits of his own powers supersedes the Ninth Circuit's interpretation of Idaho law in *Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908 (9th Cir. 2004), which held that the Attorney General was a proper defendant to a challenge to the State's

abortion laws.[2]  And neither of the two conditions for the Attorney General's prosecutorial authority—referral by a county prosecutor or a specific legislative grant—are met here.

*First*, no county prosecutor has referred any case under the Abortion Trafficking Ban to the Attorney General, and Plaintiffs do not allege otherwise.  The Attorney General would not have referral authority to prosecute violations of this statute unless there were a specific case considered by a specific county prosecutor who asked the Attorney General for help.  Plaintiffs do not allege that such a case exists.  They want to violate the law, sure enough, but they do not allege any specific circumstances in which they intend to do so.  Nor have they sued any of the county prosecutors who would have direct prosecutorial authority if they did violate the law.  Instead, they have only sued the Attorney General, whose purely derivative authority has not yet been triggered.

*Second*, the limited legislative grant of prosecutorial authority to the Attorney General under the Abortion Trafficking Ban has not been triggered here.  *See* Att'y Gen. Op. 23-1 at 2–3.  That limited authority is still contingent on actions by county prosecutors: he "has the authority, at [his] sole discretion, to prosecute a person for a criminal violation of this section *if the prosecuting attorney authorized to prosecute* criminal violations of this section *refuses to prosecute* violations of any of the

---

[2] Judge Winmill ruled to the contrary in *Planned Parenthood v. Labrador*, but refused to consider the effect of the Att'y Gen. Op. 23-1 in construing the limits of his own authority.  Case No. 1:23-CV-00142-BLW, Slip. Op., 2023 WL 5237613 (D. Idaho August 15, 2023), Judge Winmill's decision is now on appeal to the Ninth Circuit.

provisions of this section by any person *without regard to the facts or circumstances*."
Idaho Code § 18-623 (emphasis added). Thus, the Attorney General does not have
any prosecutorial authority unless a county prosecutor first refuses to exercise his or
her authority. Plaintiffs have alleged no facts that indicate that *any* prosecutor in
Idaho has so refused to enforce this section of code. Indeed, none have. The Attorney
General thus lacks any prosecutorial authority under the Abortion Trafficking Ban
at this time.

Because the Attorney General would have authority under this statute only
based on actions of county prosecutors that have not yet occurred, he is not a proper
defendant under *Ex parte Young* and Plaintiffs have not alleged a justiciable
controversy against him under Article III. There is no "special relation" between the
Attorney General and the law as required to overcome sovereign immunity, *Los
Angeles Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992), much less "a '*genuine*
threat of *imminent* prosecution'" by the Attorney General as required for ripeness.
*San Diego Cnty. Gun Rts. Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (citation
omitted). The case is not fit for review because any individuals with whom the
Plaintiffs intend to engage are not "identifiable" and the case presents no "concrete
factual scenario" to which the law applies. *Thomas v. Anchorage Equal Rts. Comm'n*,
220 F.3d 1134, 1141 (9th Cir. 2000) (citation omitted); *Hodgers-Durgin v. de la Vina*,
199 F.3d 1037, 1044 (9th Cir. 1999). Plaintiffs have not shown any irreparable injury
that warrants an injunction—in fact, they have not alleged any injury at all, and the
Court lacks jurisdiction.

## CONCLUSION

The Court should deny Plaintiffs' motion for a temporary restraining order or preliminary injunction both on the merits and for lack of jurisdiction.

DATED: August 28, 2023

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL


By: _/s/ Lincoln Davis Wilson_
LINCOLN DAVIS WILSON
Chief, Civil Litigation and
Constitutional Defense

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR TRO OR PRELIMINARY INJUNCTION – 29

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 28, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Cristina Sepe
cristina.sepe@atg.wa.gov

Jamila Asha Johnson
jjohnson@lawyeringproject.org

Emily A MacMaster
emacmaster07@gmail.com
emily@macmasterlaw.com

Kelly O'Neill
koneill@lagalvoice.org

Emma Grunberg
emma.grunberg@atg.wa.gov

Paige Butler Suelzle
psuelzle@lawyeringproject.org

Wendy Olson
wendy.olson@stoel.com
docketclerk@stoel.com
emina.hasonovic@stoel.com
hillary.bibb@stoel.com
karissa.armbrust@stoel.com
kelly.tonikin@stoel.com
tracy.horan@stoel.com

*Counsel for Plaintiffs*


  /s/ *Lincoln Davis Wilson*
LINCOLN DAVIS WILSON
Chief, Civil Litigation and
Constitutional Defense

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF IDAHO
 3   SOUTHERN DIVISION
     ----------------------------------------x
 4
     PAM POE, by and through her
 5   parents and next friends, Penny
     and Peter Poe; PENNY POE, PETER
 6   POE; JANE DOE, by and through her
     parents and next friends, Joan and
 7   John Doe, JOAN DOE; JOHN DOE,
 8                   Plaintiffs,
 9                        Case No.
10                   v.
11   RAUL LABRADOR, in his official
     capacity as Attorney General of
12   the State of Idaho; JAN M.
     BENNETTS, in her official capacity
13   as County Prosecuting Attorney for
     Ada, Idaho; and the INDIVIDUAL
14   MEMBERS OF THE IDAHO CODE
     COMMISSION, in their official
15   capacities,
16                   Defendants.
17   ----------------------------------------x
18                   10:00 a.m.
                     September 22, 2023
19
20           VIRTUAL DEPOSITION of DR. DANIEL WEISS, an
21   Expert Witness in the above entitled matter,
22   pursuant to Notice, before Stephen J. Moore, a
23   Registered Professional Reporter, Certified
24   Realtime Reporter and Notary Public of the State
25   of New York.
```

```
                                              Page 2
 1                    DANIEL WEISS
 2  A P P E A R A N C E S:
 3
 4         PAUL, WEISS, RIFKIND, WHARTON & GARRISON
 5         LLP
 6                 Attorneys for Plaintiffs
 7                 1285 Avenue of the Americas
 8                 New York, New York  100019
 9
10         BY:   ALEXIA D. KORBERG, ESQ.
11               - and -
12         AMERICAN CIVIL LIBERTIES UNION FOUNDATION
13                 125 Broad Street
14                 New York, New York  10004
15
16         BY:   LI NOWLIN-SOHL, ESQ.
17
18         DAYTON REED, ESQ.
19                 Attorney for Jan Bennetts /Ada
20                 County
21                 200 West Front Street
22                 Boise, Idaho  83702
23
24
25
```

Page 3

1               DANIEL WEISS

2        OFFICE OF THE ATTORNEY GENERAL OF IDAHO

3               Attorneys for RAUL LABRADOR, in his

4               official capacity as Attorney

5               General of the State of Idaho and

6               the INDIVIDUAL MEMBERS OF THE IDAHO

7               CODE COMMISSION, in their official

8               capacities

9               700 West Jefferson Street

10              Boise, Idaho  83702

11

12       BY:    RAFAEL DROZ, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 4**

1                         DANIEL WEISS

2    EXAMINATION BY                          PAGE

3    ATTORNEY KORBERG                              8

4

5                    E X H I B I T S

6

7    Exbt 1  Declaration of Dr. Weiss        21    5

8

9    Exbt 2  CV of Dr. Weiss                 33    9

10

11   Exbt 3   Declaration in Montana case    34   20

12

13   Exbt 4   Deposition transcript of Dr.   44   22

14        Weiss

15

16   Exbt 5   Written testimony submitted    47    6

17        in Florida on October 24, 2022

18        to the Board of Medicine

19

20   Exbt 6   Written testimony submitted    47   20

21        in North Dakota to the Senate

22        Committee on Human Services

23        regarding HB 1254

24

25

Page 5

1                      DANIEL WEISS

2    Exbt 7    Written  testimony  submitted       48   13

3          in Ohio in support of HB 68

4

5    Exbt 8    Written  testimony  submitted       49    8

6          in support of Ohio law HB 454

7

8    Exbt 9    Oral  testimony  in  support  of      49   19

9          Ohio HB 454

10

11   Exbt 10   Testimony  in  support  of  Utah      50   25

12          Senate Bill 16

13

14   Exbt 11   Testimony  in  support  of           50   25

15          Montana SB 99

16

17

18

19

20

21

22

23

24

25

Page 6

1              DANIEL WEISS
2              THE VIDEOGRAPHER:  Good
3     morning, we are going on the record.
4              The date today is September
5     22, 2023, the time is 10:02 a.m.
6     Eastern time.
7              This is media unit 1 of the
8     video recorded deposition of
9     Dr. Daniel Weiss, taken in the
10    matter of Poe, et al. versus
11    Labrador, et al., filed in the U.S.
12    District Court for the District of
13    Idaho, Southern Division, case
14    number 1:23-CV-00269.
15             My name is Christopher
16    Hanlon, I'm a certified legal
17    videographer.  Our court reporter
18    today is Steve Moore.
19             At this time I would ask
20    participating attorneys to please
21    state your appearances for the
22    record.
23             All other attorneys will be
24    noted on the stenographic record.
25             Attorney Korberg?

Page 7

```
1                    DANIEL WEISS
2               ATTORNEY KORBERG:  Good
3         morning.  My name is Alexia Korberg.
4         I am with the law office of Paul
5         Weiss Rifkind Wharton & Garrison,
6         and I am going to be taking today
7         and representing the Plaintiffs in
8         this case, Pam Poe, Penny Poe, Peter
9         Poe, Jane Doe, Joan Doe and John
10        Doe.
11              ATTORNEY DROZ:  Good morning.
12        This is Rafael Droz.  I am an
13        attorney for the Idaho Attorney
14        General, and I am a Deputy Attorney
15        General, and I am representing
16        Dr. Weiss in the deposition.
17              THE VIDEOGRAPHER:  Thank you,
18        counsel.
19              At this time I would ask our
20        court reporter, Mr. Moore, to please
21        administer the oath and we can
22        proceed.
23
24  D A N I E L      W E I S S,  called as a
25        witness, having been first duly sworn by
```

```
                                              Page 8
 1                    DANIEL WEISS
 2          the Notary Public, was examined and
 3          testified as follows:
 4
 5   EXAMINATION BY
 6   ATTORNEY KORBERG:
 7
 8          Q      Good morning, Dr. Weiss.  How
 9   are you?
10          A      Good morning.
11          Q      We haven't met before, but my
12   name is Alexia Korberg and I represent the
13   Plaintiffs in this case.
14                 Do you understand that I'm
15   going to ask you questions today for use in
16   a legal case?
17          A      Yes.
18          Q      And do you understand that in
19   certain circumstances your testimony can be
20   used in court?
21          A      Yes.
22          Q      And do you understand that
23   you are under oath sworn to testify
24   truthfully, right?
25          A      Yes.
```

Page 9

1                    DANIEL WEISS
2          Q       Are you aware of any reason
3    today that you cannot testify truthfully or
4    accurately?
5          A       No.
6          Q       If you want to take a break
7    at any point, please just let us know and we
8    can do that.
9                  So, I understand you've been
10   deposed before, so I'm really only going to
11   briefly review how this works.
12                 But if you don't understand a
13   question, I'm going to ask that you ask me
14   for clarification.
15                 Can we agree that if you do
16   answer a question I pose to you it means you
17   understood the question?
18         A       Yes.
19         Q       Great.
20                 And are you aware that you
21   are not allowed to speak to counsel either
22   during the deposition or during the breaks
23   about the substance of the case or your
24   testimony?
25         A       Yes.

```
                                    Page 10
 1                  DANIEL WEISS
 2         Q       So, do you agree that you're
 3  not going to have any e-mail, texting or
 4  messaging functions available to you today?
 5         A       During the deposition?
 6         Q       Exactly, during the
 7  deposition.
 8         A       Yes.
 9         Q       Can we agree that if you do
10  communicate with counsel during the breaks
11  about the substance of your testimony that
12  you will alert me to the fact that you have
13  done so?
14         A       Yes.
15                 ATTORNEY DROZ:  Objection.  I
16         don't know if that's the rule or
17         not, but I just want to put it out
18         there that I can talk with Dr. Weiss
19         if necessary and we can take it from
20         there.
21                 But I don't think we have to
22         disclose any substance of any
23         conversation.
24                 ATTORNEY KORBERG:  I would
25         disagree with that, but we can cross
```

Page 11

```
 1                    DANIEL WEISS
 2         that bridge if we do.
 3                    ATTORNEY DROZ:  Yes.
 4         Q       Is there anyone in the room
 5   with you today, Dr. Weiss?
 6         A       No.
 7         Q       Are there any papers or notes
 8   in the room with you?
 9         A       Only my declaration.
10         Q       Great.
11         A       On my desk.  There is
12   probably something behind me, but --
13         Q       Does your declaration have
14   any notes on it, or is it a clean copy?
15         A       No notes on it and it does
16   not -- I do not have my CV, by the way, on
17   my desk.
18         Q       Okay.
19                 So, Dr. Weiss, you're here
20   today to testify as an expert witness,
21   right?
22         A       Yes.
23         Q       On whose behalf are you
24   appearing as an expert?
25         A       For the State of Idaho,
```

Page 12

```
 1                    DANIEL WEISS
 2   Attorney General's Office.
 3          Q       And who is paying your fees
 4   in the matter?
 5          A       Idaho.
 6          Q       Have you ever personally
 7   spoken with any of the Plaintiffs in this
 8   matter, either the minors or their parents?
 9          A       No.
10          Q       Have you ever personally
11   spoken with Plaintiffs' physicians?
12          A       No.
13          Q       Have you ever personally
14   spoken with anyone who has firsthand
15   knowledge of Plaintiffs?
16          A       No.
17                  ATTORNEY DROZ:  Objection.
18          What is firsthand knowledge?
19          Q       Dr. Weiss, have you ever
20   spoken to anyone who has told you anything
21   about the Plaintiffs other than that which
22   is in the Complaint?
23          A       No.
24          Q       When did Defendants first
25   contact you about the case?
```

Page 13

```
 1                      DANIEL WEISS
 2          A       I don't remember.
 3          Q       Do you know, do you recall
 4   roughly when?
 5          A       Perhaps a few months ago, but
 6   I do not remember.
 7          Q       When you were first contacted
 8   about the case, perhaps?
 9          A       Two months ago or something
10   or sometime thereabouts.
11          Q       What did Defendants ask you
12   to opine on?
13                  ATTORNEY DROZ:  Objection to
14          the extent it calls for
15          attorney-client privileged
16          information.
17                  You can answer, Doctor, to
18          the extent it doesn't reveal any
19          conversations.
20          A       On the matter related to the
21   Plaintiffs' response to the Idaho law.
22          Q       When you say you were asked
23   to opine on the matter related to the
24   Plaintiffs' response to the Idaho law, do
25   you mean you were asked to opine on
```

Page 14

```
 1                    DANIEL WEISS
 2    Plaintiffs' Complaint in the matter, or some
 3    other document?
 4          A       The Plaintiffs' Complaint.
 5          Q       Prior to being contacted by
 6    Defendants in this case, had you read
 7    Plaintiffs' Complaint in this matter?
 8          A       No.
 9          Q       And were you asked to
10    generally give an opinion on Plaintiffs'
11    Complaint in the matter, or were you asked
12    to offer some more specific opinion?
13                  ATTORNEY DROZ:  Objection,
14          just calls -- it's confusing.
15          A       I don't understand the
16    question.
17          Q       Sure.
18                  So you said you were asked
19    that the opinion you were asked to provide
20    in the matter was a response to Plaintiffs'
21    Complaint, right?
22          A       Yes.
23          Q       So, I'm asking were you asked
24    to respond to the Complaint generally or
25    were you asked to provide some more specific
```

```
                                    Page 15
 1                  DANIEL WEISS
 2   opinion or response?
 3                  ATTORNEY DROZ:  I'm going to
 4          object just to the extent it calls
 5          for confidential communications,
 6          privileged, expert witness
 7          privileged communications.
 8                  I mean, it's pretty clear
 9          what's going on here.
10          Q       You can answer, Dr. Weiss.
11          A       So, I was asked to opine on
12   the -- on bans on hormonal interventions on
13   minors, and to the extent I was provided
14   information on the minors in this case, to
15   also comment on that.
16          Q       When did you first perform
17   work in relation to this case?
18          A       It would have been shortly
19   after I agreed to assist in the matter.
20          Q       Roughly how many hours of
21   work have you personally put into the
22   matter?
23          A       I don't remember.
24          Q       Roughly, ballpark?
25          A       Maybe 20 hours.
```

```
                                        Page 16
 1                    DANIEL WEISS
 2        Q        In relation it to this case
 3   have you performed any work not directly
 4   related to either preparing your declaration
 5   or preparing for today's deposition?
 6        A        I don't understand.
 7        Q        Sure.
 8                 So you said you performed
 9   roughly 20 hours of work in this case,
10   right?
11        A        Yes.
12        Q        And the work you performed
13   included preparing your declaration in this
14   matter, right?
15        A        Yes.
16        Q        And presumably the work you
17   performed included preparing for today's
18   deposition, right?
19        A        Yes.
20        Q        Outside of those two things
21   has any of the work that you have performed
22   in this matter --
23                 ATTORNEY KORBERG:  Withdrawn.
24        Q        Have you done any work in
25   this matter that is unrelated to either the
```

```
                                    Page 17
 1                  DANIEL WEISS
 2    preparation of your declaration or your
 3    preparation for the deposition today?
 4           A      No.
 5           Q      So, you understand this
 6    matter relates to an Idaho law, right, HB
 7    71?
 8           A      Yes.
 9           Q      Have you taken a public
10    position on HB 71 either before or after its
11    passage?
12           A      I do not recall having done
13    so, no.
14           Q      Has anyone asked you to take
15    a public position on HB 71 at any point?
16           A      Not that I recall.
17           Q      From between the time that HB
18    71 was being conceived of, drafted and then
19    ultimately passed, did you speak to anyone
20    about it, other than the attorneys in this
21    case?
22           A      So, I have taken -- I have
23    provided statements for many states related
24    to bans on hormonal interventions in minors
25    with gender dysphoria, and I may have
```

```
                                        Page 18
 1                  DANIEL WEISS
 2   provided such a statement for Idaho, but I
 3   don't recall.
 4          Q     Did anyone in the Idaho
 5   legislature or otherwise consult with you on
 6   the drafting of HB 71?
 7          A     No.
 8          Q     Have you expressed concerns
 9   to anyone about any element of HB 71?
10              ATTORNEY DROZ:  Objection.
11          Just concerns?
12          A     I would have spoken to
13   counsel about it, so.
14          Q     Sure.  So other than counsel
15   in this case, have you expressed to anyone
16   any concerns, critiques, questions about the
17   provisions of HB 71?
18          A     No.
19          Q     Have you expressed concerns
20   to anyone --
21              ATTORNEY KORBERG:  Withdrawn.
22          Q     What did you do to prepare
23   specifically for your deposition today?
24          A     I had a meeting with counsel
25   beforehand, but not today, and read through
```

Page 19

DANIEL WEISS

my declaration.

Q     And how many hours did you
meet with counsel?

A     Less than an hour, 45
minutes, maybe.

Q     Was anyone other than counsel
for the State of Idaho present for that
meeting?

A     No.

Q     Did you speak with either
Dr. Cantor or Dr. Malone in preparation for
today?

A     No.

Q     Prior to your retention in
this case had you ever spoken to Dr. Cantor
or Dr. Malone before?

A     Yes, I have spoken to
Dr. Malone once about -- well, I will stop
there.  Yes, one time.

Q     Tell me the circumstances in
which you were introduced to Dr. Malone.

A     Dr. Malone had written a
commentary about hormonal interventions in
minors with gender dysphoria, and I sent him

Page 20

                    DANIEL WEISS

1   an e-mail praising him on the lucidity and

2   the soundness of his points.

3                   He then responded to me and

4   we chatted on the phone.

5         Q       When was this?

6         A       About two years ago.

7         Q       Have you been in touch with

8   Dr. Malone since that time?

9         A       No.

10        Q       Other than counsel for the

11  State of Idaho, have you spoken to anyone

12  about your deposition today?

13        A       I spoke with -- I spoke with,

14  let's see John Reimer.

15        Q       And who is John Reimer?

16                ATTORNEY DROZ:  John Reimer

17           is an Attorney for Idaho, so --

18                THE WITNESS:  Okay.

19        Q       So, other than Mr. Reimer and

20  other counsel for the State of Idaho, did

21  you speak to anyone about your deposition

22  today?

23        A       No.

24                ATTORNEY KORBERG:  Can we

```
                                              Page 21
 1                      DANIEL WEISS
 2           please pull up tab 1, which I
 3           believe has already been marked as
 4           Exhibit 1.
 5                      (The above described document was
 6           marked Exhibit 1 for identification as of
 7           this date.)
 8                      THE CONCIERGE:  Shall I be
 9           sharing it on screen, counsel?
10                      ATTORNEY KORBERG:  Sure.
11                      THE VIDEOGRAPHER:  I have a
12           question about that, counsel, this
13           is the videographer.
14                      If he is sharing on screen,
15           would you like that included in the
16           video on a split screen or the
17           witness only?
18                      ATTORNEY KORBERG:  I don't
19           think we need to show it.
20                      THE CONCIERGE:  Do you need a
21           second, Chris, before I share it?
22                      THE VIDEOGRAPHER:  No, we are
23           good.
24           Q     Do you agree that this is the
25   declaration that you submitted in this case?
```

Page 22

```
 1                    DANIEL WEISS
 2          A       Yes.
 3          Q       And to the best of your
 4   knowledge is -- does this, does Exhibit 1
 5   reflect the full and complete declaration
 6   you submitted in this case?
 7          A       Yes.
 8          Q       And are the opinions that you
 9   espouse in your declaration your own?
10          A       Yes.
11          Q       Did you have assistance
12   drafting this declaration?
13          A       No.
14          Q       So nobody helped you draft
15   this declaration, is that correct?
16          A       The contents are solely my
17   own.  I did show it to my wife for
18   formatting only.
19          Q       Understood.
20                  Does your declaration
21   represent a complete statement of the
22   opinions that you are offering in this case?
23                  ATTORNEY DROZ:  Objection.
24          A       I might offer additional
25   opinions during this deposition, but I agree
```

Page 23

DANIEL WEISS

1
2    with all the opinions expressed -- I
3    continue to agree with the opinions
4    expressed in this declaration.
5            Q       Okay, so let's take that in
6    parts.
7                    So first, there is nothing
8    you would like to correct or amend in your
9    declaration, right?
10           A       Correct.
11           Q       And as you sit here today, at
12   this moment, the opinions expressed in this
13   declaration are all those you intend to
14   offer, but it is possible that over the
15   course of this deposition you might offer
16   additional opinions, is that right?
17           A       Yes, that's correct.
18           Q       All right.  Can we turn to
19   page 50 of Exhibit 1.
20                   It says, references at the
21   top are these the materials you relied on in
22   reaching your opinions expressed in your
23   report?
24           A       Yes, and my experience in
25   rationality.

```
                                    Page 24
 1              DANIEL WEISS
 2      Q       Did you personally read each
 3   of the references listed --
 4      A       Yes.
 5      Q       -- here?
 6      A       Yes.
 7      Q       And you think each of the
 8   representations you listed here is reliable?
 9      A       What do you mean by reliable?
10      Q       Well, am I correct that you
11   formed the opinions expressed in your report
12   in reliance on among other things these --
13   the references that you list here?
14      A       I think we need to define the
15   word reliance.  I used -- critical analysis,
16   my experience, my ability to analyze studies
17   and all of that in careful review of each of
18   the references.
19      Q       Understood.
20              But you believe in the
21   accuracy, the methodology, et cetera, of the
22   references that you list here on page 50 of
23   your report, is that correct?
24      A       I don't think it's a matter
25   of belief.
```

```
                                        Page 25
 1                    DANIEL WEISS

 2              ATTORNEY DROZ:  Objection.

 3         There is numerous references.  I'm

 4         not sure if you want to go through

 5         each one.  I suppose we could do

 6         that.

 7                  But you can answer, Doctor.

 8         A        Certainly.  So I don't think

 9    it's a matter of belief.  This is not -- we

10    are not talking about belief, we are talking

11    about analysis, thinking, evaluation,

12    careful evaluation of each of the

13    references, and I think the declaration

14    speaks for itself.

15                  When I refer to a reference,

16    I might comment on appropriate or

17    inappropriate, flaw or quality type

18    methodology.

19                  So I might refer to

20    something, and it doesn't mean I agree to

21    everything that that reference says.

