APPEAL NO. 24-142

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PAM POE, by and through her parents and next friends Penny and Peter Poe, et al.,

*Plaintiffs-Appellees*,

v.

Raúl LABRADOR, in official capacity as Attorney General of the State of Idaho, et al.,

*Defendants-Appellants*,

and

JAN M. BENNETTS, in official capacity as Ada County Prosecuting Attorney, et al.

*Defendants.*

On Appeal from the United States District Court
for the District of Idaho / Case No. 1:23-cv-00269-BLW

## SUPPLEMENTAL EXCERPTS OF RECORD OF APPELLEES
## VOLUME 2 of 3

Li Nowlin-Sohl
(admitted only in
Washington)
Chase B. Strangio
James D. Esseks
AMERICAN CIVIL LIBERTIES
UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
jesseks@aclu.org
cstrangio@aclu.org

Richard Eppink
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop

Brad S. Karp
Alexia D. Korberg
PAUL, WEISS, RIFKIND,
WHARTON &
GARRISON LLP
1285 Avenue of the
Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com

Eric Alan Stone
GROOMBRIDGE, WU,
BAUGHMAN AND
STONE LLP
565 Fifth Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0034
eric.stone@groombridgewu.com

Philip S. May
GROOMBRIDGE, WU,
BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite
1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgew
u.com

Jordan E. Orosz
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON
LLP
2001 K Street, NW
Washington, DC 20006-
1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Dina Flores-Brewer
Paul Carlos Southwick
(admitted only in Oregon)
Emily Myrei Croston
(admitted only in the District
of Columbia)
ACLU OF IDAHO
FOUNDATION
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org
psouthwick@acluidaho.org
ecroston@acluidaho.org

*Counsel for Appellees*

Page 231

                         DANIEL WEISS

1            argumentative; form.

2            A       It's possible to prove to me

3    if you give me a sensible example.  That's

4    not sensible and that person does not exist.

5                    Because the usual approach

6    now for an adolescent who might say they are

7    gender dysphoric is the conveyor belt of

8    social transition and then hormonal

9    interventions and then often surgery.

10   That's the usual approach.

11                   It's -- I can't imagine a

12   child with gender dysphoria that appears to

13   only have gender dysphoria having five years

14   of exploratory psychotherapy, most kids

15   don't have exploratory psychotherapy at all.

16           Q       So the fact that most kids do

17   in fact get to receive gender affirming care

18   means that it is impossible that there is a

19   child, who instead of receiving gender

20   affirming care, is put by his parents,

21   perhaps, who don't believe gender dysphoria

22   is real, into gender exploratory therapy?

23           A       They probably lose custody of

24   the child and domestic services will get

```
                                              Page 232
 1                      DANIEL WEISS
 2    them, for not affirming them.
 3           Q       It's your belief that someone
 4    who does not give their child cross sex
 5    hormones is going to have Child Protective
 6    Services take aware their child?
 7           A       Often.
 8           Q       Not in Idaho, right?  In
 9    Idaho it is literally going to be illegal
10    for that child to get gender affirming care,
11    right?
12           A       Do you have a question?
13           Q       Does having access to
14    hormones or surgery preclude patients from
15    also accessing gender exploratory treatment
16    that you think is more appropriate for
17    gender related distress?
18           A       It depends on the state laws.
19    So, some laws have required therapists only
20    to so-called affirm.
21           Q       I don't understand that.  Is
22    it impossible for someone to be receiving
23    hormones or hormonal gender affirming care
24    and also be in gender exploratory therapy?
25           A       No, that's possible.
```

Page 233

                            DANIEL WEISS

1

2          Q       So let's assume that you are

3    right, that a regime of puberty blockers,

4    opposite sex hormones and ultimately surgery

5    doesn't work for everyone.

6                   Is it still possible that a

7    regime of publicity blockers, opposite sex

8    homicide and ultimate surgery would benefit

9    some people, person suffering from gender

10   dysphoria?

11                  ATTORNEY DROZ:  Objection,

12        form.

13         A       Well, the question, I think

14   we need to be clear about what you mean by

15   benefit and work.

16                  If you are talking about

17   psychic distress related to this just gender

18   incongruence, it might help them with that,

19   but it might be a much less -- much simpler

20   and less harmful intervention where they can

21   understand where their rejection of their

22   natal sex derives from, and feel less

23   anxious, less depressed and so on.

24         Q       Is the only way in your mind

25   to treat gender dysphoria to have, at the

Page 234

                        DANIEL WEISS

1

2    end of the day, the person say that they

3    identify with the sex they were assigned

4    with at birth?

5          A        Absolutely not, no.

6                    No, we are talking about

7    minors, of course, but the goal of any

8    intervention, as per the Dutch Protocol, the

9    developer of the Dutch Protocol and others

10   say is to relieve psychic distress, period,

11   just psychic distress.

12                   Whatever they have, and if

13   they attribute it to gender dysphoria,

14   gender incongruence, fine, you still want

15   the relief of psychic distress.

16                   Whatever gender they or

17   non-binary they feel comfortable with, they

18   identify with, you want their psychic

19   distress to be relieved.

20                   So, that's the goal of

21   treatment, to have them not depressed, not

22   anxious, be good in terms of psycho-social

23   functioning, job, family, so on, work.

24         Q        Okay, so it's possible that

25   for some people, cross sex hormones helps

Page 235

1                    DANIEL WEISS
2    relieve gender related distress, even if you
3    believe it would have been more efficacious
4    to have just had gender exploratory therapy?
5                    ATTORNEY DROZ:  Objection,
6            form.
7            A       So, in your question you are
8    implying causation.
9                    I don't think the opposite
10   sex hormones, gender affirming surgery and
11   all that would be the reason for the
12   improvement.
13                   Maybe the person would have
14   improved over time.  Maybe they got
15   psychological counseling also.
16                   So it's complicated, but --
17   so just because they improved after that
18   intervention, doesn't mean that was the
19   reason that they improved.
20                   And that's the problem with a
21   lot of these very poor, low quality evidence
22   that's published.
23                   There are psychological
24   interventions in the example I gave, the
25   study by Chen,  et al, published by the New

Page 236

```
 1                    DANIEL WEISS
 2   England Journal of Medicine this year, he
 3   had two years of treatment.
 4                    These were minors who were
 5   seen in QS gender clinics.
 6                    They had opposite sex
 7   hormones and they -- the males did not
 8   improve at all in terms of their psychic
 9   distress.
10                    And again, there was two
11   suicides, a very high suicide rate in this
12   group.
13                    Now, maybe the females got
14   better.  Was it from the opposite sex
15   hormones they got?
16                    I don't know.  Maybe it was,
17   two years they would have gotten better,
18   maybe it was the support of being in a
19   study, maybe it was the psychological
20   counseling.
21                    So I don't think we -- we
22   shouldn't be sure about causation just
23   post-hoc here or propter hoc.
24          Q        Right, we cannot be -- I
25   certainly agree we cannot be certain of
```

Page 237

1                    DANIEL WEISS
2    causation.
3                    You would agree, likewise,
4    that if you had a study where people
5    suffering from -- there are some number of
6    people suffering from gender dysphoria
7    attempted suicide, we cannot know how many
8    people would have -- how many more people
9    would have attempted suicide had they not
10   gotten access to gender affirming care,
11   right?
12                   ATTORNEY DROZ:  Objection,
13          form.
14        A       Right.  Or how many less
15   people would have been attempted suicide if
16   they didn't get these interventions.
17                   Because I think the bulk of
18   the evidence shows it actually increases
19   suicide risk.
20                   You can argue with the
21   quality of the evidence, but the best
22   evidence suggests it increases suicide risk,
23   not decreases.
24                   I would argue with any
25   suggestion otherwise.

Page 238

```
 1                    DANIEL WEISS
 2          Q        What's the causal proof of
 3   that?
 4                    Is there a control study
 5   where you have people from the same
 6   population who were denied access to gender
 7   affirming care?
 8          A        So, those who promote these
 9   interventions refuse to do any comparative
10   studies, any controlled studies.
11                    But the studies we have,
12   which are described in my declaration, all
13   point to an apparent increased suicide rate
14   as compared to a control population who --
15   control population.
16                    For example, in the Chen
17   study, this is just over a two year period,
18   we are talking about minors, most of the
19   data is with adults, but in the Chen study
20   they had minors, and they had two suicides
21   in this small study, two suicides in a small
22   study over two years on opposite sex
23   hormones.
24                    Now, that's pretty
25   embarrassing to have that happen in these
```

```
                                        Page 239
 1                      DANIEL WEISS
 2    top notch gender clinics during treatment
 3    with these hormones that are supposed to
 4    help their mood, depression, anxiety,
 5    dysphoria, that suicide rate is 45 times
 6    higher than the general population in that
 7    age range, 45.
 8                  That's much higher than even
 9    children who would have depression.  That's
10    really high.
11          Q     Okay, but again, we are just
12    talking about correlation.  There is nothing
13    in that study to suggest causation, right?
14          A     That's correct, but -- that's
15    right, we don't have good data, but the data
16    that is available doesn't look like it's
17    helpful.
18          Q     Okay, let's look, let's turn
19    to page 28 of Exhibit 1 of your deposition,
20    which is where we discuss this.
21                  ATTORNEY KORBERG:  Can we
22          pull up that Exhibit 1, please.
23                  ATTORNEY DROZ:  Are we
24          getting close to a point for a
25          break, lunch a little bit?
```

```
                                          Page 240
 1                        DANIEL WEISS
 2                  ATTORNEY KORBERG:  Sure, we
 3          can do that now.
 4                  ATTORNEY DROZ:  Whenever you
 5          are ready, I am just throwing it out
 6          there.
 7                  ATTORNEY KORBERG:  Yeah,
 8          since we are here now, why don't we
 9          do this, then we will take a break.
10          Somehow that --
11                  ATTORNEY DROZ:  Sounds great.
12          Q       Can you go to the top of page
13     28.
14                  So your conclusion is that
15     hormonal and surgical treatments for gender
16     dysphoria do not reduce suicide risk, right?
17          A       Yes.
18          Q       And I have to admit that this
19     section really confused me, and the reason
20     it confused me is because every single study
21     that you cite merely concludes that
22     transgender people committed suicide at
23     higher rates than non-transgender people.
24                  Do you agree with that?
25          A       In general, yes.  The studies
```

Page 241

                              DANIEL WEISS

1       I'm citing also are in people on -- already

2       treated.

3              Q      Sure.  The only conclusion we

4       can draw from your studies, though, is that

5       transgender people committed suicide at

6       higher rates than non-transgender people,

7       and that cross sex hormones did not entirely

8       eliminate suicidality, right?

9              A      I think it's a little more

10      nuanced there.

11                     So the -- in that first, in

12      the section 89, the rate of suicide in youth

13      with distress attributed gender appears

14      similar to the rate in youth with other

15      mental health disorders.

16                     That's one, right?

17                     So, yes, it's higher than the

18      youth who are not seen for psychiatric

19      disorders.  It's higher in those with gender

20      dysphoria.

21                     But on the whole, the suicide

22      rate in transgender youth is low.  I mean,

23      that 13 out of 100,000 versus 15 -- sorry,

24      11.8 out of 100,000.

```
                                            Page 242

 1                      DANIEL WEISS
 2              So it's not a high suicide
 3   rate.  It is actually very low, although
 4   it's higher than people have with mental
 5   health disorders.
 6        Q     Can you point me to any study
 7   that compared suicide rates for transgender
 8   people who had received hormonal and/or
 9   surgical treatment against the suicide rates
10   for transgender people who were denied
11   access to hormonal and/or surgical
12   treatment?
13                  ATTORNEY DROZ:  Objection to
14          form.
15        A     I'm looking at my declaration
16   here.  No, the comparisons are to -- you
17   have a general population.  These are --
18   these are people with gender dysphoria who
19   had interventions, they had access to the
20   interventions, and -- one moment.
21                  No, so if you are looking for
22   a prospective group, prospective study, this
23   is what you need, a prospective study, to
24   show that those who had the -- these
25   interventions compared to a similar matched
```

```
                                    Page 243
 1                    DANIEL WEISS
 2    group who were not given the interventions,
 3    had whatever, lower, higher, similar suicide
 4    rates.
 5                  That study has not been done.
 6         Q      Okay, great.
 7                  So you would agree with me
 8    that it is impossible to conclude that
 9    hormonal and surgical treatments for gender
10    dysphoria do not reduce suicide risk without
11    comparing suicide rates of trans people who
12    received hormonal or surgical treatments
13    versus similar trans people who were denied
14    hormonal and surgical treatments, right?
15                  ATTORNEY DROZ:  Objection to
16          form.
17         A      I don't think I would agree
18    with that.  Because I think if you're
19    claiming that these interventions really
20    reduce the risk of suicide, the suicide risk
21    in people who have had hormonal or surgical
22    interventions are extremely high, they
23    remain extremely high as compared to the
24    control population.
25                  And if they were -- these
```

```
                                          Page 244

 1                     DANIEL WEISS
 2   interventions were really effective, they
 3   would not be that high.
 4          Q      Well, that's a different
 5   question, isn't it?
 6                  That's a question of how
 7   effective are they.
 8                  I'm talking about -- you have
 9   your opinion the hormonal and surgical
10   treatments for gender dysphoria do not
11   reduce suicide risk, right?
12                  It may be that they reduce
13   suicide risk some small amount, but you have
14   no proof that hormonal and surgical
15   treatments for gender dysphoria do not
16   reduce suicide risk, right?
17          A      I would say --
18                  ATTORNEY DROZ:  Objection to
19          form.
20          A      I would say that the hormonal
21   and surgical interventions, that despite
22   hormonal and surgical interventions, suicide
23   risk in these people is extremely high, and
24   it's not clear whether they -- these
25   interventions increase or decrease or do not
```

Page 245

1                    DANIEL WEISS
2    change the suicide risk at all.
3                    They are extremely high as
4    compared to the control population.
5                    But they obviously don't
6    decrease it much, because they are so much
7    higher than the control population, despite
8    the interventions.
9         Q    Okay.  But you cannot say
10   that hormonal and surgical treatments do not
11   reduce suicide risk, right?
12        A    I would say I can't say it
13   versus an untreated population.
14                 ATTORNEY KORBERG:  This is a
15            good time for a break.
16                 THE VIDEOGRAPHER:  This is
17            the videographer.  The time is 3:24.
18            This ends media file 4.
19                 (At this point in the proceedings
20            there was a luncheon recess, after which
21            the deposition continued as follows:)
22                 THE VIDEOGRAPHER:  The time
23            is 3:47.  We are back on the record.
24            This begins media file 5.
25

```
                                          Page 246
 1                   DANIEL WEISS
 2    CONTINUED EXAMINATION BY
 3    ATTORNEY KORBERG:
 4
 5          Q      So Dr. Weiss, you are here as
 6    an expert witness in support of HB 71,
 7    right?
 8          A      Yes.
 9          Q      Can you please explain to me
10    what you know about HB 71, what exactly it
11    prohibits, what the penalties are for
12    violations, et cetera?
13          A      It bans hormonal and surgical
14    interventions on minors with gender
15    dysphoria.
16          Q      And what are the penalties
17    for violations?
18          A      I don't recall the penalties.
19          Q      Did you ever know what the
20    penalties were for HB 71?
21          A      Yes, I read the bill, but I
22    just don't remember them right now.
23          Q      Are there any penalties that
24    you think would be too extreme for doctors
25    providing gender affirming care to minors?
```

Page 247

1                          DANIEL WEISS

2          A          That would in general be too
3    extreme?

4          Q          Yes.

5          A          Execution would be too
6    extreme.

7          Q          What about life imprisonment?

8          A          I think that would be
9    extreme.

10         Q          What about 30 years'
11   imprisonment?

12         A          I think that's extreme, too.

13         Q          What about 20 years'
14   imprisonment?

15         A          That's extreme.

16         Q          What about 10 years'
17   imprisonment?

18         A          Not sure.

19         Q          What about 15 years'
20   imprisonment?

21                     ATTORNEY DROZ:  Objection.

22         A          I'm not sure.  I think the
23   intent I think of the bill is to make it --
24   to ban it, is to stop it, and you have to
25   have firm penalties to discontinue this

Page 248

```
 1                    DANIEL WEISS
 2   harmful, these harmful interventions.
 3           Q       So up to 15 years'
 4   imprisonment for doctors providing gender
 5   affirming care might be reasonable in your
 6   mind?
 7           A       I'm not sure.
 8           Q       Do you have any concerns
 9   about HB 71 going into effect?
10                   ATTORNEY DROZ:  Objection to
11           form, vague.
12           A       Not that I can think of at
13   this time, no.
14           Q       So if I let you know that HB
15   71 carries the same penalties as, criminal
16   penalties as manslaughter, including up to
17   10 years' imprisonment, does that change
18   your opinion on the reasonableness of HB 71?
19           A       No.
20           Q       Do you think there should be
21   any exceptions to HB 71?
22                   ATTORNEY DROZ:  Objection,
23           form, vague.
24           A       Not that I can think of, no.
25           Q       So HB 71 would ban clinical
```

```
                                        Page 249
 1                    DANIEL WEISS
 2    research into gender affirming care for
 3    minors in Idaho.  Would you agree?
 4            A       Yes.
 5            Q       Do you support that, a ban on
 6    clinical research on gender affirming care
 7    for minors?
 8            A       I believe some research is
 9    being done, and I would support a ban in
10    Idaho into such research.
11            Q       You would support a ban on
12    such research in Idaho because such research
13    is being legally done otherwise, is that
14    right?
15            A       I don't think there is need
16    for clinical research on hormonal
17    interventions in children who have normal
18    puberty.
19                    But, for those people who
20    feel it's important to do such research,
21    there are venues for such research in the
22    world.
23            Q       So it's your opinion that
24    there is not sufficient data to prove the
25    safety and efficacy of gender affirming care
```

Page 250

```
 1                    DANIEL WEISS
 2    for minors, right?
 3                    ATTORNEY DROZ:  Objection,
 4          form, vague.
 5          A       There is evidence that the --
 6    these interventions on minors are harmful
 7    and do not improve psychic distress related
 8    to gender dysphoria or other psychic
 9    distress.
10          Q       Do you think there is
11    sufficient evidence to prove that hormonal
12    interventions on minors are harmful?
13                    Is that correct?
14                    ATTORNEY DROZ:  Objection,
15          form.
16          A       There is sufficient evidence
17    that hormonal interventions in minors with
18    gender dysphoria is not helpful, and there
19    is reason to believe based upon the evidence
20    that we have that it's harmful.
21          Q       So, you cannot yet conclude
22    from the evidence that it is harmful for
23    minors to receive hormonal interventions,
24    but you think the evidence suggests that
25    there is reason to believe that's the case,
```

Page 251

```
 1                    DANIEL WEISS
 2   is that right?
 3           A        No, it is harmful in that it
 4   interferes with normal puberty, brain
 5   development and many other things.
 6                    So, there is evidence of
 7   harm, and there is no evidence of benefit.
 8           Q        So the evidence of harm is
 9   that hormonal interventions interfere with
10   puberty and brain development, is that
11   correct?
12           A        We can go through our
13   declaration, my declaration, listing
14   concerns about harms.
15                    Much of those are derived
16   from data in adults, but there is evidence
17   of harm, and one obvious harm is you're
18   interfering with normal pubertal development
19   in children.
20           Q        Is there any evidence of harm
21   for children who delay puberty through
22   puberty blockers and then experience a
23   puberty consistent with the cross sex
24   hormones that they subsequently take?
25           A        There is evidence of harm to
```

```
                                      Page 252
 1                    DANIEL WEISS
 2    the children who had puberty blockers and
 3    then opposite sex hormones when those are
 4    used for treatment of gender dysphoria, yes.
 5          Q       And is there always harm,
 6    regardless of the period of time where
 7    puberty was delayed before the
 8    administration of cross sex hormones?
 9          A       The data would indicate that
10    yes, there is always harm.
11          Q       And what data is that?
12          A       Well, let's go -- I would
13    go -- let's go to my declaration and we can
14    look at opposite sex hormones section.
15          Q       Do you think that all gender
16    affirming care for minors should be
17    outlawed?
18          A       All hormonal --
19                  ATTORNEY DROZ:  Objection,
20          just vague as to --
21          A       All hormonal interventions in
22    minors who are being treated for gender
23    dysphoria, yes.
24                  I think those hormonal
25    interventions which are intended to relieve
```

Page 253

                          DANIEL WEISS

1
2   psychic distress attributed to gender
3   dysphoria should be outlawed.
4          Q      Would you support HB 71
5   becoming the law of the land in the United
6   States?
7          A      Yes.
8          Q      You would agree if HB 71
9   became the law of the land in the United
10  States, there would be no more clinical
11  research into cross sex hormones or puberty
12  blockers on minors in the United States,
13  right?
14         A      Correct.
15         Q      And you don't have any
16  concerns about the -- there being no more
17  advancement in terms of U.S. research into
18  gender affirming care for minors?
19         A      There would be -- there could
20  be advancements, absolutely could be
21  advancements.
22                How?
23                Don't use opposite sex
24  hormones.
25                Don't use medical

Page 254

DANIEL WEISS

1    interventions to modify the body to help
2    people who have psychic distress related to
3    gender dysphoria.
4
5              You could still research it,
6    you can do other interventions where they
7    are helping people's psyche and relieve
8    their distress through other means that do
9    not produce irreversible changes in their
10   body, potential infertility and other harms.
11        Q    Okay.  So as a scientist, you
12   don't think that there needs to be any more
13   clinical research into the effects of
14   providing puberty blockers or cross sex
15   hormones to children, minors who are
16   experiencing gender dysphoria, is that
17   right?
18        A    That's correct.
19        Q    Can you conceive of a version
20   of this law you would support as protecting
21   patients, but was less extreme in some way?
22             ATTORNEY DROZ:  Objection,
23        form.
24        A    Well, these medical
25   interventions and often subsequent surgery

```
                                        Page 255
 1                    DANIEL WEISS
 2    on children with a mental health disorder, I
 3    think they are extreme.
 4          Q       What would your opinion be of
 5    a law that required parents to pass a test
 6    on the risks of gender affirming care for
 7    their minor children?
 8                    ATTORNEY DROZ:  Objection,
 9           form; vague.
10          A       Say that one more time?
11          Q       Sure.
12                   So, let's take a step back.
13                   Adolescents, do you believe
14    that adolescents can't give informed consent
15    under any circumstances, right?
16          A       Correct.  They can't, they
17    can give ascent, but not informed consent,
18    correct.
19          Q       And the way that adolescents
20    receive medical treatment, including
21    experimental medical treatment, is that
22    their parents give informed consent on their
23    behalf, right?
24          A       Right, and the child can give
25    ascent, correct.
```

Page 256

1                    DANIEL WEISS

2          Q       Do you think that parents

3     should be prohibited from giving informed

4     consent on behalf of their minor children as

5     a general matter?

6          A       No.

7          Q       Do you think that parents

8     should be prohibited from giving informed

9     consent on behalf of their minor children to

10    access gender affirming care and puberty

11    blockers and cross hormone treatment?

12         A       Yes, I think they should --

13    they should not be giving informed consent

14    or approving a procedure that is not

15    beneficial, clearly, and it's harmful.

16                 So that would be, the same

17    reason that a parent cannot deny, for

18    example, or in many states, they can't deny

19    chemotherapy for a treatable cancer.

20         Q       So this is an area where I

21    think no matter how informed parents are,

22    they just should not be able to give

23    informed consent?

24         A       Not for this, not for this,

25    correct, because it's not -- it's not --

Page 257

                    DANIEL WEISS

1  there is -- it's very difficult to get

2  adequate informed consent because of those

3  people who are convinced that it's the only

4  way to go and because this -- the scientific

5  evidence that is available indicates harm

6  and not benefit.

7          Q        So let's say hypothetically

8  that there is a 17 year old who has been

9  suffering from gender dysphoria their whole

10 life, and their parents come to you and say

11 we would love to -- we have all the time in

12 the world, we are incredibly educated, we

13 would love you to explain to us all of the

14 risks and walk us through the science on why

15 you think it is harmful for our child to

16 access puberty blockers or cross sex

17 hormones, okay?

18         A        Right.

19         Q        And let's say at the end of

20 multiple days of sitting with you these

21 parents just disagree about the literature.

22         A        Okay.

23         Q        Do you think that they and

24 their child's doctor, if a doctor thinks it

Page 257

                    DANIEL WEISS

1   there is -- it's very difficult to get

2   adequate informed consent because of those

3   people who are convinced that it's the only

4   way to go and because this -- the scientific

5   evidence that is available indicates harm

6   and not benefit.

7           Q        So let's say hypothetically

8   that there is a 17 year old who has been

9   suffering from gender dysphoria their whole

10  life, and their parents come to you and say

11  we would love to -- we have all the time in

12  the world, we are incredibly educated, we

13  would love you to explain to us all of the

14  risks and walk us through the science on why

15  you think it is harmful for our child to

16  access puberty blockers or cross sex

17  hormones, okay?

18          A        Right.

19          Q        And let's say at the end of

20  multiple days of sitting with you these

21  parents just disagree about the literature.

22          A        Okay.

23          Q        Do you think that they and

24  their child's doctor, if a doctor thinks it

Page 258

1                        DANIEL WEISS
2       is likewise in that 17 year old's best
3       interest to access gender affirming care, do
4       you think that they should be prevented from
5       getting that medical care for their child?
6               A       Yes.
7                       I would also say I probably
8       didn't explain it to them well if they still
9       are convinced that it's the way to go.
10              Q       What would your opinion be of
11      a law that says that minor children can only
12      receive hormonal treatment if they first
13      have been treated with psychotherapy and
14      that psychotherapy proved unsuccessful at
15      relieving their suffering?
16              A       I would still be opposed to
17      such a law, because it would imply that the
18      hormonal interventions, opposite sex
19      hormones, puberty blockers, surgery, are
20      helpful interventions, whereas the evidence
21      we have is that they are not helpful and
22      that they are harmful.
23              Q       In your declaration you
24      assert that countries with longer experience
25      than the U.S. have curtailed hormonal and

```
                                          Page 259
 1                    DANIEL WEISS
 2    surgical interventions, right?
 3           A      Yes.
 4           Q      And you refer to a number of
 5    countries, including the U.K., Sweden and
 6    Denmark, among others, right?
 7           A      Yes.
 8           Q      Do you agree with the current
 9    approach that each of those countries takes
10    with regard to gender affirming care for
11    minors?
12           A      I think they should be --
13    some of them should be even more firm.
14                  The U.K. bans basically bans
15    these interventions on children under the
16    age of 16.  So I think that's a clear
17    approach.
18                  And the others are pretty
19    close to bans.
20           Q      Just to be clear, are there
21    any of these countries where you think we
22    should adopt their approach?
23           A      No, I think the -- the ban
24    that Idaho has is a very reasonable
25    approach, given the environment in the
```

```
                                            Page 260
 1                    DANIEL WEISS
 2   United States, where some more -- somewhat
 3   more cautious approaches are stated in some
 4   of these European countries.
 5                    Now, all of them place
 6   psychological counseling as the primary
 7   intervention, and great reserve or caution
 8   in the use of any kind of or bans in the use
 9   of any client of irreversible medical
10   intervention.
11                    But in the United States, I
12   think that kind of more -- somewhat more
13   liberal approach that's not quite as strict
14   would not work, for whatever reason, I don't
15   think it would work.
16        Q        Why would such an approach
17   not work in the United States?
18        A        I think because these are --
19   each of these countries, their healthcare
20   system is different than the U.S.
21                    So there can be kind of
22   healthcare guidelines that govern the whole
23   country.
24                    And here we have various
25   states with their different regulations, and
```

Page 261

DANIEL WEISS

1          DANIEL WEISS
2     we have, in the United States, financial
3     incentives that play a role in healthcare,
4     and you don't have that in Denmark, U.K.,
5     France and so on.
6          Q     So, just to be clear, are
7     there any countries that you think have an
8     appropriate legal policy with regard to
9     gender affirming care for minors?
10         A     I think the U.K. looks --
11    it's good from what I have seen of their
12    most recent statement, which is basically no
13    medical interventions in children under 16.
14              And the primary intervention
15    in those 18 -- under 18 is psycho-social
16    intervention and psychological support.
17              So they have a window of 17,
18    18, where they will give you at least a
19    little bit, perhaps, unclear there.
20              There still is psychological
21    intervention, but they may allow for medical
22    interventions there.  And that's the U.K.
23         Q     And you would agree that the
24    U.K. policy is that teens who have already
25    been receiving gender affirming care can

Page 262

```
 1                    DANIEL WEISS
 2    continue to receive that treatment, right?
 3            A       No.  No, they have to not
 4    have started before the age of 16, otherwise
 5    it's discontinued.
 6            Q       Well, let's break this down.
 7                    Is it your opinion that the
 8    U.K. bans treatment, or that the U.K. just
 9    won't have public funding, like through the
10    NHS for gender affirming treatment for
11    minors under the age of 16?
12            A       I'm not sure on that.  My
13    understanding is it was a ban for under 16.
14            Q       So if I told you that even in
15    the U.K., as long as you privately fund
16    treatment, you can access gender affirming
17    care and hormone treatment for your minor
18    children under the age of 16?
19            A       That's unfortunate if that's
20    true.
21            Q       Okay.  So you also -- does
22    that mean that you also don't agree with the
23    legal regime in the U.K.?
24            A       If it allows for under 16
25    year olds, yes, to access it outside of a
```

```
                                        Page 263
 1                 DANIEL WEISS
 2   governmental system, yes.
 3        Q     Is there any country that you
 4   think takes an appropriate legal approach to
 5   gender affirming care for minors?
 6        A     Well, multiple countries are
 7   very close to bans, but they are not strict
 8   bans like we are looking at here with this
 9   bill.
10              But again, their healthcare
11   is quite different, and most people do not
12   seek care outside of the government system.
13        Q     So, just to be clear, no
14   country in the world, to your mind, goes far
15   enough with regard to banning gender
16   affirming care without exception, right, for
17   minors, without exception, right?
18        A     Yes.  If indeed, as you said,
19   you can access it in the U.K. outside of the
20   government system, I would agree, yes, they
21   do not go far enough.
22              But they are moving, you
23   know, it's taken them a long time, decades
24   of experience, and they have finally learned
25   from their studies that these interventions
```

Page 264

```
                        DANIEL WEISS
 1
 2    appear to be experimental, not helpful, and
 3    so psychological support is the primary
 4    intervention that's used.
 5                     And if we did -- if they had
 6    something like that in Idaho where oh, we
 7    would encourage psychological support, we
 8    are not going to ban it, it's going -- it
 9    won't change the situation, I think, there
10    would still be perfunctory psychological
11    intervention, and unless there is penalties,
12    there will be no improvement, no reduction
13    in the harm that minors are suffering.
14         Q      Are there any studies showing
15    that puberty blockers alone, absent cross
16    sex hormones, impact fertility?
17         A      No, but most of those -- not
18    that I know of, but 95 percent or so of
19    children who start puberty blockers for
20    gender dysphoria go onto opposite sex
21    hormones.
22                     So that kind of -- it's a
23    little immaterial, because if it's only 5
24    percent that don't, you're basically making
25    infertile all those children who are -- who
```

```
                                            Page 265
 1                    DANIEL WEISS
 2   move on, 95 percent, who move on from
 3   puberty blockers to opposite sex hormones,
 4   you are impacting their fertility.
 5            Q       So it's your opinion that
 6   everyone on opposite sex hormones is
 7   rendered infertile by those hormones?
 8            A       It depends on when they
 9   are -- when that intervention occurs.
10                    If it's after gametes are
11   formed in late puberty, there may be some
12   chance to have -- they might be able to have
13   fertile gametes, but it's expected that they
14   will be infertile.
15                    And that's why there is
16   guidance now for all those children on
17   opposite sex hormones, that they be
18   counseled on fertility preservation or
19   gamete preservation, sperm, ovacite
20   preservation, because it is expected that
21   they will be infertile.
22            Q       And it's actually not clear
23   to me from your declaration, but what are
24   all the risks that you believe are
25   associated with puberty blockers?
```

Page 266

1                    DANIEL WEISS

2          A       Well, let's go to that

3    section.

