APPEAL NO. 24-142

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAM POE, by and through her parents and next friends Penny and Peter Poe, et al.,

*Plaintiffs-Appellees*,

v.

Raúl LABRADOR, in official capacity as Attorney General of the State of Idaho, et al.,

*Defendants-Appellants*,

and

JAN M. BENNETTS, in official capacity as Ada County Prosecuting Attorney, et al.

*Defendants.*

On Appeal from the United States District Court
for the District of Idaho / Case No. 1:23-cv-00269-BLW

## SUPPLEMENTAL EXCERPTS OF RECORD OF APPELLEES
## VOLUME 3 of 3

Li Nowlin-Sohl
(admitted only in
Washington)
Chase B. Strangio
James D. Esseks
AMERICAN CIVIL LIBERTIES
UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
jesseks@aclu.org
cstrangio@aclu.org

Richard Eppink
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop

Brad S. Karp
Alexia D. Korberg
PAUL, WEISS, RIFKIND,
WHARTON &
GARRISON LLP
1285 Avenue of the
Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com

Eric Alan Stone
GROOMBRIDGE, WU,
BAUGHMAN AND
STONE LLP
565 Fifth Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0034
eric.stone@groombridgewu.com

Philip S. May
GROOMBRIDGE, WU,
BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite
1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgew
u.com

Jordan E. Orosz
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON
LLP
2001 K Street, NW
Washington, DC 20006-
1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Dina Flores-Brewer
Paul Carlos Southwick
(admitted only in Oregon)
Emily Myrei Croston
(admitted only in the District
of Columbia)
ACLU OF IDAHO
FOUNDATION
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org
psouthwick@acluidaho.org
ecroston@acluidaho.org

*Counsel for Appellees*

Page 151

```
 1              The Endocrine Society
 2    commissioned two systematic reviews in
 3    the development of their clinical
 4    practice guidelines, correct?
 5              MR. RAMER:  Objection to the
 6         form.  Asked and answered.
 7         A.     Answering that in a yes or a no
 8    insinuates a level of completeness and
 9    utility that they don't have.
10         Q.     And I am not asking for any
11    characterization of the reviews.  Again,
12    I think this is a very simple binary
13    yes/no question.  Did they, in the course
14    of developing the clinical practice
15    guidelines, you agree the Endocrine
16    Society commissioned two systematic
17    reviews?
18              MR. RAMER:  Objection to the
19         form.  Asked and answered.  And again,
20         I object to counsel cutting off the
21         witness's response.
22         A.     It's not a dichotomous
23    question.  For example, if somebody asked
24    does surgery work?  Well, the question
25    can be phrased in a dichotomous way.
```

Page 152

```
 1          But the answer to the question
 2   is, well, it depends on the surgery and
 3   it depends on the diagnosis that you're
 4   trying to use it for.
 5          So did they conduct systematic
 6   reviews, well, did they conduct
 7   systematic reviews of the material that
 8   was needed in order to answer the
 9   questions to develop the policy it was
10   based on, as I say --
11      Q.    Let's try this a different way.
12   Look at page 1 of Exhibit 6, under the
13   subheading called "Evidence."  Do you see
14   that?
15          MR. RAMER:  Objection to the
16      form.  And again, object to counsel
17      cutting off the witness's response.
18      Q.    Can you give me the decimal
19   number of the part you're referring to?
20      A.    It's the first page of Exhibit
21   6.  So the very cover page.  And what
22   would be generally like an abstract
23   section.  Yup.
24      Q.    And the heading is called
25   "Evidence."
```

Page 153

```
 1              Do you see that?
 2      A.      Yes.
 3      Q.      The last sentence of that
 4   paragraph "The task force commissioned
 5   two systematic reviews."
 6              Do you see that statement?
 7      A.      Yes.
 8      Q.      Do you have any reason to
 9   disagree with that statement?
10      A.      Yes, it's incomplete.
11      Q.      What is incomplete about the
12   statement that the task force
13   commissioned two systematic reviews?
14      A.      What they reviewed.
15      Q.      Do you see that sentence goes
16   on to say "And used the best available
17   evidence from other published systematic
18   reviews and individual studies"?
19      A.      Yes.
20      Q.      So you would agree -- you won't
21   agree.  Let me strike that and let me try
22   that again.
23              The Endocrine Society, in
24   addition to the two systematic reviews
25   that were commissioned, also relied on
```

Page 154

1    other published systematic reviews and
2    individual studies.   "
3              Do you agree with that?
4              MR. RAMER:  Objection to the
5         form.
6         A.    I agree that they did indeed
7    include -- I have no reason to disagree
8    that they included other materials in the
9    formation of a policy.
10        Q.    And those other materials
11   included other published systematic
12   reviews, right?
13        A.    That's what they said, but it's
14   not exactly clear which ones there were,
15   especially given that, given that year.
16        Q.    If we could please go ahead and
17   turn to --
18        A.    Oh, I am sorry.  And, of
19   course, missing is the age range.  The
20   large, large majority of the information
21   that they reviewed pertained to adults.
22   Of both of those reviews the total number
23   of studies that pertained to minors was
24   one.  It was exactly one study between
25   both of those reviews, one study that was

Page 155

1    about minors.

2              So it's only by removing those

3    details that it starts sounding like that

4    there were two systematic reviews.  Yeah,

5    one of which included zero studies about

6    minors.

7              So by taking out the reviews of

8    what removes that the entire process for

9    minors included exactly one study.  Which

10   I name in my report and I think it's

11   Table number 1 of my report, compared to

12   the other systematic reviews, which list

13   exhaustively all of the studies that were

14   included in all of the systematic

15   reviews.

16             So just generically saying

17   reviews, a review of one study is not a

18   review.  It's just a study.

19        Q.    So if we can please turn to

20   page 10 of Exhibit 6, which according to

21   the internal pagination is page 3878.

22        A.    Got it.

23        Q.    Do you see there is a table on

24   that page called Table 5?

25        A.    Yes, I do.

Page 156

1      Q.    And Table 5 describes the
2   criteria for gender-affirming hormone
3   therapy for adolescents, right?
4      A.    That's their title for it, yes.
5      Q.    And it's broken into two
6   sections where the Endocrine Society
7   first provides criteria that makes
8   adolescents eligible for GnRH agonist
9   treatment, right?
10     A.    Yes.  And as I say, one study
11  that they reviewed was about cross-sex
12  hormone treatment.  The number of studies
13  that they included for the puberty
14  blockers was zero.  This is based on zero
15  studies.
16     Q.    And the bottom half of the
17  table is identified by the Endocrine
18  Society as criteria that make adolescents
19  available for subsequent sex hormone
20  treatment?
21     A.    Correct, that was the part that
22  was based on one study.
23     Q.    And when you say it's based on
24  one study, you're referring to those two
25  commissioned systematic reviews, right?

Page 157

1      A.    Right, the two of them put

2    together found for minors a total of one

3    study.

4      Q.    And you're not considering any

5    of the other articles, references and

6    studies that are cited within the

7    contents of the Endocrine Society

8    Guidelines?

9      A.    The purpose of a systematic

10   review is to apply consistent criteria

11   through all of them.

12            So the point of those not being

13   included in the systematic review is that

14   they would, you know, they didn't

15   qualify, you know, they didn't meet the

16   criteria for an even-handed

17   identification of the appropriate

18   research.

19            That isn't to say that one

20   should necessarily ignore them.  But one,

21   of course, needs to acknowledge that

22   there is a reason that they weren't of

23   the methodological quality in order to,

24   you know, be included in the systematic

25   review to begin with.

Page 158

1      Q.     So if we look at the first half
2   of Table 5, the adolescents eligible for
3   GnRH agonist treatment?
4      A.     Yes.
5      Q.     You agree that the Endocrine
6   Society lays out as one of the criteria
7   that the adolescent has demonstrated a
8   long lasting and intense pattern of
9   gender nonconformity or gender dysphoria?
10     A.     That's the text that they
11  wrote, yes.
12     Q.     And another criteria is that
13  they require that the gender dysphoria
14  has worsened with the onset of puberty?
15     A.     Yes, that's the text that they
16  included.
17     Q.     And that any coexisting
18  psychological, medical or social problems
19  that could interfere with treatment, for
20  example, that may compromise treatment
21  adherence have been addressed such that
22  the adolescent's situation and
23  functioning are stable enough to start
24  treatment?
25     A.     Yes, they included that test.

Page 159

```
 1        Q.    And that the adolescent has
 2   sufficient mental capacity to give
 3   informed consent to this reversible
 4   treatment?
 5        A.    That's their text, yes.
 6        Q.    Now, I will accept, and I know
 7   that you have strong disagreement with
 8   the inclusion of the parenthetical phrase
 9   "reversible," correct?
10        A.    I think the phrase is being
11   wildly misused and overinterpreted.
12        Q.    You would agree that -- and
13   those four criteria all need to be
14   evaluated by a qualified mental health
15   professional, right?
16        A.    I would add other criteria to
17   that.
18        Q.    And there are other criteria --
19        A.    I mean to the qualifications of
20   the mental health professional.  An
21   unfortunate side effect of the
22   polarization that's going on is that it's
23   more than possible to engage in therapist
24   shopping.
25               If you find, you know, one
```

Page 160

1  mental health person that says, says no

2  or you find a string of them that says

3  no, it's always possible to find another,

4  to find somebody who uses very low

5  stands, to find somebody with an ideology

6  bent, you know, in order to sign off on

7  whatever, on whatever it is the patient

8  wants.  So in practice a qualified

9  becomes indistinguishable from a willing.

10       Q.     Are you aware of the

11  qualifications of the various therapists

12  and mental health professionals in the

13  State of Idaho?

14       A.     Only cursorily through the --

15  only cursorily in order to be able to

16  receive a license or registration in

17  general.  But there does not exist a

18  documentation for qualifications specific

19  to being allowed to implement, implement

20  the WPATH or any other criteria.

21       Q.     Do you consider yourself a

22  qualified mental health professional

23  under these criteria?

24            MR. RAMER:  Objection to form.

25       A.     I am not aware of their issuing

Page 161

1    criteria for what's qualified.  I am not

2    aware of WPATH or any of the other groups

3    having any assessment, regulatory or

4    supervisory powers at all.  They merely

5    use the word "qualified" but there is

6    nothing in any of this that prevents

7    anybody from calling themselves

8    qualified.  It's being used as a

9    throwaway term.

10        Q.    Do you agree that the Endocrine

11   Society Guidelines say that coexisting

12   psychological, medical or social problems

13   that could interfere with treatment have

14   been -- must be addressed?

15        A.    Again, they include that --

16            MR. RAMER:  Sorry, objection to

17        the form.  Sorry, I didn't want to cut

18        you off.  Objection to the form, and

19        you can go ahead and answer.

20        A.    They include that text, yes.

21   But it's, as I say, unenforced,

22   unchecked, unoperationalized in the

23   context of the endochronological

24   statement, in practice it's just saying

25   we are not responsible for this.  We just

Page 162

```
 1   handle the endochronological part and the
 2   mental health part, as long as you sign
 3   your name to the paper and you're
 4   responsible for it, you're responsible
 5   for it.  Not us.  But they issue no
 6   guidelines.  They don't talk about how
 7   they would assess or that they even
 8   attempt to assess the qualifications of
 9   the mental health professional who is
10   signing off on the medical transition.
11       Q.   What qualifications would you
12   want the mental health professional to
13   have in order to make these
14   determinations?
15           MR. RAMER:  Objection to form.
16       A.   That's tough to say in the
17   current context.  It's exactly because
18   these questions have become as polarized
19   and as controversial that they have that
20   we, the healthcare professions and we the
21   democratic societies require an objective
22   evidenced means of making these decisions
23   in order to be fair to people who
24   disagree.  Disagree in a healthy way, I
25   mean.
```

Page 163

1              Because that necessarily
2     includes an empirical evidence-based
3     means of deciding what the criteria for
4     the patients are, that pretty much
5     requires that the same empirically
6     demonstrated, tested criteria be applied
7     for the decision for which clinicians are
8     qualified to do that.
9              So if somebody asked me that
10    question 15 years ago, you know, I could
11    relatively fluently suggest the basic
12    parts of my field and the knowledge
13    that's in it in order to say this is the
14    kind of stuff a person needs to know in
15    order to come to an educated clinical
16    decision.
17             But because of the situation
18    that's bringing these questions forth
19    today, I would need to, and I think one
20    would need to say, how do you know that
21    those are effective.  My best guess isn't
22    good enough anymore as it would have been
23    before these controversies emerged.
24             So I am still able and willing
25    to describe the areas of the field that a

Page 164

1   person needs to be able, needs to be

2   fluent in in order to be able to assess

3   the multiple possibilities that, of what

4   might help a patient expressing gender

5   dysphoria.  But there hasn't been a test

6   to demonstrate that, my hunch, my view,

7   my opinion, for what the qualifications

8   should be are, as I say, themselves

9   empirically validated.

10          The one exception to that is

11  the more general finding that has been

12  shown in research about healthcare

13  providers is that actual clinical

14  experience in this or other relevant

15  questions does not help.  It does not

16  improve clinical decision-making and

17  level of clinical care.  It increases the

18  confidence of the clinician.  But it does

19  not improve actual clinical care, which

20  is exactly the opposite of how most lay

21  people think of it and including most of

22  the legal systems where people kind of

23  have this prejudice, hunch, myth.  That

24  more experience at performing this kind

25  of care makes one better at this care.

Page 165

```
1    The research does not support that.
2         Q.    Are you a qualified mental
3    health professional who would be able to
4    make these determinations listed out here
5    -- sorry, let me strike that and start
6    over.  I realize I am asking my question
7    slowly.
8              Are you a qualified mental
9    health professional who is able to make
10   the assessments laid out in, under number
11   1 of Table 5 of the Endocrine Society
12   Guidelines?
13             MR. RAMER:  Objection to the
14        form.
15        A.    Again, without an objective set
16   of what those criteria are it's hard to
17   be definitive.  At the same token, it's
18   difficult to think of a set of criteria
19   that wouldn't approve me while still
20   being legitimate criteria at all.
21             I mean, there are people who
22   would want to disqualify me, accusing me
23   of whatever myth or stereotypes they have
24   about me.  But for objective criteria,
25   again, it would be difficult to say which
```

```
                                            Page 166

 1    ones I wouldn't -- what kind of criterion
 2    I wouldn't meet.  Again, I'm limiting my
 3    own opinions to adults.
 4        Q.    You agree that the Endocrine
 5    Society lays out in its criteria for
 6    gender-affirming hormone therapy for
 7    adolescents that a qualified mental
 8    health professional has to confirm these
 9    points under number 1 in Table 5, right?
10             MR. RAMER:  Objection to form.
11        A.    Yes.  As I say, it's an
12    expression that that is essentially the
13    coverage they are giving themselves.  If
14    it turns out the person's mental health
15    status doesn't improve this is the
16    opportunity for endochronologists to say,
17    that wasn't our job.
18        Q.    The Endocrine Society as part
19    of that wants to ensure that -- strike
20    that.
21             The Endocrine Society
22    Guidelines lay out that a patient's
23    coexisting psychological, social or
24    mental problems that can interfere with
25    the treatment have been addressed, right?
```

```
                                          Page 167
 1              MR. RAMER:  Object to the form.
 2        A.    Well, again, it's the same
 3    thing.  They are saying if they have not
 4    been addressed, that wasn't our job.
 5    That's the fault of a clinician who sent
 6    the patient and cleared the patient
 7    before they came to our door.
 8        Q.    Unless a mental health
 9    professional -- unless a qualified mental
10    health professional has confirmed that
11    the patient doesn't have coexisting
12    psychological, medical or social problems
13    that could interfere with treatment or
14    any such problems have been addressed,
15    then the Endocrine Society Guidelines say
16    that person is not eligible for GnRH
17    agonist treatment, right?
18              MR. RAMER:  Objection to the
19        form.
20        A.    Yes, that's what provides them
21    the coverage.
22        Q.    And the Endocrine Society
23    Guidelines say that GnRH agonist
24    treatment should not be started before 10
25    or stage 2, right?
```

Page 168

```
1        A.     That's a throwaway kind of
2   requirement, because you can't block a
3   puberty that hasn't happened.  So the
4   presence of that line is correct.  But as
5   I say, it's a pretty vacuous claim.
6        Q.     You can't administer puberty
7   blockers to pre-pubertal children, right?
8             MR. RAMER:  Objection to the
9        form.
10       A.     There is no point to it.  So as
11  I say, it's a vacuous, it's a vacuous
12  claim.  It shouldn't be interpreted to
13  indicate some sort of a conservatism on
14  their part.  It's an empty rule.  Don't
15  give medicine to a person who doesn't
16  need the medicine.  Okay, fine.  As I
17  say, it's an empty -- it's an empty rule.
18       Q.     If a patient satisfied all of
19  the criteria laid out in the first half
20  of Table 5 under the heading of
21  "Adolescents Are Eligible for GnRH
22  Agonist Treatment If," if there were a
23  person under the age of 18 who satisfied
24  all of those criteria, should that person
25  be able to obtain puberty blockers?
```

Page 169

1          MR. RAMER:  Objection to the

2      form.

3      A.    Well, to me able is a

4  conclusion of what's a risk-to-benefit

5  ratio.  We have grossly insufficient

6  information about the risks, and

7  especially the benefits.  The Endocrine

8  Society did not include in their

9  systematic reviews either the risks or

10  the benefits of puberty blocking

11  medication.  So we simply do not know if

12  they are able.  We simply cannot assess

13  the risk-to-benefit ratio.  And they cite

14  no evidence suggesting that they have it.

15  It's an unanswerable question.  We have

16  slightly more information now than when

17  they first wrote this.

18          I included in my report, in my

19  response to a Dr. Baker, I included a

20  table that had the exact year of this and

21  the list of all of the studies, you know,

22  by year, in order to, you know,

23  demonstrate that at the time of this, the

24  studies we had didn't exist.  These

25  criteria, indeed I think expire this

Page 170

1    year.  And they, I assume, are planning

2    to update and reengage it.

3           The current set of the

4    Endocrine Society -- their policies

5    automatically give out, I think every

6    five years, I think.  So this is as out

7    of date as their criteria.

8           I take that back.  It's the AAP

9    that just announced a redoing of it.  But

10   as I cite, the years on which this is

11   based on the lack of research on which

12   these statements about GnRHs are applied

13   are all still true.  So they came up with

14   a policy, but it is not based on any

15   research at all.

16      Q.   Do you think that GnRH agonist

17   treatment is appropriate under any

18   circumstances for purposes of treating

19   gender dysphoria?

20          MR. RAMER:  Objection to form.

21      A.   It can be, as we were

22   discussing before.  It has to have the

23   caveats of it's possible, but mostly

24   unknown, which is the whole trouble.  We

25   need to do the research in order to be

Page 171

1    able to identify, assuming it's possible

2    at all, to identify which people for whom

3    it might be beneficial or at least give

4    us a favorable risk-to-benefit ratio.  If

5    we can't identify which persons they are,

6    that it's possible, is the question.

7         Q.    I think you mentioned this

8    earlier, if we can go back to your

9    declaration, Exhibit 1, and look at Table

10   1, which I believe occurs right after

11   paragraph 78.  Or right before paragraph

12   78, I am sorry.

13              So the studies that you listed

14   in this table, under Endocrine Society,

15   the only one that you have listed is

16   Klink?

17        A.    Yes, that is the one study that

18   their systematic review found.

19        Q.    So to be clear, this table is

20   discussing what was included in

21   systematic reviews, right?

