No. 24-142

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

PAM POE, et al.,

Plaintiffs-Appellees

v.

RAÚL LABRADOR,

Defendant-Appellant

and

JAN M. BENNETTS, et al.,

Defendants

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

———————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT
OF PLAINTIFFS-APPELLEES AND URGING AFFIRMANCE
ON THE ISSUE ADDRESSED HEREIN

———————————

KRISTEN CLARKE
 Assistant Attorney General

ELIZABETH PARR HECKER
JESSICA MERRY SAMUELS
 Attorneys
 U.S. Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, D.C.  20044-4403
 (202) 598-9337

# TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES ................................................. 1

STATEMENT OF THE ISSUE ............................................................. 1

STATEMENT OF THE CASE .............................................................. 2

    A.    House Bill 71 ............................................................. 2

    B.    Procedural History ..................................................... 4

SUMMARY OF ARGUMENT ............................................................. 8

ARGUMENT

    Plaintiffs are likely to succeed on the merits of their
    equal-protection claim ................................................... 10

        A.    HB 71 is subject to heightened scrutiny. ............... 11

            1.    HB 71 triggers heightened scrutiny because the
                law relies on sex-based classifications. ................ 11

                a.    HB 71 facially discriminates based on sex. ........ 11

                b.    HB 71 discriminates based on sex by
                    targeting transgender minors. ............................... 17

                c.    HB 71 constitutes sex discrimination because
                    it treats transgender minors differently based
                    on their gender nonconformity. ........................... 18

            2.    HB 71 triggers heightened scrutiny because
                transgender persons constitute at least a
                quasi-suspect class. ........................................ 20

**TABLE OF CONTENTS (continued):**          **PAGE**

3.     Heightened scrutiny is consistent with the proper role of courts applying the Equal Protection Clause. .... 22

B.     The district court did not err in concluding that HB 71 is unlikely to survive heightened scrutiny. ............................ 23

1.     A strong medical consensus supports the use of puberty blockers and hormone therapies to treat gender dysphoria.......................................................... 24

2.     HB 71 is not substantially related to achieving Idaho's asserted interests. ............................................. 27

a.     HB 71 is underinclusive. .................................... 27

b.     HB 71 is overinclusive. ...................................... 29

CONCLUSION .................................................................. 31

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:**                                                          **PAGE**

*A.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023),
  *cert. denied*, No. 23-392 (Jan. 16, 2024) .......................................................13

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) ....................................14

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ...................................... 6, 12, 14, 17

*Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) ................................... 10, 12-13, 16

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993).........................22

*Chamber of Com. of the U.S. v. Bonta*, 62 F.4th 473 (9th Cir. 2023) ....................10

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)............................22

*Davis v. Guam*, 932 F.3d 822 (9th Cir. 2019) ........................................................22

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ....................... 14-15

*Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205 (11th Cir. 2023),
  *pet. for reh'g en banc pending*, No. 22-11707 .............................................10

*Geduldig v. Aiello*, 417 U.S. 484 (1974) ................................................................15

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020)................ 13, 18

*Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023),
  *pet. for reh'g en banc pending*, Nos. 20-35813, 20-35815 .................. *passim*

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) ....................................... 14, 18

*Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) ................................................20

*L.W. v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023),
  *pets. for cert. pending*, Nos. 23-466, 23-477, 23-492 ...................................10

- iii -

**CASES (continued):**                                                    **PAGE**

*Loving v. Virginia*, 388 U.S. 1 (1967) ........................................................14

*McLean v. Crabtree*, 173 F.3d 1176 (9th Cir. 1999)..............................16

*Nguyen v. INS*, 533 U.S. 53 (2001)..........................................................20

*Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118 (9th Cir. 2014).................. 10, 26

*SECSYS, LLC v. Vigil*, 666 F.3d 678 (10th Cir. 2012) ............................16

*Sessions v. Morales-Santana*, 582 U.S. 47 (2017) .......................... 27, 29

*United States Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) .............................23

*United States v. Virginia*, 518 U.S. 515 (1996)......................... 11, 23, 27

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017),
    *cert. dismissed*, 583 U.S. 1165 (2018)..................................... 12-13

**STATUTES:**

21 U.S.C. 355 ...........................................................................................26

42 U.S.C. 2000h-2....................................................................................1

Idaho Code § 18-1506C (2023) ...............................................................2
    § 18-1506C(2)........................................................... 2, 12, 21
    § 18-1506C(3)................................................................ *passim*
    § 18-1506C(3)(c)...............................................................2, 13
    § 18-1506C(4)................................................................ *passim*
    § 18-1506C(4)(c)....................................................................19
    § 18-1506C(5).........................................................................3

Idaho Code § 19-5307 (2023) .................................................................3

| REGULATIONS: | PAGE |
|---|---|

21 C.F.R. Pt. 314.................................................................26

Exec. Order No. 13,988, § 1, 86 Fed. Reg. 7023 (Jan. 20, 2021)...........................1

**RULE:**

Fed. R. App. P. 29(a) ..............................................................1

## INTEREST OF THE UNITED STATES

This case challenges an Idaho statute criminalizing the provision of certain medical care for transgender minors. The United States has a strong interest in protecting the rights of individuals who are lesbian, gay, bisexual, transgender, and intersex. The President issued an Executive Order recognizing the right of all people to be "treated with respect and dignity" and to receive "equal treatment" regardless of gender identity or sexual orientation. Exec. Order No. 13,988, § 1, 86 Fed. Reg. 7023 (Jan. 20, 2021). In addition, 42 U.S.C. 2000h-2 authorizes the Attorney General to intervene to address sex-based denials of equal protection of the laws under the Fourteenth Amendment.

