No. 24-142

# In The United States Court of Appeals for the Ninth Circuit

PAM POE, by and through her parents and next friends PENNY and PETER POE, PENNY POE; PETER POE; JANE DOE, by and through her parents and next friends, JOAN and JOHN DOE; JOAN DOE; JOHN DOE,

*Plaintiffs-Appellees*,

v.

RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho,

*Defendant-Appellant*,

JAN M. BENNETTS, in her official capacity as County Prosecuting Attorney for Ada, Idaho, et al.,

*Defendants*.

On Appeal from the United States District Court for the District of Idaho, No. 1:23-cv-00269-BLW

**Brief of Lambda Legal Defense and Education Fund, Inc. and 10 Other LGBTQ Rights Organizations as *Amici Curiae* in Support of Plaintiffs-Appellees and Affirmance**

Karen L. Loewy
LAMBDA LEGAL DEFENSE AND
  EDUCATION FUND, INC.
111 K Street, N.E., 7th Floor
Washington, DC 20002
(202) 804-6245

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
  EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel of record for *amici curiae* certifies that Lambda Legal Defense and Education Fund, Inc., Equality California, Family Equality, Gender Justice League, GLBTQ Legal Advocates & Defenders, Human Rights Campaign Foundation, National Center for Lesbian Rights, National LGBTQ Task Force, PFLAG, Inc., and Transgender Law Center have no parent corporations and do not issue stock. Counsel of record *amici* further certifies that Silver State Equality is a program affiliate of Equality California and does not issue stock. This representation is made in order so that the judges of this Court may evaluate possible disqualification or recusal.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................2

TABLE OF CONTENTS...................................................................................3

TABLE OF AUTHORITIES ..............................................................................4

INTERESTS OF *AMICI CURIAE* ....................................................................1

INTRODUCTION ...........................................................................................4

ARGUMENT ..................................................................................................5

   I. Idaho's Ban is subject to heightened scrutiny because it discriminates based on sex. ...............................................................................................5

     A.  The Ban facially classifies based on sex. ....................................6

     B.  The Ban discriminates based on sex stereotypes. ........................8

     C.  The Ban classifies based on sex because it discriminates based on gender transition. ...............................................................................10

     D.  The Ban classifies based on sex because it discriminates based on transgender status.............................................................................11

   II.  The Ban is also independently subject to heightened scrutiny because it classifies based on transgender status.................................................13

   III. Neither *Geduldig* nor *Dobbs* foreclose the application of heightened scrutiny to the Ban. ...................................................................................13

   IV. The Ban is subject to strict scrutiny because it interferes with the fundamental right of parents to seek medical care for their children, following the advice of medical professionals....................................................20

   IV. The Ban cannot be justified based on Idaho's purported interest in protecting minors. .................................................................................................25

CONCLUSION.............................................................................................28

CERTIFICATE OF COMPLIANCE..................................................................29

CERTIFICATE OF SERVICE .........................................................................30

# TABLE OF AUTHORITIES

## Cases

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ............................................... 6, 8, 11

*Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610 (1986) ..................................................... 21

*Boyden v. Conlin*, 341 F.Supp.3d 979 (W.D. Wisc. 2018) ........................................ 8

*Brandt by & through Brandt v. Rutledge*, 47 F.4th 661 (8th Cir. 2022) .......... 13, 27

*Brandt v. Rutledge*, No. 4:21-CV-00450-JM,
   2023 WL 4073727 (E.D. Ark. June 20, 2023) .................................................... 27

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ......................... 17

*C.P. v. Blue Cross Blue Shield of Illinois*, No. 3:20-cv-06145-RJB,
   2022 WL 17788148 (W.D. Wash. Dec. 19, 2022) .......................................... 3, 12

*Castaneda v. Partida*, 430 U.S. 482 (1977) ........................................................... 17

*Christian Legal Soc'y Chapter of the Univ. of California,*
   *Hastings Coll. of the L. v. Martinez*, 561 U.S. 661 (2010) ........................... 16-17

*Davis v. Guam*, 932 F.3d 822 (9th Cir. 2019) ........................................................ 17

*Dekker v. Weida*, No. 4:22-cv-325-RH-MAF,
   2023 WL 4102243 (N.D. Fla. June 21, 2023) ........................................... *passim*

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ....... 13, 14, 15, 20

*Doe v. Ladapo*, No. 4:23-cv-114-RH-MAF,
   2023 WL 3833848 (N.D. Fla. June 6, 2023) ........................................................ 3

*Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019) ................................ 11, 26, 28

*Eknes-Tucker v. Marshall*, 603 F.Supp.3d 1131 (M.D. Ala. 2022), *vacated*,
   80 F.4th 1205 (11th Cir. 2023), *pet. for reh'g en banc pending* ........................... 3

*Equal Emp. Opportunity Comm'n v. R.G. & G.R. Harris Funeral Homes, Inc.*,
   884 F.3d 560 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020) ............................................................................ 6, 8, 9, 10

*Evancho v. Pine–Richland Sch. Dist.*, 237 F.Supp.3d 267 (W.D. Pa. 2017) .......... 13

*Fabian v. Hosp. of Cent. Conn.*, 172 F.Supp.3d 509 (D. Conn. 2016) ................... 10

*Fain v. Crouch*, 618 F.Supp.3d 313 (S.D.W. Va. 2022) ......................................... 12

*Flack v. Wis. Dep't of Health Servs.*, 328 F.Supp.3d 931 (W.D. Wis. 2018) .. 12, 13

*Fletcher v. Alaska*, 443 F.Supp.3d 1024 (D. Alaska 2020) ......................................8

*Geduldig v. Aiello*, 417 U.S. 484 (1974) ........................................ 13, 14, 15, 16, 18

*Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) ......................................... 5, 9, 16

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020),
  *as amended* (Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878 (2021) ........ 6, 8, 9, 13

*Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993) ...................................................17

*Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023) ...............................................*passim*

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v.
  Johnson Controls, Inc.*, 499 U.S. 187 (1991) .......................................................16

*Kadel v. Folwell*, 446 F.Supp.3d 1 (M.D.N.C. 2020)..................................................9

