No. 24-142

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

PAM POE, ET AL.,

*Plaintiffs-Appellees*,

v.

RAUL LABRADOR, ET AL.,

*Defendants-Appellants*.

_____

On Appeal from the U.S. District Court for the District of Idaho
(No. 1:23-cv-00269-BLW) (The Hon. B. Lynn Winmill)

_____

**BRIEF OF STATE OF CALIFORNIA AND 20 OTHER STATES AS AMICI CURIAE
SUPPORTING PLAINTIFFS-APPELLEES AND AFFIRMANCE**

_____

ROB BONTA
Attorney General of California
RENU R. GEORGE
Senior Assistant Attorney General
KATHLEEN BOERGERS
Supervising Deputy Attorney General
NIMROD PITSKER ELIAS
SEAN C. MCGUIRE
Deputy Attorneys General
STATE OF CALIFORNIA
OFFICE OF THE ATTORNEY GENERAL
1515 Clay Street
Oakland, CA 94612
(510) 879-0011
Kathleen.Boergers@doj.ca.gov

*Attorneys for Amicus Curiae State of California*

March 12, 2024

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE................................................................8

ARGUMENT .........................................................................................9

I.    Restricting Access to Gender-Affirming Medical Care Significantly Harms Transgender Minors ...............................................................9

II.   Amici States' Laws and Policies Promote Access to Gender-Affirming Medical Care Based on Established Medical Standards..............16

III.  The Ban Violates the Equal Protection Clause..............................16

    A.    Heightened Scrutiny Applies ..............................................17

    B.    The Ban Does Not Satisfy Heightened Scrutiny.................................23

CONCLUSION......................................................................................28

STATEMENT OF RELATED CASES ......................................................32

CORPORATE DISCLOSURE STATEMENT ...........................................33

CERTIFICATE OF COMPLIANCE........................................................33

CERTIFICATE OF SERVICE .................................................................34

# TABLE OF AUTHORITIES

**Page**

CASES

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*
  75 F.4th 760 (7th Cir. 2023) ...................................................................21

*Bostock v. Clayton Cnty., Georgia*
  140 S.Ct. 1731 (2020)....................................................................20, 21

*Brandt v. Rutledge*
  47 F.4th 661 (8th Cir. 2022) ...........................................................21, 24

*Brandt v. Rutledge*
  551 F.Supp.3d 882 (E.D. Ark. 2021)......................................................24

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993)...............................................................................21

*City of Cleburne v. Cleburne Living Ctr.*
  473 U.S. 432 (1985)...............................................................................24

*Davis v. Guam*,
  932 F.3d 822 (9th Cir. 2019)…...............................................................21

*Dobbs v. Jackson Women's Health Org.*
  142 S.Ct. 2228 (2022)......................................................................18, 19

*Doe v. Ladapo*
  No. 4:23-cv-114-RH-MAF, 2023 WL 3833848 (N.D. Fla. June 6,
  2023) .............................................................................................20, 23

*Geduldig v. Aiello*
  417 U.S. 484 (1974)...............................................................................18

*Grimm v. Gloucester Cnty. Sch. Bd.*
  972 F.3d 586 (4th Cir. 2020) .................................................................20

*Hecox v. Little*
  79 F.4th 1009 (9th Cir. 2023) ........................................................*passim*

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Karnoski v. Trump*
   926 F.3d 1180 (9th Cir. 2019) .................................................................17

*McWright v. Alexander*,
   982 F.2d 222 (7th Cir. 1992) ..................................................................22

*Nyquist v. Mauclet*
   432 U.S. 1 (1977) ....................................................................................22

*United States v. Virginia*,
   518 U.S. 515 (1996) ................................................................................23

**STATUTES, LEGISLATION, & REGULATIONS**

IDAHO HOUSE BILL 71 ....................................................................*passim*

N.Y. COMP. CODES R. & REGS. Title 18 § 505.2(*l*)(2)(i) ...........................14

OR. REV. STAT. § 746.021 .............................................................................14

WASH. ADMIN. CODE §§ 182-531-1675(b)(i)–(ii), (f) ...............................15

WASH. REV. CODE § 48.43.0128(3)(a) (2019) ....................................15, 25

WASH. REV. CODE § 48.43.0128(3)(c) (2019) ...........................................16

**CONSTITUTIONAL PROVISIONS**

Fourteenth Amendment .............................................................................18

**COURT RULES**

Federal Rule of Appellate Procedure 29(a) ...............................................8

**TABLE OF AUTHORITIES**
**(continued)**

Page

OTHER AUTHORITIES

Ali Zaker-Shahrak et al., Cal. Dep't of Ins., *Economic Impact Assessment: Gender Nondiscrimination in Health Insurance* (2012), https://transgenderlawcenter.org/wp-content/uploads/2013/04/ Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pd.....................................11

American Psychiatric Association, *What is Gender Dysphoria?* (Aug. 2022), https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria ................................10

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2022)........................10

Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. Adolescent Health 643, 647–48 (2022), https://doi.org/10.1016/j.jadohealth.2021.10.036..................12

