APPEAL NO. 24-142

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PAM POE, by and through her parents and next friends Penny and Peter Poe, et al.,

*Plaintiffs-Appellees,*

v.

RAÚL LABRADOR, in official capacity as Attorney General of the State of Idaho,

*Defendant-Appellant,*

and

JAN M. BENNETTS, in official capacity as Ada County Prosecuting Attorney, et al.,

*Defendants.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:23-cv-00269-BLW

## APPELLANT'S REPLY BRIEF

RAÚL R. LABRADOR
ATTORNEY GENERAL

ALAN M. HURST
Solicitor General

JOSHUA N. TURNER
Chief of Constitutional
Litigation and Policy

JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense
OFFICE OF IDAHO
ATTORNEY GENERAL
700 W. Jefferson St.
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
josh.turner@ag.idaho.gov
james.craig@ag.idaho.gov

JOHN J. BURSCH
LINCOLN DAVIS WILSON
ALLIANCE DEFENDING
FREEDOM
440 First Street, NW,
Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
lwilson@ADFlegal.org

JONATHAN A. SCRUGGS
HENRY W. FRAMPTON, IV
ALLIANCE DEFENDING
FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

DAVID H. THOMPSON
BRIAN W. BARNES
JOHN D. RAMER
COOPER & KIRK, PLLC
1523 New Hampshire
Avenue, NW
Washington, DC 20036
202-220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Appellant Raúl R. Labrador*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii

INTRODUCTION ...............................................................................................1

ARGUMENT ....................................................................................................3

I.      Plaintiffs Cannot Prove Likely Success on the Merits. ...........................3

        A.      The Act Triggers and Meets Rational-Basis Scrutiny. ..................4

                1.      The Act does not classify based on sex or transgender
                        status. ....................................................................................4

                2.      There is no parental right to risky medical interventions. ..............9

        B.      The Act Satisfies Intermediate Scrutiny. .....................................11

                1.      The Act reasonably distinguishes between experimental and
                        well-accepted treatments. .....................................................11

                2.      The district court's "findings" are not factual and deserve no
                        deference. .............................................................................14

II.     The Other Injunction Factors Favor the Attorney General. ...............20

III.    The Injunction Is Overbroad. ..................................................................21

CONCLUSION .................................................................................................25

CERTIFICATE OF SERVICE ..............................................................................27

CERTIFICATE OF COMPLIANCE .......................................................................28

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez,*
    585 U.S. 579 (2018) ........................................................................21

*Barr v. American Association of Political Consultants, Inc.,*
    140 S. Ct. 2335 (2020) ....................................................................23

*Brandt v. Griffin,*
    No. 23-2681 (8th Cir. Oct. 6, 2023) ..............................................1

*Bray v. Alexandria Women's Health Clinic,*
    506 U.S. 263 (1993) ..........................................................................8

*Bucklew v. Precythe,*
    139 S. Ct. 1112 (2019) ....................................................................22

*Bulthius v. Rexall Corporation,*
    789 F.2d 1315 (9th Cir. 1985) ......................................................21

*Califano v. Jobst,*
    434 U.S. 47 (1977) ..........................................................................13

*City of Cleburne, Texas v. Cleburne Living Center,*
    473 U.S. 432 (1985) ..........................................................................5

*Contest Promotions, LLC v. City & County of San Francisco,*
    874 F.3d 597 (9th Cir. 2017) ..................................................13, 16

*Coyote Publishing, Inc. v. Miller,*
    598 F.3d 592 (9th Cir. 2010) ........................................................15

*Dobbs v. Jackson Women's Health Organization,*
    597 U.S. 215 (2022) ..........................................................................6

*Doe v. Lapado,*
    No. 4:23cv114-RH-MAF, 2023 WL 3833848 (N.D. Fla. June 6, 2023) ............25

*Doe v. Snyder,*
    28 F.4th 103 (9th Cir. 2022) ........................................................21

*Dunagin v. City of Oxford,*
    718 F.2d 738 (5th Cir. 1983) ........................................................17

*Edmo v. Corizon, Inc.*,
     935 F.3d 757 (9th Cir. 2019) ............................................................. 19, 21

*Eknes-Tucker v. Governor of Alabama*,
     80 F.4th 1205 (11th Cir. 2023) ..................................................1, 6, 11, 16

*Frontiero v. Richardson*,
     411 U.S. 677 (1973) ...................................................................................5

*Garcia v. Google, Inc.*,
     786 F.3d 733 (9th Cir. 2015) ...................................................................21

*Geduldig v. Aiello*,
     417 U.S. 484 (1974) ...................................................................................6

*Get Outdoors II, LLC v. City of San Diego, California*,
     506 F.3d 886 (9th Cir. 2007) ...................................................................24

*Glossip v. Gross,*
     576 U.S. 863 (2015) .................................................................................18

*Gonzales v. Carhart*,
     550 U.S. 124 (2007) ............................................................................. 4, 14

*Hecox v. Little*,
     79 F.4th 1009 (9th Cir. 2023) ............................................................. 9, 15

*Heller v. Doe by Doe*,
     509 U.S. 312 (1993) .................................................................................14

*In re Three National Security Letters*,
     35 F.4th 1181 (9th Cir. 2022) .................................................................18

*J.E.B. v. Alabama ex rel. T.B.*,
     511 U.S. 127 (1994) ...................................................................................7

*K.C. v. Individual Members of Medical Licensing Board of Indiana*,
     No. 23-2366, 2024 WL 811523 (7th Cir. Feb. 27, 2024) .........................1

*Karnoski v. Trump*,
     926 F.3d 1180 (9th Cir. 2019) ..................................................................9

*L.W. by & through Williams v. Skrmetti*,
     83 F.4th 460 (6th Cir. 2023) .......................................................1, 5, 6, 25

*Labrador v. Poe*, No. 23A763 (U.S. Feb. 16, 2024) ........................................................3

*Lewis v. Casey*,
    518 U.S. 343 (1996) ....................................................................24

*Lockhart v. McCree*,
    476 U.S. 162 (1986) ....................................................................17

*Madsen v. Women's Health Center, Inc.*,
    512 U.S. 753 (1994) ....................................................................24

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ......................................................................4

*Menora v. Illinois High School Association*,
    683 F.2d 1030 (7th Cir. 1982) ...................................................17

*Michael M. v. Superior Court of Sonoma County*,
    450 U.S. 464 (1981) ....................................................................22

*Myers v. United States*,
    652 F.3d 1021 (9th Cir. 2011) ...................................................19

