APPEAL NO. 24-142

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PAM POE, by and through her parents and next friends Penny and Peter Poe, et al.,

*Plaintiffs-Appellees*,

v.

RAÚL LABRADOR, in official capacity as Attorney General of the State of Idaho, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:23-cv-00269-BLW

## APPENDIX – VOLUME 1

RAÚL R. LABRADOR
ATTORNEY GENERAL
ALAN M. HURST
SOLICITOR GENERAL
JOSHUA N. TURNER
Chief of Constitutional
Litigation and Policy
James E. M. Craig
Chief, Civil Litigation and
Constitutional Defense
Office of Idaho Attorney
General
700 W. Jefferson St.
Boise, ID 83720
(208) 334-2400
alan.hurst@ag.idaho.gov
josh.turner@ag.idaho.gov
james.craig@ag.idaho.gov

JOHN J. BURSCH
LINCOLN DAVIS WILSON
ALLIANCE DEFENDING
FREEDOM
440 First Street, NW,
Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
lwilson@ADFlegal.org

JONATHAN A. SCRUGGS
HENRY W. FRAMPTON, IV
ALLIANCE DEFENDING
FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
hframpton@ADFlegal.org

DAVID H. THOMPSON
BRIAN W. BARNES
JOHN D. RAMER
COOPER & KIRK, PLLC
1523 New Hampshire
Avenue, NW
Washington, DC 20036
202-220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Appellant Raúl R. Labrador*

## Appendix Table of Contents

| Description | Appendix Page No. |
|---|---|
| **VOLUME 1** | |
| Attorney General's Motion for Entry of Previously Agreed Upon Protective Order [DN 95] | 1–6 |
| Memorandum Decision and Order re Protective Order [DN 108] | 7–17 |
| Unredacted pages from Exhibit 167 in *Boe v. Marshall* | 18–110 |
| Unredacted pages from Exhibit 174 in *Boe v. Marshall* | 111–118 |
| Unredacted pages from Exhibit 176 in *Boe v. Marshall* | 119–126 |
| Unredacted pages from Exhibit 180 in *Boe v. Marshall* | 127–198 |
| **VOLUME 2** | |
| Unredacted pages from Exhibit 182 in *Boe v. Marshall* | 199–221 |
| Unredacted pages from Exhibit 184 in *Boe v. Marshall* | 222–249 |
| Unredacted pages from Exhibit 185 in *Boe v. Marshall* | 250–255 |
| Unredacted pages from Exhibit 186 in *Boe v. Marshall* | 256–282 |
| Unredacted pages from Exhibit 187 in *Boe v. Marshall* | 283–309 |
| Unredacted pages from Exhibit 188 in *Boe v. Marshall* | 310–324 |
| Unredacted pages from Exhibit 190 in *Boe v. Marshall* | 325–335 |

RAÚL R. LABRADOR
ATTORNEY GENERAL

JAMES E.M. CRAIG, ISB #6365
Chief, Civil Litigation and
Constitutional Defense

RAFAEL J. DROZ, ISB #9934
Deputy Attorney General
Office of the Attorney General
P. O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
james.craig@ag.idaho.gov
rafael.droz@ag.idaho.gov

*Attorneys for Defendant Raúl Labrador*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **PAM POE**, by and through her parents and next friend, Penny and Peter Poe, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>**RAÚL LABRADOR**, in his official capacity as Attorney General of the State of Idaho, et al.,<br><br>*Defendants*. | Case No. 1:23-cv-00269-BLW<br><br>**ATTORNEY GENERAL'S MOTION FOR ENTRY OF PREVIOUSLY AGREED UPON PROTECTIVE ORDER** |

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, the Attorney General hereby moves for entry of the proposed Protective Order ("Protective Order") attached hereto as Exhibit 1, which sets forth a protocol that was previously agreed to by the parties. The parties had anticipated the production of

ATTORNEY GENERAL'S MOTION FOR ENTRY OF
PREVIOUSLY AGREED UPON PROTECTIVE ORDER — 1

documents and information that a party may believe is, or may contain, confidential, proprietary, trade secret, or commercially or personally sensitive information, and which may be appropriately subject to protection under Federal Rule of Civil Procedure 26(c).

As set forth in the previously agreed to protective order, the parties had agreed that good cause exists to protect the confidential nature of the information contained in certain documents, interrogatory responses, responses to requests for admission, or deposition testimony and that entry of the protective order was warranted to protect against such disclosure of documents and information. In September 2023, the parties reached agreement on the terms of the protective order, and all that was left was for one or more parties to file a motion for entry of the protective order. This did not happen, and so the protective order, which was agreed upon in September 2023, has not yet been issued by the Court. *See* attached Ex. 2.

On July 28, 2023, the Attorney General provided notice to all parties that it was planning on serving a subpoena duces tecum upon the World Professional Association for Transgender Health, Inc. ("WPATH"), and provided a copy of the subpoena along with the notice. *See* attached Ex. 3. On October 3, 2023, in response to the subpoena the Attorney General served upon it, and with the belief that a protective order was, or soon would be, entered in this case, WPATH produced over 100,000 pages of documents to the Attorney General, each of which

ATTORNEY GENERAL'S MOTION FOR ENTRY OF
PREVIOUSLY AGREED UPON PROTECTIVE ORDER — 2

App.002

was marked "Confidential."[1]   The Attorney General intends to file a motion with this Court under Fed. R. Civ. P. 62(d) to dissolve the preliminary injunction based upon, in part, certain of those documents, along with other recently released public information that goes to the reliability of the evidence the Plaintiffs used to support their motion for a preliminary injunction.   In order to produce the WPATH documents to counsel for the other parties in this case, the entry of a protective order is necessary.

This Court previously stayed this matter "pending the Ninth Circuit's resolution of the Attorney General's pending appeal." Dkt. 094.   However, under Fed. R. Civ. P. 62(d), the Court retains authority to "suspend, modify, restore, or grant an injunction" while "an appeal is pending from an interlocutory order … that grants … an injunction."   Further, while "the general rule [is] that a district court is divested of jurisdiction upon the filing of the notice of appeal with respect to any matters involved in the appeal," where "an appeal is allowed from an interlocutory order, the district court may still proceed with matters not involved in the appeal." *Taylor v. Sterrett*, 640 F.2d 663, 667–68 (5th Cir. 1981). "The same court that imposes a stay of litigation has the inherent power and discretion to lift the stay." *Tugaw Ranches, LLC v. United States Dep't of the Interior*, 2020 WL 61282 * 1 (D.

---

[1] The documents were produced to the Office of the Attorney General in response to identical subpoenas issued both in this case and in another case. *Roe v. Critchfield*, Case No. 1:23-cv-00315 (DCN). The other case does have a protective order issued protecting the documents. *Id.* (Dkt 046).

Idaho 2020) (quoting *Canady v. Erbe Elektromedizin GmbH,* 271 F. Supp. 2d 64, 74 (D.D.C. 2002)).

Undersigned counsel has conferred with counsel for the other parties regarding the entry of the Protective Order. Plaintiffs' counsel has advised that they will oppose this motion for entry of a protective order, despite their agreement in September 2023 to the terms and entry of the protective order at that time; counsel for the Ada County Prosecuting Attorney has indicated that the Ada County Prosecuting Attorney does not oppose this motion. Based on the foregoing, the Attorney General respectfully requests that the Court enter the attached Protective Order as an Order of the Court.

The Attorney General further respectfully requests that this motion be heard on an expedited basis in order to allow the Attorney General to provide the WPATH documents to opposing counsel as soon as possible and to allow the Attorney General to file its motion to dissolve the preliminary injunction as soon as possible.

Dated: March 29, 2024.

> STATE OF IDAHO
> OFFICE OF THE ATTORNEY GENERAL
>
>
> By:  */s/ James E.M. Craig*
>       JAMES E. M. CRAIG
>       Chief, Civil Litigation and
>       Constitutional Defense
>
>       *Counsel for Defendant*
>       *Raúl Labrador*

ATTORNEY GENERAL'S MOTION FOR ENTRY OF
PREVIOUSLY AGREED UPON PROTECTIVE ORDER — 4

App.004

## CERTIFICATE OF SERVICE

       I HEREBY CERTIFY that on March 29, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

| | |
|---|---|
| Alexia D. Korberg<br>akorber@paulweiss.com<br>mao_fednational@paulweiss.com | Heather M. McGarthy<br>hmccarthy@adacounty.id.gov<br>telemons@adacounty.id.gov |
| Ariella C. Barel<br>ariella.barel@groombridgewu.com | Jackson Cory Yates<br>jyates@paulweiss.com |
| Brad S. Karp<br>bkarp@paulweiss.com | Jordan E. Orosz<br>jorosz@paulweiss.com |
| Casey Parsons<br>casey@wrest.coop | Kyle N. Bersani<br>kyle.bersani@groombridgewu.com |
| Colleen Rosannah Smith<br>csmith@stris.com<br>6969944420@filings.docketbird.com | Cortlin H. Lannin<br>clannin@cov.com<br>docketing@cov.com |
| Richard Alan Eppink<br>ritchie@wrest.coop | Li Nowlin-Sohl<br>lnowlin-sohl@aclu.org |
| D Jean Veta<br>jveta@cov.com | Meredith Taylor Brown<br>tbrown@aclu.org |
| Dana Kennedy<br>dkennedy@paulweiss.com | Philip S. May<br>philip.may@groombridgewu.com |

ATTORNEY GENERAL'S MOTION FOR ENTRY OF
PREVIOUSLY AGREED UPON PROTECTIVE ORDER — 5

Leslie Jill Cooper
lcooper@aclu.org
ccaicedo@aclu.org
sgarcia@aclu.org

Dina M. Flores-Brewer
dfloresbrewer@alcu.org

Dayton Patrick Reed
dreed@adacounty.id.gov
civilpafiles@adacounty.id.gov
citedemann@adacounty.id.gov

William Isasi
wisasi@cov.com

/s/ James E.M. Craig
James E. M. Craig
Chief, Civil Litigation and
Constitutional Defense

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PAM POE, by and through her parents and next friends, Penny and Peter Poe; PENNY POE; PETER POE; JANE DOE, by and through her parents and next friends, Joan and John Doe; JOAN DOE, and JOHN DOE, | Case No. 1:23-cv-00269-BLW **MEMORANDUM DECISION AND ORDER** |

      Plaintiffs,

      v.

RAÚL LABRADOR, in his official capacity as Attorney General of the State of Idaho *et al.*,

      Defendants.

**INTRODUCTION**

Before the Court is Defendant Attorney General Raúl Labrador's Motion for Entry of Previously Agreed Upon Protective Order (Dkt. 95). For the reasons explained below, the Court will deny the motion.

**BACKGROUND**

Plaintiffs filed this action in May 2023. The lawsuit challenges the constitutionality of Idaho's Vulnerable Child Protection Act, which was slated to take effect on January 1, 2024. On December 26, 2023, however, this Court granted plaintiffs' motion for a preliminary injunction. The injunction prevented

App.007

Attorney General Labrador and the Ada County Prosecutor from enforcing any

provision of the Act during the pendency of this action. The case then took a quick

trip to the Ninth Circuit and the United States Supreme Court. The Attorney

General appealed the Court's injunction order, and in January 2024, the Ninth

Circuit denied the Attorney General's motion to stay the injunction pending

appeal. *See Jan. 30, 2024 Order,* Dkt. 91. A few months later, in April 2024, the

Supreme Court partly granted Mr. Labrador's emergency motion to stay the

injunction. *See Labrador v. Poe*, 144 S. Ct. 921 (2024). The Supreme Court

restricted the scope of the statewide preliminary injunction to the plaintiffs. More

specifically, the Court held that the minor plaintiffs may continue to be provided

with the treatments they seek during the pendency of this action. Otherwise,

defendants are free to enforce the Vulnerable Child Protection Act. In the coming

weeks, the Ninth Circuit will consider Mr. Labrador's appeal of the Court's

preliminary injunction order. The matter has been briefed and oral argument is

scheduled for August 21, 2024.

Meanwhile, back in district court, things have been quiet. Shortly after the

Attorney General filed his interlocutory appeal, the parties agreed to stay the

proceedings at the district-court level until the Ninth Circuit had a chance to

consider and resolve the appeal. *See Jan. 31, 2024 Stay Order,* Dkt. 94. But on

March 29, 2024—some two weeks before the Supreme Court limited the

App.008

injunction to the plaintiffs—the Attorney General filed the currently pending motion. Plaintiffs say that, from their perspective, the motion came out of nowhere. The ultimate aim of the Attorney General's motion isn't limited to seeking this Court's approval of a previously agreed-upon protective order. Rather, the Attorney General wishes to pave the way to file a motion to "dissolve" the preliminary injunction, which, of course, is the very order the Ninth Circuit is currently considering.

## GOVERNING LEGAL STANDARDS

Two legal standards are implicated by the Attorney General's motion: (1) the standard relevant to stays; and (2) the standard relevant to a district court's ability to modify a preliminary injunction order that is being appealed.

### 1.  Imposing or Lifting a Stay of Proceedings

Beginning with the standard governing stay orders, a district court's power to stay a proceeding "is incidental to the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). Similarly, a court has the "inherent power and discretion to lift the stay." *Canady v. Erbe Elektromedizin GmbH*, 271 F. Supp. 2d 64, 74 (D.D.C. 2002). In imposing or lifting a stay, courts weigh three factors, which are sometimes referred to as the *Landis* factors: "[1] the possible damage which may result from the granting [or

lifting] of a stay, [2] the hardship or inequity which a party may suffer in being

required to go forward, and [3] the orderly course of justice measured in terms of

the simplifying or complicating of issues, proof, and questions of law which could

be expected to result from a stay." *CMAX Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir.

1962) (citing *Landis*, 299 U.S. at 254-55). More broadly, whether to lift a stay is

committed to a district court's discretion, and, in considering a motion to lift a

previously imposed stay, the district court may consider whether circumstances

have changed such that its reasons for imposing the stay no longer exist. *See*

*Johnson v. Inos*, Civil Case No. 09-00023, 2013 WL 12210763, at *2, *aff'd,* 619

Fed. Appx. 651 (9th Cir. 2015) (on appeal, the Ninth Circuit observed that the

district court "did not err by requiring a showing of 'changed circumstances' as a

prerequisite for lifting the stay").

## 2. Modifying An Injunction Order That Has Been Appealed

Turning to the Court's ability to modify a preliminary injunction order that

has been appealed, the most basic principle is that "[t]he filing of a notice of appeal

is an event of jurisdictional significance—it confers jurisdiction on the court of

appeals and divests the district court of its control over those aspects of the case

involved in the appeal." *Griggs v. Provident Consumer Disc. Co*., 459 U.S. 56, 58

(1982) (per curiam); *see also Small v. Operative Plasterers' & Cement Masons'*

*Int'l Ass'n Loc. 200*, 611 F.3d 483, 495 (9th Cir. 2010). The rationale for this

MEMORANDUM DECISION AND ORDER - 4

App.010

limitation is that "a federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," because doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment." *Griggs*, 459 U.S. at 58–59. Still, though, filing a notice of appeal doesn't completely divest a district court of jurisdiction to modify a preliminary injunction order. Under Federal Rule of Civil Procedure 62(d), a district court, during the pendency of an appeal from an interlocutory order that "grants, dissolves, or denies an injunction," is authorized to "suspend, modify, restore, or grant an injunction ...." Fed. R. Civ. P. 62(d). This authorization is narrowly construed, however. *See Griggs*, 459 U.S. at 58. Once an appeal from a preliminary injunction has been filed, the district court may generally not alter the injunction "except to maintain the status quo of the parties pending the appeal." *See Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 880 (9th Cir. 2000) (citing *Coastal Corp. v. Texas E. Corp.*, 869 F.2d 817, 819–20 (5th Cir. 1989)). Thus, the Court is prohibited from granting relief regarding the preliminary injunction that divests the appellate court of its jurisdiction by eliminating or materially altering the controversy. *See, e.g., Ortho Pharm. Corp. v. Amgen, Inc.*, 887 F.2d 460, 463–64 (3d Cir. 1989). It follows, then, that the pendency of an interlocutory appeal from a preliminary injunction divests the district court of jurisdiction to vacate or dissolve the injunction. *See*

MEMORANDUM DECISION AND ORDER - 5

*Coastal Corp*, 869 F.2d at 821 (holding that "the district court lacked authority to dissolve the injunction" because of a pending appeal).

## DISCUSSION

### 1.  The Planned Dissolution Motion

As noted above, and as explained further in the briefing, the Attorney General's central aim in filing this motion is to pave the way for a later motion to dissolve this Court's preliminary injunction order. The Attorney General intends to support that motion with new or different evidence than that put forward before. But for the reasons just explained, district courts do not have free rein to modify an injunction order that has been appealed—even if the moving party comes forward with new or different evidence or arguments. The reason is simple: District courts cannot "change the order appealed from on the basis of new arguments or new evidence. Procedural chaos would result if appellate and district courts attempted to exercise jurisdiction simultaneously." Karen L. Stevenson & James E. Fitzgerald, *Rutter Group Practice Guide: Fed. Civ. Pro. Before Trial (Cal. and 9th Cir. ed.)* ¶ 13:224.5 (*citing Coastal Corp.*, 869 F2d at 820-21 *and Flynt Distrib. Co. v. Harvey*, 734 F2d 1389, 1392 n.1 (9th Cir. 1984)). And the motion the Attorney General plans to bring is not to keep the status quo in place. Just the opposite, as he wants the Court to entirely dissolve the injunction.

The plaintiffs pointed out the problems with the Attorney General's planned

dissolution motion at some length in their response brief. *See Response,* Dkt. 99, at 10, 12-15 (arguing that the Court should decline to lift the stay to facilitate briefing on a procedurally impermissible motion). On reply, the Attorney General chided plaintiffs for ruminating about a motion that hasn't even been filed yet. He urges the Court to ignore the yet-to-be filed motion for the time being and instead focus solely on the request to approve the parties' previously agreed-upon protective order. *See Reply*, Dkt. 100, at 1-2. Specifically, he says he "is not requesting a wholesale lifting of the stay" and that "[t]o the extent the lifting of the stay is necessary, it is for the singular, and limited purpose of entering a previously agreed upon protective order under F.R.C.P. 26(c)." *Reply,* Dkt. 100, at 4. But in the next breath, the Attorney General says that "[e]ntering this agreed upon protective order will simplify the presentation of evidence in support of the Rule 62(d) motion by allowing the Attorney General to provide the subpoenaed WPATH documents to all parties." *Id.* (footnote omitted).[1]

---

[1] In a footnote, the Attorney General says this: "Plaintiffs agree that a motion under Rule 62(d) is not affected by the stay, writing that 'Rule 62(d) presents an exception to the general rule divesting the district court of jurisdiction over matters on appeal,' . . . ." *Reply*, Dkt. 100, at 4 n.2. The Court does not agree with this assessment of plaintiffs' position. As the Court reads the briefing, plaintiffs were talking about a district court's *jurisdiction* to consider matters on appeal, not the separate issue of whether the Attorney General would need to obtain relief from the stay before filing his contemplated motion to dissolve the preliminary injunction. In this Court's view, the Attorney General would need to obtain relief from the stay before filing a motion to dissolve the preliminary injunction. For the reasons explained in this Order, the Court declines to grant such relief.

App.013

The Court will decline the invitation to close its eyes to the planned dissolution motion in determining whether to lift the stay. After all, the Attorney General doesn't want to lift the stay for the sole purpose of getting the protective order in place and getting documents over to plaintiffs. If *that* was all the Attorney General wanted, it seems likely that the plaintiffs would be agreeable. But the Attorney General expressly stated in his motion that he wants to get that protective order in place so that he can file a motion to dissolve the injunction as soon as possible. For the reasons already explained, the Court does not intend to lift the stay for that purpose because it "lacks jurisdiction to modify an injunction once it has been appealed except to maintain the status quo among the parties." *Prudential Real Estate Affiliates, Inc.*, 204 F.3d at 880 ; *see also* 15 Fed. Prac. & Proc. Juris. § 3921.2 (3d ed.) § 3921.2 (observing that the apparent force of Federal Rule of Civil Procedure Rule 62(d) "has been restricted by a gloss that limits the district court to acts designed to 'preserve the status quo.'"). Accordingly, in evaluating the *Landis* factors, the Court will not focus solely on the requested protective order but will additionally consider whether it should lift the stay so that the Attorney General can file the dissolution motion.

## 2.      The *Landis* Factors

The first two *Landis* factors call upon the Court to balance the hardships if the action is stayed or if the litigation proceeds. The Court finds that these factors

MEMORANDUM DECISION AND ORDER - 8

weigh in favor of keeping the stay in place. When this Court initially floated the idea of staying the litigation, no party indicated that it would suffer harm by virtue of a stay. That is particularly notable because, at the time, the Court's preliminary injunction was effective statewide. At this point, the injunction has been limited to the plaintiffs, so any hardship suffered by defendants has been significantly lessened. In his briefing, the Attorney General acknowledged that the urgency of the request to lift the stay has lessened somewhat, at least temporarily. He says, "While this order from the U.S. Supreme Court is welcome relief to the State of Idaho, lessening the urgency of the State's motion by allowing the State to again protect its most vulnerable citizens from the harmful procedures banned by the VCPA, it is only temporary relief." *Reply*, Dkt. 100, at 3. The Attorney General points out that the Ninth Circuit might reinstate the statewide preliminary injunction. The Court will cross that bridge if and when it materializes. Further, if the preliminary injunction were to be reinstated statewide, the Court believes the speedier path forward would be to push this case along toward a trial.

As for the second factor—the harm in forging ahead—the Court is concerned about the Attorney General's planned motion for the reasons already described. In short, the Court doubts it has jurisdiction to simply dissolve or vacate the injunction. And, aside from that, neither side has indicated it wishes to forge ahead in an effort to prepare the case for trial. Rather, it appears that, as was the

App.015

case back in January when the Court entered the stay, the parties are content to

wait for guidance from the Ninth Circuit.

Turning to the third factor, which relates to the orderly administration of

justice, this factor weighs heavily in favor of leaving the stay in place. Indeed, this

this factor was a key driver in the Court's initial decision to enter a stay. Granted,

"while it is the prerogative of the district court to manage its workload, case

management standing alone is not necessarily a sufficient ground to stay

proceedings." *Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F.3d

1059, 1066 (9th Cir. 2007). Indeed, the Ninth Circuit has "repeatedly admonished

district courts not to delay trial preparation to await an interim ruling on a

preliminary injunction" because preliminary injunctions often involve a limited

review of the factual record and "may provide little guidance as to the appropriate

disposition on the merits." *California v. Azar*, 911 F.3d 558, 583-84 (9th Cir.

2018). But in this case, the parties presented the Court with a significantly

developed factual record (including hundreds of pages of declarations, deposition

transcripts, and exhibits) in connection with the motion for a preliminary

injunction, and all parties declined to present live evidence at the injunction

hearing. On top of that, Attorney General Labrador argued that he is immune from

suit, which independently counsels in favor of a stay. *See Andrade Rico v. Beard,*

No. 2:17-CV-1402-KJM-DBP, 2019 WL 4127206, at *8 (E.D. Cal. Aug. 30, 2019)

MEMORANDUM DECISION AND ORDER - 10

(staying proceedings pending interlocutory appeal where merits of plaintiffs'
claims were intertwined with questions of qualified immunity on appeal).

More broadly, the complexity of the constitutional issues involved with the
Court's ruling make it likely that the Ninth Circuit's opinion will guide this Court's
future analysis. After all, plaintiffs are seeking a permanent injunction, which is
similar to the relief granted by the preliminary injunction. Given the substantial
overlap of the legal issues and the relief sought, awaiting a decision by the Ninth
Circuit will minimize the risk of inconsistent judgments. Also relevant to this
factor, the Court had judicial economy in mind when it granted the stay. This Court
is an extraordinarily busy one and has scarce judicial resources. It is therefore
critical for this Court to manage its cases with efficiency and economy in mind.

For all these reasons, the Court will decline to lift the stay and will instead
wait for a ruling from the Ninth Circuit.

## ORDER

**IT IS ORDERED that** Defendant Attorney General Labrador's Motion for
Entry of Previously Agreed Upon Protective Order (Dkt. 95) is **DENIED.**

DATED: July 31, 2024

B. Lynn Winmill
U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 11

App.017

# EXHIBIT 167

| | |
|---|---|
| **From:** | Karen Robinson |
| **To:** | Donna Kelly |
| **Subject:** | RE: Any update? |
| **Date:** | Thursday, December 21, 2017 9:25:00 AM |

Donna --
I have asked for a contact at research office to review and provide advice on wording. We then may need to discuss on phone.
In general, my understanding is that the university will not sign off on a contract that allows a sponsor to stop an academic publication.
Also, just to be clear, the "data" we are talking about is our review of existing publications.
I will be back in touch when I have heard from lawyer on this end.
Thanks for your persistence in this, Donna!
Happy holidays and best wishes for a happy and healthy new year,
Karen


-----Original Message-----
From: Donna Kelly [mailto:donna@veritasmeetingsolutions.com]
Sent: Wednesday, December 20, 2017 5:29 PM
To: Karen Robinson <      REDACTED
Subject: RE: Any update?

Thanks Karen.
Please define "other than for education, academic or research purposes" in 9.2.
Our board has very specific thoughts around having approval for all uses, they are not likely to want to grant use of the data for academic research purposes without approval of the context.
Happy to discuss this more by phone if that is easier.
Donna


-----Original Message-----
From: Karen Robinson [mailto      REDACTED
Sent: Wednesday, December 20, 2017 1:43 PM
To: Donna Kelly <donna@wpath.org>
Subject: RE: Any update?

Thanks, Donna. The prior version of section 8 covered some of that but how about this for new sections to replace original 7,8 and 9 (to be renumbered). Again, I used a prior contract with an organization as a basis. Please let me know of any suggested revisions. If you and Board are ok or mostly ok, I will revise contract and start process of getting our side (lawyers) to review.
Thanks!
Karen


<sent previously>
1.1      Rights in Data
1.1.1   The term "Project Data" as used herein includes, among others, raw data, research data, records, reports, notes, tables, writing, sound recordings, pictorial reproduction, drawings or other graphical representations, and works of any similar nature (whether or not copyrighted) which are generated or specified to be delivered in connection with the Project under this Agreement.
1.1.2   The INSTITUTION ensures that the ownership of the Project Data and all intellectual property rights in the Project Data developed by the INSTITUTION or the INVESTIGATOR in connection with the Project shall automatically be vested in WPATH as soon as they are created or, to the extent required, assigned to WPATH.
1.1.3   To the extent not prohibited by mandatory law, the INSTITUTION hereby completely waives and agrees not to enforce (and procures that its agents, designees, employees and subcontractors waive and agree not to enforce) any intellectual property rights and other proprietary rights, if any, related to the Project Data.
1.1.4   WPATH shall grant the INSTITUTION a royalty-free, nonexclusive license or permissions and licenses as

JHU_000000011

may be required for the INSTITUTION and the INVESTIGATOR to use the Project Data in so far as required by the INSTITUTION and/or the INVESTIGATOR for education or research purposes.

<suggested new section>

9.    Use and Publication

9.1    Notwithstanding anything to the contrary contained in this Agreement, WPATH shall retain the unrestricted right to use the Project Data, or any part thereof at any time, in any manner and for any purpose, including the publication of the Project Data and the communication of Project Data to third parties.

9.2    Any publication or use of the Project Data by the INSTITUTION, other than for education, academic or research purposes, must be reviewed by WPATH and approved by it prior to such publication of use.

9.3    Prior to the publication of the Project Data or any part thereof by the INSTITUTION, WPATH shall have thirty (30) days in which to review and comment on the proposed publication. The INSTITUTION will give due regard to WPATH's comments. WPATH has the right to request the deletion of any Confidential Information. WPATH further has the right to request a delay in publication to allow for any patentable invention to be legally protected.

9.4    Publication of the Project Data or any part thereof by either of the Parties shall give proper credit to the other Party. The INSTITUTION shall not mention any commercial brands or trade names in the publication of the Project Data except as such brand or trade names are essential in the description of the research, nor shall the name of WPATH be used in any way for advertising purposes without WPATH's prior written consent.

9.5    The INSTITUTION shall not originate any publicity, news release, advertising promotion or commercial material, or other public announcement, written or verbal, whether  to the public press or otherwise, relating to this Agreement, the Project conducted hereunder, or to any amendment(s) without WPATH's prior express written consent, except as required by law.

-----Original Message-----
From: Donna Kelly [mailto:donna@wpath.org]
Sent: Wednesday, December 20, 2017 2:18 PM
To: Karen Robinson <        REDACTED
Subject: RE: Any update?

Hi Karen,
Thank you for doing this it was very helpful. We discussed the revised language and most was fine as is. There are still questions around  your 1.1.4 below.  Can you provide some additional clarification? The board wants it to be clear that the data cannot be used without WPATH approval in each instance so they have some control over the context it is being used in.
Thank you, Donna

1.1.4   WPATH shall grant the INSTITUTION a royalty-free, nonexclusive license or permissions and licenses as may be required for the INSTITUTION and the INVESTIGATOR to use the Project Data in so far as required by the INSTITUTION and/or the INVESTIGATOR for education or research purposes.

-----Original Message-----
From: Karen Robinson [mailto        REDACTED
Sent: Tuesday, December 19, 2017 7:34 AM
To: Donna Kelly <donna@wpath.org>
Subject: Any update?

Good morning, Donna.. I am checking in to see if the revised contract text I sent addressed the concerns. Anything I can do on my end to move forward?
Thanks,
Karen

JHU_000000012

App.020

Sent from my iPhone

JHU_000000013

| | |
|---|---|
| **From:** | Karen Robinson |
| **To:** | "Donna Kelly" |
| **Subject:** | RE: Any update? |
| **Date:** | Wednesday, December 20, 2017 2:43:26 PM |

---

Thanks, Donna. The prior version of section 8 covered some of that but how about this for new sections to replace original 7,8 and 9 (to be renumbered). Again, I used a prior contract with an organization as a basis. Please let me know of any suggested revisions. If you and Board are ok or mostly ok, I will revise contract and start process of getting our side (lawyers) to review.

Thanks!

Karen

<sent previously>

1.1     Rights in Data

1.1.1   The term "Project Data" as used herein includes, among others, raw data, research data, records, reports, notes, tables, writing, sound recordings, pictorial reproduction, drawings or other graphical representations, and works of any similar nature (whether or not copyrighted) which are generated or specified to be delivered in connection with the Project under this Agreement.

1.1.2   The INSTITUTION ensures that the ownership of the Project Data and all intellectual property rights in the Project Data developed by the INSTITUTION or the INVESTIGATOR in connection with the Project shall automatically be vested in WPATH as soon as they are created or, to the extent required, assigned to WPATH.

1.1.3   To the extent not prohibited by mandatory law, the INSTITUTION hereby completely waives and agrees not to enforce (and procures that its agents, designees, employees and subcontractors waive and agree not to enforce) any intellectual property rights and other proprietary rights, if any, related to the Project Data.

1.1.4   WPATH shall grant the INSTITUTION a royalty-free, nonexclusive license or permissions and licenses as may be required for the INSTITUTION and the INVESTIGATOR to use the Project Data in so far as required by the INSTITUTION and/or the INVESTIGATOR for education or research purposes.

<suggested new section>

9.     Use and Publication

9.1     Notwithstanding anything to the contrary contained in this Agreement, WPATH shall retain the unrestricted right to use the Project Data, or any part thereof at any time, in any manner and for any purpose, including the publication of the Project Data and the communication of Project Data to third parties.

9.2     Any publication or use of the Project Data by the INSTITUTION, other than for education, academic or research purposes, must be reviewed by WPATH and approved by it prior to such publication of use.

9.3     Prior to the publication of the Project Data or any part thereof by the INSTITUTION, WPATH shall have thirty (30) days in which to review and comment on the proposed publication. The INSTITUTION will give due regard to WPATH's comments. WPATH has the right to request the deletion of any Confidential Information. WPATH further has the right to request a delay in publication to allow for any patentable invention to be legally protected.

9.4     Publication of the Project Data or any part thereof by either of the Parties shall give proper credit to the other Party. The INSTITUTION shall not mention any commercial brands or trade names in the publication of the Project Data except as such brand or trade names are essential in the description of the research, nor shall the name of WPATH be used in any way for advertising purposes without WPATH's prior written consent.

9.5     The INSTITUTION shall not originate any publicity, news release, advertising promotion or commercial material, or other public announcement, written or verbal, whether to the public press or otherwise, relating to this Agreement, the Project conducted hereunder, or to any amendment(s) without WPATH's prior express written consent, except as required by law.

JHU_000000014

App.022

-----Original Message-----
From: Donna Kelly [mailto:donna@wpath.org]
Sent: Wednesday, December 20, 2017 2:18 PM
To: Karen Robinson <       REDACTED
Subject: RE: Any update?

Hi Karen,
Thank you for doing this it was very helpful. We discussed the revised language and most was fine as is. There are
still questions around your 1.1.4 below. Can you provide some additional clarification? The board wants it to be
clear that the data cannot be used without WPATH approval in each instance so they have some control over the
context it is being used in.
Thank you, Donna

1.1.4   WPATH shall grant the INSTITUTION a royalty-free, nonexclusive license or permissions and licenses as
may be required for the INSTITUTION and the INVESTIGATOR to use the Project Data in so far as required by
the INSTITUTION and/or the INVESTIGATOR for education or research purposes.

-----Original Message-----
From: Karen Robinson [mailto       REDACTED
Sent: Tuesday, December 19, 2017 7:34 AM
To: Donna Kelly <donna@wpath.org>
Subject: Any update?

Good morning, Donna.. I am checking in to see if the revised contract text I sent addressed the concerns. Anything I
can do on my end to move forward?
Thanks,
Karen

Sent from my iPhone

JHU_000000015

App.023

| | |
|---|---|
| **From:** | Karen Robinson |
| **To:** | "Donna Kelly" |
| **Subject:** | RE: contact for the contract? |
| **Date:** | Wednesday, September 27, 2017 12:03:19 PM |

I don't envy you the task of finding a common meeting time!

I am willing to be flexible to other options, such as individual calls, as needed.

Thanks,

Karen

**From:** Donna Kelly [mailto:donna@wpath.org]
**Sent:** Wednesday, September 27, 2017 11:46 AM
**To:** Karen Robinson < REDACTED
**Subject:** RE: contact for the contract?

Excellent Karen.

I am still working on a common time they can all meet. If need be are you will to speak with the three chairs individually? I think that may be a better approach. I can speak with you first to give you some direction from the Board and a heads up on some of the points that need to be ironed out with the Chair.

Thanks

Donna

**From:** Karen Robinson [mailto: REDACTED
**Sent:** Wednesday, September 27, 2017 10:42 AM
**To:** Donna Kelly <donna@wpath.org>
**Subject:** RE: contact for the contract?

Donna –

I just wanted to touch base. The contract is with our research office and I hope to get it soon and then forward to you.

Any word on scheduling of calls?

Thanks,

Karen

**From:** Donna Kelly [mailto:donna@wpath.org]
**Sent:** Monday, September 18, 2017 12:04 PM
**To:** Karen Robinson < REDACTED Donna Kelly <donna@wpath.org>
**Subject:** RE: contact for the contract?

Hi Karen,

I am still working on it, one of our chairs was on holiday.

I will get back to you as soon as possible.

Thank you

Donna

**From:** Karen Robinson [mailto: REDACTED
**Sent:** Monday, September 18, 2017 10:51 AM
**To:** Donna Kelly <donna@wpath.org>
**Subject:** RE: contact for the contract?

Donna –

I just wanted to check in. Any word on call with program chairs?

JHU_000000016

App.024

The contract is working its way through the red tape here at Hopkins and I hope to send it along to you soon.

Thanks,

Karen

---

**From:** Donna Kelly [mailto:donna@wpath.org]
**Sent:** Tuesday, September 12, 2017 4:31 PM
**To:** Karen Robinson < REDACTED
**Subject:** RE: contact for the contract?

Hi Karen,

The contract should come to me and I will share it with the rest of the leadership. I agree it is good to get started on it now as they may want to send it for legal for review. I imagine if the scope changes at all based on the call much of the general language would be the same.

Thank you

Donna

---

**From:** Karen Robinson [mailto: REDACTED
**Sent:** Tuesday, September 12, 2017 7:20 AM
**To:** Donna Kelly <donna@wpath.org>
**Subject:** contact for the contract?

Donna –

As we work to schedule a call with the chairs, is there someone I should be in touch with regarding the contract? I'd like to set those wheels in motion so we can get started as soon as possible.

Thanks,

Karen

-----------------------

Karen A. Robinson, PhD

Director JHU Evidence-based Practice Center

Associate Professor of Medicine, Epidemiology, and Health Policy and Management

Johns Hopkins University

REDACTED

REDACTED

REDACTED

REDACTED

JHU_000000017

App.025

| | |
|---|---|
| **From:** | Karen Robinson |
| **To:** | "Donna Kelly" |
| **Subject:** | RE: contact for the contract? |
| **Date:** | Wednesday, September 27, 2017 11:42:23 AM |

Donna –

I just wanted to touch base. The contract is with our research office and I hope to get it soon and then forward to you.

Any word on scheduling of calls?

Thanks,

Karen

**From:** Donna Kelly [mailto:donna@wpath.org]
**Sent:** Monday, September 18, 2017 12:04 PM
**To:** Karen Robinson <           REDACTED           Donna Kelly <donna@wpath.org>
**Subject:** RE: contact for the contract?

Hi Karen,

I am still working on it, one of our chairs was on holiday.

I will get back to you as soon as possible.

Thank you

Donna

**From:** Karen Robinson [mailto:           REDACTED
**Sent:** Monday, September 18, 2017 10:51 AM
**To:** Donna Kelly <donna@wpath.org>
**Subject:** RE: contact for the contract?

Donna –

I just wanted to check in. Any word on call with program chairs?

The contract is working its way through the red tape here at Hopkins and I hope to send it along to you soon.

Thanks,

Karen

**From:** Donna Kelly [mailto:donna@wpath.org]
**Sent:** Tuesday, September 12, 2017 4:31 PM
**To:** Karen Robinson <           REDACTED
**Subject:** RE: contact for the contract?

Hi Karen,

The contract should come to me and I will share it with the rest of the leadership. I agree it is good to get started on it now as they may want to send it for legal for review. I imagine if the scope changes at all based on the call much of the general language would be the same.

Thank you

Donna

**From:** Karen Robinson [mailto:           REDACTED
**Sent:** Tuesday, September 12, 2017 7:20 AM
**To:** Donna Kelly <donna@wpath.org>
**Subject:** contact for the contract?

Donna –

JHU_000000018

App.026

As we work to schedule a call with the chairs, is there someone I should be in touch with regarding the contract? I'd like to set those wheels in motion so we can get started as soon as possible.

Thanks,

Karen

----------------------

Karen A. Robinson, PhD

Director JHU Evidence-based Practice Center

Associate Professor of Medicine, Epidemiology, and Health Policy and Management

Johns Hopkins University

REDACTED

REDACTED

REDACTED

REDACTED

JHU_000000019

App.027

| | |
|---|---|
| **From:** | Karen Robinson |
| **To:** | Donna Kelly |
| **Subject:** | RE: contact for the contract? |
| **Date:** | Monday, September 18, 2017 11:50:00 AM |

Donna –

I just wanted to check in. Any word on call with program chairs?

The contract is working its way through the red tape here at Hopkins and I hope to send it along to you soon.

Thanks,

Karen

**From:** Donna Kelly [mailto:donna@wpath.org]
**Sent:** Tuesday, September 12, 2017 4:31 PM
**To:** Karen Robinson <    REDACTED
**Subject:** RE: contact for the contract?

Hi Karen,

The contract should come to me and I will share it with the rest of the leadership. I agree it is good to get started on it now as they may want to send it for legal for review. I imagine if the scope changes at all based on the call much of the general language would be the same.

Thank you

Donna

**From:** Karen Robinson [mailto:    REDACTED
**Sent:** Tuesday, September 12, 2017 7:20 AM
**To:** Donna Kelly <donna@wpath.org>
**Subject:** contact for the contract?

Donna –

As we work to schedule a call with the chairs, is there someone I should be in touch with regarding the contract? I'd like to set those wheels in motion so we can get started as soon as possible.

Thanks,

Karen

-----------------------

Karen A. Robinson, PhD

Director JHU Evidence-based Practice Center

Associate Professor of Medicine, Epidemiology, and Health Policy and Management

Johns Hopkins University

REDACTED

REDACTED

REDACTED

REDACTED

JHU_000000020

App.028

| | |
|---|---|
| **From:** | Karen Robinson |
| **To:** | "Donna Kelly" |
| **Subject:** | RE: contract language? |
| **Date:** | Thursday, December 7, 2017 1:24:03 PM |

I would suggest that the text I sent be used to replace section 7 and 9. Again, I will have to send revised contract through office here. Let me know if this works on your end and I will start that process.

Thanks

Karen

**From:** Donna Kelly [mailto:donna@veritasmeetingsolutions.com]
**Sent:** Thursday, December 07, 2017 1:17 PM
**To:** Karen Robinson < REDACTED
**Subject:** RE: contract language?

Hi Karen.

Sorry I mistyped, it is 7, 8 and 9. Whould you please provide comment on section 9.

Thank you

Donna

**From:** Karen Robinson [mailto: REDACTED
**Sent:** Thursday, December 7, 2017 9:48 AM
**To:** Donna Kelly <donna@veritasmeetingsolutions.com>
**Subject:** RE: contract language?

Donna –

Thanks for the follow-up information.

Section 6 is standard confidentiality section and I think is ok as is.

I have pasted below some possible replacement text for Section 7 based on a prior contract of similar work.

Section 8 is about publishing the results of the reviews (called STUDY in contract, and Project Data in text below), not the SOC.

Let me know if below helps and I will see how to get it through our lawyers.

Thanks,

Karen

1.1 Rights in Data

1.1.1 The term "Project Data" as used herein includes, among others, raw data, research data, records, reports, notes, tables, writing, sound recordings, pictorial reproduction, drawings or other graphical representations, and works of any similar nature (whether or not copyrighted) which are generated or specified to be delivered in connection with the Project under this Agreement.

1.1.2 The INSTITUTION ensures that the ownership of the Project Data and all intellectual property rights in the Project Data developed by the INSTITUTION or the INVESTIGATOR in connection with the Project shall automatically be vested in WPATH as soon as they are created or, to the extent required, assigned to WPATH.

1.1.3 To the extent not prohibited by mandatory law, the INSTITUTION hereby completely waives and agrees not to enforce (and procures that its agents, designees, employees and subcontractors waive and agree not to enforce) any intellectual property rights and other

JHU_000000021

App.029

proprietary rights, if any, related to the Project Data.

1.1.4 WPATH shall grant the INSTITUTION a royalty-free, nonexclusive license or permissions and licenses as may be required for the INSTITUTION and the INVESTIGATOR to use the Project Data in so far as required by the INSTITUTION and/or the INVESTIGATOR for education or research purposes.

---

**From:** Donna Kelly [mailto:donna@veritasmeetingsolutions.com]
**Sent:** Monday, December 04, 2017 1:54 PM
**To:** Karen Robinson <    REDACTED
**Subject:** RE: contract language?

Hi Karen,

Attached here again should you not have it handy is the agreement. It is sections 6, 7 and 8. Here are my notes from the conversation at our board meeting.

* The SOC belongs to WPATH, JHU is being hired to help us with the evidence review and grading of the evidence. JHU cannot publish their findings independently, the SOC is an internal work product of WPATH.

* If we are paying for the data review through a fee for services, why wouldn't we own the results? Define exactly what data belongs to WPATH and what JH considers they own or have limited rights to. Define the limitations.

Please let me know your thoughts.

Thank you

Donna

---

**From:** Karen Robinson [mailto:    REDACTED
**Sent:** Wednesday, November 29, 2017 11:18 AM
**To:** Donna Kelly <donna@wpath.org>
**Subject:** contract language?

Donna –

Could you send me the section(s) or statement(s) in the contract that has caused concern?

Thanks,

Karen

JHU_000000022

App.030

| | |
|---|---|
| **From:** | Karen Robinson |
| **To:** | "Donna Kelly" |
| **Subject:** | RE: contract language? |
| **Date:** | Thursday, December 7, 2017 10:48:26 AM |

Donna –

Thanks for the follow-up information.

Section 6 is standard confidentiality section and I think is ok as is.

I have pasted below some possible replacement text for Section 7 based on a prior contract of similar work.

Section 8 is about publishing the results of the reviews (called STUDY in contract, and Project Data in text below), not the SOC.

Let me know if below helps and I will see how to get it through our lawyers.

Thanks,

Karen

1.1 Rights in Data

1.1.1 The term "Project Data" as used herein includes, among others, raw data, research data, records, reports, notes, tables, writing, sound recordings, pictorial reproduction, drawings or other graphical representations, and works of any similar nature (whether or not copyrighted) which are generated or specified to be delivered in connection with the Project under this Agreement.

1.1.2 The INSTITUTION ensures that the ownership of the Project Data and all intellectual property rights in the Project Data developed by the INSTITUTION or the INVESTIGATOR in connection with the Project shall automatically be vested in WPATH as soon as they are created or, to the extent required, assigned to WPATH.

1.1.3 To the extent not prohibited by mandatory law, the INSTITUTION hereby completely waives and agrees not to enforce (and procures that its agents, designees, employees and subcontractors waive and agree not to enforce) any intellectual property rights and other proprietary rights, if any, related to the Project Data.

1.1.4 WPATH shall grant the INSTITUTION a royalty-free, nonexclusive license or permissions and licenses as may be required for the INSTITUTION and the INVESTIGATOR to use the Project Data in so far as required by the INSTITUTION and/or the INVESTIGATOR for education or research purposes.

**From:** Donna Kelly [mailto:donna@veritasmeetingsolutions.com]
**Sent:** Monday, December 04, 2017 1:54 PM
**To:** Karen Robinson < REDACTED
**Subject:** RE: contract language?

Hi Karen,

Attached here again should you not have it handy is the agreement. It is sections 6, 7 and 8. Here are my notes from the conversation at our board meeting.

* The SOC belongs to WPATH, JHU is being hired to help us with the evidence review and grading of the evidence. JHU cannot publish their findings independently, the SOC is an internal work product of WPATH.

* If we are paying for the data review through a fee for services, why wouldn't we own the results? Define exactly what data belongs to WPATH and what JH considers they own or have limited rights

JHU_000000023

App.031

to. Define the limitations.
Please let me know your thoughts.
Thank you
Donna

---

**From:** Karen Robinson [mailto: REDACTED
**Sent:** Wednesday, November 29, 2017 11:18 AM
**To:** Donna Kelly <donna@wpath.org>
**Subject:** contract language?
Donna –
Could you send me the section(s) or statement(s) in the contract that has caused concern?
Thanks,
Karen

JHU_000000024

App.032

| | |
|---|---|
| **From:** | Karen Robinson |
| **To:** | Donna Kelly |
| **Cc:** | Chanel Livingston |
| **Subject:** | contract: JHU and WPATH |
| **Date:** | Wednesday, May 2, 2018 2:47:00 PM |
| **Attachments:** | WPATH JH SOC8 Contract.pdf |

Donna –

Attached is signed contract – note that before this is finalized we need the 'notices section' completed with details on to whom and where written notices are to be sent (see page 6).

I have had productive and informative calls with chairs and chapter leads – and another next week.

Thanks!

Karen

------------------------

Karen A. Robinson, PhD

Director JHU Evidence-based Practice Center

Associate Professor of Medicine, Epidemiology, and Health Policy and Management

Johns Hopkins University

REDACTED

## Sponsored Research Agreement
## Johns Hopkins University

This agreement (the "Agreement") is entered into as of this First day of April, 2018 (the "Effective Date"), by and between Johns Hopkins University, on behalf of its School of Medicine, having an Office of Research Administration located at 733 North Broadway, Suite 117 Baltimore, Maryland, 21205 ("JHU"), and the World Professional Association for Transgender Health, a private non-profit organization located at 2575 Northwest Parkway, Elgin, Illinois 60124 ("Sponsor").

WHEREAS, Sponsor wishes that JHU perform systematic reviews and other activities to support guideline development and such work is of mutual interest and benefit to the JHU and Sponsor;

WHEREAS, Karen A. Robinson, PhD, Director, JHU Evidence-based Practice Center and Associate Professor of Medicine shall be JHU's principal investigator in conducting the research for Sponsor ("Investigator"); and

WHEREAS, the research will further JHU's instructional, scholarship, and research objectives in a manner consistent with its status as a non-profit, tax-exempt, educational institution.

NOW, THEREFORE, in consideration of the following mutual promises, covenants, and conditions and any sums to be paid, the parties hereto agree as follows:


## 1.     STATEMENT OF WORK

(a)     JHU agrees to use its reasonable efforts to support update and development of the Standards of Care for the Health of Transsexual, Transgender, and Gender Noncomforming People ("Study"), as described in the statement of work for this Study (attached as <u>Exhibit A</u>). JHU shall perform the Study in accordance with academic standards and all applicable laws and regulations.

(b)     Sponsor acknowledges that JHU and/or its researchers may be engaged in similar research not financially supported by Sponsor or subject to this Agreement. Nothing in this Agreement shall be construed to limit the freedom of JHU and/or its researchers who are participants in this Agreement, whether paid under this Agreement or not, from engaging in similar research inquiries made independently under other grants, contracts, or agreements with parties other than the Sponsor, and Sponsor shall have no rights via this Agreement to the results of such similar research.

## 2.     INVESTIGATOR

This Study will be conducted under the direction of the Investigator identified above. In the event the Investigator should become unavailable to serve in that role, or shall no longer be employed by JHU, JHU shall have the right to designate a replacement principal investigator, subject to Sponsor's reasonable approval. If the parties are unable to identify a mutually

JHU_000000095
App.034

acceptable replacement principal investigator within sixty (60) days of notification to Sponsor by JHU of a proposed replacement, then either party may terminate this Agreement in accordance with the termination provision of this Agreement.

## 3.   PAYMENT

(a)    In consideration of JHU conducting the Study hereunder, Sponsor shall pay JHU in the aggregate amount of One Hundred Ninety-Six Three Hundred Seven U.S. Dollars ($196,307). Payments shall be made in accordance with the following schedule:

> A quarterly payment schedule based on milestones:
> 1. $49,076.75 upon initiation of project with signed contract
> 2. $49,076.75 upon submission of final PICO document outlining questions for review
> 3. $49,076.75 upon submission of the draft report of the systematic reviews
> 4. $49,076.75 upon submission of final report of systematic reviews

(b)    Payments shall be made as follows:

> Payable to: **The Johns Hopkins University**
> Tax I.D. Number: **52-0595110**
>
> **Payments by check shall be sent to:**
>
> **Johns Hopkins University Central Lockbox**
> **c/o Bank of America**
> **12529 Collections Center Drive**
> **Chicago, IL 60693**
>
> **All electronic fund transfers should be sent to:**
>
> **c/o Bank of America**
> **100 S. Charles Street**
> **Baltimore, Maryland 21201**
> **Transit/routing/ABA number:** REDACTED
> **Account number:** REDACTED
>
> **All payments shall include the following reference information:**
>
> 1.  Name of JHU Investigator
> 2.  Title of the Study

## 4.   EQUIPMENT AND PROPERTY

JHU_000000096

App.035

Unless otherwise explicitly provided, title to and ownership of all equipment, supplies, and property purchased or manufactured by JHU under this Agreement will be in and remain with JHU, even after completion or termination of the Agreement.

5.     **AUDIT**

Authorized representatives of Sponsor or its designee shall have the right no more than once per contract year, upon reasonable and advance written notice, during regular business hours, and in accordance with JHU's applicable policies and procedures, to examine and inspect JHU's and the applicable Investigator's records associated with this Study and inspect and copy all work products relating to this Study, subject to Section 6 of this Agreement.

6.     **PROPRIETARY INFORMATION AND CONFIDENTIALITY**

(a)     "Confidential Information" means all non-public, confidential, and/or proprietary information that is marked as "Confidential Information" as described below and which is disclosed by one party to the other, including but not limited to software, inventions (whether patentable or not), algorithms, diagrams, drawings, processes, research, product or strategic plans or collaborations or partnerships, financial information, or business models. Confidential Information, if in tangible or readable form, shall be marked as such at the time of disclosure and if disclosed orally, shall be reduced to writing, marked confidential, and addressed to the other party within ten (10) days after disclosure.

(b)     Both JHU and Sponsor shall have the right to refuse to accept any Confidential Information proffered to it by the other. If necessary, the parties will exchange Confidential Information only under the provisions set forth herein. The party who receives Confidential Information (the "Receiving Party") shall (i) hold the Confidential Information in confidence using the same care it affords its own confidential information of a similar nature, but not less than a reasonable degree of care; (ii) use the Confidential Information only for the performance of this Agreement; and (iii) restrict disclosure of the Confidential Information to employees whose duties justify the need to know the Confidential Information in furtherance of the performance of this Agreement and who are advised as to the confidential nature of the information and required to comply with the provisions of this Agreement. The Receiving Party shall not provide any third parties with access to the Confidential Information unless such third party has agreed to be bound by confidentiality and non-disclosure obligations in a form of an agreement reasonably acceptable to the party disclosing the Confidential Information (the "Disclosing Party").

(c)     Confidential Information shall not include any information disclosed that the Receiving Party can demonstrate (i) previously was in its possession, without violation of any obligation of confidentiality; (ii) was received from a third party without violation of any obligation of confidentiality; (iii) was publicly known and made generally available prior to such disclosure; (iv) becomes publicly known and made generally available, through no action or inaction of the Receiving Party, after such disclosure; or (v) was independently developed without use of any Confidential Information by employees or consultants of the Receiving Party.

JHU_000000097

App.036

(d)     If the Receiving Party is required to disclose Confidential Information by order of a court of competent jurisdiction, administrative agency or governmental body, or by subpoena, summons, or other legal process, the Receiving Party shall provide the Disclosing Party with prompt written notice of such required disclosure so that the Disclosing Party may seek a protective order or take other appropriate action, cooperate reasonably with Disclosing Party in connection with Disclosing Party's efforts to seek such relief, and thereafter to disclose only the minimum information required to be disclosed in order to comply.

(e)     Upon termination of this Agreement or the Disclosing Party's request, Confidential Information shall be promptly returned to the Disclosing Party or destroyed, with such destruction confirmed in writing. The Receiving Party may retain one archival copy of such Confidential Information, for the purpose of fulfilling its obligations under this Agreement.

(f)     The obligations of confidentiality under this Section shall continue for a period of three (3) years following conclusion or early termination of this Agreement.


## 7.     DATA USE AND PUBLICATIONS

The term "Project Data" as used herein includes, among others, raw data, research data, records, reports, notes, tables, writing, sound recordings, pictorial reproduction, drawings or other graphical representations, and works of any similar nature (whether or not copyrighted) which are generated or specified to be delivered by the JHU evidence review team in connection with the Project under this Agreement. Notwithstanding anything to the contrary contained in this Agreement, WPATH shall retain the unrestricted right to use the Project Data, or any part thereof at any time, in any manner and for any purpose, including the publication of the Project Data and the communication of Project Data to third parties. No other parties other than the JHU evidence review team will have any access to the Project Data without written permission by WPATH. Prior to the publication of the Project Data or any part thereof by the JHU evidence review team, WPATH shall have thirty (30) days in which to review and comment on the proposed publication. The JHU evidence review team will give due regard to WPATH's comments. WPATH has the right to request the deletion of any Confidential Information.


## 8.     TERM AND TERMINATION

(a)     Unless earlier terminated in accordance with subsection (b) of this Section, the term of this agreement shall commence on the Effective Date and shall terminate on 31 March 2019.

(b)     This Agreement may be terminated if any of the following events occur:  (i) for convenience by either party upon sixty (60) days written notice to the other party; (ii) either party materially breaches this Agreement, and the non-breaching party provides the breaching party with thirty (30) days advance written notice of termination and such breach is not remedied within such thirty (30) day period; (iii) Sponsor files for creditor protection under any section of the U.S. Bankruptcy Code; and/or (iv) a bankruptcy trustee or receiver is appointed for Sponsor.

JHU_000000098

App.037

Upon written notice, JHU shall proceed in an orderly fashion to limit or terminate any outstanding commitments and to conclude the work. All costs incurred by JHU associated with termination shall be allowable including, without limitation, all non-cancelable costs or commitments incurred or obligated and work performed prior to the effective date of termination, which shall include all appointment of research staff prior to the effective date of termination.

## 9.    INDEMNIFICATION

Sponsor (the "Indemnifying Party") shall indemnify, defend, and hold harmless JHU, its trustees, officers, employees, students, agents, and representatives (collectively, the "JHU Indemnitees") from and against any and all losses, liability, cost, and expenses, including attorney's fees and costs, awards, judgments, damages, fines, penalties, claims, and causes of action (collectively, "Claims") arising out of or related to the negligent acts or omissions or misconduct of the Indemnifying Party or any of its officers, directors, employees, agents, representatives, contractors, successors, assigns, or anyone acting on any of their behalf in connection with, arising from, or related to the performance of the Indemnifying Party's obligations under this Agreement, including Claims for (i) personal injury, including death, and damage to property; (ii) the breach by the Indemnifying Party of any term, representation, warranty, or covenant under this Agreement; or (iii) any use by Indemnifying Party of the research data or results including use of any intellectual property generated in the research that is provided hereunder. JHU shall not be liable to Sponsor, its officers, employees, agents, representatives, contractors, successors, assigns, or anyone acting on any of their behalf for injuries or losses arising out of the use by the Sponsor of the Study's research data or results.

## 10.    NOTICES

With the exception of Study funds paid by Sponsor pursuant to Section 3 hereof, all notices required or permitted to be given under this Agreement shall be in writing and shall be sent by certified or registered mail, postage prepaid, or by overnight courier, with proof of delivery by receipt, to the following address (or as either party shall designate by written notice to the other party):

       If to Sponsor:

       _____
       _____
       _____
       _____

       If to JHU:

       original to:    Michael B. Amey
                     Senior Associate Dean, Research Affairs
                     Johns Hopkins University School of Medicine
                     Office of Research Administration

JHU_000000099

App.038

733 North Broadway, Suite 117
Baltimore, Maryland 21205

copy to: Investigator

## 11.  INDEPENDENT CONTRACTORS

JHU and Sponsor shall each be and remain an independent contractor with respect to all rights and obligations arising under this Agreement. Nothing contained in this Agreement shall be deemed or construed to create a relationship of employment, principal and agent, partnership, co- or joint employer, or joint venture. Sponsor shall not permit any of its officers, directors, agents, employees, representatives, contractors, successors, assigns, or anyone acting on their behalf to represent or hold out itself or themselves as employees, agents, or representatives of JHU or as authorized to make any commitment to incur any obligation on behalf of JHU.

## 12.  USE OF OTHER PARTIES' NAMES

Sponsor shall not (a) issue a press release or make any other public statement that references this Agreement or discloses the Study results; or (b) use the names, logos, or trademarks (or derivatives thereof) of JHU, or its staff, contractors, or sub-contractors, for publicity or advertising purposes, except with the prior written consent of JHU, which consent may be withheld in JHU's sole discretion. All requests for JHU approval shall be directed to the JHU Office of Communications. JHU shall not use the names, logos, or trademarks of Sponsor, or its staff, contractors, or sub-contractors, for publicity or advertising purposes, except with the prior consent of Sponsor. Notwithstanding the foregoing, Sponsor acknowledges and agrees that JHU and its Investigator may disclose the existence of the funding support from Sponsor in any publication of the research, and as required by law.

## 13.  WARRANTY DISCLAIMERS

JHU DISCLAIMS AND MAKES NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, AS TO ANY MATTER, INCLUDING BUT NOT LIMITED TO WARRANTY OR FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, PATENTABILITY, OR THAT THE SPONSOR'S USE OF THE STUDY RESEARCH RESULTS WILL BE FREE FROM INFRINGEMENT OF PATENTS, COPYRIGHTS, TRADEMARKS, OR OTHER RIGHTS OF THIRD PARTIES.

## 14.  EXPORT CONTROLS

Both parties shall comply with the United States laws and regulations controlling the export of technical data, computer software, laboratory prototypes, and other commodities (including the Arms Export Control Act, as amended, and the Export Administration Act of 1979). JHU's obligations hereunder are contingent on its ability to comply with applicable United States export and embargo laws and regulations.  It is the expectation of JHU that the work done by JHU under this Agreement shall constitute fundamental research as defined under the export control laws and regulations. As an institution of higher learning, JHU does not wish to take receipt of

6

JHU_000000100

App.039

export controlled information except as may be knowingly and expressly agreed to in a writing signed by an authorized representative of JHU and for which JHU has made specific security arrangements. Sponsor agrees that it shall not provide or make accessible to JHU any export controlled materials (including, without limitation, equipment, information, and/or data) without first informing JHU of the export-controlled nature of the materials and obtaining from JHU's Export Compliance Office prior written consent to accept such materials, as well as any specific instructions regarding the mechanism pursuant to which such materials should be passed to JHU. JHU may decide, in its sole discretion, that it is not willing accept such materials. Sponsor agrees to comply with any and all applicable United States export control laws and regulations, as well any and all embargoes and/or other restrictions imposed by the Treasury Department's Office of Foreign Asset Controls.

## 15. SEVERABILITY

If any provision or a portion of any provision of this Agreement is held to be invalid, illegal, or unenforceable by a court of competent jurisdiction, the validity, legality, and enforceability of the remaining provisions of this Agreement shall not be affected or impaired in any way.

## 16. SURVIVABILITY

The terms of this Agreement which by their nature and for any reason are intended to survive and extend beyond the termination, cancellation, or expiration of this Agreement, shall remain in effect and be binding upon the parties beyond such time. Such terms shall include without limitation those that confer rights based on prior breaches or performance.

## 17. MODIFICATIONS

No amendment, modification, or addition to this Agreement will be binding upon the parties hereto unless reduced to writing and signed by an authorized representative of each party.

## 18. GOVERNING LAW

The laws of the State of Maryland, without giving effect to its choice of law provisions, shall govern all matters arising out of or relating to this Agreement, including, without limitation, its interpretation, construction, performance, and enforcement. Any legal suit, action, or proceeding arising out of or relating to this Agreement shall be brought in the Circuit Court for Baltimore City or in the United States District Court for the District of Maryland. Each of the parties waives, to the fullest extent permitted by law, any objection which it may now or later have to the exclusive jurisdiction of or the laying of venue in the Circuit Court for Baltimore City, Maryland or the United States District Court for the District of Maryland, including any objections based upon inconvenient forum. The parties agree that a final judgment in any such suit, action, or proceeding may be enforced in other jurisdictions as provided by law.

## 19. FORCE MAJEURE

Neither party will be responsible for or liable to the other party for non-performance or delay in

JHU_000000101

App.040

performance of any terms or conditions of this Agreement due to acts or occurrences beyond the reasonable control of the nonperforming or delayed party. Such causes include, but are not limited to, acts of God, acts of government, embargoes, terrorism, wars, riots, strikes or other labor disputes, shortages of labor or materials, hurricanes, fires, floods, or any other circumstances of like character. The party whose performance is delayed or prevented shall promptly provide to the other party written notice of the existence of and the reason for such non-performance or delay, and shall work diligently to mitigate its effects and make best efforts to resume performance as soon as practicable.

## 20.    ENTIRE AGREEMENT

This Agreement, including any exhibits, attachments, and documents referenced herein, which are incorporated into this Agreement, constitutes the final agreement between the parties. It is the complete and exclusive expression of the parties' agreement on the matters contained in this Agreement. All prior and contemporaneous negotiations and agreements between the parties on the matters contained in this Agreement are expressly merged into and superseded by this Agreement. In entering into this Agreement, neither party has relied upon any statement, representation, warranty, or agreement of the other party except for those expressly contained in this Agreement. There are no conditions precedent to the effectiveness of this Agreement other than those expressly stated in this Agreement.

## 21.    HEADINGS

The headings in this Agreement are for the convenience of reference only and are not substantive parts of this Agreement nor shall they affect its interpretation.

## 22.    ASSIGNMENT AND DELEGATION

Sponsor may not assign this Agreement nor assign any of its rights under this Agreement, except with the prior written consent of JHU. Sponsor may not delegate any part of its performance under this Agreement without the prior written consent of JHU, which may be withheld in its sole discretion. Any purported assignment of rights or delegation of performance in violation of this Section 24 is void.

## 23    BINDING AGREEMENT ON SUCCESSORS

This Agreement shall be binding upon each party's successors and assigns.

## 24    WAIVER

Failure on the part of any party, in any or more than one instance, to insist upon the performance of any of the terms, covenants, or conditions of this Agreement or to exercise any right or privilege contained within this Agreement, or the waiver by any party of any breach of any of the terms, covenants, or conditions of this Agreement shall not be construed as thereafter waiving any such terms, covenants, conditions, rights, or privileges, but the same shall continue and

JHU_000000102
App.041

remain in full force and effect, as if no such forbearance of waiver had occurred.

**25.    COUNTERPARTS**

This Agreement may be executed in multiple counterparts, and by either party on separate counterpart, including by facsimile or PDF delivery, each of which is deemed an original and all of which constitute one and the same agreement.

        In Witness Whereof, the parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.


**JOHNS HOPKINS UNIVERSITY**          **SPONSOR**

By:    _____          By:    _____

Name: Stephen B. Fisher          Name: GAIL A KNUDSON

Title:  Associate Director, ORA          Title: PRESIDENT, WPATH

Date:    _____          Date: MARCH 30, 2018



Read and Agreed to abide by the terms contained herein, but not as a party hereto:

_____
Investigator

JHU_000000103

App.042

Exhibit A – Statement of Work

JHU will provide services to support WPATH and SOC8:

1) In consultation with WPATH personnel, draft initial guidelines development process or "WPATH Guideline  Procedures Manual".

2) Orientation to the guideline development process and refinement of the scope. This includes:

    a. presentation and discussion of systematic review and guideline development processes with WPATH  personnel, especially the guideline chairs and chapter leads

    b. preliminary searching

    c. identification of statements within chapters for which systematic reviews will be conducted, and  which will be 'best practice statements' based on consensus expert opinion

3) Conduct systematic reviews for the topics selected, including:

    a. refinement of questions using PICO format (population, intervention, comparison, outcome)

    b. search for evidence

    c. screen results

    d. data extraction

    e. data assessment and synthesis

    f. grade certainty or confidence in evidence

    g. presentation of results to guideline panel (e.g., report, evidence and summary tables, in-person  presentation to panel).

4) Provide orientation and guidance to guideline panel in interpreting results of systematic reviews, in  developing recommendation statements, and in grading the recommendation statements. This includes  providing guidance on development of consensus-based or good practice statements.

5) Provide critical feedback on statements and guideline document(s). * We understand need to, and will  facilitate, the presentation of details on the process and, at least, some chapters at the WPATH World  Congress.

6) Provide assistance in submission of relevant guideline modules or chapters to the National Guideline  Clearinghouse (guidelines.gov).

JHU_000000104

App.043

| | |
|---|---|
| **From:** | Karen Robinson |
| **To:** | "vin.tangpricha@emory.edu" |
| **Subject:** | FW: contract language |
| **Date:** | Wednesday, March 7, 2018 2:11:36 PM |

Vin –

Thanks very much for the discussion just now. As promised, I have included below the email I sent to Donna yesterday.

I will work on sending back to you and Donna a new version of the contract with text about publications and use of data noting "our research team" (versus institution).

Thanks,

Karen

---

**From:** Karen Robinson
**Sent:** Tuesday, March 06, 2018 9:57 AM
**To:** 'Donna Kelly' <donna@veritasmeetingsolutions.com>; Donna Kelly <donna@wpath.org>
**Subject:** contract language

Donna –

I am about to have a call with Eli, Jon and Asa to discuss next steps. I hope that my team and I will be participating in the next steps.

I am happy to have a call with you and/or board members to discuss the contract language. Briefly, I cannot and Hopkins will not, sign off on a contract with the proposed language from WPATH mandating approval of any publications of research we conduct. There are two reasons for this:

1. First, Hopkins as an academic institution, and I as a faculty member therein, will not sign something that limits academic freedom in this manner. In other words, a sponsor cannot change or suppress publication of research.

2. Second, I will not sign off on language that goes against current standards in systematic reviews and in guideline development. It was my understanding that WPATH wanted to move toward the current standards for guideline development. To do so, the review team needs to be independent. (see IOM standards: http://www.nationalacademies.org/hmd/Reports/2011/Finding-What-Works-in-Health-Care-Standards-for-Systematic-Reviews/Standards.aspx and http://www.nationalacademies.org/hmd/Reports/2011/Clinical-Practice-Guidelines-We-Can-Trust/Standards.aspx).

I hope we can come to agreement. In meantime, I will keep discussion this morning to general terms and not assume that I will continue to be involved.

Thanks,

Karen

------------------------

Karen A. Robinson, PhD

Director JHU Evidence-based Practice Center

Associate Professor of Medicine, Epidemiology, and Health Policy and Management

Johns Hopkins University

REDACTED

JHU_000000147

App.044

### Sponsored Research Agreement
### Johns Hopkins University

This agreement (the "Agreement") is entered into as of this ___ day of October, 2017 (the "Effective Date"), by and between Johns Hopkins University, on behalf of its School of Medicine, having an Office of Research Administration located at 733 North Broadway, Suite 117 Baltimore, Maryland, 21205 ("JHU"), and the World Professional Association for Transgender Health, a private non-profit organization located at 2575 Northwest Parkway, Elgin, Illinois 60124 ("Sponsor").

WHEREAS, Sponsor wishes that JHU perform systematic reviews and other activities to support guideline development and such work is of mutual interest and benefit to the JHU and Sponsor;

WHEREAS, Karen A. Robinson, PhD, Director, JHU Evidence-based Practice Center and Associate Professor of Medicine shall be JHU's principal investigator in conducting the research for Sponsor ("Investigator"); and

WHEREAS, the research will further JHU's instructional, scholarship, and research objectives in a manner consistent with its status as a non-profit, tax-exempt, educational institution.

NOW, THEREFORE, in consideration of the following mutual promises, covenants, and conditions and any sums to be paid, the parties hereto agree as follows:

1.      **STATEMENT OF WORK**

(a)     JHU agrees to use its reasonable efforts to support update and development of the Standards of Care for the Health of Transsexual, Transgender, and Gender Noncomforming People ("Study"), as described in the statement of work for this Study (attached as <u>Exhibit A</u>). JHU shall perform the Study in accordance with academic standards and all applicable laws and regulations.

(b)     Sponsor acknowledges that JHU and/or its researchers may be engaged in similar research not financially supported by Sponsor or subject to this Agreement. Nothing in this Agreement shall be construed to limit the freedom of JHU and/or its researchers who are participants in this Agreement, whether paid under this Agreement or not, from engaging in similar research inquiries made independently under other grants, contracts, or agreements with parties other than the Sponsor, and Sponsor shall have no rights via this Agreement to the results of such similar research.

2.      **INVESTIGATOR**

This Study will be conducted under the direction of the Investigator identified above. In the event the Investigator should become unavailable to serve in that role, or shall no longer be employed by JHU, JHU shall have the right to designate a replacement principal investigator, subject to Sponsor's reasonable approval. If the parties are unable to identify a mutually

JHU_000001792
App.045

acceptable replacement principal investigator within sixty (60) days of notification to Sponsor by JHU of a proposed replacement, then either party may terminate this Agreement in accordance with the termination provision of this Agreement.

## 3.  PAYMENT

(a)  In consideration of JHU conducting the Study hereunder, Sponsor shall pay JHU in the aggregate amount of One Hundred Ninety-Six Three Hundred Seven U.S. Dollars ($196,307). Payments shall be made in accordance with the following schedule:

> A quarterly payment schedule based on milestones:
> 1. $49,076.75 upon initiation of project with signed contract
> 2. $49,076.75 upon submission of final PICO document outlining questions for review
> 3. $49,076.75 upon submission of the draft report of the systematic reviews
> 4. $49,076.75 upon submission of final report of systematic reviews

(b)  Payments shall be made as follows:

> Payable to: **The Johns Hopkins University**
> Tax I.D. Number: **52-0595110**
>
> **Payments by check shall be sent to:**
>
> **Johns Hopkins University Central Lockbox**
> **c/o Bank of America**
> **12529 Collections Center Drive**
> **Chicago, IL 60693**
>
> **All electronic fund transfers should be sent to:**
>
> **c/o Bank of America**
> **100 S. Charles Street**
> **Baltimore, Maryland 21201**
> **Transit/routing/ABA number: 052001633**
> **Account number: 003936830516**
>
> **All payments shall include the following reference information:**
>
> 1.  Name of JHU Investigator
> 2.  Title of the Study

## 4.  EQUIPMENT AND PROPERTY

JHU_000001793

Unless otherwise explicitly provided, title to and ownership of all equipment, supplies, and property purchased or manufactured by JHU under this Agreement will be in and remain with JHU, even after completion or termination of the Agreement.

## 5.     AUDIT

Authorized representatives of Sponsor or its designee shall have the right no more than once per contract year, upon reasonable and advance written notice, during regular business hours, and in accordance with JHU's applicable policies and procedures, to examine and inspect JHU's and the applicable Investigator's records associated with this Study and inspect and copy all work products relating to this Study, subject to Section 6 of this Agreement.

## 6.     PROPRIETARY INFORMATION AND CONFIDENTIALITY

(a)     "Confidential Information" means all non-public, confidential, and/or proprietary information that is marked as "Confidential Information" as described below and which is disclosed by one party to the other, including but not limited to software, inventions (whether patentable or not), algorithms, diagrams, drawings, processes, research, product or strategic plans or collaborations or partnerships, financial information, or business models. Confidential Information, if in tangible or readable form, shall be marked as such at the time of disclosure and if disclosed orally, shall be reduced to writing, marked confidential, and addressed to the other party within ten (10) days after disclosure.

(b)     Both JHU and Sponsor shall have the right to refuse to accept any Confidential Information proffered to it by the other. If necessary, the parties will exchange Confidential Information only under the provisions set forth herein. The party who receives Confidential Information (the "Receiving Party") shall (i) hold the Confidential Information in confidence using the same care it affords its own confidential information of a similar nature, but not less than a reasonable degree of care; (ii) use the Confidential Information only for the performance of this Agreement; and (iii) restrict disclosure of the Confidential Information to employees whose duties justify the need to know the Confidential Information in furtherance of the performance of this Agreement and who are advised as to the confidential nature of the information and required to comply with the provisions of this Agreement. The Receiving Party shall not provide any third parties with access to the Confidential Information unless such third party has agreed to be bound by confidentiality and non-disclosure obligations in a form of an agreement reasonably acceptable to the party disclosing the Confidential Information (the "Disclosing Party").

(c)     Confidential Information shall not include any information disclosed that the Receiving Party can demonstrate (i) previously was in its possession, without violation of any obligation of confidentiality; (ii) was received from a third party without violation of any obligation of confidentiality; (iii) was publicly known and made generally available prior to such disclosure; (iv) becomes publicly known and made generally available, through no action or inaction of the Receiving Party, after such disclosure; or (v) was independently developed without use of any Confidential Information by employees or consultants of the Receiving Party.

JHU_000001794

App.047

(d)     If the Receiving Party is required to disclose Confidential Information by order of a court of competent jurisdiction, administrative agency or governmental body, or by subpoena, summons, or other legal process, the Receiving Party shall provide the Disclosing Party with prompt written notice of such required disclosure so that the Disclosing Party may seek a protective order or take other appropriate action, cooperate reasonably with Disclosing Party in connection with Disclosing Party's efforts to seek such relief, and thereafter to disclose only the minimum information required to be disclosed in order to comply.

(e)     Upon termination of this Agreement or the Disclosing Party's request, Confidential Information shall be promptly returned to the Disclosing Party or destroyed, with such destruction confirmed in writing. The Receiving Party may retain one archival copy of such Confidential Information, for the purpose of fulfilling its obligations under this Agreement.

(f)     The obligations of confidentiality under this Section shall continue for a period of three (3) years following conclusion or early termination of this Agreement.


## 7.     DATA USE AND PUBLICATIONS

The term "Project Data" as used herein includes, among others, raw data, research data, records, reports, notes, tables, writing, sound recordings, pictorial reproduction, drawings or other graphical representations, and works of any similar nature (whether or not copyrighted) which are generated or specified to be delivered by the JHU evidence review team in connection with the Project under this Agreement. Notwithstanding anything to the contrary contained in this Agreement, WPATH shall retain the unrestricted right to use the Project Data, or any part thereof at any time, in any manner and for any purpose, including the publication of the Project Data and the communication of Project Data to third parties. No other parties other than the JHU evidence review team will have any access to the Project Data without written permission by WPATH. Prior to the publication of the Project Data or any part thereof by the JHU evidence review team, WPATH shall have thirty (30) days in which to review and comment on the proposed publication. The JHU evidence review team will give due regard to WPATH's comments. WPATH has the right to request the deletion of any Confidential Information.


## 8.     TERM AND TERMINATION

(a)     Unless earlier terminated in accordance with subsection (b) of this Section, the term of this agreement shall commence on the Effective Date and shall terminate on _____.

(b)     This Agreement may be terminated if any of the following events occur:  (i) for convenience by either party upon sixty (60) days written notice to the other party; (ii) either party materially breaches this Agreement, and the non-breaching party provides the breaching party with thirty (30) days advance written notice of termination and such breach is not remedied within such thirty (30) day period; (iii) Sponsor files for creditor protection under any section of the U.S. Bankruptcy Code; and/or (iv) a bankruptcy trustee or receiver is appointed for Sponsor.

JHU_000001795

App.048

Upon written notice, JHU shall proceed in an orderly fashion to limit or terminate any outstanding commitments and to conclude the work. All costs incurred by JHU associated with termination shall be allowable including, without limitation, all non-cancelable costs or commitments incurred or obligated and work performed prior to the effective date of termination, which shall include all appointment of research staff prior to the effective date of termination.

## 9.   INDEMNIFICATION

Sponsor (the "Indemnifying Party") shall indemnify, defend, and hold harmless JHU, its trustees, officers, employees, students, agents, and representatives (collectively, the "JHU Indemnitees") from and against any and all losses, liability, cost, and expenses, including attorney's fees and costs, awards, judgments, damages, fines, penalties, claims, and causes of action (collectively, "Claims") arising out of or related to the negligent acts or omissions or misconduct of the Indemnifying Party or any of its officers, directors, employees, agents, representatives, contractors, successors, assigns, or anyone acting on any of their behalf in connection with, arising from, or related to the performance of the Indemnifying Party's obligations under this Agreement, including Claims for (i) personal injury, including death, and damage to property; (ii) the breach by the Indemnifying Party of any term, representation, warranty, or covenant under this Agreement; or (iii) any use by Indemnifying Party of the research data or results including use of any intellectual property generated in the research that is provided hereunder. JHU shall not be liable to Sponsor, its officers, employees, agents, representatives, contractors, successors, assigns, or anyone acting on any of their behalf for injuries or losses arising out of the use by the Sponsor of the Study's research data or results.

## 10.   NOTICES

With the exception of Study funds paid by Sponsor pursuant to Section 3 hereof, all notices required or permitted to be given under this Agreement shall be in writing and shall be sent by certified or registered mail, postage prepaid, or by overnight courier, with proof of delivery by receipt, to the following address (or as either party shall designate by written notice to the other party):

     If to Sponsor:

     _____
     _____
     _____
     _____

     If to JHU:

     original to:    Michael B. Amey
                    Senior Associate Dean, Research Affairs
                    Johns Hopkins University School of Medicine
                    Office of Research Administration

5

JHU_000001796
App.049

733 North Broadway, Suite 117
Baltimore, Maryland 21205

copy to: Investigator

## 11.   INDEPENDENT CONTRACTORS

JHU and Sponsor shall each be and remain an independent contractor with respect to all rights
and obligations arising under this Agreement. Nothing contained in this Agreement shall be
deemed or construed to create a relationship of employment, principal and agent, partnership, co-
or joint employer, or joint venture. Sponsor shall not permit any of its officers, directors, agents,
employees, representatives, contractors, successors, assigns, or anyone acting on their behalf to
represent or hold out itself or themselves as employees, agents, or representatives of JHU or as
authorized to make any commitment to incur any obligation on behalf of JHU.

## 12.   USE OF OTHER PARTIES' NAMES

Sponsor shall not (a) issue a press release or make any other public statement that references this
Agreement or discloses the Study results; or (b) use the names, logos, or trademarks (or
derivatives thereof) of JHU, or its staff, contractors, or sub-contractors, for publicity or
advertising purposes, except with the prior written consent of JHU, which consent may be
withheld in JHU's sole discretion. All requests for JHU approval shall be directed to the JHU
Office of Communications. JHU shall not use the names, logos, or trademarks of Sponsor, or its
staff, contractors, or sub-contractors, for publicity or advertising purposes, except with the prior
consent of Sponsor. Notwithstanding the foregoing, Sponsor acknowledges and agrees that JHU
and its Investigator may disclose the existence of the funding support from Sponsor in any
publication of the research, and as required by law.

## 13.   WARRANTY DISCLAIMERS

JHU DISCLAIMS AND MAKES NO WARRANTIES OF ANY KIND, EITHER EXPRESS
OR IMPLIED, AS TO ANY MATTER, INCLUDING BUT NOT LIMITED TO WARRANTY
OR FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, PATENTABILITY,
OR THAT THE SPONSOR'S USE OF THE STUDY RESEARCH RESULTS WILL BE FREE
FROM INFRINGEMENT OF PATENTS, COPYRIGHTS, TRADEMARKS, OR OTHER
RIGHTS OF THIRD PARTIES.

## 14.   EXPORT CONTROLS

Both parties shall comply with the United States laws and regulations controlling the export of
technical data, computer software, laboratory prototypes, and other commodities (including the
Arms Export Control Act, as amended, and the Export Administration Act of 1979). JHU's
obligations hereunder are contingent on its ability to comply with applicable United States export
and embargo laws and regulations.  It is the expectation of JHU that the work done by JHU
under this Agreement shall constitute fundamental research as defined under the export control
laws and regulations. As an institution of higher learning, JHU does not wish to take receipt of

JHU_000001797

App.050

export controlled information except as may be knowingly and expressly agreed to in a writing signed by an authorized representative of JHU and for which JHU has made specific security arrangements. Sponsor agrees that it shall not provide or make accessible to JHU any export controlled materials (including, without limitation, equipment, information, and/or data) without first informing JHU of the export-controlled nature of the materials and obtaining from JHU's Export Compliance Office prior written consent to accept such materials, as well as any specific instructions regarding the mechanism pursuant to which such materials should be passed to JHU. JHU may decide, in its sole discretion, that it is not willing accept such materials. Sponsor agrees to comply with any and all applicable United States export control laws and regulations, as well any and all embargoes and/or other restrictions imposed by the Treasury Department's Office of Foreign Asset Controls.

## 15.    SEVERABILITY

If any provision or a portion of any provision of this Agreement is held to be invalid, illegal, or unenforceable by a court of competent jurisdiction, the validity, legality, and enforceability of the remaining provisions of this Agreement shall not be affected or impaired in any way.

## 16.    SURVIVABILITY

The terms of this Agreement which by their nature and for any reason are intended to survive and extend beyond the termination, cancellation, or expiration of this Agreement, shall remain in effect and be binding upon the parties beyond such time. Such terms shall include without limitation those that confer rights based on prior breaches or performance.

## 17.    MODIFICATIONS

No amendment, modification, or addition to this Agreement will be binding upon the parties hereto unless reduced to writing and signed by an authorized representative of each party.

## 18.    GOVERNING LAW

The laws of the State of Maryland, without giving effect to its choice of law provisions, shall govern all matters arising out of or relating to this Agreement, including, without limitation, its interpretation, construction, performance, and enforcement. Any legal suit, action, or proceeding arising out of or relating to this Agreement shall be brought in the Circuit Court for Baltimore City or in the United States District Court for the District of Maryland. Each of the parties waives, to the fullest extent permitted by law, any objection which it may now or later have to the exclusive jurisdiction of or the laying of venue in the Circuit Court for Baltimore City, Maryland or the United States District Court for the District of Maryland, including any objections based upon inconvenient forum. The parties agree that a final judgment in any such suit, action, or proceeding may be enforced in other jurisdictions as provided by law.

## 19.    FORCE MAJEURE

Neither party will be responsible for or liable to the other party for non-performance or delay in

JHU_000001798

App.051

performance of any terms or conditions of this Agreement due to acts or occurrences beyond the reasonable control of the nonperforming or delayed party. Such causes include, but are not limited to, acts of God, acts of government, embargoes, terrorism, wars, riots, strikes or other labor disputes, shortages of labor or materials, hurricanes, fires, floods, or any other circumstances of like character. The party whose performance is delayed or prevented shall promptly provide to the other party written notice of the existence of and the reason for such non-performance or delay, and shall work diligently to mitigate its effects and make best efforts to resume performance as soon as practicable.

## 20.   ENTIRE AGREEMENT

This Agreement, including any exhibits, attachments, and documents referenced herein, which are incorporated into this Agreement, constitutes the final agreement between the parties. It is the complete and exclusive expression of the parties' agreement on the matters contained in this Agreement. All prior and contemporaneous negotiations and agreements between the parties on the matters contained in this Agreement are expressly merged into and superseded by this Agreement. In entering into this Agreement, neither party has relied upon any statement, representation, warranty, or agreement of the other party except for those expressly contained in this Agreement. There are no conditions precedent to the effectiveness of this Agreement other than those expressly stated in this Agreement.

## 21.   HEADINGS

The headings in this Agreement are for the convenience of reference only and are not substantive parts of this Agreement nor shall they affect its interpretation.

## 22.   ASSIGNMENT AND DELEGATION

Sponsor may not assign this Agreement nor assign any of its rights under this Agreement, except with the prior written consent of JHU. Sponsor may not delegate any part of its performance under this Agreement without the prior written consent of JHU, which may be withheld in its sole discretion. Any purported assignment of rights or delegation of performance in violation of this Section 24 is void.

## 23   BINDING AGREEMENT ON SUCCESSORS

This Agreement shall be binding upon each party's successors and assigns.

## 24   WAIVER

Failure on the part of any party, in any or more than one instance, to insist upon the performance of any of the terms, covenants, or conditions of this Agreement or to exercise any right or privilege contained within this Agreement, or the waiver by any party of any breach of any of the terms, covenants, or conditions of this Agreement shall not be construed as thereafter waiving any such terms, covenants, conditions, rights, or privileges, but the same shall continue and

JHU_000001799

App.052

remain in full force and effect, as if no such forbearance of waiver had occurred.

## 25.    COUNTERPARTS

This Agreement may be executed in multiple counterparts, and by either party on separate counterpart, including by facsimile or PDF delivery, each of which is deemed an original and all of which constitute one and the same agreement.

In Witness Whereof, the parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

**JOHNS HOPKINS UNIVERSITY**          **SPONSOR**

By: _____          By: _____

Name: Stephen B. Fisher          Name: _____

Title:  Associate Director, ORA          Title: _____

Date: _____          Date: _____

Read and Agreed to abide by the terms contained herein, but not as a party hereto:

_____
Investigator

JHU_000001800



## Policy & Procedures Regarding the use of WPATH SOC8 data

**Background to the Policy**

In April 2018 WPATH commissioned John Hopkins University (JHU) to support the development of the 8th edition of the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (SOC8). WPATH entered into a Sponsored Research Agreement with Johns Hopkins University on behalf of its School of Medicine with Dr Karen A. Robinson, Director at JHU Evidence-based Practice Center as principal investigator in conducting the research for WPATH. WPATH contracted Dr Robinson and her team to perform systematic literature reviews and other activities to support the development of the 8th edition of SOC.

The contract between WPATH and JHU states the following regarding Data use and Publications: "the term "Data" principally includes raw data, research data, records, reports, notes, tables, writing, sound recordings, pictorial reproduction, drawings or other graphical representations, and works of any similar nature (whether or not copyrighted) which are generated or specified to be delivered by Dr Robinson and her team in connection with the update and development of the SOC8".

"Notwithstanding anything to the contrary contained in the contract between WPATH and JHU, WPATH shall retain the unrestricted right to use the Data, or any part thereof at any time, in any manner and for any purpose, including the publication of the Data and the communication of Data to third parties. No other parties other than Dr Robinson and her team will have any access to the Data without written permission by WPATH. Prior to the publication of the Data or any part thereof by Dr Robinson and her team, WPATH shall have thirty (30) days in which to review and comment on the proposed publication. Dr Robinson and her team will give due regard to WPATH's comments. WPATH has the right to request the deletion of any content within materials intended for publication by Dr Robinson and her team*".

*WPATH Policy Use of Data for SOC8*
*Approved by WPATH Board of Directors*

JHU_000001904

App.054

Since the start of the contract between WPATH and JHU Dr Robinson and her team have provided systematic literature reviews for the development of statements of the following chapters: Assessment, Primary Care, Endocrinology, Surgery, Reproductive Medicine, and Voice Therapy. Dr Robinson and team have also provided guidance regarding the methodology of the SOC8 and feedback for some of the statements.

**Aim of the Policy**

WPATH commissioned and financed an update and the development of the SOC8 for the benefit of transgender healthcare in order to promote health, research, education, respect, dignity, and equality for trans people globally.

Therefore, the aim is of this policy is to develop a process to ensure that any manuscripts developed from the systematic literature reviews commissioned by WPATH benefit transgender healthcare and promote health, research, education, respect, dignity, and equality for transgender people globally.

A decision-making process to give access to the Data should be underpinned by a number of good practice directives. Hence, WPATH grants access to the data to any interested party, which:

a. has the intention to use the Data for the benefit of advancing transgender health in a positive manner and;
b. has the intention to publish the Data in reputable, academic, peer-reviewed journals and;
c. involves the Work Group Leader of the Chapter or, alternatively, a designated representative of that specific SOC8 Chapter, or alternatively the Chair or Co-Chairs of the SOC8 in the design, drafting of the article, and the final approval of the article and;
d. involves at least one member of the transgender community in the design, drafting of the article, and the final approval of the article and**;
e. adheres to the WPATH Language Policy***.

**Pathway to approval for use of WPATH Data**

WPATH grants approval to use the Data for publication to any interested party, when:

*WPATH Policy Use of Data for SOC8*
*Approved by WPATH Board of Directors*

JHU_000001905

37

App.055

a. the directives outlined under the aim of this policy have been fulfilled and;
b. the author(s) have acknowledged that WPATH has sponsored the acquisition of the data in the publication and;
c. the author(s) have acknowledged that the authors are solely responsible for the content of the manuscript, and the manuscript does not necessarily reflect the view of WPATH in the publication and;
d. The publication ("manuscript") has been approved by WPATH via a designated approval process.

## Designated approval process for publication of the Data

a. Author(s) submit publication to WPATH
b. It is WPATH Executive Committee's responsibility to ensure that the manuscript is disseminated to the Chair of the SOC8, the Co-Chairs of the SOC8, and the members of the WPATH Board of Directors within 7 days after receipt of the manuscript.
c. It is WPATH Executive Committee's responsibility to ensure that a vote is held within 14 days after the dissemination of the manuscript to the Chair and Co-Chairs of the SOC8 and Board members.
d. It will be a blind vote and approval is granted to author(s) for publication by majority vote. The Chair and Co-Chairs of the SOC8 and Board members all have one equal vote. In case of a bind, the WPATH President will have the deciding vote.
e. It is the President's responsibility to respond to the author(s) with approval or disapproval within thirty (30) days of submission of the manuscript to WPATH.
f. In case of disapproval, the President may decide to hold a special meeting with the Chair and Co-Chairs of the SOC8 and Board members to discuss the manuscript and the reasons for not approving publication.

\* This will be referred to as "Confidential Information", which means all non-public, confidential, and/or proprietary information that is marked as "Confidential Information" as described below and which is disclosed by one party to the other, including but not limited to software, inventions (whether patentable or not), algorithms, diagrams, drawings, processes, research, product or strategic plans or

*WPATH Policy Use of Data for SOC8*
*Approved by WPATH Board of Directors*

JHU_000001906

App.056

collaborations or partnerships, financial information, or business models. Confidential Information, if in tangible or readable form, shall be marked as such at the time of disclosure and if disclosed orally, shall be reduced to writing, marked confidential, and addressed to the other party within ten (10) days after disclosure.

\** See T'Sjoen, G., Motmans, J., Arcelus, J., & Bouman, W. P. (2017). The need of patient involvement in transgender healthcare research. *Journal of Sexual Medicine, 14*(12), 1494-1495.

Bouman, W. P., Arcelus, J., T'Sjoen, G., De Cuypere, G., Galupo, M. P., Kreukels, B. P. C., Leibowitz, S., Riggs, D. W., Schechter, L. S., & Veale, J. (2018). Transgender and gender diverse people's involvement in transgender health research. *International Journal of Transgenderism, 19*(4), 357-358 or https://www.tandfonline.com/doi/full/10.1080/15532739.2018.1543066

\*** See Bouman, W. P., Suess, A., Motmans, J., Green, J., Deutch, M., Adams, N., Safer, J., Smiley, A., and Winter, S. (2017). Language and transgender health. *International Journal of Transgenderism, 18*(1), 1-6 or https://www.tandfonline.com/doi/full/10.1080/15532739.2016.1262127

**Checklist for JHU SOC8 systematic review papers**

Title of Paper: Hormone Therapy, Mental Health, and Quality of Life among Transgender People: A Systematic Review

Supporting Chapter: initial question part of questions from Hormone Chapter

Proposed Authors: Kellan E. Baker, MPH, Lisa M. Wilson, ScM, Ritu Sharma, BSc, Vadim Dukhanin, MD, MHS, Kristen McArthur, BA, Karen A. Robinson, PhD

Acknowledged Authors: None

| | |
|---|---|
| **Yes** or No | This paper provides data that advances the knowledge in the field of transgender health in a positive way |
| **Yes** or No | This paper will be published in a reputable, academic, peer-reviewed journal |
| | Journal proposed for first submission   The Lancet Diabetes & Endocrinology |
| **Yes** or No | Involves the work group leader of the chapter or alternatively a designated representative of that specific SOC8 Chapter in the design, drafting of the article and final approval of the article |
| | Name of persons involved  *chapter members provided original list of questions for reviews* |
| **Yes** or No | Involves at least one member of the transgender community in the design, drafting of the article and final approval of the article  *chapter members provided original list of questions for reviews* |
| | Name of person if not open about trans status, if not open about trans status then enter N/A |
| **Yes** or No | Adheres to the WPATH language policy |
| | |

JHU_000001908

App.058

*Journal of the Endocrine Society*, 2021, Vol. 5, No. 4, 1–16
doi:10.1210/jendso/bvab011
Meta-Analysis




Downloaded from https://academic.oup.com/jes/article/5/4/bvab011/6126016 by guest on 19 February 2021

Meta-Analysis

# Hormone Therapy, Mental Health, and Quality of Life Among Transgender People: A Systematic Review

**Kellan E. Baker,**[1,3] **Lisa M. Wilson,**[1,3] **Ritu Sharma,**[1,3] **Vadim Dukhanin,**[1,3] **Kristen McArthur,**[1,3] **and Karen A. Robinson**[2,3]

[1]Department of Health Policy and Management, Johns Hopkins Bloomberg School of Public Health, Baltimore, MD 21205, USA; [2]Department of Medicine, Johns Hopkins University School of Medicine, Baltimore, MD, USA; and [3]Johns Hopkins Evidence-Based Practice Center, 615 North Wolfe Street, Baltimore, MD 21205, USA

**ORCiD number:** 0000-0002-9716-7936 (K. E. Baker).

**Abbreviations:** BDI, Beck Depression Inventory; ENIGI, European Network for the Investigation of Gender Incongruence; GnRH, gonadotropin-releasing hormone; HADS, Hospital Anxiety and Depression Scale; QOL, quality of life; RCT, randomized controlled trial; SF-36, Short Form-36 Health Survey; WPATH, World Professional Association for Transgender Health.

Received: 5 October 2020; Editorial Decision: 25 January 2021; First Published Online: 2 February 2021; Corrected and Typeset: 19 February 2021.

## Abstract

We sought to systematically review the effect of gender-affirming hormone therapy on psychological outcomes among transgender people. We searched PubMed, Embase, and PsycINFO through June 10, 2020 for studies evaluating quality of life (QOL), depression, anxiety, and death by suicide in the context of gender-affirming hormone therapy among transgender people of any age. We excluded case studies and studies reporting on less than 3 months of follow-up. We included 20 studies reported in 22 publications. Fifteen were trials or prospective cohorts, one was a retrospective cohort, and 4 were cross-sectional. Seven assessed QOL, 12 assessed depression, 8 assessed anxiety, and 1 assessed death by suicide. Three studies included trans-feminine people only; 7 included trans-masculine people only, and 10 included both. Three studies focused on adolescents. Hormone therapy was associated with increased QOL, decreased depression, and decreased anxiety. Associations were similar across gender identity and age. Certainty in this conclusion is limited by high risk of bias in study designs, small sample sizes, and confounding with other interventions. We could not draw any conclusions about death by suicide. Future studies should investigate the psychological benefits of hormone therapy among larger and more diverse groups of transgender people using study designs that more effectively isolate the effects of hormone treatment.

**Key Words:** Transgender, hormone therapy, sex hormones, mental health, systematic review

ISSN 2472-1972

© The Author(s) 2021. Published by Oxford University Press on behalf of the Endocrine Society.
This is an Open Access article distributed under the terms of the Creative Commons Attribution-NonCommercial-NoDerivs licence (http://creativecommons.org/licenses/by-nc-nd/4.0/), which permits non-commercial reproduction and distribution of the work, in any medium, provided the original work is not altered or transformed in any way, and that the work is properly cited. For commercial re-use, please contact journals.permissions@oup.com



JHU_00001909   1

Transgender people are those whose gender identity is different from the sex they were assigned at birth. Estimates of the size of the transgender population vary depending on how the data are collected [1]. In studies that rely on clinical records, estimates range between 1 and 30 people per 100 000 (0.001% to 0.03%) [2]. Studies that focus instead on self-report among nonclinical populations find estimates that range between 0.1% and 2% [2].

Many transgender people seek medical services to affirm their gender identity. According to the *Standards of Care for Transsexual, Transgender, and Gender Non-Conforming People* maintained by the World Professional Association for Transgender Health (WPATH), gender-affirming medical care is different for each individual and may include a variety of services and procedures, such as psychological support, hormone therapy, and surgeries [3]. Hormone therapy, which typically involves estrogens and anti-androgens for transgender women and other trans-feminine people and testosterone for transgender men and other trans-masculine people, is a common component of medical gender affirmation [4]. Because hormone treatment can have a powerful effect on physical appearance, it is often a priority for transgender people seeking medical gender affirmation [5]. Gender-affirming hormone therapy can be managed for most patients by primary care providers, as it typically involves long-term maintenance on doses similar to those used for cisgender patients with conditions such as hypogonadism [6, 7]. Some clinicians require a minimum period of psychological counseling before hormone therapy can be initiated, while others provide hormone therapy on the basis of informed consent [8].

The need for gender-affirming care is often characterized using psychiatric diagnoses such as gender dysphoria, which replaced gender identity disorder in the fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) [9]. The 11th International Classification of Diseases (ICD-11) replaces these terms with a diagnosis called gender incongruence (codes: HA60, HA61, HA6Z), which is located in a new chapter on sexual health. These changes clarify that the target of gender-affirming medical interventions is not the person's gender identity itself but rather the clinically significant distress that can accompany a misalignment between gender identity and sex assigned at birth [10]. Some countries have further underscored that transgender identity is not a pathology by recognizing gender affirmation as fundamental to the human right to self-definition and removing requirements that transgender people seeking gender-affirming medical care present with a diagnosis such as gender dysphoria [11].

Several previous reviews have indicated that gender-affirming hormone therapy is associated with psychological benefits that include reductions in depression and anxiety and improvements in quality of life (QOL) among transgender people [12-17]. Most of these reviews did not require a minimum duration of hormone therapy [14-17]. One review that did impose a minimum follow-up requirement is 10 years old [12]. The other that required a minimum of 3 months of therapy included only uncontrolled prospective cohorts, which resulted in a sample of only 3 studies [13]. A comprehensive review without a minimum follow-up period assessed gender-affirming hormone therapy and surgeries only in adolescents [17]. By requiring a minimum duration of hormone treatment but considering all ages and a variety of study designs, we sought to update and more completely summarize the growing evidence base regarding the relationship between gender-affirming hormone therapy and psychological outcomes in transgender people.

## Search Strategy and Selection Criteria

This review is one of a series of systematic reviews on gender-affirming care conducted for WPATH to inform the eighth revision of the *Standards of Care*. The protocol is registered on PROSPERO (CRD42018115379) [18], and we followed the Preferred Reporting Items for Systematic Reviews and Meta-Analyses (PRISMA) guidelines in reporting our findings [19].

We searched PubMed, Embase, and PyscINFO from inception to October 2018 and updated the search through June 10, 2020, for studies assessing QOL, depression, anxiety, and death by suicide among transgender participants of any age in the context of gender-affirming hormone therapy [20]. We also reviewed the reference lists of previous reviews and hand-searched the *International Journal of Transgenderism*. Using DistillerSR [21], 2 reviewers independently screened titles, abstracts, and full-text articles. Differences were resolved through consensus adjudication.

We included studies that evaluated the psychological effects of any testosterone, estrogen, or anti-androgen formulation used for gender affirmation. We also considered gonadotropin-releasing hormone (GnRH) analogues used as anti-androgens or for puberty delay. Study participants must have been on hormone therapy for at least 3 months in order to reflect a minimum time for expected onset of effects [3]. Health care provider supervision was not required. We excluded studies that did not state therapy type and duration, including the range for cross-sectional studies. We included studies regardless of language (the search terms were in English) and country of origin, and we accepted any study design except case reports.

We created standardized forms for data extraction using the Systematic Review Data Repository system. The data extracted included participant demographics; study design

Downloaded from https://academic.oup.com/jes/article/5/4/bvab011/6126016 by guest on 19 February 2021

JHU_000001910
App.060

*Journal of the Endocrine Society*, 2021, Vol. 5, No. 4  **3**

and methods; hormone therapy type, dose, and duration; potential confounders such as gender-affirming surgery status; outcome scales [20]; and psychological outcomes. From studies that used the Short Form-36 Health Survey (SF-36) to measure QOL, we extracted scores in all domains [22]. For studies that used measures with depression or anxiety subscales, we extracted only the subscale scores corresponding to the psychological outcomes of interest (eg, the depression subscale of the Minnesota Multiphasic Personality Inventory [MMPI]). We extracted comparisons with cisgender controls or general population norms only when longitudinal findings in a transgender population or comparisons with an untreated transgender control group were not reported. We used WebPlotDigitizer to extract data reported only in figures [23].

Two reviewers independently assessed risk of bias [20]. For randomized controlled trials (RCTs), we used the revised Cochrane tool [24]. For non-randomized studies, we used the Cochrane Risk of Bias Assessment Tool for Non-Randomized Studies of Interventions (ROBINS-I) [25]. One reviewer graded strength of evidence for each outcome using the Agency for Healthcare Research and Quality Methods Guide for Conducting Comparative Effectiveness Reviews [26]. We considered the directionality and magnitude of effects reported in cross-sectional studies as additional context for our evaluation of evidence from trials and prospective and retrospective cohorts. Each strength of evidence assessment was confirmed by a second reviewer.

WPATH provided the research question and reviewed the protocol, evidence tables, and report. WPATH had no role in study design, data collection, analysis, interpretation, or drafting. The corresponding author had full access to all the data and had final responsibility for the decision to submit for publication. The authors are responsible for all content, and statements in this report do not necessarily reflect the official views of or imply endorsement by WPATH.

## Results

We retrieved 1753 nonduplicate studies for the broader systematic review project of which this review was a part (Fig. 1). After screening and full-text review for the specific research question on the psychological effects of gender-affirming hormone therapy, 20 studies reported in 22 publications were included (Table 1): 1 RCT [27], 2 before-after trials [28, 29], 12 prospective cohorts reported in 13 publications [30-42], 1 retrospective cohort reported in 2 publications [43, 44], and 4 cross-sectional studies [45-48]. De Vries (2014) [35] reported on a subset of the participants in de Vries (2011) [34] who continued in care. We counted these publications as a single study but extracted and reported data separately because the characteristics of the

study's adolescent population changed substantially in the period between the 2 publications. Similarly, Asscheman (2011) [44] reported on an extension of Asscheman (1989) [43]; we counted these as a single study but extracted data separately. In Table 1 and in the subsequent tables for each outcome, studies are ordered first by study design (RCTs, before-after trials, prospective cohorts, retrospective cohorts, and cross-sectional studies); within these categories, studies are presented in the following order according to how the study results were reported: adult transgender women only, adult transgender men only, adult transgender women and transgender men together, and transgender adolescents (no study reported separate results by gender identity for transgender youth). Where multiple studies shared the same study design and population, they are additionally ordered chronologically.

The time frame covered in the included studies began in 1972 [43], but most studies dated from post-2000. Eight studies were conducted in Italy [27-29, 31, 32, 36, 39, 41]; 2 each in Belgium [37, 48], the Netherlands [34, 35, 43, 44], the United States [30, 47], and Spain [38, 45]; and 1 in the United Kingdom [33], Turkey [42], and France [46]. One study recruited participants from Switzerland and Germany [40]. One study was part of the European Network for the Investigation of Gender Incongruence (ENIGI), which is a research collaborative between clinics providing gender-affirming care to transgender people in Ghent (Belgium), Amsterdam (Netherlands), Oslo (Norway), and Hamburg (Germany). The ENIGI study included in this review drew participants only from the Ghent clinic [37].

The study sizes ranged from 20 to 1331, although most had fewer than 60 participants. Fourteen studies reported on testosterone formulations in adult transgender men [27, 29, 31-33, 36, 39-46, 48]. These formulations were typically injectable testosterone cypionate or enanthate, although some studies used long-acting injectable testosterone undecanoate or daily transdermal gels. Ten studies reported on estrogen formulations in adult transgender women, usually in conjunction with an anti-androgen such as cyproterone acetate or spironolactone [28, 31, 33, 36, 37, 39, 43-47]. Estrogen formulations included transdermal, oral, or injectable estradiol (commonly estradiol valerate) or conjugated estrogens. Three studies reported on the psychological effects of GnRH therapy for puberty delay among mixed-gender groups of transgender adolescents [30, 34, 35, 38]. No study reported on hormone therapy among nonbinary people.

All studies that reported information about recruitment drew their participants largely or exclusively from specialized clinics dedicated to providing gender-affirming care for transgender people. These clinics were typically part of larger systems such as university hospitals. Clinic-based

Downloaded from https://academic.oup.com/jes/article/5/4/bvab011/6126016 by guest on 19 February 2021

*Journal of the Endocrine Society*, 2021, Vol. 5, No. 4

Downloaded from https://academic.oup.com/jes/article/5/4/bvab011/6126016 by guest on 19 February 2021



**Figure 1.** PRISMA flow diagram.

studies often applied strict eligibility criteria that included a period of psychiatric evaluation and a formal diagnosis of gender dysphoria before hormone therapy was initiated. Some studies also reported that psychological counseling was either available or required during the course of hormone therapy. In many cases, hormone therapy was considered a prerequisite for gender-affirming surgeries. The type and timing of gender-affirming surgeries and the proportion of participants for whom hormone therapy and surgeries were assessed simultaneously varied widely: some studies assessed only participants who had not had any type of gender-affirming surgery [27, 28, 30-32, 34, 36, 38-40, 42, 46, 47], while in others some or all participants

underwent gender-affirming surgeries during the study period [29, 33, 35, 43-45, 48].

### Quality of Life

Seven studies, including 1 RCT [27], 2 before-after trials [28, 29], 2 prospective cohorts [30, 39], and 2 cross-sectional studies [46, 48], assessed QOL (Table 2). An RCT found an improvement of approximately 5.5 points on a 10-point measure of life satisfaction across 3 groups of transgender men (n = 15 each) after 1 year of testosterone treatment ($P < 0.05$) [27]. A before-after trial similarly reported that life satisfaction scores almost

JHU_000001912

App.062

Downloaded from https://academic.oup.com/jes/article/5/4/bvab011/6126016 by guest on 19 February 2021

**Table 1.** Studies Reporting Effects of Gender-Affirming Hormone Therapy on Psychological Outcomes Among Transgender People

| Author, year Location Study name | Study design | Start year | Transgender population | Overall N | Age in years | Baseline HT status | Outcomes | GAS status | Risk of bias |
|---|---|---|---|---|---|---|---|---|---|
| Pelusi, 2014 [27] Italy | Randomized controlled trial[a] | NR | Men | 45 | Mean: 29.5 | No previous HT | QOL | No GAS before or during study | High |
| Gava, 2016 [28] Italy | Before-after trial | NR | Women | 40 | Mean: 3.2 (range, 19–55) | No previous HT | QOL, Depression | No GAS before or during study | Low |
| Gava, 2018 [29] Italy | Before-after trial[a] | NR | Men | 50 | Mean: 30.1 (range, 21–42) | No previous HT | QOL | 72% (n = 36) had gonadectomy during study | Serious |
| Fuss, 2015 [37] Belgium ENIGI (NCT01072825) | Prospective cohort | 2010 | Women | 20 | Mean: 33.9 (range, 17–48) | No previous HT | Anxiety | NR | Serious |
| Costantino, 2013 [32] Italy | Prospective cohort | 2001 | Men | 50 | Mean: 29.8 | No previous HT | Depression | No GAS before or during study | Serious |
| Motta, 2018 [41] Italy | Prospective cohort | 2013 | Men | 52 | Mean: 28.3 | No previous HT | Anxiety | NR | Moderate |
| Turan, 2018 [42] Turkey | Prospective cohort[b] | NR | Men | 37 | Mean: 24.6 | No previous HT | Depression, Anxiety | No GAS before or during study | Moderate |
| Metzger, 2019 [40] Switzerland, Germany | Prospective cohort[b] | 2013 | Men | 23 | Mean: 27.2 (range, 18–51) | No previous HT | Depression | No GAS before or during study | Moderate |
| Colizzi, 2014 [31] Italy | Prospective cohort | 2008 | Women and men | 107 | Mean: 29.2 | No previous HT | Depression, Anxiety | No GAS before or during study | Low |
| Manieri, 2014 [39] Italy | Prospective cohort | NR | Women and men | 83 | Mean: 32.7 (women), 30.2 (men) | No previous HT | QOL | No GAS before or during study | Moderate |
| Fisher, 2016 [36] Italy | Prospective cohort | 2012 | Women and men | 54 | Mean: 32.5 (women), 26.3 (men) | No previous HT | Depression | No GAS before or during study | Low |
| Defreyne, 2018 [33] UK | Prospective cohort | 2012 | Women and men | 155 | Median: 27 (range, 18–52) | No previous HT | Depression, Anxiety | Some had GAS during study; % and type NR | Serious |
| Asscheman, 1989 [43] Netherlands | Retrospective cohort[b,d] | 1972 | Women and men | 425 | Median: 32 (women, range, 16–67); ≥5.4 (men, range, 16–54) | Previous HT for at least 6 months | Death by suicide | 78% (n = 235) of transgender women had GAS during study; data NR for transgender men | Serious |

JHU_000001913

45

App.063

**Table 1.** Continued

| Author, year Location Study name | Study design | Start year | Transgender population | Overall N | Age in years | Baseline HT status | Outcomes | GAS status | Risk of bias |
|---|---|---|---|---|---|---|---|---|---|
| Asscheman, 2011 [44] Netherlands | Retrospective cohort[c,d] | 1975 | Women and men | 1331 | Mean: 31.4 (women, range, 16–76); 26.1 (men, range, 16–57) | Previous HT for at least 1 year | Death by suicide | 87% (n = 834) of transgender women and 94% (n = 343) of transgender men had GAS during study | Serious |
| Leavitt, 1980 [47] US | Cross-sectional | 1976 | Women | 41 | Range, 18–35 | 54% (n = 22) on HT | Depression | No previous GAS | Serious |
| Wierckx, 2011 [48] Belgium | Cross-sectional[b] | 2009 | Men | 47 | Mean: 37 (range, 22–54) | 100% on HT | QOL | 100% had GAS, but not within previous year | Serious |
| Gómez-Gil, 2012 [45] Spain | Cross-sectional | NR | Women and men | 187 | Mean: 29.9 (range, 15–61) | 64% (n = 120) on HT | Depression, Anxiety | 42% (n = 79) of all participants and 64% (n = 77) of participants on HT had previous GAS | Serious |
| Gorin-Lazard, 2012 [46] France | Cross-sectional[b] | NR | Women and men | 61 | Mean: 34.7 | 72% (n = 44) on HT | QOL | No previous GAS | Serious |
| de Vries, 2011 [34] Netherlands | Prospective cohort | 2000 | Girls and boys | 70 | Mean: 14.8 (range, 11.3–18.6) | No previous HT | Depression, Anxiety | No GAS before or during study | Moderate |
| de Vries, 2014 [35] Netherlands | Prospective cohort[b,c] | 2000 | Girls and boys | 55 | Mean: 14.8 (range, 11.5–18.5) | No previous HT | Depression, Anxiety | 100% had GAS during study | Serious |
| Achille, 2020 [30] US | Prospective cohort | 2013 | Girls and boys | 50 | Mean: 16.2 | No previous HT | QOL, Depression | No GAS before or during study | Moderate |
| López de Lara, 2020 [38] Spain | Prospective cohort[b] | 2018 | Girls and boys | 23 | Mean: 16 (range, 14-18) | No previous HT | Depression, Anxiety | No GAS before or during study | Moderate |

Abbreviations: ENIGI, European Network for the Investigation of Gender Incongruence; GAS, gender-affirming surgery; HT, hormone therapy; NR, not reported; QOL, quality of life.

[a]25 participants were included in both Pelusi [27] and Gava (2018) [29]
[b]Included a cisgender control group or a comparison to general population norms
[c]All participants were also included in de Vries (2011) [34]
[d]An unknown number of participants were included in both Asscheman (1989) [43] and Asscheman (2011) [44]

Downloaded from https://academic.oup.com/jes/article/5/4/bvab011/6126016 by guest on 19 February 2021

JHU_000001914

46

App.064

**Table 2.** Effects of Gender-Affirming Hormone Therapy on Quality of Life Among Transgender People

| Author, year Study design | Transgender population | Treatment / comparison (n) | QOL measures | Length of treatment | Findings |
|---|---|---|---|---|---|
| Pelusi, 2014 [27] RCT[a] | Men | Testoviron depot (15) vs testosterone gel (15) vs testosterone undecanoate (15) | VAS (general life satisfaction) | 54 weeks | Mean QOL scores increased from 2.8 to 8.5 ($P < 0.05$) in the testoviron depot arm, from 3.2 to 8.9 ($P < 0.05$) in the testosterone gel arm, and from 2.6 to 8.0 ($P < 0.05$) in the testosterone undecanoate arm.[d] There was no difference across arms. |
| Gava, 2016 [28] Before-after trial | Women | Cyproterone acetate + estradiol (20) vs leuprolide acetate + estradiol (20) | VAS (general life satisfaction) SF-36 | 12 months | Mean QOL scores did not change in either arm. No comparisons across arms were reported. |
| Gava, 2018 [29] Before-after trial[a] | Men | Testosterone undecanoate (25)[c] vs testosterone enanthate (25)[c] | VAS (general satisfaction) | 5 years | Mean QOL scores increased from 4.3 ± 3.1 to 8.1 ± 1.8 ($P < 0.001$) in the testosterone undecanoate arm and from 4.3 ± 3.8 to 8.3 ± 1.7 ($P < 0.001$) in the testosterone enanthate arm. No comparisons across arms were reported. |
| Manieri, 2014 [39] Prospective cohort | Women | HT (56) | WHOQOL | 12 months | Mean QOL scores increased from 62.5 to 72.2 ($P < 0.05$).[d] |
| Manieri, 2014 [39] Prospective cohort | Men | HT (27) | WHOQOL | 12 months | Mean QOL scores did not change. |
| Wierckx, 2011 [48] Cross-sectional[b] | Men | HT (47)[c] | SF-36 | At least 3 years | Mean QOL scores on the VT and MH subscales were lower for transgender men than cisgender men (VT subscale: 62.1 ± 20.7 vs 71.9 ± 18.3, $P = 0.002$; MH subscale: 72.6 ± 19.2 vs 79.3 ± 16.4, $P = 0.020$). There were no other differences between transgender men and either cisgender men or cisgender women. |
| Gorin-Lazard, 2012 [46] Cross-sectional[b] | Women and men | HT (44) vs no HT (17) | SF-36 | Median: 20 months (range, 12–42 months) | Mean QOL scores were generally higher in the group receiving HT vs the group not receiving HT (MCS: 51.0 ± 7.7 vs 39.8 ± 12.7, $P = 0.003$; MH subscale: 76.4 ± 14.1 vs 59.1 ± 19.6, $P = 0.004$, RE subscale: 88.6 ± 22.7 vs 54.9 ± 40.7, $P = 0.001$; SF subscale: 83.2 ± 23.3 vs 69.9 ± 24.2, $P = 0.026$). There were no differences in the other subscales. |
| Achille, 2020 [30] Prospective cohort | Girls and boys | GnRH treatment + HT (47) | Q-LES-Q-SF | 12 months | Mean QOL scores did not change. |

Abbreviations: GnRH, gonadotropin-releasing hormone; HT, hormone therapy; QOL, quality of life; RCT, randomized controlled trial; RE, role functioning/emotional; SF, social functioning; SF-36, Short Form-36 Health Survey; VAS, visual analog scale; VT, vitality; WHOQOL, World Health Organization Quality of Life measure.

[a]10 participants on testosterone enanthate and 15 participants on testosterone undecanoate were included in both Pelusi [27] and Gava (2018) [29]

[b]Included a cisgender control group or a comparison to general population norms

[c]Included participants who had undergone gender-affirming surgery/surgeries, or surgery status not reported

[d]No standard deviations reported

Downloaded from https://academic.oup.com/jes/article/5/4/bvab011/6126016 by guest on 19 February 2021

JHU_000001915

App.065

*Journal of the Endocrine Society*, 2021, Vol. 5, No. 4

doubled among transgender men (n = 50) over 5 years [29]. A prospective study found a 16% improvement in QOL scores among transgender women (n = 56) after 1 year of treatment ($P < 0.05$) but no change among transgender men (n = 27) [39]. Another before-after trial reported no difference in SF-36 scores among 2 groups of transgender women (n = 20 each) after 1 year [28]. Among adolescents, a mixed-gender prospective cohort (n = 50) showed no difference in QOL scores after a year of endocrine interventions, which included combinations of GnRH analogues and estrogen or testosterone formulations [30]. No study found that hormone therapy decreased QOL scores. We conclude that hormone therapy may improve QOL among transgender people. The strength of evidence for this conclusion is low due to concerns about bias in study designs, imprecision in measurement because of small sample sizes, and confounding by factors such as gender-affirming surgery status.

### Depression

Twelve studies, including 1 before-after trial [28], 9 prospective cohorts [30-36, 38, 40, 42], and 2 cross-sectional studies [45, 47], assessed depression (Table 3). A prospective study found that the proportion of transgender men and transgender women (n = 107) showing symptoms of depression decreased from 42% to 22% over 12 months of treatment ($P < 0.001$) [31]. In 2 other prospective cohorts, Beck Depression Inventory (BDI-II) scores improved by more than half among both transgender men (n = 26) and transgender women (n = 28) after 24 months of therapy ($P < 0.001$) [36] and improved from 15.7 ± 12.3 to 8.1 ± 6.2 among transgender men (n = 23) after 6 months ($P < 0.001$) [40]. A fourth prospective study reported improvements of 1.05 points (95% CI: –1.87, –0.22) and 1.42 points (95% CI: –2.61, –0.24) on the 21-point Hospital Anxiety and Depression Scale (HADS) among 91 transgender women and 64 transgender men after 12 months ($P = 0.013$ and $P = 0.019$, respectively) [33]. A before-after trial, however, found no change in BDI-II scores among 2 groups of transgender women (n = 20 each) after 1 year [28]. Two prospective studies reported no difference among transgender men (n = 37) after 24 weeks [42] or among transgender men (n = 50) after 12 months [32], although in the latter study this outcome did not change from a baseline median of 0.0 ("not at all depressed") on an unvalidated 4-point scale. Among adolescents, 2 mixed-gender prospective cohorts (n = 50 and n = 23, respectively) showed improvements in depression scores after 1 year of treatment with GnRH analogues and estrogen or testosterone formulations (both $P < 0.001$) [30, 38]. Another prospective study reported that BDI scores improved

almost by half among adolescents (n = 41) after a mean of 1.88 years of treatment with GnRH analogues to delay puberty ($P = 0.004$) [34]. The overall improvement after several subsequent years of testosterone or estrogen therapy in this cohort (n = 32) was smaller, however, resulting in no significant change from baseline [35]. No study found that hormone therapy increased depression. We conclude that hormone therapy may decrease depression among transgender people. The strength of evidence for this conclusion is low due to concerns about study designs, small sample sizes, and confounding.

### Anxiety

Eight studies, including 7 prospective cohorts [31, 33-35, 37, 38, 41, 42] and 1 cross-sectional study [45], assessed anxiety (Table 4). One prospective study found that Symptom Checklist 90-Revised scores indicating a probable anxiety disorder among a mixed-gender group of adults (n = 107) improved from borderline to normal over 12 months ($P < 0.001$) [31]. Another prospective study, however, did not find a difference in HADS anxiety scores among either transgender men (n = 64) or transgender women (n = 91) after 1 year [33], and a third study reported no change in the number of transgender men (6/52, 12%) with a diagnosed anxiety disorder after 7 months [41]. Likewise, 2 other prospective studies found no difference in anxiety scores among transgender men (n = 37) after 24 weeks of treatment [42] or transgender women (n = 20) after 12 months [37], although this latter finding represented no change from a baseline median score of 0 (answering "no" to the question, "do you feel anxious?") on an unvalidated 3-point scale. Among adolescents, 1 prospective study saw mean anxiety scores in a mixed-gender group (n = 23) improve from 33.0 ± 7.2 to 18.5 ± 8.4 after 1 year ($P < 0.001$) [38], but another reported no changes in anxiety after approximately 2 years of puberty delay treatment with GnRH analogues and 4 years of hormone therapy (n = 32) [35]. No study found that hormone therapy increased anxiety. We conclude that hormone therapy may decrease anxiety among transgender people. The strength of evidence for this conclusion is low due to concerns about study designs, small sample sizes, and confounding.

### Death by Suicide

One retrospective study reported in 2 publications assessed death by suicide (Table 5) [43, 44]. The first publication reported that 3 transgender women in the Amsterdam gender dysphoria study cohort (n = 303) died by suicide between 1972 and 1986 [43]. The authors calculated the number of suicide deaths expected in an age-matched stratum of

Downloaded from https://academic.oup.com/jes/article/5/4/bvaa001/6126016 by guest on 19 February 2021

JHU_000001916

App.066

9

**Table 3.** Effects of Gender-Affirming Hormone Therapy on Depression Among Transgender People

| Author, year / Study design | Transgender population | Treatment / comparison (n) | Depression measures | Length of treatment | Findings |
|---|---|---|---|---|---|
| Gava, 2016 [28] Before–after trial | Women | Cyproterone acetate + estradiol (20) vs Leuprolide acetate + estradiol (20) | BDI-II | 12 months | Mean depression scores did not change in either arm. No comparisons across arms were reported. |
| Fisher, 2016 [37] Prospective cohort | Women | HT (28) | BDI-II | 24 months | Mean depression score decreased from 10.12 to 4.58 ($P < 0.001$).[d,e] |
| Defreyne, 2018 [33] Prospective cohort[b] | Women | HT (91)[c] | HADS (depression subscale) | 1 year | Median depression score decreased by 1.05 (95% CI: −1.87, −0.22) on a 21-point scale ($P = 0.013$). |
| Costantino, 2013 [32] Prospective cohort | Men | HT (50) | Ad hoc questionnaire | 12 months | Depression score did not change from a median of 0.0 at baseline (IQR: 0.0, 1.0). |
| Fisher, 2016 [36] Prospective cohort | Men | HT (26) | BDI-II | 24 months | Mean depression score decreased from 9.31 to 4.25 ($P < 0.001$).[d,e] |
| Defreyne, 2018 [33] Prospective cohort[b] | Men | HT (64)[c] | HADS (depression subscale) | 1 year | Median depression score decreased by 1.42 (95% CI: −2.61, −0.24) on a 21-point scale ($P = 0.019$). |
| Turan, 2018 [42] Prospective cohort[b] | Men | HT (37) | SCL-90-R (depression subscale) | 24 weeks | Mean depression score did not change. |
| Metzger, 2019 [40] Prospective cohort[b] | Men | HT (23) | BDI-II | 6 months | Mean depression score decreased from 15.7 ± 12.3 to 8.1 ± 6.2 ($P < 0.001$). |
| Colizzi, 2014 [31] Prospective cohort | Women and men | HT (107) | Zung SDS SCL-90-R (depression subscale) | 12 months | Mean Zung SDS score improved from 48.40 ± 10.5 to 39.98 ± 10.79 ($P < 0.001$), and the proportion with Zung SDS scores indicating mild, moderate, or severe depression (vs no depression) decreased from 42% to 22% ($\chi^2 = 19.05$, $P < 0.001$). Mean SCL-90-R score decreased from 0.83 ± 0.74 to 0.51 ± 0.49 ($P < 0.001$), which represents an improvement from possible borderline depression to no depression. |
| Leavitt, 1980 [47] Cross-sectional | Women | HT (22) vs No HT (19) | MMPI (depression subscale) | At least 12 months | Mean depression score was lower in the group receiving HT vs the group not receiving HT (53.1 ± 14.7 vs 65.7 ± 11.2, $P = 0.004$). |

Downloaded from https://academic.oup.com/jes/article/5/4/bvab011/6126016 by guest on 19 February 2021

JHU_000001917

49

App.067

**Table 3.** Continued

| Author, year Study design | Transgender population | Treatment / comparison (n) | Depression measures | Length of treatment | Findings |
|---|---|---|---|---|---|
| Gómez-Gil, 2012 [45] Cross-sectional [a,b] | Women and men | HT (120)[c] vs No HT (67)[c] | HADS (depression subscale) | Mean: 11.0 years (women, range, 1–46 years); 4.7 years (men, range, 1–22 years) | Mean depression score was lower in the group receiving HT vs the group not receiving HT (3.3 ± 3.2 vs 5.2 ± 4.2, $P = 0.002$).[c] The proportion with scores indicating depression (vs no depression) was larger in the group not receiving HT (31% vs 8%, $\chi^2 = 16.46$, $P = 0.001$).[f] |
| de Vries, 2011 [34] Prospective cohort | Girls and boys | GnRH treatment (41) | BDI | 1.88 years | Mean depression score decreased from 8.31 ± 7.12 to 4.95 ± 6.72 ($P = 0.004$). |
| de Vries, 2014 [35] Prospective cohort[a,b] | Girls and boys | GnRH treatment + HT (32)[c] | BDI | 5.9 years | Mean depression score did not change. |
| Achille, 2020 [30] Prospective cohort | Girls and boys | GnRH treatment + HT (47) | CESD-R, PHQ-9 (modified for adolescents) | 12 months | Mean CESD-R score decreased from 21.4 to 13.9 ($P < 0.001$);[d] a score of <16 indicates no clinical depression. Mean PHQ-9 score decreased from 9.0 to 5.4 ($P < 0.001$).[d] |
| López de Lara, 2020 [38] Prospective cohort[b] | Girls and boys | GnRH treatment + HT (23) | BDI-II | 1 year | Mean depression score decreased from 19.3 ± 5.5 to 9.7 ± 3.9 ($P < 0.001$). |

Abbreviations: BDI/BDI-II, Beck Depression Inventory; GAS, gender-affirming surgery; GnRH, gonadotropin-releasing hormone; HADS, Hospital Anxiety and Depression Scale; HT, hormone therapy; IQR, interquartile range; MMPI, Minnesota Multiphasic Personality Inventory; NA, not applicable; SCL-90-R, Symptom Checklist 90-Revised; Zung SDS, Zung Self-Rating Depression Scale.

[a]All participants were also included in de Vries (2011) [34]

[b]Included a cisgender control group or a comparison to general population norms

[c]Included participants who had undergone gender-affirming surgery/surgeries, or surgery status not reported

[d]No standard deviations reported

[e]Adjusted for age, gender role, and surgery status

[f]Adjusted for age, gender, and education level

Downloaded from https://academic.oup.com/jes/article/5/4/bvab011/6126016 by guest on 19 February 2021

JHU_000001918

App.068

*Journal of the Endocrine Society*, 2021, Vol. 5, No. 4  **11**

**Table 4.** Effects of Gender-Affirming Hormone Therapy on Anxiety Among Transgender People

| Author, year | Transgender population | Treatment / comparison (n) | Anxiety measures | Length of treatment | Findings |
|---|---|---|---|---|---|
| Fuss, 2015 [37] Prospective cohort | Women | HT (20)[c] | Ad hoc questionnaire | 12 months | Anxiety score did not change from a median of 0.0 at baseline. |
| Defreyne, 2018 [33] Prospective cohort | Women | HT (91)[c] | HADS (anxiety subscale) | 1 year | Median anxiety score did not change. |
| Defreyne, 2018 [33] Prospective cohort | Men | HT (64)[c] | HADS (anxiety subscale) | 1 year | Median anxiety score did not change. |
| Motta, 2018 [41] Prospective cohort | Men | HT (46)[c] | DSM | 7 months | Proportion diagnosed with an anxiety disorder (6/46, 12%) did not change. |
| Turan, 2018 [42] Prospective cohort[b] | Men | HT (37) | SCL-90-R (anxiety subscale) | 24 weeks | Mean anxiety score did not change. |
| Colizzi, 2014 [31] Prospective cohort | Women and men | HT (107) | SCL-90-R (anxiety subscale) Zung SAS | 12 months | Mean SCL-90-R score decreased from $1.05 \pm 0.95$ to $0.54 \pm 0.56$ ($P < 0.001$), which represents an improvement from borderline anxiety disorder to no anxiety disorder. Mean Zung SAS score improved from $44.91 \pm 9.59$ to $37.90 \pm 8.97$ ($P < 0.001$), and the proportion with Zung SAS scores indicating mild, moderate, or severe anxiety (vs no anxiety) decreased from 50% to 17% ($\chi^2 = 33.03$, $P < 0.001$). |
| Gómez-Gil, 2012 [45] Cross-sectional | Women and men | HT (120)[c] vs No HT (67)[c] | HADS (anxiety subscale) SADS | Mean: 11.0 years (women, range, 1-46 years); 4.7 years (men, range, 1-22 years) | Mean HADS and SADS scores were lower in the group receiving HT vs the group not receiving HT ($6.4 \pm 3.7$ vs $9.0 \pm 4.0$, $P = 0.001$; $8.5 \pm 7.8$ vs $11.0 \pm 7.3$, $P = 0.038$, respectively).[d] The proportion with scores indicating anxiety (vs no anxiety) was higher in the group not receiving HT ($\chi^2 = 14.46$, $P < 0.001$).[d] |
| de Vries, 2011 [34] Prospective cohort | Girls and boys | GnRH treatment (41) | STAI (trait subscale) | 1.88 years | Mean anxiety score did not change. |
| de Vries, 2014 [35] Prospective cohort[a,b] | Girls and boys | GnRH treatment + HT (32)[c] | STAI (trait subscale) | 5.9 years | Mean anxiety score did not change. |
| López de Lara, 2020 [38] Prospective cohort[b] | Girls and boys | GnRH treatment + HT (23) | STAI (trait subscale) | 1 year | Mean anxiety score decreased from $33.0 \pm 7.2$ to $18.5 \pm 8.4$ ($P < 0.001$). |

Abbreviations: BAI, Beck Anxiety Inventory; DSM, Diagnostic and Statistical Manual of Mental Disorders; GAS, gender-affirming surgery; GnRH, gonadotropin-releasing hormone; HADS, Hospital Anxiety and Depression Scale; HT, hormone therapy; IQR, interquartile range; SADS, Social Avoidance and Distress Scale; SCL-90-R, Symptom Checklist 90-Revised; STAI, State-Trait Anxiety Inventory; Zung SAS, Zung Self-Rating Anxiety Scale.

[a]All participants were also included in de Vries (2011) [34]
[b]Included a cisgender control group or a comparison to general population norms
[c]Included participants who have undergone gender-affirming surgery/surgeries, or surgery status not reported
[d]Adjusted for age, gender, and education level

Downloaded from https://academic.oup.com/jes/article/5/4/bvab011/6126016 by guest on 19 February 2021

the general male Dutch population over this period to be 0.208. No data were reported for transgender men (n = 122). An update to this study reported 17 deaths by suicide among transgender women (n = 966) and 1 among transgender men (n = 365) between 1975 and 2007 [44].

The age- and sex-stratified standardized mortality ratios were 5.70 (95% CI: 4.93, 6.54) and 2.22 (95% CI: 0.53, 6.18), respectively. The risk of bias for this study was serious due to the difficulty of identifying appropriate comparison groups and uncontrolled confounding by surgery

JHU_000001919

App.069

**Table 5.** Effects of Gender-Affirming Hormone Therapy on Death by Suicide Among Transgender People

| Author, year | Transgender population | Treatment / comparison (n) | Measures | Length of treatment | Findings |
|---|---|---|---|---|---|
| Asscheman, 1989 [43] Retrospective cohort[a,b] | Women | HT (303)[c] | Death by suicide (confirmed by autopsy report) | Median: 4.4 years (range, 6 months to 13 years) | 3 transgender women (1%) died by suicide between 1972 and 1986. The adjusted number of suicide deaths expected among the general Dutch male population was 0.208. |
| Asscheman, 2011 [44] Retrospective cohort[a,b] | Women | HT (966)[c] | Death by suicide (confirmed by medical report or physician information) | Median: 18.6 years (range, 0.7–44.5 years) | 17 transgender women (2%) died by suicide between 1975 and 2007. The age-stratified SMR compared to the general Dutch male population was 5.70 (95% CI: 4.93, 6.54). |
| Asscheman, 1989 [43] Retrospective cohort[a,b] | Men | HT (122)[c] | Death by suicide (confirmation procedure NR) | Median: 3.6 years (range, 6 months to 13 years) | No deaths by suicide among transgender men were reported during the study period. |
| Asscheman, 2011 [44] Retrospective cohort[a,b] | Men | HT (365)[c] | Death by suicide (confirmed by medical report or physician information) | Median: 18.4 years (range, 4.7–42.6 years) | 1 transgender man (0.3%) died by suicide between 1975 and 2007. The age-stratified SMR compared to the general Dutch female population was 2.22 (95% CI: 0.53, 6.18). |

Abbreviations: HT, hormone therapy; NR, not reported; SMR, standardized mortality ratio.
[a]An unknown number of participants were included in both Asscheman (1989) [43] and Asscheman (2011) [44]
[b]Included a cisgender control group or a comparison to general population norms
[c]Includes participants who had undergone gender-affirming surgery/surgeries, or surgery status not reported

status and socioeconomic variables such as unemployment. We cannot draw any conclusions on the basis of this single study about whether hormone therapy affects death by suicide among transgender people.

## Discussion

This systematic review of 20 studies found evidence that gender-affirming hormone therapy may be associated with improvements in QOL scores and decreases in depression and anxiety symptoms among transgender people. Associations were similar across gender identity and age. The strength of evidence for these conclusions is low due to methodological limitations (Table 6). It was impossible to draw conclusions about the effects of hormone therapy on death by suicide.

Uncontrolled confounding was a major limitation in this literature. Many studies simultaneously assessed different types of gender-affirming care and did not control for gender-affirming surgery status, making it difficult to isolate the effects of hormone therapy. Others failed to report complete information about surgery status. Additional factors that may influence both access to care and psychological outcomes, including extent of social or legal gender affirmation and exposure to determinants of health such as discrimination, were typically not considered. In addition, some evidence indicates that cyproterone acetate, a common anti-androgen assessed in many studies alongside estrogen therapy, may increase depression, which may be a source of confounding [49].

Another source of potential bias was recruitment of participants from specialized clinics that impose strict diagnostic criteria as a prerequisite for gender-affirming care. The dual role of clinicians and researchers as both gatekeepers and investigators may force transgender study participants to over- or understate aspects of their mental health in order to access gender-affirming care [8]. Similarly, transgender clinic patients may feel that they cannot opt out of research-related activities, which is a serious concern for the validity of psychological outcome measurements.

Clinic-based recruitment also overlooks transgender people who cannot access these clinics for financial or other reasons and misses those whose need for gender affirmation does not fit into current medical models. This is a particular concern for nonbinary and other gender-diverse people, for whom a model of gender affirmation as a linear transition from one binary gender to another is inaccurate [50].

Most studies used well-known scales for measuring psychological outcomes. None of these scales, however, have been specifically validated for use in transgender populations [51]. Furthermore, many scales are normed

Downloaded from https://academic.oup.com/jes/article/5/4/bvaa011/6126016 by guest on 19 February 2021

JHU_000001920

*Journal of the Endocrine Society*, 2021, Vol. 5, No. 4                                                    **13**

**Table 6.** Strength of Evidence of Studies that Evaluate the Psychological Effects of Hormone Therapy Among Transgender People

| Outcome | Number of studies (n) | Strength of evidence | Summary[a] |
|---|---|---|---|
| Quality of life | 1 randomized controlled trial [27] (45)[b]<br>2 before-after trials [28, 29] (65)[b]<br>2 prospective cohorts [30, 39] (133)<br>2 cross-sectional studies [46, 48] (108) | Low[e] | Hormone therapy may improve quality of life among transgender people.[g] |
| Depression | 1 before-after trial [28] (40)<br>9 prospective cohorts [30-36, 38, 40, 42] (569)[c]<br>2 cross-sectional [45, 47] (228) | Low[e] | Hormone therapy may alleviate depression among transgender people.[g] |
| Anxiety | 7 prospective cohorts [31, 33-35, 37, 38, 41, 42] (464)[c]<br>1 cross-sectional [45] (187) | Low[e] | Hormone therapy may alleviate anxiety among transgender people.[g] |
| Death by suicide | 1 retrospective cohort [43, 44] (1756)[d] | Insufficient[f] | There is insufficient evidence to draw a conclusion about the effect of hormone therapy on death by suicide among transgender people. |

[a]Due to similarity of findings, the summary is the same for transgender men and transgender women and for adolescents and adults

[b]25 participants are included in both Pelusi [27] and Gava (2018) [29] and are counted once

[c]All 55 participants in de Vries (2014) [35] were also included among the 70 participants in de Vries (2011) [34] and are counted once

[d]An unknown number of participants were included in both Asscheman (1989) [43] and Asscheman (2011), [44] so the unique sample size is smaller than indicated here

[e]Evidence downgraded due to study limitations, including uncontrolled confounding, and imprecision because of small sample sizes

[f]Evidence downgraded due to study limitations, including confounding and a lack of meaningful comparison groups, and imprecision in measurement of a rare event

[g]The body of cross-sectional evidence tended to align with the conclusion

separately for (presumed cisgender) men and women [52]. Inconsistency in identification of appropriate general population norms hinders comparisons between transgender and cisgender groups, which is a major related research question that requires further investigation.

Beyond methodological concerns in the studies we assessed, our review has other limitations. First, it is likely subject to publication bias, as we may have missed studies not published in the peer-reviewed literature. Second, a number of potentially relevant studies could not be included because the authors did not report on a minimum of 3 months of treatment or did not clearly state the type and/or duration of therapy, including the range for cross-sectional studies [53-65]. Finally, even where outcome measurements were similar across studies, heterogeneity in study designs, study populations, intervention characteristics, and reporting of results (ie, some studies reported results separately by gender identity, while others did not), prevented us from quantitatively pooling results.

More research is needed to further explore the relationship between gender-affirming hormone therapy and QOL, death by suicide, and other psychological outcomes, especially among adolescents. Future studies should investigate these outcomes in larger groups of diverse participants recruited outside clinical settings. Studies assessing the relationship between gender-affirming

hormone therapy and mental health outcomes in transgender populations should be prospective or use strong quasi-experimental designs; consistently report type, dose, and duration of hormone therapy; adjust for possible confounding by gender-affirming surgery status; control for other variables that may independently influence psychological outcomes; and report results separately by gender identity. Despite the limitations of the available evidence, however, our review indicates that gender-affirming hormone therapy is likely associated with improvements in QOL, depression, and anxiety. No studies showed that hormone therapy harms mental health or quality of life among transgender people. These benefits make hormone therapy an essential component of care that promotes the health and well-being of transgender people.

## Acknowledgments

*Financial Support:* This review was partly funded by the World Professional Association for Transgender Health.

*Author Contributions:* R.S. developed and implemented the search strategy with input from K.B., L.W., and K.R. K.B., L.W., R.S., V.D., K.M., and K.R. screened and assessed studies, extracted data, and graded strength of evidence. K.B. wrote the report, which was reviewed by all co-authors.

Downloaded from https://academic.oup.com/jes/article/5/4/bvab011/6126016 by guest on 19 February 2021

JHU_000001921

App.071

## Additional Information

*Correspondence:* Kellan E. Baker, MPH, MA, Department of Health Policy and Management, Johns Hopkins Bloomberg School of Public Health, 624 North Broadway, Baltimore, MD 21205, USA. Email: kbaker39@jhu.edu.

*Disclosure Summary:* This review was partially funded by the World Professional Association for Transgender Health (WPATH). The authors of this manuscript are responsible for its content. Statements in the manuscript do not necessarily reflect the official views of or imply endorsement by WPATH.

*Data Availability:* Some or all data generated or analyzed during this study are included in this published article or in the data repository listed in the References.

## References

1. Collin L, Reisner SL, Tangpricha V, Goodman M. Prevalence of transgender depends on the "case" definition: a systematic review. *J Sex Med.* 2016;13(4):613-626.

2. Goodman M, Adams N, Corneil T, Kreukels B, Motmans J, Coleman E. Size and distribution of transgender and gender nonconforming populations: a narrative review. *Endocrinol Metab Clin North Am.* 2019;48(2):303-321.

3. Coleman E, Bockting W, Botzer M, et al. Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *Int J Transgenderism.* 2012;13(4):165-232.

4. Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: an Endocrine Society Clinical Practice Guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869-3903.

5. James SE, Herman JL, Rankin S, Keisling M, Mottet L, Anafi M. *The Report of the 2015 U.S. Transgender Survey.* National Center for Transgender Equality; 2016.

6. Deutsch MB, ed. Guidelines for the primary and gender-affirming care of transgender and gender nonbinary people. 2016. Accessed December 19, 2020. https://transcare.ucsf.edu/guidelines

7. Wylie K, Knudson G, Khan SI, Bonierbale M, Watanyusakul S, Baral S. Serving transgender people: clinical care considerations and service delivery models in transgender health. *Lancet.* 2016;388(10042):401-411.

8. Schulz SL. The informed consent model of transgender care: an alternative to the diagnosis of gender dysphoria. *J Humanist Psychol.* 2018;58(1):72-92.

9. American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders.* 5th ed. American Psychiatric Association; 2013.

10. Robles R, Fresán A, Vega-Ramírez H, et al. Removing transgender identity from the classification of mental disorders: a Mexican field study for ICD-11. *Lancet Psychiatry.* 2016;3(9):850-859.

11. Arístegui I, Radusky PD, Zalazar V, Romero M, Schwartz J, Sued O. Impact of the Gender Identity Law in Argentinean transgender women. *Int J Transgenderism.* 2017;18(4):446-456.

12. Murad MH, Elamin MB, Garcia MZ, et al. Hormonal therapy and sex reassignment: a systematic review and meta-analysis of quality of life and psychosocial outcomes. *Clin Endocrinol (Oxf).* 2010;72(2):214-231.

13. White Hughto JM, Reisner SL. A systematic review of the effects of hormone therapy on psychological functioning and quality of life in transgender individuals. *Transgend Health.* 2016;1(1):21-31.

14. Costa R, Colizzi M. The effect of cross-sex hormonal treatment on gender dysphoria individuals' mental health: a systematic review. *Neuropsychiatr Dis Treat.* 2016;12:1953-1966.

15. Nobili A, Glazebrook C, Arcelus J. Quality of life of treatment-seeking transgender adults: a systematic review and meta-analysis. *Rev Endocr Metab Disord.* 2018;19(3):199-220.

16. Rowniak S, Bolt L, Sharifi C. Effect of cross-sex hormones on the quality of life, depression and anxiety of transgender individuals: a quantitative systematic review. *JBI Database System Rev Implement Rep.* 2019;17(9):1826-1854.

17. Mahfouda S, Moore JK, Siafarikas A, et al. Gender-affirming hormones and surgery in transgender children and adolescents. *Lancet Diabetes Endocrinol.* 2019;7(6):484-498.

18. Sharma R, Robinson K, Wilson L, Baker KE. Effects of hormone therapy in transgender people. Accessed December 19, 2020. https://www.crd.york.ac.uk/prospero/display_record.php?RecordID=115379

19. Moher D, Liberati A, Tetzlaff J, Altman DG; PRISMA Group. Preferred reporting items for systematic reviews and meta-analyses: the PRISMA statement. *BMJ.* 2009;339:b2535.

20. Baker KE, Wilson LM, Sharma R, Dukhanin V, McArthur K, Robinson KA. Data associated with the publication: Hormone therapy, mental health, and quality of life among transgender people: a systematic review. *Johns Hopkins Univ Data Arch.* **V1**. doi: 10.7281/T1/E70MXR.

21. *Evidence Partners.* DistillerSR [software]; 2020.

22. Ware JE Jr, Kosinski M, Bayliss MS, McHorney CA, Rogers WH, Raczek A. Comparison of methods for the scoring and statistical analysis of SF-36 health profile and summary measures: summary of results from the Medical Outcomes Study. *Med Care.* 1995;33(4 Suppl):AS264-AS279.

23. Rohatgi A. WebPlotDigitizer: an HTML5-based online tool for to extract numerical data from plot images. 2020. https://automeris.io/WebPlotDigitizer/index.html

24. Sterne JA, Savović J, Page MJ, et al. RoB 2: a revised tool for assessing risk of bias in randomised trials. *BMJ.* 2019;366:l4898.

25. Sterne JA, Hernán MA, Reeves BC, et al. ROBINS-I: a tool for assessing risk of bias in non-randomised studies of interventions. *BMJ.* 2016;355:i4919.

26. Berkman ND, Lohr KN, Ansari MT, et al. Grading the strength of a body of evidence when assessing health care interventions: an EPC update. *J Clin Epidemiol.* 2015;68(11):1312-1324.

27. Pelusi C, Costantino A, Martelli V, et al. Effects of three different testosterone formulations in female-to-male transsexual persons. *J Sex Med.* 2014;11(12):3002-3011.

28. Gava G, Cerpolini S, Martelli V, Battista G, Seracchioli R, Meriggiola MC. Cyproterone acetate vs leuprolide acetate in combination with transdermal oestradiol in transwomen: a comparison of safety and effectiveness. *Clin Endocrinol (Oxf).* 2016;85(2):239-246.

29. Gava G, Mancini I, Cerpolini S, Baldassarre M, Seracchioli R, Meriggiola MC. Testosterone undecanoate and testosterone

Downloaded from https://academic.oup.com/jes/article/5/4/bvab011/6126016 by guest on 19 February 2021

JHU_000001922

*Journal of the Endocrine Society*, 2021, Vol. 5, No. 4
**15**

enanthate injections are both effective and safe in transmen over 5 years of administration. *Clin Endocrinol (Oxf)*. 2018;**89**(6):878-886.

30. Achille C, Taggart T, Eaton NR, et al. Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results. *Int J Pediatr Endocrinol*. 2020;**2020**:8.

31. Colizzi M, Costa R, Todarello O. Transsexual patients' psychiatric comorbidity and positive effect of cross-sex hormonal treatment on mental health: results from a longitudinal study. *Psychoneuroendocrinology*. 2014;**39**:65-73.

32. Costantino A, Cerpolini S, Alvisi S, Morselli PG, Venturoli S, Meriggiola MC. A prospective study on sexual function and mood in female-to-male transsexuals during testosterone administration and after sex reassignment surgery. *J Sex Marital Ther*. 2013;**39**(4):321-335.

33. Defreyne J, T'Sjoen G, Bouman WP, Brewin N, Arcelus J. Prospective evaluation of self-reported aggression in transgender persons. *J Sex Med*. 2018;**15**(5):768-776.

34. de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. *J Sex Med*. 2011;**8**(8):2276-2283.

35. de Vries AL, McGuire JK, Steensma TD, Wagenaar EC, Doreleijers TA, Cohen-Kettenis PT. Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*. 2014;**134**(4):696-704.

36. Fisher AD, Castellini G, Ristori J, et al. Cross-sex hormone treatment and psychobiological changes in transsexual persons: two-year follow-up data. *J Clin Endocrinol Metab*. 2016;**101**(11):4260-4269.

37. Fuss J, Hellweg R, Van Caenegem E, et al. Cross-sex hormone treatment in male-to-female transsexual persons reduces serum brain-derived neurotrophic factor (BDNF). *Eur Neuropsychopharmacol*. 2015;**25**(1):95-99.

38. López de Lara D, Pérez Rodríguez O, Cuellar Flores I, et al. Evaluación psicosocial en adolescentes transgénero. *An Pediatría*. 2020;**93**(1):41-48.

39. Manieri C, Castellano E, Crespi C, et al. Medical treatment of subjects with gender identity disorder: the experience in an Italian Public Health Center. *Int J Transgenderism*. 2014;**15**(2):53-65.

40. Metzger NY, Boettger S. The effect of testosterone therapy on personality traits of trans men: a controlled prospective study in Germany and Switzerland. *Psychiatry Res*. 2019;**276**:31-38.

41. Motta G, Crespi C, Mineccia V, Brustio PR, Manieri C, Lanfranco F. Does testosterone treatment increase anger expression in a population of transgender men? *J Sex Med*. 2018;**15**(1):94-101.

42. Turan Ş, Aksoy Poyraz C, Usta Sağlam NG, et al. Alterations in body uneasiness, eating attitudes, and psychopathology before and after cross-sex hormonal treatment in patients with female-to-male gender dysphoria. *Arch Sex Behav*. 2018;**47**(8):2349-2361.

43. Asscheman H, Gooren LJ, Eklund PL. Mortality and morbidity in transsexual patients with cross-gender hormone treatment. *Metabolism*. 1989;**38**(9):869-873.

44. Asscheman H, Giltay EJ, Megens JA, de Ronde WP, van Trotsenburg MA, Gooren LJ. A long-term follow-up study of mortality in transsexuals receiving treatment with cross-sex hormones. *Eur J Endocrinol*. 2011;**164**(4):635-642.

45. Gómez-Gil E, Zubiaurre-Elorza L, Esteva I, et al. Hormone-treated transsexuals report less social distress, anxiety and depression. *Psychoneuroendocrinology*. 2012;**37**(5):662-670.

46. Gorin-Lazard A, Baumstarck K, Boyer L, et al. Is hormonal therapy associated with better quality of life in transsexuals? A cross-sectional study. *J Sex Med*. 2012;**9**(2):531-541.

47. Leavitt F, Berger JC, Hoeppner JA, Northrop G. Presurgical adjustment in male transsexuals with and without hormonal treatment. *J Nerv Ment Dis*. 1980;**168**(11):693-697.

48. Wierckx K, Van Caenegem E, Elaut E, et al. Quality of life and sexual health after sex reassignment surgery in transsexual men. *J Sex Med*. 2011;**8**(12):3379-3388.

49. Heinemann LA, Will-Shahab L, van Kesteren P, Gooren LJ; Collaborating Centers. Safety of cyproterone acetate: report of active surveillance. *Pharmacoepidemiol Drug Saf*. 1997;**6**(3):169-178.

50. Reisner SL, Hughto JMW. Comparing the health of non-binary and binary transgender adults in a statewide non-probability sample. *Plos One*. 2019;**14**(8):e0221583.

51. Thompson HM, Reisner SL, VanKim N, Raymond HF. Quality-of-life measurement: assessing the WHOQOL-BREF scale in a sample of high-HIV-risk transgender women in San Francisco, California. *Int J Transgend*. 2015;**16**(1):36-48.

52. Webb A, Heyne G, Holmes J, Peta J. Assessment norms for gender and implications for transgender, nonbinary populations. *Division 44 Newsletter*. 2016. Accessed June 9, 2020. https://www.apadivision.org/division-44/publications/newsletters/division/2016/04/nonbinary-populations

53. Heylens G, Verroken C, De Cock S, T'Sjoen G, De Cuypere G. Effects of different steps in gender reassignment therapy on psychopathology: a prospective study of persons with a gender identity disorder. *J Sex Med*. 2014;**11**(1):119-126.

54. Gorin-Lazard A, Baumstarck K, Boyer L, et al. Hormonal therapy is associated with better self-esteem, mood, and quality of life in transsexuals. *J Nerv Ment Dis*. 2013;**201**(11):996-1000.

55. Gómez-Gil E, Vidal-Hagemeijer A, Salamero M. MMPI-2 characteristics of transsexuals requesting sex reassignment: comparison of patients in prehormonal and presurgical phases. *J Pers Assess*. 2008;**90**(4):368-374.

56. Oda H, Kinoshita T. Efficacy of hormonal and mental treatments with MMPI in FtM individuals: cross-sectional and longitudinal studies. *BMC Psychiatry*. 2017;**17**(1):256.

57. Elaut E, De Cuypere G, De Sutter P, et al. Hypoactive sexual desire in transsexual women: prevalence and association with testosterone levels. *Eur J Endocrinol*. 2008;**158**(3):393-399.

58. Warmuz-Stangierska I, Stangierski A, Ziemnicka K, et al. Emotional functions in transsexuals after the first step in physical transformation. *Endokrynol Pol*. 2015;**66**(1):47-52.

59. Colton Meier SL, Fitzgerald KM, Pardo ST, Babcock J. The effects of hormonal gender affirmation treatment on mental health in female-to-male transsexuals. *J Gay Lesbian Ment Health*. 2011;**15**(3):281-299.

Downloaded from https://academic.oup.com/jes/article/5/4/bvab011/6120016 by guest on 19 February 2021

JHU_000001923
App.073

**16**   *Journal of the Endocrine Society*, 2021, Vol. 5, No. 4

60. Davis SA, Colton Meier S. Effects of testosterone treatment and chest reconstruction surgery on mental health and sexuality in female-to-male transgender people. *Int J Sex Health*. 2014;**26**(2):113-128.

61. Keo-Meier CL, Herman LI, Reisner SL, Pardo ST, Sharp C, Babcock JC. Testosterone treatment and MMPI-2 improvement in transgender men: a prospective controlled study. *J Consult Clin Psychol*. 2015;**83**(1):143-156.

62. Newfield E, Hart S, Dibble S, Kohler L. Female-to-male transgender quality of life. *Qual Life Res*. 2006;**15**(9):1447-1457.

63. Gooren LJ, Sungkaew T, Giltay EJ, Guadamuz TE. Cross-sex hormone use, functional health and mental well-being among transgender men (Toms) and Transgender Women (Kathoeys) in Thailand. *Cult Health Sex*. 2015;**17**(1):92-103.

64. van Kesteren PJ, Asscheman H, Megens JA, Gooren LJ. Mortality and morbidity in transsexual subjects treated with cross-sex hormones. *Clin Endocrinol (Oxf)*. 1997;**47**(3):337-342.

65. Wiepjes CM, den Heijer M, Bremmer MA, et al. Trends in suicide death risk in transgender people: results from the Amsterdam Cohort of Gender Dysphoria study (1972-2017). *Acta Psychiatr Scand*. 2020;**141**(6):486-491.

Downloaded from https://academic.oup.com/jes/article/5/4/bvab011/6126016 by guest on 19 February 2021

JHU_000001924

App.074

Disclaimer:

This review was partially funded by the World Professional Association for Transgender Health (WPATH). The authors of this manuscript are responsible for its content. Statements in the manuscript do not necessarily reflect the official views of or imply endorsement by WPATH.

JHU_000001925

App.075



**www.wpath.org**
wpath@wpath.org

phone: 1+(847) 752-5328
fax: 1+(224) 633-2166

1061 E Main Street Ste 300
East Dundee, IL 60118

**STAFF**
**Executive Director**
Sue O'Sullivan
sue@wpath.org

**Executive Director of Global**
**Education & Development**
Donna Kelly
donna@wpath.org

**Deputy Executive Director**
Blaine Vella
blaine@wpath.org

**Educational Program Coordinator**
Taylor O'Sullivan
taylor@wpath.org

**Assistant Associate Director**
Jamie Hicks
jamie@wpath.org

**EXECUTIVE COMMITTEE**
**President**
Vin Tangpricha, MD, PhD
**President-Elect**
Walter Pierre Bouman, MD, PhD
**Secretary**
Randi Ettner, PhD
**Treasurer**
Baudewijntje Kreukels, PhD
**Past-President**
Gail Knudson, MD, MEd, FRCPC

**BOARD OF DIRECTORS**
Tamara Adrian, JD
Marci Bowers, MD
Tone Maria Hansen, MSN
Ren Massey, PhD
Asa Radix, MD, PhD, MPH
Loren Schechter, MD
Jaimie Veale, PhD

**EPATH Representative**
Walter Pierre Bouman, MD, PhD

**USPATH Representative**
Erica Anderson, PhD

**GEI Representative (Ex-Officio)**
Lin Fraser, EdD

**Student Representative (Ex-Officio)**
Penelope Strauss, BA, MPH

# Policy & Procedures Regarding the Use of WPATH SOC8 Data

### Background to the Policy

In April 2018 WPATH commissioned John Hopkins University (JHU) to support the development of the 8th edition of the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (SOC8). WPATH entered into a Sponsored Research Agreement with Johns Hopkins University on behalf of its School of Medicine with Dr Karen A. Robinson, Director at JHU Evidence-based Practice Center as principal investigator in conducting the research for WPATH. WPATH contracted Dr Robinson and her team to perform systematic literature reviews and other activities to support the development of the 8th edition of SOC.

The contract between WPATH and JHU states the following regarding Data use and Publications: "the term "Data" principally includes raw data, research data, records, reports, notes, tables, writing, sound recordings, pictorial reproduction, drawings or other graphical representations, and works of any similar nature (whether or not copyrighted) which are generated or specified to be delivered by Dr Robinson and her team in connection with the update and development of the SOC8".

"Notwithstanding anything to the contrary contained in the contract between WPATH and JHU, WPATH shall retain the unrestricted right to use the Data, or any part thereof at any time, in any manner and for any purpose, including the publication of the Data and the communication of Data to third parties. No other parties other than Dr Robinson and her team will have any access to the Data without written permission by WPATH. Prior to the publication of the Data or any part thereof by Dr Robinson and her team, WPATH shall have thirty (30) days in which to review and comment on the proposed publication. Dr Robinson and her team will give due regard to WPATH's comments. WPATH has the right to request the deletion of any content within materials intended for publication by Dr Robinson and her team*".

Since the start of the contract between WPATH and JHU Dr Robinson and her team have provided systematic literature reviews for the development of statements of the following chapters: Assessment, Primary Care, Endocrinology, Surgery, Reproductive Medicine, and Voice Therapy. Dr Robinson and team have also provided guidance regarding the methodology of the SOC8 and feedback for some of the statements.

### Aim of the Policy

WPATH commissioned and financed an update and the development of the SOC8 for the benefit of transgender healthcare in order to promote health, research, education, respect, dignity, and equality for trans people globally.

Therefore, the aim is of this policy is to develop a process to ensure that any manuscripts developed from the systematic literature reviews commissioned by

JHU_000002317

App.076



**www.wpath.org**
wpath@wpath.org

phone: 1+(847) 752-5328
fax: 1+(224) 633-2166

1061 E Main Street Ste 300
East Dundee, IL 60118

**STAFF**
**Executive Director**
Sue O'Sullivan
sue@wpath.org

**Executive Director of Global
Education & Development**
Donna Kelly
donna@wpath.org

**Deputy Executive Director**
Blaine Vella
blaine@wpath.org

**Educational Program Coordinator**
Taylor O'Sullivan
taylor@wpath.org

**Assistant Associate Director**
Jamie Hicks
jamie@wpath.org

**EXECUTIVE COMMITTEE**
**President**
Vin Tangpricha, MD, PhD
**President-Elect**
Walter Pierre Bouman, MD, PhD
**Secretary**
Randi Ettner, PhD
**Treasurer**
Baudewijntje Kreukels, PhD
**Past-President**
Gail Knudson, MD, MEd, FRCPC

**BOARD OF DIRECTORS**
Tamara Adrian, JD
Marci Bowers, MD
Tone Maria Hansen, MSN
Ren Massey, PhD
Asa Radix, MD, PhD, MPH
Loren Schechter, MD
Jaimie Veale, PhD

**EPATH Representative**
Walter Pierre Bouman, MD, PhD

**USPATH Representative**
Erica Anderson, PhD

**GEI Representative (Ex-Officio)**
Lin Fraser, EdD

**Student Representative (Ex-Officio)**
Penelope Strauss, BA, MPH

WPATH benefit transgender healthcare and promote health, research, education, respect, dignity, and equality for transgender people globally.

**A decision-making process to give access to the Data should be underpinned by a number of good practice directives. Hence, WPATH grants access to the data to any interested party, which:**

a.        has the intention to use the Data for the benefit of advancing transgender health in a positive manner and;
b.        has the intention to publish the Data in reputable, academic, peer-reviewed journals and;
c.        involves the Work Group Leader of the Chapter or, alternatively, a designated representative of that specific SOC8 Chapter, or alternatively the Chair or Co-Chairs of the SOC8 in the design, drafting of the article, and the final approval of the article and;
d.        involves at least one member of the transgender community in the design, drafting of the article, and the final approval of the article and**;
e.        adheres to the WPATH Language Policy***.

**Pathway to Approval for Use of WPATH Data**

WPATH grants approval to use the Data for publication to any interested party, when:
a.        the directives outlined under the aim of this policy have been fulfilled and;
b.        the author(s) have acknowledged that WPATH has sponsored the acquisition of the data in the publication and;
c.        the author(s) have acknowledged that the authors are solely responsible for the content of the manuscript, and the manuscript does not necessarily reflect the view of WPATH in the publication and;
d.        The publication ("manuscript") has been approved by WPATH via a designated approval process.

**Designated approval process for publication of the Data**

a.        Author(s) submit publication to WPATH
b.        It is WPATH Executive Committee's responsibility to ensure that the manuscript is disseminated to the Chair of the SOC8, the Co-Chairs of the SOC8, and the members of the WPATH Board of Directors within 7 days after receipt of the manuscript.
c.        It is WPATH Executive Committee's responsibility to ensure that a vote is held within 14 days after the dissemination of the manuscript to the Chair and Co-Chairs of the SOC8 and Board members.
d.        It will be a blind vote and approval is granted to author(s) for publication by majority vote. The Chair and Co-Chairs of the SOC8 and Board members all have one equal vote. In case of a bind, the WPATH President will have the deciding vote.
e.        It is the President's responsibility to respond to the author(s) with approval or disapproval within thirty (30) days of submission of the manuscript to WPATH.

JHU_000002318

App.077



**www.wpath.org**
wpath@wpath.org

phone: 1+(847) 752-5328
fax: 1+(224) 633-2166

1061 E Main Street Ste 300
East Dundee, IL 60118

**STAFF**
**Executive Director**
Sue O'Sullivan
sue@wpath.org

**Executive Director of Global**
**Education & Development**
Donna Kelly
donna@wpath.org

**Deputy Executive Director**
Blaine Vella
blaine@wpath.org

**Educational Program Coordinator**
Taylor O'Sullivan
taylor@wpath.org

**Assistant Associate Director**
Jamie Hicks
jamie@wpath.org

**EXECUTIVE COMMITTEE**
**President**
Vin Tangpricha, MD, PhD
**President-Elect**
Walter Pierre Bouman, MD, PhD
**Secretary**
Randi Ettner, PhD
**Treasurer**
Baudewijntje Kreukels, PhD
**Past-President**
Gail Knudson, MD, MEd, FRCPC

**BOARD OF DIRECTORS**
Tamara Adrian, JD
Marci Bowers, MD
Tone Maria Hansen, MSN
Ren Massey, PhD
Asa Radix, MD, PhD, MPH
Loren Schechter, MD
Jaimie Veale, PhD

**EPATH Representative**
Walter Pierre Bouman, MD, PhD

**USPATH Representative**
Erica Anderson, PhD

**GEI Representative (Ex-Officio)**
Lin Fraser, EdD

**Student Representative (Ex-Officio)**
Penelope Strauss, BA, MPH

f.      In case of disapproval, the President may decide to hold a special meeting with the Chair and Co-Chairs of the SOC8 and Board members to discuss the manuscript and the reasons for not approving publication.


\*       This will be referred to as "Confidential Information", which means all non-public, confidential, and/or proprietary information that is marked as "Confidential Information" as described below and which is disclosed by one party to the other, including but not limited to software, inventions (whether patentable or not), algorithms, diagrams, drawings, processes, research, product or strategic plans or collaborations or partnerships, financial information, or business models. Confidential Information, if in tangible or readable form, shall be marked as such at the time of disclosure and if disclosed orally, shall be reduced to writing, marked confidential, and addressed to the other party within ten (10) days after disclosure.

\*\*      See T'Sjoen, G., Motmans, J., Arcelus, J., & Bouman, W. P. (2017). The need of patient involvement in transgender healthcare research. Journal of Sexual Medicine, 14(12), 1494-1495.
Bouman, W. P., Arcelus, J., T'Sjoen, G., De Cuypere, G., Galupo, M. P., Kreukels, B. P. C., Leibowitz, S., Riggs, D. W., Schechter, L. S., & Veale, J. (2018). Transgender and gender diverse people's involvement in transgender health research. International Journal of Transgenderism, 19(4), 357-358 or https://www.tandfonline.com/doi/full/10.1080/15532739.2018.1543066


\*\*\*     See Bouman, W. P., Suess, A., Motmans, J., Green, J., Deutsch, M., Adams, N., Safer, J., Smiley, A., and Winter, S. (2017). Language and transgender health. International Journal of Transgenderism, 18(1), 1-6 or https://www.tandfonline.com/doi/full/10.1080/15532739.2016.1262127


*Final Policy Approved June 11, 2020*

JHU_000002319
App.078

**Brief Summary Proposal to Support Guideline Development for World Professional Association for Transgender Health**

**Karen A Robinson, Johns Hopkins University**

**12 April 17**

We are excited about the potential opportunity to support guideline development for the World Professional Association for Transgender Health (WPATH). We understand that WPATH is seeking to update and revise the Standards of Care (SOC) for the Health of Transsexual, Transgender, and Gender Nonconforming People (Version 7, 2011), moving toward an evidence-based guideline. Briefly, we understand that support for this process would include:

1) Orientation to the process and refinement of the scope. This includes:
   a. preliminary searching
   b. presentation and discussion of systematic review and guideline development processes with WPATH personnel, especially the guideline chairs
   c. identification of statements for which systematic reviews will be conducted
2) Conduct systematic reviews, including:
   a. refinement of questions using PICO format (population, intervention, comparison, outcome)
   b. search for evidence
   c. screen results
   d. data extraction
   e. data synthesis
   f. grade certainty or confidence in evidence
   g. present results for guideline panel (e.g., report, tables, in-person presentation to panel)
3) Provide orientation and guidance to guideline panel in interpreting results of systematic reviews and in developing recommendation statements
4) Provide critical feedback on statements and guideline document(s)

Proposed Team and General Structure

The proposed PI (Karen A. Robinson, PhD) is Director of the AHRQ-designated Johns Hopkins University Evidence-based Practice Center (EPC) and has been a leader in the Cochrane Collaboration for more than 20 years. Dr. Robinson has worked with organizations in developing evidence-informed recommendations and policy. This includes serving on NRC and IOM panels (The National Academies), and conducting systematic reviews used by professional organizations, and government agencies (e.g., USPSTF, CMS, OMAR). She also designed and implemented a process for the development and maintenance (including updating) of evidence-based guidelines for a large organization (CF Foundation 2004-2013). Dr. Robinson is a member of G-I-N, serving on the steering group for GIN Tech. Dr. Robinson has specific experience in providing guidance and training for guideline panel members in the assessment of evidence (such as with GRADE) and development of recommendations, guided by the

JHU_000002515

App.079

standards in systematic reviews and guideline development from the IOM, as well as from guideline appraisal concepts, such as from AGREE and GLIA. She also has experience in drafting and critically reviewing guideline documents, specifically ensuring clear links between the evidence and recommendation statements.

This would not be considered an official EPC project as it will not be conducted through the AHRQ. However, we propose that this work be conducted by investigators and staff who are at or who have worked with the EPC. Under leadership from Dr. Robinson, the project would include an experienced EPC faculty member (Lisa M. Wilson, ScM), and would be managed by an experienced senior project manager within the EPC.  Also available are EPC-affiliated medical librarians and statisticians with experience in supporting systematic review teams.

For the full team option, we would engage investigators from the newly established Johns Hopkins Center for Transgender Health (JHCTH), a multidisciplinary center of excellence, established to reduce health care disparities and improve the overall health of the transgender community through world-class clinical care, research and medical education. The Center is led by medical director Devin O'Brien Coon, MD, MSE and clinical program director Paula Neira, MSN, RN, JD. Dr. Coon is a surgeon and researcher whose medical practice is solely focused on transgender health while Ms. Neira is a U.S. Naval Academy graduate, Navy veteran, nurse and lawyer who lead advocacy efforts for the repeal of the "don't ask, don't tell" policy and became the first transgender Navy veteran to have her discharge documentation updated to reflect her correct name. Health outcomes researcher and clinical informatician Brandyn Lau, MPH, CPH leads the research committee for the JHCTH. Mr. Lau, who also has experience working on systematic reviews through the EPC, will serve as a co-investigator, while Dr. O'Brien Coon and Ms. Neira will serve as advisors. We would also engage as a co-investigator Tonia C. Poteat, PhD from the Department of Epidemiology who has experience in conducting systematic reviews in this topic area, and is a physician assistant who has provided gender-affirming medical care for transgender adults since 1996. Finally, Adrian Dobbs, MD would also be invited to serve as an advisor providing expertise in the hormonal management of transgender patients. Further details on proposed personnel, including biosketches, are available upon request.

We have extensive experience in conducting high quality systematic reviews, including updates, while adhering to strict timelines with deliverables. We also have experience in addressing challenges in evidence synthesis. For instance, Dr. Robinson serves on the Methods Steering Committee for the AHRQ EPC Program and has led workgroups developing guidance on integrating different types of evidence, such as existing reviews, into new systematic reviews.

Estimated Cost

The inclusion of the full team described above, assuming a one year budget year, would have total direct cost of about $291,000. The IDC rate is to be negotiated. We would welcome the opportunity to revise our budget estimate to meet different time or cost variables. For instance, relying more on the guideline panel members to provide input throughout the process versus internal experts could be an option to lower this estimate.

JHU_000002516

Should we be considered further, we would appreciate the opportunity to submit questions or to have an additional phone call. In the event that this may be helpful in furthering your process, we include here some of our questions:

- Is there a plan to create a publication or other document outlining the process by which the WPATH guideline panels develop recommendation statements? (We assume that this would include outlining a different process for statements that have or do not have evidence for support.)
- What materials are available from the 2011 guideline that is to be updated? i.e., are full-text references available? are data abstraction files or table files available?

We look forward to the opportunity to provide further details for consideration after the initial review of this summary proposal.

Karen A. Robinson, PhD
Director JHU Evidence-based Practice Center
Associate Professor of Medicine, Epidemiology, and Health Policy and Management
Johns Hopkins University
REDACTED
REDACTED
REDACTED
REDACTED

**Brief Summary Proposal to Support Guideline Development for World Professional Association for Transgender Health**

**Karen A Robinson, Johns Hopkins University**

**26 April 17**

We are excited about the potential opportunity to support guideline development for the World Professional Association for Transgender Health (WPATH). We understand that WPATH is seeking to update and revise the Standards of Care (SOC) for the Health of Transsexual, Transgender, and Gender Nonconforming People (Version 7, 2011), moving toward an evidence-based guideline. We understand that the <u>full-support option</u> for this process would include (please see below for other options):

1) Orientation to the process and refinement of the scope. This includes:
    a. preliminary searching
    b. presentation and discussion of systematic review and guideline development processes with WPATH personnel, especially the guideline chairs
    c. identification of statements for which systematic reviews will be conducted
2) Conduct systematic reviews, including:
    a. refinement of questions using PICO format (population, intervention, comparison, outcome)
    b. search for evidence
    c. screen results
    d. data extraction
    e. data synthesis
    f. grade certainty or confidence in evidence
    g. present results for guideline panel (e.g., report, tables, in-person presentation to panel)
3) Provide orientation and guidance to guideline panel in interpreting results of systematic reviews and in developing recommendation statements
4) Provide critical feedback on statements and guideline document(s)

<u>Proposed Team and General Structure</u>

The proposed PI (Karen A. Robinson, PhD) is Director of the AHRQ-designated Johns Hopkins University Evidence-based Practice Center (EPC) and has been a leader in the Cochrane Collaboration for more than 20 years. Dr. Robinson has worked with organizations in developing evidence-informed recommendations and policy. This includes serving on NRC and IOM panels (The National Academies), and conducting systematic reviews used by professional organizations, and government agencies (e.g., USPSTF, CMS, OMAR). She also designed and implemented a process for the development and maintenance (including updating) of evidence-based guidelines for a large organization (CF Foundation 2004-2013). Dr. Robinson is a member of G-I-N, serving on the steering group for GIN Tech. Dr. Robinson has specific experience in providing guidance and training for guideline panel members in the assessment of evidence (such as with GRADE) and development of recommendations, guided by the

JHU_000002518

App.082

standards in systematic reviews and guideline development from the IOM, as well as from guideline appraisal concepts, such as from AGREE and GLIA. She also has experience in drafting and critically reviewing guideline documents, specifically ensuring clear links between the evidence and recommendation statements.

This would not be considered an official EPC project as it will not be conducted through the AHRQ. However, we propose that this work be conducted by investigators and staff who are at or who have worked with the EPC. Under leadership from Dr. Robinson, the project would include an experienced EPC faculty member (Lisa M. Wilson, ScM), and would be managed by an experienced senior project manager within the EPC. Also available are EPC-affiliated medical librarians and statisticians with experience in supporting systematic review teams.

For the full support option, we would engage investigators from the newly established Johns Hopkins Center for Transgender Health (JHCTH), a multidisciplinary center of excellence, established to reduce health care disparities and improve the overall health of the transgender community through world-class clinical care, research and medical education. The Center is led by medical director Devin O'Brien Coon, MD, MSE and clinical program director Paula Neira, MSN, RN, JD. Dr. Coon is a surgeon and researcher whose medical practice is solely focused on transgender health while Ms. Neira is a U.S. Naval Academy graduate, Navy veteran, nurse and lawyer who lead advocacy efforts for the repeal of the "don't ask, don't tell" policy and became the first transgender Navy veteran to have her discharge documentation updated to reflect her correct name. Health outcomes researcher and clinical informatician Brandyn Lau, MPH, CPH leads the research committee for the JHCTH. Mr. Lau, who also has experience working on systematic reviews through the EPC, will serve as a co-investigator, while Dr. O'Brien Coon and Ms. Neira will serve as advisors. We would also engage as a co-investigator Tonia C. Poteat, PhD from the Department of Epidemiology who has experience in conducting systematic reviews in this topic area, and is a physician assistant who has provided gender-affirming medical care for transgender adults since 1996. Finally, Adrian Dobbs, MD would also be invited to serve as an advisor providing expertise in the hormonal management of transgender patients. Further details on proposed personnel, including biosketches, are available upon request.

We have extensive experience in conducting high quality systematic reviews, including updates, while adhering to strict timelines with deliverables. We also have experience in addressing challenges in evidence synthesis. For instance, Dr. Robinson serves on the Methods Steering Committee for the AHRQ EPC Program and has led workgroups developing guidance on integrating different types of evidence, such as existing reviews, into new systematic reviews.

Estimated Cost

Each estimate assumes a one year budget period and that the IDC rate is to be negotiated.

1. Full Team/ Full Support Option: The inclusion of the full team described above for the full support option (steps 1-4 above) would have total direct cost of about $291,000.
2. Core Team only: Inclusion of core team only for conduct of systematic reviews, and effort for front and back end activities (steps 1-4 above), is about $178,000 direct cost.

JHU_000002519

App.083

3. Restricted Core Team only: Inclusion of core team only. Completion of step 2 only with limited scope (e.g., one question/recommendation statement, use of existing reviews, etc.). Direct cost estimated at about $136,000.

Should we be considered further, we would appreciate the opportunity to submit questions or to have an additional phone call. In the event that this may be helpful in furthering your process, we include here some of our questions:

- Is there a plan to create a publication or other document outlining the process by which the WPATH guideline panels develop recommendation statements?  (We assume that this would include outlining a different process for statements that have or do not have evidence for support.)
- What materials are available from the 2011 guideline that is to be updated? i.e., are full-text references available? Are data abstraction files or table files available?
- Does WPATH have a standard IDC rate?

We look forward to the opportunity to provide further details for consideration after the initial review of this summary proposal.

Karen A. Robinson, PhD
Director JHU Evidence-based Practice Center
Associate Professor of Medicine, Epidemiology, and Health Policy and Management
Johns Hopkins University
REDACTED
REDACTED
REDACTED
REDACTED

JHU_000002520

App.084

**Preliminary Activities Report for JHU Project "Support Guideline Development for World Professional Association for Transgender Health"**

**Karen A Robinson, Johns Hopkins University**

**27 Jan 19**

We signed the contract to conduct activities to support the development of Standards of Care (SOC) 8 with a start date of 1 April 2018 with an end date of 31 March 2019. The total cost (direct and indirect) was $196,307.

We proposed the following tasks and have briefly noted below the status of each:

1) In consultation with WPATH personnel, draft initial guidelines development process or "WPATH Guideline Procedures Manual".
   - Guideline development methods document drafted (July 2018)
   - Conflict of Interest policy and disclosure of interest form drafted (Nov 2018)
   - Drafted Chapter Template, including guidance on and examples of text (July 2018)

2) Orientation to the guideline development process and refinement of the scope. This includes:
   a. presentation and discussion of systematic review and guideline development processes with WPATH personnel, especially the guideline chairs
   - provided overview of process during two calls with chairs and chapter leads (July 2018)
   - provided overview and assistance with scope in Buenos Aires (Nov 2018)

   b. preliminary searching
   - conducted preliminary searching (June 2018)
   - provided a register of relevant articles, sorted by chapter (July 2018)

   c. identification of statements within chapters for which systematic reviews will be conducted
   - reviewed SOC7 and extracted statements that seemed to be recommendations. Provided listing, and initial identification as to those needed systematic reviews, to Chairs and Chapters. (May 2018)

3) Conduct systematic reviews for the topics selected, including:
   a. refinement of questions using PICO format (population, intervention, comparison, outcome)
   b. search for evidence
   c. screen results
   d. data extraction
   e. data synthesis
   f. grade certainty or confidence in evidence
   g. present results for guideline panel (e.g., report, tables, in-person presentation to panel)
   - received last set of questions from chapters in mid-December 2018
   - completed protocols for systematic reviews for adolescent, hormone, surgery and voice chapters
   - registering protocols on PROSPERO
   - In process of completing systematic reviews addressing 34 questions and 23 subquestions (plus those received in December)

JHU_000002521

4) Provide orientation and guidance to guideline panel in interpreting results of systematic reviews and in developing recommendation statements. This includes providing guidance on development of consensus-based statements or good practice statements.
   - Provided written guidance on drafting recommendations (July 2018)
   - Provided a presentation in Buenos Aires for Chairs and Chapter leads; met individually with most chapters (Nov 2018)

5) Provide critical feedback on statements and guideline document(s).
   - Provided critical feedback on statements received to date

6) Provide assistance in submission of relevant guideline modules or chapters to the National Guideline Clearinghouse (guidelines.gov).

In addition to above, I have met regularly with the SOC8 Chairs (for instance, I drafted a 'tracking sheet' to track questions and recommendations received and other notes regarding status). I have also have joined chapter calls or had separate calls with Chapter Leads, as requested. All methods documents have been posted on the shared SOC8 drive.

JHU_000002522

App.086

**Brief Summary Proposal to Support Guideline Development for World Professional Association for Transgender Health**

**Karen A Robinson, Johns Hopkins University**

**23 June 17**

We are excited about the potential opportunity to support guideline development for the World Professional Association for Transgender Health (WPATH). We understand that WPATH is seeking to update and revise the Standards of Care (SOC) for the Health of Transsexual, Transgender, and Gender Nonconforming People (Version 7, 2011), moving toward an evidence-based guideline.

We propose the following tasks:

1)  In consultation with WPATH personnel, draft initial guidelines development process or "WPATH Guideline Procedures Manual".
2)  Orientation to the guideline development process and refinement of the scope. This includes:
    a.  presentation and discussion of systematic review and guideline development processes with WPATH personnel, especially the guideline chairs
    b.  preliminary searching
    c.  identification of statements within chapters for which systematic reviews will be conducted
3)  Conduct systematic reviews for the topics selected, including:
    a.  refinement of questions using PICO format (population, intervention, comparison, outcome)
    b.  search for evidence
    c.  screen results
    d.  data extraction
    e.  data synthesis
    f.  grade certainty or confidence in evidence
    g.  present results for guideline panel (e.g., report, tables, in-person presentation to panel)
4)  Provide orientation and guidance to guideline panel in interpreting results of systematic reviews and in developing recommendation statements. This includes providing guidance on development of consensus-based statements or good practice statements.
5)  Provide critical feedback on statements and guideline document(s).
6)  Provide assistance in submission of relevant guideline modules or chapters to the National Guideline Clearinghouse (guidelines.gov).

Proposed Team and General Structure

The proposed PI (Karen A. Robinson, PhD) is Director of the AHRQ-designated Johns Hopkins University Evidence-based Practice Center (EPC) and has been a leader in the Cochrane Collaboration for more than 20 years. Dr. Robinson has worked with organizations in developing evidence-informed recommendations and policy. This includes serving on NRC and IOM panels (The National Academies), and conducting systematic reviews used by professional organizations, and government agencies (e.g., USPSTF, CMS, OMAR). She also designed and implemented a process for the development and maintenance (including updating) of evidence-based guidelines for a large organization (CF Foundation 2004-2013). Dr. Robinson is a member of G-I-N, serving on the steering group for GIN Tech. Dr. Robinson has specific experience in providing guidance and training for

JHU_000002523
App.087

guideline panel members in the assessment of evidence (such as with GRADE) and development of recommendations, guided by the standards in systematic reviews and guideline development from the IOM, as well as from guideline appraisal concepts, such as from AGREE and GLIA. She also has experience in drafting and critically reviewing guideline documents, specifically ensuring clear links between the evidence and recommendation statements.

This would not be considered an official EPC project as it will not be conducted through the AHRQ. However, we propose that this work be conducted by investigators and staff who are at or who have worked with the EPC. Under leadership from Dr. Robinson, the project would include an experienced EPC faculty member (Lisa M. Wilson, ScM), and would be managed by an experienced senior project manager within the EPC.  Also available are EPC-affiliated medical librarians and statisticians with experience in supporting systematic review teams.

We have extensive experience in conducting high quality systematic reviews, including updates, while adhering to strict timelines with deliverables. We also have experience in addressing challenges in evidence synthesis. For instance, Dr. Robinson serves on the Methods Steering Committee for the AHRQ EPC Program and has led workgroups developing guidance on integrating different types of evidence, such as existing reviews, into new systematic reviews.

We will rely on WPATH personnel, including guideline chairs, chapter leads and, as relevant, chapter committee members, as the domain experts. Their input will ensure that we are addressing the appropriate questions and producing reviews and report(s) that will be most useful in developing the guidelines. Input will be sought at the beginning of the work and, as needed, to address any domain-specific questions throughout the process.

<u>Estimated Cost</u>

We have prepared a budget for 16 months, assuming start date of 1 July 2017 to end of October 2018 (we understand need to present details on the process and some chapters at the WPATH World Congress). The direct cost for the 16 months is $223,385. The IDC (indirect cost; also called 'facilities and administrative' fee or overhead) is to be negotiated, pending allowable costs per sponsor. Travel costs, such as to attend meetings to provide orientation or report results, will be reimbursed separately. Final payment schedule to be negotiated; we would suggest quarterly.

We look forward to the opportunity to provide further details or respond to any questions.

Karen A. Robinson, PhD
Director JHU Evidence-based Practice Center
Associate Professor of Medicine, Epidemiology, and Health Policy and Management
Johns Hopkins University
REDACTED
REDACTED
REDACTED
REDACTED

JHU_000002524
App.088

**Brief Summary Proposal to Support Guideline Development**

**for World Professional Association for Transgender Health**

**31 July 17**

**Karen A. Robinson, PhD**
**Director JHU Evidence-based Practice Center**
**Associate Professor of Medicine, Epidemiology, and Health Policy and Management**
**Johns Hopkins University**
REDACTED
REDACTED
REDACTED
REDACTED

*Robinson, JHU*

JHU_000002525
App.089

We are excited about the opportunity to support guideline development for the World Professional Association for Transgender Health (WPATH). We understand that WPATH is seeking to update and revise the Standards of Care (SOC) for the Health of Transsexual, Transgender, and Gender Nonconforming People (Version 7, 2011). We are particularly excited to help WPATH develop evidence-based guidelines by providing an independent evidence-review team to conduct rigorous, comprehensive, and transparent systematic reviews to inform the guideline recommendations.

We propose the following services to support WPATH and SOC8:

1)  In consultation with WPATH personnel, draft initial guidelines development process or "WPATH Guideline Procedures Manual".

2) Orientation to the guideline development process and refinement of the scope. This includes:
   a. presentation and discussion of systematic review and guideline development processes with WPATH personnel, especially the guideline chairs and chapter leads
   b. preliminary searching
   c. identification of statements within chapters for which systematic reviews will be conducted, and which will be 'best practice statements' based on consensus expert opinion

3) Conduct systematic reviews for the topics selected, including:
   a. refinement of questions using PICO format (population, intervention, comparison, outcome)
   b. search for evidence
   c. screen results
   d. data extraction
   e. data assessment and synthesis
   f. grade certainty or confidence in evidence
   g. presentation of results to guideline panel (e.g., report, evidence and summary tables, in-person presentation to panel).

4) Provide orientation and guidance to guideline panel in interpreting results of systematic reviews, in developing recommendation statements, and in grading the recommendation statements. This includes providing guidance on development of consensus-based or good practice statements.

5) Provide critical feedback on statements and guideline document(s). * We understand need to, and will facilitate, the presentation of details on the process and, at least, some chapters at the WPATH World Congress.

6) Provide assistance in submission of relevant guideline modules or chapters to the National Guideline Clearinghouse (guidelines.gov).

Proposed Team and General Structure

The proposed PI (Karen A. Robinson, PhD) is Director of the AHRQ-designated Johns Hopkins University Evidence-based Practice Center (EPC) and has been a leader in Cochrane for more than 20 years. (Please see attached CV.) Dr. Robinson has worked with a number of multi-specialty organizations in developing evidence-informed recommendations and policy, including serving on NRC and IOM panels (The National Academies), and conducting systematic reviews used by professional organizations, and government agencies (e.g., CF Foundation, KDIGO, USPSTF, CMS, OMAR). She also designed and implemented a process for the development and maintenance (including updating) of evidence-based guidelines for a large organization (CF Foundation). Dr.
*Robinson, JHU*

JHU_000002526

Robinson is a member of G-I-N (Guidelines International Network), serving on the steering group for G-I-N Tech. Dr. Robinson has specific experience in providing guidance and training for guideline panel members in the assessment of evidence (such as with GRADE) and the development of recommendations, guided by the standards guideline development from the IOM, as well as from guideline appraisal concepts, such as from AGREE and GLIA. She also has experience in drafting and critically reviewing guideline documents, specifically ensuring clear links between the evidence and recommendation statements.

Under leadership from Dr. Robinson, the project would include an experienced EPC faculty member (Lisa M. Wilson, ScM). Ms. Wilson is a Research Associate, Health Policy & Management and has been at the EPC for over 10 years; she has managed and led 19 EPC evidence reviews. (Please see CV.) Ms. Wilson has also conducted research to improve systematic review methodology. Ms. Wilson was a key team player, taking the lead on several sections, for our work with the KDIGO guidelines.

The project would be managed by an experienced senior project manager, with the assistance of an experienced Research Assistant. Additionally, we plan to engage graduate students to assist with tasks such as screening and data extraction.  Also available are EPC-affiliated medical librarians and statisticians with experience in supporting systematic review teams.

We have extensive experience in conducting high quality systematic reviews, while adhering to strict timelines with deliverables. We also have experience in addressing challenges in evidence synthesis. For instance, Dr. Robinson serves on the Methods Steering Committee for the AHRQ EPC Program and has led workgroups developing guidance on integrating different types of evidence, such as existing reviews, into new systematic reviews.

As we have done with some of our prior work, we will rely on WPATH personnel, including guideline chairs, chapter leads and, as relevant, chapter committee members, as the domain experts. Their input will ensure that we are addressing the appropriate questions and producing reviews and report(s) that will be most useful in developing the guidelines. Input will be sought at the beginning of the work and, as needed, to address any domain-specific questions throughout the process.

<u>Estimated Cost</u>

We have prepared a budget for 12 months, assuming start date of 1 September 2017, with direct cost $178,461. We understand that WPATH has a policy of not paying more than 10% IDC (indirect cost; also called 'facilities and administrative' fee or overhead) so total proposed budget is $196,307. Travel costs, such as to attend meetings to provide orientation or report results, will be reimbursed separately. As in the prior proposals submitted, we would be open to discussing ways to lower the total budget, such as limiting the number or scope of the reviews, or limiting the services provided.

We suggest a quarterly payment schedule based on milestones, for example:
1. upon initiation of project with signed contract
2. upon submission of final PICO document outlining questions for review
3. upon submission of the draft report of the systematic reviews
4. upon submission of final report of systematic reviews

We look forward to the opportunity to provide further details or to respond to any questions.

*Robinson, JHU*

JHU_000002527

App.091

Please find attached CVs for Dr. Robinson and Ms. Wilson.

*Robinson, JHU*

JHU_000002528
App.092



## Policy & Procedures Regarding the Use of WPATH SOC8 Data
### *Revised August 2020*

*This policy will be shared with every SOC8 member in order to inform them of the process of SOC8 Data Use and to allow each SOC8 member to apply to access the existing SOC8 data as described below*

### Background to the Policy

In April 2018 WPATH commissioned John Hopkins University (JHU) to support the development of the 8th edition of the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (SOC8). WPATH entered into a Sponsored Research Agreement with John Hopkins University on behalf of its School of Medicine with Dr Karen A. Robinson, Director at JHU Evidence-based Practice Center as principal investigator in conducting the research for WPATH. WPATH contracted Dr Robinson and her team to perform systematic literature reviews and other activities to support the development of the 8th edition of SOC.

The contract between WPATH and JHU states the following regarding Data use and Publications: "the term "Data" principally includes raw data, research data, records, reports, notes, tables, writing, sound recordings, pictorial reproduction, drawings or other graphical representations, and works of any similar nature (whether or not copyrighted) which are generated or specified to be delivered by Dr Robinson and her team in connection with the update and development of the SOC8".

"Notwithstanding anything to the contrary contained in the contract between WPATH and JHU, WPATH shall retain the unrestricted right to use the Data, or any part thereof at any time, in any manner and for any purpose, including the publication of the Data and the communication of Data to third parties. No other parties other than Dr Robinson and her team will have any

*WPATH Policy Use of Data for SOC8 – Version 2*
*Approved by WPATH Board of Directors – August 2020*

JHU_000003195

App.093

access to the Data without written permission by WPATH. Prior to the publication of the Data or any part thereof by Dr Robinson and her team, WPATH shall have thirty (30) days in which to review and comment on the proposed publication. Dr Robinson and her team will give due regard to WPATH's comments. WPATH has the right to request the deletion of any content within materials intended for publication by Dr Robinson and her team".

Since the start of the contract between WPATH and JHU Dr Robinson and her team have provided systematic literature reviews for the development of statements of the following chapters: Assessment, Primary Care, Endocrinology, Surgery, Reproductive Medicine, and Voice Therapy. Dr Robinson and team have also provided guidance regarding the methodology of the SOC8 and feedback for some of the statements.

**Aim of the Policy**

WPATH commissioned and financed an update and the development of the SOC8 for the benefit of transgender healthcare in order to promote health, research, education, respect, dignity, and equality for trans people globally.

Therefore, the aim is of this policy is to develop and to describe a process to ensure that any manuscripts developed from the systematic literature reviews commissioned by WPATH benefit transgender healthcare and promote health, research, education, respect, dignity, and equality for transgender people globally.

A decision-making process to give access to the Data should be underpinned by a number of good practice directives. Hence, WPATH grants access to the data to any interested party, which:

a. has the intention to use the Data for the benefit of advancing transgender health in a positive manner and;
b. has the intention to publish the Data in reputable, academic, peer-reviewed journals and;
c. involves the Work Group Leader of the Chapter or, alternatively, a designated representative of that specific SOC8 Chapter, or alternatively the Chair or Co-Chairs of the SOC8 in the design, drafting of the article, and the final approval of the article and;

*WPATH Policy Use of Data for SOC8 – Version 2*
*Approved by WPATH Board of Directors – August 2020*

JHU_000003196

App.094

d. involves at least one member of the transgender community in the design, drafting of the article, and the final approval of the article and**;

e. adheres to the WPATH Language Policy and/or similar publications***.

*WPATH Policy Use of Data for SOC8 – Version 2*
*Approved by WPATH Board of Directors – August 2020*

JHU_000003197

App.095

## Pathway to approval for use of WPATH Data

WPATH grants approval to use the Data for publication to any interested party, when:

a. the directives outlined under the aim of this policy have been fulfilled and;

b. the author(s) have acknowledged that WPATH has sponsored the acquisition of the data in the publication and;

c. the author(s) have acknowledged that the authors are solely responsible for the content of the manuscript, and the manuscript does not necessarily reflect the view of WPATH in the publication and;

d. The publication ("manuscript") has been approved by WPATH via a designated approval process.

## Designated approval process for publication of Data (see Figure 1)



## Figure 1 - Designated approval process for publication of Data

1. The lead author submits a proposal of the publication to WPATH with the following headings: Background; Aim(s); Method; Results;

*WPATH Policy Use of Data for SOC8 – Version 2*
*Approved by WPATH Board of Directors – August 2020*

JHU_000003198

App.096

Conclusion (Maximum 1 page and states which SOC8 chapter the publication is linked to);

2. It is WPATH's responsibility that the proposal is shared with the Chair and Co-Chairs of the SOC8, the members of the WPATH Board of Directors and all members of the SOC8 chapter linked to the proposed publication within 14 days after receipt of the proposal. The aim will be to identify an individual (s) from the chapter (maximum 2 individuals if a publication concerns more than one chapter) who will work with the lead author(s) of the proposed publication (unless the lead author is already working with one or more Working Group members); it is the responsibility of the Working Group as a whole to identify and to nominate one of their members, either by vote or general consensus within the Working Group.

3. WPATH will keep a record of the possible proposals with deadlines for draft submissions - in order to avoid the development of multiple papers with the same aims using the same data;

4. It is WPATH Executive Committee's responsibility to ensure that a vote is held within 30 days after the dissemination of the proposal.

5. It will be a blind vote and approval to write the paper is granted to the author(s) by majority vote. In case of a tie, the WPATH President will have the deciding vote.

6. It is the President's responsibility to respond to the author(s) with approval or disapproval within fifty-six (56) days of submission of the proposal to WPATH.

7. Once the manuscript draft is ready for publication, the lead author will submit the publication to WPATH

8. It is WPATH Executive Committee's responsibility to ensure that the manuscript is disseminated to the Chair of the SOC8, the Co-Chairs of the SOC8, and the members of the WPATH Board of Directors within 7 days after receipt of the manuscript.

9. It is WPATH Executive Committee's responsibility to ensure that a vote is held within 14 days after the dissemination of the manuscript to the Chair and Co-Chairs of the SOC8 and Board members.

10. It will be a blind vote and approval is granted to author(s) for publication by majority vote. The Chair and Co-Chairs of the SOC8 and Board members all have one equal vote. In case of a tie, the WPATH President will have the deciding vote.

*WPATH Policy Use of Data for SOC8 – Version 2*
*Approved by WPATH Board of Directors – August 2020*

JHU_000003199

11. It is the President's responsibility to respond to the author(s) with approval or disapproval within thirty (30) days of submission of the manuscript to WPATH.

12. In case of disapproval, the President may decide to hold a special meeting with the Chair and Co-Chairs of the SOC8 and Board members to discuss the manuscript and the reasons for not approving publication.

13. There may be cases where it will be in the benefit of the SOC8 development process to publish the manuscript before the SOC8 has been completed, but there may be cases when the manuscript will only be approved for submission after the SOC8 has been published, acknowledging that the data for the manuscript may need to be refreshed.

JHU_000003200

App.098

\* This will be referred to as "Confidential Information", which means all non-public, confidential, and/or proprietary information that is marked as "Confidential Information" as described below and which is disclosed by one party to the other, including but not limited to software, inventions (whether patentable or not), algorithms, diagrams, drawings, processes, research, product or strategic plans or collaborations or partnerships, financial information, or business models. Confidential Information, if in tangible or readable form, shall be marked as such at the time of disclosure and if disclosed orally, shall be reduced to writing, marked confidential, and addressed to the other party within ten (10) days after disclosure.

\*\* See T'Sjoen, G., Motmans, J., Arcelus, J., & Bouman, W. P. (2017). The need of patient involvement in transgender healthcare research. *Journal of Sexual Medicine, 14*(12), 1494-1495.
Bouman, W. P., Arcelus, J., T'Sjoen, G., De Cuypere, G., Galupo, M. P., Kreukels, B. P. C., Leibowitz, S., Riggs, D. W., Schechter, L. S., & Veale, J. (2018). Transgender and gender diverse people's involvement in transgender health research. *International Journal of Transgenderism, 19*(4), 357-358 or https://www.tandfonline.com/doi/full/10.1080/15532739.2018.154306 6

\*\*\* See Bouman, W. P., Suess, A., Motmans, J., Green, J., Deutch, M., Adams, N., Safer, J., Smiley, A., and Winter, S. (2017). Language and transgender health. *International Journal of Transgenderism, 18*(1), 1-6 or [https://www.tandfonline.com/doi/full/10.1080/15532739.2016.126212 7](https://www.tandfonline.com/doi/full/10.1080/15532739.2016.126212 7)
See T'Sjoen, G., Radix, A., Motmans, J. (2020). Language & Ethics in Transgender Health. *Journal of Sexual Medicine*. Advanced online publication. doi.org/10.1016/j.jsxm.2020.05.017

**Brief Summary Proposal to Support Guideline Development**

**for World Professional Association for Transgender Health**

**31 July 17**

**Karen A. Robinson, PhD**
**Director JHU Evidence-based Practice Center**
**Associate Professor of Medicine, Epidemiology, and Health Policy and Management**
**Johns Hopkins University**
REDACTED
REDACTED
REDACTED
REDACTED

*Robinson, JHU*

JHU_000003202

We are excited about the opportunity to support guideline development for the World Professional Association for Transgender Health (WPATH). We understand that WPATH is seeking to update and revise the Standards of Care (SOC) for the Health of Transsexual, Transgender, and Gender Nonconforming People (Version 7, 2011). We are particularly excited to help WPATH develop evidence-based guidelines by providing an independent evidence-review team to conduct rigorous, comprehensive, and transparent systematic reviews to inform the guideline recommendations.

We propose the following services to support WPATH and SOC8:

1) In consultation with WPATH personnel, draft initial guidelines development process or "WPATH Guideline Procedures Manual".
2) Orientation to the guideline development process and refinement of the scope. This includes:
   a. presentation and discussion of systematic review and guideline development processes with WPATH personnel, especially the guideline chairs and chapter leads
   b. preliminary searching
   c. identification of statements within chapters for which systematic reviews will be conducted, and which will be 'best practice statements' based on consensus expert opinion
3) Conduct systematic reviews for the topics selected, including:
   a. refinement of questions using PICO format (population, intervention, comparison, outcome)
   b. search for evidence
   c. screen results
   d. data extraction
   e. data assessment and synthesis
   f. grade certainty or confidence in evidence
   g. presentation of results to guideline panel (e.g., report, evidence and summary tables, in-person presentation to panel).
4) Provide orientation and guidance to guideline panel in interpreting results of systematic reviews, in developing recommendation statements, and in grading the recommendation statements. This includes providing guidance on development of consensus-based or good practice statements.
5) Provide critical feedback on statements and guideline document(s). * We understand need to, and will facilitate, the presentation of details on the process and, at least, some chapters at the WPATH World Congress.
6) Provide assistance in submission of relevant guideline modules or chapters to the National Guideline Clearinghouse (guidelines.gov).

Proposed Team and General Structure

The proposed PI (Karen A. Robinson, PhD) is Director of the AHRQ-designated Johns Hopkins University Evidence-based Practice Center (EPC) and has been a leader in Cochrane for more than 20 years. (Please see attached CV.) Dr. Robinson has worked with a number of multi-specialty organizations in developing evidence-informed recommendations and policy, including serving on NRC and IOM panels (The National Academies), and conducting systematic reviews used by professional organizations, and government agencies (e.g., CF Foundation, KDIGO, USPSTF, CMS, OMAR). She also designed and implemented a process for the development and maintenance (including updating) of evidence-based guidelines for a large organization (CF Foundation). Dr.

*Robinson, JHU*

Robinson is a member of G-I-N (Guidelines International Network), serving on the steering group for G-I-N Tech. Dr. Robinson has specific experience in providing guidance and training for guideline panel members in the assessment of evidence (such as with GRADE) and the development of recommendations, guided by the standards guideline development from the IOM, as well as from guideline appraisal concepts, such as from AGREE and GLIA. She also has experience in drafting and critically reviewing guideline documents, specifically ensuring clear links between the evidence and recommendation statements.

Under leadership from Dr. Robinson, the project would include an experienced EPC faculty member (Lisa M. Wilson, ScM). Ms. Wilson is a Research Associate, Health Policy & Management and has been at the EPC for over 10 years; she has managed and led 19 EPC evidence reviews. (Please see CV.) Ms. Wilson has also conducted research to improve systematic review methodology. Ms. Wilson was a key team player, taking the lead on several sections, for our work with the KDIGO guidelines.

The project would be managed by an experienced senior project manager, with the assistance of an experienced Research Assistant. Additionally, we plan to engage graduate students to assist with tasks such as screening and data extraction.  Also available are EPC-affiliated medical librarians and statisticians with experience in supporting systematic review teams.

We have extensive experience in conducting high quality systematic reviews, while adhering to strict timelines with deliverables. We also have experience in addressing challenges in evidence synthesis. For instance, Dr. Robinson serves on the Methods Steering Committee for the AHRQ EPC Program and has led workgroups developing guidance on integrating different types of evidence, such as existing reviews, into new systematic reviews.

As we have done with some of our prior work, we will rely on WPATH personnel, including guideline chairs, chapter leads and, as relevant, chapter committee members, as the domain experts. Their input will ensure that we are addressing the appropriate questions and producing reviews and report(s) that will be most useful in developing the guidelines. Input will be sought at the beginning of the work and, as needed, to address any domain-specific questions throughout the process.

Estimated Cost

We have prepared a budget for 12 months, assuming start date of 1 September 2017, with direct cost $178,461. We understand that WPATH has a policy of not paying more than 10% IDC (indirect cost; also called 'facilities and administrative' fee or overhead) so total proposed budget is $196,307. Travel costs, such as to attend meetings to provide orientation or report results, will be reimbursed separately. As in the prior proposals submitted, we would be open to discussing ways to lower the total budget, such as limiting the number or scope of the reviews, or limiting the services provided.

We suggest a quarterly payment schedule based on milestones, for example:
1. upon initiation of project with signed contract
2. upon submission of final PICO document outlining questions for review
3. upon submission of the draft report of the systematic reviews
4. upon submission of final report of systematic reviews

We look forward to the opportunity to provide further details or to respond to any questions.

*Robinson, JHU*

JHU_000003204

App.102

Please find attached CVs for Dr. Robinson and Ms. Wilson.

*Robinson, JHU*

JHU_000003205

App.103



**www.wpath.org**
wpath@wpath.org

phone: 1+(847) 752-5328
fax: 1+(224) 633-2166

1061 E Main Street Ste 300
East Dundee, IL 60118

**STAFF**
**Executive Director**
Sue O'Sullivan
sue@wpath.org

**Executive Director of Global**
**Education & Development**
Donna Kelly
donna@wpath.org

**Deputy Executive Director**
Blaine Vella
blaine@wpath.org

**Educational Program Coordinator**
Taylor O'Sullivan
taylor@wpath.org

**Assistant Associate Director**
Jamie Hicks
jamie@wpath.org

**EXECUTIVE COMMITTEE**
**President**
Vin Tangpricha, MD, PhD
**President-Elect**
Walter Pierre Bouman, MD, PhD
**Secretary**
Randi Ettner, PhD
**Treasurer**
Baudewijntje Kreukels, PhD
**Past-President**
Gail Knudson, MD, MEd, FRCPC

August 26, 2020

Dear Karen:

We hope this email finds you well.

On behalf of the Executive Committee, the SOCv8 Chair and Co-Chairs of WPATH, we wanted to be sure to respond to you in writing prior to the 30 days deadline of the current 2 submitted manuscripts to WPATH.

In addition, we want to set out in writing to you how we would like you and your team at JHU to proceed with writing and publishing future manuscripts from the WPATH SOCv8 data.

The last 2 manuscripts were submitted for review on 27 July 2020. While the manuscripts have been under review, there have been many concerns noted regarding these papers by our Board of Directors and SOCv8 Chair and Co-Chairs.

In essence, the 2 manuscripts were evaluated on as per our Policy & Procedures Regarding the Use of WPATH SOC8 Data and the outcome of this evaluation was that the 2 manuscripts do not adhere to our Policy & Procedures Regarding the Use of WPATH SOC8 Data. This was due to point c of the Aim section: "*involves the Work Group Leader of the Chapter or, alternatively, a designated representative of that specific SOC8 Chapter, or alternatively the Chair or Co-Chairs of the SOC8 in the design, drafting of the article, and the final approval of the article*".

We have discussed as a group how we can help you and your team addressing these issues in order for the two papers to be ready for submission.

As per the Policy & Procedures Regarding the Use of WPATH SOC8 Data you will need to reach out to the Work Group Leader of the Chapters related to the 2 manuscripts and ask him/her/they to identify one person within the chapter group to work with your team in order for the manuscripts to be finalised. Should you have difficulties getting into contact with a Work Group Leader, the SOCv8 Chair or Co-Chairs will be available to assist. This will ensure that the quality of the manuscripts fulfils adequate standards of form and content in trans health care; and is conform our Policy. It would be reasonable for this expert to be listed as a co-author of the manuscript.

In order to guaranty a quicker process for the development of future publications that use the WPATH SOCv8 data, the Policy has been adapted in order to include an approval process at an earlier stage. If anyone involved in the SOCv8 process, including yourself, would like to write a publication using the

JHU_000003732

App.104



**www.wpath.org**
wpath@wpath.org

phone: 1+(847) 752-5328
fax: 1+(224) 633-2166

1061 E Main Street Ste 300
East Dundee, IL 60118

**STAFF**
**Executive Director**
Sue O'Sullivan
sue@wpath.org

**Executive Director of Global
Education & Development**
Donna Kelly
donna@wpath.org

**Deputy Executive Director**
Blaine Vella
blaine@wpath.org

**Educational Program Coordinator**
Taylor O'Sullivan
taylor@wpath.org

**Assistant Associate Director**
Jamie Hicks
jamie@wpath.org

**EXECUTIVE COMMITTEE**
**President**
Vin Tangpricha, MD, PhD
**President-Elect**
Walter Pierre Bouman, MD, PhD
**Secretary**
Randi Ettner, PhD
**Treasurer**
Baudewijntje Kreukels, PhD
**Past-President**
Gail Knudson, MD, MEd, FRCPC

SOCv8 data they should follow a designated approval process (please see Figure 1 below).

We have revised our Policy & Procedures Regarding the Use of WPATH SOCv8 Data to ensure that further publication of WPATH SOCv8 is carried out in an orderly fashion; and that the Policy & Procedures are adhered to in full. We do hope that this process would encourage collaboration between your team and members of the SOCv8, who are the experts in their field, as this will be of benefit to everyone.

We would like to organise a Zoom meeting between us and yourself so the content of this letter can be discussed. Therefore, we would like to request that the 2 manuscripts are put "on hold" for submission, until we are able to meet with you (via ZOOM video call).

Please let Blaine know of your availability for the next two weeks, August 31 – September 4, between 10am ET – 4pm ET, and September 7 – 11, between 10am ET – 4pm ET, so that we can send a doodle to the EC and co-chairs to participate in our discussion.

We appreciate your understanding that these papers have a significant impact on JHU, WPATH, the work completed so far, and the eventual completion and release of the SOCv8. Great time, expertise, and care has been spent and we want to ensure that all our combined work is duly recognized, applied, and captured effectively.

Please confirm that you have received this email in good order and will defer the submission until our call and the subsequent outcome of such call.

Thank you and best regards,

WPATH EXECUTIVE COMMITTEE
Vin Tangpricha, MD, PhD – President
Walter Pierre Bouman, MD, PhD – President Elect
Randi Ettner, PhD – Secretary
Baudewijntje Kreukels, PhD – Treasurer
Gail Knudson, MD, MEd, FRCPC – Immediate Past President

Enc.          *Policy & Procedures Regarding the Use of WPATH SOC8 Data
(version 2)*

**Designated approval process for publication of Data (Figure 1)**

JHU_000003733



**www.wpath.org**
wpath@wpath.org

phone: 1+(847) 752-5328
fax: 1+(224) 633-2166

1061 E Main Street Ste 300
East Dundee, IL 60118

**STAFF**
**Executive Director**
Sue O'Sullivan
sue@wpath.org

**Executive Director of Global
Education & Development**
Donna Kelly
donna@wpath.org

**Deputy Executive Director**
Blaine Vella
blaine@wpath.org

**Educational Program Coordinator**
Taylor O'Sullivan
taylor@wpath.org

**Assistant Associate Director**
Jamie Hicks
jamie@wpath.org

**EXECUTIVE COMMITTEE**
**President**
Vin Tangpricha, MD, PhD
**President-Elect**
Walter Pierre Bouman, MD, PhD
**Secretary**
Randi Ettner, PhD
**Treasurer**
Baudewijntje Kreukels, PhD
**Past-President**
Gail Knudson, MD, MEd, FRCPC

**Figure 1 - Designated approval process for publication of Data**



JHU_000003734
App.106

| | |
|---|---|
| **From:** | Karen Robinson |
| **To:** | Lisa Wilson; Kellan Baker; Kristen McArthur; Vaadeem Dukhanin |
| **Subject:** | FYI FW: Letter from Your WPATH EC and SOC8 Co-Chairs - re: SOC8 Data |
| **Date:** | Wednesday, October 21, 2020 8:44:39 AM |
| **Attachments:** | image003.png |
| | Policy & Procedures Regarding the Use of WPATH SOC8 Data Final Approved Aug 2020.pdf |

All –

I think some of you know but, with this last message from WPATH and a canceled call, I wanted to be sure you were all aware of the situation.

Please work diligently to get manuscripts (re)submitted and let me know if you receive messages from members of WPATH or journal editorial boards.

I am happy to have a Zoom call to talk through any concerns or questions you may have – just let me know and we will get something in the calendar.

Thanks for all of your hard work on this project!

Thanks,
Karen

---

**From:** Karen Robinson
**Sent:** October 20, 2020 8:23 PM
**To:** WPATH EC <wpathec@wpath.org>; Jon Arcelus <Jon.Arcelus@nottingham.ac.uk>; Eli Coleman <dreli@umn.edu>; Asa Radix <asa.radix@gmail.com>; Blaine Vella <blaine@wpath.org>
**Cc:** Stephen Fisher    REDACTED    ; Stefanie Gregory    REDACTED
**Subject:** FW: Letter from Your WPATH EC and SOC8 Co-Chairs - re: SOC8 Data
**Importance:** High

All –

I am concerned about this message sent to the members of SOC8 Working Group Members as it suggests that there continues to be incorrect interpretation regarding data ownership and publications. WPATH approval for our publications is not required under the terms of the agreement, the WPATH policy was not incorporated into the executed agreement so it is not binding on us, and the JHU institution policies on academic freedom and intellectual property prohibit such restrictions/approvals regarding publication.

It seems as though the misunderstanding may be based on the sentence in section 7 of contract that states that WPATH "retains the unrestricted right to use to Project Data … including the publication of the Project Data and the communication of Project Data to third parties." Retains the right is not the same as ownership, and it also does not preclude JHU from also having those same rights in the Project Data.

JHU_000012044

App.107

We have the right to publish and any JHU publications arising out of the work conducted as part of this contract are not subject to approval by WPATH nor subject to any policy of WPATH. We will continue to send draft manuscripts to WPATH for review and will give any comments received due regard.

I feel like I have made these statements several times in email and phone conversations, beginning when the contract was being negotiated in 2018. I suggest that a call might be useful and I have copied in individuals from our Office of Research Administration and Office of General Counsel.

Thanks,
Karn

-------------
**Karen A. Robinson, PhD**
*Professor of Medicine, Epidemiology, and Health Policy & Management*
*Director, Johns Hopkins University Evidence-based Practice Center*
Johns Hopkins University
REDACTED
REDACTED
REDACTE
REDACTED



---

**From:** Jamie Hicks <jamie@wpath.org>
**Sent:** October 20, 2020 11:39 AM
**To:** Blaine Vella <blaine@wpath.org>
**Cc:** WPATH EC <wpathec@wpath.org>; Jon Arcelus <jon.arcelus@nottingham.ac.uk>; Eli Coleman <dreli@umn.edu>; asa.radix@gmail.com
**Subject:** Letter from Your WPATH EC and SOC8 Co-Chairs - re: SOC8 Data
**Importance:** High

**External Email - Use Caution**



Dear SOC8 Working Group Members,

Thank you very much for your hard work on the SOC8. Many of the chapters are going through Delphi at present whilst many chapters also are finalizing the text of their chapters and/or recommendation statements. This is an exciting accomplishment! We are hoping to see completed chapters in early 2021.

We are writing you today to inform you of an update of our Policies & Procedures regarding the WPATH SOC8 Data. As you know, WPATH commissioned a number of systematic reviews to be conducted by John Hopkins University. These systematic reviews are the property of WPATH. We would like to see as many systematic review manuscripts as possible to be published (ideally in our official journal, International Journal of Transgender Health). We want to let you know that if you or any other of your chapter members are interested in contributing a manuscript based on one of the systematic reviews, there is a policy on how to request a copy of the reviews and permission to publish these reviews. Please see the attached policy approved by the WPATH board that provides the details on how to initiate this process.

As a final note, we offer our apologies regarding the tardiness of this message and the recently developed Policy & Procedures Regarding the Use of WPATH SOC8 Data. We were caught on the wrong foot when the John Hopkins University Team informed us of wanting to publish 3 papers based on the SOC8 data.
Subsequently, we developed the attached Policy, which was ratified by the Board of Directors and the SOC8 Chair and Co-Chairs.

One paper from the John Hopkins University Team has recently been published online in the International Journal of Transgender Health, whilst two papers have not received the green light to be published. It is paramount that any publication based on the WPATH SOC8 data is thoroughly scrutinized and reviewed to ensure that publication does not negatively affect the provision of transgender healthcare in the broadest sense.

We hope that you find the Policy & Procedures Regarding the Use of WPATH SOC8 Data helpful. We thank you very much again for your support of the SOC8 revision.

Sincerely,


Vin Tangpricha
Gail Knudson
Randi Ettner

JHU_000012046

App.109

Baudewijntje Kreukels
Walter Bouman
*On behalf of WPATH*

Enc.    *Policy & Procedures Regarding the Use of WPATH SOC8 Data*

---

*Jamie*
Jamie Hicks
She/her/hers
Assistant Associate Director
1061 East Main Street
Suite 300
East Dundee, IL 60118



JHU_000012047

App.110

# EXHIBIT 174
# REDACTED

**Name of the Chapter Committee**

Institution

**Statements of recommendations with possible direct evidence requiring systematic reviews by** ███████████**'s team**

1. **Our committee has submitted all potential systematic review questions to** ████████████.

   ☐ Yes        ☐ No        ☑ N/A (no systematic review needed)

2. **Our committee is working to finalize potential systematic review questions to** ████████
   ████████

   ☐ Yes        ☐ No        ☑ N/A (no systematic review needed)

3. **If no, please explain and indicate when you will be able to finalize and submit to** ████████
   ████████ **these?**

   3.a. Expected date to finalize:

   3.b. Expected date to send the review questions to ████████████:

   3.c. Reason why statements have not been finalized or sent:


**Statements of recommendation with no direct evidence (not requiring systematic reviews by** ███████████**'s team)**

4. **Our committee has reached consensus and finalized all other best practice recommendations**

   ☑ Yes        ☐ No

5. **If your committee is still working on reaching consensus and finalizing your best practice recommendations.**

   Estimate time of completion:

6. **Have you used the list of publications sent by** ████████████**'s team for your chapter?**

   ☐ Yes        ☑ No

   Comment:


CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

App.112

**7. Have you started writing explanatory paragraphs to your recommendations?**

☑ Yes          ☐ No

Comment:

**8. Have you used the statements from the SOC-7 as sent by ▮▮▮s team?**

☐ Yes          ☐ No

Comment:

**9. What kind of support do you feel you need to complete your tasks?**

**10. Would a face-to-face meeting of some or all of your committee members be helpful to you in completing your tasks?**

☐ Yes          ☑ No          ☐ Maybe    Comment

**11. Are you planning to publish a "background paper" in IJT related to your chapter?**

☐ Yes          ☑ No          Comment

**12. Please provide any other comments or suggestions for moving forward.**

**13. Please add any particular concern that you have about the content of your chapter:**

Our concerns, echoed by the social justice lawyers we spoke with, is that evidence-based review reveals little or no evidence and puts us in an untenable position in terms of affecting policy or winning lawsuits.

**14. Any other comments:**







## WPATH Policy for Disclosures of Interests and Management of Conflicts
### Standards of Care 8

The World Professional Association for Transgender Health (WPATH) develops the Standards of Care (SOC) for the health of Transsexual, Transgender and Gender Nonconforming People. Appointment to the SOC8 Committee as a Chair, Methodologist, Chapter Lead or Chapter Member is subject to approval of the WPATH Board.

Interests must be disclosed using the WPATH Disclosure Form. The Disclosure Form collects information about financial relationships with entities with direct interest in the SOC8 as well as any non-financial interests such as previously published opinions, institutional relationships, advocacy or policy positions, or specialty practice that may relate to the topics in SOC8.

## Management of Conflicts of Interest
The WPATH Board reviews and assesses disclosure forms. Management of conflicts may include prohibiting membership in SOC8, open discussion with other chapter or SOC8 members, and/or recusal from decisions specific to disclosed interests.

Completed and signed forms should be submitted for review of the WPATH Board to ██████████████. Please complete and sign by December 22, 2018.

### Part 1. Identifying Information

**Name:** ████████████████

**Complete Mailing Address:** ███████████████████████████

**Email Address** ████████████████████

**Telephone Number (Daytime):** ████████████

**Current Employer/Affiliation:** UCSF

**Chapter(s):** USPATH

### Complete All Parts of this Disclosure Form
- *Check "No" if no disclosure exists.*
- *Check "Yes" – please provide the requested information next to each item where "Yes" was checked.*

### Part 2. Financial Activities Related to SOC8
*For each of the items listed in Section 2, consider stocks, bonds, and other financial activities and investments including partnerships (but excluding broadly diversified mutual funds and any investment or financial interest valued at less than $5,000 USD).*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_001011

App.116



| Item | No | Yes | Describe relationship, including name of entity and amount. |
|---|---|---|---|
| **2.1 Do you or your partner/spouse or minor children or dependents** own directly or indirectly (e.g., through a trust or an individual account in a pension or profit-sharing plan) any stocks, bonds or other financial investments that may in any way gain or lose financially from SOC8? | ✔ | | |
| **2.2 Do you or your partner/spouse or minor children or dependents hold or are you currently** applying for any patents related to the content of SOC8? | ✔ | | |
| **2.3 Have you or your partner/spouse or minor children or dependents received research grants or contracts (restricted or unrestricted)** from an organization that has interests or activities related to the content of SOC8? | | ✔ | NIH<br>California HIV/AIDS Research Program<br>PCORI<br>HRSA |
| **2.4 Have you or your partner/spouse or minor children or dependents received reimbursements, fees or salary from an organization** that has interests or activities related to the content of SOC8? (e.g., as a board member, advisor, consultant, payment for manuscript, speakers' bureaus, travel, expert testimony)? | | ✔ | Planned Parenthood<br>Inland Empire Health Plan |
| **2.5 Do you or your partner/spouse or minor children or dependents have any other financial** interests related to SOC8? | ✔ | | |

## Part 3. Non-Financial Activities Related to SOC8

| Item | No | Yes | Describe Interest |
|---|---|---|---|
| **3.1 Have you or your partner/spouse or minor children or dependents ever authored, coauthored,** or publicly provided an opinion related to the topics in SOC8? | | ✔ | I have over 30 peer-reviewed publications in the field of transgender health, and most if not |
| **3.2 To the best of your knowledge, do you or your partner/spouse or minor children or dependents work** for, or are you a member of an organization with a stated position (e.g., position statement, | ✔ | | |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_001012

App.117



| Item | No | Yes | Describe Interest |
|------|----|----|-------------------|
| blog, editorial, legislature or legal testimony, or related document) related to SOC8? | ✔ | ☐ | |
| **3.3 Could recommendations in SOC8 conflict** with policies you have promoted or are obliged to follow? | ✔ | ☐ | |
| **3.4 Do you have a primary specialty or subspecialty?** | ☐ | ✔ | Primary Care |
| **3.5 Do you prescribe or otherwise recommend a** test, therapy, treatment or program to be considered in SOC8? | ☐ | ✔ | I am the Medical Director for an academic transgender medicine |
| **3.6 Do you or your partner/spouse or minor children or dependents have any other non-financial** interests related to SOC8? | ☐ | ✔ | I do not understand this question. Everyone involved in the SOC process has a non-financial interest |
| **3.7 Are you or your partner/spouse or minor children or dependents** employed by an organization/company or work in a field that is likely to be directly influenced by content in SOC8? | ☐ | ✔ | ███████████████████ |

## Part 4. Certification

*I certify that the information above is true and complete. Further, I agree to update and resubmit this form if I enter into any new financial or non-financial relationships/roles related to SOC8.*

Print Name ███████████████████

Signature: ███████████████████

Date:           1/20/2019

# EXHIBIT 176

# REDACTED

## Request for emergency Board meeting

| | |
|---|---|
| **From:** | "Deutsch, Madeline" <madeline.deutsch ██████████ |
| **To:** | ████████████████████ |
| **Cc:** | "madeline.deutsch ██████████ <madeline.deutsch ██████████ |
| **Date:** | Mon, 25 Oct 2021 15:46:16 -0400 |

Hello ██████ I'd like to request an emergency Board meeting as soon as possible to discuss matters relating to a recent article in which Dr. Erica Anderson was quoted.

Best,

Maddie

*************************************
Maddie Deutsch, MD, MPH
Medical Director, UCSF Gender Affirming Health Program
Associate Professor of Clinical Family & Community Medicine
University of California - San Francisco

President-Elect, US Professional Association for Transgender Health





**www.wpath.org/uspath**
uspath@wpath.org

phone: 1+(847) 752-5328
fax: 1+(224) 633-2166

**STAFF**



**EXECUTIVE COMMITTEE**

**President**
Erica Anderson, PhD

**Immediate Past-President**
Joshua Safer, MD, FACP

**President-Elect**
Madeline Deutsch, MD, MPH



November 2, 2021

Erica Anderson, PhD
USPATH President

CONFIDENTIAL

Via email

Dr. Anderson:

This letter concerns an article published on October 4, 2021, linked here, in which you were interviewed and quoted. In the article you were identified as being a member of the WPATH Board of Directors, a position you held in service to the USPATH Board, as a part of your role as the President of USPATH.

In the article, you are quoted as saying:

""*It is my considered opinion that due to some of the — let's see, how to say it? what word to choose? — due to some of the, I'll call it just 'sloppy,' sloppy healthcare work, that we're going to have more young adults who will regret having gone through this process. And that is going to earn me a lot of criticism from some colleagues, but given what I see — and I'm sorry, but it's my actual experience as a psychologist treating gender variant youth — I'm worried that decisions will be made that will later be regretted by those making them.*""

You have been a member of the USPATH Board of Directors and Executive Committee in your roles as President-Elect, and then President, since 2019. At no point during your tenure in these roles have you initiated a dialogue about your concerns, created an exploratory committee or task force, or suggested any other process to investigate this matter in a manner consistent with our organization's values of open, scientific discourse, nor have you otherwise expressed this concern to the Executive Committee or the Board. You made no proposal or



**www.wpath.org/uspath**
uspath@wpath.org

phone: 1+(847) 752-5328
fax: 1+(224) 633-2166

**STAFF**



**EXECUTIVE COMMITTEE**

**President**
Erica Anderson, PhD

**Immediate Past-President**
Joshua Safer, MD, FACP

**President-Elect**
Madeline Deutsch, MD, MPH



attempt to have a symposium or discussion on this matter at the upcoming 2021 USPATH Conference. A search was conducted and no publications or editorials in the peer-reviewed literature on your stated concerns regarding this subject with you listed as an author or co-author were found, and to our knowledge you are not now, nor have you ever been, an investigator or co-investigator on any research study concerning the care of transgender and gender diverse youth. We intended to discuss this matter with you at the October 8, 2021, Board meeting, however you asked that it be removed from the agenda, and then informed us during the meeting that you had to leave early.

You granted an interview in the lay press with an author with known biases regarding the care of transgender and gender diverse youth, during a period of intense politicization and when litigation is in progress in multiple US jurisdictions, where legislation aims to prohibit such care by statute. You did not discuss this interview or forthcoming article with the Board in advance. Such actions sidestep and politicize the scientific process and demonstrate poor judgment in the discharge of your role as Board President.

As such the USPATH Board of Directors is serving you with this formal letter of reprimand for such actions as described above.

Regards

USPATH Board of Directors

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105165

App.122

## Re: Important Info re: Recent Washington Post Article

**From:** Dr Edwards-Leeper <████████████████████████████
**To:** ████████████████████████████
**Cc:** marcib██████ █████████ lorenschechter████████████ stephen.rosentha██████ Eli Coleman ████████████████
**Date:** Wed, 01 Dec 2021 11:29:19 -0500

Unfortunately, I'm about to start with my first client. Maybe we can connect briefly later.

Sent from my iPhone

> On Dec 1, 2021, at 8:27 AM, ███████████████████████ wrote:

Hi Laura
I am not clear what you are referring to in some of this email and would like to discuss with you rather than assume as per an email. I tried calling you, but went to voicemail. My cell is ████████

All best
████████

**From:** Dr. Laura Edwards-Leeper <███████████████████████>
**Sent:** Wednesday, December 1, 2021 11:20 AM
**To:** ████████████████████████
**Cc:** marcib████ █████████ lorenschechter████████████ Stephen.Rosenthal█████████ Eli Coleman ████████████████
**Subject:** Fwd: Important Info re: Recent Washington Post Article

Hi ████████

Thanks so much for your prompt response and assistance. I hardly slept last night (again) because this is weighing on me so much. I actually received an email from one of the top doctors in WPATH after I sent you the email, thanking me for the piece and sharing how much these issues are also concerning him. Because I feel that time is of the essence, I've decided to go ahead and send what I wrote to the people included on this email, as I know them all personally. I'll leave it to you to share it with the other WPATH leaders. My fear is that if WPATH continues to muzzle clinicians and relay the message to the public that they have no right to know about the debate, WPATH will become the bad guy and not the trusted source; it will undo all public credibility.

Thanks,
Laura

**Laura Edwards-Leeper, PhD (she/her/hers)**
████████████████████████
████████████████████

**Website: http://www.drlauraedwardsleeper.com/**

Notification of Privacy Risk     Please be advised that email transmissions are capable of beingintercepted, so any confidential information that is sent or received cannot have its privacy guaranteed. By requesting an emailed response to your medical inquiry, you are acknowledging that you are aware of the risks to your (or your patient's) privacy and indicating that you will take responsibility for any related consequences.

Statement of Confidentiality     This email (and its attachments) may contain privileged or Confidential information. This information is intended for exclusive use by the person (or agency) to whom it is addressed. Any use of this information (including review, retransmission, or dissemination) is prohibited, except by the intended recipients. If you received this email in error, please notify the sender by reply email; in addition, destroy all copies and delete the material from any computer. Thank you. [In accordance with the Electronic Communications Privacy Act, 18 U.S.C.§§2510-2521.]

---------- Forwarded message ---------
From: ███████████████████████
Date: Wed, Dec 1, 2021 at 5:03 AM
Subject: Re: Important Info re: Recent Washington Post Article
To: ████████████████████████████████████

Dear Laura

Thank you for sending, I will read again more thoroughly and forward to the appropriate people, please give me some time.

Best regards



On Dec 1, 2021, at 1:30 AM, Dr. Laura Edwards-Leeper
████████████████████████ wrote:

Hi ████████

I'm reaching out because I'm not sure who at WPATH I should contact. I figured you could point me in the right direction or pass this on to the appropriate people.

As I'm sure you know, Erica Anderson and I recently had an OpEd published in the Washington Post. We worked on this for 6 months and submitted it in early September. It has been a long and careful process. We had several colleagues give us feedback along the way, as we are well aware that it is an extremely sensitive topic and wanted to approach it in the most balanced and careful way possible. The last thing either of us want to do is hurt trans people, and it is because of the harm we see happening that we wrote the piece. Given that we are both incredibly supportive of WPATH and the SOC, we were sure to make one of our main points in the article be that providers should be following the WPATH SOC. I believe we accomplished that. I think the timing of the piece is actually perfect, given that SOC 8 is coming out soon.

I wanted to let the WPATH leadership know that while we are aware that there are some colleagues who are upset with us for doing this, we have received tremendous support for taking a stand, speaking up, and highlighlighting the importance of providers following the SOC. It seems that many health care providers and the general public seem to understand that doing so is critical for the well-being of gender dysphoric youth.

I only recently started a Twitter account and I have received 1,478 likes on my page alone for the article, with 587 retweets and 143 comments (as of right now). The comments on the WA Post page were nearing 400 before they shut it off after just a couple of days, and I would estimate 95% were positive. I have had more emails that I can keep up with from people around the world, thanking us for doing the piece. These have come from many, MANY parents, MANY trans people, MANY LGB people, and MANY health care providers (mental and medical). Countless providers have shared that they have been afraid to speak up about their concerns, but they are now going to start doing so. There is a listserve I'm on (mostly pediatric trans medical doctors) and I've had medical and mental health providers from that group privately message, thanking me and telling me they are too afraid to share their feelings with the entire group. That group largely seems to be a dangerous echo chamber that is unable to engage in constructive and critical dialogue about the state of the field, which is incredibly worrisome. Jeffrey Flier, the previous dean of Harvard Medical School re-tweeted the article and wrote "An outstanding, balanced article that incorporates medical science, empathy, and courage." This has been the sentiment of so many others.

I fear that WPATH's recent stance to shut down this conversation was a huge mistake and is resulting in very bad PR for the organization. If there is anything that people will fight to the end for, it's their kids. It would be one thing if these were simply right-wing, religious conservatives, but these parents are highly educated, liberal, and left-leaning. The majority report that they will fully support their child if medical transition is in their best interest, but they are furious that they cannot find providers who are following the SOC, and they are in disbelief that WPATH is trying to censor the conversation.

Parents and others (many trans adults and detransitioners) have reached out to me to ask how they can relay their concerns about what is happening in the field with WPATH. I can direct them to comment on the SOC8 public comments once that is released unless you have a different suggestion.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105281

As the chair of the Child and Adolescent Committee and a member of BOTH the child and adolescent SOC8 committees, I want to strongly urge WPATH leadership to carefully think through the next step regarding this issue. The time is now to course correct before the field completely implodes on itself.

I would be happy to discuss my thoughts and concerns further if that would be helpful.

Sincerely,
Laura Edwards-Leeper

**Laura Edwards-Leeper, PhD (she/her/hers)**



**Website: http://www.drlauraedwardsleeper.com/**

Notification of Privacy Risk      Please be advised that email transmissions are capable of being intercepted, so any confidential information that is sent or received cannot have its privacy guaranteed. By requesting an emailed response to your medical inquiry, you are acknowledging that you are aware of the risks to your (or your patient's) privacy and indicating that you will take responsibility for any related consequences.

Statement of Confidentiality      This email (and its attachments) may contain privileged or Confidential information. This information is intended for exclusive use by the person (or agency) to whom it is addressed. Any use of this information (including review, retransmission, or dissemination) is prohibited, except by the intended recipients. If you received this email in error, please notify the sender by reply email; in addition, destroy all copies and delete the material from any computer. Thank you. [In accordance with the Electronic Communications Privacy Act, 18 U.S.C.§§2510-2521.]

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 180

# REDACTED

## Re: Near Near Final SOC8 Hormone Chapter 1 week review

| | |
|---|---|
| **From:** | ███████████████████████████████ |
| **To:** | ███████████████████████████████ |
| **Cc:** | ███████████████████ HormoneSOC8 <hormonesoc8@wpath.org> |
| **Date:** | Thu, 04 Nov 2021 23:31:28 -0400 |

Regarding ██████ comments on my suggestions - it is unclear how suggestions to be more inclusive result in a loss of meaning. I want to push back against the idea that being precise by adding endosex will not be understood, as we can add a footnote definition or another way to make sure the meaning is not lost. I would steer VERY clear from the word 'typical' when you mean endosex, i.e., not intersex. This is the same pushback against using cisgender which has now become a commonly understood word.

I agree that estrogen and testosterone based regimens are not precise but they are certainly better than masc/fem which creates yet another binary. I also agree that the regimens we prescribe are not based on labels or identity, but rather the individual's embodiment goals which we are referring to in the chapter. Does anyone have an alternative language suggestion?

--



CONFIDENTIALITY NOTICE:
The information in this e-mail may be confidential and/or privileged. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination, or copying of this e-mail and its attachments, if any, or the information contained herein is prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and delete this e-mail from your computer system. Thank you.

On Mon, Nov 1, 2021 at 10:08 AM ███████████████████████ wrote:

Most of the edits look great.

A couple of comments regarding ██████ suggestions to be more inclusive that I think result in a loss of meaning.  Re the "female" and "male" terms for ranges for hormones, puberty, etc.:  I worry that endosex will not be understood.  Perhaps "typical" could be a qualifier that is more inclusive but also clearer to a broader audience.  Ditto for qualifying cis and cisgender where needed.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_026200

Re language to avoid saying masculinizing and feminizing, I think the suggested edits are not precise. They aren't necessarily estrogen or testosterone regimens. We are moving people in one direction or another on various spectra – and those are the words for the directions – which are binary on some spectra. What's not binary is the degree of movement. I can't think of clearer words for that. Someone non-binary identifying who comes in for medical care is still usually looking for a regimen that adds to typical male or typical female features. And that is how we label the treatment. It's not all or none of course ... very customized and completely independent of how someone labels themselves.

███████

**From:** ████████████████████████████
**Date:** Sunday, October 31, 2021 at 7:50 PM
**To:** ████████████████████████████████████
**Cc:** ████████████████████████████████
████████████████████ HormoneSOC8 <HormoneSOC8@wpath.org>
**Subject:** Re: Near Near Final SOC8 Hormone Chapter 1 week review

USE CAUTION: External
Message.

Here are my edits - using the draft ███ sent.

There are several language nuances that I want to make sure we are consistent about - some are in regard to excluding nonbinary people and others are excluding intersex people - when we are not intending to do so.

Also, goodness, "an early pubertal designated male at birth" is not only a confusing mouthful, but also ends up misgendering the person by using the term male to refer to them. So I came up with: 'a TGD adolescent with functioning testes in the early stages of puberty." There are similar edits I made in order to keep things consistent and clear.

███ I only made edits that I thought were critical.

Thanks,
███████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_026201

App.129

--



CONFIDENTIALITY NOTICE:
The information in this e-mail may be confidential and/or
privileged. If you are not the intended recipient or an
authorized representative of the intended recipient, you
are hereby notified that any review, dissemination, or
copying of this e-mail and its attachments, if any, or
the information contained herein is prohibited. If you
have received this e-mail in error, please immediately
notify the sender by return e-mail and delete this e-mail
from your computer system. Thank you.

On Sun, Oct 31, 2021 at 3:36 PM ███████████████████████
███████████████████ wrote:

Hi everybody,

Great to see that we are in the final stretch!

I made some edits as well, including to table 2 regarding hypertension and CV risk.

There were several references missing on the list which I added. Please check to see that they
are correct.

Happy Halloween to those who celebrate it. ☺

███████████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



**From:** <span style="background:black">    </span>
**Sent:** Sunday, October 31, 2021 10:39 AM
**To:** <span style="background:black">    </span>
HormoneSOC8 <HormoneSOC8@wpath.org>
**Subject:** [External] Re: Near Near Final SOC8 Hormone Chapter 1 week review

Hi ▮ hi all,

See attached for some recent reference additions, and some minor changes in the text.

1 reference was missing in the reference list.

All the best,



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_026203

App.131



**Van:** [redacted]
**Verzonden:** vrijdag 29 oktober 2021 23:53:22
**Aan:** [redacted] HormoneSOC8
**Onderwerp:** Re: Near Near Final SOC8 Hormone Chapter 1 week review

Looks great.

A trivial tweak:  The first sentence of the first paragraph of text under the first recommendation should end "… sex recorded at birth." Or "… sex designated at birth." I know [redacted] will want the latter.

I also added a few references:

1. The new primary reference for the trans man who had his egg harvested while still taking testosterone for successful childbirth.
2. My review in JCI of the concerns raised by [redacted] for recommendation #11.
3. The new primary reference for the Sinai study where we found no difference in VTE risk between trans people suspending versus maintaining gender affirming hormone Rx throughout the peri-surgical period (notably estrogens for primary vaginoplasty).

[redacted]

**From:** [redacted]
**Date:** Friday, October 29, 2021 at 8:20 AM
**To:** HormoneSOC8 <HormoneSOC8@wpath.org>
**Subject:** Near Near Final SOC8 Hormone Chapter 1 week review

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_026204

App.132

Dear Hormone Chapter Members,

We are almost at the finish line! The chapter has undergo reference checkers, language editing and review by the co-chairs. This is almost ready to be finalized.

Please see the attached draft that will be finalized shortly. Here are some instructions.

1. Please review and add any KEY references to sentences that you think needs additional references. There have been some important papers published this year so we may have missed some. I have not heard of any limit of publication date.
2. If there is an error, please flag it. Some of the editing may have changed the meaning of a sentence. Please suggest a rewording of the sentence. Please leave the "light editing" for the journal. We are looking for major edits where meaning has inadvertently changed.
3. We need these back by November 8. The deadline will not be extended. You have already seen many versions of this so hopefully it will not take too long. I might suggest looking at the statements first then your sections then the other sections.
4. Please use "Tracked changes"

Thank you very much



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_026205

## Re: question for the surgeons

**From:**  Eli Coleman <dreli█████████████
**To:**    Jon Arcelus <jon.arcelus█████████████
**Cc:**    Scott Leibowitz <scottleibowitzmd██████████ lorenschechter██████████ Stan Monstrey
           <stan.monstrey██████████, Annelou Devries <alc.devries█████████, asa.radix██████████
           vtangpr██████████████████████████
**Date:**  Wed, 06 Oct 2021 09:00:21 -0400

at their age - they would not know what they want - but I think the same informed consent as we do for
reproductive health.

On Wed, Oct 6, 2021 at 7:56 AM Jon Arcelus <Jon.Arcelus██████████████ wrote:
  This is something that Marci mentioned in the Gothenburg meeting and then she spoke to you,
  Scott about it too, I believe. It will make sense if is not there to add information which will be clinical
  more than academic regarding the effect of starting on blockers in early puberty on the type of
  surgery for vaginoplasty that they will be able to have in the future with more possible
  complications from it (if using the colom), but of course not every tranwoman wishes vaginoplasty

  Prof. Jon Arcelus Alonso, MD, PhD
  Professor (Full) of Mental Health and Transgender Health
  ----------------------------------------------------------------------------
  Honorary Consultant in Transgender Health
  Associate Editor of the International Journal of Transgender Health (IF 5.33)
  Co-Chair of the Standards of Care 8th Edition (World Professional Association of Transgender Health-
  WPATH)
  --------------------------------------------
  Academic Address:

  ████████████████████████████
  ████████████████████████████
  ████████████████████████████
  ████████████████████████████

  Clinical Address:

  ████████████████████████████
  ████████████████████████████
  ████████████████████████████

  Academic secretary: <████████████████████████████████
  **From:** Eli Coleman <dreli█████████████
  **Sent:** Wednesday, October 6, 2021 2:49:43 PM
  **To:** Scott Leibowitz <scottleibowitzmd█████████████
  **Cc:** Loren's██████████lorenschechte██████████; Stan Monstrey
  <stan.monstrey█████████; Vries, A.L.C. de ██████████ Jon Arcelus
  <████████████████ ASA RADIX <asa.radix█████████; Tangpricha, Vin
  <vtangp██████████████; ████████████████████
  **Subject:** Re: question for the surgeons

  I think so.  I don't know what the evidence base is for this - but it seems that there is a concern and
  might need to be part of informed consent.

  On Wed, Oct 6, 2021 at 7:41 AM Scott Leibowitz <scottleibowitzmd█████████ wrote:

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105025

App.134

Thank you. Do you think it is important to address?

Sent from my iPhone

> On Oct 6, 2021, at 8:32 AM, Loren's ████ <lorenschechter1████ wrote:
>
> Hello Scott
>
> I have seen the article (and spoken with Marci)
>
> We do not specifically address the impact of gnrh agonists on surgery. We do discuss the multidisciplinary approach when considering surgery on adolescents
>
> Thanks
>
> Loren
>
> Sent from my iPhone
>
>> On Oct 6, 2021, at 6:53 AM, Scott Leibowitz <scottleibowitzmd@████ wrote:
>>
>> Hi all,
>>
>> Something tells me we are all aware of this article:
>>
>> https://bariweiss.substack.com/p/top-trans-doctors-blow-the-whistle
>>
>> In it, there are concerns about the surgical implications of blockers from WPATH leadership, and this has made its way across the airwaves with responses indicating that the SOC is addressing this issue. However, this is something that we currently do **not** address in our chapter since there's no specific research article to cite on the subject.  That being said, it's a rather large point of discussion, and I believe it's an unavoidable subject that really does need to be addressed.  Personally I think that discussing the hypothetical risks of blockers, including the potential effect on surgical outcomes and sexual health, is something that should be mentioned when getting consent from parents/caregivers for use of blockers.  I know that I do this when working with families and it is greatly appreciated by families.
>>
>> Not having seen the surgery chapter, I want to double check if it is in that chapter.  If not, how do we envision SOC addressing this- in the Adol chapter?
>>
>> Thanks all,

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105026

App.135

Scott

--



**Eli Coleman, PhD.**
**Academic Chair in Sexual Health**
**Professor**
**and Director**
The Institute for Sexual and Gender Health
University of Minnesota Medical School
Family Medicine and Community Health
sexualhealth.umn.edu

This message and any attachment are intended solely for the addressee and may contain confidential information. If you have received this message in error, please contact the sender and delete the email and attachment.

Any views or opinions expressed by the author of this email do not necessarily reflect the views of the University of Nottingham. Email communications with the University of Nottingham may be monitored where permitted by law.

--



**Eli Coleman, PhD.**
**Academic Chair in Sexual Health**
**Professor and Director**
The Institute for Sexual and Gender Health
University of Minnesota Medical School
Family Medicine and Community Health
sexualhealth.umn.edu

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105027

App.136

## Re: Friday Agenda for Mental Health Mentors/Anything else to add?/ REQUEST TO RECORD

**From:** Lin Fraser <linfraser█████████████
**To:** dberg████████████
**Cc:** ████████████████████████████████████████████████

**Date:** Wed, 13 Oct 2021 01:28:42 -0400

Dear ██████

Can you please be prepared to record Friday's meeting?

We will check at the beginning of the meeting to make sure that no one objects.

I am happy to check with EC unless you would like to do so.

Best,

Lin

On Oct 12, 2021, at 10:22 PM, Dianne Berg <dberg███████████> wrote:

I have been following this thread from afar █████████████████████████████
████████████████████████████████████████████ He has terrible internet and the hotspot on my phone is not always reliable.  I really want to be able to be at this meeting but may not be able to be for a variety of reasons so I hope it can be recorded.
Take care everyone,
Dianne



**Dianne Berg, PhD LP, (she/her)**
**Assistant Professor**
The Institute for Sexual and Gender Health
Co-Director, <u>National Center for Gender Spectrum Health</u>
Coordinator, Child and Adolescent Gender Services, <u>Center for Sexual Health</u>
University of Minnesota Medical School
Family Medicine and Community Health
<u>sexualhealth.umn.edu</u>
*dberg████████████*
WPATH GEI SOC7 Certified Mentor
AASECT Certified Sex Therapist and Sex Therapy Supervisor

"Our lives begin to end the day we become silent about things that matter."
--MLK Jr.

"Light will move through broken places. Soften the edges of empty spaces."
--the album *Book of Rounds* by October Project

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

App.137

On Tue, Oct 12, 2021 at 6:19 PM ████████████████████: wrote:
I'm not clear on which "agreement regarding the value of blockers" is required to be espoused by a WPATH member/mentor.

My understanding is that a global consensus on "puberty blockers" does not exist.

On Tue, Oct 12, 2021 at 6:57 PM ████████████████████ wrote:
Yeppp,

And have something to say about that as well, but will defer until Friday 😎😎😎



The previous and this current e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

On Oct 12, 2021, at 3:55 PM, ████████████████████ wrote:

No argument ████ with what you said

My point was I think all of us are (generally) in agreement regarding the value of blockers. It is well-worth our time, of course, to be knowledgeable about the research and be able to back up our experience with research. I have in my professional life lots of time/experience with that part of this process.

What I personally have much less of (because so much time is caught up in the stuff above) is talking with colleagues about how to respond to "sloppy" clinical work by my peers. That's what I

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

thought was so brave about Marci and Erica's very public statements (and I have spoken with both of them privately about this for many years).

Do we agree that some folk are doing "sloppy" work (that would not be my language btw), and if so, what (if anything) is my responsibility in this ... or WPATHs. I could use support in knowing how to manage this.



On Tue, Oct 12, 2021 at 6:10 PM _____ wrote:

Just making sure, that's all - since the term sloppy was used by one of the interviewees.

By the same token, stating that "blockers are good," is not enough. There has already been an alarming lack of precise statements that landed us all in this pickle in the first place; when mentees come to us with questions, it's not just where to find the answers, but also being comfortable discussing them. This means leaning on verified data in peer reviewed papers and knowing what's in them.

Not sloppy = accurate,



The previous and this current e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

On Oct 12, 2021, at 2:56 PM, _____ wrote:

Did something I say infer that I wanted to talk about either Marci or Erica specifically?
That was not my intention.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105073

App.139

My intention was to suggest we discuss what is good healthcare and what is subpar. And what position we take as mentors in our community regarding the topic

█████

On Tue, Oct 12, 2021 at 5:13 PM ████████████ wrote:

Well,

I expect my fellow mentors not to discuss Marci or Erica but instead come up with science based facts re blockers.

Just arguing that blockers are good - it's not enough.

Best,



The previous and this current e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

On Oct 12, 2021, at 2:07 PM, ████████████████ wrote:

Soooo
I bulleted those issues because that's kinda how my brain works, to separate out all the issues on the table. I was not necessarily making an agenda

I *think* (generally speaking) the first issue is not really an issue for our group. We all know that blockers are a good thing for some kids, and we know that ROGD is not a "thing."

I personally would like to discuss the issue of "sloppy healthcare" (being called out on this, being called out by "one of our own," and the difficulty in discussing the topic of what

constitutes competent healthcare that is also affirming) and what our work is as competent affirming therapists to ensure that our colleagues are practicing at the highest level (or is that part of our job as colleagues or WPATH members, or WPATH representatives?).
I think this is the core issue(s) for us to wrangle with.

And I am happy to give examples of things I've seen that are problematic if y'all think that will be helpful.

I also think the issue of cis versus (not the best word) trans voices will likely become relevant.

Best



- The actual challenges/issues/concerns re: blockers/hormones
- Media representation and what we say or do not say publicly versus with our colleagues
- How WPATH "looks" in the news, and our responsibilities as members and mentors to that process
- Developing more sophisticated treatment approaches as well as media representation that stops this "them/us" dynamic that is what all US politics are about right now
- Addressing the issue raised about "sloppy healthcare" in this field and what is and is not evidence-based care.
- Space to discuss controversy without "canceling" humans with diverse opinions.

On Tue, Oct 12, 2021 at 2:07 PM Lin Fraser <███████████> wrote:
Dear Mental Health Mentors,

Please let me know other topics/cases for discussion so we can be thinking about our agenda in advance. Please be discreet. Note the statement that just came out today from WPATH/USPATH Boards about keeping our discussions within WPATH.

I think ████ list below summarized the issues quite nicely, but we had other recommendations.

It would be good if we could discuss cases that demonstrate some of these issues.

- The actual challenges/issues/concerns re: blockers/hormones
- Media representation and what we say or do not say publicly versus with our colleagues

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

App.141

- How WPATH "looks" in the news, and our responsibilities as members and mentors to that process
- Developing more sophisticated treatment approaches as well as media representation that stops this "them/us" dynamic that is what all US politics are about right now
- Addressing the issue raised about "sloppy healthcare" in this field and what is and is not evidence-based care.
- Space to discuss controversy without "canceling" humans with diverse opinions.

And what else? Does anyone have a different kind of mentor case?

And keep in mind that we will have an hour and a half.

Many thanks,

Lin

**Dr Lin Fraser EdD**



Past President, World Professional Association for Transgender Health (WPATH)
Co-Chair, Ethics Committee (WPATH)
Co-Founder, Course Developer, Trainer & Lead, Mental Health Mentor Program; Global Education Institute, (GEI)
Board Certified TeleMental Health Provider
MFT8288/LPCC1816/BC-TMH1320



"The paradox of education is precisely this - that as one begins to become conscious one begins to examine the society in which he is being educated. " James Baldwin

"Keep looking at the bandaged wound. *That's where the light enters you.*"  Rumi

PLEASE NOTE: The confidentiality of email cannot be secured because the internet is not a secure medium. Please use at your discretion. This fax/e-mail transmission, with accompanying records, may contain Protected Healthcare Information and is intended only for the use of the individual or entity to which it is addressed subject to the privacy and security provisions of HIPAA. If you are not the intended recipient, be advised that any unauthorized use, examination, analysis, disclosure, copying, dissemination, distribution or sharing of this communication is strictly prohibited, except as permitted by law. If you have received this in error, please delete the message and contact the sender at the address/phone number.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105077

App.143



"The paradox of education is precisely this - that as one begins to become conscious one begins to examine the society in which he is being educated. " James Baldwin

"Keep looking at the bandaged wound. That's where the light enters you."  Rumi

PLEASE NOTE: The confidentiality of email cannot be secured because the internet is not a secure medium. Please use at your discretion. This fax/e-mail transmission, with accompanying records, may contain Protected Healthcare Information and is intended only for the use of the individual or entity to which it is addressed subject to the privacy and security provisions of HIPAA. If you are not the intended recipient, be advised that any unauthorized use, examination, analysis, disclosure, copying, dissemination, distribution or sharing of this communication is strictly prohibited, except as permitted by law. If you have received this in error, please delete the message and contact the sender at the address/phone number.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    BOEAL_WPATH_105078

App.144



"The paradox of education is precisely this - that as one begins to become conscious one begins to examine the society in which he is being educated. " James Baldwin

"Keep looking at the bandaged wound. That's where the light enters you."  Rumi

PLEASE NOTE: The confidentiality of email cannot be secured because the internet is not a secure medium. Please use at your discretion. This fax/e-mail transmission, with accompanying records, may contain Protected Healthcare Information and is intended only for the use of the individual or entity to which it is addressed subject to the privacy and security provisions of HIPAA. If you are not the intended recipient, be advised that any unauthorized use, examination, analysis, disclosure, copying, dissemination, distribution or sharing of this communication is strictly prohibited, except as permitted by law. If you have received this in error, please delete the message and contact the sender at the address/phone number.

--



Create your own email signature

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105079

App.145

## Re: "Science Vs" Cited Seven Studies To Argue There's No Controversy About Giving Puberty Blockers And Hormones To Trans Youth. Let's Read Them.

**From:**  Eli Coleman <█████████████████████
**To:**  "Vries, A.L.C. de" <█████████████████
**Cc:**  marcib███████████, ██████ Scott Leibowitz ███████████████████ Jon Arcelus ██████████████████████████, walterbouman ██████████████████, asa.radix ██████████, Cindi Creager <███████████████████████████████

**Date:**  Mon, 13 Jun 2022 08:32:41 -0400

Try to write a short paragraph.  That couild be a start.

Eli

On Mon, Jun 13, 2022 at 5:19 AM Vries, A.L.C. de ██████████████████> wrote:

> The point is; it is not only about research evidence (so research will never persuade everyone), but also about ethics (what is *good* care), transgender and children's rights and politics (!).

> Very complex how to adress all these best.

> Annelou

Annelou L.C. de Vries, MD, PhD
Child and adolescent psychiatrist
Department of Child & Adolescent Psychiatry, Emma Pediatric Hospital, **G8-136**
Center of Expertise on Gender Dysphoria, VUmc, **Poli N**
Center of Academic Child and Adolescent Psychiatry, LevveL, San Remo
Amsterdam University Medical Centers

**Van:** Eli Coleman <███████████████
**Verzonden:** zondag 12 juni 2022 19:37
**Aan:** Dr. Marci Bowers ████████████████████
**CC:** Vries, A.L.C. de <████████████████████████>; Scott Liebowitz ████████████████████████; walter bouman ████████████████<>; Asa Radix ████████████████████████████████████████
**Onderwerp:** Re: "Science Vs" Cited Seven Studies To Argue There's No Controversy About Giving Puberty Blockers And Hormones To Trans Youth. Let's Read Them.

I think it would be good for WPATH to convene a research summit to address the research needs and find a way to develop some research studies and incentivize people to conduct more outcome-based research.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105441

App.146

Eli

On Sun, Jun 12, 2022 at 12:34 PM Dr. Marci Bowers <███████████> wrote:
Interesting but highlights the difficulty in picking an endpoint for therapeutic efficacy and use of
early puberty blockade— is it….
A. Reduction in suicidality? Difficult to prove
B. Improvement in psychosocial functioning? Easier to prove but at what cost…. As we learn
more about the difficulties associated with confirming surgeries, adulthood and longterm
happiness.

Ultimately, we must regain scientific credibility by objectively tracking outcomes, intended or not
even if we discover problems with our original hypothesis.

Kindly......

Marci Bowers MD
WPATH President-elect
Trevor Project Board of Directors

*Standing tall in times of darkness*

> On Jun 12, 2022, at 6:11 PM, Eli Coleman <██████████ wrote:
>
>
> If you have not seen...
>
> --------- Forwarded message ---------
> From: █████████████████
> Date: Fri, Jun 10, 2022 at 6:15 PM
> Subject: "Science Vs" Cited Seven Studies To Argue There's No Controversy About Giving
> Puberty Blockers And Hormones To Trans Youth. Let's Read Them.
> To: ███████████████

https://jessesingal.substack.com/p/science-vs-cited-seven-studies-to?s=r

# "Science Vs" Cited Seven Studies To Argue There's No Controversy About Giving Puberty Blockers And Hormones To Trans Youth. Let's Read Them.

The show is strikingly selective in its skepticism

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105442

App.147

Jesse Singal 7 hr ago



*I was only able to do this work, which is very resource-intensive, because of my paying subscribers. If you find this article at all useful, please consider becoming one:*

Give a gift subscription

---

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105443

App.148

*Science Vs*, a leading science journalism podcast produced by Gimlet, is dedicated to cutting through misinformation and politicization and delivering its listeners the truth. The show "takes on fads, trends, and the opinionated mob to find out what's fact, what's not, and what's somewhere in between."

In March, it published an episode called "Trans Kids: The Misinformation Battle" that seriously misled listeners about the quality of the evidence for youth gender medicine — that is, puberty blockers and cross-sex hormones. Worse, the show engaged in some rather irresponsible fearmongering on the subject.

The exchange in question came during a conversation between host Wendy Zukerman and psychiatrist Jack Turban, who is one of the most commonly quoted and enthusiastic advocates for youth gender medicine. It originally went like this, according to the show's transcript, with the discussion between Zukerman and Turban set in italics and points where Zukerman is addressing listeners directly set in plain text:

> [Zukerman:] So overall, hormones have some risks, and they're not easily reversible – but the top dogs in this space, they're all on board with this – not only hormones but puberty blockers too.

> [Turban:] *American Medical Association[115], the American Academy of Pediatrics[116], the American Psychiatric Association[117], the American Academy of Child and Adolescent Psychiatry[118], I could go on and on*

> [Zukerman:] *Not controversial at all?*

> [Turban:] *No*

> [Zukerman:] And the reason that it's not controversial is because – again – we need to look at what happens if you do nothing. Like you don't allow your kid to go on hormones. And just last month - a study from Seattle was published looking at just this. It had followed about 100 young adults, and compared those who got this gender affirming care - to trans folks who didn't.[119] And they found that while those who got this treatment ultimately felt better afterwards,[120] those who didn't felt worse and worse.[121] And by the end of the study, those who got gender affirming care were 73% less likely to have thoughts of killing themselves or hurting themselves.[122] Other research suggests the same thing.[123][124][125][126][127][128]

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105444

App.149

Let's linger on this for a moment. These treatments are utterly *un*controversial, Zukerman said, because of "what happens if you do nothing. Like you don't allow your kid to go on hormones." Following that was a summary of a recent study that — Zukerman claimed — found that access to gender-affirming medicine (henceforth GAM) led to reduced suicidality among young adults1.

Zukerman is clearly saying that if you, the parent listening, have a kid who wants to go on hormones, and you don't put them on hormones, you risk raising the probability they will become suicidal and/or attempt suicide. This is a profoundly serious claim — an invocation of every parent's worst nightmare — so one would hope that it's backed by nothing but ironclad evidence.

But that isn't the case. The study Zukerman referenced, which was published in a *JAMA Network Open* study by PhD student Diana Tordoff and her colleagues in February, didn't come close to finding what its authors claimed. I explained its many crippling flaws here in April — the post is long, but if you want to understand how aggravating it is that mainstream science outlets are treating this research so credulously, you should read it. The short version is that, in a sample of kids at a gender clinic, those who went on GAM didn't appear to experience any statistically significant improvement on any mental health measure (here's a primer on what "statistically significant" means — it is going to come up a lot in this article). So Zukerman's claim that "those who got this treatment ultimately felt better afterwards" was completely false, directly contradicted by the paper's supplementary material.

In early May, Robert Guttentag, a UNC–Greensboro psychologist, bcc'ed me on a thoughtful email he sent to the show's producers highlighting what he viewed as flaws with the episode. I forwarded the email to the show to make sure the producers saw it, and argued that they had badly misrepresented the Tordoff study. To the show's credit, later in the month I got an email from the "Science Vs Team" in which they acknowledged they'd made an error: "We now realize we had misread the paper — which had found a difference between the treatment group and the control group, not a significant change before and after the treatment. We have adjusted the study description in our episode[.]"

Unfortunately, they also said they stood by the idea that this is a quality study that adds to the evidence base for youth gender medicine: "Thanks for bringing this to our attention. We chose to call out this paper because, while it isn't perfect, it had some advantages to other studies looking at this. For example, it had a control condition and followed patients

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105445

App.150

prospectively rather than retrospectively. Because it's replicating the beneficial effect of gender-affirming healthcare that several other studies have found, we feel confident about the take-away overall."

I'm glad the show issued a partial correction, but this is still dismaying. First, it's worrisome that the *Science Vs* team thinks there was a genuine "control condition" in the Tordoff study that makes it stronger than previous research on the subject. There really wasn't. It was a 12-month study that started with 104 kids, but by the final follow-up a grand total of seven kids were left in the no-medicine group:



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105446

App.151

As I noted at the time, "Overall, according to the researchers' data, 12/69 (17.4%) of the kids who were treated left the study, while 28/35 (80%) of the kids who weren't treated left it." The authors offer no explanation as to why this was the case, no explanation why some kids went on blockers or hormones and others didn't, and little reason for us to trust that any observed differences between the groups are attributable to accessing GAM rather than any of a host of other potential confounding factors. (In the course of writing this post, I noticed that I myself called the no-medicine kids a "control" group once in my April write-up, which was a mistake, but I just fixed it.)

The headline difference between the two groups' outcomes — which really boiled down not to the treatment group improving but to the non-treatment group supposedly getting worse — was generated by highly questionable methodological choices, as I detailed at length. When I asked a leading expert on the specific statistical technique the authors used about this paper, he professed surprise they'd employed this technique, and raised a separate, potentially significant problem with their statistical model (basically, that the model factored in data from 17 kids — almost a fifth of the initial sample — who showed up at the clinic one time for an initial assessment and then dropped out of the study, despite the fact that their data can't tell us anything about anything since the subjects weren't tracked over time).

Again, see my post for all the details, but the majority of these points are fairly basic and don't require much statistical sophistication to understand. This is an extremely weak study, and it definitely doesn't have anything like a "control group" in the traditional sense. It isn't a stretch to claim that it tells us nothing about the question at hand, other than that, according to the researchers' own methods, kids who went on blockers and/or hormones in this particular clinical sample did not get less suicidal, depressed, or anxious over time. That's a small, useful nugget of knowledge to add to our understanding of this issue, but it's not an encouraging one for advocates of youth gender medicine.

The authors are quite opaque about their methods, and we could better understand what they found (and didn't find) if they would share their data. That would allow other researchers to poke around, see which of their findings are robust to different methodological choices, and so on. Tordoff claimed in an email to me that her team "provided the raw data in the supplement for transparency," but when I emailed her back to point out that no, the data weren't available online, she stopped responding. A spokesperson for her university, the University of Washington–Seattle, subsequently confirmed to me that her team refused to share its data.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105447

App.152

Despite all this, *Science Vs* continues to present this study to the public as solid recent evidence for the efficacy of puberty blockers and hormones. That's bad and misleading science communication — irresponsible, I'd argue, given the seriousness of the subject and given Zukerman's scary claim about the ramifications of not allowing kids to go on youth gender medicine. This study absolutely does not provide us with anything like a clean, statistically tenable comparison between kids who did and didn't go on blockers or hormones.

Part of *Science Vs*'s argument for accepting the study despite its shortcomings is that it is "replicating the beneficial effect of gender-affirming healthcare that several other studies have found." (Tordoff has claimed similarly: "Our study builds on what we have already seen from an already staggering amount of scientific research," she told an outlet called *Healthday News*. "Access to gender-affirming care saves trans youth's [sic] lives.") This clashed with my own understanding of the evidence base here, at least when it comes to decently rigorous research, so it made me wonder about *Science Vs*'s overall approach to the issue. What studies did the show's producers read that make them so confident that there's a clear consensus here? I decided to take a close-bordering-on-obsessive look at the research in question.

As you can likely already tell, this is going to be a long post. My goal when I go this deeply on a subject is to produce work that will be useful and durable. Hardly anyone has *closely* compared the claims surrounding youth gender medicine to the research itself to see whether the two match. *Science Vs* offers us a useful opportunity here, because it's a show that prides itself on its accuracy and rigor, and because (as we'll see) it takes an admirably transparent approach that makes this sort of exercise easier.

If this article is too long for a lot of potential readers, so be it — it's here if and when you find it useful, and I don't think this issue is going away anytime soon.

## But First, A Word On The "Top Dogs"

(This section is *completely* skippable if you are interested only in the question of what studies *Science Vs* used to support its claim that youth gender medicine is uncontroversial and what those studies actually say.)

I don't want to be accused of ignoring Zukerman's claim that the "top dogs" are all on board with youth gender medicine. After all, if all the experts really are on the same page about this, and have done their homework, I could be accused of nitpicking if I found

weaknesses with *Science Vs*'s specific choices of study citations. Maybe there are a bunch of other studies, cited by the major authorities in this space, that *do* show there's no controversy here.

Here's what *Science Vs* said about those top dogs and the citations it used to defend its claims:

> [Zukerman:] So overall, hormones have some risks, and they're not easily reversible – but the top dogs in this space, they're all on board with this – not only hormones but puberty blockers too.
>
> [Turban:] *American Medical Association[115], the American Academy of Pediatrics[116], the American Psychiatric Association[117], the American Academy of Child and Adolescent Psychiatry[118], I could go on and on*

In my experience, this is a common response to anyone who expresses qualms about the evidence for youth gender medicine. And in general, it's surely better to trust major medical and psychological organizations than to reflexively distrust them. But this particular issue is complicated and politically fraught, and I've found that often, if you closely examine the documents published by these organizations in support of youth gender medicine — or in opposition to attempts to ban it (I am also opposed to such bans) — they fail to adhere to basic standards of accurate science communication and rigor. Their biggest problem is citational mischief: They make claims, and then link those claims to research that doesn't actually support them.

I'm going to do only a brief treatment here that hopefully will show why I don't take *Science Vs*'s top-dogs argument seriously: All of the documents here are either irrelevant or contain plainly misleading citations.

The American Medical Association document is "Health insurance coverage for gender-affirming care of transgender patients," an "Issue Brief" coauthored by that organization and an organization called GLMA: Health Professionals Advancing LGBTQ Equality. A key claim in it: "Recent research demonstrates that integrated affirmative models of care for youths, which include access to medications and surgeries, result in fewer mental health concerns than has been historically seen among transgender populations." The footnote points to this study, this study, and this study. None of the three studies includes any outcome data at all. It's very bad form for the AMA — an organization that we would hope

would adhere to the highest standards of evidence — to claim X, and then point to not one but three studies that offer no statistical evidence in support of X.

The American Academy of Pediatrics document is "Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents," a "Policy Statement" published in *Pediatrics*. It's written to be a general rundown of these issues for medical providers, and it barely touches on the evidence question. It does include the claim that "There is a limited but growing body of evidence that suggests that using an integrated affirmative model results in young people having fewer mental health concerns whether they ultimately identify as transgender.**24**,**36**,**37**" That's a strikingly similar sentence to the AMA/GLMA one. And sure enough, those three endnotes are… the exact same three citations, in the same order, as are found in the AMA document. You know, the ones that offer no evidence about the outcomes of kids who go through this protocol.

I can't come up with any other explanation for the similarities in sentence structure, citations, and citation order between the AAP and AMA documents other than 1) the AMA document cribbed from the AAP document (which came out earlier), or 2) both documents adopted copy from some third source that was subsequently tweaked a bit. Either way, none of this suggests that a high level of critical, independent thinking went into these documents.

The American Psychiatric Association citation points to two documents. The first is "Best Practices" from "A Guide for Working With Transgender and Gender Nonconforming Patients." This document has nothing to do with the debate at hand — there's no mention of youth treatment anywhere. The "Medical Treatment and Surgical Interventions" section of the document, for example, deals entirely with adults, with not a puberty blocker in sight. So *Science Vs* is simply pointing us to an irrelevant citation.

The second APA document is "Position Statement on Treatment of Transgender (Trans) and Gender Diverse Youth." That one includes the sentence "Trans-affirming treatment, such as the use of puberty suppression, is associated with the relief of emotional distress, and notable gains in psychosocial and emotional development, in trans and gender diverse youth." The citation supporting that claim points to… oh, there isn't one. Okay.

Finally, the American Academy of Child & Adolescent Psychiatry: That document is "AACAP Statement Responding to Efforts to ban [sic] Evidence-Based Care for Transgender and Gender Diverse Youth." To repeat myself, I agree completely with the position expressed in the document (it can be true both that we don't have a lot of great

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105450

App.155

evidence for youth gender medicine and that having legislators *ban* it outright is a terrible idea likely to do far more harm than good), but again, there's citational mischief.

The sentence "Research consistently demonstrates that gender diverse youth who are supported to live and/or explore the gender role that is consistent with their gender identity have better mental health outcomes than those who are not (3, 4, 5)" points to these three documents.

The first is a study that can't provide any information on the question at hand (there is no comparison group of less-supported kids)2.

The second document is a study concerned with a group of 245 LGBT kids (of whom only 9% were trans) and that found, as you'll see on Tables 2 and 3, *no* statistically significant links, among those trans kids, between family support and positive outcomes on six of the seven measures3. (This could be a sample size thing but a lot of the effect sizes are tiny and one of the odds ratios, on a suicide measure, points in the wrong direction.) The third is a Substance Abuse and Mental Health Services Administration document prepared by the author of the aforementioned study. It contains a bunch of citations, including to that study, which, as you'll remember from five seconds ago, didn't really show a link between family acceptance and well-being among the tiny group of trans kids studied.

To be clear, I'm not even skeptical of the claim that all else being equal, family support is generally linked to better outcomes among trans youth! I'm just saying these documents are written in a sloppy manner and that their citations often don't come close to justifying the text to which they are affixed.

So yes, it is technically true that the "top dogs" have published documents supporting youth gender medicine. The quality of those documents is another story.

## Back To *Science Vs* And These Studies On Blockers And Hormones

Like I said, *Science Vs* deserves credit for its transparency — it releases show transcripts that feature many endnotes ostensibly backing up its specific claims, which is something a lot of outlets don't do.

The relevant, post-correction portion of the transcript for "Trans Kids: The Misinformation Battle," which comes right after the "top dogs" claim, now reads:

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105451

And the reason that it's not controversial is because – again – we need to look at what happens if you do nothing. Like you don't allow your kid to go on hormones. And just last month - a study from Seattle was published looking at just this. It had followed about 100 young adults, and compared those who got this gender affirming care - to trans folks who didn't.[119] And they found that ~~while those who got this treatment ultimately felt better afterwards,[120]~~ those who didn't felt worse ~~and worse.[121] And by the end of the study,~~ those who got gender affirming care were 73% less likely to have thoughts of killing themselves or hurting themselves.[122] Other research suggests the same thing.[123][124][125][126][127][128]

I think the revised summary of the Tordoff study is still quite misleading in light of all the above issues, but setting that aside, you'll see that *Science Vs* also cites not one but six other studies to justify its claim that Tordoff and her team basically just replicated an already-established finding. (Zukerman only mentions "allow[ing] your kid to go on hormones," but I think it's quite clear from context, and from the citations, that she's talking about both hormones and blockers. The Seattle study is itself about both, and "hormones" is sometimes used loosely to refer to both treatments.)

Let's list the papers in question and label them for ease of reference:

**Study 1 [endnote 123]:** Turban JL, Beckwith N, Reisner SL, Keuroghlian AS. Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults. *JAMA Psychiatry*.2020;77(1):68–76

**Study 2 [endnote 124]:** Kuper LE, Stewart S, Preston S, Lau M, Lopez X. Body Dissatisfaction and Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy. *Pediatrics*. 2020 Apr;145(4):e20193006

**Study 3 [endnote 125]:** de Vries AL, McGuire JK, Steensma TD, Wagenaar EC, Doreleijers TA, Cohen-Kettenis PT. Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*. 2014 Oct;134(4):696-704

**Study 4 [endnote 126]:** Costa R, Dunsford M, Skagerberg E, Holt V, Carmichael P, Colizzi M. Psychological Support, Puberty Suppression, and Psychosocial Functioning in Adolescents with Gender Dysphoria. *The Journal of Sexual Medicine*. 2015 Nov;12(11):2206-14

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105452

App.157

**Study 5 [endnote 127]:** Achille C., Taggart T., Eaton N. R., Osipoff J., Tafuri K., Lane A., Wilson T. A. (2020). Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: preliminary results. *International Journal of Pediatric Endocrinology*, 2020, 8

**Study 6 [endnote 128]:** Turban JL, King D, Kobe J, Reisner SL, Keuroghlian AS. Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults. *PLOS ONE* 17(1): e0261039

For each study, I'll paste the exact language *Science Vs* included in its show endnotes, which is always just a quote from the study itself, and then explain what the study actually shows. The links within each quote, which the producers added, point to the papers themselves.

**Study 1:** "For transgender adults who recalled gender identity conversion efforts before age 10 years, exposure [to those efforts] was significantly associated with an increase in the lifetime odds of suicide attempts."

This study has some pretty major flaws — I'm generally sympathetic to this letter to the editor critiquing it, which we'll return to a bit later in a different context — but even setting that aside, it has nothing to do with gender-affirming medicine, which is the issue at hand. It's irrelevant to this debate. (To be clear, I'm against any sort of genuine conversion therapy! But if you read the critique, you'll see that this study might not be accurately capturing the subset of kids who experienced it.)

**Study 2:** "Lifetime and follow-up rates were 81% and 39% for suicidal ideation, 16% and 4% for suicide attempt[.]"

This is a study of kids who went through a Dallas gender clinic to obtain puberty blockers and/or hormones. (*The New York Times*' news podcast *The Daily* did a really good two-part series on what's going on in Texas, including the state's Republican leadership's disgraceful efforts to shut this clinic down — though, thankfully, a recent court order partially and temporarily reopened it.) There's no control/comparison group, so the researchers examined change over time as the cohort began taking blockers and/or hormones.

The *Science Vs* producers' choice of quote suggests they believe this sample became less suicidal after going on GAM — if not, I don't know why they would include this citation and this quote in this context. But I'm not sure they read the paper; if they did, they'd realize

they're referencing the wrong comparison. After all, what matters most is the change in suicidality *before* versus *after* treatment, not how either figure compares to lifetime suicidality.

Here's the authors' rundown, from Table 5, "Suicidal Ideation, Suicide Attempt, and [Nonsuicidal Self-Injury]":



There appears to be a minor error; assuming the chart is correct and the abstract is incorrect, the language in the abstract should have read "Lifetime and follow-up rates were 81% and ~~39~~ 38% for suicidal ideation, ~~16~~ 15% and ~~4~~ 5% for suicide attempt[.]"

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105454

App.159

If you do compare the suicide/self-harm evaluations conducted at baseline versus at follow-up, at first glance it appears the kids got *worse*, since all the numbers and percentages increase from the middle column to the right column. But in reading the paper and running it by a couple of social scientists, I couldn't quite figure out whether the question was asked in an apples-to-apples way that allows for comparison between the two time periods, so I reached out to two of the authors, Laura E. Kuper and Sunita Stewart, for an explanation.

Via a spokesperson, they confirmed that no, you can't really compare the middle column to the right one:

> We cannot say from these data whether there was a change in the number of youth who reported suicide ideation and NSSI during the study period. The time frames of comparison are not equal. The follow-up period was an average of 15 months after the initial evaluation, and the time-based report at initial evaluation (the middle column in the table) was for a briefer period of between 1 (for ideation and NSSI) and 3 months (for attempt). For this reason, no statistical comparisons would have been appropriate.

If you can't make any statistical claims about the meanings of these numbers, why include, in your abstract, the line "Lifetime and follow-up rates were 81% and 39% for suicidal ideation, 16% and 4% for suicide attempt"? I'd argue this is slightly disingenuous — call it a misdemeanor — because readers are likely to misinterpret this as a statistical claim, as a decrease caused by the medicine. (It also obscures the fact that the gap between the lifetime and *baseline* suicidality percentages is even bigger — it appears the sample's suicidality issues had mostly resolved by the time they *got* to the clinic.)

Anyway, the point is we can't determine anything about suicidality here because the three columns are asking such different questions about suicidal ideation, suicide attempts, and nonsuicidal self-injury: whether the subjects had experienced any of these things *at any point in their life*, whether they'd experienced them *in the last 1–3 months*, and whether they'd experienced them *between intake at the clinic and their follow-up appointment* (a span that ranged from 11 to 18 months, depending on the kid). If you ask someone if they've done X in the last month, and then you ask them if they've done it in the last ten months, it's probably more likely they've done it in the last ten months simply because that's a much longer period of time. Contrary to what *Science Vs* is clearly implying, there isn't useful data here.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105455

App.160

What about the rest of the study's findings? It's very hard to know what to make of them, to be honest. I'm tempted to say this study doesn't really tell us much about whether blockers and hormones improve trans kids' mental health, and that maybe it *can't* given certain characteristics of the cohort. In the abstract, the researchers note: "Youth reported large improvements in body dissatisfaction (P < .001), small to moderate improvements in self-report of depressive symptoms (P < .001), and small improvements in total anxiety symptoms (P < .01)." "Small to moderate improvements in self-report of depressive symptoms" somewhat obscures the fact that measured another, more rigorous way — via clinician evaluation — the kids in the study did *not* experience an improvement in their depressive symptoms over time.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105456

App.161



I feel pretty strongly about favoring clinician report rather than self-report, but even if you disagree with me, it won't change the overall picture much. The researchers used an instrument called Quick Inventory of Depressive Symptomatology, which indeed has self- and clinician-reported versions. This paper notes that "Total QIDS scores range from 0 to 27… with scores of 5 or lower indicative of no depression, scores from 6 to 10 indicating mild depression, 11 to 15 indicating moderate depression, 16 to 20 reflecting severe depression, and total scores greater than 21 indicating very severe depression."

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105457

App.162

Whether you trust the self-report or the clinician report version more, it's the same basic deal in this study: The kids entered the study with "mild" depressive symptoms, they went on blockers or hormones, and they exited the study with… "mild" depressive symptoms. Yes, by self-report there was a statistically significant drop from 9.4 to 7.3, while by clinician report the kids went from 5.8 to 5.9 (not statistically significant), but *all these scores* are in the 6–10 "mild depression" range, and I think it's fair to ask whether even the self-report change is *clinically* significant. Depression-wise, these kids were almost fine and they stayed almost fine:



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105458

App.163

By clinician report (on the right), *a full 85%* of the sample either had "not elevated" or "mild" depression symptoms at baseline. There wasn't much room for them to get better, so we can't say much about the lack of change.

If we zoom out on Table 2, we'll see that the researchers got before and after measurements for nine mental health variables in total, and that the other results, too, are hard to interpret. Six of those variables are from the 41-item Screen for Child Anxiety Related Disorders (SCARED) instrument: each kid's full score, as well as their subscores for panic symptoms, school avoidance, and generalized, social, and separation anxiety.

Here's what happens if we go through the table and put green around each statistically significant change the "Full sample" experienced over time (the authors don't report any statistically significant changes among any of their subgroups), and red around every nonsignificant finding:

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



So out of nine variables, there were three that improved, to a statistically significant degree, over time. Reading from top to bottom on the table, the first was body dissatisfaction, where there was a genuinely sizable reduction. The second was self-reported depression, which we just discussed. The third is anxiety symptoms as measured by the SCARED scale, which went down by 3.8 points on an 82-point scale. "A total score of ≥ 25 may indicate the presence of an Anxiety Disorder," so the kids started above this cutoff (32.4, on average) and ended… above this cutoff (28.6), just by a smaller margin. In much the same way the kids started with "mild" depression symptoms and ended the study with "mild" depression symptoms, they started the study a bit over the "may have an

anxiety disorder" threshold and they ended it in that same range. I'd ask the same question about clinical significance here that I did about the depression scores.

It's tough to know what to make of the subscale variables in particular. There's just a huge amount of room for subjective interpretation. For something like school avoidance, where the kids scored a 2.6 at intake and the threshold for concern is 3 (on an eight-point scale), what should we make of the lack of statistically significant improvement? It's hard to do *that* much better than a 2 (say) on such a small scale. Maybe there's stronger evidence we should be concerned about the social anxiety disorder numbers: The cutoff there is 8 on a 14-point scale, which is exactly what the kids scored at intake, and there was no statistically significant improvement over time. This is all a pretty mixed bag, because on the one hand you don't really see any statistically significant drops, but on the other *some* of the baseline numbers were low enough so that there isn't much room for improvement.

In light of this, an honest skeptic of the claim that youth gender medicine improves trans kids' mental health should acknowledge that the nonsignificant results are hard to interpret and not always so damning; similarly, an honest believer in this claim should acknowledge that there isn't much here to support *their* opinion. Unless you engage in cherry-picking, I don't think this study provides anything close to clear evidence one way or the other.

I am *very* glad the Dallas team is doing this research and wish many more American gender clinics, who are embarrassing laggards when it comes to producing useful data, would follow their lead (while we're on the subject, I wish Republicans didn't pose existential threats to youth gender clinics). But it's an oversimplification to say that this study offers real evidence blockers and hormones improve kids' mental health. If you're going to make that claim, where's the impressive improvement and why's there so much red in that chart above? If your response to that is, "Well, the kids didn't have much room to improve," then you shouldn't have claimed that they did in the first place!

Maybe the studies get clearer? Maybe there's higher-quality and more impressive evidence forthcoming?

**Study 3: "**[125] After gender reassignment, in young adulthood, the GD [gender dysphoria] was alleviated and psychological functioning had steadily improved."

In some circles this is simply known as *the* "Dutch study." It's that important and well-known, and I've referenced it as some of the best evidence we have for the efficacy of

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105461

these treatments. It's definitely the best study cited by *Science Vs*, and it shows by young adulthood, the kids in this cohort had solid mental health.

So it should tell us something that even here, there are some pretty big questions. They're well summed up by this article in the *Journal of Sex & Marital Therapy* by Stephen B. Levine, E. Abbruzzese, and Julia W. Mason:

> While the Dutch reported resolution of gender dysphoria post-surgery in study subjects, the reported psychological improvements were quite modest. Of the 30 psychological measurements reported, nearly half showed no statistically significant improvements, while the changes in the other half were marginally clinically significant at best. The scores in anxiety, depression, and anger did not improve. The change in the Children's Global Assessment Scale, which measures overall function, was one of the most impressive changes—however it too remained in the same range before and after treatment. [citations omitted]

The "Dutch approach," at least as it was practiced during the time period covered by this 2014 study, involved careful screening of subjects. Back then this protocol was truly novel, and the clinicians really were interested only in giving blockers and hormones, followed by surgery, to young people with long, persistent histories of childhood gender dysphoria who didn't have other major problems with mental or physical health, or lackluster family support, that might stymie their transitions. They thought these were the young people who had the best chance of living happy, healthy lives as trans adults. They also discouraged childhood social transition, because in their experience most kids' gender dysphoria dissipated as puberty approached (the Dutch approach is designed to put kids on a medical track once it appears clear the GD is unlikely to desist).

As a result, the study has some of the same issues as the last one: The kids in this cohort who went on blockers and hormones, and who later received surgery, *started out* rather mentally healthy, which means, again, they didn't have much room to get better, which makes these results difficult to apply to the present debate. For example, the authors note that the Beck Depression Inventory, which they administered to their subjects, has a scoring range of "21 items, 0–3 range," or 0–63 for the total score. At baseline, the kids in the study had a BDI score of 7.89, which sits in the range of "These ups and downs are considered normal."

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



Levine and his coauthors flatly argue that "The study cannot be used as evidence that these procedures have been proven to improve depression, anxiety, and suicidality." It's hard to dispute that — the subjects weren't depressed or anxious at baseline, and suicidality wasn't even measured, so how could the study offer such evidence? It's good that the subjects' mental health didn't worsen over time, and certainly it would be a bad sign if kids going through these treatments suddenly developed new mental health problems, but this cohort can't really tell us much about whether GAM will improve the mental health of kids who are in anguish.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105463

App.168

One of the genuinely impressive-seeming findings is that the Dutch subjects' high-at-baseline gender dysphoria "was alleviated" at follow-up. But there's a catch there, too, according to Levine and his coauthors. It involves the measure the researchers used, the Utrecht Gender Dysphoria Scale:

> This 12-item scale, designed by the Dutch to assess the severity of gender dysphoria and to identify candidates for hormones and surgeries, consists of "male" and "female" versions. At baseline and after puberty suppression, biological females were given the "female" scale, while males were given the "male" scale. However, post-surgery, the scales were flipped: biological females were assessed using the "male" scale, while biological males were assessed on the "female" scale. We maintain that this handling of the scales may have at best obscured, and at worst, severely compromised the ability to meaningfully track how gender dysphoria was affected throughout the treatment. [citations omitted]

So after the trans boys went on blockers, took testosterone, and had double mastectomies, they were given an instrument with prompts like "My life would be meaningless if I had to live as a boy"; "I hate myself because I am a boy"; and "It would be better not to live than to live as a boy." It would be shocking if someone who put this much effort into transitioning to a boy/man answered these questions in the affirmative. This seriously calls into question one of the best results the Dutch team got:

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105464

App.169



Another problem is that this research doesn't control for the effects of counseling or pharmaceuticals. This is a cohort of young people who were in contact with a multidisciplinary gender clinic for years, and who had regular access to counseling, so it stands to reason that at least some of the improvements they experienced might be attributable to factors separate from blockers, hormones, and surgery (the previous study I wrote about, out of Dallas, did adjust for these variables). Clearly the Dutch clinicians themselves thought these factors bolstered their clients' mental health, or they wouldn't have made regular counseling a prerequisite for transitioning. The study doesn't account for that, leaving us to speculate about the role of factors distinct from youth gender

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105465

App.170

medicine itself, including simply getting older: The average age at first assessment was 13.6, and the average age of final assessment was 20.6. A lot of people's mental health improves on its own during this particular seven-year span. (During other seven-year spans, like, say, 7 to 14, people's mental health is more likely to worsen. Puberty is a hell of a thing!)

It's worth pausing here to note just how much more conservative the Dutch approach is than what is presently favored by the most enthusiastic American activists and clinicians, including two of the voices interviewed in the *Science Vs* segment (Jack Turban and Florence Ashley). While I understand why people latch on to one of the few solid-quality studies we have, even setting aside the aforementioned methodological challenges, it is a stretch to claim that because the Dutch got some pretty good results, their research is applicable to American clinics dedicated to far less "gatekeeping." (I don't like using that word in the context of minors, since adults have a *responsibility* to gatekeep, but that's the common terminology.)

The Dutch approach is absolutely out of fashion in many American youth gender clinics. There are no zoomed-out data on how these clinics go about their business, because no one has bothered to try to gather any (not an easy task, to be fair), but if you look around at the clinicians who have big online platforms, get quoted in major outlets, etc., you will see that they continually emphasize the need for clinicians and parents to engage in *less* gatekeeping and *more* trusting tweens and teens to know accurately what medical treatments are best for them. There are some who clearly support more careful, Dutch-style multidisciplinary approaches that include a lot of psychological assessment — Laura-Edwards Leeper and Erica Anderson are the two most famous examples — but this is not the trajectory of things in the States at all.

On a related note, there's some evidence that the profile of kids seeking youth gender medicine is changing. In fact, writing in *Pediatrics* in 2020, the 2014 study's lead author, Annelou de Vries, raised the question of "whether the positive outcomes of early medical interventions also apply to adolescents who more recently present in overwhelming large numbers for transgender care, including those that come at an older age, possibly without a childhood history of [gender incongruity/dysphoria]." The same could be said of what appears to be a growing number of kids who arrive at gender clinics with complicated psychological comorbidities. Since a kid who lacked childhood GD or who had serious psychological problems (or both) would have been disqualified outright from the 2014

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Dutch study, that study is likely inapplicable to these different populations of kids going on blockers and hormones today, and to clinics that follow different procedures.

I'll leave it at that — I did find Levine and his coauthors' article to be an informative and thoughtful example of youth gender medicine skepticism. Overall, once you acknowledge the caveats, the Dutch study does show that a cohort of very carefully screened gender dysphoric kids with a lot of family and mental health support who went on blockers and hormones, and who got surgery, appear to have been doing pretty well in early adulthood. I just don't think the results can be used to support *or* attack Zukerman's claim in light of the sample biases. I also don't think this finding really matches *Science Vs*'s stance on the issue of youth gender medicine more broadly, because, based on the show's work in this area, it seems highly unlikely it would ever discourage social transition, or would support "a comprehensive psychological evaluation with many sessions over a longer period of time" prior to the commencement of any physical interventions, as the Dutch described their protocol.

**Study 4:** "[126] At baseline, GD adolescents showed poor functioning with a CGAS [Children's Global Assessment Scale] mean score of 57.7 ± 12.3. GD adolescents' global functioning improved significantly after 6 months of psychological support (CGAS mean score: 60.7 ± 12.5; P < 0.001). Moreover, GD adolescents receiving also [sic] puberty suppression had significantly better psychosocial functioning after 12 months of GnRHa [puberty blockers] (67.4 ± 13.9) compared with when they had received only psychological support (60.9 ± 12.2, P = 0.001)."

This isn't good. As the Oxford sociologist and frequent critic of youth gender medicine research Michael Biggs pointed out in a letter to *The Journal of Sexual Medicine*, which also published this study, the methodology here is completely incapable of isolating the effects of puberty blockers and hormones.

The authors, based at the world-famous Gender Identity Development Service (GIDS) in Great Britain, adopted a version of the Dutch approach that's quite heavy on psychological assessment and addressing transition-readiness concerns (though it looks like far more of the kids in this sample had already socially transitioned than in the Dutch one). Again, I don't think *Science Vs* really supports this approach.

The main problem with drawing any conclusions from this study is that the researchers compared one group of kids who started puberty blockers relatively soon after entering the study with another that didn't start blockers at all during the study (they did later) because,

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

App.172

in the views of the assessing clinicians, they were experiencing "possible comorbid psychiatric problems and/or psychological difficulties."



The two groups were never the same at baseline — one had psychological problems the other didn't. At baseline, the psychologically worse-off group scored a bit lower on the study's main measure, the Children's Global Assessment Scale, than the psychologically better-off group, though the difference wasn't statistically significant (the researchers didn't administer other scales, such as ones measuring anxiety or depression symptoms, that seem likely to have revealed other differences between the groups). Then, at the end of

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105468

App.173

the study, after one group but not the other had been on blockers for awhile… the same deal: The group with the psychological problems scored a bit worse-off, but the difference wasn't statistically significant, "possible [sic] because of sample size," explain the authors.

The sample size is fairly low by the end of the study in part because about 65% of the subjects disappear along the way, with no explanation from the authors about this giant drop-off. The apparent dropouts are distributed almost exactly evenly between the blockers and no-blockers groups, so we don't have the differential attrition rate concerns we had in the study out of Seattle I wrote about in April, but the overall rate is still quite high:

BOEAL_WPATH_105469



You can't have your sample shrink by 65% and then offer no explanation as to why that happened!

Sample size and other issues aside, while the statistically insignificant difference in the CGAS scores of the blockers and no-blockers groups did widen slightly between the penultimate and final assessment points, there's no way to evaluate what role puberty blockers played in this result, simply because one group — but not the other — was also dealing with apparently serious mental health problems. On top of all that, the researchers didn't account statistically for access to counseling, meaning we can't even say with

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105470

App.175

certainty that the blockers, rather than the counseling, could at least partially explain the overall CGAS improvement over time, which after all was seen both in the blockers and non-blockers groups. (The authors do note that simply "getting older has been positively associated with maturity and well-being," and that that could be a factor here.)

Biggs pointed out an additional red flag to me: One of the primary measures the researchers use is the aforementioned Utrecht Gender Dysphoria Scale also employed by the Dutch. The researchers note that this was one of their measures, provide the baseline data, and then… poof. The UGDS disappears from the paper. We never find out what the follow-up numbers were. Why? Surely the point of administering this scale was to track the severity of gender dysphoria over time? It seems very unlikely to me that if they got impressive results they wouldn't have reported them, though on the other hand if they're seeking to hide their UGDS results, why mention having administered the scale at all? This is just very weird and amateurish science, to mention the scale, provide the baseline readings, and then sort of wander off to look at a butterfly. I emailed coauthor Rosalia Costa on June 3 to ask about this, and then nudged her on June 6, adding Polly Carmichael, but I didn't hear back. (I'd also be remiss if I didn't point out that another, more recent study of GIDS patients coauthored by Carmichael came out in 2021 in *PLOS ONE*, and it found no over-time improvements on any mental health measures among a subset of kids who went on blockers. This paper goes uncited by *Science Vs*.)

Wendy Zukerman's claim, you'll recall, was about "what happens if you do nothing. Like you don't allow your kid to go on hormones." Meaning: They will suffer. One way to interpret this study is that it offers no evidence for or against her claim because the core comparison is so broken. Another interpretation — one that's less charitable but technically correct — is that this study directly contradicts Zukerman:



The red line — representing kids who sought blockers but weren't able to access them during this time period — goes up. It is at a higher point at Time 3 than it is at Time 0 (though all the statistically significant improvement happens from T0 to T1). So what happens if you don't let kids go on blockers in this study? On the one measure of these kids' psychological well-being where the researchers bother reporting their follow-up data, they get better.

To be crystal clear, I am not endorsing the idea of capriciously withholding puberty blockers from kids with severe and persistent gender dysphoria. I'm simply pointing out

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105472

App.177

how silly it is to cite this study in support of the idea that if you do withhold these treatments, terrible things will happen. This study doesn't show that.

**Study 5:** "[127] Between 2013 and 2018, 50 participants (mean age 16.2 + 2.2 yr) who were naïve to endocrine intervention completed 3 waves of questionnaires. <u>Mean depression scores and suicidal ideation decreased over time</u> while mean quality of life scores improved over time."

This quote is from the "Results" section of this paper's abstract. Let's look at the entire paragraph in question, with the part that *Science Vs didn't* include in its notes bolded:

> Between 2013 and 2018, 50 participants (mean age 16.2 + 2.2 yr) who were naïve to endocrine intervention completed 3 waves of questionnaires. Mean depression scores and suicidal ideation decreased over time while mean quality of life scores improved over time. **When controlling for psychiatric medications and engagement in counseling, regression analysis suggested improvement with endocrine intervention. This reached significance in male-to-female participants.**

So when the researchers, to their credit, controlled for the stuff that should be controlled for, endocrine interventions (meaning blockers and hormones) weren't linked to any statistically significant improvements among female-to-male participants — a full two-thirds of the sample (33 female-to-male, 17 male-to-female, say the researchers).

Here's a table laying that out, looking at three psychological scales the researchers used to measure the well-being of the study's subjects:



The researchers made 12 statistical comparisons, and a grand total of one of them came back statistically significant by the traditional $P < .05$ threshold, while four more approached that threshold. And there is almost nothing on the right side of the table offering any evidence that these powerful medical treatments benefited the mental health of the female-to-male transitioners, once access to counseling and pharmaceuticals were taken into account.

For transparency's sake, I should note that the authors have an explanation for their weak findings: "Given our modest sample size, particularly when stratified by gender, most

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105474

App.179

predictors did not reach statistical significance. This being said, effect sizes ($R2$) values were notably large in many models. In [male-to-female] participants, only puberty suppression reached a significance level of $p < .05$ in the [Center for Epidemiologic Studies Depression Scale Revised]. However, associations with [Patient Health Questionnaire 9-item] and [Quality of Life, Enjoyment, and Satisfaction Questionnaire – Short Form] scores approached significance. For [female-to-male] participants, only cross sex hormone therapy approached statistical significance for quality of life improvement ($p = 0.08$)."

I'm glad the researchers broke things out by natal sex — it's ridiculous that so many youth gender medicine researchers continue to fail to do so given that testosterone and estrogen are completely different substances with completely different effects (more on this in a bit). But once they did, they were left with almost no evidence these treatments helped. I guess there are a few promising blips on the male-to-female side, but among the female-to-male transitioners who made up two-thirds of this study? There's basically no evidence that they benefited at all from blockers or hormones. In this sample, by these methods, on average they would have been just as well off solely receiving counseling and medication (if indicated) for their mental health symptoms.

Let's imagine *Science Vs* were evaluating a study not of puberty blockers and hormones, but of a novel treatment for coronavirus promoted by Joe Rogan. Let's also imagine that the authors of that study published a study evaluating the treatment in which they argued, "Well, we didn't reach statistical significance in most of our tests, but we had a small sample size. Plus, there are some potentially promising results in a subgroup that comprised one-third of our sample." It goes completely without saying that *Science Vs* would describe this as a weak finding that should nudge us toward skepticism, not acceptance, of the treatment in question. Why do different standards apply here?

Interestingly, this is the second time I've seen a major, respected, cut-through-the-bullshit science outlet treat this study in a strikingly credulous manner — Steven Novella and David Gorski committed a similar error on their website, *Science-Based Medicine*, which has had its own Nordberg-in-the-opening-scene-of-*The-Naked-Gun*-level issues covering this subject accurately. It should tell us something that when it comes to the youth gender medicine debate, some of the leading, supposedly skeptical voices are making the exact same sorts of mistakes in the exact same direction, over and over and over. They *never* make mistakes the other way — they never falsely *understate* the strength of the evidence for puberty blockers and hormones.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105475

App.180

I already covered the suicidal ideation claim from this paper when I wrote about *SBM*'s coverage. Yes, the researchers themselves note in the abstract that "[S]uicidal ideation decreased over time," but right there in the paper they also note that "Regression models for suicidal thoughts were not estimable due to the low frequency of endorsement and small cell sizes across gender."

There was just so little suicidal ideation here that there's no way to make the appropriate statistical comparisons:



So this paper provides *no* causal evidence about the effects of blockers and hormones on reducing suicidal ideation.

**Study 6:** "[128] Jack Turban's paper— After adjusting for potential confounders, accessing GAH during early adolescence (aOR = 0.4, 95% CI = 0.2–0.6, p < .0001), late adolescence (aOR = 0.5, 95% CI = 0.4–0.7, p < .0001), or adulthood (aOR = 0.8, 95% CI = 0.7–0.8, p < .0001) was associated with lower odds of past-year suicidal ideation when compared to desiring but never accessing GAH. [GAH = gender affirming hormones]"

I'm going to go deep on this *PLOS ONE* paper because it's very recent (January of this year), very influential, and I have some new developments to report about it.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Turban and his colleagues' method, both here and in another highly touted study they published in *Pediatrics* in 2020, is to take the subset of 2015 U.S. Transgender Survey respondents who recalled having ever wanted puberty blockers or hormones, and to then compare the mental health of those who recalled having accessed them to those who recalled never having done so. (The 2020 study covers blockers and this one covers hormones.)

There are many reasons to be skeptical that the USTS can provide us with any generalizable data about trans people in the U.S. This is a very nonrepresentative sample that wildly differs from past attempts to generate decent data about the American transgender population (which, to be clear, is no easy task).

Here's a chart from the letter to the editor I mentioned earlier critiquing Turban et al.'s conversion therapy paper, which was also based on the USTS. In it, the authors note the differences between the trans people surveyed in the USTS and those included in the 2014 to 2017 data from the Behavioral Risk Factor Surveillance System (BRFSS), a more rigorously conducted effort administered by the Centers for Disease Control and Prevention:

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105477

App.182



There are some gigantic differences here on crucial questions like age (the USTS skews very young compared to the BRFSS, with 84% of the respondents in the former and just 52% in the latter aged 18 to 44) and education (the USTS skews much more educated, with 47% college/technical school graduates in that sample versus 14% in the BRFSS).

The authors of the critique of Turban and his colleagues' conversion therapy paper argue, credibly, that these differences may have arisen because "the participants [in the USTS] were recruited through transgender advocacy organizations and subjects were asked to

'pledge' to promote the survey among friends and family." This claim jibes with the survey administrators' own description of their outreach efforts.

So there's a serious risk that the USTS skews heavily toward younger, more politically engaged, more highly educated members of the trans community. In much the same way sampling Jewish Americans at Chabad houses or black Americans at NAACP meetings definitely wouldn't provide you with data you could safely extrapolate to the broader Jewish or black populations, something similar is almost certainly going on with the USTS.

The authors of the letter also highlight issues that go beyond mere sampling concerns:

> A number of additional data irregularities in the USTS raise further questions about the quality of data captured by the survey. A very high number of the survey participants (nearly 40%) had not transitioned medically or socially at the time of the survey, and a significant number reported no intention to transition in the future. The information about treatments received does not appear to be accurate, as a number of respondents reported the initiation of puberty blockers after the age of 18 years, which is highly improbable (Biggs, 2020). Further, the survey had to develop special weighting due to the unexpectedly high proportion of respondents who reported that they were exactly 18 years old. These irregularities raise serious questions about the reliability of the USTS data.

If anything, the authors are understating the puberty blockers issue. As the USTS researchers explain in an endnote:

> Although 1.5% of respondents in the sample reported having taken puberty-blocking medication, the percentage reported here reflects a reduction in the reported value based on respondents' reported ages at the time of taking this medication. While puberty-blocking medications are usually used to delay physical changes associated with puberty in youth ages 9–16 prior to beginning hormone replacement therapy, a large majority (73%) of respondents who reported having taken puberty blockers in Q.12.9 reported doing so after age 18 in Q.12.11. This indicates that the question may have been misinterpreted by some respondents who confused puberty blockers with the hormone therapy given to adults and older adolescents. Therefore, the percentage reported here (0.3% or "less than 1%") represents only the 27% of respondents who reported taking puberty-blocking medication before the age of 18.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

In other words, so many respondents wrongly said they took puberty blockers that the test's architects simply had to toss the vast majority of the affirmative responses to this question. Okay. Why should we trust that everyone *else* in the survey had a firm grasp on which medication they had taken? And why should we trust that when people said they *wanted* blockers or hormones, they weren't mixing up the two? No one will say, but researchers keep publishing studies based on this data set, perhaps because there are so few options for big samples of American trans people. I think there's a case to be made that the USTS data set is simply too broken to tell us much of anything about trans people in the U.S., but I'll leave that question to the survey methods experts (if you are one, I'm genuinely curious to get your thoughts).

Either way, it's hard to count all the red flags inherent to Turban and his colleagues' methodology. Obviously, the problem with USTS respondents not knowing accurately what medicine they took is potentially crippling on its own, because if we can't even verify that the people who said they took a medicine did so, how can we say anything about that medicine's effects on them? It's also problematic to assume that because someone reports having *ever* wanted puberty blockers or hormones — the survey item on which this entire methodology hinges — it was a persistent and realistic desire. That question is phrased: "Have you **ever wanted** any of the health care listed below for your gender identity or gender transition? **(Mark all that apply)**" [bolding in the original]. If a USTS respondent selected "puberty blocking hormones" because at age 24, long after they were eligible for blockers, they went through a phase when they thought maybe their life would have turned out better if they'd gone on them, they'd be entered into the wanted-blockers "pile" and treated as equivalent to someone who wanted blockers at 13. These are very different situations, though. Nothing in the USTS even tracks whether the kids who wanted blockers or hormones had gender dysphoria, which is the most basic prerequisite for going on these medications, at least in the case of competent clinicians who follow the appropriate standards of care. (I don't understand why the survey would collect data from respondents on whether they'd been diagnosed with HIV but not ask about gender dysphoria, or gender identity disorder as it was probably known at the time for most of the respondents. It seems important, for many reasons, to try to establish what percentage of people who identify as trans are seeking out and receiving these diagnoses.)

On top of all this is the causality issue — after the publication of Turban et al.'s USTS-based *Pediatrics* study ostensibly showing a link between recalled access to blockers and better mental health, a number of critics noted that it simply could be that young people

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105480

App.185

with more mental health problems were less likely to be allowed to access blockers, because during the time period in question it was quite common for American clinicians to follow professional guidance instructing them to reject kids for such medication on the basis of uncontrolled, ongoing mental health problems (like the Dutch did). If this theory is true, it would mean that poor mental health caused a lack of access to blockers (that is, poor mental health → skeptical clinician following the rules and turning down a request for blockers → no blockers), rather than that a lack of access to blockers caused poor mental health. The new study in *PLOS ONE* supposedly addresses this by concerning itself mostly with *past-month* rather than lifetime mental health problems, but the broader point stands: It's extremely hard to make unidirectional causal claims on the basis of this data.

In their studies, Turban and his team tend to dutifully note that the differences they derive from USTS data-slicing could be attributed to other factors as well, and that it is difficult to establish clear causal relationships between recalled access to youth gender medicine and later outcomes. But inevitably, Turban will then give quotes to major outlets, or write articles for them, in which he presents his results as straightforwardly causal — to the extent the got-medicine group did better, it was *because* they got medicine. For example, Turban wrote in *The Washington Post* that "at least 14 studies have examined the impact of gender-affirming care on the mental health of youths with gender dysphoria and have shown improvements in anxiety, depression and suicidality," and "suicidality" links to the *PLOS ONE* paper about hormones. (For the record, Turban's "14 studies" link, to this article he wrote in *Psychology Today*, also reports the details of those studies rather selectively, in my opinion, leaving out some vital caveats and weaknesses.)

So, in short and even before we dig into any of the details, Turban et al.'s *PLOS ONE* study is based on a likely nonrepresentative data set of young people who don't seem to know what medicine they were on and when, who might not know what medicine they *wanted* and when, and it relies entirely on self-reported assessments of their mental health. Moreover, many, including Turban, have simply assumed that certain correlations uncovered via this method were driven by causation, despite there being little reason to make this assumption. Again, imagine a study with these characteristics being used to prop up an alternative Covid treatment: *Science Vs* would be like a vulture that had just spotted a seriously ailing buffalo.

But let's assume, for the sake of argument, that *none* of these red flags exist. Let's summon all the charity and benefit of the doubt we can muster and imagine this is a

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105481

App.186

clinical sample where we know, for sure, who went on which medicine and when, and that we are therefore in a somewhat better position to accept causal claims.

That in mind, here's what the Turban team said they found:



For everything that follows, let's stick to the adjusted odds ratio (AoR) and accompanying P-values. Outlined in green is the finding that Turban and his team highlight in their write-up, and that *Science Vs* mentions in its show notes: Among respondents who reported ever wanting hormones, those who recalled receiving them reported a lower probability of past-year suicidal ideation than those who did not recall receiving them.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105482

App.187

The actual question, from Section 16 of the USTS: "At any time in the past 12 months did you seriously think about trying to kill yourself?" The respondents who answered yes were then prompted to answer questions gauging the seriousness of their suicidal ideation: whether they had a specific plan for ending their life, whether their suicidality required medical attention, and whether they ended up in the hospital as a result. This is standard practice, because suicide experts recognize a pretty big, potentially life-and-death difference between someone who reports having considered suicide and someone who develops a specific plan to commit it. (I volunteered at a suicide hotline forever ago and we were supposed to triage people in this manner as early in the call as possible by asking if they were suicidal, and then, if they were, following up with questions about whether they had a plan and, if they did, if they already had in their possession whatever items they would need to carry it out, such as a gun or a knife.)

If someone answered yes to the USTS question "At any time in the past 12 months did you seriously think about trying to kill yourself?" but reported having never made a plan, let alone an attempt, they'd be considered to be at a more moderate risk of suicide than someone who answered yes to those follow-up questions. That obviously doesn't mean any such assessment would be foolproof, and of course the stakes here are terrifyingly high, but the point is there are important gradations when it comes to suicidal ideation. (I wanted to make sure I wasn't downplaying the severity of a situation like this, so I reached out to a suicide researcher I know. She helpfully pointed me to this resource from the organization Zero Suicide, which is adapted from the VA's Rocky Mountain Mental Illness Research Education and Clinical Center (MIRECC) for Suicide Prevention, and which suggests that a young person in this situation would probably be placed in the "low acute risk" category.)

Outlined in red are the results that go ignored by Turban et al. in their write-up, and also by *Science Vs*: Turban and his team ran eight statistical tests on these more serious measures of suicidal ideation and behavior and went zero-for-eight in terms of hitting their $P < .001$ threshold for statistical significance (they beefed it up from the standard $P < .05$ to account for all the comparisons they're making, which is good practice in general). In almost every case, the coefficients hover around 1.0, which strongly suggests there's just no link at all, among those who reported wanting to access hormones, between having recalled accessing them and having even a slightly lower risk of serious recent suicidal behavior or ideation. The cell that comes closest to hitting the significance threshold suggests that those who recalled wanting hormones and accessing them at age 16 or 17

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

were more than twice *as likely* to report having been hospitalized for a suicide attempt as those who recalled wanting but not accessing hormones. Whether or not you buy the idea that we should disregard this .01 P-value, there's nothing here to suggest any promising findings with regard to a link between hormone access and the more serious measures of suicidal ideation and behavior.

One would think that enthusiastic advocates for administering gender-affirming medicine to young people would be concerned about these null results, but as far as I can tell the authors haven't mentioned them anywhere, despite the extensive publicity the paper — or, perhaps specifically, one row of a seven-row chart — garnered. (See my March tweetstorm on this study here.) None of this is mentioned in the body of the paper itself.

Now, on the *other* other hand, the kids in the got-hormones group reported less past-month severe psychological distress than those in the non-hormones group as measured by another binary variable: whether they met a certain threshold on the Kessler 6 Psychological Distress Scale. So it's not like there's nothing in this study pointing in the direction Turban and his team want — it's just that when it comes to the most serious measures, the findings are concerningly barren. (Readers of my April post will also remember that reporting continuous variables dichotomously is an easy way for important features of data to get obscured — by this standard, a two-point improvement on a 25-point scale that crosses a certain threshold can sometimes register as more meaningful than a ten-point improvement that doesn't.)

In much the same way Turban and his team simply pretend these null findings don't exist, *Science Vs* does the same. The average pop science consumer isn't going to pull the study to check for themselves, so, mission accomplished: A bunch of people will think this study found impressive results for GAM, when in fact it's a mixed bag at best and, by the researchers' own methods and logic, runs counter to the claim commonly made by Turban and others that these medications are crucial for reducing *serious* suicidality and suicide attempts by transgender and gender nonconforming youth.

We can't depart this study without making one more very important stop: this comment left on the *PLOS ONE* website by Michael Biggs, the aforementioned Oxford sociologist, and *PLOS ONE*'s response to it. Using the USTS data, Biggs attempted to replicate the Turban team's findings as best as he could in light of the fact that the authors did not include sufficient statistical information in their paper for him to do so. Biggs notes that the study's authors "have twice previously not replied to my requests to provide their command files,"

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105484

App.189

and confirmed in an email to me that this concerned prior studies they published, and that
he didn't bother trying a third time for this study.

Biggs found a pretty straightforward statistical irregularity in the *PLOS ONE* study:

> There are odd discrepancies between the raw frequencies reported by Turban et al.
> and the USTS dataset. According to the authors, 119 respondents reported
> beginning cross-sex hormones at age 14 or 15. But for the question 'At what age did
> you begin hormone treatment' (Q12.10), 27 respondents answered at age 14, and 61
> answered at age 15, summing to 88. How did the authors obtain an additional 31
> observations? It is not due to the imputation of missing values because the authors
> drop observations with missing values; the same procedure is followed here.

Biggs also notes that Turban's team includes access to puberty blockers in their statistical
models, but doesn't report on that result. Biggs found that "Controlling for other variables,
having taken puberty blockers has no statistically significant association with any outcome.
This reveals that Turban et al.'s earlier finding from the USTS — which did not control for
cross-sex hormones — is not robust." So Turban appears to have called into question his
own prior finding about puberty blockers, but this doesn't garner even a brief mention in his
paper. (Biggs also notes that Turban and his colleagues failed to control for other variables
associated, at least in some studies, with enhanced well-being among trans people, such
as access to gender-affirming surgery.)

But dwarfing all of these issues is what happened when Biggs broke out the results by
natal sex:

> Testosterone is consistently associated with better outcomes. Estrogen is associated
> with a lower probability of severe distress, but also with a higher probability of
> planning, attempting, and being hospitalized for suicide. The latter outcome is
> particularly disturbing: males who took estrogen have almost double the adjusted
> odds of a suicide attempt requiring hospitalization.

If Biggs is correct, then the data here provide an even more conflicting storyline — one in
which a *lot* of the results aren't just null, but point in the exact wrong direction. Turban and
his team, by their own reasoning, would be forced to conclude that estrogen is *dangerous*
for trans women from a suicidality perspective. (I'm not endorsing this view because I think
the USTS and this methodology are both such messes that these studies don't really tell
us *anything* causal about the effects of gender-affirming medicine — I'm saying if you *do*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105485

App.190

accept these methods, data, and reasoning, you're forced to take the good with the bad.)
Either Turban's team didn't bother to check this, they did and then failed to report on these
alarming results, or Biggs is incorrect.

This is potentially a big deal, especially considering the way Turban, the Stanford
University hospital where he was then doing his residency, and so many media outlets
have touted this study as solid evidence that access to hormones reduces suicidality. If
Biggs is correct and accessing estrogen was in fact linked to "a higher probability of
planning, attempting, and being hospitalized for suicide," that absolutely requires further
explanation from the authors. I emailed *PLOS ONE* and three of the study's authors —
Turban, Sari L. Reisner, and Alex S. Keuroghlian — to ask about this. I got a quick
response from a *PLOS ONE* media associate saying, "I can see that you have reached out
to the authors, and I hope they will be able to respond to you soon," but after I didn't hear
back from the authors themselves, I followed up with the journal again.

I heard back from a senior communications associate, who told me that *PLOS ONE* is
going to be examining Biggs' claims. He also pointed me toward a newly posted "Editor's
Note" which reads "PLOS ONE is looking into the questions raised about this article. We
will provide an update when we have completed this work." I've asked Turban for his
team's code in the meantime, and according to *PLOS ONE*policy he's required to provide
it (haven't heard back yet). The code will only be so useful without the raw data, which is
unfortunately obtainable only via a data-sharing agreement with the The National Center
for Transgender Equality, but it would be a start. While it would be nice to figure out what's
up with that statistical discrepancy, I think the most important thing, by far, is simply to
confirm whether Biggs is correct about what happens when these results are separated by
natal sex. If he is correct, I would argue that that would require immediate action on the
part of the authors of this study to get the word out about what would be — if you buy their
logic — an extremely alarming finding. We'll see how long the process takes and what
results *PLOS ONE* will be willing to provide afterward. (If you're a researcher who has
experience working with this type of data and you want to try to get your hands on it,
please let me know.)

If Biggs is correct, the sex-disaggregated results would call into question even the
seemingly positive findings on the female-to-male side. Because, as he notes,
testosterone has established antidepressant properties (Biggs cites this meta-analysis,
though for understandable reasons it includes only studies conducted on natal males), it
would be very hard to suss out what's what here. Even assuming causality flows the way

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Turban's team wants it to, did the trans men in this study experience improvement because of the specific nature of gender-affirming medical treatment, or because anyone — particularly someone dealing with preexisting mental health problems — would feel better from regularly taking T?

## Summing Things Up

*Science Vs* viewed Tordoff et al. (2022) as a mere replication of something we already know: that puberty blockers and cross-sex hormones are linked to improved mental health in trans kids. This, the show argued, is not controversial. And, according to host Wendy Zukerman, "[T]he reason that it's not controversial is because — again — we need to look at what happens if you do nothing. Like you don't allow your kid to go on hormones." Bad things happen to their mental health — potentially dangerous things.

To support this view, Zukerman and her colleagues cited seven studies in total. For reasons ranging from complete irrelevance to the question at hand to broken comparison groups to genuinely unimpressive results, I'd argue that there is not a single study in the bunch that strongly supports Zukerman's claim that a failure to put trans kids and youth on blockers or hormones causes harm, nor that any of them clearly support the related claim that blockers and/or hormones cause significantly improved mental health in trans kids and youth.

To be clear, I continue to think that for well-assessed kids with consistent histories of severe gender dysphoria, the trade-offs of blockers and hormones are *likely* worth the risks and unknowns, though of course in the case of any medical decision as serious as this one and underpinned by so little quality evidence, the adults involved need to proceed with a tremendous amount of caution and humility (two qualities in short supply among so many of the most popular and media-friendly advocates for youth gender medicine). The fact that these seven studies don't provide much evidence, and that there's a dearth of such evidence in general, shouldn't be the end of the conversation. There's a difference between saying, "These studies don't demonstrate any meaningful link between trans kids failing to access gender-affirming medicine and experiencing harmful outcomes" and "There's no chance that it will be harmful to a trans kid if they can't access blockers or hormones." We desperately need more and better data, but it should tell us something that this was the best *Science Vs* could come up with.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105487

It shouldn't surprise anyone that, upon actually examining these studies rather than skimming abstracts or headlines, it's impossible to reach the conclusion that there's "no controversy" here. Whenever professional researchers — folks who are much smarter and better resourced than I am — have taken more ambitious, comprehensive looks at the evidence for youth gender medicine, they've found exactly the same thing I found in this mini-exercise: methodologically weak studies with mixed findings.

As I pointed out in my April post, this has happened in several different European contexts:

"Any potential benefits of gender-affirming hormones must be weighed against the largely unknown long-term safety profile of these treatments in children and adolescents with gender dysphoria," said the UK's National Institute for Health and Care Excellence in 2020, alongside a companion report on puberty blockers that found scant quality evidence of their safety and efficacy as well. The so-called Cass Review, another important UK effort geared at summarizing the data and steering the future course of youth gender treatment there, which was released just weeks ago in interim form, noted that "The important question now, as with any treatment, is whether the evidence for the use and safety of the medication is strong enough as judged by reasonable clinical standards." As in, it's still an open question. The report also notes that "Short-term reduction in bone density is a well-recognised side effect [of puberty blockers], but data is weak and inconclusive regarding the long-term musculoskeletal impact."

In Sweden and Finland, health authorities are sufficiently concerned about the lack of evidence that it's safe and effective to give puberty blockers and hormones to gender dysphoric minors that they have significantly scaled back the administration of these treatments. According to an unofficial translation of Finland's new guidelines, announced in 2020, "puberty suppression treatment may be initiated on a case-by-case basis after careful consideration and appropriate diagnostic examinations if the medical indications for the treatment are present and there are no contraindications." When Sweden followed suit, instituting new restrictions of its own just a month and a half ago, its National Board of Health and Welfare noted that "There are no definite conclusions about the effect and safety of the treatments," per Google Translate. Sweden's move was animated in part by an alarming alleged scandal — this public television documentary argues that doctors and administrators at a major hospital there appeared to cover up serious adverse effects, including a spinal injury and

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105488

App.193

suicidality, among kids who had undergone these treatments (I interviewed the lead presenter here but it's paywalled).

I don't want to belabor the point but it should be seen as quite damning — as a major abdication of the staff's responsibility as science journalists — that *Science Vs* told an audience of God knows how many hundreds of thousands or millions of people that there's no controversy here (and that Jack Turban said the same thing, for that matter). It's infuriating that they would hold over parents' heads the threat of their kids *killing themselves* despite not appearing to have much familiarity with the research they themselves are citing.

**Science Vs Is Intentionally Choosing To Adopt Less Rigorous Standards On Youth Gender Medicine Than It Does On Other Subjects**

Perhaps the weirdest and most frustrating part of this is that *Science Vs* clearly has the capacity to look closely at studies rather than accept them at face value on the basis of the stuff that all experienced science journalists know to take with a grain of salt: abstracts, press releases, and enthusiastic quotes from researchers motivated to make a media splash. The producers definitely did so in this episode on coronavirus misinformation. Hell, earlier in this very episode about youth gender medicine, they harshly criticize Lisa Littman's work on "rapid-onset gender dysphoria" (the idea that some kids develop GD or a trans identity suddenly, as a result of peer or cultural influence) by… actually reading her study and critiquing it on methodological grounds. Terms like "selection bias" and "representative sample" come up.

Setting aside the potentially derailing question of whether this critique of Littman's work is fair, the point is *Science Vs*'s producers could have, if they'd so chosen, *actually read* the papers supposedly touting the mental health benefits of youth gender medicine with the same critical eye they regularly apply to findings they view more skeptically, like Littman's, or those supporting "alternative" coronavirus treatments. They just chose not to. Or at least that's what I'm claiming. One June 1, I emailed Zukerman and the show's general contact address a polite but admittedly slightly obnoxious email in which I point-blank asked whether the show's producers had read the papers they were citing beyond their abstracts, and I didn't hear back. I simply don't think it's possible that they could have read them in full and then cited them the way they did.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105489

App.194

If I'm correct and *Science Vs* didn't read these papers before confidently citing them, why? Why didn't they approach them with as critical an eye? I can't say for sure, but I think the dynamics are similar to what I wrote about in April: Because Republicans are so aggressively and harmfully targeting youth gender medicine, taking a true rocket-launcher-against-a-butterfly approach to this issue, the response from some liberal institutions has been to circle the wagons and argue aggressively that actually, the science on this is settled. This despite the fact that it's very widely known, among serious scientists and observers of this controversy, that the science *isn't* settled. At all.

This sort of bungling is a pattern for *Science Vs*. Back in 2019, I wrote two posts pegged to an episode of the show called "The Science Of Being Transgender." That time around, the producers accidentally fabricated a study result and falsely claimed that the *DSM-IV* "list[ed] transgender as a mental disorder," which it didn't (this is a common claim among some activists because it would help them win a fairly in-the-weeds argument you can read more about if you click the above links). Zukerman and the producers corrected the first error but not the second — to this day, if you go to the transcript you'll see that *Science Vs* continues to make that claim about the *DSM-IV*. (At the time, Zukerman explained in an email that she and her colleagues disagreed with my interpretation, and attached this document from the American Psychiatric Association as supporting evidence. It discusses some of the reasoning behind the switch from "gender identity disorder" in the *DSM-IV* to "gender dysphoria" in the *DSM-5*, which included tweaks both to the name and the diagnostic criteria, but it doesn't come close to supporting *Science Vs*'s claim that in the older edition, merely being transgender was considered a mental illness.)

At the end of the day, I think *Science Vs* just isn't willing to take this issue as seriously as the other issues it covers. It's a politically risky issue to take seriously, after all, because if you do, and you come to the same conclusion as the many credible researchers who have found the literature on youth gender medicine to be strikingly shaky, you'll likely be accused of harming trans kids. I've had people tell me I am complicit in the grisly suicides of children — and sometimes demand I kill *myself* as penance — simply because I apply the same standards of rigor to this body of medical research as I previously applied to power posing and grit and Comprehensive Soldier Fitness and the implicit association test in my past reporting and book. This is a very unpleasant thing to be accused of, even if the accusation itself is deranged.

But the whole point of *Science Vs* is to "take[ ] on fads, trends, and the opinionated mob to find out what's fact, what's not, and what's somewhere in between." This mission

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105490

App.195

(198 of 200), Page 198 of 200
Case: 24-142, 08/16/2024, DktEntry: 123.3, Page 198 of 200
Case 2:22-cv-00184-LCB-CWB   Document 560-30   Filed 05/27/24   Page 122 of 193

statement gets pretty hollow if you tack on at the end: "unless it feels very uncomfortable to do so and/or it will make unhinged people on Twitter mad at you."

Anyway, I can only speculate about the strange divide between how *Science Vs* covers this issue versus how it covers others. But I'm not speculating when I say that the show has botched its coverage, even as it has railed, hypocritically, against "alternative" sources of science news on this and other subjects. The producers should really do some more careful follow-up work on this. They should really buckle down with the existing literature on youth gender medicine and imagine that they're evaluating papers claiming that the CDC is hiding something about the adverse effects of coronavirus vaccines, rather than that they're evaluating new research on a solidly established, well-replicated finding.

They should also consider the likely effect their shoddy coverage is going to have on consumers' media consumption habits. Anyone who spends 10 minutes Googling around will find the public controversy over these treatments raging in Europe — it isn't exactly a secret. If institutions like *Science Vs* (or *Science-Based Medicine*, or *Science Friday*, or… ) won't give readers and listeners honest, accurate assessments of the data on this absolutely vital question — a question that involves very vulnerable kids being put on powerful medicines that often have irreversible effects, with the logic being that this is the only way to prevent them from *literally killing themselves* — who's left to trust?

You can't have it both ways: You can't fail to do your job this profoundly and then complain when people turn to other, less reputable sources for their science news.

---

*Questions? Comments? Other red-hot controversies that are completely uncontroversial? I'm at singalminded@gmail.com or on Twitter at @jessesingal.*

*Image: A boy is dancing under the big rainbow flag, during the celebration of the Pride walk in Amsterdam, on August 7th, 2021. (Photo by Romy Arroyo Fernandez/NurPhoto via Getty Images)*

1

For the purposes of this article, I'm setting aside Zukerman's next sentence: "Ya see, over and over again we're see [sic] that trans folks who don't get treatment and aren't

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105491

App.196

supported — higher rates of attempting suicide and suicidal thoughts.[129][130]" Both citations point to survey research that focuses on parental support, and neither survey appears to have asked respondents about whether they have accessed gender-affirming medicine. This article is about the evidence base for GAM, so these citations aren't relevant.

2

The authors do mention, in the context of comparing their cohort to others, clinical samples of kids with gender dysphoria (GD), some of whom were living as their natal sex at the time. But of course you cannot compare clinical and nonclinical samples and then attribute any differences to any variable in particular — especially in a case like this where the clinical samples generally come from other countries entirely.

3

I was also surprised by the scale the researchers used to gauge parental support, which included items like "How often did any of your parents/caregivers bring you to an LGBT youth organization or event?" and "How often did any of your parents/caregivers appreciate your clothing or hairstyle, even though it might not have been typical for your gender?" A parent who is quietly supportive of their kid wearing their hair however the hell they want, or who is working too much to be around to compliment it, would be rated as unsupportive. Same deal for a parent running a household out of a trailer with insufficient space to entertain guests, or who lacks the automobile or time to take their kid to anything. There appears to be a major potential class confound here that would probably be worth looking into further.

## Subscribe to Singal-Minded

By Jesse Singal  ·  Thousands of paid subscribers

A newsletter about science, social-justice-activism, why they sometimes fight, and how to help them get along better -- plus a good deal of other, more random stuff.

--

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105492

App.197



**Eli Coleman, PhD.**
**Academic Chair in Sexual Health**
**Professor**
 **and Director**
The Institute for Sexual and Gender Health
University of Minnesota Medical School
Family Medicine and Community Health
sexualhealth.umn.edu

--



**Eli Coleman, PhD.**
**Academic Chair in Sexual Health**
**Professor**
 **and Director**
The Institute for Sexual and Gender Health
University of Minnesota Medical School
Family Medicine and Community Health
sexualhealth.umn.edu

VUmc disclaimer : **www.vumc.nl/disclaimer**
AMC disclaimer : **www.amc.nl/disclaimer**

--



**Eli Coleman, PhD.**
**Academic Chair in Sexual Health**
**Professor and Director**
The Institute for Sexual and Gender Health
University of Minnesota Medical School
Family Medicine and Community Health
sexualhealth.umn.edu

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BOEAL_WPATH_105493

App.198