22         Q        Do you have any concerns

23    about the accuracy of any reference that you

24    list here beginning on page 50 of your

25    report?
```

Page 26

1                          DANIEL WEISS

2          A       I think the word accuracy in

3     this context is unclear.

4          Q       Is there any reference that

5     you listed in your report that you think is

6     unreliable in some way?

7                     ATTORNEY DROZ:  Objection, in

8                terms of reliability.

9          A       I think the word reliable is

10    not -- it's not an absolute term, so --

11    medicine and science is not always

12    clear-cut.

13                     So I think you need to be

14    more specific, and we can look at a

15    particular reference and then you can tell

16    me about it and we can analyze it.

17         Q       Are there any references --

18    what does it mean to you, why did you list

19    these particular references in your report?

20         A       I think the declaration

21    speaks for itself.  Let's go to a particular

22    reference and I'll tell you why I listed it.

23         Q       As a whole, what does it mean

24    for you to list a reference?

25                     What does a reference mean in

Page 27

```
 1                    DANIEL WEISS
 2   this context?  What role did it play in the
 3   formation of your opinions?
 4          A       So, in the declaration I
 5   would list a reference because it
 6   solidifies, clarifies or supports a
 7   statement I make.
 8          Q       And is there any reference
 9   about which you have a concern about the
10   methodology employed in that reference?
11                  ATTORNEY DROZ:  Objection,
12              any particular reference, or what
13              are we talking about?
14                  ATTORNEY KORBERG:  No, I am
15              directing him to all the references,
16              and these speaking objections are
17              really, they are inappropriate, you
18              are directing the witness, and I
19              would ask you to stop.
20                  ATTORNEY DROZ:  I am just
21              trying to -- I don't want to say I'm
22              trying to help you, but I am just
23              trying to move it along in terms of
24              what we are talking about here.
25                  ATTORNEY KORBERG:  I hear
```

Page 28

                          DANIEL WEISS

1
2            you.  I don't need any help, please
3            just stick to the standard forms of
4            objection.
5                    ATTORNEY DROZ:  Objection,
6            vague.
7            A      I have no problem with the
8    question.  I think that we still have to
9    drill down and look at particular
10   references.
11                   I might have cited a
12   reference, for example, by Dr. Turbin, who
13   is basically a statistician who finished his
14   psychiatry training like a year or two ago.
15                   He's very well known in the
16   field of gender dysphoria.  I might have
17   cited one of -- cited one of his papers
18   here, I don't recall, among all my
19   references, that are about 160 references.
20   If I cited his paper, it likely has very
21   flawed methodology.
22                   And so that would be an
23   example of, yes, a reference I would have
24   concerns about.
25                   But we can look through each

Page 29

1                    DANIEL WEISS

2    reference.

3         Q    So, it's your belief that

4    some of these references that you list in

5    your report you do think have very flawed

6    methodology, is that correct?

7         A    I said there may be one or

8    two.  We would have to look through each.

9              I have to look at them and

10   tell you that one has a particular problem.

11   That one doesn't.

12             And I will mention that so

13   the declaration again it speaks for itself.

14             It will refer to a reference

15   and say, for example, the Dutch protocol, I

16   referred -- that's in there -- that

17   subsequent study, the late study after

18   surgical reassignment, had very flawed

19   methodology, and I discuss that in the

20   declaration.

21             Most of the other references,

22   however, I think are sound, but we have to

23   look at each individual one.

24        Q    Okay.

25             So, some of the references

Page 30

DANIEL WEISS

1

2    have methodological and other flaws that you

3    identified in the declaration, right?

4         A     Yes, and some of them may

5    have other flaws that I might not have

6    identified.

7         Q     Okay, so some of the

8    references, none of which you can identify

9    specifically as you sit here today, but you

10   relied upon in forming your report, may be

11   flawed, methodologically or otherwise,

12   right?

13        A     No; I don't think that's

14   accurate.

15              If we look through the

16   references today, sitting, and we go through

17   each one, I may tell you of flaws in them.

18              But right now, without going

19   through each individual one, I can't by

20   memory, tell you which ones are flawed.

21              We can look at each one, we

22   can go through all 163 or so of them, if you

23   would like.

24        Q     So I understand that you

25   can't by memory identify now which ones are

```
                                          Page 31

 1                    DANIEL WEISS
 2   flawed in ways that you haven't already
 3   outlined in your report.
 4                But it is your testimony that
 5   there is some number of references that you
 6   rely upon in your report and list here that
 7   are flawed in some way, whether
 8   methodological or otherwise, that you do not
 9   identify as flawed in your report, right?
10          A      No.
11                ATTORNEY DROZ:  Objection to
12          form.
13          A      I would not agree with that.
14                You're using the word relied
15   upon in a very misleading way.  I may have
16   mentioned it, I may have referred to it, but
17   I would not have relied upon a report that
18   was significantly flawed.
19                So, by using the word rely,
20   it sounds like I'm basing my statement or
21   declaration upon flawed references, and I'm
22   not.
23                I might have referred to a
24   reference that was flawed, but I'm not
25   basing an opinion or conclusion based upon a
```

Page 32

DANIEL WEISS

1                                         DANIEL WEISS

2 flawed reference.

3         Q        In reading your report, how

4 am I supposed to know which references you

5 are relying upon and which references you

6 are referring to for some other reason?

7         A        The declaration is fairly

8 clear in that, is very clear in that regard.

9         Q        For every reference it is

10 your -- it is your testimony that your

11 declaration is clear as to whether you are

12 relying on that reference or not?

13             ATTORNEY DROZ:  Objection to

14         form, vague.

15         A        I don't know what you mean by

16 relied upon.  I don't use that terminology

17 when describing a scientific or medical

18 conclusion.

19             I may consider a study, a

20 paper, but to rely upon implies that it's a

21 foundation for a decision.

22             There is no single reference

23 here that provides a sole foundation for my

24 decision.

25             It's the overall scientific

```
                                              Page 33
 1                    DANIEL WEISS
 2   literature, my clinical experience, my
 3   ability to evaluate that literature, and
 4   rationality or common sense.
 5          Q       We will return to that.
 6                  ATTORNEY KORBERG:  Let's pull
 7          up what I understand has already
 8          been marked as Exhibit 2.
 9                  (The above described document was
10          marked Exhibit 2 for identification as of
11          this date.)
12          Q       Would you agree with me that
13   this is your CV that you submitted in this
14   matter?
15          A       Looks like it, yes.
16          Q       And is the CV that you
17   submitted in this matter currently accurate?
18          A       I'm not sure when it was
19   submitted, but it should be accurate, yes.
20          Q       Do you have anything that you
21   would like to add or amend to your CV?
22          A       Not that I can think of, no.
23          Q       Starting at page 92 of your
24   CV, you list legal experience, then three
25   cases.
```

Page 34

1                        DANIEL WEISS

2                   Do the cases that follow

3       reflect all of your legal experience?

4            A      Can we go to page 92, and

5       let's look at 93.  Back to 92.

6                   Yes, that's all.

7            Q      Did you submit a declaration

8       in Van Garderen v. Montana, a challenge to a

9       Montana law banning gender affirming care

10      for transgender adolescents?

11           A      Yes.

12           Q      Why wasn't that case included

13      on your CV?

14           A      It came after the submission

15      of the CV.

16                  ATTORNEY KORBERG:  Can we

17           please mark tab 4 as Exhibit 3,

18           which is your declaration in that

19           Montana case.

20                  (The above described document was

21           marked Exhibit 3 for identification as of

22           this date.)

23                  THE CONCIERGE:  Sorry to

24           bother you.  I see 4.1, et cetera.

25           Which tab?

```
                                            Page 35
 1                    DANIEL WEISS
 2                    ATTORNEY KORBERG:  This is
 3            actually tab 3.
 4                    THE CONCIERGE:  Got it, thank
 5            you.
 6            Q        Is this a, to your knowledge,
 7    a complete and accurate reflection of the
 8    declaration that you submitted in that
 9    Montana case?
10            A        Looks like the first page.
11            Q        Have you ever been
12    disqualified to serve as an expert for a
13    case in which your expertise has been
14    offered?
15            A        No.
16            Q        Have you ever given any
17    testimony, either written or in person, on
18    any issue that a judge has ultimately
19    declined to credit or consider?
20            A        No.
21            Q        Turning back to Exhibit 2,
22    which is your CV in this case, page 24.
23            Q        Does it sound right that your
24    bibliography lists 23 publications?
25            A        I don't remember that.  We
```

Page 36

DANIEL WEISS

1
2    can scroll down, it will tell you that.

3         Q        Sure.

4                  Do you have any writing or
5    presentations not reflected in your CV?

6         A        I think it's complete in that
7    regard.

8         Q        In your report you suggest
9    you participated in 100 clinical trials, but
10   you only list 90 here.

11                 Do you know what the ten
12   clinical trials that you didn't include in
13   your CV are?

14        A        Let's look through and see
15   what that number is here.  Let's see what
16   the last states.

17        Q        I will suggest that you -- I
18   will represent to you they are not numbered
19   here, so we just counted them.

20        A        I may have miscounted.

21        Q        So it's your belief in your
22   report when you say you participated in 100
23   clinical trials, you actually meant to say
24   that you participated in the 90 clinical
25   trials that you listed in your CV, is that

Page 37

```
 1                    DANIEL WEISS
 2   right?
 3          A      If you --
 4                 ATTORNEY DROZ:  Objection.
 5          A      If you counted them and you
 6   got 90, and my declaration says 100, and --
 7   you can quibble over the ten.
 8          Q      Sure, but what I'm asking is
 9   was your assertion that you participated in
10   100 clinical trials in your declaration
11   incorrect, or are there ten clinical trials
12   that you participated in that are not
13   reflected on your CV?
14          A      So I did want to see the last
15   one listed, because it's possible I may not
16   have listed a few other trials.
17                 Can we scroll down to the
18   end?
19          Q      That would be page 108, I
20   believe.
21          A      That looks complete, and if
22   the total is 90, then, I thought I said
23   approximately 100, but if I said 100 I was
24   off by ten.
25          Q      Do any of the 590 total
```

```
                                    Page 38
 1              DANIEL WEISS
 2    publications and presentations that you
 3    reflected in your CV relate to gender
 4    dysphoria or gender affirming care?
 5         A       No.
 6         Q       Did any of the 590 total
 7    publications and presentations reflected in
 8    your CV relate in any way to pediatric or
 9    adolescent medicine?
10         A       State that question one more
11    time?
12         Q       Sure.
13              Do any of the 590 total
14    publications and presentations reflected in
15    your CV relate in any way to pediatric or
16    adolescent medicine?
17         A       Yes, some of them might,
18    because diabetes management in adults
19    overlaps with diabetes management in
20    adolescents and children.
21              So I did speak on that
22    subject, and that would be part of that.
23         Q       Are any of those 590 total
24    publications and representations
25    specifically about pediatric or adolescent
```

Page 39

1                      DANIEL WEISS
2    medicine, as opposed to on subjects that are
3    incidentally relevant?
4         A      There is overlap certainly
5    with pediatric and adolescents, but none of
6    them were solely on pediatric or adolescent.
7         Q      Were any of those 590
8    publications predominantly about pediatric
9    or adolescent medicine?
10        A      Not that I recall.
11        Q      Turning to page 7 of Exhibit
12   2, which is your CV, you list 64 major
13   courses and meetings for continuing medical
14   education you have attended or undertaken,
15   right?
16        A      If that's what it says, yes.
17   64, okay.  I don't remember the number.
18        Q      Have you undertaken any
19   continuing medical education not listed
20   there?
21        A      Let's go back to the last --
22   let's go to the last one, because I might
23   not have listed them, some since then.
24                 Certainly I have done
25   continuing medical education since the

Page 40

                        DANIEL WEISS

 1      submission of the CV.
 2                      Oh, there is substantial
 3      continuing medical education after that,
 4      yes.
 5              Q       Okay, so the CV that you
 6      submitted in this matter doesn't actually
 7      reflect all of your continuing medical
 8      education, right?
 9              A       Correct.
10                      ATTORNEY KORBERG:  Counsel,
11              we would ask you submit an updated
12              CV that accurately reflects the
13              witness' experience.
14                      ATTORNEY DROZ:  We will take
15              it under advisement.
16              Q       Have you undertaken any
17      continuing medical education related to
18      gender dysphoria or gender affirming care?
19              A       Yes.
20              Q       What were those?
21              A       I read the section on Up to
22      Date, on gender dysphoria.
23              Q       Can you explain what you mean
24      by you read the section on, Up to Date, on


Page 41

```
 1                    DANIEL WEISS
 2  gender dysphoria?
 3          A       Yes, so Up to Date is an
 4  online reference that many physicians use to
 5  get guidance on diagnosis and treatment of a
 6  variety of medical disorders.
 7                    It's used throughout the
 8  world.
 9          Q       Okay.  So other than reading
10  entries on this online reference source,
11  have you undertaken any continuing medical
12  education on gender dysphoria or gender
13  affirming care?
14          A       Well, that online reference
15  source is -- provides AMA category 1 credits
16  for review.
17                    So that is continuing medical
18  education.
19          Q       And have you, in fact,
20  received category 1 credits for your review
21  of gender dysphoria, entries relating to
22  gender dysphoria or gender affirming care on
23  Up to Date?
24          A       Yes.
25          Q       When did you receive those
```

```
                                              Page 42
 1                    DANIEL WEISS
 2    category 1 credits for that education,
 3    reading that online read source on gender
 4    dysphoria or gender affirming care?
 5            A       I don't remember.
 6            Q       What specifically did you
 7    look up or reference on that online resource
 8    relating to gender dysphoria or gender
 9    affirming care?
10            A       Management of patients with
11    gender dysphoria.
12            Q       Other than reading those
13    entries on that online resource related to
14    management of patients with gender
15    dysphoria, have you undertaken any
16    continuing medical education on gender
17    dysphoria or gender affirming care?
18            A       No.
19            Q       Other than attending a
20    symposium in 1989, have you received any
21    continuing medical education related to
22    pediatric or adolescent endocrinology?
23            A       I probably have, although I
24    don't -- I have not -- nothing specific with
25    regard to that, because the Endocrine
```

Page 43

DANIEL WEISS

1                           DANIEL WEISS
2    Society meetings I might have attended, I
3    did attend, and I listed those.
4                    I would have gone to sessions
5    that included pediatric and adolescent
6    endocrine issues.
7        Q        Okay.  So other than
8    attending meetings of the Endocrine Society,
9    where pediatric or adolescent endocrine
10   issues may have incidentally been discussed,
11   have you received any continuing medical
12   education relating to pediatric or
13   adolescent endocrinology?
14                   ATTORNEY DROZ:  Objection.
15       A        I wouldn't use the word
16   incidentally, because the Endocrine Society
17   has many sessions on adolescents, children
18   and adults.
19                   But when I list the credits,
20   the CME credits, continuing medical
21   education credits provided at those
22   meetings, I don't list each particular
23   session I went to.  That's just not done.
24                   And some of those discussions
25   may have been focused on and perhaps even

Page 44

```
 1                    DANIEL WEISS
 2   entirely devoted to adolescent or pediatric
 3   endocrine issues.
 4              I just don't recall.
 5        Q      Okay.  So you may have over
 6   the years attended sessions focused on
 7   pediatric or adolescent medicine, but you
 8   have no specific recollection of having
 9   affirmatively done so, right?
10        A      Correct.
11              ATTORNEY KORBERG:  I would
12        like to introduce as Exhibit 4
13        what's tab 4.1, which is your
14        deposition transcript in K.C. v.
15        individual members of the Medical
16        Licensing Board of Indiana.
17        Q      Have you reviewed your
18   transcript in that case?
19        A      The deposition transcript?
20        Q      Yes, in the Indiana case?
21        A      I looked at it briefly.
22              (The above described document was
23        marked Exhibit 4 for identification as of
24        this date.)
25        Q      Is there anything inaccurate
```

Page 45

```
 1                      DANIEL WEISS
 2   in your testimony in the Indiana case or
 3   anything that you wish to amen?
 4           A       Well, having not looked at
 5   the whole transcript, I can't tell you.
 6                   ATTORNEY DROZ:  Can I stop
 7           just a second here, and it's a sort
 8           of housekeeping thing, and forgive
 9           me.
10                   On the Exhibit Share, should
11           these be showing up in my folder as
12           well on the Exhibit Share, or I'm
13           just limited to what's on the
14           screen?
15                   THE CONCIERGE:  That's
16           affirmative.  They should be showing
17           up, and you and the witness and
18           everybody else should be able to
19           independently go through the
20           documents.
21                   ATTORNEY DROZ:  So I'm
22           showing only 1 and 2.
23                   THE CONCIERGE:  You have to
24           refresh your web browser.
25                   ATTORNEY DROZ:  Got it.
```

Page 46

DANIEL WEISS

1

2          Thank you.  I apologize for the

3          delay.

4                  THE CONCIERGE:  You're

5          welcome.

6                  ATTORNEY DROZ:  Please

7          continue, I apologize.

8          Q       So you testified that you did

9    review at some point your transcript in the

10   Indiana case, right?

11         A       Briefly; in part, not

12   entirely.

13         Q       And based on your review, do

14   you recall whether there was anything in,

15   that you read in that deposition transcript,

16   that you believe to be inaccurate?

17         A       No.

18         Q       And based just on your

19   recollection of what you said in the Indiana

20   case, regardless of whether you read it in

21   the transcript or not, is there anything

22   that you said that you believe to be

23   inaccurate or that you wish to amend?

24         A       Not that I recall, no.

25                 THE VIDEOGRAPHER:  I would

Page 47

```
 1                    DANIEL WEISS
 2           like to introduce as Exhibit 5 tab
 3           4.2, which is your written testimony
 4           submitted in Florida in October 24,
 5           2022 to the Board of Medicine.
 6                   (The above described document was
 7           marked Exhibit 5 for identification as of
 8           this date.)
 9           Q      You have no reason to believe
10   this is a true and complete copy of your
11   testimony there, right?
12           A      What's the question?
13           Q      Do you have any reason to
14   believe that this isn't a true and complete
15   copy of your testimony to the court?
16           A      It looks correct.
17                   THE VIDEOGRAPHER:  Same for
18           what I would like to introduce as
19           Exhibit 6, which is tab 4.3.
20                   (The above described document was
21           marked Exhibit 6 for identification as of
22           this date.)
23           Q      This is your written
24   testimony submitted in North Dakota to the
25   Senate Committee on Human Services regarding
```

```
                                              Page 48

 1                     DANIEL WEISS

 2    HB 1254.

 3                   Same question, any reason to

 4    believe this isn't a true and complete copy

 5    when it comes up of your testimony in North

 6    Dakota?

 7          A      Looks correct.

 8                   ATTORNEY KORBERG:  Same with

 9          respect to what I will mark as

10          Exhibit 7, which is tab 4.4, which

11          is the written testimony submitted

12          in Ohio in support of HB68.

13                   (The above described document was

14          marked Exhibit 7 for identification as of

15          this date.)

16          Q      Any reason to believe that

17    this, when it comes up, is not a true and

18    complete copy of your Ohio testimony?

19          A      Looks like my testimony.

20          Q      And just to be clear for the

21    record, this is your testimony in support of

22    HB 68 in Ohio.

23                   ATTORNEY KORBERG:  I would

24          like to introduce as Exhibit 8,

25          which is tab 4.5, your written
```

Page 49

```
 1                      DANIEL WEISS
 2           testimony submitted in support of
 3           another Ohio law, HB 454.
 4           Q       And when that comes up, is
 5    there any reason to believe that this isn't
 6    a true and complete copy of your testimony
 7    in Ohio in support of HB 454?
 8                   (The above described document was
 9           marked Exhibit 8 for identification as of
10           this date.)
11           A       Looks correct.
12           Q       Great.
13                   THE VIDEOGRAPHER:  And I
14           would like to introduce tab 4.6, and
15           mark it as Exhibit 9, which is --
16           which I believe to be oral testimony
17           that you gave in support of Ohio HB
18           454.
19                   (The above described document was
20           marked Exhibit 9 for identification as of
21           this date.)
22           A       Yeah.
23                   ATTORNEY DROZ:  Objection.
24           What is this?
25                   ATTORNEY KORBERG:  Why don't
```

```
                                            Page 50
 1                    DANIEL WEISS
 2          we click on the link.
 3                  THE WITNESS:  Which one?
 4                  THE CONCIERGE:  It may not go
 5          smoothly.  I'm just giving you a
 6          heads up.  So just give me one
 7          second.
 8                  ATTORNEY DROZ:  We don't need
 9          to do that if counsel is prepared to
10          just represent that those links are
11          links to --
12          Q      Okay, I will represent that
13   we have links to your testimony in Ohio in
14   support of HB 454, which we have marked as
15   Exhibit 9, your testimony in support of Utah
16   Senate Bill 16, which we have marked as
17   Exhibit 10, and your testimony in support of
18   Montana SB 99, which we have marked as
19   Exhibit 11.
20                  And we would just like to
21   confirm you have no reason to believe that
22   these wouldn't be accurate representations
23   of the testimony you gave there.
24          A      No reason to believe.
25                  (The above described documents were
```

Page 51

```
 1                  DANIEL WEISS
 2           marked Exhibits 10 and 11 for
 3           identification as of this date.)
 4           Q      So I understand you're here
 5   today as an expert witness, and I want to
 6   understand which areas or subjects you
 7   believe yourself to be an expert in.
 8                  Do you consider yourself to
 9   be an expert in pediatric or adolescent
10   medicine?
11           A      Some aspects of that, yes.
12           Q      What aspects of pediatric or
13   adolescent medicine do you believe yourself
14   to be an expert in?
15           A      Those that focus on endocrine
16   issues.
17           Q      There is a Board
18   certification for pediatric endocrinology,
19   right?
20           A      I believe so.
21           Q      And you are not Board
22   certified in pediatric endocrinology, right?
23           A      No.
24           Q      And a separate Board
25   certifications for pediatric medicine,
```

Page 52

1                    DANIEL WEISS
2    right?
3           A       I think so, yes.
4           Q       And you are not Board
5    certified in pediatric medicine?
6           A       No.
7           Q       In what aspects do you
8    consider yourself to be an expert in
9    pediatric endocrinology?
10          A       In the aspects that we are
11   dealing with here.
12          Q       What do you mean by that?
13          A       Hormonal interventions in
14   minors who have a condition called gender
15   dysphoria.
16          Q       So you believe yourself to be
17   an expert in minors who have a condition
18   called gender dysphoria, is that right?
19          A       Yes, well, the hormonal --
20   the effect of hormonal interventions in
21   those children.
22          Q       Okay.
23                  And what's the basis of your
24   expertise in the effect of hormonal
25   interventions in children with gender

Page 53

1                              DANIEL WEISS

2     dysphoria?

3              A       The basis of my expertise is

4     my expertise as an endocrinologist,

5     rationality, my experience, and my review of

6     the scientific literature.

7              Q       Is pediatric endocrinology

8     distinct from adult endocrinology?

9              A       In some areas.

10             Q       In what areas is pediatric

11    endocrinology distinct from adult

12    endocrinology?

13             A       Well, for example, a growth

14    hormone treatment in children is different

15    from growth hormone treatment in adults.

16                    But the action of

17    testosterone and estrogen is very similar in

18    children and in adults.

19                    It's not -- that's not

20    different.

21             Q       The action of testosterone

22    and estrogen is --

23                    ATTORNEY KORBERG:  Withdrawn.

24             Q       Is the action of testosterone

25    and estrogen in prepubertal children the

Page 54

1                          DANIEL WEISS
2    same or similar to in adults?
3              A       The action is similar.  The
4    children are different from adults, but the
5    action of the hormone is similar.
6              Q       The action of testosterone
7    and estrogen in prepubertal children is
8    similar to adults, right?
9              A       Yes.
10             Q       How are they different?
11             A       You need to be more specific
12   than that in your question.
13             Q       Sure.  You said that the
14   action of testosterone and estrogen is, in
15   prepubertal children, is similar to that in
16   adults.
17             A       Right, the action on
18   receptors is similar.
19                     So the hormone is the same
20   chemical structure, it's just that the
21   results might be different in a person who
22   is an adult versus a person who is a child.
23             Q       Do you believe that a
24   pediatric endocrinologist who has never
25   treated an adult is an expert on adult

Page 55