4          Q       Sure, why don't you direct

5    us.

6          A       That would be page 32.

7                  Let's start with 110, hot

8    flashes, weight gain, fatigue, mood

9    disorders, seizures, hip disorders,

10   reductions in bone density, increases in

11   pressure in the brain, called pseudo tumor

12   cerebrae, reduction in the development of

13   the external genitalia, such that it may be

14   very difficult to create a vagina-like

15   structure if you are treating biologic males

16   early on in puberty.

17                 Orgasmic dysfunction has been

18   described, and there is -- there are

19   concerns about brain, you're stopping brain

20   development that occurs, normal brain

21   development that would occur in puberty with

22   a puberty blocker, and so cognitive changes

23   may be seen.

24                 There is one study where it

25   showed a reduction in IQ in children treated

Page 267

```
                        DANIEL WEISS
1
2    for precocious puberty with puberty
3    blockers.
4                   We talked about infertility.
5         Q       Are any of these purported
6    risks of puberty blockers different from the
7    risks that a cys gender minor receiving
8    puberty blockers for some reason other than
9    gender dysphoria might experience?
10        A       It's not known, because there
11   is no comparative studies.
12                  And there is very little
13   data.  I think most of this is, that I have
14   quoted, most of it I have cited is in people
15   with treated with precocious puberty.
16                  Because the data on treating
17   minors with gender dysphoria is just so
18   poor, it's not captured.
19        Q       And were any efforts
20   undertaken to separate out what risk factors
21   and health concerns might actually just be
22   correlated with precocious puberty itself as
23   opposed to the administration of puberty
24   blockers?
25        A       That's of course an excellent
```

Page 268

```
 1                    DANIEL WEISS
 2    question, and it's hard to know.
 3                    For example, like seizures,
 4    well, did they have seizures because they
 5    have something going else on in their brain
 6    or is it from the puberty blockers?
 7                    But causation association,
 8    its difficult to know.
 9                    It's not like there were --
10    in most of these there is not controlled
11    studies, it just is these are descriptions
12    that -- of adverse events that occur in
13    people on puberty blockers, and it's
14    uncertain to what extent.
15                    In some of these cases, the
16    puberty blockers is the cause.
17                    Now, with brain development
18    and bone density, that's pretty clear.  With
19    the orgasmic dysfunction, with the small
20    genitalia being inadequate to create a
21    pseudo vagina, those -- that's pretty clear.
22                    Some of the other things, hot
23    flashes are clear, weight gain is probably
24    real and related to the puberty blockers,
25    and maybe some mood alterations.
```

```
                                        Page 269
 1                   DANIEL WEISS
 2              But some of them may not be,
    may be from the associated disorder that the
 3    child has as precocious puberty.
 4
 5        Q       Returning to our discussion
 6    about the regime in the U.K., I understand I
 7    have now clarified to you the actual state
 8    of the law in the U.K.
 9              But would you be okay with a
10    ban on gender affirming care for minors
11    under the age of --
12              ATTORNEY KORBERG:  Withdrawn.
13        Q       Would you support an approach
14    where 16 year olds and 17 year olds were
15    allowed to access gender affirming care for
16    gender dysphoria, but not adolescents who
17    are younger than 16?
18        A       No.
19              ATTORNEY DROZ:  Objection,
20          vague.
21        Q       So you think that the only
22    legal regime you would support is one where
23    only those 18 and older were able to access
24    gender affirming care, is that right?
25        A       Yes; and in fact, you know,
```

```
                                        Page 270

 1                    DANIEL WEISS
 2    people even in their 20s, the
 3    decision-making is not optimal.  So, but 18
 4    would be the minimum.
 5          Q      So you think the reason for
 6    that doesn't have to do with some difference
 7    in the risks of gender affirming care when
 8    you're 17 versus 18, but rather with the
 9    fact that we believe that 18 year olds are
10    mentally competent to make informed
11    decisions about risks and benefits?
12          A      It relates to mental
13    competence at age -- that's right.
14          Q      And you would agree that the
15    adult parents of children accessing gender
16    affirming care are mentally competent to,
17    just as mentally competent as an 18 year old
18    to assess the risks and benefits of care,
19    right?
20                 ATTORNEY DROZ:  Objection,
21          vague, form.
22          A      So, parents are mentally
23    competent, yes, but again, if they are asked
24    to assess or approve of a harmful
25    intervention on their child, that should not
```

Page 271

DANIEL WEISS

1
2       be an intervention that should be performed.

3                   So, regardless of parental

4       ascent, a minor should not be on or be given

5       medical interventions that modify their body

6       for gender dysphoria.

7           Q       Is it fair to say that you

8       are opposed to gender affirming care because

9       you believe the evidence of efficacy is of

10      low quality?

11          A       I think it's an irrational

12      intervention for a mental health disorder.

13                  There is evidence of harm,

14      add the -- and the evidence that is

15      available shows harm and no benefit.

16                  So, part of it is there is no

17      quality evidence that shows benefit, and the

18      evidence that's available shows harm.

19          Q       Is there any high quality

20      evidence that supports that psychotherapy

21      alone can treat gender dysphoria?

22          A       No, it's not high quality.

23                  It's low quality evidence,

24      but it's an intervention that's not harmful.

25      It doesn't induce -- it doesn't cause

Page 272

```
 1                    DANIEL WEISS
 2   irreversible changes that the child might
 3   regret years later.
 4              And exploratory psychotherapy
 5   doesn't cause infertility.
 6        Q     Do you think that politics
 7   should play a role in the practice of
 8   medicine?
 9        A     No.  It should be science.
10        Q     Do you think that religion
11   should play a role in the practice of
12   medicine?
13        A     No.
14        Q     Your CV states that you are a
15   senior fellow at Do No Harm Medicine, is
16   that right?
17        A     Yes.
18        Q     Can you tell me about Do No
19   Harm?
20        A     Do No Harm is an organization
21   that supports the elimination of politics
22   from medical care.
23              They want what's best for
24   training doctors to provide the best care
25   for patients and to leave politics out of
```

Page 273

1                    DANIEL WEISS

2     medicine.

3          Q       How did you become involved

4     with Do No Harm?

5          A       It's a long story, but I will

6     make it short.

7                    I joined when I heard about

8     the organization and their mission.  I

9     happened to send an e-mail, or -- e-mail I

10    think it was, in support of Florida's ban.

11                   I didn't know about Florida's

12    ban until I was notified by Do No Harm that

13    if I was interested I could support their

14    efforts to protect children with gender

15    dysphoria.

16                   And then subsequently Do No

17    Harm contacted me by e-mail and said if you

18    wrote a letter in support of Florida, would

19    you send it to us?

20                   After that they contacted me

21    and asked me to join.

22         Q       So, you wrote an e-mail in

23    support of Florida's ban on gender affirming

24    care and Do No Harm found out about that

25    e-mail and then got in touch with you, is

Page 274

                          DANIEL WEISS

 1      that right?

 2              A       Correct.

 3              Q       And you hadn't known about Do

 4      No Harm prior to Do No Harm reaching out to

 5      you, is that right?

 6              A       No, no, no, so, you missed

 7      the first part.

 8                      So, I heard about Do No Harm

 9      some way online, and I saw their mission

10      statement and what their goal was, to keep

11      politics out of medicine, and I said I'm

12      going to join, I'll be a member.

13                      They said a noble effort,

14      noble cause, let's not bring these kinds of

15      ideologies into medicine, let's just do the

16      best for patient care, and that's what their

17      goal is.

18                      And I joined, and then

19      subsequently they contacted me.

20              Q       And they asked you -- did

21      they ask you to write an e-mail to Florida

22      or --

23              A       They sent an e-mail out, they

24      said if you're interested and you have --

Page 275

```
 1                    DANIEL WEISS
 2    you provide -- if you are willing to provide
 3    input on Florida's ban, on Florida's
 4    legislation, please write to them.
 5           Q      Okay.  And when was this?
 6           A      I don't remember.  It was
 7    probably within the last couple of years or
 8    so, I don't remember.
 9                  It's probably mentioned in --
10    let me see, did my CV mention I'm on Do No
11    Harm?
12           Q     Yes, your CV says you are a
13    senior fellow at Do No Harm.
14           A      It was within the last oh,
15    probably 18 months.
16           Q      How much time elapsed between
17    when you sent this letter to Florida with Do
18    No Harm's encouragement and when you became
19    a senior fellow at Do No Harm?
20           A      I don't recall exactly, but
21    to estimate probably four or five months.
22           Q      And did you have any contact
23    with Do No Harm in those four or five months
24    before you became a senior fellow?
25           A      No, I don't think so, no.
```

Page 276

```
 1                    DANIEL WEISS
 2         Q       And how did it come to be
 3    that you became a senior fellow?
 4         A       They -- we had a discussion,
 5    we had like a Zoom call, and they said --
 6    because they know I was experienced in
 7    treating adults with gender dysphoria, and
 8    so they knew my view on this matter,
 9    particularly with regard to treating minors
10    or giving these interventions on minors.
11                 And they asked whether I
12    would be interested in working with them.
13         Q       How many senior fellows are
14    there at Do No Harm?
15         A       I don't remember.  Maybe --
16    I'll guess and say seven, something like
17    that.
18                 But you could find it on
19    line, it pulls right up.
20         Q       And what do you do as a
21    senior fellow at Do No Harm?
22         A       No, I have -- I am basically,
23    my efforts primarily have been in support of
24    legislation; that's basically it.
25         Q       In the gender dysphoria
```

```
                                     Page 277

 1                      DANIEL WEISS

 2    context, what are the goals of Do No Harm?

 3           A      The goals are to protect

 4    minors, and I think very clearly to not

 5    interfere with the adult gender dysphoria,

 6    but to stop medical, opposite sex hormones,

 7    puberty blockers and surgery on minors with

 8    gender dysphoria.

 9           Q      Is it a goal of Do No Harm to

10    in any way limit adults' access to treatment

11    for gender dysphoria, including cross sex

12    hormones?

13           A      No, not that I'm aware of at

14    all, no.

15           Q      Is a goal of Do No Harm to

16    end clinical research on gender affirming

17    care for minors?

18           A      I'm not sure what their

19    stance is on that.

20           Q      Is it your goal to end

21    clinical research on gender affirming care

22    for minors?

23           A      I think it's -- I think

24    hormonal interventions, I can't justify any

25    clinical research of hormonal interventions,
```

Page 278

DANIEL WEISS

2  even in the research setting, on minors with

3  gender dysphoria.

4          I think it's unethical.

5      Q      And you provided testimony in

6  several states in support of bills banning

7  gender affirming care for minors, is that

8  right?

9      A      Yes.

10      Q      Those states are Indiana,

11  Ohio, Montana, Utah, Wyoming and North

12  Dakota, right?

13      A      Sounds right.  Your list is

14  probably better than my memory.

15      Q      Were all of those testimonies

16  in connection with your role as a senior

17  fellow at Do No Harm?

18      A      I think most of them -- one

19  or two might not have been, but I believe

20  most of them were as a senior fellow with Do

21  No Harm.

22          And I would have listed that

23  on, it would probably be the testimony might

24  even have been submitted on Do No Harm

25  letterhead.

```
                                          Page 279

 1                      DANIEL WEISS

 2          Q       So, if your testimony wasn't

 3    submitted on Do No Harm letterhead, can I

 4    infer from that that you were testifying in

 5    your individual capacity and not as a senior

 6    fellow of Do No Harm?

 7          A       Correct.

 8          Q       Is there any difference in

 9    your testimony if done in your individual

10    capacity or as a senior fellow at Do No

11    Harm?

12          A       My thoughts and my

13    understanding of the science might have

14    evolved over time, so the testimony might

15    have changed a little bit because of that.

16                  For example, I testified in

17    Ohio before I think even Do No Harm existed,

18    what they called the SAFE Act, and you maybe

19    cited that earlier on, and that was my own

20    testimony.

21                  There was no involvement with

22    Do No Harm.

23                  ATTORNEY KORBERG:  By the

24          way, can we take down the

25          declaration?
```

```
                                          Page 280

 1                    DANIEL WEISS
 2          Q      Other than the extent to
 3   which your understanding may have evolved
 4   over the period in which you were testifying
 5   before legislators, is there any difference
 6   in the testimony you give on your behalf
 7   versus the testimony you give in your
 8   capacity as a senior fellow at Do No Harm?
 9          A      Not that comes to mind, no.
10          Q      Have you provided testimony
11   to any state legislators considering laws
12   outside the context of gender affirming
13   care?
14          A      One testimony comes to mind,
15   and that was in, I think it was Indiana,
16   related to surgery on prisoners.
17                 Do you have that one?
18          Q      I don't.
19          A      You missed that in your
20   search?
21                 Let me see, that was one.
22                 I also had testimony in
23   Texas, a statement, this is a statement
24   submitted related to medical care for
25   detransitioners.  I bet you don't have that
```

```
                                    Page 281

 1                    DANIEL WEISS
 2    either.
 3         Q       No.  Why don't you go ahead
 4    and explain to me.  Let's start with Texas.
 5                   What was -- what sentiment
 6    were you expressing to the state for their
 7    medical care for detransitioners?
 8         A       Sure.  So if someone had
 9    hormonal or surgical interventions for
10    gender dysphoria the insurances should cover
11    any complications that might arise from
12    that, or in those persons who chose to
13    detransition.
14         Q       You wanted to make sure that
15    someone that received hormonal or surgical
16    interventions for gender dysphoria had
17    insurance coverage for any complications
18    that arose from that treatment, right?
19         A       Right.  We can't abandon
20    these people, however number there might be,
21    2 percent, 1 percent, 5 percent, doesn't
22    matter.
23                   They need medical care, and I
24    wanted to support both the state and private
25    insurers to cover those problems that might
```

```
                                            Page 282
 1                      DANIEL WEISS
 2    arise.
 3           Q      Let's say that someone
 4    accessed surgery that made it such that they
 5    needed hormone replacement.
 6                  Were you advocating that
 7    insurers cover cross sex hormone coverage
 8    for those people?
 9           A      I'm very sorry, I missed that
10    first part.  Can you restate it?
11           Q      Sure.  So let's say that
12    someone has surgery, and it is a type of
13    surgery that thereafter requires some form
14    of hormone replacement therapy.
15                  Were you advocating for
16    insurance to cover the provision of cross
17    sex hormones as a form of hormone
18    replacement therapy for those people?
19           A      No, this was a statement in
20    support of those people who had a
21    complication related to their procedures or
22    had -- needed medical care, now that they
23    decided to return to their natal sex.
24           Q      I see.  So this was only
25    advocating for people who decided to cease
```

```
                                        Page 283
 1                    DANIEL WEISS
 2    accessing gender affirming care?
 3          A       They desisted or stopped the
 4    medical interventions, or they decided, we
 5    use the term detransition, to go back to
 6    their natal sex.
 7                   Or they had a complication,
 8    let's say they had genital reconstruction,
 9    and they had a complication, lots of
10    infection, suffering, pain, chronic pain,
11    whatever, related to that, that that medical
12    care was covered.
13                   Not just for those people who
14    were no longer -- those people who still
15    identified with say the opposite sex, if
16    they had a complication related to that
17    intervention.
18          Q       And your Indiana testimony,
19    what was your testimony with respect to
20    prisoners and surgery?
21          A       I don't remember the details
22    on that.
23                   It had something to do with
24    should the state require -- should the state
25    pay for surgery in a person with gender
```

```
                                    Page 284
 1                 DANIEL WEISS
 2   dysphoria who insisted upon surgery because
 3   they had gender dysphoria and they wanted
 4   those surgical modifications.
 5           Q       And what position did you
 6   take, should the state pay for that or not
 7   pay that?
 8           A       Not pay for it.
 9           Q       Am I right that you also
10   testified against vaccine mandates in Ohio?
11           A       I think it was specifically
12   COVID vaccine, COVID vaccine mandate.
13           Q       I believe earlier you
14   testified that you were supportive of the
15   COVID vaccine mandates, is that right?
16           A       No, that's incorrect.
17           Q       Okay.
18           A       I'm opposed to it.  I'm
19   opposed to the COVID -- I opposed the COVID
20   vaccine mandate, and this is a completely
21   separate scientific area where we can go at
22   great length.
23               I don't want to use up your
24   time, but it's very complicated, and I
25   oppose the COVID vaccine mandate in Ohio.
```

Page 285

1                        DANIEL WEISS

2            Q        And do you believe that the

3    COVID vaccine is not safe and effective?

4            A        That's correct.  It's unsafe

5    and ineffective, and any careful reading of

6    the literature, which is very biased,

7    reveals that it's bad.

8                        It's bad, it's a messenger

9    RNA, it's experimental, and many people

10   suffered because of it.

11                       The reporting of the studies

12   were fraudulent, they covered up adverse

13   events.  I can go on and on.  It's not safe

14   and it's not effective.

15                       Even Dr. Fauci says it does

16   not prevent transmission or infection.  They

17   claimed it only reduced severity of

18   infection.

19           Q        Are you compensated by Do No

20   Harm for your work as a senior fellow?

21           A        Yes.

22           Q        How much are you compensated

23   by Do No Harm for that work?

24           A        $325 an hour.

25           Q        And since you became a senior

Page 286

                         DANIEL WEISS

1     fellow with Do No Harm in the last year or
2     so, how much money has Do No Harm paid you
3     in total for your activities either as a
4     senior fellow or otherwise?
5           A      I don't remember that, I will
6     have to go look it up.
7           Q      Roughly?
8           A      $15,000; $12,000 to $15,000.
9           Q      And that's the total amount
10    you would have received from Do No Harm for
11    all of your various activities, whether as a
12    senior fellow or otherwise?
13          A      Correct, that's my best
14    estimate.
15          Q      Has Do No Harm compensated
16    you for your work as an expert in Indiana,
17    Montana or in this case?
18          A      No, absolutely not.  They
19    know nothing about that work.
20          Q      Do you know what groups
21    provide funding to Do No Harm?
22          A      No, I don't.
23                 Do you?  I think -- it not
24    apparent, but they are funded, not as well

Page 287

```
 1                    DANIEL WEISS
 2   as ACLU.
 3        Q      Do you -- did you have any
 4   concerns or curiosity about where the money
 5   that was funding your work was ultimately
 6   coming from?
 7        A      Oh, no concerns at all.  I'm
 8   curious, but no concerns.
 9               Unfortunately, you know, the
10   funding is substantial on -- for your
11   viewpoint, it's very extensive, as you know.
12        Q      Have you ever asked anyone at
13   Do No Harm where the funding that is
14   ultimately flowing to you is coming from?
15        A      Not specifically -- I
16   think -- no, I haven't asked directly that
17   question.
18               But I think it's kind of,
19   it's kept discrete, because if that person,
20   persons announced that they were funding it,
21   they would be cancelled, assaulted,
22   attacked.
23               There would be protests and
24   whatever.
25        Q      Do you have a guess or a
```

```
                                            Page 288
```

1                    DANIEL WEISS
2    hunch as to who is funding Do No Harm?
3            A       Not at all, no idea.
4            Q       Do No Harm also opposes, "The
5    radical ideology of anti-racism," is that
6    right?
7            A       I believe that's correct,
8    yes.
9            Q       What does that mean?
10           A       Well, I'm not a fellow in
11   that regard, but I think what they are
12   referring to is the promotion of ideas that
13   states that white people are oppressors, and
14   people of color are victims.
15                   And that within medicine
16   there is systemic racism that we as
17   physicians, especially if we are white, are
18   racist, and then it impacts on our care of
19   patients.
20                   And we need to say that we
21   have white privilege, and all this nonsense.
22   I believe it's nonsense, that's not true.
23           Q       Do you believe that minority
24   populations have unequal access to
25   healthcare in the United States?

```
                                          Page 289
 1                    DANIEL WEISS
 2          A       No.
 3                  ATTORNEY DROZ:  Objection,
 4          irrelevance.
 5          A       No.
 6          Q       Do you agree that healthcare
 7   outcomes are ever different for minority
 8   populations than for white people in the
 9   United States?
10                  ATTORNEY DROZ:  Objection,
11          relevance.
12          A       So, this is the kind of, you
13   talk about association and causation.
14                  So, I would say a thoughtful
15   person, I think you should know that this is
16   the standard kind of conclusion, that if the
17   outcomes are different, it must be that
18   something wrong is being done where we are
19   failing in terms of treating these people.
20                  So sure, the outcomes are
21   different, but there are so many factors.
22   And to claim that the outcome of a person
23   who has a darker skin is worse because I am
24   providing bad care to them is wrong, or
25   that, or that the access isn't good.
```

```
                                          Page 290
 1                    DANIEL WEISS
 2                    Well, there are many factors.
 3    There is drug use, there is broken homes,
 4    there is poverty, there is crime, there
 5    is -- all these are factors.
 6                    And to say oh, there is a
 7    difference in outcomes, it must be racism,
 8    that's an inappropriate and unwarranted
 9    conclusion.
10          Q      Is Do No Harm a politically
11    motivated organization?
12          A      No, I think on the contrary,
13    they are motivated to eliminate politics
14    from medicine and from healthcare, to
15    eliminate it, to focus on the best outcomes
16    and the science.
17          Q      What's your definition of a
18    politically motivated organization?
19          A      An organization which makes
20    decisions based upon ideology and not
21    science and medicine.
22          Q      Is the American Medical
23    Association a politically or religiously
24    motivated organization?
25          A      The leadership I believe is,
```

Page 291

```
 1                    DANIEL WEISS
 2    I think their politics and ideology, that
 3    is, that has captured their leadership.
 4                    And remember, only about 25
 5    percent at most of doctors are members of
 6    the AMA.
 7         Q      What about the American
 8    Pediatric Association, do you think that's a
 9    politically or religiously motivated
10    organization?
11         A      It's not -- I don't think
12    there is religion in the leadership there.
13                    There is politics, there is
14    ideology in the leadership.
15                    They have 66,000 members.
16    They do not poll the members to get their
17    input on how to help children who have
18    psychic distress that is attributed to
19    gender, they just made this statement
20    without a review of the literature.
21                    So, they are politically
22    motivated.
23         Q      Are the leadership of Do No
24    Harm politically motivated?
25         A      I don't think so.
```

Page 292

```
 1                    DANIEL WEISS
 2         Q      Is there any major medical
 3    group that supports the provision of gender
 4    affirming care for minors suffering from
 5    gender dysphoria that you believe is not
 6    principally motivated?
 7                    ATTORNEY DROZ:  Objection,
 8            vague and ambiguous.
 9         A      No, I think all of those --
10    any medical organization that evaluates the
11    scientific evidence on hormonal and surgical
12    interventions on children with gender
13    dysphoria will conclude that or will decide
14    not to support it.
15                    And they will look at the
16    comp reviews, they will look at the
17    systematic reviews, they will look at the
18    European experience, and they will say no,
19    we do not support it.
20                    So, I think those that are
21    supporting are either not knowledgeable,
22    they just kind of go along, and I think
23    there are organizations that just will go
24    along with maybe the AMA or the Endocrine
25    Society.
```

```
                                        Page 293
 1                DANIEL WEISS
 2              They may not be politically
 3    motivated, but they are kind of lazy and
 4    they can't really do their own research.
 5              And they might be afraid to
 6    come out and oppose it, because it's very
 7    difficult for people to be outspoken and
 8    challenge this narrative, very difficult.
 9              It's scary.  People are
10    attacked and there is -- we have seen
11    violence, threats and so on.
12         Q      Is it your belief that any
13    physicians that support gender affirming
14    care for minors are either lazy, afraid or
15    politically motivated?
16              ATTORNEY DROZ:  Objection.
17         A      You know, the lazy in terms
18    of -- maybe I shouldn't use that word, lazy,
19    they didn't put the effort into looking at
20    the science.  That's what I mean by that.
21              They either didn't put the
22    effort in to study it, or they are afraid,
23    because they don't want to speak out and
24    challenge it.
25              So that's why often they
```

Page 294

```
                              DANIEL WEISS
 1
 2   won't treat children who are, or even adults
 3   with gender dysphoria, or they are
 4   politically motivated.
 5                   I think the politically
 6   motivated people is relatively small, but
 7   they happen to be often on these leadership
 8   committees that come out with these
 9   statements.
10        Q      And the leadership of these
11   organizations are all physicians, right?
12        A      It depends what you mean by
13   all.
14                   So, pediatricians, yes.
15   Endocrine Society, some of them might be
16   Ph.D.s, theory searchers, and not M.D.s.
17        Q      Okay, how about this way.
18   You agree that there is a number of doctors
19   that support gender affirming care for
20   minors, right?
21                   ATTORNEY DROZ:  Objection,
22              vague.  And I don't want to do a
23              speaking objection, but we keep
24              talking about gender affirming care,
25              and I don't know what that includes.
```

```
                                              Page 295
 1                    DANIEL WEISS
 2              And so maybe just so we can
 3         all get on the same page as to what
 4         that is.
 5              ATTORNEY KORBERG:  We did
 6         that like hours and hours and hours
 7         ago.
 8              We agreed on a definition of
 9         gender affirming care, which
10         actually the doctor provided to me.
11              Would you like to change his
12         definition?
13              ATTORNEY DROZ:  No.
14              ATTORNEY KORBERG:  Okay.
15    A        It's okay, I will restate.
16              I think what we are talking
17    about with the gender affirming care term,
18    phrase, is opposite sex hormones, puberty
19    blockers and surgical treatment to modify
20    body appearance to the child's, person's
21    choice of appearance, gender.
22              It might be just, it might be
23    removal of gonads, their testes, because
24    they identify as a eunuch.
25              So that is what's being
```

Page 296

1                    DANIEL WEISS

2    called gender affirming care.

3                    So there are doctors who

4    support that, and there is, for WPATH

5    guidelines, there is no lower age limit for

6    that.

7                    If they say they endorse

8    WPATH, they are endorsing a 6 year old.

9                    I should also add WPATH says

10   there may be some children who don't want

11   hormones first.