22        A.    Correct.

23        Q.    This table does not indicate

24   what studies were relied on by the

25   Endocrine Society in providing their

Page 172

1    guidelines in addition to the systematic
2    review?
3         A.    That's correct.  That's the job
4    of the systematic reviews to apply that
5    criteria to everything going on.  Things
6    that are excluded by a systematic review
7    are excluded for an explicit reason.
8              Now the part that needs to be
9    answered is that if this study didn't
10   qualify for your systematic review,
11   exactly why are you including it in your
12   policy at all.  If it wasn't good enough
13   for the systematic review for the policy,
14   what makes it good enough for the policy.
15        Q.    This table also doesn't include
16   other systematic reviews that were relied
17   upon by the Endocrine Society except for
18   the two that they commissioned, right?
19        A.    The great majority, really,
20   except for this one study, everything
21   else in their systematic review is about
22   adults.
23             So the other systematic reviews
24   that they included were systematic
25   reviews about outcomes and risks for

Page 173

1    adults, not adolescents.
2        Q.    And you applied the same
3    criteria for what you included in the
4    column for the WPATH?
5        A.    Yes.
6        Q.    And so just to be clear on
7    that, because I thought that was a
8    terrible question, personally.  So in the
9    column for WPATH, the articles listed
10   there, are just the articles that were
11   included in the systematic review
12   commissioned by WPATH, right?
13       A.    Correct, that's the point of
14   the systematic review is to exclude
15   everything with the explicit criteria,
16   which says, these are the studies good
17   enough to, you know, be in.
18            If you say, oh, the studies
19   after setting your criteria, finding
20   that, oh, I don't like the studies that
21   meet my criteria, so let's include these
22   other studies that I wanted to include
23   all along.  That's now gaming the system.
24   The entire purpose of the systematic
25   review is to disallow that kind of cherry

Page 174

1    picking.

2              Once you add or read studies

3    that were excluded by a systematic

4    review, as I cite, that's spoiling the

5    whole point of trying to be objective and

6    avoid cherry picking.  That's merely

7    claiming that you're avoiding cherry

8    picking and then throwing more cherries

9    into the basket after the fact.

10       Q.    If we can turn to paragraph 143

11   of your declaration.

12             MR. RAMER:  Sorry, Philip, did

13      you say 143?

14             MR. MAY:  Yes.

15             MR. RAMER:  Thank you.

16       Q.    The first sentence of this

17   paragraph reads "The social media voices

18   today loudly advocate

19   'hormones-on-demand' while issuing

20   hyperbolic warnings that teens will

21   commit suicide unless this is not

22   granted."

23             Did I read that correctly?

24       A.    Yes.

25       Q.    What do you mean by the phrase

Page 175

1    "hormones-on-demand" in quotation marks?

2        A.    That there should not be an

3    assessment or gatekeeping process.  That

4    obtaining, obtaining these medications is

5    itself a civil right rather than an

6    assessment of risk-to-benefit ratios.

7        Q.    The Endocrine Society does not

8    endorse providing hormones-on-demand,

9    correct?

10              MR. RAMER:  Objection to form.

11       A.    They don't use that phrase.

12       Q.    We just looked at the criteria

13   for the Endocrine Society for providing

14   hormones, and there are specific criteria

15   that should be met before

16   gender-affirming medical care is

17   provided, right?

18              MR. RAMER:  Objection to the

19       form.

20       A.    Yes and no.  The language that

21   they use lacking any objective means of

22   assessment allows for absolutely anything

23   to happen with no comeuppance.  There is

24   nothing to stop anybody from calling

25   anybody qualified.

Page 176

```
 1              So saying that it needs to be a
 2    qualified person, but you give no way of
 3    determining, assessing or supervising who
 4    counts as qualified, well, that's not a
 5    rule at all anymore.
 6       Q.    Are you aware of any doctor in
 7    Idaho providing "hormones-on-demand"?
 8       A.    I can't imagine a licensed
 9    healthcare provider making such a
10    statement publicly.  As I say, it's
11    typically social media voices, people who
12    refer to themselves as activists
13    referring to engaging in such procedures
14    as a civil right, and so on, who are
15    expressing, without using the phrase, but
16    expressing what is indistinguishable from
17    operationally hormones-on-demand.  But
18    such voices and advocates don't have a
19    license or insurance coverage to enable
20    it.
21              It's people with nothing to
22    lose and for whom it's very easy to say
23    out loud in an anonymous social media
24    account.  It should be people deciding
25    for themselves, and that's that.
```

Page 177

1              But the clinicians themselves
2    again -- there is one potential
3    exception, but not in, not in Idaho.  As
4    I say, I am not aware of a licensed
5    clinician describing themselves with such
6    language.
7         Q.    Are you aware of a licensed
8    clinician in Idaho whose practices
9    conforms as what you describe as
10   hormones-on-demand?
11        A.    No, I never looked.
12        Q.    And the sentence here refers
13   generally, to social media voices.  There
14   is no citations for that sentence, right?
15        A.    Correct.  I didn't try to find
16   -- again, for example, specific quotes of
17   specific tweets or -- do we still call
18   them tweets -- posts on social media
19   where somebody said so.
20        Q.    So you're relying on your
21   expert opinion for that, right?
22        A.    I don't know really if it's an
23   actual -- I don't know if I would call it
24   my expert opinion.  It's just, you know,
25   like more than once it's a pretty

Page 178

1    ubiquitous -- it's pretty ubiquitous.

2        Q.    All right.  Let's go ahead and

3    shift gears just a little bit.  In terms

4    of assessing research literature, you

5    believe that GRADE is the most widely

6    used methodology for assessment of, for

7    assessment of studies?

8        A.    For clinical, clinical outcome

9    studies, yes.

10       Q.    And you're familiar with the

11   literature underlying GRADE?

12       A.    Yes, basically.

13           MR. MAY:  Rob, we can go ahead

14       and mark tab 19 as the next exhibit,

15       which I believe will be 7.

16           (Exhibit 7, Article entitled

17       "GRADE Guidelines:  3.  Rating the

18       Quality of Evidence by Balshem,

19       et al.", was so marked for

20       identification, as of this date.)

21       Q.    What has been marked as Exhibit

22   7 is an article entitled "GRADE

23   Guidelines:  3.  Rating the Quality of

24   Evidence by Balshem, et al."  Do you see

25   that?

Page 179

1          A.     Yes.

2          Q.     You're familiar with this

3     paper?

4          A.     I can't say this specific

5     paper.  At least I would have to check my

6     own notes to remember exactly which

7     reference, which version of this it came

8     from.  But I know roughly the contents of

9     it.

10         Q.     Why don't you turn with me to

11    page 2 of Exhibit 7 to the heading number

12    4.

13         A.     I see it.

14         Q.     You see the heading says "A

15    particular quality of evidence does not

16    necessarily imply a particular strength

17    of recommendation"?

18         A.     That's correct.

19         Q.     And in the first paragraph

20    underneath that section, the last two

21    sentences read, "Although higher quality

22    evidence is more likely to be associated

23    with strong recommendations than lower

24    quality evidence, a particular level of

25    quality does not imply a particular

Page 180

1    strength of recommendation.  Sometimes,

2    low, or very low quality evidence, can

3    lead to a strong recommendation."

4              Do you see that?

5        A.    Yes.

6        Q.    Do you disagree with that

7    statement?

8        A.    That it can happen sometimes,

9    no, I don't disagree.

10        Q.    You can go ahead and turn to

11    page 3 of Exhibit 7, section 5.

12        A.    I am there.

13        Q.    All right.  And if we look at

14    the very last paragraph of that section

15    over in the right-hand column, the second

16    to last sentence.  Quote, "Although the

17    processes for assessing quality are the

18    same, authors" --

19        A.    Hang on.  Hang on.

20        Q.    Yes.

21        A.    I am sorry, redirect me to that

22    sentence.

23        Q.    It's about halfway through to

24    the spillover of the paragraph on the

25    right-hand column.

Page 181

1      A.    I got it.  It's a couple of
2   lines above the 6.  Got it.
3      Q.    It reads "Although the
4   processes for assessing quality are the
5   same, authors of systematic reviews and
6   authors of guidelines will apply the
7   criteria differently."
8            Do you see that?
9      A.    Yes.
10      Q.    Do you agree that's an accurate
11   representation of how authors of
12   systematic reviews and authors of
13   guidelines can apply the GRADE criteria?
14      A.    Again, removed from its
15   contexts, it would suggest that it's more
16   arbitrary as opposed to back in context,
17   recognizing that it's necessarily a fault
18   with the system and, therefore, something
19   which we need to do our best to mitigate
20   by having as objective as possible, you
21   know, the determinations of what, you
22   know, how quality is assessed.
23      Q.    If you can go ahead and turn
24   with me now to page 6, excuse me, page 5
25   of Exhibit 7.  The internal pagination is

Page 182

1    page 405.

2        A.    I am there.

3        Q.    The heading 10, "Conclusion."

4        A.    Yes.

5        Q.    The first sentence the authors

6    note "In closing, we caution against a

7    mechanistic approach toward the

8    application of the criteria for rating

9    the quality of the evidence up or down."

10           Do you see that?

11       A.    Yes, I do.

12       Q.    Do you agree with that

13   statement?

14       A.    Yes, essentially.

15       Q.    The last sentence of that

16   paragraph goes on to say "Fundamentally,

17   the assessment of evidenced quality is a

18   subjective process and GRADE should not

19   be seen as obviating the need for or

20   minimizing the importance of judgment or

21   as suggesting that quality can be

22   objectively determined."

23           Do you disagree with that

24   statement?

25       A.    No, not really.

Page 183

1    Q.    You say not really.  What's the
2   really part?
3    A.    Well, it's the missing part of
4   the obvious application of those specific
5   sentences to, you know, to the particular
6   conclusions relevant to this case.
7         What they were pointing out,
8   perfectly legitimately, is that sometimes
9   there is some wiggle room and some
10  exceptions.
11        Well, what's missing is, of
12  course, the rest of that argument.  There
13  is absolutely no evidence whatsoever to
14  suggest that this is one of those
15  exceptions.
16        Nobody has listed any of the,
17  here is what the systemic reviews say and
18  here is the part where we think they
19  apply versus not.  They simply ignore the
20  systematic reviews.
21        So that -- well, I suppose,
22  actually it's exactly the same as when
23  discussing that there are potential
24  theoretical exceptions among patients.
25  Okay.

Page 184

```
 1              There can be exceptions.  But
 2     if we don't have a means of justifying
 3     which exception identifying those
 4     exceptions, how do we know that, in that
 5     example, a given particular patient is,
 6     is an exception.
 7              The identification that
 8     exceptions can exist doesn't mean that
 9     this patient is such an exception.  For
10     this document, it indicates that there
11     are potential exceptions for when rating
12     particular studies or particular
13     literature.
14              Well, what's missing is any
15     evidence to suggest that the particular
16     studies that are being used in the
17     systematic review are such exceptions.
18     The insinuated argument is that if they
19     can never exist an exception, therefore,
20     this is one.
21              Well, no, wait a second.
22     Demonstrate or show evidence that the
23     studies that are being concluded, that
24     are being involved in the systematic
25     reviews of outcomes of a medicalized
```

Page 185

```
 1    transition are such exceptions.  They are
 2    not.
 3              Also missing from the argument
 4    is exactly as I listed in my table.
 5    There have been multiple systematic
 6    reviews of this literature.  And they all
 7    came to the identical conclusion.  The
 8    only groups coming to a different
 9    conclusion are people who are the
10    managers of the clinics and are in a
11    financial conflict of interest over the
12    results.
13              So what exactly is the evidence
14    that, you know, it's that the
15    subjectivity here is on the part of
16    several public healthcare systems versus
17    the commercial system in the U.S.
18              So as I say, my really is the
19    insinuated argument of where that's going
20    to lead, because there can exist
21    exceptions, therefore the rule doesn't
22    apply to the present circumstance.  No,
23    what we are missing is the evidence that
24    this is one of those exceptions.  There
25    is no such evidence.
```

Page 186

1      Q.     Okay.  So I want to -- you said
2    something towards the end there that I
3    want to follow-up on.
4          "The only groups coming to
5    different conclusions are people who are
6    managers of clinics and are in a
7    financial conflict of interest over the
8    results."
9          What's your basis for that
10    statement?
11      A.     Primarily I'm referring to the
12    sets of experts whose reports I have been
13    evaluating and comparing to the
14    literature itself.  Again, for this
15    particular case there is only Dr. Baker
16    itself.  But in the back of my mind it's
17    the series of the same experts over and
18    over again that I have been encountering
19    in several different cases.  I am
20    including them.  And, of course, the
21    various professional societies which are,
22    they are in charge of defending guild
23    interest and defending guild interests,
24    period.  Such as groups such as the
25    endochronological society, whose members

Page 187

1    and funding come from the dues which are
2    people who perform these procedures.
3              So, as I say, they are not
4    being done by people or associations that
5    lack a conflict of interest.  They are
6    coming from people and groups with a
7    conflict of interest.
8         Q.    Okay.  So let's focus on -- you
9    refer to Dr. Baker, but it's Dr. Brady?
10        A.    I am sorry.  Thank you very
11   much.
12        Q.    Let's talk about Dr. Brady.
13   Dr. Brady is not the manager or director
14   of a clinic, right?
15        A.    Correct.  She said in her
16   report that 100 percent of her practice
17   was these patients.  So, again, a
18   conflict of interest.
19        Q.    She's not a manager or director
20   of a clinic, right?
21        A.    That is correct.  She's an
22   exception.  As I say, in my head I am
23   thinking of them as a large group and the
24   important part is that they are in a
25   conflict of interest.  I refer to them as

directors, because the majority of them are. But that is correct, she is an exception. She's in the same conflict of interest, even though she's not the director of the clinic.

Q. Dr. Brady is a psychiatrist, right?

A. I don't remember if she said psychiatrist or psychologist.

Q. And sorry, and thank you for correcting me, she's a psychologist. She's not an M.D. Dr. Brady does not provide gender-affirming medical care, right?

A. Correct. She doesn't provide medical care. She conducts the mental health assessments which then enable the medical care.

Q. She does not herself provide medical care, right?

MR. RAMER: Objection to the form. Asked and answered.

Q. Let me strike that and ask it differently. She herself does not perform gender-affirming medical care,

Page 189

1   right?

2        A.    Again, my hesitation is really

3   just a quibble over words.  The services

4   she provides are not directly hormonal or

5   surgical.  But because these decisions

6   are being made on a team basis include,

7   and the team includes medical

8   interventions, that, again, that is part

9   of a hospital, you know, in a meaningful

10  way everything in the hospital counts as

11  medical.  And there is many of the

12  activists, you know, start including,

13  refer to the entire process, including

14  the assessments as medically necessary.

15  But still require mental health

16  assessment, as I said, what counts as

17  medical, what counts as medical or not.

18  And if she does it versus a psychiatrist

19  doing it, it could be exactly the same

20  report, but one counts as coming from one

21  it's medical.  And coming from the other,

22  it's not medical, even though it's the

23  identical service.  As I say, it starts

24  becoming quibbling over what counts.

25        Q.    Sure.  My question was really

Page 190

```
 1    directed toward prescription of puberty
 2    blockers and cross-sex hormone therapy.
 3         A.    Correct, she's a psychologist
 4    and would not be directly prescribing the
 5    hormones or performing the surgeries.
 6         Q.    And it's your belief that
 7    psychotherapy should be the first line of
 8    treatment, correct?
 9         A.    That is what the research is
10    most consistent with, yes.
11         Q.    So shouldn't Dr. Brady be
12    advocating for more psychotherapy?
13              MR. RAMER:  Objection.
14         Q.    Under her conflict -- sorry.
15    According to your logic, shouldn't
16    Dr. Brady be advocating for more
17    psychotherapy and advocating against
18    gender-affirming medical care?
19              MR. RAMER:  Objection to the
20         form.
21         A.    I don't know about should be.
22    But -- I don't know what I could add to
23    that.  I'm not sure if it should be.  If
24    100 percent of her clinical time is
25    already accounted for, it's moot.
```

Page 191

1      Q.     You think a source of
2   compensation can have an undue influence
3   on a person's perspective?
4      A.     It certainly can, yes.
5      Q.     And I believe that you've
6   estimated that about 80 percent of your
7   current income comes from expert services
8   like this?
9      A.     Last year and this year.  I
10  have no control over it.  This is really
11  up to the American legislatures, how
12  quickly they pass these regulations and
13  then how quickly they get sued.  And
14  then, you know, for many of them I get a
15  phone call.  I have no reason to think
16  that this is permanent.  I can't help but
17  point out that I am a scientist.  Nobody
18  becomes a scientist for the money.  If
19  money were my motivator, then I would
20  have gone into, you know, clinical work
21  to begin with.  But that, you know, I am
22  a scientist.
23             By pure coincidence, you know,
24  relatively late in my career, even though
25  I have always, my entire career, just

Page 192

```
 1    given away to whoever would ask, you
 2    know, whatever information about my field
 3    I could.  This very bizarre,
 4    unpredictable wave in society has just
 5    changed how things work.
 6              So I've, essentially, put my
 7    private practice primarily, most of it,
 8    on hold for as long as this lasts.  And
 9    then, you know, presumably I will switch
10    back when this is over, which could be
11    anytime, which could be anytime.
12         Q.     Would being paid by an advocacy
13    group influence an opinion?
14         A.     Again, it certainly can.  But I
15    haven't said anything, you know, in any
16    of these cases that I haven't been saying
17    for many years.  In fact, the thing that
18    brought me to the attention of these
19    groups was my fact-check of the AAP, now
20    five years ago, on my own time.
21    Perfectly free.  Just because the
22    material, I could see what was going on.
23    I could see that it was dangerous.  What
24    the public needed was the actual
25    information.
```

Page 193

```
 1              So just on my own time, because
 2       I am interested in the material, I just
 3       ran a fact-check.  Well, at the time, it
 4       was the first, really, peer-reviewed
 5       publication on the subject, on the
 6       subject matter.
 7              So when the various cases
 8       started coming forth, presumably, the
 9       various legal representatives needed to
10       find an academic who knew the material,
11       and there weren't many.  There continue
12       not to be many.  I am one of the few,
13       because, exactly because I am already on
14       record.  I have nothing to lose.  I have
15       nothing to defend.  I have nothing really
16       to gain.  I just switch what it is that
17       my, my time is allocated to.  And
18       presumably, whenever this round of cases
19       finishes, things will switch back.
20          Q.    Dr. Brady could just as easily
21       change her practice in the same way,
22       right?
23              MR. RAMER:  Objection to form.
24          A.    I have no idea.  I have no idea
25       what her other interests, expertise,
```

Page 194

1    alternatives are.
2         Q.    You have never practiced in the
3    U.S. medical care system, right?
4         A.    I volunteered for parts of it.
5    I was a research assistant doing medical
6    research at Boston VA Hospital.  And then
7    came to Canada.
8              MR. RAMER:  If there is a good
9         breaking point coming up, we have been
10        going about an hour.
11             MR. MAY:  I am coming up to one.
12        Q.    Being compensated by a group
13   that advocates for the provision of
14   puberty blockers and cross-sex hormone
15   therapies could influence a person's
16   opinion, right?
17        A.    Could, yes.
18        Q.    And similarly being compensated
19   by a group that advocates against the
20   provision of puberty blockers and
21   cross-sex hormone therapy could also
22   influence an opinion, right?
23        A.    It could.
24             MR. MAY:  We can go ahead and
25        take a break.

```
                                            Page 195

 1              THE VIDEOGRAPHER:  Thank you.

 2         This is the videographer.  The time is

 3         3:17, and this ends media file 4.

 4              (Off the record)

 5              THE VIDEOGRAPHER:  We are back

 6         on the record.  The time is 3:25.

 7         This begins media file 5.

 8              MR. MAY:  We can go ahead and

 9         mark tab 25 as the next exhibit.

10         Maybe we should have done that during

11         the break.  I believe that will be

12         Exhibit 8.

13              (Exhibit 8, Article entitled

14         "GRADE Guidelines 4, Rating the

15         Quality of Evidence, Study Limitations

16         (Risk of Bias)" by Guyatt, et al., was

17         so marked for identification, as of

18         this date.)

19    BY MR. MAY:

20         Q.    Dr. Cantor, let me know when

21    you have that up.

22         A.    Got it.

23         Q.    Exhibit 8 is an article

24    entitled "GRADE Guidelines 4, Rating the

25    Quality of Evidence, Study Limitations
```

Page 196

1    (Risk of Bias)" by Guyatt, et al.