The United States files this brief under Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE ISSUE

The United States addresses the following question only:

Whether Idaho House Bill 71, which criminalizes the provision of certain kinds of medical care for transgender minors but not for other minors, is a classification based on sex and transgender status that is subject to and fails heightened equal-protection scrutiny.

# STATEMENT OF THE CASE

## A.     House Bill 71

Idaho enacted House Bill 71 (HB 71) on April 4, 2023.  2023 Idaho Sess. Laws Ch. 292 (Idaho Code § 18-1506C).  The law makes it a felony to provide certain medical treatments to "a child"—defined as a person under the age of 18— "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." *Id.* § 18-1506C(2) and (3).  HB 71 does not define "biological sex," but instead defines "[s]ex" as "the immutable biological and physiological characteristics, specifically the chromosomes and internal and external reproductive anatomy, genetically determined at conception and generally recognizable at birth, that define an individual as male or female." *Id.* § 18-1506C(2).  Prohibited procedures include "[a]dministering or supplying . . . medications" such as "[p]uberty-blocking medication to stop or delay normal puberty," and "[s]upraphysiological doses" of "testosterone to a female" or "estrogen to a male." *Id.* § 18-1506C(3)(c).

HB 71 expressly exempts treatments for certain conditions, including "genetic disorder[s] of sex development" such as "external biological sex characteristics that are ambiguous and irresolvable," or abnormal "sex chromosome structure, sex steroid hormone production, or sex steroid hormone

- 2 -

action for a male or female." Idaho Code § 18-1506C(4). The statute also allows any of the otherwise-prohibited procedures when "[n]ecessary to the health" of the patient, so long as the purpose of the treatment is not "to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." *Ibid.*

Medical providers who violate HB 71 are "guilty of a felony" and face up to ten years in prison. Idaho Code § 18-1506C(5). Convictions under HB 71 are also designated "crimes of violence" under state law and thus carry the additional penalty of a fine up to $5000. *Id.* § 19-5307.

HB 71 was enacted as part of a series of bills in recent years targeting transgender individuals in Idaho. Those bills included provisions that prohibited transgender people from changing their sex designations on birth certificates, prohibited transgender women and girls from participating in female athletic teams, and prohibited transgender students from using school bathrooms consistent with their gender identity. Doc. 32-8, Exs. A-C.[1] As to HB 71, a co-sponsor called high school students identifying as LGBTQ "an epidemic" for which "[s]tates need to help stop the spread," and referred to gender-affirming medical

---

[1] "Doc. __, at __" refers to the docket entry of district court filings below. "C.A. Doc. __" refers to documents filed in this Court. "Br. __" refers to appellant's opening brief (C.A. Doc. 25).

care as "Frankenstein procedures." 3-SER-729, 731. Other legislators likened affirming a transgender individual's gender identity to agreeing that a patient's hallucinations are real. Doc. 45, at 19.

### B.    Procedural History

Two transgender minors who currently receive medical treatments banned by HB 71, along with their parents, filed suit seeking declaratory and injunctive relief against the Idaho Attorney General and other public officials. Doc. 1, at 5-6, 32. Among other claims, the minor plaintiffs allege that HB 71 violates their rights under the Fourteenth Amendment's Equal Protection Clause. Doc. 1, at 27-29.

Several months before HB 71's effective date (January 1, 2024), plaintiffs moved for a preliminary injunction barring the law's enforcement. Doc. 32. In support, plaintiffs submitted sworn declarations by both minor plaintiffs and their parents, as well as expert declarations by three well-credentialed medical specialists (a pediatric psychologist, a pediatric endocrinologist, and a professor of child and adolescent psychiatry), all of whom have significant clinical, research, and teaching experience. Docs. 32, 70. The United States filed a Statement of Interest in support of plaintiffs' motion explaining why, in the federal government's view, HB 71 violates the Equal Protection Clause. Doc. 45.

The district court granted plaintiffs' motion on December 26, 2023. As relevant here, the district court determined that plaintiffs had demonstrated a likelihood of success on their equal-protection challenge. 1-ER-42-54.

1. The district court first concluded that HB 71 is subject to heightened scrutiny because it discriminates based on both transgender status and sex. 1-ER-45-49. In doing so, the district court relied on *Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023), *pet. for reh'g en banc pending*, Nos. 20-35813, 20-35815 (filed Aug. 31, 2023), where this Court affirmed on equal-protection grounds a preliminary injunction against an Idaho law that banned transgender women and girls from participating in women's student athletics.

With respect to discrimination based on transgender status, the district court explained that even though "the word 'transgender' doesn't appear in the statute," HB 71 still "classifie[s] on that basis" by "ban[ning] certain medical treatments if (and only if) those treatments are provided 'for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex *if that perception is inconsistent with the child's biological sex*.'" 1-ER-45-46 (quoting Idaho Code § 18-1506C(3) and adding emphasis). Because "the classified group (transgender minors) cannot have medical treatments that the similarly situated group (cisgender minors) can," the district court held that HB 71 "is [a] classification based on transgender status, pure and simple." 1-ER-46 (citing

- 5 -

*Hecox*, 79 F.4th at 1025).  The court rejected defendants' argument that HB 71 regulates based on a specific diagnosis (gender dysphoria) rather than a suspect classification (transgender status), stating that the law "discriminates by proxy, as only transgender people seek treatment for gender dysphoria."  1-ER-46.