*Kadel v. Folwell*, 620 F.Supp.3d 339 (M.D.N.C. 2022).......................3, 6-7, 26, 28

*Kadel v. Folwell*, No. 1:19-CV-272,
  2022 WL 11166311 (M.D.N.C. Oct. 19, 2022)...................................................12

*Kadel v. N. Carolina State Health Plan for Tchrs. & State Emps.*,
  12 F.4th 422 (4th Cir. 2021), as amended (Dec. 2, 2021) ...................................27

*Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) ................................................13

*Koe v. Noggle*, No. 1:23-CV-2904-SEG,
  2023 WL 5339281 (N.D. Ga. Aug. 20, 2023) ......................................................2

*L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023) ...................... 15, 22

*Lawrence v. Texas,* 539 U.S. 558 (2003)...............................................................17

*Loe v. Texas*, No. D-1-GN-23-003616
  (Travis Cnty. Dist. Ct., Tex. Aug. 25, 2023) ........................................................2

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038 (2021).......20

*McWright v. Alexander*, 982 F.2d 222 (7th Cir. 1992)............................................17

*Meyer v. Nebraska,* 262 U.S. 390 (1923) ...............................................................20

*Obergefell v. Hodges*, 576 U.S. 644 (2015)............................................................22

*Pac. Shores Properties, LLC v. City of Newport Beach*,
  730 F.3d 1142 (9th Cir. 2013) ...................................................................... 17-18

*Palko v. Connecticut*, 302 U.S. 319 (1937) ...........................................................20

*Parham v. J.R.*, 442 U.S. 584 (1979) ................................................................. 21, 24

*Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979) ...................... 15, 19

*PFLAG, Inc. v. Abbott*, No. D-1-GN-22-002569,
    2022 WL 4549009 (Travis Cnty. Dist. Ct., Tex. Sep. 16, 2022) .......................... 3

*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), *abrogated by Nat'l Inst. of Fam.
    & Life Advocs. v. Becerra*, 585 U.S. 755 (2018) ........................................... 23, 24

*PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182 (10th Cir. 2010) .............................. 21

*S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021) ........... 25, 26

*Santosky v. Kramer*, 455 U.S. 745 (1982) ............................................................ 21

*Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945 (9th Cir. 2020) ...... 17

*Schroer v. Billington*, 577 F.Supp.2d 293 (D.D.C. 2008) ...................................... 10

*Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000) .............................................. 9

*Sullivan v. Vallejo City Unified Sch. Dist.*, 731 F.Supp. 947 (E.D. Cal. 1990) ....... 17

*Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022),
    *cert. denied*, 144 S. Ct. 33 (2023) ................................................................ 14, 24

*Toomey v. Arizona*, No. CV-19-00035-TUC-RM (LAB),
    2019 WL 7172144 (D. Ariz. Dec. 23, 2019) ................................................... 9, 12

*Treistman ex rel. AT v. Greene*, 754 F.App'x 44 (2d Cir. 2018) ............................ 20

*Troxel v. Granville*, 530 U.S. 57 (2000) ................................................................ 20

*United States v. Virginia*, 518 U.S. 515 (1996) ................................................... 5, 15

*van Emrik v. Chemung Cnty. Dep't of Soc. Servs.*,
    911 F.2d 863 (2d Cir. 1990) ......................................................................... 20-21

*Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000) ............................................. 20, 21

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ..................................... 20, 22, 25

*Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982) .................................. 7

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ............................................................................ 6

*Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022) ................................................ 18

*Zablocki v. Redhail*, 434 U.S. 374 (1978) ............................................................ 25

## Statutes

Fairness in Women's Sports Act, ch. 62, Idaho Code § 33.......................................19

Fed. R. App. P. 29(a)(2)...........................................................................3, 30

Fed. R. App. P. 32(a)(5)...................................................................................30

Fed. R. App. P. 32(a)(6)...................................................................................30

Fed. R. App. P. 32(a)(7)(B).............................................................................30

Fed. R. App. P. 32(g)(1) .................................................................................30

Idaho Code § 18-1506C(3) ....................................................................... 6, 9, 11

Idaho Code § 18-1506C(4)(a)..........................................................................23

Protecting the Privacy and Safety of Students in Public Schools,
    ch. 66, Idaho Code § 33 (2023) ...............................................................20

## Bills

H.B. 71, 67th Leg., First Reg. Sess. (Id. 2023)................................................ *passim*

## Documents Filed in Other Cases

Order, *Roe v. Critchfield*, No. 23-2807 (9th Cir. Oct. 26, 2023)............................19

## Other Authorities

ACLU, *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures*,
    https://www.aclu.org/legislative-attacks-on-lgbtq-rights-2023 (last visited Mar.
    7, 2024) ....................................................................................................19

Ileana Garnand, *'Young people are being harmed': the effect of anti-trans
    legislation*, Ctr. for Pub. Integrity (June 6, 2023),
    https://publicintegrity.org/inequality-poverty-opportunity/young-people-harmed-
    anti-trans-legislation/ ...............................................................................1

Movement Advancement Project, *Under Fire: Banning Medical Care and Legal
    Recognition for Transgender People* (Sept. 2023), https://www.mapresearch.org/
    file/MAP-2023-Under-Fire-Report-5.pdf...................................................19

Reva B. Siegel et al., *Equal Protection in* Dobbs *and Beyond: How States Protect
    Life Inside and Outside of the Abortion Context,* 43.1 Colum. J. Gender & L. 67
    (2023), https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=3954
    &context=faculty_scholarship .................................................................15

## INTERESTS OF *AMICI CURIAE*[1]

*Amici* are civil rights organizations committed to ensuring all people, including LGBTQ people, can live their lives free from discrimination. Through public education, policy advocacy, and/or impact litigation, *amici* have fought to eradicate gender-based discrimination and ensure the recognition of the rights of transgender young people and their families, including by eliminating the barriers to care that transgender young people face in our country. Because Idaho's HB71 threatens these interests, *amici* offer the Court their perspectives on the nature of the discrimination HB71 perpetrates.