Ann P. Haas et al., Am. Found. for Suicide Prevention & The Williams Inst*., Suicide Attempts Among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey* (2014), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-GNC-Suicide-Attempts-Jan-2014.pd..........................................................11

Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics no. 4 at 696, 702 (2014), https://doi.org/10.1542/peds.2013-2958...........................12

Ashley Austin et al., *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*, 37 J. of Interpersonal Violence 2696 (2020), https://journals.sagepub.com/doi/10.1177/ 088626052091555.........................11

## TABLE OF AUTHORITIES
### (continued)

**Page**

Cal. Dep't of Ins., *Commissioner Lara Takes Proactive Step to Ensure Transgender Youth Have Access to Gender-Affirming Medical Care for Gender Dysphoria* (Dec. 30, 2020), https://www.insurance. ca.gov/0400-news/0100-press-releases/2020/release140-2020.cf .......................................................16

Chester A. McPherson, D.C. Dep't of Ins., Bulletin 13-IB-01-30/15, *Prohibition of Discrimination in Health Insurance Based on Gender Identity or Expression* 1 (2014), https://disb.dc.gov/ sites/default/files/dc/sites/disb/publication/attachments/Bulletin-ProhibitionDiscriminationBasedonGenderIdentityor-Expression v022714.p.......................................................15

Diana M. Tordoff, et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 J. Am. Med. Ass'n Network Open 1, 6 (2022), https://jamanetwork.com/journals/ jamanetworkopen/fullarticle/278942 .................................................12

E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (2022), https://doi.org/10.1080/2689 5269.2022.2100644 .......................................................26

Emily Newfield et al., *Female-to-Male Transgender Quality of Life*, 15(9) Quality of Life Research 1447 (2006), https://www.ncbi.nlm.nih.gov/pubmed/16758113 ............................................10

*Equality Maps: Healthcare Laws and Policies*, Movement Advancement Project, https://www.lgbtmap.org/equality-maps/healthcare_laws_and_policies (last visited Dec. 12, 2023) ......................14

Julia C. Sorbara et al., *Mental Health and Timing of Gender-Affirming Care*, *Gender-Affirming Care*, 146 Pediatrics no. 4 at 1, 5-6 (2020), https://publications.aap.org/pediatrics/article/146/4/e20193600/796 83/ Mental-Health-and-Timing-of-Gender-Affirming-Car ...............................13

## TABLE OF AUTHORITIES
### (continued)

Page

Marijn Arnoldussen et al., *Self-Perception of Transgender Adolescents After Gender-Affirming Treatment: A Follow-Up Study Into Young Adulthood*, 9 LGBT Health no. 4 at 238, 242-244 (2022), https://www.liebertpub.com/doi/epdf/10.1089/lgbt.2020.0494 .........................12

Mass. Comm'r of Ins., Bulletin 2021-11, *Continuing Applicability of Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Gender Dysphoria Including Medically Necessary Gender Affirming Care and Related Services* (2021), https://www.mass.gov/doc/bulletin-2021-11-prohibited-discrimination-on-the-basis-of-gender-identity-or-gender-dysphoria-including-medically-necessary-gender-affirming-care-and-related-services-issued-september-9-2021/download ................................25

Nat'l Conf. of State Legislatures, *Prescribing Policies: States Confront Opioid Overdose Epidemic* (June 30, 2019), https://www.ncsl.org/research/health/prescribing-policies-states-confront-opioid-overdose-epidemic.aspx (archived Apr. 26, 2022) .................27

N.Y. Dep't of Fin. Servs., *Ins. Circular Letter No. 7* (Dec. 11, 2014), https://www.dfs.ny.gov/industry_guidance/circular_letters/cl2014_07 ...................................................................................................26

Or. Health Auth., *Prioritized List: Guideline for Gender Dysphoria* (last updated Mar. 2019), https://www.oregon.gov/oha/HPA/DSI-HERC/FactSheets/Gender-dysphoria.pdf.....................................14, 26

R.I. Off. of the Health Ins. Comm'r, Health Ins. Bulletin 2015-3, *Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Expression* (Nov. 23, 2015), https://ohic.ri.gov/sites/g/files/xkgbur736/files/bulletins/ Bulletin-2015-3-Guidance-Regarding-Prohibited-Discrimination.pd.............................26

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender Incongruent-Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869 (2017), https://doi.org/ 10.1210/jc.2017-0165 ......................26

## INTERESTS OF AMICI CURIAE

Amici Curiae States of California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Washington, Wisconsin, and the District of Columbia strongly support transgender people's right to live with dignity, be free from discrimination, and have equal access to healthcare.[1] Discrimination and exclusion on the basis of transgender status cause economic, physical, and emotional harms to transgender people, including an increased risk of depression, anxiety, substance abuse, and suicide. To prevent these injuries, many amici States have adopted laws and policies to combat discrimination against transgender people who seek gender-affirming medical care. These laws and policies adhere to medically accepted standards of care and avoid interfering with the doctor-patient relationship. Such state laws and policies result in better health outcomes for our transgender residents, including transgender teenagers; safeguard their physical, emotional, and financial well-being; protect their autonomy; and preserve the integrity and ethics of the medical profession.