*National Association for Advancement of Psychoanalysis v. California Board of Psychology*,
    228 F.3d 1043 (9th Cir. 2000) ...................................................10

*Pacific Shores Properties, LLC v. City of Newport Beach*,
    730 F.3d 1142 (9th Cir. 2013) .....................................................8

*Pest Committee v. Miller*,
    626 F.3d 1097 (9th Cir. 2010) ...................................................18

*Pickup v. Brown*,
    740 F.3d 1208 (9th Cir. 2014) ...................................................10

*Powers v. Ohio*,
    499 U.S. 400 (1991) ......................................................................7

*Raidoo v. Moylan*,
    75 F.4th 1115 (9th Cir. 2023) ........................................4, 5, 15

*Reed v. Reed*,
    404 U.S. 71 (1971) ........................................................................5

*Schall v. Martin,*
    467 U.S. 253 (1984) ............................................................................4

*Seller Agency Council, Inc. v. Kennedy Center for Real Estate Education, Inc.,*
    621 F.3d 981 (9th Cir. 2010) ..........................................................20

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ........................................................................24

*Tuan Anh Nguyen v. Immigration and Naturalization Service,*
    533 U.S. 53 (2001) ........................................................ 8, 13, 16, 22

*U.S. Bank National Association ex rel. CWCapital Asset Management LLC v. Village at Lakeridge LLC,*
    138 S. Ct. 960 (2018) ......................................................................17

*United States v. Virginia,*
    518 U.S. 515 (1996) ........................................................................18

*Vivid Entertainment, LLC v. Fielding,*
    774 F.3d 566 (9th Cir. 2014) ..........................................................13

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ........................................................................22

*Washington State Grange v. Washington State Republican Party,*
    552 U.S. 442 (2008) ........................................................................21

*Washington v. Glucksberg,*
    521 U.S. 702 (1971) ....................................................................... 4, 9

## Statutes

DELAWARE CODE ANN. tit. 16, § 4909A ................................................10

IDAHO CODE § 16-2423(3) ......................................................................10

IDAHO CODE § 18-1506C(3) .....................................................4, 7, 22, 23

MISSISSIPPI CODE § 41-41-191(3)(e) .......................................................6

## Other Authorities

Adrian O'Dowd, *NHS services in England are told to stop routine prescribing of puberty blockers*, BMJ 2024;384:q660 (2024), https://doi.org/10.1136/bmj.q660 ...........2

ALDACTONE, Prescribing Information, FDA, https://bit.ly/3IYOikY ....................4

Caroline Downey, *Leading Trans Medical Org Cites Technical Glitch after Child Gender-Transition Guidance Disappears from Website*, NATIONAL REVIEW (Mar. 20, 2024) ......................................................................................2

CLEVELAND CLINIC, *Gynecomastia*, https://bit.ly/3vcTezF ..............................13

CLEVELAND CLINIC, *Hirsutism*, https://bit.ly/4cgRVAy ..................................13

CLEVELAND CLINIC, *Vaginoplasty*, https://bit.ly/3VnswyK............................12

Dr. Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People: Interim Report*, THE CASS REVIEW (Feb. 2022), https://bit.ly/3VAv5Oq ...........................................................................22

Kenji Yoshino, *Appellate Deference in the Age of Facts*, 58 WILLIAM & MARY LAW REVIEW 251 (2016) ......................................18

Mia Hughes, *The WPATH Files: Pseudoscientific surgical and hormonal experiments on children, adolescents, and vulnerable adults*, ENVIRONMENTAL PROGRESS (Mar. 4, 2024) .................................................................................2, 8, 11

NHS ENGLAND, *Puberty Suppressing Hormones (PSH) for Children & Young People Who Have Gender Incongruence / Gender Dysphoria* (March 12, 2024)............................12

Sami-Matti Ruuska, et al., *All-cause and suicide mortalities among adolescents and young adults who contacted specialised gender identity services in Finland in 1996–2019: a register study*, 27 BMJ MENTAL HEALTH (2024) .......................................1

## INTRODUCTION

As this appeal progresses, the legal and scientific support for Idaho's law only grows stronger. When Idaho appealed, two circuits had upheld laws like the VCPA, and the only circuit to strike one down had voted to take the matter en banc. *L.W. by & through Williams v. Skrmetti*, 83 F.4th 460, 473 (6th Cir. 2023); *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1227 (11th Cir. 2023); Order, *Brandt v. Griffin*, No. 23-2681 (8th Cir. Oct. 6, 2023). Since then, another circuit has signaled its position, ruling that a constitutional challenge like Plaintiffs' was likely to fail. *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, No. 23-2366, 2024 WL 811523 (7th Cir. Feb. 27, 2024), *en banc reconsideration denied,* 2024 WL 1212700 (7th Cir. Mar. 21, 2024). Now the Sixth, Seventh, and Eleventh Circuits are all on Idaho's side, and the Eighth Circuit may soon follow.

The scientific developments have been still more significant. Contrary to the district court's determination that the procedures at issue are necessary to limit suicidality, a long-term study from Finland recently found that medical transition has no effect on suicide risk.[1] Contrary to the district court's conclusion that these procedures are generally accepted, the United Kingdom's National Health Service—a world leader in so-called gender-affirming care—recently directed doctors to "stop the routine prescribing of puberty blockers to children attending gender identity clinics with

---

[1] Sami-Matti Ruuska, et al., *All-cause and suicide mortalities among adolescents and young adults who contacted specialised gender identity services in Finland in 1996–2019: a register study*, 27 BMJ MENTAL HEALTH 1–6 (2024).

1

gender dysphoria" because "there is not enough evidence to support the safety or clinical effectiveness … to make the treatment routinely available at this time."[2]

And contrary to the district court's choice to trust WPATH to establish constitutionally enforceable standards of care, newly public documents have shown WPATH's own members fretting internally about minors' inability to give informed consent to these procedures, and also about puberty blockers "robbing" children of their normal development, putting them "many years behind their peers." Mia Hughes, *The WPATH Files: Pseudoscientific surgical and hormonal experiments on children, adolescents, and vulnerable adults*, ENVIRONMENTAL PROGRESS (Mar. 4, 2024) at 212, https://bit.ly/3IDVQtr.[3] In addition, following the entry of a protective order below, Idaho will be moving to dissolve the injunction based on confidential WPATH documents Idaho obtained in discovery.