```
 1                    DANIEL WEISS
 2   endocrinology?
 3           A        In general, I think one can
 4   become very knowledgable and be an expert
 5   using the general principles of that
 6   specialty and extrapolating, based upon that
 7   experience, that knowledge, that expertise
 8   that you have gained, and then coupled with
 9   careful reading of the scientific
10   literature, you can become an expert.
11                    So yes.
12                    And I should add, I have
13   treated many children earlier in my career
14   with endocrine disorders, including growth
15   hormone problems and other -- even down to
16   the age of 5 I was treating such children
17   based upon my knowledge of the literature,
18   my -- and my training as a pediatric -- in
19   pediatric endocrinology in my fellowship.
20                    So I have treated children
21   with endocrine disorders, including growth
22   hormone disorders, congenital adrenal
23   hyperplasia.
24                    So I have had that
25   experience, because I have had over 36 years
```

Page 56

1                      DANIEL WEISS

2    of endocrine practice.

3                      In a big group I was in, I

4    was the sole endocrinologist, and I was

5    seeing children.

6         Q       Have you ever treated a child

7    or adolescent for gender dysphoria?

8         A        I have treated down to the

9    age of 18.  I have seen children, I have

10   seen people down to the age of 18 with

11   gender dysphoria.

12        Q       But you have never treated a

13   legal minor under the age of 18 for gender

14   dysphoria, right?

15        A       So, I think it would be -- it

16   would be unethical, improper and wrong to do

17   so.

18                     And as you are familiar with

19   my declaration, I have treated 100 adults

20   with gender dysphoria with opposite sex

21   hormones or hormonal blockade.

22                     But at the time I was

23   treating, there were very few minors being

24   treated, and I would consider it completely

25   unethical to do so.

Page 57

```
 1                    DANIEL WEISS
 2              So I did not do so.
 3        Q       I appreciate that.
 4              You know, we have a lot of
 5   ground to cover today, so it would be
 6   helpful if you could answer the questions as
 7   I pose them, and then if I would like you to
 8   expound on them, I can certainly ask you.
 9              But, you know, my question
10   was have you treated a minor under the age
11   of 18 for gender dysphoria?
12              ATTORNEY DROZ:  Just
13        objection.
14        Q     And the answer is no, right?
15              ATTORNEY DROZ:  Objection.
16        He gets to answer the way he feels
17        he needs to answer the question.
18        A     I have not treated anyone
19   under 18 with opposite sex hormones.
20        Q     Is the efficacy of hormonal
21   treatment similar for adolescents and
22   adults?
23        A     You need to define efficacy.
24        Q     Sure.
25              Is the effect of hormones
```

Page 58

DANIEL WEISS

1
2     similar for adolescents and adults?

3          A     Yes, but one needs to keep in
4     mind that each person that's being treated
5     is -- responds differently, and that is in
6     part related to age.

7          Q     Well, I understand that you
8     believe yourself to be an expert in the
9     treatment of children and adolescents for
10    gender dysphoria based on your experience
11    treating adults for gender dysphoria, right?

12         A     I object to the use of the
13    word treatment.

14                Opposite sex hormones,
15    hormonal blockade and puberty blockers for
16    children with gender dysphoria is not
17    treatment.  It's a hormonal intervention
18    which is harmful.

19                I don't call it treatment,
20    and I have thus far not objected to your use
21    of the term gender affirming care, because
22    it's misuse of language.

23                It doesn't affirm the child,
24    it attempts to alter their body and to treat
25    a mental health disorder.

Page 59

DANIEL WEISS

So it's not treatment, it's
an intervention.  But it's not care and it's
not treatment.

Q        Okay, so just to sort of
table set, can we agree that when, for the
purposes of this deposition, when we use the
phrase gender affirming care, what we -- or
gender affirming treatment, it is not a
judgment on the reasonableness of such
treatment, but rather the administration of
either puberty blockers or cross sex
hormones or potentially surgery to treat
gender dysphoria?

A        I object to the use of gender
affirming.  I think that's not a neutral
statement to call it gender affirming care.
I don't like that term.

And you're basically
supporting it when you are using the term
gender affirming care.

I prefer that you use the
term cross sex hormones, puberty blockers,
and it's more specific.

Q        Okay, same cross sex

```
                                         Page 60

 1                    DANIEL WEISS
 2   hormones, puberty blockers, cetera, takes up
 3   some space, can we just agree that to the
 4   extent I will try to do so, we agree to the
 5   extent I'm using the phrase, and we have
 6   used the phrase gender affirming care or
 7   gender affirming treatment so far, while you
 8   object to what you perceive to be a value
 9   judgment about that, the administration of
10   those, they are conventions, that we are
11   referring to puberty blockers, cross sex
12   hormones and potentially surgical care?
13            A      You can use that term, I will
14   be more specific.
15            Q      Great.
16                   So you testified earlier that
17   you believe yourself to be an expert in the
18   administration of puberty blockers, cross
19   sex hormones and potentially surgery to
20   minors based on the fact that you have
21   clinical experience performing those
22   interventions on adults, right?
23            A      And I have treated children
24   with same sex hormones for delayed puberty
25   in the past.
```

```
                                          Page 61

 1                    DANIEL WEISS
 2         Q       So, am I correct, based on
 3   what you're saying about your expertise,
 4   that experience with, or studies on adults
 5   with cross sex hormones, for example, are
 6   relevant to adolescents?
 7         A       Yes.
 8         Q       And is it fair to say that
 9   studies, data, experience, related to the --
10   any potential side effects or risks of the
11   administration of cross sex hormones with
12   regard to adults are also relevant to the
13   effect of cross sex hormones on children?
14         A       Yes.
15         Q       Can the symptoms of any given
16   endocrine disorder be different in children
17   and adolescents than adults?
18         A       They might be.
19         Q       Do you consider yourself an
20   expert in psychology?
21         A       Knowledgeable in many areas
22   of psychology, yes.
23         Q       Do you consider yourself to
24   be an expert in psychology?
25         A       How do you define an expert?
```

Page 62

1                       DANIEL WEISS

2          Q       Well, you are appearing here

3    today as an expert witness, right?

4          A       Yes.

5          Q       And you said that you are an

6    expert in endocrinology, right?

7          A       Yes.

8          Q       And that you believe yourself

9    to be an expert in the administration of

10   what I call gender affirming care to minors,

11   right?

12         A       Yes.

13         Q       So, however you meant expert

14   with respect to those subjects, I'm asking

15   you if you consider yourself to be an expert

16   in psychology?

17         A       No, not an expert in

18   psychology.

19         Q       And why not?  What is lacking

20   with regard to your expertise in psychology

21   as distinct from your purported expertise in

22   the effect of these interventions on

23   children suffering from gender dysphoria?

24         A       Well, there are certain

25   psychiatric disorders, if I may, psychology

```
                                          Page 63
 1                     DANIEL WEISS
 2    is not the same as psychiatry, but I'm not
 3    an expert in psychosis.
 4                    But I am knowledgeable in the
 5    comorbidities that are seen in many minors
 6    with gender dysphoria.
 7                    But I am not an expert, for
 8    example, in schizophrenia.
 9         Q      Sure, but I am asking
10    actually sort of a simpler question.
11                    You said that you're an
12    expert in the provision of these medical
13    interventions which I call gender affirming
14    care to minors to treat gender dysphoria,
15    right?
16         A      Yes.
17         Q      And you said you are not an
18    expert in psychology, right?
19         A      Yes.
20         Q      What expertise are you
21    lacking in psychology such that you cannot
22    say the same thing with respect to
23    psychology?
24                    ATTORNEY DROZ:  I object to
25         form.  You can answer.
```

Page 64

1                          DANIEL WEISS
2           A      I just gave you an example.
3    For example, treatment of psychosis.
4           Q      Right.
5           A      Or, for example, I am not an
6    expert in providing cognitive behavioral
7    therapy in people with psychological
8    disorders.
9                  I'm not an expert in treating
10   post traumatic stress disorder.  I am not an
11   expert in treating sexual abuse.
12          Q      So is the distinction just
13   that psychology is a broader category,
14   whereas you feel that treating children
15   with -- for gender dysphoria is a narrower
16   category?
17          A      No, I have not had extensive
18   years of experience being trained in
19   psychological counseling and psychological
20   disorders.
21                 That's the distinction.
22          Q      Can you catalogue for me all
23   of the mental health training or education
24   you have undertaken?
25          A      Catalogue, no.  I have done

```
                                        Page 65
 1                    DANIEL WEISS
 2   continuing medical education courses, and I
 3   have done reading on my own.
 4                    Much of it is reading on my
 5   own and training in my residency,
 6   fellowship, attending courses.
 7           Q       Do you consider yourself to
 8   be an expert in the diagnosis and treatment
 9   of mental health disorders?
10           A       No.
11           Q       Do you consider yourself to
12   be an expert in pediatric psychology?
13           A       No.
14           Q       Do you consider yourself to
15   be an expert in the diagnosis and treatment
16   of mental health disorders in children and
17   adolescents?
18           A       No.
19           Q       Do you consider yourself to
20   be an expert in the psychology of gender
21   identity?
22           A       I think you need to define
23   what you mean by gender identity.  You mean
24   gender identity disorder, gender dysphoria?
25           Q       Do you consider yourself to
```

Page 66

```
 1                    DANIEL WEISS
 2    be an expert in the psychology of gender
 3    dysphoria?
 4            A       Yes.
 5            Q       And what is the basis of your
 6    expertise in the psychology of gender
 7    dysphoria?
 8            A       Reading the literature.
 9            Q       What literature have you read
10    related to the psychology of gender
11    dysphoria?
12            A       Much of the published
13    literature in this regard.
14            Q       Other than reading published
15    literature relating to the psychology of
16    gender dysphoria, do you have any other
17    basis for your belief that you are an expert
18    in the psychology of gender dysphoria?
19            A       No.
20            Q       And just to be clear, you
21    have not read all of the literature related
22    to the psychology of gender dysphoria,
23    right?
24            A       No one has.
25            Q       Do you consider yourself to
```

Page 67

DANIEL WEISS

1    be an expert in psychology of gender

2    identity development in children and

3    adolescents?

4          A    What do you mean by that

5    specifically?

6          Q    Would you agree that all of

7    us develop a sense of our own gender

8    identity?

9               ATTORNEY DROZ:  Objection,

10    form.

11          A    WPATH can't even define

12    gender.  Look at the glossary in W path,

13    they can't define gender.

14               Gender identity is a -- is an

15    internal sense of the sex that a person

16    feels that they are.

17               That evolves over time and is

18    modified by many factors.

19          Q    Do you consider yourself to

20    be an expert in the diagnosis of gender

21    dysphoria in adults?

22          A    I think it's -- I have

23    defined -- I have described gender dysphoria

24    as a social construct, and it's very

Page 68

DANIEL WEISS

1       confusing, even for W path.

2                  Am I an expert in it?  Yes.

3           Q       Are you an expert in

4       diagnosing gender dysphoria in adults?

5           A       Yes.

6           Q       What's the basis of your

7       expertise?

8           A       Reading the scientific

9       literature and my experience in treating

10      adults.

11          Q       Is it your belief that

12      someone can be an expert in a subject solely

13      by reading academic literature in that

14      subject?

15          A       Yes.

16          Q       What qualifications or

17      experience would make someone an expert on

18      the diagnosis of gender dysphoria?

19          A       I'm not sure I understand

20      your question.

21          Q       Have you ever --

22              ATTORNEY KORBERG:  Withdrawn.

23          Q       Have you ever diagnosed

24      someone with gender dysphoria?

Page 69

1              DANIEL WEISS
2         A      Yes.
3         Q      How many people have you
4    diagnosed with gender dysphoria?
5         A      About 100 people.
6         Q      And to be clear, I'm not
7    talking about treating someone with gender
8    dysphoria.
9              You are saying you have
10   diagnosed 100 people with gender dysphoria,
11   is that right?
12        A      Yes.
13        Q      And how did you diagnose any
14   given one of those people?
15        A      At that point I was seeing
16   people in what's called gender identity
17   disorder, and those people also had
18   significant comorbidities that I was not
19   addressing, but they had -- they presented
20   to me with a sense of incongruence about
21   their sex, their gender, that was contrary
22   to their natal sex.
23        Q      Okay.  So you're able to
24   diagnose someone with gender dysphoria when
25   they present to you with a sense of

Page 70

```
 1                    DANIEL WEISS
 2   incongruence between their natal sex and
 3   their gender, right?
 4           A       In those people.
 5                   All those people had
 6   significant comorbidities, and I think, my
 7   opinion is that if those comorbidities were
 8   addressed, they would not have gender
 9   dysphoria or gender identity disorder.
10           Q       I understand.  But I'm just
11   asking you about how you diagnose someone
12   with gender dysphoria.
13           A       At that point I was using the
14   criteria, the DSM criteria of gender
15   identity disorder.
16           Q       And for each of those 100
17   people, did you do a full assessment to
18   determine whether they met the criteria for
19   gender identity disorder outlined in the
20   DSM?
21           A       I don't recall.
22           Q       Is there anyone who presented
23   to you with a perception of the incongruence
24   between their natal sex and gender identity
25   who you determined should not be diagnosed
```

```
                                              Page 71
 1                    DANIEL WEISS
 2    with gender dysphoria?
 3          A        Not that I recall.
 4          Q        Do you consider yourself to
 5    be an expert in the diagnosis of gender
 6    dysphoria in children or adolescents?
 7          A        I think gender dysphoria is a
 8    description of an internal mental state that
 9    is a result of other comorbidities.
10          Q        So, is it possible to
11    experience gender dysphoria without the
12    presence of other comorbidities?
13          A        I do not think so.
14          Q        And what are all of the
15    comorbidities that you think account for
16    gender dysphoria?
17                   ATTORNEY DROZ:  Objection,
18          form.
19          A        There are many comorbidities,
20    including sexual abuse, autism spectrum
21    disorder plays a role, physical abuse,
22    social contagion is important, although
23    that's not a comorbidity, peer influence is
24    important, bullying, social isolation.
25                   All of these are factors
```

```
                                        Page 72

 1                    DANIEL WEISS
 2   in -- I believe that in all cases those can
 3   be identified as a precipitant as the cause
 4   of the dysphoric state.
 5                    So I think the gender
 6   dysphoria is not the underlying area of
 7   focus, it's the comorbidity that's causing
 8   it.
 9        Q       Are there any other
10   comorbidities, other than sexual abuse,
11   autism spectrum disorder, physical abuse,
12   social contagion or bullying that can cause
13   gender dysphoria?
14        A       Well, social contagion is not
15   a comorbidity.
16                    But those are the main ones,
17   and those need to be identified and
18   addressed for treatment of the psychic
19   distress that we call gender dysphoria.
20                    ATTORNEY KORBERG:  We have
21           been going about an hour and change,
22           so it might be time for a break.
23                    Does that seem fine with you,
24           Dr. Weiss, and the court reporter?
25                    THE WITNESS:  I am fine.
```

```
                                          Page 73
 1                    DANIEL WEISS
 2              THE VIDEOGRAPHER:  Thank you,
 3         counsel.  This is the videographer.
 4         The time is 11:22, this ends media
 5         file 1.
 6              (At this point in the proceedings
 7         there was a recess, after which the
 8         deposition continued as follows:)
 9              THE VIDEOGRAPHER:  We are
10         back on the record.  The time is
11         11:31.  This begins media file 2.
12         Q    Great.
13              I just want to follow up on
14    something that we were talking about just
15    before the break.
16              Which is that you had
17    diagnosed adults with gender dysphoria, but
18    you have never diagnosed someone under the
19    age of 18 with gender dysphoria, right?
20         A    That's correct.
21         Q    Do you have --
22              ATTORNEY KORBERG:  Withdrawn.
23         Q    Have you read Dr. Cantor's
24    expert report in this case?
25         A    No.
```

Page 74

1               DANIEL WEISS
2        Q      Do you consider Dr. Cantor to
3   be an expert in diagnosing and treating
4   gender dysphoria in minors?
5        A      So, you know, the diagnosis
6   of gender dysphoria is a description by DSM,
7   and in all those children who have it, they
8   have some psychiatric cause or some
9   psycho-social basis for their dysphoria.
10              So, it's not -- it's not a
11  disorder that we need to be focusing on,
12  it's the underlying causes for that
13  dysphoric state.
14        Q      Is it possible for someone to
15  be an expert in the diagnosis and treatment
16  of gender dysphoria?
17        A      It's possible for someone to
18  be able to diagnose, yes, based upon some
19  criteria that have been established that are
20  evolving over time, gender identity
21  disorder, gender dysphoria, gender
22  incongruence.
23              Certainly many people can be
24  experts on just coming up with a diagnosis
25  based upon those stated criteria.  It's

Page 75

1                     DANIEL WEISS

2    easy.

3           Q        Okay.

4                    Do you consider Dr. Cantor,

5    who is being also offered as an expert

6    witness in this case, to be an expert in

7    diagnosing and treating gender dysphoria in

8    minors?

9           A        I can't speak to his

10   expertise.

11          Q        So you don't have an opinion

12   one way or the other about whether he's an

13   expert in the things that he professes to be

14   an expert in?

15          A        I think he's very

16   knowledgeable in that area, and I read some

17   of his publications.

18          Q        Are you familiar --

19                   ATTORNEY KORBERG:  Withdrawn.

20          Q        Have you read Dr. Malone's

21   expert report in this case?

22          A        No.

23          Q        Do you consider Dr. Malone to

24   be an expert in diagnosing and treating

25   gender dysphoria in minors?

Page 76

1                          DANIEL WEISS
2          A        Dr. Malone is an expert in
3    this -- the field of hormonal and medical
4    interventions in the -- in an attempt to
5    modify a person's appearance who has
6    dysphoria that they attribute to an
7    incongruence between their male sex and the
8    sex they believe they ought to be.
9                     He is an expert in those
10   aspects.
11         Q        And what's the basis of
12   Dr. Malone's expertise in those aspects?
13         A        He's an endocrinologist and
14   he knows the scientific literature very
15   well.
16         Q        Are you familiar with Dr.
17   Kara Connelly?
18         A        Only having read her
19   declaration.  I don't know her otherwise.
20         Q        And would you consider
21   Dr. Connelly to be an expert in the
22   diagnosis and treatment of gender dysphoria
23   in minors?
24         A        Absolutely not, because she's
25   promoting harmful medical interventions on

Page 77

DANIEL WEISS

1
2    these children, and obviously does not know
3    the scientific literature that indicates
4    that it's harmful and not helpful.
5              So she's the opposite of an
6    expert.
7         Q    Okay, because you just
8    testified that Dr. Malone is an expert
9    because he's an endocrinologist and because
10   he knows the scientific literature very
11   well.
12        A    Correct.
13        Q    So you agree that Dr.
14   Connelly is an endocrinologist, right?
15        A    Yes.
16        Q    And while you may disagree
17   with the conclusions that you would each
18   draw from the scientific literature, you
19   would agree that she knows the scientific
20   literature very well, right?
21        A    Absolutely not.  She does --
22   I think it's clear that she doesn't know the
23   scientific literature.
24              Either that or she refuses to
25   accept the scientific literature.

```
                                              Page 78

 1                        DANIEL WEISS

 2                   I suspect she doesn't know

 3      it, and like many pediatric endocrinologists

 4      or commonly adolescent med people who are

 5      not endocrinologists who intervene by giving

 6      opposite sex hormones or puberty blockers on

 7      these children with a mental health

 8      disorder, the fact that they do this appears

 9      to show that they do not know the scientific

10      literature at all, which shows clearly that

11      these interventions are harmful and not

12      helpful.

13                   So, she is not an expert.

14          Q        Okay, so it would be

15      impossible for someone, regardless of their

16      clinical experience, regardless of the

17      number of studies that they have reviewed,

18      if someone disagrees with you and believes

19      that it is reasonable, at least in some

20      circumstances, to provide gender affirming

21      care to minors, then they cannot be an

22      expert in the provision of gender affirming

23      care to minors.

24                   Is that your opinion?

25                   ATTORNEY DROZ:  Objection to
```

Page 79

1                         DANIEL WEISS

2              form.

3              A       Yes.  So I would object to

4      your phrasing.  It not a matter of belief,

5      it's a matter of careful and balanced and

6      rational reading of the scientific

7      literature that indicates -- it doesn't

8      matter if she's treated 1,000 people, that

9      means that's 1,000 children that she's

10     harmed based upon the science.

11                     And I have given examples in

12     my declaration of people who are so

13     convinced that they are doing the right

14     thing and they have caused harm, because the

15     studies have shown, subsequent studies or

16     studies that have already been published,

17     show that it's not beneficial, and that it's

18     harmful.

19             Q       So someone who reads all of

20     the same studies as you have ever read and

21     based on their training and experience comes

22     to a different conclusion about the efficacy

23     of this course of care, then they cannot

24     possibly be an expert, is that your opinion?

25                     ATTORNEY DROZ:  Objection to

```
                                          Page 80
 1                      DANIEL WEISS
 2            form.
 3            A       It's not care, it's an
 4    intervention, it's harmful, and if they
 5    come -- it's very difficult to believe that
 6    they have read the same studies.
 7                      I think they haven't read,
 8    and many people come out of their training
 9    and they stop learning.  They stop.  I see
10    that all the time.
11                      I've taught a lot of people
12    over my 36 years of practice, and I see that
13    people after their residency or fellowship,
14    they just basically continue the same thing
15    and they don't stay current, they don't
16    read, and they are not critical thinkers.
17                      And I think that's many of
18    the people, however well intentioned they
19    are, I'm sure Dr. Connelly is well
20    intentioned, she thinks she's doing the
21    right thing, but I suspect she hasn't read
22    the literature.
23                      And if she does, she has read
24    it, which I doubt, she is so conflicted by
25    the fact that that's her job, so she can't
```

Page 81

```
 1                    DANIEL WEISS
 2    see the science.
 3                    And the science clearly shows
 4    these interventions are not care, they are
 5    not treatment, they are harmful and they
 6    should be stopped.
 7          Q      So, other than the subject of
 8    hormonal interventions for minors suffering
 9    from gender dysphoria, are there any other
10    subjects where it is your belief that if a
11    fellow doctor reads the same studies as you
12    but comes to a different conclusion, it
13    means that they are not an expert in their
14    clinical -- area of clinical focus?
15                    ATTORNEY DROZ:  Objection,
16          form.
17          A      I don't think such -- I have
18    not seen examples of that, because when
19    there is a difference in opinion, it usually
20    means the person has not read those other
21    studies.  That's usually what it means.
22                    Or they are not open to
23    scientific discourse and discussion.  They
24    are closed minded, they don't want to see
25    the other side.
```

Page 82

```
 1                      DANIEL WEISS
 2        Q       Okay, let's think about some
 3   other subject in endocrinology, let's call
 4   it like you know, some element of diabetes
 5   management.
 6                  And let's say that you have a
 7   fellow endocrinologist who practices
 8   diabetes management who is Board certified,
 9   and some element of diabetes management,
10   despite having reviewed the same literature
11   as you, they disagree about the appropriate
12   course of treatment, okay?
13                  Would you assume from that
14   fact, the fact that you disagree about the
15   conclusions of the same literature, that
16   they are not an expert in diabetes
17   management?
18                  ATTORNEY DROZ:  Objection,
19        form.
20        A       I have not seen any
21   circumstance like that.
22                  I think there are judgments,
23   and there are different styles and different
24   approaches, but here we are talking about a
25   complete apparent unawareness of the
```

Page 83

```
 1                    DANIEL WEISS
 2    scientific literature that shows that these
 3    interventions on minors with normal puberty
 4    that cause irreversible changes and don't
 5    help their psychic distress, they are not
 6    aware of them and it's just -- it's not the
 7    same as a minor, oh, I treat diabetes this
 8    way and I do this.
 9                    I mean, there is an example,
10    for example, treating patients with a form
11    of high blood pressure caused by
12    overproduction of a hormone from the
13    adrenals.
14                    So there are guidelines on
15    that, treating that, but there is
16    controversy, some people do it this way,
17    some people do it that way, and they are
18    both knowledgeable.
19                    I wouldn't use the term
20    expert.  My style is to not do surgery on
21    those people.
22                    They say oh, you should do
23    these tests and you should do surgery.
24                    They are both acceptable,
25    these people, we are all knowledgeable on
```