12                   That is, they don't want

13   opposite sex hormones, they just want their

14   gonads removed or they want the surgery, and

15   they are fine with that.

16                   So one needs to keep that in

17   mind, that those doctors, like Dr. Connelly,

18   who endorsed WPATH, are endorsing this

19   approach.

20                   So there are doctors who

21   support it, yes.

22        Q      Yes.  And doctors all take an

23   oath to do no harm, right?

24        A      I don't know what the

25   current -- you know, they have changed the

```
                                      Page 297
 1                    DANIEL WEISS
 2    Hippocratic oath, so they have kind of
 3    eliminated it, and it's really become
 4    substantially modified.
 5                    But that is a fundamental
 6    principle of not harming, Do No Harm in
 7    evaluating any intervention looking at the
 8    benefit and potential risk.
 9         Q      And is it your opinion that
10    financial incentives in part explain the
11    provision of gender affirming care in the
12    United States?
13         A      Yes.
14         Q      Is it your opinion that
15    anyone who provides gender affirming care is
16    too biased to have an opinion on the
17    provision of such care?
18         A      No, I think there are some
19    people who are just -- may not be informed,
20    they didn't put the effort into really
21    studying it, and, you know, it's a
22    complicated matter, there is a lot of
23    material, and they just may go along.
24                    But there are others who are
25    running gender clinics, and they don't have
```

Page 298

```
 1                    DANIEL WEISS
 2    an incentive to look at the science, because
 3    that's their job.
 4                    They don't want to lose their
 5    job, so they are convinced that what they
 6    are doing is right, and they don't want
 7    to -- they have a confirmation base, they
 8    don't want to see anything that challenges
 9    that.
10        Q      Your employer, InterMountain
11    Health, has a gender clinic in Utah that
12    provides gender affirming care to minors,
13    right?
14        A      They do provide -- they were
15    providing opposite sex hormones, puberty
16    blockers, I believe, and in some cases
17    surgery for persons with gender dysphoria in
18    the northern part of the state.
19        Q      And is it your belief that
20    your colleagues at InterMountain providing
21    such care are doing so despite the fact that
22    it is against the fundamental medical
23    principle to do no harm because they stand
24    to gain financially from that?
25        A      I don't know the reason.
```

```
                                              Page 299
 1                      DANIEL WEISS
 2                 I'm concerned about finances
 3      playing a role, and I think some of them
 4      just may have that's their principal job,
 5      and some of them may be biased or other
 6      reasons.
 7                 But I think, I like to think
 8      that everyone wants what's best for these
 9      children, but I just -- I am puzzled as to
10      why they are encouraging these interventions
11      which are not best for these children.
12                 They are harmful, they don't
13      help.
14           Q      What is your affiliation with
15      the Society for Evidence Based Gender
16      Medicine?
17           A      So, I'm not a member, but I
18      do communicate with them periodically.
19           Q      Is it fair to say that you
20      generally agree with the positions taken by
21      SEGM?
22           A      Most of them, but not all.
23           Q      Do you believe that SEGM is a
24      biased organization?
25           A      No, not at all.
```

```
                                          Page 300

 1                    DANIEL WEISS
 2         Q      Do you believe that the Yale
 3   School of Medicine is a biased organization?
 4         A      Which one, Yale?
 5         Q      The Yale School of Medicine?
 6         A      I can't speak to a whole
 7   school of medicine.
 8                I can speak to a comment or a
 9   statement or a publication written by
10   someone written on staff there.
11         Q      Are you a member of the
12   American Association of Physicians &
13   Surgeons?
14         A      I am.
15         Q      I understand that that
16   membership was included on your CV when you
17   testified in Indiana, but has since been
18   removed.
19                Is that deliberate?
20         A      No, really, it got removed?
21   That's a surprise.  No, it should be on
22   there.
23                It's not on there?
24         Q      I don't believe so, but --
25         A      I don't have my CV, but
```

Page 301

                    DANIEL WEISS

1   that's an oversight, maybe, when I was

2   updating it.  No, I'm still a member.

3        Q        And what's the extent of your

4   involvment in AAPS?

5        A        I've been a member since the

6   '90s, and I just endorse many of their

7   viewpoints and stances.

8                 And their basic position

9   mission is the sanctity of the

10  patient/physician relationship, and keeping

11  meddling and interference out of that.

12       Q        Do you pay dues?

13       A        Yes.

14       Q        How much are those dues?

15       A        I don't remember, something

16  on the order of $250.

17       Q        Do you receive the AAPS

18  newsletters?

19       A        Yes.

20       Q        And do you read those

21  newsletters?

22       A        Usually.

23       Q        Last month's AAPS newsletter

24  explained that, "The switch to third person,

```
                                        Page 302

  1                    DANIEL WEISS
  2   plural gender neutral language is a weapon
  3   of mass psychological destruction, far more
  4   lethal than bullets or bombs, which begins
  5   in our late childhood.
  6                    "This is part of the
  7   globalist agenda to destroy the U.S. and
  8   merge it into its own boundaryless planetary
  9   unistate."
 10                    Do you agree with that
 11   position taken by AAPS in its newsletter?
 12                    ATTORNEY DROZ:  Objection.
 13        A        Was that written by Dr.
 14   Orient?
 15        Q        It was in the AAPS
 16   newsletter.
 17        A        Yeah, I think it's
 18   interesting, and it's some -- I agree with
 19   some of that.
 20                    I think controlling people's
 21   language is a powerful tool.
 22                    I don't know, I'm not sure
 23   about the globalist agenda.
 24        Q        So you don't think there is a
 25   globalist agenda to destroy the U.S. and
```

```
                                          Page 303
 1                      DANIEL WEISS
 2   merge it into a boundaryless planetary
 3   unistate?
 4           A       No.
 5           Q       But you do agree that the use
 6   of they/them pronouns is a weapon of mass
 7   destruction, far more lethal than bullets or
 8   bombs?
 9           A       I wouldn't say that.
10                   I think controlling someone's
11   language is a powerful tool.
12                   I wouldn't use the same
13   verbiage that was used there.
14           Q       So I use they/them pronouns,
15   is personal use of they/them pronouns a
16   weapon of mass psychological destruction
17   that's more lethal than bullets or bombs?
18           A       No.
19           Q       The AAPS issued a press
20   release protecting physicians who prescribe
21   hydroxychloroquine and Ivermectin to treat
22   COVID-19.
23                   Did you know that?
24           A       I think I did, yes.  It's
25   hydroxychloroquine is how you pronounce it.
```

Page 304

1                    DANIEL WEISS

2          Q       Do you think there is

3    evidence that hydroxychloroquine or

4    Ivermectin treats COVID-19?

5          A       Absolutely.  They are very

6    safe, too.

7          Q       What's your support for the

8    notion that hydroxychloroquine and

9    Ivermectin treat COVID-19?

10                 ATTORNEY DROZ:  Objection,

11          relevance.

12         A       Yeah, I really think this

13   is -- I mean, if you have another two hours

14   I could teach you about this, but it's

15   really complicated, and it relates to COVID

16   infection, clinical experience, what's

17   published, what's allowed to be published,

18   where it's published, retractions, the

19   government effort to crush any medical

20   therapy for COVID infection, the promotion

21   of the shots.

22                 It's really complicated, and

23   there is a lot of clinical experience that

24   those drugs are effective for treatment of

25   COVID infection when given early.

Page 305

```
 1                      DANIEL WEISS
 2          Q       And do you believe with that
 3     the AAPS that abortion causes breast cancer?
 4          A       No, I think there is -- the
 5     data on that is very unclear.  There is one
 6     or two studies that suggest that, but it's
 7     not clear; no.
 8          Q       Do you agree with AAPS that
 9     HIV does not cause AIDS?
10          A       No; I disagree with that.
11          Q       I understand -- what is your
12     involvement with the Center for Christian
13     Value?
14          A       So, they contacted me when I
15     was in Ohio, so they alerted me to the SAFE
16     Act and that was -- that was kind of the
17     impetus to give testimony back, what, maybe
18     a year before last, 2021, I think.
19                      You can check that.
20          Q       Okay.
21                      Do you generally agree with
22     the views of the Center for Christian Value?
23                      ATTORNEY DROZ:  Objection,
24           relevance.
25          A       Yeah, I don't follow them,
```

```
                                        Page 306
 1                    DANIEL WEISS
 2    they just -- they contacted me, I know their
 3    stance on gender dysphoria and hormonal
 4    interventions in children, and I agree with
 5    that position.
 6              But otherwise I am not
 7    familiar with their other views.
 8              I suspect that they are
 9    opposed to abortion, because they are
10    religious.
11        Q    "Among CCV's mission is
12    ensuring government policy promotes strong
13    families and strong marriages between one
14    man and one woman."
15              Is that a mission that you
16    also endorse?
17              ATTORNEY DROZ:  Objection,
18         relevance.
19        A    Yeah, I am fine with any
20    marriage between any sexes, but I think a
21    family is very important.  It's good to have
22    two parents.
23        Q    What's your involvement with
24    the American College of Pediatricians?
25        A    I don't have any involvement
```

```
                                        Page 307
 1                      DANIEL WEISS
 2   with them.
 3           Q       Is there a difference between
 4   desistance and regret?
 5           A       So, regret is -- so, there
 6   are different definitions.  There are
 7   articles on this.  I reference some of them.
 8                   So regret, I would describe
 9   as expressing regret that a person has
10   undertaken a particular step in life or
11   accepted a certain intervention or
12   procedure.
13                   So a person might regret and
14   still stay on their opposite sex hormones,
15   for example.
16                   And a person might desist,
17   stopping the hormones and not detransition.
18                   So it's complicated, and we
19   need to define terms whenever we use them.
20   But --
21           Q       And it's possible that a
22   person might stop receiving hormones, but
23   not regret having received them, right?
24           A       That's possible, yes.
25           Q       And of the 100 patients that
```

Page 308

DANIEL WEISS

1
2  you treated for gender dysphoria between
3  2003 and 2013, how many of those do you
4  believe desisted?
5          A       I think the majority.
6                  Probably 50, 60, maybe even
7  70 of them.  But I don't know, that's
8  because they didn't come back and say I'm
9  stopping hormones.  They just didn't come
10 back.
11                 And as you said, maybe some
12 moved, I doubt that.  Maybe some went to
13 another doctor, I doubt that, too, because
14 there were not options and they didn't
15 prefer -- the one other option was a person
16 who was in another area of town and people
17 didn't particularly like that clinic.
18                 So I think most likely those
19 who did not return just decided they weren't
20 going to take them anymore.
21                 Did they just stop the
22 hormones and not regret it or did they just
23 stop the hormones and regret it?
24                 I don't know.  I don't have
25 that data.

```
                                          Page 309
 1                    DANIEL WEISS
 2          Q       And again, you don't actually
 3    know that they stopped taking hormones at
 4    all, right?
 5          A       I don't know who would have
 6    given them to them.  As I said, there
 7    weren't options, there was no multitude of
 8    options available at that point.
 9                    I was the principal
10    prescriber of hormones in northern Ohio at
11    the time.
12          Q       Well, the Cleveland Metro
13    Clinic continued to provide cross sex
14    hormone care, correct?
15          A       Yes.  And there would have
16    been no reason to have gone there if they
17    were seeing me, and I was closer.
18                    Let's say -- maybe they got
19    disenchanted with my care, but there was
20    nothing to suggest that with the previous
21    visits.
22                    Patients, really -- I got
23    very good reviews, they loved me.
24          Q       Of the 100 patients that you
25    cared for, did any ever express regret to
```

Page 310

```
 1                    DANIEL WEISS
 2   you regarding their gender affirming care?
 3        A      No.  Well, I should say one
 4   person -- two people, sorry, so two people,
 5   went recently, recently, last year, I had a
 6   biologic male who had an orchiectomy in
 7   Philadelphia after being presumably
 8   evaluated by a therapist, had an
 9   orchiectomy.  Within months he regretted it.
10                So he was on testosterone,
11   same sex hormone, and then he wanted some
12   estrogen, he went back and forth, and then
13   he saw me, and so he was one person.
14                He was not originally seen by
15   me, so that was one.
16                There was another man in
17   his -- man, I can call him a he, he lived as
18   a male, he had auto-gynephilia.
19                He really -- and I realized
20   that later on, he was married to a female,
21   having sex with her, had a ponytail, but
22   lived as a male, basically, and wanted
23   female hormones.
24                And I obliged him, and he
25   seemed happy with that.  He went by he, and
```

```
                                        Page 311
 1                    DANIEL WEISS
 2   then came back after a hiatus of several
 3   months and said I'm having a little harder
 4   time getting erections since my surgery.
 5                   I said to him, what surgery?
 6                   Well, he had undergone
 7   orchiectomy, he had his testicles removed,
 8   having seen a psychologist first, I won't
 9   name the institution, and then had the
10   orchiectomy.
11                   And then he said this is not
12   good, I'm having a hard time getting
13   erections, having sex with my wife.
14                   And so I called the urologist
15   up I said how come you hadn't contacted me?
16   I was following this guy for years, and he
17   seemed to be fine on a little bit of
18   estrogen, he just wanted some breast tissue
19   and a little feminization.
20                   That's all he wanted.  And
21   now he's having problems with erection.
22                   So this urologist was
23   surprised that this was the case.  And I
24   don't know why they didn't contact me, and
25   the patient regretted having had the
```

```
                                    Page 312
 1                   DANIEL WEISS
 2    surgery, and I had to put him back on -- I
 3    had to put him on testosterone.
 4                   So that's a person who's an
 5    adult in their, what did I say, 30s, he was
 6    in his 40s.
 7          Q      So other than those two of
 8    your 100 patients, each of whom had
 9    orchiectomy, did any of your patients
10    express to you regret over any surgery or
11    cross sex hormone that they had to address
12    their gender dysphoria?
13          A      I had one person who had a
14    vaginoplasty, the full vagina created.
15                   I wouldn't say that person
16    had clearly regret, but was really
17    distressed, had problems after the surgery
18    that were happening related to infection and
19    drainage and -- but strictly speaking, the
20    word regret was not used.
21          Q      So none of the patients
22    expressed regret over the cross sex hormones
23    that you had been providing to them, right?
24          A      Well, no, the two with the
25    orchiectomy, they had regret over the
```

```
                                            Page 313
 1                      DANIEL WEISS
 2    surgery.
 3           Q       Yes, but none of your
 4    patients expressed regret over the
 5    administration of cross sex hormones, right?
 6           A       Correct.
 7           Q       Among the patients that you
 8    have cared for outside of the gender
 9    affirming care context, let's get a number,
10    how many patients have you --
11                   ATTORNEY KORBERG:  Withdrawn.
12           Q       Roughly how many patients
13    have you cared for in the course of your
14    career outside of the gender affirming care
15    context?
16           A       Oh, thousands, and thousands.
17    Yes.
18           Q       And have any of them ever
19    expressed regret about some aspect of their
20    treatment?
21           A       Sure.
22           Q       So how many of them would you
23    say have expressed regret over some form of
24    hormone therapy that is not cross sex
25    treatment?
```

```
                                        Page 314
 1                     DANIEL WEISS
 2         A      I can't think of anyone who's
 3   expressed regret about hormonal treatment.
 4                 It would be other medications
 5   they might have expressed regret, because
 6   they had a complication from the medication
 7   that was not hormonal.
 8         Q      Okay.  So how many of your
 9   patients have, roughly, have expressed
10   regret, felt some aspect of their treatment
11   or surgery outside of the gender affirming
12   care context?
13         A      That's a difficult to
14   estimate.  There are thousands.  Maybe I
15   don't know, 100, 150.
16                 THE VIDEOGRAPHER:  Just to
17            note for the videographer, counsel,
18            we have about ten minutes to a media
19            change break.
20                 ATTORNEY KORBERG:  Thanks.
21         Q      Roughly, like what percentage
22   of that, would you say?
23         A      I don't know.  You can do the
24   math.
25         Q      When you say thousands, like
```

Page 315

1                    DANIEL WEISS
2    how many thousands do you think, like 2,000
3    patients you have seen, 1,000 patients?
4           A      Oh, more than that, probably
5    10,000.
6           Q      Okay.
7                  And what percent of minors
8    diagnosed with gender dysphoria who received
9    gender affirming care do you believe come to
10   regret that care?
11          A      So the answer to that is not
12   clear, but there is emerging evidence of
13   increasing number of minors, and I have
14   documented some of that in my declaration.
15                 So we can turn to that
16   section about desistance and regret and
17   detransition.
18          Q      So you don't have a
19   particular percentage in mind?
20          A      I think it's not well
21   studied.
22                 There is not prospective
23   data, and the people, the adolescent
24   medicine people and the pediatric
25   endocrinologist people, they don't see these

```
                                              Page 316
 1                    DANIEL WEISS
 2   people, they stop seeing them usually at the
 3   age of 18.
 4                    So, we don't know.
 5           Q        So, generally speaking, what
 6   would you say is an acceptable regret rate
 7   for surgery?
 8           A        For this type of surgery?
 9           Q        No, for any type of surgery.
10   What's an acceptable regret rate where you
11   should say okay, people should still provide
12   that surgery?
13           A        Well, you have to look at the
14   other options, so the alternative
15   treatments, harm/benefit, so it depends;
16   depends.
17           Q        What about for cosmetic
18   surgery, what's an acceptable regret rate
19   for cosmetic surgery?
20                    ATTORNEY DROZ:  Objection.
21           A        I don't know the answer to
22   that, and I would ask -- I would have to
23   look at the plastic and cosmetic and
24   aesthetic literature for surgery.
25                    I would say it should be very
```

Page 317

1                          DANIEL WEISS
2      low.
3            Q      So if, for example, there was
4      a 20 percent regret rate for a surgery, do
5      you think that surgery should be
6      criminalized?
7                   ATTORNEY DROZ:  Objection,
8            speculative.
9            A      So, I don't think it's
10     appropriate to compare treating a mental
11     health disorder with surgery or hormonal
12     interventions with -- in minors to aesthetic
13     or cosmetic surgery in adults who want to
14     change their body because they want bigger
15     breasts or something like that.
16                   And they are more competent
17     in making that decision.
18           Q      Do you have a sense of how
19     often people come to regret having gastric
20     bypass surgery?
21           A      Yes, I think it's very low,
22     very low.  It's probably less than 5
23     percent, maybe 2 or 3 percent.
24                   Because I see a lot of those
25     people, I follow people post gastric bypass.

Page 318

1                   DANIEL WEISS

2          Q      Do you recommend gastric

3   bypass for any of your patients?

4          A      Yes.

5          Q      And if you came to learn that

6   the regret rate for gastric bypass was 30

7   percent, would that make you disinclined to

8   recommend gastric bypass surgery to your

9   patients?

10         A      Yes.  Yes, I would look and

11  see why is that?  What surgical center is

12  that happening in?  What procedure do they

13  have?

14                So, there are some older

15  procedures where there was more, a lot more

16  complications, and now, with the newer

17  procedures, there are less complications.

18                And you're treating a

19  physical problem in people who are severely

20  obese, who have often a multiple

21  comorbidities that resolve or substantially

22  improve promptly as they lose weight.

23                And they failed all these

24  other interventions that are less

25  aggressive.

```
                                        Page 319
 1                    DANIEL WEISS
 2              But now we have medicines
 3    that are seeming to work even better -- they
 4    are working well, and that some people
 5    respond well to those medicines, so well
 6    that they don't need the surgery.
 7         Q     You were making a distinction
 8    between being treated for a mental health
 9    versus surgery, so let's talk about mental
10    health.
11              Do you think that people
12    suffering from depression should take
13    antidepressants?
14         A     I think they should get
15    counseling, and consider the use of an
16    anti-depressant to help them if they choose
17    to do so, yes.
18         Q     Have you ever recommended to
19    a patient that they go on an anti-depressant
20    medication?
21         A     Oh, yes, and I have
22    prescribed it, sure.  I treat depression.
23    It's -- depression is common in people with
24    diabetes.  I see a lot of diabetes.
25         Q     Are you aware that studies
```

```
                                            Page 320
 1                    DANIEL WEISS
 2    have found that at least 16 percent of
 3    people prescribed anti-depressants had a
 4    negative experience, and only 54 percent
 5    report a positive experience?
 6            A        I believe that --
 7                    ATTORNEY DROZ:  Objection.
 8            Q        You still believe that it is
 9    appropriate to prescribe anti-depressants,
10    despite the fact that only 54 percent report
11    having a positive experience with that
12    medication, is that right?
13            A        Oh, so it depends -- so I'm
14    not familiar with that study you are citing.
15    One can never predict which anti-depressant
16    is going to work best for that individual.
17                    And people who are suffering
18    with depression are then in a shared
19    decision-making process, are offered that
20    medication, which does not produce
21    irreversible changes on the body, and helps
22    them be more positive, have interest in
23    things, more motivation, sleep better and so
24    on.
25                    And if they don't respond,
```

Page 321

DANIEL WEISS

1 they can try an alternative one.

2         Some people choose, however,

3 they don't want medications, they just want

4 counseling and therapy.

5     Q     So you would still prescribe

6 a treatment that has a meaningfully high

7 regret rate for a mental health disorder,

8 right?

9         ATTORNEY DROZ:  Objection,

10         mischaracterizing it.

11     A     Yeah, so again, I don't know

12 that particular study that you are referring

13 to.

14         When you are using

15 medication, you are not producing

16 irreversible changes on the body for the

17 mental health disorder, so they could stop

18 the pill.

19         And with surgical

20 interventions, removing breasts and cutting

21 off penises, and it's not quite comparable

22 to a pill that might give them an adverse

23 reaction.

24         It's just not -- it's kind of

```
                                      Page 322
 1                    DANIEL WEISS
 2   ludicrous to compare the two of them, even
 3   though they might both regret.
 4          Q       A number of times today you
 5   have referred to the number of people who
 6   are members of a Reddit website as evidence
 7   of a large number of people who
 8   detransition.
 9               Do you agree?
10          A       Yes, that's one piece of
11   evidence.
12          Q       And does following a Reddit
13   site on the subject of detransitioning mean
14   that that person has personally accessed
15   gender affirming care and detransitioned and
16   desisted from that care?
17          A       In many cases yes, but I
18   don't have data on that, I don't have
19   precise data on that.
20          Q       Have you taken any steps to
21   verify anything about the people who follow
22   the Reddit site on detransitioning and
23   whether they did, in fact, receive gender
24   affirming care, or have stopped that care?
25          A       No.
```

Page 323

DANIEL WEISS

1
2          Q        But it's your belief that the
3     majority of people who follow that Reddit
4     site in fact access gender affirming care
5     and then stopped accessing gender affirming
6     care, is that right?
7                    ATTORNEY DROZ:  Objection,
8              mischaracterizes.
9          A        Had gender dysphoria and
10    desisted or detransitioned or regretted.
11                   So I think it's probably a
12    diverse group of people who had gender
13    dysphoria who then accessed the site who no
14    longer are pursuing those medical
15    interventions.
16         Q        You don't think the people
17    follow that site because, like you, they are
18    interested in the question of whether, in
19    fact, people desist from care?
20         A        No.  I don't follow it,
21    either.  I just have access to it.  I'm not
22    a follower of it.
23                   ATTORNEY KORBERG:  I'm
24             turning to a new topic now.  Should
25             we change the tape?

Page 324

```
 1                    DANIEL WEISS
 2              THE VIDEOGRAPHER:  Thank you,
 3         I appreciate that.
 4              The time is 5:30, we are
 5         going off the record.  This ends
 6         media file 5.
 7              (At this point in the proceedings
 8         there was a recess, after which the
 9         deposition continued as follows:)
10              THE VIDEOGRAPHER:  The time
11         is 5:33.  We are back on the record.
12         This begins media file 6.
13         Q     Are you religious?
14         A     A little bit.
15              ATTORNEY DROZ:  Objection,
16         relevance.  You can answer.
17         A     A little bit.
18         Q     Do you have any religious
19    beliefs regarding transgender people?
20         A     No.
21         Q     Do you have any religious
22    beliefs about gay and lesbian people?
23         A     No.
24         Q     I understand that you believe
25    that sex is unchangeable and binary, is that
```

```
                                        Page 325
 1                   DANIEL WEISS

 2   right?

 3          A       Yes.

 4          Q       Is sex the same thing as

 5   gender?

 6          A       I think it is.

 7                  And I should add again that

 8   WPATH can't define gender, look in their

 9   glossary, they can't define it.  They use

10   all this circular language.

11                  And I would also add my

12   religious views have not changed since 2003

13   through 2013 to now.  So I was treating

14   adults with gender dysphoria, and my

15   religious views are the same.

16          Q       And have your political

17   beliefs changed at all since --

18          A       No.

19          Q       -- from 2003 until today?

20          A       No.  I think you asked that

21   before, but they have not.

22          Q       Do you think that men and

23   women have different capabilities because of

24   their biology?

25          A       Of course.
```

Page 326

                    DANIEL WEISS

1

2          Q      Do you believe that men and

3    women are better suited to particular jobs

4    because of their biology?

5          A      Of course.

6          Q      And can you name some jobs

7    that men are better suited to because of

8    their biology?

9          A      Construction work men are

10   better at, and climbing telephone poles men

11   might be better at.

12                Work that requires lots of

13   heavy lifting.

14         Q      Are there some jobs that

15   women are better suited to because of their

16   biology?

17                ATTORNEY DROZ:  Objection,

18         this relevance.

19         A      I would say no.

20         Q      Are there any non-physical

21   jobs that you any think men are better

22   suited to because of their biology?

23         A      No.

24         Q      In your report you refer to

25   being nonbinary in quotes.  Why do you do

Page 327

1                   DANIEL WEISS

2    that?

3          A       Where is that?

4          Q       Paragraph 84 of your report,

5    you use the word nonbinary, and you put it

6    in quotes.

7          A       Okay, I would like to see how

8    I refer to that.

9                   Oh, yes, so I think because

10   it's not clear what that means.

11                  I think they are referring to

12   a male who feels that they are neither, even

13   though they are male, they feel that they

14   are either, neither -- sorry, neither male

15   nor female.

16                  That is, they are nonbinary,

17   that's the term that they use.  They are not

18   either of those binary options, even though

19   in reality they are male.

20                  So, WPATH used that term.  I

21   happen to put that nonbinary in quotes, and

22   this is what I was stating before, they

23   might feel they identify as a eunuch, so we

24   are obliged to respect that and remove their

25   testes, if we follow WPATH guidelines, as

```
                                        Page 328
 1                   DANIEL WEISS
 2   Dr. Connelly does.
 3          Q       So do you think that there is
 4   any way in which someone who is nonbinary
 5   should be respected for being nonbinary?
 6          A       No, I think the term to say
 7   someone is nonbinary is nonsense.
 8                   They have some psychological
 9   problem accepting their -- the reality of
10   their physical being, and they say they are
11   nonbinary, that's the term they might use.
12                   But I think it's nonsense.
13          Q       Okay.  So someone who is
14   nonbinary, do you think they are suffering
15   from a delusion?
16          A       No, I think they have a
17   psychological problem that they need help
18   with.
19                   And we should not -- we
20   should not support that feeling or
21   conviction by physical intervention, by
22   surgical intervention, any more than we
23   should a young lady who has anorexia nervosa
24   who feels she's too fat, and then help her
25   lose weight when she's underweight.
```

Page 329

```
 1                    DANIEL WEISS
 2               That would be as similarly
 3   absurd to intervene surgically in that
 4   person.
 5               I am just shocked that people
 6   would consider supporting an intervention on
 7   a child, because there is no lower age
 8   limit, who doesn't like their testes who
 9   says I'm nonbinary.
10        Q     Okay.  What about an adult
11   who's nonbinary?
12        A     I think that person -- so
13   that person is not likely to regret it, and
14   I certainly wouldn't refer that person to a
15   surgeon, and I think they need therapy.
16               If they say I'm nonbinary and
17   I want my testes removed, I identify as a
18   eunuch, I had a person who wanted, a female
19   who had breasts and a vagina, normal
20   external genitalia, I believe, I didn't
21   examine her, she wanted a penis and she
22   wanted to keep her breasts.
23               Now, she was psychotic, and
24   she needed help for her psychosis.  And
25   there is this analogy between that and
```

DANIEL WEISS

someone who has -- who says they identify as a eunuch, and they are nonbinary.

Q It's your opinion that someone who is nonbinary and wants to physically appear in ways both like a male and a female, that that person is psychotic, is that correct?

A No, that patient I described was psychotic.

But no, I don't know what the psychiatric disorder would be in that person who wants to appear both as a male and female, who calls himself nonbinary, they have some psychiatric disorder and it's not -- if you want to call it gender dysphoria, go right ahead, if that's the name you want to call it, and they say they identify as nonbinary, that person needs psychiatric help.

You know, they may not seek it, they may instead seek modification of their body.