2              Do you see that?

3        A.    Yes, I do.

4        Q.    Are you familiar with this

5    document?

6        A.    Roughly.

7        Q.    If you can turn with me to

8    Section 8 of this article, which is page

9    410 by the internal pagination.

10       A.    I am there.

11       Q.    The first paragraph, second

12   sentence reads that "First, empirical

13   evidence supporting the criteria is

14   limited.  Attempts to show systematic

15   difference between studies that meet and

16   do not meet specific criteria have shown

17   inconsistent results.  Second, the

18   relative weight one should put on the

19   criteria remains uncertain."

20             Do you see that?

21       A.    Yes, I do.

22       Q.    And this is in a section titled

23   "Limitations of GRADE's Approach of

24   Assessing Risk of Bias in Individual

25   Studies," right?

Page 197

```
 1        A.     Yes, and again, acknowledging
 2    their use of bias as not the synonym for
 3    prejudice.
 4        Q.     Absolutely.  This is bias in a
 5    very specific context, right?
 6        A.     Yes, it's in the scientific
 7    method version of bias meaning how close
 8    it is to a pressure pushing in a single
 9    direction.
10        Q.     Absolutely.  Do you agree with
11    GRADE's statements here in that first
12    paragraph?
13        A.     For at that time.  I would have
14    to go and look and see what's happened in
15    the decade since.  I also think it's fair
16    to say that, again, with that sentence
17    taken out of the broader context,
18    something is missing, something gets
19    lost.
20             The sentence by itself, you
21    know, would suggest that, therefore, it
22    ought not be itself used where that's not
23    the alternative.  What's missing is if
24    somebody can come up with a better
25    system, great, let's test them.  The
```

Page 198

```
 1    alternative is not, therefore, do what
 2    you want.  This is, this is the best we
 3    have until, you know, but we need to fine
 4    point and tweak and change criteria but
 5    nobody has found anything better yet.
 6         Q.    If we can turn to page 413 with
 7    the internal pagination of Exhibit 8.
 8         A.    Yes.
 9         Q.    And in the bottom right-hand
10    column, the first full paragraph, it
11    starts with the sentence "The possibility
12    of discrepant judgments between
13    intelligent and well-informed review
14    authors is more than theoretical."
15              Do you see that?
16         A.    Yes.
17         Q.    Do you agree with that that
18    it's possible for discrepant judgments
19    between intelligent and well-informed
20    review authors?
21         A.    Yes, that's the reason why
22    these assessments have to be done by
23    several people and for them to be able to
24    hammer out where there are disagreements.
25         Q.    And the paragraph goes on to
```

Page 199

1   discuss different studies of deep vein
2   thrombosis in airline passengers taking
3   long flights.  And if you turn to page
4   414.  At the top of the page, the end of
5   the spillover paragraph, it says that
6   "Even after direct contact and discussion
7   each group adhered to its own position,
8   and it's possible that either group is
9   correct."
10          Do you see that?
11      A.    Yes.
12      Q.    So possible for there to be
13  reasonable disagreement among review
14  authors even applying GRADE criteria,
15  right?
16          MR. RAMER:  Object to the form.
17      A.    Yes.  It is indeed possible.
18      Q.    Okay.  You can put this aside
19  for now.  I want to turn back to your
20  declaration, Exhibit 1 and go to
21  paragraph 108.
22      A.    I am there.
23      Q.    Here you're discussing the term
24  "gender identity" in this paragraph,
25  correct?

Page 200

```
1        A.    Mostly, really I am discussing
2    people's common, a popular definition of
3    gender identity using a non-scientific
4    one, and trying to attribute to it all
5    kinds of scientific attributes.
6        Q.    You disagree with the idea that
7    gender identity could be defined as a
8    person's inner sense?
9        A.    It can't be scientifically
10   defined as an inner sense.
11       Q.    What do you mean by
12   scientifically defined?
13       A.    Objective, verifiable and
14   falsifiable.
15       Q.    And you say that it's
16   increasing popular to do this.  Are you
17   saying this is a new phenomenon?
18       A.    That what's a new phenomenon?
19       Q.    Defining gender identity as a
20   person's inner sense?
21       A.    Yes and no.  It's use and
22   application for decision-making is pretty
23   new.  It's been used before as just a
24   general description to kind of
25   characterize a phenomenon, generally at a
```

Page 201

1    time earlier in mental health, where all
2    of mental health was really just a series
3    of metaphors and general descriptions.
4    But again, now, in the social media age
5    and when being used to justify medical
6    transition of minors, it's being given
7    the weight and consideration, not merely
8    of a general description, but as a
9    concrete objective criterion to justify
10   physical interventions.
11           Where, as I say, it was used,
12   it was originally just used as a general
13   metaphor.  But it's no longer being
14   treated as a general metaphor.  It's
15   being treated as a physical objective
16   unquestionable truth.  That's what's new.
17           MR. MAY:  If we can please mark
18       tab 31 as the next exhibit.  I believe
19       that will be Exhibit 9.
20           (Exhibit 9, Article titled "The
21       Recalled Childhood Gender
22       Identity/Gender Role Questionnaire,
23       Psychometric Properties" by Zucker,
24       et al., was so marked for
25       identification, as of this date.)

Page 202

1           MR. BENIMOFF:  Exhibit 9 marked

2     and renamed.

3     A.    Got it.

4     Q.    If you can go actually to the

5     second page of Exhibit 9, which is the

6     first page of the real article.

7     A.    So internal page 470?

8     Q.    No, internal page 469.  Just

9     the cover page of the pdf is the cover

10    page?

11    A.    The cover page with the

12    abstract, yes?

13    Q.    Yes.  So this is an article

14    titled, "The Recalled Childhood Gender

15    Identity/Gender Role Questionnaire,

16    Psychometric Properties," by Zucker and

17    others including yourself that was

18    published in 2006, right?

19    A.    Correct.

20    Q.    Do you recall this article?

21    A.    Really only vaguely.  My

22    participation was for the statistics.

23    Q.    If you go to the second page of

24    the article which on the internal

25    pagination page 470 --

Page 203

1        A.      Got it.

2        Q.      -- you'll see here that it

3    says, the first, the very first full

4    sentence "Gender identity has been

5    defined as a person's basic sense of self

6    with regard to maleness and femaleness"

7    and then it cites articles from 1965 and

8    1968; do you see that?

9        A.      That's right.

10       Q.      Do you disagree with that

11   statement?

12       A.      Again, it depends on the

13   context in which it's given.  It's useful

14   as a general descriptor of what's going

15   on.  And in back of those days that was

16   perfectly appropriate.  But it's

17   inappropriate to use that as a literal

18   statement of a basic scientific truth

19   that would justify, you know, objective

20   and physical interventions which is how

21   it's being used now.

22       Q.      I am not really understanding

23   what you mean by -- I am having trouble

24   understanding what you mean by a basic

25   scientific truth.

Page 204

1      A.    Objective, verifiable,
2   falsifiable.
3      Q.    And isn't that the point of
4   your design of the questionnaire in this
5   article, in order to assess gender
6   identity?
7           MR. RAMER:  Objection to the
8       form.  And object, again, to not
9       allowing the witness to finish his
10      answer.
11     A.    Yes, that was the purpose of
12  the questionnaire.
13     Q.    And that's to make gender
14  identity verifiable and objective and
15  falsifiable?
16     A.    Towards that direction, yes.
17  It wouldn't change the definition of
18  gender identity.  It would be a measure
19  that would -- so that if two different
20  clinicians in two different clinics in
21  two different countries for that matter
22  administered the same questionnaire, we
23  would expect them to get the same set of
24  answers.  Therefore, we would be able to
25  compare the outcomes of one clinic with

Page 205

```
 1    the outcomes of the other clinic, because
 2    they are both using the same, the same
 3    instrument.
 4            But the instrument would not,
 5    no instrument can provide us with a
 6    definition of the construct that we're
 7    trying to measure.
 8        Q.   So you can use a survey in
 9    order to assess a person's gender
10    identity; is that fair?
11            MR. RAMER:  Objection to the
12        form.
13            And, doctor, before you start to
14        answer.  Allow me to be able to
15        interject the objections, thanks.
16        A.   This isn't a survey.
17        Q.   Apologies, a questionnaire.
18            MR. RAMER:  Same objection.
19        A.   And what was the question
20    again?
21        Q.   Is it fair to say that you can
22    use a questionnaire in order to assess a
23    person's gender identity?
24            MR. RAMER:  Objection to the
25        form.
```

Page 206

```
 1       A.    That's what we call an
 2   empirical question.  We can only find out
 3   if it's possible by trying to do it and
 4   seeing if we're successful.
 5       Q.    The purpose of this 2006
 6   article here was to design such a
 7   questionnaire, right?
 8       A.    To contribute to the design of
 9   such a questionnaire in order to address
10   some of the issues that are pertinent to
11   the creation of such questionnaires.
12       Q.    Has such a questionnaire been
13   successfully designed?
14            MR. RAMER:  Objection to the
15       form.
16       A.    I can really only compare it to
17   my, to my prior analogy about asking does
18   surgery work.  There are many different
19   kinds for many different purposes and
20   there are many different possible
21   answers.  It works for this but not that.
22   It has high quality for this purpose, but
23   not for that purpose.  It can pick up on
24   certain things, but not on other things.
25   It may have, you know, strengths and
```

Page 207

```
 1   weaknesses in different contexts.
 2              Any one, any, pretty much any
 3   one study is unlikely to unravel a
 4   complicated set of questions ranging from
 5   determining how valid a construct is all
 6   the way through finding a valid way of
 7   measuring that construct.  So it's a
 8   contribution to that literature.  Well,
 9   it's one paper contributing to that
10   literature.  But it's very, very rare
11   for, you know, any one study to
12   single-handedly establish that kind of
13   validity.
14      Q.   You said that it's ranging from
15   determining how valid a construct is all
16   the way through finding a valid way of
17   measuring that construct.  Do you
18   disagree with gender identity as a
19   construct?
20              MR. RAMER:  Objection to the
21        form.
22      A.   That's kind of a circular
23   question.  There are, for as long as
24   people use different -- people use the
25   phrase to mean different things in
```

Page 208

```
 1   different ways in different
 2   circumstances, and they can vary in the
 3   ways and circumstances in which it's
 4   valid.
 5            So it's the -- so the unpacking
 6   is about is gender identity as being used
 7   in a given circumstance valid, but
 8   somebody else using it in another way in
 9   another circumstance, I guess, there can
10   certainly be valid applications,
11   applications of it that are valid in one
12   circumstance, but not valid in another
13   circumstance.
14            The identification of whether a
15   construct is valid is -- my headphones
16   are giving out.  Hold on, I am just
17   switching speakers.  Can you still hear
18   me?
19       Q.    Yes.
20       A.    But can I still hear you?  Say
21   something clever and devastating.
22       Q.    I hope you can still hear us.
23       A.    Try again.
24       Q.    Can you hear us now, doctor?
25       A.    Thank you.  That was clever and
```

Page 209

1   devastating, perfect.

2             So the research questions

3   about, for establishing whether a

4   construct is valid and for establishing

5   how to measure a construct, go hand and

6   hand.  One begets the other.  The better

7   our measures get, the more we can

8   validate a construct.  The more valid a

9   construct is, the more directly we can

10  establish a way to measure it.

11            So as I say, each one study

12  kind of contributes to that cycle.  But

13  there is nothing about it that really

14  allows us to say gender identity is

15  valid.  That's part of that whole, part

16  of that research we find and often do

17  find it's valid in this way and this

18  circumstance but not valid in that way or

19  that circumstance.  And it's from that

20  theories of research that we find out

21  what gender identity is.

22            But when the initial definition

23  is merely an inner sense, well, you can't

24  test an inner sense.  It can't be used to

25  determine the validity of a construct

Page 210

```
 1    and, as I say, you can't measure it.  So
 2    that's what makes it not a valid
 3    scientific definition, even though some
 4    people find it an adequate descriptor
 5    when somebody's, when the phrase was
 6    first getting used, when somebody's main
 7    purpose was really to differentiate it
 8    from sexual orientation.
 9         Q.    So just looking back at this
10    article, this defines gender identity as
11    a person's basic sense of self.
12              Do you view a basic sense of
13    self to be different from an inner sense
14    of self?
15         A.    Largely overlapping but not
16    identical.  And the same issues apply.
17    Again, when we wrote this paper, you
18    know, these kinds of issues were not,
19    were not controversial.  The main purpose
20    to defining gender identity was to
21    differentiate it from, from sexual
22    orientation.  But it wasn't getting used,
23    you know, to make the kinds of dramatic
24    physical objective decisions to which
25    it's being applied now.  In order to
```

Page 211

```
 1    justify, you know, objective physical
 2    dramatic interventions we need equivalent
 3    high level of research.  A metaphor and
 4    analogy doesn't cut it in the way that it
 5    does in just getting a basic description.
 6        Q.    And while the goals in this
 7    article was to develop or contribute to
 8    the development of a questionnaire to
 9    measure and assess gender identity as
10    defined as a basic sense of self, right?
11        A.    I am hesitating on the "as
12    defined."  Because to say as defined is
13    to add that, and we know that this is the
14    correct definition, and anything outside
15    of that definition we would exclude,
16    which is --
17        Q.    I am just taking from what's in
18    the paper.
19            MR. RAMER:  Objection to the
20        form.  And objection, again, to
21        counsel interrupting the witness's
22        answer.
23        A.    It's not just in the paper.
24    The paper is one piece of a larger
25    puzzle, together with all of its
```

Page 212

```
 1   references, the conversation going on
 2   around it and absent the current
 3   controversies around it.  It was and
 4   theoretically still is always possible
 5   that during the development of such
 6   questionnaires that we find that, oh, it
 7   was the definition that we were using
 8   that was preventing us from coming up
 9   with whatever reliable or valid
10   questionnaire as opposed to this, each
11   one feeding the other kind of
12   information.
13           But we can't in that cycle of
14   measures and validity just say this is
15   the definition and now our choice is to
16   find something to measure that.  No, no.
17   We are giving this our best guess given
18   what we have.  We might have to tweak the
19   questionnaire or the instrument or we
20   might have to tweak what we are using as
21   the definition.  Each of these feeds what
22   we know about the other.
23      Q.    Does this paper, which has been
24   marked as Exhibit 9, does it advocate for
25   changing the definition of gender
```

Page 213

1    identity, away from what's written in the
2    beginning of the paper as a person's
3    basic sense of self?
4            MR. RAMER:  Objection to the
5        form.
6        A.    No, not that I recall.
7        Q.    And in the next paragraph it
8    starts with "Over the years various
9    assessment tools have been developed to
10   measure both gender identity and gender
11   role in children."
12           Do you see that?
13       A.    Yes.
14       Q.    Do you agree that gender
15   identity is measurable?
16       A.    Again, that's the same
17   interrelated set of questions.  There is
18   nothing in this questionnaire or in my
19   report that challenges the validity of
20   gender identity itself.  It challenges
21   defining gender identity in a way that
22   cannot be tested at all.
23       Q.    This paper, though, defines
24   gender identity as a person's basic sense
25   of self with regard to maleness and

Page 214

1    femaleness, right?

2             MR. RAMER:  Objection to the

3        form.  Asked and answered.

4        A.    No, not exactly.  It

5    acknowledges and describes that, you

6    know, in the conversation, you know, in

7    the literature to which it was

8    contributing, that's the basic idea we

9    were aiming for.

10            But that's not how the phrase

11   is being used today which is to take that

12   basic description and to accept it as a

13   literal truth.

14            This paper was trying to find

15   ways to tap into it but that's different

16   from defining, concretizing, making

17   unquestionable, leaving out the

18   possibility that the definition was

19   wrong:

20            This is a decent definition of

21   gender identity, then we would be able

22   to, and now we have a series of questions

23   and the actual construct is the

24   correlation matrix we call it, is the

25   interrelatedness amongst each of the

Page 215

1    variables that we have identified as

2    associated with each other.

3             But to use a phrase such as

4    inner sense and say, therefore, it cannot

5    be, a person reporting it can't be

6    questioned, that there can't be any

7    physical evidence for it that we must

8    take as literal truth, the person's

9    self-report.

10            No, that's not a scientific.

11   That is take a non-scientific or

12   pre-scientific construct and switching

13   from, in this paper, we would be taking

14   something that was untested, with the way

15   the phrase is being used now is to, as I

16   say, express something as untestable.

17       Q.    Your paper does not conclude

18   that the definition laid out at the

19   beginning of the paper is incorrect; does

20   it?

21       A.    Correct, in the context of the

22   paper we were not -- it required only a

23   general description of the phenomenon we

24   were going after.  There was nothing in

25   the paper that was along the lines of

Page 216

1    "because this is an inner sense,
2    therefore," and then assuming the
3    validity, the validity of it.  It was
4    asking questions.  If this is what it is,
5    then a person should give whatever series
6    of answers.
7              For example, with a
8    questionnaire, you know, once, after
9    developed, one can administer
10   questionnaires to groups of people which
11   would in turn allow us to say these
12   people are expressing this about their
13   gender identity and those people are
14   expressing that about their gender
15   identity.
16             But if one simply stops and
17   says that's a person's inner sense, well,
18   then it's no longer possible to disagree
19   with what somebody says their inner sense
20   is.
21      Q.   So I just want to redirect you
22   back to my question, however.  The paper
23   does not conclude that the definition of
24   gender identity that you laid out at the
25   beginning of the paper is incorrect,

Page 217

1   right?

2           MR. RAMER:  Objection to the

3       form.  Asked and answered.

4       A.    That was not the subject of the

5   paper and not an indication of any of the

6   results.

7       Q.    If we can turn back to your

8   declaration, Exhibit 1.

9       A.    Got it.

10      Q.    And I want to go to paragraph

11  139, please.

12      A.    Yes.

13      Q.    So in this section of your

14  report you distinguish between

15  suicidality and suicide, correct?

16      A.    Well, the research literature

17  on them does, and I am just summarizing

18  it.

19      Q.    Sure.  You agree that

20  suicidality is a serious issue, right?

21      A.    Yes.

22      Q.    And you agree that suicidality

23  is something that should be addressed --

24      A.    Yes.

25      Q.    -- in a patient presenting?

Page 218

```
 1   Sorry.  You agree that suicidality is
 2   something that should be addressed in a
 3   patient that presents with indicators of
 4   suicidality?
 5        A.   Yes, absolutely.
 6        Q.   You go on to discuss, if we
 7   turn to paragraph 148, you discuss a
 8   systematic review in paragraph 148 by
 9   McNeil.
10        A.   Yes.
11             MR. MAY:  I want to go ahead and
12        pull that up.  So if we can please go
13        ahead and mark tab 29 as the next
14        Exhibit, Exhibit 10.
15             (Exhibit 10, Article entitled
16        "Suicide in Trans Populations:  A
17        Systematic Review of Prevalence and
18        Correlates," by McNeil, et al., was so
19        marked for identification, as of this
20        date.)
21             MR. BENIMOFF:  Exhibit 10 marked
22        and renamed.
23        A.   Got it.
24        Q.   So Exhibit 10 is an article
25   entitled, "Suicide in Trans Populations:
```

Page 219

1    A Systematic Review of Prevalence and
2    Correlates," by McNeil et al, right?
3         A.    Yes.
4         Q.    And this was published in 2017,
5    and it's the same article that you cite
6    in paragraph 148 of your declaration,
7    right?
8         A.    Yes, it is.
9         Q.    I want to go ahead and skip
10   forward to the discussion.  And turn to
11   page 8 of the article which is 348 by the
12   internal pagination.  And I apologize,
13   this isn't skipping ahead to the
14   discussion, this is still the results.
15        A.    I am there.
16        Q.    Do you see the heading for most
17   of this page is entitled "Trans-Related
18   Variables and Suicidality"?
19        A.    Yes.
20        Q.    And if you look to the bottom
21   of the left-hand column basically towards
22   almost the end of the column, McNeil
23   reports that "In contrast, however" --
24        A.    I am sorry, I thought you were
25   reading from it, go ahead.