The district court also concluded that heightened scrutiny applies because HB 71 discriminates on the basis of sex.  1-ER-47-49.  The court began by noting that this Court already has held that "discrimination on the basis of transgender status is a form of sex-based discrimination."  1-ER-47 (quoting *Hecox*, 79 F.4th at 1026).  The court also explained, citing to *Bostock v. Clayton County*, 590 U.S. 644 (2020), that HB 71 draws lines based on sex by "effectively prohibit[ing] transgender minors from taking medications or undergoing treatments due to their gender nonconformity."  1-ER-47.  Because "the biological sex of the minor patient is the basis on which the law distinguishes between those who may receive certain types of medical care and those who may not," the court reasoned, HB 71 is a sex-based classification.  1-ER-47-48 (citation omitted).

2.  Having determined that HB 71 warrants heightened scrutiny, the district court concluded that the law failed that "demanding" standard.  1-ER-49-54 (quoting *Hecox*, 79 F.4th at 1028).  The court found that the State's asserted interest in "protect[ing] vulnerable children from the dangers of unproven medical and surgical treatments" was "pretextual" because "HB 71 allows the same

treatments for cisgender minors that are deemed unsafe and thus banned for transgender minors." 1-ER-50. In addition, the court held that "the weight of the evidence" shows that "gender-affirming medical care delivered in accordance with [medical association] guidelines is helpful and necessary for some adolescents," while denying access to such care "is harmful" and "can increase the risk of anxiety, depression, self-harm, and suicidality." 1-ER-24-25, 51. The court also found that the treatments at issue do not pose any greater risks to adolescents compared to the "similar . . . risks associated with other types of healthcare families may seek for minors." 1-ER-52.

The district court separately found that even if the State's asserted interest in safety were sincere, HB 71 is not sufficiently related to furthering that interest. 1-ER-51-53. The court explained that "the means [employed by HB 71] (a total prohibition on gender-affirming medical care) is not closely fitted with the ends (protecting children)" because more tailored approaches were available. 1-ER-52-53 (citing *Hecox*, 79 F.4th at 1030).

Accordingly, the district court held that plaintiffs had demonstrated a likelihood of success on their equal-protection claim (1-ER-54), and entered an order prohibiting the Idaho Attorney General "from enforcing any provision of House Bill 71 during the pendency of this litigation" (1-ER-66).

- 7 -

3.  The Idaho Attorney General timely appealed the district court's preliminary injunction (5-ER-1041-1046) and sought a stay of the preliminary injunction pending appeal, which the district court denied (1-ER-2-13).  The Idaho Attorney General then sought a stay in this Court, which the Court denied on January 30, 2024.  C.A. Doc. 24.  The Court also denied the Idaho Attorney General's motion for en banc reconsideration of that denial.  C.A. Doc. 31.  The Idaho Attorney General moved for a stay in the Supreme Court of the United States on February 16, 2024, *see Labrador v. Poe*, S. Ct. No. 23A763, and that motion remains pending.  The enforcement of HB 71 is therefore still enjoined.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's holding that plaintiffs are likely to succeed on the merits of their equal-protection claim because HB 71's ban on the use of puberty blockers and hormone therapies for gender-affirming medical care is subject to, and cannot survive, intermediate scrutiny.

1.  As the district court correctly held, heightened scrutiny applies to HB 71 because the law classifies based on both sex and transgender status.

a.  HB 71 discriminates based on sex for at least three reasons.  First, HB 71 facially discriminates based on sex by using explicitly sex-based terminology to delineate which adolescents may or may not receive certain treatments.  Second, it discriminates based on sex by targeting transgender minors, which this Court has

- 8 -

already recognized is a form of sex discrimination.  Third, HB 71 punishes

transgender minors for their gender nonconformity by prohibiting only those

treatments that are provided "for the purpose of attempting to alter the appearance

of or affirm the child's perception of the child's sex if that perception is

inconsistent with" their sex assigned at birth.  Idaho Code § 18-1506C(3) (2023).

   b.  HB 71 also draws lines based on transgender status, which triggers

heightened scrutiny under this Court's precedent that gender identity "is at least a

'quasi-suspect class.'"  *Hecox*, 79 F.4th at 1026 (citation omitted).

   2.  The district court correctly concluded that HB 71 fails heightened

scrutiny.  Though the State claims that the law's purpose is to protect the health

and safety of children, the record does not support the State's view that these

treatments are "experimental," "dangerous," and not medically necessary.  Br. 1.

Every major American medical association agrees that puberty blockers and

hormone therapies are safe, effective, and appropriate for adolescents with gender

dysphoria when clinically indicated.  Nor does HB 71 satisfy the close means-ends

fit required by heightened scrutiny.  The law is underinclusive because it expressly

permits non-transgender minors to access the very same care that it denies to their

transgender peers.  It is also overinclusive because it categorically prohibits—by

way of criminal felony charges—*all* gender-affirming medical care, making no

attempt to tailor the prohibition to address Idaho's purported concerns.

# ARGUMENT

## PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR EQUAL-PROTECTION CLAIM

To obtain a preliminary injunction, a movant must show, among other things, "a likelihood of success on the merits." *Chamber of Com. of the U.S. v. Bonta*, 62 F.4th 473, 481 (9th Cir. 2023). Factual findings are reviewed on appeal for "clear error" and will be set aside only if "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014). This Court should join the Eighth Circuit in holding that gender-affirming-care bans like HB 71 likely violate the Equal Protection Clause. *See Brandt v. Rutledge*, 47 F.4th 661, 669-671 (8th Cir. 2022).[2]

---

[2] The Sixth and Eleventh Circuits recently held at the preliminary injunction stage that rational-basis review applied to similar bans on gender-affirming care in Kentucky, Tennessee, and Alabama, and that the bans likely survived that minimal level of scrutiny. *See Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1227-1231 (11th Cir. 2023), *pet. for reh'g en banc pending*, No. 22-11707 (filed Sept. 11, 2023); *L.W. v. Skrmetti*, 83 F.4th 460, 486-489 (6th Cir. 2023), *pets. for cert. pending*, Nos. 23-466, 23-477, 23-492 (filed Nov. 1, 2023). For the reasons set forth below, *Skrmetti* and *Eknes-Tucker* are unpersuasive and cannot be reconciled with this Court's precedents. And while defendant is correct (Br. 1-2) that the Eighth Circuit has granted initial hearing en banc in the appeal of a permanent injunction in *Brandt* (No. 23-2681), the decision affirming the preliminary injunction remains good law until overturned and, even then, would still be persuasive in its own right.