Laws like HB71 cause significant harm for transgender youth, both through the grave consequences of withholding necessary, safe, and effective medical care for their physical and mental health, and through the negative impacts on their mental health and wellbeing from the stigmatization and dehumanization of laws targeting transgender people for differential and less favorable treatment. *See* Ileana Garnand, *'Young people are being harmed': the effect of anti-trans legislation*, Ctr. for Pub. Integrity (June 6, 2023), https://publicintegrity.org/inequality-poverty-opportunity/young-people-harmed-anti-trans-legislation/. As such, *amici* have a

---

[1] No party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money to fund preparing or submitting this brief. No person other than *amici*, their members, or their counsel made a monetary contribution to its preparation or submission.

strong interest in combating laws like HB71 to prevent the irreparable harms that transgender adolescents with gender dysphoria will experience.

*Amici* include:

- Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal");

- Equality California;

- Family Equality;

- Gender Justice League;

- GLBTQ Legal Advocates & Defenders ("GLAD");

- Human Rights Campaign Foundation ("HRC");

- National Center for Lesbian Rights ("NCLR");

- National LGBTQ Task Force;

- PFLAG, Inc.;

- Silver State Equality; and

- Transgender Law Center.

Some *Amici*, like Lambda Legal, GLAD, HRC, NCLR, and Transgender Law Center, have served as counsel of record in challenges to laws prohibiting the coverage or provision of gender-affirming medical care to transgender adolescents and adults. *See*, *e.g.*, *Loe v. Texas*, No. D-1-GN-23-003616 (Travis Cnty. Dist. Ct., Tex. Aug. 25, 2023); *Koe v. Noggle*, No. 1:23-CV-2904-SEG, 2023 WL 5339281 (N.D. Ga. Aug. 20, 2023); *Dekker v. Weida*, No. 4:22-cv-325-RH-MAF, 2023 WL

4102243 (N.D. Fla. June 21, 2023); *Doe v. Ladapo*, No. 4:23-cv-114-RH-MAF, 2023 WL 3833848 (N.D. Fla. June 6, 2023); *Eknes-Tucker v. Marshall*, 603 F.Supp.3d 1131 (M.D. Ala. 2022), *vacated*, 80 F.4th 1205 (11th Cir. 2023), *pet. for rehr'g en banc pending*; *C.P. v. Blue Cross Blue Shield of Illinois*, No. 3:20-cv-06145-RJB, 2022 WL 17788148 (W.D. Wash. Dec. 19, 2022); *Kadel v. Folwell*, 620 F.Supp.3d 339, 375 (M.D.N.C. 2022). Other *amici*, like PFLAG, have been organizational plaintiffs in such cases. *See*, *e.g.*, *Loe v. Texas*, *supra*; *PFLAG, Inc. v. Abbott*, No. D-1-GN-22-002569, 2022 WL 4549009 (Travis Cnty. Dist. Ct., Tex. Sep. 16, 2022).

And other *amici*, like Equality California, Family Equality, the National LGBTQ Task Force, PFLAG, and Silver State Equality, lead critical public education and policy advocacy efforts to safeguard the rights of LGBTQ people, including transgender youth.

*Amici* file this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2). All parties to this appeal consent to the filing of this brief.

3

## INTRODUCTION

Clinical experience and rigorous study have demonstrated that gender-affirming medical treatment[2] for a transgender person's gender dysphoria is safe and effective. This is true for adults and adolescents. Yet, in 2023, Idaho enacted H.B. 71 ("HB71" or "the Ban") to categorically prohibit this evidence-based and well-established medical treatment solely when provided to affirm a transgender minor's identity. Idaho went so far as to criminalize providing this treatment, punishable with up to 10 years' imprisonment, notwithstanding that doing so comports with established clinical practice guidelines.

In preliminarily enjoining HB71, the district court held, *inter alia*, that the Ban was subject to heightened scrutiny under the Equal Protection and Due Process Clauses of the Fourteenth Amendment and that Plaintiffs were likely to succeed on their Fourteenth Amendment claims. The district court's conclusions were correct. On appeal, the State argues that the district court erred in applying heightened scrutiny, notwithstanding this Court's precedents dictating otherwise.

*Amici* fully support the arguments made by Plaintiffs in their brief. *Amici* seek to provide the Court with additional guidance regarding the multiple reasons why the district court properly concluded that the Ban is subject to heightened

---

[2]     Gender-affirming medical treatment includes any medical care administered or prescribed for the treatment of gender dysphoria. This includes puberty-blocking medications, hormones, and surgeries, each of which HB71 bans.

scrutiny under the Fourteenth Amendment. *Amici* also provide additional information as to why HB71 cannot be justified by a purported motivation of protecting minors.

HB71 is but one of a rash of bills in Idaho and other states targeting LGBTQ people, and transgender people specifically, for discriminatory treatment. It is not, by any means, a standard health regulation. To the contrary, it was enacted along suspect lines and infringes upon the well-established fundamental right of parents to make medical decisions for their minor children in accordance with both the minor's interests and the clinical advice of a medical provider.

This Court should affirm the district court's decision and allow the injunction to remain in place.

## ARGUMENT

### I.    Idaho's Ban is subject to heightened scrutiny because it discriminates based on sex.

It is incontrovertible that "all gender-based classifications … warrant heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (1996) (quotation omitted). Here, HB71 is subject to heightened scrutiny because: (1) on its face, it classifies based on sex; (2) "[t]here is [] a congruence between discriminating against transgender … individuals and discrimination on the basis of gender-based [] norms," *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011); (3) "discrimination on the basis of … transitioning status is necessarily discrimination based on sex,"

*Equal Emp. Opportunity Comm'n v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 571 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020); and (4) any policy that treats transgender people differently "is inherently based upon a sex-classification," *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017).

### A. The Ban facially classifies based on sex.

The Ban prohibits healthcare professionals from providing to a transgender minor medical treatments "for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's *sex* if that perception is inconsistent with the child's biological *sex*," as defined by the statute. Idaho Code § 18-1506C(3) (emphasis added).[3] HB71's explicitly sex-based terms make plain that the discrimination at issue is based on sex. It simply "cannot be stated without referencing sex," *Whitaker*, 858 F.3d at 1051, and "[o]n that ground alone, heightened scrutiny should apply." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020), *as amended* (Aug. 28, 2020).