Amici States also share a strong interest in the proper application of the Equal Protection Clause to protect transgender individuals throughout our nation from

---

[1] Amici States submit this amicus brief pursuant to Federal Rule of Appellate Procedure 29(a) in support of Plaintiffs-Appellees and affirmance of the grant of a preliminary injunction.

unconstitutional discrimination. Idaho's complete ban on gender-affirming care for transgender minors violates equal protection—it discriminates based on sex and transgender status, and cannot satisfy heightened scrutiny. The ban, House Bill (HB) 71, treats cisgender minors differently from transgender minors, allowing cisgender minors to access certain medications and procedures while banning transgender minors from accessing the same. Indeed, the law makes it a felony punishable by ten years in prison for Idaho doctors to provide this care to transgender—and only transgender—minors. The ban thus singles out transgender minors for discriminatory treatment *because of* their sex—because the minors were identified as one sex at birth but now identify as another—and their gender nonconformity. Such treatment is discrimination on the basis of sex and transgender status. That discrimination is not substantially related to any asserted governmental interest, as every court that reviewed a similar ban under heightened scrutiny has held. The lower court correctly reviewed the ban under heightened scrutiny and preliminarily enjoined HB 71 during the pendency of the litigation. As the district court stated, "[t]ransgender children should receive equal treatment under the law." 1-ER-15. This Court should affirm.

## ARGUMENT

I.   **RESTRICTING ACCESS TO GENDER-AFFIRMING MEDICAL CARE SIGNIFICANTLY HARMS TRANSGENDER MINORS**

When transgender teenagers are denied care that medical professionals have

10

determined is medically necessary, their physical, emotional, and psychological health is harmed.[2] Some transgender teenagers suffer from gender dysphoria, the often debilitating distress and anxiety that can result from incongruence between a person's gender identity and sex at birth.[3] If unaddressed or untreated, gender dysphoria can affect quality of life and trigger decreased social functioning.[4] The symptoms of gender dysphoria, and the compounding effects of societal discrimination, can be fatal. One study in 2014 found that suicide attempts are nine times more common among transgender people than in the overall U.S. population

---

[2] Idaho's ban not only harms its own residents, but also threatens amici States' residents who travel to the state for school, vacation, and work. Idaho's law, for example, could compel transgender teenagers who receive gender-affirming healthcare in amici States to discontinue their prescribed medications while in Idaho. Those traveling to Idaho, even on a temporary basis, may lack access to gender-affirming medical care if they are hospitalized for an injury or need to refill a prescription. And amici States' residents working, visiting, and studying in Idaho, like college students and tourists, could be forced to forgo necessary medical care to avoid the ban's effects.

[3] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2022); *see also* American Psychiatric Association, *What is Gender Dysphoria?* (Aug. 2022), https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria.

[4] *See* Emily Newfield et al., *Female-to-Male Transgender Quality of Life*, 15(9) Quality of Life Research 1447 (2006), https://www.ncbi.nlm.nih.gov/pubmed/16758113 (observing that transgender men who received appropriate medical care reported having a higher health-related quality of life than those who had not).

(41% versus 4.6%).[5] The risks are especially high among transgender minors.[6] One study found that 56% of transgender minors reported a previous suicide attempt and 86% reported suicidal thoughts.[7]

Gender-affirming medical care—which only proceeds after doctors, parents, and patients carefully weigh the risks and benefits and agree that treatment is in the patient's best interests—improves mental health and can be especially important to transgender teenagers. A 2021 analysis found that, for teenagers under the age of eighteen, use of gender-affirming hormone therapy was associated with lower odds of recent depression and lower odds of attempting suicide compared to adolescents

---

[5] Ann P. Haas et al., Am. Found. for Suicide Prevention & The Williams Inst*., Suicide Attempts Among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey*, at 2 (2014), https://williamsinstitute.law. ucla.edu/wp-content/uploads/Trans-GNC-Suicide-Attempts-Jan-2014.pdf.

[6] *See, e.g.*, Ali Zaker-Shahrak et al., Cal. Dep't of Ins., *Economic Impact Assessment: Gender Nondiscrimination in Health Insurance* (2012), https://transgenderlawcenter.org/wp-content/uploads/2013/04/ Economic-Impact-Assessment-Gender-Nondiscrimination-In-Health-Insurance.pdf ("A recent systematic review of largely American samples gives a suicide attempt rate of approximately one in every three individuals with higher rates found among adolescents and young adults.").