To escape these developments, Plaintiffs would insulate the district court's injunction by deferring to its factual findings and limiting this Court to clear-error review. But this Court should apply rational-basis review to the VCPA and defer to the legislature, not the district court. Further, even if intermediate scrutiny applies, the district court's paper-record findings concern matters of legislative fact about the world, not adjudicative facts about the parties to this case, so this Court should give them little

---

[2] Adrian O'Dowd, *NHS services in England are told to stop routine prescribing of puberty blockers*, BMJ 2024;384:q660 (2024), https://doi.org/10.1136/bmj.q660.

[3] WPATH then temporarily removed its standards of care from its website. Caroline Downey, *Leading Trans Medical Org Cites Technical Glitch after Child Gender-Transition Guidance Disappears from Website*, NATIONAL REVIEW (Mar. 20, 2024), https://www.nationalreview.com/news/leading-trans-medical-org-scrubs-website-of-child-gender-transition-guidance-after-expose/.

deference and should hold that the VCPA substantially advances Idaho's interest in protecting vulnerable children from risky procedures. Regarding some of those procedures, even Plaintiffs' experts agree.

Finally, the district court's injunction reaches far beyond its authority. As Idaho has detailed in its pending stay application to the U.S. Supreme Court, the district court granted an unlawful universal injunction covering two million people to prevent alleged harms to two families involving more than a dozen experimental treatments that aren't at issue in this case. *See* Application, *Labrador v. Poe*, No. 23A763 (U.S. Feb. 16, 2024). That order violates the well-settled rule against awarding equitable relief to non-parties and fundamental limits on Article III standing and facial challenges. Plaintiffs' theory would allow judicial discretion to swallow each of those fundamental limits whole.

The injunction cannot stand. This Court should reverse and vacate.

## ARGUMENT

## I.    Plaintiffs Cannot Prove Likely Success on the Merits.

Plaintiffs are unlikely to succeed on the merits because Idaho's law satisfies equal protection and due process. The law triggers rational-basis scrutiny because it neither classifies based on sex or transgender status nor implicates any fundamental rights. And the law is imminently rational, as it regulates risky interventions that benefit no one. It also satisfies intermediate scrutiny because regulating these experimental interventions substantially advances the State's interest in protecting vulnerable children.

### A.  The Act Triggers and Meets Rational-Basis Scrutiny.

#### 1.  The Act does not classify based on sex or transgender status.

*The VCPA regulates medical procedures.* Idaho enacted the VCPA under its "historic police powers" to regulate health and safety, the practice of medicine, and child welfare. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *Washington v. Glucksberg*, 521 U.S. 702, 731 (1971); *Schall v. Martin*, 467 U.S. 253, 263 (1984). Thus, the Act regulates a list of specific medical procedures for minors if used "to alter the appearance of or affirm the child's perception of the child's sex if that perception is inconsistent with the child's biological sex"—that is, to treat gender dysphoria. IDAHO CODE § 18-1506C(3). Such "health and welfare" regulations are subject to "rational basis review," *Raidoo v. Moylan*, 75 F.4th 1115, 1121 (9th Cir. 2023), particularly in areas of "medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007). With the risks of the procedures becoming ever more apparent, the VCPA easily clears this low bar.

Plaintiffs say the VCPA does not meet this lenient standard and "does nothing to protect children" because it allows these procedures "for all other purposes." Pls.Br.44–45. But that is a feature of medical practice, not a bug in the statute. A procedure for one purpose often becomes unsafe when used for another. Insulin injections may be life-saving for diabetic patients, but life-ending for hypoglycemic ones. That isn't irrational. It's essential. *Cf.* Pls.Br.43.

That is why the FDA approves drugs—including the drugs at issue here—for specific indications. Every FDA label lists both the approved indications for the drug and the contraindications where it should *not* be prescribed.[4] Notably, the FDA has

---

[4] *See, e.g.*, ALDACTONE, Prescribing Information at 1, FDA, https://bit.ly/3IYOikY.

never approved any of the drugs regulated here to treat gender dysphoria. *L.W.*, 83 F.4th at 478. In fact, some of these drugs commonly used in "gender affirming care" are employed not for their effects, but for their side effects—for example, men with gender dysphoria take spironolactone because its "most common adverse reaction" is unnatural enlargement of male breast tissue.[5]

Accepting Plaintiffs' argument would require the Court to hold that no "conceivable basis" exists for the laws of twenty-two states. *Raidoo*, 75 F.4th at 1121 (quotation omitted). And the Court would have to reject as irrational the conclusions of two European nations that have reached this conclusion based on systematic review of the scientific evidence. *See* Def.Br.10–11. The growing international chorus undermines any basis to attack the Idaho legislature's concerns as irrational.

**The VCPA does not classify by sex.** Plaintiffs say that because the VCPA refers to "sex" in regulating specific uses of the procedures at issue, it classifies based on sex. Pls.Br.35. But sex discrimination concerns laws that work a "disadvantage" by imposing a burden the plaintiff "would not bear" if she were a similarly situated member of the opposite sex. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 723 n.8 (1982). It involves laws that "distribut[e] benefits and burdens between the sexes in different ways," *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985), that give "preference to members of either sex over members of the other," *Reed v. Reed*, 404 U.S. 71, 76 (1971), or that impose "special disabilities upon the members of a particular sex," *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). So it is not implicated by laws—like the

---

[5] *Id.*

VCPA—that simply regulate procedures "only one sex can undergo," *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 236–37 (2022), or that treat both sexes alike. *L.W.*, 83 F.4th at 480; *accord Eknes-Tucker*, 80 F.4th at 1227.

Plaintiffs try to distinguish *Dobbs* in a footnote on the ground that, "no party argued that being pregnant was a proxy for sex or womanhood." Pls.Br.33 n.8. But that's not good enough. The statute in *Dobbs* did not employ a proxy for sex or involve a "disparate impact" to women. *See id.* at 3. Rather, it specifically referred to women by regulating abortion with reference to "the time that has elapsed since the first day of the *woman's* last menstrual period." Miss. Code § 41-41-191(3)(e) (emphasis added). And yet despite the law's explicit reference to women only, the Supreme Court held review of that law's regulation of medical procedures was "governed by the same standard of review as other health and safety measures." *Dobbs*, 597 U.S. at 236–37; *cf. Geduldig v. Aiello*, 417 U.S. 484, 490 (1974) (applying rational basis to statute excluding benefits for pregnancy even though excluded condition encompassed "exclusively female" group). Plaintiffs' argument cannot account for on-point precedent.

Nor does it make sense. On Plaintiffs' logic, Idaho could simply rewrite its law to ban medical procedures with the purpose of trying to make minors without congenital abnormalities look or feel like someone with different reproductive genitalia than their own. That would trigger only rational-basis review because the statute did not use certain specific words like sex or gender dysphoria and stayed at a high enough level of generality. But equal-protection analysis does not turn on linguistic gymnastics.