```
                                              Page 84
 1                      DANIEL WEISS
 2    it, we just interpret it a little
 3    differently.
 4                      But Dr. Connelly appears to
 5    not be knowledgable, because if she were
 6    knowledgeable on it, and read what's
 7    published, she would not be doing what she's
 8    doing to children.  She just wouldn't.
 9                      You know, I can't imagine
10    doing that to children if you read the
11    science in a fair way.
12            Q       Okay, I'm now talking to you
13    about any subject other than gender
14    affirming care.  Okay?
15            A       Yes.
16            Q       Does the very fact that
17    someone disagrees with you about the body of
18    evidence in the literature disqualify them
19    from being an expert in their field of
20    practice?
21                      ATTORNEY DROZ:  I object to
22            the form.
23            A       In this case, in this
24    situation I say it would disqualify her,
25    because she seems to not be aware of any of
```

Page 85

1                         DANIEL WEISS
2       the science.
3                Q       Dr. Weiss, again, I'm asking
4       you about everything other than gender
5       affirming care.
6                A       I can't think of another
7       example.  But also --
8                Q       You can think --
9                A       But I might add that this is
10      the only mental health disorder for which
11      modifications of the physical body are
12      employed to fix the mental health disorder.
13                      So it's unique.
14               Q       We are talking about whether
15      someone is an expert or not and whether they
16      agree with you or not, okay?
17               A       I can't think of anything
18      else, any other condition in which --
19               Q       So if there is any other area
20      where there is a body of literature and your
21      fellow doctors may disagree about the
22      conclusions from that body of literature,
23      the fact that they disagree with you doesn't
24      disqualify them from being an expert, it's
25      only if they disagree about gender affirming

Page 86

1                         DANIEL WEISS
2    care for minors, right?
3                         ATTORNEY DROZ:  Objection,
4             argumentative and form, asked and
5             answered.
6             A       So there is a use of the word
7    expert in a legal context, and there is a
8    use of the word expert in -- as a medically
9    knowledgeable person.  So, I don't think we
10   should confuse those two.
11                      That person might be
12   medically knowledgeable and interpret the
13   science differently.
14                      In this case, legally, I
15   don't see how she could be an expert if she
16   makes statements that support the
17   interventions that she is doing on children
18   when the science and the literature shows
19   that it's harmful.
20                      So, it seems -- I don't know,
21   that's the best way I can answer that
22   question.
23            Q       Do you believe that
24   Dr. Christine Brady is an expert in
25   diagnosing and treating gender dysphoria in

Page 87

1                    DANIEL WEISS

2    minors?

3            A       I don't remember who

4    Dr. Christine Brady is.

5            Q       She is one of Plaintiffs'

6    expert witnesses.  She has a Ph.D. in child

7    clinical psychology, Board certified in

8    psychology, and has treated over 1,000 youth

9    experiencing gender dysphoria.

10           A       What's the question?

11           Q       Do you believe that she is an

12   expert in diagnosing and treating gender

13   dysphoria in minors?

14           A       She may be knowledgeable and

15   an expert in diagnoses, but beyond that I

16   would say no, she's not an expert if she

17   recommended medical interventions to address

18   their psychic distress.

19                   That means she's not an

20   expert.

21           Q       Could we pull up Exhibit 1,

22   which is your declaration in this case, and

23   go to paragraph 17.

24                   So you write, "I have been

25   designated and asked by Defendants to

Page 88

DANIEL WEISS

1        DANIEL WEISS
2   provide expert opinion based upon my
3   clinical experience treating adults with
4   gender dysphoria and my review of the
5   scientific literature concerning the
6   diagnosis and treatment of gender
7   dysphoria."
8                  So, first, is there a word
9   missing?  Were you asked to provide an
10  expert opinion or expert opinions?  What
11  exactly was your assignment in this case?
12        A     I'm not sure what the
13  question is.
14        Q     You say, "I have been
15  designated and asked by Defendants to
16  provide expert opinion."
17        A     Right.
18        Q     And I'm asking were you asked
19  to provide an expert opinion, multiple
20  expert opinions?
21        A     No, just the one expert
22  opinion.
23        Q     Okay.
24                  So this sentence tells me
25  what expertise you were asked to draw upon

```
                                        Page 89
  1                     DANIEL WEISS
  2   to form your expert opinion.
  3                     But what question were you
  4   asked to provide an opinion on, using that
  5   expertise?
  6           A       The -- relating to the House
  7   Bill 71.
  8           Q       So you were asked to opine on
  9   the reasonableness of HB 71 or something
 10   else in relation to HB 71?
 11           A       Yes.
 12           Q       So it's your expert opinion
 13   that HB 71 is a reasonable law?
 14                   ATTORNEY DROZ:  Objection;
 15           form.
 16           A       The science -- the science
 17   behind HB 71 and my experience related to my
 18   treatment of adults with gender dysphoria
 19   was used to form this opinion.
 20           Q       And do you know what science
 21   was behind HB 71, what science the Idaho
 22   State Legislature relied upon in passing HB
 23   71?
 24                   ATTORNEY DROZ:  Objection to
 25           form.
```

```
                                          Page 90
 1                    DANIEL WEISS
 2          A      I do not know, but I would
 3   imagine it would be at least some of what I
 4   have cited in my declaration.
 5          Q      Okay.  So you don't know what
 6   science was behind HB 71, so you are not --
 7   so your opinion is whether HB 71 is
 8   reasonable from a scientific perspective,
 9   right?
10          A      Yes.
11          Q      Turning to paragraph 21 of
12   your declaration, which is just a little bit
13   further down, so here is five bullet points
14   listed here.
15                 And if we scroll down on to
16   the next page, right, am I correct that
17   those five bullet points represent a summary
18   of the opinions you are offering in this
19   matter?
20          A      Yes.
21          Q      Are you offering any opinions
22   not set forth in your declaration?
23          A      No, but -- and there are
24   other opinions beyond the summary.
25          Q      Can we turn to paragraph 18.
```

Page 91

```
 1                    DANIEL WEISS
 2               You indicate that in
 3     preparing this declaration you relied on
 4     Idaho House Bill 71, the Complaint, the
 5     declarations of Plaintiffs' experts and the
 6     references that you cited in the
 7     declaration, right?
 8                    ATTORNEY DROZ:  Objection,
 9          form.
10          A     I did.
11          Q     Did you review any other
12     materials in forming the opinions in your
13     declaration aside from those cited in your
14     declaration?
15          A     Not that I recall.
16          Q     And then in paragraph 19 you
17     write, "I formed my opinion from my clinical
18     expertise and experience, my rationality or
19     common sense, and my critical review of the
20     scientific literature and the publications
21     on the subject."
22               First, what clinical
23     expertise and experience did you use to form
24     your opinions?
25          A     As an endocrinologist and as
```

Page 92

1                    DANIEL WEISS

2     a physician who has treated adults with

3     gender dysphoria.

4          Q       And generally speaking, more

5     clinical experience is a better indication

6     of expertise than less, right?

7          A       Say that again?

8          Q       Generally speaking, if you

9     rely on clinical experience, it's better to

10    have more clinical experience than less in

11    forming expertise, right?

12                 ATTORNEY DROZ:  Objection,

13          form.

14          A       All else being the same, yes.

15          Q       What does it mean to form an

16    opinion based on your rationality and common

17    sense?

18          A       Well, there are some

19    conclusions one might come to that are not

20    based upon a study.

21                 For example, one might say

22    there are no studies that show that crossing

23    the interstate as a pedestrian in the middle

24    of the night is dangerous.

25                 But it's rational to think

Page 93

DANIEL WEISS

1
2     that's a really foolish thing to do.
3         Q      Which opinions in your
4     declaration did you form based on your
5     rationality and common sense?
6         A       I can't point to any
7     particular one, but the -- it is completely
8     irrational to think, for example, that an
9     adolescent can make a decision that is life
10    long and produces irreversible change and
11    can have any contemplation about being a
12    father or a mother when they are 14 years
13    old.
14                  So it's irrational.
15                  It's not sensible to offer a
16    judgment like that for an adolescent to
17    make, nor is it rational to modify the body
18    to fix a psychic disorder.
19                  That's not rational, it
20    really isn't.
21                  But it wasn't just
22    rationality that played a role in those
23    decisions, there is science behind it, and I
24    have cited references too.
25        Q       So, is it your opinion that

Page 94

1                      DANIEL WEISS
2      even for an adult, it is not rational to
3      access hormonal interventions or a surgery
4      to address gender dysphoria?
5              A      Adults are more able and more
6      competent to make those decisions.
7                      I do not think the evidence
8      shows that those hormonal interventions will
9      improve their psychic distress.
10                     So if they have gender
11     dysphoria, they will not tend to help them.
12                     But it's a different decision
13     in an adult than an adolescent.
14                     And I've seen adults, mature
15     adults, regret decisions months after they
16     have had.
17                     I mean, I'm talking about
18     with regard to gender affirming care.
19                     For example, a man who had
20     orchiectomy, I had two patients who had
21     their testes removed, and within months they
22     regretted it.
23                     And they were evaluated by
24     psychologists and were thought to be
25     appropriate candidates for the orchiectomy

Page 95

1                    DANIEL WEISS

2   as so-called gender affirming care.

3                    That was harmful intervention

4   and the patients regretted it, and they were

5   mature adults.

6                    So.

7        Q        But as a matter -- but an

8   adult is, you think an adult is capable of

9   assessing the risks for themselves as to

10  whether the benefits outweigh the risks of

11  gender affirming care, right?

12       A        Adults are more likely to be

13  competent, more able -- they can give

14  informed consent.

15                   Children cannot give informed

16  consent.  They can ascent, but adults are

17  more likely to realize or understand the

18  consequences of their decision.

19                   But, as in my example, adults

20  make these mistakes, too.

21       Q        So, going to the opinions

22  just there in paragraph 21, the first

23  bullet, can you explain what in your

24  endocrinology training informs your opinion

25  that gender dysphoria is a social construct?

Page 96

```
 1                    DANIEL WEISS
 2               ATTORNEY DROZ:  Objection to
 3         form.
 4         A      So, that training is not --
 5    usual training -- discussion of gender
 6    dysphoria, the diagnosis is not in most
 7    persons' endocrine training.
 8               On the other hand, in my
 9    endocrine fellowship at the University of
10    Iowa, I saw patients with gender identity
11    disorder and was treating with opposite sex
12    hormones in those people.
13         Q      So the basis for your
14    expertise and ability to -- as an expert
15    offer the opinion that gender dysphoria is a
16    social construct, is the fact that during
17    your fellowship training you treated
18    patients suffering from what you then
19    characterized as gender identity disorder,
20    is that right?
21         A      No, so I think I didn't
22    probably answer your specific question at
23    first.
24               So, it's a social construct
25    based upon reading of the literature.
```

```
                                        Page 97
 1                      DANIEL WEISS
 2    That's my conclusion.
 3           Q      What literature tells you
 4    that gender dysphoria is a social construct?
 5           A      Much of the literature.
 6                  Let's pull up WPATH's
 7    definition of gender dysphoria.
 8           Q      So WPATH's definition of
 9    gender dysphoria informs you that gender
10    dysphoria is a social construct?
11           A      Yes, that and other reading.
12           Q      Have you received any formal
13    training on the social construction of
14    gender?
15           A      No formal training on it, no.
16           Q      In the second bullet -- can
17    we scroll down, please.
18                  Can you explain what in your
19    endocrinology training informs your opinion
20    that hormonal and surgical interventions
21    usually leave psychologic issues unexplored
22    and unresolved?
23           A      Well, certainly I can explain
24    that.
25                  So endocrinologists are
```

Page 98

DANIEL WEISS

1    not -- are not trained, any endocrinologists

2    are not trained in that regard.

3           You have to read the studies

4    to understand that these hormonal and

5    surgical interventions do not help

6    psychologic issues in minors with gender

7    dysphoria.  They don't help.

8       Q    So again, you're appearing as

9    an expert witness in this case to opine that

10   hormonal and surgical interventions usually

11   leave psychologic issues unexplored and

12   unresolved, and the basis for your expert

13   testimony is you have read some of the

14   literature?

15          ATTORNEY DROZ:  Objection,

16     form.

17      A    So, the scientific

18   literature, the publications, the research

19   that's been done, show that these

20   interventions do not help psychic distress

21   in minors with gender dysphoria.

22          And if Dr. Connelly read this

23   literature and did so in an open minded way,

24   she would not have caused harm to all these

```
                                          Page 99
 1                      DANIEL WEISS
 2    children.
 3          Q       What in your medical training
 4    qualifies you to opine --
 5                   ATTORNEY KORBERG:  Sorry,
 6          withdrawn.
 7          Q       Could you just scroll down,
 8    please, to the fifth bullet.  Great.
 9                   And you -- one of your
10    opinions is that a perverse set of financial
11    incentives is likely to play an important
12    role in the massive expansion of these
13    harmful interventions in the U.S., right?
14          A       Yes.
15          Q       What in your medical training
16    qualifies you to opine on the role of
17    financial incentives in certain types of
18    medical care?
19                   ATTORNEY DROZ:  Objection,
20          form.
21          A       State that one more time?
22          Q       Yes.  What in your medical
23    training qualifies you to opine on the role
24    of financial incentives in certain types of
25    medical care?
```

```
                                      Page 100
 1                   DANIEL WEISS
 2         A      This is an example of just
 3   rationality, and so this doesn't derive from
 4   endocrinology training or medical training,
 5   but we know, and there is a multitude of
 6   studies show that the more there is a
 7   financial incentive, the more people -- the
 8   more people will do the procedure.
 9                   For example, those who have
10   an ultrasound machine in their office, do
11   lots of thyroid ultrasounds, that's what
12   endocrinologists do.
13                   If they have a machine in
14   their office, they will biopsy repeatedly,
15   do ultrasounds every year, unnecessarily, on
16   people, because they get money for it.
17                   And what I have cited, some
18   of my references, indicate that this is
19   likely.
20                   The financial incentives are
21   likely an explanation for the failure to
22   realize the evidence, recognize the evidence
23   that the Europeans have recognized on the
24   harm of these interventions.
25                   And the Europeans don't have
```

```
                                        Page 101
 1                    DANIEL WEISS
 2    financial incentives like we do in the U.S.
 3    for surgeries.
 4                    And the medical treatment of
 5    minors with gender dysphoria, and that's why
 6    there has been in massive expansion with so
 7    many gender clinics now, because there is a
 8    financial incentive.
 9                    There is money made to being
10    involved.  At least that would be one
11    explanation why they have failed to see the
12    clear-cut evidence of harm, whereas here
13    they do see it.
14         Q       So it's rational to conclude
15    that someone with a financial incentive to
16    provide a particular type of treatment is
17    going to be more likely to employ that
18    treatment to patients, even if providing
19    that treatment is not in the patient's best
20    interests, right?  That's your opinion?
21         A       Correct.  And there is other
22    examples of that when these procedures are
23    performed.
24         Q       That's fine, understood.
25                    Do you believe that the
```

Page 102

1                    DANIEL WEISS
2   citations and references that you reference
3   in your report are from reputable sources?
4                    ATTORNEY DROZ:  Objection,
5          form.
6          A      I'm not sure what you mean by
7   that.
8          Q      Well, do you think it's
9   important when forming an opinion to
10  reference reputable or reliable sources?
11         A      Yes.
12         Q      Okay.  What makes a source
13  reputable or reliable?
14         A      There are many factors to
15  consider.
16         Q      What factors did you consider
17  in selecting which references and citations
18  to rely upon in your report in forming the
19  opinions there in?
20                   ATTORNEY DROZ:  Objection,
21         form.
22         A      When I looked at the
23  methodology of the research, if it was a
24  research paper, and I looked at the,
25  basically the methods was the main thing in

```
                                            Page 103

 1                       DANIEL WEISS
 2    evaluating references -- references.
 3                       There are citations that are
 4    websites that I might have listed, and
 5    that's the website.
 6                       But for published literature,
 7    it was the methodology, the sample size, the
 8    conflict of interest that might be involved,
 9    the guidelines, the quality of the research,
10    the gray criteria.
11                       So it depends on the
12    citation.
13         Q      What's the difference between
14    causation and correlation?
15         A      Well, correlation is just an
16    association that does not prove that B is
17    caused by A.  It's just an association.
18                       So, association is
19    interesting, but causation is more
20    meaningful and speaks to something being
21    caused by the event that preceded it.
22                       Harder to show causation.
23         Q      And it's your belief that
24    gender dysphoria is caused by trauma,
25    history of abuse, autism spectrum disorder,
```

```
                                          Page 104
 1                    DANIEL WEISS
 2   depression, anxiety or bullying, right?
 3          A       Yes.
 4          Q       Would you agree that
 5   transgender people face higher rates of
 6   discrimination and violence than cys gender
 7   people?
 8          A       No.
 9          Q       You don't think that as a
10   statistical matter a transgender person is
11   more likely to experience discrimination and
12   violence than a cys gender person?
13          A       No.
14          Q       What's the basis of that
15   belief?
16                  ATTORNEY DROZ:  Objection,
17          form.
18          A       I have not seen any
19   statistics that support that conclusion.  I
20   think it's a common narrative.  I think it's
21   false.
22                  So you have to show me solid
23   evidence that that's the case.
24                  I have not seen it.  What
25   evidence I have seen is the contrary.
```

Page 105

1                    DANIEL WEISS

2          Q        To the contrary.  So it's

3    your belief that transgender people

4    experience less discrimination and violence

5    than cys gender people?

6          A        At least no more.

7          Q        So, you testified earlier

8    that you saw first, you encountered a small

9    number of patients seeking gender affirming

10   care during your endocrinology fellowship

11   with -- in the 1980s, right?

12               ATTORNEY DROZ:  Objection,

13          form.

14          A      Yes.

15          Q        Do you recall how many

16   patients you saw during your fellowship?

17          A      I think that was about 12.

18          Q        And do you know how any of

19   those 12 patients are doing now?

20          A        Oh, no.  That was in the

21   1980s that was in Iowa, I do not know.  They

22   were adults, too.

23          Q        Um-hum.

24               What do you think is the

25   appropriate role of government in the

```
                                        Page 106
 1                    DANIEL WEISS
 2    doctor/patient relationship?
 3          A       Licensing and ensuring that
 4    there is appropriate conduct in the office,
 5    so that doctors do not violate the
 6    doctor/patient relationship with regard to
 7    things like sexual abuse.
 8                   And to protect persons from
 9    harmful interventions such as, in this case,
10    doctors who might be doing inappropriate
11    interventions on minors with -- that are not
12    helpful.
13          Q       Are there any other examples
14    where you think it's appropriate for
15    government to legislate what treatment is
16    available to patients and doctors?
17          A       Well, we have restrictions on
18    the use of marijuana, for example, medical
19    marijuana.
20                   There are requirements to
21    have informed consent for procedures.  There
22    are rules on -- there are very clear rules
23    on clinical research.
24                   And in this case I think, and
25    I think what you're getting at is are they
```

```
                                        Page 107
 1                   DANIEL WEISS
 2   interfering with the doctor/patient
 3   relationship.
 4                   And I think because it's
 5   clear cut that there is harm being done to
 6   these children, and there is no end -- there
 7   is no -- it's continuing, and the role of
 8   the state is to protect children from harm.
 9                   They are vulnerable, and
10   doctors have been not been able to stop
11   that.
12                   It's easy to access these
13   interventions, opposite sex therapy, and
14   even surgery?
15                   And for whatever reason,
16   maybe it's financial incentives, it's
17   continuing, and the role of the state is to
18   protect them, because doctors aren't doing
19   it.
20                   Medical societies could say
21   this should not be done, it's considered
22   improper, but they are not.
23        Q       Okay.  Is there any other
24   type of treatment that you think it's
25   appropriate for the government to outlaw?
```

Page 108

DANIEL WEISS

1

2      A       Well, this is not a

3  treatment, it's an intervention, that I

4  think when they did pre-frontal lobotomies

5  for a long time, those were then outlawed.

6              And there are procedures that

7  are not being reimbursed by insurance

8  because they are judged to be ineffective.

9              And the insurances, for

10  example, require prior authorization for

11  some procedures that -- that the physician

12  has to prove that this is necessary, because

13  everything else has failed.

14              So there are payment

15  obstacles through insurance or Medicaid in

16  some states to ensure that a person has

17  less, perhaps less invasive treatment before

18  the next step, next iteration in terms of

19  the intervention is performed.

20              So, yes.  For example,

21  kyphoplasty for vertebral crush fractures,

22  there is a controversy on the benefits of

23  that.

24              So the insurance might not

25  cover it unless other --

```
                                            Page 109
 1                      DANIEL WEISS
 2         Q        Sure.  That's an insurance
 3    question, though, right?
 4                   How about this.  Although you
 5    don't support gender affirming care, you
 6    would agree that the provision of gender
 7    affirming care, which is to say hormonal
 8    interventions, to people suffering from
 9    gender dysphoria, is the current standard of
10    care medical treatment in the United States,
11    right?
12                   ATTORNEY DROZ:  Objection.
13         A        Absolutely not, absolutely
14    not.  I object to the use of standard of
15    care.  It's not the standard of care, it's
16    not a care, it's not a standard, it's WPATH
17    guidelines.
18                   It's what many people who --
19    people who are on the gender clinics, that's
20    what they do, but many -- most
21    endocrinologists don't treat, don't see
22    patients with gender dysphoria, because they
23    think it's not right to do these hormonal
24    interventions.
25                   It's not standard of care.
```

```
                                        Page 110
 1                   DANIEL WEISS
 2    It's typically done by gender clinics, but
 3    it's harmful, and it can't be the standard
 4    of care, because it doesn't work and it's
 5    harmful.
 6          Q       So it's your opinion that
 7    most endocrinologists believe that it is not
 8    appropriate to provide cross sex hormones to
 9    people suffering from gender dysphoria,
10    right?
11          A       Correct.
12          Q       What's the basis for your
13    opinion that the majority of
14    endocrinologists think that such care is
15    inappropriate?
16          A       The basis of that is my 37
17    years of teaching and interacting with
18    endocrinologists, going to meetings, and
19    most of them do not see these people with
20    gender dysphoria and don't agree with that
21    approach.
22                  And one needs to keep in mind
23    that these societies that have come out with
24    statements or guidelines that have been
25    written, have people who are on gender
```

```
                                        Page 111
 1                    DANIEL WEISS
 2    clinics on them, and they have not polled
 3    their members in terms of the members'
 4    opinions in this regard.
 5          Q     Do you think that you
 6    interact with a representative sample of all
 7    endocrinologists in America with respect to
 8    their opinions on gender affirming care?
 9          A     Yes, I do.  Over the 36 years
10    of experience, yup.  And in fact, in our --
11    just my employer currently, most
12    endocrinologists are, people in the
13    endocrine department are not seeing these
14    people.  They decline seeing them.
15          Q     Now, the basis for your
16    belief that the majority of endocrinologists
17    do not support cross sex hormones for people
18    suffering from gender dysphoria is that you
19    personally, with regard to the doctors you
20    happen to have encountered, have experience
21    that the majority of those doctors that you
22    happen to have encountered do not support
23    cross sex hormone intervention for gender
24    dysphoria, right?
25          A     That's correct.
```

Page 112

1          DANIEL WEISS

2        Q      Do you have any other basis

3    for your opinion that the majority of

4    endocrinologists are opposed to the

5    provision of cross sex hormones for gender

6    dysphoria?

7        A      That basis, and in addition,

8    the fact that very few endocrinologists will

9    treat people with gender dysphoria; very

10   few.

11       Q      What's the basis for your

12   belief that very few endocrinologists will

13   treat people for gender dysphoria?

14       A      It's easily found on, when

15   you go to endocrinologists and sites and you

16   can call offices.

17              Most of them do not treat,

18   and I have trained people -- I have trained

19   and people I have interacted with over the

20   years, they don't see those people.

21              I was -- in Ohio, I was the

22   only endocrinology in northern Ohio seeing

23   people for years.

24       Q      What is your confidence

25   interval in your blanket statement that the

```
                                        Page 113
 1                    DANIEL WEISS
 2    majority of endocrinologists do not support
 3    cross sex hormones for people suffering from
 4    gender dysphoria based on?
 5                    ATTORNEY DROZ:  Objection.
 6         A        Well, of course, you know
 7    that's -- there is no confidence interval.
 8    But there is no data to indicate that the
 9    majority of endocrinologists do support it.
10                    So, on the contrary, on the
11    other hand, there is no evidence that the
12    majority do support it.
13                    My experience over 36, 37
14    years is that they don't.
15         Q        You agree that the American
16    Medical Association, for example, supports
17    the provision of gender affirming care to
18    treat gender dysphoria, right?
19         A        I agree that the American
20    Medical Association made that statement, and
21    they represent less than 25 percent of
22    doctors in the United States.  Less than 25
23    percent.
24         Q        If you were to add up all of
25    the major medical associations that have
```

Page 114

```
 1                    DANIEL WEISS
 2   expressed their belief that it is
 3   appropriate and in patient's best interests
 4   in some cases to provide cross sex hormones
 5   to people experiencing gender dysphoria,
 6   what percentage of the doctor population do
 7   you think all of those organizations would
 8   cover?
 9                    ATTORNEY DROZ:  Objection.
10        A        That's a meaningless
11   question, because it's not a popularity
12   contest, and many of these statements, most
13   of them, I think statements from the
14   organizations are written by a very small
15   group of members who -- and they have not
16   taken account of the majority of their
17   constituents.
18                    For example, as I have
19   written in my declaration, we can go to that
20   section about societies, this is not a
21   popularity contest.
22                    It's -- the -- the decision
23   should be based on the science.
24                    Those statements are not,
25   where they might come out and supported, are
```

```
                                        Page 115

 1                     DANIEL WEISS

 2   not based upon science.