Q And the goal of that psychiatric help would be to get them to

```
                                              Page 331
  1                      DANIEL WEISS
  2    admit that they are whatever sex they were
  3    assigned at birth?
  4          A        No, I did not say that.
  5                   The goal of that psychiatric
  6    intervention is to relieve their psychic
  7    distress that they might have, whatever
  8    psychic distress that is present, and those
  9    people have to have it.
 10                   They have to have depression,
 11    anxiety, some thing is going on that makes
 12    them call themselves nonbinary.
 13                   But the goal is not so-called
 14    conversion therapy, which is a term used for
 15    those who have a different sexual
 16    orientation.  It's not that.
 17                   The goal is to help make them
 18    feel less dysphoric, make them feel more
 19    positive about themselves and living in the
 20    world.
 21          Q        What about someone who is
 22    nonbinary and who does undergo some form of
 23    gender affirming care and then has no more
 24    psychic distress about their gender
 25    presentation?
```

```
                                        Page 332

  1                    DANIEL WEISS

  2          A      Yes.

  3          Q      Would you say that they are

  4   still mentally unwell and suffering from a

  5   delusion if they continue to identify as

  6   nonbinary?

  7          A      So, first, I didn't use the

  8   word delusion, that's your word.  They have

  9   psychological disorders in general.

 10                I mean, if they say they are

 11   nonbinary, they have some psychological

 12   disorder, and that needs to be addressed.

 13                Now, if you are coming up

 14   with a hypothetical example of someone who's

 15   had some medical intervention, surgery,

 16   hormones, and they say they are nonbinary,

 17   and they are feeling fine about themselves,

 18   no depression, anxiety.  I would say that's

 19   great.

 20                But I'm not sure what your

 21   question was.

 22          Q      Sure.  Would you still say if

 23   they are not experiencing any psychic

 24   distress but they are still identifying as

 25   nonbinary, is it still your belief that
```

Page 333

```
 1                    DANIEL WEISS
 2   person is mentally unwell in some way?
 3          A       If they say they are
 4   nonbinary still, probably there is
 5   psychological issues going on there that
 6   haven't been addressed, yeah.
 7                    But if they are happy, they
 8   are feeling great, it doesn't matter what I
 9   say, and I don't care.
10                    They shouldn't care if they
11   are -- if life is good, they are not
12   depressed, they are not anxious, they are
13   sleeping well, their energy is good, their
14   job is well, their social arrangements are
15   positive.
16                    It's immaterial, that's
17   great, and I'm glad they are doing well.
18          Q       When talking to patients to
19   whom you provide gender affirming care,
20   would you use their requested name if it
21   differed from the name?
22          A       Oh, sure.  There is no reason
23   to hurt people's feelings, insult them.
24          Q       And would you refer to your
25   patients by their preferred pronouns?
```

Page 334

DANIEL WEISS

1

2        A        Absolutely.

3        Q        And what about sort of

4   outside of their presence?

5                 For example, if you were

6   discussing a patient with a nurse, would you

7   refer to them by their preferred pronouns?

8        A        I would still try to, because

9   it's the right thing to do, and I don't want

10  to do it one way in one setting and not --

11  another way in the other setting, because I

12  don't want to offend the person.

13       Q        And what about in the medical

14  records, would you try to use people's

15  preferred pronouns in their medical charts?

16       A        Yes.  I actually prefer not

17  to use pronouns in that setting, I just use

18  the first name.

19       Q        So putting aside the issues

20  related to fertility and genital changes, do

21  all of the risks that you identified with

22  respect to puberty blockers exist when

23  blockers are used to treat precocious

24  puberty?

25       A        Let me look in my list again.

Page 335

```
 1                        DANIEL WEISS
 2    Page 32.
 3                   One more time, that question?
 4         Q        Putting aside issues related
 5    to fertility and genital changes that you
 6    discussed, do all of the risks you
 7    identified with puberty blockers that exist
 8    when blockers --
 9                   ATTORNEY KORBERG:  Withdrawn.
10         Q        Putting aside the issues you
11    identified with regard to fertility and
12    genital changes, do all of the risks that
13    you identified with respect to blockers in a
14    gender affirming care context for minors
15    exist when blockers are used to treat
16    precocious puberty?
17         A        So the data we have primarily
18    is in the setting of precocious puberty when
19    treating minors.
20                   The only caveat I would say
21    is, besides infertility and genital changes,
22    there is orgasm, concern about inability to
23    achieve orgasm if they treat early.
24                   And then the bone density,
25    which correlates to duration of treatment,
```

```
                                    Page 336
 1                   DANIEL WEISS
 2   reductions in bone density.
 3          Q      Do you support banning
 4   puberty blockers for precocious puberty?
 5          A      No.
 6          Q      Do you know anyone personally
 7   outside of your patients who is transgender?
 8          A      No.  In terms of like a
 9   friend or aware of people, or in what
10   capacity?
11          Q      Yeah, sure, let's start with
12   friends.  Do you have any friends who are
13   transgender?
14          A      No; I don't have very many
15   friends anyway.
16          Q      Have you ever worked with
17   someone who is transgender?
18          A      Yes.  I don't -- but in a
19   professional capacity.
20          Q      Do you have any personal
21   biases against transgender people?
22          A      No.
23          Q      Would you have any objection
24   to using the bathroom with someone who is
25   transgender?
```

Page 337

```
                              DANIEL WEISS
 1
 2          A        I myself, no.  But I think,
 3    you know, this is outside the scope of what
 4    we are talking here.
 5                    But I think females, biologic
 6    females might appropriately be concerned
 7    about someone who says they are female, but
 8    looks like a male or has -- exposes himself
 9    and still has his external genitalia.
10                    So I think I would be
11    sensitive to the females' concerns in that
12    regard.
13                    But I have no problem.
14          Q        Do you think that cys gender
15    men should be concerned about transgender
16    men using the same restroom?
17          A        I think it's best that people
18    who retain their genitalia that they are
19    born with go into the bathroom that is
20    appropriate for their biologic sex, and I
21    think it's most respectful and caring for
22    all parties that way.
23                    And if a person doesn't want
24    to do that who is trans, perhaps they can
25    use a bathroom that's unisex.
```

```
                                              Page 338

 1                      DANIEL WEISS
 2          Q        So you think it's most
 3    appropriate for a transgender man with a
 4    full beard who is physically presenting as a
 5    man in every way to use the women's room, is
 6    that right?
 7                    ATTORNEY DROZ:  Objection,
 8              enough.  Relevance.
 9          A        In that setting, if he looks
10    like a man and he's using -- if he looks
11    like a man, then there is not going to be an
12    issue.
13                    But if he looks like a woman
14    in some ways, he doesn't have the beard and
15    then he exposes himself, his external
16    genitalia, this is a biologic male in the
17    presence of women, that could cause anxiety
18    and concern, because of what you previously
19    stated before, about sexual assaults on
20    females is more common by males.
21                    Biologic males, if they
22    retain their external genitalia, and they
23    say they are women, that could cause
24    distress among biologic females.
25          Q        In the last year, what was
```

Page 339

DANIEL WEISS

1
2       your approximate total income from all
3       sources?
4               A       In the last -- 2022, you
5       mean?
6               Q       Let's do 2022 first, and then
7       2023.
8               A       2022 --
9                       ATTORNEY DROZ:  I will just
10              object, the relevance.
11              A       Probably -- I'm guessing here,
12      here, because I don't have my returns in
13      front of me, but probably about $300,000;
14      roughly.
15              Q       And how much of that income
16      comes from your clinical practice at
17      InterMountain?
18              A       So I joined, to clarify, I
19      joined InterMountain in -- my first day of
20      work was the end of January of this year, so
21      I wasn't working, I was not employed with
22      InterMountain last year.
23              Q       Okay, why don't we say then,
24      how much of that income came from your
25      clinical practice in Ohio?

Page 340

DANIEL WEISS

1

2          A       Let's see, I would say about

3    85 percent.

4          Q       And what percentage of your

5    income has come from various agreements with

6    drug and device manufacturers to advise on,

7    present and promote certain treatments?

8          A       Well, last year would have

9    been probably, if I am recalling correctly,

10   the other 15 percent would have been

11   promotional programs for pharmaceutical

12   companies.

13         Q       Okay.

14                 And what about, sorry, in

15   2022, did you have any other sources of

16   income?

17         A       Not that I recall.

18                 Not from employment.  It

19   would have been dividends and that kind of

20   thing.

21         Q       Sure.

22                 So in 2023, what do you

23   expect your income from your clinical

24   practice at InterMountain to be?

25         A       I am salaried, because I came

```
                                          Page 341
 1                    DANIEL WEISS
 2   in as a new person, so it's lower, $220,000.
 3          Q       How much do you expect this
 4   year to receive from the various agreements
 5   you have with drug and device manufacturers
 6   to advise, present on and promote certain
 7   treatments?
 8          A       Probably $60,000.
 9          Q       And how much of your income
10   in 2023 is -- are you going to get from your
11   position as a senior fellow at Do No Harm?
12          A       Whatever I -- what did I
13   previously say?  Probably like that, maybe a
14   little more, I don't recall.
15          Q       $18,000?
16          A       So it will be probably maybe
17   $5,000 more or something.  I am not doing
18   much work with Do No Harm now.
19          Q       So roughly you expect about
20   $20,000 from Do No Harm?
21          A       Yes.
22                  ATTORNEY DROZ:  I think the
23          testimony was 12 to 15 before.
24                  THE WITNESS:  That sounds
25          right.
```

```
                                    Page 342
 1                    DANIEL WEISS
 2           A       So yeah, 20, roughly 20.
 3           Q       And how much income do you
 4    expect this year from being an expert
 5    witness in gender affirming care cases?
 6           A       Probably $80,000.
 7           Q       And do you have any other
 8    expected income for 2023?
 9           A       Expected income, you mean
10    other sources?
11           Q       Yes, that we haven't talked
12    about here?
13           A       No.
14           Q       How does your total expected
15    income this year compare to three years ago?
16           A       Well, last year it was -- it
17    should be similar to last year's.  Three
18    years ago I think it was lower because I got
19    a raise when I was with my employer in Ohio.
20                    But this year's should be
21    pretty similar to last year's, it seems
22    like, but we will see.
23           Q       And next year, in 2024, do
24    you expect the amount of income that you
25    receive from Do No Harm to increase,
```

Page 343

DANIEL WEISS

1 decrease or stay the same?

2                    ATTORNEY DROZ:  Objection,

3          speculation.

4          Q        You can answer.

5          A        Decrease.

6          Q        Decrease?

7          A        Yes.

8          Q        Why is that?

9          A        I don't think -- my role is

10 not important at this point with what they

11 are working on.

12         Q        Do No Harm is no longer

13 focusing on gender affirming care bans for

14 minors?

15         A        No, they are doing a lot of

16 areas of focus, some of which you touched

17 on.

18                  But I suspect my role will be

19 less than -- and my income from them will be

20 less than this year, because I was doing a

21 lot more of those expert testimony

22 submissions, and there will probably be less

23 of that.

24         Q        Do you think there is going

```
                                          Page 344
 1                     DANIEL WEISS
 2    to be less of that because Do No Harm is
 3    going to prioritize supporting state bans on
 4    gender affirming care or because fewer
 5    states are going to be passing bans on
 6    gender affirming care for minors?
 7           A      Well, it's mere speculation,
 8    but I don't think either of those is the
 9    case.  I think they are working on other
10    issues.
11                  They, for example, are
12    working on affirmative action, I think they
13    have spoken on that, and the systemic racism
14    issues and things like that.
15           Q      So it's your belief that on a
16    relative basis, Do No Harm is going to focus
17    on other issues more than gender affirming
18    care bans for minors, is that right?
19           A      That's right, I suspect that.
20           Q      What's the basis for you
21    suspecting that?
22           A      If you go to their website
23    you see all the other areas they are
24    addressing.
25           Q      And do you expect the income
```

```
                                              Page 345
 1                        DANIEL WEISS
 2    that you received for being an expert
 3    witness in cases regarding gender affirming
 4    care cases to increase, decrease or stay the
 5    same?
 6           A        Again, I don't know.  I would
 7    think it might stay the same or increase.  I
 8    doubt that it will decrease, because there
 9    are a lot of bans that have been challenged,
10    and they might ask for my input.
11                    ATTORNEY KORBERG:  Okay, I
12            have no further questions.  I
13            appreciate your time today.
14                    THE VIDEOGRAPHER:  Anything
15            else, Mr. Droz?
16                    ATTORNEY DROZ:  I don't think
17            I'm going to do a redirect.
18                    THE VIDEOGRAPHER:  This is
19            the videographer.  The time is 5:56.
20            This ends media file 6, and this
21            concludes this deposition.
22                    (Time noted:  5:56 p.m.)
23
24
25
```

Page 346

1                      DANIEL WEISS
2
3
            I, the undersigned, a
4    Certified Shorthand Reporter of the
     State of New York, do hereby
5    certify:
            That the foregoing
6    proceedings were taken before me at
     the time and place herein set forth;
7    that any witnesses in the foregoing
     proceedings, prior to testifying,
8    were duly sworn; that a record of
     the proceedings was made by me using
9    machine shorthand which was
     thereafter transcribed under my
10   direction;
            That the foregoing transcript
11   is a true record of the testimony
     given.
12           Further, that if the
     foregoing pertains to the original
13   transcript of a deposition in a
     federal case before completion of
14   the proceedings, review of the
     transcript [ ] was [x ] was not
15   requested.
16           I further certify I am
     neither financially interested in
17   the action nor a relative or
     employee of any attorney or party to
18   this action.
            IN WITNESS WHEREOF, I have
19   this date subscribed my name.
                 Dated: September 25, 2023
20
21
22
23
24
          Stephen J. Moore
25        RPR, CRR

Page 347

1                    DANIEL WEISS

2        DECLARATION UNDER PENALTY OF PERJURY

3              Case Name: PAM POE v.

4        LABRADOR

5              Date of Deposition: September

6        22, 2023

7

8              I, DANIEL WEISS, hereby

9        certify under penalty of perjury

10       under the laws of the State of New

11       York that the foregoing is true and

12       correct.

13             Executed this _____ day of

14       _____, 2023, at

15        _____.

16

17

18       _____

19

20             DANIEL WEISS

21

22

23

24

25

Page 348

```
 1                    DANIEL WEISS
 2              DEPOSITION ERRATA SHEET
 3              Case Name: PAM POE v.
 4         LABRADOR.
 5              Name of Witness: DANIEL WEISS
 6              Date of Deposition: September
 7         22, 2023
 8              Reason Codes:  1. To clarify
 9         the  record.
10              2. To conform to the facts.
11              3. To correct  transcription
12         errors.
13    Page _____ Line _____ Reason _____
      From _____ to _____
14    Page _____ Line _____ Reason _____
      From _____ to _____
15    Page _____ Line _____ Reason _____
      From _____ to _____
16    Page _____ Line _____ Reason _____
      From _____ to _____
17    Page _____ Line _____ Reason _____
      From _____ to _____
18    Page _____ Line _____ Reason _____
      From _____ to _____
19    Page _____ Line _____ Reason _____
      From _____ to _____
20    Page _____ Line _____ Reason _____
      From _____ to _____
21    Page _____ Line _____ Reason _____
      From _____ to _____
22    Page _____ Line _____ Reason _____
      From _____ to _____
23    Page _____ Line _____ Reason _____
      From _____ to _____
24    Page _____ Line _____ Reason _____
      From _____ to _____
25
```

Page 349

1              DANIEL WEISS
2         DEPOSITION ERRATA SHEET
3   Page _____ Line _____ Reason _____
    From _____ to _____
4   Page _____ Line _____ Reason _____
    From _____ to _____
5   Page _____ Line _____ Reason _____
    From _____ to _____
6   Page _____ Line _____ Reason _____
    From _____ to _____
7   Page _____ Line _____ Reason _____
    From _____ to _____
8   Page _____ Line _____ Reason _____
    From _____ to _____
9   Page _____ Line _____ Reason _____
    From _____ to _____
10  Page _____ Line _____ Reason _____
    From _____ to _____
11  Page _____ Line _____ Reason _____
    From _____ to _____
12  Page _____ Line _____ Reason _____
    From _____ to _____
13  Page _____ Line _____ Reason _____
    From _____ to _____
14  Page _____ Line _____ Reason _____
    From _____ to _____
15  Page _____ Line _____ Reason _____
    From _____ to _____
16  Page _____ Line _____ Reason _____
    From _____ to _____
17              _____ Subject to the
18         above changes, I certify that the
19         transcript is true and correct
20              _____  No changes have
21         been made. I certify that the
22         transcript  is true and correct.
23
24         _____
25              DANIEL WEISS

```
                                            Page 1

 1          UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF IDAHO
 2                 SOUTHERN DIVISION
        Case No. 1:23-cv-00269
 3      ---------------------------------------x
        PAM POE, by and through her parents
 4      and next friends, Penny and Peter Poe;
        PENNY POE; PETER POE; JANE DOE, by and
 5      through her parents and next friends,
        Joan and John Doe; JOAN DOE; JOHN DOE,
 6
                            Plaintiffs,
 7
                      -against-
 8
        RAÚL LABRADOR, in his official capacity
 9      as Attorney General of the State of
        Idaho; JAN M. BENNETTS, in her official
10      capacity as County Prosecuting Attorney
        for Ada, Idaho; and the INDIVIDUAL
11      MEMBERS OF THE IDAHO CODE COMMISSION,
        in their official capacities,
12
                            Defendants.
13      ---------------------------------------x
14                      September 21, 2023
                        10:04 a.m.
15
16
17          Remote Videotaped Deposition
18      of JAMES M. CANTOR, Ph.D., an Expert
19      Witness, taken by Plaintiffs, before Dawn
20      Matera, a Certified Shorthand Reporter
21      and Notary Public for the State of New
22      York.
23
24
25
```

Page 2

```
 1    A P P E A R A N C E S :
 2
 3        GROOMBRIDGE WU BAUGHMAN & STONE LLP
          Attorneys for Plaintiff
 4            801 17th Street N.W.
              Suite 1050
 5            Washington, D.C. 20006
 6        By:   PHILIP MAY, ESQ.
                philip.may@groombridgewu.com
 7
                    - and -
 8
          GROOMBRIDGE WU BAUGHMAN & STONE LLP
 9            565 Fifth Avenue, Suite 2900
              New York, New York 10017
10
          By: KYLE BERSANI, ESQ.
11            kyle.bersani@groombridgewu.com
12
13        COOPER & KIRK
          Attorney for the State Defendants
14            1523 New Hampshire Ave N.W.
              Washington, D.C. 20036
15
          By:   JOHN RAMER, ESQ.
16              jramer@cooperkirk.com
17
18        ADA COUNTY PROSECUTOR'S OFFICE
          Attorneys for Jan M. Bennetts, in her
19        official capacity as County Prosecuting
          Attorney for Ada, Idaho
20            200 W Front Street
              Suite #3191
21            Boise, Idaho 83702
22        By:   DAYTON REED, ESQ.
23
24
25
```

Page 3

```
1    A P P E A R A N C E S : (Continued)
2
3        CIVIL LIBERTIES UNION (ACLU)
             39 Drumm Street
4            San Francisco, California 94111
5        By:  LI NOWLIN-SOHL, ESQ.
                lnowlin-sohl@aclu.org
6            LESLIE COOPER, ESQ.
                leslie-cooper@aclu.org
7
8        OFFICE OF THE ATTORNEY GENERAL FOR THE
         STATE OF IDAHO
9        Attorneys for the State Defendants
             700 W Jefferson
10           Suite #210
             Boise, Idaho 83720
11
         By:  LINCOLN WILSON, ESQ.
12
13
    Also Present:
14
         CHRIS HANLON, Videographer
15
         ROB BENIMOFF, Concierge
16
                    ~oOo~
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1          THE VIDEOGRAPHER:  Good morning.
 2      We are going on the record.  The date
 3      today is September 21st, 2023.  The
 4      time is 10:04 a.m. Eastern Time.  This
 5      is media unit number 1 of the
 6      video-recorded deposition of Dr. James
 7      Cantor taken in the matter of Pam Poe,
 8      et al., versus Raúl Labrador, et al.,
 9      filed in the U.S. District Court for
10      the District of Idaho Southern
11      Division.  This is case number
12      1:23-CV-00269.
13          My name is Christopher Hanlon, I
14      am a certified legal videographer.
15      Our court reporter today is Dawn
16      Matera and we are with Veritext New
17      York.
18          At this time I would just note
19      that I cannot go off the video record
20      unless both parties agree.  And I
21      would now ask counsel to please state
22      your appearances for the record,
23      starting with the noticing attorney,
24      please.
25          MR. MAY:  Good morning.  My name
```

Page 5

```
 1        is Philip May from the law firm of
 2        Groombridge, Wu, Baughman & Stone in
 3        Washington D.C.  And I represent the
 4        Plaintiffs.
 5             MR. RAMER:  Good morning, my
 6        name is John Ramer with the law firm
 7        Cooper & Kirk in Washington D.C. and I
 8        represent the State Defendants.
 9             MR. WILSON:  Good morning,
10        Lincoln Wilson with the Idaho Attorney
11        General's office representing the
12        State Defendants.
13             THE VIDEOGRAPHER:  Thank you,
14        counsel.  All other counsel will be
15        noted on the stenographic record.
16             At this time I would ask our
17        court reporter, Ms. Matera, to please
18        administer the oath and we can
19        proceed.
20   J A M E S   M.   C A N T O R, the Witness
21   herein, having first been duly sworn by
22   the Notary Public, was examined and
23   testified as follows:
24   EXAMINATION BY MR. MAY:
25        Q.    Good morning, Dr. Cantor.
```

Page 6

1        A.      Good morning.

2        Q.      As you heard my name is Philip

3    May.  I represent the plaintiffs here and

4    I am going to be asking you some

5    questions today.

6             I understand that you have been

7    deposed before, right?

8        A.      That's correct.

9        Q.      So some of these rules, I am

10   just going to go over some ground rules.

11   You may be familiar with them already but

12   I would like to make sure we are all on

13   the same page.

14             For today I ask that you give a

15   verbal answer to all of my questions.

16   Either a yes or a no.  No shaking of the

17   head.  No nodding, as our court reporter

18   can't take down a shake or a nod; is that

19   okay?

20       A.      I understand.

21       Q.      And also since there is a court

22   reporter we want to make sure that there

23   is a clean record of who is talking at

24   what time.  So please, let's endeavor not

25   to talk over each other, okay?

Page 7

```
 1        A.    Understood.
 2        Q.    As I said I am going to ask
 3    some questions today.  I will do my best
 4    to ask clear questions; however, I am not
 5    always successful in that goal.  If at
 6    any time you don't understand my question
 7    or you need any clarification, please ask
 8    for that clarification, okay?
 9        A.    Yup.
10        Q.    And if you don't ask for
11    clarification of any of my questions I
12    will assume that you understood them as
13    posed; do you understand that?
14        A.    Yes.
15        Q.    Is there any reason you can't
16    testify truthfully and honestly today?
17        A.    No.
18        Q.    And you understand that you're
19    testifying today under oath?
20        A.    Yes.
21        Q.    And you understand that oath is
22    the same oath that you would take in a
23    courtroom in front of a judge?
24        A.    Yes.
25        Q.    Since this deposition is
```

Page 8

1    happening remotely today I do just have a
2    couple additional kind of housekeeping
3    questions to ask you.
4              On your computer you don't have
5    any e-mail or messaging applications open
6    or actively open on your computer; is
7    that right?
8        A.    That's correct.  Although my
9    calendar window was open.  Let me get
10   that out of the way.  All set.
11       Q.    If anything happens, you think
12   you've closed out of Teams but all of a
13   sudden you get a message, please just let
14   us know that you need to take care of
15   that and address that, okay?
16       A.    You said Teams?  The software
17   package that opened I think was Zoom.
18       Q.    Right.  Sorry.  So we're doing
19   the deposition on Zoom.  But if -- Teams
20   was an example.  If, for example, you get
21   a message through like a work messaging
22   application or something like that or an
23   e-mail pops up that you thought you had
24   closed out of, just let us know?
25       A.    I understand.

Page 9

```
 1        Q.    Okay.  And do you have any
 2   papers or materials with you today for
 3   your deposition?
 4        A.    I brought a blank page and pen
 5   in case I needed it.  A clean,
 6   unannotated copy of my initial
 7   declaration, and water.
 8        Q.    Great.  I brought some coffee
 9   as well, so.
10        A.    Mine is in the next room.
11        Q.    So Dr. Cantor, you said you
12   have been deposed before, right?
13        A.    That is correct, yes.
14        Q.    Approximately how many times
15   have you been deposed in the past?
16        A.    About six.
17        Q.    And have those all been in
18   cases regarding transgender care and
19   transgender youth?
20              MR. RAMER:  Objection to the
21        form.
22        A.    When I say six I was limiting
23   specifically to transgender-related
24   cases.  I have been an expert witness for
25   several cases, usually revolving --
```

Page 10

```
 1    involving some other type of atypical
 2    sexuality, typically in the context of
 3    sex offenders.
 4              I don't think, now that I am
 5    running through them in my head, I don't
 6    think they included a deposition.
 7    Usually they were -- that was testimony
 8    for Frye hearings.
 9        Q.    So six depositions related to
10    transgender issues; is that right?
11        A.    Roughly.  Again, I would have
12    to check through my notes to be sure.
13    Give or take one, roughly six.
14        Q.    What did you do to prepare for
15    today's deposition?
16        A.    Reread my report and the major
17    supporting documentation such as the --
18    at least the summaries and my own notes
19    of the various systematic reviews and of
20    the various policies that are still in
21    place by, in the U.S., by the major
22    associations that have put forth clinical
23    guidelines.
24        Q.    Which of the associations in
25    the U.S. do you consider the major
```

Page 11

```
 1    associations that have put forth clinical
 2    guidelines?
 3         A.    The Endocrine Society.  The
 4    World Professional Association of
 5    Transgender Health.  And the one for
 6    which I published a peer-reviewed fact
 7    check, the American Academy of
 8    Pediatrics.
 9         Q.    In addition to rereading your
10    report and the documentation and your
11    notes, what else did you do to prepare
12    for today?
13         A.    I had two two-hour meetings
14    with state defendants' representatives.
15    I think those were the major activities
16    specific to this case.
17              But of course, because I do
18    several of these cases and they are
19    overlapping in time, it's a little
20    difficult to isolate what is in regards
21    to what when I read a new paper or
22    something else comes out that's pertinent
23    to all of them regardless of which, which
24    case triggered my reading of that
25    particular -- that particular document.
```

Page 12

1      Q.    You said you met with the
2  state's defendants' representatives; who
3  were those individuals?
4      A.    Mr. Wilson and Mr. Ramer.
5      Q.    Was anyone else involved in
6  those meetings besides Mr. Wilson and
7  Mr. Ramer?
8      A.    Not that I recall, no.
9      Q.    So in addition to reviewing
10  your report, materials in these meetings,
11  what else did you do to prepare for
12  today's deposition?
13          MR. RAMER:  Objection to the
14      form.  Asked and answered.
15      A.    I think that's about it other
16  than the usual get a good night sleep,
17  double-check my alarm clock and other
18  typical just be prepared for a big day
19  kinds of activities.
20      Q.    And Mr. Ramer's objection just
21  reminded me of another ground rule I
22  wanted to clarify with you.  Apologies
23  for not doing this earlier.
24          In the event your counsel makes
25  an objection, you understand that you

Page 13

```
 1    still have to answer my question unless
 2    you're specifically instructed not to?
 3         A.    Yes, I understand.
 4         Q.    Okay.  In preparing for your
 5    deposition today, did you speak with any
 6    of the state's other experts?
 7         A.    No, I did not.
 8         Q.    Have you ever spoken with any
 9    of the state's -- strike that.
10              Do you know who the state's
11    other experts are in this case?
12         A.    I guess I have to say no.
13    Again, because there are repeatedly
14    overlapping experts for the plaintiffs in
15    several of these cases in several states
16    and overlapping expert witnesses for the
17    defense in several of these cases, all
18    involving highly overlapping material.  I
19    would lose track of whose witness -- who
20    is a witness in which one.
21              So I guess I would have to say
22    no and that I don't remember who is
23    specific to this particular case.
24         Q.    I think we will talk a little
25    bit more about the other experts later.
```

Page 14

```
 1              When were you retained for this
 2   case on behalf of the State of Idaho?
 3       A.    I would have to, again, check
 4   my notes to be sure.  This is the second
 5   of -- actually, I don't remember which is
 6   first.  So this is one of two cases for
 7   which I am retained by the state.  I
 8   believe they were in June.  I would have
 9   to check, again, my notes for the exact
10   date.
11       Q.    And which is the other case
12   that you're retained by Idaho for?
13       A.    I don't remember the case's
14   name.  It's essentially a case about
15   single-sex restroom use.
16       Q.    And have you provided a
17   deposition or an expert report in that
18   case yet?
19       A.    I have submitted an expert
20   report, yes.
21       Q.    Have you sat for a deposition
22   in that case yet?
23       A.    Again, I would have to check my
24   notes to make sure I am not confusing
25   cases because these are concurrent cases
```