Page 220

```
 1        Q.    I am reading from the article,
 2    I apologize, if that's not clear.  The
 3    left-hand column, bottom paragraph, and
 4    it's four or five lines from the bottom?
 5        A.    Yes.
 6        Q.    "In contrast, however, Bauer,
 7    et al (2015), reported less suicidal
 8    ideation for those undergoing a medical
 9    transition compared to those who were
10    considering it."
11             Do you see that?
12        A.    Yes, I do.
13        Q.    And you don't disagree with
14    that assessment by McNeil of the Bauer
15    article?
16        A.    I don't disagree with their
17    describing the result.  But again taking
18    that out of context it's easy to
19    misinterpret what it means or its
20    indications, I should say.
21        Q.    And if you go to the right-hand
22    column, staying on this same page, the
23    first full paragraph.  And it starts with
24    "In terms of the specific medical
25    interventions that people might undergo,
```

Page 221

1    Colton Meier, et al (2011), found a small
2    but nonsignificant decrease in lifetime
3    prevalence of suicide attempt among a
4    group of trans men who were taking
5    hormones compared to those who were not."
6            And then, "E.C. Wilson (2015),
7    found that hormones related to a
8    significantly lower rate of suicidal
9    ideation in trans women receiving them
10   compared to those who were not.  Overall,
11   Bauer, et al 2015, reported that
12   receiving hormones was associated with
13   decreased suicidal ideation in a mixed
14   group compared with those who had not
15   started hormone therapy."
16           Did I read that correctly?
17       A.    Yes, that's what those say.
18   But as I said, you know, when you kind of
19   remove it from its context, that's easily
20   misinterpreted to mean that there was a
21   causal association between the two where
22   they hadn't yet, none of those studies
23   had yet ruled out the more mundane, the
24   more parsimonious explanation.
25           As we were saying before the

Page 222

1   successful transitioners are the ones

2   that get through the real life

3   experience, and so on, and are otherwise

4   mentally healthy.

5          When you take a sample of

6   people who have transitioned, you get a

7   sample of people who were screened for

8   mental health.  When you compare them to

9   people who have not yet gone through that

10   screening, the people with lower mental

11   health are still in the sample.

12          So if you just compare one

13   group with the other, you get a group

14   from whom the mental health issues have

15   been removed, compared to a group of

16   people for whom the mental health issues

17   had not yet been removed.

18          So, of course, there is a

19   difference between the two, even though

20   there is absolutely no evidence that it

21   was the transition itself that caused the

22   change in the levels of mental health

23   between the two.

24      Q.    All right.  We can go ahead and

25   put McNeil aside.  Can we turn to

Page 223

1    paragraph 58 of your declaration, Exhibit

2    1.

3         A.    I am there.

4         Q.    So in paragraph 58 you say that

5    "People's self-reports do not represent

6    objective evidence"?

7         A.    That's correct.

8         Q.    Are there any circumstances

9    where subjective self-reporting could be

10   the basis for medical interventions?

11        A.    Sorry, say that again.

12        Q.    Is there any circumstance in

13   which subjective self-reporting could be

14   the basis for some medical interventions?

15        A.    Sure.  If it's a low risk

16   intervention.

17        Q.    What else besides when it's a

18   low risk intervention can subjective

19   self-reporting be the basis for medical

20   intervention?

21             MR. RAMER:  Objection to the

22        form.

23        A.    I can't think of any.

24        Q.    Are questionnaires evaluating

25   an individual's subjective self-reporting

Page 224

1    or objective evidence?

2        A.      It depends on the content of

3    the questionnaire and the method by which

4    one obtains the sample.  A survey

5    typically consists of a series of face

6    valid we call it, just direct open-ended

7    questions, what you see is what you get.

8    The question being asked means the

9    question you're being asked.  The person

10   taking the survey takes a poll of who is

11   going to vote for whom in whatever

12   election tomorrow.  As I say it's a face

13   valid, obvious and easily manipulated

14   series of answers.  And anyone that wants

15   to take the survey can take the survey,

16   which leads itself to all kinds of

17   problems, who has time for the survey or

18   not.

19            People who feel more strongly

20   about an issue can take it, and people

21   who don't care are people who don't care.

22   So when you get X percent think whatever

23   it is they think, it's difficult to come

24   to a conclusion, because anybody who

25   wants to take the survey can take the

Page 225

1    survey.

2            Questionnaires in the field,

3    the sub-field or part of my field that

4    does these calls them psychometric

5    instruments, psychometric instruments,

6    where it's not so obvious what the answer

7    is and the investigator is looking for

8    patterns amongst the answers to the

9    question.  And there really is no correct

10   answer, there is no correct answer at

11   all.  And it's the way the questions

12   cluster unto themselves in order to

13   reveal an underlying pattern across them,

14   is what's of interest.

15           And such questionnaires need to

16   be what we call psychometrically valid.

17   They need to have been independently

18   determined to actually tap into whatever

19   construct it is that that questionnaire

20   is aiming at.

21           And a questionnaire would be

22   applied in a specific circumstance to a

23   particular kind of sample that was

24   ascertained by the researcher in a

25   specific way.

Page 226

1          So they can look similar in

2     that it's a person answering questions,

3     but the kinds of questions and the way

4     the questions are administered and to

5     whom it's administered are independent --

6     are independent.  Where the

7     questionnaire, the more formal and the

8     more scientifically valid method allows

9     us to come to more specific concrete

10    observations.

11       Q.    So you mentioned that there

12    could be kind of a bias, you didn't use

13    the word "bias," but I am going to ask

14    you, is it appropriate to describe the

15    way that -- strike that question.  Let me

16    start it over.

17          You mentioned the way that

18    anyone who wants to take a survey can

19    take a survey, can lead to all kinds of

20    problems.  And is one of those problems

21    bias in the sample?

22       A.    Yes, we would call that a

23    selection bias or ascertainment bias,

24    typically.

25       Q.    And then beyond the scientific

Page 227

```
1    term of bias, can the individuals who are
2    deciding to take the survey have a bias
3    one way or another towards their
4    perceived outcome of the survey?
5              MR. RAMER:  Objection to the
6         form.
7         A.    Possible, yes, certainly.
8         Q.    And is that itself a different
9    kind of scientific bias?
10        A.    Different from?
11        Q.    Or is it a subset of selection
12   bias or ascertainment bias?
13             MR. RAMER:  Objection to the
14        form.
15        A.    That's a good question.  That
16   wouldn't be the terms I would use to
17   describe that kind of a problem.  Usually
18   we would describe that as a problem with,
19   with the validity of the survey.  Usually
20   ascertainment and selection bias refers
21   to who is taking the survey rather than
22   the behavior of the people once they are
23   taking the survey.
24        Q.    If a survey were exploring
25   topic X, and that survey were advertised
```

Page 228

1    to people primarily pro-topic X, how

2    would that be described in terms of

3    scientific bias?

4              MR. RAMER:  Objection to the

5         form.

6         A.    Usually we would call that a

7    selection bias.

8         Q.    Is that a problem if a survey

9    exploring topics X is advertised

10   primarily to people who are pro-topic X?

11        A.    It depends on the content of

12   the survey and how it's being, how it's

13   being applied and interpreted.

14              There can theoretically exist

15   -- if one has a bias sample but you're

16   not asking questions -- but you're not

17   coming to conclusions that depend on that

18   bias, it's not going to make as much of a

19   difference.

20              For example, to make up a

21   generic example, if one used one's church

22   group to do a survey, well, if you ask

23   them about, you know, the nature of

24   religion, you're not going to -- it

25   wouldn't be valid from that to take that

Page 229

1    percentage of Americans are this
2    religious.  We have no reason to think
3    that, because they would be biased in
4    that specific way.  But if we asked them
5    other kinds of questions -- if we asked
6    of the survey results or if we analyzed
7    the survey results for a conclusion that
8    people who get up early in the morning
9    tend to have whatever kinds of jobs, well
10   then the selection bias is less likely to
11   be relevant, it's less likely to be
12   relevant.
13            Even if we found that for
14   example, churchgoers were more likely to
15   wake up early in the morning.  Fine.  But
16   we would have much less of a reason to
17   suspect that that would change the
18   relationship between time of morning and
19   recreational interest, and so on.
20            So such surveys are not
21   automatically meaningless.  But the
22   amount of validity we could have, depends
23   on how it's being analyzed, the questions
24   that are being asked of the survey.
25       Q.    I believe you previously

```
                                            Page 230
 1    testified to this statement, but you
 2    agree that it's easier for advocates for
 3    people with one or another political
 4    persuasion to be able to effect a survey,
 5    right?
 6              MR. RAMER:  Object to form.
 7         A.    In general, the transparency of
 8    the questions allows for that, yes.
 9         Q.    And advertising a survey on a
10    particular website can mean that the
11    results would reflect that website's
12    bias, right?
13         A.    Again, it depends on the
14    content of the survey and the questions
15    being asked.  It can be perfectly
16    legitimate to advertise on a listserv of
17    people who have an experience with
18    whatever that experience is, because it's
19    people with that experience or what
20    you're trying to find out about.
21              A generic example if you want
22    to know people's experience on cooking,
23    you can run a survey on people who cook
24    whatever it is that they cook.  Well,
25    that's perfectly fine, because that's the
```

Page 231

1    thing that you're trying to measure.

2              But in a, again, in the context

3    of these particular questions, you know,

4    where there is a large controversy or a

5    polarized debate going on, then surveying

6    a group, you can't really say, you can't

7    from surveying one side of that group and

8    being able to conclude that whatever

9    percentage of the public think whatever

10   it is that you got from surveying from

11   that, from that one side.  So it depends.

12             MR. MAY:  Why don't we go ahead

13         and take a break now before I go ahead

14         and switch gears a bit.

15             THE VIDEOGRAPHER:  Thank you,

16         the time is 4:15, we are going off the

17         record.

18             (Off the record.)

19             THE VIDEOGRAPHER:  The time is

20         4:25, we are back on the record.  This

21         begins media file 6.

22   BY MR. MAY:

23         Q.   Dr. Cantor, in your declaration

24   you cite an article by Littman from 2018,

25   right?

Page 232

```
 1        A.    Yes.
 2        Q.    And you're familiar with that
 3    article?
 4        A.    Yes.
 5              MR. MAY:  So if we can go ahead
 6        and pull up what's been marked as
 7        Exhibit 11.
 8              (Exhibit 11, Document titled
 9        "Correction:  Parent Reports of
10        Adolescents and Young Adults Perceived
11        to Show Signs of a Rapid Onset of
12        Gender Dysphoria", was so marked for
13        identification, as of this date.)
14              MR. BENIMOFF:  Exhibit 11 is
15        marked and renamed.
16        A.    Got it.
17        Q.    All right.  Exhibit 11 is a
18    document titled, "Correction:  Parent
19    Reports of Adolescents and Young Adults
20    Perceived to Show Signs of a Rapid Onset
21    of Gender Dysphoria."
22              Do you see that?
23        A.    Yes.
24        Q.    And this is a correction of the
25    Littman article and a notice of the
```

Page 233

1    republication of that article with the
2    corrections made, correct?
3        A.    Yes.  It's the editorial
4    standard in that journal to call that
5    corrections but one from that shouldn't
6    apply the usual phrase correction that
7    there was a mistake in error or something
8    false in the original version.  It's just
9    that the editorial standard is that when
10   there is any change to an article it's
11   just called a correction.
12       Q.    If we stick on the first page
13   of Exhibit 11, under the heading
14   "Emphasis That This is a Study of
15   Parental Observations Which Serves to
16   Develop Hypotheses."
17            The fourth line down, the
18   sentence reads "Rapid onset gender
19   dysphoria is not a formal mental health
20   diagnosis at this time."
21            Do you see that?
22       A.    Yes, correct.
23       Q.    You agree with that statement,
24   right?
25       A.    Yes.

Page 234

1      Q.     And a few lines down the
2   sentence reads "Furthermore, the use of
3   the term 'rapid onset gender dysphoria'
4   should be used cautiously by clinicians
5   and parents to describe youth who appear
6   to fall into this category."
7           Do you see that?
8      A.     I recall that that was a basic
9   idea in here.  I am not seeing that
10  sentence.  Where is it again?
11     Q.     About halfway down the
12  paragraph.
13     A.     And what was the first word of
14  the sentence?
15     Q.     "Furthermore."
16     A.     Yes, got it.
17     Q.     So the statement "Furthermore,
18  the use of the term 'rapid onset gender
19  dysphoria' should be used cautiously by
20  clinicians and parents to describe youth
21  who here fall into that category."
22          Do you agree with that
23  statement?
24     A.     Yes.
25     Q.     All right.  If we can turn to

Page 235

```
 1    page 3 of the correction notice, Exhibit
 2    11?
 3         A.    Got it.
 4         Q.    There is a heading called
 5    "Clarification of Study Designs, Methods
 6    and Related Limitations."
 7         A.    Yes.
 8         Q.    The last sentence of that
 9    entire section states that "For the
10    current study selection bias may have
11    resulted in findings that are more
12    positive or more negative than would be
13    found in a larger and less self-selected
14    population.  Subsequent studies should
15    address these issues."
16              Do you agree with that?
17         A.    Yes.
18         Q.    You agree that selection bias
19    may have impacted Littman's findings?
20              MR. RAMER:  Objection to form.
21         A.    May have, yes.  Again, my
22    hesitation really is about the lion's
23    share of that caution really applies to
24    how one is going to -- this is what I was
25    saying before, you know, about surveys in
```

Page 236

1  general.  It depends on exactly what it
2  is that one is going to conclude from
3  those results.
4           For example, one would not want
5  to use a survey like this to say, you
6  know, X-percentage find whatever,
7  characteristic or whatever somebody wants
8  to pull out of it.  But if one says, oh,
9  my goodness there is a pattern of people
10 who show more of this also show more of
11 that.  Oh, that's interesting because we
12 were expecting, whatever.  Therefore, we
13 need to ask more questions.
14          So it is indeed, because
15 surveys are cheap and easy, you know,
16 it's very often the first line, the first
17 line of research.  So again, with surveys
18 and everything else, one wants neither to
19 overinterpret nor underinterpret the
20 potential implications.
21     Q.    The next heading in the
22 correction notice, Exhibit 11, is
23 "Updated Information About Recruitment."
24          Do you see that?
25     A.    Yes, I do.

Page 237

1          Q.     And towards the bottom of page

2     3, there is a sentence that starts with

3     "This means that parents participating in

4     this research may have viewed the

5     recruitment information from one of at

6     least four sites with varied

7     perspectives.  Specifically, three of the

8     sites that posted recruitment information

9     expressed cautious or negative views

10    about medical and surgical interventions

11    for gender dysphoric adolescents and

12    young adults and cautious or negative

13    views about categorizing gender dysphoric

14    youth as transgender."

15              Do you see that?

16        A.     Yes, I do.

17        Q.     Does that go along with the

18    selection bias that we were discussing a

19    little bit earlier?

20        A.     Yes, essentially.

21        Q.     Do you think it's a problem

22    that this study was advertised, in the

23    three out of four sites in which this

24    study was advertised had cautious or

25    negative views about medical and surgical

Page 238

```
 1    interventions for gender dysphoric
 2    adolescents and young adults and cautious
 3    or negative views about categorizing
 4    gender dysphoric youth as transgender?
 5              MR. RAMER:  Objection to form.
 6         Compound.
 7         A.     I would hesitate with the word
 8    "problem."  It's a problem, it's more or
 9    less of a problem depending on what, you
10    know, one wants to derive from it.  It
11    would be a huge problem if one is going
12    to, as I say, you know, claim that the
13    results are representative of the entire
14    population.  That would be a problem.
15    That would be a large problem.  But to
16    identify that, oh, this is not so rare,
17    there are a chunk of people saying this
18    not very obvious kind of thing.  We
19    should follow that up.  That is
20    perfectly -- that is perfectly
21    legitimate.
22              Also, missing, also missing and
23    what gets lost when this study is pulled
24    out from the other studies and when
25    individual sentences are pulled out from
```

Page 239

1    this study.  One -- how does the saying
2    go -- mistakes the forest for the trees.
3    This is one piece that's consistent with,
4    you know, several other different kinds
5    of findings, all of which are pointing in
6    a similar direction.  No one of these
7    studies provides any kind of a firm
8    conclusion.
9          It's extremely rare outside of
10   physics for any one study to definitively
11   decide anything.  It's the overall
12   pattern throughout many different
13   studies, looking at several different
14   things in several different ways and then
15   having a tendency, all pointing in one
16   direction and then somebody comes up with
17   an explanation that best explains the
18   entire set.
19          For this particular -- I
20   hesitate to say finding, but the most
21   relevant part of this finding was that
22   parents were reporting that the kids
23   started reporting feeling gender
24   dysphoria after a relatively profound
25   increase in uses of social media.  Okay,

Page 240

```
 1    fine.  If that were the only piece we
 2    had, we really don't know what it means.
 3              But, for example, in my report
 4    I included, you know, several very large
 5    representative epidemiological samples
 6    which showed all at exactly the same
 7    time, right around 2012, skyrocketing
 8    rates of depression, suicidality, anxiety
 9    disorders.  And it corresponds exactly to
10    the large increases in gender dysphoria
11    and to social media culture having taken
12    on to youth.
13              So these are each completely
14    independent, unrelated sources of
15    information, all pointing in exactly the
16    same year.  Year?  Era?  Within a year or
17    two of each other.  As I said, you could
18    almost overlay each of these graphs on
19    top of each other.
20              So when put together, what we
21    see is no matter which way we look at it,
22    no matter who looks at it, both here and
23    in Europe, we keep finding the same
24    thing.  Social media has revolutionized,
25    not in a positive -- I guess I don't
```

Page 241

```
 1   really want to assign it positive or
 2   negative -- but in a dramatic way things
 3   have, the social interaction and social
 4   variables have drastically, drastically
 5   changed for youth.  All at the same time.
 6   All coincident.  Not coincidental, but I
 7   mean all at the same time with the
 8   introduction of social media.
 9              So in the context of all of
10   these other findings the observation that
11   parents of gender dysphoric kids noticed
12   or say that they notice that the kids
13   started reporting gender dysphoria after
14   enormous amounts of use of social media.
15              As I was describing several
16   other findings, all of these are pieces
17   of the same puzzle and it's really
18   difficult to come up with a better
19   explanation to this pattern of findings.
20   And as I keep saying, it's a pattern of
21   findings.  If one just considered one
22   finding at a time, in isolation from all
23   of the others, there is no such thing as
24   a perfect study.  We will always be able
25   to find, you know, shortcomings of any
```

Page 242

1    study.  It's a human endeavor.  But put
2    together, there is a very, very
3    consistent pattern.  All associated with
4    the onset of social media.  So that
5    presents, you know, a very, again, I
6    don't want to call it proof, but it
7    provides people could legitimately debate
8    over the word "compelling evidence," but
9    very strong evidence or evidence that
10   says that we need to take this
11   possibility extremely seriously, that
12   social media is driving all of this.
13           Nobody has presented, nobody
14   has presented any theory, hypothesis,
15   idea, explanation that explains nearly as
16   well such a wide range of these otherwise
17   completely independent observations.
18       Q.    These are all correlative
19   conclusions not causative conclusions,
20   correct?
21       A.    That's correct.  There is no
22   real good way to test causality in this
23   one.  But as I say, nobody has come up
24   with a better, with a better explanation.
25       Q.    But you can't say that social

Page 243

1    media exposure causes this presentation

2    of gender dysphoria in adolescents that

3    Littman reports on, right?

4              MR. RAMER:  Objection to form.

5        A.    Correct.  We don't have a way

6    to measure the causality of this one.