- 10 -

### A.    HB 71 is subject to heightened scrutiny.

The district court correctly concluded that heightened scrutiny applies to HB 71 for two reasons:  (1) the law discriminates based on sex, and (2) the law discriminates based on transgender status, which is a quasi-suspect class under *Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023), *pet. for reh'g en banc pending*, Nos. 20-35813, 20-35815 (filed Aug. 31, 2023).  This Court should affirm both of those well-reasoned holdings.

### 1.    HB 71 triggers heightened scrutiny because the law relies on sex-based classifications.

Laws that classify based on sex are subject to intermediate scrutiny.  *United States v. Virginia*, 518 U.S. 515, 555 (1996) (*VMI*).  HB 71 relies on sex-based classifications on the face of the statute, by targeting transgender minors, and by treating transgender minors differently based on their gender nonconformity.

### a.    HB 71 facially discriminates based on sex.

As the district court correctly observed, HB 71 "draws sex-based classifications on its face."  1-ER-47.  The statute prohibits medical providers from administering puberty blockers and hormone therapies only when "the child's perception of the child's sex . . . is inconsistent with the child's *biological sex*."  Idaho Code § 18-1506C(3) (2023) (emphasis added).  The treatments that are allowed under the statute thus depend on an individual's sex assigned at birth.  While HB 71 expressly permits treatments that are "[n]ecessary to the health" of a

- 11 -

patient, the statute states that a treatment "is *never* necessary to the health" of a minor—and thus will never fall within the exception—if the "purpose" is to "affirm the child's perception of the child's sex" where that "perception is inconsistent with the child's *biological sex.*" *Id.* § 18-1506C(4)(a) (emphases added). Although HB 71 does not separately define "biological sex," it defines "[s]ex" to mean "the immutable biological and physiological characteristics, specifically the chromosomes and internal and external reproductive anatomy, genetically determined at conception and generally recognizable at birth, that define an individual as male or female." *Id.* § 18-1506C(2)(b).

Under these provisions, a "minor's sex at birth determines whether or not the minor can receive certain types of medical care." *Brandt*, 47 F.4th at 669. For example, if HB 71 were to take effect, a minor who was assigned female at birth cannot receive testosterone to develop physical traits that would affirm a male gender identity; but a minor who was assigned male at birth and who, for example, has a testosterone deficiency and wishes to appear more masculine, can. As this example shows, in crafting HB 71, the legislature could not "writ[e] out instructions" to identify the banned medical procedures "without using the words man, woman, or sex (or some synonym)." *Bostock*, 590 U.S. at 668-669. Because HB 71 "cannot be stated without referencing sex," it is "inherently based upon a sex-classification." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,

- 12 -

858 F.3d 1034, 1051 (7th Cir. 2017), *cert. dismissed*, 583 U.S. 1165 (2018);

*accord A.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760, 772 (7th Cir.

2023), *cert. denied*, No. 23-392 (Jan. 16, 2024); *Brandt*, 47 F.4th at 669-670;

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020).

Defendant's arguments to the contrary are unpersuasive.

i.  First, defendant argues that HB 71 uses sex-based terminology not to

classify on the basis of sex, but rather "to identify certain procedures with certain

risks."  Br. 24-25.  But this framing analyzes the statute too abstractly, zooming

out to a level of generality intended to obscure the sex discrimination on the

statute's face.  Under HB 71, whether a minor may be prescribed certain

medications in Idaho depends solely on the minor's "biological sex."  Idaho Code

§ 1506C(3) and (4).  The statute explicitly relies on birth-assigned sex by limiting

hormone therapies depending on whether the minor is "female" or "male."  *Id.*

§ 18-1506C(3)(c).  That is a facial sex classification.

ii.  Defendant also asserts that HB 71 does not discriminate based on sex

because it "appl[ies] to both sexes" and "regulates them equally."  Br. 24.  As the

district court explained, however, "that does not change the fact that the biological

sex of the minor patient is the basis on which the law distinguishes between those

who may receive certain types of medical care and those who may not."  1-ER-48

(internal quotation marks and citation omitted).  The Supreme Court has repeatedly

- 13 -

held that laws restricting conduct based on race or sex are not insulated from constitutional scrutiny simply because they apply to members of all races or sexes. *See, e.g.*, *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140-142, 159-160 (1994) (holding that sex-based peremptory challenges violated the Equal Protection Clause, even though men and women were equally likely to be struck); *Loving v. Virginia*, 388 U.S. 1, 8-9 (1967) ("[W]e reject the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations."). These holdings follow from the foundational principle that equal protection is "a personal right" because "the Constitution protect[s] *persons*, not *groups*." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227, 230 (1995). By discriminating "equally" against transgender males and females, HB 71 "doubles rather than eliminates" the discriminatory nature of the law. *Bostock*, 590 U.S. at 662.

　　　iii. Defendant is wrong that the Supreme Court's decision *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), compels a different result. Br. 17, 25-26, 29. In *Dobbs*, the Supreme Court described abortion as a "medical procedure that only one sex can undergo," which did not by itself trigger heightened scrutiny "unless the regulation is a 'mere pretex[t] designed to effect an invidious discrimination against members of one sex or the other.'" 597 U.S. at

- 14 -

236 (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496, n.20 (1974)).  That point is not instructive here for at least three reasons.