"A facial inquiry is what it sounds like: a review of the language of the policy to see whether it is facially neutral or deals in explicitly … gendered terms." *Kadel*

---

[3]      Throughout this brief, *amici* utilize the terms "sex assigned at birth" or "birth-assigned sex" in lieu of "biological sex." These terms are more precise than "biological sex" because the physiological aspects of a person's sex are not always aligned with each other. In referring to birth-assigned sex, some courts cited herein use the term "natal sex."

*v. Folwell*, 620 F.Supp.3d 339, 375 (M.D.N.C. 2022) (cleaned up) (citing *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 485 (1982)).  Here, there is no evading that the Ban deals in explicitly gendered terms.

The Ban's use of "gendered terms" is not just a matter of semantics, however; *it is central to how it operates*.  HB71 does not categorically prohibit certain medical procedures writ large; instead, whether a specific treatment is prohibited depends exclusively on whether the treatment is deemed consistent or inconsistent with the person's birth-assigned sex.  Cisgender adolescents may continue receiving these treatments, but transgender adolescents may not.  The difference is their birth-assigned sex.  And "[i]f one must know the sex of a person to know whether or how a provision applies to the person, the provision draws a line based on sex." *Dekker v. Weida*, 2023 WL 4102243, at *11 (N.D. Fla. June 21, 2023).  For example, "consider an adolescent … that a physician wishes to treat with testosterone.  To know the answer [to whether the care will be covered], one must know the adolescent's sex.  If the adolescent is a natal male, the treatment is covered.  If the adolescent is a natal female, the treatment is not covered." *Id.* at *12.  In other words, the Ban "penalizes" a person designated female at birth for the same "action[]" of seeking masculinizing medical treatment that it "tolerates" in persons designated

7

female at birth.  *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020);[4] *see also Fletcher v. Alaska*, 443 F.Supp.3d 1024, 1030 (D. Alaska 2020).

Stated differently, HB71's gendered terms do not simply describe the nature of the prohibited care, but *who* can have the care they need.  As the Supreme Court explained, if the legislature cannot "writ[e] out instructions" for determining whether treatment is covered "without using the words man, woman, or sex (or some synonym)," the law classifies based on sex.  *Bostock*, 590 U.S. at 668-69.

In sum, the Ban is a "straightforward" example of sex discrimination.  *Boyden v. Conlin*, 341 F.Supp.3d 979, 995 (W.D. Wisc. 2018)

### B.  The Ban discriminates based on sex stereotypes.

The Ban also unlawfully discriminates based on sex stereotypes.  "There is no way to disaggregate discrimination on the basis of transgender status from discrimination on the basis of gender non-conformity."  *Harris Funeral Homes*, 884 F.3d at 576–77.  "Indeed, '[m]any courts ... have held that various forms of discrimination against transgender individuals constitute sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes.'"  *Hecox*, 79 F.4th, at 1026 (quoting *Grimm*, 972 F.3d at 608); *see also*

---

[4]     This Court has already applied *Bostock*'s rationale in the equal protection context.  *See Hecox v. Little*, 79 F.4th 1009, 1026 (9th Cir. 2023).

8

*Glenn*, 663 F.3d at 1316 ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes."); *Schwenk v. Hartford*, 204 F.3d 1187, 1201–02 (9th Cir. 2000). "In so holding, these courts have recognized a central tenet of equal protection in sex discrimination cases: that states 'must not rely on overbroad generalizations' regarding the sexes." *Grimm*, 972 F.3d at 609 (quoting *Virginia*, 518 U.S. at 533).

Here, the Ban is based on stereotypes of how a person's physical characteristics should look vis-à-vis their birth-assigned sex. *See* Idaho Code § 18-1506C(3) (prohibiting medical treatment "for the purpose of attempting to *alter the appearance* of or affirm the child's perception of the child's sex if that perception *is inconsistent with the child's biological sex*") (emphasis added). Treatments are prohibited only when the resulting physical appearance fails to comport with what is expected for people assigned a particular sex at birth, thereby "tether[ing] [those adolescents] to sex stereotypes which, as a matter of medical necessity, they seek to reject". *Kadel v. Folwell*, 446 F.Supp.3d 1, 14 (M.D.N.C. 2020). Relying on "notions of how sexual organs and gender identity ought to align" is impermissible sex stereotyping. *Harris Funeral Homes*, 884 F.3d at 576; *see also Toomey v. Arizona*, No. CV-19-00035-TUC-RM (LAB), 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019). Discrimination based on sex "is not only discrimination because of maleness and discrimination because of femaleness," but also "discrimination

because of the properties or characteristics by which individuals may be classified as male or female." *Fabian v. Hosp. of Cent. Conn.*, 172 F.Supp.3d 509, 526 (D. Conn. 2016).

### C. The Ban classifies based on sex because it discriminates based on gender transition.

Moreover, as multiple courts have recognized, discrimination based on gender transition is necessarily discrimination based on sex. *See Harris Funeral Homes*, 884 F.3d at 575 ("discrimination 'because of sex' inherently includes discrimination against employees because of a change in their sex"); *Fabian*, 172 F.Supp.3d at 527; *Schroer v. Billington*, 577 F.Supp.2d 293, 306–07 (D.D.C. 2008).

Just as discrimination based on religious conversion is necessarily discrimination based on religion, discrimination based on gender transition is discrimination based on sex. For example, the district court in *Schroer* noted that firing an employee for transitioning was impermissible discrimination because of sex just as firing an employee because she converts from Christianity to Judaism "would be a clear case of discrimination 'because of religion.'" 577 F.Supp.2d at 306. Even if the employer "harbors no bias toward either Christians or Jews but only 'converts[,]' … [n]o court would take seriously the notion that 'converts' are not covered" by the statutory ban on religious discrimination. *Id.*; *accord Fabian*, 172 F.Supp.3d at 527. It remains that the person's approach to religion, or in this case, sex, lies at the heart of the discriminatory treatment.

The same analysis applies here. As such, the Ban discriminates based on sex.