[7] Ashley Austin et al., *Suicidality Among Transgender Youth: Elucidating the Role of Interpersonal Risk Factors*, 37 J. of Interpersonal Violence 2696 (2020), https://journals.sagepub.com/doi/10.1177/ 0886260520915554.

who wanted, but did not receive, such therapy.[8] Another study concluded that, for teenagers and young adults ages thirteen to twenty, receiving gender-affirming care, including puberty blockers and gender-affirming hormones, was associated with 60% lower odds of moderate or severe depression and 73% lower odds of having suicidal thoughts over a twelve-month follow-up.[9] A longitudinal study that followed transgender adolescents from their intake at a gender clinic into young adulthood reported that gender-affirming treatment resulted in significant improvement in global functioning and psychological well-being and that the participants' life satisfaction, quality of life, and subjective happiness were comparable to their cisgender peers.[10] Another study found significant improvement in teenagers' sense of self-worth after starting hormone therapy.[11] In short, ensuring

---

[8] Amy E. Green et al., *Association of Gender-Affirming Hormone Therapy with Depression, Thoughts of Suicide, and Attempted Suicide Among Transgender and Nonbinary Youth*, 70 J. Adolescent Health 643, 647–48 (2022), https://doi.org/10.1016/j.jadohealth.2021.10.036.

[9] Diana M. Tordoff, et al., *Mental Health Outcomes in Transgender and Nonbinary Youths Receiving Gender-Affirming Care*, 5 J. Am. Med. Ass'n Network Open 1, 6 (2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2789423.

[10] Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics no. 4 at 696, 702 (2014), https://doi.org/10.1542/peds.2013-2958.

[11] Marijn Arnoldussen et al., *Self-Perception of Transgender Adolescents After Gender-Affirming Treatment: A Follow-Up Study Into Young Adulthood*, 9 LGBT Health no. 4 at 238, 242-244 (2022), https://www.liebertpub.com/doi/epdf/10.1089/lgbt.2020.0494.

access to gender-affirming healthcare likely improves health outcomes for our transgender teenagers.

By contrast, forcing adolescents to delay gender-affirming treatment until later stages of endogenous puberty may make it more likely that they will experience mental health challenges. A 2020 study showed that adolescents who begin gender-affirming treatment at later stages of puberty are five times more likely to be diagnosed with depression and four times more likely to have anxiety disorders than adolescents who seek treatment in early puberty; the authors concluded that "[gender incongruent] youth who present to [gender-affirming medical care] later in life are a particularly high-risk subset of a vulnerable population."[12]

## II.   AMICI STATES' LAWS AND POLICIES PROMOTE ACCESS TO GENDER-AFFIRMING MEDICAL CARE BASED ON ESTABLISHED MEDICAL STANDARDS

In light of the adverse consequences that arise when transgender individuals are denied access to medically necessary healthcare, many amici States have enacted laws and regulations to ensure that their residents, including transgender teenagers,

---

[12] *See* Julia C. Sorbara et al., *Mental Health and Timing of Gender-Affirming Care*, 146 Pediatrics no. 4 at 1, 5-6 (2020), https://publications.aap.org/pediatrics/article/146/4/e20193600/79683/Mental-Health-and-Timing-of-Gender-Affirming-Care (reporting odds ratios).

14

have access to gender-affirming healthcare when medically appropriate.[13] These laws promote sound medical practices and increase equity in healthcare. Beyond these general protections, some amici States have issued guidance prohibiting insurers from denying minors treatment for gender dysphoria solely based on their minor status, in recognition of the importance of gender-affirming interventions for this vulnerable population. For instance, Oregon has codified its prohibition on insurance plans denying benefits on the basis of gender identity and, in 2015, Oregon approved puberty suppression coverage under its Medicaid program for beneficiaries who are 15 or older.[14] Washington's Medicaid program explicitly covers puberty suppression therapy and hormone therapy for those under age twenty. WASH. ADMIN. CODE §§ 182-531-1675(b)(i)–(ii), (f). Similarly, New York's Medicaid regulations require coverage for medically necessary puberty suppression for patients who meet eligibility criteria and medically necessary hormone therapy for individuals who are sixteen years of age and older. N.Y. COMP. CODES R. & REGS. tit. 18 § 505.2(*l*)(2)(i).

---

[13] *See generally Equality Maps: Healthcare Laws and Policies*, Movement Advancement Project, https://www.lgbtmap.org/equality-maps/healthcare_laws_and_policies (last visited Dec. 12, 2023).

[14] *See* OR. REV. STAT. § 746.021; *see also* Or. Health Auth., *Prioritized List: Guideline for Gender Dysphoria*, at 1 (last updated Mar. 2019), https://www.oregon.gov/oha/HPA/DSI-HERC/FactSheets/Gender-dysphoria.pdf.