Plaintiffs also fail to show that the VCPA discriminates against both men and women by prohibiting the use of these procedures to affirm a perception "inconsistent

with the child's biological sex." IDAHO CODE § 18-1506C(3). Plaintiffs do not explain how this violates *Hogan*'s standard, which they cite. Pls.Br.36 n.10. The VCPA does not inflict any "disadvantage" that anyone "would not bear" if they were members of the opposite sex, since it prohibits these procedures if used by either sex to conform to a gender identity inconsistent with biological sex. *Hogan*, 458 U.S. at 723 n.8. And the only equal-protection cases Plaintiffs cite on this point involve an easily distinguishable situation—the impermissible use of peremptory juror challenges based on race or sex-stereotypes. *Powers v. Ohio*, 499 U.S. 400, 410 (1991); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 142 n.13 (1994). The specific discriminatory use of such challenges for both sexes is not analogous to the VCPA's application of a neutral standard equally to both sexes. As *J.E.B.* explained, the harm there was in each individual application: "[t]he exclusion of even one juror for impermissible reasons harms that juror and undermines public confidence in the fairness of the system." 511 U.S. at 142 n.13.

Finally, Plaintiffs' sex-stereotyping theory fails because it does not grapple with Idaho's showing that such stereotypes are inherent to all diagnoses of gender dysphoria (and all other sex-specific conditions too). Def.Br.27. Plus, though Plaintiffs insist that their sex-stereotyping argument does not treat basic biological differences as stereotypes, that is exactly what it does. They say the law "penalizes treatment for a minor identified as male at birth but tolerates the same treatment for a minor identified as female at birth." Pls.Br.39 (quotation omitted). That sentence only works because Plaintiffs leave out the details of the regulated procedures, which in most cases can only be performed on one sex. It is "not a stereotype" that only males can receive penectomies and only women can receive hysterectomies. *Tuan Anh Nguyen v. I.N.S.*,

533 U.S. 53, 68 (2001). These lines are drawn not by law, but by biology, and they survive any standard of review.

**The VCPA does not classify based on transgender status.** Plaintiffs' theory of discrimination based on transgender status has even less footing. Plaintiffs say the VCPA "explicitly classifies based on transgender status," but they do not identify any of its provisions that does so. Pls.Br.30. Instead, their argument invokes proxy discrimination—that by regulating procedures used to treat gender dysphoria, the VCPA actually classifies based on transgender status. *Id.* at 32. That theory has two elements: (1) a regulated activity that is "an irrational object of disfavor," *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993), and (2) a law that governs based on "seemingly neutral criteria … closely associated with the disfavored group," *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013). Neither element is met here.

First, for the same reasons that the VCPA satisfies the rational-basis standard, there is nothing irrational about regulating procedures used to treat gender dysphoria in minors. Systematic reviews of the scientific evidence have shown these treatments pose serious risks and little to no benefit, and WPATH's own internal documents reveal its members' concerns about minors' lack of real capacity to give informed consent. Mia Hughes, *The WPATH Files*, https://bit.ly/3IDVQtr; Dkt. 33.1 at 2–14. As the amicus briefs in support of Idaho show, the "irrationality" Plaintiffs claim has managed to infect numerous scientific reviews, over 20 state legislatures, numerous European countries, detransitioners, and WPATH's own members. Dkt. 40.1 at 21–30; *see also* Dkt. 32.1 at 28–33; Dkt. 33.1 at 14–17; Dkt. 41.1 at 20–27. That's just not believable.

Nor can Plaintiffs ground this case in *Hecox v. Little*, 79 F.4th 1009, 1025 (9th Cir. 2023), since they lack any meaningful support that this law was motivated by actual animus against transgender people. Their primary animus argument is that the legislature merely considered *other* proposed legislation that Plaintiffs insist was "anti-transgender," which just illustrates the weakness of their claim. Pls.Br.34 n.9. And the only evidence they cite of purported animus with any relation to this law is a single tweet by a single legislator that does not even mention the transgender issue. *Id.* (citing 3-ER-731).

Second, Plaintiffs fail to show the requisite overlap of gender dysphoria and transgender status that is critical to proxy discrimination. As Idaho explained in its opening brief, this Court specifically declined to address that question in *Karnoski*: "whether regulations of 'gender dysphoria' are so 'closely correlated with being transgender' that a regulation related to gender dysphoria "constitutes discrimination against transgender persons." Def.Br.29 (quoting *Karnoski v. Trump*, 926 F.3d 1180, 1201 n.18 (9th Cir. 2019)). And in their response brief, Plaintiffs simply assert that this correlation exists without any elaboration or any other support than the district court's order. Pls.Br.32–33. Resolving a question that at least three decisions of this Court have left open requires much more than this conclusory statement. *Cf.* Def.Br.29.

## 2. There is no parental right to risky medical interventions.

Plaintiffs' due process claim fares no better. That claim requires a right that is "fundamental" or "deeply rooted in this Nation's history and tradition," *Glucksberg*, 521 U.S. at 720–21, which is not true of a purported right for parents to obtain dangerous and experimental procedures for their children. Under this theory, a parent could claim

a right to use a lobotomy to deal with a child's mental-health issues (something Idaho law also prohibits without a court order). IDAHO CODE § 16-2423(3).

Quoting the district court, Plaintiffs complain that this framing would "render[] the Fourteenth Amendment largely meaningless" because, they say, it would limit parental rights to therapies that were available historically. Pls.Br.47 (quoting 1-ER-060). But the limits of substantive due process in this context are even more narrow: this Court has twice held there is no right for *anyone* to obtain *any* specific medical treatment, regardless of its historical provenance. *Nat'l Ass'n for Advancement of Psychoanalysis v. California Bd. of Psychology*, 228 F.3d 1043, 1051–52 (9th Cir. 2000); *Pickup v. Brown*, 740 F.3d 1208, 1236 (9th Cir. 2014), *abrogated on other grounds by Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018). That is because states—not parents—set the bounds of the practice of medicine.

Plaintiffs try to distinguish this Court's cases rejecting a due-process right to specific treatments because they didn't involve situations where a treatment was allowed for adults but not for minors. Pls.Br.47-48. But under that logic, children would have a substantive due-process right to access other things that states limit access to by age, such as medical marijuana. See, e.g., DEL. CODE ANN. tit. 16, § 4909A (restricting medical marijuana for minors under 18). States may conclude that procedures present different risks for children than for adults without thereby inviting strict scrutiny.