 3                   The most recent statement

 4   from the pediatric group, the large

 5   pediatric group which has 66,000 members,

 6   they say well, we are still supporting it,

 7   but we are going to do a systematic review.

 8                   Okay, so wait a minute,

 9   you're supporting, you're promoting this

10   concept without having done a systematic

11   review?

12                   So they are backtracking a

13   little bit.

14                   And the Endocrine Society is,

15   they are going to revise their guidelines.

16   How they are going to revise them I don't

17   know, but they are looking at it again.

18        Q       Okay, I understand your

19   opinion on that.

20                   You would agree with me at

21   the very least that hundreds, if not

22   thousands of doctors, currently provide

23   cross sex hormones to people experiencing

24   gender dysphoria in the United States,

25   right?
```

Page 116

```
 1                    DANIEL WEISS
 2         A      No, I don't know that number.
 3   I don't think you do either.
 4         Q      You wouldn't be willing to
 5   say that hundreds of doctors provide such
 6   care across all the gender clinics and all
 7   of the major universities at InterMountain,
 8   your employer, even in your state?
 9         A      It might be a few hundred,
10   yup.
11         Q      Okay.  Let say a few hundred?
12         A      Okay.
13         Q      Do you believe that criminal
14   penalties are appropriate for care that
15   hundreds of doctors are providing?
16         A      It's not care, and I think
17   when there is harm to vulnerable minors, and
18   the doctors' organizations are not stopping
19   that harm, I think criminal penalties would
20   be appropriate.
21         Q      And should there be any
22   exceptions?
23                Like, is imprisonment
24   appropriate for a doctor that honestly
25   believes that the care is in a patient's
```

Page 117

1                    DANIEL WEISS
2    best interest?
3                    ATTORNEY DROZ:  Objection,
4         form.
5         A       I think these interventions
6    ought to be banned, and whatever it takes to
7    ban them in minors, we are just talking
8    about minors, whatever it takes to ban them
9    would be appropriate, because the medical
10   groups themselves have thus far not been
11   able to stop them.
12        Q       Okay, so you think
13   imprisonment is appropriate for a doctor
14   providing interventions that he believes is
15   in a patient's best interests, if those
16   interventions are the provision of puberty
17   blockers to minors suffering from gender
18   dysphoria?
19                    ATTORNEY DROZ:  Objection,
20        form.  You can answer.
21        A       I think with full awareness
22   and an understanding of what he or she is
23   doing to that minor, and if he proceeds to
24   cause harm, despite knowing the law, I think
25   yes, then he should suffer the consequences.

```
                                                Page 118
 1                      DANIEL WEISS
 2          Q        And if the doctor has
 3    observed that puberty blockers benefit other
 4    patients, other minor patients suffering
 5    from gender dysphoria?
 6                    What if that doctor, based on
 7    their clinical experience, disagrees with
 8    you that it's harmful?
 9                    It's your belief that it's
10    still appropriate for that doctor to be
11    imprisoned?
12          A        Yes.
13                    There is an example of that.
14    You know, with use of -- doctors who are
15    thinking they are doing the right thing by
16    giving narcotics or benzodiazepines,
17    sedatives, and they think I'm really helping
18    that person, and this is even less harmful,
19    because you can stop those drugs.
20                    But that doctor will be
21    imprisoned because of regulations on
22    scheduled drugs if they are inappropriately
23    prescribing those drugs.
24                    Here we are talking about an
25    intervention which is irreversible on a
```

Page 119

```
 1                    DANIEL WEISS
 2   minor, not on an adult, on a minor.
 3                   And with full knowledge of
 4   the law, that prescriber or that physician
 5   does this to a minor, yeah, that's even --
 6   that's more justified to imprison that
 7   doctor than it is to explain imprisonment of
 8   a physician who is prescribing a scheduled
 9   drug on an adult.
10        Q       What are your opinions on the
11   COVID vaccine mandate?
12                   ATTORNEY DROZ:  Objection,
13        relevance.  I object to form.
14        A       I think that's outside the
15   scope of this discussion.
16        Q       Well, one of the subjects of
17   this discussion is the proper role for
18   government and law making when it comes to
19   treatment decisions for doctors and
20   patients.
21                   Right?  That's what this law
22   does.
23        A       Yes, and it's dealing only
24   with minors.
25        Q       Sure.
```

```
                                              Page 120

 1                       DANIEL WEISS
 2                But you said that you, when I
 3    asked you about whether you thought it was
 4    appropriate for the government to make
 5    treatment decisions for doctors and
 6    patients, you said there are other areas
 7    where you think it could be appropriate or
 8    perhaps not appropriate.
 9                So I'm asking you what is
10    your opinion with regard to the COVID
11    vaccine mandate?
12                Do you think that was an
13    appropriate government regulation?
14                ATTORNEY DROZ:  Objection to
15          form.
16          A     Yes, I do.
17          Q     Are there any other courses
18    of medical intervention that are supported
19    by the American Medical Association that you
20    think should result in imprisonment of a
21    doctor who provides that intervention?
22          A     I cannot think of any, but I
23    don't stay current on those other AMA
24    endorsements.
25                I used to be a member of the
```

Page 121

```
 1                     DANIEL WEISS
 2    AMA, and then I discontinued my membership.
 3                     ATTORNEY KORBERG:  I think
 4            this might be a good point for
 5            another break.  We have been going
 6            for about an hour.
 7                     THE VIDEOGRAPHER:  Thank you,
 8            counsel.  This is the videographer.
 9            The time is 12:31, this ends media
10            file 2.
11                     (At this point in the proceedings
12            there was a recess, after which the
13            deposition continued as follows:)
14                     THE VIDEOGRAPHER:  The time
15            is 12:37.  We are back on the
16            record.  This begins media file 3.
17            Q       So, as a clinician, you only
18    recommend treatment for your patients that
19    you believe is safe and effective, right?
20            A       Yes, there is balancing of
21    risks and benefits.
22            Q       And you only recommend
23    treatment that you believe is sufficiently
24    supported by evidence, right?
25            A       The best evidence that's
```

```
                                    Page 122
 1                   DANIEL WEISS
 2    available, in discussion with the patient
 3    and balancing risks and benefits.
 4          Q      So, at least at the point in
 5    time in which you were treating patients
 6    with cross sex hormones for gender
 7    dysphoria, you believed that such treatment
 8    was safe and effective, right?
 9          A      Yes, at that point.  The
10    evidence was much more sparse.
11          Q      But at that point you thought
12    that the evidence as it existed when you
13    were providing cross sex hormones to people
14    suffering from gender dysphoria, you
15    believed that your care was sufficiently
16    supported by the evidence that you could
17    ethically provide it to your patients,
18    right?
19          A      Yes, and that were adults.
20          Q      I understand that you treated
21    patients, you encountered patients suffering
22    from gender dysphoria during your fellowship
23    in the 1980s, right?
24          A      Yes.
25          Q      And then beginning in 2003
```

```
                                    Page 123
 1                    DANIEL WEISS
 2    you began also treating patients, adult
 3    patients for gender dysphoria, right?
 4            A      Yes.
 5            Q      Did you treat or diagnose any
 6    patients for gender dysphoria between the
 7    1980s and 2003?
 8            A      Not that I recall.
 9            Q      You write in your declaration
10    that at your independent clinic you became
11    the "key physician responsible for treating
12    patients requiring cross sex hormones,"
13    right?
14            A      Yes, in that area of Ohio.
15            Q      And what does it mean to be
16    the key physician?
17            A      I was the principal physician
18    in the area in northern Ohio seeing people
19    requesting hormonal intervention for their
20    gender dysphoria, and I was listed on an
21    LGBTQ website.
22            Q      What steps did you take to
23    establish yourself as a key physician
24    responsible for treating gender dysphoria?
25            A      I was just willing to offer
```

Page 124

1                   DANIEL WEISS
2    treatment, and word got around, and then I
3    was listed on the website.
4         Q      Did you play any role in your
5    listing on the website?
6         A      No; no, and other
7    endocrinologists declined treatment
8    consistent with what I have said before
9    about endocrinologists not treating.
10                People would call the office
11   and say -- and would convey to me that there
12   was no other endocrinologist who was willing
13   to treat, other than there was a doctor who
14   in inner city Cleveland who was willing to
15   treat.
16                But was less accessible, less
17   accessible.
18        Q      Is it your belief that other
19   endocrinologists at the time, in 2003, were
20   unwilling to treat physicians because of the
21   state of the evidence regarding the safety
22   and efficacy of cross sex hormones for
23   gender dysphoria?
24        A      I think you misspoke there.
25   Was unwilling to treat patients?

```
                                              Page 125
 1                      DANIEL WEISS
 2           Q        Yes.  Why don't I try that
 3   again.
 4                     Is it your belief that other
 5   endocrinologists in 2003 were willing to
 6   treat -- unwilling to treat patients with
 7   cross sex hormones for gender dysphoria
 8   because of the state of the evidence
 9   regarding the safety and the efficacy of
10   such treatments?
11           A        No, I don't think that was
12   the reason.
13                     I think there was -- there
14   were not that many people who felt they
15   were -- had gender dysphoria, and there was
16   an explosion of a number of people after
17   around 2015 or so, and then eventually
18   gender clinics arose.
19                     But I don't think it was that
20   there wasn't the evidence.
21                     Maybe, let see, in -- there
22   was an Endocrine Society guideline statement
23   already, and WPATH was around.
24                     So it wasn't lack of
25   evidence, it was just doctors who were not
```

Page 126

1                    DANIEL WEISS
2      willing to treat.
3           Q      And why do you think doctors
4      were unwilling to treat in 2003 when you
5      were willing to treat, if not for the
6      evidence?
7           A      I think some of it was not
8      having experience with it, and I had some
9      experience in my fellowship and I wanted to
10     help people.
11                 I felt it was probably the
12     right thing to do.  They were adults, I
13     could discuss the possible side effects that
14     I knew of, and my goal as a physician is to
15     help people and reduce suffering, reduce
16     pain and suffering, and I felt this was an
17     appropriate step to do so.
18                 And only later did I learn,
19     not just from the fact it wasn't helping
20     them, despite the physical changes, but that
21     the science indicated, especially in minors,
22     that it does not help them.
23          Q      What was the principal LGBTQ
24     website that you are referring to?
25          A      It no longer exists.  I

Page 127

```
 1              DANIEL WEISS
 2   looked for it.  It's not there anymore.  It
 3   was called -- it was called Be All, like Be
 4   All You Can Be.
 5           Q     And how did you determine
 6   that was the principal LGBTQ website?  Are
 7   you familiar with LGBTQ websites?
 8           A     Well, there is so much, it's
 9   changed.  It was, I stopped, that was 2010,
10   2003, 2010, 2013, so at that point it was.
11                 I would see my listing on
12   there, and -- but that website is not there
13   anymore.
14                 And there are a lot of other
15   websites.
16           Q     You testified earlier that
17   the patients that you were seeing in 2003
18   and the subsequent years to whom you were
19   providing cross sex hormones for their
20   gender dysphoria, you testified that you
21   were the one to diagnose them with their
22   gender dysphoria, is that right?
23           A     No, they would come to me
24   after having seen a therapist.
25           Q     Okay.
```

```
                                            Page 128

 1                      DANIEL WEISS
 2                 Is there any patient who you
 3    diagnosed with gender dysphoria rather than
 4    a therapist?
 5          A       No.  They had seen a
 6    therapist.  Most of them had seen a
 7    therapist already and then came to me.
 8          Q       Okay, of the -- am I right
 9    that you believe you saw roughly 100
10    patients during that span?
11          A       Yes, correct.
12          Q       Of those 100 patients, how
13    many of them were coming to you not having
14    received a diagnosis of gender dysphoria
15    from a therapist?
16          A       I think all of them had.
17    They may not -- some of them didn't have
18    letters in support of hormonal
19    interventions, but I think all of them felt
20    they had gender dysphoria or gender identity
21    disorder at the time, and they had at least
22    one visit with a therapist.
23          Q       Would you have treated
24    someone suffering from --
25                  ATTORNEY KORBERG:  Withdrawn.
```

```
                                           Page 129

1                    DANIEL WEISS
2          Q       Would you have treated
3    someone with cross sex hormones who had not
4    received a diagnosis of gender dysphoria
5    from a mental health professional?
6          A       No.
7          Q       Did you take steps to
8    independently diagnose those patients with
9    gender dysphoria?
10         A       No -- well, I should clarify.
11                 I would ask them at their
12   first visit, tell me about your feelings,
13   and to explore the question of gender
14   incongruence to just confirm the diagnosis
15   that the therapist would have made.
16         Q       Did you perform a
17   psychological evaluation of those patients?
18         A       Well, to the extent that the
19   questioning was, but no formal
20   questionnaires or SF 36 or things like that,
21   Beck Depression Scale.
22                 I didn't do those types of
23   things, because I left that to the
24   therapist.
25         Q       You testified earlier you
```

```
                                          Page 130
 1                   DANIEL WEISS
 2    took steps to determine whether those
 3    patients fit the criteria for either gender
 4    identity disorder or gender -- or gender
 5    dysphoria under the DSM.
 6                   Is that still your testimony?
 7         A     Yeah.  Well, just in terms of
 8    confirming the diagnosis that the therapist
 9    would make.  But I didn't do it proactively,
10    before they saw a therapist.
11         Q     Would you specifically go
12    through the DSM factors and do an analysis
13    under the DSM guidelines, or were you doing
14    something else?
15         A     It was a broad overview of
16    the DSM guidelines, yes.
17         Q     Of those -- were there ever
18    any patients that you assessed for gender
19    dysphoria who you determined did not, in
20    fact, meet the DSM criteria for gender
21    dysphoria?
22         A     There was one of my patients
23    who wanted opposite sex hormones, and I
24    really was -- felt that they needed more
25    psychological evaluation.
```

```
                                         Page 131

 1                    DANIEL WEISS
 2              And this female was -- wanted
 3   hormones right away, and was going off to
 4   college, and that person I was really unsure
 5   of, and I declined giving her hormones.
 6              And I said, you know, I think
 7   that we needed to wait a little bit.  So
 8   that was one person.
 9        Q    And when you say female, what
10   was this person's gender identity as
11   expressed to you?
12        A    She felt she wanted to have
13   hormones to make her appear like a boy;
14   male.
15        Q    And you are referring to this
16   person using she/her pronouns now.
17              Did you do so at the time?
18        A    Yes, because she was, she
19   looked like a female and was living like a
20   female at that point, and she was fine with
21   that.
22        Q    Do you know whether that
23   person ever did access testosterone?
24        A    No, because she didn't follow
25   up with me.
```

Page 132

1                          DANIEL WEISS

2          Q       Did all 100 of the patients

3     that you saw access cross sex hormone

4     therapy?

5          A       Yes, all except that one.

6          Q       And have you ever prescribed

7     anyone puberty blockers for the treatment of

8     gender dysphoria specifically?

9          A       So, I did not use puberty

10    blockers for males or females because I

11    didn't -- I was not seeing minors.

12                 Everyone had gone through

13    puberty.

14         Q       Did you offer referrals for

15    surgery for any of these 100 patients?

16         A       Yes.

17         Q       Approximately how many of the

18    100?

19         A       This was quite a while ago,

20    but I would estimate -- well, referrals,

21    yes, so referrals is one thing, and those

22    who actually had surgery is another.

23                 So, probably about 40 people

24    I referred for surgery and probably about --

25    well maybe 50, hard to remember.

Page 133

1           DANIEL WEISS
2                Those who had surgery, most
3    of the time that surgery was bilateral
4    mastectomy in biologic females, and perhaps
5    10 to 15 had orchiectomy or production of a
6    neo-vagina, faux vagina.
7         Q      Sorry, how many of the 100
8    had bilateral mastectomy?
9         A      I would say probably 40.
10        Q      So, of the 100, 40 of your
11   patients had bilateral mastectomy, 10 or 15
12   had orchiectomy, and did any of your
13   patients have any other type of surgery?
14        A      I think -- I had probably
15   about 5 who had -- well probably about 5 who
16   had vaginal -- vaginoplasty, and then a
17   couple who had neo-phalluses made,
18   phalloplasty.
19        Q      So somewhere around 65 of the
20   100, perhaps, accessed surgery for their
21   gender dysphoria, is that right?
22        A      That seems high.  I don't
23   think it was that high, it was probably --
24   it hard to remember.
25                Probably -- so those who had

```
                                        Page 134
 1                   DANIEL WEISS
 2   mastectomies.  Some of those had lower
 3   surgery, too, others didn't.  The majority
 4   did not.
 5                   So, I will leave it at that.
 6         Q      I mean, you are appearing as
 7   an expert in this case and offering all
 8   sorts of expert opinions on the provision of
 9   cross sex hormones.
10                   Based, as I understand it, on
11   your personal clinical experience providing
12   these treatments, right?
13                   ATTORNEY DROZ:  Objection,
14         form.
15         A      And the review of the
16   scientific evidence on these interventions
17   in minors.
18         Q      Right.  But you would agree
19   your clinical experience with these 100
20   patients is a major part of the basis of
21   your expertise in offering the opinions that
22   you do in your declaration and are today,
23   right?
24         A      It's part of that, actually.
25         Q      These 100 people are your
```

Page 135

1                    DANIEL WEISS
2    data set, right?
3          A       Right.
4          Q       Okay.  So I want to
5    understand from you how many of the data set
6    accessed gender affirming surgery.
7          A       I think that -- I think the
8    number of mastectomies is probably high.
9                   But, you know, I don't
10   have -- that's a long time ago, and I know
11   that some of them had mammoplasty, probably
12   maybe more like 30 or 40 had top surgery,
13   and then about 15 had bottom surgery.
14         Q       Okay.
15                  So, maybe something like 45
16   to 55 of your patients had some sort of
17   surgery to address their gender dysphoria?
18         A       Yes.
19         Q       How often did you see these
20   patients?
21         A       Usually every three months or
22   so.
23         Q       What steps did you take
24   during those visits to assure yourself that
25   the care they were receiving was safe and

Page 136

1                          DANIEL WEISS

2   effective?

3          A      I would ask them how they

4   felt and what changes they noticed.

5                 I would measure blood tests,

6   and I would ask them about their therapy

7   visits, if they had them.

8          Q      Are there any other steps you

9   felt important to take to assure yourself

10  that the care that they were receiving was

11  safe and effective?

12         A      Yes.  So again, it was a

13  questioning related to symptoms and physical

14  changes, and I would examine them, and the

15  blood tests.

16         Q      And were you following the

17  Endocrine Society treatment guidelines at

18  this point?

19         A      What were the guidelines that

20  were available, yes, and my best judgment.

21         Q      Did you conceive of your

22  role, part of your role as evaluating your

23  patient's mental health status?

24         A      Yes.

25         Q      And how did you do that?

```
                                    Page 137
 1                    DANIEL WEISS
 2         A      I would ask them how they
 3   felt, their mood, their interest in things,
 4   their sleep, their mental focusing, were
 5   they sad or down a lot?
 6                 Were they anxious, what were
 7   their stressors in their life, how was job,
 8   how was school, and so on.
 9         Q      What if someone said that
10   they were anxious or depressed, what would
11   you do then?
12         A      Well, I would try to explore
13   why in the time available for the visit, and
14   then often encourage them to follow up with
15   their therapist.
16         Q      At any point did you counsel
17   a patient that they should consider stopping
18   hormone therapy?
19         A      There were some females,
20   biologic females who were on testosterone
21   where I modified the dose because of a high
22   red cell count.
23                 But stopping, no, those, some
24   who had certainly with, after orchiectomy
25   there is no need for -- there is -- it's
```

```
                                        Page 138
 1                    DANIEL WEISS
 2   appropriate to modify dosing at that point,
 3   and so that would be a reason to modify or
 4   reduce a dose of estrogen.
 5              And those would be -- so yes,
 6   there were circumstances, there was a
 7   modification for discontinuation, usually
 8   temporary, of the medication.
 9        Q       Of those 100 patients, was
10   there ever a patient that you counseled to
11   consider stopping hormone therapy because it
12   was not either safe or effective for them?
13        A       So, the principal assessment
14   of efficacy I was looking for, even though
15   one would hope there would be an improvement
16   in psychotic distress.
17              I saw no improvement in
18   psychic distress, but I was primarily
19   looking at physical changes.
20              In those people, no, I didn't
21   stop, because there was inadequate physical
22   changes.
23              So, that's the safe and
24   effective thing.  Efficacy was originally
25   designed in the trials for minors with the
```

```
                                       Page 139
 1                   DANIEL WEISS
 2   hope of reducing psychic distress, which it
 3   did not do.
 4              And in this case, it didn't
 5   reduce psychic distress in my adult patients
 6   either.  At least that was my perception.
 7         Q      So you perceived that cross
 8   hormone therapy and in some cases surgery,
 9   did not reduce psychic distress in any of
10   these 100 patients?
11         A      No, I think actually it tends
12   to increase it.
13         Q      Okay, so let's just -- so
14   zero of the 100 patients experienced an
15   improvement in their psychic distress as the
16   result of hormones or potentially surgery,
17   right?
18         A      Right.
19         Q      How many of your patients
20   experienced a worsening of their psychic
21   distress as a result of hormones or
22   potentially surgery in this period?
23         A      Oh, I can think of one who
24   attempted suicide twice after surgery.
25              No one else that I can think
```

Page 140

                        DANIEL WEISS

1   of where it appeared to be worse.

2           Q       How did you monitor and

3   evaluate psychic distress in your patients?

4           A       So, it's really just talk

5   therapy, talking to them, asking about

6   dysphoria and hedonia, and energy, sleep,

7   those kinds of things aspects of depression.

8           Q       Did you have standards of

9   evaluative questions that assess the mental

10  health or psychic distress of your patients?

11          A       Not that I recall.

12          Q       So, you might ask each of

13  those patients different questions or no

14  questions at all, right?

15          A       No, no, I would always ask

16  questions, and it was often open-ended.

17                  So I didn't do yes/no type

18  stuff, but more open-ended, to allow for

19  discussion and exploring.

20          Q       Have you ever received

21  training in psychologic or psychiatric

22  evaluation of the type that you were doing?

23                  ATTORNEY DROZ:  Objection,

24          form.

Page 141

1                    DANIEL WEISS
2        A        Of continuing medical
3    education and -- would provide some guidance
4    in that regard and reading.
5        Q        So you specifically read up
6    on how to perform psychologic evaluation to
7    determine any changes or lack thereof
8    in-patients' psychologic distress?
9        A        Well, beyond that, continuing
10   medical education, I've had in that regard
11   and -- so reading and continuing medical
12   education.
13               But I'm not Board certified
14   in psychology.  But one can gain expertise
15   and know how with open-ended questions can
16   explore symptoms that relate to anxiety and
17   depression.
18        Q        So you felt qualified to
19   assess the absolute and relative level of
20   psychic distress of a patient via a
21   conversation, is that correct?
22        A        Yes.
23        Q        According to your
24   declaration, you stopped accepting new
25   patients with gender dysphoria in 2013, when

Page 142

```
 1                    DANIEL WEISS
 2    you realized the lack of benefit and the
 3    harm these interventions caused, is that
 4    right?
 5            A       Yes.
 6            Q       Was that realization that you
 7    had in 2013 sudden or an evolution of some
 8    sort?
 9            A       Oh, it was an evolution.
10            Q       Can you describe to me that
11    evolution, how it unfolded, when it
12    unfolded?
13            A       It was gradual, and then I
14    also saw people coming to me who did not
15    have, I felt, adequate psychological
16    evaluation.
17                    And they had lots of other
18    psycho-social factors that were complex,
19    that needed to be evaluated, and would not
20    be fixed by giving them opposite sex
21    hormones.
22            Q       Is that a sudden development
23    that at some point between 2013 and --
24    sorry, 2003 and 2013 you started seeing
25    patients that seemed to have other
```