Page 15

```
 1   all with overlapping material.  I believe
 2   a deposition was waived in that one.
 3             Again, I would have to check my
 4   notes to make sure that I am not
 5   confusing it with another one of the
 6   simultaneous cases.
 7        Q.    You understand that this case
 8   pertains to an Idaho law known as HB 71?
 9        A.    Yes, I do.
10        Q.    Have you ever publicly spoken
11   about HB 71?
12        A.    No, I have not.
13        Q.    Have you ever taken a public
14   position on HB 71?
15        A.    No, I have not.
16        Q.    Outside the context of this
17   litigation, have you ever spoken with
18   anyone about HB 71?
19        A.    No.
20        Q.    For purposes of today I think
21   we are going to be talking about a lot of
22   different issues.  So there are a couple
23   terms up front I wanted to just address
24   and make sure we are on the same page
25   about.
```

```
                                        Page 16
 1            One of those terms I think that
 2    will be referred to interchangeably in
 3    some literature and also during
 4    questioning, I believe, a term, I think
 5    you use frequently is "natal male."
 6            Do you also understand that
 7    term to mean -- do you understand that to
 8    be the same thing as someone assigned
 9    male at birth?
10            MR. RAMER:  Objection to the
11        form.
12        A.    Yes, in general.  Sometimes the
13    context can indicate that somebody is
14    either using a term in an ambiguous way,
15    in a novel way or an idiosyncratic way,
16    and generally I double-check that we're
17    using the same idea.  If there is a
18    particular phrasing that insinuates an
19    argument or insinuates information that
20    isn't pertinent, again, I tend to make
21    that explicit.
22            But in general that tells me
23    what the person is -- what the person is
24    thinking.  That's a pretty standard,
25    technique is a strong word, that's a
```

Page 17

```
 1    standard method that we have to do, those
 2    of us that do sex research, especially in
 3    controversial questions where different
 4    modes of thought, different people,
 5    different experts use different terms to
 6    refer to the same thing.  When it's
 7    ambiguous, I just clarify for purposes of
 8    definitions and then we start out, and
 9    then in general I -- in general I do my
10    best to translate in my head what
11    everybody means by it.
12              I guess what I am saying is
13    simultaneously, I have -- they're usually
14    synonyms.  When it's not clear something
15    is meant as a synonym I try to make that
16    explicit.
17       Q.     Great.  So just to be clear, we
18    will understand each other, assigned male
19    at birth and natal male are generally
20    interchangeable unless you note
21    otherwise; is that fair?
22       A.     Yes.  The other term I
23    frequently use is biological male and
24    female.
25       Q.     And yes, that would be the
```

Page 18

```
 1    exact same thing as assigned female as
 2    birth, natal female, biological female?
 3              MR. RAMER:  Objection to form.
 4         A.    Yes, those are -- excusing the
 5    occasional exception, those are basically
 6    synonyms.
 7         Q.    So we will treat those as
 8    synonymously unless there is a specific
 9    reason that you want to clarify to
10    explain why they are different; is that
11    fair?
12         A.    Yes, that's fair.
13         Q.    All right.  I believe in your
14    exhibit folder you should already have
15    Exhibit 1.
16              (Exhibit 1, Expert declaration
17         of Dr. Cantor, was so marked for
18         identification, as of this date.)
19         Q.    So if you can go ahead and open
20    it up, Exhibit 1, and just confirm for me
21    that you have that open.
22         A.    Yes, I have that open.
23         Q.    Exhibit 1 is a copy of your --
24    what's marked as your expert report is an
25    expert declaration that was filed in this
```

Page 19

1   case?
2       A.      Yes, by going through the first
3   few pages, that looks like it.
4       Q.      And I understand you have a
5   hard copy of that in front of you?
6       A.      Yes, I do, that's correct.
7       Q.      And if you want to for today,
8   you can feel free to refer to the hard
9   copy in front of you whenever we are
10  discussing questions.  You don't have to
11  go back to the electronic copy.
12      A.      Perfect.  I feel much more
13  comfortable with paper.  It doesn't need
14  updating while I read it.  It doesn't run
15  out of power or focus.
16      Q.      Considering Exhibit 1, your
17  declaration, as you sit here today are
18  you aware of any inaccuracies in your
19  declaration?
20      A.      No, I am not.
21      Q.      Is there anything in your
22  declaration you would like to correct,
23  amend or change?
24      A.      Not, not substantively.  But if
25  I had the opportunity and time and, of

Page 20

```
 1    course, whichever group that I am working
 2    with, similarly have the opportunity and
 3    time, there are sections that I would
 4    expand for greater completeness.  But
 5    there is nothing absent from it that
 6    would change any of the arguments or any
 7    of the conclusions.
 8              As I say, usually there are
 9    updates or additional examples that I
10    would include for completeness.
11       Q.    Was anyone besides you involved
12    in the authorship of your declaration,
13    Exhibit 1?
14       A.    No.  I first wrote the bulk of
15    it, the main informational sections,
16    before the assessment of Dr. Brady's
17    report.  I initially wrote that document
18    for Alabama's case.
19              So there was, you know, some
20    typo checking, formatting, ensuring that
21    I am not using an overly technical word
22    or accidentally tripping over a legal
23    language that involves a term of art.  So
24    there was that kind of minor copy editing
25    with the lawyers in that case.
```

Page 21

1      But nothing, again,
2  substantive.
3      Q.    Since the document was
4  originally written for Alabama, have you
5  made any substantive changes from that
6  Alabama case to today?
7      A.    Not substantive ones, no.  I
8  removed some sentences in the bulk of the
9  document that I wrote that were specific
10  in responses to experts in that case.
11  Nothing else of substance, no.
12      Q.    Aside from counsel in this
13  case, have you discussed the substance of
14  your declaration with anyone else?
15      A.    Yes and no.  It's hard -- yes
16  and no.  I haven't discussed anything
17  specific about the declaration itself or
18  its use, purposes for my point of view,
19  purposes for the state defendants' points
20  of view.  But, of course, the material
21  itself is central to the science that I
22  have been doing and the knowledge
23  accumulating and information that I have
24  been accumulating in this material for
25  literally decades.

Page 22

```
 1            So I very, very frequently am
 2    asked questions about this type of
 3    material, what the research says.   I
 4    often will send sections of it to the
 5    media or anybody else asking when it's
 6    relevant to answering whatever question
 7    they had.
 8            So as I say, it's a little bit
 9    difficult to make a -- to make a clean
10    mark when in the back and forth there are
11    discussions with other people helped me
12    realize what is clear, not clear.
13    Natural questions that occur in other
14    people's heads.   Their automatic
15    assumptions that would give me an idea of
16    how to phrase something, not phrase
17    something.   Other material that people
18    would need in order to understand
19    properly and not misinterpret content of
20    the science; none of which was specific
21    to any case that I am working on, but is
22    part of my, as I say, general, general
23    functioning as a sex researcher and an
24    academic.
25        Q.    So just to make sure I
```

Page 23

1    understand.  You haven't discussed the
2    substance of your declaration in the
3    context of this case with anyone besides
4    counsel for this case?
5         A.    Yes, that is correct.
6         Q.    Let's go ahead and now also go
7    to Exhibit Share and pull up what's been
8    marked as Exhibit 2.
9              (Exhibit 2, CV of Dr. Cantor,
10        was so marked for identification, as
11        of this date.)
12        A.    So this is where I need to
13   refresh the screen?
14        Q.    I should already have
15   Exhibit -- Exhibit 2 should already be in
16   that main folder.
17        A.    Yes, I got it.
18        Q.    You have Exhibit 2, which has
19   your name at the top of it and this
20   appears to be your CV; is that right?
21        A.    Yes, by the first couple of
22   pages, that looks like it, yes.
23        Q.    Is this a fair and accurate
24   copy of your CV?
25        A.    As best as I can tell from the

Page 24

1    first pages, yes.

2        Q.    So this is 32 pages.  Is this a

3    complete curriculum vitae for you?

4        A.    Yes, it looks like it.  I am

5    just looking at the list of expert

6    witness cases to make sure it's complete,

7    and, yes, I believe it is.

8        Q.    Are there any changes,

9    corrections or amendments to your CV?

10       A.    No.  But again, the only

11   potential change would be if there is an

12   additional case that I hadn't yet added

13   to this copy when it was submitted.

14       Q.    So your current role is the

15   director of the Toronto Sexuality Center;

16   is that right?

17       A.    That is correct.

18       Q.    Can you explain what your role

19   is as the director of the Toronto

20   Sexuality Center?

21       A.    That's the corporate name to my

22   private practice.

23       Q.    What is the focus of your

24   private practice?

25       A.    Sex and couples therapy.

Page 25

```
 1        Q.    What are the age of the
 2    individuals that you see in your private
 3    practice currently?
 4        A.    Currently, approximately ages
 5    25 and up.
 6        Q.    Are you currently seeing anyone
 7    under the age of 18?
 8        A.    Currently, no, I don't believe
 9    I am.
10        Q.    Are you currently seeing anyone
11    who identifies as transgender, gender
12    nonconforming or gender dysphoric?
13              MR. RAMER:  Objection to the
14        form.
15        A.    Gender nonconforming, yes,
16    depending on how one is using the term.
17              Until, I would say roughly the
18    social media age, gender nonconforming
19    meant gender nonconforming; either a
20    biological female who is tomboyish or a
21    biological male who is a bit effeminate.
22    Over the course of the social media age,
23    that's been -- that term has become more
24    loaded and some people use the term, if
25    not synonymously, but very close to mean
```

Page 26

1  towards the border of meriting a
2  potential diagnosis of gender dysphoria.
3        So gender nonconforming, in
4  what the words literally mean, but as I
5  say because some people use that term to,
6  in a bit more loaded of a way, that is
7  one of those instances I would have to
8  ask exactly what do you mean by that
9  phrase in order to decide, the people
10 that I have in mind, does it happen to
11 fit them.
12    Q.    I appreciate that explanation.
13        So to make sure I understand,
14 you're currently not seeing any patients
15 who identify as transgender, correct?
16    A.    Again, I need a little bit of a
17 yes and no.  But the question isn't --
18 the ambiguity in my head is not over
19 whether the person counts as transgender
20 or not.  The ambiguity in my head is
21 whether I am currently seeing them or
22 not.
23        As is very common in sex and
24 couples therapy, there are people ranging
25 from weekly formal psychotherapy to

Page 27

1    checking in every once in a while, to
2    they are fine and come back a couple of
3    months later because there is a
4    particular event or a particular
5    situation we were anticipating and they
6    may come back, but they are not a regular
7    weekly kind of client.  But of the
8    regularly scheduled, either once a week
9    or once every other week, I am not
10   currently seeing somebody for whom a
11   social transition or medical transition
12   is currently under consideration or
13   underway.
14        Q.    And also to be clear, of
15   that -- using that definition of
16   currently seeing someone, so someone who
17   is regularly scheduled with you, you're
18   not seeing anyone who identifies as
19   gender dysphoric; is that right?
20        A.    Yes, that's correct.
21        Q.    And using that definition of
22   someone who is regularly scheduled with
23   you, you believe you are seeing
24   individuals who identify as gender
25   nonconforming but in, how you phrase it,

Page 28

1    a biological female who a tomboyish or a
2    biological male who is a bit effeminate?
3              MR. RAMER:  Objection to the
4         form.  Mischaracterizes testimony.
5         A.    I'm not actually -- it's a bit
6    hard to say.  But there is also an
7    imperfect match between people who, you
8    use the word "identify," for this
9    particular adjective I would say just
10   describe themselves as, there were people
11   who would describe themselves as
12   effeminate and people that aren't.  That
13   doesn't mean that I or somebody else
14   would perceive them as effeminate or not.
15             There's people whose
16   presentation is completely unremarkable
17   but are insecure about their masculinity
18   and they were afraid that they appear
19   effeminate; and vice versa, there are
20   people aware, simply acknowledge that
21   there is not -- they are not as obviously
22   masculine or obviously feminine as
23   others.  But it's not really part of
24   their -- they don't consider it a part of
25   their gender.  It's just their mannerisms

Page 29

```
 1    and they would use it to describe
 2    themselves exactly as anybody else would
 3    describe themselves as introverted versus
 4    extroverted.
 5         Q.    Over the course of your -- over
 6    the course of your career, how long have
 7    you maintained a clinical practice?
 8         A.    Well, my private practice,
 9    outside of another institution, it's
10    about five years now.
11              I began this as I was -- I
12    began my current private practice a year
13    or two as I was preparing to leave my
14    hospital and faculty appointments.
15    Again, about five, six years ago.
16              Before that I was a clinical
17    researcher and still performing clinical
18    duties.  Training clinical students.
19    Fully engaged in the clinical process,
20    but not as part of a private practice.
21    It was part of a public hospital and
22    being a faculty -- a member of the
23    faculty of medicine at the University of
24    Toronto.
25         Q.    So I just want to understand
```

Page 30

1    that a little bit better.

2              So while you were on faculty at

3    the University of Toronto, what

4    percentage of your duty time was spent

5    personally seeing patients?

6        A.    Clinical scientist and clinical

7    research doesn't quite break down so

8    neatly.  For example, when I am training

9    a student I would sometimes have face-to-

10   face contact with their client.  It would

11   be somebody I am interviewing or somebody

12   I am assessing.  But my student is in the

13   room and the student writes the report or

14   conducts part of the psychometric

15   assessments and so on.

16             And in other parts of the

17   training or with more advanced students

18   that reverses.  The student then is

19   engaged in what it is that I am training

20   them in and I am watching and

21   supervising.

22             Next phase in a student's

23   training I am not in the room, but I am

24   going over the clinical reports and

25   checking, checking their materials and so

Page 31

1   on.

2             So at what part that counts as

3   my function versus their function depends

4   on the context and the nature of the

5   question, even though I am ultimately

6   responsible and it's my signature on the

7   formal clinical reports despite that I am

8   not the one who had the face-to-face

9   contact with the patient.

10             One level more abstract is that

11  when I or we or my field is conducting

12  clinical research on the outcomes, I am

13  now accumulating large amounts of data

14  from large numbers of people where I am

15  the one who directs and conducts and

16  supervises and am ultimately responsible

17  for its content.  Again, this is now very

18  many patients, but I am not the one who

19  conducted the face-to-face interview.

20             Similarly --

21        Q.    So let's cabin the question

22  then to face-to-face interview.  So

23  during your time at the University of

24  Toronto, what percentage of your time

25  were you the one involved in the

Page 32

1   face-to-face interview with a patient in
2   the context of a clinical practice?
3       A.    Early in my career, 30 to 40
4   percent and then decreasing as I became
5   more senior and more involved in those
6   supervisory and training materials and so
7   on.
8           So towards the end, 5 to 10
9   percent or towards the end of my time at
10  KMH and U of T, 5 to 10 percent.
11      Q.   So towards the end of your time
12  was 5 to 10 percent of your time being
13  spent with the one doing the face-to-face
14  interviews.  Approximately how many
15  patients does that account for that you
16  were involved in the face-to-face
17  interview for?
18      A.    50 to 100 per year, perhaps.
19      Q.    Individual patients or
20  individual sessions?
21      A.    Individual patients.
22      Q.    Over the course of your career
23  have you ever provided -- strike that.
24           Over of the course of your
25  career have you ever worked with children

Page 33

1    under the age of 16?

2         A.    Only in an observational

3    capacity.  I never had responsibility for

4    such a case, no.

5         Q.    So you never had responsibility

6    for the case of a child under the age of

7    16?

8         A.    That is correct.

9         Q.    And approximately how many

10   individuals between the ages of 16 and 18

11   have you had the responsibility for in

12   the course of your clinical career?

13        A.    Roughly two dozen perhaps.

14        Q.    Roughly two dozen between the

15   ages of 16 and 18 over the course of your

16   career?

17        A.    Yes, that's correct.  As, of

18   course, the sex and couples therapist,

19   the issues don't become pertinent until

20   the person is essentially an adult.

21        Q.    So of these roughly two dozen

22   patients between the ages of 16 and 18

23   that you have seen -- excuse me, start

24   that over.

25              Of the approximately two dozen

```
                                    Page 34
 1    patients between the ages of 16 and 18
 2    that you've had responsibility for over
 3    the course of your career, how many of
 4    those, if any, identified as transgender?
 5              MR. RAMER:  Objection to the
 6         form.
 7         A.    Such a question requires some
 8    unpacking.  The emphasis and the phrase
 9    in common use in the lay public about a
10    person identifying themselves and again
11    is a very, very modern, almost
12    exclusively post-social media construct.
13              Before the influence of social
14    media, people, parents, families, the
15    kids themselves, the adolescents wouldn't
16    use such a phrase and they would use a
17    much more personal, direct -- insightful
18    isn't the right word, but internal
19    description of their experiences rather
20    than implying a ubiquitous phrase in
21    social media which can mean any of many
22    different things that the person isn't
23    reflecting on their own experience, they
24    are using language that they see online.
25    So many of these people use or used to
```

Page 35

```
 1    use a wide range of phrases describing
 2    their experiences.
 3               Some of them -- for some of
 4    those people they would clearly translate
 5    to what today would often be said to be
 6    identified as, so the whole reason that
 7    they came to me or the clinic itself was
 8    because they had questions.  They didn't
 9    know.  They just knew that they were
10    confused.  They didn't fit in with other
11    people.  They weren't like other people.
12    Their experiences weren't like those --
13    those of their peers.
14               Today especially somebody who
15    comes in already having decided or
16    thinking that they have decided where
17    they are, where they are going, what is
18    best for them, they tend to use such a
19    strong term.  But they wouldn't be the
20    persons who came to me.  The people who
21    came to me were the ones for whom it was
22    either a question or unclear or they came
23    in for a different issue and they didn't
24    or didn't yet appreciate the role that
25    gender or public perception or social
```

```
                                            Page 36

 1    perception of their gender was a

 2    pertinent or relevant issue.

 3              So as I say, it's because the

 4    use of the term itself has evolved over

 5    time, so has the people coming in asking

 6    questions about themselves.

 7         Q.    Let me try this a different

 8    way.

 9              Of the approximately two dozen

10    patients between the ages of 16 and 18

11    that you have had responsibility for over

12    the course of your career, how many of

13    those, if any, were seen by you for

14    issues related to gender or gender

15    dysphoria?

16              MR. RAMER:  Objection to the

17         form.

18         A.    Again, it didn't, doesn't break

19    down quite that neatly.  More typically,

20    as I said, their descriptions of their

21    experiences were that they were unsure

22    what their experiences meant.  They

23    didn't know if they were trans.  They

24    weren't sure if this meant they were gay

25    or lesbian, or they were experiencing
```

Page 37

```
 1   some other atypical sexual orientation or
 2   sexual interest pattern that some
 3   proportion of the time overlapped with
 4   what we would call today gender identity,
 5   but they just didn't know.  They were
 6   unsure themselves.  And what they needed
 7   was a thorough, competent assessment,
 8   testing each of the different patterns.
 9   Testing each of the increased information
10   and education about the very wide, very
11   diverse world of sexuality, beyond
12   gender.
13            Many of the people coming in in
14   the post-social media age automatically
15   or reflexively translate everything to
16   gender and believe that the only --
17   believe that there exists only a spectrum
18   for masculine to feminine, for male to
19   female, but don't see any of the other
20   dimensions representing still other
21   spectrums.
22            One of the most common and
23   still overlooked situations would be
24   somebody who is expressing, for example,
25   sexual masochism.  People who are turned
```

Page 38

```
 1    on by people who for whom it's
 2    legitimately said their sexual
 3    orientation is about being humiliated or
 4    beaten.  That is their genuine sexual
 5    orientation.  To such a person they will
 6    often experience humiliation at being
 7    called, for example, effeminate, so they
 8    find themselves sexually aroused by it.
 9    They know it's meaningful.  They
10    experience it as core to their being, but
11    it's not actually about gender itself.
12    It's being attributed to gender.  But for
13    that person, they actually will become,
14    you know, happier and more fulfilled
15    being able to use the masochism and being
16    able to use the experiences of
17    humiliation within a, for example, kinky
18    setting.  So they will sometimes engage
19    in gender atypical behaviors, but not
20    because transition would help them engage
21    in it, but because it provokes from other
22    people in, as I say, in kinky kinds of
23    settings, it gets them the kind of
24    behavior and the kinds of partners and
25    the kind of opportunities that they want.
```

Page 39

1          But in very much of the lay

2     public today where the only consideration

3     is transition or not, masculine or not,

4     or somewhere in between, nobody is asking

5     questions.  Nobody is entertaining other

6     possibilities outside of what's now in

7     the public discourse.

8          So as I say, it simply doesn't

9     break down to gender versus not gender.

10    These various situations overlap and they

11    have been unfortunately terribly

12    oversimplified by people whose only

13    experiences are to apply what's familiar

14    according to gay/lesbian and applying it

15    to transgender status where it just does

16    not fit accurately.

17     Q.    Okay.  Of the approximately two

18    dozen patients between the ages of 16 and

19    18 that you have had responsibility for

20    over the course of your career, how many

21    of those did you provide counseling for

22    specifically in relation to transgender

23    issues?

24          MR. RAMER:  Objection to the

25       form.

Page 40

```
 1       A.    Again, I think that requires
 2   some unpacking.  Can you repeat the
 3   question?
 4       Q.    Sure.  Of the approximately two
 5   dozen patients between the ages of 16 and
 6   18 that you have had responsibility for
 7   over the course of your career, how many
 8   of those patients did you provide
 9   counseling for specifically in relation
10   to transgender issues?
11            MR. RAMER:  Same objection.
12       A.    Again, it's hard to tell
13   because whether the person's experience
14   was about transgender issues or something
15   resembling transgender issues was
16   ambiguous.
17       Q.    Okay.  How many of those
18   patients, of those patients that you have
19   treated -- strike that.
20            How many of the patients
21   between the ages of 16 and 18 that you
22   have had responsibility for over the
23   course of your career, how many of them
24   were transgender?
25            MR. RAMER:  Objection to the
```

Page 41

1      form.

2          A.     Really I can only say that it's

3      ambiguous.  All of my time as part of KMH

4      and U of T, and most of my time in

5      private practice, I am a specialized

6      specialist.

7               When a case is, I hesitate to

8      say run of the mill, when a case is

9      clear, they don't need me.  I get the

10     cases where it's not clear or it's

11     complicated or there are many intervening

12     or concurrent factors that require

13     somebody with a broader expertise than

14     the relatively, again, I am hesitating to

15     use the phrase run of the mill, because

16     in a meaningful way none of these are run

17     of the mill, but when a case, at least

18     superficially appears clear, it wouldn't

19     get to me.

20               Cases come to me or people ask

21     me to consult on cases when it's very

22     unclear.  There are several different

23     potential explanations and they need, as

24     I say, a specialized specialist.

25               If it's somebody who just needs

Page 42

```
 1    a basic assessment to be able to say, are
 2    you competent to provide informed consent
 3    in order to undergo whatever medicalized
 4    procedure, I wouldn't see such cases.
 5    Many people are qualified to conduct such
 6    an assessment and they don't bother with
 7    me, they don't bother needing to consult
 8    with me.
 9         Q.    So Dr. Cantor, you testified a
10    lot before about your experience,
11    correct?
12              MR. RAMER:   Objection to the
13         form.
14         A.    I am not quite sure what a lot
15    means, but it does take a substantial
16    proportion of my time this year and last
17    year.
18         Q.    So you provided testimony I
19    believe you said in deposition in at
20    least six other cases regarding
21    transgender issues?
22         A.    Yes, that's correct.
23         Q.    And do you recall most recently
24    sitting for a deposition in June of this
25    year in a case related to the State of
```

Page 43

1   Indiana?

2        A.    I, again, would have to check

3   my notes.  Oddly, because my role in each

4   of these cases is the same, the basic

5   questions are the same, it's very easy

6   for me to lose -- they are essentially

7   interchangeable in my head.  So I would,

8   again, would have to check my notes.

9              And I have learned to keep very

10  careful notes, about exactly which case

11  is which and in which one I provided in-

12  person testimony versus video testimony

13  versus which were the trials, which were

14  the depositions.  That sounds

15  approximately correct.  But again, I

16  would have to check my own notes to be

17  sure exactly which one was which.

18       Q.    Sure.

19             MR. MAY:  And Rob, if we can

20        please go ahead and mark tab 4 as

21        Exhibit 3, please.

22             (Exhibit 3, Transcript of

23        Dr. Cantor's deposition from K.C.

24        versus individual members of the

25        Medical Licensing Board of Indiana,

Page 44

1        was so marked for identification, as

2        of this date.)

3            MR. BENIMOFF:  Exhibit 3 has

4        been introduced.

5        A.    I got it.

6        Q.    You have Exhibit 3 open,

7    Dr. Cantor?

8        A.    Yes, I do.

9        Q.    This is a transcript of your

10   deposition from the case of K.C. versus

11   individual members of the Medical

12   Licensing Board of Indiana.

13       A.    That's what it looks like, yes.

14       Q.    Did you have a chance to review

15   this deposition testimony after you

16   provided it?

17       A.    I had a chance to review it,

18   yes.

19       Q.    And you didn't identify any

20   corrections for this transcript, right?

21       A.    Again, I don't recall.  I don't

22   remember anything outstanding that was

23   left uncorrected.  I don't think I have

24   any loose threads on it.  But as I say,

25   because there are several of them, I

Page 45

1    can't remember which corrections I might
2    have sent to which case.
3         Q.    And if you can go to page 16 of
4    the pdf, you will see there's four pages
5    of testimony per page.
6         A.    Yes, do you want me on page 16
7    of the pdf or --
8         Q.    16 of the pdf and the page
9    that's labeled 59.  And starting at line
10   21.
11        A.    Hold on one second.
12        Q.    Sure.
13        A.    Yes, I am at 59.
14        Q.    Starting at line 21 you were
15   asked:
16             "Question:  As I understand
17   from previous testimony, the extent of
18   your clinical experience with transgender
19   adolescents has been providing counseling
20   to eight transgender patients between the
21   ages of 16 and 18 in your career; is that
22   right?"
23             And you responded at page 60
24   lines 1 through 2:  "For being a formal
25   clinician for cases, that number sounds

Page 46

```
 1    about right, yes."
 2              Did I read that correctly?
 3        A.    Yes, it would seem so.
 4        Q.    So it's fair to say you've
 5    provided counseling to eight transgender
 6    patients between the ages of 16 and 18 in
 7    your career?
 8              MR. RAMER:  Objection to form.
 9        A.    No, that was at that time.
10        Q.    That was at that time, two
11    months ago or three months ago?
12        A.    Correct.  As time goes on, I
13    am, as I say -- I am frequently asked to
14    consult, answer questions, you know, see
15    somebody for a session or two, and as my
16    participation in these various legal
17    cases increases, my name becomes that
18    much more known -- that much more known,
19    and so I become -- lightning rod is not
20    the right phrase.  Because very many
21    clinicians are afraid to speak openly or
22    critically about what's going on, I am
23    one of the very few people for many cases
24    for whom people feel confident or
25    comfortable or feel that they will get a
```

```
                                        Page 47
 1    thorough assessment and ask me particular
 2    questions that other clinicians either
 3    are unwilling to see, unwilling to
 4    respond to, or the families of the kids
 5    don't trust the responses that they are
 6    getting.  They feel like they are getting
 7    reflexive, automatic or superficial
 8    responses.
 9              So as I say, as my
10    participation in these various cases
11    increases, I am more frequently called to
12    consult on additional such cases.
13       Q.   So in the last three months,
14    since you gave this deposition in Indiana
15    in June of 2023, how many transgender
16    patients between the ages of 16 and 18
17    have you provided counseling to?
18              MR. RAMER:  Objection to the
19         form.
20       A.   Again, I'm sorry, I am trying
21    to work through each of the caveats in
22    that question.  Could you say that again?
23       Q.   Sure.  In the last three months
24    how many transgender patients between the
25    ages of 16 and 18 have you provided
```

Page 48

```
 1    counseling to?
 2              MR. RAMER:  Same objection.
 3        A.    Again, about another six to
 4    eight.
 5        Q.    In the last three months you've
 6    seen another six to eight transgender
 7    adolescents between the ages of 16 and
 8    18?
 9              MR. RAMER:  Objection to the
10        form.  Asked and answered.
11        A.    Again, I would have to add the
12    same kinds of caveats.  The cases that
13    come to me are the cases for which I am
14    asking to consult are the more
15    complicated, more ambiguous.  It's not
16    quite so clear.  It's not quite so clear.
17              To call them a transgender case
18    is to presume the answer.  Well, the
19    whole problem with much of the -- what's
20    going on clinically is that the answer is
21    being presumed before actually seeing the
22    person.
23              So people are coming in asking
24    questions.  The answer is ambiguous.  And
25    I help point out, you know, give the
```

Page 49

1    person issues to think about, the
2    alternative ways to interpret their
3    experience.  And does that count as a
4    transgender case?  Sometimes yes,
5    sometimes no.
6              It's not a -- you're asking me
7    ironically to dichotomize what's actually
8    a spectrum of answers.
9        Q.    So I am just a little confused
10   because I thought earlier you told me
11   that you're currently seeing patients
12   ages 25 and up and that you're not seeing
13   anyone under the age of 18.
14       A.    Not regularly, correct.
15       Q.    So you're drawing a distinction
16   between one-off consultations versus
17   regular treatment of patients; is that
18   fair?
19       A.    Well, that's, yes, how the
20   field works, is that there are regular
21   patients and regular patients, how many
22   am I currently seeing.  Well, the ones I
23   am regularly currently seeing I have
24   regular appointments with, weekly
25   monthly, whatever it is.  And then I am

Page 50

```
 1    also asked for assessments for
 2    consultation, for input, for people for
 3    whom they have questions and it's, you
 4    know, a limited number of sessions to
 5    help them work through those issues.
 6    It's whatever, one, two, three sessions,
 7    and then their questions are answered or
 8    they have information to chew on.  We
 9    have no set appointment.  But they may,
10    indeed, return again a couple of months
11    later asking more questions or having
12    resolved it, or something else comes up
13    for which, again, they are confused.  I
14    can't say that it's a current patient of
15    mine, because we don't have regularly --
16    regularly set appointments, but the
17    number of people that I have seen
18    continues to accumulate.
19         Q.    So in the last -- so in the
20    last three months, you have seen another
21    six to eight transgender patients between
22    the ages of 16 and 18?
23              MR. RAMER:  Objection to the
24         form.  Asked and answered.
25         A.    Again, I can't automatically or
```

Page 51

1   easily say who does and does not count as

2   a transgender patient. That assumes a

3   conclusion that the person is still

4   exploring. They don't know what's right

5   for them. They don't appreciate the

6   other alternatives. They have to test

7   and try them out for themselves, and

8   neither I nor when I see them, they, know

9   what the answer is going to be. They are

10  testing it out.