7    The level of evidence for which we have

8    is, as I say, it's the going theory.

9    Nobody has a better one.  No one has a

10   better one, period.

11       Q.    The Littman study does not tell

12   you how common it is for adolescents to

13   experience gender dysphoria based on

14   exposure to social media, right?

15       A.    Correct.  It's not a

16   representative sample.

17       Q.    The Littman study doesn't

18   actually survey adolescents, right?

19       A.    It surveys their parents.

20       Q.    And Littman himself agrees that

21   there may be aspects of the adolescent's

22   life that the parents do not have full

23   visibility into, correct?

24             MR. RAMER:  Objection.

25       A.    Yes, that is possible.  Again,

Page 244

1  not just in this study.  That's the
2  nature of the study in youth, is that
3  it's very common, very common, almost
4  ubiquitous that the surveys are done of
5  the parents.  We always try -- the field
6  tries to get as many different sources of
7  information as possible.  One would, you
8  know, do a survey of parents, of
9  teachers, of their pediatricians, of the
10  youth themselves when they are old
11  enough.  And it's appropriate to the
12  questions.  The research, the findings
13  that are the most compelling are the ones
14  where, as I said before, where we keep
15  finding the same pattern no matter whom
16  we ask.
17      Q.    You would agree that LGBT youth
18  often keep their sexual orientation
19  and/or gender identity from their parents
20  for some time, right?
21          MR. RAMER:  Objection to the
22      form.  Compound.
23      A.    That was very clearly true
24  before the social media age.  I am not
25  aware of analogous research repeating

Page 245

1    that in a rigorous way of the post-social

2    media onset.

3        Q.    What do you define as the onset

4    of the social media age?

5        A.    2011-ish, 2012-ish is when all

6    of these variables seemed to have

7    exploded.

8        Q.    So if a person -- if an

9    adolescent -- let me strike that and

10   start over.

11            If an adolescent who is say

12   16-years-old in 2004?

13       A.    So they were born in --

14       Q.    '88.

15       A.    Okay.

16       Q.    You would expect that -- you

17   would not be surprised by a finding that

18   that individual hid their sexual

19   orientation or gender identity from their

20   parent, if it was not heterosexual or

21   cisgender?

22            MR. RAMER:  Objection to the

23        form.

24       A.    I don't think I would ever be

25   surprised if somebody told me that they

Page 246

1    hid it, hid their sexual orientation from
2    their parents.  But again in the social
3    media age and in the current environment,
4    there is not a lot of any report that I
5    would find surprising.  It's exactly
6    because so many youth are so strongly
7    influenced by social media that -- I am
8    skipping a step.
9              In sex research, which I have
10   been at, you know, I want to make a joke
11   about it, since they invented sex, we
12   kind of take for granted that when you
13   ask a person about their sexualities,
14   their sex lives, their desires, their
15   erotic backgrounds, their masturbation
16   habits, and so on, we take for granted
17   that what they tell us may not be the
18   whole truth.  It doesn't necessarily mean
19   they are lying, but it's hard to escape
20   the social pressures, the self-delusions
21   and stories that we tell ourselves that
22   what they are telling us, especially in a
23   first assessment meaning may not be the
24   whole story.  That's always been true.
25   Especially when it comes to any kind of

Page 247

1   atypical sexuality, including atypical
2   gender identities.
3              The methods that we have
4   objectively to tell us about people's
5   sexualities verify what we always took
6   for granted that the objective variables
7   do not always match what the person tells
8   us about their sexualities.  That was all
9   before social media.
10             Social media itself has brought
11  with it a culture that has only further
12  increased, again, that has greatly
13  increased the social pressure, the desire
14  for people to tell the right answer, the
15  focus on how somebody looks or will
16  appear.  And so I, we, an objective sex
17  researcher, is that much more in doubt
18  that a self-report is the whole story or
19  is accurate or can be taken at face
20  value.
21             So as I say, now, if somebody
22  tells me that they hid something from
23  their parents, didn't hide something from
24  their parents, there really is just about
25  nothing that somebody can say that will

Page 248

1    surprise me but by the same token, I, and
2    I think anybody should take that much
3    more of a -- I am not even sure if I
4    should say critical or cynical -- that we
5    can't take for granted, especially from a
6    youth, especially from people, you know,
7    with their own social vulnerabilities and
8    mental health issues going on, that what
9    they are telling us is the literal truth
10   as opposed to how they want to be thought
11   of, how they want to think of themselves.
12           So we have both problems.  We
13   have people who will, because of
14   perceived social stigma, hide information
15   from their parents, families, therapists,
16   doctors, friends, whoever.  But by the
17   same token, other people who will
18   exaggerate situations in order to gain
19   from the sympathy of the people around
20   them.  So in which cases is it being
21   overestimated and in which cases is it
22   being underestimated, we don't have an
23   objective way to check all of these
24   subjective reports.
25           Q.    Dr. Cantor, do you recall what

Page 249

1    my question was?
2         A.    That's a good question.  You
3    were asking something that followed from
4    the Littman study.  That was it.  Would
5    it be surprising if somebody said --
6    would I be surprised if somebody said
7    that they were hiding their sexual
8    orientation from their parents.
9         Q.    In 2004.  So I want to redirect
10   you back to my original question?
11        A.    I apologize, I don't know if I
12   heard the 2004 part.
13        Q.    If I can redirect you back to
14   my original question, you would not be
15   surprised by a finding that an individual
16   who was 16 in 2004, born in '88, hid
17   their sexual orientation or gender
18   identity from their parent, if that
19   person was not heterosexual or cisgender?
20              MR. RAMER:  Objection to the
21        form.  Asked and answered.
22        A.    I wouldn't be surprised about
23   that.
24        Q.    Is it fair to say that
25   teenagers and adolescents may conceal

```
                                          Page 250
 1    their sexual orientation from their
 2    parents?
 3         A.    Sure.
 4         Q.    And it's fair to say that still
 5    holds true today as much as it did in
 6    2004?
 7         A.    No, that's where I insert my
 8    long answer is how much has changed
 9    between then and now is that we can't so
10    easily generalize habits from then or
11    experiences from then to now.
12         Q.    Do you think -- is it still a
13    likelihood that an adolescent will
14    conceal their sexual orientation from
15    their parent?
16              MR. RAMER:  Objection to the
17         form.
18         A.    That's a good question.  I
19    don't think anybody knows.  I am not
20    aware of that kind of a question, those
21    kinds of questions really being asked in
22    contemporary surveys.  Different kinds of
23    questions have become, for lack of a
24    better word, fashionable.
25         Q.    Would it surprise you if a
```

Page 251

1    teenager or adolescent came to you and
2    told you that they were concealing their
3    sexual orientation from their parents?
4              MR. RAMER:  Objection to the
5         form.
6         A.    If a person said that today,
7    no, that would not be surprising.
8         Q.    Would you be surprised if a
9    teenager or adolescent today told you
10   they were concealing their gender
11   identity from their parents if that
12   gender identity was not cisgender?
13             MR. RAMER:  Objection to the
14        form.
15        A.    Again, I wouldn't be surprised
16   if they said that.  But I still would not
17   be sure that it's the whole story,
18   either.
19        Q.    Okay.  So in this hypothetical
20   a 17-year-old comes to you and says I've
21   been feeling like I may not, that my
22   gender identity may not align with my
23   biological sex.  I haven't told anything
24   about this to my parents.  But I am
25   feeling strongly that I may be

Page 252

```
1    transgender.  Do you have any reason to
2    suspect that this hypothetical individual
3    would be lying to you?
4              MR. RAMER:  Objection to the
5         form.
6         A.    Lying wouldn't be the right --
7    I would not readily use the word "lying."
8    Much more common and, therefore, my first
9    set of, you know, next pile of assessment
10   questions would be whether the person is
11   mistaken in labeling what it is that they
12   are experiencing.
13             If they, for example, use the
14   terms you did which are the terms
15   ubiquitously going around the, around
16   social media, I still don't know what
17   this person's actual experience is and
18   what it is that they are using those
19   terms to describe.  So I would actually
20   skip all of the popular buzz words and
21   conclusions and jump right to exactly
22   what it is that you're feeling.  How long
23   have you been feeling it.  Under what
24   circumstances.  And then I would start
25   presenting that some people say, some
```

Page 253

1    people say, there are other people who
2    say, in order to broaden the other
3    possibilities in order to start getting
4    an idea of, you know, what the person's
5    actual experience is and then, you know,
6    what happens, what we know about other
7    people who describe those kinds of
8    experiences.
9            If I start out with I think I
10   am transgender, at this point those words
11   aren't meaningful anymore.  They are just
12   kind of a generic stamp at this point
13   that people use for many different
14   purposes.  But they are not lying.  In
15   general, they are using the only
16   vocabulary that they have to describe it.
17   They are using terms that they see
18   everybody else using.
19           But my clinical or any standard
20   clinical assessment actually would be to
21   jump over that secondary vocabulary into,
22   all right, what's going underneath the
23   surface.
24       Q.    Okay.  So with that same
25   hypothetical patient.  After you have

Page 254

1    seen them for a couple of sessions or as

2    long as you need to make an appropriate

3    assessment, you come to the conclusion

4    that they meet the criteria for gender

5    dysphoria under the DSM.

6         Would you still believe them if

7    they said they had not told their parents

8    that they were, that they had feelings of

9    a gender identity, a gender identity that

10   did not align with their biological sex?

11        MR. RAMER:  Objection to the

12      form.

13      A.    Again, there are a couple of

14   things built into that question, one of

15   which is that the DSM-5 would actually

16   not be relevant to such a, such a case.

17   The DSM-5 criteria predate all of the

18   outcome studies on adolescent onset

19   gender dysphoria.

20        The research that was available

21   in 2013, there existed one outcome study

22   of kids who transitioned.  We didn't have

23   the information.  We didn't have the

24   information.  We didn't get have this,

25   you know, explosive increase in

Page 255

1  adolescent onset cases.  So its validity
2  for diagnosing adolescents is zero.  As I
3  say, the DSM doesn't cover adolescent
4  onset cases.
5           Now I am kind of working in the
6  assumption that this is an adolescent
7  onset case because they are today the
8  great, great majority of the adolescents
9  who are coming in.  Before 2012-ish,
10 before the DSM-5, there were basically
11 none.  We had the prepubescent kids
12 coming in and we had middle-aged adults
13 coming in.  Barely anybody in between.
14 That's why we had the adult or late onset
15 cases or the childhood or early onset
16 cases.
17          So if somebody comes in at 17,
18 really, my initial questions are about
19 when did this start.  Is this new.  Is
20 this something that just began.  You
21 know, is it adolescent onset or is this a
22 kid who was always ridiculed, bullied,
23 who is very clearly different from his or
24 her peers, really since childhood.  Is it
25 a childhood onset case.  And knowing the

Page 256

1    difference between those, you know, keys
2    in, you know, very, very different parts
3    of the literature as relevant.
4              If it were an adolescent onset
5    kind of case, again, nope, nothing would
6    surprise me, including that they didn't
7    tell their parents.
8              If it were a childhood onset
9    case, the question becomes moot.  Even if
10   they didn't say anything out loud to
11   their parents, their parents very likely
12   would have, you know, already figured
13   this out, even before the kid did.  As I
14   say, the childhood onset cases stick out
15   for better or for worse.
16             To back up a step, therefore,
17   whether they meet DSM-5 criteria is not
18   really pertinent because the DSM-5
19   criteria aren't what was used in the
20   research that we have about the outcomes
21   for most of these, most of these youth.
22        Q.    One of the things you mentioned
23   that even if they didn't say anything out
24   loud to their parents their parents very
25   likely would have already figured that

Page 257

1    out?

2        A.    For childhood onset cases, yes.

3        Q.    You agree that's still

4    different than the child coming out to

5    their parents as having and revealing

6    that they recognize they have a different

7    gender identity than what aligns with

8    their sex from birth?

9        A.    Yes.

10           MR. RAMER:  Objection to the

11       form.

12           THE WITNESS:  Sorry.

13           MR. RAMER:  Objection to the

14       form.

15       Q.    So that adolescent who had been

16    -- strike that.

17           That adolescent who had been

18    displaying signs of gender congruence,

19    gender dysphoria going back to childhood,

20    could still be themselves concealing

21    their gender identity from their parents?

22           MR. RAMER:  Objection to the

23       form.

24       A.    Yes, that again wouldn't, would

25    not surprise me.

Page 258

1     Q.    Turning our attention back to

2    the Littman paper, but not specifically

3    the correction.  I want to turn to your

4    declaration in paragraph 136, your

5    declaration being Exhibit 1.

6    A.    Yes.

7    Q.    Paragraph 136 you discuss the

8    Littman paper, right --

9    A.    Yes.

10    Q.    -- among other articles, fair?

11    A.    Yes.

12    Q.    And you have a footnote 5 there

13    about the corrections to the Littman

14    article.

15    And you say that the relevant

16    results were unchanged between the

17    original article and the revised article,

18    right?

19    A.    Yes.

20    Q.    Are you familiar with both

21    versions of the Littman article, both the

22    original and the revised?

23    A.    No.

24    Q.    Were there any new hypotheses

25    or conclusions that Littman laid out in

Page 259

1  the revised article that were not in the

2  original one?

3       A.    Sort of.   The range of

4  potential explanations was expanded.   As

5  I say, the findings themselves were

6  unchanged.

7            MR. MAY:   If we can go ahead and

8       mark tab 27 as the next exhibit, which

9       I believe will be Exhibit 12.

10            (Exhibit 12, Research article

11       titled "Parent Reports of Adolescents

12       and Young Adults Perceived to Show

13       Signs of a Rapid Onset of Gender

14       Dysphoria" by Littman, was so marked

15       for identification, as of this date.)

16            MR. BENIMOFF:   Exhibit 12 marked

17       and renamed.

18       A.    There it is.

19       Q.    So Exhibit 12 is a research

20  article titled, "Parent Reports of

21  Adolescents and Young Adults Perceived to

22  Show Signs of a Rapid Onset of Gender

23  Dysphoria," by Littman.

24       A.    Yes.

25       Q.    That was the revised version of

```
                                            Page 260
 1    the Littman article, right?
 2         A.    That's a good question.  I
 3    would have to compare both in my, in my
 4    notes to double check.  But I have no
 5    reason not to take your word for it.
 6         Q.    I will represent to you that it
 7    is the revised one.
 8         A.    Okay.
 9         Q.    If we can turn to page 34 of
10    Exhibit 12.
11         A.    I am there.
12         Q.    It's going to be the sections
13    spanning pages 34 and 35.  Do you see
14    this hypothesis, "Two parental conflict
15    may provide alternative explanations for
16    selective findings"?
17         A.    I see the section, yes.
18         Q.    And I will represent to you
19    that this is new in the revised version
20    of the article.
21         A.    Okay.
22         Q.    Is this one of the range of
23    potential explanations that was expanded
24    that you referenced earlier?
25              MR. RAMER:  Objection to the
```

Page 261

```
 1        form.
 2        A.    I can't say and I don't
 3   remember saying exactly which of the
 4   hypotheses were kind of alternative
 5   explanations were there.  But that,
 6   again, is not pertinent, I don't want to
 7   say that I even have a conclusion.  It's
 8   that the scientific term that we have is
 9   the principle of parsimony.
10             For any correlation there are
11   necessarily several different
12   explanations.  So when we look at any one
13   correlation, there is always any number
14   of possible ways to explain it.
15             What, as I was describing
16   before, the part that's, that makes this
17   strong evidence is that one of these
18   hypotheses, the association with social
19   media, is consistent with several others
20   of these findings entirely independent of
21   this, looking at entirely different
22   variables investigated by, as I say.
23             So if we line up the, oh, this
24   from this study goes together with that
25   study, with that study, with that study,
```

Page 262

1    with that study.  So that one hypothesis,
2    this is written by social media, explains
3    a wide range of very diverse findings.
4    That's what makes a compelling, strong,
5    important theory and the theory to beat.
6    When we isolate to one of the papers or
7    one set of correlations, yeah, no, we can
8    add as many alternative possibilities for
9    that one finding as we want.
10             But these others, parental
11   conflict might provide alternative
12   explanations.  That doesn't explain the
13   coincidental timing of things exploding
14   for the entire generation for all of
15   these other variables, all happening at
16   exactly the same time.
17             Is it theoretically possible
18   that each of these things has its own
19   independent cause?  Sure, that's
20   theoretically possible.  But the
21   scientifically superior explanation is,
22   as I said, the principle of parsimony, is
23   that the more you can explain with one
24   theory, makes that the theory to beat.
25             And so the idea that this is

Page 263

```
 1    driven by social media explains not only
 2    one of these hypotheses, but all of those
 3    others.  So, yeah, no, we can add as many
 4    other hypotheses as we want, but the
 5    principle of parsimony points us to one
 6    of them.
 7        Q.    So redirecting you back to
 8    Hypothesis 2 about parental conflict
 9    might provide alternative explanations
10    for selected findings, Littman reports
11    that almost half of the -- if you go to
12    the second and third lines -- "almost
13    half of the AYAs" -- which I believe is
14    an abbreviation for adolescents and young
15    adults -- "withdrew from family, 28.5
16    percent refused to speak to a parent and
17    6.8 percent tried to run away."
18            Do you think it's still
19    reliable to rely on parental reports from
20    parents whose children refused to speak
21    with them.
22            MR. RAMER:  Object to form.
23        A.    If that were the only variable
24    available, then it would be hard to
25    choose amongst the potential
```

Page 264

1    hypotheses -- well, explanations rather

2    than hypotheses.

3         Q.    These are all hypotheses,

4    right?

5         A.    These are evaluations of those

6    hypotheses.  Again, I wouldn't have

7    called them hypotheses.  I would have

8    reserved that term in the traditional

9    way.

10         The hypothesis is the idea that

11    you have, you know, before conducting the

12    study and the idea that you're trying to

13    either falsify or, you know, gather,

14    gather support for.

15         These are, you know,

16    hypothesized explanations for data that

17    were already gathered.  I wouldn't use

18    the word "hypothesis" for that.  But

19    again, that's within the journal's

20    editorial discretion.

21         Q.    Let me take you back to Exhibit

22    11, which was the correction notice for

23    the Littman study.