First, unlike the law in *Dobbs*, HB 71 contains express sex-based classifications.  *See* pp. 11-13, *supra*.  In *Dobbs*, by comparison, the law on its face did not discriminate based on sex.  *See* 597 U.S. at 232.  And the case on which *Dobbs* relied—*Geduldig*—similarly did not involve an explicit sex classification, but rather addressed a state insurance system that excluded from coverage "certain disabilities resulting from pregnancy."  417 U.S. at 486.

Second, neither *Dobbs* nor *Geduldig* involved a law that, like HB 71, regulates medical procedures that *all* individuals can undergo.  Put differently, as a physiological matter, medical providers are not able to perform an abortion on a non-transgender man, but they can prescribe puberty blockers or hormones to *anyone*—regardless of sex assigned at birth or gender identity.  HB 71 thus permits the regulated treatments for some people but not others.  By comparison, the law at issue in *Dobbs* banned abortion for *everyone* in Mississippi, 597 U.S. at 232; and the law at issue in *Geduldig* denied the pregnancy-related insurance benefit to *everyone* in California, 417 U.S. at 489.  The fact that HB 71 allows some people to access medical treatments while denying those same treatments to others makes the law "distinguishable" from *Dobbs* and *Geduldig*, as the district court explained. 1-ER-49.

- 15 -

Third and finally, defendant argues that HB 71 does not involve a suspect classification because "[a] state may reasonably conclude that a treatment is safe when used for one purpose but risky when used for another." Br. 29-30 (citation omitted). But that argument turns the constitutional analysis on its head. The equal-protection framework involves two distinct steps: first, what level of scrutiny applies based on the way a law classifies people; and second, whether those classifications are sufficiently related to valid government interests. *See McLean v. Crabtree*, 173 F.3d 1176, 1185 (9th Cir. 1999) (describing two-step framework); *SECSYS, LLC v. Vigil*, 666 F.3d 678, 685-687 (10th Cir. 2012) (Gorsuch, J.) (detailing how "class-based equal protection jurisprudence generally proceeds in two steps"). Here, defendant attempts to rely on the State's interest (relevant at step two) to argue that there is no differential treatment at all (at step one). As the Eighth Circuit put it, that approach "conflates the classifications drawn by the law with the state's justification for it." *Brandt*, 47 F.4th at 670. Of course, the State's justifications for treating medical procedures differently should be taken into account at the proper step of the analytical framework. But they provide no basis for refusing to acknowledge a sex-based classification in the first instance.

### b.  HB 71 discriminates based on sex by targeting transgender minors.

Heightened scrutiny applies for the additional reason that HB 71 differentiates based on transgender status, which both the Supreme Court and this Court have recognized as a form of sex discrimination.  In *Bostock*, the Supreme Court explained that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex."  590 U.S. at 660.  That is because when a law "penalizes a person identified as male at birth for traits or actions that it tolerates in [a person] identified as female at birth," the person's "sex plays an unmistakable" role.  *Ibid.*  Relying on *Bostock*, this Court has similarly held that "discrimination on the basis of transgender status is a form of sex-based discrimination."  *Hecox*, 79 F.4th at 1026.

The very purpose of HB 71 is to prohibit medical care that enables individuals to affirm a gender identity that is different from the sex they were assigned at birth.  Idaho Code § 18-1506C(3) (banning treatments to "affirm the child's perception of the child's sex if that perception is *inconsistent with the child's biological sex*" (emphasis added)).  By targeting transgender minors, HB 71 "unavoidably discriminates against persons with one sex identified at birth," but who identify with a different sex "today."  *Bostock*, 590 U.S. at 669.  This kind of discrimination is itself a form of sex discrimination that subjects HB 71 to heightened scrutiny.

- 17 -

### c.  HB 71 constitutes sex discrimination because it treats transgender minors differently based on their gender nonconformity.

The Supreme Court has recognized that differential treatment based on gender nonconformity is a form of sex classification that is subject to heightened scrutiny. *J.E.B.*, 511 U.S. at 127-128.  This Court has similarly acknowledged that "policies punish[ing] transgender persons for gender non-conformity" necessarily "rely[] on sex stereotypes" and thus "constitute sex-based discrimination for purposes of the Equal Protection Clause." *Hecox*, 79 F.4th at 1027-1028 (citation omitted).  Many other courts have reached the same conclusion. *See Grimm*, 972 F.3d at 608 (collecting cases).

Discrimination based on gender nonconformity appears in HB 71's plain text.  The statute's prohibitions turn on whether the medical care is sought to affirm a minor's gender identity that is "*inconsistent* with the child's biological sex*.*"  Idaho Code § 18-1506C(3) and (4) (emphasis added).  In other words, the very purpose of HB 71 is to deny medical treatments to transgender minors that would cause their bodies to be out of conformance with the way society expects them to appear, based on the sex they were assigned at birth.  By contrast, the law allows the same treatments to be provided to non-transgender minors whose "sex chromosome structure, sex steroid hormone production, or sex steroid hormone action" are not "*normal . . . for a male or female,*" because such treatments

- 18 -

conform to the minor's birth-assigned sex. *Id.* § 18-1506C(4)(c) (emphasis added).