### D. The Ban classifies based on sex because it discriminates based on transgender status.

Finally, there can be no doubt that classifications based on transgender status are necessarily sex-based classifications. This Court declared as much when it held that "discrimination on the basis of transgender status is a form of sex-based discrimination." *Hecox*, 79 F.4th at 1026; *see also Bostock*, 590 U.S. at 1741.

It is of no consequence that HB71 does not explicitly mention the word "transgender." For one, the treatments HB71 prohibits go to the core of what it means to be transgender, barring care provided to "affirm the child's *perception of the child's sex* if that perception is *inconsistent with the child's biological sex*." Idaho Code § 18-1506C(3). A transgender person is a person who has "a gender identity—a deeply felt, inherent sense of their gender—that does not align with their sex assigned at birth." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 768 (9th Cir. 2019); *see also Hecox*, 79 F.4th at 1016. Excluding treatments only when they intend to bring about alignment between a person's gender identity and their body targets transgender people. The State cannot evade this simple truth through linguistic acrobatics. Def's Br. 27, ECF No. 25 (arguing HB71 "does not even mention 'transgender' status"). The Ban's "specific classification" "has [] been carefully drawn to target" transgender minors, "even if it does not use the word 'transgender.'" *Hecox*, 79 F.4th at 1025.

11

For another, the Ban prohibits treatment that *only* transgender people would seek, i.e., treatment that affirms a gender identity inconsistent with one's birth-assigned sex, or gender-affirming medical care. As the court in *Toomey* explained, "transgender individuals are the only people who would ever seek [gender-affirming medical care]." 2019 WL 7172144, at *6; *see also Fain v. Crouch*, 618 F.Supp.3d 313, 327 (S.D.W. Va. 2022); *Flack v. Wis. Dep't of Health Servs.*, 328 F.Supp.3d 931, 950 (W.D. Wis. 2018). As such, the Ban "singles out transgender individuals for different treatment." *Id*. The State splits hairs in arguing otherwise.

The State spends significant ink arguing that HB71 simply regulates medical care on lines drawn based on a medical condition (gender dysphoria) and not on sex or transgender status. But HB71 makes no mention of "gender dysphoria." And in any event, a person cannot suffer from gender dysphoria without being transgender. *See Fain*, 618 F.Supp.3d at 325; *C.P. v. Blue Cross Blue Shield of Illinois*, No. 3:20-cv-06145-RJB, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022); *Kadel v. Folwell*, No. 1:19-CV-272, 2022 WL 11166311, at *4 (M.D.N.C. Oct. 19, 2022).

\*     \*     \*

In sum, HB71 classifies based on sex and the district court did not err in subjecting it to heightened scrutiny.

## II.    The Ban is also independently subject to heightened scrutiny because it classifies based on transgender status.

The district court correctly determined that heightened scrutiny also independently applies to HB71 because it discriminates based on transgender status, reasoning that such discrimination is based on at least a quasi-suspect classification. This Court already "held that heightened scrutiny applies to laws that discriminate on the basis of transgender status, reasoning that gender identity is at least a ''quasi-suspect class.''" *Hecox*, 79 F.4th at 1026 (quoting *Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019)).

This Court is not alone in that regard. *See*, *e.g.*, *Grimm*, 972 F.3d at 610; *Flack*, 328 F.Supp.3d at 952–53; *Evancho v. Pine–Richland Sch. Dist.*, 237 F.Supp.3d 267, 288 (W.D. Pa. 2017); *cf. Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 670 n.4 (8th Cir. 2022).

As explained in Section I.D, *supra*, the Ban classifies based on transgender status, providing an additional basis for subjecting it to heightened scrutiny.

## III.    Neither *Geduldig* nor *Dobbs* foreclose the application of heightened scrutiny to the Ban.

The State relies on *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974), as cited in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2235 (2022),[5] to argue

---

[5]     *Dobbs* did not create new equal-protection law; it simply cited *Geduldig* in dicta, erroneously suggesting that the particular law at issue did not facially discriminate based on sex. *See infra*.

13

it does not matter that the Ban prohibits treatment only transgender people need or seek, because HB71 regulates medical procedures, not people.[6]   But neither *Geduldig* nor *Dobbs* assist the State.  The statement in these cases "about procedures only one sex can undergo is simply inapplicable."  *Dekker*, 2023 WL 4102243, at *13.

Those cases involved laws that restricted abortion (*Dobbs*) and barred coverage for certain pregnancy-related disabilities (*Geduldig*), concluding that neither of these laws involved facial sex classifications.  But the statement in *Dobbs* was dictum[7] and there are strong arguments that *Geduldig*—which predates the Supreme  Court's  decision  to  apply  heightened  scrutiny  to  sex-based

---

[6]     The State repeatedly argues that this Court found that laws that regulate health care services involving gender dysphoria pass constitutional muster in *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022), *cert. denied*, 144 S. Ct. 33 (2023).  Not so. Indeed, *Tingley* is wholly inapposite.  *Tingley* involved Washington's prohibition of conversion therapy on minors, a practice opposed by "every major medical, psychiatric, psychological, and professional mental health organization."  *Id.* at 1064.  The statute at issue made no mention of gender dysphoria.  Moreover, *Tingley* did not involve nor address an equal protection challenge.  Rather, the plaintiff in *Tingley* unsuccessfully challenged the law under the First Amendment and vagueness under the Fourteenth Amendment.  As the Court noted in *Tingley*, "we still trust doctors, and the professional organizations representing them, to treat our ailments and update their recommendations on the governing standard of care."  *Id.* at 1081.  In enacting HB71, Idaho has done the opposite.

[7]     There was no equal protection claim active in the case.  The plaintiffs amended their complaint years prior to drop their equal protection claim.  *See Jackson Women's Health Org. v. Currier*, 349 F.Supp.3d 536, 538 (S.D. Miss. 2018).