In contrast to Idaho's categorical ban on gender-affirming care for minors, many amici States' policies also recognize that best medical practices require an *individualized* assessment to determine whether—and to what extent—gender-affirming care is medically necessary for an individual patient. For example, the District of Columbia has instructed that determinations of "medical necessity" for insurance coverage purposes "must also be guided by providers in communication with individual patients." [15] Washington forbids insurers from "deny[ing] or limit[ing] coverage for gender affirming treatment" when it is "medically necessary" and "prescribed in accordance with accepted standards of care."[16] Washington also requires "a health care provider with experience prescribing or delivering gender-affirming treatment" to "review[] and confirm[] the appropriateness of" an insurer's decision to deny or limit coverage.[17] And California encourages health insurance companies to evaluate coverage criteria for gender-affirming care in order "to avoid

---

[15] Chester A. McPherson, D.C. Dep't of Ins., Bulletin 13-IB-01-30/15, *Prohibition of Discrimination in Health Insurance Based on Gender Identity or Expression* 1, 4 (2014), https://disb.dc.gov/sites/default/files/dc/sites/disb/publication/attachments/Bulletin-ProhibitionDiscriminationBasedonGenderIdentityor-Expression v022714.pdf.

[16] WASH. REV. CODE § 48.43.0128(3)(a) (2019).

[17] WASH. REV. CODE § 48.43.0128(3)(c) (2019).

needlessly delaying and interfering with medical care recommended by a patient's doctor."[18]

Taken together, these laws and policies reflect amici States' core commitment to preserving the integrity of the medical profession, protecting the equality of all people, regardless of their gender identity, and ensuring that people with gender dysphoria are not denied medically necessary healthcare.

## III. THE BAN VIOLATES THE EQUAL PROTECTION CLAUSE

HB 71 criminalizes the provision of specified medical treatment "upon a child for the purpose of attempting to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." HB 71 § 3. As is clear from the face of the text, HB 71 prohibits these medical treatments only when they are used to assist with gender affirmation for transgender minors, and does not criminalize them when used for other purposes.

HB 71 is subject to heightened scrutiny because it facially discriminates based on: (1) sex by using sex-based terminology to delineate who can (and cannot) receive medical treatment; (2) transgender status by prohibiting medical treatment that only transgender individuals need; (3) gender nonconformity, a form of sex

---

[18] Cal. Dep't of Ins., *Commissioner Lara Takes Proactive Step to Ensure Transgender Youth Have Access to Gender-Affirming Medical Care for Gender Dysphoria* (Dec. 30, 2020), https://www.insurance.ca.gov/0400-news/0100-press-releases/2020/release140-2020.cfm.

17

discrimination, by denying transgender minors medical treatment that aligns with their gender identity but not their sex at birth; and (4) gender identity by banning medical care that only individuals identifying as transgender seek. *Hecox v. Little*, 79 F.4th 1009, 1026 (9th Cir. 2023) (holding that "gender identity is at least a 'quasi-suspect class'" that warrants heightened scrutiny.) And HB 71 cannot withstand heightened scrutiny. The district court correctly concluded that "HB 71 undermines, rather than serves, the asserted goal of protecting children" and properly granted a preliminary injunction. 1-ER-51.

### A.  Heightened Scrutiny Applies

This Court has held that discrimination on the basis of transgender status is a form of sex-based discrimination and a quasi-suspect classification in its own right, and that heightened scrutiny applies. *Hecox v. Little*, 79 F.4th 1009, 1026 (9th Cir. 2023); *Karnoski v. Trump¸* 926 F.3d 1180, 1200-01 (9th Cir. 2019). Following this precedent, the district court correctly examined the law under heightened scrutiny and held that Plaintiffs were likely to succeed on their Equal Protection claim. 1-ER-53-54.

On appeal, Idaho argues that the Act merely regulates medical procedures in accordance with well-established state police power, and that the district court erred by applying heightened scrutiny to a routine exercise of state medical regulation. Op. Br. at 20-21. But the district court correctly concluded that Idaho's "asserted

18

objective is pretextual, given that HB 71 allows the same treatments for cisgender minors that are deemed unsafe and thus banned for transgender minors." 1-ER-50. In any event, state police powers are still subject to constitutional limitations. As the district court recognized, undertaking a heightened inquiry here "is precisely how our constitutional democracy is supposed to work. The authors of the Fourteenth Amendment fully understood and intended that the amendment would prevent state legislatures from passing laws that denied equal protection of the laws or invaded the fundamental rights of the people." 1-ER-16.

Idaho points to *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228 (2022) and *Geduldig v. Aiello*, 417 U.S. 484 (1974) to support its view that HB 71 does not trigger heightened scrutiny because it classifies based on medical procedure, not sex. But *Dobbs* and *Geduldig* are inapposite for at least three reasons. First, the laws at issue in *Dobbs* and *Geduldig*, which respectively regulated abortion and excluded pregnancy-related disabilities from insurance coverage, did not facially classify based on sex. HB 71, in contrast, prohibits medical procedures "for the purpose of attempting to affirm the minor's perception of his or her *gender or biological sex*, if that perception is inconsistent with the minor's *biological sex*." HB 71 § 3 (emphasis added). Second, the laws at issue in those cases banned abortion and pregnancy-related insurance coverage for *everyone*. HB 71, on the other hand, permits these medications for every group except one: transgender

19

individuals seeking treatment for their gender dysphoria. Third, the evidentiary record demonstrates that HB 71 was "designed to effect an invidious discrimination" against transgender individuals, thereby triggering heightened scrutiny. *Dobbs*, 142 S.Ct. at 2245-46. The district court found that "there is every indication that [the Ban] was intended to single out transgender children based solely upon their transgender status." 1-ER-49; *see also* 1-ER-51 (finding that Idaho passed HB 71 "to ban an outcome that the State deems undesirable" (internal citation omitted). Those findings are entitled to deference. *Hecox*, 79 F.4th at 1020 (reversal of a preliminary injunction on factual grounds requires "clearly erroneous findings of fact").