Plaintiffs' argument contradicts itself: its whole premise is that children are not adults and parents have constitutionally protected authority over them, but then it insists medical regulation must treat children the same as adults.

### B.     The Act Satisfies Intermediate Scrutiny.

The Act also satisfies intermediate scrutiny because it substantially advances Idaho's interest in protecting vulnerable children. No one disputes that protecting children is an important interest. Pls.Br.41. And Idaho promotes that interest by prohibiting specific medical procedures that are risky and experimental when used to make a child look like a stereotype of the opposite sex, rather than when used to treat a physiologic condition. Because Idaho has a "good reason" for distinguishing between accepted and experimental uses of these procedures, the law passes intermediate scrutiny. *Eknes-Tucker*, 80 F.4th at 1234–35   (Brasher, J., concurring) (applying intermediate scrutiny to similar law). And the district court's contrary "findings"—which are not adjudicative fact-findings at all—deserve no deference and do not change the result.

### 1.     The Act reasonably distinguishes between experimental and well-accepted treatments.

The Act distinguishes between accepted and experimental uses of the regulated interventions because science does. For example, treating early puberty with puberty blockers so that a child experiences puberty at age 10 or 11 instead of 5 or 6 is well-studied and FDA-approved. 4-ER-683–84, 749. Using these same drugs to stop an adolescent's normal puberty is poorly studied, risky, and unlikely to provide any benefits. 4-ER-818–22. Even Dr. Daniel Metzger, a WPATH-affiliated endocrinologist, worries about "robbing" puberty-blocked children of their normal psychosexual development, putting them "many years behind their peers." Mia Hughes, *The WPATH Files* at 212, https://bit.ly/3IDVQtr. And earlier this month, the British National

11

Health Service stopped routinely using puberty blockers for gender dysphoria because "there is not enough evidence to support the safety or clinical effectiveness." NHS ENGLAND, *Puberty Suppressing Hormones (PSH) for Children & Young People Who Have Gender Incongruence / Gender Dysphoria* (March 12, 2024), https://bit.ly/3IVTgPM. Plaintiffs call that irrational. Idaho calls it science.

Rather than drilling into each use of each regulated procedure, the district court made the broad-brush statements that the treatments generally "are used to treat cisgender adolescents for other purposes" and involve risks "comparable to risks associated with other types of medical care." 1-ER-024–25. But each use of each procedure is different, with a different risk-benefit calculus.

Consider vaginoplasty. Performed on a male, this procedure involves removing the penis, testes, and scrotum, then creating a neo-vagina. CLEVELAND CLINIC, *Vaginoplasty*, https://bit.ly/3VnswyK. Sterility is inevitable. Performed on a female, vaginoplasty involves repairing pre-existing genital structures deformed by injury, cancer treatment, or a congenital condition. *Id.* It does not induce sterility, as it does not involve the ovaries. No one could find that performing vaginoplasty on a male has the same risks and consequences as performing it on a female—that's why the Cleveland Clinic lists distinct risks for each use of the procedure. *Id.* But rather than analyze specific procedures like vaginoplasty, the district court made the blanket and unilluminating statement that the regulated interventions "are used to treat cisgender adolescents for other purposes." 1-ER-024–25.

Plaintiffs' own examples show the problem with the district court's imprecise approach. They complain that the Act prohibits performing mastectomies on young

girls to masculinize their appearance while allowing surgery for gynecomastia: enlarged breasts in a male because of abnormal hormone levels. Pls.Br.43; CLEVELAND CLINIC, *Gynecomastia*, https://bit.ly/3vcTezF. And they complain that the Act prohibits giving a boy antiandrogens to feminize his appearance while allowing them for girls with hirsutism: abnormal growth of dark facial hair because of high testosterone levels. Pls.Br.44; CLEVELAND CLINIC, *Hirsutism*, https://bit.ly/4cgRVAy. They call gynecomastia and hirsutism treatments "gender affirming" to make them sound comparable to what the Act regulates, though their own expert disagrees that those comfortable with their sex can experience gender incongruence. Pls.Br.43; 3-ER-532–34. In any event, with gynecomastia and hirsutism, the Act simply allows doctors to treat physiologic hormone imbalances by restoring a patient's *healthy* hormone levels and physical structures. CLEVELAND CLINIC, *Gynecomastia*; CLEVELAND CLINIC, *Hirsutism*. Wordplay cannot make that the same as removing healthy breasts or raising hormones to abnormal levels in the hope (but without reliable evidence) of improving the patient's mental health.

Nor would a lone example of a procedure that carries similar risks and benefits to a regulated intervention—if one existed—invalidate the Act. Intermediate scrutiny does not require that the Act "deal perfectly and fully with an identified problem." *Contest Promotions, LLC v. City & Cnty. of S.F.*, 874 F.3d 597, 604 (9th Cir. 2017). And the law "need not be the *most* effective way to achieve the government's substantial interest." *Vivid Ent't, LLC v. Fielding*, 774 F.3d 566, 582 (9th Cir. 2014). It just has to adopt means "in substantial furtherance of important governmental objectives." *Nguyen*, 533 U.S. at 70; *accord Califano v. Jobst*, 434 U.S. 47, 55 (1977) ("[B]road legislative

classification must be judged by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples.").

The VCPA does that and more by regulating interventions for which, as the Swedish Board of Health noted, the risks "currently outweigh the possible benefits."[6] 4-ER-734. Crediting these and similar assessments was well within Idaho's "wide discretion" in this area of "medical and scientific uncertainty." *Gonzales*, 550 U.S. at 163. And it's more than enough to satisfy intermediate scrutiny.

### 2. The district court's "findings" are not factual and deserve no deference.

Plaintiffs invoke the clear-error standard for reviewing district court fact findings. But what the district court labelled fact findings should not receive deference for three reasons. 1-ER-24–25. *First*, they are so general and irrelevant to the legal issues that no deference is due. *Second*, they are not findings of adjudicative facts subject to clear error review. And *third*, they are clearly erroneous.

***Legally Irrelevant and Overly General Findings***. The district court's findings are unrelated to the legal issues in the case and thus irrelevant. As set forth above, state regulations of health and welfare receive "a strong presumption of validity," *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993), particularly where, as here, they address areas of

---

[6] Contrary to Respondents' brief, Dr. Turban expressed agreement with the Swedish Board of Health's statement that "[a]t group level (i.e., for the group of adolescents with gender dysphoria as a whole) the National Board of Health and Welfare currently assesses that the risk of puberty blockers and gender-affirming treatment are likely to outweigh the expected benefits of these treatments." 2-ER-129. When asked about that statement, Dr. Turban discussed the qualification "at group level," then said, "I agree." 2-ER-130.