```
                                          Page 143
 1                    DANIEL WEISS
 2   psycho-social factors separate and apart
 3   from their gender dysphoria?
 4          A      I think it was gradual, I
 5   think it was a realization that was a
 6   gradual realization.
 7          Q      Can you roughly pinpoint when
 8   in the decade that sort of realization
 9   coalesced into a concern?
10          A      No.
11          Q      And as that realization was
12   developing for you, did you take any
13   additional steps to evaluate the safety or
14   efficacy of the care that you were providing
15   to those patients that you hadn't been
16   taking prior?
17                 ATTORNEY DROZ:  Objection,
18          form.
19          A      Nothing new, really just to
20   still doing the open-ended questioning to
21   explore their psycho-social factors.
22          Q      Did that open-ended
23   questioning change at all as you began to
24   develop concerns about the safety and
25   efficacy of the treatment that you were
```

Page 144

1                         DANIEL WEISS

2    providing?

3          A       I don't recall.

4          Q       Did you take any steps to

5    quantify or track the psychic distress or

6    well-being of your patients over that time?

7          A       No, I didn't quantify it.

8          Q       Did you take any steps to

9    qualify it?

10         A       It was just my tracking.  I

11   didn't write things down.

12         Q       If we looked at your patient

13   notes from this time, were you keeping notes

14   of whether a patient's psychic distress was

15   better, worse or the same as compared to the

16   prior time you saw them?

17         A       Yes, I would have done that.

18         Q       And how would you have

19   notated that?

20         A       Just in a dictated -- I would

21   dictate a note.

22         Q       Would you have notated

23   whether the patient's psychic distress was

24   better, worse or the same as compared to

25   when they first presented to you for care?

Page 145

1                    DANIEL WEISS

2          A       As compared to baseline.

3                  Well, it was all qualitative.

4          Q       And how did you keep track of

5    it qualitatively?

6          A       Just through a description.

7          Q       What would be an example of a

8    description?

9          A       Patient is feeling sad and

10   down a lot.  The doctor went up on the dose

11   of antidepressant.

12                 He is feeling bullied at

13   work.  He quit his job.  Things like that.

14         Q       Do you have a very good

15   memory?

16                 ATTORNEY DROZ:  Objection.

17         A       Not as good as it used to be.

18         Q       Were you able to determine

19   the relative psychic well-being of your

20   patients based on your recollection of how

21   they appeared to you in your informal

22   conversation three months prior, or were you

23   going by some other -- did you have some

24   other system for keeping track of that?

25         A       Oh, I had -- well, I had

Page 146

1                          DANIEL WEISS
2      excellent -- I would transcribe a detailed
3      note.  It was text, it was not an electronic
4      medical record at that point.
5                      And I knew these patients,
6      there weren't that many of them, so I
7      recalled exactly what was going on with
8      them, but my medical record would reinforce
9      my previous visit.
10             Q      Did you have any like
11     quantitative system, like a scale of 1 to
12     10, for mental health or anything like that,
13     which would allow you to compare the
14     evolution or lack thereof of a patient's
15     psychic distress?
16             A      No, no quantitative, no
17     numerical scale, no.
18             Q      How did you choose the day
19     that you would no longer accept new
20     patients?
21             A      Again, it was a gradual
22     realization that both the science didn't
23     support it, the patients didn't seem to be
24     improving from a psychological standpoint,
25     which was the principal reason that those

Page 147

```
 1                    DANIEL WEISS
 2   hormonal interventions were initiated.
 3                   And lastly, that they did not
 4   have adequate psychologic assessment before
 5   they were coming to see me.
 6        Q       So you came to realize that
 7   the psychological assessment and diagnosis
 8   of gender dysphoria that they had received
 9   prior to coming to see you was inadequate in
10   some way?
11        A       Well, because the gender
12   dysphoria arose from other issues that had
13   not been addressed.
14                   The fact that their parents
15   fought all the time, that their father
16   abused them, that this guy sexually abused
17   them, that they were depressed and anxious
18   for other reasons, and so on.
19                   That those were the principal
20   psychologic issues that needed to be
21   addressed, and I wasn't addressing those
22   with hormones.
23        Q       Lots of people have parents
24   that fight all the time, have been sexually
25   abused, et cetera.
```

Page 148

1              DANIEL WEISS
2              And are cys gender, right?
3         A    Say that again, I'm sorry, I
4  missed that.
5         Q    Lots of people have had
6  parents that fight all the time or were
7  abused sexually or otherwise and are cys
8  gender, right?
9         A    If they don't -- that don't
10  express gender dysphoria, correct.
11         Q    Why are you convinced that
12  your patients' gender dysphoria was caused
13  by these other traumatic circumstances that
14  do not cause gender dysphoria in the
15  majority of people who experience them?
16         A    I think the --
17              ATTORNEY DROZ:  Objection to
18         form.
19         A    I think right now it's very
20  clear that there is an increasing number of
21  minors who come out with saying they have
22  gender dysphoria, and that is in part
23  related to peer influence and social
24  contagion and social media, in conjunction
25  with having these stressors.

```
                                         Page 149
 1                    DANIEL WEISS
 2                    The treatment for someone who
 3     is sexually abused, it's a convenient -- if
 4     you're a girl and you are sexually abused by
 5     a male, it's an unconscious -- it's just so
 6     straightforward that that girl might not
 7     want to look like a girl and attract -- and
 8     encourage any more sexual abuse, so they
 9     want to change their appearance.
10                    So that's just -- it's so
11     obvious that that would be an explanation
12     for that desire.
13                    And just because someone a
14     so-called cys gender person, someone who
15     doesn't express gender dysphoria dealt with
16     a sexual abuse and doesn't -- isn't dealing
17     with it with an attempt to change their
18     body, doesn't mean that there is a whole --
19     there is a whole group of people who pursue
20     that route.
21                    Those who say they are gender
22     dysphoric, but really that's not the
23     problem, the problem is they were sexually
24     abused.
25                    So I think there is on the
```

Page 150

1                    DANIEL WEISS

2    other hand absolutely no evidence to claim,

3    as many people do, who treat those with

4    gender dysphoria, or I should say intervene

5    with hormones, that it's the fact that they

6    are discriminated against or bullied, the

7    so-called minority stress idea, that's why

8    they have the problems with anxiety,

9    depression.

10                    For causation, there is no

11   evidence for that.

12                    And it makes psychologic

13   sense that they have -- these other

14   psychological problems could be and likely

15   are the cause for their simple, quick fix

16   desire of hormones to change them.

17                    That's a long answer, but --

18        Q        Why would a young person

19   assigned male at birth who was sexually

20   abused respond to that by accessing cross

21   sex hormones and identifying as and living

22   their life as a woman, when statistically

23   women experience much higher rates of sexual

24   violence and assault?

25                    ATTORNEY DROZ:  Objection to

Page 151

```
 1                    DANIEL WEISS
 2           form.
 3           A       Yes, so psychological issues
 4    are very complicated.
 5                    So you're presenting a
 6    hypothetical case, and there is probably
 7    many factors in that unfortunate child's
 8    history that need to be explored and
 9    addressed, and bonafiding their body
10    experience is not the answer to those
11    psychological problems.
12                    And they may actually
13    unconsciously think that modifying their
14    body appearance might fix it.
15                    They are a child, they don't
16    know about the statistics about woman being
17    assaulted.
18                    So, you are giving me a
19    hypothetical example that likely has many --
20    would in reality have many complex factors
21    that all need to be explored.
22                    And those aren't being done.
23    They are just -- they are being approached
24    by hormonal interventions.
25           Q       When I asked you why you
```

Page 152

```
 1                    DANIEL WEISS
 2   became convinced that your patients' gender
 3   dysphoria was caused by all these other
 4   traumatic circumstances that don't cause
 5   gender dysphoria in the majority of people
 6   who experience them, you talked about social
 7   contagion, right?
 8            A      Yes.
 9            Q      Do you believe that the
10   patients who were coming to you in 2003,
11   2004, were experiencing social contagion?
12            A      There was peer influence and
13   there was likely social factors, seeing it
14   on media, on social media; very likely some
15   of those people.
16                   Especially later on in that
17   period.
18            Q      In your expert opinion you
19   say that you stopped providing care because
20   of what you determined to be a lack of
21   benefit of interventions for gender
22   dysphoria, right?
23            A      Yes.
24            Q      What do you mean when you
25   refer to lack of benefit?
```

```
                                    Page 153
 1                    DANIEL WEISS
 2          A       I mean the psychic distress
 3    that they were feeling, that they attributed
 4    to this discordance between their natal sex
 5    and their internal sense of what they were,
 6    was not fixed.
 7                   Their anxiety, depression,
 8    other factors, were not mitigated by the
 9    hormonal intervention.
10                   And there was concern about
11    harm from those hormonal interventions.
12          Q       Let's talk about that.
13                   First, did any of those 100
14    patients express to you pleasure or
15    satisfaction or happiness about the physical
16    changes they were experiencing as a result
17    of cross sex hormones?
18          A       Yes.
19          Q       How many, would you say?
20          A       Maybe 15, 20, something like
21    that.
22          Q       So, 15 or 20 of the 100
23    expressed subjective happiness at the
24    results of the treatment that you were
25    providing, right?
```

Page 154

1                    DANIEL WEISS

2        A        The physical changes, yes.

3        Q        Did you ever ask why the 80

4    to 85 who didn't express affirmative

5    happiness at the results of the treatment

6    were continuing treatment?

7        A        There is a substantial number

8    who didn't -- during those ten years, they

9    chose not to follow up.

10       Q        Well --

11       A        So I don't know what happened

12   to those people.

13       Q        Um-hum, sure.

14       A        So they either stopped, maybe

15   they went to another doctor, or maybe they

16   just desisted, or the child, say, thought

17   oh, this is not really helping me that much,

18   I got the physical changes, but I'm still

19   anxious, depressed, whatever.

20       Q        Or maybe they moved?

21       A        Yup.

22       Q        Did any of your 100 patients

23   ever tell you that they were discontinuing

24   hormone treatment because they were

25   dissatisfied with the results?

Page 155

1                          DANIEL WEISS

2          A        No.

3                   But you know, the literature

4     that we have available shows that those who

5     stop, 70 percent or so never inform their

6     doctor.

7          Q        Okay.  But you would still

8     expect some number of -- you would expect

9     someone, even if it was just 70 percent, to

10    inform you why, right?

11                  But nobody ever did, right?

12                  ATTORNEY DROZ:  Objection to

13          form.

14                  You can answer if you

15          understand.

16         A        Yes, correct.

17         Q        Did you determine there was a

18    lack of benefit of all of the interventions

19    you were providing to patients for their

20    gender dysphoria?

21         A        There was -- the benefit in

22    terms of the physical changes was seen.

23                  So if they were seeking

24    physical changes, they did get changes with

25    those hormonal interventions.

```
                                         Page 156

 1                      DANIEL WEISS

 2                 On the other hand, if the

 3    condition we are treating, which is this

 4    psychic distress related to this gender

 5    incongruence, I don't think they -- most of

 6    them had benefit from them.

 7          Q      But some did, you believe?

 8          A      Perhaps, yes.

 9                 Before -- I don't know

10    whether it was that or maybe the counseling

11    they were getting was helping.

12                 So, we don't know, we don't

13    know because it was a before and after

14    thing.

15                 Association, not causation.

16          Q      Did you have a requirement

17    that anyone in your care continue to receive

18    mental health treatment while they were in

19    your care?

20          A      I did not have a requirement

21    that they had to continue to, no.  I think

22    it's a good idea, but no.

23          Q      Did you ever speak to your

24    patients' mental health provider and get

25    their assessment of whether the treatment
```

```
                                      Page 157
 1                     DANIEL WEISS
 2     you were providing was beneficial in
 3     relieving the psychological distress of
 4     gender dysphoria?
 5            A        Not after I embarked upon
 6     treatment.  But early on, whether the person
 7     was appropriate for prescribing it, I did
 8     converse I think on a couple of occasions
 9     with their therapist.
10            Q        So a couple of times out of
11     the 100 you spoke to one of your patients'
12     therapists?
13            A        Yes, early on.
14            Q        As over the course of that
15     decade, 2003 to 2013, you came to believe
16     that the treatment that you were providing
17     was not actually relieving your patients'
18     psychic distress.
19                     Did you at that point
20     undertake any effort to consult with anyone
21     else as to whether that hunch might, in
22     fact, be true?
23                     ATTORNEY DROZ:  Objection to
24            form.
25            A        I was reading some literature
```

```
                                          Page 158
 1                   DANIEL WEISS
 2   there, and it wasn't really clear that it
 3   was helpful from a scientific literature.
 4   But as I stated, I continued to provide
 5   those interventions.  I didn't discontinue
 6   them.
 7                   And those patients who
 8   continued under my care, I continued to
 9   prescribe them and encouraged those people
10   to follow up with therapy more frequently.
11       Q       But you didn't take any steps
12   to ensure that your patients did, in fact,
13   follow up with therapy more frequently,
14   right?
15           A       Say that again?
16           Q       You didn't take any steps to
17   ensure that your patients did, in fact,
18   follow up with their more frequently, right?
19           A       I could just encourage them,
20   I couldn't enforce that; no.
21                   But I was going to not
22   abandon them.  I continued to provide this
23   hormonal treatment, which they -- those who
24   stayed with me, wished to continue.
25                   And so I was going to
```

Page 159

```
 1                    DANIEL WEISS
 2   continue to offer that to them.
 3          Q      So you refer to both what you
 4   came to believe was a lack of benefit of the
 5   interventions you were giving your patients,
 6   and also the harm of the interventions you
 7   were giving your patients for gender
 8   dysphoria, right?
 9          A      Yes.
10          Q      What do you mean when you
11   refer to the harm?
12          A      Well, the harm can occur, I
13   have detailed possible harms in my
14   declaration at great length, and most of
15   those data are in adults, because we have
16   very little data that's been gathered in
17   minors, and it's harm, that's long term
18   harm.
19                 But I saw, for example,
20   patients who had very high hemoglobin
21   content, that's their red -- their blood
22   becomes very thick on testosterone,
23   worsening in sleep apnea, because, perhaps
24   related to testosterone.
25                 So those are two examples of
```

Page 160

1                    DANIEL WEISS
2    harm from those -- that intervention.
3         Q        And when you had patients
4    with very high hemoglobin content, you
5    testified earlier that you adjusted their
6    dose of testosterone to bring their
7    hemoglobin down, right?
8         A        I adjusted the dose.  Some of
9    them I encouraged to have -- to donate
10   blood.
11        Q        Were there any harms that
12   your 100 patients experienced that you were
13   not able to address with medication
14   management?
15        A        Not that I recall.
16        Q        Did you ever raise with any
17   of your patients your belief that the
18   treatment you were providing them was not
19   benefiting them?
20        A        No, I didn't.  I did raise
21   the risk of harms like blood clots with
22   estrogen therapy, mineral imbalances with
23   spirolactone and so on.
24                 But if they -- but I did not
25   raise the concern that it was not helping

Page 161

1                        DANIEL WEISS
2     them.
3            Q       And why not?  Why didn't you
4     raise the concern that with your patients
5     that the treatment that you were providing
6     them was not helping them?
7            A       Well, I think they were
8     convinced that it was the right thing to do,
9     and it was, again, as I said, a gradual
10    evolution.
11                   When I came to conclude that
12    it was really not the appropriate and best
13    and most effective intervention for them, it
14    was really more therapy counseling that they
15    needed to focus on.
16            Q       But by 2013, you had reached
17    the conclusion that the treatment you were
18    providing was not effective, right?
19            A       Yes.
20            Q       But that's not something that
21    you told the patients that you continued to
22    provide treatment to, right?
23            A       Right.
24            Q       Is it your belief that all
25    interventions for gender dysphoria cause

Page 162

1                    DANIEL WEISS

2   harm?

3        A      Well, gender dysphoria

4   arises, as I said, I think from other

5   factors, and those need to be addressed.

6               And we are not addressing

7   them when we focus on modifying physical

8   appearance to fix this sense of

9   incongruence, and there is a potential to

10  cause harm with all those interventions.

11              And so they are not

12  addressing the underlying harm, and there is

13  a risk of harm.

14              Now, in an individual case, a

15  person may or may not be harmed.

16              But why should we be

17  intervening with a treatment that's not

18  directed to the underlying cause?

19  Especially when it has a risk of harm.

20              We shouldn't.

21        Q     Did you take any steps during

22  your clinical practice to test your theory

23  that gender dysphoria is solely the product

24  of some other mental health condition or

25  trauma?

```
                                      Page 163
 1                   DANIEL WEISS
 2         A       That's not something -- I
 3    wouldn't do an experiment in my clinical
 4    practice.
 5                  So, that sounds like a
 6    clinical research trial, and that would be
 7    unethical, to conduct that on patients.
 8         Q       So, I understand your theory
 9    of why sexual assault would cause someone to
10    experience gender dysphoria and desire to
11    undergo cross sex hormone treatment.
12                  What about eating disorders,
13    which is another one of the causal factors
14    that you have said for gender dysphoria?
15                  What's your theory for why
16    eating disorders cause some people to
17    experience gender dysphoria?
18         A       Where do I say eating
19    disorders --
20                  ATTORNEY DROZ:  Objection to
21         form.
22         Q       Sure, it's in your
23    declaration, we can pull that up.
24                  We can return to that,
25    actually.  Let's put a pin in that one.
```

Page 164

DANIEL WEISS

        A       But eating disorders is -- I
know, and I have cited that in the
declaration, is a -- we are seeing less of
it now than we did years ago.

                But eating disorders often
occur in a setting of peer influence and
social contagion.

                So, that has some analogy to
gender dysphoria.

                You know, adolescent
development is very complicated, and
children want to fit in, they want to be
liked, and they might feel bullied, they
might feel isolated.

                And it's not just my theory
that these underlying psychiatric and
psycho-social factors could contribute to
the development of gender dysphoria in a
child.

                There is, you know, others
who, in published literature, who describe
this as a concern, and that those underlying
factors must be addressed before you embark
upon hormonal interventions if you are

Page 165

                        DANIEL WEISS

 1    thinking that that's an appropriate thing to

 2    do.

 3         Q      What's your theory for, let's

 4    see, I believe let's go to paragraph 27,

 5    let's pull up Exhibit 1, which is your

 6    declaration, paragraph 27.

 7                You say, "Discomfort or

 8    distress with regard to one's body is

 9    especially common in those with anxiety,

10    autism, eating disorders or history of

11    trauma," right?

12         A      Right.

13         Q      And earlier I believe you

14    testified, we can go through the exercise of

15    it, but the rough transcript here should say

16    that as a causal matter you believe that

17    gender dysphoria is caused by these totally

18    separate conditions and circumstances,

19    right?

20                ATTORNEY DROZ:  Objection,

21         form.  That's not what he said.

22         A      I think it's simplistic to

23    claim that one's psychiatric condition is

24    totally separate from another, that's really

Page 166

1                     DANIEL WEISS
2   silly, and that each individual needs to be
3   carefully evaluated through a supportive
4   exploratory approach to understand the
5   dynamics involved in the development of
6   eating disorders, their anxiety, their
7   distress and their depressive symptoms, and
8   why that child might respond with a hope
9   that changing their body is going to fix
10  these issues.
11                    And that is manifested, they
12  call it gender dysphoria, and it overshadows
13  then all of these other psychiatric and
14  psycho-social factors that must be
15  addressed.
16                    And it just -- it makes no
17  sense to intervene with modifying the body
18  to fix or help children who have all these
19  other factors that are -- that need to be
20  addressed, and safely.
21                    If you look at just the
22  risk/benefit thing, you are doing physical
23  changes on the body with the hope of a --
24  making the child a little more happy right
25  at the moment, because that's what they

Page 167

```
 1                      DANIEL WEISS
 2    think is the answer.
 3                      So complicated problems that
 4    need to be addressed without changing their
 5    body.
 6           Q      Okay, we will come back to
 7    that.
 8                      How did you communicate your
 9    decision to stop accepting new patients
10    suffering from gender dysphoria to your
11    front desk?
12           A      Oh, I just said I'm not going
13    to be seeing new people.
14                      The patients who are
15    established in my practice, I will continue
16    to see.
17                      But if patients call for a
18    visit, no, and for about, gee, maybe even a
19    year or longer after I stopped, I still
20    would be getting calls for patients to be
21    seen, patients requesting that I see them;
22    new patients, that is.
23           Q      Um-hum.
24                      And was it the standard
25    practice then for a new patient calling in
```

```
                                    Page 168
 1                DANIEL WEISS
 2    to have some sort of screening interview in
 3    which the front desk asked what they were
 4    seeking treatment for?
 5          A       Remember, something very
 6    short, you know, what are we seeing you for.
 7                  And patients could refer
 8    themselves.  They didn't have to have a
 9    referral from -- I was very welcoming in
10    that regard.
11                  Patients did not have to have
12    a doctor's note to be seen by me.
13                  They could just say I'm being
14    seen for -- I'm transgender.  Okay.
15    Dr. Weiss is not seeing new people, I'm
16    sorry, at this time, and we can give you the
17    name of this other clinic.
18          Q       And how did you -- you didn't
19    tell them that you were no longer providing
20    gender affirming care, right?
21          A       I was no longer seeing new
22    people with gender dysphoria, we told them
23    that.
24          Q       You did tell them that?
25          A       Yes.
```

Page 169

                      DANIEL WEISS

1

2          Q      And did you say why?

3          A      No.

4          Q      Did anyone ever ask why you

5   were no longer accepting patients?

6          A      Not that I know of.

7          Q      Did you communicate to your

8   existing patients who you were going to

9   continue to provide treatment to that you

10  were no longer accepting new patients

11  seeking the care that you were providing

12  them?

13         A      I think probably just in a

14  few situations where they said they were

15  going to refer their friend, I would just

16  convey to them oh, I'm sorry, I'm not seeing

17  new people.

18         Q      Did you specify you weren't

19  seeing new people for gender affirming care,

20  or did you leave it more broadly, as if you

21  weren't accepting new patients, period?

22         A      I think I was pretty clear

23  that I was just not seeing new people who

24  had gender issues.

25         Q      And what reason did you give

Page 170

```
 1                    DANIEL WEISS
 2    your existing patients who were in fact
 3    receiving that care from you, as to why you
 4    were not accepting new patients to provide
 5    that care to them?
 6          A      That's a very good question.
 7                 I don't recall giving them a
 8    reason, and I don't think they asked.
 9                 But my practice was very busy
10    in general.  It took maybe four months for
11    most patients to get in to be seen.
12                 And those patients with -- I
13    had been seeing with gender identity
14    disorder, I would make special effort to get
15    them in sooner, because there was no other
16    doctors providing readily available care.
17                 So during those ten years I
18    would -- they would get priority, frankly.
19          Q      Why did you think it was
20    important that they not wait very long
21    amounts of time, to not have to wait long
22    amounts of time to begin receiving cross sex
23    hormones?
24                 What was the urgency?
25          A      Well, I wouldn't call it
```

```
                                         Page 171
 1                    DANIEL WEISS
 2   urgency, but I was feeling that -- again, as
 3   a physician I went into medicine because I
 4   want to relieve people's suffering.
 5                    And I felt that they were
 6   seeking help, no one else was there for
 7   them.
 8                    Their primary care doctor
 9   certainly wouldn't do it, and I wanted to
10   help them, so I just wanted to relieve their
11   distress.
12        Q      Did your decision to stop
13   accepting new patients for gender affirming
14   care coincide with any changes in your
15   personal beliefs?
16        A      No.
17        Q      Did your decision to stop
18   accepting new patients to provide --
19                    ATTORNEY KORBERG:  Withdrawn.
20        Q      Did your decision to stop
21   accepting new patients seeking gender
22   affirming care coincide with any changes in
23   your personal religious beliefs?
24        A      No.
25        Q      Did any of those 100 patients
```

```
                                   Page 172
 1                 DANIEL WEISS
 2   begin treatment for their gender dysphoria
 3   while they were minors not with you, I
 4   understand you didn't ever provide care to
 5   minors, but prior to seeing you?
 6         A      Maybe one person was getting
 7   some hormones on the internet, and that's
 8   the only one I can think of.
 9         Q      And they began receiving
10   those hormones prior to turning 18?
11         A      No, I don't think so, no.  He
12   or she was an adult.
13         Q      And am I correct that after
14   you stopped accepting new patients you
15   continued to treat your existing patients
16   with cross sex hormones for a number of
17   years, until 2022?
18         A      Correct.
19         Q      And when in 2022 did you stop
20   providing gender affirming care treatment to
21   your existing patients?
22         A      Well, when I moved from out
23   of Ohio and relocated to Utah, I was not
24   going to be doing it from Utah, and so that
25   would have been the last day of practice in
```