11          So who does and doesn't count

12  as transgender is not easily or

13  dichotomously decided. But I am, on a

14  very regular basis, asked questions by

15  people, their families, their clinicians,

16  about the possibilities for any

17  particular one. So to say this was a

18  transgender patient and that one wasn't,

19  any clinic is willing to do that. But

20  for the complicated cases where people

21  are asking questions and there are

22  several different possibilities, those

23  are the ones where they tend to call me

24  in for a little while.

25          Q.    In the last three months how

Page 52

1    many patients under the age of 18 have

2    you seen?

3        A.    Again, these would the same

4    group of six-ish to eight-ish.  Again, I

5    would have to check my notes for the

6    exact cutoffs in numbers, but they would

7    be the same.  They would be the same

8    people.

9            The only cases of that age

10   range that I am asked about are the ones

11   for whom there is some -- it's somewhere

12   in the mix, the person isn't trusting the

13   feedback or they don't think that they

14   would get honest or accurate feedback

15   from -- from their regular clinicians.

16            And it's the ongoing basic, you

17   know, regularly scheduled appointments

18   are the folks 25 and up with a relatively

19   well demarcated set of issues that they

20   wanted to discuss and address.

21       Q.    And these six to eight patients

22   under the age of 18 that you've seen in

23   the last three months, have you

24   personally seen them or have these been

25   issues where another doctor has asked you

```
                                          Page 53

 1    to consult without interacting with the

 2    patient directly?

 3              MR. RAMER:  Objection to the

 4         form.

 5         A.    Those would be people that I

 6    had seen myself.  And sometimes, again, a

 7    mix.

 8              It starts by a question or

 9    consultation from a particular person.

10    Then I, myself, would see the patient,

11    have my own conversation with them.  And

12    either depending on what the case needs,

13    you know, provide my feedback to the

14    person, him or herself, to their family

15    as appropriate or to their clinicians and

16    providers as appropriate.

17         Q.    Okay.  Just to make sure I

18    understand.  So prior to June of this

19    year, you had seen over the course of

20    your career eight transgender patients

21    between the ages of 16 and 18 and then in

22    the last three months you've seen another

23    six to eight transgender patients between

24    the ages of 16 and 18?

25              MR. RAMER:  Objection to the
```

Page 54

1          form.
2          A.     That is roughly correct.
3     Again, I would have to check my calendar
4     for more precise numbers, but that's
5     roughly it.
6          Q.     Okay.
7                 MR. MAY:   We have been going
8          about an hour, so I think now may be a
9          good time to go ahead and take a
10         five-minute break.
11                THE VIDEOGRAPHER:   Thank you,
12         counsel, this is the videographer, the
13         time is 11:07, this ends media file
14         one.
15                (Off the record.)
16                THE VIDEOGRAPHER:   We are back
17         on the record.   The time is 11:13,
18         this begins media file two.
19    BY MR. MAY:
20         Q.     Dr. Cantor, with reference to
21    those six to eight patients under the age
22    of 18 that you have seen in the past
23    three months, have any of those patients
24    come to you believing them to be trans,
25    believing themselves to be trans and you

```
                                              Page 55
 1    disagree with that assessment?
 2              MR. RAMER:  Objection to the
 3         form.
 4         A.    I don't think any really.
 5    Again, it's the more complicated, unsure,
 6    could go in many different directions,
 7    kinds of cases that come to me.
 8              People who are convinced,
 9    settled, unquestioning about their
10    situation or their self-labeling, I
11    accord their self-labeling, you know, I
12    don't know if I can call myself a public
13    figure, but I mean my scientific analysis
14    and background and so on are at this
15    point, you know, sometimes very
16    positively, sometimes very negatively,
17    depending on the writer, described.  And
18    patients, people, clients, the public
19    very purposefully self-select who they
20    want to see and why.
21              If a person does not want to be
22    questioned, they are not going to come to
23    me because I have a -- because I am
24    perceived to be asking exactly those very
25    challenging questions.
```

```
                                    Page 56

 1              If the family, the situation,
 2    are seeking only affirmation, you know, I
 3    am going to have a very long list of
 4    questions and explorations ahead of that.
 5    They won't come to me for that.
 6              When it's the not so sure and
 7    there are other factors involved, and
 8    it's unclear and they specifically want
 9    to avoid an automatic presumption of, oh,
10    you're asking questions about
11    transgender, you're a transgender kid,
12    da, da, da, all you need is to be able to
13    understand the terms of the document they
14    are signing.  Like I say, they don't come
15    to me.
16              They come to me when there are
17    more complications to the case.  So I
18    really don't get presented -- people who
19    feel like they're sure don't come to me
20    to begin with.
21    Q.    Have you diagnosed any of these
22    six to eight individuals under the age of
23    18 with gender dysphoria?
24    A.    I haven't needed to because of
25    the way the healthcare system, the health
```

Page 57

```
 1    insurance and mental health insurance
 2    coverage works here in Canada, people
 3    don't require a diagnosis in order to
 4    obtain that coverage.  And because the
 5    people coming to me are not or at least
 6    not yet on track for medicalized
 7    transition, again, they don't need a
 8    diagnosis.
 9             So as I say, typically the
10    sessions are aimed at helping the person
11    ask questions, ask themselves questions.
12    Things to explore.  The final diagnosis
13    wasn't -- they needed me to help ask
14    questions, not provide them an answer.
15             We would usually give a
16    diagnosis or I would give, in this
17    context, would give a diagnosis if the
18    diagnosis is needed for a specific
19    purpose.
20             In the U.S. very often that is,
21    as I say, for insurance purposes or if
22    the person is specifically on track to
23    being medicalized, then depending on
24    their immediate circumstances, they
25    require a formal diagnosis.  But I don't
```

Page 58

```
 1    get cases where that's -- where that's
 2    part of the clinical need.
 3              A diagnosis -- assigning or not
 4    assigning a diagnosis is not a synonym
 5    for coming to a conclusion.  It's not --
 6    we will continue to have whatever
 7    sessions we will have until you get a
 8    decision, you get an official diagnosis
 9    or rule out.  That's just not how it
10    works.
11              In standard, routine, mental
12    health practice, as I say, over the
13    course of therapy, somebody has some
14    questions.  To take a non-sexual example.
15    Somebody is unhappy.  Whatever is going
16    on in their personal life or professional
17    life and they want feedback or discuss
18    through whatever the issue is and that's
19    what we do with the client.  So whether
20    the person actually merits a diagnosis
21    of, for example, depression or not, well,
22    that's just not the issue.  One needs
23    that diagnosis only when that diagnosis
24    and to put it on a person's formal
25    record, if it will be of use somehow to
```

Page 59

```
 1    whatever the person's situation is.
 2              Again, in the U.S., sometimes
 3    such a diagnosis is needed in order to
 4    qualify for insurance in the U.S., but
 5    the diagnosis doesn't change what's going
 6    on in the therapy sessions themselves,
 7    which is the check-in, the feedback, the
 8    practicing whatever skills, life skills,
 9    social skills that the person is coming
10    in asking for.
11         Q.   So just to be clear, you did
12    not diagnose any of these six to eight
13    individuals that you seen in the last
14    three months with gender dysphoria,
15    correct?
16              MR. RAMER:  Objection to the
17         form.  Asked and answered.
18         A.   I don't think there -- I can't
19    answer that in a yes or no without,
20    again, unpacking some of the -- the way
21    you phrased the question, had I
22    diagnosed.  I guess there are no means --
23    can mean two different things and I mean
24    one of them and not the other.
25              To say I did not diagnose, in
```

Page 60

```
 1    that I did not actually engage in the
 2    activity and record a diagnosis in the
 3    person's formal file.  But that shouldn't
 4    be taken to mean that I withheld the
 5    diagnosis or said that the person
 6    qualifies for a different diagnosis or
 7    disagreed with an already assigned
 8    diagnosis.
 9              It's that the person's
10    diagnosis or a diagnostic description of
11    the person's situation was not the
12    clinical question.  It just wasn't
13    pertinent to the case.
14       Q.    So you did not diagnose any of
15    these six to eight individuals that
16    you've seen in the last three months with
17    gender dysphoria, correct?
18              MR. RAMER:  Objection to the
19       form.  Asked and answered.
20       A.    There is no accurate yes or no.
21    The question -- as a matter of fact, the
22    question is logically identical to did
23    you -- "Have you stopped beating your
24    mother"; neither a yes nor a no is an
25    accurate response.  It was never the
```

Page 61

```
 1    question.  The question was that the
 2    person was unsure and needed help
 3    figuring out whatever their situation
 4    was -- whatever their situation was.
 5    Psychoeducation, as we call it,
 6    demonstrating the different
 7    possibilities.
 8            So I was never -- the only
 9    accurate answer is that I have never been
10    asked whether a diagnosis is appropriate
11    to a person in the recent cases that
12    we're discussing.
13        Q.   Of those recent cases, have you
14    ever concluded that they met the criteria
15    for gender dysphoria as defined in the
16    DSM?
17        A.   None of these kids really were
18    at a point where I, one, where a person
19    could come to a conclusion.  These were
20    ongoing exploration, seeking
21    alternatives, need to get other issues
22    resolved before anybody could say
23    anything about the person.  So none of
24    them did I really have any kind of
25    conclusion in either direction.
```

Page 62

1          For lack of a better phrase,
2     they were all works in progress.
3          Q.     So you didn't reach a
4     conclusion for any of these six to eight
5     individuals that they met the criteria
6     for gender dysphoria as defined in the
7     DSM?
8               MR. RAMER:  Objection to the
9          form.  Asked and answered.
10         A.     Again, that's another "Did you
11    stop beating your mother."  It was never
12    an intent.  It was never a question put
13    to me.
14              Well, that's not exactly true.
15    I think people hoped to have a nice,
16    clean answer yes or no.  But part of the
17    clinical conversation is that these
18    questions don't have a clear cut yes or a
19    no.  So to say did not come to a
20    conclusion, again, kind of has packed
21    into it, could not come to or would not
22    come to, as opposed to the kinds of
23    questions and complicated cases that
24    require what we call tertiary care aren't
25    conclusive.  It's like saying, "Have you

Page 63

```
 1   finished exercising?"  Well, no, that's a
 2   lifelong, ongoing, it's not a kind of a
 3   task that one finishes.
 4       Q.    Were any of these six to eight
 5   individuals that you've seen in the last
 6   three months already diagnosed with
 7   gender dysphoria?
 8       A.    It's possible that a prior
 9   clinician gave a diagnosis, but none of
10   the cases were along the lines, a person
11   came in with a diagnosis and the patient
12   or their family were challenging it or
13   asking questions or wanted somebody to
14   disagree with it, and so none of them
15   were those kinds of cases.
16          But given the background and
17   the questioning, there were people who
18   were indeed unsure or not convinced by
19   what was said by a prior clinician, but I
20   don't know for sure if the assessment
21   that the person received included
22   specific DSM or ICD code and so on.  So
23   it's possible.  But again, that wasn't
24   really the question put to me.
25       Q.    You mentioned these patients
```

Page 64

1  were coming to you seeking alternatives;
2  what do you mean by that?
3     A.    I don't know if I said so much
4  they came in seeking alternatives so much
5  as the simple dichotomous black and white
6  answers that they were receiving or
7  responses they were receiving just didn't
8  seem to fit or help or feel right, so
9  they were looking for something else.
10  Because the, as I said, dichotomous
11  simple answer they had just wasn't --
12  wasn't working for them.  The person
13  wasn't feeling any better.  Wasn't making
14  any progress.  It didn't change anything
15  for them.
16           So they knew they needed
17  something.  Or at least they felt there
18  were issues being left unaddressed.  So
19  by presenting, exploring, considering
20  other possibilities and other situations
21  that exist in the sexual world beyond
22  the, I can only say almost cookie cutter,
23  cookie cutter, all one size fits all --
24  what's the word I am looking for -- not
25  superficial.

Page 65

```
 1          These are situations where the
 2    kids or their families could perceive
 3    that there were complexities and
 4    unanswered questions, but when they
 5    receive a simplified dichotomous answer
 6    that didn't answer all of their
 7    questions, they knew there was stuff left
 8    unexplored or unexplained and -- loose
 9    ends that just didn't fit in.  So the
10    persons wanted -- knew that something was
11    missing.  And so by discussing with the
12    kid or their families the broader world
13    that exists, gave them extra food for
14    thought, things to explore, possibilities
15    to try on as they more genuinely explore
16    who they are rather than be given what's
17    almost a social media script that they
18    try to push onto themselves in order to
19    have a very simple kind of answer.  But I
20    wouldn't say they exactly came in looking
21    for alternatives.
22             There wasn't a situation --
23    there wasn't a situation where somebody
24    came in saying that they, I don't want to
25    transition or do want to transition, or
```

```
                                        Page 66
 1    the family does or doesn't, so they came
 2    in -- they came in asking me what is
 3    something else they could do.
 4              The questions were much more
 5    along the lines of the simple reflexive,
 6    superficial answers just didn't -- they
 7    didn't feel their primary clinician or
 8    previous clinicians were getting them.
 9    They were just getting fed a boilerplate.
10    That's the word I am looking for.  They
11    were getting a boilerplate report, if you
12    answer yes to any of these you're
13    transgender and off to the races, as
14    opposed to, no, this person has a more
15    complicated, deeper nuance.  There is
16    other stuff going on that needs to be
17    addressed, integrated, attempted,
18    experimented with, explored.
19        Q.    What was the natal or
20    biological sex of these six to eight
21    individuals that you have seen in the
22    past three months?
23        A.    Roughly half and half, bio male
24    and bio female.
25        Q.    Have you ever diagnosed anyone
```

Page 67

```
 1   under the age of 18 with gender
 2   dysphoria?
 3       A.    That's a bit complicated,
 4   again, by the nature of the kind of, the
 5   clinics, I am thinking now about KMH.
 6           The clinics that I have been a
 7   part of, in the Canadian healthcare
 8   system, within the hospital system, and
 9   within the clinic where I was, these were
10   teen-based assessments and teen-based
11   diagnoses.  So in such cases, I would
12   write a report and recommend or not -- or
13   recommend the ruling out -- the ruling
14   out of diagnoses.
15           But again, the process used up
16   here, the formal diagnosis, the diagnosis
17   of record that's recorded by the hospital
18   has to be assigned by an M.D.  Again,
19   that's just the nature of the -- of how
20   the health insurance system up here
21   works.  So it kind of depends on how you
22   count it.  I am the one who did the
23   assessment.  But the person's name, I was
24   going to say on paper, really on the
25   computer is the M.D., who was the head of
```

Page 68

1     the team even though the M.D. that was

2     the head of the team never saw the

3     patient.

4          Q.     Have you ever recommended

5     anyone under the age of 18 be diagnosed

6     with gender dysphoria?

7          A.     Yes.

8          Q.     How many times?

9          A.     Oh, goodness.  Five or six.

10         Q.     What were the ages of five or

11    six patients that you recommended a

12    diagnosis of gender dysphoria for?

13         A.     Again, 16 to 18.  My hesitation

14    is, again, in the context of the clinic

15    and how things worked in that clinic, is

16    that these were ongoing -- these were

17    ongoing cases.

18              And the typical situation is

19    the person would come in for their

20    initial assessment.  They would very

21    often get either no diagnosis or a

22    provisional diagnosis.  It was relatively

23    rare to get a diagnosis off the bat; not

24    because the symptoms weren't present, but

25    because, you know, a proper assessment

Page 69

```
 1    requires observing the person over time
 2    and being able to document that the
 3    symptoms were persistent and consistent,
 4    and you can't tell if something is
 5    persistent and consistent after a single
 6    assessment.
 7              The routine procedures were to
 8    see the person once every several months
 9    to update -- to update the record.  To
10    add anything that wasn't -- that wasn't
11    there before.
12              So in some cases I was the
13    initial or one of the initial, it usually
14    was a two-clinician, two appointments
15    each with a different clinician for each
16    case.  So in some cases I would be one of
17    the initial assessors.
18              And again, we would never give
19    a formal diagnosis.  It would be, you
20    know, at the most stringent provisional
21    diagnosis.  Then one of the follow-up
22    appointments or one of the repeat
23    appointments we now have whatever
24    documentation in order to be able to
25    demonstrate the consistency and
```

```
                                    Page 70

 1    persistency.  So then a provisional
 2    diagnosis could either be assigned at one
 3    of the subsequent appointments or a
 4    provisional diagnosis could then be
 5    advanced or a recommendation for it to be
 6    advanced to a formal diagnosis.
 7              So as I say, the system and the
 8    assessment procedure when performed, you
 9    know, properly, by "properly" I mean
10    according to the clinical evidence, is
11    not just come in, you get a blood test,
12    okay, you tested positive for gender
13    dysphoria, that's the diagnosis.  Send
14    you home to the races.  That's one of the
15    things that make psychiatry and mental
16    health diagnoses entirely unlike actual
17    medical diagnosis in which there is
18    physical evidence.
19        Q.    Did any of these five or six
20    patients for whom you recommend a
21    diagnosis of gender dysphoria ultimately
22    receive hormone therapy?
23        A.    Yes.
24        Q.    How many?
25        A.    I didn't see all of them -- I
```

Page 71

1    didn't always see them long enough term

2    to be sure, but I think all of them.

3        Q.    Did KMH support that provision

4    of hormone therapy to those five or six

5    individuals?

6              MR. RAMER:  Objection to the

7        form.

8        A.    Yes.

9        Q.    Did you personally support the

10   provision of hormone therapy to those

11   five or six individuals?

12             MR. RAMER:  Objection to the

13       form.  Vague.

14       A.    Depends on what you mean by

15   "support."  It was entirely appropriate

16   to the person's mental health status and

17   well-being.  But it's not, the mental

18   health assessment is not the only part of

19   the assessment.  It also takes an

20   endocrinological and more purely medical

21   diagnosis.

22             So I supported the facet of it

23   that I am qualified and able to do.  But

24   mine isn't the only equation in the mix

25   and of course the other clinicians and

Page 72

1    M.D.s at KMH also have to contribute

2    their part to it.

3        Q.    Were those individuals under

4    the age of 18 when they started hormone

5    therapy?

6        A.    Generally not.  I don't

7    remember for sure if there were

8    exceptions.  There could have been at

9    that time.  But as I say, they were --

10   they were exceptions.

11       Q.    When you say at that time, what

12   was the time frame in which you

13   recommended diagnosis for these five to

14   six individuals under the age of 18 with

15   gender dysphoria?

16       A.    The early 2000s.

17       Q.    Do you remember when the last

18   time it was that you recommended a

19   diagnosis of someone under the age of 18

20   for gender dysphoria?

21       A.    Would have been the same --

22   would have been the same period.  As I

23   say, in the cases that I am being asked

24   about or the people that I am seeing more

25   recently, that's not the question.  They

Page 73

1  are coming to me with questions.  And
2  they are not coming to me already having
3  decided on their way and just need to
4  pull the paperwork together in order to
5  accomplish it.
6      Q.    And you never diagnosed or
7  recommended a diagnosis for anyone under
8  the age of 16 for gender dysphoria,
9  correct?
10     A.    Or anything else, that's
11 correct.  As an adult psychologist, I
12 tend to get, again, the cases for whom --
13 for whom adult-related issues seem to be
14 kicking in early.  But, you know, I am an
15 adult psychologist.
16          Again, it's part of sex and
17 couples -- sex and couples therapy.
18     Q.    You don't have a medical
19 degree, correct?
20     A.    That is correct.
21     Q.    And you're not an
22 endocrinologist?
23     A.    That is correct.
24     Q.    You've never prescribed
25 personally puberty blockers or puberty

Page 74

1    suppressors?

2         A.    That is correct.

3         Q.    And you've never prescribed

4    hormones for hormone therapy for trans

5    individuals, correct?

6              MR. RAMER:  Objection to form.

7         A.    Or anybody else, that is

8    correct.

9         Q.    And all of these patients that

10    we have been discussing today, these have

11    all been patients that you saw in Canada?

12         A.    Yes, that is correct.

13         Q.    And you have never seen a

14    patient in the United States, correct?

15         A.    Correct.  Again, my

16    hesitation -- I am trying to think if

17    there is an exception.  I have never had

18    a face-to-face or video -- the cases in

19    the U.S. have been consultations with

20    their clinicians.  But I haven't seen

21    a -- myself seen or directly or video

22    directly, had clinical contact with a

23    client in the U.S., with a client in this

24    family of issues in the U.S.

25         Q.    If you can pull up Exhibit 2

Page 75

```
 1   again, which is your CV.

 2        A.    Got it.

 3        Q.    All right.  And if you would go

 4   to page 3 of your CV for me.  The heading

 5   is "Publications"?

 6        A.    Yes.

 7        Q.    So this first section of

 8   publications, there is 65 entries; is

 9   that right?  I believe it continues on

10   through page 7.

11        A.    That looks correct, yes.

12        Q.    Are these all peer-reviewed

13   publications in this section?

14        A.    I think eventually I combined

15   the two lists.  I used to keep them

16   separate.  And I added maybe six of

17   these-ish are book chapters.  For

18   example, the first one listed, my chapter

19   in the Oxford Textbook of

20   Psychopathology.  I would have to go

21   through them and look.  But I think six

22   of them were outside of the -- outside of

23   journals, peer-reviewed journals.

24        Q.    So fair to say these are

25   peer-reviewed articles or book chapters?
```

Page 76

1      A.    Yes, again, I would have to
2   look through to double-check.  But, yes,
3   essentially.
4      Q.    And it looks like those first
5   two entries relate to gender, gender
6   dysphoria, transgender issues; is that
7   fair?
8      A.    Yes.  Well, the Shirazi one is
9   also pertinent, but not directly but
10  indirect.  Has obvious implications for
11  medical care of transgender people.  But
12  it wasn't of transgender people.
13     Q.    Another article that I saw that
14  referenced gender identity, transgender
15  issues in this list of publications here
16  is entry number 54.
17            MR. RAMER:  Is there a question?
18     Q.    Sorry, are there any other --
19  is that right?
20            MR. RAMER:  Objection to form.
21     A.    That one --
22     Q.    You know what?  That was a bad
23  question.  So let me ask it over again
24  from the start.
25            Entry number 54 is an article

Page 77

1   about gender identity, gender issues; is
2   that fair?
3        A.    Yes, very explicitly.
4        Q.    Aside from entries number 2,
5   possibly 3 and number 54, are there any
6   other peer-reviewed journal articles that
7   pertain to gender identity or gender
8   issues in this area?
9        A.    Although a straightforward
10   question, it doesn't have a
11   straightforward answer.
12          The sex and gender issues are
13   strongly overlapping and again don't chop
14   apart quite so neatly.  As I gave in
15   relative detail in my report, one of the
16   aspects -- late onset or adult onset
17   transgenderism is motivated primarily,
18   some would say exclusively, by a specific
19   paraphilia called autogynephilia,
20   A-U-T-O-G-Y-N-E-P-H-I-L-A.  The
21   paraphilias, all of those highly atypical
22   sexual interest patterns, strongly
23   overlap.  Somebody with one is very
24   likely to have another.  The available
25   brain imaging evidence we have, again,

Page 78

```
 1    demonstrates that for the adult onset
 2    cases, these are strongly overlapping.
 3            So any information about any
 4    one of the paraphilias is highly, if
 5    indirectly, relevant to the other
 6    paraphilias which are in turn highly
 7    relevant to what we know about adult-
 8    onset gender dysphoria.  The child-onset
 9    gender dysphorias are strongly
10    overlapping from neuroimaging on down to
11    homosexuality and sexual orientation.
12            So research about sexual
13    orientation is, again, strongly
14    overlapping with gender identity, and you
15    can't meaningfully study one without the
16    other.
17            In the, I can't say modern era,
18    let me again say onset of social media
19    age, gender dysphoria has been the topic
20    of conversation and the lay public, and
21    unfortunately, you know, many of the
22    people who think of themselves as experts
23    on the topic collapse all of gender
24    dysphoria together and start treating
25    gender dysphoric youth as merely young
```

Page 79

1    versions of adult -- of people with
2    adult-onset gender dysphoria even though
3    these are, in every objective variable we
4    have, unrelated phenomena.
5              So as I say, all of my research
6    is at least indirectly relevant, even
7    though they are not specific studies that
8    went out, tried to recruit a set of
9    people who are -- who are gender
10   dysphoric and to look at them and to
11   examine them.
12             The best analogy that I have is
13   with headaches.  People are coming in,
14   "Doctor, my head hurts."  Well, they are
15   reporting the same symptom.  But it's not
16   competent care to say, "Ah, you have
17   headache disorder, here is the headache
18   pill."  The proper treatment is to find
19   out what's causing the headache.  A
20   migraine is not the same as a head
21   injury, is not the same as a brain tumor,
22   is not the same as an aneurism and so on,
23   even though people are describing, if
24   you're only asking does your head hurt,
25   the answer is yes.  Okay, brain tumor.

Page 80

```
 1    Let's send you into brain surgery.
 2    That's not how it works.
 3              So then if somebody is asked me
 4    how many of your publications were about
 5    aneurisms, when I am instead publishing
 6    mostly about brain tumors, well, you
 7    can't study aneurisms without including
 8    how you ruled out, for example, the
 9    aneurism.  You can't do one of these
10    without accounting for the others
11    simultaneously.
12              So as I say, they are not in
13    the superficially obvious, the way most
14    of the lay public think of it, studies
15    about gender dysphoria and go out and
16    recruit a sample.  But one cannot come to
17    any meaningful conclusion about gender
18    dysphoria without the other, as I say,
19    paraphilias and sexual orientation-
20    related phenomena because that's what
21    gender dysphoria, to the best of
22    science's ability to demonstrate so far,
23    says how it breaks down.
24              Very much of the mistaken
25    perception that's being discussed is
```

Page 81

1    gender dysphoria is gender dysphoria and

2    you just have to individualize it for the

3    person.  But they are collapsing gender

4    dysphoria to a single phenomenon where

5    instead it's the most extreme versions or

6    end points of more than one unrelated

7    phenomena.

8         Q.    Okay.  So of your 65

9    publications, aside from the three that

10   we discussed, 2, 3 and 54, did any of

11   these peer-reviewed publications have as

12   an outcome measure or a research endpoint

13   something related to gender identity?

14              MR. RAMER:  Objection to the

15        form.

16        A.    No, I don't think so.

17        Q.    Okay.  The next section of your

18   publications, I guess I am just a little

19   confused as to the difference between a

20   letter and a commentary versus an

21   editorial.

22              Can you explain to how you draw

23   that distinction?

24        A.    They are just different

25   journals give them different titles.