24         A.    I am there.

25         Q.    Sticking with page 1, the first

Page 265

1   bold heading that we looked at earlier is
2   this is an "Emphasis That This is a Study
3   of Parental Observations Which Serves to
4   Develop Hypotheses."
5           And she explains that the study
6   serves to develop hypotheses that rapid
7   onset gender dysphoria is a phenomenon,
8   and that social influences, parent-child
9   conflict and a maladaptive coping
10  mechanisms may be contributing factors
11  for some individuals, right?
12  A.    Yes.
13  Q.    The purpose of surveying the
14  data is to generate hypotheses; do you
15  agree with that?
16          MR. RAMER:  Objection to form.
17  A.    I would hesitate to narrow down
18  the purpose to a single one.  Usually
19  that expression is used in order to, as a
20  reminder of how non-conclusive surveys
21  are when, you know, trying to investigate
22  or flesh out a theory and that it's
23  purpose is not to be conclusive, it can't
24  be conclusive.  It's to help develop, oh,
25  look, these are associated.  We should

Page 266

```
1    look at that, look at that more.
2        Q.    You can put this aside for
3    right now.  Let's turn back to your
4    declaration, Exhibit 1.  And if we can go
5    ahead and turn to paragraph 245.
6        A.    I am there.
7        Q.    Would you agree that desistance
8    is less likely to occur past the age of
9    12, right?
10       A.    In childhood onset cases,
11   unfortunately a lot of people kind of use
12   that for anyone over 12, you know, and
13   including people for whom it only just
14   started when really that phrase only,
15   that conclusion only applies to people
16   for whom it was prepubertal onset and
17   persisting into adolescence, not just
18   anybody in adolescence.
19       Q.    So for a child that presents
20   prepubertal with symptoms consistent with
21   gender dysphoria, once puberty, once
22   puberty has begun, and that child
23   continues to display signs of gender
24   dysphoria, you would agree that that
25   child is likely not to desist?
```

```
                                    Page 267
 1          MR. RAMER:  Objection to the
 2      form.
 3          A.    Close.  The part that's not
 4   exactly accurate is to say once puberty
 5   has started.  There is no such sharp
 6   line.  It's not, you know, last month was
 7   prepubertal.  This week is, this month is
 8   pubertal.  Therefore, you know, this kid
 9   is going to persist.  As these studies
10   were coming out, it was generally over
11   the course of puberty and a sex drive
12   kicked in, the kids generally started
13   figuring out that they were gay or
14   lesbian, because they were experiencing
15   sex drive and their first crushes and
16   masturbatory fantasies, and so on.  But
17   even though the studies were, you know,
18   just referring to puberty as the general
19   era, people with a motivation to, that
20   medicalized transition should begin as
21   quickly as possible, started just saying
22   the beginning of puberty where none of
23   these studies really said the beginning
24   of puberty.
25          But as I said and you almost
```

Page 268

```
 1    said, a kid with prepubertal, before
 2    puberty, generally it's from the get-go
 3    and continue after, after most of puberty
 4    and into adolescence.  Those are unlikely
 5    at that point, it seems to desist for
 6    that minority for who that happens.  Most
 7    of them desist, but not all of them.
 8        Q.    And for those who do not
 9    desist, do you think that prescription of
10    puberty blockers can be appropriate for
11    some of those individuals?
12             MR. RAMER:  Objection to the
13        form.
14        A.    That's the open empirical
15    question for which we have, you know,
16    only mixed evidence.  You know, so there
17    are some cases for which it appears to be
18    the case.  But we can't figure out, we
19    haven't found a way to figure out for
20    which cases.  And there are some, several
21    studies, and again I summarize them each
22    in my report, that it doesn't make a
23    difference to their mental health.  Some
24    get better.  Some don't.  And it doesn't
25    seem to be strongly related to a
```

Page 269

1    medicalized transition.  So we can't say
2    it's impossible.  But we can't say, you
3    know, for the cases for which it does
4    seem to be legitimate, we haven't yet
5    figured out how to predict which of those
6    it is, which leads us, of course, to the
7    policy question is, well, if we can't
8    identify which ones it is, and it is
9    interfering with the healthy development
10   of healthy functioning tissue, now we're
11   at the risk/benefit ratio.  It's how much
12   risk to how much harm relative to how
13   good is the evidence to how much benefit.
14          And by and large we have,
15   exactly, as I elucidated in my report, we
16   don't have any evidence that it does any
17   good -- it does any better on average
18   than mental health treatment and
19   psychotherapy.
20       Q.    If we can turn to paragraph 114
21   of your declaration, Exhibit 1.
22       A.    I am there.
23       Q.    I actually want to talk about
24   the heading above that, it says that 11
25   cohort studies follow children not

Page 270

```
 1    permitted social transition, all showing
 2    the majority to desist feeling gender
 3    dysphoric following follow-up after
 4    puberty.
 5              How do you define the phrase
 6    "social transition," as you use it here?
 7        A.    That really wasn't pertinent to
 8    the studies themselves because there was
 9    no in-between or partial status in those
10    studies.  The kids were still being
11    treated.  Had the name.  Used the gender
12    and pronouns of their biological sex.
13    These weren't cases where it was
14    ambiguous or there were certain
15    circumstances where they presented one
16    way, and in other social areas where they
17    presented another way.
18              The contrast is between these
19    11 studies and the Olson study where the
20    kids had already socially transitioned.
21    There might have been a handful of
22    exceptions, but they were nearly 100
23    percent of them.  But again, it was not
24    particularly ambiguous that those kids
25    had socially transitioned.  They had a
```

Page 271

1    new name.  New set of pronouns.  And so

2    on.  But there hasn't been any study

3    amongst the prepubertal onset cases where

4    anybody was looking at particular aspects

5    of social transition, amounts of social

6    transition, pockets of their lives in

7    which they did versus did not transition.

8              All we have are the results

9    from this now 12 studies and the one

10   which did have transition was a pretty

11   complete social transition.  And the ones

12   that didn't transition, essentially,

13   didn't transition in any way before

14   puberty.

15       Q.    So I am just trying to make

16   sure that we are all talking about the

17   same thing.  I am trying to understand

18   what's your definition of social

19   transition?

20              MR. RAMER:  Objection to the

21       form.  Asked and answered.

22       A.    I am not giving a definition of

23   social translation.  I am describing what

24   happened in these studies.

25              Now, of course, I have no

Page 272

1    trouble acknowledging that, as I said,
2    there are mixes and ambiguous
3    circumstances where a person can do this
4    in different ambiguous ways or in
5    different ways, in different pockets of
6    their life.  But in describing this set
7    of studies, none of that ambiguity was,
8    was present.
9         Q.    This is not a trick question.
10        A.    I didn't know there was such a
11   thing.
12        Q.    You may be thinking about it a
13   little too hard.  I am just trying to
14   understand, to make sure we are all
15   discussing the same thing.  What are you
16   describing as a social transition?
17             MR. RAMER:  Objection to the
18        form.  Asked and answered.
19        A.    I am not describing anything.
20   I'm reciting and summarizing what the
21   studies contained.
22        Q.    So what I am trying to
23   understand is using a different name than
24   the name given -- strike that question.
25             Is using a different name than

Page 273

```
 1    the name that was given to you by your
 2    parents an aspect of social transition?
 3              MR. RAMER:  Objection to the
 4        form.
 5        A.     It can be.
 6        Q.     Is using different pronouns
 7    than aligned with biological sex a form
 8    of social transition?
 9              MR. RAMER:  Objection to the
10        form.
11        A.     Again, it can be.  But just as
12    with, you know, several of the other
13    questions, no one of those is ah-ha
14    that's the line.  It's the accumulation
15    of, you know, several of them and it
16    becomes more and more ambiguous, you
17    know, in between and then less and less
18    ambiguous at the other extreme.  When
19    going from none of the options are being
20    used by the kid to every option available
21    to the kid is being used.  And then in
22    between are the different pockets,
23    different circumstances, different ways
24    or the use of ambiguous pronouns or an
25    ambiguous name.  And which of them
```

Page 274

1   defines social transition?  That's one of
2   the empirical questions which remains
3   uninvestigated.
4           So I don't have, I am not using
5   a definition, a definition of social
6   transition and these studies also, it
7   became moot because none of them had an
8   in-between status, they were all pretty
9   much all untransitioned or pretty much
10  all entirely transitioned.  So I don't
11  need to generate a definition that I am
12  not using.
13      Q.   So what are the various factors
14  that could be considered in whether or
15  not there has been a social transition?
16          MR. RAMER:  Objection to the
17      form.
18      A.   I am still back to that being
19  an empirical question.  When most people
20  discuss it, they are generally referring
21  to some combination of changing names and
22  changing pronouns, but there are also
23  sometimes unspoken assumptions that go
24  along with it, such as how the kid thinks
25  of themselves:  How they are being

Page 275

 1    treated by the different people that
 2    they, that they interact with.  Those are
 3    legitimate associated ideas, but in order
 4    to know which of those really counts is
 5    one of our validity questions.  We need
 6    to be able to test which of those or the
 7    combination of those or accumulation of
 8    exactly which of those choices helps us
 9    predict the trajectory that the kid is
10    on.
11              If we find that a certain
12    number of the choices or a certain
13    combination of the choices is more versus
14    less likely to lead to a successful
15    outcome or unsuccessful outcome in one
16    direction or the other direction, now we
17    have an objective way of knowing which
18    ones do and do not count.  But we don't
19    have such research allowing us to
20    reliably predict that trajectory.  So we
21    only have our, scientifically we only
22    have a best guess.  But in communicating
23    with, you know, society, experts, policy
24    makers, other scientists, parents,
25    families and so on, again my usual

Page 276

1  question is how do they want to use the
2  phrase.  What do they mean by it, so I
3  can understand what they're saying.
4       Q.   Right.  Which is why I am
5  trying to understand what you're saying
6  when you wrote the words "social
7  transition."
8       A.   I am using --
9            MR. RAMER:  Objection, objection
10      to the form.  Asked and answered.
11      A.   I am using what those
12  scientists did, which didn't -- because
13  everything was so far from the line, they
14  didn't need and, therefore, I don't need
15  and can't offer more detailed definition
16  that could be applied to who was over and
17  under that line.
18            MR. RAMER:  If you have a
19      breaking point coming up, we have been
20      going about an hour.
21      Q.   If you go to paragraph 120 of
22  your declaration?
23      A.   120 you said?
24      Q.   Yes.
25      A.   I am there.

Page 277

1        Q.      And the heading says "One

2    Cohort Study Followed Children Who Were

3    Permitted Social Transition in Contrast

4    With Children Not Permitted to Transition

5    Socially, Most Persisted in Expressing

6    Gender Dysphoria."

7            Do you see that?

8        A.      Yes.

9        Q.      And in the next, the first

10   sentence of paragraph 120, you describe

11   Olson as discussing a cohort study of

12   children who had already made a complete

13   binary rather than intermediate social

14   transition, including a change of

15   pronouns.

16       A.      Yes.

17       Q.      Okay.  What do you mean by a

18   complete binary social transition

19   including a change of pronouns?

20       A.      I am repeating what, how Olson

21   described it.  Again, change in hair.

22   Change in clothes.  Change in pronouns.

23   Sometimes a change in name and they

24   weren't, as I said, I am just reflecting

25   what, what they said and because it was,

Page 278

1  you know, complete and dramatic and

2  exactly the reverse of the other 11

3  studies, the questions or definitions

4  about do pronouns matter, well, because

5  one changed and nobody else did, it was

6  part of it, but pronouns weren't the only

7  thing that changed either.

8          So it doesn't the contrast in

9  those results doesn't tell us anything

10  about any one of the components of social

11  transition.  All we have is the contrast

12  between people who used every option

13  available to them and the kids that

14  didn't use any such option.

15     Q.    So is it fair to say that in

16  the context of your declaration, when you

17  refer to social transition, you're

18  referring to, you're adopting the

19  definition from Olson?

20          MR. RAMER:  Objection to the

21     form.

22     A.    I am not adopting anyone.  I am

23  summarizing and reiterating the content

24  of those studies as given by those study

25  authors.

Page 279

1          THE REPORTER:  I need to take a
2      break.
3          THE VIDEOGRAPHER:  This is the
4      videographer, the time is 5:27, we are
5      going off the record.
6          (Off the record)
7          THE VIDEOGRAPHER:  We are back
8      on the record.  The time is 5:37, this
9      begins media file 7.
10 BY MR. MAY:
11      Q.    Let's turn to your declaration,
12 Exhibit 1, and go to paragraph 114, the
13 heading right above it.
14          So you said 11 cohort studies
15 followed children not permitted social
16 transition.  So I want to understand the
17 verb there.
18          Is it that they were, is it the
19 children expressed an interest in doing
20 that and they were told they could not.
21 Is that what you mean by not permitted?
22      A.    No.  Again, these are studies
23 that go back, you know, some many
24 decades.  They didn't report that level
25 of detail.  They were just describing the

Page 280

```
 1    cases themselves.
 2              So it was the only word that I
 3    can think of that would accurately
 4    capture all 11.  But they weren't, as I
 5    say, in the earlier studies they didn't
 6    give enough detail, they didn't give
 7    enough detail.  And by the same token in
 8    the 1970s, it wasn't the option that it
 9    is today.
10        Q.    Do you think it's fair to say
11    in those 11 studies, it's just that the
12    children have not socially transitioned
13    or did not socially transition as opposed
14    to the not permitted?
15              MR. RAMER:  Objection to the
16        form.
17        A.    I would have to go back and see
18    if there is an exception I am not
19    immediately recalling.  But in the Zucker
20    samples, the youth that were in treatment
21    with him, the purpose of the therapy that
22    the kids were undergoing was to develop
23    comfort in their natural bodies.  And his
24    philosophy was that allowing a social
25    transition would work exactly against
```

Page 281

1    that.
2              So part of the process was in
3    order to help somebody become comfortable
4    in a situation where they are not
5    comfortable was exposure to that
6    situation.  The same as trying to get
7    somebody uncomfortable with the fear of
8    heights.  If you give them at every
9    opportunity permission to move into the
10   basement, and so on, you're not going to
11   be helping them get over their fear of
12   heights.
13             So part of the therapy that
14   Zucker was offering, again, required that
15   the person develop and, therefore, be in
16   the situation that they start therapy as
17   uncomfortable with.  And that meant not,
18   not socially transitioning.
19             I use the word "permit," again,
20   kind of relatively generically but I
21   don't, I can't, especially without
22   checking each of the original studies
23   directly, to see what kind of --
24   enforcement isn't the right word, but
25   exactly how that situation was handled.

Page 282

```
 1              If a parent or family, you
 2    know, didn't want to engage in that kind
 3    of a therapy, then, you know, they
 4    wouldn't be in therapy with Ken Zucker.
 5    They would pick a different therapist or
 6    clinic, you know, trying to do, trying to
 7    do something else.
 8              But my use of the term, as I
 9    say, was as accurately as possible to
10    pick a word that covered, that covers all
11    11 studies.
12       Q.    Which Ken Zucker study, is that
13    the one in Table 2 of your declaration,
14    that's the one, the last study listed
15    with the first author Singh?
16       A.    And Drummond.
17       Q.    And Drummond, okay.
18              For these 11 studies, was a
19    desire to be the opposite sex an
20    inclusion requirement?
21              MR. RAMER:  Objection to the
22       form.
23       A.    It varied over the course of
24    the studies.  The DSM criteria changed.
25    Some of these used the 3.  Others the 3R.
```

Page 283

```
 1    Others the 4.  Other the 4R.  And some of
 2    them used a more generic description of
 3    the kid, regardless of what the DSM
 4    criteria at the time was.  So it varied.
 5        Q.    Did all 11 of these studies
 6    require the child to identify with a
 7    transgender -- strike that.
 8              Did all 11 of these studies
 9    require the child to have a transgender
10    identity in order to be included in the
11    study?
12              MR. RAMER:  Objection to the
13        form.
14        A.    That question assumes a certain
15    definition and validity of what identity
16    means.  And how that term is used and
17    what it means has changed over time and
18    in different situations.
19              But as I said, these used
20    several different DSMs over several
21    different decades in several different
22    countries.  And every single one of them
23    came out with exactly the same result.
24              So to the extent that there
25    could be an exception -- then, of course,
```

Page 284

1    there could always indeed be an
2    exception -- but the onus of proof then
3    belongs to whatever, whoever it is that
4    wants to say "But if you use this
5    definition, you will get something
6    different."  Okay.  That is always
7    possible.  But there has never been any
8    such indication.  It will eternally
9    remain possible, but nobody has ever
10   demonstrated any evidence that any one of
11   the symptoms or components that lead to a
12   diagnosis of gender dysphoria, that any
13   one of them is, makes a difference or how
14   much of a difference.
15       Q.    So I appreciate that.
16   Redirecting back to my question.
17            For all 11 of these studies was
18   a transgender identity an inclusion
19   criteria?
20            MR. RAMER:  Objection to form.
21       Asked and answered.
22       A.    I don't know if I have another
23   way to express it.  To answer that
24   question is to say that we have a
25   reliable way of knowing what the gender

Page 285

```
 1    identity is, and we don't.  We have what
 2    the kids say.  We have what their
 3    families say.  How accurately does what
 4    they say reflect their identity?  We have
 5    no idea.  How valid is the concept of
 6    identity in this context?  We don't know
 7    that either.  So as I say, that level of
 8    abstraction can't really be answered.
 9    All we have is the various self-reports,
10    and then the observations of the
11    behaviors.
12        Q.    Okay.  Social transition is not
13    banned by the Idaho law HB 71, right?
14        A.    That's my understanding.
15             MR. RAMER:  Objection to the
16        form.  Calls for a legal conclusion.
17        A.    Sorry.  That's my
18    understanding, yes.
19        Q.    Social transition is not a
20    medical procedure, you would agree with
21    that?
22             MR. RAMER:  Objection to the
23        form.
24        A.    Again, we're falling into a
25    level of ambiguity where, you know, the
```

Page 286

1    assumptions are the insinuations used by

2    the term, can't always be accepted at

3    face value.

4        Q.    So let me try and maybe help

5    you definitionally then and rephrase the

6    question and ask a better question.

7    Social transition does not encompass --

8    strike that.  Let me try one more time.

9             A prescription of

10   puberty-suppressing hormones is not an

11   aspect of social transition?

12            MR. RAMER:  Objection to the

13       form.

14       A.    Not directly, no.

15       Q.    And cross-sex hormone therapy

16   is part of medical transition, not social

17   transition; you agree with that?

18            MR. RAMER:  Objection to the

19       form.

20       A.    Again, not in a simple, direct

21   way.  But there are caveats to it that

22   are inescapable, that are pretty

23   inescapable.

24            The best analogy I have is that

25   going on a diet is not a medical

Page 287

```
 1    procedure, but having a really bad diet

 2    has profound medical implications.  So

 3    these don't fall apart -- these aren't

 4    completely independent either.

 5         Q.    Are you familiar with Daniel

 6    Weiss?

 7         A.    I am not getting an image of a

 8    particular person with that name, but I

 9    have to acknowledge I am terrible with

10    names to begin with.

11         Q.    I will represent to you that

12    Daniel Weiss is another one of the

13    experts that the state has submitted a

14    declaration from in this case.  Do you

15    know him?

16         A.    No, I don't think so.

17         Q.    Have you read his declaration?

18         A.    No, I haven't.

19         Q.    Have you read his CV?

20         A.    No, I haven't.

21         Q.    Have you read his declaration

22    from any other cases?

23         A.    No, not that I recall.

24         Q.    I will also represent that the

25    state has submitted a declaration from a
```

Page 288

```
 1    doctor named William Malone; are you
 2    familiar with this individual?
 3         A.    Yes, a bit.
 4         Q.    How are you familiar with
 5    Dr. Malone?
 6         A.    Mostly over social, social
 7    media and some of the essays that he's,
 8    that he's written on the topic.
 9         Q.    Did you read his declaration
10    that he submitted in this case?
11         A.    No, I haven't.
12         Q.    Have you reviewed his CV?
13         A.    I don't think so.  If I did, I
14    don't really recall any of the details
15    from it.
16         Q.    Do you think Dr. Malone is an
17    expert on the treatment of gender
18    dysphoria?
19              MR. RAMER:  Objection to the
20         form.  Calls for a legal conclusion.
21         A.    He knows the material as
22    thoroughly really as a person can.  Of
23    course, emphasizing on its medical
24    aspects.
25         Q.    Do you think that Dr. Malone is
```

Page 289

1    a credible expert with respect to gender

2    affirming medical care for minors?