To take an example, under HB 71, a minor assigned male at birth whose

testosterone levels are higher than "normal . . . for a male" due to precocious

puberty may be treated with puberty blockers to reduce testosterone.[3] *Id.*

§ 18-1506C(3). But when a doctor recommends that a minor assigned male at

birth be given the same medication (puberty blockers) to treat gender dysphoria by

doing the exact same thing (lowering testosterone levels), HB 71 prohibits that

treatment because the "purpose" would be to delay puberty in order to affirm a

gender identity (female) that is "inconsistent" with the minor's sex assigned at

birth (male). *Ibid.*

Defendant argues that drawing lines in this way is necessary to account for

"physical differences between men and women" and the "diagnosis" of gender

dysphoria. Br. 27 (citation omitted). Once again, these arguments conflate the two

distinct steps of the equal-protection analysis. The question at the first step is not

whether HB 71 is justified by the State's interests, but rather what level of scrutiny

applies to make that determination. Whether Idaho's interest in "regulat[ing]

particular procedures" (Br. 27) passes constitutional muster is instead a question

---

[3] Precocious puberty is "a condition that causes early pubertal development in children." 4-ER-908.

- 19 -

for the *second* step of the analysis.[4]  The district court therefore correctly concluded that HB 71 triggers heightened scrutiny because the law "classifies on the basis of gender nonconformity."  1-ER-47-49.

> **2.    HB 71 triggers heightened scrutiny because transgender persons constitute at least a quasi-suspect class.**

The district court was also correct that HB 71 discriminates based on transgender status.  In *Hecox*, this Court made clear that "gender identity is at least a quasi-suspect class" that triggers heightened scrutiny.  79 F.4th at 1026 (internal quotation marks and citation omitted).[5]  On appeal, defendant does not dispute that point, arguing instead that HB 71 does not classify based on transgender status at all.  Br. 27-31.  This argument ignores both the text and the operation of the statute.

As the district court correctly held, the fact that HB 71 does not expressly use the word "transgender" does not end the equal-protection analysis.

---

[4]  Defendant's reliance on *Nguyen v. INS*, 533 U.S. 53, 68 (2001), is misplaced for the same reason.  In that case, the Court accepted that a "gender-based classification" was subject to heightened scrutiny, but then held (at the second step of the analysis) that the law was justified based on physiological differences between men and women.  *Id.* at 60-61, 64.

[5]  As *Hecox* explained, that rule follows from this Court's decision in *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019), which held that a policy that "treats transgender persons differently than other persons" must be evaluated according to "a standard of review that is more than rational basis but less than strict scrutiny."  *Id.* at 1201.

1-ER-45-46. "[A] quick skim" of the statute shows that HB 71—by definition—draws lines based on gender identity. 1-ER-46. In particular, the prohibitions on medical care in paragraph (3) apply only when "the purpose" of a medical treatment is "to alter the appearance of or affirm the child's perception of the child's sex *if that perception is inconsistent with the child's biological sex*." Idaho Code § 18-1506C(3) (emphasis added). And HB 71 defines "[s]ex" to mean "immutable biological and physiological characteristics" that are "genetically determined at conception and generally recognizable at birth" and "define an individual as male or female." *Id.* § 18-1506C(2)(b). Reading these provisions together, the prohibitions in HB 71 apply *only* to individuals who are transgender, *i.e.*, those who "have a gender identity that does not align with their birth sex." 1-ER-22. Even though HB 71 does not use the word "transgender," its provisions are carefully circumscribed to target transgender individuals exclusively.

This Court has already rejected Idaho's argument that drafting statutes using this kind of wordplay somehow insulates the State's laws from equal-protection scrutiny. In *Hecox*, the Court held that the "use of 'biological sex'" in Idaho's transgender athletics law "functions as a form of proxy discrimination." 79 F.4th at 1024 (internal quotation marks and citation omitted). Where, as here, a statutory definition "is written with seemingly neutral criteria that are so closely associated with the disfavored group," the law's "discrimination on the basis of such criteria

- 21 -

is, constructively, facial discrimination against the disfavored group." *Ibid.* (internal quotation marks and citations omitted). Just as "[a] tax on wearing yarmulkes is a tax on Jews," *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993), and "discriminating against individuals with gray hair is a proxy for age discrimination," *Davis v. Guam*, 932 F.3d 822, 837-838 (9th Cir. 2019), the "specific classification of 'biological sex'" in HB 71 similarly "target[s] transgender [individuals]." *Hecox*, 79 F.4th at 1024-1025.

### 3. Heightened scrutiny is consistent with the proper role of courts applying the Equal Protection Clause.

Defendant seeks to avoid constitutional scrutiny by asserting that "debates" about gender-affirming medical care fall outside the purview of the Equal Protection Clause, and should be resolved exclusively by "the democratic process" without judicial review. Br. 19-20; *see also* Br. 36 (asserting that states enjoy "wide discretion" in regulating medicine). But of course, the Equal Protection Clause is a *limit* on state power. While the Constitution presumes in most contexts "that even improvident decisions will eventually be rectified by the democratic process[]," that "general rule gives way" when a law or policy draws lines based on race, gender, or other suspect classifications. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). As our Nation's history makes clear, such distinctions are both pernicious and "unlikely to be soon rectified by legislative means." *Ibid.* When, as here, States differentiate based on suspect classifications,

the Equal Protection Clause gives courts not just the power but the duty to carefully scrutinize a law's proffered justifications.