14

classifications—is inconsistent with subsequent case law, including *United States v. Virginia*, 518 U.S. 515 (1996).[8]

Even if *Dobbs* and *Geduldig* accurately characterized the laws they assessed, however, both cases are inapposite here. Equal protection jurisprudence has long distinguished between sex-neutral classifications (which trigger heightened scrutiny only when passed, at least in part, for a discriminatory purpose) and facial sex classifications (which always trigger heightened scrutiny). *See Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 273–74 (1979). In *Dobbs* and in *Geduldig*, the Court reasoned (incorrectly) the laws at issue did not facially discriminate. *See Geduldig*, 417 U.S. at 489–90; *Dobbs*, 142 S. Ct. at 2246. As noted here, however, the Ban *facially* classifies based on sex, requiring that in each instance a person's sex be known and used to determine whether treatment is covered. *See* Section I.A, *supra*; *see also L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 502 (6th Cir. 2023) (White, J., dissenting) (noting laws like HB71 differ from the plan in *Geduldig* because they "expressly reference a minor's sex and gender conformity—and use these factors to determine the legality of procedures"). And the Ban *facially* classifies based on transgender status, and therefore sex. *See* Sections I.D and II,

---

[8]        *See* Reva B. Siegel et al., *Equal Protection in* Dobbs *and Beyond: How States Protect Life Inside and Outside of the Abortion Context,* 43.1 Colum. J. Gender & L. 67, 68-69 (2023), https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=3954&context=faculty_scholarship.

*supra*.  Further, as Plaintiffs point out, *Dobbs* did not overrule *Virginia*'s command that all sex classifications warrant heightened scrutiny.  By conflating the purported disparate impact at issue in *Geduldig/Dobbs* with the facial classification at issue in this case, the State ignores that fundamental distinction.

What is more, the centrality of gender transition to transgender identity further distinguishes this case from *Geduldig*.  Unlike the pregnancy exclusion in *Geduldig*, HB71 is based on a characteristic that defines membership in the excluded group.  Living in accord with one's gender identity rather than birth-assigned sex, which the excluded care enables, is the defining characteristic of a transgender person.  *See*, *e.g.*, *Glenn*, 663 F.3d at 1316.  The Ban's targeting of the defining characteristic of being transgender is a proxy for targeting transgender people.[9]

This type of proxy discrimination—where a law targets an activity, conduct, or trait so closely aligned with a class of people—has long been recognized as involving an intent to disfavor that class.  The Supreme Court has "declined to distinguish between status and conduct" in analogous contexts.  *Christian Legal Soc'y Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561

---

[9]      To be sure, proxy discrimination does not require that a characteristic define membership in an excluded group.  And the capacity for pregnancy has long been used to stereotype and marginalize women.  *See*, *e.g.*, *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 197–98 (1991).  Here, however, the discrimination is based on the defining characteristic of being transgender, making the *Geduldig/Dobbs* reasoning more inapposite.

U.S. 661, 689 (2010) (holding that exclusion of same-sex intimacy is an exclusion of lesbian, gay, and bisexual people); *see also Lawrence v. Texas,* 539 U.S. 558, 583 (2003) (O'Connor, J., concurring) (same). Examples abound in which courts have found that a "proxy's fit is sufficiently close to make a discriminatory inference plausible." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 959 (9th Cir. 2020) (quotation omitted). *See*, *e.g.*, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews."); *Davis v. Guam*, 932 F.3d 822, 838 (9th Cir. 2019) (ancestral classifications may be a proxy for race); *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992) (gray hair is a proxy for age discrimination); *Sullivan v. Vallejo City Unified Sch. Dist.*, 731 F.Supp. 947, 958 (E.D. Cal. 1990) (policy excluding service dogs is a policy excluding disabled people); *cf. Hazen Paper Co. v. Biggins*, 507 U.S. 604, 613 (1993); *Castaneda v. Partida*, 430 U.S. 482, 495 (1977).

That all members of the class may not share the particular trait or activity does not alter the calculus. It is extent of the association of the trait or activity with the class that gives rise to the inference of animus, not any notion that all members of the class share the trait or engage in activity. As the Supreme Court stated in *Bray*, it is the fact that an activity "happen[s] to be engaged in exclusively or predominantly by a particular class of people" that allows "an intent to disfavor that class" to "readily be presumed." 506 U.S. at 271; *see also Pac. Shores Properties,*

17

*LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013) (proxy discrimination involves discrimination based on "criteria that are almost exclusively indicators of membership in the disfavored group" and that close association makes discrimination based on such criteria "constructively, facial discrimination against the disfavored group."). Thus, laws singling out gender transition or gender-affirming care for differential treatment should be understood as treating transgender people differently "as a class," *Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022), because of the reality that all people who have gender dysphoria or undergo gender transition are transgender, regardless of whether all transgender people experience gender dysphoria.

In addition, the inference of animus stemming from the Ban's proxy discrimination comports with *Geduldig*'s recognition that where, as here, distinctions are "mere pretexts designed to effect an invidious discrimination against the members of one [protected class] or the other," such distinctions are unconstitutional. *Geduldig*, 417 U.S. at 496 n.20. The Ban is plain: treatment is prohibited only for the purpose of affirming a transgender minor's identity. That is enough to show pretext. *See Hecox*, 79 F.4th at 1025. But beyond that inference, the intent to treat transgender persons differently pervades HB71's history and context and showcases its discriminatory purpose.

18

HB71 is but one of a whole battery of legislative acts in Idaho and throughout some parts of the country to target transgender people for discriminatory treatment. "[T]hese attacks are part of a much larger, coordinated effort to erase transgender people entirely."[10]   For example, in 2020, Idaho adopted HB500 prohibiting transgender women and girls' participation in any public-school funded women's sports.  *See Hecox*, 79 F.4th 1009.  And in 2023, on top of HB71, Idaho adopted SB1100, prohibiting access to restrooms by transgender people.  *See* Order, *Roe v. Critchfield*, No. 23-2807 (9th Cir. Oct. 26, 2023).  Nationwide, in 2023, over 500 anti-LGBTQ laws were proposed in state legislatures, and 84 of them become law.[11]  These laws were adopted "because of," not "in spite of," their adverse effects on transgender people's ability to live in accordance with their gender identity.  *Feeney*, 442 U.S. at 279.

Simply put, that HB71 regulates medical procedures does not insulate it from heightened scrutiny.