Further, Idaho insists that HB 71 does not classify based on sex because it applies equally to everyone. Op. Br. at 24. Idaho is incorrect. HB 71 treats cisgender and transgender minors differently by permitting certain procedures for the former while categorically denying the same procedures for the latter. It is beyond dispute that one group—and only one group—pursues the "gender transition procedures" that Idaho has banned: transgender minors. Under HB 71, a minor born as a male may be prescribed testosterone, but a minor born as a female is not permitted to seek the same medical treatment—the only difference in the individual's ability to access prescribed medical treatment is their sex. Idaho's classifications thus target transgender people on the basis of their sex and transgender identity, even if the ban

20

does not expressly use the word "transgender." 1-ER-45-46; *see also Doe v. Ladapo*, No. 4:23-cv-114-RH-MAF, 2023 WL 3833848, at *9 (N.D. Fla. June 6, 2023) (explaining that to know whether prescribing puberty blockers is legal or illegal, "one must know whether the child is cisgender or transgender. The treatment is legal if the child is cisgender but illegal if the child is transgender because the statute prohibits [puberty blockers] only for transgender children, not for anyone else.")

The district court's injunction follows this Court's precedent recognizing that "discrimination on the basis of transgender status is a form of sex-based discrimination." *Hecox*, 79 F.4th at 1026 (internal citations omitted); *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020) (holding that plaintiff "was subjected to sex discrimination because he was viewed as failing to conform to the sex stereotype propagated by the Policy").

The Supreme Court also recognized that discrimination against transgender people is necessarily a form of sex-based discrimination in the context of a Title VII claim in *Bostock v. Clayton County*, holding that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty., Georgia*, 140 S.Ct. 1731, 1741 (2020). In other words, "if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred." *Id*. Thus, under HB 71, "the minor's sex at birth determines whether or not the minor can

21

receive certain types of medical care under the law." 1-ER-47-48 (citing *Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022). Such discriminatory treatment of transgender minors warrants heightened scrutiny under the Equal Protection Clause. *See Hecox*, 79 F.4th at 1022–26; *see also A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023) ("*Bostock* strengthens *Whitaker*'s conclusion that discrimination based on transgender status is a form of sex discrimination").

Idaho's argument that the law classifies on the basis of medical treatment (and not sex) necessarily fails because—in the words of the district court—"that's like saying that classifying on the basis of gray hair doesn't classify on the basis of age, or that classifying on the basis of wearing a yarmulke doesn't classify on the basis of being Jewish." 1-ER-46 (citing *Davis v. Guam*, 932 F.3d 822, 837-38 (9th Cir. 2019) (providing the gray hair/age example); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) (providing the yarmulke/Jewish example)); *see also Hecox*, 79 F.4th at 1024-25. *Hecox* is instructive. There, this Court analyzed Idaho's law banning the participation of transgender women and girls in women's student athletics. *Hecox*, 79 F.4th at 1015. The Court explained how the law's "specific classification of 'biological sex'" was "carefully drawn to target transgender women and girls, even if it does not use the word 'transgender' in the definition." *Id.* at 1025; *see also id.* at 1043 (Christen, J, concurring in part and

22

dissenting in part) (concluding that the law "can only be understood as a transgender-based classification" because it "uses a technically neutral classification—biological sex—as a proxy to evade the prohibition of intentional discrimination") (citing *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992)).

So too here. HB 71's classifications concern "gender transition procedures," which by definition target transgender—and only transgender—people. Idaho thus cannot credibly assert that its law does not discriminate on the basis of transgender status. Such a claim is belied by the complete overlap between the banned procedures (gender transition) and the targeted group (transgender individuals).[19] By definition, cisgender individuals do not seek to transition their gender, and therefore no cisgender person will be subject to the ban, even though they may receive the same medical treatment denied to their transgender peers.[20] By banning certain

---

[19] Although Idaho's law targets only transgender minors, it does not affect all transgender minors. Not all transgender minors suffer from gender dysphoria, and not all individuals suffering from gender dysphoria seek to medically transition. But the fact that HB 71 does not discriminate against all transgender minors is no defense. "[A] law is not immune to an equal protection challenge if it discriminates only against some members of a protected class but not others." *Hecox*, 79 F.4th at 1025 (internal citations omitted); *see also Nyquist v. Mauclet*, 432 U.S. 1, 7-9 (1977) (invalidating New York law which barred some, but not all, immigrants from accessing state financial assistance for higher education).