"medical and scientific uncertainty." *Gonzales*, 550 U.S. at 163. So, absent a suspect classification, which Plaintiffs cannot show, the only finding the district court was empowered to make was whether a "conceivable basis" exists for the law. *Raidoo*, 75 F.4th at 1121. It had no license to assume the power reserved to Idaho's people to determine what procedures are and are not medically necessary, much less to enjoin Idaho law on that basis.

Plus, the district court's findings are extremely general. It made no specific findings about any specific procedure, much less anything comparing the risks, benefits, and consequences of each specific procedure when used to treat gender dysphoria versus other conditions. 1-ER-024–025. Instead, the district court just said these procedures—lumped together—are used "for other purposes" and carry "risks comparable to risks associated with other types of medical care." *Id.* But intermediate scrutiny is "an extremely fact-bound test" that requires analyzing the means-end fit of each regulation separately. *Hecox*, 79 F.4th at 1028; *Coyote Publ'g, Inc. v. Miller*, 598 F.3d 592, 609–10 (9th Cir. 2010) (separately analyzing two challenged brothel advertising regulations under intermediate scrutiny). Nor will it do to blame *Idaho* for regulating more than one thing in a statute. Pls.Br.41 n.12. That's hardly uncommon, and Plaintiffs cite nothing saying that it somehow avoids applying intermediate scrutiny to each challenged regulation. *Id.*

The district court's findings are also irrelevant to intermediate scrutiny. For example, the district court said that the regulated interventions "have a long history of safe use in minors for various conditions." 1-ER-024. That doesn't matter. For example, everyone agrees that treating early puberty with puberty blockers is often appropriate;

that says nothing about whether Idaho had "good reason" to regulate using puberty blockers for an off-label use that is proven to harm children. *Eknes-Tucker*, 80 F.4th at 1234–35 (Brasher, J. concurring).

Same for the finding that "gender-affirming medical care raises risks comparable to risks associated with other types of medical care families are free to seek for minors." 1-ER-025. Idaho agrees that other medical interventions—some forms of chemotherapy, for example—affect fertility. But that's only one side of the risk/benefit equation. And intermediate scrutiny doesn't require Idaho to regulate every intervention that affects fertility the same way, particularly if one kills an aggressive form of cancer and the other does not. *Contest Promotions, LLC*, 874 F.3d at 604.

So too for the finding that "gender-affirming medical care improves the wellbeing of *some* adolescents with gender dysphoria." 1-ER-025 (emphasis added). Even if that is true, that "finding" still doesn't mean that the Act fails intermediate scrutiny. Idaho agrees with respected authorities that the risks of puberty blockers, cross-sex hormones, and surgical interventions "outweigh the expected benefits of these treatments." 2-ER-129–30. The district court didn't find otherwise, and that's more than enough to satisfy intermediate scrutiny, even if there are outlier cases. *Nguyen*, 533 U.S. at 70. The district court's purported findings are irrelevant to the legal analysis.

**Legislative and Constitutional Facts**. The only "facts" at issue in this appeal relate to Idaho's scientific justification for regulating surgical and hormonal interventions for minors with gender dysphoria. All the expert reports discuss that subject. 4-ER-653–935. None of the experts here examined Plaintiffs, reviewed their medical records, or opined on their specific medical care. *Id.* There are no adjudicative

16

facts—that is, "facts pertaining to the parties"—at issue in the application of intermediate scrutiny. FED. R. EVID. 201, Advisory Comm. Notes.

The medical science of treating gender dysphoria comprises legislative facts about "the reasonableness of a rule or other enactment." *Menora v. Ill. High Sch. Ass'n*, 683 F.2d 1030, 1036 (7th Cir. 1982) (Posner, J.); FED. R. EVID. 201, Advisory Comm. Notes. And courts do not defer to lower-court findings regarding legislative facts. *Menora*, 683 F.2d at 1036; *Lockhart v. McCree*, 476 U.S. 162, 168 n.3 (1986) ("We are far from persuaded, however, that the 'clearly erroneous' standard of Rule 52(a) applies to the kind of 'legislative' facts at issue here."). Otherwise, district courts could make conflicting findings "reviewing the same" studies in areas of scientific uncertainty, and an appellate court would have to defer to conflicting conclusions affecting the validity of the same law. *Lockhart*, 476 U.S. at 168 n.3. That's unworkable, and it's why courts don't apply the clearly erroneous standard to legislative reasoning. *Dunagin v. City of Oxford*, 718 F.2d 738, 748 (5th Cir. 1983) (en banc) (applying clearly erroneous standard to legislative facts could make "identical conduct … constitutionally protected in one jurisdiction and illegal in another").

Deference is particularly inappropriate in constitutional cases. There, "the role of appellate courts in marking out the limits of a standard through the process of case-by-case adjudication favors de novo review even when answering a mixed question primarily involves plunging into a factual record." *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Village at Lakeridge LLC*, 138 S. Ct. 960, 967 n.4 (2018) (cleaned up). And this Court routinely reviews "constitutional questions of fact"—that is, factual questions intertwined with interpreting the Constitution—de novo. *In re Three*

*Nat'l Sec. Letters*, 35 F.4th 1181, 1186 (9th Cir. 2022) (cleaned up); *accord Pest Comm. v. Miller*, 626 F.3d 1097, 1103 (9th Cir. 2010).

*United States v. Virginia* illustrates the point. There, the district court made extensive "findings" on the science of sex-based differences between males and females based on Virginia's expert testimony. 518 U.S. 515, 541 (1996). The Supreme Court did not apply clear-error review to these findings, nor did it need to; it simply took its own view of sex-based differences based on material both in and outside the record and applied that understanding to the guarantee of equal protection. *Id.* at 543–46 (applying intermediate scrutiny); *id.* at 585 (Scalia, J., dissenting) (complaining that the majority "never says that a single finding of the District Court is clearly erroneous"); Kenji Yoshino, *Appellate Deference in the Age of Facts*, 58 WM. & MARY L. REV. 251, 264 (2016) (noting that the Supreme Court "declined to accord clear error deference to a district court finding"). This Court should do the same.