```
                                           Page 173
 1                    DANIEL WEISS
 2    Ohio, which was I think December 2nd, 2022.
 3           Q      Why do you choose to continue
 4    to treat your existing patients with care
 5    that you thought was not efficacious and was
 6    potentially causing them harm after 2013?
 7                    ATTORNEY DROZ:  Objection,
 8           form.
 9                    You can answer.
10           A      So those patients who
11    continue to follow with me, some of whom had
12    surgery, a fair number who were living as
13    the opposite sex, required some hormonal
14    intervention, because they maybe had
15    orchiectomy or oophorectomy, and they chose
16    to, the patients, wanted to stay on those
17    hormones, or they needed to for other
18    reasons.
19                    So it was only appropriate to
20    still continue that.
21           Q      Did you only continue
22    providing care to patients who had undergone
23    surgeries that would affect their hormone
24    production?
25           A      No, some who chose to stay on
```

```
                                        Page 174
 1                      DANIEL WEISS
 2    opposite sex hormones or blockers who still
 3    had their gonads, and they just preferred to
 4    do that.
 5                      And they were not going to be
 6    changing their conception of whether they
 7    felt it was helpful or not.
 8                      And most of those people I
 9    think were getting psychological counseling,
10    were on antidepressants, and had been on
11    treatment for some time, and they just chose
12    to stay on it.
13                      These are all adults, of
14    course.
15          Q       How many people did you
16    continue to treat for gender dysphoria after
17    2013, when you stopped accepting new
18    patients?
19          A       How many did I continue to
20    treat?  I think it was about 30 people I was
21    still seeing at that point.
22          Q       How many of those 30 people
23    underwent a surgery that affected their
24    hormone production?
25          A       Maybe about five to eight or
```

Page 175

1                    DANIEL WEISS

2    so.

3            Q       For the rest you continued to

4    provide cross sex hormones to, regardless

5    of, right?

6            A       Yes.

7            Q       And you didn't tell any of

8    those patients that you believed that the

9    care that you were providing to them had a

10   lack of benefit and, in fact, was

11   potentially harming them, right?

12           A       Well, I always talk about

13   potential harm and the benefit from the

14   psychiatric standpoint, psychological

15   standpoint.

16                   That's where I continued to

17   recommend if, depending upon how they were

18   doing, psychiatric or psychologic follow-up.

19                   And some of them were doing

20   fine, they were adapted, they were okay, and

21   it was just a regular routine visit looking

22   at general medical care.

23           Q       How many of those 30 patients

24   were doing fine on cross sex hormone

25   treatment?

Page 176

1                        DANIEL WEISS

2            A        From a psychological

3     standpoint, I don't recall at this point.

4            Q        Do you have a rough sense of

5     the proportion?  Was it the majority?

6            A        I would say maybe 10, so the

7     majority were not.

8                     Most of them had ongoing

9     depression and anxiety.  One had a suicidal

10    attempt, and that was a person who had had

11    surgery in Thailand, I think.

12                    It was a male to female.

13           Q        And that was the one person

14    out of the 100 that you said, that you

15    believed was really harmed by the treatment

16    in a way that wasn't addressable with

17    medication management, right?

18           A        So, you know, as it -- to be

19    able to honestly evaluate it, I can't prove

20    causation.  It's just -- again, it's an

21    association thing.

22                    That person had surgery, had

23    reassignment, had a faux vagina created and

24    was on antidepressants and had a suicidal

25    attempt, and was on estrogen.

Page 177

```
 1                       DANIEL WEISS
 2                       And what was the cause of
 3      that severe depression and suicidal attempt?
 4      I don't know.
 5                       But hormones at least and
 6      surgical reassignment didn't fix that
 7      person, because there was significant
 8      depression for years after.
 9           Q      Did your political beliefs
10      change in any way in 2022?
11                       ATTORNEY DROZ:  Objection.
12           A      No.
13           Q      Do you feel that doctors have
14      an ethical obligation to provide patients
15      continuity of care if they have to
16      discontinue treating a patient?
17           A      I think it depends on what
18      the science shows in terms of interventions.
19                       And my knowledge of the
20      science is much more than it was back in
21      2013 now.
22                       And so I have learned a lot,
23      even from then, and I looked at the new
24      guidelines and the systematic reviews, and a
25      lot of publications have come out in the
```

Page 178

                          DANIEL WEISS
1
2    last ten years.
3                      But in general, if there is
4    no other option for treatment, and the
5    intervention is the best intervention we can
6    offer the person, then the physician should
7    continue following that person.
8                      Even if it was withdrawing,
9    let's say, a medication that might be pulled
10   from the market because it showed some risk,
11   like Vioxx, it was harmful, it was pulled
12   from the market, but patients might have
13   loved it because it provided pain relief.
14                     Well, if the studies showed
15   that it caused harm, we are going to stop
16   it.  We will try to use something else.
17        Q     If you hadn't moved to Utah
18   in 2022, would you still be treating
19   those -- your existing patients today?
20        A     Yes.
21        Q     Do you know how many of the
22   100 patients over that period experienced
23   some sort of physical harm, like the blood
24   thickening, that you ultimately addressed
25   with medication management?

```
                                        Page 179
 1                  DANIEL WEISS
 2          A      I think it was just a few,
 3   just -- those are the things that come to
 4   mind.
 5                  But the harms that are
 6   described in the literature, with literature
 7   as poor as it is, suggest increased risk of
 8   stroke, clots in the legs, heart attacks,
 9   and in many of those harms are shown only
10   with longer term follow-up.
11                  And of course the literature
12   does not describe long term harms in minors
13   treated who would be, then have longer
14   exposure to these interventions than adults.
15          Q      Sure, but out of your 100
16   person data set, some of whom you followed
17   for a decade, none of the -- none of your
18   patients experienced any of those types of
19   harms, right?
20                  ATTORNEY DROZ:  Objection.
21          A      Other than what I had just
22   came to mind, the worsening of sleep apnea
23   and the erythrocytosis, thickening of the
24   blood.
25                  ATTORNEY KORBERG:  We have
```

```
                                              Page 180
 1                    DANIEL WEISS
 2          been going for a while now.  Is it a
 3          good time to take a break?
 4                  ATTORNEY DROZ:  I'm okay with
 5          it.
 6                  THE VIDEOGRAPHER:  Thank you.
 7          This is the videographer.  I'm going
 8          to go off the record, if that's
 9          okay.  The time is 1:55.  This ends
10          media file 3.
11                  (At this point in the proceedings
12          there was a recess, after which the
13          deposition continued as follows:)
14                  THE VIDEOGRAPHER:  The time
15          is 2:06.  We are back on the record.
16          This begins media file 3.
17          Q      So, returning to the patients
18  that you were treating who you no longer
19  treated when you left the state in 2022, did
20  you make any attempts to find alternative
21  care for them?
22          A      Yes.
23          Q      How did you do that?
24          A      I talked to the
25  endocrinologist I had hired who was
```

```
                                          Page 181
 1                    DANIEL WEISS
 2    remaining in the practice, and he was
 3    willing to see those people who were stable
 4    from a hormonal standpoint, and was willing
 5    to continue providing their hormones.
 6          Q       And did you talk to that
 7    doctor about your concerns that providing
 8    cross sex hormones to people suffering from
 9    gender dysphoria was not safe and effective?
10                    ATTORNEY DROZ:  Objection,
11          form.
12          A       Well, at that point, those
13    patients that he was willing to see, I think
14    they had all had gonads removed.
15                    So, I don't think there was
16    any safety issue in those people from that
17    standpoint.
18                    They were primarily on
19    hormonal replacement, opposite sex hormone
20    replacement.
21          Q       You talked earlier of the 30
22    who you were still seeing at the time of
23    which you moved to Utah, only 5 to 8 had had
24    some sort of surgery that would require some
25    form of hormone replacement, right?
```

Page 182

```
 1                    DANIEL WEISS
 2          A        Right.
 3          Q        So, what happened?  Did you
 4   continue to see the, you know, 25 or so
 5   patients who you were providing care who had
 6   not received surgery that would require some
 7   form of hormone replacement?
 8          A        I don't recall seeing any of
 9   those particular people in that last year I
10   was there.
11                   So I couldn't convey that to
12   them.
13          Q        So, just naturally, like 25
14   of your patients stopped coming to you for
15   care, and the only ones that were remaining
16   were the ones that happened to need some
17   form of hormone replacement therapy as a
18   result of therapy?
19          A        That's my recollection, yes.
20          Q        Did that happen all at once?
21          A        That was gradual, and it was
22   attrition over the course of years.
23                   So, there was, again, a fair
24   number of people who for whatever reason
25   stopped returning.
```

```
                                      Page 183
 1                 DANIEL WEISS
 2        Q        So it's your understanding
 3   that the only patients receiving care for
 4   gender dysphoria that your colleague
 5   continued to treat, were those who needed
 6   some form of hormone replacement therapy?
 7        A        Right.  They had their --
 8   they had orchiectomy or off oophorectomy,
 9   yes.
10        Q        Earlier I believe you
11   testified that at the time you left your
12   practice in Ohio and you moved to Utah, you
13   were still seeing 30 patients --
14        A        Well.
15        Q        -- for gender affirming care?
16        A        I may have misspoke, but that
17   last year I don't recall any patients that I
18   would have turned over to my partner there
19   that were on -- that still had their gonads.
20                 So probably the other
21   remaining patients I might have seen the
22   year before, 2021.
23                 Some of them would come in
24   less frequently, every 6 to 12 months, and
25   then there were a lot of patients who just
```

Page 184

1                    DANIEL WEISS
2  did not come back.
3          Q       Does that mean by the time
4  you ended your practice you were only seeing
5  patients who had been assigned male at
6  birth?
7          A       No, I saw both, biologic
8  females and biologic males.
9                  One of the patients I had
10 seen for many years was a biologic female
11 who had had a penis created, had an
12 oophorectomy, had a mastectomy.
13                 I had seen that person for
14 many years, and saw that person even that
15 last year I was there.
16         Q       And were you seeing any
17 patients who were assigned female at birth
18 who did not have an oophorectomy?
19         A       In that last year it was
20 actually, now that I think of it, there was
21 I think one person who lived relatively far
22 away, and that person still had ovaries, was
23 on testosterone.
24                 I had followed that person
25 for quite some time, and I think that person

```
                                        Page 185
 1                    DANIEL WEISS
 2    was following up with another doctor.
 3            Q       Not the doctor in your
 4    practice who you transferred the rest of the
 5    patients to?
 6            A       Correct.
 7            Q       And did you discuss with that
 8    doctor your belief that providing gender
 9    affirming care was potentially not safe and
10    effective?
11            A       No, and that person I was
12    treating had mastectomy and was -- wanted to
13    continue on the same course.
14            Q       Do you think it was in that
15    patient's best interest to continue
16    receiving cross sex hormones despite not
17    needing them from a surgical perspective?
18            A       I don't know.
19                    That needed to be judged on
20    an ongoing basis, pros and cons versus risks
21    and benefits, with their treating physician.
22            Q       And at least as of the last
23    moment that you were their treating
24    physician, you believed that the benefits of
25    receiving cross sex hormone treatment
```

```
 1                    DANIEL WEISS
 2    outweighed the risks, right?
 3           A      Yeah, that person was about
 4    38 years old.
 5           Q      For those patients that you
 6    continued to treat between 2013 and 2022, do
 7    you believe that your patients would have
 8    benefited by losing access to cross sex
 9    hormone treatment?
10           A      I don't know.  I think
11    probably they would benefit more from more
12    supportive psychotherapy, which they weren't
13    getting, and they would have benefited more
14    than the cross sex hormones.
15           Q      Sure, but imagine a world
16    where you hold the amount of therapy they
17    were getting constant.
18                  Would they have been better
19    off, worse or the same if they were unable
20    to get cross sex hormone treatment during
21    that time?
22           A      I think those people that I
23    was caring for would be better off if they
24    would just have taper-off.
25                  Even with therapy unchanged,
```

```
                                        Page 187
1                    DANIEL WEISS
2      they would be better off without it.
3            Q       But you continued to provide
4      them hormone therapy and cross sex hormones,
5      right?
6            A       I did.
7            Q       So you provided them care
8      that you thought they would have been better
9      off had you not provided it to them, right?
10           A       That's my thinking now, yes.
11                   I think having studied the
12     scientific literature, and in retrospect,
13     seeing the psychological challenge that
14     these people were dealing with, the social
15     factors, and the science all would point to
16     them being better off without it.
17                   But that's adults, too.
18           Q       Presumably every time you
19     wrote a prescription or refilled a
20     prescription for your patients, you were
21     making an individualized assessment of the
22     risks of that treatment versus the likely
23     benefit of that treatment, right?
24           A       Correct.
25           Q       And you determined to
```

```
                                              Page 188
 1                    DANIEL WEISS
 2   continue writing those prescriptions,
 3   refilling those prescriptions and providing
 4   them that treatment, right?
 5            A       In these adults, that's
 6   correct.
 7            Q       And you did so believing that
 8   the harms of those treatments actually
 9   outweighed the benefits for each of those
10   patients, right?
11                    ATTORNEY DROZ:  Objection,
12            form.
13            A       I was worried about the
14   harms, especially when the lack of evidence
15   to support the benefits.
16                    But I did continue them,
17   because it was an individualized decision in
18   discussing it with kind of so-called shared
19   decision-making with the patient.
20            Q       So even if a doctor believes
21   that it is -- that the harms of treatment
22   outweigh the benefits of the treatment, if a
23   patient capable of sound decision-making
24   determines that they would like to continue
25   treatment, you believe the doctor should, in
```

```
                                      Page 189
 1                    DANIEL WEISS
 2    fact, continue to provide that treatment,
 3    even if the doctor believes it is more
 4    harmful than beneficial?
 5                    ATTORNEY DROZ:  Objection.
 6         A         No, I would not make an
 7    absolute statement like that, no.
 8                    I think sometimes the doctors
 9    don't know the evidence.  Sometimes the
10    doctors are conflicted, and often the
11    patient isn't adequately informed or may not
12    be competent to make that judgment.
13                    So, it's complicated, and I
14    think certainly, in the setting of minors,
15    that's -- especially when doctors treat and
16    minors are not competent to make long term
17    decisions, I think that's where the role of
18    the state comes in, I think.
19         Q         Sure.  But in 2021, in your
20    own practice, you continued to provide cross
21    sex hormones to people despite the fact that
22    you are now telling me you believe they
23    would have been better off had you not done
24    so, right?
25         A         Yes, based upon my
```

```
                                          Page 190
 1                    DANIEL WEISS
 2    understanding of the science.
 3                    ATTORNEY DROZ:  Objection to
 4          form.
 5          A        Which I didn't know as much
 6    back then, and there has been systematic
 7    reviews that have been published since then.
 8                    So I think that more is known
 9    about the lack of benefit and the potential
10    harm than was known two years ago.
11          Q        So in 2021, did you think the
12    benefits of providing the treatment
13    outweighed the harms of providing those
14    patients cross sex hormone treatment?
15          A        Yes, at that point I did.
16          Q        And what were the benefits
17    you believed you were providing your
18    patients?
19          A        Well, the physical changes
20    that they felt were positive in their mood,
21    outlook, approach to life, social
22    interactions.
23          Q        Do you think that all doctors
24    should stop providing gender affirming care
25    to adults?
```

Page 191

1                    DANIEL WEISS

2          A      I think it's -- I think they

3    should, based upon the science.  But it's a

4    different matter with adults, who are more

5    likely, although often not, able to be

6    competent and have informed consent.

7                    But adults are a different

8    matter than minors.

9                    But I think the data on

10   adults doesn't support it either, these

11   hormone interventions.

12                   So I don't think they

13   should -- I don't think they should be doing

14   it, but it's available, and it's okay with

15   an adequately informed adult when they seek

16   that intervention.

17                   So I don't think it should be

18   banned for adults.

19         Q      And why did you think gender

20   affirming care should not be banned for

21   adults?

22         A      I think adults are more

23   likely to be able to make a sound decision

24   on risks and benefits.

25                   Some people want that --

Page 192

DANIEL WEISS

1               DANIEL WEISS
2  those physical changes, and if they are
3  consented and they -- adequately, which is
4  very difficult, they can be offered that
5  intervention.
6            But I think that -- I think
7  it's bad, I think there is substantial risk
8  with it.
9            And that consenting process,
10  as one would do in an experiment, that
11  consenting process has to be fair, balanced
12  with a complete exchange of alternative
13  interventions and the potential harms that
14  might result.
15            And I think patients who are
16  fully informed, if they are mentally
17  competent adults, are more likely to decline
18  the intervention.
19      Q    In your personal knowledge,
20  your personal clinical experience with
21  gender affirming care --
22          ATTORNEY KORBERG:  Withdrawn.
23      Q    Outside of reviewing
24  literature, your personal knowledge about
25  gender affirming care is limited to your own

Veritext Legal Solutions
www.veritext.com
212-267-6868        516-608-2400
SER-252

Page 193

```
 1                  DANIEL WEISS
 2   clinical experience, right?
 3        A       Yes, so opposite sex hormones
 4   and blockers relate to my scientific
 5   literature, careful review of the scientific
 6   literature and my clinical experience, yes.
 7        Q       You haven't personally
 8   visited any other clinics other than your
 9   own, right?
10        A       That treat persons with
11   gender dysphoria with hormones?
12        Q       Um-hum.
13        A       No.
14        Q       And you say in your
15   declaration that you observed that your
16   patient has minimal psychologic evaluation
17   and treatment for their significant psychic
18   distress, right?
19        A       Right.
20        Q       Do you know if people seeking
21   gender affirming care in Idaho have minimal
22   psychologic evaluation and treatment for
23   their psychicpsychic distress?
24        A       I know that Planned
25   Parenthood provides prescriptions with
```

Page 194

DANIEL WEISS

1

2       usually the first visit and virtually no
3       psychologic evaluation.
4                       And that's routine.
5            Q        Okay.  Do you know if the
6       majority of people who get gender affirming
7       care in Idaho do so with minimal psychologic
8       evaluation and treatment?
9            A        No, but I suspect that's the
10      case.  I do not know that as a fact.
11           Q        So, does the fact that your
12      adult patients at your clinic, some of whom
13      you were treating more than a decade ago,
14      had what you viewed to be minimal
15      psychologic evaluation and treatment,
16      necessarily mean that minor patients at
17      other clinics have minimal psychologic
18      evaluation and treatment?
19                      ATTORNEY DROZ:  Objection.
20           A        So the descriptions of
21      parents and patients with whom I have --
22      patients I have communicated with, parents
23      of children with gender dysphoria, what's
24      online, desistors, detransitions, all
25      indicates it's virtually universal.

```
                                      Page 195

 1                    DANIEL WEISS
 2                 The experience with the Gibbs
 3      Clinic in the U.K., it's all lip service
 4      that the whistle blowers, Tammy Reed, it
 5      doesn't happen.
 6                 They get hormones, basically.
 7                 They say the word gender, and
 8      they are already on the path to hormonal
 9      interventions.  So there psychologic
10      evaluation is virtually nonexistent.
11                 They dismiss the psychiatric
12      comorbidities, and that's not -- that's
13      consistent with the 100 patients that I had,
14      that those adults, they didn't have much
15      evaluation before I started them on
16      treatment.
17                 But what's described
18      extensively in these other settings that I
19      just delineated, there is no significant
20      evaluation, you know.
21                 And WPATH says they should
22      evaluate them, but they don't really
23      specifically say there should be any
24      treatment.
25                 They just need to be,
```

```
                                    Page 196
 1                  DANIEL WEISS
 2   basically make sure it doesn't interfere
 3   with the medical interventions.
 4         Q      Okay.  So the basis for your
 5   belief that minors accessing gender
 6   affirming care in Idaho are getting minimal
 7   to no psychologic evaluation or treatment is
 8   Reddit, a whistleblower in the U.K.
 9               Anything else?
10         A      The whistleblower was
11   Washington University, Hannah Barnes'
12   lengthy description of the U.K. site,
13   parents with inconvenient truths for
14   transgender site, my interviews online with
15   parents and minors who have had hormonal
16   interventions.
17               Did I leave anything out?
18               That's it.
19         Q      What steps have you taken to
20   become knowledgeable about how gender
21   affirming care is given to minors in Idaho?
22   Which is the subject of this lawsuit.
23               Have you visited any clinics
24   in Idaho?
25         A      No.
```

```
                                    Page 197
 1                  DANIEL WEISS
 2         Q      Have you spoken to any gender
 3    affirming care providers in Idaho?
 4         A      No.
 5         Q      Have you taken any other
 6    steps to become knowledgeable about the
 7    provision of gender affirming care for
 8    minors in Idaho?
 9         A      Specifically in Idaho, no.
10    But there is no reason to think Idaho would
11    be an exception to what's happening around
12    the world.
13         Q      And it's your understanding
14    that in Idaho, gender affirming care
15    surgeries are performed on minors, right?
16         A      I don't recall.  Did I state
17    that in my declaration?
18         Q      You do.
19         A      Okay, then that's my
20    understanding.
21         Q      And the sole source of
22    support for that suggestion is something
23    called the Gender Mapping Project?
24         A      Is that a question?
25         Q      Yes.  What is the Gender
```

```
                                          Page 198
 1                    DANIEL WEISS
 2   Mapping Project?
 3            A       It is a resource online of
 4   clinics that provide hormonal interventions
 5   for children, and I believe adults, too,
 6   with gender dysphoria, and also surgery
 7   sites that will do that.
 8            Q       Do you consider the Gender
 9   Mapping Project a trustworthy source?
10            A       I'm not sure.  I have no way
11   of evaluating it's -- it's quality.
12                    It's a resource where people
13   will report what they see in their locale
14   and they report it without -- because there
15   is concern about being exposed when reported
16   to the site, and they apparently assess it,
17   its accuracy.
18                    But I don't know, I can't
19   speak to its authenticity.
20            Q       But it's the sole support
21   that you rely on for your opinion that
22   gender affirming surgeries are provided on
23   minors in Idaho, right?
24            A       Correct.  I did not call that
25   clinic and make up some story that my
```

Page 199

                    DANIEL WEISS

1

2   daughter wants to have her breasts removed

3   and she's 14.

4              And people have done that

5   kind of thing to provide that information to

6   the Gender Mapping Project, I believe.

7          Q       Do you consider the Gender

8   Mapping Project an unbiased source?

9          A       I think they are -- their

10  belief is that these interventions on minors

11  are not right.

12             If you call that bias, then

13  yes.  But that's a belief based upon what

14  they believe is best.

15         Q       Do you have any qualms about

16  having the sole support for assertions that

17  you make in your declaration be sources that

18  you didn't independently verify, and in

19  fact, think are biased?

20             ATTORNEY DROZ:  Objection,

21         form.

22         A       I didn't say they were

23  biased, and you would have to define biased,

24  too.

25             So I think that that's, the

```
                                            Page 200
 1                   DANIEL WEISS
 2   Gender Mapping Project raises that concern
 3   that surgery is being performed on minors.
 4                 I think that needs to be
 5   further evaluated.
 6                 I'm concerned that that is,
 7   in fact, taking place.  And we know that
 8   hormonal interventions occur, and
 9   mastectomies are the most common surgical
10   intervention on minors with gender
11   dysphoria, and they are being done very --
12   with increasing frequency throughout the
13   U.S.
14        Q      Do you ever facilitate
15   patients seeking to lose weight with gastric
16   bypass surgery?
17        A      Yes.
18        Q      Talking now about the
19   population of your patients receiving
20   hormonal interventions which were not
21   suffering from gender dysphoria, okay?
22        A      Okay.
23        Q      What are the risks when
24   estrogen is provided to cys women?
25        A      Women who are
```