Page 82

```
 1   It's just part of the editorial style of
 2   the particular journal.
 3            I listed each of them because
 4   the different journals that they appeared
 5   in use different terms.
 6       Q.    And those are not peer-reviewed
 7   articles, correct?
 8       A.    Correct.
 9       Q.    If we can turn to page 10 of
10   your CV, which discusses your funding
11   history.
12       A.    I'm there.
13       Q.    The first study listed here
14   under funding history lists you as a
15   coinvestigator for a grant titled "Brain
16   Function and Connectomics Following Sex
17   Hormone in Adolescents Experience Gender
18   Dysphoria"?
19       A.    That is correct.
20       Q.    Had you authored any papers
21   related to this grant?
22       A.    No, it was since that time that
23   I left my formal academic role.
24       Q.    And then the fourth entry here
25   is another, is a study where you are also
```

Page 83

1    identified as a coinvestigator, titled
2    "Effects of Sex Hormone Treatment on
3    Brain Development:  A Magnetic Resonance
4    Imaging Study of Adolescents With Gender
5    Dysphoria."  Do you see that?
6         A.    Yes.
7         Q.    Have you authored any papers as
8    a result of this grant?
9         A.    No, same, that is when I was
10   leaving academic life.
11             So of course, I was
12   participating in the design of the study,
13   coming up with the research questions,
14   because I had a background in, you know,
15   studying the -- I was actually one of the
16   first sex researchers using neuroscience,
17   or neuroscientists, you know,
18   investigating sex research, depending on
19   your point of view.  Had do with
20   properly -- these were all overlapping,
21   it was my prior experiences in
22   publications investigating a different
23   sexual atypicality, of course pedophilia,
24   which I think was the first one of that
25   scale.  So, of course, you know, my

Page 84

1   contributions, it gave me a very, very

2   unique and experienced contribution for

3   them to apply that same information to

4   questions of gender dysphoria.

5           And then I left KMH.  So I

6   just, you know, accepted an indirect

7   advisory, friendly way, these have been

8   friends and colleagues now for many

9   years, but I didn't have a -- I didn't

10  require a formal academic role or

11  authorship on the publications anymore.

12      Q.    Of your remaining grants, four

13  relate to pedophilia; is that correct?

14      A.    That sounds right.

15      Q.    And one is related to

16  asexuality; is that correct?

17      A.    Correct.

18      Q.    So Dr. Cantor, you were

19  commissioned to write a report for the

20  Florida Agency For Healthcare

21  Administration in 2022; is that right?

22      A.    I would have to check the

23  details of it, but that sounds about

24  right.

25      Q.    I noticed that does not appear

Page 85

```
1    to show up on your CV.  And I am happy to
2    be told that I missed it, but do you know
3    where that appears on your CV?
4         A.    I don't think I put it on my
5    CV.  It wasn't meant to be an academic
6    contribution.  I never intended to
7    publish it and so on.
8         Q.    What do you mean by it was not
9    intended to be an academic contribution?
10        A.    They asked me to review the
11   relevant information to their case, which
12   I did, for which I was hired.  But it
13   wasn't something that, for example, I was
14   going to use to promotion to full
15   professor.  It wasn't something that I
16   was planning to publish independently in
17   a peer-reviewed journal.
18        Q.    That study has not been
19   peer-reviewed; is that fair?
20        A.    It wasn't a study.  It was a
21   summary of the existing research for the
22   purposes of, for Florida's -- for the
23   purposes of the board, medical board in
24   Florida, I think was the -- I was going
25   to say plaintiff.  The client.  The
```

Page 86

1    corporate client I'll call them.

2        Q.    So that summary of existing

3    research for Florida, that has not been

4    peer-reviewed, correct?

5        A.    Correct.

6        Q.    Are there any other summaries

7    or similar works that you have done like

8    the summary that you did for the State of

9    Florida that are not otherwise reflected

10   on your CV?

11            MR. RAMER:  Objection to the

12        form.

13       A.    Only minor ones.  In many ways

14   each of the reports that I've written for

15   the various cases, you know, each one is

16   an updated or expanded version of the

17   prior ones.

18            Chunks of that I might -- oh.

19   I guess what I am thinking is no,

20   although I circulate pieces of it when

21   somebody, whether it's a personal

22   journal, anyone asks me for the

23   information, I will take chunks of it

24   when it's relevant to their question.

25   But I am not recalling offhand any novel

Page 87

1   or independent -- independent works.  Not

2   that I -- I guess what I am saying, not

3   that I recall or these kind of overlap.

4   There is quite possible there is one

5   someplace that I am not thinking of, but

6   nothing major.  Nothing in some large

7   formal public.

8           MR. MAY:  Rob, can you please

9       mark tab 3 as the next Exhibit, which

10      I believe is Exhibit 4.

11          (Exhibit 4, Transcript of Dr.

12      Cantor's testimony in Loe versus Texas

13      was so marked for identification, as

14      of this date.)

15          MR. BENIMOFF:  Okay.  It's been

16      marked, so please refresh.

17  Q.    Dr. Cantor, let me know when

18  you have Exhibit 4 pulled up.

19          MR. MAY:  Let's go off the

20      record and try to resolve the

21      technical issue.

22          THE VIDEOGRAPHER:  This is the

23      videographer, the time is 12:02, we

24      are going off the record.

25          (Off the record.)

Page 88

```
 1              THE VIDEOGRAPHER:  We are back
 2         on the record.  The time is 12:03,
 3         this begins media file three.
 4    BY MR. MAY:
 5         Q.    Dr. Cantor, you have Exhibit 4
 6    open in front of you right now?
 7         A.    Yes.
 8         Q.    And you see this is a document
 9    entitled "Reporter's record in a case
10    titled Lazaro Loe, bunch of individuals
11    versus the State of Texas, versus some
12    other individuals related to a Hearing
13    For Application For Temporary Injunction
14    and Plea to the Jurisdiction"?
15         A.    Yes.
16         Q.    Do you recall giving testimony
17    in the context of this case, Loe versus
18    Texas, in August of this year?
19         A.    Yes, I do, again, with the
20    caveat that these cases are essentially
21    interchangeable in my head, but I
22    remember that I did one for Texas and
23    this kind of looks like it.  But it's
24    easy for me to confuse one case for
25    another.
```

Page 89

1      Q.     And does this appear to be the
2   transcript of your testimony from that
3   hearing?
4      A.     It appears to be by it's
5   content, yes.
6      Q.     Were you truthful during your
7   testimony that you gave in the case of
8   Loe versus Texas?
9      A.     Yes, I was.
10     Q.     And did you do your best to
11  answer those questions honestly?
12     A.     Yes, I did.
13     Q.     And you did your best to answer
14  your questions honestly regardless of
15  whether they came from plaintiff's
16  counsel or defendant's counsel?
17     A.     That is correct.
18     Q.     You can go ahead and put that
19  aside for right now.  I wanted to go to
20  your declaration, Exhibit 1.  And look
21  at -- and if you can go to paragraph 16
22  of your declaration, which I believe is
23  on page 7?
24     A.     Yes, I have it.
25     Q.     So in -- sorry, I am having a

```
                                          Page 90
 1    struggle on my end now.

 2              In the second sentence from the

 3    bottom of paragraph 16, the paragraph in

 4    general -- strike that and let me start

 5    that over.

 6              You agree this paragraph is

 7    discussing international approaches to

 8    provision of gender-affirming medical

 9    care to trans youth?

10              MR. RAMER:  Objection to the

11        form.

12        A.    Yes, although just the way you

13    use the word "international" in that

14    particular sentence, it's not as if any

15    one of these spans multiple nations.  So

16    it's not international in that sense.

17    But it means not limited to the U.S.

18        Q.    Sure.  I agree with that

19    characterization as well.

20              So you see the second-to-last

21    sentence of paragraph 16 reads that

22    "These range from medical advisories to

23    outright bans on the medical transition

24    of minors."

25              Do you see that?
```

Page 91

1       A.      Yes.

2       Q.      And the pronoun "these" there

3   is referring to the non-American

4   approaches that you go on to discuss in

5   your declaration; is that fair?

6       A.      Yes.

7       Q.      Which countries have outright

8   bans on the medical transitions of

9   minors?

10      A.      Finland, Sweden, Norway and the

11  U.K. have essentially banned it except

12  for research purposes.

13      Q.      Just to be clear, what do you

14  mean by the words "outright ban"?

15      A.      That general practitioners

16  aren't permitted to engage in these

17  procedures.  That if ever they are going

18  to be done, as I say, there are

19  exceptions, that the agreed-upon therapy,

20  given the current state, the agreed-upon

21  interventions, given the current state of

22  the science is to use psychotherapy and

23  mental health -- well, psychotherapeutic

24  interventions.

25      Q.      Are there circumstances under

                                                    Page 92

 1    which someone under the age of 18 can
 2    obtain medical transition in Finland,
 3    Sweden, Norway and England?
 4         A.    Can obtain, again, that
 5    requires kind of some unpacking.
 6              The state of the science and
 7    what, you know, each of those healthcare
 8    systems have concluded is that, you know,
 9    there does not exist -- to do this with
10    minors is extremely new, unknown and we
11    don't have the kind of evidence that
12    would support the risk-to-benefit ratio
13    for its use as a general part of medical
14    care.
15              But it continues to be possible
16    that if, for example, we got better at
17    diagnosing or identifying who would
18    versus would not benefit from early
19    interventions, it's possible that that
20    might change in the future.
21              So if somebody is participating
22    in a research study that includes this,
23    then such a person, you know, that way
24    could obtain it depending on -- could at
25    the moment -- I shouldn't say at the

Page 93

```
 1  moment.  Could potentially obtain it.
 2  But that's different -- but because these
 3  are part of, for the most part, at the
 4  moment, hypothetical research projects
 5  that haven't yet been designed, funded,
 6  substantiated and begun, we don't know
 7  what the content of those research
 8  projects are or what situations those --
 9  the government policies are to permit,
10  permit whatever relevant research needs
11  to be done.
12          Research projects and the
13  participants in any research project, you
14  know, have to go through a set of
15  inclusion and exclusion criteria.  Now,
16  those inclusion and exclusion criteria
17  change from study to study and project to
18  project, according to whatever the
19  research project is.  So if a person who
20  thinks that they would benefit, you know,
21  cannot, as if they were undergoing some
22  other procedure, walk in, request, and
23  say you have this official diagnosis,
24  therefore you can now get the -- whatever
25  the -- whatever the intervention is.
```

Page 94

1    These are not clinics where they are

2    saying this is the treatment for that

3    diagnosis, therefore if you walk in and

4    say these symptoms you will get that

5    treatment.  Whatever goes on, whatever

6    treatment is available is whatever

7    treatment is under investigation by that

8    particular clinic, and whoever qualifies

9    for whatever inclusion and exclusion

10   criteria.

11             Although the government

12   policies, any government's policy changes

13   very slowly and, in theory, does its best

14   to respond to the content of the

15   research.  The content of the research

16   itself is always advancing.  If the --

17   whatever, five years from now the general

18   conclusion is we tested it, none of this

19   worked, no point of doing anymore

20   experiments, that's it.  No more

21   research, no more experiments, and the

22   government policy doesn't change.  But it

23   is no longer possible to obtain under any

24   circumstances that treatment because

25   there is no ongoing research and there is

Page 95

```
 1   no government law saying scientists must
 2   investigate this.
 3            If, you know, on the flip side,
 4   the science starts revealing that, ah,
 5   now we can identify people of this
 6   profile have whatever probability of
 7   benefiting or people from that profile
 8   have whatever probability of benefiting,
 9   then they can modify -- any institution
10   can modify the conditions under which the
11   next research project can -- can perform
12   their inclusion/exclusion criteria or say
13   that it's time to change the medical
14   policy, medical policy itself.
15            So to say whether a person can
16   get it.  Well, a person can't get it in
17   the way that they can get routine or
18   standard -- routine or standard
19   interventions.
20            I guess a legitimate comparison
21   would be there exists various substances,
22   controlled substances.  They are illegal
23   for generic commercial recreational
24   purposes.  But -- oh, possession of
25   cocaine is illegal.  But for certain, you
```

Page 96

```
 1    know, research purposes, you know,
 2    certain scientists can legitimately and
 3    legally obtain cocaine for whatever
 4    research purpose -- whatever the research
 5    purpose is.  So cocaine is banned, but
 6    there are exceptions for certain research
 7    purposes.  But that's very different from
 8    saying a person can go obtain cocaine.
 9    Well, no, that's not an accurate
10    description of the situation.
11              So as I say, the presence of
12    exceptions does not void the rule to
13    which it's an exception.
14       Q.    So in these countries under
15    research protocols, individuals under the
16    age of 18 can obtain -- can obtain
17    medical transition?
18              MR. RAMER:  Objection to the
19       form.
20       A.    That phrase suggests a
21    generality that's not true.  I don't know
22    how better to phrase it other than to
23    repeat that there can be exceptions.  But
24    that there are exceptions to a ban
25    doesn't mean that there is not a ban.
```

Page 97

1      Q.     Can we turn to --

2            MR. RAMER:  If, Philip, if this

3      is a stopping point, I think we have

4      been going about an hour.  May be time

5      for a break.

6            MR. MAY:  I am fine taking a

7      break now.  So let's go off the

8      record.

9            THE VIDEOGRAPHER:  Thank you.

10     The time is 12:16, we are going off

11     the record.

12            (Off the record.)

13            (Lunch recess:  12:16 p.m.)

14

15            Afternoon Session

16                1:00 p.m.

17  J A M E S   M.   C A N T O R, having been

18  previously duly sworn, was examined and

19  testified further as follows:

20            THE VIDEOGRAPHER:  Good

21     afternoon.  We are back on the record.

22     The time is 1 p.m., and this continues

23     media file 3.

24  EXAMINATION (Continued)BY MR. MAY:

25     Q.     Dr. Cantor, if you could please

Page 98

```
 1   turn to Exhibit 1, which is your
 2   declaration.
 3        A.    I have it.
 4        Q.    And please turn to paragraph
 5   20.
 6        A.    I am there.
 7        Q.    Paragraph 20 in your
 8   declaration is discussing the current
 9   policies in England; is that correct?
10        A.    Yes.
11        Q.    You agree that England will
12   permit the use of the puberty blockers in
13   the context of a formal research
14   protocol?
15        A.    Yes, that is the exception to
16   their ban.
17        Q.    And you agree -- so you agree
18   that they will allow the use of puberty
19   blockers in the context of a formal
20   research protocol, correct?
21             MR. RAMER:  Objection to the
22        form.  Asked and answered.
23        A.    Well, that's the nature of the
24   exception, but that's a blanket -- but
25   it's not a blanket permission.  The
```

Page 99

```
1    research protocols themselves come with
2    strings attached isn't exactly the right
3    phrase.  But as I said, all of the
4    exceptions, the exceptions are limited to
5    those within research but that doesn't
6    mean that every research proposal or
7    anything that's called research,
8    therefore, is able to do anything it
9    wants.  The approval of a research
10   project requires its own applications and
11   supervisions and comes with --
12        Q.    And I appreciate that and that
13   wasn't my question.  My question was
14   England will permit the use of puberty
15   blockers in the context of a formal
16   research protocol, correct?
17             MR. RAMER:  I am going to object
18        to the form.  Asked and answered.  And
19        also ask that the witness be allowed
20        to finish his response.
21        A.    The particular phrasing you use
22   suggests a greater latitude than the
23   policy.  The policy is limited to
24   research proposals.  But to just say
25   allows it in research proposals excludes
```

Page 100

1    all of the other limitations,
2    responsibilities, supervision.  It's not
3    -- one can't merely declare we have a
4    research project and, therefore, it's
5    permitted.  It changes the -- like with
6    my prior analogy with cocaine, it's
7    banned.  There can be, you know,
8    exceptions within research.  But that
9    doesn't mean anybody can produce any kind
10   of a research project or something that
11   might pass as a research project and,
12   therefore, and therefore restart it.  As
13   I say, we don't know the results of what
14   the research is going to be.  If the
15   research shows that it doesn't actually
16   cause, produce benefits that outweigh the
17   risks, then nothing will get past a
18   research ethics board and the ban will
19   then be complete except for a technical
20   possibility that science is never done
21   and somebody might think of something,
22   something in the future.  So it leaves
23   itself at that exception, but to talk
24   about that exception broadly across all
25   potential research projects doesn't

Page 101

1    capture the situation.
2        Q.    Sure.  And Dr. Cantor, I am not
3    talking about every single possible
4    research protocol.  I am just asking you
5    what I think is a pretty simple question.
6    You agree that in England it is
7    permissible under certain circumstances
8    for a person under the age of 18 to
9    obtain puberty blockers in the context of
10   a formal research protocol?
11            MR. RAMER:  Objection to the
12       form.  Asked and answered.
13       A.    Again, the phrasing assumes a
14   certain patient or client initiation of
15   the situation as opposed to a
16   research-driven project.  A researcher
17   has a project for which they will look
18   for a certain kind of patient who will
19   qualify for the research project.  If a
20   person believes that they fit those
21   inclusion and exclusion criteria, they
22   can volunteer to join the research
23   project, which is unlike a patient coming
24   in and asking and then seeing if there is
25   a research project that matches what the

Page 102

1    patient wants.

2         Q.    Okay.  Can you -- assume for

3    the purposes of my next question that

4    there is a research protocol in place in

5    England that has, that is looking to

6    study the impact of puberty blockers on

7    individuals under the age of 18.

8              In the context of such a

9    research protocol, you agree it is, that

10   an individual under the age of 18 would

11   be able to be prescribed puberty blockers

12   in the context of that protocol?

13             MR. RAMER:  Objection to the

14        form.

15        A.    The word that's missing before

16   I could say yes would be that it's

17   possible.

18        Q.    Sure.  And that's the point of

19   the hypothetical.  You agree that in the

20   event there is a research protocol

21   looking to study the impact of puberty

22   blockers on individuals under the age of

23   18, an individual under the age of 18

24   would be able to be prescribed puberty

25   blockers in the context of that protocol

Page 103

1    in England?

2              MR. RAMER:  Objection to the

3         form.  Asked and answered.

4         A.    Again, I can't really sign onto

5    that without the word "possible."

6    Without that, again, it's broader than

7    how research happens.  Especially with --

8    especially it would be perfectly

9    reasonable and perfectly legitimate --

10   such research happens a step at a time.

11   For example, they could start with

12   whatever age range or one sex and not the

13   other sex.

14        Q.    Dr. Cantor, and I appreciate

15   all of that and your counsel will have

16   the opportunity to ask you questions to

17   clarify.  But I am really asking you to

18   focus on my hypothetical question that I

19   posed to you.

20              And my hypothetical question

21   that I've posed to you is a research

22   protocol looking to study the impact of

23   puberty blockers on individuals under the

24   age of 18.

25              Is it possible for an

Page 104

1    individual under the age of 18 to then be

2    prescribed puberty blockers in the

3    context of that research protocol in

4    England?

5         A.    Is it possible, yes.

6              MR. RAMER:  Objection to the

7         form.  Asked and answered.  And object

8         again to counsel cutting off the

9         witness's response.

10        Q.    Does England criminalize

11   doctors for providing puberty blockers to

12   individuals under the age of 18?

13             MR. RAMER:  Objection to the

14        form.  Vague.

15        A.    I don't recall their using

16   their criminal process.  Of course, it's

17   very difficult to compare -- it's

18   essentially impossible to compare that

19   level of detail in the U.K. system and

20   the public healthcare system with the

21   U.S. lack of a medical system, you know,

22   and, of course, the legislatures and

23   decision-makers have a very different set

24   of tools available to them.

25        Q.    So you don't recall whether or

Page 105

```
 1    not it is a crime for doctors to provide
 2    puberty blockers to individuals under the
 3    age of 18?
 4              MR. RAMER:  Objection to the
 5         form.  Asked and answered.
 6         A.    I don't recall the report
 7    indicating that they use their criminal
 8    system to do it.  But I don't follow the
 9    -- as I say, I don't follow the details
10    of their legal system.  I follow the
11    science itself.
12         Q.    If you can turn to paragraph 24
13    of your declaration, Exhibit 1?
14         A.    I am there.
15         Q.    Looking towards the part of the
16    paragraph that is on page 11 it reads
17    "They" meaning Finland "Restricted the
18    procedures to their centralized research
19    clinics."
20              Do you see that?
21         A.    Yes.
22         Q.    So you would agree that in
23    Finland, the provision of puberty
24    blockers or cross-sex hormone treatment
25    has been restricted to their centralized
```

Page 106

1    research clinics?

2        A.    Yes.  As I said, different

3    countries have different mechanisms

4    available to them.  And the way that they

5    instantiate the research exception is to

6    permit their research hospitals to do it

7    under the appropriate circumstances and

8    projects.

9        Q.    Do you speak Finnish,

10   Dr. Cantor?

11       A.    No, I use one or another

12   translational service or professional

13   translators, you know, if I need to.  Of

14   course, sometimes I am in contact with a

15   particular Finnish clinician in the

16   system.  We are close colleagues.

17       Q.    Do you know how you obtained

18   any of the translations of any of the

19   Finnish documents that you relied on

20   here?

21       A.    Much of the information is

22   available in English, anyway.  For

23   example, the part relevant, the relevant

24   parts or the studies that they included

25   in the, in their systematic reviews and

Page 107

```
 1    the conclusions.
 2              Now, of course, the articles
 3    that were included in their systematic
 4    reviews are written in English.  And so,
 5    the appendicis of the report that lists
 6    all of the studies that were included and
 7    all of the studies that were excluded,
 8    the lists are in English and I am already
 9    familiar with it, with the papers that
10    are in them.
11              The policy itself, I don't
12    remember if I -- no, I didn't submit it
13    with this particular report.  But I, you
14    know, retained the documentation from the
15    official translator who translated the
16    Finnish version of their policy.
17         Q.    You would agree that an
18    independent individual under the age of
19    18 can be prescribed puberty blockers or
20    cross-sex hormone therapy at a
21    centralized research clinic in Finland,
22    correct?
23         A.    The same as with the U.K.  It's
24    possible, you know, when and during a
25    particular research project if somebody
```

Page 108

1   otherwise qualifies for it, it's

2   possible.  But it's not a matter of, oh,

3   you just have to go to this hospital

4   versus that hospital.  That's not how it

5   works.  It's not merely a relocation.

6   It's their particular phrasing for the,

7   you can't do it unless, you know.  And so

8   the phrase to give permission to the

9   researchers to be able to engage in

10   whatever the research is.  But it's not

11   like there is a law requiring that there

12   actually be any research or in the future

13   they decide, oh, no, this is hopeless, no

14   more research projects are being done at

15   all, the exception still theoretically

16   exists but then there is to way to obtain

17   it.  So as I say, it's an exception and

18   when the exception is used, it is.  And

19   when it's not, it's not.

20        Q.    So you would agree an

21   individual under the age of 18 can be

22   prescribed puberty blockers or cross-sex

23   hormone therapy at a centralized research

24   clinic in Finland in the context of a

25   research protocol?

Page 109

```
 1              MR. RAMER:  Objection to the
 2        form.  Compound.  Asked and answered.
 3        A.    Same as before, I really
 4    couldn't sign onto that without being
 5    explicit to say that it is possible.
 6    Without that is to suggest a blanket
 7    permission that doesn't exist.
 8        Q.    Does Finland make it a crime
 9    for doctors to prescribe puberty blockers
10    or cross-sex hormone therapy?
11              MR. RAMER:  Objection to the
12        form.  Calls for a legal conclusion.
13        A.    To the best of my knowledge,
14    it's a similar situation as the U.K.
15    It's also a public healthcare system
16    that, you know, didn't rely on its
17    criminal system in order to?  In order to
18    create, instantiate, establish its rule.
19              Because it has a public
20    healthcare system, they were able, I
21    don't know if by fiat is the right
22    phrase, but more directly control, you
23    know, when and who and how such projects
24    are done.  They don't need to use a
25    criminal system.  They don't need to use
```

Page 110

1    their criminal codes in order to
2    instantiate the rule.
3         Q.    If we can turn to paragraph 28
4    of your declaration?
5         A.    I am there.
6         Q.    Paragraph 28 of your
7    declaration pertains to policies in
8    Sweden, correct?
9         A.    Yes, it does.
10        Q.    You would agree that the
11   Swedish Board of Health and Welfare has
12   recommended restraint when it comes to
13   hormone treatment?
14        A.    They use that phrase, yes.
15        Q.    And you reference a document
16   there, I am not going to try to pronounce
17   it because I am going to get it wrong, I
18   am going to call it the Swedish support
19   document from 2022.
20        A.    Yes, sometimes I called it try
21   S, which is a story unto itself.  But try
22   S or SSS, any of those work.
23        Q.    I am totally fine with SSS.
24             MR. MAY:  So why don't we go
25        ahead and mark as our next exhibit,

Page 111

1          tab 17, and I believe that will be

2          Exhibit 5.

3                    (Exhibit 5, Document entitled

4          "Care of Children and Adolescents With

5          General Dysphoria, Summary of National

6          Guidelines," December 2022, was so

7          marked for identification, as of this

8          date.)

9                    MR. BENIMOFF:   It's been marked

10         and also been renamed.

11         A.    Got it.

12         Q.    Dr. Cantor what's been marked

13    as Exhibit 5, this is the Swedish

14    document that's referenced in paragraph

15    28 of your declaration; is that fair?

16         A.    No, I don't think it's the same

17    document.  They released several at that

18    time including updates and they

19    overlapped.  I don't know if these are

20    the exactly the same one.

21                    MR. RAMER:   Phil, the document

22         that's been marked, it has six pages,

23         right?  Am I looking at the right

24         thing?

25                    MR. MAY:   Yes.

Page 112

1        A.    The title of this document
2    doesn't match the title in my reference
3    list.
4        Q.    Okay.  Looking at your
5    reference list, which is Page 141 of
6    Exhibit 1, your declaration, the two
7    Swedish documents located there, dated
8    February 2022 and then there is one from
9    February -- excuse me, just one from
10    2020, correct?
11        A.    Correct.
12        Q.    So the two from 2022 are both
13    from February; is that fair?
14        A.    Yes.
15        Q.    And this document that I marked
16    here as Exhibit 5, is a document from
17    December 2022, correct?
18        A.    Yes, according to its face
19    page.
20        Q.    And so this would be a more
21    recent document than a February 2020
22    document, is that a fair assessment?
23        A.    I would have to go through it
24    to be sure, but that's certainly what it
25    looks like.

Page 113

1    Q.    So this is a Document entitled,
2    "Care of Children and Adolescents With
3    General Dysphoria, Summary of National
4    Guidelines," December of 2022 published
5    by Sweden's National Board of Health and
6    Welfare, correct?
7    A.    That's how it reads, yes.
8    Q.    All right.  If you can turn to
9    page 3 of this document for me.
10   A.    Yes.
11   Q.    And you see there is a bold
12   heading that says "Caution in the Use of
13   Hormonal and Surgical Treatment"?
14   A.    Yes.
15   Q.    And then there is a bullet
16   point underneath that, correct?
17   A.    Yes.
18   Q.    This document reads, starting
19   with the sentence above that bullet
20   point, "The National Board of Health and
21   Welfare, therefore, gives the following
22   weak negative recommendation as guidance
23   to the healthcare system.  Treatment with
24   GnRH analogs, gender-affirming hormones,
25   a mastectomy can be administered in

Page 114

1    exceptional cases."

2            Do you see that?

3        A.    Yes.

4        Q.    Do you agree that in Sweden

5    that treatment with GnRH analogs or

6    puberty blockers can be administered to

7    individuals in exceptional cases?

8        A.    Yes.  And as I say and research

9    purposes is one of the exceptions.  The

10   other exceptions that they discussed are

11   people who are already in treatment who

12   have -- not to cut them off from, as I

13   say, ongoing treatment.

14       Q.    And Sweden also permits

15   treatment with gender-affirming hormones

16   to individuals under the age of 18 in

17   certain exceptional cases?

18       A.    That's how their policies have

19   consistently read, yes.

20       Q.    And I think we can put that

21   aside for now.  I don't think I have any

22   other questions about that document at

23   this time.

24            Does Sweden criminalize doctors

25   for providing puberty blockers or

Page 115

1    cross-sex hormone therapy to individuals
2    under the age of 18?
3              MR. RAMER:  Objection to the
4         form.  Calls for a legal conclusion.
5         A.    The same as with the other
6    countries, I am not aware of their using
7    their criminal systems in order to
8    establish the policy because they have a
9    nationalized, public healthcare system,
10   they have much more direct control.
11        Q.    And we can now turn back to
12   your declaration, paragraph 29.
13        A.    I am there.
14        Q.    And this discusses policies in
15   France; is that fair?
16        A.    Yes.
17        Q.    You would agree with me that in
18   France there is no actual restriction on
19   the prescription of puberty blockers or
20   cross-sex hormonal therapy to individuals
21   under the age of 18?
22        A.    Yes, not a formal ban, but
23   exactly as it reads, a far more
24   cautionary kind of statement so as to
25   avoid excessive and unnecessary

Page 116

```
 1   overapplication of medical interventions.
 2       Q.    Does France make it a crime for
 3   doctors to prescribe puberty blockers or
 4   cross-sex hormone therapy to individuals
 5   under the age of 18?
 6             MR. RAMER:  Objection to the
 7        form.  Calls for a legal conclusion.
 8       A.    I am not aware of their having
 9   used a criminal system in order to
10   enforce their guideline, recommendation,
11   urging, no.
12       Q.    All right.  And then if we can
13   please look to paragraph 30 of your
14   declaration, Exhibit 1.  This discusses
15   policies in the country of Norway,
16   correct?
17       A.    Yes, that's correct.
18       Q.    And actually I was curious on
19   this.  I tried very diligently and could
20   not locate any English translation of
21   Ukom's summary report.
22             So could you just let me know
23   how, how you were able to obtain the
24   translation and on what version you
25   relied on in forming your opinions here?
```

Page 117

1        A.      I don't remember offhand.  I
2   would have to check my notes whether it
3   was an official or unofficial
4   translation, but I am in pretty regular
5   contact with the researchers on this
6   issue all around the world and we discuss
7   these kind of issues relatively freely.
8              So the basic information has
9   always been pretty familiar to me.  And
10  then it's just a matter of using even
11  unofficial translations just to confirm
12  which document was which.  But because
13  the information, and again the papers
14  that they are citing in order to justify
15  it are, you know, well familiar and been
16  published in English in the first place.
17  It's not a, it's not a -- it's not at all
18  a mystery on what the policies were
19  based.
20             You know, I certainly would not
21  use an unofficial translation in order to
22  provide a nuanced declaration of a sense
23  in which, you know, the particular, a
24  particular rule is enforced.  But the, as
25  I say, through conversations with the

Page 118

1    people in the country, and so on, it's

2    not, the basic recommendation that this

3    is a long series of unknowns for which

4    psychotherapy is the best indicated

5    treatment is not -- I shouldn't say not

6    under debate, but that is their policy is

7    not controversial.