3             MR. RAMER:  Objection to the

4        form.  Calls for a legal conclusion.

5        A.    Yes, from my point of view,

6    that's, you know, a matter of having the

7    appropriate knowledge of the relevant

8    research, which he very much does.

9        Q.    Have you ever spoken with

10   Dr. Malone?

11       A.    We've been in group

12   conversations together.  If we've ever

13   had a one-on-one conversation, I am not

14   remembering it.

15       Q.    What were the contexts of the

16   group conversations that you had with

17   Dr. Malone?

18       A.    There is a set of researchers

19   who want to conduct what is, essentially,

20   a systematic review of systematic reviews

21   evaluating how the various of the

22   systematic reviews of the safety and

23   effectiveness of the medicalized

24   transition of minors and how well each of

25   those reviews have stuck to the

Page 290

1   appropriate protocol for the conduct of

2   systematic reviews.

3        Q.    You mentioned earlier that the

4   certainty of the benefit of

5   puberty-suppressing and cross-sex hormone

6   therapy is less clear as the patient gets

7   younger and younger.  Do you recall us

8   discussing that?

9             MR. RAMER:  Objection to the

10        form.  Mischaracterizes prior

11        testimony.

12        A.    Sort of.  I think really the,

13   what I was suggesting is that the farther

14   away we go from what's actually

15   established, you know, the less confident

16   that we can be that the information

17   generalizes to it.  But at the same time,

18   not to make any kind of a, you know,

19   perfect, you know, line, once 18, all of

20   the sudden everything is going to be

21   different than the day before.

22        Q.    Do you think that doctors,

23   families and patients are best positioned

24   in order to make a case-by-case

25   determinations for the medical treatment

Page 291

1   for the patient?

2               MR. RAMER:   Objection to the

3          form.

4        A.    I don't think that's how the

5   lines are drawn.  The quality of the

6   decision-making, as best as we can

7   measure, is how well it matches the

8   evidence we have.  So different people,

9   you know, with different relationships

10  with the kid, you know, can be applying,

11  you know, different kinds of information.

12              If it's the parents who's

13  following the science, then the parents

14  are in the position.  If the parent is

15  opposing the science, then the parent is

16  not in the best position and the same for

17  everybody else, you know, including the

18  kids themselves in their environment.

19              So it's not -- the people of

20  course factor in, but what actually will

21  be the best decision follows from how

22  well their input matches the science, not

23  really their relationship with the kid.

24       Q.    If a patient -- if a parent --

25  strike that and let's start that over.

Page 292

```
 1              If a parent and an adolescent
 2    go to their doctor and they say that we
 3    have read all of the literature.  We are
 4    familiar with Dr. Cantor's views on
 5    puberty suppression and cross-sex hormone
 6    therapy.  We are well-versed in the risks
 7    and the benefits and the relative
 8    information or lack thereof, knowing all
 9    of this, we would like to proceed with
10    cross-sex hormone therapy.
11              Do you think it would be
12    appropriate for that individual to
13    receive cross-sex hormone therapy?
14              MR. RAMER:  Objection to the
15         form.
16         A.    I can't resist the gut
17    reaction.  What 16-year-old can tell me
18    how the analyses are done, what a
19    systematic review is?  What's known and
20    unknown is a profoundly complicated kind
21    of question.  And I am having trouble,
22    you know, finding M.D.s and Ph.D.s
23    properly applying the basics of the
24    scientific methods.
25              Again, I would have to balk a
```

Page 293

```
 1    bit at the hypothetical to begin with.
 2    If a person tells me that they know this
 3    information, again, I have my usual
 4    critical thinking.  I am not going to
 5    take at face value that their description
 6    of their knowledge is true.  I have
 7    questions for them:  What did you think
 8    of this; what did you think of that; what
 9    else did you try; how did you -- how did
10    you read what it is.
11            It's the kind of stuff that I
12    said and if you decide to go, you know,
13    go ahead with it anyway, all right.  So
14    what was it that convinced you that I'm
15    -- it's not clear to me if they are
16    saying I am wrong or if they think they
17    are going to be one of the exceptions.
18            Again, my clinical nose
19    immediately is not to take it at face
20    value.  Scratch beneath the surface.  And
21    figure out how, how they got there.
22            And then after that, the
23    assessment would be pretty much as the
24    others, that they know this material.
25    All right.  That's the primary component
```

Page 294

1    of informed consent.  Great.  But the

2    rest of the clinical questions are still

3    the same.  What other less risky stuff

4    have you tried already.  You know, what

5    are the alternatives, and so on.

6              So although nothing in that

7    says, excludes them, it's not sufficient

8    either.  The information we have, knowing

9    that we can't, we the professionals are

10   no good at predicting who would and would

11   not benefit from this, well, we can't do

12   it.  Neither can the kids nor families.

13   We have no evidence suggesting, giving us

14   an idea of how accurate their predictions

15   are either.

16              And, of course, it's never, we

17   could never be too sure that what they

18   are saying is all we get.  Are they just

19   saying whatever it is, if I am the

20   clinician or somebody else is the

21   clinician or are they just saying what

22   they think the clinician needs to hear in

23   order to sign off on the paper.

24        Q.    So the same hypothetical.  The

25   patient with the additional

Page 295

1  characteristics of this patient has been

2  displaying gender dysphoric behavior

3  prepuberty.  Has persisted through

4  puberty, and has been seeing a therapist

5  or a qualified mental health professional

6  since the age of five.  Do you think that

7  that person should be categorically

8  excluded from being able to receive

9  cross-sex hormone therapy?

10           MR. RAMER:  Objection to the

11      form.

12      A.    As I say, we're no good at

13  predicting who will and won't benefit.

14  The flip side of that same coin is that

15  we can't categorically conclude in a

16  situation, you know, that matches the

17  cases of a couple of existing studies.

18           It is indeed possible that,

19  that this person would be an appropriate

20  candidate.  But the nature of the

21  research doesn't allow us to make a

22  definitive conclusion.  If they were in a

23  jurisdiction where that kind of research

24  was being done, that would be exactly the

25  place to send that person because they

Page 296

1    would be one of the people from whom we

2    might be able to learn something -- that

3    we might be able to learn something.

4    But, of course, participating as part of

5    a clinical trial comes with a very

6    different set or comes with a much more

7    detailed, advanced deeper set of just

8    what the person is consenting to.

9              Now, they are consenting to a

10   situation that by definition acknowledges

11   how much of this is really just unknown,

12   and this is our best guess which is

13   different from the kind of informed

14   consent to say this is the established

15   practice.  These are the pluses and

16   minuses.  This is how much risk you're

17   taking on and you can either sign the

18   paper or not.

19              When it's a research protocol,

20   like I say, the documentation that goes

21   along with it and that even if it

22   doesn't, no matter what the results are,

23   society at large benefits from it,

24   because it's part of a data set that gets

25   analyzed and can help the next cycle or

Page 297

1   generation of people going through it.

2           So as I say, because we can't

3   predict who would and would not benefit,

4   we can't categorically deny in the same

5   way that we can't automatically assume

6   success.

7       Q.    So you would agree that that

8   individual should not be categorically

9   denied access for the possibility of

10  receiving cross-sex hormone therapy?

11          MR. RAMER:  Objection to the

12      form.  Compound.

13      A.    I don't think I can say -- your

14  rephrasing is a bit broader than what I

15  think I am saying.

16          I am just acknowledging that

17  the current state of the science doesn't

18  allow us to do that.  But we can't say it

19  more broadly or with a more permanent --

20  there is no ideological block to it.  We

21  are just very limited still in our

22  ability to provide estimates of the

23  potential risks and potential benefits as

24  a part of, you know, a person coming to

25  their decision about it.  Even WPATH

Page 298

1    itself, as I have in my report, is just
2    long lists of unknowns.
3        Q.    Turn back to your declaration.
4    If you can turn back to paragraph 215.
5            MR. RAMER:  Was that 215?
6            MR. MAY:  Yes.
7            MR. RAMER:  Thank you.
8        A.    I am there.
9        Q.    In this paragraph you talk
10   about an elevated risk of Parkinsonism in
11   adult females.
12       A.    Yes.
13       Q.    Are you an expert in
14   Parkinsonism?
15           MR. RAMER:  Objection to the
16       form.  Calls for a legal conclusion.
17       A.    Well, I am a neuroscientist
18   studying the role of sex in the brain and
19   as part of -- Parkinson's patients
20   resemble the control patients that we
21   used when I was at the Boston VA doing
22   research on the brain and memory.  So I
23   am certainly very fluent in the relevant
24   information in assessing this kind of
25   research.

Page 299

1      Q.     And is this a study that you
2   cite in this paragraph of adult women
3   without gender dysphoria?
4      A.     That's right.
5      Q.     There is no children included
6   in this study?
7      A.     That's correct.
8      Q.     And there is no gender
9   dysphoric individuals included in this
10  study?
11     A.     That's correct.
12     Q.     There is no transgender people
13  included in this study?
14            MR. RAMER:  Objection to the
15       form.
16     A.     That's correct.
17     Q.     You think this is a relevant
18  study to consider for risks for
19  transgender youth?
20     A.     Yes, absolutely.
21            MR. MAY:  Let's go ahead and
22       take a break for about -- let's go
23       ahead and take a break.
24            THE VIDEOGRAPHER:  Thank you,
25       this is the videographer, the time is

Page 300

```
 1        6:06, we are going off the record.
 2              (Off the record.)
 3              THE VIDEOGRAPHER:  The time is
 4        6:16, we are back on the record
 5        continuing media file 6.
 6   BY MR. MAY:
 7        Q.    Dr. Cantor, we were discussing
 8   earlier today the practices of some
 9   different countries over in Europe; do
10   you recall those discussions we had?
11        A.    Yes.
12        Q.    And I want to turn your
13   attention specifically to Sweden.  Would
14   you -- would you be comfortable -- strike
15   that.
16              Turning your attention,
17   specifically to Sweden, would you support
18   adopting Sweden's policies in Idaho?
19              MR. RAMER:  Objection to the
20        form.
21        A.    Essentially, yes.  And I would
22   have to emphasize that a large chunk of
23   that is associated with Idaho.  The
24   entire country of the U.S. needs a public
25   healthcare system like Sweden.  And that
```

Page 301

1    given that kind of a situation, you know,

2    where decisions then are made with, on an

3    appropriate basis.  And like Sweden,

4    based on systematic reviews of the

5    relevant evidence.

6        Q.    Would you support Idaho

7    adopting Sweden's policies towards the

8    treatment of transgender gender

9    dysphoric, gender nonconforming youth,

10   even absent a public healthcare system?

11           MR. RAMER:  Objection to the

12        form.  Compound.  Vague.  Calls for a

13        legal conclusion.

14       A.    I'm not quite sure that those

15   can be separated.  A major distinction

16   and what's making, what's associated with

17   the U.S. going in such a very different

18   direction than the other countries we

19   discussed is, again, it's unavoidable

20   that the basic difference is that in the

21   U.S. these decisions are being made by

22   professional guilds with a conflict of

23   interest whose decisions are reflecting

24   not the science, but the broader

25   principle of opposing a government

Page 302

1    telling doctors what to do.
2              So when the science is, so when
3    the professional associations are saying,
4    oh come to our members because our
5    members are doing the right thing, we
6    know they are doing the right thing
7    because it's right for our members and
8    the decisions are being made by a group
9    with a conflict of interest.  Where in a
10   public healthcare system, the government
11   is supposed to be directing and limiting
12   what it is that the medical profession
13   does.
14             At the moment the question
15   about, you know, the government telling
16   doctors what they may or may not do
17   happens to be about the medical treatment
18   and medicalized transition of minors, but
19   the U.S. is only in this position exactly
20   because the decisions are being made by
21   the providers rather than by a public
22   healthcare system which has the public
23   health as its primary concern.
24   Profession associations have as their
25   primary concern, the professionals.

Page 303

```
 1              As I say, at the moment the
 2     question happens to be about medicalized
 3     transition of minors, but that's just the
 4     current situation.  We're here, the U.S.
 5     is here exactly because the decisions are
 6     not being made by the appropriate people
 7     on the appropriate basis, serving the
 8     appropriate public interest.
 9        Q.    Would you support a system in
10     Idaho that allows for the prescription of
11     puberty-suppressing hormones and
12     cross-sex hormone therapy in the context
13     of formally-approved research studies?
14              MR. RAMER:  Objection to the
15        form.
16        A.    As a basic, as a basic
17     principle as we were saying before, yes,
18     again, as a scientist I do believe that
19     free scientific inquiry needs to be, a
20     society, a state, any group is better
21     off, you know, when scientists have a
22     freedom of inquiry.
23              If ever it is possible for us
24     to figure out or come up with a method of
25     accurately or reliably identifying who
```

Page 304

1   would benefit from medicalized transition

2   versus who would be better off with a

3   different intervention, it's going to be

4   by increased research.

5          But in saying that, again, I

6   don't want to overstate it either.  It

7   remains eternally possible that the, it

8   remains possible that the research may

9   show that it is very, very few people and

10  we're not able to identify such -- not

11  able to come up with a method to identify

12  these kids.  And so even though there is

13  a, you know, theoretical exception made

14  for research, if there are no research

15  questions to be answered, then, again, it

16  becomes moot, it becomes not available.

17      Q.    During the course of your

18  deposition today, did you speak with

19  anyone during any breaks or anything like

20  that?

21      A.    No.

22          MR. MAY:  Okay.  Then I have no

23      further questions at this time.  And I

24      will pass the witness.

25          MR. RAMER:  And I have no

```
                                              Page 305
 1          questions for the witness.  And we
 2          just ask to review and sign.
 3               THE VIDEOGRAPHER:  Thank you,
 4          counsel.  This is the videographer.
 5          The time is 6:23, we are going off the
 6          record.  This ends media file 6 and
 7          that concludes this deposition.
 8               (Time noted:  6:23 p.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 306

1          ACKNOWLEDGMENT OF DEPONENT

2

3          I have read the foregoing transcript

4     of my deposition and except for any

5     corrections or changes noted on the errata

6     sheet, I hereby subscribe to the transcript

7     as an accurate record of the statements made

8     by me.

9                _____
                      JAMES M. CANTOR

10

11

12    SUBSCRIBED AND SWORN before

13    and to me this _____ day of _____,

14    2023.

15                _____
16                     NOTARY PUBLIC

17

18    My Commission Expires:

19

20

21

22

23

24

25

Page 307

1                    CERTIFICATION

2

3          I, DAWN MATERA, a Notary Public for

4    and within the State of New York, do hereby

5    certify:

6          That the witness whose testimony as

7    herein set forth, was duly sworn by me; and

8    that the within transcript is a true record of

9    the testimony given by said witness.

10         I further certify that I am not

11   related to any of the parties to this action

12   by blood or marriage, and that I am in no way

13   interested in the outcome of this matter.

14         IN WITNESS WHEREOF, I have hereunto

15   set my hand this 22nd day of September, 2023.

16

17

18

     _____

19              DAWN MATERA

20

21

22

23

24

25

Page 308

1                    I N D E X
2    Witness                                    Page
3    JAMES M. CANTOR                              5
4
5                  E X H I B I T S
6    No.                                        Page
7    Exhibit 1 Expert declaration of Dr.    18
              Cantor
8
     Exhibit 2 CV of Dr. Cantor                 23
9
     Exhibit 3 Transcript of Dr. Cantor's   43
10            deposition from K.C.
              versus individual members
11            of the Medical Licensing
              Board of Indiana
12
     Exhibit 4 Transcript of Dr. Cantor's   87
13            testimony in Loe versus
              Texas
14
     Exhibit 5 Document entitled "Care of   111
15            Children and Adolescents
              With General Dysphoria,
16            Summary of National
              Guidelines," December 2022
17
     Exhibit 6 Endocrine Society            147
18            Guidelines
19   Exhibit 7 Article entitled "GRADE      178
              Guidelines:  3.  Rating
20            the Quality of Evidence by
              Balshem, et al."
21
     Exhibit 8 Article entitled "GRADE      195
22            Guidelines 4, Rating the
              Quality of Evidence, Study
23            Limitations (Risk of
              Bias)"by Guyatt, et al.
24
25

Page 309

| | | |
|---|---|---|
| 1 | Exhibit 9 | Article titled "The Recalled Childhood Gender Identity/Gender Role Questionnaire, Psychometric Properties" by Zucker, et al. | 201 |
| 4 | Exhibit 10 | Article entitled "Suicide in Trans Populations:  A Systematic Review of Prevalence and Correlates," by McNeil, et al. | 218 |
| 8 | Exhibit 11 | Document titled "Correction:  Parent Reports of Adolescents and Young Adults Perceived to Show Signs of a Rapid Onset of Gender Dysphoria" | 232 |
| 11 | Exhibit 12 | Research article titled "Parent Reports of Adolescents and Young Adults Perceived to Show Signs of a Rapid Onset of Gender Dysphoria" by Littman | 259 |

~oOo~

Page 310