**B.    The district court did not err in concluding that HB 71 is unlikely to survive heightened scrutiny.**

To satisfy heightened scrutiny, defendant bears the "demanding" burden of showing that "the challenged classification serves important governmental objectives" and is "substantially related to the achievement of those objectives." *VMI*, 518 U.S. at 533 (internal quotation marks and citation omitted).  This justification must be "exceedingly persuasive" and cannot "rely on overbroad generalizations."  *Ibid.*  Moreover, a "desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."  *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

Defendant insists that HB 71 is necessary "to protect children from experimental and dangerous medical procedures."  Br. 1.  But the record here shows—and the district court correctly found—that these treatments are neither experimental nor dangerous when administered in accordance with the prevailing standard of care.  Even if the evidence supported defendant's claims, HB 71 fails heightened scrutiny because it is not "substantially related" to the State's asserted interest in protecting the health and safety of transgender minors in Idaho. *VMI*, 518 U.S. at 533.

- 23 -

1.    **A strong medical consensus supports the use of puberty blockers and hormone therapies to treat gender dysphoria.**

Defendant attempts to justify HB 71 as necessary to "protect[] children" from medical interventions that are "unsettled" and "experimental."  Br. 32.  No one disputes that those are important government interests in the abstract.  But defendant's characterization of puberty blockers and hormone therapies as unsafe and unproven treatments for gender dysphoria is inconsistent with the record below.

Well-established medical organizations, including the World Professional Association for Transgender Health (WPATH) and the Endocrine Society, publish guidelines that provide a framework for treating gender dysphoria in adolescents based on the best available scientific evidence and clinical experience. 4-ER-877-878, 900-902.  Those guidelines endorse the use of puberty blockers and hormone therapies to treat gender dysphoria only after the onset of puberty and subject to rigorous conditions.  4-ER-879-881, 902-905.  Every major American medical organization, including the American Academy of Pediatrics and the American Medical Association, has recognized that using puberty blockers and gender-affirming hormones when clinically indicated is safe, effective, and medically necessary for adolescents diagnosed with gender dysphoria. 4-ER-901-902; Doc. 33-1.  Scientific research and decades of clinical experience

- 24 -

support the safety and efficacy of these treatments.  4-ER-881-883, 906-908;

5-ER-957-959; 1-SER-14, 16, 20-22.

On appeal, defendant contends that using puberty blockers and hormone

therapies to treat gender dysphoria in adolescents carries additional risks beyond

those that exist when such treatments are used in other contexts, and without any

proven benefits to transgender minors.  Br. 32-33.  But the district court made

contrary factual findings:  that "gender-affirming medical care improves the

wellbeing of some adolescents with gender dysphoria" and "raises risks

comparable to risks associated with other types of medical care families are free to

seek for minors."  1-ER-24-25.  Those findings of fact are far from clearly

erroneous; rather, they are solidly grounded in the record, including testimony by

well-qualified physicians who treat minors with gender dysphoria as well as an

expert academic.  *See* 4-ER-869-871, 899-900; 5-ER-955-957; 1-SER-5-11, 14-19.

For example, plaintiffs' expert Dr. Christine Brady detailed the "substantial

body of evidence" that "shows the efficacy of gender affirming medical care."

4-ER-881-882.  Another one of plaintiffs' experts, Dr. Kara Connelly, explained

that "[t]here is nothing unique about gender-affirming medical care that warrants

departing from the normal principles of medical decision-making for youth,"

according to which "parents make the decision after being informed of the risks,

benefits, and alternatives by physicians."  4-ER-908-912; *see also* 1-SER-14-17,

- 25 -

19-22 (addressing risks and benefits of puberty blockers and hormone therapy).

Dr. Connelly also noted that the medical and scientific evidence "show[ing] the

risks and benefits" of providing (or not providing) gender-affirming medical care

"is comparable in quantity and quality to evidence we have in support of many

other medical interventions." 4-ER-914. Defendant's laundry-list of arguments to

the contrary merely rehashes the same views that were offered and rejected below

(*see* 5-ER-1014-1017), and in any event fall far short of showing that the district

court's factual findings were "illogical, implausible, or without support in

inferences that may be drawn from the facts in the record," *Pom Wonderful*, 775

F.3d at 1123.[6]

    Nor was the district court required to "defer" to the State's one-sided

characterization of the evidence. Br. 36. As this Court has explained, the

"deference" owed to "judgments of legislative bodies" does not insulate them

---

[6] Defendant points out that these treatments have not been approved by the U.S. Food and Drug Administration (FDA) to treat gender dysphoria. Br. 33. But the FDA does not *sua sponte* engage in a review of all drugs for all potential uses, and a particular use may lack FDA approval for reasons entirely unrelated to a medication's safety and efficacy. *See* 21 U.S.C. 355; 21 C.F.R. Pt. 314 (outlining process to request FDA approval for a particular use). As plaintiffs' experts explained, using medications for indications that have not received FDA approval—known as "off-label use"—is "legal, ethical, and common," and "a widely accepted practice in medicine." 4-ER-914-915; 1-SER-21-22. "The fact that the FDA has not approved puberty blockers, testosterone, or estrogen specifically for the treatment of gender dysphoria does not mean that the treatment is experimental or unproven." 4-ER-914.

"from meaningful judicial review altogether," and "unsubstantiated concern[s]" are "insufficient." *Hecox*, 79 F.4th at 1032 (internal quotation marks and citation omitted).

### 2. HB 71 is not substantially related to achieving Idaho's asserted interests.

Even if the record supported the State's safety concerns, HB 71 is not "substantially related" to addressing them. *VMI*, 518 U.S. at 533. The district court properly found that HB 71 is both underinclusive (by allowing non-transgender minors to access the very same treatments that are denied to their transgender peers) and overinclusive (by criminalizing the provision of puberty blockers and hormone therapies to treat gender dysphoria in any and all circumstances). 1-ER-50-54. Both of these flaws show why HB 71 does not satisfy "the close means-end fit required to survive heightened scrutiny." *Sessions v. Morales-Santana*, 582 U.S. 47, 68 (2017).