---

[10]     Movement Advancement Project, *Under Fire: Banning Medical Care and Legal Recognition for Transgender People* (Sept. 2023), https://www.mapresearch.org/file/MAP-2023-Under-Fire-Report-5.pdf.

[11]     ACLU, *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures*, https://www.aclu.org/legislative-attacks-on-lgbtq-rights-2023 (Mar. 7, 2024).

19

**IV.  The Ban is subject to strict scrutiny because it interferes with the fundamental right of parents to seek medical care for their children, following the advice of medical professionals.**

For over a century, the Supreme Court has consistently held that fundamental parental rights include the right to "establish a home and bring up children." *Meyer v. Nebraska,* 262 U.S. 390, 399 (1923); *see also Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2053 (2021) (Alito, J., concurring).  These rights are "deeply rooted in [our] history and tradition" and are "essential to our Nation's scheme of ordered liberty." *Dobbs*, 142 S. Ct. at 2246; *see Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997).  Indeed, "the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  In other words, the primacy of parents over the State in child-rearing decisions is a "principle of justice so rooted in the tradition and conscience of our people as to be ranked as fundamental." *Palko v. Connecticut*, 302 U.S. 319, 325 (1937) (citation omitted).

This fundamental liberty interest includes "the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000); *see also Treistman ex rel. AT v. Greene*, 754 F.App'x 44, 47 (2d Cir. 2018) ("[P]arents have a right to determine the medical care their

20

children receive and the government's interference in that right can violate due process." (citing *van Emrik v. Chemung Cnty. Dep't of Soc. Servs.*, 911 F.2d 863, 867 (2d Cir. 1990))); *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1197 (10th Cir. 2010) ("[A] parent's general right to make decisions concerning the care of her child includes, to some extent, a more specific right to make decisions about the child's medical care.").

In fact, in *Parham v. J.R.*, 442 U.S. 584 (1979), the Supreme Court expressly held that parents "retain plenary authority to seek [medical] care for their children, subject to a physician's independent examination and medical judgment," and "the fact that the decision of a parent … involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Id.* at 603-04. On the contrary, "[a]s long as parents choose from professionally accepted treatment options the choice is rarely reviewed in court and even less frequently supervened." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 628 n.13 (1986).

These parental rights, like any other fundamental right, are not absolute. But when the parent's and child's interests in pursuing an established course of medical care align, the strength of those interests is at its apex against state interference. *Cf. Santosky v. Kramer*, 455 U.S. 745, 760 (1982) (heightened evidentiary standards required where the "vital interest" of the parent and child in preserving their relationship "coincide"); *Wallis*, 202 F.3d at 1141. Indeed, here, the parents, their

21

adolescent children, and their doctors all *agree* that the banned care is necessary for the minor plaintiffs to grow and thrive.

In response, the State argues that the Fourteenth Amendment does not extend protection "to the choice of type of treatment or of a particular health care provider." Def's Br. at 36-37. But the State's focus on specific treatments asks the wrong question:

> [T]he issue is not the *what* of medical decision-making—that is, any right to a *particular* treatment or a *particular* provider. Rather, the issue is the *who*—who gets to decide whether a treatment otherwise available to an adult is right or wrong for a child? Do parents have the right to make that call, or does the government get to decide for itself, notwithstanding the parents' determinations of what is in their children's best interests?

*L.W.*, 83 F.4th at 510 (White, J., dissenting). *Glucksberg*'s instruction that rights must be carefully described in determining whether they are fundamental, 521 U.S. at 721, does not require limiting the scope of existing rights to the specific facts of the case. *Glucksberg* itself defines the parental autonomy right broadly as the right "to direct the education and upbringing of one's children." *Glucksberg*, 521 U.S. 702, 720 (1997); *see also Obergefell v. Hodges*, 576 U.S. 644, 671 (2015) (assessing an established fundamental right requires examining it "in its comprehensive sense"). The State's attempt to narrow the scope of the parental right ignores this clear jurisprudence.

Moreover, none of the cases the State cited actually help their argument. In each, the medical services at issue were prohibited for *everyone*. Such is not the case here. The Ban does not prohibit a medical service or procedure writ large. To the contrary, HB71 explicitly states that medical interventions are not prohibited when "[n]ecessary to the health of the person on whom it is performed and is performed by a person licensed in the place of its performance as a medical practitioner." Idaho Code § 18-1506C(4)(a). Instead, it creates an explicit "except[ion] that a surgical operation or medical intervention is never necessary to the health of the child on whom it is performed if it is for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." *Id.* In other words, other minors may be provided the very same medical treatments and services at issue. And what is more, "Idaho … does not prohibit medicalized transition in adults." Def's Br. at 28.

Similarly, the State errs in relying on *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), *abrogated by Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018), to argue that no fundamental parental right is implicated here. Indeed, the district court correctly found that *Pickup* was inapposite. *Pickup* stands for the unremarkable principle that parents have no right to obtain care for their children that is actually harmful. That Court explicitly found that the law banning sexual

orientation change efforts was rooted in the "overwhelming consensus" of mainstream medical and mental health organizations that such efforts are "harmful and ineffective." *Id.* at 1231-32. Here, the opposite is true. As the district court concluded, HB71's interference with a parent's right to seek the established course of care for their children's medical condition—treatments that the parents, adolescents, and the "overwhelming consensus" of mainstream medical and mental health organizations agree are safe, effective, and in those children's best interests— implicates a fundamental right and warrants strict scrutiny.

To be sure, no one disputes that states may regulate the medical profession to protect the public from legitimately harmful medical practices that lack evidentiary bases. *See*, *e.g.*, *Tingley*, 47 F.4th at 1078. But a state may not ban parents from providing to their child treatments in accordance with both the child's interests and the medical establishment's consensus that they are safe and medically necessary and are otherwise available to adults and other minors. Such a ban violates parents' "right … [and] high duty, ... to recognize symptoms of illness and to seek and follow medical advice." *Parham*, 442 U.S. at 602.