[20] Medical conditions for which cisgender minors would take puberty blockers include (but are not limited to) precocious puberty, endometriosis, uterine leiomyoma, ovarian cancer, premenstrual syndrome, and idiopathic short stature. 4-ER-908-09. Medical conditions for which cisgender minors would take

23

treatments for a medical purpose that only transgender people pursue, Idaho facially (and by proxy) discriminates against transgender individuals on the basis of sex and gender nonconformity. *See Hecox*, 79 F.4th at 1025.

### B.    The Ban Does Not Satisfy Heightened Scrutiny

The district court correctly concluded that HB 71 is unlikely to survive heightened scrutiny. 1-ER-49-54.[21] Under heightened scrutiny, the burden "rests entirely on the State" to demonstrate an "exceedingly persuasive" justification for its differential treatment. *Hecox*, 79 F.4th at 1028 (quoting *United States v. Virginia*, 518 U.S. 515, 531 (1996)). The classification must "serve[] important governmental objectives," and "the discriminatory means employed [must be] substantially related to the achievement of those objectives." *Id.* at 533 (internal citations omitted).

Idaho's ban is not even plausibly—let alone substantially—related to the purported goal of protecting children from ineffective or harmful medical treatment,

---

hormones include (but are not limited to) ovarian failure, Turner syndrome, hypogonadotropic hypogonadism, and Klinefelter syndrome. 4-ER-909.

[21] Although heightened scrutiny applies, at least one court has concluded on a similar record that a blanket ban of all gender-affirming treatments for all transgender minors—regardless of their individual circumstances and in conflict with well-established medical standards—is not even rationally related to a legitimate government interest. *See Ladapo*, 2023 WL 3833848, at *10 ("The State of Florida's decision to ban the treatment is not rationally related to a legitimate state interest."); *cf. City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985) (applying rational basis review and concluding that City's proffered justification for disparate treatment of class violated Equal Protection Clause because it "rest[ed] on an irrational prejudice").

24

because those very same treatments are permitted for cisgender minors. 1-ER-50-51. Indeed, "[i]f the State's health concerns were genuine, the State would prohibit these procedures for all patients under 18 regardless of gender identity. The State's goal in passing [the challenged Act] was not to ban a treatment. It was to ban an outcome that the State deems undesirable." *Brandt v. Rutledge*, 551 F.Supp.3d 882, 892 (E.D. Ark. 2021), *aff'd* 47 F.4th 661 (8th Cir. 2022). Additionally, Idaho's specific "means"—a categorical ban of gender-affirming medical care for minors, without any consideration of individualized circumstances—do not fit its proffered "end"—protecting the health of minors. The district court found that "the weight of the evidence shows not only that gender-affirming medical care delivered in accordance with WPATH and Endocrine Society guidelines is helpful and necessary for some adolescents, but also that withholding such care is harmful." 1-ER-51.

Indeed, Amici States' experiences confirm that a *categorical ban* on gender-affirming care is not substantially related to a concern about the potential individualized medical benefits and risks of receiving such care. When carefully performed in accordance with established standards of care, which includes comprehensive mental health assessments and informed consent by parents and adolescents, gender-affirming care is scientifically recognized as appropriate

medical treatment. Our laws and guidance reflect this.[22] For example, New York, Oregon, and Rhode Island's insurance guidelines cover gender-affirming care, explicitly identifying the importance of adhering to scientific evidence and prevailing professional standards. [23] The World Professional Association for

---

[22] Many States have relied on prevailing professional standards of care set forth by nationally recognized medical experts in crafting laws and guidance on coverage of gender-affirming medical care to treat gender dysphoria. *See, e.g.*, Mass. Comm'r of Ins., Bulletin 2021-11, *Continuing Applicability of Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Gender Dysphoria Including Medically Necessary Gender Affirming Care and Related Services* at 2 (2021), https://www.mass.gov/doc/bulletin-2021-11-prohibited-discrimination-on-the-basis-of-gender-identity-or-gender-dysphoria-including-medically-necessary-gender-affirming-care-and-related-services-issued-september-9-2021/download (recommending insurance carriers "consult the most up-to-date medical standards set forth by nationally recognized medical experts in the transgender health field, including but not limited to those issued by the [WPATH]"); WASH. REV. CODE § 48.43.0128(3)(a) (forbidding insurers from "deny[ing] or limit[ing] coverage for gender-affirming treatment" when it is medically necessary and "prescribed in accordance with accepted standards of care").