Plaintiffs say the Supreme Court applied the clearly erroneous standard in *Glossip v. Gross*, an Eighth Amendment challenge to a method of execution. 576 U.S. 863 (2015). But there, the Court emphasized that lethal-injection protocols uniquely "test the boundaries of the authority and competency of federal courts" and embroil them "in ongoing scientific controversies beyond their expertise." *Id.* at 882 (cleaned up). So it imposes a high burden on inmates to prove "a substantial risk of severe pain," and defers when a district court finds they have not. *Id.* Plaintiffs cite nothing applying this principle in equal-protection cases. And here, deferring to the district court would embroil this Court in an area of medical uncertainty by striking down a state's exercise

of its "historic police powers" to regulate medicine, so the concerns of *Glossip* are reversed. *Medtronic*, 518 U.S. at 485.

Plaintiffs' appeal to *Edmo v. Corizon, Inc.*, is even weaker. 935 F.3d 757 (9th Cir. 2019). There, the district court found that a specific inmate had a medical need for gender-related surgery based on expert witnesses who examined the inmate. *Id.* at 776–77. No such plaintiff-specific evidence exists here, so *Edmo*'s deference is irrelevant.

***Clearly Erroneous Findings***. If the district court's opinion is read to find that the regulated procedures carry the same risks and benefits whether used to make a child appear like the opposite sex or to treat a specific physiologic condition, then it's clearly erroneous. At the outset, the generalized nature of the district court's findings, which did not address specific procedures, make them clearly erroneous. This Court has held that a district court's findings were clearly erroneous where they ignored evidence. *Myers v. United States*, 652 F.3d 1021, 1036 (9th Cir. 2011). That is what the district court did here in failing to evaluate each procedure's risks and benefits. And doing so led it to find a constitutional right to procedures that not even the Endocrine Society believes are appropriate for minors. 4-ER-905. That is clearly erroneous.

No one contends that giving estrogen to a girl risks infertility; but, as Dr. Connelly admits, giving estrogen to a boy certainly does. 4-ER-911. No one contends that removing excess breast tissue from a male impacts breastfeeding, but removing a female's breasts does. 4-ER-811. And on the benefit side, though Plaintiffs say hormonal interventions benefit young people, they admit the studies they rely on don't

show causation.[7] 2-ER-79–80, 3-ER-586–88. Nor do Plaintiffs show that other interventions with similar risks—say, chemotherapy that affects fertility—have similarly uncertain benefits. 4-ER-911. So the record doesn't allow the conclusion that the risks and benefits of the regulated interventions are the same no matter the intervention's use, or the same as other medical treatments. *Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc.*, 621 F.3d 981, 986 (9th Cir. 2010) (finding is clearly erroneous if illogical, implausible, or lacking evidentiary support).

Again, even Plaintiffs' experts do not go that far. Dr. Connelly, for example, attested that "treatments for some pediatric cancers cause likely loss of fertility," but she did not say the benefits of treating cancer with chemotherapy are comparable to the alleged benefits of the interventions regulated here. 4-ER-911. Likewise, with respect to testosterone, she attested that some of the risks are similar for males and females, but she did not testify that all of the risks are the same, nor could she since testosterone adversely affects female but not male fertility. 4-ER-910. So even Plaintiffs' experts don't support a factual finding that risks and benefits of the regulated interventions are the same no matter their use. And ongoing scientific developments—including revelations regarding WPATH's standards of care—only further undermine that finding.

## II.    The Other Injunction Factors Favor the Attorney General.

Because Plaintiffs have not shown they are likely to succeed, this Court need not consider the remaining preliminary-injunction factors. *Garcia v. Google, Inc.*, 786 F.3d

---

[7] Plaintiffs do not explain how one can show that an intervention is beneficial without evidence of causation. Pls.Br.28 n.5.

733, 740 (9th Cir. 2015). But they also favor Idaho. A State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602–03 n.17 (2018). Plaintiffs, by contrast, have not submitted the medical evidence this Court requires to show irreparable harm. *Doe v. Snyder*, 28 F.4th 103, 106 (9th Cir. 2022). Plaintiffs insist that lay evidence is fine because they don't seek a "mandatory preliminary injunction." Pls.Br.50. But any injunction requires a showing of irreparable harm, and *Snyder* and *Edmo* illustrate that doctors, not patients, have to make that showing. *Snyder*, 28 F.4th at 106; *Edmo*, 935 F.3d at 776–77; *accord Bulthius v. Rexall Corp.*, 789 F.2d 1315, 1316 (9th Cir. 1985) (excluding as hearsay testimony of what a doctor told the declarant). Plus, Idaho has shown that hormonal interventions are risky and experimental. Def.Br.4–14. So the public interest favors Idaho as well.

## III. The Injunction Is Overbroad.

The district court enjoined Idaho from enforcing any provision of the Act against anyone, even though Plaintiffs seek but one or two of the eighteen-plus interventions the Act regulates. This was improper for three reasons.

*First*, the district court granted facial relief without finding that the Act is "unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008); 1-ER-064–65. In response, Plaintiffs ask this Court to go beyond the district court's ruling and hold the Act facially invalid. Pls.Br.52–53. They say all applications of the Act are unconstitutional because the Act "lacks a close means-end fit." *Id.* But that confuses the substantive rule Plaintiffs urge—intermediate scrutiny—with the scope of relief. Under Plaintiffs' logic, if *any* application of a law fails intermediate scrutiny by lacking a "close means-end fit," the law would automatically

be facially unconstitutional. *Id.* That can't be right, for the "facial" label "does not speak at all to the substantive rule of law." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). It merely affects "the extent to which the invalidity of the challenged law must be demonstrated"—either in all possible cases, or just the plaintiffs'. *Id.*

Here, the Act has many obviously constitutional applications. For example, the Act prohibits sterilizing genital surgeries like vaginoplasty on minors. IDAHO CODE § 18-1506C(3)(a). The Endocrine Society recommends against it.[8] 4-ER-905. Neither the United Kingdom, nor Denmark, nor Finland allows it. Dr. Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People: Interim Report* at 63, THE CASS REVIEW (Feb. 2022), https://bit.ly/3VAv5Oq; 4-ER-699, 731. And there are obvious differences in the risks and consequences of performing vaginoplasty to feminize a male's appearance and performing one to repair a female's pre-existing organs damaged by injury or disease.

The ban on genital surgeries easily passes rational basis or intermediate scrutiny. Under the latter, the challenged law does not have to "be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70, or "drawn as precisely as it might have been," *Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 473 (1981), or the "least restrictive or least intrusive means" of achieving the government's interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). It simply needs a "substantial relationship" with an important objective. *Michael M.*, 450 U.S. at 469. The genital-

---

[8] As Plaintiffs note and as Dr. Connelly's experience shows, clinicians are of course free to disregard the Endocrine Society's recommendation and perform genital surgeries anyway. Pls.Br.53 n.19. That only underscores why Idaho has an important role in regulating these procedures.

surgery ban has that. It restricts access to interventions that even Plaintiffs hasten to call "rare," Pls.Br.9, and other developed countries disallow, so it substantially advances the goal of protecting children. That takes facial relief off the table.