```
                                        Page 201
 1                   DANIEL WEISS
 2   post-menopausal, their estrogen has dropped
 3   down, and if they have hot flashes from low
 4   estrogen, then the risk with estrogen
 5   depends upon their presence of a uterus or
 6   not.
 7                   If they have a uterus, they
 8   need to also have progesterone, because
 9   estrogen alone increases the risk of cancer
10   of the lining of the uterus.
11                   If they don't have a uterus,
12   they can just take estrogen.
13                   There were doctors for quite
14   some time believing that you should give
15   post-menopausal women estrogen, and it would
16   reduce the risk of heart attacks.
17                   And only a big study showed
18   that that was -- that was foolish, and that
19   estrogen increased blood clots, risk of
20   strokes, and progesterone increased risk of
21   breast cancer.
22                   So, it took a large study to
23   show that and doctors were doing what was
24   not best for people until that study came
25   out.
```

Page 202

DANIEL WEISS

1

2    Q    Do the risks that cys gender

3    women without uteruses taking estrogen face

4    differ from those that transgender women

5    taking estrogen face?

6    A    So, transgender women are

7    biologic males.  So there is no -- there is

8    no long term studies on giving males,

9    biologic males estrogen.

10    So we have some data that

11    estrogen increases risk of heart attacks

12    from some old data when they were using it

13    for prostate cancer.

14    So, there is published data

15    now in adults followed with opposite sex

16    hormones, and I have cited that in the

17    declaration.

18    I would have to go back to

19    give you details on that, but there is, yes,

20    there is adverse events in giving estrogen

21    to biologic males.

22    Q    Do those adverse events

23    differ from the possible adverse events of

24    giving estrogen to cys gender women who do

25    not have uteruses?

Page 203

1                           DANIEL WEISS

2           A       Probably, probably, but the

3    data are -- it's not that clear.  There are

4    two different people, two different -- two

5    different sexes.

6           Q       So if the data is not clear,

7    why do you say probably?

8           A       Because the data is weak, so

9    you can't be sure.

10          Q       Right, so you can't be sure.

11   Why do you assume that there is?

12          A       Let's look at the declaration

13   of what it says, because I don't remember

14   those numbers.

15          Q       I'm just asking you as a

16   general matter.

17          A       I can't answer it as a

18   general matter.  There is increased risk of

19   giving biologic males estrogen, yes, there

20   is increased risk.

21                  And what is that risk?

22                  There is blood clots, it's

23   strokes, those are clear.  And maybe some

24   other things, too.

25          Q       But do those differ from the

Page 204

DANIEL WEISS

1    risks of giving estrogen to cys gender women

2    who do not have uteruses?

3          A      We don't know, we don't know.

4          Q      So you don't know, it's not

5    probably?

6          A      It experimental.

7          Q      You are changing your answer.

8    You don't know whether those risks are

9    different or not?

10               ATTORNEY DROZ:  Objection.

11          You are being argumentative.

12          A      I think it is not known.

13          Q      So, am I correct that after

14   32 years as a member of the Endocrine

15   Society you cancelled your membership in

16   2022?

17          A      Yes.

18          Q      And you cancelled your

19   membership over the Endocrine Society's

20   guidelines relating to the provision of

21   gender affirming care for minors, right?

22          A      It wasn't so much the

23   guidelines, it was the fact that they were

24   arguing in the Tavistock case that minors

Page 205

                        DANIEL WEISS
 1
 2   should be allowed to or should be treated in
 3   that fashion.
 4          Q      So even after you stopped
 5   accepting new patients seeking gender
 6   affirming care in 2013, you remained a
 7   member of the Endocrine Society for another
 8   nine years, right?
 9          A      Correct.
10          Q      When you were a member of the
11   Endocrine Society, did you generally follow
12   their guidelines for the treatment of
13   patients?
14          A      Some of them.  It depends.  I
15   critically evaluate each one.  There is --
16   each one is different.
17          Q      So other than gender
18   affirming care, are there any Endocrine
19   Society guidelines you choose not to follow
20   or that you disagree with?
21          A      I would have to look at each
22   individual one.
23          Q      So sitting here today you
24   can't think of any other Endocrine Society
25   guidelines that you choose not to follow or

Page 206

                          DANIEL WEISS

1    disagree with, right?

3         A      Yes, I can think of the

4    approach to aldosterone excess.

5         Q      And what do you disagree

6    with?

7         A      My approach is they recommend

8    extensive evaluation with the hope of doing

9    surgery on some of those people.

10                And my reading of the

11   scientific literature is that surgical

12   interventions are often not helpful in those

13   patients with aldosterone excess, and

14   medication often is sufficient in addressing

15   their problem.

16        Q      In paragraph 177 of your

17   declaration, you say that in the United

18   States there are over 400 clinics and

19   medical offices offering medical

20   interventions for minors with gender

21   dysphoria.

22                For how many of those 400

23   clinics do you know how care is provided to

24   minors with gender dysphoria, and whether

25   adequate psychological evaluations are done

```
                                        Page 207

 1                    DANIEL WEISS
 2    prior to initiating hormone treatment?
 3          A      I would reiterate just what I
 4    said before, that the -- my discussions with
 5    parents and with minors who have had these
 6    interventions, my -- what's seen on Reddit
 7    and Pitt and what was seen in the U.K. and
 8    the whistle blowers, all of those reports
 9    are congruent, and indicate that there is
10    minimal psychologic evaluation in minors
11    with gender dysphoria.
12          Q      Sure.  But of the 400, how
13    many of those clinics do you have knowledge
14    about?
15          A      I don't have specific
16    knowledge about any of them.
17          Q      Your report refers to
18    jeopardy in quotes.  Why is that?
19          A      Because I think it's really a
20    description of a person's feeling.
21          Q      Do you put all feelings in
22    quotes?
23          A      This particular one I do.
24          Q      Why do you put this
25    particular one in quotes?
```

```
                                              Page 208
 1                       DANIEL WEISS
 2           A        Because I think it's -- it's
 3      usage is problematic.
 4           Q        Why?
 5           A        Why are we here today?  This
 6      is a very difficult area.
 7                    The diagnosis -- the term
 8      gender even can't be defined by WPATH.
 9                    Gender clinics describe that
10      they follow WPATH guidelines, and the
11      diagnosis of this gender identity disorder,
12      gender dysphoria, gender incongruence, it's
13      constantly evolving and changing, and
14      basically it's a self-report of the person's
15      description of their feeling.
16                    So I put it in quotes.
17           Q        You do agree that some people
18      really do experience gender related
19      distress, right?
20           A        I would say that many people
21      feel that their distress derives from this
22      discordance or incongruence between what
23      they are in reality, their biologic sex in
24      reality and what they feel they are.
25                    That's affected by so many
```

```
                                        Page 209
 1                    DANIEL WEISS
 2   factors, what's culturally acceptable,
 3   stereotypes.
 4                 And so I think their
 5   attribution of this being gender related
 6   is -- is a misattribution.
 7                 And that's part of the reason
 8   I put it in quotes.
 9        Q      Okay.  But you do agree that
10   some people experience gender related
11   distress, right?
12                 Regardless, we can dispute
13   the origins of that distress, but you agree
14   that some people experience gender related
15   distress, right?
16        A      What do you mean by that?
17        Q      Okay, well, let's go to
18   Exhibit 1, which is your declaration,
19   paragraph 40.
20        A      Okay.
21        Q      You say the goal of treatment
22   of patients with gender dysphoria should be
23   to relieve gender related distress.
24        A      Okay.
25        Q      So what did you mean by
```

Page 210

DANIEL WEISS

1
2  gender related distress, if you will not
3  agree that some people experience gender
4  related distress?
5         A     So, what I mean is this, is
6  in reference to those studies, from the
7  Dutch protocol, that claim that the children
8  they were treating, who were all thoroughly
9  evaluated from a psychologic standpoint and
10  were excluded if they had significant
11  psychological problems, at least in that
12  study, that they felt that their distress
13  was related to this gender.
14         Q     Okay.  So you would agree
15  with me that some people experience gender
16  related distress, right?
17         A     Distress that they relate to
18  their gender, yes.
19              ATTORNEY KORBERG:  You can
20       take down the declaration.
21         Q     How would you diagnose gender
22  dysphoria if not via the DSM checklist?
23         A     I would -- I don't think -- I
24  think gender dysphoria, again, the reason I
25  put it in quotes, is people who have these

Page 211

1                    DANIEL WEISS
2   symptoms that they feel is related to their
3   gender, they have something else that's
4   explaining it.
5                    And so calling it gender
6   dysphoria, I'm not diagnosing it, I would
7   have a therapist see them.
8                    If they say it's gender
9   dysphoria, that's fine.  But I don't think
10  the intervention that is promoted addresses
11  the underlying problem.
12                   This is like an epi
13  phenomenon.  They are saying it's gender,
14  it's not from their -- this is a feeling
15  that they have, but they have other things
16  going on.
17                   And the DSM criteria, you can
18  use that, it's going to be different next
19  year, there is ICD 11 criteria, it changing
20  all the time in response to a variety of
21  factors.
22                   But basically, it's distress
23  related to what the child feels is this
24  incongruence between their biologic sex and
25  what they feel that child feels their sex

```
                                          Page 212

 1                  DANIEL WEISS

 2   ought to be or their gender ought to be.

 3         Q      Do you disagree with the

 4   DSM's diagnosis of gender dysphoria?

 5         A      No.  It's a description,

 6   nothing wrong with it.

 7                But, you know, the WPATH

 8   doesn't require, in adolescents, doesn't

 9   require any distress.

10                WPATH just requires

11   incongruence, and there is WPATH now has no

12   lower age limit.

13                And in fact, a child can say

14   I identify nonbinary, or I identify as a

15   eunuch, and I think I would want to have my

16   testes removed.  That's in WPATH.

17                No lower age limit.

18         Q      Sure.  We are talking about

19   the DSM here, though?

20         A      Sure, but that relates to the

21   diagnosis of gender dysphoria.

22         Q      Do you believe that gender

23   dysphoria should be recognized as a

24   psychiatric diagnosis?

25         A      Yes.
```

Page 213

1                     DANIEL WEISS
2         Q       Is it possible to suffer from
3   gender dysphoria and not suffer from other
4   mental health disorders?
5         A       I don't think so.
6         Q       So, for example, I,
7   personally, told you that I have experienced
8   gender dysphoria since I was a child,
9   consistent with the DSM diagnostic criteria.
10                 You would tell me that I have
11  to be suffering from some other mental
12  health condition, is that right?
13        A       Correct.
14        Q       There is no way possible that
15  I do not suffer from any other mental health
16  condition?
17        A       Is that a question?
18        Q       Yes.
19        A       Oh, I would say no, you just
20  haven't identified it, and you're focusing
21  on gender dysphoria as the sole condition,
22  and that we ought to do whatever medical
23  interventions to help you is misguided at
24  best.
25        Q       Okay.  But do you think there

```
                                      Page 214
 1                    DANIEL WEISS
 2   is any possibility that I could suffer from
 3   gender dysphoria and not have another mental
 4   health disorder?
 5           A       And you have significant
 6   psychic distress related to an incongruence
 7   between the fact that you are this biologic
 8   sex and you feel you should be another
 9   biologic sex or nonbinary, that's what
10   you're telling me?
11           Q       Sure, yes.
12           A       Not possible.
13           Q       There is no way?
14           A       Not possible you have
15   something else going on.
16                   You have psychiatric
17   issues -- psychological issues,
18   psycho-social issues that are not addressed.
19                   They are complicated, and you
20   might not get to them, but you have them.
21           Q       And how are you so certain?
22   What is that based on?
23           A       I think it's just rational,
24   and the literature would be supportive of
25   that, too.
```

Page 215

```
 1                    DANIEL WEISS
 2         Q       The certainty that I am
 3    suffering from some other health disorder is
 4    rationality, it would be impossible, it
 5    would be irrational to think that I do not
 6    suffer from some other mental health
 7    disorder?
 8         A       Right.
 9                 ATTORNEY DROZ:   Objection,
10         form.
11         A       It doesn't have to be
12    serious, and the scientific literature also
13    would be consistent with that.
14                 And especially these last,
15    you know, 15 years or so, most of these
16    children, 70 percent, they have identified a
17    problem, they have identified psychological
18    disorders.
19                 And that's, you know, you
20    have to carefully study each person, but you
21    would identify significant ones I think in
22    everyone.
23         Q       So what about the 30 percent
24    for whom there has been no identified other
25    psychological disorder other than gender
```

Page 216

                              DANIEL WEISS

1
2   dysphoria?
3           A       I think you would identify it
4   in 100 percent if you carefully evaluated
5   each one, 100 percent.
6           Q       How do you know that the
7   gender -- the gender dysphoria isn't causing
8   the various other mental health conditions
9   identified in that purported study?
10          A       Right.  So you're saying that
11  it could be that this psychic distress
12  related to the person's feeling about their
13  being wrong, in the wrong body, that would
14  be another way of saying it, is the real
15  cause for these other things?
16                  It's completely absurd.
17          Q       Why is that absurd?
18                  Why is it not possible that
19  the feeling of and the distress of having
20  been born in the wrong body and perceived by
21  the world as someone other than who you are,
22  would cause anxiety or depression?
23          A       There is no evidence to
24  support that, that so-called minority stress
25  kind of concept.

```
                                           Page 217

 1                   DANIEL WEISS
 2              People are not born in the
 3    wrong body, they are born in the right body,
 4    and it's just they may have distress related
 5    to growing up, adolescence, social factors,
 6    again, a variety of other things in their
 7    environment.
 8              It's just -- there is nothing
 9    to support causation from gender dysphoria.
10         Q     What is there to support
11    causation from depression or sexual assault
12    or an eating disorder or autism to gender
13    dysphoria?
14              ATTORNEY DROZ:  Objection,
15         form.
16         A     Because interventions, in
17    some cases just supportive exploratory
18    therapy resolves the dysphoria.
19              And there are many people
20    over time who no longer have gender
21    dysphoria without treatment.
22              And there is -- and there is
23    desistors and detransitioners who regret
24    having had these interventions.
25              And they say I really had
```

```
                                                Page 218
 1                        DANIEL WEISS
 2    this problem and that problem, and it wasn't
 3    gender that was the issue, it was the fact
 4    that I was physically abused, sexually
 5    abused, there was depression, I felt
 6    bullied, I felt I had no friends, I wanted
 7    to fit in.
 8                    There is emerging and more
 9    and more evidence that it's not causal, it's
10    a description that people latch onto to try
11    to feel better, and doctors are offering
12    this as a simple quick fix.
13                    And then, in addition to
14    that, the statement about gender dysphoria
15    that maybe this is the cause, how do you
16    explain there is a statement that people say
17    well, it's fixed, the gender identity is
18    fixed, you don't change, but then on the
19    other hand, there is all this evidence about
20    fluidity?
21                    So if you're dysphoric and
22    then you've got fluidity, a third of them
23    have fluidity, it doesn't -- it's not
24    consistent to say that gender dysphoria can
25    be the fundamental cause for all these other
```

```
                                       Page 219
 1                     DANIEL WEISS
 2   things in the presence of that evidence.
 3          Q      As a scientist, how can you
 4   tell me that the fact that there exists on
 5   Reddit someone who says that they didn't
 6   actually experience gender dysphoria, they
 7   were really just experiencing anxiety, mean
 8   that it is impossible for someone else to
 9   legitimately experience gender dysphoria and
10   not have anxiety be the cause of that
11   dysphoria?
12                  ATTORNEY DROZ:  Objection,
13          form.
14          A      I'm just citing Reddit, which
15   has whatever, 49,000 members, I'm citing
16   desistors, detransitioners, the resolution
17   of dysphoria untreated, and I have cited
18   those studies, and the presence of gender
19   fluidity.
20                  So, I think the gender
21   dysphoria, you remember, is -- it's a new
22   creation.
23                  It used to be gender
24   identity.  We have had depression and
25   anxiety as DSM diagnoses for decades.
```

```
                                          Page 220
 1                     DANIEL WEISS
 2                 But gender identity disorder
 3     and then gender dysphoria are -- they are
 4     novel.
 5                 And I think to say that they
 6     were the cause of these other things makes
 7     lessens, and is not based upon any good --
 8     you have to have -- in order to show that
 9     its gender dysphoria is the cause for that,
10     you would have to have a treatment that
11     affects just -- it a gender dysphoria pill
12     and then everything else gets better after
13     that.
14                 And we don't have that.  We
15     have now modification of the body for a
16     feeling.
17          Q     So in order to prove
18     causality, what we would need is a pill that
19     treats what we think is the underlying
20     cause, and then if the secondary cause still
21     persists, then we have proven that there was
22     no causality, right?
23                 So we can treat depression,
24     right, with pills.
25                 There are people who --
```

```
                                              Page 221
 1                      DANIEL WEISS
 2                 ATTORNEY DROZ:  Objection to
 3          form.
 4          Q      Who take pills for depression
 5    who continue to experience gender dysphoria.
 6    Their depression is resolved.
 7                 They are not depressed by any
 8    metric.  How then is that not using the very
 9    criteria you say to prove causality here?
10          A      Because, again, you're giving
11    me kind of a general picture here, but the
12    individual person needs to be carefully
13    evaluated, and there is a lot of factors
14    going on.
15                 And I would like to see that
16    study where you're treating the depression
17    and the person still has gender dysphoria.
18                 What else is going on in
19    those people or are is that person sexually
20    abused, and they are maybe no longer
21    dysphoric and hedonic, so they don't meet
22    the criteria for depression, but they still
23    want to exchange their body because they
24    were sexually abused.
25                 So that doesn't answer
```

```
                                    Page 222
 1                   DANIEL WEISS
 2   anything.
 3          Q       Design a study, prove to me
 4   that gender dysphoria is caused by
 5   depression, anxiety, autism or abuse?
 6          A       I think --
 7                  ATTORNEY DROZ:  Objection.
 8          A       The evidence for the
 9   improved -- the resolution with watchful
10   waiting, the evidence that treating post
11   traumatic stress disorder, people figure out
12   that this was really not what I needed to
13   do.
14                  The reports on
15   detransitioners and desistors, those are all
16   evidence that the intervention, because you
17   are only talking about one intervention,
18   which is modification of the body to change
19   a psychologic -- a feeling, a feeling in a
20   person's body that they don't like the way
21   their body is, they feel they are born in
22   the wrong body.
23                  It makes -- it's as much --
24   it's as sensible as, you know, modifying --
25   I give the example of a girl who has
```

```
                                         Page 223
 1                    DANIEL WEISS
 2    anorexia.  She feels she's fat, but she's
 3    really underweight.
 4                    And she wants to have weight
 5    affirming care.  We don't help her lose
 6    weight, we get her to psychological
 7    problems.
 8         Q       So your proof that gender
 9    dysphoria is necessarily absolutely in all
10    cases caused by some other mental health
11    disorder, is that you have desistors
12    self-reporting a comorbidity, depression or
13    abuse, and then assigning causality
14    themselves to that comorbidity.
15                    That's your data, right?
16         A       No.
17                    ATTORNEY DROZ:  Objection.
18         A       No, it's much more than that,
19    because the diagnosis of depression is not
20    just self-reporting, it's diagnosis of
21    depression and post traumatic stress and
22    sexual abuse and physical abuse.  That's
23    more than just self-reporting.
24                    And those, and treating those
25    disorders is certainly less harmful than
```

Page 224

```
 1                    DANIEL WEISS
 2   modifications to the body.
 3          Q       Sure, that may be true for
 4   some subset.  How does the fact that -- are
 5   you saying that there is a study that shows
 6   that treating depression cures someone's
 7   gender dysphoria?
 8                    ATTORNEY DROZ:  Objection;
 9          form.
10          A       There are publications where
11   they have done just therapy, and people's
12   gender dysphoria resolves because they are
13   addressing past traumas -- yes, so there are
14   studies.
15                    They are small, though.
16          Q       Does the fact that that works
17   for some subset of the population, if it
18   does, mean that there is not someone else in
19   the population for whom their gender
20   dysphoria is not caused by other mental
21   health concerns and would not be addressed
22   by other mental health treatment?
23          A       So, there is -- there is --
24   those other mental health or psycho-social
25   factors would need to be addressed, and
```

Page 225

1                     DANIEL WEISS
2    everyone is different, they are complicated,
3    they are complex.
4                     But that doesn't mean that
5    modification of the body in those people who
6    say they are or meet the criteria for gender
7    dysphoria is the treatment for those people.
8                     It is not a treatment, it's
9    an intervention that has shown in minors to
10   not be beneficial.
11                    The data shows it's not
12   beneficial.
13                    So the original study was the
14   Dutch protocol, where they didn't even have
15   these kids with psychiatric comorbidities,
16   or at least they said they didn't.
17                    They ended up having 55 of
18   them there, and at the end of the study,
19   there is no convincing evidence from that
20   where they manipulated the questionnaire or
21   earlier on, where they had more people, that
22   their psychic distress improved.
23                    So the data we have shows
24   that the intervention, which is the
25   intervention you are promoting, is not

```
                                        Page 226
 1                    DANIEL WEISS
 2   helpful and there is clearly evidence of
 3   potential harm.
 4                So that's just pretty
 5   clear-cut.
 6        Q     How does the fact that gender
 7   affirming care doesn't resolve gender
 8   dysphoria for all people in all
 9   circumstances prove that there is not some
10   subset of the population for whom gender
11   dysphoria is unrelated to other mental
12   health conditions?
13                ATTORNEY DROZ:  Objection to
14          form.
15        Q     As a scientist, how does that
16   work?
17        A     So, I think we are talking
18   about two different things.
19                Opposite sex therapy
20   treatment, opposite sex hormones, puberty
21   blockers and surgical -- surgery, the data
22   shows in minors it does not resolve their
23   psychic distress.
24                There is no data that shows
25   that it does.  And there is potential harms.
```

```
                                          Page 227

 1                 DANIEL WEISS
 2                 In the event study, which was
 3   in U.S. gender clinics, I cited that.  It
 4   had opposite sex hormones, this was in the
 5   gender clinics, opposite sex hormones
 6   followed over two years; males, no
 7   improvement in their psychic distress, none.
 8                 And two suicides while on
 9   treatment.
10                 You I shouldn't call it
11   treatment, on these opposite sex hormones,
12   it didn't help them.  So that's one thing.
13                 The interventions and medical
14   interventions modifying the body do not help
15   the dysphoria, period.
16                 The other thing is well,
17   what's the case for the dysphoria?
18                 There is at least 70 percent
19   have these comorbidities.
20                 It's a certainly safe
21   intervention and a reasonable intervention
22   to sort out what is going on in that child's
23   life and just to help their distress,
24   whatever it is, because often it's claimed
25   to be related to be just gender, easily
```

```
                                              Page 228
 1                      DANIEL WEISS
 2   fixed by trying to change their body.
 3                      But if you look at harm
 4   versus benefit, the least invasive
 5   intervention would be addressing these
 6   comorbidities.
 7                      To answer your question, you
 8   said how do I know there is not some who
 9   might just have persistent gender dysphoria,
10   and they might not have anything else.
11                      I don't know of any data that
12   shows that.
13                      And there is no -- and there
14   is, I don't know how that would be studied,
15   but it certainly is clear that from the
16   Dutch study where they didn't have any
17   apparent comorbidities, and they were
18   minors, they did not benefit from
19   modification of the body.
20                      And the more recent studies,
21   where lots of these kids have comorbidities,
22   they don't benefit from those modifications
23   to the bodies.
24                      So I don't know, what's your
25   next question?
```

Page 229

1       DANIEL WEISS

2          Q       Is there any circumstance in

3   which it would be appropriate to provide

4   gender affirming care where, for example,

5   you have a 17 year old who is in regular

6   exploratory therapy, has no history of

7   trauma or other co-occurring disorders, and

8   has persistent gender dysphoria since

9   childhood?

10         A       Such a child does not exist.

11         Q       You're certain that such a

12  child does not exist?  It's impossible that

13  a 17 year old could be in regular gender

14  exploratory therapy, could have no history

15  of trauma or other occurring disorders and

16  had gender dysphoria consistently since

17  childhood?

18         A       So, there are two -- there

19  are three papers that I cited in the

20  declaration that have described changes in

21  gender identity, gender fluidity and

22  resolution of dysphoria in adolescents with

23  no treatment.  No treatment.

24                 So, I would say --

25         Q       How does the existence of

```
                                          Page 230
 1                     DANIEL WEISS
 2   someone improving with treatment prove that
 3   there isn't someone who is in gender
 4   exploratory therapy, has no history of
 5   trauma or co-occurring disorders, and has
 6   persistent gender dysphoria, they are
 7   totally unrelated, how does what you just
 8   suggested prove that?
 9               ATTORNEY DROZ:  Objection to
10        form.
11        A     The conclusion is that person
12   should continue on gender exploratory
13   therapy, because they often change their
14   feelings, or their dysphoria resolves with
15   time.
16        Q     So the way this works is if I
17   presented you someone who is in gender
18   exploratory therapy for five years without
19   history of trauma or co-occurring disorders,
20   and their gender dysphoria didn't resolve,
21   you would just tell me they need five more
22   years of therapy, and then five more years?
23               It is impossible to prove to
24   you that you are perhaps not correct?
25               ATTORNEY DROZ:  Objection,
```