8         Q.    Do you still have the

9    translation that you relied on in writing

10   these paragraphs of your declaration?

11        A.    Oh, I have them in my files,

12   yes.

13        Q.    Okay.

14             MR. MAY:  Mr. Ramer, we would

15        just ask for, if we can get a copy of

16        that in order to -- yeah, we would ask

17        for a copy of that.  Obviously not

18        right this minute.

19             MR. RAMER:  Understood.

20        Q.    Dr. Cantor, in Norway is it

21   possible for an individual under the age

22   of 18 to be prescribed puberty blockers

23   or cross-sex hormone therapy in the

24   context of research?

25        A.    I believe they included the

Page 119

1    same exception, yes.

2        Q.    Across all of the countries

3    that we discussed and are discussed in

4    your declaration, which are England,

5    Finland, Sweden, France and Norway, you

6    would agree that in all of those

7    countries it is possible for an

8    individual under the age of 18 to obtain

9    puberty blockers or cross-sex hormone

10   therapy in the context of a research

11   protocol?

12           MR. RAMER:  Objection to the

13       form.

14       A.    Again, my hesitation is in the

15   way that you phrase it, that the patient

16   obtains it.  That kind of a situation is

17   again patient-and-client led rather than

18   researcher led -- rather than researcher

19   led.

20           It's also, that phrasing also

21   suggests a stable basis as opposed to how

22   things work in research is that, you

23   know, once the research comes out and the

24   research decides, the research indicates

25   whatever, that psychotherapy is better,

Page 120

1    all right, question answered, no more
2    research.  Well, no more research, then
3    no availability at all.  So the potential
4    exception is a potential exception for
5    now for particular research purposes.
6    And where it goes from there, depends on
7    the results of that, of that research.
8    So a more blanket yes or no, doesn't fit
9    the customized fluid situation.
10            So the potential is there for
11   the exception.  But there is no rule
12   requiring that such research forevermore
13   be available.
14       Q.    Okay.  So let me try and
15   address, try another question.
16            Across all of the countries
17   that we've discussed and are discussed in
18   your declaration which are England,
19   Finland, Sweden, France and Norway, you
20   would agree that in all of those
21   countries at the present moment it is
22   possible for an individual under the age
23   of 18 to be prescribed puberty blockers
24   or cross-sex hormone therapy by a
25   researcher in the context of a research

Page 121

1    protocol?

2            MR. RAMER:  Objection to the

3        form.  Asked and answered.

4        A.    Sort of.  The current situation

5    is more complicated than that, in that

6    the research protocols themselves have

7    not yet been designed.  The laws and the

8    regulations are designed by a different

9    stream of regulation.  So the regulators

10   have left that open, but it's not the

11   regulators who design and implement the

12   research.  They are giving researchers

13   permission to do it.  But the researchers

14   themselves have not, are not yet up to

15   that stage.

16            I don't remember if it was

17   Sweden or Finland, so they were explicit

18   in indicating, in indicating that when

19   they said exceptional cases, that was the

20   situation that the regulators there were

21   trying to address.  They were aware that

22   there did not yet exist research

23   protocols, and that that would take some

24   time.  So the exceptional cases were,

25   again, meant to be this in-between stage

Page 122

```
 1   until there is something available or for
 2   situations in which somebody is already,
 3   you know, undergoing a medicalized
 4   transition, so as to not to cut them off.
 5           So the addition of the word
 6   "current," again, there is a complication
 7   to the issue is that currently each of
 8   these countries is in a middle ground,
 9   transition.  Forgive the pun, a
10   transitional state.
11       Q.    You would agree that across all
12   of the countries that we discussed today
13   and that are discussed in your
14   declaration, England, Finland, Sweden,
15   France and Norway, to the best of your
16   knowledge, none of those countries make
17   it a crime for doctors to prescribe
18   puberty blockers or cross-sex hormone
19   therapies to individuals under the age of
20   18?
21           MR. RAMER:  Objection to the
22       form.  Asked and answered.  Calls for
23       a legal conclusion.
24       A.    Yes, I am not aware of them
25   using their criminal regulations or
```

Page 123

```
 1   needing to use their criminal regulations
 2   to enforce it.
 3           As I say, because the public
 4   healthcare systems are nationalized and
 5   the government has direct control over
 6   it.  They have a very different set of
 7   tools available to them for regulating
 8   healthcare.
 9      Q.    I want to switch gears just a
10   little bit.  Well, not really.  But
11   turning away from Europe for the moment.
12           Do you think it's appropriate
13   to criminalize the conduct of doctors in
14   their prescription of care -- excuse me,
15   strike that.
16           Do you think it's appropriate
17   to criminalize doctors in their provision
18   of care to individuals?
19           MR. RAMER:  Objection to the
20      form.
21      A.    I really don't have an opinion
22   either way.  I am a scientist.  I can
23   tell you what the science says.  I can
24   tell you how confident we can be in any
25   given conclusion.  What would give us
```

Page 124

1    more information, whether research

2    projects were done properly or not and

3    what the best indicator of a conclusion

4    is.   But how any society, democracy or

5    legislature implements what is indicated

6    or suggested by the science, but that is

7    no longer a scientific question.

8        Q.    Have you ever treated an

9    individual located in the State of Idaho?

10        A.    No, I have not.

11        Q.    Have you ever spoken with any

12    mental health practitioners or other

13    healthcare practitioners in the State of

14    Idaho?

15        A.    Not that I recall.  But I can't

16    definitively rule it out either.  I get

17    e-mailed questions or, you know, phone

18    calls all the time from all over the

19    place and sometimes somebody will just

20    tell me they are in the U.S. and the

21    particular state isn't relevant.  So I

22    can't definitively say no, but I don't

23    recall any particular -- I don't recall

24    one.

25        Q.    Are you aware of how doctors in

Page 125

1   Idaho make the decisions to prescribe
2   puberty blockers or cross-sex hormone
3   therapies for individuals under the age
4   of 18?
5              MR. RAMER:  Objection to the
6        form.
7        A.    No, not independently of how
8   any other state does it or how
9   clinicians, in general, in the U.S. do it
10  or want to do it or are recommended to do
11  it, or what they say in the media.  I
12  don't recall anything specific to Idaho.
13       Q.    So you're not familiar with the
14  specific practices or procedures of any
15  doctor in the State of Idaho who provides
16  prescriptions for puberty blockers or
17  cross-sex hormone therapy to individuals
18  under the age of 18?
19             MR. RAMER:  Objection to the
20       form.  Asked and answered.
21       A.    I think it's more accurate to
22  say I am not aware of the behavior or
23  procedures in Idaho being at all distinct
24  from other states.
25       Q.    Fair to say you don't have any

Page 126

1    knowledge either way whether or not the

2    procedures in Idaho were distinct or not

3    distinct?

4          MR. RAMER:  Objection to the

5      form.  Vague.

6      A.   No, I don't think I could say

7    that either.  I mean if there were any

8    kind of a substantive difference in

9    Idaho, it would be odd for me not to have

10    run across it.  There isn't, for example,

11    an Idaho chapter of WPATH issuing

12    standards or procedures that are distinct

13    from the overall WPATH procedures or

14    guidelines, for example.  But if there

15    were, you know, some -- something

16    different, then again it would be awfully

17    strange for me not to have, you know, run

18    into that or that never having been

19    discussed, amongst any of the other

20    colleagues that I am regularly discussing

21    this family of issues with.

22      Q.   You would agree that not every

23    doctor applies WPATH and Endocrine

24    Society Guidelines in exactly the same

25    way, right?

Page 127

1          A.     That's pretty much an
2      unanswerable question.  The nature of the
3      and one of the largest problems with the
4      WPATH standards is that they are not
5      standards at all.  They permit any
6      clinician to use his and her own clinical
7      judgment to overrule any guideline,
8      suggestion, that are in the guidelines.
9                   Two clinicians can be doing
10     completely different things and both
11     declare themselves to be following the
12     WPATH standards -- following the WPATH
13     standards.
14                  As included in my report, the
15     two versions of the WPATH standards, 7
16     and 8, changed what they were.  Version 6
17     and earlier, you know, specifically,
18     explicitly called themselves minimum
19     standards.  Beginning with version 7 they
20     took out "minimum."  Well, without
21     minimum, now clinical judgment means move
22     standards up or down.  So they are not
23     meaningfully called standards at all,
24     despite the word appearing in their
25     title.

Page 128

```
 1              So it's not possible.  It's not
 2    possible for two people to say that -- I
 3    should say that in the reverse.  It's
 4    always possible for two clinicians to be
 5    doing very different things, but both
 6    following the WPATH.
 7        Q.    And you're not aware of the
 8    specific practices of anyone in the State
 9    of Idaho who describes puberty blockers
10    or cross-sex hormone therapy, right?
11        A.    I am not aware of anybody in
12    Idaho having documented any, no.
13        Q.    Have you ever spoken to any
14    patients or former patients of any gender
15    clinic in Idaho?
16        A.    I don't recall any of them
17    identifying themselves specific to Idaho.
18    But as I say, I often receive
19    communications from people who either
20    don't mention their physical location or
21    give, you know, a vague reference to, you
22    know, a rough area of the country, but
23    don't name their state.  So I don't
24    recall one specific to Idaho.  But I
25    can't say that there is, that I never had
```

Page 129

1    such communication.

2         Q.    Do you support the provision of

3    puberty blockers and cross-sex hormone

4    therapies to individuals under the age of

5    18 in the context of answering research

6    questions and research protocols?

7                   MR. RAMER:  Objection to the

8         form.

9         A.    I have no scientific or

10   ideological opposition to it, no.  All we

11   have is the best guess we have according

12   to the current very incomplete

13   information in a large pile of unknowns.

14                  I am a scientist, I would take

15   as a basic premise that science needs to

16   be able to ask as broad a range of

17   questions in order to continuously

18   improve it.

19                  So as I say, so as a scientist

20   I pretty reflexively disagree with just

21   about any limit on what a, on scientific

22   questioning.

23        Q.    Have you reviewed HB 71, the

24   law in Idaho?

25        A.    When I was initially, initially

Page 130

1    started with this case, yes.

2        Q.    Does HB 71 permit the provision

3    of puberty blockers or cross-sex hormone

4    therapy to individuals under the age of

5    18 in the context of a research protocol

6    -- let me strike it.  Again, I will ask

7    it from the beginning.

8              Does HB 71 permit the provision

9    of puberty blockers or cross-sex hormone

10   therapy to individuals under the age of

11   18 in the context of a research protocol

12   or in the context of answering research

13   questions?

14             MR. RAMER:  Objection to the

15        form.  Calls for a legal conclusion.

16        A.    I don't recall it including an

17   exception for research, no.

18        Q.    Would you favor such an

19   exception that allows for research?

20             MR. RAMER:  Objection to the

21        form.  Asked and answered.

22        A.    As I say, yes, as a scientist I

23   reflexively side with the ability of

24   freedom of inquiry for scientists in

25   order to be able to answer the unknowns.

Page 131

1    Q.    Outside of the research
2    context, do you agree that there are
3    certain exceptional circumstances where
4    an individual under the age of 18 should
5    be prescribed puberty blockers or
6    cross-sex hormone therapy?
7              MR. RAMER:  Objection to the
8         form.
9    A.    I hesitate to say should
10   because that would, again, require
11   information that we don't yet have.  It
12   is indeed possible.  That is among the
13   unknowns.  That is among the unknowns.
14   We don't have the quality of research or
15   volume of research in order to make
16   blanket uniform all-or-none decisions,
17   which is why, you know, exceptions can
18   be, why an exception for science would be
19   useful in order, in order to identify or
20   develop or see if it's possible to
21   develop a way of identifying, you know,
22   who might be an exception.
23              But without such knowledge, you
24   know, without information helping us to
25   identify who might be an exception, the

Page 132

```
 1    regulatory process -- you know, the basic
 2    procedure that any clinician needs to use
 3    as a risk-to-benefit ratio in the context
 4    of how, how confident we can be in a
 5    given diagnosis.
 6              So far we can't be confident at
 7    all.  And so it's a matter of, so any
 8    decision-maker has to weigh the potential
 9    risks against the potential benefits.
10    And even though we acknowledge that there
11    could be exceptions, there is no good way
12    to instantiate that exception, if we
13    can't identify who might be the exception
14    in the first place.
15              So it's possible.  It requires
16    research to identify who it is.  But
17    without that research being done, we
18    can't identify who that exception is.  So
19    we're back to where we started.  We can
20    identify the possibility that they can
21    exist.  But if we can't identify who that
22    person is, there is no way to enact that.
23        Q.    Outside of the research
24    context, do you agree that there are
25    certainly exceptional circumstances where
```

Page 133

```
 1    an individual under the age of 18 should

 2    be permitted to be prescribed puberty

 3    blockers or cross-sex hormone therapy?

 4              MR. RAMER:  Objection to the

 5         form.

 6         A.    Outside of a research, I'm not

 7    sure that question makes sense.

 8              Again, the purpose of the

 9    research is in order to figure out how to

10    identify such a person so that that can

11    be, that policy can be enacted outside of

12    research.

13              So even though we can

14    acknowledge that, you know, that's

15    theoretically possible, we can't do it

16    until the research is done and tells us

17    how to identify such a person.

18         Q.    Thinking back to what we

19    discussed earlier today, I believe you

20    said it was the five to six patients that

21    you had recommended a diagnosis of gender

22    dysphoria form who had gone on to receive

23    hormone therapy.

24              Do you recall that conversation

25    we had?
```

Page 134

1      A.      Yes.

2      Q.      For those individuals, did you

3   support the decision for them to be

4   prescribed cross-sex therapy?

5            MR. RAMER:   Objection to the

6       form.

7      A.      The way that -- I don't know

8   whether I should say we, that clinic or

9   both, engaged in those decisions, it was

10  never really a matter of support.  Our

11  task and the appropriate clinical task is

12  to identify all of the other and exhaust

13  all of the other less risky potential

14  interventions that might, that could help

15  this person lead a happy, healthy life.

16  Because the medical interventions

17  necessarily pose greater risks to

18  otherwise healthy and functioning tissue,

19  it is necessarily the intervention of

20  last resort.  But it is still ultimately

21  the patient's decision.  For us to

22  support that the patient do it, for we,

23  us, the clinical teams, the clinicians to

24  say support in that context means to

25  encourage.  And we don't do that.  We

Page 135

```
1    shouldn't be doing that.
2              We can say no when there is a
3    specific physical or mental health need
4    for which, you know, we have the duty to
5    prevent patients from hurting themselves.
6    But there is never, there should be never
7    a situation in which one supports it.  We
8    give permission should the patient so
9    decide.  But that, as I say, is different
10   from our supporting it.
11       Q.    And these patients that we're
12   discussing, it's your recollection that
13   at least some of them were under the age
14   of 18 when they started hormone therapy,
15   correct?
16       A.    I actually don't remember.
17   They were all in that cusp.  They were
18   close to 18.  In that era there were
19   changes here in Ontario to the
20   regulations involving age of consent and
21   involving whether the public healthcare
22   system would for anyone over 18 or under,
23   fund medicalized transition.  And again,
24   not just for minors.
25              And I was one of the outspoken
```

Page 136

1   advocates indicating publicly then that,
2   you know, the healthcare system in my
3   view should be funding such transition.
4   But I don't definitively remember in the
5   changes in those days when I was sitting
6   in on the clinic or where, again, over
7   the line they were patients of my own
8   where I was participating in the
9   assessment of the patient versus sitting
10  in on the team which was making group
11  decisions.  But I, myself, had not seen
12  the patient.
13          So again, I don't remember if
14  they were purely after 18 or within a
15  year or two of 18.  I want to say that I
16  would go back and check, but of course
17  since I left KMH, since I left KMH, I no
18  longer have access to the records.
19      Q.    You mentioned that you --
20  sorry, you mentioned that you were an
21  advocate for the payment of medicalized
22  transition during that early 2000 period,
23  right?
24      A.    Yes, that's correct.
25      Q.    Why were you an outspoken

Page 137

1    advocate in favor of that -- strike that.

2    Let me ask that question again.

3              Why were you an outspoken

4    advocate in favor of the public health

5    system funding medicalized transition in

6    the early 2000s?

7              MR. RAMER:  Objection.

8         A.    Again, just for the record, I

9    want to make it explicit that this was

10   for adults.  Medicalized transition for

11   minors was not on the table.  It was not

12   -- it was never part of the system.  And

13   my support for it is exactly the same as

14   how any of my opinions for any of these

15   issues follow, is that that is what was

16   most consistent with the science.  For

17   otherwise mentally healthy adults who

18   have, you know, tried, already tried the

19   other options available to them, they do

20   fine most of the time after medicalized

21   transition.  They were doing fine in

22   Ontario.  They were doing fine, the

23   patients who were coming through our

24   clinic and the provincial healthcare

25   system as part of, you know, a much, much

Page 138

1    larger, more important set of budget
2    cuts, you know, eliminated this one even
3    though there was no scientific or medical
4    justification for it.
5            So as I said, I did what I
6    always do, is point out, you know, what
7    is consistent with the science and the
8    science was consistent with that is the
9    best intervention available, given the
10   criteria that were being used at the time
11   which were much, much higher than the
12   WPATH criteria.
13   Q.    Is it still your view that
14   medical transition for adults should be
15   paid for by the Canadian healthcare
16   system?
17           MR. RAMER:  Objection to form.
18   A.    Again, there are a couple of
19   caveats mixed in -- there are a couple of
20   caveats to it.
21           For example, the otherwise
22   healthy and having met the criteria that,
23   you know, the clinic, a clinic, that
24   clinic was using at the time.  But the
25   standards that are being discussed,

Page 139

1  largely in the U.S. today, have removed,
2  largely removed, have largely removed the
3  protections that were in place.  You
4  know, they eliminated the criteria that
5  were being used that demonstrated
6  successful transitions.  So without the
7  gate-keeping process, that's not so
8  clear.
9           So as a base -- so the only --
10  ideology is not the phrase.  The
11  principle that I am applying is that when
12  the science supports the transitional
13  process, then, yes, then, the only
14  consistent public policy would be to
15  enable it to happen.
16           But in the absence of the
17  gate-keeping process, which produced the
18  successful results, well, now we've lost
19  the justification for it having been
20  covered.  You know, it's just because it
21  worked for some people.
22           Once you take out that
23  assessment process, well we don't have
24  evidence that this newer -- after the
25  gatekeeping process was removed and

Page 140

1  replaced with an informed consent
2  procedure, which is a very, very low bar,
3  we don't have evidence that this, you
4  know, low bar is successfully
5  distinguishing between people who will
6  benefit and people who will make a
7  mistake.
8            So that's not -- so I can't
9  endorse -- once the procedure is changed
10  I can no longer endorse the new procedure
11  because it's not tested.
12       Q.    What are these gatekeeping
13  processes that you're referring to that
14  you believe have been removed from the
15  process?
16       A.    The major one is the use of
17  what they call and we still call the real
18  life experience.  Before that it was
19  called the real life test.  There was a
20  very specific set of stages.  Again, an
21  adult would undergo, beginning with
22  coming out to their friends and family.
23  You know, announcing that this was the
24  plan.  Cross-living for a full year, a
25  full calendar year in their new role,

Page 141

1    including legal name change and the
2    change in the sex on their -- usually it
3    was a driver's license, but any
4    government-issued documentation would
5    work.
6                The person needed to be able to
7    document that they were successfully
8    functioning in their new social role for
9    that year.
10               The definition of success was,
11   you know, actively in full-time
12   employment or a full-time student or
13   full-time volunteer work or any
14   combination of those three that summed up
15   to full-time.  So if they were, you know,
16   capable of living, as I say, documenting
17   specifically that they were engaged in
18   that new role successfully for a year,
19   then they were eligible for hormone
20   treatment.
21               The same story, they needed
22   that one year of real life experience or
23   real life test under the hormones, under
24   the hormones, continuing to be able to be
25   successful.  Document that success

Page 142

1    through whatever combination of volunteer

2    work, gainful employment or being

3    enrolled as a student.  Then after that,

4    which is now the second year, they would

5    then be eligible for surgery.

6              But as I say, in the clinic

7    where I was, and it was one of the

8    clinics that demonstrated, you know,

9    under those circumstances that people who

10   completed it did quite well.  Other

11   clinics would use time less than a year.

12   The WPATH standards have the time, I

13   think were three months.  They were the

14   lowest standards across any clinic and

15   they were untested.  That was further

16   watered down, and they also permitted a

17   person not to undergo real life

18   experience at all and instead to be in

19   psychotherapy over the course of that, of

20   that time.

21             And then the, you know, with

22   subsequent versions, and I detailed it in

23   my report, as they continued to lower the

24   standards, now clinicians are permitted

25   to, you know, remove any of the criteria.

Page 143

```
 1    And now it's just an informed consent
 2    procedure which is pretty much the lowest
 3    bar mental health has to offer.  It's,
 4    essentially do you have an IQ sufficient
 5    to understand the form that you're
 6    signing.  And essentially, are you not
 7    actively psychotic and hallucinating, the
 8    bar for, you know, mental competence is
 9    very, very low.
10               So now rather a person being
11    engaged in a substantial amount of time
12    finding out what their hoped for life
13    really will be like and making a
14    genuinely-informed decision, instead the
15    person is just guessing and undergoing
16    medical treatments based on nothing but a
17    hope.  And in some cases, even just a
18    fantasy of what they think their life is
19    going to be.
20               And we don't have evidence to
21    suggest that that low bar, lack of a bar,
22    lack of gatekeeping, successfully warns
23    people that their actual life is not
24    going to be quite like what they
25    imagined.  People are only finding out
```

Page 144

1    when it's too late.  They are finding out

2    the hard way.

3            MR. MAY:  We have been going

4        about an hour, I think now is a good

5        time for a break.

6            MR. RAMER:  Sounds good.  How

7        long would you like?

8            MR. MAY:  Let's go off the

9        record.

10           THE VIDEOGRAPHER:  Thanks, I

11       will just get us off the record.  The

12       time is 2:02.  This ends media file 3.

13           (Off the record.)

14           THE VIDEOGRAPHER:  We are back

15       on the record.  The time is 2:11, this

16       begins media file 4.

17   BY MR. MAY:

18       Q.    Dr. Cantor, you agree that with

19   appropriate gatekeeping and under

20   appropriate circumstances, as you

21   described, gender-affirming medical care

22   can be beneficial for adults, right?

23           MR. RAMER:  Objection.

24       A.    Yes.

25       Q.    Can gender-affirming medical

Page 145

1  care be beneficial for some 17-year-olds,
2  if provided appropriately, as you
3  described?
4      A.    That's a perfectly reasonable
5  hypothesis.  But because the research is
6  restricted to 18-year-olds and over, we
7  can really only say that with firm
8  scientific backing for 18-year-olds plus.
9          But exactly how much that
10 finding can be generalized, you know, to
11 people expanding the range, that's now an
12 empirical question.  You know, it's
13 relatively difficult, it's usually
14 relatively difficult to separate one year
15 of age from another year of age, given
16 the normal curve of just human abilities.
17         So because the switch from on
18 average, yes, to a little bit of a gray,
19 not really sure, the unknowns are now
20 building, it's very, very difficult to
21 draw a definitive line.
22         So we go from yes usually to
23 less certain, less certain, less certain.
24 And there is no definitive way to turn
25 that gray into a sharp line.

Page 146

1       Q.    But it's possible that
2   gender-affirming medical care could be
3   beneficial for some 17-year-olds, if
4   provided with sufficient gatekeeping?
5       A.    Possible in some under certain
6   circumstances, yes.
7       Q.    Is it possible for
8   gender-affirming medical care to be
9   beneficial to some 16-year-olds if
10  provided with appropriate gatekeeping?
11          MR. RAMER:  Objection to the
12      form.
13      A.    Same answer, really.  Some,
14  theoretically, possibly, under certain
15  circumstances with, again, the now
16  increasing amounts shifting from yes on
17  average to even more uncertain than with
18  17-year-olds.
19          And the more we loosen the
20  restrictions, the more unknowns that we
21  have and the greater difficulty we have
22  in assessing the risk-to-benefit ratio.
23  It's finding out, figuring out what the
24  best balance of those, of
25  risk-to-benefit.  And making more of the

Page 147

```
 1   unknowns more known is exactly the kind
 2   of research that we need to do.
 3        Q.    I want to turn now to the
 4   Endocrine Society Guidelines.
 5             MR. MAY:  So Rob, if you can
 6        please mark tab 7 as the next exhibit,
 7        which I believe will be Exhibit 6.
 8             (Exhibit 6, Endocrine Society
 9        Guidelines, was so marked for
10        identification, as of this date.)
11             MR. BENIMOFF:  Marked and
12        renamed as Exhibit 6.
13        Q.    Dr. Cantor, do you see Exhibit
14   6 in your folder and have you
15   successfully opened it?
16        A.    I see the 6 in the folder.  I
17   haven't been able to open it.  The thing
18   that worked last time was -- yep, rejoin
19   as viewer guest -- there is 6.  Didn't
20   work this time.  One more.  Got it.
21        Q.    Do you have Exhibit 6 opened?
22        A.    Yes.
23        Q.    Exhibit 6, these are the, what
24   are referred to as the Endocrine Society
25   Guidelines; do you agree?
```

Page 148

1    A.    Yes.

2    Q.    And you reviewed these and

3    discussed these at length in your

4    declaration, correct?

5    A.    Yes.

6    Q.    You would agree that the,

7    although your criticisms of the

8    systematic reviews that were

9    commissioned, you would agree that the

10   Endocrine Society did commission two

11   systematic reviews in the development of

12   these clinical practice guidelines,

13   correct?

14   A.    Well, it's not quite complete.

15   They had two systematic reviews, one for

16   puberty blockers.  One for cross-sex

17   hormones.  They reviewed safety.  But not

18   the effectiveness of either one.

19   Q.    You have some criticisms of the

20   systematic reviews, but you don't

21   disagree with the fact that there were

22   two systematic reviews commissioned in

23   the development of the Endocrine Society

24   Guidelines, right?

25   A.    Yes and no.  Again, my

Page 149

1  hesitation is that the missing phrase is
2  that in order to make the, in order to
3  engage in the decisionmaking pertinent to
4  this case and the various regulations
5  around it, it's not just any systematic
6  review of anything you want.
7          The information that is needed
8  by the decision-makers is to assess the
9  risk-to-benefit ratio.  That requires a
10  systematic review of safety and a
11  systematic review of effectiveness.  So
12  they engaged in systematic reviews, but
13  not systematic reviews of effectiveness
14  and safety, which is what is needed for,
15  as I say, the pertinent task.  So I
16  couldn't -- it's not just any systematic
17  review of anything.  It's partial reviews
18  of half the equation that one needs, that
19  one needs in order to assess the
20  risk-to-benefit ratio.
21      Q.    So you have criticisms of the
22  systematic reviews that were relied upon.
23  But just you don't disagree that the
24  Endocrine Society did commission two
25  systematic reviews in the development of

Page 150

```
 1    these clinical practice guidelines,
 2    right?
 3              MR. RAMER:  Objection to the
 4        form.  Asked and answered.
 5        A.    The criticisms I have aren't
 6    exactly of the systematic reviews
 7    themselves.  My criticisms really are
 8    about the application and interpretation
 9    of the results of the systematic reviews.
10    And again, given -- and given the
11    application is to enact a risk-to-benefit
12    ratio, they weren't systematic reviews of
13    all of the necessary material.  But
14    that's not a criticism of the systematic
15    reviews.  That's a criticism of the
16    question that was or a limited question
17    that was put to the systematic reviewers
18    and then people over-applying the
19    systematic reviews to pertain to material
20    that wasn't contained in the systematic
21    reviews.  And the other part just being
22    the --
23        Q.    I am just trying to make sure
24    we are on the same page.  And I think
25    this is a pretty binary yes/no fact.
```