```
 1              ERRATA SHEET
                  VERITEXT
 2
        CASE NAME: Pam Poe v Raúl Labrador
 3      DATE OF DEPOSITION: September 21, 2023
        WITNESS'S NAME: JAMES M. CANTOR
 4
 5      PAGE/LINE(s)/      CHANGE            REASON
        ____/_____/_____/_____
 6      ____/_____/_____/_____
        ____/_____/_____/_____
 7      ____/_____/_____/_____
        ____/_____/_____/_____
 8      ____/_____/_____/_____
        ____/_____/_____/_____
 9      ____/_____/_____/_____
        ____/_____/_____/_____
10      ____/_____/_____/_____
        ____/_____/_____/_____
11      ____/_____/_____/_____
        ____/_____/_____/_____
12      ____/_____/_____/_____
        ____/_____/_____/_____
13      ____/_____/_____/_____
        ____/_____/_____/_____
14      ____/_____/_____/_____
        ____/_____/_____/_____
15      ____/_____/_____/_____
        ____/_____/_____/_____
16      ____/_____/_____/_____
        ____/_____/_____/_____
17      ____/_____/_____/_____
        ____/_____/_____/_____
18      ____/_____/_____/_____
        ____/_____/_____/_____
19      ____/_____/_____/_____
20              _____
                Signature of Deponent
21
        Subscribed and Sworn To
22      Before Me This_____Day
        of_____, 2023.
23
        _____
24          Notary Public
25      My Commission Expires_____
```

Li Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
David A. DeRoin (ISB no. 10404)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

Dina Flores-Brewer (ISB no. 6141)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com

Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

*Attorneys for Plaintiffs*

*Admitted pro hac vice*

*Additional counsel for Plaintiffs identified on
the following page*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **PAM POE**, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>**RAÚL LABRADOR**, et al.,<br><br>*Defendants*. | Case No. 1:23-cv-00269-CWD<br>**DECLARATION OF<br>ARIELLA BAREL IN SUPPORT OF<br>PLAINTIFFS' MOTION FOR A<br>PRELIMINARY INJUNCTION** |

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com
kyle.bersani@groombridgewu.com

Philip S. May*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com

*Attorneys for Plaintiffs*

*Admitted *pro hac vice*

I, Ariella Barel, declare under penalty of perjury of the laws of the United States of America that the following is true and correct, and state:

1.      I am an attorney with the law firm Groombridge, Wu, Baughman and Stone LLP, counsel of record for Plaintiffs Pam Poe, Penny Poe, Peter Poe, Jane Doe, Joan Doe, and John Doe.  I have been admitted *pro hac vice* in this Court for this action.  I make the following statements of my own personal knowledge, and, if called as a witness, I would and could testify competently thereto.

2.      Attached hereto as Exhibit A is a true and correct copy of Idaho House Bill 509 of the 65th Legislature, introduced during the Second Regular Session of 2020, as published on the Idaho Legislature's official website.

3.      Attached hereto as Exhibit B is a true and correct copy of the engrossed version of Idaho House Bill 500 of the 65th Legislature, introduced during the Second Regular Session of 2020, as published on the Idaho Legislature's official website.

4.      Attached hereto as Exhibit C is a true and correct copy of the engrossed version of Idaho Senate Bill 1100 of the 67th Legislature, introduced during the First Regular Session of 2023, as published on the Idaho Legislature's official website.

5.      Attached hereto as Exhibit D is a true and correct copy of a Tweet from Tammy Nichols' official Twitter account, dated April 30, 2023.

6.      Attached hereto as Exhibit E is a true and correct copy of a Tweet from Tammy Nichols' official Twitter account, dated April 28, 2023.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  July 21, 2023

_____
Ariella Barel, Esq.

# EXHIBIT D



# EXHIBIT E



Li Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
David A. DeRoin (ISB no. 10404)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

*Additional counsel for Plaintiffs identified on the following page*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **PAM POE**, *by and through her parents and next friends, Penny and Peter Poe*; **PENNY POE**; **PETER POE**, *et al.*,<br><br>v.         *Plaintiffs*,<br><br>**RAÚL LABRADOR**, *in his official capacity as Attorney General of Idaho*, *et al.*,<br><br>        *Defendants*. | Case No. 1:23-cv-00269-CWD<br><br>**DECLARATION OF JOAN DOE IN SUPPORT OF PLAINTIFFS' MOTION FOR A <u>PRELIMINARY INJUNCTION</u>** |

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com
kyle.bersani@groombridgewu.com

Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Philip S. May*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
Tel: (202) 505-5830
philip.may@groombridgewu.com

Dina Flores-Brewer (ISB no. 6141)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
Tel: (208) 344-9750
dfloresbrewer@acluidaho.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

## DECLARATION OF JOAN DOE IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>

I, Joan Doe, hereby declare as follow:

I offer this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I have personal knowledge of the facts set forth herein and could and would testify competently to these facts if called as a witness.

1.  I am a Plaintiff in this action, and refer to myself here as "Joan Doe." I am the mother and next friend of Plaintiff Jane Doe, my minor child. Plaintiff John Doe is my husband, and Jane Doe's father. I make this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this Declaration and would testify completely to these facts if called to do so.

2.  My husband and I, with our three children, have resided in Boise for seventeen years. I work part-time at an elementary school. My husband is an engineering director at a technology company.

3.  Our daughter Jane Doe is sixteen years old, is a girl, and is transgender.

4.  My husband and I love Jane unconditionally, exactly as we do our other two children. As parents, we have always done what we know and believe to be best for her, to ensure that she is happy and healthy. That is all we have ever wanted for all of our children.

5.  Jane was assigned the sex male at birth, and we gave her a traditionally male name. Around September 2020, when she was 14 years old, Jane told my husband and me that she is transgender. She told us that she had known she was a girl for much longer, but that she had been afraid to tell us and unsure how to do so. But she told us that she could not put off telling us any

1

longer because she was in so much pain because of changes that were happening to her body. Like any mother whose child tells them that they are in pain, this broke my heart more than I could ever express. No mother ever wants their child to be in any kind of pain, let alone to struggle in silence.

6.     My husband and I have friends who are transgender, and we felt we understood at some level what it means to be transgender and how difficult it can be in this world. And like any parents confronting something new with their child, we had concerns because we just did not know how to get Jane the right help. Our main concern was and continues to be Jane's health and happiness.

7.     As a child, Jane had naturally gravitated towards things considered to be for little girls. For example, when Jane played video games, which she enjoys, she would always choose to be a female character. Jane would also often choose clothes in the girls' section of the store.

8.     Before Jane told us she is transgender, I saw her struggle immensely with her mental health, especially as puberty started. At the time, I was not sure what was causing it, but I saw her withdrawing and closing off from her normal self. In retrospect, I realize this was stemming from her gender dysphoria.

9.     After Jane told us what was going on and that she is transgender, we immediately wanted to educate ourselves and to get her help. We first took her to her long-time pediatrician. We explained to the pediatrician what Jane had told us, and Jane herself explained how she felt and what she was experiencing. While our pediatrician had no personal experience treating gender dysphoria, and therefore referred us to someone with expertise in the area, I will never forget what she said to Jane that day: "from the moment you were born my job has been to make sure you're healthy and happy, and this doesn't change anything." It meant so much to us that she knew instinctually to support us and to do so overtly.

10.     With our pediatrician's help, we found a therapist with experience working with transgender patients and made appointments for Jane, and we found a doctor who had experience caring for youth with gender dysphoria. We reached out and set up an appointment.

11.     While we waited for the appointment, Jane began to socially transition and we educated ourselves about that. She chose her new name, and she started styling her hair more femininely and wearing makeup.

12.      We noticed some improvements in Jane's mental health and confidence, just from calling her by her chosen name and pronouns, supporting her in dressing and grooming herself how she wanted, and in finally being free to live as herself. But she remained distressed about the changes that puberty was bringing to her body.

13.     When the time finally came for Jane's first appointment with the doctor in November 2020, she was very excited. During that appointment, several things happened. We provided Jane's past medical history, which was quite limited because she had never had any medical issues. The doctor evaluated her, asking her a lot of questions about her experiences, understanding of herself, and mental health history. Separately, he and I talked about what I had seen with regard to Jane's gender identity, experiences, and mental health. He also requested contact information for Jane's primary care doctor and therapist. Next, he went over the treatment options for gender dysphoria, such as puberty blockers, and later, potentially gender-affirming estrogen therapy. He explained what to expect regarding timelines, and risks associated with each type of treatment, and he also did bloodwork.

14.     After the first appointment with her doctor, Jane continued seeing her therapist, which went really well. She also continued to see her doctor during this time so he could see how she was progressing in therapy, and to continue to discuss the potential risks and benefits of

3

treatment and to discuss fertility preservation options should she proceed with gender affirming medical care.

15.     During this time, we also continued to discuss everything we were learning with Jane, privately as a family. Jane still struggled with the changes that were happening to her body as male puberty continued, and she was hopeful knowing that she had options and a competent doctor who could provide the care she needed. But she wanted the process to move faster.

16.     In January, 2021, with the support of her therapist and doctor, as a family we decided that Jane would start puberty blockers. I know that this was a huge relief for Jane. Even though the effects were not immediate, just knowing that she was finally getting the care to stop the changes to her body that were causing her so much pain really impacted her mental health in a positive way. I was just so happy to see her happy and getting what she needed to be herself.

17.     In April 2021, Jane was nearly 15 and there were no doubts about the stability of Jane's female gender identity, so in consultation with Jane's doctor and after again discussing what to expect from estrogen therapy, the potential risks and benefits, and fertility preservation options, we all agreed that it was appropriate for Jane to start estrogen therapy for the continued treatment of her gender dysphoria.

18.     Jane remains on estrogen therapy for the treatment of her gender dysphoria, under the care and supervision of her doctor.

19.     Gender-affirming medical care has changed Jane's life, and the life of our family, for the better. She has never been happier. She has never been more herself. As a parent, to see where she started, in so much pain, in comparison to where she is today, a vibrant, happy, outgoing, beautiful young woman, has been lifechanging for me and my family as well. Her mental health

has significantly improved. Her grades in school have improved. And this is all because she was able to access the healthcare that she needed.

20.     As a family, when we first heard about H.B. 71, we were naturally concerned and confused. We have seen how beneficial gender affirming medical care had been for Jane.

21.     Leading up to H.B. 71 being passed, my husband and I witnessed Jane's mental health begin to decline, out of anxiety about what was happening in the state legislature and out of fear of having to stop gender-affirming medical care. Her mental health deteriorated to a state that we had not seen since before she came out to us and began treatment. It terrified all of us. Jane's anxiety around potentially losing care intensified to such debilitating levels that her grades began to slip again. She started missing school because her anxiety was so bad that she could not get out of bed or leave her room. She was scared to go outside. I was heartbroken to see my child, this beautiful flower that had blossomed so much and was finally thriving, start to wither away.

22.     On the day H.B. 71 passed into law, Jane was so emotionally devastated that my husband and I had to pick her up from school and bring her home for the day.

23.     This is the medical care that we want for our child. This is the medical care for which we sought out experienced, competent providers for. My husband, Jane's siblings, and I, are all so scared about what will happen to Jane if she is forced to stop treatment. We do not know what to do. We have thought about trying to find care in another state, but do not know if we can make it work with out-of-state providers, insurance, time off for travel, and the additional financial burden. My husband and I are also seriously considering uprooting our lives and our

SER-738

children's lives by leaving Idaho, so that Jane can continue to receive the gender-affirming medical care she needs.

24.     We do not want to leave Idaho. Jane does not want to leave Idaho. Her siblings do not want to leave Idaho. They have lived here their entire lives. This is where we have built our lives, it is our community, it is where they go to school, and it is where our friends and family are. I love my job and care deeply about the students that I work with. The reality that I might have to quit my job because of H.B. 71 makes me incredibly sad.

25.     Our oldest child committed to attending Boise State University before any of this happened, because he wanted to remain close to us and we wanted to be close to him.

26.     As each day passes, our fear grows and we are still grappling with what we must do if H.B. 71 goes into effect in a few months. Jane's health is our priority, and we know that we have done what is best for her. The fear and uncertainty is affecting all of us, and threatens to upend all of our lives. All that we want is for Jane to be able to continue receiving the care that we agree she needs, her providers agree that she needs, and that we have seen, firsthand, as necessary for our daughter to thrive.

27.     But as parents who have seen what it means when their child is not receiving care, we understand how serious Jane's gender dysphoria is, and how harmful it would be if her treatment is cut off and all her progress is lost.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Idaho, on this 18th day of July, 2023.

_Joan Doe_

Joan Doe

6

Li Nowlin-Sohl*
(admitted only in Washington)
Leslie Cooper*
Taylor Brown*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel: (212) 549-2584
lnowlin-sohl@aclu.org
lcooper@aclu.org
tbrown@aclu.org

Richard Eppink (ISB no. 7503)
Casey Parsons (ISB no. 11323)
David A. DeRoin (ISB no. 10404)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

Brad S. Karp*
Alexia D. Korberg*
Jackson Yates*
Dana L. Kennedy*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
bkarp@paulweiss.com
akorberg@paulweiss.com
jyates@paulweiss.com
dkennedy@paulweiss.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

*Additional counsel for Plaintiffs identified on
the following page*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **PAM POE**, *by and through her parents and next friends, Penny and Peter Poe*; **PENNY POE**; **PETER POE**, *et al.*, <br><br> v. <br><br>         *Plaintiffs*, <br><br> **RAÚL LABRADOR**, *in his official capacity as Attorney General of Idaho, et al.*, <br><br>         *Defendants*. | Case No. 1:23-cv-00269-CWD <br><br> **DECLARATION OF PENNY POE IN SUPPORT OF PLAINTIFFS' MOTION FOR A <u>PRELIMINARY INJUNCTION</u>** |

Eric Alan Stone*
Ariella C. Barel*
Kyle Bersani*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
565 5th Avenue, Suite 2900
New York, NY 10017
Tel: (332) 269-0030
eric.stone@groombridgewu.com
ariella.barel@groombridgewu.com
kyle.bersani@groombridgewu.com

Jordan Orosz*
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7300
jorosz@paulweiss.com

Philip S. May*
GROOMBRIDGE, WU, BAUGHMAN AND
STONE LLP
801 17th St. NW, Suite 1050
Washington, DC 20006
(202) 505-5830
philip.may@groombridgewu.com

Dina Flores-Brewer (ISB no. 6141)
ACLU OF IDAHO FOUNDATION
P.O. Box 1897
Boise, ID 83701
(208) 344-9750
dfloresbrewer@acluidaho.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

### DECLARATION OF PENNY POE IN SUPPORT OF
### PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Penny Poe, hereby declare as follow:

1.      I offer this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I have personal knowledge of the facts set forth herein, and could and would testify competently to these facts if called as a witness. I am a Plaintiff in this Action, and call myself "Penny Poe." I am the parent and next friend of my minor child, Pam Poe, who is also a Plaintiff. My husband, "Peter Poe," is the father of Pam Poe and is also a Plaintiff.

2.      My husband and I reside in Meridian, Idaho, with our daughter Pam and her sibling. We have an adult daughter who also lives in Idaho. We are all lifelong Idahoans. We have lived in Meridian for the last fifteen years and before that, we resided in Boise.

3.      I work as a data coordinator for an Idaho agency. My husband is employed in the operations division of a warehouse.

4.      Our daughter, Pam Poe, is fifteen years old.

5.      Pam is a girl.

6.      Pam is transgender.

7.      Pam first told me that she was transgender in August 2021. My husband and I were hosting family one evening at our home. I received a text from Pam telling me that she was nonbinary, that her name was now "Pam," and the pronouns she would like to use. I realized it was a big moment for her and that she likely had a lot of fear. I can admit that in the moment I felt overwhelmed when I first read the text. Having so many family members over and not being able to go and comfort Pam in the moment made it harder. I texted her back and told her that I loved her and that we would talk more in the morning. I eventually told my husband late in the evening about what Pam had texted me.

1

SER-742

8.      The next morning, after much of my family had left, I went to Pam's room. I sat next to her on the floor, gave her a big hug, and just told her repeatedly how much I loved her. I asked her who else she had told, who does not know, and who she wanted to avoid knowing at that time.

9.      As parents, there was not a question in our minds about supporting our daughter, but when she first told me, I did not know anything about being nonbinary or transgender, or what it would look like to support her. I just knew I wanted the best for her, and I wanted her to be happy and healthy. It took me some time to learn through self-education. I also learned a lot from Pam and her healthcare providers, as we have embarked on this journey.

10.     Although I sensed that telling me was a huge relief for Pam, I saw her struggling with her mental health in late 2021. She was depressed and anxious, but most concerning was that Pam was having thoughts of self-harm and was actually engaging in self-harm. I believe that this behavior was being driven by the overwhelming emotions that she had been and was continuing to deal with, including what we later learned was gender dysphoria. It scared us a lot, as a family. I never want to lose my daughter.

11.     We quickly got her into weekly counseling, so that she would have a professional to talk to and another person to receive support from. Despite the counseling, Pam continued to have severe mental health issues and thoughts of self-harm, and she was engaging in self-injurious behavior. Thankfully, around the last week in February 2022, Pam was brave enough to come to me and tell me how severe her symptoms were and she said that she needed more support. As a family we decided that Pam would benefit from inpatient residential treatment. That way we would know she was safe, in the care of trained professionals around the clock, and she could get the care we all agreed she needed.

12.     Pam spent one week at the inpatient residential treatment facility. She was diagnosed with gender dysphoria, depression, and anxiety by one of her treating providers at the facility.

13.     My husband and I immediately started seeking out providers who had experience in treating gender dysphoria. It took longer than we would have liked because of waiting lists, but Pam was finally able to start seeing a doctor who specialized in treating gender dysphoria about two months later, around May 2022.

14.     During the first visit, my husband and I were both there with Pam. We learned a lot during that appointment. Pam's doctor went through a long questionnaire with Pam. In evaluating Pam and discussing treatment options for gender dysphoria, he considered that she was already seeing a mental health professional, had already been diagnosed with gender dysphoria, and that we had received a referral for treatment following her time in inpatient residential treatment. He also drew blood to perform lab work to establish where Pam was in terms of her puberty. The doctor discussed the risks of puberty blocking medication, the expected results from treatment, and potential effects on Pam's fertility if she were to later receive estrogen therapy.

15.     I will never forget the huge smile on Pam's face after we left that first appointment. She looked the happiest I had seen her in over a year. While it was still very early in the process, I had such a huge sense of relief. I knew we were on the right track. I was happy that we knew why Pam was experiencing the feelings she was, and that we had a doctor who could provide the treatment and support that she needed.

16.     Pam's doctor prescribed puberty blockers and she began taking them in June 2022. Pam was 14 years old at the time. The change in Pam was almost overnight. Her mental health

3

improved significantly just knowing that the changes that were happening to her body, which had been causing her such severe distress, were no longer going to happen or progress.

17.     For the next year, Pam was a different person. She started feeling more confident and happier without having to experience the distress that male puberty caused for her. We told more and more people that her name was now Pam and that she used female pronouns. She was herself, happy, and thriving. She saw her doctor regularly for check-ins and lab work, to monitor the effectiveness and dosage of the puberty blockers, and to make sure she was happy and otherwise healthy. When Pam started high school in August 2022, she went to school as Pam because it was important for her to start these next four years living authentically. Everything at school has been great for Pam regarding her being transgender. She was treated as the girl that she is from day one.

18.     In April 2023, when Pam was 15 years old, we raised with her doctor the possibility of beginning estrogen therapy as the next step in treatment for her gender dysphoria. Again, after careful consideration, evaluation by her doctor, discussion with her doctor of the potential risks and benefits of estrogen therapy and fertility preservation, and talks as a family, Pam, her father and I, along with her doctor, agreed that estrogen therapy was an appropriate medical treatment for her gender dysphoria. We signed the informed consent paperwork and her doctor prescribed her estrogen therapy. She has now been on estrogen therapy since April 2023

19.     Pam's mental health has continued to improve with treatment, as she continues to develop into the person she knows herself to be. As parents, my husband and I could honestly not be happier. We have our child back and she is flourishing.  She is a wonderful, talented, and beautiful young woman, who we are so proud of.

4

20.    Like any person these days who watches or reads the news, we started seeing the legislation banning gender-affirming medical care popping up all over the country. I do not think we ever thought it would come to Idaho. When the H.B. 71 legislation was introduced in the Idaho legislature, we were terrified. After everything that we had been through with Pam, including the fear of losing our daughter before we were able to get her the care that she needed, we just could not believe that Pam was now at risk of being taken off her medication. It was inconceivable that we, as her parents, and in consultation with her doctor, had no say in the decision.

21.    Around the time H.B. 71 was being debated, my husband and I noticed that Pam's mental health seemed to be negatively impacted. When the legislation passed, Pam was visibly devastated. As were we. Gender-affirming medical care saved our daughter. Now, we live every day knowing that in a few short months, Pam may no longer be able to receive the care she needs anywhere in Idaho, our home.

22.    The stress and fear have impacted our entire family. We are lifelong Idahoans. We never imagined a time when we would leave Idaho, and especially not during the middle of Pam's high school years. This is where our home is, our community, our lives, our family, our friends, our jobs, our children's schools, and their friends. We do not want to uproot our lives, but Pam's health, safety, and ability to access the healthcare she needs is and has to be a top priority. We are terrified of the potential consequences on Pam's health if her medical care is banned, because we do not even have to guess what will happen to her mental health and to her body, because we have been through it. The thought of my child going back to feeling like she does not want to live or wants to hurt herself is just something I cannot even think about.

23.    My husband and I would never put her through that because we would be forcing her to live as someone she is not and placing her in danger because of the effects on her mental

SER-746

health. We have explored the possibility of regularly traveling to another state for care, and the time, logistics, and costs would be very difficult for our family. If we had to move, it would mean giving up our jobs, our home, our financial security, disrupting our two youngest children's educations and lives, and leaving everything we have ever known behind. Both of these options would result in significant hardship on everyone in our family, but these are our only options if H.B. 71 goes into effect.

24. H.B. 71 will be devastating for our family. We ask the Court please not to let H.B. 71 take effect.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Idaho, on this 18th day of July, 2023.

*Penny Poe*
Penny Poe

6

SER-747