### a. HB 71 is underinclusive.

HB 71 is underinclusive in addressing the State's asserted concerns about the use of puberty blockers and hormone therapies because the statute expressly permits the same procedures to treat conditions other than gender dysphoria. *See* pp. 11-13, 18-19, *supra*.

As plaintiffs' experts explained, puberty blockers have been used for decades to treat central precocious puberty, as well as (among other things)

- 27 -

endometriosis, ovarian cancer, and idiopathic short stature in youth.
4-ER-908-909. Hormone therapies are similarly used to treat a range of conditions
other than gender dysphoria, including Turner syndrome, ovarian failure, and
Klinefelter syndrome. 4-ER-909. In these situations, the risks "are the same for
youth receiving treatment for gender dysphoria as those being treated for . . . other
conditions." 4-ER-910; *see also* 1-SER-14-16.

To the extent defendant is concerned about fertility (Br. 32-34), plaintiffs'
expert explained that using puberty blockers "has no permanent impact on
fertility." 4-ER-910. While gender-affirming hormones "may have an impact on
future fertility potential," that is not universal. 4-ER-911; 1-SER-17. In addition,
"treatment can be tailored to minimize that risk," and "there are options for fertility
preservation." 4-ER-911. And, of course, patients and their parents are informed
of any potential fertility-related risks before consenting to such treatments, so they
can decide for themselves whether the risks outweigh the benefits of the care.
4-ER-906, 911-912; 1-SER-17.

Despite the similar risk profiles of these various treatments, HB 71 makes it
a felony to prescribe puberty blockers and hormone therapies for the purpose of
treating gender dysphoria, but permits those same treatments to be administered for
other purposes. "[R]ather than targeting the treatments themselves," the district
court explained, HB 71 "allows the same treatments for cisgender minors that are

- 28 -

deemed unsafe and thus banned for transgender minors." 1-ER-50. This differential treatment runs headlong into the "close means-end fit" that heightened scrutiny requires. *Morales-Santana*, 582 U.S. at 68.

### b.    HB 71 is overinclusive.

At the same time, HB 71 is also overinclusive. As the district court explained, HB 71 sweeps too broadly to satisfy heightened scrutiny because "the means (a total prohibition on gender-affirming medical care) is not closely fitted with the ends (protecting children)." 1-ER-52. The categorical nature of this *criminal* prohibition on puberty blockers and hormone therapies to treat gender dysphoria—in the interest of protecting children's health—raises at least two problems.

1. First, instead of addressing purported safety concerns with specific treatments or particular situations, HB 71 criminalizes *all* gender-affirming medical care for *all* transgender minors under *all* circumstances. Idaho Code § 18-1506C(3) and (4). Policies like HB 71 that "classify unnecessarily and overbroadly by gender" are inconsistent with the Fourteenth Amendment "when more accurate and impartial lines can be drawn." *Hecox*, 79 F.4th at 1033. For example, a more narrowly tailored approach to address defendant's asserted concerns might include adopting reasonable limits on how puberty blockers or hormone therapies may be used, to ensure that those treatments align with best

- 29 -

practices consistent with guidelines developed by organizations like WPATH and the Endocrine Society. Here, as in *Hecox*, "the total lack of means-end fit" apparent in HB 71 "demonstrates that the [law] likely does not survive heightened scrutiny." 79 F.4th at 1033.[7]

2. Second, the district court found that "HB 71 undermines, rather than serves, the asserted goal of protecting children." 1-ER-51-52. That is because "gender-affirming medical care delivered in accordance with WPATH and Endocrine Society guidelines is helpful and necessary for some adolescents," while "withholding such care is harmful." 1-ER-51. As plaintiffs' experts explained, denying care to gender dysphoric youth under HB 71 will have devastating effects, including "increased rates of depression, anxiety, suicidal ideation, and hospitalizations for suicide attempts." 4-ER-915-919; *see also* 4-ER-876-877, 883-884, 906-908, 915-919; 5-ER-986; 1-SER-10. Though defendant claims that HB 71 is motivated by the State's interest in "[s]afeguarding the physical and

---

[7] Defendant argues that some countries have adopted restrictions on gender-affirming medical care for adolescents. Br. 10-11, 35-36. But, as the district court observed, none of these countries have imposed a sweeping, criminal prohibition like the one here. 1-ER-52-53. "Rather," plaintiffs' expert explained, these countries "have made changes to *the way in which* gender-affirming care is being delivered," such as "moving care to research settings where more data can be collected." 5-ER-968-969 (emphasis added); *see also* 4-ER-902 (explaining that, even where changes have been made, "care is provided when deemed appropriate for adolescents"). If anything, these incremental policy changes highlight the overbreadth and complete lack of tailoring in HB 71.

psychological well-being of minors" (Br. 31), the factual record shows that the law

will do just the opposite. *Accord Hecox*, 79 F.4th at 1028 (rejecting law under

heightened scrutiny where "means" of regulation "[we]re not substantially related

to, and in fact undermine[d]" state's "asserted objectives"). The district court did

not clearly err in finding that HB 71 flunks heightened scrutiny for this reason as

well.

**CONCLUSION**

For the foregoing reasons, this Court should affirm the district court's

determination that plaintiffs-appellees are likely to succeed on the merits of their

claim that HB 71 violates the Equal Protection Clause.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Jessica Merry Samuels
ELIZABETH PARR HECKER
JESSICA MERRY SAMUELS
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-9337

Date:  March 12, 2024

- 31 -

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**   24-142

I am the attorney or self-represented party.

**This brief contains**   6,951   **words,** including   0   words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   s/ Jessica Merry Samuels   **Date**   3/12/2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*