As such, the district court appropriately held that the Ban infringed on Parent Plaintiffs' right to seek and follow medical advice to protect the health and wellbeing of their minor children. Because the Ban bars these parents from pursuing the medically necessary care their transgender adolescents with gender dysphoria need,

24

the district court correctly held that the Ban was subject to strict scrutiny. The Ban interferes directly and substantially with the rights of parents of transgender youth to direct their children's medical care and is therefore subject to strict scrutiny. *See Glucksberg*, 521 U.S. 702, at 721; *Zablocki v. Redhail*, 434 U.S. 374, 387–88 (1978).

## IV. The Ban cannot be justified based on Idaho's purported interest in protecting minors.

Under heightened and strict scrutiny, the State has the burden to justify HB71. As the district court found, it cannot do so. Most of the State's argument hinges on the idea that the State can ban risky or harmful medical interventions under its power to enact "health and welfare laws" and that the medical interventions at issue are particularly risky or unproven when used to treat gender dysphoria. This is not the case, however.

For one, "courts nearly always face an individual's claim of constitutional right pitted against the government's claim of special expertise in a matter of high importance involving public health or safety." *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) (Gorsuch, J., separate op.). Just because the Ban is a "health and welfare law" does not mean that it is not subject to scrutiny, under any level of review. "It has never been enough for the State to insist on deference or demand that individual rights give way to collective interests." *Id.* Sure, courts "are not scientists," but neither are Defendants, and courts need not "abandon the field when government officials … seek to infringe a constitutionally

25

protected liberty." *Id.* The whole point of judicial scrutiny is to test the government's assertions.

Here, it is undisputed that gender dysphoria is a serious medical condition that requires treatment. The choice faced by transgender adolescents with gender dysphoria and their parents is binary: to treat a serious medical condition following the advice of medical professional, or to not treat? "Left untreated, … [gender dysphoria] can lead to debilitating distress, depression, impairment of function, substance use, … self-injurious behaviors, and even suicide." *Edmo*, 935 F.3d at 769; *Kadel*, 620 F.Supp.3d at 380. The State would deprive transgender adolescents with gender dysphoria of medical treatments their doctors have deemed necessary and leave these adolescents and their parents to suffer.

Of course, no evidence supports the State's preferred course of withholding medical interventions being effective to treat a minor's gender dysphoria. And no evidence justifies the State's supplanting the right of parents to make these decisions alongside their adolescent children and their medical providers. "It is no answer to say the evidence on the yes side is weak when the evidence on the no side is weaker or nonexistent." *Dekker*, 2023 WL 4102243, at *15.

Substantial evidence supports that the Ban prohibits medical treatment that conforms with the recognized standard of care for gender dysphoria and that such treatment is supported by medical evidence showing that it is safe and effective. *See*

26

*Brandt*, 47 F.4th at 670. "Decades of clinical experience have shown that adolescents with gender dysphoria experience significant positive benefits to their health and well-being from gender-affirming medical care." *Brandt v. Rutledge*, No. 4:21-CV-00450-JM, 2023 WL 4073727, at *16 (E.D. Ark. June 20, 2023). And "[t]he evidence base supporting gender-affirming medical care for adolescents is comparable to the evidence base supporting other medical treatments for minors." *Id.* at *17. In fact, "[i]t is commonplace for medical treatments to be provided even when supported only by research producing evidence classified as 'low' or 'very low' on [the GRADE] scale." *Dekker*, 2023 WL 4102243, at *15. "[O]nly about 13.5% of accepted medical treatments across all disciplines are supported by 'high' quality evidence on the GRADE scale." *Id.*

And "[r]isks attend many kinds of medical treatment, perhaps most." *Id.* at *16. But "it is the patient, in consultation with the doctor, who weighs the risks and benefits and chooses a course of treatment," not the State. *Id.* What is "remarkable" about HB71 is not that it addresses medical treatments with both risks and benefits but that it "arrogate[s] to the State the right to make the decision[,] … without considering any patient's individual circumstances." *Id.*

Ultimately, gender-affirming medical care is "safe, effective, and often medically necessary." *Kadel v. N. Carolina State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422, 427–28 (4th Cir. 2021), as amended (Dec. 2, 2021); *Edmo*, 935

F.3d at 770.  The guidelines for the treatment of gender dysphoria, which support

providing gender-affirming medical treatment when indicated, are recognized by

"the major medical and mental health groups in the United States … as representing

the consensus of the medical and mental health communities regarding the

appropriate treatment for transgender and gender dysphoric individuals." *Edmo*, 935

F.3d at 769.  The State "attempt[s] to create scientific controversy in this uniform

agreement … with hypothetical speculation and political hyperbole."  *Kadel*, 620

F.Supp.3d at 392.  But Defendants' "belief that gender affirming care is ineffective

and unnecessary is simply not supported by the record."  *Id.*

## CONCLUSION

For the foregoing reasons, and those articulated in Plaintiffs' brief, *amici*

respectfully request the Court affirm the district court's decision to preliminarily

enjoin Idaho's HB71.

Dated this 12th day of March 2024.

Respectfully submitted,

 */s/ Omar Gonzalez-Pagan*

| | |
|---|---|
| Karen L. Loewy | Omar Gonzalez-Pagan |
| LAMBDA LEGAL DEFENSE AND | LAMBDA LEGAL DEFENSE AND |
|   EDUCATION FUND, INC. |   EDUCATION FUND, INC. |
| 111 K Street, N.E., 7th Floor | 120 Wall Street, 19th Floor |
| Washington, DC 20002 | New York, NY 10005 |
| (202) 804-6245 | (212) 809-8585 |

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned hereby certifies that:

1.    This brief complies with the type-volume limitation, as set forth in Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B), because it contains 6,472 words, excluding the parts of the brief exempted by Rule 32(f).

2.    This brief complies with the typeface requirements, as provided in Federal Rule of Appellate Procedure 32(a)(5), and the type-style requirements, as provided in Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

3.    As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated this 12th of March 2024.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
  EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate CM/ECF system, and that it has been served on all counsel of record through the court's electronic filing system.

Dated this 12th of March 2024.

> */s/ Omar Gonzalez-Pagan*
> Omar Gonzalez-Pagan
> LAMBDA LEGAL DEFENSE AND
>   EDUCATION FUND, INC.
> 120 Wall Street, 19th Floor
> New York, NY 10005