[23] N.Y. Dep't of Fin. Servs., *Ins. Circular Letter No. 7* (Dec. 11, 2014), https://www.dfs.ny.gov/industry_guidance/circular_letters/cl2014_07 (citing the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders' recognition of gender dysphoria); Or. Health Auth*., Prioritized List: Guideline for Gender Dysphoria, supra* note 14 (approving youth puberty suppression coverage based on extensive testimony "from experts at various public meetings," "reviewing relevant evidence and literature," and citing WPATH standards); R.I. Off. of the Health Ins. Comm'r, Health Ins. Bulletin 2015-3, *Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Expression* (Nov. 23, 2015), https://ohic.ri.gov/sites/g/files/xkgbur736/files/bulletins/Bulletin-2015-3-Guidance-Regarding-Prohibited-Discrimination.pdf ("[A] growing body of scientific and clinical evidence regarding the potential harm to

Transgender Health (WPATH), the Endocrine Society, and other recognized and reputable professional associations endorse evidence-based standards of care for transgender people.[24] And while gender-affirming medical care, like all medical treatments, can carry both risks and benefits, those concerns are appropriately addressed on a case-by-case basis through consultation among treating providers, patients, and their families. A flat ban on gender-affirming care for all transgender teenagers—even in cases when doctors deem such care to be medically necessary—is inconsistent with those well-established medical standards and practices.

Alabama attempts to support Idaho's categorical ban by purporting to detail the risks of gender-affirming care and intimating that such care is provided inappropriately. Alabama Amicus at 9-10, 19-20. But based on an extensive evidentiary record that included "hundreds of pages of evidence," 1-ER-21, including substantial expert witness testimony, the district court determined that categorically denying gender-affirming care is harmful to transgender minors and at

---

consumers arising from the denial or exclusion of services on the basis of gender identity" prompted reexamination of exclusions.).

[24] *See* E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (2022), https://doi.org/10.1080/2689 5269.2022.2100644; *see also* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender Incongruent-Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869 (2017), https://doi.org/10.1210/jc.2017-01658.

odds with the prevailing medical standards of care. 1-ER-24-25. Those factual findings are entitled to deference. *Hecox*, 79 F.4th at 1020 (reversal of a preliminary injunction on factual grounds requires "clearly erroneous findings of fact").

To the extent that a State has legitimate concerns about the risks that gender-affirming care may present, those concerns can be addressed through ordinary regulatory methods—rather than by criminalizing those procedures—as recent history shows. For example, states did not react to the devastating, nationwide opioid crisis by completely banning the use of opioids and depriving all patients of medications to manage their pain. Instead, States adopted legislation or regulations to limit the amounts of opioids that physicians could prescribe and disciplined providers who engaged in improper prescribing practices.[25] Indeed, Idaho, Alabama, and amici States regulate medical practice through laws and regulations that prohibit abusive, unethical, or medically improper conduct. Given the regulatory and supervisory authority that state medical boards already possesses, a categorical ban criminalizing well-established medical treatment is not substantially related to the purported goal of protecting vulnerable minors.

---

[25] Nat'l Conf. of State Legislatures, *Prescribing Policies: States Confront Opioid Overdose Epidemic* (June 30, 2019), https://www.ncsl.org/research/health/prescribing-policies-states-confront-opioid-overdose-epidemic.aspx (archived Apr. 26, 2022) ("State lawmakers are crafting innovative policies . . . to address this public health crisis while also ensuring appropriate access to pain management.").

## CONCLUSION

The preliminary injunction should be affirmed.


Dated:  March 12, 2024                    Respectfully submitted,


                                          s/ KATHLEEN BOERGERS
                                          _____

                                          ROB BONTA
                                          Attorney General of California
                                          RENU R. GEORGE
                                          Senior Assistant Attorney General
                                          KATHLEEN BOERGERS
                                          Supervising Deputy Attorney General
                                          NIMROD PITSKER ELIAS
                                          SEAN C. MCGUIRE
                                          Deputy Attorneys General

                                          *Attorneys for Amicus Curiae State of California*

[*additional counsel listed on subsequent pages*]

29

## ADDITIONAL COUNSEL

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 North French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
100 West Randolph Street
Chicago, IL 60601

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol, 75 Rev. Dr.
Martin Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

MICHELLE A. HENRY
*Attorney General*
*Commonwealth of Pennsylvania*
Strawberry Square, 16th Floor
Harrisburg, PA 17120

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
408 Galisteo Street Santa Fe, NM 87504

ELLEN ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street N.E.
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

JOSHUA L. KAUL
*Attorney General*
*State of Wisconsin*
17 West Main Street
Madison, WI 53703

## STATEMENT OF RELATED CASES

The States are not aware of any related cases, as defined by Ninth Circuit

Rule 28-2, that are currently pending in this Court and are not already consolidated

here.

## CORPORATE DISCLOSURE STATEMENT

As governmental parties, amici are not required to file a certificate of interested persons. Fed. R. App. P. 26.1(a).

## CERTIFICATE OF COMPLIANCE

1.    I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,609 words.

2.    I certify that this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. Fed. R. App. P. 32(g)(1).

3.    In accordance with 8th Cir. R. 28A(h)(2), I certify that this brief has been scanned for viruses and that the brief is virus-free.

Respectfully submitted,

*/S/ KATHLEEN BOERGERS*

KATHLEEN BOERGERS
Supervising Deputy Attorney General
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on March 12, 2024, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  I certify that all other participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  March 12, 2024                    */s Kathleen Boergers*

KATHLEEN BOERGRES
Supervising Deputy Attorney General
*Counsel for Amici Curiae*