The district court also ignored the Act's severability provision, even though these clauses are binding "absent extraordinary circumstances." IDAHO CODE § 18-1506C(6); *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2350 (2020) (plurality op.). Even without a severability clause, there is a "a strong presumption of severability." *Id.* Here, since the Act lists each regulated procedure separately, severance would be straightforward, and neither the district court nor Plaintiffs have cited anything that would overcome the presumption to sever.

*Second*, the district court exceeded its jurisdiction by enjoining provisions of the law—like the ban on genital surgeries—that Plaintiffs lacked standing to challenge. The basic facts here are undisputed: no plaintiff seeks testosterone or any of the surgical interventions that the Act regulates. 5-ER-937–52. Citing nothing, Plaintiffs say this is no issue because the treatment they seek—estrogen—appears in the same "operative clause" of the Act as the other regulated interventions. Pls.Br.54.

Whatever Plaintiffs mean by this, the Idaho Legislature separately enumerated and addressed many different procedures, including sixteen named surgical procedures (subsection 3(a)), mastectomy (subsection 3(b)), puberty blockers (subsection 3(c)(i)), testosterone (subsection 3(c)(ii)), and estrogen (subsection 3(c)(iii)). IDAHO CODE § 18-1506C(3). And Section 6 makes the Act severable. IDAHO CODE § 18-1506C(6). So the Act contains not one "statutory prohibition," as Plaintiffs contend, but several—most of which do not affect Plaintiffs at all. Pls.Br.56.

Because "standing is not dispensed in gross," Plaintiffs can challenge only those provisions of the Act that harm them. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). And the district court had authority to address only the provisions causing Plaintiffs' injury—not provisions that Plaintiffs speculate may cause injury to others. *Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). So under Article III, Plaintiffs cannot challenge—and the district court should not have enjoined—the Act's regulating drugs and procedures Plaintiffs don't seek.

*Get Outdoors II* illuminates this reality. There, San Diego denied a billboard company's applications to erect signs in commercial areas based on two provisions of its sign code—one concerning off-premises signs and one concerning size and height restrictions. *Get Outdoors II, LLC v. San Diego*, 506 F.3d 886, 892 (9th Cir. 2007). The company sought to challenge these and other provisions of the code, such as banning all public interest messages in residential districts, even though it didn't seek to post any signs in residential areas. Opening Brief of Appellant, *Get Outdoors II* (No. 05-56366), 2006 WL 2361967, at *46–49. This Court said no because the company had standing to challenge only the provisions that affected its applications. *Get Outdoors II*, 506 F.3d at 892. The same is true here: Plaintiffs can no more challenge the Act's restriction of surgeries they don't want than the billboard company could challenge San Diego's restriction of signs it didn't want to post.

*Third*, the district court violated the basic rule that injunctions should sweep no more broadly "than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (cleaned up). Here, a sealed order for

24

each Plaintiff granting access to that person's desired interventions would suffice. The order could enjoin Idaho from enforcing the Act against a provider prescribing or supplying estrogen to Plaintiffs, to be kept in Plaintiffs' confidential medical records. That's what a district court in Florida did in a similar case. *Doe v. Lapado*, No. 4:23cv114-RH-MAF, 2023 WL 3833848, at *17 (N.D. Fla. June 6, 2023).

Plaintiffs worry that their doctors would not "be able to verify that the patients were really the parties in this case" since they are proceeding under pseudonyms. Pls.Br.57. But there's no reason for a *sealed* order to use pseudonyms. As Plaintiffs' own motion states, they are proceeding under pseudonyms "merely to avoid *public* disclosure," not to preclude the Court or the parties from knowing their identities. Dkt. 11-1 at 7. And avoiding public disclosure is exactly what a sealed order ensures.

As a last gasp, Plaintiffs speculate that their doctors will ignore a sealed order and refuse treatment. Pls.Br.57. Nothing in the record remotely suggests this. And rank "speculation about third-party behavior will not do." *L.W.*, 83 F.4th at 490. So the district court should have issued party-specific relief rather than enjoin Idaho from enforcing any provision of the Act against anyone.

## CONCLUSION

This Court should vacate the district court's preliminary injunction and direct that Plaintiffs' complaint be dismissed, or, at minimum, narrow the injunction to apply only to Plaintiffs and their ability to receive the specific interventions they seek.

Dated: March 26, 2024                           Respectfully submitted,


RAÚL R. LABRADOR                          /s/ Alan M. Hurst
ATTORNEY GENERAL

ALAN M. HURST                             JOHN J. BURSCH
SOLICITOR GENERAL                         LINCOLN DAVIS WILSON
                                          ALLIANCE DEFENDING FREEDOM
JOSHUA N. TURNER                          440 First Street, NW, Suite 600
CHIEF OF CONSTITUTIONAL LITIGATION        Washington, DC 20001
AND POLICY                                (202) 393-8690
                                          jbursch@ADFlegal.org
JAMES E. M. CRAIG                         lwilson@ADFlegal.org
CHIEF, CIVIL LITIGATION AND
CONSTITUTIONAL DEFENSE                    DAVID H. THOMPSON
OFFICE OF IDAHO                           BRIAN W. BARNES
ATTORNEY GENERAL                          JOHN D. RAMER
700 W. Jefferson St., Suite 210           COOPER & KIRK, PLLC
Boise, ID 83720                           1523 New Hampshire Avenue, NW
(208) 334-2400                            Washington, DC 20036
alan.hurst@ag.idaho.gov                   202-220-9600
josh.turner@ag.idaho.gov                  dthompson@cooperkirk.com
james.craig@ag.idaho.gov                  bbarnes@cooperkirk.com
                                          jramer@cooperkirk.com
JONATHAN A. SCRUGGS
HENRY W. FRAMPTON, IV
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

**CERTIFICATE OF SERVICE**

I hereby certify that on March 26, 2024, I electronically filed the foregoing Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Alan M. Hurst*
Alan M. Hurst
Counsel for Appellant

March 26, 2024

### CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 6,756 words, excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6). I certify that this brief complies with the word limit of Cir. R. 32-1.

*/s/ Alan M. Hurst*
Alan M. Hurst
Counsel for Appellant

March 26, 2024